## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Matthew I.W. Baker, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>mbaker@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Proposed Local Counsel to the Official*<br>*Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael Winograd, Esq.<br>Jeffrey L. Jonas, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>jjonas@brownrudnick.com<br>Seven Times Square<br>New York, NY 10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Sunni P. Beville, Esq.<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA 02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Proposed Co-Counsel for the*<br>*Official Committee of Talc Claimants* |
| **BAILEY GLASSER LLP**<br>Brian A. Glasser, Esq.<br>Thomas B. Bennett, Esq.<br>bglasser@baileyglasser.com<br>tbennett@baileyglasser.com<br>105 Thomas Jefferson St. NW, Suite 540<br>Washington, DC 20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>*Proposed Co-Counsel for the*<br>*Official Committee of Talc Claimants* | **OTTERBOURG PC**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 905-3628<br>Fax: (212) 682-6104<br>*Proposed Co-Counsel for the*<br>*Official Committee of Talc Claimants* |

<table>
<tr><td>

**PARKINS LEE & RUBIO LLP**
Leonard M. Parkins, Esq.
Charles M. Rubio, Esq.
lparkins@parkinslee.com
crubio@parkinslee.com
Pennzoil Place
700 Milan St., Suite 1300
Houston, TX  77002
Tel: (713) 715-1666
*Proposed Special Counsel to the*
*Official Committee of Talc Claimants*

</td><td>

**MASSEY & GAIL LLP**
Jonathan S. Massey, Esq.
jmassey@masseygail.com
100 Main Ave. SW, Suite 450
Washington, DC  20024
Tel: (202) 652-4511
Fax: (312) 379-0467
*Proposed Special Counsel for the*
*Official Committee of Talc Claimants*

</td></tr>
</table>

|  |  |
|---|---|
| In re: <br><br> **LTL MANAGEMENT, LLC,** <br><br>                              Debtor. | Chapter 11 <br><br> Case No.:  21-30589(MBK) <br><br> Honorable Michael B. Kaplan |

## INITIAL STATEMENT OF OFFICIAL COMMITTEE
## OF TALC CLAIMANTS RESPECTING CHAPTER 11 CASE

The Official Committee of Talc Claimants (the "Official Committee") respectfully submits this

Initial Statement respecting the Debtor's bankruptcy.  This filing is necessary because, with their

Chapter 11 petition, the Debtor submitted an "informational brief" that is more in the nature of

advocacy than factual recitation.[1]  The LTL Information Brief also suggests a case trajectory that

is unrealistic, at best.  The Official Committee herein offers its initial case counterpoint, so that

the Court can now assess the case landscape.

---

[1]       *See Informational Brief of LTL Management LLC* [N.C. Dkt. No. 3] (the "LTL Information Brief").
Pleadings and submissions filed in the North Carolina bankruptcy case (Case No. 21-30589) on the main bankruptcy
docket shall be referenced as "N.C. Dkt. No."  Pleadings and submissions filed in the preliminary injunction adversary
proceeding (Adv. P. No. 21-03032) shall be referenced as "N.C. Adv. P. Dkt. No."  Unless otherwise indicated,
capitalized terms used herein but not defined have the meaning ascribed to them in the LTL Information Brief.

This filing does not contain an explanation of ovarian cancer and mesothelioma, describing just how devastating those diseases are. It does not walk the Court through all the science proving that talcum powder causes these diseases. The filing does not explain to the Court how quickly the diseases progress and, in turn, how limited each plaintiff's time is to tell his or her story to a jury (even absent the delay imposed by bankruptcy). There are 38,000 stories, such as that of Ms. Nedelka Vanklive, a 50 year old, single mother raising a 14 year old daughter. Ms. Vanklive was a talcum powder user who was diagnosed with ovarian cancer in 2017 and mesothelioma in 2021, and has been told she now has 6 months to live. Her trial was scheduled for January 2021, continued three times at the behest of J&J, finally commenced and was midway through at the time of the Debtor's filing, and is, at present, enjoined. In very short order, the Court will come to know Ms. Vanklive and so many others so powerfully harmed by this bankruptcy case.

## I.      This Chapter 11 Case Is Untethered
##         To Any Legitimate Chapter 11 Purpose.

1.      The Debtor is a "special purpose vehicle" created by Johnson & Johnson ("J&J") and its consumer products affiliate ("Old JJCI") a mere two days before the bankruptcy filing. This was done by so-called "divisive merger" under Texas law to wall off talc-related tort liability from J&J and its non-debtor affiliates. The SPV's purpose was embedded in the corporate name: "LTL" is an acronym for "Legacy Talc Liabilities."

2.      The Debtor's board, management, and professionals are all inexplicably entwined with J&J. LTL directors work for J&J (or affiliates) and draw J&J salaries.[2] The Debtor's "first-day" declarant is a "seconded" J&J Assistant General Counsel, who played a direct role in the

---

[2]        *See* LTL 0019184-90.

divisive merger and managed all the talc powder claims against J&J.[3]  The Debtor's primary

bankruptcy counsel has long served J&J, and orchestrated the divisive merger for J&J.[4]  LTL

essentially concedes that it is here – not to serve tort claimant interests – but to serve J&J interests.

