| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Local Counsel to the Official Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael Winograd, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>Seven Times Square<br>New York, NY  10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>Sharon I. Dwoskin, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>sdwoskin@brownrudnick.com<br>One Financial Center<br>Boston, MA  02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Proposed Co-Counsel for the Official Committee of Talc Claimants* |
| **BAILEY GLASSER LLP**<br>Brian A. Glasser, Esq.<br>Thomas B. Bennett, Esq.<br>bglasser@baileyglasser.com<br>tbennett@baileyglasser.com<br>105 Thomas Jefferson St. NW, Suite 540<br>Washington, DC  20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>*Proposed Co-Counsel for the Official Committee of Talc Claimants* | **OTTERBOURG PC**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>230 Park Avenue<br>New York, NY  10169<br>Tel: (212) 905-3628<br>Fax: (212) 682-6104<br>*Proposed Co-Counsel for the Official Committee of Talc Claimants* |

| | |
|---|---|
| **PARKINS LEE & RUBIO LLP**<br>Leonard M. Parkins, Esq.<br>Charles M. Rubio, Esq.<br>lparkins@parkinslee.com<br>crubio@parkinslee.com<br>Pennzoil Place<br>700 Milan St., Suite 1300<br>Houston, TX  77002<br>Tel: (713) 715-1666<br>*Proposed Special Counsel to the Official Committee of Talc Claimants* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>jmassey@masseygail.com<br>100 Main Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>*Proposed Special Counsel for the Official Committee of Talc Claimants* |
| In Re:<br><br>**LTL MANAGEMENT, LLC,**<br><br>       Debtor. | Chapter 11<br><br>Case No.:  21-30589(MBK)<br><br>Honorable Michael B. Kaplan<br><br>Hearing: ***February 15, 2022, at 10:00 a.m***, |

## MOTION OF THE OFFICIAL COMMITTEE OF
## TALC CLAIMANTS TO DISMISS DEBTOR'S CHAPTER 11 CASE

The Official Committee of Talc Claimants (the "Committee") of LTL Management LLC, ("LTL" or the "Debtor"), by and through its undersigned proposed counsel, respectfully moves to dismiss the Debtor's Chapter 11 case for cause, pursuant to Section 1112(b) of the Bankruptcy Code (the "Motion").  In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.     Johnson & Johnson[1] ("J&J") created this Debtor on the eve of its bankruptcy filing and initiated and prosecutes this Chapter 11 case for one purpose and one purpose alone—to manage the litigation associated with J&J's decades-long manufacture and sale of a carcinogenic

---

[1]     Unless otherwise indicated, capitalized terms used herein but not defined shall have the meaning ascribed to them in the *Declaration of John K. Kim in Support of First Day Pleadings* [D.I. 5] (the "Kim Declaration") or in the Informational Brief of LTL Management LLC [D.I. 3] (the "Debtor's Information Brief").

product.  J&J even went so far as to aptly identify this Debtor as a litigation management vehicle, naming it "LTL Management", an acronym for "Legacy Talc Litigation" management.

2.      To accomplish this feat, J&J engineered a multi-step transactional scheme, reorganizing its consumer products subsidiary under Texas law in order to take advantage of a Texas statute designed to allow a company to divide itself into two (via a so-called divisive merger).  But, in reality, J&J's divisive merger subverts the very Texas law upon which it relies. The sole purpose of the merger was to hinder and delay talc claimants in the pursuit of their claims by separating the liability for those claims from the assets backing such claims.  This directly contravenes Section 10.901 of the Texas Business Organizations Code, which protects creditors from the abuse of divisive mergers to abridge their rights.

3.      Make no mistake about it.  The Debtor is a mere instrumentality of J&J.  J&J created, owns, and controls the Debtor.  The purpose of LTL and of this bankruptcy has been crystal clear from the outset: it is not to compensate creditors, but to protect J&J and its other valuable non-debtor affiliates.  Specifically, this case was filed to shield J&J from liability for the production, marketing, and sale of carcinogenic products for decades, and to remove its valuable operating assets from the reach of a single group of creditors (the talc claimants).  All of this, of course, without J&J and its operating entities having to subject themselves, and their assets, to the transparency and scrutiny of Chapter 11.

4.      This is not what Chapter 11 is for.  The purpose of Chapter 11, and of the powers and benefits granted by the statute, is "to further a valid reorganizational purpose."  In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999).  This Debtor has no such purpose.  It is a dummy entity with facially inadequate capitalization created only to purge all of J&J's and Old JJCI's massive talc-related tort liability, all in order to hinder and delay injured talc creditors, and indeed

3

injured talc creditors only, from accessing J&J's assets and providing J&J with a section 524(g) channeling injunction and a section 105 stay against present and future talc claims.  Moreover, J&J incorporated this dummy entity in North Carolina, a state in which it had no contact and no business until a month ago, in order to game the bankruptcy system and take advantage of the Fourth Circuit's test for bad faith dismissal (which is one of the most stringent in the country).

5.      Chapter 11 is intended to give reorganizing debtors a fresh start.  But this Debtor has no need for a fresh start: it was barely two days old.  It has no business, no operations, no employees, no funded debt, and no assets (except those set up for the purpose of manufacturing venue in North Carolina).  LTL has, admittedly and from the start, no desire or intention to achieve a fresh start of its own.  To the contrary, J&J caused LTL to file for bankruptcy solely in order to use the automatic stay and other provisions of Chapter 11 to summarily destroy the legitimate rights and interests of tort victims, many of whom are dying while J&J pursues this illicit bankruptcy filing.

6.      Johnson & Johnson has a better credit rating than the United States of America.  At the moment of the divisive merger in this case, it had approximately $31 billion in cash on its balance sheet, and it has a market cap of approximately a half-trillion dollars.  Nevertheless, when it purported to push its many billions of dollars of talcum powder-related liabilities into LTL, its litigation management vehicle, it funded that anemic entity with a mere $6 million in cash[2] and an

---

[2]      On November 24, 2021, the Debtor filed its Monthly Operating Report [D.I. 548].  That report includes a bank account statement showing that the $6 million is in a JJCI bank account.  Nearly six weeks after the Petition Date, the Debtor claims that it is "in the process of updating the bank account information to reflect the Debtor's name."  *Global Notes and Statements of Limitations and Disclaimers Regarding the Debtor's Monthly Operating Report* at ¶ 8.

unrelated royalty stream supposedly worth $375 million, and an illusory contract right under a funding agreement.

7.    This bankruptcy case was not filed in good faith.  It serves no legitimate purpose. It was designed to provide a litigation advantage for non-debtors.  It serves only to deprive a single group of creditors of the full panoply of assets backing their claims, rather than making the full range of an entity's assets open and available for fair distribution to all creditors.  It seeks to manipulate Texas law and the Bankruptcy Code for the sole purpose of discharging the Debtor's large and healthy non-debtor affiliates of direct and indirect tort liability, liability that J&J has admitted it was financially capable of paying.  And, worse still, it makes dying cancer victims, even those with a  judgment, scratch, claw, and fight, potentially for years, to be compensated from funds that would have been available to those creditors just two days before the filing.

