UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
Karen B. Dine
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
        kdine@pszjlaw.com
        crobinson@pszjlaw.com
        pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No. 21-30589 (MBK) |
| Debtor. [1] | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS BANKRUPTCY CASE**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

DOCS_DE:237226.9 05471/002

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION, VENUE, AND STATUTORY PREDICATES ............................................... 9

FACTUAL BACKGROUND .................................................................................................. 10

      A.     Formation of the Debtor as Part of a Separation of Old JJCI's Talc
           Liabilities from its Substantial Business Assets Immediately Prior to the
           Debtor's Chapter 11 Filing ................................................................................ 10

      B.     A Primary Purpose of this Chapter 11 Case is to Move the Resolution of
           Talc Claims Against the Debtor and J&J from the Tort System and the
           Jury Trial System to the Bankruptcy Court and the Bankruptcy System to
           Obtain a Perceived Litigation Advantage ........................................................... 14

      C.     The Other Primary Goal of the Debtor's Chapter 11 Filing is to Protect
           J&J ..................................................................................................................... 16

BASIS FOR RELIEF REQUESTED ....................................................................................... 19

      A.     Statutory Framework for Dismissal. ................................................................... 19

      B.     The Debtor's Case Lacks a Valid Bankruptcy Purpose ...................................... 21

           1.     The Debtor Is Not in Financial Distress .................................................. 21

           2.     The Debtor's Bankruptcy Filing is Simply a Litigation Tactic .............. 22

           3.     The Debtor's Bankruptcy Case is Being Managed for the Benefit
                of Its Non-Debtor Parent, J&J ................................................................. 24

      C.     The Debtor's Bankruptcy Case Is The Culmination of a Transaction
           Effected with Actual Intent to Hinder and Delay Creditors ............................... 25

NO PRIOR REQUEST ........................................................................................................... 32

NOTICE .................................................................................................................................. 32

CONCLUSION ....................................................................................................................... 33

# CASES

Page

*15375 Memorial Corp. v. BEPCO, Op (In re 15375 Mem'l Corp.)*
589 F.3d 605 (3d Cir. 2009)..................................................................... 9, 19, 20, 23, 24, 26, 30

*Bank of Am. Nat'l Trust & Sav. Assn. v. 203 N. LaSalle St. P'Ship*
526 U.S. 434 (1999)........................................................................................................ 20

*Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*
235 F.3d 375 (8th Cir. 2000) ......................................................................................... 20

*DBMP LLC v. Those Parties Listed on Appendix A to Complaint
(In re DBMP LLC)*
2021 Bankr. LEXIS 2194* at *32 (Bankr. W.D.N.C. 2021)................................... 5, 26

*In re Combustion Eng.'g, Inc.*
391 F.3d 190 (3d Cir. 2004)........................................................................................... 12

*In re Flintkote Co.*
486 B.R. 99 (Bankr. D. Del. 2012) ............................................................................... 12

*In re G-I Holdings, Inc.*
323 B.R. 583 (Bankr. D.N.J. 2005) ................................................................................ 2

*In re JER/Jameson Mezz Borrowers II, LLC*
461 B.R. 293 (Bankr. D. Del. 2011) ............................................................................. 21

*In re Little Creek Dev. Co. v. Commonwealth Mortgage Corp.
(In re Little Creek Dev. Co.)*
779 F.2d 1068 (5th Cir. 1986)....................................................................................... 19

*In re Mirant Corp.*
2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005)................................................... 20

*In re Rent-A-Wreck of Am., Inc.*
580 B.R. 364 (Bankr. D. Del 2018) ..................................................................... 9, 21, 30

*Marsch v. Marsch (In re Marsch)*
36 F.3d 825 (9th Cir. 1994) ........................................................................................... 20

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated
Telecom Express, Inc.)*
384 F.3d 108 (3d Cir. 2004).......................................................... 9, 19, 20, 21, 22, 23, 24, 30

*Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*
200 F.3d 154 (3d Cir. 1999)............................................................... 9, 19, 21, 22, 23, 26

*Owens Corning v. Credit Suisse First Boston*
22 B.R. 719 (D. Del. 2005).............................................................................................. 2

*Shapiro v. Wilgus*
287 U.S. 348 (1932).............................................................................. 5, 9, 28, 29, 30

ii

## STATUTES

11 U.S.C. § 345(b) ............................................................................................................. 16

11 U.S.C. § 502(c) .............................................................................................................. 2

11 U.S.C. § 524(g) .............................................................................................................. 23

11 U.S.C. § 524(g)(2)(B)(i)(iii) .......................................................................................... 12

11 U.S.C. § 524(g)(2)(B)(III) ............................................................................................. 27

11 U.S.C. § 1112(b) ................................................................................................ 1, 9, 19, 33

11 U.S.C. § 1112(b)(1) ....................................................................................................... 19

11 U.S.C. § 1112(b)(4) ....................................................................................................... 19

11 U.S.C. § 1112(B)(4)(A)-(P) ........................................................................................... 19

28 U.S.C. § 157(b)(2) ......................................................................................................... 9

28 U.S.C. § 1334 ................................................................................................................ 9

## OTHER AUTHORITIES

Securities Exchange Act of 1934, Section 13 ..................................................................... 31

Securities Exchange Act of 1934, Section 15(d) ................................................................ 31

## RULES

Fed. R. Bankr. P. 1017 ..................................................................................................... 1, 9

DOCS_DE:237226.9 05471/002

The law firm of Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of over 7,000 talc

personal injury claimants who are represented by Arnold & Itkin (the "Movants"), through their

undersigned counsel, hereby submits this memorandum of law in support of their motion (the

"Motion") for an order pursuant to section 1112(b) of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 1017 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") to dismiss the Debtor's bankruptcy case.  In support of the Motion, the

Movants respectfully represent as follows:[2]

## PRELIMINARY STATEMENT

1.      This case is a litigation ploy masquerading as a legitimate chapter 11 case.  The

Debtor was created **two days** before it filed this chapter 11 case (*see* Declaration of John K. Kim in

Support of First Day Pleadings [Docket No. 5] (the "Kim Declaration or "Kim Dec.")[3] at ¶ 16), to

serve as a special purpose litigation vehicle to manage and defend thousands of talc-related

personal injury suits that cancer victims had filed against the Debtor's predecessor entity, Johnson

& Johnson Consumer Inc. ("Old JJCI").[4] The Debtor was formed for the specific purpose of filing

this chapter 11 case to (i) transfer the resolution of its newly-acquired talc liabilities from the

courts in which Old JJCI had been sued, and out of the tort system (and the jury trial system), into

the bankruptcy court and the Bankruptcy Code's claims resolution process[5] (*i.e.,* aggregate claims

---

[2]      In support of the Motion, Movants also submit the Declaration of Laura Davis Jones (the "Jones Dec.").

[3]      Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Kim Declaration.

[4]      The Kim Declaration states that, "The Debtor was formed to manage and defend thousands of talc related claims and to oversee the operations of its subsidiary, Royalty A&M.  Royalty A&M owns a portfolio of royalty revenue streams . . . ."  Kim Dec. at ¶ 18.  As set forth later in this Motion, however, it is clear that the Debtor's primary function is to serve as a vehicle for invoking chapter 11 to resolve the liabilities of its predecessor, and not to manage what is basically the passive receipt of a royalty stream.

[5]      *See, e.g.,* Kim Dec. at ¶ 21 (restructuring pursuant to which Debtor was formed was effected "to enable the Debtor to globally resolve talc-related claims through a chapter 11 reorganization"); *Informational Brief of LTL Management LLC* [Docket No. 3] (the "LTL Informational Brief"), at 131 ("[T]he Debtor intends to promptly ask this court to begin the process to help determine for plan purposes any talc liability of the Debtor.").

DOCS_DE:237226.9 05471/002

estimation under 11 U.S.C. § 502(c)[6]);  and (ii) stop thousands of talc-related personal injury suits

that cancer victims have filed against the Debtor's non-debtor, controlling parent—Johnson &

Johnson ("J&J"), a corporate giant with a market capitalization **of over $400 billion**.

2.      This is, however, a litigation strategy—not a proper chapter 11 case that serves any

valid bankruptcy purpose.  The newly-created Debtor is simply a litigation vehicle that does not

claim to be in financial distress (and, indeed, has stated in writing that "following the Divisional

Merger" (*i.e.,* just two days before its chapter 11 filing), the Debtor "had financial capacity

sufficient to satisfy its obligations as they become due in the ordinary course of business, including

any Talc Related Liabilities."[7]).  The Debtor's "business" consists of defending claims against

itself and protecting J&J and other non-debtors from talc-related personal injury suits.

