# **<u>EXHIBIT C</u>**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-Q

☑ **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
for the quarterly period ended October 3, 2021

or

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
for the transition period from         to

Commission file number 1-3215

## Johnson & Johnson
(Exact name of registrant as specified in its charter)

| **New Jersey** | 22-1024240 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933
(Address of principal executive offices)

Registrant's telephone number, including area code (732) 524-0400

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☑ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☑ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☑ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicated by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☑ No

accounts in the Company's consolidated balance sheet upon execution of each agreement. Additionally, the Company has entered into certain vaccine development cost sharing arrangements with government related organizations.

[3] Medical Devices
- Includes a contingent consideration reversal of $0.2 billion in the fiscal third quarter of 2020 and $1.1 billion in the fiscal nine months of 2020 related to the timing of certain developmental milestones associated with the Auris Health acquisition.
- Includes a restructuring related charge of $0.1 billion in both the fiscal third quarter of 2021 and 2020, respectively. Includes a restructuring related charge of $0.2 billion in both the fiscal nine months of 2021 and 2020, respectively.
- Includes intangible amortization expense of $0.3 billion and $0.2 billion in the fiscal third quarter of 2021 and 2020, respectively. Includes intangible amortization expense of $0.8 billion and $0.7 billion in the fiscal nine months of 2021 and 2020, respectively.
- Includes a gain on securities of $0.1 billion in the fiscal nine months of 2021.
- Includes an in-process research and development expense of $0.9 billion related to the general surgery offering in digital robotics (Ottava) acquired with the Auris Health acquisition in 2019 in both the fiscal third quarter and fiscal nine months of 2021. See Note 3 to the Consolidated Financial Statements for more details.

[4] Amounts not allocated to segments include interest income/expense and general corporate income/expense.

SALES BY GEOGRAPHIC AREA

| (Dollars in Millions) | Fiscal Third Quarter Ended | | | Fiscal Nine Months Ended | | |
|---|---|---|---|---|---|---|
| | October 3, 2021 | September 27, 2020 | Percent Change | October 3, 2021 | September 27, 2020 | Percent Change |
| United States | $ 11,963 | 11,086 | 7.9 % | $ 34,993 | 31,324 | 11.7 % |
| Europe | 5,587 | 4,819 | 15.9 | 16,669 | 13,709 | 21.6 |
| Western Hemisphere, excluding U.S. | 1,500 | 1,296 | 15.7 | 4,291 | 3,931 | 9.2 |
| Asia-Pacific, Africa | 4,288 | 3,881 | 10.5 | 13,018 | 11,145 | 16.8 |
| Total | $ 23,338 | 21,082 | 10.7 % | $ 68,971 | 60,109 | 14.7 % |

NOTE 10— ACQUISITIONS AND DIVESTITURES

During the first fiscal quarter of 2021, in separate transactions, the Company divested two brands outside the U.S. within the Pharmaceutical segment. The Company recognized a pre-tax gain recorded in Other (income) expense, net, of approximately $0.6 billion.

During the fiscal first quarter of 2020, the Company completed the acquisition of all rights to the investigational compound bermekimab, which has multiple dermatological indications, along with certain employees from XBiotech Inc., for a purchase price of $0.8 billion. The fair value of the acquisition was allocated primarily to non-amortizable intangible assets, primarily IPR&D, for $0.8 billion. XBiotech may be eligible to receive additional payments upon the receipt of certain commercialization authorizations. The transaction was accounted for as a business combination and included in the Pharmaceutical segment. Additionally, the Company completed the acquisition of all outstanding shares in Verb Surgical Inc., a company with world-class robotics and data science capabilities, including those shares previously held by Verily. The transaction was accounted for as a business combination and included in the Medical Devices segment. The fair value of the acquisition was allocated primarily to non-amortizable intangible assets, primarily IPR&D, for $0.4 billion, goodwill for $0.2 billion, other assets of $0.2 billion and liabilities assumed of $0.3 billion. The fair value of the Company's previously held equity investment in Verb Surgical Inc. was $0.4 billion.

NOTE 11 — LEGAL PROCEEDINGS

Johnson & Johnson and certain of its subsidiaries are involved in various lawsuits and claims regarding product liability; intellectual property; commercial; supplier indemnification and other matters; governmental investigations; and other legal proceedings that arise from time to time in the ordinary course of their business. Due to the ongoing impacts of the COVID-19 pandemic, certain trials have been rescheduled or delayed. The Company continues to monitor its legal proceedings as the situation evolves and in person trials resume.

The Company records accruals for loss contingencies associated with these legal matters when it is probable that a liability will be incurred, and the amount of the loss can be reasonably estimated. As of October 3, 2021, the Company has determined that

the liabilities associated with certain litigation matters are probable and can be reasonably estimated. The Company has accrued for these matters and will continue to monitor each related legal issue and adjust accruals as might be warranted based on new information and further developments in accordance with ASC 450-20-25. For these and other litigation and regulatory matters discussed below for which a loss is probable or reasonably possible, the Company is unable to estimate the possible loss or range of loss beyond the amounts accrued. Amounts accrued for legal contingencies often result from a complex series of judgments about future events and uncertainties that rely heavily on estimates and assumptions including timing of related payments. The ability to make such estimates and judgments can be affected by various factors including, among other things, whether damages sought in the proceedings are unsubstantiated or indeterminate; scientific and legal discovery has not commenced or is not complete; proceedings are in early stages; matters present legal uncertainties; there are significant facts in dispute; procedural or jurisdictional issues; the uncertainty and unpredictability of the number of potential claims; ability to achieve comprehensive multi-party settlements; complexity of related cross-claims and counterclaims; and/or there are numerous parties involved. To the extent adverse awards, judgments or verdicts have been rendered against the Company, the Company does not record an accrual until a loss is determined to be probable and can be reasonably estimated.

In the Company's opinion, based on its examination of these matters, its experience to date and discussions with counsel, the ultimate outcome of legal proceedings, net of liabilities accrued in the Company's balance sheet, is not expected to have a material adverse effect on the Company's financial position. However, the resolution of, or increase in accruals for, one or more of these matters in any reporting period may have a material adverse effect on the Company's results of operations and cash flows for that period.

