UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-30589(MBK) |
| | . | |
| | . | Clarkson S. Fisher U.S. |
| LTL MANAGEMENT LLC, | . |   Courthouse |
| | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| | . | |
| Debtor. | . | December 15, 2021 |
| . . . . . . . . . . . . .. | | 10:04 a.m. |

TRANSCRIPT OF VARIOUS APPLICATIONS
BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Jones Day
                           By:  GREGORY M. GORDON, ESQ.
                                DAN PRIETO, ESQ.
                                AMANDA S. RUSH, ESQ.
                           2727 North Harwood Street, Suite 500
                           Dallas, TX 75201

For the Office of the      Office of the United States Trustee
United States Trustee:     By:  JEFF SPONDER, ESQ.
                           One Newark Center
                           1085 Raymond Boulevard, Suite 2100
                           Newark, NJ 07102


Audio Operator:            Wendy Romero

Proceedings recorded by electronic sound recording, transcript
           produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For the Debtor:              Otterbourg, PC
                             By:  MELANIE L. CYGANOWSKI, ESQ.
                             230 Park Avenue
                             New York, NY 10169

                             Wollmuth Maher & Deutsch, LLP
                             By:  PAUL R. DeFILIPPO, ESQ.
                             90 Washington Valley Road
                             Bedminster, NJ 07921

For the Official            Bailey & Glasser, LLP
Committee of Talc           By:  BRIAN A. GLASSER, ESQ.
Claimants:                  1055 Thomas Jefferson Street NW
                            Suite 540
                            Washington, DC 20007

                            Genova Burns, LLC
                            By:  DANIEL M. STOLZ, ESQ.
                            110 Allen Road, Suite 304
                            Basking Ridge, NJ 07920

                            Brown Rudnik, LLP
                            By:  ROBERT J. STARK, ESQ.
                            7 Times Square
                            New York, NY 10036

For Aylstock, Witkin,       Klee, Tuchin, Bogdanoff & Stern, LLP
Kreis & Overholtz,          By:  ROBERT J. PFISTER, ESQ.
PLLC:                       1801 Century Park East, 26th Floor
                            Los Angeles, CA 90067


                      *  *  *  *  *

1          THE COURT:  Bear with me for technology.

2          You have absolutely no faith in me, do you?

3          All right.  Again, good morning, everyone.  This the

4   LTL Management LLC matters, and as my law clerk is reminding

5   me, let me start with some administrative matters.

6          Already, I'm going to -- I see an attorney I'm going

7   to have to correct.  So I had a conversation with Chief Judge

8   Freda Wolfson.  She cornered me in an elevator and said she

9   heard some concerns raised by our marshals and CSOs about

10  lawyers, distancing and mask wearing.  And I assured her that I

11  would remind everybody to be more vigilant lest all of a sudden

12  we create a, yet a new ground for withdrawing the reference.

13  We don't want all of a sudden, everybody on this side of the

14  aisle will be ripping off their mask, hugging each other.

15  It'll be a new strategy.

16         So please, unless you're speaking, and then by all

17  means when you're speaking, take off the masks, but otherwise

18  keep the mask on.  Do your best.  Obviously, counsel who are

19  conferencing together, counsel who are traveling together and

20  otherwise lunching together, I'm not going to say distance.

21  That's kind of silly.  But if we could put everybody in their

22  own little group.  But from others, try to distance yourself

23  from others to the best you can.  We'll try to accommodate.

24         We do have spillover, excess availability in other

25  rooms.  I don't think we need it today.  The numbers are

4

1  reduced.  So just be vigilant.

2          As far as appearances, as I've said, I don't need to

3  go through appearances again.  And each time, I have the

4  dashboard from Court Solutions.  I have lists.  What I will ask

5  you to do is when you're addressing the Court, either on Court

6  Solutions, through Court Solutions, or here, please identify

7  yourself and we'll be able to hopefully save time and move

8  forward.

9          Let me start then.  I have the agenda.  And let me, I

10 guess, hear from debtor's counsel.  I know we have some

11 educational materials.  It's going to be school for a little

12 while.  We have some presentations on both sides of the aisle.

13 So let me turn to debtor's counsel and see how you wish to

14 begin.

15         MR. GORDON:  Good morning, Your Honor, Greg Gordon,

16 Jones Day, on behalf of the debtor.

17         We did confer with the other side, and I think we're

18 in agreement that if it's acceptable to Your Honor, we would

19 begin with those presentations.  And I think Your Honor had

20 indicated at the last hearing that you wanted us to keep them

21 to 30 minutes.

22         THE COURT:  I think that's reasonable.

23         MR. GORDON:  And I think we're prepared to do that.

24         And then otherwise, I think there's been lots of

25 meeting and conferring about the other matters on the agenda.

5

1  And I think for the most part we have resolutions or we've

2  agreed to move some things, and we'll walk through that I think

3  probably in the order that they appear in the agenda.

4          THE COURT:  That would be fine.

5          MR. GORDON:  And then the only other thing I think

6  there is, we'd like to provide a status report on discovery.

7  We obviously had the status conference with Your Honor on the

8  7th.  There's been further communication with the two sides, or

9  between the two sides about that.  I know Mr. Glasser is here

10 as well, and I think he probably wants to talk to the Court,

11 but we'd like to do that at the appropriate time.  Maybe at the

12 end.  We didn't talk about when we would do that, but --

13         THE COURT:  I think that makes sense.

14         MR. GORDON:  -- maybe at the end.

15         THE COURT:  I'd welcome that.

16         MR. GORDON:  Okay.

17         THE COURT:  All right.  So let's start the program.

18         MR. GORDON:  So, Your Honor, I'm not sure exactly

19 administratively how this is supposed to work since I don't

20 have the clicker in terms of how to move the --

21         THE COURT:  I defer to my law clerk.

22         THE CLERK:  I will be used at your verbal command.

23         MR. GORDON:  Well, that sounded pretty good.  I

24 should think about that for a minute.

25         All right, you can go to next slide, please.

6

1          THE COURT:  And of course, I have on my monitor here.

2  That's for the benefit of the courtroom.

3          MR. GORDON:  And we appreciate the setup.  I don't

4  know if I noticed the screen the last time we were here, but we

5  appreciate the Court assisting us with the mechanics of doing

6  it this way.  Thank you.

7          THE COURT:  I've got great staff who know far more

8  than I do.

9          MR. GORDON:  Well, it certainly looks like they're

10  great.

11          So, Your Honor, I think I can go through these

12  relatively quickly.

13          So the first slide, I just wanted to sort of tell the

14  Court from the debtor's perspective, what we view as the

15  purpose of the case or what we view as the ultimate goal of the

16  case.  And for us, it's delivering a fair and equitable

17  resolution of the current and future talc claims against the

18  company and doing that for the benefit of all parties,

19  including the claimants.  And I'll come back to that, but we do

20  feel strongly that this proceeding will benefit the claimants

21  as well.

22          And kind of the flip side of that is, is that we're

23  currently in a system, or we were in a system prior to the

24  bankruptcy case that we believe was very inefficient for

25  everyone, inequitable, created considerable uncertainty and

7

1  lots of delay.  And I'll come back to that as well.

2        And so we think the opportunity to use the Bankruptcy

3  Code to resolve these claims is to everyone's benefit.  And of

4  course, the ultimate goal is to establish a trust and a trust

5  that would operate under procedures that would allow for

6  claims, both current and future to be paid very efficiently,

7  paid promptly, and most importantly, paid in an equitable

8  manner, as opposed to what we've experienced in the tort

9  system, where many claimants get nothing, some claimants get

10 very, very large verdicts, but the majority literally get

11 nothing.

12        And as we indicated to Your Honor at the last

13 hearing, the debtor is prepared to begin negotiating as soon as

14 possible, or as soon as the other side is ready for that.

15        Next slide, please.

16        So, Your Honor, this is a slide that just depicts the

17 corporate history of the assets and the products that are at

18 sort of the core of the claims that have been lodged against

19 the debtor and, of course, its predecessors.  But you know, J&J

20 is a company Your Honor probably knows.  I think it was founded

21 back in 1887.  Baby powder first was manufactured and sold in

22 1894.  The company that -- you know, that was basically

23 manufactured and sold by the company itself.

24        (Audio interference from Court Solutions)

25        THE COURT:  Is that the zoom?

1          THE CLERK:  I believe that's Court Solutions.

2          THE COURT:  All right.  I'll ask those on Court

3   Solutions to remain moot -- remain mute, please.

4          Go ahead.  I'm sorry.

5          MR. GORDON:  No problem, Your Honor.

6          So in 1972, a division was created for this business

7   for the baby products division.  And then importantly, in 1979,

8   there was a decentralization effort at Johnson and Johnson

9   where it was decided that various divisions should be

10  transferred out of Johnson and Johnson and moved into

11  subsidiaries.  And, in fact, this business, the baby products

12  business, was moved in that way in 1979.  It was moved into a

13  subsidiary, Johnson and Johnson Baby Products Company.  And

14  that subsidiary, at the same time, also assumed the liabilities

15  of that operating division.  In other words, of that baby

16  products operating division.

17          And then you'll see, there were a series of further

18  transactions starting in 1981, one in '81, 1988, 1997, and then

19  in 2015 that involved movements of these assets within the

20  corporate structure, some renaming of entities and the like.

21  You'll see that some of the assets were separated out.  For

22  example, in 1981, the baby products division was moved, or the

23  company was moved, but not the diaper assets, or those assets

24  were moved but not those.  And, again, there were movements to

25  other companies.  There were assumptions of liabilities.

9

1          And then, ultimately, in 2015, you had another move

2     where the existing company then was merged into an entity,

3     McNeil-PPC, and then that entity was renamed Johnson and

4     Johnson Consumer, Inc., and that's the JJCI, or the old JJCI

5     that you've heard us refer to or you've seen in the papers.

6          Next slide, please.

7          So this is just an excerpt from the agreement for the

8     transfer of the assets from J&J to the Johnson and Johnson Baby

9     Products Company in 1979.  And, again, this was part of that

10    decentralization effort by the company at that time.  And

11    you'll see here the operative language that the subsidiary

12    agreed to assume all the indebtedness, liabilities, and

13    obligations of every kind and description, which are allocated

14    on the books or records of J&J as pertaining to its baby

15    division.  And the subsidiary hereby covenants and agrees with

16    J&J that the subsidiary will forever indemnify and save

17    harmless J&J against all the indebtedness, liabilities, and

18    obligations after said hereby assumed.  So both an assumption

19    of the liabilities, as well as an indemnity back to Johnson and

20    Johnson with respect to the liabilities that were assumed.

21          Next slide, please.

22          Your Honor, you've also heard from time to time, I

23    think, that as part of this litigation, there have been suits

24    about the Shower to Shower product, a similar product more for

25    adults.  And here, this is just an excerpt from a 1986 annual

10

1 report that indicates that these products were also part of the

2 Johnson and Johnson Baby Products Company and, ultimately, the

3 liability for these products also ended up in old JJCI and,

4 ultimately, was allocated to the debtor as part of the

5 corporate restructuring that occurred in 2021.

6          Next slide, please.

7          Your Honor, this is something that we'll likely

8 discuss in more detail in connection with the preliminary

9 injunction matter, but there was a dispute between the parties

10 as to whether or not there was an assumption of these

11 liabilities or not.  That's one of the reasons I did show you

12 one of the excerpts from the agreement at issue.  But this was

13 another set of evidence that was placed before the court in

14 North Carolina with respect to this issue.  And that is that

15 historically, all the costs related to the talc litigation have

16 always been paid by old JJCI.  And you'll see that that's

17 reflected in general ledger entries.  It's reflected in the way

18 the accounting reserve, or the placement of the accounting

19 reserve, which is in the consumer segment of the financial

20 statements.

21          Go to the next slide, please.

22          And in particular, we have shown the Court an actual

23 SAP journal entry with respect to actually the payment of the

24 Ingham verdict. You may remember that was the one very large

25 ovarian verdict that wasn't reversed on appeal, about $2.5

11

1  billion, and this is just an excerpt from a journal entry that

2  shows that that amount was paid by JJCI, or old JJCI.

3           Next slide, please.

4           So, Your Honor, what the company was facing and what

5  precipitated this bankruptcy filing by LTL, both the corporate

6  restructuring and the bankruptcy filing was literally an

7  explosion of cases that occurred primarily beginning in 2010.

8  And you can see from the data that's on the slide, the

9  substantial uptick in the number of cases that were being filed

10 against the company.  So in 2014, 46 ovarian cancer cases were

11 filed against old JJCI.  That moved up to nearly 5,000 in 2017.

12 And then, to date, or through the petition date in 2021, and

13 actually beyond, over 12,000 ovarian cancer complaints were

14 filed against the company.

15          In the last five years alone, the company has spent

16 $3.5 billion in indemnity payments.  And it's anticipated, of

17 course, that these cases are going to continue for decades.

18 And, you know, this was manufactured until -- manufactured and

19 sold until 2020.  And we know from the asbestos world that

20 there is a substantial latency period.  And, in fact, Your

21 Honor may have seen that Owens-Illinois filed bankruptcy not

22 too long ago.  Its asbestos product there, there was no

23 manufacturing of it by Owens-Illinois after 1958, and it was --

24          THE COURT:  Mr. Gordon, I'm just confused.

25          MR. GORDON:  Sure.

12

1          THE COURT:  The MDL has 38,000, roughly, cases.  My

2     understanding, only about 500 or so of those are meso cases.

3     So how does that comport with 12,300?

4          MR. GORDON:  Well, the 12,300 are just the number of

5     ovarian cancer complaints that have been filed in 2021.

6          THE COURT:  Oh, 2021 to date.  I see.  Okay.

7          MR. GORDON:  Correct.

8          THE COURT:  All right.  My apologies.

9          MR. GORDON:  And I'm sorry if I wasn't clear about

10    that, Your Honor.

11         So in any event, due to the license latency period

12    for mesothelioma and the alleged latency, long latency period

13    for ovarian cancer, it was anticipated that we'd literally be

14    looking at 40 to 50 to 60 years of continued litigation of

15    these claims.

16         Next slide, please.

17         Now, Your Honor, I recognize that we're not here to

18    debate science, but I did want to provide a few slides with a

19    little background on this, sort of presenting at a high level

20    the company's viewpoint on this.  And, in particular, I wanted

21    to raise it because the Committee spent a fair amount of time

22    in its opening statement that was filed in this Court about

23    arguing that science supports its position.  And that's simply

24    not true.

25         And you can see from this series of slides here, you

know, these various entities that have found no association

between perineal talc exposure and an increased risk of ovarian

cancer.  And it's not as if these are all, by the way, old

conclusions.  You have one from the National Cancer Initiative

2021, the ACOG 2019, FDA 2014.  You know, FDA said, "Did not

find that the data submitted presented conclusive evidence of a

causal association between talc use in the perineal area and

ovarian cancer."

          Next slide, please.

          Same thing.  There are various perspective government

sponsored studies.  And when -- this was something I learned,

Your Honor, perspective is a study where you're taking people

at a current period of time, taking women, and then looking

forward in terms of what happens as opposed to a retrospective

study where you have somebody who's already sick and is now

contending that he -- or that she, I guess, primarily in this

case, use the product.  But here, you can see this was

published in the Journal of the American Medical Association in

2020, probably the most prominent medical journal, over 250,000

participants, and the ultimate conclusion was no finding of

association between the use of baby powder and an increased

risk of ovarian cancer.

          Next slide, please.

          There's no U.S. public health authority that's

concluded that cosmetic talc causes ovarian cancer.  And you

14

1  can see here, we've added from the slide you saw before, the

2  CDC is among that group, as well as the SGO.  And the others I

3  think were on the slide that you saw previously.  So not a

4  single one has reached that conclusion, Your Honor.

5            Next slide, please.

6            There have also been a number of studies that show no

7  increased risk of mesothelioma from baby powder products as

8  well.  And these studies -- and again, I'm only going to spend

9  a minute on these.  These are all studies of miners who worked

10 at mines from which cosmetic talc is produced.  And you start

11 with a study in 1976 which covered 1,514 miners and 478 millers

12 who worked starting from 1921 through 1950.  Found no cases of

13 mesothelioma.  It was updated in 1979.  Still no cases of

14 mesothelioma.

15           Then, you had a study in 2003 of almost 1800 miners

16 and millers who worked at a mine and/or factory between 1946

17 and '95.  Again, no cases of mesothelioma.  Updated in 2017, no

18 deaths from mesothelioma.  And then, again, in 2021, after 74

19 years of follow-up, no deaths found among miners, millers from

20 mesothelioma.  And then there was further testing where there

21 was no detection of asbestos in samples of talc taken from that

22 mine.

23           Next slide, please.

24           Now, in our view, what's happened, or all the

25 plaintiffs really have to offer, is what we would characterize

1  as junk science.  Their primary expert has been Dr. Longo.  And

2  you can see from this order in the one case at the top, the

3  court's view of his testimony.  It was viewed to be practiced

4  and to employ misdirection and evasiveness.  It is at best

5  disingenuous, not credible, and unsupported by any respectable

6  community of scientists.  And, in fact, Dr. Longo previously

7  had testified that claims that cosmetic talc contained asbestos

8  were an urban legend.

9        And then, most recently in a trial that just

10  occurred, the van Clive (phonetic) trial, which you've heard

11  referenced already in this case, Dr. Egilman, one of the

12  experts basically testified to a jury that a telescopic image

13  of space was in fact talc particles under a microscope.

14        Next slide, please.

15        So not withstanding the science, Your Honor, we've

16  been, and were in a situation where, although the company was

17  prevailing in the majority of cases, there was a lottery like

18  aspect to the results in those cases.  And, of course, the best

19  example of that is the case I referred to earlier, which is the

20  Ingham case that generated almost a $4.7 billion verdict.  That

21  was for 22 claimants.  It was reduced on appeal, but it

22  obviously wasn't completely reversed on appeal.  And an effort

23  to have that matter heard by the Supreme Court failed.  Two of

24  the justices actually recused themselves.

