**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
David S. Torborg, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dstorborg@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice* or *pro hac vice* pending**)**
ATTORNEYS FOR DEBTOR

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.:  21-30589 (MBK) |
| Debtor. | Judge:  Michael B. Kaplan |
| | **Hearing Date and Time:** February 15, 2021 at 10:00 a.m. |

## DEBTOR'S OBJECTION TO MOTIONS TO DISMISS
### CHAPTER 11 CASE

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ............................................................................................................. 5

   A.   The Explosion of Talc Claims.................................................................. 5

   B.   The Corporate Restructuring and Chapter 11 Filing..................................... 10

ARGUMENT ................................................................................................................ 13

I.     LEGAL STANDARD................................................................................... 13

II.    FILING BANKRUPTCY TO ADDRESS AN EXPLODING AND
      ENTERPRISE-THREATENING DELUGE OF TALC LITIGATION CLAIMS IS A
      VALID BANKRUPTCY PURPOSE, NOT A "LITIGATION TACTIC." ..................... 14

   A.   The Debtor's Chapter 11 Filing Has a Recognized Bankruptcy Purpose. ..................... 14

   B.   Continuing To Litigate the Enterprise-Threatening Talc Claims in the Tort System Was
       Not Viable. ........................................................................................ 20

III.   THE DECISION TO UNDERTAKE THE CORPORATE RESTRUCTURING PRIOR
      TO THE BANKRUPTCY FILING DID NOT HARM TALC CLAIMANTS. ............... 24

   A.   The Corporate Restructuring Did Not Prejudice Talc Claimants. ................................. 24

   B.   Separating the Talc Claims Prior to Seeking a Bankruptcy Resolution Was Supported
       by Precedent and Did Not Harm Talc Claimants............................................. 28

IV.   THE DEBTOR'S REQUEST TO ENJOIN CLAIMS AGAINST ITS NON-DEBTOR
      AFFILIATES IS CRITICAL TO ACHIEVING THE GOALS OF THIS CASE, NOT
      EVIDENCE OF BAD FAITH. ......................................................................... 32

   A.   The Request to Enjoin the Claims Is Appropriate, Necessary, and Fully Consistent with
       Analogous Precedent. ............................................................................. 32

   B.   Statements Concerning the Extension of the Automatic Stay Were Correct and Provide
       No Evidence of Bad Faith.......................................................................... 35

V.    THE MOVANTS' REMAINING CONTENTIONS NEITHER REFLECT BAD FAITH
      NOR OTHERWISE SUPPORT THE DISMISSAL MOTIONS. ................................... 36

   A.   The Debtor's Decision to File Bankruptcy in the Western District of North Carolina Is
       Not Evidence of Bad Faith......................................................................... 36

   B.   Congressional Attention to the Case Does Not Support Dismissal. ............................. 37

CONCLUSION............................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*15375 Mem'l Corp. v. BEPCO, Op (In re 15375 Mem'l Corp.)*,
  589 F.3d 605 (3d Cir. 2009)............................................................................................ 13, 17

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997)............................................................................................................ 15

*Argus Grp. 1700, Inc. v. Steinman (In re Argus Grp.)*,
  206 B.R. 757 (E.D. Pa. 1997) ............................................................................................ 19

*Furness v. Lilienfield*,
  35 B.R. 1006 (D. Md. 1983) ............................................................................................... 19

*In re Aldrich Pump LLC*,
  2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021)........................................ 27, 28, 33, 34

*In re Am. Cap. Equip., LLC*,
  296 F. App'x. 270 (3d Cir. 2008) ....................................................................................... 18

*In re Bestwall LLC*,
  605 B.R. 43 (Bankr. W.D.N.C. 2019)............................................................................. 15, 21

*In re Bestwall LLC*,
  606 B.R. 243 (Bankr. W.D.N.C. 2019)........................................................................... 16, 25

*In re DBMP LLC*,
  2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021)........................................ 27, 28, 33, 34

*In re Dutch Flat Investment Co.*,
  6 B.R. 470 (Bankr. N.D. Cal. 1980) ............................................................................... 31, 32

*In re Eden Associates*,
  13 B.R. 578 (Bankr. S.D.N.Y. 1981)............................................................................... 31, 32

*In re EHT US1, Inc.*,
  630 B.R. 410 (Bankr. D. Del. 2021) ................................................................................... 14

*In re Fed.-Mogul Glob. Inc.*,
  684 F.3d 355 (3d Cir. 2012)............................................................................................... 16

*In re Gen. Growth Props., Inc.*,
  409 B.R. 43 (Bankr. S.D.N.Y. 2009) ................................................................................. 21

*In re Integrated Telecom Express, Inc.*,
   384 F.3d 108 (3d Cir. 2004)...................................................................................... 17, 21

*In re Johns-Manville*,
   36 B.R. 727 (Bankr. S.D.N.Y. 1984) ................................................................... 18, 20

*In re Mattera*,
   2006 WL 4452834 (Bankr. D.N.J. Feb. 6, 2006) ...................................................... 14

*In re Mid-Valley, Inc.*,
   305 B.R. 425 (Bankr. W.D. Pa. 2004). ..................................................................... 22

*In re Muralo Co., Inc.*,
   301 B.R. 690 (Bankr. D.N.J. 2003) ............................................................... passim

*In re Paradigm Elizabeth, LLC*,
   2015 WL 435067 (Bankr. D.N.J. Jan. 30, 2015) ...................................................... 14

*In re Patriot Coal Corp.*,
   482 B.R. 718 (Bankr. S.D.N.Y. 2012) ................................................................. 36, 37

*In re Quigley Co.*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................................... 4, 31

*In re Ravick Corp.*,
   106 B.R. 834 (Bankr. D.N.J. 1989) ........................................................................... 19

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999)............................................................................. passim

*In re Tamecki*,
   229 F.3d 205 (3d Cir. 2000)....................................................................................... 14

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3d Cir. 2013)....................................................................................... 19

*In re Walden Ridge Dev., LLC*,
   292 B.R. 58 (Bankr. D.N.J. 2003) ............................................................................. 13

*In re Zais Inv. Grade Ltd. VII*,
   455 B.R. 839 (Bankr. D.N.J. 2011) ........................................................................... 14

*Mandelbrot v. J.T. Thorpe Settlement Trust (In re J.T. Thorpe, Inc.)*,
   870 F.3d 1121 (9th Cir. 2017) ................................................................................... 16

*Margulis v. Hertz Corp.*,
  2019 WL 2406344 (D.N.J. Feb. 19, 2019) ........................................................... 26

*Marsch v. Marsch (In re Marsch)*,
  36 F.3d 825 (9th Cir. 1994) ................................................................................... 19

*Marshall v. Marshall (In re Marshall)*,
  721 F.3d 1032 (9th Cir. 2013) ............................................................................... 20

*Shapiro v. Wilgus*,
  287 U.S. 348 (1932) ............................................................................................... 32

*United States v. Huebner*,
  48 F.3d 376 (9th Cir. 1994) ................................................................................... 21

**Statutes**

11 U.S.C. § 1112(b) ..................................................................................................... 13

11 U.S.C. § 524(g) ....................................................................................................... 15

**Other Authorities**

Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise–Threatening Mass
  Tort Liability*, 148 U. PA. L. REV. 2045 (June 2000) ............................................ 15

U.S. Gov't Accountability Office, *Asbestos Injury Compensation: The Role and Administration
  of Asbestos Trusts* (Sept. 2011) ............................................................................ 16

*Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation* (Mar. 1991) ....... 15

S. Elizabeth Gibson, *Judicial Management of Mass Tort Bankruptcy Cases,*
  Federal Judicial Center (2005) .............................................................................. 16

LTL Management LLC, the debtor in the above-captioned chapter 11 case ("LTL" or

the "Debtor"), files this Objection to the *Motion of the Official Committee of Talc Claimants to*

*Dismiss Debtor's Chapter 11 Case* ("Comm. Mot.") and the *Memorandum of Law in Support of*

*Motion to Dismiss Bankruptcy Case* submitted by the Arnold & Itkin law firm on behalf of

certain personal injury claimants ("A&I Mot.") (collectively, with the Committee Motion,

the "Dismissal Motions").  The Official Committee of Talc Claimants (the "Committee") and

Arnold & Itkin are collectively referred to as the "Movants."[2]

## **PRELIMINARY STATEMENT**

The Debtor's chapter 11 case was necessitated by the unrelenting and enterprise-

threatening deluge of litigation alleging that JOHNSON'S® Baby Powder ("Johnson's Baby

Powder") caused ovarian cancer and/or mesothelioma (the "Talc Claims").[3]  Spurred by a small

number of blockbuster verdicts, extraordinary marketing efforts by plaintiff firms, and factually

inaccurate media reports, the explosion in the sheer number of Talc Claims is staggering.  **12,300**

new ovarian cancer claims were filed in the first ten-and-a-half months of 2021 alone.  And the

plaintiffs' bar has asserted that it will continue to file claims for the next 60 years, which would

yield **hundreds of thousands** of new ovarian cancer and mesothelioma claims.  Any one of the

38,000 now-pending or future Talc Claims has the potential for an enormous plaintiff verdict.

Compensatory and punitive awards in single-plaintiff cases have already reached tens to

---

[2] As agreed with Committee counsel, this opening brief serves to outline the Debtor's core legal arguments in opposition to the Dismissal Motions.  It does not include or discuss all of the evidence that will be proffered at the scheduled hearing on the Dismissal Motions.

[3] Certain claims have identified "Shower to Shower," a talc-based deodorizing product sold by Old JJCI (as defined herein) to a competitor in 2012, as a purported cause of ovarian cancer and mesothelioma.  Claimants generally allege the same facts and claims as to Shower to Shower as those they plead as to Johnson's Baby Powder, as both are cosmetic products containing talc as a primary or major ingredient.  Accordingly, references to "Johnson's Baby Power" herein include Shower to Shower.

hundreds of millions of dollars.  The risk is further magnified in cases where courts have

wrongly permitted or may in the future wrongly permit the consolidation of cases, as evidenced

by the **$4.69 billion** verdict reached in the *Ingham* case (the total award was reduced on appeal,

but to a still-massive amount of **$2.24 billion** for a group of just twenty individual plaintiffs).

The costs and ramifications of this litigation are enormous.  Old Johnson & Johnson

Consumer, Inc. (together with its corporate predecessors, "Old JJCI")—which manufactured and

sold Johnson's Baby Powder since 1979 (acquiring the business and also liability for all Talc

Claims that year)—incurred some **$4.5 billion** to defend and resolve Talc Claims in just the past

five years.  None of those costs have been reimbursed by third-party insurers.

In the 21 months before the Petition Date alone, Old JJCI incurred **$3.6 billion** to defend

and resolve Talc Claims—an amount representing some 34% of Old JJCI's total sales and well

over 50% of its gross profit for that period.  Payment of those costs, which were growing at an

alarming rate, was not sustainable; an otherwise healthy business began operating at a substantial

loss, as litigation expenses attributable to the legacy Johnson's Baby Powder product had

completely eroded the margin earned on Old JJCI's **entire business**.  And this does not take into

account the reputational harm caused by unrelenting attacks on the brand; the crush of ancillary

litigation and governmental investigations (including the potential liability associated with such

investigations); and billions of dollars in alleged indemnification claims from suppliers, retailers,

and others.[4]  The future of the litigation was even more bleak, given the exponential increase in

the costs and exposure from an ever-increasing volume of claims with highly variable outcomes.

