UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
Karen B. Dine
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
       kdine@pszjlaw.com
       crobinson@pszjlaw.com
       pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP*

In re:

LTL MANAGEMENT LLC,

Debtor. [1]

Chapter 11

Case No. 21-30589 (MBK)

**Hearing Date and Time:**
January 19, 2022 at 10:00 a.m.

## MOTION FOR ORDER VACATING APPOINTMENT OF SECOND OFFICIAL COMMITTEE OF TALC CLAIMANTS AND ADDITION OF NEW COMMITTEE MEMBERS

The law firm of Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of over 7,000 talc personal injury claimants who are represented by Arnold & Itkin ("Movants"), by and through the undersigned counsel, hereby submits this motion seeking entry of an order vacating the Office of the United States Trustee's ("UST") appointment of a second official committee of talc

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

claimants and addition of new committee members (the "Motion"). In support of this Motion, Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

1. Movants expect that the issue of whether there will be one Official Committee of Talc Claimants or two in this case should become academic upon the conclusion of the hearing on the pending motions to dismiss[2] next month, at which time this chapter 11 case should be dismissed. It is no exaggeration to describe this chapter 11 case as an abuse of chapter 11 by a newly-created litigation vehicle that was born through a transfer of substantially all assets of "Old JJCI" made with actual intent to hinder and delay its talc creditors, and that filed this case primarily to shield its ultimate parent, Johnson & Johnson ("J&J"), from efforts by cancer victims to seek redress for their talc-related personal injuries, and to give J&J greater settlement leverage against those victims. Nothing in this Motion should be viewed as being in derogation of the arguments set forth in the Arnold & Itkin Motion to Dismiss.

2. The threshold procedural issue raised by the UST's "reconstitution" of the previously appointed Official Committee of Talc Claimants (the "Original TCC") into two separate official committees, with new members on each, is whether it is the UST or the Court that had the power to so reconstitute the Original TCC. The Original TCC was appointed ***pursuant to a court order*** following notice and hearing: the "*Order Appointing the Official Committee of Talc Claimants*" [Docket No. 255] ("Talc Committee Appointment Order") entered by the NC Bankruptcy Court (as defined below). The Talc Committee Appointment Order (i) granted the "*Motion of the Bankruptcy Administrator to Appoint an Official Committee of Talc Claimants*" [Docket No. 227] (the "Committee Motion") filed by the Bankruptcy

---

[2] *Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case* [Docket No. 632] and *Motion to Dismiss Bankruptcy Case* [Docket No. 766] filed by Movants (the "Arnold & Itkin Motion to Dismiss").

Administrator, which sought the appointment of a single official committee of talc claimants; (ii) designated the claimants who "shall constitute the Official Committee of Talc Claimants in this case" (*id.* at 5] and (iii) specifically provided that, "The Bankruptcy Administrator's Committee Motion is GRANTED without prejudice to further consideration of the Responses Seeking Additions and the Composition/Timing Objections *by this or any other court with jurisdiction*." *Id.* at 5 (emphasis added). Movants respectfully submit that the Talc Committee Appointment Order could be modified or reconsidered only by this Court, and not unilaterally by the UST, and that the procedure required in order for the UST to reconstitute the Original TCC into two separate talc claimant committees, with new members on each, was to seek an order of this Court so providing.

3.      This oversight is not a mere procedural nicety. Had the UST sought this Court's modification or reconsideration respecting the Talc Committee Appointment Order, the UST would have been required to explain the rationale behind the extraordinary and, Movants believe, unprecedented step of forming two separate committees of personal injury claimants based solely on the nature of the disease claimed to have been caused by the product in question. Significantly, the UST would have had to explain why it reversed the decision of the Bankruptcy Administrator in North Carolina, *who was approached by some members of the plaintiffs' bar about the possibility of two committees, but elected to appoint a single committee*, and explained that decision to the NC Bankruptcy Court: "But ultimately, I could find no statutory or case law to support creating separate committees based on disease type nor any earlier cases where two such committee or anything close to that were appointed." Reporter's Transcript of Hearing, 11/4/21 ("Nov. 4 Tr.") at 56; attached as **Exhibit A**. As things now stand, there is no

publicly stated rationale for the UST's major departure from the norm and reversal of the North Carolina Bankruptcy Administrator's decision.

