# **EXHIBIT A**

1

1     UNITED STATES BANKRUPTCY COURT
      WESTERN DISTRICT OF NORTH CAROLINA
2            CHARLOTTE DIVISION

3   IN RE:                    :     Case No. 21-30589-JCW

4   LTL MANAGEMENT LLC,       :     Chapter 11

5        Debtor,             :     Charlotte, North Carolina
                                    Thursday, November 4, 2021
6                             :     9:33 a.m.

7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8   LTL MANAGEMENT LLC,       :     AP 21-03032-JCW

9        Plaintiff,          :

10           v.              :

11  THOSE PARTIES LISTED ON   :
    APPENDIX A TO COMPLAINT and
12  JOHN AND JANE DOES 1-1000, :

13       Defendants.         :

14  : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

15
                        **VOLUME 1**
16                TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE J. CRAIG WHITLEY,
17             UNITED STATES BANKRUPTCY JUDGE

18

19  Audio Operator:           COURT PERSONNEL

20
    Transcript prepared by:   JANICE RUSSELL TRANSCRIPTS
21                            1418 Red Fox Circle
                              Severance, CO  80550
22                            (757) 422-9089
                              trussell31@tdsmail.com
23
    Proceedings recorded by electronic sound recording; transcript
24  produced by transcription service.

25

```
 1  APPEARANCES:

 2  For the Plaintiff/Debtor:      Jones Day
                                   BY:  GREGORY M. GORDON, ESQ.
 3                                      DAN B. PRIETO, ESQ.
                                   2727 North Harwood St., Suite 500
 4                                 Dallas, TX  75201-1515

 5                                 Jones Day
                                   BY:  ROBERT W. HAMILTON, ESQ.
 6                                 325 John H. McConnell Blvd., #600
                                   Columbus, Ohio  43215
 7
                                   Jones Day
 8                                 BY:  JAMES M. JONES, ESQ.
                                   250 Vesey Street
 9                                 New York, NY  10281

10                                 Rayburn Cooper & Durham, P.C.
                                   BY:  JOHN R. MILLER, JR., ESQ.
11                                 227 West Trade Street, Suite 1200
                                   Charlotte, NC  28202
12
    For Johnson & Johnson and      Moore & Van Allen PLLC
13  Johnson & Johnson Consumer     BY:  HILLARY B. CRABTREE, ESQ.
    Inc.:                          100 N. Tryon Street, Suite 4700
14                                 Charlotte, NC  28202

15                                 White & Case LLP
                                   BY:  JESSICA LAURIA, ESQ.
16                                 1221 Avenue of the Americas
                                   New York, NY  10020
17
                                   White & Case LLP
18                                 BY:  LAURA FEMINO, ESQ.
                                   Southeast Financial Center
19                                 Miami, FL  33131-2352

20  For The Continental           Parker Poe
    Insurance Company:             BY:  ASHLEY A. EDWARDS, ESQ.
21                                      PHILLIP M. FAJGENBAUM, ESQ.
                                   620 South Tryon Street, Suite 800
22                                 Charlotte, NC  28202

23  For Certain Victims:          Burns Charest LLP
                                   BY:  DANIEL H. CHAREST, ESQ.
24                                 900 Jackson Street, Suite 500
                                   Dallas, TX  75202
25
```

```
 1  APPEARANCES (continued):

 2  For Imerys Talc America,      Blanco Tackabery
    Inc., Imerys Talc Canada,     BY:  ASHLEY S. RUSHER, ESQ.
 3  Inc., and Imerys Talc Vermont,404 North Marshall Street
    Inc.:                         Winston-Salem, NC  27101
 4
    For Blue Cross Blue Shield    Cordes Law, PLLC
 5  of Massachusetts, Inc.:       BY   STACY C. CORDES, ESQ.
                                  1800 East Boulevard
 6                                Charlotte, NC  28203

 7                                Hill, Hill, Carter
                                  BY:  ELIZABETH B. CARTER, ESQ.
 8                                425 South Perry Street
                                  Montgomery, AL  36104
 9
    For The Plaintiffs' Steering  COLE HAYES, ESQ.
10  Committee:                    601 S. Kings Dr., Ste. F PMB #411
                                  Charlotte, NC  28204
11
                                  Otterbourg P.C.
12                                BY:  ADAM C. SILVERSTEIN, ESQ.
                                       MELANIE L. CYGANOWSKI, ESQ.
13                                230 Park Avenue
                                  New York, NY  10169
14
    For Certain Claimants:        Essex Richards, P.A.
15                                BY:  JOHN C. WOODMAN, ESQ.
                                  1701 South Boulevard
16                                Charlotte, NC  28203

17                                Kazan McClain
                                  BY:  JOSEPH SATTERLEY, ESQ.
18                                55 Harrison Street, Suite 400
                                  Oakland, CA  94607
19
                                  Fears Nachawati PLLC
20                                BY:  DARREN P. McDOWELL, ESQ.
                                       NABIL MAJED NACHAWATI II, ESQ.
21                                5489 Blair Road
                                  Dallas, TX  75231
22
    For Certain Claimants:        Levy Konigsberg LLP
23                                BY:  JEROME BLOCK, ESQ.
                                  605 Third Avenue, 33rd Floor
24                                New York, NY  10158

25
```

```
 1   APPEARANCES (continued):

 2   For Maune Raichle, et al.:      Waldrep Wall
                                     BY:   THOMAS W. WALDREP, JR., ESQ.
 3                                         KEVIN L. SINK, ESQ.
                                           JENNIFER B. LYDAY, ESQ.
 4                                   370 Knollwood Street, Suite 600
                                     Winston-Salem, NC  27103
 5
     For Certain Talc Claimants:     Hamilton Stephens
 6                                   BY:   ROBERT A. COX, JR., ESQ.
                                     525 North Tryon Street, Ste. 1400
 7                                   Charlotte, NC  28202

 8                                   Robinson Calcagnie, Inc.
                                     BY:   MARK P. ROBINSON, JR., ESQ.
 9                                   19 Corporate Plaza Drive
                                     Newport Beach, CA  92660
10
     For Margaret Watson:            Hamilton Stephens
11                                   BY:   GLENN C. THOMPSON, ESQ.
                                     525 North Tryon Street, Ste. 1400
12                                   Charlotte, NC  28202

13   For Aylstock Witkin, etc.:      Offit Kurman
                                     BY:   PAUL BAYNARD, ESQ.
14                                   301 South College St., Suite 2600
                                     Charlotte, NC  28202
15
                                     KTBS Law LLP
16                                   BY:   ROBERT J. PFISTER, ESQ.
                                     1801 Century Park East
17                                   Los Angeles, CA  90067-2328

18   For Arnold & Itkin:             Moon Wright & Houston PLLC
                                     BY:   ANDREW T. HOUSTON, ESQ.
19                                   121 West Trade Street, Suite 1950
                                     Charlotte, NC  28202
20
     For Various Plaintiffs:         Meirowitz & Wasserberg, LLP
21                                   BY:   KUSH SHUKLA, ESQ.
                                     535 Fifth Ave, 23rd Floor
22                                   New York, NY  10017

23   For Aleathea Goodins:           D. Miller & Associates, PLLC
                                     BY:   ROCHELLE GUITON, ESQ.
24                                   2610 W. Sam Houston Pkwy. S #200
                                     Houston, TX  77042
25
```

```
 1   APPEARANCES (continued):

 2   For OnderLaw, LLC:           Parkins Lee & Rubio LLP
                                  BY:  LENARD M. PARKINS, ESQ.
 3                                     CHARLES M. RUBIO, ESQ.
                                  700 Milam Street, Suite 1300
 4                                Houston, TX  77002

 5                                J. C. WHITE LAW GROUP PLLC
                                  BY:  JAMES C. WHITE, ESQ.
 6                                100 Europa Drive, Suite 401
                                  Chapel Hill, NC  27517
 7
     For Travelers Casualty &    FisherBroyles LLP
 8   Surety Company:             BY:  DEBORAH L. FLETCHER, ESQ.
                                  338 Sharon Amity Road, #518
 9                                Charlotte, NC  28211

10   For Certain Claimants:      Andrews Myers, P.C.
                                  BY:  LISA M. NORMAN, ESQ.
11                                1885 Saint James Place, 15th Flr.
                                  Houston, TX  77056
12
                                  The Layton Law Firm, PLLC
13                                BY:  CHRISTOPHER D. LAYTON, ESQ.
                                  2701 Coltsgate Road, Suite 210
14                                Charlotte, NC  28211

15   For Certain Insurers:       Katten Muchin Rosenman LLP
                                  BY:  KATHERINE A. SCHERLING, ESQ.
16                                575 Madison Avenue
                                  New York, NY  10022-2585
17
                                  Ward and Smith, P.A.
18                                BY:  PAUL A. FANNING, ESQ.
                                  Post Office Box 2020
19                                Asheville, NC  28802-2020

20   For Kristie Doyle:          JD Thompson Law
                                  BY:  LINDA SIMPSON, ESQ.
21                                Box 33127
                                  Charlotte, NC  28233
22
     For Certain Claimants:      Cohen, Placitella & Roth, P.C.
23                                BY:  CHRISTOPHER PLACITELLA, ESQ.
                                  127 Maple Avenue
24                                Red Bank, NJ  07701

25
```

```
 1   APPEARANCES (continued):

 2   For Sue Sommer-Kresse:         Higgins & Owens, PLLC
                                    BY:  SARA (SALLY) HIGGINS, ESQ.
 3                                  524 East Boulevard
                                    Charlotte, NC  28209
 4
                                    Motley Rice, LLC
 5                                  BY:  NATHAN D. FINCH, ESQ.
                                    401 9th St., NW Suite 1001
 6                                  Washington, D.C.  20009

 7                                  Motley Rice, LLC
                                    BY:  DANIEL LAPINSKI, ESQ.
 8                                  210 Lake Drive East Suite 101
                                    Cherry Hill, NJ  08002
 9
     For Brandi Carl:              Golomb Spirt Grunfield
10                                  BY:  RICHARD M. GOLOMB, ESQ.
                                    1835 Market Street, Suite 2900
11                                  Philadelphia, PA  19103

12
     ALSO PRESENT:                 SHELLEY K. ABEL
13                                  Bankruptcy Administrator
                                    402 West Trade Street, Suite 200
14                                  Charlotte, NC  28202

15
     APPEARANCES (via telephone):
16
     For The Continental          DAVID CHRISTIAN, ESQ.
17   Insurance Company:            3515 West 75th Street, Suite 208
                                    Prairie Village, KS  66208
18
                                    Clyde & Co US LLP
19                                  BY:  CLINTON CAMERON, ESQ.
                                    55 West Monroe Street, Suite 3000
20                                  Chicago, IL  60603

21   For Travelers Casualty &     Simpson Thacher & Bartlett LLP
     Surety Company:               BY:  ANDREW T. FRANKEL, ESQ.
22                                      KATHRINE A. McLENDON, ESQ.
                                    425 Lexington Avenue
23                                  New York, NY  10017

24

25
```

```
 1   APPEARANCES (via telephone continued):

 2   For Arnold & Itkin:            Pachulski Stang Ziehl & Jones
                                    BY:  LAURA DAVIS JONES, ESQ.
 3                                  919 North Market St., 17th Floor
                                    Wilmington, DE  19801

 4
                                    Pachulski Stang Ziehl & Jones
 5                                  BY   KAREN B. DINE, ESQ.
                                    780 Third Avenue, 34th Floor
 6                                  New York, NY  10017-2024

 7   For Certain Insurers:          Mendes & Mount LLP
                                    BY   EILEEN T. McCABE, ESQ.
 8                                       STEPHEN T. ROBERTS, ESQ.
                                    750 Seventh Avenue
 9                                  New York, NY  10019

10   For the State of Texas:        Office of Texas Attorney General
                                    BY:  AUTUMN D. HIGHSMITH, ESQ.
11                                  P. O. Box 12548 MC008
                                    Austin, TX  78711-2548

12
     For Bausch Health:            Simpson Thacher & Bartlett LLP
13                                  BY:  SANDEEP QUSBA, ESQ.
                                    425 Lexington Avenue
14                                  New York, NY  10017

15   For Cyprus Mines Corporation: Northen Blue LLP
                                    BY:  VICKI L. PARROTT, ESQ.
16                                  1414 Raleigh Road, Suite 435
                                    Chapel Hill, NC  27517

17
                                    Kasowitz Benson Torres LLP
18                                  BY:  MICHAEL E. HUTCHINS, ESQ.
                                    1230 Peachtree St., NE, Ste. 2445
19                                  Atlanta, GA  30309

20                                  Reed Smith LLP
                                    BY:  PAUL M. SINGER, ESQ.
21                                  225 Fifth Avenue
                                    Pittsburgh, PA  15222-2716

22
     For Westchester Fire          Manier & Herod, P.C.
23   Insurance Company:            BY:  ROBERT W. MILLER, ESQ.
                                    1201 Demonbreun St., Suite 900
24                                  Nashville, TN  37203

25
```

```
 1   APPEARANCES (via telephone continued):

 2   For Rio Tinto America Inc.      Nexsen Pruet, PLLC
     and Three Crowns Insurance     BY:  HARRIS M. WATKINS, ESQ.
 3   Company:                        P. O. Box 3463
                                     Greensboro, NC  27402
 4
                                     WilmerHale
 5                                   BY:  DANIELLE SPINELLI, ESQ.
                                     1875 Pennsylvania Avenue, NW
 6                                   Washington, DC  20006

 7   For Employers Insurance        The Shapiro Law Firm
     Company of Wausau, et al.:     BY:  JANET A. SHAPIRO, ESQ.
 8                                   325 N. Maple Drive, #15186
                                     Beverly Hills, CA  90209
 9
     For Certain Claimants:         Blossom Law PLLC
10                                   BY:  RASHAD BLOSSOM, ESQ.
                                     301 S. McDowell St., Suite 1103
11                                   Charlotte, NC  28204

12   For Barnes Law Group           JD Thompson Law
     Plaintiffs:                    BY:  JUDY THOMPSON, ESQ.
13                                   Box 33127
                                     Charlotte, NC  28233
14
     For Imerys Talc America,       Latham & Watkins LLP
15   Inc., Imerys Talc Canada,      BY:  KIMBERLY A. POSIN, ESQ.
     Inc., and Imerys Talc Vermont,      JEFFREY E. BJORK, ESQ.
16   Inc.:                          355 South Grand Avenue, Suite 100
                                     Los Angeles, CA  90071-1560
17

18

19

20

21

22

23

24

25
```

1                                    <u>INDEX</u>

2   <u>OPENING STATEMENTS</u>:                                          <u>Page</u>

3        On behalf of the Debtor, by Mr. Gordon              74

4        On behalf of Steering Committee, by Ms. Cyganowski   81

5        On behalf of OnderLaw, by Mr. Parkins               90

6
                                <u>Direct</u>    <u>Cross</u>
7   <u>WITNESSES FOR THE</u>
      <u>DEBTOR/PLAINTIFF</u>:
8
    John K. Kim                      93          173
9

10  <u>EXHIBITS</u>:                              <u>Marked</u>    <u>Received</u>

11       All exhibits admitted subject to
           objection
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          (Call to Order of the Court)

3              THE COURT:  Have a seat, everyone.  Good morning to

4    all.

5              MR. MILLER:  Morning.

6              THE COURT:  Hope none of you had trouble finding us.

7    We had a moving courtroom issue.  We were wanting to have the

8    space here in a larger ceremonial courtroom, but District Court

9    had a jury out last night and we weren't sure whether we were

10   going to make it.

11             So sorry for changing gears on you as to where we were

12   going to be.

13             If the clerk will call the matter first.  You don't

14   need to read the entire agenda.

15             THE COURTROOM DEPUTY:  No. 1, LTL Management LLC.

16             THE COURT:  All right.  I don't know if we have a list

17   of appearances.  Let me just ask, given the number of parties

18   involved, if the principal groups will first announce and the

19   primary attorney tell me who else on your side is appearing, if

20   you can, and then we will move on and get other parties to

21   announce and try to take it.  We'll start with those in the

22   courtroom and then take telephonic appearances afterwards.

23             Mr. Gordon.

24             MR. GORDON:  Morning, your Honor.  Greg Gordon, Jones

25   Day, on behalf of the debtor.  I'm here with Dan Prieto from

1   Jones Day, Jim Jones is here from Jones Day, Bob Hamilton is

2   here from Jones Day.  And also, Jack Miller from the Rayburn

3   Cooper firm is here on behalf of the debtor.

4          THE COURT:  Okay.

5          MR. MILLER:  Morning, your Honor.

6          THE COURT:  Morning, all.

7          How about from The Steering Committee?

8          MS. CYGANOWSKI:  Melanie Cyganowski of Otterbourg P.C.

9   for The MDL Steering Committee.  With me is my partner, Adam

10  Silverstein.  And Mr. Cole Hayes of the Hayes Law Firm.

11         THE COURT:  Okay.

12         Others?  Mr. Waldrep.

13         MR. WALDREP:  Your Honor, Tom Waldrep of Waldrep Wall

14  Bailey &, Babcock & Bailey.  And with me are -- I represent

15  several --

16         THE COURT:  Uh-huh (indicating an affirmative

17  response).

18         MR. WALDREP:  -- law firms here today.  With me are my

19  partners, Kevin Sink and Jennifer Lyday.

20         THE COURT:  Morning.

21         MR. BLOCK:  Good morning, your Honor.  Jerome Block

22  from the Law Firm of Levy Konigsberg LLP.  My firm is

23  litigating numerous cases against Johnson & Johnson and, in the

24  tort system involving talcum powder.

25         Thank you.

1           THE COURT:  All right.

2           Yes.

3           MR. SATTERLEY:  Good morning, your Honor.  Joe

4    Satterley from Kazan McClain Satterley & Greenwood representing

5    several creditors.

6           THE COURT:  Okay.

7           MS. ABEL:  Shelley Abel, Bankruptcy Administrator.

8           THE COURT:  All right.

9           MR. PARKINS:  Lenard Parkins, Parkins Lee & Rubio.

10   I'm here with my partner, Mr. Rubio.  We represent OnderLaw,

11   the claimant.

12          THE COURT:  Very good.

13          MR. WOODMAN:  Good morning, your Honor.  John Woodman

14   of Essex Richards, local counsel with Joe Satterley and the

15   Kazan Law Firm.

16          THE COURT:  Uh-huh (indicating an affirmative

17   response).

18          MR. WOODMAN:  Also with me in the courtroom is Majed

19   Nachawati and Darren McDowell of the Fears Nachawati Law Firm.

20          THE COURT:  Okay.  That got it from this side?

21          Second row, anyone?

22          Others, if you would, use the microphones in the back.

23   That'll save us some time this morning.

24          Go ahead.

25          MS. CRABTREE:  Good morning, your Honor.  Hillary

1   Crabtree, Moore & Van Allen, appearing on behalf of Johnson &

2   Johnson and Johnson & Johnson Consumer Inc.  With me today are

3   Jessica Lauria and Laura Femino from White & Case.

4            THE COURT:  Okay, very good.

5            MR. COX:  Good morning, your Honor.  Rob Cox from

6   Hamilton Stephens Steele & Martin.  I'm appearing as local

7   counsel for Mark Robinson, who's sitting in the front row.

8   He's a lawyer with Robinson Calcagnie out of Orange County,

9   California.  He represents multiple claimants, including April

10  Fair, who's one of the proposed committee members.  And he has

11  been admitted *pro hac* in the case.

12           Thank you.

13           THE COURT:  Okay.

14           MS. SIMPSON:  Good morning, your Honor.  Linda Simpson

15  with JD Thompson Law representing claimant, Kristie Doyle, who

16  is a surviving spouse of Daniel Doyle.  She's represented in

17  the personal injury case by Kazan McClain Satterley & Greenwood

18  and has been recommended to selection to the Committee.

19           Thank you.

20           MR. BAYNARD:  Good morning, your Honor.  Paul Baynard

21  with Offit Kurman here in Charlotte.  We, we're local counsel

22  for the Aylstock Law Firm.  With me today is Rob Pfister with

23  KTBS Law in Los Angeles, California and he is lead counsel for

24  the Aylstock Firm.

25           THE COURT:  All right.

1          MS. EDWARDS:  Good morning, your Honor.  Ashley

2   Edwards here on The Continental Insurance Company and Phil

3   Fajgenbaum is here as well as Clint Cameron and David Christian

4   on the telephone.

5          Thanks.

6          THE COURT:  Okay.

7          MR. PLACITELLA:  Morning, your Honor.  Christopher

8   Placitella from New Jersey.  I'm the liaison counsel in the MDL

9   and represent various claimants in their own right, including

10  Joe McGovern, whose application is pending.

11         Thank you.

12         THE COURT:  Very good.

13         MS. HIGGINS:  Good morning.  Sally Higgins with

14  Higgins & Owens.  I am local counsel for Motley Rice.  I'd like

15  to introduce Nate Finch and David [sic] Lapinski of the Motley

16  Rice Firm representing multiple creditors.

17         MR. FINCH:  Good morning.  Nate Finch.  It's nice to

18  be in front of you again, your Honor.  I'm here on behalf of

19  Sue Sommer-Kresse, which is a potential applicant to the

20  Committee, and also on behalf of the Motley Rice Law Firm.

21         THE COURT:  All right.

22         MR. GOLOMB:  Good morning, your Honor.  Richard

23  Golomb.  I'm a member of the PEC and the MDL and co-lead in the

24  New Jersey state court cases.  And I also represent Brandi

25  Carl, who is a proposed member of the Committee.

```
 1            THE COURT:  Very good.  Thank you.

 2            MR. WHITE:  Your Honor, Jim White.  I'm local counsel

 3  for OnderLaw, LLC and I'm here with Mr. Parkins and Mr. Rubio,

 4  who previously introduced themselves to the Court.

 5            Mr. Houston.

 6            MR. HOUSTON:  And good morning, your Honor.  Andy

 7  Houston.  I'm here on behalf of Arnold & Itkin.  On the phone

 8  with me today is Laura Davis Jones and Karen Dine from the

 9  Pachulski Stang Firm.

10            Thank you.

11            THE COURT:  Okay.

12            MR. SHUKLA:  Good morning, your Honor.  My name is

13  Kush Shukla.  I'm with the Law Firm of Meirowitz & Wasserberg.

14  We represent various plaintiffs in talcum powder litigation

15  cases against Johnson & Johnson.

16            Thank you.

17            THE COURT:  Thank you.

18            Good morning.

19            MS. GUITON:  Good morning, your Honor.  Rochelle

20  Guiton with D. Miller & Associates.  I represent Aleathea

21  Goodins and I'm here just for the limited objection, your

22  Honor.

23            THE COURT:  Uh-huh (indicating an affirmative

24  response).

25            MS. NORMAN:  Good morning, your Honor.  Lisa Norman
```

1    from the Law Firm of Andrews Myers.  We represent approximately

2    500 ovarian cancer claimants that are represented by the

3    Personal Injury Law Firm of Williams Hart Boundas & Easterby

4              THE COURT:  Okay.

5              MR. LAYTON:  Good morning, your Honor.  Christopher

6    Layton with The Layton Law Firm and I serve as local counsel

7    for the Williams Hart Plaintiffs and Lisa Myer or -- excuse me

8    -- and Lisa Norman has been admitted *pro hac*.

9              THE COURT:  Very good.

10             MS. FLETCHER:  Your Honor, Deborah Fletcher with

11   FisherBroyles, appearing for Travelers and appearing remotely

12   are Andy Frankel and Kathy McLendon, Kathrine McLendon, from

13   Simpson Thacher.

14             THE COURT:  Okay.

15             MR. THOMPSON:  Good morning, your Honor.  Glenn

16   Thompson with Hamilton Stephens.  I'm here on behalf of

17   Margaret Watson, a claimant seeking appointment to the

18   Committee.  Cooney & Conway is the lead counsel and I believe

19   they may be on the phone as well.

20             Thank you.

21             MS. RUSHER:  Good morning, your Honor.  Ashley Rusher

22   from the Blanco Tackabery Firm here as local counsel for the

23   Imerys chapter 11 debtors.  They have cases pending in the

24   District of Delaware --

25             THE COURT:  Uh-huh (indicating an affirmative

1   response).

2         MS. RUSHER: -- and are interested parties in this

3   matter.  I'm also joined by my colleagues from California at

4   Latham & Watkins, who are joining by telephone today, a Mr.

5   Jeffrey Bjork and Ms. Kimberly Posin.

6         MS. CORDES:  Good morning, your Honor.  Stacy Cordes

7   from the Cordes Law Firm.  I'm representing Hill, Hill, Carter,

8   who -- and Elizabeth Carter is here.  They are proposed members

9   of the Committee on behalf of Blue Cross Blue Shield of

10   Massachusetts.

11         THE COURT:  Okay.

12         MR. CHAREST:  Please the Court, Daniel Charest from

13   Burns Charest.  We represent many ovarian cancer victims,

14   including Lathrop and Mercer, both of whom are proponents to

15   the, to the Committee.  And we work as, on the PEC for the MDL

16   Committee as well.

17         Thank you.

18         MR. FANNING:  Good morning, your Honor.  Paul Fanning

19   here from Ward and Smith.  I'm here with Kate Scherling from

20   the Katten Muchin Law Firm.  We represent the plaintiff

21   insurance companies in the coverage, New Jersey coverage

22   litigation.  Also co-counsel with Eileen McCabe from the Mendes

23   & Mount Law Firm, who we believe is appearing by telephone.

24         THE COURT:  Okay, very good.

25         Anyone else in the courtroom needing to announce?

1       (No response)

2                THE COURT:  All right.  Let's be ambitious and see if

3   can get telephonic announcements as well.  Couple of ground

4   rules here, folks.  If someone has already announced your

5   appearance, you don't need to say it again.  And then from

6   that, I will just say, not knowing how many of you there are,

7   we will just take it if your last name starts from A to G, this

8   would be the time to announce and we'll move on and get a

9   second group.

10               Anyone from A to G with their last name?  Anyone?

11               MR. BLOSSOM:  Good morning, your Honor.  Rashad

12   Blossom.  I'm local counsel for Christopher Placitella, who's

13   there in the courtroom.  He has noted his appearance and has

14   been admitted *pro hac vice*.  I'm also local counsel for Joseph

15   McGovern, who has an application for the Committee pending and

16   whose primary counsel is Mr. Placitella.

17               THE COURT:  Very good.

18               Any other A through Gs?

19       (No response)

20               THE COURT:  H through M?

21               By the way, if any of you --

22               MS. HIGHSMITH:  Your Honor --

23               THE COURT:  -- are struggling, it's Star 6 that

24   unmutes your receiver, I believe.  Okay.

25               All right.  Who was speaking?

```
 1              MS. HIGHSMITH:  Your Honor, Autumn -- sorry.  Autumn

 2    Highsmith with the Office of the Attorney General of Texas on

 3    behalf of the State of Texas.

 4              THE COURT:  Thank you.

 5              Anyone else in that group?

 6              MR. HUTCHINS:  Yes.  Good, good morning, your Honor.

 7    This is Mike Hutchins of Kasowitz Benson, appearing on behalf

 8    of Cyprus Mines Corporation, an interested party in this matter

 9    and in a, a related bankruptcy case.

10              THE COURT:  Give me the name of your client, again.  I

11    -- that came through --

12              MR. HUTCHINS:  Cyprus Mines.

13              THE COURT:  Okay, very good.

14              Anyone else --

15              MR. HUTCHINS:  Thank you.

16              THE COURT:  -- through M?

17              MR. MILLER:  Good morning, your Honor.  Robert Miller

18    of Manier & Herod on behalf of Westchester Fire Insurance

19    Company.

20              THE COURT:  Anyone else?

21       (No response)

22              THE COURT:  How about N through S?

23              MS. SPINELLI:  Good morning, your Honor.  Danielle

24    Spinelli of WilmerHale for Rio Tinto.

25              THE COURT:  Okay.
```

1          MS. SHAPIRO:  Good morning, your Honor.  Janet

2    Shapiro, The Shapiro Law Firm, appearing on behalf of Employers

3    Insurance Company of Wausau and four other insurers as well.

4          THE COURT:  Anyone else?

5          MR. QUSBA:  Your Honor, Sandy Qusba, Q-U-S-B as in

6    boy-A, from Simpson Thacher & Bartlett as counsel for the

7    Bausch Health entities.

8          THE COURT:  Okay.

9          Any --

10         MR. ROBERTS:  Your Honor,  Steve -- I'm sorry.

11   Stephen Roberts from the firm of Mendes & Mount for the New

12   Jersey coverage action insurers.  And my co-counsel is

13   Ms. McCabe, Ms. Scherling, and Mr. Fanning.

14         Thank you.

15         THE COURT:  Thank you.

16         Anyone else through S?

17         MS. PARROTT:  Good morning, your Honor.  This is Vicki

18   Parrott with Northen Blue in Chapel Hill, appearing as local

19   counsel on behalf of Cyprus Mines Corporation.  And I believe

20   Paul Singer is also on the line and he is lead counsel for

21   Cyprus Mines.

22         THE COURT:  Okay.

23         Anyone else through S?

24      (No response)

25         THE COURT:  Finally, T through Z?

1          MS. THOMPSON:  Your Honor, Judy Thompson of JD

2    Thompson Law on behalf of various plaintiffs who are

3    represented by the Barnes Law Group.

4          THE COURT:  Thank you.

5          MR. WATKINS:  Good morning, your Honor.  Harris

6    Watkins from Nexsen Pruet, appearing as local counsel for Rio

7    Tinto.

8          THE COURT:  Okay.

9          Anyone else?

10     (No response)

11         THE COURT:  All right.  That got it?

12     (No response)

13         THE COURT:  There have been multiple agendas floating

14   around since the filings continued all the way until the end of

15   the day yesterday.  I'm working off the Second Amended Notice

16   of Agenda that's filed at Docket No. 68 in the base case.  I

17   think that is the most up-to-date listing that I have.

18         Before we start, I would like to, to reiterate a

19   couple of ground rules here.  Big group, you're all welcome to

20   wear masks until you speak.  When you speak, I need to be able

21   to hear clearly and see your faces.  So I would ask that you

22   unmask long enough to do that, then you're welcome to put them

23   back on.

24         For purposes of the courtroom, there's, we have

25   additional microphones.  It's a haul to get all the way from

 1  the back benches up to the lectern here.  North Carolina

 2  practice allows lawyers to stand and speak at the counsel

 3  table.  So if you're one of the fortunate few, feel free to use

 4  that.  If you are in the gallery and need to speak, please

 5  consider using the microphone in the back unless you've got a

 6  lengthy argument.  That'll save us some time of everyone

 7  marching back and forth from the podiums.  So if you've just

 8  got something short, consider that.

 9         Those on the telephone, please mute -- we will try to

10  get your receivers muted on our end, but make sure you keep

11  them muted throughout the day until you need to speak and then

12  do the Star 6 and unmute.  If you speak telephonically, please

13  do not use speakerphone.  Pick up the receiver, pick up the

14  phone and talk to us.  That will make for a much clearer

15  reception.

16         And finally, most importantly, let me say that the

17  clerk and the court reporter are having a, a tough time with as

18  many parties as are appearing identifying yourselves.  I, I

19  said it last time and we kind of forgot in the course of the

20  day, but every time you speak please remind us of your name --

21  we've got a lot of new faces here today -- and please also say

22  who you're representing briefly.  And that way, the court

23  reporter will get you a good transcript and we won't have a lot

24  of ancillary problems about who was that that made the very

25  pithy remark, so.  I know everyone will want to take credit.

1          Beyond that, we have two motions on today.  It was

2   anticipated that the first motion, which was added grudgingly,

3   the, the appointment motion, was going to be relatively short.

4   Some of the responses I've seen and the volume of the responses

5   make me wonder about that.  We only have allotted for this

6   morning about, until 11:00 to do that motion.

7          So we're going to need to talk about whether that is

8   something that we can, in fact, accomplish today or whether

9   either we need to consider partial relief or a, another day to

10  be considered on, on that entirely.  Some have proposed that we

11  delay this until after the venue matter is resolved.  Others

12  will have other feelings and then we even have questions about

13  the composition of the Committee not just as to whether

14  meritorious claimants and their law firms should be added, but

15  also, the composition of the Committee as between the, the

16  various alleged injuries.

17         So that's a lot to, to cover in an hour, given the

18  number of objections.  I don't know if the parties have

19  considered that yet, but we need to talk right at the outset of

20  what are we going to do.  Because the second motion, the stay

21  motion and the injunction motions, those affect so many cases I

22  feel a need that we need to, to focus primarily on that with

23  our time.  So we can't spend the day here trying to compose the

24  Committee.

25         With that, I will ask the primary parties, the ones

1   who have taken the active role thus far, to tell me what you

2   think the, the batting order should be and how we allocate

3   time.

4           Yes.  Mr. Block.

5           MR. BLOCK:  Your Honor, good morning.  Jerome Block

6   from Levy Konigsberg.

7           It's, it's our firm's position, we share your

8   concerns.

9           THE COURT:  Uh-huh (indicating an affirmative

10  response).

11          MR. BLOCK:  And it's our position that we should go

12  right into the preliminary injunction motion.  It's so

13  important.  As you said, it affects so many cases.  I know that

14  the debtor wants to have sufficient time to present the support

15  for their motion and we are representing claimants, certainly

16  want time to oppose it.  There's going to be cross-examination,

17  direct examination.

18          And, and we agree that there's a number of

19  controversial issues --

20          THE COURT:  Uh-huh (indicating an affirmative

21  response).

22          MR. BLOCK:  -- related to the Committee and with the

23  potential that this case could be transferred out of this

24  Court, that's another factor to consider and I think it's just

25  very important for the parties to resolve their preliminary

1   injunction matter.

2           So I would propose that we go right into that.

3           Thank you, your Honor.

4           MR. SATTERLEY:  And, your Honor, Joe Satterley.

5           I would agree with Mr. Block, but I would suggest,

6   possibly, addressing the Committee tomorrow afternoon.  Because

7   we met and conferred extensively regarding time allocations.

8   We reduced our time down.  We think we can present this in an

9   efficient and effective manner and maybe it makes sense to move

10  the Committee selection to tomorrow afternoon.

11          THE COURT:  Ms. Abel, it's your motion.

12          MS. ABEL:  Thank you, your Honor.  Shelley Abel,

13  Bankruptcy Administrator.  I think I was one of the ones who

14  failed to introduce myself 'cause I think everybody ought to

15  know who I am.

16          The only thing, I, I'm sympathetic to everyone's

17  concerns about the time and I know that the, the real show

18  today is the, the second motion.  The thing that concerns me is

19  twofold:

20          One, we've had a lot of people travel to be here today

21  and they have come from all over the country and their time is

22  money for lawyers and I just, you know --

23          THE COURT:  Uh-huh (indicating an affirmative

24  response).

25          MS. ABEL:  -- crush at the thought of all the billable

1   hours that are running right now.

2          The second issue is that I think that there is a need

3   to have a unification of the voice among the parties.  It's

4   been a difficult process to come up with this recommendation.

5   It's more art than science and I think we all know that, but I

6   think the opportunity to consolidate the voice of the

7   plaintiffs' bar in the form of a unified committee and allow

8   that group to begin, you know, developing some cohesion and

9   speaking with one voice is, is a, is an important concern that

10  the Code contemplates happens early in the case.

11         So I'm super open to whatever the Court prefers and I

12  know you want to have enough time for the arguments, but I also

13  don't know that anything is gained by failing to reach a

14  decision on this issue.

15         THE COURT:  It's not the decision.  It's more the time

16  that it will take to, to get us to a decision that's a concern

17  at the moment.

18         MS. ABEL:  Well, your Honor, if you just want to adopt

19  my motion, we could just dispense with all that argument.

20         THE COURT:  Let me say at the outset that the Court

21  has read all of the objections and the requests for inclusion.

22  The two that stand out is the, do we wait until after the venue

23  matter has been addressed and the second one of what is the

24  composition between ovarian cancer disease victims and the,

25  those that assert mesothelioma claims.  I don't know how deep

1   we would be able to get into those, that issue today.  There

2   might be some half measures.  One of the things I would say is

3   even if we take this motion up now, I would tell everyone I

4   have read all of those requests to be on the Committee.

5          So the last thing I want to do is spend three hours

6   this morning hearing you tell me what you just told me.  If

7   we're going to consider that motion, then we were talking

8   about, effectively, firms having about five minutes each to

9   have a shot at it.

10          As to the composition between the two groups, I don't

11  think that can be resolved today.  The Court reserves the right

12  to change the composition of the Committee whether it's here or

13  whether it goes in New Jersey.  I think that would be, or

14  wherever else it could go.  I don't think that changes.

15          But one thing that we could do would be to try to get

16  a lump committee established now and reserve all rights beyond

17  that, though.  That's not going to be, make some of you happy

18  who have traveled here today.  And I'm happy to hear five

19  minutes each from the, the groups that want inclusion, but I

20  don't think I'm going to be in a position to talk about the

21  underlying tort claims themselves.  I'm not sure I know enough

22  at this juncture to say whether there should be a 50-50

23  representation or something else between the diseases.  We even

24  have an insurance company that's been proposed for inclusion.

25  There's no way to, to address that today.  That part of it, I

1   think I would have to reserve for a future day here or

2   elsewhere.

3           But one thing, if there is a need to get moving, would

4   be to consider whether or not the -- I haven't seen any

5   objections to those who are on the Committee itself.  I can

6   hear the rest of you briefly on why it would be a good thing to

7   add you to the Committee, but we could basically reserve

8   decision and if we have to get into the fight of the

9   composition or whether there should be two committees or all

10  those other things, we could put that off a little bit.

11          Anyone got strong feelings About it?

12          Mr. Gordon.

13          MR. GORDON:  Your Honor, Greg Gordon on behalf of the

14  debtor.

15          From my perspective, that makes sense because the

16  people are here.  It seems to me -- you've always been good

17  about controlling the time -- if you set a time of, say, 11:00

18  and we're done, I, I think it makes sense to get as much done

19  as you can.  Parties who are here, they could be heard to some

20  extent.  At the end of the day or at the end of an hour and a

21  half or so people are uncomfortable, they can let you know.

22          But it seems to me, from the debtor's perspective, we

23  shouldn't waste the time.  We ought to use what we have and see

24  what progress could be made.

25          THE COURT:  Mr. Houston, you look like you want to say

1  something?

2          MR. HOUSTON:  I do, your Honor, as always.  Andy

3  Houston for Arnold & Itkin.

4          My client represents over 7,000 ovarian cancer

5  claimants, many of which are in the MDL in New Jersey.  Trying

6  to be mindful of the parties' resources while also advocating,

7  our, our belief -- we filed a, a joinder late last night.  It

8  was, it was during the first quarter of the Warriors-Hornets

9  game. I hope you weren't monitoring the docket at the time --

10  but, but long story short, we think the court who ultimately

11  has this case, whether it's your Honor or whether it's in

12  another jurisdiction, ought to be the one that decides the

13  issue.  And for obvious efficiency reasons not going through

14  this exercise in another jurisdiction if the Court decides to

15  transfer venue, we believe those are, are fairly obvious

16  reasons why whatever court ultimately ends up with this case

17  should be the, the decider of who is on the Committee.

18          Two, there's very little benefit to having a committee

19  appointed between now and the time the Court is going to hear

20  the venue motion.  And that's going to be heard in less than a

21  week.  That's a blink of an eye in these types of cases and

22  there's not going to be any substantive negotiations that take

23  place in any meaningful fashion regarding a plan or anything

24  else over those next few days.  And again, from our standpoint,

25  there's no undue delay or prejudice.  Again, we're talking

1 about a week here and the formation of a committee is not going

2 to change whether venue is proper here.  It's not going to make

3 this Court's docket more or less burdened.  It's not going to

4 make witnesses closer to North Carolina or closer to some other

5 jurisdiction.

6 　　　　　And from our standpoint and, and at the risk of having

7 to go through this exercise again, we would ask that the Court

8 at least adjourn this matter until it decides the venue issue,

9 obviously mindful of people's time, the Court's resources.  You

10 may want to hear from people today, but, but not decide this

11 until later, so.

12 　　　　　Thank you.

13 　　　　　THE COURT:  Does anyone feel like -- I'm, I'm inclined

14 to listen to the, the groups that have traveled and wanting to

15 be included, listen briefly.  But does anyone feel like that a

16 decision today on the composition of the Committee is

17 necessary?

18 　　　　　MS. CYGANOWSKI:  Melanie Cyganowski for The Steering

19 Committee.

20 　　　　　Address, not -- I'm not addressing the composition of

21 the Committee, rather just addressing the remarks just made

22 about the delay.  Having been on both sides of the bench, I

23 appreciate the importance of, of a committee, as Ms. Abel

24 pointed out, and would, would be, would be amenable to, as

25 Mr. Gordon said, using this time right now to, to augment the,

1    the record.

2          But importance of a committee is, is significant on a

3    whole lot of levels.

4          THE COURT:  You think it is significant in the next

5    week --

6          MS. CYGANOWSKI:  Yes, sir.

7          THE COURT:  -- before we get to the Wednesday hearing

8    on venue?

9          MS. CYGANOWSKI:  Yes, sir.  There, there's a lot of

10   things for the Committee to be thinking about and addressing.

11   So having them, having them be available would be important.

12         THE COURT:  Okay.

13         Mr. Waldrep.

14         MR. WALDREP:  Your Honor, Tom Waldrep.

15         I agree with Ms. Cyganowski.  There is value to having

16   some committee before the venue motion.

17         THE COURT:  Okay.

18         Here's what I'm inclined to do, folks.  I'm, I want to

19   start this by asking the folks who've asked to join the

20   Committee to give me about a five-minute or less presentation,

21   if they care to.  You don't -- if you've already done this in

22   writing, I've got all of your notes on your applications.

23         But the first thing I would like to do is to hear from

24   the Bankruptcy Administrator as to how she came to select the

25   ones that she is recommending and give her a little more time

1   than five minutes to, to describe that for everyone's benefit.

2   And then, basically, hear from the other parties.

3          At the end of it, I will make a decision of whether to

4   adopt and reserve to make a full selection or whether to put

5   this off entirely until a future date.

6          So, Ms. Abel, if you want to tell us how you came to

7   recommend the groups that you did.

8          MS. ABEL:  Thank you, your Honor.  I'm going to act

9   like a North Carolina lawyer and speak from here.

10         Just for starters, I'll point out for everybody's

11  benefit, this, this whole thing probably wouldn't happen if we

12  were anywhere else other than North Carolina, Alabama.  By

13  virtue of local practice, we set these on for hearing because

14  of the vast interest in serving on the Committee.  But even

15  when I was a brand new Bankruptcy Administrator, I reached out

16  to the U. S. Trustee in Delaware and asked, "How do y'all do

17  this," and they wouldn't even tell me.

18         So, so nobody else knows and this, the only, only

19  place where we talk about it is right here.

20         So just to, for anybody who's new, I'm going to cover

21  some, some background.  Back on the first day hearing we had

22  about two weeks ago now, the debtor filed a motion and proposed

23  that they list the Top 30 law firms, which we all understand to

24  be the primary claimants in this case.  There are no unsecured

25  creditors that we know of other than sort of the contribution

1    claims that have been discussed.  An order hasn't been entered,

2    I don't think, on last check of the docket, but that was

3    approved on the, on the record.

4              The day after the petition was filed my office

5    prepared a notice that was filed on the docket and it included

6    a questionnaire that asked for responses by Friday, October --

7    no.  I'm sorry -- Thursday, October 21st.  That notice was also

8    published on our website.  It was e-mailed to the Top 30, it

9    was mailed to the Top 30, and it was provided to anybody who

10   called our office and requested it.

11             Third, I requested from the debtor information about

12   their pending litigation.  So I'm, I think, the only kid in the

13   room other than the debtor who has had an opportunity to look

14   at their claims database.

15             So I've, I am thankful for my prior skills in Excel

16   and I've been in there and played with that to better

17   understand the types of pending cases against the debtor,

18   which, and included in my review the number of firms and the

19   number of pending cases by firm, the jurisdictions where those

20   were pending, and the different disease types in order to help

21   me understand the broad, in broad terms the types of claims

22   pending against the debtor.

23             And then the last thing I want to make sure everybody

24   understands, while the motion and the focus today will probably

25   be on firms, I do select individuals to serve on the Committee.

1  There's a lot of discussion in other jurisdictions about

2  problems with agency in these cases.  There is a person, either

3  a sick person or a family member who represents that sick

4  person's estate, who is the named party for ease of reference

5  and in light of the notice procedures that I anticipate will be

6  entered any day, I have addressed those notices, put the

7  addresses for those claimants with their law firm on the

8  proposed Committee.

9          And then the last thing to cover is that while section

10  1102 talks about the holder, holders of seven, the seven

11  largest claims, it's just practically impossible for us to know

12  who are the seven sick people who have the greatest damages

13  resulting from the debtor's product.  So I am tasked with

14  trying to choose a group of people who can be representative of

15  the claims, both in terms of numerosity and in terms of amount,

16  against the debtor.

17          That all sounds familiar to you because it's very

18  similar to our prior asbestos cases.  This case is a little bit

19  different.  You are picking up on that in the papers that have

20  been filed and, and these are the ways that I think I would

21  point out to the Court that this is a little bit different.

22          First off is just the sheer amount of interest.  We

23  have -- when I said in my papers that we got more than 50

24  applicants, that's 50 law firms or entities.  If you wanted to

25  count the people that were submitted by each law firm, I asked

1    them to try to limit themselves to one or two when I spoke to

2    people.   If you were to include the individual claimants and

3    the stories that go with those people, I bet we had over a

4    hundred.   This is an overwhelming response, even compared to

5    our prior mass tort cases, and I think it really demonstrates

6    the degree of interest that this case has attracted.

7              I promised on the speed with which I'd get through

8    that review.  I didn't anticipate that we'd have quite that

9    much paper coming at us.  So I took a little bit longer than I

10   project, projected and I appreciate everyone's patience while I

11   worked through all the submissions last week.

12             Second thing -- and you've touched on this -- there is

13   a different type of plaintiff in this case and with them a new

14   variety of plaintiffs' firms and those patient -- those

15   claim -- claimants are patients suffering from ovarian cancer

16   and their family members.  Some believe they are sick because

17   of the talc they used contained asbestos.  Others believe they

18   are sick because talc itself may be a carcinogen and, of

19   course, the debtor based on their pleadings in this case

20   believe that neither of those things are true.  To the best of

21   my knowledge, ovarian cancer victims have not been involved in

22   mass tort cases, mass tort bankruptcies other than Imerys,

23   which was filed in 2019, and Cyprus, which was filed earlier

24   this year in Delaware.  As a result, they lack the length of

25   experience their mesothelioma brethren have been building since

1    Johns Manville in the early 1980s, but they are catching up

2    very quickly and have demonstrated to me an impressive resolve

3    to bring their best work to this bankruptcy case.

4         The other thing that overlays this case is the pending

5    bankruptcies for Imerys and Cyprus in Delaware.  There is an

6    unavoidable overlap between the two cases.  For example, if you

7    look at the short form complaint in the New Jersey MDL, there's

8    checkboxes for Johnson & Johnson Consumer Products, Johnson &

9    Johnson, and for Imerys and that just as a practical nature is

10   going to mean that there's a lot of overlap between the cases.

11   I think that the debtor's presentation on the first day

12   indicated that there were about 18,000 pending claims in this

13   case that were also asserted against Imerys.

14         So while there are unavoidable overlaps about the type

15   of claimants -- and, and that is an appropriate thing for this

16   Committee to acknowledge and, and discuss -- I did think it was

17   really important to get a new group to the table.  I took some

18   pains to make sure I wasn't re-creating the wheel that existed

19   in Imerys and Cyprus.  There is some overlap, but to

20   characterize it as a repeat is just not fair 'cause it's, it's

21   not.  That's not the case.  And if the Court is interested in

22   look, looking at that further, I do have a demonstrative that

23   covers that issue in greater detail.

24         The last thing that is really different here than what

25   we're accustomed to seeing is that we have a different, another

1    type of claimant, in addition to disease for personal injury.

2    We received applications from four different insurance company,

3    a State Attorney General, and a national community association.

4    Those are not things that we have seen in prior cases in this

5    court.  One of those insurers is included on the proposed

6    Committee.  While I was initially skeptical of the existence of

7    direct claims for these insurers, their submissions convinced

8    me that they hold claims that are separate and distinct from

9    those that are represented by plaintiffs' firms and further,

10   that a failure to involve them could complicate the debtor's

11   ability to achieve a global resolution in this case if it is to

12   proceed.

13          I read the applicants' submissions, including personal

14   statements, complaints, and appeal briefs, scientific research

15   materials, prior court rulings.  I tortured my staff with

16   entirely too many spreadsheets and I cross-referenced the

17   debtor's database and I talked to a lot of lawyers.  And we all

18   like to talk a lot, including, including me.  Many reached out

19   to me and many others, I reached out to them and it was an

20   excellent and really helpful way for me to, to learn the case

21   really fast in the, in the confines of not all these ears to

22   listen along.  And finally, I just hemmed to hawed, hemmed and

23   hawed a lot more than I care to admit.

24          As I considered applicants for inclusion, I paid

25   attention to disease types and the various jurisdictions in

1   which their litigation was pending.  I considered law firms'

2   prior committee experience, but I also intentionally chose

3   members whose counsels lack any prior committee experience

4   which I believe will bring fresh perspective to this case.

5        All the Committee can be and all that it can expect to

6   be is a representation of its constituency.  It is not

7   estimation.  It is not plan classification.  It is not TDP and

8   it is not a claims allowance.  And so it can't be all those

9   things that people would like it to be at this time.  And I

10  know that there's probably not a right answer, but I worked

11  hard to become well informed about the applicants and their

12  claims against the debtor and to use that information-gathering

13  process to make a recommendation that I think is fair for the

14  Court to consider.

15       The Committee as proposed includes six ovarian cancer

16  claimants, four mesothelioma claimants, and one insurer, but

17  two of the firms, at least, on the Committee represent both

18  types of claimants.  Again, 1102 talks about the largest

19  claims, but there's no way to know who that is.  There's been a

20  lot of discussion on the record and the responses filed that

21  you should focus on numerosity of claims and while that is part

22  of how some of the committee members were chosen, you can't

23  ignore the fact that there might be one firm with only one

24  claim that might be the claim that is the largest in this case

25  and there's just no way for us to know that sitting here today.

1            The only thing that would make everyone happy would be

2    putting all of these applicants on the Committee and I can

3    trust, I feel assured that there are others who would like to

4    be included who have not spoken up here today, but that would

5    destroy its ability to effectively function.   Each party

6    selected for the Committee is prepared to do the hard work that

7    will be required for this case.   They each, as well as their

8    respective counsel, take the role seriously.   They understand

9    their, their role is fiduciary in nature and that they will be

10   representing the constituent body as a whole.   Many of them are

11   here today and available if the Court has questions.

12           I can keep going, your Honor, and respond to the, to

13   the issues that have been raised by other counsel, or I'd be

14   happy to --

15           THE COURT:  Let's --

16           MS. ABEL:  -- save that for rebuttal.

17           THE COURT:  Let's hear from the folks who were not

18   named originally, but want to be added.

19           At this juncture again, I would suggest five minutes a

20   person and I'll decide what to do with this after I hear you.

21           So anyone wishing to be heard.

22           MR. SINK:  Good morning, your Honor.  Kevin Sink on

23   behalf of Waldrep Wall.

24           We filed two responses, one on behalf of the, the firm

25   of Maune Raichle Hartley French & Mudd, which basically asked

1    this Court to sort of do what it said at the first day hearing

2    and repeated again today, is just have a complete reservation

3    of rights depending on what happens, particularly with respect

4    to venue, and we would reiterate, reiterate that.  The second

5    response that we filed was on behalf of a client of the Maune

6    Raichle firm, Kirk Smith, seeking to be added to the Committee.

7            And let me start by first commending Ms. Abel for her,

8    I can't even imagine the herculean task that, that went into

9    this and it, it shows in her efforts and, and we commend her

10   certainly for that, first and foremost.  We do agree that a

11   committee should be appointed today.  We certainly seek the

12   inclusion, but I believe that that has an important role and,

13   and this Court should appoint one irrespective of whether it,

14   it makes additions or reserves rights for a later time.  So I

15   believe one should be appointed.

16           Mr. Smith, who is the named addition, mention two

17   facts about him.  He is a -- a -- somewhat unique in that he is

18   a, a male who was exposed to asbestos and has mesothelioma

19   using Johnson & Johnson Shower to Shower, 57 years old.  I

20   think there is some diversity that he would bring under the

21   uniqueness of his claim that I think would be a helpful

22   addition to, to any committee that the Court appoints.

23           And then I would turn to the firm, the Maune Raichle

24   Firm, which this Court is, I believe, familiar with.  It's

25   involved in some of the other committees before this, before

1   this Court.  And I certainly appreciate and, and commend

2   Ms. Abel's comments regarding a new and fresh perspective.

3   However, I do think that, in looking at it, it appears that

4   only 2 of the 11 current constituents on the Committee have

5   experience with the, the prior asbestos cases and what I would

6   refer to and this Court's referred to as the "Texas twostep,"

7   and I believe that the Maune Raichle firm's vast experience

8   with those cases and that unique bankruptcy procedure -- I'll

9   leave it, leave it at that -- brings merit and would, would

10  merit their inclusion and, and experience they bring and as

11  this Court has noted, this is not just the traditional Texas

12  twostep.  This is Texas twostep on steroids.  And so that, I

13  believe, raises an additional need for the experience in, in

14  addressing and considering the, the factors that raises before

15  this, before this Court.  The firm has approximately 75

16  unresolved mesothelioma claims against the debtor and Johnson &

17  Johnson.  They are a member of the Medical Science Team in the

18  Bestwall proceeding in this, in this District and they have

19  decades of experience in asbestos bankruptcy litigation.

20          And so I would commend, while I appreciate the fresh

21  perspective, I think the experience of the firm, the uniqueness

22  of Mr. Smith would merit his inclusion to, to the Committee,

23  and I would commend that, your Honor.

24  T       Thank you.

25          THE COURT:  Thank you.

1          All right.  Who's next?

2          MR. FINCH:  May it please the Court, good morning,

3   your Honor.  Nate Finch on behalf of Ms. Sommer Kresse and the

4   Motley Rice Law Firm.

5          I would also like to echo counsel's appreciation for

6   the Bankruptcy Administrator's thankless task in forming a

7   committee.

8          There are, the reason that Motley Rice seeks to be on

9   this Committee, I think, can boil down to the vast experience

10  that we have with not only asbestos bankruptcies or mass tort

11  bankruptcies, but also the, this sort of fraud on creditors

12  that this, this bankruptcy is involved in.  The, the Texas

13  twostep is just the latest version of a play in a very old

14  playbook.  And Mr. Rice was involved in the <u>Manville</u>

15  bankruptcy.  At my prior existence -- I opened the Washington,

16  D.C. office of Motley Rice in 2010.  Before that, I was with a

17  firm called Caplin & Drysdale and pretty much from the time I

18  was a baby lawyer I was doing fraudulent transfer and successor

19  liability cases.  A combination of the experience that Rice has

20  as our, as, as being on all of these asbestos committees -- he

21  was a Chair of the <u>Garlock</u> committee -- and his ability to

22  understand and both deal with complicated mass tort situations,

23  he's not only just involved in the asbestos bankruptcies, he's

24  involved in the opioid litigation.  He's involved with Johnson

25  & Johnson and multiple other kinds of cases and he very much

1    wants to be involved in this case.  And I don't think anybody

2    in this courtroom has the wealth of experience and knowledge

3    that the Motley Rice firm brings to resolving a case like this,

4    maybe in a creative way.  You know, Mr. Rice resolved the

5    tobacco litigation 20 some years ago for $250 billion.  I

6    happen to think that the, the dollar figure here has to be a

7    lot closer to 250 billion than the 2 billion that Johnson &

8    Johnson put on the table.

9         But I would suggest, respectfully, your Honor, that

10   including my firm as counsel for Ms. Sommer Kresse would be a

11   benefit to all the creditors who have a united front in dealing

12   with this situation.

13        Thank you.

14        THE COURT:  Thank you.

15        MR. GOLOMB:  Good morning, your Honor.  Richard Golomb

16   from Golomb Spirt & Grunfield in Philadelphia and New Jersey.

17        I, I represent Brandi Carl.  Brandi Carl was one of

18   the first cases filed in state court New Jersey back in 2014.

19   As a result, she is the, one of the two lead plaintiffs in that

20   case in, in New Jersey.  Her case was originally scheduled for

21   trial back in 2016.  It was then dismissed, along with a lot of

22   other cases, as a result of the state court Daubert rulings,

23   which I then took up to the Appellate Division in the New

24   Jersey Supreme Court, was reversed, and we're back in the New

25   Jersey state court and Brandi Carl's case is now scheduled for

1   trial.  She is one of over a thousand of the 1400 cases filed

2   in New Jersey that I represent.

3        Now I, I will say at the outset that when I filed my

4   initial papers, I filed on behalf of Linda Rabasca, who was a,

5   a bellwether finalist in the MDL.  I did not at that time seek

6   a, an appointment on behalf of Brandi Carl because she was

7   unable to travel here and my experience has been that they need

8   to travel and, and be interviewed.  But she would very much

9   like to serve.

10        You, you've got my papers.  I, I want to make two

11   quick points and that is is that there is no representation

12   from the New Jersey state court here and that is the biggest

13   block of cases outside of the MDL and I think it's particularly

14   important, in light of the fact that the likelihood that this

15   case will be filed, will be, be transferred to New Jersey, that

16   Ms. Carl be appointed.

17        The other thing is, is, is that there is no member of

18   the Committee currently on the ovarian cancer side that is from

19   the Northeast of the United States and I think that's very

20   important to have that representation, again particularly given

21   the fact that this case is likely to go to New Jersey, if not

22   Delaware.

23        Thank you.

24        THE COURT:  Thank you.

25        MS. GUITON:  Good morning, your Honor.  My name's

1   Rochelle Guiton and I represent Aleathea Goodins.

2          And Aleathea Goodins is a 51-year-old African American

3   woman and she was diagnosed with Stage IV ovarian cancer that

4   spread to her lungs and liver after using Johnson & Johnson

5   Baby Powder for over 20 years.  To date, she's undergone nine

6   cycles of chemotherapy and the effects of which, of course,

7   have prevented her from coming to court today.  And she seeks

8   to be added to the Talc Claimants' Committee in order to ensure

9   that the Committee is fairly representative of the diverse

10  constituency it will represent.

11         It has been reported, your Honor, in Reuters and other

12  publications that Johnson & Johnson focused its efforts on

13  selling talcum powder to key demographics, including African

14  American women, after the World Health Organization classified

15  cosmetic talc products, such as Johnson & Johnson's Baby

16  Powder, as possibly carcinogenic.  In furtherance of its

17  marketing strategy, among other things, Johnson & Johnson

18  distributed Baby Powder samples through churches, beauty salons

19  in African American and Hispanic neighborhoods and launched a

20  $300,000 radio advertising campaign in a half dozen markets

21  aiming to reach curvy Southern women 18 to 40 skewing African

22  Americans.  In other words, Johnson & Johnson specifically

23  targeted women like Ms. Goodins in an effort to sell them

24  carcinogenic talc, talcum powder with full knowledge and

25  complete disregard of the risk such product posed to their

1    long-term health and to compound this tragedy, a 2017 study

2    from the Journal of Ovarian Research suggested ovarian cancer

3    is 1.3 times more lethal in African American patients as

4    compared to Caucasian patients and this gap is continuing to

5    widen.

6              Now that these efforts have been exposed, Johnson &

7    Johnson seeks to avoid liability for the harm caused by using

8    bankruptcy to abandon the victims of this tragedy.  And, your

9    Honor, this Committee will be charged with representing the

10   interests of a diverse constituency of talc victims.  It is

11   unlikely that the Committee will be able to adequately

12   discharge this responsibility to victims if its composition

13   doesn't fully represent everyone.  Specifically, the Committee

14   must include a voice for colored women like Ms. Goodins Johnson

15   & Johnson preyed upon in marketing talc despite the fact that

16   it was a known carcinogen.  Ms. Goodins would like to be that

17   voice to ensure that the survivors of this catastrophe and the

18   families of those affected are made whole and that Johnson &

19   Johnson pays for the damages it caused and while she can't be

20   here today, your Honor, she is well, she is healthy, and

21   excited about the possibility to serve on this Committee.

22             If your Honor has no questions for me, I will cede the

23   podium.

24             THE COURT:  Thank you.

25             Yes, sir.

1          MR. CHAREST:  Thank you, sir.  Daniel Charest on

2     behalf of, from Burns Charest, on behalf of two applicants,

3     Julia Lathrop and Daniel Mercer.

4          I wanted -- reacting -- I'm reacting to something that

5     the Bankruptcy Administrator said that I think, candidly, is,

6     is a wrong step and the notion of reinventing the wheel.  The,

7     the debtors here usually come in and have a massive advantage

8     because of the chaos on the other side and because of the

9     existing leadership in the MDL PSC and the MDL organization

10    and, and, and help with the, the folks on the meso side we've

11    been able, I think, to present a really good opposition to what

12    they've tried to do so far.  And I think that reinventing this

13    particular plaintiffs' committee with people that are not on

14    other committees, candidly, is a mistake.

15         Inclusion is fine, but you have to have coordination

16    of effort and on that point my firm is on, in the PS, PEC for

17    the MDL.  We're on Imerys.  We are -- we were found in 2015 and

18    have been working, basically, for the life of the firm on cases

19    like this specifically and we have dedicated our resources to

20    learning and knowing the case and providing timely help.  I

21    personally took, in part, two of the depositions over the week.

22    We're there for, for these cases and I think that given our

23    inclusion and leadership in the MDL and inclusion and

24    leadership in Imerys, we should be on the leadership of this

25    committee as well.

1          And then just turning briefly to the individuals

2    themselves, Julia Lathrop is a amazing woman who gave an

3    *extremis* deposition in extraordinary pain because she wanted to

4    have her story heard and she is fighting and on sort of

5    seemingly endless, six months to live kind of basis, but she is

6    fighting because she wants to bring this case to an end.

7          And Mr. Mercer watched his wife die, gave her care day

8    to day until her death instead of putting her in hospice and

9    he, I can tell you, is very active and very involved in

10   understanding where this case is and is motivated to bring this

11   case forward.

12         Thank you, sir.

13         THE COURT:  Thank you.

14         MR. PLACITELLA:  Morning, your Honor.  Chris

15   Placitella from New Jersey.  I represent Joseph McGovern.

16         Joseph was a former Senior Counsel in the Justice

17   Department and met his wife, Fern, in law school.  Joseph now

18   is a senior partner in the Obermayer firm in Philadelphia and I

19   believe represents a unique person to contribute to

20   understanding and moving this case forward.

21         The one good thing about today, your Honor, is I don't

22   think you can actually make a bad decision on this issue.  I've

23   known these lawyers that have applied for, most of them, more

24   than 30 years.  They're all great lawyers.  I tried a talc case

25   in New Jersey shoulder to shoulder with people from Mr. Block's

1   firm and from the Maune Raichle firm and there couldn't be any

2   better.  And I'm liaison counsel in the federal court before

3   Judge Wolfson where I am appointed to serve the court and all

4   the litigants nationwide and I've stood shoulder to shoulder

5   with every one in this front row and I think that's what

6   probably makes us unique, your Honor, that we are, we are the

7   firm that can bridge the gap.  We have been on both sides not

8   just from afar, but deeply litigating both the ovarian cancer

9   cases and the mesothelioma cases.  And we've been involved in

10  the Imerys bankruptcy, the DBMP bankruptcy.  We understand the

11  issues and I think that I would be honored to be here and I

12  would make one promise to the Court.

13          I've heard a lot about statistics and the number of

14  claimants and I would just promise the Court that if appointed

15  to the Committee, along with Mr., to help Mr. McGovern, I will

16  never forget that statistics are people with the tears wiped

17  away.

18          Thank you.

19          THE COURT:  Mr. Thompson?

20          MR. THOMPSON:  Morning, your Honor.  Glenn Thompson

21  again for Margaret Watson, who is a mesothelioma claimant who's

22  seeking appointment to the Committee.  She's working with lead

23  counsel, Cooney & Conway out of Chicago, who is already

24  involved in the mass tort bankruptcies in this case in a few

25  different, or in this District in a few different cases.

1          The reason we think that Ms. Watson is, merits

2     inclusion is she is an international claimant.  She's a

3     resident of Australia with a case pending there.  We tried our

4     best to analyze the filings and we don't have access, as

5     Ms. Abel pointed out, to the, the full database.  It doesn't

6     appear to us that anyone currently either on the Committee or

7     seeking appointment is an international claimant and we,

8     frankly, don't have the resources at this point or the access

9     to know how many claimants there are, but given the ubiquity of

10    the product we're talking about here, I expect there's a lot of

11    claimants who are based outside the United States.  We think

12    the inclusion of Ms. Watson would bring a -- a -- a good --

13    different perspective, a little diversity from geographic

14    background, at least.

15         The firm of Cooney & Conway represents claimants not

16    only in Australia, also the UK and Canada, and we think that

17    that is a voice that needs to be heard.  I will also point out

18    that the firm of Cooney & Conway itself represents claimants in

19    all three buckets, mesothelioma claimants, ovarian cancer

20    claimants, and the third bucket I'm advocating now is the

21    international pool.  I think if you are inclined to maybe

22    appoint a committee on an interim basis, as has been discussed

23    this morning, a firm that can sort of speak to all three of

24    those interests is a good choice for an interim basis.  And

25    we'd seek appointment for Ms. Watson.

1              Thank you.

2              THE COURT:  Anyone else?  Any telephonic-appearing

3    groups?

4       (No response)

5              THE COURT:  Okay.

6              MS. ABEL:  Your Honor, if I may respond?

7              THE COURT:  You may.

8              MS. ABEL:  Do you have -- you okay with that?  Okay.

9              THE COURT:  Sure.

10             MS. ABEL:  I'm going to try and go in order of the

11   statements that were, were made just to keep your brain working

12   in the right order.

13             First off, you heard from Maune Raichle.  I'm a big

14   fan of Maune Raichle.  They were, they applied to be on the

15   Committee in Bestwall and at that point had never served on a

16   committee before.  And I put them on and I've put them on DBMP

17   and I've put them on Aldrich as well and they have served in

18   other courts since their first appointment in Bestwall.  I hope

19   they participate in the case.  They've been active so far, but

20   I did feel like I needed to bring some new voices to the table.

21   And so that was the reason that I ended up not selecting them

22   for this committee.

23             Motley Rice has presented today.  While they didn't

24   really talk about it in their presentation and the papers, they

25   were concerned about the lack of representation from the, the

1    Southeast and particularly, the Carolinas.  I just wanted the

2    Court to know that Alishia Landrum, who's represented by

3    Beasley Allum, Allen, is a resident of Edmund, South Carolina,

4    near Spartanburg.  And April Fair, who is represented by

5    Robinson Calcagnie, is a resident of Hayesville, North Carolina

6    and a resident of our own District.  So we will have some

7    Southern accents on this proposed committee.

8              The next person who --

9              THE COURT:  Is that to translate if, so no one who

10   doesn't understand what the Judge said will have a clue?

11             MS. ABEL:  Exactly.  We'll have an interpreter, so.

12   And for me as well.

13             Golomb Spirt.  Mr. Golomb's motion indicated that I

14   selected an Attorney General.  It did cause a small panic last

15   night where I went, did I and not realize it?  But I do not

16   believe that I placed any State Attorney Generals on the

17   Committee.  Other than the insurance company, which I

18   discussed, everyone else is a personal injury claimant

19   represented by a plaintiffs' firm.

20             Mr. Golomb's motion is difficult for me because he

21   indicates that neither of his clients were selected, but

22   really, the only one that I had to choose from at that point

23   was Ms. Rabasca, who submitted an application and not Ms. Carl.

24   I did try to get word out that the committee decisions would be

25   made primarily on the paper submissions and that I wouldn't be

1    conducting in-person interviews.  It seems practically cruel to

2    make sick people travel, anyway, particularly during this

3    pandemic.  And so I did not proceed with individual, I did not

4    proceed with in-person interviews.

5         I appreciate Mr. Golomb's arguments regarding cases

6    pending in New Jersey State Court, but given the vast

7    representation of New Jersey in terms of the MDL -- I recognize

8    that those are two different jurisdictions -- I was trying to

9    bring some other voices to the table.

10        Next, you heard from D. Miller & Associates, who was

11   concerned about a lack of representation for African American

12   women, who, who they say Johnson & Johnson targeted in its

13   advertising.  I didn't ask demographic questions of applicants.

14   I didn't know that it would be appropriate to do so or a

15   particularly relevant basis on which to choose individuals for

16   inclusion.  I do know that at least one claimant is an African

17   American woman based on her personal statement and I suspect

18   that others may be, but since the committee members must act as

19   a fiduciary of the whole body of creditors I think Ms. Goodins'

20   interest will be adequately represented.  And practically, I

21   already had two firms from Texas and I was hesitant to add a

22   third.

23        Burns Charest represents two claimants who believe

24   they should be included because they're suffering from

25   epithelial ovarian cancer.  I have become aware during this

1    process that there are different types of ovarian cancer, but

2    that education didn't occur until after the questionnaire was

3    prepared and I simply did not request that level of detail from

4    claimants.  I think that's a level that is difficult for the

5    Court to reach on this issue and it was certainly not something

6    I was prepared to make distinctions on based on my

7    understanding of the science involved.  I think those issues

8    would be better saved for estimation or TDP negotiations.

9         Burn Charest, also, already serves on the Imerys

10   committee and they were not included on the debtor's Top 30.

11        Cohen Placitella makes a good pitch to be added.  I'd

12   already included five firms that were either on the Imerys or

13   Cyprus committees.  Cohen Placitella would put me over a

14   majority mark and I was hesitant to do so.

15        And, in addition, the firm was not listed on the

16   debtor's Top 30.

17        Cooney & Conway did not speak -- oh.  They did.  I'm

18   sorry.  I almost forgot Mr. Thompson.  Cooney & Conway, their

19   submission discusses the fact that they represent several

20   hundred plaintiffs.  Ultimately, I didn't find that many claims

21   pending in the debtor's database.  That may be an issue that

22   the debtor could address because I'm, it's not clear to me that

23   they have listed in the, the TRO action, the preliminary

24   injunction action international claimants and I'm not prepared

25   to discuss on this amount of notice the intricacies of

1  extraterritorial effect of a, the automatic stay.  I know that

2  that could be a very interesting discussion, but I don't know

3  that including anyone on the basis of their international

4  citizenship is the way to, to go.

5       And then lastly, Williams Hart and Arnold & Itkin have

6  suggested that you just ask me to try again and I, and I'm

7  sympathetic to that.  I do think that if you don't think this

8  is the right group, I would suggest that, I would ask that you

9  allow me to propose a second slate, rather than trying to

10  augment it.  I think it's really hard to, to hit the thing that

11  I was trying to hit, which is a balance, without an opportunity

12  to spend a considerable amount of time sort of weighing these

13  different factors.

14       The last thing I wanted to address, your Honor -- and

15  I know I'm going on and on -- but it's been suggested that this

16  be an interim order.  The Code already contemplates at 1102(a),

17  both at Paragraphs (2) and at Paragraphs (4), the mechanisms by

18  which a party may ask to have the committee makeup re,

19  reconsidered, or, alternatively, to have an additional

20  committee formed.  Those, those rights exist under the Code and

21  they are not appropriately considered in a response to this

22  motion.  I think that the movant would need to carry that

23  burden and I'm not prepared to, to, to do that today.  Since

24  those rights exist and because of the need to get some finality

25  around this, in my opinion, just a decision will help create

1    finality and empower this group to act in concert and to

2    consolidate the interests of the, of the group.  I don't think

3    it does anybody any favors to make it an interim order and if

4    you want to address the effects of a venue transfer at the time

5    you reach that issue, that would be the appropriate time for

6    that to be considered.

7             And then I feel compelled to address what feels like

8    an elephant in the room and it showed up in some of the

9    responses.  I, I was approached by many people on both sides of

10   this plaintiffs' bar about the possibility of two committees

11   and I spent more time than I care to admit thinking that I

12   might do it.  The suggestion was that there would be one for

13   mesothelioma claimants and one for ovarian cancer claimants.

14   There's some, some apparent discord among the plaintiffs' bar

15   at times and the types and nature of those claims do appear to

16   be very different.  There's discord that emerged in the <u>Imerys</u>

17   and <u>Cyprus</u> cases in, in Delaware.  But ultimately, I could find

18   no statutory or case law to support creating separate

19   committees based on disease type nor any earlier cases where

20   two such committees or anything close to that were appointed.

21   The closest thing you could come up, I could come up with is a

22   personal injury committee and then an environmental claims

23   committee.  That's something we've seen in the past, but

24   nothing based on disease type.

25             Practically, I just lack adequate scientific knowledge

1  and I don't want to burden the Court with making those sort of

2  scientific-type judgments in creating a committee or whether

3  two should be formed.  And I developed a whole host of what ifs

4  that let me determine I could not recommend that to you.  If

5  someone wants to come in and say, "We need another one," then

6  they're more than welcome to do that and carry that burden.

7        But I just will close by saying that I think what this

8  case needs is a strong committee and an empowered committee and

9  that can only be achieved if it is appointed with as much

10 finality as any other committee is afforded under the Code so

11 that the group can make an effort at unification and begin to

12 take action in concert for the benefit of all claimants.

13       One administrative matter.  I do need to substitute

14 the responsible attorney for Weitz & Luxenberg.  And so I would

15 propose to do that in any order that I submit to your Honor.

16       And that's all, your Honor.  And before 11.00.

17       THE COURT:  Anyone else?  I'm not inviting a second

18 round of, of arguments, but if you've got something that came

19 up in the BA's statement that needs to be addressed, now's the

20 time.

21       Mr. Houston?

22       MR. HOUSTON:  Yes, sir, your Honor.  And, and I didn't

23 speak before because I thought you were hearing from the people

24 who were trying to get on the Committee.  And so I, I sat and

25 waited.

1          I wanted to respond to Ms. Abel's comments.  First,

2   and as we mentioned before, I don't think today is really the

3   right day to do this.  I understand you, you heard the parties

4   out and that seems like a prudent use of the parties' and the

5   Court's time and we would, again, ask the Court to at least

6   defer ruling on this until you decide whether you're going to

7   keep venue or not.

8          Ms. Abel did an excellent job.  I want to be very

9   clear.  She said that our objection that was filed, which is a

10  very limited objection/joinder to the Williams Hart objection,

11  asked her to try again.  I think that's strong.  I don't want

12  her to think that and I don't want the Court to think that.  We

13  wanted to make the point for the record that the proposed

14  committee, from our standpoint, does not adequately represent

15  the interests of ovarian cancer claimants or fairly represent,

16  reflect a composition of the talc personal injury creditor body

17  and we, we want that to be loud and clear on the record.  And

18  we say that principally based on the declaration that was

19  submitted by the debtors of Mr. Kim that shows that the ratio

20  between the claimants is 88-to-1 ovarian to mesothelioma

21  claimants and what we've heard is that the, the Committee is

22  balanced, more or less.  It was six ovarian claimants, four

23  meso claimants, and some carryover and we don't believe that

24  that adequately represents the actual creditor body in this

25  case.

1          That's all.

2          THE COURT:  Anyone else?

3          MR. HOUSTON:  Thank you.

4          MS. ABEL:  Your Honor, just a brief reply.

5          THE COURT:  No, hang on.  I want to go around again.

6          MS. ABEL:  Oh, I'm sorry.  I didn't realize we had

7   more coming.

8          THE COURT:  Yes.

9          MS. NORMAN:  Thank you, your Honor.  Lisa Norman on

10  behalf of the Williams Hart plaintiffs.

11          As counsel just stated, he joined in our limited

12  objection and the issue which the Bankruptcy Administrator

13  touched on and the reason this is so important is that we saw

14  in the Imerys case that the mesothelioma claimants, or, more

15  importantly, the law firms representing them on the TCC

16  somewhat ran away with that committee and in helping to draft

17  the trust distribution procedures in that case, there was a

18  result of 40 percent of the debtor's assets in the Imerys case

19  being allocated for mesothelioma claimants, only 60 percent for

20  ovarian.  And when you have a disparity such as what we have

21  here, which is 88-to-1 of ovarian to mesos, you can understand

22  why that would concern the ovarian cancer claimants.  That was

23  the basis for our limited objection.

24          The other issue that we wanted to make the Court aware

25  of is that we believe what we've seen here, as we have already

1    seen in _Imerys_, is we have some law firms that are, primarily,

2    mesothelioma law firms when it comes to talc claims who will

3    put up just one ovarian cancer claimant to try to then claim

4    that the Committee is balanced.

5         So we do think that while, obviously, individuals are

6    the ones that are appointed to the Committee, as everyone in

7    this room knows it is their counsel who's going to end up

8    playing a pretty heavy hand in what happens on the Committee.

9    And so the makeup of the Committee should fairly and adequate,

10   adequately represent the actual pool of claimants and we just

11   don't want to see a repeat of what we had in _Imerys_ with

12   mesothelioma claimants essentially prejudicing the rights of

13   38,000 ovarian cancer claimants.

14            THE COURT:  Okay.

15            MS. NORMAN:  Thank you.

16            THE COURT:  Thank you.

17            Yes, sir.

18            MR. PLACITELLA:  Ten seconds, your Honor.

19            So you heard -- I would hope that the Court -- we're

20   probably not in the Top 20 in terms of volume, but I think we

21   could be in the Top 10 in terms of keeping the peace and, and

22   I'd ask that the Court consider that.

23            You know, I grew up in Middlesex County watching the

24   Johnson & Johnson building being, headquarters being

25   constructed.  I've been there my whole life.  To the extent

1    that this case may end up in New Jersey, I, I would hope that

2    we have something to offer to the Court and to the litigants.

3             Thank you.

4             THE COURT:  Thank you.

5             Ms. Abel, you wanted to say one last thing?

6             MS. ABEL:  I'm sorry, your Honor.  I can't help

7    myself.  I'm just going to call Mr. Houston out.

8             Arnold & Itkin didn't apply to be on the Committee.

9    So that one's just hard for me 'cause they do represent a lot

10   of claimants in the ovarian cancer camp, but they did not

11   apply.

12            So they have not asked to be added.  That's not even

13   on the table, but it's, it's difficult to be criticized when

14   they didn't give me the opportunity to put them on.

15            That's all, your Honor.

16            THE COURT:  All right.

17            I agree that there is a present need to form a

18   committee.

19            I also want to tell everyone that I have not prejudged

20   the venue issue.  I may have initiated the conversation, but

21   we'll be talking about that next week and, therefore, I don't

22   have any present needs to add people because they're from New

23   Jersey or not make a committee because they might, the case

24   could go there or elsewhere.  For now, I think, though, those

25   are relevant considerations and were I to change venue, I would

1   not want to tie the hands of a successor judge.

2          So I'm going to, effectively, give you a split

3   decision.  I'm going to approve what the Bankruptcy

4   Administrator has, has proposed now with the name change of

5   the, the one attorney over at the Weitz firm, but without

6   prejudice to consider this further either by me or by another

7   court and to consider additions, deletions, changes, whatever

8   is appropriate under the circumstances.  I've made some notes

9   and I've got some thoughts about what I would do under the

10  circumstances if, should this case stay here.

11         As to the differentiation between the, the types of

12  cancer, as I said earlier, I don't think we're in a position to

13  start making decisions based on, well, 88 percent versus, you

14  know, 12 percent.  If you ask the debtor, I suspect it's a fair

15  balance because they would say zero and zero.

16         But the, there's no record for me to make those kind

17  of determinations.  If someone wants to make that pitch later,

18  what I'm doing today is not foreclosing that, but I'm not

19  inclined to, to try to address that.

20         I would say that everyone who has offered to be on the

21  Committee -- and I may add one or two of you later on, maybe

22  more, who knows -- I appreciate your interest in this.

23  Obviously, a case that has this amount of public scrutiny and

24  has such far-reaching effects draws a lot of people who are

25  qualified, both as the, the members of the Committee themselves

1  and their law firms and it would be great if we could

2  accommodate everyone.  The fact is we can't.

3          So the bottom line is if you don't get anything else

4  but the Court's appreciation, you have that.

5          And I will just hold this decision as to, until after

6  the venue and then if need be, I will put it on for further

7  consideration and, and give you notice.  Otherwise, I will

8  leave the, if there is a, a successor judge, then I'll leave it

9  in their hands as to whether to change the composition.

10  Because I can see where, where the case is venued might have

11  some effect on what you need to do here.

12          So that's it for now.  I'm, I'm approving on a

13  preliminary basis your, your selections, Ms. Abel.  If you will

14  give me a short order and make sure it has lots of qualifying

15  language, just as I described, so.  All right?

16          I would propose we go ahead and take our mid-morning

17  break and take ten minutes and then we will move over into the

18  second motions, second and third motions, whatever you want to

19  count it as, the stay and injunction motions.

20          So let's pick up about five till, as close to that as

21  we can get, okay?

22      (Recess from 10:50 a.m., until 11:01 a.m.)

23                          AFTER RECESS

24      (Call to Order of the Court)

25          THE COURT:  Have a seat, everyone.

1          All right.  We're here, moving on to the, what I refer

2     to as the stay/injunction motions.  Are we ready to proceed?

3     Do we have any preliminaries there?

4          MR. GORDON:  Your Honor --

5          THE COURT:  Mr. Gordon?

6          MR. GORDON:  -- Greg Gordon, Jones Day, on, on behalf

7     of the debtor.

8          So yes, I, I think there are at least a couple of

9     preliminaries.  One is the parties uploaded an order yesterday

10    regarding discovery, briefing schedule, and a hearing time

11    splits.  And I don't know if your Honor had a chance to look at

12    it.

13         THE COURT:  I have not seen that one, Mr. Gordon.  It

14    -- we had a number of things uploaded last night, but I don't

15    think that got to me, so.

16         MR. GORDON:  I have an extra copy of it, your Honor,

17    if -- if --

18         THE COURT:  Actually, I, I have one printed here that

19    was just given to me.  So --

20         MR. GORDON:  Okay.

21         THE COURT:  -- stay where you are.

22         MR. GORDON:  Well, the -- well, the good news, your

23    Honor, if you walk through it, you'll see that the large

24    majority of the deadlines have come and gone and -- but that's

25    actually good news because, you know, the debtor very much

1   appreciates the cooperation of all the parties that were

2   involved.  And obviously, we've been, we've had to work

3   cooperatively because of the timing pressures that everybody,

4   everyone's been under.

5             THE COURT:  Uh-huh (indicating an affirmative

6   response).

7             MR. GORDON:  And you'll see that we reached a series

8   of agreements on how to handle the discovery, how to handle the

9   depositions, and the like, you know, various other pre-trial

10   matters, how to handle exhibits, issues like that.

11            This also, and maybe the most important item for

12   purposes of this morning, is Paragraph 12 on Page 3 --

13            THE COURT:  Uh-huh (indicating an affirmative

14   response).

15            MR. GORDON:  -- which is that we had our, we have an

16   agreement, subject to your Honor's approval, on a split of the

17   hearing times.

18            THE COURT:  Okay.

19            MR. GORDON:  And you'll see that we split it, again

20   subject to your Honor's approval, 4-1/2 hours for each side and

21   that would include everything.  And you'll, you'll see that,

22   everything for each side.  So for us, it would be the time for

23   our, any opening statement, closing argument, for us putting on

24   our direct evidence, for any cross -- I guess we're not going

25   to have any cross, maybe -- but any cross-examination.  And

1    then for the other side, same thing.  Their time would include

2    their cross-examination time, their opening statement time, to

3    the extent they have one, closing argument, and the like.  And

4    the idea is that we would use -- I -- we always use the phrase

5    "chess clock" and we can, we can either keep that time.  We can

6    agree on someone to keep the time, or I don't know if, your

7    Honor, you know, one of your staff wants to keep the time.

8            But the idea would be that everyone's agreed that

9    we're limited to that amount of time and we're done.  And

10   we're, we're free to use the time the way we want.

11           THE COURT:  Okay.

12           MR. GORDON:  And then the other thing I was going to

13   mention -- Mr. Miller will handle this -- there were some

14   motions, I think, filed late last evening with respect to some

15   confidentiality issues and restriction of access.  And

16   Mr. Miller's the one who's been involved with that issue and,

17   with your Honor's permission, I'd like him to speak to that.

18           THE COURT:  Okay.

19           MR. MILLER:  Thank you, your Honor.  Good morning.

20   Again, Jack Miller, Rayburn Cooper & Durham, on behalf of the

21   debtor.

22           Yes, your Honor.  Some issues came to our attention

23   yesterday with respect to exhibits to the response that

24   Mr. Waldrep's firm filed on behalf of his various clients that

25   included -- over the course of, of the hurried document

1   production the, the parties entered into, basically, an e-mail

2   agreement about confi, that governs confidentiality of, of

3   certain documents that were being produced in advance of this

4   hearing and, and the agreement was that those documents

5   wouldn't be filed or, or wouldn't be used in court without

6   advance notice to the debtor and an opportunity to basically

7   ask the Court to seal those or to, to protect the

8   confidentiality of those.

9          So some were inadvertently, some of the confidential

10  documents were inadvertently included in some of the exhibits

11  that Mr. Waldrep's firm filed and when we brought that to

12  Mr. Waldrep's attention yesterday, his firm filed two

13  motions -- I think they're Docket Nos. 66 and 67 on the

14  adversary proceeding -- to basically restrict access to the,

15  the docket link that would lead you to those exhibits.  I don't

16  know if anything has been done through the clerk's office in

17  response to those motions, but we did want to raise it with the

18  Court and, and make the Court aware of it.

19         The other thing that we've done is there were some

20  privileged or, or work product information that was produced

21  inadvertently that we have asked to claw back from, from that

22  production and then have replaced it with some redacted

23  documents to, to take that information out.  That's been

24  provided to, to the other side.  My understanding is, to the

25  extent that's going to be used -- and, and we don't know at

1    this point whether they're going to use it or not -- but they

2    would be using the redacted documents in court today.

3            I also spoke with Ms. Fletcher, who represents

4    Travelers, whose confidential and work product documents were

5    produced and, and were the subject of the redactions, and I

6    think Travelers just wants to have a reservation of rights with

7    respect to their assertion of any privilege or, or work product

8    protection over those documents as well.

9            So I will cede to her if, at this point if she had

10   something she'd like to say.

11           MS. FLETCHER:  Your Honor, I think Mr. Miller has

12   correctly stated Travelers' position and since we have not seen

13   the redacted documents at this time, we would like to reserve

14   rights to, to be sure that our privilege is protected --

15           THE COURT:  Uh-huh (indicating an affirmative

16   response).

17           MS. FLETCHER:  -- if there's still confidential

18   information/privileged information that is included after

19   redaction.

20           THE COURT:  Okay.

21           MS. FLETCHER:  Thank you.

22           THE COURT:  Yes, ma'am.

23           MS. SCHERLING:  Hi.  Good morning.  Kate Scherling,

24   Katten Muchin Rosenman, on behalf of the Plaintiff Insurers in

25   the New Jersey coverage action.

1        WE are in a similar situation as Travelers.  We have

2   not had an opportunity to review the insurance-related

3   documents that the debtors have apparently produced and that

4   are listed on the proposed exhibit list.  We've asked the

5   debtor for these documents, but we have not yet received them.

6        So having not had the opportunity to review them, we

7   similarly are reserving our rights to make any objection to

8   their disclosure and production and are not waiving any right

9   to contest their authenticity, accuracy, and completeness and

10  the like.

11       THE COURT:  Okay.

12       Anyone else got anything to say about this?

13       MR. SATTERLEY:  I was just -- your Honor, Joe

14  Satterley.

15       I used Travelers documents in depositions this weekend

16  with no objection and nobody raised this issue during the, the

17  depositions.  And I haven't seen the redacted documents.  I was

18  on an airplane.  So maybe they were sent while I was on an

19  airplane.

20       So I'll be happy to meet and confer with counsel, but

21  I think the best approach would be to, to the extent we use

22  anything, you know, we'd address it right, immediately before

23  we, we do.  I don't think I'm planning on using anything from

24  Travelers today.  But to the extent anybody else does, we

25  should maybe meet and confer about that at lunchtime.

1          THE COURT:  Okay.

2          Anyone else?

3      (No response)

4          THE COURT:  And I take it -- I have not seen any of --

5   I haven't even had the chance to review the list of, of

6   exhibits that you're discussing.  You're talking about sealing

7   them entirely, then replacing them on the docket with redacted

8   versions, is that what, what's being proposed?

9          MR. MILLER:  Your Honor, that's my understanding based

10  on what Mr. Waldrep's firm filed yesterday.  That was the idea.

11         THE COURT:  And then only using redacted versions

12  today, as far as we know?

13         MR. MILLER:  Again, that's my understanding, yes, your

14  Honor.

15         THE COURT:  Everybody of the same mindset?

16         UNIDENTIFIED SPEAKER:  Yes, your Honor, we are.

17         THE COURT:  And this is commercial information we're

18  talking about, right?

19         MR. MILLER:  The confidentiality, yes, sir.  And the,

20  the privilege and work product, I'm less familiar with with

21  exactly what's at issue there, but, but yes.  And nevertheless,

22  it would also be commercially sensitive confidential

23  information.

24         THE COURT:  Okay.  So it'd fall under the Bankruptcy

25  Rule, is that what we're talking about?

1          MR. MILLER:  9018, yes, your Honor.

2          MR. SATTERLEY:  So, your Honor, having not seen the

3   proposed redaction and having had these documents unredacted

4   and used in deposition, I, I'm not in a position right now to

5   agree to that.

6          What I'm, was saying a few minutes ago is at lunchtime

7   if somebody will give me a copy of the redactions, I'll take a

8   look at them -- I'm not planning on using the unredacted

9   versions this morning at all -- and maybe we can work out an

10  agreement.

11         But right now, I think it's a little bit premature.  I

12  don't think anybody's going to use these this morning and, and

13  we can --

14         THE COURT:  Uh-huh (indicating an affirmative

15  response).

16         MR. SATTERLEY: -- probably satisfy everything after

17  lunch.

18         THE COURT:  Ms. Fletcher?

19         MS. FLETCHER:  Your Honor, I just wanted to clarify.

20  I believe that the, the Travelers documents at issue appear at

21  two places on the docket.  I think it's Docket 46 and then the

22  amended set of exhibits that was filed.  And many of those

23  communications are between Travelers and J&J and are in the

24  nature of privileged, confidential discussions in the nature of

25  what would be protected settlement communications or joint

1    defense related to the, to the claims.

2           And so I just wanted to be sure that in just referring

3    to the categorization of the various documents that may have

4    been produced that are considered confidential, that the Court

5    just understands that.

6           Thank you.

7           THE COURT:  Well, it's going to be a challenge for all

8    of us to try to deal with work product issues here in, in the

9    current context without privilege logs and the like, but we'll

10   do what we can.

11          Mr. Gordon?

12          MR. GORDON:  Your Honor, Greg Gordon again.

13          I hate to do this, but I think I agree with

14   Mr. Satterley.  I, I don't see this --

15          MR. SATTERLEY:  This'll be a common thing.

16          THE COURT:  That bodes well for all of us.

17          MR. GORDON:  I, I don't think the information is going

18   to be relevant, I think, to the issues that are before the

19   Court today and tomorrow.  And I think when Mr. Satterley sees

20   what's being proposed to be redacted, there won't be an issue.

21          So I think it makes sense just to push this off and,

22   and we'll meet and confer with Mr. Satterley and I, I think

23   this will all be resolved.

24          THE COURT:  Is anyone opposed at the moment to, to

25   having -- I'm going to send an instruction to the clerk to

1   basically limit access to Docket No. 46.

2            And there was another one.  What, what number was

3   that?

4            MR. MILLER:  Yes, your Honor.  56 as well.

5            THE COURT:  46 and 56.  And we'll talk about it in

6   greater length later on if, if the need arises.

7            Can that be sent down to the, the CA so that they know

8   to, to put that restriction?  I'll sign the order during

9   lunchtime.

10           All right?  Very good.

11           Any other preliminaries that we need to discuss?

12           About keeping time, that all sounds great in theory,

13   but given the multiplicity of parties, I'm, I'm concerned that

14   if we don't try to stick to limited time periods at each stage,

15   that we might find ourselves at the end and one party saying,

16   "Well, I've got another hour of argument," and being out of

17   time.

18           So what I would say is I'll ask the law clerks to keep

19   time per side, from the debtor's side and the objecting

20   parties' side, and then y'all do the same and, and let's see if

21   we can compare notes after every segment, okay?

22           All right.  I guess we're ready to get to the motions

23   now?

24           Mr. Gordon?

25           MR. GORDON:  Your Honor, Greg Gordon again on behalf

1  of the debtor.

2          I, I have a short opening statement that I would want

3  to make and then we're prepared to proceed with our witnesses.

4          THE COURT:  Okay.

5          MR. GORDON:  We don't know at this point whether the

6  other side has an opening statement, but they'll let us know.

7  And obviously --

8          THE COURT:  I assume there is.

9          MS. CYGANOWSKI:  We do.

10          MR. GORDON:  Okay.

11          MR. PARKINS:  We do, too, your Honor.

12          MR. GORDON:  There we go.

13          THE COURT:  Okay, very good.

14          Go ahead, Mr. Gordon.

15          MR. GORDON:  So, your Honor, I, I just wanted the

16  Court to know that the debtor will have five witnesses.  The

17  testimony of two of the witnesses will be presented by

18  declaration and the other three will testify live during the

19  course of the hearings today and tomorrow.  And the five

20  witnesses are as follows:

21          Mr. Kim, John Kim, who you recall --

22          THE COURT:  Uh-huh (indicating an affirmative

23  response).

24          MR. GORDON:  -- from the first hearing we had.  You

25  may remember he is the Chief Legal Officer of the debtor.  He's

1    the declarant in the first day declaration and he's also

2    provided a supplemental declaration in support of the debtor's

3    complaint and motion seeking the declaration [sic] and

4    preliminary injunction that are before the Court today.

5    Mr. Kim will testify on a variety of matters.  Those matters

6    will include the corporate history of the debtor, the

7    assumption of liabilities by and indemnification obligations of

8    Old JJCI, the defense of talc-related claims in the tort

9    system, the indemnification of retailers, and shared insurance.

10         The second witness that we have, your Honor, is Dr.

11   Edwin Kuffman [sic],  He's the Chief Medical Officer of New

12   JJCI and he served in that capacity for Old JJCI.  Dr. Kuffman

13   will testify concerning his role at Old JJC regarding the

14   safety of Old JJCI talc products and, in particular, which

15   entity made safety decisions regarding talc products sold by

16   Old JJCI.  And when I say "which entity," JJC, Old JJCI or J&J.

17         Third witness, your Honor, will be Dr. Charles Mullin.

18   The Court likely recalls Dr. Mullin from his testimony in the

19   Aldrich and Murray --

20         THE COURT:  Uh-huh (indicating an affirmative

21   response).

22         MR. GORDON:  -- chapter 11 cases.  Dr. Mullin is the

23   Managing Director of Bates White, LLC, an economic consulting

24   firm.  He's prepared an expert report, which is part of our

25   exhibit list, and he'll provide testimony and opinions on the

1  benefits of resolving talc claims through a bankruptcy trust

2  versus through litigation in the tort system.

3          Our fourth witness, your Honor, is Adam Lisman.  He's

4  a Vice President and Corporate Controller of J&J.  He will

5  testify by declaration and he will talk about, he'll address

6  that prior to the bankruptcy filing all amounts that were paid

7  in connection with the talc litigation -- and that includes

8  defense costs, settlement payments, and verdict amounts -- were

9  borne by Old JJCI and not J&J except where insurance paid the

10  costs and he will further testify that those payments and

11  charges are recorded in the general ledger of Old JJCI.

12          And our last witness, your Honor, is Susan Schirger-

13  Ward.  And I should, I should spell that.  That's

14  S-C-H-I-R-G-E-R-Ward, W-A-R-D.  She is the Senior Legal Records

15  Coordinator in the Information Services Department of J&J.  She

16  will testify by declaration that she located the January 1,

17  1979 assumption agreement between J&J and Johnson & Johnson

18  Baby Products Company.  And the Court may recall that this is

19  the document --

20          THE COURT:  Uh-huh (indicating an affirmative

21  response).

22          MR. GORDON:  -- the debtor had been unable to locate

23  at the time of the hearing two weeks ago.

24          THE COURT:  Uh-huh (indicating an affirmative

25  response).

1          MR. GORDON:  She'll testify that she located, that she

2    located that document in an electronic database used by J&J to

3    store historical records of that nature.  She'll further

4    testify that based on information contained in the document she

5    found that she was also able to locate in another electronic

6    database currently used by J&J what, to the best of her

7    knowledge, is an identical copy of the assumption agreement

8    accompanied by other January 1, 1979 restructuring documents.

9    And your Honor may recall from the first hearing that there

10   were various divisions of J&J in 1979 --

11         THE COURT:  Uh-huh (indicating an affirmative

12   response).

13         MR. GORDON:  -- that were spun out to multiple

14   subsidiaries.

15         And then, your Honor, of course, we're also going to

16   introduce a number of exhibits.  We did file an exhibit list, I

17   believe yesterday, and we have, of course, provided the Court

18   with electronic copies of those exhibits.

19         THE COURT:  Okay.

20         MR. GORDON:  So briefly, your Honor, I, I just want to

21   reference five highlights for you of important points that the

22   evidence will establish over the next two days.

23         No. 1, as I've indicated, we've now found the

24   agreement that was referenced in the board minutes discussed at

25   the prior hearing and that agreement confirms that Johnson &

1    Johnson Baby Products Company, a predecessor of Old JJCI,

2    assumed J&J's liability for talc-related products and agreed to

3    indemnify J&J with respect to the liability it assumed.  And

4    you're, you're going to see over the course of the -- well, let

5    me just say that, to go back for a second, you may recall that

6    the plaintiffs' primary argument at the prior hearing was that

7    you should not believe or find that an assumption occurred

8    because we were unable to locate the document.  Now that we've

9    located the document, what you will hear is that the document

10   doesn't mean what it says and we believe the evidence will show

11   you that the document clearly provides that all liabilities of

12   the, of the former Baby Products division of Johnson & Johnson,

13   including any liabilities for, related to talc products, were

14   assumed by Old JJCI in January of 1979.

15        Second, your Honor, we have evidence that confirms

16   that prepetition all costs associated with the talc litigation

17   have been consistently charged to and paid by Old JJCI.  And as

18   I indicated earlier, those charges are recorded in the general

19   ledger for Old JJCI.  They're recorded as intercompany payables

20   and we'll also, during the course of the next two days, show

21   the Court -- well, actually, we'll do this through his

22   declaration, Mr. Lisman's declaration -- we'll show the Court

23   an example of the, of an entry from the general ledger that

24   establishes that.

25        Third, your Honor, we are going to provide to the

1    Court court transcripts and pleadings that show that the

2    plaintiffs until recently and mostly, your Honor, since the

3    last hearing, sued J&J and Old JJCI together drawing no

4    distinction between the two, making no arguments that J&J had

5    its own liability separate and apart from Old JJCI.  We'll

6    provide further evidence that courts are allowing personal

7    liability talc cases to proceed against J&J based on the exact

8    same evidence that plaintiffs used against Old JJCI prepetition

9    and that's been occurring in the interim period since the

10   hearing we had two weeks ago.

11          Fourth, your Honor, we will provide documents that

12   establish the existence of shared insurance, insurance that's

13   shared between LT, LTL and J&J.  And you may recall testimony

14   from Mr. Kim to this effect --

15          THE COURT:  Uh-huh (indicating an affirmative

16   response).

17          MR. GORDON:  -- at the last hearing.  Those documents

18   will show that if recoveries are obtained by plaintiffs from

19   J&J or from retailers who are also, collectively, named

20   insureds under the policies, available insurance coverage will

21   be diminished.

22          And then fifth, your Honor, and last, we will provide

23   indemnification agreements and tender of, tenders of defense

24   with or from retailers and other independent, other indemnified

25   parties that confirm the indemnification obligations that exist

1    between the debtor and these other parties.

2            So, your Honor, the bottom line is we believe the

3    evidence will show that the automatic stay does apply to the

4    claims that we've described in our papers.  It, it applies to

5    the talc-based claims or talc-related claims being litigated

6    against J&J, or, alternative, we, alternatively, we submit that

7    a preliminary injunction should be issued as to the protected

8    parties.  And the reasons are that LTL -- the evidence will

9    show that LTL is responsible for all talc liability; claims

10   against J&J are the exact same claims as claims asserted

11   against LTL; LTL by virtue of indemnities with the protected

12   parties, including retailers, affiliates, and other parties, is

13   responsible for talc claims against them; and shared insurance

14   will be diminished.  In short, your Honor, the evidence will

15   show that LTL is the real party in interest on these claims,

16   whether they're brought against the protected parties or, of

17   course, if they're, they would be brought against LTL.

18           And then the last thing I would say, your Honor, that

19   even if the Court were to conclude that there, there are claims

20   separate and independent against J&J -- and we submit that the

21   evidence will show otherwise -- the Court has the authority to

22   enjoin those claims because they seek recoveries on the exact

23   same claims that are pending against LTL.  And we'll talk

24   tomorrow about the case authority that exists --

25           THE COURT:  Uh-huh (indicating an affirmative

1  response).

2          MR. GORDON:  -- that establishes that your Honor has

3  the ability to do that.

4          THE COURT:  Okay.

5          MR. GORDON:  Thank you.

6          THE COURT:  Thank you, Mr. Gordon.

7          All right.  Who's next, Ms. Cyganowski?  All right.

8          MS. CYGANOWSKI:  Thank you, your Honor.  Good morning.

9  I'm Melanie Cyganowski for Otterbourg P.C., counsel to the MDL

10 Steering Committee.

11         It'll come as no surprise to your Honor that we

12 disagree with Mr. Gordon, but it is usually helpful to begin at

13 the beginning.  And so I would like to remind the Court of

14 where this case has been and where we are today.

15         LTL Management is the product of a divisive merger of

16 Johnson & Johnson Consumer Inc., also known as Old JJCI.  It

17 was organized in Texas, domesticated in North Carolina, and

18 then filed for chapter 11 on October 14th, all in the span of

19 some 48 hours.  Old JJCI assigned to the debtor all of its

20 liabilities relating to its talcum powder products.  All of the

21 profitable assets were segregated and assigned to New JJCI.

22 Importantly, neither New JJCI nor Johnson & Johnson filed for

23 bankruptcy.  Only the remnant of Old JJCI in the form of LTL

24 Management did so.  Yet, this did not stop Johnson & Johnson

25 from filing a Form 8-K on October 19th before we even stepped

1  into this courtroom, which publicly announced that "all pending

2  cosmetic talc cases will be stayed."

3         In addition, the debtor filed Notices of Bankruptcy

4  and Stay of Litigation in almost all of the pending cases

5  against it, including the MDL in New Jersey, claiming that the

6  automatic stay arose with respect to Johnson & Johnson, New

7  JJCI, and some 490 non-debtor affiliates, some 140 retailers,

8  and some 100 insurance companies.  These filings were nothing

9  more than unilateral actions by the debtor.  No motion, no

10 injunction motion was filed with this Court until October 18th

11 when an emergency stay motion was filed.  When we complained

12 and pointed out the procedural infirmities, the debtor then

13 filed the TRO papers, including a complaint in the adversary

14 proceeding, on October 21st.

15        In the meantime, however, the Court held an

16 evidentiary hearing on the afternoon of October 20th and

17 continued it to October 22nd at the end of which the Court

18 concluded that the automatic stay that arose under section 362

19 was effective only with respect to the debtor and Old JJCI.

20 The debtor's request to extend it to include this wish list of

21 490 non-debtor affiliates and retailers and insurance companies

22 was denied.

23        The Court reinforced this holding at a status

24 conference held on October 25th and an order entered reflecting

25 the Court's ruling on October 26th.  At the status conference

1  held on October 25th the Court said very clearly, and I quote,

2  "But the bottom line is reserve your positions, but don't go

3  telling the state court judges they can't go forward because

4  the evidence you gave me did not show that, okay?"  To which

5  Mr. Hamilton of Jones Day replied on behalf of the debtor:

6          "We understand that and agree with that and we think

7           that's consistent with the actions that our affiliates

8           have been taking and they are proceeding pending the

9           hearing on the 4th and 5th on that basis."

10  And I'm quoting from Page 34 of the transcript of that day,

11  Lines 1 to 9.

12          Unfortunately, it appears that Johnson & Johnson did

13  not understand this Court's ruling and neither did its lawyers.

14  Yesterday, on November 3rd, this debtor by its lawyers,

15  McCarter & English, filed a Notice of Bankruptcy and Stay of

16  Proceeding before the Superior Court of New Jersey Law Division

17  in Middlesex County in the case of Mr. and Mrs. Cynthia and

18  Richard Pratt.  That notice recited exactly what your Honor

19  told this debtor they cannot do.  The notice said:

20          "As a result of the automatic stay, no further action

21           may be taken to prosecute the talc-related claims

22           against any LTL defendant, which includes Johnson &

23           Johnson, absent an order lifting or modifying the

24           automatic stay."

25          This notice also lists the hundreds of parties we saw

1   before, including 7-Eleven, Costco, CVS, New JJCI, Piggly

2   Wiggly, Target, the list goes on and on.  And I have this

3   notice that Mr. Hayes will give to the Court and to the

4   parties.

5        But, your Honor, this is wrong.  This debtor is not

6   coming before you in good faith or with clean hands.  The

7   Pratts complied with your order.  They did not sue LTL or Old

8   JJCI.  They sued Johnson & Johnson, Revlon, and Whittaker Clark

9   & Daniels, a supplier.  Their claims are direct claims.  They

10  are not derivative of the debtor.  They sound in breach of

11  warranty and disregard of health and safety and other tort

12  claims.

13       We are about to commence the final two days of an

14  injunction hearing, but many of us are asking why.  Because

15  clearly, no one on the debtor's side is listening to or abiding

16  by your rulings.  The Fourth Circuit held in <u>WorldCom</u> at 68 F.

17  App'x 447 in 2003 that:

18       "The doctrine of unclean hands prevents a plaintiff

19       from obtaining equitable relief if the plaintiff has

20       been 'guilty of any inequitable or wrongful conduct

21       with respect to the transaction or subject matter sued

22       on.'  A showing that the plaintiff engaged in

23       inequitable conduct does not automatically bar

24       equitable relief.  Rather, a defendant raising an

25       unclean hands defense must demonstrate 'a close nexus

1          between a party's unethical conduct and the

2          transactions on which that party seeks relief.'"

3     Here, there is a close nexus.  The debtor initially

4  filed the bankruptcy notice and stay and the Court rejected the

5  validity of that statement.  After hearing, the Court ruled

6  from the bench that the automatic stay does not extend to any

7  party other than the debtor and Old JJCI.  The Court repeated

8  its ruling on the next business day and then issued its order

9  on October 26.  There is no good reason for the debtor to file

10 this notice in the _Pratt_ case which it knew was wrong and

11 violative of the Court's ruling.  On this basis alone, the

12 Court should deny the debtor's request to extend the stay to

13 the alleged protected parties on the basis of unclean hands and

14 lack of good faith.

15     But the bottom line, your Honor, is that the burden is

16 on the debtor.  They cannot meet it.  The debtor did not meet

17 its burden last week and nothing has changed.  In fact, we

18 believe the evidence will show that their position has

19 weakened.  The issues now before the Court include the

20 following:

21     First, are the holdings of _Aldrich_ and _DBMP_ applicable

22 to the non-debtor entities, including the debtor's parent,

23 Johnson & Johnson?  The question is whether the debtor is

24 exclusively responsible for the claims sought to be stayed.

25 The answer is certainly yes as to Old JJCI, but the answer is

1    absolutely not with respect to the other debtor affiliates.

2    The further question that emanates from those decisions is

3    whether there are unusual circumstances present here such that

4    there is such an identity of interest between the debtor and

5    the third-party defendant that the debtor may be said to be the

6    real party defendant.  Again, we believe the answer is no and

7    the debtor cannot make the requisite evidentiary showing that

8    it must.

9            Since October 22nd we have engaged in expedited

10   discovery, five depositions over the weekend and thousands of

11   pages of documents have been produced and reviewed.

12   Interrogatories have been given and answered.  None of this

13   helps the debtor.  The evidence is still lacking to support the

14   debtor's expansive claim.  We showed at the TRO hearing that

15   J&J bears direct liability for talc-related cancer claims.

16   This liability is independent of and not derivative of the

17   debtor's liability.  A few examples.

18           The evidence showed that Johnson & Johnson made all

19   the health and safety policy decisions regarding talc and

20   asbestos.  It further shows that Johnson & Johnson had the

21   authority to require warnings on its Baby Products.  Further,

22   that Johnson & Johnson publicly proclaimed the safety of its

23   products.  Further, that Johnson & Johnson engaged in its own

24   tortious conduct and juries have separately ruled and

25   apportioned wrongful conduct between Johnson & Johnson and

1  their subsidiaries.  Also, that Johnson & Johnson is

2  independently liable for its Shower to Shower products,

3  especially prior to 1978 when it manufactured this product by

4  itself and not through or via any of its subsidiaries.  The

5  list goes on and on.

6        Importantly, it is not our burden to prove the

7  negative.  The burden lies squarely on the debtor to receive

8  the extraordinary relief that it seeks.  Simply stated, the

9  debtor cannot show that the alleged protected parties have,

10  share such a common identity that the automatic stay should be

11  extended to them.  As a threshold legal matter, a corporate

12  entity cannot absolve itself of tort liability merely by

13  selling an asset alleged to have caused the injury.

14        This case is not like Aldrich or DBMP.  There, the

15  debtor did not seek to extend the stay to the parent.  In

16  Federal-Mogul or Purdue Pharma, the stay did extend to the

17  parent, but that is because the parent itself filed for chapter

18  11.  Johnson & Johnson has not done that.

19        Section 362(a)(3) is also of no existence because the

20  debtor cannot establish that there is available insurance

21  coverage that would be depleted if there was no stay and this

22  is because the carriers are disputing insurance coverage and

23  because J&J is financially able to bear the cost and has done

24  so to date.

25        The debtor points to a 1979 transaction creating Old

1    JJCI's predecessor entity known as the Johnson & Johnson Baby

2    Products Company, which, according to Mr. Kim, included a

3    blanket assumption of all liabilities associated with the Baby

4    Products division.  As Mr. Gordon noted, this document was not

5    officially found, but curiously was after a two-hour search by

6    its, its primary custodian.  But in any event, this document

7    was found and it contains language limiting the assumption of

8    liabilities to "those which are allocated on the books and

9    records of Johnson & Johnson as pertaining to its Baby

10   division."

11           I disagree with Mr. Gordon.  I believe that words mean

12   something and importantly, when we look at the other words of

13   the debtor in the debtor's information brief it discloses that

14   the first lawsuit against Johnson & Johnson alleging talc-

15   related injuries was not filed until 1982, some three years

16   later.  And in response to Interrogatory No. 8, the debtor

17   states that there were no lawsuits arising from the alleged use

18   of Baby Powder prior to January 1, 1979.

19           So we are left only with questions.  What liabilities,

20   indeed, existed, if there were any, and which were assumed by

21   reason of this agreement?

22           The so-called retailer indemnification agreements and

23   tender letters are also unavailing.  They all contain

24   conditions, many involve Johnson & Johnson, not JJCI, and the

25   tender letters are revocable.  This is a far cry from the

1    absolute entitlement to indemnity which <u>Robins</u> requires.   In

2    addition, we believe that the debtor cannot make the showing

3    required in <u>Robins</u> that there is independent liability as

4    between the debtor and its parent because the debtor and its

5    parent and affiliates are alleged to be joint tortfeasors.

6    This was an express exception set forth in <u>Robins</u>.

7              In your ruling on October 22nd the Court said:

8              "The evidence presented today gives me grave concerns

9              that there may be independent liabilities of the

10             Johnson & Johnson Company that were not subject to the

11             divisional merger and thus not brought into this

12             bankruptcy case, not liabilities of the debtor."

13   And I'm citing Lines 5 to 9 of Page 159 of the transcript.

14             We submit that even though there's been additional

15   discovery and arguments presented since October 22, as the

16   Court will see from the evidence presented these next two days

17   the concerns of the Court will remain.   The debtor has not and

18   cannot wipe away the years of independent liability and direct

19   claims made against its parent, Johnson & Johnson.   And the

20   same is true with respect to the retailers and insurance whose

21   liability is direct and not derivative or vicarious through the

22   debtor.

23             Lastly, your Honor, the debtor's efforts to establish

24   the validity of its affiliates' indemnification rights against

25   the debtor show how much this case is upside down and

1    reflective of bad faith.  This is truly a bankruptcy case being

2    run to benefit the debtor's parent company and affiliates, not

3    the creditors of the debtor.  In a normal bankruptcy case, the

4    debtor would be trying to limit the claims against it and would

5    adopt the talc claimants' argument against indemnification,

6    rather than trying to refute it.

7            Thank you.

8            THE COURT:  Thank you.

9            Anyone else on the plaintiffs' side?

10           MR. PARKINS:  Your Honor, Lenard Parkins, Parkins Lee

11   & Rubio, on behalf of OnderLaw.

12           First of all, your Honor, we filed a joinder and

13   support the position of the MDL, as just advocated.  But in

14   addition, after reading the papers and seeing the arguments

15   made, questions were raised in our mind as to, really, the

16   legitimacy of the request for a TRO and expanded injunction

17   here under 105.

18           When you study your decision in DBMP, part of that

19   decision really tore into the legitimacy and issues and flaws

20   in the funding agreement.  There was a funding agreement,

21   obviously, in that case and your Honor identified numerous

22   flaws in that funding agreement and the first, I think, that

23   the Court identified was it was not unconditional.  The same

24   law firm here in filing and doing the twostep and then filing

25   this case had a new funding agreement and they tried to fix

1    that problem that you identified by trying to make this

2    unconditional.  And when your read this funding agreement, it

3    says, "For the avoidance of doubt, we're going to fund whether

4    or not there's a 105 injunction under a plan or whether or not

5    there's a 524(g) channeling order."  They also say in the

6    funding agreement they're going to "pay for the entire cost of

7    the bankruptcy case."

8         Now I go back, just as a fundamental old-time

9    bankruptcy lawyer, and look at what debtors normally need in

10   bankruptcy cases.  No. 1, need funding to prosecute the case.

11   They have a promise now to have funding to prosecute the case

12   from the payors, which is Johnson & Johnson and Johnson &

13   Johnson Consumer Inc.  You have an unconditional without, for

14   the avoidance-of-doubt obligation to fund the exit here to pay

15   talc claims by Johnson & Johnson and Johnson & Johnson Consumer

16   Services without condition, without the need for an injunction

17   under 105 or a channeling order.

18        So the debtor has funding in the case.  The debtor has

19   exit financing.  So one has to ask the question why is the

20   debtor seeking injunction to protect itself or to protect these

21   other, the payors?  And the answer is it's not legitimate.  The

22   debtor has all the money it needs to run this case, all the

23   money it needs to exit this case.  It doesn't need to protect

24   the payors who are underneath, under the funding agreement.

25        Now one could argue -- and therefore -- and it's, it's

1  really an illegitimate ask here.  The debtors are going to say,

2  "Well, LTL entered into an indemnity agreement upon its birth

3  and creation."  One has to say, as your Honor noted in the DBMP

4  case, that these agreements are not arm's length.  These were

5  all done by the same family, the same people,.  The same, same

6  group of people here negotiated this deal and the funding

7  agreement and everything with respect to the twostep.

8          So it's not an arm's-length transaction.  And one has

9  to ask, what new company on its birth, what board of directors

10 for a new company on its birth would enter into an indemnity

11 agreement and an arm's-length transaction to indemnify for

12 billions of dollars of liability?  And the answer is none.  No

13 board, no company, no members, no managers would ever do that

14 if it was an arm's-length transaction.

15         So one has to view the transaction as skeptical to

16 illegitimate and give no weight to the issue of a new LTL

17 indemnity.

18         With that, your Honor, I conclude my opening

19 statement.

20         THE COURT:  Thank you.

21         MR. PARKINS:  Thank you.

22         THE COURT:  Were there others?

23    (No response)

24         THE COURT:  Anyone else?

25    (No response)

1           THE COURT:  Ready to hear the evidence, then.

2           MR. JONES:  Your Honor, Jim Jones for the debtor.

3    Good morning, your Honor.

4           We're going to call Mr. Kim back to the stand as our

5    first witness, as Mr. Gordon suggested we would.

6           THE COURT:  Okay, very good.

7           Let's get the witness sworn, then.

8           THE COURTROOM DEPUTY:  If you'll place your left hand

9    on the Bible, please.

10          JOHN K. KIM, DEBTOR/PLAINTIFF'S WITNESS, SWORN

11          THE COURTROOM DEPUTY:  Okay.  You may have a seat.

12          THE COURT:  Okay.

13                         DIRECT EXAMINATION

14   BY MR. JONES:

15   Q   Morning, Mr. Kim.

16   A   Good morning.

17   Q   Would you reintroduce yourself to the Court?

18   A   I am John Kim, K-I-M, the Chief Legal Officer for the

19   debtor, LTL Management.

20   Q   And, and as I suggested, you were here two weeks ago, I

21   think, Friday in that same chair, is that right?

22   A   That is correct.

23   Q   And in advance of that appearance, Mr. Kim, did  you

24   prepare, sign, and submit two different declarations?

25   A   I did.

1  Q    And one in support of the first day pleadings and one in

2  support of the motion for TRO and preliminary injunction?

3  A    That is correct.

4  Q    Do those, the statements made in those declarations remain

5  true and accurate today?

6  A    They do.

7  Q    Thank you, sir.

8       Could you refresh our recollections, just briefly, about

9  what you said about your background last time we were together

10  at Johnson & Johnson or any affiliated company?

11  A    Sure.

12      So I started at Johnson & Johnson as a general litigation

13  attorney in, around 2001, basically handling general

14  litigation, including product liability and commercial

15  litigation.

16      At some point after that I also took on an additional

17  responsibility as being the litigation liaison to the Consumer

18  Sector.  So I acted as the point person for all Consumer Sector

19  litigation.

20  Q    Could you briefly share with the Court what you mean by

21  "Consumer Sector," sir?

22  A    Sure.

23      That would be the various iterations of JJCI, Old JJCI,

24  and, and other companies that sell products to, directly to

25  consumers, like Neutrogena and Aveeno.

1  Q    Thank you.

2       Continue, then, with your statement about your background.

3  A    And then -- so about ten or so years ago I became the head

4  of the Product Liability Group.  So in that role I was

5  responsible for the lawyers that manage all the product

6  liability litigation against any J&J company around the world.

7  Q    And generally, what were your duties in that role, sir?

8  A    So I supervised lawyers handling litigation, but in some of

9  the litigations I took an active management role dealing with

10 the defense and strategy of, of those litigations, such as the,

11 the talc litigation.

12 Q    So your, your role as the individual charged at the, in the

13 Johnson & Johnson Legal Department with supervising product

14 liability litigation extended to the talc litigation about

15 which we've heard so much over the last two weeks?

16 A    Yes.  I personally was involved in virtually all aspects of

17 the talc litigation.

18 Q    And you became familiar with both the defense and the

19 prosecution of the cases?

20 A    I did.

21 Q    Sir, as a part of your duties did you also have any,

22 develop any familiarity with recordkeeping and records that

23 were related to the defense of that litigation?

24 A    So with respect to talc and, frankly, with respect to all

25 the product liability litigation, during the, for the discovery

1  process and also for financial reporting we have to be, I was,

2  I became familiar with the records and the books kept by the

3  companies with respect to that litigation.

4  Q    And from both that familiarity and the work you described

5  more generally, did you come to a general understanding of, of

6  J&J's corporate history as it related to the litigation?

7  A    Yes.  As part of the litigation, I had to become familiar

8  with the, the corporate history of, of the, the products.

9  Q    And did you and have you obtained an understanding of which

10 J&J entities bore the responsibility for the liability

11 associated with the manufacturing, marketing, and sale of

12 cosmetic talc over time?

13 A    So all the liability associated with the talc litigation

14 has always been borne by JJCI.

15 Q    And we --

16 A    Old JJCI.

17 Q    Thank you.  Yes.

18      And we've come to understand a difference in those terms

19 in, in the course of these proceedings, correct?

20 A    Correct.

21 Q    And when you say "Old JJCI," what do you mean?

22 A    So that's the, the subsidiary that was responsible for the

23 manufacture, distribution, and sale of, of talc products prior

24 to the LTL transaction.

25 Q    And why is it, as you understand it, that Old JJCI or its

1    predecessors became responsible for that liability associated

2    with cosmetic talc?

3    A    Well, both from the corporate assumption records, the, the,

4    the records that we've seen in this, in this case and also from

5    my experience handling the litigation and other various

6    litigations for the, the JJCI, for JJCI.

7         So based upon that, I've come to the understanding about,

8    that, that JJCI bore all the liability and expenses for that

9    litigation.

10   Q    I think you mentioned Old JJCI or predecessors were

11   responsible from the '70s forward, is that right?

12   A    That's correct.

13   Q    Or some point in the '70s forward.

14        Tell me, were there decisions being made in the late '70s

15   that, as you understand it, that bear on this?

16   A    Well, so we've seen the board resolution from 1978 that

17   reflects, basically, a, a strategy that was incorporated in the

18   '70s, which was that the, J&J was trying to decentralize

19   operations, and, you know, as a part of a growth and innovation

20   strategy it just made sense, as, as JJI was getting bigger, it

21   wanted to take the operation --

22             MR. SATTERLEY:  Object to lack of foundation.  He has

23   no personal knowledge whatsoever regarding that the intentions

24   of somebody in 1978 or '79 was doing.

25             THE COURT:  Overruled.

KIM - DIRECT                                                                98

1   BY MR. JONES:

2   Q   You may proceed, sir.

3   A   So based on my experience and looking at the corporate

4   documents, you can see that in the '70s there was a, again, a

5   decentralization strategy which -- where the -- J&J wanted to

6   become a holding company.  And so it wanted its operations,

7   the, the, the operational aspects put into separate

8   subsidiaries who would be -- which -- which would take on the

9   responsibility for products and take, and assume the

10  liabilities for those products, you know, get all the assets

11  transferred for those products, and then give an

12  indemnification to, to J&J.  So that's -- throughout the

13  records, you can see that.

14  Q   And let's look at one of those records, sir.

15      I'm going to ask you to view with the Court and, and those

16  assembled Exhibit 6.

17          MR. JONES:  I assume it's LTL's Exhibit 6, your Honor,

18  but I'm not certain how they're framed.  But it certainly is

19  the Debtor's Exhibit 6.

20          THE COURT:  Okay.  Go ahead.

21  BY MR. JONES:

22  Q   And, sir, have you seen Debtor's Exhibit 6 before?

23  A   Yes.  This is --

24          THE COURT:  Hang on one moment.

25          Let's see if we can't tilt those screens outwardly so

1   those in the gallery can see.

2           It's not our courtroom so I'm not sure if they're

3   hinged like they are down on, on the second floor.

4           Watch out.  Grab from the side, not the, the middle.

5           IT TECH:  They are hinged.

6           THE COURT:  I would say while we're waiting.  Those of

7   you inside a well be careful.  You might hit your heads later

8   on if you're not thinking about it.

9           Okay, very good.  Excellent.

10          Please proceed, Mr. Jones.

11          MR. JONES:  Sure.  Thank you, your Honor.

12  BY MR. JONES:

13  Q   Thank you, Mr. Kim.

14      Could you tell us what is Exhibit 6, sir?

15  A   These are the minutes of a board meeting dated December 12,

16  1978.  I believe this was attached to my supplemental

17  declaration.

18  Q   And you may have been asked questions about this at the

19  last hearing a couple of weeks ago, do you recall that?

20  A   Yes.

21  Q   And, sir, I'm just asking you now to take a look at the

22  first page with me.  I think you gave us the date of December

23  12, 1978, is that right?

24  A   That's correct.

25  Q   And I'm going to ask you to look very quickly at folks in

1  attendance at this meeting of a board of directors of Johnson &

2  Johnson.  In particular, do you know who Mr. Heldrich is on the

3  right-hand column?

4  A    Mr. Heldrich was the Vice President of Johnson & Johnson.

5           MR. JONES:  And I'm going to ask now, if Patrick will

6  help us, to move a couple pages through the document.  I think

7  it's Page 6 of the board minutes.

8  BY MR. JONES:

9  Q    And I'm going to ask, Mr., Mr. Kim, for you to look at the

10  second full paragraph that starts -- my eyesight is challenged

11  there -- but I think it starts with, "The next matter," do you

12  see that?

13  A    I do.

14  Q    And can you tell us what this paragraph confirms for you,

15  if anything?

16  A    Again, if you look down at the, towards the bottom of that

17  paragraph, it says, "In keeping with Johnson & Johnson's long

18  standing policy of decentralization of corporate business...."

19       So again, this was part of a overall strategy that Johnson

20  & Johnson had at that time to, to decentralize and what this

21  does, it sets up seven subsidiaries that would, all of them

22  would, basically, be given assets related to, to the businesses

23  that, that pertained to those divisions that were turning into

24  subsidiaries.  They would assume liability with respect to

25  those.

1        MR. JONES:  Let me ask our videographer to blow back

2   up the paragraph "The next new matter" --

3        THE WITNESS:  Okay.

4        MR. JONES:  -- so we can see it.

5        THE WITNESS:  Yeah.

6        MR. JONES:  And, and right down to where it's

7   previously highlighted.  We can highlight from "The next new

8   matter" down, please.

9        THE WITNESS:  Yeah.

10        So up -- from the top "The next" -- "The next matter."

11   So basically, at the board meeting they were discussing the

12   incorporation of the divisions.  So "divisions" at that time

13   were, were not separate subsidiaries.  They were, they were,

14   basically, working groups within Johnson & Johnson.

15        So what this says is that, you know, in keeping with

16   the decentralization policies they were creating subsidiaries,

17   actual juridical entities that would then, basically, transfer

18   assets.

19        If you go down to the, after the list of the

20   subsidiaries, one of which, of course, is the Johnson & Johnson

21   Baby Products Company which is the one that -- that -- that --

22   BY MR. JONES:

23   Q   The third in order, correct, sir?

24   A   Right, right.  It's the one that's relevant --

25        MR. JONES:  Can we call that out, Patrick --

```
 1              THE WITNESS:  -- to this.

 2              MR. JONES:  -- the Johnson & Johnson Baby Company --

 3              THE WITNESS:  Sure.

 4              MR. JONES:  -- Products Baby Company.

 5              THE WITNESS:  Yes.  Thank you.

 6              MR. JONES:  Yes.  Thank you.

 7              THE WITNESS:  And, and then basically, what, what it

 8    details is a standard transaction where transfer, the assets

 9    are transferred, liabilities are assumed, and then there is an

10    indemnity given.

11    BY MR. JONES:

12    Q    So could you read with Patrick has he highlights, would you

13    read out for Patrick to highlight the language with respect to

14    the transfer, sir?

15    A    Sure.  (Reading):

16       "The incorporation will be accomplished by a transfer of

17    assets from the divisions to the corporations respectively."

18       And then there's another paragraph that goes into the, the

19    indemnification given for that.

20    Q    And where is that paragraph, sir?

21    A    I don't have the document in front of me.  I think it's --

22              UNIDENTIFIED SPEAKER:  It's in the agreement.

23              THE WITNESS:  No.  It's in the agreement.  Yeah, it's

24    in the agreement.  Sorry.

25    BY MR. JONES:
```

1   Q    That's all right.

2   A    Yeah.

3   Q    Thank you, sir.

4        Let's, then, turn to that agreement.

5        Wait a minute.  Before we do that, let's go back to Exhibit

6   6.

7             MR. JONES:  Could we go to the last page, please?  All

8   right.  Thank you.  That's what -- that's all I need.  That's

9   fine.

10  BY MR. JONES:

11  Q    Thank you, Mr. Kim.

12       Let's look, if you would, at Exhibit 2.

13       And have you seen Exhibit 2 before today?

14  A    I have.  This is --

15  Q    What, what is Exhibit 2?

16  A    This is the Agreement and Transfer of Assets and Bill of

17  Sale that effectuated the resolution that we saw in the

18  corporate minutes.  This is the document that was recently

19  found.

20  Q    And does -- this particular contract is, is an agreement

21  between which parties?

22  A    It's between Johnson & Johnson and the newly formed Johnson

23  & Johnson Baby Products Company -- or not newly formed -- the,

24  the company that took the assets of the division.

25  Q    And it's dated, again, what day?

1   A    First day of January, 1979.

2   Q    And is this the agreement among those that were found that

3   related to cosmetic talc products or other products?

4   A    Yes.  This related to the, the talc products.

5   Q    And you said it was located since the last hearing,

6   correct?

7   A    Yes.

8   Q    Do you generally know how that was the case?

9   A    I do.

10  Q    Would you please share that with the Court?

11  A    So after the hearing when we got, when I got back to the

12  office we wanted to reinitiate a search for, for this

13  particular document.  The instructions were to forget about

14  whatever we did in the past.  Let's start searching anew.  And

15  so that happened over the weekend.  On Sunday, one of the file

16  professionals managed to find this document in one of the old

17  computer systems that contained the business records, the old,

18  ancient business records of, of the company.

19  Q    And, and did you form an understanding as to why it had not

20  been located before two weeks ago Friday?

21  A    The -- yes.  The -- when the -- on the new search it was

22  discovered that this document was mislabeled.  So it was not,

23  was not found the first time.

24  Q    Let's take a moment here.

25            MR. JONES:  Your Honor, I don't know the preference of

1   the Court.  We could discuss documents and move evidence at the

2   end of our case and take objections, if any there.  We've

3   offered to stipulate to the admission of exhibits, I think,

4   reciprocally or I can move exhibits one by one.  I, I ask the

5   Court for its, its view of the matter.

6              THE COURT:  Does anyone have a strong feeling?

7        (No response)

8              THE COURT:  I would normally do it at the end of the

9   presentation.

10             MR. JONES:  Thank you, your Honor.  I just wanted to

11  make sure that I didn't forget to ask.

12             THE COURT:  Okay.

13  BY MR. JONES:

14  Q    Mr. Kim, we're going to refer back, then, to Exhibit 2 for

15  a moment.  And I'm going to ask you to look at Paragraph 1, the

16  numbered Paragraph 1 --

17  A    Uh-huh (indicating an affirmative response).

18  Q    -- which I think should follow the Bates No. 558.

19       Are you with me?

20  A    I am.

21  Q    And in this paragraph could you describe, generally, what

22  the operative language is, or share with the Court the

23  operative language?

24  A    So it would be that J&J does -- well, I would go like "does

25  grant, bargain, sell, assign, remise, release, convey,

1   transfer, set over, and confirm unto the subsidiaries and its

2   assigns forever all the businesses, franchises, properties, and

3   assets of every nature and description, tangible or intangible,

4   wherever located which are now allocated on the books or

5   records of J&J to its Baby division."

6   Q    And so to, to simplify that, that's the asset transfer?

7   A    This is the transfer of assets, yes.

8   Q    Thank you, sir.

9        And then skipping down a little bit farther, it, there is a

10  reference to a more particularized listing of the assets, is

11  that fair?

12  A    Yeah, it is, except it's "without limiting the generality

13  of the foregoing."  So you see, this is a broad grant of assets

14  and it, and it's not limited by whatever follows.  It's a --

15  Q    Yes.

16       So let's now move to Paragraph 4 of the agreement.

17  A    Uh-huh (indicating an affirmative response).

18  Q    And we're going to blow that up for your convenience and my

19  eyes and the Court's, potentially.

20       Mr. Kim, in Paragraph 4, could you help us with the

21  operative language?

22  A    Sure.  (Reading):

23       "In consideration of the Assignment, a subsidiary agrees to

24  assume and thereby does," "and hereby does assume and agrees to

25  pay, perform, or discharge, as the case may be, all the

1   indebtedness, liabilities, and obligations of every kind and

2   description which are located on the books or records of J&J as

3   pertaining to its Baby division and the subsidiary hereby

4   covenants and agrees with J&J that the subsidiary will forever

5   indemnify and save harmless J&J against all the indebtedness,

6   liabilities, and obligations aforesaid hereby assumed and

7   agreed to be paid, performed, or discharged," and so on.

8        So this is the, again, the, the assumption of liabilities

9   and the indemnification.

10  Q    And that's the indemnification you were recalling a moment

11  ago?

12  A    Yes.

13  Q    Thank you, Mr. Kim.

14       One more paragraph and that's at the bottom of this page,

15  Paragraph 5.

16       Could you call that out for the Court with the aid of

17  Patrick here?

18  A    (Reading):

19       "This agreement and the covenants and agreements herein

20  contained shall inure to the benefit of and shall bind the

21  respective parties hereto and the respective successors and

22  assigns," which, of course, would include JJC, Old JJCI and now

23  LTL.

24  Q    Thank you, Mr. Kim.

25       And we're going to skip to the last page and ask you to --

1  who signed this asset transfer agreement?

2  A   So this is -- yeah.  It's John Heldrich.  It's the -- you

3  can tell there's an attestation page that actually has his name

4  better, better laid out.  But John Heldrich, which, who, again,

5  was the Vice President and was at the board meeting where the

6  resolution was, was passed.

7  Q   Thank you, Mr. Kim.

8      And have you reviewed other similar agreements close in

9  time to the agreement we just reviewed that relate to the

10 strategy of decentralization that you mentioned?

11 A   Again, consistent with the strategy for decentralization,

12 which was evidenced in the board minutes, there are similar

13 agree, exactly the same agreements with, with the other

14 subsidiaries that were formed where the businesses of those

15 divisions were, were assigned to, to those subsidiaries.

16 Q   And, sir, you've seen Exhibit 3 before?

17 A   Yes.

18 Q   And what is Exhibit 3?

19 A   It's a compilation of the other agreements that were

20 effectuated at that time.

21 Q   And are there key terms that are similar in this set of

22 agreements to the terms set forth in the 1979 asset transfer

23 agreement, which is Exhibit 2?

24 A   Yeah.  The -- the key -- the key terms are, are clearly the

25 transfer of assets, the broad assumption of liabilities, and

1  the broad indemnity that is given to, to J&J on behalf of the

2  subsidiary, its successors, and assigns.  They're all, they're

3  all contained in this.

4  Q   And these agreements, the ones you've identified to date

5  and the board minutes, are these records that are, to your

6  knowledge and from your review of the records, generated at the

7  time by people involved?

8  A   Yes.

9  Q   And are they maintained in the normal course at J&J in its

10 legal recordkeeping?

11 A   They are.

12 Q   And it's the regular conduct of J&J to keep such records?

13 A   It is.

14 Q   Thank you, sir.

15     Are you familiar, as you sit here today, with the

16 subsequent history immediately following or, and thereafter of

17 the enterprises that, that you discussed at the outset?

18 A   Yes, I am.

19 Q   So let's go very briefly through some of that.

20     I'm going to ask you to look at Exhibit 52 with me.

21     Can you tell me, sir, what Exhibit 52 is?

22 A   This is a unanimous consent of shareholders in lieu of a

23 special meeting of shareholders with respect to Johnson &

24 Johnson Baby Products Company.

25 Q   And what does the consent refer to or authorize?

1   A   Basically, the consent transfers the business of Johnson &

2   Johnson Baby Products, which, which would include the talc

3   business, to Omni Education Corporation and then that, Omni

4   then changes its name to Johnson & Johnson Baby Products

5   Company.

6   Q   And is Exhibit A a copy of that agreement authorized by the

7   consent?

8   A   It is.

9   Q   And the assets transferred included all assets with a

10  reservation or --

11  A   Yeah.

12  Q   -- was there not a reservation?

13  A   It's a reservation of the diaper business.

14  Q   All right.

15      And does this agreement have similar transfer and

16  assumption and indemnification --

17  A   Yes.

18  Q   -- clauses?

19  A   They are.  It's a standard agreement that would have the

20  transfer of assets, a broad assumption of liabilities, and a

21  broad indemnification.

22  Q   And, sir, I'm going to ask you, then, did you mention

23  anything about a name change in connection with this agreement?

24  A   Yes.  After -- after this -- so it -- the assets get sold

25  to Omni, Omni Education Corporation, and then Omni changes its

KIM - DIRECT                                                          111

1   name to Johnson & Johnson Baby Products Company.

2   Q    And the date of this agreement, again, sir, is 1980 --

3   A    '81.

4   Q    Thank you.

5        Let's jump up a few years to January of 1988 and look at

6   Exhibit 54 very briefly.

7        And have you seen Exhibit 54 before today?

8   A    I have.

9   Q    And what is Exhibit 54, sir?

10  A    This is an Agreement and Transfer of Sale, and Bill of Sale

11  dated January 3, 1988 between, or among Johnson & Johnson Baby

12  Products Company, Johnson & Johnson Orthopaedics, Inc., and

13  Johnson & Johnson Dental Products Company.

14  Q    And have you reviewed the document?

15  A    I have.

16  Q    And what does this document or this contract effect, sir?

17  A    Again, this takes the -- this transfers the assets of the

18  Baby Products Company, essentially including the, the, the talc

19  liability, into -- it -- it's -- into Johnson & Johnson Dental

20  Products Company, which assumes the liability, gives an

21  indemnification, and then Johnson & Johnson Dental Products

22  Company changes its name to Johnson & Johnson Consumer

23  Products, Inc.

24  Q    This agreement follows the form of the earlier agreements?

25  A    It does.

1   Q    With respect to transfer --

2   A    Trans --

3   Q    -- assumption and indemnification?

4   A    It does.

5   Q    And, sir, you mentioned a name change to Johnson & Johnson

6   Consumer Products, Inc. on the, as of the date of this

7   agreement, the 3rd day of January, 1988.

8        Was there another name change in the history here after

9   that?

10  A    There was.

11  Q    When did that occur?

12  A    I might need -- I want to say '91, but I think I'd have to

13  refresh myself.  But subsequent to, to this, Johnson & Johnson

14  Consumer Products Company, Johnson & Johnson Consumer Products,

15  Inc. changed its name to Johnson & Johnson Consumer Inc. --

16  JJ -- Johnson & Johnson -- yes.

17  Q    Sir, sir, there was a name change at some point after 1988,

18  is that fair?

19  A    That is correct.

20  Q    That's what you recall today?

21  A    I do.

22  Q    All right.  That, that's fair enough, sir.

23       We're going to skip forward to June 23, 2015 and look at

24  Exhibit 61.

25  A    Yes.

1   Q    And have you seen Exhibit 61 before, sir?

2   A    I, I did.

3   Q    And what is Exhibit 61?

4   A    So this is a Agreement and Plan of Merger dated June 2015

5   among Neutrogena, Johnson & Johnson Consumer Companies LLC,

6   which was a subsequent name change from Johnson & Johnson

7   Consumer Companies, Inc., and Johnson & Johnson Sales and

8   Logistics Company, LLC with and into McNeil-PPC, Inc.

9        So in this transaction, again, the liabilities and, you

10  know, the business of, involving talc merged into McNeil-PPC,

11  Inc. and then McNeil-PPC, Inc. changed its name.

12  Q    And what did that name become, sir?

13  A    Johnson & Johnson -- JJCI -- it was Old JJCI.  It's Old

14  JJCI.

15  Q    Old JJCI?

16  A    Yeah.  Old JJCI.

17  Q    Thank you, sir.

18       And that is the chain as you have reviewed the documents

19  and understand them?

20  A    It is.

21  Q    And Old JJCI is one of the companies that underwent the

22  corporate restructuring in 2021, this year?

23  A    It is.

24  Q    Thank you, sir.

25       You're familiar with the product here, the Baby Products

1    Company here.  What was its cosmetic talc product, generally?

2    A    Generally, it was Johnson's Baby Powder.

3    Q    And you are aware that there's a Shower to Shower product?

4    A    I am.

5    Q    And have you also come to understand in your role how its

6    assets, liabilities, and any indemnification obligations were

7    treated at Johnson & Johnson?

8    A    It was very similar to Johnson's Baby Powder in that it was

9    originally marketed by a division of Johnson & Johnson, but in

10   1987 that was taken over and assumed by Personal Products

11   Company, which, through a chain of events, came into JJCI.

12   Q    Old JJCI?

13   A    Old JJCI, yes.

14   Q    Thank you, sir.

15             MR. BLOCK:  Your Honor, I, I would object to that last

16   answer as lacking foundation unless they produce an agreement

17   and show what he was relying upon.  He's not identified how he

18   knew that.

19             THE COURT:  Understood.

20             I would recommend that you clean that up, if you care

21   to.  But otherwise, I'm going to allow it to go to weight.

22             MR. JONES:  For the moment, your Honor, we'll allow it

23   to go to weight.  And I appreciate it.  Thank you.

24             THE COURT:  Okay.  Overruled.

25   BY MR. JONES:

1   Q   Mr. Kim, let's return, then, to a question I have about the

2   intercompany agreements, or, rather, intercompany conduct

3   between Johnson & Johnson and its subsidiaries during this

4   historical time period.

5        Are you familiar with that, sir?

6   A   Yes, I am.

7   Q   Can you tell us with respect to intercompany accounting and

8   chargebacks for all liability associated with talc-containing

9   products how that was dealt with between Johnson & Johnson and

10  its subsidiaries?

11  A   Yeah.

12       So as part of the Product Liability Litigation I have to

13  become familiar, I became familiar with how the billings were,

14  were handled.  And so I know that all expenses, indemnity

15  expenses, everything associated with the, with the talc

16  litigation has been borne by JJ -- Old -- Old JJCI and now LTL.

17  Q   And, sir, when you mentioned the, the Shower to Shower

18  transfer and assumption you mentioned ago, you used the date

19  1987.  Is that -- was that consistent with your recollection?

20  A   I -- I -- again --

21            MR. BLOCK:  Objection.  Foundation again, your Honor.

22            MR. JONES:  I asked him --

23            THE COURT:  Overruled.

24            THE WITNESS:  Yeah.

25  BY MR. JONES:

1    Q    You may answer, sir.

2    A    It's -- it may be in 1988.  There, there is a document

3    that, that I'm recalling.  I'm sorry.  '70 -- '70s.  I'm

4    getting my decades mixed up.  Yes, it's in the '70s.

5    Q    So all right.  Thank you, sir.

6    A    It was, it was around the same time as the Johnson's Baby

7    Powder transactions.

8              MR. BLOCK:  Objection.  Foundation.  The witness now

9    doesn't know whether it's from the '70s, from the '80s, and

10   there's no document that's presented --

11             THE WITNESS:  Yeah.  I --

12             MR. BLOCK:  -- to establish his foundation.

13             THE WITNESS:  I, I misspoke.

14             THE COURT:  Understood, but overruled.

15   BY MR. JONES:

16   Q    Thank you, Mr. Kim.

17   A    Yeah.

18             THE COURT:  Wait a minute.  I, I want to hear --

19   restate what your answer just was.  I --

20             THE WITNESS:  Sure.

21             THE COURT:  I'm not even sure I understand what you're

22   saying at this juncture.

23             THE WITNESS:  So it -- I -- I -- I got my decades

24   mixed up, your Honor.  I apologize.  The --

25             THE COURT:  Try it again.

1          THE WITNESS:  Yeah.

2          So the, the transaction -- so prior to '78 Shower to

3    Shower was marketed by a division of Johnson & Johnson.  It's

4    called the Domestic Operating Company and there was an

5    agreement that, in, in '78, that a, another subsidiary,

6    Personal Products Company, took over and assumed the

7    liabilities with respect to Shower to Shower.

8    BY MR. JONES:

9    Q    Thank you.

10   A    Consumer -- the -- PPC, as we, we call it, through a series

11   of, of transactions similar to the name changes and mergers,

12   eventually came into Old JJCI prior to the, the LTL transaction

13   and now, of course, it all has come into LTL.

14   Q    Thank you, Mr. Kim.

15        And just because we have had a bit of colloquy here with

16   our colleagues on the other side of the room and the, and the

17   Court, I want to get back to your familiarity with the

18   intercompany charges with respect to the talc litigation --

19   A    Yes.

20   Q    -- and talc liability, generally.

21        I just, for me, can you refresh me as to what you shared

22   with the Court on that topic?

23   A    So again, I have to become familiar with the intercompany

24   transactions because I am responsible for the costs and

25   reporting, SEC reporting, reserving for, for the litigation.

1   So I came to understand that like, generally, all other product

2   liability litigations involving products by operating

3   companies, that the operating company bears the responsibility

4   and the costs and its, and the costs of that litigation are put

5   on the books of the operating company.

6       So in this case for the talc litigation, all costs

7   associated with, with the litigation has been borne by Old JJCI

8   and now LTL.

9   Q   Thank you, Mr. Kim.

10      And are these exhibits through which we just marched,

11  Exhibit 52, 54, 61, these follow-on historical agreements, are

12  they also records that are generated by folks at J&J with

13  knowledge at the time?

14  A   Yes.

15  Q   And they are maintained in the normal course?

16  A   They are.

17  Q   It's a regular part of J&J's business recordkeeping and

18  activity to maintain such records?

19  A   It is.

20  Q   You have any doubt that they accurately depict what is set

21  forth in them?

22  A   I have no doubt.

23  Q   Thank you, sir.

24      Let's turn for a moment.

25          MR. JONES:  If your Honor wishes to proceed at this

1   time.  I may have a good break, maybe another ten minutes, at

2   the bottom of the hour?

3          THE COURT:  All right.

4          MR. JONES:  Or we could break now, if you like.

5          THE COURT:  We will need to take a break, at the

6   latest, about 1:00.  So whatever works for getting to a

7   discrete time period.

8          MR. JONES:  So when you say 1:00, your Honor, is that

9   what you would preview as the lunchbreak?

10          THE COURT:  That would be the latest.  We can do it

11   earlier if everyone is of a mind, but I'd like to get to a good

12   breakpoint before we do.

13          MR. JONES:  So why don't we spend -- we'll move now,

14   your Honor, for maybe 15 minutes and see where we are?

15          THE COURT:  That work for everyone else?

16          MR. BLOCK:  Yeah, your Honor.  We're comfortable going

17   up to 1:00, or whenever your Honor is ready for lunch.

18          THE COURT:  Okay.

19          Let's see where we are.

20          Move on.

21          MR. JONES:  Thank you, your Honor.

22   BY MR. JONES:

23   Q   Mr. Kim, you testified about your background, what you do

24   for a living.  You've become familiar with the, the advent or

25   the beginning and the progression and the focus of the

1   litigation, the talc product liability litigation?

2   A    I have.

3   Q    And you've described that for his Honor in your

4   declaration, is that fair?

5   A    In the declaration and in the informational brief as well.

6   Q    And can you generally tell us the arc of that litigation?

7   A    Sure.

8        So prior to, I would say, 2013 we had sporadic cases

9   involving Baby Powder, talc, and those basically related to

10  talcosis.  I think there may have been one mesothelioma case

11  filed earlier, but, you know, they were sort of sporadic.

12       The, the first big ovarian cancer case was the Berg case,

13  which was tried in, in 2013 and even though -- what -- the, the

14  jury in that case found that there was liability, but did not

15  award any damages and when that verdict hit there was increased

16  interest by the plaintiffs' bar in, in this issue.  The next

17  point would be the next case that was tried in, in St. Louis,

18  which, basically, resulted in a $71 million verdict in, in, in

19  2017.  And after that, there was an explosion of litigation

20  involving Baby Powder and I think currently or just prior to

21  the petition I think people have heard that, you know, we've

22  had about 38,000 ovarian cancer cases, over 450 mesothelioma

23  cases filed against us.  We've had numerous trials, most of

24  which we have been successful in, but there are the outlier

25  massive verdicts, one of which I think everyone knows, the

1   Ingham case, which is about, you know, $2.2 billion.

2       Our expenses are running at about 10 to $20 million a month

3   on, on average.

4   Q   And, sir, do you have an estimate -- I think you have it in

5   your declaration, but if we could share it for the Court to

6   refresh our recollection.

7       Do you have an estimate of the total indemnity payments

8   made through the course of the litigation?

9   A   Sure.

10      So indemnity, we've paid about 3., I want to say 3.2, $3.5

11  billion in, in indemnity.  A lot of that, of course, is the,

12  the Ingham verdict.  We also have, in total, about a billion

13  dollars in, in expenses, most of which came about in the last

14  five years.

15  Q   And, sir, those expenses, both the defense costs and the

16  indemnity payments to which you referred, how were those

17  internally booked at Johnson & Johnson or Old JJCI?

18  A   They, they've always been booked on the books of, of Old

19  JJCI.

20  Q   And speaking of Old JJCI for a moment, who was the

21  responsible, who was responsible for medical safety of cosmetic

22  talc sold by Old JJCI?

23  A   The, the responsibility for the safety of a product is, is

24  always on the operating company who is manufacturing and

25  selling the product.

1    So the, the responsibility for the safety of talc lies

2   squarely within, lied squarely within Old JJCI.

3   Q   And that's historical?

4   A   Historical, both for Baby Powder, but for all, all the

5   products that, that is manufactured by Johnson & Johnson

6   Company, again under the theory of, you know, the strategy of

7   decentralization, decisions with respect to specific products

8   and the safety of specific products are always done at the

9   operating company level.

10   So not, not only Baby Powder, but, but all our products.

11   The safety, you know, the safety of that, of those products are

12   -- are -- you know, the, the responsibility for the safety is

13   by the, the operating companies.

14   Q   And, and who is responsible for that duty today?

15   A   Today, that would be Dr. Ed Kuffner.

16   Q   And he would have been so responsible at the time of the

17   2021 corporate restructuring for Old JJCI?

18   A   He, he would.

19   Q   And before him, who would have been responsible?

20   A   Before him was Dr. Tony Temple.

21   Q   Sir, I'd going to ask you to look with me at Exhibit 81.

22   And have you seen Exhibit 81 for me --

23   A   I, I have.

24   Q   -- or before, rather?

25   A   I have.

1   Q    And I'm going to ask you to look at the Overview paragraph.

2        First, what is Exhibit 81?

3   A    So it says Medical Safety Standard and the group owner, the

4   owner group is, is J&J Medical Safety.  This is really, this is

5   a Johnson & Johnson document that basically lays out the SOP, I

6   would say, I would call it the SOP for, for handling safety

7   issues.

8   Q    And what do you mean when you say "SOP," sir?

9   A    Standard operating procedures.

10  Q    Thank you.

11       And when, when is the document dated?

12  A    This document was dated January 1, 2014.  This is Version

13  1.  This is, I would say, a memorialization of what the policy

14  had always been at J&J since, you know, they started

15  decentralizing.

16       So yeah.  This is sort of a memorialization of, of

17  practices and policies that had been there.

18  Q    Could you share with the Court and those that can't quite

19  see the text the Overview statement, sir?

20  A    Yes.  It says that:

21       "Each sector within Johnson & Johnson, notably the

22  Pharmaceutical Sector, the Consumer Sector, and the Medical

23  Device and Diagnostic Sector, shall establish policies and

24  processes that adhere to the Johnson & Johnson medical safety

25  standard."

1    Q    And is Old JJCI a part of any of these sectors?

2    A    Old JJCI would have been part of the Consumer Sector, but

3    as I said previously, this is a policy that extends to all

4    products manufactured by J&J operating companies.

5    Q    Thank you, sir.

6         We're going to ask you now a few questions about this

7    topic.

8         When you were last with us in this courtroom I believe you

9    were asked some questions about responsibility -- you were

10   asked some questions about responsibility for safety.

11        Do you recall that examination?

12   A    I do.

13   Q    And you were shown some testimony from a Dr. Hopkins, is

14   that right?

15   A    I, I do recall that.

16   Q    And have you learned any, since the time of that testimony

17   or, or even before that, did you know that Dr. Hopkins had

18   given other testimony on that topic?

19   A    I think, as I mentioned in the testimony last week, that

20   there's a lot of ambiguity in these questions about motherships

21   and who, you know, who's responsible for safety policy

22   decisions.

23        So what I came to understand was that subsequent to the

24   interchange that was reflected in those transcripts, that

25   Dr. Hopkins clarified what he meant when he was answering the

1  questions in the transcript and testified that it --

2         MR. BLOCK:  Objection to hearsay.

3         MR. JONES:  Your Honor, we're going to --

4         MR. BLOCK:  If they want to present the transcript,

5  your Honor --

6         MR. JONES:  We're --

7         MR. BLOCK:  -- that's one thing.

8         THE WITNESS:  Oh.

9         MR. BLOCK:  But for this witness to --

10        MR. JONES:  We're about to present the --

11        MR. BLOCK:  -- say what Dr. Hopkins said.

12        MR. JONES:  We're about to present the transcript,

13  your Honor.

14        THE COURT:  Noted and sustained.

15        But let's go ahead and present it.

16  BY MR. JONES:

17  Q   Mr. Kim, thank you.

18      I'm going to show what now is marked as Exhibit 28.

19      Have you seen this transcript before?

20  A   I, I  have.

21  Q   And what is it dated?

22  A   This is dated July 30, 2019.

23  Q   And it's --

24        MR. BLOCK:  Just, just note for the record this

25  predates the testimony that I presented at the TRO hearing.  It

 1  wasn't afterwards.  This is before.

 2              MR. JONES:  We don't -- your Honor, we're going to

 3  disagree about that, but we're going to move forward and share

 4  what --

 5              THE COURT:  Yeah.

 6              MR. JONES:  -- we need to share.

 7              THE COURT:  I don't think that's an objection.  That's

 8  an argument.  So --

 9              MR. JONES:  Thank --

10              THE COURT:  -- let's go.

11              MR. JONES:  Thank you.

12  BY MR. JONES:

13  Q   Your Honor -- Mr. Kim, rather.  I will not ask his Honor to

14  answer questions about this document.

15      Mr. Kim, the case name is?

16  A   <u>Donna Ann Hayes v. Colgate-Palmolive, et al.</u>

17  Q   Thank you.

18      And I'm going to ask you to review with me a few lines of

19  testimony so that we do not belabor the point.  They appear at

20  Page 53 for counsel, Line 15, 53, Line 15, and they continue

21  through 53, Line 24.

22      And could you just share that testimony with his Honor?

23  A   So the question was:

24  "Q   Okay.  The parent company in New Jersey is the one that

25  made all the corporate decisions regarding asbestos, talc,

1  health and safety decisions for all the global companies,

2  correct?

3  "A   We're getting into semantics of what you mean by 'parent

4  company.'   The decisions on the safety of talc were made by the

5  individual operating companies, which would be, in this case,

6  Consumer Products, which is a separate company within, as you

7  call it, the 'mothership,' the parent company."

8  Q   And whose testimony again was this, sir?

9  A   This is Dr. Hopkins.

10  Q   And were you shown this testimony by Mr. Block or anyone

11  else at the last hearing?

12  A   I was not.

13  Q   Okay.   Irrespective of when it may have been dated, you

14  weren't shown it, is that fair?

15  A   That's fair.

16  Q   Thank you, sir.

17       MR. JONES:  Your Honor, we're at the bottom of the

18  hour.  We're right in the middle of a topic that I think I

19  could break safely at.  I would propose we take whatever period

20  of lunch you would like now, for lunch you would like now, and

21  we can reconvene promptly thereafter.

22       THE COURT:  How does this side of the room feel about

23  it?  Anyone objecting?

24       MR. SATTERLEY:  I'm hungry.

25       THE COURT:  Okay.  I'll take that as a nonobjection.

1        All right.

2             MS. CYGANOWSKI:  No objection.  We would just ask that

3    obviously, that the witness, because he's under oath, not be

4    counseled during the lunchbreak.

5             MR. JONES:  Your, your Honor, we will not be speaking

6    with Mr. Kim about this trial, only about his lunch order.

7             THE COURT:  All right, very good.

8             There are quite a few of you and a limited number of

9    restaurants within walking distance, COVID fallout, but -- so

10   why don't we take an hour's break.  We'll pick up again at, at

11   1:30, okay?

12            MR. SATTERLEY:  Thank you, your Honor.

13            THE COURT:  Thank you.

14        (Lunch recess from 12:30 p.m., until 1:30 p.m.)

15                          AFTER RECESS

16        (Call to Order of the Court)

17            THE COURT:  Have a seat, everyone.

18        JOHN K. KIM, DEBTOR/PLAINTIFF'S WITNESS, ON THE STAND

19            THE COURT:  The witness remains under oath.

20            Ready to go, Mr. Jones?

21            MR. JONES:  We are ready, your Honor.

22   BY MR. JONES:

23   Q   Mr. Kim, are, are you ready to start?

24   A   Yes.  Thank you.

25            MR. JONES:  We ready to start over here?

KIM - DIRECT                                                         129

1              MR. BLOCK:  Yes, we're ready.

2              MR. JONES:  All, all ready?

3              THE COURT:  Okay.

4              MR. JONES:  We will commence.

5    BY MR. JONES:

6    Q    Mr. Kim, thank you for rejoining us.

7              THE COURT:  Hang on one --

8    BY MR. JONES:

9    Q    I'm going to ask you to look at a couple more exhibits for

10   me about a topic we visited together over, a little earlier in

11   the day.  I'm going to start with Exhibit 51.

12        Mr. Kim, I'm going to ask the, Patrick to blow that up and

13   he has.

14        Have you seen Exhibit 51 before in your review of records

15   with respect to the corporate history of the companies at issue

16   here?

17   A    I have.

18   Q    And what is Exhibit 51?

19   A    Exhibit 51 is an internal document, a memo from

20   Mr. Huetteman to Mr. Marinaro about Shower to Shower.

21   Q    What is it dated, sir?

22   A    This is dated October 31, 1977.

23   Q    And what does the memo say in its operative language?

24   A    Basically, the first line is, "As we discussed, Personal

25   Products Company will take full responsibility for Shower to

1   Shower on January 1, 1978."

2   Q   And that was the date you mentioned right before the break,

3   is that right?

4   A   Correct.

5   Q   Thank you, sir.

6       We're going to pull up now Exhibit 66 to have you review it

7   for a moment.

8           MR. JONES:  And Exhibit 66, we're going to blow the

9   page up so we get the date visible.  Thank you.

10  BY MR. JONES:

11  Q   Sir, what is Exhibit 66?

12  A   Exhibit 66 is a SEC filing.  It's a Form 10-K for the year

13  ended December 30, 1979.

14  Q   And that is a Form 10-K for which company, sir?

15  A   This is a Form -- for, for Johnson & Johnson, which is the

16  public, the publicly held company that files securities

17  filings.

18  Q   And I'm going to ask you to refer to a particular page for

19  me.  I think it's Page 7 of the 10-K.  It may end with the

20  Bates Digits 401.  There it is.

21      And at the bottom of the page, sir, could you share what

22  the -- the -- this regulatory document says in the, under the

23  heading Personal Products Company?

24  A   Right.  So this is a description of the businesses that has

25  to be filed with the SEC.  Under Personal Products Company, it

1    says, "The field of interest of this subsidiary is primarily

2    products for feminine hygiene.  Among its principal products

3    are MODESS, Stayfree, and Sure & Natural brands of sanitary

4    napkins and Carefree Panty Shields, a brand of feminine

5    protective pads.  Other products include Coets brand cosmetic

6    squares and Shower to Shower brand body powder."

7    Q    Thank you, sir.

8         One more and that's the next exhibit in order, which is

9    Exhibit 67.

10        And do you -- have you seen Exhibit 67 before?

11   A    I have.

12   Q    And what is Exhibit 67?

13   A    It's a -- this is the 1986 Annual Report, again filed by

14   Johnson & Johnson as part of its securities filings.

15   Q    And it -- it -- you mentioned some dates.  I think you

16   mentioned 1987 --

17   A    Uh-huh (indicating an affirmative response).

18   Q    -- but this is contemporaneous?

19   A    This is contemp -- so again, the 1986 Annual Report would

20   be for the period ending 1986, but the document is prepared

21   sometime after, usually in the first quarter of 1987, yeah.

22   Q    Thank you, sir.

23        We're going to ask --

24   A    Yeah.

25   Q    -- you to look at just one page of this document as well

1   and that is at Page 60 of the document and I just don't have

2   the Bates reference.

3          MR. JONES:  So I'm going to extend apologies to

4   Patrick, but it looks like he's found it.

5   BY MR. JONES:

6   Q    I'm going to ask you to look on the right-hand side under

7   the heading Johnson & Johnson Baby Products Company.

8   A    Yes.

9   Q    Do you see that paragraph, sir?

10  A    I do.

11  Q    And I think we've called that out for you.

12       Can you share with the Court what it says --

13  A    Yeah.

14  Q    -- under the heading Johnson & Johnson Baby Products

15  Company?

16  A    Yep.

17       Again, this is a securities filing describing the

18  companies.  It says, "The Johnson & Johnson Baby Products

19  Company produces the familiar line of consumer baby products,

20  including powder, shampoo, oil, washcloths, lotion, and others.

21  Additional products include educational materials and toys to

22  aid in infant development.  Sundown Sunscreen, Affinity

23  Shampoo, Coets Cosmetic Shares [sic], Take-Off Makeup Remover

24  Cloth, and Shower to Shower Baby Powder."

25  Q    Thank you, sir.

1   And Baby, Johnson & Johnson Baby Products Company is the

2   predecessor of what company?

3   A   What, what turns into be Old JJCI.

4   Q   Thank you, sir.

5   And --

6   A   And LTL now.

7   Q   LTL today?

8   A   Yeah.

9   Q   And, and, your Honor, is -- not your Honor -- Mr. Kim, the

10  financials, again, with respect to, J&J internal financials and

11  intercompany chargebacks with respect to the Shower to Shower

12  product booked expenses and indemnity in connection with that

13  product to what company?

14  A   So the Shower to Shower is considered a talc product.  It's

15  part of the talc litigation.  All that, all the charges related

16  to the talc litigation are charged to Old JJCI and now LTL.

17  Q   Thank you, Mr. Kim.  We appreciate that.

18  Let me turn you back now to where we were before we did

19  that little piece.

20  And where we, where we were, then, was discussing the arc

21  of the litigation and you had been shown at your last set of,

22  or during your last testimony a couple weeks ago and then again

23  today some testimony from Dr. Hopkins.  Do you recall that?

24  A   I do.

25  Q   And, and you saw how he clarified testimony, correct?

1   A    I did.

2   Q    And notwithstanding clarifications like that, can you share

3   for us how plaintiffs generally pursue these claims in the

4   underlying tort litigation?

5   A    So generally, these are unitary claims.  The central

6   allegation is that a Johnson & Johnson product, you know,

7   produced by one of the Johnson & Johnson companies causes, is,

8   is defective and it causes cancer in a plaintiff.  So it's,

9   generally, it's always -- it's the same -- for every, every

10  case, it's the same product, the same defect, and the same

11  injury that's claimed.

12      So essentially, you know, they don't -- it's not

13  differentiated between when Johnson & Johnson sold talc in the,

14  you know, pre-'87.  It's not differentiated between Shower to

15  Shower or, or Johnson's Baby Powder.  You know, the -- the --

16  all the claims sort of run a, a, a timeline.  So every exposure

17  to a Johnson & Johnson product was defective and it caused

18  cancer.

19  Q    That's the allegation?

20  A    That is the allegation.

21  Q    Let me ask you to look at an exhibit with me and that's

22  Exhibit 20.

23  A    And are you familiar with this pleading, your Honor --

24  Mr. Kim?

25  A    Yes, I am.

1    Q    What is this pleading?

2    A    This is the, the Master Complaint in the MDL cases.

3    Q    And the MDL cases are cases we've heard about --

4    A    Right.

5    Q    -- in this proceeding.

6         Could you just generally describe for his Honor what the

7    MDL proceeding is?

8    A    Sure.

9         So under the Federal Rules the MDL Panel at the request of

10   parties puts together all claims that are, are similar -- and

11   it's basically defined by the order -- into a single court for

12   pre-trial purposes.  And so what happens for pre-trial

13   proceedings is often, because there might be more claims that

14   are filed as the MDL is proceeding, there is a master complaint

15   form to make it uniform, make it easier for plaintiffs to

16   actually file a complaint.  And, and for defendants, we don't

17   have to deal with answering all different types of complaints.

18        So this is the, the master long-form complaint that's used

19   when, when an MDL plaintiff is bringing a claim.

20   Q    All right.  And, and we talked about a significant volume

21   of claims at issue in that MDL, is that right?

22   A    I think there's now 35,000 claims in the MDL.

23   Q    Thank you, sir.

24        Let's, ask, let's ask you to review just a couple

25   paragraphs from this master complaint with me.  First, the

1    unnumbered Paragraph 2 at the bottom of the page.

2              MR. JONES:  If we could blow that up.

3              THE WITNESS:  Uh-huh (indicating an affirmative

4    response).

5    BY MR. JONES:

6    Q    You see here the language that starts with, "The Second

7    Amended Complaint"?

8    A    I do.

9    Q    I'd like you to look at the, what looks to be the third

10   sentence, "Plaintiffs make the following allegations."  Can you

11   read that for us --

12   A    Yes.

13   Q    -- as it rolls?

14   A    (Reading):

15      "Plaintiffs make the following allegation based upon their

16   personal knowledge and upon" --

17   Q    Now we're going to go up to the top of the next page and

18   you may continue.

19   A    All right.  (Reading):

20      -- "information and belief as well as upon their attorneys'

21   investigative efforts regarding defendants' talcum-powder

22   containing products known as Johnson's Baby Powder and Shower

23   to Shower, hereinafter together or individually 'the

24   Products.'"

25      So basically, in these complaints they've now clumped

1  together Johnson's Baby Powder and Shower to Shower and treat

2  them for the purposes of the complaint as, as the same product,

3  "the Products."

4  Q    Thank you, Mr. Kim.

5       I'm going to ask you to look at numbered Paragraph 2, which

6  should be fairly soon after the one you just read to us.  And

7  we're calling that out for you now.

8       Do you see that?

9  A    Yeah.

10      So again, this is -- so I'll read it:

11      "Plaintiffs were diagnosed with various forms of cancer of

12 the female reproductive system, including epithelial ovarian

13 cancer, fallopian tube cancer, and primary peritoneal cancer,

14 which were directly and proximately caused by their regular and

15 prolonged exposure to talcum powder contained in the Products."

16      So basically, it's just saying that, again, it's the same

17 products, the same, the same defect, alleged defect, and, and

18 the same injury.  So this is, basically -- everyone is alleging

19 that prolonged use of the products.  And again, when it's

20 prolonged use, this is from, from the day that they used it to

21 the end.  So it would encompass pre-'87, post-'87, that, that

22 whole period of time.  Use of that product because it was

23 defective caused the cancers.

24 Q    Thank you, Mr. Kim.

25      I'm going to ask you to look at one, one more paragraph

1    from this complaint, Paragraph 8.

2        Mr. Kim, you just used the, the date 1987, did you mean

3    that?

4    A    I'm sorry.  I keep, I keep reversing this.  1979.

5    Q    Thank you, sir.

6        I'm now looking at Paragraph 8.

7    A    Yeah.

8    Q    And you are, too, I hope.  Are you with me?

9    A    Yeah, I am.

10   Q    Could you tell us what Paragraph 8 says for the record?

11   A    It says:

12       "The defendant, Johnson & Johnson Consumer Inc., in and has

13   been at all relevant times a wholly owned subsidiary of

14   defendant, Johnson & Johnson, under the complete dominion of

15   and control of defendant, Johnson & Johnson.  Hereinafter,

16   unless otherwise delineated, these two entities shall be

17   referred to as 'the Johnson & Johnson Defendants.'"

18       Again, what this paragraph does is basically state that,

19   that they're going to treat Johnson & Johnson and Johnson &

20   Johnson Consumer Company as the same entity because their,

21   their theory is that throughout this whole period of time, you

22   know, they acted, they're, they're one company and, and, and,

23   and all, the actions of all those contributed to the defect

24   and, you know, the same, same defect and the same injury.

25   Q    What about harm and damages?

1   A    I meant to say injury -- harm.  It's harm.

2   Q    Thank you, sir.

3   A    Yeah.

4   Q    And that's been the case for as long as you've been

5   involved in the talc litigation?

6   A    Every, every case has this as the core element, whether

7   you're talking about -- yeah.  Any -- any -- any -- any theory

8   that you may have, at the end of the day it comes down to they

9   believe that a, a product that JJCI's responsible for caused,

10  was defective, either itself or because it includes asbestos,

11  and caused cancer.

12  Q    And has -- have you become aware of the post-hearing

13  conduct of the plaintiffs or claimants, that is, post our last

14  TRO hearing, the conduct after that time?  Have you become

15  aware of any claiming activity on the part of plaintiffs since

16  that date?

17  A    Since, since that time we've had, I think around 200

18  complaints have been filed.  Most of them, again, continue to,

19  to allege the same things, but with the same defendants,

20  Johnson & Johnson and Johnson & Johnson Consumer Inc.

21  Q    Anything different from be, from before?

22  A    In those complaints, no.  There, there have been some

23  complaints that have tried to what I could consider under,

24  undermine this, this bankruptcy by trying to plead around the

25  ruling of this Court that, that cases against JJCI are stayed.

1   And so they basically just name Johnson & Johnson, but it's the

2   same core allegation that's, that's in there.  And they're,

3   it's not limited to time.  It's not limited to, to actions of a

4   specific defendant, but, you know, they're, they're basically

5   trying to get around the ruling by just naming Johnson &

6   Johnson.

7   Q    Let me pull up Exhibit 26 for you and ask you if you've

8   seen it before?

9   A    I have.

10  Q    And is -- what is this an example of?

11  A    This is an example of -- again, this is a, a lawsuit filed

12  recently in, in Indiana and it is the, again the same core

13  allegations, which are they used a product manufactured by Old

14  JJCI and that it was defective and it, it caused harm, it

15  caused cancer, but they just don't, you know, they don't call

16  out Johnson &, or they, they change the theory.  They just name

17  Johnson & Johnson -- I'm sorry -- they just name Johnson &

18  Johnson.  They don't name the other defendants and -- and --

19  but -- and -- but it's the same, same allegations, the same

20  underlying facts.  They just don't include JJCI.

21  Q    So let me ask you to look at Paragraph 64 and 65 of the

22  complaint, which is at Bates ending numbers 458.

23  A    Yeah.  I just want to clarify.  I may have said something

24  earlier.

25       What, what they're doing is that they are not including Old

1    JJCI or LTL, but it's the same complaint that they had.  It's

2    just against Johnson & Johnson.

3    Q    Thank you, sir.

4    A    Yeah.

5    Q    Now I'm looking at Paragraph 64 and 65 with you.

6         Can you tell us what these say and what they reflect?

7    A    Again, so 64 says:

8         "The plaintiff, Ronald McBride, trusted Johnson's Baby

9    Powder.  He used it on his child and on himself believing it to

10   be safe.  Plaintiff, Ronald McBride, trusted that the talc

11   products used on his child and himself were safe and did not

12   have any carcinogens.  He relied on J&J to provide any safety

13   information to him and his family and to make sure any life-

14   threatening hazards were communicated to him.  Had the

15   plaintiffs known the true fact, he would have never purchased

16   the product."

17        65 again goes to -- that's the, the same claim, same

18   products.  65 is:

19        "Ronald McBride developed malignant mesothelioma, a fatal

20   cancer, as a direct and proximate cause of the

21   misrepresentations made by J&J regarding the safety of

22   Johnson's Baby Powder and its concealment of evidence that its

23   cosmetic powder utilized talc that contained asbestos fibers

24   that could cause cancer."

25        Again, this paragraph shows the same harm.  What they try

1   to do is say that it's the misrepresentation that caused the

2   harm, but, but clearly, the, the harm that's being alleged is

3   that the product was defective and caused cancer.  So simply by

4   saying that the misrepresentation was there does, doesn't

5   change the underlying true allegation here.

6          MR. JONES:  And just skipping back to the very first

7   page of the exhibit, Patrick.

8   BY MR. JONES:

9   Q   I just want to have, have you again confirm for the Court

10  the filing date at the top of the page, or the service date,

11  anyway.

12  A   This is -- eService by, on October 25, 2021.

13  Q   Thank you, sir.

14      I'm going to ask you to share with us just one more post-

15  TRO hearing event and that involves -- actually, a couple --

16  but they involve two cases, first one in South Carolina.

17      Are you familiar with the Hood case, sir?

18  A   I am.

19  Q   And I'm going to pull up Exhibit 27.

20      And ask -- and is this a transcript of proceedings in that

21  case, sir --

22  A   Yes.

23  Q   -- that, that you have reviewed?

24  A   I have.

25  Q   And what's the date of that transcript of proceedings, do

1  we have it on there?

2  A   I don't see it on there, but this was recent.

3  Q   There it is.

4  A   Yeah.  October 28th.

5  Q   So this is October 28, 2021 in Columbia, South Carolina, is

6  that right?

7  A   Yeah.  That is correct.

8  Q   So we're going to ask you to look with us at Page 58, Line

9  5, of the transcript and through Page 58, Line 14 of the

10  transcript and ask you to read what the court on a disputed

11  motion shared with the parties, Johnson & Johnson --

12  A   Right.

13  Q   -- and others in this proceeding.

14  A   So this is a pre-trial hearing.  We had come in and moved

15  that because of the Judge's rule, the Judge's ruling here that,

16  you know, things, that the trial should be limited in some way

17  because Old JJCI was, could no longer be a defendant.  And

18  basically, what the court said was, "I tell you one thing,

19  Mr. Bernardo.  If you think anybody in any" --

20  Q   Let me stop you there.

21      Who is Mr. Bernardo?

22  A   Oh, Mr. Bernardo is our, one, one of our attorneys from

23  Skadden.

24  Q   All right.

25  A   (Reading):

1    "I tell you one thing, Mr. Bernardo.  If you think anybody

2    in any of these cases is going to allow the stay against

3    liability on behalf of Old Johnson & Johnson Consumer Inc. to

4    somehow affect the evidence that is going to be received,

5    whether that evidence was from Johnson & Johnson, Old Johnson &

6    Johnson, or New Johnson & Johnson, that is a very different

7    kettle of fish and I can tell you right now that is not going

8    to happen in this case, as far as I'm concerned."

9    Q    Thank you, Mr. Kim.

10       And have you -- are you aware of developments in the

11   Vanklive trial about which we heard when we were last together?

12   A    Yeah.

13       So a, a similar thing happened in the Vanklive case, which,

14   which we talked about last week.  Right after the hearing in

15   this case, there was a subsequent hearing in Vanklive where we

16   moved the court and on, on the basis that now that Old JJCI is

17   no longer in the case and the case should only be continuing

18   against Johnson & Johnson, that the evidence had to be

19   curtailed because, you know, evidence was brought into the case

20   against -- against -- without distinguishing who the evidence

21   was against, you know.  Of course, the time frames would be

22   different if you're relying on, on, only on Johnson & Johnson

23   and the court basically, similar to this court, said, that's

24   not going to happen.  Denied our motions to, to modify any of

25   the evidence or for jury instructions and the case is

1  continuing as if nothing ever happened.

2  Q   Mr. Kim, do you have a view, having had to hear about and

3  address these matters, about how this conduct, if it continues,

4  will affect this proceeding?

5  A   If plaintiffs' counsel are allowed to go around this

6  bankruptcy by just not naming LTL but having the same conduct

7  that LTL is responsible for be, be litigated, it creates an

8  impossible situation where there's going to be rulings, there's

9  going to be *res judicata* effect.  LTL is going to have to get

10 involved in, in these proceedings and having a dual track where

11 the same claims involving the same plaintiff, involving the

12 same injuries are ruled already or simultaneously in another

13 court would make it impossible for, for us to, to effect the

14 purpose of this bankruptcy, which is try to get an equitable

15 and efficient resolution to these talc claims.  It would just

16 make it impossible if, if we had to at the same time litigate

17 the same issues in, in, in different jurisdictions across the

18 country.

19 Q   Mr. Kim, do you have a view of the burden this would,

20 financial or otherwise, would continue?

21 A   Again, I think -- I, I know that the number of cases we

22 have, you know, I noted some of the outlier verdicts.  There is

23 no company in the, in the world that could withstand a

24 sustained onslaught like the talc cases.  It would just -- it's

25 -- it's just overly burdensome.  It -- it -- no company could,

1   could survive and take on this type of, of litigation.

2   Q    Thank you, Mr. Kim.

3        As a part of your duties that you referred to at the outset

4   of your testimony, have you had to become familiar with

5   insurance coverage in connection with the underlying talc, talc

6   litigation?

7   A    Yeah.  I, I'm actually responsible for insurance litigation

8   for the Enterprise.

9   Q    And can you share with us briefly the extent to which the

10  company has sought insurance coverage in connection with these

11  underlying claims?

12  A    So we've put all the insurers that we are aware of on, on

13  notice of these claims and made, and made a claim against the

14  policies for, for all the talc litigation.

15  Q    And in connection with your work in that regard, have you

16  had to become generally familiar with the, with the terms of

17  the policies?

18  A    I, I have, both, both in, in this case and also -- again, I

19  handle insurance coverage for the Enterprise.  So I've been

20  involved in insurance coverage litigation since I've been at

21  J&J and reviewed many of these policies before.

22  Q    So I'm going to pull one up for you as an example, Mr. Kim.

23  I believe you're going to tell me that it is an example,

24  Exhibit 11.

25              MR. JONES:  And we're going to make that a little

 1  larger for all concerned.

 2  BY MR. JONES:

 3  Q   I'm going to ask you if this is an insurance policy with

 4  which you have any familiarity?

 5  A   Yes.  This is one of the policies that we put, that we are

 6  seeking coverage for in the, in the talc litigation.

 7  Q   Who is the, this agreement with, sir?

 8  A   This agreement is with the Aetna Casualty & Surety Company.

 9  Q   And it -- and this agreement is insuring whom?

10  A   In this agreement it's -- the -- in this paragraph it names

11  Johnson & Johnson, but there is a separate endorsement that

12  basically -- like all our policies, we -- we don't -- we want

13  coverage not only for Johnson & Johnson, but for all

14  subsidiaries and affiliates.

15      So there should be a separate page that basically says that

16  all named, named insureds includes all subsidiaries and

17  affiliates.

18              MR. JONES:  Let's scroll down for that.

19              UNIDENTIFIED SPEAKER:  The next page.

20              THE WITNESS:  No.

21              MR. JONES:  Next page.  Very last page.  We'll get

22  there.

23              THE WITNESS:  It should be one in there, yeah.  It's

24  general -- Named Insured.  There it is.

25  BY MR. JONES:

1  Q    So there's the named insureds clause, sir, am I right?

2  A    Yes.  This is -- this is --

3  Q    Could you please share that with the Court?

4  A    It says:

5      "Named insured, Johnson & Johnson, and any affiliated,

6  associated, or subsidiary company in any tier as now or

7  hereafter may be formed, acquired, or constituted or any other

8  company over which Johnson & Johnson has or acquires active

9  control or management so long as Johnson & Johnson or such

10 affiliated, associated, or subsidiary company or any

11 combination thereof owns in excess of 50 percent of the stock

12 of such company."

13     So basically, we've negotiated this clause so that any

14 affiliate, subsidiary, even one that we acquire post, post

15 insurance coverage date all become a named insured.  So this is

16 just sort of a, making sure that everything that's in the

17 Johnson & Johnson family is a named insured.

18 Q    And I'm going to ask you just back at the first page for a

19 minute and in one particular -- upper left-hand corner portion

20 of the document to see -- do you see the, anything that

21 addresses limits?

22 A    Yeah.

23     So there are two limits of liability.  One is an occurrence

24 limit and one is the annual aggregate.

25     So basically, the annual aggregate means that this policy

1  has a $10 million limit, regardless of who claims under the

2  policy so that, for example, in our situation if J&J makes a

3  claim under the policy, then that erodes the annual aggregate

4  leaving less money for JJCI to claim under the policy.

5  Q   And is this, is this the same erosion clause or aggregate

6  limits clause would be in your other policies?

7  A   All our polices have aggregate limits.

8      So, you know, the -- the -- the amounts may differ, but

9  they all contain an aggregate limit so that, there's only so

10 much money each policy will pay, regardless of who takes it out

11 first.  And, and that's just the way the insurance, insurance

12 works.

13 Q   So let's ask you to look at Exhibit 12 for me.

14     Are you there?

15 A   Yes.

16 Q   And what is Exhibit 12, sir?

17 A   This is called a dec page.  This is the beginning pages of

18 the Home insurance policy that we have.

19 Q   And does it, itself, have an aggregate limit?

20 A   It, it does.  And you can see --

21 Q   And --

22 A   -- limit in the aggregate for each and on period,

23 $11,500,000.

24     So again, that means that that's the most this policy is

25 going to pay.  If one of the subsidiaries takes from this pot,

KIM - DIRECT                                                                      150

1   that pot gets diminished for everyone else.

2   Q   And I'm going to ask you, since you mentioned subsidiaries,

3   to look at the very next page in the left-hand margin under the

4   head, under the heading Named Insured.

5   A   Yes.

6   Q   Can you read that out for us, sir?  It's just under, "The

7   policy" --

8   A   Yeah.

9   Q   -- "is subject to the following definitions, Named

10  Insured."  There it is.

11  A   (Reading):

12      "Named Insured.  As stated in Item 1 of the declarations

13  forming a part hereof and" -- so it's Named Insured as stated

14  in Item 1 -- "and/or subsidiary, associated, affiliated

15  companies, or owned and controlled companies as now or

16  hereafter constituted and of which prompt notice has been given

17  to the company, hereinafter called the Named Insured."

18      Again, this is a, this is the standard way to say that all

19  affiliates, subsidiaries are, are, are also are named insured

20  under the policy and have rights under the policy.

21  Q   And the named insured here was Johnson & Johnson?

22  A   I believe it was.  We can just look back there.  But --

23          MR. JONES:  The first page.

24          THE WITNESS:  -- again, this would cover, cover Old

25  JJCI and, and now LTL.

1   BY MR. JONES:

2   Q    And the date of this policy, sir?

3   A    Yeah.  It's -- looks like --

4   Q    From the, From line, about --

5   A    3/28/74.  This -- yeah.  The From line is, that's the

6   period of coverage.

7        So the, the policy is dated 3/28/74 and it covers the

8   period from January 1, 1974 to January 1, 1977.

9   Q    Thank you, sir.

10       And have you reviewed the other policies that would be

11  subject to coverage for either LTL or Johnson & Johnson --

12  A    I --

13  Q    -- and/or --

14  A    I believe  I've reviewed most of them.  I can't say I've

15  seen every single one of them, but I've been advised that, what

16  they, what they contain.

17  Q    And I'm going to ask you to look at Exhibit 8 for me.

18       Have you seen Exhibit 8 before today?

19  A    Yes.

20  Q    What is Exhibit 8?

21  A    So this is a summary chart of all our insurance coverage.

22  Q    And it includes columns for what items?

23  A    You'd have to go back.

24       So it's the insurance company, policy number, the policy

25  period, the per occurrence limit, the aggregate limit, and then

1  what the Bates number is and, and then insured.  Oh, it says

2  J&J, insured.  So it does, does, you know, does include J&J as

3  an insured.

4  Q    And the answers for that, that column are all?

5  A    Yes.  Yes.

6  Q    What -- are all yeses?

7  A    Yes.

8  Q    Okay.

9  A    They're all yeses.

10 Q    Thank you, sir.

11      Does this fairly and accurately, to the best of your

12 ability to, to make it so, reflect the, the coverage facts set

13 forth within it?

14 A    It does.

15 Q    Thank you, sir.

16      I'm going to ask you now to switch topics with me

17 moderately, not entirely.  And that is to talk a little bit

18 about the role of retailers in the litigation.

19 A    Okay.

20 Q    And do you have an understanding of the role of retailers

21 in the underlying cosmetic talc litigation brought against

22 either Johnson & Johnson or other affiliates?

23 A    Yes.

24      So retailers are, are routinely sued for the mere fact that

25 they sold our product to an individual plaintiff.  The, the

1    reason that, that they're sued is generally because adding a

2    retailer defeats diversity jurisdiction.  And so if a plaintiff

3    wants to stay in state court, then they would routinely add the

4    retailer who has the same state of residence as the plaintiff

5    and then makes it impossible to, to remove on diversity

6    grounds.

7    Q    And speaking of routine, what, what routinely occurs when a

8    retailer is added as a defendant to the litigation?

9    A    Generally, the retailers are, are added.  There may be some

10   discovery that's done on them, primarily for records.  And we

11   actually do a lot of discovery on, on what records they keep of

12   the purchases, but then, generally, by the time the trial comes

13   along, they are dismissed.  No pay.

14   Q    Do the retailers ask anything of any of the Johnson &

15   Johnson affiliated defendants in the litigation?

16   A    So as soon as a retailer is sued, if they're sued for the

17   sale of our product, then they'll come to, to, to us and they

18   will tender the defense and seek indemnity.

19   Q    And I'm going to ask you to look at Exhibit 15 with me and

20   ask you to tell me what Exhibit 15 is by turning to the second

21   page of the exhibit.

22   A    Yeah.

23   Q    Have, have you seen this agreement before, sir?

24   A    I, I have.

25   Q    What is it?

1   A    So this is part of a distribution agreement that, that we

2   have with Safeway Stores.

3   Q    And this is an agreement that involved the distribution of

4   the product, is that right?

5   A    Yes.  Generally, the, you know, we sell -- Johnson &

6   Johnson companies sell their products through distribution

7   chains.  So we don't, we don't have a Johnson & Johnson store.

8   So we go to pharmacies, grocery stores.  Our products are sold

9   through these distributors, retailers.  And so this would be a

10  general contract for all the products that, that they sell

11  that, that are ours, or one of the Johnson & Johnson companies.

12  Q    And as a part of this agreement Johnson & Johnson agrees in

13  what looks to me to be Paragraph 1(c).

14  A    Yeah.

15  Q    Do you see that?

16  A    I do.

17  Q    What, what is the agreement set forth there?

18  A    And so it basically -- I can read it, you know:

19       "Agrees"  -- so that, that'd be a Johnson & Johnson company

20  -- "Agrees to indemnify and save Buyer harmless except as

21  hereinafter provided from and against any and all claims,

22  demands, actions, and causes of action which are hereafter made

23  or brought against Buyer by any person for the recovery of

24  damages for the injury, illness, and/or death of any person or

25  domestic animal which is caused or alleged to have been caused

1   by the handling or use of any article shipped or delivered by

2   Seller to Buyer, including, but without limitation, any

3   judgment rendered against Buyer in such action and the

4   reasonable attorney's fees and costs, if any, incurred by or on

5   behalf of Buyer in connection therewith."

6        So basically, we're telling Safeway -- we're agreeing with

7   Safeway that if they get sued for a sale of our product, that

8   we will indemnify and hold them harmless.

9   Q   And at the bottom of the page can you just read out the

10  date of this underlying indemnity agreement or distribution

11  agreement with an indemnity clause?

12  A   Yeah.

13  Q   What's the date?

14  A   So this is, this is dated March 20, 1989.

15  Q   Thank you.

16       And, sir, it's, it's with Safeway, is that right?

17  A   It is with Safeway.

18  Q   And what I'm going to ask you to do now is look at another

19  exhibit, Exhibit 18, 18, which --

20       And have you seen Exhibit 18 before?

21  A   I have.

22  Q   And it involves Safeway as well, is that right?

23  A   It does.

24  Q   And what is Exhibit 18?

25  A   So, so we have these distribution agreement with indemnity

KIM - DIRECT                                                           156

1   clauses.  Sometimes, if we don't have a distribution agreement

2   with an indemnity clause, there's common law that, that the

3   retailer will, will cite to.  But basically, they send, when

4   they get sued, they send us a request for tender.  So a tender

5   and request for indemnification.

6   Q    And let me stop you there.

7        When they say, when you say they send you "a request for

8   tender," or a "tender," what do you mean by a "tender"?

9   A    So it's a -- they tender -- they're basically -- they're

10  tendering the defense.  So they're saying, "You defend us and

11  you have to indemnify us for this, for this lawsuit."

12       So they, they send us that and this is one of the responses

13  that we, we give.

14  Q    And I'm going to ask you to look at the bottom, at the

15  bottom of the page.

16       First of all, this is a -- an -- a letter that involves a

17  response to Safeway, Inc. on behalf of whom?

18  A    This is on behalf of JJCI.

19  Q    And in May of 2019 when the letter is dated, that would

20  have been Old JJCI?

21  A    Oh, I'm sorry.  Old -- yes.  Old JJCI.

22  Q    And at the bottom of the first page, the end of the

23  paragraph, or, rather, the first line of Paragraph 1, can you

24  just read that first sentence as it starts out to us?

25  A    Sure.

1    So this, this is the -- we -- basically, we're entering

2  into a, an agreement, contractual agreement with the, the, the

3  retailer and we -- and by -- by -- so they've offered.  We've

4  accepted.  "Acceptance of Safeway's Tender of Defense is based

5  on claims alleged in plaintiff's complaint."  And it goes

6  through what the allegations of the complaint are and then it

7  says, "JJCI accepts Safeway request for indemnification only as

8  to claims alleged in plaintiff's complaint related to Safeway's

9  sale of the JJCI subject products at issue in this case."

10   So basically, this creates a contract with the retailer

11 that says, "If you're being sued for our product" -- so again,

12 you know, Safeway Store sells products from tons of people.  So

13 we're not going to accept a tender if they're being sued for

14 either their own product or someone else's product, but we are

15 entering into a contract with them that says that, "If you're

16 being sued for, for a sale of our product, we are going to

17 accept a tender and indemnify you.  So we'll take over the

18 defense and, and take over the indemnification" --

19 Q   And were those --

20 A   -- "and give you indemnification."

21 Q   I'm sorry, Mr. Kim.

22   And those acceptances, were they routine?  Sporadic?

23 A   They're routine.  They're routine.  Generally, again,

24 these, these retailers are being sued solely because they, they

25 sold our product.  They -- they don't -- they don't change the

1   product in any way.  They don't do anything.  All they're doing

2   is -- they're, they're a pass-thru entity.  They're getting

3   sued and so they're coming to us to say, "Hey," you know,

4   "we're being sued because we sold your product.  You, you have

5   to help us out," either because of an agreement in the

6   distribution agreement or because of some common law duty that

7   we may owe them.

8   Q   Let me ask you to look briefly with me at Exhibit 17.

9       And can you tell us what Exhibit 17 is, sir?

10  A   This is a compilation of the, the tender acceptances.  So

11  the, basically, the contracts that we've entered into with,

12  with retailers agreeing to, to take their tender and defend the

13  claims and give them indemnity.

14  Q   And on the -- so we -- we name the retailers, the case, and

15  the acceptance of tender status, is that right?

16  A   That, that's correct.

17  Q   For each.

18      And these -- there are voluminous acceptances of tenders,

19  am I right?

20  A   They are.  Well, some of these, you'll see they're with --

21  they -- they are complaint specific.  That's why there are so,

22  so many.

23  Q   And --

24  A   So, you know, you can see the number -- the, the retailers

25  themselves are, are listed and there are lots of duplicates

1  for, for that.

2      But again, for every -- whenever they get sued, they, they

3  tender the defense to us and we accept and then turn to this

4  binding agreement.

5  Q   And this is a many-page, many-cell, many-row summary, is

6  that right?

7  A   It is.

8  Q   And the insurance policy summary that we discussed moments

9  ago was similarly, many celled and many pages, is that right?

10 A   It is.  I think there's about, almost $2 billion worth of

11 insurance that's at issue.

12 Q   And how many policies, many tens?

13 A   Yes.  Yes.

14 Q   Thank you.

15     And this, this Exhibit 17 on the tender acceptances is, is

16 an accurate summary, to the best of your ability to make it so,

17 sir?

18 A   It is.

19 Q   And, and the policies, the tender acceptances, and the

20 tender agreements underlying them and the Shower to Shower

21 related corporate lineage documents we looked at, are these all

22 similarly generated at the time by people with knowledge and

23 maintained by Johnson & Johnson in the normal course?

24 A   They are.

25 Q   And they reflect normal and usual business activity on the

1  part of the company?

2  A   They do.

3  Q   Thank you, sir.

4      Sir, I think you mentioned there were a couple of ways you

5  might incur the indemnity obligation.  One was by contract.

6      What was the other?

7  A   For --

8  Q   With respect to a retailer.  I'm sorry.

9  A   -- retailer?  Yeah.

10     It would be, it would be a common law, the common law.

11 Q   And are the retailers themselves at times insured under the

12 policies that we discussed?

13 A   Yes.

14     So as part of many distribution agreements, one of the

15 requirements is that we include retailers as a named insured.

16 And so in many policies there'll be a separate dec page or

17 endorsement that, that says that the insurance covers any of

18 our retailers as a named insured.

19 Q   Sir, as a part of the 2021 corporate restructuring itself

20 did the debtor in this case take on any indemnification

21 obligations?

22 A   It, it did.  We entered into a merger support agreement

23 that has cross-indemnities, actually.

24 Q   And the indemnity there applied to the litigation, the talc

25 litigation?

1   A    The talc litigation, yes.

2        So basically, LTL indemnifies, you know -- again, you know,

3   it assumed, it assumed the liability.  It, it gave an indemnity

4   to, to, to Old JJCI -- I'm sorry -- to New JJCI and, and J&J

5   for any, any liability that arise, arises out of the talc

6   liability.

7   Q    And let me ask you to look real quickly at Exhibit 5 for

8   us, sir.  Just -- I just have a question.

9        Do you, do you know what this document is and could you

10  share that with us?

11  A    Yeah.  This is the divisional merger support agreement that

12  I just referenced.

13  Q    It includes the clause you just mentioned?

14  A    It does.

15  Q    Thank you, sir.

16       Let's, then, turn to the 2021 corporate restructuring for a

17  moment.

18       Mr. Kim, you've described the litigation.  You described

19  the burden of the litigation and the *quantum* of defense and

20  indemnity costs.  Did that cause folks at JJCI to make

21  assessments about how to proceed?

22  A    Yes.  They, they wanted to look at what options they had to

23  try to deal with this massive litigation.

24  Q    And as a part of those considerations, can you describe

25  how, the time frame under which they developed?

1  A    So, you know, from time to time we're -- we're -- JJCI's

2  constantly looking to figure out, you know, how to handle the

3  litigation.  At some point in time, I'd say roughly two years

4  ago when Imerys filed for bankruptcy, we started getting

5  inquiries from law firms about whether there would be some

6  strategy for, for JJCI to, to resolve their litigation issues

7  in, in bankruptcy.

8       More recently, about six months ago, JJCI started actively

9  looking at doing some due diligence on, on whether such a, you

10 know, a, a, a restructuring and bankruptcy would, would make

11 sense or be appropriate.  And so that process continued up

12 until we, you know, JJCI decided that it wanted to effectuate a

13 divisional merger with the understanding that once done, the

14 next step would be for a bankruptcy filing so that it could

15 equitably and efficiently resolve the litigation through that

16 process.

17 Q    And, sir, I'm going to ask you to look at Exhibit 1, which

18 is a voluminous collection of, of records.  I'm going to ask if

19 you've taken a look through these records before?

20 A    I have.

21 Q    And what is Exhibit 1, as large as it is?

22 A    So Exhibit 1 contains all the corporate documents that were

23 entered into to effectuate the divisional merger.

24 Q    And that includes the merger support agreement you just --

25 A    It, it does include --

1  Q    -- discussed?

2  A    Yes, it does.

3  Q    And can you just generally reconfirm for us that the

4  material steps in the corporate restructuring are summarized in

5  your first day declaration?

6  A    Yes.  The material steps are in my first day declaration.

7  Q    We want trouble the Court with repeating them now, sir.

8       So thank you.

9       And including the sequence and timing of the transactions,

10 am I right?

11 A    The sequence and timing is all laid out in the first day

12 declaration.

13 Q    And the fundamental purpose for the corporate restructuring

14 is laid out there, too, but could you remind us of that?

15 A    The, the fundamental purpose was to enter into a

16 transaction that would enable the debtor, LTL, to fairly and,

17 you know, equitably, efficiently resolve the litigation without

18 having to put the unrelated assets of, of JJ, of, of Old JJCI

19 into, into bankruptcy.  And, you know, the key steps there was

20 to make sure that we followed precedent in order to make sure

21 that the claimants were in a better position postpetition than

22 they were prepetition.

23      So basically, with the use of the funding agreement our

24 intent was to make sure that, that creditors were, were in a

25 better position than they were.

1   Q    And, and part of how that was effectuated was through a

2   particular agreement.

3        Can you tell us what that would have --

4   A    Yeah.

5   Q    -- been, sir?

6   A    That's the, that's the funding agreement that I just

7   mentioned.

8   Q    And just so we mark it for the record -- and I know it's

9   attached to your first day declaration --

10  A    Yeah.

11  Q    -- but could we pull up Exhibit 4?

12       And is this -- what is this exhibit, sir?

13  A    That's what this is, the, the funding agreement that was

14  entered into as part of this divisional merger transaction.

15  Q    And while we stay on this page, who are the obligors?

16  A    The obligors are both Johnson & Johnson and New JJCI.

17  Q    And was there another set of agreements that had some

18  connection with the funding agreement into which the parties

19  entered in connection with the funding agreement?

20  A    Well, there's also a, a qualified settlement fund document.

21  Q    And, and that is a part of Exhibit 1 as well?

22  A    I believe I is.  I'd have to check, actually.  I believe it

23  is.

24  Q    All right.  We, we will confirm that a break --

25  A    Okay.

1  Q   -- Mr. Kim.  We won't make you page through the hundreds of

2  pages.

3     So thank you for, for qualifying your answer, accurately.

4  A   Oh, that Exhibit 1.  I'm sorry.  Yes.

5  Q   The group Exhibit 1.

6  A   The group Exhibit 1, yes.  I thought you were mentioning my

7  -- I thought it was my -- I was referring to my declaration,

8  but I don't -- yeah.  It's -- it was in the binder of

9  Exhibit 1, yes.

10 Q   Okay.  The closing binder?

11 A   The closing binder, yes.

12 Q   All right.  Thank you.

13    What were the goal of these efforts in connection with the

14 funding agreement and the QSF, sir, the qualified settlement

15 fund?

16 A   Again, it's to make sure that LTL had, you know, that the

17 creditors  were in a better position postpetition than they

18 were prepetition by enabling LTL to have the funds necessary

19 to, to resolve this litigation.

20 Q   And, sir, let me ask you, then, to discuss with me a little

21 bit about that petition.

22    And, and first, I'd like to ask you about the formation and

23 first steps of LTL as it emerged from the corporate

24 restructuring.  Can we, can we move to that topic?

25 A   Sure.

1  Q   So what were some of the first steps that LTL undertook?

2  A   Well, it -- it -- after -- well, even preformation, LTL was

3  given extensive briefings about the litigation.

4  Q   LTL, sir?

5  A   I'm --

6  Q   LTL or whom?

7  A   LTL Management, right?  I'm, I'm not sure I understand.

8  Q   Who were the people that you said were given briefings?  I,

9  I didn't refer to a company.

10 A   Oh.  I'm sorry.

11     It was LTL.  I'm sorry.  Yes.  LTL Management.  So pre,

12 preformation, even preformation of LTL, the, the folks that

13 would become the LTL Management were given extensive briefings

14 on the litigation, the status of the litigation, the financial

15 aspects of it, options that, that we had been looking at, and

16 to give them, you know, a, a, a basis for, for making the

17 ultimate decision about whether to file for bankruptcy or not.

18 Q   And did the, those members of the board, once the company

19 was formed, once LTL was formed, did they meet?

20 A   They did.

21     So, so after the -- so --

22 Q   Let me, let me ask you to stop there.

23 A   Yeah.

24 Q   I'm going to bring up --

25 A   Yes.

KIM - DIRECT                                                      167

1   Q    -- a minute -- something.  Exhibit 7, sir.

2        And does this help you refresh your recollection about when

3   they met and who met?

4   A    Yes.

5        So this was the -- the board -- the board of managers of,

6   of LTL Management met on October 14, 2021.

7   Q    And were you in attendance, sir?

8   A    I was.

9   Q    Were all the board of managers members in attendance?

10  A    They were.

11  Q    And what were, what was, generally, the topic of the

12  meeting?

13  A    Generally, the topic was --

14  Q    Let me ask you to stop.  These -- for a minute.  I, I

15  apologize.

16       These are the minutes of that meeting?

17  A    These are the minutes of those meet, of that meeting.

18  Q    And that meeting was, again, what day?

19  A    The meeting was on October 14, 2021.

20  Q    Okay.

21       And, please.  Generally, what was the topic?

22  A    The topic was whether LTL should file for bankruptcy.

23  Q    And tell me, generally, without waiving or sharing, waiving

24  attorney-client privilege or sharing any privileged

25  information, tell me, generally, what the conversation was.

1   A   Well, again, we -- we gave -- we went again through sort of

2   the background of the litigation, you know.  We went through

3   the corporate formation.  We -- you know, I think the, the

4   minutes basically go through things that, in general, that

5   were, were discussed.  We went through presentions by -- by

6   both -- by me and by members of Jones Day and then we put the

7   resolutions to a vote.

8   Q   And were the resolutions carried?

9   A   They were carried.

10  Q   And are they set forth in these minutes or after?

11  A   They were.  They are.

12          MR. JONES:  Scroll down to the resolutions.

13  BY MR. JONES:

14  Q   And are these the resolutions to which we just referred?

15          MR. JONES:  Back up a page, back up another page,

16  please.  Back up another page.  There we are.

17  BY MR. JONES:

18  Q   The resolutions start on this page, is that right, Mr.,

19  Mr. Kim?

20  A   They, they do.  And --

21  Q   And they follow through the rest of the document?

22  A   They do.

23  Q   And you are the signatory of the document, am I right?

24  A   I, I am.

25  Q   And did the board of managers have any dissent in the, in

1   the resolution?

2   A    No.  It was unanimous.

3   Q    And after the resolution passed, what followed?

4   A    After the resolution passed, we, we commenced this

5   bankruptcy proceeding.

6   Q    Which we sit here today?

7   A    We do.

8            MR. JONES:  Your Honor, we are very close to being

9   done.  Is this the, is this a good time to take a break and I

10  can make sure we are done, or would you like to proceed?

11           MR. BLOCK:  I'm ready to cross-examine, your Honor.  I

12  don't need a break.

13           THE COURT:  All right.

14           Why don't you take a moment and see if you're done

15  and -- and --

16           MR. JONES:  I will, I will take that moment and I

17  appreciate it.

18      (Pause)

19           MR. JONES:  We have one piece of housekeeping or a

20  mirror housekeeping.  We're going to ask our colleague here to

21  pull up Exhibit 25.

22  BY MR. JONES:

23  Q    And while he does that, Mr. Kim, you remember when we

24  mentioned the Hood case you also mentioned the Vanklive case as

25  having some activity since the bankruptcy filing?

1   A    Yes.

2   Q    And have you seen this transcript before, sir?

3   A    I have.

4   Q    And it is a transcript in the Vanklive proceeding?

5   A    It is.

6   Q    What's it dated?

7   A    It's dated October 22, 2021.

8   Q    And, and it is, indeed, therefore, after the filing of the

9   bankruptcy?

10  A    After the filing of the bankruptcy.  I think it was right

11  after this hearing.

12  Q    Okay.  And that is the case --

13  A    Last hearing.

14  Q    And that's the case you were referring to when we spoke

15  earlier about --

16  A    Yes.

17  Q    -- post-hear, post-filing developments, is that right, sir?

18  A    Yeah, that is correct.

19  Q    Thank you.

20       Let me ask you.  Exhibit 1, the group exhibit of the

21  restructuring documents, and, and Exhibit 4, the funding

22  agreement, are business records kept in the normal course of

23  either JJCI or Johnson & Johnson pre-restructuring and LTL and

24  New JJCI and Johnson & Johnson after, is that fair?

25  A    That is fair.

1   Q    Made by people who knew the facts at the time?

2   A    Yes.

3   Q    And kept in the usual, normal business course?

4   A    Yeah, they are.

5   Q    And the same with the minutes we just referred to and the

6   resolutions with respect to LTL's management of records?

7   A    They are.

8   Q    Thank you, sir.

9        And coming back to the resolutions, can you share with us

10  LTL's goal in this bankruptcy proceeding, sir?

11  A    The goal in this bankruptcy proceeding is to come to a, an

12  efficient and equitable resolution of, of this proceeding, of

13  the, of the, of the litigation and we believe we have the

14  financial capacity and the right experience to, to quickly try

15  to resolve these, this litigation within, within this

16  bankruptcy.

17  Q    And are you -- is LTL ready to proceed immediately?

18  A    We are ready to proceed.

19  Q    And when you say that, do you mean to try to resolve the

20  case?

21  A    Yeah.  We, we want to resolve this case.  The whole, the

22  whole purpose of, of the bankruptcy, again, is to try to come

23  to a resolution as quickly as possible and efficiently as

24  possible and, yeah, and try to get, get this, you know, get the

25  resolution, get the creditors, get, get this, this whole issue

1  passed.

2  Q   Thank you, Mr. Kim.

3          MR. JONES:  I'm going to, subject to tendering his two

4  declarations and the exhibits identified, your Honor, we have

5  no further questions at this time.

6          THE COURT:  All right.

7          MR. SATTERLEY:  And subject to cross-examination, your

8  Honor, particularly the summary documents that were prepared

9  after Mr. Kim's deposition.

10         So we definitely want the opportunity to question him

11  about those.

12         THE COURT:  All right.  We'll reserve as to those.

13         Ready to go with cross-examine?

14         MR. SATTERLEY:  Your Honor, may I approach and hand

15  the witness a binder of documents?

16         THE COURT:  You may.

17         UNIDENTIFIED SPEAKER:  There's an extra one for the

18  clerk and one for the Judge.

19     (Exhibit binder handed to the Court)

20         THE COURT:  Uh-huh (indicating an affirmative

21  response).

22         MR. BLOCK:  May it please the Court, your Honor.

23         THE COURT:  Yes, sir.

24         MR. BLOCK:  Nice to see we have the metal pitchers

25  back in the courtroom.

1          THE COURT:  It's a trust issue.  We don't think anyone

2    can throw them that far, so.

3                            CROSS-EXAMINATION

4    BY MR. BLOCK:

5    Q    And, Mr. Kim, welcome back from New Jersey, sir.

6    A    Thank you, Mr. Block.

7    Q    And in thinking about New Jersey, I was looking at the

8    services agreement with Johnson & Johnson Services and the

9    debtor, LTL, and I looked at where, where the notices go and it

10   says the notices for LTL Management go to 501 George Street,

11   New Brunswick, New Jersey, is that right?

12   A    That is correct.

13   Q    And that, in fact, is the world headquarters of Johnson &

14   Johnson, right, sir?

15   A    No, it's not.

16   Q    Sir, it is one of the addresses of Johnson & Johnson,

17   correct, sir?

18   A    It's one of the addresses of Johnson & Johnson.

19   Q    And, in fact, sir, if you, if you look at the building,

20   there is a placard right in front of the building at 501

21   George, George Street that has the name Johnson & Johnson,

22   correct?

23   A    It, it does, but the world headquarters is actually 1

24   Johnson & Johnson Plaza.

25   Q    501 George Street is in New Brunswick, New Jersey and it's

1   one of the buildings for Johnson & Johnson, the parent company,

2   true or not true?

3   A   It is one of the, one of the buildings that, that Johnson &

4   Johnson owns in New Brunswick, one of --

5   Q   Okay, sir.

6   A   -- one of many.

7   Q   Johnson & Johnson owns the building that LTL Management is

8   housed in?

9   A   Oh, yes.

10  Q   Okay.  And, sir, is it true that you, John Kim, are

11  continuing to use your J&J e-mail?  It says that notices for

12  the LTL bankruptcy matter should go to you at your J&J.com e-

13  mail.  That's true, isn't it sir?

14  A   It is.  All, all employees have that ITS.J&J.com,

15  regardless of what organization they work for.

16  Q   Okay, sir.  We're on time limits.  So my only question for

17  you was do the notices to John Kim in this bankruptcy go to

18  your e-mail that has a J&J.com ending, yes or no?

19  A   It does.

20  Q   And, in fact, the President of LTL, notices go to him at

21  his e-mail at J&J.com e-mail address, correct?

22  A   That is his e-mail address.

23  Q   Sir, what is the exact date that the transactions giving

24  rise to LTL, the debtor, began in October of 2021?

25  A   The -- I believe filings were made on October 12th.

1   Q   Okay.  And I'm going to refer to those as the October 2021

2   Transactions relating to JJCI.  Do you understand that?

3   A   I will try to keep that in mind.

4   Q   Okay.

5       And, sir, do you admit that prior to the October 2021

6   Transactions relating to JJCI that J&J and JJCI were

7   financially independent of each other?  Do you admit that?  Yes

8   or no.

9   A   I don't -- it depends on what you mean by "financially

10  independent."

11              MR. BLOCK:  Let's look at the slide which shows

12  Exhibit 30.

13  BY MR. BLOCK:

14  Q   And I'd like to just have the Court understand and everyone

15  looking at this big, black binder that's in front of you the

16  numbers in the black binder match the exhibits to the

17  opposition to the motion for preliminary injunction that

18  Mr. Waldrep's firm filed.

19      So when I show Exhibit 30, that's the same Exhibit 30 from

20  Mr. Waldrep's brief, okay?  If it has a letter on it, then it's

21  something new.

22      So looking at Exhibit 30, this is an affidavit -- and, sir,

23  there's a binder in front of you -- that has a 30 on it -- if

24  you have, if you want to look at any of these documents.

25      And, sir, you know who Tina Snyder French is, don't you?

1   A    I do.

2   Q    And you know that Tina Snyder French was someone who used

3   to work in the "Office of the Corporate Secretary of Johnson &

4   Johnson, correct?

5   A    She did.

6        I'm sorry.  This binder is not cooperating.  I apologize.

7   Q    I would just recommend you keep the rings closed --

8   A    No, no, no.  Yeah, I do.

9   Q    -- and then flip.

10  A    It -- this ring is -- this ring is not aligned and so --

11  Q    Sir, you just have to, just have to turn it, okay?

12       If you'd like to go to Exhibit 30, please do, okay?

13  A    Thank you.

14  Q    And so this affidavit was signed under oath under penalty

15  of perjury by Tina Snyder on June 20, 2018.  Do you see that in

16  Exhibit 30, sir?

17  A    I do.

18  Q    And the Corporate Secretary's office, that's, that's the

19  place with financial records at Johnson & Johnson in New

20  Brunswick, correct?

21  A    No, it's not.

22  Q    There are corporate records at J&J's office of the

23  Corporate Secretary in New Brunswick, New Jersey, correct?

24  A    There are, yes.

25  Q    And, in fact, in Paragraph 3, which I don't have on the

1    slide, but you can see in Exhibit 30 Ms. French says in this

2    2018 affidavit:

3        "I have personal knowledge of all the facts set forth in

4    this affidavit.  If called and sworn as a witness, I could and

5    would testify as set forth in this affidavit.  I base my

6    statements upon information obtained from various sources,

7    including my own personal experience as an Assistant Secretary

8    of J&J, its corporate records, documents maintained by J&J in

9    the regular course of business, and other information obtained

10   by me in the ordinary course of business."

11       Do you see that?

12   A    I do.

13   Q    And this affidavit was submitted to a federal court of the

14   United States in the Southern District of Mississippi, correct?

15   A    I, I see that, yes.

16   Q    And on behalf of Johnson & Johnson, if we go to Paragraph

17   9, Ms. French says:

18       "J&J and Johnson & Johnson Consumer Inc. are financially

19   independent of each other."

20       Do you see that statement?

21   A    I do.

22   Q    And you, sir, were the head of Product Liability Litigation

23   at the time Ms. French submitted this affidavit, correct?

24   A    I was.

25   Q    And you see, sir, that this affidavit is sworn under

1   penalty of perjury and it's signed by Ms. French?

2   A   I see it is signed by Ms. French, yes.

3   Q   Okay.  And you understand, sir, because you're a lawyer,

4   that when you sign an affidavit, that's just like raising your

5   hand under oath and testifying in court, do you understand

6   that?

7   A   I do.

8   Q   And you understand if someone says something in court or an

9   affidavit that is not true, that is perjury?

10  A   I believe that's true, yes.

11  Q   Sir, do you admit, sir, that before the transactions that

12  occurred in October 2021 relating to JJCI, that J&J and JJCI

13  made no effort to divest assets away from each other?  Do  you

14  agree with that, sir?  Sir, can you answer my question?

15  A   I'm sorry.  Yeah.  I'm looking trying to figure out where

16  you --

17  Q   No, no.  I'm not asking you about Ms. French.

18  A   Oh.

19  Q   I'm asking you, sir.

20  A   Oh, okay.

21  Q   Sir, do you agree, yes or no, that before October of 2021

22  J&J and JJCI made no effort to divest assets away from one

23  another?  Do you agree with that or not?

24  A   I, I agree that for purposes of whether the companies are

25  trying to hide assets by exchanging them with one another, I

1   agree that Johnson & Johnson and JJCI did not do that.

2   Q    Sir, do you agree that prior to October of 2021 there was

3   no effort on the part of Johnson & Johnson Consumer Inc. to

4   divest any assets away from J&J?  Yes or no.

5   A    Again, I would, I would say that -- if the implication is

6   that JJCI was, you know, stealing assets away to, to get rid of

7   them so that JJCI wouldn't have them, I, I would disagree with

8   that.

9   Q    And on Paragraph 12, let's see what Ms. French said as the,

10  as the representative of Johnson & Johnson under oath:

11       "There has been no effort on the part of J&J to divest

12  assets away from Johnson & Johnson Consumer Inc. for the

13  benefit of J&J."

14       Do you see that she said that?

15  A    Yeah.  I, I agree with that.  I agree that there --

16  Q    Sir, do you see that she said it?

17  A    I do see that.

18  Q    Let me ask my next question.

19       Her next sentence in her affidavit sworn to the court in

20  federal court in Mississippi was likewise:

21       "There has been no effort on the part of Johnson & Johnson

22  Consumer Inc. to divest assets away from J&J for the benefit of

23  Johnson & Johnson Consumer Inc."

24       Do you, do you see that statement by Ms. French from June

25  20, 2018 under oath?  Do you see it?

1  A    I see it and I agree with it for the purposes of this, of

2  this type of affidavit.  That's exactly right.

3  Q    Sir, do you now agree -- will you, will you now admit to

4  the Court that before October of 2021 J&J and JJCI were

5  financially independent of each other?  Will you now admit it?

6  Q    I would admit to the extent that it -- it defines -- it

7  says right afterwards what, what she's talking about, which is

8  "financially independent of each other.  Johnson & Johnson

9  Consumer Inc. is fully capitalized.  Johnson & Johnson does not

10 pay for any of its research, salaries, raw materials, or other

11 operating companies.  J&J and Johnson & Johnson Consumer Inc.

12 maintain separate and independent bylaws."  All that stuff

13 shows, I agree that that shows that they're financially

14 independent.

15 Q    Okay, sir.

16     Now looking at Ms. French's affidavit submitted to the

17 federal court in Mississippi in 2018, do you see any mention in

18 that 13-paragraph affidavit that JJCI had agreed to provide any

19 indemnification to J&J for any liabilities?  Go ahead.  Look at

20 Exhibit 30.

21 A    No.  I, I do not see it nor would I expect to see it.

22         MR. BLOCK:  Your Honor, I'd move to strike everything

23 after "I do not see it."

24         THE COURT:  Overruled.

25 BY MR. BLOCK:

1  Q    Now -- and, sir, this affidavit -- you -- have you seen

2  this affidavit before?

3  A    I, I don't recall.

4  Q    Do, do you know that this affidavit wasn't just filed once,

5  it was filed again in the Southern District -- United States

6  District Court for the Northern District of Alabama on

7  September 10, 2018?  Do you see that on the screen as Exhibit

8  31?

9       Sir, just so you have my question in mind, isn't it true

10 that Ms. French filed this same affidavit again in September of

11 2018 and this time in the federal court in Alabama?

12 A    Yeah.  I'm -- I -- I -- I could sit here and try to figure

13 out whether they're exactly the same.

14 Q    Right.

15 A    I see that she --

16 Q    Well, let me, let me draw you to Paragraph 11.  Ms. French

17 told the federal court in Alabama that "J&J and JJCI are

18 financially independent of each other" on September 10, 2018,

19 correct?

20 A    With all the additional language that she has in there,

21 yes.

22 Q    Right.  And the Court has the whole affidavit.

23      And Ms. French told the court, federal court in Alabama,

24 that, "There has been no effort on the part of J&J to divest

25 assets away from JJCI for the benefit of J&J and that there has

 1   been no effort on the part of JJCI to divest assets away from

 2   J&J for the benefit of JJCI."

 3       Do you see that from that affidavit --

 4   A   I -- I --

 5   Q   -- Exhibit 31?  Do you see it?

 6   A   I, I do.

 7   Q   Okay.

 8       And do you know, sir, that this affidavit was also filed in

 9   2019 in Supreme Court of the State of New York, County of New

10   York, on April 17, 2019?

11   A   So, I mean --

12   Q   Sir --

13   A   I don't mean to quibble.  They're not the same affidavit

14   because there are certain differences between them --

15   Q   Okay.

16   A   -- that you can see.

17   Q   Sir, do you see Exhibit 32 is an affidavit from Tina

18   French, which was submitted to the court, the Supreme Court of

19   the State of New York, County of New York?

20   A   I, I see that, yes.

21   Q   And do you see now we're into 2019?  The date is April 17,

22   2019?

23   A   I do.

24   Q   And do you see that Exhibit 32 shows that the affidavit was

25   filed in support of a motion to dismiss filed by Johnson &

1  Johnson and Johnson & Johnson Consumer Inc.?  Do you see that

2  on Page 1 at the top?

3  A    I do.

4  Q    And so this affidavit from Ms. French was being submitted

5  to a court to have a plaintiff's case dismissed, right, sir?

6  A    Yes, for lack of personal jurisdiction.

7  Q    Okay.  They wanted a dismissal, though, right, motion to

8  dismiss?

9  A    Yes, for lack of personal jurisdiction.

10 Q    Okay.  And, and that also has the same language about

11 financial independence and it has the same language about no

12 effort on the part of either companies, either of the companies

13 to divest assets away from each other, correct?

14 A    I think, generally.

15 Q    Okay.

16 A    I'd have to check again to see if they're exactly the same.

17 Q    And, and just for the record, your Honor, Exhibit 33, and

18 Mr. Kim, that is another affidavit by Ms. French from the

19 Holleman case from April of 2019 in New York that also has the

20 same language about the two companies being financially

21 independent of each other, correct?

22 A    Again, I haven't checked word for word whether it's the

23 exact same language, but --

24 Q    Okay.

25 A    -- it's similar.

1   Q   All right.

2       And, sir, drawing your attention back to Exhibit 26 that we

3   talked about last time you were here.

4       Do you remember I showed you these answers to

5   interrogatories from Johnson & Johnson and Johnson & Johnson

6   Consumer Inc. from 2019 where both defendants were asked to

7   identify any claims for indemnification, do you remember that?

8   A   I, I do.

9       Could you point me to -- is this the interrogatory?

10  Q   It's Exhibit 26 --

11  A   Uh-huh (indicating an affirmative response).

12  Q   --  at Page 21.

13  A   Yep, I see it.

14  Q   And, sir, I put up on the screen that when Johnson &

15  Johnson and Johnson & Johnson Consumer Inc. filed answers to

16  interrogatories in May of 2019 when they were asked about any

17  claims of indemnification, they answered none, correct, sir?

18  A   No.  Subject to and without waiving all these other

19  objections, it said none.

20  Q   Okay.  It said none, right?

21  A   It did.

22  Q   Okay.  And, sir, can you provide to Judge Whitley any

23  document ever filed in a mesothelioma case or an ovarian cancer

24  case involving Johnson & Johnson or, or Johnson & Johnson

25  Consumer Inc. before October of 2021 where either company

1  asserted that there was an indemnification agreement as between

2  JJCI and Johnson & Johnson?  Can you identify any legal filing

3  that said that before October of 2021?  Yes or no.

4  A   I'm not sure whether it was in a legal filling, but we did

5  produce the minutes of the board of directors meeting that laid

6  that out.

7  Q   Sure.  We'll get to that.

8      What I meant was we just saw an answer in an interrogatory

9  where Johnson & Johnson and Johnson & Johnson Consumer Inc.

10 said none, right?

11 A   Well, that's not the same question.  This question as to

12 whether we're asserting a claim for indemnification in the

13 lawsuit is very different than is there an indemnification

14 agreement between the two parties.

15 Q   So my question for you is -- I'm not, I'm not talking about

16 historical documents and we'll get to those in your examination

17 here.  I'm talking about a legal pleading where Johnson &

18 Johnson or Johnson & Johnson Consumer Inc. asserted that

19 Johnson & Johnson Consumer Inc was indemnifying Johnson &

20 Johnson for talc liabilities.

21     Can you point this Court to a legal pleading or document

22 where J&J or JJCI asserted that before October of 2021?  Yes or

23 no.

24 A   I, I can't think of one right now.  But again, when we

25 produced those documents they were produced in a pleading, I

1   believe.  I, I'd have to go back to see --

2   Q    Okay.

3   A    -- in what, in what form that, the corporate minutes were

4   produced --

5   Q    And, sir, you --

6   A    -- and in what, and in what motion they may have been used.

7   Q    Okay.  Sir, your answer was, "I can't think of one right

8   now" --

9   A    Right.

10   Q    -- and your time is counting against my time.

11        So my question simply was, can you identify for Judge

12   Whitley a single legal pleading where J&J or JJCI ever asserted

13   that JJCI was indemnifying J&J before October '21?  Can you

14   identify a document?  Yes or no.

15   A    I want to say there was a motion to dismiss filed that had

16   those documents in it, but I, sitting here right now, I don't

17   have a recollection of --

18   Q    You want to say there was a motion to dismiss filed.

19   Where --

20   A    Yeah.  With --

21   Q    In what court?

22   A    In one of the jurisdictions, maybe Leavitt?  But again, I'd

23   have to, I'd have to go back and see.

24        So sitting here right now, I can't recall a specific one,

25   but there may have been motions filed that had as a defense or,

1   or had in it that, that board minute.

2   Q    Okay.

3        And, sir, let's talk about the 1979, what we've called the

4   transfer agreement as between Johnson & Johnson and Johnson &

5   Johnson's Baby Products Company, okay?

6   A    Uh-huh (indicating an affirmative response).

7   Q    And I'm going to call -

8   A    Yes.

9   Q    I'm going to call up the 1979 transfer agreement, but we

10  know that it was actually signed on December 1, 1978, correct?

11  A    I believe that's right.

12  Q    Okay.  But you'll understand what I'm talking about if I

13  call it the 1979 Transfer Agreement?

14  A    I will.

15  Q    Thank you.

16       So when you, when you were here last time you told the

17  Court that you had been searching for the 1979 Transfer

18  Agreement for years, is that right?

19  A    We searched for it a few years ago.

20  Q    Sir, the fact is it wasn't until Sunday, October 24, 2021,

21  that anyone from Johnson & Johnson asked the company's Senior

22  Legal Records Coordinator to look for the 1979 Transfer

23  Agreement.  That's a true statement, isn't it?

24  A    I'm not sure she was a Senior Legal Coordinator or whether

25  she was at the company to -- I actually don't know when she

1    started at the company.  I don't know what her position was at

2    the company a few years ago.

3    Q   All right.  Well, fortunately, we took her deposition this

4    past weekend and Ms. Schirger-Ward testified that she has been

5    the Senior Legal Records Coordinator at Johnson & Johnson in

6    New Brunswick, New Jersey from 2013 to the present.

7        And would you defer to Ms. Schirger-Ward about her

8    biography?

9    A   Yeah, but I would say a Senior Legal Records Coordinator,

10   not the Senior Legal Records Coordinator.

11   Q   Really?  Well, I actually asked her that question.

12   A   Yeah.

13   Q   Look at, look at the question I asked her on Halloween, on

14   Halloween Sunday.  This is my question to Ms. Schirger-Ward at

15   Page 14 of the transcript.

16   A   Yeah.

17   Q   (Reading):

18   "Q  And you are the highest-ranking person in Johnson &

19   Johnson's Legal Department, correct?

20   "A  Within my, within our Department in New Brunswick, I am the

21   Senior Legal Records Coordinator."

22       Do you see that testimony?

23   A   Yes.  At this time now.

24           MR. BLOCK:  And we will submit, your Honor, the

25   entirety of Ms. Schirger-Ward's testimony which indicates that

1   she's the only one who's held that title, at least for a number

2   of years.  She has a colleague who's known as the Legal Records

3   Coordinator.

4   BY MR. BLOCK:

5   Q   So Ms. Schirger-Ward, who was the Senior Legal Records

6   Coordinator when this bankruptcy petition was filed, had not

7   even been asked to look for the 1979 Transfer Agreement until

8   Sunday, October 24, 2021, true?

9   A   I, I, I don't know, actually.

10  Q   Well, let's, let's go --

11  A   Yeah.

12  Q   -- to the person who was asked at Page 20 of the transcript

13  of her deposition testimony from October 31st:

14  "Q  So after being contacted on October 24, 2021 and asked to

15  look for the 1979 Transfer Agreement for the first time, it

16  took you about two hours to find it, right?

17  "A  Yes."

18      Do you see that testimony?

19  A   I do see it.

20  Q   And do you dispute it?

21  A   I just don't know what she was asked to look for prior to

22  this.  In other words, my recollection was that we were doing

23  general searches.  So we would have said in prior searches,

24  "Please find any document related to," you know, "this, this

25  merger or, or this transaction."

1     So, you know, I just don't know whether we specifically

2  said to look for the 1979 Transfer Agreement.

3  Q   And, sir, do you know that when Ms. Schirger-Ward was asked

4  for the first time to look for this agreement on October 24,

5  2021 no one told her that they had ever looked for it before,

6  do you know that?

7  A   I think, as I testified earlier, when we did this search my

8  instructions were to, "Start from scratch.  Don't rely on

9  anything that happened in the past," and which is why she would

10 not have been told that we looked for it before.

11 Q   Sir, do you --

12         THE COURT:  In the interest of time, the jousting is

13 getting a little excessive.

14         THE WITNESS:  I'm sorry.

15         THE COURT:  Answer the question he's asking you.

16         Give him time to answer --

17         MR. BLOCK:  Uh-huh (indicating an affirmative

18 response).

19         THE COURT:  -- the question.

20         We'll get your other side of this on redirect, all

21 right?

22         MR. BLOCK:  Yeah.

23         THE COURT:  Let's go.

24 BY MR. BLOCK:

25 Q   In fact, sir, Ms. Schirger-Ward was asked:

1   "Q  Did anyone ever tell you that they had looked for the 1979

2   Transfer Agreement before October 24, 2021?  Did anyone ever

3   tell you that?

4   "A  I don't remember anyone telling me that."

5       Do you see that testimony?

6   A   I do see that.

7   Q   Okay.  My only question for you is do you dispute it?

8   A   I don't dispute what she said, no.

9   Q   Okay.  Thank you.

10      So let's look at what the language says in the agreement

11  that Ms. Schirger-Ward found after looking for it for about two

12  hours.

13      Do you see Exhibit 34 to your notebook is the 1979 Transfer

14  Agreement, which was signed 12/1/1978, and the agreement became

15  effective January 1, 1979, and it's between Johnson & Johnson

16  and Johnson & Johnson Baby Products Company, correct?

17  A   It is.

18  Q   Okay.  And in the first page of the agreement, Exhibit 34,

19  it says, "Whereas, the subsidiary corporation is wholly owned

20  by J&J and J&J is desirous" --

21      (Cellphone rings)

22  BY MR. BLOCK:

23  Q   Okay.

24      There is a Whereas paragraph on Page 1 that says, "Whereas,

25  the subsidiary corporation is wholly owned by J&J and J&J is

1   desirous of transferring to the subsidiary all assets and

2   liabilities which are now allocated to the Baby division on the

3   books or records of Johnson & Johnson."

4       Do you see that language?

5   A   I do.

6   Q   Okay.

7       So first of all, it's talking about both the "assets and

8   liabilities which are now allocated to the Baby division on the

9   books or records of Johnson & Johnson," right?

10  A   It says what it says, yes.

11  Q   Okay.  And let's start with the assets.  And there's more

12  language about the assets on Page 2 and it says, "Assets of

13  every nature and description, tangible and intangible, wherever

14  located which are now allocated on the books or records of J&J

15  to its Baby division, the same to include, without limiting,"

16  and it gives some examples, right?

17  A   It does.

18  Q   Okay.  And one of the examples is automobiles, trucks,

19  furniture, right?

20  A   Yes.

21  Q   Okay.  So what, what trucks were allocated on the books or

22  records of the Baby division of J&J as of this time, December

23  1, 1978?  What trucks?

24  A   I don't have that information.

25  Q   How many Ford cargo vans were on the books or records that

1   had been, that had been allocated to J&J's Baby division?

2   A   I don't know, but whatever, whatever there were were

3   allocated, were assumed.

4   Q   Well, sir, J&J, the worldwide company, they owned as of

5   December 1, 1978, they owned a lot of cars and a lot of trucks,

6   right, the J&J global company, right?

7   A   I, I don't know.

8   Q   Okay.  So you can't tell me what trucks were on the books

9   or records of J&J's Baby division because you haven't looked at

10  the book or, books or records that were allocated to the Baby

11  division that would list the specific assets, correct?

12  A   I haven't looked at records that -- of -- relating to

13  trucks or automobiles, no.

14  Q   Right.  You don't know -- furniture.  You don't know how

15  many couches, how many sofas, how many chairs, how many tables?

16  I mean, to know that, you would have to look at the list of

17  assets that then existed on the books or records allocated to

18  the Baby division as of December 1, 1978, right?  That's where

19  that information would be, right?

20  A   Not necessarily.

21  Q   All right.  Well, sir, how many couches were transferred

22  from the Baby division of Johnson & Johnson to Johnson &

23  Johnson's Baby Products Company?  It says "furniture," but how

24  many couches?

25  A   I haven't looked for that information.

1   Q    Okay.

2        And so when we look at the liabilities, we have the same

3   language about books and records.  It says, "All the

4   indebtedness, liabilities, and obligations of every kind and

5   description which are allocated on the books or records of J&J

6   as pertaining to its Baby division."

7        Do you see that?

8   A    I do see that.

9   Q    Okay.  And in order to know, for example, what specific

10  debts were allocated to the books or records of the Baby

11  division, you'd have to see the books or records, right?

12  A    Yes.  I think you would have to look at books or records.

13  Q    Okay.  And, sir, you, I mean, in terms of Ms. Schirger-Ward

14  as the Senior Legal Records Coordinator at Johnson & Johnson,

15  she did not look for the list of liabilities that were

16  transferred from Johnson & Johnson's Baby division to Johnson &

17  Johnson Baby Products Company.  You know that, correct?

18  A    I -- yes, that's true.

19  Q    Okay.  And, in fact, Ms. Schirger-Ward, the Senior Legal

20  Records Coordinator for Johnson & Johnson, was not asked to

21  look for the books or records as pertaining to the Baby

22  division of Johnson & Johnson in the December 1978-January 1979

23  time period, correct?

24  A    Her statement is what her statement is.

25  Q    And Ms. Schirger-Ward, when I asked her -- I asked

1  Ms. Schirger-Ward:

2  "Q  And because you were not asked to look for it, you don't

3  know what specific liabilities were transferred from the

4  Johnson & Johnson Baby division to the Johnson & Johnson Baby

5  Products Company in 1979.  You don't know, correct?"

6       And her answer was, "Correct."

7       You know she gave that testimony, correct?

8  A   She gave that testimony, yes.

9  Q   And, sir, you, yourself, Mr. Kim, you, yourself, have not

10 even looked for a J&J document that describes talc liabilities

11 in the books or records at the time of December 1, 1978,

12 correct?

13 A   I think we've done a search of records.

14 Q   Sir, you said earlier that you were -- let me see if I have

15 my notes --

16 A   Uh-huh (indicating an affirmative response).

17 Q   -- that you're familiar with the documents and how they're

18 kept at Johnson & Johnson, you remember that?

19 A   I do.

20 Q   Sir, you, yourself, Mr. Kim, who's here on behalf of LTL

21 seeking a preliminary injunction, you haven't looked for any

22 J&J document that describes talc liabilities in the books or

23 records at the time of December 1, 1978.  You haven't looked,

24 sir?

25 A   I have done some looking, yes.

1    Q    Sir, you gave a deposition in this case also on Halloween

2    and Mr. Satterley also took his Halloween to ask you those

3    questions.  And looking at Exhibit 5-B in the binder -- and

4    it's right up on the screen so you could just look at it -- you

5    were asked by Mr. Satterley:

6    "Q  Can you identify for me a document that describes talc

7    liabilities, a J&J document that describes talc liabilities in

8    the books or records before December the 1st, 1978?

9    "A  Sitting here, I don't recall any, but I haven't looked."

10        Do you see that?

11   A    I do.  That's referring to the accounting books and

12   records.  I did, in this deposition, did go into looking at

13   records.

14   Q    Sir, you do not recall seeing a single document where J&J

15   has talc liabilities described in books in 1978, correct?

16   A    Correct.

17   Q    And, sir, this books and records language, you showed the

18   Court an agreement from 1981, right?  So there were subsequent

19   agreements involving Johnson & Johnson's Baby Products Company.

20   There was one in 1981 with Omni and there was one in 1987 that

21   involved the, the Dental Products Company and the renaming of

22   other companies until it became known as J&J Consumer Inc.,

23   correct?

24   A    Correct.

25   Q    Okay.  And those other agreements just like the 1979

1   Transfer Agreement we looked at have that same language where

2   the only liabilities that are part of the agreement are those

3   on the books or records and it says here of Baby Products,

4   correct?

5   A    It does.

6   Q    Okay.  So, so at this time Johnson & Johnson's Baby

7   Products in 1981 was its own company, correct?

8   A    It was.

9   Q    And now it is doing a transfer agreement with this company,

10  Omni, and we could see that at Exhibit 40 of the binder and in

11  doing this agreement with Omni, sir, the liabilities that Omni

12  accepted from J&J Baby Products Company was -- and we could see

13  on the screen for Exhibit 40 -- "liabilities and obligations of

14  every kind and description on the books or records of Baby

15  Products," do you see that, sir?

16  A    I do see that.

17  Q    Okay.  And you also have not looked for the books or

18  records that Johnson & Johnson Baby Products had as of 1981,

19  correct?

20  A    We have not looked at the -- I have not looked at the

21  accounting books.

22  Q    Okay.  And, sir, as far as -- there was another agreement,

23  then, and it was an agreement between Johnson & Johnson Baby

24  Products and there were some name changes and the assets and

25  liabilities as set forth in the agreement were transferred over

1   to J&J Consumer Inc., right?  That was the 1987 agreement that

2   was effective January 3, 1988, Exhibit 41, correct?

3   A    It is.

4   Q    Okay.  And you agree, sir, in terms of this 1979 Transfer

5   Agreement that prior to January 1, 1979 there were no lawsuits

6   claiming any personal injury arising from the alleged use of

7   Johnson's Baby Powder and/or Shower to Shower filed against any

8   of the J&J companies, correct?

9   A    No.  Correct.

10  Q    That's correct?

11  A    That is correct.

12  Q    Okay.  And, and that's why, looking at Exhibit 36-A, at the

13  close of the, the financial year in 1978, December 31, 1978,

14  the same month as the 1979 Transfer Agreement was signed, J&J

15  describes legal proceedings in its 10-K and Johnson & Johnson

16  describes product liability cases for contraceptive products,

17  but it doesn't refer to any product liability cases for talc

18  because there were none at the close of 1978, correct?

19  A    There -- I agree there were none.  The fact that if, if

20  there were, it may not be reflected in the 10-K if it did not

21  reach a material amount.

22      So there's lots of litigation that's not reported in the

23  financial --

24  Q    Yeah.

25  A    -- statements, so.

KIM - CROSS                                                              199

1   Q    And I, I don't think we're arguing.

2   A    Okay.

3   Q    There were contraceptive product liability lawsuits by the

4   end of 1978.   There were no talc lawsuits against any J&J-

5   related companies as of that date?

6   A    Right, but you can't tell that from the statement.   That's

7   all I'm saying.

8   Q    Okay.

9        And, sir, you know, in terms of your history with the

10  company, you started with Johnson & Johnson in the year 2000,

11  right?

12  A    2000-2001, yeah.

13  Q    Okay. But there was a lawyer at Johnson & Johnson that

14  preceded you that managed the talc litigation involving

15  personal injury cases and his name was John O'Shaughnessy,

16  correct?

17  A    That's correct.

18  Q    Okay.   And Mr. O'Shaughnessy did a sworn declaration, which

19  is Exhibit 35-A, and he says that the first talc lawsuit

20  against any Johnson & Johnson company was in 1983.   It was

21  called the Gambino case.   Is that your understanding as well,

22  sir?

23  A    I believe it is.   I'm not sure if I knew the name, but --

24  Q    Okay.   You -- you would -- you would defer to

25  Mr. O'Shaughnessy as someone who knows the litigation from the

1    '80s and the '90s better than you do because he actually was

2    managing it, right?

3    A    Yes.

4    Q    Okay.  And Mr. O'Shaughnessy also tells us, looking at the

5    next slide, that the first mesothelioma lawsuit against any of

6    the J&J companies was in 1996.  He said it was a case called

7    Howard, do you see that?

8    A    Yes.

9    Q    Okay.  And, and you would not dispute Mr. O'Shaughnessy's

10   declaration about that?

11   A    No.

12   Q    Okay.

13       And as far ss the ovarian cancer cases -- I think you've

14   said this yourself -- that wasn't until 2009.  The Berg case

15   was the first ovarian cancer lawsuit filed against any of the

16   J&J-related companies, correct?

17   A    I believe that's true, yes.

18   Q    Okay.

19       So just to kind of refresh one issue that we talked about

20   last time quickly, you agreed last time that it was Johnson &

21   Johnson that manufactured and sold Johnson's Baby Powder prior

22   to 1979, right?

23   A    Yes.

24   Q    Okay.  And so before Johnson & Johnson Consumer Inc.,

25   before its predecessor company, Johnson & Johnson Baby Products

1  Company, even became its own separate company in 1979, Johnson

2  & Johnson had already been manufacturing and selling Johnson's

3  Baby Powder for 70 or 80 years itself, right?

4  A    Yes.

5  Q    And, sir, before you came into court and made the

6  statements you did about Shower to Shower and who made the

7  product and when, did you read the deposition of Ronald

8  Yakupcin, who was a former chemist with Kolmar?  And your

9  attorneys from Patterson Belknap, Mr. Thomas Kurland, was

10 present at the deposition.

11      Have you been educated about that, sir?

12 A    I do not --

13 Q    Okay.

14 A    -- know this.

15 Q    So, so we've submitted to the Court -- it's Exhibit 24-A --

16 this is deposition testimony from a gentleman name Ronald

17 Yakupcin and he worked for a company named Kolmar.

18      Are you familiar with Kolmar?

19 A    I am not.

20 Q    Okay.  And Mr., Mr. Yakupcin testified that Kolmar made

21 Shower to Shower for Johnson & Johnson at the time he joined

22 the company, 1969, and Kolmar continued to make Shower to

23 Shower for Johnson & Johnson up until approximately 1974.

24      Do, do you see that testimony I've put on the screen?

25 A    I do see the testimony.

1  Q   And no one's ever made you aware of that testimony, right?

2  A   It's never come up.

3  Q   Okay.  I mean, has anyone shown you documents like this

4  one, Exhibit 24, showing Johnson & Johnson itself based in New

5  Brunswick, New Jersey arranging for the delivery of hundreds of

6  thousands of pounds of talc to Kolmar for purchase orders for

7  Kolmar making talcum powder products for Johnson & Johnson?

8  A   I'm sorry.  What was the question?

9  Q   Have, have you ever seen Exhibit 24 that, that shows

10 Johnson & Johnson in New Brunswick, New Jersey in 1970 having

11 hundreds of thousands of pounds of talc delivered to Kolmar to

12 make talc products for Johnson & Johnson?

13 A   I have not looked at this before.

14 Q   Okay.  Has, has anyone shown you Exhibit 22?  And this is

15 dated 1976 and at the top it says Shower to Shower Deodorant

16 Body Powder.  Do you see that?

17 A   I do.

18 Q   And do you see there's an asterisk next to Shower to Shower

19 and there's an indication that that is a trademark of Johnson &

20 Johnson.  Do you see that?

21 A   I do.

22 Q   Okay.  And, sir, do you see that it says Lot No. 2834K was

23 manufactured on the 283rd day of 1974 at Kolmar Labs?  Do you

24 see that?

25 A   I, I see that, yes.

1   Q    Okay.

2        Sir, why don't you turn to Exhibit 22?

3             THE COURT:  Have you -- hang on.

4   BY THE COURT:

5   Q    Have you ever seen this document before?

6   A    I have not.

7             THE COURT:  Okay.  Go ahead.

8             MR. BLOCK:  Okay.

9   BY MR. BLOCK:

10  Q    And, sir, why don't you look at Exhibit 22, which was

11  produced by Johnson & Johnson as a business record in

12  litigation.

13            MR. JONES:  Excuse me, your Honor.  What litigation?

14            MR. BLOCK:  Well, it -- the Bates stamp is JNJNL61.

15  This is part of their production in mesothelioma and ovarian

16  cancer cases.

17  BY MR. BLOCK:

18  Q    Now --

19            THE COURT:  That answer your question, Mr. Jones?

20            MR. JONES:  If -- if -- on the affirmation that that's

21  a Johnson & Johnson Bates number, yes.  Thank you.

22            THE COURT:  Okay.

23            MR. BLOCK:  Yeah.

24            THE COURT:  Continue.

25            MR. BLOCK:  Okay.

KIM - CROSS                                                              204

1   BY MR. BLOCK:

2   Q   Sir, looking at this one-page document, whose, whose logo

3   is that at the top?

4   A   It says Johnson & Johnson.

5   Q   And above the date -- I don't have it on the slide -- but

6   above the date -- you're looking at the document, Exhibit 22 --

7   what city in New Jersey is that?

8   A   It says New Brunswick, New Jersey.

9   Q   Okay.  And JJCI historically has been located in Skillman,

10  New Jersey, right?

11  A   I'm not sure when the Skillman plant, the Skillman location

12  was --

13  Q   Okay.

14  A   -- was built.

15  Q   JJCI has been located in Piscataway, New Jersey and

16  Skillman, New Jersey historically, correct?

17  A   I believe those are two of the addresses.

18  Q   Okay.  JJCI is, it has not been located in New Brunswick,

19  New Jersey.  That's Johnson & Johnson, correct?

20  A   No, that's not true.

21  Q   All right, sir.

22        THE COURT:  Hang on.

23  BY THE COURT:

24  Q   Explain your answer.

25  A   JJCI has offices also in New Brunswick, New Jersey.

1            THE COURT:  Go ahead.

2            MR. BLOCK:  Okay.

3   BY MR. BLOCK:

4   Q   All right.  But with respect to this document, referring to

5   the manufacture of Shower to Shower, we only see the name

6   Johnson & Johnson and we see New Brunswick, New Jersey and we

7   see trademark of Johnson & Johnson.  And would you agree, sir,

8   there is no mention of Johnson & Johnson Baby Products Company

9   and no mention of Johnson & Johnson Consumer, do you agree?

10  A   I agree with all that, yes.

11  Q   All right.  And, sir, even the container of Johnson &

12  Johnson's Shower to Shower product, look, looking at a 1976

13  container that was produced by Johnson & Johnson in litigation,

14  do you see it says September 20, 1976?  And on the container

15  itself that's Johnson & Johnson, the parent company, New

16  Brunswick, New Jersey, correct?

17  A   I believe it is.

18  Q   Doesn't say anything about Johnson & Johnson Consumer or

19  anything about Johnson's Baby Products Company, correct?

20  A   That's correct.

21  Q   Okay.

22      So now you testified earlier that in approximately 1978

23  that Shower to Shower became part of a subsidiary of Johnson &

24  Johnson called Personal Products Company, right?

25  A   Correct.

1  Q   All right.  So it gets a little complicated, so let's just

2  make sure I understand this.

3      So we've seen that Shower to Shower was part of Johnson &

4  Johnson up until approximately 1978 and then it's your

5  testimony that Shower to Shower then became part of a

6  subsidiary called Personal Products Company, correct?

7  A   Correct.

8  Q   Okay.  You said on direct examination something about talc

9  liabilities as it relates to Personal Products Company,

10 correct?

11 A   You're going to have to be more specific.  I'm sorry.

12 Q   Where, where is the agreement for you to show the Court,

13 where is the agreement showing that Personal Products Company

14 when it took over Shower to Shower in 1978 accepted any of the

15 liabilities or what the language was about liabilities?

16 A   We don't have that right now.

17 Q   But what we do have and what we do know is that Shower to

18 Shower was not part of the Johnson & Johnson Baby Products

19 division as of 1978 when the 1979 Transfer Agreement was made,

20 correct?

21 A   Correct.

22 Q   All right.  So, so again, the 1979 Transfer Agreement says

23 that the liabilities for Johnson & Johnson, allocated to

24 Johnson & Johnson Baby division on the books or records, that's

25 what goes to J&J Baby Products Company, right?

1   A    I agree.

2   Q    But we know for a fact that the Shower to Shower business

3   was not part of the books and records for Johnson & Johnson's

4   Baby division as of December of 1978.  We know that, right?

5   A    We know that Shower to Shower was not part of the Baby

6   division --

7   Q    Right.

8   A    -- at that time, yes.

9   Q    And we know that because, if we look at the 1978 Annual

10  Report, Personal Products Company is listed separately on the

11  same page as Johnson & Johnson Baby Products Company.  Those

12  are listed as separate companies of Johnson & Johnson, correct?

13  A    I agree with that, yes.

14  Q    And Personal Products Company, the company that you don't

15  have any agreement about liabilities in 1978, they're the one

16  with the Shower to Shower now in 1978, right?

17  A    They are the ones with Shower to Shower, yes.

18  Q    Okay.  And even after the 1979 Transfer Agreement it's

19  Personal Products that continues to have Shower to Shower,

20  right?

21  A    It does.

22  Q    All right.  And, and what I've shown you because we have a

23  record here is Exhibit 42 for the 1978 Annual Report, Exhibit

24  44 from the 1979 Annual Report, and what that shows is that

25  through this 1979 Transfer Agreement Shower to Shower did not

1    go over to, to the Baby Products division as part of this 1979

2    Transfer Agreement, true?

3    A    I agree with that, yes.

4    Q    And we know that even as of 1982 Shower to Shower is still

5    part of the Personal Products Company and not part of the Baby

6    Products division.  Because looking at Exhibit 46, we see the

7    10-K where the products of Personal Products Company are

8    described and Shower to Shower was still one of the principal

9    products of Personal Products Company, which is separate and

10   apart from J&J's Baby Products Company, correct?

11   A    I agree with that, yes.

12   Q    Okay.

13        Now we get to this 1986 time period where you talked to the

14   Court about Shower to Shower going to the Baby Products

15   Company.  Remember, you showed the Annual Report for 1986?

16   A    Yes.

17   Q    All right.  So let's drill down on that.

18        First of all, have you seen this document, Exhibit 46-A,

19   which talks about major executive committee actions, and it

20   says, "The recommendation to delay the transfer of Shower to

21   Shower from Personal Products to Baby Products Company until

22   January 1, 1988 was tabled for discussion at a later date"?

23        Do you see that?

24   A    I do see that.

25   Q    All right.

1    So let's go ahead and assume that in this 1986 time period

2   that Shower to Shower, in fact, went to Johnson's Baby Products

3   Company, okay?

4   A   Okay.

5   Q   Where is the agreement, where is the agreement that shows

6   that Johnson & Johnson's Baby Products Company accepted any of

7   the liabilities for Shower to Shower and what the language was

8   in terms of whether it limited to the books and records of

9   Personal Products Company or not?

10  A   We don't have that yet.

11  Q   Another agreement you don't have yet?

12  A   Yes.

13  Q   And, sir, another thing that we know for a fact was not

14  part of the 1979 Transfer Agreement was a little old thing

15  called Johnson & Johnson's talc mine, right?

16  A   I'm sorry.  One more time.

17  Q   Well, sir, you certainly know that starting in the 1960s

18  Johnson & Johnson, they owned a talc mine, right?

19  A   I do.

20  Q   Okay.  And you, sir, know -- and this is Dr. Hopkins

21  testifying in a case -- that in the late '60s time period,

22  around 1967, Johnson & Johnson, the parent company, purchased a

23  talc mine in Vermont and operated under, and operated that

24  business under a Johnson & Johnson subsidiary called Windsor

25  Minerals, correct?

1  A    That's true.  Or they owned, they owned a subsidiary that

2  operated the mines, yes.

3  Q    Sir, in terms of whether the talc mine -- and, sir, you

4  know that the Windsor Minerals talc mine that Johnson &

5  Johnson, they, they owned a hundred percent of the shares of

6  Windsor Minerals from the late 1960s to 1989, right?

7  A    I believe that's true.

8  Q    Okay.  And, and what you do know is that that talc mining

9  business, Windsor Minerals, the talc was mined for, mined from

10 it, it was milled out of it, and then it was used to

11 manufacture Johnson's Baby Powder products and Shower to

12 Shower, right?

13 A    Yes.

14 Q    Okay.  And we know that this talc mining and supply

15 business of Johnson & Johnson's subsidiary, Windsor Minerals,

16 was not part of the J&J Baby Products division as of that key

17 date on December 1, 1978 when the 1979 Transfer Agreement was

18 executed, correct?

19 A    The mine itself was not.

20 Q    All right.  And we know that -- well, not just the mine

21 itself, but Windsor Minerals, Inc., which was the business of

22 Johnson & Johnson's that dug the talc out of the ground, that

23 put it in the mill, that processed the talc, and sent it for

24 use in the Johnson's Baby Powder and Shower to Shower

25 manufacturing, we know Windsor Minerals, Inc. was not part of

KIM - CROSS                                                                     211

1   the Baby division as of December 1, 1978, correct?

2   A    Well, it was owned by Johnson -- the shares of Windsor

3   Minerals was owned by Johnson & Johnson.

4   Q    And, in fact, you know what Johnson & Johnson called

5   Windsor Minerals, this talc mining and supply business, in its

6   Annual Report in 1978?  Johnson & Johnson called Windsor

7   Minerals "one of Johnson & Johnson's domestic operations,"

8   correct?

9   A    I don't recall.

10  Q    Sir, go to -- I'm sorry.

11       Can you please turn to Exhibit 42?

12  A    (Witness complies.)

13  Q    And I'm referring, sir, to the page numbers on the bottom

14  right of the page, not the Bates stamp number.  So Exhibit 42,

15  Page 46.

16       All right, sir.  So do we now agree that in 1978, the year

17  the 1979 Transfer Agreement was made between Johnson & Johnson

18  and Johnson & Johnson Baby Products Company, the Windsor

19  Minerals, Inc. talc mining and supply business was listed by

20  Johnson & Johnson in its Annual Report as "one of Johnson &

21  Johnson's domestic operations"?

22  A    Yes.

23  Q    And it, it could not have been a part of the Baby division

24  because it's a separate company and it was listed separately in

25  the Annual Report, correct?

1   A    Yes.  The company itself was listed separately.

2   Q    And, in fact, the same is true even after the, the date on

3   which the transfer agreement was, or became effective on

4   January 1, 1979.  Once again, we see Exhibit 44, Johnson &

5   Johnson's 1979 Annual Report, and Johnson & Johnson's domestic

6   operations include Windsor Minerals, Inc. and then separately,

7   Johnson & Johnson Baby Products Company, correct?

8   A    Yes.  I agree with that.

9   Q    And, sir, as you just conceded, if we look at Exhibit 50,

10  we know that all the way up until 1989 it was Johnson &

11  Johnson, the parent company, that owned 100 percent of Windsor

12  Minerals, which was the company whose talc was used for the

13  manufacture of Johnson's Baby Powder during the late 1960s all

14  the way up until 1989, correct?

15  A    It did own a hundred percent of the shares, yes.

16  Q    And, sir, looking at Exhibit 50-A, you know that, Exhibit

17  50 we were just looking at, that's the agreement between J&J

18  and Cyprus Mines, right?

19  A    I'm sorry.  50-A?

20  Q    Sure.  Let's, let's just go -- I'm sorry.  Let's go back to

21  Exhibit 50.

22      Exhibit 50 is the agreement between Johnson & Johnson and

23  Cyprus Mines, right?

24  A    It is.

25  Q    Okay.  And looking at Exhibit 50, the agreement of January

1   6, 1989 between Johnson & Johnson, the parent company, and

2   Cyprus Mines Corporation is that Johnson & Johnson is selling

3   the entirety of the Windsor Minerals talc operation to Cyprus

4   Mines, correct?

5   A    Yes, it is.

6   Q    Okay.  And, sir, did you know that as of -- or, sir, you do

7   know that Windsor Minerals when they would mine the talc and

8   mill it would sell it to various customers not just for use in

9   Johnson's Baby Powder, but also to companies making industrial

10  supplies, correct, or industrial materials?

11  A    I believe that's true, yes.

12  Q    Okay.  And, and you know because you've reviewed this, this

13  agreement many times that there were exhibits to this

14  agreement?  If you look at 50-A.  And the agreement is many

15  hundred pages.  So I, I just took Exhibit K to the agreement

16  between Johnson & Johnson and Cyprus Mines dated 1989, which is

17  a listing of customer sales.

18       Do you see that?

19  A    I do see that.

20  Q    Okay.  And so Johnson & Johnson through its subsidiary,

21  Windsor Minerals, would sell talc to, for use at the Johnson &

22  Johnson manufacturing plant in Royston, Georgia where Johnson's

23  Baby Powder and Shower to Shower is made, correct?

24  A    I'm sorry.  One more time.  I, I apologize.

25  Q    Yes.

1    So you agree, sir, this says Total Vermont Sales, referring

2   to Vermont talc from Windsor Minerals, Total Vermont Sales,

3   dollars, 1987, and then it lists it by top customers and it

4   says the top customer of Windsor Minerals as of that date was

5   Johnson & Johnson, Royston, Georgia, $5,952,210, estimated, do

6   you see that?

7   A    I, I do.

8   Q    And you admit, sir, that Royston, Georgia was the plant

9   that made most of the Johnson's Baby Powder and Shower to

10   Shower products as of this time, in the late 1980s?

11   A    I know that there's a plant in Royston, Georgia that made,

12   bottled --

13   Q    Right.

14   A    -- the, the Baby Powder.

15   Q    So Johnson & Johnson, the parent company, was making money

16   when the Windsor Minerals talc was sold for use in Johnson's

17   Baby Powder.  And we could see those dollars right here, right?

18   A    I'm sorry.  One more time.  What -- what -- the question

19   is?

20   Q    Yeah.

21    So Johnson & Johnson was making money on both ends.  They

22   were, they had a subsidiary that was mining the Vermont talc

23   out of the ground, milling it, and then selling it to their

24   biggest customer, which was a Johnson & Johnson plant in

25   Royston, Georgia where Johnson's Baby Powder is made, right?

1   A    Yeah.  So it's, it's true, yes, that they were selling talc

2   to a subsidiary or, or to a plant that was making Johnson's

3   Baby Powder.

4   Q    Right.  And you know that there are allegations in the

5   lawsuits in the tort system that that Vermont talc contained

6   asbestos?

7   A    I do know that allegation.

8   Q    And, sir, you even know about Dr. Blount, Dr. Alice Blount,

9   who testified that she found asbestos in that Vermont talc.

10  You know that, right?

11  A    I know that's what plaintiffs allege, yes.

12  Q    I mean, that's part of the cases that some juries have

13  accepted in rendering verdicts against both JJCI and J&J,

14  right?

15  A    That's part of the cases that plaintiffs, that some juries

16  have accepted.  Some juries have not.

17  Q    Okay.

18          MR. BLOCK:  Your Honor, can I suggest a short break at

19  this time?

20          THE COURT:  Everyone good with that?

21      (No response)

22          THE COURT:  Okay.  Let's take ten minutes.

23          MR. BLOCK:  Thank you.

24          THE COURT:  Just for the good of the order, there are

25  restrooms not only on this floor, but on the other courtroom

KIM - CROSS                                                                216

1    floors, 4, 5, 2, and 1, so.  All right?

2        (Recess from 3:30 p.m., until 3:41 a.m.)

3                            AFTER RECESS

4        (Call to Order of the Court)

5            THE COURT:  Have a seat, everyone.

6        JOHN K. KIM, DEBTOR/PLAINTIFF'S WITNESS, ON THE STAND

7            THE COURT:  Mr. Block, whenever you're ready.

8            MR. BLOCK:  Thank you, your Honor.

9    BY MR. BLOCK:

10   Q   So in the opening statement today Mr. Gordon said about the

11   1979 Transfer Agreement, "We have the agreement now," right?

12   And we do, don't we?

13   A   We do, yes.

14   Q   And the 1979 Transfer Agreement does not even mention the

15   word "talc," right?

16   A   I don't believe it does, no.

17   Q   Certainly, Johnson & Johnson knew how to talk about

18   indemnification for talc if Johnson & Johnson wanted to, right?

19   A   It, it does.

20   Q   And unlike the 1979 Transfer Agreement -- if we look at

21   Exhibit 50, again.  And this is the 1989 agreement where

22   Johnson & Johnson, the parent company, sold the Windsor

23   Minerals business to Cyprus Mines.

24       Can you go to Exhibit 50 at Page 14?

25       Are you there, sir?

1   A    I'm sorry.  Page 14?

2   Q    Exhibit 50 at Page 14.  Actually, Section 11.2, which I'm

3   sure you're very familiar with that section, are you not?

4        MR. JONES:  I don't think you have the page.  I

5   apologize.

6        THE WITNESS:  Yeah.  I don't see it there.

7        MR. JONES:  It's not in --

8        THE WITNESS:  I'm sorry.

9        MR. JONES:  Excuse me, your Honor.  I don't think the

10  exhibit has the pages that are being referred to.

11       MR. BLOCK:  Yes.  Well, I have it and, and if you

12  don't, just let me know.  It's Page 61.

13       MR. JONES:  Okay.

14       MR. BLOCK:  And the Bates stamp is J&J Talc and it

15  ends in No. 285, Page 61 of the agreement.  I think I said 14,

16  but Section 11.2 is, in fact, on Page 61 of Exhibit 50.

17       MR. JONES:  I will note, however, your Honor, the

18  agreement appears to be incomplete and that it's at least

19  missing Pages 2 through 14, as we just were able to determine.

20       MR. BLOCK:  Your Honor, we can make the whole

21  agreement available.  It's hundreds of pages.  It would --

22       THE COURT:  Well, let's see if any --

23       MR. BLOCK:  Yeah.

24       THE COURT:  -- of the relevant pages are missing, so.

25       MR. BLOCK:  Okay.  Thank you.

1  BY MR. BLOCK:

2  Q   Sir, are you at Exhibit 50 at Page 61?

3  A   I am.

4  Q   Okay.  And unlike the 1979 Transfer Agreement, J&J does use

5  the words "talc" in this agreement, right?

6  A   It's a talc mine.

7  Q   And unlike the 1979 Transfer Agreement, J&J does use the

8  word "indemnify" in this agreement, right?  Do you see the

9  screen?  "J" -- "J&J hereby agrees to indemnify and hold

10 harmless Cyprus," do you see that?

11 A   I do see that language, yes.

12 Q   And unlike the 1979 Transfer Agreement J&J uses the words

13 "product liability" in this agreement that J&J made with Cyprus

14 in 1989, right?

15 A   Just on your previous question, you said unlike that

16 agreement.  I, I believe there's indemnity language in the

17 transfer agreement.  I --

18         THE COURT:  It says what it says.  Let's --

19         THE WITNESS:  Yeah, I agree.

20 BY MR. BLOCK:

21 Q   Okay.

22 A   Yeah.  That's what it says.

23 Q   And, and, sir, it was J&J and not JJCI who agreed to

24 indemnify and hold harmless Cyprus, true or not?

25 A   True.  It was the single shareholder.

1   Q   Owned a hundred percent by Johnson & Johnson, correct?

2   A   Correct.

3   Q   And looking at Exhibit 50-B, and you're familiar with

4   Exhibit I to J&J's agreement with Cyprus from 1989, which

5   actually lists lawsuits that had been filed at that time

6   against Windsor Minerals?

7   A   I'm not sure if I saw this section of it, but I --

8   Q   Okay.

9   A   -- I --

10  Q   So let's look at Exhibit I to the agreement between Johnson

11  & Johnson and Windsor Minerals dated 1989.  And this is Exhibit

12  50-B.

13      And looking at the screen, sir, it says "Windsor has been

14  named as a defendant in various lawsuits which allege injuries

15  relating to exposure to asbestos and/or talc, primarily by

16  rubber/tire industry employees."

17      Do you see that?

18  A   I do.

19  Q   Okay.  So, so just to deal with this efficiently, I mean,

20  Johnson & Johnson as of 1989 in this agreement certainly knew

21  how to refer to specific cases that had been filed against

22  Johnson & Johnson and/or any of its subsidiary companies when

23  it made agreements, correct?

24  A   If it wanted to, it did know how.

25  Q   And not only that, Johnson & Johnson refers to another

1   matter where Windsor "is aware that an attorney in California

2   has indicated that their exists numerous claims for injuries."

3   That's pretty specific, isn't it?

4   A    I -- I -- it says what it says.

5   Q    Okay.  And, sir, in, in terms of Johnson & Johnson, they

6   not only owned that talc mine that they sold to Cyprus in 1989,

7   Johnson & Johnson, sir, always has owned its logo, Johnson &

8   Johnson, that's on the Johnson's Baby Powder containers,

9   correct?

10  A    I believe it owns the logo, yes.

11  Q    Johnson & Johnson, the parent company, has owned the

12  intellectual property that is used on the containers and that's

13  used in Johnson's Baby Powder and Shower to Shower advertising,

14  correct?

15  A    I believe that's true.

16  Q    And, sir, let's talk about Dr. Hopkins, okay?

17       You, you were asked some questions today about Dr. Hopkins'

18  testimony and what he said in different lawsuits, right?

19  A    I was, yes.

20  Q    Okay.  And you are familiar with the Prudencio case that

21  Mr. Satterley tried in August of 2021, just a few months ago,

22  right?

23  A    I am.

24  Q    And you know that your lawyer in that case is one of your

25  top trial lawyers, Morton Dubin, who is with the Law Firm of

1  King & Spalding, correct?

2  A    He is.

3  Q    And you closely monitored that case, correct?

4  A    I did.

5  Q    Did you watch it on TV?

6  A    Some parts of it, yes.

7  Q    Okay.  You did -- I'm sure you watched closing arguments?

8  A    I -- I -- I don't think I saw all the closing --

9  Q    Okay.

10  A    -- yeah.

11  Q    And I'll represent to you that this is a, a slide, a

12  closing argument slide that you, that Mr. Dubin, the attorney

13  for Johnson & Johnson and Johnson & Johnson Consumer Inc., put

14  in front of the jury arguing to the jury that they should

15  believe Dr. Hopkins' testimony.

16      Do you see the slide here?

17  A    I see the slide, yes.

18  Q    And does this look like the type of slide that Johnson &

19  Johnson and its -- and/or JJCI's lawyers would, would show to

20  juries?  They will describe Dr. Hopkins as someone who had to

21  learn about the history of talc use at the company, right?

22  A    Correct.

23  Q    And, and you know that Dr. Hopkins, unlike Dr. Kuffner, who

24  we're going to hear in this proceeding, that Dr. Hopkins

25  actually worked for, for Johnson & Johnson companies in the

KIM - CROSS                                                                222

1   1970s, 1980s, and 1990s, right?

2   A    He did.

3   Q    And you know that Dr. Hopkins actually did have some

4   responsibility for talc safety in the 1970s, 1980s, and 1990s,

5   correct?

6   A    He, he did.

7   Q    And because of Dr. Hopkins' knowledge and experience, he

8   was selected as the corporate representative for Johnson &

9   Johnson and Johnson & Johnson Consumer Inc. and he testified in

10  numerous trials and depositions for those two companies and, in

11  fact, the videotapes of his testimony are played at all the

12  trials that are still going on, correct?

13  A    That's correct.

14  Q    All right.  And, I mean, when Dr. Hopkins testified,

15  there's no dispute here that he did testify as the corporate

16  representative for both J&J and JJCI, correct?

17  A    That's correct.

18  Q    And you knew as the head of Product Liability legal issues

19  for Johnson & Johnson and Dr. Hopkins knew -- and he, he

20  testifies to it here -- that Dr. Hopkins when he gave the

21  testimony as corporate representative that his testimony was

22  binding on Johnson & Johnson and Johnson & Johnson Consumer

23  Inc., correct?

24  A    Correct.

25  Q    And so when he testified here:

1   "Q  Johnson & Johnson corporate in New Brunswick made all

2   health and safety policy decisions with regard to asbestos and

3   talc products, correct?"

4       When he was asked that question and he gave the following

5   answer:

6   "A  The -- yes.  The company in New Jersey is the parent

7   company.  For all the global companies made those decisions,

8   yes."

9       Do you see that testimony?

10  A   I see that testimony.

11  Q   And that testimony was actually July 22, 2019, right?

12  A   I'd have to go back to the transcript.

13  Q   And he didn't just say it once, he said it over and over

14  under oath.  Here, we have Dr. Hopkins' deposition, sworn

15  deposition from April 11, 2018, and he says yes to the same

16  question, right?

17  A   I see that question and answer.

18  Q   Let me ask you about the Hayes case.  Because Mr. Jones

19  asked you, "Well, in the Hayes case," you were asked whether he

20  clarified things, remember?

21  A   I do recall that.

22  Q   Okay.  So in the Hayes case Johnson & Johnson was the only

23  defendant in the case.  JJCI was not in the case, right?

24  A   I think it was dismissed out, right?

25  Q   Okay, right.  So, so when he gave that testimony it was

1   only Johnson & Johnson that was in the case, right?

2   A    It was the only defendant, but --

3   Q    Right.

4   A    -- questions were asked about --

5   Q    Right, right

6   A    Okay.  Yes.

7   Q    Sir, just answer my question.

8   A    Yes.

9   Q    Johnson & Johnson was the only defendant in the Hayes case

10  when Dr. Hopkins gave the testimony you referred to earlier

11  today, correct?

12  A    I'd have to know when JJCI got --

13  Q    Okay.

14  A    -- dismissed out.

15  Q    Right.  So in the Hayes case when Johnson & Johnson

16  Consumer Inc. was not there, when they were in the empty chair,

17  Dr. Hopkins says, "Oh, it was all JJCI," right?

18  A    I, I don't -- I'd have to go back to see, but that's not

19  what --

20  Q    But in, but in all --

21  A    -- I believe happened.

22  Q    -- the other cases -- and let's look at another one.

23  Dr. Hopkins' deposition, October 30, 2017, at Page 1993, Line

24  6, of the transcript:

25  "Q  Just so we can be clear, on any of the conversations

1  between UK and the U.S., everything, all talc and asbestos

2  decision went through Brunswick?

3  "A   Correct.

4  "Q   The headquarters for Johnson & Johnson, correct?

5  "A   Correct, yes."

6      Do you see that testimony that Dr. Hopkins gave?

7  A   I do see that testimony.

8  Q   And over and over, I mean, here's a, from the Leavitt trial

9  -- this is in front of a, a jury in California, January 28,

10 2019 -- again Dr. Hopkins confirms that his testimony is that

11 Johnson & Johnson corporate in New Brunswick, New Jersey made

12 all health and safety policy decisions with regard to asbestos

13 and talc issues, do you see that testimony?

14 A   He's just rereading his prior -- the question was to reread

15 his prior answer.  He answered -- that's what he answered

16 before.

17 Q   Well, sir, last time you were here you acknowledged that

18 Dr. Hopkins was correct, that Johnson & Johnson, the parent

19 company, has the authority and had the authority to require

20 warnings on Johnson's Baby Powder about cancer.

21     Do you still agree with that or do you want to change your

22 testimony?

23 A   No.  I -- I -- I would disagree with that.

24 Q   Okay.  So your corporate representative who testified for

25 Johnson & Johnson and Johnson & Johnson Consumer Inc. in a case

1  that I tried in New York in front of a jury, a case that's now

2  on appeal of a plaintiff's verdict against both companies,

3  you're saying your corporate representative gave false

4  testimony?

5  A    I think he may have been mistaken, yes.

6  Q    And your statement that Dr. Hopkins gave false testimony in

7  the Olson case when he said that Johnson & Johnson had the

8  authority to require warnings, have any of J&J or JJCI's

9  lawyers brought that to the attention of either the trial judge

10 in Olson or the appellate court that's hearing oral argument on

11 November 18th?

12 A    I think we -- no.  Because we, we live by the testimony

13 that was given.

14 Q    And, sir, you weren't there at Johnson & Johnson in 1970s,

15 were you?

16 A    I was not, no.

17 Q    Dr. Hopkins was working for the Johnson & Johnson companies

18 in the 1970s, wasn't he?

19 A    Yes.

20 Q    Right.  And he was there in the 1980s and you weren't,

21 right?

22 A    That's true.

23 Q    He was there in the 1990s and you weren't, right, sir?

24 A    Yeah.  I'm not sure when he actually left to form his own

25 business.

1  Q   And, sir, let's talk about the Johnson & Johnson Medical

2  Safety Council that you were asked about by Mr. Jones today,

3  okay?  Right?

4      And just -- I added this to my PowerPoint.  So I have the

5  number that it was produced, LTL 21817 through 21826.

6      And, sir, just so the Court understands, the Johnson &

7  Johnson Medical Safety Council, the charter of that, it, it

8  didn't start until 2013, correct?

9  A   That's true.  That's when this, the, the Office of the

10 Medical Safety Officer was started.

11 Q   It's true, right?

12 A   Yes.  This is dated --

13 Q   Okay.  That's all -- I mean, that's all you have to say,

14 it's true.

15 A   Yes.  It's true.

16 Q   Okay.  All right.  Here comes another question, right?

17     It says that "Johnson & Johnson Medical Safety Council has

18 been established under the leadership of the Chief Medical

19 Officer, Johnson & Johnson, to serve the needs of the Johnson &

20 Johnson Enterprise," that what it says?

21 A   That's exactly what it says.

22 Q   And the Chief Medical Officer of Johnson & Johnson, the

23 parent company, that's actually the person who chairs the

24 Safety Council that was formed in 2013, right?

25 A   That's the overall Safety Council.

1    Q    Right.  And who is the Chief Medical Officer of Johnson &

2    Johnson?

3    A    I'm embarrassed now.  I am -- Joanne Waldstreicher.  Dr.

4    Joanne Waldstreicher.  I'm sorry.

5    Q    Right.  So it's, it's Joanne Waldstreicher, Dr. Joanne

6    Waldstreicher.  She's the one who's the Chair of Johnson &

7    Johnson's Medical Safety Council, right?

8    A    Of -- of -- one of -- the overarching Council, she is the

9    Chair.

10   Q    Right, sir.

11       You see the words on the screen.  It says "The core members

12   of the Safety Council," and there's only one person who's the

13   Chair of the Safety Council and that's Joanne Waldstreicher,

14   the Chief Medical Officer of Johnson & Johnson, the parent

15   company, right?

16   A    That's true.

17   Q    Okay.

18       And, and, sir, you've been committee, you've been part of

19   committees.  You know what a chair means?

20   A    I do.

21   Q    The chair is the headperson, right?

22   A    For this committee.

23   Q    Okay.  For this -- that's the only committee I'm talking

24   about.

25   A    That's exactly --

1  Q    Okay.

2  A    -- right.

3  Q    All right.

4       And, and, sir, you know, it wasn't Mr. Kuffner, who we're

5  going to come, who's going to come in here tomorrow.  Who went

6  out to the public after the Reuters article was published about

7  asbestos and Johnson & Johnson's talc?  Who went to the public

8  and made statements?  It, it was Alex Gorsky, the CEO of

9  Johnson & Johnson, the parent company, right?

10 A    He -- he did in -- he did, yes.

11 Q    Yeah.  And, and what, what Mr. Gorsky said in this video on

12 Twitter, Exhibit 14, is that J&J's Baby Powder has never

13 contained asbestos.  He told the public that, right?

14 A    He did.

15 Q    I mean, the buck stops with the CEO of Johnson & Johnson.

16 That's why he went on to Mad Money and talked to Jim Cramer,

17 right?

18 A    He did go on Mad Money --

19 Q    Okay.

20 A    -- and talk to Jim Cramer.

21 Q    Okay.  And, sir -- sir, did you -- did you, John Kim, a

22 lawyer for Johnson & Johnson, approve public statements after

23 the Reuters article that told the public that Johnson &

24 Johnson's talc was asbestos free?  Did you do that, sir?

25 A    I may have been involved in reviewing public statements,

1  yes.

2  Q   Yeah.  Let's look at Exhibit 14-A.

3  A   Uh-huh (indicating an affirmative response).

4  Q   And just to be clear, sir, you -- you -- during December of

5  2019 when the Reuters article was published, you were employed

6  by Johnson & Johnson, the parent company, correct?

7  A   I was.

8  Q   Not Johnson & Johnson Consumer Inc., right?

9  A   No.  I'm an attorney employed by Johnson & Johnson Consumer

10 Inc. that does work -- I'm sorry -- employee at Johnson &

11 Johnson that does work for Johnson & Johnson Consumer Inc.

12 Q   And, sir, if we look at Exhibit 14-A, it's an e-mail chain

13 and the e-mail chain is talking about whether the company is

14 going to do a press release after the Reuters article was

15 published about asbestos in J&J's talc, right?  Do you see the

16 e-mail from Kimberly Montagnino --

17 A   Montagnino, yeah.

18 Q   Montagnino.

19     -- on December 14, 2018?

20 A   I'm sorry.  What --

21 Q   Sir --

22 A   I don't have the exact exhibit.

23 Q   Sir, halfway down the, halfway down the page.

24 A   I'm sorry.  The -- what, what exhibit number is it?

25 Q   Sure, 14-A.

1  A    Thank you.  I'm sorry.  I was looking at the screen.

2  Q    It's okay.  14-A.

3          MR. JONES:  I'm sorry, your Honor.  While Mr. Block or

4  Mr. Kim, rather, looks for the document, can Mr. Block tell us

5  where this document comes from?  Because it's not the --

6          MR. BLOCK:  Yes.

7          MR. JONES:  It's not the Bates number in this case.

8          MR. BLOCK:  Your Honor, they've -- they've -- as

9  Mr. Bernardo, the lawyer we heard about, the Johnson & Johnson

10 lawyer, he manages the document production from the Law Firm of

11 Skadden Arps for Johnson & Johnson.  They produced millions of

12 pages of documents and this is a document produced in the

13 standard document production by Johnson & Johnson and Johnson &

14 Johnson Consumer Inc.

15         UNIDENTIFIED SPEAKER:  It's Bates No. 01288708.

16         MR. BLOCK:  Yeah.

17         THE COURT:  All right.

18 BY MR. BLOCK:

19 Q    Okay.  Sir, are you at Exhibit 14-A?

20 A    I am.  Thank you.

21 Q    All right.  And do you see that after the publication of

22 the Reuters article in December of 2018 Kim Montagnino wrote an

23 e-mail to a number of people, including you?  Or she copied you

24 on the e-mail, do you see that?

25 A    I'm looking for the first reference to me.

1   Q    Sure.  It's, it's on the right side under Danielle Devine

2   about four lines down.

3   A    I'm sorry.  Is the whole exhibit one e-mail chain?

4   Q    Yes.

5   A    Okay.

6   Q    But I'm, I'm looking at the, the first page, the second-to-

7   last e-mail.

8   A    Yes.

9   Q    Okay.  So -- and, and just to be specific Kim Montagnino

10  sent an e-mail on Friday, December 14, 2018, at 1:16 p.m.,

11  correct?

12  A    Yes.

13  Q    And she sent the e-mail to Danielle Devine, who is the head

14  of Corporate Communications for Johnson & Johnson, the parent

15  company, correct?

16  A    Yes.

17  Q    And the e-mail was sent to Cristal Downing.  Who's that?

18  A    I'm actually not sure.

19  Q    Okay.  And Tina French, who we heard about earlier from

20  Johnson & Johnson's parent company, she's copied on the e-mail

21  just like you are, correct?

22  A    I see that, yes.

23  Q    Okay.  And you are copied as an attorney for Johnson &

24  Johnson and Andrew White, another one of Johnson & Johnson's

25  lawyers, is copied on this, correct?

1    A    Yes.

2    Q    And Kim Montagnino, is she with Johnson & Johnson, the

3    parent company?

4    A    I think she moved around a couple of times.  So --

5    Q    You're not sure?

6    A    I'm not sure at this time --

7    Q    Okay.

8    A    -- where, where she worked.

9    Q    So she sends this e-mail and she copies you and she says,

10   "I recommended we add an important point about there being a

11   lack of new evidence to support these allegations.  Below is

12   the recommended edit to the first paragraph."

13        And do you see I put up on the screen the statement that

14   was being proposed for Johnson & Johnson to make in response to

15   the Reuters article, do you see that?  "The Reuters article,"

16   do you see that, "is one sided, false and inflammatory," do you

17   see that?

18   A    I do see that.

19   Q    And the statement goes on to say, "Johnson & Johnson's Baby

20   Powder is safe and asbestos free," do you see that?

21   A    I do see that.

22   Q    And then there's a note at the bottom.  Kim Montagnino

23   says, "Andrew and John, from our Legal Team," do you see that?

24   A    I do see that.

25   Q    And the Andrew is Andrew White from Johnson & Johnson, the

1   parent company, and John is John Kim, you, from Johnson &

2   Johnson's parent company, correct?

3   A    I assume that's true.

4   Q    And then when you follow the e-mail chain all the way up,

5   we see that the last e-mail is from you about the press release

6   where Johnson & Johnson is going to tell the public that

7   Johnson's Baby Powder is safe and asbestos free, right?

8   A    Yes.

9   Q    And it's redacted.  Attorney-client privilege, right?

10  A    It is.

11  Q    And, and, sir, Johnson & Johnson did do that.  They did

12  tell the public that the Baby Powder was safe and asbestos free

13  after this series of e-mails that you were a part of, correct?

14  A    I assume that's true, yes.

15  Q    And, sir, did you actually draft statements, in the course

16  of your employment for Johnson & Johnson's parent company, did

17  you actually draft any statements that were for reporters that

18  said, "Johnson's Baby Powder is safe"?

19  A    I'm not sure if I drafted any statements.  I usually review

20  the statements.

21  Q    Sir, who is Tony Freinberg?

22  A    I actually, I don't know.

23  Q    Let's look at the next exhibit, 14-B.  Exhibit 14-B is an

24  e-mail dated 10/3/2017 and that e-mail's from you, sir, isn't

25  it?

1   A    It is.

2   Q    And that e-mail copies John O'Shaughnessy and Denise

3   Houghton, both, who at the time were lawyers for J&J's parent

4   company as well, correct?

5   A    Correct.

6   Q    And this is what you wrote, looking at Exhibit 14-B:

7        "As part of our legal advice, we have put together this

8   statement with the help of our consultant, Tony Freinberg," do

9   you see that?

10  A    I do.

11  Q    And looking at the next page, Tony Freinberg, he was a

12  consultant for a public relations or public, or crisis

13  management communications company called G. F. Bunting &

14  Company, correct?

15  A    I, I don't recall Tony Freinberg at all.  I'm sorry.

16  Q    Right.

17       So, I mean, is this funny?

18  A    No.

19  Q    Okay.

20  A    I just can't --

21  Q    All right.

22  A    I just can't believe I can't recall someone --

23  Q    Right.

24  A    -- whose name I used in, in an e-mail.  I just can't --

25  Q    Yeah.  So --

1   A   Sitting here, I just can't recall.

2   Q   What, what you said in this e-mail was, "We have put

3   together this statement with the help of our consultant, Tony

4   Freinberg."  That's what you said, right?

5   A   It is.

6   Q   And you did do that, didn't you?

7   A   I, I assume I did, yes.

8   Q   And, and what you did, sir, is you as an employee of J&J's

9   parent company, you wrote the statement with the public

10  relations consultant for use by Johnson & Johnson Consumer

11  Inc., a subsidiary.  You did that, didn't you?

12  A   We represented Johnson & Johnson Consumer Inc. in this.

13  Q   And, and, sir, in the, in the statement that you wrote with

14  the consultant, if you just turn to the, Page 2 --

15  A   I'm sorry.  Again, I was looking at the screen and not the

16  exhibit.  What -- what --

17  Q   Exhibit 14-B.  I mean, if you're comfortable looking at the

18  screen, we could do that.

19  A   Thank you.

20  Q   If you want to look at the whole exhibit, it's your choice.

21      Sir, do you see on Page 2 where it says, "Draft statement.

22  We recommend J&J provides this statement to reporters."

23      This is a statement you worked on with the consultant, do

24  you see this?

25  A   I see the statement, yes.

1  Q   Okay.  And the first sentence says, "Johnson's Baby Powder

2  is safe," right?

3  A   It does.

4  Q   And, sir, you also know that J&J's own liability for the

5  talcum powder cases is not something that's theoretical.  It's

6  actually something that has been adjudicated in many courts,

7  right?

8  A   I -- I'm -- I'm sorry.  One more time?

9  Q   Sure.

10     I mean, in the Ingham case the jury was asked whether

11  Johnson & Johnson was liable and they were separately asked

12  whether Johnson & Johnson Consumer Inc. was liable, right?

13  A   Yes.

14  Q   And you certainly read the Missouri Court of Appeals

15  decision in the Ingham case, right?

16  A   I did.

17  Q   I mean, given that it involved billions of dollars, right,

18  you probably read it more than once?

19  A   I, I'm not sure how many times I read it.

20  Q   More than once?

21  A   Maybe.  I -- I --

22  Q   Okay.  And, sir, because you read the Missouri Court of

23  Appeals case in Ingham you know that what you said earlier in

24  this Court that J&J and JJCI are treated the same in lawsuits

25  is not true.  You know that's not true.

1    A    I disagree.

2    Q    All right.  Well, let's look at what the Missouri Court of

3    Appeals said, all right?  This is what they said:

4        "Based on the evidence we believe a larger amount of

5    punitive damages is needed to deter J&J's conduct than JJCI's

6    conduct."

7        Do you see that statement?

8    A    I do see that statement.

9    Q    And then the Missouri Court of Appeals goes on to say,

10   "While both corporations are multi-billion dollar corporations,

11   J&J's net worth is considerably larger than JJCI's net worth."

12       Do you see that statement?

13   A    I do see that statement.

14   Q    And then it goes on to say, "At trial, defendants

15   stipulated to JJCI's net worth," and it gives the net worth

16   numbers as, as of that trial between J&J on one hand and JJCI

17   on the other, do you see that?

18   A    I do see that.

19   Q    All right.  And now let's look at this sentence:

20       "Furthermore, defendants' decision to chart their course of

21   reprehensible conduct began with J&J, long before JJCI was spun

22   off as a separate entity in 1979 and engaged in reprehensible

23   conduct of its own."

24       Do you see that?

25   A    I do see that.

1    Q    And so the Missouri Court of Appeals found that JJCI

2    engaged in reprehensible conduct and so did J&J, right?

3    A    It found what it found, yes.

4    Q    And, in fact, there was a different amount of punitive

5    damages that J&J was required to pay as compared to what JJCI

6    was required to pay, right?

7    A    There were different amounts, yes.

8    Q    Separate amounts, right?

9    A    Separate amounts.

10   Q    And, sir, the Ingham case was a particular group of ovarian

11   cancer cases where there was evidence at trial about asbestos

12   and the talc.  And that's discussed in this Missouri Court of

13   Appeals decision, right?

14   A    That was the theory of liability --

15   Q    Okay.

16   A    -- in Ingham, yes.

17   Q    But you know, sir, that even in terms of all the ovarian

18   cancer cases, they're not all the same.  You know that.

19            THE COURT:  Is that a question?

20            MR. BLOCK:  Okay.

21   BY MR. BLOCK:

22   Q    The question is this, sir:  You know those defense verdicts

23   that were talked about in the opening informational brief

24   involving ovarian cancer cases in 2021?

25   A    In 2021?

1  Q    Yeah, 2021.

2  A    Yes.

3  Q    Right.  Okay.  Many of those cases did not involve any

4  evidence presented by either side on the issue of asbestos.

5  Many ovarian cancer cases proceed on a theory that it's the

6  talc that causes ovarian cancer and does not, and there's no

7  evidence in the proceeding itself, the trial, about asbestos.

8  You know that?

9  A    I think early on that's true.  I think more recently

10  evidence comes in.  Whether they actually find asbestos is, is

11  another issue, but evidence generally comes in about that.

12  Q    And, sir, and you know that the mesothelioma cases and the

13  ovarian cancer cases aren't the same, either, right?  It's a

14  different disease.

15  A    It's a different specific disease.

16  Q    Right.

17  A    But basically, it's all cancer.

18  Q    And, sir, you directed a different strategy and you talk

19  about resolving cases.  I mean, the fact is is that prior to

20  this petition J&J had settled over 90 percent of mesothelioma

21  cases, right?

22  A    I -- yeah.  I don't know what the numerator or denominator

23  you're using.  Yeah.

24  Q    Yeah.

25  A    I don't, I don't know that 90 percent figure.

1  Q    Well, what, what are you comfortable with?   J&J --

2  A    I -- I don't -- I -- I --

3  Q    You certainly, you certainly admit that J&J was, was

4  settling the majority of the mesothelioma cases involving

5  talcum powder that they were presented with before the

6  bankruptcy petition, correct, the majority?

7  A    I actually don't know percentagewise --

8  Q    Okay.

9  A    -- what we were settling, yeah.

10 Q    Do, do you know that your lawyer stood up in the bankruptcy

11 court in Imerys and represented to the court that of the 850 or

12 so mesothelioma cases that were pending at the time of the

13 Imerys bankruptcy petition, that J&J had resolved over 800 of

14 them?

15 A    That may be true.  The -- the -- I can't -- the numbers

16 fluctuate over time.

17 Q    Okay.

18 A    So I'm not sure what -- what -- what percentages you're

19 talking about --

20 Q    Okay.

21 A    -- when.

22 Q    Sir, will you admit to this Court that you directed a

23 different settlement strategy with the mesothelioma cases

24 against J&J as compared to the ovarian cancer cases?

25 A    There were more settlements in the mesothelioma cases than

1   in the ovarian cancer cases, yes.

2   Q    Right.  And -- and -- and -- and because of that at the

3   time of the petition there were only over 400 mesothelioma

4   cases pending against the J&J companies, whereas what's the

5   number for ovarian cancer?

6   A    38,000.

7   Q    Okay.  And so, sir, in terms of J&J and JJCI being treated

8   separately, they were treated separately in Ingham, weren't

9   they?

10  A    They -- there were different lines on the, on the verdict

11  form for punitive damages.  I believe there's just a single

12  line for damages, for compensatory damages.

13  Q    Right.

14  A    And throughout the trial, basically, it, it's all tried as

15  a single, continuous exposure, regardless of who was

16  manufacturing the product at the time.

17  Q    Okay.  And -- and -- and for the record the Court can look

18  at Ingham v. Johnson & Johnson, the Missouri Court of Appeals

19  decision.  And if the Court looks at that, they'll see a lot of

20  separate discussion about J&J and JJCI not only in terms of

21  liability conduct, but in terms of jurisdiction, right?

22  A    Yes.

23  Q    Okay.  And you didn't agree with the Ingham decision.  You

24  took it all the way to the Supreme Court.  You had one of the

25  best Supreme Court advocates.

1   A    Neal --

2   Q    Is it Neal Katyal?

3   A    It is.

4   Q    I see him on MSNBC.  He signed your petition with the U. S.

5   Supreme Court and that petition was denied, correct?

6   A    It was.

7   Q    Okay.  J&J and JJCI lost that argument in the tort system,

8   correct?

9            MR. JONES:  Object to the form.  I don't know what --

10           THE WITNESS:  Yeah.

11           MR. JONES:  -- what argument he's referring to, your

12   Honor.

13   BY MR. BLOCK:

14   Q    J&J and JJCI lost the case and they paid the money, right?

15   A    We did.

16   Q    Okay.  Thank you, sir.

17           THE COURT:  I, I didn't hear that objection.  I'm

18   sorry.

19           MR. JONES:  Sorry.  I didn't rip my mask off.

20           I didn't understand the, the predicate for the

21   question.  He said they lost the argument, then he changed the

22   question they lost the case.

23           MR. BLOCK:  Sure.

24           THE COURT:  Okay.  You're okay now?  Good.

25   BY MR. BLOCK:

1  Q   Sir, J&J and JJCI lost the Ingham case.  The money was

2  paid, then subsequently Johnson's Baby Powder -- or -- and

3  subsequently the bankruptcy petition was filed, right?

4  A   That's the order of things, yes.

5  Q   Thank you, sir.

6            THE COURT:  All right.  That all?

7       (No response)

8            THE COURT:  Is there any water up there for you to

9  drink?

10           THE WITNESS:  There is.  Thank you, your Honor.

11           THE COURT:  All right.

12           All right, Mr. Satterley.  When you're ready.

13           MR. SATTERLEY:  Good afternoon, your Honor.  May it

14 please the Court.

15                      CROSS-EXAMINATION

16 BY MR. SATTERLEY:

17 Q   Mr. Kim, good to see you, again.

18 A   Nice seeing you, Mr. Satterley.

19 Q   I'm not going to be as long as Mr. Block and I'm not going

20 to be as fancy.  I'm not, I don't have any PowerPoints or

21 anything like that, but I'm going to ask you about maybe 15

22 minutes' worth of questions, okay?

23 A   Great, thank you.

24 Q   First of all, at the time of the LTL filing on October the

25 14th there were no talc lawsuits pending against LTL, correct?

1   A    True, yes.

2   Q    Nobody had went into any courts in the country and named

3   LTL as a defendant alleging LTL caused anybody to get cancer,

4   correct?

5   A    That is true.

6   Q    Now I want to clear up a few things before I get to the

7   real points that I want to talk with you about.  I'm going to

8   talk to you about your accounting testimony, but let me just

9   clear up a few things.

10       Your attorney showed you, showed the Court the <u>Hayes</u> trial

11  testimony.  And you know I was the lawyer at that trial, right?

12  A    I do.

13  Q    And you, you weren't intentionally being fast and loose

14  with the facts of the case, were you?

15  A    No.

16  Q    Okay.  'Cause you said that J&J or JJCI got dismissed from

17  the case, but JJCI was never even named as a --

18  A    Oh.  Maybe that was -- I'm sorry.  Yeah.

19  Q    J -- it was --

20  A    JJCI was not named in the case.  I --

21  Q    The only defendant --

22  A    Yeah.

23  Q    -- that I filed suit against was Johnson & Johnson, the

24  parent company, correct?

25  A    I, I thought -- I had a different recollection.

1   Q   Well --

2   A   If that's true, it's true.  I -- but I have a different

3   recollection.

4   Q   We, we talked about it on Halloween just the other day.

5   A   Yeah.

6   Q   And you recalled it a couple days ago.

7   A   Yeah, yeah.

8   Q   Do you not recall it now?

9   A   I don't.

10  Q   Okay.

11  A   I -- I -- I thought I saw something that suggested that it

12  was --

13  Q   Okay.  But what --

14  A   -- in, in it.

15  Q   -- he showed you, showed the Court, was Mr. Dubin, the

16  attorney for J&J, asking questions on direct examination about

17  the difference between Johnson & Johnson and Johnson & Johnson

18  Consumer, correct?

19  A   I, I don't believe that's true.

20  Q   He didn't show you the cross-examination where I impeached

21  him with the testimony?

22  A   I think that was the cross-examination.

23  Q   Okay.

24  A   It's just a different part of the cross-examination.

25  Q   But you, you know he was impeached a little bit later and

1   he admitted that he gave testimony a week before directly

2   contrary to what he said in Kentucky in 2019, correct?

3   A    Exactly.  I think you tried to impeach him and then he

4   tried to clarify what he meant the week before.

5   Q    And then I impeached him again, right?

6   A    I don't know  --

7   Q    Okay.  Let's -- let's --

8   A    -- if I read that far.

9   Q    Okay.

10       So let's -- the other thing about fast and loose, you gave

11  a lot of testimony about generally this and generally that, but

12  you would agree that different lawsuits have different

13  allegations with regards to, you know, whether they're in state

14  court, whether they're in Kentucky, whether they're in

15  California, right?

16  A    There are different allegations, of course.

17  Q    And just as you admitted it with Mr. Block, different

18  people have different diseases, different disease types, right?

19  A    Well, different types of cancer --

20  Q    Sure.

21  A    -- but they all have cancer.

22  Q    And, and Johnson & Johnson attorneys have gone to court to

23  oppose a consolidation of cases arguing these people have

24  different diseases, right?

25  A    Well, different types of cancer.

1  Q    Sure.  Some people have cancer in their, lining of their

2  lungs, mesothelioma.  Some have it in their stomach.  Some have

3  it in their lining of their hearts.  And Johnson & Johnson uses

4  that to their advantage by saying, "They're different diseases.

5  So don't consolidate the cases," correct?

6  A    That has to do with -- yeah.  Absolutely.

7  Q    Okay.

8  A    But they're all cancers.

9  Q    All right.

10     You talked about with your attorney, the attorney for LTL,

11  you talked a little bit about the process of getting to the

12  bankruptcy.  You told me that LTL has no lawsuits against them

13  for talc.  The planning of this occurred approximately six

14  months ago, this bankruptcy, correct?

15  A    The beginning of investigation into this bankruptcy

16  occurred about, started --

17  Q    And you told me --

18  A    -- about six months ago.

19  Q    About six months ago.  You told me on Sunday when I took

20  your deposition that Jones Day came to present to you a

21  planning, a pitch -- I think you called it a "pitch" -- to do

22  this divisional merger, the Texas twosteps, about six months

23  ago in April, right?

24  A    I don't think I called it the Texas twostep, but yes.

25  Sometime --

1    Q    Okay.  The divisional merger, right?

2    A    Yes.  Yes.

3    Q    Okay.  That was about six months ago in April, correct?

4    A    I believe that's true, yes.

5    Q    And then after Jones Day came and made this pitch to you

6    and other folks at J&J, you guys had a, you called it Project

7    Plato, P-L-A-T-O, correct?

8    A    Correct.

9    Q    And so you and the Jones Day lawyers and other folks at J&J

10   for six months has been working to take assets, what you call

11   unrelated assets, and to put them into bankruptcy, correct?

12   A    No.  I would say for most of that time we were

13   investigating the feasibility of, of taking these actions.  So

14   looking at various contracts and looking at covenants in

15   agreements, looking at what the regulatory requirements were.

16        So I would say that for that six months we were basically

17   doing due diligence on, on whether the, the divisional merger

18   was, was even feasible.

19   Q    And you told me before that Johnson & Johnson, Johnson &

20   Johnson Consumer stipulated as recently as August of this year

21   the value was, roughly, 14 billion of just Johnson & Johnson

22   Consumer, correct?

23   A    The, the book value we stipulated through agreements with

24   the plaintiffs' counsel is about $14 billion.

25   Q    And, and you told me and testified that the value of

1  Johnson & Johnson, the parent company, is in excess of $400

2  billion, correct?

3  A   Yeah.  I would have to refer to the stipulation that we're

4  talking about, but there was a stipulation about, again, book,

5  book value of Johnson & Johnson.

6  Q   And, and  I'm not going to get the exact amount, but you'd

7  agree it's above $400 billion, correct?

8  A   Yeah.  I, I have to look at the agreement to, to see what,

9  what that number was.

10 Q   And you testified on Sunday that you have had discussions

11 with other folks that the New JJCI is now valued at $60

12 billion, correct?

13 A   That would be the fair market value, is, is around that.

14 We would --

15 Q   So -- and that's currently, the New JJCI, 60 billion,

16 whereas the Old JJCI was 14 billion?

17 A   No, no, no.  That, that would have been just prior to the

18 filing.  There -- there -- around the time period of the filing

19 it was, again, fair market value was about $60 billion.  The,

20 the book value is a very different number and if you looked at

21 the book value today, my guess it would still be around 14

22 billion.  But the fair market value, it would be around 60

23 billion.

24 Q   Sixty -- just for the New JJCI, correct?

25 A   Well, New JJCI, you know, just before and after the, the

KIM - CROSS                                                          251

```
 1  divisional merger.

 2  Q   Okay.

 3      Last area here for me and I'll turn you over to somebody

 4  else is the, the financial discussion where you talked about --

 5  your attorney actually stood up and said, "I want to talk about

 6  agreements," and then he changed and said "intercompany

 7  agreements" and then he said, "No.  Let's talk about

 8  intercompany conduct."

 9      Do you recall him saying that?

10  A   I, I don't recall what --

11  Q   Because the truth of the --

12  A   -- the exact words were.

13  Q   -- matter is, the truth of the matter is there are no

14  intercompany agreements between Johnson & Johnson and Johnson &

15  Johnson Consumer regarding the payment of judgments for talc

16  liability, true?

17  A   I, I would say that the asset purchase, you know, the sales

18  transfer agreement that we talked about in 1978 lays out that

19  agreement and is the basis upon which we are now, you know,

20  that JJCI bears all the responsibility for those costs.

21  Q   I -- I under -- I understand your interpretation of that.

22  A   Uh-huh (indicating an affirmative response).

23  Q   Set that aside.  And - and -- you know who Mr. Adam Lisman

24  is, correct?

25  A   I do.
```

1   Q    And I took his deposition on Saturday, I believe.

2        Who is Adam Lisman?

3   A    Adam Lisman is a VP of Finance.

4   Q    At, at J&J, the parent company, correct?

5   A    He works at J&J, the parent company.  I'm not actually sure

6   who his actual employer is.

7   Q    And, and you've read his testimony since Saturday, right?

8   A    I have not.

9   Q    So do you know that Mr. Lisman testified that there are no

10  contracts between J&J and JJCI regarding the payment of any

11  judgments?

12  A    Yeah.  I would have to see what he meant by that.  I, don't

13  know.  I haven't seen that.

14  Q    Have you seen, you personally seen -- and set aside your

15  interpretation of the 1979 document -- have you seen any

16  contracts between Johnson & Johnson, the parent company, and

17  Johnson & Johnson, the consumer, regarding the payment of

18  judgments?

19  A    Other than the agreement that we referenced in all the, you

20  know, the subsequent assumptions of liability and the

21  indemnification, I haven't seen a specific agreement with

22  respect to the talc liabilities.

23  Q    And with regards to the settlements, you've not seen any

24  agreement other than the way you're interpreting the '79

25  agreement, actually, December 1, 1978.  Other than that one,

 1   you've not seen any agreements between JJCI and J&J regarding

 2   the payment of settlements for talc-related liabilities, true?

 3   A    Other than that agreement, I haven't seen any specific

 4   contract subsequently nor would I expect to for, for that

 5   liability.

 6   Q    And you have not participated in any negotiations between

 7   J&J and JJCI regarding the payment of litigation costs or

 8   anything like that, correct?

 9   A    No.   There's been no negotiation of that.

10   Q    In fact, the only thing that exists with regards to the

11   payment of, of litigation costs is a Johnson & Johnson policy

12   entitled Worldwide Financial Procedures, correct?

13   A    That's correct.

14   Q    And in that document, Worldwide Financial Procedures -- it

15   bears the Bates No. LTL0021763 -- there's no discussion

16   whatsoever regarding the payment of judgments, correct?

17   A    I don't have the document in front of me.

18           MR. SATTERLEY:   Your Honor, may I approach and --

19           THE COURT:   You may.

20           MR. SATTERLEY:   -- hand --

21   BY MR. SATTERLEY:

22   Q    And, by the way, at the time of your deposition I hadn't

23   seen this.   It was just given to me yesterday. (Counsel hands

24   document to the witness.)

25           MR. JONES:   Is there an exhibit number for this --

 1            THE WITNESS:  Thank you.

 2            MR. JONES:  -- Mr. Satterley?  Is it on your exhibit

 3   list?

 4            MR. SATTERLEY:  Well, we'll -- I don't know if it's on

 5   our exhibit list.  I just got it yesterday.

 6            May I tender this to the Court, your Honor?

 7            THE COURT:  You may, but you --

 8            MR. JONES:  From, from whom did you just --

 9            THE COURT:  -- need to mark it.

10            MR. JONES:  From whom did you just --

11            MR. SATTERLEY:  I guess we'll mark this as 200,

12   Exhibit 200.

13            MR. JONES:  From whom did you just get it yesterday?

14            MR. SATTERLEY:  You guys.

15            MR. JONES:  All right.  I'm just asking a question.

16            MR. SATTERLEY:  I mean.

17            MR. BLOCK:  You might use Elmo.

18            MR. SATTERLEY:  That's okay.  We -- we -- we don't

19   have time for the Elmo.  I'm not --

20            MR. BLOCK:  Okay.

21            MR. SATTERLEY:  -- that fancy.

22   BY MR. SATTERLEY:

23   Q   I just want you -- you, you've seen this document, correct?

24   A   I, I have.

25   Q   And this is, this is a Johnson & Johnson prepared document

1  from Johnson & Johnson parent, true?

2  A    This is an SOP document from the parent, yes.

3  Q    From the parent.  It's -- and, and I was provided these,

4  looks like four pages.  There's no signators to it.  It's not

5  like it's an arm's-length negotiation where somebody on behalf

6  of J&J is negotiating with JJCI regarding payment of anything?

7  A    I don't see any signature lines or, or anything.

8  Q    So what we know, then, is that Johnson & Johnson, the

9  parent company, has a, has created a policy regarding the

10 payment of legal fees and impose that upon JJCI, correct?

11 A    No.  I -- I would -- I would say this basically

12 memorializes what the, the standard has always been, which is

13 because of the strategy of decentralization all liability and

14 responsibility for products are given to the operating company.

15 And so this just memorializes that the accounting for that

16 would follow that, that, you know, all the liability would

17 come, again, for any product expense, product liability

18 expenses or, or other expenses would be pushed down to the, to

19 the operating company.

20 Q    Nowhere in this policy is there any reference to payment of

21 judgments or payment of settlements, correct?

22 A    Not specifically, no.

23 Q    And you said in your supplemental declaration on Paragraph

24 7 -- this was, I think, Exhibit 6, Defendants' Exhibit 6 --

25 that this is done for administrative convenience, correct?

1  A    The original payment.  So when a large judgment comes in,

2  there is a specific account that is held by Johnson & Johnson

3  that makes the initial payment and then it is put on the books

4  and records of the, of the operating company.

5      So the administrative part is having a master account that

6  all, you know, the judgments, can be used to, to pay judgments.

7  Q    So examples.  The Leavitt case, which I tried to verdict in

8  2019, the jury put 78 percent responsibility on Johnson &

9  Johnson, the parent company, 20 percent on Johnson & Johnson,

10  the Consumer company, and 2 percent on Cyprus, Cyprus Mines

11  Company.  You know that, right?

12  A    I do.

13  Q    And that case is all briefed at the California Supreme

14  Court and if they do not petition, my client may get

15  compensation at some point in it.  But what J&J does internally

16  is J&J, the parent company, even though the court system

17  allocates 78 percent responsibility, internally, privately,

18  they have, they put all that on JJCI, correct?

19  A    Right, pursuant to the assumption of all that liability,

20  that's the responsibility of JJC, of Old JJCI.  And that's

21  always been the case.  That's always how we, we've accounted

22  for that.

23  Q    Well, you wouldn't say that's always been the case.  The

24  only document that was provided to me is from yesterday.  They,

25  a four-page document dated March 2005, right?

1   A    That is a document -- yeah, that's one document, yes.

2   Q    Okay.  And are you saying that there should be other

3   documents out there before March of 2005 that go back to the

4   '90s and the '80s and, and --

5   A    I think if you look at the books and records for all

6   product liability cases not, not just talc, but all product

7   liability cases, you'll see in the accounts and records that,

8   that the operating company is charged with the costs of product

9   liability litigation for the products that they manufacture and

10  distribute.

11  Q    Have you looked yourself personally for these books and

12  records?

13  A    Well, I know this because I'm in charge of doing the -- the

14  account -- the reserving and getting bills paid in, in all

15  product liability litigations and I've been doing that for 20

16  years.

17  Q    So is that a yes, you've looked for the books and records?

18  A    Well, I've looked -- I haven't looked at the books, the

19  accounting books and records, but I understand that's how the

20  records are kept.  That's by talking to people in Finance,

21  understanding where the money is coming from, who I have to get

22  approval for.  I know that that's how the accounting is done.

23  Q    My question was, have you looked at the books and records

24  for this information?  Is that a yes or no?

25  A    I, I don't believe I've looked for that particular

1   information.

2   Q   My final, final question.

3       Towards the end of your direct examination from your

4   esteemed counsel you said that you want to "quickly resolve

5   this litigation."  You said that, right?

6   A   Yes.

7   Q   I've gone to verdict against Johnson & Johnson and talc six

8   times and you will agree being in charge of that litigation in

9   all six of those cases Johnson & Johnson at the time we start

10  trial offered zero money to my clients, correct?

11  A   Well, we have -- we've -- if you want to talk about

12  settlement negotiations, we have tried to settle cases with you

13  and we have settled cases with you.

14  Q   All my trials, will you agree, Mr. Kim, Johnson & Johnson

15  and Johnson & Johnson Consumer offered zero money to my clients

16  at the start of trial?

17  A   I'd have to go back and determine what we actually put on

18  or what discussions we had with you before the prior, prior to

19  your trials.

20  Q   Good seeing you, Mr. Kim.

21  A   Nice seeing you, sir.

22          MR. SATTERLEY:  I'm going to pass, pass the witness.

23          THE WITNESS:  Okay.  Thank you.

24          MR. JONES:  Your Honor?

25          THE COURT:  Counsel?

1          MR. JONES:  If, if I may, just to make sure that we're

2    clear about the production of this document, we just confirmed,

3    Mr. Rasmussen just confirmed the document was, indeed, produced

4    to the claimants' counsel on November 1, three days ago.  I

5    don't know when Mr. Satterley got it and I'm not purporting to

6    know.

7          THE COURT:  Right.

8          MR. JONES:  But it was produced in advance of their

9    exhibit list due date on November 1, is, is our understanding

10   of the productions.

11         MR. SATTERLEY:  I apologize.  I -- I -- what occurred,

12   your Honor, if I may speak to the Court?

13         THE COURT:  Yes, sir.

14         MR. SATTERLEY: I took the deposition of these

15   witnesses over the weekend.  We had a meet and confer on Monday

16   morning.  I begged for more documents and they, they e-mailed

17   me these whenever they did.  And I don't think there's any

18   prejudice to the, to the debtor as well.

19         MR. JONES:  And I'm not suggesting and I'm just making

20   sure --

21         THE COURT:  Right.

22         MR. JONES:  -- that we understand that we, we produced

23   when we produced.

24         THE COURT:  Okay, very good.  Thank you.

25         MR. JONES:  And it wasn't, and it wasn't yesterday.

 1          THE COURT:  Okay.

 2          Counsel?

 3                         CROSS-EXAMINATION

 4  BY MR. SILVERSTEIN:

 5  Q   Good afternoon, Mr. Kim.  How you holding up?

 6  A   Fine, thank you.

 7  Q   All right.  We, we, we spent Halloween together as well.

 8  A   We did.

 9  Q   And you got three, three ghouls today instead of two.

10          THE COURT:  Counsel, for the benefit of the court

11  reporter, tell us your name again.

12          MR. SILVERSTEIN:  Adam Silverstein --

13          THE COURT:  Okay.

14          MR. SILVERSTEIN:  -- of Otterbourg for The --

15          THE COURT:  Right.

16          MR. SILVERSTEIN:  -- Plaintiffs' Steering Committee.

17  BY MR. SILVERSTEIN:

18  Q   So, Mr., Mr. Kim, I want to cover some areas that Mr. Jones

19  went over with you that neither Mr. Block nor Mr. Satterley

20  questioned you about.  And I want to start with, I think, the,

21  what you've described as the tidal wave of, of lawsuits.

22      So you were the head of Products Litigation at Johnson &

23  Johnson immediately before this bankruptcy filing?

24  A   That's correct.

25  Q   And, and in that capacity you oversaw the MDL talc

1    litigation, or at least the, the lawyer managing the MDL talc

2    litigation on a day-to-day basis?

3    A    I did.

4    Q    Okay.  And when Mr. Jones questioned you, I, I wrote this

5    down because it, it seemed ominous.  You were, you were

6    testifying about the arc of the litigation and the reasons for

7    the bankruptcy filing.  And I, and I wrote this down and I

8    think it's verbatim.  You wrote "No" -- you said, "No company

9    could survive that kind of litigation," do you remember saying

10   that?

11   A    Yeah.  What -- yes, I do.

12   Q    Okay.  Now, Mr., Mr. Kim, before this bankruptcy filing

13   when you were head of Product Litigation in October of 2020 did

14   you believe that Johnson & Johnson, the parent company, could

15   survive this litigation?

16   A    When I say "survive," what -- what I -- the -- no

17   company -- yeah.  I think no.  I think if, if the litigation

18   continued as it, as it was going and, and it would continue for

19   the next 60 years because of the latency period and if we were

20   getting verdicts routinely like the verdict that we got in the

21   Ingham case, which Mr. Block discussed, no, I don't, I don't

22   think any company would survive that.

23   Q    Okay.  And Johnson & Johnson, who cannot survive litigation

24   like this, just like Old JJCI, has not spun off its talc

25   liability, done a divisive merger, and filed that spun-off

1  entity into bankruptcy, has it?

2  A   No.  We thought that this route was the preferable route.

3  Q   Right.  And so you thought that Johnson & Johnson would get

4  a stay of all of its litigation by JJCI doing a divisive merger

5  and putting its liability into bankruptcy, correct?

6  A   We believe that according to the law Johnson & Johnson

7  would certainly be entitled to a stay, yes.

8  Q   Okay.  Let's, let's talk about the MDL.

9      You -- the MDL talc litigation is not the first MDL

10  litigation you've been involved in, right?

11  A   No.  I think we went --

12  Q   We, we talked about that this weekend?

13  A   Yes, we did.

14  Q   Right.  You were involved with the Tylenol MDL in

15  Philadelphia, correct?

16  A   Correct.

17  Q   True or false.  That case has been settled?

18  A   For the most part.  I believe that's true.  I think there

19  may be one or two cases that are remaining.

20  Q   Okay.  You were involved with the Pinnacle Hip Replacement

21  MDL in Texas, correct?

22  A   I was.

23  Q   True or false.  The cases, in your words, "basically

24  resolved," correct?

25  A   I think we have an agreement in principle.  We've resolved

1    many cases.  We're still waiting to see how many go into the

2    settlement.

3    Q    You were involved with the Xarelto Pharmaceutical MDL in

4    Louisiana, correct?

5    A    Correct.

6    Q    True or false.  Settlement agreements with the vast

7    majority of plaintiffs in that MDL have been entered into and

8    are being processed?

9    A    That is correct.

10   Q    You were involved with the Propulsid Pharmaceutical MDL in

11   Louisiana?

12   A    That's correct.

13   Q    True or false.  That MDL has "finally been resolved,"

14   according to you, right?

15   A    Yes.  That was 20 years ago.

16   Q    Okay.  You were involved with the Latex MDL in

17   Philadelphia?

18   A    Correct.

19   Q    True or false.  That MDL has been resolved?

20   A    Again, 20 years ago, yes.

21   Q    You were involved with the Ortho Evra MDL in New Jersey?

22   A    Yes.

23   Q    True or false.  That MDL has been settled and disbanded?

24   A    Yes, that's true.

25   Q    You have been involved with the Invokana Prescription Drug

1    MDL in Indiana?

2    A    That's true.

3    Q    True or false.  Johnson & Johnson has settled most of the

4    Invokana cases out there?

5    A    Today, yes.

6    Q    And, and Mr. Kim, you cannot testify that in any of those

7    MDL settlements the claimants were treated unfairly or

8    inequitably, can you?

9    A    Oh, I can't test -- I, I don't know how -- because these

10   are MDLs, I don't have any visibility as to how the plaintiffs'

11   lawyers treated their clients.

12   Q    And, and you cannot testify that in any of those MDL

13   settlements claimants received lottery-like results, can you?

14   A    Again, because these are MDLs and not class actions I don't

15   have any visibility as to how the plaintiffs' lawyers treated

16   their individual clients.

17   Q    And, and you have never discussed your experience at

18   Johnson & Johnson settling MDL litigations with Dr. Charles

19   Mullin, have you?

20   A    I have not spoken to Charles Mullin about -- about the --

21   about these cases.

22   Q    All right.

23        Mr. Kim, isn't it true that Johnson & Johnson preferred to

24   litigate tens of thousands of claims in the MDL talc litigation

25   in open court rather than in the Imerys bankruptcy?

1   A    I'm sorry.  Can you repeat that?

2   Q    Isn't it true that Johnson & Johnson preferred to litigate

3   tens of thousands of talc litigation claims in open court in

4   the MDL, rather than deal with them in the Imerys bankruptcy?

5   A    No, I don't think that's true.

6   Q    Okay.  Johnson & Johnson is represented by Weil Gotshal in

7   the Imerys bankruptcy, correct?

8   A    It is.

9   Q    And while you were the head of Products Litigation, you

10  oversaw Johnson & Johnson's efforts in that regard, correct?

11  A    I did.

12  Q    Okay.  I'm going to ask Mr. Hayes to share on the screen

13  Exhibit 136.  I'm sorry.  Debtor's Exhibit 136.

14          MR. HAYES:  Okay, what?

15          MR. SILVERSTEIN:  Oh, no.  I'm sorry.  Defendants'

16  Exhibit 136.

17  BY MR. SILVERSTEIN:

18  Q    Mr. Kim, while we, while we wait, are -- are -- were you

19  aware that Johnson & Johnson filed a motion to lift the

20  automatic stay in the Imerys bankruptcy case?

21  A    I, I am.

22  Q    Okay.  And are you aware of the reasons that Johnson &

23  Johnson articulated to the court in the Imerys bankruptcy case

24  for lifting the automatic stay?

25  A    I do.

1   Q   Okay.  And if Mr. Hayes will scroll down -- I'm sorry -- to

2   Paragraph 2.

3          MR. SILVERSTEIN:  I'm, I'm sorry, Mr. Hayes.  I just

4   meant to scroll down to the lower part of Paragraph 2.

5          MR. JONES:  I'm sorry.  Is there an exhibit number?

6          MR. SILVERSTEIN:  Yes.  Exhibit 136.

7          I'm sorry.  The -- okay.

8   BY MR. SILVERSTEIN:

9   Q   And, and is it, isn't it true in the, in the second line

10  that Johnson & Johnson said it "prefers to defend the safety of

11  its products and the core causation issues in open court"?

12  That's what Johnson & Johnson said in Imerys, correct?

13  A   At that -- at this point in time in that sentence, that's

14  absolutely correct.

15  Q   Okay.  Well, there's some other sentences I want to talk

16  about, also.

17      Let's go to Paragraph 5.  Johnson & Johnson demanded the

18  opportunity "to defend its products in court as is its right,"

19  correct?

20  A   Correct.  At this point in time after these proceedings had

21  been going, these bankruptcy proceeding has been going on.

22  Q   Johnson & Johnson offered to remove over 90 percent of the

23  Imerys estate's talc claims from the bankruptcy and pay

24  successful claimants in full, correct?

25  A   Yes.  At this point in time, yes.

1   BY THE COURT:

2   Q    And what point in time is that?

3   A    This is after -- we originally tried to --

4   Q    Okay.

5   A    -- get into the bankruptcy by removing the core, the cases,

6   our cases into the Imerys bankruptcy.

7   Q    Okay.

8   A    Subsequent to that, the plaintiffs and the, and Imerys

9   basically colluded to put a massive TDP amount so that they can

10  then shift that indemnity to us.  With that --

11         THE COURT:  I will, I will move to strike because that

12  was my question.

13         THE WITNESS:  I apologize, your Honor.

14         MR. SATTERLEY:  May 28, 2020.

15         THE COURT:  Not surprising, that was granted as well.

16  BY MR. SILVERSTEIN:

17  Q    I was going to say May, May 28th is the -- is the date of

18  the -- is the date of the filing.

19     And, and the reason is that at that point in time, a little

20  more than a year ago, Johnson & Johnson preferred its chances

21  in a lottery system than resolving cases through the Imerys

22  bankruptcy, correct?

23  A    There was no resolution of cases through the Imerys

24  bankruptcy.  This is -- this is -- the debtor -- there was no

25  opportunity to resolve our cases in the Imerys bankruptcy at

1    this point.

2    Q    There was an opportunity for Imerys to resolve the Imerys

3    cases, correct?

4    A    Yes.  Yes, there --

5    Q    That's what you were seeking to remove?

6    A    Yes, there was.  It was an opportunity for Imerys to make

7    decisions and then try to hoist that upon Johnson & Johnson.

8    Q    And -- and -- and Johnson & Johnson wanted to undertake

9    this task and remind the court that "the conduct of bankruptcy

10   proceedings not only should be right, but must seem right"?

11   A    Absolutely.

12   Q    Okay.  And so Johnson & Johnson offered to pay the Imerys

13   debtor's defense in tens of thousands of claims in the MDL,

14   rather than have those claims determined in bankruptcy court in

15   Delaware, correct?

16   A    Rather than have the claims, the Imerys claims and have the

17   effect against Johnson & Johnson, yes.

18   Q    Right.  But Johnson & Johnson is not offering to pay LTL's

19   defense of claims in the MDL bankruptcy court, is it?  In the

20   MDL court.  I'm sorry.

21       Johnson & Johnson is not offering this debtor to remove

22   claims from this bankruptcy and resolve them in the MDL

23   litigation, is it?

24   A    No.

25   Q    Okay.  Because this bankruptcy seems right to Johnson &

1   Johnson, right?

2   A    I'm not sure what that, how to answer that question.

3   Q    Okay.

4   A    I'm not sure I understand what you're, you're asking.

5   Q    Let -- let's -- let's try one that may be easier.

6        Before there was even a first day hearing in this

7   bankruptcy Johnson & Johnson filed a Form 8-K on October 19th

8   announcing that since this debtor had filed for bankruptcy "all

9   pending cosmetic talc cases will be stayed," is that true?

10  A    That is true.

11  Q    And meanwhile, in the same Form 8-K Johnson & Johnson

12  assured the market that "Johnson & Johnson and its other

13  affiliates did not file for bankruptcy petition and will

14  continue their businesses as usual"?

15  A    That's true.

16  Q    Now after the Court declined to grant a stay to Johnson &

17  Johnson on October 22nd and entered an order on October 25th

18  denying the TRO except as to LTL and Old JJCI, Johnson &

19  Johnson has not filed any new Form 8-K updating the market that

20  all pending cosmetic talc cases are not stayed, has it?

21  A    I think that was already reported in the press.

22  Q    You were here when the Court denied the TRO as to Johnson &

23  Johnson, were you not?

24  A    I was.

25  Q    You understood the ruling?

1    A    I did.

2    Q    Okay.  And did you authorize John Garde of McCarter &

3    English yesterday to file on behalf of the debtor a Notice of

4    Bankruptcy in a case called <u>Pratt</u> where LTL is not even a

5    party?

6    A    I'd have to see the notice.  I don't, I don't recall seeing

7    that before it was mentioned this morning.  But I, if I could

8    take a look at it, I'd, I'd appreciate it.

9    Q    All right.

10             MR. SILVERSTEIN:  Mr. Hayes, do you have copies?  One,

11   one was passed to the Court this morning.

12             THE COURT:  Uh-huh (indicating an affirmative

13   response).

14             MR. HAYES:  It's the last copy we have.

15             MR. SILVERSTEIN:  All right.

16             May I approach the witness?

17             THE COURT:  You may.

18        (Counsel hands document to the witness)

19             THE WITNESS:  Thank you.

20   BY MR. SILVERSTEIN:

21   Q    Take, take as much time as you need, Mr. Kim, to just look

22   through it.

23   A    Thank you.

24        So I, I have not seen this before, but this is not the

25   direction that we gave our, our counsel.

1  Q    Okay.  So your counsel without the direction of the debtor

2  filed a notice yesterday in a case in which the debtor's not a

3  party stating that Johnson & Johnson and/or a whole slew of

4  other non-debtor parties can have no further action taken to

5  prosecute talc-related claims against them absent an order of

6  the bankruptcy court lifting or modifying the stay?

7  A    Yeah.  Our, our directions -- there's a new document that

8  they're supposed to file that actually goes into the TRO

9  ruling.  We -- and -- yeah.  I'm, I'm not sure how this got

10 filed.

11 Q    Who, who authorizes LTL's debtors to make filings in, in

12 cases in which LTL is not even a party?

13 A    Well, I think we file -- so it would be both a joint effort

14 between LTL and Johnson & Johnson and the direction would be to

15 clarify what the Court had ruled.  Basically, the, the new

16 notice would say that LTL is responsible for the conduct

17 that -- and -- of Old JJCI and that there was a ruling by the

18 Court, but that we believe that the automatic stay applied, but

19 that there would be a further hearing.

20     So it, it goes into the history of the ruling.  It gives

21 sort of the full information as to the status, that there would

22 be a further hearing about it, and basically tells the court

23 the current status.

24 Q    So --

25 A    So that -- that -- that should have been sent.

1  Q   All right.  So McCarter & English missed that memo?

2  A   It was a blast e-mail that went out as soon as we got the

3  ruling.  I'm not sure --- yeah.  Certainly, we'll follow up on

4  it to find out how that happened.

5  Q   Okay.

6      Now, Mr. Kim, when you resigned from your position as head

7  of Products Litigation Group, that was before this bankruptcy

8  filing, correct?

9  A   Yes.

10 Q   And, and you resigned from whatever other titles you had at

11 Johnson & Johnson companies before accepting the position as or

12 contemporaneously with accepting the position as Chief Legal

13 Officer of this debtor?

14 A   I did.

15 Q   You no longer have any responsibilities at Johnson &

16 Johnson?

17 A   I, I am helping on some transition issues.

18 Q   Okay.  You no longer are overseeing the MDL litigation?

19 A   I am not.

20 Q   So if --  and -- and --

21 A   Well, I am not to the extent -- well, the -- let me back up

22 for a second.

23     The MDL litigation was actually -- so I take that -- the

24 MDL litigation was transferred, basically, to LTL.  So I, I do

25 handle -- all talc litigation is now LTL's litigation.

1  Q    I see.  Does, does the Judge know that?

2  A    I, I don't know what the Judge knows or does not know.

3  Q    All right.

4  A    But either the bankruptcy -- it's clear that all, the

5  assumption of liabilities would mean that all, all the

6  litigation involving Baby Powder would fall to LTL.

7  Q    I see.  So you are overseeing the Johnson & Johnson --

8  A    I am.

9  Q    -- litigations because they've been transferred to this

10 Court?

11 A    From the -- from the -- from the viewpoint of, of LTL.  Of

12 course, you know, like, I think, people have noted, Johnson &

13 Johnson is also a named defendant in virtually all the cases.

14      So there's some shared responsibility, but as far as Old

15 JJCI's liability, that's LTL's liability.  And so I oversee

16 that portion of it.

17 Q    Is there any portion that hasn't been transferred to this

18 Court, already, from the MDL?

19 A    When you say "transferred to this Court," I mean, I --

20 the --

21 Q    Well, it's --

22 A    It's my response -- you know, the -- LTL took on the

23 obligations of, of Old JJCI.  I don't think cases were

24 transferred to this Court.  I think, you know, LTL's --

25 they're, they're within the jurisdiction of the Court,

1  certainly.  But, you know, I don't believe that there's been

2  like a transfer of, of MDL cases to this jurisdiction.

3  Q   All right.

4      Let's -- let's -- let's talk about the process for the --

5  the -- how we got here.  Because Mr. Jones asked you some

6  questions about that.

7      He showed you the funding agreement.  That was attached to

8  your first day declaration, do you recall that?

9  A   I do.

10 Q   And I think you answered to Mr. Satterley that, that

11 Johnson & Johnson, Johnson & Johnson and Old JJCI were

12 considering its options with regard to legacy talc litigation

13 for the past six months or so, correct?

14 A   Yes.

15 Q   And the transactions that culminated were the results of

16 those deliberations, correct?

17 A   That's true.

18 Q   All right.  And in connection with the divisive merger that

19 led to the funding agreement and this bankruptcy, no one

20 obtained, to your knowledge, an external fairness opinion,

21 correct?

22 A   That's true.

23 Q   You went through what you described as, over the weekend,

24 an internal fairness process, correct?

25 A   Internally, yes.  I would say that internally the

1    transaction was looked at and determined to be fair and

2    reasonable and, and people approved it.

3    Q   And, and that, that process, that determination of fairness

4    and reasonableness was no different within Johnson & Johnson

5    than if it was approving an arm's-length deal with a third

6    party, correct?

7    A   Well, I think it is a different process.

8    Q   Well, that's not what you said this weekend, is it?

9    A   Well, I, I think I did say that there's -- the process is

10   different because there's no negotiation internally.  When

11   you're dealing with a third party -- I, I'm sure I said this --

12   when you're dealing with a third party there's a negotiation

13   process that goes on.  But internally, it's really just a, you

14   know, internal fairness.  We're looking at -- at -- you know,

15   people are looking at whether it's a, it's fair internally.

16   Q   Right.  There was no negotiation of the funding agreement

17   whatsoever, was there?

18   A   No, not -- I -- I -- no.  There was no negotiation within

19   the company.

20   Q   There was no negotiation of the merger support agreement,

21   was there?

22   A   No negotiation, *per se*.  There's no -- it wasn't like --

23   again, it's not like a third-party decision where everyone has

24   their own interests and then you're trying to come up with some

25   negotiated number.  This was something that people looked at

1  internally to determine whether it was a fair and reasonable

2  process, a real fair and reasonable solution and then they

3  approved it.

4  Q   And, Mr. Kim, the lawyers who were involved in the funding

5  agreement and the merger support agreement and every other

6  agreement executed in connection with the transactions were the

7  same lawyers represented the interests of everyone, correct?

8  A   Essentially, yes.

9  Q   And that was the internal fairness review?

10  A   That would be part of the internal fairness review, yes.

11  Q   And, and by the way, just very quickly to pick up on

12  something that Mr. Block asked you about, in fact, you sit in

13  the same building that you sat before this bankruptcy, correct?

14  A   It's the same office, yes.

15  Q   The exact same office at Johnson & Johnson's worldwide

16  headquarters at 1 Johnson Way, correct?

17  A   1 Johnson & Johnson Plaza, yes.

18  Q   Okay.  And the only difference between before and now is

19  you have less files in your office, correct?

20  A   Generally, yes.

21  Q   All right.  Let's, let's talk about the merger support

22  agreement, which today you rely on for an indemnification,

23  correct?

24  A   I thought -- yeah.  I thought -- I think we relied on it

25  throughout this process.

1  Q   Okay.  And I, and I think you, you testified that in the

2  merger support agreement the debtor indemnified Johnson &

3  Johnson?

4  A   Yes.

5  Q   Okay.  Let's -- let's -- let's look at the merger support

6  agreement, again.

7           MR. SILVERSTEIN:  Mr. Hayes, can you put up Debtor's

8  Exhibit 5?  Mr. Kim has already looked at it today.

9           THE WITNESS:  Do we have a copy somewhere?

10          MR. HAYES:  Okay.

11  BY MR. SILVERSTEIN:

12  Q   I, I don't have a copy.  We're going to show it to you on

13  the screen.  I think your, your counsel showed it to you, a

14  copy of it.

15          THE COURT:  While we're in a break, we can run till

16  about 5:30 today before we're obliged to stop.

17          MR. SILVERSTEIN:  I'll be, I'll be done before then.

18          THE COURT:  Okay.

19  BY MR. SILVERSTEIN:

20  Q   All right.

21          MR. SILVERSTEIN:  Mr. Hayes, can you scroll up?

22          MR. HAYES:  Where would you like me to stop?

23          MR. SILVERSTEIN:  Yeah.

24  BY MR. SILVERSTEIN:

25  Q   So the, the merger -- the Amended and Restated Divisional

1   Merger Support Agreement, that's an agreement between the

2   debtor and New JJCI, correct?

3   A    It is.

4   Q    Okay.  And now let's go to the indemnity.  Let's look at

5   that wording.

6           MR. SILVERSTEIN:  It's Paragraph 3, Mr. Hayes.  Sorry.

7   BY MR. SILVERSTEIN:

8   Q    Okay.  It says, "LTL will indemnify and hold harmless JJCI

9   and each of its affiliates," and it carries on.  Do you see

10  that?

11  A    I do.

12  Q    And there's no mention of Johnson & Johnson whatsoever,

13  correct?

14  A    There's no mention here.

15  Q    Right.  And, and you've, you've seen indemnification

16  agreements involving JJCI and its affiliates before, have you

17  not?

18  A    Depends on how you define "affiliates."

19  Q    Well, we looked at one this weekend.

20  A    We did.

21  Q    The -- the -- so this, this agreement says "JJCI and each

22  of its affiliates," with a small "a," correct?

23  A    It, it does.

24  Q    And I'm going to ask -- you, you recall looking at the

25  Valeant or Bausch Health indemnification this weekend with me,

1   right?

2   A   I, I do.

3   Q   And in that indemnification, which I'm going to ask

4   Mr. Hayes to put up.  It's a -- it was marked at your

5   deposition as Exhibit 7.

6       In this indemnification JJCI and its affiliates gave an

7   indemnification to Bausch, correct, or Valeant?

8   A   It did.

9   Q   Right.  And when I asked you did JJCI and its affiliates

10  include the ultimate parent company this weekend you said, "If

11  it was Johnson & Johnson generally, we would have the agreement

12  marked as the Johnson & Johnson agreement and then list other

13  affiliates, but the fact that this is JJCI agreement talking

14  about affiliates it's really just, you know, other companies,

15  operating companies that had product."

16      Isn't that what you testified to?

17  A   But I also clarified that you'd have to look at the

18  definition of "affiliates" and --

19  Q   Okay.  So --

20  A   -- I offered to go back to the actual language in the

21  Valeant contract, which you declined --

22  Q   Well, we --

23  A   -- to have done.

24  Q   Well, we can go look at the transcript.

25  A   Yeah.

1   Q   We did look at it.  There was a definition and you didn't

2   give an answer.  But we don't need to belabor that.

3       There was -- it's JJCI and small "a" affiliates in the

4   indemnification agreement with Valeant.  JJCI and each of its

5   affiliates with a small "a" in the merger support agreement and

6   one includes Johnson & Johnson when there's an indemnification

7   that expands the stay and in the other it doesn't include

8   Johnson & Johnson to expand the stay, correct?

9   A   I disagree with that characterization.

10  Q   All right.  Let -- let's -- let's go to the issue of

11  indemnifications of, of third parties.

12      And, and I want to look at a chart that you were shown

13  earlier.  It's Debtor's Exhibit 17.  It's Tender Acceptances

14  FRE 1006 Summary of Evidence, right?

15  A   Yes.

16  Q   Are you aware that the claimants received this yesterday?

17  A   I don't know when the claimants received this.

18  Q   Okay.  Are you aware that we received it three days after

19  your deposition?

20  A   Yeah.  I, I, I don't know when you received this.

21  Q   And you'll agree that nobody on this side of the room got

22  the opportunity to ask you a single question about this

23  document, correct?

24  A   I, I would agree with that, yes.

25  Q   Okay.  And when's the first time that you saw this

1   document?

2   A    I think it was yesterday.

3   Q    Okay.  Just like us.

4        And, and so I take it from that that you had no role in

5   preparing the chart?

6   A    It was sent to me for review.

7   Q    Okay.  And, and it was sent to you for review.  You did not

8   take the chart and compare it to each of the tender acceptances

9   that is referred to in the 80 pages, correct?

10  A    Not, not all of them.  I looked at a selection of them and,

11  and I questioned counsel on how it was prepared and who

12  prepared it and what the basis was.

13  Q    Right.  And, and other than what counsel told you, you have

14  no idea who prepared it, what they did, and how they did it,

15  correct?

16  A    Well, other than what they told me they did.

17  Q    Somebody told you what they did?

18  A    I asked for, what the process was for, for getting this and

19  I, I know that we had been assembling each of the tenders ever

20  since we started doing discovery in this case.  I had counsel

21  at, at Shook Hardy, who's responsible for these tenders,

22  collect all of them and have been sending me reports on their

23  status.  And then this was the culmination of everything that

24  they found.

25  Q    Right.  And so all the people who collected the

1    indemnifications, all the people who worked on this summary,

2    none of them are here today?  We have you.

3        Oh, are there --

4    A    Yeah.  I think they may --

5    Q    -- some lawyers here?

6    A    Yeah.  Some, some may be.  I -- yeah.  I'm not, I'm not

7    sure that's correct.

8    Q    Are there lawyers that should be testifying about the

9    summary chart?

10   A    I'm perfectly capable of testifying about the summary

11   chart.

12   Q    Even though you had nothing to do with preparing it or

13   look, gathering any of the indemnifications that went into it?

14   A    It was all done under my direction and supervision.

15   Q    Okay.  Let -- let me -- let me ask you about the, the,  the

16   tender acceptances in here.

17   A    Uh-huh (indicating an affirmative response).

18   Q    Each one of these tender acceptances is case specific,

19   meaning that the acceptance of the tender is limited to the

20   defense of a specific case or cases, correct?

21   A    Because they, they tender the cases, we respond to the

22   tender of the cases, yes.

23   Q    Okay.  We're all going to get out of here quicker if, if

24   you are capable of answering the question yes or no -- and I

25   don't know if you are but if you are, then we'll be -- we'll --

1   we'll get through this quicker.

2            THE COURT:  Don't lecture the witness.

3            MR. SILVERSTEIN:  I apologize.

4            THE COURT:  Okay.

5   BY MR. SILVERSTEIN:

6   Q    You do not know whether there is an indemnification or a

7   tender agreement for all 38,000 talc cases that are pending

8   today, do you?

9   A    These are all agreements.  Each, each one of these is an

10  agreement to indemnify.

11  Q    You do not know whether all of these agreements cover all

12  38,000 cases pending today, correct?

13  A    They should.

14  Q    Okay.  But do, do you know?

15  A    So -- let me -- can I -- if I could just explain.  You --

16  you --

17           THE COURT:  Please.

18           THE WITNESS:  You say the 38,000 cases.  In many of

19  the cases, no retailer was sued.  So they wouldn't have given

20  us a tender for a case in which they weren't sued.

21           THE COURT:  Okay.

22           THE WITNESS:  What I know is that every time that a, a

23  retailer was sued and, and tendered to us, we took it except

24  for a very few situations where, when looking at the complaint,

25  it was obvious they were not being sued for our product.  In

1  those cases, we did not accept the tender.

2            So when you're referencing the 38,000 cases, you know,

3  there are, there are many cases where there's no retailer

4  involved.

5            THE COURT:  Go ahead.

6  BY MR. SILVERSTEIN:

7  Q   And when -- after the bankruptcy filing when cases are

8  filed against Johnson & Johnson and a retailer, you agree that

9  LTL is not providing any tender acceptances, correct?

10 A   I don't know that we've been put in that situation.

11 Q   Has LT --

12 A   I, I just don't know whether, whether anyone's tendered

13 since, since we filed.

14 Q   And -- but LTL is not going to sign an agreement accepting

15 a defense from somebody, from a, from a retailer that got sued

16 in a case with Johnson & Johnson, is it?

17 A   So it should be stayed, is, is the real issue here, that

18 the -- the -- it wouldn't, it wouldn't do it because it's the

19 same claim, the same defect, same product.  And so there

20 shouldn't be a situation that arises where -- where -- so --

21 but if, if those situations arose, then we'd be in a dilemma as

22 to, as to what to do.

23 Q   Right.  So in the situation where a retailer's sued with

24 Johnson & Johnson post bankruptcy the case should be stayed,

25 even though there is no signed agreement with Old JJCI or the

1   debtor, correct?

2   A   (a) there could be an agreement, a distributor agreement.

3   We don't, we don't know until we look at the, the facts and (b)

4   there could be common law that would dictate it.

5       So they'd be, they'd be bringing a claim based upon a sale

6   of a product by Old JJCI which would be LTL's responsibility.

7   Q   Well, the -- the --

8   A   So again, that's why it -- it should be -- it's the same

9   claims that they're making against LTL.  So it, it should be

10  stayed.  If it's not stayed, then we're in a dilemma as to how

11  to, how to deal with that.

12  Q   Okay.  And, in fact, there are alleged protected parties

13  that the debtor is seeking to stay litigation against as to

14  which there is no signed tender agreement, isn't that true?

15  A   Because -- yes, because in the future if they get named --

16  they shouldn't get named in a, in a lawsuit in the first place.

17  But if they get named, then we'd be in this dilemma of, of

18  trying to deal with the indemnity, which is why it should be

19  stayed in the first place.

20  Q   Okay.  So it's -- you're anticipating -- you're --

21  withdrawn.

22      So just one, one came to mind just as an example that just

23  came up today when I saw it.  Exhibit -- I'm going to ask to,

24  to look at Debtor's Exhibit 27 which you testified about.

25  It's, it's a hearing transcript with a, with a caption.

1          MR. SILVERSTEIN:  And just scrolling down, Mr. Hayes,

2    this is the Hood case.  There's a series of parties.  Scroll

3    down, Mr. Hayes.  Cyprus.  Keep scrolling, please.  Johnson &

4    Johnson, Johnson & Johnson Consumer Inc., and then I see Smith

5    Drugstore.

6    BY MR. SILVERSTEIN:

7    Q   And -- and -- so you -- do you recall looking at this this

8    morning?

9    A   I do.

10   Q   And it sort of jumped out at me.  So I checked to see and,

11   in fact, Smith Drugstore is one of the protected parties that

12   Johnson & Johnson -- I'm sorry -- that the debtor is seeking to

13   protect litigation against, correct?

14   A   Only if they're being sued for sale of our product.

15   Q   Right.  And, in fact, if you look at the Pratt notice that

16   you were handed by Mr. Hayes, if you go to the back and you

17   look at the list of parties that are, are non-debtor parties,

18   on the last page before the Certificate of Service you'll see

19   it says Smith Food & Drug Center, Inc.

20       Do you take my word for that, or do you want to look?

21   A   I can take your word for it.  If they, if they sell our

22   product and they're being sued for it, then they should be a

23   protected party, yes.

24   Q   So, so now let's look at the summary of all the tender

25   agreements that, that the debtor or Old JJCI has signed.  Let's

1  go to Page 50.  'Cause this, this is alphabetized, right?  The

2  list is alphabetized, is it not?

3  A    It could be.  I -- I --  I --

4  Q    Well --

5  A    I'd have to see it.

6  Q    -- do you want to look, do you want to look at it or --

7  A    Yeah.  I don't have it in front of me, so.

8  Q    I think you, you looked at it yesterday and you verified

9  that it was --

10 A    Yeah.

11 Q    -- accurate, did you not?

12 A    So it's, it's a spreadsheet.  So you can actually organize

13 it within, any way you want to organize it --

14 Q    But we, we don't have --

15 A    -- so.

16      Yeah, okay.

17 Q    -- that capacity today, do we?

18 A    Okay.

19 Q    This is a PDF.

20      But scrolling down, we're going to scroll down on Page 50.

21 We're looking at SO, SO, SO, SO, ST.  I don't seem Smith Food &

22 Drug anywhere on this chart, right?

23 A    Yeah.  It could be that it -- yeah.  This is the best we

24 could do at the short time we had.

25      So maybe we missed it or maybe that tender agreement wasn't

1   part of this.

2   Q    So --

3   A    I would have to see.

4   Q    So either the debtor is seeking a stay as to a retailer it

5   doesn't have a indemnity with or the chart's wrong?

6   A    Or the debtor -- the -- we had an indemnity agreement with

7   them in a prior case that got dismissed and now they don't show

8   up currently on this list.  So, I mean, there's, could be a lot

9   of reasons why it doesn't show up --

10  Q    Uh-huh (indicating an affirmative response).

11  A    -- on this particular list.

12  Q    All right.  A few more questions on this subject and we're

13  going to cover insurance, then we're, we're going to be done.

14       Mr., Mr. Kim, you agree that in order to understand which,

15  which Johnson & Johnson entities, whether it's the debtor, New

16  JJCI, Old JJCI, Johnson & Johnson, which entities accepted the

17  terms and under what conditions one needs to actually review

18  the underlying acceptances, correct?

19  A    I'm sorry.  Could you repeat that?  I apologize.

20  Q    Do you agree that in order to understand who provided the

21  indemnity and under what conditions someone actually needs to

22  look at each of these indemnity agreements, correct?

23  A    The basis for the indemnity, yes, but the fact of the

24  indemnity, the, the fact that there's a, a tender acceptance

25  is, is proof that there is an indemnity.

1   Q    Right.  And, and you saw over the weekend on Halloween that

2   these indemnities vary from one to the other, correct?

3   A    From time to time, they varied, yes.

4   Q    Yeah.  And, in fact, there was a time two years ago or so

5   when an internal project was done for all indemnification

6   letters issued by Johnson & Johnson or its affiliates, correct?

7   A    Generally, yes.

8   Q    Yeah.  That was in -- in -- in or around 2019 or 2020,

9   correct?

10  A    I believe that's right.

11  Q    And following the internal review there were changes made,

12  at least in some cases, to the contents and the parties to the

13  indemnity agreements, correct?

14  A    We're talking about all product liability cases, not just

15  limited to talc.  So in some agreements, yes, there, there were

16  changes made.

17  Q    And we saw that there were indemnifications of talc

18  liability that Shook Hardy sent in 2017 that I can represent to

19  you are on this list that are different from the ones that were

20  sent in 2019 and 2020, correct?

21  A    Yes, I agree with that.

22  Q    So from before the review to after the review could change,

23  correct?

24  A    Well, I'll just -- that's a -- timewise, yes.  Whether it's

25  a result of the review that we did depends on what the changes

1  were.  But there were change -- there were certainly changes

2  made throughout this process as we were getting tenders.

3  Q   And, and the changes, if any changes were made during this

4  internal review process, the internal review process was about

5  the same time that Johnson & Johnson began to meet with a

6  series of law firms about the possibility of dealing with its

7  talc liabilities, correct?

8  A   Temporally.  I think they were around the same time, but

9  one had nothing to do with the other.

10 Q   Okay.

11     The insurance summary chart, you didn't, you did not

12 prepare that, did you?

13 A   I, I did not.  I reviewed that.

14 Q   Right.  And that was -- you saw that for the first time

15 yesterday, also?

16 A   Yes.  The summary chart, I did.

17 Q   Right.  And, and there's not a single policy on that list

18 where any carrier has acknowledged an obligation to insure talc

19 liability to any insured, correct?

20 A   I, I don't believe that's true.

21 Q   And there's not a single policy on that list where any

22 carrier is obligated to pay the insured's costs of defense,

23 true?

24 A   I'm sorry.  One more time?

25 Q   There is not a single policy on that list in which the

1   insurance carrier is obligated to pay the costs of defense,

2   true?

3   A    Not true.

4   Q    There are some?

5   A    Obligated to pay the cost of defense, yes.  Virtually all

6   the policies have -- the definition of "loss" would include

7   expenses for litigation.  In fact, some of the policies, the

8   expenses are actually outside of the limits.

9       So yes, they would be responsible for costs of defense.

10  Q    But you haven't identified in your chart which policies

11  that is and which policies don't have any obligation to pay

12  costs of defense, have you?

13  A    I would think -- all, all of them have an obligation to pay

14  cost of defense.

15  Q    Have -- have -- do -- when was the last time you looked at

16  your first day declaration?

17  A    Yesterday.

18  Q    Okay.  And, and you agree that any dollar that Johnson &

19  Johnson receives from an insurance company for costs of defense

20  or any other reason is one dollar less that it can claim under

21  the 1979 agreement or any other indemnity against the debtor,

22  correct?

23  A    Wait, I'm sorry.  Can you repeat that one more time?

24  Q    You agree that any dollar that Johnson & Johnson receives

25  from an insurance company under a policy is one less dollar

1   that Johnson & Johnson can collect from the debtor under an

2   alleged indemnity, correct?

3   A   Well, I think -- that's not correct.  I, I think that

4   assumes that Johnson & Johnson would be the one getting the

5   money in the first place.

6       So again, both Johnson & Johnson and JJCI are named insured

7   under the policies.  So any recovery from an insurance company

8   would be, would be credited to, to JJCI.

9   Q   Mr. Kim, I appreciate your time.  And get some rest.

10              THE COURT:  Okay.

11              THE WITNESS:  Thank you.

12              THE COURT:  Let's take stock very quickly as to, were

13  there other cross-examination questions?

14      (No response)

15              THE COURT:  Got everybody?

16      (No response)

17              THE COURT:  How about redirect?  What kind of time are

18  you looking for, Mr. Jones?

19              MR. JONES:  Your Honor, I -- I -- I would keep it

20  modest, but I do not believe I could complete it in 14 minutes.

21              THE COURT:  Okay, very good.

22              In that case, we're going to take a recess.  We can

23  start tomorrow morning, I guess, at 9:00, if that helps any,

24  just to make sure we have enough time.

25              Everyone good with that?

1          (No response)

2                    THE COURT:  Okay.

3                    All right.  We'll be back here tomorrow.

4                    Yes?

5                    MR. JONES:  Could we get the running clock from

6     whomever's keeping it?  As we suggested, it might be a help.

7                    THE COURT:  All right.  Let's see.

8                    How much are the law clerks showing?

9                    I have the debtor with about 150 minutes left and

10    since we did about 50 then, I'm showing about 80 on the other

11    side.

12                   MR. JONES:  So --

13                   THE COURT:  Let me make sure they're in agreement

14    here.

15                   Okay.  A hundred and ten on the other side.

16                   What are you two showing?

17                   LAW CLERK:  I have 2-1/2 for the debtor and

18    (inaudible).

19                   THE COURT:  2-1/2 for the debtor and how much for the

20    other side?

21                   LAW CLERK:  An hour and a half.

22                   THE COURT:  An hour and a half?  A hundred minutes?

23                   That's what we're showing.

24                   MR. SATTERLEY:  We'll take that.

25                   THE COURT:  Okay.  I don't want to be too precise.

1   It's just a question of making sure we finish.

2          MR. JONES:  So you hear from the debtor, I think our

3   best estimates are an hour and 56 minutes --

4          THE COURT:  Uh-huh (indicating an affirmative

5   response).

6          MR. JONES:  -- for the debtor and 2 hours and 55

7   minutes for the defendants' cumulatively.

8          THE COURT:  Okay.  Okay.

9          All right.

10          MR. JONES:  So 1, 1:56 for the debtor; 2:55 for the

11   defendants cumulatively, is our, is our best count.

12          THE COURT:  Okay.

13          Well, we can talk tomorrow some more if we need to

14   about how much.  Let's try to stick to the, the rough estimates

15   there.  I don't want to be too precise on this, folks.

16   Y'all've got a lot to talk about and I don't want to

17   shortchange it based on --

18          MR. JONES:  So 9:00 a.m. tomorrow?

19          THE COURT:  -- artificial timekeeping.

20          On the other hand, getting flights out of Charlotte

21   tomorrow with what's going on in American might be a bit of an

22   issue, okay?

23          So bottom line is I'd like to get you out at a

24   reasonable time tomorrow, but I don't want to stilt the

25   presentation.  Try to stick to your time limits as best we can

1    and if we need to talk about it tomorrow, we will.

2              Otherwise, we're in recess.

3              MR. JONES:  Thank you, your Honor.

4              MR. SILVERSTEIN:  Have a good evening, your Honor.

5              THE COURT:  All right.  You can --

6         (Court recessed for the day at 5:19 p.m., to reconvene at

7    9:00 a.m. on Friday, November 5, 2021)

8

9

10

11

12                         CERTIFICATE

13              I, court approved transcriber, certify that the

14   foregoing is a correct transcript from the official electronic

15   sound recording of the proceedings in the above-entitled

16   matter.

17   _/s/ *Janice Russell*_____          ___November 12, 2021___

18   Janice Russell, Transcriber                    Date

19

20

21

22

23

24

25