**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)
*ATTORNEYS FOR DEBTOR*

In re:

LTL MANAGEMENT LLC,[1]

            Debtor.

Chapter 11

Case No.: 21-30589

Judge: Michael B. Kaplan

**Hearing Date and Time:**
January 19, 2022 at 10:00 a.m.

**DEBTOR'S REPLY IN SUPPORT OF MOTION FOR AN
ORDER DETERMINING THAT THE UNITED STATES TRUSTEE'S
NOTICE OF "RECONSTITUTED AND AMENDED" TALC CLAIMANTS
COMMITTEE IS INVALID AND REINSTATING THAT COMMITTEE**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

NAI-1525471858

The above-captioned debtor (the "Debtor") files this reply (the "Reply") in support of the Debtor's motion [Dkt. 1047] (the "Motion")[2] and in response to the objections filed by:

(a) the purported Official Committee of Talc Claimants I ("Talc I") [Dkt. 1159] (the "Talc I Objection");

(b) the purported Official Committee of Talc Claimants II ("Talc II", and together with Talc I, the "Committees") [Dkt. 1158] (the "Talc II Objection"); and

(c) the Office of the United States Trustee (the "UST") [Dkt. 1161] (the "UST Obj." and collectively with the Talc I Objection and the Talc II Objection, the "Objections").[3]

## PRELIMINARY STATEMENT

1. The Objections represent yet another effort by the claimants and the UST to wrest decisions away from this Court. The TCC tried it with its motion [Adv. Dkt. 110] seeking withdrawal of the reference of the adversary proceeding (Adv. Pro. No. 21-03032 (MBK)) that is central to this Chapter 11 Case. District Judge Wolfson denied that motion. Order, Case No. 21-20252 (FLW) [Dkt. 32] (D.N.J. Jan. 11. 2022). The UST tried it with his motion [Dkt. 843] seeking the appointment of an examiner for the purpose, among other things, of forming various legal conclusions, for instance with respect to the 2021 Corporate Restructuring, rather than leaving the consideration of such matters to the Court. That motion was withdrawn at the request of the Court. The Committees and the UST now try it again by together proclaiming that the Court lacks the power to even consider the relief the Debtor seeks

---

[2] Capitalized terms used herein but not otherwise defined have the meanings given to them in the Motion.

[3] Talc I, Talc II, and the U.S. Trustee are collectively referred to herein as the "Objectors." Motley Rice LLC also filed a response to the Motion on behalf of Talc II member Shirleeta Ellison [Dkt. No. 1164]. The response joins the substantive arguments raised in the Talc I and Talc II Objections and requests that Motley Rice's client continue serving as a member of either the Talc II or the TCC.

-2-

in the Motion. To the contrary, the Court unquestionably has the power to grant the requested relief.

2. The Court indisputably has the authority to uphold orders entered in this case and should do so here in the face of the UST's effort to unilaterally rescind it.

3. As clarified last week on the record, the UST is not relying on the validity of his rationale for issuing the Notice as a basis for his purported authority to do so. Accordingly, the narrow question presented here is whether the UST can, *sua sponte*, ignore and purport to vacate a valid court order, entered after notice, an opportunity to object, and a hearing, without notice of his action, without analysis or justification of his action, and without any transparency whatsoever with respect to his action. The answer is no. A UST cannot simply purport to countermand a court order. This Court should respect and enforce Judge Whitley's order as entered—just like it has enforced or would enforce every other court order coming out of the NC Bankruptcy Court.

4. Simply put, the Notice is invalid, as the UST cannot disband a committee appointed by court order. Sharon Steel is directly on point, and the Objectors' attempts to distinguish that case are wholly unavailing. As in Sharon Steel, the UST's Notice here "would effectively review and modify the [court's prior] order," and, were the Notice allowed to stand, would "violate the constitutional principle that no administrative agency may usurp the adjudicatory function of the courts." 100 B.R. 767, 775 (Bankr. W.D. Pa. 1989) (internal quotation marks omitted).[4] The Objectors' attempt to distinguish Sharon Steel as being the

