**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**HERRICK, FEINSTEIN LLP**
Sean E. O'Donnell, Esq. (*pro hac vice* pending)
Stephen B. Selbst, Esq. (*pro hac vice* pending)
Steven B. Smith, Esq.
Rachel H. Ginzburg, Esq.
sodonnell@herrick.com
sselbst@herrick.com
ssmith@herrick.com
rginzburg@herrick.com
2 Park Avenue
New York, NY 10016
Tel: (212) 592-1400
Fax: (212) 592-1500
*Counsel to the Amici Professors*

In Re:

**LTL MANAGEMENT, LLC,**

                    Debtor.

Chapter 11

Case No. 21-30589 (MBK)

Honorable Michael B. Kaplan

Hearing: TBD

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO FILE BRIEF
OF *AMICI CURIAE* BY CERTAIN LAW PROFESSORS**

The proposed *amici curiae*, the seven law professors listed in the attached **Exhibit A** (the "Amici Professors"), respectfully submit this motion for leave (the "Motion for Leave") to file an *amici curiae* brief (the "Amicus Brief") in support of the *Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case* [ECF No. 632] (the "Motion to Dismiss"). A copy of the proposed Amicus Brief is attached as **Exhibit B**.

## INTEREST OF PROPOSED *AMICI CURIAE*

1.      The Amici Professors are venerable law professors, many tenured and/or chaired, who have lectured, practiced, and written extensively in the field of bankruptcy law, with scholarship and teaching that focuses on bankruptcy policy and the purposes and uses of bankruptcy as an attribute of commercial behavior in the United States. The Amici Professors have written influential articles, testified before legislative bodies, and play a leading role in the shaping of American bankruptcy laws for decades.

2.      As scholars in the field of bankruptcy law, the Amici Professors have a professional interest in ensuring that this Court is fully informed of the fundamental purpose and practical limitations of title 11 of the United States Code (the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## ARGUMENT

### I.      This Court Should Exercise its Broad Discretion and Grant the Requested Relief

3.      While no specific Bankruptcy Code provision, Bankruptcy Rule or Local Rule for the United States Bankruptcy Court for the District of New Jersey governs the filing of *amicus*

2

briefs, "§ 1109(b) has been construed to create a broad right of participation in Chapter 11 cases."[1]

Indeed, courts enjoy broad discretion to grant motions for leave to file *amicus* briefs.[2]

4.     In keeping with this right of participation, this Court has frequently recognized or directly allowed the filing of *amicus* briefs. For example, in *In re Global Outreach, S.A.*, Judge Steckroth discussed the Third Circuit's grant of permission to Prudential Insurance Company of America to file an amicus brief.[3] Similarly, in *In re S B Building Associates Limited Partnership*, Judge Vincent F. Papalia noted his granting of a motion for leave to appear as *amicus.*[4] Also, in *In re Christensen*, Judge Rosemary Gambardella discussed the entry of order granting a motion for leave to file *amicus curiae* brief.[5]

5.     Here, the Amici Professors respectfully request that the Court exercise its authority and grant leave to file the proposed *amicus* brief because it will aid in the Court's determination. The Amici Professors, having dedicated their careers to the study of bankruptcy law, possess unique, specialized knowledge that will lend critical context to the Court in determining the pending Motion to Dismiss.[6]

---

[1] *In re Combustion Eng'g*, 391 F.3 190, 214 n. 21 (3d Cir. 2004)*.*

[2] *In re Ginaldi*, 463 B.R. 314, 316 n. 1 (Bankr. E.D. Pa. 2011); *see also Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, 550 B.R. 241, 256 (Bankr. S.D.N.Y. 2016) (citation omitted) ("The decision whether to permit a person to appear as *amicus curiae* is committed to the Court's discretion."); *Dwelling Place Network v. Murphy*, Civil No. 20-6281 (RBK/AMD), 2020 WL 3056305, at *1 (D.N.J. June 9, 2020) (citation omitted) ("Whether to grant amicus status is within the broad discretion of the district court.").

[3] No. 09-15985 (DHS), 2009 WL 1025465, at *3 (Bankr. D.N.J. April 1, 2009) (citing *Counties Contracting & Construction Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1055 (3d Cir.1988)).

[4] 621 B.R. 330, 345 (Bankr. D.N.J. 2020).

[5] 95 B.R. 886, 889 (Bankr. D.N.J. 1988).

[6] Capitalized terms not herein defined shall have the meanings ascribed to them in the proposed amicus brief, annexed hereto as Exhibit B.

6.      While the Amici Professors believe the Committee has presented a meritorious motion and the instant proceeding is ripe for dismissal, they respectfully submit that the proposed brief provides additional detail that will aid the Court in reaching a fully-considered conclusion.

7.      In particular, the Amici Professors wish to offer their expertise regarding the crucial requirement that a debtor possess a valid reorganizational purpose and the practical implications, both in the instant case and for the public, of dismissing this case.

8.      Therefore, the Amici Professors respectfully request that this Court exercise its broad discretion and allow them to appear in this case and file their Amicus Brief.[7]

## II.      The Requested Relief Aligns with Comparable Federal Authority

9.      In the absence of a controlling Bankruptcy Code provision or Rule guiding the filing of an *amicus* brief in this Court, an examination of instructive federal authority supports granting the requested relief. District Courts within the Third Circuit specifically point to the guidance of Rule 29 of the Federal Rules of Appellate Procedure ("Rule 29"),[8] which provides, in relevant part, that *amicus curiae* such as the Amici Professors "may file a brief only by leave of court or if the brief states that all parties have consented to its filing," and that such motion must be accompanied by the proposed brief and state "the movant's interest" and "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case."[9]

---

[7] *In re Ginaldi*, 463 B.R. at 316 n. 1 (exercising broad discretion to permit an amicus curiae to participate in a pending action).

