# EXHIBIT A

From: Spector, Mike (Reuters) <Mike.Spector@thomsonreuters.com<mailto:Mike.Spector@thomsonreuters.com>>
Sent: Wednesday, February 2, 2022 1:06 PM
To: Montagnino, Kimberly [VISUS] <kmontag@ITS.JNJ.com<mailto:kmontag@ITS.JNJ.com>>; Sargent, Jake [JJCUS] <JSargen3@ITS.JNJ.com<mailto:JSargen3@ITS.JNJ.com>>
Cc: Levine, Daniel R. (Reuters) <Dan.Levine@thomsonreuters.com<mailto:Dan.Levine@thomsonreuters.com>>
Subject: [EXTERNAL] Reuters seeking comment on talc-litigation story

Hi Kim and Jake,

Hope you're both doing well.

I am working with my colleague, Dan Levine, copied here, on a potential story about talc litigation against Johnson & Johnson. Our focus is on the company's planning of the legal maneuver to place the liability from those cases into a new subsidiary that then filed for bankruptcy.

We wanted to share our preliminary findings and ask a series of questions to ensure our story is fair and accurate. We ask that you respond by noon eastern time Monday, Feb. 7. Please also confirm receipt of this message.

We would also like to request interviews with Chairman Alex Gorsky, CEO Joaquin Duato, General Counsel Michael Ullmann, J&J Assistant General Counsel Chris Andrew and/or LTL Chief Legal Officer John Kim. We would also like to speak with recently retired J&J Treasurer Michelle Ryan on the email exchanges she had with a Moody's analyst that are further detailed below. Please let us know if and when one or more of these executives would be available to speak with us.

Broadly speaking, we have learned that throughout the summer of 2021, in public statements and in court, J&J repeatedly said it had not made any decisions regarding the talc litigation it faced except to continue defending the safety of talc in trial courts. The company also downplayed the prospect of executing the bankruptcy maneuver, known as a Texas two-step, with one lawyer representing J&J using the term "unsubstantiated rumors" to describe reports of the company's planning and consideration of the strategy.

During this period, the company also took to trial a case filed by Shawn Johnson, who blamed his terminal mesothelioma on asbestos in J&J Baby Powder. A Los Angeles jury ultimately awarded Johnson $27 million on October 12.

Our reporting shows that, while these events were transpiring, top J&J executives urgently worked to develop the bankruptcy plan starting as early as April. Those efforts took on added exigency after the

U.S. Supreme Court rejected J&J's Ingham appeal in June. The new J&J subsidiary, LTL Management, was created on October 12, the same day as Johnson's verdict. LTL filed for bankruptcy on October 14.

Our reporting shows this could result in far lower compensation for plaintiffs, as a whole and in some individual cases. In Johnson's case, his lawyers now believe he may only get a fraction of the jury award if the bankruptcy court signs off on the LTL reorganization. That's because he would have to get in line with at least 38,000 other plaintiffs seeking compensation through an LTL administrative process to hand out a capped amount of money.

Please let us know whether these broad findings are consistent with J&J's understanding. We would welcome the company's general comments on these events in addition to answers to our specific questions. If you believe any information we have is inaccurate, please let us know and tell us what is accurate.

Our questions:

1. J&J is facing about 38,000 lawsuits related to its talc products. At the time of the LTL bankruptcy filing, J&J paid about $3.5 billion in judgments and settlements, and about $1 billion in legal costs. To date, J&J has won 16 talc cases that went to trial. How many talc lawsuits has J&J settled, and what portion of the $3.5 billion do those settlements represent? How many trials has J&J lost, and what portion of the $3.5 billion do those adverse verdicts represent? Why is J&J proposing $2 billion, plus royalty streams valued at $350 million, to compensate all other plaintiffs in talc suits? What is the company's rationale for why that amount represents just compensation?
2. J&J received a presentation from Jones Day partner Greg Gordon and his team on a potential divisional merger and bankruptcy in April 2021. J&J lawyers Erik Haas, John Kim and Andrew White decided to hire the firm. The Jones Day team had previously helped other companies execute a divisional merger/bankruptcy, including Koch Industries' Georgia Pacific. Why did J&J hire Jones Day? What role, if any, did Jones Day's work for Koch's Georgia Pacific play in J&J's decision to hire the team?
3. Alex Gorsky convened the company's board on May 17, 2021. J&J General Counsel Michael Ullman briefed directors on talc litigation and J&J's appeal of the Missouri Ingham verdict to the U.S. Supreme Court. Were J&J directors briefed on the divisional merger/bankruptcy plan at this board meeting, or any other? If so, did any directors raise concerns about the plan? Was it ever authorized by J&J's board? If not, who authorized the creation of LTL and its bankruptcy? And did board members generally support the plan?
4. Our reporting shows that in July, Jim Murdica, an outside attorney J&J charged with resolving talc litigation, told a plaintiffs' lawyer during settlement discussions that the company intended to move forward with the subsidiary bankruptcy. Murdica said: "You guys will be fighting over scraps five years from now" in the bankruptcy. Had the company decided by July to move forward with this plan? If not, why did Murdica have that impression, and why was he conducting settlement negotiations with plaintiffs' lawyers based on the understanding that the company would transfer all its liability to a bankrupt subsidiary?
5. On July 12, J&J attorney Chris Andrew sent a note to about 30-40 people including personnel from finance, risk management, tax and business development. These people had been assigned to explore and plan the subsidiary bankruptcy. That note identified the bankruptcy project as "Project Plato" and

