| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Matthew I.W. Baker, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>mbaker@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Local Counsel to the Official Committee of Talc Claimants I* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael Winograd, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>Seven Times Square<br>New York, NY  10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>Sharon I. Dwoskin, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>sdwoskin@brownrudnick.com<br>One Financial Center<br>Boston, MA  02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Co-Counsel for the Official Committee of Talc Claimants I* |
| **OTTERBOURG PC**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>230 Park Avenue<br>New York, NY  10169<br>Tel: (212) 905-3628<br>Fax: (212) 682-6104<br>*Co-Counsel for the Official Committee of Talc Claimants I* | **PARKINS LEE & RUBIO LLP**<br>Leonard M. Parkins, Esq.<br>Charles M. Rubio, Esq.<br>lparkins@parkinslee.com<br>crubio@parkinslee.com<br>Pennzoil Place<br>700 Milan St., Suite 1300<br>Houston, TX  77002<br>Tel: (713) 715-1666<br>*Special Counsel to the Official Committee of Talc Claimants I* |

1

| In Re:<br><br>**LTL MANAGEMENT, LLC,**<br><br>Debtor. | Chapter 11<br><br>Case No.: 21-30589(MBK)<br><br>Honorable Michael B. Kaplan<br><br>Hearing: *February 14, 2022, at 10:00 a.m.* |
|---|---|

**REPLY OF THE OFFICIAL COMMITTEE
OF TALC CLAIMANTS I IN SUPPORT OF
MOTION TO DISMISS DEBTOR'S CHAPTER 11 CASE**

The Official Committee of Talc Claimants I ("TCC I") of LTL Management LLC, ("LTL" or the "Debtor"), by and through its undersigned proposed counsel, submits this Reply to the *Debtor's Objection to Motions to Dismiss Chapter 11 Case* [Dkt. No. 956] (the "Objection") and in support of the underlying *Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case* [Dkt. No. 632] (the "Motion to Dismiss"). In Reply to the Objection and in support of the Motion to Dismiss, TCC 1 respectfully states as follows:

**PRELIMINARY STATEMENT**

1. LTL's Objection does not undermine the Motion to Dismiss. On the contrary, virtually every page of that brief confirms why dismissing this bankruptcy is necessary and appropriate under the law of this Circuit.

2. The Objection describes, hyperbolically, an "unrelenting . . . deluge" of talc-related tort litigation. It lards on the adjectives and adverbs, scatters statistics and dollar figures. But, here's the thing: *None of that tort litigation was ever asserted against the Debtor*. All of it was

2

asserted against non-Debtor affiliates, J&J and Old JJCI.[1]  The talc litigation has always involved, and has always been about, *non*-Debtors: (i) the talc victims, who are suing J&J and Old JJCI; and (ii) J&J and Old JJCI, who are being sued by the talc victims.  The Debtor is mere artifice, set up by J&J to be an incidental "go-between" for *non*-Debtor litigants.

3.  In this way, the Objection essentially concedes the merits of the Motion to Dismiss. First, it admits (if there was any doubt) that this bankruptcy was designed to deliver the benefits of bankruptcy to J&J and New JJCI, without placing the burdens of bankruptcy on J&J and New JJCI.  Pithy rhetoric, like the "tide … is certainly rising, and Old JJCI was flooded and drowning," loses all meaning when the brief ignores the question that it so desperately begs: If Old JJCI was in such dire circumstances, why didn't it file for bankruptcy itself?  The same holds true for J&J. What seems clear is that the J&J board is unwilling to cede one iota of control to this Court.  As such, this bankruptcy is unlike a single "mass tort" case mentioned in the Objection.  See Objection at 15 (referencing Johns-Manville, A.H. Robins, and Dow Corning).  This alone should be dispositive.

4.  Second, the Objection is remarkably disengaged from the underlying case facts. The Debtor essentially asks the Court to ignore, as irrelevant, the following: (i) LTL has no business purpose whatsoever; (ii) it has no business counterparties or creditors, other than the talc victims; (iii) LTL's board, management and employees all work for J&J and owe 100% fealty to J&J; and (iv) J&J's exploitation of the "Texas 2-Step," including the strategic North Carolina filing, was an obvious legal maneuver to impose an unfavorable settlement dynamic on talc victims.  To the Debtor, the only thing that matters under SGL Carbon is the *possibility* of a

---

[1] Capitalized terms not defined herein shall have the meanings ascribed thereto in the Motion to Dismiss.

settlement. There is no settlement today, and there may never be one. But, to the Debtor, a "valid bankruptcy purpose" need not be rooted in actual fact; conjecture – the mere possibility of "what could be" if J&J and New JJCI are empowered to herd talc victims to their parochial will – is all that is required. As discussed herein, that is *not* what the Third Circuit held in SGL Carbon, and that is *not* what SGL Carbon's progeny stands for. Bankruptcy is not meant to be a trip through J&J fantasyland.

