**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

| | |
|---|---|
| **COOLEY LLP** | **BAILEY GLASSER LLP** |
| Cullen D. Speckhart (admitted pro hac vice) | Brian A. Glasser (admitted pro hac vice) |
| Ian Shapiro (admitted pro hac vice) | Thomas B. Bennett (admitted pro hac vice) |
| Russell Capone (admitted pro hac vice) | Kevin W. Barrett (admitted pro hac vice) |
| Michael Klein (admitted pro hac vice) | Maggie B. Burrus (admitted pro hac vice) |
| 55 Hudson Yards | 1055 Thomas Jefferson St. NW, Suite 540 |
| New York, NY 10001 | Washington, DC 20007 |
| Tel: (212) 479-6000 | Tel: (202) 463-2101 |
| Fax: (212) 479-6275 | Fax: (202) 463-2103 |
| Email: cspeckhart@cooley.com | Email: bglasser@baileyglasser.com |
|     ishapiro@cooley.com |     tbennett@baileyglasser.com |
|     rcapone@cooley.com |     kbarrett@baileyglasser.com |
|     mklein@cooley.com |     mburrus@baileyglasser.com |
| | |
| Matthew Kutcher (pro hac vice forthcoming) | *Proposed Co-Counsel to the* |
| 444 W Lake Street, Suite 1700 | *Official Committee of Talc Claimants II* |
| Chicago, IL 60606 | |
| Tel: (312) 881-6500 | |
| Fax: (312) 881-6598 | |
| Email: mkutcher@cooley.com | |
| | |
| Shamis Beckley (pro hac vice forthcoming) | |
| 500 Boylston Street, 14th Floor | |
| Boston, MA 02116-3736 | |
| Tel: (617) 937-2300 | |
| Fax: (617) 937-2400 | |
| Email: sbeckley@cooley.com | |
| | |
| Kathleen Hartnett (pro hac vice forthcoming) | |
| Julie Veroff (pro hac vice forthcoming) | |
| 3 Embarcadero Center, 20th Floor | |
| San Francisco, CA 94111-4004 | |
| Tel: (415) 693-2000 | |
| Fax: (415) 693-2222 | |
| Email: khartnett@cooley.com | |
|     jveroff@cooley.com | |
| | |
| *Proposed Co-Counsel to the* | |
| *Official Committee of Talc Claimants II* | |

**WALDREP WALL**
**BABCOCK & BAILEY PLLC**
Thomas W. Waldrep, Jr. (admitted pro hac vice)
Kevin L. Sink (admitted pro hac vice)
James C. Lanik (admitted pro hac vice)
Jennifer B. Lyday (admitted pro hac vice)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Tel: (336) 717-1280
Fax: (336) 717-1340
Email: notice@waldrepwall.com

*Proposed Co-Counsel to the*
*Official Committee of Talc Claimants II*

**MASSEY & GAIL LLP**
Jonathan S. Massey (admitted pro hac vice)
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Tel: (202) 652-4511
Fax: (312) 379-0467
Email: jmassey@masseygail.com

*Proposed Co-Counsel to the*
*Official Committee of Talc Claimants II*

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Alan I. Moldoff
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
         amoldoff@shermansilverstein.com
         rswitkes@shermansilverstein.com

*Proposed Local Counsel to the*
*Official Committee of Talc Claimants II*

In re:

**LTL MANAGEMENT LLC,**

Debtor.

Chapter 11

Case No.: 21-30589 (MBK)

Honorable Michael B. Kaplan

**OFFICIAL COMMITTEE OF TALC CLAIMANTS II'S**
**REPLY IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.    To Avoid Dismissal, LTL Must Establish Good Faith Based on the Totality of the Facts and Circumstances—Exposure to Mass Tort Claims Alone Is Insufficient. ............ 2

II.    LTL Cannot Establish Good Faith Because It Cannot Show a Valid Reorganizational Purpose. .................................................................................. 5

    A.    LTL Is Not in Serious Financial Distress. ............................................. 7

    B.    LTL Is Not Experiencing Significant Managerial Distraction. ........................ 12

    C.    LTL's Bankruptcy Petition Does Not Seek to Preserve a Going Concern. ......... 14

    D.    That LTL Faces Mass Tort Liability and Seeks to Create an Asbestos Trust Under 11 U.S.C. § 524(g) Does Not Itself Establish a Valid Reorganizational Purpose. ................................................................... 16

    E.    The Court Should Reject LTL's Effort to Redirect Its Attention to Old JJCI .......................................................................................... 22

    F.    Even if the Court Focuses on Old JJCI Rather than LTL, There Was No Valid Reorganizational Purpose. .......................................................... 24

III.    LTL Cannot Establish Good Faith Because Its Chapter 11 Filing Was Merely an Effort to Obtain a Tactical Litigation Advantage. ........................................... 27

IV.    The Equities Overwhelmingly Fail to Show LTL's Good Faith and Support Dismissal. ........................................................................................... 33

CONCLUSION ..................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 15375 Mem'l Corp. v. BEPCO L.P.*,
589 F.3d 605 (3d Cir. 2009) ................................................................ *passim*

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004) ............................................................20, 21

*Aldrich Pump LLC. v. Those Parties to Actions Listed on Appendix A*,
2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021) ...........................................35

*In re Am. Cap. Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) ..................................................................19

*In re Arrowmill Dev. Corp.*,
211 B.R. 497 (Bankr. D.N.J. 1997) ...........................................................34, 36

*In re Bestwall LLC*,
605 B.R. 43 (W.D.N.C. 2019) .................................................................16, 21

*In re DBMP LLC*,
2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021)...........................................23, 35

*Deutsche Bank Nat. Tr. Co. v. FDIC*,
109 F. Supp. 3d 179 (D.D.C. 2015) .............................................................26

*In re Falch*,
450 B.R. 88 (Bankr. E.D. Pa. 2011) ...........................................................2

*Farm Bureau Mut. Ins. Co. of Idaho v. Eisenman*,
286 P.3d 185 (Idaho 2012).....................................................................32

*Furness v. Lilienfield*,
35 B.R. 1006 (D. Md. 1983) ...................................................................34

*In re G-I Holdings*,
323 B.R. 583 (Bankr. D.N.J. 2005) ............................................................22

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989)...........................................................................21

*In re GVS Portfolio I B, LLC*,
2021 WL 2285285 (Bankr. D. Del. June 4, 2021) ...............................................16

# TABLE OF AUTHORITIES

(continued)

Page(s)

*In re Imerys Talc Am., Inc.*,
　No. 19-10289 (LSS) (Bank. D. Del.) .............................................................21, 30

*In re Integrated Telecom Express, Inc.*,
　384 F.3d 108 (3d Cir. 2004) ................................................................ *passim*

*In re J T Thorpe Co.*,
　308 B.R. 782 (Bankr. S.D. Tex. 2003) ..................................................................20

*In re Johns-Manville Corp.*,
　36 B.R. 727 (S.D.N.Y. 1984) .........................................................................17, 18

*Johnson & Johnson v. Ingham*,
　141 S. Ct. 2716 (2021) ...............................................................................29

*In re Liberate Techs.*,
　314 B.R. 206 (N.D. Cal. 2004) ..................................................................6, 8, 14

*In re Little Creek Dev. Co.*,
　779 F.2d 1068 (5th Cir. 1986) .........................................................................4

*Local Loan Co. v. Hunt*,
　292 U.S. 234 (1934) ...................................................................................33

*In re Molded Acoustical Prods., Inc.*,
　18 F.3d 217 (3d Cir. 2017) ..........................................................................34

*In re Mottilla*,
　306 N.R. 782 (Bankr. M.D. Pa. 2004) .................................................................2

*In re Muralo Co., Inc.*,
　301 B.R. 690 (Bankr. D.N.J. 2003) ..............................................................13, 17

*In re Nat'l Rifle Ass'n of Am.*,
　628 B.R. 262 (N.D. Tex. 2021) ........................................................................27

*N. Pipeline Constr. Co. v. Marathon Pipeline Co.*,
　458 U.S. 50 (1982) ....................................................................................21

*Ortiz v. Fibreboard Corp.*,
　527 U.S. 815 (1999) ...................................................................................22

*Pepper v. Litton*,
　308 U.S. 295 (1939) ...................................................................................33

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Plastronics Socket Partners, LTD. v. Dong Weon Hwang,*
    2022 WL 108948 (Fed. Cir. Jan. 12, 2022) ........................................................... 35

*In re Rent-A-Wreck of Am., Inc.,*
    580 B.R. 364 (Bankr. D. Del. 2018) ...................................................................... 7

*In re SB Props., Inc.,*
    185 B.R. 198 (E.D. Pa. 1995) ............................................................................... 15

*In re SGL Carbon Corp.,*
    200 F.3d 154 (3d Cir. 1999) ........................................................................ *passim*

*Stern v. Marshall,*
    564 U.S. 462 (2011) .............................................................................................. 21

*In re Stingfree Techs. Co.,*
    427 B.R. 337 (E.D. Pa. 2010) ............................................................................... 15

*In re Tamecki,*
    229 F.3d 205 (3d Cir. 2000) ................................................................................... 2

*In re Tronox Inc.,*
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) .................................................................. 23

*United States v. Energy Res. Co.,*
    495 U.S. 545 (1990) .............................................................................................. 33

*In re Victory Constr. Co.,*
    9 B.R. 549 (Bankr. C.D. Cal. 1981) ..................................................................... 34

*Vincent v. Alden-Park Strathmoor, Inc.,*
    948 N.E.2d 610 (Ill. 2011) ................................................................................... 32

*Young v. United States,*
    535 U.S. 43 (2002) ................................................................................................ 33

**Statutes**

11 U.S.C.
    § 524(g) ........................................................................................................ *passim*
    § 1112(b) ............................................................................................................... 2
    § 1129(a) .............................................................................................................. 21

Ariz. Rev. Stat. § 14-3110 ........................................................................................ 32

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Cal. Civ. Proc. Code § 377.34 .........................................................................................32

Colo. Rev. Stat. § 13-20-101 ............................................................................................32

Idaho Code § 5-327............................................................................................................32

Ind. Code § 34-9-3-1 .........................................................................................................32

Texas Bus. Orgs. Code § 10.901.......................................................................................35

**Other Authorities**

7 Collier on Bankruptcy ¶ 1112.07 ...................................................................2, 3, 8, 24

140 Cong. Rec.
   20 (1994)...................................................................................................................20
   S14461 (Sept. 12, 1994)...........................................................................................19

Black's Law Dictionary (10th ed. 2014).........................................................................33

H.R. Rep. 103–835 (1994).................................................................................................20

## INTRODUCTION

Debtor "Legacy Talc Litigation" or LTL Management LLC ("LTL" or "Debtor") filed the bankruptcy petition pending before this Court in bad faith, as part of an effort by the supersolvent Johnson & Johnson ("J&J") to reap the benefits of bankruptcy without bearing any of its attendant costs. Specifically, J&J created LTL as a well-funded shell corporation—not a going concern in distress—for the express purpose of being put into bankruptcy to resolve J&J's liabilities at minimal cost, to the detriment of talc claimants and without having to put J&J or its direct subsidiary into bankruptcy. LTL's gambit is contrary to the Bankruptcy Code and Third Circuit precedent, and therefore should be dismissed.

