**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
krosen@lowenstein.com
mseymour@lowenstein.com

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
Gregory M. Starner (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200 (Telephone)
(212) 354-8113 (Facsimile)
jessica.lauria@whitecase.com
gkurtz@whitecase.com
gstarner@whitecase.com

*ATTORNEYS FOR JOHNSON & JOHNSON*
*AND JOHNSON & JOHNSON*
*CONSUMER, INC.*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC, [1]<br><br>          Debtor. | Chapter 11<br><br>Case No.: 21-30589(MBK)<br><br>Honorable Michael B. Kaplan |

**MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION TO PREVENT REUTERS FROM
PUBLICIZING CONFIDENTIAL DOCUMENTS SUBJECT TO A PROTECTIVE
ORDER**

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

Debtor LTL Management, LLC ("LTL") and its parent company Johnson & Johnson ("J&J") (together, "Movants") respectfully submit this memorandum in support of their emergency motion for a temporary restraining order.  Movants also request an expedited hearing on this motion given its time-sensitive nature.

## INTRODUCTION AND BACKGROUND

This motion presents two simple (albeit fundamental) questions of law:  First, whether a media outlet can conspire with a party to violate a judicially imposed protective order and knowingly use documents designated "Confidential" under that order, by wrapping itself in the protections of the First Amendment?  The answer to that question is plainly no, because the First Amendment is not a license to knowingly violate the law.  This Court should grant the motion to prevent the immediate and irreparable harm associated with the imminent publication of the Movants' confidential documents, which were obtained in flagrant defiance of the Agreed Protective Order entered by this Court in December 2021.  *See* ECF No. 948 ("Protective Order").

Second, whether counsel to a proceeding may knowingly violate a judicially imposed protective order and knowingly transmit to a media outlet documents designated "Confidential" under that order with impunity?  The self-evident answer to that question is no, and the Court should determine which counsel made the wrongful disclosure and fashion the relief it deems appropriate.

As part of the bankruptcy litigation process, Debtor has turned over thousands upon thousands of documents that it would otherwise have been entitled to keep private.  These documents, like all documents produced in discovery, are to be used for only one purpose:  to "assist[] in the preparation and trial, or the settlement, of [legal] disputes."  *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984).  (*See* Protective Order § G (protected information to be used

"solely for the purpose of carrying out the duties" of bankruptcy court).)  To protect that

principle, the parties agreed, and this Court ordered, that documents designated as "Confidential"

"shall not be disclosed by the Parties or their Representatives to any other Person, without the

Disclosing Party's written consent[.]"  (Protective Order § F; *see also id.* § G ("[A]bsent

agreement from the [d]isclosing [p]arty" confidential information "may not be disclosed or used

for any purpose outside of the [b]ankruptcy [p]roceedings.").)

      On the afternoon of Wednesday, February 2, Mike Spector, a reporter at Reuters news

agency, sent an email to two J&J employees indicating his intention to write and publish a story

spinning a one-sided narrative of this bankruptcy and of the talc litigation more generally.  (*See*

Email from M. Spector to K. Montagnino and J. Sargent, Feb. 2, 2022 (Ex. 1).)  In that email,

Mr. Spector referenced a panoply of non-public documents and deposition testimony from the

matter.  Of note, Mr. Spector discussed two documents that were produced in this bankruptcy

proceeding pursuant to the Protective Order and that were marked "Confidential":  (1) the

minutes from a May 17, 2021 Special Meeting of the Board of Directors of J&J, during which

J&J General Counsel Michael Ullman briefed directors on talc litigation and J&J's appeal of a

Missouri talc verdict to the U.S. Supreme Court (LTL 0019825); and (2) a series of

communications in April 2021 regarding a meeting that included Jones Day partner Greg Gordon

and his team to discuss a potential divisional merger and bankruptcy (LTL 0036459-61).  These

documents are not available from any public source and could not possibly have been obtained

other than through willful violation of the protective order to which the parties agreed and that

this Court entered.

      In response to Mr. Spector's correspondence, Debtor's counsel sent an email later the

same day, requesting that Reuters "immediately return" the stolen documents and "refrain from

publishing" them "or any information gleaned therefrom." (Ltr. from T. Clare and J. Oliveri to

K. Larsen (Feb. 2, 2021) (Ex. 2).) The following day, counsel for Reuters responded,

"reject[ing]" that request even though she did not dispute that Reuters possesses documents

designated as "Confidential" under the Court's Protective Order. (Email from K. Larsen to T.

Clare, J. Oliveri, and D. Pusch (Feb. 3, 2021) ("K. Larsen Email") (Ex. 3).)

