UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Order Filed on February 24, 2022
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In Re: | Case No.: 21-30589 |
| LTL MANAGEMENT LLC | Chapter: 11 |
| | Hearing Date: |
| | Judge: Michael B. Kaplan |

**JOINT STIPULATION AND AGREED ORDER BETWEEN MOVANTS AND DEBTOR REGARDING THE ADMISSION OF DEPOSITION DESIGNATIONS AT MOTION TO DISMISS TRIAL**

The relief set forth on the following pages  is  **ORDERED**.

**DATED: February 24, 2022**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY**

| Caption in Compliance with D.N.J. LBR 9004-1(b) | BAILEY GLASSER LLP |
|---|---|
| **COOLEY LLP**<br>Cullen D. Speckhart (admitted pro hac vice)<br>Michael Klein (admitted pro hac vice)<br>Erica J. Richards (pro hac vice to be filed)<br>Lauren A. Reichardt (pro hac vice to be filed)<br>Evan Lazerowitz<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Fax: (212) 479-6275<br>Email: cspeckhart@cooley.com<br>　　　mklein@cooley.com<br>　　　erichards@cooley.com<br>　　　lreichardt@cooley.com<br>　　　elazerowitz@cooley.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* | Brian A. Glasser, Esq. (admitted pro hac vice)<br>Thomas B. Bennett, Esq. (admitted pro hac vice)<br>Kevin W. Barrett, Esq. (admitted pro hac vice)<br>Maggie B. Burrus, Esq. (admitted pro hac vice)<br>105 Thomas Jefferson St. NW, Suite 540<br>Washington, DC 20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>Email: bglasser@baileyglasser.com<br>　　　tbennett@baileyglasser.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* |
| **WALDREP WALL BABCOCK & BAILEY PLLC**<br>Thomas W. Waldrep, Jr. (admitted pro hac vice)<br>Kevin L. Sink (admitted pro hac vice)<br>James C. Lanik (admitted pro hac vice)<br>Jennifer B. Lyday (admitted pro hac vice)<br>370 Knollwood Street,<br>Suite 600<br>Winston-Salem, NC 27103<br>Tel: (336) 717-1280<br>Fax: (336) 717-1340<br>Email: notice@waldrepwall.com<br><br>*Proposed Co-Counsel to the Official Committee of Talc Claimants II* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq. (admitted pro hac vice)<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>Email: jmassey@masseygail.com<br><br>*Proposed Co-Counsel to the*<br>*Official Committee of Talc Claimants II* |
| **SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.**<br>Arthur J. Abramowitz<br>Alan I. Moldoff<br>Ross J. Switkes<br>308 Harper Drive, Suite 200<br>Moorestown, New Jersey 08057<br>Tel: (856) 662-0700<br>Email: aabramowitz@shermansilverstein.com<br>　　　amoldoff@shermansilverstein.com<br>　　　rswitkes@shermansilverstein.com<br>*Proposed Local Counsel to*<br>*the Official Committee of Talc Claimants II* | |

| In re: | Chapter 11 |
|---|---|
| **LTL MANAGEMENT LLC,** | Case No.:  21-30589 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

### JOINT STIPULATION AND AGREED ORDER BETWEEN MOVANTS AND DEBTOR REGARDING THE ADMISSION OF DEPOSITION DESIGNATIONS AT MOTION TO DISMISS TRIAL

The relief set forth on the following pages is hereby **ORDERED**.

2

This stipulation and agreed order (this "Stipulation") is made on this 18th day of February, 2022 (the "Stipulation Date") by the Official Committee of Talc Claimants I (the "TCC I"), the Official Committee of Talc Claimants II (the "TCC II"), Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO"), and Arnold & Itkin LLP on behalf of certain personal injury tort plaintiffs (collectively, "Movants"), and LTL Management LLC, the debtor and debtor-in-possession ("Debtor"), regarding the evidentiary record for the Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case [Docket No. 632] and Motion to Dismiss Bankruptcy Case filed by Arnold & Itkin LLP on behalf of certain personal injury tort plaintiffs [Docket No. 766] (the "Motions to Dismiss").

### Recitals

WHEREAS, the Preliminary Hearing on the Motions to Dismiss commenced on February 14, 2022 (the "MTD Trial");

WHEREAS, the Movants have designated certain portions of the following depositions that they wish the Court to consider ("Movants' Designations"), and the Debtor has counter-designated other portions of these depositions that it wishes the Court to consider ("Debtor's Counters"):

- Michelle Goodridge (Dec. 20, 2021);

- Robert Wuesthoff (Dec. 22, 2021);

- Thibaut Mongon (Jan. 19, 2022);

- Jose Azevedo (Jan. 24, 2022);

- Richard Dickinson (Jan. 26, 2022);

- Michelle Ryan (Jan. 27, 2022);

- John Kim (Jan. 31, 2022);

3

- John Kim (30(b)(6)) (Feb. 1, 2022);

- Adam Lisman (Feb. 8, 2022);

- Arthur Wong (Feb. 11, 2022); and

- David Kaplan (Feb. 11, 2022).

WHEREAS, the Debtor has designated certain portions of the following depositions that it wishes the Court to consider ("Debtor's Designations"), and the Movants have designated other portions of these depositions that they wish the Court to consider ("Movants' Counters"):

- Michelle Ryan (Jan. 27, 2022);

- Arthur Wong (Feb. 11, 2022); and

- David Kaplan (Feb. 11, 2022).

WHEREAS, a listing of (a) Movants' Designations, (b) Debtor's Counters, (c) Debtor's Designations, and (d) Movants' Counters (collectively, the "Stipulated Designations") to which the parties either have no objections or have waived objections, together with agreed-upon confidentiality treatment in accordance with the Agreed Protective Order Governing Confidential Information [Docket No. 948] (the "Protective Order"), is attached hereto as Exhibit A;

WHEREAS, the Parties wish the Court to accept the Designations into evidence, and consider the Designations in connection with deciding the MTD Trial;

WHEREAS, those Stipulated Designations that are, pursuant to the Protective Order, available for public view are annexed hereto as Exhibit B.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, AND UPON APPROVAL BY THE BANKRUPTCY COURT OF THIS STIPULATION, IT IS SO ORDERED AS FOLLOWS:

1.      The Stipulated Designations in Exhibit B hereto are admitted into evidence and are made part of the public record herewith

2.      The remaining Stipulated Designations (*i.e.*, those listed in Exhibit A hereto that are subject to confidential treatment in accordance with the Protective Order) are also admitted into evidence and shall be filed in accordance with the Protective Order or otherwise in the form and manner agreed between and among the parties and the Court.

3.      This Stipulation shall constitute the entire agreement and understanding between Movants and Debtor relating to the subject matter hereof and supersedes all prior agreements and understandings between Movants and Debtor relating to the subject matter hereof.

4.      The Court shall retain jurisdiction to resolve any disputes, controversies, or ambiguities arising from this Stipulation.

*{Signature page follows}*

AGREED AS TO FORM AND SUBSTANCE:

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
*Proposed Local Counsel to the*
*Official Committee of Talc Claimants II*


By: ___*/s/ Arthur J. Abramowitz*_____
      Arthur J. Abramowitz
      Ross J. Switkes
      308 Harper Drive, Suite 200
      Moorestown, NJ
      Tel: (856) 662-0700
      aabramowitz@shermansilverstein.com
      rswitkes@shermansilverstein.com

Dated: February 18, 2022

**GENOVA BURNS, LLC**
*Proposed Local Counsel to the*
*Official Committee of Talc Claimants I*


By: ___*/s/ Daniel M. Stolz*_____
      Daniel M. Stolz
      Donald W. Clarke
      110 Allen Road, Suite 304
      Basking Ridge, NJ 07920
      Tel: (973) 533-0777
      dstolz@genovaburns.com
      dclarke@genovaburns.com

Dated: February 18, 2022


**WOLLMUTH MAHER & DEUTSCH LLP**
*Counsel to the Debtor*


By: ___*/s/ Paul R. DeFilippo*_____
      Paul R. DeFilippo
      500 Fifth Avenue
      New York, New York 10110
      Tel: (212) 382-3300
      pdefilippo@wmd-law.com

Dated: February 18, 2022

**OFFIT KURMAN, P.A.**
*Counsel to Aylstock, Witkin, Kreis &*
*Overholtz, PLLC*


By: ___*/s/ Paul J. Winterhalter*_____
      Paul J. Winterhalter
      99 Wood Avenue South, Suite 302
      Iselin, New Jersey 08830
      Tel: (267) 338-1370
      pwinterhalter@offitkurman.com

Dated: February 18, 2022


**PACHULSKI STANG ZIEHL & JONES LLP**
*Counsel to Arnold & Itkin LLP*


By: ___*/s/ Colin Robinson*_____
      Laura Davis Jones
      Colin Robinson
      919 N. Market Street, 17th Floor
      Wilmington, DE 19801
      Tel: (302) 652-4100
      ljones@pszjlaw.com

Dated: February 18, 2022

# EXHIBIT A: DEPOSITION DESIGNATIONS

**JOSE AZEVEDO – JANUARY 24, 2022**

| Movants' Designation (Azevedo) | Debtor's Counter Designation |
|---|---|
| 11:20-25 | |
| 14:19-22 | |
| 17:4-17:11 | |
| 18:12-20 | |
| 22-17-23:22 | |
| 33:14-34:6 | |
| 35:11-37:16 | |
| 39:3-20 | |
| 42:20-45:12 | |
| 52:12-53:20 | |
| 55:4-57:12 | |
| 58:5-61:6 | 57:18 – 22 |
| 62:23-63:20 | |
| 65:21-68:8 | |
| 68:17-70:16 | |
| 72:2-8 | |
| 73:5-74:2 | |
| 74:13-23 | |
| 79:4-80:22 | |
| 85:18-86:6 | |
| 87:5-89:8 | |
| 90:11-98:6 | |
| 98:17-24 | |
| 99:11-101:18 | |
| 102:17-23 | |
| 103:4-108:16 | |
| 110:13-115:16 | |
| 116:4-118-21 | |
| 119:16-21 | 119:23-120:3 |
| 120:4-121-13 | |
| 147:2-8 | |
| 148:13-149:22 | |
| 152:12-22 | |
| 156:24-157:9 | |
| 168:20-169:23 | |
| 175:12-183:4 | 166:20 – 168:19, 183: 5 – 16 |

**RICHARD DICKINSON – JANUARY 26, 2022**

| Movants' Designation (Dickinson) | Debtor's Counter Designation |
|---|---|
| 18:23-19:6 | |
| 19:11-20:20 | |
| 24:3-20 | |
| 25:20-26:17 | |
| 27:19-28:7 | 28:8-29:8; 29:21-24; 30:9-17 |
| 32:14-33:20 | |
| 34:7-34:13 | |
| 34:20-35:13 | |
| 35:15-35:18 | |
| 40:12-41:12 | |
| 42:5-42:13 | |
| 44:22-45:13 | |
| 48:9-48:20 | |
| 49:24-50:11 | |
| 61:10-61:17 | |
| 70:3-70:11 | |
| 72:14-74:8 | |
| 75:10-77:15 | |
| 78:9-79:13 | |
| 80:13-20 | |
| 81:5-7 | |
| 83:12-84:17 | |
| 86:12-22 | |
| 88:12-88:18 | |
| 89:19-91:9 | |
| 91:21-93:21 | |
| 92:23-93:21 | |
| 94:14-95:21 | |
| 101:13-15 | 101:16-17 |
| 101:19-102:11 | |
| 103:17-104:15 | |
| 107:20-108:7 | |
| 117:20-118:8 | 113:17-21; 116:23-18 |
| 146:7-11 | |
| 147:5-147:11 | |
| 150:11-151:21 [sic] | 149:18-150:7;151:22-25 |
| 155:22-158:19 | |
| 158:25-159:22 | |
| 172:19-174:6 | |
| 176:17-19 | |
| 176:22-178:5 | |

| Movants' Designation (Dickinson) | Debtor's Counter Designation |
|---|---|
| 182:20-183:16 | 181:22-183:1;182:15-19; 183:17-19 |
| 189:16-190:8 | |
| 196:25-197:4 | |
| 197:8-17 | |
| 198:12-199:10 | |
| 199:18-24 | |
| 200:3-25 | |
| 201:17-202:3 | |
| 202:17-203:4 | |
| 203:6-17 | 203:18-22; 204:12-15 |
| 204:17-205:3 | |
| 207:8-17 | |
| 209:7-210:18 | |
| 211:24-212:17 | |
| 214:3-215:18 | |
| 218:20-219:15 | |
| 219:23-220:20 | |
| 230:6-230:19 | |
| 232:12-233:7 | |
| 236:14-238:6 | |
| 244:7-245:25 | |
| 248:25-249:16 | |
| 252:16-252:25 | |
| 256:11-256:17 | |
| 262:21-263:10 | |
| 292:25-293:18 | |
| 312:22-313:14 | |
| 318:17-319:9 | |
| 332:19-21 | |
| 333:7-335:5 | |
| 336:14-336:22 | 336:12-13 |
| 338:17-339:7 | |
| 339:16-23 | |
| 340:7-21 | |
| 346:12-24 | |
| 347:19-20 | |
| 348:3-24 | |
| 350:20-351:6 | |
| 351:18-352:4 | |
| 352:11-354:9 | |
| 355:7-356:8 | |
| 356:20-357:19 | |

| Movants' Designation (Dickinson) | Debtor's Counter Designation |
|---|---|
| 357:23-358:15 | |
| 360:20-361:6 | |
| 364:7-365:5 | |
| 401:5-10 | |

**MICHELLE RYAN – JANUARY 27, 2022**

| Movants' Designation (Ryan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 8:19-8:21 | | 8:19 – 21 | |
| 9:8 – 10:17 | | 9:8 – 10:17 | |
| 11:09-11:16 | | 15:14 – 18 | |
| 15:14-18 | | 17:21 – 18:19 | 16:21 – 24 |
| 16:21-24 | | 140:3 – 141:20 | 141:21 – 144:16 |
| 17:1-9 | | 143:19 – 22 | 143:24 – 144:16 |
| 17:19-18:25 | | 145:5 – 7 | 145:13 –23; 148:21 – 149:10 |
| 19:11-21:01 | | 145:13 – 23 | 145:5 – 7; 148:21 – 149:10 |
| 22:4-23:8 | | 149:16 – 150:6 | |
| 23:13:-24:5 | | 201:19 – 207:7 (including Ex. 107) | 207:11 – 20 |
| 24:7-17 | | 207:11 – 20 | 201:19 – 207:7 |
| 25:14-26:3 | | 214:24 – 215:1 | 216:5 – 8; 218:6 – 15 |
| 27:1-5 | | 215:10 – 25 | 214:24 – 215:1; 216:5 – 8; 218:6 – 15 |
| 27:24-28:2 | | 218:17 – 20 | 219:7 – 15; 221:10 – 222:14; 222:16 – 25; 223:1 – 13 |
| 29:18-21 | | 219:7 – 15 | 221:10 – 222:14; 222:16 – 25; 223:1 – 13 |
| 29:23-30:1 | | 221:10 – 222:10 | 221:10 – 222:14; 222:16 – 25; 223:1 – 13 |
| 31:8-32:1 | | 222:14 | 221:10 – 222:14; 222:16 – 25; 223:1 – 13 |
| 32:3-32:5 | | 223:14 – 224:1 | |
| 32:7-25 | | 230:11 – 231:6 | 231:17 – 232:2 |
| 33:2-8 | | 234:15 – 235:7 | |
| 33:11-33:12 | | | |
| 33:17-24 | | | |
| 34:13-35:7 | | | |
| 35:22 – 36:18 | | | |
| 36:23 – 38:8 | | | |
| 39:6-13 | | | |
| 40:10 – 42:24 | 42:25 | | |
| 43:1-43:2 | | | |

| Movants' Designation (Ryan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 43:8 -45:1 | | | |
| 45:5 – 47:3 | | | |
| 48: 8-49: 7 | | | |
| 49:18 – 50:13 | | | |
| 51:13-52:5 | 51:5-51:11 | | |
| 52:12 – 53:5 | | | |
| 53:17-19 | | | |
| 54:22- 56:8 | | | |
| 56:12-57:13 | | | |
| 58:14-58:22 | | | |
| 59:10-60:6 | | | |
| 60:13-60:15 | 60:10-16 | | |
| 60:17-60:19 | | | |
| 60:21-60:24 | | | |
| 61:4-15 | | | |
| 61:17-62:25 | | | |
| 63:11-63:15 | | | |
| 64:4-65:9 | | | |
| 65:24-66:7 | 66:8-9 | | |
| 66:10-67:7 | | | |
| 67:9-22 | | | |
| 67:24-68:15 | 68:16-17 | | |
| 68:18-69:8 | | | |
| 69:10-69:17 | 69:18-21 | | |
| 69:22-69:23 | | | |
| 69:25-70:02 | | | |
| 70:10-70:22 | 70:23-24 | | |
| 70:25 | 70:23-24 | | |
| 75:22-75:25 | 75:17-18 | | |
| 76:06-76:20 | 76:1-5 | | |
| 80:20-22 | | | |
| 80:24-25 | | | |
| 81:8-87:8 | | | |
| 89:4 – 91:16 | | | |
| 93:14 – 94:12 | | | |
| 95:21 – 97:14 | | | |
| 99:8 – 101:22 | | | |
| 104:6-104:11 | | | |
| 104:11-104:21 | 104:22-105:1 | | |
| 105:7 -106:8 | | | |
| 106:17 -20 | | | |
| 108:8-18 | | | |
| 111:13-111:25 | | | |

| Movants' Designation (Ryan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 117:1-118:3 | | | |
| 118:8-10 | | | |
| 121:1-23 | | | |
| 131:13-132:17 | | | |
| 134:8-134:21 | | | |
| 135:8-136:1 | 136:2-3 | | |
| 136:4-9 | 136:11-12 | | |
| 136:13-15 | | | |
| 136:17-136:23 | 136:24-25 | | |
| 137:3-11 | | | |
| 138:14-138:24 | | | |
| 140:3-141:20 | | | |
| 143:19-144:16 | | | |
| 145:5-23 | | | |
| 148:20 -149:14 | 149:16-150:6 | | |
| 150:12-151:2 | | | |
| 151:22-152:5 | 152:6-7 | | |
| 152:8-152:11 | | | |
| 152:13-152:22 | 152:23 | | |
| 152:24-152:25 | | | |
| 154:15-24 | | | |
| 156:14-156:22 | | | |
| 157:1-157:18 | 157:19-23 | | |
| 158:2-158:3 | 158:4-7 | | |
| 158:8-158:10 | | | |
| 158:12-158:20 | | | |
| 161:8 – 161:14 | | | |
| 172:21 – 173:7 | | | |
| 174:19-23 | | | |
| 175:7 – 176:22 | | | |
| 176:25-178:1 | | | |
| 179:23-180:23 | | | |
| 190:2-191:10 | | | |
| 196:20- 197:24 | | | |
| | 201:19-207:7; 207:11-20 | | |
| 204:4-207:20 | | | |
| 208:2-12 | | | |
| 209:2-18 | | | |
| 212:17-212:25 | | | |
| 216:5-8 | 214:24-215:1; 215:10-25 | | |
| 216:9-217:10 | | | |

| Movants' Designation (Ryan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 217:13-21 | | | |
| 218:6-218:15 | 218:17-20; 221:10-222:10 | | |
| 224:2-7 | 223:14-224:1 | | |
| 229:2-19 | 228:24-229:1 | | |
| 231:17-232:2 | 230:11-231:6 | | |
| 243:19-244:8 | | | |
| 247:8 – 248:24 | | | |
| 252:9 -253:6 | | | |
| 274:9-22 | | | |
| 275: 4-15 | | | |
| 296:6 – 297:21 | | | |
| 298:12-25 | | | |
| 299: 7-19 | | | |
| 302: 20-303:2 | | | |
| 303:4-15 | 303:17-303:22 | | |
| 303:23 – 307:5 | | | |

**ARTHUR WONG – FEBRUARY 11, 2022**

| Movants' Designation (Wong) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 11:5 - 11:10 | 11:11-14 | 18:7-19 | |
| 11:24 - 12:5 | | 19:5-7 | |
| 14:8 - 15:18 | 13:19-14:7 | 19:13-19 | |
| 18:7 - 18:19 | | 19:25-20:11 | |
| 19:5 - 22:7 | 22:8-9 | 47:8-48:25 | |
| 23:20 - 24:3 | | 50:24-51:18 | |
| 24:19 - 26:25 | 24:4-18 | 51:21-52:8 | |
| 27:25 - 28:9 | | 56:10-22 | 55:16-56:9; 56:23-57:4 |
| 30:2 - 30:13 | | 57:17-21 | |
| 31:21 - 34:6 | | 58:8-18 (just A. I do.) | |
| 34:22 - 35:23 | | 58:20-59:2 | |
| 36:1 - 36:6 | | 59:22-25 | |
| 39:1 - 40:25 | | 60:12-62:2 | |
| 71:14 - 72:24 | 72:25-73:25 | 64:15-66:14 | 63:15-64:14; 67:3-7; 76:20-77:4 |
| | | | |

**DAVID KAPLAN – FEBRUARY 11, 2022**

| Movants' Designation (Kaplan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 13:18 - 13:21 | | 160:3-161:12 | 161:13-163:12 |
| 13:23 - 14:4 | | 165:6-166:7 (just A. Not – not specifically) | 166:7-167:3 |
| 14:7 - 14:13 | | 171:7-172:13 | 172:14-15 |
| 17:2 - 19:8 | | 174:25-176:5 | |
| 20:20 - 20:24 | | 177:18-180:19 | 180:20-21 |
| 20:25 - 21:25 | | 180:22-181:6 | |
| 22:8 - 23:4 | 23:5 – 23:19 | 191:12-192:24 | 191:6-10 |
| 23:20 - 25:20 | | 193:10-193-13 | |
| 26:10 - 26:19 | 26:20 – 27:14 | 197:23-198:14 | 198:15-16 |
| 27:15 - 28:24 | | 198:17-199:4 | 199:5-23 |
| 30:1 - 30:22 | 30:23 – 34:15 | 199:24-200:4 | |
| 34:16 - 37:20 | | 203:6-16 | |
| 38:24 - 40:25 | | 205:24-206:6 | |
| 42:22 - 43:18 | | 208:19-209:23 | |
| 44:3 - 44:10 | 44:11 | 211:16-213:5 | |
| 44:12 - 44:24 | | 214:1-214:9 | |
| 45:5 - 45:7 | | 214:24-216:25 | |
| 45:13 - 48:3 | | 219:24-220:7 | |
| 48:4 - 49:11 | | 248:8-249:23 | |
| 51:4 - 51:16 | | | |
| 53:10 - 53:22 | | | |
| 56:24 - 59:24 | | | |
| 59:25 - 60:12 | 60:13 – 60:25 | | |
| 61:1 - 62:19 | | | |
| 70:12 - 71:6 | | | |
| 78:23 - 80:21 | | | |
| 82:2 - 82:20 | 82:21 – 83:5 | | |
| 83:25 - 84:8 | | | |
| 84:10 - 87:8 | | | |
| 88:18 - 89:1 | 89:2 | | |
| 91:11 - 91:16 | 91:17 – 94:16 | | |
| 94:17 - 96:5 | 96:6 – 96:9 | | |
| 96:10 - 97:2 | | | |
| 98:8 - 98:23 | | | |
| 102:21 - 103:16 | 105:9 – 106:9 | | |
| 106:10 - 106:13 | | | |
| 108:17 - 110:24 | 110:25 – 111:15 | | |
| 111:16 - 111:19 | 111:20 – 112:10 | | |
| 112:12 - 112:19 | | | |

| Movants' Designation (Kaplan) | Debtor's Counter Designation | Debtor's Designation | Movants' Counter Designation |
|---|---|---|---|
| 119:4 - 119:15 | | | |
| 120:16 - 121:8 | | | |
| 121:24 - 122:21 | 122:22 – 123:2; 124:24 – 125:9; 130:4 – 132:9; 137:13 – 138:25; 144:16 – 146:21; 149:10 – 149:24; 150:7 – 150:18; 150:20 – 151:13; 160:3 – 160:20; 160:21 – 161:12; 162:3 – 163:12; 164:16 – 165:1 | | |
| 165:20 - 166:16 | 167:4 – 167:13; 168:3 – 168:6 | | |
| 169:14 - 170:16 | 172:1 – 172:13; 174:25 – 176:10; 178:13 – 179:23; 194:3 – 194:13; 197:10 – 198:14; 199:5 – 200:4; 200:5-206:06; 208:19 – 211:15; 211:16 – 211:25; 212:1 – 212:23; 213:9 – 213:25 | | |
| 214:1 - 214:16 | 214:17 – 214:23; 216:12 – 217:2; 217:3 – 217:9; 219:24 – 220:7; 224:21 – 225:1; 225:2 – 226:20 | | |
| 228:2 - 233:25 | | | |
| 234:14 - 234:25 | | | |
| 235:21 - 236:8 | | | |
| 243:14 - 244:20 | | | |
| 246:6 - 247:24 | 248:8 – 249:23 | | |
| 251:15 - 252:25 | 253:1 – 253:8 | | |

**ADAM LISMAN – FEBRUARY 8, 2022**

| Movants' Designation (Lisman) | Debtor's Counter Designation |
|---|---|
| 10:10 - 10:17 | 9:13-25; 10:8-9 |
| 13:2 - 14:22 | |
| 15:9 - 17:8 | |
| 19:2 - 19:9 | 19:10-16 |
| 21:12 - 21:20 | 20:25-21:19 |
| 23:5 - 25:20 | 22:21-23:5 |
| 37:16 - 38:2 | |
| 38:19 - 39:17 | 38:3-9 |
| 40:1 - 41:8 | |
| 42:13 - 43:7 | |
| 44:5 - 44:12 | |
| 51:8 - 52:13 | 50:17-51=:7 |
| 52:25 - 53:11 | |
| 68:16 - 69:17 | |
| 69:19 - 70:14 | |
| 71:18 - 71:25 | |
| 89:24 - 90:11 | |
| 92:20 - 93:7 | |
| 100:8 - 100:13 | 99:2-100:7 |
| 102:8 - 102:22 | |
| 110:10 - 110:21 | 109:15-110:9 |
| 113:22 - 114:19 | |
| 120:11 - 121:17 | |
| 123:3 - 124:16 | 122:24-123:3 |
| 131:20 - 132:5 | |
| 133:3 - 133:21 | |
| 134:4 - 135:6 | |
| 140:23 - 141:18 | |
| 141:23 - 143:10 | |
| 143:14 - 146:2 | 141:11-14 |
| 146:25 - 147:17 | 147:8-149:2 |
| 149:17 - 150:10 | |
| 151:19 - 152:7 | |
| 152:15 - 154:1 | |
| 155:4 - 155:21 | |
| 164:19 - 165:14 | |
| 172:12 - 172:19 | |
| 186:19 - 187:8 | |
| 187:21 - 190:17 | 187:9-20 |
| 192:7 - 193:21 | 191:23-192:6 |

| Movants' Designation (Lisman) | Debtor's Counter Designation |
|---|---|
| 197:7 - 197:17 | |
| 204:17 - 205:10 | |
| 213:13 - 216:20 | 213:2-12 |
| 229:12 - 229:25 | 228:23-229:11 |
| 243:13 - 243:22 | 243:4-12 |
| 249:25 - 250:7 | |

**ROBERT WUESTHOFF – DECEMBER 22, 2021**

| Movants' Designation (Wuesthoff) | Debtor's Counter Designation |
| --- | --- |
| 17:25 - 18:17 | 17:8-24 |
| 18:25 - 19:15 | |
| 20:13 - 20:15 | |
| 21:2 - 21:18 | 21:19-23 |
| 22:3 - 22:10 | 22:11-12 |
| 26:17 - 26:21 | 26:22-27:1 |
| 27:2 - 27:9 | |
| 28:2 - 28:25 | |
| 29:25 - 30:4 | 30:5-8 |
| 30:9 - 30:11 | |
| 34:11 - 34:16 | 34:17-35:1 |
| 35:22 - 36:6 | |
| 39:24 - 40:11 | 40:12-16 |
| 42:11 - 42:20 | 41:20-42:10 |
| 50:13 - 50:19 | |
| 53:19 - 53:23 | |
| 57:6 - 57:8 | 57:9-15 |
| 57:16 - 57:22 | 57:23-58:7 |
| 58:8 - 59:18 | |
| 61:18 - 63:1 | |
| 63:4 - 63:12 | 63:13-14 |
| 63:15 - 64:5 | |
| 65:22 - 66:1 | |
| 66:8 - 66:12 | |
| 67:8 - 67:18 | |
| 68:8 - 68:15 | |
| 69:24 - 70:17 | 7:18-21 |
| 70:22 - 73:4 | |
| 74:6 - 77:12 | |
| 78:3 - 78:19 | |
| 82:3 - 82:15 | |
| 108:25 - 109:8 | |
| 109:11 - 109:12 | 109:9-10; 109:14-18 |
| 127:16 - 127:21 | |
| 127:24 - 128:8 | |
| 128:11 - 128:23 | 128:24-25 |
| 129:1 - 129:2 | |
| 129:4 - 130:6 | |
| 130:13 - 130:14 | 130:7-12 |
| 130:16 - 130:17 | 130:18 |
| 130:19 - 130:25 | |

| Movants' Designation (Wuesthoff) | Debtor's Counter Designation |
|---|---|
| 131:2 - 131:20 | 131:21 |
| 131:22 - 131:25 | |
| 132:2 - 132:4 | 132:5-6 |
| 132:7 - 132:9 | |
| 132:11 - 132:17 | |
| 142:17 - 143:13 | |
| 144:25 - 145:3 | |
| 146:9 - 146:22 | 146:23-24 |
| 146:25 - 147:2 | |
| 150:1 - 150:15 | |
| 150:22 - 152:3 | 152:4-5 |
| 152:9 - 152:9 | 152:10-153:1 |
| 153:2 - 153:8 | 153:9-10 |
| 153:11 - 153:15 | |
| 154:16 - 154:18 | 154:19-20 |
| 154:21 - 154:24 | |
| 155:3 - 156:17 | |
| 160:3 - 160:17 | |
| 161:4 - 161:23 | |
| 162:3 - 162:15 | |
| 163:1 - 163:15 | |
| 167:16 - 168:5 | |
| 168:8 - 168:15 | 168:16-18 |
| 168:21 - 168:25 | |
| 169:2 - 169:10 | 169:1 |
| 169:12 - 169:15 | 169:16-17 |
| 169:18 - 169:20 | |
| 169:23 - 170:1 | |
| 171:13 - 171:14 | 171:15 |
| 171:16 - 171:17 | |
| 171:19 - 172:10 | |
| 172:21 - 173:15 | |
| 173:22 - 173:25 | |
| 178:17 - 178:23 | 178:24-25 |
| 179:1 - 179:13 | |
| 180:9 - 180:12 | 180:13 |
| 180:14 - 180:15 | |
| 180:17 - 180:20 | 180:21-22 |
| 180:25 - 181:2 | |
| 181:4 - 181:14 | 181:15-16 |
| 181:17 - 181:17 | |
| 189:1 - 189:20 | |
| 190:12 - 190:18 | |

| Movants' Designation (Wuesthoff) | Debtor's Counter Designation |
|---|---|
| 221:14 - 221:20 | 221:2-9 |
| 222:2 - 222:7 | 221:21-222:1, 222:8-13 |
| 222:14 - 222:15 | 222:16 |
| 222:17 - 222:21 | |
| 222:23 - 223:2 | |
| 223:9 - 223:24 | |
| 224:25 - 225:16 | 224:14-24; 225:17 |
| 225:20 - 225:22 | |
| 237:8 - 238:13 | |
| 249:19 - 249:22 | |
| 250:10 - 250:14 | |
| 283:25 - 284:4 | 284:5-7 |
| 284:9 - 284:21 | |
| 285:19 - 286:1 | 286:2-3 |
| 286:4 - 286:4 | |
| 333:14 - 334:16 | |

**JOHN KIM – JANUARY 31, 2022**

| Movants' Designation (Kim) | Debtor's Counter Designation |
|---|---|
| 21:2 - 22:5 | |
| 25:24 - 26:3 | 25:4 – 25:23 |
| 29:25 - 30:17 | 28:14 – 29:4 |
| 31:8 - 31:16 | |
| 32:5 - 33:20 | |
| 34:6 - 34:14 | |
| 46:8 - 46:21 | |
| 49:2 - 49:24 | |
| 50:3 - 50:13 | |
| 51:15 - 52:13 | |
| 55:4 - 55:20 | |
| 62:3 - 62:23 | |
| 63:1-63:11 | 64:21 – 65:22 |
| 65:23 - 67:7 | 67:8 – 67:18 |
| 73:3 - 74:7 | |
| 105:13 - 107:10 | |
| 107:16 - 109:9 | |
| 114:5 - 114:17 | |
| 117:12 - 118:9 | |
| 119:9 - 119:21 | Designated Confidential |
| 124:18 - 124:24 | 124:25 |
| 125:1 - 125:3 | |
| 135:4 - 135:9 | 140:19 – 141:3 |
| 141:17 - 142:9 | |
| 149:8 - 150:8 | |
| 152:1 - 152:14 | |
| 153:18 - 154:15 | |
| 166:21 - 167:2 | 167:3 – 167:13 |
| 181:18 - 182:7 | |
| 183:22 - 184:4 | |
| 184:18 - 184:22 | |
| 193:11 - 194:8 | |
| 197:25 - 199:8 | |
| 202:1 - 202:14 | |
| 204:10 - 204:21 | |
| 206:8 - 206:14 | |
| 213:20 - 214:15 | |
| 215:16 - 216:17 | |
| 217:23 - 218:12 | |
| 223:9 - 224:9 | |
| 226:1-227:16 | |

**JOHN KIM 30(B)(6) – FEBRUARY 1, 2022**

| Movants' Designation (Kim – 30(b)(6)) | Debtor's Counter Designation |
|---|---|
| 13:7 - 15:13 | |
| 15:16 - 16:16 | |
| 21:7 - 23:1 | |
| 23:20 - 28:21 | |
| 30:9 - 30:18 | 32:20 – 33:9 |
| 33:10 - 35:7 | |
| 35:13 - 36:7 | 36:8 – 36:16 |
| 36:23 - 36:24 | |
| 37:5 - 37:13 | |
| 45:10 - 45:13 | |
| 45:15 - 45:18 | |
| 45:21 - 46:17 | |
| 50:21 - 51:4 | |
| 52:25 - 53:10 | |
| 58:15 - 58:18 | |
| 60:4 - 60:7 | |
| 60:21 - 60:25 | |
| 61:2 - 61:8 | |
| 64:1 - 64:15 | |
| 64:18 - 64:23 | |
| 68:1 - 69:9 | |
| 69:16 - 70:5 | 70:18 – 71:1 |
| 76:1 - 76:15 | |
| 77:1 - 77:14 | 79:13 – 80:6 |
| 82:4 - 83:8 | |
| 84:5 - 84:19 | |
| 88:15 - 88:25 | |
| 90:17 - 91:6 | |
| 92:6 - 93:3 | |
| 94:8 - 94:11 | |
| 95:15 - 95:23 | |
| 102:24 - 103:10 | |
| 105:1 - 106:2 | |
| 111:5 - 111:22 | |
| 113:24 - 115:20 | |
| 116:16 - 116:23 | |
| 118:23 - 120:22 | |
| 122:17 - 123:4 | |
| 125:21 - 126:7 | |
| 130:7 - 132:11 | |
| 134:21 - 136:1 | |

| Movants' Designation (Kim – 30(b)(6)) | Debtor's Counter Designation |
|---|---|
| 138:15 - 139:20 | |
| 141:20 - 142:11 | |
| 145:10 - 145:19 | |
| 149:7 - 149:18 | |
| 149:21 - 151:4 | |
| 155:19 - 155:23 | 155:24 |
| 155:25 - 156:8 | |
| 157:3 - 157:5 | 157:6 – 157:7 |
| 157:8 - 157:13 | |
| 158:24 - 158:25 | 159:1 – 159:7 |
| 168:15 - 169:6 | |
| 170:17 - 171:9 | 172:13 – 173:2 |
| 178:23 - 179:6 | |
| 186:25 - 187:8 | |
| 192:16 - 194:17 | |
| 194:23 - 196:4 | |
| 199:9 - 199:22 | |
| 200:9 - 200:25 | 203:9 – 203:23 |

**THIBAUT MONGON – JANUARY 19, 2022**

| Movants' Designation (Mongon) | Debtor's Counter Designation |
|---|---|
| 9:22 – 10:16 | |
| 12:12 – 12:16 | |
| 14:14 – 14:24 | |
| 15:11 – 16:10 | |
| 16:14 – 17:18 | |
| 17:24 – 18:22 | 18:23 – 18:24 |
| 18:25 – 19:3 | 18:23 – 18:24 |
| 19:5 – 19:25 | |
| 20:8 – 21:1 | |
| 22:2 – 23:5 | |
| 23:17 – 24:5 | 23:6 – 23:16 |
| 24:18 – 24:22 | 24:23 – 25:7 |
| 25:6 – 27:15 | |
| 27:23 – 28:22 | |
| 29:25 – 30:5 | |
| 34:19 – 35:2 | |
| 35:15 – 35:24 | 35:3 – 35:13 |
| 36:15 – 36:24 | 36:8 – 36:14 |
| 43:15 – 44:12 | 43:10 – 43:14 |
| 45:15 – 46:5 | |
| 46:21 – 47:17 | |
| 52:4 – 53:10 | Designated Confidential |
| 62:2 – 62:11 | |
| 63:4 – 63:14 | |
| 63:16 – 63:21 | |
| 64:1 – 64:8 | 64:9 |
| 64:10 – 64:10 | |
| 69:25 – 70:12 | |
| 72:13 – 72:25 | |
| 83:15 – 84:2 | |
| 84:14 – 85:3 | 84:4 – 84:11 |
| 90:3 – 90:21 | |
| 94:8 – 95:1 | |
| 100:1 – 100:10 | 100:11 |
| 100:22 – 101:22 | |
| 103:7 – 103:22 | |
| 107:6 – 108:23 | 108:24 |
| 113:25 – 115:6 | 115:7 – 115:9 |
| 121:10 – 122:25 | |
| 123:20 – 124:14 | |
| 124:19 – 125:11 | |

| Movants' Designation (Mongon) | Debtor's Counter Designation |
| --- | --- |
| 134:11 – 134:17 | |
| 135:18 – 136:13 | |
| 136:24 – 137:8 | |
| 137:17 – 139:6 | |
| 139:15 – 140:17 | |
| 142:2 – 142:7 | |
| 143:18 – 144:4 | |
| 146:5 – 146:24 | |
| 148:23 – 149:3 | |
| 149:11 – 150:16 | |
| 152:6 – 155:6 | 151:17 – 152:5 |
| 155:20 – 156:12 | |
| 162:22 – 165:12 | |
| 167:3 – 167:12 | |
| 168:1 – 168:11 | |
| 169:3 – 169:13 | |
| 171:2 – 171:10 | |
| 172:3 – 173:1 | 171:15 – 172:2 |
| 177:22 – 178:18 | |
| 179:6 – 179:10 | |
| 180:7 – 180:19 | |
| 181:1 – 181:19 | |
| 182:22 – 183:1 | |
| 186:14 – 187:18 | |
| 191:15 – 196:8 | 196:9 – 196:14 |
| 196:15 – 196:25 | |
| 197:6 – 198:14 | |
| 201:20 – 202:7 | 201:12 – 201:18 |
| 206:18 – 206:24 | 207:10 – 207:16 |
| 207:5 – 207:16 | |
| 209:18 – 210:21 | |
| 212:15 – 212:19 | |
| 215:3 – 215:10 | |
| 216:3 – 217:1 | 217:8 – 217:23 |
| 217:24 – 219:1 | |
| 219:12 – 219:23 | 219:2 – 219:11, 219:23 – 220:2 |
| 220:12 – 220:23 | |
| 221:12 – 222:10 | |
| 223:21 – 224:2 | 123:5 – 123:18 |
| 227:21 – 228:13 | 227:18 – 227:21 |
| 231:18 – 231:25 | 230:18 – 231:17 |
| 235:12 – 236:12 | 236:13 – 236:17 |

| Movants' Designation (Mongon) | Debtor's Counter Designation |
|---|---|
| 236:25 – 237:4 | |
| 237:19 – 237:25 | |
| 238:12 – 239:13 | |
| 243:11 – 243:22 | |
| 244:8 – 244:22 | |
| 246:24 – 247:9 | |
| 247:19 – 249:5 | |
| 251:7 – 254:1 | |
| 254:24 – 257:5 | 254:2 – 254:23 |
| 257:18 – 258:3 | 256:17 – 257:18; 258:4 – 258:6 |
| 259:19 – 260:3 | |
| 264:3 – 264:12 | 263:21 – 264:2 |
| 268:5 – 268:21 | |
| 270:4 – 270:20 | 269:13 – 270:5 |
| 272:4 – 272:20 | |
| 273:12 – 274:1 | |
| 274:9 – 275:5 | 275:6 – 275:8 |
| 275:9 – 277:12 | 277:13 – 278:2 |
| 278:3 – 279:4 | |
| 287:23 – 289:18 | |
| 294:25 – 295:22 | |
| 296:12 – 296:24 | 296:6 – 296:11; 296:25 – 297:12 |
| 297:23 – 298:10 | 297:13 – 297:21 |
| 298:23 – 299:13 | |
| 299:19 – 300:12 | |
| 300:24 – 301:7 | |
| 303:9 – 304:7 | 302:8 – 303:8 |
| 322:24 – 323:11 | |
| 330:3 – 330:13 | |
| 331:1 – 331:6 | |
| 332:13 – 333:8 | |
| 336:12 – 337:15 | |
| 340:25 – 341:9 | 338:14 – 338:20; 339:11 – 339:17 |

**MICHELLE GOODRIDGE – DECEMBER 20, 2021**

| Movants' Designation (Goodridge) | Debtor's Counter Designation |
|---|---|
| 7:22 - 8:1 | |
| 8:7 - 8:20 | |
| 13:23 - 14:4 | |
| 17:23 - 18:3 | |
| 18:18 - 18:23 | 18:24-18:25 |
| 19:1 - 19:23 | 19:24-19:25 |
| 20:1 - 21:2 | 21:3-21:4 |
| 21:5 - 21:13 | 21:14-21:15 |
| 21:16 - 22:1 | 22:1-22:3 |
| 22:4 - 22:8 | |
| 22:15 - 22:16 | 22:17-22:18 |
| 22:19 - 22:19 | 22:20-22:20 |
| 22:21 - 22:23 | |
| 22:25 - 23:4 | 23:5-23:6 |
| 23:7 - 23:12 | |
| 23:15 - 23:21 | |
| 24:23 - 25:16 | |
| 25:20 - 25:24 | 25:25-26:1 |
| 26:2 - 26:4 | |
| 27:14 - 28:17 | |
| 30:3 - 30:6 | |
| 31:11 - 31:22 | |
| 34:14 - 36:4 | |
| 36:11 - 37:1 | |
| 38:4 - 38:19 | |
| 40:23 - 41:5 | 41:6-41:7 |
| 41:8 - 41:13 | 41:14-41:14 |
| 41:15 - 42:3 | 42:4-42:4 |
| 42:5 - 43:19 | |
| 44:17 - 44:24 | |
| 45:3 - 45:8 | |
| 46:5 - 46:6 | |
| 46:20 - 46:22 | |
| 48:9 - 48:14 | |
| 49:8 - 49:16 | |
| 50:17 - 51:17 | |
| 53:13 - 53:14 | |
| 55:25 - 56:2 | |
| 56:5 - 56:7 | |
| 56:22 - 57:12 | |
| 59:11 - 59:18 | |

| Movants' Designation (Goodridge) | Debtor's Counter Designation |
|---|---|
| 61:6 - 61:24 | |
| 61:18 - 61:24 | |
| 62:2 - 62:9 | |
| 62:24 - 63:3 | |
| 64:23 - 65:2 | 65:3-65:3 |
| 65:4 - 65:13 | |
| 65:21 - 66:23 | 66:24-66:24 |
| 66:25 - 67:3 | |
| 69:22 - 69:24 | 69:25-69:25 |
| 70:1 - 70:6 | |
| 70:11 - 70:15 | |
| 71:7 - 71:8 | 71:9-71:9 |
| 71:10 - 71:16 | 71:17-71:17 |
| 71:18 - 72:3 | 72:4-72:4 |
| 72:5 - 72:19 | |
| 74:8 - 74:11 | 74:12-74:12 |
| 74:13 - 74:23 | |
| 76:16 - 77:18 | |
| 80:10 - 81:1 | |
| 81:2 - 81:10 | |
| 83:10 - 83:13 | 83:14-83:15 |
| 83:16 - 84:6 | 84:7-84:8 |
| 84:9 - 84:15 | 84:16-84:17 |
| 84:18 - 85:1 | |
| 85:9 - 85:19 | |
| 86:11 - 86:13 | 86:14-86:14 |
| 86:15 - 86:23 | |
| 91:7 - 91:15 | 91:16-91:16 |
| 91:17 - 92:6 | |
| 93:8 - 93:12 | 93:13-93:14 |
| 93:15 - 94:18 | |
| 94:23 - 95:7 | 94:19-94:22 ; 95:8-95:9 |
| 95:10 - 96:3 | 96:4-96:5 |
| 96:6 - 96:12 | 96:13-96:13 |
| 96:14 - 97:6 | 97:7-97:8 |
| 97:9 - 98:7 | 98:8-98:9 |
| 98:10 - 98:20 | |
| 99:8 - 99:18 | |
| 107:10 - 107:12 | 107:13-107:13 |
| 107:14 - 107:18 | |
| 108:12 - 108:19 | |
| 111:12 - 112:14 | 112:15-112:15 |
| 112:16 - 112:18 | |

| Movants' Designation (Goodridge) | Debtor's Counter Designation |
|---|---|
| 114:1 - 114:10 | 114:11-114:11 |
| 114:12 - 114:14 | 114:15-114:16 |
| 114:17 - 115:9 | |
| 115:23 - 116:1 | 116:1-116:2 |
| 116:3 - 116:7 | |
| 119:15 - 119:17 | |
| 119:21 - 120:2 | |
| 120:17 - 121:1 | |
| 125:3 - 125:6 | 125:7-125:8 |
| 125:9 - 126:1 | 126:2-126:3 |
| 126:4 - 126:18 | |
| 130:6 - 130:8 | 130:9-130:12 |
| 130:13 - 130:15 | |
| 130:22 - 130:23 | 130:24-130:25 |
| 131:1 - 131:3 | |
| 132:18 - 132:22 | 132:23-132:24 |
| 132:25 - 133:4 | |
| 142:22 - 143:5 | |
| 144:1 - 144:7 | |
| 148:22 - 150:5 | |
| 149:14 - 150:5 | |
| 150:11 - 151:16 | 151:17-151:20 |
| 156:1 - 156:4 | 156:5-156:6 |
| 156:7 - 156:9 | 156:10-156:10 |
| 156:11 - 156:14 | 156:15-156:15 |
| 156:16 - 157:7 | 157:8-157:9 |
| 157:10 - 157:12 | |
| 163:14 - 163:16 | 163:17-163:18 |
| 163:19 - 163:20 | 163:21-163:22 |
| 163:23 - 163:24 | 163:25-163:25 |
| 164:1 - 164:1 | 162:2-164:2 |
| 164:3 - 164:4 | |
| 172:21 - 173:14 | |
| 176:8 - 176:21 | |
| 176:22 - 177:11 | |
| 179:7 - 179:12 | 179:13-179:14 |
| 179:15 - 180:6 | |
| 189:7 - 189:8 | 189:9-189:10 |
| 189:11 - 190:5 | 190:6-190:7 |
| 190:8 - 190:13 | 190:14-190:21 |
| 190:22 - 191:1 | 191:2-191:2 |
| 191:3 - 191:15 | |
| 199:25 - 200:5 | |

| Movants' Designation (Goodridge) | Debtor's Counter Designation |
|---|---|
| 200:22 - 201:1 | |
| 200:25 - 201:12 | |
| 201:6 - 201:8 | |
| 201:12 - 201:17 | 201:18-201:19 |
| 201:20 - 201:23 | |
| 202:2 - 202:7 | |
| 203:19 - 204:1 | 204:2-204:8 |
| 204:9 - 204:17 | |
| 208:23 - 209:18 | |
| 210:8 - 210:16 | |
| 214:20 - 215:1 | |
| 230:20 - 231:11 | |
| 248:15 - 248:17 | 248:18-248-18 |
| 248:19 - 249:7 | |
| 249:20 - 250:1 | 250:2-250:11 |
| 250:12 - 250:23 | |
| 253:1 - 253:4 | 253:5-253:8 |
| 253:9 - 253:12 | |
| 254:1 - 254:3 | 254:4-254:5 |
| 254:6 - 254:21 | |
| 310:11 - 310:22 | 310:23-310:24 |
| 310:25 - 311:5 | |
| 311:11 - 312:15 | |
| 312:20 - 313:4 | |
| 314:14 - 314:20 | |
| 325:2 - 325:21 | |
| 338:11 - 338:22 | 338:23-339:12 |

# Exhibit B

# AZEVEDO, JOSE LUIZ

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 11**
11 :20      J O S E L U I Z A Z E V E D O,
21          called as a witness, having been duly
22          sworn by a Notary Public, was
23          examined and testified as follows:
24              THE WITNESS: Yes, I do.
25                  * * *

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 14**
14 :19      Q. Great.
20          Is there anything affecting your
21      ability to testify truthfully today?
22          A. No.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 17**
17 :4           Can you let me know where you
5       went to college and what your degree was?
6           A. Yes.
7               I went to college in Brazil. It
8       was Universidade Federal de Minas Gerais.
9       I did economics. And then I did a master
10      -- MBA here in the United States at
11      University of Rochester.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 18**
18 :12          Q. And then after your MBA, what was
13      your next employment?
14          A. I joined Johnson & Johnson.
15          Q. What year was that?
16          A. It was 1999.
17          Q. Am I correct that you've been at
18      Johnson & Johnson since 1999?
19          A. Yes, since 1999. July of '99.
20      Correct.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 22**
22 :17          Q. What was your position after VP
18      of finance for innovation?
19          A. So in 2019, I became vice
20      president for the pharmaceutical business
21      in North America, so responsible for the
22      United States and Canada.
23          Q. And for which organization within
24      Johnson & Johnson was this position?
25          A. Pharmaceuticals. Janssen.
23 :1           J. Azevedo - Confidential
2       Pharmaceuticals business at Janssen.
3       Janssen Pharmaceuticals.
4           Q. How long did you hold that

```
5    position?
6         A. Also approximately two years.
7    Two years and a half until, I would say,
8    October last year.
9         Q. October 2021?
10        A. October 2021, yes.
11        Q. In your role as -- I believe you
12   said it was VP of finance of Janssen
13   Pharmaceutical, what were your
14   responsibilities?
15        A. So I was responsible to support
16   the chairman of the business in North
17   America in all finance-related issues. So
18   we talk about investments, business
19   planning, strategic plan, you know,
20   closing, controls, stocks. Everything
21   related to finance, I was responsible to
22   support the business.
```

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 33**

```
33 :14        Q. Do you have any knowledge
15   regarding the dollar amount of talc claims
16   against Johnson & Johnson or any of its
17   related entities?
18        A. I don't.
19        Q. Have you ever obtained any
20   information regarding the history of talc
21   litigation at J&J -- against J&J?
22        A. No.
23        Q. Are you aware of the amount that
24   J&J or any other J&J entity ever
25   historically paid on talc claims?
34 :1         J. Azevedo - Confidential
2         A. No.
3         Q. Are you aware of any estimate of
4    future claims that Johnson & Johnson might
5    pay to claimants?
6         A. No.
```

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 35**

```
35 :11        Q. Are you a member of the board of
12   directors of Janssen Pharmaceutical?
13        A. I was, and I believe I may be.
14   Because I know after I changed the position
15   from the U.S. commercial to R&D, my
16   understanding is that they are going to be
17   moving all of the board and replace with
18   the person that is replaced in my previous
19   role. So I'm not sure if that process has
20   been completed or not.
21        But, yes, I was a board member
22   for at least for the time that I was CFO
23   for the North America business.
24        Q. Okay. So I want to back up to
25   the beginning.
36 :1         J. Azevedo - Confidential
2         When did you become a member of
3    the board of Janssen Pharmaceutical?
4         A. I believe that when I became --
5    when I became the CFO for the commercial
```

```
 6      business in North America, that was in
 7      2019. So during that time -- sometime
 8      during that time, I became a board member.
 9          Q. Do you recall if it was right
10      when you started your role as the VP of
11      pharmaceutical North America?
12          A. I don't recall. Probably. But I
13      don't recall.
14          Q. How did you become a board member
15      of Janssen Pharmaceutical?
16          MR. STARNER: Objection.
17          You can answer.
18          A. How I became?
19          THE WITNESS: Sorry, I should
20      answer or not? I should answer?
21          MR. STARNER: You can answer if
22      you can.
23          A. Yeah, I think, like I said, when
24      I became CFO for the North America
25      business, you know -- and, again, I'm
```

37 :1          J. Azevedo - Confidential
```
 2      trying the recall here -- I believe I was
 3      approached by the lawyers and they told me,
 4      hey, you're going to become a board member
 5      there. And probably I signed some
 6      documents and I became a board member. I
 7      think that was the process.
 8          Q. When you say you were approached
 9      by the lawyers, which lawyers?
10          A. I don't recall.
11          Q. Was it internal lawyers within
12      J&J?
13          A. Oh, yes, internal lawyers.
14          Q. So in-house counsel?
15          A. Yes, internal lawyers, yes.
16      Internal lawyers, yes, yes.
```

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 39**

39 :3          Q. Did you ever weigh the pros and
```
 4      cons to becoming a board member of Janssen
 5      Pharmaceutical?
 6          MR. STARNER: Objection.
 7          You can answer.
 8          A. I would say probably -- not as a
 9      Janssen Pharmaceutical. Probably when I
10      was in Brazil, my first time I became a
11      board member, I thought about that, right.
12      But I know in my view that the company has
13      the processes in place and everything,
14      right, that if I'm doing the right thing in
15      line with the policies of the company, I
16      would be protected. So I was not concerned
17      because of that because I know the company
18      was always doing the right thing. We have
19      processes in places, and so I was not
20      concerned about being a board member.
```

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 42**

42 :20          Q. What was your understanding of
```
21      your role on the board of directors for
```

22    Janssen Pharmaceutical?
23        A. Yeah, my understanding is more of
24    a statutory role. You know, a lot of times
25    signing documents. Some of the documents

43 :1        J. Azevedo - Confidential
2    that I signed, I would say I was part of
3    the decision process. Some of the
4    documents I signed, I am not part of the
5    decision-making process.
6        You know, it's a big business, it
7    is the legal business, and I don't have
8    full responsibility on everything. So I
9    would say a lot of that is really statutory
10    signing documents. That's a big part of
11    that.
12        Q. What do you mean when you say
13    that you didn't have -- you weren't part of
14    the decision-making process of documents
15    that you would sign --
16        MR. STARNER: I'll just object to
17    that question.
18        But you can answer if you
19    understand.
20        A. Yes, because again, J&J -- maybe
21    step back a little bit.
22        When I'm saying I'm finance VP
23    for commercial of North America, right, I'm
24    responsible for, like I said before, the
25    commercial business of North America.

44 :1        J. Azevedo - Confidential
2    However, the Janssen Pharmaceutical, the
3    legal entity that I support, has a lot of
4    activities that are beyond commercial, like
5    supply chain, R&D, and et cetera.
6        So sometimes I'm signing
7    documents that are really related to areas
8    that I don't have, I would say, managerial
9    responsibility. So I don't -- so I'm not
10    part of the decision-making of some of the
11    documents I am signing.
12        Q. What do you do to get comfortable
13    to make a business decision and sign
14    documents when it's areas outside of your
15    decision-making?
16        A. Yes, I make sure that -- I make a
17    couple --
18        MR. STARNER: Hold on, Jose.
19    Give me a chance to object.
20        I object to the question.
21        But you can answer, Jose. Just
22    give me a second to object, if you
23    would.
24        THE WITNESS: Sorry about that,
25    Greg.

45 :1        J. Azevedo - Confidential
2        A. No, I make sure that when things
3    are brought to me, that the people --
4    because J&J, I would say, has a very clear
5    process, right? Roles and responsibilities
6    and et cetera.
7        So I make sure that things come
8    to me that the people who had to review or
9    approve, they have approved it. So after I
10    have that visibility, right, that the right
11    people have done the due diligence and

12        approved, then I approve.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

Page 52
52 :12        Q. So earlier when you were
13        mentioning that there are documents that
14        you sign for which you are not part
15        decision-making process and documents that
16        you sign for which you are part of the
17        decision-making process, when it comes to
18        the 2021 Johnson & Johnson corporate
19        restructuring, which bucket would that
20        restructuring fall into for you?
21        A. I'm not part of the
22        decision-making process. I'm not, no.
23        Q. So in that -- with regards to the
24        corporate restructuring, you were provided
25        a document to sign but were not part of the
53 :1        J. Azevedo - Confidential
2        decision-making process?
3        MR. STARNER: Objection.
4        You can answer.
5        A. That is correct.
6        Q. Okay. And for the corporate
7        restructuring, were you aware of a specific
8        matrix or business guidelines that you were
9        required to follow?
10        MR. STARNER: Objection.
11        A. For the corporate restructuring,
12        I think when the lawyers -- because a lot
13        of case, when the lawyers comes to me, you
14        know, because what happened that the
15        lawyers came to me, they explained to me
16        the restructuring they were trying to
17        achieve there. And I understand that at
18        that point in time, the people who had, you
19        know, the decision-making had made that
20        decision. So I was okay to sign that.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

Page 55
55 :4        Q. Do you know who -- do you know
5        whether there were other members of the
6        board of directors of Janssen
7        Pharmaceutical at the time of the corporate
8        restructuring?
9        MR. STARNER: Objection.
10        A. Yes, absolutely there are others.
11        Q. Do you know who they are?
12        A. I cannot tell you for 100 percent
13        certainty. I believe that one of the
14        persons that was also my colleague in the
15        board was Sarah Brennan. But, again, I'm
16        not 100 percent sure of that. Because she
17        replaced Jeff Smith, and I believe she was
18        -- again, I believe that she replaced him
19        as a board member in the Janssen
20        Pharmaceutical.
21        Q. Do you know what Sarah Brennan's
22        title is?
23        A. I don't know -- I know what she
24        does. I don't know the title specifically.

```
25          Q. And what does Sarah Brennan do?
56 :1           J. Azevedo - Confidential
 2          A. She is responsible for business
 3      development for U.S. commercial.
 4          Q. Do you know if there were any
 5      other board members of Johnson at the time
 6      of the corporate restructuring?
 7              MR. STARNER: Objection.
 8              You can answer.
 9          A. I don't know who were the other
10      members, if there were. I believe there
11      were, but I don't know who are they.
12          Q. Is it fair to say that you had no
13      discussions with other board members of
14      Johnson regarding the corporate
15      restructuring?
16              MR. STARNER: Objection. Assumes
17          evidence not -- facts not in evidence.
18              You can answer.
19              THE WITNESS: That's okay.
20          A. Yes, I didn't have discussions
21      with other board members about the
22      restructuring. I did not.
23          Q. Thank you.
24              When did you first learn about
25      the possibility of a corporate
57 :1           J. Azevedo - Confidential
 2      restructuring?
 3              MR. STARNER: Objection. Vague.
 4          A. I believe it was sometime in
 5      October when the internal lawyers -- they
 6      approached me and -- because of course I
 7      have the -- my role as a board member of
 8      Janssen Pharmaceutical, they approached me
 9      and they explained me the corporate
10      restructuring, what they are trying to do,
11      what is the intent of the restructuring and
12      what is being done.
```

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 57**
```
57 :18          Q. Does the board of Janssen
19      Pharmaceutical ever meet whether it's
20      virtually or in person?
21          A. I never met. I'm not sure if
22      there are other meetings, but I never did.
```

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 58**
```
58 :5           Q. So it's fair to say you did not
 6      meet with other members of the board of
 7      Janssen with regard to the corporate
 8      restructuring that occurred in 2021?
 9              MR. STARNER: Objection.
10              You can answer.
11          A. No, I did not meet.
12          Q. Does the board of Janssen
13      Pharmaceutical ever hire its own counsel?
14          A. I'm not -- I don't know.
15          Q. In your experience, have you ever
16      been part of a decision to hire counsel for
17      the board of Janssen Pharmaceutical?
```

18          A. No.
19          Q. So is it fair to say in your
20    experience, you rely on Johnson & Johnson
21    internal counsel to make decisions on
22    behalf of the board of Janssen?
23              MR. STARNER: Objection.
24              You can answer.
25          A. I would say yes. And I'm not
59 :1          J. Azevedo - Confidential
2    sure, so let me -- so, yes, I'm not sure --
3    but I'm not sure if the lawyers, they get
4    external advice or not. So most of the
5    time, my contact is with internal lawyers,
6    yes.
7          Q. And when you speak with those
8    in-house lawyers, those lawyers for Johnson
9    & Johnson, you understand that they're
10    representing the interests of the board of
11    Janssen & Janssen [sic]?
12              MR. STARNER: Objection.
13              You can answer.
14          A. Yes.
15          Q. So those in-house Johnson &
16    Johnson counsel are providing advice on
17    behalf of the board of Janssen
18    Pharmaceuticals?
19              MR. STARNER: Objection.
20          A. Yes, I believe so. Yes.
21          Q. In your experience as a board
22    member of Janssen Pharmaceutical, do you
23    ever rely on advice of outside counsel?
24              MR. STARNER: Objection.
25          A. I don't -- I don't recall --
60 :1          J. Azevedo - Confidential
2    again, I don't recall any decision as a
3    board member that I had to go outside to --
4    again, I don't recall -- to get external,
5    external advice.
6          Q. Without -- I'm not asking about
7    content of any communication with lawyers.
8              With regard to the corporate
9    restructuring, did you ever speak with
10    counsel, with outside counsel such as Jones
11    Day?
12          A. Such as, sorry?
13              MR. STARNER: Objection.
14          Q. Such as Jones Day.
15              MR. STARNER: Objection.
16              You can answer.
17          A. So let me try to recall here,
18    right? So I -- when -- when the lawyers,
19    the lawyers approach me to sign the
20    document, and of course, you know, to make
21    sure that I understood, you know, the whole
22    process, the restructuring, to make sure
23    that I was comfortable, I believe, I
24    believe at that point in time, I just
25    talked to internal lawyers, I guess. I
61 :1          J. Azevedo - Confidential
2    believe.
3              I don't recall talking to
4    external, but I'm -- but, you know, I'm not
5    100 percent sure here. I think it was the
6    internal lawyers only.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 62**

62 :23      Q. When did you first hear about the
24      possibility of a Johnson corporate
25      restructuring with regard to talc
63 :1      J. Azevedo - Confidential
2      liabilities?
3          MR. STARNER: Objection.
4          You can answer.
5      A. It was when, like I said, when
6      the lawyers approached me in October to
7      explain me the restructuring. That is the
8      first time I heard that.
9      Q. Okay. Do you recall
10      approximately when in October you were
11      approached?
12      A. I don't know. I would not be --
13      no, I don't know.
14      Q. Would you say it was closer to
15      the beginning of October or the end of
16      October?
17      A. Probably, again, I think probably
18      the beginning of October.
19      Q. Who approached you?
20      A. Internal J&J lawyers.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 65**

65 :21      Q. Okay. And from the time that you
22      received the email -- strike that.
23          Am I correct that you received an
24      email scheduling a meeting with these
25      lawyers?
66 :1      J. Azevedo - Confidential
2          MR. STARNER: Objection.
3          Go ahead.
4      A. Yeah, I received an email asking
5      for my flexibility to schedule a meeting.
6      It was not -- it was not to schedule the
7      meeting specifically. Just to say we need
8      to talk and I would need to talk to you and
9      would likely in the next X days if you have
10      -- you know, for me to be more flexible if
11      possible.
12      Q. And did you end up having a
13      meeting with these lawyers?
14      A. Yes, I did.
15      Q. Was that meeting in person,
16      virtual, a telephone call, or something
17      else?
18      A. It was a Zoom call.
19      Q. I'm going to put aside that call
20      for a second and we'll come back to that
21      later.
22          Sitting here today, what is your
23      understanding of the J&J corporate
24      restructuring?
25          MR. STARNER: I'll just object.
67 :1      J. Azevedo - Confidential
2          I'll instruct you not to reveal
3          any specific communications you may

4      have had with counsel on that topic,
5      but subject to that, Jose, you know,
6      you can answer the question.
7          THE WITNESS: Thank you Greg.
8      A. So you want me to -- what is my
9      overall understanding of the restructuring?
10     Q. Right.
11     A. Yeah. Okay. So I -- so I
12     understand Johnson & Johnson, we create
13     this new company, LTL, that is going to be
14     carrying out the liability -- existing
15     future liability in regards to the talc.
16     This company, of course, is being funded.
17     You know, I think they have a royalty
18     stream. Yeah, so my understanding of the
19     -- so let me start again.
20          So my understanding is that what
21     they are trying to do here is really to
22     solve the talc litigation in a fair and
23     equitable way to all the parties involved.
24     And to do that, J&J set up a new company.
25     LTL I believe that is the name.
68 :1          J. Azevedo - Confidential
2          And that company is going to be
3      the one carrying out the liabilities and
4      the liabilities that exist today, plus any
5      future liabilities. And that company is
6      going to be funded, you know, to resources
7      to, of course, to handle those liabilities.
8      That is my understanding.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 68**
68 :17          What is your understanding of how
18     LTL came into existence?
19          MR. STARNER: Objection.
20          You can answer.
21     A. Like I said, I think it was a
22     corporate restructuring, right? That, you
23     know, one of the outcomes of that was we
24     need to create that company that is going
25     to be receiving all the liabilities related
69 :1          J. Azevedo - Confidential
2      to talc. So that's my understanding.
3      Q. Are you aware of the specific
4      steps in the process of creating LTL?
5      A. No, not the details.
6      Q. Are you familiar with a company
7      called Currahee Holding Company Inc.?
8      A. Yes.
9      Q. What is your understanding of the
10     purpose of that company?
11     A. My understanding that this
12     company is the one that is going to
13     continue to carry the Johnson & Johnson
14     Consumer business, aside, of course, of the
15     talc litigation. So the business
16     operations. That is what I recall. That
17     is my understanding.
18     Q. When did you form that
19     understanding?
20     A. When I talked to the lawyers.
21     Because if I'm not mistaken, this was one
22     of the steps that I was -- the reason was

23    going through the process, right, is to
24    sign, as a Johnson & Johnson pharmaceutical
25    board member is really to -- the creation
70 :1        J. Azevedo - Confidential
2    of that company that you mentioned
3    Currahee, right, there is going to be a
4    Holdco under Janssen Pharmaceutical to
5    continue to do the business operations of
6    consumers.
7         So that's when I learned. Of
8    course as part of my signatory
9    responsibility, right, I understood that
10    because I signed that specific step of the
11    process.
12        Q. Were you involved in any other
13    steps of the process?
14        MR. STARNER: Objection.
15        You can answer.
16        A. I was not.

## AZEVEDO, JOSE LUIZ - *01/24/2022*

**Page 72**

72 :2        Q. Prior to the creation of Currahee
3    Holding Company, were you aware of the
4    assets and liabilities of Johnson & Johnson
5    Consumer Inc.?
6        MR. STARNER: Objection.
7        A. No, I don't have visibility of
8    that. I don't have access to that.

## AZEVEDO, JOSE LUIZ - *01/24/2022*

**Page 73**

73 :5        Q. So you said it is your
6    understanding that Currahee was going to be
7    the one that was going to be doing some of
8    the activities that JJCI was doing.
9         Which activities?
10        A. The commercial activities and et
11    cetera. I would say -- and that is my
12    understanding. All the activities except
13    for the talc liabilities. That is going to
14    be done by LTL.
15        Q. Are you familiar with a company
16    called Chenango Zero LLC?
17        A. No.
18        Q. Are you familiar with a company
19    called Chenango One LLC?
20        A. No.
21        Q. Are you familiar with a company
22    called Chenango Two LLC?
23        A. No.
24        Q. Are you familiar with a company
25    called Royalty A&M?
74 :1        J. Azevedo - Confidential
2        A. No.

## AZEVEDO, JOSE LUIZ - *01/24/2022*

**Page 74**

74 :13        Q. Mr. Azevedo, you can take a
14    moment to look at the document.
15        MS. D'AQUILA: We are going to be

16     marking this document as Exhibit 53.
17         (Deposition Exhibit 53, Email
18     chain beginning with email dated
19     10/6/2021 from McCann to McCann and
20     others, Bates-stamped LTL 0032091
21     through 32093, marked for
22     identification, as of this date.)
23         (Document review.)

## AZEVEDO, JOSE LUIZ - *01/24/2022*

**Page 79**

79 :4     Q. Do you recall whether the meeting
5     being referenced in the document up on your
6     screen is the first meeting -- is
7     referencing the first meeting you had ever
8     had a meeting with Johnson & Johnson
9     counsel regarding the corporate
10     restructuring?
11     A. Yeah. Like I said, I mean, the
12     first -- so maybe step back again a little
13     bit, right, because I know that in that
14     timeline, I had two meetings with the
15     lawyers. So I am not sure if this is the
16     first or second, right? So just recalling.
17     So like I said, I was contacted
18     by the lawyers to try to set up some time.
19     And then I had a meeting with the lawyers,
20     maybe this one, where they explained to me
21     the restructuring, right, to make sure,
22     number one, I understand the restructuring;
23     number two, that I'm comfortable that
24     everybody had to analyze, analyze.
25     And then I had a second meeting
80 :1     J. Azevedo - Confidential
2     with the lawyers I believe in the moment --
3     in the day that I signed the documents,
4     just to make sure that I'm signing -- if
5     there was any questions, any other
6     followups that I had to do.
7     So if this -- probably this was
8     the first meeting, but I am not so sure if
9     this is the first or the second. Maybe the
10     first.
11     Q. Okay. At your first meeting with
12     Johnson & Johnson attorneys, was anyone
13     else present other than you and the Johnson
14     & Johnson attorneys?
15     A. That's what I recall.
16     Q. I'm sorry, what is it that you
17     recall? That it was just yourself --
18     A. Only myself -- yeah, what I
19     recall, that only myself and the J&J
20     lawyers. But I'm not 100 percent sure. I
21     think it was only us and the internal
22     lawyers.

## AZEVEDO, JOSE LUIZ - *01/24/2022*

**Page 85**

85 :18     MS. D'AQUILA: Deane, if you
19     could please pull up what Brown Rudnick
20     has identified for the court reporter
21     as Document C and put it on the screen

22      for all parties, please.
23           We are going to be marking this
24      document as Exhibit 54.
25             (Deposition Exhibit 54, Email
86 :1      J. Azevedo - Confidential
2      chain beginning with email dated
3      10/7/2021 from McCann to McCann and
4      others, Bates-stamped LTL 0032094
5      through 32096, marked for
6      identification, as of this date.)

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

Page 87

87 :5        Q. So if you see, the email appears
6      to have been sent to you on October 7th,
7      2021, at 4:27 p.m.
8             Do you see that?
9      A. Yes, I do.
10      Q. And it appears to be scheduling a
11      call or a meeting for October 11th, 2021,
12      at 3:30 p.m.
13             Do you see that?
14      A. I do.
15      Q. Do you recall attending a meeting
16      on October 11th with the J&J attorneys with
17      regard to the corporate restructuring?
18      A. If -- I don't recall. It was a
19      long time ago. But if the meeting was
20      scheduled, probably that happened, yeah.
21      Q. Are you --
22      A. I don't recall the specific dates
23      specifically if anything changed. But like
24      I said before, I had two meetings with the
25      lawyers in the beginning of October. So
88 :1        J. Azevedo - Confidential
2      that could be one of those meetings no
3      doubt.
4      Q. And when you -- so just looking
5      chronologically, comparing the last
6      exhibit, which appears to be -- the call
7      appears to have been scheduled for
8      October 6th at 7:00 p.m., and this document
9      the call was scheduled for October 11th at
10      3:30 p.m., is it fair to say that this
11      document is likely reflecting the second
12      meeting with counsel that you were
13      describing?
14           MR. STARNER: You can answer.
15      A. Yes, that is correct. So like I
16      said before, Danielle, I had the first
17      meeting maybe October 6th, right, where the
18      lawyers, they explained, you know, the
19      restructuring, the goals, and et cetera.
20           And then the second meeting, that
21      may be the October 11th, was I think during
22      the time that I signed the documents,
23      right, just to check again if I have any
24      questions, any doubts, any concerns and
25      everything like that.
89 :1        J. Azevedo - Confidential
2           So probably, you know, not having
3      100 percent certainty because this may have
4      changed a little bit, but, yeah, these
5      probably were the two meetings; October 6th

6    the first one and October 11th, the second
7    one, the one after or during the time I was
8    signing the document.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 90**
90 :11        Q. So if I understand the timeline
12    correct, roughly October 6th is when you
13    first learned of the J&J corporate
14    restructuring, correct?
15            MR. STARNER: Objection.
16            You can answer.
17        A. I believe so. Around that
18    timeline. If the meeting was October 6th,
19    the first one, that is when I learned.
20        Q. Between October 6th and
21    October 11th, what did you do, if anything,
22    to analyze the corporate restructuring?
23            MR. STARNER: Objection. Vague.
24            You can answer.
25            THE WITNESS: Sorry?
91 :1        J. Azevedo - Confidential
2            MR. STARNER: I objected to the
3        form of the question, but you can
4        answer.
5        A. Yeah, I -- so a couple of things,
6    right? I think the October 6th, the first
7    meeting where I had the meeting with the
8    lawyers and they explained me the
9    restructuring. And then at some point in
10    time is where I did receive the document
11    and I read the document. That is how I
12    analyzed that, the document that I was
13    supposed to sign, that I was going to sign.
14            But I don't think I did that in
15    any other activities there. I think the
16    lawyers were very clear if I have any
17    questions, if I want to have any follow-up
18    calls to, you know, to learn more on this
19    or that, that they were open to do that,
20    but I don't think -- I think the first
21    meeting for me was, I would say, enough to
22    understand and to be comfortable to sign.
23        Q. How long did that first meeting
24    last?
25        A. I don't remember.
92 :1        J. Azevedo - Confidential
2        Q. Did it last approximately 30
3    minutes?
4        A. No. Probably more.
5        Q. Did it last --
6        A. I would say around one hour.
7    Between half an hour and an hour, but I
8    don't remember anyhow.
9        Q. Did you receive any materials
10    other than the Janssen Pharmaceutical
11    unanimous consent that you executed with
12    regard to the corporate restructuring?
13        A. So I don't think so. I think the
14    lawyers, I think they -- they, during the
15    meeting, they did share documents and their
16    restructuring, the design of the
17    restructuring, but I don't recall having
18    received that. I don't think I did. I saw

19    it during the meeting.
20        Q. How many documents did you see
21    during the meeting?
22        A. I don't remember.
23        Q. Fewer than five?
24        A. I don't --
25            MR. STARNER: Objection.
93 :1        J. Azevedo - Confidential
2            THE WITNESS: Sorry, Greg.
3            MR. STARNER: Yeah, just
4        objection.
5            You can answer.
6        A. I don't know. I don't recall. I
7    would be speculating here. I have no idea.
8        Q. At least one?
9        A. For sure, yes, more than one.
10        Q. I'm trying to understand roughly
11    the number of documents that you were
12    shown, Mr. Azevedo, during your first
13    meeting with the J&J attorneys.
14            So you saw at least one document,
15    correct?
16        A. Yeah, at least one document. You
17    know, I remember I saw documents. I saw
18    corporate design, some drafts, but I don't
19    recall how many documents. I would be
20    speculating to say. It's more than one for
21    sure.
22        Q. Other than -- so -- strike that.
23            You saw documents with regard to
24    corporate structure and the corporate
25    design of the corporate restructuring,
94 :1        J. Azevedo - Confidential
2    correct?
3        A. Very high level. Yes.
4        Q. Can you describe for me the other
5    documents that you were shown?
6        A. I would say what I recall at this
7    point in time -- again, Danielle, of course
8    the lawyers, they showed me, you know, the
9    design, the LTL, et cetera, what we are
10    trying to do here. So I remember I saw
11    some of the corporate design, the documents
12    there.
13        Q. Did you see any documents with
14    regard to the financial impact that the
15    corporate restructuring would have
16    specifically on Janssen Pharmaceutical?
17        A. No.
18        Q. Did you see any documents with
19    regard to the financial impact of the
20    corporate restructuring would have on JJCI?
21        A. No.
22        Q. Did you see any documents with
23    regard to the financial impact that the
24    corporate restructuring would have on LTL?
25            MR. STARNER: Objection.
95 :1        J. Azevedo - Confidential
2        A. No.
3        Q. Were you shown any documents with
4    regard to the tax implication that the
5    corporate restructuring would have on
6    Janssen Pharmaceutical?
7            MR. STARNER: Objection.
8        A. The tax implications, no, I have

9    not seen that.
10        Q. And is it fair to say that at no
11    point in time have you seen documents with
12    regard to how the corporate restructuring
13    would -- strike that.
14        Is it fair to say that at no
15    point in time that you've seen documents
16    with regard to the financial impact of how
17    the corporate restructuring would impact
18    Janssen Pharmaceutical?
19        MR. STARNER: Objection.
20        A. The financial impacts of the
21    restructuring in the Janssen
22    Pharmaceutical?
23        Q. Correct, that is my question.
24        A. Yeah, I don't recall. I don't
25    recall having that discussion.
96 :1        J. Azevedo - Confidential
2        Q. Okay. And you don't recall
3    seeing those documents, not just at the
4    meeting with the attorneys that we were
5    talking about, but I'm talking about at any
6    point in time?
7        MR. STARNER: Objection.
8        A. I think your question is if I saw
9    the documents only in the meeting or at any
10    other point in time?
11        Q. Correct.
12        So let me back up a second.
13        My prior question was specific to
14    documents that -- whether you were shown
15    them at the time of your discussions with
16    attorneys prior to the J&J restructuring.
17        I'm now asking have you ever seen
18    documents with regard to the financial
19    impact that the corporate restructuring
20    would have on Janssen Pharmaceutical?
21        A. I don't recall having seen that.
22        Q. And at any point in time did you
23    see -- have you seen documents with regard
24    to the financial impact that the corporate
25    restructuring would have on JJCI?
97 :1        J. Azevedo - Confidential
2        MR. STARNER: Objection.
3        A. I -- I don't recall having seen
4    that.
5        Q. At any point in time have you
6    seen documents with regard to the financial
7    impact that the corporate restructuring
8    would have on LTL?
9        MR. STARNER: Objection.
10        A. The financial impact that the
11    restructuring would have on LTL?
12        Q. Correct.
13        A. I don't recall having seen that.
14        Q. Okay. Going back to the meeting
15    that occurred on October 6th between
16    yourself and the J&J attorneys, from that
17    point forward, what else did you do other
18    than talk to the attorneys at these two
19    meetings with regard to the J&J corporate
20    restructuring?
21        MR. STARNER: Objection.
22        A. I just talked to -- let's see, my
23    role on that and also to get me comfortable

24      to sign was talking with the attorneys. So
25      I think the attorneys -- I talked only to
98 :1         J. Azevedo - Confidential
2      the attorneys, the attorneys only.
3         Q. You never talked to any other
4      businessperson at J&J with regard to the
5      corporate restructuring?
6         A. No.

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

---

**Page 98**
98 :17         So you never spoke to any other
18      Janssen board member with regard to the
19      Johnson & Johnson restructuring?
20         A. I have not. No, Danielle, like I
21      said, the only people I talked to were the
22      attorneys and the attorneys only on the
23      restructuring, the only people that have
24      contact and talk to understand.

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

---

**Page 99**
99 :11         Q. Sure. I'll rephrase it.
12         Am I correct that at some point
13      in time, you received a copy of the Janssen
14      Pharmaceutical unanimous written consent?
15         MR. STARNER: Objection. Vague.
16         A. I'm not sure. I mean I know that
17      the document -- so let me step back a
18      little bit.
19         So the document I have received
20      was the one that I signed, right? And if
21      that is the one that you are referring to,
22      you are correct.
23         Other documents, you know, were
24      shared with me by the lawyers for me to
25      have an understanding of the restructuring
100 :1         J. Azevedo - Confidential
2      so I would be comfortable to sign. But I
3      believe that the only one that I had
4      received was the one that I did sign.
5         Q. And when you say that the lawyers
6      shared documents with you, how did they
7      share them?
8         A. In the Zoom like you're doing
9      here, like sharing the Zoom so I could read
10      and could talk like in a presentation mode,
11      you know, could go through the documents
12      and have a discussion and while they're
13      explaining, you know, the whole
14      restructuring, the organization.
15         Q. During your October 11th meeting
16      with the attorneys, were documents shared
17      with you then as well?
18         A. Can you repeat that? Sorry.
19         Q. No problem.
20         During the October 11th meeting
21      with the attorneys, is the document that is
22      up on your screen right now, did the
23      attorneys share documents with you during
24      that meeting as well?
25         A. I don't recall the specific of

101 :1          J. Azevedo - Confidential
    2     that meeting. I think that meeting was
    3     more -- you know, if I remember, if I
    4     recall well, like I said, the first meeting
    5     was really to have -- highlight the
    6     understanding, so they shared more
    7     documents.
    8          I think the second meeting, if I
    9     recall well, we really focused on the
    10    document that I was signing.
    11         So the document that I was
    12    signing of course were shared and
    13    everything else, but I don't recall at that
    14    point in time whether all the documents
    15    were shared or not. It may be or it may be
    16    not. I think the focus was really the
    17    document being signed at that point in
    18    time.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 102**
102 :17         (Deposition Exhibit 1.5, Document
    18    entitled "Janssen Pharmaceuticals, Inc.
    19    Unanimous Written Consent in Lieu of a
    20    Meeting of the Board of Directors,"
    21    dated 10/11/2021, Bates-stamped LTL
    22    0001079 through 1091, marked for
    23    identification, as of this date.)

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 103**
103 :4          MS. D'AQUILA: For the record,
    5     this document is, as I mentioned, the
    6     fifth document in the closing binder
    7     that we received. It's labeled
    8     "Janssen Pharmaceutical Inc. Unanimous
    9     Written Consent in Lieu of a Meeting of
    10    the Board of Directors, October 11th,
    11    2021." And the Bates number on the
    12    first page is LTL_0001079.
    13    BY MS. D'AQUILA:
    14        Q. Do you recognize this document,
    15    Mr. Azevedo?
    16        A. I think -- again, it was a long
    17    time ago. I think that is the one that I
    18    may have signed the creation of the Newco,
    19    or Holdco. I believe that is the one, but
    20    again...
    21        MS. D'AQUILA: Deane, if you
    22    could scroll to the third page. The
    23    Bates number ends in 101.
    24        Great. Thank you.
    25    BY MS. D'AQUILA:
104 :1          J. Azevedo - Confidential
    2         Q. Mr. Azevedo, is that your
    3     signature on this page?
    4         A. That is correct, yes.
    5         Q. Do you recall, how did you sign
    6     this document?
    7         A. I think that -- again, when I
    8     look at this, I think they sent the
    9     document, I print, I signed, I scanned, and

10    I sent back to them.
11        Q. Do you recall approximately what
12    time of day that you signed this document?
13        A. I don't. I'm sorry.
14        Q. As we saw on the first page of
15    this document, it is dated October 11th.
16        Do you recall whether you signed
17    this document on October 11th?
18        A. I don't recall. Probably, but I
19    don't recall exactly the date. But if that
20    is the date, I would assume that is when I
21    signed the document. Because, you know, I
22    don't have the dates or anything like that.
23        Q. And I believe you said you sent
24    it back to them.
25        Who did you send the completed

105 :1        J. Azevedo - Confidential
2    version of this document to?
3        A. To the lawyers.
4        Q. At J&J?
5        A. Yes, internal lawyers of J&J,
6    yes.
7        MS. D'AQUILA: Deane, if you
8        could please go back to the first page.
9        (Document review.)
10    BY MS. D'AQUILA:
11        Q. So I'm looking at the first full
12    paragraph under the heading "Incorporation
13    of Currahee Holding Company Inc."
14        And this paragraph starts,
15    "Whereas, the corporation desired to form a
16    New Jersey corporation named Currahee
17    Holding Company Inc., Currahee Holding,
18    which was formed on October 6th, 2021..."
19        Do you see where I am reading,
20    Mr. Azevedo?
21        A. Can you repeat the question,
22    Danielle?
23        Q. Sure.
24        I just read the first, about half
25    of the first sentence of the paragraph, the

106 :1        J. Azevedo - Confidential
2    first paragraph that starts "Whereas..."
3        Do you see where I am reading?
4        A. Yes, I see it.
5        Q. Why did Janssen Pharmaceutical
6    desire to form a New Jersey corporation
7    named Currahee Holding Co?
8        MR. STARNER: Objection.
9        A. Why? You're asking me the
10    question why?
11        Q. That is correct.
12        Why did Janssen Pharmaceutical
13    desire to form a New Jersey corporation
14    named Currahee Holding Company Inc.?
15        A. So let me step back again, right.
16        So again, I will say, right, I
17    was a signatory of this document as part of
18    my statutory role, but I believe this was
19    -- my understanding when I talked to the
20    lawyers and the need to understand the
21    operation, that is one necessary step for
22    the restructuring to create the LTL to
23    really to address the talc litigation. So
24    I believe this was one necessary step to do

25    that, so that is why.
107 :1         J. Azevedo - Confidential
2         Q. Is it correct that your
3    understanding with regard to the desire to
4    form Currahee Holding Co came entirely from
5    in-house counsel at Johnson & Johnson?
6         MR. STARNER: Objection.
7         A. So I cannot answer that question.
8         Q. Why can't you answer that
9    question?
10         A. Because I don't know the answer.
11    Like I said, I have, I have -- I've been in
12    contact with internal lawyers, so the
13    internal lawyers conveyed that to me. But
14    I was not part of the decision process and
15    who was involved and who was advising and
16    et cetera. So I cannot answer that
17    question.
18         Q. I'm just trying to make sure I'm
19    understanding what you're saying, so
20    forgive me.
21         Is it fair to say, though, that
22    your understanding came solely from the
23    Johnson & Johnson in-house counsel.
24         You're just saying you don't know
25    where the Johnson & Johnson in-house
108 :1         J. Azevedo - Confidential
2    counsel necessarily got their information?
3         MR. STARNER: Objection. Vague.
4    Lacks foundation.
5         You can answer if you understand.
6         A. Yeah, that's my understanding.
7    Yeah, exactly. I think my understanding
8    and my connect was with Johnson & Johnson
9    internal counsel. But I think your
10    question was if the idea of the design,
11    right? So I don't know who did participate
12    and who -- if there are the involvement of
13    external advisers or not, so I cannot
14    answer that. But my understanding came
15    through the internal lawyers, yes, and
16    only.


**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 110**
110 :13         Q. Moving down now to the next
14    "whereas" paragraph, the paragraph that
15    starts with "Whereas under approval of the
16    subscription agreement," this states,
17    "Whereas the corporation desires to
18    subscribe for one share of common stock,
19    par value at $0.01 per share of Currahee
20    Holdco, in consideration of which the
21    corporation will deliver to Currahee Holdco
22    one share of common stock, par value $0.01
23    per share, of Johnson & Johnson Consumer
24    Inc. "
25         Do you see where I just read
111 :1         J. Azevedo - Confidential
2    from, Mr. Azevedo?
3         A. Can you repeat the last part of
4    the question? Sorry, Danielle.
5         Q. Sure.
6         I just wanted to see that you

7       were following along where I read from the
8       document.
9            A. Yes, I see it. Yes.
10           Q. Why did the corporation desire to
11      subscribe for one share of common stock of
12      Currahee Holdco in consideration for one
13      share of common stock of Johnson & Johnson
14      Consumer Inc.?
15             MR. STARNER: Objection.
16             You can answer.
17           A. Yeah, I'm not aware of the
18      details and why that. You know, because
19      again, as I said, I was not part of the --
20      I was not an expert on the details of the
21      operation and the shares and et cetera. I
22      cannot answer. Sorry.
23           Q. Why was Currahee Holding Company
24      formed as a New Jersey company?
25             MR. STARNER: Objection.
112 :1         J. Azevedo - Confidential
2            A. I cannot -- I can't answer that.
3       Like I said, I'm not an expert on shares
4       and why.
5              MS. D'AQUILA: Deane, if you
6          could, please, go back to the third
7          page of this document.
8              Thank you so much.
9              (Document review.)
10      BY MS. D'AQUILA:
11           Q. Mr. Azevedo, as we said before,
12      we see your name and signature on this
13      page, correct?
14           A. Yes.
15           Q. And underneath, there are two
16      other names, Sarah Brennan and Randy Nixon?
17           A. Yes.
18           Q. Is it fair to say those are the
19      two other board members of Janssen
20      Pharmaceutical as of October 11th, 2021?
21           A. I would say yes when I see the
22      names, yes.
23           Q. Who is Randy Nixon?
24           A. I don't know. I know Sarah, like
25      I said before. I don't know who is Randy.
113 :1         J. Azevedo - Confidential
2       I believe he may be a lawyer, but I am not
3       100 percent sure.
4            Q. Have you ever had discussions
5       with Randy Nixon during your tenure at
6       Johnson & Johnson to your recollection?
7            A. I don't recall, but I may have
8       had, but I don't recall.
9            Q. But it's fair to say you did not
10      have any conversations with Randy Nixon
11      with regard to the unanimous written
12      consent that we are talking about right now
13      in?
14             MR. STARNER: Objection.
15           A. That is correct. Like I said
16      before, I just talked to the lawyers.
17             MS. D'AQUILA: Deane, if you
18         could, I'm trying to figure out which
19         page number this is. It's Bates number
20         ending 1086, so it would be either page
21         6 or 7. Keep going. 8 maybe? This

22          one. Sorry. You're right there.
23          Thank you.
24              (Document review.)
25      BY MS. D'AQUILA:
114 :1          J. Azevedo - Confidential
2          Q. Mr. Azevedo, do you see towards
3      the bottom of the page the name Christopher
4      Andrew under Article 7?
5          A. Yes, I do.
6          Q. Do you know who Christopher
7      Andrew is?
8          A. I believe he is a lawyer.
9          Q. Who selected him as the board of
10      director of Currahee Holding Co.
11          MR. STARNER: Objection. Lacks
12      foundation.
13          A. Danielle, can you repeat the
14      question? Sorry.
15          Q. Yeah. I'll back up.
16              So Article 7 on this page of the
17      document, Bates number ending in 1086,
18      Article 7 states, "The numbers of directors
19      constituting the first board of directors
20      is one, and the name and address of the
21      person who is to serve as such director is
22      Christopher Andrew."
23              Do you see where I just read
24      from?
25          A. Yes, I do.
115 :1          J. Azevedo - Confidential
2          Q. And if we are looking at the top
3      of this document, this is the Certificate
4      of Incorporation for Currahee Holding Co.?
5          A. Yes.
6          Q. Who would determine that
7      Christopher Andrew was going to serve as
8      the first board of director for Currahee
9      Holding Co?
10          MR. STARNER: Objection.
11          A. I don't know. I cannot answer
12      the question.
13          Q. It's fair to say that you did not
14      make that determination?
15          A. It is fair to say, yes, I did
16      not.

AZEVEDO, JOSE LUIZ - *01/24/2022*

Page 116
116 :4          Q. Mr. Azevedo, did you make any
5      revisions to the unanimous consent?
6          A. No -- are you saying if I --
7      (inaudible.)
8              (Reporter clarification.)
9          THE WITNESS: I'm asking a
10      question to Danielle. Sorry.
11          A. So are you saying if I made any
12      revisions, if I suggest any changes to the
13      document? That is your question?
14          Q. Correct.
15          A. No, I have not.
16          Q. So you received the Janssen
17      unanimous consent that we marked at
18      Exhibit 1.5, and you signed it, correct?
19          MR. STARNER: Objection.

20          You can answer.
21      A. That is correct.
22      Q. How many hours do you think you
23  spent on phone calls, in meetings or
24  otherwise, analyzing the corporate
25  restructuring prior to signing the
117 :1      J. Azevedo - Confidential
2  unanimous consent?
3          MR. STARNER: Objection.
4      A. I would say maybe one or two
5  hours.
6      Q. Before you signed the Janssen
7  unanimous consent, were you presented with
8  any alternatives to the corporate
9  restructuring?
10         MR. STARNER: Objection.
11         You can answer.
12     A. I have not. But when I was
13  talking to the lawyers, I think --
14         MR. STARNER: Mr. Azevedo, I just
15         instruct you not to reveal anything
16         your lawyers may have told you. You
17         can obviously respond with your general
18         understanding.
19         THE WITNESS: Yeah, okay.
20     A. My general understanding is that
21  all the other alternatives had been
22  considered and there was, you know, the
23  final, the best alternative to move
24  forward. That is my understanding.
25     Q. Were you provided with those
118 :1      J. Azevedo - Confidential
2  other alternatives?
3          MR. STARNER: Objection.
4      A. I didn't ask to, so I was not.
5      Q. Before you signed the Janssen
6  unanimous consent, were you provided with a
7  fairness opinion regarding the corporate
8  restructuring?
9          MR. STARNER: Objection.
10     A. What do you mean by the fairness
11  opinion? What do you --
12     Q. Are you aware of what a fairness
13  opinion is in your experience as a
14  businessperson at Johnson & Johnson?
15     A. No, I am not.
16     Q. After you executed the unanimous
17  written consent, did you have any other
18  involvement with the corporate
19  restructuring?
20         MR. STARNER: Objection.
21     A. I have not.

---

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 119**
119 :16         MS. D'AQUILA: We will be marking
17         this document as Exhibit 1.6. This is
18         the sixth document in the closing
19         binder that we received. The Bates
20         number on the first page of this
21         document is LTL_0001092.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 119**

119 :23        Q. Mr. Azevedo, have you seen this
24        document before?
25        A. I cannot answer. I don't know.
120 :1        J. Azevedo - Confidential
2        Maybe it's the one that I signed? I don't
3        remember.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 120**

120 :4        Q. So we can go to the signature
5        page on this. It's the fifth page, I
6        believe. You will see this was signed by
7        Christopher Andrew.
8            Do you see that?
9        A. Yes.
10        Q. So I will represent to you that
11        your signature does not appear anywhere on
12        this document.
13            To your recollection, do you
14        recall ever seeing this document before?
15        A. I would say no, I don't recall
16        having seen it.
17            MS. D'AQUILA: And if you could,
18        Deane, go to the very last page of this
19        document.
20            (Document review.)
21    BY MS. D'AQUILA:
22        Q. Do you see this is labeled
23        Exhibit B to this document, and it's called
24        "Officers of Currahee Holding Company Inc.,
25        a New Jersey corporation"?
121 :1        J. Azevedo - Confidential
2        A. I can see that, yes.
3        Q. Did you have any role in hiring
4        any of these officers for Currahee Holding
5        Company Inc.?
6            MR. STARNER: Objection.
7        A. I have not.
8        Q. Were you aware that any of these
9        individuals were going to be officers of
10        Currahee Holding Company Inc. at the time
11        you signed the unanimous consent for
12        Janssen?
13        A. I was not.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 147**

147 :2        Q. Hi, Mr. Azevedo. I'll be as
3        short as I can be.
4            So you were the VP of finance and
5        CFO of Janssen North America from sometime
6        in 2019 until approximately October of
7        2021; is that correct?
8        A. That is correct, yes.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 148**

148 :13    Q. Did you have a general
14    understanding during that time of the
15    assets that Janssen Pharmaceutical had?
16        MR. STARNER: Objection.
17    A. Yeah, I would say yes.
18    Q. And one of those assets was its
19    equity interest in Johnson & Johnson
20    Consumer Inc.?
21    A. Yeah, I was aware that Janssen
22    Pharmaceutical was underneath Johnson &
23    Johnson.
24    Q. During that time from 2019 until
25    October 2021, did you have an understanding
149 :1        J. Azevedo - Confidential
2    of the approximate value of that asset to
3    Janssen Pharmaceuticals?
4    A. No, I have not. Like I said,
5    these are statutory in the tax department
6    and others are doing that incorporation.
7    So I have an idea, you know, of the legal
8    structuring, but I don't have all the
9    details and et cetera.
10    Q. Were there schedules, financial
11    schedules for Janssen Pharmaceuticals that
12    listed its equity interest in JJCI as an
13    asset?
14        MR. STARNER: Objection. Lacks
15    foundation.
16    A. Not that I would receive, because
17    as I said, I had a managerial
18    responsibility for the business. This was
19    more of the legal structure and the tax
20    structure and you have, I would say,
21    experts in the enterprise that are looking
22    at that.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 152**

152 :12    Q. Do you have an understanding
13    prior to October 11th, 2021, whether
14    Johnson & Johnson Consumer Inc. had a
15    positive value as an asset?
16        MR. STARNER: Objection. Vague.
17    Lack of foundation.
18    A. I'm not -- again, it would be
19    speculation. I don't have -- I don't have
20    access to the consumer financial
21    informations, so I cannot answer your
22    question.

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 156**

156 :24    Q. Have you considered any forecasts
25    relating to the restructuring?
157 :1        J. Azevedo - Confidential
2        MR. STARNER: Objection. Asked
3    and answered.
4    A. I have not.

```
5        Q. Would you consider any analysis
6   relating to the solvency of any entities
7   involved in the restructuring?
8        MR. STARNER: Objection.
9        A. I specifically would not.
```

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 166**
```
166 :20       Q. Okay. And are you aware of
     21   anybody at Janssen Pharmaceutical or J&J
     22   for that matter who evaluates the impact of
     23   the restructuring on a mesothelioma victim?
     24        MR. STARNER: Objection.
     25        A. It's a difficult question, but I
167 :1        J. Azevedo - Confidential
      2   would say that my understanding talking to
      3   the lawyers, as I said before to Danielle,
      4   is that the experts in the company, they
      5   have weighed the different alternatives and
      6   they believe, right, that this was the best
      7   alternative for all the stakeholders,
      8   right. Not specifically one here, one
      9   there, but that is my understanding and
     10   that is why I was confirmed to sign that.
     11        MR. SATTERLY: Respectfully, I am
     12        going to move to strike that answer and
     13        just ask it a little bit differently.
     14   BY MR. SATTERLEY:
     15        Q. Can you tell me the names of
     16   anybody at either Janssen or Johnson &
     17   Johnson that had evaluated the impact of
     18   the restructuring on a mesothelioma victim?
     19        MR. STARNER: Objection.
     20        A. I cannot give you a name. I
     21   don't -- yeah.
     22        Q. And what you said, your previous
     23   answer, you mentioned Danielle.
     24        You are talking about Danielle
     25   Devine?
168 :1        J. Azevedo - Confidential
      2        A. The lawyer, the first one that
      3   was asking me the questions, yes.
      4        Q. Oh, the lawyer. I'm sorry. I
      5   thought you meant -- do you know who
      6   Danielle Devine is?
      7        A. No, I don't.
      8        Q. Okay.
      9        A. Because what I am saying to you
     10   is that -- I was repeating what I told to
     11   Danielle, the first person that was asking
     12   the questions, right that --
     13        Q. My apologies.
     14        A. Yeah. Because for me to sign the
     15   document and talk to the lawyers, my
     16   understanding, right, is that all the
     17   alternatives had been analyzed and it was
     18   considered the best alternative to move
     19   forward.
```

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 168**
```
168 :20       Q. Now I think this is pretty clear
```

21      based on your previous testimony, but you
22      would agree that you did not participate in
23      any long-arm's length negotiations with
24      regards to the restructuring of
25      October 2021, correct?
169 :1          J. Azevedo - Confidential
2           MR. STARNER: Objection. Lacks
3           foundation. Calls for a legal
4           conclusion.
5           A. I specifically, if I have not --
6       yeah, I have not participated with
7       negotiations with the claimants or
8       anything, no.
9           Q. Okay. And you weren't present in
10      any room or even in any Zoom meetings where
11      there was an arm's length negotiation with
12      regards to the restructuring regarding the
13      various entities involved, correct?
14          MR. STARNER: Objection.
15          A. When you say if I was involved in
16      arm's length negotiations with the other
17      parties, that's what you're saying?
18          Q. Yes.
19          A. Yeah, the claimants, no, I was
20      not.
21          Q. Okay.
22          A. No, I was not part of the
23      negotiations.

## AZEVEDO, JOSE LUIZ - *01/24/2022*

**Page 175**
175 :12         Q. Following up on Mr. Satterley's
13      questioning, was there any consideration of
14      the effect of the restructuring on ovarian
15      cancer claimants?
16          MR. JONES: Object to foundation.
17          MR. STARNER: Yeah, lack of
18          foundation objection. Vague.
19      BY MR. KAHN:
20          Q. That you know of?
21          A. So sorry. You're saying are
22      there any consideration of the effect of
23      the restructuring in the ovarian cancer?
24      That is your question?
25          Q. Yes, as to ovarian cancer
176 :1          J. Azevedo - Confidential
2       claimants.
3           A. Not that I am aware. Like I said
4       before, my understanding is that
5       alternatives were considered what was the
6       best one, but I don't know the specifics,
7       and I don't know if, you know, each case
8       specifically, right, so I cannot answer
9       that.
10          Q. And you don't have any details as
11      to what those other alternatives were --
12          (Simultaneous talking.)
13          Q. You have no understanding as to
14      what the other alternatives that were
15      considered, do you?
16          MR. STARNER: Objection. Lacks
17          foundation. Mischaracterizes the
18          testimony.
19          A. So my understanding, Steve, is

20    that there were a lot of alternatives
21    considered, but I cannot, as I said, go
22    into details which ones and why this and
23    that because I was not part of that.
24         Q. All right. Now as the VP of
25    finance and CFO of Janssen Pharmaceuticals
177 :1         J. Azevedo - Confidential
2     Commercial, I think you said you have no
3     oversight of the financial performance of
4     JJCI; is that correct?
5         A. That is correct. That's what I
6     said.
7         Q. Did anybody else at Janssen
8     Pharmaceutical have responsibility for
9     oversight of the financial performance of
10    JJCI?
11            MR. STARNER: Objection. Lacks
12        foundation.
13        A. I don't know. I can't answer
14    that. Not that I am aware.
15        Q. But would it be correct that just
16    prior to the restructuring that Janssen
17    Pharmaceutical was the sole shareholder of
18    JJCI?
19            MR. STARNER: Objection.
20        Foundation.
21        A. Can you repeat the question, sir?
22        Q. Prior to the corporate
23    restructuring, isn't it correct that
24    Janssen Pharmaceutical was the sole
25    shareholder of JJCI?
178 :1         J. Azevedo - Confidential
2         A. I believe so.
3         Q. And it did not, to your
4     knowledge, oversee the financial
5     performance of JJCI?
6         A. Yes, I said that I didn't --
7            MR. STARNER: Jose, hold on. I
8        just want to object to the question.
9            You can answer.
10        A. I said that I did not have
11    visibility. Like I told you, I cannot tell
12    you who had or who had not. So I'm pretty
13    sure that on an enterprise level, there are
14    people that have that visibility. It's
15    just not me.
16        Q. When you say on the enterprise
17    level, what do you mean?
18        A. Enterprise at Johnson & Johnson
19    in other levels, right, of the
20    organization. People of course have
21    visibility to JJCI, but it's not me. I
22    don't know who are those people.
23        Q. Do you know whether any J&J
24    entity prepared or had prepared on its
25    behalf an analysis of the fair market value
179 :1         J. Azevedo - Confidential
2     of JJCI at any time?
3            MR. STARNER: Objection.
4        Foundation.
5        A. I'm not aware. I didn't
6     participate on that, so I don't know.
7         Q. You haven't heard that any such
8     document was prepared?
9            MR. STARNER: Objection.

10      A. No.
11      Q. Was one of the purposes of the
12   corporate restructuring, to your
13   understanding, to protect J&J from talc
14   claims?
15          MR. STARNER: Objection.
16      Foundation.
17          I just caution the witness not no
18      disclose any communications he may have
19      had with counsel.
20          But with that, you know, you can
21      answer the question if you understand
22      it.
23      A. My understanding, again, my
24   understanding of the restructure was really
25   to solve the issue in the most equitable
180:1       J. Azevedo - Confidential
2    and proper way for all the stakeholders,
3    right? So that's my understanding of that,
4    you know.
5       Q. When you say that for all the
6    stakeholders, you're including Johnson &
7    Johnson, are you not?
8          MR. STARNER: Objection.
9       A. I include everyone, correct. The
10   JJCI, the claimant, and everybody else.
11      Q. Now you mentioned earlier when
12   you were talking about your understanding
13   of the restructuring that it was to solve
14   the talc claims' current and future
15   liabilities in a, quote, "fair and
16   equitable," unquote, way.
17          Do you recall that?
18      A. I said, yeah, I said that the new
19   company of course is going to -- is going
20   to handle all the existing and future
21   liabilities, yes. Yes.
22      Q. In a quote "fair and
23   equitable" --
24      A. I did probably say that, yes.
25      Q. Are those your words or had you
181:1       J. Azevedo - Confidential
2    seen that description of or heard that
3    description from somebody else?
4       A. That's my understanding.
5          (Reporter clarification.)
6       Q. Are those your words or had you
7    seen that description of or heard that
8    description from elsewhere?
9          MR. STARNER: Objection.
10   BY MR. KAHN:
11      Q. I think your answer was, "It's my
12   understanding."
13          Where did you gain that
14   understanding?
15      A. Through the conversations with
16   the lawyers.
17      Q. So given to what you have
18   testified to so far, would it be correct to
19   say that you have no understanding as to
20   whether JJCI just prior to the
21   restructuring had any difficulty meeting
22   its debts when due?
23          MR. STARNER: Objection. Lacks
24      foundation.

```
        25          A. Yeah, again, I'm not involved on
182 :1          J. Azevedo - Confidential
         2    that, right, on the day to day, on the
         3    financials of JJCI, so to say -- I cannot
         4    answer that question because I am not the
         5    right person to do it.
         6          Q. Okay. Have you ever heard from
         7    any source that as of that time, JJCI had
         8    difficulty meeting its debts when due?
         9            MR. STARNER: Objection. Lacks
        10       foundation.
        11          A. I have not heard about the
        12    difficulties to meet the debts when due.
        13    Like I said before, I heard the company was
        14    under a lot of financial constraints. So
        15    what does that mean? I don't know exactly.
        16    But I know that that is what I heard. That
        17    is what I understood from management
        18    meetings.
        19          Q. You understood from management
        20    meetings it's operating under financial
        21    constraints, but you don't know what those
        22    financial constraints --
        23          A. No, because again, I don't have
        24    visibility or work on Consumer, so I am not
        25    on the day to day, so I don't know the
183 :1          J. Azevedo - Confidential
         2    implications. I don't know what is
         3    actually going on there. But that is the
         4    reason why.
```

**AZEVEDO, JOSE LUIZ** - *01/24/2022*

**Page 183**
```
183 :5          Q. That's what you were told, but
         6    you don't know what it's based on?
         7          A. That's what I was told. And also
         8    if I -- and I believe, you know, my
         9    understanding as well, and this is public
        10    information, that in 2020, right, the
        11    company was losing money, the JJCI. And
        12    that is public information. The company
        13    was losing money because of the litigation
        14    costs and et cetera. That is my
        15    understanding, that it was public
        16    information. That is what I was told.
```

## DICKINSON, RICHARD

**DICKINSON, RICHARD** - *01/26/2022*

**Page 18**

| | |
|---|---|
| 18 :23 | Q. Good. |
| 24 | Well, let's get started with your |
| 25 | education, since graduating from high school; |
| 19 :1 | R. DICKINSON |
| 2 | if you could tell me about that. |
| 3 | A. Yes. I have an undergraduate |
| 4 | degree from Slippery Rock University in |
| 5 | finance, and a graduate degree from the |
| 6 | University of Pittsburgh in finance and MIS. |

**DICKINSON, RICHARD** - *01/26/2022*

**Page 19**

| | |
|---|---|
| 19 :11 | Q. And if you could take me through |
| 12 | your employment history since getting your MIS |
| 13 | to -- to today. |
| 14 | A. Yes. |
| 15 | MB- -- MBA in finance and MIS. |
| 16 | Q. Oh, great. |
| 17 | Okay. My apologies. |
| 18 | A. I -- |
| 19 | Q. I don't want to take that away from |
| 20 | you. |
| 21 | A. Yeah, please. |
| 22 | I started -- initially -- |
| 23 | initially, my career, a few years with Xerox |
| 24 | Corporation in, you know, financial analyst |
| 25 | position. |
| 20 :1 | R. DICKINSON |
| 2 | And then I spent ten years with |
| 3 | Aventus Pharmaceuticals, changed names a few |
| 4 | times, but ended up being Aventus |
| 5 | Pharmaceuticals. |
| 6 | And then I joined Johnson & Johnson |
| 7 | roughly in 2001. |
| 8 | And I spent three years at Ortho |
| 9 | Clinical Diagnostics within Johnson & Johnson, |
| 10 | three years as the finance director at Medical |
| 11 | Devices, roughly three years as the strategic |
| 12 | planning director at Ethicon. And for the |
| 13 | last 12 years prior to this role I was the |
| 14 | strategic director, senior director/vice |
| 15 | president of business development for Medical |
| 16 | Devices, primarily acquisitions and |
| 17 | divestitures. |
| 18 | And currently I'm employed with J&J |
| 19 | Services and seconded to LTL as the chief |
| 20 | financial officer. |

**DICKINSON, RICHARD** - *01/26/2022*

**Page 24**

| | |
|---|---|
| 24 :3 | Q. Okay. |
| 4 | And were you familiar, while you |
| 5 | were at J&J, with the talc litigation? |
| 6 | A. I -- I was. |
| 7 | Q. Okay. |
| 8 | And how were you familiar with it? |

9          A. In the normal course of -- of
10     business, being a shareholder,
11     understanding -- reading annual reports or,
12     you know, any time that there was something in
13     the news.
14          Q. But you weren't in any -- well, I
15     won't describe this properly.
16          But in terms of internal
17     information loops relating to talc litigation,
18     updates, that type of thing, were you -- were
19     you involved in those?
20          A. I was not.
21          Q. Okay.
22          All right.
23          I'm curious: When you -- who --
24     how did you join J&J?
25          Who hired you?
25 :1          R. DICKINSON
2          A. I joined Ortho Clinical
3     Diagnostics. An individual named Joe Bondi
4     hired me, and I was, you know, as I said, the
5     financial director for Ortho Clinical
6     Diagnostics.
7          Q. Okay.
8          And how -- how did it come to be
9     that you moved from role to role?
10          How did that -- how is that
11     determined at J&J?
12          Does someone just call you and say,
13     "Rich," you know, "you would be good for this
14     spot"?
15          Or how -- how does that work
16     internally?
17          A. In my career, yes, that's -- that's
18     typically how it worked.
19          Q. Okay.
20          So let's turn to your latest
21     assignment or role, that is, at J&J Services.
22          And, perhaps just generally, can
23     you tell me when that started and how that
24     came to be?
25          A. Yeah. Late -- late September 2021,
26 :1          R. DICKINSON
2     I received a call from Mike Ullmann and Erik
3     Haas, introducing LTL and the potential CFO
4     position.
5          Q. Okay.
6          Do you recall -- when you say "late
7     September," do you recall the date, or
8     approximately the date?
9          A. September 28th.
10          Q. Okay.
11          And that was a phone call from
12     those two gentlemen?
13          A. It was.
14          Q. And as best you can, can you --
15          (Simultaneous speaking.)
16          A. It was a -- let me correct that.
17     It was a Zoom -- a Zoom call.
18          Q. Okay. Great.
19          And let me just be -- one more
20     ground rule. I apologize.
21          Sometimes -- I like to speak,
22     myself, so sometimes I'll jump in and I'll cut
23     you off.

24          Just -- just tell me that you're
25    still answering.
27 :1              R. DICKINSON
2          Or if you want to come back and
3    answer a question more fully, again, you're --
4    you're in charge today. So whatever I can do
5    to -- to help you, just let me know.
6          Okay?
7    A. Thank you. I'm good.
8    Q. Okay.
9          So how did -- well, did they just
10    send you an email and say, Let's have a Zoom
11    call"?
12          Or how did that come to be, that
13    September 28th Zoom call?
14    A. I think it was, "Hey, can we talk
15    this afternoon" --
16          (Simultaneous speaking.)
17    Q. Okay.
18    A. -- type of thing.
19    Q. Okay.
20          And prior to that initial reach-out
21    from them, were you, you know, ensconced in
22    your present position or -- or had you had
23    plans to move on or retire or do anything like
24    that?
25    A. I was focused on my current
28 :1              R. DICKINSON
2    responsibilities.
3    Q. Okay.
4          So were you surprised when they
5    reached out to you?
6    A. I was -- yes, I was surprised by
7    the phone call.
8    Q. Okay.
9          And had you had any interaction
10    with Mr. Ullmann prior to that?
11    A. Yes. I've known Mike.
12    Q. Okay.
13          How long have you known him?
14    A. Multiple years, probably 12 or so
15    years, just --
16          (Simultaneous speaking.)
17    Q. Okay.
18    A. -- dealing with business
19    development.
20    Q. Okay.
21          So in your day-to-day role at
22    Medical Devices, there were occasions where
23    you interacted directly with Mr. Ullmann?
24    A. There were.
25    Q. Okay.
29 :1              R. DICKINSON
2          And, again, could you just -- I
3    have a feeling I -- I could guess, but can you
4    tell me: Why was that?
5          Did you have legal -- legal
6    questions?
7          Or why did you have interaction
8    directly with Mr. Ullmann?
9          MS. BROWN: And, Rich, let me just
10    jump in.
11          Certainly you can answer that
12    question in terms of the subject of your
13    interactions with Mr. Ullmann, but I'll

14      caution you not to reveal --
15          THE WITNESS: Yes.
16          MS. BROWN: -- any specific
17      conversations in which you may have been
18      requesting legal advice or Mr. Ullmann
19      may have been providing it.
20          With that, you can answer.
21          THE WITNESS: They were, in
22      general, questions as it related to the
23      business development projects I was
24      working on.
25          MR. JONAS: Okay.
30 :1           R. DICKINSON
2       Q. (BY MR. JONAS) And was he -- were
3   there other lawyers that you had more --
4   inside J&J that you had more day-to-day
5   contact than Mr. Ullmann, or was he the one
6   you would go to with questions, et cetera?
7       A. There were multiple lawyers,
8   depending on who was on the project.
9       Q. Okay.
10          How about Mr. Haas?
11          Had you ever had any interaction
12  prior to him or them reaching out to you on
13  September 28th, with Mr. Haas?
14      A. Yes.
15      Q. And what was the nature of those
16  interactions?
17      A. Business development dealings.
18      Q. Do you know what Mr. Haas's title
19  or role was?
20      A. I don't specifically know his role,
21  title, but chief litigation -- liti- -- I know
22  he's in litigation.
23      Q. That's why I --
24          (Simultaneous speaking.)
25      A. -- (inaudible) --
31 :1           R. DICKINSON
2       Q. Yeah. That's why I'm asking.
3           When you had interactions with
4   Mr. Haas prior to September 8th (sic), was it
5   in connection with litigation?
6       A. It had to deal with the projects
7   that I was dealing with.
8       Q. Okay.
9           But, more specifically, were the --
10  those projects you were dealing with, were
11  there litigation issues that required you to
12  reach out to Mr. Haas?
13      A. Likely, but I can't recall
14  exactly --
15          (Simultaneous speaking.)
16      Q. Okay.
17      A. -- every conversation or dealings
18  with him.
19      Q. Okay.
20          And -- and I'm sure you -- you know
21  this is coming, but we're going to, perhaps a
22  little painfully -- but it's important to me,
23  so we're going to go through this
24  step-by-step.
25          So --
32 :1           R. DICKINSON
2           (Simultaneous speaking.)
3       A. Sure.

```
 4           Q. Great.
 5               So September 28th, you get an
 6      invite, I guess, or a call to a Zoom meeting.
 7               Did they tell you -- and -- and,
 8      again, was that a call or just an email showed
 9      up inviting you to the Zoom meeting?
10           A. It was an email from Mike, I
11      believe, in the morning that just said, "Hey,
12      can we talk later today?"
13           Q. Okay.
14               And then do you recall what time it
15      was that you had the Zoom call?
16           A. It was roughly 4:00 o'clock,
17      sometime in the afternoon.
18           Q. Okay.
19               And, if you could, describe for me
20      that tele- -- that Zoom call.
21           A. Yes.
22               Well, first off, I just want to
23      clarify one thing: I was surprised by the
24      call with regard to the -- you know, I had no,
25      you know, pre-information or preexisting
33 :1               R. DICKINSON
 2      information with regard to the contemplated,
 3      you know, plans for either restructuring or,
 4      you know, eventually LTL.
 5               I was not surprised, once I had
 6      learned of that -- of an offer position or the
 7      potential of a CFO.
 8               It was in general terms with regard
 9      to, "Hey, well, J&J, right, was, you know,
10      contemplating financial distress, you know,
11      that J&JCI, you know, potentially, were -- was
12      under, and introduction on the CFO role.
13               It was -- and most importantly it
14      was, "Hey, you know, how's the CFO position?"
15               Right?
16               "You'll have -- not all the
17      decisions are going to be made -- are made.
18      You guys have, you know, full control over
19      LTL."
20               And, you know, that was it.
21           Q. And you -- you used the words
22      "LTL." So in that call they were already
23      using the -- the name LTL?
24           A. I don't recall if they were using
25      the words "LTL," but, you know, a new entity,
34 :1               R. DICKINSON
 2      new entity structure.
 3           Q. Okay.
 4               And what did they tell you about
 5      the new --
 6           MR. JONAS: Strike that.
 7           Q. (BY MR. JONAS) You said that -- I
 8      think you -- you specifically said "financial
 9      distress of JJCI."
10               Did I -- is that correct?
11           A. Correct.
12           Q. And how did they describe the
13      financial distress of JJCI to you?
```

**DICKINSON, RICHARD** - *01/26/2022*

21          My understanding from the facts
22    that were related to me was that, you
23    know, over the last five or so years
24    Johnson & Johnson Consumer had spent
25    roughly, you know, a billion dollars in
35 :1            R. DICKINSON
2    defense of litigation, talc-related
3    claims, an additional roughly three and
4    a half billion with regard to
5    settlements and verdicts.
6          And that was primarily the -- the
7    discussion, along with the number of
8    cases, you know, that, you know, we were
9    litigating over the last five years; and
10    how many cases, you know, out of, you
11    know, millions that that was -- or
12    thousands that that was, kind of,
13    representative of.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 35**

35 :15          Can we get a read-back of the
16    question -- or the answer, please?
17          Just a read-back of the answer.
18          Thank you.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 40**

40 :12          Q. (BY MR. JONAS) And what did they
13    tell you about that new entity?
14          A. What was told to me was, this is --
15    the facts that were told to me is that Johnson
16    & Johnson Consumer was under financial
17    distress, you know, based on the billion
18    dollars in -- in costs over the last five
19    years, the verdicts and settlements, and by
20    what was potentially contemplated, which was
21    to be voted on by the new entity's board, that
22    the resolution -- the intention or the
23    contemplation is a complete resolution of the
24    talc-related litigation.
25          Q. Okay.
41 :1            R. DICKINSON
2          And how did you -- more
3    practically, how did you understand, just
4    setting up a new entity that you were going to
5    be CFO of -- how was that going to resolve the
6    talc liabilities?
7          A. My understanding was that through
8    the Bankruptcy Court, and that was -- there
9    was no other alternatives, based on the facts
10    that I went through, is that there was going
11    to be potentially a fair resolution for
12    current and future claimants.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 42**

42 :5          And how -- how did you understand
6    that was going to resolve the talc liability?
7          How was that going to happen?
8          A. My understanding, through the

9      process that was contemplated and the
10     decisions of the LTL board through the
11     Bankruptcy Court, that there would be a
12     complete resolution of talc-related
13     litigation --

**DICKINSON, RICHARD** - *01/26/2022*

Page 44

44 :22         The facts, as I understood them,
23     was that there was a -- what was
24     contemplated was a restructuring that
25     initially would result into a new
45 :1          R. DICKINSON
2      entity, which turned out to be LTL.
3          And that was -- that -- those were
4      the facts; and that the liability for
5      talc-related claims would go from Old
6      JJCI to LTL.
7          Those are the facts as I understand
8      it.
9          But there also would be a funding
10     agreement in place, et cetera, that
11     once -- once, you know, LTL and the
12     bankruptcy was formed, then that was,
13     you know, fully in place.

**DICKINSON, RICHARD** - *01/26/2022*

Page 48

48 :9          Q. Did you have an understanding after
10     that first Zoom call that a bankruptcy of the
11     new entity would be fundamental to a
12     resolution of the talc claims?
13         A. It was -- it was contemplated.
14             But over a period of time, either
15     through reviewing of documents, my own
16     questions, my own professional experience,
17     that's how I came to the conclusion that
18     bankruptcy was the best -- (noise
19     interruption) -- sorry about that -- the best
20     alternative path.

**DICKINSON, RICHARD** - *01/26/2022*

Page 49

49 :24         Did you -- did they tell you how
25     long the planning had been in -- in the works
50 :1          R. DICKINSON
2      for this resolution of talc liabilities?
3          A. They did not.
4          Q. Okay.
5              Did they --
6              (Simultaneous speaking.)
7          A. But I --
8          Q. -- tell you -- I'm sorry. Go
9      ahead.
10         A. No. Go ahead.
11         Q. Did they tell you who else was

**DICKINSON, RICHARD** - *01/26/2022*

Page 61

61 :10          What happened next?
    11          A. Over the next week or two it was a
    12      fair amount of discussions, reviewing of the
    13      informational brief, or drafts of it, the
    14      first-day pleadings, and discussions, whether
    15      they occurred in -- via official calendar,
    16      Outlooks, or either phone calls or
    17      discussions.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 70**

70 :3          And were there other financial
    4      materials or -- or other materials or
    5      documents that you recalled reviewing in the
    6      lead-up to LTL filing bankruptcy?
    7          A. You know, once again, the first-day
    8      declarations. Primarily, you know, it was,
    9      kind of, the funding agreement, you know,
   10      generally aware of; and, you know, of course,
   11      the RAM projections.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 72**

72 :14          Q. Okay.
    15          So up until the time of the filing,
    16      since you spent a lot of time getting up to
    17      speed, what was your understanding of how the
    18      talc liabilities would be resolved in, I think
    19      you said, a fair manner for talc claimants?
    20          How was that going to happen?
    21          A. My understanding is that once we
    22      filed for bankruptcy -- and that was a
    23      board -- board decision -- that the cases
    24      automatically get -- get stayed, and
    25      ultimately there would be a trust set up by
73 :1              R. DICKINSON
    2      the court.
    3          And through a -- you know, that
    4      trust distribution process, you know, all
    5      legitimate claims, based on some criteria,
    6      would go through that process to -- for
    7      resolution -- a complete resolution of current
    8      and future --
    9          (Simultaneous speaking.)
   10          Q. Okay.
   11          A. -- claims.
   12          Q. Was -- was it your understanding
   13      that, from the point of the bankruptcy
   14      forward, JJCI and J&J, the parent -- or people
   15      call it the apex company -- that those --
   16      those entities would be protected from talc
   17      liability?
   18          MS. BROWN: I object. Vague.
   19          You can answer if you understand,
   20      Mr. Dickinson.
   21          THE WITNESS: My understanding is
   22      that the responsibility of talc-related
   23      claims was LTL's responsibility, through
   24      a funding agreement up to the value of
   25      JJCI prior to a restructuring; that that
74 :1              R. DICKINSON
    2      funding agreement, which is a co-funding

3          agreement between JJ- -- J&J and JCI,
4          you know, would stand behind, you know,
5          whatever talc-related, you know,
6          settlement, you know, was decided upon
7          by the court from LTL.
8              That's my understanding.


**DICKINSON, RICHARD** - *01/26/2022*

Page 75

75 :10          Q. (BY MR. JONAS) No. No. Well, I
11      understand that.
12              But -- but you've said a few times
13      that J&J and J&J -- JJCI would be responsible
14      up to the value of JJCI at the time of the
15      bankruptcy filing.
16              Is that -- have I got that right?
17              Is that what you said?
18          A. That's what I can speak to, yes.
19          Q. Okay.
20              So what was the value?
21              What -- what is that value, the
22      value of JJCI at the time of the filing?
23          A. I know that J& -- JJCI is a
24      multibillion dollar company. I don't have
25      that value, nor was I involved in that
76 :1              R. DICKINSON
2      determination of value.
3          Q. So let me -- let me see if I -- let
4      me just make sure I understand this.
5              As the CFO of this new entity, you
6      said that the new entity, LTL, would be
7      responsible for all the talc liability.
8              Right?
9          A. That is correct.
10          Q. Okay.
11              But the -- the funding of those
12      liabilities would be by JJ -- J&J and JJCI, up
13      to the value of JJCI, right?
14          A. That was my understanding, yes.
15          Q. Okay.
16              But you didn't know the value of
17      JJCI?
18          A. I do not.
19          Q. As the -- as a CFO of a company
20      that's taking on liabilities, I guess you
21      didn't think it was important to know what
22      the -- the counterparties to the funding
23      agreement would have to pay?
24              MS. BROWN: I object. Misstates
25      testimony.
77 :1              R. DICKINSON
2              THE WITNESS: Yes, I didn't say
3      that.
4              In the -- in the funding agreement
5      there is a provision, and at some point
6      in time when that value is needed to be
7      known, that there's a mechanism to
8      determine that value.
9          Q. (BY MR. JONAS) And you -- you
10      didn't ask any -- you didn't say, "Hey, what
11      is that value?"
12          A. I know J&JCI to be a multibillion
13      dollar company, and I know there was a
14      provision to determine that value at -- at an

15          appropriate time.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 78**

78 :9          Q. (BY MR. JONAS) So let me ask you,
10          then: What was -- what -- at the time of the
11          bankruptcy filing, what was your understanding
12          of the liabilities of LTL?
13              A. The liabilities of LTL is the
14          costs, any appropriate costs with regard to
15          the litigation and, you know, any potential
16          settlement that comes from the bankruptcy
17          filing.
18              Q. Okay.
19                  And it had no other liability?
20              A. You would have to refer to the --
21          the -- you know, that's a better question
22          asked of the Legal team than me.
23                  But my general understanding is
24          expenses and the settlement.
25              Q. Okay.
79 :1              R. DICKINSON
2                  You -- you think asking about a
3          company's liabilities, the question is better
4          made to lawyers than the chief financial
5          officer of that company?
6                  Is that what you're saying?
7              A. I do. It's -- it's -- it's
8          speculation and, I mean, my general
9          understanding -- I'm not a lawyer, I'm not a
10          legal expert -- I know that it's legitimate
11          expenses with regard to talc litigation and,
12          you know, any potential future settlement
13          decided by the court.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 80**

80 :13          Q. (BY MR. JONAS) At the time of the
14          LTL filing for bankruptcy, what was your
15          understanding of the assets of LTL?
16              A. The assets of LTL, of course, are
17          the 2 billion, call it prepayment or the
18          qualified settling -- I think it's called QSF,
19          and the RAM assets that were allocated to the
20          business.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 81**

81 :5              Do you recall if there were any
6          other assets at the time of the filing?
7              A. $6 million in cash.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 83**

83 :12          Q. Okay.
13                  And when did you first learn about
14          the $2 billion QSF?
15              A. I think within -- you know, within
16          the first, you know, several days.

17    Q. Okay.
18         And was -- was that something that
19    you -- you negotiated, that you were involved
20    in negotiating?
21    A. I -- I was not.
22    Q. Okay.
23         And when you became CFO, did you
24    say, "Gee, I'd like more than 2 billion. I'm
25    CFO of this company. I'd like more than

84 :1         R. DICKINSON
2    $2 billion"?
3         Did you --
4         (Simultaneous speaking.)
5    A. I --
6    Q. -- ever do that?
7    A. I did not.
8    Q. Okay.
9         Why not?
10    A. It's -- I don't know if 2 billion
11    is -- that's the right figure or not the right
12    figure.
13         We'll go through the process. The
14    settlement fund or the QSF fund is -- as my
15    understanding, is up to the value of JJCI, and
16    I believed that the two billion is a sign of
17    good faith and a down payment.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 86**
86 :12         And what about in your role -- what
13    are your -- what are your responsibilities or
14    your duties in your role as a director or a
15    manager -- a manager on the board of managers?
16    A. Is to ensure the decisions we're
17    making and whatever decisions we'll make in
18    the future are, you know, supporting our
19    purpose.
20    Q. Which is what?
21    A. Fair and equitable resolution of
22    talc-related litigation.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 88**
88 :12         Q. (BY MR. JONAS) Do you have any
13    experience with bankruptcy?
14    A. I do not.
15    Q. Okay.
16         You've never been involved with a
17    company that was in bankruptcy?
18    A. I was not.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 89**
89 :19         Q. Okay.
20         And did you -- do you know who
21    negotiated the funding agreement?
22    A. I do not.
23    Q. You weren't involved in that?
24    A. I was not.
25    Q. Okay.
90 :1         R. DICKINSON

```
 2              Do you know if it was negotiated at
 3      all?
 4              A. I do not.
 5              Q. Have you had any -- did you ever
 6      ask anybody, like, "Hey, this is a critical
 7      document for us. Who negotiated this?"
 8              A. I've read the funding agreement and
 9      it looks reasonable and it looks sufficient
10      and appropriate to achieve our stated purpose.
11              Q. And -- and what analysis did you do
12      to reach that conclusion?
13              A. The funding agreement is an
14      unconditional funding agreement, and I
15      understand that there will be professional
16      fees and a potential settlement, and at some
17      point in time that value can be determined.
18              Q. Okay.
19              I guess, just to cut to the chase,
20      Mr. Dickinson, I'm trying to figure out what
21      would happen if the claims exceeded the value
22      of JJCI.
23              How would those be resolved?
24              MS. BROWN: I object. It calls for
25      speculation and lacks foundation.
91 :1           R. DICKINSON
 2              THE WITNESS: Yeah.
 3              Listen, it's speculating. I know
 4      that Johnson & Johnson Consumer is a
 5      multibillion dollar corporation. We
 6      have an unconditional funding agreement,
 7      and -- up to that value, and I believe
 8      that we'll be able to satisfy our
 9      obligations.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 91**
```
91 :21          You -- you answered the last
22      question and you said you were satisfied that
23      the funding agreement, et cetera, was
24      sufficient for LTL to be -- to -- to be able
25      to meet its obligations, I think you said.
92 :1           R. DICKINSON
 2              And so now I'm focusing on the
 3      obligations side, the liabilities side, of the
 4      LTL balance sheet, if you will, and I just
 5      want to know what your understanding of the
 6      total -- the aggregate total of those -- of
 7      that amount was.
 8              A. I can only answer to my
 9      understanding.
10              My understanding is that we spent
11      roughly a billion dollars over the last five
12      years with litigation costs, and three and a
13      half billion in either settlements and
14      verdicts.
15              From a future standpoint, you know,
16      I didn't have a -- I don't have a projection
17      with regard to what those expenses and
18      settlements or verdicts would be, but there is
19      no reason to believe that, you know, those
20      won't continue in the future.
21              Q. Yeah. Okay. And I accept that --
22      I'm sure they'll continue in the future.
23              But how -- how did you reach a
```

```
24        conclusion that the arrangements you had in
25        place under the funding agreement were
93 :1             R. DICKINSON
 2        satisfactory from -- from, if you will, an
 3        asset side of the balance sheet, when you
 4        didn't know or even have any understanding of
 5        what the total liabilities were -- the talc
 6        liabilities were?
 7                 MS. BROWN: Objection. Misstates
 8        testimony.
 9                 THE WITNESS: Yes.
10               I understood from our funding
11        agreement and the wild and unpredictable
12        claims in the past, the -- and the
13        expenses, that going forward through the
14        bankruptcy system, that -- and assuming
15        that -- not assuming -- knowing that
16        JJCI is a multibillion dollar company,
17        that, you know, within that amount, that
18        it would be appropriate.
19               But I can't speculate whether, you
20        know -- what that amount would be in the
21        future.
```

DICKINSON, RICHARD - *01/26/2022*

Page 94

```
94 :14            With regard to, you know, the
15        potential future costs, my understanding
16        is that it's a multibillion dollar
17        company and through the funding
18        agreement, that we'll reach, you know --
19        that we'll be able to satisfy our
20        obligations.
21               MR. JONAS: Okay.
22               Q. (BY MR. JONAS) Did anybody give
23        you any sort of materials or analysis relating
24        to -- relating to projections of future talc
25        liability?
95 :1             R. DICKINSON
 2        A. No.
 3        Q. Okay.
 4               And you didn't ask for anything
 5        like that?
 6        A. I -- I asked, I believe, "Hey, was
 7        there any way to predict future talc
 8        liability?"
 9               And the answer is, "No."
10               But once again, I understood from
11        the wild and unpredictable verdicts that were
12        first asked, and continue to ask, and awarded
13        that there was no reason to believe that
14        wouldn't continue.
15        Q. Did you ask anybody approximately
16        how much J- -- either JJCI or J&J were paying
17        on -- an account of certain claims?
18               For example, on an ovarian cancer
19        claim, when they settled those, how much they
20        paid?
21        A. I did not.
```

DICKINSON, RICHARD - *01/26/2022*

Page 101

101 :13          And what's your role with RAM?
14          A. I'm the chief financial officer,
15     chief -- or the treasurer.
16          Q. Okay.
17          A. They're one and the same.
18          Q. Okay.
19          And RAM -- at the time of the LTL
20     filing, RAM had, I think it's four royalty
21     streams.
22          Is that right?
23          A. That is correct.
24          Q. Okay.
25          And were you involved in the
102 :1          R. DICKINSON
2     negotiation of those royalty arrangements,
3     those stream arrangements?
4          A. I was not.
5          Q. Okay.
6          And were those just presented to
7     you as that's what's going into RAM?
8          Or how did that come to be?
9          A. I was informed that, you know, that
10    was an asset that was allocated to the RAM
11    business from JJCI.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 103**
103 :17          Q. And so RAM executed agreements that
18     would provide it with a royalty stream.
19          Is that fair?
20          A. RAM and -- and whoever had those
21     royalty streams within JJCI, yes.
22          Q. Okay. Okay.
23          And do you know who the -- on those
24     four royalty agreements, do you know who the
25     counterparties are, specifically?
104 :1          R. DICKINSON
2     A. I do.
3     Q. Okay.
4          And who are they?
5          THE WITNESS: Alli, am I safe to --
6     to divulge who those royalty streams are
7     with?
8          MS. BROWN: In terms of the -- the
9     RAM, Rich?
10         THE WITNESS: Yes.
11         MS. BROWN: That's fine. Sure.
12         Thank you.
13         THE WITNESS: Yeah.
14         So the products are Lactaid,
15     Rogaine, Tena and Mylanta, Mylicon.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 107**
107 :20          And as -- as CFO of RAM, did you
21     negotiate the loan agreement with J&J?
22          A. I did not.
23          Q. Okay.
24          Who at RAM negotiated the loan
25     agreement with J&J?
108 :1          R. DICKINSON
2     A. That was prior to the establishment

3        of RAM, with regard to the agreement.
4             I understand the agreement. I just
5        don't -- and it's appropriate and reasonable.
6        I wasn't part of the negotiation up front, or
7        the establishment of it.

## DICKINSON, RICHARD - *01/26/2022*

**Page 113**
113 :17           Can you tell me if you're annualize
18        salary as -- in the offer you ultimately
19        signed was more or less than your salary
20        immediately prior to accepting this position?
21             A. It was roughly the same.

## DICKINSON, RICHARD - *01/26/2022*

**Page 116**
116 :23           Q. (BY MR. JONAS) Prior to accepting
24        this role, in your prior role did you have a
25        bonus target?
117 :1               R. DICKINSON
2             A. Yes.
3             Q. Okay.
4             And is the -- the amount of this
5        bonus target substantially similar to the
6        prior one?
7             A. Correct.
8             Q. Okay.
9             And then there is also here -- the
10        next blackout is "...long-term incentive
11        target is..." percentage of "base salary."
12             Do you have a long-term incentive
13        target bonus in your -- in your immediately
14        prior role?
15             A. Yes.
16             Q. And is this substantially about the
17        same?
18             A. Yes.

## DICKINSON, RICHARD - *01/26/2022*

**Page 117**
117 :20           And then there's -- the next
21        blackout refers to: "In addition...you will
22        be eligible for a retention bonus in the" ...
23        "gross amount of" -- blank.
24             Do you have a retention bonus like
25        this -- did you have a retention bonus like
118 :1               R. DICKINSON
2        this in connection with your prior role at
3        J&J?
4             A. I did not.
5             Q. Okay.
6             So this is -- this is a new form of
7        compensation for you?
8             A. That is correct.

## DICKINSON, RICHARD - *01/26/2022*

**Page 146**
146 :7            Q. (BY MR. JONAS) And since you
8        assumed your role at LTL, have you authorized

9          the retention of any firm to value potential
10         legacy talc liabilities?
11             A. I -- I have not.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 147**
147 :5           Q. (BY MR. JONAS) So looking at
6          Exhibit 21, Mr. Dickinson, are you aware that
7          LTL has retained Bates White to value
8          potential legacy talc liabilities?
9              MS. BROWN: I object. Lacks
10             foundation. Calls for speculation.
11             THE WITNESS: No.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 149**
149 :18          You said that, in connection with
19         existing talc liability, you were aware of the
20         billion dollar in costs --
21             (Simultaneous speaking.)
22             A. Yes.
23             Q. -- correct?
24             You were aware of, I think you
25         said, something akin to three and a half-odd
150 :1             R. DICKINSON
2          million (sic) dollars in settlements,
3          verdicts, judgments that --
4              (Simultaneous speaking.)
5              A. Three and --
6              Q. -- were made, correct?
7              A. Three and a half billion, yes.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 150**
150 :11          I'm just wondering: Beyond that,
12         on a financial basis, did you have any further
13         knowledge about talc liabilities -- J&J talc
14         liabilities?
15             A. As I -- as I testified earlier with
16         regard to my own general knowledge of -- as,
17         you know, a curious stockholder, and
18         knowing -- reading the annual report, I knew
19         generally what the costs and expenses were
20         from those -- from that report.
21             But other than that, no.
22             Q. Okay.
23             So this type of -- what we're
24         looking at here in terms of these detailed
25         gross product liability balances for the
151 :1             R. DICKINSON
2          balance from 2020, and then through 2021,
3          relating to talc, this kind of detailed
4          information you were not provided with prior
5          to LTL filing bankruptcy.
6              A. That is correct.
7              Q. Okay.
8              Thank you.
9              MR. JONAS: Skip that.
10             So now let's go to what's
11         previously been marked as Exhibit 23.
12             (Exhibit No. 23 Previously Marked.)

13          Q. (BY MR. JONAS) And Exhibit 23, at
14     the top you'll see it says, "Minutes of Board
15     of Managers, LTL Management, LLC," and it
16     refers to the board meeting on October 14,
17     2021.
18          Do you see that?
19          A. I do.
20          Q. And -- and I -- we're happy to give
21     you control of this, but I'm guessing you're
22     pretty familiar with this.
23          But let me ask: Have you seen
24     these minutes before?
25          A. I have.

---

**DICKINSON, RICHARD** - *01/26/2022*

**Page 155**

155 :22          I think you've said that one of the
23     purposes of the bankruptcy, or LTL, was to
24     treat talc claimants fairly.
25          Have I got that right?
156 :1               R. DICKINSON
2          A. I -- I believe what I said is fair
3     and equitable resolution to the talc-related
4     liabilities litigation.
5          Q. And what -- what was it about
6     bankruptcy that made you conclude that that
7     would help effect a -- a fair and equitable
8     resolution of talc liability litigation?
9          A. My understanding of that is a few
10     things -- was a few things.
11          One is that old JJCI was on under
12     financial distress due to the wild and
13     unpredictable settlements and claims; two, the
14     costs to defend; and as far as claimants,
15     there was uncertainty, there was delays, and
16     the same wild and unpredictable verdicts for a
17     select few versus any legitimate claims.
18          And bankruptcy allowed for a
19     complete global resolution of those claims.
20     And the benefit to LTL was, of course, a
21     complete global resolution.
22          And the benefit to claimants would
23     be to eliminate that delay on -- in
24     uncertainty, and it would make available a
25     streamlined process through a trust
157 :1               R. DICKINSON
2     distribution process.
3          That was -- that was generally my
4     understanding.
5          And, secondly, my understanding is
6     that any alternatives to that was not a
7     feasible alternative.
8          Q. And it was not feasible why?
9          As to your understanding, why was
10     it not feasible?
11          A. My understanding as to why is that,
12     from an insurance -- and I'm not an expert.
13     You'll have to ask a legal person, you know,
14     the specifics.
15          But -- it's not feasible from --
16     if -- repeat the question, just to make sure
17     I'm...
18          Q. Sure.
19          You -- you said that -- I think you

20        said -- or something like alternatives to
21        bankruptcy were not feasible, and I just want
22        to understand why you say alternatives were
23        not feasible.
24            A. Yeah.
25                So, the alternative is stay as you
158 :1              R. DICKINSON
2        go, right, stay the course.
3                Out of approximately 40,000 cases,
4        we've tried, I think the O-N was -- number was
5        40 cases, right?
6                So I had asked the question: Was
7        there any ability for us to manage more than a
8        handful?
9                You know, I think the answer came
10       back as we could legitimately handle 10 a
11       year, right?
12               Two is that the system today only
13       accounts for current claims, not future
14       claims.
15               Insurance pathways weren't going to
16       work and -- you know.
17               So from that understanding -- and
18       that was a pretty big understanding -- is that
19       bankruptcy was the only option.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 158**
158 :25             Q. (BY MR. JONAS) (Continuing) -- the
159 :1              R. DICKINSON
2        sole motivation for LTL to file bankruptcy was
3        to benefit claimants?
4            A. I -- I said the -- I did not say
5        "the sole reason."
6                I said the reason for bankruptcy
7        was a global resolution for all parties as it
8        relates to LTL and claimants.
9            Q. And what -- what did you understand
10       the benefits to either LTL, JJCI or J&J to be
11       in filing bankruptcy?
12           A. Pure and simple: Global resolution
13       of, you know, all current and future claims,
14       you know.
15           Q. Okay.
16           A. And, you know -- and an avoidance
17       of, you know, spending 80- -- you know, an
18       additional 80-something years litigating this
19       for claimants, you know, eliminate the delays
20       of uncertain -- of litigation, the
21       uncertainty, and they would be able to follow
22       a streamlined process.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 172**
172 :19             Q. (BY MR. JONAS) Bankruptcy of LTL
20       was one resolution strategy, correct,
21       Mr. Dickinson?
22           A. Yes.
23               I would push back on "strategy" and
24       just -- it was an alternative.
25           Q. Okay.
173 :1              R. DICKINSON

```
 2          A. One alternative.
 3          Q. And I just -- I don't want to
 4  belabor it, but I just want to make sure I
 5  understand what your understanding was at the
 6  time of the other alternatives, if there were
 7  more than one, or what the other alternatives
 8  were.
 9          A. I think I -- I mentioned earlier --
10  and I'm pretty sure I did mention earlier --
11  was stay the course, which was untenable with
12  regard to, you know, approximately
13  40,000 cases, hearing in totality around
14  40 cases over the last four years; the wild
15  and unpredictable settlements.
16          Insurance options, you know,
17  weren't feasible through Imerys. That option
18  wasn't feasible.
19          And, you know, even staying the
20  course -- I'll go back to that -- it didn't
21  have any resolution with regard to future
22  claimants, other than litigating this for the
23  next, you know, 80 or some-odd years, due to
24  the latency period of the disease.
25          So my understanding of -- that was
174 :1          R. DICKINSON
 2  my general understanding of the options.
 3          And the bankruptcy option or
 4  alternative was the only one, in my mind and,
 5  I believe, the board's mind that, you know,
 6  was feasible.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 176**
```
176 :17          Q. And so had you done your own
 18  valuation of JJCI?
 19          A. I did not.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 176**
```
176 :22          So how -- how have you arrived at
 23  that $60 billion -- your understanding of a
 24  $60 billion valuation?
 25          A. How?
177 :1          R. DICKINSON
 2          Just over a period of time and
 3  knowing, you know, financials.
 4          But, once again, it wasn't, you
 5  know -- it wasn't exact knowledge or any
 6  calculation I have ever done.
 7          Q. Okay.
 8          But would you agree with me that --
 9  that one -- that a critical part of the
10  funding agreement is that J&J and JJCI will
11  provide funding up to the value of JJCI?
12          A. That is correct. Prior to the
13  restructuring, is my understanding.
14          Q. Okay.
15          And as far as you know, up through
16  the time that LTL filed bankruptcy, in -- in
17  all your meetings with Mr. Kim and Mr. Deyo
18  and Mr. Wuesthoff and other Jones Day people
19  and, et cetera, that -- did that ever come up
```

```
     20        at all?
     21               A. We never discussed it, or at least,
     22        you know, in my presence.
     23               Q. Okay.
     24                  Okay.
     25               A. I know that there was an
 178 :1               R. DICKINSON
      2        appropriate period of time that we may have to
      3        calculate that value, and that will -- you
      4        know, that will be an appropriate period of
      5        time.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 181**
```
 181 :22               Q. (BY MR. JONAS) One of your
     23        responsibilities as CFO was to prepare and
     24        sign the schedules of assets and liabilities
     25        for LTL correct?
 182 :1               R. DICKINSON
      2        A. Correct.
      3        Q. Okay.
      4               And I have just a few questions for
      5        you, particularly --
      6               UNIDENTIFIED SPEAKER 1: And this
      7        is a lot earlier.
      8               MR. JONAS: I'm sorry?
      9               UNIDENTIFIED SPEAKER 2: I think
     10        someone is not on mute.
     11               MR. JONAS: Okay.
     12               If folks not speaking could mute,
     13        please.
     14               Thank you.
     15               Q. (BY MR. JONAS) So just to
     16        orientate you, I'll just let you know this was
     17        something that was filed -- you signed, and
     18        that was filed on December 6th, 2021.
     19               And as you've already said, this is
     20        something you're responsible for.
     21               Just a few questions before we turn
     22        to the document.
     23               Are you familiar with the Ingham,
     24        I-n-g-h-a-m, talc liability case in which J&J
     25        and related parties were defendants?
 183 :1               R. DICKINSON
      2               Have you heard that?
      3        A. Yes.
      4        Q. Okay.
      5               And what's your understanding of
      6        the Ingham case?
      7        A. Generally -- general understanding
      8        is that the Ingham case -- 22 plaintiffs,
      9        St. Louis, Missouri, and the initial verdict
     10        was, I believe, 4.7 billion, and 550 million
     11        compensatory.
     12               That was subsequently reduced by
     13        the Supreme -- Missouri Supreme Court, and
     14        ultimately -- neither by the U.S. Supreme
     15        Court.
     16               Outside of that, you would have to
     17        refer to someone else for -- for the
     18        specifics. But that's my general
     19        understanding.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 189**

189 :16              So -- well, tell me -- you
17       mentioned it: Why did it go from -- to use
18       your words, why did it go from Texas to North
19       Carolina?
20              A. I don't know that.
21              Q. You -- were you aware of it when it
22       happened?
23              A. I was aware of it when it happened.
24       I don't know why it happened.
25              Q. And you didn't ask anybody?
190 :1                 R. DICKINSON
2              A. I didn't ask anybody. I just know
3       that -- I just know that it was an appropriate
4       jurisdiction.
5              Q. How did you know that?
6              A. That was relayed to me.
7              Q. Who relayed that to you?
8              A. I can't recall.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 196**

196 :25              MR. JONAS: Then let's look at the
197 :1                 R. DICKINSON
2       next exhibit, which will be 1.24.
3              (Exhibit No. 1.24 Previously
4       Marked.)

**DICKINSON, RICHARD** - *01/26/2022*

**Page 197**

197 :8              Q. (BY MR. JONAS) This is a "Plan of
9       Divisional Merger," dated October 12th.
10              And -- and I'll just represent to
11       you -- and I'll be happy to have you take a
12       look at it -- this is the document by which
13       Chenango Zero, LLC, basically split into
14       Chenango One, LLC, and Chenango Two, LLC.
15              And I just -- have you seen this
16       document before?
17              A. I believe I have, yes.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 198**

198 :12              Q. (BY MR. JONAS) You'll see, if you
13       were to scroll through this, this document --
14       and then we're going to take a look at another
15       document in a minute, the schedules -- provide
16       all the detail for the split of Chenango Zero
17       into Chenango One and Chenango Two, both
18       liabilities, assets, et cetera.
19              I'm just curious whether you were
20       involved in any of the decision-making
21       relating to this particular plan of divisional
22       merger?
23              A. I was not.
24              Q. Okay.
25              So this was something that, again,

199 :1                          R. DICKINSON
2              you might have reviewed, but it was presented
3              to you as -- as -- I mean, you didn't have an
4              opportunity to provide any input.
5                      A. I -- I was not part of it.
6                      Q. Okay.
7                          And so I take it you don't know why
8              certain assets or certain liabilities went
9              either to Chenango One or to Chenango Two.
10                     A. That is correct.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 199**
199 :18                 Q. (BY MR. JONAS) Just one question
19             on the document we looked at before, that is,
20             the split of Chenango Zero.
21                     Do you know who was involved in the
22             details relating to that, that divisional
23             merger?
24                     A. I do not.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 200**
200 :3                      Well, let's look at Exhibit 1.31.
4                      This is a "Divisional Merger
5              Support Agreement" between Chenango One, the
6              entity at which you're on the board, and
7              Chenango Two.
8                      Have you seen this before?
9                      A. I have.
10                     Q. And I take it, it was in the
11             lead-up period?
12                     A. Correct.
13                     Q. Okay.
14                     And were you involved in the -- the
15             details relating to this agreement?
16                     A. I was not.
17                     Q. Okay.
18                     So I take it you weren't involved
19             in any of the negotiation of this agreement?
20                     A. I was not involved.
21                     Q. Okay.
22                     Do you know who negotiated this
23             agreement between Chenango One, the entity at
24             which you're a board member, and Chenango Two?
25                     A. I do not.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 201**
201 :17                 Q. (BY MR. JONAS) This document,
18             Exhibit 1.32, is titled "Services Agreement."
19             It's between, as you'll see, Johnson & Johnson
20             Services, Inc., and Chenango One, LLC.
21                     And, again, I'll just represent to
22             you it's a docu- -- an agreement whereby
23             Johnson & Johnson provides certain services to
24             Chenango One.
25                     Have -- I take it you've seen this
202 :1                          R. DICKINSON
2              during the lead-up period?

3          A. Yes.

**DICKINSON, RICHARD** - *01/26/2022*

Page 202
202 :17          Q. (BY MR. JONAS) So I take it --
18          were -- were you involved in any of the
19          details of putting together the Services
20          Agreement?
21          A. I was not.
22          Q. And I take it you were not involved
23          in any of the negotiations relating to the
24          Services Agreement.
25          A. I was not.
203 :1          R. DICKINSON
2          Q. Do you know who negotiated the
3          Services Agreement?
4          A. I do not.

**DICKINSON, RICHARD** - *01/26/2022*

Page 203
203 :6          MR. JONAS: And if we go to
7          Document 1.33. That's 1.33.
8          (Exhibit No. 1.33 Previously
9          Marked.)
10          Q. (BY MR. JONAS) Mr. Dickinson,
11          Document 1.33 -- Exhibit 1.33 is a
12          secondment -- I always say "secundment"
13          (phonetics), but I don't know what's
14          pronounced correctly.
15          So I'll say it's a secondment
16          agreement between Johnson & Johnson Services,
17          Inc., and Chenango One, LLC.
18          Did you see this in the lead-up
19          period?
20          A. Do you mind if you give me the
21          access again?
22          Q. Sure.

**DICKINSON, RICHARD** - *01/26/2022*

Page 204
204 :12          So now I'll ask you: Did you see
13          this document or a version of this document in
14          the lead-up period?
15          A. Yes.

**DICKINSON, RICHARD** - *01/26/2022*

Page 204
204 :17          And I take it you were not involved
18          in any of the details of this particular
19          document.
20          A. Correct.
21          Q. And I take it you were not involved
22          in the negotiation of this particular
23          document.
24          A. Correct.
25          Q. And I take it you don't know who
205 :1          R. DICKINSON
2          negotiated this document.

3          A. That is correct.

**DICKINSON, RICHARD** - *01/26/2022*
_____

**Page 207**
207 :8          Q. (BY MR. JONAS) This lists the
9          documents we looked at -- or some of the
10          documents we looked at, what are referred to
11          here as the intercompany agreements, right?
12          A. Yes.
13          Q. And you're signing here was to sign
14          for approval as a board member of Chenango
15          One, for the company to go forward with those
16          agreements, right?
17          A. That is true.

**DICKINSON, RICHARD** - *01/26/2022*
_____

**Page 209**
209 :7          Q. (BY MR. JONAS) And you'll see it
8          says, "Amended and Restated Funding
9          Agreement." And it was among Johnson &
10          Johnson, Johnson & Johnson Consumer, Inc., and
11          LTL Management LLC.
12          Is this the funding agreement that
13          you mentioned earlier whereby LTL can borrow
14          funds from J&J or JJCI?
15          A. I push back on your notion -- or
16          your wording of "borrow funds."
17          It can access funds for the
18          appropriate use of LTL's business and --
19          including the settlement.
20          Q. Okay.
21          MR. JONAS: Hold on one second.
22          Okay. Fair enough.
23          Q. (BY MR. JONAS) And -- and, again,
24          I don't want to go over all -- all the old
25          ground, but you -- you were not involved in
210 :1          R. DICKINSON
2          any detailed way in the preparation and
3          negotiation of this document.
4          A. I was not.
5          Q. And you don't know who was?
6          A. I do not.
7          Q. Okay.
8          And this -- this was presented --
9          and I don't mean to be pejorative, but it was
10          presented to you as kind of a done deal.
11          When you saw this it was completed
12          already, correct?
13          A. The funding agreement was
14          contemplated. I don't know exactly when it
15          went into effect. It was contemplated and it
16          looked completely reasonable to me, and
17          appropriate, to satisfy the business dealings
18          of LTL.

**DICKINSON, RICHARD** - *01/26/2022*
_____

**Page 211**
211 :24          With respect to the amended and
25          restated merger support agreement, services
212 :1          R. DICKINSON
2          agreement, and services agreement -- let's

3        just start with those -- secondment agreement,
4        we have looked at a series of those relating
5        to Chenango One, and they were -- they were
6        not amended and restated. They were the
7        initial agreements.
8               They then were amended and restated
9        relating to LTL. And in each case, in the
10       initial agreements you said you had not been
11       involved in their preparation, their
12       negotiation. You didn't know who had prepared
13       those and negotiated those.
14              I just want to know, as to the
15       extent they were then amended and restated for
16       LTL, would your answers be the same?
17              A. Yes.

**DICKINSON, RICHARD** - *01/26/2022*

Page 214

214 :3              (Exhibit No. 1.66 Previously
4        Marked.)
5               Q. (BY MR. JONAS) So this is a
6        document referenced, "Purchase and Sale
7        Agreement," dated as of October 11th, 2021,
8        between McNeil Nutritionals, LLC, and Royalty
9        A&M LLC.
10              Again, we can give you control of
11       this.
12              And in the closing binders provided
13       to us, I think by Jones Day, there are, in
14       fact, four of these royalty-type agreements.
15       This is the first one.
16              And I just have a few questions
17       about these. We've talked about these briefly
18       before, but I want to make sure I've got the
19       right document.
20              So if you need to take a look at
21       it, I -- just for example, I want to show you
22       these and see if you're familiar with these
23       particular documents, and if you've seen them
24       before.
25              A. I am familiar with these documents.
215 :1              R. DICKINSON
2               Q. Okay.
3               And I'll represent to you each of
4        these was signed by Royalty -- by
5        Mr. Wuesthoff at the time, for Royalty A&M
6        LLC.
7               But were you involved in the
8        negotiation of these -- when I say "these,"
9        I'm referring to all -- all four of these,
10       these initial funding agreements -- royalty
11       agreements.
12              Were you involved in the
13       negotiation of these?
14              A. I was not.
15              Q. Do you know how the particular
16       prices that were to be paid by LTL -- how
17       those were arrived at?
18              A. I did not -- I do not.

**DICKINSON, RICHARD** - *01/26/2022*

218 :20         Q. Can you describe for me the -- the
21      RAM business?
22              And, again, I apologize, but as I
23      understand it you're buying these streams of
24      royalty payments.
25              Is that fair?
219 :1              R. DICKINSON
2       A. Yes. Royalty monetization is --
3       someone holds the intellectual property of --
4       Q. Uh-huh.
5       A. -- a product, and you call that the
6       ingredient.
7               Someone else markets a product that
8       uses that ingredient.
9               In exchange for that use of the
10      ingredient -- ingredient, which is the
11      intellectual property, you get anywhere from
12      four to eight percent royalty arrangement to
13      be paid over a period of time. That's
14      essentially what a royalty monetization
15      business is.


**DICKINSON, RICHARD** - *01/26/2022*

Page 219
219 :23         Q. (BY MR. JONAS) RAM itself doesn't
24      have any ingredients that it --
25              (Simultaneous speaking.)
220 :1              R. DICKINSON
2       A. RAM does not hold the intellectual
3       property of the four current royalty streams
4       we have, mostly for administrative purposes.
5       It takes a long time to administer these
6       royalty arrangements.
7               We have the most important part,
8       which is the financials.
9       Q. Yeah.
10              When you say "the financials,"
11      so -- and, again, I apologize because this is
12      new to me.
13              But -- so RAM has bought the
14      royalty stream that -- that the ingredient
15      maker had with the -- the marketer.
16              Is that fair to say?
17      A. The -- it was allocated -- royalty
18      streams were allocated to RAM and RAM
19      receives, on a quarterly basis, approximately
20      $14 million for the royalty streams.


**DICKINSON, RICHARD** - *01/26/2022*

Page 230
230 :6          Q. And prior to your secondment to LTL
7       by Johnson & Johnson, you didn't have any role
8       in managing Johnson & Johnson's asbestos talc
9       litigation, did you?
10      A. I did not.
11      Q. And you didn't have any role in
12      valuing that litigation, right?
13      A. I did not.
14      Q. You didn't have any role in
15      evaluating the merits of any case, right?
16      A. I did not.
17      Q. And you didn't have any role in

18          resolving any talc litigation case, correct?
19              A. I did not.

## DICKINSON, RICHARD - *01/26/2022*

**Page 232**

232 :12              Q. (BY MR. KUTCHER) At the time that
13          you voted to authorize the filing of LTL's
14          bankruptcy, did you know by year how much
15          Johnson & Johnson Consumer, Inc., had spent in
16          legal fees related to the talc litigation?
17              A. I did not.
18              Q. Did you -- am I correct that you
19          also understood that Johnson & Johnson
20          Consumer, Inc., had spent approximately three
21          and a half billion dollars over the last five
22          years settling cases or paying verdicts?
23                  Is that right?
24              A. Generally, I understood that, yes.
25              Q. And same question: At the time
233 :1              R. DICKINSON
2          that you voted to authorize LTL to file
3          bankruptcy, did you understand how much of
4          those expenses were paid each year during the
5          five years by Johnson & Johnson Consumer,
6          Inc.?
7              A. I did not.

## DICKINSON, RICHARD - *01/26/2022*

**Page 236**

236 :14              Q. Okay.
15                  And did you have an understanding
16          of whether the amounts that Johnson & Johnson
17          had paid, either in settlements or verdicts,
18          were -- was -- had decreased between 2020 and
19          2021?
20              A. I -- I -- that is not my
21          understanding.
22                  My understanding is that, you
23          know -- I had no reason to believe that
24          anything was decreasing.
25                  Cases were increasing from 46 to
237 :1              R. DICKINSON
2          approximately 4- -- 5,000 in 2017. 2019, the
3          cases were over -- you know, nearly 10,000.
4          And 2021, the cases -- and I'm respectfully
5          calling them cases -- were 13- -- 13,000 at
6          the time -- at the time -- time of the
7          restructuring.
8                  From a dollar standpoint, the wild
9          and unpredictable verdicts, a billion dollars
10          in expenses and, you know, well over
11          3 million (sic) with regards to settlements
12          and verdicts.
13              Q. Mr. Dickinson, with respect to
14          Johnson & Johnson Consumer, Inc., did you have
15          any understanding of whether it, at the time
16          of the restructuring, was able to meet its
17          financial obligations?
18              A. Repeat that. Repeat that question.
19              Q. Did you have any understanding, at
20          the time that -- of the restructuring that
21          Johnson & Johnson Consumer, Inc., was not able

```
      22      to meet its financial obligations?
      23          A. I don't have any -- I don't have
      24      knowledge with regard to, you know -- it's
      25      not -- not part of my job or not part of my,
 238 :1              R. DICKINSON
       2      you know, segment to understand what J&JCI
       3      could do with regard to its financial
       4      obligations.
       5              It has a lot of financial
       6      obligations.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 244**

```
 244 :7          Q. You understand that the funding
       8      agreement allowed -- or permits LTL to request
       9      payment for certain funds from Johnson &
      10      Johnson and Johnson & Johnson Consumer, Inc.,
      11      correct?
      12          A. That's my understanding, yes.
      13          Q. And I think you testified earlier
      14      that you understood those requests could go
      15      all the way up to the value of JJCI
      16      immediately prior to the restructuring.
      17              Is that right?
      18          A. That is my understanding, yes.
      19          Q. And you also understand,
      20      Mr. Dickinson, that LTL could access those
      21      funds prior to going into bankruptcy or during
      22      bankruptcy, correct?
      23          A. Whenever the -- whatever it took
      24      into -- whatever it was placed as an
      25      executable agreement, that's when I know that
 245 :1              R. DICKINSON
       2      we could utilize those funds.
       3          Q. So I guess my question is: On
       4      October 14th of 2021, when you voted to put
       5      LTL into bankruptcy, did you understand that
       6      at that time, prior to bankruptcy, LTL had
       7      access to the funds that were contemplated in
       8      the funding agreement?
       9          A. I understood that LTL had funds. I
      10      wasn't think of the specific days. I just
      11      know that in order to conduct our business, we
      12      had access to those funds. I wasn't -- you
      13      know, the days, you know, didn't come into
      14      play.
      15          Q. Right.
      16              So LTL could access those funds
      17      whether or not LTL was in bankruptcy, correct?
      18          A. If you're going to show me -- if
      19      you want to show me a document that you're
      20      referring to, I'm happy to look at it.
      21              But, once again, I understood that
      22      the funding generally -- it's a better
      23      question to ask a legal person. But I
      24      understood that the funding agreement allowed
      25      us to conduct our business.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 248**

```
 248 :25         Q. Okay.
 249 :1              R. DICKINSON
```

2              Let me -- let me ask you this: On
3    October 14th of 2021, did you understand what
4    assets LTL held?
5              A. Yes.
6              Q. Was one of those assets the funding
7    agreement?
8              A. On October 14th, I understood, yes,
9    the funding agreement was in place.
10             Q. Okay.
11             And when you voted to put LTL into
12   bankruptcy, was that based on your
13   understanding that LTL had access to the
14   funding -- the funds that were contemplated by
15   the funding agreement?
16             A. Yes.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 252**
252 :16            Q. So am I right that a permitted
17   funding use in this agreement is the payment
18   of all costs and expenses of the payee when
19   there is no proceeding under the Bankruptcy
20   Code?
21             A. I'll have to refer to lawyers for
22   the actual text. I'm not -- I'm not a lawyer.
23             Q. Okay.
24             So I'll go back to my questions
25   that I was asking before.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 256**
256 :11            Q. (BY MR. KUTCHER) It's a simple
12   question.
13             Did you understand, at the time of
14   the bankruptcy, that these funds were
15   available whether LTL went in or not?
16             A. I think I answer -- I think I
17   answered the question already.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 262**
262 :21            Before voting to put LTL into
22   bankruptcy, did you think it was important to
23   understand the value of the assets of LTL?
24             A. No.
25             Q. Did you think it was important to
263 :1             R. DICKINSON
2    understand the value of the liabilities of LTL
3    before voting to put LTL into bankruptcy?
4             A. I think I answered that question,
5    as well.
6             With regard to the liabilities of
7    LTL, in allowing an unpredictable verdict
8    there was no way to foresee a -- a definitive
9    projection on what the liabilities in the
10   future would be.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 292**

292 :25          Q. (BY MR. SATTERLEY) Sir, if you've
293 :1               R. DICKINSON
2          not evaluated the merits of any specific case,
3          how do you know that a verdict is wild?
4               A. The wild and unpredictable nature
5          of it is based on some knowledge that I do
6          have with regard to, you know, the Ingham
7          verdict.
8                    For seemingly the same disease
9          state, some people receive astronomical
10         amounts, some people receive zero.
11                   For the case in 2001, the
12         incongruity of the -- there were two cases.
13         One, I believe it was $27 million, and the
14         compensatory and the punitive were completely
15         reversed.
16                   And that is, you know, the extent
17         of my knowledge with regard to the wild and
18         unpredictable nature of those verdicts.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 312**
312 :22          Q. (BY MR. SATTERLEY) The -- I think
23         I heard from your testimony with Mr. Jonas
24         that you did not participate in any arm's
25         length negotiations regarding any of the
313 :1               R. DICKINSON
2          restructuring agreements.
3                    Correct?
4               A. That is correct.
5               Q. And you weren't made privy, or you
6          weren't even told specifics, of how any arm's
7          length negotiations occurred for any of the
8          restructuring documents, right?
9                    MS. BROWN: Asked and answered this
10         morning. I object.
11                   MR. SATTERLEY: Go ahead, sir.
12              Q. (BY MR. SATTERLEY) That's true?
13              A. I was not told of any prior to them
14         being put in place.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 318**
318 :17          One last -- one last area.
18               Did -- did you learn and have an
19         understanding that one of the benefits of the
20         LTL filing would be to -- one of the benefits
21         would be to stop verdicts?
22                   Right?
23                   These wild and unpredictable
24         verdicts.
25                   That would be one of the benefits,
319 :1               R. DICKINSON
2          right?
3                    MS. BROWN: Lacks foundation.
4                    THE WITNESS: I think I answered.
5          The reason we filed bankruptcy --
6          bankruptcy was for -- to reach a fair
7          and equitable resolution, and the
8          stay -- the -- an automatic stay was an
9          outcome of that process.

**DICKINSON, RICHARD** - *01/26/2022*

**Page 332**

| | |
|---|---|
| 332 :19 | MR. DINE: If we could put the |
| 20 | board minutes, Exhibit 23, up on the |
| 21 | screen, please. |

**DICKINSON, RICHARD** - *01/26/2022*

**Page 333**

| | |
|---|---|
| 333 :7 | Q. (BY MR. DINE) And looking on |
| 8 | Page 19186, there's a heading, "Review of the |
| 9 | Company's Assets and History with Talc-related |
| 10 | Liabilities." |
| 11 | Do you see that? |
| 12 | A. I do. |
| 13 | Q. And then the -- the -- the third |
| 14 | sentence of that states: "Mr. Kim then |
| 15 | reviewed the company's history with |
| 16 | talc-related liabilities." |
| 17 | Do you see that sentence? |
| 18 | A. Yes. |
| 19 | Q. And is that an accurate statement? |
| 20 | A. Yes. |
| 21 | Q. And this second -- the next |
| 22 | sentence says: "Mr. Kim's presentation |
| 23 | addressed, among other things, the" -- "the |
| 24 | use of talc in products of the company's |
| 25 | predecessors, the evolution of talc-related |
| 334 :1 | R. DICKINSON |
| 2 | lawsuits in the tort system, the experience of |
| 3 | company's predecessors in the tort system, |
| 4 | challenged faced by the company's predecessors |
| 5 | in the court system, and historical and |
| 6 | forecasted costs and expenses of the company's |
| 7 | predecessors and the company, respectively, |
| 8 | associated with talc-related lawsuits." |
| 9 | Is -- is that an accurate |
| 10 | statement? |
| 11 | A. Yes. That's my understanding, it's |
| 12 | an accurate statement. |
| 13 | Q. And so Mr. Kim presented forecasted |
| 14 | costs and expenses of the company's |
| 15 | predecessors and the company associated with |
| 16 | talc-related lawsuits? |
| 17 | A. Well, it's -- it's a look back, |
| 18 | right? |
| 19 | So it's, in general, the costs |
| 20 | and -- you know, it's the same conversation I |
| 21 | had earlier or the same answer I had earlier. |
| 22 | It referred to the costs of approximately a |
| 23 | billion, and the three and a half billion |
| 24 | dollars' worth -- required for verdicts and |
| 25 | settlements. |
| 335 :1 | R. DICKINSON |
| 2 | Q. But it did not say: In the coming |
| 3 | years we expect to pay X amount of money out |
| 4 | in verdicts to talc claimants. |
| 5 | A. No. |

**DICKINSON, RICHARD** - *01/26/2022*

**Page 336**

```
336 :12            Q. (BY MR. DINE) Did you have any
   13      factual basis to believe that the value of
   14      JJCI would be insufficient to pay talc
   15      liabilities going forward?
   16            MS. BROWN: Same objection.
   17            THE WITNESS: Yeah.
   18            That's a hypothetical. I didn't
   19      know what -- you know, obviously, we
   20      didn't know -- we don't know what any
   21      future liabilities would be, so that
   22      wasn't even in the question.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 338**
```
338 :17            Q. (BY MR. DINE) I think the
   18      question, then, is: Was the existence of the
   19      funding agreement considered with respect
   20      specifically to LTL's ability to satisfy
   21      judgments against -- or judgments against it,
   22      or settlements with talc claimants, going
   23      forward?
   24            A. That was not discussed as an
   25      alternative, nor does it take away the fact
339 :1                  R. DICKINSON
    2      that the wild and unpredictable verdicts that
    3      old JJCI experienced a number of cases that we
    4      would be able to litigate in a year's time
    5      period, and the costs would be eliminated.
    6            So it wasn't discussed and it
    7      wasn't an option.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 339**
```
339 :16            Q. (BY MR. DINE) Did any person ever
   17      instruct you about the manner in which you
   18      needed to carry out those duties, as far as
   19      duties of prudence or care?
   20            A. No one instructed me how to operate
   21      in my job, nor would J&J ever put me in a
   22      position of instructing me how to operate in
   23      my job.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 340**
```
340 :7            Q. Did any person ever instruct you
    8      that you have a duty of loyalty to LTL
    9      specifically?
   10            MS. BROWN: Objection. Calls for a
   11      legal --
   12            (Simultaneous speaking.)
   13      Q. (BY MR. DINE) As a --
   14            MS. BROWN: -- opinion.
   15            THE WITNESS: -- (inaudible) --
   16      Q. (BY MR. DINE) -- board member.
   17            MS. BROWN: I -- I object. Calls
   18      for speculation. Legal conclusion.
   19            MR. DINE: You can answer the
   20      question.
   21            THE WITNESS: I said no.
```

**DICKINSON, RICHARD** - *01/26/2022*

---

**Page 346**

346 :12          Q. Did you understand whether or not
13          Mr. Deyo had any relationship with Johnson &
14          Johnson or any of its subsidiaries or
15          affiliates?
16              A. Mr. Deyo is a former J&J employee,
17          and outside of, you know, the specific details
18          of his relationships, it's a question better
19          asked of somebody else.
20              But I generally knew of -- that he
21          was -- you know, Russ is a former employee,
22          that as it relates to LTL he's been a board --
23          board member, and he was going to receive
24          compensation.

**DICKINSON, RICHARD** - *01/26/2022*

---

**Page 347**

347 :19          MR. DINE: Can we bring up
20          Exhibit 1.32, please.

**DICKINSON, RICHARD** - *01/26/2022*

---

**Page 348**

348 :3          Q. (BY MR. DINE) Mr. Dickinson, you
4          testified that you had the same email address
5          now as you did prior to your appointment to
6          the board and as chief financial officer of
7          LTL.
8              Correct?
9              A. That is correct.
10              Q. And so your email is on Johnson &
11          Johnson's servers?
12              A. Yes, it is.
13              Q. And the same is true of
14          Mr. Wuesthoff's email.
15              A. I can speak to my email. I can't
16          speak to anybody else's email.
17              Q. So if your email is on Johnson &
18          Johnson's servers, can Johnson & Johnson's IT
19          system administers read your email?
20              MS. BROWN: Objection. Foundation.
21          Speculation.
22              MR. DINE: You can answer if you
23          know.
24              THE WITNESS: I do not know.

**DICKINSON, RICHARD** - *01/26/2022*

---

**Page 350**

350 :20          Q. (BY MR. DINE) Mr. Dickinson, as
21          chief financial officer of LTL, does LTL have
22          an accounting system?
23              A. We're -- I'm a band of one, and we
24          don't have an accounting system. We utilize
25          the -- through the services agreement, the
351 :1              R. DICKINSON
2          services of Treasury and the Financial Team.
3              Q. So LTL does not have its own
4          accounting system; it relies on Johnson &

5  Johnson's accounting system.
6   A. Currently, that is correct.

## DICKINSON, RICHARD - *01/26/2022*

**Page 351**
351 :18    MR. DINE: Could we bring up
19  Exhibit 66, please.
20   Q. (BY MR. DINE) Mr. Dickinson, you
21  recognize this document, correct?
22   A. I do.
23   Q. And you edited this document,
24  correct?
25   A. I was part of editing it, correct.
352 :1     R. DICKINSON
2   Q. You were one of the editors of the
3  document?
4   A. Correct.

## DICKINSON, RICHARD - *01/26/2022*

**Page 352**
352 :11    Q. (BY MR. DINE) If you could look at
12  the fourth paragraph, starting, "In his
13  current role..."
14   A. Yeah.
15   Q. Okay.
16   That sentence says -- that first
17  sentence starts: "In his current role, Rich
18  has been" -- "has led/been instrumental in the
19  execution of multiple divestitures across
20  J&J."
21   What -- what is -- how do you
22  define divestiture?
23   A. A divestiture is a selling of an
24  asset that is currently within J&J to another
25  entity.
353 :1     R. DICKINSON
2   Q. Was the creation of LTL a
3  divestiture?
4   A. The creation of LTL --
5   (Simultaneous speaking.)
6   MS. BROWN: I object. That calls
7  for a legal conclusion.
8   Q. (BY MR. DINE) I'm asking: Within
9  your definition of "divestiture," was the
10  creation of LTL a divestiture?
11   A. And -- and I'm not a legal expert.
12  It's a better question to ask somebody else.
13   But my understanding is it's not a
14  divestiture. It's completely something
15  different.
16   Q. Why is it different?
17   A. Once again, I'm not a legal expert.
18  It's --
19   (Simultaneous speaking.)
20   Q. Let me --
21   MS. BROWN: Please don't --
22   Q. (BY MR. DINE) -- interrupt --
23   MS. BROWN: -- please don't --
24   Q. (BY MR. DINE) I'm asking --
25   MS. BROWN: -- please interrupt
354 :1     R. DICKINSON
2  him. Let him finish his answer.

```
3              MR. DINE: I know.
4              THE WITNESS: The creation of LTL
5      was simply to reach a fair and equitable
6      resolution of the talc-related --
7      -related litigation in front of old JJCI
8      and now LTL. It had nothing to do with
9      divestitures or my past experience.
```

## DICKINSON, RICHARD - *01/26/2022*

**Page 355**
```
355 :7              Q. (BY MR. DINE) Let -- let me -- let
8      me go through them in specific. It may be
9      easier.
10              Advanced Sterilization Products,
11     that was the sale of a business to Forta for
12     $2.8 billion, correct?
13              A. That is correct.
14              Q. And that sale to Forta was
15     negotiated with Forta, correct?
16              A. Correct.
17              Q. I imagine Forta tried to drive a
18     hard bargain, correct?
19              MS. BROWN: Objection. Vague.
20              THE WITNESS: Yeah.
21              It was a fair -- a fair resolution
22     of a transaction.
23              Q. (BY MR. DINE) So Johnson & Johnson
24     didn't say -- simply say to Forta, "You will
25     buy this for $2.8 billion," correct?
356 :1              R. DICKINSON
2              A. That's not how it worked.
3              Q. Okay.
4              Codman Neurosurgery, that was a
5      sale to Integra Life Sciences Holdings, and
6      that was about $1.045 billion, correct?
7              A. My recollection is that that's
8      approximately accurate, yes.
```

## DICKINSON, RICHARD - *01/26/2022*

**Page 356**
```
356 :20              Q. (BY MR. DINE) Integra Life
21     Sciences negotiated with Johnson & Johnson
22     concerning the sale of Codman Neurosurgery,
23     correct?
24              A. That every -- every divestiture is
25     negotiated between an acquirer and the
357 :1              R. DICKINSON
2      divesting party.
3              Q. You have a number -- looking at the
4      LTL transaction -- and I understand your
5      answer to my question.
6              Who -- was there a counterparty in
7      the LT- -- in the LTL corporate restructuring?
8              A. That's a -- it's a vague question.
9      The LTL was created from old JJCI to -- with
10     the purpose of a fair and equitable resolution
11     for the interested parties, claimants and LTL.
12     It had -- it had nothing to do with a
13     divestiture or business development
14     transaction.
15              Q. Right.
16              But there was a series of corporate
```

```
17      transactions that created LTL, correct?
18          A. There -- there was restructurings
19      that initially occurred, yes.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 357**
```
357 :23             Q. (BY MR. DINE) The creation of LTL
24      included assigning all talc liability of old
25      JJCI to LTL, and almost all the operating
358 :1              R. DICKINSON
2       assets of old JJCI to new JJCI, correct?
3           A. That is my understanding.
4           Q. Would you consider the transaction,
5       splitting the assets and liabilities of old
6       JJCI, to be a divestiture?
7           A. No.
8           Q. And who was looking out for the
9       interests of LTL in this transaction?
10          MS. BROWN: Objection. Vague.
11          THE WITNESS: That's -- I think
12      that's a legal question. That's not a
13      financial question.
14          I answered the question with regard
15      to why LTL was created.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 360**
```
360 :20             Q. And in any of the divestitures
21      listed -- listed in Exhibit 66, was there a
22      document like the funding agreement?
23          A. It's completely a different -- it's
24      completely different with regard to the
25      purpose and the transaction, and so it's
361 :1              R. DICKINSON
2       apples and oranges; not a relevant question.
3           Q. The answer is "no"?
4           A. Yeah, there's no funding
5       arrangement that occurs with regard to
6       divestitures.
```

**DICKINSON, RICHARD** - *01/26/2022*

**Page 364**
```
364 :7              So other than the J&J 2020 annual
8       report and the informational brief for the
9       bankruptcy filing and the first-day pleadings
10      for the bankruptcy filing, is it correct that
11      you did not review any other specific
12      documents in forming your opinion that Johnson
13      & Johnson Consumer was in financial distress
14      before its restructuring?
15          Correct?
16          A. Those were the documents that I
17      primarily relied upon.
18          Q. Okay.
19          And you can't identify any other
20      specific documents that you relied upon at
21      this time, correct?
22          A. I cannot, except for the PowerPoint
23      presentation that was, you know, provided to
24      me and that we went through.
25          Q. Okay.
```

365 :1         **R. DICKINSON**
2         **A. Other than -- there were multiple**
3     **discussions. There was my own professional**
4     **judgment leading me to that conclusion.**
5         **Q. Okay.**

**DICKINSON, RICHARD** - *01/26/2022*

**Page 401**

401 :5       **Q. (BY MR. BLOCK) When LTL filed for**
6     **bankruptcy, did it have any overdue debts?**
7         **MS. BROWN: I object as vague.**
8         **THE WITNESS: No, we didn't. We**
9     **didn't have any, you know, debts, you**
10     **know, on our books and records.**

# GOODRIDGE, MICHELLE

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 7**

| | |
|---|---|
| 7 :22 | MICHELLE GOODRIDGE |
| 23 | of lawful age, being produced, sworn and examined |
| 24 | on the part of the Talc Creditor Committee, and |
| 25 | after responding 'Yes' to the oath administered |
| 8 :1 | by the court reporter, deposes and says: |

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 8**

| | |
|---|---|
| 8 :7 | Q: Okay. Tell the court reporter your |
| 8 | name, ma'am. |
| 9 | A: Michelle Goodridge. |
| 10 | Q: You are the president of Johnson & |
| 11 | Johnson Consumer, Inc.? |
| 12 | A: Yes, I am. |
| 13 | Q: How many years have you been |
| 14 | president of Johnson & Johnson Consumer, Inc.? |
| 15 | A: That's a good question. I don't have |
| 16 | the exact years, but I have been at Johnson & |
| 17 | Johnson for 24 years and I have been serving in |
| 18 | that capacity for -- certainly in this current |
| 19 | role for over two and a half years, approximately |
| 20 | there. |

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 13**

| | |
|---|---|
| 13 :23 | Q: All right. So the business situation |
| 24 | that we are here to discuss is the 2021 corporate |
| 25 | reorganization that JJCI engaged in October. |
| 14 :1 | Are you familiar with that |
| 2 | transaction? |
| 3 | A: I am familiar with the transaction at |
| 4 | hand, yes. |

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 17**

| | |
|---|---|
| 17 :23 | Q: Okay. Now, I take it -- I understood |
| 24 | from your LinkedIn profile you came up through |
| 25 | the marketing side of the J&J business; is that |
| 18 :1 | right? |
| 2 | A: Yes. I grew up in the marketing side |
| 3 | of our business, yes. |

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 18**

| | |
|---|---|
| 18 :18 | Q: All right. But -- okay. This year, |
| 19 | you are president of the company, how many |
| 20 | hundreds of millions of dollars is Johnson & |
| 21 | Johnson Consumer, Inc., going to spend this year |
| 22 | on advertising Johnson & Johnson Consumer, Inc., |
| 23 | brands -- |
| 24 | MS. BROWN: Objection to the form. |
| 25 | BY MR. GLASSER: |

19 :1     Q: -- directly? I don't need it to the
2          penny.
3          A: Well, that's good because I don't
4           know it to the penny. I know that we spend a
5           significant amount of money marketing but also,
6           you know, educating consumers on our products.
7           And I don't actually know the exact number.
8          Q: All right. I don't want the exact
9           number.
10          What's the significant amount of
11          money?
12         A: I think my -- again, I have
13          responsibility -- operating responsibility for a
14          certain portion of our business, not all, so I am
15          not the best person to answer that question. I'm
16          sure our finance folks can give you an exact
17          number.
18         Q: I don't want to be fobbed off on the
19          finance folks. I just want you to tell me, as
20          president of the company, do you even have the
21          remotest idea how much you are going to spend
22          this year on advertising the Johnson & Johnson
23          brands?
24         MS. BROWN: I object to the
25          argumentative portion of that question.
20 :1     THE WITNESS: Sure. Well, one, I
2           just want to clarify we have many brands, not
3           just one Johnson & Johnson brand. So we market
4           across a series of products across an entire
5           portfolio. So, therefore, it's very difficult
6           for me to put one number out there for you.
7          BY MR. GLASSER:
8          Q: All right. Is it more than $1?
9          A: Yes, it is more than $1.
10         Q: Is it more than a million dollars?
11         A: It depends on what you are asking
12          for. But for most of our products, yes.
13         Q: Okay. Is it more than a hundred
14          million a year in gross? You're the president.
15         A: I am the president, but I'm also --
16          you are asking a very broad question. And,
17          again, as I stated, we market a whole series of
18          brands and products and every single one of them
19          has a different budget every year.
20         Q: All right. I'm -- really, these are
21          totally simple non-trick questions.
22          Is it fair to say Johnson & Johnson
23          over the years -- Johnson & Johnson Consumer,
24          Inc., over the years has literally spent at
25          least -- over the last ten years has probably
21 :1      spent at least a billion dollars on advertising
2           Johnson & Johnson branded products?
3          MS. BROWN: And, again, I object to
4           the argumentative portion and the speech.
5          THE WITNESS: Again, as I stated, we
6           market many brands, many products with different
7           budgets over the years and it would not be
8           responsible for me to give you an exact number
9           when I don't have that in front of me.
10         BY MR. GLASSER:
11         Q: I have clearly not asked you for an
12          exact number.
13          Is it more than 500 million?
14         MS. BROWN: I object to this. Asked
15          and answered several times now.

16       THE WITNESS: Again, I can't answer
17        to the specifics. Again, we market across many
18        brands over many years. And, again, that number
19        we could find out for you separately.
20       BY MR. GLASSER:
21       Q: I don't want -- you're the president
22        of the company.
23        You don't have any idea within a
24        hundred or $200 million how much a year you spend
25        on marketing the brand Johnson & Johnson?
22 :1    MS. BROWN: I object, again, to the
2         argumentative nature and asked and answered
3         several times.
4        THE WITNESS: I just want to clarify,
5         we don't market one brand, as you stated, J&J
6         brand. We market a series of brands and products
7         as part of Johnson & Johnson and all of them have
8         a very different budget every year.

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 22**

22 :15   Q: Does the Johnson & Johnson name have
16        any value?
17       MS. BROWN: Objection to the form.
18       BY MR. GLASSER:
19       Q: Monetary value?
20       MS. BROWN: Objection to the form.
21       THE WITNESS: Again, I can't tell you
22        if the J&J brand has monetary value. I know it's
23        an important brand for consumers.
24       BY MR. GLASSER:
25       Q: So even though you came up through
23 :1     the marketing side of the business and even
2         though you are the president of the consumer
3         business, you don't know if the Johnson & Johnson
4         name has any value?
5        MS. BROWN: Well, I object. It
6         completely misstates her testimony.
7        THE WITNESS: As I stated, the J- --
8         I can tell you that the Johnson & Johnson brand
9         has importance to consumers.
10        And, again, as I stated, J&J has many
11        brands and many products, not one Johnson &
12        Johnson brand.
13         (Whereupon, Exhibit No. 1.11 was
14          marked.)
15       MR. GLASSER: All right. I want to
16        show you Exhibit 1.11 which is an agreement and
17        plan of merger between Old Johnson & Johnson
18        Consumer, Inc., and a company called Chenango
19        Zero. I'm going to put it in the index, but it's
20        only a few pages, so we will just put it up on
21        the screen.

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 24**

24 :23   Q: That's fine. So you recognize this
24        agreement and plan of merger between Johnson &
25        Johnson Consumer, Inc., and Chenango Zero, a
25 :1     Texas limited liability company, don't you,
2         Ms. Goodridge?
3        A: I do. I recall it, yes.

```
4        Q: All right. And you know -- and you
5         are the president of Chenango Zero and the
6         president of Johnson & Johnson Consumer, Inc.; is
7         that correct?
8        A: Yes.
9        Q: Okay. When did you first learn you
10        were president of Chenango Zero?
11       A: I first learned that I was president
12        of Chenango Zero, from what I recall, through
13        some meetings with my lawyers regarding this
14        transaction.
15       Q: I asked you when was that.
16       A: From what I recall, in early October.
```

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 25**
```
25 :20    Q: All right. So this is dated
21        October 12.
22        How many days before October 12 did
23        you first learn you were president of Chenango
24        Zero?
25       MS. BROWN: I object to the form,
26 :1     misstates her testimony.
2        THE WITNESS: I don't remember the
3         exact days. I would say a week or two before,
4         approximately. Early October.
```

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 27**
```
27 :14    Q: Yes. I asked you when did you first
15        learn you were going to be president of Chenango
16        Zero.
17        You told me it was probably within a
18        week of October 12, but it could have been
19        earlier in October; right?
20        Do you remember that question and
21        answer?
22       A: I remember I said early October,
23        yeah.
24       Q: All right. And you told me about a
25        meeting with your lawyer.
28 :1     A: Yes.
2        Q: And I'm saying, was there one meeting
3         or more than one meeting before the -- with you
4         personally before this transaction went down?
5        A: I had several meetings with the
6         lawyers from what I recall.
7        Q: All right. I'm saying before the
8         transaction went down, so you are saying in
9         October you had several meetings.
10        How many?
11       A: In early October. I don't remember
12        specifically, a handful of meetings, three or
13        four. I don't remember exactly.
14       Q: All right. Were lawyers present at
15        every single meeting?
16       A: Lawyers were present in all the
17        discussions, yes.
```

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 30**

30 :3    Q: Okay. Who informed you you were
4    going to be president of Chenango Zero?
5    A: From what I recall, I learned about
6    it from one of our lawyers named Chris Andrew.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 31**

31 :11    Q: All right. On the day of October 12,
12    were you delivered signature pages or the actual
13    entire documents to sign?
14    A: I don't recall the specific timing,
15    but I remember reviewing the -- I had the entire
16    document before signing and we reviewed the
17    document.
18    Q: With those lawyers in those meetings
19    in October?
20    A: Well, to be clear, I reviewed it
21    with -- Chris Andrew was one of the lawyers that
22    I reviewed it with.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 34**

34 :14    Q: Okay. So here's my precise question.
15    As president of Chenango Zero,
16    Ms. Goodridge, you proposed zero changes to this
17    document before you signed it; correct?
18    A: Again, I can only speak to the
19    document I signed. When I signed this document,
20    I did not have any changes at that moment when I
21    signed it.
22    Q: Okay. And you didn't have any
23    changes on behalf of Johnson & Johnson Consumer,
24    Inc., when you signed it; correct?
25    A: I can only speak to the timing of
35 :1    the -- when I signed the document and reviewed
2    the document, at that point in time, I had no
3    changes to the document.
4    Q: Well, let's be clear.
5    You personally, Ms. Goodridge -- we
6    are going to go through about 20 -- maybe 30
7    documents you signed.
8    Isn't it true that you didn't propose
9    a change of a single word in any of those
10    documents?
11    A: I can only state that in my
12    interactions with the document which as I
13    reviewed them extensively with our lawyer, I
14    signed on behalf of our corporation, and I don't
15    recall making specific changes to any documents
16    at that point in time.
17    Q: At any point in time; isn't that
18    true?
19    You first learned about these
20    documents in October of 2021; correct?
21    A: I learned about the documents in
22    early October.
23    Q: And from that time until the time you
24    signed, you proposed zero changes to any of them;
25    isn't that true? You personally proposed zero
36 :1    changes to any of them?
2    A: From what I recall, I don't remember
3    proposing any changes. I know I reviewed it

4        extensively with my lawyers before signing.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 36**

36 :11        Q: Ms. Goodridge, you recognize
    12        Exhibit 1.17 as a written consent in lieu of
    13        meeting that you signed; isn't that right? On
    14        behalf of --
    15        A: I agree that is the document that we
    16        are looking at.
    17        MR. GLASSER: I'm sorry. Do you
    18        recognize -- let's show her her signature on
    19        page 2.
    20        BY MR. GLASSER:
    21        Q: Do you recognize that as your
    22        signature, Ms. Goodridge?
    23        A: I do.
    24        Q: On behalf of a company called
    25        Currahee Holding Company, Inc.?
37 :1        A: Yes, I do.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 38**

38 :4        Q: By the way, do you know what a
    5        Chenango is?
    6        A: Are you asking from me a definition?
    7        I'm sorry. Could you restate the question?
    8        Q: Well, you are the president of
    9        Chenango Zero; right?
    10        A: I am the president of Chenango Zero.
    11        Q: What's a Chenango?
    12        A: I know -- I can only tell you what I
    13        know which is it's the name of this entity. I
    14        don't -- there may be other definitions, but I
    15        can't answer that.
    16        Q: You weren't involved in choosing the
    17        names?
    18        A: I was not involved in choosing the
    19        name which is not unusual.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 40**

40 :23        Q: All right. Well, I tell you what
    24        then, can you give me a business reason Johnson &
    25        Johnson Consumer, Inc., a company that had spent
41 :1        some substantial amount of money, although you
    2        don't know the amount establishing its name in
    3        the consumer market, would want to become
    4        Chenango Zero, a thing you don't know the meaning
    5        of?
    6        MS. BROWN: Objection to the form of
    7        the question, argumentative.
    8        THE WITNESS: Could you restate the
    9        question, please?
    10        BY MR. GLASSER:
    11        Q: Yeah. Give me the business reason
    12        Johnson & Johnson Consumer, Inc., would want to
    13        change its name to Chenango Zero.
    14        MS. BROWN: Objection to the form.
    15        THE WITNESS: Again, I can't speak
    16        to -- I'm not a lawyer. You know, I think I'm

17          not privy to all the details. My under- -- I
18          understand that there were important reasons,
19          business reasons, to conduct the transactions
20          that I'm aware of that day which included Johnson
21          & Johnson Consumer, Inc., merging into Chenango
22          Zero.
23          BY MR. GLASSER:
24          Q: Okay. Tell me a business reason a
25          company that had spent, in your words, a
42 :1       substantial amount of money over the prior decade
2           advertising its name would want to change it to
3           Chenango Zero.
4           MS. BROWN: Objection to the form.
5           THE WITNESS: Well, two things. One
6           is I want to be clear I didn't say before that we
7           spent substantial money advertising the J&J name.
8           We market a bunch of products. I just want to
9           clarify that for the record.
10          And then, two, that I understand that
11          for -- again, I can't speak to the legalities of
12          how the transactions work. You can defer to our
13          lawyers for that. I think they are in a better
14          position to answer that.
15          I can under -- I can only tell you
16          what the ultimate intent or purpose was for the
17          business transactions that -- where I was
18          involved.
19          BY MR. GLASSER:
20          Q: Okay. So let me see if I can break
21          down your lengthy answer.
22          You never had a businessperson to
23          businessperson meeting outside the presence of a
24          lawyer to discuss a business purpose for this
25          transaction; correct?
43 :1       A: Well, let me answer in two parts.
2           One is I did not have a businessperson to
3           businessperson discussion about this transaction
4           when I was signing it.
5           Second is I do believe there is a
6           business purpose in the transaction that's a
7           separate point.
8           Q: Okay. But my question to you was not
9           about the -- it's what's the business purpose for
10          abandoning the name Johnson & Johnson and
11          becoming Chenango Zero?
12          What's the business purpose for that
13          from a businessperson's perspective?
14          A: Well, again, you know, I'm
15          not going -- I can't speak to that. I think we
16          can defer to our lawyers.
17          But I -- again, the transactions and
18          the names, again, I'm not in the best position to
19          speak to that.

**GOODRIDGE, MICHELLE** - *12/20/2021*

Page 44

44 :17      Q: All right. So in agreeing to it,
18          you, Ms. Goodridge, were relying on advice of
19          counsel?
20          A: When signing this document, yes. And
21          that would not be unusual that it was under
22          advisement of my lawyer.
23          MR. GLASSER: Let's go to

24          **Exhibit 1.19.**

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 45**
45 :3       **Q: Just so we can get it into evidence**
4            **since everything is not agreed to be authentic,**
5            **this is, in fact, the consent of the sole member**
6            **that you signed on page 2.**
7            **Is that your signature on page 2?**
8            **A: It is.**

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 46**
46 :5       **MR. GLASSER: Okay. Let's go to**
6            **Exhibit 1.34.**

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 46**
46 :20      **Q: All right. Is that your -- is that**
21           **your signature, Ms. Goodridge?**
22           **A: Yes, that is my signature.**

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 48**
48 :9       **Q: I'm saying, did you authorize the**
10           **division of the company you were president of,**
11           **Chenango Zero, into two other companies.**
12           **A: So what I recall is I do recall a**
13           **transaction where Chenango Zero was divided into**
14           **Chenango One and Chenango Two.**

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 49**
49 :8       **Q: Well, let me ask you this -- let me**
9            **do it this way then.**
10           **Is it true that you never had a**
11           **discussion outside the presence of lawyers about**
12           **why Chenango One -- Chenango Zero needed to**
13           **divide into Chenango One and Chenango Two?**
14           **A: What I recall is having the**
15           **conversation only with my lawyer about that**
16           **transaction.**

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 50**
50 :17      **Q: That's not what I asked you, ma'am.**
18           **I didn't ask that.**
19           **I said did you have a conversation**
20           **with a nonlawyer businessperson about -- prior to**
21           **doing it outside the presence of lawyers to**
22           **discuss a business purpose for this transaction?**
23           **A: I did not have any discussions with**
24           **business -- from a businessperson to**
25           **businessperson perspective about the specific**
51 :1        **transaction.**
2            **Q: All right. So as per the decision to**

```
3          make Johnson & Johnson Consumer, Inc., into
4          Chenango Zero, likewise, the decision to divide
5          it into Chenango One and Chenango Two was -- your
6          agreement with that was based on advice of
7          counsel?
8     A: My agreement to sign the document was
9          based on my discussions with my lawyers, yes.
10     Q: So you were relying on advice of
11          counsel to make that decision?
12     A: Yes, which is not unusual. I was
13          under advisement by my lawyers. I do under- --
14          also was aware that this was -- there was a team
15          that was involved in understanding the options
16          and the best path forward and I was relying on
17          that process as well.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 53**
```
53 :13     MR. GLASSER: Okay. All right.
14          Let's go to Exhibit 1.20, the funding agreement.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 55**
```
55 :25     Q: And on page 17, there's your two
56 :1          signatures; right?
2     A: I see my two signatures, yes.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 56**
```
56 :5     Q: That Michelle Ryan signed on behalf
6          of Johnson & Johnson.
7     A: I see that, yes.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 56**
```
56 :22     Q: All right. So you did not sit down
23          at the bargaining table with Michelle Ryan and
24          bargain this document; correct?
25     A: I can't speak to what you are
57 :1          referencing. I can only speak to the discussions
2          I had when I signed the document.
3     Q: Right. And we already established
4          you didn't change any words in any document, so
5          you did not negotiate this with Michelle Ryan;
6          correct?
7     A: Two separate points there, but I
8          can't speak to the negotiation with Michelle
9          Ryan. I was -- I'm not part of that discussion.
10          The first part of that is a separate
11          question, if you want to restate the question
12          just to make sure I understood it.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 59**
```
59 :11     BY MR. GLASSER:
12     Q: So we already established you
13          personally didn't negotiate with Michelle Ryan;
```

```
14        true?
15        A: I personally did not. I think you
16        are -- it's a broad question. I'm not -- I don't
17        feel like I can answer that, but I didn't have a
18        discussion with Michelle Ryan.
```

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 61**

```
61 :6     Q: Okay. And you are telling me that
7         you, therefore, personally never had a
8         businessperson to businessperson discussion away
9         from lawyers about the business purpose of this
10        agreement; true?
11        A: Just -- again, just to clarify, so
12        in -- for this agreement, you are referring to
13        the funding agreement specifically?
14        Q: Correct.
15        A: I did not have a businessperson to
16        businessperson discussion about the agreement. I
17        had a discussion with our lawyers.
18        Q: All right. And, therefore, when you
19        agreed to this on behalf of Johnson & Johnson
20        Consumer, Inc., you were doing it based on advice
21        of counsel?
22        A: I was signing this based on advice
23        from counsel, yes, and after discussion and
24        extensive review.
25           (Whereupon, Exhibit No. 1.52 was
62 :1        marked.)
2         MR. GLASSER: Okay. Now let's go to
3         the amended and restated funding agreement,
4         Exhibit 1.52 and we will put it in your index.
5         Can you pull up the first paragraph
6         and the signature page and show her her
7         signature? You can blow up the first paragraph
8         so she just sees what it is and her signature
9         page.
```

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 62**

```
62 :24    Q: Okay. You agree --
25        A: Okay.
63 :1     Q: -- this is the amended and restated
2         funding agreement that you signed?
3         A: I do.
```

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 64**

```
64 :23    Q: All right. I think the first
24        sentence basically says in plain English that the
25        payors are going to give the payee money for
65 :1     permitted funding use.
2         Do you agree?
3         MS. BROWN: Objection to the form.
4         THE WITNESS: Again, my understanding
5         as I read the document here is the payors are
6         agreeing. Again, as I defer to the document
7         here, it says exactly in the document what the
8         payors are obligated for in terms of payments to
9         the payee.
10        BY MR. GLASSER:
```

11      **Q: For, quote, the defined term**
12       **permitted funding use; right?**
13      **A: Yes, for permitted funding use.**

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 65**

65 :21      **Okay. And you agree the payee under**
22       **this amended and restated funding agreement is**
23       **LTL Management; right?**
24      **A: That is my understanding.**
25      **Q: All right. Great. And so what this**
66 :1       **basically says -- my understanding of this, you**
2       **tell me if you agree, is basically it says the**
3       **payors -- a permitted funding use is basically**
4       **the day-to-day normal operation of the business**
5       **of LTL, do you agree, when there is no proceeding**
6       **under the bankruptcy code?**
7       **When it's not in bankruptcy, it's**
8       **normal operating expenses of its business?**
9      **A: Again, I can only state what's**
10       **actually stated in the document which is all --**
11      **Q: Where it says --**
12      **MS. BROWN: Let her finish, please.**
13      **THE WITNESS: -- costs and expenses**
14       **are according to the normal course of its**
15       **business.**
16      **BY MR. GLASSER:**
17      **Q: All right. So what's your**
18       **understanding of that?**
19      **A: Exactly as it's stated, in the normal**
20       **course of its business, all costs and expenses.**
21      **Q: All right. In the 27 years you have**
22       **been a business executive, have you ever seen an**
23       **agreement like this before?**
24      **MS. BROWN: Objection to the form.**
25      **THE WITNESS: Again, I see a lot of**
67 :1       **different business transactions. They are all**
2       **different. I haven't seen this exact one. But I**
3       **have been involved in so many different ones.**

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 69**

69 :22      **Q: You sitting here cannot identify by**
23       **name another transaction or business deal where a**
24       **similar concept was employed?**
25      **MS. BROWN: Object to the form.**
70 :1       **THE WITNESS: Again, I have been**
2       **involved in different transactions, but I can't**
3       **recall any -- again, every single business**
4       **transaction is unique and different, so --**
5       **BY MR. GLASSER:**
6       **Q: And you can't recall --**

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 70**

70 :11      **A: As I was saying, I have been involved**
12       **in different transactions. They are all**
13       **completely unique. So I can't make a correlation**
14       **or draw any generalization of the ones I can**
15       **recall.**

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 71**

71 :7      Q: What's your understanding of what
8      B -- what B covers?
9      MS. BROWN: Objection to the form.
10      THE WITNESS: My understanding would
11      be exactly as it's stated in the document.
12      BY MR. GLASSER:
13      Q: Okay. So A covers all the costs of
14      operating the business outside bankruptcy and B
15      covers all the costs of operating inside
16      bankruptcy; is that your understanding?
17      MS. BROWN: Same objection.
18      THE WITNESS: I can only defer to
19      what's written in the contract -- I mean, the
20      document here. And so are you asking a specific
21      interpretation? I can only defer to what's
22      exactly here in the contract.
23      BY MR. GLASSER:
24      Q: I'm just saying, is it your
25      understanding that Johnson & Johnson Consumer,
72 :1      Inc., the company of which you are president, is
2      going to pay all the costs of LTL in its
3      bankruptcy case pursuant to B here?
4      MS. BROWN: Objection to the form.
5      THE WITNESS: Again, as I relate --
6      as related to the document that's in front of me,
7      I can only state, you know, what's in the
8      document itself and what my --
9      BY MR. GLASSER:
10      Q: What --
11      A: -- understanding is. If you can let
12      me finish. Sorry.
13      Which is that the payment of any and
14      all costs of the payee incurred during bankruptcy
15      case would be incurred -- would be provided by
16      the payors.
17      Q: Okay. Great.
18      A: That's my understanding as stated in
19      the document here.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 74**

74 :8      Q: Well, you cannot out of your own
9      personal knowledge identify for me a single other
10      transaction by name with this feature sitting
11      here today; isn't that true?
12      MS. BROWN: Objection to the form.
13      THE WITNESS: Well, as I sit here,
14      again, I can't recall everything, but I can't
15      recall a transaction with this specific detail, I
16      guess.
17      But, again, I can't recall the
18      details. And I'm not a lawyer. I'm not in
19      business development. So it would be normal for
20      me not to understand all the details of every
21      agreement I signed.
22      MR. GLASSER: Let's go -- let's pull
23      up Exhibit 2, please.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 76**

76 :16    Q: I think you'll recognize Exhibit 2,
17    Ms. Goodridge. So I have here Johnson &
18    Johnson's form 10-Q filed with the Security and
19    Exchange Commission in October of 2021.
20    You are familiar with forms like
21    this; right, Ms. Goodridge?
22    A: Generally speaking.
23    Q: Yeah.
24    A: I'm not an expert.
25    Q: Right. But as president of one of
77 :1    the big sectors of this company, you are familiar
2    with the obligation of companies -- with
3    Johnson & Johnson's obligation to report to the
4    Security and Exchange Commission on a quarterly
5    basis its results; right?
6    A: Absolutely, I understand that.
7    And could you refer me to which
8    document where this is located just to make sure
9    we are on the same page?
10    Q: Yeah. Right now it's just on the
11    screen, but we can put it in your index.
12    But I just want to know if you know
13    what a Form 10-Q is. It's a filing with the
14    Security and Exchange Commission that you're
15    personally familiar with in terms of the company
16    generally doing; right?
17    A: I understand the general role of it,
18    yes, absolutely.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 80**

80 :10    Q: And in this instance as of October 3,
11    2021, Johnson & Johnson on a consolidated basis
12    is reporting 17.6 -- more than $17.6 billion of
13    cash and cash equivalents; isn't that true?
14    A: Yeah. I can only refer to what I'm
15    looking at on the document, but that is what the
16    document is referring to -- saying -- stating.
17    Q: And for marketable securities,
18    $13.397 billion; isn't that true?
19    A: That's what I see on this particular
20    document.
21    Q: So it's fair to say that as of
22    October 3rd, 2021, Johnson & Johnson on a
23    consolidated balance sheet basis had more than
24    $31 billion of cash, cash equivalents, and
25    marketable securities; isn't that true?
81 :1    MS. BROWN: Objection to the form.
2    THE WITNESS: I can only refer to
3    what's in front of me which is -- which states
4    what the cash and cash equivalents and marketable
5    securities are.
6    BY MR. GLASSER:
7    Q: And if you add those two numbers
8    together, you are above $31 billion; isn't that
9    true?
10    A: Yes.

**GOODRIDGE, MICHELLE** - *12/20/2021*

Page 83

83 :10    **Q: So as of October 3rd, 2021, the**
11    **company also had $10 billion of available**
12    **borrowing under that credit facility; isn't that**
13    **correct?**
14    **MS. BROWN: Objection to the --**
15    **objection to the form.**
16    **THE WITNESS: On this -- what is**
17    **exactly in the document here as stated which is**
18    **that in September of 2021 that the company**
19    **secured a 364-day credit facility -- took credit**
20    **available to the company approximating 10**
21    **billion.**
22    **BY MR. GLASSER:**
23    **Q: Okay. So 31 plus 10 is 41; right?**
24    **A: If you are just doing the math of 31**
25    **plus 10, yes, I would agree.**
84 :1    **Q: All right. So as of the time you**
2    **learned about this transaction to cause a**
3    **divisive merger, the most recent public filings**
4    **of Johnson & Johnson indicated more than**
5    **$41 billion of available liquidity; isn't that**
6    **true?**
7    **MS. BROWN: Objection to the form,**
8    **foundation.**
9    **THE WITNESS: Well, I'm not an expert**
10    **on financial terms, so could you restate the**
11    **question?**
12    **BY MR. GLASSER:**
13    **Q: Well, $31 billion of cash plus**
14    **$10 billion of credit is $41 billion of available**
15    **liquidity; correct?**
16    **MS. BROWN: Objection, form,**
17    **foundation.**
18    **THE WITNESS: I'd agree that we**
19    **looked at the -- the document that you just**
20    **shared with me had that 31 in cash and the 10**
21    **billion in credit.**
22    **I am not a financial expert, so I**
23    **can't -- I don't know what you mean by liquidity.**
24    **But I -- those are the facts that I can defer to**
25    **as stated in the document.**
85 :1    **MR. GLASSER: Okay. Now let's go**

**GOODRIDGE, MICHELLE** - *12/20/2021*

Page 85

85 :9    **Q: All right. So now we know that the**
10    **payor -- payors Johnson & Johnson, Johnson &**
11    **Johnson Consumer, Inc., with $41 billion in**
12    **available liquidity have agreed under Section 2.A**
13    **to fund all LTL's costs and expenses in the**
14    **normal course of business; right?**
15    **We already had those questions and**
16    **answers. Do you remember that?**
17    **A: Well, I remember the specific**
18    **questions and answers related to the paragraphs**
19    **in this funding agreement. Yes.**

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 86**

| | |
|---|---|
| 86 :11 | Q: Okay. Explain to the Court how a |
| 12 | company with access to $41 billion in available |
| 13 | liquidity is in financial distress. |
| 14 | MS. BROWN: Objection to the form. |
| 15 | THE WITNESS: Well, I can -- all I |
| 16 | can say is what my understanding is, that the |
| 17 | payee in this case that we are referring to as |
| 18 | LTL and my understanding as officer of J&J |
| 19 | Consumer, Inc., is that the payee and previously |
| 20 | Johnson & Johnson Consumer, Inc., was under |
| 21 | significant hardship as related specifically to |
| 22 | the talc litigation. So I don't agree with your |
| 23 | original statement. |

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 91**

| | |
|---|---|
| 91 :7 | Q: Do you see that, the middle of the |
| 8 | page, 1.5 billion and 1.2 billion in fiscal |
| 9 | nine months of 2021 and 2020. Litigation expense |
| 10 | in both periods is primarily related to talc. |
| 11 | Do you see that? |
| 12 | A: I do. I see that statement. |
| 13 | Q: All right. So it's not exclusively |
| 14 | related to talc. |
| 15 | Do you agree with that? |
| 16 | MS. BROWN: Objection to form. |
| 17 | THE WITNESS: All I can see is what's |
| 18 | stated there which says that it's primarily |
| 19 | related to talc. |
| 20 | BY MR. GLASSER: |
| 21 | Q: Right. And you do agree that fiscal |
| 22 | nine months means the whole cost for the nine -- |
| 23 | first nine months of 2021 is 1.5 billion? |
| 24 | A: All I can refer to is what's exactly |
| 25 | in the document which is 1.5 billion for 2021 |
| 92 :1 | fiscal nine months of litigation expenses. |
| 2 | Q: Great. Is 1.5 billion a smaller |
| 3 | number than 41 billion? |
| 4 | A: Is 1.5 billion smaller than? Yes, it |
| 5 | is smaller -- it is an absolute smaller number |
| 6 | than 41, yes. |

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 93**

| | |
|---|---|
| 93 :8 | Q: Yes. I'd like you to explain to the |
| 9 | Court how a company with access to $41 billion in |
| 10 | liquidity whose entire cost for all litigation of |
| 11 | every kind before the division was 1.5 billion is |
| 12 | in financial distress. |
| 13 | MS. BROWN: Objection to the form, |
| 14 | calls for speculation. |
| 15 | THE WITNESS: Well, I can't comment |
| 16 | on your specific statement. But what I can tell |
| 17 | you is what I understand which is that our -- |
| 18 | the -- for JJ Consumer, Inc., which is where I |
| 19 | play a role that -- you know, again, I wasn't |
| 20 | involved in the day to day of talk. |
| 21 | But I was very much under the clear |

22    understanding that the talc liability was a
23    significant financial constraint and concern for
24    the company and it was causing significant
25    financial constraint, hardship, resource
94 :1    constraints, potential reputational damage.
2    And so that's what I can speak to
3    when I think -- I don't know what you are
4    referring to as financial distress. But when I
5    think about financial distress, those are all
6    aspects of financial distress that I was under
7    the understanding that we were involved in.
8    BY MR. GLASSER:
9    Q: All right. So let's break it down.
10    The company reported in the Consumer
11    Health segment that while it's not exclusively
12    related to talc, its talc-related costs were
13    1.5 billion for the prior nine months.
14    That's a concrete fact; right?
15    That's a number? That's an ascertainable fact;
16    agreed?
17    A: I can only speak to the number that
18    was reflected in the document you shared.
19    Q: Okay. You are unaware of any other
20    higher number that you've ever seen; correct?
21    MS. BROWN: Objection, calls for
22    speculation.
23    THE WITNESS: I can't speak to that.
24    What -- can you state the question again? I'm
25    not sure what you are asking.
95 :1    BY MR. GLASSER:
2    Q: Well, the publicly reported number
3    for the financial constraint coming out of
4    litigation is 1.5 billion for the first
5    nine months.
6    I'm asking you as the president of
7    the company, are you aware of any other number?
8    MS. BROWN: Objection, lacks
9    foundation.
10    THE WITNESS: So I can't speak to --
11    I mean, I'm not the finance leader at this
12    organization. But what I can speak to is my
13    understanding as a business leader of what the
14    financial hardship was on our business related to
15    talc which was not only the number that is on
16    that document.
17    BY MR. GLASSER:
18    Q: All right. Which businessperson away
19    from a lawyer did you have that conversation?
20    A: Well, as part of the operating
21    company for Johnson & Johnson Consumer, Inc., you
22    know, as a business leader of that group, we are
23    all under the understanding of what the talc
24    litigation was causing in terms of financial
25    hardship.
96 :1    Q: Okay. Give me an example of a
2    business investment you did not make in the last
3    six months because of talc.
4    MS. BROWN: Objection to the form,
5    foundation, speculation.
6    THE WITNESS: Can you restate the
7    question, please?
8    BY MR. GLASSER:
9    Q: Identify for me one business
10    investment that you did not make in Consumer
11    Health because of resource constraints imposed by

```
12        talc.
13        MS. BROWN: Same objection.
14        THE WITNESS: Okay. Well, you know,
15        I can only tell you what I know. As a business
16        leader, I was not involved in the day-to-day
17        management of the talc litigation, so I can't
18        speak to that. I'm not involved in the day to
19        day of our talc business.
20        I can tell you as a business leader
21        across the U.S., that we were making tradeoff
22        decisions all the time in a resource constrained
23        environment. And the talc litigation was
24        significant constraint to us and we made
25        significant tradeoffs, but I can't -- it's not
97 :1     just one answer. It's not a black-and-white
2        situation.
3        BY MR. GLASSER:
4        Q: So you can't identify a specific
5        business decision that you turned down because of
6        talc in the last six months?
7        MS. BROWN: Objection, misstates
8        testimony.
9        THE WITNESS: Well, I didn't say that
10        exactly. What I said is we made tradeoff
11        decisions all the time when we are in a
12        constrained position.
13        I am very aware of decisions we made
14        where we could not move forward because of a
15        constrained P&L. I am aware of many decisions we
16        have made because we are constrained.
17        BY MR. GLASSER:
18        Q: Okay. Give me one example.
19        A: Again, just to clarify, the context
20        of my comment is in the context of making
21        tradeoff decisions when we are financially
22        constrained.
23        Examples of that would include media
24        investments that we want to make to support our
25        business that we did not make, resource
98 :1     investments that we wanted to make that we could
2        not make. Those are examples and not limited to
3        those examples.
4        Q: All right. Give me -- you got to be
5        more concrete.
6        What media investment did you want to
7        make you couldn't afford to make because of talc?
8        MS. BROWN: Objection to the form of
9        the question.
10        THE WITNESS: Well, there are
11        multiple media investments across different
12        businesses that we wanted to make.
13        BY MR. GLASSER:
14        Q: Name one.
15        A: Well, I can give you some examples of
16        ones.
17        Q: Go ahead.
18        A: Again, it's not specific to any one.
19        There are a much broader set of decisions that we
20        make when it's related to our P&L every year.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 99**
```
99 :8     Q: Oh, okay. All right. Well, in the
9        first nine months of 2021, did J&J Consumer
```

10      Health grow?
11      A: I can tell you that parts of
12      Johnson & Johnson Consumer, Inc., grew and parts
13      of Johnson & Johnson Consumer, Inc., did not
14      grow.
15      Q: Overall did it grow?
16      A: Overall it grew in a small amount.
17      But, again, there are puts and takes to that and
18      I don't know where the year will end up yet.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 107**

107 :10     Q: And we have already established that
11      your assent to it was based on advice of counsel;
12      right?
13      MS. BROWN: Objection to the form.
14      THE WITNESS: Again, what I can share
15      is I walked through and reviewed the purpose and
16      intent of the documents that I was signing and
17      that was under advisement of my legal counsel.
18      Yes.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 108**

108 :12     Q: You see that right there?
13      JJCI that you were president of on
14      October 12; right?
15      A: Yes, I see that.
16      Q: Okay. What law firm represented Old
17      JJCI in the transaction where it merged with
18      Chenango Zero?
19      A: I don't know.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 111**

111 :12     Q: Okay. I don't want to grind through
13      that. Okay. I just want to ask you a simple
14      question.
15      As of the day you signed this, what
16      was the fair market value of JJCI's assets?
17      A: When I signed it, I don't know the
18      precise value of the market -- the assets.
19      Q: Okay. Did you ask anyone to find
20      that for you before you signed this?
21      A: No, I did not ask anyone to find it.
22      I didn't need -- I didn't feel like I needed to.
23      Q: Okay. Before you signed this
24      agreement, did you ascertain the fair market
25      value of JJCI's then existing liabilities?
112 :1      A: No, I did not.
2       Q: Did you ask -- did you ask anyone to
3       find that for you before you signed this
4       agreement?
5       A: I did not ask anyone at that time.
6       But I also am very aware that there is a constant
7       view, let's call it a statement, and assessment
8       of what the JJCI market value is at any point in
9       time. So I was very aware that it existed and is
10      constantly evaluated.
11      Q: Great. As of October 12, 2021, what
12      is the JJCI value?

13      A: I don't remember. I don't know.
14      Q: Did you ask anyone to figure it out?
15      MS. BROWN: Asked and answered.
16      THE WITNESS: I did not ask anyone at
17       that time to figure it out but I did not feel
18       like I needed to.

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 114**

114 :1      Q: All right. What's your last
2       understanding of the JJCI value?
3      A: I don't -- I can't answer that as a
4       specific question because there is -- it's a
5       number that is a market value that I wouldn't be
6       able to answer a specific number on.
7      Q: So it's fair to say that you signed
8       this agreement without knowing what the JJCI
9       value is?
10      A: No --
11      MS. BROWN: Objection, assumes --
12      THE WITNESS: -- I did not say that.
13      BY MR. GLASSER:
14      Q: Okay. What is it?
15      THE WITNESS: Sorry, Alli.
16      MS. BROWN: No, it's okay.
17      THE WITNESS: I said that I don't
18       have a specific number, but I understand what the
19       JJCI value is in terms of how to -- how we would
20       calculate that, where it would be available, but
21       I don't -- and it would not be unusual for me not
22       to know what the exact number is.
23      BY MR. GLASSER:
24      Q: Okay. I don't want the exact number.
25       Give me the directional number. I'm okay. You
115 :1       can miss by a few billion.
2       What's the number?
3      A: No, I don't -- I'm not comfortable
4       missing by a few billion. I apologize.
5       But you could ask our -- you can ask
6       our financial leaders for what an appropriate
7       market value is based on their calculation at a
8       specific time. I'm sure they would be in a much
9       better position to answer that than me.

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 115**

115 :23      Q: What is your understanding of the
24       JJCI value even if somebody else may have a
25       different understanding?
116 :1      MS. BROWN: Objection, asked and
2       answered.
3      THE WITNESS: I think I stated it
4       before that I understand what the JJCI value
5       means when I signed this document. But I don't
6       have a specific number and I wouldn't want to
7       state a number that's not accurate.

### GOODRIDGE, MICHELLE - *12/20/2021*

**Page 119**

119 :15      MR. GLASSER: Okay. Let's go to
16       Exhibit 1.57, an amended and restated commitment

```
  17        and loan agreement.
  18         (Whereupon, Exhibit No. 1.57 was
  19         marked.)
  20        BY MR. GLASSER:
  21        Q: Okay. Do you recognize this amended
  22         and restated commitment and loan agreement dated
  23         October 12, 2021, between Johnson & Johnson and
  24         Johnson & Johnson Consumer, Inc., that you signed
  25         on page 12?
120 :1      A: Okay. Yes, I see the document. I
   2         recall the document.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 120**
```
120 :17     Q: Right. I'm not asking about this
   18        one.
   19        I'm saying prior to this loan
   20        agreement being entered, are you aware of any
   21        other master loan agreement or loan agreement
   22        between Old JJCI and Johnson & Johnson, the apex
   23        company, away from this reorganization?
   24        A: I am not aware of any agreements, but
   25        that doesn't mean that I would be privy to that,
121 :1       so I may not be in the position to know that.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 125**
```
125 :3      Q: Yes. What was the business need for
   4         the loan agreement that you and I just looked at
   5         if it's a true statement that Johnson & Johnson
   6         Consumer, Inc., has access to its own cash?
   7        MS. BROWN: Objection, foundation,
   8         speculation.
   9        THE WITNESS: Again, I don't know
   10        exactly which question you are asking me. Is
   11        there something specific to the agreement that
   12        you are asking me to look at?
   13       BY MR. GLASSER:
   14       Q: I'm trying to get you to articulate a
   15        single business reason for this loan agreement.
   16       A: Again, I'm not a lawyer. I'm not in
   17        the finance department. I don't know how the
   18        intricacies work. I understand the overall
   19        premise and intent of the transactions that day.
   20        But if you are asking me a specific
   21        question about cash flow and other things, I'm
   22        not in the best position to answer that.
   23       Q: Why would Johnson & Johnson Consumer,
   24        Inc., need a loan agreement if it has the power
   25        to either use its own cash or call the cash if
126 :1        need be?
   2        MS. BROWN: Objection, foundation,
   3         speculation.
   4        THE WITNESS: Well, are you
   5         referring -- is there something specific to the
   6         agreement that you are asking a question about?
   7        BY MR. GLASSER:
   8        Q: Its existence. I'm trying to figure
   9         out the business rationale for the existence of
   10        an agreement like this.
   11        Do you know one?
   12       A: Well, again, I mean, I'm not in the
```

```
13        best position -- again, I'm not a lawyer. I
14        don't understand -- I may not understand the
15        specific details behind each agreement.
16        But if there is a specific question
17        about the specific agreement, maybe we can defer
18        to the document.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 130**
```
130 :6        Q: Have you ever one time asked somebody
7         in your company what is the average cost of the
8         medical care for an ovarian cancer case?
9        MS. BROWN: That's been asked and
10         answered. It lacks foundation and calls for
11         speculation.
12        BY MR. GLASSER:
13        Q: You can answer the question.
14        A: I have not asked that specific
15         question, no.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 130**
```
130 :22        Q: Have you ever asked what is the
23         average cost of care for a mesothelioma case?
24        MS. BROWN: All the same objections.
25        BY MR. GLASSER:
131 :1        Q: Have you ever asked that?
2        A: Have I asked the specific question?
3         No.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 132**
```
132 :18        Q: Okay. Have you ever tried to figure
19         out in your own mind what it is you put on LTL,
20         the aggregate amount of all the talc-related
21         liability? Did you ever try and figure out what
22         that was?
23        MS. BROWN: Objection to the form,
24         foundation.
25        THE WITNESS: No. I personally did
133 :1         not try to do the specific math of what that was,
2         nor would I be in the position to do so
3         accurately and I would depend on others to do so,
4         but it was not my obligation or my duty.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 142**
```
142 :22        Q: If somebody underneath you in the
23         chain of command wanted to spend, say, for
24         example, $2 billion, would you expect to know
25         about it?
143 :1        A: If someone wanted to spend 2 billion,
2         I would definitely assume that I would see that
3         before it was agreed to.
4        MR. GLASSER: Let's go to
5         Exhibit 1.24.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

---

**Page 144**

144 :1     Q: Okay. Great. Again, this you first

2     saw in that early October meeting; right?

3     A: Yes.

4     Q: And it was explained to you by Chris

5     Andrew; right?

6     A: It was explained to me by Chris

7     Andrew, yes.

**GOODRIDGE, MICHELLE** - *12/20/2021*

---

**Page 148**

148 :22     Q: Did you -- before you divided and

23     created LTL as the president of JJCI, did you ask

24     to see a pro forma balance sheet for LTL after

25     the division?

149 :1     MS. BROWN: Objection, form,

2     foundation.

3     THE WITNESS: After the division, I

4     did not specifically ask to see a pro forma

5     statement, no.

6     BY MR. GLASSER:

7     Q: Again, I'm saying prior to creating

8     LTL and giving it all the talc liabilities, you

9     never asked to see a pro forma balance sheet?

10     A: I didn't make the specific request,

11     but I think we could defer to the documents for

12     all the necessary information or to the experts

13     involved.

14     Q: All right. And prior to creating

15     LTL, you didn't ask to see any pro forma income

16     statements of what the new entity would look like

17     on a pro forma basis; isn't that correct?

18     A: Again, I didn't make that specific

19     request. But, again, we could defer to the

20     documents and to the experts for all the details.

21     Q: Prior to creating LTL and assigning

22     it the sum of all the talc liabilities, you

23     didn't ask to see a pro forma statement of cash

24     flow that it would, in fact, operate; correct?

25     A: I specifically -- I didn't

150 :1     specifically ask to see a certain document but I

2     know I reviewed multiple documents.

3     And, again, I would defer to the

4     agreements and I would defer to the lawyers and

5     the experts that were involved for the detail.

**GOODRIDGE, MICHELLE** - *12/20/2021*

---

**Page 150**

150 :11     Q: Among the documents you reviewed in

12     October of 2021 prior to agreeing to this deal,

13     did you see any pro forma financial statements

14     for LTL giving effect to the division?

15     A: You know, I'm trying to recall. I

16     reviewed many documents that day, so I don't

17     know -- I don't recall which specific documents I

18     reviewed or not. So if there is a specific

19     document that you are calling on, I'm sure I

20     could -- I would like the opportunity to review

21     that before I address it.

22    Q: So sitting here today, you have no
23    specific recollection of having been shown any
24    pro forma financial statements for the future
25    LTL?
151 :1    A: You know, again, I reviewed many
2    documents that day, so I don't recall exactly
3    which ones. But we could defer to the agreements
4    that I have in front of me, all the ones that I
5    reviewed and signed. I'm happy to look through
6    that and to understand exactly what I -- was
7    reviewed that day.
8    Q: But you have no memory of having
9    reviewed any pro forma financial statements for
10    the newly created entity carrying the weight of
11    the talc liabilities; correct?
12    A: Well, I just want to clarify. I'm
13    not saying I didn't see it for sure. I don't
14    recall exactly which documents. I know I
15    reviewed documents around LTL, but I don't
16    remember exactly what they were.
17    Q: All right. Let's go --
18    A: And, again, we can defer to the
19    documents that I signed. I know that I reviewed
20    those extensively.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 156**

156 :1    Q: Isn't it true, Ms. Goodridge, that if
2    a settlement agreement has a future obligation
3    for JJCI, we could ascertain that by reading the
4    agreement?
5    MS. BROWN: Objection, calls for
6    speculation, lacks foundation.
7    THE WITNESS: I don't know because
8    I'm not involved with those settlement
9    agreements.
10    BY MR. GLASSER:
11    Q: Is the normal way --
12    A: I'm not the right person to ask.
13    Q: Is the normal way that you determine
14    what a contract says by reading it?
15    MS. BROWN: Same objection.
16    THE WITNESS: I'm sorry. I'm not
17    sure what you are asking me.
18    BY MR. GLASSER:
19    Q: Has it been your common experience in
20    27 years of business that to learn what a
21    contract provides, reading it is helpful?
22    A: I would just -- I can -- I can't
23    comment on the settlement contracts that are in
24    front of me here.
25    I do think in general reading the
157 :1    contracts as stated are helpful to understand the
2    construct of what the contract's intent is.
3    Q: All right. So to determine the
4    future obligations of Johnson & Johnson, the apex
5    company, under these assigned settlement
6    agreements, one could read them to determine
7    that; agreed?
8    MS. BROWN: Asked and answered. I
9    object.
10    THE WITNESS: Again, I am not the
11    right person to address it. I don't even feel

12        comfortable addressing a comment on that.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 162**
162 :2        THE WITNESS: I don't know.
3        BY MR. GLASSER:
4        Q: So deciding litigation settlements
5         with JJCI's money is outside your chain of
6         command; isn't that true?
7        MS. BROWN: I object to the form of
8         that question. It's argumentative.
9        THE WITNESS: I didn't say that. But
10         I was not involved specifically in the
11         specific -- the specific litigation that you are
12         talking about.
13        BY MR. GLASSER:
14        Q: Well, they were clearly
15         accomplished -- these settlement agreements were
16         clearly accomplished without your authority;
17         isn't that true?
18        A: I didn't say that. I just said that
19         I was not involved in any of the specifics of
20         what you described.
21        Q: Well, if you didn't sign the
22         settlement agreement, you didn't read the
23         settlement agreement, you weren't involved in any
24         way, shape, or form, how in the world were you
25         exercising any authority as president of JJCI in
163 :1         entering the settlement agreements?
2        MS. BROWN: Well, that lacks
3         foundation.
4        THE WITNESS: Again, I can't speak to
5         the legalities of the authorities of who is
6         involved and not involved. I can tell you that I
7         wasn't involved in the settlement contracts.
8        BY MR. GLASSER:
9        Q: All right. How many --
10        A: And I don't know who was.
11        MS. BROWN: Let her finish her
12         answer, please, Counsel.
13        BY MR. GLASSER:
14        Q: How many cases have been settled?
15         How many talc cancer cases have already been
16         settled prior to the division?
17        MS. BROWN: I object, lacks
18         foundation.
19        THE WITNESS: I don't know.
20        BY MR. GLASSER:
21        Q: Is it more than 2,000?
22        MS. BROWN: Same objection.
23        THE WITNESS: As I stated, I don't
24         know.
25        BY MR. GLASSER:
164 :1        Q: Is it more than ten?
2        MS. BROWN: Same objection.
3        THE WITNESS: As I stated, I don't
4         know.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 172**
172 :21        Q: Have you ever met Mr. Wuesthoff?
22        A: In my previous roles at Johnson &

23          Johnson, I have met Mr. Wuesthoff before, yes.
24          Q: Did you ever meet him in connection
25          with this transaction?
173 :1      A: I did not.
2           Q: Did you ever meet with Mr. Dickinson
3           who is the CFO of LTL that you put in in
4           connection with this transaction?
5           A: I did not.
6           Q: Did you ever meet with Mr. Dayo, the
7           third manager of LTL in connection with this
8           transaction before you put him in the job?
9           A: I did not.
10          Q: So it's fair to say that you did not
11          discuss roles and responsibilities with any of
12          those three people before you put them in their
13          positions?
14          A: I personally did not, no.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 176**
176 :8      Q: Ms. Goodridge, did you determine this
9           case -- this transaction should occur in Texas?
10          A: Are you referring specifically to the
11          Chenango transaction?
12          Q: Correct.
13          A: I was involved in signing for that
14          entity be constructed in Texas. I was not
15          involved in the details of the options that were
16          assessed which I defer to the lawyers for more
17          details.
18          Q: So you had to rely on counsel for
19          that choice?
20          A: I relied in this particular case when
21          signing it to counsel.
22          MR. GLASSER: All right. Let's pull
23          up the amended and restated divisional merger
24          support agreement, 1.53.
25            (Whereupon, Exhibit No. 1.53 was
177 :1        marked.)
2           BY MR. GLASSER:
3           Q: All right. So this is an amended and
4           restated divisional merger support agreement
5           between JJCI and LTL. Okay?
6           A: Okay.
7           Q: So you signed it on, I guess, the
8           fourth page -- sorry. Four, five -- sorry, fifth
9           page, PDF page 7.
10          Is that your signature?
11          A: Yes.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 179**
179 :7      Q: Well, do you under- -- do you have an
8           independent understanding of why this transaction
9           was structured so as to assign the insurance to
10          LTL but leave all the power and authority to
11          prosecute the insurance at JJCI? Was that ever
12          explained to you?
13          MS. BROWN: Objection, lacks
14          foundation.
15          THE WITNESS: Again, I'm not an
16          expert in that area, nor would I even try to even

17        basically explain your question. But I would
18        defer to our lawyers and our other experts to,
19        you know, help understand like the structure of
20        how that works.
21        BY MR. GLASSER:
22        Q: All right. So that structuring is
23        something you again relied on advice of counsel.
24        You didn't make an independent
25        business decision that that was the right thing
180 :1    to do; right?
2         A: No. In my role, I regularly rely on
3         experts and lawyers in matters where there is an
4         expertise like this. And in this case, I relied
5         on our counsel and obviously any previous
6         discussions to arrive at that.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 189**

189 :7    Q: Okay. Why didn't you guys just put
8         JJCI into bankruptcy?
9         MS. BROWN: Objection, foundation,
10        speculation.
11        THE WITNESS: Sorry. I'm not in a
12        position to answer that. Maybe we could defer to
13        the lawyers on the constructs of that.
14        BY MR. GLASSER:
15        Q: Did you ever have a conversation with
16        anybody ever about that idea?
17        A: I'm not sure which idea you are
18        referencing.
19        Q: Putting JJCI itself into bankruptcy.
20        A: I can't -- again, I'm not in a
21        position to speak to that. I'm not a lawyer. I
22        was not involved in the options of what made most
23        sense. Again, I would defer to my lawyers for
24        those questions.
25        Q: Okay. I'm asking you a very
190 :1    different question.
2         Did you, Michelle Goodridge, ever
3         have a conversation with anybody at Johnson &
4         Johnson about why we are not putting Johnson &
5         Johnson Consumer, Inc., into bankruptcy?
6         MS. BROWN: Objection, asked and
7         answered.
8         THE WITNESS: As I said, I was not
9         involved in the details of those discussions.
10        BY MR. GLASSER:
11        Q: Okay. Well, I'm asking you, is it
12        also true that you never even had that discussion
13        with your lawyer?
14        MS. BROWN: Well, hang on a second.
15        I don't want you to reveal any specific
16        discussions you had with counsel, Ms. Goodridge,
17        but you are certainly able to answer the question
18        as to your general understanding or your
19        knowledge of the particular facts that allowed
20        you to fulfill your role here as JJCI president.
21        BY MR. GLASSER:
22        Q: No, hang on. I'm asking a yes or no.
23        If the answer is you never had the conversation,
24        then you surely never got legal advice on it.
25        So did you ever have that
191 :1    conversation why don't we put JJCI in bankruptcy?
2         MS. BROWN: Asked and answered.

3          THE WITNESS: As I stated before, I
4           was not involved in that specific discussion.
5          BY MR. GLASSER:
6          Q: So the answer is, no, I, Michelle
7           Goodridge, was never subject to a discussion like
8           that ever anywhere with anyone?
9          A: No. I was answering specifically the
10          question you asked about JJCI and bankruptcy. I
11          was not involved in any of those discussions
12          myself personally.
13         Q: Right. So you personally never had
14          such a discussion with any human being?
15         A: About that specific statement, no.

---

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 199**

199 :25        Q: So in those conversations you had in
200 :1          early October, the discussion -- there was a
2           discussion around LTL filing bankruptcy; correct?
3          A: Again, my understanding was that that
4           was a likely outcome as the next step, but that's
5           my understanding of it. That's it.

---

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 200**

200 :22        Q: So you are going to telling the Court
23          honestly coming out of the meetings with
24           Mr. Andrews, you didn't -- you didn't think there
25          was essentially a hundred percent chance LTL was
201 :1         filing bankruptcy?
2          MS. BROWN: She literally answered
3           that question three times. I object, asked and
4           answered.
5          BY MR. GLASSER:
6          Q: There was some confusion coming out
7           of the meeting whether it would actually go
8           bankrupt?
9          MS. BROWN: She already answered
10          that.
11         BY MR. GLASSER:
12         Q: What's your answer?
13         A: I didn't say there was any confusion.
14          I said that it was -- my understanding was it was
15          a likely outcome.
16         Q: Wasn't it your understanding that is
17          what was going to happen?
18         MS. BROWN: Objection, asked and
19          answered.
20         THE WITNESS: I already answered the
21          question the way I understood it.
22         MR. GLASSER: Let's go to
23          Exhibit 1.65.
24           (Whereupon, Exhibit No. 1.65 was
25           marked.)
202 :1         BY MR. GLASSER:
2          Q: Okay. This is the operating
3           agreement of a company called Royalty A&M and you
4           will see that you signed it on page 15.
5           Is that your signature,
6           Ms. Goodridge?
7          A: Yes, it is.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 203**

203 :19    **Q: Did you receive a briefing covering**
20    **why it was going to be a North Carolina company?**
21    **A: Based on my conversations with Chris**
22    **Andrew, I understood that was where the entity**
23    **would be structured. But I don't have -- again,**
24    **I'm not a lawyer and I would defer to them for**
25    **the details of why North Carolina.**
204 :1    **Q: So you have no understanding of what**
2    **relation Royalty A&M had to North Carolina?**
3    **A: My understanding is that Royalty A&M,**
4    **LLC, was established in North Carolina.**
5    **Q: Why?**
6    **A: That's the basis of my understanding.**
7    **I'm sure the lawyers would have a better answer**
8    **of why.**
9    **Q: So you relied on advice of counsel to**
10    **make it a North Carolina entity as opposed to any**
11    **other state?**
12    **A: I --**
13    **MS. BROWN: I object, foundation.**
14    **BY MR. GLASSER:**
15    **Q: The answer is I did; right?**
16    **A: I relied on my discussions with Chris**
17    **Andrew and the counsel from Chris Andrew.**

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 208**

208 :23    **MR. GLASSER: Let's go to**
24    **Exhibit 1.66.**
25    **(Whereupon, Exhibit No. 1.66 was**
209 :1    **marked.)**
2    **BY MR. GLASSER:**
3    **Q: This is a purchase and sale agreement**
4    **between a company called McNeil Nutritional LLC**
5    **and Royalty A&M LLC. Do you see that?**
6    **A: I do.**
7    **Q: And you signed this on page 31, so if**
8    **you want to look and see your signature.**
9    **You are apparently the president of**
10    **McNeil Nutritionals, LLC, Ms. Goodridge. Okay?**
11    **A: Yes, I am.**
12    **Q: All right. I take it you did not sit**
13    **down and negotiate this purchase and sale**
14    **agreement between McNeil and Royalty A&M?**
15    **A: Well, in answer to your question, I**
16    **did not personally sit down and negotiate this**
17    **agreement, but I'm aware of the agreement and**
18    **what I signed on that day.**

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 210**

210 :8    **Q: All right. So you don't know who**
9    **negotiated the purchase price in this agreement?**
10    **A: I am personally not aware of that --**
11    **the answer to that specific question.**
12    **Q: You don't know when it was**
13    **negotiated?**
14    **A: I am not aware. Again, I'm not the**

15      best person to ask. I don't know the answer to
16      that.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 214**

214 :20     Q: So you signed it based on advice of
21          counsel?
22          A: I signed it based on my understanding
23          of the agreement, my understanding of the purpose
24          intent, and my comfort level of that, as well as
25          based on information provided by my counsel.
215 :1      Q: All right. What did Chris Andrew

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 230**

230 :20     Q: Now, we have reviewed, you know, lots
21          of paper today about the 2021 corporate
22          reorganization, but some things aren't in the
23          papers, so I want to ask you about them. Okay?
24          A: Okay.
25          Q: Why was this done in October?
231 :1      A: I don't know. I would defer to my
2           legal counsel and other experts involved. I
3           don't know why.
4           Q: Did anybody tell you why you wanted
5           to get it accomplished in October?
6           A: Again, I didn't have any specific
7           conversations about why October.
8           Q: Okay. Why was it done so fast in
9           only two days?
10          A: And I'm not a lawyer and I don't --
11          I'm not in a position to answer that question.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 248**

248 :15     Q: Are you aware that LTL has asserted a
16          right to stay all the lawsuits pending against it
17          on account of the bankruptcy?
18          MS. BROWN: Objection, foundation.
19          THE WITNESS: I can only give you my
20          understanding. Again, not as a lawyer and not as
21          someone involved with LTL is that that -- with
22          bankruptcy there is a pause of the cases. That's
23          my only -- my understanding, but I can't give you
24          more details to that. I would defer to my
25          lawyers.
249 :1      BY MR. GLASSER:
2           Q: And did you have that understanding
3           when you signed these documents?
4           A: As I stated before, I understood that
5           bankruptcy was a likely outcome and I understood
6           that one component of bankruptcy was a pause in
7           the cases.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 249**

249 :20     Q: Well, since the 39,000 cancer victims
21          cases have been stayed, but people with other
22          unsecured cases have not been stayed, would it be

23    fair to say the cancer victims are in a worse
24    position than they were before the transaction
25    having to do with their ability to prosecute
250 :1    their lawsuit?
2    MS. BROWN: I object. It misstates
3    the evidence and it lacks foundation and calls
4    for speculation.
5    BY MR. GLASSER:
6    Q: Who is better off, somebody who
7    didn't have a stay or somebody whose case has
8    stayed?
9    MS. BROWN: I object, foundation,
10    speculation.
11    BY MR. GLASSER:
12    Q: Ms. Goodridge, you can answer.
13    A: Well, I can only answer what I'm
14    comfortable answering which is that I don't think
15    those are relevant comparisons in my
16    understanding of it, I mean, in just my sense of
17    the question.
18    And I can tell you my understanding
19    of the purpose and intent of what LTL was to do
20    was actually to provide a fair and equitable
21    resolution for plaintiffs for talc litigation.
22    And that's my understanding. That's -- I can't
23    comment on your other comparisons.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 253**

253 :1    Q: Is there anything in the funding
2    agreement where JJCI pledges not to do a further
3    divisional merger leaving the funding agreement
4    with Old/New JJCI with a lot less assets?
5    MS. BROWN: I object. The question
6    makes no sense. It lacks foundation and it calls
7    for speculation.
8    BY MR. GLASSER:
9    Q: You can answer.
10    A: I don't feel comfortable answering --
11    I know. But I don't feel comfortable answering
12    that question as stated.

## GOODRIDGE, MICHELLE - *12/20/2021*

**Page 254**

254 :1    Q: As president of JJCI, have you signed
2    any document pledging not to do any more divisive
3    mergers?
4    MS. BROWN: Objection, foundation,
5    assumes facts.
6    THE WITNESS: You know, I don't --
7    have I signed any documents? Can you repeat that
8    part again because that is a complicated
9    question.
10    BY MR. GLASSER:
11    Q: Have you signed any agreement on
12    behalf of New JJCI pledging not to do any more
13    divisive mergers?
14    A: Again, I would defer to my lawyers
15    for the details. From my recollection, I mean, I
16    only can speak to what I signed regarding this
17    transaction. I'm not aware or I can't recall any
18    specific agreement relating to what you are

```
19        saying. But, again, I would defer to my lawyers
20        because I might not remember that. But I don't
21        recall as we sit here.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 310**
```
310 :11   Q: Well, what was the intent of the
12        creation of LTL based upon your understanding?
13        A: From my understanding and upon review
14        of the documents and review of the different
15        transactions, my understanding was that the
16        intent and purpose was to provide a more fair,
17        efficient, and equitable resolution of the talc
18        litigation both current and future.
19        Q: And who told you that bankruptcy
20        would be a more fair, efficient, and equitable
21        way of handling the talc cases as compared to the
22        civil litigation? Who told you that?
23        MS. BROWN: Objection. That
24        misstates her testimony and lacks foundation.
25        THE WITNESS: Okay. So what I shared
311 :1    was -- I only can share what I understood.
2         What I understood is that the
3         creation of LTL was to provide what I mentioned
4         which is a more fair resolution of the talc
5         litigation. Separate from that --
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 311**
```
311 :11   A: Then I will answer separate from
12        that, I was under the understanding that
13        bankruptcy would be a likely outcome from the
14        transactions.
15        And I was informed of this through my
16        discussions with Chris Andrew.
17        Q: So other than Attorney Chris Andrew,
18        did anyone else tell you that an LTL bankruptcy
19        filing would create a more fair and equitable
20        resolution of the talc litigation?
21        A: One is I didn't say those exact
22        words. I just want to clarify. But, two, my
23        discussions -- my understanding of the structure
24        and the intent of the restructuring was through
25        Chris Andrew.
312 :1    Q: Okay. Other than Chris Andrew --
2         other than what Chris Andrew told you, do you
3         have any other basis for the statement you made
4         that the LTL bankruptcy filing would be a more
5         fair and equitable way to resolve talc cases?
6         A: Again, I just want to clarify that I
7         am separating those two comments because that's
8         not -- my understanding was that LTL was created
9         for the resolution of the talc litigation,
10        period. Separately, that that bankruptcy was the
11        likely outcome and process that could occur.
12        So, again, I'm not a lawyer. I --
13        it's -- I don't want to comment on sort of the
14        relationship between the two and I don't think
15        I'm in a good position to do that.
```

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 312**

312 :20    Q: Okay. I wrote down your words,
21    quote, LTL was created for the resolution of the
22    talc litigation, period.
23    You heard your words in the last
24    answer; correct?
25    A: I heard my words, yes.
313 :1    Q: Okay. Who told you that?
2    A: That was my understanding from my
3    discussions within -- when I was reviewing the
4    documents.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 314**

314 :14    Q: Who told you that other than Chris
15    Andrew? Did anyone else other than Chris Andrew
16    tell you that, yes or no?
17    MS. BROWN: Objection.
18    THE WITNESS: When I was signing the
19    documents and reviewing the documents, no one
20    else told me that other than Chris Andrew.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 325**

325 :2    Q: So, again, in this memo, it says
3    that -- we are looking on the screen -- that the
4    commercial capabilities are expected to continue
5    through New JJCI upon consummation of the
6    restructuring without interruption.
7    Do you see that?
8    A: I do.
9    Q: And is that exactly what has
10    happened, that JJCI, the company that you are
11    president of, has been able to continue business
12    as usual without any commercial interruption
13    since the filing of the LTL bankruptcy on
14    October 14, 2021? Is that correct?
15    A: Well, again, as you know, J&J
16    Consumer, the Global Consumer company is very
17    big, so I can't speak to every aspect of it.
18    But in general I think that J&J
19    Consumer, Inc., from my -- where I sit from the
20    realm of responsibility I have has been able to
21    continue operating without interruption.

**GOODRIDGE, MICHELLE** - *12/20/2021*

**Page 338**

338 :11    Q: And how do you know it would be more
12    fair and equitable?
13    A: Well, I can only tell you what I
14    understood through my conversations. And my
15    understanding was that it was created -- there
16    are different aspects to it, but that it would
17    be -- it's created so that we could manage and
18    resolve all the talc litigation which is both
19    current and future and that there were aspects
20    like the funding agreement that helped enable

21    that fair and -- fair and equitable resolution of
22    those litigation costs.
23    Q: What was the basis for your
24    understanding that when you signed the documents,
25    that the LTL bankruptcy would result in a fair
339 :1    and equitable way of resolving all the talc cases
2    against JJCI? What was the basis of your
3    understanding?
4    A: The basis of my understanding --
5    Q: Yes.
6    A: -- were a combination -- I'm just
7    trying to answer the question. The basis of my
8    understanding was a combination of understanding
9    the documents and the details of the agreements
10    that I was -- that I was privy to in signing as
11    well as an explanation of the agreements from my
12    lawyer Chris Andrew.

**KAPLAN, DAVID**

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 13**

13 :18             Do you understand that last
19      fall, Johnson & Johnson undertook a corporate
20      restructuring that resulted in the creation of
21      a company called "Legacy Talc Litigation?"

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 13**

13 :23          A. Yes.
24          Q. And do you understand that
25      Johnson & Johnson and Johnson & Johnson's
14 :1      consumer health subsidiaries, Talc
2      Liabilities, were placed into that newly
3      created company, Legacy Talc Litigation?
4          A. Yes.

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 14**

14 :7          Q. And if I use the shorthand, "LTL,"
8      for Legacy Talc Litigation, do you understand
9      what I'm referring to?
10          A. Yes.
11          Q. And do you understand that LTL filed
12      for bankruptcy?
13          A. Yes.

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 17**

17 :2          Q. And have you been the Director of
3      Corporate Ratings Healthcare, at Standard and
4      Poor's, for the last 14 years?
5          A. No. So, my current role is
6      director. And I've been at Standard and
7      Poor's, in the Credit Ratings Department, for
8      14 years. But I've not been director for the
9      full 14 years.
10          Q. And for how long have you been
11      director?
12          A. I don't recall, offhand. But it's
13      a -- a good number of years.
14          Q. Okay. At least three or four years?
15      Is that fair?
16          A. Yes.
17          Q. And what is your role as a Director
18      of Corporate Ratings, Healthcare?
19          A. So, the department that I work in,
20      Corporate Ratings, we establish a grading
21      system, like Triple A, for -- which is an
22      evaluation of credit risk. The risk that a
23      company will go bankrupt.
24          My -- in my role, I focus currently,
25      primarily on pharmaceutical companies, but
18 :1      also, other types of healthcare companies like
2      medical device, or healthcare service
3      companies.

```
 4          And I have a group of more junior
 5    analysts who don't report directly to me, but
 6    are on my team. Kind of a dotted line. And
 7    I'm responsible for their work, and quality
 8    control training, et cetera.
 9          Q. Got it. Thank you. Do you have
10    responsibility for covering Johnson & Johnson
11    in your role?
12          A. Yes.
13          Q. And for how long have you been
14    covering Johnson & Johnson?
15          A. I think it was since 2019 was when I
16    picked up coverage from a colleague.
17          Q. And does your coverage of
18    Johnson & Johnson include Johnson & Johnson
19    subsidiaries?
20          A. Yes. I mean, I -- well, to clarify,
21    our rating is on the parent, but the -- the
22    activities of the subsidiaries influence the
23    credit rating of the parent.
24             So, if it's related to the
25    creditworthiness of the overall entity, then
19 :1    yes. You know, it gets technical when we
 2    think about how we rate different entities
 3    within a group.
 4             But, generally, they have a single
 5    family rating that reflects the comprehensive
 6    activities of the entities that are part of
 7    the group which is backing the
 8    creditworthiness of the parent.
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 20**

```
20 :20        Q. Got it. And in the course of
21    covering Johnson & Johnson as part of your
22    role at Standard and Poor's, do you
23    communicate with people at the company?
24          A. Yes.
25          Q. And who are the principal people
21 :1    that you communicated with from 19 -- 2019 to
 2    the present?
 3          A. So, we -- we typically try to
 4    schedule a meeting annually, that involves a
 5    large group of analysts or a group of analysts
 6    from my team, Standard and Poor's credit
 7    ratings group.
 8             May be three to half a dozen, or
 9    sometimes more. And on JNJ side, there will
10    also be, kind of a handful of people. Often
11    the treasurer; some people from investor
12    relations. Sometimes the CFO. Sometimes
13    legal folks, if it's -- we have some questions
14    about legal matters.
15             And then, there is kind of an annual
16    thing. And the company will share with us
17    forecasts and other information that maybe
18    sometimes is not shared publicly. So it's
19    kind of confidential information.
20             And then we also kind of maintain a
21    single person who is our primary contact.
22    That was Michelle Ryan, for the last couple
23    years. It's recently switched to
24    Duane Van Arsdale, I believe is the name of
```

25    the individual, who is the treasurer.

KAPLAN, DAVID - *02/11/2022*

**Page 22**

22 :8          Q. And as the director on that account,
9      if that's the right terminology, were you the
10     principal point of contact with Michelle Ryan,
11     during the period that she was the point
12     person at JNJ?
13          A. I was the primary point person, with
14     the exception of a short period of leave in
15     September and October of 2021. I would say
16     yeah.
17              It's not always the director who's
18     the primary point of contact. Typically,
19     names that are credits that are larger and
20     more complex, are allocated to directors to be
21     the primary analyst.
22              Companies that are smaller and less
23     complicated are often -- associates are the
24     primary point of contact.
25              So it's not -- the role -- the title
23 :1     is not necessarily for that role. But yes, to
2      your original -- I guess to the key question,
3      I am the primary point of contact with the
4      company on JNJ.
5          Q. And how often would you have
6      telephone calls with Michelle Ryan in, let's
7      say, 2020 and 2021?
8          A. So, again, it could vary. If
9      everything is very stable, it could be, you
10     know, just when a company issues debt. So
11     maybe once a year, aside from the annual
12     meeting.
13              In the case of Johnson & Johnson,
14     there were various developments, so it was
15     more frequent. It's hard for me to say
16     whether it was twice a year or four or five
17     times a year. Just don't recall.
18          Q. Somewhere in that range?
19          A. Yes.
20          Q. And when you did have telephone
21     calls with Michelle Ryan, how did you record
22     the substance of those telephone calls?
23          A. If the conversations are
24     substantive, the practice is --
25              MR. STARNER: I may object
24 :1     occasionally. Just give me a moment.
2              Obviously, you can answer the
3      question, if you understand, after that.
4      But if you just give me one second, so --
5      if you don't mind. Thank you.
6              Go ahead.
7              THE WITNESS: Sure.
8              Yeah. Our practice is to take
9      written notes if they are substantive
10     matters that, you know, wouldn't be
11     documented.
12              So, for example, if a company plans
13     on issuing debt, you might just take a
14     few notes. But then, when the issuance
15     is -- when you publish your note,
16     everything is there, so there is nothing
17     really that is meaningful or material,

18    that needs to be recorded.
19        But if there's notes that are
20    meaningful, the practice -- the practice
21    in the organization and the department is
22    to save them into a specific depository
23    for the record.
24        We are a regulated entity. And so,
25    we are required to save the material
25 :1    information we gather, as part of that
2    rating analysis.
3    BY MR. SHAPIRO:
4        Q. And what is the name of that system
5    where you maintain your notes?
6        A. We refer to it as "RDR."
7        Q. RDR. And what does "RDR" stand for?
8        A. Probably something like "rating
9    depository" -- yeah. We use a lot of
10    acronyms.
11        Q. We can call it "RDR." And is -- and
12    is RDR a database of notes that the S&P
13    analyst take to record the conversations that
14    they have with the companies that they cover?
15            MR. STARNER: Objection.
16        You can answer.
17        A. It's a system where those documents
18    are saved. We often use, kind of, the
19    administrative assistants to help file it
20    there. Yes.

**KAPLAN, DAVID** - *02/11/2022*

**Page 26**
26 :10        Q. Let me ask you the question this
11    way. Do you rely on those notes in the course
12    of developing ratings for the companies that
13    you cover?
14        A. Certainly, those are an input that
15    go into it. And we'll refer back to it.
16        Q. And do you rely on those notes for
17    the purpose of preparing the reports that S&P
18    prepares?
19        A. We could. Certainly, yeah.
20        Q. And -- and in the course of your
21    career at S&P, have you always intended for
22    those notes to be as accurate as possible?
23        A. They are shorthand. But they are
24    supposed to be a reference for -- at least for
25    me, to be able to decipher what I was thinking
26
27
27 :1    or hearing.
2        I guess that is to say that, they
3    are not edited, or they are usually drafted as
4    the conversation is going.
5        So there is a little bit of a --
6    there is a looseness in the note-taking that's
7    obviously not going to be present in something
8    we would publish, or even something that we
9    would share with a committee, like a -- a
10    package for others to review.
11        They are really not generally
12    reviewed by anyone else. So, you know, if
13    they have a grocery list on the side, that
14    wouldn't be a problem.
15            MR. SHAPIRO: Let me mark as

16          Exhibit 384, a document that's Bates
17      stamped SPG100 -- or "SPGI0001078_001"
18      through "002."
19          And for the videographer, it's tab C
20      in the binder. You can put that on the
21      screen.
22      (Exhibit 384 marked for identification)
23  BY MR. SHAPIRO:
24      Q. Mr. Kaplan, do you have the ability
25  to control the notes? To control the screen
28 :1  to go through it?
2       A. Yes.
3       Q. Okay. Let me know when you've had a
4   chance to review them.
5           [Witness perused document.]
6       A. Okay.
7       Q. Do you recognize these as your
8   notes, Mr. Kaplan?
9       A. I recognize these as mine. This
10  would not be -- these are not notes that were
11  taken during a conversation with the company.
12          This would be notes that I drafted
13  for our conversation with my colleagues to
14  discuss the rating on JNJ, or the outlook on
15  JNJ. In addition to having a rating, we also
16  have an outlook which could be stable,
17  positive or negative.
18          So, this was October of 2020. This
19  was, I guess, an internal conversation we had
20  scheduled to discuss JNJ's rating and some of
21  the developments.
22      Q. Are these notes that you prepared in
23  advance of the internal conversation?
24      A. Yes.


**KAPLAN, DAVID** - *02/11/2022*
_____

**Page 30**
30 :1       Q. That's okay. And what was the
2   purpose of the meeting?
3       A. So, based on, you know, the
4   contents, there were two legal matters that
5   were facing Johnson & Johnson, that seemed to
6   be -- had reached the point where the
7   liability could be material.
8           And so, we were discussing whether
9   this has, or should have an influence on the
10  rating or the rating outlook.
11      Q. And what was the source of the
12  information that you included in these notes?
13      A. So, it could be conversations we had
14  with the company. It could be information we
15  digested from media sources we viewed as
16  reliable.
17          It could be information that the
18  company had shared publicly with investors, or
19  had put in its SEC filings, like its 10K or
20  10Q.
21          You know, we kind of gathered from
22  multiple sources.
23      Q. Okay. I want to ask you, if we can
24  scroll up. I guess I can't control it. Let
25  me -- let's scroll up to the part that says,
31 :1  "Talc settlements."
2               Do you see the section at the

3    bottom of the page, which is Bates stamped --
4    I guess it's the first page, "001," which
5    says, "Talc settlements?"
6                  You're there, Mr. Kaplan? If
7    you scroll down.
8        A. Sure.
9        Q. Do you see that the first sentence
10   says:
11                  "Company has capitulated on
12   talc, talcum powder/baby powder litigation
13   settlements in contrast to fiercely litigating
14   that."
15                  Do you see that?
16       A. Yes.
17       Q. And is that based on a conversation
18   you had with Michelle Ryan?
19       A. That would have been my -- my view.
20   So the term, "capitulated," in particular, is
21   just a word that came to me. But it's -- this
22   is my interpretation of the events that I'm
23   observing.
24                  So, I doubt that the company would
25   have said that to me, specifically. But the
32 :1  company, in my experience, has been -- has
2    taken the strategy -- and I believe
3    Michelle Ryan had mentioned this -- of, you
4    know, of generally being very assertive in
5    litigating claims.
6                  Michelle had expressed that J --
7    that the company feels -- Johnson & Johnson
8    feels that they are unfairly challenged by
9    litigation because of their financial
10   strength.
11                  And so, their strategy is generally
12   to litigate even things that might be economic
13   to ignore, or just to settle, to avoid
14   nuisance cases.
15                  So, it was therefore a change for us
16   to see that they started to reserve some --
17   some amounts on their financial statements as
18   expected losses or exhibited liabilities for
19   talc.
20                  So that -- that's what that first
21   sentence refers to. Is that the company has
22   basically shifted in strategy from fighting
23   talc to starting to settle some cases, at
24   least.
25       Q. And the basis for your observation,
33 :1  that the company had begun to settle some of
2    the cases is the fact that, as reflected in
3    your notes, that they had accrued $350 million
4    in Q2, and $540 million in Q4?
5                  Is that fair?
6        A. I'm not sure if it was -- was it Q4?
7        Q. Q3, sorry.
8        A. But the fact that they had reserved
9    the 350, and expect to reserve another 540.
10   Right. Correct.
11       Q. And what was your understanding of
12   the significance of the fact that the company
13   had reserved $890 million in Q2 and Q3, for
14   this litigation? What was the significance of
15   that, to your understanding?
16       A. So, you know, we see litigation very
17   often in healthcare. And the overwhelming

18    majority of the time, it ends up not being
19    material -- not end up being a material
20    liability for the company.
21        And so, when we think about credit
22    risk, that's an important observation. But
23    when we see a company take a reserve, it --
24    it's one development that suggests that the
25    liability may be material here.
34 :1        It's not the only way. And it's not
2    a certainty. But that's one development that
3    is suggestive; the liabilities might be
4    material.
5        And so, that is something we try to
6    incorporate in the credit -- in the thinking
7    around the credit risk is -- well, it looks
8    like now the company is going to take some
9    degree of liability.
10    Q. And did you understand, or do you
11    understand, that when a company takes a
12    reserve, the company is making a judgment that
13    the liability is probable and estimable?
14    A. Yes. Based on the SEC or GAP
15    definitions. Correct. Yeah.
16    Q. And then, let me ask you about the
17    third bullet point that refers to the 25,000
18    talc cases. Do you see that?
19    A. Uh-huh. Yes.
20    Q. In that bullet point, it says that:
21        "The company estimates that the
22    liability could reach as much as $7 billion to
23    $7.5 billion, inclusive of all future cases."
24        Do you see that?
25    A. Yes.
35 :1    Q. And when you refer to the company in
2    that bullet point, who are you referring to in
3    particular, as the source of that information?
4        MR. STARNER: Objection.
5        You can answer.
6    A. That would be our -- that would be
7    from conversation we had with the company.
8    Q. Okay.
9    A. Most likely, Michelle Ryan.
10    Q. And what did you understand was the
11    significance of that estimate, that the
12    liability could reach as much as $7 billion to
13    $7.5 billion, inclusive of all future cases?
14        What did that mean?
15        MR. STARNER: Objection.
16    Q. Or what did you understand, based on
17    your conversation?
18    A. It sounds -- well, I don't recall.
19    But based on my reading of my notes, as I
20    would have written them, I think what I was
21    trying to communicate here to my colleagues
22    was that we had a conversation with
23    Johnson & Johnson. And, you know, although --
24    excuse me.
25        Although, you know, the company --
36 :1    you know, there's a lot of uncertainty from
2    the benefit of -- for the purposes of our
3    credit risk, it's important to understand what
4    the -- you know, maximum liability could be.
5        And I think what we gathered from
6    the company is that -- and maybe based on some
7    of the math in the two bullet points above,

8  the company is estimating that its liability
9  will be -- could be as much as $7.75
10  billion -- $7 billion to $7.5 billion.
11          Which is, again, helpful for us to
12  think about it, you know, in the context of
13  Johnson & Johnson. The company generates, you
14  know, $30 billion of EBITDA.
15          As a worst case scenario, you know,
16  what's -- what's the worst case scenario. So
17  even if it's not probable, but at least to
18  have some numbers around it can be very
19  helpful for us.
20          You know, I know the media had some
21  speculation with numbers that were higher than
22  that. So being able to say, you know, media
23  numbers are, you know, just, completely -- you
24  know, meaning when some of my colleagues will
25  sometimes see stuff in the media, and then,
37 :1  you know, send me a link or an article.
2          You know, hearing from the company
3  that they feel that the maximum is $7 billion
4  to $7.5 billion is reassuring in a sense,
5  relative to, maybe something that we read in
6  the media that said the liabilities could be
7  much more than that.
8          So it's helpful, even if it's not --
9  it doesn't become our base case expectation.
10      Q. And let me ask you to take a look at
11  your next bullet point at the top of the next
12  page. Do you see where it says:
13          "The company expects payment
14  would be $2.5 billion per year, in each of the
15  next three years."
16      A. Yes.
17      Q. And is that also based on your
18  conversation with Michelle Ryan?
19      A. Yes. That's what -- that's what the
20  notes indicate.

**KAPLAN, DAVID** - *02/11/2022*

**Page 38**
38 :24          Q. And let me just ask you a couple of
25  more questions about these notes. You were
39 :1  explaining this at the beginning. These are
2  notes that you prepared in advance of your
3  internal meeting with other analysts at S&P?
4      A. Yes.
5      Q. And those -- this -- this type of
6  internal note is something that you regularly
7  prepared in advance of internal meetings like
8  that?
9          MR. STARNER: Objection.
10      A. So, we have two types of internal
11  conversations. There is a more formal one,
12  which is when we kind of formally gather a
13  committee. There's various formalities and
14  processes around that.
15          The internal conversation is kind of
16  a less formal. So it's typically for
17  developments that are where we don't expect
18  there to be a change in the rating, but we
19  just want to run it by our colleagues to make
20  sure they feel similarly.
21          Or in a company that, you know, is

22    high profile and might be getting a lot of
23    media attention, we want our colleagues to
24    understand kind of what we're thinking. And,
25    you know, make sure that, kind of, the
40 :1   communication.
2         If anyone else is being asked about
3    it, they just kind of understand what's going
4    on, and why we're thinking about it. So there
5    are two types -- I guess there are at least
6    two types, maybe more, of reviews.
7         There's kind of the formal, internal
8    review, which we'll call it "committee." And
9    then there is a little bit more of an informal
10   mechanism, where we try to document it.
11        And sometimes, also, it's a way to
12   just kind of have some records for future
13   reference. Meaning, I might refer back to
14   this. If we have a committee several months
15   later, I've got all my notes drafted and
16   organized, and can refer back to that.
17        Q. And this meeting, these notes were
18   prepared in advance of what you would describe
19   as an informal review?
20        A. Yes.
21        Q. And did you circulate these notes to
22   your colleagues in advance of the meeting? Or
23   you just relied on them in the meeting?
24        A. No. I would circulate it to my
25   colleagues in advance of the meeting.

**KAPLAN, DAVID** - *02/11/2022*

**Page 42**

42 :22        Q. Let's turn back to Exhibit 385. Do
23   you recognize this document, Mr. Kaplan?
24        A. Yes.
25        Q. And what is this periodic review?
43 :1        A. Okay. So, I mentioned there's two
2    types of reviews. Let's call it three types.
3    There's the informal type, which was the
4    previous document. And then we have a formal
5    review with a committee, that requires a
6    process.
7         There is a certain formality to this
8    document. It's created in a -- a system -- a
9    platform that we use.
10        So, within the formal reviews, there
11   is a periodic review, and there is an
12   event-driven review. The periodic review is
13   done every year. It's got to be done at least
14   once every 12 months. So it's calendar-based.
15        The idea being that if nothing has
16   happened over 12 months, at least the credit
17   should be reviewed by someone, other than just
18   a primary analyst. So that's this review.

**KAPLAN, DAVID** - *02/11/2022*

**Page 44**

44 :3        They're just kind of making sure the
4    credit has been looked at. Kind of a quality
5    control mechanism. I think there may also be
6    a regulatory requirement for these.
7         And that's different than an

8      event-driven review, where we -- there's some
9      development, and there is a more formal
10     process committee. Again, usually three
11     voters. Often more.
12            Where the recommendation is, or the
13     discussion is whether the rating or output
14     needs to change. In the periodic review,
15     ratings do not typically change.
16            If there is a thought that a rating
17     needs to change as a result of a periodic
18     review, then it would be taken to an
19     event-driven review. So this is kind of the
20     annual check, up if you will, as an analogy.
21            Q. And who prepared this periodic
22     review?
23            A. So, the primary analyst is
24     responsible for the content. We do have

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 45**

45 :5          Q. And were you ultimately responsible
6      for the substance of this periodic review?
7              A. Yes.

---

**KAPLAN, DAVID** - *02/11/2022*

---

**Page 45**

45 :13         Q. What -- what did you do with this
14     periodic review, after preparing it?
15             A. Okay. So, on this first page, it
16     says the sign-off analyst was Shannan Murphy.
17     She is the manager of the healthcare team,
18     more broadly. So I report to her.
19             And she was the one who I had
20     selected to be the reviewer. So we,
21     presumably, had a meeting that was 30
22     minutes -- possibly less -- where we kind of,
23     you know, went through this or said, "Oh, you
24     know, we just reviewed this very recently."
25             You know, these are the document --
46 :1   this is the documents from the internal
2      conversation. This is the forecast model.
3      This is the -- you know, the details on
4      liquidity. And, you know, the rating is still
5      right.
6              And, again, she may have had -- she
7      would have reviewed the document; possibly
8      asked some questions; or, you know, may
9      have -- it may have been a relatively quick
10     review if we had a -- a conversation touching
11     on those points, very recently.
12             "Okay, we just talked about this.
13     We just updated the rating." You know, we can
14     call that a fast-track. It's not a formal
15     term, but if we're both very fluent in what's
16     going on and feel comfortable with the rating,
17     we can kind of accelerate the process.
18             It becomes less of a -- a less
19     rigorous discussion because, a discussion
20     really has been had and the recollection is
21     still there.
22             Q. And in preparing this document, you
23     relied on your conversations with

24    Michelle Ryan?
25        A. In part. As well as the company's
47 :1    financial performance; financial reports;
2    earnings call. But that certainly was one
3    input.
4        Q. And let me ask you to turn to page
5    15 of 31 in the document. Do you see the
6    section labeled, "Talc settlements?"
7        A. Yes.
8        Q. And do you see the reference to the
9    $7 billion to $7.5 billion estimate? Do you
10    see that?
11        A. Yes.
12        Q. And do you see the reference to the
13    payment of 2.5 billion per year?
14        A. Yes.
15        Q. And am I correct that those bullet
16    points are the same bullet points that we had
17    seen in the prior document, which were your
18    internal discussion notes?
19        A. Yes.
20            MR. STARNER: Objection.
21        Q. And those estimates were based on
22    your conversations with Michelle Ryan?
23        A. The -- right. They are based on my
24    conversation with Michelle Ryan.
25            Again, it's not clear to me that
48 :1    they were estimates as much as worst case
2    scenario. But correct. They are based on
3    conversations with Michelle Ryan.
4        Q. And in the last bullet point, it
5    says:
6            "The company does not plan to
7    reserve those at this point. As each case has
8    distinct differences."
9            Can you explain that bullet
10    point?
11        A. So, again -- so it looks to me like
12    the number, $7 billion to $7.5 billion is what
13    the company had shared with us as being their
14    thoughts around a worst case scenario.
15            My experience with legal
16    liabilities, with other companies that I've
17    covered over the years, is that the accounting
18    requirements; or GAP; or SEC is that, there
19    are only -- a company would only record as a
20    reserve -- as a liability -- the amounts that
21    are probable and estimable.
22            So, those amounts are typically --
23    could be less than what the company's base
24    case expectation is. Certainly, it would be
25    less than what the company's worst case
49 :1    expectation is.
2            My understanding is that -- and my
3    experience is that usually those reserve
4    amounts tend -- not always, but can -- or
5    often below what the ultimate amount of
6    settlement is.
7            But different companies have
8    different standards. So, for example, the
9    standard of probable -- you know, what's the
10    amount that's probably going to be a
11    liability.

**KAPLAN, DAVID** - *02/11/2022*

**Page 51**

51 :4          MR. SHAPIRO: Let me mark as
5      Exhibit 386 a document Bates stamped
6      "SPGI00011321" through "4." And for the
7      videographer, this is Exhibit -- or this
8      is tab F in the PDF.
9         (Exhibit 386 marked for identification)
10    BY MR. SHAPIRO:
11        Q. Do you recognize these notes,
12    Mr. Kaplan?
13        A. Ah, yes. This looks like another
14    internal conversation.
15        Q. These were notes that you prepared?
16        A. Yes.

**KAPLAN, DAVID** - *02/11/2022*

**Page 53**

53 :10        Q. Okay. And what was the context in
11    which you prepared these internal notes?
12        A. So, it looks like there were two
13    questions or matters that we were looking to
14    discuss. That I was looking to discuss with
15    my colleagues.
16          One was just kind of an update on
17    the credit ratios. And then, the other -- and
18    I guess it was -- it was related to the
19    development that the -- the strategy
20    Johnson & Johnson had, of putting the talc
21    liabilities into an entity and settling it
22    that way.

**KAPLAN, DAVID** - *02/11/2022*

**Page 56**

56 :24        Q. If you turn to the -- if you scroll
25    to the third page, it says "Item two.
57 :1    Cordoning off Talc Liabilities."
2          Do you see that? On page
3    three.
4        A. Yes.
5        Q. Okay. And do those notes reflect
6    what you learned in your conversation with the
7    company?
8          MR. STARNER: Objection.
9        A. Some of it might. Again, I don't
10    recall. I mean, some of it clearly is based
11    on media. I see some references here to some
12    of the research I've done myself, referring to
13    other companies that have taken this approach.
14          So it's hard for me to discern what
15    I may have heard directly from the company,
16    versus what I may have gathered from, you
17    know, other sources I viewed as reliable or --
18    and you can see here various links -- URL
19    links to articles that I referenced again for,
20    the benefit of my colleagues who may want to
21    read the entire article.
22        Q. Do you have underlying notes that
23    you took when you discussed the talc strategy
24    with Michelle Ryan, which you used to prepare

25    this internal document?

58 :1         A. I should. Those should be saved in
2    RDR. I try to be pretty diligent about that.
3         Q. And did you prepare this internal
4    document, based on the notes that you take of
5    your conversation with Michelle Ryan?
6         A. That would be one of the inputs that
7    would go into these -- into drafting these --
8    this memo, if you will.
9         Q. Okay.
10        A. In addition to media -- media
11   sources that we view as reliable. Company
12   press releases, et cetera.
13        Q. And do you see the reference to the
14   objectives with this tactic? I think that's
15   the fifth bullet point.
16        A. Yes. I see that.
17        Q. Those -- again, the identification
18   of those objectives, that's based on your
19   conversation with Michelle Ryan?
20             MR. STARNER: Objection. Calls
21   for speculation.
22        A. I -- some of it would be. Some of
23   it could be -- we definitely had a
24   conversation with Michelle about the
25   objectives. And if I actually -- this is a

59 :1    vague recollection -- was that maybe some of
2    it, she wasn't a hundred percent sure.
3             But, I mean, the first one -- the
4    idea -- the objective is that it allow the
5    company to move on. I believe that was
6    something that she shared with us. I think I
7    had asked her whether that prevents bellwether
8    cases, and I think she wasn't certain.
9             But that was, kind of, maybe
10   something I had read. And then, I think, I
11   don't recall about the punitive damages. If
12   that was also something that I had read, or
13   understood from other experience, versus
14   something that she had said.
15            But I think my recollection is that
16   it -- yeah. Well, the -- two benefits are
17   it accelerates the resolution, and I think
18   it -- it contains or limits the -- the
19   maximum.
20            So both a timing perspective, and a
21   quantification. But I don't recall if bullets
22   two and three were something that Michelle had
23   said, or something that I had come to with my
24   own understanding or readings.
25        Q. But those -- those first two points

60 :1    about accelerating and capping the liability,
2    those are two points that you do recall
3    discussing with Ms. Ryan?
4             MR. STARNER: Objection.
5    Mischaracterizes the document.
6    Mischaracterizes the witness' testimony.
7        Q. You can answer, Mr. Kaplan.
8        A. I -- I don't recall -- well, the
9    first one, that it allows the company to move
10   on, to kind of settle it and put this behind
11   it, was something that I -- I recall hearing
12   directly from the company.
13            My understanding -- I think, if I
14   recall correctly, I had asked whether the --

15    it also prevents bellwether cases. Because
16    I -- the company had a large case -- was a
17    large liability, 4.7 that went down to 2.1.
18            So I was kind of curious about that
19    or interested in understanding that. That was
20    something that I understood to be a benefit,
21    but I don't recall if I heard that directly
22    from the company.
23            And then, whether it caps it. Yeah.
24    I don't recall. I don't recall. It's been a
25    while. I'm sorry. But if -- yeah.
61 :1        Q. What did you understand the company
2    meant when it referred to quantifying the
3    obligation?
4        A. So, again, I've had some experience
5    with companies -- companies that I covered
6    previously, that had liability relating to
7    pelvic mesh, medical device companies. And,
8    you know, it kind of stretched on for years
9    and years, and it kept growing.
10            So the ability to set a -- and
11    there's, you know, a lot of uncertainty, both
12    you know, in the media investors. So the
13    ability to establish an amount, and have that
14    be final, is a positive in a sense, from a
15    credit perspective, in the sense that it
16    reduces uncertainty.
17            So, again, hypothetically, from a
18    credit personality, you might rather a company
19    have -- let's say in the case of opioids, you
20    know, Johnson & Johnson, you know, has agreed
21    to a $5 billion settlement.
22            We might rather see a company have a
23    $5 billion settlement and be certain about it,
24    than have an estimate of $3 billion and have,
25    you know, a 10 percent chance that it could be
62 :1    $10 billion.
2            So that the certainty is positive,
3    from our perspective. And then from a timing
4    perspective, you know, as long as the case is
5    active, you know, there tends to be, kind of,
6    negative discussion in the media.
7            So, being able to resolve it and put
8    it behind you, is positive from a -- a
9    reputation perspective. You know, it moves
10    the conversation on from -- from -- the
11    conversation among investors from this matter
12    to, you know, the business fundamentals; the
13    profits; the growth; the opportunities.
14            So, there were clearly -- there
15    clearly are benefits, as we see it from -- as
16    we assess creditworthiness, to having this
17    behind -- resolved, in the sense that it's --
18    the amounts are quantified and final. And
19    that the matter is no longer uncertain.

KAPLAN, DAVID - *02/11/2022*

**Page 70**

70 :12        Q. Let me ask you this question.
13    Earlier in the deposition, we saw a note in
14    which the -- in which you reported that the
15    company had estimated $7 billion to $7.5
16    billion, as what you described as a worst case
17    scenario.

18          Do you remember that?
19      A. Yes.
20      Q. Do you remember that projection
21  changing over the course of the next several
22  months in your conversations with the company?
23      A. I do not -- I do not recall any
24  other -- yeah. No, I don't.
25      Q. So you don't recall the $7 billion
71 :1  to $7.5 billion projection changing in one
2   direction or the other?
3       A. As a worst case -- as a worst case
4   scenario, no, I do not. I do not recall any
5   change to that.
6       Q. Okay.

## KAPLAN, DAVID - *02/11/2022*

**Page 78**

78 :23      Q. And did you understand -- did you
24  understand that it was important to
25  Johnson & Johnson to remove that negative
79 :1  outlook?
2           MR. STARNER: Objection.
3       A. So, I don't -- well, it's hard to
4   say. You know, when -- the primary benefit
5   for most companies, I think that they gain
6   from their rating, is that -- the interest
7   rate in which lenders will lend to them.
8           So, a lot of lenders look at the
9   ratings that we, Standard, or S&P Global, or
10  other rating agencies provide, to rely on that
11  for credit worthiness.
12          So, a company whose rating is
13  Triple A, would presumably get -- be able to
14  borrow money at a lower rate, than a company
15  that was a rating notch down; Double A plus.
16          But my understanding is that the
17  incremental difference is extremely modest at
18  those levels. So, we're not as close to the
19  pricing.
20          But from an economic perspective,
21  you know, I think the value -- there is some
22  value, I think, of every higher rating in
23  terms of borrowing cost. But it's relatively
24  modest at that level.
25          For Johnson & Johnson, because the
80 :1  Triple A rating is so rare, I believe we only
2   have two corporate companies that have
3   Triple A. Johnson & Johnson and Microsoft, at
4   this point.
5           It used to be more common, but
6   companies have gradually increased their
7   leverage over time. So, because it's rare,
8   it's a little bit of a -- a -- it can't be
9   perceived as kind of being a sign of high
10  quality.
11          Obviously, the rating only reflects
12  the credit worthiness, but Johnson & Johnson
13  is a company that, you know, takes pride in
14  its quality and reputation. So it could be
15  used as kind of a -- you know, strengthening
16  the company's image.
17          You know, it's our understanding
18  that, you know, Johnson & Johnson does view
19  the Triple A rating as being more than just

20      the -- you know, the credit benefit in terms
21      of borrowing cost.

**KAPLAN, DAVID** - *02/11/2022*

Page 82
82 :2           (Exhibit 392 marked for identification)
3                       MR. SHAPIRO: 392. Thank you.
4                       THE WITNESS: Okay. I have an
5               email here from Duane to me, on November
6               1st 2021.
7       BY MR. SHAPIRO:
8               Q. Do you see that it refers to a
9       discussion earlier in the day of Project
10      Diamond?
11              A. Yes.
12              Q. And do you recall discussing Project
13      Diamond with Michelle Ryan and
14      Duane Van Arsdale?
15              A. Yes.
16              Q. Okay. And what was your
17      understanding of Project Diamond?
18              A. So, the company was planning to
19      announce a change to the business, where they
20      were going to separate the consumer business.
21                      So, Johnson & Johnson has three --
22      three large businesses. A pharmaceutical
23      business. A medical device business. And a
24      consumer business.
25                      And so, they were going to separate
83 :1   that, using some mechanism which was not yet
2       defined. That would, you know, make the
3       company, you know, change the dynamics of the
4       company, so the company would be smaller.
5       Less diverse.

**KAPLAN, DAVID** - *02/11/2022*

Page 83
83 :25          Q. And did you make notes of your
84 :1   meeting with Mr. Van Arsdale and
2       Michelle Ryan, relating to Project Diamond?
3               A. I believe I would have. Yes.
4               Q. And do you expect that those notes
5       are in RDL?
6               A. RDR.
7               Q. RDR.
8               A. Yes.
9               Q. Sorry.
10                      MR. SHAPIRO: And let me mark
11              as Exhibit 393, a document Bates stamped
12              "SPGI1115_001" through "1115_004." And
13              this is tab N.
14      (Exhibit 393 marked for identification)
15                      THE WITNESS: Okay. So yeah.
16              I see a document with a lot of green
17              highlighting.
18      BY MR. SHAPIRO:
19              Q. Do you recognize these notes,
20      Mr. Kaplan?
21              A. Yes.
22              Q. Are these your notes?
23              A. Yes.
24              Q. And are these the notes you took

25   when you met with Mr. Van Arsdale and
85 :1   Ms. Ryan?
2       A. No. So these notes -- so I
3   mentioned kind of when we had the more formal
4   review, there are certain processes. We have
5   a web-based platform that we use to create the
6   document that we share with the committee. We
7   refer to that document as a "RAMP."
8           Sometimes, I find it cumbersome to
9   work in the web-based platform, so I would
10   draft it in Microsoft Word, and then kind of
11   paste it in. Sometimes, again, this is kind
12   of my own document. It's not kind of the
13   formal record.
14           I would use kind of green
15   highlighting to -- as a reminder that either
16   I'm satisfied with this section, or that I've
17   pasted it into the RAMP. Green being go, or
18   good.
19           And then, you know, if there are
20   sections that there's -- you know, I still
21   have questions, I might highlight those as
22   yellow.
23           So, this is kind of -- I would say
24   kind of my preparation or work-in-process
25   document. Here are some things that I had
86 :1   planned to include in the -- in the RAMP.
2           So, this is kind of my own loose
3   form notes in preparing the -- the formal RAMP
4   document.
5       Q. So you would have taken the -- you
6   would have taken the portions of these notes
7   that you've highlighted in green and inputted
8   that into the company's RAMP system?
9       A. Into S&P Global's system, to prepare
10   the RAMP. Yes.
11       Q. To prepare the "ram." And what does
12   "ram" stand for?
13       A. I'm sorry. It's "RAMP." R-A-M-P.
14   I'm not sure.
15       Q. Okay. And the RAMP system is the
16   system through which you present your
17   discussion points to other people at S&P, in
18   preparation for committee review meeting?
19       A. So, the system is not called "RAMP."
20   We have a lot of systems that we use. But the
21   system is called "RAMP Online" or referred to
22   as "ROL."
23           And that's the platform we use to
24   prepare the document. Once we're done, we
25   create a PDF, and then we share it with
87 :1   colleagues that way. So --
2       Q. You share it with colleagues in
3   preparation for what meeting?
4       A. If a formal event-driven committee.
5       Q. Okay. And the prospect of Project
6   Diamond resulted in an event-driven formal
7   committee meeting?
8       A. Yes.

**Page 88**
88 :18       Q. And do you see that you wrote:
19           "Company has filed a subsidiary

20    into bankruptcy to accelerate settlement of
21    talc litigation. This reduces the risk of
22    punitive damages, speeds up the process and
23    enhances JNJ's negotiating position.
24    Ultimately, the Court decides how much the
25    company has to set aside."
89 :1         Do you see that?
2         A. Yes.

**KAPLAN, DAVID** - *02/11/2022*

**Page 91**
91 :11    Q. And it says:
12         "Ultimately, the Court decides
13    how much the company has to set aside. We
14    assume $4 billion."
15         Do you see that?
16    A. Yes.
17    Q. And that assumption was based on
18    your conversations with the company?
19         MR. STARNER: Objection.
20    A. No. I'm sorry. That was not --
21    that number was something that we -- was my
22    recommendation, I think initially. And then
23    it was accepted by my colleagues.
24         And so, we'd been -- at this point,
25    this is kind of the established assumption.
92 :1    You know, I think at this point, the company
2    has served $2 billion. We assumed that that
3    was kind of a starting point. Layered on some
4    conservatism.
5         It looks like we had some numbers,
6    you know, in terms of a worst case scenario.
7    So this seemed to be, you know, based on a
8    little bit of a gut feeling to be conservative
9    but not extremely so, as a reliable base case.
10         But that was a number -- the
11    $4 billion was a number we came to --
12    initially, I came to, but ultimately, it's a
13    decision that's done with my colleagues, that
14    we came to.
15         And that's what -- that's what we
16    have currently in our measure of debt. So,
17    our current measure of debt includes an
18    assumption of $10 billion of liabilities for
19    legal matters; $5 billion for opioid;
20    $4 billion for talc; $1 billion for
21    Respiradal.
22         And then we take that $10 billion,
23    and we discount it by 21 percent. Which is
24    a standard haircut to reflect the tax benefits
25    of those liabilities. So that's $7.9 billion.
93 :1         And that's what we have reflected in
2    our measure of debt today. A $7.9 billion
3    adjustment for after tax; for legal matters;
4    comprehensive of those three -- three big
5    issues.
6    Q. Did you discuss the $4 billion
7    assumption with the company?
8    A. I think I've communicated it. I
9    would not necessarily have discussed it with
10    them before we came to a conclusion. But I
11    would have communicated that it may be in some
12    of the publications.
13         So, for example, the adjustments we

14  make to debt, investors have access to that.
15  So an investor who subscribes to our platform
16  can see that $7.9 billion adjustment.
17          So I would have been transparent
18  with any investor who would have asked me, if
19  the company asked me. And I would have been
20  -- freely communicated that to the company,
21  once it was -- and it would have been freely
22  communicated to that company.
23          So, I believe I communicated to the
24  company, but that would have not -- that would
25  not have been something -- excuse me -- that
94 :1 would not have been something that we arrived
2  at in conversation, or in dialogue with the
3  company.
4          That would be something that we
5  would have independently arrived at, you know,
6  as part of our role as independent valuators
7  of credit risk.
8          Q. And you didn't discuss with the
9  company whether or not that estimate was
10  reasonable?
11          A. I don't recall. And I would not
12  have felt any reason to be compelled to
13  discuss that with the company.
14          Those are the type of things --
15  those decisions that we make independent --
16  independently.
17          Q. What information did you receive
18  from the company, which led you to conclude
19  that $4 billion was a reasonable estimate?
20          MR. STARNER: Objection.
21          A. So, I think one data point would be
22  the $2 billion reserve. You know, compounded
23  by our knowledge and experience that those
24  reserves tend to be kind of low end of the
25  range.
95 :1          Yeah, I don't recall if the seven
2  point -- $7 billion to $7.5 billion, worst
3  case scenario was kind of still in my
4  recollection at that time. But that would
5  have been another variable. So somewhere
6  between two and seven and a half. Could have
7  been that.
8          And then, you know, we often try to
9  layer on a little bit of conservatism. So
10  just for example, if a company is projecting
11  five to seven percent growth, we might, you
12  know -- for the coming year, we might say,
13  well, let's assume, be a little bit
14  conservative. Assume four to five.
15          So, again, as a credit rating
16  agency, lenders tend to be more focused on the
17  downside than the upside, because of the
18  nature of the investment, which doesn't --
19  they don't share in the upside. They share
20  primarily on the downside.
21          So we tend to be a little bit
22  conservative. So there is some, you know,
23  measure of conservatism in there, relative to
24  the reserve of $2 billion.
25          You know, I guess it doesn't feel
96 :1 like, with those numbers, the $2 billion
2  dollars -- the $7.5 billion dollars -- it
3  doesn't feel like you could be off too much.

```
 4      And, again, a couple billion is not very
 5      material for a company of this scale.
 6          Q. And you --
 7          A. There is not a -- kind of a -- an
 8      exact formula how we got to it. It's
 9      judgment, if you will.
10          Q. And the $2 billion reserve that
11      you're referring to, is that the amount that
12      Johnson & Johnson set aside to fund the
13      anticipated trust in bankruptcy?
14          A. Right. Right. Yes. I don't
15      recall. Again, I'm trying to recreate the
16      thought process. I don't remember exactly
17      when we heard about the $2 billion.
18          But if we heard about the $2 billion
19      before we established a $4 billion, then that
20      would have been something we would have input.
21      It's hard to recall my thoughts from many
22      months ago.
23          MR. SHAPIRO: Let me mark as
24      Exhibit 394, a document Bates stamped
25      "SPGI1124_1" through "_66." And that's
97 :1   tab O in the PDF.
 2          (Exhibit 394 marked for identification)
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 98**
```
98 :8       MR. SHAPIRO: Sorry. Go ahead.
 9          THE WITNESS: This looks to
10      be -- this is the -- the formal committee
11      package event-driven review that was --
12      we pursued, following the information
13      about the company's plan to separate its
14      consumer health business.
15          I recognize the package. Yes.
16      BY MR. SHAPIRO:
17          Q. And you've prepared this package in
18      the aftermath of learning about Project
19      Diamond?
20          A. Right. Likely with some assistance
21      from our kind of more junior staff. But yes.
22      I would have been responsible for the contents
23      of it.
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 102**
```
102 :21     Q. And if you turn to page 12 of 66, do
22      you see there is a litigation update?
23          A. Yes.
24          Q. And the information there reflects
25      the information that was in your notes that we
103 :1  looked at earlier? Do you see that?
 2          A. I mean, I haven't -- I haven't
 3      cross-referenced it, but that would make
 4      perfect sense to me. That's what I would
 5      expect.
 6          Q. And do you see in the second bullet
 7      point, you explain to the committee that the
 8      filing of the subsidiary into
 9      bankruptcy reduces the risk of punitive
10      damages, speeds up the process, and enhances
11      JNJ's negotiating position?
```

12          **Do you see that?**
13          **A. Yes.**
14          **Q. And those are all -- those are all**
15   **points that you communicated to the committee?**
16          **A. Yes.**

## KAPLAN, DAVID - *02/11/2022*

**Page 105**
105 :9          **Q. And when you ultimately shared the**
10   **credit note with Johnson & Johnson, did they**
11   **take issue? Did Johnson & Johnson take issue**
12   **with your $4 billion assumption?**
13              **MR. STARNER: Objection.**
14          **A. I don't recall if we were explicit.**
15   **But I think the company -- I would say you**
16   **know, kind of our conversations with**
17   **Johnson & Johnson have been -- our rapport or**
18   **dialogue is -- I feel is relatively open. And**
19   **so, they appreciate, you know that we are**
20   **independent.**
21          **We do -- the -- when we send the**
22   **draft of a note to the company, if the company**
23   **has any feedback, we save that as a record,**
24   **and, also in the RDR system. So that -- that**
25   **would be in that record.**
106 :1          **I don't recall if they -- I don't**
2   **recall if I was explicit about the $4 billion.**
3   **I don't recall if the company had any**
4   **objection to that.**
5          **Meaning, if possibly, I had that as**
6   **explicit and they said, remove it. I don't**
7   **recall that being the case.**
8          **Q. Were there --**
9          **A. There would be a record of that.**
10          **Q. Were your conversations with the**
11   **company consistent with your assumption of**
12   **$4 billion?**
13          **A. Yes.**

## KAPLAN, DAVID - *02/11/2022*

**Page 108**
108 :17          **Q. We were in Exhibit 394. And I**
18   **wanted to ask you about page -- let me ask you**
19   **to turn to page 22 of 66.**
20          **A. Okay.**
21          **Q. Do you recall that this is the**
22   **Project Diamond presentation that**
23   **Michelle Ryan and Van Arsdale made to you on**
24   **November 1st?**
25          **A. Yes.**
109 :1          **Q. And we'll attach this to the**
2   **committee package? Correct?**
3          **A. Correct.**
4          **Q. And if we turn to page 32 of 66,**
5   **there is a pro forma for the spun off JNJ**
6   **consumer company. Do you see that?**
7          **A. Yeah. Let me just flip that. But**
8   **yes. I see that.**
9          **Q. Let me -- let me back up for a**
10   **second. JNJ RemainCo. Is that the spun off**
11   **consumer health business? Or is that -- is**
12   **that what remains of the existing business?**

13        A. You know, so that is on slide --
14    okay, I guess on page 31 and 32 of 66. The
15    JNJ -- the expectation -- well, this is, as a
16    simplification, this projection assumes that
17    the consumer businesses separated on
18    January 1st 2023, which is a simplifying
19    assumption.
20            And so, 2021 and 2022 represents the
21    company as is. And 2023 and beyond, represent
22    the remaining pharmaceutical and medical
23    device company without the consumer business.
24        Q. Got it. Got it. Okay. And do you
25    see on page 32 of 66, there is a line item
110 :1    that says, "Talc Opioid Settlement Payments?"
2            Do you see that?
3        A. Yes.
4        Q. And did you understand that RemainCo
5    would be paying the talc opioid settlement
6    payments as a result of this presentation?
7            MR. STARNER: Objection.
8        A. Yes. That was my interpretation.
9        Q. And did you discuss the settlement
10    payments in the presentation that you received
11    from Michelle Ryan and Van Arsdale?
12        A. So, the presentation would have been
13    part of a meeting where they went through it
14    and discussed it.
15            I don't remember if I had specific
16    questions, or how much detail they elaborated
17    on it. But it would have been something that,
18    you know, we would have been interested in,
19    for sure.
20        Q. And do you see that
21    Johnson & Johnson is projecting roughly
22    $11 billion in settlement payments for talc
23    and opioid?
24        A. Yes.
25        Q. And was that information an input
111 :1    into your assumption, that the talc
2    liabilities could be resolved for roughly
3    $4 billion?
4            MR. STARNER: Objection.
5        Lacks -- mischaracterizes the testimony.
6        A. This -- well, this, we established a
7    4 billion-dollar estimate before we got this
8    presentation. So this -- that we haven't
9    changed it as a result of this presentation.
10            But it -- so, I guess I would say
11    the $4 billion was not influenced by this, in
12    the sense that again, we got this in -- was it
13    November of 2021? I believe the
14    $4 billion-dollar estimate, you know, preceded
15    that in time.
16        Q. And nothing you heard from the
17    company in this November 1st presentation
18    changed your $4 billion-dollar assumption?
19        A. That's correct.
20        Q. And that presentation included a
21    description of the anticipated settlement
22    payments for talc and opioid?
23        A. Correct? That's what --
24            MR. STARNER: Objection.
25    Sorry.
112 :1            THE WITNESS: That's what --
2            MR. STARNER: Mischaracterizes

```
3        the document. Lacks foundation.
4              THE WITNESS: Yeah. Right. I
5        mean I wouldn't say that -- this is -- my
6        interpretation is not that this -- the
7        company has great confidence in this.
8        But that this is a base case that we
9        could use for our purposes. I don't know
10       if, you know --
11    BY MR. SHAPIRO:
12       Q. My question, Mr. Kaplan, was just
13    simply whether or not the anticipated
14    settlement payments for talc and opioid were
15    part of the presentation on November 1st.
16       A. Yes.
17       Q. That was the subject of the company
18    address. Correct?
19       A. Yes.
```

### KAPLAN, DAVID - *02/11/2022*

**Page 119**
```
119 :4              MR. SHAPIRO: There we go. So
5        this is Exhibit 396. And it's Bates
6        stamped "SPGI1143001" through "1143006."
7     BY MR. SHAPIRO:
8        Q. Mr. Kaplan, earlier, you testified
9     about the credit note that would follow the
10    committee review. Do you recall that?
11       A. Yes.
12       Q. And is this the credit note that
13    followed the committee review?
14       A. This is a draft of it. There could
15    be multiple iterations, but this is one draft.
```

### KAPLAN, DAVID - *02/11/2022*

**Page 120**
```
120 :16       Q. And the credit note that was
17    ultimately published, is publicly available.
18    Correct?
19       A. Correct. I mean, we do have a
20    subscription service. So not everyone is --
21    it's not accessible to everybody, but it's --
22    it's available to all of the subscribers.
23       Q. And so, the credit note that was
24    ultimately published is a document that would
25    have been subject to Johnson & Johnson's
121 :1  input?
2        A. Yes.
3        Q. Okay. And let me ask you to turn to
4     page two of this document. At the bottom of
5     the page. Do you see that their credit note
6     included an estimate of litigation liabilities
7     at the bottom of this page?
8        A. Yes.
```

### KAPLAN, DAVID - *02/11/2022*

**Page 121**
```
121 :24       Q. And did the estimate that you
25    ultimately included in the credit note
122 :1  incorporate your 4 billion-dollar assumption
2     for talc?
3        A. Yes. Yes. So this represents
```

4    $5 billion for opioids. Four for talc. One
5    for Respiradal, which is $10 billion pretax.
6    Discounting it 21 percent for tax, gets you to
7    7.9, which I just wrote at about $8 billion.
8        Q. And understanding that as you sit
9    here this morning, you don't know whether this
10   final paragraph is the paragraph that made it
11   into the final?
12           Understanding that point, you
13   don't recall any conversation with the
14   company, where the company said that the talc
15   estimate incorporated into the litigation
16   estimate should be higher or lower?
17           MR. STARNER: Objection.
18       A. Correct. I have no recollection of
19   the company objecting to the numbers that I
20   put in the final report, or that I shared with
21   them.

### KAPLAN, DAVID - *02/11/2022*

**Page 160**

160 :3       Q. Okay. But I guess my question is,
4    there was no point in time where JNJ came to
5    you and said, "Here is our estimate of what it
6    would cost to litigate all of the cases in
7    court, you know, into the future?"
8           MR. SHAPIRO: Hang on.
9        Objection. Leading. And asked and
10       answered.
11       Q. Go ahead. Sorry.
12       A. Yeah. We never had a discussion. I
13   don't recall any discussion of the company
14   providing an estimate of what it would cost to
15   litigate -- yeah.
16           You know, obviously, there is a lot
17   of uncertainty, you know, with that, and how
18   that pattern of wins versus losses goes. And
19   so, we never had such a discussion in that
20   way.
21       Q. Right. And just in terms of the
22   uncertainty, can you give me a sense -- you've
23   talked a little bit about the reputational
24   issues.
25           Were there other kind of issues
161 :1   of uncertainty that would come in play, in
2    your mind?
3        A. So, I mean, the longer, you know,
4    the company's name is dragged in the media in
5    a negative way. Then it also, kind of, you
6    know, increases the harm. You know, if it's
7    short-lived and everybody moves on.
8           But if it drags on for a decade,
9    it's harder to shake that negative reputation.
10   So, in that sense, you know, a quicker
11   resolution from -- we viewed as being more
12   favorable from a credit perspective.
13       Q. And is it fair that these estimates
14   that we've been talking about were -- that the
15   company was talking to you about, was in the
16   context of a -- a quicker settlement, you
17   know, to get that certainty? And not in
18   connection with projecting out what it would
19   cost to litigate the cases into the future?
20           MR. SHAPIRO: Objection.

```
21          Leading. It's also unclear as to which
22      estimates you're talking about.
23          A. We -- I don't think it was
24      specified. I don't -- I never thought of it
25      as being an estimate in one form of settlement
162 :1  versus the other. I was just thinking about
 2      it in economic terms.
 3          Q. But you understood when they talked
 4      about, you know, settling talc, you understood
 5      it to be a settlement in the near term.
 6      Right?
 7              MR. SHAPIRO: Objection.
 8          Leading.
 9          A. So, we understood that they had a
10      presence to -- to, you know, get this resolved
11      quicker. After the company started to reserve
12      some amounts in late Q4 -- in late 2020, we
13      understood that that had become part of the
14      strategy.
15              You know, I think when thinking
16      about those numbers, you know, there was kind
17      of the precedence of some of the settlements
18      that had occurred.
19              There were, in some of the prior
20      files, 25,000 claimants times a hundred
21      thousand dollars, or whatever it was. So,
22      maybe that's how the numbers came about.
23              But it was -- yeah. I mean, so I
24      guess thinking -- reflecting on it, perhaps
25      that was the intent. You know, it wasn't
163 :1  something that I had placed a lot of focus on,
 2      as this being the cost, one way versus
 3      litigation being the cost the other way.
 4              You know, I think the litigation,
 5      while obviously, it's longer, it's also less
 6      certain. So, you know, I guess with the
 7      benefit of hindsight, maybe it makes sense to
 8      say that, the estimate was more of a
 9      settlement approach.
10              But it wasn't something that I was
11      thinking about as kind of being a -- an amount
12      that's dependent on which approach is taken.
```

KAPLAN, DAVID - *02/11/2022*

**Page 165**
```
165 :6          Q. This is a document we looked at
 7      earlier, Mr. Kaplan.
 8          A. Okay.
 9          Q. If you go down to the bottom
10      section? This is the section called "Talc
11      settlements."
12          A. Okay.
13          Q. And these are your notes. Right?
14          A. Yes.
15          Q. And these are notes where you're
16      talking about certain settlements that JNJ
17      entered into, in connection with the talc
18      litigation?
19          A. Correct.
20          Q. And you were asked some questions
21      about that -- the last sentence; that number
22      $7 billion to $7.5 billion? Do you recall the
23      questions you got on that?
24          A. Yes.
```

```
      25           Q. And just so I'm clear, that number
166 :1      is not a number that you recall the company
      2      providing to you, and suggesting that reflect
      3      the cost of litigating the talc litigation in
      4      court into the future?
      5               MR. SHAPIRO: Hang on.
      6      Objection. Leading.
      7           A. Not -- not specifically. I mean,
      8      two points. One is that, again, the way I've
      9      articulated here, which would have been, is
      10     one that is as much as. So this is kind of a
      11     worst case scenario.
      12              And, again, I have no recollection,
      13     or no -- I did not pay attention to the
      14     distinction between settling versus
      15     litigating. It's more focused on what's the
      16     economic cost.
      17          Q. Okay. So this was a -- an estimate
      18     of what the company indicated would be the
      19     economic cost to settle the talc litigation?
      20              MR. SHAPIRO: Objection.
      21     Leading. Asked and answered.
      22          A. To resolve.
      23          Q. Okay.
      24          A. What I would think of as "resolve."
      25     So I would -- wherever I write "settle," you
167 :1      think of it as being resolved, rather than
      2      maybe the legal distinction between settling
      3      versus litigation.
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 169**

```
169 :14          Q. But you understood that in order to
      15     get the certainty we've been talking about,
      16     and trying to resolve this, they couldn't let
      17     the litigation, you know, continue for
      18     decades. Right?
      19              MR. SHAPIRO: Objection.
      20     Leading. Asked and answered.
      21          A. So the question is, did I understand
      22     that it would take decades to litigate this?
      23     Again, I'm -- I would have thought that an MDL
      24     process would have maybe taken a couple of
      25     years. I don't know.
170 :1               I didn't -- I didn't -- I understood
      2      that there was a desire to accelerate it.
      3      There was an unwillingness or, you know, a
      4      willingness to litigate if it was not going to
      5      be resolved for this amount. So, therefore,
      6      it would not likely cost more than this.
      7               I know that the company -- the
      8      company had shared with me that they had won
      9      many cases. You know, in these -- either
      10     initially, or on appeal.
      11              And so, again, the exact route to
      12     getting to that amount, you know, was not
      13     something that I focused on. You know, I was
      14     conservative, in assuming that those amounts
      15     were paid out soon, that's a conservative
      16     assumption.
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 171**

171 :7    **Q. But I'm just kind of focusing on the**
8    **conversation you had with the company. Did**
9    **you understand that they were, you know,**
10    **exploring a potential settlement of the talc**
11    **litigation? And that was informing any**
12    **estimate they are providing to you?**
13    **MR. SHAPIRO: Objection.**
14    **Leading. Asked and answered. And lacks**
15    **foundation.**
16    **A. So, the inclusion of the information**
17    **in these two indented bullet points kind of**
18    **refer to settlements that were made. And a**
19    **willingness to settle.**
20    **And, again, a desire to accelerate**
21    **it. You know, a willingness to settle more**
22    **broadly at, you know, a price -- at a price**
23    **that they felt was -- I don't know if**
24    **"reasonable" is the right word -- but**
25    **acceptable.**
172 :1    **Q. Will you agree with me, Mr. Kaplan,**
2    **that the discussion of the talc settlements,**
3    **these are settlements that the company agreed**
4    **to, outside of court?**
5    **Is that consistent with your**
6    **understanding?**
7    **A. These cases that are referenced in**
8    **the indented bullet points? Yes. Those are**
9    **settled out of court.**
10    **Q. And so, you were talking to**
11    **Johnson & Johnson about talc cases that they**
12    **had settled outside of court. Right?**
13    **A. Yes.**
14    **MR. SHAPIRO: Just hang on.**
15    **Objection to the last question.**

**KAPLAN, DAVID** - *02/11/2022*

**Page 174**

174 :25    **Q. But you understand that, ultimately,**
175 :1    **the company was required to pay this judgment**
2    **of $2.1 billion as part of this -- this case**
3    **that was litigating. Right?**
4    **A. Yes. That was not -- that did not**
5    **yet occur at the date of this document. But**
6    **yes.**
7    **Q. And you know, you'll agree with me**
8    **that in terms of that, the $7 billion to $7.5**
9    **billion number -- you'll agree with me that if**
10    **you have, you know, a few of these type of**
11    **judgments of this magnitude, that would**
12    **quickly exceed that estimate. Right?**
13    **MR. SHAPIRO: Objection.**
14    **Leading. Speculative.**
15    **A. Yes. 2.1 times only a small number**
16    **exceeds seven and a half.**
17    **Q. And there are tens of thousands of**
18    **these cases that are still pending. Right?**
19    **At in point in time?**
20    **A. Correct.**
21    **Q. Okay. And so, is it fair to say**

22   that the idea of $7 billion to $7.5 billion,
23   that that would be -- that wouldn't
24   necessarily be an estimate of what the
25   potential exposure would be if all of these
176 :1   cases were litigated to a verdict?
2           MR. SHAPIRO: Objection.
3   Leading. Asked and answered.
4     A. I think -- I think what you're
5   saying is logical.

## KAPLAN, DAVID - *02/11/2022*

**Page 177**
177 :18     Q. Okay. And if you scroll down to the
19   talc settlement section again? And if you go
20   to the top of the next page, you see there is
21   a reference to:
22         "The company expects payment
23   would be $2.5 billion a year in 2021, 2022,
24   and 2023."
25         Do you see that?
178 :1     A. Yes.
2     Q. Is that consistent with
3   your understanding that they were talking
4   about the idea of structuring a potential
5   settlement, where there would be a payout in
6   these periods of time?
7           MR. SHAPIRO: Objection.
8   Leading. And vague.
9     A. You know, I hear what you're
10   suggesting. I don't recall paying a lot of
11   attention to the -- the -- the exact mechanics
12   of how that settlement would work out.
13     Q. But you'll agree with me that
14   what -- you're saying here -- this is again
15   based on your conversation with the company.
16       That they were telling you that
17   to the extent they were estimating $7 billion
18   to $7.5 billion to resolve the talc
19   litigation, that they would anticipate paying
20   out on that amount, to resolve those claims
21   over these three-year period.
22        Is that fair?
23     A. Yes. So the statement says, "the
24   company expects." That would have been
25   something that I heard directly from the
179 :1   company. As opposed to another statement that
2   doesn't say that. That would be my own
3   thinking.
4     Q. Okay. And is that -- so, was it
5   your understanding that the company did not
6   expect that their estimate of $7 billion to
7   $7.5 billion would reflect having to litigate
8   these claims past 2023?
9     A. That would be implied. Yes.
10     Q. And is that consistent with your
11   discussions with the company?
12     A. Again, I don't recall the
13   conversation. But this is, you know, kind of
14   a reflection of my -- a recollection of the
15   conversation at that point, on the date of
16   this document.
17       That it implied that the amounts
18   would be as much as seven and a half billion
19   dollars, and that they would be paid out over

```
20    the next couple of years.
21           So, again, it's the company's
22    estimate of worst case scenario. And it's the
23    company's expectations for payments.
24        Q. Okay. But is it fair that you don't
25    recall any discussions with anybody at JNJ, to
180 :1    suggest their estimate of the $7 billion to
2    $7.5 billion, to resolve the talc liability,
3    would involve litigating talc claims, you
4    know, past 2023?
5           Is that fair?
6           MR. SHAPIRO: Objection.
7    Leading. Asked and answered.
8        A. Right. Not specifically. Again,
9    the company did articulate in the other email,
10    that if they don't settle for that amount,
11    then they could contemplate litigating.
12           But in this scenario, they
13    contemplated resolving it fully by 2023.
14        Q. Okay. So just to make sure I
15    understand that. So is it your understanding
16    that the company indicated that if they
17    couldn't settle for this amount, then they
18    would litigate the talc claims going forward?
19        A. Yes.
20           MR. SHAPIRO: Objection.
21    Leading. And misstates his testimony.
22        Q. So that was a yes, Mr. Kaplan?
23        A. Yes. My understanding was that if
24    the company could not settle for $7 billion to
25    $7.5 billion, that they would contemplate
181 :1    litigating it for a longer period of time.
2           Even though it would take a longer
3    period of time.
4        Q. Understood.
5        A. Or notwithstanding the fact that it
6    would take a longer period of time. Yes.
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 191**
```
191 :6           MR. STARNER: 399. Excuse me.
7    Let's mark exhibit -- lets mark
8    Exhibit 399, which is Bates stamped,
9    "SPGI80_1" through "5."
10    (Exhibit 399 marked for identification)
11    BY MR. STARNER:
12        Q. If you look at the top here, you'll
13    see an email -- it's an email from Ms. Kwan to
14    you, in April 2019. Do you see that,
15    Mr. Kaplan?
16        A. Yes.
17        Q. Does this refresh your recollection
18    about who Patricia Kwan is?
19        A. Yes. I mean, I don't know who she
20    is, but I vaguely recall this. This was, you
21    know, very early in the development, in terms
22    of the talc case, as we were thinking about
23    it.
24           But okay.
25        Q. Okay. What is Ms. Kwan's role at
192 :1    S&P?
2        A. She looked to be a director. I
3    don't think I had much -- I had much
4    interaction with her, beyond this -- this one
```

```
5      dialogue. But I remember -- I remember now
6      something about -- I was -- yeah.
7            I mean, I was thinking her last name
8      is spelled with "Q." But yeah. I don't think
9      I ever -- I don't think I ever met her. I
10     don't know that we've had interactions other
11     than this dialogue, where she had some sort of
12     statistical tool that was coming up with a --
13     I think a worst case scenario.
14           If I recall correctly, I think maybe
15     she even published an article. And she -- on
16     S&P's platform. And she asked me to review a
17     paragraph, to make sure that I was not
18     uncomfortable with it.
19           But we have not had interaction
20     since then. And I don't think we've had much
21     interaction previous to this, either.
22           Q. Okay. But you understand she's a
23     director at S&P?
24           A. Yes.
```

## KAPLAN, DAVID - *02/11/2022*

**Page 193**

```
193 :10          Q. But you recall getting this email
11     from Ms. Kwan, in April of 2019?
12           A. I recall -- I recall now, vaguely,
13     some interaction around this.
```

## KAPLAN, DAVID - *02/11/2022*

**Page 197**

```
197 :23          Q. So if you look at this email, this
24     is an email that Ms. Kwan forwards to you. If
25     I could direct your attention to the third
198 :1     bullet there. Number three.
2            It says:
3            "Praedicat's preliminary
4      economic disaster scenario estimate for a
5      range of products containing talc contaminated
6      with asbestos totals $84 billion."
7            Do you see that?
8            A. Yes.
9            Q. Did you understand that this
10     was their estimate of what -- you know, the
11     losses associated with, you know, talc-related
12     litigation, potentially could be in the
13     scenario they are running?
14           A. Yes.
15           MR. SHAPIRO: Objection.
16     Foundation.
17           A. Yes. I understood that. Again, I
18     didn't find it to be analytically meaningful
19     for the rating. Because I understood this to
20     be, kind of, again, a low probability outcome.
21     But I understood that it -- you know, it could
22     be that amount.
23           And, again, it's based on what I
24     understood to be some sort of, you know -- you
25     know, quantitative model which, you know, I
199 :1     think I was probably a little bit suspicious
2      of.
3            But, okay. Yes. Yeah. I was aware
4      of that.
```

5        Q. Okay. And you understood S&P had
6    retained and engaged this outside vendor,
7    Praedicat, to run these -- these analyses.
8    Right?
9        A. Like I said, it wasn't done on my
10   initiative. Or I don't think any of my
11   colleagues on the healthcare side. I think
12   that -- I forget where Patricia is within the
13   organization. But somehow, she had decided to
14   do this and looked at some -- you know, some
15   scenarios. And I think, again, she had
16   published a report.
17          But I -- the point being that, it
18   wasn't -- when we got this information, it
19   didn't -- it didn't really move us much, as
20   we discussed -- as I mentioned earlier, about
21   kind of tail risk. And then, reliability.
22          You know, kind of a model-driven
23   estimate. It felt kind of speculative.
24       Q. But you understood this was their
25   analysis, you know, seeking to estimate what
200 :1   would be a potentially worst case scenario, in
2    connection with talc litigation? Correct?
3        A. Yes. I understood that. That
4    that's what it was. Yes.


**KAPLAN, DAVID** - *02/11/2022*

**Page 203**
203 :6      Q. My question was, did you understand
7    this attachment to be a discussion of kind of
8    talc litigation, in connection with the -- the
9    work Ms. Kwan was doing to try to estimate --
10   you know, get an estimate of what the losses
11   could be, associated with talc litigation.
12          MR. SHAPIRO: Same objection.
13       A. Yes. I understood that, you know,
14   the discussion -- the dialogue; the details
15   that were associated with trying to quantify
16   the worst case scenario for talc.


**KAPLAN, DAVID** - *02/11/2022*

**Page 205**
205 :24     Q. So this is -- this is where, you
25   know, this -- this vendor, I guess in
206 :1   connection with working with Ms. Kwan at S&P,
2    was estimating that talc liability, associated
3    with asbestos contamination mass litigation,
4    like the Ingham case, could potentially result
5    in damages reaching $83.5 billion. Right?
6        A. Correct.


**KAPLAN, DAVID** - *02/11/2022*

**Page 208**
208 :19     Q. I just have a question about two
20   these last documents. If we could bring up
21   Exhibit 393 real quick, please.
22          So, if we look at these notes,
23   these are the highlighted green notes we were
24   looking at a bit earlier. Do you remember
25   looking at this, Mr. Kaplan?
209 :1      A. Sure. This was with the November

2  date?
3      Q. Yeah. If you go -- please go to the
4  top. Let's orient ourselves, in terms of
5  timing.
6      A. Yeah.
7      Q. So this was some notes you took as
8  part of some meetings you had in November of
9  2021. Right?
10     A. Correct. And then a committee that
11 followed that about the divestiture or
12 separation of the consumer segment.
13     Q. And, ultimately, I think you said,
14 these notes ultimately made their way into the
15 RAMP kind of report that was put together.
16 Right?
17     A. Correct.
18     Q. And it also formed the basis for
19 what ultimately became the credit note that
20 was prepared?
21     A. Correct.
22     Q. Is that fair?
23     A. Correct.

**KAPLAN, DAVID** - *02/11/2022*

Page 211

211 :16     Q. Okay. And the reference there to
17 $4 billion for talc, I think you characterize
18 that as a guesstimate. Do you see that?
19     A. Yes.
20     Q. And that's a reference to your
21 guesstimate of the amount that would
22 potentially be used to settle the talc
23 litigation in the bankruptcy?
24         Is that right?
25     A. Correct.
212 :1     Q. If we go to the next page, if you
2  could, under the -- I think it's the section
3  "Recent News/Performance." And you were asked
4  some questions about one of these paragraphs.
5         I think it's the one beginning
6  with "The company has filed a subsidiary." Do
7  you see that?
8      A. Yes.
9      Q. And let me just ask you, at the end
10 of that bullet, you see it says, "We assume
11 $4 billion." Do you see that?
12     A. Yes. Let me just read the bullet.
13     Q. Oh, for sure.
14         [Witness perused document.]
15     A. Yes. Okay.
16     Q. That's the same guesstimate of
17 $4 billion we just talked about. Right?
18     A. Yes.
19     Q. And that's a guesstimate of what
20 potentially would be the amount that
21 Johnson & Johnson would use to settle the talc
22 litigation in the bankruptcy. Right?
23     A. Correct.
24     Q. That's not an estimate of what it
25 would potentially cost to litigate the talc
213 :1 claims outside of bankruptcy; is it?
2      A. So, again, at this point, our
3  assumption is that the bankruptcy technique
4  will proceed, and the $4 billion is a

5    reflection of that expectation.

**KAPLAN, DAVID** - *02/11/2022*

Page 214

214 :1        Q. Understood. And I'm just asking
2    about what you're assuming here on this
3    document, Mr. Kaplan. It says, "We assume
4    $4 billion." I just want to confirm, that
5    assumption of $4 billion is to settle the talc
6    litigation in bankruptcy. Right?
7        A. I would say that the assumption is
8    $4 billion. And the assumption is that the
9    settlement will occur in bankruptcy.
10       Q. Okay.
11       A. If you're trying to link the two to
12   say one is dependent on the other, I don't
13   know that that necessarily is the case. I
14   haven't contemplated, you know, what that
15   number would be, if it were to -- the scenario
16   were to change.

**KAPLAN, DAVID** - *02/11/2022*

Page 214

214 :24       Q. All right. And I think you were
25   asked a question about this, but I just want
215 :1    to confirm, this bullet point that talks about
2    the company filing subsidiary for bankruptcy,
3    just to be clear, it talks about some -- some
4    issues around what filing for bankruptcy might
5    mean.
6            Now, and I think you were asked
7    some questions about, well, who told you that.
8    Did someone from JNJ say these things to you?
9            And I just want to be clear,
10   it's your testimony that you don't recall
11   somebody from JNJ saying anything specifically
12   about any of the pieces in this bullet here?
13   About reducing the risk of damages -- punitive
14   damages; speaking about the process; or
15   anything like that. Correct?
16           MR. SHAPIRO: Objection.
17       A. I think I do recall JNJ -- Michelle
18   mentioning that the benefit is that it
19   resolves the issue more quickly.
20           In terms of punitive damages, and in
21   terms of negotiating position, that, I don't
22   recall what sources of information led me to
23   that conclusion.
24           Whether it was my own experience;
25   discussions with investors; media articles I
216 :1    was reading; or I mentioned I had reached out
2    to a number of colleagues who have companies
3    who have gone through a similar process.
4            So that all helped educate me on
5    what this process is all about.
6            So, I guess, the "speeds up the
7    process," is, I think, something I heard from
8    JNJ. My recollection is that I heard that
9    from JNJ or from Michelle Ryan.
10           The other two points, I don't recall
11   where I gathered that information.
12       Q. Thank you. And just in terms of

13    speeding up the process, that goes back to
14    what we've been talking about in terms of
15    certainty. Right? It gives the company some
16    certainty in the near term. Right?
17          A. Certainty, as well as the cloud of
18    reputation risk is kind of put behind it.
19    With certainty comes kind of no longer being a
20    topic of interest.
21            So the -- the speeding up the
22    process, yeah -- is -- has, you know, both the
23    benefit of certainty; but also the benefit of
24    not -- the company's reputation is no longer
25    being dragged through the streets.

**KAPLAN, DAVID** - *02/11/2022*

**Page 219**

219 :24        Q. Okay. So, I just want to make sure
     25    I understand this before I move on. So, this
220 :1    idea that -- the company is unable to settle,
     2    in bankruptcy, for somewhere around what you
     3    guys assume to be $4 billion, that would be a
     4    material development.
     5            And it could potentially
     6    adversely affect their credit rating. Fair?
     7        A. It could. It could.

**KAPLAN, DAVID** - *02/11/2022*

**Page 228**

228 :2            Do you see Exhibit 384 is on
     3    the screen? And that's the one entitled
     4    "JNJ -- Internal Conversation --
     5    October 13th 2020."
     6            Do you see that?
     7        A. Yes.
     8        Q. And I just wanted to confirm that
     9    this is a document that you created in the
     10    ordinary course of business at S&P. Correct?
     11        A. Yes.
     12        Q. And this was a document that was
     13    kept in the ordinary course of business at
     14    S&P. Correct?
     15        A. Yes.
     16        Q. And this is a document containing
     17    information that you had knowledge of, at the
     18    time you created the document?
     19        A. Yes.
     20        Q. Okay. And similar questions for
     21    Exhibit 385. 385 is the periodic review
     22    document. And did you say that you supervised
     23    the creation of this document?
     24        A. Yes.
     25        Q. And did you do that in your ordinary
229 :1    course of business of S&P?
     2        A. Yes.
     3        Q. And it was kept in the ordinary
     4    course of business at S&P. Correct?
     5        A. Yes.
     6        Q. And this document contains
     7    information that you had knowledge of, at the
     8    time the document was created. Correct?
     9        A. Yes.
     10        Q. Okay. And similar questions for

11    **Exhibit -- and that last exhibit was 385, for**
12    **the record.**
13        **Similar questions for 386.**
14    **Exhibit 386, which is entitled**
15    **"Johnson & Johnson -- Internal Conversation,**
16    **August 26th 2021."**
17        **And am I correct that this is**
18    **another document that you created in the**
19    **ordinary course of business, and was kept in**
20    **the ordinary course of business at S&P?**
21    **A. Yes. One comment on this document.**
22    **I just -- this was a document that I reviewed.**
23    **So just on the background section, there is**
24    **that bold on 10/28/2021. That has a typo.**
25        **That should have said**
230 :1    **"10/28/2020" was when we initially set the**
2    **rating outlook to negative.**
3    **Q. Thank you for clarifying that.**
4    **Again, Exhibit 386 is a document that you**
5    **created in the ordinary course of your**
6    **business at S&P, and that was kept in the**
7    **ordinary course of business at your company?**
8    **A. Yes.**
9    **Q. And this is -- and this document**
10    **contains information that you had knowledge**
11    **of, at the time the document was created.**
12    **Correct?**
13    **A. Yes.**

**KAPLAN, DAVID** - *02/11/2022*

**Page 230**
230 :23    **Q. So, I don't know if you went through**
24    **this with Mr. Shapiro, but just to confirm, do**
25    **you see that this is a document that was**
231 :1    **produced by S&P, and it's from you,**
2    **David Kaplan, and it's a meeting invite, dated**
3    **July 19th 2021?**
4        **And it's to Michelle Ryan and**
5    **others, with the subject "JNJ S&P Ratings.**
6    **Discuss Media Reports about Cordoning off Talc**
7    **Liabilities."**
8        **Do you see that?**
9    **A. Yes.**
10    **Q. And this meeting invite,**
11    **Exhibit 387, does this appear to be a document**
12    **that you would have created in the ordinary**
13    **course of your business at S&P? And that was**
14    **kept in the ordinary course of business at**
15    **your company?**
16    **A. Yes.**
17    **Q. Okay. And, obviously, the meeting**
18    **invite contains information in terms of the**
19    **subject; the people you typed in the email to;**
20    **that you were knowledgeable about, at the time**
21    **you created it. Correct?**
22    **A. Yes.**
23    **MR. STARNER: Objection.**
24    **Vague.**
25    **Q. Okay. And then, jumping past some**
232 :1    **exhibits. Almost through here. Exhibit 393.**
2    **This is the document with the green**
3    **highlighting. Let me just get the title for**
4    **the record.**
5        **Okay so Exhibit 393, this is**

6      the document titled, "Johnson & Johnson --
7      Committee. November 2021." With the green
8      highlighting.
9              Do you see that document?
10     A. Yes.
11     Q. Okay. And Exhibit 393 is a document
12     that you created in the ordinary course of
13     your business, and that was kept in the
14     ordinary course of your business, at S&P.
15     Correct?
16     A. Just to clarify, it was created in
17     the ordinary course of business. When you say
18     "kept in the ordinary course of business," can
19     you just clarify?
20     Q. Yeah. Just meaning that it was
21     produced by your counsel with -- with markings
22     on it, that it came from S&P.
23     A. Okay.
24     Q. And so, just -- you know, your
25     normal understanding of this is a document
233 :1  that's kept, you know, as a business record of
2      S&P.
3              MR. STARNER: Objection.
4      A. Okay. I mean, just to distinguish.
5      And, again, this might be kind of an S&P
6      speak. But this was kind of a work in process
7      document that was only kind of a placeholder
8      to be saved in the RAMP.
9      Q. Right.
10     A. So it's -- there was -- you know,
11     there is -- the formal record would have been
12     the RAMP package. But this was a document
13     that was created in the normal course of
14     business. Yes.
15     Q. Okay. Right. And this isn't a
16     document that came from you, personally? It's
17     a document that was kept in the ordinary
18     course of business at S&P. And that's why it
19     was produced to us by S&P. Right?
20     A. Yes.
21     Q. Okay. And this is a document that
22     contains information that you had knowledge
23     about, at the time the document was created.
24     Correct?
25     A. Yes.

**KAPLAN, DAVID** - *02/11/2022*

**Page 234**
234 :14        Q. Okay. Okay. And Exhibit 396, this
15     is a document titled "Johnson & Johnson's
16     Triple A ratings Affirmed. Outlook Remains
17     Negative."
18             Do you see that?
19     A. Yes.
20     Q. Okay. And this is a document that
21     you created in the ordinary course of your
22     business at S&P; and that was kept in the
23     ordinary course of business by S&P as a
24     business record. Correct?
25     A. Correct.

KAPLAN, DAVID - *02/11/2022*

**Page 235**

235 :21          Q. Did you -- did you create
22          Exhibit 396? Did you write it or supervise
23          the creation of the document,
24          "Johnson & Johnson's Triple A Ratings
25          Affirmed," where it says it at the top?
236 :1          A. Yes.
2          Q. Okay. And you did that in the
3          ordinary course of your business at S&P.
4          A. Yes.
5          Q. Okay. And you had knowledge about
6          the matters contained in this document, at the
7          time it was created?
8          A. Yes.

KAPLAN, DAVID - *02/11/2022*

**Page 243**

243 :14          Q. Okay. And because JNJ has the
15          highest possible credit rating of Triple A,
16          does that mean that S&P has, and continues to
17          rate JNJ as having really the lowest risk of
18          bankruptcy, of pretty much any company in the
19          world?
20          A. Yes.
21          Q. And when Michelle Ryan, or
22          Mr. Van Arsdale, or others from JNJ would talk
23          to you about the talc litigation, did they
24          ever say anything, or communicate to you
25          anything along the lines that the talc
244 :1          litigation was causing JNJ to be in financial
2          distress?
3          A. No. No. Even -- no.
4          Q. And same question. Did anyone from
5          JNJ ever communicate to you that the talc
6          litigation was causing any of JNJ's
7          subsidiaries or affiliates to be in financial
8          distress?
9          A. No. We viewed JNJ as extremely
10          strong. Even with the assumption of, you
11          know, billions of dollars of liability.
12          Q. And, in fact, did Ms. Ryan,
13          Mr. Van Arsdale, and others from
14          Johnson & Johnson, give you reason to believe
15          that JNJ and its affiliates were financially
16          able to handle the talc litigation?
17          A. I suppose in giving us a worst case
18          scenario of $7 billion to $7.5 billion, which
19          is barely material, you know, that would be
20          implied.

KAPLAN, DAVID - *02/11/2022*

**Page 246**

246 :6          MR. SHAPIRO: So it's
7          Exhibit 401, I'm marking "SPGI433_001"
8          through "008."
9          RE-EXAMINATION BY MR. SHAPIRO:
10          Q. And, Mr. Kaplan, is this the final
11          version of the credit note that you were
12          referring to earlier, when we looked at the

```
        13      draft credit note?
        14          A. Yes.
        15          Q. And this is the credit note that
        16      Standard and Poor's published after the
        17      announcement of the divestiture of the
        18      consumer health business?
        19          A. Correct.
        20          Q. And JNJ would have had the
        21      opportunity to review this credit note for
        22      accuracy. Correct?
        23          A. Correct.
        24          Q. And if you turn to page two of the
        25      note, you'll see the same paragraph that we
247 :1      saw in the draft note, which includes an
        2       estimation of litigation liabilities.
        3              Do you see that?
        4           A. Is that one in this paragraph here?
        5       "Moreover?"
        6           Q. Yes.
        7           A. Okay. I see it. So what's your
        8       question.
        9           Q. That -- the published version of the
        10      credit note included the same estimate of
        11      litigation liabilities that we had seen in the
        12      draft note. Correct?
        13          A. Correct.
        14          Q. And S&P's estimate was $8 billion
        15      post-tax, and $10 billion pre-tax. Correct?
        16          A. Inclusive of opioids, talc, and
        17      Respiradal. Correct.
        18          Q. And included $5 billion for opioid;
        19      $4 billion for talc; and $1 billion for
        20      Respiradal. Correct?
        21          A. Correct. Although I don't know that
        22      we made those individual amounts public. But
        23      that's clearly what we were thinking is.
        24          Q. Okay.
```

**KAPLAN, DAVID** - *02/11/2022*

**Page 248**
```
248 :8          Q. Just real quick. With respect to --
        9       do you understand that the debtor is a company
        10      called "LTL?"
        11          A. Correct. Yes.
        12          Q. That's the JNJ subsidiary that's
        13      filed for bankruptcy. Right?
        14          A. Yes.
        15          Q. You have not analyzed their
        16      financial condition or ability to deal with
        17      any type of -- of talc litigation, going
        18      forward, outside of bankruptcy; have you?
        19          A. No.
        20          Q. Okay.
        21          A. No. As a standalone, no.
        22          Q. Okay. And you understand that there
        23      was a company, before the restructuring, there
        24      was a subsidiary called "JJCI" that had the
        25      talc liabilities, that were then ultimately
249 :1      moved into the LTL entity?
        2               Did you understand that?
        3               MR. BLOCK: Objection.
        4       Misstates the evidence.
        5           Q. You can answer, Mr. Kaplan.
        6           A. Not specifically focusing on the
```

7    name of the entity, but I understood the idea
8    that this -- the subsidiary that has a
9    liability was being moved into the LTL entity.
10    Q. Okay. Did you do any analysis of
11    that particular subsidiary before the
12    restructuring, whether or not they had, as a
13    standalone company, the wherewithal to -- you
14    know, potentially, to deal with or fund talc
15    litigation, going forward?
16    A. No.
17    Q. So you didn't analyze the financial
18    distress of either that subsidiary or the
19    ultimate debtor entity, at any point in time;
20    did you?
21    A. That's correct. I did not.
22    Q. Okay.
23    A. We did not.

## KAPLAN, DAVID - *02/11/2022*

**Page 251**

251 :15    Q. Well, now, I just want to make sure
16    I don't get confused. This credit rating that
17    just got published. This is published, of
18    course, when the company -- the relevant
19    company with the talc liability is in
20    bankruptcy. Right?
21    A. Correct.
22    Q. And this -- again, the credit rating
23    with the 4-billion-dollar number is used for
24    talc liability, that is based on the
25    assumption that money would be used to resolve
252 :1    talc litigation in bankruptcy. Right?
2    MR. SHAPIRO: Objection. Asked
3    and answered. I think at this point,
4    you're badgering him.
5    BY MR. STARNER:
6    Q. I just want to make sure the
7    assumption is for this document. The number
8    in this document that was published. Right?
9    Is the assumption is,
10    resolution in bankruptcy. Right?
11    A. The assumption is $4 billion. And
12    the assumption is that the path in which it
13    will be resolved is in bankruptcy. I don't
14    think one should infer, necessarily -- one can
15    infer that the number would be different if
16    there is a different mechanism of resolution.
17    Q. But you have not analyzed what,
18    potentially, would be required to resolve any
19    case outside all the -- the talc litigation
20    out of bankruptcy. Right?
21    A. Well, we did have a $4 billion
22    estimate before we learned about the LTL
23    strategy. So, again, that estimate was not
24    conditioned upon the bankruptcy strategy,
25    specifically.

**KIM, JOHN 1/31/22**

Page 21

```
21 :2        Q: Okay. Great. Thank you.
   3          So I want to go back -- well, let's see.
   4          I want to go back before you took your position at LTL.
   5          So when -- so that we can orientate ourselves, when did
   6          you -- you said last year. Approximately when did you
   7          take on your position of, I think you said general
   8          counsel at LTL?
   9        A: Chief litigation officer.
  10        Q: Thank you. So when about was that?
  11        A: October 10th of last year.
  12        Q: Okay. So going back before October 10th when I
  13          think you said you were head of really the products
  14          liability group within the law department. Is that
  15          right?
  16        A: Yes.
  17        Q: Okay. And just tell me a little more, what
  18          kind of stuff were you doing in that role?
  19        A: So I was administratively the head of that
  20          group. So I had six or seven attorneys, six or seven
  21          paralegals and administrative staff that reported to me.
  22          All product liability litigation for all Johnson &
  23          Johnson companies worldwide was within that group.
  24          So I was basically overseeing all product
  25          liability or the -- I was overseeing the lawyers who
22 :1        oversaw daily all the product liability litigations that
   2          were faced by any Johnson & Johnson company worldwide.
   3        Q: Okay. And would that include the talc cases or
   4          talc liability?
   5        A: That did include the talc cases, yes.
```

Page 25

```
25 :4        Q: And when you say 'restructuring,' what do you
   5          mean by restructuring?
   6        A: At the time there was a contemplated
   7          restructuring -- well, what I mean by that was a
   8          divisional merger where the current -- at that point
   9          Johnson & Johnson Consumer, Inc. would be involved in a
  10          divisional merger and create companies, one of which
  11          would have talc liabilities and the other would have the
  12          remaining business of that JJCI.
  13        Q: And why was that being considered?
  14        A: The consideration of the restructuring was
  15          because of the -- I would say the -- because of the
  16          litigation -- the increase -- the rapid increase in
  17          litigation that we were seeing with the talc cases
  18          causing financial distress on the company and looking --
  19          as we were looking at all -- different options to deal
  20          with this exponentially growing liability, at some point
  21          the only viable option that we could think of was a
  22          restructuring followed by a bankruptcy. So we were
  23          exploring that possibility.
  24        Q: Okay. And when you say -- I think you said --
  25          'financial distress' I think your words were 'on the
26 :1        company.' What do you -- when you say 'on the company,'
   2          what company are you referring to?
```

3        A: That would be JJCI.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 28**

28 :14        Q: (By Mr. Jonas) You made a statement that -- I
15        think you said JJCI had the talc liability, something to
16        that effect. What do you mean by that?
17        A: Well, I mean that generally the company,
18        operating company, that is responsible for the product
19        has responsibility for the financial liability arising
20        out of litigation regarding that product.
21        So JJCI had responsibility -- I'll break
22        it up in two ways. When JJCI sold the product, it was
23        responsible financially for all the litigation that
24        arose out of that product.
25        We also know that prior to JJCI selling
29 :1        that product, it took on, it assumed, it gave
2        identification for any liability prior to itself selling
3        it. So JJCI was the entity that was wholly responsible
4        for the talc liability.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 29**

29 :25        So do you have a recollection as to a
30 :1        date? You mentioned 2021 when the name Project Plato,
2        if you will, was first ascribed to the project; and I
3        appreciate that. Was it early '21, middle of -- '21? Do
4        you have any recollection?
5        A: I think it was -- I think Project Plato was,
6        you know, somewhere in the summer of 2021. There's a --
7        you know, it went in fits and spurts. So there was a
8        time when we were -- I think there may have been a time
9        where the Project Plato team was set up.
10        Q: Uh-huh.
11        A: But it really didn't do anything for a period
12        of time. And then there was a period where it started
13        doing more work.
14        So I would say from, you know, the late
15        spring to the summer is when, you know, Project Plato
16        was being set up and then work was being done. But,
17        again, it was sporadic during that period.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 31**

31 :8        Q: Okay. I just want to go back for a minute.
9        When you were supervising other lawyers and one of your
10        responsibilities was -- were talc cases and talc
11        liability, were you handling both litigation and
12        settlements or was there a distinction between those?
13        A: So I would be overall responsible for all of
14        the talc liability, both the litigation and the
15        resolution of it. So I would be involved in all aspects
16        of the litigation.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 32**

32 :5        Q: Okay. And there were a number of verdicts
6        finding both J&J and JJCI liable -- well, let me just
7        say liable in connection with talc claims, correct?

8     A: There were. There were also defense
9     verdicts --
10    Q: Sure.
11    A: -- at that time, yes.
12    Q: Okay. And do you know how many verdicts there
13    were finding J&J liable for talc liability?
14    A: I don't have the list in front of me.
15    Q: Okay.
16    A: But there were a number of cases, yes.
17    Q: Okay. And I take it you're familiar with the
18    Ingham case?
19    A: I am.
20    Q: And what is your familiarity with that case?
21    A: Well, again, I was responsible for the talc
22    liability through, you know, the day-to-day operations
23    that someone else was handling. But I was involved in
24    the case. I actually attended most of that trial.
25    Q: Okay. And that was in St. Louis, correct?
33 :1   A: That was in St. Louis, yes.
2     Q: And there was a multi-billion-dollar verdict
3     against J&J and JJCI in the Ingham case, correct?
4     A: There were -- there was a multi-billion-dollar
5     verdict against both companies.
6     Q: And I say 'you.' I'm referring to Johnson &
7     Johnson and JJCI. But you appealed the trial verdict,
8     correct?
9     A: We did.
10    Q: And ultimately appealed that to the Supreme
11    Court or attempted to appeal that to the Supreme Court
12    of the United States, correct?
13    A: We filed for a certiorari to the United States
14    Supreme Court, yes.
15    Q: And it was denied, correct?
16    A: Cert was denied in that case, two recusals.
17    Q: Do you recall just about when that cert denial,
18    when that came down?
19    A: I think the denial of cert was in the summer of
20    2021.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 34**

34 :6   Let me ask you. As a result of cert being
7     denied in Ingham, Johnson & Johnson paid out, I think it
8     was close to $2 1/2 billion, correct?
9     A: It did. It paid on the judgment.
10    Q: Okay. And that payment was made, I take it,
11    shortly after cert was denied, right? So we're talking
12    about the summer of 2021?
13    A: Very shortly after cert was denied we made the
14    payment, yes.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 46**

46 :8   Q: (By Mr. Jonas) Okay. Do you recall whether at
9     any point in time Johnson & Johnson had hopes of using
10    the Imerys bankruptcy as a global resolution for talc
11    liability?
12    A: I'm sorry. What was your question?
13    Q: It's too complicated.
14    (The record was read as requested.)
15    A: I do recall that Johnson & Johnson and
16    Johnson & Johnson Consumer, Inc. had a deal with the

17      Imerys TCC to resolve most of the talc liability through
18      the Imerys bankruptcy.
19      Q: (By Mr. Jonas) And is it fair to say that was
20      not successful?
21      A: I would say it fell through, yes.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 49**
49 :2      Q: (By Mr. Jonas) I want to take a look at what's
3      now been marked Exhibit 134. Mr. Kim, at the top here
4      you'll see an e-mail from Mr. Haas of March 17, 2021;
5      and it includes Greg Gordon, Andrew White and yourself.
6      Obviously it says, 'Greg, thank you, greatly
7      appreciated.'
8      Let me ask you, does this help refresh
9      your recollection now that you can see that Mr. Gordon
10      of Jones Day was in communication with you and Mr. Haas
11      in the middle of March 2021? Would this help refresh
12      your recollection as to whether Project Plato was in
13      place on or about the middle of March?
14      A: So what I would say is, you know, in the middle
15      of March I think it -- I don't know what this invite --
16      I don't recall what this invite was and what has been
17      redacted here. But I will say that in March, that is
18      consistent with my recollection of our discussing with
19      Jones Day various, you know, restructuring options.
20      Project Plato, again, was a designation
21      that was made at some point, probably after this, for
22      the due diligence project. So, you know, I think this
23      confirms that in the spring of 2021 we were discussing
24      restructuring with Jones Day.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 50**
50 :3      You'd agree with me Mr. Gordon is a
4      bankruptcy lawyer at Jones Day, right?
5      A: He is, yes.
6      Q: And so in this context when you say
7      restructuring, you mean that in March of 2021 relating
8      to talc liability, at least as a strategy, you were
9      discussing bankruptcy as an option, right?
10      A: What I would say is that in March of 2021 we
11      had been discussing a variety of options, including
12      restructuring and a bankruptcy of the restructured
13      entity.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 51**
51 :15      Q: (By Mr. Jonas) We'll pull up Exhibit 135. And
16      this is an e-mail from yourself dated April 7, 2021 to
17      Mr. D. Prieto, Mr. Haas, Mr. Jung and Mr. Andrew. Do
18      you see that?
19      A: Yes.
20      Q: That was the basis of my question, just to
21      orientate you who -- let me ask you this: The subject
22      line is J&J - call to discuss potential restructuring
23      alternatives. Do you see that?
24      A: Yes.
25      Q: And you were organizing a meeting for a few
52 :1      days later, right?
2      A: I was.

3          Q: Why were you inviting Mr. Jung to a question --
4          I'm sorry, to a call to discuss potential restructuring
5          alternatives?
6          A: He's in the business development group that
7          handles -- like Mr. Andrew, handles corporate M&A and
8          other transactions.
9          Q: Okay. Got it.
10          And then down below, optional attendees
11          include Mr. Gordon. Is Mr. Lewis, is he at Jones Day,
12          do you know?
13          A: He is.

---

KIM, JOHN 1/31/22 - *01/31/2022*

Page 55
55 :4          Q. (By Mr. Jonas) Okay. So we're looking at
5          Exhibit 137. It's an e-mail from Mr. Christopher Andrew
6          dated July 12th. And I see you there, Mr. Kim, among
7          others. And the 're' line or the subject line is
8          'Project Plato kick-off.' Do you see that?
9          A: I do.
10          Q: And does this help refresh your recollection as
11          to it was about the middle of July that the Project
12          Plato team began to have regularly scheduled weekly or
13          more frequently meetings to discuss Project Plato?
14          A: I think this is consistent with my
15          understanding that at some point around this time period
16          regular meetings were being set for the due diligence
17          project.
18          Q: Okay. The due diligence project which came to
19          be known as Project Plato, right?
20          A: Correct, yes.

---

KIM, JOHN 1/31/22 - *01/31/2022*

Page 62
62 :3          Q: Okay. So do you recall this Project Plato
4          kick-off meeting in the middle of July 2021?
5          A: I recall that it was taking place. I don't
6          recall whether I attended.
7          Q: Okay. Let me ask you, do you recall in July of
8          2021 a Wall Street Journal story relating that -- I
9          don't want to say revealed, but it was a story that came
10          out that made reference to counsel for J&J telling
11          plaintiffs' attorneys who were pursuing talc claims that
12          J&J was considering putting a corporate subsidiary in
13          Chapter 11? Do you recall that story?
14          A: I recall there were a series of stories that we
15          believe came from plaintiffs' lawyers about a potential
16          restructuring that was fed to the press. I don't know
17          if I remember that specific one. I don't think I've
18          seen that specific one.
19          Q: Okay.
20          A: But I do know that there were those stories.
21          Q: Okay. And your view is that those stories
22          emanated from plaintiffs' lawyers?
23          A: That is my belief, yes.

---

KIM, JOHN 1/31/22 - *01/31/2022*

Page 63
63 :1          It is the case that in July of '21
2          Johnson & Johnson was considering a restructuring that
3          involved the bankruptcy of a subsidiary, correct?

4       A: I think at this time we were looking to see
5        whether one was even feasible.
6       Q: Okay.
7       A: So at the time that these stories were coming
8        out, there had been no decision made on any particular
9        transaction going forward; and we were looking at
10       options. But our main focus at that time was continuing
11        to litigate these cases.

**KIM, JOHN 1/31/22** - *01/31/2022*

Page 64

64 :21      Q: And let me ask you, strategically, what were
22       the advantages of this strategy -- I'll call it the
23       bankruptcy strategy -- to J&J?
24       MS. BROWN: I'm going to object as calling
25        for speculation.
65 :1       I'll also instruct you, Mr. Kim, not to
2        reveal any legal advice or legal discussions with inside
3        or outside counsel.
4       Q: (By Mr. Jonas) You can answer as best you can,
5        Mr. Kim.
6       A: Could you repeat your question.
7       Q: Sure.
8       MR. JONAS: I'll have it read back.
9         (The record was read as requested.)
10       MS. BROWN: Same objection and
11        instruction.
12       A: I would say that the advantages of bankruptcy
13        inure to the benefit of both JJCI and the creditors. I
14        think, as we laid out in our first-take declaration and
15        in the informational statement, that the bankruptcy
16        option is the most efficient way to get a full and fair
17        resolution of the -- of this litigation to JJCI and to
18        the claimants.
19        So when you look at this -- a bankruptcy
20        of LTL compared to other options, it is the most
21        efficient way to get a full and fair settlement for the
22        parties.
23       Q: (By Mr. Jonas) When you use the word
24        'efficient,' what do you mean by that?
25       A: Well, primarily what I mean is if you have
66 :1       30,000-plus cases currently and, you know, multitudes
2        more in the future, it is virtually impossible to try
3        all those cases in any reasonable amount of time to, you
4        know, get whatever result you can get.
5       A: bankruptcy, on the other hand, is a much
6        more efficient process to deal with all current and
7        future liabilities in a reasonable amount of time, much,
8        much more reasonable than trying to go through the tort
9        system and effectuate a resolution of the litigation.
10       Q: Do you believe that the bankruptcy strategy
11        would help accelerate a resolution of talc liability?
12       A: Well, I don't want to call it bankruptcy
13        strategy. What I would say is, you know, using the
14        bankruptcy system, again, it provides a much more
15        efficient, faster way to deal with the number of claims
16        that is part of the litigation and is better for all
17        parties, including claimants.
18       Q: You mentioned benefits to claimants. You
19        mentioned benefits to JJCI. Do you also believe there
20        would be benefits to J&J?
21       A: Clearly there might be benefits to J&J as a
22        shareholder of JJCI. You know, J&J is the principal
23        shareholder. So a resolution of the claims for JJCI, it

24          would basically put a definition on whatever that
25          liability is and would benefit its shareholders and the
67 :1       shareholders of J&J, for that matter.
2           Q: It would cap, c-a-p, the talc liability,
3           correct?
4           MS. BROWN: Objection, lacks foundation.
5           A: Well, if you mean capping in terms of -- it
6           would put a definitive amount to it. It would do that,
7           yes.
8           Q: (By Mr. Jonas) Okay. And aside from the
9           benefits J&J would receive as a shareholder or owner of
10          JJCI, wouldn't this strategy also assist J&J in
11          resolving its direct liability?
12          MS. BROWN: Objection, assumes facts,
13          lacks foundation, calls for speculation.
14          Q: (By Mr. Jonas) You can answer.
15          A: So I would say I don't believe J&J actually has
16          direct liability in this litigation. You know, again, I
17          think the resolution of the talc liability would benefit
18          all parties.

### KIM, JOHN 1/31/22 - *01/31/2022*

**Page 73**

73 :3       Mr. Kim, I'm showing you what's been
4           marked as Exhibit 139, which is an e-mail of July 20,
5           2021 from Mr. Haas to Mr. Darby, John Darby, and to you.
6           And it looks to be forwarding an e-mail and the re line
7           is 'The Wall Street Journal: How bankruptcy could help
8           Johnson & Johnson corral vast talc litigation.'
9           Do you see Exhibit 139?
10          A: I do see the exhibit.
11          Q: There's a reference here at the beginning of
12          the story; you can see it at the bottom of the screen.
13          It says, 'The company has told personal injury attorneys
14          it is considering filing a' -- stop rolling.
15          'The company has told personal injury
16          attorneys it is considering filing a subsidiary for
17          bankruptcy which legal experts say could prompt injury
18          claimants to settle.'
19          Do you see that?
20          A: I see that, yes.
21          Q: Are you aware of whether or not any Johnson &
22          Johnson either personnel or outside lawyers were telling
23          personal injury attorneys in or about July of 2021 that
24          J&J was considering filing a subsidiary for bankruptcy?
25          A: No, no. This is an example where the --
74 :1       basically, again, with the last article, our
2           understanding and my belief was that plaintiffs put that
3           story into the media. And then other media outlets -- I
4           think it might be the same one -- keep repeating that
5           one, you know, that article.
6           So, again, I don't know what this is
7           about.

### KIM, JOHN 1/31/22 - *01/31/2022*

**Page 105**

105 :13     Q: Okay. And let me ask you. How was the
14          $2 billion QSF amount determined?
15          A: I was not involved with that.
16          Q: Okay. You have no idea how the $2 billion
17          figure amount was arrived at?
18          A: I don't know how it was arrived at. My

19    understanding is that that was thought to be a
20    sufficient amount, but I was not involved in that
21    process.
22    Q: Well, how do you know that that was thought to
23    be a sufficient amount?
24    A: That was just my understanding from
25    conversations. But I was not involved in the $2 billion
106 :1    amount.
2    Q: Okay. And you said 'my understanding from
3    conversations.' Conversations with whom?
4    A: I'd say internal conversations with the law
5    department. I don't know whether I had conversations
6    with anyone from finance. Primarily from internal
7    conversations with the law department.
8    Q: And when you say 'law department,'
9    particularly --
10    A: The lawyers, yeah.
11    Q: No, no. But particularly which people, names?
12    A: It would be Erik Haas and Andrew White.
13    Q: So let me ask you, other than conversations you
14    had with Erik Haas and Andrew White, is that kind of the
15    limit of your knowledge relating to the $2 billion
16    amount, QSF amount?
17    A: Jones Day counsel may have been involved. I'm
18    not -- I can't presently recall a specific conversation.
19    Q: Okay. Have you ever seen any analysis which
20    was used to arrive at the $2 billion amount?
21    A: I have not.
22    Q: Do you know if any analysis exists?
23    A: I've never seen or heard of a written analysis
24    of that, no.
25    Q: So I want to make sure I get the scope of your
107 :1    testimony correct. I think you've said that all you
2    know about the $2 billion QSF is that based on
3    conversations with Mr. Haas and perhaps one other lawyer
4    at J&J, it was thought to be sufficient. Is that what
5    you said?
6    A: I did. I would say that it was -- maybe
7    sufficient is wrong. Appropriate. It would be the
8    appropriate amount to put into a QSF.
9    Q: And when you say 'appropriate,' what do you
10    mean by using that word?

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 107**
107 :16    A: No. I think this is -- the extent of it is I
17    can say that would it be appropriate in the circumstance
18    to have a $2 billion QSF.
19    Q: (By Mr. Jonas) Okay. Well, let me ask you
20    this: As chief legal officer of LTL, speaking for the
21    debtor, for LTL, does LTL believe that a $2 billion QSF
22    is appropriate?
23    A: Yes.
24    Q: And why?
25    A: Because $2 billion is a substantial amount of
108 :1    money. It is prefunding from a funding agreement. The
2    $2 billion is not a cap. It shows, you know, the good
3    faith and the -- you know, the desire to try to
4    efficiently and fully and equitably resolve the
5    litigation.
6    So $2 billion, I think, is more than
7    appropriate from LTL's perspective as a QSF.
8    Q: Would you agree that from LTL's perspective,
9    $3 billion or $4 billion would have been better to have

```
10        funded -- would have been better from a QSF perspective
11        for LTL?
12    MS. BROWN: Object, calls for speculation.
13    A: I don't know how I could answer that. I don't
14        understand what 'better' is. I think it's appropriate.
15        LTL thinks that's the appropriate number.
16        I don't know if there's such a thing as
17        more appropriate. $2 billion is the appropriate number.
18    Q: (By Mr. Jonas) Well, did LTL negotiate that
19        number?
20    A: There's no negotiation of the number. Clearly,
21        if LTL thought it was inappropriate, it could have
22        raised issues or asked or said something. But LTL
23        believes that $2 billion QSF is the appropriate number
24        for a QSF.
25    Q: And what analysis did LTL do to determine that
109 :1      the $2 billion was the right number for the QSF?
2     A: I don't know that there was a financial
3        analysis done, but I can tell you that LTL and I
4        personally have an immense knowledge of the tort system,
5        the talc liabilities, its history and its progression
6        and all the underlying facts.
7        So based upon my experience managing these
8        cases and managing a number of mass torts, $2 billion is
9        an appropriate amount for QSF.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 114**
```
114 :5    Q: If I've got this right, at one of those
6        meetings you said, Hey, I'd love to be the chief legal
7        officer?
8     A: At one of the meetings -- at one of the meetings -- at one of the
9        conversation I had with Mr. Haas I indicated that I
10        would like to be the chief legal officer.
11    Q: And what made you want to do that?
12    A: I thought it would be a good fit.
13    Q: Okay. Why?
14    A: Because I know the litigation and the issues
15        involved in various other settlement options, and I
16        thought that I could get this case resolved efficiently
17        and expeditiously and equitably if given the chance.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 117**
```
117 :12   Q: Okay. And maybe last. Let me see. Hold on.
13        I guess I'll ask you. Are there any
14        components of your compensation at LTL that are in any
15        way different than they were when you -- immediately
16        prior to joining LTL?
17    A: My compensation or --
18    Q: I'm sorry. Go ahead.
19    A: So the only difference is the retention bonus.
20    Q: And how is that different, if you could just
21        describe it.
22    A: Well, there's no retention bonus prior to my
23        move. So technically I'm working for Johnson & Johnson
24        Services, Inc. It's a comment to LTL. And the
25        retention bonus would be a component that I did not have
118 :1      prior to my move.
2     Q: Okay. And how much is the retention bonus?
3     A: I don't recall specifically. It's a portion of
4        salary in two years. So it goes for two years.
```

```
5        In other words, I get a bonus at the end
6        of the first year and a bonus at the end of the second
7        year.
8        Q: Okay.
9        A: I'd have to look to see what that amount is.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 124**
```
124 :18      Q: And at least for a number of weeks or months
19        leading up to Mr. Wuesthoff and Mr. Dickinson and
20        Mr. Deyo joining LTL, when you say the prime -- I think
21        you said the primary -- I don't know if you said work or
22        whatnot of LTL was to resolve talc claims, it was
23        anticipated that would be done through a bankruptcy,
24        correct?
25        MS. BROWN: Objection, lacks foundation.
125 :1       A: I would say that the expectation throughout the
2        process was that LTL would file for bankruptcy to
3        resolve the talc claims, the talc litigation.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 135**
```
135 :4       Q: What insurance does LTL have available to it on
5        account of or to satisfy talc liability claims?
6        A: So it has -- there are policies in excess of, I
7        think, you know, $1.9 billion that LTL has an interest
8        in that it has made claims on. So those would be all
9        excess policies -- or, I'm sorry, insurance policies.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 140**
```
140 :19      Q: And what benefits to talc claimants were
20        discussed at this board meeting?
21        A: The issue would be the equitable and efficient
22        resolution of talc claims and comparisons of the
23        lottery-like results in the tort system coupled with the
24        number of claims that had to be -- would have to be
25        adjudicated through the tort system versus a fair and
141 :1       equitable trust situation where claimants would be paid
2        more quickly and have the ability to take into account
3        all current and future claims.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 141**
```
141 :17      Q: Why was LTL formed as a North Carolina limited
18        liability company?
19        MS. BROWN: I'll instruct you, Mr. Kim, to
20        the extent you cannot answer that without revealing
21        privileged information.
22        A: I think the subject matter of where best --
23        where an efficient resolution -- you know, again,
24        because the purpose was to get an efficient, equitable
25        resolution as quickly as possible. There were
142 :1       discussions about where that would be best accomplished.
2        In other words, where could we expect that things could
3        be done efficiently.
4        Q: (By Mr. Jonas) And you mean in which
5        bankruptcy court? Is that what you're saying?
6        A: In which bankruptcy court and, therefore, where
```

```
7        it might make sense to incorporate, similar to why
8        companies incorporate in Delaware when they actually
9        have no presence in Delaware.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 149**
```
149 :8      Q: Okay. That's helpful. I appreciate your
9        trying to cut to the chase with me. So thank you.
10        But while we're on the topic, let me ask
11        you. So what are the assets -- what do you understand
12        the assets of LTL to be?
13        A: The assets of LTL are the funding agreement,
14        which includes a $2 billion QSF. It has the -- a
15        subsidiary, Royalty A&M LLC. It has a bank account of
16        (transmission interference) dollars. The subsidiary has
17        an income stream present value at around 370-odd million
18        dollars basically and has a -- the subsidiary also has
19        access to a credit facility for $50 million.
20        Q: Okay. And among those assets would you say the
21        most valuable is the funding agreement?
22        A: Yes.
23        Q: Okay. And what do you think the value of the
24        funding agreement to be?
25        A: There's a formula in the funding agreement that
150 :1      says what is available under the funding agreement. The
2        availability is -- and, again, I would defer to the
3        terms of the funding agreement, but in general it would
4        be the value -- the fair market value of new JJCI right
5        at the time of the divisional merger.
6        Q: Okay. And --
7        A: Sorry. And is backstopped basically by
8        Johnson & Johnson at that value.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 152**
```
152 :1      Q: No. And I appreciate that. I'm just -- I
2        mean -- what I think you're saying is at the time
3        of signing the funding agreement, LTL had no specific
4        valuation material or analysis relating to the value of
5        new JJCI. Is that right?
6        A: That is right. What it understood was that --
7        whatever the value of old JJCI -- JJCI was at that time,
8        that was what was available to LTL; therefore, putting
9        creditors in at least the same position but better
10        because on top of that value there was the backstop of
11        Johnson & Johnson which did not have to -- prior to the
12        divisional merger would have no obligation to backstop
13        that liability. But as part of the funding agreement,
14        it did. So that's what LTL knew at the time.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 153**
```
153 :18      Q: I very much appreciate that. Thank you.
19        But my question, I guess what I'm -- I
20        appreciate you telling me what you think each
21        individual's knowledge was; but my question is as a
22        board at LTL, were there any presentations, any experts
23        brought in, retained, any analysis? Formally what
24        information was provided to LTL in connection with
25        signing the funding agreement relating to the value of
154 :1      new JJCI? That's my question.
```

2      A: So there was no outside independent finance
3         person or financial analysis done. What LTL understood
4         was that JJCI was a substantial company, and what the
5         funding agreement did was put LTL in the exact same
6         position with respect to value as JJCI. In terms of the
7         creditors, it was even better because not only did it
8         have the value of JJCI, but it also had a financial
9         backstop that JJCI did not have before.
10     Q: Okay. So if I have your testimony correct --
11        and please tell me if I don't -- you're saying that a
12        talc claimant -- a talc claimant today is better off
13        than it was before LTL filed bankruptcy?
14     A: Yes, in terms of financial -- access to the
15        financial assets of both JJCI versus LTL.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 166**

166 :21   Q: Okay. But that's my -- you understand that old
22        JJCI doesn't exist anymore, correct?
23     A: Yes, yes. As part of the Texas divisional
24        merger statute, its assets and liabilities were
25        separated and given to two other entities. So they
167 :1    still remain but in two different entities. And the
2         original entity that now had nothing in it disappeared.
3      Q: Well, there were still claims against that
4         entity, weren't there?
5      A: All the claims were assumed by one or the other
6         entities, both for old JJCI -- all talc claims and any
7         other claim, any other contract claim, any employment
8         claim, any tax claim, all those claims were separated.
9         One of the companies had them, and then
10        the company that was left with nothing disappeared. So
11        none of the claims disappeared. They were just given to
12        one or the other entity. And that's just not only talc
13        claims; that's any claim.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 181**

181 :18   Q: But you did not at any time tell the board of
19        LTL what you believe the value of the funding agreement
20        was. Isn't that true?
21     A: I told the board the value of the funding
22        agreement was laid out in a formula in the funding
23        agreement and that that formula gives a formula for
24        calculating the value if necessary.
25     Q: But at no time prior to the decision to pull
182 :1    the trigger and file bankruptcy were they informed of
2         this $60 billion. Isn't that true?
3      A: It was not necessary for them to be informed of
4         that. They understood what the terms of the funding
5         agreement was. Everybody understands that JJCI is a
6         substantial business, and that was the basis of their
7         decision.

**KIM, JOHN 1/31/22** - *01/31/2022*

**Page 183**

183 :22   Q: (By Mr. Glasser) Back to the board meeting
23        October 14th, 2021, isn't it also true that you never
24        showed the board actual specific numbers for future talc
25        liability before they pulled the trigger on the
184 :1    bankruptcy, actual estimates?

| | |
|---|---|
| 2 | A: We do not have an estimate of future talc |
| 3 | liabilities, and so that was not presented to the board |
| 4 | because it is virtually impossible to come up with one. |

**KIM, JOHN 1/31/22** - *01/31/2022*

---

**Page 184**

| | |
|---|---|
| 184 :18 | Q: How many ovarian cancer trials were scheduled |
| 19 | between October 14th, 2021 and December 31st, 2021, |
| 20 | Mr. Kim? |
| 21 | A: Sitting here, I don't recall. It would only be |
| 22 | a couple. |

**KIM, JOHN 1/31/22** - *01/31/2022*

---

**Page 193**

| | |
|---|---|
| 193 :11 | Q: All right. So let's just take the maxi/min. |
| 12 | If it was 20 million a month and we rounded up to |
| 13 | $250 million a year, you agree with me it would take |
| 14 | 240 years to grind through $60 billion? |
| 15 | A: That's a math exercise. I'm not sure what |
| 16 | that -- that's a math exercise. |
| 17 | Q: That's a math exercise nobody did at that board |
| 18 | meeting. Isn't that so? |
| 19 | MS. BROWN: Objection, lacks foundation. |
| 20 | A: Yeah. I agree we did not do that exercise |
| 21 | because it's useless and irrelevant and not -- and not |
| 22 | helpful to any decision to make. So that calculation |
| 23 | was not done. |
| 24 | Q: (By Mr. Glasser) All right. In your first day |
| 25 | declaration you said that you'd spent something like |
| 194 :1 | $4.5 billion over the last five years, right? |
| 2 | A: Historically, yes. |
| 3 | Q: All right. So dividing 60 billion by |
| 4 | 4.5 billion, that's another 13.3 years if the future is |
| 5 | like the past, right? |
| 6 | A: Potentially. But, again, the 4.5 could be a |
| 7 | minimum and could be exponentially larger. 13 years is |
| 8 | not a lot of time. |

**KIM, JOHN 1/31/22** - *01/31/2022*

---

**Page 197**

| | |
|---|---|
| 197 :25 | Q: (By Mr. Glasser) All right. So you did not |
| 198 :1 | tell the board of LTL that based on 5,738 data points of |
| 2 | ovarian cancer settlements, the average settlement cost |
| 3 | was $92,000. You did not convey that information to the |
| 4 | board in that granular form, correct? |
| 5 | A: Again, that number can be calculated. But we |
| 6 | don't believe -- I don't believe that it's relevant for |
| 7 | future liability or for -- you know, or a valid |
| 8 | methodology for determining what future liability might |
| 9 | be. |
| 10 | Q: And I don't either, but I'm just asking you a |
| 11 | question. So listen to my question and see if you can |
| 12 | answer it. |
| 13 | Isn't it true you did not tell the board |
| 14 | that you had 5,378 prior settlements of ovarian cancer |
| 15 | cases at an average cost of approximately $92,000? |
| 16 | MS. BROWN: Object, asked and answered, |
| 17 | lacks foundation. |
| 18 | A: We went over in aggregate the settlement |
| 19 | profiles, the finances. I did not do the exact |
| 20 | calculation that you mentioned. |

21    Q: (By Mr. Glasser) All right. Likewise, you did
22      not do -- you did not tell the board -- at the time of
23      the bankruptcy, there were 438 remaining mesothelioma
24      cases. You did not tell the board that on 1,098 prior
25      data points, the average cost was approximately 400,000
199 :1    to settle these cases, did you?
2    MS. BROWN: Same objections.
3    A: Again, we told the board how many cases were
4      out there, the history of the litigation, the settlement
5      information. But I did not do the exercise of doing
6      that calculation and multiplying it out like the way
7      that you had done because I thought that that would not
8      be relevant.

## KIM, JOHN 1/31/22 - *01/31/2022*

**Page 202**
202 :1    Q: All right. Now, Ms. Ryan said -- let me ask
2      you this: If the plaintiffs toughened up and it cost
3      three times as much to resolve the existing cases as the
4      old cases, that only implies an $18 billion problem,
5      right?
6    MS. BROWN: Objection, foundation,
7      speculation.
8    A: Again, I'm not sure -- when you're talking
9      about settlement amounts, that has very little to do
10      with potential future liability. What you're talking
11      about is, you know, a speculative exercise where two
12      parties have to agree. And again, that's not something
13      that the board was relying on when it was looking at its
14      financial distress.

## KIM, JOHN 1/31/22 - *01/31/2022*

**Page 204**
204 :10    Q: Did any of the three board members suggest that
11      they hire an actuary to give them an estimate of their
12      real exposure?
13    A: No, because it was unnecessary. We went
14      through the history of the litigation, the amount of
15      spending we were doing, the risks of these lottery-like
16      verdicts.
17      And it was determined that -- again, it
18      was determined that the company -- the best option for
19      all was to efficiently and fairly resolve this
20      completely under the bankruptcy code. No third-party
21      analysis was required.

## KIM, JOHN 1/31/22 - *01/31/2022*

**Page 206**
206 :8    All right. Did you explain to the board
9      on the day -- did you explain to the board before they
10      decided to file bankruptcy that LTL would have its
11      current obligations paid as and when incurred outside of
12      bankruptcy?
13    A: We went over this provision with the board,
14      yes.

## KIM, JOHN 1/31/22 - *01/31/2022*

**Page 213**
213 :20    MR. GLASSER: I'm asking him how did he

21    explain to the board how bankruptcy would affect the
22    insurance other than delaying the fight.
23    MS. BROWN: Lacks foundation and vague.
24    If you understand, you can try to answer,
25    John.
214 :1    A: I don't know that we went into detail on the
2    bankruptcy issues -- the bankruptcy issues with respect
3    to insurance. I think we did note that there was
4    insurance, but I don't believe we went into any detail
5    as to how the bankruptcy would affect the rights of
6    insurers or our rights under the policies.
7    Q: (By Mr. Glasser) Royalty A&M did not file
8    bankruptcy. Isn't that so?
9    A: That is true.
10    Q: So nothing about the bankruptcy is affecting
11    the royalty streams in Royalty A&M. Isn't that a fact?
12    A: Only to the extent that under certain
13    circumstances we would have to use those royalty streams
14    and, frankly, Royalty A&M as an asset to deal with any
15    liabilities.

**KIM, JOHN 1/31/22** *- 01/31/2022*

**Page 215**

215 :16    Q: (By Mr. Glasser) Well, you've told me many
17    times that you guys were really looking after the talc
18    cancer victims. I'd just like you to explain why you
19    would take the company from a position where it could
20    pay them on a current basis or settle the claims on a
21    current basis to having them all wait however long it
22    takes to have a trust.
23    How was that better for claimants, to have
24    to -- instead of having an individualized right to
25    payment, getting some group right to payment?
216 :1    A: So the assumption in that question is that the
2    talc claimants could immediately knock on LTL's door and
3    get money. These talc claimants would have to go
4    through a process that could take decades, you know, and
5    war to go through 38,000 claims. There is no way,
6    looking at the talc claimants in general, that that
7    option is better than trying to come to a resolution in
8    bankruptcy.
9    You know, the tort system for these -- for
10    any individual plaintiff could -- when they have to
11    stand in line while 38,000 others take their shot at
12    trying to collect money, most of them will lose in these
13    cases if the future goes the way the past went.
14    And there's no doubt that the bankruptcy
15    option -- the vast majority of claimants would be better
16    off coming to a quick resolution than having to go
17    through the tort system.

**KIM, JOHN 1/31/22** *- 01/31/2022*

**Page 217**

217 :23    But you told Mr. Jonas earlier when he was
24    asking you about the $2 billion that you thought it was
25    more than enough to satisfy these claims?
218 :1    A: I said it was appropriate. I said it was --
2    Q: And you must have thought it was appropriate --
3    MS. BROWN: Please let him finish his
4    answers.
5    A: I said it was sufficient and appropriate to do
6    it. So what might be sufficient and appropriate to

```
 7        settle these cases is very different than what the risk
 8        in the tort system is.
 9        So, again, settling cases -- can we come
10        to a settlement, a resolution? That amount is very
11        different than the potential in the tort system for both
12        sides.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

Page 223

```
223 :9     Q: Right. So the top three attorneys for the talc
   10        litigation for the Johnson & Johnson entities in 2021
   11        prior to the LTL bankruptcy filing were Erik Haas, John
   12        Kim and Andrew White, correct?
   13        A: I believe that would be true.
   14        Q: Okay. And do you remember what happened, I
   15        guess, immediately before Andrew White sending this
   16        meeting invite to Greg Gordon of Jones Day on
   17        March 16th, 2021 at 11:32 a.m.? Did it happen out of
   18        the blue, or can you remember when you got the
   19        invitation, it sort of making sense in the context of
   20        things that were happening at the time?
   21        A: I think what I would say is that in that time
   22        period before March of 2021 Andrew had been soliciting
   23        views from a number of law firms on resolution of the
   24        talc liabilities.
   25        Jones Day was one of the law firms that we
224 :1     were asking about ideas on how we might be able to
    2        resolve them.
    3        Q: Okay. And was that the purpose in reaching out
    4        to Greg Gordon on March 16th, 2021, to speak to him
    5        about the subject of resolving the J&J entities' talc
    6        litigation?
    7        A: Yes. That would be -- well, I think it would
    8        be the subject of, you know, how to, you know, resolve
    9        the litigation for JJCI as well as J&J but mostly JJCI.
```

**KIM, JOHN 1/31/22** - *01/31/2022*

Page 226

```
226 :1     Q: Okay. And at this time in March of 2021 when
    2        you and other litigation attorneys handling the talc
    3        litigation for Johnson & Johnson reached out to
    4        Mr. Gordon from Jones Day, had you at that time,
    5        Mr. Kim, ever spoken to Michelle Goodridge about JJCI's
    6        financial condition?
    7        A: I personally did not speak to Michelle
    8        Goodridge about the JJCI's financial condition.
    9        Q: Okay. At any time between March of 2021 up to
   10        October 14th, 2021 did you ever speak to Michelle
   11        Goodridge about JJCI's financial condition?
   12        A: I don't recall that I ever spoke to Michelle
   13        Goodridge about JJCI's financial condition.
   14        Q: From March of 2021 up until October 14, 2021
   15        did you, Mr. Kim, ever speak to Thibaut Mongon about
   16        JJCI's financial condition?
   17        A: I personally did not speak to Thibaut Mongon,
   18        although there was -- I do recall there may have been
   19        one meeting with Mr. Mongon about the restructuring that
   20        I attended.
   21        Q: Okay. Did you ever specifically discuss JJCI's
   22        financial condition with Mr. Mongon at any time between
   23        March of 2021 all the way until October 14, 2021?
   24        A: Again, I do recall one meeting where we talked
```

25    about the talc litigation with Mr. Mongon.
227 :1    Q: Okay. In that one meeting do you recall
2     Mr. Mongon telling you any specific information about
3     JJCI's financial condition?
4    A: I don't recall.
5    Q: Okay. Did you ever speak to Paul Ruh, R-u-h,
6     about JJCI's financial condition at any time between
7     March of 2021 until October 14, 2021?
8    A: No.
9    Q: Same question for Kevin Neat?
10    A: I did not.
11    Q: Okay. Can you identify any non-attorney,
12     businessperson that you had any discussion with
13     specifically about JJCI's financial condition at any
14     time between March of 2021 until October 14, 2021?
15    A: I don't recall that I did. I don't believe I
16     did.

**KIM, JOHN 30(b)(6)**

**Page 13**

13 :7    Q: Okay. Can you identify for me the in-house
8         counsel who negotiated or drafted or participated in the
9         negotiation or drafting of the funding agreement on
10        behalf of old JJCI?
11        A: So, again, I think I'll refer to the entire
12        response that says that there are no external
13        counterparties with whom to negotiate. And as is the
14        case with internal corporate restructurings generally,
15        the funding agreement was entered into after -- not
16        entered into after arm's length negotiations but rather
17        was the product of a review for fairness by the
18        authorized signatories for the parties and their
19        advisors.
20        With that, I would say that the counsel
21        for old JJCI were the counsel that were -- participated
22        in reviewing the funding agreement, which would include
23        myself, Andrew White, Erik Haas, Chris Andrew, White &
24        Case, Jones Day -- well, White & Case was specifically
25        representing J&J.
14 :1     And there may have been other outside -- I
2         think that's it. I'm thinking there might be tax
3         people, inside tax people as well; but I'm not -- but
4         principally for the drafting of participation in the
5         funding agreement would be the ones that I just listed.
6         Q: Okay. I just want to go through the four
7         in-house individuals starting with yourself.
8         A: Uh-huh. Yes.
9         Q: Whose interests were you representing when you
10        negotiated or drafted or participated in the negotiation
11        or drafting of the funding agreement?
12        A: As counsel that's employed by J&J but
13        representing all of its subsidiaries, I was representing
14        all the parties in reviewing the fairness of the deal.
15        Q: Okay. Same question for Mr. White. Whose
16        interests was Mr. White representing when he negotiated
17        or drafted or participated in the negotiation or
18        drafting of the funding agreement?
19        A: That would be the same answer. As a lawyer
20        hired -- employed by J&J representing all of its
21        subsidiaries, he was looking out for the interests of
22        all the parties to the funding agreement.
23        Q: Okay. Would you give the same answer in
24        response to the same question relating to Mr. Haas?
25        A: I would.
15 :1     Q: And would you give the same answer in response
2         to the same question with respect to Mr. Andrew?
3         A: I would.
4         Q: Were any conflict waivers ever sought or
5         obtained in connection with the negotiation or drafting
6         of the funding agreement?
7         A: No. Because there was no conflict in an
8         intercompany arrangement like this.
9         Q: Was any conflict waiver sought or obtained with
10        respect to any aspect of the corporate restructuring
11        described in your first-day declaration?
12        A: No. Because, again, there was no conflict in
13        that restructuring.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 15**

| | |
|---|---|
| 15 :16 | Did the debtor have independent counsel to |
| 17 | advise it in connection with the negotiation or drafting |
| 18 | of the funding agreement? |
| 19 | MS. BROWN: I object as lacking |
| 20 | foundation. |
| 21 | A: I don't know what you mean by 'independent |
| 22 | counsel.' The debtor was -- prior to the formation of |
| 23 | the debtor, LTL, the lawyers were representing all |
| 24 | parties' interests in the documentation. |
| 25 | Once LTL was formed, Jones Day was the |
| 16 :1 | attorney for LTL; and I became its chief legal officer. |
| 2 | And we provided legal advice to LTL. |
| 3 | Q: (By Mr. Morris) Okay. But the original |
| 4 | funding agreement was drafted and executed prior to the |
| 5 | time LTL was formed. Is that correct? |
| 6 | A: That is correct. |
| 7 | Q: Okay. You mentioned White & Case and Jones |
| 8 | Day. Were they like the in-house counsel, also |
| 9 | representing the interests of all of the Johnson & |
| 10 | Johnson parties who were parties to the restructuring? |
| 11 | A: Jones Day was. White & Case was specifically |
| 12 | hired to represent Johnson & Johnson, but Jones Day at |
| 13 | the time was retained to hire -- was retained for the |
| 14 | interests of old JJCI, Johnson & Johnson, you know, |
| 15 | throughout the transaction up until the formation of |
| 16 | LTL, at which point Jones Day became only LTL's counsel. |

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 21**

| | |
|---|---|
| 21 :7 | Q: And you're not aware of any other analysis that |
| 8 | was done that you can cite to that attempted to estimate |
| 9 | the fair market value of JJCI, correct? |
| 10 | A: LTL is not aware of any other document. |
| 11 | Q: Okay. Now, you were asked some questions by |
| 12 | Mr. Glasser yesterday about a reference to $60 million |
| 13 | that was made at the first-day hearing. Do you remember |
| 14 | that? |
| 15 | A: $60 billion. |
| 16 | Q: I'm going to try and sew the hole in my pocket |
| 17 | pretty soon. I appreciate that. |
| 18 | So I think you testified yesterday that |
| 19 | Mr. Haas was the source of the $60 billion number. Do I |
| 20 | have that right? |
| 21 | A: Yeah. As I testified in the prior hearing, at |
| 22 | some point in conversations with Mr. Haas I was -- he |
| 23 | noted that he believed that the number was around |
| 24 | 60 billion. But, again, that was just his belief at the |
| 25 | time. |
| 22 :1 | Q: But it was a belief that the debtor was |
| 2 | comfortable in relying upon when it presented that |
| 3 | number to the Court. Is that fair? |
| 4 | MS. BROWN: Objection, lacks foundation. |
| 5 | A: I testified at length that no valuation was |
| 6 | done by LTL about that -- about that valuation that was |
| 7 | in the funding agreement. |
| 8 | And when I mentioned the conversation I |
| 9 | had with Mr. Haas, it was in the context of LTL has no |
| 10 | idea what the actual number is. It had heard in a |
| 11 | conversation with Mr. Haas, and Mr. Haas believed it was |

12      $60 billion.
13      But, again, I made no representation that
14      that was the actual number. But we believe that that
15      is -- we believe it -- it sounds like a reasonable
16      estimation to us. And now this other document sort of
17      confirms the ballpark figure.
18      But, again, the document that was provided
19      is a source of information but is not the actual
20      calculation that is required to be done -- it was not
21      done under the funding agreement.
22      So, again, LTL doesn't know whether that
23      number is the actual number that you would get if you
24      did the funding agreement calculation; but we believe
25      that it's a fair approximate -- it could be a fair
23 :1    approximation or estimation of that amount.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 23**
23 :20   Q: Okay. Can we go to topic No. 5. Topic No. 5
21      concerns estimation of claims. Do you see that?
22      A: I do.
23      Q: Okay. Did LTL prepare or ask anybody to
24      prepare any analysis to estimate the number of talc
25      personal injury claims that might be asserted in the
24 :1    bankruptcy case?
2       A: No.
3       Q: Was the LTL board ever presented with any
4       analysis that purported to estimate the number of talc
5       personal injury claims that might be asserted in
6       bankruptcy?
7       A: Not claims that might be asserted in
8       bankruptcy, no. It was given the extent of the
9       litigation, the underlying cases, case numbers, and
10      understanding that the current case numbers would grow
11      outside of the bankruptcy and the financial impact of
12      that.
13      But it did not -- was not given
14      information nor -- LTL does not have any information, I
15      do not have any information about the potential number
16      of claims in the bankruptcy.
17      Q: And did LTL prepare or ask anybody to prepare
18      on its behalf any analysis that would show the growth
19      that you've just described?
20      A: The growth in the bankruptcy or outside of
21      bankruptcy?
22      Q: Either way, the growth of claims.
23      A: Well, outside of bankruptcy, we detailed our
24      understanding that because there's a latency period of
25      at least 60 years for cancer cases, that there will be
25 :1    exponential growth of claims outside of bankruptcy.
2       Again, in the bankruptcy, it was -- there
3       was no determination prior to filing bankruptcy and to
4       currently about estimating the actual claims that would
5       be presented in the bankruptcy case. We believe that's
6       something that may have to be done later, but there's
7       been no work done on that to date.
8       Q: Okay. So there's no -- withdrawn.
9       LTL does not have an estimate of the
10      number of claims that might be asserted in the
11      bankruptcy, correct?
12      A: Currently it does not. That exercise we
13      believe might have to be undertaken later.
14      Q: Okay. But it wasn't done prior to the filing
15      of the petition, correct?

16    A: Correct. Again, the numbers that they had were
17    the numbers that could be expected outside of
18    bankruptcy. But we did not do an estimation of what
19    might be expected in the bankruptcy.
20    Q: Can you tell me how many claims LTL expects
21    would have been filed outside of bankruptcy but for the
22    commencement of the bankruptcy proceedings?
23    A: In general terms, there would be exponential
24    growth of claims because of a 60-year latency period and
25    the fact that use of Johnson's Baby Powder was
26 :1    ubiquitous. So virtually every person in the country
2    could claim that they were exposed to Johnson's Baby
3    Powder at one point or another.
4    Q: Do you have any other information to share with
5    me about LTL's analysis of the number of claims that
6    might be asserted outside of bankruptcy?
7    A: I'd refer to --
8    MS. BROWN: Objection, vague.
9    THE WITNESS: I'm sorry?
10    MS. BROWN: I objected as vague. If you
11    understand, you can answer.
12    A: I would refer to and incorporate by reference
13    the first-day declaration that I filed and also the
14    objection to the motion to dismiss that lays out facts
15    upon which LTL relied upon in terms of potential
16    exposure in the tort system.
17    Q: (By Mr. Morris) Okay. Did LTL perform any
18    analysis or ask anybody to perform any analysis as to
19    the cost of resolving talc personal injury claims that
20    might be brought in the bankruptcy case?
21    A: At the LTL board meeting and prior to that
22    information was given to LTL board members about
23    settlements. There was no -- there was no calculation
24    of what settlements may be in the future in bankruptcy
25    because we believed that's premature.
27 :1    It's virtually -- it is impossible to
2    extrapolate from past settlements to what, you know, a
3    future bankruptcy settlement may look like. So that
4    exercise was not undertaken.
5    Q: Okay. Did LTL ever attempt to quantify the
6    costs that it would have to incur in order to resolve
7    talc personal injury claims outside of bankruptcy?
8    A: Again, because settlement is a negotiated
9    amount between parties and differs depending upon the
10    underlying facts and counsel, it was virtually
11    impossible to come up with an estimate of what future
12    talc liability may cost, not even including the fact
13    that there were future claimants who have not even been
14    exposed -- not even experienced their injury yet, which
15    we understand there could be an amount that would appear
16    in the future.
17    So, you know, the rate that that might
18    occur and the cost of that would be something that's --
19    that would be very difficult to come up with at that
20    time. So that process was not under -- that calculation
21    was not undertaken.
22    Q: Okay. So I've asked you questions about LTL
23    and whether it's done any of these analyses or whether
24    anybody's done it on its behalf. I want to go a little
25    bit broader now.
28 :1    Is LTL aware of any analysis or estimation
2    of the number of claims that might be asserted against a
3    Johnson & Johnson enterprise within the bankruptcy case?
4    A: LTL is not aware of any of that.
5    Q: Is LTL aware of any analysis that purports to

```
6        estimate the number of talc personal injury claims that
7        might have been asserted against the Johnson & Johnson
8        enterprise outside of bankruptcy?
9    A: Again, LTL -- for the same reasons why LTL
10       couldn't come up with that information, LTL is not aware
11       that that information was done outside of LTL.
12   Q: Is LTL aware of any analysis performed by
13       anybody at any time that attempts to estimate the cost
14       of resolving talc personal injury claims within the
15       bankruptcy?
16   A: It is not aware of that.
17   Q: Is LTL aware of any analysis that was performed
18       by anybody that purports to estimate the cost of
19       resolving talc personal injury claims outside of
20       bankruptcy?
21   A: LTL is not aware of that.
```

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 30**
```
30 :9    Q: Okay. So LTL knows what the reserve that was
10       taken with respect to talc personal injury claims, but
11       it won't reveal that in discovery because it contends
12       that it's privileged. Do I have that right?
13   A: LTL up through its chief legal officer
14       understands the process that reserves are set. Sitting
15       here today, it does not know the actual number; but it
16       knows that there is a number that's there that was
17       provided -- that was based on attorney/client-privileged
18       information.
```

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 32**
```
32 :20   Q: Okay. And that information wasn't provided to
21       the LTL board, correct?
22   A: The information underlying that calculation, so
23       the number of cases that we had, the number -- the cost
24       of those cases, how much we've been spending, the 5 to
25       $10 million a month run rate, the number of settlements
33 :1    that we -- you know, the amount of settlements we
2        entered into, all that which was a component of reserve
3        setting was given to the board.
4        What was not told to the board was that
5        because of that, on the consolidated statement there is
6        a reserve off.
7        So all the financial aspects were told to
8        the board. It just was not told in the form that
9        there's a reserve for that.
10   Q: But the reserve reflects the judgment of the
11       lawyers at Johnson & Johnson with respect to the
12       reasonably ascertainable future costs. Is that fair?
13   A: That is fair, yes.
14   Q: Okay. And that judgment in the form of the
15       reserve number wasn't shared with the LTL board,
16       correct?
17   MS. BROWN: Objection.
18   A: I disagree. I can answer again. The --
19   Q: (By Mr. Morris) Okay.
20   A: I disagree with that. What wasn't told to the
21       board was that this was a reserve number.
22   Q: Okay.
23   A: The board --
24   Q: That's my only question.
```

```
   25      A: The board was given all the underlying
34 :1       information about it.
    2      Q: I know.
    3       Do you know why -- do you know why the
    4       board wasn't just given the number?
    5      A: I think it was unnecessary for the board's
    6       determination. Again, what's in the reserve is not --
    7       again, it's probable and estimable. But the information
    8       we gave the board was far more than what the reserve
    9       number is.
   10       So, you know, again, the information given
   11       to the board encompassed all that, but --
   12      Q: But the -- I apologize. I don't mean to step
   13       on your words.
   14      A: The information given to the board encompassed
   15       all the information that would go into setting the
   16       reserve plus more, plus advice of counsel.
   17       So, again, the underlying information
   18       about the reserves -- about how reserves are set or the
   19       basis of the reserves was given to the board. It just
   20       wasn't told to the board that this was the reserve.
   21      Q: And the difference between what was given to
   22       the board, those are facts that reflect the actual cost
   23       and the number of cases and the actual settlements,
   24       correct?
   25      A: Plus the board was told what was expected, what
35 :1       we could expect. So the future was -- the future of the
    2       litigation was discussed at length with the board.
    3       So it's not just -- again, all the
    4       information that goes into calculating reserve was given
    5       to the board. We just did not give the board the
    6       reserve number that was in the books because we thought
    7       we were giving the board more information than that.
```

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 35**

```
35 :13     Q: Has LTL or anyone acting on its behalf prepared
   14       any draft Chapter 11 plan of reorganization?
   15      A: It has not.
   16      Q: Has anyone -- withdrawn.
   17       Has LTL or anyone acting on its behalf
   18       created any projections of future financial performance
   19       of a post-reorganized LTL?
   20      A: We have not at this point done that.
   21      Q: Has LTL or anybody acting on its behalf
   22       prepared any type of feasibility analysis with respect
   23       to any contemplated Chapter 11 reorganization plan?
   24      A: Not a written feasibility analysis. We believe
   25       that a plan is feasible and that we hope to develop one.
36 :1      Q: Okay. Anything other than your hopes that the
    2       debtor has undertaken to try to determine whether
    3       there's a feasible plan of reorganization?
    4      A: Well, based upon discussion with counsel -- so
    5       it's not only our hopes, it's, you know, based upon
    6       discussions, we believe that there's a plan that's
    7       feasible, yes.
    8      Q: Okay. But no feasibility analysis has been
    9       undertaken, correct?
   10      A: So I'm not sure what you mean by feasibility
   11       analysis. There's no -- we don't have a written
   12       document that goes -- titled Feasibility Analysis. But
   13       we have had discussions, and we believe that based upon
   14       the experience and expertise of our bankruptcy counsel
   15       and the facts of the case, we believe that a Chapter 11
```

16        plan will be feasible.

---

**KIM, JOHN 30(b)(6)** - *02/01/2022*

---

**Page 36**

36 :23        Q: Okay. Does LTL have any secured creditors?
24        A: I do not believe it does.

---

**KIM, JOHN 30(b)(6)** - *02/01/2022*

---

**Page 37**

37 :5        Q: Okay. As the corporate representative, are you
6        aware of any secured debt that the debtor needs to
7        address or resolve within the bankruptcy?
8        A: I do not. I am not aware of any.
9        Q: Are you aware of any asset that LTL owns that
10        is subject to a lien or security interest of any kind?
11        A: I do not believe that there are any, no.
12        Q: Okay. Does LTL have any trade creditors?
13        A: I do not believe it does.

---

**KIM, JOHN 30(b)(6)** - *02/01/2022*

---

**Page 45**

45 :10        Other than contracts that concern claims
11        based on talc and intercompany agreements, is LTL party
12        to any other contract that you're aware of?
13        A: I am not aware of any.

---

**KIM, JOHN 30(b)(6)** - *02/01/2022*

---

**Page 45**

45 :15        LTL has no employees, correct?
16        MS. BROWN: Objection, foundation.
17        A: LTL's employees that have been seconded to it
18        from Johnson & Johnson Services, Inc.

---

**KIM, JOHN 30(b)(6)** - *02/01/2022*

---

**Page 45**

45 :21        Are you aware of any tax claims that have
22        been asserted against LTL?
23        A: I am not aware of any claims asserted.
24        Q: Okay. We talked yesterday -- not we, but other
25        lawyers and yourself spent some time on the funding
46 :1        agreement. Do you remember that?
2        A: I do recall that, yes.
3        Q: Okay. Does LTL have any reason to believe that
4        Johnson & Johnson and JJCI will not honor its
5        obligations under the funding agreement?
6        A: It has no reason to believe that Johnson &
7        Johnson and JJCI will not honor the terms of the funding
8        agreement.
9        Q: In fact, LTL expects Johnson & Johnson and JJCI
10        to honor their obligations under the funding agreement,
11        correct?
12        A: LTL does and has already undertaken -- gotten
13        funds from the funding agreement.
14        Q: Okay. Does LTL have any reason to believe that
15        Johnson & Johnson or JJCI will be unable to fulfill
16        their obligations under the funding agreement?

17        A: It has no reason to believe that.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 50**

50 :21        Q: And I appreciate that. So LTL expects to be
22        able to fully fund the cost of managing and resolving
23        talc personal injury claims at an amount that's less
24        than the full value of JJCI, correct?
25        A: I would say yes. Again, if things go as LTL
51 :1        believes it should, that would be true.
2        Outside the bankruptcy system, though,
3        that -- you know, the cost of the litigation, again,
4        could be substantial and unsustainable.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 52**

52 :25        Q: Okay. And are you personally familiar with the
53 :1        types of assets that LTL owns?
2        A: I am familiar with the assets, yeah. As a
3        30(b)(6) witness for LTL, I am familiar with LTL's
4        assets, yes.
5        Q: All right. And I think we talked about that
6        yesterday, but has anyone -- has LTL or anybody acting
7        on its behalf done any analysis to determine its
8        going-concern value?
9        A: There's been no analysis of LTL's going-concern
10        value, no.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 58**

58 :15        Q: And, Mr. Kim, does LTL have any knowledge of
16        the net income after taxes under GAAP of old JJCI for
17        the period ended December 2020?
18        A: Again, no. LTL would not have that knowledge.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 60**

60 :4        Q: (By Mr. Dine) Mr. Kim, is LTL aware of what
5        the net income of JJCI was as of September 2021 under
6        GAAP after taxes?
7        A: It does not.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 60**

60 :21        Q: And, Mr. Kim, are you aware of any valuation,
22        formal or informal, of any royalties or royalty streams
23        or rights to royalties assigned to or acquired by
24        Royalty A&M?
25        A: It is.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 61**

61 :2        Of what valuations is LTL aware?
3        A: LTL is aware of a net present value calculation
4        which has been produced for the royalty streams that was
5        acquired by Royalty A&M.

6    **Q: And is that the only valuation of which LTL is**
7    **aware?**
8    **A: It is.**

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 64**

64 :1    **Exhibit 173 is the intercompany facility**
2    **agreement between Johnson & Johnson and Royalty A&M LLC,**
3    **and it's bearing Bates No. -- starting with Bates**
4    **No. LTL 2663. I just want to confirm that that's the**
5    **same as the Exhibit 11 -- No. 11 in your binder.**
6    **A: It is, and I have downloaded it.**
7    **Q: All right. And, Mr. Kim, what is this**
8    **document?**
9    **A: This document represents a revolving credit**
10    **line that Royalty A&M has with Johnson & Johnson up to**
11    **$50 million. So this facility allows RAM to borrow**
12    **money from Johnson & Johnson in order to do its business**
13    **of acquiring royalty streams.**
14    **Q: And this agreement is currently in effect?**
15    **A: Yes. It is in effect, yes.**

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 64**

64 :18    **Has Royalty A&M drawn any funds under this**
19    **agreement?**
20    **A: Royalty A&M has indicated to Johnson & Johnson**
21    **that it intends to in connection with an acquisition of**
22    **a royalty stream that Royalty A&M is currently**
23    **negotiating.**

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 68**

68 :1    **Q: Now, the proposed funding of a qualified**
2    **settlement for payment of talc claims, that's**
3    **$2 billion, correct?**
4    **A: It is.**
5    **Q: And LTL has not received that $2 billion,**
6    **correct?**
7    **A: That is correct. We're waiting for court**
8    **approval.**
9    **Q: And do you know -- does LTL know on what**
10    **calendar date that amount will be received by LTL?**
11    **A: I think it depends on court approval.**
12    **Q: Does LTL know that it will receive court**
13    **approval for payment of that sum?**
14    **A: It believes it will.**
15    **Q: But it does not know?**
16    **A: It is more probable that it will.**
17    **Q: Well, when you say 'more probable,' what**
18    **percentage probability does LTL assign to the likelihood**
19    **of the Court approving such funding?**
20    **A: I think probable enough to warrant putting it**
21    **in as a account receivable in its monthly reporting**
22    **report.**
23    **Q: But that payment might not occur?**
24    **A: If the Court does not approve it, then it may**
25    **not occur, which is why in the global notes we specify**
69 :1    **that it is if approved.**
2    **Q: And is the presentation of that $2 billion with**
3    **respect to the pre-petition funding, item 2(a), is that**

4        made under generally accepted accounting principles?
5        **A: I do not believe the monthly operating report**
6         **is GAAP accounting, but --**
7        **Q: Is your next --**
8        **A: -- I would have to defer to our accounting**
9         **experts at AlixPartners who helps us with this filing.**

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 69**
69 :16      **Are LTL's books and records kept under**
17        **GAAP?**
18        **MS. BROWN: Objection, speculation, vague.**
19        **A: I don't know that we currently have a financial**
20         **statement that was prepared under GAAP in its books and**
21         **records at this point in time.**
22        **Q: (By Mr. Dine) Has LTL recorded the $2 billion**
23         **as a receivable on its books and records?**
24        **A: I don't believe LTL has made any recordings at**
25         **this time other than these monthly operating reports.**
70 :1       **Q: Is there any -- I'm sorry.**
2        **A: I'm just trying to think. I'm trying to think**
3         **if there are any other financials that have been**
4         **created. I believe these monthly operating reports are**
5         **the only financials that have been created so far.**

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 70**
70 :18      **Q: (By Mr. Dine) Is there any explanation in this**
19         **document as to whether or not this $2 billion is**
20         **appropriately recorded in LTL's books and records under**
21         **GAAP?**
22        **A: Again, this deals with the monthly operating**
23         **report, which I do not believe is under GAAP. And the**
24         **notes to this report details all the information**
25         **required to understand what those numbers are and what**
71 :1       **they represent.**

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 76**
76 :1       **Q: Who determined that RAM should be formed?**
2        **A: As part of the reorganization, a consensus was**
3         **reached by the folks putting the reorganization together**
4         **to create and capitalize RAM.**
5        **Q: And those would be people in the Project Plato**
6         **work stream?**
7        **A: Well, Project Plato work stream, and there were**
8         **discussions with Thibaut Mongon and folks that work with**
9         **Mr. Mongon about capitalization of Royalty A&M. So he**
10         **was involved in those discussions.**
11        **Q: And what was the purpose of the formation of**
12         **RAM?**
13        **A: So RAM is an asset of LTL whose worth and**
14         **income can be used to help LTL in its mission of fairly,**
15         **completely and efficiently resolve the talc litigation.**

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 77**
77 :1       **Q: (By Mr. Kahn) So the purpose of forming RAM**
2         **was to provide an income stream to LTL. Is that**

3      correct?
4      A: An asset and income stream, yes.
5      Q: Was RAM formed for the purpose of attempting to
6      comply with the requirements of section 524(g) of the
7      Bankruptcy Code?
8      MS. BROWN: I'm going to object. That
9      calls for a legal conclusion.
10     And to the extent that it would implicate
11     legal advice, Mr. Kim, I'll instruct you not to answer.
12     Q: (By Mr. Kahn) Can you answer?
13     A: I think I answered to the extent that I can
14     without revealing privileged information.

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 79**

79 :13    Q: What did old JJCI receive in exchange for its
14        contribution of a revenue stream to RAM?
15        MS. BROWN: Asked and answered.
16        Go ahead again.
17        A: I'm not sure if I understand your question.
18        This was a restructuring where a subsidiary was formed.
19        As part of the restructuring, old JJCI -- there was a
20        series of steps in the step plan where, you know,
21        companies become parents of other companies,
22        contributions of capital are made, and, you know, it
23        would be exchanged for being a parent of a company and
24        so there's no -- I don't believe the question what did
25        old JJCI receive for a contribution makes any sense.
80 :1     RAM contributed an income stream of
2         367.1 million. RAM and its parents were allocated the
3         liabilities of old JJCI as it relates to talc
4         liabilities, and through a series of mergers old JJCI
5         stopped existing. I think that's the best I can answer
6         the question.

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 82**

82 :4     Q: (By Mr. Kahn) I'm sorry. Does RAM have any
5         employees?
6         A: RAM has employees to it -- it's the same
7         employees that were seconded to LTL. So Mr. Wuesthoff,
8         Mr. Dickinson and I are all employees of RAM as well.
9         Q: Okay. And on the board of both LTL and RAM is
10        Mr. Deyo, correct?
11        A: Mr. Deyo is on the board of managers for LTL.
12        He is not on the board of managers for RAM.
13        Q: For purposes of the board of members of LTL,
14        he's listed as disinterested director, is he not?
15        A: He is.
16        Q: Did LTL come to an understanding that he was
17        disinterested?
18        A: Yes. LTL believes that he is an uninterested
19        director.
20        Q: And upon what basis did it make that
21        determination?
22        A: Mr. Deyo has been not a employee of any
23        Johnson & Johnson entity for over ten years, was not
24        working for or had any relationship -- any working
25        relationship with Johnson & Johnson at the time -- since
83 :1     that time, and so -- any Johnson & Johnson entity since
2         that time. So it was determined that he would be a
3         disinterested director.

4       **Q: Mr. Deyo had been an employee of Johnson &**
5       **Johnson or one of the entities in its enterprise for**
6       **over 20 years, had he not?**
7       **A: He had. But that ended more than ten years**
8       **ago.**

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 84**
84 :5       **Q: (By Mr. Kahn) Did LTL make any inquiry of**
6       **Mr. Deyo's disinterestedness as to whether he currently**
7       **owns any stock in J&J?**
8       **A: We do not consider stock ownership itself to be**
9       **interest in LTL -- make him interested.**
10       **Q: So you didn't make that inquiry of him?**
11       **A: I do not believe we made inquiry of him as to**
12       **what shares of whatever stock he owns.**
13       **Q: Did you make any inquiry as to whether he was**
14       **receiving any type of pension or retirement benefits**
15       **from Johnson & Johnson or arising from his employment at**
16       **Johnson & Johnson?**
17       **A: Again, I think because he has not been employed**
18       **by Johnson & Johnson for the last ten years, we did not**
19       **make those inquiries.**

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 88**
88 :15       **Q: So all of the royalty accounting and daily**
16       **rigmarole of monitoring royalty streams is being**
17       **performed by new JJCI under this agreement?**
18       **A: It is.**
19       **Q: And that was the type of services that were**
20       **rendering as to these royalty streams prior to the**
21       **creation of RAM, was it not?**
22       **A: They were.**
23       **Q: So there's no change in terms of day-to-day**
24       **drudgery of monitoring and tracking royalty?**
25       **A: Correct.**

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 90**
90 :17       **Q: Would it be correct to state that prior to**
18       **let's say October 1, 2021, you were employed by**
19       **Johnson & Johnson?**
20       **A: I was employed by Johnson & Johnson, the parent**
21       **company, yes.**
22       **Q: All right. And then we went through yesterday**
23       **that sometime in the first half of October of 2021 your**
24       **employer changed to JJSI. Would that be correct?**
25       **A: That is correct.**
91 :1       **Q: Is the same true as to Mr. Wuesthoff? Was he**
2       **employed by J&J but then became employed by JJSI shortly**
3       **before the restructuring?**
4       **A: I believe that's true, yes.**
5       **Q: And would the same be true as to Mr. Dickinson?**
6       **A: Yes.**

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 92**
92 :6       **Q: What does seconded mean, your understanding?**

        7        A: My understanding is that you become an employee
        8         of another organization, but your salary and benefits
        9         and administrative -- administrative issues are dealt
       10         with by your -- the company that's seconding you.
       11         So administratively, in terms of benefits
       12         and salary, all amounts are being -- still being paid by
       13         the employer seconding, sending you to the new employer,
       14         and that new employer's obligation is to pay back a
       15         portion of that.
       16        Q: But currently you're an employee of JJSI,
       17         correct?
       18        A: I am an employee of JJSI seconded as an
       19         employee to LTL.
       20        Q: As an employee of JJSI, to whom do you report?
       21        A: I report to Bob Wuesthoff.
       22        Q: And to whom does Mr. Wuesthoff report?
       23        A: Mr. Wuesthoff reports to Mr. Bob Decker.
       24        Q: Remind me who Mr. Decker is, please.
       25        A: He is the controller at Johnson & Johnson. So
    93 :1         he reports to him administratively.
        2        Q: And to whom does Mr. Dickinson report?
        3        A: Mr. Dickinson also reports to Mr. Decker.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 94**
    94 :8        Q: Okay. Do you understand that as an employee,
        9         you owe a fiduciary duty to your employer?
       10        A: I think as a lawyer I understand that my
       11         fiduciary duty is to LTL.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 95**
    95 :15       Q: There were no independent fairness opinions
       16         generated or received in connection with any of those
       17         (inaudible)?
       18        A: I agree there are no third-party fairness
       19         opinions generated or received nor were they required
       20         because of the intercompany transaction.
       21        Q: And it's your understanding that all of these
       22         transactions were fair to all of the parties involved?
       23        A: It is.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 102**
   102 :24       Q: (By Mr. Glasser) Is it the case that you -- is
       25         it true that you never told the board of LTL what the
   103 :1         amount of the potential settlement in Imerys was?
        2        A: I believe they were told.
        3        Q: When?
        4        A: Prior to the board meeting. Prior to the board
        5         meeting there were conversations about the Imerys --
        6         potential resolution of Imerys and how that fell
        7         through. In the context of that, I think ranges may
        8         have been given in that context.
        9        Q: What was the highest range given?
       10        A: That would be privileged.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 105**

105 :1    Q: No, no. So in the Travelers documents and in
2    other documents we've received it is clear that there
3    were deals cut with lawyers that were like, we'll take
4    your existing cases and then we'll take a hundred more
5    ovarian cancer cases or 200 more cases.
6    Explain to me how those deals worked.
7    A: That's a subject of privilege, and that
8    document that you're referring to was -- is privileged.
9    Q: I'm not using the document. I want to know how
10    do you do -- is it a written deal or just a handshake
11    deal with somebody that, Hey, you can settle a hundred
12    more cases?
13    A: So as I testified to yesterday already, there
14    were agreements to agree for certain deals. So there
15    were deals that we had an agreement where if they
16    presented a number of plaintiffs we would settle, those
17    deals -- for some of those deals they did present people
18    for settlement that was not consummated.
19    So we didn't get to -- we got the
20    releases, but we paid -- we did not pay by the time we
21    filed for bankruptcy. So, in other words, if I have a
22    deal with you that says, you know, We will pay you
23    $5,000 for these plaintiffs when you give us the
24    releases, at some point you gave us the releases, but we
25    didn't pay prior to filing bankruptcy. So those were
106 :1    unconsummated. So basically we never paid them.
2    Bankruptcy got filed, and now they're in limbo.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 111**
111 :5    Q: (By Mr. Glasser) Let me ask the question
6    again. Explain to me what benefit would adhere to LTL
7    to even remotely keep those indemnities.
8    MS. BROWN: I object. Beyond the scope of
9    the notice and calls for speculation and has been asked
10    and answered.
11    Q: (By Mr. Glasser) Okay. You can answer the
12    question.
13    A: We have not done that analysis on accepting or
14    rejecting executory contracts at this point.
15    Q: Okay. So it follows from that you cannot have
16    shown the board any such analysis, correct?
17    MS. BROWN: Objection, beyond the scope of
18    the notice.
19    A: We discussed with the board the contract, the
20    indemnity obligations. So that was discussed. What was
21    not discussed was whether we should -- whether we should
22    try to reject them and the ramifications of that.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 113**
113 :24    Q: So you agree that qualified settlement funds
25    are not LTL; they're a separate trust?
114 :1    MS. BROWN: Objection, beyond the scope.
2    A: I would say they are -- currently they would be
3    under a separate trust on the form that we submitted;
4    but, again, this is all subject to court approval. So
5    it's speculative at this point.
6    Q: (By Mr. Glasser) And you also understand that
7    because it's a separate trust and because it's a
8    qualified settlement fund, Johnson & Johnson, the
9    contributor, will actually get a tax deduction for it,

10      right?
11      A: LTL, I think, is -- would not be aware of --
12      isn't aware of the tax implications of this. Again, the
13      fund itself and the order -- the creation is also
14      subject to court order, which has not happened.
15      Q: You said in response to some questions from
16      Mr. Morris that the 2 billion should be sufficient to
17      resolve the case in bankruptcy. Do you remember those
18      questions and answers?
19      MS. BROWN: Objection, misstates his
20      testimony.
21      A: I testified that the 2 billion I thought was
22      appropriate.
23      Q: (By Mr. Glasser) And it must have been
24      appropriate in relation to what you expect the
25      obligation to be in bankruptcy, right?
115 :1      MS. BROWN: This is beyond the scope. I
2      object.
3      A: Yeah, I think -- we had a lengthy discussion
4      about what the result of the bankruptcy should be and
5      what it might be versus what it could -- what it will
6      be.
7      So, you know, again, LTL believes that
8      baby powder, talc, does not cause the injuries that's
9      being complained of in the complaints. So we think
10      that, you know, 2 billion would be sufficient for that
11      purpose.
12      But, again, we are here on a good-faith
13      basis to try to resolve the claims which takes -- which
14      means that it would be an agreement among all the
15      parties to the right amount.
16      So, you know, again, the value of JJCI is
17      well beyond the $2 billion. Somewhere near 2 billion or
18      over 2 billion or under 2 billion up to $60 billion
19      would be sort of the value -- the numbers that these
20      values would contemplate.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 116**
116 :16      Q: (By Mr. Glasser) Do you contend you're in
17      financial distress? So answer the question, Mr. Kim.
18      A: Yes. We contend we're in financial distress.
19      Q: And I'm asking you. Is one mesothelioma trial
20      out there in tort world enough to put LTL in financial
21      distress?
22      A: I think it's speculative and would depend upon
23      the circumstances.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 118**
118 :23      Q: I want to know where the -- any kind of serious
24      near-term financial distress, or do you concede there
25      was no serious near-term financial distress?
119 :1      A: So if your hypothetical was as of the time, you
2      know, did the next trial cause financial distress, I
3      would say the company was already in financial distress.
4      It doesn't matter how many trials are in the future. It
5      was already in financial distress because of the number
6      of cases that were out there, the rate of spending that
7      the company was doing, the likelihood of these jackpot
8      jury awards that sporadically happened, the future
9      development of the cases, including the fact that

10      there's a 60-year latency period, and that virtually
11      everyone in the country had been exposed to Johnson's
12      Baby Powder at one point.
13      All those caused the financial distress.
14      It was not the next trial or the next five trials. At
15      that point the company was already in financial
16      distress.
17      Q: How many cases had LTL named as a defendant on
18      October 14, 2021?
19      MS. BROWN: Objection, beyond the scope.
20      A: So LTL assumed the liability of old JJCI and
21      old JJCI ceased to exist. At that point on October 14
22      any lawsuit that involved JJCI was the responsibility of
23      LTL.
24      So to ask whether LTL was named as a
25      defendant misstates what the facts were at that time.
120 :1   Q: (By Mr. Glasser) What's the answer to my
2       question, though? How many cases had named LTL as a
3       defendant as of the bankruptcy?
4       MS. BROWN: It's beyond the scope.
5       Q: (By Mr. Glasser) Zero, right? Zero.
6       MS. BROWN: He's going to answer. You
7       need to stop asking compound questions. I'm going to
8       object as beyond the scope.
9       If you know the answer in your individual
10      capacity, Mr. Kim, you can go ahead and answer.
11      A: So at the time of LTL's formation, nobody knew
12      of LTL's existence. So nobody named it as a defendant.
13      After LTL came into existence, it, A,
14      assumed all the liability that old JJCI had and by
15      operation of law generally we would say became liable
16      for those lawsuits.
17      Subsequent to LTL filing for bankruptcy,
18      there have been a number of cases that have been filed
19      despite the fact that there was an order -- a temporary
20      restraining order that named LTL as a defendant.
21      Sitting here today, I don't recall how many cases there
22      were.

---

**KIM, JOHN 30(b)(6)** - *02/01/2022*

---

**Page 122**

122 :17   Topic 3 references a Jones Day
18      announcement which I'm sure you're familiar with which
19      -- I'll read you the title of the announcement. If we
20      have to pull it up, we certainly can. It was on
21      November 12, 2021 where the heading was Johnson &
22      Johnson announces plans to accelerate innovation, serve
23      patients and consumers and unlock value through intent
24      to separate consumer health business.
25      Are you generally familiar with that
123 :1   announcement which J&J made in November?
2       A: I am familiar with the announcement. I think
3       this is a topic we objected to. I'm happy -- I don't
4       know what Ms. Brown wants to recommend here.

---

**KIM, JOHN 30(b)(6)** - *02/01/2022*

---

**Page 125**

125 :21   Q: Okay. And were you -- strike that.
22      Was anybody -- to your knowledge, was
23      anybody at RAM involved in negotiation of the contracts
24      which provide a royalty stream to RAM?
25      A: Well, the contracts that gave the royalty

126 :1    stream to RAM were not negotiated contracts. Those were
2    contracts drafted by attorneys representing all the
3    parties.
4    Again, because it was an intercompany
5    transaction, those attorneys represented all interested
6    parties and there was no third-party negotiation on
7    them.

---

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 130**

130 :7    Q: (By Mr. Jonas) Can I ask you, are you
8    familiar -- is it fair to say that the permitted funding
9    use, the uses for which LTL can make a request of J&J or
10    JJCI for funding?
11    A: Yes. You can call on the funding agreement to
12    pay -- these would be permitted uses for funding, yes.
13    Q: Okay. And I just want to -- was this position
14    negotiated by LTL at all?
15    MS. BROWN: Asked and answered.
16    A: Yeah. I would refer to the answers to the
17    interrogatories. Because these are intercompany
18    arrangements, there was no third-party negotiations on
19    these. All these documents were reviewed by the company
20    and its advisors for fairness; but there's no -- and at
21    any time if anyone thought something was unfair, they
22    could always raise their hand and say, Hey, this is
23    unfair. So that's the process that was used.
24    Q: (By Mr. Jonas) So as the chief financial
25    officer -- I'm sorry. As the chief legal officer of
131 :1    LTL, then is it fair to say that you believe that all
2    provisions of the amended and restated funding agreement
3    are, in fact, fair?
4    A: I believe that's true, yes.
5    Q: So I'd like you to take a look at section --
6    where we're looking here under permitted funding use,
7    particularly (c). Do you see section (c) where it
8    begins, 'The funding of any amounts to satisfy'?
9    A: I do see that.
10    Q: I think we talked about (i) yesterday. It
11    says, 'The funding of any amounts to satisfy the payee's
12    talc-related liabilities established by a judgment of a
13    court of competent jurisdiction,' et cetera. Then it
14    goes on to say 'at a time when there's no proceeding
15    under the Bankruptcy Code.'
16    I think you said it was one of LTL's
17    options that if it stayed out of bankruptcy, it would
18    have the availability in this section to seek funding of
19    talc-related liabilities. Is that generally correct?
20    A: Generally. This would be the option of going
21    forward in the tort system.
22    Q: And I guess the option that LTL chose -- that
23    is, to file bankruptcy -- that's effectively covered by
24    (c)(ii) which says, 'Following the commencement of any
25    bankruptcy case,' right? Is my understanding correct?
132 :1    A: But there's also section (b) above that deals
2    with the payment of any and all costs and expenses of
3    the payee incurred during the pendency of any bankruptcy
4    case, including the costs of administering the
5    bankruptcy case.
6    So that provision also applies if there's
7    a pending bankruptcy.
8    Q: And what is your understanding of what costs
9    and expenses means, since you made reference to it?
10    A: It's the costs of administrating the case, as

11          stated there.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

Page 134
134 :21          If you look at (c)(ii), is it correct
22          that -- is it LTL's understanding that Johnson & Johnson
23          and JJCI's obligations to fund LTL's talc-related
24          liabilities after the beginning of the bankruptcy case
25          is conditioned on there being a confirmed plan of
135 :1          reorganization?
2          A: That is not correct.
3          Q: Can you explain to me why that is not correct
4          pursuant to (c)(ii)?
5          A: (c)(ii) only relates to the specific issue of
6          creating a fund. All right? So if you look at (c)(ii),
7          it says, 'Following the commencement of any bankruptcy
8          case, the payee's talc-related liabilities in connection
9          with the funding of one or more trusts for the benefit
10          of existing and future claimants created pursuant to a
11          plan of reorganization for the payee confirmed by a
12          final non-appealable order of the bankruptcy court and
13          to the extent required, the district court,' and it goes
14          on.
15          So that (c)(ii) relates only to the
16          funding of a trust. All right? So that would be -- if
17          there's a settlement fund, then it's got to be approved
18          through a final non-appealable order.
19          Section (b) and section (c)(iii) deals
20          with the cost of paying talc-related liabilities not in
21          the trust.
22          Q: Okay.
23          A: So only the trust portion -- if you're going to
24          settle the cases and create a trust, then it only gets
25          funded if that's an approved -- subject to an approved
136 :1          plan.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

Page 138
138 :15          How does LTL plan to fairly and equitably
16          resolve talc claims in bankruptcy?
17          A: So I'll refer to my first-day declaration where
18          there is a statement in there about how it wants to
19          settle the claims through a trust.
20          Q: Uh-huh.
21          A: So, again, I would incorporate the first-day
22          declaration answer and refer to that.
23          Q: Great.
24          A: So it states that the intent -- the intent is
25          to negotiate a trust agreement -- a settlement trust.
139 :1          Q: Okay. Thank you very much. That's very
2          helpful.
3          So now let's go back to (b)(ii). Since we
4          now understand that LTL intends to create a trust to
5          fairly and equitably resolve talc claims, that would
6          fall under -- in order to compel payment or seek payment
7          from J&J and JJCI, you'd have to look to section (c)(ii)
8          that we're looking at now, right? Isn't that where I
9          would look to find out how you're going to effect
10          payment pursuant to a trust for talc claimants?
11          A: Yes.
12          Q: Okay. And when I look at (c)(ii), isn't it the
13          case that the only way to effect that payment from J&J

14        or JJCI is pursuant to a confirmed final non-appealable
15        order of the bankruptcy court of a plan of
16        reorganization which contains, pursuant to which J&J and
17        JJCI will receive injunctive protection under either 105
18        or 524(g)? Isn't that what that says?
19        A: The agreement says what it says. Yeah, the
20        agreement says what it says.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 141**
141 :20        Q: (By Mr. Jonas) Yeah. If you just look at the
21        last sentence. It says the JJCI value shall be
22        calculated at and only at any date on which, and it says
23        (x) the payors refuse to make a requested payment under
24        this agreement, et cetera, et cetera.
25        Again, I -- there's nothing wrong with it.
142 :1        I guess it's a good thing. I'm trying to confirm that.
2        You only have to value old JJCI if the payors refuse to
3        make a payment. So as long as they're paying, you never
4        have to value old JJCI even if they pay more than
5        whatever old JJCI's worth. That's what I'm trying to
6        understand.
7        A: I hear what you're saying. So, again, if by
8        happenstance we overshoot it, I agree that that provides
9        for that, that -- what the payment date -- when you
10        calculate the payment may be at a time where they've
11        already provided more money than the value.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 145**
145 :10        Q: (By Mr. Jonas) And let me ask this question.
11        I'm really almost done. But has LTL determined whether
12        it will be necessary to obtain J&J and JJCI's consent to
13        the assignment of the amended and restated funding
14        agreement in order to emerge from bankruptcy?
15        MS. BROWN: Objection, beyond the scope,
16        calls for speculation.
17        A: I think that would be speculative and depend
18        upon how -- you know, what the emergence of bankruptcy
19        looks like.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 149**
149 :7        Q: (By Mr. Block) On behalf of LTL, who was your
8        chief legal officer on October 12th, 2021?
9        A: It was me.
10        Q: Okay. And on behalf of LTL, did LTL have a
11        chief legal officer before October 12th, 2021?
12        A: It did not.
13        Q: Okay. Did LTL's chief legal officer, John Kim,
14        as of October 12th, 2021 possess years of knowledge
15        about the talc litigation that had occurred against J&J
16        in the previous years?
17        A: He previously -- he personally did. So I
18        personally have knowledge.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 149**
149 :21        And testifying on behalf of LTL, has LTL's

22  chief legal officer, John Kim, utilized the knowledge he
23  knew about the talc litigation prior to the time that he
24  joined LTL?
25  A: I would say to some extent, yes.
150 :1  Q: Okay. Testifying on behalf of LTL, did John
2  Kim, LTL's chief legal officer, educate the LTL board
3  about certain facts relating to the talc litigation that
4  LTL's legal officer, Mr. Kim, had learned about over the
5  previous number of years before Mr. Kim had joined LTL?
6  A: There were certain facts that were reported to
7  LTL Management.
8  Q: Okay. And the board that we've been talking
9  about today was -- of LTL is Dickinson, Wuesthoff and
10  Deyo, correct?
11  A: Correct.
12  Q: And you're not on the board even though you
13  hold these positions of chief legal officer, treasurer
14  and secretary, correct?
15  A: Correct. I am not on the board.
16  Q: Okay. So you as chief legal officer of LTL,
17  you shared with the board your knowledge about the
18  volume of talc cases that had been pending against the
19  J&J entities and that were now pending against LTL after
20  its creation, correct?
21  A: I along with Andrew White at times and along
22  with the first-day declaration and informational
23  statement that was given to the board.
24  Q: Okay. And I think you said today that you had
25  shared with the board or Mr. White had shared with the
151 :1  board that you believe that the talc litigation, as it
2  then stood against LTL after its formation, was, I think
3  you said, unpredictable, correct?
4  A: I would say the verdicts are unpredictable.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 155**

155 :19  THE REPORTER: 'Question: Okay. Well,
20  was the LTL board informed that one of the possible
21  alternatives to filing for bankruptcy was potentially
22  settling the talc cases in the tort system? Were they
23  informed of that as one of the alternatives?'
24  MS. BROWN: Beyond the scope. I object.
25  A: In discussing alternatives and going forward
156 :1  with the tort system, it was understood that, yes, we
2  can always try to settle cases.
3  But it was, again, A, you can't deal with
4  futures in the tort system. Regardless of how many
5  cases you want to settle, you can't deal with claimants
6  that haven't appeared, that haven't been represented by
7  any lawyer, that might not even have been born yet.
8  So it was discussed, yes.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 157**

157 :3  Did LTL prior to voting on the filing of
4  bankruptcy on October 14, 2021 know that J&J had settled
5  the majority of mesothelioma cases that had been filed?

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 157**

157 :6  MS. BROWN: Object as beyond the scope.

7        Go ahead.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

Page 157
157 :8        A: I think we went through the statistics of cases
9             that were there and cases that had been recalled. I
10            don't know whether we said it was the majority of the
11            cases that were filed. We did go through the statistics
12            and also noted that there could be an explosion of cases
13            in the future.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

Page 158
158 :24       THE REPORTER: 'Question: Is it true
25            that -- did LTL know that when J&J had historically
159 :1        settled talc cases, that J&J considered both the facts
2             and circumstances of the case and the law firm
3             representing the particular claimant?'
4             MS. BROWN: Same objections.
5             A: Among those factors, I think the board was
6             apprised that there were a multitude of factors that
7             might go into settlement, yes.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

Page 168
168 :15       Did LTL's chief legal officer and
16            secretary of October 14, 2021 know that the J&J entities
17            had paid less to settle mesothelioma claims in 2021 as
18            compared to 2020? Yes or no?
19            MS. BROWN: Same objections.
20            A: No.
21            Q: (By Mr. Block) No?
22            A: No.
23            Q: Okay. So when did the chief legal officer and
24            secretary of LTL first learn that the J&J entities had
25            paid less to settle mesothelioma claims in 2021 as
169 :1        compared to 2020?
2             MS. BROWN: Foundation, beyond the scope.
3             A: When we put together this exhibit.
4             Q: (By Mr. Block) All right. Which was
5             approximately when?
6             A: couple weeks ago.

**KIM, JOHN 30(b)(6)** - *02/01/2022*

Page 170
170 :17       THE REPORTER: 'Question: On October 14,
18            2021 did the chief legal officer and secretary of LTL
19            know whether the J&J entities had paid more or less
20            money to settle ovarian cancer claims in 2021 as
21            compared to 2020?'
22            MS. BROWN: Same objection.
23            A: LTL wouldn't have known -- LTL wouldn't have
24            known. If you want to ask me personally whether I knew
25            at that time, same answer as last time, I did not know
171 :1        the yearly breakdown until I saw -- we put together this
2             chart.
3             Q: (By Mr. Block) Okay. So the answer is the
4             same with regard to the mesothelioma claims and the
5             ovarian cancer claims. LTL was not aware of a breakdown

6     between 2021 and 2020 or any other previous years until
7     the chart was created recently and you learned about
8     that on behalf of LTL, correct?
9     A: Until I saw the chart, yes.

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 172**

172 :13     Q: Right. And you also have to include in your
14     analysis the fact that there were a number of firms that
15     no longer filed talc cases against J&J but instead
16     presented those cases to the Barnes & Thornburg firm for
17     settlement processing, right?
18     A: And there are also plaintiffs who had never
19     sued us before, law firms that had not been there that
20     appeared and started suing us now.
21     If you're going to do an analysis of why
22     there's a difference in years, then that would have to
23     be done.
24     And at the end of the day we don't think
25     that would make any difference because, again, we were
173 :1     looking at 38,000 cases with future claims and a -- you
2     know, a latency period of 60 years.

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 178**

178 :23     Q: (By Mr. Block) Okay. And it's a true
24     statement that after the Ingham verdict there were no
25     plaintiffs' verdicts in any ovarian cancer case against
179 :1     the J&J entities, correct?
2     MS. BROWN: Beyond the scope.
3     A: I believe that's true. Again, I'd have to
4     confirm that by looking at a chart, but I don't have one
5     right now.
6     Q: (By Mr. Block) Okay. And believing that

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 186**

186 :25     Q: (By Mr. Block) Okay. In terms of considering
187 :1     the alternatives to the October 2021 restructuring of
2     JJCI, my question for you is did the J&J entities ever
3     try a talc case in federal court?
4     A: So I don't know that it has anything to do with
5     an alternative to a corporate restructuring. I disagree
6     that it has anything to do with that. But I can tell
7     you there were no cases -- no ovarian cases tried in
8     federal court.

### KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 192**

192 :16     Q: Okay. So my question for you is a little
17     different, which is can you point to any specific
18     financial documents that support LTL's contention that
19     old JJCI was in financial distress as of October 2021?
20     A: Well, I would say -- I'm not sure what you mean
21     by financial documents. What I would say is that
22     documents affecting the finances would be basically the
23     records of all the underlying litigation.
24     So the complaints, the, you know,
25     requests -- the ad damnum clauses in the complaints, the

193 :1    trial transcripts, the requests for jury verdicts,
2    closing argument statements, expert reports. You know,
3    I can go on.
4    There are -- I would say virtually all the
5    documents in the underlying litigation are documents
6    that support the financial distress of the company at
7    the time that it filed for bankruptcy.
8    Q: What specific business records generated by any
9    J&J entity in the ordinary course of business does LTL
10    rely upon for its contention that old JJCI was in
11    financial distress as of October 2021?
12    A: The invoices that were submitted for payment of
13    fees and expenses, the books and records that's in the
14    SAP system that J&J uses to make accounting -- for the
15    accounting of expenses to its -- for its subsidiaries,
16    the 2021 year-end financials that show the loss in 2020
17    to the consumer sector.
18    I'm sure there are other financial
19    documents in the records of the accounting group that
20    document the cost of the litigation that have been borne
21    by JJCI.
22    And then there are the income statements
23    that have been produced, you know, the income statements
24    in the financial records as well.
25    So I think those would be generally the
194 :1    documents that we would rely upon to show financial
2    distress.
3    Q: Okay. What financial analysis or financial
4    projections does LTL rely upon for its contention that
5    old JJCI was in financial distress as of October of
6    2021?
7    A: Well, based upon all the documents that I
8    relayed as well as the informational statement and the
9    materials and the objections in the motion to dismiss
10    that detail the analysis of ongoing litigation and our
11    belief that because of the future litigation and the --
12    and the latency period of this, that the finances --
13    it's unsustainable.
14    There are also expert reports that were
15    recently filed that detail the financial distress of the
16    company. So that would be the stuff -- as that
17    interrogatory states, material that we rely upon.

## KIM, JOHN 30(b)(6) - *02/01/2022*

**Page 194**

194 :23    Q: Yeah. Does LTL know of any specific instance
24    in which old JJCI as of October of 2021 had any
25    difficulty meeting or satisfying any debts or
195 :1    obligations that had already come due?
2    A: Again, I think LTL would not have that
3    information, and I would refer to old JJCI or the
4    records that are in that SAP system for the answer to
5    that. I don't think -- LTL would not have that
6    information.
7    Q: Has LTL ever had any difficulty meeting or
8    satisfying any debt or obligation that has come due?
9    A: Not since filing bankruptcy, no.
10    Q: Well, from the time of LTL's creation on
11    October 12, 2021, has LTL ever had any difficulty
12    meeting or satisfying any debt or obligation that had
13    come due?
14    A: I'm not sure that there was anything -- the
15    concept of coming due in that short period of time I
16    don't think is a relevant inquiry. I don't believe that

```
17        during that formation anything was presented to LTL.
18      Q: So was any debt or obligation presented to LTL
19        for payment between October 12, 2021 and October 14,
20        2021?
21      A: I don't believe anything was presented to LTL,
22        but it had obligations as of its formation. As soon as
23        it was formed, it had all the talc liability on it.
24        I don't know whether -- frankly, you know
25        what? It probably was true during that period those
196 :1      were submitted or invoices may have been submitted that
2        were not yet paid, and at that time LTL would have been
3        in financial distress. By the time they filed
4        bankruptcy, everything got stayed.
```

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 199**
```
199 :9      In between the time LTL was formed on
10        October 12, 2021 and when LTL filed for bankruptcy on
11        October 14, 2021, did LTL default on any existing or
12        futures debts or obligations?
13      MS. BROWN: Objection, beyond the scope.
14      A: LTL had not defaulted prior to filing
15        bankruptcy on any obligations.
16      Q: (By Mr. Block) Okay. And as to LTL's
17        contention that old JJCI was in financial distress in
18        October of 2021, does LTL know whether old JJCI had
19        defaulted on any existing or future debts or obligations
20        as of October of 2021?
21      A: LTL does not know whether JJCI had defaulted on
22        any of those things that you mentioned.
```

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 200**
```
200 :9      As to LTL's contention that old JJCI was
10        in financial distress as of October of 2021, does LTL
11        have any knowledge that old JJCI was having any
12        difficulty raising or borrowing money when needed as of
13        October of 2021?
14      A: LTL has no information about that.
15      Q: And LTL -- from October 12th, 2021 to
16        October 14th, 2021, you would not say that LTL had any
17        impaired access to capital markets, correct?
18      A: LTL doesn't know whether it had impaired access
19        because it didn't try to -- it did not attempt to raise
20        money in the capital assets market.
21      Q: Okay. And as to LTL's contention that old JJCI
22        was in financial distress in October of 2021, is LTL
23        aware of old JJCI having any impaired access to capital
24        markets as of that time in October of 2021?
25      A: LTL has no information about that.
```

**KIM, JOHN 30(b)(6)** - *02/01/2022*

**Page 203**
```
203 :9      QUESTIONS BY MS. BROWN:
10      Q: Mr. Kim, you were asked a number of questions
11        about the funding agreement. Do you remember those
12        questions?
13      A: I do.
14      Q: And you were asked certain hypotheticals about
15        the funding agreement. Do you remember all those
16        questions?
```

17    A: I do remember those questions, yes.

18    Q: Okay. Would you, sir, defer to the text of the

19    funding agreement for its meaning?

20    A: Absolutely. The text would control my

21    understanding of the agreement, yes.

22    Q: Thank you, Mr. Kim. I have no further

23    questions.

**LISMAN, ADAM**

---

**LISMAN, ADAM** - *02/08/2022*

---

Page 9

9 :13      Q. All right. Well, I'd like to put up --
14    in that deposition, you may recall you talked
15    about a legal -- an accounting policy related to
16    legal costs. Do you recall discussing that?
17      A. Yes.
18      MR. GLASSER: Can we put Exhibit 284 in the
19    chat?
20    BY MR. GLASSER:
21      Q. Subsequent to that deposition, this
22    policy was produced to us, and I'm wondering if
23    it's the one you were referencing when you were
24    talking about an accounting policy related to
25    legal costs.

---

**LISMAN, ADAM** - *02/08/2022*

---

Page 10

10 :8      Q. 284. It's two pages long.
9      A. Yep, I got it here.
10      Q. So Mr. Lisman, my question to you --
11    and you can look at the second page, too, if
12    you'd like, obviously it's only two pages
13    long -- is this the policy you were referencing
14    when you said there was an internal policy
15    pertaining to accounting for legal-related
16    costs?
17      A. Yes.

---

**LISMAN, ADAM** - *02/08/2022*

---

Page 13

13 :2      Q. All right. Let's go back to
3    Exhibit 284.
4        Can you please look through Exhibit 284
5    and show me the words that allow for the
6    accounting of a judgment against Johnson &
7    Johnson, specifically against Johnson & Johnson,
8    for punitive damages to be allocated to JJCI?
9    Can you just look through the policy and show me
10    the words you're relying on to make that
11    decision?
12      MS. BROWN: No, I object to the exercise, and
13    it lacks foundation.
14    BY MR. GLASSER:
15      Q. Take all the time you'd like.
16      A. Okay. Let me just read it slowly,
17    please.
18        So in the first line under Section A,
19    "In general" -- "In general, payments of bills
20    for domestic affiliates shall be made by the
21    corporate law department and charged out to the
22    company to whom responsibility has been assigned
23    by the corporate finance and the corporate law
24    departments."
25        That would be the general policy that
14 :1    covers payments for legal bills or claims and
2    that it's ultimately the responsibility of the
3    domestic affiliate.

4       Q. Okay. Is there -- are there any other
5    words in this policy that are relevant to that
6    decision on your behalf to pay punitive damages
7    awarded against Johnson & Johnson and assign
8    them to JJCI?
9       Just look through the rest of the
10   policy. I want to make sure that one sentence
11   is what we're talking about.
12       MS. BROWN: Well, I -- I object to the
13   question, lacking foundation and asking for a
14   legal conclusion about the document.
15   BY MR. GLASSER:
16       Q. Go ahead, Mr. Lisman. She gets to
17   object, and then you get to answer the
18   questions.
19       A. Is there anything else in this
20   high-level policy?
21       Q. Correct.
22       A. I guess not, no.

**LISMAN, ADAM** - *02/08/2022*

Page 15
15 :9       Q. Go ahead. Did you download it from the
10   chat?
11       A. Yeah, yeah. One second.
12       Yeah. There's no other specific
13   language or policies here that would pertain to
14   recording costs to the local affiliates.
15       Q. All right. Blow up that one sentence,
16   the first sentence of that paragraph.
17       Okay. So the internal accounting that
18   took that $716 million of punitive damages
19   charged against Johnson & Johnson in the Ingham
20   case and put it on the JJCI books arises from
21   this policy, the highlighted sentence, that I
22   have in front of you?
23       A. I would say this policy in addition
24   with the requirements and policies of U.S. GAAP.
25   This policy is an interpretation of
16 :1   plain-English view of what the requirements of
2    U.S. GAAP are. We do our accounting decisions
3    relying on both.
4       Q. Okay. So what U.S. GAAP rule, to your
5    knowledge, allows the corporate finance and law
6    department at Johnson & Johnson to override an
7    allocation of responsibility for intentional
8    action imposed by a court? Which GAAP -- what
9    GAAP principle are we dealing with?
10       A. Yeah. So in the building-block
11   concepts of U.S. GAAP referred to as CON, or
12   C-O-N, which I believe is short for "concept,"
13   these are the fundamentals of GAAP. It defines
14   what an asset is. It defines what a liability
15   is. It defines what revenue is.
16       And in those statements, it talks about
17   a liability shall be recorded by the entity who
18   is ultimately responsible for such cost. I'm
19   paraphrasing. I don't have the exact word from
20   U.S. GAAP, but something to that extent. If you
21   go look for it -- I think it's Concept 5 or 6 --
22   you'll see it.
23       And it talks about, generally and
24   ultimately, the liability is the responsibility
25   of one entity, unless there are contracts and

17 :1    agreements in place where liability is shared or
2    there's indemnifies or something like that. But
3    the general concept is, the liability relates to
4    the cost of the entity who is responsible for
5    that cost.
6        That fundamental concept of GAAP plus
7    this interpretation of a policy, that is what
8    would drive the accounting by JJCI.

**LISMAN, ADAM** - *02/08/2022*

**Page 19**

19 :2    Q. All right. Is there any GAAP rule that
3    says, notwithstanding legal obligation to pay,
4    we can assign it to another entity?
5        MS. BROWN: Okay. I object. It lacks
6    foundation, calls for a legal conclusion, and
7    calls for speculation.
8        THE WITNESS: GAAP is not that specific, as I
9    talked about.
10       MR. GLASSER: You can take this down.
11       THE WITNESS: GAAP talks about a liability is
12   the responsibility of the legal entity that
13   incurred that cost.
14       MR. GLASSER: All right. We just looked
15   at --
16       THE WITNESS: That's what GAAP says.

**LISMAN, ADAM** - *02/08/2022*

**Page 20**

20 :25   Q. So when you made the -- was it you who
21 :1   made the decision to allocate it -- this to JJCI
2    instead of leaving it on the J&J books? Who
3    made the --
4        A. No, it was not my decision.
5        Q. Who made the decision?
6        MS. BROWN: Calls for speculation.
7        THE WITNESS: I don't know the individual.
8    But the folks in the accounting department, in
9    the legal department, they follow the policies
10   of the company and the requirements of GAAP.
11   BY MR. GLASSER:
12       Q. To your knowledge, did anyone in the
13   accounting department ask for a legal opinion as
14   to whether or not JJCI could be allocated? I
15   don't want to know the content of the opinion,
16   but did anybody ask for a legal opinion as to
17   whether the internal accounting policy could
18   trump the judgment of a court?
19       MS. BROWN: Calls for speculation.
20       THE WITNESS: Not that I know of, no.

**LISMAN, ADAM** - *02/08/2022*

**Page 22**

22 :21   Q. So you are emailing with Mr. Decker in
22   this because he is about to have a meeting with
23   Joe Wolk, who you described earlier as the
24   person two levels above you and to whom
25   Mr. Decker reports; is that right?
23 :1    A. Correct.
2        Q. You are helping Mr. Decker decide what
3    to talk about at this meeting, correct?

4        A. Yes.
5        Q. The second bullet point is "potential
6    unique talc liability structure I mentioned two
7    weeks back and these unique complexities."
8            Do you see that?
9        A. Yes.
10        Q. Two weeks back would have been mid
11    March, right?
12        A. Yep.
13        Q. What did you mention to Mr. Decker in
14    mid March?
15        A. That's about a year ago. I probably
16    had a meeting and a discussion with some of the
17    internal J&J lawyers about --
18        MS. BROWN: And hang on a second, Adam,
19    before you finish that, I just want to caution
20    you not reveal any legal advice you may have
21    received from those lawyers or any requests for
22    legal advice you may have made to the lawyers.
23    If there are facts about that conversation, it's
24    fine to answer with those.
25        THE WITNESS: Okay. The discussion would
24 :1    have been potential avenues or structures in how
2    we are addressing the talc claims that the
3    company is facing and if there was an accounting
4    or reporting concept or attribute that I would
5    need to think about.
6    BY MR. GLASSER:
7        Q. What were the unique complexities?
8        A. I don't recall. This is a year ago.
9            Looking back with hindsight now, it
10    probably was talking about what are different
11    avenues and the accounting implications of, you
12    know, legal strategies that the legal department
13    was thinking about. But the details, I don't
14    recall.
15        Q. Okay. So the -- which lawyers?
16        A. It would have been Andrew White and
17    Erik Haas.
18        Q. Why were you having the meeting?
19        A. As part of my role, I provide
20    accounting advice and disclosure advice for a
21    lot of our most complicated and unique
22    accounting requirements. So if the business or
23    the legal department or the tax department is
24    thinking about a transaction or an event or
25    hypothetically modeling something, they will
25 :1    want to understand how would the accounting work
2    and how would the reporting work for the Johnson
3    & Johnson consolidated company, and that's a big
4    part of my job. And I have discussions with the
5    legal team on these types of matters frequently.
6        Q. So this must have been the start of
7    thinking of putting talc liability in a
8    separate -- in a company separate from JJCI
9    since it would change the reporting, right?
10        MS. BROWN: Objection, calls for speculation,
11    lacks foundation.
12        THE WITNESS: Looking back with hindsight
13    now, I would think so, yes.
14    BY MR. GLASSER:
15        Q. Because, otherwise, there wouldn't be
16    any new structure to even be discussing, right?
17    It would be housed in the existing structure,
18    correct?

19        MS. BROWN: Objection, calls for speculation.
20        THE WITNESS: I would think so, yes.

## LISMAN, ADAM - *02/08/2022*

Page 37

37 :16        Q. For example, to your knowledge, you've
17    never run these JJCI financials for Michelle
18    Goodridge, have you?
19        A. No.
20        Q. Prior to asking them to be run for this
21    case, had you actually ever looked at them on a
22    standalone basis?
23        A. Me personally?
24        Q. Correct.
25        A. No. But I've never looked at any
38 :1    Johnson & Johnson legal entity standalone
2    financials ever.
3        Q. Were you involved in Project Plato?
4        A. Yes.
5        Q. You were the person helping to set up
6    the accounting for all of Project Plato?
7        A. I was one of the people providing input
8    from an accounting and reporting perspective,
9    yes.

## LISMAN, ADAM - *02/08/2022*

Page 38

38 :19        Q. Do you see these names of people who
20    received an approval memorandum in respect of
21    Project Plato?
22        A. Yes.
23        Q. Did you -- were you actually on some of
24    the distributions of the drafts of this approval
25    memorandum?
39 :1        A. Yes.
2        Q. Take a minute and look at these names,
3    okay?
4        A. Yep.
5        Q. To your knowledge, did any person on
6    this screen ever see a standalone balance sheet
7    or income statement for Johnson & Johnson
8    Consumer, Inc., that's like Exhibit 235 prior to
9    October 11, 2021, to your knowledge?
10        MS. BROWN: That calls for speculation.
11        MR. GLASSER: No, it doesn't.
12    BY MR. GLASSER:
13        Q. To your knowledge.
14        MS. BROWN: It still would require him to
15    speculate.
16        THE WITNESS: I can't answer that question
17    positively or negatively. I have no idea.

## LISMAN, ADAM - *02/08/2022*

Page 40

40 :1        Q. And there were regular meetings of
2    Project Plato in the months leading up to
3    October 2021; isn't that true?
4        A. Yes.
5        Q. Did you attend those meetings on a
6    regular basis?
7        A. Many of them, yes.

8        Q. At any one of the meetings you
9    attended, was a balance sheet like Exhibit 235
10    ever discussed?
11        A. Not in the meetings that I attended.
12        Q. I'm going to show you the income
13    statement which is 233. I don't want to pull it
14    up right now. But in any of those meetings, was
15    an income statement of JJCI on a standalone
16    basis entity ever shared, to your knowledge?
17        A. Not to my knowledge, no.
18            (Whereupon, Lisman Deposition
19             Exhibit 233 was first referred
20             for identification.)
21    BY MR. GLASSER:
22        Q. In those meetings that you attended on
23    a regular basis leading up to the decision on
24    October 11, 2021, you never heard an income
25    statement of Johnson & Johnson Consumer, Inc.,
41 :1    on a standalone basis discussed; isn't that
2    true?
3        A. Not that I remember, no.
4        Q. It is true you do not remember it being
5    discussed --
6        A. True.
7        Q. -- correct?
8        A. Yes.

**LISMAN, ADAM** - *02/08/2022*

**Page 42**
42 :13        Q. Let's go back to September. Were the
14    meetings less frequent in September?
15        A. I believe so. I think that October the
16    pace really picked up, yes.
17        Q. Why? Why did the pace pick up in
18    October?
19        MS. BROWN: Objection, speculation.
20        THE WITNESS: That was the timeline that the
21    legal department for the restructuring was
22    working on.
23    BY MR. GLASSER:
24        Q. So the -- so the hurry-to-get-it-done
25    by the certain date was -- was based on the law
43 :1    department time frame?
2        MS. BROWN: Misstates testimony, lacks
3    foundation, I object.
4        THE WITNESS: I could say that primarily the
5    team in the legal department were the ones
6    calling the meetings or organizing according to
7    a timeline that they were working on, yes.

**LISMAN, ADAM** - *02/08/2022*

**Page 44**
44 :5        Q. All right. So in this deal, I'll call
6    it the Plato deal, the people running point were
7    the legal department?
8        A. Yes.
9        Q. In particular, Erik Haas?
10        MS. BROWN: Objection, speculation.
11        THE WITNESS: Erik was involved amongst many
12    others.

LISMAN, ADAM - *02/08/2022*

**Page 50**

50 :17    Q. Okay. Who told you when you were
18    running the legal entity, Johnson & Johnson
19    Consumer, Inc., to exclude companies it owns?
20    A. No one told me that. This is how the
21    SAP report is set up, applying how Johnson &
22    Johnson does accounting for its companies and
23    its subs.
24    Q. But as a metaphysical legal fact, it
25    does not, in fact, roll up all the gross income
51 :1    of the things Johnson & Johnson Consumer, Inc.,
2    actually does own, true?
3    A. We do not apply consolidations of
4    individual Johnson & Johnson subs within the
5    company's consolidated financial statements;
6    otherwise, you'd be double-counting things when
7    you roll it all up.
8    Q. So it is a fact, then, that JJCI, on a
9    standalone basis, does not have its own entire
10    consolidated financial statement?
11    A. As far as I'm aware, no one is
12    preparing a consolidated set of financial
13    statements for JJCI. There's no accounting
14    requirement that would require that.
15    Q. Got it. It's, therefore, the case that
16    even to this day, Michelle Goodridge could not
17    possibly have ever seen a set of financial
18    statements that is the actual entire legal
19    entity of Johnson & Johnson Consumer, Inc.;
20    isn't that true?
21    MS. BROWN: I object. It's vague, and it
22    calls for speculation.
23    THE WITNESS: I couldn't comment to what
24    Michelle has seen. There are ad hoc -- or there
25    are things -- there could be financial
52 :1    information put together for different purposes.
2    Have I seen it? No.
3    BY MR. GLASSER:
4    Q. All right. So it is a true statement
5    that JJCI does not, in fact, maintain income
6    statements that truly consolidate everything it
7    owns on a regular basis?
8    MS. BROWN: Objection, misstates testimony,
9    lacks foundation.
10    THE WITNESS: I don't know all of the
11    different potential ways that you could run
12    reports in SAP for JJCI. There may be a way to
13    do it. I'm not aware. I -- I have not seen it.

LISMAN, ADAM - *02/08/2022*

**Page 52**

52 :25    Q. Therefore, to make an income statement
53 :1    that, in fact, consolidates what Johnson &
2    Johnson Consumer, Inc., legally owns, you would
3    have had to do something abnormal, correct?
4    MS. BROWN: Objection, lacks foundation,
5    calls for speculation.
6    THE WITNESS: If there was a hypothetical
7    request to ask for a set of standalone
8    consolidated financial statements of JJCI and

9      all of the subsidiaries that it owns, they would
10      have had to run a different kind of analysis,
11      yes.

---

**LISMAN, ADAM** - *02/08/2022*

---

Page 68

68 :16      Q. Let's go back to Exhibit 285. Go ahead
17      and pull it up so we can remember what it was.
18          I'm back to the unique liability
19      structure. Are you with me, second bullet
20      point?
21      A. Yes.
22      Q. The unique liability structure is what
23      allowed the bankruptcy of only LTL and not old
24      JJCI; you would agree with me, right?
25          MS. BROWN: Objection, speculation,
69 :1   foundation.
2          THE WITNESS: Looking back with hindsight
3      almost a year later, the structure that is in
4      place with LTL and the QSF fund, those are
5      unique complexities that require accounting
6      thought that we had to apply.
7      BY MR. GLASSER:
8          Q. And the manifestation of that is that a
9      subsidiary is bankrupt, not Johnson & Johnson
10      Consumer, Inc., correct?
11          MS. BROWN: Foundation, I object.
12          THE WITNESS: The physical -- or the actual
13      subsidiary that filed for bankruptcy isn't
14      terribly relevant. We would need to think about
15      how to account for a subsidiary that filed for
16      bankruptcy. That is what I needed to think
17      about.
18      BY MR. GLASSER:
19          Q. But wasn't the whole purpose of these
20      weeks of Plato meetings that we've talked about
21      carving out an acceptable subsidiary to file
22      bankruptcy?
23          MS. BROWN: Objection, calls for speculation,
24      lacks foundation.
25          THE WITNESS: One of the topics of the
70 :1   aspects of the Plato transaction contemplated
2      potential bankruptcy.
3      BY MR. GLASSER:
4          Q. For a specific created subsidiary?
5      A. For a subsidiary that was being
6      affected as a result of the reorganization.
7          Q. Created for that purpose, correct?
8          MS. BROWN: Objection, vague.
9          THE WITNESS: As far as the detailed purpose
10      of what it was created for, that would be
11      outside of my scope from a legal perspective.
12      And as I mentioned, there were other things that
13      are folded into the subsidiary like RAM that we
14      talked about.

---

**LISMAN, ADAM** - *02/08/2022*

---

Page 71

71 :18      Q. Let's go to Exhibit 286. Blow up the
19      top.
20          You recognize 286 as a Microsoft Teams
21      meeting invite between you, Mr. Lisman,

22    **Dan Prieto, a lawyer at Jones Day, and**
23    **Andrew White, on April 14, 2021. Do you see**
24    **that?**
25    **A. Yes.**

---

**LISMAN, ADAM** - *02/08/2022*

**Page 89**

89 :24    **Q. Were you present in any meetings where**
25    **it was discussed whether 2 billion was too much?**
90 :1    **A. No.**
2    **Q. Were you present in any meetings where**
3    **it was discussed whether 2 billion was too**
4    **little?**
5    **A. No.**
6    **Q. Do you have any idea who chose the**
7    **2 billion?**
8    **A. As far as an individual person?**
9    **Q. Right.**
10    **A. No. It's -- it's a collaborative**
11    **effort with the legal team.**

---

**LISMAN, ADAM** - *02/08/2022*

**Page 92**

92 :20    **Q. All right. So based on the 20- -- the**
21    **up to 24 meetings you've attended on this**
22    **subject, to your knowledge, has anybody ever**
23    **contemplated that this overall liability could**
24    **exceed $6 billion?**
25    **A. Not that I recall. The purpose of the**
93 :1    **meetings is to understand the current facts and**
2    **circumstances that are in place as of the**
3    **upcoming balance sheet date for the quarter.**
4    **So I need to understand where we are**
5    **with trials or settlements and what might be**
6    **happening to make sure we record the accounting**
7    **reserves appropriately under GAAP.**

---

**LISMAN, ADAM** - *02/08/2022*

**Page 99**

99 :2    **Q. All right. Isn't it a fair reading of**
3    **this answer to JP Morgan that Johnson & Johnson**
4    **as of October 14, 2021, was telling JP Morgan**
5    **that they believe 2 billion is enough to satisfy**
6    **future and current liabilities?**
7    **MS. BROWN: Object to the form, lacks**
8    **foundation, calls for speculation.**
9    **THE WITNESS: That's what's written. You**
10    **essentially just reread what's there.**
11    **BY MR. GLASSER:**
12    **Q. Correct. Therefore --**
13    **MS. BROWN: Hold on, Brian. He was not done**
14    **with his answer.**
15    **Mr. Lisman, please finish.**
16    **THE WITNESS: I have no comment outside**
17    **what's written there.**
18    **BY MR. GLASSER:**
19    **Q. All right. But let's just drill down**
20    **on your lawyer's objection.**
21    **I'm not speculating that Ms. Romanko**
22    **told Mr. Schott it was enough to satisfy future**
23    **and current liabilities, right?**

```
24        A. If that's what's in the email that Lisa
25    wrote, yes.
100 :1        Q. It's not speculation, is it? It's what
  2    you all said.
  3        MS. BROWN: Well, I object. That lacks
  4    foundation.
  5        THE WITNESS: I'm reading what's there.
  6    That's what's written.
  7    BY MR. GLASSER:
  8        Q. All right. Did Mr. White object and
  9    say, oh, no, it could be 5 billion?
 10        A. Not from the email that I'm staring at.
 11        Q. Did you object and say, That's insane,
 12    obviously it should be higher than 2 billion?
 13        A. I did not.
```

### LISMAN, ADAM - *02/08/2022*

**Page 102**
```
102 :8        Q. Do you agree that Johnson & Johnson
  9    ought not omit to state a fact when it is
 10    material -- when it would make the statements of
 11    fact correct as well? You understand both those
 12    obligations, right? You cannot omit a material
 13    fact either if you make a misleading statement.
 14            Do you agree?
 15        A. Yes.
 16        Q. All right. And you agree that it's
 17    important that we be precise in our answers when
 18    we're talking to the investing public, I would
 19    assume?
 20        A. That we are precise up to the point
 21    that we're not disclosing nonmaterial public
 22    information.
```

### LISMAN, ADAM - *02/08/2022*

**Page 109**
```
109 :15        THE WITNESS: It's the same answer that we
 16    covered when we were looking at the PwC audit
 17    rep letter from the third quarter.
 18    BY MR. GLASSER:
 19        Q. All right. So --
 20        MS. BROWN: He's still speaking.
 21    BY MR. GLASSER:
 22        Q. Go ahead.
 23        A. As of the balance sheet date,
 24    the $2 billion was the probable and reasonably
 25    estimable reserve under GAAP for the current and
110 :1    future claims. Same language that's in the PwC
  2    rep letter, the same language that we disclosed
  3    in the 8-K is the same language we put in our
  4    10-Q filed a couple weeks after that. That is
  5    my responsibility, those three documents. And
  6    if an analyst asked about it, it should all be
  7    the same or else I'm not doing my job. The
  8    accounting --
  9    BY MR. GLASSER:
 10        Q. You agree this answer to this analyst
 11    is not the same as your October 29th letter we
 12    looked at that has the reasonable and estimable
 13    disclaimer?
 14        A. Agreed. The technical accounting
 15    language that's included in the management rep
```

16    letter, I agree it's not in the answer there.
17        Q. You think it should have been included?
18        MS. BROWN: Speculation.
19        THE WITNESS: It would have helped clarify
20    the basis for the 2 billion to the analyst. If
21    that would have helped him or her, then yes.

---

**LISMAN, ADAM** - *02/08/2022*

Page 113
113 :22        Q. All right. So, essentially, you know
23    -- I know the analyst doesn't know where you're
24    going, but the company is basically a billion
25    dollars below the analyst internally when he
114 :1    asks this question, right?
2        MS. BROWN: Objection, foundation.
3        THE WITNESS: If you're comparing a number
4    that we had on our books to a hypothetical
5    number asked by an analyst with no facts, sure.
6    BY MR. GLASSER:
7        Q. Okay. Great.
8            So the answer to the guy -- I
9    understand you're not saying you're right,
10    3.5 billion is fair, we should extrapolate the
11    settlements. In fact, your July letter, if
12    you'll recall, said you don't do that, right?
13        A. Yep.
14        Q. So the upshot of the July letter we
15    looked at, which was exhibit -- for the record,
16    Exhibit 112, was, no, that's not what we should
17    be doing, extrapolating across future
18    settlements to come up with a number, right?
19        A. That's what we stated, yes.

---

**LISMAN, ADAM** - *02/08/2022*

Page 120
120 :11        Q. All right. So this is Bernstein coming
12    in. Okay.
13            And the Bernstein analyst at two there
14    asked how you settled on the $2 billion number.
15        Do you see that?
16        A. Yep.
17        Q. And basically it says it's the same
18    answer, "we believe 2 billion is enough to
19    satisfy current and future liabilities."
20        Do you see that answer? Maybe it's
21    hard to read.
22        A. Yeah, I could --
23        Q. Could you blow that up?
24        A. Yeah, I could make it out, though.
25        Q. So it's not quite the same question
121 :1    asked by the prior analyst at JP Morgan, but
2    it's the same answer, right?
3        A. Yep.
4        Q. And then at the top, though, before --
5    again, what Lisa's doing here is she's going
6    back to Andrew White and you to confirm that her
7    answers were reasonable, right?
8        A. Yeah.
9        Q. We've already discussed your role.
10    Andrew White, I take it, was kind of
11    point-of-the-spear-guy on talc liability
12    assessment every quarter as well.

13          Did he work with you every quarter on
14    this?
15          A. Yes. I worked with Andrew, yes.
16          Q. And he checks off "good" here, right?
17          A. Yep, that's what he said.

**LISMAN, ADAM** - *02/08/2022*

**Page 122**
122 :24        Q. So this is you and Mr. Decker working
25    to prepare for a September 13th audit committee
123 :1    meeting, right?
2          A. Yes.
3          Q. And you actually do a redline of
4    Mr. Decker's remarks that he's going to make at
5    the audit committee. If we go to page 2, you'll
6    see your redline.
7          Well, you know what, first on page 1,
8    can you read the email to understand that you
9    did make and track changes?
10          A. Yes, yep.
11          Q. Now, let's go to page 2. And you -- at
12    the bottom here, you say -- you add the word
13    "currently" to [as read]: not extrapolate a
14    range of loss since settlements to date have
15    been unique and one-off in nature.
16          Do you see that?
17          A. Yes.
18          Q. That's consistent with the statement
19    made to the auditors in the July 29th letter
20    that we read before, right?
21          A. Yes.
22          Q. You go on to add that [as read]: Any
23    substantial settlement program we execute could
24    require us to extrapolate -- you taught me that
25    word -- extrapolate for a disclosed potential
124 :1    range of loss.
2          Do you see that addition?
3          A. Yes.
4          Q. What is the GAAP basis or what was the
5    basis for that addition?
6          A. So the extrapolation concept requires
7    that a population of data -- it could be claims
8    or anything else -- is essentially uniform in
9    nature and, therefore, you know, a price tag or
10    an economic value of one item is representative
11    of the entire population.
12          So statistically speaking, does my
13    population in question, is it generally uniform
14    in nature. And if it is, that would be one of
15    the first gates to get through to apply any sort
16    of extrapolation concept.

**LISMAN, ADAM** - *02/08/2022*

**Page 131**
131 :20        Q. Okay. And do you agree that the
21    obvious purpose of this structuring is to put a
22    top on it?
23          MS. BROWN: I object, lacks foundation,
24    misstates the evidence.
25          THE WITNESS: Nothing that I ever saw or gave
132 :1    input on was about capping or putting a top on.
2          Was the reorganization a structure to,

3      say, work through the claims in a different
4      manner than we have been before? Yeah.
5      That's -- we were changing the legal entities.

**LISMAN, ADAM** - *02/08/2022*

Page 133

133 :3          Q. Okay. Great. So you would agree with
4      me that all things being equal, the spinout
5      of -- of the consumer health into a separate
6      publicly-traded company would benefit from
7      knowing the talc liability?
8          MS. BROWN: Objection, speculation,
9      foundation.
10         THE WITNESS: Would it benefit? It would be
11     a variable and a factor that an investor would
12     need to understand.
13     BY MR. GLASSER:
14         Q. Right. I mean, you worked in capital
15     markets. You understand that investors want to
16     be able to predict, right?
17         A. Yes.
18         Q. And you understand that investors like
19     certainty around financial statements more than
20     uncertainty?
21         A. Absolutely.

**LISMAN, ADAM** - *02/08/2022*

Page 134

134 :4          Q. All right. So you know that when you
5      go on the road show, the less question marks
6      around a company you can have, the better,
7      right?
8          A. Being able to answer questions from
9      investors on an IPO road show, that's critical,
10     yes.
11         Q. All right. And the more you can have a
12     concrete answer to a concrete question, the
13     better you're going to do on that road show,
14     right?
15         A. Yes.
16         Q. So just based on your prior M&A
17     experience and capital-markets experience, I
18     think you'd agree with me that if it were the
19     case that the amount of the talc liability
20     embedded in LTL could be known by the time of
21     the spin-off of the consumer group into a
22     separate public company, it would be helpful,
23     right?
24         MS. BROWN: Speculation, improper
25     hypothetical.
135 :1         THE WITNESS: The -- the -- the way I would
2      think about it is if you're offering shares in a
3      new public company, understanding the risks and
4      uncertainties and liabilities known and unknown
5      would be a critical factor, yes.

**LISMAN, ADAM** - *02/08/2022*

Page 140

140 :23         Q. So just to orient you to 296, you
24     recognize this as an email between you and
25     Marijke -- I don't even know how to say that.

141 :1          A. Marijke --
      2          Q. Marijke --
      3          A. -- Vertenten.
      4          Q. -- about whether or not LTL would
      5    qualify as a significant sub, just to orient
      6    you.
      7              There's --
      8          A. Yeah.
      9          Q. -- some other email that were between
     10    Mar- -- Marijke and Michelle Ryan that I haven't
     11    shown you where an analyst at Moody's was asking
     12    about defaults under bonds. So that may help
     13    you.
     14              Were you running down the answer for
     15    Marijke on this issue?
     16          A. Yeah, I think I was providing some
     17    input on how to think about significant
     18    subsidiaries.

**LISMAN, ADAM** - *02/08/2022*

**Page 141**
141 :23         Q. Explain to me how we understand whether
     24    a subsidiary is significant in your mind.
     25          A. Yeah, so it really defines on the
142 :1    definition of significant. My view is, the SEC
      2    has rules about what a significant sub is and it
      3    gives you quantitative thresholds.
      4              Generally, off the top of my head --
      5    it's been a little while -- if an individual sub
      6    is 20 percent or more of the consolidated
      7    parents' revenue or assets, then, by default,
      8    it's defined as "significant." I think that was
      9    the context I was trying to give her.
     10          Q. All right. All right.
     11              So, therefore -- let's go revenue --
     12    the total revenue of J&J is approximately
     13    80 billion a year, right?
     14          A. 90, yeah.
     15          Q. All right. So 20 percent would be
     16    18 billion. That --
     17          A. Yep.
     18          Q. -- would be the significance threshold,
     19    right?
     20          A. Yep.
     21          Q. On a revenue basis.
     22              And then on an asset basis, do you go
     23    book value of assets?
     24          A. Yes.
     25          Q. So you'd use that 70 billion we looked
143 :1    at before, right?
      2          A. No. I would use total assets, which is
      3    the asset number, which is, like, 160 billion.
      4          Q. Okay. So 32 billion would be the
      5    significance threshold, then?
      6          A. In that test, yep.
      7          Q. So under the two tests, it's pretty
      8    obvious LTL is under that under any
      9    circumstances, is what you're basically saying?
     10          A. Correct.
     11          MR. GLASSER: Let's go to Exhibit 297.
     12              (Whereupon, Lisman Deposition
     13                Exhibit 297 was first referred
     14                for identification.)
     15    BY MR. GLASSER:

16      Q. This is Oct- -- October 1st. It's an
17  email with Mark Schneider and you having to do
18  with something around a sales package, and I
19  really just want to know what, if any- -- what
20  is that? What were you guys talking about?
21      A. Yep. So the sales package is,
22  basically, our report that we issue at the end
23  of a fiscal quarter. That goes to the executive
24  board and investor relations team, and it really
25  is an analysis of what the company's sales look
144 :1  like.
2      Q. All right. And in the middle of the
3  page, it says here -- you were saying [as read]:
4  Hi - was hoping the three of us can spend an
5  hour together papering out some JE's together
6  for these transactions.
7      What are you talking about there?
8      A. Within the context of the Plato
9  subject, any time we are creating new legal
10  subsidiaries or management reporting companies,
11  we need to record accounting transactions that
12  are going to reflect how those entities were set
13  up, what's included in those entities, and model
14  out how the accounting is going to look.
15      So as we were contemplating the Plato
16  structure, these are two directors on my team
17  that I needed some help to think about how the
18  accounting would work.
19      Q. What does the acronym JE stand for for
20  lay people?
21      A. Journal entry.
22      Q. Oh, Okay. Thanks. Great. All right.
23  Got it.
24      Let's go back to Exhibit 298.
25
145 :1      (Whereupon, Lisman Deposition
2      Exhibit 298 was first referred
3      for identification.)
4  BY MR. GLASSER:
5      Q. Later that same -- October 1st in the
6  evening, 7:46 p.m., it looks like you're working
7  both shifts now on this Plato thing, agreed?
8      A. It seems like that, yeah.
9      Q. So this is an email from Thomas McCann
10  to you and some others setting up a meeting to
11  discuss the funding agreement.
12      Do you agree with that?
13      A. Yep.
14      Q. Had you, prior to this October 1st
15  meeting, understood there would be such a thing
16  as a funding agreement?
17      A. I don't believe so. It all happened,
18  as we talked about, pretty quickly.
19      Q. So this was maybe -- I'm not -- you
20  know, it's not the end of the world if it's not.
21  But I'm saying, is this maybe your first
22  introduction to the concept of the funding
23  agreement?
24      A. It probably came up in discussions
25  they're working on a funding agreement, hence,
146 :1  this is the meeting to talk about it. So this
2  day or the day before, likely.

**Page 146**

146 :25       Q. So this is an email between you,

147 :1    Mr. Wolk, and Mr. Decker on October 5, 2021.

2       Do you see that?

3    A. Yep.

4       Q. At the bottom you say [as read]: Quick

5    change from what I talked about -- talked to you

6    about on Monday. There will be no 8-K event

7    this week.

8       Do you see that?

9    A. Yes.

10       Q. So it must be the case that you had

11    previously believed that the LTL filing for

12    bankruptcy, which would necessitate an 8-K,

13    would happen this week of October 5th, right?

14       A. Yes. We were clear that if and when it

15    occurred, it would be an 8-K event and Joe, as

16    the CFO, needs to know those things.

17       Q. What caused it to move for a week?

18       A. I don't remember. I don't know.

19       Q. Huh, that is interesting.

20       So the reserve would be booked for Q3.

21    I guess you can book the reserve even though you

22    don't make the payment, that's the distinction,

23    right?

24       A. Partly right, so yes.

25       Under GAAP -- again, not to rehash it,

148 :1    but we record a reserve when it's probable and

2    reasonably estimable. But we couldn't book the

3    reserve until the transaction was effected.

4       Q. So you couldn't book the reserve in

5    Q -- but the transaction wasn't -- your quarter

6    ended October 3rd, the transaction was the 11th.

7    How could you book it in the third quarter?

8       A. So we talked a bit before. There are

9    different kinds of subsequent events.

10       There is a subsequent event which is

11    called a recognized subsequent event and there's

12    one called a nonrecognized subsequent event

13    under GAAP.

14       A recognized subsequent event is what

15    the Plato transaction was, which means under

16    GAAP, I became aware of new information that

17    essentially existed or relates to a potential

18    liability or claim that existed as of the

19    balance sheet date, which was what Joe was

20    referring to for Q3.

21       So if legal contingencies, product

22    liability are one of the areas under GAAP, they

23    are generally treated as a recognized subsequent

24    event. If you become aware of something that

25    changes what the liability should have been that

149 :1    existed as of the balance sheet date, I need to

2    change it.

**Page 149**

149 :17       Q. This is not an email that you were on,

18    but we unfortunately received it in its

19    unredacted form after the deposition of

20    Ms. Ryan.
21         So I'm just going to ask you if you
22    know what the Diamond assets are. Let's blow up
23    that top two paragraphs and -- yeah, let him
24    see.
25         I didn't get a chance to ask Ms. Ryan
150 :1    about it. It's October 7th. It's between
2    Duane Van Arsdale and Michelle Ryan and they're
3    talking about the funding agreement is being
4    structured in a way that JJCI can "spin out" the
5    Diamond assets up the chain or to create a new
6    legal entity and be unencumbered going forward.
7         What is Diamond?
8         A. Diamond is the project name for the now
9    announced spinout or separation of the consumer
10    health business from J&J.

---

**LISMAN, ADAM** - *02/08/2022*

**Page 151**
151 :19    Q. From the perspective of making a clean
20    spin of the consumer products as a separate
21    company, structuring the talc liability to a
22    nonoperating subsidiary of J&J that might not be
23    spun would make a cleaner balance sheet for the
24    spun Diamond entity, right?
25    MS. BROWN: That lacks foundation and calls
152 :1    for speculation; I object.
2         THE WITNESS: If we were going to separate
3    the consumer health business and liabilities
4    associated with talc were not included based
5    upon how that spin was structured, then,
6    correct, the liabilities would not go with it,
7    if that's how the deal was done.

---

**LISMAN, ADAM** - *02/08/2022*

**Page 152**
152 :15    Q. Okay. Have you had a discussion about
16    this concept with anybody?
17         A. About what -- how we were going to
18    treat the talc liabilities in context of the
19    consumer health transaction?
20         Q. Yes.
21         A. Yes. In the context of the financial
22    statements that are being prepared for the
23    consumer health segment and transaction.
24         Q. And what is the plan?
25         A. We were setting out a course to prepare
153 :1    the consumer health financial statements without
2    including the historical liability and expenses
3    and reserves associated with talc.
4         Q. The structuring accomplished with
5    Project Plato assists in that endeavor, correct?
6    MS. BROWN: Objection, foundation.
7         THE WITNESS: As far as the legal merits and
8    structure, I don't know. My responsibility as
9    it pertains to the consumer health transaction is
10    to provide input on what's called "carveout
11    financial statements." Carveout financial --
12    BY MR. GLASSER:
13         Q. Go ahead.
14         A. Carveout financial statements are used
15    to an IPO. They have to be filed with the SEC.

16    That's my area of expertise.
17          When you prepare carveout financial
18    statements, you need to know what is the
19    perimeter of the business and assets and
20    liabilities that you're going to reflect in
21    those financial statements.
22          We are preliminary modeling the
23    transaction. These financials would not include
24    it.
25          Q. Would not include talc?
154 :1    A. Correct.

**LISMAN, ADAM** - *02/08/2022*

**Page 155**
155 :4    Q. What did that delta turn out to be in
5    respect of the QSF?
6          A. I think the net income statement
7    reserve charge in the third quarter was about
8    $1.4 billion.
9          Q. Oh. So you think there was only
10    600 million on the accrual at that moment and
11    you added the 1.3, or there was 700 --
12          A. That's what the math was because in the
13    bullet there, that 1.3 billion that you
14    quoted --
15          Q. Yeah.
16          A. -- that's as of Q2 or June.
17          We did this transaction in October, so
18    there were likely payments that may have been
19    made that reduced the reserve.
20          So, again, I have to -- I have X and I
21    need Y; I had to figure out what the delta was.

**LISMAN, ADAM** - *02/08/2022*

**Page 164**
164 :19    Q. Let's go to 22. Just the first bullet
20    point [as read]: This case is not an indication
21    of future litigation strategy. The cosmetic
22    talc claims present a unique situation.
23          Do you see that?
24          A. Yeah.
25          Q. What did you understand the company to
165 :1    be trying to convey to this -- to its audience
2    by saying this?
3          MS. BROWN: Objection, speculation.
4    BY MR. GLASSER:
5          Q. You, what did you understand?
6          MS. BROWN: Same objection.
7          THE WITNESS: All I can say is what do I
8    understand is what I read here and what I was
9    told, that this individual case is not an
10    indication of future strategies. This is a
11    unique matter and that's all I know from a
12    litigation strategy perspective.
13          Again, I'm not an attorney and it's not
14    my area.

**LISMAN, ADAM** - *02/08/2022*

**Page 172**
172 :12    Q. Oh. You were shown an email from
13    October that dealt with the funding agreement,

14    and I believe you said that was the first time
15    you had any involvement in the funding
16    agreement, correct?
17        A. Yeah, I think my general knowledge of
18    the funding agreement probably started early
19    October, correct.

**LISMAN, ADAM** - *02/08/2022*

Page 186
186 :19        Q. Okay. And why were you suggesting that
20    Mr. Decker bring up this idea for a potential
21    unique talc liability structure to Joseph Wolk,
22    the CFO of Johnson & Johnson, in March of 2021?
23        A. Yep. So as the legal team was
24    evaluating different structures and avenues to
25    deal with the claims being brought against the
187 :1    company, depending upon the structure, the
2    commitment from the company, there could be
3    accounting and disclosure events which came to
4    fruition in mid-October.
5        If we're going to have a significant
6    accounting or disclosures type event that
7    investors need to be aware of, Mr. Wolk needs to
8    understand that.
9        Q. Okay. You said something about lawyers
10    in the context of this potential unique talc
11    liability structure, correct?
12        A. Yes. I work with the legal team in
13    understanding the talc matter as a whole, yes.
14        Q. Okay. And are you talking -- are you
15    talking about the litigation team including
16    Erik Haas and Andrew White?
17        A. Yes. As we talked about, every quarter
18    I meet several times with the litigation team
19    depending on the topic. I oversee all of them.
20    So for talc, it would be Mr. White and Mr. Haas.
21        Q. Okay. Who first brought up the issue
22    of a potential unique talc liability structure
23    in March of 2021?
24        A. I don't remember exactly who. It would
25    have been -- those were the two attorneys within
188 :1    J&J that I work with on talc.
2        Q. Okay.
3        A. It could have been either.
4        Q. Did you initiate the discussion of a
5    talc liability structure with Mr. White or
6    Mr. Haas or did they initiate that discussion
7    with you?
8        A. Yeah, I'm not a litigation attorney.
9    My role is to give input around the financial
10    implications. So the legal team is tasked with
11    being responsible for the litigation. I provide
12    the accounting advice.
13        Q. Okay. I see.
14        So in March of 2021, Erik Haas and
15    Andrew White brought up the idea of a potential
16    unique talc liability structure to you and
17    sought out your accounting and financial
18    perspective on that, correct?
19        A. Yeah. As they are working through the
20    claims and how the company is managing them and
21    they're thinking about scenarios or structures,
22    they would need to understand what the
23    accounting implications are and that's what they

24    talked about with me.
25        Q. Okay. And you understood that this was
189 :1    one of the litigation strategies that Mr. Haas
2    and Mr. White were considering for the talc
3    litigation at this time in March of 2021,
4    correct?
5        MS. BROWN: Objection, foundation.
6        THE WITNESS: If Mr. White or Mr. Haas asked
7    me how the accounting worked for a potential,
8    you know, talc structure work, presumably they
9    were considering that. I can't tell you for
10    sure. But if they asked me the question, I
11    would have provided input.
12    BY MR. BLOCK:
13        Q. Right.
14        And you understand that Mr. Haas and
15    Mr. White are litigators for Johnson & Johnson
16    that were working on the talc litigation and
17    they were looking for your accounting and
18    financial perspective on the litigation strategy
19    of setting up a talc liability structure in
20    March of 2021, correct?
21        MS. BROWN: I object to the foundation of
22    litigation strategy.
23    BY MR. BLOCK:
24        Q. Is that correct, sir?
25        A. I provided accounting input around
190 :1    potential legal avenues and what might happen.
2        Q. Okay. So -- so the potential unique
3    talc liability structure was brought to your
4    attention in March of 2021 by J&J's litigators
5    Erik Haas and Andrew White as one of the legal
6    avenues of dealing with the talc litigation,
7    correct?
8        A. Those are the two attorneys that I
9    discuss talc matters with. They are the only
10    two, so yes.
11        Q. All right. And when you say those are
12    the only attorneys you discuss talc matters
13    with, you're talking about the talc litigation
14    matter, correct?
15        A. Yes, correct. I want to say they're
16    the only two internal J&J attorneys. There's
17    obviously other outside counsel as well.

**LISMAN, ADAM** - *02/08/2022*

**Page 191**
191 :23        Q. Okay. So in April 2021, you made
24    Mr. Prieto of Jones Day aware of the accounting
25    policy of Johnson & Johnson whereby all
192 :1    talc-related expenses and charges, even those
2    imposed directly on Johnson & Johnson by a
3    judgment, are booked to JJCI, correct?
4        A. Yeah, I think we talked through the
5    accounting mechanics and how it gets reflected
6    on the financial records of J&J.
7        Q. Okay. And as of this time in April of
8    2021, you knew that Johnson & Johnson was
9    considering placing its talc-related liabilities
10    into a bankruptcy process, correct?
11        MS. BROWN: Objection, foundation.
12        THE WITNESS: I did not know that was
13    happening for sure. Was it an alternative that
14    people were potentially thinking about, yes.

15      BY MR. BLOCK:
16          Q. Okay. So you knew that -- strike that.
17              So as of April 2021, you knew that
18      Johnson & Johnson was at least considering
19      placing talc-related liabilities and placing
20      them into a bankruptcy process, correct?
21          A. Did I know in April that the word

**LISMAN, ADAM** - *02/08/2022*

**Page 197**

197 :7      Q. Okay. And by this time, in July of
8       2021, you did know that Johnson & Johnson was
9       considering placing talc-related liabilities
10      into a bankruptcy process, correct?
11          A. I knew it was one of the alternatives
12      that were being thought about, yeah.
13          Q. Okay. You knew it was one of the
14      things that Johnson & Johnson was considering in
15      July of 2021, correct?
16          A. Yes.

**LISMAN, ADAM** - *02/08/2022*

**Page 204**

204 :17     Q. Mr. Lisman, is there anything in these
18      two sentences of Ms. Ryan's email which talks
19      about capping our liability and capturing the
20      liability in a subsidiary and bankrupting that
21      subsidiary that you believe is factually
22      inaccurate?
23          MS. BROWN: All the same objections. Go
24      ahead.
25          THE WITNESS: I can't personally address to
205 :1  what Ms. Ryan meant in the context of her email
2       of her response. I don't know. But as far as
3       we were looking at different structures to
4       manage the talc claims, was that true, yes.
5              I've established that there were
6       multiply scenarios and different things going on
7       in the legal environment that I was aware of and
8       I'm reading Michelle's emails to say we are
9       looking at a number of ways. That's all I can
10      comment on.

**LISMAN, ADAM** - *02/08/2022*

**Page 213**

213 :2      Q. Back to Exhibit 293. You were asked
3       about this earlier. An email from you,
4       Mr. Lisman, on September 23rd, 2021, to Carl
5       Stanzione. Subject: Plato LE Set Up.
6              Do you see that?
7          A. Yes.
8          Q. And you explained to us earlier that LE
9       stands for legal entity, and this email chain
10      was about actually setting up the LTL legal
11      entity, right?
12          A. Correct.
13          Q. Okay. And you tell Mr. Stanzione to
14      convey to someone else that this is urgent,
15      correct?
16          A. Yes.
17          Q. Okay. Who told you that setting up the

18    LTL legal entity was urgent as of September
19    23rd, 2021?
20        A. It would have been my understanding in
21    the overall project, and using the word "urgent"
22    in this context it takes days, if not longer.
23    To get a management company set up within
24    Johnson & Johnson you need things like a
25    taxpayer ID, a name, cost centers, a whole bunch
214 :1    of administrative information which takes a
2    while. So the "ask" was to get moving on it
3    quickly.
4        Q. Okay. Did someone tell you or direct
5    you about these matters, including getting LTL,
6    the legal entity set up, did anybody tell you
7    that was something that was urgent as of
8    September of 2021?
9        A. As part of the overall project, it
10    was -- people were working quickly. That was
11    the general understanding. As far as exact
12    dates, I can't comment on the exact dates.
13        Q. Okay. Earlier you were looking at a
14    document with Mr. Glasser and you testified that
15    J&J was aiming to have the LTL bankruptcy filed
16    I think the week of October 4th but it got --
17    ended up getting put over to October 11th,
18    right, the week of October 11th?
19        A. I don't think I said the word "aiming".
20    But planning, yes.
21        Q. Okay. And you would have been aware of
22    that target date of October -- of the week of
23    October 4th, 2021, for the filing of the
24    bankruptcy when you were working with
25    Mr. Stanzione to get the LTL legal entity set up
215 :1    here on September 23rd, 2021, correct?
2        A. Yes, we needed to be aware of the dates
3    of what was happening so we could get the
4    accounting correct. That's what my role is.
5        Q. And do you have any understanding of
6    why J&J was aiming to have the LTL bankruptcy
7    filed by that early October time frame?
8        A. No, I do not.
9        Q. Who told you that J&J was aiming to get
10    the LTL bankruptcy filed by early October?
11        A. It would have been in context of the
12    overall project team, that here's the dates that
13    we're working toward. October was the date and
14    that's when the meetings were going on.
15        Q. Okay. Did -- was Erik Haas or Andrew
16    White one of the people that told you that J&J
17    as aiming to get the LTL bankruptcy filed by
18    early October?
19        A. No, the project team, which was
20    coordinated which we looked at some of the memos
21    and documentation was Chris Andrew with some
22    other J&J team.
23            As far as the logistics and the timing
24    and the work streams, it was all with that team.
25        Q. Okay. So Chris Andrew was one of the
216 :1    people that told you that J&J was aiming to have
2    the LTL bankruptcy filed by early October?
3        MS. BROWN: I object. It lacks foundation.
4        THE WITNESS: I don't recall if Chris Andrew
5    used those exact words. We were working on a
6    timeline to get the structures and the entities
7    and the accounting completed at the end of

8      September, into October. The exact dates I
9      can't comment on.
10     BY MR. BLOCK:
11         Q. Chris Andrew was one of the people that
12     was directing this timeline, correct?
13         A. He had a -- he had an oversight role,
14     yes.
15         Q. Okay. Other than Chris Andrew, who
16     else was directing the timeline for the LTL
17     bankruptcy filing?
18         A. Chris was the primary point of contact
19     coordinating all of the work streams. That was
20     who I worked with, as we saw.

---

**LISMAN, ADAM** - *02/08/2022*

---

**Page 228**
228 :23        Q. Okay. So -- so the information
24     provided by J&J's legal team that you just
25     referred to, along with your quarterly talc
229 :1     memos, is that the information that you think
2      would have the information needed if someone
3      were to attempt to project J&J's current or
4      future talc liabilities?
5          MS. BROWN: I object. It lacks foundation,
6      calls for speculation.
7          THE WITNESS: I would not use that
8      information to do any kind of projecting. I use
9      that information to get the accounting right at
10     the end of a given quarter. That's it.
11     BY MR. BLOCK:
12         Q. Okay. And your -- were your
13     projections of J&J's current and future talc
14     liabilities in those quarterly talc memos that
15     you provided to business people at J&J?
16         MS. BROWN: Objection, foundation.
17         THE WITNESS: I have never made a projection
18     of what future liability would be, no.
19     BY MR. BLOCK:
20         Q. And to this day, you have never
21     attempted to project J&J's future talc
22     liabilities, correct?
23         A. No, I have not.
24         Q. Do you know if anyone has?
25         A. Not that I'm aware of.

---

**LISMAN, ADAM** - *02/08/2022*

---

**Page 243**
243 :4         Q. Did you ever tell anyone or email
5      anyone with any of the J&J entities that, in sum
6      or substance, you believe that JJCI was having
7      financial problems or was in financial distress?
8          A. Did I notify anyone that the legal
9      entity is in distress, no. But I have had
10     multiple conversations with very senior J&J
11     members around the cash cost and the economic
12     impacts of talc on J&J.
13         Q. My question is about JJCI. Did you
14     ever tell anyone that you believe that JJCI, the
15     legal entity JJCI, was having financial problems
16     or was in financial distress?
17         A. To that level of detail, no.
18         Q. Okay. Did anyone with any of the J&J

19    entities ever tell you or email you that they
20    believed that the legal entity JJCI was having
21    financial problems or was in financial distress?
22        A. At that level of detail, no.

**LISMAN, ADAM** - *02/08/2022*

**Page 249**

249 :25        Q. Mr. Lisman, did you ever attend a
250 :1    meeting about JJCI having any financial
2    problems?
3        A. A meeting of that precise subject, no.
4        Q. Okay. To your knowledge, was there
5    ever any meetings about any financial problems
6    of JJCI?
7        A. Not that I attended, no.

**MONGON, THIBAUT**

---

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 9**

```
9 :22        Q: Exhibit 36 is the -- is another email
   23        the same day from Mr. Andrew. Let's start at
   24        the bottom there. Do you see that at the bottom
   25        Mr. Andrew sent you this approval memorandum at
10 :1        8:07 in the morning as well?
    2        Do you see that?
    3        A: Yeah, I see that. Yes.
    4        Q: Okay. Great.
    5        MR. GLASSER: Take down that blowup.
    6        BY MR. GLASSER:
    7        Q: And you responded with your approval --
    8        let's blow up the middle part -- at -- you've
    9        got to do the approved so he can see -- you
   10        responded with your approval about an hour and
   11        51 minutes later at 9:58.
   12        Do you see that?
   13        A: Yeah, I can see it.
   14        Q: All right. And you agree that's what
   15        you did, right?
   16        A: Uh-huh.
```

---

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 12**

```
12 :12       Q: All right, great. Can you tell me all
   13        the other things you reviewed that day before
   14        you approved it between 8:07 a.m. and 9:58, if
   15        anything, other than the memorandum?
   16        A: No, I just reviewed the memorandum.
```

---

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 14**

```
14 :14       Q: Okay. Great. Let's take down 41.
   15        Let's go back to before you approved
   16        the memorandum. You only had the memorandum.
   17        So it's fair to say that before you
   18        approved this transaction, you did not review
   19        financial analysis in connection with the
   20        creation of each of the companies involved in
   21        the transaction; is that correct?
   22        MS. BROWN: Objection, lacks foundation.
   23        THE WITNESS: I -- I didn't review
   24        financials, no.
```

---

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 15**

```
15 :11       Q: And I'll represent to you there are 81
   12        deal documents that have to do with those nine
   13        steps. Okay?
   14        A: I was not aware of that.
   15        Q: Okay, great. That's what I thought the
   16        answer would be.
   17        So is it the case that you had no
   18        involvement in the negotiation or drafting of
   19        those 81 deal documents involved in the nine
```

20    steps of the transaction?
21    A: I was not involved.
22    Q: Great. So you didn't negotiate any of
23    them, right?
24    A: I was not involved in the preparation
25    of these documents.
16 :1    Q: You didn't read any of them, correct?
2    A: I was not involved. No, I didn't read
3    them.
4    Q: You didn't ask for any changes in any
5    of them since you didn't negotiate them and you
6    didn't read them, right?
7    A: No.
8    Q: Correct? When I say 'right' and you
9    say 'no,' I think you're agreeing with me.
10    A: No, I was not involved.

## MONGON, THIBAUT - *01/19/2022*

**Page 16**

16 :14    Q: Okay. And consistent with what you
15    just told me, you didn't look at the financial
16    effects -- you didn't look at any financial
17    statements or pro formas for any of the
18    companies occurring at any of these nine steps
19    in advance of the approval, correct?
20    A: No, I didn't.
21    Q: So you -- so you approved the
22    transaction without looking at any financial
23    forecast for the entities created as a result of
24    the transaction; isn't that true?
25    MS. BROWN: Objection, lack of foundation.
17 :1    THE WITNESS: Correct.
2    BY MR. GLASSER:
3    Q: 'Correct,' right?
4    A: (No audible response.)
5    Q: You've to say 'yes' because if you nod
6    it's not on the transcript.
7    A: Yes, yes, yes.
8    Q: Before you approved the transaction,
9    you did not review any financial analysis of
10    LTL, LLC; isn't that true?
11    A: What do you mean by 'financials'?
12    Q: Well, we said you didn't look at any
13    pro formas, right?
14    A: Pro formas of?
15    Q: Of how a company could be expected to
16    perform in the future once it's formed. You
17    know, like a business plan.
18    A: No, I didn't.

## MONGON, THIBAUT - *01/19/2022*

**Page 17**

17 :24    Q: Yeah. Before you approved the
25    transaction on October 11th, 2021, you did not
18 :1    review any financial analysis of JJCI's
2    historical mesothelioma liability, did you?
3    A: I didn't review this before -- right
4    before approving the memo, no.
5    Q: Okay. And you -- before approving this
6    memo, were you presented with any financial
7    analysis of an alternative transaction?
8    A: I don't know what you mean by

```
 9        alternative financial transaction.
10        Q: Well, lots of times in business when
11         you're running a business and you're choosing
12         what to do with a company and, you know,
13         strategic alternatives, don't you often run
14         different scenarios, different choices?
15        A: We, in normal course of business, we
16         look at different scenarios, yeah, from time to
17         time, yes.
18        Q: Okay. And you did not do that --
19        A: In this case that was -- the memo was
20         describing the recommendation.
21        Q: Right. And you did not look at any
22         alternative recommendations; isn't that true?
23        MS. BROWN: Objection, misstates testimony
24         and lacks foundation.
25        THE WITNESS: No, I didn't look at other
19 :1      alternatives. By the fact that this memorandum
 2         is -- does not have objectives to give
 3         alternatives and to describe the recommendation.
 4        BY MR. GLASSER:
 5        Q: Got it. So, therefore, it follows from
 6         that that you didn't look at any financial
 7         analysis of any alternative transaction
 8         structures at any time, isn't this true, with
 9         respect to this reorganization, Project Plato?
10        A: No, Project Plato was -- already
11         exists.
12        Q: Okay. And so you didn't, in approving
13         this Project Plato reorganization, you also did
14         not review any financial analysis regarding the
15         liquidity or sources of liquidity for LTL; isn't
16         that true?
17        A: I don't know what you mean by 'sources
18         of liquidity.' If you mean by source of
19         liquidity that LTL -- that we would allocate
20         revenue stream, the royalty revenue stream to
21         LTL, I was aware of this allocation of royalties
22         to LTL.
23        Q: We'll see it later in this deposition.
24         Did you look at any other financial
25         analysis regarding liquidity of the LTL?
```

## MONGON, THIBAUT - *01/19/2022*

**Page 20**

```
20 :8      Q: Other than the royalty -- A&M royalty
 9         stream -- are you aware of any -- did you look --
10         well, okay.
11         With respect to the royalty, A&M
12         royalty stream, did you personally look at any
13         financial analysis of the valuation of that
14         royalty?
15        A: No, I didn't look at the valuation.
16        Q: So the sum total of your knowledge of
17         the RAM valuation of the royalty stream is from
18         this approval memorandum where it discusses that
19         it's approximately 50 million a year?
20        MS. BROWN: Objection, misstates testimony,
21         lacks foundation.
22        THE WITNESS: I -- normally if it's in this
23         memorandum, a document that exists in
24         plaintiff's memorandum, that I was aware that it
25         was the approximate annual value of the royalty
```

21 :1        streams that we are allocating to LTL.

**MONGON, THIBAUT** - *01/19/2022*

**Page 22**

22 :2        Q: All right. I'm on page 6 of the PDF,
3            but I pulled it up on the screen. This is where
4            it says -- on page 5, it's -- of the memorandum,
5            it says --
6            A: Yeah.
7            Q: -- 'Over 50 million of after-tax annual
8            income from royalty streams will be transferred
9            from JJCI and its affiliates to RAM in the
10           restructuring.'
11           Do you see that?
12           A: Yes.
13           Q: All right. Is that the sum total of
14           the financial analysis of the liquidity of LTL
15           that you reviewed prior to approving this
16           transaction?
17           A: Yes.
18           Q: Okay. So obviously before you approved
19           the transaction, you were not presented with --
20           you can take down the exhibit -- you were not
21           presented with and you did not review any
22           solvency analysis; is that correct?
23           MS. BROWN: Objection, lacks foundation.
24           THE WITNESS: I was not presented such an
25           analysis.
23 :1        BY MR. GLASSER:
2            Q: And you did not review such an
3            analysis, correct?
4            A: Yeah, by definition. I was not
5            presented so.
6            Q: Right, exactly. We're just tapping it
7            down.
8            Prior to approving the transaction, you
9            were not presented with and you did not review
10           any fairness opinion having to do with any of
11           the nine steps of the transaction; is that
12           correct?
13           MS. BROWN: I object, that lacks foundation.
14           THE WITNESS: What do you mean by 'fairness
15           opinion'?
16           BY MR. GLASSER:
17           Q: Like you've gotten fairness opinions in
18           business transactions, haven't you, where
19           they're affiliate transactions? You get an
20           investment bank or an independent party to opine
21           as to the fairness of the transaction to all the
22           parties.
23           Do you know what I'm talking about?
24           A: Yeah, sometimes. Yes, uh-huh.
25           Q: Right. And in this instance, for each
24 :1        of these nine steps, you, Mr. Mongon, before
2            approving this transaction, did not review any
3            fairness opinions, correct?
4            A: No, I didn't. I rely on the experts
5            who are in charge of it.

**MONGON, THIBAUT** - *01/19/2022*

**Page 24**

24 :18       Q: Right. So to your -- you cannot recall

19    any discussion of transferring insurance that
20    you remember prior to approving this
21    transaction, right?
22    A: No, I don't remember.
23    MS. BROWN: Objection, vague.
24    MR. GLASSER: You interrupted him, Alli.
25
25 :1    BY MR. GLASSER:
2    Q: Go ahead.
3    MS. BROWN: I'm sorry. Objection, vague.
4    You can go ahead. You can answer if
5    you understand, Thibaut.
6    THE WITNESS: I don't remember any discussion
7    about that.
8    BY MR. GLASSER:
9    Q: So none of the entities involved in the
10    2021 restructuring Project Plato transaction
11    retained any independent investment bank to
12    review or assist in the transaction; is that
13    true?
14    MS. BROWN: I object, calls for speculation.
15    THE WITNESS: I cannot say it's not true.
16    I'm not aware of it.
17    BY MR. GLASSER:
18    Q: So to your knowledge --
19    A: To my knowledge, no knowledge of that.
20    Q: Do you know who was the lawyer for each
21    party at each of the nine steps of the
22    transaction?
23    A: No, I don't.
24    Q: Did you ever ask?
25    A: No.
26 :1    Q: How many hours -- we know that you got
2    the memo at 8:07 in the morning and we know you
3    approved it at 9:58.
4    Away from the work on that one day,
5    October 11th, how many hours of your life do you
6    think you've spent on Project Plato?
7    A: I have no exact recollection. At the
8    meeting in -- about Project Plato in July and
9    then a couple of dates and then -- and then the
10    memo in October so.
11    Q: All right. So how long did the meeting
12    in July take?
13    A: I don't remember exactly. It's a
14    standard meeting.
15    Q: So a standard meeting would you -- do
16    you guys try and do efficient meetings with
17    Johnson -- would a standard meeting be an hour?
18    A: A standard meeting would be half an
19    hour to an hour, yes.
20    Q: Okay. So it was a standard meeting, to
21    your recollection?
22    A: Yeah.
23    Q: Okay. And then after July, you said
24    there were a couple of updates, right?
25    A: Correct.
27 :1    Q: All right. So by 'a couple,' do you
2    mean two?
3    A: Yeah, I don't recall exactly how many,
4    but about.
5    Q: Okay. All right, a couple updates.
6    So let's go to the first update you
7    recall. How long did that take?
8    A: I don't -- I don't remember.

```
 9          Q: Was it a standard meeting?
10          A: Yeah, it would be a standard update.
11          Q: Okay. So 30 minutes to an hour?
12          A: I don't remember.
13          Q: You don't remember it being
14           excruciatingly long, though, right?
15          A: No, these were updates.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 27**
```
27 :23      Q: Okay. And then the second update, how
   24        long was that?
   25        A: I think regular updates on the regular
28 :1        course of business.
    2        Q: Okay. Standard update?
    3        A: Yeah.
    4        Q: So 30 minutes to an hour, right?
    5        A: It can be shorter than that, right, and
    6         is everything going okay, yes, good, let's move
    7         on.
    8        Q: Okay. And then on October -- prior to
    9         the 11th, do you remember any other meeting in
   10         October?
   11        A: I don't remember, no.
   12        Q: All right. The meeting in July, who
   13         was there?
   14        A: It was with the law department.
   15        Q: Who?
   16        A: Of J&J.
   17        Q: Who?
   18        A: So it was -- we had Mike Newman, Erik
   19         Haas, Andrew White, and maybe a few more people
   20         from the legal department that I don't remember.
   21         And I brought from my team Paul Ruh and
   22         Peter Kerrane.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 29**
```
29 :25      Q: Well, I guess -- I guess you agree that
30 :1        on the approval memorandum, and we can go back
    2         to it if you want, but you're the highest
    3         ranking Johnson & Johnson official on the
    4         approval memorandum, right?
    5        A: Correct.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 34**
```
34 :19      Q: Okay. But you did -- you already told
   20         me you didn't -- you reviewed zero analysis of
   21         the cash flow of LTL verses its expected
   22         obligations, right?
   23        A: No, I didn't.
   24        Q: You did not review any such analysis?
   25        A: I did not.
35 :1        Q: Okay. So --
    2        A: That was not my role.
    3        Q: So how could you give me the prior
    4         answer you just gave me --
    5        MS. BROWN: I object --
    6        BY MR. GLASSER:
    7        Q: -- that you understood that everything
```

```
8          was kosher in terms of, it can be -- it could --
9          I mean, you didn't look at any analysis of its
10         ability to meet its obligations before you
11         approved it.
12         MS. BROWN: I object. That question is
13         argumentative and misstates his testimony.
14         BY MR. GLASSER:
15         Q: You just trusted the memo, right?
16         MS. BROWN: Same objection.
17         THE WITNESS: So what this memo does is
18         explain what the recapping, I would say, what
19         the intent is, what the transaction is about,
20         and the due diligence that has been done by the
21         respective experts that we -- we have to work
22         on -- on the transaction, and provided me with
23         all the elements I needed to approve the
24         transaction from my perspective.
```

### MONGON, THIBAUT - *01/19/2022*

**Page 36**

```
36 :8      Q: All right. So how, based on the memo,
9          could you know that that was enough money to
10         meet its obligations?
11         MS. BROWN: Objection, lacks foundation,
12         calls for speculation.
13         Go ahead, Mr. Mongon, you can answer.
14         THE WITNESS: What -- what was -- what I was
15         told is that this level of revenue would -- was
16         what we were looking for in terms of allocation
17         of revenues to LTL.
18         BY MR. GLASSER:
19         Q: Okay. Were you involved in the
20         decision -- as a member of the Johnson &
21         Johnson, you're on the executive committee,
22         right?
23         A: Yes, I am.
24         Q: All right. That's the highest
```

### MONGON, THIBAUT - *01/19/2022*

**Page 43**

```
43 :10     Q: And it basically says there will be
11         minimal impacts to JJCI. That's the upshot of
12         the memo, right?
13         MS. BROWN: Objection to the form, misstates
14         the evidence.
15         THE WITNESS: They -- I think it describes in
16         detail the impact and shows the due diligence
17         made by the different experts in the different
18         areas that may or may not be impacted by the
19         transaction.
20         BY MR. GLASSER:
21         Q: Right; commercial, corporate, human
22         resources. Next page: Real estate,
23         intellectual property, legal, regulatory,
24         finance and tax, treasury and cash flow,
25         information technology, supply chain. Next
44 :1      page: And communication.
2          Right?
3          A: Uh-huh.
4          Q: All right. And in respect of each of
5          those functional areas, the memo essentially
6          explains that JJCI will be able to continue with
```

7       minimal impact, business as usual, right?
8       A: We explain that what needs to be done
9       in each -- on -- in these areas and the impact
10      that we have on each -- you know, and on these
11      areas.
12      Q: Okay. And would it be fair to say that

---

**MONGON, THIBAUT** - *01/19/2022*

**Page 45**

45 :15      Q: You don't believe that a goal of the
16      restructuring transaction was to take out of
17      JJCI talc claims and liabilities and assign them
18      to the new entity LTL? You don't agree that
19      that was one of the objectives?
20      A: I don't agree with your
21      characterization. The objective here is to
22      allocate the talc liabilities to a different
23      legal entity, or LTL, yes.
24      Q: Why?
25      A: We -- we felt that these -- the
46 :1      creation of LTL and the allocation of the talc
2       liabilities to this new entity would allow for,
3       as we said, fair and equitable resolution of the
4       ongoing litigation, not only for existing
5       claimants, but also for future claimants.

---

**MONGON, THIBAUT** - *01/19/2022*

**Page 46**

46 :21      Q: Were you not getting a fair shake in
22      regular court?
23      MS. BROWN: Objection, asked and answered.
24      THE WITNESS: I'm -- I have no opinion on
25      that.
47 :1      BY MR. GLASSER:
2       Q: Well then why did you execute the
3       transaction to move 38,000 cancer victims'
4       claims to bankruptcy court if you personally, as
5       the person who approved it, had no opinion that
6       the state courts were doing something wrong?
7       MS. BROWN: Object. It's argumentative and
8       it misstates his testimony and the evidence.
9       THE WITNESS: That was the recommendation, to
10      make -- do this transaction as the best way to
11      resolve the litigation, the talc litigation,
12      that up to this day, after many years of
13      litigation, is not resolved.
14      And so finding a way to solve this --
15      this talc litigation, again, for current and
16      future plaintiffs, is -- is a very appealing
17      proposition.

---

**MONGON, THIBAUT** - *01/19/2022*

**Page 62**

62 :2      Q: Well, all right. So like, for
3       example -- and I can go get the Travelers
4       document or whatever. But let's say it was like
5       a $400 million settlement with -- you know, with
6       a certain plaintiff's lawyer, okay. Let's say
7       we're going to settle $400 million worth of
8       cases with, say, Mark Lanier.
9       Do you, Mr. Mongon, get to approve that

10        or is that approved in legal?
11        A: I don't approve this number.


**MONGON, THIBAUT** - *01/19/2022*

Page 63
63 :4        Q: Right. So back to my premise, they're
5           spending your money without consulting you,
6           right?
7           MS. BROWN: Objection to the form of the
8            question, misstates the evidence, asked and
9            answered.
10           THE WITNESS: I repeat, I'm responsible for
11           the operational performance without the
12           litigation costs. The litigation is handled by
13           the law department. So I'm not responsible for
14           that or involved.
15           BY MR. GLASSER:
16           Q: All right. So when the decision is
17           made -- well, let me give you an example.
18           $2 billion has been offered up for a qualified
19           settlement fund in this bankruptcy.
20           Are you aware of that?
21           A: I'm not aware of that.


**MONGON, THIBAUT** - *01/19/2022*

Page 64
64 :1        You were not involved in picking that
2           number?
3           A: I was not involved.
4           Q: You were not consulted about picking
5           that number?
6           A: I was not consulted.
7           Q: It was not a business decision to pick
8           that number; it was made in legal?
9           MS. BROWN: Objection, calls for speculation.
10           THE WITNESS: I was not consulted.


**MONGON, THIBAUT** - *01/19/2022*

Page 69
69 :25        Q: Okay. I'm not -- away from the email,
70 :1         isn't it fair to say that by September you
2            understood Project Plato would result in a
3            bankruptcy filing?
4            A: So my understanding that it would -- it
5            was a potential outcome of -- of -- of the LTL
6            creation.
7            Q: 'Potential' sounds a little
8            wishy-washy. Should we say nearly certain
9            outcome?
10           MS. BROWN: Objection, lacks foundation.
11           THE WITNESS: I would say it was a likely
12           outcome.


**MONGON, THIBAUT** - *01/19/2022*

Page 72
72 :13        Q: All right. So aside from your
14           speculations about the board, let me ask you
15           about yourself.
16           Were you pretty certain yourself it was

```
17      going to be filed?
18      A: I know it was an anticipated move.
19      Q: All right. And the first bullet point
20      [as read]: All lawsuits asserting claims to be
21      immediately and automatically stayed.
22      You understood that as well, right?
23      A: And it said it was one -- one of the
24      benefits of this restructuring. We know the two
25      that are mentioned here.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 83**
```
83 :15      Q: Got it. So it's a feature, not a bug,
16      in Project Plato that the rest of the Johnson &
17      Johnson enterprise continues to operate as
18      usual, correct?
19      MS. BROWN: Objection to the form.
20      THE WITNESS: I don't know what -- exactly
21      what you mean by that. But what this document
22      shows and that was really our intent is to make
23      sure there was no misunderstanding from anyone
24      about who was filing for Chapter 11 bankruptcy.
25      It was not Johnson & Johnson. It was
84 :1      not any other affiliate than the newly created
2      LTL subsidiary.
3      BY MR. GLASSER:
4      Q: Got it. And that was -- that's a
5      feature of the transaction; that was intentional
6      structuring to get that resolved, right?
7      MS. BROWN: Objection, calls for speculation
8      and lacks foundation.
9      THE WITNESS: I wouldn't characterize it this
10      way. The sole in terms of this was to make sure
11      there was no misunderstanding.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 84**
```
84 :14      Q: You have to agree with me that the
15      entire purpose of Project Plato is to allow a
16      corporate toenail to go bankrupt and the body to
17      remain functional?
18      A: I disagree --
19      MS. BROWN: I object --
20      THE WITNESS: -- with the way you
21      characterize it. As I told you several times,
22      the -- in terms of Project Plato is to find a
23      way to solve this talc litigation that had been
24      going on for a number of years that had not been
25      resolved to date, and that move was -- the
85 :1      objective was to provide current and future
2      claimants with a fair and equitable way to bring
3      their case and get their case resolved.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 90**
```
90 :3      Q: Right. And we saw that Johnson &
4      Johnson Worldwide Health on Exhibit 35 brought
5      in about $14 billion a year, and we saw,
6      according to the approval memo, that LTL is
7      going to bring in about 50 million a year.
8      A: Uh-huh.
```

9        Q: Would you characterize 50 million as a
10        minute part of 14 billion?
11        A: It's -- no. It's part of -- of the --
12        it was part of the business. And, you know,
13        it's -- even if it's only a part of the bigger
14        business, it's -- I wouldn't characterize it as
15        small. $50 million is a lot of money.
16        Q: But you don't know whether it's a lot
17        of money compared to the obligations because you
18        didn't look at any financial analysis of those
19        obligations; isn't that true?
20        A: Correct. I didn't look at financial
21        analysis.

## MONGON, THIBAUT - *01/19/2022*

**Page 94**
94 :8        Q: All right. And so having seen this
9        exhibit, you think these were the people who
10        were at that initial meeting you described to me
11        earlier?
12        A: Yeah. So you have Mike Ullmann, Erik
13        Haas, Chris Andrew, Andrew White. I didn't
14        remember that Valeria was in that meeting. And
15        then I brought with me Paul Ruh and Peter
16        Kerrane.
17        Q: Okay. And looking back at Exhibit 41,
18        which I don't want to pull up, it looks like you
19        got -- you got your first two emails on Project
20        Plato. Your first email, it looks like it -- it
21        came to you on -- at 8:49 p.m. on July 19th.
22        So that would be consistent what you're
23        thinking, that this is the first time you
24        learned about Project Plato, right?
25        A: Yeah, that's -- we talked about it at
95 :1        the -- in July at that meeting, yes.

## MONGON, THIBAUT - *01/19/2022*

**Page 100**
100 :1        Q: Okay, great. And then it says here [as
2        read]: The license agreements were not
3        transferred, just the right to the royalty
4        stream. JJCI is still responsible for the
5        agreements and JJCI employees will still be
6        fulfilling all responsibilities under the
7        agreements.
8        Is that under -- your understanding of
9        what happened in the royalty transaction?
10        A: Yes.
11        MS. BROWN: Objection, calls for speculation.

## MONGON, THIBAUT - *01/19/2022*

**Page 100**
100 :22        Q: Okay. Let's go to exhibit -- let's go
23        to section 31.
24        [As read]: Does LTL own the underlying
25        brands/products? No, it only holds an interest
101 :1        in the royalty streams. JJCI is still
2        responsible for the product license agreements.
3        JJCI employees will still fulfill all
4        responsibilities under these agreements.
5        Is that your understanding of the

6      royalty deal?
7      MS. BROWN: Objection, speculation.
8      THE WITNESS: My understanding that's what's
9       written here, yes.
10      BY MR. GLASSER:
11      Q: Great. Let's go to Exhibit -- paragraph 32.
12       [As read]: Does this matter impact the
13       manufacturing, distribution, or sales of these
14       brands in any way? No. RAM only holds an
15       interest in the royalty stream revenues of these
16       products.
17       Is that your understanding of the
18       transaction?
19      A: And, no, RAM only holds an interest in
20       the royalty revenue streams of these products.
21       LTL's filing does not impact this in any way.
22       Correct.

## MONGON, THIBAUT - *01/19/2022*

**Page 103**
103 :7      Q: Great. Next page, top bullet point.
8      [As read]: Aside from a handful of
9       officers overseeing administrative activities
10       and the Chapter 11 cases, LTL has no employees
11       or operations. It does not develop, manufacture
12       or produce any products or brands.
13       Is it your understanding of the
14       transaction?
15      MS. BROWN: Objection, calls for speculation,
16       misstates the facts.
17      THE WITNESS: I think that's a simple answer
18       that does -- that forgets to mention that LTL
19       will mention -- mention and remind everybody of
20       what was stated in other parts of this document
21       in terms of LTL's role in managing the revenue
22       stream of these royalties.

## MONGON, THIBAUT - *01/19/2022*

**Page 107**
107 :6      Q: So the bankruptcy case was filed, you
7       know, on October 14th, just three days after you
8       authorized the transaction.
9       All right, Mr. Mongon? Do you agree
10       with me there?
11      A: I don't remember but...
12      Q: Close in time. You remember that,
13       right?
14      A: Uh-huh.
15      Q: 'Yes'?
16      A: Yes.
17      Q: You have to say 'yes.'
18      A: Let me remind you that I authorized the
19       creation of LTL with this memo.
20      Q: Right.
21      A: I didn't authorize the bankruptcy
22       filing.
23      Q: Okay. Do you have any inkling of why
24       it happened so quick in time after the -- after
25       the authorization of the creation of the
108 :1      company? Why did it happen in such a tight time
2       frame?
3      MS. BROWN: Calls for speculation, I object.

```
 4        THE WITNESS: No, I have no idea why the
 5         board of LTL decided on that day.
 6        BY MR. GLASSER:
 7        Q: So you have no insight into why there
 8         was a big hurry to get it done?
 9        MS. BROWN: Same objections.
10        THE WITNESS: I wouldn't characterize it as a
11         big hurry. It's just a decision that LTL
12         company -- the LTL board made.
13        BY MR. GLASSER:
14        Q: Well, do you even know how many days
15         before the board made that decision the board
16         members ever even knew they were going to be
17         board members of LTL?
18        MS. BROWN: Foundation, speculation.
19        THE WITNESS: No, I don't.
20        BY MR. GLASSER:
21        Q: Okay. So you have no idea if they
22         acted in a hurry, you're saying?
23        A: I don't know.
24        MS. BROWN: Same objection.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 113**

```
113 :25   Q: When did the workflow start with
114 :1     respect to the planned separation of the corp --
  2         of the consumer business?
  3        MS. BROWN: Speculation, foundation.
  4        THE WITNESS: I don't know --
  5        BY MR. GLASSER:
  6        Q: If you know.
  7        A: I -- I don't know when the conversation
  8         started. I was not involved at the beginning of
  9         this conversation.
 10        Q: When did you first know that there was
 11         a potential plan to spin off the consumer
 12         business?
 13        A: I would say around July 2021.
 14        Q: Was the board meeting July 19, 2021,
 15         in -- discussing that potential?
 16        A: No.
 17        MS. BROWN: Objection, asked and answered.
 18        THE WITNESS: Sorry. Just to rephrase, I did
 19         not discuss the spinoff at the board meeting.
 20        BY MR. GLASSER:
 21        Q: But you think you knew about it -- the
 22         possibility around the time of that board
 23         meeting?
 24        A: No, I distinctly remember that I didn't
 25         know about it when we had the board meeting.
115 :1     Q: All right. So after the July --
  2         sometime after July 19 is when you learned?
  3        A: That -- that's right.
  4        Q: All right. Did the potential for the
  5         spinoff come up in the September board meeting?
  6        A: Yes, it did.
  7        Q: And was the interaction with Project
  8         Plato and the spin discussed?
  9        MS. BROWN: Objection, assumes facts.
```

**MONGON, THIBAUT** - *01/19/2022*

```
121 :10        Q: As of December 4, 2019, Bernstein
    11         accurately reported what they had been told at
    12         the meeting, that management was supremely
    13         confident in the strength of J&J's legal
    14         position on talc?
    15         A: That's how Bernstein reported it.
    16         Q: And you agree that they were not making
    17         that up, that's what they were told at the
    18         meeting?
    19         A: Of their interpretation, right, of what
    20         they heard from management.
    21         Q: Okay. And do you think it was an
    22         unfair interpretation of what they heard from
    23         management?
    24         MS. BROWN: Calls for speculation.
    25
122 :1         BY MR. GLASSER:
     2         Q: You were there. Do you think that's an
     3         unfair message they got?
     4         A: I don't recall exactly what -- what we
     5         talked about. But that's their understanding
     6         and recollection of the -- of the conversation.
     7         Q: Let's go to the first bullet point
     8         under 'During the Skillman visit.'
     9         [As read]: Management made a few
    10         additional points. Management wanted to make it
    11         clear that litigation is not a distraction for
    12         the business. There is a very small team
    13         dedicated to the case, and the vast majority of
    14         people in the business are doing their jobs.
    15         Commercially, J&J does not believe talc
    16         litigation is having a negative spillover effect
    17         across brands outside of baby powder.
    18         Do you see that?
    19         A: I can see that.
    20         Q: Isn't it true that's what management
    21         told Bernstein at the meeting?
    22         MS. BROWN: Objection, calls for speculation.
    23         THE WITNESS: I think that's what meant --
    24         what it says in this document, that's what --
    25         that's what Bernstein reported.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 123**

```
123 :5         Isn't it true that's what you guys told
     6         Bernstein at this meeting?
     7         MS. BROWN: Misstates the evidence, lacks
     8         foundation.
     9         THE WITNESS: I don't recall exactly what we
    10         talked about at this meeting.
    11         BY MR. GLASSER:
    12         Q: Explain to me how they could have come
    13         up with that on their own.
    14         MS. BROWN: Calls for speculation.
    15         THE WITNESS: I -- I cannot extrapolate,
    16         right, or speculate on what they -- what they
    17         did. I don't recall exactly what we talked
    18         about at this meeting.
    19         BY MR. GLASSER:
    20         Q: As a matter of fact, do you agree
    21         that's a true statement, though, independent of
    22         what they were told at the meeting; at that time
    23         in December of 2019, there was a small team
    24         dedicated to talc inside Johnson & Johnson.
```

```
25        MS. BROWN: Calls for speculation.
124 :1     THE WITNESS: So remember that, as I told you
2         before, I -- I went -- when we talk about, and I
3         don't know if this is what they referred to when
4         they refer to management. When I talk about the
5         Consumer Health business, I talk about the
6         operational performance of the business
7         excluding the cost and impact of the litigation
8         business.
9         So from that perspective, you have very
10        few people on the operational side of the
11        business who deal with the litigation. The
12        litigation is handled by the law department of
13        Johnson & Johnson outside of the operational
14        team of the Consumer Health business.
```

MONGON, THIBAUT - *01/19/2022*

**Page 124**
```
124 :19    Q: Okay. Let's go to the second and third
20        bullet points.
21        So there is a quote here [as read]:
22        Management could not have been clearer about
23        their confidence in their product. We
24        absolutely stand behind this product. Our talc
25        does not contain asbestos. It is safe and does
125 :1     not increase the risk of cancer.
2         Do you see that quote?
3         A: Yes, I can see it.
4         Q: Okay. So you were there. Isn't that
5         what investor relations told them?
6         A: Yeah, absolutely. And I -- I tell this
7         to different stakeholders each time I'm asked
8         about the product. So it was not new
9         information that we were and we continue to
10        stand behind the quality and safety of the -- of
11        the product --
```

MONGON, THIBAUT - *01/19/2022*

**Page 134**
```
134 :11    Q: All right. If it's true that talc
12        causes mesothelioma, do you think negative
13        headlines are warranted?
14        MS. BROWN: Objection, speculation.
15        THE WITNESS: I don't agree with your first
16        statement, as I told you. We believe our talc
17        product is safe and effective.
```

MONGON, THIBAUT - *01/19/2022*

**Page 135**
```
135 :18    Q: So this is the '2nd Quarter 2021
19        Results.' And it looks like J&J had an
20        excellent 2nd quarter 2021.
21        Would you agree with me?
22        A: It's -- it's a good quarter for J&J,
23        yes.
24        Q: Okay. And for your Worldwide Consumer
25        Health -- let's blow that up on the right
136 :1     side -- sales increased 13.3 -- percent, or
2         9.2 -- percent operationally.
3         Do you see that?
4         MS. BROWN: Objection.
```

```
5        THE WITNESS: Yes, I can see that.
6        BY MR. GLASSER:
7        Q: All right. And so that's a great
8         quarter for Worldwide Consumer Health, right?
9        A: Sorry?
10       Q: That's a really good quarter; do you
11        agree?
12       A: It's a good quarter for the -- for
13        Consumer Health globally, yes.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 136**

```
136 :24   MR. GLASSER: All right. Let's go to
25         Exhibit 33.
137 :1      (Document shown on the screen.)
2         BY MR. GLASSER:
3         Q: This is the 2nd Quarter Earnings Call
4          and you were one of the presenters; isn't that
5          right?
6         A: Uh-huh.
7         Q: 'Yes'?
8         A: I don't recall.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 137**

```
137 :17   Q: You were a presenter at the 2nd quarter
18         earnings call; isn't that true?
19        A: I don't recall but --
20        Q: Go to page 4. There you are.
21        A: Then I was.
22        Q: All right, great. Okay, here we go.
23        MR. GLASSER: Let's go to the -- let's go to
24         Exhibit 33, please. Oh, we have 33. I forgot
25         what I wanted to use this for. Oh, here we go.
138 :1      Let's go to page 7, Consumer Health.
2         BY MR. GLASSER:
3         Q: All right. So what does this tell us
4          about the state of the Consumer Health business
5          in the 2nd quarter of 2021, Mr. Mongon?
6         A: So this side depicts the financial
7          performance from an operational perspective for
8          the Consumer Health business in terms of
9          revenue. I believe it's by the different
10         segments. And then the drivers for each
11         segment.
12        Q: And is this good performance?
13        A: It's overall a good performance from a
14         revenue perspective versus the prior quarter --
15         sorry, the end quarter in the year 2020. And
16         I'll highlight it here.
17         We mention the fact that it's primarily
18         due to the market recovery, because the 2nd
19         quarter of 2020, due to the COVID pandemic, so a
20         very low performance of our business.
21         So when you compare the 2nd quarter of
22         2021 to the 2nd quarter of 2020, the base of
23         comparison is favorable to the growth rate
24         reported in '21. And so that's what --
25
139 :1      MR. GLASSER: Okay. Let's go to Exhibit 34.
2          (Document shown on the screen.)
3         BY MR. GLASSER:
```

4       Q: So here's a transcript of a conference
5        that Barclays ran on September 10, 2021, that
6        you presented at; isn't that right, Mr. Mongon?

## MONGON, THIBAUT - *01/19/2022*

**Page 139**

139 :15     Q: All right. And let's go to page --
16        page 5 of your remarks.
17        So this is what you told the Barclays
18        investor conference about the performance in the
19        2nd quarter; isn't that right?
20        A: Uh-huh, yes.
21        Q: And you told them that your three
22        segments in your business are working, right?
23        A: Right.
24        Q: That you're driving strong revenue
25        growth, right?
140 :1     A: Yes.
2        Q: That you're increasing your margin as
3        well; isn't that right?
4        A: Correct.
5        Q: And that Consumer Health --
6        A: And you will see that we characterize
7        it as operating profit.
8        Q: I understand. You made that point.
9        A: Which does not include the cost of
10        litigation.
11        Q: And then you say that [as read]: We
12        continue to solidly position J&J Consumer Health
13        in the top quartile of our industry for
14        profitability while delivering top line growth
15        at the same time.
16        Right?
17        A: Correct.

## MONGON, THIBAUT - *01/19/2022*

**Page 142**

142 :2     Q: But you do stand by this statement you
3        made, that [as read]: We are a thriving
4        business with a balanced, resilient power
5        portfolio delivering top quartile profitability?
6        A: I do. Again, from an operational point
7        of view, excluding cost of litigation.

## MONGON, THIBAUT - *01/19/2022*

**Page 143**

143 :18     12:16 p.m., after which the
19        deposition was resumed at
20        1:02 p.m. as follows:)
21        THE VIDEOGRAPHER: The time is 1:02 p.m. We
22        are now back on the record.
23        EXAMINATION
24        BY MR. JONAS:
25        Q: Good afternoon, Mr. Mongon.
144 :1     A: Good afternoon.
2        Q: My name is Jeff Jonas from the firm
3        Brown Rudnick, and I represent the Talc
4        Claimants Committee I in the LTL bankruptcy.

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 146**

146 :5     Q: Okay. Okay. So I want to just come
6     back to what we've now -- what you've described
7     for me as Project Plato.
8     Was Project Plato approved by the board
9     of J&J?
10     MS. BROWN: Objection, foundation.
11     THE WITNESS: I don't know about it. I'm not
12     aware of that.
13     BY MR. JONAS:
14     Q: Okay. Are you -- well, let me ask you,
15     are you aware of what approvals within J&J were
16     obtained in connection with Project Plato?
17     A: No, I don't. I'm not aware of that.
18     Q: Okay. Do you know who could tell us
19     what approvals were obtained at J&J for Project
20     Plato?
21     A: I would say, you know, you can -- you
22     have the memo that approved the transaction. So
23     you have the list of approvals on the -- on the
24     memo.

---

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 148**

148 :23     Q: Okay. So now that we've done -- we've
24     gone through that exercise -- and maybe you do,
25     maybe you don't, I'll just ask -- would you
149 :1     agree that Project Plato was authorized by J&J?
2     A: I would say, absolutely, it was a
3     transaction approved by our company.

---

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 149**

149 :11     Do you consider yourself a senior
12     member of management at J&J?
13     A: I do.
14     Q: Okay. And as a senior member of
15     management at J&J, when you consider and then
16     approve a transaction, do you consider the
17     business rationale or reasons to do that
18     transaction?
19     A: I consider the rationale attached to
20     the project.
21     Q: Okay. So in this case, what were the
22     business -- what was the business rationale for
23     you to approve Project Plato?
24     A: I think the -- the main rationale
25     that -- was that the Project Plato appeared to
150 :1     be a reasonable option that we had to create a
2     way for current and future claimants to get the
3     ongoing talc litigation resolved in a fair and
4     equitable way.
5     From that perspective and based on the
6     recommendation of -- of the team, it was -- it
7     was possible.
8     The other thing that was important for
9     me from an operational standpoint is that the
10     due diligence done by the experts highlighted in
11     the memo, demonstrated that that it was doable

12      from an operational standpoint. And so from
13      these two perspectives, my -- my judgment was
14      that it was a good transaction to do.
15      Q: Okay. And I think -- I appreciate the
16      second perspective, that it was operationally

**MONGON, THIBAUT** - *01/19/2022*

**Page 151**

151 :17    Q: Yeah. So part of project -- part of
18      the business rationale for Project Plato was
19      profit motive, correct?
20      MS. BROWN: Objection, misstates testimony.
21      THE WITNESS: No, I don't agree with your
22      characterization.
23      BY MR. JONAS:
24      Q: Okay.
25      A: I -- what I said is that it was a way
152 :1    to offer claimants who have claims related to
2      talc a way to get their case resolved in a fair
3      and equitable way, something that has been going
4      on for years and has not been resolved as of
5      today.
6      Q: Okay. So I -- I don't want to be
7      facetious. I just want to ask a simple question.
8      Are you saying that the motivation for
9      J&J to do Project Plato, the sole -- are you
10      saying the sole motivation was to help claimants
11      resolve their claims? Is that your testimony?
12      MS. BROWN: I object. It lacks foundation
13      and asks for speculation.
14      THE WITNESS: That's not what I said.
15      I said that the goals -- the goal as to
16      Project Plato, which, I remind you, is the
17      creation of this subsidiary where we would
18      allocate the talc liabilities, would provide a
19      forum for claimants to get their case resolved.
20      That's good for the claimant. That's
21      good for the company.
22      BY MR. JONAS:
23      Q: Let me ask you, did you ever see any
24      financial analysis or economic analysis that
25      suggested to you that Project Plato would be
153 :1    financially beneficial for J&J?
2      A: What do you mean by 'financially
3      beneficial' to J&J?
4      Q: Well, fair question. Let me -- let me
5      break it down.
6      First I mean, any sort of analysis
7      whatsoever from anybody at any time that showed
8      that, hey, if we do Project Plato, whether it's
9      a year from now or five years from now or ten
10      years from now, we'll have -- doing Project
11      Plato versus not doing Project Plato, will have
12      a better financial outcome for J&J.
13      And when I mean 'financial outcome,' I
14      mean our bottom line will be improved in some
15      way for having done Project Plato than not doing
16      it.
17      MS. BROWN: Objection, calls for speculation.
18      THE WITNESS: Yeah, let me break down your
19      question and -- let me break it.
20      The -- while I haven't seen the
21      financial analysis, I'm aware of the very high
22      cost linked to litigation. And I'm also aware,

```
 23         as you are over the years, of the very negative
 24         verdict, what we call the Ingham verdict, that
 25         we had to book in our books in 2020.
154 :1      BY MR. JONAS:
  2         Q: Uh-huh.
  3         A: This -- these costs, while I was not
  4          shown a specific analysis, is not rocket
  5          science, it doesn't take you long to see that
  6          if -- if that Project Plato is a way to get
  7          resolution and certainty about the -- about the
  8          case and the costs associated with these -- with
  9          these cases.
 10          And from that perspective, it's -- it's
 11          beneficial to the company.
 12         Q: Yeah, it would be beneficial because
 13          your hope in doing Project Plato was to avoid --
 14          in part, avoid future verdicts like Ingham that
 15          had a very big hit to the bottom line, correct?
 16         MS. BROWN: Objection, assumes facts, calls
 17          for speculation, lacks foundation.
 18         MR. JONAS: Wow.
 19         THE WITNESS: I didn't agree with -- with
 20          your characterization.
 21          With Project Plato, we are not trying
 22          to avoid what you talked about. What -- again,
 23          we are trying to provide a forum for all
 24          complaints to be heard by the bankruptcy judge
 25          and find resolution to the degree that the judge
155 :1       will decide.
  2          So we are not -- we are not avoiding
  3          anything. We just believe that Project Plato
  4          will provide this forum for -- again, for
  5          today's claimants and future claimants.
  6         BY MR. JONAS:
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 155**

```
155 :20     Q: Okay. Do you know if anybody at J&J
 21          ever talked to any claimants and asked them if
 22          they would prefer to be in bankruptcy or not in
 23          bankruptcy?
 24         MS. BROWN: Calls for speculation.
 25         THE WITNESS: I don't know.
156 :1      BY MR. JONAS:
  2         Q: Did you ask anybody?
  3         A: No, I didn't.
  4         Q: Do you think it would make sense, if
  5          you're making a decision that this is the way to
  6          go for -- it's good for these people, do you
  7          think it makes any sense to have asked them what
  8          they would prefer?
  9         MS. BROWN: Objection, foundation,
 10          speculation.
 11         THE WITNESS: It's not my field of expertise
 12          so I rely on the experts.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 162**

```
162 :22     Are you aware that certain J&J
 23          employees were seconded, or seconded, to work at
 24          LTL?
 25         A: Yes, yes, I am.
```

163 :1    Q: And do you know how those particular
2    employees were chosen or selected?
3    A: Not -- not really other than, you know,
4    the fact that I believe they were the right
5    candidates for the role.
6    Q: Well, how do you know they were the
7    right candidates for the role?
8    A: Because that's how we nominate people
9    in the company.
10    Q: Okay. Well, do you know who nominated
11    them for their roles at LTL?
12    A: No, I don't.
13    Q: Do you know -- we've talked about
14    Mr. Kim, who, I think, is chief legal officer at
15    LTL.
16    Do you know Mr. Deyo, D-e-y-o, who is a
17    board member, a manager? Do you know him?
18    A: I don't know him personally, no.
19    Q: Okay. But you're aware he's a board
20    member at LTL?
21    A: I know about it, yes.
22    Q: Okay. How do -- how did you come to
23    know about that?
24    A: I think it was at one of the updates.
25    Q: And did somebody say -- I just want to
164 :1    know how you learned about it.
2    So at one of the update meetings,
3    somebody said, Oh, Mr. Deyo is going to be a
4    board member at LTL?
5    A: I don't recall exactly, but the -- who
6    was associated with LTL was probably provided as
7    one of the updates about the case.
8    Q: Okay. And do you know who Robert
9    Wuesthoff is?
10    A: Yes, I know him.
11    Q: Okay. And who is he? How do -- what
12    do you know about him?
13    A: I know he left LTL now and used to
14    work for J&J.
15    Q: Okay. And do you know how he was
16    chosen to -- for that position?
17    A: No, I don't.
18    Q: You don't know what -- I think you said
19    to be nominated, you got to be qualified. You
20    don't know what qualified him for that position?
21    A: No. I know -- other than I know he
22    knows the Consumer Health business because he
23    was part of the Consumer Health business before.
24    Q: Okay. Do you view the business of LTL
25    as Consumer Health?
165 :1    A: What -- what do you mean?
2    Q: Well, let me ask you, what -- what is
3    your understanding of what business LTL is in?
4    A: LTL is in the business of -- of
5    handling royalty streams. So we allocate it to
6    them the royalty streams we talked about this
7    morning. And their objective is to find new
8    royalty streams and develop this part of the
9    business.
10    So I -- if you ask me, is it part of
11    Consumer Health, it's -- LTL is not part of
12    Consumer Health.

**MONGON, THIBAUT** - *01/19/2022*

**Page 167**

| | |
|---|---|
| 167 :3 | Q: Yeah. Well, let me ask you, since |
| 4 | you've said that. I mean, why was -- you know, |
| 5 | why was it 50 million and not 25 million or a |
| 6 | hundred million or some other number? How was |
| 7 | it -- how was it determined that that was the |
| 8 | right amount of royalties to go into LTL? |
| 9 | MS. BROWN: Objection, calls for speculation. |
| 10 | THE WITNESS: I wouldn't be able to answer |
| 11 | your question. I don't know why this number was |
| 12 | that issue. |

**MONGON, THIBAUT** - *01/19/2022*

**Page 168**

| | |
|---|---|
| 168 :1 | Q: Have you ever been involved in any |
| 2 | conversations -- let me strike that -- |
| 3 | communications about J&J itself filing for |
| 4 | bankruptcy? |
| 5 | A: No, no, I haven't. |
| 6 | Q: Okay. Have you ever had any |
| 7 | communications about, I guess, what was -- |
| 8 | what's been called old JJCI filing for |
| 9 | bankruptcy? |
| 10 | A: Old JJCI filing for bankruptcy, no, I |
| 11 | haven't. |

**MONGON, THIBAUT** - *01/19/2022*

**Page 169**

| | |
|---|---|
| 169 :3 | Q: Okay. Okay. |
| 4 | I'm a little confused about the scope |
| 5 | of the talc claims which LTL will be dealing |
| 6 | with, so I just have a few questions about that. |
| 7 | Is it correct that Johnson & Johnson's |
| 8 | Baby Powder overseas -- that is, outside of the |
| 9 | United States -- continues to contain talc? |
| 10 | A: We continue to have talc baby powder |
| 11 | outside of North America, United States. |
| 12 | Q: Okay. And if -- if a company -- |
| 13 | A: United States and Canada. Sorry. |

**MONGON, THIBAUT** - *01/19/2022*

**Page 171**

| | |
|---|---|
| 171 :2 | Q: Well, let me back up. Have you seen -- |
| 3 | or had any -- well, have you seen any valuations |
| 4 | of new -- financial valuations of new JJCI? |
| 5 | A: No, I haven't. |
| 6 | Q: Have you had any communications -- |
| 7 | again, email, text, conversations, anything of |
| 8 | the sort -- about the value or valuation of new |
| 9 | JJCI? |
| 10 | A: No, I have not. |

**MONGON, THIBAUT** - *01/19/2022*

**Page 171**

| | |
|---|---|
| 171 :15 | THE WITNESS: I -- I don't know. I'm not |

16    responsible for the accounting, and we are not
17    managing the business through legal entities.
18    So we are managing the business operationally.
19    And then the accounting department, if you will,
20    will allocate revenues and costs to the
21    appropriate legal entity.
22    I have dozens of legal entities forming
23    my business, and I don't think about my business
24    through the lens of legal entities, and I don't
25    review financial statements about different
172 :1    legal entities.
2    BY MR. JONAS:
3    Q: Okay. Do you know, roughly, how many
4    people ultimately report to you?
5    A: 6- to 8,000 report, I would say,
6    directly to me, and more employees report to
7    other functions and work at the time, if you
8    will, under Consumer Health business.
9    So probably 6- to 8,000 report directly
10    to me. Approximately 20,000 would -- would work
11    on the Consumer Health business in the different
12    capacities that do not necessarily report to me.
13    Q: And notwithstanding that everybody is
14    remote these days, where is your primary
15    physical office?
16    A: The headquarter is -- is New Brunswick.
17    Our main operations in the -- in the U.S. are in
18    Skillman, New Jersey, and Port Washington,
19    Pennsylvania.
20    Q: And when -- when you do go to your
21    primary office, that's in -- in -- is that in
22    New Brunswick?
23    A: That's where my office as a Consumer
24    Health member, yes.
25    Q: Okay. Okay. And this may be beyond
173 :1    your expertise, and if it is, just let me know.

---

**MONGON, THIBAUT** - *01/19/2022*

**Page 177**

177 :22    Q: What is the difference between
23    Worldwide Consumer Health and Johnson & Johnson
24    Consumer, Inc.?
25    A: I'm responsible for the global
178 :1    performance and operations of the Consumer
2    Health sector around the world. And to be very
3    clear about how we are organized, these
4    operations in each market are hosted within one
5    of several legal entities. JJCI is one of these
6    legal entities, and it's where we hold the
7    majority of our Consumer Health business in the
8    United States.
9    Q: Okay. So JJCI is within Johnson &
10    Johnson's Worldwide Consumer Health sector,
11    correct?
12    A: It's one of the legal entities we use
13    to report -- to book our revenues and -- and
14    expenses and be we bought (indiscernible).
15    Q: All right. And the majority of J&J's
16    Consumer Health sector business in the United
17    States is with the company called JJCI, correct?
18    A: Correct.

**MONGON, THIBAUT** - *01/19/2022*

**Page 179**

179 :6      Q: Okay. And is it fair to say that the
7      overwhelming majority of Johnson & Johnson's
8      Consumer Health sector business in the United
9      States is Johnson & Johnson Consumer, Inc.?
10      A: That's my understanding, yes.

**MONGON, THIBAUT** - *01/19/2022*

**Page 180**

180 :7      Q: Have you ever held the opinion that
8      JJCI was in financial distress?
9      A: I'm not sure I would characterize it
10      this way. What I would say is that when I
11      looked at our annual report in 2021 reporting on
12      our 2020 results and I saw that when allocating
13      the cost of litigation to the result of the
14      Worldwide Consumer Health sector, the whole
15      Consumer Health sector globally was reporting a
16      loss. I had the -- I formed the opinion that
17      the business where this liability is, which is
18      the U.S. business, was under serious strain
19      linked to the cost into this litigation.

**MONGON, THIBAUT** - *01/19/2022*

**Page 181**

181 :1      Q: Okay. And are you saying that based on
2      your review of Johnson's 2020 annual report you
3      concluded that JJCI was having financial
4      problems?
5      A: That's not what I said.
6      I said that when I looked at the 2021
7      annual reports reporting on the 2020 financial
8      results, I saw that when allocating the cost of
9      litigation, talc litigation, to the operational
10      performance of the business, my business that
11      was operationally doing well, as we talked about
12      this morning, when allocated with the cost of
13      litigation that do reside in JJCI, the whole
14      global Consumer Health sector was reporting a
15      loss. And so as a result of that, I formed the
16      opinion that the legal entity that was hosting
17      the majority of the business in the U.S. and was
18      -- where we allocated the cost of talc
19      litigation was, indeed, in the red as well.

**MONGON, THIBAUT** - *01/19/2022*

**Page 182**

182 :22      Q: So is your best estimate that this was
23      sometime in the 1st quarter of 2021 or some
24      other time?
25      A: Yeah, I don't recall exactly, but
183 :1      probably around that time.

**MONGON, THIBAUT** - *01/19/2022*

**Page 186**

186 :14    Q: Okay. And what percentage of J&J's
15    Worldwide Consumer Health sector's expenses in
16    the year 2020 came from talc litigation expenses
17    as compared to the non-talc litigation expenses?
18    A: I don't have this number. I cannot
19    answer your question.
20    Q: And you've never known the answer to
21    that question, correct?
22    A: No. I don't look at it this way.
23    What -- what I look at is that what we did in
24    2020 is book the costs related to the -- what we
25    call the Ingham verdict, which was a
187 :1    multibillion-dollar verdict. And so that case
2    alone was very significant.
3    Q: Okay. So a very significant part of
4    the talc litigation expenses for J&J's Worldwide
5    Consumer Health sector came from the payment of
6    the Ingham judgment, correct?
7    A: Correct. That's why we booked it.
8    Q: Okay. And why was the Ingham judgment
9    paid for by JJCI and not J&J?
10    A: That, I would refer you to the
11    accounting department. But the accounting
12    department allocates the costs where -- to the
13    appropriate legal entity, and so that's where
14    the costs were allocated.
15    Q: Do you know if the Ingham judgment was
16    against Johnson & Johnson, Johnson & Johnson
17    Consumer, Inc., or both?
18    A: I don't know.

## MONGON, THIBAUT - *01/19/2022*

**Page 191**
191 :15    Q: This was approximately one month before
16    you approved of JJCI's restructuring as set
17    forth in the approval memo that was sent to you
18    on that same day, October 11, 2021, correct?
19    A: Correct.
20    Q: All right. And -- and here in these
21    remarks -- you remember this conference, right?
22    A: Yep.
23    Q: Okay. And in these remarks, you are
24    talking about J&J Consumer's broad-based
25    portfolio, right?
192 :1    A: Yes.
2    Q: And that includes Band-Aids, right?
3    A: Our portfolio? Yeah, they seem to our
4    portfolio.
5    Q: Right. It includes some of the most
6    iconic brands in the world, including Band-Aids,
7    Tylenol, Motrin, right?
8    A: Correct.
9    Q: J&J Consumer, another brand they have
10    is Nicorette, right?
11    A: Correct.
12    Q: Listerine, right?
13    A: Uh-huh.
14    Q: And what you said to the investors and
15    to the public here, that this was a broad-based
16    portfolio, it enables Johnson & Johnson Consumer
17    to handle market disruptions and drive
18    consistent performance, right?
19    A: Correct.
20    Q: You called this a power portfolio,

21    right?
22    A: Correct.
23    Q: And you said that Johnson & Johnson
24    Consumer was doing very well as measured by
25    operational growth, correct?
193 :1    A: Correct.
2    Q: And -- and you said that Johnson &
3    Johnson Consumer strategies across all three of
4    its segments were working, correct?
5    A: Uh-huh, absolutely.
6    Q: And those strategies are still working,
7    right?
8    A: Correct.
9    Q: And Johnson & Johnson Consumer is
10    continuing to drive strong revenue growth,
11    right?
12    A: Correct.
13    Q: Johnson & Johnson Consumer at this
14    time, September 10, 2021, and today, is
15    achieving the highest operating profit
16    improvement in what you would call their
17    competitive set, correct?
18    A: I'm glad you highlighted operating
19    profit. Yeah, absolutely.
20    Q: And then and now, Johnson & Johnson
21    Consumer has strong momentum, which allows
22    Johnson & Johnson Consumer to reinvest in
23    revenue growth and create what you would call a
24    virtuous cycle, correct?
25    A: Correct.
194 :1    Q: And what is the virtuous cycle for
2    Johnson & Johnson Consumer section that -- that
3    you're describing here?
4    A: It's a virtuous cycle when you create
5    products that are attractive for consumers,
6    consumers buy them, and they generate a profit
7    for the company. You can reinvest this profit
8    in the development of new products so you can
9    offer these consumers or other consumers the
10    same products or other products. So that's what
11    we talk about when we talk about this virtuous
12    cycle.
13    Q: And that's what Johnson & Johnson's
14    Consumer sector was doing before the LTL
15    bankruptcy filing, and that's still what the
16    Johnson & Johnson Consumer sector is doing
17    today, right?
18    A: That's what we strive to do every day
19    from an operational point of view, absolutely.
20    Q: And that's what you've achieved as the
21    head of J&J's Consumer sector?
22    A: Correct, from an operational --
23    Q: And the J&J Consumer sector, you said
24    then and you believe now, is solidly positioned
25    in the top quartile of the industry for
195 :1    profitability while delivering top-line growth
2    at the same time. That's a true statement then
3    in September of 2021, and it's a true statement
4    today, right?
5    A: Correct.
6    Q: And you said a few things I would
7    like -- you wanted people to remember about your
8    comments, September 10, 2021, with Barclays --
9    do you see where you start saying that there?
10    A: Uh-huh, yes.

11      Q: Okay. And you know when you make
12       statements to banks and to investors, it's
13       important to be completely honest, right?
14      A: Absolutely.
15      Q: And you know that banks and investors
16       and the public rely upon you to give full and
17       complete information about Johnson & Johnson's
18       Consumer Health sector whenever you make these
19       public statements, correct?
20      A: Correct.
21      Q: And in the statements from
22       September 10, 2021, you said [as read]: In
23       closing, a few things I would like to remember
24       about Johnson & Johnson Consumer Health.
25       And you said [as read]: First, we are
196 :1       a thriving business with a balanced and
2       resilient power portfolio that is delivering top
3       quartile profitability.
4       Do you see that?
5      A: I see it, yes.
6      Q: And that was true when you said it on
7       September 10, 2021, right?
8      A: That's true at the time I said it.
9      Q: And it's still true today, right, sir?
10     A: That's what we are focused on every
11      day.
12     Q: It's still true today, right, sir?
13     A: We are trying to achieve that every
14      day.
15     Q: It's still true today, sir, that the
16      Johnson & Johnson Consumer Health group is a
17      thriving business with a balanced and resilient
18      power portfolio, right?
19     A: Right.
20     Q: And it's still true today that
21      Johnson & Johnson Consumer Health is delivering
22      top quartile profitability, fueled by
23      world-class teams and world-class capabilities,
24      right, sir?
25     A: Correct.

**MONGON, THIBAUT** - *01/19/2022*

**Page 197**
197 :6      Q: On September 10, 2021, you said there
7       has never been a better time to be in Consumer
8       Health. And that was true then and it's true
9       now, right?
10     A: Correct.
11     Q: And what you said on September 10,
12      2021, was what the pandemic has done is
13      accelerated trends that were present
14      pre-pandemic that are really becoming very, very
15      important in a COVID and post-COVID world.
16      That's what you said then, right?
17     A: Right.
18     Q: And what was happening was during
19      COVID, which is still continuing, the demand for
20      Johnson & Johnson Consumer Health products has
21      gone up, right?
22     A: Some; not others.
23     Q: But, in general, Johnson & Johnson
24      Consumer Health is selling more of its products
25      than ever, right?
198 :1      A: That's not what I said.

```
2          Q: Is that a true statement, that today
3           and in the last year, Johnson & Johnson Consumer
4           Health has sold more products than ever and
5           that's, in part, due to COVID?
6          A: What is true is that revenues have
7           grown. I wouldn't be able to tell you in terms
8           of -- in terms of products sold what it means
9           exactly.
10          And what is also true is that some
11          categories benefitted from COVID with more
12          consumers reaching out for trusted solutions in
13          certain categories. Other categories suffered a
14          lot from -- from COVID.
```

## MONGON, THIBAUT - 01/19/2022

**Page 201**

```
201 :12    Q: Okay. So have you ever -- did you ever
13          hear anyone at Johnson & Johnson ever internally
14          or publicly say that Johnson & Johnson's
15          consumer sector was in financial distress, using
16          those words?
17          MS. BROWN: Objection.
18          THE WITNESS: Can you repeat the question?
19          BY MR. BLOCK:
20          Q: Have you ever -- have you ever heard
21          anyone from Johnson & Johnson, either internally
22          or publicly, say that Johnson & Johnson's
23          consumer sector was in, quote, financial
24          distress?
25          MS. BROWN: Asked and answered.
202 :1      THE WITNESS: No. But I didn't agree with
2           the way you characterize it because that's not
3           the way we talk about the company. We talk
4           about the whole company. And as I said, we make
5           a very clear effort to segment for investors
6           what is linked to litigation, what is linked to
7           the underlying performance of each business.
```

## MONGON, THIBAUT - 01/19/2022

**Page 206**

```
206 :18    Q: And, in fact, that's what you did as
19          head of Johnson & Johnson's Consumer sector, you
20          beat expectations for the remainder of 2021,
21          didn't you?
22          A: I am -- we did in the 3rd quarter. We
23          haven't published all these other results for
24          the 4th quarter yet.
```

## MONGON, THIBAUT - 01/19/2022

**Page 207**

```
207 :5     Q: Okay. So in the quarter that happened
6           right before the LTL bankruptcy was filed,
7           Johnson & Johnson's Consumer Health sector beat
8           financial expectations in terms of how it did,
9           right?
10          A: In terms of operational performance, I
11          cannot repeat enough, because that's very
12          important for you to understand that every
13          single time we talk about segments, specific
14          segments, we talk about the operational
15          performance. This does exclude the impact of
```

16      the litigation.

**MONGON, THIBAUT** - *01/19/2022*

**Page 209**

209 :18      **Q: Did you ever express any concern to**
19            **anyone that Johnson & Johnson would be forced to**
20            **pay another judgment that was similar in size to**
21            **Ingham, which resulted from the Ingham verdict?**
22            **A: I don't recall that. But it's a**
23            **possibility given what happened with Ingham,**
24            **absolutely.**
25            **Q: I'm sorry, could you repeat your**
210 :1        **answer?**
2            **A: I don't recall that. But it's a**
3            **possibility that it will happen again.**
4            **Q: Okay. I want to separate the answer**
5            **here.**
6            **You do not recall ever expressing any**
7            **concern to anyone that Johnson & Johnson could**
8            **be forced to pay another judgment similar in**
9            **size to Ingham, correct?**
10            **MS. BROWN: Objection, asked and answered.**
11            **THE WITNESS: Yeah, I don't recall an exact**
12            **conversation about that.**
13            **BY MR. BLOCK:**
14            **Q: Okay. And then you said, well, it's**
15            **possible that there could be another verdict**
16            **like Ingham, right?**
17            **A: That's uncertainty, yes.**
18            **Q: Okay. Did you -- did you ever do**
19            **anything to assess the likelihood of there being**
20            **other verdicts similar to Ingham?**
21            **A: No, I didn't.**

**MONGON, THIBAUT** - *01/19/2022*

**Page 212**

212 :15      **Q: You never asked any questions about the**
16            **details of the ovarian cancer and mesothelioma**
17            **cases against Johnson & Johnson or Johnson &**
18            **Johnson Consumer, Inc., right?**
19            **A: No.**

**MONGON, THIBAUT** - *01/19/2022*

**Page 215**

215 :3        **Q: Okay. So from J&J's investor relations**
4            **group, Ms. Wood, Sarah Wood says [as read]:**
5            **Let's move to 3rd quarter results. Worldwide**
6            **sales were 23.3 billion for the 3rd quarter of**
7            **2021, an increase of 10.7 -- percent versus the 3rd**
8            **quarter of 2020.**
9            **Do you see that?**
10            **A: Uh-huh. I can see that.**

**MONGON, THIBAUT** - *01/19/2022*

**Page 216**

216 :3        **Q: All right. And an increase of**
4            **10.7 -- percent in terms of worldwide sales for the**
5            **Johnson & Johnson enterprise for the 3rd**
6            **quarter, it was 10.7 -- percent increase as**

```
 7          compared to the same time in 2020, that is very
 8          positive financial news for Johnson & Johnson,
 9          correct?
10          A: It's a good performance, yes.
11          Q: And Mr. Wolk makes a statement, he
12          says, quote, We appreciate you joining us to
13          discuss our 3rd quarter results, which reflect
14          continued strength in our Pharmaceutical and
15          Consumer Health businesses.
16          Do you see that?
17          A: Yes.
18          Q: So the CFO of Johnson & Johnson
19          highlighted the Consumer Health sector as being
20          strong as of the 3rd quarter of 2021, correct?
21          A: Right.
22          Q: And the Consumer Health sector of
23          Johnson & Johnson is still strong today,
24          correct?
25          A: We see that when we publish our quarter
217 :1      four results, but in Q3 they were good.
```

### MONGON, THIBAUT - *01/19/2022*

**Page 217**
```
217 :8      Q: Okay. I understand that.
 9          So at the same time of the LTL
10          bankruptcy, you admit that the Consumer Health
11          business, as Mr. Wolk is saying here, was
12          strong, right?
13          A: I think you need to look at, as all our
14          investors always do, you need to look at the
15          whole picture here instead of taking specific
16          sentences, look at all the transcript and you
17          will see that, as I described earlier,
18          consistent with our usual practices, we separate
19          the restriction of our legal liability that, in
20          that case, Joe Wolk appeared to describe to
21          investors, and separating how our different
22          units are doing, our different sectors are doing
23          from an operational quality.
24          Q: Mr. Wolk said that as of October 19,
25          2021, five days after the LTL bankruptcy filing
218 :1      that there was continued strength in the
 2          Consumer Health businesses, correct?
 3          A: Correct.
 4          Q: And that was true, right?
 5          A: That was true as related to the 3rd
 6          quarter.
 7          Q: Of 2021, right?
 8          A: 2021.
 9          Q: Okay. And Mr. Wolk does talk about
10          talc, and he says [as read]: Other income and
11          expense in the 3rd quarter includes a
12          $2.1 billion charge of litigation expenses,
13          primarily driven by an incremental 1.4 billion
14          charge associated with a recently announced
15          qualified fund for current and future talc
16          claims.
17          Do you see that?
18          A: Yes, I can see.
19          Q: Okay. So Johnson & Johnson is telling
20          investors that this $1.4 billion charge is being
21          charged against the Consumer Health sector as
22          part of the qualified settlement fund for the
23          current and future talc claims, and that relates
```

24          to Project Plato, correct?
25      A: That relates to Project Plato,
219 :1        absolutely.
2       Q: Okay. And it says [as read]: The
3         qualified settlement fund is intended to
4         facilitate a final equitable resolution of all
5         talc litigation in a structured manner through
6         established bankruptcy law precedent.
7         Do you see that?
8       A: Yes, I can see it.
9       Q: And is that statement true?
10      MS. BROWN: Objection, foundation,
11        speculation.
12      THE WITNESS: That's how Joe Wolk described
13        it at this earning call.
14      BY MR. BLOCK:
15      Q: Okay. And do you agree with that
16        statement by Mr. Wolk, the CFO of Johnson &
17        Johnson?
18      MS. BROWN: Same objection.
19      THE WITNESS: This is his statement.
20      BY MR. BLOCK:
21      Q: You said yourself, sir, that one of the
22        purposes of Project Plato was to create a fund
23        in the bankruptcy courts to finally and
24        equitably resolve all the talc litigation, true?
25      A: I didn't talk about a fund. I talked a
220 :1      forum that would provide current and future
2         claimants a forum to get their case resolved.


**MONGON, THIBAUT** - *01/19/2022*

**Page 220**
220 :12     Q: So, Mr. Mongon, it was your intention
13        in approving Project Plato that the talc claims
14        would move from the various courts that they
15        were in into the bankruptcy courts where the
16        claims could be resolved in the bankruptcy
17        courts, correct?
18      MS. BROWN: Objection, misstates testimony.
19      THE WITNESS: My understanding in approving
20        the creation of -- of this new entity was to
21        allocate to this new entity the talc liabilities
22        so that current and future plaintiffs could have
23        a forum where they can get their case resolved.


**MONGON, THIBAUT** - *01/19/2022*

**Page 221**
221 :12     Q: Well, if LTL -- so you did -- you
13        approved the formation of LTL and the talc
14        liabilities all being transferred to LTL,
15        correct?
16      A: I approved the formation of LTL and the
17        transfer of talc liabilities to LTL.
18      Q: And I think what I heard you say was
19        that the likely result of creating LTL and
20        transferring the talc claims to LTL was that LTL
21        would file for bankruptcy, and you knew that,
22        right?
23      A: Yes, it was stated as a likely outcome.
24      Q: Okay. What other outcomes was there
25        once the talc claims were transferred to LTL
222 :1      other than LTL filing for bankruptcy?

2        MS. BROWN: Objection, speculation, lacks
3        foundation.
4        THE WITNESS: I think as we reviewed earlier
5        today -- we can look at the memo again if you
6        want -- but one aspect would be that the current
7        litigation would be put on hold and then the
8        current and future claimants could, through this
9        mechanism, get their case heard and resolved as
10        per the judge decision.

## MONGON, THIBAUT - *01/19/2022*

**Page 223**

223 :21        Q: A new avenue. Okay. Just to be clear,
22        when you approved -- when you approved the
23        creation of LTL, you anticipated that all the
24        court cases would stop and the talc cases would
25        be resolved in a new forum, which you understood
224 :1        to be the bankruptcy court, correct?
2        A: That's my understanding, yes.

## MONGON, THIBAUT - *01/19/2022*

**Page 227**

227 :18        Q: Okay. All right. So -- and I want to
19        be specific. All right. So the second session,
20        your second preparation session, there were six
21        lawyers, right? Mr. Haas, in fact, did attend
22        for the last few minutes; is that right?
23        A: No. In the last session, in the last
24        session, Erik Haas did join for a few minutes.
25        Q: So was Erik Haas in the room for part
228 :1        of your deposition preparation session?
2        A: Yes, he joined the Zoom meeting for a
3        few minutes.
4        Q: Okay. All right.
5        So were there any other people or
6        lawyers present for any amount of time in your
7        deposition preparation sessions other than the
8        people you identified?
9        A: No.
10        Q: All right. Did you take any notes in
11        preparation for this deposition?
12        A: Yes, a few notes.
13        Q: And I see you're motioning to something

## MONGON, THIBAUT - *01/19/2022*

**Page 230**

230 :18        Q: Anything other than the fact that the
19        talc litigation had been going on for a number
20        of years and that there was still cases pending,
21        did you know anything else whatsoever about the
22        talc litigation when you voted in favor of
23        restructuring JJCI on October 11, 2021?
24        A: Absolutely. I knew that this ongoing
25        litigation resulted in litigation costs of
231 :1        hundreds of millions of dollars each year. I
2        knew that we had had to pay the Ingham verdict,
3        a multibillion dollar verdict. I knew that
4        there was ongoing litigation.
5        Q: All right. So on October 11, 2021,
6        when you voted in favor of restructuring JJCI,
7        you knew that the talc litigation had been going

8       on for a number of years, that it had not been
9       completely resolved, that -- that the company
10      had ongoing litigation costs and that it -- that
11      it had paid the Imerys -- or the Ingham
12      judgment, correct?
13      A: Correct. I also note that you
14      mentioned Imerys, that the planned settlement,
15      the planned Imerys settlement didn't -- was
16      not -- did not happen. So there were a number
17      of initiatives over the years.
18      Q: You knew that -- you knew that
19      Johnson & Johnson had tried to completely
20      resolve all the talc cases against it within the
21      Imerys bankruptcy, right?
22      A: I don't know the specifics about the
23      Imerys case, but I know that it was an avenue
24      that was explored that did not ultimately lead
25      to any resolution.

**MONGON, THIBAUT** - *01/19/2022*

**Page 235**

235 :12     Q: Okay. And -- and you know, sir, that
13      you were approached by Johnson & Johnson's
14      general counsel, Mike Ullmann, about Project
15      Plato about a month after the Supreme Court
16      decided not to hear the Ingham case, right?
17      A: Yeah, I don't recall the exact timing,
18      but it was in July that we started talking about
19      Plato, yes.
20      Q: Right. And if the United States
21      Supreme Court decided not to take the Ingham
22      case on June 1, 2021, that would be about a
23      month later that you started working on Project
24      Plato, right?
25      A: Uh-huh.
236 :1      Q: All right. Yes?
2       A: Yes.
3       Q: Okay. So other than Johnson & Johnson
4       trying to settle talc cases in the Imerys
5       bankruptcy, trying to get the United States
6       Supreme Court to hear the Ingham case, trying to
7       get the cases dismissed with Daubert, what were
8       some other solutions, to your knowledge, that
9       Johnson & Johnson tried to resolve its talc
10      problem?
11      A: The -- the other solution was the
12      creation of -- of LTL.
13      Q: Well, what about litigation, like
14      trying your case in court in front of a jury or
15      asking the Court to dismiss it on legal grounds?
16      A: That was another avenue that was still
17      going on at that time.

**MONGON, THIBAUT** - *01/19/2022*

**Page 236**

236 :25     Q: Now, those litigation expenses from
237 :1      2020 that you've been referring to today, most
2       of that or a lot of that was from paying Ingham,
3       right?
4       A: Correct.

**MONGON, THIBAUT** - *01/19/2022*

**Page 237**

| | |
|---|---|
| 237 :19 | Q: Okay. In trying to understand what |
| 20 | might happen in the future with relate- -- in |
| 21 | relation to Johnson & Johnson's talc litigation |
| 22 | expenses, did you look at the result of the |
| 23 | ovarian cancer cases that Johnson & Johnson went |
| 24 | into court and tried in 2021? |
| 25 | A: No, I didn't. |

**MONGON, THIBAUT** - *01/19/2022*

**Page 238**

| | |
|---|---|
| 238 :12 | Q: Mr. Mongon, how did you know whether or |
| 13 | not to be concerned about other ovarian cancer |
| 14 | verdicts similar to Ingham or not? How did you |
| 15 | make that assessment? |
| 16 | A: I made that assessment based on the |
| 17 | long history of the talc litigation that we have |
| 18 | been witnessing and going through for a number |
| 19 | of years. |
| 20 | Q: So just based upon the fact that the |
| 21 | Ingham verdict happened and the litigation has |
| 22 | been going on for a number of years, right? |
| 23 | A: Correct. |
| 24 | Q: Okay. You did not attempt to look at |
| 25 | the likelihood of future verdicts or judgments |
| 239 :1 | either for ovarian cancer cases or mesothelioma |
| 2 | cases, right? |
| 3 | A: No -- |
| 4 | Q: And you didn't look at -- |
| 5 | A: -- that's not my area of expertise. |
| 6 | Q: Right. And in weighing whether to |
| 7 | approve the restructuring of JJCI, you didn't |
| 8 | look at what J&J's settlement strategy was with |
| 9 | respect to ovarian cancer cases or mesothelioma |
| 10 | cases, right? |
| 11 | A: Not at all. |
| 12 | Q: Not at all, right? |
| 13 | A: Not at all. |

**MONGON, THIBAUT** - *01/19/2022*

**Page 243**

| | |
|---|---|
| 243 :11 | Q: You said earlier that you approved |
| 12 | transferring the talc liabilities to LTL to |
| 13 | fairly and equitably resolve the talc litigation |
| 14 | in a different forum, which was the bankruptcy |
| 15 | courts, correct? |
| 16 | A: Yeah. |
| 17 | Q: Okay. And the rationale and benefits |
| 18 | for JJCI's restructuring from J&J's perspective |
| 19 | were actually set out in the approval memo that |
| 20 | was sent to you on October 11, 2021, correct? |
| 21 | A: The memo relates the objective and |
| 22 | expected benefits from the transaction, yeah. |

**MONGON, THIBAUT** - *01/19/2022*

**Page 244**

| | |
|---|---|
| 244 :8 | Q: Yeah, let me back up. |

9        All right. Earlier -- earlier -- let
10        me just see if I can make this clear.
11        You have never seen any financial
12        projections of J&J's talc liabilities, correct?
13        A: No, I have not.
14        Q: You have never seen any financial
15        analysis that calculated J&J's talc liabilities,
16        correct?
17        A: No, I have not.
18        Q: You have not seen any financial
19        analysis that extrapolated J&J's talc
20        liabilities either presently or into the future,
21        correct?
22        A: No, I have not.

**MONGON, THIBAUT** - *01/19/2022*

**Page 246**

246 :24        Q: Okay. It says that the divisional
25        merger is going to take place -- you knew it
247 :1        would take place in Texas, right?
2        A: Yes.
3        Q: And then you knew that the company that
4        had the talc liabilities, that would -- would
5        then be incorporated in North Carolina, right?
6        A: Yeah, I was not really -- I didn't
7        really pay attention to the details of this
8        transaction. That was really left to the
9        experts.

**MONGON, THIBAUT** - *01/19/2022*

**Page 247**

247 :19        Q: And he was -- Mike Ullmann, the general
20        counsel of Johnson & Johnson, was the first
21        person who told you about Project Plato, right?
22        A: Yes, he was. I don't remember who
23        talked first at the meeting, but he was the part
24        of the meeting when he talked about Project
25        Plato and the -- the assets that we -- we would
248 :1        look to transfer to -- to the new entity, right.
2        Q: And, of course, the talc liabilities?
3        A: The talc liabilities and all the
4        assets, like the royalty streams.
5        Q: Okay. And it says here that you were
6        also being -- requesting approval to delegate
7        authority to LTL board of managers. Do you see
8        that?
9        A: Yes, I do.
10        Q: Okay. Did you even know who LTL's
11        board of managers were on October 11, 2021, when
12        you approved this restructuring?
13        A: I don't remember if we knew at that
14        time who would be on the board, but I knew that
15        there would be a board.
16        Q: Did you -- do you even know who all of
17        LTL's board of managers are today?
18        A: I don't remember, no.
19        Q: You don't know, right?
20        A: Yeah, I don't remember.
21        Q: Well, did you ever know?
22        A: It was probably mentioned in one of the
23        updates, but I -- I don't remember.
24        Q: Do you know how many people are on the

25    LTL board of managers?
249 :1    A: No, I don't.
2    Q: Do you know how many board meetings the
3    LTL board of managers had before voting to file
4    the LTL bankruptcy?
5    A: No, I don't.

## MONGON, THIBAUT - *01/19/2022*

**Page 251**

251 :7    Q: Okay. So the memo that -- where you
8    approved JJCI's restructuring actually has the
9    rationale or the benefits from J&J's perspective
10    written down in the memo under a heading that
11    says 'Rationale/Benefits,' right?
12    A: Correct.
13    Q: All right. So -- and it says [as
14    read]: The restructuring, followed by the
15    anticipated bankruptcy, will enable new JJCI to
16    continue to develop, manufacture, and sell J&J's
17    Consumer Health products and other solutions to
18    customers.
19    Do you see that?
20    A: I do.
21    Q: Okay. And as we've talked about, JJCI
22    was -- was doing well in selling consumer
23    products before the bankruptcy; it's continued
24    to have done well after the bankruptcy; it
25    hasn't affected JJCI one bit, right?
252 :1    MS. BROWN: Objection, misstates his
2    testimony.
3    THE WITNESS: What you see in this memo is
4    what it says, right, not with one word or more,
5    right. But I think it's very explicit about
6    the -- what the restructuring would enable.
7
8    BY MR. BLOCK:
9    Q: Okay. One of the benefits is that JJCI
10    would continue to develop, manufacture, and sell
11    J&J's Consumer Health products to customers.
12    And my question for you is, that
13    benefit has happened, it was happening before
14    the LTL bankruptcy, and it's continued to
15    happen, right?
16    A: Correct.
17    Q: Okay. And then it says -- another
18    thing under rationale and benefits that was
19    presented to you as the person -- one of the
20    people who would have to decide whether to
21    approve this, was LTL to secure an equitable and
22    efficient resolution of the claims.
23    Do you see that?
24    A: Yes, I do.
25    Q: And it says more specifically the
253 :1    bankruptcy case. The bankruptcy case would
2    allow for -- and there's a series of bullets,
3    right?
4    A: Correct.
5    Q: Okay. So you said earlier that you
6    relied upon experts in making the decision to
7    vote yes on JJCI's restructuring based upon the
8    information presented to you in the memo, right?
9    A: Yeah, I rely on experts to do the due
10    diligence and ensure that we can execute this
11    transaction, yes.

12    Q: Okay. All right. So you met with
13    lawyers for Johnson & Johnson, we looked at, on
14    July 19, 2021, right?
15    A: Yeah.
16    Q: Then again -- we looked at earlier, on
17    September 24th, 2021, you again met with
18    Johnson & Johnson's lawyers, Mr. Haas and
19    Mr. Ullmann, right?
20    A: Yeah, we had several updates.
21    Q: Okay. Were Johnson & Johnson's
22    lawyers, including Mr. Ullmann, Mr. Haas,
23    Mr. White, Mr. Kim -- were those some of the
24    people you relied upon for information in
25    deciding to approve JJCI's restructuring?
254 :1  A: Absolutely.
2    Q: And what information from these lawyers
3    from JJCI did you rely upon in making your
4    decision to approve JJCI's restructuring?
5    MS. BROWN: And, Mr. Mongon, I'll just
6    instruct you. The facts that you may rely on, I
7    have -- I have no objection to you testifying
8    to, but I will caution you not to reveal
9    specific conversations that you may have had
10    with lawyers who may have been giving you legal
11    advice about the transactions.
12    MR. BLOCK: Okay. Our position is that we're
13    entitled to any information that was provided to
14    Mr. Mongon from the lawyers that he relied upon
15    in making his decision to approve JJCI's
16    restructuring.
17    So you made your objection. I made my
18    statement. But can I have the reporter read
19    back my last question?
20    (Whereupon, the record was read
21    as requested.)
22    MS. BROWN: So same instruction and same
23    objection.
24    THE WITNESS: I rely on their recommendation
25    that this transaction would be a way to secure
255 :1  an equitable and efficient resolution of the
2    current and future claims.
3    BY MR. BLOCK:
4    Q: Okay. So in terms of your
5    understanding that the bankruptcy case would
6    allow for an equitable and efficient resolution
7    of the talc cases, you relied upon information
8    provided to you by J&J's lawyers, correct?
9    A: By J&J's lawyers and by the other
10    experts who conducted the due diligence.
11    Q: Okay. And what information provided to
12    you by J&J's lawyers convinced you that moving
13    the cases to bankruptcy court was a way to
14    provide an equitable and efficient resolution of
15    the talc cases?
16    A: The three bullet points mentioned here.
17    Q: All right. And the three bullet points
18    are, Number 1, that all of the lawsuits that
19    were being litigated in court would be stayed,
20    correct?
21    A: Correct.
22    Q: Number 2, that the determination of an
23    appropriate amount to resolve the talc claims by
24    the bankruptcy court would be done following
25    either an agreement or an adjudication by the
256 :1  bankruptcy court, right?

2      A: Correct.
3      Q: And, Number 3, that this would allow
4       for the global and permanent resolution of the
5       claims pursuant to a plan of reorganization for
6       LTL in the bankruptcy, right?
7      A: Correct.
8      Q: And are those three points a fair and
9       accurate summary of the information provided to
10      you by Johnson & Johnson's lawyers that
11      convinced you that JJCI should be restructured
12      and that the talc claims should be transferred
13      to LTL Management LLC?
14     A: My understanding of the benefits of the
15      restructuring was -- as described here, was what
16      led me to approve this restructuring.
17     Q: Okay. But my question was, the three
18      points that are in the bullets that you -- that
19      I -- that I just read and just described to you,
20      is that the information that was provided to you
21      by Johnson & Johnson's lawyers that convinced
22      you to vote yes to Johnson & Johnson Consumer,
23      Inc.'s restructuring and have the talc
24      liabilities transferred to LTL with the
25      anticipation the bankruptcy would be filed?
257 :1    MS. BROWN: Objection, asked and answered and
2      misstates the answer.
3      THE WITNESS: It's -- it's based on this
4       rationale and the other elements of this memo
5       that I decided to approve this transaction.
6      BY MR. BLOCK:
7      Q: All right. Is there any -- any other
8       information that the lawyers from Johnson &
9       Johnson provided to you other than filing the
10      LTL bankruptcy would result in the cases being
11      stayed, some determination as to the amount that
12      should be paid in the bankruptcy court, and the
13      global and permanent resolution of the claims?
14      Is there other information -- any other
15      information that the J&J lawyers provided to you
16      other than that about this?
17     MS. BROWN: I object to the form of the
18      question. That's not what he testified to
19      and --
20     MR. BLOCK: Well, he actually did just
21      testify to it, and please --
22     MS. BROWN: And you weren't -- you weren't
23      listening.
24     MR. BLOCK: That's not an objection.
25     MS. BROWN: It is an objection. You're
258 :1    misleading --
2      MR. BLOCK: That's not what he testified to.
3       That's you speaking and testifying.
4      MS. BROWN: No. You're misleading the
5       witness, and I object. It misstates his
6       testimony and that's an objection and I have it.

**MONGON, THIBAUT** - *01/19/2022*

**Page 259**
259 :19    Did -- did you have any knowledge of
20      any waste or abuses experienced in the state
21      court tort system in relation to any of J&J's
22      talc litigation as of the time that you reviewed
23      this memo in October of 2021 or any other time?
24     A: I'm aware of the significant costs

```
      25        linked to defending these cases that are not
260 :1          supported by -- by science and the significant
      2         amount that was -- resulted from the Ingham
      3         verdict.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 263**
```
263 :21        Q: How do you know whether to trust the
      22         information about waste and abuse in the tort
      23         system in J&J's talc litigation if you don't
      24         know where the information came from?
      25        A: The information came from this group
264 :1           who did the due diligence and made sure that
      2          everything that is in the memo is accurate.
      3         Q: And did you do a single thing to check
      4          on any of the factual information that is set
      5          forth in this October 11, 2021, approval memo,
      6          anything?
      7         A: No. I rely on the experts.
      8         Q: And you took everything in this memo as
      9          true even though you did nothing to confirm
      10          yourself the accuracy of any of the statements
      11          in this memo, right?
      12        A: I rely on the experts.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 268**
```
268 :5         Q: All right. So I mean, in September of
      6          2021, even going back to July, when you were
      7          working on Project Plato, you were discussing
      8          the fact that this was going to involve a
      9          bankruptcy filing, right?
      10        MS. BROWN: Misstates the document.
      11        THE WITNESS: In September?
      12        BY MR. BLOCK:
      13        Q: Yes. It says September 20, 2021, that
      14          the email chain was about the strategy for
      15          implementing a proposed corporate restructuring
      16          and bankruptcy filing.
      17          Do you see that?
      18        A: Yes.
      19        Q: And you were -- you were -- you were
      20          discussing that in September of 2021, right?
      21        A: As an anticipated move, yes.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 269**
```
269 :13        Q: Okay. So in September of 2021 as the
      14          head of Johnson & Johnson Consumer Health, you
      15          were working with the HR professionals on the
      16          implementation of Project Plato which included
      17          the creation of LTL and the anticipated
      18          bankruptcy filing that would occur in the month
      19          of October of 2021, correct?
      20        A: Yeah, I was -- I was more focused on
      21          identifying the assets that would be transferred
      22          to LTL and the royalty stream we -- we talked
      23          about.
      24        Q: And what work were you doing with the
      25          HR professionals at J&J Consumer Health on
270 :1          Project Plato in September of 2021?
```

```
 2      A: I don't recall exactly, but it was
 3       probably to discuss if any employee attached to
 4       these royalty streams would be impacted by the
 5       transfer.
 6      Q: So --
 7      A: So as you saw in the memo, the due
 8       diligence committee showed that no -- no
 9       employee would be impacted by the transfer of
10       royalty streams.
11      Q: All right. So at the first Project
12       Plato meeting July 19, 2021, Mike Ullmann was
13       there. He's on the executive committee with
14       you. He called the meeting, right?
15      A: Correct.
16      Q: Erik Haas, he's head of litigation at
17       J&J. He was at the meeting, right?
18      A: Correct.
19      Q: Andrew White, he was at the meeting,
20       right?
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 272**

```
272 :4     Q: Who decides -- Okay. Who at J&J -- so
 5       at the first meeting, July 19, 2021, you talked
 6       to Erik Haas, Mike Ullmann, Valeria Cnossen,
 7       Andrew White. Those are all J&J lawyers, right?
 8      A: Correct, and two members of my team,
 9       Paul Ruh and Peter Kerrane.
10      Q: Right. You brought two people from the
11       J&J Consumer Health to the meeting with all
12       those Johnson & Johnson lawyers, right?
13      A: We brought the -- I brought -- yeah, I
14       invited Paul, and Paul and Peter came out to
15       this meeting.
16      Q: Right. And you and Mr. Ruh and
17       Mr. Kerrane were finding out about Project Plato
18       for the first time at this meeting on July 19,
19       2021, correct?
20      A: I think so, yeah.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 273**

```
273 :12    Mr. Ruh and Mr. Kerrane and Johnson & Johnson's
13       lawyers, who else did you ever have any specific
14       discussion with about Project Plato?
15      A: So we talked about from HR personnel,
16       about employees, and then you have the list of
17       people in the organization who worked on the due
18       diligence and confirmed that the different
19       aspects of the transaction were -- were -- were
20       taken care of.
21      Q: Okay. Did you ever speak to Andrew
22       Lisman about Project Plato?
23      A: I -- no.
24      Q: Did you ever speak to Chris Andrew
25       about Project Plato?
274 :1    A: Yes, in that meeting.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 274**

```
274 :9     Q: Sir, how many times did you speak to
```

10      Chris Andrew about Project Plato?
11      A: I cannot remember.
12      Q: More than once?
13      A: I don't remember. I remember about
14       that meeting in July. I don't remember if he
15       was present on that date or not.
16      Q: Okay. Who's V. Coulson?
17      A: I don't know, a member of the law
18       department. You have their function -- you have
19       their highlighted on the left-hand side.
20      Q: Did you ever speak to that person?
21      A: No.
22      Q: M. Larkin and L. Giacino, did you ever
23       speak to those people?
24      A: No.
25      Q: Okay. And for all these questions,
275 :1       when I say 'speak,' are you understanding me
2        also to mean email?
3        A: Correct. That's why we have --
4        Q: And when I ask you whether you ever
5         spoke to them, I'm including emails, okay?
6        MS. BROWN: He was answering, Jerry. You cut
7         him off. Let's let him answer.
8        BY MR. BLOCK:
9        Q: Is that understood, sir?
10      A: Yes, it is. And that's what this memo
11       is about, to avoid this -- a number of internal
12       emails and have all the expertise in one place
13       and sending one summary of the -- the findings
14       of the different teams.
15      Q: Did you ever speak to Donny McGraw
16       about Project Plato?
17      A: No, I didn't.
18      Q: Did you ever speak to Luke Freyne about
19       Project Plato?
20      A: No, I didn't.
21      Q: Did you ever speak to M. Verenten about
22       Project Plato?
23      A: No, I didn't.
24      Q: Steve Kowalski?
25      A: No, I didn't.
276 :1   Q: C. Stanzione?
2        A: Stanzione, no.
3        Q: We know you spoke to Andrew White about
4         Project Plato; he's a lawyer, right?
5        A: Correct.
6        Q: How many times did you speak to Andrew
7         White about Project Plato before you voted for
8         the JJCI restructuring on October 11, 2021?
9        A: I told you I -- one time in this July
10       meeting. I don't remember if there were other
11       updates.
12      Q: The person you spoke most about Project
13       Plato with were Mike Ullmann and Erik Haas,
14       right?
15      A: Mike Ullmann, Erik Haas, and the team
16       who identified the royalty stream.
17      Q: Okay. Other than -- so we know that
18       you spoke to Mike Ullmann and Erik Haas multiple
19       times about Project Plato, right?
20      A: I wouldn't say multiple times.
21      Q: Well, multiple is more than one, right?
22      A: More than one. More than one time,
23       yes.
24      Q: Okay. We have the two meeting invite

```
      25         scheduling, so we know you met with both of them
277 :1            at least twice.
       2         Did you meet with them more than the
       3          two times to talk about Project Plato?
       4         A: We probably had more updates of the
       5          project from Mike Ullmann.
       6         Q: All right. So you spoke to Mike
       7          Ullmann and Erik Haas more than twice about
       8          Project Plato, right?
       9         A: I said that Mike Ullmann provided
      10          updates about Project Plato. I don't remember
      11          how many between the July update and the signing
      12          of the memo.
      13         Q: Was Mike Ullmann the main person
      14          keeping you updated about Project Plato?
      15         A: No, I wouldn't say that.
      16         Q: Who was the main person keeping you
      17          updated on Project Plato?
      18         A: There was not one main person. I
      19          was -- as I told you, I was really focused on
      20          the operational aspects of it. And so I got --
      21          you know, I was making sure that the assets were
      22          identified, and I wanted answers to the
      23          questions about what you saw in the memo on --
      24         Q: Okay.
      25         A: -- how it will impact it, are there any
278 :1            costs that will impact my business, things like
       2          that.
       3         Q: Did you ever speak to K. Manfre,
       4          M. McCormack, J. Chiodo, A. Kessel, J. Feldman,
       5          M. Pater, G. Murphy, E. Scott, L. Berlin,
       6          N. Petito, S. Prud'homme, M. Riewe, P. Karnik,
       7          K. Januzzi, K. Montagnino, and M. Munoz -- did
       8          you ever speak to any of them about Project
       9          Plato at any time before you voted on
      10          October 11, 2021, to restructure JJCI?
      11         A: I don't remember. The human resources
      12          people may have been part of the conversations
      13          on employees. I don't remember interacting with
      14          these employees.
      15         Q: All right. So your answer was no to
      16          all of those people I just listed except you
      17          think you might have talken to -- spoken
      18          L. Berlin or N. Petito in human resources about
      19          Project Plato?
      20         A: Correct.
      21         Q: Did you or didn't you? You don't know?
      22         A: I don't remember.
      23         Q: Okay. And did you ever speak to Steve
      24          Kowalski about Project Plato?
      25         A: I think the people -- I don't remember
279 :1            the exact thing, but the people I interacted
       2          with were more finance, HR, and communications,
       3          which are the areas that are closest to my
       4          responsibility -- my area of responsibility.
```

**MONGON, THIBAUT** - *01/19/2022*

**Page 287**
```
287 :23         Q: Earlier you were asked who the highest
      24          ranking official was on the approval memo -- let
      25          me ask you a different question.
288 :1            Who is the highest ranking Johnson &
       2          Johnson official that had any involvement in
       3          Project Plato?
```

4       MS. BROWN: Objection, calls for speculation.
5       THE WITNESS: Yeah, as I said this morning,
6        it's not how it works. The team is -- is
7        looking at a project that the team that is
8        mentioned in the memo that we just went through,
9        then there are updates given to the relevant
10        leaders or the executive committee.
11        As I told you, I don't recall how many
12        updates we had between the July meeting and the
13        signing of the memo. And so I can -- I don't
14        remember if there was an update to the executive
15        committee prior to the signing of the memo or
16        after.
17       BY MR. BLOCK:
18       Q: Okay. So the executive committee of
19        Johnson & Johnson was updated on Project Plato
20        after it was approved on October 11, 2021?
21       A: As I told you several times, I don't
22        remember when we got updates on Project Plato,
23        and so I cannot tell you that.
24       Q: As someone who is on Johnson &
25        Johnson's executive committee, can you give us
289 :1        an answer about whether Project Plato was ever
2        discussed at any Johnson & Johnson executive
3        committee meetings or emails at any time before
4        October 14, 2021?
5       A: I don't remember that. It was -- it
6        was part of updates to the executive committee.
7        I cannot recall the exact date of that executive
8        committee, if it was before the formal approval
9        or after the formal approval.
10       Q: The formal approval you're referring to
11        is October 11, 2021, correct?
12       A: Correct.
13       Q: So sometime after October 11, 2021, the
14        executive committee of Johnson & Johnson was
15        updated about Project Plato, correct?
16       A: No. What I just told you, that I don't
17        recall if the executive committee was updated
18        before or after the signing of the memo.

## MONGON, THIBAUT - *01/19/2022*

**Page 294**

294 :25       Q: And, sir, did you consider jury
295 :1        verdicts finding that talc caused a person's
2        mesothelioma when they were published in the
3        newspaper, did you consider those to be negative
4        headlines, as Ms. Lorenson says here?
5       A: I think any verdict against Johnson's
6        baby -- Johnson's Baby Powder does generate
7        negative headlines in the media, yes.
8       Q: And as the head of Johnson & Johnson's
9        Consumer Health sector that sells Johnson's Baby
10        Powder, why do you consider those to be negative
11        headlines when it's reported that a person's
12        cancer was caused by Johnson's Baby Powder?
13       A: I think it has a negative impact on our
14        brand, as you can imagine, in terms of
15        reputation of the brand. It creates questions
16        from consumers, from customers, from regulatory
17        authorities in the United States, outside the
18        United States. And so it requires us to put a
19        lot of effort in answering these questions and
20        reassuring the different stakeholders about the

21      science around the product and that we stand by
22      the quality and safety of our product.

**MONGON, THIBAUT** - *01/19/2022*

Page 296

296 :6      A: I want to make sure I understand your
7       question. But as I said, when you have the
8       quality and safety of a product in doubt, that
9       generates questions about the quality and safety
10      of the brand that impact the reputation of the
11      brand.
12      Q: And why did you -- why did you just
13      testify a few answers back that headlines about
14      juries finding that Johnson's Baby Powder caused
15      certain plaintiffs to get cancer, why did you
16      say that that was something that would
17      negatively impact the Johnson's brand and
18      reputation? Why did you say that?
19      A: As I told you, because it creates doubt
20      and confusion in the mind of consumers,
21      customers, and other constituents and it forces
22      us to reiterate and spend a lot of effort
23      reiterating the -- why we stand behind the
24      quality and safety of our product.
25      Q: And why do you believe that news
297 :1      articles reporting juries finding that Johnson's
2       Baby Powder cause cancer, why did you say that
3       that would be something that was negative for
4       Johnson & Johnson's reputation? Why did you say
5       that?
6       A: As I told you three times, because it
7       generates confusion in the mind of customers,
8       customers, and other stakeholders, and that we
9       need to spend a lot of time and effort answering
10      these questions and reiterating the fact that we
11      stand behind the quality and safety of our
12      product.
13      Q: And if the jury finding that Johnson's
14      Baby Powder contained asbestos and caused a
15      person's cancer, how is that consistent or
16      inconsistent with what Johnson & Johnson
17      Consumer Health tells the public health about
18      its values and its credo?
19      MS. BROWN: I don't understand. I object.
20      The question is vague.
21      THE WITNESS: Can you be more specific?
22      BY MR. BLOCK:
23      Q: Sure, sure. When a consumer reads a
24      news article that says that a jury found that
25      Johnson's Baby Powder contains asbestos and
298 :1      caused these plaintiffs to get cancer, how is
2       that message -- how would you compare that
3       message to Johnson & Johnson's Consumer Health
4       message about what the company stands for?
5       MS. BROWN: Objection, vague.
6       THE WITNESS: What I can tell you is that we
7       stand behind the quality and safety of our
8       product. And as we said numerous times, decades
9       of scientific evidence show that our product is
10      safe and effective.

**MONGON, THIBAUT** - *01/19/2022*

**Page 298**

298 :23    Q: Okay. Let me restate it.
     24    When you approved the creation of LTL
     25    and the transferring of talc liabilities to LTL,
299 :1    you did so in anticipation of a bankruptcy
      2    filing and based upon what you were told, which
      3    is that the cases in the court system would stop
      4    and the cases would be resolved in the
      5    bankruptcy system, right?
      6    A: Right, that's one of the benefits,
      7    yeah.
      8    Q: Okay. And if the cases in the court
      9    systems are stopped and there aren't any jury
    10    verdicts, then there can't be any negative
    11    headlines which report that Johnson's Baby
    12    Powder caused a person's cancer, right?
    13    A: I would agree with your statement.

**MONGON, THIBAUT** - *01/19/2022*

**Page 299**

299 :19    Q: And you know since LTL -- since the LTL
    20    case was filed on October 14, 2021, you know
    21    that there haven't been any negative headlines
    22    about juries finding that Johnson's Baby Powder
    23    caused cancer because none of the cases are
    24    being tried to juries because the cases are
    25    currently stopped, right?
300 :1    A: Yes. And I don't see the point of your
      2    question.
      3    Q: Well, I mean, one point is, have there
      4    been any negative headlines about jury verdicts
      5    against Johnson & Johnson from October 14, 2021,
      6    and talc cases to the present?
      7    A: You know, I'm not aware of any verdict
      8    that happened between the LTL -- creation of LTL
      9    and now.
    10    Q: Right, because you know the cases are
    11    stopped?
    12    A: The cased are stopped, exactly.

**MONGON, THIBAUT** - *01/19/2022*

**Page 300**

300 :24    Q: Another thing you said earlier was when
    25    there is a verdict finding that a plaintiff
301 :1    developed cancer because of Johnson's Baby
      2    Powder, that not only negatively affects
      3    Johnson & Johnson's reputation, but it also
      4    provokes inquiries by regulators, right?
      5    A: It generates questions by consumers,
      6    customers, regulatory authorities about the
      7    quality and safety of the product.

**MONGON, THIBAUT** - *01/19/2022*

**Page 302**

302 :8    A: As I told you this morning, I'm not in
      9    the detail of accounting. It's not the way I
    10    manage the business.

11          What I know is that if you take 2020 as
12          a year of reference, the amount paid related to
13          the talc litigation, both in terms of legal
14          costs and payments linked especially to the
15          Ingham verdict, you clearly see, me or anyone,
16          else that this type of costs are unbearable for
17          any business, for -- in the case of 2020, it
18          puts a whole Consumer Health business globally
19          at a loss, as reported in the reports.
20          And so you can imagine that the JJCI,
21          being a part of the global Consumer Health
22          sector, was in the same situation, given that
23          the cost of the pretax litigation are allocated
24          to JJCI.
25          Q: You never reviewed any financial
303 :1      analysis that informed you about whether
2          Johnson & Johnson Consumer, Inc., was able to
3          pay its talc liabilities on a going-forward
4          basis, correct?
5          A: No, I'm not. As I told you, I don't
6          look at my business through the lens of the
7          legal entities and the accounting related to the
8          legal entities.
9          Q: Let me state it differently. I think
10          there was a double negative.
11          It's true that you never reviewed any
12          financial analysis that provided you with any
13          information about whether JJCI was able to pay
14          its talc liabilities on a going-forward basis,
15          correct?
16          A: It's not part of my -- the way I manage
17          the business to look at the accounting related
18          to the different legal entities in -- in my
19          business.
20          Q: That means you did not review such a
21          financial analysis, correct?
22          A: I did not.
23          Q: Okay. And do you have any knowledge
24          about any financial analysis ever conducted by
25          Johnson & Johnson, Johnson & Johnson Consumer,
304 :1      Inc., or any of its professionals regarding
2          whether those companies were able to pay their
3          talc liabilities on a going-forward basis? Do
4          you have any personal knowledge about any such
5          financial analysis?
6          A: I don't have the knowledge of such
7          financial analysis.

## MONGON, THIBAUT - *01/19/2022*

**Page 322**

322 :24     Q: Okay. So there are nine people on the
25          'to,' on the 'to' part of the memo who I'm
323 :1      calling the decision committee.
2          Are you telling me that the first time
3          you knew who the other eight members were were
4          at 8:07 in the morning when you got the email
5          with Exhibit 44, the approval memo?
6          A: Yes.
7          Q: And that -- and I think you've already
8          said, and you guys never did meet as a
9          committee, you all just emailed in your separate
10          approvals?
11          A: Right, that was done by email.

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 330**

330 :3       **Q: And if Mr. Kim referred to the Ingham**
   4       **payment in 2020 as an 'outlier,' would you**
   5       **dispute that?**
   6       **MS. BROWN: Objection, speculation.**
   7       **THE WITNESS: I don't have any -- any opinion**
   8       **on that. What I can tell you is that the Ingham**
   9       **verdict was a very, very large verdict and --**
  10       **BY MR. BLOCK:**
  11       **Q: Okay.**
  12       **A: -- the largest one we had at this**
  13       **point.**

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 331**

331 :1       **Q: Okay. And what was the next closest**
   2       **judgment from a verdict in a talc case that J&J**
   3       **has paid as compared to Ingham?**
   4       **A: I couldn't tell.**
   5       **Q: Okay. You never looked into that?**
   6       **A: No.**

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 332**

332 :13     **Q: Okay. And you didn't look into that**
  14       **question about whether JJCI was operating at a**
  15       **profit or a loss as of the end of the 2nd**
  16       **quarter of 2021 before you made your decision to**
  17       **approve the JJCI restructuring on October 11,**
  18       **2021, correct?**
  19       **A: No, no idea.**
  20       **Q: You didn't do that, right?**
  21       **A: No, I didn't.**
  22       **Q: Okay. And when the 3rd quarter of 2021**
  23       **results were reported five days after the LTL**
  24       **bankruptcy filing, was JJCI operating at a**
  25       **profit or a loss?**
333 :1       **A: As I told you a number of times, I**
   2       **don't look at my business through the lens of**
   3       **legal entities.**
   4       **Q: And you didn't look at any of the**
   5       **profit or loss information for 2021 before you**
   6       **approved the restructuring of JJCI on**
   7       **October 11th of that year, correct?**
   8       **A: No, I didn't.**

**MONGON, THIBAUT** - *01/19/2022*

---

**Page 336**

336 :12     **Q: What -- what -- what does J&J's**
  13       **reputation have to do with the company's**
  14       **decision to take talc out of baby powder from --**
  15       **in May of 2020?**
  16       **A: As I said, the -- every time that there**
  17       **is a development in the talc litigation, it**
  18       **creates -- generates questions from consumers,**
  19       **from customers, from all stakeholders about the**
  20       **product itself, about the brand itself, about**

21      the quality and safety of our product, and that
22      expands beyond the talc product to the --
23      there's a brand at minimum, Johnson's Baby, and
24      that requires us to provide extra efforts to
25      reassure our different constituents about the
337 :1    quality and safety of -- of our product.
2      Q: Okay. Tell us more about the brand of
3       Johnson's Baby and why you believe it's
4       important to Johnson & Johnson.
5      A: Johnson's Baby brand is one of the
6       brands we have in -- in our portfolio. It's a
7       large brand that is present around the world,
8       has been present for many, many decades. It's
9       trusted by consumers as a brand that offers
10      products of high quality and safety. And so
11      it's important for us to maintain and reenforce
12      the trust in -- in these products.
13      Q: Okay --
14      A: These products deserve it, deserve the
15       trust.

## MONGON, THIBAUT - *01/19/2022*

**Page 338**

338 :14    A: What I say is that during the course of
15      this litigation a lot of misinformation was
16      communicated to all different stakeholders, that
17      created questions. And it's -- it's -- we have
18      to put a lot of effort in answering the question
19      and re- -- reassure our different constituents
20      about the quality and safety of the product.

## MONGON, THIBAUT - *01/19/2022*

**Page 339**

339 :11    THE WITNESS: I just told you I'm aware of
12      that, and I also told you that as a result of
13      these statements, we conducted a thorough
14      analysis and were able to demonstrate that the
15      product quality was not in question. What was
16      in question was the environment where the test
17      was conducted.

## MONGON, THIBAUT - *01/19/2022*

**Page 340**

340 :25    Q: Okay. And what basis, sir, do you
341 :1    have, based upon your personal knowledge, to say
2      that information about Johnson's Baby Powder
3       causing cancer has misinformation? What
4       personal knowledge do you have about that?
5      A: As I told you earlier this afternoon,
6       as we mentioned several times in a continual
7       basis, we relied on decades of scientific
8       evidence showing that talc powder is safe and
9       effective.

**RYAN, MICHELLE**

**RYAN, MICHELLE** - *01/27/2022*

**Page 8**

8 :19        Can you just tell the court reporter
20     your name officially.
21      A. Michelle Ryan.

**RYAN, MICHELLE** - *01/27/2022*

**Page 9**

9 :8        So what was your position at the
9     company when you left?
10      A. I was the treasurer of Johnson &
11     Johnson.
12      Q. How long had you been the treasurer of
13     Johnson & Johnson?
14      A. For a little over six-and-a-half years.
15      Q. What does the treasurer of Johnson &
16     Johnson actually do?
17      A. The treasurer is responsible for the
18     treasury function. And at Johnson & Johnson,
19     that includes several different centers of
20     excellence, as we call them.
21        So all of the company's insurance needs
22     were managed by the treasury department. All of
23     our retirement assets were managed by the
24     treasury department. We have -- I have a small
25     team that managed -- did financial analysis on
10 :1    all of the company's mergers and acquisitions
2     and divestitures.
3        And then the -- the majority of my team
4     that we called treasury services managed all of
5     the capital markets' work that a treasury
6     department would do.
7        So things like managing the company's
8     debt and banking relationships around the globe;
9     managing our cash and investments; managing all
10     of our foreign currency; hedging that we do. We
11     have a complicated supply chain, and so we do
12     hedging globally. Managing our relationship
13     with our credit rating agencies.
14        Those are probably the bulk. It's
15     really a risk-focused group mitigating risk
16     across financial investments and financial
17     instruments.

**RYAN, MICHELLE** - *01/27/2022*

**Page 11**

11 :9      Q. It looks like during the six years you
10     were treasurer, one of the significant uses
11     every year was obviously dividends, right?
12      A. Yes.
13      Q. And it would be fair to say during the
14     six years you were there, dividends probably
15     averaged 10 or 11 million a year?
16      A. Billion, yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 15**

15 :14      Q. All right. So, obviously, you're
15    familiar with Ingham and you were familiar with
16    the company's desire to have the Supreme Court
17    review it, right?
18      A. Definitely, yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 16**

16 :21      Describe your knowledge of the state of
22    Project Plato as of June.
23      A. I was not aware of any Project Plato or
24    any planned restructuring as of June 1.

**RYAN, MICHELLE** - *01/27/2022*

**Page 17**

17 :1      So when after June 1, 2021, did you, if
2    you recall -- and we'll have some more documents
3    in here to help us pin us down. But just
4    directionally, when do you think you first
5    became aware of it and how?
6      A. I don't remember the exact date. It
7    was probably sometime in June, July, later
8    June or July. But I don't remember the exact
9    date.

**RYAN, MICHELLE** - *01/27/2022*

**Page 17**

17 :19      Q. So really my question's not about your
20    lawyer's thinking, it's just about yours.
21      In your mind, as Michelle Ryan, do you
22    believe that the Ingham verdict helped catalyze
23    Project Plato?
24      A. I believe that as a company we had --
25    we were running out of options really because we
18 :1    had -- we had tried to go through the court
2    system and -- well, first of all, the science is
3    on our side, and yet we -- we were winning
4    cases, we were winning cases on appeal, and yet
5    we also could have outcomes like Ingham where
6    due process was not afforded and ultimately the
7    appellate side of the court was unavailable to
8    us.
9      And so while we believe science was on
10    our side, we -- we did not -- as a -- running a
11    business, we also had to make choices. And so
12    with our consumer entity under significant
13    financial pressure because the mounting legal
14    costs, we had to think of other options.
15      Q. So I'm taking that as a yes; in my
16    mind, Michelle Ryan, I think the Ingham
17    declining to hear it helped catalyze Project
18    Plato?
19      A. I would think so, yes.
20      MR. GLASSER: The next document in your pile
21    is 101 and it's dated June 2, 2021. Let's put
22    it in the chat.

23          (Whereupon, Ryan Deposition
24           Exhibit 101 was first referred
25           for identification.)

RYAN, MICHELLE - *01/27/2022*

Page 19

19 :11          Mr. Levesque apparently works at
12     Moody's. Was this somebody whom you regularly
13     communicated with at Moody's as part of your job
14     of managing the credit rating relationship?
15          A. Yes. Michael was Moody's lead analyst
16     for pharmaceutical companies, including Johnson
17     & Johnson.
18          Q. Just because this deposition may be
19     read by people who don't know what that is, can
20     you just tell the Court and the -- what that is,
21     what an analyst -- lead analyst is?
22          A. Yes.
23              So credit rating agencies, their --
24     their role is to issue credit ratings on any
25     company -- any company that has debt
20 :1     outstanding, any public company with debt
2     outstanding, so that debt investors can -- can
3     have a sense of the credit worthiness of that
4     company.
5              And so the companies then have analysts
6     who spend time understanding each of the
7     companies that they are responsible for. And
8     through their research and analysis, they then
9     issue a credit rating.
10             So in this case, Michael and I would
11     speak, and he would -- he would ask various
12     questions to better understand change -- it's
13     really all about cash flows to the credit rating
14     agencies. They want to make sure that a company
15     can generate the cash to service its debt,
16     meaning to pay off any principal that's coming
17     due and pay the interest to the bondholders.
18             So their focus is very much from a cash
19     perspective. And we would regularly have
20     conversations about all -- you know, various
21     issues and just overall the standing of the
22     company.
23          Q. So this email dated June 2, 2021, is a
24     discussion where -- between you and Michael
25     about the Imerys bankruptcy, right?
21 :1          A. That's correct.

RYAN, MICHELLE - *01/27/2022*

Page 22

22 :4          Q. And it says here that there's a
5     negotiation going on in the bankruptcy of
6     Imerys, and that's what I want to ask you about.
7     Okay?
8          A. All right.
9          Q. I understand that prior to the time --
10     in the Imerys bankruptcy, my understanding is at
11     some time Johnson & Johnson attempted to a
12     global settlement of talc liabilities in the
13     Imerys bankruptcy.
14             Is that your understanding?
15          A. I probably don't have a great

16     understanding of all of the legal mechanics of
17     Imerys.
18         My understanding of Imerys was that
19     Imerys was sued -- Imerys was named as a
20     defendant, as was J&J, in talc lawsuits. And
21     Imerys was looking -- was trying to settle its
22     lawsuits and then saying that J&J would have to
23     indemnify them and -- and cover any settlements
24     that they've reached.
25         And so knowing that J&J had much deeper
23 :1   pockets than Imerys, we said, we want to step in
2      to Imerys's shoes and let us manage all of the
3      cases. And I believe that was called a
4      channeling injunction, where we would -- we
5      would be the defendant, no longer Imerys would,
6      and J&J would have that liability since we're
7      both named as defendants in those cases anyway.
8         That was my understanding of Imerys.

**RYAN, MICHELLE** - *01/27/2022*

**Page 23**
23 :13      Q. Let's unpack that.
14         There was obviously a cash amount
15     needed for the potential resolution of Imerys.
16     Do you recall the -- directionally the magnitude
17     of that number?
18         A. I was never given a number.
19         Q. So you weren't read into any
20     discussions about a particular number in respect
21     to Imerys?
22         A. Correct.
23         Q. So this idea that Johnson & Johnson
24     would take on all the Imerys liability, you were
25     involved in those discussions, obviously?
24 :1   MS. BROWN: Objection, misstates testimony.
2         You can answer.
3      THE WITNESS: I was -- yeah.
4         I was not involved in all discussions
5      in any way. I was -- I heard some discussions.
6      BY MR. GLASSER:
7         Q. And did you give me the sum and
8      substance of what you understood of those
9      discussions?
10         A. Yes. That is -- that is my nonlegal
11     layman's understanding of what the channeling
12     injunction would lead to and why we were looking
13     to do it.
14         Q. Why, to your understanding, or why do
15     you understand it didn't work out?
16         A. I actually never understood what
17     happened. I just knew it did not work out.

**RYAN, MICHELLE** - *01/27/2022*

**Page 25**
25 :14      Q. So, Ms. Ryan, this is a July 1 email
15     inviting you to a 30-minute meeting with
16     Joseph Wolk and Louise -- actually, you were
17     inviting them. You're inviting Joseph Wolk and
18     Louise Weingrod to a 30-minute Plato meeting.
19         Do you see that?
20         A. Yes, I do.
21         Q. All right. So this is -- I think this

22   is the earliest email that I have from you in
23   respect to Plato.
24        Is that kind of consistent with your
25   prior testimony, that you think it was after
26 :1  Ingham in probably late June, early July that
2   you first learned about it?
3     A. Yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 27**

27 :1     MR. GLASSER: Let's call up the next one,
2   103.
3        (Whereupon, Ryan Deposition
4        Exhibit 103 was first referred
5        for identification.)

**RYAN, MICHELLE** - *01/27/2022*

**Page 27**

27 :24     Q. So it looks like Michael had a
25   technical question in respect of your debt
28 :1  agreements, right?
2     A. Yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 29**

29 :18     Can you pull up 104.
19        (Whereupon, Ryan Deposition
20        Exhibit 104 was first referred
21        for identification.)
22  BY MR. GLASSER:
23     Q. All right. So the -- so the question
24  we were talking about on 103 is right there in
25  the middle of 104, right, Ms. Ryan?
30 :1     A. Yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 31**

31 :8     Q. When you got this email, what did you
9   understand him to want to know?
10     A. I think what he's here -- so in the
11  previous email, the previous exhibit we
12  reviewed, he was asking -- or I was responding
13  to him about Imerys and the fact that if Imerys
14  went through, Imerys would be the company filing
15  bankruptcy and they were not a J&J subsidiary.
16        Michael is now saying, well, what
17  happens if a J&J subsidiary does file bankruptcy
18  specifically related to the bond indentures? So
19  like I said before, the credit rating agency's
20  role is to make sure that our -- our bondholders
21  get paid.
22        And so he was wondering if there would
23  be an implication to our -- to our ability to
24  pay our debt, as well as would there be some
25  kind of technical default if a subsidiary of J&J
32 :1  were to file bankruptcy.
2     Q. Right.
3     MR. GLASSER: And let's blow up, Scott, right
4   there in the middle where it says 6E and 6F. I

5      think that's what Ms. Ryan is referring to.
6      BY MR. GLASSER:
7          Q. 6E, I think, refers to some provision
8      in your bond indentures about the bankruptcy of
9      a, quote, significant subsidiary, right --
10         A. Yes.
11         Q. -- in 6F?
12             So that's what you were talking about
13     with Michael, whether -- whether the Imerys
14     thing would involve a bankruptcy of a
15     significant subsidiary, and your answer was, no,
16     it's in Imerys, it was not a J&J company?
17         MS. BROWN: Objection, misstates the
18     document.
19     BY MR. GLASSER:
20         Q. Isn't that what you just basically told
21     me?
22         A. Yeah. I -- I think his question is
23     relative to these things he's called out.
24     He's -- he's asking, is there going to be a
25     problem.
33 :1      Q. Right, let's drop that.
2              And you gave the -- and your answer
3      below -- you have an answer below.
4          A. No, that's not an answer below. That
5      was my email on June 2nd. His is July 1st.
6              So that was the Imerys question that I
7      was answering on June 2nd, and on July 1st he
8      sent his email.
9          Q. Got it. Okay. Let's go to 105 -- or
10     106.
11             Is there a 105 in your packet there?
12         A. I have -- yes, there is.
13             (Whereupon, Ryan Deposition
14              Exhibit 106 was first referred
15              for identification.)
16     BY MR. GLASSER:
17         Q. What's the date of it?
18         A. 105, it's an email from me to Luc
19     Freyne dated 7/13/21.
20         Q. What's the LTL number on the bottom? I
21     have to go get it.
22         A. You're asking me?
23         Q. Yes.
24         A. 0030188.
25         Q. Okay, great.
34 :1      MR. GLASSER: All right. Let's take a little
2      break. I want to pull up 105 and get it in the
3      chat. So we'll take a ten-minute break.
4          THE VIDEOGRAPHER: The time is 9:32 a.m.,
5      Eastern. We are going off the record.
6              (Whereupon, a recess was had at
7               9:32 a.m., after which the
8               deposition was resumed at
9               9:36 a.m. as follows:)
10         THE VIDEOGRAPHER: The time is 9:36 a.m.,
11     Eastern. We are now back on the record.
12     BY MR. GLASSER:
13         Q. So 105, Ms. Ryan, is just you forwarding
14     that same email from the Moody's analyst to the
15     legal team, Erik Haas in particular; is that
16     right?
17             (Whereupon, Ryan Deposition
18              Exhibit 105 was first referred
19              for identification.)

```
20        THE WITNESS: It looks like that, yes.
21    BY MR. GLASSER:
22        Q. And at the top, whatever Mr. Haas tells
23    you, you send to Luc Freyne, F-R-E-Y-N-E.
24            How do you say that?
25        A. Freyne.
35 :1        Q. What is Mr. Freyne's role in the
2    company?
3        A. Luc is Johnson & Johnson's assistant
4    treasurer. He leads the group before that I
5    called our treasury services team. So Luc is
6    responsible for all the capital markets' work,
7    as well our relationships with our banks.
8        Q. Got it. So he's the logical person to
9    send the question to, A, If we bankrupt a
10    significant subsidiary, are we going to blow our
11    debt coverage?
12        MS. BROWN: Objection --
13        THE WITNESS: I don't -- I don't know what I
14    said in this email so --
15    BY MR. GLASSER:
16        Q. No, I'm not -- I'm not asking about
17    what's under the redaction.
18            I'm just saying, he's the logical guy
19    to send this question to?
20        A. I wouldn't know what the question is so
21    I --
22        Q. The question from Michael there at the
23    bottom. Go to the second page of 105.
24        A. Oh, that -- yeah. If -- yeah. He
25    would be the person on my team that I would ask
36 :1    those questions to around potential
2    implications.
3        Q. Right. Go to 106.
4            Now we're on July 19th. It's an email
5    from you to a gentleman named Scott Borup,
6    B-O-R-U-P.
7            Who is he?
8        A. It says right there. He's our VP of
9    corporate risk management at J&J. He's
10    responsible for all of the insurance.
11            And so, again, one of the groups on my
12    team in treasury managed all of J&J's insurance
13    needs, and Scott was the head of that group.
14        Q. To your knowledge, is he an attorney?
15        A. Scott is not an attorney.
16        Q. To your knowledge, did you give
17    Mr. Borup legal advice in this email?
18        A. No.
```

**RYAN, MICHELLE** - *01/27/2022*

Page 36

```
36 :23        Q. Basically it's you and Mr. Borup and
24    Ms. Weingrod talking about the leak of the
25    possibility of a J&J -- of J&J weighing
37 :1    bankruptcy in some way, shape, or form, right?
2        A. It's a -- it was -- it appears Louise
3    forwarded to J&J's CFO and myself an article out
4    of Fox News where it says J&J is weighing a
5    bankruptcy.
6        Q. "As it considers offloading its baby
7    powder liabilities" is the title, right?
8        A. That's what Fox News wrote, correct.
9        Q. And you say to Mr. Borup [as read]: I
```

10   think you were in the Plato meeting last week
11   too.
12       By this time, were there weekly Plato
13   meetings?
14       A. I don't remember how often a team was
15   meeting because I was not in -- I was not in the
16   detail diligence team. But a detail diligence
17   team had been formed to look at our structuring.
18       Q. In respect of the treasury diligence
19   team, I take it it was looking at questions like
20   the one the Moody's analyst asked, i.e. would
21   the bankruptcy of this subsidiary somehow breach
22   covenants?
23       A. That's correct. So -- so that's
24   why Scott -- it was also -- there's financial
25   contracts from the insurance side.
38 :1       So Luc Freyne was involved looking at
2   debt covenants. Scott Borup was involved
3   looking at insurance contracts.
4       Q. What did Mr. Borup report back
5   generally in respect of insurance contracts?
6       A. In terms of -- is your question, would
7   there be an -- any negative impact as a result
8   of the restructuring?

## RYAN, MICHELLE - *01/27/2022*

**Page 39**
39 :6       Q. In respect of the debt covenants, was
7   the report back to you that so long as it was
8   not a significant subsidiary we wouldn't breach
9   those covenants?
10      A. The report -- my understanding, based
11   on the diligence done, was that the
12   restructuring as planned would not cause us any
13   concerns with regards to our debt covenants.
14      Q. Mr. -- the Moody's analyst obviously
15   had a copy of your debt documents when he --
16   when he asked you about paragraph 6E and 6F or
17   he couldn't have done so, right?
18      A. Correct.
19      MS. BROWN: Objection, speculation.
20      THE WITNESS: They're public, so, yes.
21   BY MR. GLASSER:
22      Q. Could I find them -- are they --
23      MR. GLASSER: We can take down 106 so I can
24   see her better.
25
40 :1   BY MR. GLASSER:
2       Q. Are they actually appended to your
3   10-K? Is that how they're published? How would
4   I find them? Are they an exhibit to the K?
5       A. When debt is issued.
6       Q. Oh, Okay. You're saying --
7       A. It's not attached to the 10-K but when
8   debt is issued.
9       Q. Right.
10      MR. GLASSER: So now let's go to 107.
11           (Whereupon, Ryan Deposition
12            Exhibit 107 was first referred
13            for identification.)
14   BY MR. GLASSER:
15      Q. Your -- this is an answer back to him
16   about that technical question we've seen in a
17   few other emails.

18          Do you see the -- at the middle of 107
19    there's that question he asked about significant
20    subsidiaries, right there in the middle?
21          A. Correct, yep.
22          Q. Okay. And then your response is 18
23    days later in July; is that correct?
24          A. That is correct.
25          Q. So you apologize in the first sentence
41 :1    for taking a little while to respond to his
2    question, correct?
3          A. Yes.
4          Q. Then your second sentence is [as read]:
5    We are looking at a number of ways of capping
6    our talc liability, especially with the recent
7    disappointing Supreme Court action on our case.
8          A. Inaction.
9          Q. Yeah, sorry, inaction.
10          So you wrote those words, right?
11          A. It appears so. I don't remember
12    sending this exact email, but this is -- yes,
13    the words on the page say I wrote them.
14          Q. The inaction -- the Supreme Court
15    inaction is that case we started this discussion
16    with, the Ingham case, right?
17          A. That is correct. And the Supreme Court
18    being unable/unwilling to hear our appeal.
19          Q. The next sentence is [as read]: One
20    scenario being considered would be to capture
21    the liability in one subsidiary and fund that
22    subsidiary for current and future losses, and
23    then basically bankrupt that subsidiary.
24          Do you see that sentence?
25          A. Yes, I do.
42 :1          Q. That's essentially what happened here
2    in this case, right?
3          A. From a layman's legal perspective, I
4    guess, yes. Legally I think there is more, but
5    that was -- that was a way, I guess, two
6    financial people might discuss it.
7          Q. And you ask him to tell you how Moody's
8    would view such an action, meaning the impact on
9    our credit rating, right?
10          A. Yes, I specifically asked, would there
11    be an impact on our credit rating.
12          Q. And, in fact, when we were discussing
13    Exhibit 101, you told me that the Moody's -- to
14    the Moody's people, it's all about cash flow,
15    right?
16          A. Yes, that is -- that is their focus.
17          Q. Now, in the first day declaration of
18    Mr. Kim, he said that the cost of defense in
19    this case was somewhere between 10 and 20
20    million a month for J&J away from any verdicts.
21    It was just kind of the boiling cost of the
22    litigation was 10 to 20 million a month.
23          Do you have any reason to doubt or take
24    issue with that?
25          MS. BROWN: Lacks foundation.
43 :1          THE WITNESS: You know, I -- it's not a
2    number that I've heard so.

Page 43
43 :8          Q. Let's just use the $20 million number.

9          If it's 20 million a month, and in 12
10   months it would be $240 million, right?
11          A. Yes. That's -- that's basic math.
12          Q. I love dealing with financial people
13   because you all can do the math. It's great.
14          So if the bankruptcy of LTL stops a
15   quarter-billion dollar bleed on a yearly basis
16   from a all-about-the-cash-flow fundamental
17   analysis, it would actually increase credit --
18   creditworthiness of the ultimate parent, if you
19   could avoid for a year a $240-million outflow
20   that you would otherwise make; isn't that so?
21          MS. BROWN: I object, as in using bleed, an
22   improper hypothetical, and it assumes facts not
23   in evidence.
24          THE WITNESS: Yeah, I would -- I don't agree
25   with that. And, honestly, my question -- I'll
44 :1   read, my question to Michael is, "Would there be
2    an impact on our credit rating on how Moody's
3    views J&J from a financial policy perspective."
4          And so within a credit rating, the
5    majority of the calculation done by the credit
6    rating agency is driven by -- by the financials
7    of the company. So, you know, your cash flow is
8    a major component of that. They look at the
9    size of the company.
10          So part of why J&J is AAA is because we
11   have sales in excess of $80 billion.
12          But another component is they do a
13   qualitative assessment that they call financial
14   policy. And so quite honestly, my concern here
15   is that the bankrupting of a subsidiary will
16   cause them to view our financial policy in a
17   negative way and that the bankrupting of a
18   subsidiary would lead to a downgrade in our
19   credit rating, not that the elimination of
20   $200 million of expenses -- because quite
21   honestly, Johnson & Johnson's cash flows are --
22   are significantly greater than 200 million.
23          So that -- that was not really the
24   question, nor was it ever part of the
25   conversation that Michael Levesque and I had.
45 :1   It was not about the ongoing litigation cost.

**RYAN, MICHELLE** - *01/27/2022*

**Page 45**
45 :5          Basically, I think I hear you saying,
6    look, 10 million a month, that's not a
7    significant -- that's in -- that not material to
8    J&J.
9          MS. BROWN: Objection --
10   BY MR. GLASSER:
11          Q. Just materiality -- (inaudible).
12                (Simultaneous crosstalk.)
13   BY MR. GLASSER:
14          Q. Go ahead.
15          A. I would say to Johnson & Johnson it's
16   not. To Johnson & Johnson Consumer, Inc., it's
17   a different story. But to J&J -- and that's the
18   perspective -- as the treasurer, I bring the
19   enterprise perspective; I don't bring the
20   subsidiary perspective.
21          Obviously, as the treasurer, I also
22   know that J&J is the accumulation of all of our

23    subsidiaries. But we have other subsidiaries
24    who are generating significant cash outside of
25    our consumer subsidiary.
46 :1         So from a JJCI perspective, that kind
2     of ongoing cash flow, it is not immaterial. And
3     I think that's evident in the financial
4     statements that we file that showed how the
5     consumer group went negative as a result of --
6     of talc litigation. But J&J didn't go negative.
7         So -- so my question here is really
8     about the enterprise's financial policy if we
9     were to bankrupt a subsidiary.
10    Q. So it's -- so it's fair to say that
11    even 240 million a year is not material to J&J
12    on an enterprise basis?
13    A. To Johnson & Johnson consumer it's
14    material. To J&J the enterprise, it would not
15    be material based on the material -- yes.
16        It's not insignificant because, you
17    know, our purpose is many. But our major
18    purpose is to bring innovative medicines, and
19    $200 million a year could fund a clinical trial
20    to help bring, you know, a new innovative
21    medicine to the market.
22        So it's not that it's a meaningless
23    amount of money, certainly. But in discussions
24    with our credit agency, it would have a certain
25    materiality perspective.
47 :1    Q. Which wouldn't be -- which just isn't
2     there for that amount, right?
3     A. To the enterprise, that's correct.

---

**RYAN, MICHELLE** - *01/27/2022*

**Page 47**

47 :9    Q. It looks like on the same day,
10    July 19th, that you responded to Mr. -- to the
11    man from Moody's, whose name I can't pronounce,
12    even though you've told me twice.
13        You also got a ping from David Kaplan,
14    his counterpart at S&P, based on the same -- or
15    based on a historian in Reuters about the
16    potential for a bankruptcy as well, right?
17    A. That is correct.

---

**RYAN, MICHELLE** - *01/27/2022*

**Page 47**

47 :23    Q. So it looks like you called David about
24    his email. Did you -- what information did you
25    convey to Mr. Kaplan?
48 :1    A. I don't remember honestly.
2     Q. Do you think it was essentially the
3     same as in your email to Mr. -- to Mr. Moody's
4     man, that we're exploring the possibility of
5     capping our liability through a subsidiary but
6     we don't know what we're going to do yet?
7     A. I honestly don't remember.
8     MR. GLASSER: Let's go to 110.
9         (Whereupon, Ryan Deposition
10         Exhibit 110 was first referred
11         for identification.)
12    BY MR. GLASSER:
13    Q. So this is the answer from -- 110 is a

14    follow-up email from the Moody's analyst to you
15    on that same day, July 19th, right?
16        A. I'm just going to read it real quick.
17        Q. Sure.
18        A. Okay. Yes, I've read it.
19        Q. And basically he gives the answer that
20    you kind of gave me, that they're going to use a
21    fundamental approach to evaluate the impact;
22    they're going to really look at cash outflow,
23    impact on balance sheet, and credit metrics.
24        Do you see that?
25        A. Yes, I do.
49 :1        Q. That's kind of consistent with the
2    answer you gave me earlier, isn't it?
3        A. He's answering my question about
4    financial policy and saying the technical aspect
5    shouldn't be any concern for financial policy
6    and they would just look at the -- ultimately
7    the financial implications of such a bankruptcy.

**RYAN, MICHELLE** - *01/27/2022*

**Page 49**
49 :18        Q. Well, if -- if the effect of a
19    bankruptcy is no one can get a verdict for a
20    year or two and J&J's burn goes from a quarter
21    billion a year to, say, 50 million year, how
22    from a credit matrix perspective could that be a
23    bad thing?
24        MS. BROWN: Lacks foundation; calls for
25    speculation. I object.
50 :1        THE WITNESS: Johnson & Johnson has 40-year
2    bonds. So the credit rating agency isn't just
3    looking at 12 months; they're not just looking
4    out at one year. So they're looking at our cash
5    flows over many, many years.
6        And the other thing that I noted in my
7    email is that we would fund the subsidiary for
8    current and future losses, and that amount is
9    undefined. And so that's why he's saying,
10    think -- tell us more details.
11        So nothing is defined here and that --
12    that's why -- he's not saying it's a good thing
13    or a bad thing and he wants more details.

**RYAN, MICHELLE** - *01/27/2022*

**Page 51**
51 :6        A. There would be an initial funding of --
7    of $2 billion as good faith funding, and
8    ultimately, the bankruptcy court would determine
9    the appropriate amount and that amount would be
10    funded, as well as, in addition to, the royalty
11    assets that would be provided.

**RYAN, MICHELLE** - *01/27/2022*

**Page 51**
51 :13        Do you believe that $2 billion was
14    funded into LTL?
15        A. As of the time that I left Johnson &
16    Johnson on December 31st, the plan was that the
17    funding would happen sometime in 2022.
18        Q. All right. So from your personal

19      knowledge, you are certain that $2 billion was
20      not funded at least as of 12/31/2021?
21          A. The plan was that the funding would
22      happen in Q1. And so consistent with the plan,
23      the funding had not yet happened as of the time
24      of my retirement --
25          Q. So it is --
52 :1       A. -- on 12/31.
2           Q. So it is fair to say that in
3       October 2021 when LTL filed bankruptcy, nobody
4       had actually funded $2 billion, correct?
5           A. That is my understanding, correct.

**RYAN, MICHELLE** - *01/27/2022*

**Page 52**
52 :12      Q. So if consistent with your knowledge in
13      2021, at the time of its bankruptcy the
14      2 billion had not been funded, then the -- then
15      the funding in LTL was $50 million of royalty
16      stream per year, you know, 5 million a month,
17      approximately, right?
18          MS. BROWN: Objection, lacks foundation,
19      misstates the evidence.
20          THE WITNESS: We had made the commitment to
21      put the $2 billion in, J&J had made that
22      commitment. JJCI had made that commitment.
23      BY MR. GLASSER:
24          Q. From a -- as a businessperson, don't
25      you think actual funds are better than promises
53 :1       of funds?
2           A. J&J has never not paid an obligation.
3       That's why we're AAA rated and we pay our
4       obligations. So I don't think there's any risk
5       in the 2 billion being funded.

**RYAN, MICHELLE** - *01/27/2022*

**Page 53**
53 :17          (Whereupon, Ryan Deposition
18              Exhibit 1.52 was first referred
19              for identification.)

**RYAN, MICHELLE** - *01/27/2022*

**Page 54**
54 :22      Q. This is the amended -- this is the
23      amended and restated funding agreement.
24          A. Yep.
25          Q. Dated October 12, 2021.
55 :1       A. Yes, I have that.
2           Q. And you signed it as treasurer on
3       behalf of payor Johnson & Johnson, right?
4           A. That is correct.
5           Q. Before we get to this -- this Section
6       C, permitted funding use, let's just lock down a
7       few basic questions.
8               I take it you did not actually
9       negotiate this agreement with anyone, correct?
10          A. Negotiate, no, that is correct; it
11      wasn't negotiated.
12          Q. You did not change a single word in
13      this agreement when it was given to you,
14      correct?

15      A. It was a legal document, so, no, I
16   didn't change it.
17      Q. You just signed it?
18      A. No, that's not correct. I -- a couple
19   of the J&J lawyers took me through it and
20   reviewed it and -- and helped me understand the
21   main aspects of it, as well as help me
22   understand kind of how it fit into the overall
23   restructuring and approval memo that
24   eventually this -- this funding agreement was
25   approved as part of the approval memo.
56 :1      So they spent some time with me just
2   walking me through it.
3      Q. And was that the day you signed it?
4      A. I don't remember the exact timing of --
5   of the different discussions.
6      Q. Was it near in time to the time you
7   signed it?
8      A. I would think it had to be, yeah.

## RYAN, MICHELLE - *01/27/2022*

**Page 56**

56 :12      Let's go to the page 5 and see that
13   we're in the definition of permitted funding
14   use.
15      A. Okay.
16      Q. See that?
17      A. Yes.
18      MR. GLASSER: Highlight that, Scott. Down at
19   the bottom, "permitted funding use." No, just
20   the definition, "means the following."
21   BY MR. GLASSER:
22      Q. Okay. And let's go to page 2. And now
23   we're in "Permitted Funding Use" (c)(ii).
24      [As read]: Following the commencement
25   of any bankruptcy case" -- do you agree that's
57 :1   where we are today because LTL has filed
2   bankruptcy? Right, Ms. Ryan?
3      A. Yes.
4      Q. "Following the commencement of any
5   bankruptcy case, the payee's talc-related
6   liabilities in connection with the funding of
7   one or more trusts for the benefit of existing
8   and future claimants created pursuant to a plan
9   of reorganization for the payee, confirmed by
10   final, nonappeable order of the bankruptcy
11   court."
12      Do you see that?
13      A. Yes.

## RYAN, MICHELLE - *01/27/2022*

**Page 58**

58 :14      There are two circumstances under C,
15   (c)(i) and (c)(ii). Let's look at (c)(i). It
16   says that [as read]: LTL's talc-related
17   liabilities established by a judgment of a court
18   of competent jurisdiction will be paid under the
19   funding agreement at any time when there's no
20   bankruptcy proceeding.
21      Do you see that?
22      A. Yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 59**

59 :10     Q. All right. So it's circumstance little
11    c, one in the hole, I in the hole, is, if
12    there's no bankruptcy proceeding and a judgment
13    happens, we're going to pay it.
14        Is that your understanding of (c)(i)?
15    A. Yes.
16    Q. Okay. That's what I think it says too,
17    so we're in agreement.
18        All right. Then in (c)(ii), it's
19    something different, right?
20    A. Yes; (c)(ii) is now there is a
21    bankruptcy.
22    Q. Correct.
23        And in the case of a bankruptcy, it is
24    not if there's a judgment we will pay it, it's
25    we will pay pursuant to a plan of reorganization
60 :1    confirmed by non-appealable order.
2        Do you see that?
3    A. Yes, I see that.
4    Q. And do you understand that (i) is
5    different than (ii)?
6    A. Yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 60**

60 :10     MS. BROWN: Objection to the form of the
11    question; misstates the document.
12    BY MR. GLASSER:
13    Q. Do you understand there to be a cap on
14    the total amount of funding having to do with
15    the funding agreement?
16    MS. BROWN: Same objection.
17    THE WITNESS: I understand, I think it's even
18    defined somewhere in here, what the funding
19    obligation is.

**RYAN, MICHELLE** - *01/27/2022*

**Page 60**

60 :21     Q. Yeah, I'll just -- just to help you
22    recall. It's up to the JJCI value, which is a
23    defined term that takes like two pages.
24    A. Yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 61**

61 :4     Q. What do you understand that to be
5    directionally?
6    A. So we never did an estimate. So I --
7    you know, I can't speculate on the amount. But
8    JJCI is a significant component of our consumer
9    business, so it would be a -- it would be a
10    significant value.
11    Q. Well, your lawyer -- not your lawyer,
12    LTL's lawyer stood up in court, and he's J&J's
13    lawyer too, and said -- told the Court it was
14    $61 billion.

15          Do you have any reason to dispute that?

**RYAN, MICHELLE** - *01/27/2022*

**Page 61**

61 :17          THE WITNESS: I -- it's very specific in the
18          document how the valuation would be determined,
19          so I -- I think my guessing at a number as -- a
20          lawyer, I guess, might be willing to guess
21          numbers, a finance person won't. Just like a
22          lawyer wouldn't guess the legal stuff but a
23          finance person might say some things that could
24          get them in trouble.
25                  So I'm not going to guess numbers.
62 :1          There's a specific way to calculate the value,
2          and I would think that would be the appropriate
3          way to determine that. But I think it would be
4          in the tens of billions of dollars.
5          BY MR. GLASSER:
6             Q. So it's fair to say that neither you
7          nor anyone else -- well, neither you nor anyone
8          to your knowledge who approved this funding
9          agreement ever asked what is the JJCI value?
10             MS. BROWN: Calls for speculation.
11             THE WITNESS: I don't know what others did.
12          I did not say, please show me the JJCI value.
13          But based on my knowledge and experience, I knew
14          that it was a substantial value.
15          BY MR. GLASSER:
16             Q. Right. You told me tens of billions?
17             A. Yes.
18             Q. Are you comfortable above 30 billion?
19             A. I'm not going to guess.
20             Q. So you must be comfortable on 20
21          billion because you said tens of billions,
22          right?
23             A. I'm not going to guess. It's a large
24          amount. I shouldn't have said tens of billions.
25          It's a large value.

**RYAN, MICHELLE** - *01/27/2022*

**Page 63**

63 :11          Q. This is the list of currently existing
12          -- although a couple have been paid -- mesothelioma
13          verdicts that are out there. Most of these are
14          on appeal. Okay? Do you see that?
15             A. Yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 64**

64 :4          Donna Olson's case, tried
5          November 30th, 2020, $15 million compensatory
6          award; $105 million punitive award.
7                  Do you see that one?
8             A. Yes, I do.
9             Q. All right. Let's go back to the
10          funding agreement. Section C.
11             A. Okay.
12             MR. GLASSER: Permitted funding use, Section
13          (c)(i).
14          BY MR. GLASSER:
15             Q. We've already discussed that if LTL is

16    not in bankruptcy, it's going to pay final
17    judgments when due, right?
18        A. This says -- this is related to the
19    payor's paying the payee, I think, not LTL
20    paying.
21        Q. Okay. All right. If -- let's get
22    technical.
23            If LTL said, well, Ms. Olson has a
24    final judgment, we need $120 million, it could
25    make a claim -- and it was not in bankruptcy --
65 :1    under this document, it could get the 120
2    million from J&J, a payor under the agreement,
3    right?
4        A. If -- if LTL followed all the
5    procedures and -- and sent the appropriate
6    documentation to JJCI, then, yes. If everything
7    was done correctly and it was an approved -- or
8    permitted funding, then yes, then the payors
9    would have to -- would pay LTL.


**RYAN, MICHELLE** - *01/27/2022*
_____

**Page 65**
65 :24        Q. Okay. Now, we're not in the situation
25    where Ms. Olson could demand of LTL that they
66 :1    make a demand for payment because we're
2    following the commencement of a bankruptcy case.
3            Now we're in (ii) where Ms. Olson's --
4    in the example I'm using, that LTL can't get --
5    actually even if it wants to pay Ms. Olson,
6    cannot do so under this contract accessing these
7    funds without a confirmed plan; isn't that so?
8        MS. BROWN: I object. That misreads this
9    document.
10        THE WITNESS: Again, there's -- there's a lot
11    of -- I think -- I'll defer to the document to
12    answer that question. It's a legal document,
13    and I don't want to sit here and try to -- I
14    think I'll get myself in trouble as a nonlawyer
15    trying to parse the words here.
16    BY MR. GLASSER:
17        Q. But I mean, you said to me earlier that
18    you thought you understood it when you signed
19    it.
20        A. Yes.
21        Q. Isn't your understanding of (ii) that
22    Ms. Olson in our example is going to need to
23    wait until there's a confirmed plan because LTL
24    does not even have the right to call funding for
25    Ms. Olson's claim, even if they want to,
67 :1    following the commencement of a bankruptcy
2    absent a confirmed plan. Isn't that so?
3        MS. BROWN: I object. Improper hypothetical,
4    improper reading of the document, and lacking
5    foundation.
6        THE WITNESS: Is this a question that I
7    should try and answer?
8    BY MR. GLASSER:
9        Q. Yes, you should.
10            Isn't it your understanding that
11    following the commencement of the bankruptcy
12    case, even if LTL wanted to pay Ms. Olson, they
13    have to get a confirmed plan to do so?
14        MS. BROWN: Same objections.
15        THE WITNESS: My understanding is by filing

16    the bankruptcy, as it's stated here, it allows
17    the payment of existing and future claimants.
18        So -- so the bankruptcy and ultimately
19    the funding that would be provided ensures a
20    fair and equitable outcome for both existing
21    claimants and future claimants. And that was
22    one of the benefits of doing it.
23    BY MR. GLASSER:
24        Q. Respectfully, Ms. Ryan, I understand
25    that every witness has given me that -- that
68 :1    talk. That's not the question I asked,
2    honestly.
3        The question I asked is comparing the
4    situation for Ms. Olson, pre-bankruptcy or
5    post-bankruptcy. Pre-bankruptcy she had a final
6    judgment, we've already -- you've already agreed
7    LTL could pay it. If they went through the
8    proper steps to demand the funding properly,
9    they could pay it under (c)(i).
10        Now I'm asking about (c)(ii). It's
11    different.
12        Isn't it true that you understand the
13    document you signed to be even if LTL wants to
14    pay Ms. Olson, they can't pay her until they can
15    pay everyone?
16        MS. BROWN: I object. Improper hypothetical;
17    calls for speculation.
18        THE WITNESS: Certainly when we did this, it
19    wasn't looking at any individual case. There
20    are thousands of cases. And with a product
21    that's used over a lifetime and the type of
22    cases that have come to us, there's a -- there's
23    a probability that cases will need to come in
24    the future.
25        And so the -- the thinking was not
69 :1    specific to any one case, but rather to the
2    longevity of this and the desire to have a -- a
3    way to manage both existing and future claims.
4        So if -- I can't speak to one case.
5    That was -- you can look at one case and put it
6    through (c)(i) and (c)(ii) and come to a
7    conclusion, but that was never what I did and
8    never how I thought about this.
9    BY MR. GLASSER:
10        Q. So I showed you the list of 13 people
11    who have current judgments who want to get paid
12    just like Ms. Olson.
13        So in respect of those -- at least
14    those 13 people, it's fair to say that they are
15    worse off in terms of getting current pay under
16    the bankruptcy for the reasons you just gave,
17    right?
18        MS. BROWN: I object. It completely
19    misrepresents the document in terms of final
20    judgment and it calls for speculation and it
21    lacks foundation.
22        THE WITNESS: No, I don't think I can agree
23    to that.
24    BY MR. GLASSER:
25        Q. You just agree it's different.
70 :1    Everyone has to wait until these conditions are
2    met, a final non-appealable plan is confirmed?

**RYAN, MICHELLE** - *01/27/2022*

---

**Page 70**

70 :10      THE WITNESS: It provides a fair and
11      equitable outcome for all of today's cases and
12      future cases.
13      BY MR. GLASSER:
14          Q. But explain to me how any funding can
15      happen under the agreement. Do you remember
16      when we were talking about whether the two
17      billion had funded, and you said, well, no, not
18      by the time I'd left the company?
19              Reading (ii) here, it's the case that
20      that funding will not happen. J&J is not
21      obligated to fund unless and until these
22      conditions are met. Isn't that true?
23          MS. BROWN: Calls for speculation, lacks
24      foundation.
25          THE WITNESS: There's not an obligation.


**RYAN, MICHELLE** - *01/27/2022*

---

**Page 72**

72 :4      MS. BROWN: I object. She's answered this
5      question several times. You are asking for a
6      legal conclusion and interpretation. It lacks
7      foundation and it calls for speculation.
8      BY MR. GLASSER:
9          Q. What did you understand when you signed
10      it?
11          A. As I've stated, my understanding of the
12      funding agreement was that Johnson & Johnson
13      would provide the assets RAM that had the
14      royalty piece, Johnson & Johnson -- or JJCI
15      would pre-fund $2 billion, and that ultimately
16      the bankruptcy court would determine the overall
17      amount that had to be funded.
18              That was my understanding.


**RYAN, MICHELLE** - *01/27/2022*

---

**Page 75**

75 :17      MS. BROWN: Objection, improper hypothetical,
18      calls for speculation, lacks foundation.


**RYAN, MICHELLE** - *01/27/2022*

---

**Page 75**

75 :22      Q. On behalf of Johnson & Johnson, you
23      signed a document allowing LTL to pay talc
24      liabilities if and only if there's a trust.
25              What did you understand that to mean?


**RYAN, MICHELLE** - *01/27/2022*

---

**Page 76**

76 :1      MS. BROWN: I object --
2      BY MR. GLASSER:
3          Q. What did you understand that to mean?
4          MS. BROWN: I object. That misstates the
5      funding agreement and it lacks foundation.

6       THE WITNESS: Again, sir, I -- this is words
7    in a -- in a very legal document. And so I
8    explained to you my understanding of it.
9       All of the mechanisms we did not go
10   over. And I did not think it necessary because
11   Johnson & Johnson and JJCI were making a
12   commitment, and that's -- that's what I
13   understood. And I left it to the lawyers to
14   manage the legal aspects of this and make sure
15   that that would happen as -- as I understood it.
16   BY MR. GLASSER:
17       Q. When you say "mechanisms" in the trust,
18   what do you mean by that?
19       A. I don't -- that's what I'm saying. I
20   don't know what all of the mechanisms are.

**RYAN, MICHELLE** - *01/27/2022*

**Page 80**

80 :20              (Whereupon, Ryan Deposition
21                Exhibit 111 was first referred
22                for identification.)
23   BY MR. GLASSER:
24       Q. Do you have that in front of you?
25       A. Yes, I do.

**RYAN, MICHELLE** - *01/27/2022*

**Page 81**

81 :8       Q. In fact, I mean, how did you prepare
9    for the deposition, actually?
10       A. I had J lawyers and Alli Brown, who's
11   on this call, Jim Jones, and Greg Starner, who I
12   guess represent J&J and represent me.
13       Q. And how long did you spend with them,
14   Ms. Ryan?
15       A. I don't know the exact, but probably
16   about five to six hours, maybe a little more,
17   over various days, over a couple of weeks.
18       Q. All right. Let's look at Exhibit 111.
19   There is an email at the bottom.
20       I guess Louise Weingrod sends to you
21   the Wall Street Journal article appended to
22   Exhibit 111, correct?
23       A. Yes.
24       Q. I kind of got the sense just from the
25   email traffic that Louise is kind of your buddy
82 :1   in the company and you're just plain friends.
2    Is that fair to say?
3       A. I guess we -- we are definitely
4    friends.
5       Q. And she asks you if it now sounds more
6    credible, and you respond you could see this
7    happening.
8       Do you see that?
9       A. Yes.
10   Q. In July 19.
11       So obviously, I don't want -- I'm not
12   asking you about what Ms. Weingrod's state of
13   mind was, but in your state of mind, why did you
14   think by July 19th, 2021, that you could see
15   this bankruptcy filing happening?
16       What was it that you understood or had
17   concluded that made it seem like it could happen

18    at this point?
19        MR. GLASSER: We could take that down.
20        THE WITNESS: It just -- it seemed like we
21    were getting some traction. So -- so Louise and
22    I had been -- our teams were working on the
23    potential restructuring, and we had been brought
24    in sometime, sometime in July I'm going to
25    guess, late June, like I said earlier, sometime
83 :1    around then.
2        And so when -- I think when we first
3    heard about it we were unsure as to whether it
4    would be an actual avenue that we would pursue.
5    And then when -- to see an article like this
6    coming out that certainly was not from us, it --
7    it started to give more and more credibility
8    that the restructuring may be able to move
9    forward.
10    BY MR. GLASSER:
11        Q. When you said to me just a few seconds
12    ago that it was getting more traction, I took
13    you to mean internally with the teams at Johnson
14    & Johnson. Is that a fair understanding?
15        MS. BROWN: Object, calls for speculation.
16    BY MR. GLASSER:
17        Q. From your perspective.
18        A. Certainly internally work was being
19    done. But the fact that, you know -- the
20    perspective here was that the plaintiffs bar
21    were the ones floating articles like this in
22    order to try to prevent us from -- from
23    following an appropriate legal pathway.
24        And so this was -- the fact that the
25    plaintiff's bar -- plaintiff's side in this case
84 :1    would be now taking PR measures, it started to
2    suggest that there might be a real credible path
3    here because the plaintiffs' attorneys seemed
4    scared.
5    BY MR. GLASSER:
6        Q. So I guess -- I'm reading your sentence
7    up there at the top. [As read:] Could have
8    been a plan...an ill-fated arrogant plan. Try
9    to scare them.
10        What are you trying to tell me about,
11    your -- what do you mean there?
12        A. That this is the plaintiffs' bar
13    thinking that they're going to get out and
14    create a -- kind of a negative PR storm that's
15    going to scare us from -- scare our lawyers,
16    scare us, from -- from pursuing this approach.
17        Q. So you're saying that you think the --
18    this discussion of bankruptcy is an ill-fated
19    arrogant plaintiffs' lawyers' plan?
20        A. Yes. Because this is the plaintiffs'
21    lawyers who are floating this article to get
22    traction, which -- that it did get some
23    traction, right? I think there were -- there
24    were senators and congressmen who got involved
25    and said -- had opinions on whether J&J should
85 :1    do this or not.
2        And so it was -- it was almost like we
3    had found a legal pathway here that was very
4    viable and the plaintiffs' lawyers who felt that
5    they had us in a corner were now trying to fight
6    us in the court of public opinion and public
7    relations here by putting out bad press.

```
 8        And so that -- they're trying to scare
 9   us off.
10        Q. So the "them" is Johnson -- so when you
11   say "tried to scare them," you're saying Johnson
12   & Johnson is the "them"?
13        A. Yes, our lawyers. Like this is now --
14   this is now the plaintiffs' lawyers versus our
15   lawyers and they're trying to scare our team, to
16   scare them, the J&J lawyers.
17        Q. I thought I heard you tell me at the
18   beginning of the answer a few questions ago,
19   though, that you thought the bankruptcy scared
20   the plaintiffs' lawyers and that's why they were
21   doing this.
22        A. Yeah, I did think that's what -- I
23   think they -- the plaintiffs' lawyers realized
24   that we actually had a very real pathway here
25   and they couldn't stop it because legally it was
```
```
86 :1   an appropriate pathway.
 2        And so the way to stop it was to try to
 3   get the court of public appeal in front of it
 4   and to put pressure on us to not pursue this
 5   pathway.
 6        Q. So the scaring was working both ways,
 7   the plaintiffs' lawyers, in your judgment --
 8        A. We weren't trying to scare the
 9   plaintiffs' attorneys. We had a pathway.
10        Q. That was scary to them?
11        A. That led them to believe that
12   lottery-type settlements like the one that
13   just -- this is, what, July 20th -- that just
14   seven weeks before the Supreme Court said, we're
15   not going to offer Johnson & Johnson their
16   opportunity for an appropriate appeal, I think
17   the plaintiffs' lawyers were feeling pretty
18   bullish at that point and they were -- they were
19   willing to keep trying to play for the
20   lottery-type settlements.
21        And certainly under a restructuring
22   under bankruptcy, that would be a very different
23   set of circumstances, was my understanding, in
24   terms of how -- how claimants would be paid out.
25        So, yeah, I think the plaintiffs'
```
```
87 :1   lawyers who stand to make significant amounts of
 2   money in these trials, especially with
 3   lottery-like settlements, were concerned that
 4   they -- they might be pushed down a different
 5   pathway.
 6        Q. Ms. Ryan, did you ever read the
 7   Missouri Court of Appeals opinion in Ingham?
 8        A. No, I did not.
```

RYAN, MICHELLE - *01/27/2022*

---

**Page 89**

```
89 :4        Q. So I'm still on Exhibit 111, Ms. Ryan.
 5   And I understand that you've told me very
 6   clearly that you think the ill-fated, arrogant
 7   plan was the plaintiffs' lawyers plan to scare
 8   Johnson & Johnson.
 9        That's your interpretation of your
10   email to your friend Louise, right?
11        A. Who's Johnson & Johnson's head of tax,
12   Louise, yes, and my friend, yes.
13        Q. But I have to say -- and I just want to
```

```
14    put it to you, it doesn't -- that doesn't make a
15    lot of sense to me given that she said, "If
16    accurate, not quite zealous representation of
17    our interests."
18            You couldn't have thought -- isn't it
19    true that you could not possibly have thought
20    that the plaintiffs' lawyers were representing
21    J&J's interests?
22        A. I honestly don't know what Louise meant
23    so I can't -- I can't speak to her comments. I
24    can speak to what I thought was happening.
25        Q. Right. But you're responding -- you --
90 :1    I'm asking about your state of mind.
 2            You could not possibly believe she was
 3    talking about plaintiffs' lawyers, true?
 4        MS. BROWN: Objection, calls for speculation.
 5        THE WITNESS: I don't know what she was
 6    thinking. I know what I was -- I think I'm
 7    telling you what I'm thinking when I said in the
 8    response regardless --
 9    BY MR. GLASSER:
10        Q. I understand. I'm not asking at all
11    what she is thinking.
12            I am asking you, explain to me how
13    you -- isn't it true that you -- you did not,
14    you did not understand Louise to be talking
15    about plaintiffs' lawyers representing your
16    interests, you, Michelle Ryan, understanding?
17        A. I don't -- I don't remember what I
18    thought about her comments. I know what I was
19    thinking and I know what I was referring to.
20            So I -- I can't -- I can't remember
21    everything and every thought that I had in the
22    last eight months, so I don't know.
23        Q. Because if the interpretation of the
24    email is as you've said, it's a non sequitur;
25    your response has nothing to do with her
91 :1    statement, right?
 2        A. I don't know, sir. So I'm -- I don't
 3    know what she was referring to. I know at the
 4    time there was --
 5        Q. And you --
 6            (Simultaneous crosstalk.)
 7        THE WITNESS: I know at the time that we --
 8    these emails -- I know at the time we were
 9    looking for paths forward.
10            We had been in discussions on this
11    potential path forward for, at this point,
12    probably a few weeks from the first time that
13    we -- Louise and I had been made aware of it.
14    And it seemed like we actually had a path
15    forward and that the plaintiffs' lawyers were
16    trying to shut it down.
```

**RYAN, MICHELLE** - *01/27/2022*

**Page 93**

```
93 :14            Q. What is your understanding of "properly
15    reserved for"? What are you trying to reserve?
16        A. For any liability that the company had,
17    not just litigation, you would make sure that --
18    I mean, generally accepted accounting principles
19    say you have to have something that is both
20    probable and estimable or estimatable.
21            So -- so even if something is probable,
```

22    if you can't make an estimate of it, you can't
23    accrue it. And if you can estimate something
24    but it's not probable, you also don't reserve
25    for it.
94 :1         So it has to meet the test of probable
2     and estimable. And then based on that -- so
3     then to estimate, you have to have foundational
4     information to create your -- your estimate.
5     And the probability piece in this case really
6     comes from the lawyers' judgment, as well as the
7     accountants have a say in what's probable or
8     have a perspective in both.
9         So it really would be our corporate
10    controller team and our -- our litigation team
11    making the conclusions on both probability and
12    estimation.

**RYAN, MICHELLE** - *01/27/2022*

Page 95

95 :21        On the next page we see that 996 number
22    from the prior page and then a payments number
23    of 534 with a subtotal of 462 million.
24        Explain that to me. What's happening
25    there?
96 :1     A. What's happening on this -- just with
2     the 99 -- so the 996, again, would have come
3     from...
4         So the top line called "talc" would be
5     the total reserves that had been established for
6     talc over time. And so you see the first column
7     there is 2018. So as of the end of 2018, we had
8     $550 million reserved and we had paid out 306.
9         So there -- on Johnson & Johnson's
10    balance sheet, then, at the end of 2018, we
11    would have $244 million reserved for talc
12    litigation. And then quarter-by-quarter -- Q1,
13    2, 3, and 4 -- if you add across, the 550 plus
14    8, 190, and 248, you'll get the 996, I'm
15    assuming. And -- so that just shows each
16    quarter.
17        So in Q1, the lawyers must have said,
18    oh, we're going to need to spend a little bit
19    more than the 550 we had estimated, and we made
20    payments of 45 million in Q2. Again, updates
21    from lawyers. We paid some fees out to lawyers.
22        Q3, the estimate of the ongoing cost
23    didn't increase, but we paid 45 million. And in
24    Q4, I think that's from the previous page where
25    it was about 250 million, it's about 248.
97 :1         So now the lawyers again looking
2     forward said, okay, it's going to cost us about
3     this much for the next 24 months to continue in
4     pursuit of this. Paid out 75.
5         So in total at the end of 2019,
6     Johnson & Johnson had booked $996 million of
7     reserves over time relative to talc litigation,
8     and we had paid out 534 million. So on our
9     balance sheet, we had $462 million of reserves
10    related to talc litigation.
11    MR. GLASSER: Okay. Let's go to Exhibit 116.
12        (Whereupon, Ryan Deposition
13         Exhibit 116 first referred for
14         identification.)

**Page 99**

99 :8    Q. And we see 2020's balance there,

9    5 billion, right?

10    A. Yes.

11    Q. 5 billion 25.

12    And then we see that payment for

13    Ingham, which is 2.5 billion there in Q2 of

14    2021. Do you see that?

15    A. Yep.

16    Q. All right. So it's fair to say that

17    this not only includes legal costs, but it --

18    costs of settlements and verdicts, too?

19    A. Yes.

20    Q. That are paid?

21    A. Yes. Yes.

22    Q. Leaving 2.391 billion accrued on the

23    balance sheet as of 2021, as of October 31,

24    2021.

25    Does this have any relation to the

100 :1    choosing of the, you know, offered initial

2    funding being $2 billion?

3    MS. BROWN: Objection, speculation.

4    THE WITNESS: I do not know -- no, not that

5    I'm aware of.

6    BY MR. GLASSER:

7    Q. But you are aware that historically

8    Johnson & Johnson did not accrue on its balance

9    sheet estimates for future as yet unfiled claims

10    because they're not estimable in your -- using

11    the words you used, estimable, right?

12    MS. BROWN: Objection, speculation.

13    And I would just caution you, Michelle,

14    to the extent that what was -- any decisions

15    about accruals or reserves were informed in your

16    mind by legal counsel and legal advice, I would

17    instruct you not to reveal those conversations.

18    THE WITNESS: Okay. I mean, I think in

19    our -- I think in the footnote to our financial

20    statements we're pretty clear with what -- what

21    we accrued and what we didn't accrue.

22    So my understanding is that we did not

23    reserve for future claims because both the

24    probability and the ability to estimate them

25    would be -- we couldn't do that, couldn't do

101 :1    that in a way that met the requirements of GAAP

2    accounting.

3    BY MR. GLASSER:

4    Q. So earlier today when we were talking

5    about the funding agreement and how (ii) in the

6    hole was designed to have a plan that covers

7    existing and future claims and we talked about

8    the $2 billion, if the $2 billion -- J&J itself,

9    as we can tell from this document which is

10    Exhibit 116, at least as of the day before the

11    bankruptcy, believed it could estimate as

12    probable $2.391 billion of obligation in respect

13    to talc, right?

14    MS. BROWN: Objection, speculation,

15    foundation.

16    THE WITNESS: We were able to -- by what's in

17    our financial statements, the fact that it's in

18    our financial estimates, we had the ability to

19    say it was probable and an estimate. It does
20    not mean that's an exact amount, but it was --
21    there was a probable, estimable liability for
22    the enterprise of $2.391 billion, yes.

**RYAN, MICHELLE** - *01/27/2022*

**Page 104**
104 :6         Q. At the beginning of this deposition we
7    talked about the $31 billion in available cash
8    and cash equivalence that were on the balance
9    sheet at the time of this bankruptcy.
10         Why, to your knowledge, did J&J not
11    just put $5 billion in LTL?
12       MS. BROWN: I object. Calls for speculation.
13       THE WITNESS: Well, the reality is the
14    responsibility is JJCI's. But J&J in good faith
15    was going to fund the $2 billion as a means to
16    show the Court that setting -- that the
17    restructuring that we were doing was a --
18    something we believed in and we wanted to
19    provide fair and appropriate settlements as --
20    as ultimately required for current and future
21    claimants.
22         And so $2 billion is certainly not an
23    insignificant amount of funding to commit to
24    this. And ultimately the bankruptcy court would
25    tell us the amount due and we would fund the
105 :1    remainder.

**RYAN, MICHELLE** - *01/27/2022*

**Page 105**
105 :7         Q. Yeah. Where is old JJCI today? You
8    said this is JJCI's obligation.
9         Where is that company that had that
10    obligation?
11       A. Old JJCI was restructured and new JJCI
12    exists. I don't know.
13       Q. So old JJCI -- old JJCI was
14    extinguished by the transaction, right?
15       A. New JJCI has all the responsibilities
16    of old JJCI.
17       Q. It doesn't have the talc liabilities
18    according to the piece of paper you all wrote
19    each other. LTL does, right?
20       A. Through the funding agreement JJCI and
21    J&J have agreed to fund LTL as necessary.
22       Q. So since J&J signed --
23       A. Up to -- up to the value -- up to the
24    value of old JJCI. So --
25       Q. Which you already -- which you already
106 :1    told me in this deposition was tens of billions
2    of dollars.
3         So I'm saying, why didn't you just put
4    5 billion in LTL? Who made that decision?
5       MS. BROWN: Objection, lacks foundation,
6    calls for speculation.
7       THE WITNESS: I don't know who made the
8    decision.

**RYAN, MICHELLE** - *01/27/2022*

**Page 106**

106 :17     Q. Did you ever discuss businessperson to
18     businessperson inside J&J with anybody what an
19     appropriate amount of funding for LTL would be?
20     A. No, I did not.

## RYAN, MICHELLE - *01/27/2022*

**Page 108**
108 :8     Q. In fact, I've asked this question of
9     every witness in the case and haven't really
10     gotten an answer yet.
11     Why -- do you know why it had to happen
12     so fast over the two-day period?
13     MS. BROWN: Objection, calls for speculation.
14     THE WITNESS: I do not.
15     BY MR. GLASSER:
16     Q. Were you ever involved in any discussions
17     about when it ought to happen?
18     A. No, I was not.

## RYAN, MICHELLE - *01/27/2022*

**Page 111**
111 :13     Q. So I take it the normal money
14     management system is, at least in the United
15     States -- I know this may not be true globally,
16     but at least in the United States, accounts are
17     swept every evening to a concentration account,
18     right?
19     A. Yes.
20     Q. Those concentration accounts are -- is
21     a bank -- I take it at Bank of America in the
22     name of Johnson & Johnson, right?
23     A. Yes.
24     Q. I couldn't hear you.
25     A. Yes. Sorry.

## RYAN, MICHELLE - *01/27/2022*

**Page 117**
117 :1     (Whereupon, Ryan Deposition
2     Exhibit 121 was first referred
3     for identification.)
4     BY MR. GLASSER:
5     Q. Do you know, when it says "End," does
6     that tell us how long the meeting actually
7     lasted, or was that -- is that the planned
8     amount when you get these invites?
9     A. That would be the amount that is
10     scheduled for meetings, as I'm sure you know,
11     can run really long or can run short.
12     Q. I like those better.
13     So do you recall what this meeting on
14     the 6th was about?
15     A. Yeah, this was to discuss the
16     restructuring plan and the -- approval memo
17     and the funding agreement.
18     Q. So this is the call you think where you
19     were -- where you were briefed in on what the --
20     what the meaning of the funding agreement when
21     we were -- we were talking about the funding
22     agreement before, and you said, I had a meeting.
23     I think you might have said with Chris and -- do
24     you think this was this meeting?

25        A. Yeah, I'm going to think this was
118 :1    probably the meeting. I don't know if there was
2         another meeting, but this was probably the
3         meeting.

---

**RYAN, MICHELLE** - *01/27/2022*

**Page 118**
118 :8              (Whereupon, Ryan Deposition
9                   Exhibit 122 was first referred
10                  for identification.)

---

**RYAN, MICHELLE** - *01/27/2022*

**Page 121**
121 :1        Q. And then when he drills down a little
2         bit more, as you said on page 1, he gives us a
3         $1.3 billion number.
4             Do you see that right above the box?
5         A. Yes.
6         Q. Redacted --
7         A. Yes, he said we had 1.3 billion on the
8         balance sheet.
9         Q. For settlements previously accrued,
10        right?
11        A. Yes, that's what it says.
12        Q. So it looks to me like the drill down
13        is trying to figure out the incremental
14        difference between settlements previously
15        approved and $2 billion.
16            Is that how you read it?
17        A. Without being able to see the redacted
18        box, I can't for sure. But, yes, the first two
19        -- Adam is saying that what will hit JJCI's P&L
20        for Q3 and, therefore, J&J's P&L for Q3 won't be
21        the full 2 billion because there are already
22        things that were reserved on J&J's balance
23        sheet.

---

**RYAN, MICHELLE** - *01/27/2022*

**Page 131**
131 :13       Q. Let's go to Exhibit 126. And we don't
14        need to pull this up. We can put it in the
15        chat.
16              (Whereupon, Ryan Deposition
17                  Exhibit 126 was first referred
18                  for identification.)
19        BY MR. GLASSER:
20        Q. This is an email from you, October 11,
21        2021, 1:00 p.m. in the afternoon, approving the
22        transaction. Do you agree?
23        A. Yes.
24        Q. I take it you did this on your own, you
25        did not, in fact, have a committee meeting of
132 :1    the other approving parties, correct?
2         A. Correct. The approvers did not all get
3         together. We each had our own, I'll call it,
4         areas of responsibility and -- for approving
5         somewhat relative to that, I guess I would say.
6         Q. So when you gave your approval, you
7         believed you were saying, from a treasury
8         perspective, I approve that this will not cause
9         us trouble from a treasury perspective?

10      A. That's right. I mean, if you look at
11   the to list, on the to list there are -- there
12   are four members of CFO staff, Paul Ruh,
13   Robert Decker, Louise Weingrod, and myself.
14          So we certainly don't need four members
15   of the CFO staff called just to approve in
16   general, so we were all looking at specifics
17   related to our areas of expertise.

### RYAN, MICHELLE - *01/27/2022*

**Page 134**

134 :8      Q. I asked you questions with respect to
9    the funding agreement. But to tap it down,
10   there are nine steps set forth in the approval
11   memorandum and the deal documents. There are 82
12   deal documents that effect, you know, each of
13   those nine steps.
14          I take it you personally did not have
15   any involvement in negotiating or writing or
16   commenting on any of those deal documents?
17      A. That's correct, personally I did not.
18   My team would have been involved just to make
19   sure from an understanding standpoint of having
20   -- related to our treasury department. But I
21   did not have personal input into any of it.
22      Q. Exhibit 1.57 [sic] is in your stack.
23   It's the amended and restated commitment and
24   loan agreement between Johnson & Johnson and
25   Johnson & Johnson Consumer, Inc., that you
135 :1   signed. Do you recognize that?
2       A. Yes.
3       Q. Why did Johnson & Johnson and Johnson &
4    Johnson Consumer, Inc., need to enter this loan
5    and commitment agreement, to your knowledge?
6          MS. BROWN: Objection, calls for speculation,
7    lacks foundation.
8          THE WITNESS: I don't know all the legal
9    aspects of it. I know that J&J does not have to
10   fund JJCI's cash flows forever under the funding
11   agreement. J&J's commitment to LTL was defined.
12   And so J&J has a certain commitment, but JJCI is
13   truly the parent company of LTL. And so JJCI is
14   first and foremost responsible.
15   BY MR. GLASSER:
16      Q. All right. Do you remember I asked you
17   a series of questions before about how does JJCI
18   call cash or get cash from Johnson & Johnson
19   prior to this transaction under its normal --
20   under its normal operations. And part of the
21   reason I asked you those questions is it feels
22   like, to me, that this first -- this loan
23   document is the first evidence I've seen of an
24   actual right or ability of JJCI to actually get
25   money from J&J without J&J's consent, kind of an
136 :1   obligation. Is that why it was done?
2          MS. BROWN: Lacks foundation, calls for
3    speculation.
4          THE WITNESS: I'm not sure as to the specific
5    reasons why.
6    BY MR. GLASSER:
7       Q. So it's fair to say that even though
8    you signed the loan and commitment agreement,
9    its role in the transaction you're not sure of?

**RYAN, MICHELLE** - *01/27/2022*

**Page 136**

136 :11    MS. BROWN: Objection, misstates testimony.
12    Go ahead.
13    THE WITNESS: I understood the
14    responsibilities that J&J had under the loan
15    agreement.
16    BY MR. GLASSER:
17    Q. Did you ever see any pro forma
18    financial analysis of LTL as a post-bankruptcy
19    company?
20    A. No, I did not.
21    Q. How was the initial capitalization of
22    LTL for $6 million plus a royalty stream arrived
23    at?

**RYAN, MICHELLE** - *01/27/2022*

**Page 137**

137 :1    THE WITNESS: I don't know.

**RYAN, MICHELLE** - *01/27/2022*

**Page 137**

137 :3    Q. I couldn't hear you, ma'am. I'm sorry.
4    A. I do not know how it was derived.
5    Q. Have you ever in your last six years as
6    treasurer at any time seen any estimate of what
7    the future talc liability, future total overall
8    fair value analysis or whatever of what the sum
9    and substance of the existing cases could yield
10    in terms of liability for J&J?
11    A. No, I never did.

**RYAN, MICHELLE** - *01/27/2022*

**Page 138**

138 :14    Q. Well, maybe another way then is to say
15    it's the case that the bankruptcy of LTL,
16    despite that, J&J continued to operate its
17    businesses as usual, correct?
18    A. We continued our business operations,
19    yes. Again, as part of our -- I would say part
20    of our operations is always the planning for
21    different scenarios. We're looking at different
22    scenarios. We're looking at different uses of
23    cash. So we knew we had at least $2 billion
24    less cash.

**RYAN, MICHELLE** - *01/27/2022*

**Page 140**

140 :3    You -- there was reference earlier in
4    your deposition to Project Plato, and I just
5    want to know what your understanding of those
6    words as used at J&J is.
7    A. My understanding of Project Plato was
8    that it was a team of experts from various
9    functions who were brought together to do due
10    diligence around the restructuring of our

11    consumer group that could lead ultimately to the
12    structure that is documented in the approval
13    memo. But it wasn't -- it wasn't a preconceived
14    structure, so it was let's do diligence and
15    understand if there's a way to restructure that
16    could -- that could allow us ultimately to get
17    to some type of structure that allowed us to
18    file for our -- for one of the subs to file for
19    bankruptcy.
20        Q. And did -- what was your understanding
21    of the ultimate purpose if that was carried out?
22        A. We felt like we had run out of options.
23    So we had a -- JJCI was under significant
24    financial pressure from these continued and
25    mounting legal costs. And with what we would
141 :1   call lottery-like outcomes, we didn't view that
2    as sustainable for JJCI for the long run.
3        And we felt that in the legal system
4    our options had -- had run out with our belief
5    that due process wasn't afforded to us and
6    ultimately the appellate court would not listen
7    to our -- our appeal about that. There were
8    very few options left.
9        So if there was an appropriate legal
10    pathway, then we wanted to understand that so
11    that we could ultimately provide a fair and
12    equitable outcome and efficient for all parties
13    involved.
14        Q. And did you understand there to be
15    economic benefits to J&J if Project Plato was
16    carried out?
17        A. I never -- I never heard of it
18    discussed in economic terms. It was really a
19    legal path forward because we didn't feel we had
20    a legal path forward.
21        Q. Well, let me -- let me -- let me try
22    and break that down. Thank you.
23        Is it -- in your experience, from your
24    many years at J&J including as treasurer, was
25    one of J&J's primary goals to provide value to
142 :1   shareholders?
2        A. Certainly. As a publicly traded
3    corporation, one of -- one of your goals is to
4    create value for your shareholders.
5        J&J is -- with our credo speaks about
6    our -- our four major responsibilities, the
7    first of which is to the patients, the moms, the
8    dads, the people who use our product. Second is
9    to our employees. Third is to our communities.
10    And, finally, we believe if we do the first
11    three correctly, the shareholders will receive a
12    fair return.
13        Q. In your experience at J&J, either
14    generally or specifically, would J&J take --
15    undertake strategies that impaired shareholder
16    value?
17        A. That is not the norm. You could look
18    at things like why do we give donations. That
19    takes away from -- potentially from a dollar in
20    our pocket and, therefore, a dollar in our
21    shareholders' pockets. But no, we don't
22    typically do things that destroy value.
23        Q. So, in fact, would you agree that at
24    least one of the motivations in the Project
25    Plato strategy was to provide an economic

143 :1  benefit to J&J?
      2       MS. BROWN: I object, lacks foundation, calls
      3  for speculation.
      4       THE WITNESS: I never heard it described as
      5  in economic terms why we were pursuing it.
      6  BY MR. JONAS:
      7       Q. So is it the true that the only --
      8  strike it -- strike that.
      9          Is your understanding that the only
     10  reason that J&J undertook Project Plato was to
     11  provide -- let me see if I get this right -- to
     12  provide a fair and equitable resolution to talc
     13  claimants?
     14       MS. BROWN: I object. That misstates her
     15  testimony.
     16       MR. JONAS: I'll restate the question so we
     17  have a clean record.
     18  BY MR. JONAS:
     19       Q. Is it your understanding that the only
     20  reason that J&J undertook Project Plato was to
     21  provide a fair and equitable resolution to talc
     22  claimants?
     23       MS. BROWN: Calls for speculation.
     24       THE WITNESS: I won't say that was -- I don't
     25  know all of the reasons. Certainly one of the
144 :1  reasons was to provide an efficient, fair, and
      2  equitable outcome for all parties.
      3  BY MR. JONAS:
      4       Q. Okay. Do you have an understanding as
      5  to whether there are any other reasons to
      6  undertake Project Plato?
      7       A. Again, as a company, we were looking
      8  for a valid legal pathway because we felt that
      9  other legal pathways had been closed when the
     10  Supreme Court couldn't or wouldn't hear our
     11  appeal.
     12       Q. And when you say "a valid legal
     13  pathway," to what? A valid legal pathway to
     14  what end?
     15       A. To a fair and equitable and efficient
     16  settlement for all parties involved.

**RYAN, MICHELLE** - *01/27/2022*

**Page 145**
145 :5          In July of 2021, you were part of
      6  strategic discussions at J&J relating to capping
      7  talc liability, correct?
      8       A. I think --
      9       MS. BROWN: I object, lacks foundation.
     10          Go ahead.
     11       THE WITNESS: Sorry, Alli.
     12       MS. BROWN: No. Go ahead.
     13       THE WITNESS: I was going to say I think
     14  you're using the word there in terms of capping
     15  that I'm not sure how you're defining that, and
     16  so I'm not comfortable agreeing that the
     17  diligence we were doing was designed to cap talc
     18  litigation.
     19          We were looking for a legal path
     20  forward to manage our talc, all the cases that
     21  we had today and into the future. I never heard
     22  anyone saying the goal was the capping of the
     23  liability.

RYAN, MICHELLE - *01/27/2022*

**Page 148**

148 :20     Q. Okay so let me try it again.
     21          Were you part of discussions at J&J as
     22     early as July 2021 relating to a strategy to
     23     manage talc liability by moving talc liability
     24     into a newly formed subsidiary and putting that
     25     subsidiary into bankruptcy?
149 :1     A. Yes, I was involved in conversations
     2     and ultimately the analysis of such a strategy.
     3          Q. Thank you.
     4          And as far as you know, that strategy
     5     was put into effect and carried out ultimately
     6     resulting in the bankruptcy of LTL, which was
     7     filed in North Carolina in October 2021,
     8     correct?
     9          A. The LTL filed bankruptcy in 2021,
     10     October 2021, that is correct.
     11          Q. I'm sorry. You were breaking up. It's
     12     not your fault.
     13          A. Ultimately, LTL filed bankruptcy in
     14     October of 2021.

RYAN, MICHELLE - *01/27/2022*

**Page 149**

149 :16     Is it your understanding that LTL's
     17     filing bankruptcy in twenty -- October of 2021
     18     was the culmination of Project Plato?
     19          A. I'm not sure I would say it just like
     20     that. But Project Plato -- the work of the
     21     Project Plato team was to do the diligence to
     22     understand multiple aspects.
     23          So as an example, in the treasury
     24     space, as discussed earlier, would there be any
     25     negative implication to our bond covenants, to
150 :1     our hedging agreements, to our banking
     2     agreements, to our insurance agreements.
     3          So the teams, each from their own
     4     discipline, did an analysis and determined that
     5     Plato could go ahead. The ultimate bankruptcy
     6     was the decision of the LTL board.

RYAN, MICHELLE - *01/27/2022*

**Page 150**

150 :12     Did you believe -- I want -- I want to
     13     know your understanding, your belief as
     14     treasurer of J&J. Strike that.
     15          As treasurer of J&J, did you believe
     16     that Project Plato was a good strategy for J&J?
     17     MS. BROWN: Objection, vague.
     18     THE WITNESS: I -- I think if we ultimately
     19     could have a defined liability for talc,
     20     regardless of the size of that defined
     21     liability, that would be a good thing for the
     22     company.
     23          I thought if ultimately we had a
     24     bankrupt subsidiary, we would also have negative
     25     PR. So I thought it was kind of a balance of
151 :1     probably good and -- and bad depending on how it

2        all came together.

**RYAN, MICHELLE** - *01/27/2022*

Page 151
151 :22        Q. Okay. We may need to have you do that.
23        But I will try to make it easier. So let me see
24        if I can get you there. And if not, we can
25        certainly go back and look at document -- have
152 :1        you look at the document.
2                If Project Plato is ultimately
3        successful, do you believe that J&J -- that
4        J&J's talc liability could exceed the value of
5        old JJCI?
6        MS. BROWN: Lacks foundation and calls for
7        speculation.
8        THE WITNESS: I don't know because it depends
9        ultimately on how the bankruptcy court
10        determines the value for LTL that has to be --
11        has to be provided.

**RYAN, MICHELLE** - *01/27/2022*

Page 152
152 :13        Q. I'm sorry, I'm confused. You signed
14        the funding agreement, correct?
15        A. Yes, I did.
16        Q. You were part of strategic discussions
17        at a high level at least relating to Project
18        Plato, correct?
19        A. Yes, I was.
20        Q. Are you testifying now that you do not
21        understand what J&J's talc liability may be if
22        Project Plato is successful?
23        MS. BROWN: Objection.
24        THE WITNESS: I don't know what J&J's talc
25        liability will be because it's not defined.

**RYAN, MICHELLE** - *01/27/2022*

Page 154
154 :15        But do you understand one way or the
16        other whether old JJCI could have, itself, filed
17        bankruptcy?
18        A. I don't know the answer to that.
19        Q. Do you have any understanding one way
20        or the other if Johnson & Johnson, the parent
21        company, could have filed or could file for
22        bankruptcy?
23        A. Again, I don't know all of the rules
24        and regulations for filing for bankruptcy.

**RYAN, MICHELLE** - *01/27/2022*

Page 156
156 :14        Do you recall the discussion relating
15        to the $2 billion of, I think it might have been
16        referred to as qualified settlement fund or
17        funding that was discussed earlier?
18        A. Yes, I do.
19        Q. Okay. And do you know who was involved
20        in the decision surrounding that amount that is
21        using $2 billion as the -- that funding amount?

22        A. I do not know.

**RYAN, MICHELLE** - *01/27/2022*

---

**Page 157**

157 :1            When you first saw the $2 billion
2        number as treasurer, how was that presented to
3        you?
4            A. I honestly don't remember the first
5        time that I saw it. I don't remember.
6            Q. Okay. And I mean, $2 billion, that's a
7        fair amount of money even for a company like
8        J&J, right?
9            A. It's a significant amount of money,
10       yes.
11           Q. So did -- did you ask any questions
12       like, hey, why is it 2 billion and not a billion
13       or -- did you ask anybody any questions about it
14       or you just accepted it?
15           A. I believe I asked Chris Andrew --
16           Q. Okay.
17           A. -- who is our lawyer to help me
18       understand -- not so much the -- yes.
19           MS. BROWN: And I'll caution you, again,
20       Ms. Ryan, to the extent the answer would
21       indicate discussions with Mr. Andrew in a legal
22       capacity, I will instruct you not to reveal the
23       substance of that conversation.
24           THE WITNESS: Yep.
25
158 :1       BY MR. JONAS:
2            Q. And what is your understanding how the
3        $2 billion was arrived at?
4            MS. BROWN: And, again, if that understanding
5        comes from something lawyers told you in their
6        capacity as providing legal advice, my same
7        instruction would apply.
8            THE WITNESS: I don't think there is much
9        else I can say. I think the only conversation
10       being with Mr. Andrew.

**RYAN, MICHELLE** - *01/27/2022*

---

**Page 158**

158 :12           Q. Okay. Did Mr. Andrew tell you how --
13       I'm not asking for the detail. I simply want to
14       know yes or no -- did Mr. Andrew tell you how
15       the $2 billion number was arrived at?
16           A. No.
17           Q. Okay.
18           A. That's not --
19           Q. And you didn't ask that?
20           A. Not that I recall.

**RYAN, MICHELLE** - *01/27/2022*

---

**Page 161**

161 :8           Who first told you about Project Plato?
9            A. I first heard about the concept of a
10       potential restructuring from Erik Haas, our head
11       of litigation. I don't know the exact date.
12       And eventually the team put in place to do the
13       due diligence around the potential restructuring

14    was given the code name "Plato."

**RYAN, MICHELLE** - *01/27/2022*

Page 172
172 :21          So -- so John Kim was present for your
        22    deposition preparation; is that true?
        23          A. That is true.
        24          Q. So it was John Kim, Alli Brown,
        25    Mr. Starner from White & Case, Mr. Jones from
173 :1    Jones Day --
        2          A. Yes.
        3          Q. -- and -- and John Kim that were
        4    present at your deposition preparation, correct?
        5          A. Yes. And Erik Haas was there for part
        6    of it, and Andrew White from J&J was also there
        7    for part of it.

**RYAN, MICHELLE** - *01/27/2022*

Page 174
174 :19          Q. All right. So let's look at
        20    Exhibit 105.
        21          MS. BROWN: Michelle, just take a minute and
        22    let us know when you have it.
        23          THE WITNESS: Yes, I have it.

**RYAN, MICHELLE** - *01/27/2022*

Page 175
175 :7          Q. Okay. And Mr. Levesque says [as read]:
        8    We realize the contemplated scenario involves a
        9    subsidiary other than a J&J subsidiary, but we
        10    are thinking through what happens in the event
        11    the process went through and involves a J&J
        12    subsidiary after all.
        13          Do you see that?
        14          A. Yes.
        15          Q. Okay. So you had been discussing with
        16    Mike Levesque from Moody's about a contemplated
        17    scenario involving the transfer of J&J's talc
        18    liabilities to a subsidiary, correct?
        19          MS. BROWN: Objection.
        20          THE WITNESS: No, you're misreading this.
        21    Michael Levesque is responding to my email that
        22    is further down this chain from June 2nd. The
        23    timing is completely coincidental with the
        24    meeting that I had with Joe Wolk and any
        25    discussions on Project Plato.
176 :1          So Michael, he says, "We realize the
        2    contemplated scenario involves a subsidiary
        3    other than a J&J subsidiary." He's talking
        4    about the Imerys situation in his email. But he
        5    then jumped to, But we, Moody's, are thinking
        6    through what happens in the event that it would
        7    involve a J&J subsidiary.
        8          So I got that email and thought, wow,
        9    they've kind of jumped on to what we're actually
        10    thinking about doing, which is why ultimately
        11    there's an email from me that takes me a couple
        12    weeks to even get back to him because I thought,
        13    well, I'm not going to tell him at this point
        14    about what we're thinking about in Project Plato
        15    until I better understand if there is a chance

16    Project Plato could be moving ahead.
17         So he in his July 1st, the time of it
18    and everything is completely coincidental with
19    the meeting that I had with Joe Wolk. I did not
20    call him. I had not mentioned to him anything
21    about a potential J&J restructuring or J&J
22    subsidiary going into bankruptcy.

## RYAN, MICHELLE - *01/27/2022*

**Page 176**
176 :25         So here -- here you get this email from
177 :1    Mike Levesque on July 1st, at 1:40 p.m., July 1,
2    2021, and he's clearly talking about the
3    resolution of J&J's talc liabilities that he's
4    saying something about, well, what would happen
5    if it involved a J&J subsidiary, right?
6         A. That's right.
7         Q. And on your --
8              (Simultaneous crosstalk.)
9         THE WITNESS: (Inaudible) very clearly what
10    would happen with our -- some of our debt
11    agreements and would it be considered a default.
12    BY MR. BLOCK:
13         Q. Right, okay. And on your end, am I
14    correct you were thinking that we're talking
15    internally about transferring our talc
16    liabilities to a subsidiary en route to
17    resolving the cases in bankruptcy and here
18    you're being asked by Mr. Levesque essentially
19    about that?
20         A. Yes, I was -- I was -- yes, I don't
21    remember exactly how I felt, but I know I was a
22    little surprised that he had gone down that path
23    on his own.
24         Q. Okay.
25         A. Because it was something we had never
178 :1    discussed.

## RYAN, MICHELLE - *01/27/2022*

**Page 179**
179 :23         Q. Were your concerns about negative PR
24    from J&J transferring its talc liabilities to a
25    subsidiary that then filed for bankruptcy, were
180 :1    those concerns at any point in time alleviated
2    or resolved?
3         A. I think when we ultimately decided to
4    move ahead when the LTL board approved the
5    bankruptcy and it was announced publicly, I
6    think we were prepared from a communications and
7    PR standpoint.
8         Q. And one of the things that J&J
9    communicated to the public was very clearly that
10    J&J itself had not filed for bankruptcy, right?
11         A. Yes, yes.
12         Q. And that -- and that no other J&J
13    affiliate including JJCI had filed for
14    bankruptcy, correct?
15         A. Yes.
16         Q. And J&J told the public that J&J and
17    JJCI would continue their operations business as
18    usual, correct?
19         A. Yes. And that was important to do when

20    you have retail customers expecting your
21    product. You don't want them to think that
22    there's going to be some kind of issues with
23    just the operations of the business.

**RYAN, MICHELLE** - *01/27/2022*

**Page 190**
190 :2        Q. Okay. So was this -- when you were
3    forwarded this news article, are you basically
4    finding out that somehow J&J's internal
5    discussions about Project Plato had leaked to
6    the press?
7        A. I think there was an internal -- well,
8    there was a debate whether somebody in J&J
9    leaked, which is what Scott Borup believes here
10    when he says, "I'm mystified how it leaked." Or
11    that the plaintiffs' bar was trying to get in
12    front of anything we might do and were leaking,
13    if you will, on our behalf that -- to try to
14    head us off at the pass so that --
15        Q. Okay.
16        A. -- we could not pursue this legal
17    strategy.
18        Q. To your knowledge, how would any of the
19    plaintiffs' lawyers who were handling talc cases
20    against J&J have -- have even known about
21    Project Plato before this news article on
22    July 19, 2021?
23        A. That I'm not sure of, but I know that
24    they're smart lawyers. So they knew that we
25    were running out of options and this is an
191 :1    option. And so maybe they wanted to clog up
2    that artery before we opened it up and used it.
3        Q. Okay. So you don't -- you don't have
4    any personal knowledge --
5        A. No.
6        Q. -- of how any plaintiff's lawyer
7    handling any talc cases could have found out
8    about Project Plato before July 19, 2021, right?
9        A. I do not. I have no knowledge of
10    anything like that.

**RYAN, MICHELLE** - *01/27/2022*

**Page 196**
196 :20        Why did you wait to respond to
21    Mr. Levesque until the story had been reported
22    in the media earlier that morning of July 19,
23    2021?
24        A. I believe we were waiting to be more
25    confident about that strategy of something that
197 :1    we were going to pursue, that that was a pathway
2    that we could pursue because, like I said
3    before, my concern with our credit rating agency
4    was that the bankrupting of a subsidiary would
5    be viewed as a negative. And it's why in my
6    email to Michael I ended it with I'd like to
7    understand if there is an impact on our credit
8    rating or how Moody's views J&J from a financial
9    policy perspective.
10        I viewed that it would be -- I thought
11    it would be viewed as a negative by the credit
12    agency and I did not want to alert them that we

13    were considering such a thing until I was more
14    certain that it was something that we were going
15    to pursue.
16          Once there is a story in the press
17    about it, I know they're going to call -- and I
18    think there is even an email further in the deck
19    where I -- it's Exhibit 108 where they did call,
20    and I forwarded it to the CFO and said they both
21    reached out on this.
22          So I had no choice but to now respond
23    to what was happening because they were saying
24    what's going on.

## RYAN, MICHELLE - *01/27/2022*

**Page 201**

201 :19         Q. Okay. So looking at your email from
20    July 19, 2021, at 1:59 p.m. that you sent to
21    Michael Levesque at Moody's, I want to read you
22    a sentence from your email. [As read]: We are
23    looking at a number of ways of capping our talc
24    liability, especially with the recent
25    disappointing Supreme Court inaction on our
202 :1    case.
2          Do you see that sentence?
3         A. Yes, I do.
4         Q. And was that a true statement that you
5    made to Moody's on July 19, 2021?
6         A. Yes. What I would like to say about
7    it -- I guess a couple of things. I mean --
8    I'll focus on the one.
9         A couple questions earlier around the
10    use of the word capping. Capping in the context
11    with a credit rating agency, I don't know if
12    there is actually like a legal meaning of
13    capping here.
14         But as finance professionals, capping
15    to us, what it meant, both to Moody's and to me
16    in using the word, was defining.
17         We would have a defined liability
18    because what we did not have was -- what we had
19    at this moment in time was something very
20    undefined. And when you could have Ingham-like
21    outcomes of $4-plus billion or ultimately
22    $2-and-a-half billion lottery-like outcomes,
23    then it was very detrimental to us and it was
24    creating an overhang on the company's credit
25    rating because there was such uncertainty.
203 :1         And if you go back and read Moody's
2    reports or S&P's reports, you will see that both
3    of them took our credit rating down -- not our
4    credit rating down, but they put us on negative
5    watch and the negative watch is typically the
6    step before your credit rating is reduced a
7    notch or more.
8         And in their reports they reference the
9    uncertain liability and they talk very much
10    about talc.
11         So capping in this context, really, I
12    guess I could have used a better word, but
13    capping to me and to them in our conversations,
14    it was really "we're going to have a defined
15    amount."
16         Q. Okay.
17         A. And I think -- I'm just reading what I

18    said here. Yeah.
19         So it was not meant to say we were
20    looking to put some arbitrary amount but rather
21    by doing this we could finally have a defined
22    amount.
23         Q. So you're a financial professional,
24    correct?
25         A. Yes.
204 :1         Q. Mike Levesque is a financial
2    professional, correct?
3         A. Yes.
4         Q. And the words you used were [as read]:
5    We are looking at a number of ways of capping
6    our talc liability, especially with a recent
7    disappointing Supreme Court inaction in our
8    case.
9         Do you see that?
10         A. Yes, I see that.
11         Q. Okay. And my only question for you is
12    was that statement true when you made it to
13    Mr. Levesque on July 19, 2021?
14         A. The statement is true. And what I'm
15    trying to make sure the record states is what I
16    meant by the word "capping." So -- because I
17    think different people can look at that word
18    differently.
19         So there is -- our goal was to have a
20    defined amount for the liability, and that's
21    what this would -- from a -- from a Moody's
22    perspective, having a defined amount was very,
23    very important.
24         And so it wasn't so much was it a
25    dollar, a billion, ten billion. The defined
205 :1    amount was really, really important as they look
2    at us having over $30 billion of debt
3    outstanding, a $10 billion revolver, a
4    $10 billion line of credit, and an undefined
5    liability.
6         So, yes, I used the word "capping," but
7    I just want to make sure it's clear what my
8    intent was with that word.
9         Q. Capping, by definition, means creating
10    a ceiling that you're not going to -- that
11    you're not going to go above of. I mean, the
12    word "cap," right, it's a cap on something. Are
13    you saying -- are you saying you misspoke?
14         A. I'm saying my understanding of the
15    ultimate restructuring was that we would have a
16    defined amount because the bankruptcy court
17    would ultimately define the amount that had to
18    be funded to LTL. And so there would be a
19    defined amount, and that -- so, therefore, the
20    defined amount would put a number.
21         Q. Okay. So --
22         A. I'm not sure I misspoke. I mean, I
23    think it's kind of like a step from one word to
24    the other. But they -- I guess what I'm trying
25    to say is I think it means the same thing,
206 :1    because the bankruptcy court would define the
2    amount. If you have a defined amount -- you
3    just said the definition of capping is no more
4    than; a defined amount equals no more than.
5         Q. Okay. So what you're testifying to
6    today is that what you meant to convey to
7    Moody's was that Johnson & Johnson was looking

8      at a number of ways to define the amount of its
9      talc liability, especially with the recent
10     disappointing Supreme Court inaction in the
11     Ingham case; is that correct?
12         A. That's correct. And the importance of
13     the mention of the Supreme Court again was that
14     we felt that our legal avenues were becoming
15     fewer and fewer.
16             And so leading up to the Supreme Court
17     inaction in our case, we had said to Moody's,
18     even though we had -- had to book a reserve the
19     prior year, we believed we would prevail. Once
20     we were heard at Supreme Court, our appeal would
21     win the day.
22             And with that inaction, it caused the
23     credit agency to -- to say, well, now what, and
24     now you do have lottery-like losses and this is
25     concerning to your credit rating and how will we
207 :1   get a defined amount.
2          Q. So are you saying that Johnson &
3      Johnson was concerned in July of 2021 -- I think
4      you said this earlier -- that the talc
5      litigation was potentially damaging to J&J's
6      credit rating because the amount of liability of
7      the talc litigation was undefined?
8          A. It was putting an --
9          MS. BROWN: Objection. Objection. It calls
10     for speculation.
11         THE WITNESS: Our credit rating had a
12     negative watch on it. And part of that negative
13     watch was driven by the uncertainty related to
14     talc liability and driven by -- I believe
15     Moody's put us on negative watch soon after the
16     initial Missouri decision on Ingham, the in
17     excess of $4 billion decision.
18             So clearly the talc liability was
19     having a negative implication on J&J's credit
20     rating.

**RYAN, MICHELLE** - *01/27/2022*

**Page 208**

208 :2      Q. Okay. What other factors, what other
3      things other than the undefined amount of the
4      talc litigation, to your knowledge, caused J&J
5      to have a negative watch put on it from Moody's
6      in terms of J&J's credit rating?
7          A. It was probably litigation overall.
8      But with the other major litigation item that
9      J&J had related to opioids having -- having a
10     cap, having clarity, having a defined amount,
11     really the biggest uncertainty that remained was
12     talc.

**RYAN, MICHELLE** - *01/27/2022*

**Page 209**

209 :2      Q. I think what you're testifying to right
3      now -- and you can correct me if I am wrong --
4      that J&J still has a negative watch put on it by
5      Moody's in terms of J&J's credit rating, in your
6      opinion, because of the undefined amount of the
7      talc litigation, as we sit here today.
8              Is that your testimony? Or if it's

9      different, please clarify.
10          A. I believe that at least a portion of
11     J&J's negative watch from Moody's is driven by
12     the undefined nature of our talc liability.
13     That does not mean that -- that removing that
14     negative watch was a driver in pursuing a
15     restructuring.
16          And as far as I know, the two were
17     never connected. But I was not in the room when
18     the legal strategy was developed.

### RYAN, MICHELLE - *01/27/2022*

**Page 212**
212 :17     Q. Well, when you told Mr. Levesque that
18     J&J was looking at capping our talc liability,
19     had you spoken to Michelle Goodridge, the
20     president of JJCI?
21          A. No, I had not.
22          Q. Have you ever spoken to Michelle
23     Goodridge, the president of JJCI, about Project
24     Plato?
25          A. No, I have not.

### RYAN, MICHELLE - *01/27/2022*

**Page 214**
214 :24     How would you characterize Johnson &
25     Johnson's financial condition as of October 2021
215 :1     when the LTL bankruptcy was filed?

### RYAN, MICHELLE - *01/27/2022*

**Page 215**
215 :10     THE WITNESS: I would say that Johnson &
11     Johnson Consumer, Inc., who was responsible for
12     the talc liabilities, their financial standing
13     had weakened with the Ingham verdict.
14          Our financial records, public records,
15     show that they were in the red. They were
16     negative from an income perspective the prior
17     year. So the impact of -- or the whole consumer
18     group was because of the impact of JJCI.
19          So certainly the legal liability that
20     had been incurred to date was taking a toll on
21     the financial strengths of JJCI.
22          J&J's financial position was strong.
23     But J&J didn't have an obligation to fund JJCI
24     forever, and so JJCI needed to take action.
25

### RYAN, MICHELLE - *01/27/2022*

**Page 216**
216 :5     You just said that in October of 2021,
6      J&J's financial condition was strong. Is that a
7      true statement, yes or no?
8          A. Yes.
9          Q. And how strong was J&J's financial
10     condition as of October 2021?
11          A. I'm not sure how to define -- so strong
12     is the word I used. I don't know if there's
13     degrees of strength.

14      **I think the fact that there were**
15      **billions of dollars flowing to legal costs**
16      **prevented us from being even stronger and being**
17      **able to invest in innovation, which has -- is**
18      **what has driven our company and driven the value**
19      **for our shareholders.**
20      **So billions of dollars, as shown on a**
21      **previous exhibit, prevented us from investing**
22      **further behind all of the innovations that we**
23      **create in both our pharmaceutical and medical**
24      **device and consumer businesses. So we were**
25      **strong --**
217 :1      **Q. But well, you said --**
2      **A. -- but we could have been stronger.**
3      **Q. You said --**
4      **A. There was an overhang on our stock for**
5      **a number of years as a result of the uncertainty**
6      **of litigation. There's an overhang on our**
7      **credit rating.**
8      **So I guess we were strong but could**
9      **have been stronger without the impact of -- of**
10      **the uncertainty of talc litigation.**

**RYAN, MICHELLE** - *01/27/2022*

**Page 217**
217 :13      **So not only is it your position that**
14      **the undefined amounts of J&J's talc liability**
15      **affected J&J's credit rating, but what you're**
16      **telling us today is that that liability also was**
17      **what you would term "an overhang" on J&J's stock**
18      **price; is that true?**
19      **A. That's my opinion. I don't know if**
20      **everybody in the company would agree. That's my**
21      **opinion.**

**RYAN, MICHELLE** - *01/27/2022*

**Page 218**
218 :6      **Johnson in 2021. So I just want to know why you**
7      **characterize Johnson & Johnson's financial**
8      **condition as being strong in 2021. Can you --**
9      **can you put that in any sort of monetary terms**
10      **or professional terms that are understandable?**
11      **A. $80 billion of sales and 15 to**
12      **$20 billion of cash flows is -- is a strong**
13      **business. The market cap of 4- to $500 billion**
14      **is a large business. So there were financial**
15      **metrics that show financial strengths.**

**RYAN, MICHELLE** - *01/27/2022*

**Page 218**
218 :17      **Now, a few times today you said that**
18      **the talc liabilities were the responsibility of**
19      **JJCI and not J&J. Do you recall that testimony?**
20      **A. Yes.**

**RYAN, MICHELLE** - *01/27/2022*

**Page 219**
219 :7      **Q. Who told you that JJCI was responsible**
8      **for the talc liabilities and not J&J? Who told**

9    you that?
10        A. That's the way it works. They're the
11    legal entity that is responsible for talc.
12    J&J isn't responsible for -- just like Janssen
13    Pharmaceuticals is responsible for our
14    pharmaceutical business, JJCI is responsible for
15    our consumer business.

## RYAN, MICHELLE - *01/27/2022*

**Page 221**

221 :10        Q. Okay. Do you have an understanding, as
11    you sit here today, that JJCI is legally
12    responsible for the talc liabilities and not
13    Johnson & Johnson?
14        A. It's my understanding that JJCI is
15    responsible for the talc liabilities.
16        Q. And what do you mean when you say
17    "responsible"?
18        A. That they are the legal entity that is
19    required to pay them, and if -- yes, they are
20    the legal entity responsible to pay for any --
21    any liabilities there.
22        Q. And where did you get the information
23    that you just testified to?
24        A. That's how our business is set up. So
25    that company -- the company who has
222 :1    responsibility is accountable. Like when our
2    McNeill unit had legal issues, the McNeill unit
3    was responsible and whatever legal entity
4    ultimately it reported to. So it's -- it's how
5    our corporate structure works.
6            The affiliates are responsible for
7    their liabilities, not --
8        Q. Okay.
9        A. -- the corporate structure, not the
10    corporate --
11        Q. Do you have any --
12        MS. BROWN: Let her finish her answer.
13        MR. BLOCK: Sure.
14        THE WITNESS: I just said not the enterprise.
15    BY MR. BLOCK:
16        Q. Okay. Do you have any awareness of
17    whether there's ever been a judgment, a legal
18    judgment, requiring J&J, the parent company, to
19    pay talc liabilities from particular cases. Do
20    you have any awareness about that at all?
21        A. I do not.
22        Q. Okay. Was it your understanding that
23    the Ingham judgment was against JJCI and not
24    against Johnson & Johnson, the parent company?
25        A. That was my understanding, yes.
223 :1        Q. Okay. And if a portion of the Ingham
2    judgment was against J&J, the parent company, do
3    you know why JJCI would be paying that on behalf
4    of J&J, the parent company?
5        A. I have no idea since I'm -- yeah, I'm
6    not aware of it, so I wouldn't even know to ask
7    a question about it.
8        Q. Okay. And I assume you've never seen
9    any agreement or any document that required JJCI
10    to pay any talc judgment or liabilities that
11    were against J&J, the parent; is that correct?
12        A. That's correct, I've never seen such a
13    document.

14          Q. Okay. So I think you used the words
15     "financial stress" earlier. I think you said
16     that JJCI was under financial stress before the
17     restructuring. Is that the word you used?
18          A. I believe it is, yes.
19          Q. Okay. And what is the basis for your
20     statement that JJCI was under financial stress
21     before the October 2021 restructuring?
22          A. In 2020, they reported negative
23     earnings as a result of the legal accruals that
24     were required. So that is certainly a sign of
25     financial stress for a -- for a company with
224 :1  decent size sales and operations to be negative.
2          Q. Other than your review of the 2020
3     annual reports, are there any other documents or
4     records that you're relying upon in support of
5     your statement that JJCI was under financial
6     stress as of October 2021?
7          A. No, I think that document shows it.

**RYAN, MICHELLE** - *01/27/2022*

**Page 228**
228 :24         And I think you agree with me that the
25     J&J talc-related costs and expenses in 2021
229 :1  before the bankruptcy filing were actually
2     substantially less as compared to 2020, right?
3          A. It's a function of the timing of cases.
4     It's not -- it's not -- I mean, we saw the chart
5     earlier that showed quarterly expenses and we --
6     and -- and it shows how it's zero in one quarter
7     and 700 in the next quarter.
8          So I think that just confirms that
9     there's a wild uncertainty here. And as cases
10     get settled, it causes significant volatility.
11     And these numbers as well show that when you can
12     have an asterisk on a page because one quarter
13     has no earnings on a business that probably has
14     3 billion -- it's probably on here somewhere --
15     had sales that quarter of -- I'm looking for
16     it -- the consumer group in the second quarter
17     of 2020 had sales of $3.3 billion and no income.
18          So it shows that because of the
19     volatility of legal expenses, the group income

**RYAN, MICHELLE** - *01/27/2022*

**Page 230**
230 :11         Q. All right. Now, you had said earlier
12     that you feel like these jury verdicts -- I
13     think you said wild and unpredictable; is that
14     right?
15          A. Lottery-like, unpredictable, yes.
16          Q. Okay. And did you -- did you feel that
17     there could be another Ingham verdict, that that
18     was representative of other verdicts that J&J
19     was likely to see in the future?
20          A. I'm not sure we would say anything was
21     likely, but that's why it's lottery-like.
22          I'm not likely to win the Mega
23     Millions, but it's a lottery and I could. And
24     so that's why lottery-like outcomes in
25     litigation are a big concern for us.
231 :1          So, yes, it was a possibility that we

2    could have very large and, in our view,
3    inappropriate outcomes, especially since the
4    science is on our side. We believe we should
5    win every case and certainly not lose
6    multi-billion dollars verdicts.

**RYAN, MICHELLE** - *01/27/2022*

---

**Page 231**

231 :17        Q. Okay. And it says here in the 10-Q for
18    2021 for J&J [as read]: The facts and
19    circumstances, including the terms of the award,
20    were unique to the Ingham decision and not
21    representative of other claims brought against
22    the company.
23            Do you see that?
24        A. Yes.
25        Q. And was that statement to investors, at
232 :1    least to your knowledge, true?
2        A. It's definitely true, yes.

**RYAN, MICHELLE** - *01/27/2022*

---

**Page 234**

234 :15        Q. Okay. So what you just testified to
16    there is in making the decisions that you did
17    with respect to Project Plato, you believe that
18    restructuring JJCI and LTL filing for bankruptcy
19    and resolving the case in the bankruptcy system
20    is the most fair and equitable way for J&J to
21    resolve its talc litigation; is that correct?
22        A. I think it is the most fair for all
23    parties involved, yes.
24        Q. Okay. So how did you come to that
25    conclusion that the resolution of the cases in
235 :1    the bankruptcy system, which includes staying
2    all the court cases against Johnson & Johnson
3    pending throughout the country, on what basis
4    did you conclude that the bankruptcy system was
5    better than the court system?
6        A. Because it would lead to more timely
7    and efficient settlement is what I understood.

**RYAN, MICHELLE** - *01/27/2022*

---

**Page 243**

243 :19        Q. I mean, you're an officer of Johnson &
20    Johnson, and Louise Weingrod, she's pretty high
21    level at Johnson & Johnson, right?
22        A. Yes, we're both on the staff of the
23    CFO.
24        Q. Okay. And with -- and she's saying
25    "sounding more credible?" You're saying "I
244 :1    could see this happening."
2            So it sounds to me like the two of you
3    aren't the ultimate decision makers about
4    whether to pursue Project Plato, right?
5        A. Project Plato was a legal strategy
6    predominantly, so the legal team would be the
7    one driving it. We were informing the decision.
8    Our teams were informing the decision.

**RYAN, MICHELLE** - *01/27/2022*

**Page 247**

247 :8      So is that what you believe and what
9    you believed when you were treasurer of Johnson
10    & Johnson, that the plaintiff lawyers
11    representing people who developed cancer and
12    sued Johnson & Johnson as a result of their
13    client's use of baby powder are playing the
14    lottery, in the words you used?
15      A. No, I don't think they're playing the
16    lottery. But I think it's -- our company gets
17    sued -- my opinion, I have a distaste for the
18    whole product liability system in our country
19    because I think it -- it encourages frivolous
20    lawsuits and that's -- but that's my opinion.
21    That's not the treasurer of Johnson & Johnson
22    speaking.
23      As the treasurer of Johnson & Johnson,
24    the way this is explained to me is if -- if we
25    were to go down this path, we -- we don't run
248 :1    the risk of outside verdicts any longer and we
2    can get to efficient, fair, equitable outcomes
3    for the claimants who deserve to be paid, and
4    the very volatile and un- -- undefined aspect of
5    the claims that we had been facing would go
6    away.
7      So -- so I believe that. And I believe
8    that plaintiffs' lawyers who do make a lot of
9    money in these cases saw that they might not
10    make as much money. And so that would be
11    something concerning, in my opinion, to a
12    plaintiff lawyer and why they would not want us
13    to be able to avail ourselves of this legal
14    pathway.
15      Q. You mentioned your distaste for the
16    American product liability system. Do you also,
17    quite honestly, have a distaste for the
18    plaintiff lawyers that file product liability
19    claims against Johnson & Johnson?
20      MS. BROWN: Note my objection.
21      THE WITNESS: I don't have any personal point
22    of view. I don't think I know any of them. I
23    guess today maybe I met a few, but I don't know
24    the lawyers. So it's not a personal thing.

**RYAN, MICHELLE** - *01/27/2022*

**Page 252**

252 :9      Q. All right. And is it true -- is it
10    true that you had helped draft the Project Plato
11    approval memo?
12      A. I wouldn't say I helped draft it. I
13    would say a -- and I think it was a previous
14    exhibit as well. Yeah, a previous exhibit
15    showed it being passed around the work team and
16    ultimately Duane Van Arsdale sending it to me
17    and I sent back a couple of thoughts on edits.
18      So I wouldn't say draft; I would say
19    edited a few things. And as I said earlier, I
20    edited it not with anything to do with the legal
21    plan or the restructuring itself but more around
22    structure of the documents because I'm very used

23    to receiving restructuring documents and I
24    wanted it to have the same form and substance
25    that other J&J -- my language, now I'm probably
253 :1   using legal terms there -- a similar flow, a
2    similar template, a similar flow to other J&J
3    restructuring documents.
4        Q. Okay. So let me --
5        A. And it was a basic restructuring of the
6    company.

**RYAN, MICHELLE** - *01/27/2022*

**Page 274**
274 :9       Q. And so in approving the restructuring
10    plan that you approved on October the 11th --
11    and this is Exhibit 126 -- did you hope that
12    this plan, this restructuring plan would result
13    in a situation where the liability is clearly
14    defined?
15       A. I believe that if the board of LTL
16    ultimately approved the bankruptcy, that we
17    would then -- my understanding, my
18    businessperson's understanding of the bankruptcy
19    system is that the court would then determine an
20    amount that had to be funded. And so through
21    that process, yes, we would have a defined
22    amount.

**RYAN, MICHELLE** - *01/27/2022*

**Page 275**
275 :4       Q. And you knew when you approved the plan
5    that the bankruptcy created an automatic stay
6    would stop the litigation with regards to the
7    state court jury system, correct?
8        MS. BROWN: Objection, calls for speculation,
9    lacks foundation.
10       THE WITNESS: I understood the stay because
11    that was part of it. I didn't understand all
12    the mechanisms of it. I just knew that for a
13    period of time cases would be stopped while the
14    bankruptcy court kind of organized itself and
15    determined the path forward for the cases.

**RYAN, MICHELLE** - *01/27/2022*

**Page 296**
296 :6       Q. When did you hear, if you did hear,
7    that it looks like the spinoff is going to be a
8    go?
9        A. Our board formally approved it in
10    October and I think probably after -- in about
11    -- throughout this year it started to become
12    more and more probable that it would happen.
13       Q. When you say "this year," do you mean
14    2022 or --
15       A. 2020 -- I'm sorry, 2021.
16          Throughout 2021, as we had more
17    conversations internally and conversations were
18    had with our board, there seemed to be growing
19    acceptance or growing alignment that this was --
20    this was a good course of action for us.
21       Q. Do you have an understanding as to why
22    it was believed within J&J that this was a good

23    course of action?
24        A. Well, I think this document, although I
25    don't have it all totally known, but right there
297 :1  [as read]: The separation designed to enhance
2     operational performance and strategic
3     flexibility, benefiting patients and consumers
4     and unlocking value for all stakeholders.
5         So it was a strategic decision as our
6     innovative healthcare businesses in
7     pharmaceuticals and medical device have really
8     gone down a different path. I mean, 30 years
9     ago pharmaceuticals were mainly chemical drugs
10    and our consumer business had a -- had -- a
11    pretty large portion of that was OTC drugs. So
12    there were synergies there.
13        But our pharmaceutical business has
14    gone more and more toward biologics and things
15    like that. And the synergies that exist between
16    the two businesses have become much less and the
17    -- just the overall business models have really
18    diverged. And so it was a belief that
19    separation was best for both companies and would
20    lead to the best outcomes ultimately for our
21    shareholders as well.

**RYAN, MICHELLE** - *01/27/2022*

**Page 298**

298 :12        Q. Was one of the purposes of the
13    corporate restructuring formation of LTL and
14    capping talc liabilities, in part, to enhance
15    the value of the global consumer business?
16        A. No, no, not at all. It -- because
17    really J&J had choices on how to manage the talc
18    liability, and so it was -- again, they were two
19    irrespective pieces.
20        So, no, it wasn't -- it -- the -- the
21    restructuring and LTL and, you know, what it
22    ultimately -- would we have -- would LTL be
23    bankrupt, that was not part of any of the
24    discussions that we had as we talked about the
25    separation of consumer.

**RYAN, MICHELLE** - *01/27/2022*

**Page 299**

299 :7        Q. In your email to Moody's, you know, you
8     state that you're looking at number -- numerous
9     ways of capping our talc liability and then you
10    described the one option.
11        But what are the other options being
12    considered?
13        A. We really didn't have other options at
14    that time that I was aware of. So I think it
15    was my way of kind of stepping into this
16    discussion with him. But this was -- this was
17    the only option that I had been made aware of
18    other than continuing in the court system that
19    we felt was -- was not a worthy option.

**RYAN, MICHELLE** - *01/27/2022*

**Page 302**

302 :20        Q. Going back to the spinoff that we just

21    looked at, the announcement of the spinoff, do
22    you think that would have been possible if talc
23    liabilities were still allocated to JJCI?
24        MS. BROWN: Lacks foundation, calls for
25    speculation.
303 :1        THE WITNESS: I don't know because that
2    wasn't the case.
3    BY MR. KAHN:
4        Q. Okay. Would capping the liabilities
5    for talc, in your mind, enhance the value of new
6    JJCI?
7        MS. BROWN: Lacks foundation, calls for
8    speculation.
9        THE WITNESS: A defined liability would --
10    would certainly help in defining the value of
11    any company. So it -- having -- having a
12    defined liability -- you say capped, I say
13    defined -- it helps to understand the value of a
14    company. When it's an undefined amount, it's
15    very difficult to say what is the company worth.
16    BY MR. KAHN:
17        Q. All right. So it would make it a more
18    attractive investment?
19        A. It may not. That all depends. If the
20    bankruptcy court comes back and were to say it's
21    a $50 billion liability, then that may not make
22    it a more attractive company.
23        Q. All right. Looking at just the day
24    before this corporate restructuring occurred,
25    did J&J have any difficulty meeting its debts
304 :1    when due?
2        A. The phone broke up. The day before did
3    J&J what?
4        Q. Have difficulty meeting its debts when
5    due?
6        A. No, Johnson & Johnson did not have any
7    issues servicing its debt.
8        Q. Did it have any overdue debts?
9        A. Not that I was aware of, certainly
10    nothing intentional.
11        Q. Had it defaulted on any debts at that
12    time?
13        A. No.
14        Q. Did it have any difficulty raising or
15    borrowing money?
16        A. No.
17        Q. Did it have impaired access to capital
18    markets?
19        A. No.
20        Q. Now, I want to ask you the same
21    yes-or-no type questions as to JJCI.
22        As of the day before the corporate
23    restructuring, did JJCI have difficulty meeting
24    its debt when due?
25        A. Not that I was aware of.
305 :1        Q. Did it have any difficulty -- or strike
2    that.
3        Did it have any overdue debts?
4        A. JJCI wouldn't have debt because we --
5    our U.S. affiliates don't have access to capital
6    markets; the corporate enterprise does. So they
7    wouldn't have debt. They might have accounts
8    payable through their vendors, but they wouldn't
9    have debt.
10        Q. Are you aware of whether it had any

11  overdue accounts with its vendors?
12     A. Only something that was unintentional
13  where something got hung up in the accounts
14  payable department for some reason.
15     Q. All right. But not as a result of an
16  inability to pay?
17     A. That's correct, not that I was aware
18  of.
19     Q. And I think you said it had no debts
20  because that would be on the corporate -- or the
21  J&J level, correct?
22     A. Yes.
23     Q. And it would not have difficulty
24  raising or borrowing money because that would be
25  at the J&J level?
306 :1     A. That's right, it wouldn't. That's not
2  an entity that would do that.
3     Q. And the same would be true as to access
4  to capital markets, that would be on the J&J
5  level --
6     A. That's correct.
7     Q. -- not the JJCI?
8     A. Correct.
9     Q. Now, I think you said this before, I
10  just want to make sure.
11        Do you know whether any J&J entity
12  prepared or had prepared on its behalf analysis
13  of the fair market value of JJCI?
14     A. I had not seen any analysis calculating
15  the fair value of JJCI.
16     Q. Okay. It may have occurred, it may not
17  have occurred, you just haven't seen it?
18     A. Yeah, I don't know who would have done
19  that, though. So I would be surprised if it was
20  done, but I definitely have not seen it if it
21  was done.
22     Q. Have you ever heard of anybody
23  preparing an estimate, either draft or
24  otherwise, of the value of current talc claims?
25     A. I have not seen any analysis or
307 :1  valuation of the current talc liability.
2     Q. Have you heard that anybody has
3  prepared an estimate, either draft or otherwise,
4  of the value of future talc claims?
5     A. I have not heard of that or seen that.

**RYAN, MICHELLE** - *01/27/2022*

**Page 308**
308 :8        In the ordinary course would J&J be the
9  entity that would cut any settlement check or
10  any check to satisfy a judgment?
11     A. The check would come out of the J&J
12  kind of central account, but the accounting
13  would then drive the costs back to the
14  responsible entity.
15        So in this case, the check may come
16  from a Johnson & Johnson account, but the
17  accounting would push the expense or the -- you
18  know, the cash outflow back to JJCI.
19     Q. It would show it as an expense of JJCI?
20     A. JJCI, yes.

## WONG, ARTHUR

**WONG, ARTHUR** - *02/11/2022*

**Page 11**

11 :5          Do you understand that
6     Johnson & Johnson recently undertook a
7     corporate restructuring that resulted in
8     creating a new company called "Legacy Talc
9     Litigation?" Or LTL?
10          A. Yes.
11              MR. STARNER: Objection --
12              MR. SHAPIRO: And do you
13      understand --
14              MR. STARNER: Objection.

**WONG, ARTHUR** - *02/11/2022*

**Page 11**

11 :24          Q. And do you understand that
25     Johnson & Johnson then placed LTL into
12 :1     bankruptcy?
2          A. Yes.
3          Q. And did you learn all of that in the
4     course of your duties at Standard and Poor's?
5          A. Yes.

**WONG, ARTHUR** - *02/11/2022*

**Page 13**

13 :19          Q. Did the company share with you its
20     estimate of the talc liability?
21              MR. STARNER: Objection. Lacks
22      foundation. Speculative.
23          A. No. Not that I can recall, in terms
24     of an updated estimate.
25          Q. And what do you mean when you refer
14 :1     to an updated estimate?
2          A. Well, I guess when they initially
3     announced and proposed this thing, they had an
4     amount that they were going to put in.
5     Though, it was understood by us that it could
6     change, based on further negotiation and what
7     the judge decides.
8          Q. What did the company tell you --
9     well, and when was that conversation when the
10     company discussed with you what its estimate
11     of the potential liability was?
12              MR. STARNER: Objection.
13      Mischaracterizes his testimony.
14          A. Originally, the -- the discussion
15     started back in October, when we took the
16     initial call. And JNJ shared their plans with
17     us for the -- for the process.
18              At that time, we had asked if -- if
19     there was a possibility of if this number
20     could increase. And they said yeah, it can
21     still -- I mean, this was the initial number
22     of the estimate, and it could still increase
23     to what -- you know, it was speculation at
24     that point.
25              We didn't receive any updated
15 :1     estimate since then.

2        Q. What was the company's initial
3    estimate of its talc liability when you had
4    that meeting in October?
5            MR. STARNER: Objection.
6        Mischaracterizes the testimony. Lacks
7        foundation.
8            Go ahead.
9        A. I believe we were looking at -- I
10   guess it's in my notes, that we -- we
11   discussed internally, after our initial call
12   back in October with JNJ.
13           I believe it was -- it was anywhere
14   from $2 billion to $5 billion was the original
15   estimate that it could be.
16       Q. I understand. And -- and who from
17   JNJ provided that estimate to you in October?
18       A. The treasurer, Michelle Ryan.

## WONG, ARTHUR - *02/11/2022*

**Page 18**
18 :7        Q. Oh. Sorry. Sorry. What is your
8    current role at S&P?
9        A. I'm a Senior Director at S&P. And I
10   serve as the Sector Specialist for the
11   healthcare team.
12       Q. And what are your responsibilities
13   in that role?
14       A. My role is to support the different
15   various healthcare franchises on the
16   healthcare team. Such as pharmaceuticals;
17   healthcare services; medical devices. And I
18   serve as a point person for, I guess, the
19   outreach.

## WONG, ARTHUR - *02/11/2022*

**Page 19**
19 :5        Q. And do you have responsibility for
6    covering Johnson & Johnson?
7        A. Currently as a backup analyst. Yes.
8        Q. And who are you the backup analyst
9    to?
10       A. I'm a backup analyst to the primary.
11   In the case of Johnson & Johnson, it would be
12   David Kaplan.
13       Q. I see. And when did you become the
14   backup analyst for Johnson & Johnson.
15       A. When I took on my new role as the
16   Sector Specialist, I believe back in 2018.
17       Q. I see. So, since 2018, you've been
18   the backup analyst for Johnson & Johnson?
19       A. Yes.
20       Q. And was Mr. Kaplan the primary
21   analyst throughout that whole period? Or was
22   there someone else before Mr. Kaplan?
23       A. No. It was David Kaplan, since
24   then, who has been the primary?
25       Q. And what are your responsibilities
20 :1    as the backup analyst for Johnson & Johnson?
2        A. As the backup analyst, I serve as
3    the point of contact for the company, or for
4    investors, in case David Kaplan is not
5    available.

6          And I attend the management
7     meetings, and will be up to speed on
8     Johnson & Johnson. Although I'm not
9     responsible for day-to-day coverage of it.
10    I'm responsible in terms of being familiar
11    with the credit.
12         Q. And in 2020 and in 2021, who were
13    the people that you communicated with at
14    Johnson & Johnson, in your role as the backup
15    analyst?
16         A. It was mainly with Michelle and
17    Duane.
18         Q. Got it. And that's
19    Duane Van Arsdale?
20         A. Yes.
21         Q. And when you participated in
22    conversations with Michelle Ryan and
23    Duane Van Arsdale, how did you record those
24    conversations?
25              MR. STARNER: Objection.
21 :1       A. Usually, well, through our notes.
2          Q. And when you saw "through our
3     notes," does the company have a note-taking
4     system?
5          A. For S&P? No. It's -- we take our
6     notes -- management meeting notes, we call
7     them. And then we scan them in and file them.
8          Q. And you -- they are called -- did
9     you say they are called "management meeting
10    notes?"
11         A. Yes.
12         Q. And did you take management meeting
13    notes any time you spoke to Michelle Ryan or
14    Duane Van Arsdale?
15         A. Usually, yes.
16         Q. And then you said that you scan them
17    into a system at S&P?
18         A. Yes.
19         Q. And what system is that?
20         A. It's -- we used a box, where we have
21    individual folders for each company. And
22    that's where we filed our -- our notes.
23         Q. Okay. And the practice that you
24    described was the practice that you always
25    followed, in the ordinary course of business,
22 :1       when you spoke to a JNJ representative?
2          A. Yes.
3          Q. And was it your understanding that
4     other analysts within the healthcare group at
5     S&P also followed that practice when they
6     spoke to corporate representatives?
7          A. Yes.
8              MR. STARNER: Objection.
9         Vague.

---

**WONG, ARTHUR** - *02/11/2022*

**Page 23**
23 :20      Q. Okay. Let me -- let me mark as --
21    or let me show you what's been previously
22    marked Exhibit 386. If the videographer could
23    help us with that?
24             Mr. Wong, take your time to
25    scroll through these notes. And then I'll ask
24 :1       you questions about them.

2          A. Okay. Thank you.
3              [Witness perused document.]
4          Q. I'll let you -- you might want to
5     focus your attention -- if you scroll back up,
6     there is a section called "Item 2: Cordoning
7     off of Talc Liabilities -- Strategy on Hold."
8              Let me -- I will represent to
9     you that earlier today, Mr. Kaplan said that
10    these were notes that he prepared in
11    preparation of an internal discussion about
12    these topics.
13             And my question for you is, do
14    you recall participating in an internal
15    meeting where these topics were discussed?
16         A. I do not. Actually, I don't -- I'm
17    thinking I may have missed -- I may have been
18    out on this day for this meeting.
19         Q. Okay. Does the material described
20    in item two refresh your recollection about a
21    conversation with Michelle Ryan, or others at
22    Johnson & Johnson, about the bullet points
23    listed in item two?
24             MR. STARNER: Objection.
25         A. It does. This reminds me -- it's
25 :1   similar to the conversation I had with her in
2     October, I believe, when David was out. And
3     this is similar to what we've -- what we've
4     discussed.
5          Q. And which of the items described in
6     item two here, did Ms. Ryan talk to you about
7     in October?
8              MR. STARNER: Objection.
9          A. Let's see. I think pretty much all
10    five points we had chatted about. That this
11    was -- this was what the plan was.
12         Q. And let me ask you, with respect to
13    the fifth bullet point, where Mr. Kaplan's
14    notes describe the objectives of the strategy.
15    Do you see that?
16         A. Yes.
17         Q. Can you tell me what Ms. Ryan said
18    to you about those three points, in
19    particular?
20             MR. STARNER: Objection. Lacks
21    foundation. Calls for speculation. And
22    mischaracterizes testimony.
23         A. I think it's -- I think it properly
24    summarizes what -- I had chatted with her in
25    October. I took some notes from the October
26
26 :1   discussion. So I think these points were
2     reflected in my notes as well.
3          Q. Okay. And I think we'll come to
4     those notes. But just so that the record is
5     clear, did she explain to you that the company

Page 27

27 :25        Q. Got it. And did Ms. Ryan describe
28 :1   to you, in that October meeting, that the
2     company's talc strategy would reduce the
3     exposure for punitive damages?
4              MR. STARNER: Objection.
5          A. That, I -- that, I don't recall. I

6    mean, I -- it was -- it was understood that it
7    was to limit the total number of damage --
8    amount of damages, and the amount that JNJ
9    could be exposed to.


**WONG, ARTHUR** - *02/11/2022*

**Page 30**

30 :2       Q. So let me show you what's been
3    previously marked as Exhibit 388.
4              [Witness perused document.]
5       Q. Mr. Wong, if you look at the first
6    calendar invite, it refers to an
7    October 14th meeting with Michelle Ryan.
8              Do you see that?
9       A. Yes.
10      Q. And is that the meeting you're
11   recalling, where Ms. Ryan provided you with
12   the $2 billion to $5 billion estimate?
13      A. Yes.


**WONG, ARTHUR** - *02/11/2022*

**Page 31**

31 :21      Q. And if we turn to the next email,
22   which I guess is not a calendar invite, but
23   it's next in time, it's an email from you, at
24   5:27 p.m., to your team.
25             Do you want to scroll to that?
32 :1   It's the document Bates stamped "692" at the
2    bottom. And you write:
3              "Hi everyone,
4              We had an update call with JNJ
5    this morning on the talc
6    litigation/settlement.
7              Below are the links to the
8    discussion notes/recommendation and the latest
9    projections."
10             Do you see that?
11      A. Yes.
12      Q. And does the first link refer, or
13   link to your notes of the meeting with
14   Michelle Ryan?
15      A. I believe the second one does.
16      Q. The second one does.
17      A. Yes.
18      Q. Okay. And what does the first link
19   refer to?
20      A. I believe that's the memo I created
21   from the notes, just to summarize the points
22   and to share with everyone where we last left
23   off in terms of our thinking on JNJ's rating.
24             And how does this move -- may
25   potentially affect the ratings.
33 :1   Q. Okay.
2    A. And how --
3       Q. And I'm going to show you some notes
4    that we received. And I'm going to ask you
5    whether those documents are the notes or memo
6    that these links relate to. And I'll do that
7    in a few moments.
8              But, before I do that, the
9    links on this -- in this email, in
10   Exhibit 388 -- the links to the notes and the

11   memo, are those examples of the notes that you
12   would prepare in the ordinary course of your
13   work at Standard and Poor's, and then maintain
14   in the box system, as you described at the
15   beginning of the deposition?
16      A. You mean, are these notes like
17   examples of what we keep in our box?
18      Q. Yes.
19      A. Yes.
20      Q. And the notes that you made of your
21   conversation with Michelle Ryan are the kinds
22   of notes that you make with corporate
23   representatives in the ordinary course of your
24   work at Standard and Poor's. Correct?
25      A. Yes.
34 :1      Q. And the same is true of the memo?
2      A. Yes. That memo would document our
3   internal discussions, in terms of what we were
4   trying to decide what to do with the rating or
5   outlook -- if we do, in fact, do something
6   with the rating or outlook.

**WONG, ARTHUR** - *02/11/2022*

**Page 34**
34 :22      Q. Let me show you what we've
23   previously marked as Exhibit 389.
24         [Witness perused document.]
25      Q. Tell me when you've had a chance to
35 :1   look at all of it, Mr. Wong.
2      A. Oh, I'm sorry. I wasn't sure if you
3   were waiting for me to -- yeah. I created
4   this document. That's the link to -- this is
5   one of the documents that was in the -- that
6   was linked to -- for our internal discussion.
7      Q. Got it. And which of the two
8   documents is this? Is this your notes of the
9   meeting? Or the memo you created from your
10   notes of the meeting?
11      A. This is the memo I created from the
12   notes of the meeting. And this is my -- my
13   summary of the discussion. And then my
14   summary of the background of -- of where we
15   see Johnson & Johnson's rating and outlook.
16      Q. Okay.
17      A. And then I make a recommendation as
18   to the internal group, what I felt we would --
19   how -- how our reaction would be, in terms of
20   from a ratings and outlook perspective.
21      Q. And did you create this on
22   October 14th?
23      A. Yes.

**WONG, ARTHUR** - *02/11/2022*

**Page 36**
36 :1      Q. Okay. You created this soon after
2   your meeting with Michelle Ryan. Correct?
3      A. Yes. Yes. And the time since the
4   discussion with Michelle, and the actual
5   meeting -- internal meeting. This is when I
6   created this.

**WONG, ARTHUR** - *02/11/2022*

**Page 39**

39 :1      Q. Got it. Okay. And at the bottom of
2    the page, you wrote -- LTL:
3        "JNJ to commit to funding LTL
4    additional monies when ultimate litigation
5    amount is decided by Federal Court, roughly
6    six to 12 months, estimating roughly
7    $5 billion in total (so another $3 billion in
8    funding?)"
9        Do you see that?
10    A. Yes.
11    Q. And that reflects what Michelle Ryan
12    explained to you?
13    A. Yes. That was just --
14        MR. STARNER: Objection.
15        THE WITNESS: Sorry.
16        MR. STARNER: Okay.
17        THE WITNESS: Yeah. That was
18    just from the conversation with her.
19    Because when we initially discussed the
20    $2 billion, our follow-up question was,
21    could this go higher.
22      And that was just a number that was
23    put out there in our discussion. So we
24    included it in our discussion.
25    BY MR. SHAPIRO:
40 :1      Q. And Ms. Ryan explained to you that
2    Johnson & Johnson thought that they could
3    resolve the talc liabilities in the Bankruptcy
4    Court within six to 12 months?
5        MR. STARNER: Objection.
6    A. Yes. If this was approved by the
7    judge.
8    Q. And she explained to you that their
9    current estimate was $5 billion in total?
10        MR. STARNER: Objection.
11    A. She -- yeah. I mean, that was the
12    amount that it could -- she was just trying to
13    give us an idea of how much further it can go
14    up.
15    Q. From the $2 billion?
16    A. Right.
17    Q. Got it. I will ask the court
18    reporter to show you a document that's been
19    previously marked "390."
20    A. Right. This is the -- these are my
21    notes from the discussion with her.
22    Q. Okay. So these are the notes that
23    you literally made while you were talking to
24    her?
25    A. Yes.

**WONG, ARTHUR** - *02/11/2022*

**Page 47**

47 :8      Q. Okay. And you were asked some
9    questions about estimates and initial numbers.
10    I just want to make sure that the record's
11    clear.
12        In your discussions with
13    Johnson & Johnson in this period of time, the

14    estimates related to talc liability was in the
15    context of resolving the talc liability and
16    the bankruptcy. Right?
17        A. Right. Right. That number would
18    be -- if that was agreed upon, that would be
19    the number in the vehicle, which would be --
20    which would go into bankruptcy.
21            But that would be the amount that
22    was -- that would have been negotiated, and be
23    the total -- the ultimate settlement.
24        Q. You weren't discussing any estimates
25    with Johnson & Johnson about the cost of
48 :1    litigating the talc claims outside of
2    bankruptcy, at this point in time; were you?
3        A. No.
4        Q. Okay. And the discussion around the
5    2 billion-dollar number. Did you understand
6    that that was an amount of money that
7    Johnson & Johnson had -- had agreed to
8    initially fund as part of the bankruptcy
9    process?
10        A. Yes. My understanding was, that was
11    the amount that was going to be in the
12    proposal.
13        Q. But you understood that was an
14    initial amount. Correct?
15        A. Right. Right. Initial amount which
16    then would be negotiated upon.
17        Q. And you understand any ultimate
18    settlement or resolution of the talc claims in
19    bankruptcy would be a product of negotiations?
20            Is that right?
21        A. Right.
22        Q. And the Court would ultimately have
23    to sign off any ultimate settlement in
24    bankruptcy. Is that right?
25        A. Right.

**WONG, ARTHUR** - *02/11/2022*

**Page 50**
50 :24            In your conversations with JNJ
25    in this period of time, they were -- they were
51 :1    relaying to you an estimate of what they
2    thought it would potentially take to settle
3    talc litigation in the bankruptcy. Right?
4        A. Correct.
5        Q. And at no point in time were you,
6    you know, talking to the company about any
7    estimate about what it would, you know,
8    potentially cost to litigate all these claims
9    out of bankruptcy. Right?
10        A. No. No. There wasn't any estimate
11    that was talked about. But that would be one
12    of the savings of going through with this
13    process as well.
14        Q. Right. You would avoid what could
15    potentially be a significantly higher risk of
16    litigating these cases outside of bankruptcy.
17    That's one of the benefits. Right?
18        A. Right. Right.

**WONG, ARTHUR** - *02/11/2022*

Page 51

51 :21          You've done some work in this
22    space about, you know, estimating what
23    potentially could be, you know, the cost of
24    talc liability and litigating talc claims.
25    Right?
52 :1          A. We have an idea that it could be
2    significant to defend all these cases. Just
3    being familiar with other litigation that
4    happens in the industry.
5          So while we didn't talk about a
6    specific number, we do understand that, you
7    know, even if -- even if a company wins, the
8    cost of litigation is -- could be significant.

**WONG, ARTHUR** - *02/11/2022*

Page 55

55 :16          Q. Okay. And there is a reference
17    there to a number of claims and time period
18    involved. What was your understanding of
19    what -- well, strike that.
20          What were you referring to
21    there, when you say "number of claims and time
22    period involved?"
23          A. It's -- I guess the number of claims
24    was just looking at the schedule of upcoming
25    trials. And that -- and that there could be
56 :1    just a number of claimants that were -- that
2    were growing.
3          And, also, looking at how -- I guess
4    the protracted process of going through them,
5    you know, individually. That this was going
6    to stretch out over a long period.
7          That's -- that's why it made more
8    sense, from a pragmatic standpoint, to do
9    this -- this -- this process.
10          Q. And you understood there was tens of
11    thousands of plaintiffs in claims, that were
12    currently pending against JNJ? Is that right?
13          A. Right.
14          Q. And you understood it would
15    potentially take, you know, an extremely long
16    period of time to litigate all those claims in
17    court?
18          A. Right. That's the understanding as
19    to just having that negative headline and
20    negative -- the uncertainty continue to be --
21    to stretch out over years for
22    Johnson & Johnson.
23          Q. And you understand that's one of the
24    reasons why Johnson & Johnson pursued this
25    restructuring, and ultimately put this
57 :1    subsidiary into bankruptcy? Is that
2    consistent with your understanding?
3          A. Right. That's -- that this choice
4    was, I guess -- again, a pragmatic choice.

**WONG, ARTHUR** - *02/11/2022*

Page 57

57 :17      Q. So, Mr. Wong, if you look at this
18      first page here, this is something entitled,
19      "The Unpredictable Cost of Latent
20      Catastrophes." Do you see that?
21      A. Right.

**WONG, ARTHUR** - *02/11/2022*

**Page 58**

58 :8      And you see the primary credit;
9      you see Patricia Kwan? Do you see that name?
10      A. Oh, yes. I'm sorry. This is from a
11      while back. Sorry.
12      Q. Okay. And do you see your name
13      there as secondary contacts? You see your
14      name listed there?
15      A. Right.
16      Q. Okay. Do you recognize this
17      document now?
18      A. I do. Can't say I'm up-to-date on

**WONG, ARTHUR** - *02/11/2022*

**Page 58**

58 :20      Q. Okay. Generally, what's your --
21      what's your understanding of kind of what this
22      document is?
23      A. I believe it's a document that talks
24      about litigation in general. If I remember
25      correctly, I was contacted just to talk about
59 :1      just large litigations that we have come
2      across.

**WONG, ARTHUR** - *02/11/2022*

**Page 59**

59 :22      Q. And just to be -- and just so that
23      we orient -- orient ourselves, do you recall
24      when this publication was released by S&P?
25      A. I believe two or three years ago.

**WONG, ARTHUR** - *02/11/2022*

**Page 60**

60 :12      Q. Okay. If you look at the very top
13      of the document, Mr. Wong, you'll see a date.
14      Maybe we can take a look at that and see if
15      that's consistent with your understanding.
16      A. All the way at the beginning? Yeah.
17      Okay. I'll just go.
18      Q. Do you see --
19      A. Yes.
20      Q. Is it June 3rd 2019? Do you see
21      that?
22      A. Yes.
23      Q. Okay. Is that consistent with your
24      recollection of when this was published?
25      A. Yes. I mean, I know it was -- at
61 :1      least a couple years ago.
2      Q. Okay. And is this something that
3      S&P, you know, does, kind of in the ordinary
4      course? They publish articles like this?
5      A. Yeah. We do. When we think

6    there's -- there's a credit story to talk
7    about.
8        Q. And is this kind of like a research
9    report you issued to the market, to, you know,
10   talk about relevant, you know, credit issues?
11       A. Yes.
12       Q. Okay. How often would you say that
13   you've been involved with publishing a report
14   like this?
15       A. Since I started with S&P, 23 years
16   ago.
17       Q. Sure. Is that a lot? Is that what
18   you can tell me?
19       A. Yeah. I mean, when we feel like we
20   have something to say, we go out there with
21   these -- we would call them commentaries.
22       Q. Yeah. I just want to confirm that
23   this type of commentary is something that's
24   fairly typical when it's done in the ordinary
25   course.
62 :1            Is that fair?
2        A. Yes.

## WONG, ARTHUR - *02/11/2022*

**Page 63**

63 :15       Q. Okay. Do you know who -- this
16   entity called "Praedicat?" I mean, have you
17   heard of them?
18       A. I -- I don't recall, actually.
19       Q. Okay. Were you aware that S&P had,
20   you know, engaged with a kind of data
21   analytics company to look at, you know,
22   potential losses associated with talc
23   litigation?
24       A. No, I wasn't.
25       Q. Okay. Do you recall being aware
64 :1    that they had done some work, and, you know,
2    applied certain scenarios in estimating
3    potential damages associated with talc
4    litigation?
5        A. No.
6        Q. Okay. And looking at, you know,
7    their kind of estimate of, you know, a damages
8    scenario, that could potentially result in,
9    you know, $84 billion of exposure.
10           Is that something that you were
11   aware that, you know, Ms. Kwan had, you know,
12   helped -- you know, had pulled together and
13   included in this commentary?
14       A. You know, I don't remember.
15       Q. Okay. But this is something you
16   would -- again, this is something that S&P,
17   you know, publishes to the market on a kind of
18   regular basis. And so, they are very --
19   regular basis. Right?
20       A. Yeah. This is -- yeah. We would
21   do -- again, we would do commentaries on a
22   regular basis, when there is -- when we
23   believe there is, I guess, a demand for it.
24           So, the amount that you're referring
25   to -- $84 billion -- I mean, it's -- it's
65 :1    speculative, in terms of the amount. But
2    compared to prior litigations, it's not -- I
3    mean, it's a large amount, but it's not

4      something that, you know, just goes to the
5      unpredictability of the -- of the process.
6          Q. So you're saying that the estimate
7      of potential damage in the amount of
8      $84 billion just reflects how, you know,
9      uncertain the talc litigation could be, going
10     forward, if you litigated it?
11             Is that what you're -- is that
12     fair?
13         A. Yeah. I think that's fair. I mean,
14     again, we understand each litigation and the
15     merits of the litigation are different. But,
16     no one has seen numbers like this with other
17     litigation.
18         Q. And when S&P would put out a
19     commentary like this, they would certainly
20     ensure to make sure that what they are
21     including in the commentary, you know, is kind
22     of accurate and fairly represents the correct
23     information. Right?
24         A. Right. I mean, it just gives -- it
25     gives some perspective as to how -- to the
66 :1   readers. Gives some perspective as to how
2      high some of these numbers can get with
3      litigation, and how unpredictable it could be.
4              Which is what we're trying to write
5      about. It's just the uncertainty, from a
6      credit perspective.
7          Q. And from that perspective, do you
8      understand the $84 billion to be, you know,
9      kind of a worst case scenario, or something
10     that is, you know, a potential -- while maybe
11     not as likely, but still a potential risk in
12     connection with the talc litigation?
13         A. Right. That's why we had published
14     that -- went out with this number.

## WONG, ARTHUR - *02/11/2022*

**Page 67**

67 :3      Q. First, S&P didn't change
4      Johnson & Johnson's Triple A rating after
5      publishing this article. Correct?
6          A. No. We didn't change the -- the
7      rating. It still remained Triple A.

## WONG, ARTHUR - *02/11/2022*

**Page 71**

71 :14     Q. So, Mr. Wong, take a look at this.
15     This is an email dated October 18th 2021.
16     We've marked it as Exhibit 404. And it's
17     Bates stamped "SPGI759_001" through "002."
18             And if you scroll down to the
19     second email, you'll see an email from you to
20     Ms. Ryan and Mr. Van Arsdale, on
21     October 15th?
22             And if you take a look at that,
23     in your email, you say:
24             "Just a quick
25     question/clarification. What if the Federal
72 :1   Court comes back with a really high settlement
2      number? Can JNJ back out?"
3              Do you see that?

```
     4          A. Yes.
     5          Q. Okay. Let's scroll up, if you
     6     would? And this is Mr. Van Arsdale, from
     7     Johnson & Johnson, responding to your email.
     8              Do you see that?
     9          A. Right.
    10          Q. Okay. And he says:
    11              "Hi Arthur,
    12              To your question below, the
    13     ultimate determination of the value of the
    14     trust will be resolved via negotiations
    15     between the parties or an estimation before
    16     the Bankruptcy Court.
    17              The parties have the ability to
    18     appeal any bankruptcy plan, including values
    19     to the District Court, so JNJ can't back out
    20     of the bankruptcy process for this reason, but
    21     has the ability to influence its outcome in a
    22     more reasonable manner."
    23              Do you see that?
    24          A. Right.
    25          Q. So you understood that
73 :1     Johnson & Johnson could not back out?
     2          A. Yeah. I apologize. I got the
     3     timing and understanding incorrect.
     4          Q. That's okay. We've got lots of
     5     documents. That's all good.
     6          A. Right.
     7          Q. So does this accurately reflect kind
     8     of what Johnson & Johnson's response to your
     9     question was, as to whether or not they could,
    10     you know, back out of the bankruptcy process?
    11          A. Right. No, I think it clarified for
    12     us that -- I think for us, that it was trying
    13     to understand if a number came back, was that
    14     final. And JNJ would just have to accept that
    15     much higher number than what was -- you know,
    16     what JNJ originally thought it would look to
    17     settle for.
    18          Q. So you understood that
    19     notwithstanding, you know, the kind of general
    20     estimate we talked about earlier for
    21     settlement and bankruptcy, the ultimate
    22     settlement number is still to be determined,
    23     and it will be subject to the process in the
    24     bankruptcy court. Right?
    25          A. Right.
```

WONG, ARTHUR - *02/11/2022*

**Page 76**

```
76 :20              Do you have any knowledge of
    21     what JNJ told the S&P group was JNJ's
    22     projections of the amount of money that it
    23     would take to resolve JNJ's current and future
    24     talc cases, before the bankruptcy filing?
    25              MR. STARNER: Objection.
77 :1          A. No. I don't -- I don't believe I --
     2     we have anything in our -- we've been given
     3     any upper amount, in terms of how much it
     4     would ultimately cost.
```

# WUESTHOFF, ROBERT

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 7**

| | |
|---|---|
| 7 :18 | reporter will now swear in the witness. |
| 19 | ROBERT WUESTHOFF, |
| 20 | called as a witness, and having been first duly |
| 21 | sworn, was examined and testified as follows: |

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 17**

| | |
|---|---|
| 17 :8 | Q: Okay. When said -- I think you said |
| 9 | then -- after the Enterprise Acceleration, you |
| 10 | said then this assignment. When you say 'this |
| 11 | assignment,' what do you mean by that? |
| 12 | A: It's probably not the right |
| 13 | characterization, but this opportunity, this role |
| 14 | was presented to me and -- and then I accepted |
| 15 | it. |
| 16 | Q: And when you say 'this role,' what do |
| 17 | you mean by that? |
| 18 | A: The role of being president of LTL. |
| 19 | Q: Okay. |
| 20 | A: And president of Royalty A&M. |
| 21 | Q: Okay. And when were you first |
| 22 | approached to take those roles? |
| 23 | A: Late September. I believe September |
| 24 | 28th. |
| 25 | Q: And who approached you -- let's just |
| 18 :1 | back up. |
| 2 | Up until September 28th, you were |
| 3 | more or less happily doing your Enterprise |
| 4 | Acceleration job? |
| 5 | A: Yeah. I was -- I was doing it. I |
| 6 | think doing a good job at it. Yes, that's |
| 7 | correct. |
| 8 | Q: Okay. Okay. I'm sure you were. |
| 9 | And then on September 28, who |
| 10 | approached you about this new role? |
| 11 | A: Michael Ullmann. |
| 12 | Q: Okay. And who was he? |
| 13 | A: He is the -- I guess you call it the |
| 14 | general counsel for Johnson & Johnson. |
| 15 | Q: Okay. And that first conversation |
| 16 | you had with him, can you describe that |
| 17 | conversation for me? |

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 18**

| | |
|---|---|
| 18 :25 | THE WITNESS: Yep. |
| 19 :1 | My understanding was that they |
| 2 | were -- they -- Michael was interested in, I |
| 3 | guess, the company -- in me as -- to take on this |
| 4 | role as president of LTL and also a company |
| 5 | called -- a subsidiary of Royalty A&M, which |
| 6 | would be associated with LTL. |
| 7 | BY MR. JONAS: |
| 8 | Q: And then that initial conversation on |
| 9 | September 28th, was that just you and |
| 10 | Mr. Ullmann? |

11    A: No. Erik Haas was always present on
12      the call.
13    Q: And who is he?
14    A: He's also a senior attorney with
15      Johnson & Johnson.

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 20**

20 :13    Q: Okay. And did they -- did you ask --
14      well, how long was that conversation?
15    A: Roughly, half an hour.

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 21**

21 :2      And what did they tell you the
3      business of LTL would be?
4    A: The business of LTL would be to
5      oversee and -- and help resolve the talc cases
6      that were sitting in what's referred to as old
7      JJCI.
8    Q: Okay. And was there any further
9      discussion about what the business of LTL would
10      be?
11    A: Other than the RAM subsidiary, which
12      is a Royalty monetization business.
13    Q: Uh-huh.
14    A: And that's the other role that I have
15      as president of both. And the Royalty
16      monetization business or RAM is to grow that
17      business.
18    Q: Okay. And do you know why they
19      approached you to take on this role?
20    A: I asked that question. And the
21      answer I got back was, you know, your name was
22      recommended by a number of people, so we're
23      coming to you to ask you if you're interested.

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 22**

22 :3      And just so we can frame this up, on
4      what date did you leave your position at the
5      Enterprise Acceleration unit, whatever job, and
6      take on a formal -- another formal job?
7    A: I verbally accepted the new role
8      approximately Wednesday. I think it was
9      October 6th.
10    Q: Okay.
11    A: And then written confirmation was a
12      couple days later.

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 26**

26 :17    Q: Okay. And let me ask you: Prior
18      to -- to that date, what had been your
19      involvement at J&J or any of its entities or
20      subsidiaries relating to talc?
21    A: Really -- really none.
22    Q: Okay.
23    A: You know, being in the supply chain,

24          you know, I -- I had operations that manufactured
25          the talc. But other than that, that's the extent
27 :1        of my involvement.
2            Q: Okay. Were you -- had you been --
3            prior to September 28th, were you familiar with
4            the -- the various talc litigations against J&J
5            that was going on?
6            A: Only in very general high-level terms
7            and from what the company would disseminate
8            globally to all the employees. That's all that I
9            was aware of.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 28**
28 :2        Q: Okay. So -- well, let me ask you:
3            Do you -- without telling me the substance of it,
4            do you recall whether there was any discussion
5            about the magnitude of J&J or any of its related
6            entities about the talc liability?
7            A: No. No.
8            Q: Okay. So -- just so I understand,
9            they asked you to become president of a company
10          that would address J&J's talc liabilities,
11          correct?
12          A: Correct.
13          Q: And you didn't ask what the amount of
14          those liabilities was?
15          A: I had a general understanding that
16          there were a lot.
17          Q: Okay. And when you say you had a
18          general understanding and you used the word 'a
19          lot,' can you be more specific?
20          A: In terms of the number of claims,
21          that there were a lot of claims.
22          Q: Okay. Do you have -- do you have any
23          understanding as to what the magnitude of those
24          claims might be?
25          A: Not at that time, no.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 29**
29 :25       Q: So what did the -- in those first
30 :1        conversations, what did they tell you the assets
2            of L -- these new entities that you were going to
3            be president of, LTA -- LTL, excuse me -- what
4            did they tell you the assets were going to be?
5            MS. BROWN: And, again, Mr.
6            Wuesthoff, you can answer to your understanding
7            to the extent that doesn't involve advice of
8            counsel.
9            THE WITNESS: I didn't get an
10          understanding of the assets until much later in
11          the process.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 34**
34 :11       Q: Okay. Okay. Had you ever done any
12          work at all in your career in connection with
13          managing litigation liabilities?
14          A: Not directly. I've been exposed to
15          them in my career, but I've never managed them

```
16        directly.
17        Q: Did you think it was strange they
18        were asking you to take on a role to manage talc
19        liabilities?
20        A: I didn't, as president, given that I
21        would have a chief legal officer to handle. And
22        my board and myself, we delegated to my chief --
23        our chief legal officer to devise and implement
24        that plan. So I'm overseeing it, staying in
25        touch with it, but I was fine with that as a
35 :1     president.
2         Q: Okay. So let's just back up, because
3         you've mentioned a couple things here.
4         When you first met with Mr. Ullmann
5         or the second meeting you had with Mr. Haas, did
6         you discuss who else would be employed or work in
7         some capacity at either of those new entities?
8         A: Yes. They told me I would have a
9         chief legal officer; there would be -- and there
10        would be a chief financial officer.
11        Q: And who -- did they tell you who that
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 35**

```
35 :22    Q: Okay. Okay. And in either of those
23        first two conversations, did -- was there any
24        discussion about the bankruptcy of LTL?
25        A: It was -- my understanding was that
36 :1     bankruptcy would be an option to pursue.
2         Q: Okay. And -- and other than that,
3         what you just described, was there any further
4         discussion about bankruptcy in those first two
5         conversations?
6         A: No.
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 39**

```
39 :24    Q: Let me -- I just want to see if I've
25        got this right. On the initial meeting on
40 :1     September 28th, which I think you said was about
2         30 minutes, you then had a conversation with
3         Mr. Haas, which was probably less than
4         30 minutes. You then had another conversation
5         with Mr. Ullmann, which was probably about
6         15 minutes.
7         Those were the sum and substance of
8         the discussions you had with anyone at J&J before
9         verbally accepting the LTL presidency on
10        October 8th?
11        A: That's correct.
12        Q: Okay.
13        A: By the way, just to correct, I
14        don't -- I don't know how long the conversation
15        with Erik was. It wasn't five minutes. It was
16        probably 20 to 30 minutes, but --
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 41**

```
41 :20    Q: Okay. And as best you can recall,
21        what did you think the pros and cons were of
22        taking the job?
```

23    A: The con would be some of the unknown,
24    that -- you know, that's uncertain with any new
25    role, particularly a new role with a new
42 :1    position. But just to put that out there. I
2    coach a lot of people and I do it to myself. You
3    know, it's okay to get out of your comfort zone.
4    That's the way to grow. And I'd decided, you
5    know what? I'm not too late in my career to grow
6    and learn; so, yes, so I -- I said fine with
7    that.
8    What -- what -- what, frankly,
9    intrigued me about the role a lot was growing the
10    RAM business.
11    Q: Okay. And what intrigued you about
12    that?
13    A: Being in more of a commercial
14    business development role. I've never had one
15    directly. I've supported them. I've been part
16    of senior management teams. I've been charged
17    with growth of a company. But actually growing
18    it with a team myself, with a CFO, a chief legal
19    officer and grow that business, I found that to
20    be very interesting.

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 50**

50 :13    Q: Okay. So as far as you know -- and I
14    appreciate you may need to check with others --
15    but as far as you know, there's no LTL office, an
16    LTL desk, LTL filing cabinet or any other owned
17    office materials by LTL?
18    A: Correct. And that's consistent with
19    how J&J operates.

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 53**

53 :19    Q: When did you come -- when did you
20    reach the conclusion as president of this entity
21    that it was going to have to file bankruptcy?
22    A: We voted and confirmed that on our
23    board meeting on Thursday the 14th.

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 57**

57 :6    Had you had any experience with
7    Chapter 11 bankruptcy prior to this?
8    A: No, not directly.
9    Q: Okay. And so you've told me you
10    did -- you were brought up to speed on the talc
11    liability. I take it there were some materials
12    provided to you in that record?
13    A: Material that was reviewed with me.
14    I don't know if I actually physically got the
15    material.
16    Q: Well, did you -- did you -- prior to
17    that board meeting on the 14th, did you -- did
18    you get any written material at all relating to
19    LTL or the talc liability or the bankruptcy or
20    anything like that?
21    A: I don't recall specifically on those
22    topics.

23    **Q: Okay.**
24    **A: The materials were around the**
25    **divisional merger, the services agreements, the**
58 :1   **funding agreements, the second amended**
2     **agreements. That was mostly the written**
3     **materials.**
4     **Q: And we'll talk about those things**
5     **later. So thank you.**
6     **Okay. So were you provided with --**
7     **strike that.**
8     **Were you provided with any written**
9     **analysis relating to whether or not LTL should**
10    **file bankruptcy?**
11    **A: No.**
12    **Q: Okay. And so what analysis did you**
13    **do that helped you reach the conclusion that LTL**
14    **should file bankruptcy?**
15    **A: Yeah. What I -- what I did, and,**
16    **frankly, it was a pretty common sense call. I**
17    **looked at the fact that there -- there**
18    **were roughly 38,000 outstanding cases that was**
19    **growing rapidly. In fact, there were 12,000 --**
20    **that included 12,000 that were added just this**
21    **year through October. We had -- again, based on**
22    **the safety of our talc, we had won most of the**
23    **judgments.**
24    **There was one judgment, the Ingham**
25    **case, which was just an exorbitant judgment, over**
59 :1   **$4 billion. And moving forward, there would**
2     **continue to be, really, this -- the wave of**
3     **litigation. It seemed obvious it was going to**
4     **continue, and one reason is this 60-year latency**
5     **of some of these cancers. So the volume of**
6     **current and future claims was really**
7     **overwhelming.**
8     **And with processing, roughly, you**
9     **know, one a month, we didn't see any way to**
10    **equitably and efficiently resolve these cases if**
11    **the status quo stayed as it was. Just the**
12    **mathematics, it would take thousands of years at**
13    **12, even 24 cases a year to settle these.**
14    **So moving it into a structured**
15    **bankruptcy, you know, funded by a trust seemed**
16    **like the obvious way to equitably and efficiently**
17    **resolve these claims for all claimants and**
18    **stakeholders.**

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 61**
61 :18   **Q: Okay. And let me ask you: Why --**
19    **was there a sense of urgency to file bankruptcy?**
20    **A: No. The only -- no, there wasn't.**
21    **There was not. But the -- I mean, to me, because**
22    **it was such an obvious next move, why would we**
23    **wait? Why deliberate any further with something**
24    **that was -- it was so commonsensical, and then**
25    **delay, you know, revolving these claims. That**
62 :1   **doesn't make sense to me. So, no, there was no**
2     **pressing matter, but why not just move on?**
3     **Q: Well -- and you felt that you had**
4     **enough time -- between the formation of LTL on**
5     **the 12th and the 14th, you felt there was enough**
6     **time to do all the analysis necessary to make an**
7     **informed decision that LTL had to file**

8    bankruptcy?
9    **A: Well, again, the background**
10   **information that we were provided was worked on**
11   **for quite some time by many people. It wasn't**
12   **just us in one week. There was -- the**
13   **information we were presented was -- had been**
14   **gathered up over -- I don't even know how long.**
15   **So assuming the information is factual and where**
16   **I -- well, the board assumed that everybody at**
17   **J&J is super high integrity, there's no reason to**
18   **not believe the information. Again, it just**
19   **seemed like such an obvious choice, because the**
20   **status quo is that that would be a way to settle**
21   **these cases. It put old JCCI in financial**
22   **distress, which put LTL in financial distress.**
23   **So the only way to resolve, in our view -- and**
24   **then, again, we thought it was a pretty**
25   **straightforward decision -- was to file for**
63 :1    **bankruptcy.**

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 63**
63 :4    **So, in fact, working on a new entity**
5    **and it's filing bankruptcy, I think you said that**
6    **work was being done at J&J for weeks and**
7    **months -- let me finish my question, please.**
8    **A: I'm sorry.**
9    **Q: That's okay.**
10   **That work was being done at J&J weeks**
11   **and months before you were approached to even**
12   **take this job, right?**
13   **MS. BROWN: I object. Misstates**
14   **testimony.**
15   **THE WITNESS: No. I -- I probably**
16   **miss -- well, I either -- I misstated or I'll**
17   **correct.**
18   **The background information of the**
19   **number of cases that were present and building**
20   **the information around the -- the -- the**
21   **judgments to date and the dollar amounts, the**
22   **expenses paid to date and then projecting**
23   **forward, anybody with common sense could project**
24   **forward there's such volatility and such**
25   **uncertainty, cases growing by the thousands, how**
64 :1    **could we possibly stay the course and resolve**
2    **these in any equitable or efficient way?**
3    **So whatever work was done prior to**
4    **LTL being formed, I can't comment to that. I**
5    **wasn't part of that.**

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 65**
65 :22    **Did anybody provide you with specific**
23   **analysis relating to how a bankruptcy of LTL**
24   **would work?**
25   **A: Other than -- and this was, I**
66 :1    **believe, verbal.**

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 66**
66 :8    **My understanding was that a trust**

9  would be formed. J&J and JJCI would contribute
10  to that trust. And that trust is what would be
11  used by the bankruptcy court to -- to settle the
12  current and future cases.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 67**

67 :8  Did you -- as president of LTL, did
9  you think it was important that LTL have legal
10  counsel?
11  A: Yes. And legal -- legal counsel was
12  provided.
13  Q: Okay. When you say 'was provided,'
14  what do you mean by that?
15  A: Jones Day was -- was assigned to LTL
16  to be our counsel -- outside counsel.
17  Q: By whom?
18  A: I don't know.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 68**

68 :8  Q: Okay. And you don't know who made
9  the decision that LTL would retain Jones Day?
10  A: I do not.
11  Q: Okay. Do you know if when -- when
12  LTL retained Jones Day, do you know if Jones Day
13  was also representing other Johnson & Johnson
14  entities?
15  A: I don't know that answer.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 69**

69 :24  Okay. So do you remember the time
25  that that meeting started on the 14th?
70 :1  A: The -- not exactly. It was either
2  11:30 or 12:30. It might have been 12- -- I
3  don't know. It was a 90-minute meeting.
4  Q: The whole meeting lasted 90 minutes?
5  A: Yes. Give or take a few minutes.
6  Q: And can you -- the best you can, can
7  you describe for me what happened at that
8  meeting?
9  A: We recapped and reviewed the
10  restructuring. So we were, you know, all
11  refamiliarized with that. We reviewed the talc
12  liabilities and the history of the talc claims.
13  We talked about our new company and, you know,
14  protocols of a new company and how a new company
15  needs to operate. We talked about the options to
16  resolve the claims and had a discussion there,
17  and then we voted on the resolution.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 70**

70 :22  Q: So tell me more particularly, what
23  was the nature of that review?
24  A: It was sort of a recap -- and sorry
25  to be redundant, but the 38,000 cases, 12,000 new
71 :1  this year alone, the prospect of that will

```
    2        continue to grow, potentially, exponentially; the
    3        fact there's a 60-year latency period, which
    4        means in normal course of events, this would
    5        easily run through the decade. And, again -- and
    6        by the way -- I'm sorry. I don't mean to say by
    7        the way.
    8        And then, you know, we -- based on
    9        the safety of our product, we prevailed in many
   10        of the cases; but exorbitant judgements such as
   11        the Ingham case were there and certainly could be
   12        there in the future. That uncertainty. So
   13        that's the sort of information we reviewed.
   14        Q: Uh-huh. Okay. And let me ask you
   15        more particularly: Did you review the amounts
   16        that J&J or any J&J entities had paid
   17        historically on talc claims?
   18        A: Yes. That was -- that was part of
   19        the discussion. So in defense of the talc
   20        claims, roughly a billion dollars and in
   21        judgments, roughly three and a half billion in
   22        total; so close to four and a half, five billion
   23        in total spent.
   24        Q: And that would include the Ingham
   25        payment we talked about?
72 :1      A: Correct.
    2        Q: Okay. And was there any discussion
    3        about any sort of estimates or projections of
    4        future talc liability?
    5        A: We didn't do any mathematical
    6        exercise, but just based on the -- the number of
    7        cases and over a short period of time and the
    8        volatile nature of the judgments, if that
    9        continued in any sort of a similar pattern, the
   10        expenses and costs would grow exponentially. We
   11        would never get at solving these claims for many
   12        of the claimants. It just wouldn't physically be
   13        possible.
   14        Q: Uh-huh. But there was absolutely --
   15        you don't recall at all, absolutely, any
   16        discussion about future -- strike that -- an
   17        estimate of what the future claim amounts might
   18        be that would have to be paid?
   19        A: No. Other than the fact that if they
   20        continued at this rate, it could be an exorbitant
   21        dollar figure. But other than that, we didn't do
   22        any numerical analysis.
   23        Q: And in light of what you just said,
   24        were you concerned that you would become
   25        president of an entity that would take on these
73 :1      liabilities?
    2        A: Yes. Of course concerned, but not
    3        worried because the funding agreement is there as
    4        an asset for LTL to resolve these cases.
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 74**
```
74 :6      Q: Okay. And what were the -- other
    7        than bankruptcy, what were the options you
    8        discussed to resolve the claim?
    9        A: Well, the main option was to stay the
   10        course; you know, just continue to litigate or
   11        to -- just, you know, address one -- one case at
   12        a time. You know, to stay the course. So the
   13        status quo was -- was, frankly, the main
```

14    alternative. We briefly discussed an insurance
15    option, and that was quite brief, because it
16    just -- that just doesn't -- there's no way that
17    that pencils and insurance companies would --
18    would cover any sort of liability moving forward
19    in anything that would be close to affordable.
20    So that really was discounted quickly.
21    So it really came down to the status
22    quo versus filing for bankruptcy and dissolving
23    this to a trust. And, again, it came back to we
24    thought that was the most equitable and efficient
25    way to resolve these claims.

75 :1    Q: And when you say -- you used two
2    words. I want to break it down. You said
3    'equitable' and 'efficient.'
4    Can you tell me your understanding of
5    why it was efficient for bankruptcy to be used to
6    resolve these claims?
7    A: Yeah. You know, efficient is a broad
8    term. But there are lots of resources being
9    expended, not just by old JJCI and now LTL, but
10    by courtrooms; time spent researching, time
11    spent -- attorneys all over the place. It's just
12    very -- you know, just very -- that's one piece
13    of efficient.
14    The other piece of efficient is how
15    do you process the number of current and future
16    claims in any sort of a way -- one at a time or
17    two at a time or in the case of Ingham, 22 at a
18    time -- when you've got 38,000 and building?
19    There's just no efficient way to do that in our
20    view.
21    And a bankruptcy court handling this,
22    it wouldn't be efficient any other way. You
23    couldn't get through them. And it certainly
24    wouldn't be equitable, because there would be
25    many claims you could never get to.

76 :1    Q: And when you use the -- you said the
2    word 'equitable.' What do you mean by that?
3    A: I guess what I mean by equitable is
4    many -- well, the cases that have been tried to
5    date, many claimants getting nothing and a few
6    getting an exorbitant award, I don't think -- we
7    don't view that as equitable. But when you've
8    got so many claims to process, again, 38,000 and
9    growing, there'd be no way to address many of
10    those, and that certainly wouldn't be equitable.
11    Now, having said all of that, we
12    don't believe the claims had merit, but I know
13    there's another -- there's a counter view to
14    that, which is why we're talking. But we just
15    don't see the claimants can be equitably treated
16    if we were to stay the status quo.
17    Q: So are you telling me, at least in
18    part, the LTL bankruptcy was -- one of the
19    considerations was to treat claimants equitably;
20    it was for their benefit? Is that what you're
21    saying?
22    A: We looked at all stakeholders
23    benefitting from this, not just claimants, not
24    just LTL, not just others. It's just -- it would
25    benefit all -- all parties. Yes, it would be

77 :1    more equitable to the claimant. Yes, we believe
2    that.
3    But the real reason we filed for

```
4        bankruptcy is looking at the voluminous amount of
5        cases, how they're growing, the lottery size
6        awards, put us in -- old JJCI in financial
7        distress because of the volatility in moving
8        forward, and that's certainly where LTL is.
9        So, again, to work through these
10       cases in an equitable and efficient way for all
11       parties for current and future claims, we believe
12       this is the best course.
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 78**
```
78 :3    Did you say that LTL was in financial
4        distress?
5        A: Yes.
6        Q: Okay. Why?
7        A: Because we have 38,000-some open
8        claims. They're growing and building. They will
9        continue, based on the latency of at least
10       mesothelioma -- if I'm pronouncing that right --
11       at least 60 more years. In other words, no end
12       in sight. And the nature of some of the -- of
13       the judgments being such -- in our view,
14       extraordinary in terms of the size of the dollar
15       amounts, yes, I'd say we are in financial -- now,
16       having said that, I think we're in equally
17       distressed, but not -- but slightly better
18       position than old JJCI, because we have the
19       backing of the funding agreement.
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 82**
```
82 :3    Q: Does LTL owe anybody money?
4        A: We do -- we do have to -- we have
5        bills we have to pay, yes.
6        Q: What bills are those?
7        A: Attorneys' bills, fees. We have to
8        pay J&J for any services we get from J&J -- from
9        JJCI and J&J Services, Inc.
10       Q: Okay. So other than bills from J&J
11       for services and other than bills from lawyers,
12       does -- and I'll -- just bear with me. Let's say
13       those are creditors, you owe money.
14       Does LTL have any other creditors?
15       A: Not to my knowledge.
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 108**
```
108 :25   So is -- is -- does any
109 :1    Johnson & Johnson entity continue to sell talc
2         baby powder outside of the United States?
3         A: I don't know for sure. I've been out
4         of that for quite a while.
5         Q: Okay. Well, let me ask you: If
6         there was any asserted liability in connection
7         with foreign, outside of the United States, talc
8         sales, would that be a liability of LTL?
9         MS. BROWN: Objection. Form.
10        Foundation.
11        THE WITNESS: That's a legal
12        question. I -- I don't know the answer.
```

13    **BY MR. JONAS:**
14    **Q: Well, you're the president of LTL,**
15    **right?**
16    **A: Yes. But I'm not a lawyer, and I**
17    **would defer to my chief legal officer for that**
18    **answer.**

---

**WUESTHOFF, ROBERT** - *12/22/2021*

---

**Page 127**
127 :16    **Q: Okay. What is the value of LTL's**
17    **assets today?**
18    **A: We have six million in the bank**
19    **account, we have RAM with royalties valued at**
20    **some $367 million, and we have the service**
21    **agreement with JJCI and J&J.**

---

**WUESTHOFF, ROBERT** - *12/22/2021*

---

**Page 127**
127 :24    **And what's the value of the funding**
25    **agreement?**
128 :1    **A: The value of the funding agreement is**
2    **up to the value of JJCI.**
3    **Q: Okay. And what is the -- what is**
4    **that? What is the value of JJCI?**
5    **A: I do not know.**
6    **Q: Have you ever had any discussions**
7    **about that?**
8    **A: No.**

---

**WUESTHOFF, ROBERT** - *12/22/2021*

---

**Page 128**
128 :11    **Did you sign the -- and we'll look at**
12    **it, but did you sign the funding agreement on**
13    **behalf of LTL?**
14    **A: I'm sure I did. I'd have to look at**
15    **the document.**
16    **Q: Okay. And you just said that the**
17    **funding agreement was to provide LTL with funding**
18    **up to the value of JJCI, correct?**
19    **A: Correct.**
20    **Q: And so when you were about to sign**
21    **the funding agreement, you didn't have any**
22    **understanding or appreciation of what that value**
23    **to LTL could be?**
24    **MS. BROWN: Objection. Misstates**
25    **testimony.**
129 :1    **THE WITNESS: I -- I did not have a**
2    **quantified number. No, I did not.**
3    **BY MR. JONAS:**
4    **Q: Could be -- as far as you knew, it**
5    **could be a dollar, right?**
6    **A: Well, I was sure it was more than a**
7    **dollar.**
8    **Q: Oh, okay. So was it more than a**
9    **million dollars?**
10    **A: I -- I honestly don't have a figure**
11    **for you, sir.**
12    **Q: But you knew it was more than a**
13    **dollar, right?**
14    **A: I knew it was more than a dollar.**
15    **Q: How did you know it was more than a**

16      dollar?
17      A: Because the company -- JJCI, I know,
18       just common sense, is worth more than a dollar.
19      Q: Okay. Well, does common sense tell
20       you that JJCI's worth more than a billion
21       dollars?
22      A: I can't say that. I'm not in
23       finance. I don't know what JJCI is worth.
24      Q: Okay. Do you know what any -- by
25       amount, do you have any idea what JJCI is worth?
130 :1  A: I do not.
2       Q: Okay. So when you signed the funding
3        agreement and it said that value would be funded
4        or provided to LTL up to the value of JJCI, other
5        than it being more than a dollar, you had no idea
6        what that amount might be, correct?
7       MS. BROWN: Objection to the form.
8        Misstates testimony.
9       THE WITNESS: Ali, can you say that
10       again slower?
11      MS. BROWN: I'm sorry. I object to
12       the form. It misstates your testimony.
13      THE WITNESS: No. That's correct. I
14       do not know the dollar value of JJCI.
15      BY MR. JONAS:
16      Q: Okay. So, therefore, you didn't know
17       the value of LTL, right?
18      MS. BROWN: Objection. Speculation.
19      THE WITNESS: I guess that would
20       be -- that would be correct. I knew the assets,
21       the six million and the royalties and then I have
22       an agreement with JJCI and J&J to if -- if we
23       move into bankruptcy and move into a trust, there
24       would be moneys there that those two would
25       provide the trust.
131 :1  BY MR. JONAS:
2       Q: But when LTL filed -- when you voted
3        to put LTL into bankruptcy, you did not know the
4        value of its assets, correct?
5       A: I did not know the value of JJCI.
6       Q: That's not my question, sir.
7       A: Okay.
8       Q: My question is: When you put -- when
9        you voted to put LTL into bankruptcy, one of its
10       assets was the funding agreement, correct?
11      A: Correct.
12      Q: And the value of the funding
13       agreement was up to the value of JJCI, correct?
14      A: That's correct.
15      Q: And you did not know the value of
16       JJCI, correct?
17      A: Correct.
18      Q: So when you voted to put LTL into
19       bankruptcy, you did not know or have any idea of
20       the value of its assets, correct?
21      MS. BROWN: Objection to the form.
22      THE WITNESS: Quantitatively, no. I
23       did not know the full value of the funding
24       agreement, because not knowing the full value
25       of -- of JJCI -- what you're stating is correct.
132 :1  BY MR. JONAS:
2       Q: Okay. So you didn't know whether or
3        not LTL was insolvent when it filed bankruptcy,
4        did you?
5       MS. BROWN: Objection to the form.

```
 6        Speculation.
 7        THE WITNESS: What -- what I did know
 8         is we were no worse and, in fact, better than old
 9         JJCI was with these same liabilities.
10        BY MR. JONAS:
11        Q: Okay. Do you know what the word
12         'insolvency' means?
13        A: Run out of money.
14        Q: Do you know what the word
15         'insolvency' means?
16        A: I would say no. If I don't look at
17         it literally, probably not.
```

## WUESTHOFF, ROBERT *- 12/22/2021*

**Page 142**
```
142 :17      Q: Do you know who the Bates White firm
    18        is? Do you know them?
    19        A: I'm not sure exactly.
    20        Q: How about not exactly? Do you have
    21        any idea who Bates White is?
    22        A: I -- I think it might be a -- a law
    23        firm. I'm bad on names, to be honest; but I'm
    24        sure it's a law firm.
    25        Q: Okay. And L- -- do you know if LTL
143 :1        has hired them?
     2        A: Not to my -- not -- no. Well, I
     3        don't know that answer.
     4        Q: Okay. So -- and I don't want to
     5        waste any time. I mean, you don't -- if you
     6        don't -- you don't know what kind of work they
     7        do?
     8        A: I don't.
     9        Q: Okay. Do you know if -- let me ask
    10        you: Do you know if LTL -- and by that I mean
    11        anyone at LTL -- has undertaken any work to value
    12        potential legacy talc liabilities?
    13        A: No. I'm not aware of that.
```

## WUESTHOFF, ROBERT *- 12/22/2021*

**Page 144**
```
144 :25      Q: And do you know if J&J has ever
145 :1        retained PricewaterhouseCoopers for anything?
     2        A: I can't answer that. No, I have no
     3        knowledge of that.
```

## WUESTHOFF, ROBERT *- 12/22/2021*

**Page 146**
```
146 :9       Q: And you'll see here, Mr. Wuesthoff --
    10        a lot of this has been redacted, but you'll see
    11        in the middle of the page -- well, at the top of
    12        the page it says, 'Gross product liability
    13        balance is in the millions.' And in the middle
    14        of the page, it says 'talc' -- one line says
    15        'talc,' then it says 'payments,' and then it gets
    16        to a sub total.
    17        Have you ever seen this document
    18        before?
    19        A: No. I've never seen this.
    20        Q: Okay. So do you have any idea -- and
    21        I'd like you to take a look at this. Do you have
    22        any idea what the purpose of this document is?
```

```
23        MS. BROWN: Objection. Foundation.
24         Speculation.
25         A: Other than reading the heading, not
147 :1      really knowing what that means -- I mean,
 2          literally, it means I don't know.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 150**
```
150 :1      Q: Okay. Well, do you recall at that
 2          board meeting -- or prior to the board meeting, I
 3          think you said there was -- you had certain
 4          information that was made available to you
 5          relating to talc liabilities, right?
 6          A: No. Only to the respect of the
 7          number of cases --
 8          Q: I see.
 9          A: -- the money that was spent to date,
10          the billion in processing the three and a half
11          billion in judgments. Those were the only
12          numbers we had.
13          Q: Okay. Nothing more specific than
14          that?
15          A: No.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 150**
```
150 :22     At that board meeting on
23          October 14th, was there any discussion about
24          insurance available to cover talc liabilities?
25          A: We said the -- we briefly talked
151 :1      about insurance and said that the proposals we
 2          were getting -- or would get from insurance, and
 3          apparently there had been some prior discussion
 4          that I was not part of -- that it just would be
 5          an exorbitant amount of money for them to cover
 6          the current and future potential cases. So it
 7          was, frankly, a brief discussion.
 8          Q: Okay. And you're talking about the
 9          possibility of insurance to cover -- on a
10          go-forward basis to cover future liabilities,
11          correct?
12          A: Well, current -- yeah, future
13          liabilities based on current claims and future
14          claims.
15          Q: Okay. Was there any discussion about
16          existing insurance at that October 14th meeting?
17          A: No, not that I recall.
18          Q: Okay. And so when you -- when you
19          voted -- when the board voted -- excuse me --
20          A: Uh-huh.
21          Q: -- to put LTL into bankruptcy, what
22          was your understanding of what existing talc
23          liability insurance existed?
24          A: Very, very limited. Next to zero.
25          Q: Okay. You don't know if there was
152 :1      any insurance available to J&J for talc liability
 2          when you decided -- when you voted to put LTL
 3          into bankruptcy, correct?
 4          MS. BROWN: Object. Misstates
 5          testimony. Lacks foundation.
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 152**

152 :9      A: No. It was never -- never discussed.

10      Q: Okay. And leading up to that

11      meeting, you didn't have any materials provided

12      to you relating to existing insurance for talc

13      liabilities, correct?

14      A: I'd have to relook at the documents,

15      to be honest. I'd have to look -- relook at the

16      documents.

17      Q: Okay. But you don't recall any

18      insurance-related materials being provided to

19      you, correct?

20      A: Not specifically insurance-related

21      materials. Was insurance in the materials? And

22      there were a lot of materials. It's -- it's

23      possible. It's been two and a half months since

24      I've read a lot of those documents. I'm happy to

25      look at the document, but it's been a long time.

153 :1      I just don't remember.

2      Q: Okay. Okay. But just come back to

3      what -- what you knew when you voted to put LTL

4      into bankruptcy.

5      You didn't know whether there was a

6      billion or ten million or any particular amount

7      of insurance available to cover talc liabilities,

8      right?

9      MS. BROWN: Objection. Misstates

10      testimony.

11      THE WITNESS: Yeah. We didn't

12      discuss that as a viable option, because there

13      was never any -- any substance to that, that

14      would have warned to anything of value and that

15      was the extent of the conversation.

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 154**

154 :16      Q: Okay. And the LTL bankruptcy was

17      intended, at least in part, to address the ordeal

18      with the financial distress of JJCI, correct?

19      MS. BROWN: Objection. Foundation.

20      Speculation.

21      THE WITNESS: I think that's

22      incorrect. LTL was formed to address the -- the

23      outstanding and future claims of the talc

24      liability.

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 155**

155 :3      What is your understanding of your

4      statement that JJCI was experiencing financial

5      distress? What was the basis of that distress?

6      A: The basis was the sheer number of

7      current outstanding cases that were growing

8      exponentially; again, 12,000 new ones in 2021

9      through October, plus the projecting that we

10      would continue to get based on the latency of the

11      cancer, particularly the meso- -- I can't

12      pronounce it -- the lung cancer.

13      And the other of the distress was

14    the -- was the huge lottery-type of awards that
15    seemed like it would be possible, and, in fact,
16    with the Ingham case, was the settlement. The
17    uncertainty moving forward and the ongoing legal
18    expense of hundreds of thousands of dollars a
19    year through the rest of the decade was -- yeah,
20    that would put most companies in some sort of
21    distress.
22    Q: Okay. And the way that the
23    restructuring that we've been talking about
24    addressed JJCI's -- JJCI's financial distress,
25    was to move that -- was to move the talc

156 :1    liabilities from JJCI to LTL, correct?
2    A: No. It wasn't done to alleviate
3    their liability to JJCI, because LTL got the
4    exact same liability. The advantage that LTL has
5    slightly over what JJCI had, the old JJCI, is we
6    have the funding agreement backed by JJCI and
7    J&J. So we're actually in a slightly stronger
8    position than JJCI would have been on their own.
9    Q: Okay. So do you believe today that
10    both LTL and JJCI are both responsible for the
11    talc liability we've been talking about?
12    MS. BROWN: Objection. Foundation.
13    Speculation.
14    THE WITNESS: LTL is responsible for
15    resolving them; through funding agreements JJCI
16    and J&J are committed to help fund that
17    resolution.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 160**

160 :3    Q: Do you know why LTL was formed in
4    North Carolina as opposed to any -- any other
5    state?
6    A: I do not.
7    Q: Did you ever ask anybody why it was a
8    North Carolina company?
9    A: I did not.
10    Q: Did it ever -- did you ever think
11    about that, well, why in North Carolina as
12    opposed to some other state?
13    A: I didn't give it a lot of thought,
14    no.
15    Q: Any thought at all?
16    A: Not a thought. No -- no substantial
17    thought.

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 161**

161 :4    So on September 28th, you met with
5    Mr. Ullmann and Mr. Haas?
6    A: Uh-huh.
7    Q: On -- and then you had a relatively
8    short follow-up meeting with Mr. Haas at some
9    point. On October 6th, you verbally accepted the
10    role.
11    A: Uh-huh.
12    Q: On October 8th, you signed the
13    document -- the document to become president?
14    A: Uh-huh.
15    Q: On October 11th, I guess, you

16      formally became president of LTL and RAM. And
17      October 12th, LTL was formed. And on the 14th,
18      there was a board meeting.
19      A: Correct.
20      Q: And I know you said in advance of the
21      board meeting you thought you had spent seven
22      hours reviewing things.
23      A: Uh-huh.

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 162**
162 :3      Q: But now you're saying there were
4      informal meetings of the -- that would become, I
5      guess, the managers of LTL.
6      Can you tell me about those, please,
7      or describe those?
8      A: People who are now members --
9      board -- board managers, we were included in --
10      in briefings by lawyers on the history of the
11      safety of talc and -- and some matters like that.
12      Q: Okay. And was this part of the seven
13      hours, were those meetings part of that seven
14      hours you were talking about?
15      A: Yes.

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 163**
163 :1      Q: Okay. And how many of those, if you
2      recall, how many of those types of meetings do
3      you think you had?
4      A: I know there were two, potentially
5      three, but I know of two.
6      Q: Okay. And were those between the 8th
7      and the 14th, would you say?
8      A: Yes. Yes.
9      Q: Okay. Great. All right. And so
10      coming back, have you had -- since October 14th,
11      have there been any more LTL board meetings?
12      A: There have not been formal meetings,
13      but we -- we have met at least pretty much
14      weekly. Sometimes a couple times a week we get
15      together and talk.

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 167**
167 :16      Q: What's your understanding of what a
17      qualified settlement fund is in bankruptcy?
18      A: My understanding -- and it's --
19      it's -- you know, my understanding is it's --
20      it's a fund that would be used as -- as -- for
21      the bankruptcy court to resolve the claims.
22      Q: Okay. And do you recall -- strike
23      that.
24      In this case, has -- is there a
25      proposed quantum or amount that J&J would fund to
168 :1      the LTL qualified settlement fund? Are you
2      familiar with that?
3      A: Yes. Yes. There is a figure. Yes.
4      Q: Okay. And what is that figure?
5      A: Two billion dollars.

**WUESTHOFF, ROBERT** - *12/22/2021*

---

**Page 168**

168 :8     So -- just so I make sure I connect
9     your understanding of what a qualified settlement
10     fund is to that number -- that two billion
11     dollars would be available to satisfy talc
12     claims, correct?
13     A: That's my understanding, yes.
14     Q: Okay. How was that two billion
15     dollar figure arrived at?
16     MS. BROWN: Objection. Foundation,
17     speculation.
18     THE WITNESS: I -- I don't know that
19     answer.
20     BY MR. JONAS:
21     Q: Okay. Well, did you negotiate it?
22     A: No.
23     Q: Okay. So how do you know that two
24     billion dollars is going to be enough to satisfy
25     talc claims?
169 :1     MS. BROWN: Objection. Foundation.
2     THE WITNESS: I -- I don't know
3     either way. I -- what I -- what I do know is
4     that we believe our talc is safe and the claims
5     have no merit; but there are these -- these huge
6     settlements that, frankly, we don't believe were
7     based in science; and, you know, I don't know
8     what those could be at some point; and we've
9     talked about that. But the two billion is a --
10     is a good start.
11     BY MR. JONAS:
12     Q: Oh, okay. So have you talked to
13     anybody about the fact that that's only a
14     starting number; that it, in fact, will -- it
15     will be more than that?
16     MS. BROWN: I object. Misstates his
17     testimony.
18     THE WITNESS: Yeah. There's a
19     funding agreement, and the two billion is -- is
20     essentially part of that funding agreement --
21     BY MR. JONAS:
22     Q: Uh-huh.
23     A: -- which says JJCI and J&J will fund,
24     you know, the settlement up to the value of old
25     JJCI. The two billion is really, I guess, an
170 :1     advance towards that.

---

**WUESTHOFF, ROBERT** - *12/22/2021*

---

**Page 171**

171 :13     Q: Okay. So let me ask you: Who came
14     up with the two billion dollar figure?
15     MS. BROWN: Objection. Foundation.
16     THE WITNESS: As I said, I don't
17     know.
18     BY MR. JONAS:
19     Q: Well, when someone said to you or
20     explained to you that we're going to put up two
21     billion dollars to fund LTL's liability, did you
22     say, well, how about some more? Can I get more?
23     A: No. I did not.
24     Q: Why not?

```
 25        A: Frankly, I thought the two billion
172 :1        was a great start, and hopefully, not even two
  2           billion is needed, but that's not my decision.
  3        Q: Okay. Well, what analysis did you do
  4           that led you to conclude that two billion dollars
  5           was, quote, unquote, a great start?
  6        A: Because it's a lot of money.
  7           Particularly, when we believe that the -- our
  8           talc is safe and does not cause cancer and the
  9           claims don't have merit. I mean, two billion's a
 10           lot of money.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 172**
```
172 :21        Q: And you didn't do any analysis to
 22           estimate or project future liability, correct?
 23        A: Nope. Other than -- nope. I don't
 24           mean to say nope.
 25           No, we didn't. Other than, like I
173 :1        said, we looked at the numbers, looked at the
  2           number of claims projected forward. That -- it's
  3           hard -- it's very hard to actually project what
  4           it might be. But, again, we -- we stand behind
  5           the safety of the product and, you know, I don't
  6           know where it'll end up.
  7        Q: Okay. Would you agree with me that
  8           the funding agreement is the most important asset
  9           of LTL?
 10        A: It's very important. I would say
 11           that, yes.
 12        Q: Do you think it's the most important
 13           asset?
 14        A: I think it's very, very important,
 15           yes.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 173**
```
173 :22        Was there any negotiation by LTL of
 23           the funding agreement?
 24        A: Not -- not with myself or our board,
 25           no.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 178**
```
178 :17        Q: Okay. And -- and did you -- from the
 18           time you got the document -- first got the
 19           document, were -- were any changes made at your
 20           request?
 21        A: No.
 22        Q: Okay. So, basically, you got the
 23           document and you signed it, right?
 24        MS. BROWN: Objection. Misstates
 25           testimony.
179 :1        THE WITNESS: Well, I said -- as I
  2           said, I reviewed the document. I read the
  3           document, asked any questions I had about it, and
  4           then I signed it.
  5        BY MR. JONAS:
  6        Q: Okay. What questions did you have
  7           about it?
  8        A: I don't recall.
```

9    **Q: Do you think it was -- do you know**
10    **how many questions you had?**
11    **A: Not -- not -- I would guess not a**
12    **lot, because I think the language is quite clear**
13    **in it, and it's quite understandable.**

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 180**

180 :9    **In connection with the decision to**
10    **file LTL for bankruptcy, was there any specific**
11    **analysis as to the impact on talc claimants? Do**
12    **you recall whether there was?**
13    **MS. BROWN: Objection. Vague.**
14    **THE WITNESS: Yeah. What do you mean**
15    **by impact?**
16    **BY MR. JONAS:**
17    **Q: Well, was there any analysis done of**
18    **whether talc claimants, whether their rights**
19    **would be abridged in any way by the LTL -- the**
20    **restructuring that was taking place?**
21    **MS. BROWN: Objection. Vague.**
22    **Foundation.**
23    **Mr. Wuesthoff, if you understand, and**
24    **if you know, you're free to answer.**
25    **THE WITNESS: Yeah. They're -- what**
181 :1    **we discussed is claimants are no worse off, in**
2    **fact, we think better off with this arrangement.**
3    **BY MR. JONAS:**
4    **Q: Okay. I'm just -- I just am back**
5    **to -- I appreciate that. I know you said that.**
6    **I just want to know specifically what**
7    **analysis you did to arrive at that conclusion?**
8    **A: The -- the analysis was, frankly,**
9    **pretty straightforward in that we have what old**
10    **JJCI had, plus the QSF funding agreement and --**
11    **the QSF, including this funding agreement, which**
12    **JJCI did not have.**
13    **Q: And did you hire any experts to help**
14    **you reach that conclusion?**
15    **MS. BROWN: Objection. No**
16    **foundation.**
17    **THE WITNESS: No. No.**

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 189**

189 :1    **Do you understand, even as you sit here, that as**
2    **a result of the bankruptcy, certain talc**
3    **litigation has been stayed or stopped?**
4    **A: I am aware.**
5    **Q: Okay. When did you first become**
6    **aware of that?**
7    **A: I don't remember exactly.**
8    **Q: Was it after the bankruptcy?**
9    **A: You mean after the filing?**
10    **Q: Yes.**
11    **A: No. I believe it was before that.**
12    **Q: Okay. So you knew before the**
13    **bankruptcy filing that one of the things that**
14    **would happen once LTL filed was there would be a**
15    **stay or stoppage of talc litigation, right?**
16    **A: Yes. Correct.**
17    **Q: Okay. All right.**

18    **A: It was not discussed, though.**
19    **Q: Okay. But you knew that?**
20    **A: Yeah.**

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 190**
190 :12    **Q: Well, how did you anticipate those**
13    **would be resolved as you -- to use your words?**
14    **How was that going to happen?**
15    **A: That they would go into -- into a**
16    **bankruptcy; there would be a trust that would be**
17    **funded; and the bankruptcy court would handle**
18    **that accordingly.**

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 221**
221 :2    **A: At a high level is the Royalty stream**
3    **that comes from -- and I think in this case, this**
4    **is Lactaid -- those royalties -- the royalty**
5    **income comes to Royalty A&M.**
6    **Q: Okay. And do you know -- do you know**
7    **how much RAM paid for this?**
8    **A: I do. It's in the -- it's in the**
9    **agreement, under price.**

---

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 221**
221 :14    **But, I guess, my question is: Do you**
15    **know who settled on the price? Who -- who -- who**
16    **said that's a good price or bad price, or do you**
17    **know?**
18    **A: I do not know.**
19    **Q: Okay. Do you know who would know?**
20    **A: I do not.**
21    **Q: And -- and do you know -- well,**
22    **strike that.**
23    **So you're not familiar in any way**
24    **with any of the underlying negotiations between**
25    **RAM and McNeil that led to this agreement?**
222 :1    **A: I'm not aware that any took place.**
2    **Q: And you don't even know who -- do you**
3    **know who -- with McNeil being on one side of the**
4    **table and RAM or somebody being on the other side**
5    **of the table, do you know who that was? Was it**
6    **someone at J&J?**
7    **A: I do not know.**
8    **Q: Okay.**
9    **A: By the way, the purchase -- the**
10    **purchase price is under Section 2.2.**
11    **Q: Okay. Let me just take a look.**
12    **$315 million?**
13    **A: Yep.**
14    **Q: And do -- do you think that's a**
15    **good -- a fair price?**
16    **MS. BROWN: Objection. Foundation.**
17    **THE WITNESS: What I did look at was**
18    **the -- the recent history of the earnings stream**
19    **on that royalty and the discounted cash flow**
20    **value moving forward, and it seemed like a fair**
21    **price.**
22    **BY MR. JONAS:**

```
      23          Q: Okay. But you don't know if anybody
      24          on the RAM side of the table said, will you take
      25          300 million, or 250 million, or any other amount
223 :1          lower than 315, right?
       2          A: No. I'm not aware of that.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 223**
```
223 :9          Q: And see if I can expedite this, Mr.
      10          Wuesthoff.
      11          There's a purchase and sale
      12          agreement, same date, between
      13          McNeil Pharmaceutical Co. and RAM; and then at
      14          1.68, there's a purchase and sale agreement, same
      15          date, between Johnson & Johnson Consumer, Inc.,
      16          and RAM; and then, lastly, at 1.69, there's a
      17          purchase sale agreement of same date agreement between
      18          Johnson & Johnson Consumer, Inc., and RAM.
      19          And if I asked you all the same --
      20          generally the same questions with respect to your
      21          understanding of, you know, who negotiated
      22          et cetera, those -- would your answers generally
      23          be the same?
      24          A: Yes.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 224**
```
224 :14          Q: Okay. So if we're looking at 1.72,
      15          it's called an intercompany facility agreement
      16          between Johnson & Johnson and -- and RAM.
      17          You see that?
      18          A: Yep.
      19          Q: And you signed this on behalf of RAM,
      20          right?
      21          A: Correct.
      22          Q: And Ms. Ryan signed this on behalf of
      23          Johnson & Johnson, correct?
      24          A: Yes.
      25          Q: And so what's your understanding of
225 :1          the purpose of this agreement?
       2          A: This agreement, my understanding, is
       3          to provide funding to RAM to acquire additional
       4          royalty streams outside of JJCI or outside of
       5          Johnson & Johnson, for that matter.
       6          Q: I see. Okay.
       7          And do you know the total amount of
       8          funding that would be provided?
       9          A: Yes. It's -- it's a revolving
      10          $50 million.
      11          Q: Okay. And do you know if anybody
      12          negotiated this on behalf of RAM?
      13          A: I do not.
      14          Q: Okay. And did you get any legal
      15          advice, as president of RAM, in connection with
      16          this document?
      17          MS. BROWN: Objection to the form.
      18          To the extent you understand that,
      19          you can answer, Mr. Wuesthoff.
      20          THE WITNESS: Yep. My understanding
      21          is if RAM requests the money for investment
      22          purposes, then the money will be granted.
```

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 237**

237 :8    Have you -- have you inquired as to
9    whether this would have any impact on LTL or its
10    business?
11    A: No. I have not.
12    Q: Have you considered that?
13    A: Briefly.
14    Q: And what -- tell me about that
15    consideration.
16    A: My consideration is that the funding
17    agreements remain intact despite that's -- that's
18    where I am.
19    Q: Okay. And have you determined -- did
20    you do any analysis to determine that this -- if
21    and when this separation takes place, it -- there
22    won't be any further or additional barriers to
23    LTL or LTL or claimants -- talc claimants being
24    able to collect or get funding from
25    Johnson & Johnson?
238 :1    A: Well, yeah. No. I -- I've had no
2    discussion about it. I would imagine that'll be
3    a lawyer discussion at some point, but I would
4    expect Johnson & Johnson will honor its
5    commitments. And I would -- personally, based on
6    the integrity of all the executives at J&J, I
7    don't see this as a problem.
8    Q: Okay. Just to -- just to be clear,
9    you haven't done -- you haven't -- as president
10    of LTL, you haven't done or commissioned any
11    analysis as to the impact of this on LTL,
12    correct?
13    A: Correct.

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 249**

249 :19    Q: Okay. So at any no point in your
20    career did you have any role or responsibility
21    with regard to selling talc at all, right?
22    A: Correct.

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 250**

250 :10    Q: Okay. And did you -- were you
11    involved in any negotiations wherein LTL would
12    take on any talc liabilities for any other
13    companies other than JJCI?
14    A: No.

**WUESTHOFF, ROBERT** - *12/22/2021*

**Page 283**

283 :25    Q: You had testified earlier that the
284 :1    two million dollars [sic] potentially contributed
2    to a qualified settlement fund was a start and it
3    -- the fund could be funded up to the value of
4    old JJCI.
5    Do you recall that testimony?
6    MS. BROWN: Misstates the testimony.

```
7          I object.
8     BY MR. DINE:
9          Q: Do you recall that testimony?
10    A: I don't recall those exact words,
11         but, yeah, I said the two billion dollars is a
12         significant amount, and it could -- it could be
13         the beginning or a start, if you will, but it's a
14         significant amount and maybe it is sufficient.
15         I, frankly, don't know.
16         But, again, we stand behind the fact
17         that we don't believe the claims have merit, in
18         which case the two billion would be sufficient,
19         maybe more than sufficient. But I -- you know,
20         that's -- that's up to the bankruptcy court,
21         assuming it would go there to determine that.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 285**

```
285 :19    Q: Mr. Wuesthoff, you testified that you
20         reviewed the amended and restated funding
21         agreement. Do you recall that testimony -- that
22         testimony?
23    A: Yes. Yes.
24    Q: In your review of that document, did
25         you conclude -- come to a conclusion about the --
286 :1     what the JJCI value is under that agreement?
2     MS. BROWN: Objection. Asked and
3          answered.
4     THE WITNESS: Yes. No. We did not.
```

## WUESTHOFF, ROBERT - *12/22/2021*

**Page 333**

```
333 :14    Q: Okay. Do you -- did you and do you
15         defer to others to calculate precisely the value
16         of LTL's assets?
17    A: Yeah. That's --
18    MR. MORRIS: Objection, yeah, to the
19         form of the question.
20    BY MS. BROWN:
21    Q: You can answer.
22    A: I get to answer, right?
23    Q: You do, sure.
24    A: Yes, my CFO.
25    Q: Okay. Did you, nevertheless,
334 :1     understand -- without that precise dollar figure,
2          do you nevertheless understand LTL to be in
3          financial distress?
4     A: Yes. In financial distress, correct.
5     Q: And what was that understanding based
6          on, Mr. Wuesthoff?
7     A: It was based on the uncertainty and
8          volatility around the -- what I would call the
9          extreme number of cases that were growing and
10         the -- the huge exorbitant settlements on several
11         of those. That's what we based our thinking on.
12    Q: You were --
13    A: And the fact -- and the fact these
14         were going to continue for at least another
15         60 years, probably, based on the latency of the
16         cancer.
```