UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in compliance with D.N.J. LBR 9004-1(b)**

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones
Karen B. Dine
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
         kdine@pszjlaw.com
         crobinson@pszjlaw.com
         pkeane@pszjlaw.com

*Counsel to Arnold & Itkin LLP*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No. 21-30589 (MBK) |
| Debtor. [1] | |

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN that Arnold & Itkin LLP ("Arnold & Itkin"), on behalf of

certain personal injury claimants represented by Arnold & Itkin (the "Movants"), hereby appeals

to the United States District Court for the District of New Jersey, pursuant to 28 U.S.C. § 158(a)

and Rules 8002 and 8003 of the Federal Rules of Bankruptcy Procedure, from the Order entered

on March 2, 2022 [D.I. 1603] (the "Order"), denying the *Motion to Dismiss Bankruptcy Case* [D.I.

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

766] filed on December 9, 2021, which Order is based upon the Opinion, entered February 25,

2022 [D.I. 1572] (the "Opinion").

A copy of the Order is attached hereto as **Exhibit A** and a copy of the Opinion is attached

hereto as **Exhibit B**.

The parties to the Order and Opinion appealed from, and the names, addresses and

telephone numbers of their respective attorneys are as follows:

| PARTIES | ATTORNEYS |
|---|---|
| Arnold & Itkin LLP | **PACHULSKI STANG ZIEHL & JONES LLP**<br>Laura Davis Jones<br>Karen B. Dine<br>Colin R. Robinson<br>Peter J. Keane<br>919 N. Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705 (Courier 19801)<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400<br>Email: ljones@pszjlaw.com<br>        kdine@pszjlaw.com<br>        crobinson@pszjlaw.com<br>        pkeane@pszjlaw.com<br><br>*Counsel for Arnold & Itkin LLP* |
| Debtor LTL Management, LLC | WOLLMUTH MAHER & DEUTSCH LLP<br>Paul R. DeFilippo, Esq.<br>500 Fifth Avenue<br>New York, New York 10110<br>Telephone: (212) 382-3300<br>Facsimile: (212) 382-0050<br>pdefilippo@wmd-law.com<br><br>JONES DAY<br>Gregory M. Gordon, Esq.<br>Brad B. Erens, Esq.<br>Dan B. Prieto, Esq. |

Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

(Admitted pro hac vice)

ATTORNEYS FOR DEBTOR

Office of the United States Trustee

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA UNITED STATES
TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
Lauren Bielskie, Esq.
Robert J. Schneider, Jr., Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Fax: (973) 645-5993
E-mail: jeffrey.m.sponder@usdoj.gov
lauren.bielskie@usdoj.gov
robert.j.schneider@usdoj.gov

Official Committee of Talc
Claimants I

GENOVA BURNS LLC
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126
Local Counsel to the Official Committee of Talc
Claimants I

BROWN RUDNICK LLP
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
dmolton@brownrudnick.com

3

rstark@brownrudnick.com
mwinograd@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
Co-Counsel for the Official Committee of Talc
Claimants I

OTTERBOURG PC
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 905-3628
Fax: (212) 682-6104
Co-Counsel for the Official Committee of Talc
Claimants I

Official Committee of Talc
Claimants II

SHERMAN, SILVERSTEIN, KOHL, ROSE &
PODOLSKY, P.A.
Arthur J. Abramowitz
Alan I. Moldoff
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
amoldoff@shermansilverstein.com
rswitkes@shermansilverstein.com

4

DOCS_DE:238556.1 05471/002

Proposed Local Counsel to the Official Committee
of Talc Claimants II

COOLEY LLP
Cullen D. Speckhart (admitted pro hac vice)
Michael Klein (admitted pro hac vice)
Erica J. Richards (admitted pro hac vice)
Lauren A. Reichardt (admitted pro hac vice)
Evan M. Lazerowitz
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Fax: (212) 479-6275
Email: cspeckhart@cooley.com
mklein@cooley.com
erichards@cooley.com
lreichardt@cooley.com
elazerowitz@cooley.com
Proposed Co-Counsel to the Official Committee of
Talc Claimants II

BAILEY GLASSER LLP
Brian A. Glasser (admitted pro hac vice)
Thomas B. Bennett (admitted pro hac vice)
Kevin W. Barrett (admitted pro hac vice)
Maggie B. Burrus (admitted pro hac vice)
1055 Thomas Jefferson St. NW, Suite 540
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 463-2103
Email: bglasser@baileyglasser.com
tbennett@baileyglasser.com
kbarrett@baileyglasser.com
mburrus@baileyglasser.com
Proposed Co-Counsel to the Official Committee of
Talc Claimants II

WALDREP WALL BABCOCK & BAILEY PLLC
Thomas W. Waldrep, Jr. (admitted pro hac vice)
Kevin L. Sink (admitted pro hac vice)
James C. Lanik (admitted pro hac vice)
Jennifer B. Lyday (admitted pro hac vice)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Tel: (336) 717-1280
Fax: (336) 717-1340

DOCS_DE:238556.1 05471/002

Email: notice@waldrepwall.com
Proposed Co-Counsel to the Official Committee of
Talc Claimants II

MASSEY & GAIL LLP
Jonathan S. Massey (admitted pro hac vice)
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Tel: (202) 652-4511
Fax: (312) 379-0467
Email: jmassey@masseygail.com
Proposed Co-Counsel to the Official Committee of
Talc Claimants II

Aylstock, Witkin, Kreis & Overholtz,
PLLC

OFFIT KURMAN, P.A.
Paul J. Winterhalter
99 Wood Avenue South, Suite 302
Iselin, New Jersey 08830
Telephone: (267) 338-1370
Facsimile: (267) 338-1335
E-mail: pwinterhalter@offitkurman.com

KTBS LAW LLP
Michael L. Tuchin (pro hac vice)
Robert J. Pfister (pro hac vice)
Samuel M. Kidder (pro hac vice)
Nir Maoz (pro hac vice)
1801 Century Park East, 26th Floor
Los Angeles, California 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090
Email: mtuchin@ktbslaw.com
rpfister@ktbslaw.com
skidder@ktbslaw.com
nmaoz@ktbslaw.com

Attorneys for Aylstock, Witkin, Kreis & Overholtz,
PLLC

Dated: March 11, 2022                    **PACHULSKI STANG ZIEHL & JONES LLP**


By: */s/ Colin R. Robinson*
Laura Davis Jones
Karen B. Dine
Colin R. Robinson
Peter J. Keane
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
        kdine@pszjlaw.com
        crobinson@pszjlaw.com
        pkeane@pszjlaw.com

*Counsel for Arnold & Itkin LLP*

DOCS_DE:238556.1 05471/002

## EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
_____
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Order Filed on March 2, 2022
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| | |
|---|---|
| In Re: | Case No.:    _____ |
| | Chapter:    _____ |
| | Hearing Date:    _____ |
| | Judge:    _____ |

## ORDER DENYING MOTIONS TO DISMISS

The relief set forth on the following pages, numbered two (2) through _____2_____ is **ORDERED**.

DATED: March 2, 2022

Honorable Michael B. Kaplan
United States Bankruptcy Judge

**THIS MATTER** comes before the Court upon motions filed by the Official Committee of Talc Claimants  (ECF No. 632) and the law firm of Arnold & Itkin, LLP, on behalf of certain talc personal injury claimants (ECF No. 766), seeking an order of the Court dismissing the within bankruptcy proceeding pursuant to § 1112(b) as not having been filed in good faith; And the Court having considered fully the submissions of the parties and the argument of counsel the week of February 14, 2022 - February 18, 2022; and for good cause; IT IS HEREBY

**ORDERED** that the Motions (ECF Nos. 632 and 766) are DENIED in their entirety for reasons set forth in the accompanying opinion on the docket (ECF No. 1572).

# **EXHIBIT B**

FOR PUBLICATION

<table>
<tr><td>
UNITED STATES BANKRUPTCY COURT<br>
DISTRICT OF NEW JERSEY<br>
<strong>Caption in Compliance with D.N.J. LBR 9004-2(c)</strong><br><br>
In re:<br><br>
LTL MANAGEMENT, LLC,<br><br>
      Debtor.
</td>
<td>
Case No. 21-30589 (MBK)<br><br>
Chapter 11<br><br>
Hearing Date: February 14-18, 2022<br><br>
Judge:  Michael B. Kaplan,<br>
    Chief Judge
</td></tr>
</table>

*All Counsel of Record*

## MEMORANDUM OPINION

This matter comes before the Court upon motions (collectively, "Motions") filed by the Official Committee of Talc Claimants[1] (ECF No. 632) and the law firm of Arnold & Itkin, LLP, on behalf of certain talc personal injury claimants (ECF No. 766) (together, "Movants" or "Claimants"),[2] seeking an order of the Court dismissing the within bankruptcy proceeding

---

[1] On November 8, 2021, prior to transferring venue of the Case to this Court, the United States Bankruptcy Court for the Western District of North Carolina entered an order appointing the Official Committee of Talc Claimants (the "Original TCC") (ECF No. 355). On December 23, 2021, subsequent to the filing of the Motions, the United States Trustee for Region 3 docketed a Notice of the United States Trustee's Filing of Reconstituted and Amended: (i) Notice of Appointment of Official Committee of Talc Claimants I; and (ii) Notice of Appointment of Official Committee of Talc Claimants II (ECF No. 965) ("Amended Notice").  The Amended Notice effectively divided the membership of the Original TCC into two committees—the Official Committee of Talc Claimants I ("TCC I"), consisting of ovarian cancer claimants, and the Official Committee of Talc Claimants II ("TCC II"), consisting of mesothelioma claimants— and appointed additional members to each such committee.  Each committee has expressed support for the within Motions. At a hearing held on January 20, 2022, this Court granted the motions filed by Debtor and the law firm of Arnold & Itkin, LLP, challenging the validity of the Amended Notice, and struck the Amended Notice, effectively reinstating the Original TCC.

[2] A separate motion and joinder to the Motions has been filed on behalf of Aylstock, Witkin, Kreis & Overholtz, PLLC, ("AWKO") (ECF No. 1003), as well as a joinder by the Barnes Law Group (ECF No. 1092). In addition, three *amici curie* briefs have been filed on behalf of Certain Bankruptcy Law Professors (ECF No. 1384), on behalf of Complex Litigation and Mass Torts Professors (ECF No. 1410), and on behalf of Erwin Chemerinsky, who is Dean of the University of California, Berkeley School of Law (ECF No. 1396). At the hearing held on February 17, 2022, the United States Trustee read a statement into the record supporting either dismissal of the case or the appointment of a chapter 11 trustee. Besides Debtor's objection to the Motions, the Court has also reviewed the Canadian Class

pursuant to § 1112(b) as not having been filed in good faith. For the reasons expressed below, the

Court denies the Motions in their entirety. The Court issues the following findings of fact and

conclusions of law as required by FED. R. BANKR. P. 7052.[3]  The Court has jurisdiction over this

contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United

States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy

cases to the Bankruptcy Court. This matter is a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2)(A). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## I. Background & Procedural History

On October 14, 2021, LTL Management, LLC ("LTL" or "Debtor") filed a voluntary

petition for chapter 11 relief (ECF No. 1) in the United States Bankruptcy Court for the Western

District of North Carolina (the "North Carolina Bankruptcy Court"). LTL is an indirect subsidiary

of Johnson & Johnson ("J&J") and traces its roots back to Johnson & Johnson Baby Products,

Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly-owned

subsidiary of J&J. *See Declaration of John K. Kim in Support of First Day Pleadings* ("*Kim Decl.*")

¶¶ 9-10, ECF No. 5. J&J, a New Jersey company incorporated in 1887, first began selling

JOHNSON'S® Baby Powder ("Johnson's Baby Powder") in 1894, launching its baby care line of

products. *Id*. at ¶¶ 10-14. In 1972, J&J established a formal operating division for its baby products

business, including Johnson's Baby Powder. *Id.* In 1979, J&J executed a transaction (the "1979

---

Action Plaintiffs' Opposition to Motions to Dismiss Chapter 11 Case (ECF No. 1432) (the "Canadian Plaintiffs' Opposition").

