**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Cohen, Placitella & Roth, P.C.
Christopher M. Placitella
Michael Coren
Dennis M. Geier
Eric S. Pasternack
cplacitella@cprlaw.com
mcoren@cprlaw.com
dgeier@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com
justinplacitella@cprlaw.com
127 Maple Avenue
Red Bank, NJ 07701
Telephone: (732) 747-9003
Facsimile: (732) 747-9004

*Attorneys for Non-Party Movants Daniel Edley and Roger Edley*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>        Debtor.[1] | Chapter 11<br>Case No. 21-30589 (MBK)<br><br>Hearing Date: April 12, 2022 |

MEMORANDUM OF LAW IN SUPPORT OF MOTION BY NON-PARTY MOVANTS DANIEL EDLEY AND ROGER EDLEY FOR AN ORDER (I) CONFIRMING THAT THE AUTOMATIC STAY AND PRELIMINARY INJUNCTION DO NOT APPLY TO AN INTENDED PUTATIVE CLASS ACTION TO BE FILED AGAINST JOHNSON AND JOHNSON AND OTHER NONDEBTOR DEFENDANTS, OR, IN THE ALTERNATIVE, (II) GRANTING RELIEF FROM THE AUTOMATIC STAY TO ALLOW THE INTENDED PUTATIVE CLASS ACTION TO PROCEED

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933

Non-party movants, Daniel Edley and Roger Edley (the "Edleys"), move the

Court for an order (i) declaring that the automatic stay and preliminary injunction

do not apply to a putative class action against Johnson and Johnson ("J&J") and

other nondebtor John/Jane Doe defendants that they intend to forthwith file in the

Superior Court of New Jersey, Middlesex Vicinage, or, in the alternative, (ii)(a)

lifting the automatic stay to allow the Edleys to file the intended putative class

action against J&J and other nondebtor John/Jane Doe defendants or (b) modifying

the automatic stay to permit the intended putative class action to proceed.  In

support hereof, the Edleys respectfully represent as follows:

## I.    Introduction

The family of Louis Edley, deceased, intends to file a class action complaint

against Johnson & Johnson ("J&J") and other nondebtor John/Jane Doe defendants

in the Superior Court of New Jersey, Middlesex Vicinage (the "Edley Class

Action") and before doing so seeks a declaration from this Court that they are not

enjoined from filing the Complaint and that the Class Action is not stayed by this

Court's Preliminary Injunction Order or Section 362(a)'s automatic stay

provision.[2]

---

[2] The Complaint (Exhibit A) along with the accompanying exhibits detail J&J's
scheme to conceal evidence as well as the recent discovery of documents proving
the deception of its "no evidence" of asbestos in talc defense.

1

The *Edley* Class Action charges J&J with fraud, fraudulent concealment, and fraud upon the courts in its defense of past asbestos personal injury lawsuits arising from exposure to industrial talc ("J&J/Windsor's Industrial Talc") mined, milled, and manufactured by its subsidiary, Windsor Minerals, Inc. ("Windsor"). J&J concealed evidence in litigation that its talc contained asbestos. It also deceived litigants and courts by falsely stating that no such evidence existed. As a result of J&J's deception, thousands of injured workers who had been exposed to J&J/Windsor's Industrial Talc voluntarily dismissed their suits on unfavorable terms or suffered the involuntary dismissal of their cases. J&J now admits that its representations about there being no evidence of asbestos contamination in its talc were false.

None of the claims in the *Edley* Complaint was asserted or could have been asserted against the Debtor LTL Management LLC or its predecessors, including Old JJCI. Nor did any of the dismissed claims involve injuries caused by exposure to cosmetic talc.[3] The lawsuits underlying the *Edley* Class Action were instead filed against J&J, Windsor Minerals, Inc. ("Windsor"), a direct subsidiary of J&J,

---

[3] *See* Exhibit B, ¶ 8-9 (affidavit of Gene M. Williams, an attorney for J&J and JJCI, distinguishing between industrial and cosmetic talc stating "industrial talc is different from the cosmetic talc used in Johnson's Baby Powder or Shower to Shower, including that industrial talc was a different grade of talc which was processed and handled in a manner different from cosmetic talc").

or a legally responsible third-party for J&J/Windsor's Industrial Talc. The claims of the *Edley* Class Action thus neither concern liabilities of the Debtor nor asbestos injuries resulting from use of or exposure to cosmetic talc.

The *Edley* Class Action is also not a personal injury case and does not seek to reopen or relitigate the dismissed underlying lawsuits. The *Edley* Class Action indeed is "not itself an asbestos injury case, but rather an action about [defendant's] conduct when [it] confronted asbestos injury cases in state courts around the country." *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 310 (3d Cir. 2014). As a result, and for the reasons outlined below, before filing their Complaint and in the interest of judicial economy, the Edleys seek a declaration from this Court that claims to be asserted in their action are not "Enjoined Talc Claims," as defined by this Court's March 7, 2022 Order (Dkt. 1635) and are not otherwise barred by Section 362(a)'s automatic stay.

