**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>        Debtor.[1] | Chapter 11<br><br>Case No. 21-30589 (MBK)<br><br>Judge:  Michael B. Kaplan<br><br>**Hearing Date and Time:**<br>March 30, 2022 at 10:00 a.m. |

### DEBTOR'S OMNIBUS OBJECTION TO INSURERS'
### MOTIONS FOR RELIEF FROM THE AUTOMATIC STAY

LTL Management LLC, the debtor in the above-captioned chapter 11 case

(the "Debtor"), files this omnibus objection to the *Motion for an Order Granting Relief From the*

*Automatic Stay to Allow the NJ Coverage Action to Proceed* [Dkt. 1488] (the "Travelers

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501
George Street, New Brunswick, New Jersey 08933.

Motion") filed by Travelers Casualty and Surety Company ("Travelers") and the *Motion for an*

*Order (I) Confirming That the Automatic Stay Does Not Apply to the New Jersey Coverage*

*Action Or, in the Alternative, (II) Granting Relief From the Automatic Stay to Allow the New*

*Jersey Coverage Action to Proceed* [Dkt. 1491] (the "Plaintiff-Insurers Motion" and, together

with the Travelers Motion, the "Motions") filed by the New Jersey Coverage Action

Plaintiff-Insurers (the "Plaintiff-Insurers" and, together with Travelers, the "Moving Insurers").

In support of this omnibus objection, the Debtor respectfully represents as follows:

### Preliminary Statement

The Moving Insurers request permission to proceed with litigation of the insurance

coverage action styled Atlanta Int'l Ins. Co., et al. v. Johnson & Johnson, et al., MID-L-3563-19

(Law Div.) currently pending in the Superior Court of New Jersey (the "NJ Coverage Action").

But there simply is no need to lift the stay at this time, when the Debtor is preparing to engage in,

and should be focusing its efforts on, mediation with representatives of talc claimants as well as

settlement discussions with certain governmental authorities.  Moreover, lifting the stay to permit

the NJ Coverage Action to proceed would harm the Debtor and its estate, and the stay should not

be lifted for many of the same reasons the Court recently determined to stay and enjoin talc-

related claims (the "Talc Claims")[2] against third-party defendants.  See *Memorandum Opinion*,

Adv. Pro. No. 21-03032, Adv. Dkt. 184 (Bankr. D.N.J. Feb. 25, 2022) (the "PI Opinion").

Litigation of the NJ Coverage Action, at this time, could adversely impact the Debtor's

settlement efforts.  If the NJ Coverage Action is permitted to proceed, the Debtor would be

forced to actively participate in the action, which seeks a declaration regarding the Debtor's

---

[2]     Talc Claims include all claims relating in any way to talc or talc-containing materials that formerly were
asserted against (or that could have been asserted against) the former Johnson & Johnson Consumer, Inc.
("Old JJCI") on any theory of liability (whether direct, derivative, joint and several, successor liability,
vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise).

NAI-1527062109

ability to access nearly $2 billion dollars of insurance coverage.  Likewise, the Debtor

understands that the talc claimants have an interest in the NJ Coverage Action and the extent of

the Debtor's insurance assets, and may desire to intervene in the NJ Coverage Action.  In fact,

the Official Committee of Talc Claimants I ("Talc Committee I")[3] recently filed an application to

retain insurance counsel [Dkt. 1702].  The Debtor should not be forced to participate in the NJ

Coverage Action at a time when the Debtor, the Committees and the Future Talc Claimants'

Representative (the "FTCR") should be focused on settlement discussions and attempting to

formulate a consensual plan of reorganization.

Additionally, in the NJ Coverage Action, one of the asserted defenses to coverage

(the "expected and intended" defense) requires a determination of whether there was a subjective

intent to cause the resulting injury, a quintessential factual inquiry.  This inquiry overlaps with a

key contested allegation in the talc litigation and this case regarding the safety of Old JJCI's and

Johnson & Johnson's ("J&J") talc products.  The Debtor maintains that cosmetic talc products

manufactured or distributed by the Debtor's predecessor or J&J are safe, did not contain

asbestos, and do not cause disease.  By contrast, the talc claimants allege that such talc products

---

[3]    On November 8, 2021, prior to transferring venue of this chapter 11 case (the "Chapter 11 Case") to this
Court, the United States Bankruptcy Court for the Western District of North Carolina entered an order
appointing an official committee of talc claimants (the "Talc Committee") [Dkt. 355].  On
December 23, 2021, the United States Trustee for the District of New Jersey docketed the *Notice of the
United States Trustee's Filing of Reconstituted and Amended:  (i) Notice of Appointment of Official
Committee of Talc Claimants I; and (ii) Notice of Appointment of Official Committee of Talc Claimants II*
[Dkt. 965] ("Amended Notice").  The Amended Notice effectively divided the membership of the Talc
Committee into two committees—Talc Committee I, consisting of ovarian cancer claimants, and the
Official Committee of Talc Claimants II ("Talc Committee II" and together with Talc Committee I,
the "Committees"), consisting of mesothelioma claimants—and appointed additional members to each such
committee.  At a hearing held on January 19, 2022, this Court granted the motions filed by the Debtor and
the law firm of Arnold & Itkin, LLP, challenging the validity of the Amended Notice, and struck the
Amended Notice, effectively reinstating the Talc Committee.  At a hearing on March 8, 2022, this Court
authorized the continuance of Talc Committee I and Talc Committee II until April 12, 2022.  The Debtor
continues to believe the Amended Notice is invalid and reserve all its rights.

-3-

contain asbestos and cause disease, and, in many cases, that Old JJCI and J&J intended to harm them.

Recommencing the NJ Coverage Action thus will necessarily implicate factual issues that substantially overlap with issues that are at the heart of the Chapter 11 Case. The Debtor, which is a party to the NJ Coverage Action (contrary to the Moving Insurers' assertions), should not be forced to litigate those issues in the NJ Coverage Action while simultaneously seeking an equitable and efficient resolution in this Chapter 11 Case. Nor should the Debtor be forced to face the corresponding risks of collateral estoppel and evidentiary record prejudice that could result from such parallel litigation. Indeed, litigation of the NJ Coverage Action would directly impact the Debtor's ability to resolve the Talc Claims in the Chapter 11 Case and could interfere with or impact the valuation of the Talc Claims in the upcoming settlement negotiations and in any claims estimation proceeding.

Thus, despite the Moving Insurers' contention to the contrary, there are significant "legitimate reason[s] to delay resolution of the" NJ Coverage Action, Plaintiff-Insurers Mot. ¶ 8, and "delaying resolution" of the NJ Coverage Action, would in fact "advance this chapter 11 case." Travelers Mot., 10.

By contrast, the Moving Insurers have failed to demonstrate any need for the automatic stay to be lifted at this time. As an initial matter, the NJ Coverage Action, despite having been pending for almost three years, is still in its early stages, with the exchange of written and document discovery still not complete. Moreover, the Debtor is not pursuing, and does not intend to pursue, while the NJ Coverage Action is stayed, its affirmative claims, so the Moving Insurers' fears of prejudice in that regard are unwarranted. Additionally, the Moving Insurers are not incurring indemnification or defense costs at this time given the stay of the talc litigation.

