**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
David S. Torborg, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dstorborg@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)
ATTORNEYS FOR DEBTOR

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 21-30589 (MBK) |
| Debtor. | Judge: Michael B. Kaplan |
| | **Hearing Date and Time:** March 30, 2022, at 10:00 a.m. |

## DEBTOR'S OMNIBUS OBJECTION TO
## MOTIONS FOR CERTIFICATION OF DIRECT APPEAL

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT ............................................................................................................. 3

I.    CERTIFICATION OF DIRECT APPEALS UNDER 28 U.S.C. § 158(D)(2) .................................... 3

II.   THE MOVANTS HAVE IDENTIFIED NO GROUND FOR CERTIFYING THE DISMISSAL
      OPINION, WHICH APPLIED SETTLED, CONTROLLING THIRD-CIRCUIT PRECEDENT
      ON "BAD FAITH" DISMISSALS TO THE DETAILED FACTS OF THIS CASE ............................... 7

      A.    The Dismissal Opinion involves no question of law as to which
            controlling precedent is lacking ................................................................. 8

      B.    The Dismissal Opinion involves no "matter of public importance".......................... 19

      C.    An immediate appeal of the Dismissal Opinion to the Third Circuit would
            not "materially advance" the progress of this bankruptcy case ................................. 24

III.  THE MOVANTS HAVE IDENTIFIED NO GROUND FOR CERTIFYING THE
      INJUNCTION OPINION, WHICH IS CONSISTENT WITH EVERY OTHER
      DECISION TO CONSIDER A SIMILAR QUESTION ..................................................... 27

      A.    The Injunction Opinion involves no question of law as to which
            controlling precedent is lacking................................................................. 27

      B.    The Injunction Opinion involves no "matter of public importance" ......................... 31

      C.    An immediate appeal of the Injunction Opinion to the Third Circuit would
            not "materially advance" the progress of this bankruptcy case ................................. 32

CONCLUSION........................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*15375 Mem'l Corp. v. Bepco, L.P. (In re 15375 Mem'l Corp.)*,
　589 F.3d 605 (3d Cir. 2009)...........................................................................8, 9

*Ahrenholz v. Bd. of Trs. of Univ. of Ill.*,
　219 F.3d 674 (7th Cir. 2000) ..............................................................................4

*Am. Home Mortg. Inv. Corp. v. Lehman Bros. Inc.*
　*(In re Am. Home Mortg. Inv. Corp.)*,
　408 B.R. 42 (D. Del. 2009)............................................................................5, 20

*Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm.*
　*(In re Pac. Lumber Co.)*,
　584 F.3d 229 (5th Cir. 2009) .............................................................................22

*Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*,
　877 F.3d 136 (3d Cir. 2017)................................................................................4

*Bepco LP v. Globalsantafe Corp. (In re 15375 Mem'l Corp.)*,
　2008 WL 2698678 (D. Del. July 3, 2008) ........................................... *passim*

*Bullard v. Blue Hills Bank*,
　575 U.S. 496 (2015)............................................................................................3

*Calyon N.Y. Branch v. Am. Home Mortg. Holdings, Inc.*
　*(In re Am. Home Mortg. Holdings, Inc.)*,
　637 F.3d 246 (3d Cir. 2011)................................................................................6

*Carval Invs. UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*,
　2013 WL 5272937 (S.D.N.Y. Sept. 18, 2013)....................................................24

*Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.)*,
　900 F.3d 126 (3d Cir. 2018)................................................................................6

*In re Abengoa Bioenergy Biomass of Kan., LLC*,
　2016 WL 3180587 (Bankr. D. Kan. May 26, 2016) ...........................................24

*In re Allen*,
　2013 WL 1952338 (Bankr. D.N.J. May 10, 2013) .............................................10

*In re Bestwall LLC*,
　605 B.R. 43 (Bankr. W.D.N.C. 2019)........................................................7, 14, 32

*In re City of San Bernardino*,
　206 F. Supp. 3d 1216 (C.D. Cal. 2013) ............................................................25

*In re Combustion Eng'g, Inc.*,
　391 F.3d 190 (3d Cir. 2004)........................................................................18, 19

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*In re Flintkote Co.*,
    486 B.R. 99 (Bankr. D. Del. 2012) ........................................................................19

*In re Gen. Motors Corp.*,
    409 B.R. 24 (Bankr. S.D.N.Y. 2009) .....................................................................23

*In re Greektown Holdings, LLC*,
    2016 WL 825537 (E.D. Mich. Feb. 24, 2016) ...........................................24, 26, 33

*In re Millennium Lab Holdings II, LLC*,
    543 B.R. 703 (Bankr. D. Del. 2016) .......................................................4, 5, 20, 25

*In re MPF Holdings U.S. LLC*,
    444 B.R. 719 (Bankr. S.D. Tex. 2011) ...................................................................20

*In re Nortel Networks Corp.*,
    2010 WL 1172642 (Bankr. D. Del. Mar. 18, 2010) .....................................9, 19, 20

*In re Nortel Networks Inc.*,
    2016 WL 2899225 (D. Del. May 17, 2016) ...........................................................21

*In re Plant Insulation Co.*,
    734 F.3d 900 (9th Cir. 2013) .................................................................................19

*In re Resorts Int'l, Inc.*,
    372 F.3d 154 (3d Cir. 2004) ..................................................................................31

*In re Revel AC, Inc.*,
    2015 WL 333341 (D.N.J. Jan. 23, 2015) ................................................................6

*In re Ruitenberg*,
    745 F.3d 647 (3d Cir. 2014) ....................................................................................6

*In re Sabine Oil & Gas Corp.*,
    2016 WL 6238616 (S.D.N.Y. Oct. 25, 2016) .......................................................25

*In re SGL Carbon Corp.*,
    200 F.3d 154 (3d Cir. 1999) ...................................................................... *passim*

*In re Springfield Hosp., Inc.*,
    618 B.R. 109 (Bankr. D. Vt. 2020) .......................................................................20

*In re The Muralo Co.*,
    301 B.R. 690 (Bankr. D.N.J. 2003) .........................................................10, 11, 14

*In re Tribune Co.*,
    477 B.R. 465 (Bankr. D. Del. 2012) ........................................................................5

*In re Trump Ent. Resorts*,
    810 F.3d 161 (3d Cir. 2016) ....................................................................................6

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*In re W.R. Grace & Co.*,
    591 F.3d 164 (3d Cir. 2009)................................................................................31

*In re Winstar Commc'ns, Inc.*,
    554 F.3d 382 (3d Cir. 2009)................................................................................31

*IRS v. Davis*,
    2016 WL 3567039 (D.N.J. June 29, 2016) ............................................................4

*Kos Pharms. Inc. v. Andrex Corp.*,
    369 F.3d 700 (3d Cir. 2004)................................................................................28

*Luxliner P.L. Export, Co.. v. RDI/Luxliner, Inc.*,
    13 F.3d 69 (3d Cir. 1993)....................................................................................17

*McCartney v. Integra Nat. Bank N.*,
    106 F.3d 506 (3d Cir. 1997)..........................................................................28, 30

*McTernan v. City of York, Pa.*,
    577 F.3d 521 (3d Cir. 2009)................................................................................28

*Moroccanoil, Inc. v. Conforti*,
    2021 WL 2310092 (D.N.J. June 4, 2021) ...........................................................17

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*
    *(In re Integrated Telecom Express, Inc.)*,
    384 F.3d 108 (3d Cir. 2004)..............................................................................8, 9

*NRDC v. Texaco Ref. & Mktg., Inc.*,
    2 F.3d 493 (3d Cir. 1993)....................................................................................17

*Polk 33 Lending LLC v. THL Corp. Fin., Inc.* (*In re Aerogroup Int'l, Inc.*),
    2020 WL 757892 (D. Del. Feb. 14, 2020) ...........................................3, 19, 20, 24

*Sabine Oil & Gas Corp.*,
    551 B.R. 132 (Bankr. S.D.N.Y. 2016)................................................................23

*Standard Fed. Bank v. United States*,
    51 Fed. Cl. 695 (2002) ........................................................................................17

*Stanziale v. Car-Ber Testing, Inc.* (*In re Conex Holdings, LLC*),
    534 B.R. 606 (D. Del. 2015)..............................................................5, 9, 18, 24

*Stoe v. Flaherty*,
    436 F.3d 209 (3d Cir. 2006)................................................................................31

*The Majestic Star Casino, LLC v. Barden Dev., Inc.*
    *(In re The Majestic Star Casino, LLC)*,
    716 F.3d 736 (3d Cir. 2013)..................................................................................6

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Troisio v. Erickson* (*In re IMMC Corp.*),
    2016 WL 356026 (D. Del. Jan. 28, 2016)......................................................................4, 6, 20

*U.S. Tr. v. Gryphon at the Stone Mansion, Inc.*,
    166 F.3d 552 (3d Cir. 1999)...............................................................................................31

*United States v. Bell*,
    414 F.3d 474 (3d Cir. 2005)...............................................................................................28

*Weber v. United States*,
    484 F.3d 154 (2d Cir. 2007).........................................................................................*passim*

STATUTES

11 U.S.C. § 524.........................................................................................................*passim*

11 U.S.C. § 1112.......................................................................................................*passim*

28 U.S.C. § 158.........................................................................................................*passim*

