**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in Compliance with D.N.J. LBR 9004-1(b)**

| | |
|---|---|
| **COOLEY LLP**<br>Cullen D. Speckhart (admitted pro hac vice)<br>Ian Shapiro (admitted pro hac vice)<br>Russell Capone (admitted pro hac vice)<br>Michael Klein (admitted pro hac vice)<br>55 Hudson Yards<br>New York, NY 10001<br>Tel: (212) 479-6000<br>Fax: (212) 479-6275<br>Email: cspeckhart@cooley.com<br>　　　ishapiro@cooley.com<br>　　　rcapone@cooley.com<br>　　　mklein@cooley.com<br><br>Matthew Kutcher (admitted pro hac vice)<br>444 W Lake Street, Suite 1700<br>Chicago, IL 60606<br>Tel: (312) 881-6500<br>Fax: (312) 881-6598<br>Email: mkutcher@cooley.com<br><br>Shamis Beckley (admitted pro hac vice)<br>500 Boylston Street, 14th Floor<br>Boston, MA 02116-3736<br>Tel: (617) 937-2300<br>Fax: (617) 937-2400<br>Email: sbeckley@cooley.com<br><br>Kathleen Hartnett (admitted pro hac vice)<br>Julie Veroff (admitted pro hac vice)<br>3 Embarcadero Center, 20th Floor<br>San Francisco, CA 94111-4004<br>Tel: (415) 693-2000<br>Fax: (415) 693-2222<br>Email: khartnett@cooley.com<br>　　　jveroff@cooley.com<br><br>*Co-Counsel to the*<br>*Official Committee of Talc Claimants II* | **BAILEY GLASSER LLP**<br>Brian A. Glasser (admitted pro hac vice)<br>Thomas B. Bennett (admitted pro hac vice)<br>Kevin W. Barrett (admitted pro hac vice)<br>Maggie B. Burrus (admitted pro hac vice)<br>1055 Thomas Jefferson St. NW, Suite 540<br>Washington, DC 20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>Email: bglasser@baileyglasser.com<br>　　　tbennett@baileyglasser.com<br>　　　kbarrett@baileyglasser.com<br>　　　mburrus@baileyglasser.com<br><br>*Co-Counsel to the*<br>*Official Committee of Talc Claimants II* |

| **WALDREP WALL** | **MASSEY & GAIL LLP** |
|---|---|
| **BABCOCK & BAILEY PLLC** | Jonathan S. Massey (admitted pro hac vice) |
| Thomas W. Waldrep, Jr. (admitted pro hac vice) | 1000 Maine Ave. SW, Suite 450 |
| Kevin L. Sink (admitted pro hac vice) | Washington, DC 20024 |
| James C. Lanik (admitted pro hac vice) | Tel: (202) 652-4511 |
| Jennifer B. Lyday (admitted pro hac vice) | Fax: (312) 379-0467 |
| 370 Knollwood Street, Suite 600 | Email: jmassey@masseygail.com |
| Winston-Salem, NC 27103 | |
| Tel: (336) 717-1280 | *Co-Counsel to the* |
| Fax: (336) 717-1340 | *Official Committee of Talc Claimants II* |
| Email: notice@waldrepwall.com | |
| | |
| *Co-Counsel to the* | |
| *Official Committee of Talc Claimants II* | |

**WALDREP WALL**
**BABCOCK & BAILEY PLLC**
Thomas W. Waldrep, Jr. (admitted pro hac vice)
Kevin L. Sink (admitted pro hac vice)
James C. Lanik (admitted pro hac vice)
Jennifer B. Lyday (admitted pro hac vice)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Tel: (336) 717-1280
Fax: (336) 717-1340
Email: notice@waldrepwall.com

*Co-Counsel to the*
*Official Committee of Talc Claimants II*

**MASSEY & GAIL LLP**
Jonathan S. Massey (admitted pro hac vice)
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Tel: (202) 652-4511
Fax: (312) 379-0467
Email: jmassey@masseygail.com

*Co-Counsel to the*
*Official Committee of Talc Claimants II*

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**
Arthur J. Abramowitz
Alan I. Moldoff
Ross J. Switkes
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Tel: (856) 662-0700
Email: aabramowitz@shermansilverstein.com
        amoldoff@shermansilverstein.com
        rswitkes@shermansilverstein.com

*Local Counsel to the*
*Official Committee of Talc Claimants II*

In re:

**LTL MANAGEMENT LLC,**

Debtor.

Chapter 11

Case No.:  21-30589 (MBK)

Honorable Michael B. Kaplan

**REPLY IN SUPPORT OF MOTION OF OFFICIAL COMMITTEE OF TALC
CLAIMANTS II, PATRICIA COOK, EVAN PLOTKIN, RANDY DEROUEN, KRISTIE
DOYLE AS ESTATE REPRESENTATIVE OF DAN DOYLE, KATHERINE
TOLLEFSON, JAN DEBORAH MICHELSON-BOYLE, GIOVANNI SOSA AND
TONYA WHETSEL AS ESTATE REPRESENTATIVE OF BRANDON WHETSEL, FOR
CERTIFICATION OF DIRECT APPEAL TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT**

# PRELIMINARY STATEMENT[1]

The Debtor's opposition to TCC II and the Individual Movants' certification motion fails to address the Motion's fundamental arguments and does nothing to disturb the clear conclusion that certification of a direct appeal to the Third Circuit of the Motion to Dismiss Order ("MTD Order") and Preliminary Injunction Order ("PI Order") (together, the "Orders") is required.  As the Debtor concedes (Opp. at 4 n.3), certification is mandatory if any one of the grounds listed in 28 U.S.C. § 158(d)(2) applies.  Here, as set forth in the Motion, *three* are present: (1) the Orders "involve[] question[s] of law as to which there is no controlling" Third Circuit or Supreme Court decision; (2) the Orders "involve[] a matter of public importance"; and (3) an immediate appeal "may materially advance the progress of the case."  28 U.S.C. § 158(d)(2).

First, the Orders rest on multiple unsettled questions of law that have never been addressed by the Third Circuit.  With respect to the MTD Order, these questions include (1) whether a policy preference for the bankruptcy forum over the tort system can be considered, particularly as a dominant factor, in the totality-of-circumstances analysis of whether the bankruptcy petition has been filed in good faith; (2) whether a debtor which was not "named" as a defendant in asbestos tort suits at the time of the petition may seek the benefit of a § 524(g) injunction; (3) the degree to which a non-Debtor entity's financial circumstances may be considered as pertinent to determining whether the Debtor is under financial distress; and (4) the degree and imminence of financial distress a Debtor must demonstrate in order to establish good faith.  The PI Order implicates not only the unsettled questions underlying the MTD Order (with which it is bound up), but also, as the Court recognized (PI Order at 11), the question of the statutory source of authority for

---

[1] All capitalized terms herein are used as previously defined in the Motion (ECF 1654-1).

extending the automatic stay, which is an unsettled legal question that is neither "academic" nor "semantics."

