| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Matthew I.W. Baker, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>mbaker@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Local Counsel to the Official Committee of Talc Claimants I* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael S. Winograd, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>Seven Times Square<br>New York, NY 10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>Sharon I. Dwoskin, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>sdwoskin@brownrudnick.com<br>One Financial Center<br>Boston, MA 02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Co-Counsel for the Official Committee of Talc Claimants I* |
| **OTTERBOURG PC**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 905-3628<br>Fax: (212) 682-6104<br>*Co-Counsel for the Official Committee of Talc Claimants I* | **PARKINS LEE & RUBIO LLP**<br>Lenard M. Parkins, Esq.<br>Charles M. Rubio, Esq.<br>lparkins@parkinslee.com<br>crubio@parkinslee.com<br>Pennzoil Place<br>700 Milan St., Suite 1300<br>Houston, TX 77002<br>Tel: (713) 715-1666<br>*Special Counsel to the Official Committee of Talc Claimants I* |

| | |
|---|---|
| In Re:<br><br>**LTL MANAGEMENT, LLC,[1]**<br><br>Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Honorable Michael B. Kaplan |

## REPLY OF OFFICIAL COMMITTEE OF TALC CLAIMANTS I
## IN SUPPORT OF REQUEST FOR ORDER CERTIFYING DIRECT APPEAL

To argue, as the Debtor does, that these appeals do not involve a matter of public importance is farcical. The same is true of the Debtor's efforts to wish-away the multiple other statutory criteria that likewise require this Court to provide the Third Circuit with the opportunity to determine for itself whether to accept these appeals directly. This is a landmark case that will determine the permissibility of a new lawyer-devised tactic that would allow the use of a Texas statute to cherry pick specific liabilities of a company for bankruptcy, while leaving that company's assets, operations, and other liabilities out of bankruptcy (and the Bankruptcy Court's supervision) and under the continued control of management.

For that very reason, as the Court has acknowledged, this case has gripped the "public, media, government regulators, [and] policy makers." Op. at 48. It has prompted active involvement from academia. It has even been the subject of congressional hearings that may well lead to new legislation specifically to address the issue at the very heart of these appeals. The remarkable scope and volume of this public attention (and action) concerning the permissibility of the Texas Two Step scheme reflects the undeniable reality that the ultimate ruling in this case will

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

2

have a broad impact far beyond the confines of this case and its litigants. It will reach into corporate boardroom strategy sessions, affect (if not create new) bankruptcy jurisprudence and law, and dictate how current and future tort victims may pursue relief for their harm.

The North Carolina bankruptcy court in this case acknowledged as much in its Transfer Order, noting: "There is no reason this Court should be the only bankruptcy court to have the opportunity to weigh in on these novel issues, especially considering that the 'Texas Two Step' tactic is being employed by national corporations and impacts tens of thousands of present and future claimants across the country." Dkt. 416, at 11. Several speakers during the congressional hearings on this very issue echoed that. The Debtor's counsel has already made an industry of implementing this scheme well beyond this case.

The Debtor's circular arguments and philosophical sophistry in its Objection (Dkt. 1835) as to what is a question of law as opposed to fact (if even relevant) is no more than an effort to distract from what is otherwise clear: the Request seeks clean legal rulings based on the facts as determined by the Court or over which there is no dispute and for which there is no controlling law. Simply put, the primary issue on appeal is not to determine the facts related to the newly devised Texas Two Step scheme, but rather how the law should treat it. As set forth below, the Third Circuit (and Supreme Court) have expressly held that is a question of law.

Moreover, there is no question that direct appeal will materially advance the progress of this case. The Debtor does not deny that a reversal here could end this case. But it argues that something more is needed: that Appellants must show something "extraordinary or urgent" about the situation here. Obj. at 25. While that is not correct, as explained below, it is in any event hard to imagine anything more extraordinary *and* urgent than a case worth tens of billions of dollars, arising from the use of a "ubiquitous" household product, with tens of thousands of victims

3

suffering — many dying — from cancer while awaiting the outcome of their claims. Moreover, as to any mediation, expedition of the appeals on a parallel track would only facilitate the mediation process and make fruitful negotiation more likely.

