# Exhibit 3

Form 10
[Rule 3.25]

| | |
|---|---|
| COURT FILE NUMBER | 1901-11748 |
| COURT | Court of Queen's Bench of Alberta |
| JUDICIAL CENTRE | Calgary |
| PLAINTIFFS | Diane DiSanto, as Representative Plaintiff |
| DEFENDANTS | Johnson & Johnson, Johnson & Johnson Consumer Companies, Inc., and Johnson & Johnson Inc. |
| DOCUMENT | **STATEMENT OF CLAIM** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | Guardian Law Group LLP<br>Clint Docken, QC<br>342 – 4 Avenue S.E.<br>Calgary, Alberta T2G 1C9<br>Telephone: 403-457-7778<br>Facsimile: 877-517-6373<br><br>James H. Brown & Associates<br>2400, 10123 – 99 Street NW<br>Edmonton, Alberta T5J 3H1<br>Telephone: 780-428-0088<br>Facsimile: 780-428-7788 |

Clerk's Stamp
CLERK OF THE COURT
FILED
AUG 2 2 2019
CALGARY, ALBERTA

**A Class Proceeding pursuant to the Class Proceedings Act, S.A. 2003, C-16.5**

**NOTICE TO THE DEFENDANTS**

You are being sued. You are a defendant.

Go to the end of this document to see what you can do and when you must do it.

**STATEMENT OF FACTS RELIED ON:**

I. **PARTIES**

    A. **PLAINTIFF**

1. The proposed Representative Plaintiff, Diane DiSanto (the "Plaintiff"), is an individual residing in the Town of Cochrane, in the Province of Alberta (hereinafter referred to as the "Plaintiff").

## B. DEFENDANTS

2. The Defendant, Johnson & Johnson. ("J & J"), is a U.S. health care corporation that is engaged in the business of, either on its own or in conjunction with its subsidiaries, designing, developing, testing, manufacturing, licensing, assembling, distributing, importing and/or exporting, marketing, and/or selling their Talc based products within Canada. J & J's head office located in the City of New Brunswick, in the State of New Jersey, with the address One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J & J is the parent company of both Johnson & Johnson Inc. and Johnson & Johnson Consumer Companies, Inc.

3. The Defendant, Johnson & Johnson Consumer Companies, Inc. ("J & J CCI.") is a U.S. corporation and a subsidiary of J & J, with its principles place of business in New Brunswick, New Jersey. At all material times hereto, J & J CCI, either on its own or together with its parent company, J & J, and/or other subsidiaries of J & J was engaged in designing, developing, testing, manufacturing, licensing, assembling, distributing, importing and/or exporting, marketing, and/or selling their Talc based products within Canada.

4. The Defendant, Johnson & Johnson Inc. ("J & J Canada") is a Canadian corporation, validly incorporated under the *Canada Business Corporations Act*, with its headquarters in the City of Markham in the Province of Ontario. J & J Canada is a wholly owned subsidiary of Johnson & Johnson with its head office located at 88 McNabb Street, Markham, Ontario, L3R 5L2. At all material times hereto, J & J Canada, either on its own or together with its parent company, J & J, and/or other subsidiaries of J & J was engaged in designing, developing, testing, manufacturing, licensing, assembling, distributing, importing and/or exporting, marketing, and/or selling their Talc based products within Canada.

5. The Defendants herein shall hereinafter individually be referred to as "J & J", "J & J CCI", and "J & J Canada" respectively, and collectively as the "Defendants".

## C. CLASS

6. The proposed Class herein is defined as:

    (a) All women in Alberta or elsewhere in Canada who developed ovarian cancer from the use of the following Johnson & Johnson products:

        i.   Baby Powder; and
        ii.  Shower to Shower.

(b) All persons who, by reason of his or her relationship to a member of the Class, are entitled to assert derivative claims under any of the Dependants Statutes in Alberta or elsewhere in Canada as a result of the personal injury of such member of the Class (the "Family Class").

