| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br><br>**WOLLMUTH MAHER & DEUTSCH LLP**<br>Paul R. DeFilippo, Esq.<br>500 Fifth Avenue<br>New York, New York 10110<br>Telephone: (212) 382-3300<br>Facsimile: (212) 382-0050<br>pdefilippo@wmd-law.com<br><br>**JONES DAY**<br>Gregory M. Gordon, Esq.<br>Brad B. Erens, Esq.<br>Dan B. Prieto, Esq.<br>Amanda Rush, Esq.<br>2727 N. Harwood Street<br>Dallas, Texas 75201<br>Telephone: (214) 220-3939<br>Facsimile: (214) 969-5100<br>gmgordon@jonesday.com<br>bberens@jonesday.com<br>dbprieto@jonesday.com<br>asrush@jonesday.com<br>(Admitted *pro hac vice*)<br><br>*ATTORNEYS FOR DEBTOR* | |
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>                      Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Judge: Michael B. Kaplan<br><br>**Hearing Date and Time:**<br>May 4, 2022 at 10:00 a.m. |

**DEBTOR'S REPLY IN SUPPORT OF SECOND MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. § 1121(d) EXTENDING THE EXCLUSIVE PERIODS TO FILE A PLAN OF REORGANIZATION AND SOLICIT ACCEPTANCES THEREOF**

        The above-captioned debtor (the "Debtor") submits this reply in support of the

*Debtor's Second Motion for an Order Extending the Exclusive Periods to File a Plan of*

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

NAI-1530038220

*Reorganization and Solicit Acceptances Thereof* [Dkt. 2095] (the "Motion")[2] and in response to the objection (the "Objection") filed by the Official Committee of Talc Claimants (the "TCC") [Dkt. 2181].

**Preliminary Statement**

By the Objection, and based primarily on an alleged concern that the Debtor will shortly file a non-consensual cramdown plan of reorganization, the TCC asks this Court to abruptly terminate the Debtor's exclusive right to file and solicit a plan of reorganization, ironically to permit the TCC to propose a non-consensual, cramdown plan. Far from encouraging consensus or promoting the prospects of a successful mediation, the TCC's request, if granted, would only generate wasteful litigation, divert the parties' attention from settlement and discourage the claimants from seeking a consensual resolution of this chapter 11 case. The Objection, which is riddled with false innuendo about the Debtor's conduct in the mediation, is contrary both to Congressional intent and precedent established by numerous mass tort bankruptcy cases.

The fundamental premise of the TCC's Objection is that a proposed cramdown plan by the TCC is "the best way to move this case, incent good faith mediation to a prompt and equitable resolution." Obj. ¶ 2. But this case is not stalled nor is there any basis for finding that the Debtor is not participating in the mediation in good faith. To the contrary, as set forth in the Motion, significant progress has been made during the less than seven months the case has been pending. It is the TCC, not the Debtor, who initially refused to participate in mediation. In addition, there is no basis to conclude (nor does the TCC offer any) that the Debtor needs

---

[2] Capitalized terms used herein but not otherwise defined have the meaning given to such terms in the Motion.

NAI-1530038220

encouragement, "pressure," or "risk" to "negotiate with focus and in good faith." Obj. ¶ 35. The Debtor has been clear since the very beginning of this case about its desire to engage in mediation to reach a consensual resolution as soon as possible. And, as this Court has recognized, the claimants already have significant leverage by virtue of the requirements of the Bankruptcy Code.

Contrary to the TCC's assertions, a confirmable plan requires more than the ability to garner the requisite votes (and of course, the required support is of talc claimants, not the TCC itself). The Debtor's aggregate liability on account of talc-related claims would need to be estimated or agreed to in order for a plan to have any real prospect for confirmation. A cramdown plan devoid of any determination of, or agreement with respect to, the Debtor's aggregate talc liability would likely be a non-starter.

