**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Matthew I.W. Baker, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
mbaker@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126
*Local Counsel for the*
*Official Committee of Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
*Co-Counsel for the*
*Official Committee of Talc Claimants*

**BAILEY GLASSER LLP**
Brian A. Glasser, Esq.
Thomas B. Bennett, Esq.
Kevin W. Barrett, Esq.
Maggie B. Burrus, Esq.
bglasser@baileyglasser.com
tbennett@baileyglasser.com
kbarrett@baileyglasser.com
mburrus@baileyglasser.com
1055 Thomas Jefferson St. NW, Suite 540
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 463-2103
*Co-Counsel for the*
*Official Committee of Talc Claimants*

**OTTERBOURG PC**
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 905-3628
Fax: (212) 682-6104
*Co-Counsel for the*
*Official Committee of Talc Claimants*

| | |
|---|---|
| **PARKINS & RUBIO LLP**<br>Lenard M. Parkins, Esq.<br>Charles M. Rubio, Esq.<br>lparkins@parkinsrubio.com<br>crubio@parkinsrubio.com<br>Pennzoil Place<br>700 Milan St., Suite 1300<br>Houston, TX 77002<br>Tel: (713) 715-1666<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>jmassey@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* |
| In Re:<br><br>**LTL MANAGEMENT, LLC,**[1]<br><br>                    Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Honorable Michael B. Kaplan |

## THE OFFICIAL COMMITTEE OF TALC CLAIMANTS' STATUS REPORT DATED JUNE 10, 2022

The Official Committee of Talc Claimants (the "TCC" or the "Talc Claimants' Committee", and, together with the Debtor, the "Parties") in the above captioned case (the "Case"), by and through its undersigned counsel, hereby respectfully submits this status report (the "Status Report") in accordance with the Court's May 27, 2022 directive:

## STATUS REPORT

1.      This Status Report is intended to provide the Court and parties-in-interest with an update on the status of various matters in this Case as well as the Talc Claimants' Committee's views regarding potential paths forward for a successful exit and conclusion of this Case.

---

[1]    The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## I.    PRELIMINARY INJUNCTION & PARTIAL LIFT STAY PROPOSAL

1.      As discussed in greater detail below, the TCC respectfully submits that any basis for this Court's decision to grant the preliminary injunction enjoining certain actions against non-debtors in this Case is no longer applicable, and, as other Courts have found, the ongoing prejudice to the talc claimants far outweighs any prejudice to the Debtor if the injunction and stay were terminated as to the non-debtor parties.  As such, and as set forth below in more detail, the TCC requests that the preliminary injunction be lifted at this time to avoid further prejudice to those victims who have been unable to prosecute their claims in the face of declining health and evaporating time.

2.      By Order dated March 4, 2022, this Court declared that the automatic stay applied to certain actions against non-debtors and preliminarily enjoining certain actions (the "PI Order") [Docket No. 187 in Adv. Proc. No. 21-03032].  As set forth below, the PI Order is on appeal before the United States Court of Appeals for the Third Circuit (the "Third Circuit" or the "Court of Appeals").

3.      In this Court's related *Memorandum Opinion* (the "PI Opinion") [Docket No. 184 in Adv. Proc. No. 21-03032], this Court determined that the preliminary injunction was appropriate at that time as "continued litigation against the Protected Parties would undoubtedly impair mediation efforts and negotiations within this bankruptcy and would complicate estimation hearings, with multiple uncoordinated hearings nationwide."  PI Opinion at 22.

4.      Pursuant to paragraph 7 of the PI Order, any party was entitled to seek relief from the provisions of the Order for cause shown.

5.      Pursuant to paragraph 16 of the PI Order, the Court is to revisit continuation of the automatic stay and preliminary injunction on or about June 29, 2022.

6.      During the course of hearings held before this Court on May 24, 2022, this Court acknowledged its intent to revisit the continued application of the automatic stay and the preliminary injunction on or around June 29, and indicated that it would consider argument and suggestion from the parties with regard to whether a segment of the pending talc claims against the Debtor and J&J should be permitted to proceed in the court system.[2]

7.      For the reasons set forth in the opposition to the entry of the PI Order and the TCC's appeal therefrom and based upon the passage of a full eight months during which the talc claimants have been enjoined from pursuing their claims against the non-debtor defendants, the TCC continues to believe that the facts and law support complete termination of the applicability of the automatic stay and the preliminary injunction.

8.      As this Court recognized at the May 24th hearing, mediation has not yielded results. *See* Hr'g. Tr. May 24, 2022, 3:22 – 4:2 ("I guess over the past month or so you've been engaged in mediation efforts with Judge Schneider and Mr. Russo. My limited understanding -- I had a very brief conversation with them, we are, I think it's fair to say, not as far along as he would have liked"). As such, the TCC submits that the principal underlying basis for this Court's extension of the preliminary injunction to non-debtors has diminished and is no longer applicable.

9.      Additionally, the TCC believes it would be remiss if it did not remind the Court

---

[2]   *See* Hr'g. Tr. May 24, 2022, 4:17 – 5:10 (Court: "I'm not going to simply rely on mediation. We have a pending bankruptcy case that has to move forward. We have exclusivity that goes through September. We have a reevaluation date, I'll call it in, in June -- the end of June -- June 29th -- to see where we're at. There are options for the Court that I'm going to consider and I'm going to be candid. I plan on reaching out for Judge [Wolfson] to see where we left off in bellwether cases. If that's a possibility or if there is a small segment of cases that should go forward or whether nothing should go forward.

