**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No. 21-30589 (MBK) |
| Debtor.[1] | Judge: Michael B. Kaplan |
| | **Hearing Date and Time:**<br>June 14, 2022 at 10:00 a.m. |

**DEBTOR'S STATEMENT ON PROPOSED NEXT STEPS IN CHAPTER 11 CASE**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

### Introduction

The Debtor respectfully requests that the Court order the parties to engage in a process to estimate the aggregate value of the talc claims asserted against it and, thereby, facilitate the on-going mediation designed to achieve an equitable resolution of this case.  Estimation here will force the parties to develop support for their positions pursuant to a schedule set by and under the supervision of this Court, which will advance this case and mediation by requiring the parties to objectively consider their positions.  Despite their many disagreements and commitment to vigorous advocacy, one thing should not be in dispute as between the parties:  A consensual resolution is in the best interests of all.  One-sided plans of reorganization or additional, duplicative or lottery-like "test" trials of a single plaintiff's claim would do nothing to advance the fundamental goal of a full, fair and final resolution of this chapter 11 case.

As the Court is aware, the Debtor, the Official Committee of Talc Claimants (the "TCC"), the legal representative for future talc claimants (the "FTCR"), and other parties are currently engaged in mediation in an effort to reach agreement on a consensual plan of reorganization.  The Debtor remains fully committed to the mediation process.  Unfortunately, as of the submission of this Statement, no agreement has yet been reached.  And, while the Court has expressed support for continuing mediation, it has also made clear that this case "has to move forward."  See May 24, 2022 Hr'g Tr. 4:17-18; id. 4:22-5:1.

This Statement sets forth the Debtor's effort to harmonize the goal of a consensual resolution with the realities of the mediation process to date, and to address the Court's objective to "both move forward with mediation but move the case forward as need be and try to preserve the rights of the claimants as well as the debtor."  Id. at 5:2-6.

## I.     Overview of the Debtor's Proposed Path Forward

The primary, underlying dispute among the parties – and the central issue in this case – is the extent of the Debtor's liability for current and future ovarian cancer and mesothelioma claims allegedly caused by exposure to talcum powder products.  It is the principal focus of the mediation and the issue that must be resolved before a successful, consensual reorganization can be achieved.

The Debtor respectfully submits that an estimation process is necessary to move this case forward.  It will require the parties to focus on and develop well-supported, well-reasoned positions with respect to the central issue in this case, and it will provide a framework for further mediation sessions that will significantly enhance the prospects for successful negotiation of a consensual plan.

The estimation the Debtor proposes would be for purposes of formulating and confirming a plan of reorganization, not for purposes of determining distributions to claimants.  Its focus on the extent of the Debtor's liability for talc claims will assist plan negotiations in a number of ways.  First, it will enable the parties to gather needed information relevant to a determination of the extent of the Debtor's liability.  Second, it will enable the parties to better understand and evaluate the strength of their own positions and the positions of other parties with respect to that liability.  Third, if settlement is not reached before the conclusion of the estimation process (which has occurred in multiple other mass tort cases and is the goal here), the parties will obtain the benefit of the Court's impartial views on the extent of the liability.  Estimation has been essential to the resolution of a number of mass tort cases.  In these cases, it proved to be the key event fostering a consensual resolution and, ultimately, confirmation of a reorganization plan.

Estimation here will impose discipline on the mediation process, requiring the parties to develop both factual and expert support for their positions within a timeline and pursuant to a

NAI-1531248323

schedule set by this Court.  It will exert pressure on the parties to objectively consider their

positions in advance of a potential ruling by the Court on the merits of those positions.

Estimation will also provide the Court with information it will need to address any future

disputes or non-consensual plans, assuming that a consensual resolution cannot be reached as

part of the estimation process.  And, at a minimum, fulsome disclosures of the parties' positions

with respect to the extent of the Debtor's liability will allow the parties and the Court to

understand the "bookends" or the range within which a settlement should be possible.

