MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com

150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922

*Counsel for Mesothelioma Claimant and Appellant*
*Katherine Tollefson and Certain Mesothelioma Claimants*

### IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No. 21-30589 |
| Debtor. | Adv. Pro. No. 21-03032 |
| | Honorable Michael B. Kaplan |
| LTL MANAGEMENT, LLC, | **Hearing date: July 26, 2022** |
| Plaintiff, | |
| v. | |
| THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT and JOHN AND JANE DOES 1-1000, | |
| Defendants. | |

### MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC'S[1] REPLY IN SUPPORT OF OBJECTION TO EXTENDING PRELIMINARY INJUNCTION TO NON-DEBTOR JOHNSON & JOHNSON

---

[1] "MRHFM" represents 61 mesothelioma victims with pending lawsuits against Johnson & Johnson and its affiliates, including Appellant Katherine Tollefson, as well as other mesothelioma victims who would have filed suit against these entities but for the preliminary injunction this court ordered.

MRHFM appreciates the concern the court has expressed for cancer victims throughout this case, including at the recent hearing on July 6. There has been much discussion about a "settlement" of this matter, which the court apparently favors.[2] Unfortunately, the insurmountable—and *constitutional*—impediment is that *no one* on Earth has power to give Johnson & Johnson what the Company requires to "settle": a permanent channeling injunction that binds future victims or that compels current plaintiffs to forego a jury trial and from seeking punitive damages. The Seventh Amendment gurantees an individual's right to a trial by jury and prohibits any "settlement" that closes courthouse doors to objecting current victims or to future plaintiffs that are not even sick yet. In this *non*-limited fund case, an Article I bankruptcy court, three mediators, a futures claims representative, court appointed experts, and a whole of bunch of lawyers, *cannot* fix the unconstitutionality of the only "settlement" J&J will ever accept; so let's not waste what little time dying mesothelioma victims have left trying to. No matter how many people are working hard for no matter how long, we can't get *there* from here.[3]

A common Two Step "debtor" refrain is that this is all being done for the benefit of the "claimants." MRHFM's clients didn't ask for, don't need, and don't want "saving" from the tort system. J&J doesn't like losing jury verdicts but the Company apparently doesn't like resolving cases at arm's length with mesothelioma victims in the legal system, either. *Tough*. MRHFM's clients don't like being poisoned to death.[4] These plaintiffs and their families will not be

---

[2] From the court's comments on July 6, it is only considering lifting the injunction for a few cases and only if it furthers the purpose of "plan formation", noting that "every day we substitute continued litigation in lieu of resolution we are wasting time and resources that could otherwise be devoted to addressing those who are in the midst of suffering." Exhibit 1, Tr. 7/6/2022, pg. 5.

[3] "*There*" is a permanent channeling injunction for a non-distressed non-debtor with independent liability in a non-limited fund case.

[4] In granting wealthy non-debtor and independently liable tortfeasor Johnson & Johnson injunctive relief in February, this court wrote it would "revisit" the automatic stay and preliminary injunction at the end of June to "ensure that the parties progress in good faith towards mediation and plan confirmation." Dkt.

strongarmed or outlasted by Johnson & Johnson or its army of lawyers, simply because J&J hates that many different juries across the country—objective, selected, finders of fact—have concluded and will conclude in jury trials to come that asbestos in Johnson's Baby Powder causes mesothelioma.

MRHFM's clients stand on their Seventh Amendment rights, they object to any "plan", "re-organization" or "settlement" that offers *anything* less than unfettered access to jury trials and punitive damages, and they are in good company: four groups of cancer appellants have asked the Third Circuit to dismiss this case and/or lift the preliminary injunction, as has the Department of Justice, a constitutional scholar and law school dean, and seven bankruptcy law professors.[5] Despite the Debtor preaching to this court about what's "best" for the "claimants" and this court's sincere desire to provide relief to them, MRHFM's clients and other mesothelioma victims have repeatedly and strenuously objected to being here. *That* should matter.

Johnson & Johnson's arguments are legally unsupportable so instead it advances policy positions with sacharine infused false concern for its loyal—and now dying—customers. When mesothelioma plaintiffs began suing Johnson & Johnson in recent years—because long hidden internal documents revealed for the first time that J&J knew for decades that carcinogenic asbestos fibers were in its Baby Powder and the Company kept selling it anyway—J&J didn't care about mesothelioma victims. There was no "equitable" or "efficient" option for MRHFM and Levy

---

1573, pg. 54. More than a year after Jones Day pitched the Two Step to Johnson & Johnson, and now that the Company is shielded behind an injunction and stay, J&J has increased dividends and (surprise!) mediation is apparently at an "impasse" in reaching a "consensus among the parties." Exhibit 1, Tr. 7/6/2022, pg. 4.

[5] Exhibit 2, Brief for Erwin Chemerinsky, as *Amicus Curiae* in Support of Appellants and Supporting Reversal. Case 22-2003, Doc. 72, filed July 7, 2022. *See also* Exhibit 3, Brief For Andrew Vara, United States Trustee, as *Amicus Curiae* in Support of Appellants and Supporting Reversal. Case 22-2003, Doc 45, filed June 30, 2022; Exhibit 4, Brief for *Amici Curiae* Law Professors in Support of Appellants. Case 22-2003, Doc 74, filed July 7, 2022.

Konigsberg clients Donna and Robert Olson. J&J offered them $0. The Olsons had two options: ask a jury to decide their case or take $0. After several plaintiffs' verdicts, Johnson & Johnson "capitulated" and starting settling mesothelioma cases, all without financial distress.[6]

The oft-quoted statistics show that more than a super-majority of mesothelioma victims were timely receiving tangible relief in the tort system all while J&J was making more money and paying more dividends. And, none of these plaintiffs in the jury system had to sell out future victims or vote to approve the "re-organization" of a useless sheet of paper in order to receive compensation. An asbestos company like Johnson & Johnson doesn't pay victims because it *wants* to; J&J lost enough mesothelioma jury trials that the Company realized it was better to settle mesothelioma cases than to refuse to negotiate and continue losing verdicts. If Johnson & Johnson wants the protections of bankruptcy, it can file Chapter 11. By doing so, J&J would put its money where its mouth is, if, in reality, the Company is so worried about its asbestos liabilities.[7]

For a host of legal reasons, as well as practical ones, MRHFM urged the court—and will urge it again in 120 days—to lift the preliminary injunction protecting J&J and hundreds of non-debtor retailers, all with independent liability. *See* Dkt. 2564. A constitutionally sound and legally sustainable "consensual resolution" is **impossible** in this fraudulent solvent "bankruptcy" and ***non***-limited fund case. So, if all of the parties really care about the claimants as much as they say they do, this case should end. *Now.* Lifting the injunction would effectively do that. There's no reason to spend any more time or money trying the reach an unenforceable and unconstitutional "settlement."

---

[6] *See* MRHFM Opp. Exhibits, Dkt. 2569, Exhibit 15, David Kaplan Deposition (27:22-28:24, 31:7-32:24, 34:20-35:7) and Kaplan's "JNJ-Internal Conversation-10-13-2020" memo.

[7] Of course, first, the Company must admit it has **asbestos** liabilities because its talc contained **asbestos**. That, among other several other things, is required under a plain reading of 524(g); at least the original one. The Texas Two Step "debtors" and their non-debtor puppet masters contort 524(g) into a completely different statute than the one Congress passed in 1994.

Respectfully submitted:

**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**

_____
Clayton L. Thompson, Esq.
**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
cthompson@mrhmflaw.com

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-30589(MBK) |
| | . | Chapter 11 |
| LTL MANAGEMENT LLC, | . | |
| | . | Clarkson S. Fisher U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| | . | |
| | . | Tuesday, July 6, 2022 |
| . . . . . . . . . .. | | 10:03 a.m. |

TRANSCRIPT OF RAYBURN COOPER & DURHAM, P.A. FINAL APPLICATION
FOR COMPENSATION OF FEES AND REIMBURSEMENT OF EXPENSES OF [DKT
1748]; BROWN RUDNIK FIRST INTERIM APPLICATIONS FOR COMPENSATION
OF FEES AND REIMBURSEMENT OF EXPENSES OF [DKT 1761].

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day |
| | By:  GREGORY M. GORDON, ESQ. |
| | DAN B. PRIETO, ESQ. |
| | 2727 North Harwood Street, Suite 500 |
| | Dallas, TX 75201 |
| | |
| For the Official | Brown Rudnik, LLP |
| Committee of Talc | By:  DAVID J. MOLTON, ESQ. |
| Claimants 1: | 7 Times Square |
| | New York, NY  10036 |
| | |
| For Future Claims Rep | Walsh Pizzi O'Reilly Falanga LLP |
| Randi S. Ellis: | By:  MARK FALK, ESQ. |
| | 3 Gateway Center |
| | 100 Mulberry Street, 15th Floor |
| | Newark, NJ 07102 |
| | |
| Audio Operator: | Luz Di Dolci |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

4

1    and to address specific concerns that I may have, and since my

2    words from the bench seem to reappear quite often in briefs

3    filed subsequently, I thought it would be better to choose my

4    words carefully.  So, I apologize to the extent I'm reading

5    from notes.

6           First, as to the current mediation efforts.  I have

7    been kept up to date by the co-mediators up to the meaningful

8    progress made to date, but also as to the unfortunate reality

9    that we've reached an impasse in getting a consensus among the

10   parties.  And, quite simply, we are not there yet.  Not

11   everybody's on board with all or parts of the proposals laid

12   out by the co-mediators.

13          Allow me to emphasize now that in my discussions with

14   the co-mediators we do not discuss specific dollar amounts, or

15   specific issues, or specific party positions.  I just get a

16   reading on the -- in this case, cooperative efforts to date by

17   the parties, and where we're at, as far as how close to a

18   consensus.  But as I said I've been told we are simply not

19   there yet, and we could benefit from additional good faith

20   efforts by all.

21          Since I regard the July 26th hearing date as a

22   turning point in this case I am directing all the parties to

23   continue in good faith in mediation through the next hearing

24   date.  And I'm emphasizing I hope there's a willingness to

25   negotiate all key terms.  I am confident the parties are aware,

1  but I will nonetheless remind everyone what hangs in the

2  balance with respect to these negotiations which is a

3  settlement and a confirmed plan that can benefit the lives of

4  real people and their loved ones, and provide tangible, but

5  most importantly timely relief.

6          I am mindful that no party can accept a resolution

7  that is patently unfair, nor should it.  However, every day we

8  substitute continued litigation in lieu of a resolution we are

9  wasting our time and resources that could otherwise be devoted

10 to addressing those who are in the midst of suffering.

11 Needless to say, this Court is prepared to take any reasonable

12 steps to process any settlement that could be reached, and move

13 forward with a consensual plan if there were agreement.

14         Now, after July 26th I do expect further mediation

15 efforts to continue on an informal basis to the extent the co-

16 mediators and the parties regard further talks as beneficial

17 towards resolving specific issues.  At some point down the road

18 I will again require a more formal scheduled mediation session,

19 or multiple sessions, but we will see how the case progresses.

20         As to the continuation of the preliminary injunction

21 and the continued extension of the automatic stay, in reading

22 the briefs and statements that have been filed I believe

23 there's been, for some, a misunderstanding as to the Court's

24 intentions and expectations.  Let me be clear, I do not intend

25 to allow, and will not consider reargument of my decisions as

# Exhibit 2

# United States Court of Appeals

*for the*

# Third Circuit

---

Case Nos. 22-2003(L), 22-2004, 22-2005,
22-2006, 22-2007, 22-2008, 22-2009,
22-2010, 22-2011

In re: LTL MANAGEMENT LLC

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

## BRIEF FOR ERWIN CHERMINSKY, AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS AND SUPPORTING REVERSAL

NATALIE D. RAMSEY
ROBINSON & COLE LLP
*Attorneys for Amicus Curiae*
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
(302) 516-1700

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF *AMICUS CURIAE* .......................................................... 1

INTRODUCTION AND SUMMARY OF THE CASE ............................. 3

ARGUMENT .......................................................................................... 8

    I.    LTL'S PETITION CREATES SERIOUS CONSTITUTIONAL
        VIOLATIONS. ............................................................................ 8

        A.    The Resolution of State Law Tort Claims by the
              Bankruptcy Court Would Violate *Stern* and Raise Serious
              Questions Under Article III ........................................ 8

        B.    This Case Gives Rise to Grave Seventh Amendment
              Violations .............................................................. 13

        C.    This Case Raises Serious Questions Regarding the
              Deprivation of Claimants' Constitutional Due Process
              Rights ................................................................... 17

    II.    THE SEPARATION OF POWERS PRINCIPLES REQUIRE
        THIS COURT TO APPLY THE CANON OF
        CONSTITUTIONAL AVOIDANCE. ........................................ 21

CONCLUSION .................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Almendarez-Torres v. United States*,
　523 U.S. 224 (1998) ..................................................................................23

*Amchem Prods. v. Windsor*,
　521 U.S. 591 (1997) ...........................................................................18, 24

*Ashwander v. Tenn. Valley Auth.*,
　297 U.S. 288 (1936) ..................................................................................23

*Ass'n v. Gibbons*,
　455 U.S. 457 (1982) ..................................................................................21

*Beard v. Braunstein*,
　914 F.2d 434 (3d Cir. 1990) ..............................................................14, 15, 17

*In re Bellingham Ins. Agency, Inc.*,
　702 F.3d 553 (9th Cir. 2012) .....................................................................11

*Billing v. Ravin, Greenberg & Zackin, P.A.*,
　22 F.3d 1242 (3d Cir. 1994) ......................................................................14

*Cohen v. de la Cruz*,
　523 U.S. 213 (1998) ....................................................................................5

*Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi., R.I. & P. Ry. Co.*,
　294 U.S. 648 (1935) ..................................................................................22

*DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Const. Trades Council*,
　485 U.S. 568 (1988) ..................................................................................24

*In re Energy Future Holdings Corp*,
　949 F.3d 806 (3d Cir. 2020) ......................................................................18

*Exec. Benefits Ins. Agency v. Arkison*,
　134 S. Ct. 2165 (2014) ..............................................................................12

*In re Fisher Island Invs., Inc.*,
　778 F.3d 1172 (11th Cir. 2015) ..................................................................11

# TABLE OF AUTHORITIES

(continued)

*In re Frazin,*
732 F.3d 313 (5th Cir. 2013) ...................................................11

*In re G-I Holdings, Inc.,*
323 B.R. 583 (Bankr. D. N.J. 2005) .........................................14, 17

*In re Global Techs. Inc.,*
694 F.3d 705 (6th Cir. 2012) ..................................................11

*Granfinanciera, S.A. v. Nordberg,*
492 U.S. 33 (1989)...........................................................11, 14, 21

