MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com

150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922

*Counsel for Mesothelioma Claimant and Appellant*
*Katherine Tollefson and Certain Mesothelioma Claimants*

### IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No. 21-30589 |
| Debtor. | Honorable Michael B. Kaplan |
|  | **Hearing date: July 26, 2022** |

### MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC'S[1] OPPOSITION TO ESTIMATION AND PROPOSED NEXT STEPS IN THE CASE

Five wealthy non-distressed asbestos companies are mocking the bankruptcy system and trampling on the Bill of Rights, all in an effort to impose an unconstitutional "final resolution" on current and *future* mesothelioma victims by means of the Texas Two Step. Jones Day, the only law firm actively pushing this strategy, brags that it's "the greatest innovation in the history of bankruptcy."[2] It is certainly the most ***lucrative*** one…for everyone but the sick people, anyway.[3]

---

[1] "MRHFM" represents 61 mesothelioma victims with pending claims against Johnson & Johnson and its affiliates, including former TCC2 Member and Appellant Katherine Tollefson, plus several additional victims who cannot file suit because of this court's order.

[2] *See* Exhibit 1, *Transcription of American Bankruptcy Institute*, "Texas Two-Step of Tort Liability (J&J) Annual Spring Meeting 2022" ("*ABI*"), pg. 4.

[3] *See* MRHFM Opp. To Prelim. Injunction, Dkt. 2564, pgs. 39 - 40. Jones Day has been paid over **$70,000,000** and Bates White has been paid over **$31,000,000** across the five pending Two Step cases. And the meter is running.

I.      **The Third Circuit Will Decide This Case Soon So Let's Do *Nothing* Now**

Pending before the United States Court of Appeals for the Third Circuit are this court's orders (1) denying the motions to dismiss and (2) granting wealthy non-debtor Johnson & Johnson and hundreds of non-distressed non-debtor retailers an injunction that bars cancer victims from having their cases decided in the legal system. Dkt. 1603 and Ad. Pro. Dkt. 102. Four separate groups of appellants—all cancer victims and including MRHFM plaintiff Katherine Tollefson— have filed opening briefs, all briefing is to be completed by early September and oral argument is anticipated to take place soon after. [4]

The Third Circuit appears poised to decide this case very soon; if it rules as requested by all appellants and several *amici curiae*, including the Department of Justice, J&J's ongoing assault on the individual constitutional rights of the people it poisoned is over. While these expedited and dispositive appeals are pending there is no reason to do *anything* in this case, other than hear and rule on requests or objections related to relief from the preliminary injunction or to lift the automatic stay. If a few months pass without a ruling from the Court of Appeals, this court can always re-visit the path forward. In the meantime, a three-month pause will save the Estate tens of millions of dollars in professional fees from all sides.[5]

---

[4] *See* Case No. 22-2003, Doc. 45, Brief of Andrew R. Vara, United States Trustee, As *Amicus Curiae* In Support Of Appellants And Supporting Reversal; Case No. 22-2008, Doc. 57, Brief for Appellants (Ad Hoc Committee of Mesothelioma Claimants [Katherine Tollefson and others]); Case No. 22-2003, Doc. 55, Opening Brief of Appellant Aylstock, Witkin, Kreis & Overholtz, PLLC; Case No. 22-2003, Doc. 54, Brief for Appellant (Arnold & Itkin); Case No. 22-2003, Doc. 46, Brief for Appellant Official Committee of Talc Claimants. *See also* Exhibits 2-4 to MRHFM Reply in Support of Objection to Preliminary Injunction, Dkt. 2711, attaching briefs from Dean Erwin Chemerinsky, seven bankruptcy professors, and Mr. Vara, United States Trustee.
[5] The court has noted the number and amount of professional fees in this case on all sides. MRHFM agrees not to use its proposed few months 'stand-down' pending a decision from the Court of Appeals against the Debtor later in calculating any delay.

## II.    All "Creditors" Oppose Estimation

The court asked the parties to give input on whether there is a need for estimation.  There

is not.[6]  In aggregate, Two Step "bankruptcies" have been pending for ten (10) years (120

months).[7]  None are "resolved."  None are close.

The Meriam-Webster dictionary defines "bankrupt" as:

> **a:** a debtor (such as an individual or an organization) whose property is subject
> to voluntary or involuntary administration under the bankruptcy laws for the
> **benefit** of the debtor's **creditors**[8]

It would seem that what the "creditors" want should be considered when it comes to

estimation, even in a Two Step "bankruptcy."  The "debtors" frequently *say* this Two Step

boondoggle benefits the "creditors" (Two Stepese for asbestos poisoned cancer victims).  *Actions*

speak louder than words: the mesothelioma plaintiffs in all Two Step cases have aggressively

opposed all attempts to strip them of their rights and pursued multiple remedies (and likely

multiples more to come) in North Carolina and here.[9]  If it matters—and it should—the "creditors"

don't want to be in bankruptcy court and demand to be heard in our country's legal system.  If it

matters—and it should—the "creditors" ***universally*** oppose estimation.  MRHFM does not

presume to tell LTL where it to put its filing cabinet (if it has one) or how to blindly obey Johnson

---

[6] The court stated on June 14: "And I have extended it to any other party. So that for the, for any other party that wants or the Futures Claims rep as well. I want to hear from you all as to whether we, whether we should now proceed down the path of estimation. Whether it's not —- because I've heard argument peripherally that it's not needed. Before we talk about how, let's make sure we have a need." Exhibit 2, Tr. 6/14/2022, pg. 149.

[7] *Bestwall*, November 2017 (56 months); *DBMP*, January 2020 (30 months); *Aldrich/Murray,* June 2020 (25 months); *LTL*, October 2021 (9 months).

[8] https://www.merriam-webster.com/dictionary/bankrupt (last accessed July 7, 2022) (emphasis added). "Bankruptcy" is defined as: "utter failure or impoverishment."
https://www.merriam-webster.com/dictionary/bankruptcy?src=search-dict-box

[9] Just last week, Judge Whitley denied CertainTeed's Motion to Dismiss the claimants complaint for fraudulent transfer. *See Saint-Gobain Must Face Challenge to Asbestos Unit's Bankruptcy Case,* Wall Street Journal, Andrew Scurria, July 7, 2022.  Available at: https://www.wsj.com/articles/saint-gobain-must-face-challenge-to-asbestos-units-bankruptcy-case-11657320389.