3.    The Debtor does not have an operational presence.  It does not make anything; it

does not sell anything; it does not employ anyone.[5]  It does not participate in the commercial world

in any capacity.  On its creation date (again, a few days before the bankruptcy filing), it was

bestowed a few assets befitting a passive SPV: a royalty stream, a $6 million bank deposit, and a

limited indemnity right from J&J and Old JJCI.  LTL's assets "were all created to effectuate a

bankruptcy filing and have no other business purpose."[6]

4.    The Debtor does not have any funded or operational debt.  There are no banks,

bondholders, landlords, unions/pensions, vendors/suppliers, or taxing authorities.  The Debtor's

debt structure has only one line-item: the 38,000 pending tort claims arising from the use of J&J's

talcum powder products.[7]  There is, in turn, only one creditor class that could possibly support a

plan, and that class most assuredly does not support this case.

---

[3]    *See Declaration of John K. Kim in Support of First Day Pleadings* [N.C. Dkt. No. 5] (the "Kim First Day Decl."), ¶ 2 ("I am employed by Johnson & Johnson Services, Inc. ('J&J Services'), a non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent company, Johnson & Johnson ('J&J').  Just prior to my role as the Chief Legal Officer of the Debtor, I was J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group.  In that role, I was responsible for product liability litigation globally.  I began my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group. . . .").

[4]    *Debtor's Ex Parte Application for an Order Authorizing It to Employ Jones Day as Counsel as of the Petition Date* [N.C. Dkt. No. 404], Exh. C, Gordon Decl. ¶ 16 ("Prior to the Petition Date, Jones Day represented J&J and Old JJCI in connection with the restructuring that led to the formation of the Debtor, as described below.")

[5]    *See Order Transferring Case to the District of New Jersey* [N.C. Dkt. No. 416], at 2 ("The employees of the Debtor are all employees of Johnson & Johnson Services, Inc. ('JJS'), a New Jersey corporation, that have been seconded to the Debtor.").

[6]    *Id.* at 9.

[7]    *Id.* at 2 (describing only claims as "Old JJCI's liabilities arising from talc-related claims.").

5.      In sum, the Debtor is an insignificant legal entity set up solely for bankruptcy, not because it has any need for bankruptcy, but instead to serve as a passive conduit through which J&J – a conglomerate of monumental size, power, and wealth *despite* its well-known current and future talc liability – can seize the injunctive benefits of Chapter 11 without having to file for Chapter 11.  The injunctive benefits that J&J hopes to seize are, as the Debtor concedes, worth billions of dollars.

6.      This is not what Chapter 11 is for.  The bankruptcy process is intended to give "the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."[8]  The powers and benefits of Chapter 11 are only available "to further a valid reorganizational purpose."[9]  As the Fifth Circuit (affirmed by the Supreme Court) noted in *Timbers of Inwood Forest*, "when there is no reasonable likelihood that the statutory objective of reorganization can be realized . . . then the automatic stay and other provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries."[10]

7.      There is no "reorganizational purpose" undergirding this case.  This is about litigation advantage.[11]  And, by litigation advantage, J&J is not seeking a leg up in some

---

[8]      *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

[9]      *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999); *see* Report of the Committee on the Judiciary, House of Representatives to Accompany H.R. 8200, H.R. Rep. No. 595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6179 ("The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders.").

[10]      *United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 373 (5th Cir. 1987) (en banc), *aff'd*, 484 U.S. 365 (1988); *see also SGL Carbon Corp.*, 200 F.3d at 167 (dismissing bankruptcy case as having been filed in bad faith where "the petition was not motivated by a desire to reorganize or rehabilitate SGL Carbon's business.").

[11]      *See SGL Carbon Corp.*, 200 F.3d at 165 (quoting *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994)); *Argus Grp. 1700 v. Steinman*, 206 B.R. 757, 765 (E.D. Pa. 1997) (finding that bankruptcy case was filed in bad faith where debtor sought to "fabricate federal court jurisdiction" for ongoing litigation); *Furness v. Lilienfield*,

5

commercial dispute with another corporate behemoth.  This bankruptcy was structured deliberately to deprive people who are dying of cancer their rightful day in court.  For bankruptcy, it simply does not get any uglier than this.[12]

## II.     The Debtor Characterizes J&J As The Innocent Victim Of A Tort System Run Amok; The Scientific Studies, The Government, The Judges, And The Juries All Say Differently.

8.      The LTL Information Brief weaves a sort of conspiracy theory involving a large cabal of participants working together across State lines, in and out of court systems, to take down J&J.  There is, says the Debtor, "no scientific or other proof that Johnson's Baby Powder either contained asbestos or was a cause of ovarian cancer or mesothelioma."[13]  Indeed, the decision to "permanently discontinue its line of talc-based Johnson's Baby Powder in the U.S. and Canada" had nothing to do with talc-related disease, but rather "was based on business considerations, including lack of sales due to misinformation about the safety of Old JJCI's talc-based Johnson's Baby Powder."[14]  To this day, "the Debtor stands behind the safety of Johnson's Baby Powder and asserts, based on decades of internal and third party studies and testing, that it is not a cause of either ovarian cancer or mesothelioma."[15]  To this day, the Debtor denies the presence of asbestos in its talcum powder.  Now come the facts.

---

35 B.R. 1006, 1013 (D. Md. 1983) ("[Bankruptcy is] not intended to be used as a mechanism to orchestrate pending litigation."); *In re HBA East, Inc.*, 87 B.R. 248, 259-60 (Bankr. E.D.N.Y. 1988) (where "there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.").

[12]     The Debtor's approach is reminiscent of Joseph Stalin's famous quip: "The death of one man is a tragedy, the death of millions is a statistic."