8.    Simply put, J&J, the Debtor, and its non-debtor affiliates seek to exploit Chapter 11 to deprive tens of thousands of individuals suffering from ovarian cancer and mesothelioma due to J&J's products their day in front of a jury.

9.     As described in more detail below, despite J&J's scheme to have this case proceed under the Fourth Circuit's test for bad faith dismissal, this is a textbook case for bad faith dismissal under applicable law in the Third Circuit.  LTL's bankruptcy should be dismissed in order to avoid further harm and delay to talc claimants, which they can ill afford, and to permit them to exercise their jury trial rights against J&J and the rest of the Debtor's non-debtor affiliates benefiting from this ploy.

10.    The world is watching this case.  In light of J&J's literal corporate shell game (including the Texas Two-Step and the state incorporation change) certain Members of Congress sent a letter to Alex Gorsky, J&J's Chairman and CEO objecting to "Johnson & Johnson's efforts

to manipulate bankruptcy laws to evade accountability for any harm caused by [its] products" and noting that "[e]xploitation of the bankruptcy system by large companies to avoid accountability is unsurprising, but it is also unacceptable."[3]

11.    As these Members of Congress recognized, J&J's attempt to escape the scrutiny of American juries perverts the bankruptcy system.  Indeed, if LTL's bankruptcy case is permitted to proceed, the floodgates would open for any company subject to mass tort litigation to slough off its responsibility via a Texas Two-Step and subsequent bankruptcy of the new subsidiary. Plaintiffs would no longer be able to rely on the tort litigation system, but would, even after having litigated for years, be subject to the shell game J&J is attempting here.  This would abridge fundamental individual rights.  The Debtor's bankruptcy case should therefore be dismissed.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2) and the *Amended Standing Order of Reference from the United States District Court for the District of New Jersey*, dated September 18, 2012.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  The statutory basis for the relief requested herein is section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code").

---

[3]    Letter from Sen. Richard J. Durbin, Sen. Elizabeth Warren, Sen. Richard Blumenthal, Rep. Carolyn B. Maloney, and Rep. Raja Krishnamoorthi to Alex Gorsky (Nov. 10, 2021), available at https://www.durbin.senate.gov/imo/media/doc/2021-11-10%20Letter%20from%20Senators%20and%20Members%20of%20Congress%20to%20Mr.%20Gorsky.pdf.

## RELEVANT FACTUAL BACKGROUND

13.     The factual background for this Motion can be found in the *Initial Statement of Official Committee of Talc Claimants Respecting Chapter 11 Case* (the "Committee Initial Statement") [D.I. 495], which is incorporated herein.  For the Court's convenience, the Committee summarizes particularly relevant facts here.

## I.      J&J Has Direct And Derivative Liability For Talc-Related Claims.

14.     With no hint of the open and honest disclosures expected in a Chapter 11 case, the Debtor incorrectly proclaims that there is "no scientific or other proof that Johnson's Baby Powder either contained asbestos or was a cause of ovarian cancer or mesothelioma." *Debtor's Emergency Motion to Enforce the Automatic Stay Against Talc Claimants Who Seek to Pursue Claims Against the Debtor and its Non-Debtor Affiliates* [D.I. 44] at ¶ 23.  Johnson & Johnson's own internal documents belie LTL's proclamation.  In recent years, J&J has been compelled for the first time to produce particularly sensitive documents in discovery.  These documents show that, for decades, J&J  knew that its products sometimes tested positive for carcinogens, expressed concern with the issue, and intentionally failed to warn regulators and the public of the carcinogenic nature of its talcum powder products.  See Girion, Lisa, Johnson & Johnson Knew for Decades that Asbestos Lurked in its Baby Powder, Reuters, Dec. 14, 2018.

15.     Federal and State court judges across America that have permitted tort claims against Old JJCI and J&J to go to jury verdict obviously disagree with the Debtor's proclamation. These include both Chief Judge Freda Wolfson of the District of New Jersey, who presides over the Multi-District Litigation (the "MDL")[4] (see In re Johnson & Johnson, 509 F. Supp. 3d 116 (D.

---

[4]     In re Johnson & Johnson Talcum Powder Prods. Liability Litig., MDL 2738 (D. N.J.).

N.J. 2019)), and the Appellate Division of the State of New Jersey (see Carl v. Johnson & Johnson, 237 A.3d 308 (N.J. Super. Ct. 2020); Barden v. Brenntag North America, et al., No. MID-L-1809-17 (N.J. Super. Ct July 24, 2020).  Other appellate courts that have passed on these cases likewise disagree.  See, e.g., Ingham v. Johnson & Johnson, 608 S.W.3d 663, 724 (Mo. App. 2020), cert. denied, 141 S. Ct. 2716 (June 1, 2021) (affirming a jury verdict finding: (i) Old JJCI liable for $500 million in actual damages; (ii) J&J liable for $125 million in actual damages; and (iii) $1.6 billion in aggregate punitive damages, with a greater amount imposed on J&J in part because of its "reprehensible conduct of its own" above and beyond that of Old JJCI).

16.    Multiple scientific studies, conducted over decades by dozens of independent researchers, have repeatedly found (i) that samples of Johnson's Baby Powder and Shower to Shower contained amphibole asbestos and fibrous talc; (ii) that perineal or genital application of talcum powder increases the risk of and can cause ovarian cancer; and (iii) that exposure to asbestos-contaminated talcum powders can cause mesothelioma.  See Committee Initial Statement at ¶¶ 9-11.

17.    J&J sought to have expert scientific testimony on these issues excluded in case after case, and court after court has agreed with plaintiffs that there is sufficient reliable evidence to submit the causation question to a jury.  See, e.g., In re Johnson & Johnson, 509 F. Supp. 3d at 146 (Chief Judge Wolfson denying (in principal part) J&J's Daubert motions in the MDL and admitting plaintiffs' expert testimony); Leavitt v. Johnson & Johnson, Nos. A157572, A159021, 2021 WL 3418410, at *8 (Cal. Ct. App. Aug. 5, 2021) (affirming jury verdict against J&J and finding that the trial court did not abuse its discretion in admitting plaintiff's expert testimony).

18.    As a result, the tide of litigation relating to J&J's talc liability has begun to shift. Juries across the country have held Old JJCI liable for tortious conduct relating to its manufacture

and sale of talcum-power products. Juries have found J&J itself directly liable for its own tortious conduct relating to the sale of talcum-powder products. And juries in many cases have assessed punitive damages against J&J and Old JJCI, respectively. Equally important, in this very District, after Chief Judge Wolfson denied J&J's <u>Daubert</u> motions, bellwether trials in the ovarian cancer MDL proceeding were scheduled to begin in April 2022.

19.    Having been unable to persuade state and federal trial courts and the MDL to exclude plaintiffs' expert causation evidence, and having exhausted their appellate remedies, this contrived bankruptcy is J&J's last-ditch effort to escape from litigating its liability in the tort system.