3.      As a preliminary matter, however, the Debtor's creation and near-concurrent

chapter 11 filing raise an obvious question:  If Old JJCI was in financial distress and in need of

financial rehabilitation because of the talc-related litigation against it (which is not even alleged to

have been the case, and was not the case), why did Old JJCI itself not just file a chapter 11 case,

instead of transferring its talc liabilities to the Debtor so that the Debtor could do so? The answer is

clear and simply compounds the absence of good faith in the Debtor's chapter 11 filing.

4.      The Debtor is the product of a so-called "divisional merger" of Old JJCI that was

intended to hinder and delay Old JJCI's talc creditors, by divorcing Old JJCI's substantial business

assets and operations from its substantial talc liabilities.  The design of this bifurcation was (i) to

enable the Debtor to subject those creditors and their claims to a bankruptcy proceeding (and the

implementation of J&J's talc litigation strategy through such a proceeding), while at the same time

---

[6]     *See generally, Owens Corning v. Credit Suisse First Boston,* 322 B.R. 719 (D. Del. 2005); *In re G-I Holdings, Inc.,* 323 B.R. 583 (Bankr. D.N.J. 2005).
[7]     Amended and Restated Funding Agreement (Kim Dec. Annex 2) at ¶ E.

2

(ii) isolating Old JJCI's substantial business assets (a multi-billion dollar global consumer health business) in a ***different*** newly-formed entity, and thereby blocking talc creditors from obtaining access to those assets to satisfy their claims in the planned bankruptcy proceeding (and outside of it), and shielding those assets from the concomitant restrictions and limitations of the Bankruptcy Code that are designed to protect creditors like Old JJCI's talc creditors and from the purview of the Bankruptcy Court and such creditors.  As the Debtor's Chief Legal Officer phrased it euphemistically, "Old JJCI implemented the 2021 Corporate Restructuring to enable the Debtor to globally resolve talc-related claims through a chapter 11 reorganization ***without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding***."  Kim Dec. at ¶ 21.  This is "debtor-speak" for asset-stripping.

5.      Old JJCI abused a quirk of Texas law to thwart Old JJCI's creditors in this fashion. As provided above, the Debtor was created as part of an eve-of-bankruptcy mitosis of Old JJCI permitted under Texas law, which resulted in Old JJCI ceasing to exist, and two new entities being created: (a) the Debtor; and (b) an entity that became known as Johnson & Johnson Consumer Inc. ("New JJCI").  Through this divisional merger, the assets and liabilities of Old JJCI were divided such that, "the Debtor received certain limited assets from Old JJCI, together with all of Old JJCI's liabilities arising from talc-related claims."[8]  All of Old JJCI's other assets—consisting primarily of its global consumer health business—and its non-talc related liabilities were transferred to New JJCI.  Thus, while New JJCI became the asset-rich "GoodCo," [9] the Debtor became the "BadCo"

---

[8]    *Order Transferring Case* to *the District of New Jersey* [Docket No. 416] (the "Transfer Order"), at 2.

[9]    Indeed, J&J is already planning to "unlock" the value of New JJCI now that is allegedly free of the talc liability as part of the separation of J&J's consumer health business to create a new public company.  *See Johnson & Johnson Announces Plans to Accelerate Innovation, Serve Patients and Consumers and Unlock Value Through Intent to Separate Consumer Health Business,* J&J press release dated November 12, 2021 (the "J&J Announcement"), a copy of which is attached as **Exhibit A** to the Jones Dec.

3

into which all of Old JJCI's talc-related liabilities were dumped in anticipation of BadCo's imminent chapter 11 filing.

6.    In order to make this construct look less like asset-stripping,  the architects of the divisional merger arranged for the Debtor to receive, as its primary "asset," the "Payee's" rights under a Funding Agreement under which J&J and New JJCI are the "Payors," which (subject to certain conditions and limitations) ostensibly obligates New JJCI and J&J to fund the expenses incurred by the Debtor in "managing" its talc-related litigation and satisfying the Debtor's talc-related liabilities.  *See* Kim Dec. at ¶ 27.

7.    In this fashion, J&J and Old JJCI purported to convert Old JJCI's talc creditors involuntarily from creditors of a debtor that owned a robust, multi-billion dollar global consumer health business (Old JJCI), to creditors of a new debtor (the Debtor) whose primary asset consists of limited payment obligations of J&J and New JJCI under the Funding Agreement that, ostensibly, only the Debtor can enforce.  With that done, the Debtor was on its way to the Bankruptcy Court.  The Debtor attempts to "spin" this as a good trade for talc creditors (*see* Kim Dec. at ¶ 21), but this attempt is disingenuous, as the trade is only a good trade for J&J and New JJCI.

8.    The Funding Agreement is not an arm's length transaction—one of the Payors (J&J) controls both the Payee (the Debtor) and the.other Payor (New JJCI); the Funding Agreement was crafted and originally entered  into before the Debtor even came into existence (Kim Dec. at ¶ 23) and, apparently, was "negotiated" by Mr. Kim, who worked for J&J at the time (*Id.* at ¶ 21), and the Jones Day law firm, which apparently represented J&J and Old JJCI in connection with the corporate "restructuring" that eventually produced the Debtor while the Funding Agreement was crafted, and then migrated to become the Debtor's counsel after the

4

Debtor was created and the "Payee's" rights under the pre-baked Funding Agreement were assigned to the Debtor.[10] No one seems to have been acting independently on behalf of the Debtor; no one was looking out for the interests of Old JJCI's talc creditors—and it shows.

9.    The funding commitment under the Funding Agreement is made to the Debtor, not to the talc claimants.  The Payors' funding obligations purport to be enforceable only by the Debtor (*see* Kim Dec. Annex 2 at ¶ 15), which is controlled by J&J—one of the "Payors" under the Funding Agreement.  One wonders how the Debtor could ever enforce the Funding Agreement unless J&J wanted the Funding Agreement enforced.  *See DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, 2021 Bankr. LEXIS 2194 at *32 (Bankr. W.D.N.C. 2021).

10.    Additionally, the Payors' funding obligations are limited to the amount of the "JJCI Value" (Kim Dec. Annex 2 at § 2(a))—an imprecise and uncertain metric whose more than one half page, single-spaced definition  (*see id.,* § 1, at 4-5 (definition of "JJCI Value"))  would likely spawn complex, protracted litigation if placed at issue.  Thus, in "exchange" for having access to the assets of a multi-billion dollar global consumer health business to satisfy their claims taken from them, Old JJCI's talc creditors were relegated to problematic access to the Debtor's right to sue J&J and New JJCI under the Funding Agreement.

11.    Under these circumstances, the transfer of Old JCCI's assets to move them away from the entity that was to house its talc-related liabilities, in contemplation of that entity's bankruptcy filing, was a transfer made with actual intent to hinder and delay Old JJCI's talc creditors.  *Cf. Shapiro v. Wilgus,* 287 U.S. 348 (1932) (where state law did not permit receivership for individual but did permit one for a corporation, transfer of assets by individual engaged in

---

[10]    *See Debtor's Ex Parte Application for an Order Authorizing it to Retain and Employ Jones Day as Counsel as of the Petition Da*te [Docket No. 404] at ¶ 21

5

business to a newly formed corporation for the purpose of instituting a receivership to protect assets from recalcitrant creditors was voidable as a transfer made with actual intent to hinder and delay creditors). The Debtor should not be permitted to play its role in this ill-conceived scheme by remaining in chapter 11.

12.      Even without this element of particularly egregious bad faith, this Debtor has no business being in chapter 11. The newly-formed Debtor does not claim to be in financial distress or in need of financial rehabilitation. Nor does it suggest that this chapter 11 filing was necessary to preserve its "going concern value;" indeed, it would be preposterous to speak of the "going concern value" of a Debtor whose "business" consists primarily of managing and defending the litigation of claims against itself (and trying to shield its non-debtor parent from talc-related litigation).[11] The Debtor filed this chapter 11 case simply to use the Bankruptcy Court as its mass torts tribunal of choice, and the Bankruptcy Code's claims resolution process as its claims resolution process of choice. Stripped of its window dressing, this chapter 11 case is simply a matter of forum shopping and claims-resolution-process shopping by the Debtor to implement J&J's litigation strategy.[12]

13.      The Debtor has clearly telegraphed the fact that a primary motivation for filing this chapter 11 case was to move the adjudication of the mass tort liability that it inherited away from the jury trial system in which that liability was being litigated. The Debtor's 129-page so-called

---

[11]      The Debtor touts the supposed benefits of this case by asserting that, "This chapter 11 case appropriately affords the parties an efficient and certain pathway to resolve all current and future cosmetic talc claims, while allowing New JJCI, J&J and its affiliates to operate their businesses and continue to develop, manufacture, and distribute lifesaving therapy and devices. *See LTL Informational Brief* at 6. **Conspicuously absent from this litany is any reference to "allowing" the Debtor to "operate its business."** As to the Debtor, this case is simply about "resolv[ing]" all current and future talc claims" in the forum and through the process of its choice, and not about operating any business.