**PRODUCT LIABILITY**

Johnson & Johnson and certain of its subsidiaries are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages. While the Company believes it has substantial defenses, it is not feasible to predict the ultimate outcome of litigation. From time to time, even if it has substantial defenses, the Company considers isolated settlements based on a variety of circumstances. The Company has established accruals for product liability claims and lawsuits in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. The Company accrues an estimate of the legal defense costs needed to defend each matter when those costs are probable and can be reasonably estimated. For certain of these matters, the Company has accrued additional amounts such as estimated costs associated with settlements, damages and other losses. Product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns. Changes to the accruals may be required in the future as additional information becomes available.

The most significant of these cases include: the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System; the PINNACLE® Acetabular Cup System; pelvic meshes; RISPERDAL®; XARELTO®; body powders containing talc, primarily JOHNSONS® Baby Powder; INVOKANA®; and ETHICON PHYSIOMESH® Flexible Composite Mesh. As of October 3, 2021, in the United States there were approximately 300 plaintiffs with direct claims in pending lawsuits regarding injuries allegedly due to the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System; 5,400 with respect to the PINNACLE® Acetabular Cup System; 10,700 with respect to pelvic meshes; 9,000 with respect to RISPERDAL®; 6,600 with respect to XARELTO®; 38,200 with respect to body powders containing talc; 100 with respect to INVOKANA®; and 4,700 with respect to ETHICON PHYSIOMESH® Flexible Composite Mesh.

In August 2010, DePuy Orthopaedics, Inc. (DePuy) announced a worldwide voluntary recall of its ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System used in hip replacement surgery. Claims for personal injury have been made against DePuy and Johnson & Johnson. The number of pending lawsuits is expected to fluctuate as certain lawsuits are settled or dismissed and additional lawsuits are filed. Cases filed in federal courts in the United States have been organized as a multi-district litigation in the United States District Court for the Northern District of Ohio. Litigation has also been filed in countries outside of the United States, primarily in the United Kingdom, Canada, Australia, Ireland, Germany, India and Italy. In November 2013, DePuy reached an agreement with a Court-appointed committee of lawyers representing ASR Hip System plaintiffs to establish a program to settle claims with eligible ASR Hip patients in the United States who had surgery to replace their ASR Hips, known as revision surgery, as of August 31, 2013. DePuy reached additional agreements in February 2015 and March 2017, which further extended the settlement program to include ASR Hip patients who had revision surgeries after August 31, 2013 and prior to February 15, 2017. This settlement program has resolved more than 10,000 claims, thereby bringing to resolution significant ASR Hip litigation activity in the United States. However, lawsuits in the United States remain, and the settlement program does not address litigation outside of the United States. In Australia, a class action settlement was reached that resolved the claims of the majority of ASR Hip patients in that country. In Canada, the Company has reached agreements to settle the class actions filed in that country. The Company continues to receive information with

respect to potential additional costs associated with this recall on a worldwide basis. The Company has established accruals for the costs associated with the United States settlement program and DePuy ASR™ Hip-related product liability litigation.

Claims for personal injury have also been made against DePuy Orthopaedics, Inc. and Johnson & Johnson (collectively, DePuy) relating to the PINNACLE® Acetabular Cup System used in hip replacement surgery. Product liability lawsuits continue to be filed, and the Company continues to receive information with respect to potential costs and the anticipated number of cases. Cases filed in federal courts in the United States have been organized as a multi-district litigation in the United States District Court for the Northern District of Texas. Litigation also has been filed in some state courts and in countries outside of the United States. Several adverse verdicts have been rendered against DePuy, one of which was reversed on appeal and remanded for retrial. During the first quarter of 2019, DePuy established a United States settlement program to resolve these cases. As part of the settlement program, adverse verdicts have been settled. The Company has established an accrual for product liability litigation associated with the PINNACLE® Acetabular Cup System and the related settlement program.

Claims for personal injury have been made against Ethicon, Inc. (Ethicon) and Johnson & Johnson arising out of Ethicon's pelvic mesh devices used to treat stress urinary incontinence and pelvic organ prolapse. The Company continues to receive information with respect to potential costs and additional cases. Cases filed in federal courts in the United States had been organized as a multi-district litigation (MDL) in the United States District Court for the Southern District of West Virginia. In March 2021, the MDL Court entered an order closing the MDL. The MDL Court has remanded cases for trial to the jurisdictions where the case was originally filed and additional pelvic mesh lawsuits have been filed, and remain, outside of the MDL. The Company has settled or otherwise resolved a majority of the United States cases and the estimated costs associated with these settlements and the remaining cases are reflected in the Company's accruals. In addition, class actions and individual personal injury cases or claims seeking damages for alleged injury resulting from Ethicon's pelvic mesh devices have been commenced in various countries outside of the United States, including claims and cases in the United Kingdom, the Netherlands and class actions in Israel, Australia and Canada. In November 2019, the Federal Court of Australia issued a judgment regarding its findings with respect to liability in relation to the three Lead Applicants and generally in relation to the design, manufacture, pre and post-market assessments and testing, and supply and promotion of the devices in Australia used to treat stress urinary incontinence and pelvic organ prolapse. In March 2020, the Court issued a decision and entered damages awards to the three Lead Applicants. The Company appealed the decision to the intermediate appellate court, the Full Court. The appeal was heard in February 2021 and, in March 2021, the Full Court entered a judgment dismissing the appeal. An application for special leave to the High Court of Australia was filed in April 2021, and in July 2021, the High Court agreed to hear oral argument on the application, which is scheduled to occur in November 2021. With respect to class members other than the Lead Applicants, the Federal Court will conduct an individual case assessment process that will require proof of use and causally related loss, although the form of that process has not yet been decided. The class actions in Canada were discontinued in 2020 as a result of a settlement of a group of cases and an agreement to resolve the Israeli class action was reached in May 2021, which is subject to court approval. The Company has established accruals with respect to product liability litigation associated with Ethicon's pelvic mesh products.