25        Then, you have the instance of large verdicts in some

16

1  of the single plaintiff mesothelioma cases.  You can see the

2  numbers ranging from 6 million to over 25 million.  And then,

3  in ones that are under appeal, you had verdicts ranging from 12

4  million to 120 million.  Again, just a lottery like experience

5  in the tort system, many claimants receiving nothing, the

6  majority receiving nothing, and then some receiving literally

7  astronomical numbers.

8           Next slide, please.

9           This is another depiction, Your Honor, of the results

10 on the ovarian side.  Again, showing initial jury awards.  And

11 you can just see the wide range of outcomes.  You have the ones

12 along the bottom that received nothing.  There's a couple of

13 mistrials in there as well.  You can see the <u>Ingham</u> in there, I

14 guess that's 2018.  That number is in there.  And, of course,

15 that's the only one that wasn't fully reversed on appeal.  All

16 these other ones, all these other ovarian jury verdicts were

17 reversed on appeal.

18          And, again, this, Your Honor, is why, in our view,

19 the bankruptcy is beneficial to the claimants.  This is a very

20 inequitable situation.  You know, put aside the debate over the

21 science.  You have this situation where the large majority of

22 claimants literally get nothing, where a very small handful get

23 an astronomically large number.  Yet, if you were to compare

24 the facts of those claims to each other, you would see that

25 they're substantially similar.  And, of course, if we can get

17

1    to a successful result in this case and establish a trust, that

2    inequity will be eliminated both for current claimants and for

3    future claimants.

4              Next slide, please.

5              This slide, Your Honor, just focuses on the verdicts

6    themselves on the ovarian side.  So you can see here 15 trials

7    completed, you had seven defense verdicts, two miss trials.

8    Then you had 1, 2, 3, 4, 5 verdicts that were reversed with the

9    only one that remains standing, being the Ingham case, which

10   again was reduced.  And the reason, by the way, on Ingham, the

11   numbers look different is that's per claimant.  That's taking

12   those verdict numbers that you saw on the prior slide and

13   dividing them by 22.

14             Next slide, please.

15             And the same is true for the mesothelioma claimants

16   as an earlier slide alluded to.  This is just a more granular

17   depiction of that.  You can see the defense verdicts across the

18   top.  Then, you can see verdicts reversed on appeal, mistrials,

19   and then you start to see situations where there was a

20   plaintiff verdict under appeal or where an appeal was lodged

21   and withdrawn.  But, again, I mean look at the compensatory

22   awards.  They go from zero to 15 million to 26 million, a huge

23   disparity.  Same thing on the punitive side, from zero, you see

24   80 million, you see 105 million, 4 million.  And it just,

25   really all over the place.

1          Next slide, please.

2          And, you know, unfortunately, Your Honor, the MDL,

3    which you've heard a lot about, it's just not the solution.

4    And it's not the solution because, number one, its primary

5    focus is on pre-trial issues, particularly, discovery issues.

6    There were, prior to the bankruptcy case, a few bellwether

7    trials that were scheduled, or tentatively scheduled.  But from

8    the perspective of the company those are of limited utility

9    because the primary benefit of a bellwether trial is it

10   provides information to the parties to see how a trial might

11   play out.

12         Well, the company had already tried -- old JJCI had

13   already tried 12 ovarian cancer cases by then.  So from the

14   company's perspective, that information was of limited use.

15   And then, most importantly, the MDL doesn't encompass

16   everything.  It doesn't include meso cases.  It doesn't include

17   state court cases.  They're all federal cases.  And it doesn't

18   include any future claims.

19         Next slide, please.

20         So from the perspective of the company, the situation

21   it was in pre-bankruptcy simply was untenable.  As Your Honor

22   just mentioned a few moments ago, 38,000 pending ovarian cancer

23   cases, 430 mesothelioma cases.  And those, both ovarian cancer

24   and meso cases were escalating at a significant rate.  And, in

25   fact, even post-petition, when we had the initial hearing with

19

1  Judge Whitley that did not receive the stay we were asking for,

2  there were hundreds of cases filed in that interim period.  And

3  any one of those cases, as you can see from the prior slides,

4  could result in a multimillion dollar or multi-billion dollar

5  verdict.

6           And then, of course, in addition to that, you have

7  the associated costs of defense, which are running from ten to

8  $20 million per month.  And as I indicated earlier, you're

9  talking about latency periods that run for 50 years and more.

10 So that's what we were confronting at the time.  From the

11 company's position, that was simply untenable, not only for the

12 company, but it's, again, inequitable for the claimants as

13 well.

14           Next slide, please.

15           So, Your Honor, there were -- you know, the company

16 basically engaged in a number of efforts to try to resolve this

17 liability outside of Chapter 11.  I mean, obviously it was

18 attempting to resolve them in the tort system.  But in the tort

19 system, ultimately, when you have a situation where the claims

20 are increasing at such a rapid case and the costs of defense

21 are so substantial, it's virtually impossible to continue to do

22 that.  In other words, it's virtually impossible to try to

23 litigate every case.  And think about it, too, from the

24 perspective of the claimants, you have almost 40,000 -- excuse

25 me -- claims pending.  How many years is it going to take to

1  have those claims run through the tort system?  I mean, you

2  probably try 12 cases a year, maybe 15.  They would take

3  literally years and years, maybe decades, to have those

4  resolved in the tort system.

5        So you had that.  The other problem the company was

6  facing is an inability to obtain review by the Supreme Court.

7  And it's really the death knell of a cert petition when you

8  have two justices who are conflicted.  I mean, that's a huge

9  problem in having cert granted.  And it happened not only in

10  Ingham, it happened more recently in one of the AG litigations

11  that went up on a cert petition.  Again, the same two justices

12  recused themselves.

13        And, of course, the other issue with the tort system

14  as Your Honor knows is that there's no way to obtain a global

15  resolution in the tort system.  You can't deal with future

16  claims.  You can't do that.  You can just take these cases on a

17  one-by-one basis.  Obviously, there have been efforts in the

18  past to see if these could be handled by some sort of class

19  action or class settlements, and those have all been rejected

20  by the courts.  But the other avenue the company pursued as

21  well, which I think Your Honor probably is aware of based on

22  your review of the record, is that there were efforts by old

23  JJCI and J&J to reach a settlement at least of a substantial

24  majority of the claims in the Imerys case.

25        And those negotiations were very advanced.  Lots of

21

1  progress was made.  It was reported to the bankruptcy court by

2  the claimants that, in fact, a settlement offer had been made

3  in those cases.  And I'm not going to comment on that except to

4  say that that's one of the reasons we're very hopeful we can

5  reach a settlement relatively early because of the progress

6  that was made.  But the bottom line in Imerys was that those

7  negotiations failed.  The agreement could not be delivered by

8  the claimants.  And there were legal hurdles to getting it done

9  when you're not in bankruptcy yourself.

10        And so having attempted to resolve this through the

11  tort system and basically being stymied in a number of ways,

12  both due to the number of claims that would have to be

13  litigated and then this kind of roadblock at the Supreme Court

14  level, coupled with the fact that the negotiations were

15  unsuccessful in Imerys, the company felt that it only had one

16  alternative left and that alternative was to file for

17  Chapter 11.

18        Next slide, please.

19        So, Your Honor, this is where the corporate

20  restructuring came about.  This is a slide that just attempts

21  to depict graphically how that restructuring worked.  It

22  obviously had a number of steps.  And I know Your Honor has

23  read the record, so I won't belabor it.  To me, what's of

24  course very important about this transaction is the funding

25  agreement.  And I mean, the funding agreement, from our

1  perspective, is what demonstrates that there's no fraudulent

2  conveyance here, that no harm has been done to these claimants.

3  That's its intended purpose.  And in here, it's not only a

4  funding agreement from new JJCI, but you have Johnson and

5  Johnson, the parent itself, who agreed to be jointly and

6  severally liable on that up to the extent of the value of new

7  JJCI.  And the record from the PI proceeding reflects that the

8  fair market value of new JJCI is approximately $60 billion.

9          THE COURT:  Six-zero?

10          MR. GORDON:  Sixty billion dollars.

11          THE COURT:  Sixty.  Okay.

12          MR. GORDON:  That's in the record.  That was elicited

13  from John Kim, our chief legal officer on cross examination by

14  the claimants.

15          Next slide, please.

16          So, Your Honor, I'm just going to comment on these

17  next two slides just briefly.  So there's been a lot of focus

18  on the Texas divisional merger.  There's been a lot of negative

19  things that have been said about it.  We're obviously aware and

20  I'm sure Your Honor is as well, there's actually even

21  legislation that's been proposed that would effectively outlaw

22  it almost from a bankruptcy perspective.  In other words, if --

23  I think it provided, if a company filed for bankruptcy within

24  10 years of having completed a Texas divisional merger, the

25  case must be dismissed, I think is the way it reads.

23

1    And that's a gross over-reaction to the statute.  And

2 I put these two slides up to show that.  The Texas divisional

3 merger statute doesn't enable a company to do anything it

4 otherwise could not do through different restructurings.  And,

5 in fact, in other cases, the same results have been achieved

6 through different kinds of restructurings.  So you'll see

7 here -- and Mr. Huff wrote this article in 1989 and he was

8 involved.  And I'm sorry, I can't remember exactly what his

9 role was with respect to this, but he was involved, as I

10 understand it, with respect to the formulation of the bill.

11    But it says "Changes include provisions permitting a

12 single corporation to adopt a plan of merger, providing a

13 division of that corporation's assets and liabilities among two

14 or more resulting corporations or other entities."  Then, it

15 goes on to say, "Traditionally, the transaction had to be

16 effected through multiple steps utilizing common law

17 conveyancing of assets, assumption of liabilities, and

18 distributions to shareholders in connection with the merger.

19 The new provisions will no longer require the many

20 complications previously attendant to such transactions."

21    And if you go to the next slide, please.

22    Kind of a similar point here.  "The amendments

23 permitting these transactions directly through mergers reflects

24 a recognition that because no significant substantive

25 distinction between the two forms of transactions exists,

1  corporations and their shareholders can accomplish these

2  transactions through a merger if a merger provides the most

3  efficient or desirable means of accomplishing the transaction."

4          So this statute doesn't enable a company to do

5  anything differently.  And Your Honor may be aware that

6  Owens-Illinois recently did basically the same thing through a

7  holding company reorganization, but the result was the same.

8  It ended up effectively separating the company into two pieces.

9  And then, they had the equivalent of a funding agreement

10 between the two.  And Your Honor's probably aware that an

11 agreement with the claimants was reached in that case, to fund

12 the trust, and I understand a plan will be filed this month in

13 that case.

14         A similar transaction occurred in the Garlock case

15 with its parent CoalTech.  And rather than using a divisional

16 merger, it basically took its entity, spun assets out to a

17 different entity, left a few remaining assets in, filed that

18 entity, and then had what they call to keep-well agreement from

19 the entity that it received the other assets.  Same type of

20 transaction, but a Texas divisional merger allows you to do

21 that in ways that are simpler and more efficient.

22         And I did just want to come back and say there's

23 obviously been a lot of rhetoric about the impropriety of this

24 and about how the claimants have been harmed and the, you know,

25 the fraud that's been perpetrated.  But, you know, to my mind,

1    the exact opposite happened here.  Considerable thought was

2    given to how to do the transaction in a way that did not harm

3    the claimants.  And, in fact, in some respects, put them in a

4    stronger position.  Now, what it did allow the company -- what

5    it did allow old JJCI to do was not put the entirety of its

6    assets into a bankruptcy case.  But I would submit, Your Honor,

7    that's to the benefit of the parties as well, because all that

8    would do is make the case more complicated, it would cause it

9    to take longer, it would cost more money, there would be more

10   constituents to be heard from, yet the claimants would be in

11   the same position they're in today, which is their cases would

12   be stayed and we'd be working together on a plan that would

13   provide treatment for the claimants and in our view would be

14   much more equitable, much more efficient, provide recoveries

15   much more promptly than what their experience, or what they

16   were experiencing in the tort system before the filing.

17            Next slide, please.

18            There's also been a lot of rhetoric about LTL being a

19   bad co., it being a shell.  And it's simply not.  It's not

20   accurate.  It owns a subsidiary that has substantial value.  It

21   has a funding agreement that backstops its ability to pay these

22   claims.  And at its core, it ensures that the same assets that

23   were available to pay claims before remain available now.

24   Plus, it has the backing of J&J also as the parent company.

25   And, of course, there was an agreement by J&J and new JJCI to

26

1  advance $2 billion under that agreement to be placed into a

2  QSF, a qualified settlement fund, for the exclusive benefit for

3  the claimants.  Now, there's opposition to that.  We're not

4  going to address that today.  We're going to push that off.

5  But, again, the whole purpose of all of this was to set this up

6  in a way that we thought would take off the table these

7  concerns about the transaction and harm.  But, again, a lot of

8  thought was given to this, and in doing this, there was study

9  done of developments in the other cases, the other similar

10 cases, to come up with ways to, you know, to make this an even

11 more beneficial transaction or one that certainly minimized any

12 potential risk, or should have alleviated largely any concerns

13 about what happens.

14         Next slide, please.

15         Now, what the restructuring did not do is it did not

16 allow anyone to escape liability.  The debtor is here.  The

17 claims are here.  It didn't remove any assets.  The same assets

18 and paying power remain available.  And there's been no ring

19 fencing or quarantining of assets, at least not in the way that

20 I think about it, Your Honor.  To me, a ring --

21         THE COURT:  Mr. Gordon, I've given some latitude.  I

22 don't want to -- we're not arguing the dismissal motion.

23         MR. GORDON:  Okay.

24         THE COURT:  I am sure I'm going to be hearing all of

25 this again in February.

1           MR. GORDON:  Fair enough, Your Honor.

2           THE COURT:  Thank you.

3           MR. GORDON:  I'll move on.  Thank you.

4           THE COURT:  Thank you.

5           MR. GORDON:  Next slide, please.

6           So, Your Honor, I don't want to spend much time on

7  this because, again, I know Your Honor is familiar with this.

8  But this is the funding agreement, and I made, I think, a

9  number of these points already.  But it's literally as no

10 conditions.  That the funding's available under that we believe

11 it's a fully enforceable agreement.  It's not a loan.  There's

12 no obligation to repay it.  It's a commitment by both new JJCI

13 and J&J to backstop the obligation of, or any liability of LTL

14 with respect to ovarian cancer claims or mesothelioma claims.

15          Next slide, please.

16          Qualified settlement fund.  Again, I touched on this.

17 you can see that there are qualified settlement funds in two of

18 the other cases, or at least there was one approved in Bestwell

19 (phonetic) at 1 billion.  One is proposed in the Aldrich and

20 Murray cases is at 270.  It is irrevocable.  It does provide

21 for an independent trustee.  And importantly, it does not cap

22 the liability or attempt to oppose some sort of cap on the

23 liability.  That's not the purpose of it at all.

24          Next slide, please.

25          So, Your Honor, in our view, the case has a proper

28

 1  purpose.  These are just the quotes.  Well, the first is a

 2  quote from Judge Beyer in _Bestwall_ that she found that in the

 3  _Bestwall_ case.  And she makes specific reference to an asbestos

 4  or mass tort case.  And she also made reference to the fact

 5  there's not a need for the company to be insolvent.

 6         And then, I wanted to put up some information from

 7  the _SGL Carbon_ case because I know that that's a case that the

 8  Committee has been heavily relying on.  And I think it's

 9  important to note in that case that the court went out of its

10  way to distinguish the circumstances in that case from other

11  mass tort cases.  And you can see _Johns-Manville_, _Dow Corning_,

12  and _AH Robins_ there.

13         Next slide, please.

14         We believe, Your Honor, as I said at the outset, a

15  trust resolution here is more efficient than what was occurring

16  in the tort system.  And if you think about it here, and this

17  is unlike asbestos cases, causation hasn't been established.

18  In other words, you know, asbestos, I think it's become clear

19  over the years, there's agreement, or the science supports that

20  there is general causation between asbestos products and

21  certain disease.  That's not the case with these baby powder

22  products or with talc.  And that means that literally both the

23  claimants and the company are having to retry causation in

24  every single case, which is, from our perspective, very

25  inefficient.  And those efficiencies would be eliminated if we

29

1   can get to the point in this case, which we believe we can, of

2   having a resolution that involves the trust.  And, of course,

3   the cost of administration of the trust are substantially less

4   than the cost of litigating in the tort system.

5          Next slide.

6          And, again, you know, the point is you, you would

7   have more equitable recoveries under a trust.  You would have,

8   and I'm sure Your Honor is familiar with this, you would have

9   trust distribution procedures that would have established

10  criteria for paying claims based on the characteristics of

11  those claims.  And the individuals who can demonstrate those

12  characteristics would be getting amounts that are equivalent to

13  others who have the same claim characteristics, which again is

14  very unlike the situation in the tort system.

15         Next slide.

16         So, Your Honor, just to conclude, we're coming to

17  this Court in good faith.  Our singular goal is to resolve

18  these claims, to do that on a basis that's equitable, that's

19  efficient, and to do it as quickly as we can.  And, again, as I

20  said earlier, we believe that all parties will benefit,

21  including the claimants because we don't think that the

22  claimants benefit from being put through the stress and the

23  delay and the uncertainty of litigation, particularly when

24  they're losing the large majority of these cases, when instead,

25  they would have the ability to simply fill out a trust form,

1  describe their claims, prove it up as required by the

2  procedures, and recover.

3         And so, we are prepared to commence negotiations with

4  the representatives, Your Honor, as soon as they're ready to

5  go.

6         THE COURT:  Thank you, Mr. Gordon.  I appreciate the

7  information.