---

[4] The Movants' focus on the financial wherewithal of Johnson & Johnson ("J&J") is misguided and
irrelevant.  J&J is not the Debtor, nor was the Debtor formed from a divisional merger of J&J.  Rather, the Debtor
was formed from a divisional merger of Old JJCI.  Moreover, Old JJCI was the manufacturer and seller of Johnson's
Baby Powder since 1979, when it received all of the assets and assumed all of the existing liabilities of J&J's Baby
Products Division (including as to Talc Claims), and agreed to indemnify J&J for those liabilities.

Continuing down that wildly unpredictable path was simply not viable.  The Movants—

who themselves allege there are "many billions of dollars" of Talc Claims—cannot credibly

suggest otherwise.  Accordingly, and despite its continuing belief that the Talc Claims have no

valid scientific basis, Old JJCI determined that pursuing an equitable resolution through chapter

11 was the only feasible option.

None of the Movants' various arguments for dismissal of this case as a "bad faith" filing

is supported by the facts or the law.  Courts have uniformly acknowledged that filing a chapter

11 petition to equitably resolve tens of thousands of mass tort claims qualifies as a valid

bankruptcy purpose, just as Congress recognized when it enacted section 524(g) of the

Bankruptcy Code.  No remotely analogous mass tort chapter 11 petition has ever been dismissed

as a bad faith filing.  Even the cases cited by the Movants acknowledge the differences between

chapter 11 filings aimed at obtaining a "tactical litigation advantage" in a specific litigation and

the need to equitably resolve a flood of mass tort claims of the type faced here.  Like the asbestos

claimants' committee's unsuccessful motion to dismiss in *In re Muralo Co., Inc.*, 301 B.R. 690

(Bankr. D.N.J. 2003), the Movants have "misread, if not abused" the Third Circuit's precedent

on the dismissal of chapter 11 petitions.  *Id.* at 696; *see also In re SGL Carbon Corp.*, 200 F.3d

154, 163-64, 168-69 (3d Cir. 1999) (distinguishing nature of litigation in *SGL Carbon* with the

debtor's need in *Johns-Manville*, *A.H. Robins*, and *Dow Corning* to resolve thousands of mass

tort claims).

Nor do the Movants' various attacks on the Corporate Restructuring (defined below) that

created the Debtor support dismissal.  The Corporate Restructuring did not "block" or "remove"

assets "from the reach" of talc claimants.  To the contrary, the Funding Agreement between the

Debtor, the newly created Johnson & Johnson Consumer Inc. ("New JJCI"), and J&J assures that

the Debtor has the same, if not an enhanced, ability to satisfy the Talc Claims as Old JJCI had

prior to the Corporate Restructuring. The Movants' speculative critiques of the Funding

Agreement—including the notion that New JJCI and J&J will "refuse" to honor their

obligations—are unfounded, particularly given that those entities have already agreed to make an

immediate and substantial prefunding of those obligations through a proposed $2 billion

qualified settlement trust ("QSF")—funding that the Committee has inexplicably opposed.

Talc claimants simply were not harmed by the Corporate Restructuring. The Movants

deride the transaction and bankruptcy filing as the "Texas two-step," but deliberately disregard

that other states have analogous statutes permitting divisional mergers and the same result may

be accomplished just as legally (although less efficiently) by other means. Allocating the Talc

Claims to the Debtor prior to filing bankruptcy avoided a complex, value-destructive, and

exponentially more costly bankruptcy harmful to thousands of Old JJCI's stakeholders (*e.g.*,

suppliers, vendors, customers, and employees to name a few) and beneficial to no one, including

talc claimants. Old JJCI is hardly the first mass tort defendant to enter into a corporate

restructuring prior to a bankruptcy filing. None of those prior bankruptcy filings has been

dismissed as a bad faith filing, and none of the Movants' authorities supports dismissal. The

only remotely comparable case cited by the Committee, *In re Quigley Co., Inc.*, 437 B.R. 102

(Bankr. S.D.N.Y. 2010), actually favors the Debtor. That court **declined to grant a dismissal**

**motion** and confirmed a plan with a channeling injunction in favor of Quigley's non-debtor

parent, Pfizer. The court's finding of bad faith, made in denying an earlier proposed plan, related

to "vote-buying" and has no relevance here.

None of the Movants' remaining allegations supports dismissal, either. The Debtor's

request to enjoin claims against New JJCI and J&J—the subject of a separate adversary

proceeding—is indisputably necessary to achieve the legitimate goals of this case.  As Judge

Whitley acknowledged, "[w]e're not going to have a bankruptcy of any sort if everybody can go

sue J&J and assert the same claims that they would be asserting here."  Nor was the Debtor's

filing of its bankruptcy case in the Western District of North Carolina evidence of bad faith.

Judge Whitley expressly stated that he did not fault the Debtor's choice of venue.

The Dismissal Motions should be denied.

## BACKGROUND[5]

### A.    The Explosion of Talc Claims

Johnson's Baby Powder has been used by hundreds of millions of people worldwide for

over 125 years.  Multiple studies, commissioned by government agencies and others, have shown

that the product is safe.[6]  Prior to the 2010s, only a small number of isolated product liability

claims involving Johnson's Baby Powder had ever been filed.  But that has changed—and

dramatically—over the last decade.  In 2013, the jury in the *Berg* case found for the plaintiff but

awarded no damages.  The verdict sent ripples through the plaintiffs' bar.  In 2016, a St. Louis

jury in the *Fox* case reached a plaintiff verdict of $72 million.  While the verdict was reversed on

appeal, it sparked even more interest.  Five more cases were tried in St. Louis over the next year

and a half, resulting in plaintiff verdicts totaling more than $235 million.[7]

While these verdicts were also reversed on appeal, the claims relating to Johnson's Baby

Powder exploded as plaintiff lawyers commissioned dubious expert causation reports (that some

courts labeled "junk science") and launched extensive marketing campaigns through misleading

---

[5] The information contained in this section is taken from the Debtor's Informational Brief (Dkt. 3) ("Info. Br.") and First Day Declaration (Dkt. 5) ("First Day Decl.").  Supporting citations are contained in those submissions, where indicated herein.

[6] Info. Br. at 11-43.

[7] *Id.* at 46-47; First Day Decl. ¶¶ 34-36.

commercials, "infomercials," spam emails, and social media. Estimates suggest plaintiff firms

have spent as much as $4.5 million a month soliciting Talc Claims, with a focus on saturating

their favored litigation jurisdictions (such as St. Louis). Advertising for Talc Claims is among

the highest of any tort.[8]

The resulting explosion in filings is unprecedented. In 2014, Old JJCI was served with

just 46 ovarian cancer complaints. Just three years later, that number had escalated to nearly

5,000.

Inquiries and demands from all directions only increased when, in October 2019, Old

JJCI initiated a voluntary recall in response to an FDA-sponsored test indicating the potential

presence of sub-trace levels of chrysotile asbestos (no greater than 0.00002%) in samples from a

single bottle of Johnson's Baby Powder. Although Old JJCI's investigation determined there

was no asbestos in the bottle tested (and identified test sample contamination and/or analyst error

as the most probable root causes of the FDA's finding), the finding only fueled further

unsupported allegations and misinformation. Ultimately, on May 19, 2020, Old JJCI announced

it would permanently discontinue its line of talc-based Johnson's Baby Powder in the U.S. and

Canada. Demand for the product had declined significantly, due in large part to misinformation

around the safety of the product and a constant barrage of litigation advertising.[9]

From January 2020 to the Petition Date, the company was, on average, served with a new

ovarian cancer complaint **every single hour of the day, 365 days a year**. As of the Petition

Date, approximately 38,000 ovarian cancer cases relating to Johnson's Baby Powder were

---

[8] Info. Br. at 46-48, 77, 90-93. Given the exit of many traditional asbestos defendants from the tort system and a decline of mesothelioma claimants who can credibly allege any significant exposure to asbestos, plaintiff firms have evidently pinned their hopes on talc as a new white powder (not unlike asbestos itself for story telling purposes) to revitalize a waning asbestos litigation industry.

[9] *Id.* at 38-39; First Day Decl. ¶ 33.

pending. New mesothelioma filings also skyrocketed. At the time of the *Fox* trial, only six mesothelioma cases included Johnson's Baby Powder. By the Petition Date, that number had grown to 430 pending claims.[10]

Damage demands have escalated as fast as the litigation itself. In *Herford*, the first mesothelioma case against J&J/Old JJCI to go to jury verdict, the plaintiff asked for roughly $23 million in compensatory damages. In *Johnson*, the most recent mesothelioma trial to go to verdict, plaintiff's counsel suggested **$8 billion** was an appropriate award.[11]

Despite securing dismissals in some 1,300 ovarian cancer and 250 mesothelioma cases, achieving 16 defense verdicts, and reversing numerous plaintiff verdicts on appeal, Old JJCI and J&J also suffered unpredictable, wildly divergent, and enormous plaintiff verdicts. Compensatory damages awards in single-plaintiff ovarian cancer cases have ranged from $5 million to $70 million, while punitive damages ranged from $50 million to $347 million. In mesothelioma cases, compensatory damages awards in single-plaintiff cases have ranged from $2.5 million to $40 million, while punitive damages ranged from $100,000 to $300 million. Awards can skyrocket in multi-plaintiff cases, reaching $550 million in compensatory damages and $4.14 billion in punitive damages in the *Ingham* case, one of the largest personal injury verdicts ever seen in the United States. Although reversed in part and reduced on appeal, the total award was still $2.24 billion.[12]

---

[10] First Day Decl. ¶¶ 42-44.

[11] Info. Br. at 119; 10.6.21 Hr'g Tr. at 10909-10, *In re LAOSD Asbestos Cases*, No. JCCP 4674/20STCV17335 (Cal. Sup. Ct. Oct. 6, 2021) (Torborg Decl., Ex. A). Exhibits (or excerpts of Exhibits) cited herein are attached to the Declaration of David S. Torborg ("Torborg Decl."), filed contemporaneously herewith.

[12] Info Br. at 119-20. The two plaintiff verdicts rendered in 2021 further demonstrate the unpredictable and incongruous nature of the awards. In one, the jury awarded $25 million in compensatory damages and a nominal $100,000 in punitive damages. In the other, the jury awarded the inverse, roughly $2.5 million in compensatory damages and $25 million in punitive damages. *Id.* at 120.