4.  In any event, even if the UST had the power to modify the Talc Committee Appointment Order without seeking an order of this Court, there simply is no basis in law, precedent or fact to support the formation of two official committees to represent talc personal injury claimants based on the nature of the cancer that is alleged to have resulted from the use of talc products.[3]  Indeed, Movants believe that the UST's action in forming TCC I and TCC II (defined below at ¶ 13) to represent claimants with different types of disease resulting from the same basic product is unprecedented.  Breaking the Original TCC into one committee for ovarian cancer claimants and one committee for mesothelioma claimants defies the fact that both sets of talc personal injury and wrongful death claims are tort claims that belong in the same class; does not comport with the case law; and deviates from the precedent of all previous mass tort/asbestos cases.

5.  Like the Bankruptcy Administrator in North Carolina, Movants have been unable to locate a single mass tort bankruptcy case where two separate committees were formed to represent personal injury claimants based on disease or injury type.  Typically in most mass tort cases, either a single official committee of tort claimants is appointed or tort claimants are included in the membership of the official committee of unsecured creditors.  Occasionally, a mass tort case will have separate tort claimant committees, one for personal injury claims and one for property damage claims.  But none have had two committees appointed for different sets of personal injury claims based on the nature of the underlying disease, let alone on the type of

---

[3] Arnold and Itkin recognizes that Blue Cross Blue Shield of Massachusetts ("BCBS") was a member of the Original TCC (as defined herein) and is now a member of TCC I (as defined herein). Its membership is not relevant for purposes of this Motion.

cancer that the claimant suffers. Attached hereto as **Exhibit B** is a chart detailing the official committees appointed in numerous mass tort cases over the past two decades.

6. This consistent practice in mass tort cases should come as no surprise, as it comports with applicable law. "[I]ntercreditor conflicts inhere in any committee;" and "[T]he reconciliation of the differing interests of creditors within a single committee is the norm, and the appointment of a separate committee is an *extraordinary remedy* . . ." *In re Sharon Steel Corp.*, 100 B.R. 767, 777-78 (Bankr. W.D. Pa. 1989). There is simply no reason to depart from the norm here and impose the extraordinary remedy of creating a separate official committee of talc personal injury claims to represent the interests of holders of mesothelioma claims, especially when the North Carolina Bankruptcy Administrator went out of her way to assure "adequate representation" of mesothelioma claims on the Original TCC by appointing a committee, *over one third of which was comprised of holders of mesothelioma claims*, even though holders of such claims comprise *a fraction over 1%* of the talc personal injury claimants. (Four of the eleven members of the Original TCC were appointed to TCC II, which, Movants understand, is to represent the interests of mesothelioma claimants.) The UST's "two TCC" construct simply creates a mechanism by which to have the estate finance the parochial agenda (whatever that agenda may be) of a very small minority of talc personal injury claimants which was already more than adequately represented on the Original TCC. Such a "two TCC" construct can do nothing but exacerbate intercreditor discord and division.

7. Movants respectfully submit that in issuing the UST Notice (defined below), the UST has exceeded its authority under section 1102(a) of the Bankruptcy Code. For all the reasons set forth in more detail below, this Court should enter an order vacating the UST Notice

so that only one official committee of talc claimants, consisting of the holders of claims appointed pursuant to the Talc Committee Appointment Order, is appointed in this case.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

8.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2) and the Amended Standing Order of Reference from the United States District Court for the District of New Jersey, dated September 18, 2012. Venue is proper before this Court pursuant to 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The statutory basis for the relief requested herein is sections 105 and 1102(a) of the Bankruptcy Code.

## BACKGROUND

9.  On October 14, 2021 (the "Petition Date"), two days after it was formed, the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina (the "NC Bankruptcy Court").

10. According to the Debtor, as of the Petition Date, there were approximately 38,000 ovarian cancer cases pending against it and approximately 430 mesothelioma cases pending against it. *See Declaration of John K. Kim in Support of First Day Pleadings* [Docket No. 5] at ¶¶ 42, 44.