---

[4] The Talc II Objection erroneously attempts to distinguish Sharon Steel, asserting that the court there "finally adjudicated" the issue of a second committee. Talc II Obj. ¶¶ 39-41. But the facts here are nearly identical. In both cases, the court held a committee appointment hearing at which the propriety of appointing an additional committee was discussed. See Motion at ¶¶ 10, 12; Sharon Steel at 770-71 (stating that the "notion of a separate committee for debenture holders was advanced" at the hearing). In

-3-

minority view with respect to the Court's review of the U.S. Trustee's actions under section 1102(a)(1) again misses the point—that is not the basis on which the Debtor relies on Sharon Steel.[5]  See UST Obj. ¶ 33 & n.5; Talc II Obj. ¶ 41 & n.12.

5. The Motion should be granted.

## ARGUMENT

**I. The TCC Order Is Valid and Enforceable, Notwithstanding the Transfer of Venue.**

6. The Court need only determine whether it should enforce the TCC Order. The UST argues that, following transfer of the case, "the entry of an 'order' appointing a committee in a Bankruptcy Administrator district" is not binding upon him. UST Obj. 4, ¶ 59. The UST provides no case law supporting this argument, and the UST's citation to the 1991 Advisory Committee Note to Bankruptcy Rule 9035 does nothing to help his case. See UST Obj. ¶ 59 n.11.[6]  It is not (at least it should not be) controversial that this Court inherited the NC Bankruptcy Court's docket as it existed upon transfer, inclusive of the TCC Order. In re Miller, 485 F.2d 74, 76 (5th Cir. 1973) ("[T]he orders issued prior to the transfer continued as though the case were still pending in the original district. The transfer for the convenience of the

---

neither case did the court enter an order finding that it should not appoint a second committee upon a request for such a committee.

[5] It is also incorrect to state that Sharon Steel was decided at a time when there was "no procedure or standard for a court to review the adequacy of a committee's representation." UST Obj. ¶ 34. Instead, section 1102(a)(2), which allows the court to appoint an additional committee upon a request of a party in interest in order to achieve "adequate representation," existed at that time.

[6] The 1991 Advisory Committee Note to Bankruptcy Rule 9035 simply points readers to section 302(d)(3)(F) of the 1986 Bankruptcy Act for the statutory provisions governing procedures for cases pending in non-UST districts at the time those districts become UST districts, which has of course not happened. Neither the 1991 Advisory Committee Note nor the transition provisions of the 1986 Bankruptcy Act apply to cases transferred from non-UST districts to UST districts. Even if these provisions did apply, they would not provide any support for the UST's argument. Section 302(d)(3)(F) only provides that, in a transitional case, the 1986 Bankruptcy Act amendments to the UST provisions generally will not take effect until one year after the transition date.

NAI-1525471858

parties simply brought the cause as it was to the transferee jurisdiction.").[7] The TCC Order is valid and enforceable, and the UST cannot simply purport to overrule it.

**II.     Granting the Motion Is in the Best Interest of Parties in Interest.**

7.    Because the relevant issue is whether the Court should grant the Motion, not whether it has the power to do so, the Court need not wade into extensive arguments made by the Objectors regarding the separation of responsibilities between the Court and the UST under section 1102, the legislative history of section 1102 through multiple changes to the statute, canons of statutory construction potentially applicable to section 1102, the case law for and against the power of the Court to disband a committee created by the UST, or the extent of section 105 of the Bankruptcy Code.[8]

8.    If the Court decides that the UST's Notice is invalid or that the number of committees and the membership of any committee should otherwise be reconsidered, the question for the Court should be:  what is in the best interest of the parties in interest?  On this question, the Court owes no deference to the UST.[9]