[8] *Dwelling Place Network*, 2020 WL 3056305 at *1 ("When addressing a motion to appear as amicus curiae, district courts are 'guided by the Third Circuit's application of Federal Rule of Appellate Procedure 29, which governs the appearance of amici in the circuit courts.'") (citation omitted).

[9] Fed. R. App. P. 29.

Rule 29 provides that the authority to grant such motions is within the discretion of the District Court.[10]

10.     In deciding whether to exercise such authority and grant such a motion, courts consider whether (1) the *amicus curiae* has a 'special interest' in the particular case; (2) the *amicus curiae*'s interest is not represented competently or at all in the case; (3) the proffered information is timely and useful; and (4) the petitioner is not partial to a particular outcome in the case."[11] We discuss each of these factors in turn.

11.     *First*, the Amici Professors have a 'special interest' in the case. The Amici Professors have a special interest in aiding the Court in reaching a fully-considered conclusion in a proceeding that threatens the integrity of the Bankruptcy Code. The reorganization strategy employed by the Debtor and its predecessors effectively minimizes the estate value, to the direct detriment of the creditor-tort victims. The Amici Professors seek to aid the Court by offering expertise to fully explain the implications of sanctioning this tactic, which they view as wholly incompatible with the equitable purpose and spirit of the chapter 11 system.

12.     *Second*, the Amici Professors present unique perspectives that are separate and apart from those currently appearing in this proceeding. The Amici Professors' deep understanding of and involvement in the shaping of bankruptcy policy through their teaching, writing of scholarly articles, and presentations to legislative bodies empowers them to advise the Court on these issues and the greater implications of the resulting precedent to the integrity of the bankruptcy system.

13.     *Third*, the Amicus Brief is timely and useful. The Amici Professors respectfully submit that their Amicus Brief is timely, as the hearing on the Motion to Dismiss is set to begin

---

[10] *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002).

[11] *Dwelling Place Network*, 2020 WL 3056305 at *1 (citation omitted).

on February 14, 2022, and the instant briefing would provide the Debtor ample time to respond. The Amici Professors further submit the Amicus Brief is useful, as this Court's determination respecting the Motion to Dismiss is being widely observed, is a significant matter of public interest, and is of considerable importance to American bankruptcy law and bankruptcy policy and would therefore benefit from the added perspectives of the non-partisan Amici Professors.

14.     *Fourth*, the Amicus Professors are not partial to a particular outcome in the case. The Amici Professors have no affiliation with any party, nor any economic interests in the outcome of this matter.

15.     Accordingly, Rule 29 supports granting the Motion for Leave.

16.     For the foregoing reasons, the Amici Professors respectfully request that the Court (i) grant the Motion for Leave and permit the Amici Professors to file the Amicus Brief and (ii) grant such other relief as the Court may deem just and appropriate.

Dated: January 25, 2022                              Respectfully submitted,

                                                     HERRICK, FEINSTEIN LLP

                                                     By: /s/ *Steven B. Smith*
                                                     Sean E. O'Donnell (*pro hac vice* pending)
                                                     Stephen B. Selbst (*pro hac vice* pending)
                                                     Steven B. Smith
                                                     Rachel H. Ginzburg
                                                     2 Park Avenue
                                                     New York, New York 10016
                                                     (212) 592-1400
                                                     (212) 592-1500 (fax)
                                                     sselbst@herrick.com
                                                     sodonnell@herrick.com
                                                     ssmith@herrick.com
                                                     rginzburg@herrick.com

                                                     *Counsel to the Amici Professors*

# EXHIBIT A

|   | Professor | Law School |
|---|---|---|
| 1 | Kenneth Ayotte | U.C. Berkeley School of Law |
| 2 | Susan Block-Lieb | Fordham University School of Law |
| 3 | Diane Dick | Seattle University School of Law |
| 4 | Jared Ellias | University of California, Hastings College of the Law |
| 5 | Bruce Markell | Pritzker School of Law, Northwestern University |
| 6 | Robert K. Rasmussen | U.S.C. Gould School of Law |
| 7 | Yesha Yadav | Vanderbilt University Law School |

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**HERRICK, FEINSTEIN LLP**
Sean E. O'Donnell, Esq. (*pro hac vice* pending)
Stephen B. Selbst, Esq. (*pro hac vice* pending)
Steven B. Smith, Esq.
Rachel H. Ginzburg, Esq.
sodonnell@herrick.com
sselbst@herrick.com
ssmith@herrick.com
rginzburg@herrick.com
2 Park Avenue
New York, NY 10016
Tel: (212) 592-1400
Fax: (212) 592-1500
*Counsel to the Amici Professors*

|  |  |
|---|---|
| In Re: | Chapter 11 |
| **LTL MANAGEMENT, LLC,** | Case No. 21-30589 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |
|  | Hearing: February 14, 2022 at 10:00 a.m. |

### MEMORANDUM OF LAW OF *AMICI CURIAE* BY CERTAIN LAW PROFESSORS IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS TO DISMISS DEBTOR'S CHAPTER 11 CASE

The *amici curiae* are law professors from 7 different law schools who have lectured, practiced, and written extensively in the field of bankruptcy law (the "Amici Professors"). The Amici Professors are scholars with expertise in the purposes of the Bankruptcy Code and the historical, statutory, and common law bases for dismissals of Chapter 11 petitions filed in bad faith. The Amici Professors file this brief in support of the *Motion of the Official Committee of*

1

*Talc Claimants to Dismiss Debtor's Chapter 11 Case* [ECF No. 632] (the "Motion to Dismiss"),[1]

and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      This bankruptcy is not about reorganizing, rehabilitating, or granting a fresh start

to an honest, unfortunate debtor. Nor is it about maximizing estate value for the benefit of creditors.