informed team members that they could not inform anyone about the work, including colleagues and family members, even spouses. Why did J&J pledge its team to secrecy? What advantage did the company gain by keeping the project confidential? Who named the work "Project Plato?" Why did they choose that name? Why didn't J&J publicly acknowledge the project, in court and in public statements, instead of downplaying reports that it was considering the subsidiary bankruptcy and planning to carry it out?

  6.  A week later, a day after Reuters revealed J&J's consideration of a Texas two-step, corporate treasurer Michele Ryan emailed Moody's senior VP Michael Levesque. Ryan outlined the bankruptcy plan and said it was a way of "capping our talc liability." Ryan asked if such a move would impact J&J's credit. Levesque replied that it likely would not. Why did Ryan reach out to Moody's, and who asked her to do so? Would a potential negative hit to J&J's credit have dissuaded the company from pursuing a subsidiary bankruptcy? How does J&J respond to critics who contend that a Texas two-step allows J&J to reap the benefit of a bankruptcy litigation shield without suffering the consequences of diminished credit that other companies and individuals filing bankruptcy usually face?

  7.  At a July 23 pre-trial hearing in Northern California, King & Spalding lawyer Amy Zumsteg told a judge that the idea of a divisional merger/bankruptcy was "rumor" and that she had "no information to substantiate those rumors." Why did Zumsteg make such a representation to a judge, in light of the concrete steps J&J had taken to prepare for such a bankruptcy? Was Zumsteg briefed about J&J's plan at that point? Had she sought a briefing, and if so, what was J&J's response?

  8.  In August, plaintiffs' lawyers asked the judge overseeing the Imerys bankruptcy case to preemptively block J&J from undertaking the Texas two-step. The judge declined, siding with J&J's argument that she could not block the company from undertaking a restructuring it had not yet decided whether to pursue. This prompted Ryan to forward a news article about the ruling to Luc Freyne.  "Looks like Plato can move forward if we want to," Ryan wrote. "Good news indeed," Freyne responded. Does the company have any comment on this exchange? Was it a common view among J&J executives that moving forward with Project Plato was good news for the company?

  9.  In an early morning email on October 11, a J&J lawyer sought approval of the bankruptcy plan "as soon as possible," attaching a detailed memo outlining the purported benefits. After J&J's consumer business freed itself from responsibility for talc lawsuits, a bankruptcy judge would approve the final amount of money for resolving all the litigation "without the waste and abuses experienced in the state court tort system," the memo said. The plan would be consummated under a tight timeframe, and garner significant media scrutiny. "Appropriate messaging (internally and externally) will be required to avoid or mitigate misunderstandings about the nature of the restructuring and negative publicity," the memo said. Who made the decision to move forward with the bankruptcy plan in response to this memo? Did Gorsky review this memo, express any guidance, or make any decisions in connection with it? Did any J&J directors review this memo, or make any decisions in connection with it? Did the J&J board take a vote on moving forward with the plan? Did any members oppose, and if so, which ones? What specifically was the memo characterizing as "waste and abuses" in the state court tort system? What "negative publicity" did the company anticipate and why?

  10. A group of J&J colleagues, which included several senior executives, quickly approved the bankruptcy plan. LTL held its first board meeting on October 14, and for about 90 minutes, directors and executives (all seconded J&J executives) received a presentation from Jones Day lawyers, now representing LTL, and LTL Chief Legal Officer John Kim, who until recently was a J&J product-liability lawyer. The newly-formed subsidiary faced "exorbitant" costs if the current talc litigation barrage continued, which included 12,000 lawsuits alone through the first nine-and-a-half months of 2021. Judgements, settlements and other legal costs already totaled nearly $5 billion. After a Jones Day review of the bankruptcy option, Kim recommended the LTL board approve a bankruptcy filing. The board agreed. J&J disclosed the move that evening as one that would "equitably" resolve more than 38,000

3

lawsuits. Robert Wuesthoff, LTL's president, testified that the "real reason" for the bankruptcy was that the litigation put J&J's consumer business in "financial distress." Has LTL hired anyone who is not a J&J executive? Does it have any business purpose beyond shielding J&J from liability in talc cases and, if so, what? What is J&J's response to critics of the bankruptcy plan who argue it is not equitable to plaintiffs and robs them of their ability to seek legal redress in court against J&J itself?