5. Not to worry, says the Debtor, there is a "Band-Aid" (one of New JJCI's ubiquitous product offerings): the so-called "Funding Agreement." Time and again, the Debtor points to this device as proof of its case bona fides, and the Objection is no exception. But, as laid out in the *Initial Statement of Official Committee of Talc Claimants Respecting Chapter 11 Case* [Dkt. No. 495] and in the Motion to Dismiss (and will be discussed further at trial), the Funding Agreement is not actionable without J&J's full cooperation. It is, and has always been, an illusory promise defined by its ambiguous and capped payment terms, lack of an effective enforcement mechanic, and clear obstacles to assumption/assignment without J&J's consent. Like so many other facets of the Debtor's case, it is a "papering-over" to make an inappropriate case *look* appropriate. And, regardless, the Funding Agreement fails to whitewash all the other, myriad, wrongful attributes of the case record showing that this filing (and the request for a Section 105(a) preliminary injunction) was all about J&J and New JJCI gaining "a tactical litigation advantage" over people who are sick and/or dying of cancer.

6. Finally, it bears observing that the Objection utterly fails to engage on just how important, just how visible, and just how central this case is to the current, national debate over bankruptcy abuse. The "Texas 2-Step" undertaken here has not gone unnoticed. The fact that this bankruptcy is being sponsored by, and prosecuted for the obvious benefit of, one of the richest and

most powerful companies in the world has not gone unnoticed. That virtually every aspect of J&J's bankruptcy strategy *drips* of profiteering on the backs of people who are gravely ill has not gone unnoticed. Congress has taken notice.[2] Top academics from leading law schools around the country have taken notice.[3] The media and public at large have taken notice.[4]

7. Allowing this bankruptcy to proceed is tantamount to judicial approbation of what J&J has done. The Order will assuredly prompt a large public outcry, perhaps even Congressional action. But, it will also open a Pandora's Box of egregious corporate mischief. LTL (really J&J) does not address any of this because LTL (really J&J) does not *have* an answer for any of this.

8. The Objection should be overruled. The Motion to Dismiss should be granted.

---

[2] The Court may take judicial notice that, on February 8, 2022 at 3:00 p.m. Eastern, the United States Senate *Subcommittee on Federal Courts, Oversight, Agency Action, and Federal Rights* will convene a public hearing entitled *Abusing Chapter 11: Corporate Efforts to Side-Step Accountability Through Bankruptcy*. A live video feed of the hearing may be accessible to the Court through the Senate Subcommittee's website: https://www.judiciary.senate.gov/meetings/abusing-chapter-11-corporate-efforts-to-side-step-accountability-through-bankruptcy.

[3] TCC 1 hereby joins in, and incorporates herein by reference, the three amicus curiae briefs sought to be filed in this case. See *Memorandum of Law of Amici Curiae by Certain Law Professors in Support of Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case* [Dkt. No. 1265 at Ex. B]; *Memorandum of Law of Amici Curiae by Certain Complex Litigation Law Professors in Support of Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case* [Dkt. No. 1317-2]; *Memorandum of Law of Amicus Curiae by Erwin Chemerinsky in Support of Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case* [Dkt. No. 1323-4].

[4] This case has been the subject of widespread media coverage, including lengthy television and radio segments. See, e.g., CBS News, "Johnson & Johnson talc powder spinoff files for bankruptcy," October 15, 2021, available at https://www.cbsnews.com/news/johnson-johnson-talc-powder-cancer-lawsuits-bankruptcy-ltl-management; National Public Radio, "J&J is using a bankruptcy maneuver to block lawsuits over baby powder cancer claims," October 21, 2021, available at https://www.npr.org/2021/10/21/1047828535/baby-powder-cancer-johnson-johnson-bankruptcy; The Daily Show, "How Companies Use Bankruptcy to Avoid Liability," November 2, 2021, available at https://www.youtube.com/watch?v=-OM0soktsqI.

**ARGUMENTS IN REPLY**

**I.   The Objection Should Be Overruled Because
Relieving *J&J And New JJCI* Of Their Talc Liability
Is Not A Legitimate "Bankruptcy Purpose" *For LTL*.**

9.  In the Objection, the Debtor states its "bankruptcy purpose" as follows: (i) "[t]he Debtor's chapter 11 case was filed for the purpose of bringing the tens to hundreds of thousands of pending and future Talc Claims into one forum for an efficient and equitable resolution," Objection at 32; (ii) to "enable the parties to reach a sensible resolution of the Talc Claims," id. at 28; and (iii) to "seek a bankruptcy resolution of mass tort liability, as specifically sanctioned by Congress," id. at 17.