Third Circuit law is clear: a bankruptcy petition filed in bad faith must be dismissed, it is LTL's burden to prove good faith, and a petition is not filed in good faith if it does not further a valid reorganizational purpose or is filed solely to secure a tactical litigation advantage. LTL's petition fails on both grounds: it does not further a valid reorganizational purpose and was filed solely to secure a tactical litigation advantage. A valid reorganizational purpose cannot exist absent financial distress, but here, LTL was financially healthy and sufficiently funded to pay its debts when it filed for bankruptcy. Further, LTL's desire to take advantage of Section 524(g) of the Bankruptcy Code and obtain a channeling injunction for talc cases in itself does not provide such a purpose under the law, unless there is the type of genuine financial distress not present here.

And LTL's petition—filed just 48 hours after LTL's creation to resolve J&J's "Legacy Talc Litigation"—was plainly deployed for the purpose of securing a tactical litigation advantage in ongoing talc litigation by seeking to halt that litigation and settle cases globally and on the cheap. Although LTL fails to meet these recognized requirements for showing good faith, the good faith requirement is at bottom an equitable one, and the equities here overwhelmingly favor dismissal: a well-funded shell corporation seeks to take advantage of the bankruptcy system to

1

render talc claimants worse off than they would been in the tort system.  There is no basis in equity for allowing this bankruptcy to proceed.

Because LTL has not and cannot establish the good faith of its bankruptcy filing, the petition should be dismissed.

## ARGUMENT

### I.    To Avoid Dismissal, LTL Must Establish Good Faith Based on the Totality of the Facts and Circumstances—Exposure to Mass Tort Claims Alone Is Insufficient.

Because of the extraordinary relief provided for by the Bankruptcy Code, "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith . . . ." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004).  "Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith."  *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000); *see also In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir. 1999) ("Once [good faith is] at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in 'good faith.'").[1]  Whether the good faith requirement has been satisfied is subject to this Court's broad discretion.  *See* 7 Collier on Bankruptcy ¶ 1112.07; *In re 15375 Mem'l Corp. v. BEPCO L.P.*, 589 F.3d 605, 616 (3d Cir. 2009).[2]

---

[1] Although Third Circuit has not made "entirely clear what a movant must do to 'appropriately put at issue' a debtor's good faith so as to shift the burden to the debtor," it is not a high bar. *In re Falch*, 450 B.R. 88, 93 n.5 (Bankr. E.D. Pa. 2011) (quoting *In re Tamecki*, 229 F.3d at 208 (Alito, J., concurring)); *see also In re Mottilla*, 306 B.R. 782, 789 (Bankr. M.D. Pa. 2004) ("After scrutinizing the *Tamecki* decision, I can only conclude that the Circuit requires a movant to produce relatively little evidence to place a debtor's good faith at issue."). Here, the Committee presented ample evidence to put the Debtor's good faith at issue, and the Debtor does not contend otherwise.

[2] The Third Circuit's approach to assessing good faith is similar to that of multiple other Circuits, with the Fourth Circuit an outlier in at least two respects—first, it puts the burden to establish bad faith on the party seeking dismissal, and second, it requires a showing of objective futility in addition to a showing of bad faith. *See In re 15375 Mem'l*, 589 F.3d at 619 n.7 (collecting cases).

LTL's argument for good faith is premised on the flawed notion that exposure to mass tort claims alone establishes a valid reorganizational purpose and thus the good faith of its petition. Specifically, LTL maintains that "filing a chapter 11 petition to equitably resolve tens of thousands of mass tort claims qualifies as a valid bankruptcy purpose." *See* Obj. 3; *see also id.* at 14 ("The Debtor filed this case to resolve the explosion of potentially financially crippling Talc Claims in a manner efficient and equitable to all parties, including current and future claimants."); *id.* at 17 ("[The Debtor] filed because it faced a deluge of enterprise-threatening litigation and seeks a bankruptcy resolution of mass tort liability . . ."); Wuesthoff Tr. 58:12–59:18 (explaining that Debtor filed for bankruptcy because it "didn't see any way to equitably and efficiently resolve [talc litigation] if the status quo stayed as it was."); Dickinson Tr. 153:22–155:7 ("[B]ankruptcy allowed for a complete global resolution of [the talc] claims. And the benefit to LTL was, of course, a complete global resolution."); Mongon Tr. 84:20–85:3 ("[T]he objective [of the restructuring] was to provide current and future claimants with a fair and equitable way to bring their case and get their case resolved.").

LTL's premise is wrong:  the mere fact that an entity faces and wishes to resolve mass tort claims does not establish good faith.  To start, the good faith inquiry is based on "'the totality of facts and circumstances.'"  *In re Integrated Telecom*, 384 F.3d at 118 (quoting *In re SGL Carbon*, 200 F.3d at 162).  Accordingly, the court must undertake a "'fact intensive inquiry'" to "determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently

---

The Fourth Circuit's approach has been criticized as "too stringent," because "[t]he effect of adding a requirement of objective futility to the good faith doctrine when objective futility already is encompassed within the enumerated bases for cause under section 1112(b)(4) may effectively negate bad faith filing as a separate basis for dismissal or conversion of the case."  7 Collier on Bankruptcy ¶ 1112.07.

abusive." *In re Integrated Telecom*, 384 F.3d at 118 (quoting *In re SGL Carbon*, 200 F.3d at 162).

Accepting LTL's position that the threat of mass tort liability alone establishes good faith would

displace the requisite broader inquiry.   Moreover, as further detailed in *infra* Section II.D, a

showing of good faith cannot be based solely on a desire to resolve a large number of asbestos

claims through a Section 524(g) trust without otherwise meeting the requirements for petitioning

under the Bankruptcy Code, such as financial distress, because Congress created an asbestos claim

trust fund system *within* the Bankruptcy Code, not separate from it.   *See* 11 U.S.C. § 524(g).   In

other words, a company must be sufficiently *bankrupt* to avail itself of the Code's asbestos trust

provisions; it is not enough for an entity lacking financial distress, such as LTL, to cite its desire

for a trust as the basis for its petition, irrespective of the overall facts and circumstances.

The required "totality of the circumstances" inquiry to determine good faith makes good

sense, as the good faith gatekeeping requirement to the bankruptcy system is rooted in the equitable

foundation of the Bankruptcy Code, the purpose of which is "to validly reorganize financially

troubled businesses," not provide healthy companies an easier pathway to resolving litigation.   *In

re SGL Carbon*, 200 F.3d at 169; *see also In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th

Cir. 1986) (explaining that the good faith filing requirement "protects the jurisdictional integrity

of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those

debtors and creditors with 'clean hands'").   As the Third Circuit has recognized, "the Bankruptcy

Code presents an inviting safe harbor for . . . companies" facing mass tort liability, which "creates

the possibility of abuse" by companies seeking simply to manage their potential liability, as

opposed to reorganizing a going concern in financial distress.   *In re SGL Carbon*, 200 F.3d at 169.

Rigorous application of the good faith requirement is therefore necessary to "guard[] against" such

abuse and "to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *Id.*

Here, as explained in the Motion and in the sections below, the totality of circumstances weighs conclusively in favor of dismissal.  First, as explained in *infra* Sections II and III respectively, LTL cannot show good faith based on two factors that the Third Circuit has highlighted as particularly critical to the analysis: "'(1) whether the petition serves a valid bankruptcy purpose' and '(2) whether the petition is filed merely to obtain a tactical litigation advantage.'" *In re 15375 Mem'l*, 589 F.3d at 618 (quoting *In re Integrated Telecom*, 384 F.3d at 118).  Here, the record conclusively shows no valid bankruptcy purpose, but rather a filing solely to gain tactical advantage; this precludes a showing of good faith.  Second, as explained in *infra* Section IV, the equities surrounding LTL's petition overwhelmingly favor dismissal:  LTL is not a going concern facing financial distress, but rather was created for the sole purpose of taking advantage of the Bankruptcy Code to minimize tort liability and enrich J&J and its direct subsidiary.  There is no basis in equity—the principle animating the Bankruptcy Code—to deem such a petition as having been filed in good faith.

## II.    LTL Cannot Establish Good Faith Because It Cannot Show a Valid Reorganizational Purpose.

To be filed in good faith, a Chapter 11 petition must be supported by "a valid reorganizational purpose." *In re SGL Carbon*, 200 F.3d at 165–66.  This requirement exists given the "considerable powers" afforded Chapter 11 petitioners, including an "automatic stay, the exclusive right to propose a reorganization plan, [and] the discharge of debts," all of which "can impose significant hardship on particular creditors." *Id.*  When petitioners that are actually "financially troubled . . . seek a chance to remain in business, the exercise of those powers is justified.  But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code."

5

*Id.* at 165–66.  In other words, "the good faith requirement" demands that "the debtor *need* Chapter 11 relief."  *In re Liberate Techs.*, 314 B.R. 206, 211 (N.D. Cal. 2004) (emphasis added).