        This is not the first time that Reuters is acting as a mouthpiece for plaintiffs, and not the

first time plaintiffs' lawyers are using the media to advance their one-sided story in the talc

litigation. Indeed, it appears to be part of their respective business models. In 2018, Reuters

published an article entitled, "Johnson & Johnson knew for decades that asbestos lurked in its

Baby Powder." *See* Lisa Girion, Johnson & Johnson knew for decades that asbestos lurked in its

Baby Powder, Reuters (Dec. 14, 2018), https://www.reuters.com/investigates/special-

report/johnsonandjohnson-cancer/ (Ex. 4). The 2018 article purported to contain newly

discovered information about asbestos contaminants in talc that was being reported by Reuters

"for the first time," but instead merely regurgitated false allegations by plaintiffs' lawyers, who

sought to use media publicity to give their meritless allegations a veneer of legitimacy, drive

down J&J's stock price and improve their settlement leverage against the company. As

plaintiffs' lawyer Mark Lanier admitted in a recent declaration submitted in a securities

proceeding, he was a primary source for the 2018 article, and publication of the 2018 article

"serve[d] [his] purposes as a litigator to say, 'Yes, get their attention; keep driving the stock

down.'" *See* Decl. of Mark Lanier ("Lanier *Hall* Decl.") ¶ 6, Dec. 20, 2021, *Hall v. Johnson &

Johnson*, No. 3:18-CV-01833-FLW-TJB (D.N.J.) (Ex. 5). (Notably, Mr. Lanier also stated in

that declaration that the Reuters article did not contain any information about talc that was not

previously available in the public record, contrary to Reuters' suggestions in the article that it was publicizing various documents for the first time.)

A temporary restraining order should be entered to protect the integrity of this Court's Protective Order and the confidentiality of the documents at issue because all of the requirements are easily met.

*First*, the Movants will succeed on the merits.  The reason is simple:  Mr. Spector and Reuters possess confidential documents by virtue of someone "deliberately thwart[ing] a federal court's power to effectively conduct civil litigation under the rule of law," and neither the First Amendment nor any other claimed right or provision of law entitles them to publish documents obtained in violation of that order, as courts have repeatedly held.  *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 395 (E.D.N.Y. 2007), *aff'd sub nom. Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010).

*Second*, Movants will suffer irreparable harm if the injunction is denied.  The publication of confidential information is a classic example of irreparable harm, because once information has been released into the public sphere, no later order from this Court or any other can claw it back, or remedy any privacy, reputational or financial effects that it has already had.

*Third*, the balance of the equities weighs entirely in favor of Movants because Reuters will suffer essentially no harm at all.  The proposed relief will not prevent Reuters from publishing an article using publicly available sources about this topic.  Rather, it will only preclude Reuters from using documents that it was never supposed to obtain in the first place – i.e., those designated as "Confidential" pursuant to the Protective Order.

*Fourth*, the public interest overwhelmingly favors relief.  If the parties were unable to trust Court-entered protective orders, document production in complex litigation would grind to

a halt.  In fact, "'rather than expose themselves to unwanted publicity,'" some parties would

simply "'forgo the pursuit of their just claims altogether.'"  *Seattle Times*, 467 U.S. at 36 n.22.

Any countervailing public interest is minimal at best since "judicial limitations on [the] ability to

disseminate information" obtained through discovery "implicate[] the First Amendment rights of

the restricted party to a far lesser extent than would restraints on dissemination of information in

a different context."  *Id.* at 34.

For all of these reasons, as elaborated in this brief, the Court should enter the requested

temporary restraining order prohibiting Reuters from publishing any report that relies on

documents designated as "Confidential" in this proceeding and requiring Reuters to return any

such documents to the source from which they were obtained.  In addition, the Court should

order each attorney who has made an appearance in the above-captioned proceeding to submit to

the Court a declaration under penalty of perjury stating whether he or she disclosed any materials

designated as "Confidential" in this proceeding to Reuters.  After all, the original violation of the

Court's protective order would have had to involve a lawyer in this proceeding who had access

to "Confidential" documents, making such relief appropriate.  *Cf. In re Zyprexa Injunction*, 474

F. Supp. 2d at 399-402 (citing affidavit from lawyer regarding circumstances of document leak).

## ARGUMENT

"In determining whether a party is entitled to a temporary restraining order, courts

consider four factors:  (1) whether the movant has shown a reasonable probability of success on

the merits; (2) whether the movant will be irreparably harmed without the temporary restraining

order; (3) [whether] the balance of the equities favors granting a temporary restraining order,

including any harm to the nonmoving party; and (4) whether granting the temporary restraining

order will be in the public interest."  *Revzip, LLC v. McDonnell*, No. 3:19-cv-191, 2019 WL