[3] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

Agreement") transferring all assets associated with the Baby Products division to J&J Baby Products. *Id.* In connection with this transfer, J&J Baby Products assumed all liabilities associated with the Baby Products division. *Id.* J&J no longer manufactured or sold baby products, such as Johnson's Baby Powder after this transaction. *Id*. Today, J&J is a global company primarily focused on products relating to human health and wellbeing. *See Expert Report of Saul E. Burian, Ph.D.,* ("*Burian Report*") at 25. J&J is composed of three business segments, including Consumer Health, Pharmaceutical, and Medical Devices. *Id.*

Prior or to October 12, 2021, one of J&J's corporate subsidiaries was Johnson & Johnson Consumer Inc. ("Old JJCI"). *See Kim Decl.* ¶¶ 10-14, ECF No. 5. As the result of a series of intercompany transactions, Old JJCI assumed responsibility for all claims alleging that J&J's talc-containing Johnson's Baby Powder caused ovarian cancer and mesothelioma. *Id*. at ¶¶ 15, 32. In the talc lawsuits, claimants contend generally that multiple scientific studies have repeatedly found (i) that samples of Johnson's Baby Powder contain amphibole asbestos and fibrous talc; (ii) that perineal or genital application of talcum powder increases the risk of and can cause ovarian cancer; and (iii) that exposure to asbestos-contaminated talcum powders can cause mesothelioma. *Original TCC's Motion to Dismiss* ¶ 16, ECF No. 632. Despite this product being sold since 1894, prior to 2010, there were a limited number of isolated cases involving cosmetic talc filed against Old JJCI and J&J, asserting a range of claims including talcosis, mesothelioma, dermatitis, and rashes. *Kim Decl.* ¶ 34, ECF No. 5. Litigation escalated after the 2013 trial *Deane Berg v. J&J*, wherein plaintiff alleged she had developed ovarian cancer as a result of genital exposure to Old JJCI's talc-based product. *Id*. at ¶ 35. The jury found for the plaintiff but awarded no damages. Following that

verdict, over thirteen hundred ovarian cancer lawsuits were filed against Old JJCI and J&J by the

end of 2015. *Id*. Since 2016, talc-related lawsuits have grown to over 38,000 cases. *Burian Report*

at 35. In May 2020, Old JJCI announced their discontinuation of talc-based baby powder in the

United States and Canada. *Expert Report of Gregory K. Bell, Ph.D.* ("*Bell Report*") ¶ 17. Debtor

contends that from January 2020 to today, the company has been served on average with one or

more ovarian cancer complaint every hour of every day, every single day of the week. *Debtor's*

*Informational Brief* 125, ECF No. 3. The $4.69 billion verdict reached in the *Ingham* case[4] (the

total award was reduced on appeal to $2.25 billion) certainly raised the stakes for all concerned.

The increase in talc-related litigation imposed a financial burden on Old JJCI. In the seven

quarters of operations preceding the bankruptcy filing, the talc litigation led to financial statement

charges totaling $5.6 billion and cash payments totaling $3.6 billion. *Bell Report* at ¶ 8. Talc

litigation charges—otherwise referred to as "probable costs"—accounted for 51 percent of sales,

and the talc litigation payments—or costs previously paid—accounted for 122 percent of the pre-

tax cashflows estimated to be generated by operations. *Id*. Old JJCI's income before tax for the

business segment dropped from a $2.1 billion profit in 2019 to a $1.1 billion loss in 2020. *Id*. Much

of the reverse in profits, of course, were attributable to the *Ingham* charge and payment.

On October 12, 2021, Old JJCI engaged in a series of transactions (the "2021 Corporate

Restructuring") through which it ceased to exist, and two new companies, LTL and Johnson &

Johnson Consumer Inc. ("New JJCI"), ultimately were formed. *Kim Decl.* ¶¶ 16, 22-23, ECF No.

---

[4] *Robert Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020), *reh'g and/or transfer denied* (July 28, 2020), *transfer denied* (Nov. 3, 2020), *cert. denied*, 141 S. Ct. 2716, 210 L. Ed. 2d 879 (2021).

5. The labyrinthine progression toward the creation of Debtor is somewhat overwhelming. First, Old JJCI's then-direct parent, Janssen Pharmaceuticals, Inc., organized Currahee Holding Company Inc. ("Currahee") to become the new direct parent of Old JJCI. Currahee organized Chenango Zero LLC, a Texas limited liability company, as its wholly-owned subsidiary. After this, Old JJCI merged with Chenango Zero LLC, leaving Chenango Zero LLC as the surviving entity. A funding agreement, as discussed below, was agreed to by J&J and Currahee as payors and Chenango Zero LLC as payee. Using the Texas Business Organizations Code, Chenango Zero (Old JJCI) effected a divisional merger where Old JJCI was dismantled, leaving two new Texas limited liability companies—Chenango One LLC and Chenango Two LLC—to divide all the assets and liabilities of Old JJCI. Chenango Two LLC merged with and into Currahee. As the surviving entity, Currahee then changed its name to Johnson and Johnson Consumer Inc. ("New JJCI"). Chenango One LLC converted from a Texas limited liability company into a North Carolina limited liability company and changed its name to LTL Management, LLC. *Id*. at ¶¶ 22-23.

The supposed purpose of this restructuring was to "globally resolve talc-related claims through a chapter 11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." *Id*. at ¶ 21. As a result of the 2021 Corporate Restructuring, LTL assumed responsibility for Old JJCI's talc-related liabilities. *Id*. at ¶¶ 16, 24. Through the restructuring, LTL also received Old JJCI's rights under a funding agreement (the "Funding Agreement"). *Id*. at ¶ 24. Under the Funding Agreement, J&J and New JJCI, on a joint and several basis, are obligated to

5

pay "any and all costs and expenses" up to the value of New JJCI[5] excluding the talc liability that LTL incurs during its bankruptcy case, "including the costs of administering the Bankruptcy Case" to the extent necessary. *Funding Agreement* 6, *Annex 2 to Kim Decl.* ECF No. 5. In addition, the Funding Agreement obligates New JJCI and J&J to fund amounts necessary:

> (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.

*Id*. at ¶ 27. Debtor has no repayment obligation as the Funding Agreement does not establish a loan. *Id*.

The 2021 Corporate Restructuring also lays out Debtor as the direct parent of a North Carolina limited liability company, Royalty A&M LLC ("Royalty A&M"), which owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON® and ROGAINE® products. *Burian Report* at 15. Debtor asserts that it intends to review royalty monetization opportunities in the healthcare industry and grow its business by reinvesting the income from these existing royalty revenue streams into both the acquisition of additional external royalty revenue streams, as well as financings to third parties secured by similar royalty streams. *Kim Decl.* ¶ 18. On October 11, 2021, Old JJCI organized Royalty A&M as a direct subsidiary of LTL and—in exchange for full

---

[5] As explained at trial by Debtor's Counsel, the "floor" of the Funding Agreement is the value of Old JJCI at the time of the merger, minus the talc liability. The value of the Funding Agreement increases, however, as the value of New JJCI post-transaction increases.

ownership of Royalty A&M's equity—contributed $367.1 million. *Id.* at ¶ 22. Subsequently, Royalty A&M used those funds to acquire certain royalty streams from Old JJCI and certain of its affiliates. *Id.* Debtor estimates that the fair market value of its interest in Royalty A&M was approximately $367.1 million as of the petition date. Together with the $6 million in cash it received for its bank account after the merger, Debtor's value is approximately $373.1 million, not including the Funding Agreement with New JJCI and J&J. *Id.* at ¶ 26. Thereafter, on October 14, 2021, LTL filed a voluntary petition for chapter 11 relief in the North Carolina Bankruptcy Court.

On December 1, 2021, the Original TCC filed a motion to dismiss Debtor's chapter 11 bankruptcy case with prejudice pursuant to § 1112(b) of the Bankruptcy Code (ECF No. 632). Shortly thereafter, the law firm of Arnold & Itkin LLP ("A&I") filed its own motion (ECF No. 766) also seeking dismissal of Debtor's case. Debtor filed opposition to the Motions (ECF No. 956). Two law firms representing talc claimants filed joinders to the Motions (ECF Nos. 1003 and 1092). A&I, TCC I, and TCC II (collectively, the "Movants") filed separate replies (ECF Nos. 1354, 1357 and 1358, respectively). The Canadian Class Action Plaintiffs opposed the Motions (ECF No. 1432). The Court approved a briefing schedule that allowed for the filing of sur-replies by Debtor and Movants (ECF Nos. 1444 and 1457, respectively). On February 14, 2022, the Court commenced a five-day trial to address the Motions and the related Preliminary Injunction Motion in the pending Adversary Proceeding (ECF No. 2 in Adv. Pro. No. 21-03032). Both sides made oral argument and introduced fact and expert witnesses. Specifically, the Court considered testimony from the following fact witnesses:

- John H. Kim, Chief Legal Officer of LTL Management LLC
- Adam Lisman, Vice President and Assistant Corporate Controller of Johnson & Johnson

7

- Thibaut Mongon, Executive Vice President and Worldwide Chair of Johnson & Johnson Consumer Health
- Michelle Ryan, former Treasurer of Johnson & Johnson (via recorded deposition testimony)
- Michelle Wang Goodridge, President of U.S. Self-Care with Johnson & Johnson Consumer Health and President of Johnson & Johnson Consumer Inc.
- Robert O. Wuesthoff, President of LTL Management, LLC and President of Royalty A&M LLC

The Court also heard testimony from five expert witnesses including:

- Gregory K. Bell, PhD, Group Vice President of Charles River Associates for Debtor
- John R. Castellano, Managing Director at Alix Partners for Debtor
- Charles H. Mullin, PhD, Managing Partner at Bates White Economic Consulting for Debtor
- Saul E. Burian, Managing Director at Houlihan Lokey for Movants
- Matthew Diaz, Senior Managing Director at FTI Consulting, Inc. for Movants

To the extent the Court finds the expert testimony helpful, reference has been made in this opinion to the applicable report or testimony. In rendering its decision, the Court also has reviewed declarations submitted by Rebecca J. Love, D.D.S., a member of TCC I, and Kristie Doyle, a member of the TCC II. Finally, the Court has considered brief statements offered by the United States Trustee and counsel for the Canadian Class Action Plaintiffs on the final day of trial, February 18, 2022.

## II. Discussion

### A. Overview

By way of brief overview, the Movants and other talc claimants, in their own words, view their tasks as a moral and legal imperative to vigorously oppose the efforts of **both** J&J and Old JJCI to utilize the bankruptcy system as a litigation tactic to address their talc-related litigation liabilities through this Debtor. Movants point to the fact that LTL was created within hours before the chapter 11 filing, as a special purpose vehicle, with the stated purpose of filing chapter 11 to

8

employ the bankruptcy's automatic stay and asbestos resolution schemes for the benefit of its

solvent operating parent and affiliated entities, as well as certain third parties ("Protected Parties"),

without such entities filing for chapter 11.[6] Movants further note that Debtor has no business

purpose, no employees apart from those seconded by J&J, and that LTL's board, management and

employees all work for J&J and owe 100% fealty to J&J. Movants assert that Debtor has no trade

creditors, lenders, bondholders, customers, suppliers, vendors, landlords, tax creditors, etc., and,

in general, the chapter 11 process offers nothing of value to this estate and its creditors. Moreover,

Movants contend that Debtor's creation through the pre-petition restructuring mechanism—the

divisional merger under the Texas Business Corporation Act widely referred to as the "Texas Two-

Step" ("2021 Corporate Restructuring")—was intended to force talc claimants to face delay and

to secure a "bankruptcy discount"; in Movants' words, "an obvious legal maneuver to impose an

unfavorable settlement dynamic on talc victims." *TCC I Reply Mem.* 3, ECF No. 1357.

   Not unexpectedly, Debtor takes a far more positive view of the chapter 11 foundation and

its purposes: to produce an equitable resolution of both current and future talc claims by means of

a settlement trust, established pursuant to § 105 or § 524(g), that can promptly, efficiently, and

fairly compensate claimants. Indeed, from the very outset of the case, Debtor acknowledges

through John Kim's First Day Declaration that the 2021 Corporate Restructuring was implemented

to enable Debtor to fully resolve talc-related claims though a chapter 11 reorganization, without

subjecting the entire enterprise to a bankruptcy proceeding. Debtor makes no effort to conceal its

---

[6] In the Committees' words, the bankruptcy lacks a proper purpose because LTL is a "dummy" corporation with "no business, no operations, no employees, no funded debt," limited "assets," and no need for a "fresh start." *Comm. Mot.* ¶¶ 4-5, 41, ECF No. 632.

reservations regarding redress through the tort system, which Debtor views as creating inefficiencies, inequities, and delay. Debtor characterizes the jury system as a lottery in which a few plaintiffs have obtained recoveries ranging from tens of millions to multiple billions in dollars, while others have been denied recoveries completely. Unsurprisingly, Debtor also disputes the negative portrayal of the intent and impact of the restructuring, noting that neither Debtor, nor any of its affiliated entities have escaped liability and also emphasizing that all of the assets and funding sources extant pre-restructuring, remain available through this proceeding. Debtor highlights that the Funding Agreement, which provides funding up to at least the fair market value of Old JJCI (pegged by Debtor's management at approximately $60 billion) serves to eliminate any prejudice to creditors and overcome fraudulent transfer challenges.

## B.  Applicable Legal Standard

The Third Circuit has held that "a Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999). At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy:

> [A good faith standard] furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy. Requirement [sic] of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way . . . .

*SGL Carbon*, 200 F.3d at 161–62 (quoting *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986)); *see also Carolin Corp.*

10

*v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989) (holding that the good faith requirement is

"indispensable to proper accomplishment of the basic purposes of Chapter 11 protection"). Once

the movant establishes that there is an issue regarding good faith,[7] the debtor bears the burden of

proving that a petition was filed in good faith. *NMSBPCSLDHB, L.P. v. Integrated Telecom*

*Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004); *In re*

*GVS Portfolio I B, LLC*, No. 21-10690 (CSS), 2021 WL 2285285, at *5 (Bankr. D. Del. June 4,

2021) (quoting *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 208 (3d Cir. 2000) ("[O]nce a

debtor's good faith is appropriately put at issue, it is the burden of the debtor to produce evidence

of good faith.")); *In re Cloudeeva, Inc.*, No. 14-24874, 2014 WL 6461514, at *4 (Bankr. D.N.J.