## II.    Background

Louis Edley, like so many others, was exposed to asbestos dust while working with and around J&J/Windsor's Industrial Talc. Exhibit A, ¶ 7. J&J did not warn Mr. Edley, or others like him, that by working with or near the Industrial Talc they would be exposed to asbestos, or that asbestos could make them sick and die. *Id.* at ¶ 8. After Mr. Edley became ill with asbestosis and brought a personal

injury suit against J&J's subsidiary, Windsor Minerals, Inc.,[4] J&J responded by

denying the existence of any evidence that there was asbestos in its talc. *Id.* at ¶¶

12, 13.

On August 27, 1986, John Beidler, Esq., an in-house J&J lawyer, went even

further by writing to Mr. Edley's attorney, Ronald Grayzel, on letterhead of the

Office of J&J's General Counsel, demanding that he dismiss the case because no

evidence of asbestos "has ever been revealed" in J&J/Windsor's Industrial Talc.

His letter threatened sanctions under New Jersey's rule against baseless lawsuits.

*Id.* at ¶ 79.

After Mr. Edley's counsel did not immediately submit to J&J's dismissal

demand, J&J continued pressuring Mr. Edley to dismiss his case. J&J sent Mr.

Edley's lawyer a sworn affidavit from Roger Miller (then the president of J&J's

subsidiary, Windsor Minerals). The Miller affidavit copied word for word the

representations made by J&J's in-house counsel: "***No evidence*** of the presence of

asbestos in Windsor Minerals' product ***has ever been revealed*** by this testing." *Id.*

at ¶ 80 (emphasis added). Lacking the critical proof that the Industrial Talc

contained asbestos, Mr. Edley dismissed his case.

---

[4] Mr. Edley brought the lawsuit in the Superior Court of New Jersey, Middlesex
Vicinage, under Docket No. L-075913-86.

At the time, neither Mr. Edley nor his attorney knew, or could have known, that the representations in Mr. Beidler's letter and Mr. Miller's affidavit were false. In fact, J&J had dozens of talc sample analysis reports documenting the presence of asbestos fibers in talc mined and milled by Windsor. J&J also had numerous memoranda and correspondence by and between its officers, scientists and other employees addressing these reports and how the company should deal with them in the face of anticipated asbestos injury litigation arising from workers exposed to Windsor's Industrial Talc. *Id.* at ¶¶ 49-61.

By the end of 1989, more than a thousand industrial talc cases were pending alleging that J&J/Windsor's Industrial Talc caused asbestos-related disease in industrially exposed workers. *Id.* at ¶ 86. In each case, J&J misleadingly asserted the false defense through its attorneys and representatives that no evidence whatsoever existed indicating that J&J/Windsor's Industrial Talc ever contained asbestos. *Id.* at ¶¶ 78-105.

In 2017, J&J finally began unveiling reports and correspondence revealing that, contrary to what it had represented to Mr. Edley and thousands of other industrial workers, J&J had known of evidence showing that J&J/Windsor's Industrial Talc contained asbestos. The *Edley* Class Action Complaint details the many instances of J&J's knowledge of, as well as its machinations to conceal this evidence. *Id.* at ¶¶ 141-147.

For example, beyond merely denying the existence of the asbestos-positive reports it possessed, J&J had developed testing protocols that, by its own admission, were designed to avoid detecting and reporting low levels of chrysotile or tremolite asbestos existing in J&J/Windsor's Industrial Talc. *Id.* at ¶¶ 62-77. It even tested these protocols with talc spiked with asbestos verifying that the misleading testing methods worked as J&J had intended. *Id.* at ¶ 65.

When testing nevertheless found asbestos in assay or test samples, J&J required its consultants to use misleading language in their reports to suggest that they "did not find any quantifiable amount of asbestiform minerals in any of the samples," which J&J embellished upon even further to represent the tests were negative, even though asbestos had been found. *Id.* at ¶ 75. As described in the *Edley* Complaint, when J&J's consultants failed to follow its instructions, J&J insisted that the reports be changed to use the misleading language preferred by J&J. *Id.* at ¶ 76.

The recently discovered evidence also revealed that J&J had destroyed physical evidence in its possession and control, thereby compounding the effect of its concealment. Although J&J, in the early 1970s, had accurately forecasted asbestos talc cases would be coming, and it was actually sued continuously thereafter, J&J intentionally failed to preserve the relevant evidence as the law

required, giving rise to the *Edley* Class Action Complaint's claims for intentional spoliation. *Id.* at ¶ 106-140.

The story does not end there. Though some of the material evidence that J&J should have (but failed) to produce has been uncovered, more apparently remains to be uncovered. For example, shortly before this Bankruptcy Action was filed, J&J was ordered to turnover a memo documenting a meeting between Vermont Geology Professor Barry Doolan and J&J's in-house counsel, John O'Shaughnessy. As set forth in that memo, Professor Doolan reviewed the original asbestos testing file of an early J&J consultant, McCrone Associates, and afterwards advised Mr. O'Shaughnessy that the file, in fact, contained positive test results indicating Windsor talc contained chrysotile asbestos. *Id.* at ¶ 144. The whereabouts of the original file remains unknown.