-4-

And the Plaintiff-Insurers' concern regarding any interest that may ultimately be payable is premature and speculative given that any determination with respect to interest would not occur until after a resolution of the NJ Coverage Action in the Debtor's favor.  The Moving Insurers assert that they "need clarity" as to their coverage obligations.  That may be so at some point, but there simply is no urgent need, particularly when weighed against the prejudice to the Debtor described herein, to resume the NJ Coverage Action at this time.

## **Relevant Background**

### *The Debtor's Talc Liabilities*

1.      Prior to 2010, only a small number of isolated cases involving talc-related claims had been filed against Old JJCI and J&J.  *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 5] (the "First Day Declaration") ¶ 34.  The number of claims against Old JJCI and J&J began to skyrocket after trials in 2013 and 2016.  Id. ¶ 35.  As of October 14, 2021 (the "Petition Date"), however, there were approximately 38,000 ovarian cancer cases pending against the Debtor, including approximately 35,000 cases pending in the federal multi-district litigation in New Jersey, and approximately 3,300 cases in multiple state court jurisdictions across the country.  Id. ¶ 42.  In addition to the ovarian claims, more than 430 mesothelioma cases were pending against the Debtor on the Petition Date.  Id. ¶ 44.

### *The Debtor's Insurance Coverage*

2.      The Debtor has valuable rights to insurance coverage for these talc-related claims arising from products manufactured and/or sold by Old JJCI or for which Old JJCI may otherwise have had legal responsibility.  Id. ¶ 46.  In particular, the Debtor has access to primary

and excess liability insurance policies that cover, among other things, defense and/or indemnity

costs related to talc bodily injury claims, subject to the terms of the policies.[4]  Id.

      3.      Travelers, f/k/a Aetna Casualty and Surety Company, issued primary

general liability policies to J&J (which policies cover the Debtor) for the period 1957 to 1980

(the "Travelers Policies").  Id. ¶ 47.  The combined limits of the Travelers Policies (not

accounting for deductibles or erosion/exhaustion of limits) total more than $214 million per

occurrence and $263 million in the aggregate.  Id.  The deductibles increase over time, starting at

a minimal level and increasing to $5 million per occurrence by 1977.  Id.  The limits of the

Travelers Policies before 1973 are not eroded by defense costs; under later policies, defense

costs erode limits.  Id.  From 1957 to 1985, Travelers also provided excess liability coverage to

J&J that covers the Debtor.  The combined aggregate limits of those policies total approximately

$563 million.  Id. ¶ 48.

      4.      From 1973 to 1985, a variety of other insurers, including the

Plaintiff-Insurers, issued excess policies that cover the Debtor.  Id. ¶ 49.  The combined limits of

those excess policies total more than $1.09 billion in the aggregate.  Id.

      5.      From 1973 through 1985, Middlesex Insurance Company ("Middlesex"), a

captive insurance company that is a wholly-owned subsidiary of J&J, issued policies that cover

J&J and the Debtor.  Id. ¶ 51.  Those policies insured J&J and Old JJCI for large deductibles

under certain policies, including the Travelers Policies.  Id.  From 1977 to 1985, Middlesex also

issued excess insurance policies that cover J&J and Old JJCI.  Id.  As described in the First Day

Declaration, there is a dispute between J&J, the Debtor, and Middlesex, on the one hand, and the

---

[4]      The policies that cover the Debtor were issued to J&J as the named insured.  Those policies cover the
period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI
was a subsidiary of J&J.

NAI-1527062109

Moving Insurers, on the other hand, regarding the applicability, extent of coverage and limits of the Middlesex policies, in particular with respect to the post-1985 Middlesex policies. Id.

6.      In total, the limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities are in excess of $1.95 billion. Id. ¶ 52.

***The NJ Coverage Action***

7.      J&J and Old JJCI have tendered talc-related claims to the third-party insurers, including the Moving Insurers. To date, none of those insurers has acknowledged its coverage obligations, defended Old JJCI or J&J, paid the costs of defense, or indemnified J&J or Old JJCI for settlements or judgments. Instead, the third-party insurers, including the Moving Insurers, have asserted various coverage defenses. Id. ¶ 53.

8.      In May 2019, the Plaintiff-Insurers filed the NJ Coverage Action against J&J, Old JJCI and Middlesex, as well as various other insurers, seeking a declaratory judgment regarding the parties' respective obligations under various insurance policies. See id. ¶ 54. The Plaintiff-Insurers filed a Second Amended Complaint on June 22, 2020. On July 31, 2020, J&J, Old JJCI, and Middlesex filed answers to the Second Amended Complaint, and asserted counterclaims and cross-claims against certain insurer defendants. Id. Travelers and certain other insurers filed cross-claims against J&J, Old JJCI, and Middlesex to which J&J, Old JJCI, and Middlesex responded later in 2020. Id.

9.      One of the coverage defenses the insurers assert is that J&J and Old JJCI expected or intended the injuries to plaintiffs. See, e.g., *Answer of Defendant Travelers Casualty and Surety Company to Johnson & Johnson's Cross Claims*, MID-L-3563-19 (N.J. Super. Ct. Law Div. Sep. 4, 2020), 11 ("J&J's causes of action against Travelers are barred, in whole or in

part, to the extent that the injuries caused and/or damages sought in the Underlying Claims were
expected or intended by J&J."); *Plaintiffs/Counterclaim Defendants' Answer to the
Counterclaims of Defendants Johnson & Johnson and Johnson & Johnson Consumer, Inc. in
Response to Plaintiffs' Second Amended Complaint*, MID-L-3563-19 (N.J. Super. Ct. Law Div.
Sep. 4, 2020), 17 ("To the extent J&J expected or intended the acts or harm giving rise to the
Underlying Claims, coverage for said claims is barred.").  This defense is based on language in
certain policies issued by the insurers that excludes coverage for bodily injury where such injury
is "expected or intended" by the insured.  Adjudication of this issue requires a determination of
whether the insured had the subjective intent to cause the resulting injury, a quintessential factual
inquiry.  See, e.g., SL Indus, Inc. v. Am. Motorists Ins. Co., 128 NJ 188, 212, 607 A.2d 1266,
1278 (N.J. 1992) (finding that the "court must inquire as to whether the insured subjectively
intended or expected to cause that injury").  This issue overlaps directly with factual assertions
and claims plaintiffs are making in the underlying talc personal injury actions, in which they
claim that J&J and Old JJCI were aware that the talc products would cause injury to consumers.
See, e.g., Carl v. Johnson & Johnson, ATL-L-6546-14 (N.J. Super. Ct. Law Div. Apr. 7, 2021),
¶ 399 ("[Old JJCI and J&J] sold the [talc products] to Plaintiffs and other consumers throughout
the United States in spite of their knowledge that the [talc products] cause the problems
heretofore set forth in this Amended Complaint, thereby causing the severe and debilitating
injuries suffered by the Plaintiffs"); Bryant v. Johnson & Johnson, Case No. 21-1960-NP, Circuit
Court of Michigan, Wayne County (Feb. 12, 2021), ¶ 5 ("[Old JJCI and J&J] knew that [their]
cosmetic talc products, including Johnson's Baby Powder and Shower to Shower, contained
asbestos fibers, knew those fibers could cause cancer, and knew that it was not safe to be selling
such products to the public for use on babies, children, and adults"); In re Johnson & Johnson