OTHER AUTHORITIES

1 *Collier on Bankruptcy* ¶ 5.06 ...............................................................................................20

Fed. R. Civ. P. 25 ..............................................................................................17, 18, 25

LTL Management LLC, the debtor in the above-captioned Chapter 11 case ("LTL" or

the "Debtor"), files this Omnibus Objection to the *Request for Certification of Direct Appeal to*

*Circuit Court* ("TCC II Mot.") [Dkt. 1654]; *Request for Certification of Direct Appeal to Circuit*

*Court* ("TCC I Mot.") [Dkt. 1709]; *Motion for Certification of Direct Appeal to the U.S. Court of*

*Appeals for the Third Circuit* ("Aylstock Mot.") [Dkt. 1713]; and *Request for Certification of*

*Direct Appeal to Circuit Court* ("A&I Mot.") [Dkt. 1720], collectively, the "Certification

Motions" of the "Movants." All four seek certification of a direct appeal to the Third Circuit of

this Court's opinion and order denying motions to dismiss this case (the "Dismissal Opinion")

[Dkt. 1572, 1603], 2022 WL 596617 (Feb. 25, 2022); three of the four (all but the A&I Motion)

also seek certification of this Court's opinion and order granting stay and injunctive relief (the

"Injunction Opinion") [Adv. Dkt. 184, 187], 2022 WL 586161 (Feb. 25, 2022).[2]

## PRELIMINARY STATEMENT

Based on a five-day trial featuring extensive fact and expert testimony, and on hundreds

of pages of pre-trial briefing and documentary evidence, this Court on February 25, 2022, issued

two comprehensive opinions—denying the motions to dismiss Debtor's case as a bad-faith filing

and granting the Debtor's motion to declare that the automatic stay applies to talc-related claims

against non-debtors and to preliminarily enjoin such actions during the Chapter 11 case. The

Court's two opinions rested on extensive factual findings from a copious record, and in both the

Court exhaustively discussed and then applied the relevant, binding case law of the Third Circuit,

as informed by the persuasive authority of lower courts in this circuit and of other circuit,

district, and bankruptcy courts. With those two threshold challenges comprehensively litigated

---

[2] The three motions requesting certification of the Injunction Opinion were also filed on the
adversary proceeding docket. *See* Adv. No. 21-03032 (MBK), Dkt. 191, 205, 206. In this Omnibus
Objection, citations of those motions use the pagination of the versions filed on the main docket.

and now resolved in meticulous, reasoned decisions—both of them consistent with prior

precedent and authority in their respective areas—it is appropriate, as the Court also has

recognized, for the parties to proceed toward the consensual resolution envisioned by 11 U.S.C.

§ 524(g) and that would best serve current and future claimants.

The Court should deny these Certification Motions. None of them raises a question of

controlling law, the resolution of which by a precedential decision is the core purpose of the

certification procedure of 28 U.S.C. § 158(d)(2). Nor do they satisfy any of the other grounds for

certifying a decision to the Third Circuit.

As to the Dismissal Opinion, the controlling Third Circuit law is well-developed and

settled, and no Movant even claims a need to resolve conflicting lower-court decisions. The

controlling question for the motions to dismiss was whether Debtor's bankruptcy case presented

"cause" for dismissal because it was filed in bad faith. The Third Circuit has defined and applied

its understanding of bad faith in a series of precedential decisions across a quarter-century. The

parties agree on what those decisions are; they extensively briefed their application to the facts

here; and the Court scrupulously discussed and employed them in its opinion. Applying that case

law to a particular case is necessarily fact-intensive, as the Third Circuit has recognized and this

Court's Dismissal Opinion confirms. Thus, the core of any appeal here would not be defining

controlling law but applying settled law to a particular factual scenario—which is precisely when

the warrant for a certified appeal is at its lowest. Similarly, in the absence of a real question of

law, much less one that would transcend this case, the appeal presents no "matter of public

importance" as contemplated by § 158(d)(2)(A)(i). Nor would a certified appeal materially

advance the progress of this case as contemplated by § 158(d)(2)(A)(iii); the Movants'

arguments on that ground are the typical ones that prove too much.

The Injunction Opinion is even less worthy of certification. As the Court made clear

throughout that opinion, and the Movants concede, it depends in large measure on the Dismissal

Opinion. With no reason to certify the latter, there is no reason to certify the former. Beyond

that, the issues on appeal in the Injunction Opinion all turn on applying established law in the

Third Circuit to the facts of this case. No issue asserted by Movants raises a pure question of law

for which there is not a controlling decision. And Movants present no ground, independent of the

Dismissal Opinion or the alleged (but not actual) need for controlling law, for why a direct

appeal of the Injunction Opinion would involve a matter of public importance or materially

advance the progress of the case.

## **ARGUMENT**

### I.    CERTIFICATION OF DIRECT APPEALS UNDER 28 U.S.C. § 158(D)(2)

The direct-appeal pathway for a bankruptcy court order under 28 U.S.C. § 158(d)(2) was

enacted to "foster the development of coherent bankruptcy-law precedent" by facilitating

"guidance on pure questions of law" from the circuit courts of appeals. *Weber v. United States*,

484 F.3d 154, 158–59 (2d Cir. 2007). It is generally reserved for gaps or conflicts in bankruptcy-

law precedent—when the order "involves a question of law as to which there is no controlling

decision" or "involves a question of law requiring resolution of conflicting decisions."

§ 158(d)(2)(A)(i), (ii); *see also Bullard v. Blue Hills Bank*, 575 U.S. 496, 508 (2015) (describing

§ 158(d)(2) as a "useful safety valve[] for promptly correcting serious errors and addressing

important legal questions" like the "pure question of law" at issue there) (citation and quotations

omitted). Certification may also be granted for an order that "involves a matter of public

importance" or for which immediate appeal "may materially advance the progress of the case,"

§ 158(d)(2)(A)(i), (iii), but courts construe these secondary provisions "narrowly." *Polk 33*

*Lending LLC v. THL Corp. Fin., Inc.* (*In re Aerogroup Int'l, Inc.*), 2020 WL 757892, at *5 (D.

Del. Feb. 14, 2020).[3]

Courts in this circuit have consistently recognized that certifying "pure" legal questions accords with the precedent-building purpose of § 158(d)(2). *See*, *e.g.*, *IRS v. Davis*, 2016 WL 3567039, at *2 (D.N.J. June 29, 2016) ("the question on appeal—whether there is a timeliness requirement to the term 'return' under the BAPCA—is a legal one"); *Troisio v. Erickson* (*In re IMMC Corp.*), 2016 WL 356026, at *5 (D. Del. Jan. 28, 2016) ("whether bankruptcy courts are included in the definition of 'courts' under § 610 for purposes of § 1631 is a pure question of law"). And, as those examples show, a "question of law" is "a question of *the meaning* of a statutory or constitutional provision, regulation, or common law doctrine." *Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 676 (7th Cir. 2000) (emphasis added). Circuit courts have special competency in answering such pure legal questions, over which they exercise "plenary review." *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 148 (3d Cir. 2017) (citation omitted); *see also Weber*, 484 F.3d at 158 ("When a discrete, controlling question of law is at stake, we may be able to settle the matter relatively promptly.").

In contrast, certification is ordinarily not appropriate when there is no need for additional binding precedent, because there is already ample precedent, "referenced in numerous cases." *In*

---

[3] Section 158(d)(2) requires certifying a direct appeal if one of the following circumstances exists:

(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

*re Millennium Lab Holdings II, LLC*, 543 B.R. 703, 712 (Bankr. D. Del. 2016). Such precedent

of course "may be supplied by combining holdings from multiple cases." *Id.*

     Nor is certification ordinarily appropriate when there is no opportunity to build additional

precedent because the lower court's order involves questions of fact, mixed questions of fact and

law, or the application of well-settled law to a particular set of facts. *See Weber*, 484 F.3d at 158

("Congress believed direct appeal would be most appropriate … to resolve a question of law not

heavily dependent on the particular facts of a case"). Correspondingly, while a "controlling"

decision means one that "admits of no ambiguity," a movant cannot claim ambiguity "merely

because the Third Circuit in [a prior] case did not address the present facts." *Stanziale v. Car-Ber

Testing, Inc.* (*In re Conex Holdings, LLC*), 534 B.R. 606, 610–11 (D. Del. 2015).

     Thus, courts in this circuit have rejected requests to certify fact-bound orders, including

questions of good faith. *See In re Tribune Co.*, 477 B.R. 465, 472 (Bankr. D. Del. 2012) ("[H]ow

this Court measured materiality is not a pure legal issue; it is not appropriate for direct appeal.");

*Bepco LP v. Globalsantafe Corp.* (*In re 15375 Mem'l Corp.*), 2008 WL 2698678, at *1 (D. Del.

July 3, 2008) (Under § 1112(b) of the Bankruptcy Code, "whether such 'unusual circumstances'

exist on the record … is necessarily fact-intensive, as is a review of that court's determination

that no lack of good faith exists on the part of the debtors. Such factual issues preclude a direct

appeal."). Similarly, because § 158(d)(2) was enacted to promote the creation of *bankruptcy*

precedent, courts have similarly refused to certify cases intertwined with the application of *non-*

bankruptcy law. *See, e.g.*, *In re Tribune Co.*, 477 B.R. at 472 ("Interpretation of the PHONES

Indenture requires application of state law and is not appropriate for direct appeal to the Third

Circuit."); *Am. Home Mortg. Inv. Corp. v. Lehman Bros. Inc.* (*In re Am. Home Mortg. Inv.