The Debtor fails to engage meaningfully with the multiple unsettled questions of law raised by this appeal and identified in TCC II's Motion. Instead, the Debtor contends that this Court merely "applied settled, controlling Third-Circuit precedent on 'bad faith' dismissals to the detailed facts of this case." (Opp. at 7 (quoting heading).) That characterization fails. Third Circuit precedent does not supply clear-cut answers to the legal issues identified in TCC II's Motion. This Court resolved those open issues and then *applied* its legal premises to the facts it found. In other words, that the Court applied its construction of the legal framework to the facts does not mean that there are not open questions of law undergirding its analysis: TCC II has identified those questions, and the Debtor has failed to refute them.

Second, this bankruptcy and the Court's Orders undoubtedly involve a matter of "public importance." This Court noted that the legal questions presented in this case "have been the subject of academic, judicial, and policy debates for years." (MTD Order at 13.) Moreover, they arise in the context of a proceeding involving one of the largest companies in the world, tens of thousands of tort claimants, and potentially tens of billions of dollars in liability. The Debtor does not—nor can it—seriously dispute the importance of the matters at stake in this appeal. Indeed, the Court has acknowledged that every aspect of this case is under scrutiny by both lawmakers and the public.

Third, and finally, the Debtor does not meaningfully dispute that an immediate appeal will materially advance the case. This Court has recognized that a Court of Appeals review of the Orders is inevitable. (*Id.* ("[T]here is no expectation that this decision will be the final word on the matters.").) The choice is between a prompt appeal to the Third Circuit or a drawn-out appeal

that languishes in the District Court, which is a mere way station to the Court of Appeals. Only the Third Circuit can provide an authoritative resolution of the legal issues presented, and it should be in the interest of all concerned to resolve the issues as expeditiously as possible. An affirmance would allow the parties to proceed to endeavor to resolve this case without further debate and uncertainty about the likelihood that the Court's decisions will be overturned. A reversal, by contrast, would immediately terminate this bankruptcy, sending the Debtor and the claimants back into the tort system. This Court has consistently moved this case along a fast track, and it should not abandon that approach now.

The presence of any single § 158(d)(2) factor obligates this Court to certify an appeal to the Third Circuit. The presence of multiple such factors confirms that certification is not only required, but sensible. The Third Circuit should have the opportunity to consider the issues at hand as quickly as possible, so that the bankruptcy case can either be dismissed or can proceed without the cloud of legal uncertainty that currently hangs over it.[2]

## ARGUMENT

### I.    The Appeals Should Be Certified

#### A.    The Appeal from the MTD Order Involves Unsettled Questions of Law

The Debtor acknowledges that legal questions representing "gaps or conflicts" in the precedent warrant certification of a direct appeal. (Opp. at 3.) TCC II and the Individual Movants have identified at least four such legal questions (as described in the preliminary statement, *supra*).

---

[2] A denial of a motion to dismiss a Chapter 11 proceeding is a final appealable order under 28 U.S.C. § 158(a)(1). *See In re Brown*, 916 F.2d 120, 124 (3d Cir. 1990). At the hearing on March 8, 2022, the Court characterized *In re Brown* as an "outlier" and noted that the appealability of the MTD Order had not been briefed. (Mar. 8, 2022 Hr'g Tr. at 27:10-28:4.) A week later, A&I explained in its motion to certify that *In re Brown* is controlling and that the MTD Order is appealable. (*A&I Mot. for Cert.* at 9-11 (ECF 1720-1).) Moreover, interlocutory orders and final orders both may be certified for immediate appeal to a circuit court under 28 U.S.C. § 158(d)(2)(A), rendering the characterization of the Orders immaterial for purposes of the present certification motion. *See* 28 U.S.C. § 158(d)(2)(1); *see also Perkins v. Haines*, 661 F.3d 623, 625-26 n.2 (11th Cir. 2011); *In re OCA, Inc.*, 552 F.3d 413, 418 (5th Cir. 2008); *Stanziale v. Car-Ber Testing, Inc. (In re Conex Holdings, LLC)*, 534 B.R. 606, 609-10 (D. Del. 2015).

Resolution of these issues is critical to determining the meaning of "good faith" and how it should be assessed in the Third Circuit, and the Court has recognized that they are not conclusively addressed by existing precedent. This appeal should be directly certified so the Third Circuit can answer these open questions of law.

### 1.    Whether and to What Extent the Relative Merit of the Tort and Bankruptcy Systems Is an Appropriate Factor for Consideration

The Debtor does not dispute (Opp. at 13) that the Court analyzed the relative merits of the tort and bankruptcy systems in serving the interests of present and future talc claimants as part of its assessment of the Debtor's good faith. (*See* MTD Order at 18-28.) The Court then accorded this factor—specifically, its conclusion that the bankruptcy system was preferable for talc claimants—more weight than any of the other relevant factors in its totality-of-circumstances analysis. (*See id.* at 13-14 (characterizing it as a "far more significant issue").) Whether this comparative inquiry is an appropriate factor to weigh as part of the standard set forth in *In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999) is a matter of law that has not been addressed by existing precedent and yet was critical to the Court's analysis.

The Debtor does not seriously dispute that this is an unsettled question of law. The Debtor contends only that the various movants were not in agreement on whether this issue presents a legal question or a matter of public importance. (Opp. at 13.) In fact, the question of whether a policy argument about the relative merits of the bankruptcy and tort systems is a permissible factor to consider in the "good faith" analysis is *both* an unsettled question of law and a matter of public

importance.[3]    It is a question of law because it reflects a judgment by the Court that this

comparative analysis is properly part of the "totality of circumstances" analysis.[4]

Rather than disputing that this legal question is unsettled, the Debtor principally contends

that the Court's policy analysis played only a supporting role in the MTD Order.  (*See* Opp. at 13-

14.)  But the Court called this question a "far more significant issue" than the two-prong inquiry

(valid reorganizational purpose and tactical litigation advantage) set forth in controlling Third

Circuit law.  (MTD Order at 12 (citing *15375 Mem'l Corp. v. BEPCO, L.P. (In re 15375 Mem'l*

*Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009).)[5]  It also acknowledged that the Individual Movants

"may take issue with the Court's decision to assess the merits of the competing judicial systems

as part of the totality of circumstances underlying the chapter 11 filing."  (*Id.* at 13 n.8.)  The

Court's emphasis of the importance of this factor, and the recognition that it would draw scrutiny

and potentially reshape mass tort law, confirms that this is an unsettled legal question that should

be addressed by the Court of Appeals as soon as possible.  (*See id.* at 52 ("[G]iven the Court's

view that the establishment of a settlement trust within the bankruptcy system offers a preferred

approach . . . maybe the [flood]gates should be opened.").)