The Court has made clear it does not expect to be the "final word on the matters." The Third Circuit should and will weigh in on these appeals. It should be given the opportunity to do so sooner rather than later.

## I. THE MTD OPINION AND ORDER

The Debtor does not dispute that certification of both final and interlocutory orders is mandatory if any one or more of four statutory criteria enumerated in Section 158(d)(2)(A) are satisfied. Here, the Request satisfies *at least three* of those criteria. The Debtor does not — and cannot — credibly argue otherwise as to any of those criteria, much less all of them.

### A. It Is Beyond Cavil that this Appeal Involves a Matter of Public Importance

The Debtor contends that there is no question of public interest here because the appeals "involve no question of law" and do not "'transcend' the parties in this bankruptcy case." Obj. at 20-21. It is wrong on both counts.

#### 1. The appeals involve questions of law

As an initial matter, unlike two of the four enumerated criteria, the "public importance" prong makes no mention of requiring a "legal question." 28 U.S.C. § 158(d)(2)(A)(i) (order must "involve[ ] matter of public importance). In contrast, for example, a different prong in that same subsection requires that the order "involve[ ] a question of law as to which there is no controlling decision." Id.; see also In re Millennium Lab Holdings II, LLC, 543 B.R. 703, 708 (Bankr. D. Del. 2016) ("subpart (i) sets forth two separate benchmarks for certification").

Nevertheless, to the extent relevant to this criterion (as it is to the next one, addressed below), the appeals involve questions of law. The Request seeks clean legal rulings on the application of law to facts as determined by the Court or over which there is no dispute. See Black's Law Dictionary (11th Ed. 2019) (defining "question of law" as "1. An issue . . . concerning the application or interpretation of the law"); Guerrero-Lasprilla v. Barr, 140 S. Ct. 1062, 1068 (2020) ("the term 'questions of law'" includes "the application of a legal standard to settled facts. Indeed, we have sometimes referred to whether a given set of facts meets a particular legal standard as presenting a legal inquiry. Do the facts alleged in a complaint, taken as true, state a claim for relief under the applicable legal standard?"); Joe v. Attorney Gen. U.S., 2022 WL 604038, at *2 (3d. Cir. Mar. 1, 2022) ("the phrase 'questions of law' includes the application of a legal standard to undisputed or established facts") (quoting Guerrero-Lasprilla).

Most notably, the primary issue on appeal is not to determine the facts related to the newly devised Texas Two Step scheme, but rather how the law should treat it — both in this case and beyond. In other words, the appellate court will decide whether creating and filing into bankruptcy a special purpose entity in order to isolate specific liabilities of a company, while its assets and other liabilities remain outside of bankruptcy (and the Bankruptcy Court's supervision) and under the continued control of management is a good faith filing. This plainly involves a question of law. The Third Circuit itself has made that clear: "The determination of whether the basic and inferred facts of a case support the conclusion of good faith in the filing of a Chapter 11 bankruptcy petition, *i.e.*, whether the application of law to fact was proper, is reviewed as an ultimate fact and is subject to plenary review *because it is, essentially, a conclusion of law*." In re 15375 Mem'l Corp. v. Bepco, L.P., 589 F.3d 605, 616 (3d Cir. 2009) (emphasis added) (citation omitted).

5

The Request also seeks direct appeal of additional legal questions, including, for example, (i) whether it is proper to impute the financial condition of a non-debtor with different assets and liabilities to a debtor for purposes of determining whether the debtor is in financial distress, (ii) whether Section 524(g) is available where the debtor is not a named defendant in the underlying litigation; and (iii) whether a Bankruptcy Court is permitted to consider its view on the relative merits of the bankruptcy and tort systems in determining whether a debtor's petition, which would have tens of thousands of mass tort cases removed from the victims' venues of choice, was filed in good faith. The Third Circuit need not conduct a review of the factual record in order to reach these legal issues either because, again, in each case the question is of the application of the law to facts as determined by the Court or over which there is no dispute. That the questions raised in this Request are legal is further evident by the reality that their impact will extend far beyond the litigants, facts, and circumstances of this case. Indeed, as discussed in the next section, that is the crux of the inquiry as to this criterion. Infra Section I.A.2.