(c) The Class herein as so defined is hereinafter referred to as the "Class", and any individual member of the Class are hereinafter referred to as a "Class Member", and collectively as "Class Members".

### D. SERVICE EX JURIS

7. The Plaintiffs have sufficient facts and grounds to serve this Statement of Claim ex juris outside of Alberta on the Defendants and outside Canada on the Defendants, since there is a real and substantial connection between Alberta and the facts on which the claims in this action are based as outlined in this pleading, including without limitation to the following ground and facts:

   (a) The within claim arises out of and related to torts committed in Alberta;

   (b) The Plaintiff is a resident of Alberta;

   (c) The claim relates to a contract or alleged contract made, performed and breached in Alberta; and

   (d) The action relates to a breach of an equitable duty in Alberta.

## II. FACTS

### A. FACTS OF THE DEFENDANTS

8. J & J was founded in 1887 in New Brunswick, New Jersey, United States, by Robert Wood Johnson, James Wood Johnson, and Edward Mead Johnson. The Johnson brothers created their first products in 1886 and incorporated in 1887.

9. J & J is the world's largest healthcare company with an excess of 130,000 employees globally.

10. According to J & J's 2018 financial statement their worldwide sales to customers were about $81.581 billion with its gross profit being $54.490 billion and its net earnings being $15.297 billion.

### B. GENERAL FACTS

11. Talc is an inorganic clay mineral composed of hydrated magnesium silicate, which has a chemical formula of $Mg_3Si_4O_{10}(OH)_2$. It is one of the softest known minerals. Talc is often combined with cornstarch and is widely used as a baby powder. Talc is also used as a thickening agent and lubricant due to its softness. It is used in ceramics, paint and roofing material and is also one of the main ingredients in many cosmetic products.

12. Shower to Shower® is a mixture of talc and cornstarch, while Johnson's Baby Powder® is made mostly of talc, with the only other added ingredient being "parfum".

13. In or about 1983 Talc was put on the market in the U.S. and it became available in Canada soon thereafter. The Defendants have continually marketed Talc as a means of keeping skin cool, dry and comfortable. Talc is an astringent chemical that shrinks or constricts body tissue. The Defendants has also marketed refined Talc powder for its use as an astringent powder to prevent diaper rash. The defendants have previously marketed Talc for women to "use anytime you want skin to feel soft, fresh and comfortable." The Defendants have continually advertised and marketed talc as safe for human use.

14. Through various advertising campaigns the Defendants have marketed towards women, in particular larger women and women associated with minorities. Some of their slogans have been "A sprinkle a day keeps the odours away" and "Your body perspires in more places than just under your arms. Use Shower to Shower to feel dry, fresh, and comfortable throughout the day." The Defendant advertising campaigns for their product Shower to Shower used slogans such as "Use Shower to Shower to feel dry, fresh, and comfortable throughout the day" and "Shower to Shower can be used all over your body."

15. The Defendants have an iconic brand that is well known to consumers and these same consumers have assumed for decades and come to expect that Talc is safe for use.

16. Some studies have shown that the use of cornstarch is safer than Talc due to cornstarch being an organic carbohydrate. Cornstarch is quickly broken down in the body and has no known side effects.

17. Although there has been overwhelming evidence that Talc is inherently dangerous, the Defendants have continually marketed the product as safe. The Defendants represent Talc as being safe, if used as intended.

18. Studies have shown that perineal application is unsafe and increase risks of cancer, but the Defendants continue to represent Talc is safe for this type of use. As recently 2014 the defendants stated that, "the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."

19. However, it is not the Talc itself, rather it is when asbestos is contained within the Talc powder and Talc products that the Talc powder increases risks of cancer. As such it is not

the Talc itself, but the asbestos which was not removed or could not be removed that causes the increased risk of cancer.