The TCC's argument that exclusivity should be terminated because the Debtor may file a plan without TCC support is based on pure speculation. The Debtor has never threatened or indicated that it intends to pursue such a plan; rather, it has repeatedly expressed that its goal is to reach a consensual resolution as quickly as possible.

Finally, terminating exclusivity now would be contrary to the vast weight of precedent in mass tort cases. In fact, the Debtor is not aware of a single mass tort case save PG&E, which is entirely distinguishable, in which a debtor was not afforded the full exclusivity periods permitted by the Bankruptcy Code. There are no exceptional or unusual facts here that warrant prematurely cutting short the Debtor's time to propose and solicit a plan. The TCC's Objection should be overruled.

3

## Reply

***The Debtor Has Established Cause for the Requested Extension and
An Abrupt Termination of the Exclusivity Periods Will Not Move This Case Forward***

1. As set forth in the Motion, the legislative history of section 1121(d) and applicable case law support the Debtor's requested extension of the Exclusive Periods. In particular, the requested extension of the Exclusive Periods is justified: (a) by the size and complexity of the Debtor's case (which involves tens of thousands of talc personal injury lawsuits), Mot. ¶¶ 15-17; (b) by the Debtor's substantial progress in the case, including the resolution of threshold issues and the commencement of mediation efforts, id. at ¶¶ 7-10, 18; (c) because the requested extension will not harm the talc claimants or other parties in interest (particularly given that the parties should be focusing on mediation and no plan is likely confirmable absent a consensual resolution or other developments or determinations in this case), id. at ¶¶ 19-20; and (d) because the requested extension is in line with extensions granted in other mass tort chapter 11 cases (of which the vast majority of courts in complex mass tort cases have granted extensions of the Exclusive Periods for the full permitted statutory periods), id. at ¶ 21.

2. The TCC has not shown (nor could it) that this case is not progressing expeditiously. In fact, as recognized in the Objection, the parties, with the assistance of the Court, have ensured that this case has progressed promptly and efficiently—the motions to dismiss were extensively litigated, tried and a lengthy opinion issued by the Court less than three months after the motions were filed, and the mediation was ordered slightly over a week later. Obj. ¶¶ 10-22. There can be no serious allegation that this case has stagnated or failed to move

forward. As a result, the underlying premise of the Objection is false—there is no need for a TCC plan to encourage progress in the case.[3]

3. Indeed, permitting the TCC to submit a non-consensual plan during mediation is "a prescription for purposeless litigation."[4] Dow Corning, 208 B.R. at 669-70. And for the reasons discussed below, it would be a waste of time and resources because it would likely be unconfirmable.

4. The TCC argues that the Exclusive Periods should not be extended based on unsupported speculation that the Debtor will engage in an "aggressive" and "scorched earth litigation" strategy "that serves to disrespect" talc claimants and "will not move the case[] along." Obj. ¶¶ 5, 7, 32-34. The TCC then contends that this imagined strategy will "lead to significant litigation costs and ultimately the Debtor's proposed plan be[ing] voted down." Obj. ¶ 33. However, these arguments (a) presume that the mediation will not succeed, (b) presuppose that any plan the Debtor may propose will be objectionable and (c) fundamentally ask this Court to deny the Debtor's Motion based on nothing but baseless speculation. There is no need for or benefit in permitting the TCC to propose a plan at this time, nor has the TCC articulated one,

---

[3] In both cases cited by the TCC to support its argument that exclusivity should be terminated in order to move this case forward, the courts refused to terminate exclusivity—in Dow Corning so that the parties could heed the court's guidance in its recent draft estimation opinion and negotiate a consensual plan and in Adelphia Communications so that the debtors' proposed plan, which in that case was being solicited, could be put to a vote. See In re Dow Corning Corp., 208 B.R. 661, 669-70 (Bankr. E.D. Mich. 1997) (agreeing with arguments that terminating exclusivity to allow unsecured creditors' committee and tort claimants' committee to attempt to cram down plan on debtor was "a prescription for purposeless litigation" and denying motion to terminate exclusivity); In re Adelphia Commc'ns Corp., 352 B.R. 578, 590 (Bankr. S.D.N.Y. 2006) (finding that terminating exclusivity could result in a "competing plans battle" that would "jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, and push this process back to square one").