You know, obviously, I'm going to hear from the parties but there are a number of considerations out there as to how both move forward with mediation but move the case forward as need be and try to preserve the rights of the claimants as well as the debtor. I certainly will be open to argument and suggestions on all of these issues, but I certainly want to be clear I'm going to, at least, I'm taking it on my own responsibility to try to see how best to move the case forward and it calls for maybe some creativity.").

that while this Chapter 11 case proceeds, claimants continue to suffer irreparable injury, including worsening illness and death.[3]  This Court recognized, as the court in <u>The Diocese of Rochester v. AB 100 Doe (In re The Diocese of Rochester)</u>, Adv. Pr. No. 22-02075-PRW (Bankr. W.D.N.Y. May 23, 2022) (decision attached hereto as <u>Exhibit A</u>) recently did[4], that this issue is of great import to the victims currently enjoined from pursuing their claims.  Indeed, in its MTD Opinion denying the motions to dismiss filed by the TCC and other parties, this Court acknowledged that this case "is so much more than an academic exercise or public policy debate. These issues impact real lives." <u>See</u> <u>MTD Opinion</u> at 55 [Docket No. 1572].  This Court mentioned by name Vincent Hill, a plaintiff who died from mesothelioma cancer in February 2022, after denial of his motion to lift the stay to permit him to proceed with a scheduled state-court trial against J&J.  <u>Id.</u>  Many other talc claimants represented by counsel representing TCC members have passed away while this Case has been pending and just last week, a TCC member learned that her ovarian cancer had reoccurred, in a form more vengeful than in the past.  This Court noted that talc claimants "deserve the comfort in knowing that their families' financial needs will be addressed timely," and accordingly there is a strong need to ensure that this bankruptcy case proceeds as expeditiously as possible.  <u>Id.</u>

  10. The TCC also points to the cautionary tale from <u>Bestwall</u>.  Counsel for the Debtor has frequently referred to the <u>Bestwall</u> case [Case No. 17-31795] pending before the United States

---

[3] Since October 26, 2021, the date of this Court's *Order Regarding Debtor's Motions For An Order (I) Declaring The Automatic Stay Applies To Certain Actions Against Non-Debtors Or (II) Preliminarily Enjoining Such Actions, And (III) Granting A Temporary Restraining Order Pending A Final Hearing* [Docket No. 28 in Adv. Proc. No. 21-03032], hundreds of claimants represented by the lawyers who represent the TCC's members have passed away.

[4] *See* Docket No. 48 at p. 7 ("[T]he weight of public interest during these later months now tips in favor of the Abuse Survivors—who have suffered in silence for so long—to be able to seek redress in the state courts from the non-debtor Catholic Corporations.").

Bankruptcy Court for the Western District of North Carolina.  Bestwall is represented by the same counsel as the Debtor herein, and Bestwall similarly involves a prepetition "Texas two-step" transaction, where the primary goal appears to be protection of large non-debtor related parties.

11.    The Bestwall case has been pending for almost five years and appears far from resolution.  We understand that all of the original representatives on the asbestos claimants creditors' committee in Bestwall have died during the pendency of that case.  Discovery continues with regard to an estimation proceeding that has been pending for several years, and which will apparently not reach trial until sometime in 2023.

12.    This case should not follow the same "script" crafted by Debtor's counsel in Bestwall, all parties, and especially injured talc claimants, will be severely and irreparably injured by a copycat case.

13.    The Bankruptcy Court for the Western District of New York similarly pointed to the harm that delay causes tort victims in its recent decision to deny a preliminary injunction to non-debtor entities in the sexual abuse case.  See The Diocese of Rochester v. AB 100 Doe (In re The Diocese of Rochester), supra, at p. 14 ("[g]iven the age of many of the Abuse Survivors, if enjoined from going forward with actions against the independent Catholic Corporations, it is likely that more will be denied the chance to seek justice because the sands of time are working against them"). In denying the preliminary injunction, the *Rochester* court further noted that "state courts are far better equipped to handle the trial of CVA cases (and provide the valuation of CVA claims) than is bankruptcy court or the district court.  And, the Abuse Survivors are entitled to have juries hear their cases – an option rarely available in bankruptcy courts." Id. The same reasoning applies here, and it was and remains the TCC's position that the injunction against non-Debtors should be lifted.

14.     Nonetheless, the TCC acknowledges and appreciates the Court's suggestion that the Court may consider terminating application of the stay and the preliminary injunction with regard to a segment of the pending talc cases.  The TCC and its professionals have been hard at work attempting to identify an appropriate "segment" of the pending talc cases, which would be appropriate and suitable for the Court to terminate application of the automatic stay and the application of the preliminary injunction so as to allow trials of these cases to proceed forthwith.

15.     In addition, counsel for the TCC and the Debtor have met and conferred concerning a briefing schedule in advance of the July 6th Hearing, at which the Court will consider whether the PI Order should be terminated or modified.  The Parties have agreed, subject to the Court's approval, that the TCC shall file its opposition to continuation of the stay by no later than June 22, the Debtor will submit its response by June 29th and the TCC will submit its reply no later than July 5th at noon.

16.     The pendulum has swung and the public interests of the talc claimants and other factors in addressing a PI weigh starkly in favor of terminating the PI and the TCC is prepared to brief that issue in accordance with a briefing schedule agreed to with the Debtor.  Nonetheless, if the Court is not inclined to fully lift the PI in toto as to all plaintiffs, the TCC will present a proposal which will, as noted above, permit certain trials which are "ready for trial" to proceed with respect to ovarian cancer and mesothelioma cases across multiple jurisdictions to proceed. To be clear, the TCC submits that it is critical that more than just a few cases be allowed to proceed to trial, as this does little to help progress this Case and only further prejudices talc claimants.  The TCC respectfully requests that a more fulsome approach be taken.