Importantly, these disclosures will also provide the parties with an opportunity to assess the

sufficiency or reasonableness of amounts that have already been raised and discussed in the

mediation.  Indeed, the Debtor believes that estimation will show that it currently is willing to

agree to an amount to resolve this case that is far in excess of any amount that could reasonably

be presented to and estimated by this Court.

 The Debtor recognizes that, in some cases, estimation has taken a substantial period of

time.  That is antithetical to the Debtor's goal here.  Accordingly, to expedite the process in this

case and to promote mediation efforts, the Debtor proposes a different approach.  Specifically,

the Debtor proposes that the Court conduct the estimation in two distinct phases and, of *equal

importance*, that each phase incorporate mediation sessions into the schedule.

 A more fulsome explanation of the two phases, as well as the proposed schedule and

discovery for each phase, is provided in Sections II.C and II.D below.  The highlights, however,

are as follows:

- Phase One would address the medical and science evidence relevant to the ovarian cancer and mesothelioma claims.  This phase would conclude ***this calendar year (2022)***, take no more than ***7 Court days*** in total, and include at least ***4 additional mediation sessions.***

- Phase Two would address quantification evidence (<u>i.e.</u>, the value of the claims). To maximize efficiencies and avoid delay, discovery for Phase Two would commence immediately and run concurrently with the conduct of Phase One.  The hearing for Phase Two would conclude within *one year* of the date of this submission (June 2023), take no more than *5 Court days* in total, and include at least *4 additional mediation sessions*.

- *1* additional mediation session would be scheduled after the Court's estimation ruling.  The mediators would be free to schedule further mediation sessions at other points during the estimation process.

In short, the Debtor's proposal is designed to give the parties every conceivable opportunity to fully analyze both their own and competing positions on all the key issues, reach consensus in a deliberate and organized manner, and to do so in the next 12 months.  No doubt other possible paths forward will be offered, and the Debtor has proactively addressed some of the likely alternative proposals in Section III.  But the Debtor strongly believes that its proposed two-phase estimation process, which includes milestones for additional mediation sessions, is the most effective alternative, indeed the only alternative, that will foster a prompt consensual resolution of this case.

The Debtor is prepared to immediately meet and confer with the parties on a form of case management order to implement this process.

## II.    Estimation

### A.    Absent Agreement, Estimation Is Mandatory

The Bankruptcy Code provides that "[t]here *shall* be estimated for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . ." 11 U.S.C. § 502(c) (emphasis added).  "Section 502(c) of the Bankruptcy Code is drafted in mandatory terms.  That is, any contingent or unliquidated claim 'shall' be estimated so long as the 'liquidation' of the particular claim would 'unduly delay the administration of the case.'" <u>In re G-I Holdings, Inc.</u>,

NAI-1531248323

323 B.R. 583, 599 (Bankr. D.N.J. 2005); see also In re Federal-Mogul Glob., Inc., 330 B.R. 133,

154 (D. Del. 2005) (". . . it is apparent that the Bankruptcy Code requires an estimation in order

to prevent undue delay in the administration of the estate"); A.H. Robins Co. v. Piccinin,

788 F.2d 994, 1011–12 (4th Cir. 1986) ("Th[e] duty of estimation in a proper case

under section 502(c) is not a permissive one; it is a mandatory obligation of the bankruptcy

court.").

Numerous courts have found estimation necessary and appropriate in analogous, mass

tort contexts.  See, e.g., G-I Holdings, 323 B.R. at 599–600 ("Given this very real assessment of

the enormity of litigation facing G–I Holdings, requiring the Company to first liquidate each and

every asbestos-related personal injury claim outside of the bankruptcy context would

undoubtedly cause undue delay in the administration of the bankruptcy case and could possibly

be the death knell for the successful reorganization of this debtor.  Therefore, some form of

estimation proceeding is required."); In re Federal-Mogul, 330 B.R. at 154 ("It is undisputed that

the Personal Injury Claims are contingent and unliquidated, and that liquidation of each claim by

a trial would unduly delay the administration of these cases."); In re Bestwall LLC,

No. 17-31795 (LTB) (Bankr. W.D.N.C. Jan. 19, 2021), *Order Authorizing Estimation of Current*

*and Future Mesothelioma Claims*, Dkt. 1577 ¶ 4 ("There is no dispute that the liquidation of the

asbestos-related claims asserted or that may be asserted against the Debtor (collectively,

the "Bestwall Asbestos Claims") would unduly delay the administration of this chapter 11 case;

accordingly, cause exists to grant the Motion."); In re DBMP LLC, No. 20-30080 (JCW) (Bankr.