*In re Grossman's Inc.,*
607 F.3d 114 (3d Cir. 2010) ..................................................18

*Hooper v. California,*
155 U.S. 648 (1895).........................................................24

*Logan v. Zimmerman Brush Co.,*
455 U.S. 422 (1982).........................................................17

*In re LTL Mgmt. LLC,*
No. 22-8015 [Dkt. No. 12-1] (3d Cir. May 11, 2022) ....................5, 23

*In re Millennium Lab Holdings II, LLC,*
945 F.3d 126 (3d Cir. 2019) ................................................9, 12, 13

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
458 U.S. 50 (1982)...........................................................10, 14, 21

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999).........................................................18, 19

*In re Ortiz,*
665 F.3d 906 (7th Cir. 2011) ................................................11, 18, 19, 20

*Plaut v. Spendthrift Farm, Inc.,*
514 U.S. 211 (1995)..........................................................9

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Renewable Energy Dev. Corp.*,
792 F.3d 1274 (10th Cir. 2015) ........................................................................11

*Ross v. Bernhard*,
396 U.S. 531 (1970) ..........................................................................................14

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) ..........................................................6, 17, 21, 22

*Stern v. Marshall*,
564 U.S. 462 (2011) ............................................... 8, 9, 10, 11, 12, 13, 21

*Tulsa Pro. Collection Servs., Inc. v. Pope*,
485 U.S. 478 (1988) ..........................................................................................18

*United States ex rel. Toth v. Quarles*,
350 U.S. 11 (1955) ..............................................................................................9

*Waldman v. Stone*,
698 F.3d 910 (6th Cir. 2012) ...........................................................................11

*Wellness Int'l Network, Ltd. v. Sharif*,
135 S. Ct. 1932 (2015) .......................................................................................12

**Statutes**

11 U.S.C. § 524(g) .......................................................................6, 15, 16, 24

11 U.S.C. § 1112(b) ............................................................................................4

28 U.S.C. § 157 ...........................................................................................3, 12, 15

28 U.S.C. § 158 ....................................................................................................5

**United States Constitution**

Article I ....................................................................................................3, 6, 13, 21

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Article III ........................................................................... 3, 7, 8, 9, 12, 13

Fifth Amendment ................................................................................ 7

Seventh Amendment ............................................... 3, 7, 13, 14, 15, 16, 17

Fourteenth Amendment ................................................................ 7, 17, 18

**Rules**

Federal Rule of Appellate Procedure 29(a) ............................................. 1

Federal Rule of Civil Procedure 23 ...................................................... 18

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Erwin Chemerinsky is a scholar of United States constitutional law, and files this brief under Federal Rule of Appellate Procedure 29(a).  As a historian, academic and professor of constitutional law, Dean Chemerinsky has a strong interest in the constitutional issues presented in this case.

Dean Chemerinsky has an academic career spanning nearly 40 years. Presently, he is the Dean of the University of California, Berkeley School of Law and the Jesse H. Choper Distinguished Professor of Law, and the 2022 President of the Association of American Law Schools.  Prior to assuming this position, from 2008 to 2017, he was the founding Dean and Distinguished Professor of Law, and Raymond Pryke Professor of First Amendment Law, at the University of California, Irvine School of Law, with a joint appointment in Political Science.  Before that, he was the Alston and Bird Professor of Law and Political Science at Duke University from 2004 to 2008, and from 1983 to 2004 was a professor at the University of Southern California Law School, including as the Sydney M. Irmas Professor of

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Dean Chemerinsky declares that: (i) while no party has authored this amicus brief in whole or in part, the brief does include arguments Dean Chemerinsky included in an amicus brief filed with the Bankruptcy Court, parts of which TCC counsel contributed to; (ii) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (iii) no person, other than Dean Chemerinsky and his counsel, contributed money to prepare or submit this brief.  Pursuant to Rule 29(a)(2), the Appellee, along with each of the Appellants, consented to the filing of this *amicus curiae* brief.

Public Interest Law, Legal Ethics, and Political Science. He is the author of 14 books, including casebooks and leading treatises on constitutional law and federal jurisdiction. Amicus has authored more than 200 law review articles and is a contributing writer for several newspapers. He also frequently argues appellate cases, including in the Supreme Court of the United States.

Dean Chemerinsky has frequently written and lectured about constitutional issues relating to the bankruptcy courts. He submits this brief to address his concerns about the ramifications of a judicial endorsement of bankruptcy cases that breach the borders drawn by the United States Constitution and the United States Bankruptcy Code. Specifically, Dean Chemerinsky writes to address why, as a matter of constitutional law, the order of the United States Bankruptcy Court for the District of New Jersey issued in the Chapter 11 case of LTL Management, LLC, case no. 21-30589 (MBK), denying the *Motion of the Official Committee of Talc Claimants to Dismiss Debtor's Chapter 11 Case* [Dkt. No. 632], should be reversed.

## INTRODUCTION AND SUMMARY OF THE CASE

Bankruptcy courts are courts of limited jurisdiction, created by Congress pursuant to Article I, Section 8, Clause 4 of the Constitution.  They are empowered to provide extraordinary relief to the "honest but unfortunate" debtor, and in so doing permit, among other things, maximization of recovery to creditors, preservation of jobs, and other societal benefits.  But Article I, Section 8, Clause 4 of the Constitution does not allow for the deprivation of other constitutional rights.  For that reason, personal injury cases may not be liquidated by the bankruptcy courts and the right of personal injury claimants to a jury trial is expressly preserved by 28 U.S.C. § 157.

In cases whose purpose is not a legitimate business reorganization, even a temporary or interim impact on the fundamental and essential constitutional rights of creditors cannot be justified.  Without strict adherence to the statutory framework created by the Bankruptcy Code, the bankruptcy process could be abused to deny creditors their constitutionally protected rights under Article III and the Seventh Amendment.  The Bankruptcy Code should not be construed in that manner.

This case involves just such an abuse.  The Debtor is a newly created shell, with no business to restructure, no operations to rehabilitate, and no customers or genuine employees to serve.  In short, the Debtor has no reorganizational purpose.  Worse, the Debtor's case was filed to provide bankruptcy relief to non-debtor

Johnson & Johnson Consumer Inc. ("New JJCI"), the real successor to tortfeasor
Johnson & Johnson Consumer Inc. ("Old JJCI"), which received the assets and
business of tortfeasor Old JJCI in the divisional merger that created the Debtor.
And perhaps worst of all, it is a blatant litigation tactic and forum-shopping exercise
that affects the constitutional rights of thousands of individual tort claimants.

On October 11-12, 2021, Johnson & Johnson ("J&J"), a conglomerate with a
market capital of over $400 million, embarked on a series of corporate machinations
to isolate all of the talc-related personal injury tort liabilities of its solvent and
successful subsidiary, Old JJCI, through a divisive merger under Texas law.  The
transaction resulted in the creation of New JJCI and LTL Management, LLC
("LTL" or the "Debtor").  Substantially all of the operating assets of Old JJCI were
allocated to New JJCI, while all of Old JJCI's talc liabilities, and little else, were
foisted upon LTL.

Just two days later, on October 14, 2021, LTL sought bankruptcy protection
under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")
before the United States Bankruptcy for the Western District of North Carolina.  The
case was subsequently transferred to the United States Bankruptcy Court for the
District of New Jersey (the "Bankruptcy Court").  Thereafter, several parties
representing talc claimants sought to dismiss LTL's bankruptcy pursuant to
Bankruptcy Code § 1112(b) for cause as a bad faith filing (the "Dismissal Motions").

4

Following motion practice and a multiday hearing on the Dismissal Motions (and a related preliminary injunction motion), the Bankruptcy Court denied the Dismissal Motions.  The Bankruptcy Court certified its decision for direct review before this Court pursuant to 28 U.S.C. § 158(d)(2).  Over the Debtor's opposition, this Court granted the claimants' petitions for permission to appeal, *see* Order, *In re LTL Mgmt. LLC,* No. 22-8015 [Dkt. No. 12-1] (3d Cir. May 11, 2022), and these consolidated appeals followed.

When bankruptcy courts adhere to the Bankruptcy Code's "basic policy" of "affording relief only to an 'honest but unfortunate debtor,'" *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998), bankruptcy provides a debtor with a "fresh start" that can benefit not only the debtor, but its creditors and society at large.  But where the goal of a bankruptcy is to afford a non-debtor with the benefits of bankruptcy without submitting itself to bankruptcy, as in the instant case, serious constitutional issues arise.

The Debtor in this case is a sham entity that was created solely to allow the Debtor's wealthy predecessor and its ultimate parent (J&J, which has separate, direct liability) to avoid the resolution of claims in the state tort system, and thus to deny individual tort claimants fundamental and constitutionally guaranteed rights, including: (i) the right to have Article III courts resolve traditional causes of action, such as personal injury suits; (ii) the right to jury trial in such cases; and (iii) the

right to due process, including the right to have each individual case heard on the merits.

This Court has held that the Bankruptcy Code does not "allow for the filing of a bankruptcy petition that lacks a valid reorganizational purpose." *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999). But that is precisely what the Debtor, New JJCI, and J&J seek to do. If LTL is in financial distress because its predecessor, Old JJCI, was in financial distress—as the Bankruptcy Court found— then Old JJCI should have filed for bankruptcy protection. The structural subordination of one type of creditor, and the failure to fairly distribute assets among creditors in accordance with the Bankruptcy Code's priority scheme, constitutes bad faith. If the Bankruptcy Court's determination that LTL is in financial distress is in error because it is based on the general proposition that the future is uncertain, then LTL would have no legitimate basis to take advantage of "bankruptcy" as envisioned by Article I, Section 8, Clause 4.

In either event, LTL is not an entity seeking to reorganize consistent with the policies underlying bankruptcy. It is not "reorganizing" so that it may continue in business, save jobs, or benefit the community; it is not liquidating under chapter 11 so that it may fairly distribute limited funds among its creditors. Indeed, LTL cannot liquidate because liquidation would not afford it the section 524(g) relief it seeks. It is not seeking to adjust its debtor/creditor relationships in a proper manner. Instead,

the Debtor is taking a discrete group of creditors and trapping them in one-sided
litigation that deprives them of their urgent constitutional rights to seek justice for
the injuries caused by the products of non-debtors—the very non-debtors that crafted
a corporate manipulation designed to misuse bankruptcy.   In addition, LTL's
bankruptcy is not designed principally for the relief of the newly created "Debtor."
It is designed to provide relief to entities that have not placed themselves in a
bankruptcy process.

JJCI's machinations disserve, rather than promote, chapter 11's
reorganization purposes, and the Debtor's abuse of the Bankruptcy Code raises grave
constitutional questions under Article III of the Constitution, the Due Process
Clauses of the Fifth and Fourteenth Amendments, and the right to jury trial protected
by the Seventh Amendment. Therefore, this Court should reverse the Bankruptcy
Court and dismiss the Debtor's case.   Such a course of action would also comport
with separation of powers principles by ensuring that courts do not apply the
Bankruptcy Code in a manner that Congress never imagined, and certainly never
authorized.

## ARGUMENT

## I.    LTL'S PETITION CREATES SERIOUS CONSTITUTIONAL VIOLATIONS.

### A.    The Resolution of State Law Tort Claims by the Bankruptcy Court Would Violate *Stern* and Raise Serious Questions Under Article III.

Permitting the Debtor to invoke bankruptcy jurisdiction to resolve tort claims

on the basis of the "Texas two-step" bankruptcy at issue here raises serious questions

under Article III of the Constitution.  This case presents two unusual and problematic

components.  First, this case was ***not*** filed by the "real" tortfeasor; it was filed by an

entity created to seek bankruptcy resolution of a certain type of liability disfavored

by the entity with the liability, while allowing that entity to avoid submitting itself

to the bankruptcy process.  This structure is ***not*** intended to provide bankruptcy relief

to the "debtor," but instead to provide that relief to one or more non-debtors.

Second, Appellees seek to use bankruptcy relief to adjust the rights of

creditors where the entity holding the liabilities is not in imminent or foreseeable

financial distress.  In so doing, it constitutes a litigation strategy that deprives the

targeted creditors of their fundamental and guaranteed constitutional rights to

resolve those claims on an individual basis before an Article III court and jury.

Instead, these creditors are forced into a proceeding before a court that cannot

determine those liabilities, while LTL seeks to impose a process that will delay and

adjust these creditors' rights against an entity that has the financial wherewithal to

fully satisfy these liabilities.[2]  Case law interpreting the bounds of Bankruptcy Court

jurisdiction has expressly held that the Constitution does not so permit.

"Article III provides for the establishment of a court system as one of the

separate but coordinate branches of the National Government . . . ." *United States

*ex rel. Toth v. Quarles*, 350 U.S. 11, 15 (1955). "Since ratification, Article III has

served a crucial role in our 'system of checks and balances' and 'preserve[s] the

integrity of judicial decisionmaking[.]'" *In re Millennium Lab Holdings II, LLC*,

945 F.3d 126, 139 n.13 (3d Cir. 2019) (quoting *Stern v. Marshall*, 564 U.S. 462,

483-84 (2011)). It protects each branch from undue interference by the other two

branches and helps secure individual liberty. *Stern*, 564 U.S. at 483.

The "record of history shows that the Framers crafted this charter of the

judicial department with an expressed understanding that it gives the Federal

Judiciary the power not merely to rule on cases, but to *decide* them, subject to review

only by superior courts in the Article III hierarchy." *Plaut v. Spendthrift Farm, Inc.*,

514 U.S. 211, 218-19 (1995) (emphasis in original). The Supreme Court has "long

recognized that, in general, Congress may not 'withdraw from judicial cognizance

any matter which, from its nature, is the subject of a suit at the common law, or in

---

[2] Neither the Bankruptcy Court's opinion on the Motion to Dismiss nor its companion opinion relating to injunctive relief appears to address this argument. *See generally*, Memorandum Opinion, Case No. 21-30589 (MBK) [Doc. No. 1572] (filed Feb. 25, 2022) (the "Dismissal Opinion"); Memorandum Opinion, Adv. Pro. No. 21-03032 (MBK) [Doc. No. 184] (filed Feb. 25, 2022).

equity, or admiralty.'" *Stern*, 564 U.S. at 484 (citation omitted). "When a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Id*. (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in judgment)); *see also N. Pipeline*, 458 U.S. 50 (1982) (plurality opinion) (holding bankruptcy court could not constitutionally decide state law claim for breach of contract against entity that was not otherwise part of the bankruptcy proceedings).