& Johnson; by the same token, Jones Day's opinion about what is best for the "creditors"—all represented by their own counsel as well as an official committee and counsel—does not matter. The "creditors" oppose estimation. *That* should matter.

## III.    No One Has Power To Give J&J What It *Requires* To "Settle"

Many people are working hard on this case. But no one involved, including MRHFM, has power to give J&J the only thing it will accept to "settle" this case: a permanent channeling injunction under 524(g) that binds future claimants or that compels current claimants to forego a jury trial liquidating their state law claims, including claims for punitive damages, and collecting 100% of the damages. This court lacks power to decide the value of current claims, and no one in this *non*-limited fund case—where neither the non-debtor parent nor its bankruptcy stooge are overwhelmed by asbestos liabilities or in financial distress as required by 524(g)—has authority to bind future victims to a "resolution" years before they are even sick. *See* the Seventh Amendment of the United States Constitution, a plain reading of section 524(g) and its legislative history, binding precedent from the Third Circuit barring 524(g) injunctive relief to non-debtors with independent asbestos liabilities in *Combustion Engineering*[10] and *W.R. Grace,*[11] and Supreme Court protection of jury rights in asbestos class action cases in *Amchem*[12] and *Ortiz,*[13] both involving corporate behavior and attempted "settlements" much less egregious than those at issue in J&J's assault on individual rights here.

## IV.    Estimated "Aggregate Liability" Is Useless In This *Non*-Limited Fund Case

Sick and dying cancer victims don't need to wait 18 months (but probably five years) for an *advisory* opinion about J&J's "total liability" that they can reject right now. *See* 11 U.S.C. §

---

[10] *In re Combustion Eng'g,* 391 F.3d 190 (3rd Cir. 2004).
[11] *In Re W.R. Grace*, 591 F.3d 164 (3rd Cir. 2009). *See* MRHM Objection, Dkt. 2564, pgs. 9-20.
[12] *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997).
[13] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

502(c).  Johnson & Johnson, having successfully opposed a second official creditors' committee

for mesothelioma victims because of the "expense," can now bulldoze piles of cash to Jones Day,

White & Case, Skadden, and Bates White without shame in an estimation billing "bonanza" that,

by itself, will probably cost the Estate $150 million across all professionals (but probably much

more).[14]  While paltry to a company that pays 80 times that much in dividends **every year**—all to

equity holders **outside** of this bankruptcy court—it's money that could be put to better use.

Because *anything* is a better use.  Estimation is a colossal waste of time (which mesothelioma

victims don't have) and money;[15] but more importantly, estimation will play exactly zero role in

bringing about a "global" or "final" resolution.

"Total liability" is useless in a **non**-limited fund case; how does a lawyer recommend an

*aggregate* settlement to an **individual** client where the wealthy non-debtor parent—with

independent tort liability, by the way—says its "funding agreement has no cap"?[16]

> **Lawyer:** Mr. Client, your wife, perfectly healthy until a year ago, suffered for
> eleven months and died at age 45 of mesothelioma, a disease only caused by
> breathing in asbestos fibers.  She leaves behind you, three minor children, and 20
> years of lost income.  As you know, she was a school teacher and her parents
> worked at a bank.  Her only exposure to asbestos came from her daily use of talc-
> based Johnson's Baby Powder for twenty years.  All of this exposure occurred *after*
> the Company knew Baby Powder had dangerous levels of asbestos in it and J&J
> sold it to your wife anyway.  With all of this in mind, I recommend you vote on a
> re-organization plan whereby *Legacy Talc Litigation Management LLC* can emerge
> from bankruptcy so its zero employees can get back to LTL's core businesses of
> selling, making and doing absolutely nothing.  As part of this re-organization,

---

[14] The court estimated Johnson & Johnson has already spent $50 million on professionals for all sides.  Tr.
6/14/2022, pg. 25.  The case is approximately nine months old.  The volume of fee applications reveals a
lot of time and money will be spent working towards and conducting estimation. *See also 'Texas two-step'
outcry risks ending fee bonanza for law firm Jones Day*, Financial Times, Jamie Smyth, February 6, 2022,
https://www.ft.com/content/de1da1ea-d19a-4f2d-a790-8ff45368d7d1.

[15] *See* MRHM Objection, Dkt. 2564, pg. 10.

[16] Tr. 10/20/2021, pgs. 29-30; *ABI*, pg. 18 "funding unlimited."  *See* N.J. Rule Prof. Conduct 1.8(g): "A
lawyer who represents two or more clients shall not participate in making an aggregate settlement of the
claims or against the clients…unless each client gives informed consent after a consultation that shall
include disclosure of the existence and nature of all the claims…and the participation of each person in the
settlement."

Johnson & Johnson will put $2 billion into a qualified settlement trust.  Trustees you will never meet will review your wife's paperwork and decide what to pay you and your children.  But, you should vote for this plan of re-organization because $2 billion is an accurate aggregate liability amount for Johnson & Johnson's total talc liability from now until the end of time.

**Client:** How was this decided?

**Lawyer:** I don't know because I wasn't permitted to participate in mediation.  But if I had participated in mediation I couldn't tell you about it.

**Client:** What was the give and take during the negotiation for this?

**Lawyer:** I don't know because I wasn't permitted to participate in mediation.  But if I had participated in mediation I couldn't tell you about it.

**Client:** If J&J says it's Baby Powder was always safe, never contained asbestos, and doesn't cause mesothelioma, why is it putting money into a trust for mesothelioma victims?