[13]     *Debtor's Emergency Motion to Enforce the Automatic Stay against Talc Claimants Who Seek to Pursue Claims against the Debtor and Its Non-Debtor Affiliates* [N.C. Dkt. No. 44], ¶ 23.

[14]     *Id.* ¶ 11.

[15]     *Id.* ¶ 12.

A.    **The Scientific Studies Say Differently**.

9.    In over 25 case-control studies and three prospective cohort studies since the 1980s investigating the link between talcum powder and ovarian cancer, all but two demonstrated an increased risk of ovarian cancer with the perineal or genital application of talcum powder.  A 2018 meta-analysis that included 24 case-control (13,421 cases) and three cohort (890 cases) studies, found that "any" perineal talcum powder use was associated with an increased risk of ovarian cancer.[16]  Two other recent meta-analyses and a pooled study in 2020 describe similar findings.[17]

10.    A 2020 peer-reviewed article, titled "*Mesothelioma Associated with the Use of Cosmetic Talc*," concluded that exposure to asbestos-contaminated talcum powders can cause mesothelioma.[18]    Another recently published peer-reviewed article, titled "*Malignant Mesothelioma Following Repeated Exposures to Cosmetic Talc*," likewise concluded that exposure to talc-based products caused mesothelioma in the study subjects.[19]

11.    Using samples from the 1960s through the early 2000s, Drs. William Longo and Mark Rigler found that 68% of the samples of Johnson's Baby Powder and Shower to Shower were positive for amphibole asbestos and 98% of the samples contained fibrous talc.[20]  It bears

---

[16]    *See* Penninkilampi et al., *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis*, 29 Epidemiology 41 (2018).

[17]    *See* Berge, et al., *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis*, 27 European J. Cancer Prev. 248 (2018); Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88 (2019); O'Brien et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 49 (2020); O'Brien et al., Supplementary Online Content (2020).

[18]    *See Journal of Occupational and Environmental Medicine*, Vol. 62, No. 1 (Jan. 2020).

[19]    Theresa S. Emory, MD, John C. Maddox, MD, and Richard L. Kradin, MD, Am. J. Ind. Med., 63:484-489 (2020).

[20]    *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d 116, 147 (D.N.J. 2020); *See* Second Supplemental Rule 26 Expert Report of William E. Longo, PhD and Mark W. Rigler, PhD, pp. 7, 9  (Feb. 1, 2019).

observing that Chief District Court Judge Freda L. Wolfson has found "that the three-step TEM method applied by Dr. Longo, and his reliance on the AHERA counting rules, were reliable."[21]

### B.  The Government (Canada and U.S.) Says Differently.

12.    In December 2018, Health Canada, the public department of the Government of Canada, preliminarily concluded that

> Available human studies . . . indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer.  Further, available data are ***indicative of a causal effect***.[22]

13.    In response, J&J submitted a 255-page review of the data and several countervailing expert reports, and its scientists lobbied Health Canada on numerous occasions.  In addition to submitting its 255-page review, J&J notably sent Heath Canada the expert reports that its lawyers submitted to Chief Judge Wolfson in the MDL.  Not only did Health Canada reaffirm its preliminary conclusions, it specifically addressed – and rejected – the reasoning employed by J&J's litigation experts, noting areas of scientific disagreement with J&J's litigation experts.  It found that:

> Overall there is a high degree of consistency in the epidemiological studies across several decades conducted in different parts of the world.  Although there are uncertainties related to bias, there is confidence in the robustness of the available database for use in characterizing ovarian cancer risk attributed to talc exposure.  Furthermore, the available data are indicative of a causal relationship.[23]

---

[21]    *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d at 150.

[22]    Draft Screening Assessment, Environment and Climate Change Canada, Health Canada, Dec. 2018, at 28 (emphasis added).

[23]    Screening Assessment, Environmental and Climate Change Canada, Apr. 2021, at 36.

14.    In 2019, the U.S. Food and Drug Administration tested two bottles of Johnson's Baby Powder.[24]  It found one bottle to be contaminated with asbestos and talc fibers.[25]  This led to J&J's recall of 33,000 bottles of its Baby Powder.[26]  Today, J&J no longer sells talcum powder consumer products in the United States or Canada, as the Debtor concedes.[27]

### C.    The Judges Say Differently.

15.    As this Court knows, Chief District Court Judge Freda L. Wolfson has overseen the talc MDL proceeding against non-debtor J&J affiliates for more than five years.  On April 27, 2020, Chief Judge Wolfson issued a 141-page decision respecting dueling *Daubert* motions.  If, as LTL says, there is "no scientific or other proof that Johnson's Baby Powder either contained asbestos or was a cause of ovarian cancer or mesothelioma," all plaintiff experts would have been excluded.  That was not the Court's determination.  The Court concluded: "what remains clear from the general causation evidence relied by the experts on both sides in this matter, is that there is scientific evidence supporting each side's opinion."[28]

16.    Three months later, the Appellate Division of the Superior Court of New Jersey issued an opinion in another talc-injury case, *Carl v. Johnson & Johnson*,[29] where the trial judge excluded plaintiffs' expert causation testimony.  In a unanimous 36-page opinion, the Appellate Division reversed the exclusion order, holding that "plaintiffs' experts adhered to methodologies

---

[24]    FDA News Release, *Baby Powder Manufacturer Voluntarily Recalls Products for Asbestos*, Oct. 18, 2019.

[25]    *See* AMA Analytical Services, Inc., Certificate of Analysis, dated October 11, 2019.