20.    This is a massive turn in decision-making at Johnson & Johnson. Just over a year ago in connection with the Chapter 11 cases of its talc supplier, Imerys Talc America, Inc. ("<u>Imerys</u>")[5], J&J moved for relief from the automatic stay to continue litigating in the tort system, stating unequivocally that "J&J, of course, has the financial wherewithal to defend these claims and satisfy any successful talc claim in full"[6] and, in a subsequent pleading, that it "prefers to defend the safety of its products (and the core causation issues) in open court."[7]

---

[5]    Imerys, which is much smaller than J&J, did not perform a "Texas Two-Step" prior to its filing.

[6]    See <u>In re Imerys Talc America, Inc. et al.</u>, Case No. 19-10289 (Bankr. D. Del. Mar. 20, 2020) (LSS), *Johnson & Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying the Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and Implement Talc Litigation Protocol* [D.I. 1567] at ¶¶ 4, 41, 45.

[7]    See <u>In re Imerys Talc America, Inc. et al.</u>, Case No. 19-10289 (Bankr. D. Del. May 19, 2020) (LSS), *Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [D.I. 1769] at ¶¶ 2-4.

21.     J&J's sudden and recent flipflop away from the tort system and into the bankruptcy court is itself evidence of bad faith.

## II.     J&J Created LTL as a Special Purpose Vehicle to Shelter Itself From Derivative Talc Liability.

22.     J&J formed LTL on October 12, 2021, approximately 48 hours before its Petition Date, by a divisive merger under Texas law.  Kim Decl. at ¶ 16.  The so-called "Texas Two-Step" by which J&J created the Debtor is summarized in the Kim Declaration (¶¶ 21-25): in brief, J&J terminated the corporate existence of Old JJCI, created six different corporate entities over a forty-eight-hour period to take advantage of the Texas divisive merger statute and wind up with a North Carolina-organized debtor.  It was ultimately left with (i) LTL as the "BadCo," which succeeded to all of Old JJCI's talc-related liabilities, along with certain limited assets, including ownership of Royalty A&M (allegedly valued at $367.1 million), a bank account holding $6 million, and rights under the Funding Agreement; and (ii) New JJCI as the "GoodCo," which succeeded to Old JJCI's other, far more valuable assets and other liabilities, including those related to "a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter pharmaceutical products."  Kim Decl. at ¶¶ 19, 23.

23.     The Debtor falsely claims that the Funding Agreement "ensure[s] that [LTL] has at least the same, if not greater, ability to fund talc-related claims and other liabilities as Old JJCI had before the restructuring" (Kim Decl. at ¶ 26).  Rather, the Funding Agreement obligates J&J  and New JJCI to fund LTL up to the value of Old JJCI as of the date of the divisive merger.  _See_ Funding Agreement[8] at § 1 (definition of "JJCI Value").  J&J and JJCI thus replace operating

---

[8]     The Funding Agreement was filed at Annex 2 to the Kim Declaration.

businesses (which have historically increased in value) with an amorphous, artificially capped contract right, the value of which would take years to adjudicate.  And that litigation only ripens when J&J and New JJCI refuse to make payments under the Funding Agreement.  See id. at § 2(a) ("The JJCI Value shall be calculated at, ***and only at***, any date on which (x) the Payors refuse to make a requested Payment under this Agreement…" (emphasis added)).  In other words, a tort claimant in possession of a judgment against LTL cannot enforce that judgment on assets held by LTL: instead, it must request that LTL (controlled by J&J) demand payment from J&J or New JJCI.  If they refuse, the claimant must wait on LTL to litigate for that funding.  Moreover, at present, J&J's and New JJCI's obligations to provide financing under the Funding Agreement are likely "financial accommodations," as such term is used in section 365(c) of the Bankruptcy Code, and are therefore unenforceable by the Debtor against J&J or New JJCI absent further order of the Court or a different agreement from J&J and New JJCI.  Talc claimants have thus been intentionally rendered worse off than they were prior to the divisional merger, an outcome prohibited by the statute.  See Aldrich Pump LLC v. Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC), Adv. No. 20-03041 (JCW), 2021 WL 3729335, at *27 & n.220 (Bankr. W.D.N.C. Aug. 23, 2021) (quoting Tex. Bus. Orgs. Code § 10.901 and noting that "[f]or while the TBOC permits a company to engage in a divisional merger, it does not permit that company to thereby prejudice its creditors.").

## III.    LTL Exploited The Bankruptcy Process To Shelter J&J.

24.    The second step of J&J's Texas Two-Step strategy was to cause LTL to file for Chapter 11 protection in the Western District of North Carolina, in an attempt, specifically, to take advantage of the Fourth Circuit's stringent test for dismissal.  See Order Transferring Case to District of New Jersey [D.I. 416] (the "Transfer Order") at 10 ("[T]he Debtor's actions indicate a

11

preference to file bankruptcy in this district, likely due to the Fourth Circuit's two-prong dismissal

standard . . . .").

25.    Immediately upon the commencement of its case, the Debtor began a campaign to

halt all ongoing litigation against its non-debtor affiliates, including direct claims against J&J.  On

October 18, 2021, LTL filed the *Debtor's Emergency Motion to Enforce the Automatic Stay*

*Against Talc Claimants Who Seek to Pursue Their Claims Against the Debtor and Non-Debtor*

*Affiliates* [D.I. 44] (the "Emergency Stay Motion"), seeking entry of interim and final orders

applying the Section 362(a) automatic stay to all talc-related claims asserted against J&J and New

JJCI.  The Emergency Stay Motion entirely ignores the direct liability of J&J and JJCI, and states

incorrectly that "the commencement or continuation of the talc claims against Old JJCI or J&J is

for the purpose of liquidating and recovering claims against the Debtor."  Id. at 2.  Just one day

later, before its first-day hearing (and before the Debtor had been granted any injunctive relief),

J&J filed a Form 8-K misrepresenting the automatic stay and preemptively announcing that "*all*

pending cosmetic talc cases will be stayed" as a result of the Debtor's filing (emphasis added).[9]

Even before the North Carolina Court entered any injunctive relief, J&J filed notices of the

automatic stay in courts across the country.  This callous disregard for dying victims who in their

final days seek justice and help in taking care of their families they soon will leave behind is truly

beyond the pale.

26.    The United States Bankruptcy Court for the Western District of North Carolina (the

"North Carolina Court") denied the Emergency Stay Motion and directed the Debtor to proceed

---

[9]    Johnson & Johnson Current Report on Form 8-K, filed on October 19, 2021, available at
https://www.sec.gov/ix?doc=/Archives/edgar/data/200406/000020040621000067/jnj-
20211019.htm.

by adversary proceeding[10] and to file a complaint seeking the injunctive relief requested in the

Emergency Stay Motion, and on October 21, LTL filed its complaint [Adv. D.I. 1] (the

"Complaint").    The Complaint seeks to stay all talc-related claims against 490 non-debtor

affiliates, including J&J and New JJCI (along with retailers and insurers), and seeks a preliminary

injunction and a temporary restraining order against talc claimants.