[12]      The Debtor tipped its hand as to the litigation-driven motivation for this chapter 11 case when, as the centerpiece of its "first day" filings, it filed a 129-page pleading styled as an "Informational Brief" that focused largely on efforts to discredit the merits of the plaintiffs' claims against the Debtor, Old JJCI, J&J, and the jury trial system. *See LTL Informational Brief.*

6

"Informational Brief" is literally peppered with criticisms of the jury trial system. *See, e.g., LTL Informational Brief* at 2 (complaining about "incongruity" of jury verdicts); *id.* at 118 ("Finding a jury that has not been exposed to misinformation is simply impossible."). Whether or not one is an advocate of the jury trial system, however, chapter 11 was not intended either as a federal remedy for asserted deficiencies in the jury trial system, or as a means by which a mass tort defendant who is not in financial distress or in need of financial rehabilitation can "escape" the jury trial system.

14.    The Debtor's conduct to date also exposes that it filed this chapter 11 case as a litigation tactic to protect its controlling, non-debtor corporate parent, J&J, from talc-related personal injury litigation that cancer victims have filed against J&J.  As evidenced by a motion that was filed by the Debtor shortly after filing the chapter 11 case and a Complaint and Motion that the Debtor filed shortly thereafter, [13] the Debtor seeks to use chapter 11 to invoke the automatic stay and this Court's injunctive powers to bring to a halt talc-related litigation against J&J.  The Debtor also intends to seek confirmation of a plan that will "permanently protect" affiliates of the Debtor, presumably including J&J, "from further talc-related claims arising from products manufactured and/or sold by Old JJCI" (Kim Dec. at ¶ 59); but even if this effort fails and no plan is ever confirmed, the Debtor's strategy would make J&J the primary beneficiary of this chapter 11 case, because talc litigation against J&J would still be stayed for years while this case dragged on, potentially creating pressure on some plaintiffs (such as underinsured cancer victims with mounting medical costs) to settle cheaply with J&J.

---

[13]    On October 18, 2021, the Debtor filed *Debtor's Emergency Motion to Enforce the Automatic Stay Against Talc Claimants Who Seek to Pursue Their Claims Against the Debtor and Its Non-Debtor Affiliates* ([Docket No. 44] the "J&J Stay Motion").  Then, on October 21, 2021, following objections on behalf of talc plaintiffs and the hearing before the Bankruptcy Court on October 20, 2021, the Debtor initiated an adversary proceeding (Adv. No. 21-03032) (the "J&J Stay Adversary") by filing a complaint and filed a motion seeking a preliminary injunction to protect J&J (the "J&J Injunction") and other non-debtor third parties [Adv. Pro. Docket No. 2] (the "J&J Injunction Motion").

7

15.    The fact that the Debtor filed this chapter 11 case to protect J&J is hardly

surprising.  J&J apparently started planning this chapter 11 case with the advice of current counsel

to the then non-existent Debtor as early as six months before the Debtor even came into being.[14]

J&J planned this chapter 11 case and then created the Debtor as the instrument of its plan.[15]  It is

no exaggeration to characterize J&J as the puppet master (or, perhaps, the ventriloquist) of this

chapter 11 case. As if to underscore the point, ***the Debtor does not even have any employees of its

own***.  Johnson & Johnson Services, an affiliate of J&J, "seconds" the services of its employees to

the Debtor (including the Debtor's Chief Legal Officer) pursuant to a "secondment agreement"

with the Debtor.  Kim Dec. at ¶ 29.  Just prior to becoming the Debtor's Chief Legal Officer (and

the declarant in the Kim Declaration), John Kim, a 20-year veteran of J&J (Kim Dec. at  ¶ 2) was

J&J's Assistant General Counsel, Practice Group Lead for the Product Liability Litigation Group.

*Id.* ¶ at 21.  The fact that the "face" of this chapter 11 case served as J&J's "Group Lead for the

Product Liability Group" speaks volumes about the litigation-tactic underpinnings of this chapter

11 case.

16.    The circumstances of this case make clear that the Debtor's formation and near-

concurrent chapter 11 filing simply represent a litigation tactic orchestrated by, and for the benefit

of, J&J, to transfer the adjudication of talc-related claims against the Debtor to the Bankruptcy

Court and the bankruptcy claims-adjudication process and to protect J&J from talc litigation. This

chapter 11 case does not serve any valid bankruptcy purpose.  Accordingly, controlling Third

---

[14]    Jones Day provided legal services to J&J and Old JJCI in connection with advice regarding restructuring in
matters relating to talc liabilities; the corporate restructuring that led to the Debtor's formation; and other related
matters from March 30, 2021 until the Debtor's formation on October 12, 2021. *See Debtor's Ex Parte
Application for an Order Authorizing it to Retain and Employ Jones Day as Counsel as of the Petition Da*te
[Docket No. 404] (the "Jones Day Retention Application") at ¶ 21.

[15]    For example, no one can seriously think that the Debtor prepared the 129 page "Informational Biref" filed on the
first day of this case in the two days of the Debto'rs existence that preceded its chapter 11 filing.  This was
clearly a script written for the to-be-created Debtor by J&J.

Circuit authority requires the dismissal of this chapter 11 case on the basis that the Debtor did not

file its chapter 11 petition in good faith. *See 15375 Memorial Corp. v. BEPCO, Op (In re 15375

Mem'l Corp.),* 589 F.3d 605 (3d Cir. 2009*) ("15375 Mem'l Corp."); NMSBPCSLDHB, L.P. v.

Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.,* 384 F.3d 108 (3d Cir.

2004) *("Integrated Telecom Express"); Official Comm. of Unsecured Creditors v. Nucor Corp. (In

re SGL Carbon Corp.),* 200 F.3d 154 (3d Cir. 1999) *("SGL Carbon"); In re Rent-A-Wreck of Am.,

Inc.* 580 B.R. 364 (Bankr. D. Del 2018*).*

17.    The words of Justice Cardozo in *Shapiro* also resonate here:

> It is another thing for a debtor, cooperating with friendly creditors, ***to
> bring the corporation into being with the hindrance and delay of
> suitors the very aim of its existence. The power to intervene before
> the legal remedy is exhausted is misused when it is in aid of such a
> purpose.*** Only exemplary motives and scrupulous good faith will
> wake it into action.  The receivership decree assailed upon this
> record does not answer to that test…. Conduct and purpose have a
> quality imprinted on them by law.

*Shapiro,* 287 U.S. at 356-357 (emphasis added).

## <u>JURISDICTION, VENUE, AND STATUTORY PREDICATES</u>

18.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and

157(b)(2) and the Amended Standing Order of Reference from the United States District Court for

the District of New Jersey, dated September 18, 2012. Venue is proper before this Court pursuant

to 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court

may enter a final order consistent with Article III of the United States Constitution. The statutory

basis for the relief requested herein is section 1112(b) of the Bankruptcy Code and Bankruptcy

Rule 1017.

9

## FACTUAL BACKGROUND

**A.**      **Formation of the Debtor as Part of a Separation of Old JJCI's Talc Liabilities from its Substantial Business Assets Immediately Prior to the Debtor's Chapter 11 Filing**

19.      The Debtor was formed as part of an eve-of-bankruptcy "restructuring" of Old JJCI under Texas law known as a "divisional merger," under which Old JJCI ceased to exist and two new entities were created: the Debtor and New JJCI.  Prior to Old JJCI's dissolution and the Debtor's birth  two days before this chapter 11 filing (*see* Kim Dec. at  ¶ 22), Old JJCI housed a multi-billion dollar global consumer health business, but was subject to thousands of talc-related personal injury suits.  *See id.* at *¶¶* 19, 42.  Old JJCI, under the control of J&J, wanted to separate its talc-related liabilities from the assets and operations of its consumer health business and place them in different entities, so that the entity that received the liabilities (the Debtor) could file a chapter 11 case to move the resolution of those liabilities from the tort system to the bankruptcy system, while shielding the assets and operations of the consumer health business from the purview of the Bankruptcy Code, the bankruptcy court and creditors.  *See id.* at ¶ 21.