Following a June 2016 worldwide market withdrawal of ETHICON PHYSIOMESH® Flexible Composite Mesh, claims for personal injury have been made against Ethicon, Inc. (Ethicon) and Johnson & Johnson alleging personal injury arising out of the use of this hernia mesh device. Cases filed in federal courts in the United States have been organized as a multi-district litigation (MDL) in the United States District Court for the Northern District of Georgia. A multi-county litigation (MCL) also has been formed in New Jersey state court and assigned to Atlantic County for cases pending in New Jersey. In addition to the matters in the MDL and MCL, there are additional lawsuits pending in the United States District Court for the Southern District of Ohio, which are part of the MDL for polypropylene mesh devices manufactured by C.R. Bard, Inc., one multi-plaintiff lawsuit pending in Oklahoma state court and lawsuits pending outside the United States. In May 2021, Ethicon and lead counsel for the plaintiffs entered into a term sheet to resolve approximately 3,600 Physiomesh cases (covering approximately 4,300 plaintiffs) pending in the MDL and MCL at that time. A master settlement agreement was entered into in September 2021. All deadlines and trial settings in those proceedings are currently stayed pending the completion of the settlement agreement. The costs associated with this proposed settlement are reflected in the Company's accruals.

Claims have also been filed against Ethicon and Johnson & Johnson alleging personal injuries arising from the PROCEED® Mesh and PROCEED® Ventral Patch hernia mesh products. In March 2019, the New Jersey Supreme Court entered an order consolidating these cases pending in New Jersey as an MCL in Atlantic County Superior Court. Additional cases have been filed in various federal and state courts in the US, and in jurisdictions outside the US. Discovery is underway in the MCL proceedings.

Ethicon and Johnson & Johnson also have been subject to claims for personal injuries arising from the PROLENE™ Polypropylene Hernia System (PHS). In January 2020, New Jersey Supreme Court created an MCL in Atlantic County Superior Court to handle such cases. Cases involving this product have also been filed in other federal and state courts in the United States.

The Company has established accruals with respect to product liability litigation associated with ETHICON PHYSIOMESH® Flexible Composite Mesh, PROCEED® Mesh and PROCEED® Ventral Patch, and PROLENE™ Polypropylene Hernia System products.

Claims for personal injury have been made against Janssen Pharmaceuticals, Inc. and Johnson & Johnson arising out of the use of RISPERDAL®, and related compounds, indicated for the treatment of schizophrenia, acute manic or mixed episodes associated with bipolar I disorder and irritability associated with autism. Lawsuits primarily have been filed in state courts in Pennsylvania, California, and Missouri. Other actions are pending in various courts in the United States and Canada. Product liability lawsuits continue to be filed, and the Company continues to receive information with respect to potential costs and the anticipated number of cases. The Company has successfully defended a number of these cases but there have been verdicts against the Company, including a verdict in October 2019 of $8.0 billion of punitive damages related to one plaintiff, which the trial judge reduced to $6.8 million in January 2020. In September 2021, the Company entered into a settlement in principle with the counsel representing plaintiffs in this matter and in substantially all of the outstanding cases in the United States. The costs associated with this and other settlements are reflected in the Company's accruals.

Claims for personal injury arising out of the use of XARELTO®, an oral anticoagulant, have been made against Janssen Pharmaceuticals, Inc. (JPI); Johnson & Johnson; and JPI's collaboration partner for XARELTO®, Bayer AG and certain of its affiliates. Cases filed in federal courts in the United States have been organized as a multi-district litigation in the United States District Court for the Eastern District of Louisiana. In addition, cases have been filed in state courts across the United States. Many of these cases were consolidated into a state mass tort litigation in Philadelphia, Pennsylvania and in a coordinated proceeding in Los Angeles, California. Class action lawsuits also have been filed in Canada. In March 2019, JPI and Johnson & Johnson announced an agreement in principle to settle the XARELTO® cases in the United States; the settlement agreement was executed in May 2019, the settlement became final in December 2019, and the settlement was funded in January 2020. This resolved the majority of cases pending in the United States. The Company has established accruals for its costs associated with the United States settlement program and XARELTO® related product liability litigation.

A significant number of personal injury claims alleging that talc causes cancer were made against Johnson & Johnson Consumer Inc. and Johnson & Johnson arising out of the use of body powders containing talc, primarily JOHNSON'S® Baby Powder. The number of these personal injury lawsuits, filed in state and federal courts in the United States as well as outside of the United States, continued to increase through, and including, October 2021.

In talc cases that previously have gone to trial, the Company has obtained a number of defense verdicts, but there also have been verdicts against the Company, many of which have been reversed on appeal. In June 2020, the Missouri Court of Appeals reversed in part and affirmed in part a July 2018 verdict of $4.7 billion in *Ingham v. Johnson & Johnson, et al.*, No. ED 207476 (Mo. App.), reducing the overall award to $2.1 billion. An application for transfer of the case to the Missouri Supreme Court was subsequently denied and in June 2021, a petition for certiorari, seeking a review of the *Ingham* decision by the United States Supreme Court was denied. In June 2021, the Company paid the award, which, including interest, totaled approximately $2.5 billion. The facts and circumstances, including the terms of the award, were unique to the *Ingham* decision and not representative of other claims brought against the Company. The Company continues to believe that it has strong legal grounds to contest the other talc verdicts that it has appealed. Notwithstanding the Company's confidence in the safety of its talc products, in certain circumstances the Company has and may settle cases.

In October 2021, Johnson & Johnson Consumer Inc. (Old JJCI) implemented a corporate restructuring (the 2021 Corporate Restructuring). As a result of that restructuring, Old JJCI ceased to exist and three new entities were created: (a) LTL Management LLC, a North Carolina limited liability company (LTL or Debtor), (b) Royalty A&M LLC, a North Carolina limited liability company and a direct subsidiary of LTL (RAM); and (c) the Debtor's direct parent, Johnson & Johnson Consumer Inc., a New Jersey company (New JJCI). The Debtor received certain of Old JJCI's assets and became solely responsible for the talc-related liabilities of Old JJCI, including all liabilities related in any way to injury or damage, or alleged injury or damage, sustained or incurred in the purchase or use of, or exposure to, talc, including talc contained in any product, or to the risk of, or responsibility for, any such damage or injury, except for any liabilities for which the exclusive remedy is provided under a workers' compensation statute or act (the Talc-Related Liabilities).

In October 2021, notwithstanding the Company's confidence in the safety of its talc products, the Debtor filed a voluntary petition with the United States Bankruptcy Court for the Western District of North Carolina, Charlotte Division, seeking relief under chapter 11 of the Bankruptcy Code (the LTL Bankruptcy Filing). As a result of the LTL Bankruptcy Filing, the Court entered a temporary restraining order staying all litigation against LTL and Old JJCI. Further hearings on whether a permanent restraining order staying all litigation against those entities, as well other entities, such as Johnson & Johnson, its affiliates, and certain other third parties, are scheduled in November 2021. The Company has agreed to provide funding to LTL for the payment of amounts the Bankruptcy Court determines are owed by LTL through the establishment of a $2 billion trust in furtherance of this purpose. The Company has established a reserve for approximately $2 billion in connection with the aforementioned trust, resulting in an incremental $1.4 billion litigation charge. Subsequent to the fiscal third quarter, the

Company has de-consolidated LTL as a result of the bankruptcy filing. The impact of the de-consolidation is not material to the Company.