8         And we'll bring up the presentation of the TCC.

9         MS. CYGANOWSKI:  Good morning, Your Honor.  Melanie

10 Cyganowski, Otterbourg PC, proposed co-counsel for the Talc

11 Claimants Committee.

12        THE COURT:  Good morning.

13        MS. CYGANOWSKI:  First, for the record, and it

14 probably does not need to be said, but please do not accept our

15 silence as conceding any of the theories or facts put forward

16 by the debtor this morning.  We obviously disagree and we will

17 be presenting our views shortly.

18        At this time, Your Honor, I would like to take a few

19 moments to introduce our Committee members.  One of whom is

20 personally present in the courtroom with the others appearing

21 on Court Solutions.  Those who were unable to attend did not do

22 so either because of their own health issues or fear of COVID

23 while traveling.

24        The Office of the U.S. Trustee has rightly called

25 attention to the importance of active participation by

31

1  individual Committee members.  I can personally assure the

2  Court, as well as the Office of the U.S. Trustee, that our

3  Committee members actively participate in our meetings and

4  decision-making, notwithstanding any health or personal issues

5  they may have.  For these reasons and others, I would like to

6  take a few moments to share their individual sagas.

7        The first to present is Alicia Landrum (phonetic).

8  Alicia Landrum is represented by Leigh O'Dell and Ted Meadows

9  of Beasley Allen law firm.  Both Lee and Ted are present in the

10 courtroom today.  Alicia is present on Court Solutions.  She is

11 a single mother of two, who is employed as a practice manager

12 at the Spartanburg Regional Medical Center.  She was diagnosed

13 with Stage 3 ovarian cancer of June of 2011 at the age of 39.

14       Alicia underwent extensive testing, scans,

15 chemotherapy, and debulking surgery.  She continues to undergo

16 medical yearly monitoring and lives with the ongoing fear from

17 the statistics that her ovarian cancer might return, as well as

18 the financial burden associated with a cancer diagnosis.

19 Alicia used Johnson and Johnson's baby powder as part of her

20 feminine hygiene routine for approximately 25 years, applying

21 the powder to her genital area on a regular basis.  Her case is

22 currently pending in the state court in St. Louis.

23       April Fair is represented by Mark Robinson, Jr., and

24 Lila Razmara of Robinson Calcagnie, Inc.  Mark and Lila are

25 both present here in the courtroom today.

1          April started using Johnson and Johnson's baby powder

2    in her peritoneal area around 1993 when she was 15 years old.

3    She used it daily for almost 20 years.  Unfortunately, she was

4    unaware of any connection between ovarian cancer and the use of

5    baby powder.  April was originally diagnosed with ovarian

6    cancer in 2010 when she was only 33 years old.  At the time of

7    her diagnosis, she had a four-year-old daughter.  She underwent

8    a hysterectomy and chemotherapy and she has remained in

9    remission for several years.

10          Unfortunately, April experienced a recurrence in 2020

11   that required surgery to remove masses in her pelvis, bowell,

12   abdomen, and colon followed by chemotherapy.  She continues to

13   be on maintenance therapy with Zejula.  As a result of the

14   necessary hysterectomy, April can no longer have children.  And

15   the chemotherapy has left her with persistent neuropathy, which

16   has worsened over time.

17          She is in constant pain.  So much so that she has

18   been unable to remain -- or to return to work as a certified

19   nursing assistant.  And her daughter has sadly witnessed her

20   mother's misery and suffering throughout her life as she has

21   grownup.

22          Our third member of the TCC is Blue Cross Blue Shield

23   of Massachusetts.  Blue Cross and Blue Shield of

24   Massachusetts, Inc., and Blue Cross and Blue Shield of

25   Massachusetts HMO Blue, Inc., together simply referred to as

33

1  Blue Cross and Blue Shield, are represented by Lyzzette

2  Bullock, who is the Associate General Counsel, and Elizabeth

3  Carter of Hill, Hill, Carter, Franco, Cole, and Black.  Each of

4  them are present on the Court Solutions today.

5          Blue Cross and Blue Shield has insured and/or

6  administered self-funded health plans that have covered

7  hundreds of plaintiffs who have filed personal injury lawsuits

8  against J&J and JJCI for both injuries, including ovarian

9  cancer and mesothelioma, caused by talcum powder products.

10  Blue Cross and Blue Shield has not filed a direct action

11  against the Johnson and Johnson defendants or intervened in a

12  member's litigation as of this point, but they are impacted by

13  the debtor's bankruptcy strategy the same way as any injured

14  persons may be with respect to recovering medical expenses.

15          Our fourth member is Darlene Evans (phonetic) who is

16  represented by James Onder and Cynthia Garber of OnderLaw, LLC.

17  Jim Onder is present in the courtroom today.

18          Darlene is the mother of Erin who was diagnosed with

19  Stage 4 ovarian cancer at the age of 38.  Erin was a single

20  mother of two beautiful girls.  Sadly, Erin suffered for two

21  years as she underwent chemotherapy before she passed.

22  Darlene's daughter wanted, like all of us, to have a life and

23  enjoy her children as they grew up.  She wanted to see her

24  daughters go on their first date, graduate, and walk down the

25  aisle.  Her youngest daughter was just 12 when Erin passed.

1          In Darlene's words, and I quote, "No mother should
2  have to bury her child."  And she lives with the weight of
3  having introduced to her Johnson and Johnson's talc from the
4  time she was an infant.  As Darlene reflected upon her life, as
5  a black American child, using Johnson and Johnson's baby powder
6  made her feel like she had crossed a barrier.  When she used
7  the product, she became like the people in those commercials.
8  Regardless of the color of her skin or what she had or didn't
9  have, Johnson and Johnson's baby powder made her feel like she
10 could be just like any other girl.

11         In her words, "I belonged.  I was part of something
12 bigger."  Darlene appreciates that no one can put a dollar
13 value on her daughter's life, but she believes in her fight to
14 secure justice.

15         Our next member is Kellie Brewer.  And Kellie Brewer
16 is represented by Majed Nachawati and Darren McDowell of Fears
17 Nachawati law firm.  Majed is present in the courtroom today.

18         Kellie is a 60-year old mother of two and the proud
19 grandmother who was diagnosed with Stage 4 ovarian cancer in
20 September of 2000.  Because of her diagnosis, Kellie endured
21 multiple surgical procedures and countless sessions of
22 chemotherapy, which have taken a toll on Kellie and her family,
23 both physically, mentally, and financially.  As part of her
24 daily hygiene, a personal routine, Kellie used J&J's baby
25 powder for more than 30 years.  Prior to being diagnosed with

1 Stage 4 ovarian cancer, Kellie was healthy, vibrant, and
2 enjoyed spending time with her husband, Tim, and their two
3 children.

4          Our next member is Kristie Doyle, who is represented
5 by Steve Kazan and Joe Satterley of Kazan, McClain, Satterley
6 and Greenwood PLC.  Steven is present on Court Solutions this
7 morning.

8          Kristie is the widow of Dan Doyle who was born on
9 November 29, 1970, and died of malignant mesothelioma in
10 December of 2018 at the age of 48.  His only exposure to
11 asbestos occurred from his decades use of Johnson and Johnson's
12 baby powder.  Autopsy analysis demonstrated that talc and the
13 exact type of asbestos documented in Johnson's baby powder was
14 found in his lung and lymph tissue in addition to mica and
15 aluminum's silicates, both documented ingredients in Johnson's
16 baby powder.

17          Dan was happily married to Kristie and their only
18 child, Ethan, who was just 14 years old when his father passed.
19 Ethan was obviously devastated by watching his mentor and
20 father suffer through a horrific battle with mesothelioma.  In
21 his deposition, Dan spoke candidly about the pain that he and
22 his family had endured.  His trial had been scheduled to start
23 in May of 2020, but was adjourned due to COVID, rescheduled
24 then for September, 2021.  But once again, rescheduled to take
25 place in April of 2022 in Santa Clara.

36

1          Our next member is Patricia Cook.  Patricia "Patty"

2  Cook is represented by Perry Weitz and Lisa Busch of Weitz and

3  Luxenberg.  Lisa is present in the courtroom today.

4          Patty is 58 years old.  She is living with peritoneal

5  mesothelioma.  Patty was exposed to asbestos from her personal

6  application of Johnson and Johnson's baby powder from

7  approximately 1976 through 2001.  She was further exposed to

8  asbestos from applying J&J's baby powder to her two children

9  during diaper changes from approximately 1996 through 2000.

10 It's been almost a year since her diagnosis of mesothelioma.

11         At the time of her diagnosis, Patty had been married

12 only one month.  It was only days before Christmas in 2020.  In

13 February of this past year, in 2021, Patty underwent extensive

14 surgery where she had multiple organs and tumors removed,

15 followed by chemotherapy.  The treatment which she receives has

16 caused her to lose significant amounts of hair resulting in her

17 needing to wear a wig at times when she is out in public.

18         As a certified personal trainer, she had always been

19 physically fit and healthy prior to her mesothelioma diagnosis.

20 She also enjoyed traveling with her husband.  They have two

21 children in their mid-twenties.  Prior to the preliminary

22 injunction in this case, Patty's case was nearing trial-ready

23 status.  Her case is pending in Middlesex County, New Jersey,

24 and is in the process of expert discovery -- or had been.  A

25 trial date was scheduled for May of 2022.

37

1          Our next member is Randy Derouen, who is represented

2    by Jerome Block of Levy Konigsberg LLP.   Jerry is present in

3    the courtroom today on his behalf.

4          Randy was born in Biloxi, Mississippi, in 1993 and is

5    48 years old.   Randy was exposed to Johnson and Johnson's baby

6    powder as an infant when his mother and grandmother used it

7    during every butt diaper change and after bathing him.   Growing

8    up in a southern climate, Randy continued to use Johnson and

9    Johnson's baby powder daily.

10          Randy was diagnosed with peritoneal mesothelioma in

11    June of 2020 just as he was enjoying a successful career in the

12    casino industry.   Currently, Randy is battling devastating

13    anemia from his chemotherapy treatments.   He is often so weak

14    that he needs to crawl to the bathroom.   Within the past few

15    weeks, he was hospitalized for four days where he received

16    blood transfusions.   His mesothelioma is so extensive that his

17    chances of long-term survival are not high.   He is not a

18    candidate for surgery.

19          Randy's case is pending in the Superior Court of New

20    Jersey in Middlesex County.   Fact discovery has been completed.

21    Expert's reports were due this past November, but delayed,

22    obviously, because of the preliminary injunction in this case.

23    His trial had been scheduled for February '22, but is now

24    adjourned without a date.

25          Our next member is Rebecca Love, who is represented

38

1    by Michelle Parfitt and James Green of Ashcraft & Gerel, LLP.

2    Michelle and Jim are both in the courtroom today.  Rebecca is a

3    dental surgeon and a retired Air Force officer.  Rebecca

4    received her doctorate of dental surgery degree from the

5    University of Texas Health Science Center in San Antonio School

6    of Dentistry.

7            In June of 1980 she then entered into active service

8    in the United States Air Force.  After her tour was completed

9    she entered into private practice while also serving in the Air

10   Force Reserve.  While in the reserves Rebecca was called to

11   active duty to serve our country as a dentist during Desert

12   Shield and Desert Storm.  She retired from Air Force Reserves

13   in 2003.

14           While serving in the reserves Rebecca took a forensic

15   dentistry course from the Armed Forces Institute of Pathology

16   and received her forensic dentistry certification.  In civilian

17   practice she was a key member of the Fort Worth District Dental

18   Society Mass Disaster Team that had the dubious task of

19   performing dental identifications on 83 victims of the David

20   Koresh Branch Davidian inferno in Waco, Texas in April and May

21   of 1993.

22           In July of 2018, however, while on a women's retreat

23   Rebecca discovered a walnut-sized lump in her right groin.  Her

24   VA physician immediately took steps for a radiology appointment

25   for a CAT scan.  This was followed by a lymph node biopsy under

general anesthesia, and three days later she learned she had

stage 4 ovarian cancer with a 17-percent five-year survival

rate.  For over 43 years of her life Rebecca regularly used

Johnson & Johnson's baby powder.

Tonya Whetsel is represented by Erik Karst, Doug von

Oiste, and David Chandler of Karst, von Oiste, LLP.  Doug is

present on CourtSolutions.

Tanya is the mother of Brandon Whetsel, who passed

away from mesothelioma three years ago.  Brandon was diagnosed

with mesothelioma in May 2017 at the age of 36.  Brandon

struggled through the next 18 months after his diagnosis,

losing a hundred pounds, and ultimately passing away in

November of 2018 at the age of 37.  Brandon left behind Kristen

(phonetic), his wife, his three-year-old daughter Avery

(phonetic), his mother and stepfather.

Brandon's only known exposure to asbestos was talc.

He was first exposed to Johnson & Johnson's baby powder as an

infant when Tanya would use it on him when changing his

diapers.  Later in life Brandon used J&J's baby powder while

playing basketball and baseball in junior high, high school,

and thereafter.

This case was filed in Jackson County, Missouri and

was scheduled for trial several times.  Due to COVID the trial

was delayed.  They finally got a firm trial date in January of

2022, but, obviously, because of the pending preliminary

1  injunction this date will not proceed, either.

2          Our next and last member of the committee is

3  Mr. William Henry, who I'm pleased to present to the Court is

4  personally present.

5          Mr. Henry, would you please rise?  And with him is

6  his counsel, Mr. Christopher Tisi of Levin Papantonio Riferty

7  (phonetic) -- Rafferty.  I practice so much on the Italian name

8  I forgot the other one.  My apology.

9          Mr. Henry is the widower of Debra Sue Henry.  They

10 first met in 1973.  They were engaged on their sixth date.

11 William and Debra were married for more than 46 years until

12 Debbie's untimely passing on October 22, 2020.

13         In addition to William, Debbie left behind four

14 children and 11 beautiful grandchildren.  Debbie was a longtime

15 employee of Lakeside Junior High School in Clay County,

16 Florida.  She was extremely involved with the church.  She and

17 William attended as many overseas missionary trips as they

18 could, and together they helped build three Native American

19 bible colleges.

20         Debbie used Johnson & Johnson's baby powder with

21 talc, as well as Shower to Shower, daily in some form or

22 another literally her entire life.  In October 2019 Debbie

23 began to experience severe pain in her upper pelvic and

24 abdominal regions.  Following further medical workup, surgery,

25 and pathological examination Debbie was ultimately diagnosed

41

with stage 3 high-grade serous carcinoma of the peritoneum,
ovaries, and fallopian tubes.  Debbie was BRCA negative and had
no genetic predisposition for ovarian cancer.  Sadly, she
passed barely a year after her diagnosis.

While I appreciate that this is unusual, I would ask
the Court for its indulgence since Mr. Henry traveled from
Florida, if he might just say a few words.

THE COURT:  I have no issue with that.

MS. CYGANOWSKI:  Mr. Henry.

THE COURT:  Good morning.

MR. HENRY:  Good morning, Judge.  I'll try to get
through this.

MS. CYGANOWSKI:  You can take the mask --

THE COURT:  You can take the mask --

MS. CYGANOWSKI:  -- off, Mr. Henry.

THE COURT:  -- off as well.

MR. HENRY:  As she said, I'm a widower still in love
with his wife.  Debbie and I were engaged when we were 16.  We
were engaged for one year.  Forty-six years after our wedding
on a Wednesday evening Debbie quietly asked me to let her go.

Early that Thursday morning Debbie said she couldn't
breathe.  We called 911 and Debbie's cancer's doctors.  As I
held her hand and held her close her heart stopped.  She took
her last breath.  That was at 5:30 in the morning on Thursday,
October the 22nd.  Debbie was gone.

42

1         There can be no apologies.  There can be no do-overs.
2    Debbie's gone.  Please hear the 38,000 echoes of this voice.
3    We are people, not numbers.
4         THE COURT:  Thank you, sir.  That --
5         MR. HENRY:  Thank you.
6         THE COURT:  I know it must have been difficult.
7    Thank you.
8         MS. CYGANOWSKI:  Your Honor, the Committee members
9    and their personal plights mirror the 38,000-plus litigants who
10   have sued Johnson & Johnson, JJCI, and the many other
11   affiliated entities in both federal and state court.  Their
12   voices have a right to be heard.
13        No one with a terminal illness wants to sue.  None of
14   these claimants want to spend their last breaths in a courtroom
15   litigating against Johnson & Johnson or anyone.  If they had
16   the choice of being cured and going home, they would not
17   hesitate.  But given their lack of choice they are now
18   desperately seeking their day in court.
19        We know and are confident that this Court will be
20   dedicated to assuring that their voices and personal pleas will
21   remain important and integral, and not be lost in the cascade
22   of economics which all too often consume our bankruptcy cases.
23   Thank you.
24        THE COURT:  Thank you, Ms. Cyganowski.
25        MR. STARK:  Good morning, Your Honor.

43

1              THE COURT:  Good morning, counsel.

2              MR. STARK:  My name is Robert Stark.  I'm with Brown

3    Rudnick.  It's hard to follow that, forgive me.

4              If I may, I first want to thank the Court and

5    particularly Mr. (indiscernible) for the help this morning and

6    the patience.

7              We have a presentation to make.  I sadly have the job

8    after following that with a little intellectual and conceptual

9    stuff.  But I find myself, having sat through what I thought

10   was an 85-percent presentation not to the Court, but to these

11   people, as to why you won't negotiate with you.  I think that

12   answer was there.  Now I have to put it into the

13   intellectualism.  So if Your Honor will allow me, please.

14             THE COURT:  By all means.

15             MR. STARK:  Next slide, please.  If it's okay, I

16   brought some water.  Is that all right?

17             THE COURT:  Feel free.

18             MR. STARK:  Thanks.  LTL Management LLC, what is it?

19   What's its purpose?  What are we supposed to be doing here

20   before Your Honor?  I ask that before every single case I have.

21   This one's a new one for me, Your Honor, and I've been doing

22   this a long time.