With nearly 40,000 lawsuits filed in just a matter of years, the challenges of mounting an effective, uniform, and efficient defense are staggering. As are the costs. In just the last five years, defense costs alone have grown to nearly $1 billion, with Old JJCI incurring $10 million to $20 million a month in defense costs prior to the Petition Date—amounts that will escalate exponentially when the roughly 35,000 Talc Claims included in the MDL pending before Chief Judge Wolfson are remanded to their home jurisdictions after completion of pretrial proceedings. The Debtor estimates that it costs some $2 million to $5 million to try a single ovarian cancer claim. Defending just the over 38,000 pending ovarian cancer claims through trial would cost up to $190 billion. In addition to defense costs, Old JJCI has paid some $3.5 billion in settlements and plaintiff verdicts. Making matters worse, Old JJCI and J&J are facing billions of dollars in indemnification claims from their talc supplier, Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys").[13]

Further still, based upon plaintiff counsels' allegations, as corroborated by their investment in advertising soliciting additional claimants, the Debtor reasonably expected the litigation would grow well beyond the over 38,000 Talc Claims already pending. Plaintiff experts estimate that the latency period for mesothelioma can be as long as 60 years. And they have recently begun to allege similar extended latency periods for talc-based ovarian cancer claims. As a result, even though business considerations caused Old JJCI to stop North American sales of talc-based Johnson's Baby Powder in 2020, individuals developing mesothelioma or ovarian cancer could conceivably bring suit for several decades, which could

---

[13] First Day Decl. ¶ 40. In its bankruptcy case, Imerys has contended that it has claims against Old JJCI and J&J for indemnification and joint insurance proceeds, claims allegedly in the billions of dollars. Similarly, Cyprus Mines Corporation and its parent company, which had owned certain Imerys talc mines, filed an adversary proceeding in the Imerys bankruptcy against Old JJCI, J&J, Imerys Talc America, Inc., and Imerys Talc Vermont, Inc. seeking a declaration of indemnity under certain contractual agreements. Cyprus Mines Corporation has since filed its own bankruptcy case.

ultimately bring the total number of Talc Claims to the hundreds of thousands.[14]  Given trial

costs incurred to date, taking these future cases to trial would cost hundreds of billions of dollars.

Beyond the monetary cost of the personal-injury Talc Claims, the damage to Old JJCI's

business, and the impact of the litigation on J&J and Old JJCI employees—from scientists and

specialists to in-house counsel and up through management—cannot be overstated.  Among

other things, management and in-house counsel have had to coordinate responding to hundreds

of sets of discovery, thousands of individual interrogatories, and document requests resulting in

the production of over two-and-a-half million pages of documents from more than 200

individuals and document sources.  Management has sat for nearly 100 depositions, spanning

33,000 pages of testimony.[15]

And that does not even consider the crush of ancillary litigation, government

investigations, and demands associated with the Talc Claims, including Congressional,

Department of Justice, SEC, and state attorneys general investigations, derivative actions,

ERISA class action lawsuits, and various consumer protection actions.  *See generally* J&J Form

10-K for the Fiscal Year Ended Jan. 3, 2021, at 86-87 (excerpts at Torborg Decl., <u>Ex. B</u>).  The

potential costs and exposure of the state attorneys general investigations alone—which started

with two consumer protection/unfair trade practices actions (Mississippi and New Mexico) and

has now ballooned to a coalition of 42 states investigating Johnson's Baby Powder—are

staggering, given the potential for civil penalties on a per-sale, per-exposure, and per-solicitation

---

[14] *Id.* ¶¶ 41, 45.  According to data from National Cancer Institute's Surveillance, Epidemiology, and End Results Program ("<u>SEER</u>"), there are over 21,000 estimated new ovarian cancer diagnoses in 2021.  *See https://seer.cancer.gov/statfacts/html/ovary.html.*

[15] Info Br. at 123.

basis, restitution for state expenditures on Johnson's Baby Powder, damages attributable to state expenditures for treating patients allegedly harmed by the product, and even punitive damages.[16]

Old JJCI has borne all of these costs on its own. To date, none of Old JJCI or J&J's third-party insurers have accepted coverage for the Talc Claims.[17]

The Movants do not and cannot contest the severity of the impact occasioned by the talc litigation. The Committee itself states that Old JJCI faces "many billions of dollars of talcum powder-related liabilities." Comm. Mot. ¶ 6. It further states that the "tide" is turning in plaintiffs' favor, citing recent allegedly damaging document productions, unfavorable judicial decisions, and scientific studies purporting to support the plaintiffs' causation allegations. *See id.* ¶¶ 14-18. The Committee's contention is incorrect. As this year's trial record shows, Old JJCI prevailed with unanimous defense verdicts in six out of the eight claims tried this year—but then faced extraordinary and inconsistent verdicts in the other two. The tide has not changed; however, it certainly is rising, and Old JJCI was flooded and drowning.

### B.    The Corporate Restructuring and Chapter 11 Filing

Prior to the Corporate Restructuring described below (and more fully in the Debtor's First Day Declaration), Old JJCI manufactured and sold a broad range of products used in the baby care, beauty, oral care, wound care, and women's health care fields, as well as over-the counter pharmaceutical products. Major brands include: AVEENO®; CLEAN & CLEAR®; DR. CI:LABO®; NEUTROGENA®; OGX®; TYLENOL®; SUDAFED®; BENADRYL®; ZYRTEC®; MOTRIN®; NICORETTE®; ZARBEE'S NATURALS®; PEPCID®;

---

[16] Earlier this month, the United States Supreme Court denied a request to halt the Mississippi Attorney General action.

[17] First Day Decl. ¶ 53.

JOHNSON'S®; AVEENO Baby®; LISTERINE®; STAYFREE®; CAREFREE®; BAND-AID®; and NEOSPORIN®.  New JJCI continues these product lines today.

While Old JJCI—the entity responsible for the Talc Claims prior to the Corporate Restructuring[18]—was a substantial entity, its resources were finite and the Talc Claims were an immense drain on its finances and ability to maintain what was otherwise a healthy business. For the 21 months (January 1, 2020 through September 30, 2021) preceding the Petition Date, Old JJCI incurred some **$3.6 billion** of litigation expenses relating to the Talc Claims—**34%** of the company's sales and an amount that alone significantly exceeds what the company spent for marketing ($2.23 billion), selling, general, and administrative expenses ("SG&A") ($1.71 billion), and research and development ($536.8 million) for that time period.[19]  As a result of talc-based litigation expenses, Old JJCI suffered a **pre-tax loss** of nearly a billion dollars ($893.4 million) in the 21 months leading up to the Petition Date.  Simply put, the financial burden of continuing to litigate the Talc Claims was not sustainable.  No business could survive (much less compete) by having to expend a full third of its sales revenue—and well over half of its gross profit (net sales less cost of goods sold)—to pay litigation claims attributable a legacy product that, even when sold, provided only a relatively small margin contribution to the business.

Moreover, as discussed above, the costs to Old JJCI stood to increase exponentially, and the continuing exposure of the Talc Claims and government actions was simply not sustainable.

---

[18] As set forth in the Debtor's *Supplemental Memorandum of Law in Support of Preliminary Injunction Motion*, in the 1970s J&J transferred the assets and liabilities associated with Johnson's Baby Powder and Shower to Shower products to subsidiaries, which ultimately resulted in Old JJCI becoming responsible for all claims alleging that Johnson's Baby Powder or Shower to Shower cause cancer or other diseases.  Adv. Dkt. 128 at 8-14.  Likewise, prior to the Petition Date, costs associated with litigation concerning talc products—including defense costs, settlements, and any verdict payments—were borne by Old JJCI.  *Id.* at 17-18; *Declaration of Adam Lisman In Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions* [Adv. Dkt. 51] ("Lisman Decl.") ¶¶ 8-12.

[19] *See* JJCI Income Statements for the periods Jan. 1, 2020 to Dec. 31, 2020 and Jan. 1, 2021 to Sept. 30, 2021 (Torborg Decl., Exs. C & D).

Old JJCI anticipated that it would continue spending at least hundreds of millions of dollars a year in defense costs for the foreseeable future.  Worse, if only a small fraction of the pending cases continued to yield such inconsistent and blockbuster awards, the Old JJCI assets available to pay current and future Talc Claims would have been completely exhausted.[20]

Accordingly, as further described in the First Day Declaration, Old JJCI implemented a corporate restructuring on October 12, 2021 (the "Corporate Restructuring").  As a result of the restructuring, Old JJCI ceased to exist and the Debtor and New JJCI were created.  The Debtor was allocated talc-related liabilities of Old JJCI and certain assets, including ownership of a royalty management and finance business, Royalty A&M LLC, valued at over $350 million.  New JJCI was allocated all of Old JJCI's other assets and liabilities.  The design of the Corporate Restructuring ensured that the Debtor would have the same, if not greater, ability to fund the costs of defending and resolving Talc Claims as Old JJCI did prior to the restructuring.  In addition to assets received by the Debtor, the Debtor's ability to pay claims is supported by a Funding Agreement with both New JJCI and J&J, as joint obligors, for the full amount of the value of New JJCI.[21]  J&J and New JJCI have also agreed to advance an aggregate amount of $2 billion under the Funding Agreement into a qualified settlement fund for the exclusive payment of Talc Claims.

The Corporate Restructuring would enable a global, equitable, and efficient resolution of the Talc Claims through a chapter 11 reorganization without subjecting the entire Old JJCI

---

[20] Per stipulations filed in the underlying talc litigation, Old JJCI's book value net worth is approximately $14 billion.  *See also* JJCI Balance Sheet for the period ending Sept. 30, 2021 (Torborg Decl., Ex. E).

[21] Without any corresponding repayment obligation, the Funding Agreement requires New JJCI and J&J, up to the full value of New JJCI, to fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M LLC are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.  *See* First Day Decl. ¶ 27.

enterprise to a complex, value-destructive, and costly bankruptcy proceeding.  The Debtor filed

its chapter 11 petition on October 14, 2021.  The Bankruptcy Code provides the only means

available for companies plagued by massive numbers of tort claims to permanently resolve those

claims in a manner that is fair and equitable to all parties, including talc claimants.  Indeed,

notwithstanding the conflicting interests of plaintiff firms, bankruptcy provides the **only means**

by which the Talc Claims can be resolved and paid efficiently and equitably.

## ARGUMENT

### I.    LEGAL STANDARD

Under Third Circuit law, "a Chapter 11 petition is subject to dismissal for 'cause' under

11 U.S.C. § 1112(b) unless it is filed in good faith."  *In re SGL Carbon*, 200 F.3d at 162.

Determining whether a chapter 11 petition was filed in good faith is a "fact intensive inquiry" to

determine where the petition "falls along the spectrum ranging from the clearly acceptable to the

patently abusive."  *Id.*

The focus of the inquiry is whether the petitioner sought "to achieve objectives outside

the legitimate scope of the bankruptcy laws."  *Id.* at 165 (internal quotations omitted).  The Third

Circuit has focused on two primary questions: "(1) whether the petition serves a valid bankruptcy

purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage."

*15375 Mem'l Corp. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir.

2009) (citing *In re SGL Carbon*, 200 F.3d at 165).

The party seeking dismissal "has the initial burden to present a *prima facie* case alleging

bad faith; once achieved, the burden shifts to the debtor to prove that the petition was filed in

good faith."  *In re Walden Ridge Dev.*, *LLC*, 292 B.R. 58, 62 (Bankr. D.N.J. 2003).  The

Committee's suggestion that merely "ma[king] allegations that a filing was not made in good

faith," Comm. Mot. ¶ 30, is sufficient to shift the burden to the Debtor is incorrect.  The movant

must first "put on evidence sufficient to impugn th[e] [debtor's] good faith."  *In re Tamecki*, 229

F.3d 205, 207 n.2 (3d Cir. 2000); *In re EHT US1, Inc.*, 630 B.R. 410, 429 (Bankr. D. Del. 2021)

(stating, in corporate chapter 11 case, that a "debtor's good faith is 'at issue' if a party (i) 'call[s]

into question [the] debtor's good faith, and' (ii) 'put[s] on evidence sufficient to impugn that

good faith….'") (quoting *Tamecki*, 229 F.3d at 207 n.2).[22]

## II.    FILING BANKRUPTCY TO ADDRESS AN EXPLODING AND ENTERPRISE-THREATENING DELUGE OF TALC LITIGATION CLAIMS IS A VALID BANKRUPTCY PURPOSE, NOT A "LITIGATION TACTIC."