11. On November 8, 2021, on Motion of the Bankruptcy Administrator, the NC Bankruptcy Court entered the Talc Committee Appointment Order [Docket No. 355] appointing the Official Committee of Talc Claimants as the Original TCC in this chapter 11 case. The Original TCC consisted of eleven members: ten (10) personal injury claimants and BCBS. The Original TCC has retained or sought to retain no fewer than eight (8) separate law firms as

bankruptcy or special counsel: (i) Genova Burns LLC as local counsel (ii) Brown Rudnick LLP as bankruptcy co-counsel, (iii) Bailey Glasser LLP as bankruptcy co-counsel, (iv) Otterbourg PC as bankruptcy co-counsel, (v) Parkins Lee & Rubio LLP as special counsel, (vi) Massey & Gail LLP as special counsel, (vii) Miller Thompson LLP as special Canadian counsel, and (viii) Monzack Merskey and Browder, P.C. as special counsel.[4] The Original TCC also sought to retain FTI Consulting, Inc. as financial advisor, and Houlihan Lokey Capital, Inc. as investment banker.[5]

12. On November 16, 2021, the NC Bankruptcy Court entered an order transferring this case to the District of New Jersey, which referred the case to this Court [Docket No. 416].

13. On December 23, 2021, the UST filed its *Notice of the United States Trustee's Filing of Reconstituted and Amended: (i) Notice of Appointment of Official Committee of Talc Claimants I; and (ii) Notice of Appointment of Official Committee of Talc Claimants II* [Docket No. 965] (the "UST Notice"). The UST Notice stated that the UST reconstituted the Original TCC and appointed the Official Committee of Talc Claimants I ("TCC I") and the Official Committee of Talc Claimants II ("TCC II"). TCC I is comprised of nine (9) members, seven (7) of whom were members of the Original TCC plus two (2) new members. TCC II consists of seven (7) members, four (4) of whom were members of the Original TCC plus three (3) new members. It appears that TCC I, with the exception of BCBS, is comprised of ovarian cancer claimants while TCC II is comprised of mesothelioma claimants.[6]

---

[4] The Original TCC filed applications to retain counsel at Docket Nos. 385, 389, 502 (Bailey Glasser); 388 (Parkins Lee & Rubio); 387, 503 (Otterbourg); 386, 501 (Brown Rudnick); 394, 504 (Massey & Gail); 422 (Genova Burns); 829 (Miller Thompson); and 869 (Monzack Merskey).
[5] Docket Nos. 955 and 953, respectively.
[6] The UST Notice does not specifically identify the nature of the claims held by the members of TCC I and TCC II or provide any explanation of the basis for the two committees. Arnold & Itkin believes, however, that the breakdown is between ovarian cancer and mesothelioma claims based on its understanding of the claims asserted by the various committee members. This breakdown is further evidenced by TCC counsel comments at the hearing on December 30. 2021 regarding the two committees' composition.

14. It appears that six[7] of the eight law firms that represented the Original TCC have been allocated among TCC I and TCC II, and three law firms that did not previously represent the Original TCC have been added to represent TCC II, as follows: the firms of (i) Genova Burns, (ii) Brown Rudnick, (iii) Parkins Lee & Rubio and (iv) Otterbourg purport to represent TCC I while the firms of (i) Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. ("SSKRP"), (ii) Bailey & Glasser LLP, (iii) Cooley LLP ("Cooley"), (iv) Massey & Gail, and (v) Waldrep Wall Babcock & Bailey ("WWBB") purport to represent TCC II.[8] None of SSKRP, Cooley or WWBB represented the Original TCC. It is, however, unclear what role counsel who represented the Original TCC but now represents TCC I or TCC II will play in the event of a conflict between the two successor TCC's.[9] In addition, it is likely that there will now be two sets of committee financial advisors and investment bankers instead of just one. The appointment of TCC II may also be a precursor to a request that there be not one, but two future claims representatives—one for ovarian cancer claims, and one for mesothelioma claims. There was, however, no need to create this morass; the Original TCC was adequate.