---

[7]  See also Pac. Coast Marine Windshields v. Malibu Boats, 2011 WL 6046308, at *2 (E.D. Cal. Dec. 5, 2011), report and recommendation adopted sub nom. Pac. Coast Marine Windshields v. Boats, 2012 WL 12903557 (E.D. Cal. Jan. 4, 2012) ("When an action is transferred, that which has already been done remains untouched; only further proceedings in the case are referred to another tribunal."); see also In re Judzewitsch, 2008 WL 817108, at *1 (Bankr. E.D. Tenn. Mar. 26, 2008) ("The general rule is that a change of venue does not alter an action procedurally, and it arrives in its transferee court unchanged and unimpeded."); In re Dambrie, 153 B.R. 602, 603 (Bankr. D. Me. 1993) ("This Court does not consider the change of venue to be such an extraordinary circumstance to warrant this Court's use of its equitable powers to retroactively extend the bar date for this sophisticated creditor."); 15 Charles Alan Wright, et. al., Fed. Prac. & Proc. Juris. § 3846 (2021) ("When an action is transferred, it remains in the posture it was in and all further proceedings in the action merely are referred to and determined by the transferee tribunal. This leaves in place whatever already has been done in the transferor court.").

[8]  The Court also need not wade into the question of the proper standard of review of the UST's acts, *i.e.* either *de novo* review or review for abuse of discretion.

[9]  Notwithstanding, the Debtor stands by its position in the Motion that the Court has the power to disband a committee, even one originally created by the UST.  Both the UST and Talc II argue that each of the cases cited by the Debtor in support of this position are inapplicable.  UST Obj. ¶¶ 52-56; Talc II Obj. ¶ 34, n.9. This is simply not true.  For instance, Continental Cast Stone did not hold that a court can only disband a committee if the UST placed members on the committee not eligible by statute.  The court instead stated "[i]f the court is unable to disband a creditors' committee once convened, the court is therefore unable to

9. Contrary to Talc I's assertion, it is not too late to change things based on the fact the two committees have been operating for a mere three weeks. Talc I Obj. ¶ 5 ("further modifications would result in unnecessary disruption to a process that has been working smoothly since" December 23, 2021). As Talc I concedes, the TCC was functioning quite well before the UST's unilateral intervention. Id. at ¶ 2. And this is consistent with statements the TCC's counsel made in Court: "And it's good to say, we've been working very well together as a committee in the past number of weeks since the Committee was formed". Nov. 22, 2021 Hr'g Tr., 50:12-14. There should be no material disruption if the TCC is effectively put back together, particularly since all the TCC's members and all the TCC's counsel have remained involved in the case since the UST issued the notice.

10. The Court should reinstate the TCC for all of the reasons stated in the Motion.

## III. There is No Precedent for Separate Personal Injury Claimants Committees Based on Disease Type.

11. No court or UST has ever appointed a separate committee based on disease category.[10] Now is not the time to start, especially given that mesothelioma claims

---

rule on a creditor or debtor's argument that a creditor wholly ineligible under the Code has been appointed to the committee *or that a committee is not viable in the specific case*. 625 B.R. 203, 209. As another example, the court's ruling in City of Detroit that it could disband the UST's committee is not "dicta," but instead an alternative ruling of the court. 519 B.R. 673, 679-82 Bankr. E.D. Mich. 2014). Continental Cast Stone remains the latest published pronouncement on this issue and reaffirms that the majority view is that the Court can disband a UST-appointed committee. 625 B.R. at 209.

10   Talc II tries to make it seem like what the UST seeks to do here—appointing an additional committee of tort personal injury claimants who allege exposure to the same products—is common. See Talc II Obj. ¶ 47 n.16. But, as set forth below, in all but two of the cases cited by Talc II in footnote 16, the U.S. Trustee appointed only one committee comprised exclusively of tort claimants, plus one or two other committees comprised primarily of non-tort unsecured creditors. In Armstrong World Indus and Celotex, separate tort committees of personal injury claims and property damage claims that are treated differently under the Code. For example, personal injury claimants have distinct rights under various statutes applicable in chapter 11, including 28 U.S.C. §§ 157 and 1411. See, e.g., § 157(b)(2)(B) (requiring the district court to liquidate or estimate personal injury claims for purposes of distribution; § 1411(a) (title 11 does not "affect any right to trial by jury . . . with regard to a personal injury or wrongful death tort claim").

NAI-1525471858

represent only 1% of the current claimants and were already over-represented on the TCC.[11] Sanctioning the appointment of two committees in this case would create a precedent for disproportionately empowering minority interests in mass tort cases, for unduly burdening debtors with the substantially higher costs of multiple committees and professionals, and for making more complicated and difficult a path forward to a consensus. Debtors with venue options would be disinclined to commence chapter 11 cases in this District.