Rather, this bankruptcy is about ***minimizing*** estate value to the detriment of J&J's tort victims, the

sole "creditors" in this case. J&J, an obviously solvent company with a market capitalization of

about $400 billion, created LTL, a shell corporation with no operating business and ***no***

***reorganizational purpose***, specifically to distance and protect J&J's assets from its talc victims,

end all existing and future litigation against J&J, and deprive innocent talc victims of their day in

court. Neither LTL nor its creditors benefit from this bankruptcy filing—only J&J benefits.

2.      This is not the first time a company has sought bankruptcy relief to address its mass

tort litigation exposure. But the strategy employed here—manufacturing an undercapitalized

company solely to file for bankruptcy for that entity—is a novel and dangerous tactic that

represents a "significant departure from the use of Chapter 11 to validly reorganize financially

troubled businesses."[2] The Amici Professors believe this strategy is a direct attack on the

fundamental integrity of the Chapter 11 system, which is intended to protect honest but unfortunate

debtors who are willing to subject themselves and their assets to the supervision of the Court.

Solvent tortfeasors, like J&J, should not be permitted to use Chapter 11 as a tool to shield assets

from the claims of their victims.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion to Dismiss.

[2] *See In re SGL Carbon*, 200 F.3d 154, 169 (3d Cir. 1999) (remanding proceeding to District Court for dismissal "for cause" due to lack of valid reorganizational purpose and good faith where debtor's filing was a litigation tactic).

3.      Although amicus briefs are rare in trial court proceedings, the Amici Professors believe they can bring their experience as scholars to assist the Court in evaluating the Motion to Dismiss because they believe LTL's bankruptcy case is wholly incompatible with the equitable purpose and spirit of the Bankruptcy Code. The Amici Professors have no economic interest at stake, but they share a concern about the effect of this case, and others like it, on the bankruptcy system. If the Court sanctions LTL's strategy, the important concept of dismissal because of a "bad faith" filing will be eviscerated. Any company facing a debt it does not wish to repay, regardless of its solvency or bad faith actions, could wipe the slate clean simply by creating a new entity to file for bankruptcy in its stead. In another case dealing with a perceived abuse of the Bankruptcy Code system, Judge Chapman noted: "Whether one characterizes [it] as exploiting a loophole or as simply not fair, one thing is clear: it is not the thing which the statute intended."[3]

4.      Although J&J is not the first entity to use the Texas Two-Step strategy, this case is part of an alarming recent trend, and J&J's status as a prominent public company warrants the Amici Professors' attention. Permitting LTL's bankruptcy case to proceed would be a serious abuse of Chapter 11 and would add to an evolving roadmap for other companies facing liability to manufacture a sham entity to unfairly rid themselves of liability. The Amici Professors believe that the egregious circumstances of this case warrant immediate dismissal.

## BACKGROUND

5.      In October 2021, J&J performed a series of transactions under Texas law known as the "Texas Two-Step."[4] These transactions resulted in two entities: (i) LTL, which succeeded to

---

[3] *In re Patriot Coal Corp.*, 482 B.R. 718, 745 (Bankr. S.D.N.Y. 2012).

[4] *See Declaration of John K. Kim in Support of First Day Pleadings* (ECF No. 5) (the "First Day Declaration"), ¶ 16.

all of Old JJCI's talc-related liabilities and received limited assets; and (ii) New JJCI, which received Old JJCI's most valuable assets.[5]

6.      Just two days after its creation, LTL filed a bankruptcy petition in the Western District of North Carolina and the case was assigned to Judge Craig Whitley.[6] The Bankruptcy Administrator and other entities filed motions to transfer venue to the District of New Jersey, which Judge Whitley granted.[7]

7.      Judge Whitley found, *inter alia*, that "[t]he Debtor may have assets, but they were all created to effectuate a bankruptcy filing and have no other business purpose" and that the Debtor "[was] not just forum shopping; the Debtor [was] manufacturing forum and creating a venue to file bankruptcy."[8] LTL was forum shopping, according to Judge Whitley, based on its "preference to file bankruptcy in this district, likely due to the Fourth Circuit's two-prong dismissal standard."[9]

---

[5] First Day Declaration, ¶¶ 21-25.

[6] Some parties have suggested that entities formed via the Texas Two-Step could constitute avoidable fraudulent transfers. The Amici Professors believe that the Court does not need to resolve whether LTL's use of the Texas Two-Step constitutes a fraudulent transfer under Bankruptcy Code sections 548 and 544 or under Texas state law to determine that this was a bad faith filing and should be dismissed on those grounds.

[7] *In re LTL Management, LLC*, 2021 WL 5343945 at * 1 (Bankr. W.D.N.C. Nov. 16, 2021).

[8] *Id*. at *6.

[9] *Id*. at *6.

## ARGUMENT

I.  **To enjoy the extraordinary relief afforded by the Bankruptcy Code, the law requires that a debtor file in good faith with a valid reorganizational purpose.**

A.  <u>The requirement that a bankruptcy petition must be filed in good faith is rooted in equity and reinforces the fundamental purpose of bankruptcy.</u>

8.  The Bankruptcy Code provides for extraordinary relief—*i.e.*, "the forced compromise of creditors' claims against the debtor by limiting creditors to a pro rata distribution and prohibiting creditors, by the discharge provisions, from taking any further action on their claims."[10]

9.  A bankruptcy court has the power to dismiss any case for lack of good faith "in order to prevent abuse of the Chapter 11 process or in response to misconduct that is incompatible with the functioning of the bankruptcy system."[11]

10.  The good faith filing standard stems from principles of equity.[12] As the Fifth Circuit has noted, the requirement "protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with clean

---

[10] Judith R. Starr, *Bankruptcy Court Jurisdiction to Release Insiders from Creditor Claims in Corporate Reorganizations*, 9 Bankr. Dev. J. 485, 498 (1993).