  11. During Shawn Johnson's trial in Los Angeles Superior Court, J&J argued that his cancer could be attributed to family genetics, and that Johnson could not prove his family used Baby Powder. Johnson testified that he used Baby Powder during significant stretches throughout his life, first as a child, then for a time as deodorant during his teenage years and later on all seven of his children, including an adult son with disabilities who needed to be changed up to eight times a day.  Is this consistent with J&J's understanding?

  12. Johnson said the jury verdict, which included $25 million in punitive damages, made him feel as if there was some justice in the world. After learning of LTL's bankruptcy filing, Johnson said he felt very angry because the company knowingly damaged people like him by selling Baby Powder that contained asbestos. Since Johnson's verdict had not yet been entered as a certified judgment, he would now be an unsecured creditor in any LTL bankruptcy and likely receive pennies on the dollar. What is J&J's response to Johnson's comments?

  13. Several members of Congress have proposed legislation that would forbid most third-party releases in bankruptcy, and eliminate the Texas two-step as an option for companies. What is J&J's position on these efforts?

Thanks for your attention and we look forward to your responses.

Best,

Mike and Dan

Mike Spector

U.S. Corporate Crisis Correspondent

Reuters

332 219 1752 | Desk

347 266 9966 | Mobile

313 320 7388 | Mobile

mike.spector@tr.com<mailto:mike.spector@tr.com>

On Twitter @mike_d_spector

This e-mail is for the sole use of the intended recipient and contains information that may be privileged and/or confidential. If you are not an intended recipient, please notify the sender by return e-mail and delete this e-mail and any attachments. Certain required legal entity disclosures can be accessed on our website:
https://www.thomsonreuters.com/en/resources/disclosures.html<https://nam11.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.thomsonreuters.com%2Fen%2Fresources%2Fdisclosures.html&data=04%7C01%7Ckfournier%40kslaw.com%7C452daa9794714e7073c708d9e67d1b51%7C070bb826d2dc4db791103d46e2a9e315%7C0%7C0%7C637794247285525049%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000&sdata=866WmfewgOc7hvD7PuYM67%2BlCq0edTvTG1ohu%2BTRMgg%3D&reserved=0>

_____

**From:** Levine, Daniel R. (Reuters) <Dan.Levine@thomsonreuters.com>
**Sent:** Wednesday, February 2, 2022 3:11 PM
**To:** Gordon, Gregory M. <gmgordon@JonesDay.com>; Prieto, Dan B. <dbprieto@JonesDay.com>; Petrou, David R. <drpetrou@JonesDay.com>
**Cc:** Spector, Mike (Reuters) <Mike.Spector@thomsonreuters.com>
**Subject:** Reuters seeking comment on J&J story

\*\* External mail \*\*

Hi there,

We are Reuters News reporters researching a potential story about talc litigation against Johnson & Johnson. Our focus is on the company's decision to place the liability from those cases into a new subsidiary that then filed for bankruptcy.

In the course of our work we have learned some details about the role Jones Day and some of its partners played in advising J&J on executing a bankruptcy filing for its subsidiary, LTL Management LLC, following a divisional merger in Texas.

To ensure that our reporting is fair and accurate, we wanted to share our preliminary findings and ask a series of questions. If you could please respond by noon eastern time Monday, Feb. 7 we would be grateful. Please also confirm receipt of this message.

We would also like to request interviews with Greg Gordon and/or Dan Prieto to hear the firm's views. Please let us know when one of these attorneys would be available to speak with us.

Broadly speaking, we have learned that throughout the summer of 2021, in the press and in public, J&J repeatedly said it had not made any decisions regarding the talc litigation if faced except to continue defending the safety of talc in trial courts. The company also downplayed the prospect of executing the bankruptcy maneuver, known as a Texas Two-Step, describing it as unsubstantiated rumors or a hypothetical restructuring the company had not yet decided to pursue.

We also learned that while these events were transpiring, top J&J executives urgently worked to develop the bankruptcy plan starting as early as April, when the company retained Gordon and his Jones Day team. J&J's efforts took on added urgency after the U.S. Supreme Court rejected J&J's Ingham appeal in June. The new J&J subsidiary, LTL, was created on Oct. 12, then filed for bankruptcy two days later.

Please let us know whether these broad findings are consistent with Jones Day's understanding. We would welcome the firm's general comments on these events in addition to answers to our specific questions. If you believe any information we have is inaccurate, please let us know and tell us what is accurate.