10. The Debtor's chosen words reflect serious confusion over the applicable law.  This bankruptcy filing is, by the Debtor's own admission, intended to exploit bankruptcy "powers," specifically those codified in Sections 362 and 524(g), for J&J and New JJCI's benefit.  But, under applicable Third Circuit precedent, a desire to exploit bankruptcy "powers" (for non-Debtor affiliates, no less) is decidedly *not* a legitimate bankruptcy "purpose."  As such, this case fails the analysis required by SGL Carbon and its progeny.

**A.   LTL's Stated "Bankruptcy Purpose" Is Mere
Exploitation of "Bankruptcy Powers," And This Is
Insufficient To Establish Good Faith Under Third Circuit Law.**

**1.   *SGL Carbon* Does Not Permit LTL To Co-Opt J&J's
And New JJCI's "Bankruptcy Purpose" And Make It Its Own.**

11. As the Third Circuit observed, "Chapter 11 vests petitioners with considerable powers – the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc. – that can impose significant hardship on particular creditors." In re SGL Carbon Corp., 200 F.3d 154, 164 (3d Cir. 1999).  The exercise of those powers, and the hardship on creditors, is

6

justified when "financially troubled creditors seek a chance to remain in business . . . [b]ut this is not so when a petitioner's aims lie outside those of the Bankruptcy Code." Id. at 165.

12. As such, and "[a]s the Third Circuit has made clear, a debtor's desire to invoke *the powers* conferred by the Bankruptcy Code does not establish good faith, nor does it constitute a valid bankruptcy *purpose*." In re Rent-A-Wreck of America, Inc., 580 B.R. 364, 374 (Bankr. D. Del. 2018) (emphasis added), citing NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 128 (3d Cir. 2004) ("Although the Bankruptcy Code contains many provisions that have the effect of redistributing value from one interest group to another, these redistributions are not the Code's *purpose*.").

13. Bankruptcy "purpose" is rooted in historical rationales for our general bankruptcy scheme. "The Supreme Court has identified two of the basic purposes of Chapter 11 as (1) 'preserving going concerns' and (2) 'maximizing property available to satisfy creditors.'" In re Integrated Telecom Express, Inc., 384 F.3d at 119 (quoting Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999)); see also Toibb v. Radloff, 501 U.S. 157, 163-64 (1991) (discussing "the congressional purpose of deriving as much value as possible from the debtor's estate.").

14. Neither of the bankruptcy "purposes" identified in Integrated Telecom are served here. Nor could they be. The Debtor is a shell SPV that does not participate in the commercial world. It does not operate a "going concern."[5] It does not have an asset-base to rehabilitate or "maximize" through the Chapter 11 process. It does not have parties-in-interest, besides the non-

---

[5] One of LTL's assets is equity in Royalty A&M, which, in turn, owns the right to receive the proceeds of certain royalty streams (but not to renegotiate or otherwise alter the underlying royalty agreements). Neither LTL nor its subsidiary Royalty A&M operates any business.

7

Debtor litigants (i.e., J&J, New JJCI, and talc victims). At bottom, LTL is a mere "go-between" for non-Debtor litigants, set up to deliver bankruptcy benefits (free of bankruptcy burdens) to the defense side of that litigation. It is an inconsequential corporate being, created to serve J&J and New JJCI's litigation strategy, nothing more. It *has no* bankruptcy "purpose."

15. Not so, says the Debtor, citing to many "mass tort" Chapter 11 cases, such as Muralo, Johns-Manville, A.H. Robins, Dow Corning, and others. See Objection at 18-20. But, the Objection ignores a most critical distinction: In each and every one of these cited cases, the company being prosecuted through the tort system, with asset value at risk, and with real "skin in the game," was the debtor itself. In this case, by contrast, J&J set up a shell corporation (LTL) to "take all the hits" and avoid having it and New JJCI put their own "skin in the game." Unlike Johns-Manville, for example, J&J and New JJCI are calling the plays from the safety of the box seats. It is a comfortable way to play the game, but it violates the rules.