Here, LTL's asserted basis for its bankruptcy filing is that it "faced a deluge of enterprise-threatening litigation."  Obj. 17.  When a company "seek[s] the protections of bankruptcy when faced with pending litigation that pose[s] a serious threat to compan[y's] long term viability," a valid reorganizational purpose exists only if the company is experiencing "serious financial and/or managerial difficulties at the time of filing . . . to establish the good faith of its present petition."  *In re SGL Carbon*, 200 F.3d at 164.  In the same vein, if a debtor cannot show that the bankruptcy petition "preserv[es] a going concern," it cannot satisfy the good faith requirement.  *In re 15375 Mem'l*, 589 F.3d at 619.[3]

As set forth in the subsections below, none of these "objective indicia" of a valid reorganizational purpose exists with respect to LTL:  no serious financial distress, no managerial

---

[3]    The Third Circuit has also provided that a debtor cannot establish good faith if the bankruptcy does not "maximiz[e] the values of the [debtor's] estate[]."  *In re 15375 Mem'l*, 589 F.3d at 619.  "[M]aximizing the value of the debtor's estate" essentially reduces to "alleviating the problem of financial distress."  *In re Integrated Telecom*, 384 F.3d at 120–21; *see also In re 15375 Mem'l*, 589 F.3d at 619–25 (identifying "eleven purported benefits of filing for bankruptcy" that the district court "believed maximized the values of the Debtors' estates" and explaining why none "add[ed] or preserve[d] value that would otherwise be unavailable to creditors outside of bankruptcy").  Accordingly, because LTL was not in financial distress, as explained further *supra* Section II.A, bankruptcy would not maximize the values of its estate.

At a more granular level, the value considered in the maximization analysis is the going concern value of an entity that can be preserved in a bankruptcy, or assets to be liquidated that would otherwise be lost outside a bankruptcy when compared to that obtained by an orderly disposition of assets in a bankruptcy case.  *In re Integrated Telecom*, 384 F.3d at 120.  There is no going concern value to be preserved for LTL, and, even assuming that LTL may propose an orderly liquidation of its assets, no added value is capable of being obtained due to the nature of the properties LTL owns.  Namely, LTL's bankruptcy will not alter the cash it was allocated by the divisive merger; the royalties stream from Royalty A&M, as it is not an asset in the bankruptcy case; the value of LTL's insurance coverage, which is fixed; or the value of the Funding Agreement.

difficulties, and no preservation of a going concern.  *In re SGL Carbon*, 200 F.3d at 164.  Rather,

LTL hinges its claim of good faith on the existence of mass tort liability, but that alone is not

enough to establish a valid reorganization purpose.  And these failings exist regardless of whether

the inquiry pertains to LTL (as the law requires) or to Old JJCI (as LTL erroneously seeks to

argue).  Because LTL lacks a valid reorganizational purpose, its Chapter 11 bankruptcy petition

should be dismissed for lack of good faith.

### A.    LTL Is Not in Serious Financial Distress.

As LTL concedes, it is the relevant entity for the financial distress analysis.  *See* Obj. 23.

LTL then baldly asserts that "[w]hatever degree of financial distress is required, it is plainly

satisfied here," offering only mass tort claims as the basis for this supposed "financial distress."

Obj. 21.  LTL's argument fails.  Were the mere existence of mass tort claims enough to show

financial distress and establish good faith, that would eviscerate the "totality of facts and

circumstances" analysis the Third Circuit has held is required to assess good faith.  *See In re SGL*

*Carbon*, 200 F.3d at 165.

Evaluating whether serious financial distress exists requires a fact-based analysis involving

multiple factors.  *See id* at 163–64, 169 (discussing multiple factors that contributed to the financial

distress determinations in mass tort cases, including managerial difficulties, cash flow and

financing problems, and the number of cases filed over a multi-decade time period).[4]  Although

insolvency is not required, the mere possibility of financial problems due to litigation does not

---

[4] More generally, courts consider such factors as: solvency; cash reserves; recent financial
performance and profitability; the proportion of debt owed to insiders; realistic estimates of actual
or likely liability; the threat of litigation; whether a debt is fixed, substantial, and imminent; current
cash position or current liquidity; ability to raise capital; and overdue debts or the ability to pay
debts as they come due. *See, e.g.*, *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 375–76 (Bankr.
D. Del. 2018) (summarizing financial distress factors).

establish the requisite good faith for seeking bankruptcy protection.  A real showing of financial

distress is required.  "Courts, therefore, have consistently dismissed Chapter 11 petitions filed by

financially healthy companies with no need to reorganize under the protection of Chapter 11." *In

re SGL Carbon*, 200 F.3d at 166.

The serious financial distress also must exist in the present; it cannot be a future concern.

"The mere possibility of a future need to file, without more, does not establish that a petition was

filed in 'good faith.'" *Id.* at 164; *see also In re Liberate Techs.*, 314 B.R. at 213–14 (noting that

the bankruptcy petition was "premature" because the debtor was "actively contesting the suits"

against it and "could win at trial, could settle the claims for much less than the maximum recovery,

or could lose at trial but suffer judgments much smaller than the damages claimed"); 7 Collier on

Bankruptcy ¶ 1112.07 ("Even where the debtor is currently suffering substantial losses, if the

debtor does not have a present need for chapter 11 relief but instead files to discharge litigation

claims and minimize claims for future rent notwithstanding that it holds sufficient cash to meet its

obligations, the filing may be found in bad faith . . . .").

Here, the totality of facts and circumstances conclusively show that LTL was not in serious

financial distress when it filed its bankruptcy petition.  To the contrary, prior to LTL filing for

bankruptcy, J&J entered into a Funding Agreement with LTL pursuant to which it and New JJCI

agreed to fund LTL's current and future talc liabilities up to the value of New JJCI—roughly *$61*

*billion*. ██████████████████████.[5]  Specifically, pursuant to the Funding Agreement,

J&J and New JJCI agreed "to make payments to [LTL], the proceeds of which shall be used by

[LTL] for a Permitted Funding Use" up to the value of JJCI immediately prior to the Divisional

---

[5] While not attached hereto, each of the discovery materials cited herein will be proposed exhibits
at the February 14, 2022 hearing.

Merger.  Funding Agreement at §§ 1 and 2(a).[6]  "Permitted Funding Use," in turn, is defined to

include "payment of any and all costs and expenses of [LTL] incurred in the normal course of its

business … at any time when there is no proceeding under the Bankruptcy Code pending with

respect to [LTL]," as well as LTL's "Talc Related Liabilities established by a judgment of a court

of competent jurisdiction or final settlement thereof at any time when there is no proceeding under

the Bankruptcy Code pending with respect to [LTL]."  Funding Agreement at § 1.

In other words, prior to filing its bankruptcy petition, LTL had the ability to require that

J&J and New JJCI fund up to $61 billion to satisfy talc liabilities.  Witnesses from all of the

relevant J&J entities – including LTL Chief Financial Officer Richard Dickinson, JJCI President

Michelle Goodridge, and J&J Treasurer Michelle Ryan – agreed.  *See* Dickinson Tr. 173:9–174:16,

242:7–18 (stating his understanding that "JJCI [ ] probably had a value of somewhere around 60

[b]illion" and that the Funding Agreement permits LTL to request payment "from Johnson &

Johnson and Johnson & Johnson Consumer, Inc." up to "the value of JJCI immediately prior to

the restructuring"); Goodridge Tr. 65:25–66:20 (confirming Funding Agreement covers all costs

and expenses incurred outside bankruptcy); Ryan Tr. 58:14–59:15, 61:11–62:4, 64:15–65:9,

105:13–24 (confirming J&J and JJCI agreed to fund LTL up to the value of JJCI, which is "in the

tens of billions of dollars," and confirming Funding Agreement covers judgments outside

bankruptcy).

LTL has provided no analysis of its talc exposure, let alone one indicating that its $61

billion in funding is insufficient in any relevant timeframe to cover such exposure.  *See* Wuesthoff

Tr. 172:21–24 (confirming LTL has not done "any analysis.").  Rather, LTL relies on speculation

---

[6] The Funding Agreement was filed at Annex 2 to the Declaration of John Kim in Support of First
Day Pleadings.

regarding the *possibility* of "enterprise threatening" liability. *See* Obj. 14 ("potentially financially crippling Talc Claims"); *id.* at 1 ("the potential for an enormous plaintiff verdict"); *id.* at 9 ("potential costs" and "potential for civil penalties"); *id.* at 15 ("potentially financially ruinous mass tort claims").

Indeed, LTL witnesses have confirmed that no such analysis was ever performed. Robert Wuesthoff, the President of LTL, recalled no analysis relating to talc liability and testified that he instead authorized the decision to file for bankruptcy because it was a "pretty common sense call" due to a "wave of litigation." *See* Wuesthoff Tr. 58:12–59:18.

Wuesthoff's "common sense call" is not enough to sustain the good faith of LTL's decision to file for bankruptcy. Indeed, according to the Debtor, Old JJCI incurred $3.6 billion in talc-related liability in the 21 months preceding the divisive merger and LTL bankruptcy – significantly short of the value available to LTL under the Funding Agreement. Obj. 7, 10. And $2.5 billion of that $3.6 billion—or more than 2/3 of it—related to a *single litigation*, *Ingham v. Johnson & Johnson*, that J&J and the Debtor have themselves trumpeted ███████████████████████ ███. *See* Lisman Tr. 77:18–78:9; Nov. 4, 2021 Preliminary Hearing Tr., Testimony of John Kim, at 120–21 (describing *Ingham* as a "massive outlier verdict" while noting that J&J has "won" most talc trials, and acknowledging that "[a] lot of [the total talc indemnity payments], of course, is the, the Ingham verdict"); Johnson & Johnson 7/29/21 10-Q for 2Q 2021, at 31 ("The facts and circumstances, including the terms of the award, were unique to the Ingham decision and not representative of other claims brought against the Company."). For these reasons, any suggestion that LTL would not be able to utilize the Funding Agreement to satisfy its talc-related liability is speculative and unfounded.