7629238, at *2 (W.D. Pa. Nov. 14, 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

7, 22 (2008)); *see Peoplestrategy, Inc. v. Lively Emp. Servs., Inc.*, No. 3:20-cv-02640-BRM-DEA, 2020 WL 7869214, at *3 (D.N.J. Aug. 28, 2020) (similar).  The standard for a temporary restraining order is the same as for a preliminary injunction, *see Astrazeneca AB v. Dr. Reddy's Lab'ys, Inc.*, 145 F. Supp. 3d 311, 316 (D. Del. 2015), and "one of the goals of the preliminary injunction analysis is to maintain the status quo."  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).  Here, as explained in greater detail below, all of the relevant factors strongly favor preservation of the status quo by way of a temporary injunction.

## I.    <u>MOVANTS WILL SUCCEED ON THE MERITS.</u>

Movants are beyond likely to succeed on the merits because Reuters is in possession of confidential documents that were obtained in derogation of the Court's Protective Order, and the proper remedy for such violations is to prevent their publication and require their return.  Reuters's First Amendment arguments do not alter the analysis.

### A.    <u>It Is Indisputable That The Documents Were Obtained In Violation Of The Protective Order, And An Order Barring Publication And Directing Return Of The Documents Is The Proper Remedy.</u>

"The propriety and desirability of protective orders securing the confidentiality of documents containing sensitive commercial information that are the subject of discovery in complex cases is too well established to belabor here."  *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F. Supp. 866, 889 (E.D. Pa. 1981); *see also Genentech, Inc. v. Amgen Inc.*, No. 17-1407-CFC, 2019 U.S. Dist. LEXIS 49796, at *6 (D. Del. Mar. 26, 2019) ("[T]he ability to rely on [a] Protective Order is essential in cases involving the disclosure of highly confidential business information.")  (citation omitted).  As the U.S. Court of Appeals for the Third Circuit has recognized, such orders, "'carefully drafted to suit the circumstances of the case, greatly expedite the flow of discovery material while affording protection against unwarranted

disclosures.'" *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1123 n.19 (3d Cir. 1986) (citing

Manual for Complex Litigation Second (MCL 2d) (1985) § 21.431 at 53)).

These orders are enforceable by way of injunctions pursuant to a court's "inherent

authority," *In re Zyprexa Injunction*, 474 F. Supp. 2d at 418-19, and Federal Rule of Procedure

65(d)(2), which authorizes injunctive relief not only against the parties to an action, but also

"other persons who are in active concert or participation with [them]," *see Redapt Inc. v. Parker*,

No. 2:20-CV-00862-JRC, 2020 WL 3128859, at *6 (W.D. Wash. June 11, 2020) (granting a

temporary restraining order barring the use in any way of stolen confidential information

"binding on any such person who has or may have access to the information, devices, or

materials that are the subject of this order and who received actual notice of this Order").  In

accordance with this authority, courts have issued injunctions barring dissemination and

requiring the return of confidential documents from individuals who improperly obtained the

materials and those with whom they shared the confidential information – i.e., "third parties who

aid and abet the violation of their protective orders." *Eli Lilly & Co.*, 617 F.3d at 195; *see also,

e.g.*, *In re Zyprexa Injunction*, 474 F. Supp. 2d at 422; *Henry Schein, Inc. v. Cook*, 191 F. Supp.

3d 1072, 1079 (N.D. Cal. 2016) ("Defendant, and all those acting in concert or participation with

her, are hereby enjoined from directly or indirectly accessing, using, disclosing, or making

available to any person or entity other than Plaintiff, any of [the] confidential, proprietary, or

trade secret documents, data or information."); *Zendar Inc. v. Hanks*, No. 20-CV-03391-JSW,

2020 WL 4458903, at *7 (N.D. Cal. May 27, 2020) ("IT IS FURTHER ORDERED THAT

[Defendant] shall return to [Plaintiff], through [Plaintiff's] counsel, all copies of all documents,

materials, and other media, whether in paper form or in an electronic medium, containing

[Plaintiff's] confidential, proprietary, or trade secret information that [Defendant] possesses or has in his custody or control.").