Nov. 18, 2014). The debtor bears the burden of proving good faith by a preponderance of the

evidence. *In re Vascular Access Centers, L.P.*, 611 B.R. 742, 761 (Bankr. E.D. Pa. 2020).

The good faith inquiry is based on "'the totality of facts and circumstances.'" *In re*

*Integrated Telecom*, 384 F.3d at 118 (quoting *In re SGL Carbon*, 200 F.3d at 162). In determining

whether a chapter 11 petition was filed in good faith, the court must undertake a "fact intensive

inquiry" to determine where the petition "falls along the spectrum ranging from the clearly

acceptable to the patently abusive." *Id.*; *see also Perlin v. Hitachi Cap. Am. Corp.*, 497 F.3d 364,

---

[7] Debtor contends that a movant must first establish a *prima facie* case of "bad faith" before the burden shifts to the Debtor and cites to *In re Walden Ridge Dev. LLC*, 292 B.R. 58, 62 (Bankr. D. N.J. 2003). While this case, and others in fact so hold, this line of cases traces this proposition all the way back to *Matter of Century City, Inc.*, 8 B.R. 25 (Bankr. D.N.J. 1980), in which Judge DeVito simply noted that unlike chapter X of the Bankruptcy Act of 1898, the Bankruptcy Code does not explicitly require filings to be undertaken in good faith, and thus required the movant to make a *prima facie* showing of lack of good faith. The bulk of the case law in this Circuit has evolved in the past 42 years without employing this *prima facie* showing requirement. Notwithstanding, even if the Court were to do so, Movants have raised the issue of Debtor's good faith sufficiently to shift the burden upon Debtor. *See In re Mottilla*, 306 B.R. 782, 789 (Bankr. M.D. Pa. 2004) ("After scrutinizing the *Tamecki* decision, I can only conclude that the Circuit requires a movant to produce relatively little evidence to place a debtor's good faith at issue.").

372 (3d Cir. 2007). The focus of the inquiry is whether the petitioner sought "to achieve objectives outside the legitimate scope of the bankruptcy laws." *In re SGL Carbon Corp.*, 200 F.3d at 165 (internal quotations omitted). The question of a debtor's good faith "depends on an amalgam of factors and not upon a specific fact." *Id.* (quoting *Idaho Dep't of Lands v. Arnold* (*In re Arnold*), 806 F.2d 937, 939 (9th Cir. 1986)). "[T]he courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'" *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.*), 849 F.2d 1393, 1394 (11th Cir. 1988) (quoting *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir. 1984)); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 297–98 (Bankr. D. Del. 2011); *see also In re Schaffer*, 597 B.R. 777, 791 (Bankr. E.D. Pa. 2019), *aff'd sub nom. Matter of Schaffer*, 606 B.R. 228 (E.D. Pa. 2019), *aff'd sub nom. In re Schaffer*, No. 19-3664, 2020 WL 2529371 (3d Cir. Jan. 24, 2020).

All parties acknowledge that the general focus must be "(1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *15375 Mem'l Corp. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) (citing *In re SGL Carbon*, 200 F.3d 154,165 (3d Cir. 1995)). "[T]he 'good faith' filing requirement encompasses several, distinct equitable limitations that courts have placed on Chapter 11 filings . . . to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws." *SGL Carbon,* 200 F.3d at 165 (quoting *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994)). In evaluating the legitimacy of Debtor's bankruptcy filing, this Court must also examine a far more significant issue: which judicial system—the state/federal court trial system,

12

or a trust vehicle established under a chapter 11 reorganization plan structured and approved by the United States Bankruptcy Court—serves best the interests of this bankruptcy estate, comprised primarily of present and future tort claimants with serious financial and physical injuries.[8] It goes without saying that this and related inquiries have been the subject of academic, judicial, and policy debates for years. In ruling today, however, this Court considers only the facts and applicable law relevant to this case, and this case only, and there is no expectation that this decision will be the final word on the matters.

As will be discussed below, the Court is unwilling to dismiss this case as a bad faith filing. The Court employs the standards cited above and followed by other courts within the Third Circuit. On aside, the Court acknowledges there is a much more stringent standard for dismissal of a case for lacking good faith in the Fourth Circuit, which would have governed a decision by Judge Whitley in North Carolina.  The Court cannot help but ponder how a bankruptcy filing, which took place in North Carolina and most likely satisfied the good faith standards under the applicable law in that jurisdiction, suddenly morphs post-petition into a bad faith filing simply because the case travels 400 miles up I-95 to Trenton, New Jersey. Notwithstanding, the Court rules today that the chapter 11 filing also satisfies the standards this Court must apply under Third Circuit precedent.

---

[8] While Movants may take issue with the Court's decision to assess the merits of the competing judicial systems as part of the totality of circumstances underlying the chapter 11 filing, these issues are likewise relevant as to whether § 1112(b)(2) provides an alternative to dismissal. "[E]ven if 'cause' exists, § 1112(b)(2) precludes dismissal or conversion if 'unusual circumstances' exist such that that conversion or dismissal of the case is not in the best interests of the creditors or the bankruptcy estate and there is a reasonable likelihood that a chapter 11 plan will be confirmed within either a reasonable time or applicable statutory deadlines." *In re: 1121 Pier Village LLC, et al.*, No. 21-11466 (ELF), 2022 WL 102622 (Bankr. E.D. Pa. Jan. 11, 2022). As discussed *infra,* the Court finds that Debtor has pursued the chapter 11 filing in good faith. Even if this were not the case, the Court holds that the interests of current tort creditors and the absence of viable protections for future tort claimants outside of bankruptcy would constitute such "unusual circumstances" as to preclude either dismissal or conversion of the case.

13

### 1.  Valid Bankruptcy Purpose Underlying LTL Management LLC's Decision to File Chapter 11

To be filed in good faith, a chapter 11 petition must be supported by "a valid reorganizational purpose." *In re SGL Carbon*, 200 F.3d at 165–66. When a company "seek[s] the protections of bankruptcy when faced with pending litigation that pose[s] a serious threat to [a] compan[y's] long term viability," a valid reorganizational purpose exists only if the company is experiencing "serious financial and/or managerial difficulties at the time of filing . . . to establish the good faith of its present petition." *In re SGL Carbon*, 200 F.3d at 164. As the Supreme Court has explained, the two main functions of the bankruptcy law are (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors." *In re Integrated Telecom Express, Inc.*, 384 F.3d 119 (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453, 119 S. Ct. 1411, 143 L.Ed.2d 607 (1999)). "If **neither** of these purposes can be demonstrated, the petition will be dismissed." *In re Am. Cap. Equip., LLC*, 296 F. App'x 270, 274 (3d Cir. 2008) (citation omitted) (emphasis added).  In their oral and written arguments, Movants urge the Court to restrict its examination to the valid business purpose held by the Debtor, LTL, as opposed to the reorganizational needs of Old JJCI. The Court certainly agrees that it is the **Debtor's** good faith at issue. Yet, even the Movants' experts testified that the 2021 Corporate Restructuring and the ensuing bankruptcy filing should be viewed by this Court as "a single, pre-planned, integrated transaction" comprised of interdependent steps. *See Burian Report* at 8; *Expert Report of Matthew Diaz* ("*Diaz Report*") at 19. This Court must undertake an analysis that considers the totality of the circumstances and consider the financial risks and burdens facing both Old JJCI and Debtor.

14

While the parties may debate whether as a result of the 2021 Corporate Restructuring, LTL continues as a "going concern," this Court has little trouble finding that the chapter 11 filing serves to maximize the property available to satisfy creditors by employing the tools available under the Bankruptcy Code to ensure that all present and future tort claimants will share distributions through the court-administered claims assessment process. Movants' challenge to the manner the estate is to be maximized does not alter the fact that a successful reorganization and implementation of a settlement trust will dramatically reduce costs and ensure balanced recoveries for present and future claimants. *See, e.g.*, *In re Am. Cap. Equip., LLC*, 296 F. App'x at 274 ("As the District Court explained, while Appellants make a number of arguments that Debtors' plan does not maximize the value of the estate, what these arguments actually take issue with is 'how the value was maximized.' What is clear is that under Debtors' plan, both the asbestos claimants and the unsecured creditors will be able to share in the assets of the estate").

From the outset, J&J and Debtor have been candid and transparent about employing Debtor's chapter 11 filing as a vehicle to address the company's growing talc-related liability exposure and costs in defending the tens of thousands of pending ovarian cancer claims and hundreds of mesothelioma cases, as well as future claims. As Movants' own experts have acknowledged, the use of the Texas divisional merger statute and subsequent filing by the newly formed LTL constituted a single integrated transaction designed to allow "New JJCI to continue to operate Johnson & Johnson's Consumer Health business in the United States without interruption and provide LTL with the opportunity to pursue process to resolve current and future [cl]aims in an equitable and efficient manner." *Debtor's Exhibit* D-56.

15

Let's be clear, the filing of a chapter 11 case with the expressed aim of addressing the present and future liabilities associated with ongoing global personal injury claims to preserve corporate value is unquestionably a proper purpose under the Bankruptcy Code. *See, e.g., In re Bestwall LLC*, 605 B.R. 43, 49 (Bankr. W.D.N.C. 2019) ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency);[9] *In re SGL Carbon*, 200 F.3d at 163-64, 169 (distinguishing confined nature of litigation in *SGL Carbon* with efforts to resolve thousands of mass tort claims) (citing ALAN N. RESNICK, *Bankruptcy as a Vehicle for Resolving Enterprise–Threatening Mass Tort Liability*, 148 U. PA. L. REV. 2045, 2050–51 (June 2000*)); In re Muralo, Co. Inc.*, 301 B.R. 690, 706 (Bankr. D.N.J. 2003) (finding debtor's "sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos . . . cases" a "significant factor evidencing the good faith of Debtors' filings"). At the time of filing, Debtor— as did its immediate predecessor—faced nearly 40,000 pending tort claims, with thousands of additional claims expected annually for decades to come. *Bell Report* at 10. As of the petition date, Debtor also anticipated billions of dollars in talc-related liability and defense costs. *Id.* Indeed, in the first nine months of 2021, more than 12,300 new lawsuits were filed. *Id.* Additionally, there were pending (although contested) indemnification obligations owing to talc suppliers Imerys Talc America, Inc. and Cyprus Mines Corporation estimated at anywhere between $25 billion to $118.2 billion in damages. *Bell Report* at 12. These anticipated liabilities

---

[9] Movants contend that the Court should not rely upon *Bestwall* since that court was considering dismissal under the far more stringent *Carolin* standard of "objective futility." However, a determination as to the existence of a "valid business purpose" is separate and apart from the futility of a debtor's reorganization efforts and the court's opinion retains relevance.

are not merely speculative, given the history of actual defense spending and verdicts rendered to date. Since June of 2018, there have been 13 mesothelioma verdicts awarding $320.6 million in punitive damages and $155.2 million in compensatory damages for a total of $475.8 million. S*ee Diaz Report* at 13. By this Court's math, that averages to approximately $36.6 million per claim. With approximately 430 mesothelioma claims filed as of the chapter 11 petition date, one could argue that the Debtor's financial exposure exceeded $15 billion, not including the tens of thousands of ovarian cancer claims and all future cancer claims. Debtor's efforts to address the financially draining mass tort exposure through a bankruptcy is wholly consistent with the aims of the Bankruptcy Code.

The Court is cognizant of the Third Circuit's admonition, as pointed out by Movants, that "a desire to take advantage of a particular provision in the Bankruptcy Code, standing alone . . . does not . . . establish[] *good* faith." *In re Integrated Telecom*, 384 F.3d at 127-128 ("Just as a desire to take advantage of the protections of the Code cannot establish *bad* faith as a matter of law, that desire cannot establish *good* faith as a matter of law. Given the truism that every bankruptcy petition seeks some advantage offered in the Code, any other rule would eviscerate any limitation that the good faith requirement places on Chapter 11 filings."). However, Debtor here has demonstrated an intent to make use of the Bankruptcy Code as a whole, apart from any single Code section, to address its financial needs. There is no question as to the import and value to Debtor of implementing an asbestos trust under § 524(g). Nonetheless, this tool does not operate in a vacuum. Rather, the Debtor seeks to take advantage of the centrality of the bankruptcy forum, the breathing spell available under § 362, the efficiencies found in the claims allowance and

17

estimation processes, and most significantly the opportunity to negotiate a global resolution to torrents of talc-related litigation as to present and future cancer victims. Moreover, the creation of a settlement trust is not wholly dependent upon § 524(g)—numerous non-asbestos mass tort cases have established trust mechanisms under confirmed plans bottomed on other Code provisions.