Given little choice but to finally admit the truth, J&J's corporate representatives have been forced since 2017 to acknowledge that J&J's "no evidence of asbestos" defense was false. For example, during cross-examination at a trial in 2019, J&J corporate representative Dr. John Hopkins admitted that the affidavit signed by Windsor's President, Roger Miller, in Louis Edley's case, was false:

> Q. This is the President of Windsor Mineral [Roger N. Miller] in a lawsuit saying, no evidence of the presence of asbestos in Windsor Minerals' product. And he included -- I asked you, he included

everything they'd ever sold, cosmetic and industrial, has ever revealed
or been revealed by this testing. Here's the question. Was that true or
was that false?

A. On the face of it, it does not appear to be true.

***

Q. And he was under oath, wasn't he?

A. I believe so, yes.

Q. And that is -- you understand that is perjury, do you not?

A. I do.

*Id.* at ¶ 146. Dr. Hopkin's admission alone proves that J&J's "no evidence"

defense constituted a fraud, which J&J devised and employed to obtain the

dismissal of scores of cases. *Id.* at ¶ 147. This and other evidence revealing J&J's

deceptive conduct forms the basis for the *Edley* claims.

The *Edley* Complaint seeks "relief for thousands of asbestos claimants, who

previously sued and whose cases were dismissed against J&J, its wholly owned

subsidiary, Windsor Minerals, Inc. ("Windsor"), and/or any third-parties alleged to

be legally responsible for the sale of Windsor's ***industrial talc*** ("Responsible Third

Party"), for asbestos personal injury damages caused by exposure to ***industrial talc***

***products*** mined, milled, sold, and distributed prior to January 6, 1989, by Windsor

or its corporate predecessor." *Id.* at ¶ 1.

For avoidance of any doubt, the *Edley* Complaint does not assert any claims against the Debtor or its immediate predecessors. As set forth in the Complaint, the Edleys neither, directly or indirectly, seek:

> Any legal or equitable claim for relief or remedy relating to the manufacture or sale of Johnson's Baby Powder or Shower to Shower against or with respect to the former or current Johnson & Johnson Consumer Inc. (**"JJCI"**)(formerly known as Johnson & Johnson Baby Products Company, a New Jersey company incorporated in 1979 and wholly owned by J&J), nor against LTL Management LLC (**"LTL Mgt."**). This lawsuit is not seeking, directly or indirectly, any damages or equitable relief, for any talc-related injury claims against JJCI or LTL Mgt., including any claims relating in any way to talc or talc-containing materials that formerly were asserted against (or that could have been asserted against) the former Johnson & Johnson Consumer Inc., formerly known as Johnson & Johnson Baby Products Company ("Old JJCI") on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). The claims asserted are, therefore, not Enjoined Talc Claims as the term is defined in the protective injunction and restraining orders entered in LTL Mgt.'s current Chapter 11 proceeding, as of the time of this Action's commencement.

*Id.* at ¶ 20(a). Rather, the *Edley* Class Action is to be "brought under New Jersey law solely for J&J's fraud, fraudulent concealment, and fraud on the court in defending personal injury claims arising out of the Industrial Talc Products mined, milled, sold, and distributed by its wholly owned subsidiary, Windsor, whether or not J&J was a named party in the prior Underlying Lawsuits." *Id.* at ¶ 21.

### III.    Basis for Requested Relief

**A. The Edley Class Action is not subject to the Preliminary Injunction Order or the automatic stay in this Action.**

As requested by Debtor, this Court's Preliminary Injunction Order (Dkt. 1635) stays claims against the "Protected Parties" but only for "Enjoined Talc Claims."

Paragraph 3 of the Preliminary Injunction Order states:

> [T]he Court finds and declares that the commencement or continued prosecution of any ***Enjoined Talc Claims*** by any Defendant against any of the Protected Parties while the Chapter 11 Case remains pending including the actions listed in the last sentence of paragraph 2 above, would violate the automatic stay imposed by sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code and therefore is prohibited.

Dkt. 1635, ¶ 3 (emphasis added). As defined in the Preliminary Injunction Order, "Enjoined Talc Claims" means:

> [A]ny talc-related claims ***against the Debtor***, including all claims relating in any way to talc or talc-containing materials that were ***asserted against (or that could have been asserted against) the former Johnson & Johnson Consumer Inc. ("Old JJCI")*** on any theory of liability (whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise). For the avoidance of doubt, Enjoined Talc Claims include, without limitation, all talc personal injury claims and other talc-related claims ***allocated to the Debtor from Old JJCI in the documents implementing the 2021 Corporate Restructuring***.

*Id.*, pg. 2 n.2 (emphasis added).