NAI-1527062109

<u>Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation</u>, MDL No. 16-2738 (FLW) (D.N.J. Dec. 22, 2020), ¶ 393(g) ("Despite knowing about the carcinogenic nature of talc and its likelihood to increase the risk of ovarian cancer in women, the Johnson & Johnson Defendants falsely marketed, advertised, labeled and sold the [talc products] as safe for public consumption and usage"). The expected and intended defense also relies upon a determination that Old JJCI's and J&J's talc products were harmful.

10. At the time of the Debtor's chapter 11 filing, although the NJ Coverage Action has been pending for almost three years, fact discovery was still underway and the parties were continuing to engage in extensive document and written discovery in advance of depositions, which had not yet been scheduled or commenced. The parties had not yet begun expert discovery, nor had any dispositive motions been filed by any of the parties.

***The 2021 Corporate Restructuring***

11. On October 12, 2021, Old JJCI implemented a corporate restructuring (the "<u>2021 Corporate Restructuring</u>") pursuant to which Old JJCI ceased to exist and two new entities were created: (a) the Debtor and (b) Johnson & Johnson Consumer Inc. ("<u>New JJCI</u>"). First Day Decl. ¶ 16. As a result of the 2021 Corporate Restructuring, the Debtor became responsible for Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation state or similar laws), <u>id.</u> ¶ 24, and the Debtor was allocated "[a]ll rights to make claims under any and all insurance policies as to which [Old JJCI] has rights as an insured, additional insured, successor beneficiary or otherwise, solely to the extent such policies provide [Old JJCI] with coverage or a right to coverage for Talc Related Liabilities." <u>See</u> *Declaration of Mark W. Rasmussen* [Adv.

NAI-1527062109

Dkt. 135], Ex. 1.25, Schedules to the Plan of Divisional Merger by Chenango Zero LLC dated

October 12, 2021 (the "Divisional Merger Schedules"), Schedule 5(b)(i), ¶ (1)(b).

12.    In addition, the Debtor became party to the funding agreement

(the "Funding Agreement") between the Debtor, on the one hand, and J&J and New JJCI (on a

joint and several basis) on the other.  First Day Decl. ¶ 21.  During the pendency of any

chapter 11 case, the Funding Agreement requires J&J and New JJCI to (a) pay for the costs and

expenses of the Debtor incurred in the normal course of its business, including the costs of

administering the Chapter 11 Case, to the extent that any cash distributions received by the

Debtor from its non-debtor subsidiary are insufficient to pay such costs and expenses, and

(b) provide the funding for a trust pursuant to a chapter 11 plan to the extent that the Debtor's

other assets are insufficient to provide that funding.  Id. ¶ 27.

**The Debtor's Chapter 11 Case**

13.    On the Petition Date, the Debtor commenced this reorganization case by

filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy

Court for the Western District of North Carolina.  On November 16, 2021, that court entered an

order transferring the case to the District of New Jersey, which referred the case to this Court.

14.    On October 18, 2021, the Debtor filed a *Notice of Bankruptcy Filing and

Stay of Proceedings* in the NJ Coverage Action informing the parties and the New Jersey

Superior Court that "LTL Management LLC, a North Carolina limited liability company . . . is

now responsible for the talc related claims asserted against Old JJCI and was allocated the

insurance rights of Old JJCI" and that "upon the filing of LTL's chapter 11 case, the automatic

stay imposed by section 362 of the Bankruptcy Code . . . became immediately effective" to stay

the NJ Coverage Action.  See Travelers Mot. Ex. B.

-10-

15.     On February 15, 2022, the Moving Insurers filed the Motions.

*Settlement Efforts*

16.     At a hearing held on March 8, 2022, the Court ordered the appointment of Judge Joel Schneider and Gary Russo to serve as mediators in a mediation among the Debtor, the Committees, the FTCR and potentially other parties, in an effort to resolve the Chapter 11 Case and provide equitable recoveries to creditors.[5]

17.     In addition, the Debtor anticipates that it will shortly be engaging in settlement discussions with certain governmental authorities that are conducting investigations or have commenced lawsuits related to the talc products of Old JJCI and J&J.  The Debtor has commenced discussions regarding the formation of an ad hoc committee representing more than 40 state attorneys general to enter into settlement discussions with the Debtor with a view to resolving their claims.

## Argument

## I.     THE AUTOMATIC STAY APPLIES TO THE NJ COVERAGE ACTION.

18.     The Moving Insurers assert that the automatic stay does not apply to the NJ Coverage Action (or in Travelers' case, refuse to concede that the stay applies to the insurer claims in the NJ Coverage Action).  See Plaintiff-Insurers Mot. ¶ 37; Travelers Mot., 1.  As set forth below, the Moving Insurers' arguments are based largely on incorrect factual assertions, and the fundamental protections of the automatic stay clearly apply to the NJ Coverage Action.

---

[5]     On March 10, 2022 [Dkt. 1694], Talc Committee II filed a letter with the Court indicating support for the appointment of Messrs. Schneider and Russo.

### A.    The Automatic Stay Applies Pursuant to Section 362(a)(1) Because the Debtor Unquestionably Is a Party to the NJ Coverage Action.

19.    The automatic stay of section 362 has been described as "one of the fundamental debtor protections provided by the bankruptcy laws."  Midlantic Nat'l. Bank v. N.J. Dep't of Env't. Prot., 474 U.S. 494, 503 (1986) (citation omitted).  The purpose of the automatic stay is three-fold:  "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor."  Borman v. Raymark Ind., Inc., 946 F.2d 1031, 1036 (3d Cir. 1991) (citations omitted).  To that end, section 362(a)(1) of the Bankruptcy Code prevents "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title."  11 U.S.C. § 362(a)(1).

20.    The Moving Insurers attempt to obfuscate the issue by making various assertions, including that the Debtor:  (a) has no rights under the policies at issue; (b) only has an indirect financial interest in the claims asserted in the NJ Coverage Action; (c) has not sought coverage or asserted claims against the Moving Insurers and (d) is not a party to the NJ Coverage Action.  Travelers Mot., 1; Plaintiff-Insurers Mot. ¶ 39.  But, in so asserting, the Moving Insurers ignore (or misunderstand) the 2021 Corporate Restructuring and the allocation of insurance rights to the Debtor thereunder.[6]  As the Court recently recognized, "although the extent of shared insurance coverage is disputed, it remains uncontested **that Debtor shares insurance**

---

[6]    As a result, the Plaintiff-Insurers' citations to cases finding that the automatic stay does not apply to cases involving non-debtors are inapposite.