Corp.*), 408 B.R. 42, 44 (D. Del. 2009) (similar); *Bepco LP*, 2008 WL 2698678, at *1 (similar).

Because the vast majority of direct appeals in this circuit concern purely legal questions, Third Circuit opinions on direct appeal have consequently fulfilled § 158(d)(2)'s central mission, providing guiding bankruptcy precedent construing *particular provisions* of the Bankruptcy Code. For example, in *In re Trump Entertainment Resorts*, 810 F.3d 161 (3d Cir. 2016), the Third Circuit addressed "a question of first impression among the courts of appeals," which had "divided" the bankruptcy courts and lay at the intersection of the Bankruptcy Code and the National Labor Relations Act—"whether § 1113 authorizes a Chapter 11 debtor to reject the continuing terms and conditions of a [collective bargaining agreement] after its expiration." *Id.* at 164, 167. This decision reflects the pattern of lower courts certifying, and the Third Circuit taking, well-defined, discrete questions of law.[4]

Under Federal Rule of Bankruptcy Procedure 8006, this Court has jurisdiction to decide requests for certification until April 6, 2022, thirty days after the first notices of appeal were filed by several of the Movants on March 7. *See Troisio*, 2016 WL 356026, at *2 n.2. This provision allows a bankruptcy court the "opportunity" to rule on certification requests. *In re Revel AC, Inc.*, 2015 WL 333341, at *2 (D.N.J. Jan. 23, 2015) (quoting advisory committee notes to Rule 8006). If this Court does not rule on the Motions for Certification by that date, jurisdiction to determine certification passes to the district court. *See Troisio*, 2016 WL 356026, at *2 n.2.

---

[4] *See also*, *e.g.*, *Cont'l Cas. Co. v. Carr* (*In re W.R. Grace & Co.*), 900 F.3d 126, 135–38 (3d Cir. 2018) (interpreting the "derivative liability" and "statutory relationship" requirements for third-party-claims challenging injunctions under 11 U.S.C. § 524(g)(4)(A)(ii), and then remanding for further findings); *In re Ruitenberg*, 745 F.3d 647, 650 (3d Cir. 2014) (deciding "when an interest in the equitable distribution of marital assets in a divorce proceeding becomes a claim against the bankruptcy estate" under § 101(5)(A)); *The Majestic Star Casino, LLC v. Barden Dev., Inc.* (*In re The Majestic Star Casino, LLC*), 716 F.3d 736, 741 (3d Cir. 2013) (deciding "whether a non-debtor company's decision to abandon its classification as an 'S' corporation for federal tax purposes, thus forfeiting the pass-through tax benefits that it and its debtor subsidiary had enjoyed, is void as a postpetition transfer of 'property of the bankruptcy estate'"); *Calyon New York Branch v. Am. Home Mortg. Holdings, Inc.* (*In re Am. Home Mortg. Holdings, Inc.*), 637 F.3d 246, 254 (3d Cir. 2011) (addressing the open question of "[t]he proper construction of the phrase 'commercially reasonable determinants of value' in § 562(a)").

-6-

## II. THE MOVANTS HAVE IDENTIFIED NO GROUND FOR CERTIFYING THE DISMISSAL OPINION, WHICH APPLIED SETTLED, CONTROLLING THIRD-CIRCUIT PRECEDENT ON "BAD FAITH" DISMISSALS TO THE DETAILED FACTS OF THIS CASE.

As to the Dismissal Opinion, none of the Movants identifies any pure question of law that that decision presents for appeal—no question of determining the meaning of a Code provision or any other law—nor does any of them claim a need to resolve conflicting decisions on a question of law, whether within or even without the Third Circuit. Indeed, while they emphasize the five "Texas Two-Step" bankruptcies that are pending, only one other, *Bestwall*, has even faced a motion to dismiss under 11 U.S.C. § 1112(b), and the court in that case denied the motion too. *In re Bestwall LLC*, 605 B.R. 43 (Bankr. W.D.N.C. 2019).

Although the present case was transferred from that same court to this one with much fanfare involving the differences between the Third Circuit's and Fourth Circuit's standards for assessing whether a bankruptcy filing was made in good faith for purposes of § 1112(b), this Court readily reached the same result under the settled Third Circuit standard—which none of the Movants claim this Court misstated. *See* Dismissal Op. 13 ("The Court employs the standards cited above and followed by other courts within the Third Circuit," rather than the "much more stringent standard for dismissal" in the Fourth Circuit.). Judge Whitley, in ordering transfer, desired to give another bankruptcy court "the opportunity to weigh in" on the "novel issues" of good faith and "the 'Texas Two Step.'" Order Transferring Case to the District of New Jersey, *In re LTL Management LLC*, No. 21-30589-JCW [Dkt. 416], at 10 (Bankr. W.D.N.C. Nov. 16, 2021) (stating view that Debtor filed within the Fourth Circuit due to its "two-prong dismissal standard"). This Court has done so, and the result was the same. Nor do the Certification Motions otherwise satisfy any ground under § 158(d)(2) for certifying the Dismissal Opinion.

### A. The Dismissal Opinion involves no question of law as to which controlling precedent is lacking.

Given what this Court actually considered and decided in its Dismissal Opinion, there is no issue of lack of controlling precedent. On the contrary, there is—and this Court faithfully applied—abundant, settled, agreed precedent from the Third Circuit that controlled its decision.

The motions to dismiss contended that Debtor's case should be dismissed "for cause," under § 1112(b)(1) of the Code, because it was filed in "bad faith." "Bad faith" is a judicial gloss on "cause," and the Third Circuit has articulated its meaning in a series of precedents—which all of the parties agree provide the controlling rule and which this Court accordingly discussed, particularly *15375 Mem'l Corp. v. Bepco, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605 (3d Cir. 2009); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108 (3d Cir. 2004); and *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999). These decisions, among others, pervade the Court's opinion. *See* Dismissal Op. 10–12 (citing and quoting all three); *see also id.* at 14–18, 37–38, 41, 50–51.

The Court accordingly recognized that it must consider the totality of facts and circumstances; that its "general focus must be (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage"; that, to show the former, a company needs to show financial distress (which does not require insolvency); and that "the two main functions of the bankruptcy law are (1) preserving going concerns and (2) maximizing property available to satisfy creditors." *Id.* at 12–14 (internal quotations omitted). And it put the burden on the Debtor to show its good faith. *Id.* at 11 n.7. Movants dispute none of this.

As these controlling standards convey, good faith is a "fact-intensive inquiry," which accordingly is reviewed for abuse of discretion. *Integrated Telecom*, 384 F.3d at 118; *see also*

*15375 Mem'l*, 589 F.3d at 616–18. Here, this Court, among other things, had "little trouble"

determining from that inquiry that Debtor filed its petition "to maximize the property available"

to "ensure balanced recoveries for present and future claimants," in the face of "tens of

thousands of pending ovarian cancer claims and hundreds of mesothelioma cases." Dismissal

Op. 15.

One would barely know this from the Motions here. Indeed, the TCC I Motion cites none

of the controlling Third Circuit cases on bad-faith dismissals, and the TCC II Motion (at 10–11)

cites only *SGL Carbon*, and only as to a sub-issue. *See also* A&I Mot. 6, 14. The Aylstock

Motion describes the issues here as "of a piece" with those in these three primary controlling

decisions. Aylstock Mot. 7; *see id.* at 4. Indeed. This betrays the Movants' misdirection in

pursuing certification.[5] A circuit precedent "is not ambiguous merely because the Third Circuit

in that case did not address the present facts." *Stanziale*, 534 B.R. at 611. And an appeal that

"disputes the application of existing controlling law to specific facts" does not satisfy this

criterion for certification. *In re Nortel Networks Corp.*, 2010 WL 1172642, at *1 (Bankr. D. Del.

Mar. 18, 2010). So here, on the "question of law" actually at issue for deciding the motion to

dismiss, there is no lack of "controlling decision" of the Third Circuit. § 158(d)(2)(A)(i). Rather,

as the district court recognized and held in *Bepco*, "review of [this] court's determination that no

---

[5] So also do the Statements of Issues on appeal that Movants have filed to date. As to the
Dismissal Opinion, TCC II lists, as its first issue, "Whether the Bankruptcy Court's denial of the motions
to dismiss cannot stand under the Third Circuit's decisions in *Integrated Telecom*, *SGL Carbon*, and
*Memorial*; and adds, as its second issue, "Whether the Bankruptcy Court erred in determining that, under
the totality of the circumstances, the Debtor's petition was filed in good faith." Dkt. 216, at 3. Aylstock
lists, as its first issue: "Did the Bankruptcy Court err in the [sic] denying the motions to dismiss for cause
under 11 U.S.C. § 1112(b)?" Dkt. 214, at 2.

lack of good faith exists on the part of the debtor[]" is "necessarily fact-intensive," and "[s]uch factual issues preclude a direct appeal." 2008 WL 2698678, at *1.[6]

The Movants purport to identify several "questions of law" as to which there is, allegedly, no controlling decision—at least five. The sheer number underscores the lack of *any* actually controlling question of law in the Dismissal Opinion beyond the clear, settled one just discussed. None qualifies.