---

[3] It is also a matter of public importance because, if endorsed by the Third Circuit, it would fundamentally refocus the "good faith" inquiry away from a consideration of the Debtor's financial distress and whether the Debtor intended the bankruptcy as a litigation tactic, into a consideration of whether the bankruptcy system represented a better forum than the state and federal system for the resolution of the claims against the estate.

[4] Other decisions from the Supreme Court and Third Circuit in similar contexts suggest—but do not decisively hold here—that a comparative analysis of the bankruptcy and tort systems is *not* a proper factor in the totality-of-the-circumstances inquiry used to assess good faith.

[5] The Debtor argues that the Individual Movants opened the door to this policy analysis because certain *amici curiae* addressed the relative merits of the tort system over the bankruptcy system.  (Opp. at 14.)  But *amici* were merely responding to arguments introduced by the Debtor about the relative merits of the two systems.  (*See Debtor's Opp. to Mot. to Dismiss* at 16 (ECF 956) (arguing that a bankruptcy resolution "would provide far more equitable treatment of claims").)  The hotly-debated subject of the Debtor's argument makes certification more, not less, appropriate.  Moreover, TCC II and the Individual Movants have never conceded that policy analysis is a proper element of *SGL Carbon*'s totality-of-circumstances test.  (*See TCC II's Reply in Supp. of Mot. to Dismiss* at 20 (ECF 1358) ("LTL's discussion of the purpose and benefits of Section 524(g) is irrelevant to the question at hand").)

## 2.    Whether a § 524(g) Injunction in Favor of Non-Debtors Is Available

The Court's resolution of the policy question in favor of bankruptcy (rather than the tort system) depended on the premise that a channeling injunction would be available to resolve the anticipated future claims.  (*Id.* at 28-29.)  But a channeling injunction under 11 U.S.C. § 524(g) is available only when the debtor is "named" as a defendant in a personal injury lawsuit at the time of the petition.  11 U.S.C. § 524(g)(B)(i)(I).  Here, the Debtor's chief legal officer conceded under oath that the Debtor was not named in any such lawsuit.  (Nov. 4, 2021 Hr'g Tr. at 244:24-245:1.)  Therefore, under the plain text of 11 U.S.C. § 524(g), no injunction may be issued in favor of non-Debtor entities.  (*See generally* Mot. at 8-10.)  The Court acknowledged the "challenging and interesting issue" of whether an unnamed *successor* to an asbestos defendant can take advantage of § 524(g), even when not named as a defendant, but cited no controlling law addressing it.  (MTD Order at 28-29.)  Certification should be granted so the Court of Appeals can answer this question.[6]

In opposition, the Debtor argues that resolution of this question can await plan confirmation.  (Opp. at 16-17.)  But the Debtor's stated goal in this proceeding (and that of its indirect parents, New JJCI and Johnson & Johnson) is to obtain the benefits of a § 524(g) injunction.  (*See, e.g.*, *First Day Dec.* ¶ 59 (Case No. 21-30589, ECF 5).)  If such an injunction is unavailable as a matter of law, then the role of § 524(g) in establishing the Debtor's supposed good faith evaporates.  Thus, this question warrants resolution now.

Contending that the question is addressed by controlling law, the Debtor cites Federal Rule of Civil Procedure 25(c).  (Opp. at 17-18.)  But TCC II and the Individual Movants anticipated

---

[6] The Debtor asserts that the Court "noted" that "Debtor in fact has been named in pending suits."  (Opp. at 17 (quoting MTD Order at 29).)  The Debtor omits from this quote the critically important introductory phrase: "*At closing during the hearing, Debtor's counsel apprised the Court and all parties* that Debtor in fact has been named in pending suits." (MTD Order at 29 (emphasis added).)  The Debtor cannot rely on its counsel's factual assertion in closing argument unsupported by any evidence to support this point.  The only evidence in the record is the Debtor's chief legal officer's sworn testimony that the Debtor had *not* been named in any suits as of the petition date.

this argument and addressed it in the Motion (*see generally* Mot. at 9 n. 1): Rule 25(c) does not provide for automatic substitution of successors as defendants.  In fact, it contemplates the opposite: the action against the original defendant continues, and the successor may only be substituted or joined "on motion."  This rule does not suggest in any way that an unnamed defendant should be eligible for § 524(g) injunction, and neither the Court nor the Debtor cites any cases that so hold.[7]

In opposition, the Debtor does not attempt to defend the Court's reference to the possibility that a global resolution of future claims could be reached *without* express resort to § 524(g).  (MTD Order at 29 (discussing, *inter alia*, the USA Gymnastics and Boy Scouts settlements); *cf.* Opp. at 16-18 (focusing only on § 524(g)).)  As discussed in the Motion, § 105(a) does not authorize a channeling injunction in an asbestos case where the requirements of § 524(g) have not been met. (Mot. at 9 (citing *In re Combustion Eng'r, Inc.*, 391 F.3d 190, 233-237 (3d Cir. 2004)).)  The Debtor argues that *In re Combustion Eng'r* is inapposite because the injunction rejected in that case was defective for reasons that arguably would not apply here (Opp. at 18 n. 16), but the Third Circuit's reasoning that § 105(a) cannot be invoked to circumvent the limits of § 524(g) does apply: § 524(g) reflects Congress' legislative judgment on the limited circumstances in which a channeling injunction may be granted in an asbestos case.

---

[7] The Debtor cites several cases which explain that Fed. R. Civ. P. 25(c) permits the action to continue against the original named defendant and for the judgment to be binding on the successor as a matter of law.  (*See* Opp. at 17-18 (citing *Moroccanoil, Inc. v. Conforti*, No. 11-136, 2021 WL 2310092, at *3, 5 (D.N.J. June 4, 2021); *Standard Fed Bank v. United States*, 51 Fed. Cl. 695, 708 (2002); *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69 (3d Cir. 1993); *NRDC v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 506 (3d Cir. 1993)).)  None of the cases hold that the unnamed defendant is automatically *named* in the lawsuit, only that the resulting judgment is binding on them; they are therefore irrelevant to the legal question of whether a § 524(g) injunction would be available to such an unnamed party.

The Debtor's eligibility for a channeling injunction is an outstanding legal question which the Court considered to be relevant to its analysis of good faith. That legal determination should be addressed by the Court of Appeals.