### 2.    Issues on appeal here transcend this case

At the heart of whether an issue on appeal involves a matter of public importance is whether it involves an issue that "transcends" this case and these parties and will "advance the cause of jurisprudence to a degree that is usually not the case." In re Nortel Networks Inc., 2010 WL 1172642, at *2 (D. Del. May 17, 2016). To suggest that is not the case here is absurd. By all accounts, this is a landmark case that will determine the permissibility of a new lawyer-devised tactic that would allow the use of a Texas statute to cherry pick specific liabilities for bankruptcy in federal court, while leaving assets and other liabilities out of bankruptcy and under the continued control of management.

The sheer volume, scope, and fervor of the attention given to this case by Congress, both legal and mainstream media alike, and academia would seem to answer that question. The Court itself has readily acknowledged the swirl this case has created amongst the "public, media, government regulators, [and] policy makers." Op. at 48. In fact, it is not just attention that this case has attracted, but action: Congress has held hearings on this case and is considering legislation to prevent companies from implementing the very Texas Two Step scheme at issue here in the future. See Nondebtor Release Prohibition Act of 2021, H.R. 4777, 117th Congress (2021); Congressional Hearing, Feb. 8, 2022, available at https://www.c-span.org/video/?517788-1/hearing-corporate-bankruptcy-laws.

This remarkably intense and widespread public reaction is a testament to the undeniable reality that the ultimate ruling in this case will have a broad impact far beyond the confines of this case and its litigants. It will reach into corporate boardroom strategy sessions, affect (if not create new) bankruptcy jurisprudence and law, and dictate how current and future tort victims may pursue relief for their harm.

The prior court in this case, in North Carolina, expressly acknowledged the reach of the issues here in its Transfer Order: "There is no reason this Court should be the only bankruptcy court to have the opportunity to weigh in on these novel issues, especially considering that the 'Texas Two Step' tactic is being employed by national corporations and impacts tens of thousands of present and future claimants across the country." Dkt. 416, at 11. Judge Judith Fitzgerald (among many others) echoed that point at the Senate Hearing concerning, as she put it, the Senate's "work on issues related to the abuse of bankruptcy and the impact of divisive mergers." Senate Judiciary Subcomm. Hr'g (Feb. 8, 2022), available at https://www.c-span.org/video/?517788-1/hearing-corporate-bankruptcy-laws, at 11:54. As Judge Fitzgerald noted, "problems and

possible abuse arise" when "the corporate division separates out all of the troublesome liabilities into one company that I refer to as BadCo and puts the vast majority of the valuable assets into another company that I call GoodCo and then BadCo files bankruptcy and GoodCo does not." Id. None of these concerns are specific or confined to this case. Rather, the decision on appeal will impact cases, boardrooms, and victims far beyond this case, as well as the industry the Debtor's counsel has built on this new scheme — an industry that already extends beyond this case.

The Debtor cites to holdings in two cases to seek to minimize the import of the enormous attention that has been directed to this case. Obj. at 23. But those cases offer little refuge. In fact, they further support certification here. In In re Sabine Oil & Gas Corp., the court simply held that the fact that there were "news articles" about the case did not, by itself, elevate the issue (which involved whether specific covenants in private midstream agreements created real property interests) to one of public importance. 551 B.R. 132, 140-41 (Bankr. S.D.N.Y. 2016). This case, by contrast, has garnered far more than "news articles," and that is because unlike the issue in In re Sabine, the issue here centers around the widespread implications of a new lawyer-created mechanism designed to end-run around the requirements of the bankruptcy code to the detriment of mass tort victims.

The Debtor's reliance on the GM case as a "telling example" is even more puzzling. In that case, when asked to certify its order approving a Section 363 sale, the court noted that while "GM's well-being is a matter of public importance," deciding the alleged question of law at issue in the case ("[w]hether successor liability can be imposed in Section 363 sales"), which had "already been decided by the [Second] Circuit," was not. 409 B.R. 24, 28 (Bankr. S.D.N.Y. 2009). Here it is the issues on appeal, not just the Debtor or its affiliate non-debtors, that have garnered the widespread attention and action. But perhaps more tellingly, years later in the same case, after

8

the sale of assets to "New GM" had occurred and New GM announced "serious defects in ignition switches" which prompted approximately 140 class actions seeking "$7 to $10 billion," the Bankruptcy Court in fact *did* find that whether the "free and clear" successor liability provisions under the sale order were still enforceable to be "a matter of considerable public importance" and certified the question directly to the Second Circuit. In re Motors Liquidation Co., 529 B.R. 510, 597-98 (Bankr. S.D.N.Y. 2015); see also In re Motors Liquidation Co., 829 F3d 135, 151(2d Cir 2016) (accepting direct appeal).