20. Asbestos is a naturally occurring silicate material. There are six types of recognized asbestos, which are: Actinolite, Amosite, Anthophyllite, Chrysotile, Crocidolite, and Tremolite. These six types belong to two classes, serpentine class and amphibole class. However, Chrysotile is the only one belonging to the Serpentine class of asbestos fibres. All six types of asbestos are known human carcinogens and the World Health Organization, as well as other authorities, recognize there is no safe level of exposure to asbestos.

21. While most people exposed to asbestos will never develop cancer, for some, even a small amount of asbestos exposure is enough to trigger the disease years later. However, just how small of an amount of exposure has not been established.

22. Any product containing 1% or more of asbestos is considered asbestos-containing and will need to be labelled as such. However, those products that with under 1% asbestos does not have to have the same distinction.

23. Talc is often naturally found near asbestos within the earth; therefore, Talc can easily become contaminated by asbestos while it is being mined. This has led to much concern over exposure to contaminated Talc powder products, which have been linked to cases of mesothelioma, lung cancer and ovarian cancer.

### C. PLAINTIFF'S PARTICULARS

24. The Plaintiff had been using Talc (Shower to Shower) from the time she was approximately 13 years old up until approximately 36 years of age. She used it as part of her personal hygiene routine, every day for all those years. She was loyal to the brand because she felt that it worked to absorb sweat and odour and believed that it worked especially well to absorb and mask the odour of menstrual blood for herself as a girl and then as a young woman. She also liked the scent of Shower to Shower as it reminded her of baby powder rather than a perfume. Her husband recalls that she smelled of Shower to Shower when they met. The Plaintiff's mother recalls that she was buying Shower to Shower for the Plaintiff when the Plaintiff was at 13, if not earlier.

25. In addition, beginning at the age of 17, the Plaintiff began working doing strenuous work in hot environments. She has worked as a cleaner, a hospital kitchen worker, a cook in restaurants, a high-rise construction worker in the 1980's, a road construction worker, as a labourer in a greenhouse and doing landscaping. She used, and relied on, Shower to Shower on a daily basis and used no other under-arm, body deodorants or feminine hygiene products. She applied it specifically to her underarms, under her breasts and to her genital area, there in larger amounts during her period. She applied it before going to work and also after a shower or bath after she returned home from work.

26. By the age of 25 the Plaintiff was in a permanent common-law relationship. The Plaintiff was having increasingly severe pelvic pain and extreme heavy bleeding during menstruation, and she believed she was having unusual hormonal problems. After several years of being told by her doctor that her discomfort and pain "was all in her head", in her later 20's, she was hospitalized in the emergency at the Foothills Hospital. She had severe bleeding, pain, and what she suspected was a miscarriage from an unusual and abnormally late period. The Plaintiff found a female doctor who immediately sent her for an initial ultrasound where it was discovered that she had a "grapefruit-sized" tumour on one ovary. She was referred to a gynaecological surgeon. On or around October 21, 1993 she underwent surgery and the "grapefruit sized" mass was removed. It had been decided that the surgery should conserve the Plaintiff's fertility, if possible, because the surgeon thought that cancer was unlikely due to the Plaintiff's young age and no family history of ovarian or reproductive cancer and all three of the Plaintiffs sisters have had normal pregnancies and deliveries.

27. Because of the expectation that the tumour was a benign cyst there were no additional "samples" taken during her surgery. However, the pathology showed that the tumour was not benign as expected and was a carcinoma. As such, the Plaintiff had to undergo a second, equally invasive, exploratory surgery, after healing sufficiently from the first surgery. The exploratory surgery consisted of taking 30 tissue samples, which had to be taken in order to rule out any metastasis. After the diagnosis and pathology from the first surgery, the Plaintiff's medical case had been taken over by the Tom Baker Cancer Centre.