[4] The cases cited by the TCC to support its argument that competing plans are beneficial are distinguishable because those cases did not involve ongoing negotiations to resolve the case. One case involved invalidation of a creditor vote and sanctions for improper solicitation, Century Glove, Inc. v. First Am. Bank of N.Y., 860 F.2d 94 (3d Cir. 1988), and the other involved a motion for deferral of consideration of a creditor's plan and sanctions for improper solicitation, In re Rook Broad. of Idaho, Inc., 154 B.R. 970 (Bankr. D. Idaho 1993).

5

aside from its apparent desire to increase its negotiating leverage.  See Obj. ¶ 35.  The TCC's speculation provides no basis for denying the Debtor's requested extension of the Exclusive Periods.[5]

***The Parties' Focus Should Be On Mediation Not Competing Plans***

5.     The TCC is frank that it seeks an opportunity to file its own plan of reorganization to increase its leverage against the Debtor.  Obj. ¶ 35.  But as a case cited by the TCC recognizes:  "One of the most important reasons for extending the debtor's period of exclusivity is ***to give the Chapter 11 process of negotiation and compromise an opportunity to be fulfilled***, so that a consensual plan can be proposed and confirmed without opposition."  In re All Seasons Indus., Inc., 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (emphasis added).

6.     A party's desire to propose its own plan, even a plan that it believes is more favorable to creditors, is not a basis for denying a debtor's request for an extension of the Exclusive Periods.  In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 134 (D.N.J. 1995) ("This Court is not satisfied that statements made by creditors and parties in interest that they were prepared to offer more favorable plans if the court were to terminate the exclusivity period constitutes sufficient cause to cut short the debtor's window of opportunity opened by Congress"); see also Matter of Excel Maritime Carriers Ltd., 2013 WL 5155040, at *1 (Bankr.

---

[5] Likewise, the TCC's suggestion that the Court may deny the requested extension of the Exclusive Periods even if the Court finds cause is unavailing.  See Obj. ¶ 31.  This is not a case where the Debtor is delaying or attempting to pressure other parties.  See In re Sharon Steel Corp., 78 B.R. 762, 765 (Bankr. W.D. Pa. 1987) ("Even if the court is satisfied that sufficient cause may exist, the court may still deny an extension of the exclusivity period as we have discussed previously.  This may occur where, although a company seeking reorganization is unusually large, the debtor has delayed in arriving at an agreement or is attempting to pressure other parties to yield to a position which is necessarily prejudicial.").  Moreover, while the decision to extend the Exclusivity Period rests within the discretion of the Court, in the cases cited by the TCC, the courts ultimately either (a) found no cause for an extension or (b) extended the exclusive periods.  See id. at 765-66 (holding that no cause was shown to justify extension of the exclusivity periods because the debtor had made no progress on key issues in the case); In re Mirant Corp., 2004 WL 2250986, at *1 (N.D. Tex. Sept. 30, 2004) (affirming bankruptcy court order extending debtors' exclusive periods for approximately 8 months).

6

S.D.N.Y. Sep. 13, 2013) ("The mere fact that key players want to file a competing plan is not sufficient cause to terminate a debtor's exclusive periods."); In re Express One Int'l, Inc., 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996) ("The issue to be determined, however, is not whether some other plan may exist which provides greater recovery; the issue is whether debtor has been diligent in its attempts to reorganize."); In re Eagle-Picher Indus., Inc., 176 B.R. 143, 147 (Bankr. S.D. Ohio 1994) (holding no cause to terminate exclusivity where the only ground for doing so was to enable movant to file alternate plan).[6]

7. The TCC's purpose in seeking to prevent extension of the Exclusive Periods is inconsistent with the intent of section 1121 of the Bankruptcy Code—"to facilitate the rehabilitation of debtors in Chapter 11 . . . [and] afford[] the debtor the opportunity to negotiate the settlement of its debts by proposing and soliciting support for its plan of reorganization without interference—in the form of competing plans—from its creditors or others in interest"— and would instead create a perverse incentive for the mediation to be unsuccessful. Geriatrics Nursing Home, 187 B.R. at 131.