## II.    ESTIMATION, EXCLUSIVITY AND CASE PROGRESS

17.     On the date of the scheduled status conference, this Case will be exactly 8 months

old.  Regrettably, little has occurred in these 8 months that brings the injured claimants closer to recovering just compensation for their damages.  Even if this Court were to have jurisdiction to conduct an estimation proceeding, which the TCC would argue it does not, an estimation trial would only immerse this case further into "legal quicksand".  An estimation path is a path to delay and will not assist in any way resolution of this Case under a plan.  The estimation history in In re Garlock Sealing Technologies LLC, Case No. 10-31607 (Bankr. W.D.N.C. 2014), is instructive. There, the court adopted the debtor's estimation position, thereby allowing the debtor to propose a plan based on that estimation.  However, the debtor's plan failed to achieve the requisite support of the claimants for 11 U.S.C. § 524(g) purposes.  It was only after significant further litigation and negotiation, long after the plan was voted down, that the debtor was able to exit bankruptcy based on a new Plan that included a settlement with asbestos claimants that was approximately four times the estimated aggregate liability.  Here, not only does a confirmed plan similarly rest on the affirmative acceptance by claimants, the Debtor, per its repeated representations, has access to a $61 billion funding agreement, which would cover the value of the claims in this Case and further obviate any need for an estimation proceeding.   Indeed, other recent mass tort cases, including Purdue, Boy Scouts, Mallinckrodt, Imerys, and Cyprus have proceeded without any formal estimation proceeding.  In this jurisdiction, Judge Poslusny denied a motion for estimation in the Camden Diocese case.[5]  Simply put, the TCC submits that, where there is a viable alternative to estimation, it should be pursued.

18.    Should the Court terminate exclusivity, the TCC stands ready to file a plan of reorganization, utilizing the Funding Agreement, which Plan the TCC believes will receive overwhelming support from all classes of creditors.  The TCC's plan would not require claim

---

[5]    See In re The Diocese of Camden, New Jersey, Case No. 20-21257 (JNP) (Bankr. D.N.J.) [Docket No. 1125].

estimation at all. The TCC will certainly continue to use its best efforts to negotiate a global resolution with the Debtor and J&J, through the mediators. It is respectfully submitted that this case should not stand still while we hope for progress in the mediation. It is respectfully submitted that to create the appropriate balance and motivation for the parties in this Case the stay and injunction should be partially or completely vacated and exclusivity should be terminated.

## III.   **MEDIATION**

19.     The Talc Claimants' Committee is grateful for the hard work, deliberation and time committed to date by the Court-appointed mediators.  The TCC welcomes the appointment of retired Judge Steckroth pursuant to *Order Appointing Co-Mediator* [Docket No. 2370].  The TCC continues to speak with the mediators and remains willing to engage the Debtor and Johnson & Johnson ("J&J") in good faith but regrettably, as the Court noted at the May 24 hearing, less progress has been made than the Parties and the Court would have liked.[6]

## IV.   **APPEALS**

20.     On May 11, 2022, the Court of Appeals authorized direct appeal of this Court's opinions and orders denying the motion to dismiss and extending the automatic stay and granting a preliminary injunction to non-debtors, including J&J.  See, e.g., 3d Cir. Case No. 22-8015, Docket No. 12.  Those appeals (the "Appeals"), which number nine in total from multiple Appellants, are currently pending before the Court of Appeals as Case Nos. 22-2003, 22-2004, 22-2005, 22-2006, 22-2007, 22-2008, 22-2009, 22-2010, and 22-2011.  On May 27, 2022, the TCC filed an emergency motion with the Court of Appeals to (i) confirm, out of an abundance of caution, that the TCC as reconstituted has standing to pursue the Appeals filed by TCC I and TCC

---

[6]   *See* Hr'g. Tr. May 24, 2022, 3:22 – 4:2 ("I guess over the past month or so you've been engaged in mediation efforts with Judge Schneider and Mr. Russo. My limited understanding -- I had a very brief conversation with them, we are, I think it's fair to say, not as far along as he would have liked").

II; (ii) consolidate the Appeals; (iii) set briefing deadlines and word limits in connection with the Appeals; and (iv) expedite the Appeals by holding oral argument as promptly as is convenient for the Court of Appeals following the completion of briefing.  See, e.g., 3d Cir. Case No. 22-2003, Docket No. 5.  That Motion remains pending.  Under the proposed schedule, Appellants would file their respective opening briefs by June 30, 2022 and the Appellee would file its brief by August 15, 2022 (with reply briefs to be filed in accordance with the local rules).  Id.  In addition, on June 1, 2022, the TCC filed with the Court an application to retain MoloLamken LLP as special appellate litigation counsel in connection with the Appeals [Docket No. 2394].  That application remains pending.

21.    On March 21, 24, and 25, 2022, respectively, the TCC and Aylstock, Witkin, Kreis & Overholtz, PLLC also filed notices of appeal from the Court's final orders authorizing the Debtor's retention of the law firms of Skadden Arps, Slate, Meager & Flom LLP [Docket Nos. 1687, 1736] and Jones Day [Docket. 1855].  Those appeals are currently pending before Chief Judge Wolfson of the United States District Court for the District of New Jersey as Civil Action Nos. 22-cv-01621-FLW, 22-cv-01716-FLW, 22-cv-01696-FLW, and 22-cv-01712-FLW and have been procedurally consolidated under Civil Action Nos. 22-cv-01621-FLW (appeals from Skadden retention orders) and 22-cv-01712-FLW (appeals from Jones Day retention order).  On May 31, 2022, Chief Judge Wolfson entered a stipulated order staying briefing in the retention appeals pending resolution of the plenary Appeals pending before the Court of Appeals.  See, e.g., Civil Action No. 22-cv-01621-FLW, Docket No. 12.

## V.    **INSURANCE MATTERS**

22.    On May 2, 2022, the TCC selected Anderson Kill P.C. to serve as special insurance counsel for the TCC ("TCC Insurance Counsel"), and the related retention application in respect

of the firm was filed on May 26, 2022 [Docket No. 2365].  The objection deadline for the retention

application was June 7, 2022.

23.     TCC Insurance Counsel has begun receiving and reviewing the materials produced

by the Debtor related to insurance policies sold to J&J and Johnson & Johnson Consumer, Inc., to

which the Debtor now has certain rights.