W.D.N.C. Nov. 29, 2021), *Order Authorizing Estimation of Current and Future Mesothelioma*

*Claims,* Dkt. 1239 (authorizing estimation of current and future mesothelioma claims); In re

NAI-1531248323

<u>Aldrich Pump LLC</u>, No. 20-30608 (JCW) (Bankr. W.D.N.C. Apr. 18, 2022), *Order Authorizing Estimation of Asbestos Claims*, Dkt. 1127 (same).

The same is true here.  With nearly 40,000 ovarian cancer and over 400 mesothelioma claims pending against the Debtor on the petition date, it would take literally hundreds of years to liquidate these claims on an individual basis.

### B.    The Need for Medical and Scientific Evidence to Assist With Quantification

Formation of a consensual plan and the eventual resolution of this case hinges on the parties' and this Court's ability to appropriately estimate the value of the unliquidated claims. The value of those claims turns, in significant part, on the medical and scientific evidence; therefore, an estimation process requires consideration of such evidence.

Because estimation is "bound by the legal rules which may govern the ultimate value of the claim," the goal of estimation is to determine a reasonable estimate of the Debtor's liability for current and future talc claims under state law.  <u>Bittner v. Borne Chem. Co.</u>, 691 F.2d 134, 135 (3d Cir. 1982) ("when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law").  In estimation, claims that are unenforceable under state law should not receive value.  <u>See</u> 11 U.S.C. § 502(b)(1) (claims must be disallowed to the extent unenforceable under applicable law).[2]  Moreover, the ***value*** of any potentially allowable claims must also be determined under applicable state law.  <u>See, e.g.</u>, <u>In re Farley, Inc.</u>, 146 B.R. 748, 752-56 (Bankr. N.D. Ill. 1992) (estimating group of personal injury claims pursuant to section 502(c) according to their merit under state tort law, and estimating by determining claimants had "about a one-in-four chance of winning" in any jury trial on key

---

[2]    <u>In re Cont'l Airlines Corp.</u>, 64 B.R. 858, 860-61 (Bankr. S.D. Tex. 1986) (estimating at zero mental anguish claims because they failed "as a matter of law").

NAI-1531248323

factual issue); <u>In re Ralph Lauren Womenswear</u>, 197 B.R. 771, 775 (Bankr. S.D.N.Y 1996)

(holding that estimated value of contract claim is "the amount of the claim diminished by [the]

probability that it may be sustainable only in part or not at all") (quotation omitted).

Accordingly, courts in analogous contexts have consistently found it is necessary and

appropriate to consider medical and science evidence in estimating the value of a debtor's

aggregate liability.  For example, in the <u>USG</u> case, the debtor contended that it had valid

defenses to liability and sought to "challenge the validity of the claims against [it] in the context

of the estimation hearing."  <u>In re USG Corp.</u>, 290 B.R. 223, 223-24 (Bankr. Del. 2003).  The

claimants' committee and future claimants' representative contended that a "merits-based

estimation hearing" would be "unnecessary and unduly burdensome" and that estimation should

be based solely on USG's "pre-petition settlements and litigation history." <u>Id.</u> at 224.  The <u>USG</u>

court agreed with the debtor, stating:  "In an asbestos bankruptcy, the Court will, within the

constraints of the law, reject unsubstantiated claims, bogus medical evidence and fanciful

theories of causation."  <u>Id.</u> at 225.  The case settled while the parties were engaged in the

estimation process.