Article III prevents a bankruptcy court from adjudicating common-law tort claims against non-debtors that are brought before a bankruptcy court through artifice, as in this case. In *Stern*, the Supreme Court held that the bankruptcy court lacked the constitutional power to enter a final judgment on a state law tortious interference counterclaim the debtor had asserted in an adversary proceeding where the claim would not be "resolved in the process of ruling on [the counterclaim defendant's] proof of claim" and did not derive from or depend upon bankruptcy law. 564 U.S. at 497, 499, 503. *Stern* explained that the tortious interference claim had to be decided by an Article III court because "this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when

10

the action neither derives from nor depends upon any agency regulatory regime." *Id*.

at 494 (emphasis in original). "[T]he "'experts' in the federal system at resolving

common law counterclaims such as [debtor's] are the Article III courts, and it is with

those courts that [debtor's] claim must stay." *Id*. Otherwise, "[i]f such an exercise of

judicial power may nonetheless be taken from the Article III Judiciary simply by

deeming it part of some amorphous 'public right,' then Article III would be

transformed from the guardian of individual liberty and separation of powers we

have long recognized into mere wishful thinking." *Id.* at 494-95.[3] Thus, "Congress

---

[3] *See also Waldman v. Stone*, 698 F.3d 910, 918-20 (6th Cir. 2012); *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 564 (9th Cir. 2012) ("*Granfinanciera* involved a federal-law claim, and *Stern* involved a state-law claim. But *Stern* held that both claims required an Article III court."); *In re Global Techs. Inc.*, 694 F.3d 705, 722 (6th Cir. 2012) (*Stern* held that "[w]hen a claim is 'a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy,' the bankruptcy court cannot enter final judgment.") (quoting *Stern*, 564 U.S. at 487) (additional citation omitted); *In re Frazin*, 732 F.3d 313, 319 (5th Cir. 2013) ("Despite the narrowing language at the end of the Court's opinion, *Stern* clearly grounded its reasoning in principles that are broad in scope."); *In re Ortiz*, 665 F.3d 906, 911, 914 (7th Cir. 2011); *In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1192 (11th Cir. 2015).

As now-Justice Gorsuch explained for the Tenth Circuit:

> But along the way *Stern* did clearly take at least one thing off the table. It held that when a "claim is a state law action . . . and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," it implicates private rights and thus is not amenable to final resolution in bankruptcy court.

*In re Renewable Energy Dev. Corp.*, 792 F.3d 1274, 1279 (10th Cir. 2015) (Gorsuch, J.), *as amended on denial of reh'g* (July 28, 2015) (citations omitted).

may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* (emphasis in original).

The Supreme Court's opinions following *Stern* have adopted the same reasoning. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) (holder of a *Stern* claim is entitled to an adjudication of that claim by an Article III court, unless he **consents** to a final disposition of the claim by the Bankruptcy Court); *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2172 (2014). *Stern* held that Article III barred bankruptcy court adjudication of the claim even though that counterclaim was a "core" proceeding under the Bankruptcy Code. As this Court has explained, *Stern* makes clear that "bankruptcy courts may violate Article III even while acting within their statutory authority in 'core' matters." *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 135 (3d Cir. 2019) (citation omitted).

In recognition of these constitutional concerns, Congress expressly excluded "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11" from "core" claims. *See* 28 U.S.C. § 157(b)(2)(B).

The mesothelioma and ovarian cancer talc claims at issue here are "'made of the stuff of the traditional actions at common law tried by the courts at Westminster

in 1789.'" *Millennium*, 945 F.3d at 134 (quoting *Stern*, 564 U.S. at 484). These claims do not "stem from the bankruptcy itself." *Id.* at 136. And the claims against third-party entities (including J&J and New JJCI) would not "necessarily"—indeed ***cannot***—be resolved in the bankruptcy proof of claim process. Because the bankruptcy is a transparent attempt to evade the limits of Article I by creating a shell "debtor" to take on certain liabilities of New JJCI and J&J (the true defendants), the claims cannot be considered integral to the restructuring of a debtor-creditor relationship, which this Court has said is critical to assessing a *Stern* claim. *See Millennium*, 945 F.3d at 140.

The Debtor and its parent seek to subvert Article III jurisdiction through a carefully orchestrated charade through which non-debtors New JJCI and J&J have sought to claim all the benefits of bankruptcy, with none of the obligations. If the "exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by" manipulation of corporate structure such as occurred here, "then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking." *Stern*, 564 U.S. at 494-95.

### B.    This Case Gives Rise to Grave Seventh Amendment Violations.

The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be

preserved . . . ." U.S. Const., amend. 7. The Seventh Amendment applies to suits in which "legal rights [are] to be ascertained and determined," *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (internal quotation marks omitted), and these include "[a]ctions sounding in tort" for damages to person or property. *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1245 (3d Cir. 1994). Accordingly, "asbestos claims . . . constitute lawsuits seeking the adjudication of 'legal rights' under the Seventh Amendment," and the court may not sanction any application of the Bankruptcy Code that infringes upon those rights. *In re G-I Holdings, Inc.*, 323 B.R. 583, 602 (Bankr. D. N.J. 2005).

Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury" by assigning them to a bankruptcy court. *Granfinanciera*, 492 U.S. at 51-52. "[L]egal claims are not magically converted into equitable issues by their presentation to a court of equity," *Ross v. Bernhard,* 396 U.S. 531, 538 (1970), "nor can Congress conjure away the Seventh Amendment by mandating that traditional legal claims be brought there or taken to an administrative tribunal." *Granfinanciera*, 492 U.S. at 53-55 (holding that fraudulent conveyance action was a "private right" that was "not closely intertwined with a federal regulatory program" and had to be decided "by an Article III court"); *see also Beard v. Braunstein*, 914 F.2d 434, 439-40 (3d Cir. 1990); *cf. N. Pipeline*, 458 U.S. at 90-91 (Rehnquist, J., concurring in judgment) (explaining that the

14

damages claims for breach of contract and misrepresentation under state law were "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789" as to which "[n]o method of adjudication is hinted, *other than the traditional common-law mode of judge and jury*") (emphasis added). This Court has applied these teachings to invalidate a bankruptcy court decision in a breach of contract action brought by the Trustee. *Beard*, 914 F.2d at 447. It held that the assertion of a compulsory counterclaim did not constitute consent to jurisdiction. *Id.* at 442.[4]

In its decision denying the Motion to Dismiss, the Bankruptcy Court held that an asbestos trust implemented under Bankruptcy Code section 524(g) would not violate claimants' Seventh Amendment jury rights because the "rights of talc plaintiffs would remain intact under a properly drafted and approved plan and [trust distribution procedures]." *See* Dismissal Opinion, at 24-25 (noting that "numerous

---

[4] The Bankruptcy Code itself recognizes that even in core proceedings, there may be a right to a jury trial. With respect to personal injury tort and wrongful death claims, it directs that such claims "shall be tried in the district court" where such claim "is pending or in the district court" presiding over the bankruptcy proceedings. 28 U.S.C. § 157(b)(5). And it says that "[i]f the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e). Absent that express consent, the jury trial must occur in and Article III court. But the Debtor's petition is designed to eliminate the jury rights of parties whose claims that are not even against the Debtor and who have not consented to resolution in bankruptcy court.

asbestos trusts implemented under § 524(g) . . . provide tort victims with choices between receiving guaranteed compensation under the trusts, or alternatively pursuing recovery against trusts through jury trials").

But the Bankruptcy Court's dismissal of Seventh Amendment concerns presupposes a bankruptcy that was filed in good faith. Because both mesothelioma and certain stages of ovarian cancer are terminal diseases, the very filing of the bankruptcy will deprive those creditors who passed during the pendency of LTL's bankruptcy case of their Seventh Amendment rights. Further, relying on a super-majority vote to bind non-consenting creditors poses a threat to the Seventh Amendment right of the non-consenting creditors of a solvent corporation (even assuming that the requirements of sections 1129 and 524(g) could be met).

Importantly, the potential loss of a jury trial is not a mere by-product of the filing; the sole purpose of the bankruptcy is to remove tort claimants from the tort system and strip them of their rights against extraordinarily wealthy and highly solvent entities. This fundamental concern merits more than a perfunctory consideration and dismissal.[5]

---

[5] The Bankruptcy Court takes a well-intentioned but paternalistic position, substituting its judgment for those of tort claimants in weighing "the substantial risks facing the talc claimants in the tort system." Dismissal Opinion, at 26-27. ("In the eyes of this Court, the tort system produces an uneven, slow-paced race to the courthouse, with winners and losers. Present and future talc claimants should not have to bear the sluggish pace and substantial risk if there exists another viable option."). But the claimants, and not the Bankruptcy Court, should be able to

Just as the bankruptcy court's decision on the merits in *Beard* violated the Seventh Amendment, a bankruptcy court's decision to resolve non-consenting claimant's legal claims against a solvent corporation (and without the statutory authority to determine the merits of these claims *at all*) would violate the Seventh Amendment, and this would be so even if the decision was reviewed *de novo* by a district court. *G-I Holdings* already held that asbestos claimants possess jury trial rights for the purpose of liquidating their claims. 323 B.R. at 602, 605. Indeed, in *In re SGL Carbon Corp.*, 200 F.3d at 169 n.23, this Court reserved the question of whether a bankruptcy plan that resolves, without consent, jury-triable claims violates the Seventh Amendment right to a jury trial.

## C.    This Case Raises Serious Questions Regarding the Deprivation of Claimants' Constitutional Due Process Rights

The Debtor's petition also created due process violations, which similarly are not adequately addressed by the Dismissal Opinion. "[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428 (1982). Thus, "the Due Process Clauses protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or as plaintiffs attempting to redress grievances." *Id.* at 429 (citation omitted). This Court has explicitly "recognized as a protected property

---

determine their chosen method for vindicating their rights.

17

interest the ability to pursue an asbestos claim." *In re Energy Future Holdings Corp.*, 949 F.3d 806, 822 (3d Cir. 2020) (citing *In re Grossman's Inc.*, 607 F.3d 114, 127 (3d Cir. 2010)); *see also Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) ("Appellant's interest is an unsecured claim, a cause of action against the estate for an unpaid bill. Little doubt remains that such an intangible interest is property protected by the Fourteenth Amendment.").

Bankruptcy calls into question the ability of claimants to pursue their claims in the civil justice system, which is a constitutionally protected due process interest. Here, the Debtor proposes to curtail that interest by imposing an asbestos trust on unwilling claimants through an artificially staged and orchestrated bankruptcy. The Supreme Court has twice rejected similar attempts to impose asbestos trusts via the class action mechanism of Fed. R. Civ. P. 23, and that experience is highly instructive here. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845-48 (1999); *Amchem Prods. v. Windsor*, 521 U.S. 591, 597-98 (1997).

*Ortiz* involved a staged proceeding in which a "limited fund" was created between the parties through an insurance settlement. The Supreme Court held that a federal court may not rely on a "limited fund" rationale where the limitation was contrived by a settlement between the parties. 527 U.S. at 864. The Court explained that "[a]ssuming, arguendo, that a mandatory, limited fund rationale could under some circumstances be applied to a settlement class of tort claimants, it would be

essential that the fund be shown to be limited *independently of the agreement of the parties to the action*." *Id.* at 864 (emphasis added).

*Ortiz* further explained that permitting an artificially limited fund to justify a mandatory class action would be "irreconcilable with the justification of necessity in denying any opportunity for withdrawal of class members whose jury trial rights will be compromised, whose damages will be capped, and whose payments will be delayed." *Ortiz*, 527 U.S. at 860. Enforcing "the traditional norm" that each individual is entitled to his day in court absent non-artificial inadequacy of funds, *id.* at 842, ensures that the defendant with the inadequate fund "ha[s] no opportunity to benefit himself or claimants of lower priority by holding back on the amount distributed to the class," and giving himself "a better deal than *seriatim* litigation would have produced." *Id.* at 839.

While the Bankruptcy Court held that *Ortiz* actually supports the use of bankruptcy to address mass tort claims, *see* Dismissal Opinion at 21-22, that assertion again assumed underlying good faith. The Bankruptcy Court, noting what it viewed as conflicting positions as to whether any filing was necessary by any J&J-related party at all, ignored the distinction between LTL and the non-filing entities, apparently finding that the "torrent of significant talc-related liabilities facing J&J and Old JJCI" were sufficient evidence of *the Debtor's* financial distress. *Id.* at 36.

By failing to distinguish between the pre-restructuring Old JJCI and the post-restructuring LTL, the Bankruptcy Court has begged the very question it has been asked to resolve. *See id.* at 33 (expressly acknowledging the Bankruptcy Court's determination to not "distinguish between the financial burdens facing Old JCCI and Debtor" and noting that, "[a]t issue in this case is *Old JJCI's talc liability* (and the financial distress that liability caused), now the legal responsibility of Debtor") (emphasis added). The Bankruptcy Court thus appears to relegate the divisive merger and subsequent bankruptcy filing by LTL as a matter of form over substance, concluding that "neither entity would be able to defend or economically resolve the current and future talc-related claims." *Id.* But the question of good faith does not require consideration of whether Old JJCI could have weathered the storm of mass tort litigation without bankruptcy; it requires an examination of why J&J, in carrying out the transactions that preceded this Chapter 11 case, went to great lengths to ensure they would never need to address that question—*and then* it requires a consideration of the effect of those transactions on the due process rights of personal injury claimants. Thus, the due process questions raised by *Ortiz* are not fully answered by the Dismissal Opinion: in determining to conduct the divisive merger, J&J and its subsidiaries ensured that only tort claimants—and neither any other J&J affiliate nor any other creditor constituency—would suffer the negative effects of a bankruptcy filing.

## II.    THE SEPARATION OF POWERS PRINCIPLES REQUIRE THIS COURT TO APPLY THE CANON OF CONSTITUTIONAL AVOIDANCE.

This Court has warned that:

> Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.

*In re SGL Carbon*, 200 F.3d at 164-65.

That warning is fully applicable here.   At a minimum, there are serious constitutional questions whether (1) under the principles recognized by the Supreme Court in *Stern v. Marshall*, 564 U.S. 462, 484 (2011), *Granfinanciera*, 492 U.S. at 58-59, *N. Pipeline*, 458 U.S. at 52, an Article I judge may properly preside over litigation transferred to the bankruptcy court by virtue of a Chapter 11 filing that serves no valid reorganizational purpose; (2) resolution of causes of action that are before the Article I judge only as a result of that filing would violate the right to a jury trial, and (3) resolution without adjudication on the merits would be consistent with due process.