**Lawyer:** Because Johnson & Johnson knows better than you do what is best for your family and your wife's case.  J&J is really worried about a jury giving you $0 …. which according to J&J is what your wife's case is worth.[17]

Johnson & Johnson has no incentive to accept a valuation that reflects its ***actual*** history of liability in the tort system.  If J&J wanted to pay what it paid mesothelioma victims in the tort system when it resolved 95% of the pending claims, paid the verdicts against it that were upheld on appeal, and bonded the verdicts remaining on appeal without financial distress, it would have done so already.  LTL, always the dutiful stooge, demands a meaningless "aggregate estimation" that is not legally binding and opposes individual trials because thirty-three mesothelioma trials "have already occurred pre-bankruptcy."[18]

---

[17] *ABI*, pg. 16 "It was awful from [the claimant's] perspective too because…the large majority of these claimants who were actually moving forward weren't getting anything."

[18] "But Your Honor as we explained in our statement, trying a few additional mesothelioma cases on a one off basis would not provide useful information to the parties given the number of trials that have already occurred. We cited the stats in our statement but I think it was 33 trials that have already occurred pre-bankruptcy." Tr. 6/14/2022, p. 119 (arguing against the individual motions to lift stay filed by Mr. Valadez and Ms. Johnson).

J&J says assets are unlimited (up to full value of JJCI) and no more trials are necessary to inform the parties.  Then *why* is estimation needed?  It's not.  The problem is that to Two Step "debtors," preparing for and conducting estimation is straight out of the 'Project Long Stall' playbook; anything that keeps the stooge in bankruptcy and its puppet master conducting "business as usual" hiding behind an injunction.  Real debtors, on the other hand, with real operations, real employees, and shareholders want to get out of bankruptcy and back to contributing to society as soon as possible.  Garrett Motion filed for bankruptcy in September 2020, it emerged in April 2021.[19]  Hertz filed in May 2020, it emerged in June 2021.[20]  J.C. Penney filed in May 2020, it emerged in December 2020.[21]  Real debtors take on obligations in bankruptcy they don't want to have for longer than they need to.  "To benefit from bankruptcy, a debtor is required to shoulder a host of obligations."  Appellate Brief of Andrew R. Vara, United States Trustee, pgs. 17-18.  "Furthermore, the equity owners of the debtor generally cannot retain their interest or receive a distribution on account of their ownership until all **creditors** have been paid in full." *Id. citing In re Telegroup, Inc.*, 281 F.3d 133, 139 (3d Cir. 2002)(emphasis added).

Legacy Talc Litigation Management has only three "obligations": (1) obey J&J, (2) have the "bankruptcy" take as long as possible, and (3) say "equitable" or "efficient" five thousand

---

[19] *See Garrett Motion Successfully Completes Chapter 11 Restructuring With New Capital and Strong Balance Sheet,* Business Wire, April 30, 2021.  Garret filed for bankruptcy in September 2020. *Auto parts maker Garrett files for bankruptcy*, Reuters, https://www.reuters.com/article/us-garrett-motion-bankruptcy/auto-parts-maker-garrett-files-for-bankruptcy-idUSKCN26C06O.
 *https://www.businesswire.com/news/home/20210430005564/en/Garrett-Motion-Successfully-Completes-Chapter-11-Restructuring-With-New-Capital-and-Strong-Balance-Sheet*
[20] *Hertz leaves bankruptcy, a year after the pandemic devastated the car rental business*, New York Times, June 30, 2021. https://www.nytimes.com/2021/06/30/business/hertz-bankrupcty.html.
[21] *JCPenney emerges from bankruptcy*, Fox Business News, December 7, 2020
https://www.foxbusiness.com/lifestyle/jcpenney-emerges-from-bankruptcy.

times.  Meanwhile Johnson & Johnson, obligation free, throws billions out the window to equity

holders and conducts business as usual.

## V.      North Carolina Two Step-Cases: How's That Working Out For You?[22]

Jones Day has removed any need to speculate about what the Debtor intends to do in this

case.  The North Carolina "bankruptcies" are a nice case study in ***why*** estimation is a completely

futile and pointless exercise.  The "debtors" in Two Step "bankruptcies" have a love affair with

*Garlock*, which was filed in the Western District of North Carolina several years ago.  The

bankruptcy court estimated that Garlock—who itself actually filed for Chapter 11, not a

manufactured stooge—had $125 million in liability. *In re Garlock Sealing Techs., LLC*, 504 B.R.

71 (Bankr. W.D.N.C. 2014).  But, nothing says 'advisory opinion' more than the case resolving

for nearly four times that amount. *See In re Garlock Sealing Technologies LLC*, Case No. 10-BK-

31607, Doc 5332, pg. 6.  The expense, delay, and disputable relevance of estimation to the *Garlock*

resolution was noted by Judge Whitley recognizing that professional fees were well over $100

million and that regardless of whether estimation played any role in resolving the case, "it didn't

work in a short period of time."  Exhibit 4, *DBMP*, Tr. 10/14/2021, pg. 83.

Therefore, because estimation cost a lot of money and time in *Garlock*, because the case

settled for much more than the estimated total, because Garlock was actually bankrupt and had a

limited-fund, and because working towards estimation in *Bestwall, DBMP* and *Aldrich/Murray*

has not accomplished what the "debtors" in the North Carolina cases all claim they want—an

"efficient" and "fair" resolution—despite being nine total court years into Two Steps in North

Carolina, why should this court do estimation here?  And, if so, why ***now*** with the Third Circuit

about to decide this case?

---

[22] *ABI*, pg. 19, Judge David Jones asking Debtor's counsel Greg Gordon about Two Step cases, "how has
that worked out for you so far?"