[26]    FDA News Release, *Baby Powder Manufacturer Voluntarily Recalls Products for Asbestos*, Oct. 18, 2019.

[27]    On information and belief, J&J still sells its talcum powder worldwide.  It is unclear where the constituent parts of that operation sit in J&J's new corporate structure.

[28]    *See In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d at 187.

[29]    237 A.3d 308, 311 (N.J. App. Div. 2020), *cert. denied*, 244 A.3d 270 (N.J. 2021).

generally followed by experts in the field, and relied upon studies and information generally considered an acceptable basis for inclusion in the formulation of expert opinions.  Suppression of their testimony was an abuse of discretion."[30]

17.     And, in June 2020, the Missouri Court of Appeals considered the sufficiency of expert opinion testimony linking talc-based products and ovarian cancer.[31]  There, too, J&J argued that plaintiffs' general causation theory was "contrary to the overwhelming scientific consensus" that talcum powder products do not cause ovarian cancer.[32]  The Missouri Court of Appeals unanimously rejected J&J's position.[33]

### D.    The Juries Say Differently.

18.     It is true that, for decades, J&J was very successful defending talc-related personal injury lawsuits.  In recent years, however, J&J was compelled – for the first time – to produce certain particularly sensitive documents in discovery.[34]  These documents showed that, from at least 1971 to the early 2000s, J&J knew its talc-based products sometimes tested positive for carcinogens, that it was concerned with the issue, and that it intentionally failed to warn regulators or the public of the carcinogenic nature of it talcum powder products.[35]  This proof of knowing concealment dramatically changed the complexion of personal injury litigation against J&J.

---

[30]     *Id.* at 344.

[31]     *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 709-714 (Mo. App. 2020).

[32]     *Id.* at 711.

[33]     *Id.* at 714.

[34]     *See* Girion, Lisa, *Johnson & Johnson Knew for Decades that Asbestos Lurked in Its Baby Powder*, Reuters, Dec. 14, 2018.

[35]     *Id.*

19.     Today, there are more than 38,000 cases currently pending alleging that J&J's talc-based products caused cancer.[36]  Over 35,000 of those cases are part of the MDL pending before Chief Judge Wolfson.[37]   Juries have awarded plaintiffs verdicts against J&J in the billions, inclusive of punitive damages.[38]  J&J claims that it is facing a judicial system "run amok."  Perhaps it is more apt to say that J&J is now facing juries that are enraged by the evidence long secreted in J&J files.

## III.    Liability Mapping: LTL vs. Old JJCI vs. J&J.

20.     Some mass tort bankruptcies involve a debtor attached to successful non-debtor affiliates.  In certain of those cases, the liability is "contained" in the debtor because only the debtor was involved in the production and selling of the harm-inducing product.  But, that is not always the case.

21.     *In re Quigley Company* is a case in point.[39]   There, the debtor produced an insulation product that contained asbestos.  In 1968, it was acquired by Pfizer, which started marketing Quigley's insulation product with Pfizer's name, logo, and trademark.  Eventually, more than 160,000 plaintiffs filed asbestos-related suits against, not only Quigley, but Pfizer too.  Pfizer had Quigley file for Chapter 11, not to rehabilitate Quigley's defunct business, but as a conduit for Pfizer to secure for itself a plan injunction.  The strategy didn't work.

> [T]his is a Quigley bankruptcy in name only.  Pfizer conceived and executed the global strategy, including the resuscitation of the moribund Quigley and the filing of the chapter 11 case contemplated

---

[36]     Kim First Day Decl. ¶¶ 42-43.

[37]     *Id.*

[38]     *See Ingham*, 608 S.W.3d at 709-714.

[39]     *In re Quigley Co., Inc.*, 437 B.R. 102, 126-27, 160 (Bankr. S.D.N.Y. 2010).

in the Pfizer Settlement Agreements.  Pfizer funded the chapter 11 .
. . [and] is also providing the bulk of the plan funding.  The Fourth
Plan . . . is designed to free the Pfizer Protected Parties from
derivative liability, and only incidentally, to reorganize Quigley to
the extent necessary to confirm the plan.  Pfizer, the parent of
Quigley, the architect of the global strategy, the only source of
chapter 11 and plan financing and the principal beneficiary of the
channeling injunction, is the real proponent of this plan. . . .
Quigley's motion to confirm the Fourth Plan is denied.

22.     Confirmation was denied, in large part, because it was not proposed in "good faith".

This Chapter 11 case has remarkable similarities.  J&J (like Pfizer) had, for extensive periods of

time, sole, and thereafter, direct involvement in the sale, marketing, and safety of all talc-related

products, and this involvement renders J&J directly liable for talc-related personal injury claims.[40]

This remains true today, despite the divisional merger.[41]  Set forth below are certain salient

datapoints:

- Dr. John Hopkins, who had responsibility for talc safety at the J&J group of
  companies in the 1970s, 1980s, and 1990s, was designated by J&J and Old JJCI as
  their corporate representative to testify at numerous trials and depositions.  Dr.
  Hopkins repeatedly testified under oath that, even after 1979, J&J made health and

---

[40]     *See, e.g.*, *Arevalo v. Saginaw Machine Systems, Inc.*, 782 A.2d 931, 941 (N.J. Super. App. Div. 2001)
(holding that predecessor company that manufactured defective products remained liable for products liability claims,
even after manufacturer spun off division that had manufactured product in exchange for assumption of liabilities
agreement, explaining that "the liability sought to be imposed in this case is direct – not vicarious" and that "the
original manufacturer, albeit reconstituted, is in effect extant and viable," and therefore retained liability despite the
assumption agreement).