27.    On November 12, 2021 (just two days after the North Carolina Court transferred

the Chapter 11 case to this Court), J&J announced[11] a plan to spin off its Consumer Health business

(largely New JJCI) from J&J, creating additional barriers between tort claimants and the assets

that should be available to satisfy their claims.    This second spin-off also throws into question

which of New JJCI and J&J should be the primary obligor under the Funding Agreement, which

will likely lead to additional complications under the Funding Agreement.

### RELIEF REQUESTED

28.    The LTL Chapter 11 case is not a legitimate good faith filing.    The Official

Committee seeks an order of this Court dismissing the Debtor's Chapter 11 case, with prejudice,

pursuant to Section 1112(b) of the Bankruptcy Code.

---

[10]    Adv. Pro. No. 21-03032.  Pleadings and submissions filed in the preliminary injunction
adversary proceeding shall be referenced as "Adv. D.I."  The Committee has asked the
United States District Court for the District of New Jersey to withdraw the reference of the
adversary proceeding.

[11]    Johnson & Johnson, Current Report on Form 8-K, filed on November 15, 2021, available
at    https://www.sec.gov/ix?doc=/Archives/edgar/data/200406/000020040621000072/jnj-
20211115.htm.

## ARGUMENT

**I.     The Chapter 11 Case Should Be Dismissed
        For Cause Because It Was Not Filed In Good Faith**

29.     Section 1112(b) of the Bankruptcy Code requires courts to convert or dismiss a Chapter 11 case, whichever is in the best interests of creditors and the estate, "for cause", unless the court determines that appointment of a trustee or examiner is in the best interests of creditors and the estate.  See 11 U.S.C. § 1112(b)(1).  Bankruptcy Courts "have wide latitude in determining whether cause exists to convert or dismiss" a Chapter 11 case.  In re NuGelt, Inc.,142 B.R. 661, 665 (Bankr. D. Del. 1992).

30.     The Third Circuit and other courts have overwhelmingly held that "a Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith." In re SGL Carbon Corp., 200 F.3d at 162; see also Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994); C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC Ave. P'ship), 113 F.3d 1304, 1311 (2d Cir. 1997); Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989).  Once a party in interest has made allegations that a filing was not made in good faith, the burden shifts onto the debtor to establish that good faith exists.  NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 118 (3d Cir. 2004), In re Cloudeeva, Inc., No. 14-24874, 2014 WL 6461514, at *4 (Bankr. D.N.J. Nov. 18, 2014).

31.     Determining whether a petition for Chapter 11 was filed in good faith is a fact-specific undertaking and requires an examination of the totality of the facts and circumstances surrounding a debtor's filing.  In re SGL Carbon, 200 F.3d at 162.  The focus of the inquiry is whether the petitioner sought "to achieve objectives outside the legitimate scope of the bankruptcy laws" when filing for protection under Chapter 11.  Id. at 165 (citing In re Marsch, 36 F.3d at

14

828).  The Third Circuit has focused on two primary questions, namely, (i) whether the petition

was filed to obtain a tactical litigation advantage; and (ii) whether the petition serves a valid

bankruptcy purpose.  See 15375 Mem'l Corp. v. Bepco, L.P., 589 F.3d 605, 618 (3d Cir. 2009)

(citing SGL Carbon Corp, 200 F.3d at 165).  Other factors courts consider include improper pre-

petition conduct and whether the debtor was formed immediately prepetition.  See Primestone Inv.

Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.), 272 B.R. 554, 557-58

(D. Del. 2002) (citing In re SGL Carbon, 200 F.3d at 165; In re Phoenix Piccadilly, Ltd., 849 F.2d

1393, 1394-95 (11th Cir. 1988); In re SB Props., 185 B.R. 198, 205 (E.D. Pa. 1995)).  "[N]o single

factor is determinative of a lack of good faith in filing a petition."  In re Tiffany Square Assocs.,

Ltd., 104 B.R. 438, 441 (Bankr. M.D. Fla. 1989).   In evaluating whether the Texas Two-Step and

the subsequent bankruptcy filing were undertaken in good faith, this Court should apply equitable

principles, considering the fiduciary obligations of J&J.  See Pepper v. Litton, 308 U.S. 295, 306-

07 (1939) ("The essence of the test [for good faith of an insider transaction] is whether or not under

all the circumstances the transaction carries the earmarks of an arm's length bargain.  If it does

not, equity will set it aside.").   Because each of the above factors exists and indisputably

demonstrates that the case was not filed in good faith, it should be dismissed.

> **A.    J&J Abused Texas Law When It Created
> LTL Two Days Prior To The Petition Date.**

32.    As described above and in the Kim Declaration (see ¶¶ 22-25), J&J used the Texas

divisive merger statute to bring the Debtor into existence via a series of transactions on October 11 and

October 12, 2021, mere days before the Petition Date.  That statute does not permit J&J to use it, as it

was used here, as a device to disadvantage creditors or to curtail rights bestowed by state or federal

law, including the Bankruptcy Code.  See Tex. Bus. Orgs. Code § 10.901 ("This code does not …

abridge any right or rights of any creditor under existing laws."); <u>see also</u> <u>In re Aldrich Pump LLC</u>,

2021 WL 3729335, at *27 & n.220 (Bankr. W.D.N.C. Aug. 23, 2021) ( "[W]hile the TBOC permits

a company to engage in a divisional merger, it does not permit that company to thereby prejudice

its creditors."); <u>DBMP LLC v. Those Parties Listed on Appendix A to Complaint and John and</u>

<u>Jane Does 1-1000 (In re DBMP LLC)</u>, Adv. No. 20-03004, 2021 WL 3552350, at *24 & n.160

(Bankr. W.D.N.C. Aug. 11, 2021) (citing § 10.901 and noting that "[b]ut, while the TBOC permits

a company to engage in a divisional merger, it does not permit that company to thereby prejudice

its creditors.").

33.     Indeed, prejudicing tort claimants *was the whole point* of the Texas Two-Step.  Prior

to the divisive merger, a claimant that secured a tort judgment against Old JJCI[12] could enforce that

judgment on assets held by Old JJCI.  Moreover, claims against J&J would be payable by J&J, which

has a market cap of approximately half a trillion dollars.  After the divisive merger, a claimant that

secures a judgment against LTL (which is controlled by J&J) must first request that it demand payment

from J&J or New JJCI.  If they refuse, that claimant must wait on LTL to litigate for that funding.  <u>See</u>

Funding Agreement § 2(a) ("The JJCI Value shall be calculated at, ***and only at***, any date on which (x)

the Payors refuse to make a requested Payment under this Agreement . . .") (emphasis added).  And,

under the Funding Agreement, claims against J&J are now capped at the value of New JJCI: J&J and

Old JJCI are obligated to fund only up to the value of New JJCI as of the date of the divisive merger.