20.      As the first step in this corporate metamorphosis, Old JJCI merged into a Texas LLC, which was the surviving entity, so that Old JJCI could effect a divisional merger under Chapter 10, Subchapter A of the Texas Business Organizations Code ("TBOC").  *See* Kim Dec. at ¶¶ 22-23. The TBOC permits the division of a business entity into two new entities in what is commonly referred to as a "divisional merger." *See* TBOC § 10.003.  In a divisional merger, the subject entity can allocate its assets and liabilities between two successor entities and then dissolve.  *Id.*

10

21.    In the past few years, five companies facing substantial asbestos liabilities (all,

including the Debtor's predecessor, hiring the same law firm[16]) have seized upon this device to

split themselves into two entities—a "BadCo," which becomes responsible for all mass tort claims

against the predecessor and receives limited assets, and a "GoodCo," which receives the lion's

share of the predecessor's assets and its non-mass tort liabilities.  Thus, "BadCo" becomes the

dumpster for all of the predecessor's mass tort liability.  Through this construct, BadCo is used as

the vehicle to invoke chapter 11 to move the resolution of its predecessor's asbestos liabilities to

the bankruptcy court, while the predecessor's assets are isolated in GoodCo and thereby shielded

from the purview of the Bankruptcy Code, the Bankruptcy Court and creditors and the ability of

creditors to access those assets to satisfy their claims through a plan (among other means).   Here,

the Debtor is "BadCo;" New JJCI is "GoodCo;" and the Debtor has essentially acknowledged the

existence of that asset-shielding design here.  *See Kim Dec. at ¶ 21.*

22.    Through a convoluted and contrived series of steps centered around the divisional

merger (*see id.* ¶¶ 22-23), the assets and liabilities of Old JJCI were divided such that, at the

conclusion of the "restructuring," the Debtor became  responsible for the all of Old JJCI's

liabilities arising from talc-related claims, and received limited assets that included (i) a bank

account containing about $6 million in cash; (ii) rights as "Payee" under a Funding Agreement that

is now between the Debtor, on the one hand, and New JJCI and J&J, as "Payors," on the other,

which ostensibly requires New JJCI and J&J (subject to certain limitations and conditions) to pay

the expenses incurred by the Debtor in "managing" the talc-related litigation (including the

expenses of this chapter 11 case) and satisfying the Debtor's talc-related liabilities;

(iii) membership interests in Royalty A & M, a limited liability company formed just prior to the

---

[16]    *See Order Transferring Case to the District of New Jersey* [Docket No. 416] (the "<u>Transfer Order</u>") at 10.

11

Debtor (valued at approximately $367 million);[17] (iv) access to various insurance policies that potentially cover talc-related liabilities; and (v) contracts of Old JJCI related to its talc-related litigation. *See id.* ¶ 24.

23.     The much-touted Funding Agreement that the Debtor received was negotiated and agreed to among (i) J&J; (ii) a Texas LLC into which Old JJCI had been merged; and (iii) an entity that eventually became New JJCI, ***before*** the Debtor came into existence. *See* Kim Dec. at ¶ 23. The interests of the then non-existent Debtor were not separately or independently represented in the "negotiation" of the Funding Agreement.

24.     The Jones Day firm apparently represented both J&J (a Payor under the Funding Agreement) and Old JJCI (the original Payee) in connection with the divisional merger (and presumably, in preparing the Funding Agreement that was entered into in connection with that "restructuring"), and now represents the Debtor (having begun its representation of the Debtor and ended its representation of J&J and Old JJCI when the Debtor was formed[18]).  Old JJCI's rights under the pre-baked Funding Agreement were assigned to the Debtor after the Debtor was formed

---

[17]     *See* Kim Dec. at ¶ 22.  One might ask the purpose of providing the Debtor with Royalty A&M, when the Debtor had the Funding Agreement, and the value of $367 million ascribed to Royalty A&M's equity does not even begin to approach the talc-related liabilities with which the divisional merger saddled the Debtor.  The likely answer is that those who engineered the Debtor's birth hoped that giving the Debtor this "business" would enable it to satisfy the "going concern" requirement of Section 524(g)(2)(B)(i)(iii) of the Code, in order to confirm a plan under Section 524(g) that would include a channeling injunction to protect, among others, New JJCI and J&J.  *See generally In re Combustion Eng.'g, Inc.,* 391 F.3d 190, 248 (3d Cir. 2004); *In re Flintkote Co.,* 486 B.R. 99, 129-132 (Bankr. D. Del. 2012). Bankruptcy Judge Whitley's characterization of the Debtor's venue machinations as an attempt "to outsmart the purpose of the statute" (Transfer Order at 10) seems an equally apt characterization of this contrivance.

[18]     Jones Day, counsel to the Debtor discloses in its retention application its prior work for both Old JJCI and J&J:
     In addition, prior to the Petition Date, J&J paid Jones Day a total of $4,953,859.25 for actual fees and expenses for March 30, 2021 through August 31, 2021 and estimated fees and expenses for September 1, 2021 through October 11, 2021 (the "J&J Estimated Amount") relating to certain prepetition legal services provided to J&J and Old JJCI, in connection with (a) advice regarding restructuring matters related to talc liabilities; (b) the corporate restructuring completed on October 12, 2021; and (c) other related legal services. As described in the Gordon Declaration, as a result of this corporate restructuring, the Debtor was assigned Jones Day's engagement with Old JJCI.  Jones Day's representation of J&J in respect of restructuring matters was terminated as of October 12, 2021.
     Jones Day Retention Application at ¶ 21.

(Kim Dec. at ¶ 24(b)), and, although the Funding Agreement became an "Amended and Restated Funding Agreement," the Funding Agreement was simply "amended and restated to reflect the names of the parties to [that agreement] at the conclusion of the 2021 Corporate Restructuring." *Id* at ¶ 23.

25.    As explained elsewhere in this Memorandum, the enforcement of the Payee's rights under this Agreement is rendered problematic by the fact that the Debtor is purportedly the only entity entitled to enforce those rights, but is controlled by one of the Payors.  Moreover, the Payor's obligations are limited to the "JJCI Value"—a metric that would likely spawn complex and protracted litigation if placed in issue.  *See supra* ¶¶ 6-10.

26.    As part of the divisional merger of Old JJCI, New JJCI, which became the Debtor's immediate parent (Kim Dec. at ¶ 17), was allocated all other assets and liabilities of Old JJCI. New JJCI thereby succeeded to Old JJCI's consumer health business—a business that "manufactures and sells a broad range of products used in the baby care, beauty care, oral care, wound care, and women's health care fields, as well as over-the-counter pharmaceutical products." *Id.* ¶ 19. J&J's consumer health business generates approximately $15 billion in annual revenues;[19] and Movants understand that the bulk of the assets and operations of that business were formerly housed in Old JJCI and, through the divisional merger, are now housed in New JJCI. These are the assets and business of Old JJCI that J&J sought to keep away from the auspices of the bankruptcy court and talc creditors while the Debtor invoked chapter 11 to "resolve" the talc-related liabilities of Old JJCI and "protect" J&J, New JJCI and other non-debtors from talc-related claims.

---

[19]    *See Jones Dec.* **Exhibit A** (J&J Announcement).

13

27.     About one month after this chapter 11 case was filed, J&J announced plans to spin off the consumer health business that was previously housed in Old JJCI and, is now housed in New JJCI, to shareholders of J&J.[20]

28.     Following the divisional merger on October 12, the Debtor converted from a Texas limited liability company to a North Carolina limited liability company.  *See id.* ¶ 23.  Two days later, the Debtor filed this chapter 11 case in the Western District of North Carolina, predicating venue on its newly-minted status as a North Carolina limited liability company.  Less than two weeks after this case was filed, the Bankruptcy Court in North Carolina took the unusual step of issuing an order to show cause why venue of this chapter 11 case should not be transferred to another district.[21]   The Bankruptcy Court ultimately ordered that venue be transferred to this District, noting, among other things, that, "Here, the Debtor is trying to manufacture venue and is attempting to outsmart the purpose of the statute."[22]   This sort of conduct by the Debtor seems to be a recurring feature of this case—everything about this case seems contrived.

**B.     A Primary Purpose of this Chapter 11 Case is to Move the Resolution of Talc Claims Against the Debtor and J&J from the Tort System and the Jury Trial System to the Bankruptcy Court and the Bankruptcy System to Obtain a Perceived Litigation Advantage**

29.     As noted above, the Debtor was formed for the specific purpose of filing this chapter 11 case to transfer the resolution of its newly-acquired talc liabilities from the courts in which Old JJCI had been sued, and out of the tort system (and the jury trial system), into the bankruptcy court and the Bankruptcy Code's claims resolution process.   The Debtor has announced that it was formed "to enable the Debtor to globally resolve talc-related claims through

---

[20]     *See id.*
[21]     On October 26, 2021, the North Carolina Bankruptcy Court entered an *Order to Appear and Show Cause Why Venue Should not be Transferred to Another District* [Docket No. 208].
[22]     Transfer Order at 10.

14

a chapter 11 reorganization…."  Kim Dec. at ¶ 21.  The Debtor has gone on to declare that it

"intends to promptly ask this court to begin the process to help determine for plan purposes any

talc liability of the Debtor." LTL Informational Brief at 131.