In February 2019, the Company's talc supplier, Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, Imerys) filed a voluntary chapter 11 petition under chapter 11 of title 11 of the United States Code (the Bankruptcy Code) in the United States Bankruptcy Court for the District of Delaware (Imerys Bankruptcy). The Imerys Bankruptcy relates to Imerys's potential liability for personal injury from exposure to talcum powder sold by Imerys (Talc Claims). In its bankruptcy, Imerys alleges it has claims against the Company for indemnification and rights to joint insurance proceeds. During the bankruptcy, the Company proposed to resolve Imerys's (and the Company's) obligations arising out of Talc Claims involving the Company's products by agreeing to assume the defense of litigation of all such Talc Claims, waiving the Company's indemnification claims against Imerys, and lifting the automatic stay to enable the Talc Claims to proceed outside the bankruptcy forum with the Company agreeing to settle or pay any judgment against Imerys. Imerys rejected that proposal. In May 2020, Imerys, its parent Imerys S.A., the Tort Claimants' Committee (TCC), and the Future Claimants' Representative (FCR) (collectively, the Plan Proponents) filed their Plan of Reorganization (the Plan) and the Disclosure Statement related thereto. The Plan Proponents have since filed numerous amendments to the Plan and Disclosure Statement. A hearing on the Plan Proponent's Disclosure Statement was held in January 2021, and the Court entered an order approving the Disclosure Statement, allowing Imerys to proceed with soliciting votes on the Plan. In March 2021, the Company voted to reject the Plan and opted out of the consensual releases in the Plan. In April 2021, the Plan Proponents announced the Plan had received the requisite number of accepting votes to confirm the Plan. In October 2021, the Bankruptcy Court issued a ruling deeming almost 16,000 votes in favor of the Plan as withdrawn, based upon evidence that no due diligence had been done by the plaintiff's counsel to ascertain whether the votes were cast on behalf of individuals who used the Company's products. The Bankruptcy Court also ruled that more than 1,500 votes cast by another firm should count as rejecting instead of accepting. In October 2021, Imerys filed a notice on the docket cancelling the confirmation hearing on its Plan that was scheduled to begin in November 2021.

In July 2021, Imerys commenced an adversary proceeding against the Company in the Imerys Bankruptcy (the Imerys adversary proceeding). The Imerys adversary proceeding sought, among other things, certain declarations with respect to the indemnification obligations allegedly owed by the Company to Imerys. The TCC and FCR simultaneously filed a motion for temporary restraining order and preliminary injunction seeking to enjoin the Company from undergoing a corporate restructuring that would separate the Company's talc liabilities from its other assets. The bankruptcy court denied the motion. The Company thereafter filed a motion to dismiss the adversary proceeding. The Bankruptcy Court has not yet decided the motion to dismiss. In October 2021, the Company filed a Notice of Bankruptcy Filing and Stay of Proceedings clarifying that the automatic stay arising upon the LTL Bankruptcy Filing should apply to the Imerys adversary proceeding.

In June 2020, Cyprus Mines Corporation and its parent (together, Cyprus), which had owned certain Imerys talc mines, filed an adversary proceeding against the Company and Imerys in the Imerys Bankruptcy seeking a declaration of indemnity rights under certain contractual agreements (the Cyprus adversary proceeding). The Company denies such indemnification is owed, and filed a motion to dismiss the adversary complaint. In February 2021, Cyprus filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and filed its Disclosure Statement and Plan. The Plan contemplates a settlement with Imerys and talc claimants where Cyprus would make a monetary contribution to a trust established under the Imerys Plan in exchange for an injunction against Talc Claims asserted against it. Cyprus has not yet sought approval of its Disclosure Statement and Plan. In October 2021, the Company filed a Notice of Bankruptcy Filing and Stay of Proceedings clarifying that the automatic stay arising upon the LTL Bankruptcy Filing should apply to the Cyprus adversary proceeding.

In February 2021, several of the Company's insurers involved in coverage litigation in New Jersey State Court (the Coverage Action) filed a motion in the Imerys Bankruptcy Court proceeding seeking a determination that the automatic stay does not apply to the Coverage Action and, in the alternative, seeking relief from the automatic stay to allow them to continue to litigate their claims in the Coverage Action. In March 2021, the Company filed a limited response and reservation of rights with respect to the motion. The Court entered an agreed order modifying the stay to allow the litigation in the Coverage Action to continue. In October 2021, LTL filed a Notice of Bankruptcy Filing and Stay of Proceedings clarifying that the automatic stay arising upon the LTL Bankruptcy Filing should apply to the Coverage Action.

In February 2018, a securities class action lawsuit was filed against Johnson & Johnson and certain named officers in the United States District Court for the District of New Jersey, alleging that Johnson & Johnson violated the federal securities laws by failing to disclose alleged asbestos contamination in body powders containing talc, primarily JOHNSON'S® Baby Powder, and that purchasers of Johnson & Johnson's shares suffered losses as a result. Plaintiff is seeking damages. In April 2019, the Company moved to dismiss the complaint and briefing on the motion was complete as of August 2019. In December 2019, the Court denied, in part, the motion to dismiss. In March 2020, Defendants answered the complaint. In April 2021 briefing on Plaintiffs' motion for class certification was completed. Discovery is ongoing.