23             Let's go to the next slide, please.  It has only one

24   purpose, and that's to shelter J&J, and by J&J I mean the non-

25   debtor attributes of the J&J conglomerate, the empire.

44

1  Includes J&J, includes JJCI, the farthest reaches of the

2  global, unbelievable wealth.  That's what I mean by J&J.

3          This debtor has got one purpose in life, and that's

4  to shelter J&J from its top liabilities.  It was created

5  literally hours before it filed for bankruptcy.  It had one

6  stated purpose, which was to file for bankruptcy.  It's its

7  only purpose for being.  It has no business.  Nothing to

8  rehabilitate.  Nothing to reorganize.  Nothing to sell.

9          The business, because there isn't one, doesn't buy

10  anything.  Doesn't sell anything.  It doesn't produce anything.

11  Doesn't deliver anything.  It does not participate in the

12  commercial world.  It is a passive shell.  It is a special

13  purpose vehicle, but colloquially SPV.

14          I enjoyed the effort to try to commercialize this

15  into something that it's not.  It is nothing.  It is an

16  insignificant legal entity as a conduit through which the rest

17  of J&J seeks to tap the benefits of bankruptcy without being in

18  bankruptcy.  It has no creditors, except for one class:  these

19  people.  There are now banks, bondholders, trade creditors,

20  customers, suppliers, vendors, landlords, utilities, unions, or

21  taxing authorities.  There ain't anybody else but these people.

22          There is no common pool problem to work through.

23  There are no employees.  They're all J&J employees secunded and

24  drawing a J&J salary.  There is no independent board.  They're

25  all J&J employees drawing a J&J salary.  J&J's longstanding

45

1  corporate law firm Jones Day created this special purpose

2  vehicle hours before the filing to file, not to protect the

3  nonexistent assets and nonexistent business, but to enable J&J

4  to borrow the automatic stay without it having to file for

5  bankruptcy itself.

6           It is a conduit passthrough, and they don't even hide

7  it.  They hide it in plain sight, if you want to call it that.

8  LTL stands for Legacy Talc Liabilities.  It has no other

9  purpose.

10          Importantly, Your Honor -- next slide, please -- this

11  is an inside-out bankruptcy case, another attribute -- I've

12  never seen this before.  There's nothing in the estate.

13          Bankruptcy, bankruptcy code, bankruptcy

14  jurisprudence, bankruptcy academia, all sorts of principles

15  going back to the beginning of modern bankruptcy, through the

16  Supreme Court cases in the '20s and the '30s all the way to

17  today, talk about the estate, what is in the estate; how do we

18  create its profit-making potential; what pre-petition transfers

19  ought to be brought back into that business; how do we value

20  that estate; how do we whack it up; who gets what amongst all

21  those varying constituents who don't appear here.

22          There's nothing in our estate.  They put a little bit

23  of cash.  They put an AR stream in it which they value, but we

24  probably don't value it, at a rather small number relative to

25  the claims.

1          And then there's the contract, this limited capped

2    contingent opportunity to do a deal with J&J where maybe if

3    they feel like it they'll put money in if the price is right.

4    This is an inside-out bankruptcy because the value proposition

5    is not what's in the estate.   It's what J&J might contribute if

6    all of these people start getting, in their eyes, reasonable on

7    the global settlement term.   There is no case like that in our

8    histories.

9          But now let's look at the legal machinations.

10   Ms. Earl.

11         J&J's New Jersey.   I grew up in East Brunswick down

12   the block from it.   It was founded in New Jersey.   It's been

13   headquartered in New Jersey.   Everybody on my block worked for

14   J&J.   It's operating under New Jersey law since 1800s.   It is

15   an integral multifaceted part of the New Jersey economy.

16   Indisputable.

17         But New Jersey corporate law doesn't allow them to do

18   what they wanted to do here.   So what did they do?   They found

19   a way into Texas and said even though we're a stranger to

20   Texas, we'll go orchestrate this entire restructuring under

21   Texas law and call it as if it was in New Jersey.

22         And that's not enough.   Because they most assuredly

23   did not want to be before Your Honor, they then manufactured

24   jurisdiction in North Carolina, not because LTL or J&J has any

25   particular business connectivity to North Carolina, or Texas,

1  for that matter, but to evade the Third Circuit standard on bad

2  faith filing.  And what did they do immediately upon filing?

3  They went to get a 105(a) injunction to protect not LTL, but

4  J&J, JJCI, everybody else.

5          The conduit was working.  The machinations were

6  working.  And none of this comports with bankruptcy law.

7          Ms. Earl.  Chapter 11 offers this estate and its

8  creditors nothing.  There's no business here to protect,

9  preserve, enhance.  The estate is not a melting ice cube.

10  There's nothing in it.  There's no inter-creditor dispute over

11  who gets what.  There's no business rehabilitation that can be

12  done here, because there ain't no business.  There is no valid

13  reorganizational purpose here at all.

14          This case is all about litigation advantage, not for

15  this debtor, but for J&J.  It's borrowing LTL's automatic stay

16  without filing for bankruptcy itself to seek -- to seize all of

17  these claims and stop them in their tracks from being

18  prosecuted against J&J, while people are dying of cancer and

19  while they're trying to prepare their families' financially

20  postmortem.  It does not get more inhumane than that.

21          And by the way, because I sat through so much about

22  all the corporate lawsuits, just another case, there's no

23  inherent viability to the Texas two-step or any other

24  structuring here.  This is about as avoidable as can be.  I

25  don't remember what the slide said, but my jaw -- I had to pick

48

1  it up with a shovel when I saw it, about they're not moving

2  anybody away from the assets.  Sixty billion he said was just

3  in JJCI alone.  And that's the entire purpose of the

4  transaction, to get these people away from the 60 billion, plus

5  everybody -- every other asset class in the JJ -- J&J

6  conglomerate.

7       That's avoidable.  It's also wrong under such big

8  chestnuts in our jurisprudence as Pepper v. Litton.  You can't

9  just write off by hiring a high-falutin lawyer overnight

10  decades of tort liability.  Imagine the public outcry to that.

11  Imagine the public policy, consumer protections, even capital

12  markets, implications of that.  Go ahead, poison the city.  We

13  could just have -- hire these guys to just overnight dump it

14  into an SPV, put it before Judge Kaplan, and all go away.

15       But let's step back.  Ms. Earl.

16       Why, then, go through all the trouble?  Why do all

17  this?  I saw all those slides.  My goodness.  We have no case,

18  apparently.  What was that one about our expert thought that

19  the cosmos was talcum, whatever.  Well, if that's the case,

20  then why fear the tort system?  What's so wrong about it if

21  we're just so silly?

22       In fact -- Ms. Earl -- J&J for a very long time, and

23  these folks are providing more than I'll ever learn about it,

24  but for a very long time they were winning.  They won.  They

25  loved the tort system.  They loudly proclaimed it in the Imerys

49

1  case down in Delaware, how they really wanted to go back to

2  juries.  But then things changed.

3         Ms. Earl.  2018, Canada's version of the FDA does

4  find a causal relationship between talc use and ovarian cancer,

5  and then it reaffirms it last year -- or this year.  In 2019

6  the FDA finds that J&J's talc products do contain asbestos.

7  What -- they said they did.

8         What did J&J do right after that?  They removed all

9  baby products, all talc-related baby products off the shelf.

10  You can't buy what was put in my diaper and what Your Honor may

11  have put in your child's diaper, because the FDA said you

12  shouldn't do it anymore.  But then the Daubert rulings started

13  going the other way.

14         2020 the Appellate Division of the Superior Court of

15  New Jersey issued a unanimous 36-page opinion holding that the

16  plaintiffs' experts adhered to methodologies generally followed

17  by experts in the field relied upon by studies and information

18  generally considered an acceptable basis for inclusion in the

19  formulation of expert opinions, reversed the lower court's

20  order excluding the plaintiffs' experts on causation.  That's

21  not a trial court.  That's not a jury who was amuck.  That was

22  the Appellate Court.

23         Chief Judge Wolfson, April 27th, 2020, issues a 141-

24  page decision.  You know, she's been doing this for five years.

25         THE COURT:  I slogged through that opinion, yeah.

50

1          MR. STARK:  Did you see this point, this quote:

2          "What remains clear from the general causation

3    evidence relied by the experts on both sides in this matter is

4    that there is scientific evidence supporting each side's

5    opinion."

6          I think Judge Wolfson deserves better than to think

7    she's just some jury that's gone amuck.

8          In June 2020 the Missouri Court of Appeals considered

9    the sufficiency of expert opinion testimony linking talc-based

10   products and ovarian cancer.  I don't know, is this the -- was

11   this the case where the expert, you know, thought that the

12   Cosmos was made of talcum powder?

13         Contrary to the overwhelming scientific consensus,

14   that's what they said, Missouri Court of Appeal unanimously

15   rejected J&J's decision.  Not the trial court.  Not a jury gone

16   amuck.

17         So J&J doesn't like the court system anymore, so it

18   turns to liability management.  Ms. Earl, please.

19         And it's important, and Your Honor's going to see all

20   of this soon enough, that J&J didn't disclose a bunch of stuff

21   along the way.  It turns out that they had some files that more

22   recently they've had to disclose and, boy, that infuriated some

23   juries.  Suggested they may have known all along, were told to

24   warn, and decided not to.

25         So juries have been responding, and they have been

51

1  responding with big punitive damages that are being sustained

2  on appeals.  And not just against JJCI, but J&J, because

3  they're deeply involved in the daily attributes of talc mining,

4  the business of creating it, the business of marketing it,

5  making sure that everybody felt -- when they saw that pink

6  lettering in the script that we all grew up with that you felt

7  warm and cozy and had no idea that it might in fact kill you.

8          J&J now flees the courts, doesn't like the courts

9  anymore, and the heart of its liability management is Your

10 Honor.  Congratulations.  You now have them.  Their desire is

11 for Your Honor to deliver to J&J the benefits of bankruptcy

12 without compelling it to undertake any of the burdens of

13 bankruptcy.

14         They want to file for bankruptcy?  Sure we'll engage,

15 because we have to.  But they file a little SPV as a conduit to

16 get everything else.  It don't work like that.

17         And the strategy is clear, and it's really inhumane.

18 If they can borrow the automatic stay long enough and delay the

19 cancer patients, people who are now trying to financially plan

20 for their familiar postmortem, they can push them into a cheap

21 settlement.  This is not your typical commercial transaction.

22 This is not your typical commercial bankruptcy.

23         Ms. Earl, please.  How many slides did we have on J&J

24 deserving of judicial sympathy?  Ten, 15?  Let's leave aside

25 the obvious, which is they made the stuff, they sold the stuff,

52

1  they buried the files and didn't want to warn people to an

2  issue of their own making.  Let's leave that aside for a

3  minute, okay?

4           J&J is one of the world's wealthiest, most powerful

5  and politically-connected conglomerates.  It can afford

6  probably more than anybody else to manage its tort issues

7  without the help of this Court.  You don't need to save Johnson

8  & Johnson.  That is not something you need to wake up at night

9  and worry about.

10          It complains about 3.5 billion in tort costs over

11  five years.  If Your Honor took a look at the last 10-Q

12  statement filed by J&J, you'd see there's 41 billion of cash on

13  hand or cash equivalents on hand.  It has a captured insurance

14  company.  It enjoys a higher credit rating than the United

15  States government.  It has a stock market capitalization of

16  nearly half a trillion dollars.  It distributed to its

17  stockholders as dividends and buybacks $150 billion in the last

18  10 years.  And it's complaining about 3-1/2 billion that it has

19  to pay for what it did?  No.  This company does not need your

20  help, Your Honor.

21          Last -- next slide, please.  I've done a lot of

22  bankruptcy cases, Your Honor.  It's rich people fighting over

23  rich people.  This is a case of moral imperative.  This is not

24  a legal issue for us.  This is a moral issue for us.  The TCC

25  must vigorously oppose what's going on here.  It is wrong.  It

53

1  is wrong for this country.  It is wrong for these people.

2          And we're not alone in that regard.  Ms. Earl.  On

3  November 10th a number of senators signed a letter and sent it

4  to the CEO of Johnson & Johnson, and I quote:

5          "We write to strongly object to Johnson & Johnson's

6  efforts to manipulate bankruptcy laws to evade accountability

7  for any harm caused by your products.  We urge you to

8  immediately reverse course so that tens of thousands of

9  consumers can have their fair day in court."

10         Exploitation of the bankruptcy system by large

11 companies to avoid accountability is unsurprising, but it is

12 also unacceptable.

13         Next slide, please.  Preliminary injunction tramples

14 dying people's Seventh Amendment rights.  It's not right under

15 the law.  It's not right as a matter of basic human decency and

16 equality and equity.  It's going to dissolve.  It should

17 dissolve.

18         This bankruptcy case should be dismissed as a bad

19 faith filing just because it's horrible what's happening here,

20 but because everyone's watching it, and if they get rid -- away

21 with this, can you imagine what the environmental issues, the

22 products, the capital markets, implications of that ruling

23 would be?

24         Let's go further.  The derivative standing, you can't

25 trust J&J board and J&J employees secunded to LTL, being

54

1  advised by J&J's longstanding corporate counsel, to control all

2  of the claims that the estate has against J&J.  Fraud -- it's

3  dripping fraudulent transfer and complicity with fraudulent

4  transfer, and contribution indemnity.  Any liability we have is

5  their liability.  Business tort, veil piercing, substantive

6  consolidation.  It goes on and on and on.  Only then do we pick

7  up the question that Mr. Gordon would have us all listen to in

8  45 percent of his presentation.

9          Should we, the one class of creditors in this case,

10  last time I checked how 1129 works that class needs to accept

11  the plan and to do the thing that they want at 75 percent.

12  Should we endorse this charade?  No, Your Honor.  That's not

13  what we're prepared to do.

14          Does Your Honor have any questions for me?

15          THE COURT:  No, I don't.  Thank you very much.

16          MR. STARK:  Thank you.

17          THE COURT:  Thank you for the information and thank

18  you for the participation of the Committee who were involved.

19  I appreciate the information.  Needless to say, I take these

20  presentations as argument.  They're not evidence for today's

21  matter, certainly, and not evidence going forward as we

22  progress over the next -- course of the next couple months.

23  But I thank you for your efforts, and I think it was quite

24  informative all the way around.

25          All right.  Let's turn, Mr. Gordon, to today's

55

1   matter, and I think your suggestion as to following the agenda

2   that was filed makes the most sense.  I will work with my court

3   recorder to coordinate what matters are on our -- my calendar,

4   but we'll work by the agenda numbers.

5            MR. GORDON:  Your Honor, Greg Gordon, Jones Day.  I

6   think the first uncontested matter -- well, we had a couple of

7   matters that were adjourned.  I just wanted to, as you can see

8   from the agenda --

9            THE COURT:  Let me just so that we always have a

10  record --

11           MR. GORDON:  Sure.

12           THE COURT:  -- acknowledge for the record that

13  numbers 2 and 9 on my calendar, number 2 being the motion

14  relative to the QSF, as well as the motion seeking to seal

15  certain information, that's number 9, are being carried to

16  February 18th of, I think at --

17           MR. GORDON:  Correct.

18           THE COURT:  -- this point 10 a.m.  And now --

19           MR. GORDON:  Correct.

20           THE COURT:  -- will go to the uncontested matters

21  going forward?

22           MR. GORDON:  Right, and I think the first one up is

23  the application of the Committee to retain Brown Rudnick.

24           THE COURT:  Right.  That is, Bruce, numbers 10 and 24

25  on the calendar today.  Counsel.

56

1        MR. GORDON:  I had no prepared remarks, just to

2  answer any questions Your Honor may have.

3        THE COURT:  No, I had the benefit of reviewing

4  everything you've submitted.

5        MR. GORDON:  As long as is.

6        THE COURT:  And my understanding is that for these

7  uncontested matters there are -- I believe we received this

8  morning a set of orders, Mr. Stolz?

9        MR. STOLZ:  Yes, Your Honor.  Daniel Stolz, Genova

10 Burns, on behalf of the Committee.  Yes, we have dealt with the

11 U.S. Trustee's Office.  We have addressed their concerns, and

12 we have filed supplemental certifications for each of the firms

13 and submitted revised orders incorporating the requests of the

14 U.S. Trustee.

15       THE COURT:  All right.  Let me ask, Mr. Sponder,

16 you're on CourtSolutions, if you can confirm the U.S. Trustee's

17 agreement in having this go as uncontested.

18       MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

19 from the Office of the United States Trustee.  Your Honor, the

20 United States Trustee sent inquiries to each of the Committee

21 processionals, and each professional has filed a supplemental

22 declaration or certification on the docket which resolved the

23 United States Trustee's concerns.  Thank you, Your Honor.

24       THE COURT:  All right.  I -- thank you, Mr. Sponder.

25 I'm going to proceed through these uncontested, and we'll mark

57

1  them -- Mr. Sponder, if there's any issue you wish to raise,

2  please interject, but for expediency -- so numbers 10 and 24 on

3  the calendar as far as the Brown Rudnick retention it is being

4  granted, marked OTBS.

5          The next matter is the retention of Parkins Lee &

6  Rubio.  That's numbers 11 and 25 on my calendar today.  And my

7  understanding is that is also granted and OTBS.

8          Someone will correct me when I'm wrong.  Happens

9  often enough.

10          Next on the agenda, number 5, is the application of

11  Bailey & Glasser, which is numbers 9 and 23 on my calendar, and

12  that is going to be granted, with order to be submitted.

13          Next on the uncontested matters, number 6, the

14  retention of -- for -- and these are all for the TCC --

15  Massey & Gail as special counsel, calendar numbers 12 and 26,

16  and this will be marked granted, OTBS.

17          Next, number 7, is the application -- next -- number

18  7 on the agenda, is it actually not listed, Bruce, on today's

19  calendar.  It was Docket No. 565, which was vacated.  It is the

20  application for retention of Genova Burns as local counsel.  It

21  is granted.