### A.    The Debtor's Chapter 11 Filing Has a Recognized Bankruptcy Purpose.

The Movants' first principal ground for dismissal—that this case lacks a valid bankruptcy

purpose (Comm. Mot. ¶¶ 1, 4, 7 , 31, 35-49; A&I Mot. ¶¶ 2-3, 12, 47-53 )—finds no support in

the law.  The Debtor filed this case to resolve the explosion of potentially financially crippling

Talc Claims in a manner efficient and equitable to all parties, including current and future

claimants.  This includes in excess of 38,000 already pending claims, not to mention the

potentially hundreds of thousands of additional claims likely to be filed over the next several

decades.  Neither the Debtor nor its predecessor could possibly defend all of these claims.  Even

the Committee acknowledges that the Debtor faces "many billions of dollars of talcum powder-

related liabilities."  Comm. Mot. ¶ 6.  The plaintiff bar's view of the liability is considerably

higher.

---

[22] *See also In re Zais Inv. Grade Ltd. VII*, 455 B.R. 839, 848 (Bankr. D.N.J. 2011) ("When a party files a
motion to dismiss and places good faith "at issue" by presenting a *prima facie* case of bad faith in the filing, the non-
moving party bears the burden of demonstrating good faith.") (citing *In re SGL Carbon*, 200 F.3d at 162 n.10); *In re
Paradigm Elizabeth, LLC*, No. 14-24901 (DHS), 2015 WL 435067, at *3 (Bankr. D.N.J. Jan. 30, 2015) ("If a
moving party presents sufficient evidence placing the debtor's good faith at issue, the burden of proving that a
chapter 11 petition was filed in good faith is on the petitioner."); *In re Mattera*, No. 05-39171 (DHS), 2006 WL
4452834, at *2 (Bankr. D.N.J. Feb. 6, 2006) ("The movant has the initial burden to present a *prima facie* case
alleging bad faith; once achieved, the burden shifts to the debtor to prove that the petition was filed in good faith.").

The Debtor's objective is unquestionably a proper purpose of a chapter 11 case. *See, e.g.*, *In re Bestwall LLC*, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency. The Committee agrees."); *In re SGL Carbon*, 200 F.3d at 163-64, 169 (distinguishing confined nature of litigation in *SGL Carbon* with the debtor's need in *Johns-Manville*, *A.H. Robins*, and *Dow Corning* to resolve thousands of mass tort claims) (citing Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise–Threatening Mass Tort Liability*, 148 U. PA. L. REV. 2045, 2050–51 (June 2000)); *In re Muralo*, 301 B.R. at 697, 706 (finding debtor's "sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos … cases" a "significant factor evidencing the good faith of Debtors' filings").

Seeking a rational resolution of thousands of costly, unpredictable, and potentially financially ruinous mass tort claims is neither unprecedented nor inconsistent with the Bankruptcy Code. The inability of the tort system to effectively and equitably resolve such claims is well established.[23] Congress enacted a specific provision of the Bankruptcy Code—11 U.S.C. § 524(g) ("section 524(g)")—to permit entities besieged by asbestos-related claims to permanently resolve such claims through establishment of a trust. More than 60 entities have filed bankruptcy and established such trusts.[24] Courts, including the Third Circuit, and observers

---

[23] *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 598 (1997) ("[D]ockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.") (quoting *Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation* 2-3 (Mar. 1991)).

[24] *See* U.S. Gov't Accountability Office, *Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts*, at 3 (Sept. 2011); *see also* S. Elizabeth Gibson, *Judicial Management of Mass Tort Bankruptcy Cases,* Federal Judicial Center, at 1 (2005), available at https://www.fjc.gov/sites/default/files/2012/GibsJudi.pdf (noting that "bankruptcy courts have become a forum for companies seeking the resolution of pending and

have repeatedly acknowledged the benefits of a bankruptcy court resolution of mass tort claims

as compared to the overburdened tort system.  *See, e.g.*, *In re Fed.-Mogul Glob. Inc.*, 684 F.3d

355, 362 (3d Cir. 2012) ("[O]bservers have noted the trusts' effectiveness in remedying some of

the intractable pathologies of asbestos litigation, especially given the continued lack of a viable

alternative providing a just and comprehensive resolution.") (citing various sources); *In re*

*Bestwall LLC*, 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019) ("[A] section 524(g) trust will

provide all claimants—including future claimants who have yet to institute litigation—with an

efficient means through which to equitably resolve their claims.").

The Talc Claims at issue in this case provide an especially compelling case for resolution

through a chapter 11 reorganization.  Putting aside their crushing weight on the Debtor and its

predecessor, there is simply no way that the tort system—especially if limited to the plaintiffs'

relatively few favored jurisdictions—could conceivably resolve the exponentially increasing

volume of claims.  By contrast, as detailed in the expert report of Charles E. Mullin (submitted in

connection with preliminary injunction proceedings before Judge Whitley), resolving the Talc

Claims through a bankruptcy resolution provides a far more efficient alternative than the tort

system, both in terms of cost and timeliness.[25]  As importantly, a bankruptcy resolution would

provide far more equitable treatment of claims, avoiding the lottery-like results of the tort

system.  *See* Mullin Expert Report ¶¶ 26-32.[26]

---

threatened mass tort litigation" and that, as of the publication date, "over seventy companies, motivated primarily by
their desire to reach a final resolution of their mass tort liabilities, have sought bankruptcy protection").

[25] *See Expert Report of Charles H. Mullin, PhD* , dated October 29, 2021 (the "Mullin Expert Report") at
¶¶ 8, 17-25 (Torborg Decl., Ex. F).  *See also Mandelbrot  v. J.T. Thorpe Settlement Trust (In re J.T. Thorpe, Inc.)*,
870 F.3d 1121, 1123 (9th Cir. 2017) ("Trusts often compensate claimants through a streamlined procedure less
clunky than traditional litigation.  This system diverts fewer resources away from compensating claimants, which is
generally a good thing.").

[26] The Movants' suggestion that the decision to seek a bankruptcy resolution reflects a "massive turn" and
"flipflop" in decision-making compared to prior statements made in the Imerys bankruptcy that Old JJCI and J&J
preferred to litigate in the tort system, Comm. Mot. ¶¶ 20-21, 38, 50, is flawed for several reasons.  Among other

The Debtor is not aware of **any** decision to dismiss a chapter 11 bankruptcy petition on facts remotely comparable to this case.  Certainly the Movants have not identified any such precedent.  The Movants cite *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004), and *In re 15375 Memorial Corp.*, 589 F.3d 605, for the proposition that a desire to use a particular provision in the Bankruptcy Code is "by itself" insufficient to establish good faith. Comm. Mot. ¶ 48; A&I Mot. ¶¶ 51-52.  In *Integrated Telecom*, "smoking gun" evidence showed that the debtor—which had already dissolved and held cash that far exceeded its potential liabilities—filed for the sole purpose of using section 502(b)(6) of the Bankruptcy Code to limit a landlord's claim for future lease payments.  384 F.3d at 112.  Likewise, in *15375 Memorial*, the Third Circuit upheld the bankruptcy court's finding that the filing was a "litigation tactic" motivated solely by a desire to protect its parent and affiliated entities from liability in a single case.  589 F.3d at 609, 626.

Here, the Debtor did not file its chapter 11 petition "solely" to "take advantage" of section 524(g) or the automatic stay.  Comm. Mot. ¶¶ 5, 48.  It filed because it faced a deluge of enterprise-threatening litigation and seeks a bankruptcy resolution of mass tort liability, as specifically sanctioned by Congress.  Indeed, in *Integrated Telecom*, the Third Circuit **expressly contrasted** the debtor's relative lack of litigation exposure to that typically faced by a debtor in a mass tort bankruptcy.  *See* 384 F.3d at 125 ("This case is therefore entirely distinguishable from cases such as *Johns-Manville*, where the debtor faced 'approximately 16,000 lawsuits pending as of the filing date,' with the prospect of the 'filing of an even more staggering number of suits

---

things, the cited statements were made in connection with Old JJCI and J&J's opposition to a proposed Imerys bankruptcy plan that proposed to pay exponentially inflated values for talc claims, for which the trust would then seek indemnification from Old JJCI and J&J.  Moreover, the decision to pursue a bankruptcy resolution also postdated the Supreme Court's decision to deny certiorari in the *Ingham* case.

over the course of 20-30 years'") (quoting *In re Johns-Manville Corp.*, 36 B.R. 727, 729 (Bankr. S.D.N.Y. 1984)).

The Movants fail to explain how the Debtor's filing effectuated any "tactical litigation advantage" in any of the tens of thousands of Talc Claims pending as of the Petition Date.  There has been no showing that the Debtor filed bankruptcy to stay, prevent collection, or otherwise gain a "litigation advantage" in any particular case.  The fact that the Debtor has moved to enforce the automatic stay does not suggest otherwise.  *See In re Am. Cap. Equip., LLC*, 296 F. App'x. 270, 274 (3d Cir. 2008) (finding no intent to confer "a particular litigation advantage to Debtors, over and above the advantages that a typical debtor may properly obtain by availing himself of the bankruptcy system").  Here, the Debtor filed its chapter 11 case to pursue an expedient, global resolution of some 38,000 pending claims and potentially hundreds of thousands of future claims.  The proposed $2 billion QSF is powerful evidence of the Debtor's and its non-debtor affiliates' intentions.  Far from attempting to "hinder and delay talc claimants," Comm. Mot. ¶ 2, the bankruptcy attempts to **accelerate** payment to talc claimants through a global resolution.

Likewise, this case is nothing like *SGL Carbon*, which instead fully supports the good faith of the Debtor's filing.  The Third Circuit cited company admissions that it filed bankruptcy "solely to gain tactical advantages" in a single antitrust class action—by "chang[ing] the negotiating platform" and "increas[ing] the pressure on … plaintiffs to settle"—and had no financial reason to seek bankruptcy protection.  *See* 200 F.3d at 166-67.  The decision specifically distinguished the "finite number of suits" and exposure facing the debtor in *SGL Carbon* to the mass tort bankruptcies in *Johns-Manville*, *Dow Corning*, and *A.H. Robins*.  *Id.* at 164, 169.