## ARGUMENT

15. Section 1102(a)(1) of the Bankruptcy Code provides that "… the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors … as the United States trustee deems appropriate." Section 1102(a)(2) of the Bankruptcy Code states that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors … if necessary to assure adequate

---

[7] It is unclear what role or allocation will be assigned to special Canadian and Delaware counsel to the Original TCC.
[8] See Docket Nos. 1055 and 1056.
[9] Indeed, although Movants take no position on the issue, it is not inconceivable that, due to conflict issues, counsel who represented the Original TCC could not represent either TCC 1 or TCC II if this case is not dismissed. This is because such counsel would be representing one portion of their prior constituency against the other in matters relating to this chapter 11 case if the two TCC's had a conflict; and the decision to create two separate TCC's presupposes that one or more conflicts will arise between them-- otherwise, why appoint two TCC's in the first place?

representation of creditors."  Nothing in section 1102, however, empowers the UST to modify a court order by unilaterally "reconstituting" a committee of creditors whose composition has been established by such an order.

16.  Nevertheless, here, the UST "reconstituted" (but essentially disbanded) the Original TCC that had been appointed pursuant to the NC Bankruptcy Court's Talc Committee Appointment Order and appointed TCC I and TCC II in the place of the Original TCC, all without a hearing before this Court or prior notice to interested parties (but presumably after lobbying by some plaintiffs' lawyers whose request for two committees had already been carefully considered and rejected by the North Carolina Bankruptcy Administrator).  As a result, neither Movants nor the Court is privy to the circumstances surrounding, or the rationale behind, the UST's decision to reconstitute the Original TCC into TCC I and TCC II — a decision that is an outlier in the history of mass tort/product liability chapter 11 cases by any standard.  In any event, the UST's appointment of two committees for talc personal injury claimants is unsupported by fact or law and should be rescinded.

17.  At the threshold, the UST's "reconstitution" of the Original TCC was in disregard of the Talc Committee Appointment Order, through which the NC Bankruptcy Court appointed the Original TCC "without prejudice to further consideration of the Responses Seeking Additions and the Composition/Timing Objections *by this or any other court with jurisdiction*.  Docket No. 255, at 5 (emphasis added).  That Order granted the Bankruptcy Administrator's Committee Motion [Docket No. 227], which the Bankruptcy Administrator had filed after receiving and considering over 50 responses to her "*Notice of Solicitation of Parties Interested in Serving on the Official Committee of Talc Claimants*" [Docket No. 38].  A hearing on the Committee Motion was held, on notice to interested parties, on November 4, 2021.  At the

hearing, the Bankruptcy Administrator, Shelley Abel, detailed the extensive efforts that her office had undertaken to select the membership of the Original TCC, including the possibility – considered and rejected – of creating two committees. Nov. 4 Tr. at 32-39, attached hereto as **Exhibit A**. Interested parties spoke at the hearing as well. *Id.* at 39-59. The NC Bankruptcy Court thus entered the Talc Committee Appointment Order on consideration of a full record, approving the Original TCC as proposed by the Bankruptcy Administrator.

18.     The Talc Committee Appointment Order is now law of the case and comes to this Court in full force and effect. *See generally, Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994) ("The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it."). While the NC Bankruptcy Court may have deliberately limited the effect of the law of the case doctrine on *this Court's* future consideration of the composition and possible reconstitution of the Original TCC, by granting the Committee Motion "without prejudice to further consideration of the Responses Seeking Additions and the Composition/Timing Objections ***by this or any other court with jurisdiction***" (Docket No. 255 at 5 (emphasis added)), the Talc Committee Appointment Order is without doubt an order that *the UST* cannot alter unilaterally by administrative ukase without this Court's consideration and adoption. *In re Sharon Steel Corp.*, 100 B.R. at 774 ("As an agency of the executive branch, the U.S. Trustee may not be empowered to overturn decisions of the bankruptcy court, made in the exercise of its judicial power.")

19.     In any event, the UST's decision to appoint (or not to appoint) additional committees is subject to this Court's *de novo* review. *Id.* at 767. Bankruptcy courts have the discretion to examine, on a case-by-case basis, whether additional committees are warranted under the circumstances. *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006).

20. Courts generally have found that "[a]ppointment of an additional Committee is an *extraordinary remedy* that courts are reluctant to grant." *In re New Century TRS Holdings, Inc.*, 2013 Bankr. LEXIS 4021 at *7 (Bankr. D. Del. 2013) (emphasis added; internal citations omitted). *See also*, *In re Sharon Steel Corp.*, 100 B.R. at 776-777 ("[T]he reconciliation of differing interests of creditors within a single committee is the norm, and … the appointment of a separate committee is an extraordinary remedy….")