12. Committees are generally not comprised of a particular type of creditor.[12] Rather, committees are designed to include a variety of creditor interests, and a separate

---

[11] None of the cases cited by Talc II supports this. See In re Mallinckrodt plc, No. 20-12522 (Bankr. D. Del. 2020) [Docket Nos. 306, 308] (official committee of unsecured creditors and opioid related claimants committee appointed); In re Boy Scouts of Am. and Delaware BSA, LLC, No. 20-10343 (Bankr. D. Del. 2020) [Docket Nos. 141, 142] (committee of unsecured trade creditors and unsecured committee of tort claimants appointed); In re The Roman Catholic Church for the Archdiocese of New Orleans, No. 20-10846 (Bankr. E.D. La. 2020) [Docket Nos. 94, 772] (official committee of unsecured creditors and committee of commercial creditors appointed); In re PG&E Corp., No. 19-30088 (Bankr. N.D. Cal. 2019) [Docket Nos. 409, 453] (official committee of unsecured creditors and official committee of tort claimants (fire victims) appointed); In re TK Holdings, Inc., No. 17-11375 (Bankr. D. Del. 2017) [Docket Nos. 164, 167] (official committee of unsecured trade creditors and unsecured tort claimant creditors appointed); In re Archdiocese of St. Paul & Minneapolis, No. 15-30125 (Bankr. D. Minn. 2015) [Docket Nos. 124, 220] (official committee unsecured creditors (tort claimants) and committee of Parish creditors appointed); In re Armstrong World Indus., Inc., 320 B.R. 523, 525 (D. Del. 2005) (official committee of unsecured creditors [Dkt. 90], official committee of asbestos personal injury claimants [Dkt. 91], and the official committee of asbestos property damage claimants [Dkt. 1075]); In re Dow Corning Corp., 280 F.3d 648, 654 (6th Cir. 2002) (official committee of tort claimants, official committee of physician creditors, and official committee of unsecured creditors appointed); In re Nat'l Gypsum Co., 219 F.3d 478, 480 (5th Cir. 2000) (unsecured bond and trade claims committee and the asbestos claims committee appointed); In re Celotex Corp., 204 B.R. 586, 588–91 (Bankr. M.D. Fla. 1996) (trade creditors committee, asbestos health claimants committee, and asbestos property damage claimants committee appointed); In re A.H. Robins Co., 88 B.R. 742, 744 (E.D. Va. 1988) (equity security holders' committee, official unsecured creditors' committee, and dalkon shield claimants' committee appointed). Talc II also cites Imerys as having two committees appointed, but that is incorrect. The docket entries cited by Talc II are the notice of appointment of a single official committee of tort claimants [Dkt. 132] representing ovarian cancer and mesothelioma claimants and a notice of amendment to the membership of the same committee [Dkt. 683].

[12] See In re Garden Ridge Corp., No. 04–10324 (DDS), 2005 WL 523129, at *3-4 (Bankr. D. Del. Mar. 2, 2005) (declining to appoint official committee for landlords where landlords already were represented on official committee of unsecured creditors and because official committee "is simply not intended to represent individual creditor interests"); Mirant Americas Energy Mktg., L.P. v. Off. Comm. of Unsecured Creditors of Enron Corp., No. 02 CIV. 6274 (GBD), 2003 WL 22327118, at *6 (S.D.N.Y. Oct. 10, 2003) ("The principal purpose of creditors' committees is not to advocate any particular creditor class's agenda, but rather to 'strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished.'") (internal quotation marks omitted).

NAI-1525471858

committee may only be justified if the existing committee is effectively paralyzed.[13] The TCC exhibited no paralysis in this case. The well-established principle that committees need not, and in fact should not, be homogenous is, indeed, the very policy espoused by the UST. See *United States Trustee Program Policy and Practices Manual*, Volume 3, at 56 ("The mere presence of a potential conflict of interest among creditors does not automatically require the appointment of separate committees.").