[11] 7 Collier on Bankruptcy ¶ 1112.07[1] (citing *Carolin Corp. v. Miller*, 886 F.2d 693, 702 (4th Cir. 1989) (the aim of the good faith standard "is to determine whether the petitioner's real motivation is 'to abuse the reorganization process' and 'to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities.'") (citation omitted)).

[12] *In re SGL Carbon*, 200 F.3d 154, 161 (3d Cir. 1999) ("The 'good faith' requirement for Chapter 11 petitioners has strong roots in equity.").

5

hands."[13] Moreover, "Congress has never intended that bankruptcy be a refuge for the irresponsible, unscrupulous or cunning individual."[14]

11.     The Collier's treatise summarizes the purpose of the good faith filing requirement:

> One of the basic underpinnings of the good faith doctrine, and a factor that helps explain its purpose, is ***the fundamental policy that bankruptcy relief is generally limited to the honest but unfortunate debtor***. . . .
>
> [B]ankruptcy relief is equitable in nature, and as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion. . . . Indeed, there is a strong equitable undercurrent within the good faith standard that establishes that it is designed to fulfill the promise that ***application of the bankruptcy laws in pursuit of the benefits of reorganization will not operate to create injustice***.[15]

B.     <u>A Chapter 11 bankruptcy case should be dismissed as a bad faith filing where the debtor lacks a valid reorganizational purpose.</u>

12.     The leading case in the Third Circuit on the issue of dismissal of a bad faith filing under 11 U.S.C. § 1112, *In re SGL Carbon*, emphasizes that the good faith standard requires that the debtor "enter Chapter 11 with a valid reorganizational purpose."[16]

13.     The Supreme Court has identified two basic purposes of Chapter 11: (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors."[17] Other objectives of the Bankruptcy Code include "avoidance of the consequences of economic

---

[13] *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986).

[14] *In re Rognstad*, 121 B.R. 45, 50 (Bankr. D. Haw. 1990).

[15] 7 Collier on Bankruptcy ¶ 1112.07[3] (citation omitted) (emphasis added).

[16] *In re SGL Carbon*, 200 F.3d at 164.

[17] *Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 452, 119 S. Ct. 1411, 143 L.Ed.2d 607 (1999); *see also Integrated Telecom*, 384 F.3d at 119 (citation omitted).

6

dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected."[18]

14.    The Third Circuit has explained "[w]hen financially troubled petitioners seek a chance to remain in business," the exercise of the considerable powers afforded a debtor under the Bankruptcy Code is justified. "But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code."[19]

15.    The Amici Professors believe that two Third Circuit cases construing the good faith standard should guide the Court's analysis here: *In re SGL Carbon Corp.*[20] and *In re Integrated Telecom Express, Inc.*[21] In *SGL Carbon*, the debtor was a financially healthy company with potentially significant civil antitrust liability.[22] But at the time it filed its petition, no judgment had been entered; the debtor merely faced settlement demands.[23] In determining that the filing lacked good faith, the Court made the following findings: (i) there was no evidence that the possible antitrust judgment might force the debtor out of business;[24] (ii) the debtor lacked a valid reorganizational purpose;[25] and (iii) the debtor's officers expressly and repeatedly acknowledged that the Chapter 11 petition was filed solely to gain tactical litigation advantages.[26]

---

[18] *SGL Carbon*, 200 F.3d at 161 (citing *In re Victory Construction Co., Inc.*, 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981) *order stayed, Hadley v. Victory Construction Co., Inc. (In re Victory Construction Co., Inc.)*, 9 B.R. 570 (Bankr. C.D. Cal. 1981), *order vacated*, 37 B.R. 222 (1984)).

[19] *SGL Carbon*, 200 F.3d at 165-66.

[20] 200 F.3d 154 (3d Cir. 1999).

[21] 384 F.3d 108 (3d Cir. 2004).

[22] *SGL Carbon*, 200 F.3d at 156.

[23] *Id*. at 157.

[24] *Id*. at 167.

[25] *Id*. at 166.

[26] *Id*. at 167.

7

16.     The *SGL Carbon* Court concluded its analysis with the following observation:

> In reaching our conclusion, we are cognizant that it is growing increasingly difficult to settle large scale litigation. . . . We recognize that companies that face massive potential liability and litigation costs continue to seek ways to rapidly conclude litigation to enable a continuation of their business and to maintain access to the capital markets. As evidenced by SGL Carbon's actions in this case, the Bankruptcy Code presents an inviting safe harbor for such companies. ***But this lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings***. Allowing SGL Carbon's bankruptcy under these circumstances seems to us a significant departure from the use of Chapter 11 to validly reorganize financially troubled businesses.[27]

17.     The *Integrated Telecom* opinion sheds further light on the Third Circuit's good faith standard. In *Integrated Telecom*, the debtor was "out of business," and had no going concern value to preserve in Chapter 11 through reorganization or liquidation under the Bankruptcy Code.[28] In determining whether the debtor's filing was undertaken in good faith, the Third Circuit considered whether the debtor's petition "might reasonably have maximized the value of the bankruptcy estate."[29] In defining the parameters of what reasonably maximizes the value of the bankruptcy estate, the Court noted that "[t]o say that liquidating under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy."[30] The Third Circuit also found that "[t]o be filed in good faith, a petition must do more than merely invoke some distributional mechanism in the Bankruptcy Code. It must seek to create or preserve

---

[27] *Id*. at 169 (internal citations omitted) (emphasis added).

[28] *See Integrated Telecom*, 384 F.3d at 120.

[29] *Id*. (citation omitted).