Below are our preliminary findings and some questions:

1. J&J is facing roughly 38,000 lawsuits related to allegations of asbestos in its talc products. At the time of the LTL bankruptcy filing, J&J paid about $3.5 billion in judgments and settlements, and about $1 billion in legal costs. To date, J&J has won 16 talc cases that went to trial. *Is this consistent with Jones Day's understanding? How many talc lawsuits has J&J settled, and what portion of the $3.5 billion do those settlements represent? How many trials has J&J lost, and what portion of the $3.5 billion do those adverse verdicts represent?*

2. J&J received a presentation from Jones Day partner Greg Gordon and his team on a potential divisional merger and bankruptcy in April 2021. J&J lawyers Erik Haas, John Kim and Andrew White decided to hire the firm. The Jones Day team had previously helped other companies execute a divisional merger/bankruptcy, including Koch Industries' Georgia Pacific. *Is this consistent with Jones Day's understanding? What role, if any, did Jones Day's work for Koch's Georgia Pacific play in J&J's decision to hire the team?*

3. On July 12, J&J attorney Chris Andrew sent a note to about 30-40 people including personnel from finance, risk management, tax and business development. That note identified the bankruptcy project as "Project Plato" and informed team members that they could not inform anyone about the work, including spouses. *Is this consistent with Jones Day's understanding? Why did J&J pledge its team to secrecy and decide against publicly acknowledging the project? Who named the work "Project Plato"? Was it someone at Jones Day? Why did they choose that name?*

4. At a July 23 pre-trial hearing in Northern California, King & Spalding lawyer Amy Zumsteg told a judge that the idea of a divisional merger/bankruptcy was "rumor" and that she had "no information to substantiate those rumors." *Is this consistent with Jones Day's understanding? Why did Zumsteg make such a representation to a judge, given all of the work J&J executives and Jones Day were doing on the bankruptcy? Was Zumsteg briefed about J&J's plan at that point? Had she sought a briefing with the company or Jones Day, and if so, what was their response?*

5. In an early morning email on October 11, a J&J lawyer sought approval of the bankruptcy plan "as soon as possible," attaching a detailed memo outlining the purported benefits. After J&J's consumer business freed itself from responsibility for talc lawsuits, a bankruptcy judge would approve the final amount of money for resolving all the litigation "without the waste and abuses experienced in the state court tort system," the memo said. The plan would be consummated under a tight timeframe, and garner significant media scrutiny. "Appropriate messaging (internally and externally) will be required to avoid or mitigate misunderstandings about the nature of the restructuring and negative publicity," the memo said. *Is this consistent with Jones Day's understanding? Did Gorsky review this memo, express any guidance, or make any decisions in connection with it? Did any J&J directors review this memo, or make any decisions in connection with it? What specifically was the memo characterizing as "waste and abuses" in the state court tort system? What "negative publicity" did the company anticipate and why?*

7

6. A group of J&J colleagues, which included several senior executives, quickly approved the bankruptcy plan. LTL held its first board meeting on October 14, and for about 90 minutes, directors and executives (all seconded J&J executives) received a presentation from Jones Day lawyers, now representing LTL, and LTL Chief Legal Officer John Kim, who until recently was a J&J product-liability lawyer. The newly-formed subsidiary faced "exorbitant" costs if the current talc litigation barrage continued, which included 12,000 lawsuits alone through the first nine-and-a-half months of 2021. Judgements, settlements and other legal costs already totaled nearly $5 billion. After a Jones Day review of the bankruptcy option, Kim recommended the LTL board approve a bankruptcy filing. The board agreed. J&J disclosed the move that evening as one that would "equitably" resolve more than 38,000 lawsuits. Robert Wuesthoff, LTL's president, testified that the "real reason" for the bankruptcy was that the litigation put J&J's consumer business in "financial distress." *Is this consistent with Jones Day's understanding? Why did Jones Day transition from representing J&J to representing LTL? The U.S. Trustee overseeing LTL's bankruptcy case has objected to LTL's retention of Jones Day, arguing that the firm's previous representation of J&J, and its role helping devise the divisional merger the company undertook, creates a conflict of interest. What is Jones Day's response to this charge?*

7. Several members of Congress have proposed legislation that would forbid most third-party releases in bankruptcy, and eliminate the Texas Two-step as an option for companies. *What is Jones Day's position on these efforts?*

Thanks for your attention and we look forward to your responses.

Best,
Dan and Mike


**Dan Levine**
Correspondent

**Reuters News**

Phone: +1 415 348 4726
Mobile: +1 415 828 0883

dan.levine@thomsonreuters.com
http://www.reuters.com/

**Linkedin:** www.linkedin.com/in/dlevine1