16. Stated more directly, SGL Carbon does not allow LTL to co-opt *J&J and Old JJCI's* bankruptcy purpose and make it its own.[6] Indeed, courts are particularly skeptical of debtors that are "asset-culled entities," as well as parent companies that have "elected not to submit the actual entities in interest to the jurisdiction of the court, thereby isolating the entities in interest from the scrutiny and control of the court during proceedings.'" See In re Eden Assocs., 13 B.R. 578, 584 (Bankr. S.D.N.Y. 1981) (quoting In re Dutch Flat Inv., 6 B.R. 470, 471 (Bankr. N.D. Cal. 1980)). That is precisely what J&J and New JJCI have done here, and it does not work.

---

[6] Here, it is worth observing another rhetorical "game" being played by J&J and New JJCI. When it serves its purposes (e.g., the Objection), LTL melds into and disavows separation from J&J and Old JJCI. When, however, it is necessary to show corporate independence, LTL primly asserts autonomy. See, e.g., *Debtor's Supplemental Reply in Support of Application to Retain Weil, Gotshal & Manges LLP* [Dkt. No. 1197] at ¶ 11. This, of course, invokes principles of judicial estoppel. See, e.g., Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 273 (3d Cir. 2012). It also shows how dodgy the Debtor's case theory is.

8

### 2. Pointing To Section 524(g) Offers Little Help For LTL Because That Section Also Only Codifies A Bankruptcy "Power," Not A Bankruptcy "Purpose".

17. The Objection characterizes Section 524(g) as LTL's "bankruptcy purpose." Objection at 15. This is more of the same.

18. As an initial matter, there is substantial question as to whether the Section even has applicability to this case. The Section may be used only by "a debtor which at the time of entry of the order for relief has been named as a defendant" in an asbestos case. See 11 U.S.C. § 524(g)(2)(B)(i)(I). LTL was not named as a defendant in any of the talc litigation as of the petition date; it only existed for less than 48 hours before it sought Chapter 11 protection. The Debtor, clearly aware of this conundrum, says FRCP 25(c) is curative.[7] Courts do not usually interpret procedural rules as conferring substantive rights but, regardless, that argument ignores the words "predecessor in interest" used elsewhere in the statute. See 11 U.S.C. § 524(g)(4)(A)(iii)(II). Courts also do not usually read statutes to create language surplusage.

19. But, more to the point, Section 524(g) is just another example of a bankruptcy "power," not a bankruptcy "purpose." The Section is a mechanic; it facilitates; it is a means to an end; *it is not the end unto itself*. Affording J&J and New JJCI a Section 524(g) shield is not a valid "bankruptcy "purpose" for LTL. See Integrated Telecom, 384 F.3d at 128; Rent-A-Wreck, 580 B.R. at 374. The Objection should be overruled.

---

[7] See *Debtor's Omnibus Reply in Support of Motion for an Order (A) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or (B) Preliminarily Enjoining Such Actions and (C) Granting a Temporary Restraining Order Pending a Final Hearing* [Adv. Dkt. No. 146] at 49-50.

### B. Permitting This Case To Proceed For The Benefit Of *Non*-Debtors (J&J And New JJCI) Would Undermine Fundamental Bankruptcy Principles.

20. The Objection triumphantly proclaims that it is *the Debtor* that is the "real party in interest" respecting talc liability. See Objection at 33. That is an obvious "spin" of the facts. It is also *ipse dixit* rhetoric, given that the divisive merger is poised for a whopper of a fraudulent transfer attack.[8] Regardless, the evidence at trial will indisputably show that J&J and Old JJCI – not the inconsequential SPV Debtor – are, and have always been, the true targets of all talc-related litigation.

21. It is this reality that drives the bankruptcy "benefits/burdens" analysis. To be sure, LTL's bankruptcy presents an enormous opportunity for J&J and New JJCI to shed all talc-related liability, perhaps even (if J&J gets its way) at an economic price. Under the law, J&J and New JJCI must shoulder burdens commensurate to such benefits: "Since a discharge is an extreme remedy, stripping a creditor of claims against its will, it is a privilege reserved for those entities which file a petition under the bankruptcy code and abide by its rules. Simply put, 'the enjoyment of the benefits afforded by the code is contingent on the acceptance of its burdens.'" In re Arrowmill Dev't Corp., 211 B.R. 497, 503 (Bankr. D.N.J. 1997) (citation omitted). J&J and New JJCI thus must file for bankruptcy for this kind of benefits package. See id. at 506.

22. In fact, solvent non-Debtors exploiting the benefits of bankruptcy without incurring its burdens have been derogatorily (for good reason) called "bankruptcy grifters." See Lindsay

---

[8] In each of In re DBMP LLC (Bankr. W.D.N.C. Case No. 20-30080) [Dkt. No. 1197]; and In re Aldrich Pump LLC (Bankr. W.D.N.C. Case No. 20-30608) [Dkt. No. 973], two cases which the Debtor characterizes as "involv[ing] prepetition restructurings similar to the restructuring at issue here" (see Objection at 27), the court granted standing to the tort claimants committee to pursue, among other claims, intentional fraudulent transfer claims related to the prepetition restructuring.