10

Indeed, consistent with their characterization of the *Ingham* verdict as an outlier, the Debtor's witnesses believe that future liabilities will never approach the amount available to LTL under the Funding Agreement. All of the Debtor's three employees have taken the position that the Funding Agreement – which included an initial "qualified settlement fund" of $2 billion – is sufficient to cover its talc exposure. *See* Kim Tr. 132:3–8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Wuesthoff Tr. 171:4–172:2 (LTL's President "thought the two billion [qualified settlement fund] was a great start, and hopefully, not even two billion is needed"); Dickinson Tr. 88:19–92:20 (stating his belief that LTL will "be able to satisfy its obligations" because JJCI is "a multibillion dollar corporation" and LTL has an "unconditional funding agreement" with JJCI and J&J). Moreover, LTL never tested whether the Funding Agreement was sufficient in practice—for example, by entering into negotiations with plaintiffs and invoking the Funding Agreement before entering bankruptcy.[7] Rather, without even seeking to determine whether it could resolve the liability against it on a global basis by invoking the Funding Agreement and without serious financial distress, LTL immediately put itself into bankruptcy upon creation and moved to stay all cases against itself, JJCI and J&J. This is evidence of bad faith, not serious financial distress showing good faith

Courts regularly dismiss for bad faith bankruptcy petitions filed by entities that—like LTL—cannot demonstrate serious financial distress. For example, the Third Circuit held in *In re Integrated Telecom* that because the debtor was not in any (let alone serious) financial distress, its Chapter 11 petition was not filed in good faith, as it could not—and did not—preserve any value

---

[7] It is unquestionable that LTL could have relied on the Funding Agreement to do so before filing for bankruptcy, because at the moment of the divisive merger J&J had approximately $31 billion in cash on its balance sheet, and a half trillion-dollar market cap. *See* Mot. to Dismiss at 4.

for the debtor's creditors that would have been lost outside of bankruptcy. 384 F.3d at 129. In so holding, the court noted that, although the debtor's business model had failed, the company had no significant debt apart from a landlord's $26 million claim, the record demonstrated that the $93 million securities class action did not present a significant threat to the debtor's finances, and the debtor maintained $105 million in cash and had a $20 million directors' and officers' insurance policy. *Id.* at 124, 129.

Similarly, in *In re SGL Carbon*, the Third Circuit held that whether or not the debtor faced "potentially crippling antitrust judgment," it would be incorrect to conclude that it faced immediate serious financial distress. 200 F.3d at 163. As evidence, the court pointed to that fact that the debtor had assets of $400 million and liabilities of only $276 million, showed no evidence that it had difficulty meeting its debts as they came due or that it had defaulted on any debts, and did not present any evidence showing difficulty raising or borrowing money, or otherwise having impaired access to the capital markets. *Id.* at 163, 166.

Just as in these cases, LTL was not experiencing serious financial distress at the time of its filing, as it had the ability to pay talc claims as they arose by invoking the Funding Agreement. Its petition should therefore be dismissed as lacking a valid reorganizational purposes, and thus lacking good faith.

### B.    LTL Is Not Experiencing Significant Managerial Distraction.

LTL also has failed to show the significant managerial distraction that can support a showing of a valid reorganizational purpose. LTL conducts no business. Rather, it was created by J&J solely as a vehicle to resolve talc claims, as made clear by its name, "Legacy Talc Litigation Management." Because LTL's purpose is to resolve talc claims, its few employees—all of whom

12

are paid by J&J and have been seconded to LTL by J&J—have no business to be distracted from. In other words, responding to talc litigation is LTL's raison d'etre—not a management distraction.

In supposed support of its claim of managerial distraction, LTL asserts that management and in-house counsel at Old JJCI had to respond to discovery requests and sit for nearly 100 depositions, *see* Obj. 9, and offers the blanket assertion that "the underlying litigation and its many repercussions have had a material impact on management," Obj. 22. But LTL fails to connect those arguments to *LTL*, which is the relevant entity for the managerial distraction analysis.[8]

LTL cites *Muralo* in support of its claim of "material impact on management," Obj. 22 (citing *In re Muralo Co., Inc.*, 301 B.R. 690, 697 (Bankr. D.N.J. 2003)), but that case provides no such support to LTL. In *In re Muralo*, "the entire senior management" of the small, family-run company "was spending substantial time evaluating and responding to issues caused by the asbestos claims" and constantly needed to address fire drills to avoid large default judgments. 301 B.R. at 694. Muralo had "quite limited resources . . . and no support system." *Id.* at 698. Here, by contrast, there is no evidence that any member of LTL's management team was required to spend substantial time responding to litigation and emergency fire drills, nor that the company's "day-to-day business" (to the extent LTL has any such business) was disrupted as a result. *Id.* at 706.

Nor, even viewed through the lens of J&J and Old JJCI – who are *not* the Debtors – is there evidence of any substantial management distraction. To the contrary, the evidence indicates that J&J's legal team handled all of the talc litigation, and that management at J&J and Old JJCI were

---

[8] Even if the management of Old JJCI or other J&J entities were relevant, the Debtor fails to provide any detail showing a "material impact" on Old JJCI's management or how management was distracted from other operations.

13

not required to spend meaningful time on it. *See* Mongon Tr. 123:20–124:14 (The Consumer
Health business has "very few people on the operational side of the business who deal with the
litigation. The litigation is handled by the law department of Johnson & Johnson outside of the
operational team of the Consumer Health business."); Mongon Tr. 121:10–122:17 & Mongon Dep.
Ex. 29 (confirming that, after a meeting with J&J Consumer, a Bernstein Analyst Report stated
that "Management wanted to make it clear that litigation is not a distraction for the business").

    In sum, the record does not permit a conclusion that LTL suffers from significant
managerial distraction to support its claim of a valid reorganizational purpose, and thus good faith.

### C.    LTL's Bankruptcy Petition Does Not Seek to Preserve a Going Concern.

    "Where the debtor is solvent," as here, "the only bankruptcy policy implicated is the
avoidance of piecemeal liquidation that destroys the going concern value of an enterprise." *In re
Liberate Techs.*, 314 B.R. at 212. Plainly, LTL's Chapter 11 petition was not an attempt to
preserve a going concern because LTL has no business to operate—there are no jobs to save,
nothing to sell, and nothing to preserve. *See In re 15375 Mem'l*, 589 F.3d at 619 (explaining that
there are "no going concerns to preserve" where a debtor has "no employees, offices, or business
other than the handling of litigation"). Indeed, LTL nowhere contends that its Chapter 11 filing
was necessary "to enable a continuation of [its] business and to maintain access to the capital
markets." *In re SGL Carbon*, 200 F.3d at 169. That J&J and Old JJCI allocated ownership of
Royalty A&M LLC ("RAM") to LTL, *see* Obj. 12, does not change that conclusion. RAM simply
provides LTL with royalty streams that are managed by RAM employees. That company can
continue as a going concern with or without LTL; a bankruptcy filing by LTL is not needed to
save RAM. *See* Dickinson Tr. 103:19–25 ("[RAM is] in the process of evaluating a pretty
significant opportunity and, we'll . . . hopefully . . . add an additional four royalties in the next . .

. 45 days."); *id* at 222:16–223:16: (asserting that RAM's current arrangements are "adequate to start growing the business" and indicating RAM can borrow externally if necessary to grow the business"); *id.* at 104:16–105:18 (noting RAM's cash balance is "roughly $14 million" and RAM also has "a line of credit within J&J that we can borrow up to $50 million, if need be, to accelerate the RAM business"; *id.* at 216:18–21 ("RAM receives, on a quarterly basis, approximately $14 million for the royalty streams.").

Courts in this Circuit have repeatedly dismissed for lack of good faith bankruptcy petitions filed by debtors that, much like LTL, are essentially shell companies with no employees, no tangible or valuable assets, and no ongoing businesses. This Court should do the same.

For example, in *In re SB Properties, Inc.*, the court held that a bankruptcy petition was properly dismissed as a bad faith filing because it was filed by "a shell corporation created solely for the purpose of filing a bankruptcy petition" to prevent the forced sale of a property. *In re SB Props., Inc.*, 185 B.R. 198, 205 (E.D. Pa. 1995). "Aside from some rental income," the corporation had no employees, no ongoing business, and no significant creditors other than a mortgage. *Id.* The court explained—in reasoning equally applicable here—that the record "clearly shows no viable business entity in need of bankruptcy protection. '[I]f there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effort has lost its *raison d'etre*.' . . . Appellant's alleged motivation to have its long-standing dispute decided by a more speedy bankruptcy forum is not a sufficient basis to prevent dismissal." *Id.* at 205–06 (citations omitted).

Similarly, in *In re Stingfree Technologies Co.*, the court concluded that a bankruptcy petition was not filed in good faith where the debtor, "an entity without current operations, virtually no employees or tangible assets, and which filed its bankruptcy petition on the eve of a state court

15

hearing involving its chief adversary," proposed "to reorganize by selling assets it encumbered prepetition, with the sale to an entity formed just prior to the bankruptcy filing and that funded the bankruptcy petition to date, and with little or no marketing." 427 B.R. 337, 353 (E.D. Pa. 2010).

And in *In re GVS Portfolio I B, LLC*, the court dismissed a bankruptcy petition for bad faith where, among other factors, there was "no ongoing business or employees." 2021 WL 2285285, at *7 (Bankr. D. Del. June 4, 2021).

As *amici* bankruptcy law professors note, nearly all other Chapter 11 cases involving mass tort liability involved debtors that were "the actual company or organization facing the threat of litigation"—by analogy here, J&J or Old JJCI—not, as here, an entity manufactured solely for the purpose of filing for bankruptcy, with no history as an operating company and no business to rehabilitate. *See* Amicus Br. of Bankruptcy Law Professors at 10 ¶¶ 22–23.[9] Because LTL's petition does not seek to preserve a going concern, it serves no valid bankruptcy purpose and is subject to dismissal for lack of good faith.

### D.    That LTL Faces Mass Tort Liability and Seeks to Create an Asbestos Trust Under 11 U.S.C. § 524(g) Does Not Itself Establish a Valid Reorganizational Purpose.