For example, in *In re Zyprexa Injunction*, thousands of lawsuits were filed against Eli Lilly, the manufacturer of Zyprexa, an allegedly defective anti-psychotic drug.  474 F. Supp. 2d at 391-92.  During the course of that proceeding, a plaintiffs' expert, Dr. David Egilman, conspired with a *New York Times* reporter, Alex Berenson, to evade the court's protective order by asking James Gottstein, an attorney in an Alaska case unrelated to Zyprexa, to subpoena confidential trade secret and other protected documents from Egilman that had no relevance to the Alaska litigation.  *Id.* at 392.  None of the three conspirators sought declassification of the confidential documents pursuant to the procedures set forth in the order.  *Id.*  Upon receiving the confidential documents, Gottstein distributed them to the *New York Times*, which immediately published excerpts from, and summaries of, the protected materials in a series of highly suggestive and one-sided articles, including – for example, "Eli Lilly Said to Play Down Risk of Top Pill[.]"  *Id.* at 392-93.

Upon being informed of the breach, the district court issued a preliminary injunction, ordering Gottstein to retrieve the documents and return them to the court-appointed Special Master and enjoining various other individuals and organizations who had received the documents from further disseminating them.  *Id.* at 392.  The injunction also ordered specified websites that had received the documents not to publish them.  *Id.*[2]  Although Eli Lilly did not seek an injunction against the *New York Times*, that is presumably because "Egilman and Gottstein took particular pains to deny Lilly an opportunity to prevent the breach; they made the

---

[2]    Although the court ultimately declined to issue a final injunction enjoining the websites from posting the confidential documents, it did so on the narrow ground that "[p]rohibiting five of the internet's millions of websites from posting the documents w[ould] not substantially lower the risk of harm posed to Lilly," particularly given that the *New York Times* had already published multiple articles containing the protected materials.  *Id.* at 426.

documents public **before** Lilly could move to preclude their release[.]" *Id.* at 395 (emphasis added).

After Gottstein and Egilman refused to comply with the injunction, the court issued a final injunction requiring them to return the documents and cease disseminating them, reasoning that the "[c]onspirators . . . who deliberately thwarted a federal court's power to effectively conduct civil litigation under the rule of law, as well as those in concert with them, should be enjoined to deter further violations of this and other courts' orders." *Id.* at 395.  In so reasoning, the court explained that the matter was "not a case of a government employee, whistleblower, protestor, or juror who face[d] the difficult choice of 'conform[ing his] behavior to the official "law" while protesting that the law was "wrong" . . . or . . . conform[ing] to [his] interpretation' of the law . . . . ." *Id.* at 396 (quoting Robert M. Cover, *The Supreme Court, 1982 Term, Foreword: Nomos and Narrative*, 97 Harv. L. Rev. 4, 47 (1983)).  After all, "the 'law,' i.e. the protective order, contained an explicit means of escape for those who believed they had a reasonable justification for not complying; the court reserved the power to modify and declassify sealed documents in the public interest." *Id*.  Nor did the case involve a "newspaper obtaining, with clean hands, documents provided to it by government employees, whistleblowers, or protestors." *Id.*  Rather, as the court stressed, the reporter was "deeply involved in the effort to illegally obtain the documents" in contravention of its order. *Id.*  On appeal, the Second Circuit affirmed, rejecting Gottstein's argument that the district court lacked jurisdiction to enjoin a nonparty, explaining that ample authority establishes that courts have "the power to enjoin nonparties or nonsignatories who aid and abet the violation of their discovery courts." *Eli Lilly*, 617 F.3d at 195.

The same logic supports the entry of an injunction here.  There is no dispute that Reuters

reporter Mike Spector is in possession of at least two documents designated as "Confidential"

under Section C of the Protective Order containing highly sensitive information regarding J&J's

legal strategy related to the broader talc litigation and a potential bankruptcy.  (*See* LTL

0019825; LTL 0036459-61; Order § C.)  The only way those confidential documents could be

possibly made their way into the hands of Mr. Spector is if someone with access to them in the

underlying bankruptcy proceeding gave them to him or one of his colleagues – a clear violation

of the Protective Order's command that documents designated as "Confidential" "***shall not be

disclosed by the Parties or their Representatives to any other Person***[.]"  (*See* Protective Order

§ F (emphasis added); *see also id.* § G (reiterating that such documents "may not be disclosed or

used for any purpose outside of the [b]ankruptcy [p]roceedings").)  Needless to say, neither

Movants nor any of their affiliates gave the documents to Mr. Spector.  And given the history of

talc plaintiffs' lawyers feeding documents to Reuters that Reuters authors then weave into

slanted broadsides against J&J (*see* Lanier *Hall* Decl. ¶ 6), it takes little imagination to conclude

that the same pattern has repeated itself here, this time in derogation of the Court's Protective

Order.  As such, it is overwhelmingly likely that members of the plaintiffs' bar and Reuters have