All Code sections are not equal in import or impact. In *Integrated Telecom,* a nonoperating liquidating debtor desired to take advantage of the § 502(b)(6) cap on the landlord's claim and argued that this purpose, in and of itself, established good faith. *See In re Integrated Telecom*, 384 F.3d 108. *Integrated* involved an effort to file a chapter 11 to reduce a singular type of claim for an isolated creditor. In contrast, Congress added 11 U.S.C. § 524(g) to the Bankruptcy Code to "help asbestos victims receive maximum value" from bankrupt entities. 140 Cong. Rec. S14,461 (Sept. 12, 1994) (statement of Sen. Heflin); *see also In re Am. Cap. Equip., LLC*, 688 F.3d 145, 159 (3rd Cir. 2012) ("[T]he [bankrupt] company remains viable . . . [and] continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims." (alterations in original)); *In re ACandS, Inc.* 311 B.R. 36, 42 (Bankr. D. Del. 2004). Section 524(g) was meant to "strengthen . . . trust/injunction mechanisms," 140 Cong. Rec. 20, 27, 692 (1994), and, to the extent possible, account for "the interests of future claimants," H.R. Rep. No. 103–835, 3349 (1994). Quite simply, this Court will not equate the use of this provision with merely an effort to cap a landlord's rent.

Determining whether Debtor is pursuing a valid bankruptcy purpose through this chapter 11 proceeding also requires the Court to examine a far more difficult issue—whether there is

18

available to Debtor and the tort claimants a more beneficial and equitable path toward resolving Debtor's ongoing talc-related liabilities. For the reasons which follow, this Court holds a strong conviction that the bankruptcy court is the optimal venue for redressing the harms of both present and future talc claimants in this case—ensuring a meaningful, timely, and equitable recovery.

There is no question that, over time, our bankruptcy courts have witnessed serious abuses and inefficiencies, striking at the heart of the integrity of our bankruptcy courts.  For instance, the approval of overly broad nonconsensual third-party releases, and the propriety/necessity for twenty-four hour accelerated bankruptcy cases have drawn deserved scrutiny. Likewise, the selection of case venue, as in the matter at hand, has warranted critical attention and debate.[10] In point of fact, there has been a deluge of critical commentary in recent months by academics, commentators, and even policymakers[11] challenging the shortfalls of the bankruptcy system and calling for reform. Some have even employed such distasteful, click-generating insidious phrases as "morally corrupt" or "lawless" in reference to the bankruptcy courts. No one can deny that there are situations in which tools and strategies have been abused and warrant critical review. Unfortunately, however, these commentators choose to focus on the limited failings of the system, as opposed to its innumerable successes. Every one of the Court's 370 plus colleagues on the

---

[10] This case is venued now where it should be. The appropriateness of the original filing in North Carolina can be debated, but that discussion should not color the primary inquiry as to whether the case at this point should proceed in the bankruptcy court.

[11] By way of example, upon direct and cross examination, Mr. Kim was shown correspondence dated November 10, 2021, from certain members of Congress taking issue with the Debtor's approach in this bankruptcy proceeding. As these policymakers have not had the benefit of reading the briefs, examining the evidence, or listening to oral arguments, the correspondence holds no weight. As is well-established, Congress speaks with one voice through enacted legislation *Cf.* MICHAEL B. W. SINCLAIR, *Guide to Statutory Interpretation* 103 (2000) ("[O]ur legislatures speak only through their statutes; statutes are their only voice. . . .")

bankruptcy bench can point to successful case outcomes where large and small businesses are reorganized, productive business relationships are maintained, jobs preserved and, most importantly, meaningful returns distributed to creditors—all in situations where outside of the bankruptcy system there would be fewer if any identifiable benefits, and the parties left to expensive and time-consuming litigation. This holds especially true for mass tort situations, including asbestos bankruptcies, in which § 524(g) trusts and comparable non-asbestos trust vehicles have been established to ensure meaningful, timely recoveries for present and future suffering parties and their families.

While this Court recognizes and appreciates the passion and commitment of the Committee members and every one of the attorneys advocating for the interests of the injured cosmetic talc claimants in this case, the Court simply cannot accept the premise that continued litigation in state and federal courts serves best the interest of their constituency. Many of these cases, both in the United States and abroad, have been pending for a half dozen or more years and remain years away from trial dates, not to mention the substantial delays they face in the inevitable appeals process. Notably, since 2014, there have been only 49 trials that have proceeded to verdict. True, in this same period, there have been approximately 6,800 cases which have settled outside of court. *Movants' Exhibit* 161. This number is dwarfed, nonetheless, by the projected 10,000 new cases to be filed each year going forward. *See Expert Report of Charles H. Mullin, PhD* ("*Mullin Report*") at 5. As noted in her *amici curiae* brief, Professor Maria Glover acknowledges there is no perfect solution to the problems with mass tort litigation: "But no mechanism for handling the thorny challenges of mass torts is perfect, including bankruptcy. Indeed, it is the nature of mass torts to

present different combinations of challenges, and those challenges follow mass torts wherever they go." *Memorandum of Law of Amici Curiae by Certain Complex Litigation Law Professors* ("*Glover Brief*") 25, ECF No. 1410.

For instance, a class action is not usually suitable for mass tort cases, since there typically exists too much variation concerning claimants' injuries, illnesses, and related losses. In the 1990s, the United States Supreme Court issued two decisions that effectively terminated the use of class actions, at least for product liability cases. In *Georgine v. Amchem Prods., Inc.*, 521 U.S. 591, 138 L.Ed.2d 689 (1996), an asbestos case, the Supreme Court held that class actions under Fed. R. Civ. P. 23 could not be used to manage mass tort cases. The cases were too dissimilar, and there were also some "future" plaintiffs, individuals exposed to asbestos, but not yet manifesting disease. Likewise, in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 144 L.Ed. 715 (1999), the Supreme Court shut the door with respect to class actions for mass tort cases involving a "limited fund," where the parties attempted to structure the settlement as a mandatory class—that is, without opt-out rights for class members—on the theory that a "limited fund" existed. The Supreme Court took issue with the settlement class in *Ortiz* for failing to assure the necessary level of cohesiveness of interests among absent class members, the representative plaintiffs, and class counsel to justify class treatment. The Court held that the class failed to provide structural protections against the likely conflicts of interests among class members. *Ortiz*, 527 U.S. at 856-57. The attempt to describe the litigation as a limited fund also received minimal sympathy. In the Court's view, a limited fund class had to demonstrate both necessity and equitable distribution. *See id.* at 850–53

21

(admonishing lower courts for accepting, without investigation, the litigants' attempt to create a limited fund by discounting the value of assets available for payment to class members).

Significantly, as Debtor points out, the *Ortiz* Court highlighted the difference between due process concerns in representative suits (*e.g.* class actions) versus bankruptcy cases. *Id.* at 846; *see also Debtor's Omnibus Response to the Amicus Briefs* 20-21, ECF No. 1554.  The Supreme Court rejected the use of class actions under FED. R. CIV. P. 23 to aggregate unliquidated tort claims under a limited fund rationale and, in examining commentary to the Rule, observed that if such action were allowed, "in mass torts, (b)(1)(B) 'limited fund' classes would emerge as the functional equivalent to bankruptcy by embracing 'funds' created by the litigation itself[.]" *Ortiz*, 527 U.S. at 843 (quoting HENRY PAUL MONAGHAN, *Antisuit Injunctions and Preclusion Against Absent Nonresident Class Members*, 98 COLUM. L. REV. 1148, 1164 (1998).  Thus, in *Ortiz*, the Supreme Court recognizes bankruptcy as a sound and appropriate approach to addressing mass tort claims. *Id.*

> As further noted by Professor Troy A. McKenzie:
>
> The Court's strict formalism in *Amchem* and *Ortiz* also derived from an unhidden skepticism about the use of the Federal Rules of Civil Procedure as license to undertake essentially legislative reforms. The question presented in *Amchem*, as Justice Ginsburg phrased it, was "the *legitimacy under Rule 23* of the Federal Rules of Civil Procedure of a class action certification sought to achieve global settlement of current and future asbestos claims." The unspoken assumption in both cases, then, was that methods of global resolution that did not invoke the Federal Rules of Civil Procedure could escape the rigid strictures placed on the class action by the Court.

TROY A. MCKENZIE, *Toward a Bankruptcy Model for Non-Class Aggregate Litigation*, 87 N.Y.U. L. REV. 960, 977 (2012) (emphasis in original).

Addressing mass torts through a legislative scheme enacted by Congress within the bankruptcy system does not run afoul of the concerns expressed above and provides a judicially accepted means of aggregating and resolving mass tort claims. There is no authority to the contrary ruling that use of § 105 or § 524(g) settlement trusts contravene *Amchem* and *Ortiz.* Moreover, there is no evidence before this Court that Debtor or its predecessor, Old JJCI, manufactured a limited fund by undervaluing or limiting assets. Rather, the Court finds that any such limited fund is the product of overwhelming potential talc liabilities, which far exceed Debtor's (and Old JJCI's) capacity to satisfy through current available assets.

The multi-district litigation ("MDL") poses its own set of significant challenges and inefficiencies. Here in New Jersey, for instance, the MDL being handled by Chief Judge Wolfson —which does not include mesothelioma cases, the Canadian class actions, state court proceedings, or the claims of future tort victims—will at best produce a handful of bellwether trials later in 2022, offering some insight into the strength of the cases, but will also necessarily return nearly 40,000 cases to federal courts across the country to await pre-trial proceedings and eventual trials and appeals. Notwithstanding the pre-trial work undertaken through the MDL, the fact remains that plaintiffs and defendants will be forced to relitigate causation, and damages, and apportion liability among defendants in every case, which will be both costs prohibitive and "burden the tort system with unnecessarily drawn-out litigation." *Mullin Report* at 9.

Again, in her *amici curiae* submission, Professor Glover touts the "flexibility and adaptiveness" of MDL in facilitating settlements and global resolutions by experienced MDL judges. *Glover Brief* at 24. The Court has no doubt that talented federal judges have produced

23

significant settlements though MDL devices. To be sure, this Court knows of no better jurist at bringing about settlements than Chief Judge Wolfson. Yet, in nearly six years, there has been no progress toward a global resolution through the current MDL. The Court is unaware of any meaningful settlement talks apart from the near global settlement in the *Imerys* bankruptcy.

The fact remains that since 2014—over seven years ago—only 49 trials have gone to verdict, and many of those remain on appeal or have been remanded to retry. Given the pace of the litigations to date, as well as the mounting escalation in the number of new actions being brought monthly,[12] the vast majority suffering from illness in the existing backlog of cases will not see a penny in recovery for years. The tort system has struggled to meet the needs of present claimants in a timely and fair manner.[13] The system is ill-equipped to provide for future claimants. The Court has no reason to believe this will differ for the talc plaintiffs here.

This Court is neither blind nor deaf to the stated preferences of plaintiffs who seek to remain in the tort system and have their cases tried before a jury. The tort claimants have not chosen the bankruptcy forum. Indeed, creditors rarely choose to have their rights vindicated in the bankruptcy courts, but our Constitution and the laws passed by Congress countenance such a result. Undeniably, there have been sizable multi-million and multi-billion dollar verdicts in favor of handful of plaintiffs who were fortunate to have their claims brought in front of a jury. Movants

---

[12] New ovarian cancer filings have been accruing at more than 10,000 claims per year. *Mullin Report* at 5.

[13] *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 598 (1997) ("[D]ockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.") (quoting *Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation* 2-3 (Mar. 1991)).

24

contend that the loss of jury trial rights would violate claimants' Seventh Amendment jury rights.

Nonetheless, there have been numerous asbestos trusts implemented under § 524(g) which provide

tort victims with choices between receiving guaranteed compensation under the trusts, or

alternatively pursuing recovery against the trusts through jury trials.[14] The trust distribution

procedures ("TDP") and plans, however, will usually place timing restrictions and caps on

compensatory and punitive damage recoveries. These limitations are critical to the process since

one of Congress's primary intentions in creating § 524(g) was to ensure uniform treatment of all

claimants. *In re W.R. Grace & Co.*, 475 B.R. 34, 171 (D. Del. 2012), *aff'd sub nom. In re WR*

*Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd,* 532 F. App'x 264 (3d Cir. 2013), and *aff'd,*

729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir.

2013). If the talc claimants were not subject to such a cap on jury verdicts and judgments, they

would be receiving preferential treatment in comparison to other similarly situated claimants.

---

[14] By way of example, § 7.6 of the Trust Distribution Procedures in the *Duro Dyne National Corp.* bankruptcy case provides:

> 7.6 Suits in the Tort System. If the holder of a disputed claim disagrees with the Asbestos Trust's determination regarding the Disease Level of the claim or the claimant's exposure history, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.8 above, the holder may file a lawsuit against the Asbestos Trust in the Claimant's Jurisdiction as defined in Section 8.3 below. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos Trust, all defenses which could have been asserted by a Debtor) shall be available to both sides at trial; however, the Asbestos Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the Asbestos Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

*Trust Distribution Procedures* 43, *Exhibit F to Third Amended Plan*, ECF No. 1-2 in Case No. 19-cv-15433 (also available at ECF No. 784-3 in Bankr. Case No. 18-27963).

Critically important is that § 524(g) ensures that present claimants do not exhaust the debtor's assets before future claimants have even manifested injuries. *Id*. The Seventh Amendment jury rights of talc plaintiffs would remain intact under a properly drafted and approved plan and TDP, and no case cited to the Court provides otherwise.