10

Plainly stated, the claims asserted in the *Edley* Class Action do not fall within the definition of "Enjoined Talc Claims." They are not talc personal injury claims. Nor are they asserted against or been allocated from Old JJCI to the Debtor. As Debtor's Chief Legal Officer confirmed, in 1979 J&J transferred its liabilities for cosmetic talc to the Baby Products division. Dkt. 5, ¶ 10. After several more transactions, those liabilities apparently wound up on the balance sheets of Old JJCI. *Id.* at ¶ 11-14. There has been no assertion that in any of those transactions, J&J transferred to Old JJCI its or Windsor's liabilities for Industrial Talc or J&J's liabilities resulting from its own conduct in defending against Industrial Talc lawsuit claims. Moreover, the Edleys' claims are about J&J's misconduct in prior litigation, not claims for asbestos injuries.

This distinction is critical as the Third Circuit recognized in *Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014). Much like the allegations of the *Edley* Complaint, the *Williams* Action asserted that after the defendants there learned that their industrial talc contained asbestos, they "pursue[d] a strategy of denial and deceit" rather "than confront the consequences of [the] discovery." *Id.* at 310. As part of that scheme, the defendants "collected tests and reports that documented the presence of asbestos and "destroyed or hid them[.]" *Id.* at 310-11. The *Williams* Action further alleged that the defendants thereafter represented that the talc "did not contain asbestos and that no tests had ever said otherwise." *Id.* at

11

311. The Third Circuit recognized the severity of the deceit alleged in *Williams*, noting that the action for fraud and fraudulent concealment was "not itself an asbestos injury case, but rather an action about [defendants'] conduct when they confronted asbestos injury cases in state courts around the country." *Id.* Accordingly, the Third Circuit reversed the District Court's dismissal of the case and remanded it to the District Court.

The Preliminary Injunction Order should not be applied to bar the *Edley* Class Action because the claims to be asserted in *Edley* are not "Enjoined Talc Claims." They are not personal injury or cosmetic talc claims but are claims for fraud, fraudulent concealment, and fraud on the court against J&J for its conduct in defending J&J/Windsor's Industrial Talc cases using the "no evidence" of asbestos defense.

### B.  The Bankruptcy Code does not provide a basis for enjoining the *Edley* Class Action's claims against J&J.

The definition of "Enjoined Talc Claims" does not include claims like those asserted in the *Edley* Class Action because the Bankruptcy Code does not provide the Court with the authority to stay the direct, non-derivative claims asserted against nondebtor J&J.

In *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), the Supreme Court observed that the Bankruptcy Code is a

"comprehensive scheme" that Congress designed to "deliberately target[] specific

problems with specific solutions." *Id.* at 645 (quoting *Varity Corp. v. Howe*, 516

U.S. 489, 519 (1996)).  However, as a comprehensive scheme, the inclusion in the

Bankruptcy Code of a provision granting bankruptcy courts certain authority,

means the Code's silence reflects the opposite: a decision to not grant authority. In

the same way, the Third Circuit has recognized, under the canon of "*expressio*

*unius est exclusio alterius*," when a statute specifically enumerates some

categories, it impliedly excludes others." *United States v. Daniels*, 915 F.3d 148,

156 (3d Cir. 2019).

> Section 362(a) of the Bankruptcy Code operates as a stay of:
>
> (1) the commencement or continuation, including the issuance or
> employment of process, of a judicial, administrative, or other action or
> proceeding ***against the debtor*** that was or could have been
> commenced before the commencement of the case under this title, or
> to recover a claim against the debtor that arose before the
> commencement of the case under this title;
>
> . . .
>
> (3) any act to obtain possession of property of the estate or of property
> from estate or to exercise control over property of the estate[.]"

11 U.S.C. §§ 362(a)(1) (emphasis added).

"[T]he clear language of section 362(a)(1) stays actions only against a

'debtor.'" Dkt. 1573, pg. 8 (internal citations omitted). Therefore, with Congress

having affirmatively granted bankruptcy courts the authority to stay actions against

debtors, the Code's silence as to nondebtors should not be taken as a grant of authority, but an exclusion of such authority. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236-37 (3d Cir. 2004) (holding where the Bankruptcy Code "***provides no specific authority***," bankruptcy courts could not use Section 105 or their equitable powers to extend a channeling injunction under Section 524(g)) (emphasis added); *Purdue Pharma, L.P.*, __ B.R. __, 2021 U.S. Dist. LEXIS 242236, *189 (S.D.N.Y. 2021) (holding that provisions of shareholder release were not consistent with Section 524(e) because they permitted "the discharge of debts that are not contemplated by § 524(e)); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.");

The same result obtains under Section 362(a)(3). By its terms, this provision stays only actions affecting possession or the exercise of control of the estate's property (in contrast to Section 362(a)(1), which more broadly applies to an action commenced against a "debtor"). Section 362(a)(3) permits a bankruptcy court to enjoin a non-debtor or third-party from taking an action that would directly affect the estate's property. But it does not permit a stay of an action against a nondebtor by a third-party that has no effect on the bankruptcy estate of the debtor. Here, neither J&J nor the Edleys have any recourse against the Debtor's estate for J&J's

direct fraudulent acts committed in the defense of Industrial Talc cases brought against it and Windsor. The Edley Class Action is therefore not an action against Debtor or its estate, but against nondebtor J&J.