**policies**—**which are estate property** under 11 U.S.C. § 541(a)—with the Protected Parties."
See PI Op., 14 (emphasis added).

21.    Addressing the Moving Insurers' arguments in turn, first, there is no
dispute that, pursuant to the 2021 Corporate Restructuring, Old JJCI ceased to exist and the
Debtor was allocated all of Old JJCI's talc-related liabilities and certain assets, including the
"rights to make claims under any and all insurance policies" to the extent such policies provided
Old JJCI "with coverage or a right to coverage for Talc Related Liabilities."  See Divisional
Merger Schedules, Schedule 5(b)(i), ¶ (1)(b).  Contrary to the Moving Insurers' assertions,
therefore, the Debtor does have rights under the insurance policies, including the right to make
claims, and has a direct financial interest in the claims asserted in the NJ Coverage Action.

22.    Additionally, as Travelers acknowledges, **both** J&J and Old JJCI made
demands for coverage.  See Travelers Mot., 1.  Similarly, despite the Moving Insurers' assertions
to the contrary, there can be no legitimate dispute that **both** Old JJCI and J&J were parties to the
NJ Coverage Action.  See Travelers Mot., 1, 4-5; Plaintiff-Insurers Mot. ¶¶ 19, 39.  Indeed, the
pleadings filed in the NJ Coverage Action and related correspondence with the Moving Insurers
have been on behalf of J&J, Old JJCI and Middlesex—not solely J&J.  See Travelers Mot., 1.
Following the 2021 Corporate Restructuring, Old JJCI ceased to exist and the Debtor stepped
into its shoes with respect to the claims asserted by Old JJCI in the NJ Coverage Action.  It is
sufficient that Old JJCI sought coverage and asserted claims against the Moving Insurers.

23.    Finally, the Moving Insurers' argument that the Debtor is not a named
party in the NJ Coverage Action fails because it disregards the 2021 Corporate Restructuring and
that the Debtor is the true party in interest as successor to the claims asserted by Old JJCI in the
NJ Coverage Action.  Under New Jersey State Court Rules, a movant can simply request that a

NAI-1527062109

court direct "the person to whom the interest is transferred to be substituted in the action or

joined with the original party." N.J. Court Rules, R. 4:34-3. Such substitution requests are

considered "routine." See Siligato v. State, 268 N.J. Super. 21, 28, 632 A.2d 837, 840 (N.J.

Super. Ct. App. Div. 1993) (discussing Rule 4:34-3 in the context of complaint amendments to

add parties); see also Marshall V. Raritan Valley Disposal, 398 N.J. Super. 168, 180, 940 A.2d

315, 322 (N.J. Super. Ct. App. Div. 2008) (granting permissive substitution after consideration of

time and expense of adjudication of the claims and whether the claims derive from the same

coverage provisions). The NJ Coverage Action, therefore, is an action against the Debtor that is

stayed by section 362(a)(1) as the Debtor would be entitled to a routine substitution under

Rule 4:34-3.

**B.      The Automatic Stay Applies Pursuant to Section 362(a)(3) Because
the Debtor's Insurance Rights Are Assets of the Debtor's Estate.**

24.      Although styled as a declaratory judgment action, the NJ Coverage Action

seeks to adjudicate—and exercise control over—valuable property rights of the Debtor and is

stayed by section 362(a)(3).[7]  As discussed above, the Debtor believes that, in total, the limits of

solvent insurance policies that potentially cover talc-related liabilities are in excess of

$1.95 billion. First Day. Decl. ¶ 52; see also PI Op., 43 (noting that "nearly the entire policy

coverage of $2 billion is potentially still available to Debtor and J&J").

25.      Courts, including this one, have found that liability insurance policies, **and

the rights under such policies**, are property of a debtor's estate under the Bankruptcy Code.[8]

---

[7]      Section 362(a)(3) provides that the filing of a chapter 11 petition operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

[8]      Under section 541(a)(1) of the Bankruptcy Code, property of the estate includes "all legal and equitable interests of the debtor in property" as of the petition date. 11 U.S.C. § 541(a)(1). Pursuant to section 541(a)(6) of the Bankruptcy Code, property of the estate also includes, "[p]roceeds, product, offspring, rents, or profits from property of the estate…." 11 U.S.C. § 541(a)(6). Together, these

See PI Op., 42 (collecting cases); ACandS, Inc. v. Travelers Cas. and Sur. Co., 435 F. 3d 252,

260 (3rd Cir. 2006) ("The fact that the Letter Agreement is not itself an insurance policy, and so

the rights secured by that contract merely pertain to ACandS's right to coverage, does not

exclude these contractual rights from the broad definition of property found in § 541."); In re GB

Holdings, Inc., 2006 WL 4457350, at *2 (Bankr. D.N.J. Sep. 21, 2006) ("The Third Circuit

recently confirmed that insurance policies constitute property of the estate under Section 541");

In re Kaiser Aluminum Corp., 343 B.R. 88, 94 (D. Del. 2006) (finding that rights to proceeds

under general or product liability insurance policies are property of the estate).[9]

26.     It follows, then, that a state court action brought by insurance companies

that seeks to eviscerate the availability of coverage under insurance policies with respect to

which the Debtor has rights quintessentially is the type of matter stayed by section 362.  Safety

Nat'l Cas. Corp. v. Kaiser Aluminum & Chem. Corp. (In re Kaiser Aluminum Corp.), 303 B.R.

299, 303 (D. Del. 2003) (denying insurer's motion to lift the automatic stay because the

"automatic stay also specifically applies to actions related to the scope of insurance coverage"

and because the debtor has an interest in the scope of the insurer's obligations under the

insurance policies).

---

provisions establish an exceedingly broad definition of "property of the estate," i.e., one that includes
essentially all of the debtor's property interests existing at the time of the bankruptcy filing as well as all
property interests created with or by such property.

[9]     See also In re A.H. Robins Co, Inc., 788 F. 2D 994, 1001 (4th Cir. 1986) (finding that a products liability
policy is valuable property of the debtor and that "[a]ny action in which judgment may diminish this
'important asset' is unquestionably subject to a stay"); Westmoreland Human Opportunities, Inc. v. Walsh,
246 F.3d 233, 242 (3d Cir. 2001) ("expansive nature" of section 541's definition of property "encompasses
rights and interests arising from ordinary contractual relationships").  In re Adelphia Commc'ns Corp.,
298 B.R. 49 (S.D.N.Y. 2003), see Plaintiff-Insurers Mot. ¶ 41, which involved director & officer insurance
policies, as opposed to liability insurance policies as is the case here, is inapposite.  See Kaiser Aluminum,
343 B.R. at 94 (noting that although a split exists as to whether director & officer insurance policies and
proceeds are property of the estate, such a debate "does not exist in the context of general or product
liability insurance policies").