    *1.*    ***Financial Distress.*** As noted, this Court both stated and applied Third Circuit law regarding financial distress for assessing good faith. Nevertheless, three of the four Movants raise the purported issue of whether "the *mere* prospect of significant *future* liabilities, which in the future may result in actual financial distress, is sufficient to establish the level of present financial distress necessary to establish a debtor's good faith." TCC II Mot. 7 (emphases added); *see* A&I Mot. ¶ 21(3) ("possible litigation outcomes at some indefinite future time, whose likelihood was not demonstrated"); Aylstock Mot. 8 ("without a 'failing company' facing the specter of 'a forced liquidation'") (citation omitted).

None of the Movants, however, identifies any lack of clarity in the Third Circuit's legal standards on this aspect of the good-faith inquiry. And those standards indisputably include that (1) a debtor need not be insolvent to file bankruptcy;[7] (2) a debtor need not wait to file bankruptcy until business operations are threatened past the breaking point;[8] and (3) the threat

---

[6] Additional issues that TCC II and Aylstock have identified for appeal confirm, on their face, that the appeal of the Dismissal Opinion is pervaded with questions of how controlling law applies to the specific facts of LTL, its affiliates, and this case. *See* Dkt. 216 ¶¶ 3, 4, 5, 6, 13; Dkt. 214 ¶¶ 2, 3, 4.

[7] *See* Dismissal Op. 35–36; *In re SGL Carbon*, 200 F.3d at 163 ("It is well established that a debtor need not be insolvent before filing for bankruptcy protection."); *In re The Muralo Co.*, 301 B.R. 690, 699 (Bankr. D.N.J. 2003) (same); *In re Allen*, 2013 WL 1952338, at *12 (Bankr. D.N.J. May 10, 2013) (same).

[8] *See, e.g.*, Dismissal Op. 37 ("there exists a 'need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation'") (quoting *In re SGL*

posed to long-term viability by mass torts can create sufficient financial distress.[9]

Those suffice here. The problem for the Movants is not any lack of controlling decision but, rather, that they do not like this Court's *fact-finding* under the controlling law. Moreover, because that fact-finding particularly included ample evidence of financial distress from *present* liabilities, along with the prospects of future liabilities, even the fact-bound issue they identify depends on misstating the record and this Court's findings.

The Court devoted several pages to the financial distress created by talc litigation—expressly finding that the Debtor's "anticipated liabilities are not merely speculative, given the history of *actual defense spending and verdicts* rendered to date" (Dismissal Op. 16–17 (emphasis added))—and the Court correctly determined this to be sufficient under Third Circuit law. The Court based this finding on numerous specific facts, including:

- "[a]t the time of filing, Debtor—as did its immediate predecessor—faced nearly 40,000 pending tort claims, with thousands of additional claims expected annually for decades to come" (*id.* at 16 (citing Bell Report));

- at the time of filing, the Debtor "had contingent liabilities in the billions of dollars and likely would be expending annually sums ranging $100-200 million in its defense of the tens of thousands of talc personal injury cases for decades to come" (*id.* at 34);

- plaintiffs' attorneys' statements asserting that the Debtor's talc liabilities are in the tens to hundreds of billions of dollars (*see id.* at 34);

- wide-ranging verdicts were experienced in the tort system, including the multi-billion dollar *Ingham* verdict (*id.* at 36) and "recent verdicts for hundreds of

---

*Carbon*, 200 F.3d at 163). The Court specifically rejected the Movants' request that the Court "require the highest level of distress, for which there is no precedent." Dismissal Op. 38.

[9] *See In re SGL Carbon*, 200 F.3d at 164 ("We do not hold that a company cannot file a valid Chapter 11 petition until after a massive judgment has been entered against it. Courts have allowed companies to seek the protections of bankruptcy when faced with pending litigation that posed a serious threat to the companies' long term viability."); *Muralo*, 301 B.R. at 699 ("exposure to liability and *potential insolvency* are significant factors in evidencing the good faith of" a bankruptcy filing).

millions of dollars (*id.* at 33–34, 36);[10]

- "talc-related litigation was the 'primary driver' that caused J&J's entire Consumer Health segment 'to drop from a $2.1 billion profit (14.8 percent of sales) in 2019 to a $1.1 billion loss (-7.6 percent of sales) in 2020'" (*id.* at 33 (citing Bell Report));

- "the talc litigation payments and expenses forced Old JJCI into a loss position in 2020" (*id.* at 34 (citing Bell Report));

- recent events, highlighted by Movants, "which point toward greater talc exposure for Debtor," including the denial of review by the U.S. Supreme Court of the *Ingham* verdict and the breakdown of a potential global settlement in *Imerys* (*id.* at 40);

- based on estimates of the cost to try cases, "[d]efending just the over 38,000 pending ovarian cancer claims through trial would cost up to $190 billion" (*id.* at 37);

- the lack of any evidence that J&J would have continued to fund all talc-related obligations of Old JJCI without any bankruptcy filing (*id.* at 38).

Relatedly, three of the Movants raise whether, for assessing financial distress, the Court must limit its analysis to the Debtor (LTL) and cannot consider the impact of the talc litigation on Old JJCI. *See* TCC I Mot. 13; TCC II Mot. 7; A&I Mot. 7, 13. This, however, is not a question of law, particularly given that it is undisputed that Old JJCI is Debtor's immediate predecessor, not some stray third party. In addition, the Court found as a *fact* (including based on testimony of the Movants' own experts) that the corporate restructuring and bankruptcy filing here were a "single integrated transaction."[11] Accordingly, in considering the totality of the

---

[10] The Court further noted that, "[e]ven without a calculator or abacus, one can multiply multi-million dollar or multi-billion dollar verdicts by tens of thousands of existing claims, let alone future claims, and see that the continued viability of all J&J companies is imperiled." *Id.*

[11] *See* Dismissal Op. 14 ("even the Movants' experts testified that the 2021 Corporate Restructuring and the ensuing bankruptcy filing should be viewed by this Court as 'a single, preplanned, integrated transaction' comprised of interdependent steps") (citing Burian and Diaz Reports); *id.* at 15 ("As Movants' own experts have acknowledged, the use of the Texas divisional merger statute and subsequent filing by the newly formed LTL constituted a single integrated transaction …."); *id.* at 43 ("it is uncontested that the restructuring was intended as a single integrated transaction").

circumstances, as it must under the controlling Third Circuit precedent, the Court properly considered Old JJCI's financial distress. Dismissal Op. 14 ("This Court must undertake an analysis that considers the totality of the circumstances and consider the financial risks and burdens facing both Old JJCI and Debtor.").

In any event, the Court found, as an additional *fact*, that one "cannot distinguish between the financial burdens facing Old JJCI and Debtor." *Id.* at 33; *see id.* ("At issue in this case is Old JJCI's talc liability (and the financial distress that liability caused), now the legal responsibility of the Debtor."). And that, "[a]bsent a global settlement, *neither entity* would be able to defend or economically resolve the current and future talc-related claims." *Id.* (emphasis added).

2.    ***The Relative Merits, Here, of the Tort and Bankruptcy Systems.*** The Movants claim that the Court's considering of the relative merits of the tort and bankruptcy systems for resolving Debtor's talc claims involves a "question of law" (or a "matter of public importance," or both). *See* TCC I Mot. 13; TCC II Mot. 7–8; Aylstock Mot. 3, 8; A&I Mot. ¶¶ 10, 21(1), 23. Tellingly, they are unable to agree on whether the Court's assessment is a question of law, a matter of public importance, or a policy consideration.[12] This helps to confirm that no controlling question of law is at issue. Nor, in any event, was the Court's comparison either the "dominant factor" in its decision, TCC II Mot. 7, or an "independent factor [used by the Court] to establish the good faith of the Debtor's chapter 11 filing," A&I Mot. ¶¶ 10, 21(1).

Rather, the Court's observations supported its conclusion, which Movants do not

---

[12] *Compare* TCC II Mot. 7 (listing issue as its first "question of law"); TCC I Mot. 13 (arguing that "the Court's reliance on its assessment of the superiority of the bankruptcy system for resolving mass tort liability itself raises a question of public importance for bankruptcy jurisprudence going forward" and contending that the Court's assessment was "frankly policy-driven"); Aylstock Mot. 8 (highlighting the "legal and policy issues involved" and stating, "There are few legal questions of greater public importance than 'whether there is available to the Debtor and the tort claimants a more beneficial and equitable path' than the traditional tort system.").

challenge, that Debtor's goal of seeking to resolve tens to hundreds of thousands of present and

future mass-tort claims can qualify as a valid reorganizational purpose—again, under controlling

Third Circuit precedent. The Court stated the general proposition, which Movants also

understandably do not challenge, that "the filing of a chapter 11 case with the expressed aim of

addressing the present and future liabilities associated with ongoing global personal injury claims

to preserve corporate value is unquestionably a proper purpose under the Bankruptcy Code."

Dismissal Op. 16 (citing, among other authority, *SGL Carbon*, *Muralo*, and *Bestwall*).[13] And it

analyzed that purpose in the context of the facts here, as it said at the outset of its comparative

analysis: "Determining whether Debtor is pursuing a valid bankruptcy purpose" requires

examining "whether there is available *to Debtor and the tort claimants* a more beneficial and

equitable path toward resolving *Debtor's* ongoing *talc-related* liabilities." Dismissal Op. 18–19

(emphases added).