### 3.    Whether the Financial Condition of Defunct Non-Party Old JJCI Can Be Considered in Assessing Good Faith

The Debtor does not dispute that the Court considered the financial condition of a defunct non-Debtor entity, Old JJCI, as part of its inquiry into the Debtor's good faith. (*See* MTD Order at 33-41.) The distinction between the two entities is no mere technicality: the Debtor is a special purpose vehicle. It has no operations or employees and offers no products or services. Its assets consist of the Funding Agreement, a royalty stream, and a bank account. It has a single liability: the talc tort claims. The Debtor's financial condition and creditors are very different from those of Old JJCI, yet the Court (and the Debtor) repeatedly point to the impact of the talc liability on *Old JJCI's* operations and financial performance in justifying the Debtor's financial distress. Neither the Court nor the Debtor has pointed to any case law permitting such reliance on a non-debtor's financial distress. Thus, the question whether a non-debtor entity's financial condition is relevant to establishing the financial distress required in the Third Circuit to establish good faith has not been addressed by controlling law and warrants certification.

In opposition, the Debtor identifies no Third Circuit opinion endorsing the Court's approach. Instead, the Debtor contends only that, having decided to consider Old JJCI, the Court found various facts pertinent to its financial condition. (Opp. at 13.) But these factual findings presuppose the resolution of the antecedent, unsettled legal question of whether a non-debtor's financial condition is relevant at all. Because the Court's reliance on non-Debtor Old JJCI's financial condition to establish financial distress is not grounded in any controlling law, the question of whether that analysis is permissible should be addressed by the Court of Appeals.

10

### 4.    Whether Financial Distress Can Be Based on the Prospect of Future Liability

Finally, the Debtor contends that the question of whether it established sufficient financial distress is one dependent on facts, not law.  (*Id*. at 10-12.)  But this Court's financial distress analysis rested on two legal choices—first, relevant to the question discussed immediately above (Point I.A.3, *supra*), to consider the distress of the non-Debtor, Old JJCI; and second, to consider anticipated *future* distress to the Debtor which had not yet materialized.  (*See* Opp. at 11; *see also* MTD Order at 36 ("Even without a calculator or abacus, one can multiply multi-million dollar or multi-billion dollar verdicts by tens of thousands of existing claims, let alone future claims, and see that the continued viability of all J&J companies is imperiled.").)  Whether these anticipated future liabilities—all of which assumed that these cases could not be settled in the tort system—were sufficient to demonstrate good faith depends on what legal standard is applicable for finding "financial distress" at the time the Debtor filed its bankruptcy petition in October 2021.  This question warrants certification.

This Court's description of the legal test reveals the imprecise and unsettled nature of the standard: "[w]hile the Third Circuit requires 'some' degree of financial distress, *see In re Integrated*, *supra*, the Bankruptcy Code does not 'require any *particular* degree of financial distress as a condition precedent to a petition seeking relief.'"  (MTD Order at 37-38 (quoting *In re Gen. Growth Props., Inc*., 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (quoting *United States v. Huebner*, 48 F.3d 376, 379 (9th Cir. 1994))).) This Court's reliance on out-of-circuit precedent for the notion that no *particular* degree of distress is required confirms the absence of Third Circuit precedent on the precise question resolved by this Court.

Although *SGL Carbon* referred to the Johns-Manville, Dow Corning, and Dalkon Shield mass tort scenarios, it also emphasized that there must be "immediate" and "serious" financial

11

distress. 200 F.3d at 163-64. When addressing Johns-Manville, *SGL Carbon* noted that Johns-Manville was being forced to choose between "book[ing] a $1.9 billion reserve thereby triggering potential default on a $450 million debt which, in turn, could have forced partial liquidation, or file a Chapter 11 petition." 200 F.3d at 164. When addressing the Dalkon Shield litigation, *SGL Carbon* cited the bankruptcy court's opinion explaining that, at the time of the bankruptcy filing, "Robins' financial picture had become so bleak that financial institutions were unwilling to lend it money. With only $5 million in unrestricted funds and the inability to secure commercial financing, it appears that Robins had no choice but to file for relief under Chapter 11 of the Bankruptcy Code." 89 B.R. at 558. These references indicate that the degree (i.e. "some" versus "serious") and imminence of financial distress demanded by the Third Circuit are significant. Plainly, the parties view *SGL Carbon* as susceptible to multiple interpretations when it comes to establishing a test for financial distress, evincing a gap in the legal standard that must be addressed.

## B.      The Appeal from the PI Order Involves Unsettled Questions of Law

The Debtor contends that the PI Order simply involves the issue "of how to apply the same governing law to the facts of this case." (Opp. at 30.) But the Debtor ignores the unprecedented nature of this proceeding. This case is different from Johns-Manville, Duro Dyne, and every other previous asbestos and mass tort bankruptcy in a critical respect: never before has a parent like J&J sought to stay its independent liability (without filing for bankruptcy) via an artificially structured set of corporate transactions resulting in the creation of a new debtor vehicle whose assets exceeded its liabilities. (*See* Movants' Ex. 1.52, *Am. Funding Agmt. Recital E* ("[F]ollowing the effectiveness of the Divisional Merger, Chenango One had assets having a value at least equal to its liabilities and had financial capacity sufficient to satisfy its obligations as they become due in the ordinary course of business, including any Talc Related Liabilities.").) Even in prior cases involving the same kind of restructuring, the principal entities seeking protection of the stay were

12

themselves parties to the Texas divisional merger. There was no parent company, like J&J here, seeking to stay direct, pre-merger personal injury claims against the parent company and its commercial partners, without being part of the restructuring. This is precisely the kind of ground-breaking case for which certification is warranted.

TCC II and the Individual Movants have identified specific questions of law raised in the appeal from the PI Order which are not addressed by controlling law, including (1) whether the automatic stay can be extended to stay actions against Johnson & Johnson, which has liability independent from that of the Debtor and its predecessor, Old JJCI, and (2) whether § 362 provides an independent basis for extending the automatic stay in favor of non-debtor entities, or whether § 105 provides such a basis. (*See* Mot. at 12-13.)