The issues raised on appeal other than those related to the Texas Two Step also include matters of public importance. For example, whether the Court's determination that the bankruptcy system provides a "more beneficial and equitable path" than the tort system for resolving mass tort liabilities may provide a "valid bankruptcy purpose" has wide ranging import. MTD Op. at 18-19. The Debtor argues that the Court's analysis on that issue was strictly limited to the facts of this case. Obj. at 14. But the Court's view that "[t]here is nothing to fear in the migration of tort litigation out of the tort system and into the bankruptcy system" (MTD Op. at 27) only reinforces the potentially broad impact of a decision that may have the practical effect of executing *sub rosa* tort reform.

In addition, both the size of the amount at stake and the practical ramifications of the decision constitute independent and alternative grounds for establishing public importance. The Debtor acknowledges that the public importance criterion may be satisfied where the order involves "'important practical ramifications' such as impacting 'a large number of jobs or other vital interest in a community.'" Omnibus Obj. at 20, quoting In re Aerogroup Inc., 2020 WL 757892, at *5, 1 Collier on Bankruptcy ¶ 5.06(4)(b) (16th ed. 2021). In In re Nortel Networks Inc., a $7.3 billion escrow "standing alone" rendered the issue on appeal "a matter of vital public

Document      Page 10 of 15

importance." 2016 WL 2899225, at *4. The Debtor does not address this in its Objection. Here, the verdicts to date are well into the billions and, according to the Debtor at trial, they may reach the trillions while pretrial defense costs alone it calculates would reach $190 billion. In addition, this case will have substantial practical ramifications for the tens of thousands of victims of J&J's products, including how they may obtain compensation for the harm caused by J&J's "ubiquitous" baby powder, as well as for future tort victims within and outside of this case. This is yet another basis to find what is otherwise obvious public importance of matters involved in the appeal.

### B.  There Is No Controlling Decision as to the Questions of Law at Stake here

The Debtor argues that controlling decisions exist as to the fundamental issue here because "all the Court did was apply existing law to the facts to determine that the use of the divisional merger statute *here* to create the Debtor in advance of its bankruptcy did not involve bad faith." Obj. at 15 (emphasis in original), 8-9. That argument is disingenuous, if not specious, and the Debtor does not, because it cannot, cite any caselaw to support it. See supra at 4-6.

There is no — and can be no — controlling Third Circuit or Supreme Court decision as to this central question of law on appeal because the three other cases in which the new lawyer-created Texas Two Step mechanism employed by the Debtor here has been implemented were all filed in the Western District of North Carolina.[2] Only one motion to dismiss for bad faith was

---

[2] See In re Bestwall, LLC, Case No. 17-31795; In re DBMP LLC, Case No. 20-30080; and In re Aldrich Pump LLC, Case No. 20-30608. In prior filings, the Debtor has raised two other similar cases: In re Garlock Sealing Techs. LLC, No. 10-31607 (Bankr. W.D.N.C.) and In re Paddock Enters., LLC, No. 20-10028 (Bankr. D. Del.). Both cases are inapposite, as neither comes from this Circuit or the Supreme Court. It is worth further noting that neither involved a motion to dismiss for bad faith, Paddock did not even involve a divisive merger, and Garlock-Coltec involved a consensual restructuring and did not release third parties from direct liability for tort claims.

filed in these cases, and that motion, decided under Fourth Circuit precedent, has risen no further than the non-binding Western District of Carolina Bankruptcy Court.

Moreover, the general Third Circuit case law on good faith filings are not, as the Debtor insists, "controlling decisions" on these issues. For the purposes of Section 158(d)(2)(A)(i), a "controlling decision . . . is one that admits of no ambiguity in resolving the issue." In re Tribune Media Co., 2016 WL 1451161, at *3 (D. Del. Apr. 12, 2016). None of the Third Circuit cases cited by the Debtor (Obj. at 8-9) resolve the fundamental question here without ambiguity. Indeed, none even address it. Nor could they, as the Texas Two Step maneuver at issue is brand new. So new (and troublesome) that it has prompted Congressional hearings that may lead to new law specifically to deal with the new scheme.