28. After the sample-taking surgery, on or about January 1994, the Plaintiff met with a fertility doctor. It was decided that if she was not successfully pregnant, with only one ovary, after a period she could pursue other methods of fertility treatment, such as invitro fertilization. It was explained that invitro fertilization is not covered under Alberta Health Care and the Plaintiff should expect personal costs of around $15,000.00. The Plaintiff and her husband were not immediately able to financially pursue this as a medical option but hadn't ruled it out when the Plaintiff began to have alarming abdominal symptoms that resembled her previous diagnosis. An ultrasound showed a similar structure to the first tumour and it was suspected to be cancer. It was decided that the Plaintiff would undergo a "complete" hysterectomy even though she was only 36 years old and had no children.

29. The Plaintiff sought the help of a psychologist at the Cancer Centre because she had consciously experienced a temporary inability to breathe when she was in the recovery room and she had trouble with her memory for a period of time. The Plaintiff was terrified of having another general anaesthetic as she feared suffocation while under the anaesthetic, but it was necessary for the second surgery. Also, she was contending with the trauma of a second cancer diagnosis and the possibility that metastasis had occurred. In or around 1995, the Plaintiff had a second surgery and had a "soft ball sized" mass removed.

30. On December 9, 1996, the day of her birthday, the Plaintiff had a third surgery consisting of a resection of retroperitoneal tumor mass, total abdominal hysterectomy and left salpingo oophorectomy (removing both the ovary and fallopian tubes). Her cervix was also removed.

31. As a result, the Plaintiff suffered extreme pain and suffering from ovarian cancer as a result of using Talc. She subsequently underwent a course of chemotherapy, as well as numerous tests and procedures caused by the ovarian cancer. In addition, the Plaintiff could no longer have children.

32. In addition to the surgical pain, her recovery and disfigurement, the Plaintiff suffered immediate and severe "surgical menopause". The Plaintiff tried to find a doctor to deal with her sudden hormone loss, resulting from her surgery, but was unsuccessful at finding a doctor with any specialized knowledge pertaining to the total loss of hormones at such an early age. Because the Plaintiff's hysterectomy was shortly after the Women's Health Initiative Study was published, it was extremely difficult to convince doctors to prescribe hormone replacement drugs. In addition to the lack of normal hormonal health, disfigurement, the psychological effects of the ovarian cancer and subsequent surgeries the Plaintiff has experienced a loss of libido which has negatively affected her relationship with her husband. She has since been made aware by other doctors that over time there may be many other health consequences of having surgical menopause and a lack of normal hormones necessary for health, especially for the health of her heart and brain.

33. In addition to the disfigurement and scar tissue resulting from three incisions at the same pelvic site, the Plaintiff has a surgical hernia at the location of the incisions, which is currently causing problems and normal surgical repair with mesh is not recommended. This is because of all the scar tissue from the ovarian cancer surgeries which would prevent the mesh from attaching. The Plaintiff has been informed by the GE surgeon that the type of surgical hernia she has is more dangerous than a large hernia and that she needs to immediately go to the emergency if she has any more suspicious pain events at site of the incision.

34. The Plaintiff continues to experience ongoing and concerning bladder problems and believes this is related infections connected to the surgeries.

35. The Plaintiff has a large number of surgical staples remaining in her body. Her records were requested by her present doctor to determine the composition of the materials because she was told after her last surgery that the staples could migrate and become a problem. In that event the staples do become a problem they may need to be surgically removed. The composition of the staples was not recorded and so they remain a worry for the Plaintiff.

36. While reading the surgical records the Plaintiff discovered that it was recorded that the bowel was incised and repaired, and she worries that it is at the same surgical site as the hernia. The bowel is what will protrude through the hernia and is what she has been advised

by her gastroenterologist to be vigilant about. The GE thinks that a repair might not be possible due to the scar tissue, which resulted from the ovarian cancer surgeries.

37. The Plaintiff has suffered other consequences as a result of the three abdominal surgeries including the permanent damaging and weakening of abdominal muscles which have resulted in lower back pain and an inability to strengthen abdominal muscles as recommended by her medical professionals.