8. The TCC complains of "apparent power imbalances," Obj. ¶ 38; see also id. ¶ 35, and argues, without support, that this is not a case where the Debtor should have the first opportunity to propose a plan. Obj. ¶ 1. But, the concept of exclusivity, on its face, "contradicts the notion that parties in a Chapter 11 bankruptcy case be given an equal opportunity to seek confirmation of a plan." Eagle-Picher Indus., 176 B.R. at 148 (denying unsecured creditors' committee argument that "a level playing field was what was contemplated by the Bankruptcy Code" and stating the "concept of an exclusivity period in favor of a debtor, a consideration at

---

[6] And here the TCC would have no basis to believe that it could offer a more favorable plan given the status of the mediation.

the heart of the Bankruptcy Code, on its face contradicts the notion that parties in a Chapter 11 bankruptcy case be given an equal opportunity to seek confirmation of a plan."). Moreover, the TCC recognizes the Bankruptcy Code gives significant control to creditors, including by requiring their substantial support to confirm a plan. See Obj. ¶ 1. ("[U]ltimate control rests in the required affirmative support of 75% of the tens of thousands of cancer victims. . . .").[7] There is no need to rebalance leverage in this case. The Debtor, consistent with the Congressional intent, should be permitted to have the first opportunity to develop and propose a plan. Although the TCC assumes, without basis, that the Debtor will never be able to achieve the requisite support for a plan, the very purpose of the mediation is to attempt to reach agreement on the terms of a plan. And, of course, any plan would require the requisite vote of *claimants*, not necessarily "the overwhelming support of the TCC." See Obj. ¶ 2.

9. Further, the TCC's assertions that the Exclusive Periods should not be extended because "the Debtor and J&J need to feel pressure" to "negotiate with focus and in good faith" and a plan proposed by the TCC would incentivize "J&J and JJCI to negotiate more seriously," Obj. ¶ 35, suggests that the Debtor and J&J are not engaging in mediation in good faith. The Debtor disputes that suggestion, which is entirely unsupported. The Debtor has consistently stated its intention of commencing negotiations on a consensual plan of reorganization with the representatives of the talc claimants since the first hearing in this chapter 11 case before the NC Bankruptcy Court. Oct. 20, 2021 Hr'g Tr. at 41:21-23 (Bankr.

---

[7] In re Public Serv. Co. of N.H., 99 B.R. 155 (Bankr. D.N.H. 1989), cited by the TCC in support of the proposition that a plan proposed by the TCC may make a resolution of the case more likely, is inapposite. In that case, the bankruptcy court determined that termination of exclusivity created a level playing field given that the debtor, an electricity provider, had not actively negotiated with the State regarding the rates to be charged by the reorganized entity and "another factor unique" to that case, "i.e., the circular questions relating to the valuation of a regulated monopoly utility company and the setting of rate levels for that company." Id. at 175-76. No such considerations are present here, in a mass tort case where the Debtor is actively participating in a mediation that it has sought since the initiation of this case.

8

NAI-1530038220

W.D.N.C.). The Debtor again stated its commitment to mediation at the first hearing before this Court, and even suggested that such mediation could proceed in parallel to the TCC's to-be filed motion to dismiss the case and the TCC's objection to the Debtor's preliminary injunction motion in order to advance this case to resolution. Nov. 22, 2021 Hr'g Tr. at 27:9-13 (Bankr. D.N.J.). It was not the Debtor's delay that resulted in the mediation not commencing until recently, but rather the refusal of the TCC to mediate until its motion to dismiss and opposition to the Debtor's requested extension of the preliminary injunction were first litigated. The Debtor and J&J are highly motivated to reach a consensual resolution as quickly as possible. If the Debtor and J&J are not engaging in good faith negotiations, the Mediators will presumably advise the Court of that fact.