24.     TCC Insurance Counsel has learned through its due diligence that J&J entered into

a settlement agreement on December 2, 2020 with the Home Insurance Company in Liquidation,

in respect of certain insurance policies obtained by J&J to which the Debtor is represented to have

rights.  Home Insurance Company ("Home") is in insurance insolvency proceedings in New

Hampshire Superior Court.  The New Hampshire Superior Court has granted several motions by

J&J and the Liquidator of the Home estate to hold approval of the J&J/Home settlement in

abeyance.  The present abeyance expired on June 6, 2022.  On June 2, 2022, J&J filed a motion to

hold approval of the settlement in abeyance for an additional 120 days.  J&J represented to the

New Hampshire Superior Court that the Liquidator of the Home estate had agreed to that requested

adjournment.

25.     J&J has represented that the Debtor's estate has rights to the Home insurance

policies.  The TCC will need additional time to evaluate the Home insurance coverage and its

proposed settlement.  J&J and the Liquidator of Home filed a motion to hold approval of the

settlement agreement in abeyance for 120 days and the TCC has filed a joinder in that request.

## VI.     ANCILLARY CANADIAN PROCEEDINGS

26.     The Canadian Proceeding is a foreign non-main proceeding ancillary to the Case.

Activity in the Canadian Proceeding is largely limited to recognition of critical relief granted in

the Chapter 11 Case.  The last court order granted in the Canadian Proceeding was on March 7,

2022, which recognized the extension of the US Preliminary Injunction Order following this Court's *Order (I) Declaring that the Automatic Stay Applies to Certain Actions against Non-Debtors and (II) Preliminarily Enjoining Certain Actions.*.

27.     As an update to Canadian stakeholders, on May 20, 2022, Ernst and Young Inc., in its capacity as Court-appointed Information Officer in the Canadian Proceeding, issued a Third Report of the Information Officer, which provided a general status update to stakeholders about the Case.

28.     The TCC's Canadian counsel, Miller Thomson LLP, will continue to monitor the Canadian Proceeding and participate in the Case as appropriate, provide material updates about the Canadian Proceeding, and assist with any other matter directed by the Talc Claimants' Committee.

## VII.   DATA, DILLIGENCE, AND DISCOVERY NEEDS

29.     As the Court may recall, the TCC served the Debtor with a Rule 2004 subpoena requiring the production of documents which the TCC believes remains important to the TCC and FCR in further negotiations and the continued administration of this Case. The Future Claims Representative (the "FCR") supported this request. That request was denied without prejudice by the Court.  The TCC maintains that the requested discovery and diligence is necessary for a productive mediation.  The data is also critical for wider case purposes, and it is necessary for the fiduciaries for Johnson & Johnson's talc creditors to have a full picture of the Debtor's and its affiliates' pre-petition liabilities.

## VII.   CONCLUSION

30.     The TCC is grateful for this Court's thoughtful consideration of the important and complicated issues that have arisen in this novel Chapter 11 Case. The TCC stands ready to address

the matters set forth above, or any other matters the Court feels should be addressed at the Status

Conference.

Respectfully submitted,

**GENOVA BURNS, LLC**


By: ___/s/  Daniel M. Stolz_____.

Daniel M. Stolz, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com

*Local Counsel to the Official Committee
of Talc Claimants of LTL Management, LLC*

## EXHIBIT A

**(Rochester Diocese)**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:

        The Diocese of Rochester,           Bankruptcy Case No. 19-20905-PRW
                                            Chapter 11

                Debtor,

_____

        The Diocese of Rochester,

                Plaintiff,

        vs.                           Adversary Proceeding No. 22-02075-PRW

        AB 100 Doe, et al,

                Defendant(s).

_____

### DECISION AND ORDER
### DENYING MOTION OF DIOCESE
### SEEKING TO ENJOIN THE PROSECUTION
### OF STATE COURT ACTIONS AGAINST
### INDEPENDENT CATHOLIC CORPORATIONS AND
### DISMISSING COMPLAINT

PAUL R. WARREN, U.S.B.J.

      For over two years, the victims of child sexual abuse ("Abuse Survivors") have refrained

from moving forward with their state court civil actions against parishes, schools and other

Catholic institutions ("Catholic Corporations") under the terms of a stipulated standstill agreement.

None of those Catholic Corporations have filed for bankruptcy protection—and, since the moment

the Diocese filed its Chapter 11 case, the Diocese has repeatedly reminded the Court that the assets

of the Catholic Corporations are beyond the reach of the Bankruptcy Court.  But, after eleven

extensions of their agreement to refrain from pursuing their claims against the Catholic

Corporations, the Abuse Survivors refused to extend the standstill agreement beyond March 23,

2022. In the two and a half years that have passed since the Chapter 11 case was filed by the

Diocese, at least three Abuse Survivors have died, without ever having the chance to tell their

stories to a state court jury.

In response to the looming termination of the standstill agreement, the Diocese filed this

adversary proceeding seeking to enjoin "the prosecution of certain lawsuits against the Diocese[1]

and/or non-debtor parishes, schools and other Catholic ministry entities and institutions within the

geographical territory of the Diocese" by victims of child sexual abuse. (ECF AP No. 4 at 1; *see

also* ECF AP No. 1). At the same time, the Diocese filed a motion requesting that the Court enjoin

the Abuse Survivors from moving forward with their state court actions against hundreds of

independent Catholic Corporations, none of which has sought bankruptcy protection. (ECF AP

Nos. 1-1, Ex. A; 1-2, Ex. B). Portraying itself as a victim, trying to do right by the Abuse

Survivors, the Diocese predicts that if state court litigation is permitted to move forward against

any of the Catholic Corporations, "the Diocese may be forced to pursue a non-consensual plan of

reorganization." (ECF AP No. 4 ¶ 5). That is a pretty heavy-handed threat to be leveled at the

people who are the real victims here—the Abuse Survivors.

For the reasons that follow, the motion of the Diocese is **DENIED**. The Abuse Survivors

can move forward with their state court civil actions against non-debtor independent Catholic

---

[1]      No suggestion has been made by counsel to any Abuse Survivor that the Diocese would be
included in any state court action against a Catholic Corporation, absent leave of this Court. The
Diocese's statement is curious by its presence. In July 2021, this Court refused to lift the automatic
stay as to state court actions against the Diocese. (ECF BK No. 1212). No one has made a
subsequent request for similar relief.