Likewise, in <u>G-I Holdings</u>, the court rejected an attempt to preclude the debtor from

contesting liability, holding that the debtor "should be afforded an opportunity to review the

claims against the estate and object to those claims that it believes are illegitimate or dispensable

as a matter of law."  323 B.R. at 623.  The court permitted the debtor to "present any relevant

defenses" and "attack any medical evidence submitted by the Committee in the estimation

proceeding," as well as "move for summary judgment on certain issues on a claims-wide

consolidated basis pursuant to Federal Rule of Bankruptcy Procedure 7042." <u>Id.</u> at 626.  Like

<u>USG</u>, this case also settled during the estimation process.

NAI-1531248323

In the <u>Garlock</u> case, the court considered both the debtor's legal liability approach and the claimants' representatives' settlement approaches to estimation.  The competing analyses yielded estimates that differed by more than $1 billion.  <u>In re Garlock Sealing Techs., LLC</u>, 504 B.R. 71, 74 (Bankr. W.D.N.C. 2014).  After considering the evidence, the court concluded that the settlement approach was an "unreliable predictor of [Garlock's] true liability," <u>id.</u> at 86, for two principal reasons:  because the settlement history was "infected by the manipulation of exposure evidence by plaintiffs and their lawyers" and because many cases were settled "virtually entirely for cost avoidance" with no "real analysis of the 'liability' to any individual claimant." <u>Id.</u> at 82, 87.  The court further relied on its consideration of medical and science evidence, concluding that "Garlock's products exposed people to only a low-dose of a relatively less potent chrysotile asbestos and almost always in the context where they were exposed to much higher doses of more potent amphibole asbestos," such that "across all potential claims, Garlock's liability for mesothelioma should be relatively small." <u>Id.</u> at 75.

Here, the Court has discretion to determine the appropriate method for estimating claims, consistent with the purpose of estimation to avoid undue delay in the administration of the estate. <u>See</u> <u>Bittner</u>, 691 F.2d at 135; <u>In re Adelphia Commc'ns Corp.</u>, 368 B.R. 140, 278-79 (Bankr. S.D.N.Y. 2007).  Regardless of the precise procedures or estimation methodology adopted, however, the goal would be to determine the validity and amount of claims on an aggregate basis under applicable law (here, state tort law).

### C.    Phase One:  Medical and Science Evidence

During Phase One of the estimation, the parties would introduce medical and science evidence sufficient to enable the Court to assess the strength of claimants' contentions that talcum powder products are a substantial contributing factor to the development of ovarian cancer and mesothelioma.  That assessment will assist the Court in ultimately determining its

NAI-1531248323

estimate of the extent of the Debtor's liability for these talc claims.  The parties would prepare

and exchange expert reports, conduct depositions of the experts and, if appropriate, file pretrial

motions, including motions that challenge all or parts of the opinions of the other side's experts.[3]

More specifically, Phase One would consist of two separate hearings on medical and

science evidence – one for ovarian cancer claims and one for mesothelioma claims.  The details

of Phase One would include the following:

- Each hearing would proceed with the sides being allotted equal time, which time would be subject to a chess clock.

- Because the vast majority of talc claims filed against the Debtor assert ovarian cancer, the hearing on ovarian claims would proceed first.

- The *ovarian hearing* would occur over the course of *4 Court days*.  Each side would be allotted *2 Court days*, total, for any opening or closing statements, presentation of affirmative evidence and any cross examinations.

- To ensure the completion of Phase One within the current calendar year, the ovarian hearing would be scheduled for *November 2022*.

- A mediation session would occur after completion of expert depositions during Phase One;

- A mediation session would occur after the disposition of any pretrial motions.

- A mediation session would occur after the close of the ovarian hearing in Phase One.

- The second hearing, regarding mesothelioma claims, would commence approximately 30 days after the close of the ovarian hearing, in *December 2022*.

- The *mesothelioma hearing* would occur over the course of *3 Court days*.  Each side would be allotted *1 Court day* plus 2 ½ additional hours, total, for any opening or closing statements, presentation of affirmative evidence and any cross examinations.

- A mediation session would occur after the close of the mesothelioma hearing in Phase One.