These constitutional concerns arise because the Debtor's bankruptcy petition lies at the very outer limits of the Bankruptcy Code, if not beyond.  "Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'" *Ry. Lab. Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quoting

21

*Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi., R.I. & P. Ry. Co.*, 294 U.S. 648, 673

(1935)).  "The purpose of Chapter 11 reorganization is to assist financially distressed

business enterprises by providing them with breathing space in which to return to a

viable state."  *In re SGL Carbon*, 200 F.3d at 166 (internal quotation marks and

citation omitted). And "there must be 'some relation' between filing and the

'reorganization-related purposes that [Chapter 11] was designed to serve.'"  *Id*. at

165. This Court has explained that "filing a Chapter 11 petition merely to obtain

tactical litigation advantages is not within 'the legitimate scope of the bankruptcy

laws.'"  *Id.* (citation omitted). "The Bankruptcy provisions are intended to benefit

those in genuine financial distress.  They are not intended to be used as a mechanism

to orchestrate pending litigation."  *Id.* (internal quotation marks and citation

omitted).  "Chapter 11 was designed to give those teetering on the verge of a fatal

financial plummet an opportunity to reorganize on solid ground and try again, not to

give profitable enterprises an opportunity to evade contractual or other liabilities."

*Id.* at 166 (internal quotation marks and citation omitted).  In such circumstances,

"the 'statutory provisions designed to accomplish the reorganizational objectives

become destructive of the legitimate rights and interests of creditors."  *Id.* (citation

omitted).

The Bankruptcy Court expressly endorsed the Debtor's filing, concluding that

LTL did not file solely to gain a litigation advantage, Dismissal Opinion at 50, and

22

that it had a reorganizational purpose. *Id.* The determination of the Debtor's good faith, however, required the Bankruptcy Court to look broadly at the entire J&J enterprise and the cherry-picking engaged in by the non-debtor entities that was enabled by the corporate reshuffling that resulted in the LTL filing. LTL has no meaningful operations of its own, and its chapter 11 case was filed for the sole purpose of forcing the resolution of claims against a profitable operating predecessor, Old JJCI, and its parent, non-debtor J&J, itself a solvent and indeed extremely wealthy entity. The bankruptcy courts were not intended to be an alternative to the tort system. In reviewing the Bankruptcy Court's decision, this Court should not construe the Bankruptcy Code as authorizing the kind of abusive filing the Debtor is attempting here.

Settled principles of statutory interpretation, as well as the separation of powers, require this Court to construe the Bankruptcy Code as precluding the *LTL* case. The canon of constitutional avoidance requires courts to construe statutes, "if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Almendarez-Torres v. United States*, 523 U.S. 224, 237-38 (1998) (citations omitted); *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question, although properly presented by the record, if there is also present some other ground upon which the case may be disposed of . . . . Thus, if a

case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."). "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems," courts will construe the statute to avoid such problems "unless such construction is plainly contrary to the intent [of the legislature]." *DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). "'The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Id.* (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)). "This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that [legislatures,] like [the courts] [are] bound by and swear[ ] an oath to uphold the Constitution." *Id.*

The Supreme Court has already opined that the courts should defer to Congress with respect to the creation of innovative administrative compensation schemes for mass torts and asbestos in particular. *Amchem Prods.*, 521 U.S. at 628-29 ("The argument is sensibly made that a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure. Congress, however, has not adopted such a solution"). Indeed, Congress enacted section 524(g) of the Bankruptcy Code to permit good faith debtors to resolve runaway asbestos claims through a trust

process.  That relief does not, however, permit the machinations initially before the Bankruptcy Court, and now before this Court on appeal.

At a minimum, the Debtor's petition raises serious questions regarding fundamental constitutional rights, and this Court should interpret the Bankruptcy Code to preclude the deprivation of those rights.

## **CONCLUSION**

For the reasons stated above, the Bankruptcy Court's order denying the Motion to Dismiss should be reversed and the Motion to Dismiss should be granted.

Date: July 7, 2022

Respectfully submitted,

ROBINSON & COLE LLP

*/s/ Natalie D. Ramsey*
Natalie D. Ramsey, Esq.
Davis Lee Wright, Esq.
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
Email:  nramsey@rc.com
        dwright@rc.com

*Attorneys for Erwin Chemerinsky,
Proposed Amicus Curiae*

## <u>CERTIFICATE OF ADMISSION TO BAR</u>

I, NATALIE D. RAMSEY, certify as follows:

1.      I am a member in good standing of the bar of the United States Court

of Appeal for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the

foregoing is true and correct.

**ROBINSON & COLE LLP**
Attorneys for Erwin Chemerinsky
Proposed Amicus Curiae


By: /s/    Natalie D. Ramsey_____

Dated:      July 7, 2022

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 6,115 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in Microsoft Word in fourteen (14) point Times New Roman font.

3.    This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.


 */s/ Natalie D. Ramsey*
Natalie D. Ramsey

## **CERTIFICATE OF SERVICE**

I certify that on July 7, 2022, I electronically filed the foregoing with the Clerk

of the Court for the United States Court of Appeals for the Third Circuit by using

the CM/ECF system.  I certify that all participants in the case are registered CM/ECF

users and that service will be accomplished by the CM/ECF system.


  /s/ Natalie D. Ramsey

Natalie D. Ramsey

# Exhibit 3

Nos. 22-2003(L), 22-2004, 22-2005, 22-2006,
22-2007, 22-2008, 22-2009, 22-2010, 22-2011

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

In re: LTL Management LLC

———————————

On Appeal from the United States Bankruptcy Court
for the District of New Jersey

———————————

## BRIEF FOR ANDREW R. VARA, UNITED STATES TRUSTEE,
## AS AMICUS CURIAE IN SUPPORT OF APPELLANTS
## AND SUPPORTING REVERSAL

———————————

*Of Counsel:*

RAMONA D. ELLIOTT
*Deputy Director and General Counsel*

P. MATTHEW SUTKO
*Associate General Counsel*

SUMI SAKATA
JOHN P. SHEAHAN
*Trial Attorneys*
*U.S. Department of Justice*
*Executive Office for United States Trustees*
*441 G Street NW, Suite 6150*
*Washington, DC 20530*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

PHILIP R. SELLINGER
*United States Attorney*

MARK B. STERN
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTEREST OF THE UNITED STATES TRUSTEE ....................................................1

INTRODUCTION AND SUMMARY ............................................................2

STATEMENT OF THE ISSUE.............................................................4

STATEMENT OF THE CASE..........................................................4

    A.    Statutory Background....................................................4

    B.    Factual and Procedural Background ...........................................8

ARGUMENT ......................................................... 12

    A.    LTL's Petition Does Not Serve a Valid Bankruptcy Purpose .................13

    B.    The Pre-Petition Corporate Restructuring Underscores the Extent
        to Which LTL's Petition Was Not Filed in Good Faith...........................17

    C.    The Bankruptcy Court's Contrary Conclusion Is Unpersuasive ..............22

CONCLUSION ......................................................... 26

COMBINED CERTIFICATIONS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                          **Page(s)**

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
  526 U.S. 434 (1999) ........................................................................................................... 13

*Czyzewski v. Jevic Holding Corp.,*
  137 S. Ct. 973 (2017) ................................................................................................ 17, 19

*15375 Mem'l Corp. v. Bepco, L.P., In re,*
  589 F.3d 605 (3d Cir. 2009) ................................................................ 12-13, 14, 16, 22

*Integrated Telecom Express, Inc., In re,*
  384 F.3d 108 (3d Cir. 2004) ...................................... 3, 4, 7, 8, 12, 13, 14, 15, 17, 22, 23

*LTL Mgmt. LLC, In re,*
  No. 21-30589, 2021 WL 5343945 (Bankr. W.D.N.C. Nov. 16, 2021) ................. 11, 14

*Merit Mgmt. Grp. v. FTI Consulting, Inc.,*
  138 S. Ct. 883 (2018) ......................................................................................................... 21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
  566 U.S. 639 (2012) ....................................................................................................... 4-5

*Railway Labor Execs.' Ass'n v. Gibbons,*
  455 U.S. 457 (1982) .............................................................................................................. 5

*SGL Carbon Corp., In re,*
  200 F.3d 154 (3d Cir. 1999) ................................................................... 3, 7, 8, 13, 15, 20

*Telegroup, Inc., In re,*
  281 F.3d 133 (3d Cir. 2002) ............................................................................................. 18

*Tennessee Student Assistance Corp. v. Hood,*
  541 U.S. 440 (2004) ......................................................................................................... 18

*Wright v. Union Cent. Life Ins. Co.,*
  304 U.S. 502 (1938) ............................................................................................................. 4

**Statutes:**

11 U.S.C. § 307.................................................................................................1

11 U.S.C. § 362.................................................................................................8

11 U.S.C. § 524(e)...........................................................................................16

11 U.S.C. § 524(g)...........................................................................................19

11 U.S.C. § 548...............................................................................................21

11 U.S.C. § 701 *et seq.*...................................................................................6

11 U.S.C. § 1101 *et seq.*.................................................................................6

11 U.S.C. § 1112(b) ............................................................................ 1, 3, 4, 7, 12

11 U.S.C. § 1112(b)(2) ...................................................................................25

11 U.S.C. § 1129(a)(7) .....................................................................................7

11 U.S.C. § 1129(b)(1) .....................................................................................7

11 U.S.C. § 1208(c)-(d) ....................................................................................7

11 U.S.C. § 1307(c)-(d) ....................................................................................7

28 U.S.C. § 158(d)(2) .....................................................................................12

28 U.S.C. §§ 581-589a......................................................................................1

28 U.S.C. § 586(a)(8) ........................................................................................1

28 U.S.C. § 1407.............................................................................................23

**Rule:**

Fed. R. App. P. 29(a).........................................................................................1

**Legislative Materials:**

H.R. Rep. No. 95-595 (1977)................................................................................................1

H.R. Rep. No. 103-835 (1994)..............................................................................................5

## INTEREST OF THE UNITED STATES TRUSTEE

The United States Trustee files this brief under Federal Rule of Appellate Procedure 29(a).

The Attorney General appoints United States Trustees to supervise the administration of bankruptcy cases and trustees. 28 U.S.C. §§ 581-589a. They "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena." H.R. Rep. No. 95-595, at 88 (1977). To this end, Congress has provided that "[t]he United States trustee may raise and may appear and be heard on any issue in any case or proceeding." 11 U.S.C. § 307. 28 U.S.C. § 586(a)(8) specifically authorizes United States Trustees to seek the conversion and dismissal of chapter 11 cases under 11 U.S.C. § 1112(b).

In this case, a solvent company facing substantial tort liability used what is referred to as a "divisional merger" to insulate its valuable ongoing business assets in one successor company while saddling a different successor company with that tort liability. That latter company then immediately filed for chapter 11 bankruptcy relief, sought to enjoin the ongoing tort litigation against not only the debtor but also its parent company and other nondebtor affiliates, and stated a goal to eliminate the civil liability of those affiliates through releases in the debtor's bankruptcy plan. The misuse of the bankruptcy system is an issue of substantial importance to the United States Trustee, who often files motions for conversion or dismissal under § 1112(b).

## INTRODUCTION AND SUMMARY

Johnson & Johnson (J&J) and its related entities sold a talc-based baby powder product for decades; there are now approximately 38,000 pending tort claims contending that the product caused ovarian cancer or mesothelioma. Last year, Johnson & Johnson Consumer Inc. (Old JJCI), the corporate subsidiary that had held all of the assets and liabilities relating to the baby powder product for decades, underwent a transaction under Texas corporate law known as a "divisional merger." Through that transaction, Old JJCI was divided into two companies. One of the companies was a new subsidiary—also called Johnson & Johnson Consumer Inc. (New JJCI)—that was assigned almost all of Old JJCI's non-talc assets and liabilities. That corporation is currently worth approximately $61 billion. The other company was LTL Management LLC (LTL), which was assigned all of Old JJCI's talc-related liabilities and very few assets.

During its brief existence, LTL has had no substantial ongoing business operations, no employees other than those seconded from other J&J affiliates, and no reason for existing other than to file for bankruptcy. And indeed, two days after its creation, LTL did exactly that, filing a voluntary petition for chapter 11 bankruptcy relief. The stated purpose of this corporate restructuring and subsequent bankruptcy filing was to enable the J&J corporate enterprise to resolve all of its talc-related tort liabilities in a single bankruptcy proceeding—with the stated aim of confirming a plan of reorganization that would create a trust for talc claimants' benefit and would

2

preclude them from pursuing their claims against not only LTL but also J&J and other nondebtor corporate affiliates that have not filed for bankruptcy.

LTL's bankruptcy filing was not in good faith and should be dismissed for cause under 11 U.S.C. § 1112(b). As this Court has explained, chapter 11 petitioners receive considerable benefits at the expense of creditors, including "the automatic stay, the exclusive right to propose a reorganization plan, [and] the discharge of debts." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 129 (3d Cir. 2004) (quotation omitted). Congress has determined that those benefits are appropriate in circumstances where bankruptcy relief will benefit creditors as a group, such as where a "financially troubled petitioner[] seek[s] a chance to remain in business," *id.* (quotation omitted), or where the prospect of near term insolvency threatens a race to the courthouse pitting creditors against each other or a "fire sale" harming all creditors, *id.* at 121 (quotation omitted). At the same time, those benefits mean that bankruptcy "presents an inviting safe harbor for" solvent companies that face large potential tort liability, "creat[ing] the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *In re SGL Carbon Corp.*, 200 F.3d 154, 169 (3d Cir. 1999).

To guard against such abuse, a bankruptcy court must dismiss a chapter 11 petition "unless it is filed in good faith," *SGL Carbon*, 200 F.3d at 162, a standard that focuses generally on "(1) whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's estate, and (2)

3

whether the petition is filed merely to obtain a tactical litigation advantage," *Integrated Telecom*, 384 F.3d at 119-20.

In this case, LTL's petition fails the good faith test in all respects. Because LTL has no substantial ongoing business operations, its petition cannot preserve any going concern. Because LTL is not facing any substantial prospect of short-term financial distress, the petition cannot maximize the value of its estate. And because LTL's petition was self-evidently filed in large part as an attempt to extend the benefits of bankruptcy to nondebtor corporate affiliates, it cannot further a valid bankruptcy purpose. That conclusion is confirmed by the pre-petition corporate restructuring that was undertaken for the purpose of enabling the company to misuse the Code by making its bankruptcy filing a weapon against tort claimants rather than a good-faith means of reorganization.

## STATEMENT OF THE ISSUE

The issue presented is whether LTL's chapter 11 petition should be dismissed for cause under 11 U.S.C. § 1112(b) as not having been filed in good faith.

## STATEMENT OF THE CASE

### A.    Statutory Background

1. Bankruptcy is the "subject of the relations between a[] . . . debtor[] and his creditors, extending to his and their relief." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation omitted). To standardize an "expansive (and sometimes unruly) area of law," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639,

649 (2012), Congress enacted the Bankruptcy Code under the Bankruptcy Clause of

the U.S. Constitution, which vests Congress with power to "adjust[] . . . a failing

debtor's obligations," *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982)

(quotation omitted).