The estimation hearing in *Bestwall* is currently scheduled for October of 2023. The "creditors" objected to estimation. It was ordered anyway. Not surprisingly given the Two Step objectives, Bestwall has delayed estimation. First, Bestwall insisted on gathering information that did not assist the estimation process. Rather, this information assisted Bestwall in an inappropriate and feckless attempt to prove fraud among the asbestos plaintiffs' bar. Bestwall requested, and the bankruptcy court approved, a Personal Injury Questionnaire ("PIQ") that the bankruptcy court required every mesothelioma claimant in Bestwall's claims database to complete and file. *Bestwall*, Doc. 1670. This process was contested by the official creditors committee, the futures claims representative, and thousands of potential claimants for numerous reasons, including the bankruptcy court's lack of jurisdictional authority over the potential claimants who had been ordered to complete the PIQ, as well as the PIQ's requirement to provide confidential settlement information. *Bestwall,* Docs. 1326, 1331, 1845, 1935-43, 1947-53, 1861, 1876, 2218, 2221-2. For these reasons, and others, many of the claimants refused to fully complete the PIQ, and they were held in contempt and fined. *Bestwall,* Docs. 2401 & 2553. After a month of waiting to find out to whom the fines were to be paid—Bestwall suggested fining dead or dying cancer victims $100 *per day* for refusing to provide irrelevant information—on June 23, 2022, Judge Beyer ruled that the claimants substantially complied with the PIQ Order as of May 18, 2022 and any fines will be a setoff against future § 524(g) trust claims.

Second, the method that LTL has chosen to collect information (PIQs) is by its nature time-consuming and elaborate. In *Garlock*, *Bondex/Specialty Products*, and *Bestwall*, the PIQ motions and subsequent enforcement motions took *years* to litigate (14 months in *Garlock*, 24 months in *Bondex*, and 22 months (and counting) in *Bestwall*). LTL is aware of this and is purposely engaging in an information-gathering mechanism that has delayed estimation proceedings in

previous asbestos cases.  Moreover, there have been numerous *real* asbestos bankruptcy cases, the vast majority lead to 524(g) trusts *without* PIQs.[23]

Third, Bestwall has also delayed estimation by continuing to seek evidence in support of its bogus fraud theory through depositions of five asbestos plaintiffs' law firms.  The focus of those depositions is on approximately 30 asbestos personal injury cases tried by these firms that, in many cases, resulted in significant jury verdicts and/or settlement amounts against Bestwall's wealthy and injunction shielded puppet-master, Georgia-Pacific.  Some of these cases are more than 20 years old.  Most of the subpoenas were served by Bestwall in the late fall of 2021, over four years after the case began.  *Bestwall,* Docs. 2273 & 2285.  Two of them were served more recently.  *Bestwall*, Docs. 2469 & 2595.  Because Bestwall began this process so late, and because depositions are not scheduled until August or September of this year, it will serve as another excuse for Bestwall to delay estimation, which has a discovery deadline of October of 2022.

If Bestwall had solely sought information related to the estimation of its asbestos liability, and done so in a timely manner, then the estimation proceeding would have been completed long ago.  But, this is a bizzarro Two Step "bankruptcy" world and cancer victims are just living in it.  In this world, delay *only* prejudices "creditors"; the stooges have no operations, employees or stakeholders to be prejucied, and the wealthy shielded non-debtor puppet master pays less to the bankruptcy professionals  each year than it was paying sick people in the jury system.

Back to *real* bankruptcies: Hertz, JC Penney, and Garret Motion, three very different companies, collectively filed for and successfully emerged from bankruptcy in less *total* time (27 months) than *Bestwall* (56 months) or *DBMP* (30 months) have lasted *individually*.  *Aldrich/Murray* will blow by this 27 month mark soon.  So, is following the Jones Day Two Step

---

[23] Here is a chart that lists asbestos bankruptcy cases:https://www.crowell.com/files/20220504-List-of-Asbestos-Bankruptcy-Cases-Chronological-Order.pdf

script by proceeding to estimation *really* the right course in this case?  At least someone is enjoying this; Debtor's counsel can joke about the Two Step at a bankruptcy seminar full of lawyers.[24]  The "greatest innovation" in bankruptcy has paid $0 to asbestos cancer victims in ten court years.

## VI.   **MRFHM'S Clients Will Have Juries Liquidate Their Claims In District Courts**

As if more reasons were needed to forego estimation, MRHFM's individual clients will exercise their right to a jury trial before an Article III district court (28 U.S.C. § 157(b)(5)) before they will support a "consensual plan of reorganization" that "caps" J&J's or LTL's liability, is based on an advisory opinion by an Article I bankruptcy court, that lacks an absolute unfettered opt-out to the tort system with no bar on punitive damages, or which infringes upon their constitutional jury trial rights in any other way.[25]  MRHFM's plaintiffs cannot do worse under a Chapter 11 "plan of reorganization" than they would in a Chapter 7 liquidation of the Debtor, regardless of whether or not such a plan garners 75% support from other claimants; they will go before juries to liquidate (quanitfy) their individual claims.  They will not accept a global or

---

[24] *How a bankruptcy 'innovation' halted thousands of lawsuits from sick plaintiffs,* Reuters, Dan Levine and Mike Spector, June 23, 2022, https://www.reuters.com/investigates/special-report/bankruptcy-tactics-two-step/.  The article, referring to the video of the ABI panel discussion: "Gordon, grinning at his audience, made a bold claim about his maneuver, which he contends benefits both companies and plaintiffs. The two-step, he said, is 'the greatest innovation in the history of bankruptcy.'  The remark prompted laughter at the April bankruptcy conference in Washington. But the two-step is no joke: Gordon's innovation could radically reshape corporate liability law, legal scholars say, by allowing companies to easily divert any lawsuits against them into bankruptcy court – without filing for bankruptcy themselves."

[25] Chapter 11 gives this court authority to estimate "contingent or unliquidated" claims (11 U.S.C. § 502(c)(1)) and to handle core proceedings arising under or in a title 11 case (28 U.S.C. § 157(b)(1). Liquidating or estimating "personal injury tort wrongful death claims against the [debtor's] estate" is expressly *excluded* from a "core proceeding" and not within this court's power.  *Id.* at § 157(b)(2)(B)(emphasis added).  Rather, 28 U.S.C. § 157(b)(5) grants sole authority for liquidating personal injury claims such as those of MRHFM's clients to the District Court.  A bankruptcy court cannot conduct a jury trial absent "express consent of all the parties", which MRHFM clients do not.  28 U.S.C. § 157(e).

aggregate plan forced on them in violation of their constitutional, statutory and state-law rights. *See* 11 U.S.C. § 1129 (A)(7)(a)(ii).[26]

This court is not permitted to estimate or liquidate the plaintiffs' claims for purposes of distribution. 11 U.S.C. § 157(b)(2)(B); *see In re G-I Holdings, Inc.*, 323 B.R. 583, 615 (Bankr. D.N.J. 2005) ("At this juncture, § 157(b)(5) and § 1411(a) direct where such a valuation is to take place and by what procedure—a jury trial in the district court."). Here, this court may only estimate claims for purposes of allowance, and only when the fixing or liquidation of such claims would "unduly delay the administration of the case." 11 U.S.C § 502(c); *see also In re Dow Corning Corp.*, 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997) ("[B]ankruptcy law's general rule is to liquidate, not to estimate.").