[41]     The Debtor wrongfully contends that, as a result of the "divisional merger," it alone bears the entirety of talc-
related personal injury cases.  *See, e.g.*, *Debtor's Motion for an Order (I) Declaring that the Automatic Stay Applies
to Certain Actions Against Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary
Restraining Order Pending a Final Hearing* [N.C. Adv. P. Dkt. No. 2], at 13, 14 (describing the "Debtor Talc Claims"
by stating: "Old JJCI is responsible for all claims alleging that Johnson's Baby Powder and other talc-containing
products cause cancer or other disease" and that the "Debtor Talc Claims are asserted in virtually every case against
both the Debtor and J&J . . . [and] seek to hold the Debtor and J&J jointly and severally liable for the Debtor Talc
Claims.").

safety policy decisions regarding talcum powder.[42]  Dr. Hopkins also conceded that
J&J had the authority to require warnings on Johnson's Baby Powder.[43]

- In 1982, the first epidemiologic study was performed on talcum powder use in the female genital area.  This study was conducted by Dr. Daniel Cramer and others and found a 92% increased risk in ovarian cancer with women who reported genital talcum powder use.  Shortly after this study was published, Dr. Bruce Semple of J&J visited Dr. Cramer about his study.  Dr. Cramer advised Dr. Semple that J&J should place a warning on its talcum powder products about the ovarian cancer risks so that women could make an informed decision about their health.[44]  J&J did not do so.

- A J&J Technology Forecast dated 1986 acknowledged that safety of cosmetic powders was a concern and that health professionals had decided that powders provide no health benefit.  The document also acknowledged that "[r]etrospective studies have implicated talc use in the vaginal area with the incidence of ovarian cancer."[45]  J&J did not warn or take other action.

- In 1994, the Cancer Prevention Coalition mailed a letter to then J&J CEO Ralph Larson, informing his company that studies "show[ ] conclusively that the frequent use of talcum powder in the genital area pose[ ] a serious health risk of ovarian cancer."[46]  J&J again did not warn or take other action.

- In 1997, J&J's own toxicology consultant, Dr. Alfred Wehner, informed the company about false public statements being made by the company regarding talc safety.[47]  No warning or other action.

---

[42]     Nov. 4, 2021 Hr'g Tr. at 221:23-222:24; PI Exhibit List 1 (Meso Ex. 10) at 20:11-17 (Dr. Hopkins: "the parent company [J&J] for all the global companies made those decisions, yes."); PI Exhibit List 2 (Meso Ex. 10A) at 1993:6-12 (Dr. Hopkins: "Q. [A]ll talc in asbestos decision went through [New] Brunswick? A. Correct.  Q. The headquarters for Johnson & Johnson, correct? A. Correct."); PI Exhibit List 3 (Meso Ex. 10B) at 17:24018:3 (Dr. Hopkins: "Q. Johnson & Johnson Corporate in New Brunswick, New Jersey made all health and safety policy decisions with regard to asbestos and talc issues, correct? A. Yes."); PI Exhibit List 4 (Meso Ex. 11) at 25:10-15 (same).

[43]     PI Exhibit List 6 (Meso Ex. 8) at 7752:11-15 (Dr. Hopkins: "Q. And you would agree that Johnson & Johnson has the authority to require warnings on Johnson's Baby Powder about cancer, correct? A. They have the authority to require warnings.").

[44]     PSC PI Exhibit List 42 (First Amended MDL Complaint) ¶ 30.

[45]     PSC PI Exhibit List 42 (First Amended MDL Complaint) ¶ 31.

[46]     PSC PI Exhibit List 42 (First Amended MDL Complaint) ¶ 41.

[47]     PSC PI Exhibit List 42 (First Amended MDL Complaint) ¶ 43.

- J&J instead required its branding on the front of each Baby Powder container to display its signature cursive "Johnson & Johnson" logo.[48]  The J&J logo, of course, is owned by J&J, and not by any subsidiary.[49]  Johnson's Baby Powder bottle specifically targeted women, stating: "For you, use every day to help feel soft, fresh, and comfortable."[50]

- In 2013, J&J established the Office of Chief Medical Officer, with responsibility for "labeling updates, warnings, and, when necessary, product withdrawals."[51]  Yet, J&J never required warnings, even though it directly received information regarding health risks from talcum powder.

- In December 2018, J&J circulated a video of its CEO, Alex Gorsky, to millions of people around the world stating that "J&J's Baby Powder Has Never Contained Asbestos", "J&J's Baby Powder is Safe and Does Not Cause Cancer", and "We Know Our Talc Is Safe."[52]

23.    J&J's direct tort exposure is more extensive than Pfizer's given that J&J (unlike Pfizer) did more than just marketing – it had direct involvement in production.  From 1967 until 2003, the primary source of talc for J&J products were Vermont mines owned and operated by a J&J subsidiary until 1989.  J&J exercised control over all key decisions concerning the mines until they were sold in 1989 to Cyprus Mines Corporation ("Cyprus").  Through 2003, the Vermont mines continued to be the company's primary talc source (whether owned by Cyprus or later, Rio Tinto Minerals or Imerys Talc America, Inc.), and J&J maintained control of all talc-related specifications and conducted occasional testing source ore mines and testing of finished Johnson's Baby Powder end-products.