<u>See</u> <u>id.</u> at § 1 (definition of "JJCI Value").  In other words, claimants are much worse off because they

---

[12]     As described herein, and in the Committee Initial Statement, tort victims also hold direct
claims against J&J.

must rely on LTL (again, controlled by J&J) to litigate the valuation of New JJCI, and must await the outcome of that litigation, in order to be assured of payment.

34.     The Texas statute does not truly let "GoodCo" (JJCI) off the hook for liabilities vested in "BadCo" (LTL): GoodCo, as surviving co-liable entity, remains secondarily liable.[13]  In order to attempt to ensure that tort claimants would have *no* recourse to JJCI assets, J&J added a transactional step: it "killed" Old JJCI by terminating its corporate existence, and incorporated a new entity that adopted the identical name, asset base, and profile as Old JJCI.  New JJCI is, in every respect, GoodCo's doppelganger, but purportedly without the secondary liability.  J&J's prepetition conduct does not accord with the intent of the Texas statute, and its failure to comply with the statute demonstrates a lack of good faith.[14]

### B.     The Debtor Filed Its Petition As A Litigation Tactic.

35.     Filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within "the legitimate scope of the bankruptcy laws."  Marsch, 36 F.3d at 828.  As this Court has previously explained, "[g]enerally, where . . . the filing for relief under the Bankruptcy Code is intended to frustrate the legitimate efforts of creditors to enforce their rights against the debtor, dismissal for 'cause' is warranted."  In re Ravick Corp., 106 B.R. 834, 844 (Bankr. D.N.J. 1989).

---

[13]     Tex. Bus. Org. Code § 10.008(a)(4) ("[E]ach surviving or new domestic organization to which a liability or obligation is allocated under the plan of merger is the **primary** obligor for the liability or obligation, and, except as otherwise provided by the plan of merger or by law or contract, no other party to the merger, **other than a surviving domestic entity or non-code organization liable or otherwise obligated at the time of the merger**, and no other new domestic entity or non-code organization created under the plan of merger is liable for the debt or other obligation . . .") (emphasis added).

[14]     J&J's bad faith can be imputed to the Debtor because the Debtor has "acquiesced" to J&J's strategy.  In re Quigley Co., Inc., 437 B.R. 102, 127 n.32 (Bankr. S.D.N.Y. 2010).

Courts typically dismiss Chapter 11 petitions where such abuse of the bankruptcy system is evident. See Argus Grp. 1700, Inc. v. Steinman (In re Argus Grp. 1700, Inc.), 206 B.R. 757, 765-66 (E.D. Pa. 1997); Furness v. Lilienfield, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.").

36.    In re SGL Carbon Corp. is a case in point.  There, the debtor was sued by steel producers for price fixing in a class action and in separate antitrust lawsuits.  200 F.3d at 156-57. Shortly thereafter, the debtor filed a bankruptcy petition and a proposed plan, which provided that all creditors would be paid in full except the antitrust claimants, and which barred any claimant from bringing action against non-debtor affiliates arising out of or in any way connected with the antitrust claims against the debtor.  Id. at 157.  The debtor explained that it filed "to protect itself against excessive demands made by plaintiffs in civil antitrust litigation and in order to achieve an expeditious resolution of the claims against it."  Id.  The antitrust plaintiffs moved to dismiss the bankruptcy case as having been filed in bad faith, and the Delaware district court denied the motion.  The Third Circuit reversed, remanding the case for dismissal as having been filed in bad faith and noting that the debtor's officers had acknowledged that the filing was due to "the excessive demands [of litigants]" and the difficulties in reaching settlements of the antitrust

litigation, and that there was no evidence of the debtor's need to reorganize or rehabilitate its business. Id. at 167.[15]

37.    Here, as in In re SGL Corp., the Debtor admits that it "commenced this Chapter 11 case to equitably and permanently resolve all current and future talc-related claims against it . . . ." Complaint at ¶ 1. See also *Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions* [Adv. D.I. 3] (the "Supplemental Kim Declaration") at ¶ 18 (goal of "reorganizing" is to address talc claims against "Protected Parties" (as listed on Appendix B of the Complaint, including Old JJCI, non-debtor affiliates, indemnified parties, insurers, and retailers)).

38.    The scheme to create LTL and have it file for bankruptcy to insulate J&J from talc liability is a dramatic reversal of course for J&J. Prior to the Supreme Court's denial of *certiorari* with respect to the Ingham verdict, J&J assured the Imerys court that "J&J, of course, has the financial wherewithal to defend these claims and satisfy any successful talc claim in full."[16]  Then, J&J demanded it be permitted to defend talc claims at trial because J&J "prefers to defend the safety of its

---

[15]    The Third Circuit rejected the debtor's argument, also made by LTL, that the antitrust litigation would be a "harmful distraction of its management." 200 F.3d at 167; see Supplemental Kim Decl. at ¶ 18. There was no evidence that the purported "distraction" related to the antitrust litigation harmed the company in any way, as the company was (and remained) financially healthy. Here, LTL conducts no business, and exists only as a vehicle to resolve talc claims. The resolution of talc claims is not a "distraction" to the Debtor's management—rather, it is the only reason the Debtor exists at all.

[16]    See In re Imerys Talc America, Inc. et al., Case No. 19-10289 (Bankr. D. Del. Mar. 20, 2020) (LSS), *Johnson & Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying the Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and Implement Talc Litigation Protocol* [Dkt. No. 1567], ¶¶ 4, 41, 45.

products (and the core causation issues) in open court."[17]  Now, after it has exhausted its appellate

remedies, the Debtor claims that "inconsistent and excessive awards"[18]in the MDL and by state

courts and juries could exhaust "the assets available to pay current and future claimants."  Debtor's

Information Brief at 2.  Now, the Debtor demands that the automatic stay apply not only to it, but

to all the allegedly "Protected Parties."  Complaint at ¶ 2.  In other words, the Debtor no longer

likes its chances with American juries, and instead asks this Court to sit in lieu of factfinders across

the country.  This is not an appropriate use of the Bankruptcy Code.

39.    Moreover, by staying all litigation against Old JJCI and J&J, the Debtor and J&J

are using this Court to divest plaintiffs of their Seventh Amendment right to a jury trial.  There is

at minimum a serious constitutional question whether, under the principles recognized by the

Supreme Court in Stern v. Marshall, 564 U.S. 462, 484 (2011); Granfinanciera, S.A. v. Nordberg,

492 U.S. 33, 58-59 (1989); and Northern Pipeline Construction Co. v. Marathon Pipeline Co., 458

U.S. 50, 52 (1982), an Article I judge may properly preside over litigation transferred to the

bankruptcy court by virtue of a chapter 11 filing that serves no reorganizational purpose.  The

Third Circuit has reserved the question whether such a bankruptcy filing may vitiate the Seventh

Amendment right to a jury trial.  See In re SGL Carbon Corp., 200 F.3d at 169 n.23 ("Because we

conclude SGL Carbon's petition should be dismissed, we need not address the creditors' argument

that the failure to dismiss would deprive it of its Seventh Amendment right to try its antitrust claims

---

[17]    See In re Imerys Talc America, Inc. et al., Case No. 19-10289 (Bankr. D. Del. May 19,
2020) (LSS), *Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry
of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [Dkt. No. 1769],
¶¶ 2-4.