30.    When the Debtor speaks of "resolv[ing]" or "determin[ing]" the Debtor's liability

for talc-related claims, it means estimating present and future talc claims in the aggregate under

section 502(c) of the Bankruptcy Code, and limiting its liability to that estimate, in lieu of

litigating those claims in the tort system. Consistent with that design, the Debtor (and J&J) clearly

are already preparing to use the bankruptcy process to implement this preferred litigation strategy.

Among its initial professional retentions in this case, the Debtor seeks to retain Bates White LLC

for the purposes of, among other things:

> (b) estimating the number and value of, and producing analysis with
> respect to, present and future talc personal injury claims against the
> Debtor; (c) assisting the Debtor in negotiations with various parties
> regarding the Debtor's talc liability, including by evaluating
> proposals or potential proposals and providing analysis, information
> and support in connection therewith….

*Application for Retention of Bates White, LLC*, Effective as of October 14 2021 [Docket

No.  547] the "Bates White Application") at ¶ 5.[23]

31.    The LTL Informational Brief, which is the centerpiece of the Debtor's "first day"

filings, underscores the point that for the Debtor, this chapter 11 filing is part of a litigation

strategy to move the adjudication of the talc claims against it and J&J from the tort system and the

jury trial system to an estimation proceeding under the Bankruptcy Code. The Informational Brief

is replete with criticisms of the jury trial system that has held Old JJCI and J&J accountable for the

harm caused by their talc products (*see* LTL Informational Brief, *passim*), and leaves no doubt

---

[23]    On the day of the Debtor's formation (October 12, 2021), the Debtor paid the Bates White firm a $250,000
retainer.  Bates White Application Exhibit B at ¶ 6.

about the Debtor's desire to move the resolution of the talc-related claims against the Debtor (and

J&J, through a channeling injunction to "protect" J&J) out of the jury trial system and into this

Court.

**C.      The Other Primary Goal of the Debtor's Chapter 11 Filing is to Protect J&J**

32.      The Debtor makes no secret of its ultimate goal: protecting J&J (and other

non-debtor affiliates, among others) from talc related suits:

> The Debtor's goal in this case is to negotiate, obtain approval of and
> ultimately consummate a plan of reorganization that would, among
> other things, (a) establish and fund a trust to resolve and pay current
> and future talc-related claims and (b) provide for the issuance of an
> injunction that will ***permanently protect*** the Debtor, ***its affiliates*** and
> certain other parties from further talc-related claims arising from
> products manufactured and/or sold by Old JJCI, or for which Old
> JJCI may otherwise have had legal responsibility….

Kim Dec. at ¶ 59.

33.      The Debtor was not, however, content to wait until confirmation of a plan to

"protect" J&J from talc-related claims. The centrality of the goal of protecting J&J through the

Debtor's bankruptcy case was immediately apparent from the inception of the Debtor's bankruptcy

case.

34.      While the focus of most first day motions in a chapter 11 case is to allow for the

continued, uninterrupted operation of a debtor's business, little such relief was sought or required

in this case,[24] since the Debtor is a litigation vehicle that does not operate any meaningful business.

---

[24]      The only "operations"-related motion filed for by the Debtor for a first day hearing was a motion to use its bank
account (holding $6 million as of the Petition Date).  *See Debtor's Motion for an Order: (I) Approving the
Continued Use of Its Bank Account and Business Forms; (II) Granting a Waiver of the Requirements of Section
345(b) of the Bankruptcy Code; and (III) Authorizing the Debtor's Bank to Charge Certain Fees and Other
Amounts* [Docket No. 11].  The other motions were related to case management, including a motion to retain a
noticing and balloting agent and motions with respect to noticing procedures.  *See Docket Nos. 6 (Debtor's
Application for an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as
Claims, Noticing and Ballot Agent),* 7 (*Debtor's Motion for an Order: (I) Authorizing It to File a List of the Top
Law Firms With Talc Cases Against the Debtor in Lieu of the List of 20 Largest Unsecured Creditors;
(II) Approving Certain Notice Procedures for Talc Claimants; and (III) Approving the Form and Manner of*

16

Instead, the Debtor kicked off this case by filing a 129-page, litigation-driven polemic that sought to discredit the merits of the plaintiffs' talc claims; their counsel; and the jury trial system that was styled as an "Informational Brief." Beyond this attempt to "poison the well" for purposes of the talc claims litigation that the Debtor hopes to move from the tort system to this Court, the focus of the Debtor's initial efforts in this case have been on trying to extend the automatic stay to J&J and other third parties to bring any talc-related litigation against them to a halt.

35.    The Debtor and J&J got the process of using this chapter 11 case to protect J&J rolling by representing to various courts that, notwithstanding that J&J itself did not file for bankruptcy, the automatic stay nonetheless applied to J&J and its affiliates, filing "notice[s] of suggestion of bankruptcy in thousands of pending talc lawsuits to inform the courts and the parties about the commencement of this case and the applicability of the automatic stay to their pending lawsuit." J&J Stay Motion at ¶ 25. These notices expressly stated that the stay applied as to J&J, as well as the Debtor. *Id.* Exhibit B (form of Notice of Bankruptcy Filing and Stay of Proceedings).

36.    Many of the talc plaintiffs in pending actions challenged these suggestions of bankruptcy and stay with respect to J&J, against whom most, if not all, assert direct claims. *See* J&J Stay Motion at 1-2. As a result, the Debtor rushed to Court and filed the J&J Stay Motion on an emergency basis on October 18, 2021 seeking an initial hearing on October 20, 2021.

37.    In the J&J Stay Motion, the Debtor argued that the automatic stay itself applied to J&J as the claims being asserted against J&J were in actuality claims against the Debtor. *Id.* at pp. 2-3, 13-16. This premise was hotly contested by the talc plaintiffs and other interested parties (the "Objecting Parties") who challenged whether the automatic stay applied to J&J and, in the

---

*Notice of Commencement of This Case*), and 10 (*Debtor's Motion for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures*).

alternative, whether the Debtor had met its burden to support the Bankruptcy Court issuing a
preliminary injunction protecting J&J.[25]

38.      Among other issues, the Objecting Parties argued that J&J has direct liability for
certain of the talc claims, thus challenging the central premise of the Debtor's argument for
extension of the stay or granting an injunction.  *See, e.g.*, MDL Plaintiffs' Objection at ¶¶ 13-21;
Aylstock Objection at ¶¶ 1, 9; Mesothelioma Plaintiffs' Objection at ¶¶ 34-71.

39.      Following a hearing, the North Carolina Bankruptcy Court granted the proposed
J&J Injunction (Order Granting Preliminary Injunction Motion [Adv. Pro. Docket No. 102] (the
"Preliminary Injunction Order") essentially to preserve the status quo for 60 days, as that
Bankruptcy Court had just ordered the transfer of  the Debtor's bankruptcy case to this District and
did not want to send the case to this District "on fire."  Hearing Transcript dated November 10,
2021 (the "11/10/21 Transcript")[26] at 143:12-18 ("But the point is that I think that, particularly
given that I am moving the case, the last thing I want to do is ***send it with it on fire*** to the, to the
recipient court. And so we need to, to slow down just for a little bit here and let a new judge take a
look at this situation….") (emphasis added).

40.      The North Carolina Bankruptcy Court expressly held that entry of the Preliminary
Injunction Order was without prejudice "to (i) any further finding by a subsequent court with
jurisdiction over this proceeding (the "Presiding Court") that there are direct claims against any of

---

[25]     *See, e.g., Memorandum of Law of Certain Mesothelioma Claimants as Creditors Opposition to  Debtor's Motion
for an Order (I) Declaring that the Automatic Stay Applies to Certain Actions Against Nondebtors or (II)
Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final
Hearing* [Adv. Pro. Docket No. 44] (the "Mesothelioma Claimants' Objection"); *Opposition of Aylstock, Witkin,
Kreis & Overholtz PLLC to Debtor's Request for Preliminary Injunctive Relief* [Adv. Pro. Docket No. 45] (the
"Aylstock Objection"); *The MDL Plaintiffs' Steering Committee's Memorandum of Law In Opposition to
Debtor's Motion for an Order (I) Declaring that the Automatic Stay Applies to Certain Actions Against
Nondebtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order
Pending a Final Hearing* [Adv. Pro. Docket No. 49] (the "MDL Plaintiffs' Objection").

[26]     Cited portions of the 11/10/21 Transcript are attached as **Exhibit B** to the Jones Dec.

18

the Protected Parties, other than the Debtor and Old JJCI, which should not be stayed or enjoined,

and (ii) the right of any party to challenge on any basis the corporate transactions that created the

Debtor."  Preliminary Injunction Order at ¶ E.