In June 2019, a shareholder filed a complaint initiating a summary proceeding in New Jersey state court for a books and records inspection. In August 2019, Johnson & Johnson responded to the books and records complaint and filed a cross motion to dismiss. In September 2019, Plaintiff replied and the Court heard oral argument. The Court has not yet ruled in the books and records action. In October 2019, December 2019, and January 2020, four shareholders filed four separate derivative lawsuits against Johnson & Johnson as the nominal defendant and its current directors and certain officers as defendants in the United States District Court for the District of New Jersey, alleging a breach of fiduciary duties related to the alleged asbestos contamination in body powders containing talc, primarily JOHNSON'S® Baby Powder, and that Johnson & Johnson has suffered damages as a result of those alleged breaches. In February 2020, the four cases were consolidated into a single action under the caption *In re Johnson & Johnson Talc Stockholder Derivative Litigation*. In July 2020, a report was delivered to the Company's Board of Directors by independent counsel retained by the Board to investigate the allegations in the derivative lawsuits and in a series of shareholder letters that the Board received raising similar issues and demanding that suit be brought against certain Directors. Four of the shareholders who sent demands are plaintiffs in the *In re Johnson & Johnson Talc Stockholder Derivative Litigation*. The independent counsel recommended that the Company reject the shareholder demands and take the steps that are necessary or appropriate to secure dismissal of the derivative lawsuits. The Board unanimously adopted the recommendations of the independent counsel's report. In October 2020, the shareholders filed a consolidated complaint, and in January 2021, Johnson & Johnson moved to dismiss the consolidated complaint. In March 2021, Plaintiffs filed a motion for discovery. The Court temporarily terminated Johnson & Johnson's motion to dismiss pending a decision on Plaintiff's motion for discovery. In October 2021, the Court requested supplemental briefing on Plaintiff's motion for discovery.

In January 2019, two ERISA class action lawsuits were filed by participants in the Johnson & Johnson Savings Plan against Johnson & Johnson, its Pension and Benefits Committee, and certain named officers in the United States District Court for the District of New Jersey, alleging that the defendants breached their fiduciary duties by offering Johnson & Johnson stock as a Johnson & Johnson Savings Plan investment option when it was imprudent to do so because of failures to disclose alleged asbestos contamination in body powders containing talc, primarily JOHNSON'S® Baby Powder. Plaintiffs are seeking damages and injunctive relief. In September 2019, Defendants filed a motion to dismiss. In April 2020, the Court granted Defendants' motion but granted leave to amend. In June 2020, Plaintiffs filed an amended complaint, and in July 2020, Defendants moved to dismiss the amended complaint. As of October 2020, briefing on Defendants' motion was complete. In February 2021, the Court granted Defendants' motion, and granted Plaintiffs leave to amend. In April 2021, Plaintiffs informed the Court that they did not intend to file an amended complaint, and the Court dismissed the case with prejudice. In May 2021, Plaintiffs filed a notice of appeal with the Third Circuit. In July 2021, Plaintiffs filed their opening brief in the Third Circuit and in September 2021, Defendants filed their response brief. In October 2021, Plaintiffs filed their reply brief.

A lawsuit was brought against the Company in the Superior Court of California for the County of San Diego alleging violations of California's Consumer Legal Remedies Act (CLRA) relating to JOHNSON'S® Baby Powder. In that lawsuit, the plaintiffs allege that Johnson & Johnson violated the CLRA by failing to provide required Proposition 65 warnings. In July 2019, the Company filed a notice of removal to the United States District Court for the Southern District of California and plaintiffs filed a second amended complaint shortly thereafter. In October 2019, the Company moved to dismiss the second amended complaint for failure to state a claim upon which relief may be granted. In response to those motions, plaintiffs filed a third amended complaint. In December 2019, the Company moved to dismiss the third amended complaint for failure to state a claim upon which relief may be granted. In April 2020, the Court granted the motion to dismiss but granted leave to amend. In May 2020, plaintiffs filed a Fourth Amended Complaint but indicated that they would be filing a motion for leave to file a fifth amended complaint. Plaintiffs filed a Fifth Amended Complaint in August 2020. The Company moved to dismiss the Fifth Amended Complaint for failure to state a claim upon which relief may be granted. In January 2021, the Court issued an Order and opinion ruling in the Company's favor and granting the motion to dismiss with prejudice. In February 2021, Plaintiffs filed a Notice of Appeal with the Ninth Circuit. In October 2021, a Notice of Suggestion of Bankruptcy was filed with the Ninth Circuit.

In addition, the Company has received preliminary inquiries and subpoenas to produce documents regarding talc matters from Senator Murray, a member of the Senate Committee on Health, Education, Labor and Pensions, the Department of Justice and the U.S. Congressional Subcommittee on Economic and Consumer Policy. The Company produced documents as required in response and will continue to cooperate with government inquiries.

Claims for personal injury have been made against a number of Johnson & Johnson companies, including Janssen Pharmaceuticals, Inc. and Johnson & Johnson, arising out of the use of INVOKANA®, a prescription medication indicated to improve glycemic control in adults with Type 2 diabetes. In December 2016, lawsuits filed in federal courts in the United States were organized as a multi-district litigation in the United States District Court for the District of New Jersey. Cases have also been filed in state courts. Class action lawsuits have been filed in Canada. Product liability lawsuits continue to be filed, and the Company continues to receive information with respect to potential costs and the anticipated number of cases. The Company has settled or otherwise resolved many of the cases and claims in the United States and the costs associated with these settlements are reflected in the Company's accruals.

Claims for personal injury have been made against a number of Johnson & Johnson companies, including Janssen Pharmaceuticals, Inc. and Johnson & Johnson, arising out of the use of ELMIRON®, a prescription medication indicated for the relief of bladder pain or discomfort associated with interstitial cystitis. These lawsuits, which allege that ELMIRON® contributes to the development of permanent retinal injury and vision loss, have been filed in both state and federal courts across the United States. In December 2020, lawsuits filed in federal courts in the United States, including putative class action cases seeking medical monitoring, were organized as a multi-district litigation in the United States District Court for the District of New Jersey. Cases also have been filed in various state courts. In addition, three class action lawsuits have been filed in Canada. Product liability lawsuits continue to be filed, and the Company continues to receive information with respect to potential costs and the anticipated number of cases. The Company has established accruals for defense costs associated with ELMIRON® related product liability litigation.

**INTELLECTUAL PROPERTY**

Certain subsidiaries of Johnson & Johnson are subject, from time to time, to legal proceedings and claims related to patent, trademark and other intellectual property matters arising out of their businesses. Many of these matters involve challenges to the coverage and/or validity of the patents on various products and allegations that certain of the Company's products infringe the patents of third parties. Although these subsidiaries believe that they have substantial defenses to these challenges and allegations with respect to all significant patents, there can be no assurance as to the outcome of these matters. A loss in any of these cases could adversely affect the ability of these subsidiaries to sell their products, result in loss of sales due to loss of market exclusivity, require the payment of past damages and future royalties, and may result in a non-cash impairment charge for any associated intangible asset. Significant matters are described below.