22          Is that -- Mr. Stolz, that's one of the orders that's

23  included?

24          MR. STOLZ:  Yes.

25          THE COURT:  Okay, thank you.  Number 8 on the

58

1  calen -- sorry, 8 on the agenda, number 27 on the calendar, the

2  retention of Otterbourg firm, and that is marked granted, OTBS.

3          Number 9, this is not a retention matter.  This was

4  The Miller Firm's application to add Michael Miller to the talc

5  -- to the TCC.  This was carried from an order shortening time.

6          Ms. Cyganowski?

7          MS. CYGANOWSKI:  Yes, Your Honor.  It's our

8  understanding that this is being withdrawn by the firm.  There

9  was the untimely death of Mr. Miller around Thanksgiving.  So

10 probably at this point I would simply ask adjournment on it so

11 that the firm can make whatever arrangements they want to make.

12         THE COURT:  All right, then.

13         MR. SPONDER:  Yes, Your --

14         THE COURT:  I'm sorry?

15         MR. SPONDER:  -- Honor?

16         THE COURT:  Yes, Mr. Sponder?

17         MR. SPONDER:  Yes.  Thank you.  This is Jeff Sponder

18 from the United States Trustee's Office.  A withdrawal was

19 already filed on the docket yesterday afternoon.  I don't have

20 the appropriate docket number, but we did correspond with The

21 Miller Firm and they advised that they are withdrawing the

22 application.

23         THE COURT:  All right, then.  Number 14 on today's

24 calendar, Bruce, we're going to mark this matter as withdrawn.

25 Thank you, Mr. Sponder.

1           MR. SPONDER:  Thank you, Your Honor.

2           THE COURT:  You're welcome.  Number 10 on the agenda

3    -- and now we move I believe to the debtor's professionals,

4    this is also not on our calendar today -- Mr. Defilippo, is

5    your firm's retention?

6           MR. DEFILIPPO:  Yes, Your Honor.  No objections have

7    been received.  We believe the U.S. Trustee is satisfied with

8    our supplemental declaration, and we also believe we have an

9    agreement on form of order.

10          THE COURT:  Mr. Sponder, are you -- is there a

11   consensus?

12          MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

13   from the Office of the United States Trustee.  Similarly with

14   the Committee professionals, we had some inquiry to Wollmuth,

15   and they provided supplemental declarations, which resolved

16   that issue, so the United States Trustee does not have any

17   objection to Wollmuth's retention in this case.  Thank you,

18   Your Honor.

19          THE COURT:  All right.  Thank you.  And the Court has

20   -- I have reviewed the supplemental certifications that have

21   been submitted for all of the professionals in the past three

22   days or so.  We'll mark, then -- again, not on the calendar,

23   but this is Docket No. 725.  We're going to mark this granted,

24   OTBS.

25          And, Mr. Defilippo, these orders on the debtor's

1 side, who will be submitting them?

2          MR. DEFILIPPO:  We'll be submitting them

3 electronically.

4          THE COURT:  All right.

5          MR. DEFILIPPO:  Thank you.

6          THE COURT:  Address them to Ms. Earl, please, in

7 chambers.

8          MR. DEFILIPPO:  Yes, sir.

9          THE COURT:  That way we avoid confusion.  We come now

10 to number 11 on the agenda, which is the contested matters

11 going forward, number 1 on the calendar, which is the ordinary

12 course motion for professionals.  Counsel?

13          MS. RUSH:  Good morning, Your Honor.  Amanda Rush

14 with Jones Day for the debtor.  I'm happy to report as an

15 initial matter that we did have one objection to the ordinary

16 course professionals motion by the Talc Committee.  We believe

17 we reached an agreement with them on the terms that will be set

18 forth in an amended order.

19          We also received some informal comments from the

20 United States Trustee, and we believe we've reached agreement

21 with the United States Trustee on those comments.

22          So we will be submitting -- we do have a blackline of

23 the order if Your Honor would like to --

24          THE COURT:  That's what I was going --

25          MS. RUSH:  -- take a look at it.

1        THE COURT:  -- to ask.

2        MS. RUSH:  So --

3        THE COURT:  I'll review it when -- and you're going

4   to be emailing to Ms. Earl the final version?

5        UNIDENTIFIED SPEAKER: Yes, Your Honor.

6        THE COURT:  All right, thank you.

7        MS. RUSH:  All right.  First I'll just go through a

8   little background on the motion, and then we'll get to the

9   changes in the order.

10       THE COURT:  Sure.

11       MS. RUSH:  And I'll go through those quickly, and

12  then the Committee and the United States Trustee can weigh in

13  if they'd like to.

14       As Your Honor is probably aware, this is the debtor's

15  motion for an order authorizing the retention and compensation

16  of professionals used in the ordinary course.  We're proceeding

17  pursuant to Sections 327, 105 and 330 of the Bankruptcy Code.

18       Here the ordinary course professionals are the pre-

19  petition talc defense counsel.  There's approximately 45 of

20  them.  And toward the beginning of this case there current --

21  the case is currently stayed, so the activity isn't incredible

22  in most matters, but, of course, in the beginning of the case

23  they were actively involved in filing stay notices.

24       There's also one of the ordinary course professionals

25  which I'll get to when we walk through the redline, Orrick, who

62

1   is handling certain appeals as to which the stay has been

2   lifted because they're covered by surety --

3           THE COURT:  Bonded for.

4           MS. RUSH:  -- bonds, so they're fairly active and

5   they're moving forward as we speak.  And the debtor also

6   anticipates that these professionals would provide other

7   services related to the talc litigation, monitoring dockets,

8   providing information to the debtor as needed, but,

9   importantly, the debtor would not be using these professionals

10  for matters of case administration relevant to the

11  administration of the bankruptcy case.  They would be involved

12  in the talc litigation.

13          And the debtor believes that it's important for the

14  debtor to continue to have access to these professionals.  It

15  would be inefficient and it would be very expensive to try to

16  replace them or even seek to retain them in the bankruptcy

17  case, particularly given that for many of the firms we believe

18  that their roles will be de minimis or ad hoc over time.

19          We -- I wanted to point out as we get to the

20  procedures, and this is one of the items that we talked with

21  the Talc Committee about, Your Honor may have seen this morning

22  we filed an application to retain Skadden, Arps as special

23  counsel, so they will no longer be on the ordinary course

24  professionals list pending their review and argument of their

25  retention application.

63

1          Now I think it probably makes sense to sort of walk

2    through the order, because we're getting to sort of the

3    procedures --

4          THE COURT:  Yes, please.

5          MS. RUSH:  -- portion, which is where most of the

6    revisions occur.  So initially here we'll be -- you know, the

7    ordinary course professionals will be retained upon the

8    submission of both the declaration and a questionnaire.  That's

9    what the redline shows.  Then, you know, after an objection

10   period, 14 days, the professionals will be considered retained

11   and the debtor will have the ability to pay them.

12         Then moving down to paragraph 3F, this provides that

13   in connection -- that the professionals also will provide

14   copies of reasonably detailed invoices to the United States

15   Trustee, the Talc Committee, and if appointed, a future

16   claimants representative, and they'll do that on a monthly

17   basis.

18         Let's see.  The next thing I'd like to go through is

19   sort of what occurs if an ordinary course professional exceeds

20   the caps, and jumping down a little bit in the order to -- it's

21   paragraph 4 -- we did agree to significantly reduce caps at the

22   request of the United States Trustee.  The general caps were

23   monthly -- on a monthly basis are -- is 25,000, and with an

24   aggregate cap of 187,500.

25         The one exception to this is Orrick, who, as I

64

1  described earlier, is handling the appeals that are not subject

2  to the stay.  They have higher caps at 60,000 a month and

3  $450,000 on an aggregate basis.

4         And going back to paragraph 3F, this sort of goes

5  through what will occur in the event that an ordinary course

6  professional exceeds a cap.  If they exceed a cap on a monthly

7  basis, they'll be required to file a fee application subject to

8  review of, you know, the parties and the United States Trustee.

9  If they exceed the aggregate cap, then the debtor would have to

10 seek to retain that professional.

11        The next thing I think to go through is that we

12 agreed between United States Trustee and the Talc Committee to

13 add various reservations of rights language.  Essentially, and

14 I can speak more to it if they'd like to, but essentially

15 reserving rights to object to ordinary course professional

16 retentions.  If, for example, it comes to light or it's

17 discovered that ordinary course professionals have a conflict

18 or they're engaging in -- their scope of activities has

19 exceeded what the professionals set forth in their declaration,

20 Talc Committee's right would be reserved to object to that.

21        And from my perspective those were sort of the key

22 high-level items that I wanted to go through.  At this point

23 I'd ask if Your Honor has any questions.

24        THE COURT:  Thank you.  I'm going to just review it

25 before -- and then we'll wait for the electronic version to

65

1 come.

2        Mr. Sponder, on behalf of the U.S. Trustee is your

3 office onboard with the changes?

4        MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

5 from the Office of United States Trustee.  I'm not sure if

6 there were any more changes made after our agreement with the

7 debtor, that there's, in other words, any additions from the

8 Committee that I need to review.

9        And with that said, Your Honor, the debtor has agreed

10 to all the requested revisions of the United States Trustee,

11 including, most importantly, a provision that the order is only

12 procedural in nature and that the U.S. Trustee reserves his

13 rights to object to retention of any ordinary course

14 professional on any grounds, including those ordinary course

15 professionals identified on the OCP list which was attached as

16 Exhibit A to the motion.  Thank you, Your Honor.

17        THE COURT:  All right, thank you, Mr. Sponder.  And,

18 obviously, you'll take a look at what's being submitted, and if

19 there are any changes you'll reach out to chambers.  That

20 applies to anybody.

21        On behalf of the Committee, any issues with the

22 presentation?

23        MR. STARK:  Your Honor, Robert Stark from Brown

24 Rudnick.  We signed off on this order.

25        THE COURT:  Thank you.  All right.  That's great.  I

66

1  appreciate the consensus.  I always will and always do.  And

2  we'll -- and I'll take a look at it.

3          MS. RUSH:  Thank you, Your Honor.

4          THE COURT:  Thank you.  So we're going to mark number

5  1 granted, OTBS.  Number 1 on the calendar.

6          That brings us to number 12 on the contested matters,

7  probably the most interesting one, Jones Day application for

8  retention.

9          MR. GORDON:  Greg Gordon, Jones Day, Your Honor.  I

10 don't know if I'd characterize this as the most interesting.

11 Your Honor, that --

12          THE COURT:  Subject of interest?

13          MR. GORDON:  Your Honor, that -- the objection -- I'm

14 sorry -- the application obviously drew objections from the

15 Talc Committee, the U.S. Trustee, and from the Alystock, Witkin

16 law firm, and we have had discussions with the parties in an

17 effort to try to work this out and I think we've made -- you

18 know, we've made progress, but we're not there.  We do have an

19 agreement for an interim approval of the retention pending a

20 further hearing on January the 11th with the Committee.

21          We've been advised by both the U.S. Trustee and the

22 Alystock law firm that they oppose that.  We would ask that the

23 Court, nonetheless, approve a form of order, and I have a copy

24 here this morning, Your Honor, this form of interim order, if I

25 may --

1          THE COURT:  Yes, please.

2          MR. GORDON:  -- approach.

3          THE COURT:  Thank you.

4          MR. GORDON:  So, Your Honor, the thought from the

5     debtor's perspective was that the parties and the Court and the

6     U.S. Trustee, including the U.S. Trustee, would benefit from

7     additional time to consider the issues that have been raised,

8     including an opportunity for our firm to provide some

9     additional information responsive to some of the factual

10    questions that have been raised or some of the factual

11    statements that have been made.

12          And that was the thought behind pushing this to

13    January, but in the interim we're asking for approval on this

14    sort of interim time period for the firm to continue to work

15    for the debtor, and, frankly, to be paid by year end fees that

16    are due to the firm.  And the -- so the principle focus of the

17    order I would say is probably reflected in the first two

18    paragraphs, that it's on an interim basis only and that the

19    Court's not making any findings, particularly with respect to

20    no adverse interest and disinterestness, which are the two

21    areas of focus I think of the objections, and then on top of

22    that there's a number of provisions in the body of the order

23    that had reservations of rights to --

24          THE COURT:  No law of the case, res judicata --

25          MR. GORDON:  Correct.

68

1             THE COURT:  -- collateral estoppel.

2             MR. GORDON:  Yeah, they make it entirely clear that

3   no one's positions would be prejudiced and that the firm

4   wouldn't use the entry of an interim order against any of the

5   arguments that are being advanced by the parties.  Now, I will

6   say just for the Court and the parties to consider that the

7   debtor is willing to have conflicts counsel brought in to the

8   extent that parties think that would be of assistance or

9   perhaps address their issues at least in part, and we'll

10  continue to meet and confer with the parties and see, Your

11  Honor, if we can make further progress in the interim.  But

12  that's the game plan.

13            Again, it's -- my understanding is that's agreeable

14  to the Committee.  It's not acceptable to the U.S. Trustee and

15  Aylstock that the firm be retained on an interim basis with

16  full reservations of rights to the parties, and then we would

17  revisit this with a fuller record and more time for briefing

18  and argument at the hearing on January 11th.

19            THE COURT:  And apart from the U.S. Trustee and the

20  Aylstock firm the Committee is onboard with the briefing

21  schedule that -- that's embodied in the order?

22            MR. STARK:  Yeah, if I can have the computer --

23            MR. GORDON:  Sure.

24            THE COURT:  Yes, please.

25            MR. STARK:  -- (indiscernible).

69

1          MR. GORDON:  We are, Your Honor, to answer the

2    question directly, but I did want to rise and urge the Court,

3    with all due respect to the U.S. Trustee and the Alystock firm,

4    to overrule their objection to the proposed -- without

5    prejudice, okay.  The most important thing from our perspective

6    is moving to those upcoming hearing dates.  That trial on the

7    motion to dismiss is very important to us, okay?

8          And I will say this about my colleagues on the side.

9    We've met, we've conferred, and they talked to us, and they're

10   willing to accommodate to do the things that are necessary to

11   keep the calendar forward, as they said in their pleadings, and

12   I honor them for that.

13         So we sat down and we said, look, these are big

14   issues, right?  If you're right and your case theory holds,

15   well, I guess we'll lose and then you'll have your issue.  If

16   we're right, that's your risk.  That's what we've put in our

17   proposal.  And they said, to their credit, we'll take that

18   risk, we'll do that.  Okay?

19         It is without prejudice to anybody.  You want to

20   object on disinterested grounds to their fee application?

21   That's still up in the air.  That's available.

22         All that's happened is we've moved forward, and with

23   it we've moved all of the efforts that -- undertaken right now,

24   discovery, et cetera, to get trial ready in February on the

25   motion to dismiss.  Critically important to us, dislodging

1  counsel and starting over again, not eye on the prize from our

2  perspective.  Since nobody is going to be hurt by this, we

3  think it's the right way to go.

4          THE COURT:  All right.  Thank you for your comments.

5  Let me hear first, counsel for the Alystock firm.  I hope I'm

6  pronouncing it correctly.

7          MR. PFISTER:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. PFISTER:  Rob Pfister from the (indiscernible)

10  firm on behalf of the Alystock firm.

11          THE COURT:  Alystock.  All right, thank you.

12          MR. PFISTER:  Your Honor, two points.  First, as a

13  practical timing matter the Jones Day firm has been

14  representing this debtor from October 14th, the petition date,

15  through today, December 15th, with no interim order in place.

16  We're talking about going from today, December 15th, to a

17  hearing on January 11th.

18          I don't understand why we would need an interim order

19  that raises issues when we could just continue the application

20  to January 11th.  We have no objection to continuing the

21  hearing on the application to January 11th.  We do have an

22  objection to the interim order.

23          I share the Committee's concerns about moving this

24  case forward.  We are aligned with the Committee in virtually

25  every respect.  However, I don't believe there's a basis in the

71

1  Bankruptcy Code to authorize the retention of a professional

2  and the compensation of a professional without a finding of the

3  critical issue of disinterestedness and no adverse interest.

4        So that's the issue in terms of an interim order.

5  Again, no question -- no objection from me, and I don't believe

6  there's one from the U.S. Trustee, on merely continuing the

7  application to January 11th.  We're willing to dialogue with

8  the debtor.  We're willing to dialogue with the Committee and

9  with the UST to find -- you know, to work towards the January

10 11th date.  We're comfortable with the briefing schedule that's

11 set out.  But we do object to any interim order.

12        THE COURT:  All right, thank you.

13        MR. PFISTER:  Thank you.

14        THE COURT:  Let me hear from Mr. Sponder, U.S.

15 Trustee.

16        MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

17 from the Office of United States Trustee.

18        Your Honor, the debtor has apparently taken up the

19 offer of this procedural accommodation made by the Talc

20 Committee concerning Jones Day's retention as counsel.  As I

21 understand it, the Talc Committee will not press its objection

22 to the general retention of Jones Day subject to the Court not

23 making any findings or conclusions that Jones Day are

24 disinterested professional and they are not burdened by an

25 adverse interest.

72

1          The Talc Committee cites the Third Circuit's decision

2    in <u>Marvel</u> that purportedly obligates this Court to disallow

3    Jones Day's, and I quote,  "Retention if after adjudication an

4    actual conflict of interest is found that allows the retention

5    if in the Court's discretion there's only today a potential

6    conflict of interest," end quote.

7          As such, Your Honor, the Talc Committee argues that,

8    and I quote again, "Reserving the issue for a later date

9    adjudication places this contested matter in the potential

10   category," and end quote.

11         Your Honor, this is a clever argument made by the

12   Talc Committee, and it still stands under <u>Marvel</u> and the

13   Bankruptcy Code.  <u>Marvel</u> stands for the proposition that

14   retention should be denied if there exists an actual conflict,

15   and that the -- that a potential conflict is left to the sound

16   discretion of the court.