-18-

Judge Stern's decision in *In re Muralo* is instructive. There, the debtors filed bankruptcy to resolve some 60,000 asbestos-related claims pending in state courts. 301 B.R. at 692. The official committee of asbestos claimants moved to dismiss, contending that the filing was "simply a litigation tactic designed … for the sole purpose of obtaining a judgment from this Court declaring that the Debtors are not liable as successors in interest for asbestos liabilities relating to Synkoloid products." *Id.* at 695. Comparing the decisions in *SGL Carbon* and *Johns-Manville*, Judge Stern found that the debtors' circumstances in *Muralo* were—as they are here— "plainly most closely related to" the "mass tort litigation context" in *Johns-Manville* and not comparable to the "more contained and manageable" litigation in *SGL Carbon*. *Id.* at 698, 704-05. Like the court in *Johns-Manville*, the *Muralo* court denied the motion to dismiss. *Id.* at 704-06 ("Rather, *Johns-Manville* and its progeny, recognizing the need for open access to bankruptcy for mass-tort driven filings, remain the most compelling precedent given Debtors' circumstances.").[27]

Finally, the Committee's claim that resolving individual plaintiffs' claims through section 524(g) would deny due process and jury trial rights, Comm. Mot. ¶ 39, is false. A trust established by the Bankruptcy Court will resolve individual claims through court-approved procedures that must afford due process rights. *See In re W.R. Grace & Co.*, 729 F.3d 311, 324 (3d Cir. 2013) ("Therefore, as long as a court correctly determines that § 524(g)'s requirements

---

[27] Nor are the circumstances here remotely analogous to additional cases the Movants cite to support their "litigation tactic" charge. In each case, the courts dismissed the case after finding that the debtors filed solely to gain a litigation advantage in a two-party dispute. *See Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 829 (9th Cir. 1994) (finding debtor with clear ability to pay judgment filed solely to avoid paying a judgment or posting appeal bond); *In re Ravick Corp.*, 106 B.R. 834, 851 (Bankr. D.N.J. 1989) (finding debtor sought to upend previous decision of trial court ordering specific performance against debtor); *Argus Grp. 1700, Inc. v. Steinman (In re Argus Grp.)*, 206 B.R. 757, 759-60 (E.D. Pa. 1997) (finding financially health debtor filed bankruptcy three days after state appellate court vacated earlier order staying proceeding); *Furness v. Lilienfield*, 35 B.R. 1006, 1007-08 (D. Md. 1983) (finding debtor filed bankruptcy on the eve of trial after repeated delays and multiple unsuccessful attempts to postpone trial).

are satisfied, present and future claims can be channeled to a § 524(g) trust without violating due

process."). Otherwise, of course, no mass tort case could ever exist in chapter 11. In any case,

as the Movants well know, claim procedures for trusts established under chapter 11 plans in mass

tort cases include a provision that allows claimants to demand a jury trial if they so choose.

### B. Continuing To Litigate the Enterprise-Threatening Talc Claims in the Tort System Was Not Viable.

As Judge Stern recognized in *Muralo*, "[t]he Third Circuit readily acknowledges that '[i]t

is well established that a debtor not need be insolvent before filing for bankruptcy protection.'"

301 B.R. at 699 (quoting *In re SGL Carbon*, 200 F.3d at 163).[28] *SGL Carbon* also cited the

"need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it

is faced with a hopeless situation." 200 F.3d at 163; *see also id.* at 164 ("We do not hold that a

company cannot file a valid Chapter 11 petition until after a massive judgment has been entered

against it. Courts have allowed companies to seek the protections of bankruptcy when faced

with pending litigation that posed a serious threat to the companies' long term viability.");

*Johns-Manville*, 36 B.R. at 736 (holding debtor "should not be required to wait until the

economic situation is beyond repair in order to file a reorganization petition," noting that the

"'Congressional purpose' in enacting the Code was to encourage resort to the bankruptcy

process").[29]

---

[28] *See also Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1052 (9th Cir. 2013) (affirming bankruptcy court conclusion that, "[a]s a statutory matter, it is clear that the bankruptcy law does not require that a bankruptcy debtor be insolvent, either in the balance sheet sense (more liabilities than assets) or in the liquidity sense (unable to pay the debtor's debts as they come due), to file a chapter 11 case or proceed to the confirmation of a plan of reorganization"); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 32 (Bankr. D. Colo. 1999) ("A Chapter 11 debtor need not be insolvent to be eligible for relief. Indeed, Chapter 11 cases can be initiated for any of an infinite variety of business reasons.").

[29] In addition to the recent cases of *Bestwall*, *DBMP*, *Paddock*, and *Aldrich Pump/Murray Boiler*, there are many other examples of "solvent" companies that have filed chapter 11 to resolve the uncertainty and potentially enterprise-threatening risks posed by thousands of mass tort claims. These include *In re Mid-Valley*, Case No. 03-35592-JKF (Bankr. W.D. Pa.); *In re N. Am. Refractories Co.*, Case No. 02-20198 (Bankr. W.D. Pa.); *Coltec-Garlock*, Case No. 10-BK-31607 (Bankr. W.D.N.C.); *In re W.R. Grace & Co.*, Case No. 01-1139 (Bankr. D. Del.);

Nor does the Bankruptcy Code "require any particular degree of financial distress as a condition precedent to a petition seeking relief." *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (quoting *United States v. Huebner*, 48 F.3d 376, 379 (9th Cir. 1994)). Whatever degree of financial distress is required, it is plainly satisfied here. Like other courts, the Third Circuit has readily acknowledged the financial distress posed by entities facing thousands of mass tort claims. *See, e.g.*, *In re SGL Carbon*, 200 F.3d at 163-64, 169; *Integrated Telecom*, 384 F.3d at 125; *Bestwall*, 605 B.R. at 49 ("The volume of current asbestos claims that Bestwall faced as of the Petition Date [64,000 claims], coupled with the projected number of claims to be filed through 2050 and beyond, is sufficient financial distress for Bestwall to seek resolution under section 524(g) of the Bankruptcy Code.").

The explosion of Talc Claims against Old JJCI and J&J is unprecedented. Fueled by millions in plaintiff firm-sponsored "infomercials," spam emails, social media posts, and other advertising, ovarian cancer claims have ballooned from just 46 ovarian cancer claims filed against Old JJCI in 2014 to the filing of over **12,300** such claims in the first ten-and-a-half months 2021 alone. Mesothelioma claims have likewise increased exponentially. And if the Committee is correct, the situation will only escalate given the alleged turning of the "tide" in plaintiffs' favor. Comm. Mot. ¶¶ 14-18; *In re Muralo*, 301 B.R. at 702 ("It is no small irony that it is the potential validity of the asbestos claims—something the Asbestos Committee would advocate—which is a factor supporting Debtors' eligibility for chapter 11.").

One does not need to speculate about the material risks posed by the Talc Claims, as Old JJCI and J&J have already suffered a number of verdicts in the millions to billions of dollars. As

---

*USG Corp.*, Case No. 01-2094 (Bankr. D. Del.); and *United Gilsonite Laboratories*, Case No. 5:11-bk-02032 (Bankr. M.D. Pa.). None of these cases was or has been dismissed as a bad faith filing.

noted, in just the last five years alone, Old JJCI has incurred some **$4.5 billion** to defend and

resolve Talc Claims.  The yearly litigation expenses incurred in defending against Talc Claims

has now eroded the entirety of Old JJCI's earnings.  Old JJCI's book value net worth is

approximately $14 billion.  If only a small fraction of the pending or future cases continue to

yield such inconsistent and excessive awards, Old JJCI's assets would easily be exhausted in

their entirety—and quickly.[30]

        As detailed above, the distress caused by the talc litigation extends far beyond the

financial costs associated with defending and resolving the Talc Claims themselves.  The

ongoing litigation—and its unrelenting disparagement of the Johnson & Johnson name—

tarnishes the company's reputation and its many brands in ways that are impossible to

exaggerate.  The litigation has spawned a seemingly endless series of ancillary lawsuits,

government enforcement actions and investigations, demands, and recalls—all of which are

individually substantial and some of which could expose the company to tens or even hundreds

of billions of dollars in civil penalties, restitution, and damages.  Not surprisingly, the underlying

litigation and its many repercussions have had a material impact on management.  *See Muralo*,

301 B.R. at 697 (observing the "undeniable destructive effect on [the] [d]ebtors' everyday

business operations wrought by their sudden immersion in the world of asbestos mass tort").

_____

        [30] In similar cases, plaintiff representatives have previously acknowledged the risks posed by mass asbestos
tort litigation.  For example, in *In re Mid-Valley, Inc.*, the debtors' insurers moved to dismiss the case as a bad faith
filing, contending that the "Debtors by their own admission are solvent and are not distressed by the existence of
asbestos liability."  305 B.R. 425, 429 (Bankr. W.D. Pa. 2004).  Certain of the claimants strenuously opposed the
insurers' dismissal arguments, correctly observing that "any one" of the personal injury claims facing the debtors
"might lead to liability in the tens or even hundreds of millions of dollars, and which, in aggregate, could threaten
the financial viability of even the healthiest company."  *See Response of Tort Victims Represented by Baron & Budd
and Silber Pearlman to the Motions to Dismiss Filed by Various Insurers* (Torborg Decl., Ex. G) at 3.  The
claimants further stated that the debtors' chapter 11 case was "possessed of a clear reorganization purpose:  the
invocation of 11 U.S.C. §§ 524(g) and 105(a) to ensure equitable treatment of present and future mass tort claimants
and provide a mutually acceptable global resolution of crippling mass tort litigation."  *Id.* at 25.  Judge Fitzgerald,
who noted that the "fact of solvency does not require a finding that the bankruptcy filing was in bad faith," 305 B.R.
at 429-31, declined to dismiss the case and later approved the Mid-Valley plan of reorganization.

The Committee does not appear to dispute that the Debtor and Old JJCI were financially distressed as a result of the talc litigation.[31]  Presumably, that is because the Committee acknowledges its allegations that the talc litigation represents "many billions of dollars" in liability, Comm. Mot. ¶ 6, and has otherwise stressed the magnitude and risk presented by the Talc Claims.  *Id.* ¶¶ 6, 14-18.  Rather, the Committee cites prior statements that "**J&J** has admitted it was financially capable of paying" all Talc Claims, *id.* ¶ 7 (emphasis added) and focused on **J&J's** credit rating, cash, and market capitalization.  *Id.* ¶¶ 6, 20 (emphasis added).  But the Movants' focus on J&J's wherewithal is misguided and irrelevant.  J&J is not the Debtor, nor was the Debtor formed from a divisional merger of J&J.  LTL was formed from a divisional merger of Old JJCI—the entity that more than 40 years ago assumed all liability for Talc Claims.[32]

In arguing that neither "the Debtor, [n]or Old JJCI, is (or was) in any financial distress," Arnold & Itkin at least focuses on the correct entities.  A&I Mot. ¶ 47.  But it fails to provide **any** analysis of the likely financial and other impacts of the tens to hundreds of thousands of current and future Talc Claims on the long-term viability of LTL or Old JJCI.  Instead, it merely observes that Old JJCI was meeting its debts as they came due, did not have overdue debts, had not defaulted on any debt, and was not otherwise currently impaired in accessing capital markets.

---

[31] The Committee instead charges that this bankruptcy lacks a proper purpose because LTL is a "dummy" corporation with "no business, no operations, no employees, no funded debt," limited "assets," and no need for a "fresh start."  Comm. Mot. ¶¶ 4-5, 41.  This ignores the overwhelming impact of the talc litigation on Old JJCI (which had extensive business operations and thousands of employees) and is inconsistent with Movants' assertion that the bankruptcy is designed to protect Old JJCI and J&J.  *See* Comm. Mot. ¶ 23; A&I Mot. ¶¶ 2, 14-16.  Moreover, the Debtor has business operations housed in a wholly-owned subsidiary and seeks a fresh start in the form of a global resolution of the substantial and growing number of Talc Claims filed and anticipated to be filed against it.