21. Importantly, the case law is clear that, "Adequate representation exists through a single committee as long as the diverse interests of the various creditor groups are represented on and have participated in that committee." *Id.* at 777-778. There can be no question that the Bankruptcy Administrator in North Carolina went out of her way to make sure that the Original TCC met that standard here. Four of the eleven members of the Original TCC (comprising four of the ten personal injury claimants on the Original TCC) were appointed by the UST to TCC II, which means that *even though the mesothelioma claimants whose interests are to be represented by TCC II represent only a fraction over 1% of the talc personal injury claimants, holders of mesothelioma claims received more than one third of the seats on the Original TCC*, representing 40% of the seats given to personal injury claimants.

22. The *Sharon Steel* decision is instructive. In that case, the UST, acting on a written request from a group of unsecured debenture holders, formed an official committee of debenture holders, despite there already being an official committee of unsecured creditors in place. The unsecured debenture holders who had pressed for this separate committee based their request on the "conflict" that assertedly resulted from "the differing interests of the trade creditors and holders of debentures." *Id. at 776.* Following a hearing at which the Court considered objections to the formation of the second committee, the Court determined that the debenture holders'

interests were adequately represented by the unsecured creditors committee and that a second committee solely for debenture holders was not warranted.

23. In so doing, the *Sharon Steel* court explained that the fact that committee members may have divergent views on some issues simply is not sufficient to warrant the appointment of a second committee. "It is universally recognized that intercreditor conflicts inhere in any committee" *Id.* at 778. Despite such conflicts, "… the reconciliation of differing interests of creditors within a single committee is the norm …" *Id.* at 778. In reaching this conclusion, the *Sharon Steel* court noted the Third Circuit's observation in *In re Altair Airlines, Inc.,* 727 F.2d 88, 90 (3rd Cir. 1084) that:

> "[Union] members may be interested in a plan of reorganization which preserves both their jobs and their collective bargaining agreement, while other creditors may be interested in a liquidation, or a reorganization involving a merger with a [third party]. *Such conflicts of interests are not unusual in reorganizations.* Materialman creditors, for example, may sometimes prefer to forego full payment for past sales in hopes of preserving a customer, while lenders may prefer liquidation and prompt payment. (emphasis supplied)."

24. Other courts have adopted the *Sharon Steel* reasoning. *See, e.g.*, *In re Residential Capital, LLC*, 480 B.R. 550, 557 (Bankr. S.D.NY. 2012) ("In the vast majority of chapter 11 cases, a single committee of creditors has been deemed sufficient."); *In re Garden Ridge Corp.*, 2005 Bankr. LEXIS 323 (Bankr. D.Del. 2005) ("Adequate representation is lacking only when … conflicts prevent an official committee from upholding its fiduciary obligations to all general unsecured creditors.").

25. This case law makes it clear that the appointment of two talc claimant committees here is not warranted. The interests of both ovarian cancer claimants and mesothelioma claimants are adequately represented by the Original TCC. There is no evidence that conflicts

prevented or would prevent the Original TCC from upholding its fiduciary obligations to all holders of talc personal injury claims.

26. The Original TCC as originally constituted is more than capable of representing the interests of *all* holders of talc personal injury claims, regardless of disease type. It has, in fact, been doing just that since its formation, presenting a unified front in dealing with numerous issues that have arisen in this case. The Original TCC has participated in every aspect of this case, including resisting the Debtor's attempt to shield J&J and other third parties from talc litigation; responding to various other motions and applications of the Debtor; filing its own motion to change venue and then to dismiss this case; propounding discovery; and appearing at multiple court hearings. The Original TCC was well represented by experienced and sophisticated counsel who certainly know how to deal with, and reconcile, divergent views of members of an official creditors committee – a critical skillset for any committee counsel.