### IV. There Is No Justification for Empowering Mesothelioma Claimants with Their Own Committee.

13. There is no reason to provide just 1% of the current claimants (and much less than 1% of all claimants when considering future claimants) with their own committee. As of the filing of this case, mesothelioma claimants comprised only 1% of the talc claims pending against the Debtor. Yet these claimants comprised 40 percent of the membership of the TCC (4 of its 10 members), and, thus, were well represented (actually overrepresented). The Court should not amplify this over-representation further by permitting the UST to *sua sponte* provide mesothelioma claimants with their own committee.

14. Talc II asserts that mesothelioma and ovarian cancer claimants have "unique" interests, Talc II Obj. at ¶¶ 46, 48, but fails to even attempt to articulate why those

---

[13] See, e.g., In re Dana Corp., 344 B.R. 35, 38-39 (Bankr. S.D.N.Y. 2006) ("Creditor committees often contain creditors having a variety of viewpoints . . . however, these differing views do not require a separate homogenous committee unless they impair the ability to reach a consensus.") (citing In re McLean Indus., Inc., 70 B.R. 852, 861 (Bankr. S.D.N.Y. 1987)); Garden Ridge, 2005 WL 523129, at *4 ("Courts generally will not authorize an additional committee . . . unless the current committee is 'hopelessly divided, unable to take a position on important matters and ineffective….'") (quoting In re Enron Corp., 279 B.R. 671, 686 (Bankr. S.D.N.Y. 2002)); In re Texaco, Inc., 79 B.R. 560, 567 (Bankr. S.D.N.Y. 1987) ("Dissident factions of the same class of creditors are not automatically entitled to separate committees."); Sharon Steel, 100 B.R. at 777-78 ("It is universally recognized that intercreditor conflicts inhere in any committee" and "adequate representation exists through a single committee as long as the diverse interests of the various creditor groups are represented on and have participated in that committee.").

NAI-1525471858

interests are unique from each other, much less unique enough to warrant the substantial step of separate committees.[14]

15. As pointed out in the Motion, in both the Imerys and Cyprus cases pending in Delaware,[15] the UST appointed only a single talc claimants committee consisting of mesothelioma and ovarian cancer claimants.[16] In fact, the UST opposed the appointment of a second committee in one of those cases.[17]

16. Talc II argues that "every bankruptcy case is different." Talc II Obj. ¶ 49. Imerys is not different with respect to committee formation. The claimants there substantially overlap the claimants in this case, as it was very rare for a plaintiff to sue Imerys, Old JJCI's talc supplier, but not also sue J&J or Old JJCI. See Kim Decl. at 55; see also Imerys First Day Decl. ¶ 18.

V. **An Additional Committee Will Make It More Difficult to Reach a Case Resolution.**

17. The Objectors fail to address that appointment of an additional committee would make it more difficult to reach a consensual resolution in this case. The addition of

---

[14] Talc II states that these undisclosed differences will result in different approaches in certain aspects of the Chapter 11 Case. But, as discussed below, this is not a basis for creating a separate committee.

[15] See In re Imerys Talc America, Inc., No. 19-10289 (LSS) ("Imerys") (Bankr. D. Del. Feb. 13, 2019); In re Cyprus Mines Corporation, No. 21-10398 (LSS) ("Cyprus") (Bankr. D. Del. Feb. 11, 2021).

[16] This is true notwithstanding that mesothelioma claimants in Imerys, also the minority claimants in that case, accounted for 5.8% of the claims pending against the debtors in contrast to 1% here. See *Decl. of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings*, Imerys [Dkt. 10] ("Imerys First Day Decl.") at ¶ 32. In Cyprus, the debtor estimated that over 95% of the talc personal injury claims against it were mesothelioma claims rather than ovarian cancer claims. [Dkt. 7] at ¶ 39. Yet in Cyprus the UST appointed a single committee comprised of six mesothelioma claimants and one ovarian cancer claimant. See *United States Trustee's Objection to Motion of Kazan McClain Firm Personal Injury Plaintiffs for Modification of the Tort Claimants Committee or for Appointment of Tort Claimants Conflicts Committee* (the "Cyprus UST Objection"), Cyprus Mines Corporation, No. 21-10398 (LSS) (Bankr. D. Del. Feb. 11, 2021) [Dkt. 189] at ¶ 10.