[30] *Id*. at 120-21 (citing Elizabeth Warren, *Bankruptcy Policymaking in an Imperfect World*, 92 Mich. L. Rev. 336, 350 (1993)).

some value that would otherwise be lost—not merely distributed to a different stakeholder—outside of bankruptcy."[31]

18.      The Third Circuit could "identify no value for Integrated's assets that was threatened outside of bankruptcy by the collapse of Integrated's business model, but that could be preserved or maximized in an orderly liquidation under Chapter 11," and ultimately found that the debtor's petition was not filed in good faith.[32]

## II.   LTL's petition should be dismissed because, as an entity simply created to funnel mass tort litigation claims through bankruptcy, LTL has no reorganizational purpose.

### A.   Mass tort bankruptcies are not new, but the circumstances of LTL's bankruptcy filing are unique.

19.      "When the Bankruptcy Code was enacted in 1978, Congress did not contemplate the unique problems caused by mass tort liability involving future, as well as present, claimants, or that companies facing such massive liability would seek relief under bankruptcy laws."[33]

20.      Nonetheless, as the Debtor has argued,[34] there is a long line of debtors who have used Chapter 11 to manage mass tort liabilities. In *Johns-Manville*—the first case to employ a mass tort channeling injunction, which led to the enactment of Bankruptcy Code section 524(g)—the world's largest miner of asbestos and a major manufacturer of insulating materials and other asbestos products filed for Chapter 11 because it knew it could not meet the massive personal injury liability it faced as a result of scientific studies linking respiratory disease with asbestos.[35]

---

[31] *Id*. at 129.

[32] *Id*. at 129.

[33] Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2046 (2000).

[34] *See* Debtor's Objection to Motions to Dismiss Chapter 11 Case (ECF No. 956), at pp. 15-16.

[35] *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988).

Similarly, in *Dow Corning*, the predominant producer of silicone gel breast implants—accounting for nearly 50% of the entire market—filed for bankruptcy to address billions of dollars of litigation exposure arising out of its allegedly defective silicone breast implants.[36]

21.     More recently, USA Gymnastics[37] filed its bankruptcy petition to "implement orderly, equitable, and efficient procedures to allocate [its] available insurance proceeds to survivors who hold allowed claims against USAG" and to regain the trust and confidence of the United States Olympic Committee and the athletes in USA Gymnastics.[38] And in 2020, the Boy Scouts of America filed its bankruptcy petition to achieve dual objectives: (i) "timely and equitably compensating victims of abuse in Scouting" and (ii) "ensuring that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission."[39]

22.     In nearly all other Chapter 11 cases involving mass tort liability, however, the debtor seeking Chapter 11 protection was the actual company or organization facing the threat of litigation that, collectively, threatened to prevent the company from meeting its business and organizational objectives. In that light, it is easy to understand the reorganizational purpose to be served by those debtors' bankruptcy filings.

23.     LTL's Chapter 11 filing, as well as other recent cases employing the same Texas Two-Step strategy, departs from that precedent. LTL has never been an operating company and has no business to rehabilitate. Instead, it was manufactured just days before its bankruptcy filing as a means to funnel J&J's and Old JJCI's talc litigation liabilities into bankruptcy without

---

[36] *In re Dow Corning Corp.*, 86 F.3d 482, 485 (6th Cir. 1996).

[37] *In re USA Gymnastics*, Case No. 18-09108 (Bankr. S.D. Ind. 2018).

[38] Declaration of James Scott Shollenbarger in Support of Chapter 11 Petition and Requests for First Day Relief, *USA Gymnastics* (ECF No. 8).

[39] Debtors' Informational Brief (ECF No. 4), *In re: Boy Scouts of America and Delaware BSA, LLC* (Case No. 20-10343) (D. Del. 2020) at 6.

requiring those obviously solvent operating businesses to accept the burdens associated with a Chapter 11 case.

24.     In the words of former Chief Judge William H. Gindin, "the enjoyment of the benefits afforded by the code is contingent on the acceptance of its burdens."[40] The Court's opinion also included this observation:

> The Bankruptcy Code essentially provides for the forced compromise of creditors' claims against the debtor by limiting creditors to a pro rata distribution and prohibiting creditors, by the discharge provisions, from taking any further action on their claims. ***In return for this protection, the debtor must disclose all its assets and submit them to the control of the bankruptcy court***. It is the acceptance of this burden by the debtor, together with the economic reality that a debtor in a bankruptcy cannot pay all claims against it in full, which form the basis for the extraordinary power of the court to force a creditor to accept less than full value for its claim . . . "[S]uch an extension of the [discharge] is necessarily naked of the protections woven into [the Code]."[41]

B.      <u>LTL's bankruptcy filing should be dismissed because LTL does not enter Chapter 11 with a valid reorganizational purpose.</u>

25.     Although the facts in *SGL Carbon* and *Integrated Telecom* may be factually distinguishable, the Third Circuit's reasoning in these cases is on point. LTL was specifically manufactured to be undercapitalized and to have no business other than to file for bankruptcy and

---

[40] *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503 (Bankr. D.N.J. 1997) (citation omitted); *In re SGL Carbon*, 200 F.3d 154, 161 (3d Cir. 1999) ("A debtor who attempts to garner shelter under the Bankruptcy Code . . . must act in conformity with the Code's underlying principles.").