10

Simon, Bankruptcy Grifters, 132 Yale L.J. (forthcoming 2022), available at https://ssrn.com/abstract=3817530 (explaining that such companies act as "parasites" on the bankruptcy system). Academic analysis of "bankruptcy grifters," like J&J and New JJCI, is part of a recent wave of scholarship focused on bankruptcy abuse and eroding confidence in our bankruptcy system.[9] Indeed, Congress is presently conducting hearings on the topic. See supra n.2.

23. The Debtor counters: "[S]ubjecting all of Old JJCI and its many stakeholders – including thousands of trade creditors, employees, customers, business partners, and even contingent tort claimants – to a value-destructive, complex, and exponentially more expensive bankruptcy would benefit no one." Objection at 28. This is too self-serving. Subjecting J&J and New JJCI's strategic decision-making to Court oversight: (i) would assuredly benefit the talc victims under attack in this case; (ii) would expose J&J and New JJCI's "upside" business value to talc claims, something fully commensurate with the "downside" protection they now demand from LTL's bankruptcy; and (iii) levels the playing field and better empowers the Court to achieve an objectively fair and just outcome. See Knapp v. Seligson (In re Ira Haupt & Co.), 361 F.2d 164, 167 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right.").

---

[9] See, e.g., Adam J. Levitin, Purdue's Poison Pill: The Breakdown of Chapter 11's Checks and Balances, 100 Tex. L. Rev. (forthcoming 2022), available at https://ssrn.com/abstract=3851339 (analyzing problematic elements of recent mass-tort Chapter 11 cases); Ralph Brubaker, Mandatory Aggregation of Mass Tort Bankruptcy in Litigation, 131 Yale L.J. F. (forthcoming 2022), available at https://ssrn.com/abstract=3960117 (emphasizing that non-debtor releases are beyond the bankruptcy court's authority and calling for the Supreme Court to intervene); Melissa B. Jacoby, Shocking Business Bankruptcy Law, 131 Yale L.J. F. 409 (2021) (identifying ways that Chapter 11 is being abused beyond its intended scope).

24. The J&J board is not interested in fairness, however. It is interested in control, and it certainly is not ceding any of that control to this Court. That is inconsistent with American bankruptcy values, culture, and jurisprudence. See, e.g., Pepper v. Litton, 308 U.S. 295, 308 (1939) ("[T]he bankruptcy court has the power to sift the circumstances . . . to see that injustice or unfairness is not done in administration of the bankruptcy estate.").

25. On this point, it is worth retracting the lens just a bit further. A critical principle of bankruptcy theory – one that is inherently accepted in American commerce and the capital markets – is that contracting parties understand how bankruptcy is supposed to work. Chapter 11 is, essentially, a legal "backdrop" for all kinds of commercial activity. When parties allocate risk in contracts, they bear in mind the possibility that their counter-party may someday file for bankruptcy. Our bankruptcy system intends to reliably deliver on "bargained-for" allocations of insolvency risk. See, e.g., Butner v. United States, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law . . . . [T]here is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); Lewis v. Mfrs. Nat'l Bank, 364 U.S. 603, 609 (1961) (bankruptcy laws are not intended to deliver "a windfall merely by happenstance of bankruptcy"); Board of Trade v. Johnson, 264 U.S. 1, 14-15 (1924) (stakeholder rights in estate property are established by pre-petition contracts).[10]

26. Often, insolvency risk-allocation is observable. Unsecured bonds issued by an "asset-lite" holding corporation will frequently carry a riskier rating (and yield a higher interest rate) than bonds issued by an "asset-rich" operating affiliate. That is because, if the conglomerate files for bankruptcy, bond debt "closer" to the operating assets has structural seniority to unsecured

---

[10] This is often referred to in the academic literature as the "Creditor's Bargain." See, e.g., Thomas H. Jackson, Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain, 91 Yale L.J. 857 (1982).

12

debt elsewhere in the conglomerate (i.e., they have a "leg up" in the creditor competition for asset value). Bankruptcy law is deeply cognizant of the finance/commercial expectations surrounding structural seniority and subordination, and it goes to great lengths to protect it. See, e.g., In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005) (holding that "the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness").