LTL candidly admits that its reason for filing the Chapter 11 petition was to resolve the talc claims against the J&J entities. *See* Obj. 14 ("The Debtor filed this case to resolve the explosion of potentially financially crippling Talc Claims in a manner efficient and equitable to all parties, including current and future claimants."). LTL appears to presume that the mere fact that

---

[9] The only case LTL cites for this proposition is *In re Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019), but that case was resolved based on objective futility—an element unique to the Fourth Circuit's bad faith test that is not part of the Third Circuit's test—and did not address subjective bad faith. *Id.* at 50–51.

a company faces mass tort claims is enough to constitute financial distress and thus establish good faith. *See, e.g.*, *id.* at 3 ("filing a chapter 11 petition to equitably resolve tens of thousands of mass tort claims qualifies as a valid bankruptcy purpose"). But no case so holds. To the contrary, even in the face of mass tort claims—including those involving asbestos—a fact-specific, totality-of-the-circumstances inquiry is required to determine whether the bankruptcy filing is in good faith. And courts uphold filings as in good faith in the face of mass tort liability only where—unlike here—the debtor is experiencing serious financial and/or managerial difficulties and lacks access to funding streams through resource-rich parent companies.

For example, LTL repeatedly attempts to analogize to *In re Muralo*. *See* Obj. 3, 15, 19, 20, 21, 22. But, as noted above, *In re Muralo* involved a very small family-run business that suddenly faced an onslaught of asbestos cases after an intermediary company that previously had been indemnifying it and handling all the asbestos litigation went bankrupt. 301 B.R. at 692–93. The abrupt shift of responsibility meant that *all* of Muralo's top-level management needed to devote a substantial amount of their time to resolving issues related to the litigation, including constant fire drills to avoid large default judgments. *Id.* at 694. LTL, by contrast, did not experience a sudden and surprising shift of responsibility that distracted from its previous operations; rather, it was created for the very purpose of being assigned the talc liabilities. And unlike LTL, Muralo did not have a deep-pocketed parent to support it through a funding agreement. *Id.* at 698. Additionally, unlike here, where LTL filed for bankruptcy two days after its creation, the debtor in *Muralo* struggled for nearly a year before filing for bankruptcy. *Id.* at 700.

LTL also attempts to rely on *In re Johns-Manville Corp*, in which the court found good faith in materially different circumstances than those presented here. *See* 36 B.R. 727 (Bankr. S.D.N.Y. 1984). *See* Obj. 18, 20. To begin, the Third Circuit has explained that *Johns-Manville*

17

"had a narrow view of what constitutes 'good faith.'" *In re SGL Carbon*, 200 F.3d at 168 (explaining that *Johns-Manville* "suggested that a Chapter 11 petition lacks good faith only if filed by a creditor-less company formed as a sham solely for the purpose of filing a bankruptcy petition, by a company that never operated legitimately, or by a company wishing to forestall tax liability or deed of trust powers").    In any event, *Johns-Manville* does not support a good faith determination here, as *Johns-Manville* involved gamesmanship by movants and evidence of serious financial difficulty not present here.  As to gamesmanship, the *Johns-Manville* court was troubled by the asbestos committee's failure to pursue its motion to dismiss until a year after filing, and only after plan formulation negotiations deadlocked. 36 B.R. at 730.  As the court reasoned— in reasoning *inapplicable* here—"If there was merit in the motion to dismiss on grounds of lack of good faith, it could have been fervently pressed a year ago instead of tolerating this alleged misuse of the courts. . . . This Court must therefore bear in mind the strategical motivations underlying the pursuit of these motions . . . ." *Id.* at 731.  And as to financial difficulty, the court observed that the company's "present holdings of cash and liquid assets would be insufficient to pay [its] obligations." *Id.* at 740.  Here, by contrast, LTL—and certainly its parent and funding obligor— has adequate resources to pay its obligations.  Indeed, J&J has a better credit rating than the United States of America and, at the moment of the divisive merger that resulted in LTL, had approximately $31 billion in cash on its balance sheet and a market cap of approximately a half-trillion dollars. *See* Mot. to Dismiss at 4.[10]

---

[10] LTL claims that there "are many other examples of 'solvent' companies that have filed chapter 11 to resolve the uncertainty and potentially enterprise-threatening risks posed by thousands of mass tort claims." Obj. 20 n.29 (collecting petitions).  But none of those petitions involved motions to dismiss based on bad faith, and thus provide no guidance here.

In addition to arguing, incorrectly, that facing mass tort claims itself establishes good faith, LTL likewise errs in contending that seeking to establish an asbestos claims trust under Section 524(g) of the Bankruptcy Code itself establishes a valid organizational purpose. *See* Obj. 15 ("Seeking a rational resolution of thousands of costly, unpredictable, and potentially financially ruinous mass tort claims is neither unprecedented nor inconsistent with the Bankruptcy Code. . . . Congress enacted a specific provision of the Bankruptcy Code—11 U.S.C. § 524(g)—to permit entities besieged by asbestos-related claims to permanently resolve such claims through establishment of a trust."). On this point, the Third Circuit has been clear—"a desire to take advantage of a particular provision in the Bankruptcy Code, standing alone . . . does not . . . establish[] *good* faith." *In re Integrated Telecom*, 384 F.3d at 127; *id.* at 127–28 ("Just as a desire to take advantage of the protections of the Code cannot establish *bad* faith as a matter of law, that desire cannot establish *good* faith as a matter of law. Given the truism that every bankruptcy petition seeks some advantage offered in the Code, any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings."). To the contrary, LTL must show a valid reorganizational purpose to access the Bankruptcy Code's protections, including Section 524(g).[11]

Congress added 11 U.S.C. § 524(g) to the Bankruptcy Code to "help asbestos victims receive maximum value" from bankrupt entities. 140 Cong. Rec. S14,461 (Sept. 12, 1994)

---

[11] Not only is the desire to take advantage of Section 524(g) insufficient to provide a valid bankruptcy purpose, but in this case, the Debtor may have no ability to create such a trust. To the extent LTL cannot propose a plan of reorganization that implements a trust that "assume[s] the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury" because LTL has never been named as a defendant in a talc case, then a channeling injunction and Section 524(g) trust will be unavailable under the plain language of the statute. *See* 11 U.S.C. 524(g)(2)(B)(i)(I).

19

(statement of Sen. Heflin); *see also In re Am. Cap. Equip., LLC*, 688 F.3d 145, 159 (3rd Cir. 2012)

("[T]he [bankrupt] company remains viable.... [and] continues to generate assets to pay claims

today and into the future. In essence, the reorganized company becomes the goose that lays the

golden egg by remaining a viable operation and maximizing the trust's assets to pay claims."

(alterations in original)); *In re ACandS, Inc.* 311 B.R. 36, 42 (Bankr. D. Del. 2004).  Appearing in

a section of the Bankruptcy Code titled "Effect of discharge," *see* 11 U.S.C. § 524, Section 524(g)

is a discharge vehicle for future claims, designed in light of asbestos latency.  Section 524(g) was

meant to "strengthen . . . trust/injunction mechanisms," 140 Cong. Rec. 20, 27, 692 (1994), and,

to the extent possible, account for "the interests of future claimants," H.R. Rep. No. 103–835, 3349

(1994).  In other words, Section 524(g) comes into operation only *after* a bankruptcy involving

asbestos claims has been initiated and is proceeding in good faith; it does not eliminate or displace

the initial requirement that a bankruptcy be filed in good faith.

Therefore, LTL's discussion of the purpose and benefits of Section 524(g), *see* Obj. 15–

16, is irrelevant to the question at hand:  whether LTL has established that its bankruptcy petition

was filed in good faith.  Such good faith must be shown by reference to the totality of the

circumstances, including, as explained above, a valid reorganizational purpose (including serious

financial distress and/or management distraction) or the need to preserve a going concern.  *See*

*supra* Sections II.A–II.C.  It cannot be shown, however, by simply invoking a desire to take

advantage of Section 524(g).  *See In re Integrated Telecom*, 384 F.3d at 127.  Were it otherwise,

Section 524(g) would be available to *all* companies facing asbestos claims, rather than only

*bankrupt* companies—contrary to Congress placing Section 524(g) in the Bankruptcy Code.

Indeed, courts have been clear that the Section 524(g) inquiry is separate from any inquiry into

good faith.  *Cf, e.g.*, *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003) ("The Debtor,

as proponent of the Plan, has met its burden of proving, by a preponderance of the evidence, that

the elements of Sections 524(g) and 1129(a) of the Bankruptcy Code are satisfied."); *In re*

*ACandS*, 311 B.R. at 42 (explaining that even if the company there had satisfied all the

requirements of Section 524(g), the court still would have denied confirmation of the plan as not

having been proposed in good faith).  Determining that the good faith requirement for a bankruptcy

filing has been satisfied must happen before any analysis of Section 524(g)'s use, which occurs in

the context of good faith for plan confirmation.[12]

Furthermore, resolving plaintiffs' claims through Section 524(g)—not to mention allowing

LTL access to the benefits of Chapter 11 solely by reference to the existence of mass tort litigation

or Section 524(g)—would violate claimants' Seventh Amendment right to a trial by jury and Fifth

and Fourteenth Amendment rights to due process.[13]  An Article I judge may not properly preside

over litigation transferred to a bankruptcy court by virtue of a Chapter 11 filing that serves no

reorganizational purpose and so is not a *bona fide* bankruptcy. *See Stern v. Marshall*, 564 U.S.

462, 483–84 (2011); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58–59 (1989); *N. Pipeline*

*Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 56–57 (1982); *see also* Mot. to Dismiss at 20–

21.  LTL denies that resolving claims through Section 524(g) would deny jury trial rights, *see* Obj.

---

[12] *In re Bestwall LLC* does not hold otherwise.  Although the court there observed that
"[a]ttempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational
purpose," 605 B.R. at 49, it did so in the context of analyzing *objective futility*—an element that is
not part of this Circuit's good faith test.  *Bestwall* never reached "the issue of whether this case
was filed in subjective bad faith," and instead deferred the question of "Bestwall's good faith" for
confirmation.  *Id.* at 50–51.