"deliberately thwarted a federal court's power to effectively conduct civil litigation under the

rule of law," and that Reuters should therefore "be enjoined to deter further violations of" the

Protective Order, *In re Zyprexa Injunction*, 474 F. Supp. 2d at 395, by requiring the return of the

confidential documents and barring their publication.[3]

---

[3]    Reuters appears to be taking the position that *In re Zyprexa Injunction* is inapposite on the ground that "no injunction was issued against either the reporter or the publication in that case." (K. Larsen Email.)  However, that was presumably so because the articles containing those documents were published ***before*** Lilly could move to preclude their release, as previously discussed.  474 F. Supp. 2d at 395.  The court's emphasis on that fact, combined with the reality that it did enter preliminary relief enjoining further publication, strongly suggests that a timely injunction to preclude the publication of the confidential documents would have been granted.

**B.**     **Reuters's First Amendment Rights Do Not Give It License To Violate Protective Orders.**

Although Reuters has invoked the First Amendment in resisting the Movants' demand that it not publish the confidential documents (*see* K. Larsen Email), it is a bedrock First Amendment principle that there is no constitutional right "to take advantage of speech or press to violate valid laws designed to protect important interests of society." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 501 (1949).  And "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965).  Elaborating on these principles, the Supreme Court has explained that "the Rules authorizing discovery were adopted by [Congress], the processes thereunder are a matter of legislative grace. […]  Thus, continued court control over the discovered information does not raise the same specter of government censorship that such control might suggest in other situations." *Seattle Times*, 467 U.S. at 32; *see also Cipollone*, 785 F.2d at 1119 ("the first amendment is simply irrelevant to protective orders in civil discovery.").

An injunction ordering the return of confidential documents obtained in violation of a court discovery order and barring their publication is entirely in keeping with these precedents. Such an order would not inappropriately limit speech "based on the message [the] speaker conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (When determining whether a regulation is content based, the Supreme Court has instructed lower courts "to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys.").  This is so because the injunction "is justified not by reference to the content of the covered documents, but rather by their unlawful acquisitions," as the *In re Zyprexa Injunction* court explained.  474 F. Supp. 2d at 423.  Such "[c]ontent neutral injunctions . . . . do 'not arouse the fears that trigger the application of constitutional prior restraint principles.'"  *Id.* at 424

12

(quoting *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d

Cir. 1979)).

None of the cases cited in Reuters's February 3 response holds otherwise.  For example,

Reuters relies on *Bartnicki v. Vopper*, 532 U.S. 514, 528-29 (2001), for the proposition that "the

First Amendment bars the imposition of liability against a publisher for truthful speech about a

matter of public concern, even if the third-party who provided the information obtained that

information unlawfully."  (K. Larsen Email.)  However, the Court squarely did not resolve "'the

question whether, in cases where information has been acquired ***unlawfully*** by a newspaper . . .

[the] government may ever punish not only the unlawful acquisition, but the ensuing publication

as well.'"  *Id.* at 528-29 (citation omitted) (emphasis added).  Although the Court invalidated the

application of state legislation prohibiting intentional disclosure of an illegally intercepted

communication by a third person, it did so because, *inter alia*, the third person played ***no*** part in

the underlying illegal interception and the information was "lawfully" obtained by the third

party.  *Id.* at 525.[4]  Neither circumstance is present here, as previously discussed.

Reuters's reliance on *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir.

1996), is also fundamentally misplaced.  As the *In re Zyprexa Injunction* court explained in

distinguishing *Procter & Gamble*, the injunction in that case "prohibit[ed] publication of

'standard litigation filings' – consisting of a memorandum of law, complaint, and case statement

– rather than documents produced in discovery and not relied upon by the court[.]"  *In re

Zyprexa Injunction*, 474 F. Supp. 2d at 421.

---

[4]        The same is true of *Matter of Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986), in which the FBI had
"wrongfully released [protected] logs and memoranda" to a newspaper without any complicity by the newspaper.
*Id.* at 1344.

For all of these reasons, Movants have a very substantial likelihood of prevailing on their claim that the disclosure of documents designated as "Confidential" to Reuters violated the Protective Order and that a permanent injunction requiring their return and preventing their publication is well-grounded.

## II.    MOVANTS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER.

If the Court does not grant the requested temporary restraining order, Movants will suffer irreparable harm from the disclosure of confidential documents that cannot possibly be remedied at a later time because their injury will be complete and irreversible upon publication of the improperly obtained documents.