This Court also has factored into its decision the substantial risks facing the talc claimants in the tort system. There have been countless plaintiffs denied any recovery and many of the plaintiffs' verdicts have been reversed ultimately on appeal.[15] "The results of the 49 [t]alc [l]itigation cases to proceed to trial are inconsistent in terms of liability and damages awards. Defendants prevailed in 18 cases; plaintiffs prevailed in 17 cases; eight cases resulted in mistrials; and six cases settled during trial." *Bell Report* at 14.  It is inarguable that continued litigation of talc claims in the state and federal tort system comes with a meaningful risk of recovery. Debtor points to prior multiple litigation successes by J&J and Old JJCI over the years by securing dismissals of roughly 1,300 ovarian cancer cases and over 250 mesothelioma cases without payment and trying sixteen cases to defense verdicts. *See Kim Decl*. ¶ 38. ECF No. 5.  Old JJCI secured reversal of numerous plaintiff verdicts. *Id.* Of equal concern to this Court is the capacity for the state and federal courts to protect future claimants, whose claims may surface in the next half century given the acknowledged latency period for the types of cancer at issue. The needs of these victims are wholly ignored by the current rush to secure judgments against Debtor in the

---

[15] *See Hrg. Tr.* 34:11-12, Oct. 20, 2021, ECF No. 178 ("Old JJCI . . . ultimately prevailed in most of the talc cases it tried."); *Hrg. Tr.* 15:16-17, Dec. 15, 2021, ECF No. 846 ("[T]he company was prevailing in the majority of cases . . . ."); *Hrg. Tr.* 75:8-11, Jan. 11, 2022, ECF No. 1118 ("And most of the cases ended up with a defense verdict, and even where there's a plaintiff verdict most of them are reversed on appeal.").

26

federal and state courts. In the eyes of this Court, the tort system produces an uneven, slow-paced race to the courthouse, with winners and losers.  Present and future talc claimants should not have to bear the sluggish pace and substantial risk if there exists another viable option.

The Court's comments are not intended to dismiss or discredit the inarguable benefits of our tort system and the essential work of our plaintiffs' bar in bringing about corporate transparency and vindicating the rights of those victims who are ill-equipped to pursue their rights against large corporate defendants.  In this vein, we can all point to concrete illustrations where such litigation has been responsible for necessary safety reforms and health measures. What the Court regards as folly is the contention that the tort system offers the **only fair and just pathway** of redress and that other alternatives should simply fall by the wayside. It is manifestly evident that Congress did not share this narrow view in developing the structure of asbestos trusts under §524(g). There is nothing to fear in the migration of tort litigation out of the tort system and into the bankruptcy system.[16] Rather, this Court regards the chapter 11 process as a meaningful opportunity for justice, which can produce  comprehensive, equitable, and timely recoveries for injured parties. The bankruptcy courts offer a unique opportunity to compel the participation of all parties in interest (insurers, retailers, distributors, claimants, as well as Debtor and its affiliates) in a single forum with an aim of reaching a viable and fair settlement. As the Third Circuit noted in *In re Federal-Mogul Global, Inc.*:

> Bankruptcy has proven an attractive alternative to the tort system for corporations [facing mass tort claims] because it permits a global resolution and discharge of

---

[16] *But cf.* BRUBAKER, RALPH, *Mandatory Aggregation of Mass Tort Litigation in Bankruptcy* (November 9, 2021). The Yale Law Journal Forum, forthcoming, University of Illinois College of Law Legal Studies Research Paper No. 22-01, Available at SSRN: https://ssrn.com/abstract=3960117.

present and future liability, while claimant's interests are protected by the bankruptcy court's power to use future earnings to compensate similarly situated tort claimants equitably.

684 F.3d 355, 359 (3d 2012). Indeed, the Third Circuit has taken notice that the asbestos bankruptcy trusts achieved Congress's expressed aims in best serving the interests current and future asbestos victims,[17] as well as corporations saddled with such liabilities:

> Furthermore, the trusts appear to have fulfilled Congress's expectation that they would serve the interests of both current and future asbestos claimants and corporations saddled with asbestos liability. In particular, observers have noted the trusts' effectiveness in remedying some of the intractable pathologies of asbestos litigation, especially given the continued lack of a viable alternative providing a just and comprehensive resolution. Empirical research suggests the trusts considerably reduce transaction costs and attorneys' fees over comparable rates in the tort system.

*In re Federal-Mogul Glob., Inc.,* 684 F.3d at 362 (citing studies).

The Court acknowledges that Movants have raised a challenging and interesting issue as to whether Debtor can take advantage of a §524(g) trust: "[B]ecause LTL has never been named as a defendant in a talc case, then a channeling injunction and Section 524(g) trust will be unavailable under the plain language of the statute." *TCC II Reply Mem.* at 19 n.11, ECF No. 1358 (citing 11 U.S.C. § 524(g)(2)(B)(i)(I), which dictates that the injunction, together with the trust, must "assume the liabilities of a debtor which at the time of entry of the order for relief *has been named as a defendant* in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or

---

[17] The legislative history of § 524(g) is clear that Congress enacted the statute to assist any company facing liability that involves asbestos. H.R. REP. 103-835, 41, 1994 U.S.C.C.A.N. 3340, 3350 ("The asbestos trust/injunction mechanism established in the bill is available for use by any asbestos company facing a similarly overwhelming liability.").

asbestos-containing products") (emphasis added). The causes of action held by the talc plaintiffs are owing by Debtor as successor in interest to Old JJCI and, consequently, Debtor substitutes for Old JCCI in all federal actions as a matter of law. *See* FED. R. CIV. P. 25(c). At closing during the hearing, Debtor's counsel apprised the Court and all parties that Debtor in fact has been named in pending suits. Notwithstanding, as we have seen in other non-asbestos mass tort cases, referenced below, chapter 11 can still offer the opportunity to reach consensus on a global resolution of present and future claims without express resort to § 524(g).

In recent weeks and months, we have seen comprehensive and productive mediated settlements, producing hundreds of millions of dollars in funding of settlement trusts. Indeed, we need look only at the USA Gymnastics settlement approaching $400 million, the proposed Mallinckrodt $1.7 billion trust and the Boy Scouts proposed settlement nearing $3 billion as examples. Likewise, settlement trusts are in some stage of negotiation in over thirty Catholic Church diocese cases across the country. The Court places these positive results against a backdrop of dozens of successful asbestos trust cases created over the years pursuant to § 524(g), which continue to fund payments to asbestos victims. Claims reconciliation through these bankruptcy trusts place reduced evidentiary and causation burdens on the injured and their families, and resolution of claims and payments to victims can be achieved at a far more expeditious pace than through uncertain litigation in the tort system. A trust would establish a far simpler and streamlined process—both for present and future cosmetic talc claimants—than

currently available in the tort system.[18] As noted by the court in *In re Bestwall LLC*, 606 B.R. at 257: "[A] section 524(g) trust will provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims."

Through adopted procedures, these trusts establish fixed criteria and common parameters for payments to claimants, ensuring a level playing field for all present and future victims, taking into consideration the significance of preserving all due process rights. *See In re W.R. Grace & Co.*, 729 F.3d 311, 324 (3d Cir. 2013) ("Therefore, as long as a court correctly determines that § 524(g)'s requirements are satisfied, present and future claims can be channeled to a § 524(g) trust without violating due process."). In recent years, state attorneys general and the United States Justice Department have undertaken numerous investigations of existing trust funding and trust distribution procedures and have brought issues before courts aimed at safeguarding the availability of funding for future claimants. In sum, the bankruptcy system, through use of a §524(g) trust, will "provide all claimants—including future claimants who have yet to institute litigation—with an efficient means through which to equitably resolve their claims." *In re Bestwall LLC*, 606 B.R. at 257.   A settlement trust, with proper oversight and funding, can best serve the needs of Debtor and talc claimants alike.

---

[18] "A plan of reorganization can implement a trust with administrative procedures to resolve claims with far lower transaction costs [attorneys' fees] and in a timelier manner for both the claimants and Debtor than continued litigation in the tort system." *Mullin Report* at 5, 12.

Throughout their submissions and oral argument, Movants have decried Debtor's (and its affiliated entities') efforts to "cap" the liabilities owing the injured parties.[19] Likewise, there have been emotive contentions that the chapter 11 process offers Debtor—as well as J&J and other affiliates—an unfair advantage, or upper hand in protecting assets and escaping liabilities and exposure. The Court does not share these views. Frankly, it is unsurprising that J&J and Old JJCI management would seek to limit exposure to present and future claims. Their fiduciary obligations and corporate responsibilities demand such actions. Nonetheless, merely seeking to limit liabilities, standing alone, does not demonstrate "bad faith" for purposes of filing under chapter 11. If that were so, nary a debtor would meet the "good faith' requirements. Rather, the Court finds this chapter 11 is being used, not to escape liability, but to bring about accountability and certainty.

The record before the Court does not reflect assets that have been ring-fenced, concealed, or removed. Neither J&J nor New JJCI (nor any J&J affiliate for that matter) are to be released from liability, or their assets placed out of reach of creditors, absent a negotiated settlement under a plan in which J&J's and New JJCI's roles and funding contributions warrant a release as a matter of both law and fact. True, a handful of claimants who have secured judgments may be delayed by the bankruptcy process, but this Court must act to ensure justice for all the nearly 40,000 current claimants and undetermined future injured parties (and families) who face years in litigation. Also, it is nonsensical to accept the notion that J&J and Old JJCI would bear the brunt of public and judicial scrutiny, as well as the time and costs to implement this integrated transaction, simply to

---

[19] *See, e.g.*, *A&I Reply Mem.* 23, ECF No. 1354 ("J&J created LTL to file for bankruptcy not only to "cap" the talc liabilities of Old JJCI that had been imposed on the Debtor, but also to 'cap' the talc liabilities *of J&J* and shield it from any talc litigation and any more judgments in favor of talc victims.").

stall claimants or walk away from its financial commitments under the Funding Agreement. Moreover, remedial creditor actions addressing the pre-petition divisive merger and restructuring remain available for creditors to pursue, if necessary. It is appropriate to note that the true leverage remains where Congress allocated such leverage, with the tort claimants who must approve of any plan employing a § 524(g) trust by a 75% super majority.[20] In filing this chapter 11, Debtor faces a risk that good-faith negotiations will not produce the consensus necessary to confirm a plan; notwithstanding, the Court hopes and expects the parties to undertake a sensible, pragmatic and reasonable approach to negotiations.

---

[20] As noted by Judge Beyer in *In re Bestwall, LLC*, 606 B.R. 243, 251 (Bankr. W.D.N.C. 2019), "claimants will be afforded due process in this case as a result of the requirements of the Bankruptcy Code and, in particular, section 524(g). Section 524(g) contemplates the active participation and support of the Committee, requires the affirmative vote of at least 75% of asbestos claimants in connection with confirmation of a plan seeking the benefits of that section (*see* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb)), and calls for approval of the plan of reorganization by both this Court and the District Court (*see* 11 U.S.C. § 524(g)(3)(A))."

### 2. **Debtor's Financial Distress**

Debtor is the successor to Old JCCI and has been allocated its predecessor's talc-based liabilities, including verdicts, settlements, and defense costs, "as reflected in Old JJCI's general ledger." *Debtor's Sur-Reply* 9, ECF No. 1444. As testified in detail by Mr. Adam Lisman, Assistant J&J Controller, at both his deposition and during trial, the talc-related expenses were charged to Old JJCI because it had legal responsibility for them. *Deposition Tr. of Adam Lisaman Lisman Dep. Tr.* 117:1-3, Oct. 30, 2021, *Ex. H to Toroborg Decl.*, ECF No. 1444-9 ("[T]hese are talc product liability costs that JJCI was ultimately responsible for, which is why it is showing up as a [sic]expense on their account.").[21] One cannot distinguish between the financial burdens facing Old JCCI and Debtor. At issue in this case is Old JJCI's talc liability (and the financial distress that liability caused), now the legal responsibility of Debtor. Absent a global settlement, neither entity would be able to defend or economically resolve the current and future talc-related claims. As Debtor's expert, Dr. Gregory Bell testified, and as reflected in J&J's public filings, talc-related litigation was the "primary driver" that caused J&J's entire Consumer Health segment "to drop from a $2.1 billion profit (14.8 percent of sales) in 2019 to a $1.1 billion loss (-7.6 percent of sales) in 2020." *Bell Report* at 4; *see also id.* at 6 ("This current and potential future financial drain imposed by the Talc Litigation . . . was threatening Old JJCI's ability to sustain the marketing, distribution, and R&D expenditures needed to compete in the U.S. market . . . placing Old JJCI at a significant competitive disadvantage.").