While not provided for in the Bankruptcy Code, there is a line of cases nonetheless holding that bankruptcy courts may properly stay proceedings against nondebtors when there are "unusual circumstances." Dkt. 1573, pg. 9 (citing *A.H. Robins Co.*, 788 F.2d 994, 1001-03 (4th Cir. 1986)). In those cases, the rationale for extending the automatic stay to nondebtors, as the Fourth Circuit put it, rests on the premise that when "unusual circumstances" are present to justify the grant of a stay to a nondebtor, the refusal of an application for a stay of a claim against a nondebtor "would defeat the very purpose and intent of the statute." *A.H. Robins*, 788 F.2d at 999.

While addressing a different issue concerning priority under the Bankruptcy Code, the Supreme Court's recent decision in *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973 (2017), calls into question the "unusual circumstances" grounds for extending Section 362(a)'s automatic stay to nondebtors. The *Czyzewski* Court stressed that the Bankruptcy Code's protections cannot be overridden in a "rare" case, even if doing so would carry out certain bankruptcy objectives. *Id.* at 987. In rejecting the argument that a bankruptcy court could disregard priority if there were "sufficient reasons," the Supreme Court aptly noted: "It is difficult to give

15

precise content to the concept 'sufficient reasons.' That fact threatens to turn a

'rare case' exception into a more general rule.'" *Id.* at 986. So, as the Court

concluded, "Courts cannot deviate from the strictures of the [Bankruptcy] Code,

even in 'rare cases.'" *Id.*

The Supreme Court in *Czyzewski*, in essence, held that Congress "did not

authorize a 'rare case' exception." *Id.* at 987. For the same reason, Congress also

did not authorize an "unusual circumstances" exception. It thus remains that even

where there may arguably be some laudable purpose for granting a stay to a

nondebtor, a bankruptcy court cannot, following *Czyzewski*, grant a stay to a

nondebtor just because some "unusual circumstance" might exist or there would be

some benefit to be gained by extending the stay. Moreover, if it were simply

enough that a third-party action against a nondebtor could have some conceivable

adverse impact on the debtor's ability to reorganize, such "unusual circumstances"

would not be the exception, but the rule. And that would fundamentally and

impermissibly "alter the balance struck by the statute," *id.* at 987 (quoting *Law v.

Siegel*, 571 U.S. 415, 427 (2014)), which allows stays only "against the debtor." 11

U.S.C. § 362(a)(1).

That said, there are no "unusual circumstances" raised by the *Edley* Class

Action that warrant application of the stay to nondebtor J&J. The *Edley* case is

founded on different legal bases than those facing the Debtor (fraud v. product

16

defect), and the Debtor would not be a party to, nor impacted by the claims to be

asserted against the *Edley* defendants. The short of it is that any liability against the

*Edley* defendants will not impact Debtor's obligations or ability to successfully

reorganize.

Section 105 of the Bankruptcy Code also should not be relied on to extend

automatic stays to nondebtors. Section 105, for all its powers, only operates

"within the context of bankruptcy proceedings." *Joubert v. ABN Motg. Group Inc*.,

411 F.3d 452, 455 (3d Cir. 2005). Indeed, "any 'power that a judge enjoys under

§ 105 must derive ultimately from some other provision of the Bankruptcy Code.'"

*In re Purdue Pharma*, 2021 U.S. Dist. LEXIS at *189 (quoting D*eutsche Bank AG,

London Branch v. Metromedia Fibert Network, Inc.*, 416 F.3d 136, 142 (2d Cir.

2005)). Section 105 does not "create substantive rights that would otherwise be

unavailable under the code." *Joubert*, 411 F.3d at 455 (quoting *In re Morristown &

Erie Railroad Co.*, 85 F.2d 98 (3d Cir. 1990)). Yet the use of Section 105 to grant

stays to nondebtors does precisely that, it creates a substantive right for nondebtors

not authorized by Congress.

As the Third Circuit has cautioned, Section 105 cannot be relied on "to

achieve a result inconsistent with" another provision of the Bankruptcy Code.

*Combustion Eng'g*, 391 F.3d at 236. In *Combustion Engineering*, the bankruptcy

court, having recognized the "limitations imposed by §524(g)," "relied upon its

17

equitable powers under § 105(a) to expand the scope of [a] channeling injunction."
*Id.* at 235. But recognizing that Section 105 does not "constitute a roving
commission to do equity[,]" the Third Circuit reversed, finding the bankruptcy
court's use of Section 105 inappropriate because "§ 524(g) provides ***no specific
authority*** to extend a channeling injunction to include third-party actions against
non-debtors where the liability alleged is not derivative of the debtor." *Id.* at 236
(emphasis added).