NAI-1527062109

27.     In any event, if the property  "arguably" is property of the estate, the

automatic stay applies, as highlighted by a case cited by the Plaintiff-Insurers.  See

Plaintiff-Insurers Mot. ¶ 39 (citing In re Manley Toys Ltd., No. 16-15374 (JNP), 2018 WL

1033426, at *3 (Bankr. D.N.J. Feb. 14, 2018)); In re Manley Toys Ltd., 2018 WL 1033426 at

*4-7 (stating that "several courts have concluded that the automatic stay applies to any property

that is even 'arguably' property of the estate" and finding that party's actions violated the

automatic stay because the property at issue was alleged to belong to the debtor and was the

subject of an ongoing legal dispute to determine the debtor's interest in the property); see also PI

Op., 43 ("Admittedly, certain coverage is disputed, and no definitive determination has been

made as to exhaustion.  However, these uncertainties do not change the fact [] that the

[insurance] policies are estate property.").

28.     The Plaintiff-Insurers' manufactured assertion that the NJ Coverage

Action seeks only to resolve J&J's demands on the insurance policies, Plaintiff Insurers

Mot. ¶ 46, is belied by the fact that every pleading filed in the action includes not only J&J, but

Old JJCI and Middlesex as well.  Even Travelers acknowledges, as it must, Old JJCI's

involvement in the coverage issues.[10]  See supra ¶ 22.

29.     The Plaintiff-Insurers' argument that the NJ Coverage Action would not

violate section 362(a)(3) because the action is styled as a declaratory judgment action is likewise

unavailing.  Plaintiff Insurers Mot. ¶ 47.  The sole case cited for this proposition, In re Spaulding

Composites Co., Inc., 207 B.R. 899 (9th Cir. B.A.P. 1997), is readily distinguishable.  In that

case, the insurer sought to proceed with a state court action against two non-debtor affiliates that

---

[10]     See Travelers Mot., 1 (asserting that the NJ Coverage Action arose "from J&J **and Old JJCI's** demands
for coverage for thousands of talc claims that J&J has been defending for the past five years.") (emphasis
added).

NAI-1527062109

were coinsured with the debtor.  The court's finding in that case rested on the failure of the
committee to establish that allowing the action to proceed would harm the debtor.  Id. at 907.
Here, recommencing the NJ Coverage Action unquestionably would impact (and harm) the
Debtor for the reasons set forth herein.

30.    The Plaintiff-Insurers' final argument, that the automatic stay does not
apply because the Debtor does not need insurance proceeds to satisfy its liabilities, defies logic.
Plaintiff-Insurers Mot. ¶ 48.  The Debtor's insurance rights are property of the estate regardless
of whether other assets may be available to the Debtor, and the availability of other assets does
not make such rights less worthy of the protection of the automatic stay.

31.    In re Phar-Mor, Inc. Sec. Litig., 164 B.R. 903 (W.D. Pa. 1994) provides
no support to the Plaintiff-Insurers' position.  In that case, the committee sought a preliminary
injunction to stay, rather than relief from stay of, security law actions against the former auditors
of the debtor to permit the debtor's estate to assert claims against the auditors (and potentially
recover against insurance proceeds).  Id. at 904.  The Pennsylvania court denied the preliminary
injunction, in part, because the auditor's insurance policies and proceeds from those policies
were not assets of the debtor's estate.  Id. at 906.  Unlike Phar-Mor, the Debtor's rights to make
claims under the insurance policies are a valuable asset of the estate.  See supra ¶¶ 6, 24.
Allowing the Moving Insurers to continue the NJ Coverage Action would allow the insurers to
exercise control over the Debtor's property and the action therefore is automatically stayed by
section 362(a)(3).

## II.    THE AUTOMATIC STAY SHOULD NOT BE LIFTED AT THIS TIME.

32.    Notwithstanding the fundamental protections afforded by the automatic
stay, in appropriate instances, relief from the automatic stay may be granted.  See In re SCO
Grp., Inc., 395 B.R. 852, 856 (Bankr. D. Del. 2007).  Thus, section 362(d)(1) provides that:

NAI-1527062109

> On request of a party in interest and after notice and a hearing, the
> court shall grant relief from the stay provided under subsection (a)
> of this section, such as by terminating, annulling, modifying, or
> conditioning such stay—(1) for cause . . . .

11 U.S.C. § 362(d)(1).  "Cause" is a flexible concept and a bankruptcy court is granted wide

discretion to determine whether to lift the automatic stay for cause.  See In re Mid-Atlantic

Handling Sys., LLC, 304 B.R. 111, 130 (Bankr. D.N.J. 2003).  The Moving Insurers, as the

moving parties, have the initial burden of establishing "cause."  In re Telegroup, Inc., 237

B.R. 87, 91 (Bankr. D.N.J. 1999); In re Rexene Products Co., 141 B.R. 574, 577 (Bankr. D.

Del. 1992).

33.    To determine whether "cause" exists to lift the stay, the court should

"weigh factors favoring denial of [the] motion against the benefits to be gained by the movant

should this Court be inclined to allow the requested litigation to proceed."  Telegroup, 237 B.R.

at 92.  Thus, courts look to (a) whether any great prejudice to either the bankrupt estate or the

debtor will result from continuation of the civil suit; (b) whether the hardship to the moving party

by maintenance of the stay considerably outweighs the hardship to the Debtor; and (c) whether

the moving party has a probability of prevailing on the merits.  Rexene, 141 B.R. at 576.

34.    In considering the above balancing test, courts also often rely upon the

twelve factors set forth in Mid-Atlantic to determine whether to grant a motion for relief from the

automatic stay to permit litigation to proceed.  Mid-Atlantic, 304 B.R. at 130.  "All twelve

factors are not necessarily present in a particular case, and a court need not rely on any plurality

of factors in deciding whether to lift the automatic stay."  Id.  The twelve Mid-Atlantic factors

are:

> 1) whether relief would result in a partial or complete resolution of
> the issues; 2) lack of any connection with or interference with the
> bankruptcy case; 3) whether the other proceeding involves the
> debtor as a fiduciary; 4) whether a specialized tribunal with the

NAI-1527062109

necessary expertise has been established to hear the cause of action; 5) whether the debtor's insurer has assumed full responsibility for defending it; 6) whether the action primarily involves third parties; 7) whether litigation in another forum would prejudice the interests of other creditors; 8) whether the judgment claim arising from the other action is subject to equitable subordination; 9) whether the moving party's success in the other proceeding would result in a judicial lien avoidable by the debtor; 10) the interests of judicial economy and the expeditious and economical resolution of litigation; 11) whether the parties are ready for trial in the other proceeding; and 12) impact of the stay on the parties and the balance of the harms.