　　Movants also neglect their own role in prompting the Court to consider this question: At

least some of them solicited briefs of purported *amici curiae*, one of which, by "Complex

Litigation and Mass Torts Professors" (the Glover Brief), trumpeted the relative merits of class

actions and MDLs for resolving mass torts. The Court appropriately considered those points—in

the context of this case—in the analysis the Movants now criticize as "irrelevant," TCC II Mot.

7–8. *See* Dismissal Op. 20–24 (discussing both class actions and MDLs, repeatedly quoting the

Glover Brief, and citing Debtor's response to *amici*); *see also id.* at 1 n.2 (noting amici). Indeed,

---

[13] The Court's observations on the tort and bankruptcy systems also supported its related finding that the Debtor's bankruptcy maximized value available for creditors, as well as its holding that the benefits of a bankruptcy resolution would "preclude either dismissal or conversion" of this case under 11 U.S.C. § 1112(b)(2) regardless of any bad faith. Dismissal Op. 13 n.8, 15; *see id.* at 29-30 ("[a] trust would establish a far simpler and streamlined process—both for present and future cosmetic talc claimants—than currently available in the tort system"); *id.* at 51 ("a global resolution of [talc] claims though the bankruptcy may indeed accelerate payment to cancer victims and their families").

it was precisely because of this context that the Court made the statement, which Movants repeatedly quote out of context, that it did not expect that its decision would "be the final word on the matters." *Id.* at 13. That was because, as it said at the beginning of that very sentence, the Court was "consider[ing] only the facts and applicable law relevant to this case, and this case only," not purporting to globally resolve "policy debates." *Id.*

Accordingly, and contrary to the Movants' suggestion, the Court did not rule that every company facing any sort of mass tort liabilities could effectively opt out of the tort system through bankruptcy, regardless of its particular circumstances. This case-specific question is also not a question of law.

**3.    *Prepetition Restructurings.*** Each Movant asserts that use of the Texas divisional merger statute to divide Old JJCI into New JJCI and the Debtor before the bankruptcy filing provides grounds for a direct appeal. Once again, the Movants take varying positions on whether this issue is a "question of law" or a "matter of public importance."[14]

But all the Court did was apply existing law to the facts to determine that the use of the divisional merger statute *here* to create the Debtor in advance of its bankruptcy did not involve bad faith. The Court rightly found no *blanket* bar on using the longstanding Texas law according to its terms: "[T]he Court finds nothing inherently unlawful or improper with application of the Texas divisional merger scheme in a manner which would facilitate a chapter 11 filing for one of the resulting new entities." Dismissal Op. 51–52; *see id.* at 46 (finding that "the 2021 Corporate

---

[14] *Compare* TCC I Mot. 11–12, 15 (identifying use of "Texas two-step" or the "divisional merger scheme" as both a matter of public importance and a question of law); TCC II Mot. 16–17 (identifying "controversial Texas Two-Step" as a matter of public importance); Aylstock Mot. 7 ("Whether the divisional merger strategy adopted by J&J here is an effective and efficient way to 'globally resolve [tort liability] through a chapter 11 reorganization without subjecting the entire … enterprise to a bankruptcy proceeding' … is at bottom a legal question – not a factual question."); A&I Mot. ¶ 21(4) (listing "divisive merger effected in contemplation of the Debtor's chapter 11 filing" as a "question of law").

Restructuring was not such a novel ploy"). No Movant claims otherwise. The Court further considered whether there was anything inappropriate *on the facts of this case*, answering that question in the negative as well: After a lengthy analysis of the 2021 Corporate Restructuring—including the terms of the Texas law (*id.* at 42) and details of the Funding Agreement here (*id.* at 43–45)—the Court "[did] not find that the rights of the talc claimants and holders of future demands [were] materially affected by the divisional merger." *Id.* at 51; *see id.* at 56 ("The record does not support a finding of Debtor's pre-petition or post-petition malfeasance …").[15]

At best, the Movants' displeasure with the prepetition restructuring, here and in other cases, raises an issue of bankruptcy *policy*. The Movants cannot help but acknowledge this. *See, e.g.*, A&I Mot. ¶ 29 (noting use of "Texas Two-Step" strategy has "wider ramifications for bankruptcy law *and policy* in general") (emphasis added). But that is not a question for this Court or the Third Circuit to answer. Rather, as this Court observed: "[I]f current use of the divisional merger scheme as a foundation for chapter 11 filings conflicts with Texas' legislative scheme and goals, it can be repealed or modified." Dismissal Op. 52. The judicial question is simply whether "use of the statute as undertaken in this case, standing alone, evidences bad faith," and the Court answered that fact-bound question in the negative. *Id.*

> **4.    *Debtor's Eligibility Under One Provision of § 524(g) (named defendant).*** To varying degrees, three of the Movants contend that, because of a possible factual peculiarity unique to this case, *this Debtor's* eventual eligibility for protection under *a § 524(g) plan* presents a question of law—at the dismissal stage—lacking a controlling decision. The purported

---

[15] For this reason, A&I's assertion that whether the divisional merger in contemplation of the Debtor's Chapter 11 filing led to an actual fraudulent transfer presents a "question of law" is similarly flawed. A&I Mot. ¶¶ 21(5), 27. As A&I concedes, the Court "essentially rejected" the Movants' argument that the "Texas two-step" was made with an actual intent to hinder or delay talc creditors by finding, after conducting a detailed analysis of the facts, "that there was no impropriety or prejudice to creditors in the divisive merger." *Id.* ¶ 27.

question is "whether Section 524(g) may apply to a debtor that has not been named as a defendant in underlying litigation." TCC I Mot. 12–13 (describing this as a "subsidiary legal ruling"); *see* TCC II Mot. 8–10; Aylstock Mot. 5, 9–10. Initially, the Court noted that "Debtor in fact has been named in pending suits." Dismissal Op. 29. Furthermore, the purported question would be one for later, at plan confirmation, *if* the proposed plan is under § 524(g). *Cf. id.*; *see also* 11 U.S.C. § 524(g)(2)(B)(i)(I) (looking to "the time of entry of the order for relief") (emphases added).

In any event, the Court answered that hypothetical and premature question with existing law, in a sentence, correctly citing Civil Rule 25(c): "The causes of action held by talc plaintiffs are owing by Debtor as successor in interest to Old JJCI and, *consequently*, Debtor substitutes for Old JJCI in all federal actions *as a matter of law*." Dismissal Op. 29 (emphases added).

That resolution was straightforward, not lacking for controlling law. Regardless of whether the Debtor was "named" as a party pre-petition, it *automatically*, by the combined virtue of the Texas divisional merger statute and Civil Rule 25(c) (and similar state law analogs), "stepped into the shoes" of its predecessor entity, Old JJCI, and was considered named in the pending talc-related suits against Old JJCI. *Moroccanoil, Inc. v. Conforti*, 2021 WL 2310092, at *3, 5 (D.N.J. June 4, 2021); *see Standard Fed. Bank v. United States*, 51 Fed. Cl. 695, 708 (2002) ("the surviving corporation stands in the shoes of the dissolving corporation"). Indeed, the Third Circuit has a leading case applying Civil Rule 25(c) in connection with corporate mergers: *Luxliner P.L. Export, Co.. v. RDI/Luxliner, Inc.*, 13 F.3d 69 (3d Cir. 1993). *See id.* at 71–72 (noting rule "does not require that anything be done after an interest has been transferred"; "the case may be continued against the original defendant and the judgment will be binding on the successor") (quotations omitted); *see also NRDC v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493,

-17-

506 (3d Cir. 1993) (holding that injunction against predecessor (Texaco) applied to entity (Star)

that purchased refinery; Rule 25(c) made it "unnecessary" to join Star, because an "injunction

against the named party will bind all successors in interest and assigns"). Movants here, as

elsewhere, are "not arguing the absence of controlling law; rather, [they are] arguing the absence

of a decision that adopts [their] position." *Stanziale*, 534 B.R. at 611.[16]

> **5.**    ***Debtor's Eligibility Under Another Provision of § 524(g) (trust funding).*** A&I,

alone, asserts a micro-issue also under § 524(g), whose bearing on the good faith of Debtor's

filing is similarly not clear—whether the "divisional merger … eliminated the trust funding

rights that holders of talc claims against Old JJCI that became talc claims against the Debtor

would otherwise have held against Old JJCI's business, assets, and future earnings capacity

under § 524(g)(2)(B)(i)(II)-(III)" if Old JJCI had filed. A&I Mot. ¶ 21(4); *see id.* ¶ 26. The

simple answer, on the facts, is that the divisive merger did not deprive talc claimants of any

"trust funding rights" that § 524(g) requires, because Debtor is perfectly capable, in a plan, of

satisfying the cited requirements.