### 1.    The Breadth of the "Unusual Circumstances" Exception Is a Question of Law for Which There Is No Controlling Precedent

In opposition, the Debtor contends that the legal question relating to the independent liability of Johnson & Johnson is not "genuine," essentially because the Court rejected it in granting the preliminary injunction. (Opp. at 29.) It is true that the Court rejected the PI movants' invocation of *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) (and other cases) and explained why these cases did not "convince the Court" that the automatic stay should not be extended for Johnson & Johnson's benefit. (PI Order at 23.) However, that the Court disagreed with this reading of *Robins* and the other cases relied upon by the PI movants does not eliminate the existence of the legal question of whether the "unusual circumstances" exception can extend to cover a scenario in which a joint tortfeasor has independent liability. That must be decided on appeal.[8]

---

[8] Other courts have read *Robins* as excluding "from the 'unusual circumstances' exception those cases in which the non-bankrupt codefendant is 'independently liable.'" *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 33

The Debtor contends that this question has been decided by controlling law, citing *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 511 (3d Cir. 1997). (Opp. at 30.) But *McCartney* did not address this question. In *McCartney*, the court considered a scenario in which, had the stay not been granted, the claimant would have been required under the Pennsylvania Deficiency Judgment Act to name the debtor as well as the non-debtor as respondents or "risk discharging [the debtor] as loan guarantor." *Id.* That is not the scenario here: in the absence of a judgment, tort claimants could choose to pursue tort claims against Johnson & Johnson directly, and many have done so. Tellingly, the Court did not rely on *McCartney* in rejecting the PI movants' argument that the stay should not be extended to Johnson & Johnson. (*Cf.* PI Order at 22-24.)

There is no controlling law in the Third Circuit which supports the proposition that direct claims against non-debtor tortfeasors with liability completely independent of the debtor can be stayed by virtue of the automatic stay. This question is simply a gap in the precedent. The breadth of the "unusual circumstances" exception is therefore an important question of pure law that has been discussed by countless lower courts and is ripe for immediate consideration by the Court of Appeals.

### 2.    The Authority for Extending the Automatic Stay Is Uncertain

A second question of law for which there is no controlling Third Circuit or Supreme Court case law relates to the source of authority for extending the automatic stay to non-debtors, and in

---

(S.D.N.Y. 1990) (quoting *Robins*, 788 F.2d at 999); *see also Stanford v. Foamex L.P.*, No. 07-4225, 2009 WL 1033607, at *2 (E.D. Pa. Apr. 15, 2009) ("unusual circumstances" did not permit automatic stay to extend to non-debtor entities because "plaintiff in this action alleges that each of the non-bankrupt defendants is independently liable"); *Thomson Kernaghan & Co. v. Global Intellicom, Inc*., No. 99-Civ-3005, 2000 WL 640653, at *15 (S.D.N.Y. May 17, 2000) (reasoning that "[b]ecause the claims against [the defendant] are not derivative of his status as Chairman and Chief Executive Officer of [debtor], but rather are premised upon [the defendant's] own conduct, including an alleged breach of his fiduciary duty . . . a stay is not warranted . . . .").

particular, whether it derives from § 105 and or § 362 of the Bankruptcy Code.  (Mot. at 12.)

Contrary to the Debtor's assertions (Opp. at 28-29), the source of authority for extending the stay

is a pure legal question that is not addressed by controlling law.

As the Debtor concedes, the Court noted that there is an unsettled legal issue of whether §

362 provides an independently sufficient basis for extending the automatic stay to non-debtor

entities or whether § 105 (or a court's inherent powers) must be relied upon in extending the stay.

(PI Order at 11; Opp. at 27-28.)  Importantly, the Court concluded that "the proper *procedure* for

getting there under each basis [of §§ 105 and 362] employs different methodologies and, thus,

cannot be brushed aside as semantics."  (PI Order at 11.)

The Debtor argues that a conclusive identification of the source of authority is academic

because the Court concluded that extension of the stay would be appropriate under either statute.

(Opp. at 28.)  But this does not eliminate the legal question, which has important practical effects.

*First,* this question determines the stricture with which the inquiry into extension of the

automatic stay must proceed.  If § 362 applies, the predicate for "unusual circumstances" must be

strictly adhered to, but if § 105 applies, the inquiry includes the familiar elements for injunctive

relief.  The source of authority for extending the stay is far from academic.  If the Third Circuit

concludes the stay is not authorized under § 362 (because, for example, the "identity of interest"

test cannot be met where J&J faces independent liability), or if it concludes this Court's reasoning

with respect to § 105(a) erroneously assumed the availability of a channeling injunction under §

524(g), then the Court of Appeals would need to consider the source of authority for extending the

stay.

*Second*, this question clarifies the standard of review on appeal: if § 362 applies, the appeal

is a "core" proceeding under 27 U.S.C. § 157(b)(1), subject to a "clearly erroneous" standard under

28 U.S.C. § 158(b); if § 105 applies, it is a non-core proceeding which must be reviewed *de novo* by the higher court.  27 U.S.C. § 157(c)(1); Fed. R. Civ. P. 9033.

*Finally,* this question affects whether the stay will automatically apply to *new* litigations against indemnitees of the Debtor who are not listed as Protected Parties.  If § 105 is the sole authority for the stay, then the procedure in Paragraph 4 of the PI Order applies.

Considering the numerous practical implications of the legal question raised by the Court concerning the source of authority for extending the automatic stay to non-debtors, the Court should certify the preliminary injunction decision and order for direct appeal to the Third Circuit.

### 3.      The Debtor Is Wrong in Arguing the PI Order Presents No Legal Questions

The Debtor also argues that the PI Order does not warrant certification because the Court simply "identifies controlling law and then applies it to the facts of this case." (Opp. at 27.)  Even apart from the issues already identified, the Debtor's characterization of the PI Order is demonstrably incorrect.  For example, the Debtor contends this Court made factual findings that Old JJCI agreed to indemnify J&J for talc products liability claims.  But this Court's holding in that regard rested on legal determinations regarding the proper interpretation of the 1979 Transfer Agreement.  (PI Order at 24-30); *see also Tamarind Resort Assocs. v. Gov't of V.I.*, 138 F.3d 107, 110 (3de Cir. 1998) (holding that disputes involving interpretation of unambiguous contracts "are resolvable as a matter of law").  This Court pointed to the assumption agreement in *Bouton v. Litton Indus., Inc.*, 423 F.2d 643 (3d Cir. 1970) even though it was different from the 1979 Transfer Agreement because it contained broad language referring to "all liabilities and obligations . . . in respect of the contracts and commitments referred to in paragraph (f) of Section 3, and all other contracts and commitments entered into in the regular and ordinary course of . . . business at any

time." *Id*. at 648.  In short, the Court's determination that Old JJCI assumed J&J's talc-related liabilities was a legal conclusion appropriate for appellate resolution.