There will, however, be controlling law on the issue soon, once the Third Circuit weighs in on this case. And this Court is bound to allow the Third Circuit to decide for itself whether that should happen sooner rather than later.

The same is true for the subsidiary legal issues on which the Court's overarching ruling regarding the Texas Two Step scheme is premised, such as considering a non-debtor's financial condition in determining a debtor's financial distress, as well as the additional issue of whether it is permissible for a bankruptcy court to base its dismissal decision in part on its view of the relative merits of the bankruptcy and tort systems. The Debtor cites to no controlling Third Circuit or Supreme Court decision as to either of these. Obj. at 10-15. Rather, as to the former, it simply asserts general caselaw concerning the necessary financial condition of a company for *it*, not one of its affiliates, to file for bankruptcy. Obj. at 10-11 nn. 7-9. As to the latter, the Debtor notes only citations in the Court's Opinion relating to the aim of "preserv[ing] corporate value." Obj. at 14. None of those cases address the permissibility to deny a motion to dismiss based in part on

the Court's written views regarding the potential benefits of a "migration of tort litigation out of the tort system and into the bankruptcy system." MTD Op. at 27).

### C. Direct Appeal Would Materially Advance the Progress of this Case

The Debtor argues that the mere fact that a direct appeal will save time is not alone sufficient to satisfy the "material advancement" criterion because that would be true in all cases. Obj. at 24. It then seeks to add a new requirement that "movants must show why there is something 'extraordinary or urgent' about this situation" to satisfy this criterion. Obj. at 24 (citing In re Conex Holdings, LLC, 534 B.R. 606, 611 (D. Del. 2015)). But the case it cites for authority injects no such new sweeping requirement, but rather states simply in denying a request for certification that "there is nothing extraordinary or urgent about this situation that recommends departing from the standard appellate process." In re Conex Holdings, LLC, 534 B.R. at 611. Regardless of whether that amounts to an effort to set a new standard (it does not), it is hard to imagine anything more extraordinary *and* urgent than a case involving mass tort claims resulting from the use of a "ubiquitous" product seeking tens of billions of dollars with tens of thousands of victims suffering — many dying — from cancer while awaiting the outcome of their claims.

In any event, the Debtor does not deny that a reversal here could end this case. Obj. at 25. They argue, however, that accepting such a premise would apply to all denials to motions to dismiss. Obj. at 25. But that overlooks the point made by the Second Circuit in Weber in this regard: certification is warranted where the ruling "will essentially determine the result of future litigation," because "the parties adversely affected by the ruling might very well fold up their tents if convinced that the ruling has the approval of the court of appeals, but will not give up until that becomes clear"). Weber v. United States, 484 F.3d 154, 158 (2d Cir. 2007) (cited in Req. at 15). Indeed, the very threat of such an expedited ruling will no doubt aid in the effectiveness of any

mediation in this case. And while the Debtor contests the dispositive nature of the certainty of appeal here (Obj. at 25), it fails to address the cases cited in the Request suggesting otherwise (Req. at 16) and makes no effort to contest that, at the very least, the certainty of appeal here weighs in favor of certification.[3]

## II.    The Stay Opinion and Order

The Debtor tacitly acknowledges that if the MTD Opinion and Order is certified, so too must the PI Opinion and Order, which "builds" upon it. Obj. at 27. For the same reasons discussed above, the PI Opinion and Order must also be certified.

But because the Stay Opinion and Order is also based on grounds wholly independent from the MTD Opinion and Order, additional independent bases also exist that require certification of the Stay Opinion and Order. Specifically, as the Court itself acknowledged, the Stay Opinion and Order involves a clear and undeniable question of law for which there is no controlling decision from the Third Circuit or Supreme Court.

The Debtor concedes that an open issue of law exists as to from which statute the Court gets its authority to extend the automatic stay to non-debtors, but argues the issue of certification is moot because the Court rendered an opinion based on controlling decisions as to each potential source. Setting aside whether that assertion is accurate (it is not), it is of no moment here.