38. The Plaintiff suffered extreme pain and suffering from ovarian cancer, which is ongoing. In addition, the Plaintiff cannot have children and feels that she has been castrated at a very young age. She believes she was disfigured and has ongoing medical issues as a result of using Shower to Shower for so many years.

39. On August 30, 2017, during a family gathering at the Plaintiff's parents' house, the Plaintiff was advised by a relative of a news item that there had been a lawsuit against the makers of Shower to Shower, which had been determined to cause ovarian cancer, and that the lawsuit was successful. The Plaintiff felt shocked and said, "I used that for years!" Her sister pulled up the article and read parts of it out loud. This is when the Plaintiff discovered that Shower to Shower was linked to ovarian cancer. The Plaintiff looked up the lawsuit and found out that it was the talc ingredient in Shower to Shower that was determined to cause ovarian cancer.

## III.  THE CLAIM

40. The Plaintiff brings this action on her behalf and on behalf of all women in Alberta or elsewhere in Canada who used Johnson & Johnson Baby Powder® or Shower to Shower® (hereinafter referred to as "Talc") and have been diagnosed with ovarian cancer.

41. The Plaintiff claims that the Defendants' Talc products were not safe for use, they were inherently dangerous, and increased the risks of ovarian cancer to women who applied it to their perineal area.

42. The Plaintiff claims that the Defendants have known for decades that their Talc products contained known carcinogens that the World Health Organization has stated there is no levels of healthy exposure to.

43. The Plaintiff claims that the Defendants Talc products contained asbestos and even minor amounts are dangerous and cancer causing. The Defendant failed to disclose this latent defect in their product, which resulted in the health and lives of the Plaintiff and other Class Members to be put in jeopardy.

44. The Defendants failed to disclose to Canadian regulatory authorities that their Talc products contained asbestos, even if there were trace amounts.

45. The Defendants misinformed the Plaintiff and other Class Members, through advertising campaigns targeting women, by utilizing slogans such as "Your body perspires in more places than just under your arms. Use Shower to Shower to feel dry, fresh, and comfortable throughout the day." The Defendants represented that their Talc products were safe to use all over their bodies and failed to inform the Plaintiff and other Class Members of the inherent risks of the product and even further risks of applying it to certain areas of their bodies.

46. The Defendants failure to inform contravenes the Consumer Protection Act and other equivalent provincial and territorial legislation.

## A. NEGLIGENCE

47. The business of the Defendants is intertwined in that they each play a role in some or all aspects of the business, such as design, development, testing, manufacturing, licensing, assembling, distribution, importing and/or exporting, marketing, and/or selling their Talc products.

48. The Defendants had and continue to have an obligation to the consumer to research, test and monitor their Talc products for any deficiencies, adverse reactions and safety issues.

49. The Defendants owe a duty of care to the consumer to ensure their produce is safe for use and free from latent defects that may affect the safety of the end consumer.

50. The defendants, at all material times, owed a duty of care to the Plaintiff and other Class Members to ensure they had researched, tested and monitored their Talc products and manufactured them in a manner that would remove harmful impurities or defects that could otherwise cause harm.

51. The Defendants breached the standard of care that would otherwise have been expected in the circumstances.

52. Once the Defendants discovered a correlation between their product and specific types of cancer, such as ovarian cancer and mesothelioma, they had an obligation to either recall their Talc products and/or test and research the connection of their product to the abovementioned cancers to either disprove the connection or prove the connection and adjust their product accordingly.

53. As a result of the Defendants' duty of care toward the Plaintiff and other Class Members, they had a duty to inform them if there were any latent defects in their product that could pose a health risk as it would be reasonably foreseeable that if their product was proven to be associated with certain forms of cancer then the end user, being the Plaintiff and other Class Members, would be at risk of developing the associated cancers.