***A Confirmable Plan Depends Not Only on Obtaining the Requisite Votes But Also on an Agreement Regarding or Determination of the Debtor's Aggregate Talc Liability***

10. Additionally, the Debtor submits that, notwithstanding the TCC's contentions to the contrary, Obj. ¶¶ 37-39, a confirmable plan depends on more than the ability to garner the requisite votes (and of course, the required support is of talc claimants, not the TCC itself). The Debtor's aggregate liability on account of talc-related claims would need to be estimated or agreed to in order for a plan to have any real prospect of success.

11. Here, the parties are engaged in mediation with further sessions scheduled for next month, and there has to date been no consensual agreement regarding, or other determination of, the Debtor's aggregate liability for the talc-related claims alleged against it. A confirmable plan is not only one that has the necessary votes, but one which also meets the statutory requirements. See *Order Authorizing Estimation of Current and Future Mesothelioma Claims*, In re Bestwall LLC, No. 17-31795 (LTB) (Bankr. W.D.N.C. Jan. 19, 2021), Dkt. 1577

9

¶¶ 8, 9 (stating that "some determination must be made about the Debtor's aggregate liability to current and future claimants for purposes of evaluating the Debtor's amended plan of reorganization" and that without estimation, "[t]he Court similarly has no basis to assess the merits or fairness of either of the plans of reorganization proposed by the Debtor on the one hand and the ACC and the FCR on the other"). Either a consensual determination of the Debtor's liability or some other determination will be necessary to enable this Court to evaluate the "best interests of creditors" test under 11 U.S.C. § 1129(a)(7)[8] and whether any plan complies with the absolute priority rule under 11 U.S.C. § 1129(b)(2),[9] among other plan considerations. Thus, it is highly likely that any plan the TCC seeks authority to propose simply would have no prospect for success but rather would only waste time and divert the parties from efforts that could lead to a successful conclusion of this case.

***The Debtor's Requested Extension is Supported by
Rulings in the Vast Majority of Mass Tort Cases***

12. The Debtor's first request to extend the Exclusive Periods was granted by the Court and the Exclusive Periods were extended for three months from the initial periods. See First Extension Order. Prior to the expiration of the Current Extension Period, the Debtor filed the Motion, requesting that the Court further extend the Exclusive Periods for an additional four

---

[8] For example, the Fourth Circuit in A.H. Robins used the estimation conducted on remand after A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.), 788 F.2d 994, 1013 (4th Cir. 1986), to find that the "best interests of creditors" test was met and to reject dissenting claimants' allegations that the trust funding was too low. In re A.H. Robins Co., Inc., 880 B.R. 694, 698-700 (4th Cir. 1989).

[9] Such a consensual or other determination of the Debtor's aggregate liability would also be necessary to determine whether the plan complies with the corollary to the absolute priority rule, which prohibits a plan from paying more to a class than what it is owed. See, e.g., In re Breitburn Energy Partners LP, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) ("An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."); In re Idearc Inc., 423 B.R. 138, 170-71 (Bankr. N.D. Tex. 2009) ("The corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims.").

months, for a total extension to date of seven months.[10] In objecting to the Debtor's requested extension, the TCC disregards that in virtually all mass tort cases in which a debtor requests to extend its Exclusive Periods, the court ultimately granted such requests for the full time period provided under the Bankruptcy Code, including in cases involving divisional mergers and talc-related claims, given the size of the case and the complexities inherent in mass tort bankruptcies.[11] This is so even in contentious cases and in cases where further extensions of the