2

Corporations (and individual abusers)[2] and seek to reduce their claims to judgment.  However, the

Abuse Survivors are *not* permitted to attempt to enforce a state court judgment against any policy

of insurance that provides coverage to the Diocese as a named insured, without obtaining the prior

permission of this Court, following a motion on notice to all parties in interest.

## I.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding

under 28 U.S.C. § 157(b)(2)(A), (G) and (O).  In the event that it is determined that this Court

lacks the constitutional authority to enter a final judgment in this case, this Decision constitutes

the Court's findings of fact and conclusions of law, to the extent required by Rule 7052 FRBP.

## II.

## FACTS

In February 2019, New York State enacted the Child Victims Act ("CVA").  N.Y. C.P.L.R.

§ 214-g.  The CVA modified the existing statute of limitations, creating a "window" during which

the victims of child sexual abuse could commence a civil action against those individuals and

organizations alleged to be responsible for the abuse.  As a result, victims whose claims were (in

many instances) long-ago barred by the statute of limitations could now bring civil actions in the

state court to seek redress for their injuries.  The "window" opened on August 14, 2019, and was

---

[2]      Litigation against the Diocese or the Bishop is not permitted to proceed in state court,
however, absent further order of this Court.

3

to remain open for a one-year period.[3]  Faced with the prospect of potentially being named as a

defendant in hundreds of civil actions by Abuse Survivors, on September 19, 2019, the Diocese

filed a petition under Chapter 11 of the Bankruptcy Code.  (ECF BK No. 1).  The filing of the

Chapter 11 action stayed all litigation against the Diocese.

From day one, the Diocese has asserted that "[u]nder New York Law, the Diocese is an

incorporated legal entity, separate from the parishes and other Catholic entities within its territory."

(ECF BK No. 7 ¶ 16).  The 86 parishes located within the 12-county territory covered by the

Diocese are separate legal corporations, beyond the fiscal and operating control of the Diocese,

and no parish has filed for bankruptcy protection.  (*Id.* at ¶¶ 17, 23, 24).  The 8 non-Diocesan

Catholic schools located within the Diocese are similarly also separate legal corporations, and none

of these schools has filed for bankruptcy protection.  (*Id.* at ¶ 25-27).  Finally, there are a number

of other non-Diocesan Catholic entities[4] within the Diocese.  These Catholic entities are separate

legal corporations, beyond the fiscal and operating control of the Diocese, and none of these

entities has filed for bankruptcy protection.[5]   (*Id.* at ¶¶ 28-45).  Some of these Catholic

Corporations are (or would be) defendants in civil actions brought by Abuse Survivors in state

court.

Early on in the Chapter 11 case, the Creditors' Committee (acting on behalf of the Abuse

Survivors) and the Diocese entered into a "standstill agreement," by which the Abuse Survivors

---

[3]      The one-year window was extended to August 14, 2021 by the State because of the Covid-19 pandemic.

[4]      These "entities" include: Catholic Charities of the Diocese of Rochester, Inc.; Rochester Catholic Press Association, Inc. ("Catholic Courier"); Catholic Youth Organization of Catholic Charities of the Diocese of Rochester; Providence Housing Development Corporation; Camp Stella Maris of Livonia, N.Y.; St. Bernards School of Theology and Ministry; Villa of Hope; De Paul Community Services and Becket Hall.  (ECF BK No. 7 ¶¶ 29-45; ECF AP No. 1-2, Ex. B).

[5]      For the sake of brevity, the Court will refer to the parishes, schools and other entities as "Catholic Corporations."

agreed to refrain from pressing their state court actions against the Catholic Corporations for a period of time.  (ECF BK Nos. 428, Ex. B; 452).  That agreement was extended eleven times, with the most recent agreement expiring on March 23, 2022.  (ECF BK No. 1421).  Under the agreement, the Catholic Corporations had a period of 45 days from termination of the standstill agreement to respond to any state court actions brought under the CVA.  (ECF BK No. 452 ¶ 6).  Unsatisfied with the progress of negotiations, the Committee refused to consent to any further extension of the standstill agreement.  (ECF AP No. 4 ¶ 4).

In response, on April 6, 2022, the Diocese filed a complaint initiating this adversary proceeding.  (ECF AP No. 1).  The Diocese seeks a judgment declaring that the automatic stay, under section 362 of the Code, operates to prevent the Abuse Survivors from proceeding with litigation in their state court actions against the Catholic Corporations.  (*Id.* at ¶ 50).  In the alternative, the Diocese seeks an injunction barring the Abuse Survivors from continuing with their state court actions against any of the Catholic Corporations for a period of 90 days from the effective date of a confirmed Chapter 11 plan—a nebulous date that could be many months or years in the future.  (*Id.* at ¶ 51).  Contemporaneously with the filing of its complaint, the Diocese also filed a motion requesting that the Court issue a ruling declaring that § 362 of the Code automatically stays the Abuse Survivors from proceeding in state court against any of the Catholic Corporations.  (ECF AP No. 4 ¶ 6).  Alternatively, the Diocese's motion requests that if § 362 does not stay the state court litigation, the Court issue an injunction under § 105 of the Code and immediately enjoin the Abuse Survivors from moving forward with their state court actions against the Catholic Corporations.  (*Id.*).

The Committee strenuously opposes the motion, arguing that § 362 does not stay litigation against the non-debtor Catholic Corporations and that the Diocese has failed to carry its burden of

proof necessary for the imposition of an injunction.  (ECF AP No. 17).  Specifically, the Committee

argues that § 362(a)(1) and (a)(6) have no application here, and that § 362(a)(3), if it applies at all,

should only be applied to prevent the Abuse Survivors from attempting to enforce judgments

against insurance policies that also cover the Diocese, without the Court's prior permission.  (*Id.*

at ¶¶ 42-52).  And, the Committee asserts that the Diocese has failed to prove that it would suffer

an irreparable harm if the Abuse Survivors are permitted to go forward with civil actions against

the Catholic Corporations.  (*Id.* at ¶¶ 53-56, 85-87). The Committee is joined in its opposition by

many of the attorneys representing a number of Abuse Survivors, in their quest to have their day

in court to finally tell their stories to state court juries and have those juries decide the value of

their claims.  (ECF AP Nos. 18, 19, 21, 24, 25, 30, 31, 32, 33).  The Committee and state court

counsel confirmed that no state court litigation would (or could) proceed against the Diocese.