- Additional proposed deadlines for Phase One (both hearings) would be as follows:

---

[3]    Although District Judge Wolfson issued a <u>Daubert</u> ruling in the MDL in April 2020, the evidence on which her ruling was based was presented in July 2019.  Since the submission of that evidence approximately three years ago, there have been significant developments, including additional studies and publications by health agencies and experts, that further establish the absence of any link between talcum powder products and the development of ovarian cancer or mesothelioma.

     o   July 30: Expert Disclosures

     o   September 1:  Expert Reports

     o   October 15: Close of Expert Discovery and Depositions

     o   Mediation session to follow conclusion of Expert Discovery

     o   November 1: Pre-trial Motions, if any, to be filed

At the conclusion of these hearings in Phase One, the Court would ***not*** be asked to make any findings regarding the medical and science evidence for either ovarian cancer or mesothelioma claims.  Rather, the Court would take the evidence into account during Phase Two and make any such findings at the conclusion of Phase Two and as part of its ultimate estimation ruling.

### D.    Phase Two – Quantification Evidence

During Phase Two of the Debtor's proposed estimation, the parties would present evidence quantifying the Debtor's liability for current and future ovarian cancer and mesothelioma claims.  Specifically, in addition to evidence on the history of the products at issue, the litigation arising from those products and other topics, the Debtor expects to present expert testimony regarding the number of current ovarian cancer and mesothelioma claims actually being asserted against the Debtor and the characteristics of those claims.  The Debtor will also present expert testimony on the aggregate value of the current claims taking into account their characteristics and the applicable requirements of state law.  This valuation will rely on the factors directly relevant under state law, including the total damages incurred by the claimants, the number of other responsible parties, the recoveries claimants might receive or have received from other parties (including bankruptcy asbestos trusts), and the claimants' likelihood of success.

The Debtor's case also will include expert testimony projecting the number of future ovarian cancer and mesothelioma claimants that will have and assert compensable claims against

NAI-1531248323

the Debtor.  The Debtor's expert(s) will present an aggregate valuation of the claims of such

future claimants, again relying on the factors directly relevant under state law, and taking into

account their likelihood of success.  Finally, the Debtor will present expert testimony applying

inflation and discount rates to the aggregate estimation amount, which is necessary to determine

the net present value of the claims as of the petition date.

The Debtor anticipates that the TCC will present an analysis that treats past settlements of

ovarian cancer and mesothelioma claims as proxies for its liability and then estimate the Debtor's

liability based on its settlement history.  The Debtor will oppose that approach on a number of

grounds but, in the wake of these respective evidentiary presentations by both sides, the parties

and the Court will have important information regarding the "bookends" for the ongoing

negotiations as well as important information to assess the reasonableness or sufficiency of the

amounts that have been discussed to date.[4]

The details of Phase Two would include the following:

- The hearing would proceed with the sides being allotted equal time, which time would be subject to a chess clock.
- The hearing would occur in *June 2023* over the course of *5 Court days*.  Each side would be allotted 2 ½ Court days, total, for any opening or closing statements, presentation of affirmative evidence and any cross.
- Mediation sessions would occur after completion of fact discovery, after completion of expert depositions, after disposition of any pretrial motions and after the conclusion of the hearing during Phase Two;
- Additional deadlines for Phase Two are as follows:
    - January 27, 2023:  Close of Fact Discovery
    - February 28, 2023:  Expert Disclosures
    - April 3, 2023:  Expert Reports
    - May 19, 2023:  Close of Expert Discovery

---

[4]    Whether the respective estimations will be viewed by each side as appropriate "bookends" for the negotiations will depend on whether the approaches are scientifically sound and supported by the facts and reasonable assumptions.

NAI-1531248323

      o   June 2, 2023:  Pre-trial Motions, if any, to be filed

- A further mediation session would occur after the Court issues its estimation ruling.