In enacting the Code, Congress was particularly concerned with "protect[ing]

creditors in general," seeking to prevent "an insolvent debtor from selectively paying

off the claims of certain favored creditors at the expense of others" and to temper the

"inevitable temptation among creditors to compete fiercely over the debtor's limited

funds." H.R. Rep. No. 103-835, at 33 (1994). Congress thus designed a bankruptcy

system "to enforce a distribution of the debtor's assets in an orderly manner in which

the claims of all creditors are considered fairly, in accordance with established

principles rather than on the basis of the inside influence or economic leverage of a

particular creditor." *Id.* In addition, Congress intended the bankruptcy system to

"provide honest debtors who have fallen on hard times the opportunity for a fresh

start." *Id.* at 32.

To achieve both of those objectives, the Code implements a comprehensive

scheme that establishes a highly reticulated mechanism for the equitable adjustment of

the debtor-creditor relationship. In particular, Congress has designed a basic

bankruptcy *quid pro quo* that imposes a host of duties—including requiring debtors to

comply with extensive disclosure and reporting obligations, generally requiring them

to devote the value of all but certain statutorily exempt assets to the estate, and

specifying how the estate's assets must be distributed to creditors—that debtors must

satisfy to receive relief.

2. In general, a company may file a bankruptcy petition under either chapter 7

or chapter 11 of the Code. In a chapter 7 bankruptcy, the company's pre-petition

assets are liquidated and distributed to creditors according to specific rules of priority

established in the Code. 11 U.S.C. § 701 *et seq.* A chapter 7 bankruptcy is typically

undertaken in circumstances where the debtor's business cannot be rehabilitated.

By contrast, a chapter 11 bankruptcy typically results in a "plan" that specifies

how each class of creditors' claims will be treated in exchange for a discharge of debts

to the extent provided by the Code. *See* 11 U.S.C. § 1101 *et seq.* A chapter 11 plan can

either provide for the reorganization and ongoing operation of the debtor's business

or a liquidation and distribution to creditors in accordance with the Code's priority

scheme. At a high level, chapter 11 reflects Congress's recognition that a debtor may

suffer from temporary financial distress but may nevertheless be able to preserve its

business as a going concern if it can resolve that distress. The successful

implementation of a plan under chapter 11 and preservation of the debtor's business

will often benefit creditors, because a company will usually be worth more as a going

concern than as a bare set of assets.

3. A debtor's right to adjust its debts through chapter 11 is, however, subject to

several important limitations. To ensure that creditors are not prejudiced by a debtor's

choice to file under chapter 11 rather than chapter 7, Congress has provided that a

plan may generally be confirmed only if each creditor receives at least as much as it would receive in a chapter 7 liquidation or consents to less favorable treatment. *See* 11 U.S.C. § 1129(a)(7), (b)(1).

Congress has also instituted mechanisms to protect creditors at the outset of a chapter 11 case. As particularly relevant here, Congress has provided that, generally speaking, "on request of a party in interest, and after notice and a hearing, the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under [chapter 11], whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1112(b). Under this provision, a "Chapter 11 petition is subject to dismissal for 'cause' . . . unless it is filed in good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999). Notably, § 1112(b) speaks in mandatory language, providing that the bankruptcy court "shall" convert or dismiss the case upon a finding of cause, in contrast to other provisions of the Code that provide a discretionary authority to convert or dismiss. *See* 11 U.S.C. §§ 1208(c)-(d), 1307(c)-(d).

"At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy . . . ." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004). As is explained above, the underlying purposes of the bankruptcy system are to ensure that creditors are treated fairly and that they receive maximum value on their claims; at the same time, the bankruptcy system necessarily imposes costs on creditors by, for example, preventing

them from continuing to pursue their claims outside of bankruptcy during the

bankruptcy case. *See* 11 U.S.C. § 362. The good-faith standard thus "furthers the

balancing process between the interests of debtors and creditors which characterizes

so many provisions of the bankruptcy laws and is necessary to legitimize the delay and

costs imposed upon parties to a bankruptcy." *SGL Carbon*, 200 F.3d at 161 (quotation

omitted). The determination whether a petition was filed in good faith focuses on "(1)

whether the petition serves a valid bankruptcy purpose, *e.g.*, by preserving a going

concern or maximizing the value of the debtor's estate, and (2) whether the petition is

filed merely to obtain a tactical litigation advantage." *Integrated Telecom*, 384 F.3d at

119-20.

### B.    Factual and Procedural Background

1. Johnson & Johnson (J&J) is a New Jersey company, first incorporated in

1887, that is a "profitable global supplier of health[ and] consumer products and

pharmaceuticals." J.A. 2, 47. In 1894, J&J began selling a talc-based baby powder

product; through a series of corporate transactions beginning in the 1970s, the assets

and liabilities related to that product were assigned to Johnson & Johnson Consumer

Inc. (Old JJCI), a subsidiary of J&J, which continued to sell the product until 2020

(when its sale was discontinued in the United States and Canada). J.A. 2-4.

In recent years, J&J and Old JJCI have faced a large, and escalating, number of

lawsuits claiming that their talc-based baby powder contained asbestos and fibrous

talc; that certain applications of talc powder can increase the risk of, or cause, ovarian

cancer; and that exposure to asbestos-containing talcum powder can cause
mesothelioma. J.A. 3. These lawsuits together threatened J&J and Old JJCI with
significant liability: one case involving 22 plaintiffs recently resulted in a $2.25 billion
final judgment assessed against J&J and Old JJCI, and there are approximately 38,000
claims currently pending. J.A. 4; *see also* Decl. of John K. Kim ¶ 39, J.A. 458.

Nevertheless, J&J and Old JJCI have repeatedly suggested, even following the
$2.25 billion verdict, that the talc-related litigation has not created a significant risk of
near-term insolvency for either company. For example, J&J has indicated that, in a
worst-case scenario, total talc-related liabilities may reach $7 to $7.5 billion—but J&J
had liquidity of over $41 billion last year. *See* J.A. 3427, 4670, 4766-67, 4782. And in
its 2020 10-K filing, J&J publicly reported that it "anticipates that operating cash
flows, the ability to raise funds from external sources, borrowing capacity from
existing committed credit facilities and access to the commercial paper markets will
continue to provide sufficient resources to fund operating needs, including the talc
litigation." Trial Ex. 398, at 30, Form 10-K for the Fiscal Year Ended January 3, 2021,
Johnson & Johnson.

2. On October 12, 2021, Old JJCI underwent a "labyrinthine" set of corporate
transactions that gave rise to this bankruptcy case. J.A. 4-5. Of particular importance,
Old JJCI engaged in a "divisional merger" under Texas corporate law, through which
Old JJCI ceased to exist and its assets and liabilities were divided between two new

companies—LTL Management LLC (LTL) and a new Johnson & Johnson Consumer

Inc. (New JJCI)—that were formed in its place. *See* J.A. 5.

Through that merger, LTL received all of Old JJCI's talc-related assets and

liabilities, along with approximately $6 million in cash and a royalty revenue stream

estimated to generate approximately $50 million annually. *See* Kim Decl. ¶¶ 24-26, J.A.

453-54. In addition, LTL received rights under a Funding Agreement that generally

obligates New JJCI and J&J to fund, up to the greater value of New JJCI or Old JJCI

(and to the extent that LTL's royalty stream or other assets are insufficient), various

LTL costs and expenses and—in the event of an LTL chapter 11 bankruptcy—any

trust for the benefit of existing and future claimants created under a reorganization

plan confirmed by a final, nonappealable order of the bankruptcy court. *See* Kim Decl.

¶ 27, J.A. 454; J.A. 5-6. All other assets and liabilities of Old JJCI were allocated to

New JJCI, which is valued at approximately $61 billion. Kim Decl. ¶ 25, J.A. 453; J.A.

35. Shortly after its creation, LTL relocated from Texas to North Carolina and

"entered into a secondment agreement pursuant to which J&J Services has agreed to

second to [LTL] certain of its employees . . . on a full-time basis to manage [LTL's]

business." Kim Decl. ¶¶ 16, 29, J.A. 448, 455.

Two days after the divisional merger, LTL filed a voluntary petition for chapter

11 relief in the Western District of North Carolina. The stated purpose of the

corporate restructuring and subsequent bankruptcy filing was "to enable [LTL] to

globally resolve talc-related claims through a chapter 11 reorganization without

subjecting the entire Old JJCI enterprise to a bankruptcy proceeding." Kim Decl.

¶ 21, J.A. 450. Although only LTL filed for bankruptcy, it has explained that its "goal

in this case is to negotiate, obtain approval of and ultimately consummate a plan of

reorganization that would, among other things, . . . provide for the issuance of an

injunction that will permanently protect" not just LTL but also "its affiliates and

certain other parties from further talc-related claims." Kim Decl. ¶ 59, J.A. 463-64.

3. After the petition was filed in North Carolina, it was transferred to the

District of New Jersey, which is where J&J is headquartered and where LTL's

employees—all of whom are seconded from other corporate affiliates—work. *See In re*

*LTL Mgmt. LLC*, No. 21-30589, 2021 WL 5343945, at *1 (Bankr. W.D.N.C. Nov. 16,

2021). Following the transfer, multiple groups representing talc claimants moved to

dismiss LTL's bankruptcy petition for cause under § 1112(b) as not having been filed

in good faith.

The bankruptcy court held a five-day trial on the motions to dismiss (and a

related motion for a preliminary injunction). *See* J.A. 7-8. It then denied the motions.

First, the court concluded that LTL's petition was "supported by a valid

reorganizational purpose" because "the chapter 11 filing serves to maximize the

property available to satisfy creditors." J.A. 14-32 (quotation omitted). Second, the

court concluded that LTL was in significant financial distress, finding that it "had

contingent liabilities in the billions of dollars and likely would be expending annually

sums ranging $100-200 million" were it forced to defend against the talc claims. And

11

although the Funding Agreement obligates J&J and New JJCI to cover LTL's expenses up to approximately $61 billion, the court stated that actually requiring J&J and New JJCI to meet that obligation "would have a horrific impact on these companies." J.A. 33-41. Third, the court concluded that the chapter 11 filing was not undertaken only to secure a tactical litigation advantage but was instead undertaken— following a legal divisional merger under state corporate law—to allow for the more efficient and equitable resolution of claims through an LTL-specific bankruptcy rather than through a JJCI bankruptcy or through tort litigation. J.A. 41-52.

A number of movants filed notices of appeal, and the bankruptcy court certified its decision for direct review in this Court under 28 U.S.C. § 158(d)(2). *See* J.A. 135-39. This Court then granted, over debtor's opposition, the claimants' petitions for permission to appeal. *See* Order, *In re LTL Mgmt. LLC*, No. 22-8015 (3d Cir. May 11, 2022), ECF No. 12-1. These consolidated appeals followed.

## ARGUMENT

A petition under chapter 11 is "subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith, and the burden is on the bankruptcy petitioner to establish that its petition has been filed in good faith." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004). Although the bankruptcy court's underlying factual findings are subject to review for clear error, the determination of whether the "facts of a case support the conclusion of good faith" is "subject to plenary review because it is, essentially, a conclusion of law." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d

12

605, 616 (3d Cir. 2009). In this case, the totality of the facts and circumstances

demonstrate that LTL's petition was not filed in good faith.

### A. LTL's Petition Does Not Serve a Valid Bankruptcy Purpose

A bankruptcy court must dismiss a chapter 11 petition "unless it is filed in

good faith." *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999). In applying that

standard, a court considers "(1) whether the petition serves a valid bankruptcy

purpose, *e.g.*, by preserving a going concern or maximizing the value of the debtor's

estate, and (2) whether the petition is filed merely to obtain a tactical litigation

advantage." *Integrated Telecom*, 384 F.3d at 119-20.

LTL's petition fails the good faith test in every respect. Because LTL was

created for the sole purpose of filing for bankruptcy, it has no substantial ongoing

business operations that might be protected by a bankruptcy filing. Similarly, because

LTL faces no substantial prospect of short-term insolvency, the petition cannot

maximize the value of its estate. And because LTL's petition was filed in principal part

to extend the benefits of bankruptcy to nondebtor corporate affiliates, it does not

further a valid bankruptcy purpose.

A central purpose of chapter 11 is to allow a distressed business to "preserv[e]

going concerns" while navigating financial hardship. *Integrated Telecom*, 384 F.3d at 119

(quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434,

453 (1999)). As an entity created as a vehicle to file for bankruptcy, LTL has no

substantial going concerns to preserve. Other than various items linked to Old JJCI's

13

talc-related assets and liabilities, LTL's only assets are an equity interest in a single

royalty revenue stream and rights under the Funding Agreement. *See* Kim Decl. ¶ 26,

J.A. 453-54. Its only employees are employees of other J&J affiliates that have been

seconded to LTL. *See In re LTL Mgmt. LLC*, No. 21-30589, 2021 WL 5343945, at *1

(Bankr. W.D.N.C. Nov. 16, 2021). Because LTL has "no going concerns to

preserve—no employees, offices, or business other than the handling of litigation,"

*Bepco*, 589 F.3d at 619—the petition cannot substantially further the fundamental

reorganization purpose of chapter 11.

    In some cases, even where there is no substantial need to preserve going

concerns, a chapter 11 petition may still serve a valid bankruptcy purpose to the

extent that it enables the debtor the "maximiz[e] the value of [its] estate" for the

benefit of creditors. *Integrated Telecom*, 384 F.3d at 119-20. As this Court has explained,

"[a]t its most basic level, the Bankruptcy Code maximizes value by alleviating the

problem of financial distress." *Id.* at 121. In short, in the absence of the successful

preservation of the debtor's business, the Code ensures at least an "orderly liquidation

[that] is likely to produce more value—or to avoid more loss—than [a] piecemeal

liquidation" and avoids the problem "that the system of individual creditor remedies

may be bad for the creditors as a group when there are not enough assets to go

around." *Id.* at 120-21 (quotations and emphasis omitted).

    Achieving these benefits, however, requires that a debtor be facing the prospect

of financial distress: without such distress, there is no prospect of a fire-sale

liquidation or of pitting creditors against each other to fight over a limited pot. As a

result, invoking this purpose of the Code to demonstrate "good faith necessarily

requires some degree of financial distress on the part of a debtor." *Integrated Telecom*,

384 F.3d at 121. Thus, courts "have consistently dismissed Chapter 11 petitions filed

by financially healthy companies with no need to reorganize under the protection of

Chapter 11." *SGL Carbon*, 200 F.3d at 166.