Johnson & Johnson settled nearly 1,100 mesothelioma cases in the jury system (the majority during 2020 and 2021); so, disingenuous statements like "with nearly 40,000 ovarian cancer and over 400 mesothelioma claims pending against the Debtor on the petition date, it would take literally hundreds of years to liquidate these claims on an individual basis" are untethered to reality. The Company proactively resolved more mesothelioma cases than were filed against it the past two years, and did so efficiently, equitably and without distress.[27]

Texas Two-Step "bankruptcies" differ from real Chapter 11 bankruptcies because Texas Two-Step "bankruptcies" do not involve a limited fund; the non-debtor puppet master can make

---

[26] *See In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 154-55 (D. Del. 2005) (in a limited fund case, estimation of asbestos liability for limited purpose of plan formulation is "fruitful endeavor" because it promotes speed and efficiency goals of Bankruptcy Code without implicating claimants' procedural rights).
[27] Debtor also argues that estimation will "assist plan negotiations," "impose discipline on the mediation process," and "exert pressure on the parties to objectively consider their positions." Debtor's Statement on Proposed Next Steps in Chapter 11 Case ("LTL Statement") (Dkt. No. 2473), pgs. 3-4. *See also* pg. 7 ("hundreds of years"). Even if these claims had any basis in reality—they do not—the fact that an estimation may have salutary effects does not come close to establishing that the failure to conduct one would unduly delay this proceeding.

all current and potential claimants whole. Exhibit 3, Tr. 10/20/2021, pgs. 29-30 (funding

agreement "makes available for payment of talc-related claims the **full value** of New JJCI, both as

a result of New JJCI being obligated under the funding agreement with **no cap**, but also because

J&J is likewise obligated on a joint and several basis up to the full value of New JJCI.") (emphasis

added).[28]

   The fact that neither J&J nor the Debtor are actually limited in funding and both have

access to pay plaintiffs full value stands in stark contrast from every real bankruptcy involving

mass tort claimants. Here, there is no need to figure out how to apportion limited funds, *see In re*

*Dow Corning Corp.*, 211 B.R. 545, 600 (Bankr. E.D. Mich. 1997), since the funds available to

compensate the claimants have no limit. Nor is there a need to reassure potential purchasers of

Debtor by estimating its aggregate liability, *see In re A.H. Robbins Co., Inc.*, 88 B.R. 742, 746

(E.D. Va. 1988), since a fund to fully compensate claimants can be funded without selling off the

Debtor. And because this is a wholly contrived bankruptcy intended to gain litigation advantage,

the only "creditors" are tort claimants so there is no need to estimate claims if the sole purpose is

to determine the allocation of voting power among various claimant classes.[29]

## VII. MRHFM's Estimation Proposal, If Estimation Is Ordered

   If some type of estimation is ordered, without waiving its objection because MRHFM's

clients will never agree to be bound by any aggregate estimate of total liability or plan of "re-

organization", MRHFM has a better proposal than the one Jones Day is offering (and that is epicly

---

[28] *See How a bankruptcy 'innovation' halted thousands of lawsuits from sick plaintiffs*, Dan Levine and Mike Spector, Reuters, June 23, 2022 (Debtor's attorney "rejected the criticism that his strategy aims primarily to restrict plaintiff compensation, saying the only limit is the financial reserves of the healthy company funding the bankrupt subsidiary.").
https://www.reuters.com/investigates/special-report/bankruptcy-tactics-two-step/
[29] *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 720-21 (D. Del. 2005).  Both the mesothelioma claimants and ovarian cancer claimants are united in opposition to conducting an estimation.

failing in *Bestwall*).  LTL says "there is nothing that a series of mesothelioma trials can tell the parties that they have not already learned through the underlying litigation."  Dkt. 2473, LTL's "Statement of Proposed Next Steps", pg. 17.  *Perfect*.  Here is MRHFM's proposal:

1. The average mesothelioma verdict is $36.6 million.[30]

2. MRHFM knows what it settled cases with J&J for in the tort system at arm's length and so does every other plaintiff's firm with current claimants.

3. J&J can easily provide the court and the parties all relevant information for each mesothelioma case it settled in the jury system.

Therefore, the court can estimate J&J's "total liability" for mesothelioma cases using the above data.  No experts, no investment banks, no years of billing opportunities.  MRHFM just saved Johnson & Johnson over $150 million and everyone else five years.

## VIII.   Conclusion

The Court of Appeals will decide this case in as soon as a few short months; none of the "creditors" want estimation; MRHFM clients will individually liquidate their claims before juries in Article III district courts before they heed any estimation opinion; and estimation has done nothing to "resolve" the Two Step cases in North Carolina.  Any of these reasons, alone, are sufficient to avoid the delay and futility of the estimation money pit.

Respectfully submitted:

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**

_____
Clayton L. Thompson, Esq.
**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
cthompson@mrhmflaw.com

---

[30] Opinion of Motion to Dismiss, Dkt. 1572, pg. 17.