---

[48]    PI Exhibit List 4 (Meso Group Ex. 11) at 22:10-13.

[49]    *Id.*; *see* Oct. 22, 2021 Hr'g Tr. (John K. Kim Testimony) at 90:13-17.

[50]    PSC PI Exhibit List 42 (First Amended MDL Complaint) ¶ 25.

[51]    Nov. 5, 2021 Hr'g Tr. at 412:3-5.  Dr. Joanne Waldstreicher, Chief Medical Officer of J&J, chairs the Safety Council overseeing the J&J corporate family.  Nov. 4, 2021 Hr'g Tr. at 227:16-229:2.  The Council could have overruled any health or safety decision by Old JJCI.  Nov. 5, 2021 Hr'g Tr. at 408:6-8, 509:5-11.

[52]    Oct. 22, 2021 Hr'g Tr. (John K. Kim Testimony) at 98:8-100:23; *see also* Nov. 4, 2021 Hr'g Tr. at 229:3-20.

24.    For these reasons, juries have repeatedly found J&J individually liable, separate

and apart from Old JJCI.[53]    That includes punitive damages.[54]    *Ingham v. Johnson & Johnson*[55] is

a case in point.  There, the Missouri Court of Appeals affirmed a jury verdict finding: (i) Old JJCI

liable for $500 million in actual damages; (ii) J&J liable for $125 million in actual damages;[56] and

(iii) $1.6 billion in aggregate punitive damages, with a greater amount imposed on J&J in part

because of its "reprehensible conduct" above and beyond that of Old JJCI.

> [B]ased on the evidence, we believe a larger amount of punitive
> damages is needed to deter J&J's conduct than JJCI's conduct.
> While both corporations are multi-billion dollar corporations, J&J's
> net worth is considerably larger than JJCI's net worth. At trial,
> Defendants stipulated JJCI's net worth is $13.3 billion and J&J's net
> worth is $63.2 billion.  ***Furthermore, Defendants' decision to chart
> their course of reprehensible conduct began with J&J long before
> JJCI was spun off as a separate entity in 1979 and engaged in
> reprehensible conduct of its own.  Given this evidence, the higher
> ratio of 5.72:1 for J&J is justified***.[57]

25.    This bankruptcy is, in sum, based on a faulty legal premise: that all talc-related

personal injury claims are, following the divisive merger, fully contained in the Debtor.  That is

---

[53]    *See, e.g.*, PI Exhibit List 17 (Meso Group Ex. 21) at 9 (*Leavitt* verdict form); PI Exhibit List 18 (Meso Group Ex. 19) at 5 (*Prudencio* verdict form); PI Exhibit List 19 (Meso Group 20) (*Barden, Etheridge, McNeil, Ronning* verdict forms); PI Exhibit List 16 (Meso Ex. 17) at 9518:24-9520:16 (*Olson* verdict form); PI Exhibit List 125 (*Fox* verdict form); PI Exhibit List 126 (*Ristesund* verdict form); PI Exhibit List 127 (*Slemp* verdict form).

[54]    *See, e.g.*, PI Exhibit List 20 (Meso Group Ex. 18) at 10139:13–20 (jury imposed $200MM punitive damages against J&J and $100MM against JJCI); PI Exhibit List 21 (Meso Group Ex. 21) ($70MM punitive damages against J&J and $35MM against JJCI).  When J&J and JJCI are found liable for punitive damages, each company secures its separate payments with separate bonds.  *See* PI Exhibit List 21 (Meso Group Ex. 21).

[55]    608 S.W.3d 663 (Mo. App. 2020), *cert. denied*, 141 S. Ct. 2716 (June 1, 2021).

[56]    The Debtor has noted that the *Ingham* jury arbitrarily treated each plaintiff "the same" because it awarded $25 million in compensatory damages each.  But the Debtor has failed to mention that none of the *Ingham* plaintiffs sought economic damages.  All sought solely pain and suffering damages.  It was entirely reasonable for the jury to believe it was acting fairly by treating all plaintiffs equally in that regard.  Moreover, the defendants did not even address damages in closing or suggest to the jury what compensatory damages it should award.

[57]    *Id.* at 724 (emphasis added).

simply not the case. Here, just as in *Quigley*, there are very serious questions and doubt as to the

Debtor's (and J&J's) "good faith," which will be before the Court in short order.

**IV.    J&J Resorts To Structuring As "Liability Management".**

26.    It bears repeating that J&J's courtroom losses are a relatively recent phenomenon,

following the revelation of sensitive documents through discovery. Just last year, in the Delaware

Chapter 11 cases of *Imerys Talc America, Inc*. ("Imerys"), J&J moved for relief from the automatic

stay to continue litigating in the tort system, stating "J&J, of course, has the financial wherewithal

to defend these claims and satisfy any successful talc claim in full."[58]   In a subsequent pleading,

J&J reiterated its demand to defend at trial tort claims asserted against Imerys because J&J "prefers

to defend the safety of its products (and the core causation issues) in open court."[59]

27.    Then came the decision affirming the *Ingham* verdict, and the stakes went up

considerably. Avoiding the courtroom became the preferred strategy. So commenced the "liability

management" transactions.