[18]    The Debtor, however, admits that "[a]pproximately 35,000 of [38,000 ovarian cancer
claims] are pending in the MDL."  Debtor's Information Brief at 124.

20

before a jury."). The constitutional concerns are magnified by Congress' express exclusion of "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11" from "core" claims. See 28 U.S.C. § 157(b)(2)(B).

**C.     There Is No Valid Reorganizational Purpose For This Bankruptcy.**

**i.     LTL's Creation Had No Legitimate Business Purpose, And It Has No Business To Rehabilitate.**

40.    The purpose of bankruptcy is to give "to the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934); see Report of the Committee on the Judiciary, House of Representatives to Accompany H.R. 8200, H.R.Rep. No. 595 (1977), reprinted in 1978 U.S.C.C.A.N. 6179) ("The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders."). As the Fifth Circuit (affirmed by the Supreme Court) noted in Timbers of Inwood Forest, "when there is no reasonable likelihood that the statutory objective of reorganization can be realized . . . then the automatic stay and other statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries." United Savs. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.), 808 F.2d 363, 373 (5th Cir. 1987) (en banc), aff'd, 484 U.S. 365 (1988). A petition lacks good faith when it is filed without a "valid reorganizational purpose":

Chapter 11 vests petitioners with considerable powers - the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc. - that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code…***if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed***.

In re SGL Carbon Corp., 200 F.3d at 164-66 (emphasis added).

41.    This Chapter 11 case is not designed to serve any "valid reorganizational purpose." As set forth in the Kim Declaration, the Debtor is a special-purpose bankruptcy vehicle with no business to reorganize.  There are no jobs to save.  There are no leases or contracts to reject.  There is nothing to sell.  There is no "creditor's bargain"[19] to preserve: there is no debt to restructure, no liens being primed, no cash collateral required, and no post-petition financing being granted.  There is no rehabilitation to maximize value for creditors because there is no value to maximize. Furthermore, the divisive merger that created the Debtor had no legitimate business purpose, violated the creditor protection provisions of the Texas Business Organizations Code, and was intentionally done to, at a minimum, delay and hinder existing and future talc claimants.  In sum, apart from enforcing the stay against itself, New JJCI, and J&J, there is nothing for the Debtor, or for this Court, to *do* in this case.

---

[19]    See Thomas H. Jackson, Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain, 91 YALE L.J. 857, 859-60 (1982) (bankruptcy is "a system designed to mirror the agreement one would expect the creditors to form among themselves were they able to negotiate such an agreement from an ex ante position.").

ii.      **The Protection Of J&J and New JJCI**
         **Is Not A Valid Reorganizational Purpose For LTL.**

42.      As described above, LTL exists only as a litigation tool to wall off talc-related tort

liability from its non-debtor affiliates.  By engineering the Texas Two-Step and this bankruptcy

case, J&J attempts to obtain the benefit of the automatic stay of talc claims against it, and a

channeling injunction without having to subject itself to the scrutiny of the Chapter 11 process.

Indeed, when questioned about why J&J did not file its own petition, in light of the litigation against

it, Mr. Kim testified that "[w]e thought that this route was the preferable route" and that "we believe

that according to the [Texas divisive merger statute] Johnson & Johnson would certainly be entitled to

a stay, yes."  Nov. 4, 2021 Hr'g Tr. at 262:2-7; see also Transfer Order at 2 ("The Debtor maintains

this restructuring was undertaken to enable the Debtor to fully resolve talc-related claims through a

chapter 11 reorganization without subjecting the entire J&J enterprise to a bankruptcy proceeding.").

43.      When considering dismissal of a bankruptcy case, courts apply particular scrutiny

to "***asset-culled entities where 'debtors have elected not to submit the actual entities in interest***

***to the jurisdiction of the court, thereby isolating the entities in interest from the scrutiny and***

***control of the court during proceedings***.'" In re Eden Assocs., 13 B.R. 578, 584 (Bankr. S.D.N.Y.

1981) (quoting In re Dutch Flat Inv., 6 B.R. 470, 471 (Bankr. N.D. Cal. 1980)) (emphasis added).

In In re Quigley Co., 437 B.R. 102 (Bankr. S.D.N.Y 2010), the court found bad faith in such a

circumstance.  Quigley manufactured a product that contained asbestos.  It was subsequently

acquired by Pfizer, which started marketing Quigley's product.  As of Quigley's petition date,

hundreds of thousands of asbestos personal injury claims had been brought against Quigley and

Pfizer (both derivative claims on account of Quigley products, and direct claims). Id. at 112.  Pfizer

caused Quigley to file for Chapter 11 in order to secure for itself a section 524(g) injunction.  The

strategy didn't work: the ad hoc committee of tort claimants and the United States trustee objected

to confirmation and moved to dismiss the case.  The court denied confirmation, in large part,

because Pfizer did not act in good faith in proposing it:

> [T]his is a Quigley bankruptcy in name only.  Pfizer conceived and executed
> the global strategy, including the resuscitation of the moribund Quigley and
> the filing of the chapter 11 case . . . . Pfizer funded the chapter 11 . . . [and]
> is also providing the bulk of the plan funding.  The Fourth Plan . . . is
> designed to free the Pfizer Protected Parties from derivative liability, and
> only incidentally, to reorganize Quigley to the extent necessary to confirm
> the Plan.  Pfizer, the parent of Quigley, the architect of the global strategy,
> the only source of chapter 11 and plan financing and the principal
> beneficiary of the channeling injunction, is the real proponent of this plan.

Id. at 126-27.  Moreover, because "Quigley acquiesced in if not actively embraced Pfizer's actions

in connection with the prosecution of its chapter 11 case, . . . Pfizer's bad faith may be attributed

to Quigley as well."  Id. at 127 n.32.

44.     As in Quigley, this is an LTL bankruptcy in name only.  The true beneficiary of the

case is J&J.  As described in detail in the Committee Initial Statement, J&J (like Pfizer) had direct

involvement in the sale, marketing, and safety of all talc-related products.  In addition, J&J was

directly involved in the production of talc, owned and operated (through a subsidiary) the mines

that were the primary source of talc for J&J products for decades, and maintained control of all

talc-related specifications.  Additionally, J&J made all health and safety policy decisions with

regard to asbestos and talc products.  See Oct. 22, 2021 Hr'g Tr. at 88:4-9 (Q: "So, Mr. Kim, you

assume that some decisions must be, must have been made elsewhere, but your corporate

representative says all health and safety policy decisions with regard to asbestos and talc products

were made by the parent company, Johnson & Johnson? Yes or no." A: "That's what he said,

yes.").  J&J is thus directly liable for talc-related personal injury claims.  Ingham, 68 S.W.3d at

724 (affirming jury verdict finding J&J individually liable, separate and apart from Old JJCI, for actual

and punitive damages on account of its "reprehensible conduct."). Like Pfizer, J&J assigned its

liabilities to LTL and then caused its bankruptcy to seize the injunctive benefits of Chapter 11 for itself

(which, the Debtor admits, are worth billions of dollars) without having to file its own petition. This

is not a valid reorganizational purpose.