41.    The history of this case thus far makes it clear that a primary purpose, if not ***the***

primary purpose, of this chapter 11 case is to protect J&J and its non-debtor affiliates from talc

litigation.

## BASIS FOR RELIEF REQUESTED

### A.    Statutory Framework for Dismissal.

42.    "[O]n request of a party in interest, and after notice and a hearing, the court

*shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under  this

chapter, whichever is in the best interests of creditors and the estate, for cause." *See* 11

U.S.C. § 1112(b)(1) (emphasis added). Section 1112 includes a non-exhaustive list of what

constitutes "cause." *See* 11 U.S.C § 1112(B)(4)(A)-(P); *see also SGL Carbon Corp.*, 200 F.3d at

160. In addition to the list enumerated in Section 1112(b)(4), cause exists to dismiss a case

when the petition was not filed in good faith. *See 15375 Mem'l Corp.*, 589 F.3d at 618; *SGL*

*Carbon Corp.*, 200 F.3d at 160; *In re Little Creek Dev. Co. v. Commonwealth Mortgage Corp.*

*(In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir. 1986).

43.    It is well-settled in this circuit that:

> Chapter 11 bankruptcy petitions are subject to dismissal under 11
> U.S.C. § 1112(b) unless filed in good faith, and the burden is on the
> bankruptcy petitioner to establish that its petition has been filed in
> good faith.

*Integrated Telecom Express*, 384 F.3d at 118; *SGL Carbon Corp.*, 200 F.3d at 162 & n.10.

44.    The Third Circuit Court of Appeals has adopted the following framework for

evaluating the good faith of a chapter 11 petition:

19

> Our cases have accordingly focused on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage.

*Integrated Telecom Express,* 384 F.3d at 119-20.  Applying this framework here, and adding on top of that the design of the divisional merger that produced the Debtor to hinder and delay Old JJCI's talc personal injury creditors, the Debtor cannot meet its burden of showing that the petition herein was filed in good faith. Indeed, this case reeks of bad faith.

45.     The proper purpose for commencing a Chapter 11 case is "preserving going concerns and . . . maximizing property available to satisfy creditors." *See Integrated Telecom Express, Inc.*, 384 F.3d at 119 (citing *Bank of Am. Nat'l Trust & Sav. Assn. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999)). When the debtor lacks a "valid bankruptcy purpose" for its filing, a presumption arises that the case was not filed in good faith. *See 15375 Memorial Corp.*, 589 F.3d at 618 (a relevant question in determining questions of good faith is "whether the petition serves a valid bankruptcy purpose"); *Integrated Telecom Express, Inc.*, 384 F.3d at 118; *see also SGL Carbon Corp.,* 200 F.3d at 162 (holding that chapter 11 case filed by financially healthy company solely to gain a tactical advantage in litigation was in bad faith); *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F.3d 375 (8th Cir. 2000) (case dismissed because avoiding litigation was not a valid bankruptcy purpose); *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 829 (9th Cir. 1994) (case dismissed because filing bankruptcy to avoid posting an affordable appeal bond was bad faith); *In re Mirant Corp.*, 2005 WL 2148362 (Bankr. N.D. Tex. Jan. 26, 2005).

46.     In order to carry its burden of showing that the chapter 11 case maximizes the value of the entity, the Debtor must show that there is "some value that otherwise would be lost outside

20

of bankruptcy." *See Integrated Telecom*, 384 F.3d at 120; *Rent-A-*Wreck, 580 B.R. at 383; *In re JER/Jameson Mezz Borrowers II, LLC*, 461 B.R. 293, 303 (Bankr. D. Del. 2011). Put another way, to "maximize property of the estate" the bankruptcy must "create or preserve some value that would be lost-not merely distributed to a different stakeholder-outside of bankruptcy." *Integrated Telecom*, 384 F.3d at 129.

**B.      The Debtor's Case Lacks a Valid Bankruptcy Purpose**

**1.      The Debtor Is Not in Financial Distress**

47.      To begin with, this case lacks a "valid bankruptcy purpose," because there is no allegation that either the Debtor, or Old JJCI, is (or was) in any financial distress.  *See Integrated Telecom Express,* 384 F.3d at 121 ("As Integrated conceded at oral argument, good faith necessarily requires some degree of financial distress on the part of a debtor."); *SGL Carbon,* at 165-66 (noting that, "a Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose," and citing authority to the effect that "bankruptcy provisions are intended to benefit those in genuine financial distress" and that "the purpose of chapter 11 reorganization is to assist financially distressed business enterprises.").

48.      Although the Debtor goes to great lengths to lament the costs and burdens associated with the mass tort litigation against its predecessor, Old JJCI (*see* Kim Dec. at ¶¶ 38-45), there is no allegation that either the Debtor or Old JJCI, was (or is) in financial distress. There is no allegation, let alone evidence, that Old JJCI had difficulty meeting its debts as they came due; had any overdue debts; had defaulted (or was in danger of defaulting) on any debt; had any difficulty raising or borrowing money when necessary; or otherwise had impaired access to the capital markets; nor is there any such allegation or evidence with respect to the Debtor.  Compare *SGL Carbon* 200 F.3d at 166 ("[T]here is no evidence that SGL Carbon had difficulty meeting its

21

debts as they came due, had any overdue debts, or that it had defaulted on any debts. Nor is there

any evidence that SGL has any difficulty raising or borrowing money, or otherwise had impaired

access to the capital markets.").  To the contrary, the Funding Agreement (which is dated only two

days before the Petition Date) recites that, taking into account rights under the Funding

Agreement, "following the effectiveness of the Divisional Merger, Chenango One [which changed

its name to "LTL Management LLC' and is now the Debtor] had assets having a value at least

equal to its liabilities **and *had financial capacity sufficient to satisfy its obligations as they**

***become due in the ordinary course of business, including any Talc Related Liabilities***."  Kim

Dec., Annex 2 at ¶¶ E-F (emphasis added).  Speculation about the possible future impact of talc

litigation on the Debtor's financial viability (or that of Old JJCI) is insufficient to establish a "valid

bankruptcy purpose." *See SGL Carbon,* 200 F.3d at 163 ("Whether or not SGL Carbon faces a

potentially crippling antitrust judgment, it is incorrect to conclude that it had to file when it did. As

noted, SGL Carbon faces no immediate financial difficulty.").

49.    Similarly, there is no allegation—let alone evidence—that the Debtor's chapter 11

petition might reasonably have "maximized the value of the bankruptcy estate," *i.e.,* "that there is

some value that otherwise would be lost outside of bankruptcy."  *Integrated Telecom Express,* 384

F.3d at 120-121.  There is no reason to believe that the roughly $6 million in the Debtor's bank

account; its insurance policies (to the extent they cover its talc liabilities); the royalty stream of

Royalty A&M; or the Debtor's rights under the Funding Agreement would lose value if this case

was dismissed and the Debtor was no longer in chapter 11.

### 2.    The Debtor's Bankruptcy Filing is Simply a Litigation Tactic

50.    Thus, what this case really comes down to is the Debtor's use (or abuse) of chapter

11 as a litigation tactic, to move the resolution of the talc-related claims against it that it inherited

22

from Old JJCI out of the tort system and the jury trial system, and unto the bankruptcy system, and

to take advantage of provisions and procedures regarding the adjudication and other resolution of

claims that are unique to bankruptcy proceedings (such as the automatic stay; the ability to seek a

third party injunction to halt litigation against non-debtor affiliates and other non-debtor third

parties;  the estimation of mass tort claims on an aggregate basis without a jury; and the use of a

channeling injunction under section 524(g) of the Code to protect non-debtors from litigation).  It

is axiomatic, however, that the filing of a chapter 11 petition simply to obtain tactical litigation

advantages or orchestrate litigation is in bad faith and warrants dismissal.  *See 15375 Mem'l Corp.,*

589 F.3d at 618; *Integrated Telecom Express,* 384 F.3d at 119; *SGL Carbon,* 200 F.3d at 165.

51.     Moreover, a desire to take advantage of a particular provision (or provisions) of the

Bankruptcy Code, standing alone, does not establish good faith.  *See Integrated Telecom Express,*

384 F.3d at 128.  In fact, in *15375 Mem'l Corp.*, the Court expressly found that:

> The protection of the automatic stay, however, is not *per s*e valid
> justification for a Chapter 11 filing; rather it is a consequential
> benefit of an otherwise good faith filing.  As such, courts universally
> demand more of Chapter 11 petitions than a naked desire to stay
> pending litigation, and any perceived benefit of the automatic stay,
> without more, cannot convert a bad faith filing to a good faith one.
> More generally, ***the desire to take advantage of the protections of
> the Code, such as the automatic stay of litigation outside of
> bankruptcy cannot establish good faith as a matter of law given the
> truism that every bankruptcy petition seeks some advantage offered
> in the Code [and that] any other rule would eviscerate any
> limitation that the good faith requirement places on Chapter 11
> filings***.