Medical Devices

In December 2016, Dr. Ford Albritton sued Acclarent, Inc. (Acclarent) in United States District Court for the Northern District of Texas alleging that Acclarent's RELIEVA® Spin and RELIEVEA SpinPlus® products infringe U.S. Patent No. 9,011,412. Dr. Albritton also alleges breach of contract, fraud and that he is the true owner of Acclarent's U.S. Patent No. 8,414,473. Trial began in October 2021, and shortly thereafter, the parties reached an agreement to settle the case. Plaintiff's motion to dismiss with prejudice was filed in October 2021.

In November 2017, Board of Regents, The University of Texas System and TissueGen, Inc. (collectively, UT) filed a lawsuit in the United States District Court for the Western District of Texas against Ethicon, Inc. and Ethicon US, LLC (collectively, Ethicon) alleging the manufacture and sale of VICRYL® Plus Antibacterial Sutures, MONOCRYL® Plus Antibacterial Sutures, PDS® Plus Antibacterial Sutures, STRATAFIX® PDS® Antibacterial Sutures and STRATAFIX® MONOCRYL® Plus Antibacterial Sutures infringe plaintiffs' United States Patent Nos. 6,596,296 ('296) and 7,033,603 ('603) directed to implantable polymer drug releasing biodegradable fibers containing a therapeutic agent. UT is seeking damages and an injunction. In December 2018, Ethicon filed petitions with the United States Patent and Trademark Office (USPTO), seeking Inter Partes Review (IPR) of both asserted patents. In June 2020, the USPTO denied institution of the '296 patent IPR and granted institution of the '603 patent IPR. UT dismissed the '603 patent from the suit and no longer accuses PDS® Plus Antibacterial Sutures or STRATAFIX® PDS® Plus Antibacterial Sutures of infringement. In August 2021, the parties entered into a settlement agreement, and the case was dismissed.

In August 2018, Intuitive Surgical, Inc. and Intuitive Surgical Operations, Inc. (collectively, Intuitive) filed a patent infringement suit against Auris Health, Inc. (Auris) in United States District Court for the District of Delaware. In the suit, Intuitive alleges willful infringement of U.S. Patent Nos. 6,246,200 ('200); 6,491,701 ('701); 6,522,906 ('906); 6,800,056 ('056); 8,142,447 ('447); 8,620,473 ('473); 8,801,601 ('601); and 9,452,276 ('276) based on Auris' Monarch™ Platform. Auris filed IPR Petitions with the U.S. Patent and Trademark Office (USPTO) regarding the '200, '056, '601 '701, '447, '276 and '906 patents. Intuitive subsequently dropped the '200, '473 and '701 patents from the suit. In December 2019, the USPTO instituted review of the '601 patent and denied review of the '056 patent. In February and March 2020, the USPTO instituted review of the '200, '447, '701 and '906 patents and denied review of the '276 patent. In December 2020, the USPTO declared all of the challenged claims in the '601 patent to be invalid. Intuitive has appealed that decision. In March 2021, the USPTO ruled that the challenged claims of the '447 and '906 patents are not invalid. Auris has appealed that decision. Trial is scheduled to begin in January 2023.

In August 2019, RSB Spine LLC (RSB Spine) filed a patent infringement suit against DePuy Synthes, Inc. in United States District Court for the District of Delaware. In October 2019, RSB Spine amended the complaint to change the named defendants to DePuy Synthes Sales, Inc. and DePuy Synthes Products, Inc. In the suit, RSB Spine alleges willful infringement of United States Patent Nos. 6,984,234 and 9,713,537 by one or more of the following products: ZERO-P-VA™ Spacer, ZERO-P® Spacer, ZERO-P NATURAL™ Plate, SYNFIX® LR Spacer and SYNFIX® Evolution System. RSB Spine seeks monetary damages and injunctive relief. In November 2019, the suit was consolidated for pre-trial purposes with other patent infringement suits brought by RSB Spine in the United States District Court for the District of Delaware against Life Spine,

Inc. and Zydus Worldwide DMCC (collectively, Zydus), who filed an ANDA seeking approval to market a generic version of UPTRAVI® before expiration of Nippon Shinyaku's United States Patent Nos. 7,205,302 ('302); 8,791,122 ('122); and 9,284,280 ('280) relating to UPTRAVI®. In January 2021, the court entered a joint stipulation dismissing the claims against Zydus related to the '122 and '280 patents. Actelion is the exclusive licensee of the '302 patent.

Actelion and Nippon Shinyaku are seeking an order enjoining Zydus from marketing a generic version of UPTRAVI® before the expiration of the '302 patent.

**GOVERNMENT PROCEEDINGS**

Like other companies in the pharmaceutical, consumer health and medical devices industries, Johnson & Johnson and certain of its subsidiaries are subject to extensive regulation by national, state and local government agencies in the United States and other countries in which they operate. Such regulation has been the basis of government investigations and litigations. The most significant litigation brought by, and investigations conducted by, government agencies are listed below. It is possible that criminal charges and substantial fines and/or civil penalties or damages could result from government investigations or litigation.

Average Wholesale Price (AWP) Litigation

Johnson & Johnson and several of its pharmaceutical subsidiaries (the J&J AWP Defendants), along with numerous other pharmaceutical companies, were named as defendants in a series of lawsuits in state and federal courts involving allegations that the pricing and marketing of certain pharmaceutical products amounted to fraudulent and otherwise actionable conduct because, among other things, the companies allegedly reported an inflated Average Wholesale Price (AWP) for the drugs at issue. Payors alleged that they used those AWPs in calculating provider reimbursement levels. The plaintiffs in these cases included three classes of private persons or entities that paid for any portion of the purchase of the drugs at issue based on AWP, and state government entities that made Medicaid payments for the drugs at issue based on AWP. Many of these cases, both federal actions and state actions removed to federal court, were consolidated for pre-trial purposes in a multi-district litigation in the United States District Court for the District of Massachusetts, where all claims against the J&J AWP Defendants were ultimately dismissed. The J&J AWP Defendants also prevailed in a case brought by the Commonwealth of Pennsylvania. Other AWP cases have been resolved through court order or settlement. The case brought by Illinois was settled after trial. In New Jersey, a putative class action based upon AWP allegations is pending against Centocor, Inc. and Ortho Biotech Inc. (both now Janssen Biotech, Inc.), Johnson & Johnson and ALZA Corporation. All other cases have been resolved.