17         The Third Circuit in <u>Marvel</u> found that employment of

18   a professional is a potential conflict and disfavored.  Under

19   <u>Marvel</u> if the Court were to find an actual conflict Jones Day's

20   retention would be denied.  If the Court were to find a

21   potential conflict, the Court would have the discretion whether

22   to approve or deny that retention.

23         What the Talc Committee suggests, and Jones Day now

24   requests, is the Court to approve Jones Day's retention on the

25   theory that they have a potential conflict and reserve the

73

1  issue of a disinterested and actual conflict for a later date.

2  I'd rather -- there's nothing in the Bankruptcy Code that

3  authorizes such a conditional retention.

4         Section 327(a) requires a professional to be

5  disinterested and not hold an adverse interest in order to be

6  retained.  Without such findings, Your Honor, how can Jones

7  Day's retention be approved?  In fact, if the Court were to

8  determine today that the conflict is potential, the Court then

9  would be required to make a decision as to whether the

10 retention should be approved or denied, which is not what Jones

11 Day or the Talc Committee is requesting.

12        Instead, Your Honor, there should either be a hearing

13 today on Jones Day's retention and an adjournment, which the

14 United States Trustee has already consented to.  In fact, Your

15 Honor, Jones Day agrees to adjournment to January 11th, 2022

16 for the Court denies procedural accommodation request.

17        Your Honor, practically speaking, if the Court allows

18 this, what's to stop this type of conditional retention from

19 being sought in every case the United States Trustee objects to

20 retention.  I just think this is taking us down a rabbit hole

21 that you don't want to go down, and the result, Your Honor, the

22 United States Trustee objects to this, quote, unquote,

23 conditional retention.  Thank you, Your Honor.

24        THE COURT:  Thank you, Mr. Sponder.  Is there any

25 response offered?

74

1           MR. GORDON:  Greg Gordon again, Your Honor.

2    Mr. Sponder's correct, we have agreed to adjourn it if the

3    Court's not willing to approve the conditional retention.  From

4    our perspective there is no record today that suggests there's

5    an actual conflict, and the Court does have discretion.  I

6    mean, honestly from our perspective it's a matter of -- it's --

7    I'll just be blunt about it, it's year end.  There's always an

8    effort at year end to try to collect what you can collect, and,

9    you know, if it turns out that our application's approved we'll

10   be the only ones that hadn't -- you know, weren't able to be

11   paid.

12          And otherwise if our application is denied by the

13   Court in January, we'll have to pay the money back.  I mean, we

14   recognize that.  I don't think anyone's worried about the

15   ability of the firm to disgorge the payment and pay it back.

16          So from our perspective you have a legal basis to do

17   it.  We would ask that you do it over the objection of the U.S.

18   Trustee, but to be clear, we're prepared to adjourn it if the

19   Court isn't comfortable with the interim relief.

20          THE COURT:  Thank you, Mr. Gordon.  Thank you,

21   counsel.

22          It's interesting.  Different districts have different

23   ways of providing -- approving retention.  I went through the

24   process that the North Carolina courts used where it's ex parte

25   with very little information other than what appears in the

1  pleadings.  They're granted, and then we have motions for

2  reconsideration that were amended orders.

3       We had such a motion for reconsideration in <u>Bestwell</u>

4  which was ultimately dropped, with briefing on many of the same

5  issues, not all, but because with every case, there's slight

6  modifications, the bells and whistles on both, the funding

7  agreements, the structuring and the retention and every case is

8  different.

9       Judge Whitley approved retention in DBMP.  Even in an

10  amended order provided, I think, fewer reservations of rights

11  than what I've just gleaned from the proposed order that's

12  being proffered.

13       I appreciate the U.S. Trustee's concerns about the

14  slippery slope.  I will say is, what is to stop that from

15  becoming problematic is the Judge and the Court, to only do so

16  when it's appropriate.  At this juncture, I am going to

17  overrule the objections.

18       I am prepared to make findings that, for the limited

19  purpose, of entering interim retention and not to be binding as

20  law of the case going forward, that I see only the potential

21  for a conflict.

22       Certainly, I don't have a record that supports an

23  actual conflict at this juncture and I don't think anybody can

24  point to at this juncture on the record on the pleadings that

25  are in front of me; actual conflict or, at least, they'll be

1  further amplified in arguments, in pleadings and in argument

2  and perhaps testimony as we go forward.  I appreciate the

3  concerns but I don't see the prejudice to the Estate.

4          I obviously see prejudice to Jones Day.  I've

5  practiced; we all practiced.  I know of year end burdens, but

6  that is not of consequence either.

7          What's appropriate here is that professionals go

8  forward with a comfort level that the Court's seeing what's

9  going on and can monitor and oversee and make decisions at the

10 appropriate time.  And the appropriate time will be probably in

11 January, after briefing.  But at this juncture, what has been

12 identified as conflicts may indeed bloom into actual conflicts

13 or determination that the potential conflicts are not so remote

14 or are so severe as to warrant disqualification.

15         I have confidence that Jones Day is not going

16 anywhere as a firm, nor their finances and that this Court is

17 certainly probable if there were a change and the Court were to

18 terminate the retention.  Enough said.  We'll -- I'll approve

19 the retention over the limited objections.  We'll look forward

20 to the briefing.

21         Any other -- Counsel, any other reservation of rights

22 or any other comments?

23         MR. STARK:  No, no, no, no.  I just -- just for

24 clarification, if I may?

25         THE COURT:  I'm sorry, go ahead.

1          MR. STARK:  I just would like a clarification.

2          THE COURT:  Yes.

3          MR. STARK:  If I may.  It's very important, and I was

4 listening to Your Honor extremely carefully -- Robert Stark

5 from Brown Rudnick again.  It's very important that the record

6 is very clear.

7          The negotiated proposed form of order that's, that

8 we've agreed upon, which I hope that Your Honor will sign, is

9 extremely clear that there's no findings at all, at all,

10 respecting today, yesterday, tomorrow, disinterest in this.

11          They may be burdened with a conflict that's

12 disinterested today, but we're not having a trial today.  Your

13 Honor controls when trials happen and it's not going to happen

14 today.  So to the extent that Your Honor's commentary about

15 whether today or potential --

16          THE COURT:  Making a finding, correct.

17          MR. STARK:  -- I want to be sure that that -- the

18 record does not overwhelm what's in the order which is -- was

19 carefully calibrated under the circumstances of the case.

20          THE COURT:  Let me clarify.  Thank you.

21          I'm noting the potential for conflicts.  There is no

22 findings.  As I said, the record doesn't support that one way

23 or the other.  I expect that to change by January.  So, at this

24 juncture, I've noted the potential conflicts.  I don't see a

25 barring in the code for making an interim, while there may not

78

1  be express authority, there's no -- nor is there an express

2  prohibition.

3       So I will approve the consensual arrangement going

4  forward through January.

5       MR. STARK:  Thank you.

6       THE COURT:  All right?

7       MR. SPONDER:  Your Honor?

8       THE COURT:  Yes, Mr. Sponder?

9       MR. SPONDER:  Thank you, Your Honor.  I know that

10 debtor's counsel provided me with the proposed order prior to

11 the hearing.  I did not review the proposed order.  I'm hoping

12 that Your Honor would comment on the United States Trustee

13 side.  I'd like a -- some time today to go over that order,

14 make any requested revisions and-or perhaps the order was

15 revised since the last time I received it.

16      But I'd just like some time to take a look at that.

17 Thank you, Your Honor.

18      THE COURT:  That's fine.  With all orders, I have

19 strong doubts I'm entering them today.  They should be entered

20 tomorrow giving -- I'm waiting for many of electronic

21 submissions and we'll go through them.  I'll have a chance to

22 review what's been handed up.

23      If there are any issues or concerns and you want to

24 ensure that the orders are not entered, call Chambers.  I'll

25 arrange for a conference call so we can address it in short

1  order.  All right?

2          That takes us through -- so, Bruce, that numbers 3

3  and 16 are going to be carried to January 11th and we're

4  marking interim order to be entered and to be submitted.

5          All right.  Thank you.  That takes us -- well, the

6  next matter on was the King and Spalding retention, numbers 4

7  and 18.  Counsel?

8          MR. PRIETO:  Good afternoon, Your Honor.  Dan Prieto

9  on behalf of the debtor.  Yeah, the next item on the agenda is

10 King and Spalding's application -- and, Your Honor, it sounds

11 like you've reviewed the application so I can forego discussion

12 of them, unless you would find that helpful?

13         THE COURT:  No, I have reviewed it.  I appreciate the

14 offer though.

15         MR. PRIETO:  Okay.

16         THE COURT:  Thank you.

17         MR. PRIETO:  Yeah, and on this one, Your Honor, I

18 believe the objection by the Committee has been resolved.  We

19 did discuss informal comments, first with the U.S. Trustee,

20 that resulted in a supplemental certification Your Honor may

21 have seen, as well as some revisions to the proposed order.

22         And then, in order to resolve the limited objection

23 of the Committee, we did add some reservation of rights

24 language in the order.  It's in paragraph 10.

25         And, Your Honor, I do have a black lined, if it's

1   okay for me to present?

2           THE COURT:  Yes, please.  Thank you.

3           MR. PRIETO:  Your Honor, as you'll see in the order,

4   most of the changes relate to addressing just Trustee's

5   comments regarding compliance with the U.S. Trustee fee

6   guidelines and other related fee issues and also preserving

7   rights of the parties to challenge the allocation of fees, that

8   we provided for in the application.

9           And as I indicated previously, in paragraph 10, you

10  have the reservation of rights language that we discussed and

11  negotiated with the Official Committee.

12          THE COURT:  All right.  Thank you.  I would assume

13  it's safe for the Court to make the assumption that many of

14  these same changes are going to appear in subsequent Special

15  Counsel retentions?

16          MR. PRIETO:  You're going to see remarkably similar

17  comments, Your Honor.

18          THE COURT:  All right.

19          Then, Mr. Sponder, you've had the opportunity to

20  review the proposed language?

21          MR. SPONDER:  I have not had an opportunity to review

22  the proposed paragraph 10, Your Honor.  I'd like it be sent to

23  me and I'll take a look at it and I'll get back to counsel

24  later on today.  But everything else in the order was based on

25  negotiations with debtor's counsel and pursuant to a

81

1  supplemental declaration and it's in King and Spalding and all

2  the other debtor professional applications.  Those supplemental

3  certifications have been filed and United States Trustee does

4  not object to those retentions.

5           Thank you, Your Honor.

6           THE COURT:  All right.  Thank you.  It sounds like

7  both you and I have afternoon homework.  Then, we're going to

8  mark number 13 on the agenda which is 4 and 18 on the calendar

9  as granted or to be submitted and we'll await the electronic

10 version.

11          MR. STARK:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MR. PRIETO:  Your Honor, the next item on the agenda

14 is item number 14 which is the debtor's application to retain

15 Bates White as its talc expert consultant.

16          Your Honor, on this one, we did also discuss the

17 terms of the proposed order with the U.S. Trustee and did make

18 some changes to that order to address the issues similar to

19 what you saw in the other order.

20          On this one though the objection of the Committee

21 remains outstanding.  We had been meeting and conferring with

22 the Committee to discuss this one and hope to continue to do

23 that but similar to what we agreed to on Jones Day, we've

24 agreed, the debtor has agreed with the Committee, to do an

25 interim retention of Bates White subject to the objection and

1  the application being heard at the January 11th hearing.

2         All rights are preserved in the same manner that it

3  is in the Jones Day order and I do have an order to present to

4  Your Honor.

5         THE COURT:  All right.  You can come up.

6         Mr. Stark, counsel has had an opportunity to review

7  the order?

8         MR. STARK:  May I confer with my counsel?

9         THE COURT:  Sure.

10        MR. STARK:  Okay.

11        Yes, the Talc Committee's on board.

12        THE COURT:  All right.

13        UNKNOWN SPEAKER:  Well, we just need to review the

14  final version of the order, Your Honor.

15        MR. STARK:  Forgive me, Your Honor.

16        THE COURT:  Okay.  Fair enough.

17        And, Mr. Sponder, I guess you'll have the opportunity

18  again just to make sure that the U.S. Trustee's concerns are

19  reflected in the interim order.  I understand -- I would

20  anticipate, Mr. Sponder -- well, I shouldn't anticipate

21  anything.

22        Does the U.S. Trustee have an objection to the

23  interim arrangement?

24        MR. SPONDER:  Thank you, Your Honor.  The United

25  States Trustee raises the same objection that was denied

1  shortly ago with respect to Jones Day.  So we do raise that

2  objection again.

3        With that said, Your Honor, the order that you're

4  holding for Bates White is much different than the King and

5  Spalding order.  It had many other things that needed to be

6  included in there, that I recall.  So I just wanted to let Your

7  Honor be aware of that.  But the order, as it stands, except

8  for if there's a paragraph 10 in there, like in King and

9  Spalding, acceptable to the United States Trustee.

10        MR. PRIETO:  Your Honor, the U.S. Trustee is correct.

11 There are additional provisions that we incorporated in this

12 order relating to provisions of the engagement letter that the

13 U.S. Trustee wanted modified and related issues like that.

14        So Mr. Sponder is correct and those were -- we made

15 an attempt to include all the changes the U.S. Trustee had

16 negotiated with respect to the prior order, we tried to

17 incorporate them in this order.

18        THE COURT:  All right.  So, Mr. Sponder, you take a

19 look.  The Court will take a look.  We're going to mark number

20 14 on the agenda.  And, Bruce, it's numbers -- I think the

21 number 15 and number -- no, number 5 and number 17 on the

22 calendar.

23        We're going to mark those carried to the January 11th

24 date at 10 a.m. and we're going to enter an interim order that

25 is to be submitted.

84

1          That takes us to Shook, Hardy and Bacon, number 15 on

2     the agenda?

3          MR. PRIETO:  Thank you, Your Honor.  Similar to King

4     and Spalding, changes were made.  After discussions with the

5     U.S. Trustee's Office, supplemental certification was submitted

6     to address those questions and comments and the limited

7     objection of the Committee was resolved, again, by including in

8     the order some reservation of rights language, similar to what

9     you've seen in the other orders and I do have a black lined to

10    present.

11         THE COURT:  All right.  So this is not an interim

12    order.  This is a negotiated resolution?

13         MR. PRIETO:  Correct, Your Honor.  The objection has

14    been resolved.

15         THE COURT:  All right.  Thank you.

16         Mr. Sponder, do you need to weigh in?

17         MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

18    from the Office of the United States Trustee.  Shook Hardy,

19    like King and Spalding, filed a supplemental declaration to

20    address the United States Trustee's concerns.  The order, I

21    believe, includes all of the requested revisions that the U.S.

22    Trustee made, with just paragraph 10, if it's the same as King

23    and Spalding would just like the opportunity review that.

24         Thank you, Your Honor.

25         THE COURT:  All right.  Thank you.

85

1          And just for the record, with respect to the Bates

2    and Whites retention application, the Court is, because I value

3    consistency, is overruling the U.S. Trustee's objection and

4    this number 15, Bruce, it's number 6 and number -- well, it's

5    number 6 on the calendar.  And we're going to mark it granted

6    OTBS.

7          MR. PRIETO:  Thank you, Your Honor.  I think that

8    takes us to item number 16 on the agenda, which is the

9    application to retain AlixPartners as the financial advisor to

10   the debtor.

11         THE COURT:  Right.

12         MR. PRIETO:  There was a limited objection by the

13   Committee.  I believe that -- well, that has been resolved by,

14   again, including language in the order reserving the

15   Committee's rights.

16         In addition, Your Honor, there was discussions with

17   the U.S. Trustee's Office who had a number of proposed

18   revisions to the order that were accepted.  Several of them

19   went to the terms of the engagement letter including agreement

20   by AlixPartners to forego during the pendency of the case, the

21   enforceability of the limitation of liability provisions,

22   foregoing the enforceability of arbitration provisions,

23   requiring that any termination of the engagement agreement

24   would need Your Honor's approval and similar type of

25   clarifications with respect to the engagement letter.

1          And I do have a form of order to present Your Honor.

2          THE COURT:  All right.  So number 16 on the agenda,

3  Bruce, is number 7 and number 20.

4          Mr. Sponder, same concerns to see the final order?

5          MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

6  from the Office of the United States Trustee, same concern.

7          THE COURT:  All right.  Then, we'll mark number 16

8  granted OTBS and give everybody a chance to review it.

9          Number 17, McCarter and English?

10          MR. PRIETO:  I'm going to sound like a broken record,

11  Your Honor.  It's similar situation; the application to retain

12  McCarter and English as special insurance counsel.  There were

13  changes made to the proposed order to address comments from the

14  U.S. Trustee's Office.

15          As well, the Committee had a limited objection that

16  was resolved by the inclusion of reservation of rights language

17  in the order and I do have a black lined to present.

18          THE COURT:  All right.  You can hand it up.  Thank

19  you.

20          Mr. Sponder, subject to your right to review the

21  order, correct?

22          MR. SPONDER:  Thank you, Your Honor.

23          THE COURT:  Thank you.  And of course, I'm assuming

24  the Committee has seen the language and is comfortable with

25  such language.

1          Bruce, this is number 8 and 22 on the calendar.

2          THE COURT CLERK:  I'm just confirming for the record

3    we have (inaudible), Your Honor.

4          THE COURT:  Thank you.

5          And we'll mark this granted, OTBS.

6          MR. PRIETO:  Thank you, Your Honor.  I think that

7    takes us to agenda item number 18, which is the application for

8    the debtors to retain Weil Gotshal as special counsel.

9          Your Honor, on this one, there were some discussions

10   with the U.S. Trustee's Office which I believe were fully

11   addressed by inclusion of a change in the proposed order as

12   well as a filing of a supplemental certification.  However, on

13   this one, there does remain an outstanding objection with the

14   Committee and like we did with Jones Day and Bates White, we

15   have agreed to the procedure of interim retention preserving

16   all rights of the Committee and setting the application and the

17   objection for hearing on January 11th.