[32] Contrary to the Committee's suggestion, the Debtor has never contended that any liability on the Talc Claims is its "alone."  Comm. Mot. ¶ 30.  What the Debtor has stated—and proved to Judge Whitley—is that Old JJCI assumed and indemnified J&J for that liability in 1979 and that the Talc Claims against Old JJCI and J&J are inextricably intertwined and, in fact, one and the same.  *See* Dkt. 128 at 8-14, 17-22.

*Id.* ¶ 48.  Citing *SGL Carbon*, Arnold & Itkin trumpets that "[s]peculation about future impact of

talc litigation on the Debtor's financial viability (or that of Old JJCI) is insufficient to establish a

'valid bankruptcy purpose.'"  *Id.*  That contention is directly at odds with the language in the

*SGL Carbon* decision recognizing the financial distress caused by "tens of thousands of asbestos

health-related suits over the course of 20-30 years" and making crystal clear that "[c]ourts have

allowed companies to seek the protections of bankruptcy when faced with pending litigation that

posed a serious threat to the companies' long term viability."  *In re SGL Carbon*, 200 F.3d at

164.  Like the asbestos committee in *Muralo*, the Movants have "misread, if not abused" the *SGL

Carbon* decision.  301 B.R. at 696.

There can be no question that the Debtor's filing of this chapter 11 case is proper.  The

Movants cannot credibly assert on one hand that the Debtor has massive liability for Talc Claims

but on the other maintain that it cannot file for chapter 11 relief to address that purported

enormous liability.  This chapter 11 case has a proper bankruptcy purpose.

## III.    THE DECISION TO UNDERTAKE THE CORPORATE RESTRUCTURING PRIOR TO THE BANKRUPTCY FILING DID NOT HARM TALC CLAIMANTS.

The Movants' second principal argument for dismissal—a series of contentions

concerning the Corporate Restructuring and decision to allocate the Talc Claims to the Debtor

prior to a bankruptcy filing—fares no better.  *See* Comm. Mot. ¶¶ 2-4, 22-23, 32-34, 42-43; A&I

Mot. ¶¶ 4-11, 19-28, 55-63.  The Corporate Restructuring was specifically structured to **avoid**

harm to talc claimants and did not result in any fraudulent transfer.

### A.    The Corporate Restructuring Did Not Prejudice Talc Claimants.

The Movants' allegations that the Corporate Restructuring "hindered," "delayed," and

"prejudiced" talc claimants—by "blocking talc creditors from obtaining access" to "Old JJCI's

substantial business assets" and "remov[ing] Old JJCI's business assets and operations from the

-24-

reach of its talc creditors"—are baseless.  Comm. Mot. ¶¶ 2-4, 41, 50; A&I Mot. ¶¶ 4, 55-63.

The Corporate Restructuring was specifically structured to assure that talc claimants were **not**

harmed.  The Funding Agreement assures that the Debtor will have the same, if not greater,

ability to satisfy Talc Claims as Old JJCI had before the Corporate Restructuring.  *See In re*

*Bestwall*, 606 B.R. at 252 ("The Court disagrees with the [c]ommittee's argument [that the

divisional merger 'enabled Old GP to replace the assets against which asbestos creditors had a

claim with a much smaller subset of assets'] for several reasons.  First, because of the [f]unding

[a]greement, the [d]ebtor's ability to pay valid Bestwall [a]sbestos [c]laims after the 2017

[c]orporate [r]estructuring is identical to Old GP's ability to pay before the restructuring.").  And

because the Funding Agreement obligations fall equally on J&J, talc claimants are in a **better**

position than they were prior to the Corporate Restructuring.  There was no "asset-stripping."

A&I Mot. ¶ 6.[33]

The Movants' speculative critiques of the Funding Agreement are unfounded.  There is

simply no factual basis to suggest that J&J and New JJCI will "refuse to make payments under

the Funding Agreement."  Comm. Mot. ¶ 23; *see also id.* 33; A&I Mot. ¶ 10.  Through the

proposed QSF, J&J and New JJCI have already proposed to make a $2 billion pre-funding

commitment of their obligations.  A similar funding agreement-structure has been used in at least

five other mass tort bankruptcies (*Coltec-Garlock*, *Paddock*, *Bestwall*, *DBMP*, and *Aldrich*

*Pump/Murray Boiler*).  The Movants do not and cannot cite a single instance where the payor

under any of these agreements has failed to honor its obligations.  The related charge that the

---

[33] J&J's joint obligation also renders moot the Committee's odd complaint that the proposed spin-off of the Consumer Health business creates uncertainty about whether New JJCI and J&J "should be the primary obligor under the Funding Agreement."  Comm. Mot. ¶ 27.  Having two Payors under the Funding Agreement cannot be bad for LTL or talc claimants, and J&J's joint obligation moots any concern about the impact of the proposed spin-off on New JJCI's value.

Funding Agreement lacks a sufficient enforcement mechanism is false.  Comm. Mot. ¶ 23; A&I

Mot. ¶¶ 9, 25, 57.  The obligations are owed to LTL (and not to talc claimants holding contingent

and highly disputed tort claims) and both New JJCI and J&J have agreed to submit to the

jurisdiction of the bankruptcy court as necessary to enforce their obligations.  Funding

Agreement § 5, 9.  And the notion that LTL is "controlled by J&J" and would disregard its rights

under the Funding Agreement, Comm. Mot. ¶ 23, ignores that LTL is a debtor subject to court

oversight.  The Funding Agreement is a valid, legally enforceable contract and should be

considered as such.[34]

Nor is there any basis to suggest that the Funding Agreement has been "artificially

capped," presumably because it does not include all of the assets of J&J, the parent company.

Comm. Mot. ¶¶ 7, 23, 33; A&I Mot. ¶ 7.  The Corporate Restructuring involved a divisional

merger of **Old JJCI**, not J&J, and the Funding Agreement provides that New JJCI must fund at

least up to the value of Old JJCI ("Chenango") as of the divisive merger (the "JJCI Value").

Funding Agreement at § 1.  The Movants' complaint that JJCI Value would "take years to

adjudicate" (Comm. Mot. ¶ 23)—and the suggestion that claimants "must await the outcome of

that litigation" before getting paid (*id.* ¶ 33; *see also* A&I Mot. ¶¶ 10, 25, 58)—misses the mark.

The argument falsely assumes that the JJCI Value will actually have to be "adjudicated."  The

Funding Agreement was drafted to require a determination of the JJCI Value **only if** J&J and

New JJCI refused to make payments required under the Funding Agreement, an event never

expected to occur.  Funding Agreement § 2(a) ("The JJCI Value shall be calculated at, and only

---

[34] There is no legitimate basis to ignore the Funding Agreement as not being an "arm's length transaction."
A&I Mot. ¶¶ 8, 23-24, 56.  Agreements between corporate affiliates are routinely drafted by centralized corporate
counsel, with neither affiliate having "independent" counsel.  *See Margulis v. Hertz Corp.*, No. CV 14-1209-JMV-
MF, 2019 WL 2406344, at *2 (D.N.J. Feb. 19, 2019) ("'[P]arent companies often centralize provision of legal
services to the entire corporate group in one in-house legal department,' and can be, and often are, 'represented by
the same in-house counsel.'") (internal citations omitted).

at, any date on which (x) the Payors refuse to make a requested Payment under this

Agreement.").  There should never be a need for collateral litigation concerning the theoretical

value of Old JCCI at the time of the Corporate Restructuring.

The Movants' citations to Judge Whitley's decisions in the *DBMP* and *Aldrich

Pump/Murray Boiler* cases, Comm. Mot. ¶¶ 23, 32; A&I Mot. ¶¶ 9, 57, do not support the

Dismissal Motions.  Judge Whitley made clear in those decisions that actions demonstrating that

the debtors are "true to their word" and are "committed to providing [a] 'full and fair' resolution"

of the mass tort liabilities would obviate any need to challenge the prepetition restructurings in

those cases.[35]  Judge Whitley made similar remarks in this matter.  *See* Nov. 10, 2021 Hr'g Tr. at

142-43 ("[I]f J&J is true to its word and they are interested in a full and fair and final treatment

of these talc claim liabilities, then there may be no reason to, to attack the corporate restructuring

at all.") (Torborg Decl., Ex. H).  The Debtor, New JJCI, and J&J are committed to achieving a

resolution of the talc liability as quickly as possible and have already confirmed their intention to

carry out that commitment through the proposed establishment and funding of the $2 billion

QSF.

Four other mass tort bankruptcies (*Bestwall*, *Paddock*, *DBMP*, and *Aldrich Pump/Murray

Boiler*) have involved prepetition restructurings similar to the restructuring at issue here.  In

these cases, claimants' counsel raised the same attacks advanced here.  None of those cases have

been dismissed as a bad faith filing.  Indeed, in one of the cases (*Paddock*), the parties have

reached a consensual resolution.[36]

---

[35] *See In re DBMP LLC*, No. 20-30080 (JCW), 2021 WL 3552350, at *43 (Bankr. W.D.N.C. Aug. 11, 2021); *In re Aldrich Pump LLC*, No. 20-30608 (JCW), 2021 WL 3729335, at *38 (Bankr. W.D.N.C. Aug. 23, 2021).

[36] *O-I Glass Announces Agreement of Potential Plan of Reorganization for Paddock Subsidiary*, Apr. 26, 2021, available at https://ml.globenewswire.com/Resource/Download/16cd291a-0087-410c-a07c-262d56b0697d (Torborg Decl., Ex. I).

**B.    Separating the Talc Claims Prior to Seeking a Bankruptcy Resolution Was Supported by Precedent and Did Not Harm Talc Claimants.**

Ultimately, the Movants' complaint appears to be that it was improper for Old JJCI to undergo a restructuring that allowed the company to seek a resolution of the Talc Claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding. Comm. Mot. ¶¶ 3, 42-43; A&I Mot. ¶¶ 4, 21, 55, 59, 63. Subjecting all of Old JJCI and its many stakeholders—including thousands of trade creditors, employees, customers, business partners, and even contingent tort claimants—to a value-destructive, complex, and exponentially more expensive bankruptcy would benefit no one.[37] Even if Old JJCI had itself filed for bankruptcy, the Talc Claims would still be stayed, the assets available to pay those claims would be no greater (given the Funding Agreement), and the sole issue in the case would still be the resolution of the talc liability. None of the negative consequences of submitting all of Old JJCI bankruptcy is necessary to enable the parties to reach a sensible resolution of the Talc Claims—itself a "valid reorganization purpose."

As the Movants' acknowledge (A&I Mot. ¶ 21), this is not the first case to involve a divisional merger or similar restructuring that separated mass tort liabilities from other assets and liabilities shortly before a chapter 11 filing. In the *Garlock-Coltec* bankruptcy, Coltec (Garlock's parent company), transferred most of its assets to "NewCo," while its asbestos liabilities, a consulting business, certain insurance rights, and rights under a "Keepwell" agreement remained in or were provided to "OldCo," which then filed for chapter 11 protection. The explicit purpose of the restructuring was to afford an opportunity for a section 524(g) plan while "avoid[ing] disruption and damage to" to the broader business. Garlock Discl. Statement,

---

[37] *See In re Aldrich Pump LLC*, 2021 WL 3729335, at *8 (acknowledging the "serious negative consequences" of a hypothetical bankruptcy filing of Old IRNJ and Old Trane); *In re DBMP LLC*, 2021 WL 3552350, at *8 (acknowledging adverse effects of hypothetical bankruptcy filing of Old CertainTeed).

at 12-34 (Torborg Decl., Ex. J).  The claimant representatives supported the restructuring and ultimate plan, which was confirmed by the bankruptcy and district courts.