27. Breaking the Original TCC into two committees - one for ovarian cancer claimants and one for mesothelioma claimants – is unprecedented; there is nothing even close. Asbestos mass tort cases typically involve both personal injury claims based on mesothelioma, and personal injury claims based on an assortment of other asbestos related diseases; yet Movants have **not identified a single mass tort bankruptcy case where two separate committees were formed to represent personal injury claimants based on the nature of the diseases on which the personal injury claims were premised.** Nor had the Bankruptcy Administrator in North Carolina: "… I was approached by many people on both sides of this plaintiffs' bar about the possibility of two committees … But ultimately, I could find no statutory or case law to support creating separate committees based on disease type nor any earlier cases where two such

committees or anything close to that were appointed." Nov. 4 Tr. at 56 attached hereto as **Exhibit A**.

28. It is easy to understand why no such cases exist – the personal injury claims are tort claims of equal rank and priority and all belong in the same class. *See, In re Congoleum Corp.*, 362 B.R. 167, 184 (Bankr. D.N.J. 2007) (tort claims have the same nature and should be classified together); *Cf. In re Sharon Steel Corp.,* 100 B.R. at 776 ("The appointment of a separate committee of debenture holders is not necessary to secure adequate representation where, as here, they share pari passu with other general unsecured creditors.")

29. Movants cannot help but be concerned that the formation of TCC I and TCC II is the "Trojan horse" precursor to an improper attempt to separately classify ovarian cancer claims and mesothelioma claims for plan purposes.[10] The formation of a separate committee to represent the interests of mesothelioma claimants, which would appear regularly before this Court to represent the "separate" interests of such claimants, cannot help but foster the (erroneous) impression that such claims, having "need" of their own Committee, also belong in a separate class.

30. Such a classification scheme would, however, give inappropriately outsized leverage to holders of mesothelioma claims, which represent ***only a fraction over 1% of the overall number of talc claims***. Among other points of undue leverage, the separate classification of mesothelioma claims would give the holders of a few hundred mesothelioma claims the ability to: (i) force a "cram down" of the "class" of mesothelioma claims in accordance with the requirements of section 1129(b) of the Code; and (ii) contend that, in order to satisfy the voting

---

[10] There is no basis for separate classification of ovarian cancer and mesothelioma cancer personal injury claims. *See, In re Congoleum Corp.*, 362 B.R. 167 (Bankr. D.N.J. 2007) (debtor improperly separately classified tort claims of equal rank and provided certain classes with preferential treatment under plan.)

requirements of Section 524(g)(2)(B)(ii)(IV)(bb) of the Code, holders of 75% of the claims in the mesothelioma claims "class" that vote on the plan must vote to accept the plan. Thus, the formation of a separate committee for mesothelioma claimants potentially represents the first step in an attempt to hand a plan veto power to a very small minority of personal injury claimants and to have the estate finance that attempt.

31.    Even if the formation of a separate committee for mesothelioma claimants is not a precursor to an estate financed move to separately classify mesothelioma claims, the creation of a second, estate financed committee of personal injury claimants will foster division, not compromise, and enable a small minority of talc personal injury claimants to pursue their agenda on "someone else's dime," i.e., at the expense of the estate. Although Movants are not particularly concerned about saving J&J money, they are concerned that creating a separate official committee that allows a small subset of creditors of a particular class to pursue the litigation of their agenda at someone else's expense will spawn division and litigation, not compromise, within the personal injury claimant group.

32.    The *Sharon Steel* court recognized this danger. "[T]his case will succeed or fail to the extent the members of the Official Committee can adjust their differences within the framework of the existing Official Committee. The formation of a separate committee will not eliminate the inherent tensions; indeed, it will only weaken the impetus to compromise." *Sharon Steel*, 100 B.R. at 779. Put more bluntly, "separate teams of professionals rarely contribute to the spirit of compromise that is intended as the guiding star of chapter 11." *Id.* at 778. The same holds true here. Adding a second committee composed of mesothelioma claimants potentially pits tort claimants against each other and threatens the ability to exit this case (if it is not dismissed) through a creditor plan filed upon the termination of plan exclusivity that devotes the

assets of the Debtor and the estate (including causes of action) to the payment of talc personal injury claims against the Debtor, while leaving talc claimants free to pursue their remedies against J&J.  *See, generally*, *In re New Century TRS Holdings, Inc.*, 2013 Bankr. LEXIS 4021 at *8 (Bankr. D. Del. 2013) ("The principal purpose of creditors' committees is not to advocate any particular creditor class's agenda, but rather to 'strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished.'")