[17] See Cyprus UST Obj. at ¶ 3 (stating in opposition that "[t]he U.S. Trustee appointed individuals who adequately represent the Cyprus personal injury claimants.").

NAI-1525471858

another party and another set of professionals would inevitably result in delay and would inevitably slow down the case. See Sharon Steel, 100 B.R. at 770-71 (the notion of appointing a separate committee for a category of unsecured creditors "met with general disfavor in view of the obvious complexities it would create, complicating negotiations of the [Debtor] . . . .").

18. Further, the alleged, unarticulated differences between mesothelioma claimants and ovarian cancer claimants that allegedly necessitate an additional committee would not disappear upon the appointment of that committee. Instead, separate committees would only create an additional obstacle to reaching consensus. And any differing interests that may exist could be addressed in other ways, including through the formation of subcommittees within the TCC. Already, claimants are predicting that the two committees will fight over matters that go to the heart of resolving this case. See Talc II. Obj. ¶ 46 (predicting divergent approaches to "plan, estimation, and/or claim reconciliation proceedings"); A&I Motion ¶¶ 28-31 (the additional committee "will foster division, not compromise" on plan classification and other plan-related matters). Those potential divergent interests should be addressed and resolved within the confines of a single committee.

19. The appointment of two committees will only add complexity (in addition to cost, delay, and duplication of effort) to what already is a complex case. The same U.S. Trustee himself has recognized this: "A second committee . . . will also add to the complexity of this case." See Cyprus UST Obj. at 10. The UST's position in Cyprus should be adopted here.

**VI.    The Costs Resulting From an Additional Committee Would Be Astronomical.**

20. Both the UST and Talc II essentially argue that costs should be irrelevant to the Court's consideration because the Debtor can obtain the funds to pay professional fees

NAI-1525471858

from the Funding Agreement. UST Obj. ¶ 44; Talc II Obj. ¶ 51.[18] Given that the UST acts as a watchdog on professional costs, this position is especially surprising coming from him.[19] The fact that professional fees may be paid through the Funding Agreement or that professional fees may not impact claimant recoveries is not the point. See In re Texaco, Inc., 79 B.R. 560, 567 (Bankr. S.D.N.Y. 1987) (although the debtor was an "admittedly solvent and prosperous oil giant," the court emphasized that merging two committees of unsecured creditors would relieve the debtors' estates of the "additional financial burden of supporting two separate groups of attorneys, accountants and investment bankers performing duplicative services for two committees of the same class of creditors" while maintaining adequate representation of creditors). The point is that the appointment of two committees will result in unnecessary and substantial duplication and expense.

21. The Committees to date have shown an inability to restrain professional retentions and costs. The TCC itself took the unprecedented step of seeking retention of EIGHT law firms just to represent it,[20] without any true attempt to distinguish between the roles of most of the proposed advisors. Then, just prior to the Notice, the TCC sought to retain not only a

---

[18] The Debtor's access to funding under the Funding Agreement is only to the extent that any cash distributions received by the Debtor from its direct subsidiary Royalty A&M LLC are insufficient to pay the costs and expenses of the Chapter 11 Case. See First Day Decl. ¶ 27.

[19] The UST suggests that "specific concerns about costs are better handled in the retention and fee application context." UST Obj. at 3 & ¶ 46. But this is not realistic, especially given the number of professional firms already retained in this case. Using the fee application process to police duplication would itself be time consuming, inefficient, costly, and potentially unfair, both for the parties and for this Court, not to mention that it would be essentially impossible to do so. Based on the requests for compensation received to date, this would involve reviewing millions of dollars of professional fees from Committee professionals set forth in thousands of time entries in scores of fee applications over time. The only way effectively to rein in professional costs at this stage is to reduce duplication at the outset.