[41] *Arrowmill*, 211 B.R. at 506 (quoting Judith R. Starr, *Bankruptcy Court Jurisdiction to Release Insiders from Creditor Claims in Corporate Reorganizations*, 9 Bankr.Dev.J. 485, 498 (1993)) (emphasis added).

protect J&J from the tort system and unfavorable jury verdicts. Settling third party claims, on its own, is not a valid reorganizational purpose.[42]

26.     This case was not commenced to preserve or maximize the value of LTL's assets under Chapter 11 for the benefit of its creditors, the talc claimants. Quite the contrary. J&J created LTL to shelter its assets by filing for bankruptcy and capping the value paid to the talc claimants—in effect, *minimizing* the value that may be recoverable by those claimants.[43]

27.     Although J&J was the entity that acted in bad faith when it created LTL, any bad faith by J&J should be attributed to LTL because LTL has fully complied with and acquiesced in J&J's scheme.[44]

28.     The facts and circumstances supporting LTL's petition cannot amount to a good faith filing for three separate reasons: (i) LTL's bankruptcy filing serves no recognized Bankruptcy Code objective; (ii) LTL has no business to protect and therefore no reorganizational purpose; and (iii) LTL's petition was filed solely to gain a tactical advantage for J&J respecting its talc litigation.

---

[42] *See, e.g., In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 462 (Bankr. N.D. Fla. 2011) ("Chapter 11 was not designed for the purpose of protecting assets and interests of non-debtor parties under the guise of a legitimate plan of reorganization.").

[43] The effect of the Funding Agreement is that J&J and New JJCI are only required to fund LTL up to the value of Old JJCI as of the date of the Texas Two-Step. *See* Funding Agreement, at § 2(a) ("Nothing in this Agreement shall obligate the Payors to (i) make Payments under this Agreement that in the aggregate exceed the lesser of (A) the JJCI Value and (B) the aggregate amount of all Permitted Funding Uses . . . ."); Funding Agreement, § 1 (defining "JJCI Value").

[44] *See In re Quigley Co., Inc.*, 437 B.R. 102, 126-27 n. 32 (Bankr. S.D.N.Y. 2010) (in finding that Pfizer, the debtor's parent company, had wrongfully manipulated the voting process to assure confirmation of the Quigley plan, the Court noted that "Quigley acquiesced in if not actively embraced Pfizer's actions in connection with the prosecution of its chapter 11 case, and Pfizer's bad faith may be attributed to Quigley as well"). Indeed, J&J and LTL have acted together from the beginning, even through the same in-house legal counsel. LTL's Chief Legal Officer, John Kim, is actually employed by a non-debtor affiliate of LTL and a subsidiary of LTL's ultimate non-debtor parent company, J&J. *See* First Day Declaration, ¶¶ 1-2. Before Mr. Kim was Chief Legal Officer of LTL, he was J&J's Assistant General Counsel. *See* First Day Declaration, ¶ 2.

1.    <u>LTL's bankruptcy filing serves no recognized Bankruptcy Code objective.</u>

29.    LTL's bankruptcy filing does not serve any recognized objective of the Bankruptcy
Code. LTL's First Day Declaration states that it "has at least the same, if not greater, ability to
fund talc-related claims and other liabilities as Old JJCI had before its restructuring,"[45] implying
that it is maximizing property available to satisfy the talc claimants. But this premise is nonsensical
and should not be accepted as evidence of good faith. Indeed, the opposite must be true—LTL was
created, and entered into the Funding Agreement with J&J, solely to ***minimize*** property available
to satisfy talc victims. LTL cannot file a bankruptcy petition with the goal of capping tort victims'
claims while simultaneously claiming that its reorganizational purpose is to maximize property
available to satisfy these claimants.

30.    LTL's aims and the strategy it used to file its bankruptcy are antithetical to the basic
purpose of bankruptcy,[46] and allowing LTL's bankruptcy case to continue under these
circumstances would signal a "significant departure from the use of Chapter 11 to validly
reorganize financially troubled businesses."[47]

2.    <u>LTL has no business to protect and, therefore, no reorganizational purpose.</u>

31.    In reviewing multiple motions to dismiss the *Johns-Manville* case, Bankruptcy
Judge Burton R. Lifland in the Southern District of New York found that "in the case of a filing
by a viable and legitimate company with real creditors not formed as a sham solely for the purpose

---

[45] *See* First Day Declaration, ¶¶ 21, 26.

[46] *See Integrated Telecom*, 384 F.3d at 119 ("At its most fundamental level, the good faith
requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined
by petitioners whose aims are antithetical to the basic purposes of bankruptcy."); *SGL Carbon*,
200 F.3d at 165 ("[F]iling a Chapter 11 petition merely to obtain tactical litigation advantage is
not within the legitimate scope of bankruptcy laws. . . .").

[47] *See SGL Carbon*, 200 F.3d at 169.

13

of filing, the burden of establishing the company's 'good faith' should be tested where Congress

placed it: for emergence out of Chapter 11 pursuant to Section 1129."[48]

32.    Even as the *Johns-Manville* court "express[ed] doubt that § 1112(b) impose[d] a

good-faith requirement in all Chapter 11 cases,"[49] Judge Lifland recognized that a filing by a

company "formed as a sham solely for the purpose of filing" would, at the very least, raise

questions as to whether that filing was in good faith.[50]

33.    Here, LTL is a sham debtor with no reorganizational purpose because (i) it has no

business; and (ii) there is no value to LTL's assets that was threatened outside of bankruptcy but

that could be preserved or maximized under Chapter 11. LTL has confirmed that its overriding

objective is to settle the talc claims against J&J.[51] Even setting aside that settling third party claims

against a non-debtor, on its own, is not a recognized reorganizational purpose,[52] this objective can

be accomplished outside of Chapter 11. In other words, LTL does not need Chapter 11 to settle

the talc claims—it can settle them through counsel, on a case-by-case basis, the way that most

litigations settle.[53] And, as more fully discussed below, if LTL's only purpose in filing its petition

---

[48] *See In re Johns-Manville*, 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984).

[49] *See SGL Carbon*, 200 F.3d at 168 (citing *Johns-Manville*, 36 B.R. at 737).

[50] *Johns-Manville*, 36 B.R. at 737.