27. LTL's case theory upends all of this. By the "Texas Two-Step," J&J is attempting unilateral repudiation of Owens Corning, its progeny, and the vast amount of historical jurisprudence underlying same. The J&J board *moved* the talc liability from asset-rich entities (J&J and Old JJCI) to an impoverished SPV, filed the SPV for bankruptcy, and immediately demanded an injunctive shield for J&J and New JJCI. It is true that LTL is not trying to upset the expectations of contract counter-parties – it is instead trying to upset the rights of tort victims – but that distinction only heightens the concern: If J&J can orchestrate a divisive merger to denude tort victims of an enormous panoply of consumer protections, commercial parties are even *more* at risk, given that their remedies are entirely contract-derived. What J&J did to tort victims (unilaterally separating assets from liabilities) can, in sum, be done just as easily to commercial creditors and no bargained-for covenant can protect against it.

28. This is a Pandora's Box full of future-case mischief. The Court should ensure the box is shut tight. The Objection should be overruled.

### C. The North Carolina "Two-Step" Cases Are Not "Precedent" For This Court To Base Its Ruling On The Motion To Dismiss.

29. The Objection trumpets that "[n]o remotely analogous mass tort chapter 11 petition has ever been dismissed as a bad faith filing." See Objection at 3. Indeed, what J&J has attempted here is so brazen that only a small handful of remotely analogous "mass tort" Chapter 11 petitions have ever been filed. The Objection leans heavily on three "mass tort" cases Jones Day filed in the Western District of North Carolina: In re Bestwall, LLC, Case No. 17-31795; In re DBMP LLC, Case No. 20-30080; and In re Aldrich Pump LLC, Case No. 20-30608. The Debtor says that these cases provide precedential support for this bankruptcy. See Objection at 27.[11]

30. The question of whether the Chapter 11 filing of a bankruptcy SPV following a divisive merger is subject to dismissal as a bad-faith filing has only been evaluated *once*. See In re Bestwall, LLC, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) (denying motion to dismiss). But the Fourth Circuit's standard for bad-faith dismissal is substantially different—and far more exacting – than the Third Circuit's standard. Compare Carolin Corp. v. Miller, 886 F.2d 693, 700-01 (4th Cir. 1989) (requiring proof of "*both* objective futility and subjective bad faith") with SGL Carbon, 200 F.3d at 165 (focusing on (i) whether the petition serves a valid bankruptcy purpose and (ii) whether the petition was filed to obtain a litigation advantage).

---

[11] The Debtor also cites the Garlock-Coltec and Paddock bankruptcy cases, but each of these is inapposite. In Garlock-Coltec, the restructuring at issue was completed with the consent and support of the asbestos claimants in connection with a comprehensive settlement, and non-debtor third parties were not released from direct liability. See Torborg Decl. [Dkt. 956-1] at Ex. J, 31-34. Paddock did not involve a divisional merger, no motion to dismiss was filed, and the debtor and the asbestos claimants negotiated a consensual resolution. See *Disclosure Statement for Plan of Reorganization for Paddock Enterprises, LLC Under Chapter 11 of the Bankruptcy Code*, Case No. 20-10028-LSS (Bankr. D. Del.) [Dkt. 1131] at 5.

14

31.     Neither DBMP nor Aldrich Pump involved a motion to dismiss, and the reason was clear: Carolin set too high an evidentiary bar.  See DBMP LLC v. Those Parties Listed on Appendix A to Complaint and John and Jane Does 1-1000 (In re DBMP LLC), Adv. No. 20-03004, 2021 WL 3552350, at *4 (Bankr. W.D.N.C. Aug. 11, 2021) ("[E]ven if [the divisional merger] reflect[s] 'bad faith' on the part of DBMP, under the Fourth Circuit's exacting Carolin standard, dismissal would be difficult to obtain at such an early stage of the bankruptcy case."); In re Aldrich Pump LLC, 2021 WL 3729335, at *3 (Bankr. W.D.N.C. Aug. 23, 2021) ("[A]s Judge Beyer's recent Bestwall decision reflects, due to the Fourth Circuit's exacting Carolin standard, dismissal of a chapter 11 case – even one potentially filed in bad faith – is difficult to obtain in the early stages of the bankruptcy case.").

32.     Bankruptcy court decisions are not binding on other bankruptcy courts, and that is especially true for out-of-circuit cases employing an inapplicable legal standard.  See, e.g., Threadgill v. Armstrong World Inds., Inc., 928 F.2d 1366, 1371 n.7 (3d Cir. 1991) (lower court decisions are not binding on other lower courts whether in the same or different judicial district); In re Jones, 538 B.R. 844, 848 (Bankr. W.D. Okla. 2015) ("Under principles of stare decisis, a decision of a federal district court judge or bankruptcy court is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge.").  The Objection lacks legal support, and it should be overruled.