[13] For the mesothelioma plaintiffs that TCC II represents, these Seventh Amendment rights are
both constitutionally important and of real benefit.  All mesothelioma plaintiffs to have proceeded
to trial against Johnson & Johnson in the two years preceding this bankruptcy filing succeeded at
trial.  *See* Expert Report of Matthew Diaz at 14.  That result incentivized J&J to substantially settle
the mesothelioma cases against it. *See In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS) (Bank. D.
Del.), January 25, 2021 Hr'g Tr. at 56 [Dkt. No. 2851].

19–20, but the Third Circuit has expressly left open the question whether a channeling injunction vitiates the Seventh Amendment right to a jury trial. *See In re SGL Carbon*, 200 F.3d at 169 n.23 ("Because we conclude SGL Carbon's petition should be dismissed, we need not address the creditors' argument that the failure to dismiss would deprive it of its Seventh Amendment right to try its antitrust claims before a jury."); *see also In re G-I Holdings, Inc.*, 323 B.R. 583, 605 (Bankr. D.N.J. 2005) (holding that "claims held by the asbestos claimants are 'legal in nature,' and thus, they carry 'with it the Seventh Amendment's guarantee of a jury trial'" (quoting *Granfinanciera*, 492 U.S. at 55)).  That the bankruptcy court will provide certain procedures in conjunction with the claims process, *see* Obj. 20, is no answer to these constitutional violations, as those procedures do not satisfy constitutional requirements.  Moreover, the artificial creation of a "limited fund" as part of a bankruptcy plan when J&J itself bears and has borne direct liability for these torts would violate due process, as the Supreme Court observed in a similar context.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846–47 (1999) (holding that a "limited fund" artificially created by the parties to justify a mandatory asbestos trust raised "due process" questions and could not be imposed under Rule 23).  To avoid these serious constitutional violations under the Seventh Amendment, Fifth and Fourteenth Amendments, and Article III, LTL's petition should be deemed to be in bad faith and dismissed.  *See* Amicus Br. of Erwin Chemerinsky.

### E.    The Court Should Reject LTL's Effort to Redirect Its Attention to Old JJCI

LTL is the entity before the Court and the entity that must be assessed in determining whether a valid reorganizational purpose—and thus good faith—exists.  LTL, which has the burden to establish good faith, has not pointed to any case in which the bankruptcy court assessed an entity other than the debtor, and doing so here would be unprecedented.  Indeed, in its Objection, LTL takes the position that to "focus on the financial wherewithal of [J&J] is misguided and

irrelevant" because "J&J is not the Debtor . . . ." Obj. 2 n.4. The same rule should apply to Old JJCI, which was extinguished from existence during the divisive merger.

But that is where LTL's focus is—not on itself, but on the financial status of Old JJCI, its predecessor, which is not in bankruptcy and does not exist. Having decided not to subject Old JJCI to bankruptcy, the Debtor cannot now rely on JJCI's pre-bankruptcy condition to justify its own bankruptcy. If the Debtor and/or J&J wanted the Court to focus on the financial condition of Old JJCI in evaluating the good faith of this proceeding, ***Old JJCI should have filed for bankruptcy.*** It did not.

The Debtor asserts that Old JJCI did not file because "[a]llocating the Talc Claims to the Debtor prior to filing bankruptcy avoided a complex, value-destructive, and exponentially more costly bankruptcy harmful to thousands of Old JJCI's stakeholders (*e.g.*, suppliers, vendors, customers, and employees to name a few) and beneficial to no one, including talc claimants." Obj. 27. That is of no moment here. J&J or Old JJCI could have chosen what it perceived to be the difficult path of obtaining the benefits and complying with the burdens of Chapter 11. Regardless of how onerous or not that path would have been, what J&J and Old JJCI could *not* have done was to simply siphon off the talc liabilities and shield them from the rest of Old JJCI's assets. Doing so would be plainly fraudulent,[14] and it is for this reason that J&J implemented the Funding Agreement.

---

[14] *See, e.g.*, *In re DBMP LLC*, 2021 WL 3552350, at *26 (Bankr. W.D.N.C. Aug. 11, 2021) ("[I]f a corporation uses a divisional merger to dump its liabilities into a newly created 'bad' company which lacks the ability to pay creditors while its "good" twin corporation walks away with the enterprise's assets, a fraudulent transfer avoidance action lies"); *In re Tronox Inc.*, 503 B.R. 239, 270–72 (Bankr. S.D.N.Y. 2013) (corporate reorganization leaving debtor with environmental and tort liabilities and few assets determined to be actual and constructive fraudulent transfer).

23

But in its effort to keep Old JJCI out of bankruptcy without engineering a blatantly undercapitalized debtor, as described above, J&J necessarily created a company with sufficient funding to pay its liabilities, *i.e.*, one that does not need the protection of Chapter 11.  It must live with that decision.

F.      **Even if the Court Focuses on Old JJCI Rather than LTL, There Was No Valid Reorganizational Purpose.**

Even if the Court considers the financial status of Old JJCI, which it should not, the Debtor still cannot meet its burden to establish a valid reorganizational purpose based on serious financial distress or managerial distraction.

As noted above, *see* Section II.B *supra*, the mere possibility that litigation could be disastrous in the future is not sufficient to establish a valid reorganizational purpose—a company needs to face serious financial difficulty in the present. LTL cannot make this showing even by referencing Old JJCI.  Prior to being disbanded so that LTL could file this bankruptcy, Old JJCI was a financially healthy company.  It housed multiple product lines in the consumer health sector – such as Band-Aid, Tylenol, Motrin, and Nicorette – many of which were doing substantially well during the pandemic.  As Thibaut Mongon, the Worldwide Chairman of Consumer Health (which included Old JJCI), said in remarks at a September 10, 2021 Barclay's conference (one month before the petition in this case), "as you can tell, our very clear strategies across our three segments are working.  They are driving strong revenue growth.  But simultaneously, we are increasing our margin profile [and] achieving the highest operating profit improvement in our competitive set." *See* Mongon Dep. Ex. 34, at 5; *see also* Mongon Dep. Ex. 33, at 7 (earnings up 73%).

Indeed, Mongon testified that he did not even "form[] the opinion that [Old JJCI] was under serious strain linked to the cost into this litigation" until he saw J&J's publicly available annual report for the year 2020.  *See* Mongon Tr. 180:7–19.  In other words, he did not think the company

24

he managed was in financial distress until he saw a publicly reported financial record showing a loss. In any event, suffering a loss in a single year is not sufficient to establish financial distress. *See* 7 Collier on Bankruptcy ¶ 1112.07 ("Even where the debtor is currently suffering substantial losses, if the debtor does not have a present need for chapter 11 relief but instead files to discharge litigation claims and minimize claims for future rent notwithstanding that it holds sufficient cash to meet its obligations, the filing may be found in bad faith."). As noted above, though the Debtor points to $3.6 billion in talc-related liability in the 21 months preceding the petition date, two-thirds of it resulted from a single case, *Ingham*, that J&J considers an outlier. Beyond that, talc expenses were substantially less in 2019, and fell to a fraction of the 2020 amount in the first half of 2021. These figures belie the notion of cascading liability over a long period of time. *See* 2020 J&J Annual Report at 29 ("Higher litigation expense [for Consumer Segment] of $3.9 billion in 2020 vs. $0.4 billion in 2019 (primarily associated with talc related reserves and certain settlements); 7/29/21 10-Q for 2Q 2021, at 27 (referring to "$0.1 billion and $0.6 billion in [expenses in] both the fiscal second quarter and fiscal six months of 2021 and 2020, primarily talc related costs"). Further, J&J has emphasized again and again to this Court that it wins "most" or the "vast majority" of its cases. *See* October 20, 2021 Hr'g Tr. at 34 [Dkt. No. 178] ("Old JJCI . . . ultimately prevailed in most of the talc cases it tried."); December 15, 2021 Hr'g Tr. at 15–16 [Dkt. No 846] ("[T]he company was prevailing in the majority of cases . . . ."); January 11, 2022 Hr'g Tr. at 75 [Dkt. No. 1118] ███████████████████████████████

████████████████████████████████████████████████ LTL repeatedly expresses concern that even if it wins the majority of the cases against it, another outlier case like *Ingham* could be "enterprise-threatening." *See, e.g.*, Obj. 9, 11–12. But speculation about future financial distress is not enough to establish good faith. The company seeking Chapter 11's benefits

25

must be experiencing financial distress at the time of filing.  LTL was not, and neither was its predecessor.

Further, Old JJCI did not bear the risk of liability alone.  Both Old JJCI and J&J were the legal entities subject to talc verdicts, with J&J typically apportioned higher liability.  (*See* Expert Report of Matthew Diaz at 13–14.)  For example, two-thirds of the *Ingham* verdict was apportioned to J&J, leaving $825 million, not the full $2.5 billion, for Old JJCI.  Thus, even the large, outlier verdict on which LTL continues to focus was principally the legal obligation of J&J, not Old JJCI. Moreover, that J&J's own talc liability was assigned to Old JJCI ███████████████████ ████████████████████████████████████████████████████████.  *See* Lisman Tr. 42:18–43:8, 141:24–144:4; *see also id*. 115:19–117:22 (████████████████████████████ █████████████████████), 130:9–131:21 (████████████████████████████████████ ██████████████████████).  In short, ███████████████████████████████████ ████████████████████████████  Just as J&J has agreed to fund talc payments now via the Funding Agreement, it could well have made the same decision prior to the divisive merger, particularly where so much of the liabilities were its own.