"'In order to demonstrate irreparable harm, the [party seeking a temporary restraining order] must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy'" at a later date. *Thakker v. Doll*, 451 F. Supp. 3d 358, 364-65 (M.D. Pa. 2020); *see also USA Techs., Inc. v. Tirpak*, No. 12-2399, 2012 WL 1889157, at *5-6 (E.D. Pa. May 24, 2012) (noting irreparable harm from breach of non-disparagement agreement because "[c]laims, whether proven or not, would persist"). "'Grounds for irreparable injury include the loss of control of reputation.'" *Kos Pharms.*, 369 F.3d at 725. As courts in this circuit have repeatedly explained in other contexts, "[w]here a party is in possession of another party's confidential information and is poised to use or disclose that information, there is a likelihood of irreparable harm." *Jackson Hewitt, Inc. v. H.E.A.T., LLC*, No. 10-cv-5108 (DMC)(JAD), 2011 WL 63598, at *3 (D.N.J. Jan. 5, 2011); *see also, e.g.*, *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 440 (E.D. Pa. 2017) ("Disclosure of confidential information can support a finding of irreparable harm").

Courts applying these principles have repeatedly held that publication or dissemination of confidential or otherwise sensitive information constitutes irreparable harm because once that information has been revealed to the public, no subsequent order can restore the confidentiality that has been lost. *See, e.g.*, *Pfeiffer v. Ajamie PLLC*, 469 F. Supp. 3d 752, 764 (S.D. Tex. 2019) ("In any situation placing confidential information at stake, once it is made public, its confidential nature is permanently and irrevocable impaired . . . . This is irreparable harm sufficient to obtain equity's protection"); *Paisley Park Enters. v. Boxill*, 253 F. Supp. 3d 1037, 104 (D. Minn. 2017) ("the disclosure of such confidential information cannot be adequately compensated in damages"); *In re Zyprexa Injunction*, 474 F. Supp. 2d at 423-25 (disclosure of confidential information involves irreparable harm); *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) (disclosure of confidential information "which [is] not readily addressed through payment of economic damages, [is] sufficient to meet the irreparable injury requirement for a preliminary injunction"); *see also Covidien LP v. Esch*, 229 F. Supp. 3d 94, 99 (D. Mass. 2017) ("[I]mproper disclosure of confidential information 'is, in itself, an irreparable harm.'").

*In re Zyprexa Injunction* is again instructive. That case involved a complex product liability litigation in which "[t]he court ordered internal documents of [defendant] sealed on consent of the parties so that discovery could be expedited." 474 F. Supp. 2d at 391. As discussed above, a reporter schemed with a rogue expert witness (who subsequently served as a plaintiffs' expert in talc litigation) to publicly release documents produced in discovery that "would be annoying, embarrassing, oppressive, and burdensome" to the pharmaceutical company defendant. *Id.* at 404. In granting the preliminary injunction ordering return of the documents, the court concluded that preventing the "[d]isclosure of confidential" information was "[n]ecessary to [p]revent [i]rreparable [h]arm" to the company that produced the documents.

*Id.* at 424.  That was so in large part because "selective and out-of-context disclosure may lead to confusion in the [consumer] community and undeserved reputational harm."  Such harm would be impossible to remedy in a court of law by a subsequent damages action.  *See Gottstein*, 617 F.3d at 195 ("deal[ing] with the damages issue after the fact" "would eviscerate courts' ability to manage discovery").  And it would be impossible to remedy in the court of public opinion even if the "context" of the selectively leaked documents was ultimately "'shown to be neutral or even favorable to the defendant.'"  *In re Zyprexa Injunction*, 474 F. Supp. 2d at 425.

The same principles apply here, if anything, with greater force.  Just as in *In re Zyprexa Injunction*, a company is being threatened with significant reputational harm by the publication of improperly obtained confidential documents – which is very likely the intent of the conspirators.  Indeed, a talc plaintiffs' lawyer recently admitted that Reuters's prior publication attacking J&J (developed in collaboration with plaintiffs' lawyers) caused an immediate drop in J&J's stock price, benefiting the position of plaintiffs' lawyers.  (*See* Lanier *Hall* Decl. ¶ 6.)  But the case for a temporary restraining order is even more compelling here than in *In re Zyprexa Injunction* because, unlike in *In re Zyprexa Injunction* the improper publication here has not yet occurred (a reality that limited the scope of the final injunction granted in the *In re Zyprexa Injunction* case, since many of the documents had already been released, *see* 474 F. Supp. 2d at 426).  Here, the Court still has the opportunity to fully prevent irreparable harm to Movants by entering a temporary restraining order (as well as to protect the sanctity of its own orders).  For this reason, too, the motion should be granted.