This chapter 11 followed denial of review by the U.S. Supreme Court of a multi-billion dollar award in the *Ingham* litigation, as well as other more recent verdicts for hundreds of millions

33

of dollars. There was also a break-down of a potential multi-billion dollar global settlement in the *Imerys* bankruptcy. The evidence before the Court establishes that at the time of the chapter 11 filing, this Debtor, LTL, had contingent liabilities in the billions of dollars and likely would be expending annually sums ranging $100-200 million in its defense of the tens of thousands of talc personal injury cases for decades to come.[22] The evidence confirms that the talc litigation payments and expenses forced Old JJCI into a loss position in 2020. *Bell Report* at 4-5. Indeed, to date, the talc-related litigation charges have eradicated all profits earned by Old JJCI from sales of talc-based consumer products, since inception, by more than four times over and have displaced more than 140% of the cash generated from the sales. *Bell Report* at 14. As highlighted in Debtor's Reply Memorandum, even plaintiffs' attorneys have recognized the substantial exposure facing Debtor (as successor to Old JJCI):

> Mr. Klein: "If the last seven jury awards in mesothelioma trials are any indication, and I submit to Your Honor that they are, then my Committee's constituents' claims are worth ten[s] of billions of dollars." [transcript citations omitted]

> Mr. Finch: "You know, Mr. Rice resolved the tobacco litigation 20 some years ago for $250 billion. I happen to think that the, the dollar figure here has to be a lot closer to 250 billion than the 2 billion that Johnson & Johnson has put on the table." [transcript citations omitted]

*Debtor's Sur-Reply* at 8, n.12, 13, ECF No. 1444 (citing transcripts of hearings held on Jan. 19, 2022 and Nov. 4, 2021 (*Toroborg Decl. Ex. E, F*, ECF No. 1444-6, 1444-7)).

---

[21] In the accompanying Memorandum Opinion Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors and Preliminarily Enjoining Such Actions, dated February 28, 2022, the Court analyzes in greater detail the bona fides of J&J's 1979 transfer of assets to and assumption of liabilities by Old JJCI's predecessor, which serves as the basis for the latter's legal responsibility for all talc-related liabilities.

[22] "$1 billion in defense costs over the prior five years; $3.5 billion in verdicts and settlements over that same timeframe; billions more in indemnification claims from Imerys; and (given latency) the immense costs of decades more of the same." *Debtor's Obj.* at 8. "It would cost $190 billion in defense costs just to try the *current* claims." *Id.*

Claimants repeatedly have called to the Court's attention the market capitalization ($450 billion) and stellar credit-rating of Debtor's indirect parent, J&J. Nonetheless, apart from voluntarily undertaking such an obligation or a judicial finding as to alter ego status, J&J (like all parent corporations) have no legal duty to satisfy the claims against its wholly-owned or affiliated subsidiaries. *See, e.g., Travelers Indem. Co. v. Cephalon, Inc.,* 32 F. Supp. 3d 538, 556 (E.D. Pa. 2014), *aff'd,* 620 F. App'x 82 (3d Cir. 2015) (a parent company is not liable for the actions of its subsidiaries unless the parent company itself has engaged in wrongdoing, or exercises control over the subsidiary entity).

It is true that Debtor, under the Funding Agreement, could compel J&J to deplete its available cash (amounting to nearly 7% of its entire market cap) or pursue a forced liquidation of New JJCI to tap into its enterprise value of $61 billion. Needless to say, such actions would have a horrific impact on these companies, with attendant commercial disruptions and economic harm to thousands of employees, customers, vendors, and shareholders, and threaten their continued viability. The Court is at a loss to understand, why—merely because Debtor contractually has the right to exhaust its funding options—the Debtor is not to be regarded as being in "financial distress."

It is of no moment that the Debtor, by virtue of the Funding Agreement, was not insolvent on the date of the chapter 11 filing. "As a statutory matter, it is clear that the bankruptcy law does not require that a bankruptcy debtor be insolvent, either in the balance sheet sense (more liabilities than assets) or in the liquidity sense (unable to pay the debtor's debts as they come due), to file a chapter 11 case or proceed to the confirmation of a plan of reorganization." *Marshall v. Marshall*

35

*(In re Marshall)*, 721 F.3d 1032, 1052 (9th Cir. 2013). Prior to the chapter 11 filing, J&J and Old JJCI incurred compensatory damages awards in ovarian cancer cases which ranged from $5 million to $70 million, while punitive damage awards ranged from $50 million to $347 million. Likewise, in mesothelioma cases, there were compensatory damages awards ranging from $2.5 million to $40 million, while punitive damages ranged from $100,000 to $300 million. As acknowledged by all parties, in the *Ingham* case, a jury awarded $4.14 billion in punitive damages, one of the largest personal injury verdicts ever seen in the United States, ultimately reversed in part and reduced on appeal to $2.24 billion.[23] Even without a calculator or abacus, one can multiply multi-million dollar or multi-billion dollar verdicts by tens of thousands of existing claims, let alone future claims, and see that the continued viability of all J&J companies is imperiled.

As Dr. Bell testified at trial,

> Old JJCI was not positioned to continue making substantial Talc Litigation payments from working capital or other readily marketable assets. . . . As a consequence, it is apparent that Old JJCI had no significant excess net current assets available for the satisfaction of future Talc Litigation payments. In addition, Old JJCI had no other assets that were readily marketable in order to satisfy liabilities associated with the Talc litigation, which could be substantial.

*Bell Report* at 19-21, 32. At the time of filing, the prospects of continued monthly $10-20 million defense expenditures, with rapidly increasing numbers of new claims being filed, warranted seeking action in this Court. By comparison, the administrative burdens and costs to oversee the trust distributions under a § 524(g) trust represent a small fraction of the funds being expended currently to litigate these cases through the trial and appellate courts.

---

[23] *Debtor's Informational Br.* at 119-20.

36

Several years ago, Judge Laurie Selber Silverstein noted in *In re Rent-A-Wreck of America, Inc.*, 580 B.R. 364 (Bankr. D. Del. 2018), that a valid business purpose assumes an entity in distress. Well, such distress is patently apparent in the case at bar. *Id.* at 375. The Debtor has estimated that the costs to try a single ovarian cancer claim ranges between $2 million to $5 million. Defending just the over 38,000 pending ovarian cancer claims through trial would cost up to $190 billion. In addition, Old JJCI and J&J are facing billions of dollars in indemnification claims from their talc supplier, Imerys Talc America, Inc. and two of its affiliates, Imerys Talc Vermont, Inc. and Imerys Talc Canada, Inc. (collectively, "Imerys").[24]

No public or private company can sustain operations and remain viable in the long term with juries poised to render nine and ten figure judgments, and with such litigation anticipated to last decades going forward. The Court must also factor in the negative impact of ongoing regulatory investigations by state attorneys general. The Third Circuit in *In re SGL Carbon* noted that there exists a "need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation." 200 F.3d at 163; *see also In re Johns-Manville*, 36 B.R. 727, 736 (Bankr. S.D.N.Y 1984) (holding debtor "should not be required to wait until the economic situation is beyond repair in order to file a reorganization petition," and noting that the "'Congressional purpose' in enacting the Code was to encourage resort to the bankruptcy process"). While the Third Circuit requires "some" degree of financial distress, *see In re*

---

[24] "In its bankruptcy case, Imerys has contended that it has claims against Old JJCI and J&J for indemnification and joint insurance proceeds," claims allegedly in the billions of dollars. *Kim Decl.* ¶ 55, ECF No. 5. Similarly, Cyprus Mines Corporation and its parent company, which had owned certain Imerys talc mines, filed an adversary proceeding in the Imerys bankruptcy against Old JJCI, J&J, Imerys Talc America, Inc., and Imerys Talc Vermont, Inc. seeking a declaration of indemnity under certain contractual agreements. Cyprus Mines Corporation has since filed its own bankruptcy case. *Id.* at ¶ 56.

37

*Integrated*, *supra*, the Bankruptcy Code does not "require any **particular** degree of financial distress as a condition precedent to a petition seeking relief." *In re Gen. Growth Props., Inc*., 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (quoting *United States v. Huebner*, 48 F.3d 376, 379 (9th Cir. 1994) (emphasis added)). Old JJCI need not have waited until its viable business operations were threatened past the breaking point. Movants ask the Court to require the highest level of distress,[25] for which there is no precedent.

At the hearing, Movants attempted to make the case that J&J would have continued to fund all talc-related obligations of Old JJCI without any bankruptcy filing. This was merely supposition, offered without evidentiary support. The focus then shifted to Old JJCI's rising profits, year after year, of J&J's Consumer Health Sector, allegedly undermining any claim of financial distress. Movants' expert, Saul E. Burian, testified, on both direct and cross examination, that none of the entities (LTL, J&J, Old JJCI or New JJCI) needed to file bankruptcy. *Burian Report* at 34-39. To be sure, Mr. Burian highlighted that *after taking out payments and charges relative to the talc litigation*, the sales and adjusted income before tax for J&J's Total Consumer Health sector have grown steadily since 2016; pointedly, the loss experienced in 2020 by Old JJCI is attributable primarily to the one-off payment of the *Ingham* judgment. *Id.* Movants also call to the Court's attention Debtor's access to funding through the Funding Agreement:

> Here, the totality of facts and circumstances conclusively show that LTL was not in serious financial distress when it filed its bankruptcy petition. To the contrary, prior to the bankruptcy, J&J entered into a Funding Agreement with LTL pursuant

---

[25] " Because those tort claims were not a **terminal threat** to the company, as detailed above, LTL's intent plainly was to use the bankruptcy system to gain advantages that J&J and Old JJCI were unable to obtain in the tort system." *TCC II Reply Mem*. 28, ECF No. 1358 (emphasis added).

to which it and New JJCI agreed to fund LTL's current and future talc liabilities up
to the value of New JJCI—roughly $61 billion.

*TCC II Reply Mem*. 8, ECF No. 1358. As a result, Movants contend that "LTL had the ability to
require that J&J and New JJCI fund up to $61 billion to satisfy talc liabilities." *Id*. at 9. Similarly,
Movants insist that LTL was not in serious financial distress because it could "have relied on the
Funding Agreement to [settle its liabilities] before filing for bankruptcy, because at the moment of
the divisive merger, J&J had approximately $31 billion in cash on its balance sheet, and a half
trillion-dollar market cap." *Id*. at 11, n.7.

Movants appear to suggest that due to Old JJCI's pre-petition sales revenues, as well as
Debtor's financial capacity (primarily derivative from funding provided by J&J and New JJCI),
this Court cannot find that Debtor suffered from financial distress at the time of filing. This
suggestion, as a corollary, would mean that neither J&J nor Old JJCI (which had an even greater
asset base than New JJCI) could have filed for chapter 11 in good faith. Yet, this is wholly
inconsistent with Movants oft repeated contention:

> If the Debtor and/or J&J wanted the Court to focus on the financial condition of
> Old JJCI in evaluating the good faith of this proceeding, ***Old JJCI should have
> filed for bankruptcy.*** It did not. . . . J&J or Old JJCI could have chosen what it
> perceived to be the difficult path of obtaining the benefits and complying with the
> burdens of Chapter 11.

*TCC II Reply Mem*. at 23, ECF No. 1358 (emphasis in original).

More significantly, the Court is troubled by Movants' conflicting positions as to whether
any chapter 11 filing had to be undertaken at all, as claimants submit that J&J and Old JJCI could
have satisfied the extant claims without resorting to the bankruptcy court. On the one hand,
Movants minimize Debtor's true talc-related financial exposure by pointing out that over 6,800

39

ovarian cancer and mesothelioma claims have been settled since 2017 for under $1 billion. *Movants' Ex.* 161. Similarly, during trial, Movants presented video testimony of two Directors at S&P Global, a rating agency, as well as supporting documentary evidence (contemporaneous notes and emails) reflecting the understanding of these witnesses that J&J allegedly viewed their overall talc-related liabilities at no greater than $7 billion. These understandings were reached after communications with J&J personnel. In sum, Movants press that J&J could have managed its talc-related liabilities without resort to the bankruptcy court.

Yet, on the other hand, Movants' counsel compelled Mr. Kim to acknowledge on cross examination that plaintiffs have prevailed in the last seven mesothelioma trials, for verdicts totaling over $360 million. *Diaz Report* at 13. These verdicts average to over $50 million for each mesothelioma claim and hardly can be characterized as manageable. Movants also highlighted significant events in the timeline which point toward greater talc exposure for Debtor:

- October 2019: FDA finds asbestos in Johnson's Baby Powder
- June 2020: Missouri Court of Appeals affirms *Ingham*
- April 21, 2021: Health Canada confirms its 2018 finding of a significant association, indicative of a causal effect, between exposure to talc and ovarian cancer
- May/June 2021: Settlement in *Imerys* falls apart
- June 2021: U.S. Supreme Court denies *certiorari* in the *Ingham* case

*TCC I Closing* at 19. Simply put, there is a clear inconsistency in the message to the Court: either JJCI was facing increased unmanageable financial risk from the talc litigation, warranting bankruptcy consideration, or it was not. At the end of the day, this Court concludes that the weight of evidence supports a finding that J&J and Old JJCI were in fact facing a torrent of significant talc-related liabilities for years to come. The evidence at trial, including the testimony of S&P Global witnesses Arthur Wong and David Kaplan, raise doubts about the intentions underlying the

40

communications to S&P Global—were they truly projections of amounts necessary to resolve current and future talc liabilities, or estimates of anticipated short-term reserves or bankruptcy settlements? What is not in doubt are a series of events which pointed to the need for bankruptcy consideration: the $4.16 billion *Ingham* verdict and ultimate denial of appellate review, the shift by claimants to multi-billion dollar damage demands, as well as the failure to reach an accord in *Imerys*. These were triggering events that changed the landscape for future talc settlements and litigation. Neither the settlements nor verdicts which predated these events could thereafter serve as dependable guideposts for expectations going forward.