The use of Section 105 in this manner also runs contrary to the principle that
specific statutory provisions govern the general, as expressed by the Supreme
Court in *RadLAX Gateway Hotel*, where the Court recognized that the canons of
statutory construction require the specific to govern the general. *RadLAX Gateway
Hotel,* 566 U.S. at 645. As the Court acknowledged, the perhaps most frequently
applied general/specific canon involves a general permission or prohibition that is
contradicted by a specific prohibition or permission. *Id.* In such cases, the "specific
provision is construed as an exception to the general one." *Id.* (citing *Morton v.
Mancari*, 417 U.S. 535, 550-51 (1974)).

As in *RadLAX Gateway Hotel,* there are two Bankruptcy Code provisions at
issue here, one of which is a more general authorization (§ 105) and the other
(§ 362), a more specific one. The more general provision, Section 105, authorizes
this Court to "issue any order, process, or judgment that is necessary or appropriate

to carry out the provisions of this title." 11 U.S.C. § 105(a). That provision, however, does not specify when the court may exercise such authority. In contrast, the more specific provision here, Section 362(a), does specify when the court can grant a stay. And as that provision makes clear, Congress only authorized bankruptcy courts to issue stays against debtors. *See* Dkt. 1573, pg. 8 (quoting *McCartney*, 106 F.3d at 509). Under the canons of statutory construction, as recognized by the Supreme Court in *RadLAX Gateway Hotel*, Section 105 therefore cannot be used to enlarge the reach of Section 362(a) to nondebtors for to do so, would violate the maxim that the specific should limit the general. In the end, "[t]he terms of the specific authorization must be complied with." *RadLAX Gateway Hotel*, 566 U.S. at 645. And for that reason, Section 105 cannot be used to circumvent the limitations imposed by the more specific authorization, Section 362(a)(1).

Nor should a court's inherent authority and equitable powers be used to expand the authority granted to the bankruptcy court under Section 362(a). In *Norwest Bank Worthington v. Ahlers*, the Supreme Court held that the "traditional equitable power" of a bankruptcy court "can only be exercised within the confines of the Bankruptcy Code. 485 U.S. 197, 206 (1988). So, too, in *Law v. Siegel*, the Supreme Court reasoned that a bankruptcy court "may not exercise its authority to 'carry out' the provisions of the Code" by taking an action inconsistent with its

other provisions. 571 U.S. 415, 425 (2014). Echoing the discussion in *RadLAX Gateway Hote*l about the Bankruptcy Code being "comprehensive," the *Law* Court explained: "The Code's meticulous—not to say mind-numbingly detailed— enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions." *Id.* at 424. Therefore, with the Bankruptcy Code authorizing automatic stays against only debtors, a bankruptcy court's inherent authority and equitable powers cannot be used to afford relief to nondebtors not expressly provided for under the Bankruptcy Code.

The Third Circuit has recognized the limits of a bankruptcy court's exercise of jurisdiction over claims like *Edley* that are not derivative and have no relationship to the Debtor. In the context of examining the right to extend a channeling injunction to the nondebtor under Section 524(g), the Third Circuit in *In Re Combustion Engineering* recognized that while affording nondebtor affiliated companies the right to avoid unrelated civil lawsuits might facilitate the debtor's reorganization, it would also impermissibly allow the nondebtors "to cleanse themselves of non-derivative asbestos liability without enduring the rigors of bankruptcy." *Combustion Eng'g*, 391 F.3d at 237. The Third Circuit further noted that "[a]lthough some asbestos claimants here may benefit from an augmented fund, equity does not permit nondebtor affiliated entities to secure the benefits of Chapter 11 in contravention of the plain language" of the Bankruptcy Code. *Id.*

Accordingly, the Third Circuit found the bankruptcy court's jurisdiction lacking over independent, non-derivative claims against two affiliated companies of the debtor. *Id.*

In reaching that conclusion, the Third Circuit found that "the asbestos-related personal injury claims asserted against Combustion Engineering, Basic and Lummus arise from ***different products***, involved ***different asbestos-containing materials***, and were sold to ***different markets***." *Id.* at 231 (emphasis added). As such, the Third Circuit recognized that "[t]hese ***distinct products and customers*** do not establish a 'unity of interest' between [the debtor] and the nondebtors." *Id.* (emphasis added). In finding no "related to" jurisdiction, the Third Circuit also rejected the argument that the use of "common production sites" shared by the debtor and nondebtors could result in indemnification claims creating  a unity of interest. *Id.* On this point, the Third Circuit explained that any indemnification claims "would require the intervention of another lawsuit to affect the bankruptcy estate, and thus cannot provide a basis for 'related to' jurisdiction." *Id.*

As in *Combustion Engineering*, different products and different markets are at issue here. But here, there is an additional factor that makes jurisdiction over the direct, non-derivative claims against J&J and the other nondebtor John/Jane Doe defendants all the more inappropriate: this case is one for fraud, fraudulent concealment, and fraud on the courts for J&J's misleading conduct in defending

Industrial Talc cases, not product liability claims. Accordingly, the Edleys respectfully submit that Section 362(a)'s automatic stay does not protect nondebtors from direct, non-derivative litigation and should not bar the commencement of the *Edley* Class Action against nondebtor J&J and other nondebtor John/Jane Doe defendants.