Id.[11]

### A.    Lifting the Stay at This Time Would Harm the Debtor.

35.    The Moving Insurers' assertions that resolution of the coverage issues will not impact the Debtor, see Travelers Mot., 8-10; Plaintiff-Insurers Mot. ¶ 53, ignore that resuming the NJ Coverage Action, and in particular the pursuit of any expected and intended coverage defense, would harm the Debtor by, among other things, depriving it of the benefits of its bankruptcy case and subjecting the Debtor to risks of collateral estoppel and record taint.  In addition, resuming the NJ Coverage Action, at a time when the Debtor is on the verge of engaging in settlement negotiations with key constituencies in this case, could interfere with the Debtor's efforts to effectively pursue those negotiations in an attempt to reach agreement on a plan that efficiently and equitably resolves Talc Claims.  And, despite the Moving Insurers mistaken assertions to the contrary, this is so regardless of the existence of the Funding Agreement, and the value provided to the Debtor's estate by that agreement.  See Travelers Mot., 9-11; Plaintiff-Insurers Mot. ¶¶ 53-54, 56.

---

[11]    Several factors do not apply here (factor numbers 5, 8, 9).  Those that do apply in this case, for the reasons discussed below, do not weigh in favor of lifting the automatic stay to recommence the NJ Coverage Action.

NAI-1527062109

> i.  *Litigation of Any Expected and Intended Coverage Defense Would
> Harm the Debtor.*[12]

36.    The Moving Insurers have asserted the "expected and intended" coverage
defense in the NJ Coverage Action.  See supra ¶ 9.  This defense is based on language in certain
policies issued by the Moving Insurers that excludes coverage for bodily injury where such
injury is "expected or intended" by the insured.  The defense relies upon a determination of
whether the insured had the subjective intent to cause the injury alleged in the underlying
claims—here the Talc Claims.  Moreover, to prevail on the defense, the Moving Insurers
necessarily would have to establish that J&J's and Old JJCI's products were harmful.  These
issues overlap directly with factual assertions and claims plaintiffs are making in the underlying
talc personal injury actions and that are at the heart of this Chapter 11 Case.  See supra ¶ 9.
Permitting the Moving Insurers to pursue an expected and intended defense thus "would
undermine the purposes of chapter 11 and section 524(g) to resolve all such current and future
claims in a fair and equitable manner through a chapter plan."  DBMP LLC v. Those Parties
Listed on Appendix A to Complaint (In re DBMP LLC), 2021 WL 3552350, at *41 (Bankr.
W.D.N.C. Aug. 11, 2021).

37.    In particular, the Debtor should not be forced to litigate issues
fundamental to the Chapter 11 Case in the NJ Coverage Action and face the corresponding risks
of collateral estoppel and evidentiary record prejudice that would flow from such parallel
litigation, all while the Debtor is seeking to achieve a global resolution with respect to the Talc
Claims in its Chapter 11 Case.  Here, because the Debtor would be a party to the NJ Coverage
Action, the risk of the Debtor being collaterally estopped by findings or rulings made in the

---

[12]    As set forth above, despite the Moving Insurers' assertions to the contrary, the Debtor is in fact a party to
the NJ Coverage Action.

NJ Coverage Action is particularly acute.  And, as this Court has recognized in the similar

preliminary injunction context, because the assertion of an expected and intended coverage

defense in the NJ Coverage Action would "implicate the same product, the same time period, the

same alleged defect and the same alleged harm, it is possible that the evidentiary record . . .

could prejudice the Debtor.  PI Op., 41; see also *Order Granting the Debtor's Request for

Preliminary Injunctive Relief*, Adv. Pro. 21-3032 (Bankr. W.D.N.C. Nov. 15, 2021), Adv.

Dkt. 102, 5-6 (recognizing that "[s]tatements, testimony and other evidence generated in

litigation of Debtor Talc Claims" against other parties "could be used to try to establish the

Debtor's own liability for the exact same talc-related claims.").

38.     Critically, any factual findings on liability in the NJ Coverage Action

could affect any estimation proceeding concerning the Talc Claims before this Court and, in turn,

the value of the Debtor's estate.  If the automatic stay is lifted, the Debtor would be attempting to

reorganize and efficiently settle the Talc Claims through bankruptcy in one courtroom, as factual

findings that could influence fundamental aspects of the Chapter 11 Case are being issued in

another.  Any such parallel process undoubtedly would "have an adverse impact on the

bankruptcy estate, . . . hinder reorganization efforts, and . . . serve as a constant drain on

resources and time."  PI Op., 48.

39.     Indeed, given that such risks can support **extending the stay** to

non-debtors given the harm imposed upon the debtor, they certainly establish sufficient harm to

warrant refusing to **lift a stay** already in place.  See, e.g., DBMP, 2021 WL 3552350 at *41

(litigating the same claims outside of the bankruptcy "would undermine the purposes of chapter

11 and section 524(g) to resolve all such current and future claims in a fair and equitable manner

through a chapter 11 plan"); In re Bestwall LLC, 606 B.R. 243, 256 (Bankr. W.D.N.C. 2019)

(allowing the asbestos claims to process would potentially bind the debtor and "any rulings or findings regarding Bestwall Asbestos Claims could frustrate the Debtor's efforts to resolve the claims globally and equitably in this Chapter 11 case"); ; <u>W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)</u>, 386 B.R. 17, 34-35 (Bankr. D. Del. 2008) (finding that the court "takes into account the risks of collateral estoppel and record taint" and that forcing the debtors to participate in the state court actions "to prevent these adverse consequences" would "encumber the estates with additional litigation burdens from which the stay specifically protects them"); <u>In re Am. Film Techs., Inc.</u>, 175 B.R. 847, 850-55 (Bankr. D. Del. 1994) (staying claims against debtor's directors and holding that a potential finding of liability against such directors would be based on acts undertaken by directors as agents of the debtor and therefore would expose the debtor to the risk of being collaterally estopped from denying liability for the directors' actions).[13]

      40.     Accordingly, permitting the Moving Insurers to pursue expected and intended coverage defenses in the NJ Coverage Action would harm the Debtor, and accordingly, the automatic stay should not be lifted.

---

[13]     <u>See also</u> <u>In re Johns-Manville Corp. (Johns-Manville II)</u>, 40 B.R. 219, 225 (S.D.N.Y. 1984) (finding that "once a witness has testified to a fact, or what sounds like a fact, that witness may be confronted with his prior testimony under oath in a future proceeding directly involving [the debtor], whether or not [the debtor] was a party to the record on which the initial testimony was taken" and that no matter what the parties to the action may stipulate, the "thousands of other claimants and cross-claimants who are after [the debtor's] assets, would be entitled to use the product of such discovery."); <u>Sudbury, Inc. v. Escott</u>, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) (granting injunctive relief after finding that debtor's liability "may be determined on collateral estoppel principles [by fact determinations reached on the same fact issues] in Plaintiffs' actions" against non-debtors); <u>In re Johns-Manville Corp.</u>, 26 B.R. 420, 429 (Bankr. S.D.N.Y. 1983) (concluding that the risk of collateral estoppel would irreparably injure the estate and, thus, issuance of a stay of claims against non-debtors was warranted).