Section 524(g)(2)(B)(i)(II) requires that a trust be funded "in whole or in part by the

securities of 1 or more debtors involved in such plan and by the obligation of such debtor or

debtors to make future payments." Here, through the Funding Agreement, LTL will itself

provide at least a substantial part of a trust's funding (and can employ a security to do so), and,

as the Court recognized, the claimants have access to the same business assets as they did before

---

[16] TCC II and A&I's discussion of *In re Combustion Engineering, Inc.*, 391 F.3d 190, 223–34 (3d Cir. 2004), apart from being irrelevant given the Court's other reasons for rejecting this § 524(g) argument, is also misplaced on its own terms. *Combustion Engineering* involved non-debtors (Basic and Lummus) who were ineligible for relief under §§ 105(a) and 524(g) because the claims against them, compared to those against the debtor, "ar[o]se from different products, involved different asbestos-containing materials, and were sold to different markets." *Id.* at 231. Here, the claims against the debtors and non-debtors "involve the same products, same time periods, same alleged injuries, and same evidence as claims against Debtor." Inj. Op. 19.

the divisional merger.

In any event, because this provision by its terms only requires that such funding be "part" of the total, it does not require that LTL fund the *entirety* of a § 524(g) trust with its own assets or securities, so it is not clear what the supposed question of law is. As Debtor identified in its Objection to the motions to dismiss, there are many examples of solvent, non-debtor entities making substantial contributions to a debtor-affiliate's bankruptcy reorganization. *See, e.g.*, Dkt. No. 956, at 29–30 (discussing *NARCO*, *Quigley*, *Babcock & Wilcox*, *Leslie Controls*, and *THAN* cases). And, on the facts, even apart from the Funding Agreement, LTL owns sufficient assets and revenue-generating business to satisfy the actual requirements of that sub-section as well as any "ongoing" or "going concern" business requirement contained in §§ 524(g) and 1141(d)(3) of the Code. *See* Dismissal Op. 5–7 (discussing facts, including based on Movants' expert); *Combustion Eng'g*, 391 F.3d at 248; *In re Flintkote Co.*, 486 B.R. 99, 130–35 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014); *In re Plant Insulation Co.*, 734 F.3d 900, 913–15 (9th Cir. 2013).

Review of a court's determination of the debtor's good faith "is necessarily fact intensive," and such "factual issues preclude a direct appeal." *Bepco*, 2008 WL 2698678, at *1 (D. Del. July 3, 2008). So here. For the foregoing reasons, none of the Movants' various critiques to the Court's Dismissal Opinion involves a question of law as to which there is a lack of controlling authority, and therefore none justifies certification.

**B.    The Dismissal Opinion involves no "matter of public importance."**

Certification may be granted for an order that "involves a matter of public importance," 28 U.S.C. § 158(d)(2)(A)(i), but courts read this basis "narrowly," and to have a specific meaning. *E.g.*, *Polk 33 Lending*, 2020 WL 757892, at *5; *In re Nortel Networks Corp.*, 2010 WL 1172642, at *2 (Bankr. D. Del. Mar. 18, 2010). In particular, they emphasize that an order must

"*transcend the litigants **and** involve a legal question*, the resolution of which will advance the

cause of jurisprudence to a degree that is usually not the case." *Polk 33 Lending*, 2020 WL

757892, at *5 (emphasis added) (quoting *Am. Home Mortg.*, 408 B.R. at 44). Even if it

implicates "public policy concerns," those concerns must be "broad," and it still must raise a

"question of law." *Troisio*, 2016 WL 356026, at *6; *see Nortel*, 2010 WL 1172642, at *2 (should

affect "the public at large"); *In re MPF Holdings U.S. LLC*, 444 B.R. 719, 726 (Bankr. S.D. Tex.

2011) (contrasting mere "matter of statutory interpretation and common law analysis," not

warranting certification on this ground, with "complex constitutional issues that affect the public

as a whole"). Thus, that an issue is hotly contested and "unqualifiedly important to the parties" is

not sufficient. *See In re Millennium Lab*, 543 B.R. at 716 (declining to certify dispute over third-

party releases). Similarly, "an issue involving a mixed question of law and fact generally does

not constitute a matter of public importance," because such issues "generally do not 'transcend'

the parties and advance the cause of jurisprudence to an unusual degree." *Polk 33 Lending*, 2020

WL 757892, at *5 (collecting cases).

Secondarily, an order might involve "important practical ramifications," *id.*, such as

impacting "a large number of jobs or other vital interest in a community," 1 *Collier on

Bankruptcy* ¶ 5.06(4)(b); *see In re Springfield Hosp., Inc.*, 618 B.R. 109, 118 (Bankr. D. Vt.

2020) (order implicating hospitals' access to funds would affect community's access to

healthcare during pandemic and large number of jobs). But it is "doubtful" that, even in such

circumstances, a case raises a matter of public importance when controlling precedent of the

circuit court or Supreme Court exists. 1 *Collier* ¶ 5.06(4)(b). (The two considerations of course

appear in the same sub-section of § 158(d)(2).)

The Debtor has located only a *single* certification order in this Circuit in which an order was deemed to raise a matter of public importance (or material advancement, discussed below) without *also* involving a legal issue lacking controlling precedent or requiring resolution of conflicting decisions, and that case had a unique procedural posture. In *In re Nortel Networks Inc.*, 2016 WL 2899225 (D. Del. May 17, 2016), the bankruptcy case was proceeding in "courts around the globe," which resulted in "coordinated, cross-border trials" by videoconference in Delaware and Canada. *Id.* at *1, 5. Appeals from those joint trials had been proceeding in both courts, but the Canadian appellate process suddenly ended when the Canadian appeals court declined discretionary appeal. *Id.* at *2. In the Delaware case, even though certification had been denied by the bankruptcy court, and even though briefing and oral argument were complete in the district court, the district judge *sua sponte* raised § 158(d)(2) and, after briefing, granted certification to spur the case to keep pace with Canadian proceedings. *Id.* at *3. The court also found that the estate's limited assets were going to waste, with $2 billion already spent in global professional fees. *Id.* at *4. The coordinated, cross-border nature of the case plus the precipitous decline in limited assets prompted the court to hold both that the case was publicly important and that material advancement was necessary. *Id.* at *7–8.

None of those types of facts is present here. And here, as discussed above in Argument II.A, the desired appeals involve no "question of law," as opposed to questions of fact and the application of law to fact. And they in any event do not "transcend" the parties in this bankruptcy case. Although Debtor of course considers its case important for itself and its constituents, and the case has proven newsworthy, that does not give it the "public importance" that § 158(d)(2) contemplates.

TCC II tries (at 14) to contend otherwise by suggesting potential implications for New

JJCI and J&J under the Funding Agreement, but those two entities are not the public "as a

whole" or "at large," and, in any event, the scenario TCC II posits is speculative at best: Neither

this Court nor any party is suggesting, in connection with the Dismissal Order, any imminent or

even likely need of Debtor to invoke the Funding Agreement to its maximum amount or

anything close to it. Similarly, the mere fact that a lot of money is at issue (*see* TCC II Mot. 15)

is insufficient, whether under the 2016 *Nortel* decision just discussed or under cases such as

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584

F.3d 229 (5th Cir. 2009), which both TCC I and TCC II cite. *See id.* at 242–43 (finding

certification warranted under all three bases in § 158(d)(2)(A), and that the dollar values merely

added context for finding that the bankruptcy court's "unusual, perhaps unprecedented

decisions" satisfied § 158(d)(2)(A)(ii)).

Some of the arguments Movants make for why the Dismissal Opinion involves a matter

of public importance replicate arguments they make for the existence of a question of law

lacking a controlling decision. *See* TCC II Mot. 5, 13 (case is "fundamentally" about whether

"the prospect of mass tort liability, even before it has been realized," "can constitute financial

distress"); *id.* at 15 (case presents question of "which judicial system"); *id.* at 16 (case presents

question of "the controversial Texas Two-Step"); TCC I Mot. 11–13 (case presents "the

overarching question" of use of "a Texas two-step in tandem with a bankruptcy filing," with

"subsidiary legal rulings embedded"; and the Court's "reliance on its assessment of the

superiority of the bankruptcy system for resolving mass tort liability"); A&I Mot. ¶ 29 (moving

"the resolution of [] mass tort liabilities from the tort system to the bankruptcy system, and the

extent to which a mass tort defendant may employ the Texas Two-Step strategy"); Aylstock Mot.

8 (invoking "the number of people" affected and "the sheer breadth of the legal and policy issues involved"). As discussed above, however, there is no lack of controlling precedent on any question of law involved in the Dismissal Opinion. The arguments fare no better when repackaged as involving matters of public importance. They remain fact-bound, focused on the particulars of this case and important for the parties to it. TCC II admits as much when inconsistently contending that the "*unique* features of this case" somehow give it significance for the broader public. TCC II Mot. 17 (emphasis added); *see id.* at 19 (describing "issues on appeal" as "novel").

Similarly, that plaintiffs' lawyers have managed to generate media and political interest in a case (*see* TCC II Mot. 17) does not equate to the public importance of an appeal of a particular ruling in that case. Public importance does not exist simply "because this dispute has received substantial news coverage or because [a given] industry is watching this case closely." *Sabine Oil & Gas Corp.*, 551 B.R. 132, 141 (Bankr. S.D.N.Y. 2016). A telling example comes from the General Motors Chapter 11 case. The bankruptcy court was asked to certify an order selling the entire company in a § 363 sale, based on the issue of whether successor liability could be imposed. *In re General Motors Corp.*, 409 B.R. 24, 26-27 (Bankr. S.D.N.Y. 2009). The sale created a new enterprise worth more than $63 billion; it was a major event, if not the major event, in that case; and the court recognized that "many people would agree that GM's wellbeing is a matter of public importance." *Id.* at 26, 28. Yet court denied certification, emphasizing the absence of a legal question lacking controlling precedent. *Id.* at 28. As in *Sabine Oil* and *General Motors*, so here: However important this case is to the parties and their friends and allies, that does not give the Dismissal Opinion "public importance" within the meaning of § 158(d)(2).