Similarly, this Court decided that it could rely on disputed Johnson & Johnson insurance policies in granting relief to non-debtor parties, even though the Court itself acknowledged that "[a]dmittedly, certain coverage is disputed, and no definitive determination has been made as to exhaustion" (PI Order at 43), and "[a]dmittedly, the record in the instant case is not as sufficiently developed with respect to the insurance policies as in some of the other cases that have extended the stay on this basis." (*Id*. at 45.)  In *Robins*, by contrast, the Fourth Circuit noted that the insureds' status was "undisputed on the record," and "the record and the limited fund available under Robins' insurance policy is recognized in the record."  788 F.2d at 1008.  This Court further ruled that it could grant sweeping relief to non-debtor retailers based on Tender Agreements not clearly documented in the record.[9]

And this Court also reached the legal conclusion that extending relief to non-debtor entities was necessary under the legal principles of *res judicata*, collateral estoppel, and "record taint." *Compare Pacor, Inc. v. Higgins*, 743 F.2d 984, 995 (3d Cir. 1984) (concluding that outcome of asbestos litigation involving non-debtor entity would "in no way bind [Debtor] Manville, in that it

---

[9] Other courts have held that "the mere existence of an indemnity clause alone has never been deemed sufficient to justify staying the case as to a non-debtor defendant." *Mims v. Wal-Mart Stores, Inc*., No. 1:12-CV-244, 2012 WL 12893691, at *4 (N.D. Ala. Apr. 13, 2012) (citation and internal quotation marks omitted). *See also Aerologistics Inv. Partners, LLC v. Cessna Aircraft Co*., No. 5:10-CV-92, 2011 WL 3444149, at *3 (W.D.N.C. Aug. 8, 2011) (showing of "absolute indemnity" required); *Doyle v. Fleetwood Homes of Va., Inc*., No. 2:08-1442, 2009 WL 1210697, at *2 (S.D.W.Va. Apr. 30, 2009) ("even if CMH Homes and Vanderbilt may be entitled to contribution or indemnification from [the debtor], they have not offered any evidence that they would be entitled 'to absolute indemnity by the debtor'") (quoting *Robins*, 788 F.2d at 1000)).

could not determine any rights, liabilities, or course of action of the debtors. Since Manville is not

a party to the Higgins-Pacor action, it could not be bound by res judicata or collateral estoppel").[10]

The Debtor is wrong in contending that these rulings involve application of controlling

precedent to the facts of this case. All of these rulings are legal determinations that should be

subject to prompt appellate resolution.

### C.    Both Appeals Involve Matters of Public Importance

As the Debtor itself has acknowledged, "[t]he costs and ramifications of this litigation are

enormous." (*Debtor's Opp. to Mot. to Dismiss* (ECF 956) at 7.) Both appeals plainly involve

matters of public importance. They concern one of the most prominent and successful companies

in the world, with a market capitalization in the hundreds of billions of dollars. They involve the

fate of thousands of terminally ill tort claimants and their ability to vindicate their claims before

juries of their peers. More fundamentally, this case is also a test for whether a corporate enterprise

can unilaterally restructure itself to create a well-funded special-purpose entity whose assets

exceed its liabilities (and is therefore able to satisfy its liabilities without availing itself of

bankruptcy), with the sole purpose of cabining and limiting its tort liability. (*See* Movants' Ex.

1.52.) Naturally, the public is watching this case; as the Court recognized, the case is proceeding

"under a microscope." (Nov. 18, 2021 Hr'g Tr. at 114:24-25.)

The Debtor argues that for a matter of public importance to support certification under

§ 158(d)(2), it must involve a question of law that transcends the litigants. (Opp. at 19-20.) But

this case surely does, as shown in Parts I.A. and I.B, *supra*. In any event, the Debtor's position on

---

[10] *See also In re Metal Ctr., Inc.*, 31 B.R. 458, 463 (Bankr. D. Conn. 1983) ("the debtor would not be bound by any judgment [the creditor] might obtain against [the co-debtor] in state court, and consequently, [the co-debtor] is not protected by the automatic stay"); *In re MCSi, Inc.*, 371 B.R. 270, 275 (S.D. Ohio 2004) ("[T]his concern [about collateral estoppel] has never been the sole justification for extending the stay as to such co-defendants. This should scarcely be surprising, given the general inevitability of common issues arising as to co-defendants in a lawsuit with common causes of action as to the various co-defendants.").

the law is wrong.  While the presence of a transcendent legal issue can establish public importance, courts also recognize an "alternative basis for certification on the public importance prong where resolution of the issue has 'important practical ramifications.'"  *Polk 33 Lending, LLC v. THL Corp. Fin., Inc.* (*In re Aerogroup Int'l, Inc.*), No. 19-648, 2020 WL 757892, at *5 (D. Del. Feb. 14, 2020) (quoting *WestLB AG v. Kelley*, 514 B.R. 287, 293 (D. Minn. 2014) and *In re Qimonda AG*, 470 B.R. 374, 386 (E.D. Va. 2012)).  This "alternative basis" rests on the plain text of § 158(d)(2), which provides that the presence of a matter of public interest is an independent basis for certification.

The Debtor attempts to minimize the stakes of the matters at hand, arguing that no party is suggesting "any imminent or even likely need of Debtor to invoke the Funding Agreement to its maximum amount or anything close to it."  (Opp. at 22.)  Of course, this statement is an opportunistic reversal of the very arguments and evidence the Debtor has presented throughout this case.  The Court found that the Debtor was in financial distress based on the Debtor's apocalyptic presentation at trial, which included both fact and expert testimony and convinced the Court that the burden of the talc litigation was an existential threat to the continued viability of "all J&J companies," based on tens of thousands of outstanding tort cases with thousands more expected to be filed each year, multi-million dollar or multi-billion dollar verdicts, and basic multiplication.  (MTD Order at 36.)  Indeed, the Debtor reiterated these points earlier in the same opposition brief to this Motion.  (*See* Opp. at 12.)  The Court took these projections seriously, repeatedly cited these figures and projections in its ruling, and was convinced that the burden on Johnson & Johnson and Old JJCI of litigating these cases would be "horrific," potentially resulting in "forced liquidation of New JJCI to tap into its enterprise value of $61 billion," with attendant

"disruption and economic harm to "thousands of employees, customers, vendors, and shareholders." (MTD Order at 35.)

These figures dwarf the amount at stake in *Nortel Networks*, a case the Debtor acknowledges (Opp. at 21) qualified for direct certification based on the amount in controversy, even in the absence of an unsettled legal issue. *See Nortel Networks Inc. v. Ernst & Young Inc. (In re Nortel Networks Inc.)*, No. 15-196, 2016 WL 2899225, at *4 (D. Del. May 17, 2016) ("Even standing alone, this sole fact [the existence of $7.3 billion in Escrow Funds] could be sufficient to render the overarching issue presented in these appeals . . . a matter of vital public importance"); *see also Bank of New York Trust Co. v. Official Unsecured Creditors' Committee (In re Pac. Lumber Co.)*, 584 F.3d 229, 242-43 (5th Cir. 2009) (certifying direct appeal based on novel issue presented in connection with reorganization of $1 billion in debt). The Debtor contests the relevance of *Nortel Networks*, arguing that it involved unique facts that heightened the need for an expeditious resolution, including the possibility that the estate's limited assets would be lost to professional fees in ongoing litigation. (Opp. at 21.) But here, the need for expeditious resolution is even more pressing: TCC II's constituents are suffering from mesothelioma, a horrific disease with a bleak prognosis (as acknowledged by the Court (MTD Order at 55)) that makes it unlikely many of them will survive to see their cases tried unless the MTD Order is reversed on appeal.