---

[3] The Debtor also suggests that any ruling on the good faith issue would be "effectively moot" because of the Court's alternative ruling that "unusual circumstances" exist. Obj. 26-27. But that alternative ruling itself is challenged on appeal, and also embeds multiple legal issues, including, for example: (i) whether a global observation about the relative merits of the tort and bankruptcy systems can ever qualify as an "unusual" circumstance present in just one case, protecting it from dismissal; and (ii) whether the Court erred as a matter of law by making a finding under Rule 1112(b)(2) without addressing several of its statutory prerequisites, including whether the Debtor has established that there is "a reasonable likelihood that a plan will be confirmed" within the appropriate timeframe. 11 U.S.C. § 1112(b)(2). In any event, once an order "involves" a matter that satisfies a Section 158(d) criterion, certification is mandatory. There is no basis to suggest the presence of additional bases for a decision somehow negate that. And the Debtor cites no authority for any such proposition.

The appeal must be certified if it "*involves* a question of law as to which there is no controlling decision of the court of appeals for the circuit." 28 U.S.C. § 158(d)(2)(A)(i) (emphasis added). Here the Court acknowledged that the source of its authority to extend the stay "remains unsettled" and will continue to "until the Third Circuit provides clearer guidance." Stay Op. at 11. As the Debtor acknowledges, the Court further noted that "because the end result is the same, the proper *procedure* for getting there under each basis employs different methodologies and, thus, cannot be brushed aside as semantics. Stay Op. at 11 (emphasis in original). As a result, the Court proceeded "to follow the framework established in the *In re Philadelphia Newspapers* line of cases" — a line of Pennsylvania district court cases, which believed the issue of the source of authority was academic, a point with which this Court noted it "disagrees" — to decide the Stay Motion. Stay Op. at 10-11. Taking the plain words of the certification statute together with the plain words of the Stay Opinion, the Court already has found that its "order . . . involves a question of law as to which there is no controlling decision of the court of appeals." 28 U.S.C. § 158(d)(2)(A)(i).

As to a second legal issue with no controlling decision — whether the Stay Motion is a "core" proceeding — the Debtor argues that "[h]ighly developed caselaw in the Third Circuit governs the extent of a bankruptcy court's 'core' jurisdiction." Obj. at 31. But that general observation misses the point. As this Court observed: "Although 'the Third Circuit has not addressed this precise issue, other courts have concluded that motions to extend an automatic stay and injunction to non-debtor third parties pursuant to sections 362 and 105 qualify as 'core' proceedings.'" Stay Op. at 13 (citation omitted). There is no controlling decision on this issue. And that is why the Court did not cite any in reaching its conclusion. Stay Op. at 14 (citing only to District Court opinion in this case on motion to withdraw reference).

Finally, the Debtor briefly asserts that the Original TCC's motion to withdraw the reference as to the Stay Motion is "at odds with the suggestion that the district court should now be eliminated entirely from the appellate process." Obj. at 26. It is not, and in all events it is again beside the point. In both cases, the motions aim(ed) to streamline the proceedings. And the familiarity the District Court has with this case has now been dwarfed by the proceedings that have taken place since that motion. Ultimately, while the wisdom of the District Court on the stay issue is clear, appeal to the Third Circuit is a certainty and time continues to be of the essence. Regardless, however, that is neither here nor there for purposes of this Request. The Court's requirement to certify is absolute provided, for example, the Stay Opinion and Order involves a question of law as to which there is no controlling decision. Because it does, certification is mandatory.

TCC I respectfully requests that the Court overrule the Objection and certify the MTD Opinion and Order and Stay Opinion and Order for direct appeal to the Third Circuit.

DATED this 28th day of March 2022

Respectfully submitted,

**GENOVA BURNS, LLC**

By: __/s/ Daniel M. Stolz_____
    Daniel M. Stolz, Esq.
    Donald W. Clark, Esq.
    dstolz@genovaburns.com
    dclarke@genovaburns.com
    110 Allen Road, Suite 304
    Basking Ridge, NJ 07920
    Tel: (973) 533-0777
    Fax: (973) 467-8126

*Local Counsel to the Official Committee of Talc Claimants I*