10

54. The Defendants were negligent in the design, development, testing, manufacturing, licensing, assembly, distribution, importing and/or exporting, marketing, monitoring and sale of their Talc products. The particulars of the Defendants negligence are, but not limited to, the following:

   (a) The Defendant knew or ought to have known that Talc is mined from locations that also contain asbestos;

   (b) The Defendant knew or ought to have known that their Talc products were dangerous and contained known carcinogens;

   (c) The Defendant knew or ought to have known that their Talc products were inherently dangerous;

   (d) The Defendant knew or ought to have known that their product was defective or tainted;

   (e) They actively misled consumers about the risks and safety of using the Defendants' Talc products;

   (f) They failed to provide accurate information to consumers regarding the risk of the Defendant's Talc products;

   (g) They failed to recall the talc products immediately once the risks were known;

   (h) Failure to ensure proper testing was conducted prior to distributing the product;

   (i) Failure to, or manufacture, design and test their product prior to selling or distributing;

   (j) Failure to properly design, manufacture or test their product to ensure that it was safe for use before distributing;

   (k) Failure to conduct studies on the safety of the talc products;

   (l) Failure to monitor their talc products for deficiencies, safety and any adverse reactions;

   (m) Concealment of information that is material and relevant to whether their product would otherwise be allowed to be sold;

   (n) Concealment of testing reports from the public, regulatory authorities, the FDA and Health Canada;

(o) Concealment from consumers that their product was defective; and

(p) Such further and other particulars of negligence within the knowledge of the Defendants.

## B. WAIVER OF TORT / DISGORGEMENT

55. The Defendants conduct was so egregious that disgorgement may be an appropriate remedy in light of the circumstances as set out in the within claim. The Plaintiff reserves the right to elect, at the trial of common issues, to waive the tort of negligence and have an accounting of damages to a claim tort remedies under tort law, the Plaintiff claims disgorgement for, and an accounting of the amounts received by the Defendant, which the Defendant was unjustly enriched, the period of time while they were misrepresenting, for their Talc products, or a percentage of the proceeds from the sale of the Defendants talc products. The accounting shall be an accounting of the Defendants' ill-gotten gains for the purpose of unjust enrichment.

56. Disgorgement is an appropriate remedy for the following reasons:

(a) The Defendant earned profits on a contaminated product;

(b) The Defendant knowingly and wilfully marketed a product that they knew or ought to have known was unsafe for the consumer market; and

(c) The Defendant knowingly and wilfully entered a contaminated product into the marketplace despite having knowledge that their product increased the risk of injury;

## C. FAILURE TO WARN

57. The Defendant failed to warn or recall their product, which caused a foreseeable health and safety risk to the Plaintiff and other Class Members and as a result of the Defendants' failure and overall negligence, the Plaintiff and other Class Members have suffered injury and damages.

58. The Defendants failed to warn the Plaintiff and other Class Members of the risks of using their Talc products and applying it to their perineal areas. The Plaintiff and other Class Members were falsely led to believe that the Defendants products were safe for use, when in fact, women who use Talc in the perineal area have an increased risk of ovarian cancer in comparison with women who have never used Talc.

59. Barring prior knowledge regarding cancer caused by their product, the Defendant failed to warn consumers of the potential risks associated with their Talc products once they obtained such knowledge.

12

60. At all times material times, the defendants knew or ought to have know, that Talc was not safe for use in the perineal area and that such use led to a significant increase in the risk of ovarian cancer. The defendants knew or ought to have known of the defects in Talc, but concealed this information and did not warn the Plaintiff, the other Class Members or regulators, thereby preventing the Plaintiff and the Class Members from making informed choices about the use of Talc.