---

[10] Prior to the amendment of section 1121 of the Bankruptcy Code, which limited the total exclusivity period that can be afforded to the Debtor, the total extensions of exclusivity ultimately granted in other complex asbestos and mass tort related chapter 11 cases typically extended for years. See, e.g., In re G-I Holdings, Inc., No. 01-30135 (RG) (Bankr. D.N.J. Mar. 19, 2009), Dkt. 8999 (8 years); In re W.R. Grace & Co., No. 01-1139 (JFK) (Bankr. D. Del. July 26, 2007), Dkt. 16396 (6 years 11 months); In re USG Corp., No. 01-2094 (JFK) (Bankr. D. Del. Feb. 15, 2006), Dkt. 10216 (4 years 9 months); In re Armstrong World Indus., Inc., No. 00-4471 (JFK) (Bankr. D. Del. Sept. 20, 2006) Dkt. 9852 (6 years).

[11] See In re Mallinckrodt plc, No. 20-12522 (JTD) (Bankr. D. Del. Mar. 25, 2022), Dkt. 6941 (order extending the debtors' exclusive period to file a plan to Apr. 12, 2022 and exclusive period to solicit the plan to June 13, 2022, 18 and 20 months after the petition date of Oct. 12, 2020, respectively); In re The Diocese of Camden, N.J., No. 20-21257 (JNP) (Bankr. D.N.J. Feb. 25, 2022), Dkt. 1215 (order extending the debtors' exclusive period to file a plan to Apr. 1, 2022 and exclusive period to solicit the plan to June 1, 2022, 18 and 20 months after the petition date of Oct. 1, 2020, respectively); In re Aldrich Pump LLC, No. 20-30608 (JCW) (Bankr. W.D.N.C. Sept. 9, 2021), Dkt. 826 (order extending the debtors' exclusive period to file a plan to Dec. 18, 2021 and exclusive period to solicit the plan to Feb. 16, 2022, approximately 18 and 20 months after the petition date of June 18, 2020, respectively); In re Boy Scouts of Am., No. 20-10343 (LSS) (Bankr. D. Del. Aug. 18, 2021), Dkt. 6076 (order extending the debtors' exclusive period to file a plan to Aug. 18, 2021 and exclusive period to solicit the plan to Oct. 18, 2021, 18 and 20 months after the petition date of Feb. 18, 2020, respectively); In re Paddock Enters., LLC, No. 20-10028 (LSS) (Bankr. D. Del. May 24, 2021), Dkt. 866 (order extending the debtors' exclusive period to file a plan to July 6, 2021 and exclusive period to solicit the plan to Sept. 6, 2021, 18 and 20 months after the petition date of Jan. 6, 2020, respectively); In re DBMP LLC, No. 20-30080 (JCW) (Bankr. W.D.N.C. May 12, 2021), Dkt. 827 (order extending the debtors' exclusive period to file a plan to July 23, 2021 and exclusive period to solicit the plan to Sept. 21, 2021, approximately 18 and 20 months after the petition date of Jan. 23, 2020, respectively); In re Purdue Pharma L.P., No. 19-23649 (RDD) (Bankr. S.D.N.Y. Mar. 1, 2021), Dkt. 2433 (order extending the debtors' exclusive period to file a plan to Mar. 15, 2021, 18 months after the petition date of Sept. 15, 2019); In re Imerys Talc Am., Inc., No. 19-10289 (LSS) (Bankr. D. Del. June 26, 2020), Dkt. 1942 (order extending the debtors' exclusive period to file a plan to Aug. 13, 2020 and exclusive period to solicit the plan to Oct. 13, 2020, 18 and 20 months after the petition date of Feb. 13, 2019, respectively); In re Bestwall LLC, No. 17-31795 (LTB) (Bankr. W.D.N.C. Mar. 26, 2019), Dkt. 799 (order extending the debtor's exclusive period to file a plan to May 2, 2019 and exclusive period to solicit the plan to July 2, 2019, 18 and 20 months after the petition date of Nov. 2, 2017, respectively); In re Kaiser Gypsum Co., Inc., No. 16-31602 (JCW) (Bankr. W.D.N.C. Jan. 3, 2018), Dkt. 738 (order extending the debtors' exclusive period to file a plan to Mar. 30, 2018 and exclusive period to solicit the plan to May 30, 2018, 18 and 20 months after the petition date of Sept. 30, 2016, respectively); In re Yarway Corp., No. 13-11025 (BLS) (Bankr. D. Del. July 28, 2014), Dkt. 546 (order extending the debtors' exclusive period to file a plan to Oct. 22, 2014 and exclusive period to solicit the plan to Dec. 22, 2014, 18 and 20 months after the petition date of Apr. 22, 2013, respectively); In re Specialty Products Holding Corp., No. 10-11780 (JKF) (Bankr. D. Del. Nov. 15, 2011), Dkt. 1802 (order extending the debtors' exclusive period to file a plan to Nov. 30, 2011 and exclusive period to solicit