### III.

### DISCUSSION

The complaint that initiated this adversary proceeding and the motion before the Court are

substantially similar (if not identical) to the complaint and accompanying motion filed in cases

involving The Roman Catholic Diocese of Syracuse, New York (AP No. 21-50005-5-wak (Bankr.

N.D.N.Y. filed on May 16, 2022), ECF Nos. 1, 5) and The Diocese of Buffalo, N.Y. (AP No. 20-

01016-CLB (Bankr. W.D.N.Y. filed on May 2, 2020), ECF Nos. 1, 4).  Except for the words on

the pages of those documents, the similarities end there.  In both the Syracuse Diocese and Buffalo

Diocese cases, the request for injunctive relief was made very early-on in the bankruptcy case and

was directed only to a small subset of survivors.[6]  The vast majority of Abuse Survivors in both of those cases, acting through the Committee, consented to a voluntary standstill of state court litigation against the non-debtor Catholic Corporations.  The Diocese points to those cases as blueprints for this Court to follow in ruling on its motion.  But, this case is markedly different.  Here, the entire Abuse Survivor class (or nearly the entire class) opposes continuation of the self-imposed stay of litigation against the Catholic Corporations.  And, this bankruptcy case is far from its early stages, having been filed nearly 3 years ago.  So, while the Syracuse and Buffalo Diocese cases bear some similarities, there are far more differences to be considered here in balancing the competing interests of the parties.  And, while the public interest in preserving the *status quo* in favor of the Diocese may have been strong in the early months of this case, the weight of public interest during these later months now tips in favor of the Abuse Survivors—who have suffered in silence for so long—to be able to seek redress in the state courts from the non-debtor Catholic Corporations.

**A.  The Sweeping Injunction Sought by the Diocese Goes Too Far**

In its motion, the Diocese requests that the Abuse Survivors be enjoined from litigating against the Catholic Corporations in state court for a period of *90 days after the effective date of a confirmed Chapter 11 plan*.  (ECF AP No. 4, Ex. A ¶ 6).  Not only is that date nebulous, it is most likely very distant—particularly if the Diocese follows through on its suggestion that the Diocese may pursue a Chapter 11 plan to which the Abuse Survivors do not consent.  (ECF AP No. 4 ¶ 6).  At oral argument, the Diocese tempered its request for a long-term injunction by suggesting that the Court issue a preliminary injunction that the court could revisit every 3 to 4 months.  During

---

[6]      In Syracuse, the injunction request was directed to 6 Abuse Survivors.  In Buffalo, the injunction request was directed to approximately 35 Abuse Survivors.

7

that 3 to 4 month period, and for each successive 3 to 4 month period, the Abuse Survivors would continue to be prevented from pressing their claims against the non-debtor Catholic Corporations.

A preliminary injunction is a tool that is to be wielded with great care.  The Second Circuit has instructed the trial courts that:

> To obtain a preliminary injunction, a plaintiff must demonstrate: (1) *either* a likelihood that he will succeed on the merits of his claim, *or* that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, he will likely suffer irreparable harm before the court can rule upon his claim.

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994).  Coupled with the standards for the imposition of a preliminary injunction established by the Second Circuit, the Supreme Court has more recently advised the trial courts that:

> Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents. . . . In awarding a preliminary injunction a court must also "conside[r] . . . the overall public interest."  In the course of doing so, a court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."

*Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citations omitted).

Here, it is worth noting that the injunctive relief sought by the Diocese in its motion is identical to the relief it seeks in its complaint that initiated this adversary proceeding.  As the Court sees the relationship between the motion and the complaint, a win by the Diocese on the motion would logically be a win by the Diocese on the underlying action.  And, a loss by the Diocese on the motion would logically be a loss by the Diocese on the underlying action—calling for dismissal of the complaint.  With those principles in mind, the Court turns to the claim of the Diocese that the automatic stay under sections 362(a)(1), (a)(3), and (a)(6) prevent the Abuse Survivors from proceeding against the non-debtor Catholic Corporations.

8

1. ***Sections 362(a)(1) and (a)(6) Do Not Extend the Automatic Stay to the Catholic Corporations***

Taken together, sections 362(a)(1) and (a)(6) provide that the filing of a bankruptcy petition automatically stays "the commencement or continuation . . . of a judicial . . . proceeding *against the debtor* . . . or to recover a claim *against the debtor* that arose before the commencement of the [bankruptcy] case" and also stays "any act to collect, assess, or recover a claim *against the debtor* that arose before the commencement of the case." 11 U.S.C. § 362(a)(1) and (a)(6) (emphasis added). The Diocese argues that the reach of sections 362(a)(1) and (a)(6) is broad enough to prevent the Abuse Survivors from pressing their claims against the Catholic Corporations. The Court disagrees.

Both sections 362(a)(1) and (a)(6) specifically and in plain language refer to the stay of actions *against the debtor*. From the day that this Chapter 11 case was filed, on September 12, 2019, the Diocese has publicly and unequivocally insisted that the parishes, schools and Catholic Charities are separate legal entities, whose assets are beyond the reach of this Court. In a "Letter to the Faithful" from Bishop Matano, dated September 12, 2019, the Diocese said:

> I am sure you are concerned how this Chapter 11 filing affects your parish. The parishes are separately incorporated under New York State's Religious Corporation Law. Charitable entities such as Catholic Charities are separately incorporated under New York's Not for Profit Corporation Law. The ministries and operations of parishes and entities, such as our Catholic Charities agencies, should not be directly affected by the Diocese's Chapter 11 proceeding.