### E.    Discovery In Connection with Phase Two of the Estimation

To expedite the Phase Two schedule and maximize efficiencies, the Debtor proposes that discovery relevant to Phase Two issues commence immediately and proceed on a parallel track with Phase One.  As part of the Phase Two discovery process, the Debtor will seek the submission of personal injury questionnaires that provide, among other things, information regarding (a) the type of ovarian cancer or mesothelioma alleged, (b) use of the cosmetic talc products, (c) risks factors, (d) other exposures and (e) economic loss.  The Debtor also will seek information from certain asbestos bankruptcy trusts to determine if any of the mesothelioma claimants whose claims the Debtor resolved prepetition have submitted trust claims to those trusts.  In addition, the Debtor may seek discovery from plaintiff law firms and other defendants regarding resolved talc claims.  For their part, the TCC and the FTCR will have an opportunity to seek discovery from the Debtor regarding its settlements and other relevant information, and from other parties.

### F.    Mediation Sessions

The Debtor's goal remains to reach a resolution of this chapter 11 case as soon as possible.  As reflected above, the Debtor believes it would be beneficial to schedule mediations at the following key milestones in the estimation proceeding:

      (a)  After completion of expert depositions during Phase One;

      (b)  After the Court's rulings on any pretrial motions during Phase One

      (c)  After the conclusion of each of the hearings in Phase One;

      (d)  After completion of fact discovery during Phase Two;

      (e)  After completion of expert depositions during Phase Two;

(f)  After the Court's rulings on any pretrial motions during Phase Two;

(g)  After the conclusion of the Phase Two hearings;

(h)  After the Court issues its estimation ruling (for a total of *9* additional

mediation sessions); and

(i)  Any other date selected by the co-mediators or ordered by the Court.

These sessions will only take place if a settlement has not been reached by the time of the

relevant milestone.

III.    **Other Potential Alternatives Would Not Advance This Chapter 11 Case**

A.    **Permitting a Claimant Plan of Reorganization Would Only Distract the Parties and Waste Time and Resources**

Permitting the claimants to file a plan of reorganization would not encourage settlement

or otherwise advance this chapter 11 case.  The Debtor has consistently stated its intention of

negotiating a consensual plan of reorganization as soon as possible.  The Debtor and Johnson

& Johnson ("J&J") are already highly motivated to achieve this goal.

In addition, a confirmable plan depends on more than the ability to garner the requisite

votes.  The Debtor's aggregate liability on account of talc-related claims would need to be

estimated or agreed to in order for a plan to have any prospect of success.  See Bestwall, *Order

Authorizing Estimation of Current and Future Mesothelioma Claims*, Dkt. 1577 ¶¶ 8, 9 (stating

that "some determination must be made about the Debtor's aggregate liability to current and

future claimants for purposes of evaluating the Debtor's amended plan of reorganization" and

that without estimation, "[t]he Court similarly has no basis to assess the merits or fairness of

either of the plans of reorganization proposed by the Debtor on the one hand and the ACC and

the FCR on the other").  Among other plan considerations, either a consensual determination of

the Debtor's liability or some other determination will be necessary to enable this Court to

NAI-1531248323

evaluate the "best interests of creditors" test under 11 U.S.C. § 1129(a)(7).[5]  In addition, to

confirm a plan, the claimants would have to prove that they are not receiving more than the

allowed amount of their claims.  As Collier states, "The second major component of the 'fair and

equitable' requirement is that no creditor or interest holder be paid a 'premium' over the allowed

amount of its claim.  Once the participant receives or retains property equal to its claim, it may

receive no more.  The reason for this rule is obvious, and goes back to the basic understanding

between debt and equity."  7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][ii] (16th 2022)

(footnotes omitted).[6]  That is not possible without an agreement or an estimation.  Thus, any

cram down plan the claimants might seek authority to propose would have no prospect for

success absent an estimation and would only waste time and divert the parties from efforts that

could lead to a successful conclusion of this case.