LTL does not face any immediate financial distress. Under the Funding

Agreement, the company has access to up to approximately $61 billion to fund

ongoing litigation costs and tort judgments. As explained above, J&J and Old JJCI

repeatedly suggested that the total expected cost of the talc-related tort litigation was

far lower than that number, and, in any event, there certainly was no impending

danger of LTL being unable to fulfill its obligations.

Finally, the avowed purpose of LTL's bankruptcy filing is not to protect

creditors but to protect corporate affiliates that are not themselves in bankruptcy. As

LTL itself explained, the corporate restructuring and bankruptcy petition were

implemented "to enable [LTL] to globally resolve talc-related claims through a chapter

11 reorganization without subjecting the entire Old JJCI enterprise to a bankruptcy

proceeding," and LTL's "goal in this case is to . . . consummate a plan of

reorganization that would[] . . . provide for the issuance of an injunction that will

permanently protect [LTL], its affiliates and certain other parties from further talc-

related claims." Kim Decl. ¶¶ 21, 59, J.A. 450, 463-64. But the purpose of the Code is

to provide a mechanism for the adjustment of the debtor-creditor relationship, not to permit nondebtors—who do not themselves shoulder the obligations of bankruptcy—to benefit from the Code's protections. *Cf.* 11 U.S.C. § 524(e) (providing that a discharge in bankruptcy generally "does not affect the liability of any" nondebtor for that debt). LTL's filing—designed primarily (if not exclusively) to benefit nondebtor corporate affiliates—does not serve a valid bankruptcy purpose. *See Bepco*, 589 F.3d at 624-25.

The absence of good faith is underscored by the absence of evidence that LTL made an independent decision to seek bankruptcy protection, much less to do so for any purpose other than to protect corporate affiliates. LTL's first-day filings suggest— consistent with the two-day gap between LTL's creation and its bankruptcy petition— that the decision to have LTL file for bankruptcy was made by J&J or Old JJCI before LTL's creation. *See* Kim Decl. ¶ 21, J.A. 450. And LTL itself is controlled entirely by employees seconded from other J&J affiliates, who may not be fully beholden to LTL's interests. This Court has recognized bad faith in similar circumstances, where the debtor was directed by a representative who "was primarily concerned with protecting [nondebtor affiliates], not the Debtors." *Bepco*, 589 F.3d at 624 (emphasis omitted); *see also id.* at 624-25 (explaining that it weighed in favor of bad faith that "the Debtors' decision to file for bankruptcy was not their own; [a corporate affiliate] was ultimately in control of whether the Debtors filed").

16

### B.     The Pre-Petition Corporate Restructuring Underscores the Extent to Which LTL's Petition Was Not Filed in Good Faith

The pre-petition corporate restructuring underscores the absence of good faith. Through that restructuring, Old JJCI spun off its talc-related liabilities into a separate entity with minimal assets other than its rights under the Funding Agreement. That entity then filed a chapter 11 petition to benefit not only the debtor but also its nondebtor corporate affiliates. Those corporate maneuvers have resulted in a bankruptcy that "circumvent[s] the Code's procedural safeguards," *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 986 (2017), and undermines the "Code's careful balancing of interests," *Integrated Telecom*, 384 F.3d at 119, which provides additional cause to dismiss the petition.

The corporate restructuring and subsequent bankruptcy petition undermine the basic *quid pro quo* contemplated by the Code. To benefit from bankruptcy, a debtor is required to shoulder a host of obligations. A chapter 11 debtor must make extensive disclosures of its creditors, assets and liabilities, income and expenditures, and the nature of its financial affairs. It must then, under the supervision of the bankruptcy court, agree to, and obtain confirmation of, a plan of reorganization that meets a variety of substantive requirements to ensure that the plan is feasible, treats all of the creditors' claims equitably, and generally leaves each class of creditors no worse off than it would be if the debtor were liquidated. Furthermore, the equity owners of the debtor generally cannot retain their interest or receive a distribution on account of

17

their ownership until all creditors have been paid in full. *In re Telegroup, Inc.*, 281 F.3d 133, 139 (3d Cir. 2002). Only if a debtor can successfully consummate such a plan does it receive a discharge of its debts that "releases [the] debtor from personal liability with respect to any discharged debt by voiding any past or future judgments on the debt." *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004).

In this case, because only LTL has filed a bankruptcy petition, only LTL has agreed to take on the obligations and duties that the Code requires. Neither New JJCI nor J&J has made the extensive financial disclosures required for a debtor, and neither has submitted itself to the supervision of the bankruptcy court to obtain relief under a feasible and equitable plan of reorganization. At the same time, because of the corporate restructuring that left LTL with few assets other than its rights under the Funding Agreement (which themselves have no liquidation value), LTL can meet creditor demands only to the extent that those demands are covered by that agreement. As reflected in LTL's first-day filings, the corporate enterprise's apparent strategy is to have J&J and New JJCI fund a settlement trust for talc claimants as part of an LTL plan of reorganization and, in exchange, to seek an injunction from the bankruptcy court preventing claimants from continuing to pursue those claims against nondebtors J&J and New JJCI. And LTL has already sought automatic stay relief not only for its own benefit but also for the benefit of its corporate affiliates.

In short, through the corporate restructuring and subsequent bankruptcy filing, J&J and New JJCI seek to garner the fundamental benefits of bankruptcy—a stay that

prevents talc claimants from pursuing litigation in the forum of their choice and the

ability to reach a single, overarching resolution of all the talc-related tort claims (even

over some claimants' potential objections)—without themselves shouldering its

attendant obligations, undermining the framework established by the Code.[1]

In addition, through its eve-of-bankruptcy transactions, J&J essentially chose

which subset of its assets would be exposed to the bankruptcy case and which subset

of its creditors would be forced to deal with the delay and uncertainty of the

bankruptcy process. That undermines the Code's priority scheme, "which ordinarily

determines the order in which the bankruptcy court will distribute assets of the estate"

and which provides that equity holders "receive nothing until all previously listed

creditors have been paid in full." *Jevic*, 137 S. Ct. at 979. That scheme "constitutes a

basic underpinning of business bankruptcy law" and "has long been considered

fundamental to the Bankruptcy Code's operation." *Id.* at 983-84.

Carving out that single class of tort creditors also provides additional evidence

that LTL's petition was "filed merely for tactical advantage" in ongoing litigation.

---

[1] Only one provision of the Code, 11 U.S.C. § 524(g), contemplates permitting a
bankruptcy court to extinguish third-party claims against a nondebtor. That provision
permits bankruptcy courts to enjoin third parties from pursuing certain asbestos-
related claims against a limited set of non-debtors where several stringent
requirements are satisfied. *See id.* Here, although it is possible that some of the talc
claimants' tort claims might be subject to that provision, LTL has not yet
demonstrated that most or all of the claims would be or that it will comply with the
stringent requirements articulated in that provision. And in any event, the possibility
that LTL's nondebtor affiliates could permissibly obtain some relief under § 524(g)
does not cure the many bad-faith aspects of LTL's filing.

19

*SGL Carbon*, 200 F.3d at 165. In *SGL Carbon*, for example, the debtor filed for

bankruptcy after it was named as a defendant in a large antitrust suit, apparently

because it believed that bankruptcy would provide a preferable venue for resolving

the antitrust claims. In evaluating a motion to dismiss the petition, this Court

examined the proposed reorganization plan, which provided for all creditors to "be

paid in full in cash" except antitrust judgment creditors—who would be "required to

accept limited-time credits to purchase SGL Carbon's products." *Id.* at 167. This

Court explained that the "plan's differing treatment of creditors suggests SGL

Carbon's petition was not filed to reorganize the company but rather to put pressure

on antitrust plaintiffs to accept the company's settlement terms." *Id.*

Although J&J and its affiliates have pursued different tactics in this case, the

fundamental result is the same. J&J and New JJCI continue to satisfy their obligations

to all of the enterprise's creditors outside of bankruptcy, with the single exception of

the talc-related tort claimants. Those creditors, and those creditors alone, have now

had their claims subjected to the burdens of bankruptcy. Thus, through the corporate

restructuring, the J&J affiliates have essentially managed to achieve what SGL Carbon

sought: they have put pressure on talc claimants—and no other creditors—to take a

bankruptcy-induced discount on their claims.

Finally, the corporate restructuring and immediate bankruptcy filing are, at the

least, in substantial tension with the Code's fraudulent transfer provisions. Under

those provisions, a trustee is given the power to avoid any transfer of assets from or

obligations to the debtor if the transfer was made within two years of the petition

filing date and various actual or constructive fraud conditions are satisfied (including

if the transfer was made "with actual intent to hinder, delay, or defraud any entity to

which the debtor was or became" indebted or if the debtor "received less than a

reasonably equivalent value in exchange" and "became insolvent as a result"). 11

U.S.C. § 548. This avoidance power "help[s] implement the core principles of

bankruptcy" by allowing the trustee to "set aside transfers that unfairly or improperly

deplete assets" of the estate to the detriment of creditors. *Merit Mgmt. Grp. v. FTI

Consulting, Inc.*, 138 S. Ct. 883, 888 (2018) (alterations and quotation omitted).

If Old JJCI had simply transferred nearly all of its assets to a different J&J

affiliate and then filed a bankruptcy petition two days later in an attempt to resolve its

talc-based liabilities, that transfer almost certainly would have been avoidable in a

fraudulent transfer action and the transferred assets would have been available to

creditors. Although the question of whether J&J or other affiliates will ultimately be

liable for a fraudulent transfer remains unresolved in this case, the divisional merger

technique employed here appears designed to, at the least, hinder these fundamental

creditor protections. The resulting bankruptcy petition does not constitute a good

faith filing.

## C.    The Bankruptcy Court's Contrary Conclusion Is Unpersuasive

The bankruptcy court failed to come to grips with the fundamental concerns raised by the petition.

First, the bankruptcy court stated that "the chapter 11 filing serves to maximize the property available to satisfy creditors," on the ground that the bankruptcy system produces more efficient and equitable outcomes than tort litigation. J.A. 14-32; *see* J.A. 18-19 ("[T]his Court holds a strong conviction that the bankruptcy court is the optimal venue for redressing the harms of both present and future talc claimants in this case . . . .").

This Court has made clear, however, that bankruptcy is not intended as a general vehicle for efficient resolution of mass tort claims but is instead designed to address the specific circumstance of a potentially insolvent debtor. Thus, a good-faith petition must do more than attempt to leverage the perceived efficiencies of bankruptcy over other litigation; it "must seek to create or preserve some value that would otherwise be lost—not merely distributed to a different stakeholder—outside of bankruptcy." *Integrated Telecom*, 384 F.3d at 129. Because there was no apparent risk of LTL (or, before LTL's formation, Old JJCI or J&J) becoming insolvent or unable to satisfy tort judgments in the foreseeable future, the bankruptcy process does not preserve value by avoiding a race to judgment or intracreditor fighting over a limited pot. *See Bepco*, 589 F.3d at 620 (explaining that "the centralization of claims and the

22

consolidation of litigations into a single forum" is not a sufficient good-faith basis for a petition because the distribution problem "bankruptcy is designed to handle" is the problem where "the system of individual creditor remedies harms the creditors as a group and there are not enough assets to go around").

This Court has emphasized that, "[r]ather than pursuing a valid bankruptcy purpose," a bare desire to resolve tort claims more efficiently than is possible in the tort system "suggest[s] that [the debtor] filed for Chapter 11 in part to gain a litigation advantage over [plaintiffs], a use of Chapter 11 that [was] emphatically rejected in *SGL Carbon.*" *Integrated Telecom*, 384 F.3d at 125. Insofar as LTL is simply attempting to leverage bankruptcy to resolve the pending tort claims, that purpose further confirms that the petition is no more than an attempt "to distribute value directly from a creditor to a company's shareholders"—a paradigmatic example of a bad-faith filing. *Id.* at 129.

The bankruptcy court's reasoning is also at odds with Congress's judgment regarding the appropriate mechanisms for resolving mass claims. Congress has not determined to impose the bankruptcy system on all mass tort claimants, even when there is no prospect of a defendant's near-term insolvency. Instead, Congress has created other mechanisms to facilitate the efficient and equitable mass resolution of claims, including federal multidistrict litigation procedures, *see* 28 U.S.C. § 1407. Indeed, at the time of LTL's bankruptcy petition, approximately 90% of the pending ovarian cancer claims were proceeding in a multidistrict litigation. *See* Kim Decl. ¶ 42,

23

J.A. 459. Regardless of any "strong conviction" that Congress's judgment about which mechanisms are appropriate in which circumstances is wrong, a desire to circumvent that judgment cannot constitute the good faith required to support a bankruptcy petition.

Second, the bankruptcy court concluded that LTL was in financial distress, finding that it "had contingent liabilities in the billions of dollars and likely would be expending annually sums ranging $100-200 million" were it forced to defend against the talc claims. J.A. 33-41. But that conclusion fails to account for LTL's rights under the Funding Agreement, which would enable LTL to receive at least approximately $61 billion in funding to cover both litigation and judgment-related costs from J&J and New JJCI. Nowhere did the bankruptcy court suggest that LTL's talc-related costs would likely approach or exceed $61 billion, much less that they might do so in the near term.

Indeed, the court recognized the significance of the Funding Agreement, but it declared that requiring J&J and New JJCI to meet their full obligations under the agreement "would have a horrific impact on these companies." J.A. 35. It stated that the "Court is at a loss to understand, why—merely because [LTL] contractually has the right to exhaust its funding options—[LTL] is not to be regarded as being in" distress. *Id.* The court's statement highlights its assumption that the LTL bankruptcy case is the appropriate way to globally resolve all claims against its affiliates, who are

24

not themselves in bankruptcy. But as explained, such a goal is not a valid bankruptcy

purpose supporting a good-faith petition.

Finally, the bankruptcy court briefly suggested that even if LTL's petition were

filed in bad faith, it would refuse to dismiss the case under 11 U.S.C. § 1112(b)(2),

which creates a narrow exception to the section's mandatory dismissal command. J.A.

13 n.8. That provision states that a court should not convert or dismiss a case under

§ 1112(b) if "unusual circumstances establish[] that converting or dismissing the case

is not in the best interests of creditors and the estate" and if, among other

requirements, the "grounds for converting or dismissing the case include an act or

omission of the debtor" for which there is a "reasonable justification" and which "will

be cured within a reasonable period of time." 11 U.S.C. § 1112(b)(2).

The suggestion that § 1112(b)(2) might preclude dismissal in this case is

without merit. At the least, LTL could not meet the requirements of § 1112(b)(2)

because there could never be a reasonable justification for filing a petition in bad faith,

nor could such a bad-faith filing ever be cured.

25

## CONCLUSION

For the foregoing reasons, the order of the bankruptcy court should be

reversed.