# Exhibit 1

1

2

3

4

5

6

7

8                   Transcription of File:

9       American Bankruptcy Annual Spring Meeting

10                     Texas Two Step

11

12

13                 Runtime:  01:02:02

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 1 | hope that what we have is a conversation. | 02:52 |
| 2 | I grew up with this statute as a practitioner, | 02:56 |
| 3 | and I hope that you will take advantage of the panel | 03:00 |
| 4 | that we have here this morning and ask questions. | 03:02 |
| 5 | Remember, the only bad question is one that you don't | 03:05 |
| 6 | ask.  In terms of connections, you know, there are no | 03:09 |
| 7 | Texas Two Step cases in Texas, and we can -- we can | 03:14 |
| 8 | certainly talk about that as well. | 03:16 |
| 9 | MS. TSIOURIS:  Thank you.  Greg? | 03:18 |
| 10 | MR. GORDON:  I am Greg Gordon, a partner with | 03:20 |
| 11 | Jones Day.  I am a long-time bankruptcy and | 03:26 |
| 12 | restructuring lawyer probably longer than I would like | 03:31 |
| 13 | to think about. | 03:32 |
| 14 | But I'm involved in I think probably all the | 03:38 |
| 15 | divisional merger cases that are pending at the | 03:40 |
| 16 | moment starting with the Bestwall Chapter 11 Case, | 03:46 |
| 17 | an affiliate of Georgia Pacific that we filed in | 03:48 |
| 18 | November of 2017 through to the LTL case that we | 03:53 |
| 19 | filed in October of last year.  That's the affiliate | 03:58 |
| 20 | of J&J as you probably know. | 03:59 |
| 21 | And I, of course, think the divisional merger | 04:02 |
| 22 | is the greatest innovation in the history of | 04:04 |
| 23 | bankruptcy, and we'll talk about that more today. | 04:07 |
| 24 | MS. TSIOURIS:  Thank you, Greg.  So, and -- and | 04:10 |
| 25 | I'm Natasha Tsiouris.  I'm a partner in the | 04:13 |

Page 16

1    they -- they went from virtually nothing in cost to            16:32

2    paying about four and a half billion dollars in that           16:37

3    five -- five-year period, about a billion of which             16:40

4    was defense costs.  And they were actually to the              16:42

5    point of incurring about 10,000 new claims a year.             16:46

6    They had 12,500 I think just in the first part of              16:49

7    2021 alone.                                                    16:51

8         So, from the company's perspective, completely            16:54

9    unmanageable.  How do you litigate 40,000 cases?  How          16:57

10   do you deal with the fact you're getting 10,000 more           16:59

11   per year and they're anticipated to continue for the           17:01

12   next 50 years?  What do you do about that as a                 17:04

13   company no matter how big you are?                             17:07

14        But then look at it from the standpoint of the            17:09

15   claimants.  It was awful from their perspective too            17:12

16   because it was literally -- and this gets reported             17:14

17   in the press, but I think it's true, it was literally          17:17

18   like a lottery for the claimants.  The large majority          17:20

19   of the claimants lost, and they lost on science                17:23

20   issues based on the fact that the juries just didn't           17:26

21   believe that the product caused disease, either                17:29

22   ovarian cancer or mesothelioma, or they would win              17:34

23   and then the case would get reversed on appeal.                17:37

24        So, the large majority of these claimants who             17:38

25   were actually moving forward weren't getting anything.         17:42

Page 18

1   the same time, they didn't want to be criticized for          18:50

2   having harmed the claimants in any way.                       18:53

3       So, in all of these cases including J&J, the             18:56

4   divisional merger was done in a way where the                 18:58

5   liability was allocated to the entity that filed.  So,        19:02

6   in the J&J case, it was the talc liability.  There            19:06

7   were operating assets put into that entity although           19:09

8   they were put into a subsidiary.                              19:11

9       But the most important thing is, and it's often          19:13

10  overlooked in the press, is that there was a                  19:16

11  funding agreement that was put in place between the           19:19

12  entities that it split.  It's a little more                   19:21

13  complicated than this.  I'm simplifying.  But the             19:24

14  entity that received the the larger segment of                19:27

15  the assets agreed to provide funding unlimited, you           19:30

16  you know, basically, capped only by its ability to            19:33

17  pay to back step -- back stop the obligation of the           19:37

18  entity that filed to pay the claims.                          19:39

19      And the idea was, and these companies all felt           19:41

20  the same way, was we don't even want to have an               19:45

21  argument.  We -- we would like to avoid an argument           19:47

22  that there  was any kind of fraudulent transfer here.         19:48

23  So, we're not interested in putting a cap on the              19:54

24  funding agreement.  We're not interested on just              19:55

25  allocating certain assets and putting all the other           19:57

Page 19

1  ones there and not having a funding agreement.  We'd          20:00

2  like to do it in a way where we can say to the               20:02

3  claimants and say to court, look, the same assets            20:05

4  that were available before the Chapter 11 to support         20:09

5  the payment of these claims are available post the           20:12

6  Chapter 11.                                                  20:13

7        JUDGE JONES:  How -- how has that worked out for       20:14

8  you so far?                                                  20:15

9        MR. GORDON:  That's not worked out too well.           20:15

10 That's not worked out too well.                              20:18

11       JUDGE JONES:  I do have a question.  So, when          20:20

12 you're making -- when you're making that decision as         20:22

13 to the allocation, why it is important that the              20:25

14 company that has the perspective tort liability also  2      0:30

15 have operating assets?  Why wouldn't you just -- why         20:33

16 wouldn't you just dump a bunch of cash in there and          20:36

17 say there you go?                                            20:38

18       MR. GORDON:  Well, from our -- you know, we've         20:39

19 always felt -- you know, we've tried to look forward         20:40

20 into these cases and think through what do you need          20:45

21 to have?  What position do you need to be in order to        20:47

22 ultimately confirm a plan?  And it's been our view           20:50

23 for a long time that you have to have an operation.          20:52

24 You -- you need to have something to reorganize at           20:55

25 the end of the day.                                          20:56

# Exhibit 2

                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF NEW JERSEY

IN RE:                   .      Case No. 21-30589(MBK)
                         .      Chapter 11
LTL MANAGEMENT LLC,  .
                         .      Clarkson S. Fisher U.S. Courthouse
            Debtor.  .          402 East State Street
                         .      Trenton, NJ 08608
                         .
                         .      Tuesday, June 14, 2022
. . . . . . . . . . ..           10:00 a.m.