28.    The so-called "Texas two-step" is complex in implementation, but simple in result:

Old JJCI is split into two companies, one taking the assets ("GoodCo"), the other taking the

liabilities ("BadCo"). The end result is no different than if Old JJCI moved its assets to a new

corporation, leaving the liabilities in the residual shell. A classic fraudulent transfer. At the

closing, J&J caused BadCo (LTL) to reincorporate in North Carolina, giving it access to the North

---

[58]    *See In re Imerys Talc America, Inc., et al.*, Case No. 19-10289 (Bankr. D. Del. Mar. 20, 2020) (LSS), *Johnson & Johnson's Motion pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and Implement Talc Litigation Protocol* [Dkt. No. 1567], ¶¶ 4, 41, 45

[59]    *See In re Imerys Talc America, Inc., et al.*, Case No. 19-10289 (Bankr. D. Del. May 19, 2020) (LSS), *Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Dkt. No. 1769], ¶¶ 3-4.

Carolina bankruptcy court and, more importantly, the Fourth Circuit's stringent standard for dismissal as a "bad faith" bankruptcy filing.[60]

29.    This is not, by the way, how the transaction is supposed to work.  Texas does not truly let GoodCo (JJCI) off the hook for liabilities vested in BadCo (LTL); GoodCo remains secondarily liable.[61]  But, that would defeat the purpose, so J&J added a transaction step: It "killed" Old JJCI (literally terminated its corporate existence) and then incorporated a new entity that adopted the identical name, asset base, and profile as Old JJCI.  New JJCI is, in every respect, GoodCo's doppelganger, but purportedly without the secondary liability.  This is further proof of a fraudulent intent.

30.    Five days after the bankruptcy filing, on October 19, 2021, before the "first-day" hearing before Judge Whitley, before the Debtor had applied for, let alone been granted, any injunctive relief, J&J filed a Form 8-K announcing that "*all* pending cosmetic talc cases will be stayed" as a result of the Debtor's bankruptcy filing.[62]  Yet more evidence of fraudulent intent.

31.    Anticipating the fraudulent transfer attack, J&J put in place the so-called "Funding Agreement."  This document purports to "ensure that [LTL] has at least the same, if not greater,

---

[60]    *See Order Transferring Venue to the District of New Jersey* [N.C. Dkt. No. 416], at 9-10 ("Here, the Debtor is trying to manufacture venue and is attempting to outsmart the purpose of the statute. . . .  [T]he Debtor's actions indicate a preference to file bankruptcy in this district, likely due to the Fourth Circuit's two-prong dismissal standard and Judge Hodges's estimation ruling in the Garlock case.").

[61]    Tex. Bus. Org. Code § 10.008(a)(4) ("[E]ach surviving or new domestic organization to which a liability or obligation is allocated under the plan of merger is the **primary** obligor for the liability or obligation, and, except as otherwise provided by the plan of merger or by law or contract, no other party to the merger, **other than a surviving domestic entity or non-code organization liable or otherwise obligated at the time of the merger**, and no other new domestic entity or non-code organization created under the plan of merger is liable for the debt or other obligation;") (emphasis added).

[62]    Nov. 4, 2021 Hr'g Tr. at 269:6-270:9; Johnson & Johnson, Current Report on Form 8-K, filed on October 19, 2021.

ability to fund talc-related claims and other liabilities as Old JJCI had before the restructuring."[63]

That is not accurate.

32.     Under the Funding Agreement, J&J and Old JJCI are obligated to fund LTL to the "value" of New JJCI as of the date of the divisive merger (the "JJCI Value").[64]  J&J and JJCI, thus, replace hard assets (that might increase in value) with an amorphous, artificially capped contract right that would take years to adjudicate to quantum meaning.  And that litigation only ripens when J&J and New JJCI refuse to make payments under the Funding Agreement.[65]  In other words, if a claimant secures a tort judgment against LTL, it cannot enforce that judgment on assets held by LTL; instead, it must request LTL (controlled by J&J) demand payment from J&J or New JJCI; if they refuse, the claimant then must wait on LTL (again, controlled by J&J) to litigate for that funding.  Moreover, the Funding Agreement only pays to a plan trust, implying broad plan injunctions are conditions precedent to payment.[66]

33.     Apparently, the divisive merger is not intended to be J&J's last "liability management" transaction.  On November 12, 2021, J&J announced a plan to spin off its Consumer Health business (largely New JJCI) from J&J.[67]  This would create further barriers between tort claimants and assets that should be available to satisfy their claims.  Most significantly, it creates an additional potential issue under the Funding Agreement.  New JJCI and J&J are jointly and

---

[63]     Kim First Day Decl. ¶ 26.

[64]     *See* Funding Agreement § 1 (definition of "JJCI Value").

[65]     *See* Funding Agreement § 2(a) ("The JJCI Value shall be calculated at, *and only at*, any date on which (x) the Payors refuse to make a requested Payment under this Agreement…") (emphasis added).

[66]     *See* Funding Agreement § 1 (definition of "Permitted Funding Use").

[67]     *See* Johnson & Johnson, Current Report on Form 8-K, filed on November 15, 2021.

severally liable for funding obligations thereunder.[68]  While New JJCI remains a wholly-owned subsidiary of J&J, this merely expands the assets that the Funding Agreement purports to make available to tort claimants – the payment ultimately would come out of the pockets of J&J's owners and there would be little reason to debate which entity should make the payment.  However, if New JJCI and J&J become separately-traded entities, this is no longer true:  each entity may seek to litigate which entity should be the primary obligor under the Funding Agreement, creating a new reason to dispute or delay payment under the Funding Agreement.