45.    The Debtor disagrees, claiming that it intends to seek a channeling injunction "that

will permanently protect the Debtor, its affiliates and certain other parties from further talc-related

claims arising from products manufactured and/or sold by Old JJCI, or for which Old JJCI may

otherwise have had legal responsibility, pursuant to sections 105(a) and/or 524(g) of the

Bankruptcy Code." Kim Decl. at ¶ 59 (emphasis added).[20]  In its Informational Brief (filed prior

to the transfer of this Chapter 11 case to New Jersey), the Debtor cited to In re Bestwall, LLC, 605

B.R. 43, 49 (Bankr. W.D.N.C. 2019) for the proposition that a channeling injunction resolving "all

current and future cosmetic talc claims, while allowing New JJCI, J&J, and its affiliates to operate

their businesses and continue to develop, manufacture, and distribute lifesaving therapies and

devices . . . . is unquestionably a proper objective of a chapter 11 case." Debtor's Information

Brief at 6.

---

[20]    On its face, the Funding Agreement does not require a section 105(a) injunction or a section 524(g) channeling injunction. See Funding Agreement at §§ 1 (definition of "Permitted Funding Use"), 2 ("Funding Obligations and Procedures"). In reality, however, J&J has ensured that its obligations under the Funding Agreement will depend upon a channeling injunction and a trust. First, J&J controls the Debtor, and only the Debtor can propose a plan during the exclusivity period: presumably, any plan proposed by the Debtor would contain an injunction protecting J&J. Second, the Funding Agreement pays only to a plan trust, implying that broad plan injunctions will be conditions precedent to payment. This is a clear bait and switch by the Debtor and J&J solely to pass muster before the North Carolina Court, which is further evidence of bad faith.

46.    In <u>Bestwall</u> (where the debtor was represented by the same counsel that currently

represents LTL, New JJCI, and J&J), the debtor was created through a Texas Two-Step, which

vested the debtor with asbestos liability and certain assets, and the "NewCo" with all other assets

and certain non-asbestos liabilities.  605 B.R. at 47.  Pursuant to a funding agreement, the debtor

could draw from NewCo the amount necessary to fund a section 524(g) trust.  The official

committee of asbestos claimants moved to dismiss the case as having been filed in bad faith.  The

court applied the Fourth Circuit's standard for dismissal: there, a court may dismiss a petition as a

bad faith filing only when the reorganization is both (i) objectively futile and (ii) filed in subjective

bad faith.[21]  <u>Id.</u> at 48.  The court held that the debtor's chapter 11 petition was not "objectively

futile" because "Bestwall has the ability to reorganize and establish a trust that meets each of the

statutory requirements of section 524(g) of the Bankruptcy Code."  <u>Id.</u> at 49.

47.    Now that the Debtor's attempt to "manufactur[e] forum and creat[e] venue" has

failed (<u>see</u> Transfer Order at 10), however, the Debtor can no longer rely on the Fourth Circuit's

standard for dismissal, which is "one of the most stringent articulated by the federal courts." <u>Id.</u> at

48, quoting <u>In re Dunes Hotel Assocs.</u>, 188 B.R. 162, 168 (Bankr. D.S.C. 1995).  Notably, the

Fourth Circuit places the burden on the ***movant*** to demonstrate both objective futility and

subjective bad faith by a preponderance of the evidence.  605 B.R. at 48 (citing <u>In re SUD Props.</u>,

462 B.R. 547, 551 (Bankr. E.D.N.C. 2011)).

48.    In the Third Circuit, however, the burden is on the ***debtor*** to establish that the filing

was in good faith.  <u>In re Integrated Telecom Express, Inc.</u>, 384 F.3d at 118.  Per the Kim Declaration,

---

[21]    As the North Carolina Bankruptcy Court noted, "the Debtor's actions indicate a preference
to file bankruptcy in this district, likely due to the Fourth Circuit's two-prong dismissal
standard . . . ." Transfer Order at 10.

the Debtor filed this Chapter 11 case to take advantage of a particular provision in the Bankruptcy

Code, that is, the section 524(g) channeling injunction.  The desire to use a particular provision in the

Bankruptcy Code is insufficient *by itself* to establish good faith to survive dismissal, as the Third

Circuit has held:

> The Bankruptcy Court did not hold that Integrated's desire to take
> advantage of the § 502(b)(6) cap established ***good*** faith. Instead, the
> Bankruptcy Court held that "it does not establish ***bad*** faith for a debtor to
> file a chapter [11] case for the purpose of taking advantage of provisions
> which alter pre-petition rights, including altering the rights of a landlord
> under State law."  We agree. Indeed, we believe it to be a truism that it is
> not bad faith to seek to avail oneself of a particular protection in the
> Bankruptcy Code–Congress enacted such protections with the expectation
> that they would be used. In re James Wilson Assocs., 965 F.2d 160, 170
> (7th Cir.1992) ("It is not bad faith to seek to gain an advantage from
> declaring bankruptcy–why else would one declare it?") . . . ***The far more
> relevant question is whether a desire to take advantage of a particular
> provision in the Bankruptcy Code, standing alone, establishes good faith.
> We hold that it does not.***

Id. at 127 (emphasis added).

49.     In other words, the desire to use Section 524(g) is not by itself a "valid bankruptcy

purpose" sufficient to establish good faith.  LTL bears the burden of establishing good faith, and

gesturing toward a channeling injunction is not sufficient.

### D.     Debtor's And J&J's Actions And Admissions Demonstrate Subjective Bad Faith.

50.     "While the good faith inquiry is more an objective analysis of whether the debtor has

crossed the equitable limitations on bankruptcy filings, a debtor's subjective intent may also be relevant

in considering the totality of the circumstances." In re Rent-A-Wreck of America, Inc., 580 B.R. 364,

382 (Bankr. D. Del. 2018).  Although discovery is underway, the following actions and admissions

demonstrate subjective bad faith:

- J&J improperly used the Texas Business Organizations Code's divisive merger provisions to establish LTL for the purpose of hindering and delaying a single group of creditors for its own benefit.

- Just last year, J&J moved for relief from the automatic stay in the <u>Imerys</u> cases in order to continue litigating in the tort system, stating "J&J, of course, has the financial wherewithal to defend these claims and satisfy any successful talc claim in full." <u>See</u> <u>In re Imerys Talc America, Inc. et al.</u>, Case No. 19-10289 (Bankr. D. Del. Mar. 20, 2020) (LSS), *Johnson & Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying the Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and Implement Talc Litigation Protocol* [D.I. 1567], ¶¶ 4, 41, 45. Subsequently, J&J reiterated its demand to defend talc claims against Imerys at trial because J&J "prefers to defend the safety of its products (and the core causation issues) in open court." <u>See</u> <u>In re Imerys Talc America, Inc. et al.</u>, Case No. 19-10289 (Bankr. D. Del. May 19, 2020) (LSS), *Johnson & Johnson's Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* [D.I. 1769], ¶¶ 2-4. Now, after the Supreme Court refused to reconsider the <u>Ingham</u> verdict, the Debtor and J&J have changed their tune.