*15375 Mem'l Corp.*, 589 F.3d at 620 (internal quotations and citations omitted, emphasis

added).

52.     Yet, that is pretty much all there is to this chapter 11 case—the Debtor's desire (and

that of its controlling parent, J&J) to take advantage of particular provisions of the Bankruptcy

Code such as those relating to the automatic stay, third party injunctions and claims resolution.
*See* Kim Dec. at ¶ 58.

53.    In arguing that certain provisions of the Bankruptcy Code might be beneficial to the
Debtor in attempting to resolve the mass tort liability that was dumped on it two days before its
chapter 11 filing, the Debtor is placing the proverbial cart before the proverbial horse: "Although
the Bankruptcy Code contains many provisions that have the effect of redistributing value from
one interest group to another, these redistributions are not the Code's *purpose*. Instead, the
purposes of the Code are to preserve going concerns and to maximize the value of the Debtor's
estate." *Integrated Telecom Express,* 384 F.2d. at 128.  The purpose of this case is neither to
preserve going concern value nor to maximize the value of the Debtor's estate, but rather to use the
bankruptcy court and selected provisions of the Bankruptcy Code to implement a litigation
strategy.

### 3.    The Debtor's Bankruptcy Case is Being Managed for the Benefit of Its Non-Debtor Parent, J&J

54.    In pursuing this chapter 11 case, the Debtor's representative—its Chief Legal
Officer, John Kim—is primarily concerned with protecting the interests of J&J and non-debtor
affiliates.  Indeed, Mr. Kim, a 20-year veteran of J&J (Kim Dec. at ¶ 2), is not even an employee
of the Debtor; he is employed by Johnson & Johnson Services, Inc., a non-debtor subsidiary of
J&J, and is "seconded" to the Debtor pursuant to a "secondment agreement."  Kim Dec. at
¶¶ 2, 29. Just prior to his role as Chief Legal Officer of the newborn Debtor, Mr. Kim was J&J's
Assistant General.  Counsel, Practice Group Lead for the Product Liability Litigation Group, (*id.*
¶ 2).  The fact that the Debtor's representative is primarily concerned with protecting JJ&J and
New JJCI, and not the Debtor, is still another factor that weighs in favor of dismissal.  *See 15375
Mem'l. Corp.*, 589 F.3d at 624.  (In reversing lower court's denial of dismissal of chapter 11 case

24

on bad faith grounds, Court of Appeals noted that, "[W]e turn to an issue that the Bankruptcy

Court failed to consider in its good faith analysis: *the Debtor's representative was primarily*

*concerned with protecting the GSF Entities, not the Debtors.* Faure, the principle decision-maker

guiding the Debtor's bankruptcy, was inextricably entangled in numerous aspects of the GSF

Entities' operations . . . Faure's mixed allegiances prevented him from adequately protecting the

Debtor's interests.") (emphasis in original).

## C.    The Debtor's Bankruptcy Case Is The Culmination of a Transaction Effected with Actual Intent to Hinder and Delay Creditors

55.    The circumstances described above are, of themselves, more than sufficient to

compel dismissal under the standards established by the Third Circuit cases cited above; but there

is more. The creation of the Debtor to file this case was an inextricable part of a transfer made

with actual intent to hinder and delay Old JJCI's talc creditors, by separating the talc-related

liabilities of Old JJCI from its primary assets and business operations, such  that its talc-related

liabilities could be made subject to resolution under chapter 11, without subjecting its assets and

operations to access by Old JJCI's talc creditors in such a case to satisfy their claims or the

concomitant  protections and rights which chapter 11 provides to creditors with respect to assets of

a chapter 11 estate. *See* Kim Dec. at ¶ 21. *See generally, e.g.,* 11 U.S.C. §§ 363 (requiring notice

and a hearing for any sale, use or lease of property of the estate out of the ordinary course of

business); 364 (requiring notice and a hearing prior to incurrence of debt out of the ordinary course

of business); 1123(a)(5)(once a debtor's plan exclusivity expires, creditors can file a plan that can

provide, among other provisions,  for the retention, transfer or sale of property of the estate; the

cancellation of existing securities of the debtor; or the issuance of new securities to creditors that

would give them an interest in the debtor and an indirect interest in its business and assets).

25

56.     More broadly, the design of the divisional merger and the asset transfer from Old

JJCI to New JJCI was to remove Old JJCI's business assets and operations from the reach of its

talc creditors. In essence, the divisional merger was crafted to convert Old JJCI's talc creditors

unilaterally from (i) creditors of a debtor that owned the bulk of a consumer health business that

J&J has touted as a "leading global consumer health company" with "a powerful portfolio of

iconic brands" that is expected to generate revenue of approximately $15 billion,[27] to (ii) creditors

of a debtor whose primary asset consists of payment obligations of J&J and New JJCI under the

Funding Agreement.  The Debtor's attempt to portray this as a good trade for talc creditors of Old

JJCI (*see* Kim Dec. at ¶ 21) paints a false picture. The Funding Agreement is a non-arms' length

agreement with respect to which the interests of the Debtor had no independent representation. J&J

basically negotiated this agreement with itself.

57.     To begin with, the payment obligations of the "Payors" under the Funding

Agreement run in favor of the Debtor, not in favor of the talc creditors and the Funding Agreement

purports to make the obligations of the Payor enforceable only by the Debtor.  *See* Kim Dec.

Annex 2 at § 15.  This ostensible limitation makes enforcement of those obligations problematic,

since the Debtor is controlled by one of the "Payors" under the Funding Agreement, J&J.  Indeed,

no one can seriously expect that the Debtor's Chief Legal Officer, a 20-year veteran of J&J, would

"bite the hand that feeds him" and place his career with J&J in jeopardy by causing the Debtor to

sue J&J (or New JJCI) to enforce the Debtor's rights under the Funding Agreement.  *Cf. 15375*

*Mem'l Corp.,* 589 F.3d at 611 ("Faure further testified that filing a lawsuit against [GSF] on behalf

of the Debtors to facilitate the return of upstreamed funds would jeopardize his job."); *DBMP LLC,*

2021 Bankr. LEXIS 2194, at \*32. ("Only DBMP can enforce the agreement. One wonders how

---

[27]     *See* Jones Dec. **Exhibit A** (J&J Announcement).

26

DBMP could ever do so unless New CertainTeed wanted the Funding Agreement enforced. Apart from being sister corporations, DBMP has no employees of its own…. its employees are borrowed from SGC, the parent company of both DBMP and New CertainTeed. Thus, the people who would have to enforce the agreement on behalf of DBMP against New CertainTeed are officers and employees of SGC, the corporate parent of both companies.").

58.    Moreover, the Payors' funding obligations under the Funding Agreement are limited to the amount of the "JJCI Value." *Id.* § 2(a).  This "Value" is unspecified, and the term "JJCI Value" is the subject of a dense definition that occupies more than half a page of single spaced type and leaves plenty of room for argument.  *See id.* § 1, at 4-5 (definition of "JJCI Value").  If this term is ever placed at issue by a refusal to fund, the resulting litigation is likely to be complex and protracted.  To compound the problem, fixing the "JJCI Value" would require a determination, among other things, of value as of the time of the divisional merger; but that determination would not be made until some future time in the context of a refusal to fund, which could occur years after the divisional merger.  Thus, the divisional merger substituted (i) access to a right, ostensibly exercisable only by a debtor controlled by J&J, to sue J&J and New JJCI to enforce their obligations under the Funding Agreement, for (ii) access to the assets of a multi-billion dollar global consumer health giant, as a source of recovery by holders of talc claims against Old JJCI. This is hardly an exchange that talc claimants could be expected to welcome.

59.    Finally, by moving Old JJCI's consumer health business away from talc creditors, those creditors were deprived of the ability—which they would have had absent the divisional merger had Old JJCI itself filed a chapter 11 petition—to seek confirmation of a chapter 11 plan that would provide for a plan trust established for the benefit of talc creditors to own a majority of the stock of this "global consumer health company."  *See generally* 11 U.S.C. § 524(g)(2)(B)(III).

27

Regardless of whether talc creditors, after consultation with financial advisors, would elect to pursue this course of action, the design of the divisional merger was to strip them of this option.

60.     Thus, the transfer of the assets and operations of Old JJCI to New JJCI as part of the divisional merger that produced the Debtor was a transfer made with actual intent to hinder and delay talc creditors of Old JJCI.  The Debtor should not be permitted to carry out its role in this ill-conceived scheme by remaining in chapter 11.