Opioid Litigation

Beginning in 2014 and continuing to the present, Johnson & Johnson and Janssen Pharmaceuticals, Inc. (JPI), along with other pharmaceutical companies, have been named in approximately 3,300 lawsuits related to the marketing of opioids, including DURAGESIC®, NUCYNTA® and NUCYNTA® ER. The suits also raise allegations related to previously owned active pharmaceutical ingredient supplier subsidiaries, Tasmanian Alkaloids Pty, Ltd. and Noramco, Inc. (both subsidiaries were divested in 2016). The majority of the cases have been filed by state and local governments. Similar lawsuits have also been filed by private plaintiffs and organizations, including but not limited to the following: individual plaintiffs on behalf of children suffering from Neonatal Abstinence Syndrome; hospitals; and health insurers/payors. To date, complaints against pharmaceutical manufacturers, including Johnson & Johnson and JPI, have been filed by the state Attorneys General in Arkansas, Florida, Idaho, Illinois, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, New York, Ohio, Oklahoma, South Dakota, Texas, Washington and West Virginia. Complaints against the manufacturers also have been filed in state or federal court by city, county and local government agencies in the following states: Alabama, Arizona, Arkansas, California, Connecticut, Florida, Georgia, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia and Wisconsin. The Government of Puerto Rico filed suit in Superior Court of San Juan. There are approximately 390 cases pending in various state courts. There are over 2,900 federal cases coordinated in a federal Multi-District Litigation (MDL) pending in the U.S. District Court for the Northern District of Ohio. In addition, the Province of British Columbia filed suit against Johnson & Johnson and its Canadian affiliate Janssen Inc., and many other industry members, in Canada, and is seeking to have that action certified as an opt in class action on behalf of other provincial/territorial and the federal governments in Canada. Additional proposed class actions have been filed in Canada against Johnson & Johnson and Janssen Inc., and many other industry members, by and on behalf of people who used opioids (for personal injuries), municipalities and First Nations bands. In October 2019, an anti-trust complaint was filed by private plaintiffs in federal court in Tennessee and is pending transfer to the MDL. These actions allege a variety of claims related to opioid marketing practices, including false advertising, unfair competition, public nuisance, consumer fraud violations, deceptive acts and practices, false claims and unjust enrichment. The suits generally seek penalties and/or injunctive and monetary relief and,

in some of the suits, the plaintiffs are seeking joint and several liability among the defendants. An adverse judgment in any of these lawsuits could result in the imposition of large monetary penalties and significant damages including, punitive damages, cost of abatement, substantial fines, equitable remedies and other sanctions.

The trial in the matter filed by the Oklahoma Attorney General resulted in a judgment against Johnson & Johnson and JPI in the amount of $465 million. Johnson & Johnson and JPI have appealed the judgment. The Company believes that it has strong grounds to overturn this judgment. In October 2019 Johnson & Johnson and JPI announced a settlement of the first case set for trial in the MDL with two counties in Ohio. In April 2021, three California counties and the City of Oakland commenced a trial in California state court against Johnson & Johnson and JPI, and other affiliates, as well as three other pharmaceutical manufacturers. The trial concluded in October 2021 and the parties are awaiting a ruling.

In August 2019, Johnson & Johnson received a grand jury subpoena from the United States Attorney's Office for the Eastern District of New York for documents related to the Company's anti-diversion policies and procedures and distribution of its opioid medications, in what the Company understands to be part of a broader investigation into manufacturers' and distributors' monitoring programs and reporting under the Controlled Substances Act. In September 2019, Johnson & Johnson received subpoenas from the New York State Department of Financial Services (NYDFS) as part of an industry-wide inquiry into the effect of opioid prescriptions on New York health insurance premiums. In September 2020, the Company learned that NYDFS filed a statement of charges related to this investigation.

In June 2021, the Company and JPI announced a settlement agreement with the State of New York and its participating subdivisions, including Nassau County and Suffolk County, resolving their opioid-related claims against the Company on terms consistent with the Company's previously announced agreement in principle to contribute up to $5 billion to all-in settlement of opioid-related claims by states, cities, counties, and tribal governments. The settlement provides New York and its participating subdivisions with up to $263 million to address opioid-related issues, reimburses attorney fees and costs, and removes the Company and Janssen from a multi-defendant trial of opioid-related claims that commenced in Suffolk County in June 2021. In exchange, the Company and JPI receive releases from the claims asserted by New York and the participating parties, including NYDFS.

In October 2021, the Company and JPI announced a settlement agreement with the State of Texas and its participating subdivisions, including Dallas County, Bexar County, and Tarrant County, resolving their opioid-related claims against the Company on terms consistent with the Company's previously announced agreement to contribute up to $5 billion to all-in settlement of opioid-related claims by states, cities, counties, and tribal governments. The settlement provides Texas and its participating subdivisions with up to $297 million to address opioid-related issues and reimburse attorney fees and costs, and removes the Company and Janssen from multi-defendant bellwether trials of opioid-related claims scheduled to commence in Texas state courts in early 2022. In exchange, the Company and JPI will receive releases from the claims asserted by Texas and the participating subdivisions.

Johnson & Johnson, JPI and other pharmaceutical companies have also received subpoenas or requests for information related to opioids marketing practices from the following state Attorneys General: Alaska, Indiana, Montana, New Hampshire, South Carolina, Tennessee, Texas and Washington. In September 2017, Johnson & Johnson and JPI were contacted by the Texas and Colorado Attorney General's Offices on behalf of approximately 38 states regarding a multi-state Attorney General investigation. In October 2019, the Company announced a proposed agreement in principle that would include the Company paying $4 billion as settlement of these matters. In October 2020, the Company agreed to contribute up to an additional $1 billion to an all-in settlement amount that would resolve opioid lawsuits filed and future claims by states, cities, counties and tribal governments, for a total of $5 billion which has been accrued, subject to various conditions and an agreement being finalized. This agreement in principle is not an admission of liability or wrong-doing. In July 2021, the Company announced that the terms of the agreement to settle the state and subdivision claims have been finalized and up to 25% of the all-in settlement is expected to be paid within the next 12 months, depending upon the level of participation by the states and their subdivisions. The terms provide a period of time for states to elect to participate in the agreement and, thereafter, a period for the subdivisions of the participating states to opt-in. The opt-in period expires in January 2022. The Company retains the right to opt-out of the agreement if, in its sole discretion, there is insufficient participation.