18         And I do have a proposed order that the Committee has

19   seen.

20         THE COURT:  All right.

21         Mr. Sponder, I will overrule the U.S. Trustee's

22   objection to the interim nature, noting your objection; give

23   you a chance to review the interim order as well?

24         MR. SPONDER:  Thank you, Your Honor.

25         THE COURT:  You're welcome.

88

1          And we're going to mark number 18 as carried to --

2    I'm sorry, Bruce, it's number 21 on the calendar today; 18 on

3    the agenda and it's carried to January 11th, all at 10 a.m. and

4    we've marked it OT -- interim order submitted.  Thank you.

5          MR. PRIETO:  Thank you, Your Honor.

6          So, Your Honor, I think that takes us to the last

7    item on the agenda, which is agenda item number 19, the

8    debtor's motion for authority to act as a foreign

9    representative on behalf of the debtor's estate in Canada.

10         I know Your Honor's reviewed the motion so I won't

11   belabor the issue.  I did want to note that if the relief is

12   granted today, Your Honor, the debtor does intend to seek

13   relief in Canada on behalf of the debtor's estate, pursuant to

14   the Companies, Creditors Arrangement Act in the Ontario

15   Superior Court of Justice and we intend to do that on December

16   17th, two days from now, where there's a tentative hearing

17   scheduled in Canada.

18         And of course, the primary reason for doing that is

19   to ensure that the automatic stay and the PI order are enforced

20   in Canada, because otherwise there would be unequal treatment

21   between American and Canadian claimants.

22         There was a limited objection filed by the Committee

23   and I believe that objection was joined by one of the law firms

24   and after discussions with the Committee, I think making some

25   statements on the record may resolve the issue.

1      I think the issue was primarily a concern about how

2 broad the relief might permit the debtors in terms of relief

3 they were seeking in Canada.  And so, I think I can say on the

4 record, Your Honor, that the debtors current intend to seek

5 recognition only of the following at the December 17th hearing

6 which is the Chapter 11 as a foreign main proceeding under the

7 applicable provisions of the CCAA.

8      We would seek recognition of the existing PI order

9 which does apply pursuant to its terms to some of the

10 proceedings pending in Canada.  And if granted today, Your

11 Honor, we would also seek recognition of the order permitting

12 the debtor to act as a foreign representative.

13      I would also say, of course, if the PI order is

14 extended, we would intend to seek recognition of that in the

15 future.  And of course, we would provide notice to the

16 Committee and I understand they've retained Canadian counsel.

17 We would provide --

18      THE COURT:  I saw that on the docket.

19      MR. PRIETO:  -- yeah.  We would provide notice to

20 that counsel as well of any further request for relief in

21 Canada.

22      And then, finally, Your Honor, I should note for the

23 record that we did a comment, an informal comment, from the

24 U.S. Trustee's Office indicating that they wanted the order to

25 make clear that professionals retained by the foreign

90

1 representative would be retained in the Chapter 11 case, as

2 opposed to in Canada.

3      We've agreed to add the language that the U.S.

4 Trustee proposed and as a result, we will be filing an

5 application to retain our Canadian counsel who's involved in

6 that matter.  And I do have a black lined showing the

7 additional language from the U.S. Trustee.

8      THE COURT:  All right.

9      Let me hear from any  objectors?

10      MS. CYGANOWSKI:  Yes, Your Honor.  Melanie

11 Cyganowski, co-counsel for the Talc Committee.  As the Court is

12 aware, the Talc Committee filed a limited objection and

13 reservation of rights in connection with this Motion.

14      The debtor has no operations or employees in Canada.

15 Indeed, there's no judicial or other proceedings in Canada,

16 hence our objection.

17      Having said that, we did confer with debtor's

18 counsel, as explained, and based on representations that were

19 made on the record today, and the reservations in our papers

20 here and in Canada, we do not object to the grant of this

21 motion as reflected in that order.

22      THE COURT:  Thank you, Ms. Cyganowski.

23      Any other counsel, either on the phone or in Court?

24      MR. PFISTER:  Once again, Your Honor, Rob Pfister for

25 the Aylstock firm.  We join the Committee's limited objection

1  and to the extent this resolution is acceptable to the

2  Committee, it's acceptable to us as well.

3          THE COURT:  Thank you, Counsel.

4          MR. SPONDER:  And, Your Honor, Jeff Sponder from the

5  Office of U.S. Trustee and that is correct that that language

6  was proposed and included in the order.  I just would ask that

7  any requests for relief in Canada, I know debtor's counsel

8  advised that they would send notice to the Committee.  They

9  should also send notice to the United States Trustee, please.

10          MR. PRIETO:  Your Honor, that's fine.

11          THE COURT:  All right.  Thank you.

12          Thank you, Mr. Sponder.

13          MR. SPONDER:  Thank you, Your Honor.

14          THE COURT:  We'll mark this matter, which is number

15  15 on my calendar this morning as granted, order to be

16  submitted.  I accept the representations made as of record and

17  also appreciate the Committee Counsel's review of the

18  appropriateness and the limited nature of the retention as

19  reflected in the representations.

20          So we'll mark it OTBS.  And of course, everybody has

21  a chance -- the final -- for final review of the language of

22  the order.

23          That takes us to the end of the agenda.

24          Ms. Cyganowski?

25          MS. CYGANOWSKI:  Almost, almost but not quite, Your

1  Honor.

2          THE COURT:  I know, we're getting close.

3          MS. CYGANOWSKI:  With the Court's indulgence,

4  something came up during today's hearing and we'd like to

5  discuss with out committee members.  If we may, just have a 15-

6  minute recess and then, report back because it might require

7  asking the Court of something.

8          THE COURT:  That's fine but before we do that, should

9  we address the correspondence regarding the meeting minutes,

10 that the issue on?

11         MS. CYGANOWSKI:  Exactly.  I forgot about the

12 discovery.  Thank you.

13         MR. GORDON:  Your Honor, Greg Gordon on behalf of the

14 debtor.  Yes, I think if it works for Your Honor, we're

15 prepared to talk about that.  And I also want to give sort of a

16 general status report on where they are -- where we are with

17 the discovery with the Committee and I'm sure Mr. Glasser would

18 like to address the Court as well.

19         So we can begin with the correspondence.

20         THE COURT:  Why don't we start there.  Thank you.

21         MR. GORDON:  So, Your Honor, we, as reflected in the

22 letter that we filed with the Court, I forget now, a day or two

23 ago, there appears to have been a misunderstanding about the

24 reason for the redactions or the redaction of the minutes.

25         It wasn't primarily on privilege ground; it was due

93

1  to relevance.  That was a committee meeting that, not

2  surprisingly to the Court, that Johnson & Johnson level that

3  involved a variety of matters which had absolutely nothing to

4  do with the issues before the Court.

5          There was a request in the letter from Mr. Glasser

6  that we provide Your Honor with a unredacted version of the

7  minutes for in-camera review.  And we're prepared to do that.

8  We would just need guidance from Your Honor as to how to do

9  that procedurally exactly.  But we're prepared to do that so

10 Your Honor can take a look at the unredacted minutes.

11         THE COURT:  I think the best approach is not to give

12 you my direct email, but to give you my law clerk's direct

13 email, which I think you probably have?

14         MR. GORDON:  Well, and we do have a hard copy here

15 that we could put in an envelope and pass it -- you know,

16 whatever works best for Your Honor.

17         THE COURT:  I think it's fine, just email the

18 unredacted version to my -- not to my Chambers, to Ms. Earl,

19 because I don't -- want to make sure it doesn't get on the

20 docket.

21         MR. GORDON:  Okay.

22         THE COURT:  And I'll take a look as quickly as

23 possible for it --

24         MR. GORDON:  Okay.

25         THE COURT:  -- and advise you all probably by email,

94

1 as to any determination.

2          MR. GORDON:  All right.

3          THE COURT:  All right.

4          MR. GORDON:  And then, otherwise, Your Honor, I just

5 wanted to report generally where we are and I know, again, Mr.

6 Glasser -- oh, here he is, he's right here.  He disappeared

7 there for a second.

8          I know he wants to probably address the Court.  But

9 you may recall that -- well, I'm sure you recall, we had the

10 telephone conference with the Court.  And again, we appreciate

11 the time Your Honor gave us.  And we want away -- the debtor

12 went away with a few deliverables, I think, in the wake of

13 that, one of which was Your Honor asked us to make every effort

14 to try to schedule the three deponents, potential deponents --

15          THE COURT:  Correct.

16          MR. GORDON:  -- that we discussed by year end.  And

17 we went to work on that right away and in fact, within a couple

18 of days I think of the hearing, we proposed deposition dates

19 for all three of those individuals and that's Ms. Goodridge,

20 Mr. Wuesthoff and Mr. Acevado for next week and propose that

21 those be handled by video.

22          And those are set.  So Ms. Goodridge is scheduled for

23 Monday, the 20th at 9.  Mr. Wuesthoff is scheduled for

24 Wednesday, the 22nd at 9.  And then, Mr. Acevado is scheduled

25 for approximately for 1 in the afternoon on the same day, on

1  the 22nd.  So that was done.

2           The second thing was that Your Honor asked us to

3  provide two lists.  I think we offered to do that and Your

4  Honor directed that we in fact do that.  One was a list of

5  individuals who approved or authorized aspects of the corporate

6  restructuring.  And the other was a list of individuals who

7  signed NDAs or their equivalents or consulting agreements in

8  connection with the restructuring.

9           Those lists were put together.  Those lists were

10  provided to counsel for the Committee, I believe, on December

11  9th, so within two days.  I might have said during the

12  conference call that I thought there might be few, if any,

13  individuals who signed NDAs and that was a misunderstanding on

14  my part.

15           There are actually -- there's actually a document

16  called a clean sheet that a number of individuals sign which

17  has an NDA-type provision.

18           THE COURT:  Okay.

19           MR. GORDON:  And it wasn't crossing my mind that it

20  was technically an NDA but we went back and looked at that and

21  so, we've provided a list.  And -- so that's a fairly long list

22  of individuals but that's been provided.

23           And then, of course, we're supposed to be working

24  with the Committee counsel on custodians and search terms.  On

25  custodians, we received, I think also on the 9th, an initial

1  designation of two custodians; one is the Chief Executive

2  Officer of Johnson & Johnson.  The other was an individual

3  who's the, basically, the CEO in waiting.

4        And I sent some correspondence to Mr. Glasser right

5  away saying we objected to that, that they would go right to

6  the very top of the organization.  And then, it was either

7  yesterday or the day before, Mr. Glasser sent five other, I

8  think five other names of individuals who they're demanding be

9  custodians.

10        And just to give Your Honor a bit of refresher, you

11 may remember that prior to the December 7th hearing, we had

12 proposed five custodians who we thought would be the business

13 people that would make sense for the Committee to target, and

14 also would be the right ones for depositions; both custodians

15 and depositions.

16        The Committee's not using any of those individuals

17 and that's obviously their choice.  Since the correspondence,

18 we've had further discussions, both with the debtor and with

19 J&J and I think on the custodians, notwithstanding, it seems to

20 us kind of borderline improper to go right to the top of the

21 organization and ask for their emails and other electronic

22 communications.

23        But if we're talking about custodians only, we're

24 prepared to do that.  Now, we advised the other side, and I

25 said this in Court -- or on that Court call that Johnson &

1  Johnson did not approve the restructuring of the bankruptcy.

2  They weren't asked to do that.  As a consequence, we think

3  asking for documents from those two individuals is not going to

4  produce much of anything responsive, if anything.

5       But we're prepared to do that, notwithstanding we've

6  made that caution but really on the condition that if it turns

7  out, as we suspect, that those custodians generate little, if

8  any, documents that we don't get a further request saying, that

9  didn't work and now, we want to add two or three other

10 individuals.

11      So we do have a concern about that, but with that

12 understanding, and also with the further understanding that we

13 don't agree and would oppose any effort to depose the Chairman

14 or the CEO and the CEO in waiting under the Apex Doctrine and I

15 think we've communicated this, we would oppose that.  We think

16 that's highly inappropriate and so, we just want to make very

17 clear on the record that by agreeing to have them serve as

18 custodians, we are not at all agreeing that they are proper

19 deponents and we would oppose that.

20      So on basically those -- that condition and that

21 understanding the condition being that if you don't get much of

22 anything, you can't come back.  It's your choice, but with the

23 understanding also that we're not agreeing that those

24 individuals should be the subject of depositions.  If they want

25 to go forward on that basis, fine.

1          On the search terms, Your Honor may remember that we

2    had indicated we were going to run hit -- what we call hit

3    reports.  I think Your Honor probably knows what those are.

4          THE COURT:  Sure.

5          MR. GORDON:  I'm not that conversed in the lingo.  I

6    think that's what they're called.  Anyway, we'd run the search

7    terms against, I believe, five potential custodians and see

8    what results we got and then, have a further dialogue with the

9    other side.

10         And I think we expressed to Your Honor we had a

11   concern about the general nature of the search terms, like talc

12   and words like market and things like that.

13         So we ran those searches.  We provided the hit

14   reports to the other side.  And I don't have the exact numbers

15   in front of me, but my memory is that there were six that came

16   back with high numbers of hits.  And -- so we basically

17   indicated to the other side, we thought those six terms should

18   be excluded and we'd go forward with the rest.

19         Where we are is the response that came back was,

20   well, we agree on the one; and I think it was the term, market.

21   We don't agree on the other five.  And where we are on those,

22   and I guess we'll see what Mr. Glasser has to say, I can get

23   you the precise numbers.  But two of the five, the numbers were

24   like in the tens of thousands, as I remember, like 25,000,

25   35,000 hits.

1          The other three were less than that, more in like the

2     5,000, maybe the 10,000-range.  Again, I'm approximating.  But

3     our view is nonetheless that all of them should be excluded

4     because even the ones at the lower numbers, we checked

5     responsiveness, and they were a hundred percent -- the hits

6     were one hundred percent non-responsive.

7          So in our view, given the time period that we're in,

8     you know, it's obviously a fairly short time period, it doesn't

9     make sense, we don't think, to run those search terms.

10          So those six were still of the view -- well, five of

11     the six --

12          THE COURT:  Five of the six.

13          MR. GORDON:  -- they've agreed to one, so five of the

14     six, we think should still be excluded.  We'll obviously do

15     whatever we're directed to do.  And then, the only other thing

16     I wanted to say, Your Honor, is, and I think I said this

17     before, this is a transaction where at the virtual initiation

18     of the case, we provided all the transaction documents.  The

19     other side, and you've seen it in their pleadings, they know

20     exactly what happened, they know what every step was.  They've

21     obviously already built their arguments on what's wrong with

22     the transaction, what its consequences are.

23          And so, we believe they have virtually everything

24     they need and we also believe that the facts aren't going to be

25     in dispute.  We're going to dispute what the facts mean under

1  the applicable standards.

2        But the other thing, and so I'm just trying to

3  provide the context, but the other thing is, we know that

4  lawyers were involved, there's going to be significant

5  privilege issues and -- I'm just going to sort of put this out

6  there that we don't believe that these searches that we're

7  doing are going to produce much of any helpful non-privileged

8  information and we're probably going to have significant

9  disputes, I would guess, or negative reaction to the fact that

10  you've produced so few; why are there so many documents on the

11  privileged list.

12        But that's sort of the nature of where we are and

13  they were spending a lot of time, we think, responding to these

14  requests and we'll do the best we can but whether it will

15  elicits much in the way of meaningful response of information,

16  we're very skeptical of that.

17        Just let me think, Your Honor, if there's anything

18  else that I want to raise.  I think that's fundamentally it.

19  Obviously, I'll listen to what Mr. Glasser has to say but I did

20  want to kind of set the framework and wanted Your Honor to know

21  that we did comply with the direction that Your Honor gave us

22  and we're making progress but there are, you know, are still

23  open issues that have to be addressed.

24        THE COURT:  All right.  Thank you.  Now, we also set

25  a -- like a follow up -- was that the 3rd or 4th?

1          MR. GORDON:  I believe it was January 3rd.

2          THE COURT:  Third, yeah.

3          MR. GORDON:  I forget the exact time.  It might have

4  been 2 o'clock.

5          THE COURT:  Probably 4 o'clock or --

6          MR. GORDON:  Yeah, some time in the afternoon, I

7  believe.

8          THE COURT:  -- yeah, all right.

9          MR. GORDON:  Yes.

10          THE COURT:  Thank you.

11          MR. GORDON:  Thank you, Your Honor.

12          THE COURT:  Thank you, Counsel.

13          Mr. Glasser?

14          MR. GLASSER:  Thank you, Your Honor.

15          THE COURT:  You're welcome.

16          MR. GLASSER:  Let me first address the custodian

17  issue.  So as Your Honor will recall, you asked them to produce

18  the list of people essentially involved in the transaction who

19  were important enough to have signed these NDAs, or have made

20  the actual official decisions on the documents.

21          We got that list from them.  It was approximately 135

22  people long.  So I wrote back and I said, could you please give

23  me three or four words on each person for what they actually

24  did, because I have been limited to choose seven custodians

25  from the Court out of 135 people who did this deal and I don't

1  know what they did.  I don't know who they are and the debtors

2  refused to give me those answers, so I picked seven.

3         I obviously picked people that I believe would have

4  to be a fulcrum of something important, because if I have to

5  guess, I want to guess about a fulcrum, not a capillary.  So

6  that's how we picked the seven.  So I don't think conditioning

7  -- what the Court said at the last hearing is, let's do the

8  seven, let's see what you find out, take your three depositions

9  and then, we'll report back on the 3rd and we'll discuss

10 whether more custodians are needed or not needed or whether its

11 fair or where we are.