Likewise, in *Paddock*, Owens-Illinois underwent a corporate restructuring immediately before *Paddock* filed bankruptcy to "structurally separate the legacy [asbestos] liabilities … from the active operations of Owens-Illinois, Inc.'s subsidiaries, while fully maintaining the Debtor's ability to access the value of those operations to support its legacy liabilities." *Declaration of David J. Gordon, President and Chief Restructuring Officer of the Debtor, in Support of Chapter 11 Petition and First Day Pleadings*, *In re Paddock Enters. LLC*, No. 20-10028 [Dkt. 2] at 11-13 (Bankr. D. Del. Jan. 6, 2020) (Torborg Decl., Ex. K).  As noted, the Debtor, the asbestos committee, and the future claimants' representative have reached agreement on a consensual plan.  Likewise, the Corporate Restructuring here will not prevent or impede a consensual and equitable bankruptcy resolution of the Talc Claims.[38]

There are numerous other examples of solvent, non-debtor entities receiving the benefits of a channeling injunction by making substantial contributions to a debtor-affiliate's bankruptcy trust.  These include *In re N. Am. Refractories Co.*, No. 02-20198 (Bankr. W.D. Pa.) ("NARCO"), *In re Quigley Co., Inc.*, No. 04-15739 (Bankr. S.D.N.Y.);[39] *In re Babcock &*

---

[38] Notably, the future claimants' representative in the *Aldrich Pump/Murray Boiler* case has not joined in the asbestos claimants' committee's contention that the prepetition restructuring prevents a resolution under section 524(g).  *See The Future Claimants' Representative's Initial Submission on the Debtors' Preliminary Injunction Motion*, *In re Aldrich Pump LLC*, Case No. 20-30608 (JCW), Adv. No. 20-03041 [Adv. Dkt. 129] (Bankr. W.D.N.C. Mar. 19 2021) (Torborg Decl., Ex. L).

[39] *See Quigley Company, Inc. Fifth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, *In re Quigley Co. Inc.*, No. 04-15739 [Dkt. 2670-1] at 14-15 (Bankr. S.D.N.Y. July 2, 2013) (non-debtor Pfizer's contribution to the trust included, among other things, a cash contribution of approximately $260 million, forgiveness of intercompany and DIP debt owed by Quigley to Pfizer, and relinquishment of its rights under certain insurance policies) (Torborg Decl., Ex. M).

*Wilcox*, No. 00-10992 (Bankr. E.D. La.);[40] *In re Leslie Controls*, No. 10-12199 (Bankr. D.

Del.);[41] and *In re T H Agriculture & Nutrition*, No. 08-14692 (Bankr. S.D.N.Y.).[42]

None of the authorities or arguments advanced by the Movants supports the conclusion

that it was improper or illegal to separate the Talc Claims in advance of the bankruptcy filing.

The Movants' claim that Old JJCI "shield[ed]" its assets from the "purview of the Bankruptcy

Court," A&I Mot. ¶ 4; *see also* Comm. Mot. ¶ 3, ignores the Debtor's ability (and, if necessary,

the Court's ability) to enforce the Funding Agreement against New JJCI and J&J.  And the

Debtor, New JJCI, and J&J have willingly submitted themselves to the jurisdiction of the

bankruptcy court as necessary to enforce the Funding Agreement.  Funding Agreement § 9.

Nor do the Movants' concerns that not filing Old JJCI for bankruptcy deprives talc

claimants of the typical protections of chapter 11—including notice and a hearing for non-

ordinary course actions involving estate property and incurrence of debt (A&I Mot. ¶ 55)—

warrant dismissal.  J&J is also a Payor under the Funding Agreement—up to the full JJCI

Value—providing protection against any theoretical future diminishment of New JJCI's ability

to pay Talc Claims.  Likewise, Arnold & Itkin's contention that not filing Old JJCI "deprived"

---

[40] *See Summary Disclosure Statement as of September 28, 2005 Under Section 1125 of the Bankruptcy Code With Respect to the Joint Plan of Reorganization as of September 28, 2005 Proposed by the Debtors, the Asbestos Claimants' Committee, the Future Asbestos-Related Claimants' Representative, and McDermott Incorporated*, 2005 WL 8168731, at *6 (Bankr. E.D. La. Sept. 29, 2005) (non-debtor MI and McDermott International Inc.'s ("MMI") contribution included transfers of MMI common stock valued at $123.1 million, $92 million of promissory notes, and certain tax benefits).

[41] *See Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Plan of Reorganization of Leslie Controls, Inc. Under Chapter 11 of the Bankruptcy Code, In re Leslie Controls, Inc.*, No. 10-12199 [Dkt. 382] at 25, 46 (Bankr. D. Del. Oct. 28, 2010) (Torborg Decl., Ex. N).

[42] *See First Amended Prepacked Plan of Reorganization of T H Agriculture & Nutrition, L.L.C. Under Chapter 11 of the Bankruptcy Code, In re T H Agriculture & Nutrition, L.L.C.*, No. 08-14692 [Dkt. 465-1] at 13-14 (Bankr. S.D.N.Y. May 29, 2009) (non-debtor parent PENAC contribution included cash sufficient for the total trust contributions from all parties to equal $900 million, assumption of environmental and retirement liabilities, forgiveness of intercompany debt, and relinquishment of its rights under certain insurance policies) (Torborg Decl., Ex. O).

talc claimants of the ability to confirm a plan that provides for a trust owning a majority of the

stock of Old JJCI, (A&I Mot. ¶ 59), is baseless.   There is no reason to believe that talc claimants

want stock in a consumer health business, as opposed to monetary compensation.   Arnold &

Itkin effectively admits as much.   *Id.* ("Regardless of whether talc creditors, after consultation

with financial advisors, would elect to pursue this course of action, the design of the divisional

merger was to strip them of this option.").

The Committee misstates the decision in *In re Quigley*, which favors the Debtor.   There,

the court **denied** a motion to dismiss the chapter 11 case.[43]   In denying confirmation of

Quigley's fourth plan of reorganization, the court did **not** find the bankruptcy was filed in bad

faith on the basis that Pfizer sought the protection of section 524(g) without filing bankruptcy

itself.   Rather, it found that "the accepting votes cast on behalf of the Settling Claimants were

procured in bad faith" and could not be used to confirm the plan.   *In re Quigley*, 437 B.R. at 130-

32.   Ultimately, *Quigley* successfully confirmed a different chapter 11 plan, which included a

channeling injunction in favor of Pfizer.[44]

Neither *In re Eden Associates*, 13 B.R. 578, 584 (Bankr. S.D.N.Y. 1981), nor *In re Dutch

Flat Investment Co.*, 6 B.R. 470, 471 (Bankr. N.D. Cal. 1980), bear any resemblance to this case.

In *Eden*, the court dismissed the filing of a shell entity, formed on the eve of bankruptcy, to hold

an alleged security interest in a single parcel of improved property (its only asset).   The debtor's

---

[43] *See In re Quigley*, 437 B.R. at 102, 111 (noting ad hoc committee of tort victims and United States
Trustee opposed confirmation and sought dismissal of case); *Findings of Fact, Conclusions of Law, and Order (i)
Confirming Quigley Company Inc.'s Chapter 11 Plan of Reorganization Under 11 U.S.C. § 1129(a) and (ii)
Recommending Affirmance by the U.S. District Court, In re Quigley Company, Inc.*, Case No. 04-15739 (SBM)
(Bankr. S.D.N.Y. July 2, 2013) (Dkt. 2670) (the "Quigley Confirmation Order") at 5, 20 ("For the reasons stated on
the record at the Confirmation Hearing, the Wilentz Objection and the Dismissal Motion, together with any and all
reservations of rights included therein, are overruled on the merits.") (Torborg Decl., Ex. P).

[44] *See* Quigley Confirmation Order ¶¶ 17, 28; *See Law360, Pfizer To Pay $964M In Quigley's Approved
Ch. 11 Plan*, available at https://www.law360.com/articles/453333/pfizer- to-pay-964m-in-quigley-s-approved-ch-
11-plan (June 26, 2013); *In re Quigley Co., Inc.*, Case No. 04-15739 [Dkt. 2681] (district court approval).

owner, a serial filer of bankrupt entities, had formed the entity in an attempt to stop foreclosure

on the property.  The court found the debtor was equitably estopped from claiming a "secret

deed" to the property due to an assortment of "deceptive practices" by its owner concerning the

property.  13 B.R. at 582-84.  With no assets, no creditors, no employees, and no ongoing

business, there was nothing to reorganize and no bankruptcy purpose.  *Id.* at 584.  Likewise, in

*Dutch Flat*, the court dismissed the chapter 11 case filed by two entities—each formed five days

before the bankruptcy and each with the same sole secured creditor—finding the case's "sole

purpose" was to frustrate the creditor's collection efforts.  6 B.R. at 471 ("Many cases have held

that dismissal is proper when a dummy entity is created for purpose of obtaining a stay.").[45]

The Debtor's chapter 11 case was filed for the purpose of bringing the tens to hundreds of

thousands of pending and future Talc Claims into one forum for an efficient and equitable

resolution.  As detailed above, court after court has found this to be a proper bankruptcy purpose.

## IV.    THE DEBTOR'S REQUEST TO ENJOIN CLAIMS AGAINST ITS NON-DEBTOR AFFILIATES IS CRITICAL TO ACHIEVING THE GOALS OF THIS CASE, NOT EVIDENCE OF BAD FAITH.

### A.    The Request to Enjoin the Claims Is Appropriate, Necessary, and Fully Consistent with Analogous Precedent.

The Movants further contend that the Debtor's bankruptcy should be dismissed because

the "ultimate goal" of the case is to protect New JJCI and J&J from Talc Claims.  A&I Mot.

¶¶ 32-33; *see also id.* ¶¶ 35, 54; Comm. Mot. ¶ 4, 42-44.  As an initial matter, this issue is

already being litigated in connection with the *Debtor's Motion for an Order (I) Declaring That*

---

[45] *Shapiro v. Wilgus*, 287 U.S. 348 (1932), cited by Arnold & Itkin, is even more afield.  There, a lumber dealer unable to pay his debts transferred his assets to a new corporation in an effort to get around a Pennsylvania law prohibiting appointment of a receiver for an individually owned businesses.  *Id.* at 352.  The Supreme Court dismissed the receivership proceeding, finding it part of a plan to hinder and delay creditors inconsistent with Pennsylvania law.  *Id.* at 355 (the plan "did not gain validity when [the lumber dealer] transferred the business to another with a capacity for obstruction believed to be greater than his own").

*the Automatic Stay Applies to Certain Actions Against Non-Debtors or (II) Preliminarily*

*Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final*

*Hearing* [Adv. Pro. Dkt. 2] (the "PI Motion").