33. The appointment of a separate mesothelioma claimants committee also places other talc claimants, like the 7,000 talc claimants represented by Arnold & Itkin, who may disagree with positions taken by the mesothelioma plaintiff group whose interests are represented by TCC II, at an unfair disadvantage.  While Movants and other creditors in a similar position have to retain and compensate their own counsel to participate in this case, the formation of TCC II will arm the holders of a very small percentage of the talc personal injury claims with the ability to participate in the case and litigate their agenda *at the estate's expense*.  There is no factual or legal justification for giving such a comparatively small creditor group such disproportionate power and leverage, when those creditors already have a meaningful voice in the case as part of a single official committee, an outsized portion of whose members consist of mesothelioma claimants.

34. The creation of two separate committees raises additional questions and concerns, including thorny conflict of interest issues and questions regarding future claims representatives for talc claimants ("FCRs").  If TCC I and TCC II represent separate constituencies with conflicting interests, how can any counsel for the Original TCC not be conflicted from representing either TCC I or TCC II? Movants take no position on this issue in this Motion, but

raise it for the Court's [and the UST's] consideration.[11]  In addition, as discussed at the December 30th hearing, having two talc claimant committees creates the potential for the appointment of two FCRs, instead of the one the Court apparently had contemplated.  If a personal injury claimant group merits its own official committee, it would presumably merit its own FCR for the same reason; it is difficult to imagine any other outcome.  After all, if a single committee cannot adequately represent the interests of all talc personal injury claimants, how can a single future claims representative adequately represent the interests of all future talc personal injury claimants?

35. The "two TCC" construct also creates additional issues and complexities regarding the pursuit and resolution of substantive matters that could have a material impact on recoveries by holders of talc personal injury claims—issues and complexities that would not exist but for the formation of a second talc claimants committee. For example, one would have expected the Original TCC to seek derivative standing to prosecute fraudulent transfer claims and other causes of action arising out of the divisional merger of "Old JJCI" on behalf of the estate. Now that there are two TCC's, will both TCC's seek such derivative standing and prosecute such litigation, or will one TCC cede control of such litigation to the other? Will each TCC have a veto over the presentation for court approval of any proposed settlement of such litigation, or will one TCC cede control of the power to settle such actions to the other?

36. Similarly, based on what has transpired in at least one other chapter 11 case that is the outgrowth of a divisional merger, one might have expected the Original TCC to seek to substantively consolidate the Debtor and "New JJCI." Now that there

---

[11] Moreover, regardless of how the Original TCC professionals split themselves between TCC I and TCC II, it is clear from counsel's comments at the December 30th hearing that additional professionals will need to be retained at estate expense.

are two TCC's, the same questions arise regarding control of the prosecution and settlement of any such action.

37. Although the answers to these and other questions raised by the formation of a second committee of talc claimants remain unclear, what is clear is that the full extent of the adverse ripple effects and unintended consequences of going where no mass tort chapter 11 case has gone before, and forming two separate committees to represent personal injury claims based on disease type, is unpredictable. The risk of such adverse ripple effects and unintended consequences can, however, be avoided if the Court sticks to the norm and directs the UST to revert to the Original TCC, with its existing set of professionals, to represent the interests of all talc personal injury claimants.

38. Simply put, the facts here do not support the "extraordinary remedy" of a second committee in a context where such appointment would be unprecedented. Not only is there no necessity for such a separate committee, but the appointment of such a committee to represent the interests of what are now fewer than 450 out of over 38,000 claimants would simply fan divisiveness and intercreditor warfare, and be prejudicial to the interests of thousands of other talc personal injury claimants.

WHEREFORE, Movants respectfully request that the Court enter an order (i) vacating the UST Notice; (ii) reconstituting TCC I and TCC II as the Original TCC with its original composition; and (iii) granting such other relief as the Court deems just.

Dated: January 5, 2022 **PACHULSKI STANG ZIEHL & JONES LLP**

By: */s/ Colin R. Robinson*
Laura Davis Jones
Karen B. Dine
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
kdine@pszjlaw.com
crobinson@pszjlaw.com
pkeane@pszjlaw.com

*Counsel for Arnold & Itkin LLP*