[20] The TCC retained the following law firms: Brown Rudnick (general bankruptcy, bankruptcy litigation, and mass tort bankruptcy counsel) [Dkt. No. 853]; Bailey & Glasser LLP (litigation counsel) [Dkt. No. 865]; Otterbourg P.C. ("special" bankruptcy counsel) [Dkt. No. 855]; Massey & Gail LLP (litigation counsel) [Dkt. No. 864]; Parkins Lee & Rubio LLP ("special" bankruptcy counsel) [Dkt. No. 856]; Genova Burns LLC (local counsel) [Dkt. No. 850]; Miller Thomson LLP (Canadian counsel) [Dkt. No. 1008]; Monzack Mersky and Browder, P.A (Delaware counsel) [Dkt. No. 1007].

financial advisor, but also an investment bank without clear purpose and against precedent in this type of mass tort case.[21]

22.   In total, the Committees are up to ELEVEN separate law firms, for now, because Talc II has already proposed to retain three additional law firms to provide services that are duplicative of those provided by law firms already retained by the TCC.[22]  The Talc II co-counsel applications clearly indicate that in addition to duplicating the services of existing Talc I counsel, each firm would provide overlapping services to Talc II.[23]  The Committees have further advised the Debtor that they will seek to retain two separate financial advisors and two investment banks.  See also Jan. 11, 2022 Hr'g Tr. at 101:16-17 (Talc II stating that sharing a financial advisor "is not really a workable solution from our perspective.").

23.   And this is even before bringing in other professionals, which may include potential insurance counsel, tort claim estimation advisors (such as Bates White sought to be retained by the Debtor), a variety of experts, and potentially others.  This is also before a major estate representative who has not yet appeared, a future claimants representative, is appointed and seeks retention of his or her own set of professional advisors.

---

[21]   See *Application For Retention of Professional Houlihan Lokey Inc. as Investment Bank to Official Committee of Talc Claimants* [Dkt. No. 953] at 4 (proposed services include "[a]nalyzing business plans and forecasts of the Debtor" and "Assessing the financial issues and options concerning the Debtor"); *Application For Retention of Professional FTI Consulting, Inc. as Financial advisor to the Official Committee of Talc Claimants* [Dkt. Nos. 954] at 3-4. (proposed services include "[a]ssessing and monitoring of the Debtor's and its non-Debtor subsidiary's short-term cash flow, liquidity, and operating results").

[22]   See Dkt. 1079 (seeking to retain Sherman, Silverstein, Kohl, Rose & Podolsky, P.A. as local counsel to Talc II); Dkt. 1080 (seeking to retain Cooley LLP as co-counsel to Talc II); Dkt. 1091 (seeking to retain Waldrep Wall Babcock & Bailey PLLC as co-counsel to Talc II).

[23]   The Debtor provides a detailed comparison of the services of these professionals in its omnibus objection to their retention applications [Dkt. 1162].  See id. at ¶ 7 (comparing Cooley App. [Dkt. 1080] at 3; Waldrep App. [Dkt 1091] at 3-4; and Sherman App. [Dkt.1079] at 2).

24. The Debtor cannot but help to believe that the plaintiff law firms, through their support of the UST's unilateral action, the many retention applications and other measures are engaging in an intentional strategy to run up exorbitant costs in this case to both take advantage of the "open checkbook" aspect of chapter 11 and discourage other companies from seeking similar relief through bankruptcy filings. The veritable armies of professional advisors proposed by the two committees would undoubtedly drive costs in this case well beyond reason, and make dramatically more difficult efforts to reach a prompt resolution of this case.[24]

---

[24] As of January 13, 2022, TCC professionals have requested distributions totaling almost $6,000,000 solely for the last two weeks of November and the month of December, and solely for the first six law firms that the TCC originally retained. That amount does **not** include the fees and expenses incurred by Otterbourg and Massey & Gail for the latter half of December. Nor does it include the additional costs that will be incurred going forward as a result of the either Talc I or Talc II's retention of Monzack Mersky and Browder, P.A (Delaware counsel) and Miller Thomson LLP (Canadian counsel). The monthly totals also do **not** reflect the additional cost going forward of Talc II's proposed financial advisor (FTI), the extraordinary fees of Talc I's proposed investment bank (Holihan), the additional investment bank and financial advisor the Committees are seeking to retain, or the three additional firms Committee II has proposed to retain as its co-counsel.

**CONCLUSION**

For the foregoing reasons, the Court should enter an order, substantially in the form attached to the Motion as Exhibit B, granting the relief requested in the Motion and provide the Debtor such other and further relief as the Court deems just and proper.

Dated: January 17, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

-14-