[51] *See* First Day Declaration, ¶ 59 ("The Debtor's goal in this case is to negotiate, obtain approval of, and ultimately consummate a plan of reorganization that would, among other things, (a) establish and fund a trust to resolve and pay current and future talc-related claims and (b) provide for the issuance of an injunction that will permanently protect the Debtor, its affiliates and certain other parties from further talc-related claims arising from products manufactured and/or sold by Old JJCI, or for which Old JJCI may otherwise have had legal responsibility, pursuant to sections 105(a) and/or 524(g) of the Bankruptcy Code.").

[52] *See, e.g., Davis Heritage* 443 B.R. at 462 ("Chapter 11 was not designed for the purpose of protecting assets and interests of non-debtor parties under the guise of a legitimate plan of reorganization.").

[53] *See Integrated Telecom*, 384 F.3d at 126-27 (finding that even though the sale of certain assets during the bankruptcy realized an additional $1 million beyond the sale that the debtor had

14

was to gain an advantage with respect to settling this litigation, such a purpose would be indicative of bad faith.

34.    LTL was created solely to protect J&J by (i) taking on all of the talc claims, along with minimal assets, and (ii) filing a bankruptcy petition to obtain a channeling injunction and non-debtor third party releases for J&J's benefit.[54]

35.    Neither LTL nor its creditors benefit from this bankruptcy filing. The only entity benefitting from this filing is J&J, a financially healthy non-debtor that manufactured LTL solely to reap the benefits of Chapter 11. J&J should not be rewarded for this abusive behavior. Manufacturing a financially unhealthy debtor for the sole purpose of using the power of Chapter 11 to protect a solvent non-debtor cannot be a valid reorganizational purpose.

>    3.    <u>LTL's petition was filed solely to gain a tactical advantage with respect to talc litigation.</u>

36.    LTL has all but admitted that it filed its petition solely to aid in J&J's settlement of talc litigation, which the Third Circuit has made clear is not within the legitimate scope of bankruptcy law.

---

negotiated prior to filing its petition, that fact "hardly justifie[d] invocation of Chapter 11" because the debtor "did not need Chapter 11 to discover that a more open and competitive auction might increase the price obtained for its assets").

[54] The strategy of this case—namely, filing bankruptcy for LTL solely to protect non-debtor J&J—rests on jurisdictional principles and arguments about substantive bankruptcy law that the Third Circuit rejected over fifteen years ago. *See In re Combustion Engineering*, 391 F.3d 190, 234 (3d Cir. 2004) (vacating a section 105(a) injunction "[b]ecause the injunctive action on independent non-derivate claims against non-debtor third parties . . . would violate § 524(g)(4)(A), would improperly extend bankruptcy relief to non-debtors, and would jeopardize the interests of future [non-debtor] claimants").

37.    "[B]ecause filing a Chapter 11 petition merely to obtain tactical litigation advantage is not within the legitimate scope of bankruptcy laws, . . . courts have typically dismissed Chapter 11 petitions under these circumstances as well."[55]

38.    The First Day Declaration admits that LTL's only goal is to consummate a plan of reorganization that would "establish and fund a trust to resolve and pay current and future talc-related claims" and to provide for the issuance of an injunction for the Debtor, its affiliates, and certain other parties from talc claims.[56]

39.    Further, "[w]here the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being in good faith."[57] For example, in *In re 15375 Memorial Corp. v. Bepco, L.P.*, the Court found that given a mix of facts and "the Debtors' sudden decision to file for bankruptcy despite their having been dormant and without employees or offices for several years," the Court "[could not] escape the conclusion that the filings were a litigation tactic."[58]

40.    Here, too, the Court cannot ignore the timing and circumstances surrounding LTL's filing, which point to the inescapable conclusion that the filing was a litigation tactic.

- <u>March 2020</u>: "J&J assure[s] the *Imerys* court that 'J&J, of course, has the financial wherewithal to defend these claims and satisfy any successful talc claim in full.'"[59]

---

[55] *SGL Carbon*, 200 F.3d at 165 (internal citation omitted); *see also Integrated Telecom*, 384 F.3d at 120 (quoting *SGL Carbon*, 200 F.3d at 165); *see also Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation.") (cited by *SGL Carbon*, 200 F.3d at 165).

[56] *See* First Day Declaration, ¶ 59.

[57] *In re 15375 Memorial Corp. v. Bepco, L.P.*, 589 F.3d 605, 625-26 (3d Cir. 2009) (citing *SGL Carbon*, 200 F.3d at 165).

[58] *Id*. at 625-26.

[59] Motion to Dismiss, ¶ 38 (citing *In re Imerys Talc America, Inc. et al.*, Case No. 19-10289 (Bankr D. Del. Mar, 20, 2020) (LSS), *Johnson & Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rules 4001-1 for Entry of Order Modifying the*

16

- June 2021: The Supreme Court denies a petition for certiorari of a decision awarding $500 million in actual damages against Old JJCI, $125 million against J&J jointly and severally with Old JJCI, $900 million in punitive damages against Old JJCI, and $715,909,091 in punitive damages against J&J.[60]
- July 2021: Reuters reports that J&J is "exploring a plan to offload liabilities from widespread Baby Powder litigation into a newly created business that would then seek bankruptcy protection . . . ."[61]
- October 2021: LTL is formed[62] and days later, LTL's bankruptcy petition is filed.[63]

41.    The timing of this filing, together with the circumstances of LTL's formation, make clear that LTL's bankruptcy petition was filed as a litigation tactic.

42.    While there is precedent for filing a bankruptcy petition to resolve existing and future litigation claims when a debtor is financially troubled, there is no precedent for ***creating*** a financially troubled entity to file a bankruptcy petition solely to resolve litigation for the benefit of a non-debtor.