## II. The Objection Should Be Overruled Because This Case Was Filed As A "Litigation Tactic" To Advantage J&J And Old JJCI.

33. To hide the undergirding (but obvious) intent of this bankruptcy, the Objection resorts to a "turn-the-table" rhetorical trick. According to LTL, judicial sympathy should flow – not to talc victims who want to exercise their rights in the tort system[12] – but to J&J and New JJCI. That is because J&J and New JJCI are the ones: facing "a deluge of enterprise-threatening litigation," Objection at 17; and subjected to the "lottery-like" outcomes of a tort system gone amok, id. at 16. This rhetorical trick is devoid of substance. It is also highly offensive.

34. As an initial matter, J&J and Old JJCI made the ubiquitous product, reaped astronomical profits from it, ignored warning signs, and hurt a lot of people. See TCC Initial Statement. Tort law is not just about compensating injury; it is also about deterring risky behavior. See, e.g., Martinez-Santiago v. Public Storage, 38 F. Supp. 3d 500, 512-13 (D. N.J. 2014). The safety of American citizens is protected because even the richest and most powerful companies must pay for their misdeeds. J&J and New JJCI are no exceptions, and that should be the end of the analysis.

35. But there is more. The evidence at trial will expose the true nature of the "Texas Two-Step" and this bankruptcy case. It will show that LTL is a mere legal artifice, created to afford J&J and New JJCI shelter under the automatic stay and access to the global release

---

[12] The Debtor attempts to wave away the constitutional concerns of the talc victims by claiming that Section 524(g) must afford due process rights, and that trust procedures could allow claimants to demand a jury trial. See Objection at 19-20. These attempts miss the mark. As Dean Chemerinsky lays out in his amicus brief [Dkt. No. 1323-4], any compromise of the Seventh Amendment rights of tort plaintiffs cannot be justified by a "limited fund" unless such fund is "shown to be limited independently of the agreement of the parties to the action." See Ortiz v. Fibreboard Corp., 527 U.S. 815, 864 (1999). The features of the Section 524(g) trust contemplated here would be arranged by the Debtor, J&J, and New JJCI. The Debtor cannot, therefore, rely on features of a potential Section 524(g) trust to provide constitutional protections for the tort plaintiffs.

16

mechanics of Chapter 11. The evidence will establish that this strategy was engineered by J&J, not because it lacks the financial wherewithal to manage its talc-related tort exposure, but to facilitate a more favorable settlement dynamic with talc victims. It will further show that Chapter 11 preparations were driven by certain specific litigation outcomes and run directly contrary to representations J&J recently made to the Delaware bankruptcy court in the Imerys case. See Motion to Dismiss at ¶ 20. The evidence will prove that this bankruptcy case is, in fact, a "litigation tactic" being exploited by *non*-Debtors J&J and New JJCI to single out one group of litigants (the rights of other unsecured creditors of Old JJCI, and, indeed, other mass tort plaintiffs with claims against J&J and Old JJCI, are untouched).

36. As for LTL's characterization of the American tort system as a "lottery," a few observations should be made. First, in this regard, the Objection is a petulant refusal to accept a change in circumstance. J&J and Old JJCI had no complaints about the tort system when they were winning trials. Then things changed. J&J had to start disclosing particularly sensitive documents in discovery. It was no longer winning Daubert motions, in particular, the Daubert motion in Chief Judge Wolfson's MDL proceeding. The Supreme Court refused to grant certiorari in the Ingham case. Now, J&J and New JJCI have good reason to no longer like their odds in the tort system. That is not a "lottery," that is losing. Nothing in SGL Carbon or its progeny suggest that this is a legitimate basis to find that LTL's bankruptcy is a good-faith filing. To the contrary, "where . . . the filing for relief under the Bankruptcy Code is intended to frustrate the legitimate efforts of creditors to enforce their rights against the debtor, dismissal for 'cause' is warranted." In re Ravick Corp., 106 B.R. 834, 844 (Bankr. D.N.J. 1989).

37. Second, the Objection demonstrates a fundamental disrespect of the Anglo-American system of law, which, from the Magna Carta through the Seventh Amendment, has

17

protected the civil jury. By decrying the jury system as a "lottery," J&J seems to suggest that American juries are haphazard and capricious, maybe even thoughtless. Most assuredly, the towering figures of American law would not agree with that, including Justices Jay, Story, Brandeis, White, Brennan, Marshall, and many others.[13] Indeed, "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." Dimick v. Schiedt, 293 U.S. 474, 486 (1935), quoted in Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 501 (1959) and Teamsters v. Terry, 494 U.S. at 566. This Court should see this characterization for what it is (the petulance of a losing defendant) and should see the Debtor's bankruptcy case for what it is (a tactical litigation maneuver to stay litigation against non-Debtors J&J and New JJCI). The Objection should be overruled.