Finally, the 1979 Agreement the Debtor emphasizes, *see* Obj. 2 n.4, is not an indemnification agreement and is not a basis to attribute all talc liability to Old JJCI.  Under the 1979 Agreement, the only obligations assumed by Old JJCI were "liabilities . . . allocated on the books or records of J&J as pertaining to its BABY Division."  A.P. Dkt. No. 46-5.  That language does not encompass *all* liabilities, but only those reflected on accounting and financial documents.  *See Deutsche Bank Nat. Tr. Co. v. FDIC*, 109 F. Supp. 3d 179 (D.D.C. 2015).  *Deutsche Bank* is instructive:  that case involved a purchase agreement in which the only purchased liabilities were "liabilities on the books and records" of Washington Mutual

("WaMu").  *Id*. at 188.  The District Court held that the contract unambiguously covered only those liabilities reflected on the WaMu's accounting records.  *Id*. at 212.  So too here—the 1979 Agreement unambiguously provided that only liabilities "allocated on the books or records of J&J" were transferred to Old JJCI.  LTL has cited no evidence that talc liabilities were reflected on J&J's books at the time of the 1979 Agreement.  Nor could it.  The Debtor has never undertaken the exercise of examining its own books and records because it knows such an exercise would only help establish the lack of any indemnification for talc liabilities.  After all, no talc lawsuits had been asserted against J&J as of the 1979 Agreement.  Nov. 4 H'rg. Tr., at 198:4–11; *see also* TCC II Surreply in Opp. to Debtor's Mot. for Prelim. Inj. (citing additional reasons why the Debtor (via Old JJCI and its predecessors) did not agree to assume or indemnify J&J for its talc liability).

\* \* \*

In *In re SGL Carbon*, the Third Circuit held that dismissal was appropriate where the debtor's financial strength was evident from the record and an assessment that pending litigation might result in financial ruin was premature.  The same factors are present here, and this Court likewise should dismiss the bankruptcy.

## III.   LTL Cannot Establish Good Faith Because Its Chapter 11 Filing Was Merely an Effort to Obtain a Tactical Litigation Advantage.

In assessing whether a debtor's filing lacks good faith by seeking "to achieve objectives outside the legitimate scope of the bankruptcy laws," *In re SGL Carbon*, 200 F. 3d at 165, the Third Circuit also examines whether "the petition is filed merely to obtain a tactical litigation advantage." *In re 15375 Mem'l*, 589 F.3d at 618 (citing *In re SGL Carbon*, 200 F.3d at 165). "Courts have consistently held that a bankruptcy case filed for the purpose of obtaining an unfair litigation advantage is not in good faith and should be dismissed." *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 281 (Bankr. N.D. Tex. 2021) (collecting cases).  LTL concedes that its bankruptcy

was filed to resolve talc claims.  Obj. 17.  Because those tort claims were not a terminal threat to

the company, as detailed above, LTL's intent plainly was to use the bankruptcy system to gain

advantages that J&J and Old JJCI were unable to obtain in the tort system.  Most evidently, LTL's

creation and bankruptcy filing were designed to cap the liability J&J faces from the talc claims.

The result is a situation where the advantages of bankruptcy flow to J&J and LTL, and numerous

burdens flow to a particular class of creditors.  For this reason, too, the petition fails for lack of

good faith.

J&J's own press releases and public statements in announcing this bankruptcy make plain

that creating LTL and filing for Chapter 11 was an effort to favorably resolve the litigation.  *See*

Press Release, J&J, Johnson & Johnson Takes Steps to Equitably Resolve All Current and Future

Talc Claims (October 14, 2021), https://www.jnj.com/johnson-johnson-takes-steps-to-equitably-

resolve-all-current-and-future-talc-claims ("This filing is intended to resolve all claims related to

cosmetic talc in a manner that is equitable to all parties, including any current and future

claimants.  Johnson & Johnson and its other affiliates did not file for bankruptcy protection and

will continue to operate their businesses as usual."); *id.* ("While we continue to stand firmly behind

the safety of our cosmetic talc products, we believe resolving this matter as quickly and efficiently

as possible is in the best interests of the Company and all stakeholders."); *id.* ("The determination

of an appropriate amount to resolve all current and future claims will be decided by the Bankruptcy

Court in the Chapter 11 proceedings.  This established process will allow for a more efficient and

consistent resolution for all parties.  While LTL pursues this equitable resolution, all cosmetic talc

cases will be stayed pending the outcome of the proceedings.").  Just as in *In re SGL Carbon*—in

which the debtor similarly publicly touted that bankruptcy was an "effective and efficient means

28

for resolving the [litigation]"—J&J "expressly and repeatedly acknowledged [the] Chapter 11 petition was filed *solely* to gain tactical litigation advantages." 200 F.3d at 157.

Moreover, the Debtor has not produced and can point to no contemporaneous evidence that concerns about financial distress—as opposed to concerns about how to maximize J&J's posture in the talc litigation—motivated the Two-Step. Rather, the available evidence suggests the opposite. At its very inception, the possibility of bankruptcy appears to have been borne from J&J *litigators*, not from anyone affiliated with its corporate law, business or finance functions. █

██████████████████████████████████████████████████████████████████

████████████████████████████████ *See* LTL 0035372. The following month, on April 9, 2021, ████████████████████████████████████████████

██████████████████ *See* LTL 0036459. And those litigators remained involved throughout. When those on the financial side did express their views on a restructuring, they did so in terms that reflected not alarm over the distress caused by talc litigation, but rather in terms that emphasized the litigation benefits for J&J. For example, ████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████ *See* LTL 0030195. In another email, Ryan commented that a press leak regarding the plan to put LTL into bankruptcy "[c]ould have been a plan . . . an ill-fated arrogant plan. Try to scare [the plaintiffs' lawyers]." *See* LTL 0030198.

████████████████████, the decision to create and bankrupt LTL came on the heels of adverse events in talc litigation, including the Supreme Court's denial of certiorari in the *Ingham* case on June 1, 2021. LTL 0030195; *Johnson & Johnson v. Ingham*, 141 S. Ct. 2716 (2021). ██████████████████████████████████████████████████

███. *See* LTL 30(b)(6) Tr. 201:1–202:25 (█████████████████████████████████████

████████████████████████████████████████████████████████████████████).

Within two weeks of the *Ingham* denial, the first of many meetings for "Project Plato"—J&J's

codename for the divisive merger—began. *See* LTL 0036462.

Prior to that spring/summer, J&J had sought to vigorously defend its talc cases, going so

far as to seek relief from the automatic stay in *Imerys* to permit those cases to continue to be

litigated in the tort system.  Indeed, J&J had previously assured the *Imerys* court that "J&J, of

course, has the financial wherewithal to defend these claims and satisfy any successful talc claim

in full" and further stated that it "prefers to defend the safety of its products (and the core causation

issues) in open court." *In re Imerys Talc Am., Inc.*, No. 19-10289 (Bankr. D. Del. Mar. 20, 2020)

(LSS); *In re Imerys Talc Am., Inc.*, No. 19-10289 (Bankr. D. Del. May 19, 2019).  Previously, J&J

touted that it was winning trials. *See* October 20, 2021 Hr'g Tr. at 34 [Dkt. No. 178] ("Old

JJCI . . . ultimately prevailed in most of the talc cases it tried."); December 15, 2021 Hr'g Tr. at

15–16 [Dkt. No 846] ("[T]he company was prevailing in the majority of cases . . . ."); January 11,

2022 Hr'g Tr. at 75 [Dkt. No. 1118] ("████████████████████████████████████████

████████████████████████████████████.");  November 4, 2021

Hr'g Tr., Testimony of John Kim, at 120 [Dkt. No 390] ("We've had numerous trials, most of

which we have been successful in . . . .").

Only when the tides turned with the failure of its effort to navigate *Imerys*, the failure of

the *Ingham* appeal, and the impending bellwether trials this spring in the ovarian cancer MDL, did

J&J suddenly change its position that it "of course, has the financial wherewithal" to resolve the

talc claims and instituted these proceedings.  That sudden change is not reflective of impending

financial distress, but as the next in a series of litigation tactics by the J&J Enterprise to obtain the upper hand in the talc litigation.

"[T]he timing of the filing of the bankruptcy petition[]" can show that a debtor sought Chapter 11 protection not for a valid bankruptcy purpose, but instead as a "litigation tactic to avoid"—or, in this instance, as J&J's Treasurer acknowledged, to "cap"—liability. *In re 15375 Mem'l*, 589 F.3d at 619. Here, the sequence of events in the months leading up to LTL's filing makes clear that it was intended to achieve a litigation advantage. So too does the hasty creation and bankrupting of the Debtor. Old JJCI created a shell entity in LTL on October 12, 2021, a mere 48 hours before the Petition Date, *see* Kim Declaration ¶¶ 16, 22–25, to minimize the impact of potential tort liability. LTL fails to explain why it filed for bankruptcy immediately upon its creation, and its non-response hardly suffices to contradict the conclusion that Old JJCI restructured and immediately petitioned for bankruptcy to obtain an unfair litigation advantage.

For these reasons, that J&J's motive in creating and bankrupting LTL was to maximize its position vis-à-vis talc plaintiffs is evident. Equally evident – and not lost on J&J – are the concrete litigation benefits of this proceeding to the J&J Enterprise and the corresponding costs to talc claimants. Most obviously, those benefits include potential automatic stay protection for *J&J itself*, even though J&J faces independent liability – indeed, as noted above, the larger portion of talc verdicts are against it rather than Old JJCI – and there are few more solvent entities in the world than J&J.

Beyond this, other benefits for J&J and LTL are obvious: talc claimants' relief will be delayed. While mesothelioma trials are typically fast tracked, a reorganization would require terminally ill cancer patients to endure stays while they wait out a potentially years' long

proceeding.[15]   Those delays may permanently cost mesothelioma victims their day in court—patients who die during the pendency of bankruptcy will never have the chance to personally challenge a company and a product that they maintain has cost them their lives.  Not only will they lose their day in court – but their estates' damages in many instances will be reduced, all to the benefit of the Debtor and J&J.  Several states deny recovery of damages for pain and suffering and punitive damages after a claimant's death.   In these states, the families or representatives of mesothelioma claimants who die during the pendency of the bankruptcy process will not be able to recover what the claimants would have absent the bankruptcy.[16]   Finally, as discussed above, this may deny claimants two fundamental trial rights—the right to a jury trial and the right to an appeal.  All of this works to the litigation advantage of J&J.

---

[15] The *Imerys* bankruptcy provides a cautionary tale.  That proceeding has been ongoing for three years, since February of 2019.