## III.  **REUTERS WILL SUFFER LITTLE TO NO HARM BY BEING DENIED THE ABILITY TO DISSEMINATE CERTAIN CONFIDENTIAL DOCUMENTS.**

Compared to the severe and irreparable harm that Movants would suffer if their confidential and stolen documents were shared with the world, a temporary restraining order

would cause very little harm to Reuters.  This is so because:  (1) Movants do not take aim at the substance of Reuters's proposed speech, but only at its dissemination of judicially protected documents; and (2) there is already a procedure in place to challenge any inappropriate designation of confidentiality.  Thus, the balance of the equities favors granting a TRO/preliminary injunction.

  ***First***, the narrow scope of the present motion will limit any harm to Reuters.  This motion does not seek to prohibit Reuters from publishing its planned attack on the Debtor and J&J – slanted though it is likely to be.  Nor does it seek to prevent anyone else from running similar reports addressing the same topic.  The motion also does not seek to prohibit Reuters from using the great majority of the sources it appears poised to reference in its forthcoming articles or drawing from the nearly limitless public record that has already been established on this issue.  Thus, the news agency's ability to contribute to the public debate – and its own bottom line – would not be impaired in any material way.

  All the Movants ask in this motion is to temporarily prevent Reuters from disseminating, or making reference to, documents produced in discovery that were designated "Confidential" under this Court's orders.  This is hardly any restraint at all.  As a threshold matter, this limitation barely changes the content of the proposed piece.  But more importantly, Reuters had no right to the documents at issue in the first place.  Debtor produced them "only by virtue of the [bankruptcy] court's discovery process" – a process that exists for the sole purpose of "preparation and trial, or . . . settlement" of discrete legal controversies.  *Seattle Times*, 467 U.S. at 32-33.  For just this reason, the *In re Zyprexa Injunction* court found that requiring the return of similar "stolen documents" imposed "minimal" "harm" on the parties that illegitimately possessed them.  *In re Zyprexa Injunction*, 474 F. Sup. 2d at 425.  The same principle applies

here.  Since Reuters cannot have any legitimate interest in possessing the two documents in the

first instance, neither can it have any legitimate interest in disseminating them to the general

public.  *See Pfeiffer*, 469 F. Supp. 3d at 764 ("no real hardship" to "abide by . . . duties to

keep . . . information confidential"); *cf. State of New York v. United States Metals Refining Co.*,

771 F.2d 796, 802 (3d Cir. 1985) (noting propriety of "an order prohibiting the disclosure of

information obtained under the rules of discovery").

      *Second*, to the extent that Reuters, or whichever party leaked the documents at issue,

believes those documents are not legitimately confidential, and that there is a real interest in

disseminating them publicly, a procedure for challenging confidentiality designations already

exists, and parties are free to avail themselves of it.  But that is no excuse not to abide by the

Protective Order unless and until it is modified.  *See In re Zyprexa Injunction*, 474 F. Supp. 2d at

425 ("To the extent [enjoined parties] believe access to the protected documents is essential to

their pursuit of the public interest, they may petition the court for declassification of the

documents or modification of the protective order."); *Gottstein*, 617 F.3d at 196 ("If [enjoined

parties] believed that particular documents were improperly designated as confidential, then the

proper procedure was for either of them to avail himself of the procedure envisioned . . . for

declassifying" them).  In this case, anyone with access to confidential information under the

Protective Order is entitled to "move at any time for relief from [the order's] provisions," at

which time the designating party would bear the burden of proving a specific document should

be kept confidential.  (*See* Protective Order § E.)[5]  Moreover, even absent any petition, the

confidentiality order remains always subject to amendment by the Court.  (*Id.* § Q.)

---

[5]     Section E references "Parties," but that term is defined to include not just the Debtor and claimant
committee, but also anyone "that agrees to the Protective Order."  (Protective Order § A.18.)

For all of these reasons, any minimal harm that harm might befall Reuters if this motion is granted pales in comparison to the harm that would befall the Movants (as well as the integrity of the court system as a whole) should it be denied.

## IV.    THE PUBLIC INTEREST IN THE INTEGRITY OF PROTECTIVE ORDERS IS OVERWHELMING.

Finally, the public interest also weighs in favor of the requested relief, which would simply effectuate the Protective Order in this case and ensure the fair and proper functioning of discovery in this and other litigation.