### 3. Debtor's Chapter 11 Filing Was Not Undertaken to Secure an Unfair Tactical Advantage

As noted, in addition to gauging whether a chapter 11 filing serves a valid bankruptcy purpose, courts must also consider "whether the petition is filed merely to obtain a tactical litigation advantage." *In re Integrated Telecom Express, Inc.*, 384 F.3d at 120; *SGL Carbon*, 200 F.3d at 165. In this regard, the thrust of Movants' challenge to Debtor's filing appears bottomed on the 2021 Corporate Restructuring and the use of the Texas divisional merger statute to create a special purpose vehicle in the hours before the filing to accomplish J&J's goals. Pertinently, Movants contend that the 2021 Corporate Restructuring "hindered," "delayed," and "prejudiced" talc claimants—by "blocking talc creditors from obtaining access" to "Old JJCI's substantial business assets" and "remov[ing] Old JJCI's business assets and operations from the reach of its talc creditors." *Original TCC's Mot. to Dismiss* ¶¶ 2-4, 41, 50, ECF No. 632; *A&I's Mot. to Dismiss* ¶¶ 4, 55-63, ECF No. 766. Yet, notwithstanding the barrage of academic and media criticism leveled at the use of the divisional merger provisions under the Texas Business

41

Organizations Code, the Court concludes that there have been no improprieties or failures to comply with the Texas statute's requirements for implementation, and that the interests of present and future talc litigation creditors have not been prejudiced.

Debtor was incorporated and domiciled in Texas prior to effectuating the 2021 Corporate Restructuring, albeit only days before implementation. The Texas statute "applies to all business entities, regardless of when such entities were formed." *Phillips v. United Heritage Corp.*, 319 S.W.3d 156, 163 n.5 (Tex. Ct. App. 2010). The Texas Business Organizations Code establishes the procedures that an entity must follow to effect a divisional merger, including development of a plan of merger (specifying, among other things, the allocation of assets and liabilities) and a filing with the Secretary of State. *See* Tex. Bus. Orgs. Code Ann. §§ 10.001(b), 10.002, 10.003, 10.151. Moreover, under Texas's Business Organizations Code, upon a divisional merger in which the dividing entity does not survive, "all liabilities and obligations" of the dividing entity automatically "are allocated to one or more of the . . . new organizations in the manner provided by the plan of merger." Tex. Bus. Orgs. Code Ann. § 10.008(a)(2), (3). So, where the dividing entity does not survive (such as Old JJCI), and the plan of merger allocates a particular liability or obligation to a single new entity, that designated new entity is exclusively liable for that obligation. Except as otherwise provided, "no other [entity] created under the plan of merger is liable for the debt or other obligation." *Id.* § 10.008(a)(4). The record establishes conclusively that Old JJCI complied with all requirements under Texas law.

42

Movants posit that the 2021 Corporate Restructuring left Debtor undercapitalized from the outset and placed the contingent talc creditors at greater risk.[26] Indeed, Movants have raised several challenges as to the efficacy of the Funding Agreement, including that: (1) J&J and New JJCI may refuse to make payments under the Funding Agreement; (2) the Funding Agreement substitutes the assets of valuable operating businesses with "an amorphous, artificially capped contract right, the value of which would take years to adjudicate;" and (3) enforcement of the agreement rests with the Debtor, which is under the control of both Payors under the Funding Agreement. *Original TCC's Mot. to Dismiss* ¶ 23, ECF No. 632. Accordingly, Movants contend that "[t]alc claimants have thus been intentionally rendered worse off than they were prior to the divisional merger, an outcome prohibited by the statute." *Id.*

The divisional merger under the Texas statute, in the absence of any subsequent bankruptcy filing by LTL, may possibly have prejudiced creditors by requiring them to await LTL's draw upon the Funding Agreement; however, that did not occur and is not the situation presented. Rather, a bankruptcy filing for the newly created, smaller entity housing the talc liabilities was a critical component of the 2021 Corporate Restructuring from the outset. As noted above, it is uncontested that the restructuring was intended as a single integrated transaction. Indeed, no one contests that J&J and Old JJCI looked to the Bankruptcy Code for a way to globally address all talc-related claims. With Debtor's chapter 11 filing, this Court now has jurisdiction and oversight over the bankruptcy estate, which controls LTL's rights under the Funding Agreement, and can ensure that Debtor pursues its available rights against J&J and New JJCI. It is inexplicable

---

[26] The Court previously raised the inconsistency of Movants' argument, given the repeated contention that neither Old JJCI nor the Debtor was in financial distress at the time of the filing.

that Movants would want to dismiss this proceeding and lose such leverage and access to an immediate enforcement vehicle. The Court is unpersuaded that the tort claimants have been placed in a worse position due to either the 2021 Corporate Restructuring or implementation of the Funding Agreement.

The Funding Agreement between Debtor, on the one hand, and J&J and New JJCI (on a joint and several basis) on the other, is not intended to—and is unlikely to—impair the ability of talc claimants to recover on their claims. *See Kim Decl.* ¶ 21, ECF No. 5 ("A key objective of the restructuring was to make certain that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims as Old JJCI did prior to the restructuring.") In this regard, under the Funding Agreement, all creditors, including talc claimants, maintain the ability to enforce any liquidated and fixed claims against LTL, with the added benefit of having both J&J and New JJCI backstop such obligations, up to the fair market value of Old JJCI as a floor amount, along with any additional value in New JJCI.[27] Thus, as a result of the 2021 Corporate Restructuring, Debtor would have the funding available to satisfy present and future claims against Old JJCI, with the added contractual right to look to J&J and New JJCI as primary obligors without having to establish independent liability. Moreover, with

---

[27] Without any corresponding repayment obligation, the Funding Agreement obligates New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, to pay for costs and expenses of the Debtor incurred in the normal course of its business (a) at any time when there is no bankruptcy case and (b) during the pendency of any chapter 11 case, including the costs of administering the chapter 11 case, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses. *Declaration of John K. Kim in Support of First Day Pleadings* ¶ 27, ECF No. 5. In addition, the Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding. *Id.*

the bankruptcy filing, the bankruptcy estate succeeds to all rights held by Debtor, with the

oversight and jurisdiction of this Court as needed for enforcement. Significantly, the resources

under the Funding Agreement will be available upon confirmation of a plan—whether or not the

plan is acceptable to J&J or New JJCI, and whether or not the plan offers payors protections under

§ 524(g).

This Court agrees with Judge Beyer in *In re Bestwall LLC,* in analyzing a comparable

funding agreement facing similar challenges:

> The Court disagrees with the [c]ommittee's argument [that the divisional merger
> 'enabled Old GP to replace the assets against which asbestos creditors had a claim
> with a much smaller subset of assets'] for several reasons. First, because of the
> [f]unding [a]greement, the [d]ebtor's ability to pay valid Bestwall [a]sbestos
> [c]laims after the 2017 [c]orporate [r]estructuring is identical to Old GP's ability to
> pay before the restructuring.

606 B.R. at 252. Debtor, in argument and its submissions, points out that for over thirty years,

Texas law has permitted divisional mergers that exclusively allocate liabilities (and assets) to a

new entity created by the transaction, *see* CURTIS W. HUFF, *The New Texas Business Corporation

Act Merger Provisions*, 21 St. Mary's L.J. 109, 110 (1989), and that several other states have since

enacted similar statutes, *see, e.g.*, 15 PA. CONS. STAT. § 361; ARIZ. REV. STAT. ANN. § 29-2601;

DEL. CODE ANN. tit. 6, § 18-217(b)-(c).  Debtor further underscores that corporate transactions

similar to the 2021 Corporate Restructuring were effectuated pre-bankruptcy filing in several other

mass tort bankruptcies—even apart from the other similarly structured filings currently pending in

the Western District of North Carolina.[28] Indeed, the Court has come to learn that in *G-I Holdings,*

---

[28] *See, e.g., In re Garlock Sealing Tech., LLC,* 10-31607 (Bankr. W.D.N.C. 2017); *In re Mid Valley, Inc.,* No. 03-25592 (Bankr. W.D. Pa. 2003); *In re Babcock & Wilcox Co.* No. 00-10992-10995 (Bankr. E.D. La, 2002).

45

*Inc.* (Case No. 01-30135 (RG)), a case which graced our court's hallways here in New Jersey for

nearly a decade, was filed by a successor-in-interest entity which assumed liability for over

100,000 then pending asbestos-related lawsuits. While all of these cases may indeed have factual

distinctions from the case at bar, the important takeaway is that the 2021 Corporate Restructuring

was not such a novel ploy and the attention it has received is likely attributable more to the

significant financial capacity of J&J, the controversial venue effort, and the timing of the

bankruptcy filing given the uproar surrounding the *Purdue Pharma* confirmation battle. None of

these factors, however, bear upon on this Court's resolution of the pending Motions.

Movants point to the indisputable fact that the current Debtor had no liabilities (and thus

no need for a bankruptcy filing) until the divisional merger was completed hours before the filing.

The Court fully understands the refrain that if J&J or New JJCI are to obtain the benefits under the

Bankruptcy Code, they should file their own chapter 11 cases and bear the burdens under the

Bankruptcy Code. As noted in Movants' Reply Memorandum:

> Under the law, J&J and New JJCI must shoulder burdens commensurate to such
> benefits: "Since a discharge is an extreme remedy, stripping a creditor of claims
> against its will, it is a privilege reserved for those entities which file a petition under
> the bankruptcy code and abide by its rules. Simply put, 'the enjoyment of the
> benefits afforded by the code is contingent on the acceptance of its burdens.'" *In re
> Arrowmill Dev't Corp.*, 211 B.R. 497, 503 (Bankr. D.N.J. 1997) (citation omitted).
> J&J and New JJCI thus must file for bankruptcy for this kind of benefits package.
> *See id.* at 506.

*TCC I Reply Mem.* at 10, ECF No. 1357. While that argument has facial appeal, it falters when the

Court reviews and weighs the harm such filings would cause to Debtor, its affiliates, the

bankruptcy estate, all creditors and claimants, and non-insider third parties. Filings by these

companies would create behemoth bankruptcies, extraordinary administrative costs and burdens,

46

significant delays and unmanageable dockets. One need only look at the conflict list in this case—revealing pages and pages of domestic and global affiliated entities and related parties—to confirm that such filings would pose massive disruptions to operations, supply chains, vendor and employee relationships, ongoing scientific research, and banking and retail relationships—just to name a few impacted areas. The administrative and professional fees and costs associated with such filings would likely dwarf the hundreds of millions of dollars paid in mega cases previously filed—and for what end? Even if Old JJCI had itself filed for bankruptcy, the talc actions would still be subject to the automatic stay, the assets available to pay those claims would be no greater, and the sole issue in the case would still be the resolution of the talc liabilities.

Let me be clear, this is not a case of too big to fail… rather, this is a case of too much value to be wasted, which value could be better used to achieve some semblance of justice for existing and future talc victims. The Court is not addressing the needs of a failing company engaged in a forced liquidation. Instead, the J&J corporate enterprise is a profitable global supplier of health, consumer products and pharmaceuticals that employs over 130,000 individuals globally, whose families are dependent upon continued successful operations. Why is it necessary to place at risk the livelihoods of employees, suppliers, distributors, vendors, landlords, retailers—just to name a few innocent third parties—due to the dramatically increased costs and risks associated with all chapter 11 filings, when there is no palpable benefits to those suffering and their families? Clearly, the added hundreds of millions of dollars that would be spent on professional fees alone would be better directed to a settlement trust for the benefit of the cancer victims. As acknowledged by other

47

courts, bankruptcy filings by J&J, Old JJCI, or New JJCI would pose potential negative consequences, without offering a positive change in direction or pathway to success in this case.[29]

And what are the important burdens of bankruptcy that J&J, Old JJCI and New JJCI have avoided through use of the Texas divisional merger statute? The Bankruptcy Code requires full transparency of all assets, liabilities and financial conduct through scheduling and reporting. Moreover, the Code mandates accountability for all assets and expenditures. Likewise, the Code requires judicial oversight over all non-ordinary course of business conduct. Finally, the Code burdens a debtor with the need to reach a consensus with its creditor base though the plan process and voting requirements. Given what will be required to confirm a plan in this case, as well as the attention this case is receiving from the public, media, government regulators, policy makers—let alone the Court, the United States Trustee and the dozens of attorneys involved—the Court is disinclined to view any of these entities as escaping the scrutiny or burdens.

There is no question that a fair resolution of this chapter 11 proceeding will require extraordinarily large contributions by the J&J corporate family, and likely insurers, toward a settlement fund. The sooner we get there, the better all around. Grossly multiplying the costs and complexity of this proceeding will not help the process. The J&J corporate family will not attain the benefits sought in this proceeding unless and until the parties can reach a court-approved global resolution under a confirmed plan of reorganization. This dynamic does not change whether Debtor, as a special purpose vehicle, filed the chapter 11 or the J&J family filed independent

---

[29] *See In re Aldrich Pump, LLC,* 2021 WL 3729335, at *8 (acknowledging the "serious negative consequences" of a hypothetical bankruptcy filing of Old IRNJ and Old Trane); *In re DBMP LLC*, 2021 WL 3552350, at *8 (acknowledging adverse effects of hypothetical bankruptcy filing of Old CertainTeed).

chapter 11 cases. The potential loss in market value, the disruptions to operations, and the excessive administrative costs associated with independent chapter 11 filings justify the business decision to employ the divisional merger statute as a means of entering the bankruptcy system.