### C. If the automatic stay applies to the *Edley* Class Action, cause exists to grant relief under Bankruptcy Code Section 362(d)(1).

The claims to be asserted against nondebtor J&J and other nondebtor John/Jane Doe defendants in the *Edley* Class Action are direct and not derivative of any claims against Debtor or Old JJCI. Therefore, if the Court determines that the *Edley* Class Action is subject to the automatic stay, "cause" exists to lift the stay under Bankruptcy Code Section 362(d)(1).

The Bankruptcy Code does not define "cause." 11 U. S. C. § 362(d)(1). The Third Circuit has nonetheless recognized that "cause" is a broad and flexible concept that must be determined on a case-by-case basis. *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997); *In re The Score Bd., Inc.*, 238 B.R. 585, 593 (D.N.J. 1999). When deciding whether cause exists to lift a stay, this Court has conducted a balancing test, in which the interests of the Debtor's estate are weighed against the hardships that will be incurred by the movant. *In re Donington, Karcher, Salmond, Ronan & Rainone, P.A.*, 194 B.R. 750, 751 (D.N.J. 1996).

### a. The Edleys and the many others similarly defrauded by J&J will suffer significant hardship if the stay is not lifted.

In a case very similar to the one the Edleys seek to file, the Third Circuit recognized that, under New Jersey law, an action for fraudulent concealment is separate and distinct from the underlying cause of action targeted by the fraud. *Williams,* 765 F.3d at 315. There, as here, the defendants were accused of concealing evidence "about the presence of asbestos in their products."[5] *Id.* at 323. Addressing the significance of concealing such evidence, the Third Circuit rhetorically asked: "What could be more important to a claim that talc caused asbestos disease than proof that the talc contained asbestos?" *Id.* Answering that question, the Third Circuit responded that the plaintiffs' cases against "[Defendants] would have been much stronger if [they] have evidence that [its] products contained asbestos." *Id.* As in *Williams*, Mr. Edley would have had a much stronger case had J&J not concealed evidence of asbestos in the J&J/Windsor's Industrial Talc; without such evidence, he had no case.

Having had to voluntarily dismiss their underlying asbestos cases for no or, at best, nominal payment or suffer the dismissal of their cases by court order due to the absence of evidence of asbestos in J&J/Windsor's Industrial Talc, the members

---

[5] The product at issue in the *Williams* matter was talc produced from a mine in Vermont once owned directly by J&J and subsequently by its subsidiary Windsor Minerals.

of the putative *Edley* Class Action have been victimized once. To now join them into a bankruptcy action over a different product and product-line, a different harm, and a different cause of action against a tortfeasor that did not, itself, seek the protections of bankruptcy, would victimize the members of the putative *Edley* Class Action again. *See Combustion Eng'g*, 391 F.3d at 231.

In the end, plaintiffs earnestly believe there is no good reason for staying the *Edley* Class Action Complaint against J&J and burdening this Court with the task of dealing with charges against nondebtor J&J, which, by any measure, are not "Enjoined Talc Claims." *Cf. In re Rexene Prods. Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992) (modifying automatic stay to allow prosecution of a class action against debtor where the claim would have to be resolved before plan confirmation); *see also Purdue Pharma*, 2021 U.S. Dist. LEXIS at 133 (finding that Bankruptcy Code does not authorize nondebtor, nonconsensual releases).

Here, the harm to the Edleys and the putative Class Members is significant, and further delay would especially exacerbate the prejudice to these putative Class Members considering that, in many instances, they were denied justice decades ago.

**b. In addition, the bankruptcy process should not be used to delay the public interest in holding J&J accountable for its fraud upon the courts particularly as the *Edley* Class Action will not impact Debtor, its estate or creditors.**

The Debtor assumed Old JJCI's liabilities for cosmetic talc and not for the Industrial Talc at issue in the *Edley* Class Action. This is the result of a decision by J&J (several, in fact) when structuring its affairs to separate its cosmetic and industrial talc divisions and subsidiaries. J&J made the deliberate decision to keep separate the liabilities and obligations of Windsor Minerals and old JJCI. At no time, did Old JJCI assume any liabilities relating to Industrial Talc. There is simply is no basis to conclude that J&J took an additional, significant step of assigning to Debtor J&J's liability for its own corporate misconduct in defending Industrial Talc cases.

While J&J may want the benefit of the automatic stay for its direct and non-derivative liability, its desire is irrelevant. What matters is whether Debtor would benefit. And here, stopping the Edleys from filing suit would not affect or benefit Debtor, as the claims the Edleys seek to bring solely concern: (1) J&J's fraudulent conduct that caused the wrongful dismissal of cases involving exposure to J&J/Windsor Mineral's Industrial Talc; and (2) J&J's own conduct in fraudulently defending these Industrial Talc personal injury actions. Because Debtor has not assumed J&J's liability relating to Industrial Talc or J&J's misdeeds in defending Industrial Talc lawsuits involving a completely different subsidiary separate and