NAI-1527062109

        ii.    *Lifting the Stay at This Time Could Adversely Impact the Debtor's Settlement Efforts.*

41.    Litigation of the NJ Coverage Action, at this time, could adversely impact the Debtor's settlement efforts.  Not only is the Debtor on the cusp of commencing mediation with representatives of talc claimants in an effort to facilitate the establishment and funding of a trust to resolve the Chapter 11 Case and provide equitable recoveries to creditors, but the Debtor also is preparing to engage in settlement discussions with certain governmental authorities.  If the NJ Coverage Action is permitted to proceed, the Debtor would be forced to actively participate in that action, which seeks a declaration regarding the Debtor's access to nearly $2 billion dollars of insurance coverage.  This participation would burden the Debtor's personnel.

42.    In particular, the Debtor expects that Mr. Kim, the Debtor's Chief Legal Officer and a key necessary participant in any settlement negotiations of the Debtor, would need to be substantially involved in the NJ Coverage Action given his significant expertise with respect to that matter.  The Debtor further expects that the insurers in the NJ Coverage Action will seek to take the depositions of numerous individuals, including many individuals who have been deposed repeatedly in the talc litigation.[14]  If such depositions were permitted to proceed, the Debtor, as a party, necessarily would be required to attend each of them.

43.    Likewise, the Debtor understands that the talc claimants have an interest in the NJ Coverage Action and the extent of the Debtor's insurance assets, and may desire to intervene in the NJ Coverage Action.  As noted above, Talc Committee I recently filed an application to retain insurance counsel [Dkt. 1702], and the Debtor understands that talc

---

[14]    Moreover, given the extensive materials from the talc litigation available to the insurers, it is the Debtor's view that further depositions of such individuals likely would be objectionable in any event.

NAI-1527062109

claimants likely would require a period of time to familiarize themselves with the Debtor's

insurance assets and the NJ Coverage Action.

   44. The Debtor and the Committees should not be forced to participate in the

NJ Coverage Action at a time when they should be focused instead on settlement discussions and

attempting to formulate a consensual plan of reorganization.

   45. Finally, as set forth above, given in particular the assertion of the expected

and intended coverage defense, the litigation of the NJ Coverage Action will directly impact the

Debtor's ability to resolve the Talc Claims in the Chapter 11 Case and would interfere with or

impact the valuation of the Talc Claims in settlement negotiations.

   **B.**  **The Moving Insurers Have Not Demonstrated And Cannot Demonstrate Any Harm That Would Outweigh the Harm to the Debtor.**

   46. As an initial matter, cause for relief from the automatic stay does not exist

in the absence of hardship to the requesting party.  See, e.g., In re Ramkaran, 315 B.R. 361, 364

(D. Md. 2004) (affirming denial of motion to lift stay because requesting party "did not . . .

assert[] any significant hardship"); In re Dallas, 2011 WL 6101832, at *2 (Bankr. S.D. Ga. Nov.

29, 2011) (absent showing of hardship that "considerably outweighs" prejudice to debtors'

estates, relief should be denied); see also In re Danzik, 549 B.R. 804, 810 (Bankr. D. Wyo. 2016)

(explaining that relief from stay is not appropriate if it only shifts the burden from another party

to the debtor).  Here, the Moving Insurers have not demonstrated that they would be harmed

absent immediate relief from stay.

   47. Although the Plaintiff-Insurers cite to other bankruptcy cases in which

courts have lifted the automatic stay to allow insurance coverage actions to proceed, none of

those cases involved assertions by the debtors that issues in the coverage actions were identical

to critical issues in the debtors' reorganizations or that resumption of the coverage litigation

would place the debtors at risk of suffering collateral estoppel and record taint or adversely

impact critical settlement efforts.  Finally, maintaining the stay of the NJ Coverage Action will

not prejudice the rights of the Moving Insurers.[15]  Rather, as set forth above, proceeding with the

NJ Coverage Action at this time would harm the Debtor.[16]

48.     The Moving Insurers assert that relief from the automatic stay is necessary

to provide "clarity" regarding the parties' respective rights and obligations under the insurance

policies.  See Travelers Mot., 8, 13; Plaintiff-Insurers Mot. ¶ 57-58.  This may be so, but a lack

of clarity without more is not harm.  A resolution of the NJ Coverage Action is not essential to a

resolution of this Chapter 11 Case.  Accordingly, "clarity" with respect to the NJ Coverage

Action is not essential to the Debtor, particularly at this critical stage of the Debtor's Chapter 11

Case, and the Moving Insurers have not shown why it is essential to them.

49.     The Plaintiff-Insurers' suggestion that they are harmed because they have

not been permitted to "defend, control, and settle the Underlying Claims," Plaintiff-Insurers Mot.

¶ 59, is also unavailing given that the talc litigation currently is stayed.  Likewise, the Moving

Insurers' contention that they are harmed because the Debtor's affirmative claims against the

Moving Insurers are not stayed, see Travelers Mot., 13-14; Plaintiff-Insurers Mot. ¶ 60, is

---

[15]     The Plaintiff-Insurers' cases in support of the assertion that resolution of the NJ Coverage Action is
necessary and inevitable are distinguishable.  See Plaintiff-Insurers Mot. ¶¶ 57-58; In re Cicale, 2007 WL
1893301, *1, *4 (Bankr. S.D.N.Y. June 29, 2007) (lifting stay after finding that state court foreclosure
procedure was relatively straight forward and would not require a great deal of trial preparation); In re
Rexene Prods. Co., 141 B.R. at 577 (finding that claims against the debtors would have to be resolved prior
to confirmation through a claims estimation proceeding and such litigation could be duplicative of the state
court action); Colony Ins. Co. v. Vill. at Dadeland Condo. Ass'n, 2010 WL 1817038, at *2-3 (S.D. Fla.
Apr. 15, 2020) (on a motion before the district court to stay proceeding, determining insurance coverage
action should proceed prior to forcing insurer to litigate the underlying claim).

[16]     Travelers cites to In re Webb, 2016 WL 2616756 (Bankr. S.D. W. Va. May 4, 2016) for the proposition
that the automatic stay should be lifted when no monetary relief is sought.  But in Webb, relief from the
automatic stay was sought to compel the debtors to follow through with their agreed-upon settlement
obligations.  Webb, 2016 WL 2616756 at *3.  There is no such agreement with respect to the NJ Coverage
Action, which will require active involvement by the Debtor to resolve.  Nor does Webb stand for the
general proposition that stay relief is per se appropriate when monetary relief is not sought.

-25-

unavailing because it ignores that the Debtor has not continued (and will not continue while the

NJ Coverage Action is stayed) to pursue its affirmative claims in the NJ Coverage Action since

the commencement of this Chapter 11 Case.