**C.    An immediate appeal of the Dismissal Opinion to the Third Circuit would not "materially advance" the progress of this bankruptcy case.**

Certification may also be warranted if immediate appeal "may materially advance the progress of the case." 28 U.S.C. § 158(d)(2)(A)(iii). Movants must, however, have some reason *beyond* the mere time saved by skipping the district court, because that argument proves too much: "Any litigant could maintain that skipping district court review in the appeal process may expedite final resolution." *Polk 33 Lending*, 2020 WL 757892, at \*4 (collecting cases). If the mere "desire to skip one appellate level" could satisfy the material-advancement prong whenever further appeal to the circuit court seems likely, the exception would swallow the rule, "effectively eliminat[ing] the district court from the bankruptcy review process altogether." *Id.* (quoting *Carval Investors UK Ltd. v. Giddens (In re Lehman Bros. Inc.)*, 2013 WL 5272937, at \*5 (S.D.N.Y. Sept. 18, 2013)). So movants must show why there is something "*extraordinary or urgent*" about this situation that recommends departing from the standard appellate process." *Stanziale*, 534 B.R. at 611 (emphasis added).

Instead, in most cases, "[c]ourts of appeals benefit immensely from reviewing the efforts of the district court to resolve" "unsettled areas of bankruptcy law." *Weber v. United States*, 484 F.3d 154, 160 (2d Cir. 2007). "Percolation" through the district court can "cast more light on the issue and facilitate a wise and well-informed decision." *In re Greektown Holdings, LLC*, 2016 WL 825537, at \*4 (E.D. Mich. Feb. 24, 2016) (citation omitted). Because district court review aids the circuit court, "[p]ermitting direct appeal too readily might impede the development of a coherent body of bankruptcy case-law." *In re Abengoa Bioenergy Biomass of Kansas, LLC*, 2016 WL 3180587, at \*1 (Bankr. D. Kan. May 26, 2016) (citation omitted). Thus, there must be some pressing reason to "short-circuit the normal appellate process, which provides for a decision by

the district court to be followed by a decision of the Court of Appeals." *In re Sabine Oil & Gas Corp.*, 2016 WL 6238616, at *2 (S.D.N.Y. Oct. 25, 2016).

The Movants cannot show anything extraordinary or urgent here to justify bypassing the standard appellate process. They point out the obvious fact that, if the Dismissal Opinion is reversed, that might end the case, but, setting aside the possibility of a remand, that is a classic argument that proves too much, as it would make every denial of a motion to dismiss certifiable. *E.g.*, TCC I Mot. 15; A&I Mot. ¶¶ 30–31.[17] Beyond that, they essentially just argue that, because they lost in this Court, and probably will exhaust their appellate rights, it might help their negotiating position to bypass the district-court stage and see now whether they will fare differently in the Third Circuit. *See* TCC II Mot. 18 (arguing that resolution by circuit court "would either end the case entirely or remove an impediment to achieving a global consensual resolution"); *id.* at 20 (asserting it is "virtually certain that an appeal will make its way to the Third Circuit," "given the significance of this matter"); TCC I Mot. 16 (similar); A&I Mot. ¶ 30 (similar); Aylstock Mot. 9 (similar). This is not a sufficient basis to support a direct appeal. *See In re Millennium Lab*, 543 B.R. at 716–17 ("[C]ase law is clear that even the near certainty that this appeal will ultimately end up before the Third Circuit is not a basis on which to certify the order."). In a similar vein, Aylstock claims that, for the Third Circuit to decide the issue of § 524(g) and Civil Rule 25(c) would break "a potential logjam to any negotiated resolution," but overlooks the immateriality of that issue, discussed above. Aylstock Mot. 10. TCC I, TCC II, and Aylstock all invoke *Weber*, but it does not help them. The Second Circuit viewed the possibility

---

[17] In *In re City of San Bernardino*, 206 F. Supp. 3d 1216 (C.D. Cal. 2013), cited by TCC II, the district court did not certify a direct appeal of the bankruptcy court's denial of a motion to dismiss on grounds of material advancement. *Id.* at 1227. Rather, it certified a direct appeal to the Ninth Circuit due to the "absence of any binding authority construing section 109(c)(4) and section 921(c)." *Id.* at 1228–29 (stating the Ninth Circuit could "weigh in on these tricky definitions of desire and good faith"). The district court's language on material advancement involved its decision to grant leave to appeal.

of material advancement as arising when a ruling was "manifestly correct or manifestly

erroneous." 484 F.3d at 158. Not even Movants assert that the Dismissal Opinion was *manifestly*

erroneous, and presumably they do not concede that it is manifestly *correct* and that it would

help the parties for the Third Circuit to confirm this.

District court review in this case is especially likely to "cast more light on the issue and

facilitate a wise and well-informed decision" by the Third Circuit, in light of the district court's

familiarity with the talc litigation. *See In re Greektown*, 2016 WL 825537, at *4. Indeed, the

Original TCC moved to withdraw the reference of the adversary proceeding concerning whether

to enjoin talc litigation against non-debtor entities, emphasizing that the district court "has gained

considerable knowledge and experience with the facts and circumstances having direct bearing

on the underlying claims" given its role as the presiding court over the talcum-powder MDL.

Adv. Dkt. No. 110-1 at 5. The Original TCC therefore argued that the district court was "best

positioned" to adjudicate the issue of injunctive relief, *id.* at 6, which is at odds with the

suggestion that the district court should now be eliminated entirely from the appellate process.

Finally, Movants do not grapple with the implications of this Court's alternative holding

that, even if there were "cause" (that is, bad faith) under § 1112(b)**(1)**, the Court would, under

§ 1112(b)**(2)**, decline to dismiss due to its finding of "unusual circumstances." Dismissal Op. 13

n.8. That makes the alleged issues and importance of a certified appeal of the good-faith holding

effectively moot, as any Third Circuit ruling would likely be dicta. And a finding of unusual

circumstances is itself, like a finding of good faith, "necessarily fact-intensive," and "[s]uch

factual issues preclude a direct appeal." *Bepco*, 2008 WL 2698678, at *1. Although the Court did

support its finding of unusual circumstances with its assessment of the relative merits of the tort

system and bankruptcy, that assessment was, as detailed above in Argument II.A, specific to this

case, thus a factual finding reviewable for clear error, certainly not a ruling as a matter of law.

And the Court said as much in its alternative ruling as well, referring to its assessment of "the

interests of current tort creditors" and of "future tort claimants" here. Dismissal Op. 13 n.8.

Respectfully, the Court should deny certification of its Dismissal Opinion.

**III.    THE MOVANTS HAVE IDENTIFIED NO GROUND FOR CERTIFYING THE INJUNCTION OPINION, WHICH IS CONSISTENT WITH EVERY OTHER DECISION TO CONSIDER A SIMILAR QUESTION.**

As to the Injunction Opinion as well, none of the Movants identifies a need to resolve

conflicting decisions on a question of law (pure or otherwise). Nor does any other ground for

certification exist, certainly not given that, as discussed above, the Dismissal Opinion, on which

the Injunction Opinion builds, does not involve any such ground. Although, as this Court noted,

there are "unsettled" issues of law in this area, which can matter for the *path* of a court's

analysis, they have not before mattered, and do not here matter, for the *result*—that is, whether a

court appropriately protected affiliates, during a debtor's bankruptcy case, from claims that

amount to claims against the debtor. Inj. Op. 10–11; *see id.* at 9 (concluding that "ample

authority exists to conclude that § 362(a), § 105(a), or a court's inherent powers can each serve

as independent bases for extension of a stay to nondebtor third parties"). The Court here simply

and unremarkably followed the "three-step inquiry" that other district courts in this circuit "have

used and re-used." *Id.* at 11.

**A.    The Injunction Opinion involves no question of law as to which controlling precedent is lacking.**

At each step of the analysis in the Injunction Opinion, the Court identifies controlling law

and then applies it to the facts of this case, some of which are familiar and some of which are

novel. Because controlling decisions govern here, and because contested issues depend heavily

on the facts of this case, no issue in the Injunction Opinion warrants direct review as "a question

of law as to which there is no controlling decision." 28 U.S.C. § 158(d)(2)(A)(i). Movants TCC I

and TCC II attempt to evade this fact by proposing a collection of fact-bound variations on legal

issues for which controlling precedent exists.

> ***1.    Source of Authority for Extending the Stay.*** The TCC I Motion submits that the

primary issue for which there is no controlling law is "whether Section 362(a) or Section 105(a)

is a proper source of authority for extension of stay relief to a non-debtor entity in a bankruptcy

case." TCC I Mot. 17–18. The TCC II Motion identifies the same issue. *See* TCC II Mot. 12

("whether Section 362 is an independent basis for extension of the automatic stay to non-debtor

entities, or whether Section 105 of the Code (or a court's inherent powers) must be relied upon in

extending the stay."). That question is not presented here, however, because the Court, like many

before it, ruled that it was appropriate to extend the stay under both sections.