The Debtor's use of the Texas divisional merger statute to commence this bankruptcy also heightens the public importance of this case. (Mot. at 16-17.) In opposition, the Debtor acknowledges that the use of that maneuver raises important questions of bankruptcy policy. (Opp. at 16.) In particular, this appeal raises the question of whether a financially healthy corporate enterprise can voluntarily restructure itself to create a special purpose vehicle whose assets exceed its liabilities, and then send that vehicle into bankruptcy for the sole purpose of segregating the

enterprise's tort liability.  (*See* Movants' Ex. 1.52.)  The Third Circuit should have the opportunity to consider this issue as soon as possible.

The Debtor also attempts to minimize the clear public interest in this case, asserting that the hearings on Capitol Hill, public outrage at Johnson & Johnson's machinations, and academic criticisms of its strategy have all been "generate[d]" by "plaintiffs' lawyers."  (Opp. at 23.)  But the public interest and outrage from lawmakers transcends political affiliation and cannot be dismissed as mere PR: at a hearing last month before the U.S. Senate Subcommittee on Federal Courts, Oversight, Agency Action, and Federal Rights, the Subcommittee's Chair, Democratic Senator Sheldon Whitehouse of Rhode Island, noted the Texas Two-Step appeared to be a "trick of corporate law to hide assets in plain view, with courts' connivance."[11]  At the same hearing, the Subcommittee's Ranking Member, Republican Senator John Kennedy of Louisiana, also expressed considerable interest in the propriety of the Texas Two-Step and under what circumstances might a bankruptcy petition of a "PoorCo" constitute bad faith.  *Id.*  Even the Texas lawmakers who drafted and presented the original bill creating the Two-Step have recently criticized its application in this case, with the bill's original author saying, "[s]hame on J&J for trying to evade its liabilities for products it sold with its golden stamp of approval for safety."[12]

As this bipartisan legislative interest reflects, the Debtor's voluntary restructuring and creation of a special-purpose vehicle are of paramount public interest.  Global media outlets such

---

[11] Abusing Chapter 11: Corporate Efforts to Side-Step Accountability Through Bankruptcy: Hearing Before the Subcomm. On Federal Courts, Oversight, Agency Action, and Federal Rights, 117 Cong. (2022).

[12] Jamie Smyth, *Architects of 'Texas two-step' Lambast J&J for its use of the Manoeuvre*, FINANCIAL TIMES, Feb. 14, 2022.

as Bloomberg,[13] Reuters,[14] and the Wall Street Journal,[15] among countless others, have extensively reported on this case and its important issues, including its implications for whether other major companies will follow Johnson & Johnson's lead and attempt to cabin their tort exposure through controlled bankruptcies.  The Debtor's suggestion that the tort plaintiffs' bar manufactured this publicity is implausible.

This sustained interest transcends a particular subset of the public or even a particular industry.  It reflects a general awareness that a major company has unilaterally implemented a corporate restructuring which, if blessed by the courts, will have far-reaching implications for the resolution of mass torts in America.  For this reason, *Sabine Oil & Gas Corp. v. HPIP Gonzales Holdings, LLC (In re Sabine Oil & Gas Corp.)*, 551 B.R. 132, 141-42 (Bankr. S.D.N.Y. June 15, 2016), cited by the Debtor (Opp. at 23), is distinguishable.  *Sabine* involved an appeal from the court's ruling interpreting certain private-party contracts in the oil and gas industry, and the party seeking certification had no basis to believe the ruling would affect non-parties, let alone members of the general public.

Finally, the Debtor cites *In re General Motors Corp.*, 409 B.R. 24, 26-27 (Bankr. S.D.N.Y. 2009) as a supposed example of a case involving an equally prominent large American company that was not certified directly to the Court of Appeals.  The *General Motors* court appears to have misread § 158(d)(2) as requiring the *question of law* to involve a matter of public importance, as discussed above (*see* Point I.C, *supra*).  This reading cannot be squared with the text of the statute,

---

[13] Steven Church, *J&J Bankruptcy Ploy Must be Dismissed, Cancer Victims Tell Judge*, BLOOMBERG, Feb. 16, 2022.

[14] Dan Levine & Mike Spector, *Inside J&J's Secret Plan to Cap Litigation Payouts to Cancer Victims*, REUTERS, Feb. 4, 2022.

[15] Jonathan Randles, Profitable Companies Enlist Bankruptcy Courts to Sidestep Cancer Trials, THE WALL STREET JOURNAL, Feb. 8, 2022.

nor its interpretation by courts in this Circuit.  *See, e.g.*, *Polk 33 Lending, LLC*, 2020 WL 757892, at *5.[16]

### D.    Certification of Both Appeals Will Materially Advance the Case

The Court has recognized that an appeal is inevitable.  (MTD Order at 13 (acknowledging that "there is no expectation that this decision will be the final word on the matters.").)  In light of the significance of the legal questions, the magnitude of the controversy, and the broader policy implications, this case will ultimately arrive at the Court of Appeals.  It is in the parties' interest— and the interest of judicial efficiency—that this occur as quickly as possible.

Concerning the MTD Order, the Debtor argues that the District Court should have the opportunity to further refine the issues before the Court of Appeals is asked to do so, touting the District Court's "familiarity with the talc litigation."  (Opp. at 26.)  But the Debtor previously opposed withdrawing the reference to the District Court because, *inter alia*, the District Court supposedly *lacked* familiarity with the bankruptcy issues at stake in the litigation.  (*LTL Opp. to Mot. to Withdraw the Ref.* at 24, No. 3:21-CV-20252 (FLW-LHG) (D.N.J. Dec. 20, 2021) (ECF 14).)  In light of this prior position, the Debtor's argument appears to be disingenuous.