### D. PROVINCIAL HEALTH INSURERS

61. As a result of injuries and effects, some of the Class Members received healthcare services, insured services, treatment or other services and became beneficiaries of such services pursuant to the healthcare legislation of the Province or Territory in which each Class Member resided or received treatment. A claim is hereby advanced for the cost of such services under each applicable Provincial and Territorial Legislation including Health Care Costs Recover Act, S.B.C. 2008, Health Services Insurance Act, C.C.S.M. c J-35, Health Services Act, R.S.N.B. 1973 c. H-3, Health Services and Insurance Act, R.S.N.S. 1989 c. 197, Health Insurance Act, R.S.O. 1990 c H-6,Health Insurance Act, R.S.Q. c. A-29, and The Department of Health Act R..S.S c. P-17, Health Insurance Plan Act, R.S.Y. 2002, c. 107, Hospital Insurance and Health and Social Services Administration Act, R.S.N.W.T., 1988 c. T-3, Hospital Insurance and Health and Social Administration Act, R.S.N.W.T. (Nu) 1988 c. T-3, and the regulations thereunde3r and amendments thereto.

### E. LEGISLATION

62. The Plaintiff pleads and relies upon the following statutes and the regulations as amended hereto:

   (a) Alberta Health Care Insurance Act, R.S.A. 200, c. A-20;

   (b) Business Practices and Consumer Protection Act, S.B.C. 2004, c. 2;

   (c) Civil Code of Quebec, CQLR c C-1991;

   (d) Class Proceedings Act, R.S.O. 1992, S.O. 1992, c.6;

   (e) Courts of Justice Act, R.S.O. 1990, c.43;

   (f) Consumer Protection Act, 2002, S.O. 2002, c. 30, Sch. A;

   (g) Consumer Protection and Business Practices Act, S.N.L. 2009 c. C-31. I;

   (h) The Consumer Protection Act, S.S. 1996, c C-30.1;

   (i) Consumer Protection Act, CQLR c P-40.1;

   (j) Family Law Act, R.S.O. 1990, c. F.3;

   (k) Fatal Accidents Act, R.S.N.L. 1990, c. F.6;

13

(l)  Fatal Accidents Act, C.C.S.M. c.F.50;

(m) Fatal Accidents Act, R.S.A. 2000, c. F-8;

(n) Fatal Accidents Act, R.S.N.B. 1973, c. F-7;

(o) Fatal Accidents Act, R.S.N.W.T. 1988, c. F-3;

(p) Fatal Accidents Act, R.S.P.E.T. 1988, c. F-5;

(q) Fatal Accidents Act, R.S.S. 1978, c.F-11, s.3;

(r) Fatal Accidents Act, R.S.Y. 2002, c.86;

(s) Fatal Injuries Act, R.S.N.S. 1989, c. 163;

(t) Food and Drugs Act, R.S.C. 1985, c. F-27;

(u) Health Insurance Act, R.S.O. 1990, c. 11.6;

(v) Health Insurance Act, CQLR c A-29;

(w) Health Services and Insurance Act, R.S.N.S. 1989, c. 197;

(x) Health Services Insurance Act, C.C.S.M., C. I 135;

(y) Hospital and Diagnostic Services Insurance Act, R.S.P.E.1. 1988,

(z) H-8; Hospital Insurance Agreement Act, R.S.N.I. 1990, c.11-7

(aa) Hospital Insurance and Health and Social Services Administration Act, R.S.N.W.T. 1988, C. T-3;

(bb) Hospital Insurance Services Act, R.SY. 2002, c. 112;

(cc) Hospital Services Act, R.S.N.B. 1973, c. 11-9

(dd) Hospitals Act, R.S.A. 2000, c. 11-12;

(ee) Negligence Act, R.S.O. 1990, c. N.l;

(ff) Sale of Goods Act, R.S.O. 1990, c. S.1;

(gg) Trustee Act, C.C.S.M. c. Tl 60;

(hh) Trustee Act, R.S.N.W.T. 1988, c. T-8; and

(ii) Trustee Act, R.S.O. 1990, c. T.23.