11

Exclusive Periods have been challenged. See Boy Scouts of Am., No. 20-10343, Dkt. 6076 (order granting debtors' third request for further extension of exclusive periods notwithstanding objections by the official committee of tort claimants, Dkt. 2506, and the Coalition of Abused Scouts for Justice and the future claimants' representative, Dkt. 2672). Indeed, the relief requested by the TCC is virtually unprecedented in the mass tort context.

13. The TCC cites to a single case, In re PG&E Corp., which it asserts "strongly suggests" that it was that court's termination of exclusivity that "kick-started" negotiations for a global resolution. Obj. ¶ 36. But that case was driven by unique circumstances and is factually distinct from this case. First, in PG&E there existed a "looming" deadline under state legislation that created a wildfire insurance fund to protect victims of future fires. The court was rightly concerned with the risks of a single plan going forward and not being confirmed in advance of that deadline. See *Order Granting Joint Motion of the Official Committee of Tort Claimants and Ad Hoc Committee of Senior Unsecured Noteholders to Terminate the Debtors' Exclusive Periods Pursuant to Section 1121(d)(1) of the Bankruptcy Code*, In re PG&E Corp., No. 19-30088 (DM) (Bankr. N.D. Cal. Oct. 9, 2010), Dkt. 4167 at 3 ("This is doubly important in light of the looming deadline for meeting the Wildfire Fund requirements of AB 1054. The risk that Debtors' plan will not be confirmable for some reason is not worth turning away a viable alternative."). Second, the tort claimants' committee in that case categorically refused to participate in mediation until exclusivity had been terminated. See Oct. 7, 2019 Hr'g Tr. at 166:2-9 (Bankr. N.D. Cal.), Dkt. 4162 ("MS. DUMAS: The committee believes that no mediation prior to lifting exclusivity will be any more productive than any of the

---

the plan to Jan. 30, 2012, 18 and 20 months after the petition date of May 31, 2010, respectively); In re Garlock Sealing Techs. LLC, No. 10-31607 (GRH) (Bankr. W.D.N.C. May 31, 2011), Dkt. 1361 (order extending the debtors' exclusive period to file a plan to Nov. 28, 2011 and exclusive period to solicit the plan to Jan. 26, 2012, approximately 18 and 20 months after the petition date of June 5, 2010, respectively).

12

other dozens of mediations conducted with qualified mediators. THE COURT: So that means that at least for now, you and your client are not – you're only going to go in the face of exclusivity if you're ordered to do it? MS. DUMAS: Yes. That's right, Your Honor").

14. Conversely, here, the Debtor, the TCC and other parties in interest are currently participating in mediation, which as discussed above, the Debtor submits should be the focus of the parties. And, while all the parties desire an expeditious resolution of this case, there is no justification at this time for further litigation inherent in a competing plan process without first attempting the mediation process and permitting the Debtor, at an appropriate time, to propose a plan of reorganization as envisioned by the Bankruptcy Code and relevant precedent.

## Conclusion

For the reasons set forth above, the Debtor respectfully requests that the Court overrule the Objection and enter an order granting the Motion.

NAI-1530038220

Dated: April 29, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

NAI-1530038220