*Letter to the Faithful: Sept. 12, 2019*, https://www.dor.org/reorganization/.

The Catholic Corporations have not had to shoulder the burdens imposed by the Bankruptcy Code on debtors who submit to the jurisdiction of the bankruptcy court. And, but for the voluntary stay of litigation by the Committee, the Catholic Corporations are not protected by the automatic stay that sections 362(a)(1) and (a)(6) give to the Diocese. The Court holds that

sections 362(a)(1) and (a)(6) do not extend the bankruptcy automatic stay to Catholic Corporations.

> ### 2. *The Diocese Has Failed to Carry Its Burden of Proof Under Section 362(a)(3) to Demonstrate that Litigation Against the Catholic Corporations Would Adversely Affect Property of the Estate*

Perhaps recognizing that if successful in obtaining a finding by this Court that litigation in state court by the Abuse Survivors against the Catholic Corporations would adversely affect property of the Estate, and is therefore *automatically stayed* under section 362(a)(3), the Diocese has used a broad brush to paint a picture attempting to portray all litigation against the Catholic Corporations as necessarily diminishing the insurance coverage available to the Diocese. To that end, the Diocese asserts:

> [L]itigation in the CVA cases (even if only against the [Catholic Corporations]) will require the Diocese to expend funds to defend its own legal interests and will also erode collective insurance coverage shared by the Diocese and the [Catholic Corporations]. Because of this, the Diocese believes that any attempt by CVA Claimants to pursue the CVA Cases directly implicates property of the Diocese's bankruptcy estate and is therefore a direct violation of the Diocese's automatic stay.

(ECF AP No. 4 ¶ 9).

But, it is one thing to make that sweeping statement. It is another thing to prove it. Here, the Diocese made no effort to provide evidence showing that a *specific* CVA case would have a materially adverse impact on the per-occurrence limits of a *specific* policy of insurance. Instead, the Diocese invites the court to make a leap of faith and find that *any* state court litigation by *any* Abuse Survivor against *any* Catholic Corporation will necessarily adversely affect property of the Diocese's Estate. The Court declines that invitation.

The Court holds that the Diocese has failed to carry its burden of proving that a specific CVA case would materially erode coverage under a specific policy of insurance. As a consequence, the Court is not convinced that section 362(a)(3) stays litigation by Abuse Survivors

10

against non-debtor Catholic Corporations.  However, in the event that a reviewing court might come to a different conclusion, the Court will go a step further "to mold its decree to meet the exigencies of th[is] particular case." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citations omitted).  While litigation against the Catholic Corporations by Abuse Survivors can go forward in state court, this Court *will not* permit any judgment in favor of an Abuse Survivor to be executed against the proceeds of any insurance policy *under which the Diocese is named as a co-insured*, without the specific permission of this Court—as was suggested by the Committee.  (ECF AP No. 17 ¶ 47).  To be clear, under the authority granted by section 105(a) of the Code, the Court is *prohibiting* any Abuse Survivor from attempting to execute against or gain access to the proceeds of any insurance policy naming the Diocese as a covered co-insured, without the express permission of this Court in the form of an order, following a motion on notice to all parties in interest.  This prohibition does not extend to any policy of insurance naming only a Catholic Corporation and it does not extend to other assets owned in the name of a Catholic Corporation.  The Court molds the relief being granted to the Abuse Survivors in consideration of the overall public interest in allowing the Abuse Survivors to seek relief against the non-debtor Catholic Corporations in state court.

### B.  The Diocese Has Failed to Demonstrate that a Preliminary Injunction is Warranted

The Diocese argues that, if the Court finds that the reach of the automatic stay under section 362(a) does not operate to enjoin the Abuse Survivors from prosecuting actions against the Catholic Corporations, this Court should issue a preliminary injunction under section 105(a) of the Code.  To obtain a preliminary injunction, it is necessary for the Diocese to demonstrate (i) the likelihood of success on the merits, (ii) the likelihood of irreparable harm to the Diocese absent the injunction issuing, (iii) the balance of hardships tips decidedly in favor of the Diocese, and (iv)

11

the issuance of the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994). A preliminary injunction, while a tool of equity, is an "extraordinary and drastic remedy which should not be routinely granted except upon a clear showing that the movant has carried its heavy burden." *In re Anje Jewelry Co.*, 47 B.R. 485, 487 (Bankr. E.D.N.Y. 1983) (citation omitted).

### 1. *Likelihood of a Successful Reorganization Is Not a Given*

In the bankruptcy context, "likelihood of success on the merits" is treated by the courts as "likelihood of successful reorganization." *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007). The Diocese points to several bankruptcy landmarks it has passed along the way, as an indication of its progress toward a successful reorganization. (ECF AP No. 4 ¶ 57). But, in its motion, the Diocese also points to the serious possibility that it may seek to confirm a non-consensual Chapter 11 plan—a plan that does not have the consent of the Abuse Survivors. (*Id.* at ¶ 5).[7] While obtaining confirmation of a non-consensual plan is not impossible, it makes the likelihood of a successful reorganization much more difficult. Given the Diocese's suggestion that it may seek to confirm a Chapter 11 plan without the consent of the Abuse Survivors, the Court cannot conclude that a successful reorganization is likely. As a result, this factor weighs against the imposition of a preliminary injunction.

### 2. *Likelihood of Irreparable Harm Has Not Been Demonstrated*

The Courts point to "irreparable harm" as the most important element necessary to justify the imposition of injunctive relief. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.

---

[7]      In a filing made late last Friday, May 20, 2022, the Diocese made good on its prediction. (AP No. 19-02021-PRW, ECF Nos. 190-192).

1985).  Injuries to be avoided by a preliminary injunction must be actual, imminent, and unable to be rectified through monetary damages alone.  *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995).  The bankruptcy courts have issued preliminary injunctions "where the action to be enjoined is one that threatens the reorganization process."  *In re Calpine Corp.*, 365 B.R. at 409-10 (internal quotation marks and citation omitted).