It is simply premature to incur the significant costs of a plan solicitation process – costs

that will likely be incurred a second time after the parties reach an agreement on a consensual

plan.  These costs would include preparation of a plan of reorganization and related disclosure

statement as well as solicitation procedures and related noticing program.  They would also

include the costs of providing notice of the disclosure statement, including by publication, to

claimants, and the parties' attendance at multiple court hearings.  These efforts will likely be

accompanied by significant motion practice and hearings.  Moreover, it would require significant

time to complete the solicitation and plan process associated with a claimant proposed plan.  In

---

[5]     For example, the Fourth Circuit in A.H. Robins used an estimation to find that the "best interests of
creditors" test was met and to reject dissenting claimants' allegations that the trust funding was too low.
In re A.H. Robins Co., Inc., 880 F.2d 694, 698-700 (4th Cir. 1989).

[6]     See, e.g., In re Breitburn Energy Partners LP, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) ("An unwritten
corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for
its claims."); In re Idearc Inc., 423 B.R. 138, 170-71 (Bankr. N.D. Tex. 2009) ("The corollary of the
absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%)
recovery for their claims.").

NAI-1531248323

short, there is no reason to move forward with a cramdown plan now that would require a ruling

on estimation.  See Bestwall, Jan. 20, 2022 Hr'g Tr. 13:15-14:13, Dkt. 2371 (adjourning hearing

on asbestos claimants' committee's proposed cramdown plan and related disclosure statement

until after conclusion of estimation hearing because estimation should occur before consideration

of plan).

### B.    MDL Trials Would Not Generate Meaningful Information and Would Take Significant Time

Thirteen ovarian cases were tried to verdict over the last eight years.  Plaintiffs sustained

a judgment for monetary damages in only *one* of those cases.[7]  In each of the thirteen cases,

plaintiffs' counsel selected the individual plaintiffs whose cases would proceed to trial and chose

the state court jurisdiction in which the cases would be tried, most if not all of which are very

well known to be difficult venues for defendants.

Despite these challenges, Johnson & Johnson Consumer, Inc. ("Old JJCI") and J&J

consistently won.  In fact, they obtained unanimous defense verdicts in all four ovarian cases

tried in 2021, including a 3-plaintiff trial[8] – trials which occurred *years after* the MDL court's

Daubert opinion on general causation was issued.

Trying some number of additional ovarian cases in the MDL will not provide useful

guidance to the parties or the Court.  Old JJCI and J&J have already demonstrated the ability to

obtain defense verdicts even when the jurisdictional odds were stacked against them.  Thus,

trying a case in the MDL will not change the Debtor's view of its aggregate liability.  Likewise,

---

[7]    See Ingham v. Johnson & Johnson, 608 S.W. 3d 663, 724-25; 693-94 (Mo. App. 2020).

[8]    See Cadagin v. Johnson & Johnson, (Case No. 18-L-572, Circuit Court of the Twentieth Judicial Circuit, St. Clair County, IL July 30, 2021), Kleiner v. Johnson & Johnson, (Jan. Term 2017 No. 2505, Court of Common Pleas of Philadelphia County September 24, 2021), Giese, et al. v. Johnson & Johnson, (Case No. 1522-CC00419-02, Circuit Court for the City of St. Louis September 27, 2021), and Monroe v. Johnson & Johnson, (Case No. 2018RCSC01222, Court of Richmond County, GA. October 4, 2021).

NAI-1531248323

if multiple unanimous defense verdicts in jurisdictions of the claimants' choosing have not

educated the TCC or other parties as to the value of the cases, a MDL trial is unlikely to make a

difference.  If anything, the overwhelming record on the ovarian trials makes abundantly clear

what the Debtor has already stated:  The Court should hear from the parties on the science and

medicine of ovarian cancer to assist with the assessment of the value of such claims.

Relatedly, the time and expense required to try even one or two additional ovarian cases

would be substantial.  As of the petition date, six cases had undergone only partial expert

discovery in the MDL.  Even assuming one of those cases were chosen as a trial case, expert

depositions, expert challenges, dispositive briefing, and other pretrial matters (designations,

motions in limine, exhibit lists, etc.) would all still remain and require substantial time and effort

by the parties.