Respectfully submitted,

*Of Counsel:*

RAMONA D. ELLIOTT
*Deputy Director and General Counsel*

P. MATTHEW SUTKO
*Associate General Counsel*

SUMI SAKATA
JOHN P. SHEAHAN
*Trial Attorneys*
*U.S. Department of Justice*
*Executive Office for United States Trustees*
*441 G Street NW, Suite 6150*
*Washington, DC 20530*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

PHILIP R. SELLINGER
*United States Attorney*

MARK B. STERN

*s/ Sean R. Janda*

SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

June 2022

## COMBINED CERTIFICATIONS

1.      Government counsel are not required to be members of the bar of this Court.

2.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,489 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

3.      The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.      This document was scanned for viruses using Symantec Endpoint Protection, Version 14.3 and no virus was detected.

*s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

# TABLE OF CONTENTS

11 U.S.C. § 1112 ...................................................................................................................A1

**11 U.S.C. § 1112**

**§ 1112. Conversion or dismissal**

(a) The debtor may convert a case under this chapter to a case under chapter 7 of this title unless—

    (1) the debtor is not a debtor in possession;

    (2) the case originally was commenced as an involuntary case under this chapter; or

    (3) the case was converted to a case under this chapter other than on the debtor's request.

(b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

    (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

        (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

        (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

            (i) for which there exists a reasonable justification for the act or omission; and

            (ii) that will be cured within a reasonable period of time fixed by the court.

    (3) The court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

    (4) For purposes of this subsection, the term "cause" includes—

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;

(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

(c) The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.

(d) The court may convert a case under this chapter to a case under chapter 12 or 13 of this title only if—

(1) the debtor requests such conversion;

(2) the debtor has not been discharged under section 1141(d) of this title; and

(3) if the debtor requests conversion to chapter 12 of this title, such conversion is equitable.

(e) Except as provided in subsections (c) and (f), the court, on request of the United States trustee, may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate if the debtor in a voluntary case fails to file, within fifteen days after the filing of the petition commencing such case or such additional time as the court may allow, the information required by paragraph (1) of section 521(a), including a list containing the names and addresses of the holders of the twenty largest unsecured claims (or of all unsecured claims if there are fewer than twenty unsecured claims), and the approximate dollar amounts of each of such claims.

(f) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

# Exhibit 4

# United States Court of Appeals

*for the*

# Third Circuit

―――――――――― •❧• ――――――――――

Case Nos. 22-2003, 22-2004,
22-2005, 22-2006, 22-2007,
22-2008, 22-2009, 22-2010, 22-2011

In re: LTL MANAGEMENT, LLC,

*Debtor.*

―――――――――――――――――――

OFFICIAL COMMITTEE OF TALC CLAIMANTS, *et al.*,

*Petitioners-Appellants,*

― v. ―

LTL MANAGEMENT, LLC,

*Debtor-Appellee.*

―――――――――――――――――

DIRECT APPEAL FROM THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF NEW JERSEY IN CH. 11
NO. 21-30589 AND ADV. PRO. NO. 21-03032

## BRIEF FOR *AMICI CURIAE* LAW PROFESSORS IN SUPPORT OF APPELLANTS

SEAN E. O'DONNELL
STEPHEN B. SELBST (*pro hac vice* pending)
STEVEN B. SMITH (*pro hac vice* pending)
RACHEL H. GINZBURG (*pro hac vice* pending)
HERRICK, FEINSTEIN LLP
Two Park Avenue
New York, New York 10016
(212) 592-1400

*Attorneys for the Law Professors*

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ............................................................... 1

SUMMARY OF ARGUMENT ................................................................. 1

ARGUMENT ........................................................................................ 2

   I.    J&J's Attempt to Limit the Rights of Creditors Undermines the Statutory
       Scheme of Chapter 11. .................................................................. 2

  II.   Despite J&J's Assertions, This Is Not a Normal Mass Torts Bankruptcy ... 7

 III.  The Texas Two-Step Will Undermine Public Confidence in the
       Bankruptcy System. ................................................................... 11

CONCLUSION ................................................................................... 14

## TABLE OF AUTHORITIES

Page(s)

### Cases

*In re A.H. Robins Co., Inc.*,
88 B.R. 742 (E.D. Va. 1988) ...............................................................................10

*In re A.H. Robins Co., Inc.*,
880 F.2d 695 (4th Cir. 1989) ..............................................................................10

*In re Abbotts Dairies of Pennsylvania, Inc.*,
788 F.2d 143 (3d Cir. 1986) .................................................................................3

*In re City of Detroit, Michigan*,
Case No. 13-53846 (Bankr. E.D. Mich. 2013) ...................................................11

*In re Dow Corning Corp.*,
86 F.3d 482 (6th Cir. 1996) ................................................................................10

*In re Duratech Indus.*,
241 B.R. 283 (E.D.N.Y. 1999) .............................................................................3

*In re General Motors Corp*,
Case No. 09-50026 (Bankr. S.D.N.Y. 2009).......................................................11

*In re Johns-Manville Corp.*,
32 B.R. 728 (S.D.N.Y. 1983) ...............................................................................9

*In re PG&E Corporation and Pacific Gas and Electric Co.*,
Case No. 19-30088 (Bankr. N.D. Cal. 2019) ......................................................11

*In re Reliant Energy Channelview LP*,
594 F.3d 200 (3d Cir. 2010) .................................................................................3

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988) .................................................................................8

*Matter of Celotex Corp.*,
128 B.R. 478 (Bankr. M.D. Fl. 1991) ...................................................................9

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
330 F.3d 548 (3d Cir. 2003) .................................................................................3

## Statutes

11 U.S.C. § 1129 .......................................................................................................4

11 U.S.C. § 363(b)(1)............................................................................................3, 4

11 U.S.C. § 363(m) ..................................................................................................3

11 U.S.C. § 521(a)(1) ...............................................................................................3

## Other Authorities

Khristopher J. Brooks, *Johnson & Johnson talc powder spinoff files for
   bankruptcy*, CBS News (Oct. 15, 2021) ...............................................................12

Jared A. Ellias, *[Texas Two-Step and the Future of Mass Tort Bankruptcy Series]
   Upending the Traditional Chapter 11 Bargain*,
   Harvard Law School Bankruptcy Roundtable (June 21, 2022) ...........................6

Michael A. Francus, *Texas Two-Stepping
   Out of Bankruptcy* (Jan. 30, 2022)........................................................................8

Chris Isidore, *GM bankruptcy: End of an era*,
   CNN Money (June 2, 2009) .................................................................................11

Melissa B. Jacoby & Edward J. Janger, *Ice Cube Bonds: Allocating the Price of
   Process in Chapter 11 Bankruptcy*, 123 Yale L. J. 4 (2014) ...............................6

Melissa B. Jacoby, *Shocking Business Bankruptcy Law*,
   131 Yale L.J. Forum 409 (2021). ..........................................................................5

Jesus Jiménez, *Johnson & Johnson Subsidiary Seeks Bankruptcy Protection to
   Handle Talc Product Claims*, N.Y. Times (Oct. 14, 2021)..................................13

Dietrich Knauth and Tom Hals, *Judge greenlights J&J strategy to resolve talc
   lawsuits in bankruptcy court*, Reuters (Feb. 25, 2022) ........................................13

Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening
   Mass Tort Liability*, 148 U. Pa. L. Rev. 2045 (2000).............................................9

iii

David Skeel, *The populist backlash in Chapter 11*,
    The Brookings Institution (Jan. 12, 2022)...........................................................14

## INTEREST OF AMICI CURIAE[1]

The amici curiae, whose names and affiliations are set forth in the attached Appendix A, are seven professors of law who have expertise bearing directly on the purposes of the Bankruptcy Code (the "Law Professors"). The Law Professors regularly teach courses in bankruptcy law and principles, and have authored numerous articles, textbooks, and treatises on bankruptcy law. The Law Professors have an interest in the orderly development of bankruptcy law and practice and in preventing abuses of the bankruptcy system, including through the robust and thoughtful appellate review of difficult questions posed by complex cases.

## SUMMARY OF ARGUMENT

The Law Professors have no economic interest at stake, but share a concern about the effect of the Texas Two-Step[2] on the bankruptcy system. The Law Professors believe that Judge Kaplan erred in his decision below for three reasons. First, Judge Kaplan erred in allowing J&J to use complicated maneuvering to sever

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no counsel or party, other than counsel to the Law Professors, made a monetary contribution to fund the preparation or submission of this brief. The institutional affiliations of the Law Professors are listed for identification only.

[2] Capitalized terms not defined herein shall have the terms ascribed to them in the Brief for Appellant Official Committee of Talc Claimants [ECF No. 46]. In the interest of avoiding repetition, this amicus brief assumes familiarity with the basic facts of the Debtor's ("LTL Management") bankruptcy filing.

the burdens and oversight that bankruptcy law requires of a Chapter 11 debtor from the benefits that Chapter 11 provides to distressed companies. If Judge Kaplan's decision is allowed to stand, it will provide a roadmap for large, rich debtors to deal with liability issues using bankruptcy tools without providing creditors with the full protections they are entitled to. Second, the Law Professors believe Judge Kaplan erred in viewing this as a run-of-the-mill mass torts bankruptcy instead of an extraordinary effort by a sophisticated company to evade bankruptcy court supervision. Third, the Law Professors worry that Judge Kaplan's decision will undermine public confidence in the bankruptcy system by allowing a large, rich company to take advantage of the bankruptcy system on terms far better than those available to smaller and less sophisticated debtors, let alone consumer debtors.

## ARGUMENT

### I.    J&J's Attempt to Limit the Rights of Creditors Undermines the Statutory Scheme of Chapter 11.

In designing the bankruptcy system, Congress created a system that offers benefits to debtors – but at the cost of accepting provisions that protect creditors by providing oversight and obligations. The benefits include the tremendous powers that Congress gave to Chapter 11 debtors as well as the protections of bankruptcy law, such as the automatic stay. For mass tort debtors, the powers of the bankruptcy court to estimate claims and provide discharge are often especially important.

2

These powers are qualified by provisions of bankruptcy law that protect

creditors, such as, among other things:

- Fiduciary duties that obligate companies to maximize value for the benefit of creditors;[3]

- Court and creditor supervision of corporate assets, including both reporting requirements and an obligation to submit to examination and to provide disclosure;[4]

- Court and creditor supervision of asset sales and disposition;[5]

---

[3] "[D]ebtors-in-possession have a fiduciary duty to maximize the value of the estate . . . ." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3d Cir. 2010) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003)).

[4] *See, e.g.*, 11 U.S.C. § 521(a)(1) ("[T]he debtor shall . . . file . . . a list of creditors; and . . . unless the court orders otherwise . . . (i) a schedule of assets and liabilities; (ii) a schedule of current income and current expenditures; (iii) a statement of the debtor's financial affairs . . . ."); *In re Duratech Indus.*, 241 B.R. 283, 290 (E.D.N.Y. 1999) ("Examinations under Rule 2004 are allowed for the purpose of discovering assets and unearthing frauds and have been compared to a fishing expedition.") (citation and quotation marks omitted).

[5] *See* 11 U.S.C. § 363(b)(1). The Code further provides that "reversal or modification on appeal of an authorization under subsection (b) . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) ("Courts applying section 363(m) . . . have . . . turned to traditional equitable principles, holding that [good faith] encompasses one who purchases in 'good faith' and for 'value.'") (citations omitted).

3

- Extensive oversight of management's business decisions, such as submitting actions outside of the ordinary course of business for judicial approval in a public court hearing;[6] and

- The need to satisfy the high standards of Bankruptcy Code section 1129, which protects creditors, before a final order confirming a plan of reorganization can be approved.[7]

Importantly, the extra protection that Congress provided to creditors is not meant to be punishment for filing for Chapter 11 – they are tools that ensure creditors have a say in maximizing the estate's value. Congress created guardrails that allow a federal judge and creditors to have a say in how assets are used and maintained, which help to protect against waste and fraud. Congress imposed a bargain on companies that seek to make use of the bankruptcy system, in which debtors trade enhanced powers to address financial distress in exchange for giving creditors monitoring rights and control over corporate assets that go far beyond what exists outside of bankruptcy. That is the bargain that Congress created to allow large companies to reorganize in Chapter 11.

Through the Texas Two-Step, J&J has found a way to "carve up" the bankruptcy bargain, taking advantage of the legal rights that favor their litigation strategy without providing creditors the enhanced rights that Congress provides in

---

[6] *See* 11 U.S.C. § 363(b)(1) ("The trustee, ***after notice and a hearing***, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . .") (emphasis added).

[7] *See* 11 U.S.C. § 1129.

4

Chapter 11.[8]  For example, J&J currently benefits from a bankruptcy court order

shielding not only LTL but also various J&J subsidiaries from litigation.[9] J&J will

be able to dispose of the talc-litigation claims through the bankruptcy process, which

must offer significant advantages to them – otherwise they would not have concocted

this scheme.

However, J&J has not provided creditors with their customary bankruptcy

rights. The J&J enterprise is operating free of any judicial supervision, with no

obligation to seek court approval of major business decisions or to provide a level

of public reporting that goes far beyond what the SEC requires of public companies.

Simply put: This is not the system that Congress designed.  If Congress wants

to decouple the rights that the Bankruptcy Code provides to creditors from what it

gives to debtors, it has the power to create a new chapter of the Bankruptcy Code

that would do so. As Congress has not done so, J&J should not be allowed to use

---

[8] Melissa Jacoby refers to this as "bankruptcy a la carte." *See* Melissa B. Jacoby, *Shocking Business Bankruptcy Law*, 131 Yale L.J. Forum 409, 411 (2021).

[9] *See* A196 (Preliminary Injunction Order, ¶ 2) ("The Defendants are prohibited and enjoined . . . from commencing or continuing to prosecute any Enjoined Talc Claim against any of the Protected Parties, on any theory of liability . . . ."); A195 (Preliminary Injunction Order, n. 3) ("The Protected Parties are listed in Appendix B to the Complaint"); *see also* A3830-34 (Preliminary Injunction Complaint, Appendix B, listing various J&J subsidiaries).

5

Texas state law to amend a federal statute and create a completely different
bankruptcy system than the one implemented through the Bankruptcy Act of 1978.

Importantly, a key benefit of the Texas Two-Step for J&J is that it re-calibrates
the bargaining power that Chapter 11 normally provides to creditors. In addition to
their statutory rights to inspect assets, creditors benefit from their valuable control
rights over the debtor's assets and the pressure that the "fishbowl of bankruptcy"
puts on debtors to exit bankruptcy, which is pressure that helps creditors obtain
favorable settlements. As one of the Law Professors has written elsewhere, "[t]he
burden of court oversight . . . gives creditors bargaining power, as companies seek
to exit bankruptcy quickly to escape the expense and distraction of a bankruptcy
proceeding."[10] By severing Old JJCI's assets from its liabilities, J&J has
manufactured a court process where the debtor has a significant advantage relative
to the bargaining environment J&J would have otherwise enjoyed.