    TRANSCRIPT OF RETENTION APPLICATION FOR HOULIHAN LOKEY, AS
INVESTMENT BANKER; STATUS CONFERENCE OF THE APPLICATIONS OF THE
             OFFICIAL COMMITTEE OF TALC CLAIMANTS
          BEFORE THE HONORABLE MICHAEL B. KAPLAN
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:              Jones Day
                             By:  GREGORY M. GORDON, ESQ.
                                  DAN B. PRIETO, ESQ.
                             2727 North Harwood Street, Suite 500
                             Dallas, TX 75201


For the Official            Brown Rudnik, LLP
Committee of Talc           By:  DAVID J. MOLTON, ESQ.
Claimants 1:                     JEFFREY L. JONAS, ESQ.
                             7 Times Square
                             New York, NY  10036

                             Genova Burns, LLC
                             By:  DANIEL M. STOLZ, ESQ.
                             110 Allen Road, Suite 304
                             Basking Ridge, NJ  07920



Audio Operator:             Luz Di Dolci


 Proceedings recorded by electronic sound recording, transcript
             produced by transcription service.

                **J&J COURT TRANSCRIBERS, INC.**
                    **268 Evergreen Avenue**
                 **Hamilton, New Jersey 08619**
                **E-mail:  jjCourt@jjCourt.com**

           **(609) 586-2311    Fax No. (609) 587-3599**

25

1   but presumably the funds are not limitless or we wouldn't be

2   here today.

3        And the fact is these administrative costs will

4   factor into what's ultimately allocated to creditors or a

5   trust.  All parties in this case should be cognizant of the

6   fees of the retained professionals.  This case is not being run

7   to pay professional fees.  The focus should be on the recovery

8   to creditors.  While Your Honor has afforded both the debtor

9   and the Committee deference in their selection of counsel to

10   date, we do not believe that deference is intended to be

11   limitless.

12        For these reasons and for those set forth in the

13   objection, the U.S. Trustee submits that the application should

14   not be approved.  Thank you, Your Honor.

15        THE COURT:  Thank you, Ms. Bielskie.

16        All right, let me at least touch on some of the

17   irony.  To date the best I can glean from all of the fee

18   applications, we're approaching roughly two dozen professional

19   firms that have billed probably to date in the neighborhood of

20   $50 million or so.  It's a little odd that the U.S. Trustee's

21   objecting to the fees and the retention now of the firm that's

22   going to defend my opinion.  I mean, I'd be inclined, you know,

23   to let the debtor retain Clarence Darrow if he were alive,

24   granted, probably cheaper.  I mean, again, that's tongue in

25   cheek somewhat.

1 of binding the debtor through principles of res judicata,

2 collateral estoppel.  And that creates risk of establishing

3 evidentiary record taint that would prejudice the debtor, all

4 of which could and would irreparably harm the debtor."

5          And now there's even more harm to the debtor because

6 lifting the stay would negatively impact the ongoing mediation

7 efforts.

8          Now I think what you heard repeatedly today, it

9 wasn't really emphasized in their papers, but there's this

10 argument that these two claims, Judge, you should let these two

11 claims go forward because one of the ideas you were considering

12 last hearing was allowing certain claims potentially to go

13 forward for purposes of moving the case forward.

14          But Your Honor as we explained in our statement,

15 trying a few additional mesothelioma cases on a one off basis

16 would not provide useful information to the parties given the

17 number of trials that have already occurred.  We cited the

18 stats in our statement but I think it was 33 trials that have

19 already occurred pre-bankruptcy.

20          So rather what it would do, it would take significant

21 time to litigant.  And that would include the appeals.  I mean

22 what you saw today was potentially the most expedited schedule

23 that would occur in California.  But, you know, there could

24 also be appeals.  And that would just be distracting the

25 parties for no real purpose.

1           THE COURT:  Yes.

2           MR. GORDON:  Is that for us also?

3           THE COURT:  I wasn't going to have, I would have

4   contemporaneous submissions by July 1.

5           MR. MOLTON:  Yeah, exchange, exchange statements

6   basically.

7           THE COURT:  Yes.

8           MR. MOLTON:  Okay.

9           THE COURT:  And I have extended it to any other

10  party.  So that for the, for any other party that wants or the

11  Futures Claims rep as well.  I want to hear from you all as to

12  whether we, whether we should now proceed down the path of

13  estimation.  Whether it's not -- because I've heard argument

14  peripherally that it's not needed.  Before we talk about how,

15  let's make sure we have a need.

16          MR. MOLTON:  Yeah.  I need to say a few things if you

17  don't mind Judge and then I'll move on.

18          THE COURT:  Why not.

19          MR. MOLTON:  Clearly you've heard from us and you've

20  read in our statement, at least in short form, why we believe

21  that estimation is a rabbit hole and quicksand.

22          And actually I'm going to take something Mr. Thompson

23  said, because you know, Clay Thompson, I don't know if he's

24  still here.  But he made the point that was made that this

25  isn't a typical debtor.  This isn't a debtor that needs to get

# Exhibit 3

1

```
 1                   UNITED STATES BANKRUPTCY COURT
                   WESTERN DISTRICT OF NORTH CAROLINA
 2                        CHARLOTTE DIVISION

 3    IN RE:                     :    Case No. 21-30589-JCW

 4    LTL MANAGEMENT LLC,        :    Chapter 11

 5         Debtor.              :    Charlotte, North Carolina
                                     Wednesday, October 20, 2021
 6                               :    9:30 a.m.

 7    : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8                     TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE J. CRAIG WHITLEY,
 9                    UNITED STATES BANKRUPTCY JUDGE

10    APPEARANCES:

11    For the Debtor:            Jones Day
                                 BY:  GREGORY M. GORDON, ESQ.
12                                    DAN B. PRIETO, ESQ.
                                      AMANDA RUSH, ESQ.
13                                    MARK W. RASMUSSEN, ESQ.
                                 2727 North Harwood St., Suite 500
14                               Dallas, TX  75201-1515

15                               Jones Day
                                 BY:  ROBERT W. HAMILTON, ESQ.
16                               325 John H. McConnell Blvd., #600
                                 Columbus, Ohio  43215
17
                                 Jones Day
18                               BY:  JAMES M. JONES, ESQ.
                                 250 Vesey Street
19                               New York, NY  10281

20    Audio Operator:            COURT PERSONNEL

21
      Transcript prepared by:    JANICE RUSSELL TRANSCRIPTS
22                               1418 Red Fox Circle
                                 Severance, CO  80550
23                               (757) 422-9089
                                 trussell31@tdsmail.com
24
      Proceedings recorded by electronic sound recording; transcript
25    produced by transcription service.
```

1          THE COURT:  Uh-huh (indicating an affirmative

2    response).