34.    The timing of the announcement (two days after the change in bankruptcy venue) does not appear coincidental.  As one analyst covering J&J's stock observed: "the firm's timing [of 'the abrupt announcement of plans to divest its consumer healthcare division'] is surprising, as we don't see any major catalyst for the move.  However, if the consumer division no longer holds the deep pockets of the combined company, the risk of future consumer product litigation – such as the large talc settlement – may decrease."[69]

## V.    <u>Where Do We Go From Here</u>?

35.    <u>**The Preliminary Injunction**</u>.  On October 21st (before appointment of the Official Committee), the Debtor sued more than 800 individual cancer plaintiffs (plus "John and Jane Does 1-1000") to enjoin them from prosecuting their tort claims against non-debtor J&J affiliates.  Essentially, through the adversary proceeding, the Debtor asked the N.C. Bankruptcy Court (Judge Whitley) to enter an order enjoining Chief District Court Judge Wolfson from continuing the MDL proceeding she has overseen for more than five years.

---

[68]    *See* Funding Agreement at 5 ("Payors" defined as J&J and JJCI); ss 16 (liabilities joint and several).

[69]    Damien Conover, CFA, *J&J Announces Divestment of Consumer Group*, Morningstar (November 12, 2021).

36.     Immediately after initiating the adversary proceeding, the Debtor pressed Judge
Whitley to issue a temporary restraining order, essentially targeting Chief Judge Wolfson.
Unsurprisingly, Judge Whitley said no.  In transferring the case to this Court, Judge Whitley
granted a 60-day bridge injunction to prevent the Chapter 11 case from arriving "on fire."[70]  That
bridge injunction will expire on January 14, 2022, and the Debtor will assuredly seek an extension.

37.     The Official Committee will undertake several measures in connection with the
adversary proceeding and preliminary injunction.  First, the Official Committee will intervene in
the adversary proceeding, as a defendant.  Second, the Official Committee will move, or will
support the motion of other defendants, to withdraw the reference of the adversary proceeding (but
only the adversary proceeding), so that Chief Judge Wolfson can decide whether the MDL and
other lawsuits against non-debtor J&J affiliates should be stayed.  Finally, the Official Committee
will oppose the extension of the preliminary injunction, and will seek dismissal of the adversary
proceeding.

38.     **<u>Motion to Dismiss the Bankruptcy Case as a "Bad Faith" Filing</u>**.  As noted
above, this case has important similarities to the *Quigley* Chapter 11 case, where the Court found
the debtor not to be acting in "good faith."  The pathology of the Debtor's creation and exploitation
for J&J's benefit quickly show this to be a "bad faith" bankruptcy filing.  LTL was created solely
as a litigation tactic designed to frustrate the prosecution of civil negligence and products liability
talc claims pending against J&J and JJCI.  The Debtor, obviously, does not have a valid
"reorganizational purpose," given that it lacks a business to reorganize.  The Debtor concedes – in

---

[70]     *See* Nov. 5, 2021 Hr'g Tr. at 143:12-18 ("But the point is that I think that, particularly given that I am moving
the case, the last thing I want to do is send it with it on fire to the, to the recipient court.  And so we need to, to slow
down just for a little bit here and let a new judge take a look at this situation, read what we've written before, and then
get the other constituencies on board before we go any further with that.").

page-after-page of the LTL Information Brief – that this case is a litigation tactic to shield non-debtor J&J affiliates from their tort exposure.  The Official Committee will be moving to dismiss this Chapter 11 case as a "bad faith" filing.

39.    **Derivative Standing Motion**.  The Debtor clearly holds viable claims against non-debtor J&J affiliates, among others.  The divisional merger is plainly a fraudulent transfer and, under New Jersey law, parties working with JJCI to achieve that result bear joint and several culpability for that outcome.  That includes: (i) J&J and all other affiliated companies that assisted in the transaction; (ii) all directors, officers and employees that played a role; and (iii) all professionals that provided advice and assistance in documenting the transaction.  Indeed, it bears observing that, in the *Banco Popular* case,[71] the New Jersey Supreme Court found the lawyer who counseled the debtor in connection with a fraudulent transfer bore equal liability for the transfer.

40.    There are, of course, many other available theories of action including claims sounding in indemnity, contribution, unjust enrichment, veil piercing, substantive consolidation, and business tort.  The Debtor is, almost admittedly, a shill for J&J and cannot retain possession of such assets.  The Official Committee will be moving for derivative standing to initiate suit on behalf of the estate.

41.    **Other Motion Practice**.  The Official Committee will be objecting to the Debtor's professional retention applications, given that the proposed professionals are certainly not "disinterested."  The Official Committee likewise will be objecting to the Debtor's "ordinary course professionals" motion, which is a particularly ironic motion given that nothing about this Debtor is "ordinary course" or concerns actual business operations.  The Official Committee also will be objecting to the Debtor's motion to establish a so-called "qualified settlement fund," given

---

[71]    *Banco Popular No. Am. v. Gandi*, 876 A.2d 253 (N.J. 2005).

that it is obviously a sub rosa plan and requests an improper advisory opinion (the sub rosa plan

lacks any creditor support).

42.     The Official Committee will continue to oppose any and all other motions seeking

relief until this sham of a Chapter 11 case has ended, and J&J's victims can receive the fair day in

court they are due as American citizens.

**GENOVA BURNS LLC**
*Proposed Local Counsel to the Official*
*Committee of Talc Claimants*


By:  */s/  Daniel M. Stolz*                            .
     DANIEL M. STOLZ


By:  */s/  Donald W. Clarke*                         .
     DONALD W. CLARKE


Dated: November 19, 2021