- J&J "killed" Old JJCI and "resurrected" an identical New JJCI to give the appearance that no surviving entity would remain to be secondarily liable on the liability assigned to LTL.

- The Debtor misrepresents that the Funding Agreement "ensure[s] that [LTL] has at least the same, if not greater, ability to fund talc-related claims and other liabilities as Old JJCI had before the restructuring." This is not accurate, as described above.

- The Debtor and J&J have repeatedly misrepresented the scope of the automatic stay, and the orders of the North Carolina Court in its securities filings and in the notices of automatic stay that the Debtor filed in courts around the country:

  o On October 19, 2021, before its first-day hearing and before the Debtor had applied for, let alone been granted, any injunctive relief, J&J filed a Form 8-K misrepresenting the automatic stay and preemptively announcing that "*all* pending cosmetic talc cases will be stayed" as a result of the Debtor's filing.[22]

  o As but one example of the Debtor's and J&J's misrepresentations, in Mississippi v. Johnson & Johnson[23], the Mississippi chancery court ordered briefing on the applicability of the Debtor's automatic stay to an action brought by the Mississippi Attorney General against J&J. The Debtors and J&J filed a *Supplement to Reply in Support of Defendant's Notice of Bankruptcy Filing*, in which they specifically represent that "the Bankruptcy court held the automatic stay applied to prohibit the commencement or continuation of any action seeking to hold LTL, Old JJCI, J&J and a number of other entities liable on account of the Enjoined Talc Claims." To the contrary, the North Carolina

---

[22] Nov. 4, 2021 Hr'g Tr. at 269:6-270:9; Johnson & Johnson Current Report on Form 8-K, filed on October 19, 2021.

[23] Case No. 25CH1:14-cv-01207 [Docket No. 393] (Miss. Ch. Nov. 26, 2021).

Court's *Order Granting the Debtor's Request for Preliminary Injunctive Relief* [Adv. D.I. 102] (at ¶ 7) expressly ruled that "governmental units . . . are not Defendants in this proceeding. The relief granted herein . . . shall not apply to restrict or enlarge the rights of the Debtor or any governmental unit under applicable bankruptcy law and all such rights are hereby preserved."

- The Debtor wrongfully contends that, as a result of the divisive merger, it alone bears the entirety of the liability for talc-related personal injury cases. *See, e.g.*, *Debtor's Motion for an Order (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing* [Adv. D.I. 2] at 13, 14 (describing the "Debtor Talc Claims" by stating: "Old JJCI is responsible for all claims alleging that Johnson's Baby Powder and other talc-containing products cause cancer or other disease" and that the "Debtor Talc Claims are asserted in virtually every case against both the Debtor and J&J . . . [and] seek to hold the Debtor and J&J jointly and severally liable for the Debtor Talc Claims."). In fact, and as described in the Committee Initial Statement, juries have repeatedly found that J&J has individual and direct tort liability, separate and apart from Old JJCI. *See, e.g.*, <u>Ingham</u>, 68 S.W.3d 663.

- After this Chapter 11 case was transferred to less favorable (for J&J) venue, J&J announced a new plan to spin off its Consumer Health Business, creating additional delays and hurdles for tort claimants. <u>See</u> Johnson & Johnson, Current Report on Form 8-K, filed on November 15, 2021. This spin-off throws into question which of New

30

JJCI and J&J should be the primary obligor under the Funding Agreement, creating a new delay and hindrance to payments under the Funding Agreement.

**E.    Equitable Principles Weigh In Favor Of Dismissal.**

51.    In determining that this Chapter 11 case was not filed in good faith, this Court may also apply "the principles and rules of equity jurisprudence." See Pepper v. Litton, 308 U.S. at 304. A controlling stockholder, such as J&J, is a fiduciary:

> Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.

Id. at 306-07 (citations omitted). In Pepper, the debtor's insider used technically legal maneuvers (including filing its own claim) to thwart the claim of a judgment creditor. The district court, exercising its equitable powers as a court of bankruptcy, disallowed the insider's claim on equitable grounds. The Supreme Court upheld that judgment, finding that "where on the facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder", id. at 309, disallowance of a claim on equitable grounds is appropriate.

52.    LTL is the "corporate pocket" into which J&J has purported to deposit all of its and Old JJCI's talc liability by means of the Texas Two-Step. J&J's corporate machinations involved no arm's-length negotiations or bargains, no independent directors or managers, and were done without consulting the talc claimants who are the only creditors being affected by these transactions. Thus, when evaluating with "rigorous scrutiny" the facts and circumstances

surrounding the Texas Two-Step and LTL's bankruptcy filing, the Court should apply equitable principles and conclude that this Chapter 11 case was not filed in good faith.

## II.  **Dismissal Is In The Best Interests of Creditors.**

53.    Once cause is established, "a bankruptcy court *shall* convert a case to Chapter 7 or dismiss the case 'unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of the creditors and the estate.'" In re Dr. R.C. Samanta Roy Inst. of Sci. Tech. Inc., 465 F. App'x 93, 96-97 (3d Cir. 2011) (quoting 11 U.S.C. § 1112(b)(1)).  Here, dismissal, rather than the appointment of a trustee or examiner, is in the best interest of the Debtor's creditors, some of whom are literally dying as they wait to have their day in court.    The vast majority of claims against the Debtor, New JJCI, and J&J are being administered through the MDL, and Chief District Court Judge Freda L. Wolfson has overseen that proceeding for more than five years.  Dismissal would ensure not only that creditors be able to see that proceeding (and other proceedings) through, but also that any tort claimant who secures a judgment against J&J or New JJCI can enforce that judgment on assets held by those companies without being subject to the roadblocks and limitations of the Funding Agreement.

54.    Because LTL is merely a special purpose vehicle created days before the Chapter 11 case was filed, for the purpose of sheltering its non-debtor affiliates, there is no benefit to be obtained by the appointment of an examiner or a trustee that could not also be served by dismissing the case.  Given the short period of time in which LTL has existed, there is unlikely to be any role for an examiner.  A trustee in this case would pursue estate claims against J&J and JJCI for the benefit of LTL's creditors, but LTL's creditors could pursue such claims on their own behalf if the case were dismissed.

## <u>CONCLUSION</u>

Based on the foregoing, the Committee respectfully requests that the Court dismiss the

Debtor's Chapter 11 case with prejudice, and grant such other and further relief as appropriate.


Respectfully submitted,

**GENOVA BURNS, LLC**


*/s/ Daniel M. Stolz*

By: _____

Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee*
*of Tort Claimants of LTL Management, LLC*