61.     The Supreme Court's decision in *Shapiro v. Wilgus,* 287 U. S. 348 (1932) is instructive.  There, an individual engaged in business was unable to pay his debts as they matured, but believed that he could fully pay them if his creditors cooperated.  Two creditors refused and threatened suit.  The debtor sought to hold those creditors "at bay" through a receivership, but State law did not permit the appointment of a receiver for a business conducted by an individual— as distinguished from one conducted by a corporation or partnership.  To overcome this obstacle, the debtor formed a new Delaware corporation to which he conveyed all of his property, receiving its stock and "a covenant by the grantee to assume the payments of the debts" in return.  Three days later, in conjunction with a cooperative creditor, a suit was brought against the newly-created corporation in federal district court for the appointment of receivers with an accompanying injunction.  Receivers were appointed, and the court enjoined attachments and executions unless permitted by the court.

62.     One of the recalcitrant creditors then filed a petition with the district court alleging that the conveyance from the individual debtor to his corporation and the ensuing receivership "were part of a single scheme to hinder and delay creditors in their lawful suits and remedies," and sought to levy upon the transferred assets in the receiver's possession and sell them to satisfy a

28

judgment obtained against the debtor.  The Supreme Court reversed the lower courts' denial of the

petition in language that resonates here:

> . . . .The sole purpose of the conveyance was to divest the debtor of
> his title and put it in such a form and place that levies would be
> averted. . . . A conveyance is illegal if made with an intent to defraud
> the creditors of the grantor, but equally it is illegal if made with an
> intent to hinder and delay them.  Many an embarrassed debtor holds
> the genuine belief that if suits can be staved off for a season, he will
> weather a financial storm, and pay his debts in full. . . . The belief,
> even though well founded, does not clothe him with a privilege to
> build up obstructions that will hold his creditors at bay.  This is true
> in Pennsylvania under the Uniform Fraudulent Conveyance
> Act, . . . .
>
> The conveyance to the corporation being voidable because
> fraudulent in law, the receivership must share its fate.  It was part
> and parcel of a scheme whereby the form of a judicial remedy was to
> supply a protective cover for a fraudulent design. . . . The design
> would have been ineffective if the debtor had been suffered to keep
> the business for himself. . . . ***It did not gain validity when he
> transferred the business to another with a capacity for obstruction
> believed to be greater than his own.  The end and aim of this
> receivership was not to administer the assets of a corporation
> legitimately conceived for a normal business purpose and
> functioning or designed to function according to normal business
> methods.  What was in view was very different.  A corporation
> created three days before the suit for the very purpose of being
> sued was to be interposed between its author and the creditors
> pursuing him, with a restraining order of the court to give check to
> the pursuers.***

*Id.* at 353-355.  To paraphrase the Supreme Court, the purpose of the transfer of

substantially all of Old JJCI's assets to New JJCI as part of the divisional merger was "to

divest the debtor [Old JJCI] of [its] title and put it in such a form and place that the [talc

lawsuits] would be averted."

63.     Indeed, the transfer of assets from Old JJCI to New JJCI as part of the divisional

merger here involved an even more pronounced design to hinder and delay creditors than the

transfer in *Shapiro*.  Unlike New JJCI, the entity to which the individual transferred his assets in

29

*Shapiro* also covenanted to assume the payment of the transferor's debts directly.  Moreover, the transfer of assets in *Shapiro* was ***to*** the entity that would become the subject of a receivership proceeding, which would place those assets in the hands of an independent third party receiver and subject them to judicial oversight and all of the creditor protections entailed in such a proceeding. Here, in contrast, the transfer of substantially all of Old JJCI's business assets and operations was purposefully ***away*** from the entity that would be tasked with filing the chapter 11 case (the Debtor), in order to keep those assets away from the auspices of the bankruptcy court and talc creditors and make them inaccessible to talc creditors. Allowing the Debtor to remain in chapter 11 to carry out its role in this scheme would represent an abuse of chapter 11.

*********************************

64.    In considering the Motion and the various legal arguments that will be made back and forth, it is easy to lose sight of the element of human tragedy that is a central feature of this case; but the fact is that the human dimension of this case distinguishes it from the cited Third Circuit cases (and the cited Third Circuit lower court case) that resulted in dismissal, and makes the case for dismissal here even more urgent and compelling than it was in those cases.  In the cited cases, the creditor or creditors aggrieved by the Debtor's abuse of chapter 11 were essentially commercial actors, *i.e.,* commercial antitrust plaintiffs (*SGL* Carbon); a commercial landlord (*Integrated Telecom Express);* a company engaged in oil and gas exploration (*15375 Mem'l Corp.)*; and a rental car company (*Rent –A-Wreck*).

65.    In contrast, the creditors aggrieved by this Debtor's abuse of chapter 11—and the targets of this chapter 11 case—are sick and, in some cases, dying victims of particularly lethal forms of cancer (ovarian cancer, mesothelioma, or both) whose efforts to obtain judicial redress for their injuries have been brought to a grinding halt by this chapter 11 case, not only as against the

30

Debtor and its predecessor, Old JJCI, but also as against the Debtor's $400 billion plus non-debtor corporate parent. This cannot possibly be a proper use of chapter 11 by a Debtor that is simply a single purpose litigation vehicle, without any pretense of being in financial distress or in need of financial rehabilitation, or having any sort of "going concern value."

66.    The Court should also consider the adverse systemic implications of allowing this chapter 11 case to stand. If dismissal is denied, this case will serve as a road map for other financially-robust corporate giants facing mass tort claims who believe they would fare better having those claims resolved by the Bankruptcy Court using the Bankruptcy Code's claims resolution process, in lieu of the tort system, to use the same ploy. Following the lead of this case, a corporation could restructure itself to dump its mass tort liabilities into its own "BadCo," and use a BadCo chapter 11 filing to employ the bankruptcy court as its mass tort claims resolution tribunal of choice. Indeed, J&J itself might be emboldened at some point to dump its liabilities arising from opioid-related claims[28] or from personal injury claims arising from myriad other products[29] into "BadCo II" and have BadCo II file a chapter 11 case in order to employ the bankruptcy court as a mass tort claims tribunal for the liabilities that BadCo II inherits. This simply is not the intended function of chapter 11. Chapter 11 was meant to operate as a process

---

[28]    *See* J&J Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the quarterly period ended October 3, 2021 (the "J&J 10Q") at 39-41. A copy of relevant portions of the J&J 10Q are attached as **Exhibit C** to the Jones Dec.

[29]    *See id.* at 29 (identifying numerous products for which J&J faces product liability exposure, including "the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System; the PINNACLE® Acetabular Cup System; pelvic meshes; RISPERDAL®; XARELTO®; body powders containing talc, primarily JOHNSONS® Baby Powder; INVOKANA®; and ETHICON PHYSIOMESH® Flexible Composite Mesh. As of October 3, 2021, in the United States there were approximately 300 plaintiffs with direct claims in pending lawsuits regarding injuries allegedly due to the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System; 5,400 with respect to the PINNACLE® Acetabular Cup System; 10,700 with respect to pelvic meshes; 9,000 with respect to RISPERDAL®; 6,600 with respect to XARELTO®; 38,200 with respect to body powders containing talc; 100 with respect to INVOKANA®; and 4,700 with respect to ETHICON PHYSIOMESH® Flexible Composite Mesh.").

.

for the rehabilitation of financially distressed entities—not as a weapon in every mass tort

defendant's litigation toolbox.

## **NO PRIOR REQUEST**

67.    The Movants have made no prior request for the relief sought herein.    On

December 1, 2021, the Official Committee of Talc Claimants filed the *Motion of the Official*

*Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case* [Docket No. 632].

## **NOTICE**

68.    Notice of this Motion has been given to (a) counsel to the Debtor; (b) the United

States Trustee; (c) J&J; (d) New JCCI, and (e) all parties who have filed notices of appearances.

The Movants respectfully submit that no other or further notice need be given.

32

## **CONCLUSION**

69.    For the reasons and based on the authorities set forth above, this case should be

dismissed in accordance with section 1112(b) of the Bankruptcy Code.


Dated: December 9, 2021                **PACHULSKI STANG ZIEHL & JONES LLP**


By: */s/ Colin R. Robinson*
                Laura Davis Jones
                Karen B. Dine
                Colin R. Robinson
                Peter J. Keane
                919 N. Market Street, 17th Floor
                P.O. Box 8705
                Wilmington, DE 19899-8705 (Courier 19801)
                Telephone: (302) 652-4100
                Facsimile: (302) 652-4400
                Email: ljones@pszjlaw.com
                       kdine@pszjlaw.com
                       crobinson@pszjlaw.com
                       pkeane@pszjlaw.com

       *Counsel for Arnold & Itkin LLP*