From June 2017 through December 2019, the Company's Board of Directors received a series of shareholder demand letters alleging breaches of fiduciary duties related to the marketing of opioids. The Board retained independent counsel to investigate the allegations in the demands, and in April 2020, independent counsel delivered a report to the Board recommending that the Company reject the shareholder demands and take the steps that are necessary or appropriate to secure dismissal of related derivative litigation. The Board unanimously adopted the recommendations of the independent counsel's report.

In November 2019, one of the shareholders who sent a demand filed a derivative complaint against Johnson & Johnson as the nominal defendant and certain current and former directors and officers as defendants in the Superior Court of New Jersey. The complaint alleges breaches of fiduciary duties related to the marketing of opioids, and that Johnson & Johnson has suffered damages as a result of those alleged breaches. In May 2020, the shareholder filed an amended complaint challenging the

40

Board's rejection of his demand. In August 2020, Johnson & Johnson moved to dismiss the amended complaint. In February 2021, the Court held oral argument on Johnson & Johnson's motion. In August 2020, another shareholder who sent a demand filed a separate derivative complaint in the same court making similar allegations. In October 2020, the Court granted defendants' request to reassign the second-filed case to the division where the first-filed case is pending.

In December 2019, two additional shareholders who sent demands filed two separate derivative complaints making similar allegations against Johnson & Johnson as the nominal defendant and certain current and former directors and officers as defendants in the United States District for the District of New Jersey. In April 2020, the two federal cases were consolidated into a single action captioned *In re Johnson & Johnson Opioid Stockholder Derivative Litigation*. In July 2020, the shareholders filed a consolidated complaint. In September 2020, Johnson & Johnson moved to dismiss the consolidated complaint, and in December 2020, the shareholders opposed Johnson & Johnson's motion. Johnson & Johnson filed its reply in February 2021. In July 2020, an additional shareholder who sent a demand filed a derivative complaint in the same federal court making similar allegations against the same defendants named in the consolidated action. In January 2021, pursuant to an order in the consolidated action, the third case was consolidated into the consolidated action. In February 2021, the Court granted the shareholders motion to voluntarily dismiss the consolidated action without prejudice, and the shareholders' counsel then filed a notice of association in the first-filed derivative action pending in the Superior Court of New Jersey.

Other

In August 2012, DePuy Orthopaedics, Inc., DePuy, Inc. (now known as DePuy Synthes, Inc.), and Johnson & Johnson Services, Inc. (collectively DePuy) received an informal request from the United States Attorney's Office for the District of Massachusetts and the Civil Division of the United States Department of Justice (the United States) for the production of materials relating to the DePuy ASR™ XL Hip device. In July 2014, the United States notified the United States District Court for the District of Massachusetts that it had declined to intervene in a *qui tam* case filed pursuant to the False Claims Act against the companies concerning the hip devices. In February 2016, the District Court granted the companies' motion to dismiss with prejudice, unsealed the *qui tam* complaint, and denied the *qui tam* relators' request for leave to file a further amended complaint. The *qui tam* relators appealed the case to the United States Court of Appeals for the First Circuit. In July 2017, the First Circuit affirmed the District Court's dismissal in part, reversed in part, and affirmed the decision to deny the relators' request to file a third amended complaint. The relators' remaining claims are now pending before the District Court, and the District Court has not yet closed the fact discovery time period. In March 2021, DePuy filed its motion to strike and dismiss the relators' second amended complaint; the District Court denied DePuy's motion to strike and dismiss on July 6, 2021. DePuy filed a motion for reconsideration of the District Court's July 6, 2021 ruling. On August 18, 2021, the District Court stated that it was reviewing DePuy's motion for reconsideration, and on September 16, 2021, in connection with the District Court's review of the motion for reconsideration, the District Court ordered the parties to file additional submissions by September 30, 2021, which are now under review by the District Court.

In October 2012, Johnson & Johnson was contacted by the California Attorney General's office regarding a multi-state Attorney General investigation of the marketing of surgical mesh products for hernia and urogynecological purposes by Johnson & Johnson's subsidiary, Ethicon, Inc. (Ethicon). In May 2016, California and Washington filed civil complaints against Johnson & Johnson, Ethicon and Ethicon US, LLC alleging violations of their consumer protection statutes. Similar complaints were filed against the companies by the following states: Kentucky, Mississippi, West Virginia and Oregon. In April 2019, Johnson & Johnson and Ethicon settled the Washington case. The California case started trial in July 2019 and concluded in September 2019. The trial date for the Kentucky case was scheduled for September 2019 but has been adjourned and no new trial date has been scheduled. In October 2019, Johnson & Johnson and Ethicon settled the multi-state investigation with 41 other states and the District of Columbia. In January 2020, the Court in California issued a statement of decision, finding in favor of the State of California, and awarded civil penalties in the amount of $344 million. In April 2020, the Court in California denied the Company's motion for a new trial. In August 2020, the Court entered judgment with respect to the penalties of $344 million, but denied the Attorney General's request for injunctive relief. The Company is appealing the penalty judgment. In April 2020, the Company settled the West Virginia case. In October 2020, the Company settled with the Attorney General of Oregon. In November 2020, the Company settled with the Attorney General of Mississippi.

In June 2014, the Mississippi Attorney General filed a complaint in Chancery Court of The First Judicial District of Hinds County, Mississippi against Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. (now known as Johnson & Johnson Consumer Inc.) (JJCI). The complaint alleges that defendants violated the Mississippi Consumer Protection Act by
failing to disclose alleged health risks associated with female consumers' use of talc contained in JOHNSON'S® Baby Powder and JOHNSON'S® Shower to Shower (a product divested in 2012) and seeks injunctive and monetary relief. The Mississippi Supreme Court granted Johnson & Johnson and JJCI's request to file an interlocutory appeal of the denial of the motion for summary judgment in late 2019. Johnson & Johnson and JJCI moved for summary judgment on the grounds that the State's claim was barred by preemption. In April 2021, the Mississippi Supreme Court dismissed the Company's interlocutory appeal and remanded the case back to the Hinds County Chancery Court. Discovery is now proceeding in that court. In August 2021, Johnson & Johnson and JJCI filed a Petition for Writ of Certiorari in the US Supreme Court.