12        And so, I don't think I ought to be required to

13 accept the condition.  I'm not saying we want to depose those

14 people.  I'm saying we want to look at their documents and we

15 want to see who did what.  And the seven we picked were the,

16 you know, the CEO and the incoming CEO, the head of consumer

17 health, the head of finance, the project leader for the thing,

18 the public affairs person who's dealing with issues of talc and

19 the treasurer who signed some of the deal documents.

20        Those were, in my view, a fair guess as to seven

21 people who ought to be at least somewhere in the air traffic

22 control system, getting important things.  But until I see the

23 documents and take these depositions, I really am not in a

24 position to agree to conditions and I don't think it's -- I

25 think it's premature to ask that we have to.

1          So that's the custodian issue, Your Honor.

2          THE COURT:  Is it your intention -- they identified

3    five custodians that they believe would be responsive to your

4    needs.

5          MR. GLASSER:  Yes, sir.

6          THE COURT:  So are you putting them aside?

7          MR. GLASSER:  Well, you know, my view is, Your Honor,

8    if they want to call a witness to the stand, and those are

9    probably be their five witnesses, they're going to have to

10   produce their documents and they're not going to be able to

11   say, gotcha, the Court held you to seven custodians; you'd

12   never get their documents, you have to -- they get to testify

13   and you don't get to know anything.

14         That would be supremely unfair.  So if those are

15   their five witnesses, I urge them to run the searches and

16   produce their documents.

17         THE COURT:  All right.  Continue.  Thank you.

18         MR. GLASSER:  Now, let's talk about the searches.  I

19   got a letter that said, we're only going to search business

20   email; we're not going to look at written notes; we're not

21   going to look at handwritten documents; we're not going to look

22   at their texts; we're not going to look at any slack or instant

23   messaging in the company.

24         I think that's completely unfair, Your Honor.  The

25   normal way that you produce documents in a case is you do your

1 search -- your ESI search across all your devices and you

2 produce -- you know, if somebody keeps a notebook like this,

3 you have the lawyer look and see if there's notes on the topic.

4      And so, I don't think that limitation that they're

5 proposing is fair and I'd like the Court to, well, frankly,

6 Your Honor, I'd like you to say that it's unfair and they

7 should search all their devices.  That's a normal ESI search.

8 It's only seven people.

9      Now, as to the searches themselves, counsel is

10 correct that there was a hit.  They searched their five

11 custodians and they hit on the word, market, like 40,000

12 documents.  And so, we said, fine, you can get rid of that.

13      The next biggest one was the word, stay.  And we have

14 a theory of the case that there's been a misuse or a goal to

15 misuse the breath of a stay as a litigation tactic which is

16 relevant under the SGL case.  And that yielded 37,000

17 documents.  Your Honor, that is an inconsequential number of

18 documents to our law firm, to the -- to our law firms here.

19      We can literally look through 40,000 documents in a

20 weekend.  That's the next highest hit.  The ones below that,

21 the one next below that was 25,000 documents.  And then, you're

22 in to 6,000 documents, 4,000 documents, 2,000 documents.  It's

23 nothing.

24      So our position was fine, we'll get rid of the big

25 one.  The second biggest one is actually a relevant term.  It

1  is 40,000 documents, 37,000 documents, but it is a super

2  relevant term for the case.  And we can easily review that

3  many.  So we'd like you to produce those.  And then, the rest

4  are so small as to be inconsequential in our view.

5        So that's why we stood pat on the search terms

6  beneath the market term which I do think is too broad because

7  maybe it's a market for a produce; maybe it's a market for

8  this; a market for that.  So that's why we put the line where

9  we did, Your Honor.

10        Now, there is another issue which is, for example, we

11  sent a specific request on Royalty A and M.  The Court will

12  recall that Royalty A and M is the royalty vehicle that got

13  these streams of royalties through five transactions with

14  McNeil, with J&J CI.  They bought royalty streams that the

15  debtor has valued on their slides today at $373 million.

16        We sent a discovery request that said we would like

17  the evaluations that cause you to believe it's $373 million,

18  relevant to the motion to dismiss, if it's intentionally

19  underfunding the debtor.

20        The response is, we need to see your custodians and

21  do the searches and see, basically, see if the searches turn up

22  the valuation.  That is not the purpose of the searches or the

23  custodians.  Independent requests for valuations that are

24  perfectly relevant to this case, they ought to go find the

25  valuations and produce them, no matter which custodian had the

1  valuations.

2          So conditioning the production of documents on the

3  choice of custodians is likewise not fair and is asking us to

4  do needle in haystack work instead of getting the documents

5  that everyone agrees in the case are super relevant like the

6  valuation of the royalty stream.

7          So the second thing that is a meta issue between us

8  is they think that the custodian choices cabin what should be

9  produced on every essential request for production and we

10 disagree with that.  If it's a clear request for production for

11 an ascertainable thing, it doesn't matter who the custodian

12 was, whoever did that valuation, whoever got that valuation.

13 It should be produced irrespective of our search for the key

14 people's knowledge through the custodial searches.  So that is

15 a major issue, Your Honor, that will impede discovery.

16         And the third, and this is my last one, and we could

17 -- and the third is, for example, this is another one where, to

18 me, the custodians don't matter; they put a slide up in the

19 presentation today explaining how the cash moved in the company

20 and who paid the <u>Ingham</u> verdict.  They said it was JJCI who

21 paid it.

22         One of our requests, request number 44 is, give us

23 your account control agreement with your bank that moves the

24 cash on a daily basis, among all these companies.  Frankly,

25 Your Honor, I want to see if JJCI has an independent right to

1  draw cash or not without the permission of J&J under those

2  account control agreements.

3       They refuse to produce them.  I don't understand how

4  we can have a bankruptcy case about which entity is in charge

5  of which money and not see account control agreements.  It

6  seems super relevant to understanding the movement of money

7  among the debtor, JJCI and J&J and they put an example of it on

8  the board but won't give me the documents to truth test it.

9       So those are my three big issues.  One, that the

10 searches ought to be, you know, more than just business email;

11 it ought to be all devices and physical notes.  Two, that it's

12 not proper to link specific requests for specific ascertainable

13 documents to who the custodian was, the example being, those

14 valuations.  And three -- and also that -- those account

15 control agreements.  Those are two great examples of where the

16 custodian doesn't matter.  It's just a relevant document to the

17 case that we asked for with very much specificity.  That ought

18 to be produced.

19      Oh, and that's it, Your Honor.  The only thing I'll

20 say about the review you're going to do in-camera is, if it is

21 something that's not relevant, there is a confidentiality order

22 in this case and to the extent they're choosing relevance

23 choices and just blacking things out, it's better for them,

24 it's better for everyone's, like, trust in each other, to just

25 produce it subject to the confidentiality order.

1          I mean, if it were like, hey, we're going to buy

2    another company, it's an M&A problem, I get that.  But in

3    general, that's what the confidentiality order is for, not for

4    parties to just choose to black out everything because they

5    think it's not relevant.

6          THE COURT:  All right.

7          MR. GLASSER:  Okay.  Thank you, Your Honor.

8          THE COURT:  With respect to the hits --

9          MR. GLASSER:  Yes, sir?

10         THE COURT:  -- and you used an example, stay?

11         MR. GLASSER:  Yes, sir.

12         THE COURT:  Are you telling me there's not a way of

13   refining it with --

14         MR. GLASSER:  So when we --

15         THE COURT:  -- by employing additional word, like,

16   automatic or bankruptcy?

17         MR. GLASSER:  -- so when we put the word, automatic,

18   it --

19         THE COURT:  Yup.

20         MR. GLASSER:  -- gave one hit.  I just, people

21   colloquially pry when their email, and they're not saying

22   automatic stay; they're saying, stay the cases, stay this.  If

23   we added on, when we -- we tried that.  When we added

24   automatic, we got one hit out of 37,000.

25         THE COURT:  All right.  Thank you.

1         MR. GLASSER:  Thank you, Your Honor.

2         THE COURT:  Mr. Gordon, response?

3         MR. GORDON:  Yes, Your Honor.

4         On the issue of the extent of the ESI search, what I

5    had understood and what was objectionable to us, is that, for

6    example, with Mr. Gorsky, the CEO of Johnson & Johnson, they're

7    asking that we get his phone, that we pull all the texts off

8    his phone and review those, that we look at any voice messages

9    that are on his phone; things like that.

10         That, to us, seems highly inappropriate.  He

11   represented to you, Mr. Glasser did, that that's the way these

12   e-searches are always done.  I talked to our litigators.

13   They're not the way these are done, typically, from our

14   experience in commercial disputes.  I mean, maybe if this were

15   a -- some sort of harassment case or something and you were

16   targeted on a specific individual.

17         But to ask the debtor to go to Johnson & Johnson, the

18   ultimate parent, and tell the Chairman that he has to give us

19   his phone and we're going to take all the data off his phone

20   and review it.  That seems to us to be over the top so we did

21   object to that.

22         On the --

23         THE COURT:  What other business devices are employed,

24   I mean, although we have iPads, we have laptops, all right.

25   Through which devices, have you undertaken searches?

1          MR. GORDON:  -- well, I think, you know,

2    fundamentally, it's the computers at the office, laptops,

3    whatever it would be.  I don't have the precise answer --

4          THE COURT:  Right.

5          MR. GORDON:  -- to that.  If you give me five

6    minutes, I can probably get the answer to that, but we're

7    certainly prepared to look at all the devices on which business

8    communications would appear.  But to ask someone to, again,

9    hand over their phone to us, seems to go over and above what's

10   appropriate.

11         Well, I'm not sure I have anything to add on the

12   search terms.  It was interesting on the stay, we -- that's

13   what we proposed as an alternative, was to use the term,

14   automatic stay, and that wasn't acceptable.  But it still comes

15   down to us -- there are pretty substantial numbers of hits and

16   on the lower end ones, there was literally no responsive

17   documents.  We were trying to avoid that.  But again, we'll

18   comply with whatever directive Your Honor gives us.

19         On the valuation of the subsidiary, I think on that

20   there may be a miscommunication.  I don't think we ever said --

21   if there was a specific request, and I don't have the requests

22   in front of me, for a valuation of that subsidiary, I don't

23   think we ever said, we're only going to give it to you to the

24   extent it shows up in ESI.

25         What we would have said was, a lot of these requests

1  said, we want the document and all communications related to

2  the document.  And I think what we said was, when you're asking

3  for communications, that'll be whatever [sic] generated from

4  the reports.  We're no going to endeavor, because that's a huge

5  task to try to come up with all communications related to

6  certain documents and that's the way a number of their requests

7  read.

8          THE COURT:  And on the account control agreement?

9          MR. GORDON:  Well, I think what Mr. Glasser is

10  referring to is the concentration account among Johnson &

11  Johnson and its affiliates.  The reason we didn't think that

12  was appropriate is that LTL is not a party to it.

13          And so, what he's fundamentally asking, and I haven't

14  followed the argument when it's been made is, he wants to see

15  how the money moves and he wants to see whether entities are

16  real or not real; that's the terms he's used with me.

17          Well, these are all non-debtor entities.  So I don't

18  really know -- I don't understand what the connection is.  It'd

19  be one thing if LTL were a party to it, but LTL is not.  So we

20  just don't understand what the relevance is providing the

21  concentration account agreement.

22          The only other comment I should make, Your Honor,

23  because I didn't make it before, is on the custodians.  And

24  again, we indicated we're willing to go with their list of

25  custodians.  They obviously don't trust us and that's fine, you

1 know, that's their prerogative.

2          I would point out that Mr. McCann, who is on their

3 list, he's not a lawyer but he's in the Legal Department.  He's

4 like a project manager.  And so, he in particular is likely to

5 generate a significant amount of privileged communications, we

6 suspect.

7          So I'm just putting it out there.  We're not

8 resisting that because he's not a lawyer and, you know, we

9 appreciate the fact there are not lawyers on the list, but he

10 is a project manager, so it's closer to the line on that.

11          THE COURT:  All right.

12          MR. GORDON:  Thank you, Your Honor.

13          THE COURT:  Thank you.

14          As far as the searches, they should be conducted on

15 all business devices.  I will exclude personal telephones, but

16 laptops, iPads, business desktops; we all work through those.

17 The phones, I think, is a step too far at this juncture.

18          Provide the documents for the seven custodians they

19 have identified.  We're going to talk about who is being

20 deposed.  I doubt you're getting to it before January 3rd.

21 You're going to be fortunate to complete the three that you

22 have on tap.

23          I will tell you, I am circumspect and have serious

24 reservations about depositions of the top.  I think we all

25 share, and with no disrespect to anyone, that the top doesn't

1  always really know, have valuable information.

2      If documents demonstrate a reason, great.  If you

3  haven't filed documents that point to a reason to take a

4  deposition of anybody, save time.  Point it in the right

5  direction.  We'll take about it on the 3rd, I guess.

6      Produce the valuation documents, not communications.

7  We'll leave the communications to see if the search terms -- be

8  creative with search terms.  See if you can narrow it down for

9  those who have to review it as well as produce it.  It's in

10  everybody's interest to refine it.

11      The same -- I'm not going to direct the account

12  control agreement at this point.  When you take your

13  depositions, as I'm sure you will, you'll ask questions in that

14  regard, regarding the flow of money as is relevant for the

15  dismissal motion.

16      I mean, it's a narrow -- we're talking about, I

17  guess, the funding agreement and the ability to honor the

18  funding agreement.  It has relevance.  See what -- I guess,

19  it's going to depend on who you are deposing in that regard.

20      We can revisit on the 3rd.  Bu let's take this, as

21  I've always said, in steps.  I think I've -- I don't know if

22  there's any other immediate concern.

23      I'll look at the document.  I agree with, as far as

24  the confidentiality, obviously if it -- if there's -- if the

25  information's been blackened out here, if it looks to me to be

114

1  privileged, I'm not going to authorize it.  If it's subject to

2  a confidentiality agreement, I assume that's -- that it can be

3  produced.  If it looks to me that there's other concerns, such

4  as transactions that shouldn't be -- that are wholly

5  irrelevant, I'll take that into account too.  I'll take a look

6  at it.

7          There's enough for you all to look at the -- as far

8  as documents that are just will have no bearing.

9          Anything else on discovery?

10          MR. GORDON:  No.

11          MR. GLASSER:  Just one item, Your Honor, if I may?

12          THE COURT:  Yeah.

13          MR. GLASSER:  I also mentioned that they should, I

14  believe, look to ask the custodian, do you have physical notes,

15  do you take notes, do you have a notebook and the Court didn't

16  address that?

17          THE COURT:  Yeah.  I'm not ordering the disclosure of

18  notebooks.

19          MR. GLASSER:  Okay.

20          THE COURT:  Thank you.

21          Ms. Jones?

22          MS. JONES:  Good afternoon, Your Honor.

23          THE COURT: Good afternoon.

24          MS. JONES:  Laura Davis Jones of Pachulski Stang

25  Ziehl and Jones, on behalf of Arnold and Itkin.  Your Honor, I

1  rise only to advise your Court as I think you know, that we

2  filed a motion to dismiss as well.

3       Your Honor, we are actively trying to get into the

4  discovery loop.  I thank the TCC who responded immediately to

5  us and brought us into the loop for getting us documents, have

6  given us their discovery that they issued and so forth.  So

7  we're moving forward.

8       A bit more delay from the debtor, but yesterday we

9  did at least receive a phone call so I'm hopeful that we'll be

10 able to move forward on that.

11      Your Honor, we are going to try to integrate as

12 efficiently as possible into the scheduling.  This discovery

13 that's already scheduled, the issues have already been

14 discussed and so forth.

15      But, Your Honor, I did want to stand and reserve my

16 rights in case we have issues that are not raised by the TCC or

17 not raised by the debtor with respect to discovery.  We may be

18 back before the Court.

19      THE COURT:  You're welcome to join us on the 3rd or

20 at other times.  Thank you.

21      MS. JONES:  Thank you, Your Honor.

22      THE COURT:  Mr. Gordon?

23      MR. GORDON:  Your Honor, Greg Gordon again.  The only

24 point -- the only reason I rise is over the minutes, the board

25 minutes.  I haven't had a chance, obviously, to confer with the

1  client or with J&J about that.

2           I just would note, obviously I heard that we have a

3  protective order, we can do that.  But we're talking about

4  minutes of the ultimate J&J board.  There may be added

5  sensitivity around those.  I don't know the answer to that, but

6  I'd at least like an opportunity to confer with our client to

7  see.

8           THE COURT:  I won't mentor any ruling on it for the

9  next couple of days.  So if there's a reason, if you need to

10  supplement any objection, just send the Court a letter.

11          MR. GORDON:  Thank you, Your Honor.

12          THE COURT:  All right.  And if we need, we'll have a

13  call.

14          MR. GORDON:  Thank you, Your Honor.

15          THE COURT:  All right.

16          Now, Ms. Cyganowski, you needed about 15 minutes?

17          MS. CYGANOWSKI:  Yes, sir.

18          THE COURT:  All right.  Guys, time flies.  It's ten

19  to one.  Can we do it by five after 1, or do you need more?

20          MS. CYGANOWSKI:  How about 1:15?

21          THE COURT:  1:15.  I'll change my tee time.

22          All right, folks.  Thank you.

23           (Recess from 12:51 p.m. until 1:18 p.m.)

24          THE COURT CLERK:  For those of you still on the Zoom,

25  we are not going to resume hearings this afternoon.  So these

117

1 | proceedings have concluded.

* * * * *

**C E R T I F I C A T I O N**

We, KAREN WATSON, DANA KELLY and TRACY E. VERGOLLO,
court approved transcribers, certify that the foregoing is a
correct transcript from the official electronic sound recording
of the proceedings in the above-entitled matter, and to the
best of my ability.


/s/ Karen Watson

KAREN WATSON


/s/ Dana Kelly

Dana Kelly


/s/ Tracy E. Vergollo

TRACY E. VERGOLLO

J&J COURT TRANSCRIBERS, INC.        DATE: December 16, 2021