In addition, the argument provides no basis for dismissal.  As Judge Whitley

acknowledged in his preliminary injunction ruling, "[w]e're not going to have a bankruptcy of

any sort if everybody can go sue J&J and assert the same claims that they would be asserting

here."  Nov. 10, 2021 Hr'g Tr. at 142:15-17 (Torborg Decl., Ex. H).  Enjoining claims against

Old JJCI and J&J is critical to achieving the legitimate goals of this case.  *See In re DBMP*, 2021

WL 3552350, at *41 ("[T]he litigation of DBMP Asbestos Claims in the tort system while the

Chapter 11 Case remains pending would undermine the purposes of chapter 11 and section

524(g) to resolve all such current and future claims in a fair and equitable manner though a

chapter 11."); *In re Aldrich Pump,* 2021 WL 3729335, at *36 (same).

As detailed above and at length in the *Debtor's Supplemental Memorandum of Law in*

*Support of Preliminary Injunction Motion* ("Suppl. PI Memo."), Old JJCI was and had been for

over 40 years the entity responsible for all Talc Claims prior to the Corporate Restructuring.  *See*

Dkt. 128 at 8-14.[46]  Responsibility for the Talc Claims was then allocated to the Debtor in the

Corporate Restructuring, and the Debtor owes indemnification obligations to its non-debtor

affiliates for any costs associated with the Talc Claims.  *See id.* at 3-4, 36.  As a result, the

Debtor is the real party in interest for any claims against New JJCI or J&J relating to the Talc

Claims and, therefore, an extension of the automatic stay and a preliminary injunction enjoining

claims against New JJCI and J&J is warranted and necessary.  *See id.* at 39-92; *In re DBMP*,

---

[46] Prior to the Petition Date, except where insurance coverage was available, all talc-related litigation costs—including defense costs, settlements, and any verdict payments, were borne by Old JJCI.  *Id.* at 17 (citing Debtor's PI Hr'g Ex. 50, Lisman Decl. ¶¶ 8-12).  The notion that J&J is the "true" (Comm. Mot. ¶ 44) or "primary" (A&I Mot. ¶ 14) beneficiary of this bankruptcy is therefore false.

2021 WL 3552350 (extending automatic stay to debtor's non-debtor affiliates and enjoining

claims under section 105 of the Bankruptcy Code); *In re Aldrich Pump,* 2021 WL 3729335

(same).

The Movants' contention that J&J allegedly has "direct" liability for the Talc Claims,

Comm. Mot. ¶¶ 18, 25, 44; A&I ¶¶ 36, 38, 40, does not support dismissal.  As Judge Whitley

correctly found—after a lengthy evidentiary hearing—the Talc Claims against J&J are

effectively claims against, and inextricably intertwined with, Talc Claims against Old JCCI (and

now the Debtor):

> Because I believe that the liabilities were assumed by JJCI in '79
> and indemnities were given to Old J&J, I think that any claim against
> J&J for its, its manufacture and product liability for the operational
> periods prior to that become Old JJCI's liabilities and thus the
> debtor's.  To the extent we're talking about post-'79, then, as to the
> baby products, we're also talking about matters that are based on the
> conduct of JJCI.

Nov. 10, Hr'g Tr. at 139:1-8 (Torborg Decl., Ex. H).  Accordingly, any attempt to resolve the

Talc Claims in this bankruptcy necessarily requires that alleged "direct" claims against J&J be

enjoined.  Again, without such an injunction, "we're not going to have a bankruptcy case of any

sort if everybody can go sue J&J and assert the same claims that they would be asserting there."

*Id.* at 142:15-17; *see also* Suppl. PI Memo. at 65-72 (discussing cases enjoining alleged "direct"

liability claims against non-debtors intertwined with claims against the debtor, including

decisions in several mass tort bankruptcies, to maintain the integrity of the debtor's estate and

reorganizational efforts).

B.    **Statements Concerning the Extension of the Automatic Stay Were Correct and Provide No Evidence of Bad Faith.**

Relatedly, the Movants contend that certain public filings and court notices concerning the reach of the automatic stay in this case are evidence of bad faith. *See* Comm. Mot. ¶¶ 25-26, 50; A&I Mot. ¶¶ 35-38. These attacks, too, are meritless.

Neither the Debtor, Old JJCI, nor J&J ever "misrepresented the scope of the automatic stay." Comm. Mot. ¶ 50. The statements that the automatic stay would enjoin claims against its non-debtor affiliates, including J&J, were accurate, as confirmed after the November 5, 2021, evidentiary hearing before Judge Whitley. The Debtor's counsel made statements on the reach of the stay based on its correct understanding of Old JJCI's (and, subsequently, the Debtor's) responsibility for all Talc Claims, the intertwined nature of the claims against its predecessor (Old JJCI) and non-debtor affiliates (including J&J), and governing precedent (including the recent decisions in *DBMP* and *Aldrich*, which involved similar facts). While Judge Whitley initially declined to stay the claims against J&J—due to uncertainty as to whether Old JJCI (and, subsequently, the Debtor) had assumed that liability—the court later **agreed** that the stay should be so extended after the November 5, 2021 evidentiary hearing confirmed that the Debtor (and Old JJCI before it) had assumed or were responsible for that liability (a fact Movants conveniently ignore). *See* Nov. 10, 2021 Hr'g Tr. at 139:1-142:17 (Torborg Decl., Ex. H).[47]

---

[47] The Committee also takes issue with Debtor counsel's filing of a stay notice in an action by the Mississippi Attorney General against J&J. Comm. Mot. ¶ 50. In fact, the notice stated that the "Bankruptcy Court's ruling expressly does not address the claims of governmental entities, which were not defendants in the Adversary Proceeding, and all parties' rights with respect to the application of the automatic stay to actions by such entities were preserved." *Reply in Support of Defendants' Notice of Bankruptcy Filing* at 3, *The State of Mississippi v. Johnson & Johnson*, Civ. Action No. 25CH1:14-cv-001207 (Miss. Ch. Ct. Nov. 6, 2021) [Dkt. 392] (Torborg Decl., Ex. Q) (emphasis added). Although the Bankruptcy Court did not expressly rule on the application of the stay to the Mississippi Attorney General's action, the Debtor believes—consistent with well-established law—that the stay applies because that action does not fall within the "police powers exception" to the automatic stay, as the State is "not seeking to enjoin any ongoing wrong by Defendants here." *Id*. The State's monetary claim represents an alter ego claim that is property of the Debtor's estate and, accordingly, is automatically stayed. *See id*. at 3, 6-9. At best, the Committee's allegation concerns a disputed legal issue and does not provide evidence of bad faith.

## V.   THE MOVANTS' REMAINING CONTENTIONS NEITHER REFLECT BAD FAITH NOR OTHERWISE SUPPORT THE DISMISSAL MOTIONS.

### A.   The Debtor's Decision to File Bankruptcy in the Western District of North Carolina Is Not Evidence of Bad Faith.

The Movants contend that the Debtor's decision to file bankruptcy in the Western District of North Carolina constitutes evidence of bad faith.  Comm. Mot. ¶ 4 (alleging J&J attempted to "game the bankruptcy system and take advantage of the Fourth Circuit's test for bad faith dismissal"), ¶¶ 5, 22, 24, 47-48; A&I Mot. ¶¶ 28.  This attack, like the others, is meritless.

There can be no reasonable dispute that venue was proper in the Western District of North Carolina.  *See, e.g.*, Dkt. 205 at ¶ 1 (Bankruptcy Administrator motion to transfer venue).  Moreover, the Debtor had multiple valid reasons to file its petition in the Western District of North Carolina.  *See generally Debtor's Objection to Transfer of Venue* [Dkt. 345].  These included that court's extensive experience in asbestos-related bankruptcies, which is directly relevant to the economic and efficient administration of the bankruptcy (the most important consideration in bankruptcy venue matters).  *See id.* at 2-4, 8-10.  While Judge Whitley decided that venue should be transferred, he specifically stated that he did **not** fault the Debtor or its counsel for filing the bankruptcy in the Western District of North Carolina.  *See* Nov. 10, 2021 Hr'g Tr. at 128 (noting it "would be malpractice almost [to] go somewhere else if you're, if you were getting the result that you want and it's no surprise that as broad as the venue statute is for bankruptcy chapter 11 filings for corporations, there's a lot of latitude there to pick a district where you think that circumstances benefit you . . . .") (Torborg Decl., Ex. H).

The Movants cite no precedent to support their contention that the Debtor's choice of venue should factor into this Court's decision on the Dismissal Motions.  Indeed, in *In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012), which the plaintiff representatives relied upon extensively to argue for a transfer of venue, the court found that the debtor did **not** act in

bad faith by filing its chapter 11 case in New York.  In fact, the court recognized that it was appropriate to file a bankruptcy case in the "optimal venue," commenting that "it could be argued that doing so was entirely consistent with, or even required by, the Debtors' fiduciary duties."  *Id.* at 742.

  **B.**  **Congressional Attention to the Case Does Not Support Dismissal.**

  Finally, the Committee warns that "[t]he world is watching this case," noting that "certain Members of Congress" sent a letter to J&J's Chairman and CEO objecting to the bankruptcy filing.  Comm. Mot. ¶ 10.  But the views of five legislators provide no basis to depart from years of precedent that establish that this case was filed for a proper bankruptcy purpose, nor do they constitute evidence that this case was filed in bad faith.[48]  If it were otherwise, bankruptcy cases (and high profile cases in particular) could be dismissed for reasons that have little if anything to with the criteria to be applied in considering whether or not a particular case is a "bad faith" filing.

  Likewise, speculation that permitting the Debtor's bankruptcy case to proceed would "open the floodgates" for "any company subject to mass tort litigation to slough off its responsibility via a Texas Two-Step and subsequent bankruptcy" is unfounded and illogical. Comm. Mot. ¶ 11.  There has been no attempt in this case to "slough off" liability.  Rather, as detailed above, the goal of this case is to reach an equitable, efficient, and consensual resolution of the Debtor's Talc Claims.  The purpose of this case is to resolve the Debtor's liability, not "escape" it.

---

[48] See https://www.durbin.senate.gov/imo/media/doc/2021-11-10%20Letter%20from%
20Senators%20and%20Members%20of%20Congress%20to%20Mr.%20Gorsky.pdf.  There are multiple misstatements in the referenced letter, including the unsupported and false notion that this bankruptcy filing would leave talc claimants "with pennies on the dollar."  There is no basis for this statement.

Moreover, the Talc Claims filed against Old JJCI and J&J are indisputably unprecedented and unique. The targets of the talc litigation are limited, with Old JJCI and J&J being the most significant. That this case will spur a "flood" of new filings by companies facing talc-related litigation lacks any basis. It also ignores the fact that the end goal of this case is to provide current and future claimants with a simpler, more streamlined, more efficient, more equitable, and more timely process for obtaining payments on their claims, a process that would replace the uncertainty, cost, delay, and stress of litigation in the tort system. The goal of this case, when realized, will benefit all parties in interest.

### **<u>CONCLUSION</u>**

For the foregoing reasons, the Dismissal Motions should be denied.

Dated: December 22, 2021

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
David S. Torborg, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dstorborg@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice* or *pro hac vice* pending)
ATTORNEYS FOR DEBTOR