**III.    This Court should not create precedent for other courts to entertain such a blatant abuse of the Bankruptcy Code.**

43.    This case is a flagrant attempt by J&J to abuse benefits granted to legitimate debtors by the Bankruptcy Code while evading its rules and requirements. Bankruptcy courts are courts of equity, and debtors who seek shelter under the Bankruptcy Code must act in conformity with the Code's underlying principles.[64] Accordingly, and especially because other entities have already

---

*Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and Implement Talc Litigation Protocol* [Dkt. No. 1567], ¶¶ 4, 41, 45.).

[60] *See Ingham v. Johnson & Johnson*, 608 S.W.3d 664, 724-25 (Mo. App. E.D. 2020).

[61] Reuters, *EXCLUSIVE: J&J exploring putting talc liabilities into bankruptcy*, available at https://www.reuters.com/business/healthcare-pharmaceuticals/exclusive-jj-exploring-putting-talc-liabilities-into-bankruptcy-sources-2021-07-18/.

[62] First Day Declaration, ¶ 23.

[63] First Day Declaration, ¶ 5.

[64] *See SGL Carbon*, 200 F.3d at 161.

17

used this inappropriate strategy to take advantage of the Bankruptcy Code, the Court should not

rubberstamp J&J's bad faith attempt to outmaneuver the good faith standard.[65]

44.     In *In re Patriot Coal Corp.*, a debtor created two new entities and incorporated them

in New York weeks prior to the petition date, which resulted in 96 affiliates across the country

filing for bankruptcy in the Southern District of New York.[66]

45.     The Court noted that the debtors did not act in bad faith in filing in the Southern

District of New York, but did not allow their venue choice to stand because "to do so would elevate

form over substance in [a] way that would be an affront to the purpose of the bankruptcy venue

statute and the integrity of the bankruptcy system."[67] The Court further found:

> Whether one characterizes the creation of venue as exploiting a
> loophole or as simply not fair, one thing is clear: ***it is not the thing
> which the statute intended***. While the Court agrees, at least as a
> general matter, with the Debtors' observation that it is the province
> of Congress and not the courts to close loopholes in legislation,
> ***nothing in our jurisprudence requires the Court to condone every
> strategy devised by clever lawyers to outsmart statutory purpose
> and language***, even where, as here, they do so with the best of
> intentions. To do so here would violate Judge Friendly's oft-quoted
> maxim that '***[t]he conduct of bankruptcy cases not only should be
> right but must seem right***.'[68]

46.     Here, too, the strategy undertaken by LTL is nothing more than an attempt to

outsmart the purpose of the Bankruptcy Code and clear language in both the Code and case law.

---

[65] Improperly filed cases, such as the one before the Court, are not only improper as to that organization's creditors. These cases threaten to undermine the legitimacy of the bankruptcy system entirely. *See, e.g.,* David Skeel, The populist backlash in Chapter 11, Jan. 12, 2022, available at https://www.brookings.edu/research/the-populist-backlash-in-chapter-11/.

[66] 482 B.R. 718, 726-28 (Bankr. S.D.N.Y. 2012).

[67] *Patriot Coal*, 482 B.R. at 743-44.

[68] *Id*. at 745 (emphasis added) (citing *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966)).

It is not the thing which the Bankruptcy Code intended. This Court is not required to—and should

not—condone this strategy.

## CONCLUSION

For the reasons set forth above, the Court should grant the Motion to Dismiss and hold that

LTL's bankruptcy petition was filed in bad faith.

Dated: January 25, 2022                              Respectfully submitted,

                                                     HERRICK, FEINSTEIN LLP

                                                     By: */s/ Steven B. Smith*
                                                     Sean E. O'Donnell (*pro hac vice* pending)
                                                     Stephen B. Selbst (*pro hac vice* pending)
                                                     Steven B. Smith
                                                     Rachel H. Ginzburg
                                                     2 Park Avenue
                                                     New York, New York 10016
                                                     (212) 592-1400
                                                     (212) 592-1500 (fax)
                                                     sselbst@herrick.com
                                                     sodonnell@herrick.com
                                                     ssmith@herrick.com
                                                     rginzburg@herrick.com

                                                     *Counsel to the Amici Professors*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**HERRICK, FEINSTEIN LLP**
Sean E. O'Donnell, Esq. (*pro hac vice* pending)
Stephen B. Selbst, Esq. (*pro hac vice* pending)
Steven B. Smith, Esq.
Rachel H. Ginzburg, Esq.
sodonnell@herrick.com
sselbst@herrick.com
ssmith@herrick.com
rginzburg@herrick.com
2 Park Avenue
New York, NY 10016
Tel: (212) 592-1400
Fax: (212) 592-1500
*Counsel to the Amici Professors*

In Re:

**LTL MANAGEMENT, LLC,**

                              Debtor.

Chapter 11

Case No. 21-30589 (MBK)

Honorable Michael B. Kaplan

**ORDER GRANTING MOTION FOR LEAVE TO FILE
BRIEF OF *AMICI CURIAE* BY CERTAIN LAW PROFESSORS**

The relief set forth on the following page, numbered two (2) is hereby **ORDERED**.

| | |
|---|---|
| Debtor: | LTL MANAGEMENT, LLC, |
| Case No.: | 21-30589 (MBK) |
| Caption of Order: | Order Granting Motion for Leave to File Brief of *Amici Curiae* by Certain Law Professors |

THIS MATTER having been opened to the Court upon the filing of a motion by the Amici

Professors for entry of an Order granting their Motion for Leave to File Brief of *Amici Curiae* by

Certain Law Professors (the "Motion"); and the Court having considered the Motion and pleadings

filed in support thereof and any objections to the Motion; and for good cause shown, it is hereby

ORDERED that the Motion is granted in its entirety; and

ORDERED that the Amici Professors are hereby granted leave to file a brief of *amici*

*curiae*.