### III. The Objection Should Be Overruled Because LTL's Denials And Justifications Of Other Factors Evidencing Bad Faith Are Ineffective.

38. The Debtor's filing also meets at least three other factors that courts in the Third Circuit evaluate when weighing dismissal for lack of good faith.

39. First, the Debtor was formed immediately pre-petition, existing for less than forty-eight hours before it filed this bankruptcy case. See Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners), 272 B.R. 554, 557 (D. Del. 2002) (noting that a debtor formed immediately pre-petition is a factor evidencing bad faith).

---

[13] Georgia v. Brailsford, 3 U.S. 1 (1794) (Jay, J.); Parsons v. Bedford, 28 U.S. 433 (1830) (Story, J.); In re Peterson, 253 U.S. 300 (1920) (Brandeis, J.); Duncan v. Louisiana, 391 U.S. 145 (1968) (White, J.); Granfinanciera, S.A. v Nordberg, 432 U.S. 33 (1989) (Brennan, J.); Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558 (1990) (Marshall, J.).

40. Second, there can be no serious dispute that the Debtor filed for bankruptcy for the sole purpose of creating the automatic stay and attempting to apply that stay to its parent companies and their commercial partners. The Debtor admits that it filed in order to bring J&J and Old JJCI's mass tort litigation out of the tort system and into this Court, and has stated no other purpose for its filing unrelated to managing this tort litigation. The automatic stay is the means by which that was accomplished. See In re Primestone Inv. Partners, 272 B.R. at 557 (noting that a filing solely to create an automatic stay is a factor evidencing bad faith).

41. Third, the circumstances surrounding the creation of the Debtor and the filing of this case provide ample evidence of improper conduct and subjective bad faith. See id. (noting that improper pre-petition conduct is a factor evidencing bad faith); Motion to Dismiss at ¶ 50. The Objection denies that the divisive merger hindered creditors. The facts speak quite differently:

- With respect to the divisive merger, the evidence will show that it abridged the rights of talc claimants, because it replaced their access to Old JJCI's and J&J's assets with a contractual right held by LTL against its affiliates New JJCI and J&J. Moreover, in each of DBMP and Aldrich Pump (which the Debtor contends are analogous), Judge Whitley rejected the argument posited by the debtors (and the Debtor in this case) that the divisive mergers did not abridge the rights of creditors because, by virtue of funding agreements and other assets allocated to the debtors, each debtor had the same capacity to fund the tort claims as its predecessor-in-interest: "Possibly, but that is not the relevant question. Under the TBOC, the proper question is 'Were the rights of creditors, here asbestos claimants and holders of future demands, materially affected by the Divisional Merger and its asset and liability allocations?' The preliminary answer to that question would have to be, 'Yes.'" Aldrich Pump, 2021 WL 3729335, at *29; DBMP, 2021 WL 3552350, at *26 (same). In each case, Judge Whitley granted the tort claimants committee's standing motion to pursue claims (including claims for intentional fraudulent transfer) related to this hindrance of creditors.

- With respect to J&J's misrepresentations, on October 19, J&J filed a Form 8-K preemptively announcing that "all pending cosmetic talc cases will be stayed" as a result of the Debtor's filing. In fact, as the Debtor notes, the application of the automatic stay to non-Debtor affiliates was the subject of extensive litigation and was not decided (even on a preliminary basis) until November 10, 2021. Moreover,

19

although the Debtor defends its statement by claiming that Old JJCI was responsible for all the talc claims, and that it assigned these liabilities to the Debtor (see Objection at 35), the Debtor is well aware that J&J has been found *independently* liable for actual and punitive damages *on account of its own actions*, including in the Ingham case. Misleading the public in securities filings is clearly improper conduct that should be considered under the totality of the circumstances.

42. The totality of the circumstances shows that the Debtor filed this bankruptcy petition in bad faith. The Objection should be overruled.

## CONCLUSION

43. Based on the foregoing, TCC I respectfully requests that the Court overrule the Objection and dismiss the Debtor's Chapter 11 case with prejudice.

Respectfully submitted,

**GENOVA BURNS, LLC**

By: _/s/ Daniel M. Stolz_ .

Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee of Tort Claimants I*

64331189 v10-WorkSiteUS-037381/0001