[16] For example, in California, damages for pain and suffering are not available after death for actions filed before January 1, 2022 that were not given preference prior to that date.  Cal. Civ. Proc. Code § 377.34 (West 2022).  Indiana denies after-death recovery for pain and suffering if a claimant dies from injuries related to the wrongful act or omission of another.  Ind. Code § 34-9-3-1.  Arizona, Colorado, and Idaho all deny after-death recovery for pain and suffering for all claimants.  Ariz. Rev. Stat. § 14-3110 (explicitly excepting "damages for pain and suffering" from its survival statute); Colo. Rev. Stat. § 13-20-101 (explicitly excepting "damages for pain, suffering, or disfigurement" from its survival statute); Idaho Code § 5-327 (expressly limiting damages for personal injury recoverable after death to three categories, not including pain and suffering); *Farm Bureau Mut. Ins. Co. of Idaho v. Eisenman*, 286 P.3d 185, 189 (Idaho 2012) ("Claims for pain and suffering abate upon the death of the injured person.").  Likewise, Illinois and Idaho deny after-death recovery for punitive damages.  Idaho Code § 5-327 (expressly limiting personal injury damages recoverable after death to three categories, not including punitive damages); *Vincent v. Alden-Park Strathmoor, Inc.*, 948 N.E.2d 610, 615 (Ill. 2011) ("That the right to recover common law punitive damages abates upon the death of the injured party has not been altered by the Survival Act.").

**IV.      The Equities Overwhelmingly Fail to Show LTL's Good Faith and Support Dismissal.**

Bankruptcy courts are courts of equity.  *See, e.g.*, *Young v. United States*, 535 U.S. 43, 50–51 (2002) (explaining that bankruptcy courts "appl[y] the principles and rules of equity jurisprudence") (citation omitted); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships."); *Pepper v. Litton*, 308 U.S. 295, 304 (1939) ("for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity'" (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934))).  "Equity" entails a "recourse to principles of justice to correct or supplement the law as applied to particular circumstances," enabling judges to "prevent[ ] hardship that would otherwise ensue from the literal interpretation of a legal instrument [in] . . . extreme case[s] or from the literal exclusion of a case that seems to fall within what the drafters of the instrument probably intended." *Equity*, *Black's Law Dictionary* (10th ed. 2014).  A bankruptcy court can exercise its equitable powers "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper*, 308 U.S. at 305.

The good faith requirement is rooted in principles of equity.  Indeed, in *In re SGL Carbon*, the Third Circuit explicitly connected the good faith requirement to the equitable nature of bankruptcy relief and the bankruptcy court's powers as a court of equity.  200 F.3d at 161 ("The 'good faith' requirement for Chapter 11 petitioners *has strong roots in equity*.") (emphasis added).  Quoting the first case to articulate the good faith requirement under the Bankruptcy Code in 1981, the Court explained:

> Review and analysis of [the bankruptcy laws and relevant cases] disclose a common theme and objective [underlying the reorganization provisions]:  avoidance of the consequences of economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of

the parties affected.   But the perimeters of this potential mark the borderline between fulfillment and perversion; between accomplishing the objectives of rehabilitation and reorganization, and *the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy.*

*Id.* (alterations in original) (emphasis added) (quoting *In re Victory Constr. Co.*, 9 B.R. 549, 558 (Bankr. C.D. Cal. 1981)).   And it is the role of the bankruptcy courts, as "courts of equity, armed with the doctrine of 'good faith'" to "patrol" "that borderline." *Id.*

"At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy." *In re Integrated Telecom*, 384 F.3d at 119.   The basic purposes of bankruptcy are: "to benefit those in genuine financial distress," *id.* (quoting *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D. Md. 1983)); to guarantee "the equitable treatment of creditors," *In re Molded Acoustical Prods., Inc.*, 18 F.3d 217, 224 (3d Cir. 1994); and to ensure that "the enjoyment of the benefits afforded by the code is contingent on the acceptance of its burdens," *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503 (Bankr. D.N.J. 1997).

J&J and Old JJCI's corporate restructuring, creation of LTL, and filing Chapter 11 for LTL contravenes all of these basic purposes of bankruptcy.   LTL's behavior, and that of J&J, has been decidedly *inequitable*, from the pre-bankruptcy cleaving of all the valuable business assets from Old JJCI to shield them from the LTL bankruptcy to the violation of the non-abridgement of creditor's rights and everything in between.

As noted above, *see* Section II.A *supra*, LTL is not in genuine distress.   And the divisive merger prejudices the rights of a single class of creditors.   Specifically, the Two-step permitted JJCI to carve out one source of its liabilities and bankrupt the remaining entity without putting any of its other assets into bankruptcy or impairing any other class of creditors—of which there are

34

many, given JJCI's many product lines.  It also extinguished Old JJCI, a defendant in pending lawsuits, thus preventing talc claimants from directly enforcing their claims against that defendant; rendered Old JJCI's assets no longer directly available to talc claimants; and structurally subordinated talc creditors—and only talc creditors—to the claims of every other creditor of New JJCI.  And while the Funding Agreement may have provided substantial capital to LTL, it created additional hurdles to actual recovery by talc claimants, such as requiring claimants to rely on LTL to affirmatively enforce the Funding Agreement against its own parent, J&J.  Beyond this, the divisive merger and bankrupting of LTL created numerous litigation disadvantages for talc claimants, including the loss of their rights to jury trials, as detailed above.  The use of the Two-step to prejudice the rights of talc claimants is not only evidence of a tactical litigation advantage, *see* Section III, and of a petition so inequitable it cannot have been filed in good faith, but it also violates the Texas divisive merger statute, which includes a provision specifying that "this code does not . . . abridge any right or rights of any creditor under existing laws."  Texas Bus. Orgs. Code § 10.901; *see In re Aldrich Pump LLC*, 2021 WL 3729335 at *26–*30 (Bankr. W.D.N.C. Aug. 23, 2021) (holding that the divisive merger statute does not permit a company to prejudice any certain group of creditors); *In re DBMP LLC*, 2021 WL 3552350, at *22, *24 (same); *Plastronics Socket Partners, LTD. v. Dong Weon Hwang*, 2022 WL 108948 at *2–*4 (Fed. Cir. Jan. 12, 2022) (same).

At bottom, through this restructuring, creation of LTL, and bankruptcy filing, J&J extracts the benefits of the bankruptcy code—namely, the ability to avail itself of 11 U.S.C. § 524(g) and the channeling injunction—without accepting any of its burdens for itself or for JJCI.  LTL asserts that "[a]llocating the Talc Claims to the Debtor prior to filing bankruptcy avoided a complex, value-destructive, and exponentially more costly bankruptcy harmful to thousands of Old JJCI's

stakeholders (*e.g.*, suppliers, vendors, customers, and employees to name a few) and beneficial to

no one, including talc claimants." Obj. 27. But setting aside whether, given all the facts above, it

is credible that LTL was created to avoid an unnecessarily destructive and complicated bankruptcy

for Old JJCI, J&J cannot obtain the "enjoyment of the benefits afforded by the code" without "the

acceptance of its burdens." *In re Arrowmill*, 211 B.R. at 503.

By entering into the Funding Agreement, J&J has made evident that it is willing (in

contravention of its supposed internal accounting policy) to put its own financial strength behind

the resolution of the talc cases. It could have done so without creating and bankrupting LTL in

the first place, or, if Old JJCI were legitimately in financial distress, it could have entered Old JJCI

into bankruptcy. In an inequitable attempt to avoid either, its chartered course seeks to resolve all

talc claims in the bankruptcy system without encumbering itself or Old JJCI with any of the

concomitant burdens. Permitting it to do so on the basis that bankruptcy is difficult and

complicated would pervert the entire structure of Chapter 11 and enable any company to spin off

a liability and bankrupt it while preserving the rest of the company. Moreover, here, because of

the Funding Agreement, J&J has created a *solvent* entity—LTL—that is not in need of Chapter 11.

For these reasons, permitting this bankruptcy to proceed would be inequitable and

antithetical to the fundamental principles of fairness that underlie the code. It also would invite

further abuse. Accordingly, it should be dismissed.

## CONCLUSION

Despite its efforts to paint the Committee as extreme, it is LTL's position that is extreme,

unsupported by Third Circuit precedent, and contrary to the letter and purpose of the Bankruptcy

Code. Dozens of bankruptcy petitions have been dismissed where, as here, they are lacking in

good faith. This Court will be on firm ground in doing the same here.

The Court should grant the Motion to Dismiss for lack of a showing by LTL that its bankruptcy petition was made in good faith.

Dated: February 3, 2022

Respectfully submitted,

**COOLEY LLP**

By: */s/ Cullen D. Speckhart*
Cullen D. Speckhart, Esq.
Ian Shapiro, Esq.
Russell Capone, Esq.
Michael Klein, Esq.
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Fax: (212) 479-6275
Email: cspeckhart@cooley.com
        ishapiro@cooley.com
        rcapone@cooley.com
        mklein@cooley.com

Matthew Kutcher, Esq.
444 W Lake Street, Suite 1700
Chicago, IL 60606
Tel: (312) 881-6500
Fax: (312) 881-6598
Email: mkutcher@cooley.com
Shamis Beckley, Esq.
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Tel: (617) 937-2300
Fax: (617) 937-2400
Email: sbeckley@cooley.com

Kathleen Hartnett, Esq.
Julie Veroff, Esq.
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Tel: (415) 693-2000
Fax: (415) 693-2222
Email: khartnett@cooley.com
        jveroff@cooley.com

**BAILEY GLASSER LLP**

Brian A. Glasser, Esq.
Thomas B. Bennett, Esq.
Kevin W. Barrett, Esq.
Maggie B. Burris, Esq.
1055 Thomas Jefferson St. NW, Suite 540
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 463-2103
Email: bglasser@baileyglasser.com
      tbennett@baileyglasser.com
      kbarrett@baileyglasser.com
      mburrus@baileyglasser.com

*Proposed Counsel to*
*Official Committee of Talc Claimants II*

-and-

**SHERMAN, SILVERSTEIN, KOHL,
ROSE & PODOLSKY, P.A.**

By: */s/ Arthur J. Abramowitz*
Arthur J. Abramowitz
Alan I. Moldoff
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, New Jersey 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
      aamoldoff@shermansilverstein.com
      rswitkes@shermansilverstein.com

*Proposed Local Counsel to*
*Official Committee of Talc Claimants II*

38