In entering the Protective Order in this case, the Court necessarily balanced the litigants' privacy rights against the public's interest in information designated as confidential in good faith. *See Grant Heilman Photography, Inc. v. Pearson Educ., Inc.*, No. 11-cv-4649, 2012 U.S. Dist. LEXIS 75312, at *1-2 (E.D. Pa. May 31, 2012) ("In determining that such a protective order was warranted, we carefully and appropriately balanced the relevant public and private interests, including [defendant's] private interest in maintaining the confidentiality of its 'print quantity report'; the public's interest in open proceedings and exposing potential wrongdoing; and the public's interest in encouraging the parties to deal with the courts . . . openly and honestly, so that disputes may be resolved justly and efficiently.").  That balancing "incorporate[d] consideration of the overarching purpose of the discovery process: 'Discovery involves the use of compulsory process to facilitate orderly preparation for trial, not to educate or titillate the public.'" *In re Zyprexa Injunction*, 474 F. Supp. 2d at 415 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).  If Reuters believes that there is a legitimate public interest in the documents protected under the Court's Protective Order, the proper course is to challenge the confidentiality designations under Section E.  *See id.* at 425 ("To the extent they believe access to the protected

documents is essential to their pursuit of the public interest, they may petition the court for

declassification of the documents or modification of the protective order.").

Reuters has not even attempted to mount such a challenge.  Instead, it has simply ignored

the Protective Order altogether, undermining its effectiveness and setting a dangerous precedent

for similar orders, which have become a mainstay in complex civil litigation.  As *In re Zyprexa

Injunction* explains, "[p]rotective orders serve essential functions in civil adjudications, including

the protection of the parties' privacy and property rights."  *In re Zyprexa Injunction*, 474 F.

Supp. 2d at 414 (citing *Seattle Times Co.*, 467 U.S. at 34-35 ("It is clear from experience that

pretrial discovery . . . has a significant potential for abuse.  This abuse is not limited to matters of

delay and expense; discovery also may seriously implicate privacy interests of litigants and third

parties.")).  They also "encourage and simplify the exchanging of large numbers of documents,

volumes of records and extensive files without concern of improper disclosure. . . . The objective

is to speed up discovery."  *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356-57 (11th Cir.

1987).

Those important functions would be rendered a dead letter if parties to protective orders

were allowed to purloin confidential documents and feed them to reporters for purposes of

litigating claims in the media rather than in the courtroom.  "Without an ability to restrict public

dissemination of certain discovery materials that are never introduced at trial, litigants would be

subject to needless annoyance, embarrassment, oppression, or undue burden or expense."  *S.E.C.

v. TheStreet.com*, 273 F.3d 222, 229 (2d Cir. 2001) (citing Fed. R. Civ. P. 1).  The specter of

these harms would inevitably discourage potential litigants from bringing suit in the first place

"'rather than expose themselves to unwanted publicity,'" "'resulting in frustration of a right as

valuable as that of speech itself.'"  *Seattle Times*, 467 U.S. at 36 n.22 ("The Supreme Court of

Washington properly emphasized the importance of ensuring that potential litigants have unimpeded access to the courts[.]").  They would also threaten to create a civil justice system in which litigants do not enter into protective orders, grinding discovery in complex litigation such as the present one to a halt.  Both outcomes are fundamentally at odds with the public interest and further warrant the entry of an emergency temporary restraining order.  These public policy concerns make it critical not only to preclude the publication of information gleaned from the publication of documents designated as "Confidential" but also to determine which attorney(s) violated the Protective Order in sharing such materials with Reuters and fashion the relief the Court deems appropriate.

## CONCLUSION

For the foregoing reasons, the Court should issue an emergency temporary restraining order against Reuters, requiring the return of documents designated as "Confidential" under the Protective Order and precluding their publication.  In addition, the Court should order each attorney who has made an appearance in the above-captioned proceeding to submit to the Court a declaration under penalty of perjury stating whether he or she disclosed any materials designated as "Confidential" in this proceeding to Reuters.

Dated: February 3, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
David S. Torborg, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dstorborg@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

**LOWENSTEIN SANDLER LLP**

*/s/ Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
krosen@lowenstein.com
mseymour@lowenstein.com

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
Glenn M. Kurtz (admitted *pro hac vice*)
Gregory M. Starner (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
(212) 819-8200 (Telephone)
(212) 354-8113 (Facsimile)
jessica.lauria@whitecase.com
gkurtz@whitecase.com
gstarner@whitecase.com

Jaime A. Bianchi (admitted *pro hac vice*)
Michael C. Shepherd (admitted *pro hac vice*)
Laura L. Femino (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
(305) 371-2700 (Telephone)
(305) 357-5744 (Facsimile)
jbianchi@whitecase.com
mshepherd@whitecase.com
laura.femino@whitecase.com

*ATTORNEYS FOR JOHNSON & JOHNSON
AND JOHNSON & JOHNSON CONSUMER,
INC.*