The decision to seek resolution of the present and future talc claims within the bankruptcy system, through a § 524(g) asbestos settlement trust in lieu of continued state court litigation, is consistent with congressional objectives dating back to implementation of the § 524 asbestos provisions, which codified the approach taken in *In re Johns-Manville*. Congress has not made significant modifications to the statute, so we must assume that such mass tort resolutions—at least as to asbestos claims—are consistent with public policy. Notwithstanding, Movants and the plaintiffs' committees in the cases pending in North Carolina are vigorously challenging the chapter 11 process. As noted previously, Congress placed the tort claimants in a strong position by implementing a 75% super majority class voting requirement to confirm a plan with a § 524(g) trust. This leverage comes with responsibility, however, to engage in good faith and pursue the best interests of the collective class. In exchange, this Court will endeavor to ensure that those who are suffering currently, and in the future, have their day in court—this Court—and receive fair compensation under a comprehensive and transparent distribution scheme.

As to whether the divisional merger or the desired implementation of a § 524(g) trust should be regarded as an abusive or unfair "litigation strategy" warranting dismissal of the case for bad faith, this Court is tasked to define the permissible parameters of a debtor's pre-petition litigation strategy. In doing so, this Court takes into account the totality of circumstances, such as litigation posture outside the bankruptcy court, the subjective intent of the debtor and management,

49

the degree of financial distress facing the debtor, the pressures from nonmoving creditors, pre-petition litigation conduct, the nature of the creditor body and the extent of assets, the structure and formation of the debtor, and—most importantly in this Court's view—the debtor's reorganizational purpose and exit strategy. Here, Debtor did not undertake the corporate restructuring and bankruptcy filing as litigation tactics designed **solely** to gain a litigation advantage or hinder a plaintiff in any of the thousands of pending tort actions. Rather, Debtor seeks to employ the tools provided by Congress under the Bankruptcy Code (the automatic stay and §105 or § 524(g) trust) to attain a bankruptcy resolution of its mass tort liabilities. Without more, merely availing itself of chapter 11 tools does not constitute an improper litigation tactic. *See In re Am. Cap. Equip., LLC*, 296 F. App'x. 270, 274 (3d Cir. 2008) (finding no intent to confer "a particular litigation advantage to Debtors, over and above the advantages that a typical debtor may properly obtain by availing himself of the bankruptcy system").

A finding that there exists an abusive litigation strategy, warranting dismissal of the case, is made most often in such obvious circumstances as a filing intended to simply delay the inevitable entry of judgment, to forestall collection efforts to allow the transfer of assets, a filing without any real prospects of confirming a plan or reorganizing, or where there is pointed effort to exploit the Bankruptcy Code—to name just a few examples. Certainly, this case differs from the above scenarios. The Claimants cite to *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004), and *In re 15375 Memorial Corp.*, 589 F.3d 605 (3d Cir. 2009), for the proposition that a desire to use a particular provision in the Bankruptcy Code is "by itself" insufficient to establish

good faith.[30] *Comm. Mot. to Dismiss* ¶ 48, ECF No. 632; *Arnold & Itkin Mot. to Dismiss*. ¶¶ 51-

52, ECF No. 766. Yet, Claimants fail to explain how Debtor's filing effectuated any "tactical

litigation advantage" in any of the tens of thousands of talc claims pending as of the Petition Date.

It is evident from the record that Debtor filed this case to resolve the potentially crippling costs

and financial drain associated with defending—over the next several decades—tens of thousands

(if not hundreds of thousands) of personal injury claims with a multi-billion dollar exposure to

Debtor and nondebtor affiliates.[31] Indeed, as this Court has emphasized throughout this Opinion,

far from a means to "hinder and delay talc claimants," a global resolution of these claims though

the bankruptcy may indeed accelerate payment to cancer victims and their families.

With respect to the use of the now infamous "Texas Two-Step," the Court finds nothing

inherently unlawful or improper with application of the Texas divisional merger scheme in a

manner which would facilitate a chapter 11 filing for one of the resulting new entities. This Court

does not find that the rights of the talc claimants and holders of future demands are materially

affected by the divisional merger.  Certainly, I can say with some confidence, that the legislature

---

[30] The Court finds many of the other cases cited by Movants to be inapposite, in that they involve efforts by a debtor to hinder, delay or disrupt a pending two-party disputes, as opposed to the circumstances present in this matter. *See Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 829 (9th Cir. 1994) (finding debtor with clear ability to pay judgment filed solely to avoid paying a judgment or posting appeal bond); *In re Ravick Corp.*, 106 B.R. 834, 851 (Bankr. D.N.J. 1989) (finding debtor sought to upend previous decision of trial court ordering specific performance against debtor); *Argus Grp. 1700, Inc. v. Steinman (In re Argus Grp.)*, 206 B.R. 757, 759-60 (E.D. Pa. 1997) (finding financially health debtor filed bankruptcy three days after state appellate court vacated earlier order staying proceeding); *Furness v. Lilienfield*, 35 B.R. 1006, 1007-08 (D. Md. 1983) (finding debtor filed bankruptcy on the eve of trial after repeated delays and multiple unsuccessful attempts to postpone trial).

[31] It is uncontested that during the twenty-one months (January 1, 2020 through September 30, 2021) preceding the petition date, Old JJCI expended roughly $3.6 billion of litigation expenses relating to the Talc Claims—34% of the company's sales, resulting in a pre-tax loss of nearly a billion dollars ($893.4 million) in the 21 months leading up to the petition date. *See JJCI Income Statements* (for the periods Jan. 1, 2020 to Dec. 31, 2020 and Jan. 1, 2021 to Sept. 30, 2021), *Torborg Decl. Exhibits C, D*, ECF No. 956-4.

which passed the statute into law probably did not foresee its current popular use. Notwithstanding, the statute makes clear the legislative intent that there be a neutral impact upon creditors. If current use of the divisional merger scheme as a foundation for chapter 11 filings conflicts with Texas' legislative scheme and goals, it can be repealed or modified. Until such time that there is legislative action, I am not prepared to rule that use of the statute as undertaken in this case, standing alone, evidences bad faith.

Argument has been put forward by Movants, other parties in interest, and the drafters of the *amici curie* brief that allowing this case to proceed will inevitably "open the floodgates" to similar machinations and chapter 11 filings by other companies defending against mass tort claims. Given the Court's view that the establishment of a settlement trust within the bankruptcy system offers a preferred approach to best serve the interests of injured tort claimants and their families, maybe the gates indeed should be opened. Nonetheless, for most companies, the complexity, necessary capital structure, and financial commitments required to lawfully implement a corporate restructuring as done in this case, will limit the utility of the "Texas Two-Step." Not many debtors facing financial hardships have an independent funding source willing and capable of satisfying the business's outstanding indebtedness. Moreover, the Court notes that in the fifteen years since having been appointed to the bankruptcy bench, there have been roughly 60 asbestos case filings under chapter 11 across the country, and under 100 filings since the very first case in 1982—hardly a flood. There have been, of course, dozens of additional mass tort cases not involving asbestos, primarily filings by a handful of pharmaceutical companies, manufacturers and several dozen catholic dioceses. With respect to the latter, the Court doubts very much that the dioceses will be

52

utilizing the Texas Business Code to restructure in advance of filing under the Bankruptcy Code.

Quite simply, the Court does not anticipate the forecasted parade of horribles.

### 4. Application of Equitable Considerations

Movants urge the Court to exercise its equitable powers in dismissing this proceeding:

> Bankruptcy courts are courts of equity. *See, e.g., Young v. United States*, 535 U.S. 43, 50–51 (2002) (explaining that bankruptcy courts "appl[y] the principles and rules of equity jurisprudence") (citation omitted); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.") (citation omitted); *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships."); *Pepper v. Litton*, 308 U.S. 295, 304 (1939) ("for many purposes 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity'" (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934))). . . . A bankruptcy court can exercise its equitable powers "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper*, 308 U.S. at 305.

*TCC II Reply Mem.* at 33, ECF No. 1358. The Court is unsure how this argument aides Movants' position. Indeed, the last quote above from the *Pepper* opinion suggests—and the Court agrees— that form should not supplant substance. Such is the very reason the Court is disinclined to dismiss this case based on Debtor's 2021 corporate reorganization efforts. At the risk of being labeled didactic, the Court observes that notwithstanding the ubiquitous acceptance by courts and attorneys, bankruptcy courts are not courts of equity. Rather, bankruptcy courts exercise authority granted by statute and may address both legal and equitable claims. *See* HON. MARICA S. KREIGER, *"The Bankruptcy Court is a Court of Equity": What does that Mean?,* 50 S.C.L. REV. 275 (1999).

True, for purposes of jurisdiction and authority, the Bankruptcy Act of 1898[32] granted the

district courts exclusive bankruptcy jurisdiction at law and equity. A comparable grant of equitable

jurisdiction is wholly absent in the Bankruptcy Code or Judicial Code. Bankruptcy courts are

specialized courts with limited jurisdiction that apply statutory law. Included within these statutory

powers is § 105(a) of the Bankruptcy Code which empowers this Court to "[i]ssue any order,

process or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy

Code. 11 U.S.C. § 105(a). Pursuant to this provision, the Court has certain authority to fashion any

order or decree that is in the interest of preserving or protecting the value of a debtor's assets. *See*

*e.g., In re Morristown & Erie Railroad Co.*, 885 F.2d 98, 100 (3d Cir. 1990) (noting that § 105(a)

of the Bankruptcy Code is a powerful and versatile tool).

In permitting this case to proceed going forward, this Court stands prepared to employ its

limited equitable authority under § 105(a) to facilitate and assist Debtor and all tort claimants to

achieve a fair and just result, consistent with the social policies and objectives intended by

Congress in enacting the Bankruptcy Code. As noted by the late District Judge Jack B. Weinstein,

the use of equitable concepts is particularly appropriate to address the social needs involved with

mass tort cases:

> Once the province of common law courts and judges, mass tort cases now forced
> the courts to adopt an equitable posture. Courts of equity traditionally have taken
> into account the equities-the concrete issues of fact and fairness of the particular
> situation-in fashioning remedies. In the mass tort context these include: (1) fairly
> and expeditiously compensating numerous victims, and (2) deterring wrongful
> conduct where possible; while (3) preventing over deterrence in mass torts from
> shutting down industry or removing needed products from the market, (4) keeping
> the courts from becoming paralyzed by tens or even hundreds of thousands of

---

[32] Bankruptcy Act of 1898, ch. 541, 30 Stat. 545 (1898).

repetitive personal injury cases, and (5) reducing transactional costs of
compensation.

JACK B. WEINSTEIN & EILEEN B. HERSHENOV, *The Effect of Equity on Mass Tort Law,* 991 U. ILL.

While class actions offer no pathway for redress with personal injury mass tort litigation and
MDL's have been employed in the past with only limited success, and neither address the needs
of future claimants, the use of the tools found within the Bankruptcy Code may well be the key
here to fashion the remedies envisioned by Judge Weinstein.

**III.    Conclusion**

For the reasons discussed, the Court denies the Motions in their entirety. The Court is aware
that its decision today will be met with much angst and concern. Nonetheless, the matter before
the Court is so much more than an academic exercise or public policy debate. These issues impact
real lives. This Court lives with the distress in the voice of Vincent Hill, a mesothelioma plaintiff,
when he testified about wanting his day in court and the need to care for his family. Sadly, Mr.
Hill passed away recently and his death reaffirms for this Court the horrible truth that many of
these cancer victims will not live to see their cases through the trial and appellate systems, but
certainly deserve the comfort in knowing that their families' financial needs will be addressed
timely. The Court remains steadfast in its belief that justice will best be served by expeditiously
providing critical compensation through a court-supervised, fair, and less costly settlement trust
arrangement.

During closing arguments, the U.S. Trustee suggested that if the case were not dismissed,
the Court should consider the appointment of a chapter 11 trustee. This same argument was raised
by counsel for the Canadian Class Plaintiffs. In apparent response, Debtor offered to consent to

55

(1) the appointment of an examiner to investigate and (2) derivative standing for the Original TCC to pursue any valid claims for possible avoidance actions or other claims relative to the 2021 Corporate Restructuring. The record does not support a finding of Debtor's pre-petition or post-petition malfeasance, or other cause warranting the appointment of a chapter 11 trustee and the attendant costs. The Court, nonetheless, agrees that there is a need for independent scrutiny of possible claims while the case progresses through the appointment of a Future Talc Claims Representative, mediation and towards the plan formulation process. The Court will take up these issues at the upcoming March 8, 2022, omnibus hearing. The Court will enter an order consistent with this Opinion.

Michael B. Kaplan, Chief Judge
U.S. Bankruptcy Court
District of New Jersey

Dated: February 25, 2022