25

apart from Old JJCI, the *Edley* Class Action will not impact Debtor's

reorganization. Nor would it lessen J&J's ability to satisfy its obligation to provide

funding to Debtor for the matters at issue in this bankruptcy proceeding or assist in

developing a Chapter 11 Plan. J&J's funding obligation is tied to Debtor's

liabilities resulting from cosmetic talc and the 2021 Funding Agreement guarantees

J&J's obligation to the "full value of JJCI," which Debtor's Chief Legal Office has

valued at $60 billion (which while considerable, pales in comparison to J&J and its

$400 billion valuation).[6]

Conversely, extending the automatic stay so that the Edleys cannot file and

proceed with the contemplated fraudulent concealment Class Action would

impinge upon Debtor's reorganization efforts. With the 2021 Funding Agreement

limited to the value of JJCI, keeping the *Edley* Class Action in the bankruptcy

proceeding could result in an already too small fund being divided even further.

So, while J&J might benefit from staying the filing of the *Edley* Class Action, it

would be alone in this regard.

---

[6] *See* Transcript of Proceedings dated Nov. 4, 2021, T2250:10-23, attached as
Exhibit 14 to the Rochester Declaration. As of March 8, 2022, MarketWatch
reports that J&J is valued at $452.79 billion.
https://www.marketwatch.com/investing/stock/jnj?mod=mw_quote_tab (last
visited March 8, 2022).

Any argument for sweeping up the *Edley* Class Action into the present bankruptcy action is in the end fatally undermined by the lack of any identity of interests between the *Edley* claims for fraud and fraudulent concealment relating to Industrial Talc cases and Debtor's liabilities arising from injuries allegedly caused by cosmetic talc. The affidavit J&J by Gene M. Williams, Esq., an attorney for J&J and Old JJCI, puts to bed any notion that there is significant corporate interconnectedness between litigation over Industrial Talc and cosmetic talc to justify enjoining the *Edley* Class Action from proceeding. He avers on behalf of J&J in a prior matter, that J&J recognizes "industrial talc cases" as being distinct from the "Johnson's Baby Powder cases." Exhibit B, ¶ 8. Mr. Williams further explains in his affidavit that "industrial talc is different from the cosmetic talc used in Johnson's Baby Powder or Shower to Shower, including that industrial talc was a different grade of talc which was processed and handled in a manner different from cosmetic talc." *Id.*, ¶ 9.

Ultimately, J&J could have sought bankruptcy protection. It did not. Only Debtor LTL Management has, and while it has sought (and obtained) a Preliminary Injunction barring the commencement of "Enjoined Talc Claims," neither it nor J&J have sought a stay of claims such as those in the *Edley* Class Action. That decision confirms that the Debtor's claims (which again, arise from cosmetic talc) bear no relation to claims against J&J over Industrial Talc, much less the fraud,

fraudulent concealment, and fraud on the court claims relating to J&J's actions in

defending Industrial Talc cases involving a completely different subsidiary

corporation: Windsor Minerals, Inc. That liability is direct and nonderivative of

any claims against Debtor. Indeed, under New Jersey law, they are separate causes

of action for fraud and fraudulent concealment distinct from the underlying

dismissed asbestos claims. *See Williams,* 765 F.3d at 315. Therefore, allowing the

Edleys to bring the proposed Class Action would not impact Debtor's

reorganization.

In balancing these interests, this Court should find that the harm to the

putative *Edley* Class Members by staying their litigation indefinitely while this

bankruptcy action plays out far outweighs any argued benefit that the Debtor might

obtain from staying the case during the pendency of this Bankruptcy Action. In

fact, there is no benefit to be gained by the Debtor because the Edleys and the

members of the putative Class are not creditors of the Debtor and J&J has

guaranteed funding to Debtor. J&J may find comfort from delaying the inevitable

results of the *Edley* Complaint going forward—but that is of no moment. J&J has

not sought the protections of bankruptcy. Debtor and its parent companies,

therefore, should not be able to obtain a stay of the *Edley* Class Action, which is

intended to bring justice to all those whose personal injury claims were dismissed

because of J&J's fraudulent concealment scheme and to hold J&J and other

nondebtor John/Jane Doe defendants accountable for fraud on the judicial system.

## IV.    Conclusion

For all these reasons, the Court should (1) clarify that the Preliminary

Injunction Order does not stay the commencement of the *Edley* Class Action; or in

the alternative, (2) lift the automatic stay so that the Edleys may bring the direct,

non-derivative claims against Johnson & Johnson and other nondebtor John/Jane

Doe defendants for fraud, fraudulent concealment, and fraud on the courts.

COHEN, PLACITELLA & ROTH PC


___/S/ Christopher M. Placitella_____
Christopher M. Placitella (ID 27781981)
Michael Coren (ID 24871979)
Dennis M. Geier (ID 035272006)
Eric S. Pasternack (ID 015132011)
Jared M. Placitella (ID 068272013)
Justin I. Placitella (ID 105812014)
(732) 747-9003
cplacitella@cprlaw.com
mcoren@cprlaw.com
dgeier@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com
justinplacitella@cprlaw.com


Dated: March 14, 2022