50.    Nor is any alleged harm of interest accruing sufficient to outweigh the

prejudice to the Debtor.  See Plaintiff-Insurers Mot. ¶ 59.  As an initial matter, concerns with

respect to interest are premature.  Any right to interest would be determined only after a

resolution of the NJ Coverage Action in favor of the Debtor and/or other defendants, and the

NJ Coverage Action remains in early stages (as described herein).  Moreover, the

Plaintiff-Insurers fail to quantify, in any sense, the amount of interest that has accrued or is

expected to accrue.  A hypothetical and speculative concern with respect to interest is not

sufficient harm, if it is harm at all, to outweigh the harm to the Debtor in lifting the stay.

51.    Finally, although the Moving Insurers attempt to suggest that the

NJ Coverage Action is sufficiently advanced to warrant lifting the stay, ultimately, the Moving

Insurers concede that the NJ Coverage Action is still in its early stages.  See Travelers Mot.,

10-11 (noting that fact discovery was not scheduled to be completed until May 2022);

Plaintiff-Insurers Mot. ¶ 77 (same).[17]  Even though the NJ Coverage Action has been pending for

almost three years, the parties are still in the process of completing written and document

discovery and depositions have not yet commenced.[18]  No expert discovery has begun, and no

---

[17]    The Plaintiff-Insurers assert that issues are already at the summary judgment stage, see Plaintiff-Insurers
Mot. ¶ 8, but this assertion is belied by the fact that no depositions or expert discovery have yet taken place.

[18]    The cases cited by Travelers for the proposition that the time the NJ Coverage Action has been pending and
the amount of discovery that has taken place justify lifting of the automatic stay are distinguishable given
that discovery is not close to completion in this case, notwithstanding that it has been pending for almost
three years.  See Travelers Mot., 11.  In addition, in In re R.J. Groover Constr., LLC, 411 B.R. 460 (Bankr.
S.D. Ga. 2008), the court's decision also turned on the finding that the debtor's estate would not suffer any
cost in defending the suit because the debtor's insurance company had assumed defense of the action.
Here, no insurer has assumed the defense of the NJ Coverage Action, rather the insurers were the ones to
bring the action in the first instance.

NAI-1527062109

dispositive motions have been filed.  While trial had tentatively been scheduled for early 2023,

even if the NJ Coverage Action were allowed to recommence immediately, optimistically, a trial

would likely not be scheduled before the end of 2023 or early 2024.  Judicial efficiency,

therefore, is not a strong consideration here.  For all of the foregoing reasons, the Moving

Insurers have failed to meet their burden to demonstrate that failure to immediately lift the

automatic stay would result in any harm to them.

        **C.**      **The Plaintiff-Insurers Failed To Establish They Are Likely To Prevail.**

       52.     The Plaintiff-Insurers argue that they are likely to prevail on the merits of

the NJ Coverage Action and that this factor supports lifting the stay.  Plaintiff-Insurers Mot.

¶¶ 63-65.  Given that the harm to the Debtor and the lack of harm to the Moving Insurers weighs

heavily in favor of denying the Motions, the Court need not consider whether the

Plaintiff-Insurers are likely to prevail.  See In re DBSI, Inc., 407 B.R. 159, 167 (Bankr. D. Del.

2009) (denying motion to lift the stay where hardship to movant did not outweigh hardship to the

estate without considering movant's likelihood of success).  Nevertheless, even if the Court were

to consider the likelihood of the Plaintiff-Insurers to prevail, the insurers have failed to

demonstrate they would succeed on the merits.

       53.     The Plaintiff-Insurers contend that they only have to show the "slightest

probability of success on the merits" in order for relief to be granted.  See Plaintiff-Insurers Mot.

¶ 63.  However, the Plaintiff-Insurers have provided nothing more than conclusory allegations.

They point to the Talc Committee's position in contesting the Debtor's request for an extension

of the automatic stay and a preliminary injunction that "there is ample support" for the insurers'

arguments in the New Jersey Coverage Action, and assert, with no support, that the insurance

policies support the Plaintiff-Insurers' arguments.  See Plaintiff-Insurers Mot. ¶ 64.  Although it

NAI-1527062109

is true that the required showing on the merits is "slight," the Plaintiff-Insurers' unsupported

statements, with respect to litigation that is still in early stages (and as to which no dispositive

motions have even been filed) fail to meet even that showing.

> **D.** **Questions of Abstention Are Not Relevant to the Court's Determination of the Motions.**

54.     The Plaintiff-Insurers argue that the stay should be lifted because this

Court would be required to abstain from presiding over the NJ Coverage Action.  However, the

critical issue brought before this Court by the Motions is **when** the NJ Coverage Action should

proceed—not **where**.  As set forth above, resolution of the NJ Coverage Action is not necessary

(and would be harmful to the estate) at this time.  Indeed, a resolution of the NJ Coverage Action

is not necessary to a resolution of the Chapter 11 Case.  Which court may ultimately be the

proper court to determine the NJ Coverage Action simply is not relevant to whether the stay

should be lifted and questions of abstention are, therefore, currently irrelevant, and may not

become relevant at all.[19]  See In re Diocese of Buffalo, N.Y., 616 B.R. 10, 13 (Bankr. W.D.N.Y.

2020) (denying insurers motions for abstention, dismissal of adversary proceeding and relief

from the automatic stay without prejudice and finding that concern over whether proceeding was

a core proceeding was premature and should be addressed only after failure of efforts to first

negotiate a settlement).[20]

> **E.** **The Suggested Modification of the Automatic Stay Is Not Workable and Would Prejudice the Debtor If the Harms to the Debtor Described Herein Are Not Appropriately Addressed**

55.     As a final effort, the Plaintiff-Insurers contend the Court should lift the

stay "partially" to allow the insurers to "continue seeking discovery on the Middlesex and

---

[19]    There is no pending request by the Debtor to remove the NJ Coverage Action to this Court.

[20]    Similarly, the fact that the NJ Coverage Action involves state court issues does not weigh in favor of lifting the stay immediately given the harm the Debtor's estate would suffer if the NJ Coverage Action were

NAI-1527062109

Allocation Issues and to file and litigate, and the New Jersey Superior Court to adjudicate and enter judgment on the Summary Judgment Motion." See Plaintiff-Insurers Mot. ¶ 80.  Initially, and contrary to the Plaintiff-Insurers' assertions, the Debtor does not agree that proceeding in such a fashion would necessarily resolve the core of the coverage issues before the New Jersey court—rather, it would only lead to piecemeal litigation of certain issues, including issues that would have little, if any, bearing on the overall outcome of the litigation.  See Plaintiff-Insurers Mot. ¶ 81.  Further, even continuing the NJ Coverage Action on this limited basis would burden and distract the Debtor and likely other key constituencies from pivotal negotiations which should be commencing shortly.  Accordingly, at this time, the Debtor objects to proceeding on the terms suggested by the Plaintiff-Insurers.

### Conclusion

For all the reasons set forth herein, the Debtor respectfully requests that the Court (a) deny the Motions and (b) grant the Debtor such other and further relief as the Court may deem proper.

---

permitted to proceed at this time and the complete lack of prejudice to the Moving Insurers if the automatic stay remains in place

NAI-1527062109

Dated: March 16, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

NAI-1527062109