As the Court acknowledged, the question of *which* Code section governs "remains

unsettled" in the Third Circuit. Inj. Op. 11. And distinction between the two sections is not

"academic" for purposes of *implementing* the analysis, because proceeding under § 105(a)

requires finding subject-matter jurisdiction. Inj. Op. 11. But, importantly, *each* analysis *is*

governed by settled Third Circuit law, as the Court's opinion shows. The Court followed the

Third Circuit's decision in *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506 (3d Cir. 1997), for

its consideration of "§ 362 as an independent basis for extending the stay." Inj. Op. 10.

(*McCartney*, in turn, follows leading Fourth Circuit precedent.) And for § 105(a), the Court

followed well-established standards in Third Circuit cases like *McTernan v. City of York, Pa.*,

577 F.3d 521 (3d Cir. 2009); *United States v. Bell*, 414 F.3d 474 (3d Cir. 2005); and *Kos

Pharmaceuticals Inc. v. Andrex Corp.*, 369 F.3d 700 (3d Cir. 2004). Under each, the Court found

that injunctive relief was appropriate.

Once both analyses point in the same direction, the "ultimate *effect*" of the distinction *is*

"purely academic," as the Court likewise acknowledged. Inj. Op. 11. Settled law governs the

application of each section, and Movants do not challenge that settled law. The Court's thorough,

belt-and-suspenders approach to extending the stay blazed no new trail, following an inquiry that

"district courts have used and re-used . . . to determine whether the bankruptcy court's extension

of a stay to a nondebtor was appropriate." Inj. Op. 11. Because the Court reached the same

conclusion after independently applying both standards (and Movants do not contend that the

result depends on the choice of standard), the Injunction Opinion raises no question of law as to

choosing among the standards. *Id.* at 54.

      *2.*     ***Extension of the Stay to Joint Tortfeasors.*** The TCC II Motion claims that a

different issue is the primary "question of law" raised by the Injunction Opinion: "whether the

automatic stay could be extended to joint tortfeasors with independent liability or whether

judgments holding a non-debtor independently liable could be ignored in the analysis of whether

to extend the stay*, based on a finding* that a predecessor to the debtor agreed to indemnify the

debtor for, and financially assume the burden of, past and future products liability claims." TCC

II Mot. 12. That TCC II needs 61 words to state its purported question of law betrays that it is not

a genuine one. TCC II also ignores this Court's analysis, which rejected this argument as

"misleading" and depending on "selective portions of underlying case law." Inj. Op. 23. As the

Court explained, the authority the Original TCC invoked (1) was not on point, involving a

distinct question of indispensable parties, and (2) was dicta, at odds with the next sentence of the

Fourth Circuit decision invoked. *Id.* Elsewhere, the Court recognized—including under a

subsequent Fourth Circuit decision involving the same bankruptcy, and decisions of and in the

Third Circuit—"that the mere possibility of indemnification obligations warrants extension of

the automatic stay" and, in any event, the Court here found that the indemnification agreements "are automatic." *Id.* at 32–33. So this issue, as TCC II's own phrasing suggests in referring to the "finding" here, is really one of applying the law to the Court's extensive factual findings regarding the debtor's indemnity arrangements with its affiliates, particularly the 1979 Agreement (Inj. Op. 24–30); it is not a genuine question of law on which controlling precedent is lacking.

Moreover, even recast as the overbroad question of whether the automatic stay ever, under any circumstances, may be extended to non-debtors, it still fails, under Third Circuit precedent. *See McCartney*, 106 F.3d 506, 511 (holding the automatic stay may be extended to non-debtors). This Court followed *McCartney* and extensive additional precedent from within and outside of the Third Circuit to conclude that it was appropriate to extend the automatic stay. And it is of course particularly appropriate to do so when the stay is simply extended, as here, to claims involving "the same products, the same time period, the same alleged defect, and the same alleged harm." Inj. Op. 30–31; *see id.* at 19 (similar).

TCC II's narrower argument that the extension of the automatic stay to joint tortfeasors with independent liability presents a question of law fails for the same reasons. This is a question of how to apply the same governing law to the facts of this case. The Court already rejected the Original TCC's argument that applying the stay to joint tortfeasors with independent liability requires analysis under a different standard than that which governs all applications of the automatic stay to non-debtors. Inj. Op. at 23 ("Thus, even assuming direct liability exists, the analysis for whether an extension of the automatic stay is warranted based on 'unusual circumstances' remains unaffected.").

**3.**   ***The Court's "Core" Jurisdiction.*** Finally, the TCC I Motion argues that a further

issue without controlling authority is "whether *the Debtor's request to extend the automatic stay under § 362(a) or for a preliminary injunction under § 105(a) fall within this Court's 'core' jurisdiction.*" TCC I Mot. 18 (emphasis added). On its face, this question is bound to the facts of this particular case, calling for an answer limited to the instant issue.

Highly developed caselaw in the Third Circuit governs the extent of a bankruptcy court's "core" jurisdiction. The Court reviewed and followed this to determine that the adversary proceeding to extend the automatic stay invoked the Court's "core" jurisdiction. *See* Inj. Op. 12–14 (citing, among other decisions, *Stoe v. Flaherty*, 436 F.3d 209 (3d Cir. 2006), *as amended* (Mar. 17, 2006); *United States Trustee v. Gryphon at the Stone Mansion, Inc.*, 166 F.3d 552 (3d Cir. 1999); and *In re Resorts Int'l, Inc.*, 372 F.3d 154 (3d Cir. 2004)). The Court followed similar extensive Third Circuit precedent to find that the adversary proceeding also invoked its "related to" jurisdiction. *See* Inj. Op. 12–15 (citing among other decisions, *In re Winstar Commc'ns, Inc.*, 554 F.3d 382 (3d Cir. 2009); and *In re W.R. Grace & Co.*, 591 F.3d 164 (3d Cir. 2009)).

The Movants do not, because they cannot, identify any questions of law presented here not subject to controlling decisions raised by the Injunction Opinion.

### B.   The Injunction Opinion involves no "matter of public importance."

The Movants' claims that the Injunction Opinion involves a matter of public importance appear to collapse into their arguments that the Dismissal Opinion does so or that the Injunction Opinion presents a question of law lacking controlling precedent, or both. *See* TCC II Mot. 13–18 (discussing orders together and focusing on Dismissal Opinion, apart from one paragraph contending that the Injunction Opinion "similarly implicate[s]" matters of public importance and claiming lack of "controlling authority" on extending the stay); *see also* TCC I Mot. 4, 17–19 (similar; not making a distinct public-importance argument as to Injunction Opinion); Aylstock Mot. 8 (discussing "the Orders" together). This Court similarly recognized that its Injunction

Opinion was largely derivative of its Dismissal Opinion—starting from "the baseline that the bankruptcy was filed in good faith," including that the pre-petition restructuring was not inappropriate. Inj. Op. 18; *see id.* at 2, 17–18, 20–21, 47–48, 50, 53.

And none of the Movants mentions the prior decisions uniformly granting preliminary injunctions in these and similar circumstances, including in other "Texas Two-Step" cases—on an issue for which, unlike with the question of bad faith, Fourth Circuit and Third Circuit law are in harmony. *See* Inj. Op. 9–10, 16, 22, 32–33. Yet this Court did consider those uniform prior decisions, as well as noting Judge Whitley's (non-binding) decision in this very case; and that uniformity undermines the public importance of yet another instance of granting such a preliminary injunction. *See id.* at 5, 17–19 (discussing Judge Whitley's reasoning); *id.* at 22 (noting prior cases); *id.* at 51 (same); *see also id.* at 39 n.9 (citing, among other decisions, district court affirmance of preliminary injunction in *Bestwall*). If the Injunction Opinion is in accord with them, it is unremarkable; if it is not in accord, it is a product of, and its importance is limited by, its "unique facts." *Id.* at 53. Either way, it does not present a matter of public importance.

### C.    An immediate appeal of the Injunction Opinion to the Third Circuit would not "materially advance" the progress of this bankruptcy case.

Movants fail to offer any extraordinary or urgent reason why immediate direct appeal of the Injunction Opinion would materially advance the progress of this case for much the same reasons that, as just discussed, they fail to show that it would involve a matter of public importance. Here too, the Movants do not present arguments distinct from those involving the Dismissal Opinion or the controlling-precedent question as to the Injunction Opinion. *See* TCC II Mot. 18–20; TCC I Mot. 18–19; Aylstock Mot. 8–11. Debtor's discussions above thus apply here too.

It is worth reiterating, in particular, that the contention that the district court should be cut out of the appellate process for this Court's grant of injunctive relief is inconsistent with the Original TCC's motion to withdraw the reference as to *that very issue*, based on the district court's experience with the underlying talc litigation. As the Original TCC's position shows, the district court here is well positioned to "cast more light on the issue and facilitate a wise and well-informed decision" by the Third Circuit. *In re Greektown Holdings, LLC*, 2016 WL 825537, at *4 (E.D. Mich. Feb. 24, 2016) (citation omitted).

## **CONCLUSION**

The Court should deny all of the Certification Motions, as to both the Dismissal Opinion and the Injunction Opinion.

Dated: March 23, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/  Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
David S. Torborg, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dstorborg@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
Admitted *pro hac vice*
ATTORNEYS FOR DEBTOR