The Debtor argues that the "material advancement" prong requires some anticipated benefit of skipping District Court review other than mere expedience.  (Opp. at 24 (citing *Polk 33 Lending*, 2020 WL 757892, at *4).)  But *Polk 33 Lending* denied certification of an appeal from the Bankruptcy Court's allocation of proceeds of an asset sale; the party opposing certification argued

---

[16] In any event, *General Motors* involved very different circumstances from those at issue here.  There, the very successor liability question the plaintiffs sought to certify for immediate appeal had already been decided by the Second Circuit in a companion case.  *See In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) and 405 B.R. 79 (Bankr. S.D.N.Y. 2009)*, aff'd for substantially the reasons stated in the opinions below*, No. 09-2311-bk (2d Cir. June 5, 2009), *temporary stay vacated and further stay denied*, 129 S.Ct. 2275 (Mem.) (June 8, 2009).  The "question of law" underlying the motion for certification had therefore already been authoritatively resolved by the Court of Appeals.  *See* 409 B.R. at 28 ("deciding it again is not a matter of public importance").

convincingly that "the underlying bankruptcy cases are proceeding regardless of this appeal," and "the appeal will have no bearing on the current and limited administration of the underlying bankruptcy." 2020 WL 757892, at *4. Here, the appeal will decide whether this bankruptcy should proceed at all, a threshold question that should be answered as quickly as possible.

No purpose would be served by engaging in another round of duplicative briefing and argument before the District Court. So long as this appeal is pending, the bankruptcy proceeding is subject to significant uncertainty, impacting every aspect of the case, including, most importantly, the negotiations between the Debtor and its creditors over a possible plan of reorganization. *See CALPERS v. City of San Bernardino, California (In re City of San Bernardino, California)*, 260 F.Supp.3d 1216, 1226-27 (C.D. Cal. Dec. 13, 2013) ("Given that dismissal of the petition is a possible outcome, which would result in the termination of this litigation, the Court finds the [material advancement] factor satisfied").[17]

The Debtor argues that the appeal will not materially advance the case, citing the Court's alternate holding that *even if* the Debtor had filed the proceeding in bad faith, "unusual circumstances" would preclude dismissal of the bankruptcy under 11 U.S.C. § 1112(b)(2). (Opp. at 26-27 (citing MTD Order at 13 n. 8).) According to the Debtor, this alternate holding "effectively moots" the appeal. (*Id.*) But the alternative holding raises the novel legal question of what "unusual circumstances" would suffice to warrant declining to dismiss a bankruptcy proceeding even in the face of bad faith by the Debtor. To the extent the Debtor seeks to rely on

---

[17] The Debtor disputes the relevance of *In re City of San Bernardino*, noting that the Court's discussion of the material advancement factor related to its decision to grant leave to appeal rather than certification (Opp. at 25 n. 17), but as explained in that case, in deciding whether to grant leave to appeal, the Ninth Circuit "look[ed] to the standards set forth in 28 U.S.C. § 1292(b)." 260 F.Supp.3d at 1222-23. Those standards include the same factors at issue in this motion, including whether the appeal will materially advance the litigation.

the Court's footnote to defend this proceeding, this legal question provides an *additional* reason to certify the appeal.

Certification of the appeal from the PI Order will also materially advance the case. The two appeals are practically interconnected and involve overlapping issues. Even the Debtor acknowledges that the PI Order rests upon the holding of the MTD Order—that the bankruptcy was filed in good faith. (Opp. at 32 (quoting PI Order at 18).) The Orders also share certain fundamental legal questions—such as the availability of a § 524(g) injunction (which this Court assumed as part of its analysis under § 105(a)), and the legal effect of the 1979 agreement on obligations with the Johnson & Johnson family. Practically speaking, the Orders arise from the same record and same proceeding. It makes sense to obtain a prompt authoritative resolution of both orders in the Third Circuit, rather than splitting up the Orders and putting them on different tracks. It will be more efficient for the Court of Appeals to address these questions at the same time.

Further, as with the MTD Order, an immediate appeal of the PI Order will assist in removing substantial uncertainty from this case. Even if the MTD Order were to be affirmed, if the PI Order were reversed, the dynamics of the case would change substantially, and many tort claimants—including TCC II's terminally ill constituents—would be able to pursue their tort claims in state court.

## CONCLUSION

For the reasons stated herein, and in the Motion, TCC II and the Individual Movants respectfully request that this Court certify direct appeal to the Third Circuit of the PI Order and the MTD Order pursuant to 28 U.S.C. § 158(d)(2)(A)-(B).

Date: March 28, 2022                    Respectfully submitted,

**SHERMAN, SILVERSTEIN,**
**KOHL, ROSE & PODOLSKY, P.A.**


By: /s/ Arthur J. Abramowitz
      Arthur J. Abramowitz
      Ross J. Switkes
      Sherman, Silverstein,
      Kohl, Rose & Podolsky, P.A.
      308 Harper Drive, Suite 200
      Moorestown, NJ 08057
      Tel: (856) 662-0700
      aabramowitz@shermansilverstein.com
      rswitkes@shermansilverstein.com

*Local Counsel to the*
*Official Committee of Talc Claimants II*

**WEITZ & LUXENBERG, P.C.**

/s/ Lisa Nathanson Busch
Lisa Nathanson Busch
700 Broadway
New York, NY 10083
Tel: (212) 558-5500
lbusch@weitzlux.com

*Counsel to Patricia Cook*

**LEX NOVA LAW, LLC**

/s/ E. Richard Dressel
E. Richard Dressel
10 E. Stow Rd., Suite 250
Marlton, NJ 08053
Tel: (856) 382-8550
rdressel@lexnovalaw.com

*Counsel to Evan Plotkin and Giovanni Sosa*

**LEVY KONIGSBERG LLP**

/s/ Jerome H. Block
Jerome H. Block
605 Third Avenue, 33rd Floor
New York, NY 10158
Tel: (212) 605-6200
jblock@levylaw.com

*Counsel to Randy Derouen*

**MAUNE RAICHLE**
**HARTLEY FRENCH & MUDD LLC**

/s/ Suzanne M. Ratcliffe
Suzanne M. Ratcliffe
150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922
sratcliffe@mrhfmlaw.com

*Counsel to Katherine Tollefson and Jan*
*Deborah Michelson-Boyle*

**KARST & von OISTE, LLP**

/s/ David A. Chandler
David A. Chandler
505 Main Street
Port Jefferson, NY 11777
Tel: (855) 970-9988
dac@karstvonoiste.com

*Counsel to Tonya Whetsel, as estate
representative of Brandon Whetsel*

**SAIBER LLC**

/s/ John M. August
Marc E. Wolin
John M. August
18 Columbia Turnpike, Suite 200
Florham Park, NJ 07932
Tel: (973) 622-8401
mwolin@saiber.com
jaugust@saiber.com

**KAZAN, MCCLAIN, SATTERLEY &
GREENWOOD**
Steven Kazan (*pro hac vice*)
Joseph D. Satterley (*pro hac vice*)
Jack London Market Building
55 Harrison Street, Suite 400
Oakland, CA 94607
Tel: (510) 302-1005
skazan@kazanlaw.com
jsatterley@kazanlaw.com

*Counsel to Kristie Doyle, as estate
representative of Dan Doyle*