## IV. DAMAGES

63. As a result of the negligence of the defendants, the Plaintiff and the Class Members have suffered the following damages:

    (a) Serious injury or death;

    (b) Pain and suffering;

    (c) Emotional and psychological trauma;

    (d) Cost of future care;

    (e) Loss of housekeeping;

    (f) Special damages for out of pocket expenses;

    (g) Loss of income and earning capacity;

    (h) Loss of amenities and enjoyment of life;

    (i) Such further and other particulars that will be provided at trial

64. The Plaintiff and the other Class Members are also entitled to recover, as damages or costs in accordance with the *Class Proceedings Act*, SA 2003, c C-16.5, the costs of administering the plan to distribute the recovery of this action.

65. The Plaintiff pleads that the defendants have acted in such a high-handed, wanton and reckless manner, without regard to public safety, as to warrant a claim for punitive damages. In particular, the defendants' conduct in the design, development, testing, manufacture, licensing, assembly, distribution, marketing, and sale of Talc, the failure to recall Talc sooner or at all, the wilful concealment of the defects in Talc and the facts pleaded above were entirely without care, deliberate, callous, disgraceful, wilful, and an intentional disregard of the Class Members' rights and safety, indifferent to the consequences, and motivated by economic considerations.

66. The Plaintiff proposes that this action be tried at the Court House in Calgary, in the Province of Alberta and that the trial should not exceed 45 days.

## V. REMEDY SOUGHT

67. An Order certifying this action as a class proceeding under the *Class Proceedings Act*, SA 2003, c C-16.5 and appointing the Plaintiff as Representative Plaintiffs for the Class proposed above.

68. A declaration that the defendants owed a duty of care to the Class Members;

69. A declaration that the defendants were negligent in the development, testing, design, manufacturing, licensing, distribution, marketing and sale of Talc and are liable to the Classes for resulting damages;

70. A declaration that the defendants breached their duty to warn the plaintiffs and other Class Members of the health risks associated with Talc;

71. A declaration that the packaging and labeling for Talc was false, misleading, deceptive, unconscionable and amounted to deceptive and unfair business practices in breach of the *Consumer Protection Act* and equivalent provincial and territorial legislation;

72. A declaration that the defendants breached their implied warranties relating to the safety of Talc;

73. A declaration that the defendants made representations related to the safety and efficacy of Talc to the Plaintiff and other Class Members that were false, misleading, deceptive and unconscionable and amounted to unfair practices;

74. A declaration that the defendants are vicariously liable to the Classes for the acts and omissions of their officers, directors, agents, employees and representatives;

75. General damages in amount of $10,000,000.00 or other such amounts as may be spoken to by counsel and this Honourable Court may allow;

76. Special Damages in an amount to be proven at trial;

77. Punitive Damages in the amount of $1,000,000.00 or other such amounts as may be spoken to by counsel and this Honourable Court may allow;

78. An Order directing a reference or giving such other direction as necessary to determine issues not determined at the trial of common issues;

79. Prejudgement interest and post-judgment interest pursuant to the *Judgment Interest Act*, RSA 2000, c J-1;

80. Goods and Services Tax as applicable on amounts awarded;

16

81. An Order for distribution amongst the Class Members of the aggregate assessment of monetary relief as this Honourable Court deems appropriate;

82. Costs of this action on a solicitor/client basis or on such other basis as this Honourable Court may see fit and GST thereon; and

83. Such other and further relief as this Honourable Court may allow or counsel may advise.

---

**NOTICE TO THE DEFENDANTS**

You only have a short time to do something to defend yourself against this claim:

20 days if you are served in Alberta

1 month if you are served outside Alberta but in Canada

2 months if you are served outside Canada

You can respond by filing a statement of defence or a demand for notice in the office of the clerk of the Court of Queen's Bench at Edmonton, Alberta, AND serving your statement of defence or a demand for notice on the plaintiff's(s') address for service.

**WARNING**

If you do not file and serve a statement of defence or a demand of notice within your time period, you risk losing the lawsuit automatically. If you do not file, or do not serve, or are late in doing either of those things, a court may give a judgement to the plaintiff(s) against you.