Here, the Diocese argues that allowing the Abuse Survivors to move forward with their actions against non-debtor Catholic Corporations will threaten the reorganization process by depleting insurance proceeds, creating the risk of collateral estoppel and evidentiary prejudice, and diverting the attention of key personnel away from the task of reorganization.  (ECF AP No. 4 ¶ 60-62).  The Court is not persuaded.

First, by this Decision and Order, the Court specifically prohibits all Abuse Survivors from attempting to enforce a CVA judgment granted by any court from executing against the proceeds of any insurance policy that names the Diocese as a co-insured, absent a further order of this Court. Next, this case is nearly 3 years old.  Key personnel are well beyond the scramble for information that is typical in the early stages of a large Chapter 11 case.  Finally, the Court is not persuaded that *an immediate and irreparable adverse economic consequence* will be visited on the Diocese as a result of this decision.  None of the state court CVA cases have advanced much beyond the filing of a complaint.  There is likely much discovery to be conducted before any of the cases will be ready for trial.  It will be many months or years before any of the CVA cases are presented to a jury.

### 3.  *The Balance of Harms Tips Decidedly in Favor of the Abuse Survivors*

The injunction sought by the Diocese is open-ended and tied to the "effective date" of a confirmed Chapter 11 plan.  That date could be many months or years in the future.  During the

nearly 3 years that this Chapter 11 case has been pending, at least 3 Abuse Survivors have died. Whether those Abuse Survivors had potential CVA claims against any of the non-debtor Catholic Corporations is now largely academic.  But, what is not academic is the fact that those Abuse Survivors lost the chance to seek justice in a court of law.  Given the age of many of the Abuse Survivors, if enjoined from going forward with actions against the independent Catholic Corporations, it is likely that more will be denied the chance to seek justice because the sands of time are working against them.  Additionally, given the Diocese's unequivocal threat to pursue a non-consensual Chapter 11 plan, the valuation of CVA claims becomes vitally important to the confirmation process.  The state courts are far better equipped to handle the trial of CVA cases (and provide the valuation of CVA claims) than is the bankruptcy court or the district court.  And, the Abuse Survivors are entitled to have juries hear their cases—an option rarely available in bankruptcy courts.

The Court finds that the balance of harms to the Abuse Survivors, by the continued stay of litigation against non-debtor Catholic Corporations, is substantially greater than the speculative harms imagined by the Diocese.

### 4.   *The Public Interest Is Not Advanced By an Injunction Against the Abuse Survivors From Prosecuting CVA Cases Against Non-Debtor Catholic Corporations*

Since this bankruptcy case was filed in September 2019, the Diocese and the Abuse Survivors, acting through the Committee, endeavored to find a "global resolution" to be memorialized in a consensual Chapter 11 plan.  But the Diocese, the insurance carriers, and the Abuse Survivors have reached a point where a consensual resolution appears to be fading.  And, the Diocese's threat of pursuing a non-consensual plan—one that the Diocese would attempt to force on the Abuse Survivors—is no small matter.  It makes the possibility of a successful reorganization far more difficult and far more remote.

14

The Diocese asks this Court to place "the valuable public services performed by . . . the Diocese" above the interests of the Abuse Survivors in seeking justice and the right to proceed with their CVA cases against the Catholic Corporations. (*See* ECF AP No. 4 ¶ 64). The Catholic Corporations have, so far, been shielded from litigation by virtue of the Abuse Survivors' consent. That consent has been terminated. The Diocese asks this Court to find that the public interest is advanced more by the charitable public works it performs and will perform in the future, than would be the case if the Abuse Survivors were given the chance to ask for justice from a jury of their peers. But, what good are future charitable works if the people (children at the time) who suffered horrific acts of sexual abuse in the past (allegedly at the hands of clergy) are silenced? After all, it appears that silence played a leading role in perpetuating a climate where the abuse of children was possible. The appropriate remedy for the Catholic Corporations is to seek bankruptcy protection themselves, should the need arise, not for this Court to issue a sweeping injunction that would continue to shield non-debtor independent Catholic Corporations.

The Court finds that the public interest factor strongly favors denial of the injunctive relief sought by the Diocese.

# IV.

## CONCLUSION

The Abuse Survivors have been silenced, in many cases, for decades. The CVA window gave them the right to be heard. Instead, the Abuse Survivors agreed to refrain from pursuing their CVA claims against the independent Catholic Corporations in hopes that the Diocese's Chapter 11 case might provide an adequate measure of justice. After nearly 3 years, the Abuse Survivors have indicated their desire to seek redress from non-debtor Catholic Corporations. In response,

the Diocese has requested that the Court enjoin the Abuse Survivors, while also announcing an intention to seek confirmation of a Chapter 11 plan over the objection of the Abuse Survivors. After decades of silence, that might strike the Abuse Survivors as ironic.

The motion of the Diocese, seeking injunctive relief, is in all respects, **DENIED**.  The non-Debtor Catholic Corporations are directed to answer or otherwise appear in previously commenced state court CVA cases within 21 days of this decision.  Abuse Survivors whose claims against a non-debtor Catholic Corporation were not yet prosecuted, because of the standstill agreement issued in connection with this bankruptcy case, are permitted to file a CVA complaint in state court within 30 days of the date of this decision.  Under 11 U.S.C. § 362(a), no CVA cases are to be commenced or continued against the Diocese, as a party defendant—this prohibition extends to and includes any CVA action against the Bishop.  The Abuse Survivors are not permitted to attempt to enforce a state court judgment against any policy of insurance that provides coverage to the Diocese as a named insured, without obtaining the prior permission of this Court, following a motion on notice to all parties in interest.

Finally, because the relief sought by the Diocese in its motion is identical to the relief requested in the complaint in this adversary proceeding, which relief has been denied, the complaint is **DISMISSED, as MOOT**.  The Clerk of Court is directed to close this adversary proceeding immediately.

**IT IS SO ORDERED.**

DATED: May 23, 2022                              _____/s/_____
        Rochester, New York                    HON. PAUL R. WARREN
                                         United States Bankruptcy Judge