### C.    Mesothelioma Trials Yield Unpredictable, Lottery-Like Verdicts and, As a Result, Additional Trials Will Not Assist the Court or the Parties

Similarly, there is nothing that a series of mesothelioma trials can tell the parties that they

have not already learned through the underlying litigation.

From 2017 through the petition date, 33 mesothelioma trials commenced with 26 of those

cases culminating in a jury verdict or mistrial.  The plaintiffs whose cases proceeded to trial

included those suffering from pleural, peritoneal or pericardial mesothelioma.  Some of the cases

were consolidated for trial, while others proceeded on a single plaintiff basis.  The facts of the

cases ranged widely, including allegations that some of the plaintiffs were exposed to traditional

sources of asbestos or other brands of talcum powder, whereas others were allegedly exposed

only to Johnson's Baby Powder.  The cases were tried before juries in thirteen separate cities

across ten states.  The plaintiffs were represented by eight different law firms, all of which are

either members of the TCC or otherwise actively participating in this chapter 11 case.  The trials

commenced both before and after the Food and Drug Administaration's findings in October of

2019 of sub-trace levels of chrysotile asbestos in a single bottle of Johnson's Baby Powder, a

finding that J&J's own extensive investigation revealed was caused by test sample contamination

or analyst error or both.  And the results of the trials – both before and after October 2019 – run

the gamut from defense verdicts to plaintiff verdicts, with compensatory damages ranging from

$2.45 to $40 million for a single plaintiff.  While some juries awarded substantial punitive

damages, others awarded none at all.

In addition, while the parties disagree on both the motivations and significance of the

settlements and, importantly, whether the settlements should be treated as proxies for the

Debtor's liability, it bears noting that hundreds of mesothelioma cases were settled with

numerous plaintiffs' firms across a variety of states and for a range of values.  Additional trials

will not add any material information to this body of data, nor change the lottery-like outcomes

of the dozens of cases already tried.[9]

Lastly, trying additional mesothelioma cases would also take substantial time.

Mesothelioma trials take many weeks (and sometimes many months, depending on venue) to try,

and then a year or more for appellate resolution.  In contrast, the Debtor's proposed phased

estimation can be completed in approximately a year and, unlike trials of individual cases, will

focus the parties on the Debtor's aggregate liability for all current and future talc claims as

opposed to its liability in a handful or less of individual cases.  Moreover, important milestones

---

[9]     Notably, the developing appellate record in talc litigation – both in those cases tried by Old JJCI and J&J
and those tried by others – does not lean in plaintiffs' favor.  See, e.g., Lanzo v. Cyprus Amax Minerals
Co., 467 N.J. Super. 476, 517-18 (App. Div. 2021) (reversing an adverse verdict against J&J and rejecting
the opinions of Plaintiffs' core talc experts as unreliable); Nemeth v. Brenntag N. Am., No. 24, 2022 WL
1217464 (NY Apr. 26, 2022) (reversing and dismissing a talc plaintiff's trial win while affirming that, even
in talc cases, the plaintiff must quantify the risk and show an actual increased risk from talc use).

NAI-1531248323

in the proposed estimation process, which are coupled with additional mediation sessions, will

begin to occur in the next few months.

### Conclusion

The estimation proposal described in this Statement offers the most effective option for

this Court to move this case forward to a prompt consensual resolution.  The proposed

combination of estimation and mediation will foster settlement by focusing the parties on the

central issue in this case:  the extent of the Debtor's liability for talc-related claims.  It will

require the parties to develop reasoned, supportable positions and it will enable them to assess

the strengths and weaknesses of their own position and the positions of the other side.  It will

also impose discipline on the process by setting a schedule by which the parties must be in a

position to present their respective cases on the central issue in the case.

Other alternatives identified to date will not foster a prompt resolution or advance the

parties' views on the central issue.  Instead, they will only distract the parties, generate

unnecessary costs and take a significant period of time.

The Debtor respectfully submits that the best path forward to achieve a consensual

resolution is the process proposed in this Statement, a thoughtful estimation process that moves

expeditiously but deliberately and allows for mediation throughout.

NAI-1531248323

Dated: June 10, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

NAI-1531248323