Crucially, the funding agreement between New JJCI and LTL Management is
no substitute for real court supervision and creditor oversight. J&J asserts that the
Old JJCI assets are equally available to pay talc victims as they would be outside

---

[10] Jared A. Ellias, *[Texas Two-Step and the Future of Mass Tort Bankruptcy Series]
Upending the Traditional Chapter 11 Bargain*, Harvard Law School Bankruptcy
Roundtable (June 21, 2022),
http://blogs.harvard.edu/bankruptcyroundtable/tag/jared-a-ellias/ (citing Melissa B.
Jacoby & Edward J. Janger, *Ice Cube Bonds: Allocating the Price of Process in
Chapter 11 Bankruptcy*, 123 Yale L. J. 4 (2014)).

bankruptcy.[11] This is so, J&J claims, because of the funding agreement: LTL

Management has the power under the funding agreement to compel New JJCI to pay

consideration equal to the value of New JJCI as needed to satisfy the talc victims.[12]

But this is not the same as allowing creditors to supervise the assets during the

bankruptcy case and creditors have no assurance that the value of New JJCI's assets

will be maximized.

## II.    Despite J&J's Assertions, This Is Not a Normal Mass Torts Bankruptcy.

For a company facing financial distress arising from mass tort liabilities,

Chapter 11 can be a meaningful opportunity for troubled debtors to resolve tort

claims and for victims to get justice. When the bankruptcy court's jurisdiction is

properly invoked, Chapter 11 is an appropriate way to address mass tort cases, while

respecting the rights of debtors and creditors. Since Johns-Manville first used the

bankruptcy court system to resolve its asbestos liabilities, there has been a long line

---

[11] *See* A450 (John K. Kim First Day Declaration, ¶ 21) ("A key objective of this restructuring was to make certain that the Debtor has the same, if not greater, ability to fund the costs of defending and resolving present and future talc-related claims as Old JJCI did prior to the restructuring. This was achieved through the establishment of a funding agreement between the Debtor, on the one hand, and J&J and New JJCI (on a joint and several basis) on the other . . . .").

[12] *See* A454 (John K. Kim First Day Declaration, ¶ 27) ("[T]he Funding Agreement requires New JJCI and J&J to, up to the full value of New JJCI, fund amounts necessary (a) to satisfy the Debtor's talc-related liabilities at any time when there is no bankruptcy case and (b) in the event of a chapter 11 filing, to provide the funding for a trust . . . .").

of mass tort cases allowing for that use of Chapter 11.[13] But in those cases, the

entirety of each debtor's assets was subject to bankruptcy court jurisdiction. J&J's

strategy is unique because unlike other mass tort debtors, who submitted all their

assets and liabilities before the Court, J&J created LTL solely to offload certain

liabilities and to submit select assets before the Court while shielding other valuable

assets from the oversight of the Court and creditors. LTL is only facing financial

trouble because it was manufactured to do so.

J&J's strategy is "the latest addition to a panoply of aggressive techniques

debtors have developed to gain the upper hand against creditors."[14] Rather than

providing an orderly process and distribution of assets to its creditors, J&J

"decide[d] what price tag it wishe[d] to put on the tort claims and aim[ed] to foist

that dollar value upon the tort claimants."[15] This is not what Chapter 11 is for.

Companies should not be allowed to manufacture financially unhealthy subsidiaries

to cherry-pick which assets creditors get access to.

---

[13] *See Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) (affirming district
court order affirming bankruptcy court's confirmation order).

[14] *See* Michael A. Francus, *Texas Two-Stepping Out of Bankruptcy* (Jan. 30, 2022)
at 1, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4021502.

[15] *See id*. at 13.

While Congress did not contemplate the "unique problems caused by mass tort liability" when the Bankruptcy Code was enacted in 1978, many companies faced with mass tort liability that "threaten[ed] the viability of the enterprise" have sought protections under the federal bankruptcy laws.[16]

> Johns-Manville Corp., Celotex Corp., . . . and at least a dozen other asbestos manufacturers deluged with thousands of personal injury claims; A.H. Robins Co. facing potentially devastating Dalkon Shield personal injury claims; Dow Corning Corp. under an onslaught of breast implant litigation; and other companies . . . have sought protection under Chapter 11 of the Bankruptcy Code within the past twenty years.[17]

But in prior mass tort cases, the companies facing liability were the ones who filed for bankruptcy, rather than brand new companies that the tortfeasors manufactured to hold their liabilities and file for bankruptcy.[18]

---

[16] Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2045-46 (2000).

[17] *Id.* at 2046 (citations omitted).

[18] *See In re Johns-Manville Corp.*, 32 B.R. 728, 730 (S.D.N.Y. 1983) ("On August 26, 1982, the Johns-Manville Corporation and affiliated corporations ('Appellees') filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. Prior to the filing, Appellees had been sued in a number of lawsuits throughout the country for injuries resulting from exposure to asbestos fibers or asbestos products that were mined, manufactured, or sold by Appellees."); *Matter of Celotex Corp.*, 128 B.R. 478, 479 (Bankr. M.D. Fl. 1991) ("The Celotex Corporation and Carey Canada Inc. (collectively referred to as 'Debtor') filed a voluntary petition for relief under Chapter 11 . . . At the time the petition was filed, over 141,000 asbestos-related bodily injury lawsuits were pending against Debtor."); *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 743 (E.D. Va. 1988) ("By the time of filing of the instant proceedings,

9

Here, the policy balance of debtor and creditor rights is upended because J&J is taking advantage of all of the Bankruptcy Code's advantages without any of the oversight over the vast majority of its assets. Sanctioning J&J's strategy would set a dangerous precedent allowing debtors to skirt the Bankruptcy Code's requirements. Indeed, approving this strategy paves the way for future tortfeasors to undergo divisional mergers and file for bankruptcy, regardless of whether the original entity was insolvent. Moreover, non-mass tort debtors could also take advantage of this strategy, separating all of their liabilities from their assets, and deciding which assets the creditors will have access to. And Judge Kaplan's statement that "for most companies, the complexity, necessary capital structure, and financial commitments required to lawfully implement a corporate restructuring as done in this case, will limit the utility of the 'Texas Two-Step'" only means that the wealthiest companies with the greatest means would be able to take advantage of this method, while companies that are less fortunate will be subjected to court oversight, deepening any perceived inequity between large and small companies in Chapter 11.[19]

---

Robins was faced with almost 6,000 lawsuits and claims arising from the Dalkon Shield . . . ."), *aff'd*, 880 F.2d 695 (4th Cir. 1989); *In re Dow Corning Corp.*, 86 F.3d 482, 485 (6th Cir. 1996) ("Until it ceased their manufacture in 1992, Dow Corning was the predominant producer of silicone gel breast implants, accounting for nearly 50% of the entire market.").

[19] *See* A52 (Opinion Denying Motions to Dismiss).

### III.     The Texas Two-Step Will Undermine Public Confidence in the Bankruptcy System.

One of the key accomplishments of the Bankruptcy Act of 1978 is that it yielded a flexible system that has proven capable of providing useful bargains to a wide range of problems.  Importantly, bankruptcy law's resolution of those problems – whether it was General Motors' overly large dealership network,[20] the Pacific Gas & Electric Company's billions of dollars of damage to property all over California[21] or the City of Detroit's overly generous pension benefits[22] – has been widely, although perhaps not exclusively, received as legitimate by the public at large.

J&J is clearly one of the world's leading corporations and one of the most famous American companies.  However, the public's ability to understand this bankruptcy case is very different from the now familiar story of a corporate titan restructuring in Chapter 11. For an example of how this will matter to the public, consider how CNN covered the GM bankruptcy in 2009: "General Motors filed for bankruptcy protection early Monday . . . ."[23]

---

[20] *See In re General Motors Corp*, Case No. 09-50026 (Bankr. S.D.N.Y. 2009).

[21] *See In re PG&E Corporation and Pacific Gas and Electric Co.*, Case No. 19-30088 (Bankr. N.D. Cal. 2019).

[22] *See In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich. 2013).

[23] Chris Isidore, *GM bankruptcy: End of an era*, CNN Money (June 2, 2009), https://money.cnn.com/2009/06/01/news/companies/gm_bankruptcy/.

11

Now compare this to the convoluted news coverage of the LTL Management

bankruptcy, which is utterly incomprehensible to the average American:

CBS News:

> A bankruptcy move from Johnson & Johnson could stall
> any talcum powder settlements for the thousands of
> families that have sued the company for billions of dollars
> in damages in recent years.
>
> Officials with Johnson & Johnson said they have created
> a new subsidiary called LTL Management. Johnson &
> Johnson said it then moved $2 billion in baby powder
> lawsuit settlement money to LTL, then submitted LTL for
> bankruptcy.   LTL   Management filed for   bankruptcy
> protection in North Carolina on Thursday and listed its
> liabilities between $1 billion and $10 billion.
>
> Johnson & Johnson itself has not filed for bankruptcy and
> neither has any of its other subsidiaries like Aveeno and
> Neutrogena.[24]

Reuters:

> Feb 25 (Reuters) - Johnson & Johnson (JNJ.N) can use the
> bankruptcy system to resolve multibillion-dollar litigation
> claiming its talc products cause cancer, a U.S. judge ruled
> on Friday, signing off on a legal maneuver that enables the
> company to avoid fighting more than 38,000 individual
> lawsuits.
>
> J&J used a strategy known as the "Texas two-step," which
> allows companies to split valuable assets from liabilities
> through a so-called divisive merger. In October, J&J,

---

[24] Khristopher J. Brooks, *Johnson & Johnson talc powder spinoff files for
bankruptcy*, CBS News (Oct. 15, 2021), https://www.cbsnews.com/news/johnson-
johnson-talc-powder-cancer-lawsuits-bankruptcy-ltl-management/.

which maintains its talc products are safe, put the claims into a newly created entity called LTL Management LLC, which filed for bankruptcy days later.[25]

The New York Times:

> Johnson & Johnson announced on Thursday that a subsidiary that it recently created to manage claims that assert that its talc-based products caused cancer had filed for bankruptcy protection.
> The company said in a statement that it hoped its filing for Chapter 11 protection would help resolve current and future claims "in a manner that is equitable to all parties." J.&J. said that it would provide money for the subsidiary for whatever amounts the bankruptcy court decided were owed, and that it would create a $2 billion trust for that reason. Certain royalty revenue streams have been allocated for the subsidiary to pay for any future costs, it added.[26]

Transparency and legitimacy are important policy goals of any bankruptcy regime. Here, J&J has managed to turn what was once a straightforward aspect of the Chapter 11 bankruptcy system into multiple paragraphs of explanation.

If the bankruptcy court's ruling is affirmed by this Court, the Law Professors share a concern that this filing, and the many future contortions of the Bankruptcy

---

[25] Dietrich Knauth and Tom Hals, *Judge greenlights J&J strategy to resolve talc lawsuits in bankruptcy court*, Reuters (Feb. 25, 2022), https://www.reuters.com/legal/transactional/judge-allows-johnson-johnson-talc-unit-remain-bankruptcy-court-2022-02-25/.

[26] Jesus Jiménez, *Johnson & Johnson Subsidiary Seeks Bankruptcy Protection to Handle Talc Product Claims*, N.Y. Times (Oct. 14, 2021), https://www.nytimes.com/2021/10/14/business/johnson-johnson-bankruptcy-talc-claims.html.

13

Code that will come after it, will undermine public confidence in the fairness and integrity of the bankruptcy system.[27] It will also undermine the perception of fairness of any bankruptcy outcome on the part of the talc victims, whose interests are the key feature of this bankruptcy case.

## CONCLUSION

For the foregoing reasons, this Court should reverse the MTD Order and find that LTL's bankruptcy filing should be dismissed as a bad faith filing.

Dated: July 7, 2022
    New York, New York

**HERRICK, FEINSTEIN LLP**
*By: /s / Sean E. O'Donnell*
Sean E. O'Donnell
Stephen B. Selbst (*pro hac vice* pending)
Steven B. Smith (*pro hac vice* pending)
Rachel H. Ginzburg (*pro hac vice* pending)
Two Park Avenue
New York, New York
Tel: (212) 592-1400
Fax: (212) 592-1500
sodonnell@herrick.com
sselbst@herrick.com
ssmith@herrick.com
rginzburg@herrick.com

*Attorneys for the Law Professors*

---

[27] *See* David Skeel, *The populist backlash in Chapter 11*, The Brookings Institution (Jan. 12, 2022), https://www.brookings.edu/research/the-populist-backlash-in-chapter-11/ ("There is a growing populist perception that Chapter 11 . . . has become deeply unfair. It benefits insiders—the "haves"—at the expense of outsiders—the "have nots."").

# APPENDIX A

Kenneth Ayotte
Robert L. Bridges Professor of Law
U.C. Berkeley School of Law

Susan Block-Lieb
Professor of Law; Cooper Family Chair in Urban Legal Issues
Fordham University School of Law

Diane Lourdes Dick
Professor of Law
University of Iowa, College of Law

Jared Ellias
Professor of Law
Harvard Law School

Bruce A. Markell
Professor of Bankruptcy Law and Practice
Northwestern Pritzker School of Law

Robert K. Rasmussen
J. Thomas McCarthy Trustee Chair in Law and Political Science
University of Southern California Gould School of Law

Yesha Yadav
Associate Dean and Robert Belton Director of Diversity, Equity and Community;
Professor of Law
Vanderbilt University Law School

## **CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to Third Circuit Local Rule 28.3(d), I certify that I am a member of

the Bar of this Court.

July 7, 2022                                   */s/ Sean E. O'Donnell*
                                              Sean E. O'Donnell

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 3,604 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

This brief complies with the electronic filing requirements of Third Circuit Local Rule 31.1(c) because the text of the electronic brief is identical to the text in the paper copies, and a virus detection program has been run on this file and no virus was detected. The virus detection program utilized was Microsoft Defender for Endpoint, Antivirus Version 1.369.880.0.

July 7, 2022

*/s/ Sean E. O'Donnell*
Sean E. O'Donnell

## CERTIFICATE OF FILING AND SERVICE

I certify that today, July 7, 2022, I electronically filed the foregoing brief with

the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit using the

appellate CM/ECF system. Participants in the case who are registered CM/ECF users

will served by the appellate CM/ECF system.

July 7, 2022                              */s/ Sean E. O'Donnell*
                                          Sean E. O'Donnell