3          MR. GORDON:  -- and Trane -- to engage in intercompany

4    transactions such as dividends or forgiveness of intercompany

5    debt that can diminish the payors' assets.  And here, we're

6    hoping that through the addition of J&J to the funding

7    agreement that that fact will alleviate concerns about

8    hypothetical transactions like that.  Because the ultimate

9    parent company, J&J, has agreed to be jointly and severally

10   liable under the funding agreement to the full extent of the

11   value of New JJCI.

12         I should also point out, your Honor, that there

13   obviously were concerns raised in the other cases that the

14   payors' obligations in those cases were not guaranteed.  Your

15   Honor obviously heard that --

16         THE COURT:  Uh-huh (indicating an affirmative

17   response).

18         MR. GORDON:  -- in hearings in the other cases and the

19   fact that J&J is jointly and severally liable under this

20   funding agreement, in our view, is better than a guarantee.

21         So again, as your Honor knows from the other cases,

22   the funding agreement includes no obligation to repay, it's not

23   a loan agreement, and it makes available for payment of talc-

24   related claims the full value of New JJCI, both as a result of

25   New JJCI being obligated under the funding agreement with no

1    cap, but also because J&J is likewise obligated on a joint and

2    several basis up to the full value of New JJCI.  Like the other

3    funding agreements the Court's familiar with, this funding

4    agreement obligates New JJCI and J&J to provide funding for all

5    costs related to the defense of talc claims in and outside of

6    bankruptcy, including the costs of administering the bankruptcy

7    case, and in, that's to the extent that the cash distributions

8    to LTL from the Royalty A&M business are insufficient to do so.

9          The funding agreement also obligates J&J and New JJCI

10   to fund amounts necessary to pay talc-related liabilities when

11   there is no bankruptcy case and in the event of a bankruptcy

12   case, to provide funding for a trust and in both cases, to the

13   extent that LTL's unable to do so.

14         In the case, your Honor, of the required funding of

15   the trust, there are no conditions.  The funding is not

16   conditioned on a plan of reorganization that's acceptable to

17   the debtor, to New JJCI, or any affiliate of the debtor,

18   including J&J.  Funding, the funding's also not conditioned on

19   New JJCI or any non-debtor affiliate receiving any rights or

20   benefits under the plan.

21         Your Honor, to hopefully assuage any concerns that New

22   JJCI and J&J will not honor their obligations under this

23   funding agreement New JJCI and J&J have also agreed to advance

24   an aggregate amount of $2 billion under the funding agreement.

25   That amount will be used -- and this is, obviously, subject to

# Exhibit 4

1

```
 1                  UNITED STATES BANKRUPTCY COURT
                   WESTERN DISTRICT OF NORTH CAROLINA
 2                        CHARLOTTE DIVISION

 3   IN RE:                     :    Case No. 20-30080-JCW

 4   DBMP LLC,                  :    Chapter 11

 5      Debtor.                 :    Charlotte, North Carolina
                                     Thursday, October 14, 2021
 6                              :    9:30 a.m.
     : : : : : : : : : : : : : : : : : : : : : : : : : : : :
 7

 8
                        TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE J. CRAIG WHITLEY,
                 UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:          Robinson, Bradshaw & Hinson, P.A.
12                            BY:  RICHARD C. WORF, ESQ.
                              101 N. Tryon Street, Suite 1900
13                            Charlotte, NC  28246

14                            Jones Day
                              BY:  GREGORY M. GORDON, ESQ.
15                            2727 North Harwood Street
                              Dallas, TX  75201-1515
16
                              Jones Day
17                            BY:  JEFFREY B. ELLMAN, ESQ.
                              1221 Peachtree St., N.E., #400
18                            Atlanta, Georgia  30309

19
     Proceedings recorded by electronic sound recording; transcript
20   produced by transcription service.

21   _____

22                     JANICE RUSSELL TRANSCRIPTS
                          1418 Red Fox Circle
23                        Severance, CO  80550
                            (757) 422-9089
24                       trussell31@tdsmail.com

25
```

1   run that either way would make settlement more likely in the

2   short run.  The litigation, as we know, is going to take a long

3   period of time, some potential appeals, great deal of expense.

4   I'm proud to say that I remember Garlock 'cause I took over

5   right after the estimation hearing and the professional fees

6   were at 125 million there.

7        So I wasn't responsible for much of that 150.  I, I

8   tell Judge Hodges that, too, on occasion, that, but I do

9   remember by the end of it the parties were pretty hot at one

10  another and it looked to me, while there was an agreement that

11  was reached between the debtor and the FCR in a year's time,

12  the parties overall were, were farther away instead of closer,

13  at least that was my view of it at the point.  I wasn't there

14  at the first part of the case.  But the bottom line is in the

15  long run they did produce a settlement and we can argue about

16  whether estimation caused that or something else.  But the

17  bottom line is if it, if it worked, it didn't work in a short

18  period of time.

19       And as I've alluded to before, I have a question in my

20  own mind whether this pre-petition activity was such that, that

21  no matter what it needed to be examined and ruled upon by a

22  court and that nothing else might happen other than that.

23  I've, I've listened to you talk about -- I also wondered about

24  whether we were talking about a fight over capped plans,

25  evergreen plans, full-pay plans or something else and I still