**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Matthew I.W. Baker, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
mbaker@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126
*Local Counsel for the*
*Official Committee of Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
Eric R. Goodman, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
egoodman@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
*Co-Counsel for the*
*Official Committee of Talc Claimants*

**BAILEY GLASSER LLP**
Brian A. Glasser, Esq.
Thomas B. Bennett, Esq.
Kevin W. Barrett, Esq.
Maggie B. Burrus, Esq.
bglasser@baileyglasser.com
tbennett@baileyglasser.com
kbarrett@baileyglasser.com
mburrus@baileyglasser.com
1055 Thomas Jefferson St. NW, Suite 540
Washington, DC  20007
Tel: (202) 463-2101
Fax: (202) 463-2103
*Co-Counsel for the*
*Official Committee of Talc Claimants*

**OTTERBOURG PC**
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 905-3628
Fax: (212) 682-6104
*Co-Counsel for the*
*Official Committee of Talc Claimants*

| | |
|---|---|
| **PARKINS & RUBIO LLP**<br>Lenard M. Parkins, Esq.<br>Charles M. Rubio, Esq.<br>lparkins@parkinsrubio.com<br>crubio@parkinsrubio.com<br>Pennzoil Place<br>700 Milan St., Suite 1300<br>Houston, TX 77002<br>Tel: (713) 715-1666<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>jmassey@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* |

| | |
|---|---|
| In Re:<br><br>**LTL MANAGEMENT, LLC,**[1]<br><br>                    Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Honorable Michael B. Kaplan |

## OFFICIAL COMMITTEE OF TALC CLAIMANTS' STATEMENT IN OPPOSITION TO DEBTOR'S REQUEST FOR ESTIMATION UNDER SECTION 502(c) OF THE BANKRUPTCY CODE AND STATEMENT ON PROPOSED NEXT STEPS IN CHAPTER 11 CASE

The Official Committee of Talc Claimants (the "TCC"), by and through its undersigned counsel, respectfully submits this statement (a) in opposition to the Debtor's request for estimation under section 502(c) of the Bankruptcy Code, as set forth in LTL Management, LLC's ("LTL") Statement on Proposed Next Steps filed June 10, 2022 (Dkt. No. 2473) (the "Status Report"), and (b) in support of the termination of exclusivity to facilitate the on-going mediation and to achieve an equitable resolution of this chapter 11 case.

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## <u>INTRODUCTION</u>

1.      This case is at a critical juncture.  If the objective is to use the chapter 11 process to provide a meaningful opportunity for justice and to produce comprehensive, equitable, and timely recoveries for cancer victims—which has been the oft-recited mantra of the Debtor since the first day hearing in North Carolina as a justification for the "Texas Two Step" abusive machinations of Johnson & Johnson ("<u>J&J</u>") in creating LTL and putting it into bankruptcy—the Court should forgo a time consuming, counterproductive, and harmful estimation proceeding proposed by the Debtor and, instead, terminate exclusivity and permit the TCC to file its plan. *See* Memorandum Opinion (Dkt. No. 1572) at 27.[2]  A TCC proposed plan would not require estimation and can be confirmed in the first quarter of 2023.

2.      J&J is incentivized by two related goals:  (a) pay as little as possible to sick and dying claimants, and (b) delay this case as long as possible before it pays as little as possible to sick and dying claimants.  These incentives go hand-in-hand.  J&J is not incentivized, and it is not its objective, to confirm a plan that treats victims fairly, let alone confirm a plan in a timely manner. LTL's request for estimation, in which it seeks, *inter alia*, to relitigate fully liability issues which have already been the subject of careful and thorough judicial determinations, and numerous jury verdicts, reveals J&J's true intentions.

3.      As a matter of law and basic logic, estimation serves no legitimate purpose in this case.  This follows from the plain language of section 1129 and 524(g) of the Bankruptcy Code.  Case law and experience has proven this to be true again and again.  Every "Texas Two Step" filed

---

[2]    The TCC has asserted and continues to assert that the Debtor's chapter 11 case was filed in bad faith and should be dismissed.  This matter is now pending before the Third Circuit.  The TCC's chapter 11 plan assumes, *arguendo*, that the Debtor's chapter 11 case is not dismissed as a bad faith filing.  The TCC reserves the right to argue that dismissal is required under the Bankruptcy Code.  However, if this bankruptcy is to proceed, it should proceed efficiently given the devasting consequences of delay for talc claimants.

by Jones Day to date has resulted in ***prolonged litigation and undue delay***.[3]  Since the inception

of the bankruptcy, hundreds of victims have died.  With each passing day, more succumb to cancer

and are denied the opportunity to have their claims paid in their lifetimes.

4.       The overwhelming majority of mass tort cases are resolved ***without any estimation***

***proceeding***.  As other cases have demonstrated, courts that have opted to venture down the road

of estimation in similar situations often find themselves on the road to nowhere.  Sadly, in these

situations, such choice only serves to further harm people who are already suffering.

5.       This Court need not adopt J&J's script.  This Court does not have to approve a

process that will serve no benefit to the adjudication of this case and will, instead, only cause

victims to suffer the irreparable harm that would result from an unproductive estimation

proceeding.  Another path forward is possible.  The TCC is ready to file a plan of reorganization,

a disclosure statement, and a motion to approve solicitation procedures.

6.       The TCC believes that its plan will receive the overwhelming support of the talc

claimants and can be solicited and confirmed in the first quarter of 2023.  The TCC's plan could

be solicited using input provided by a Court-appointed expert regarding the appropriate matrix

values and procedures for reaching final settlements with talc claimants.  The cancer victims here,

including the representatives of those who have died, deserve the opportunity to consider a plan

that treats them fairly and with respect.

---

[3]     Late on July 14, 2022, LTL filed its *Debtor's Verified Complaint for Injunctive Relief (I) Preliminarily Enjoining the Prosecution of the New Mexico and Mississippi State Actions and (II) Granting a Temporary Restraining Order Pending a Final Hearing* [Dkt. No. 2713], which further demonstrates the Debtor's intent to cause undue delay.

**ARGUMENT**

I.      **LTL's Status Report Is Inaccurate**

7.      Typical of a pleading that is "thin" in support, the LTL's Status Report is replete with inaccurate statements on estimation under section 502(c) and the need for it in this case. The text of section 502(c) provides: "There shall be estimated for purposes of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would ***unduly delay*** the administration of the case; or (2) any right to payment arising from a right to an equitable remedy for breach of performance." 11 U.S.C. § 502(c) (emphasis added).

8.      The tort claims are not contract claims based on a breach of performance. Thus, the issue is whether the estimation of tort claims is necessary to avoid the undue delay of the administration of this case. *In re Diocese of Camden, New Jersey*, Case No. 20-21257 (JNP) (Bankr. D.N.J. Feb. 15, 2022) ("estimation would not satisfy the standard under Section 502(c) because it could cause, rather than prevent, undue delay in the administration of the case.") LTL is proposing estimation to create undue delay and cause talc claimants to suffer irreparable harm in a naked and unabused effort to lever the talc claimants into capitulating to an unfair and inequitable settlement. LTL's request, therefore, must be denied.

A.      **Estimation Will Not Move this Case Forward**

9.      LTL asserts that "an estimation process is necessary to move this case forward." Status Report at 3. But estimation under section 502(c) is futile in a section 524(g) case or any case where the plan includes nonconsensual non-debtor releases, all of which require overwhelming claimant support to confirm such a plan.

10. This is evident from the plain language of the Bankruptcy Code and cases where debtors have successfully used estimation proceedings under section 502(c) to create undue delay and deprive victims of their day in court. Simply put, if the claimants disagree with the results of the estimation proceeding, they can veto the proposed plan based on that estimation, leaving the case unresolved and putting parties right back to where they started.

11. As a threshold matter, J&J would never permit LTL to file a plan that does not afford J&J with the benefit of releases.[4] J&J wants to permanently protect itself, its affiliates, and its distributors from all talc-related claims.[5] J&J, therefore, needs a plan confirmed that channels asbestos claims under section 524(g) of the Bankruptcy Code. But section 524(g) requires the support of 75% of the creditors whose claims are addressed by the trust.[6]

12. If LTL's plan channels talc claims to a trust and limits the right of victims to recover from third parties, the claims are impaired under section 1124 and victims are entitled to vote. Section 524(g) also mandates that holders of the claims that will be "addressed by a trust" vote,

---

[4] *See* Debtor's Complaint for Declaratory and Injunctive Relief (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or, (II) Preliminarily Enjoining Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing (Dkt. No. 1 in Adv. Proc. No. 21-03032) (the "Preliminary Injunction Motion") ("Further, such an injunction is critical to the Debtor's ability to achieve the purposes for which it commenced its reorganization case."); *see also* Hr'g. Tr. Oct. 20, 2021, 41:4-9 ("MR. GORDON: LTL's goal in this case is to negotiate and confirm a plan as quickly as possible, a plan that will establish a trust to process and pay equitably current and future talc claims and provide for the issuance of an injunction that would permanently protect LTL *and its affiliates* from further talc-related claims.") (emphasis added).

[5] *See* Appendix B to the Preliminary Injunction Motion.

[6] Even if the Court found that section 524(g) is not available and considers entering a channeling injunction under section 105(a) instead, the analysis would not be more favorable to LTL. First, section 105(a) cannot be employed to channel claims in an asbestos case if the requirements of section 524(g) are not met. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 233-37 (3d Cir. 2004). Moreover, in cases where non-debtor, third-party releases have been approved, courts require a showing of overwhelming creditor support—*i.e.*, the support of at least 85% of the affected voting creditors has been held sufficient to satisfy this criterion—which is a higher threshold than under section 524(g). *See In re Millennium Lab Holdings II*, 945 F.3d 126, 132 (3d Cir. 2019) (93% acceptance), *cert. denied*, 140 S. Ct. 2805 (2020); *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1045 (7th Cir. 1993) (95% acceptance); *Menard-Sandford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 702 (4th Cir. 1989) (94% acceptance); *In re AOV Indus.*, 792 F.2d 1140, 1143 (D.C. Cir. 1986) (90% acceptance); *In re Am. Family Enters.*, 256 B.R. 377, 392 (D.N.J. 2000) (99% acceptance); *In re Purdue Pharma L.P.*, 633 B.R. 53 (Bankr. S.D.N.Y. 2021) (96% acceptance); *In re Blitz U.S.A.*, 2014 Bankr. LEXIS 2461, at *15-16 (Bankr. D. Del. Jan. 30, 2014) (95% acceptance); *In re Master Mortgage Inv. Fund*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) (95% acceptance).

regardless of whether they are deemed impaired or unimpaired.  *See In re W.R. Grace*, 475 B.R. 34, 166-67 (D. Del. 2012) (requiring unimpaired subclass to vote on 524(g) plan).

13.     The only way to satisfy section 524(g) is for the holders of claims whose claims will be channeled to the trust to vote in favor of the plan by over 75%.

14.     Cramdown is not possible in a section 524(g) case as this concept simply does not exist in section 524(g).  If LTL cannot obtain the required support, its plan cannot be confirmed under sections 524(g) and 1129 of the Bankruptcy Code.  Estimation will not make talc claimants more likely to vote in favor of a plan.  This is the reason why estimation is the proverbial "road to nowhere" in a section 524(g) case.

15.     Case law and case experience—*Garlock*, *G-I Holdings*, and all three prior Texas-Two Steps—prove this "road to nowhere" point and show that estimation in a section 524(g) case is a tool used to ***create undue delay***, which means that it is impermissible under section 502(c).

16.     In *In re Garlock Sealing Techs., LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014), the debtor filed for bankruptcy on June 5, 2010, facing substantial liability for asbestos claims.  *Id.* at 73.  The debtor moved for estimation of its asbestos liability under section 502(c) of the Bankruptcy Code.  The *Garlock* Court agreed to conduct an estimation of this liability.  *Id.*  On January 10, 2014—over three and a half years after the petition date—the Court sided with the debtor and adopted the debtor's estimation of $125 million.  *Id.*

17.     But this ruling had the effect of ***preventing*** the debtor in *Garlock* from confirming its desired plan.  The debtor in *Garlock* proposed a plan based on the Court's estimation.  The asbestos claimants ***overwhelmingly rejected*** the plan.  This left the debtor in *Garlock* with no viable path forward—no votes, no plan.

18.    To obtain the votes necessary to confirm a section 524(g) plan, the debtor ultimately proposed a different plan with a trust funded with approximately $500 million—roughly 4 times the estimated value of the tort claims.  *Garlock* at Dkt. No. 5444-3, Ex. 2.  To confirm that plan, the debtor had to ***affirmatively abandon and reject*** the Court's estimation of its aggregate liability.

19.    The debtor in *In re G-I Holdings, Inc.*, 323 B.R. 583 (Bankr. D.N.J. 2005), also led the Court down the estimation road to nowhere.  Because of its liability for asbestos claims, the debtor in *G-I Holdings* filed for bankruptcy on January 5, 2001 and moved for estimation on June 19, 2002.  Six (6) years later, on July 7, 2008, the Court entered its ***Sixth*** Amended Estimation Scheduling Order making May 26, 2009, the new deadline for completing fact discovery.  *G-I Holdings* at Dkt. No. 8079.  The debtor did not emerge from bankruptcy until November 12, 2009—over eight (8) years after the petition date.

20.    Importantly, the debtor's plan in *G-I Holdings* was ***not*** confirmed based on an estimation that was imposed over the tort claimants' objection.  Rather, it was based on a settlement under which the debtor funded a $770 million asbestos trust.  There is no evidence that estimation accomplished anything other than six (6) years of delay.[7]

21.    *Garlock* shows that LTL's prognostications regarding the impact of estimation is incorrect.  Even if LTL and J&J are successful in convincing this Court to estimate low, estimation is still nothing more than a diversion because any plan based on such estimation would be voted

---

[7]    The Debtor also refers to *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003), in its Status Report.  In June 2002, the debtors in *USG* asked District Judge Wolin to conduct an estimation proceeding with respect to their liability for asbestos personal injury claims.  The debtors in *USG* renewed this request after Judge Conti was appointed to replace Judge Wolin.  In June 2005, Judge Conti held that evidence relating to estimation could be gathered through discovery.  And in October 2005, Judge Conti approved the use and content of a claimant questionnaire.  The case settled shortly after the debtors were served with extensive discovery.  The *USG* Court did not estimate any asbestos personal injury claims.  Nor is there any evidence that estimation (or the threat of estimation) caused a settlement to occur.  A complete summary of the events that occurred during *USG*'s bankruptcy can be found in the Disclosure Statement filed by the debtors on March 27, 2006, Dkt. No. 10715 at Article V.

down, meaning that estimation would have accomplished nothing other than undue delay.

22.    Jones Day's Texas Two Step cases have largely followed the *Garlock* script and used estimation proceedings to create undue delay.  *Bestwall*, *Aldrich*, and *DBMP* all filed for bankruptcy following a divisional merger under Texas law.  *See In re Bestwall LLC*, Case No 17-31795 in Bankr. W.D. N.C.; *In re Aldrich Pump LLC*, Case No. 20-30608 in Bankr. W.D. N.C.; *In re DBMP LLC*, Case No. 20-30080 in Bankr. W.D. N.C.  All three debtors offered estimation as their alleged path to success.  All three debtors are still in bankruptcy having made no meaningful progress towards the confirmation of a plan.

23.    In fact, every member of the *Bestwall* tort claimants' committee has now died without ever seeing their day in court or receiving any form of compensation during their lifetimes.  And that, of course, is the point of the Texas Two Step.

24.    Estimation in *Garlock*, *G-I Holdings*, *Bestwall*, *Aldrich* and *DBMP* accomplished nothing other than years of delay—meaning that the estimation undermined the purpose of section 502(c) by unduly delaying the administration of the case.

25.    What is worse, during the years these cases spent going down the estimation rabbit hole, families watched their loved ones suffer through rounds of chemotherapy and ultimately die.  Victims suffered and died without receiving compensation or having their day in court.  Through delay—needless and senseless delay—tort victims were stripped of their Seventh Amendment right to a jury trial by the passage of time and death itself.  These cases prove what can be readily discerned from the plain language of the Bankruptcy Code—estimation in this context is about creating, not eliminating undue delay.

**B.    <u>Estimation Is Not a Determination of Legal Liability</u>**

26.    LTL asserts that estimation here should be used to determine "the Debtor's

liability" for talc claims—*i.e.*, estimation equals ultimate allowance.  Status Report at 7-10.

27.    But "estimation of claims is not the same thing as actual liquidation"—*i.e.*, estimation is not "a conclusive finding of liability."  Jay M. Goffman, Skadden, Arps, Slate, Meagher & Flom LLP, Claims Issues—Selected Topics, 100104 ABI CLE 197 (Oct. 1, 2004).

28.    Title 28 does not afford this Court with the ability to make an actual determination of liability.  28 U.S.C. § 157(b)(2)(B) ("liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims" for the "purposes of distribution" is not a core proceeding); 28 U.S.C. § 157(b)(5) (the "district court shall order that personal injury and wrongful death claims shall be tried" in a specified district court).

29.    As the Supreme Court made clear in *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665, 679-80 (2015), this Court does not possess a "free-floating authority to decide claims traditionally heard by Article III courts."  *See also Stern v. Marshall*, 564 U.S. 462, 494-95 (2011).  Thus, LTL's request that this Court adjudicate its tort liability under the guise of an estimation is leaps beyond the limits of constitutional bankruptcy power.  *Wellness*, 575 U.S. at 679.

30.    LTL cites to *Bittner*, *Ralph Lauren*, *Farley*, and *Continental Airlines*.  *See* Status Report at 7-9.  But the Courts in these cases estimated claims under section 502(c) for ***voting, not liability or allowance purposes***; they did not decide the debtor's liability or the ultimate allowance of any claims.[8]  As the Third Circuit found in *Bittner*, estimation for voting purposes prevents

---

[8]    *See Bittner v. Borne Chem. Co.*, 691 F.2d 134, 137 & fn. 9 (3d Cir. 1982) (affirming court's estimation of stockholders' claims for "voting" purposes "at zero, and temporarily disallowing them until the final resolution of the state action"); *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (holding that "[t]he estimation of [former chief executive officer's] claim for voting purposes does not entail consideration on the merits of all the issues in dispute respecting that claim. … This being but an estimation hearing, my findings of fact will not have any preclusive effect upon the ultimate disposition of [former chief executive officer's] claim."); *In re Farley, Inc.*, 146 B.R. 748, 756 (Bankr. N.D. Ill. 1992) (estimating personal injury claims "for purpose of voting and determining plan feasibility" and finding that "final determination sought by debtor" was not "within the purview of [28 U.S.C.] § 157(b)(2)(B)"); *In re Continental Airlines Corp.*, 60 B.R. 903, 906 (Bankr. S.D. Tex. 1986) (estimating claim "at zero value for voting purposes" pending liquidation "through subsequent proceedings, independent of [the] reorganization [proceeding].")

certain stakeholders from wielding "a significant, if not controlling, voice in the reorganization proceedings" when their chances "of ultimately succeeding in [a] state court action are uncertain." 691 F.2d at 137. But an estimation under section 502(c) is not a "final resolution" of the "contingent claim." *Id.*

31.     LTL also cites to *In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007). *See* Status Report at 9. But the Court in *Adelphia* estimated claims "for the purposes of establishing a fair [claims] *reserve*, and not for the purpose of ultimate allowance." *Id.* at 279 (emphasis added). As the Court in *In re Chemtura Corp.*, explained: "Reserves are frequently established [by claims estimation under Section 502(c)] to permit distributions to [other] creditors and other stakeholders" without the "delay[]" that would result if the disputed claims were resolved by "litigation." 448 B.R. 635, 648 fn. 45 (Bankr. S.D.N.Y. 2011). *See also In re Health Diagnostics Lab., Inc.*, 551 B.R. 218, 235 (Bankr. E.D. Va. 2016) (finding that estimation is necessary "to protect the interests of all creditors in order to maintain adequate reserve amounts throughout the claim approval process.")

32.     Here, LTL has not identified any other creditors or stakeholders whose distributions will be delayed absent an estimation under section 502(c) of the Bankruptcy Code because LTL has no other creditors or stakeholders besides the talc claimants.

33.     Courts also estimate claims for the purpose of determining if a plan is confirmable under section 1129—*i.e.*, feasibility and/or cramdown of a rejecting impaired class of creditors.[9]

---

[9]  *See, e.g., In re North Am. Health Care, Inc.*, 544 B.R. 684, 690 (Bankr. C.D. Cal. 2016) (finding estimation of tort claims under section 502(c) appropriate for the limited purpose of determining whether the debtor's plan of reorganization satisfies "the all-important plan feasibility requirement" in section 1129(a)(10) where the estimated amount would "not be any kind of cap on eventual distributions by the Debtors to tort claimants" because unliquidated tort claims were not being "discharged under 11 U.S.C. § 1141(d) but instead [would] be liquidated in amount through trials in state court or federal district court (or settled in such courts)."); *In re Tsai*, No. 2:13-BK-27391-PC, 2014 WL 1154032, at *3 (Bankr. C.D. Cal. Mar. 19, 2014) (finding estimation of claim under section 502(c) appropriate to determine "confirmation issues under § 1129" but noting that "estimation of an unliquidated claim for the limited purpose of confirmation has no collateral estoppel effect with respect to the

But this also is not a determination of liability and has no "collateral estoppel effect with respect to the merits of the claim." *Tsai*, 2014 WL 1154032, at *3. **Moreover, LTL has yet to file a plan—i.e., its request for estimation is untethered to any plan**. Therefore, the proposed estimation cannot be for the purpose of determining if LTL's plan is confirmable under section 1129 of the Bankruptcy Code.

34.     Finally, even assuming *arguendo* that estimation could result in an actual determination of LTL's liability for talc claims, LTL also fails to explain how this Court could estimate such liability given that such estimation would presumably be used to create a capped trust fund to pay talc claims. The Bankruptcy Court in *In re Roman Catholic Archbishop of Portland*, 339 B.R. 215 (Bankr. D. Or. 2006), found that such an estimation would be "for distribution purposes" under 28 U.S.C. § 157(b)(2)(B), and therefore not within the province or jurisdiction of the Bankruptcy Court, because if the estimate proved to be too low, claimants' distributions would be limited to a share of the trust. *Id.* at 220-21.

35.     The Court in *In re Dow Corning Corp.*, 211 B.R. 545, 566-67 (Bankr. E.D. Mich. 1997), reached the same conclusion, as did the Court in *In re PG&E Corp.*, No. 19-30088 (DM) (Bankr. N.D. Cal. Aug. 21, 2019) (Dkt. No. 3671), which *sua sponte* recommended that the District Court withdraw the reference of an estimation proceeding involving personal injury and wrongful death claims. In *Farley*—one of the cases LTL cites—while the Court agreed to estimate tort claims "for purpose of voting," it also found that it could not make a "final determination" of liability because of 28 U.S.C. § 157(b)(2)(B). 146 B.R. at 753.

---

merits of the claim."); *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003) (finding "estimation was appropriate for determining feasibility" of filed chapter 11 plan where administrative claim asserted against the estate raised concerns that the requirement of section 1129(a)(9)(A) that all administrative claims would be "paid in full" was not met); Jay M. Goffman, Skadden, Arps, Slate, Meagher & Flom LLP, Claims Issues—Selected Topics, 100104 ABI CLE 197 (explaining that courts often permit the use estimation under section 502(c) to establish "that a proposed plan is feasible or that it satisfies the absolute priority rule").

36.     Title 28 makes it clear that this Court cannot adjudicate personal injury tort or wrongful death claims to final judgment (28 U.S.C. §§ 157(b)(2)(B) & 157(b)(5)) and that title 11 does "not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim." 28 U.S.C. § 1411(a).

## C.    The Central Issue Is Providing Equitable Compensation to Victims

37.     LTL asserts that "the central issue in this case … is the extent of the Debtor's liability for current and future ovarian cancer and mesothelioma claims." Status Report at 3.

38.     But if J&J—a solvent company with a half a trillion-dollar market cap—wanted to contest liability, it can do so in the tort system.  J&J apparently wants to use estimation to collaterally attack *Daubert* rulings in the MDL as well as liability determinations upheld by state trial courts and state courts of appeals.[10]  J&J wants this Court to become an *uber* jury that reconsiders admissibility issues and decides factual issues in personal injury and wrongful death actions that have been presented and adjudicated for years to the MDL Court, state trial courts, state appellate courts, and juries across the country.

39.     This is not permissible under title 28 of the United States Code.  Under *G-I Holdings*, this Court would have to overrule the District Court's ruling on *Daubert* before it could entertain LTL's request that it decide LTL's liability for current and future ovarian cancer claims.

---

[10]    *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d 116, 198 (D.N.J. Apr. 27, 2020) (denying in principal part J&J's Daubert motions and admitting (with limited exceptions) plaintiffs' expert testimony finding a causal relationship between talc products and ovarian cancer); *see also Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) (highest Missouri state court sustaining $2.2 billion judgment against J&J and JJCI for 22 women alleging ovarian cancer claims, finding J&J "engaged in reprehensible conduct of its own."); *Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*, 37 Cal. App. 5th 292 (Cal. Ct. App. 2019) (holding there is "substantial evidence to support" the jury's findings of general and specific causation (as against JJCI) and for compensatory damages from JJCI arising out of its breach of its duty to warn customers of the risk of ovarian cancer from use of its talc products, but affirming a judgment notwithstanding verdict as to liability and punitive damages for J&J (and punitive damages against JJCI) and granting JJCI's motion for retrial).  Mesothelioma plaintiffs have won twelve jury verdicts against J&J and Old JJCI, for a total of over $655 million in compensatory damages and more than $1.9 billion in punitive damages.

323 B.R. at 615-16.

40.     In *G-I Holdings*, the Court considered the interplay between section 502(c) and title

28—*i.e.*, sections 157(b)(2)(B) and 157(b)(5).  *Id.*  The Court found that while it could make "a

threshold finding that the claim is sustainable as a matter of law"—*i.e.*, that there is no

"proscription for summarily disposing" of the claim under Rule 12(b)(6) or Rule 56—and still

leave it "open for trial elsewhere for 'liquidation or estimation' for purposes of distribution," ***it

could not go further and try personal injury or wrongful death claims by deciding issues

properly submitted to a jury***.  *Id.*

41.     The TCC submits that the Court in *G-I Holdings* was wrong in interpreting section

157(b)(2)(B) to permit a Bankruptcy Court to make a threshold liability determination for purposes

of distribution (as opposed to the District Court), but that distinction does not alter its subsidiary

conclusion that it could not try the claims and decide issues properly submitted to a jury.

42.     Here, the ovarian cancer claims—approximately 38,000 of them—have not been

summarily dismissed in state court and have survived the District Court's *Daubert* decision,

making the issues of causation and liability resulting therefrom jury issues.  *See infra* fn. 10.

Simply put, these cancer claims have already been held to be legally sufficient with respect to

general causation and liability issues in the MDL and other state courts across the nation.  This

Court should therefore decline the poisoned invitation to sit as a reviewing court on science issues

already decided by other Courts.

43.     Even under *G-I Holdings*, to do what LTL is asking, this Court would have to

reconsider and reverse the District Court's rulings in the MDL and then decide, contrary to multiple

state trial courts, state appellate courts, and juries across the country, that it can summarily dispose

of all the talc claims on general causation and liability grounds.  Even under *G-I Holdings* this is

a bridge too far.  It is simply wrong for LTL to seek to overturn decisions and judgments made by

constitutionally appropriate courts and fact finders in this forum.  This tactic is leaps beyond what

Bankruptcy Courts have found appropriate when they have recognized that their province is not to

try and liquidate personal injury and wrongful death claims.

44.    LTL would subvert what it has claimed is the central issue in this case.  For LTL's

bankruptcy to not constitute a bad faith filing, the central issue in this case must be just as this

Court framed it:  can "the chapter 11 process" be used to provide "a meaningful opportunity for

justice" and "produce comprehensive, equitable, and timely recoveries for injured parties"?

*See* Memorandum Opinion (Dkt. No. 1572) at 27.  In contrast to J&J's and LTL's estimation

boondoggle, the TCC's proposed path forward by way of a TCC proposed plan can make this so.

### D.    A Successful Reorganization Is Possible Without J&J's Consent

45.    LTL asserts that the Debtor's liability is "the principal focus of the mediation and

the issue that must be resolved before a successful, consensual reorganization can be achieved."

Status Report at 3.  But the Debtor's consent is not required for there to be a successful

reorganization.  Nor is J&J's position that there is no liability, no science supporting talc claims,

and zero evidence of asbestos or other carcinogens in J&J's baby powder conducive to mediation.

46.    The TCC continues to adhere to its position that this bankruptcy should be

dismissed, but if this case is to proceed the TCC would prefer to achieve a consensual plan.  As

the TCC's plan demonstrates, this case can proceed to a final resolution around parties that refuse

to negotiate in good faith.  By creating LTL, executing the Funding Agreement, and placing LTL

into bankruptcy and, importantly, under the oversight of this Court, J&J has provided all the tools

necessary to bring this case to a conclusion.  Neither LTL's nor J&J's consent are needed for this

to occur.  A TCC-sponsored plan could be filed the moment this Court lifts exclusivity and could

be confirmed in the first quarter of 2023.

### E.    Estimation Will Not Further Mediation

47.    LTL asserts that "an estimation process is necessary to move this case forward" and that estimation "will provide a framework for further mediation sessions that will significantly enhance the prospects for successful reorganization of a consensual plan."  Status Report at 3.

48.    But section 502(c) does not permit estimation for the purpose of mediation—only to avoid "undue[] delay [in] the administration of the case."  11 U.S.C. § 502(c).  The Court recently addressed this issue in *In re Diocese of Camden, New Jersey*, Case No. 20-21257 (JNP) (Bankr. D.N.J. Feb. 15, 2022) ("*Camden*").

49.    The Diocese of Camden filed for bankruptcy facing liability for sexual abuse claims.  The Diocese of Camden filed a plan that called for the creation of a trust to liquidate tort claims post-confirmation—the same structure that the TCC wants to propose.  The tort claimants' committee moved for estimation and argued, *inter alia*, that estimation would help make progress in mediation.  *Camden* at Dkt. No. 962-1.  The debtor—the Diocese of Camden—opposed estimation on the grounds that it would create undue delay.  *Id.* at Dkt. No. 1016.

50.    Judge Poslusny agreed with the debtor and denied the TCC's motion for estimation. Feb. 15, 2022, Hr'g Tr. at 4:13-14, *Camden*.  The Court found that "[h]aving the Court estimate claims to aid the mediation or settlement process is not – again, not the standard by which an estimation hearing is required under Section 502(c)."  *Id.* at 12:25-13:3.

51.    The Court also found that while the "fixing or liquidating" of tort claims "within the trust" may "delay trust distribution[s]" to individual claimants, it "would not delay administration of the Chapter 11 case;" thus, the movant did not satisfy its burden of showing "any undue delay in the administration of the case as required under Section 502(c)."  *Id.* at 5:23-6:6,

13:20-23.  Likewise, the availability of the TCC's plan, under which tort claims can be settled and determined post-confirmation by a trust, shows that estimation is not needed to avoid any undue delay in the administration of LTL's case and, therefore, is not permitted under section 502(c).

52.     Moreover, the overwhelming majority of mass tort bankruptcies have resolved without the aid of any standalone estimation proceeding.  *See*, *e.g.*, *In re Mallinckrodt*, Case No. 20-12522 (JTD) (Bankr. D. Del.); *In re Boy Scouts of America and Delaware BSA, LLC* ("*Boy Scouts*"), Case No. 20-10343 (LSS) (Bankr. D. Del.); *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) (Bankr. D. Del.); *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del.) (Dkt. No. 2120).  The difference is that the parties in those bankruptcies wanted to reach a resolution.

53.     LTL's goal here is to create undue delay.  To further this objective, LTL still refuses to produce basic settlement data and other information that it has already provided to its own experts to prepare for estimation and that could have been used to facilitate mediation.  Even though LTL has represented to this Court that the parties do not need this data, LTL concedes in its Status Report that such information is relevant and necessary to "quantifying the Debtor's liability for current and future ovarian cancer and mesothelioma claims."  Status Report at 11.

54.     LTL does not propose to make this information fully known under its case management order until January 2023.  A plain and obvious truth is that LTL can voluntarily produce any relevant information it wants to the parties to the mediation without estimation.  The fact that LTL *claims* that it wants to move this case forward and, at the ***same time***, refuses to produce core information regarding its settlements of talc claims speaks for itself.[11]

---

[11]  The TCC continues to maintain that the production of data that LTL has in its possession, custody, and control and can readily produce is critical to the success of ongoing settlement efforts.

F.    **Estimation Is Not Needed to Formulate a Plan**

55.     LTL asserts that estimation "would be for purposes of formulating and confirming

a plan of reorganization."   Status Report at 3.   But J&J's own counsel, White & Case LLP,

formulated a plan in *Boy Scouts* that included nonconsensual third-party releases—which plan also

required the support of a supermajority of the tort claimants—without the benefit of any separate

estimation proceeding under section 502(c).

56.     The Boy Scouts filed for bankruptcy on February 18, 2020, also facing substantial

liability for sexual abuse claims.   The Boy Scouts formulated and filed a plan that included

nonconsensual third-party releases that required the acceptance of a substantial majority of the tort

victims.  *See* Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and

Delaware BSA, LLC (Dkt. No. 2592), filed on April 13, 2021, in *Boy Scouts*.   Like a section 524(g)

plan, the Boy Scouts' plan was unconfirmable without such overwhelming acceptance—*i.e.*, over

75% under the Third Circuit's *Millennium* decision and its progeny.

57.     ***After*** the Boy Scouts filed its plan, the tort claimants' committee in *Boy Scouts* and

other parties moved to estimate sexual abuse claims.  *Boy Scouts* at Dkt. No. 2391.[12]  J&J's own

counsel, then representing the Boy Scouts, argued:   "[T]he Movants' ***estimation proceeding***,

which would ***cause undue delay*** of the administration of these Chapter 11 Cases instead of

avoiding it, is ***antithetical*** to section 502(c) and cannot be 'mandatory.' … [T]he Debtors' Global

Settlement Plan and Confirmation Scheduling Motion contemplate a ***far more efficient*** estimation

that leads the Debtors toward confirmation."  *Id.* at Dkt. No. 2612, ¶ 37 (emphasis added).

---

[12]   In addition to showing overwhelming acceptance, the debtor in *Boy Scouts* also sought to show that the plan
satisfied the fifth *Millennium* factor—*i.e.*, that the plan provides for the "payment of all or substantially all of the
claims or classes affected by the injunction."  *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 271-72
(Bankr. D. Del. 2017) (quoting *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).
Estimation could have been used to show that the amount of trust funding was (or was not) adequate to provide
for payment in full of the tort claims affected by the channeling injunction.

58.    The Court in *Boy Scouts* agreed with J&J's counsel and did not conduct an estimation in advance of plan confirmation.  J&J's counsel here not only formulated and filed a plan in *Boy Scouts* without the benefit of any estimation proceeding under section 502(c), but they successfully opposed estimation as something that would create "undue delay." *Id.*

59.    Likewise, the TCC has not faced any headwinds due to the absence of an estimation proceeding and has formulated, drafted, and can file a plan and disclosure statement forthwith.  Most mass tortfeasors that have filed for bankruptcy have had no issue formulating a plan of reorganization without the benefit of an estimation proceeding.  The only party that claims to have a problem formulating a plan right now is LTL, which also speaks for itself.

### G.    LTL Cannot Identify a Single Section 1129 Purpose of Estimation

60.    LTL identifies three reasons why it thinks estimation is necessary:  "(1) it will enable the parties to gather information relevant to the determination of the extent of the Debtor's liability; (2) it will enable the parties to better understand and evaluate the strength of their own positions and the position of other parties with respect to that liability; and (3) if settlement is not reached before the conclusion of the estimation process, the parties will obtain the benefit of the Court's impartial views on the extent of the liability."  Status Report at 3.

61.    But none of LTL's proffered reasons support estimation or have anything to do with section 1129 of the Bankruptcy Code.  LTL has not and cannot identify a single section 1129 purpose for estimation here because there are none.  All of LTL's reasons pertain to the Debtor's liability—which is something that this Court cannot determine—and are inaccurate.

62.    In fact, the parties already have substantial information which can be produced and shared immediately.  J&J has been litigating these issues for years in the tort system.  Verdicts have been rendered.  Appellate courts have ruled.  The parties have been through discovery.  Both

sides understand each other fully.  J&J has been settling talc claims for years.  All of this data is presently available.

63.     Estimation is not needed to gather information or help anyone evaluate the strengths of their own positions or the positions of other parties.  And, as *Garlock* shows, a ruling by this Court on LTL's liability would not necessarily be helpful, nor is it an appropriate ask for LTL to make.  This Court should be offered a plan that can be confirmed under section 1129 of the Bankruptcy Code.  Such a plan can be filed and confirmed without any estimation proceeding by the first quarter of 2023.  The party standing in the way is LTL.

**H.     Estimation in this Context Has Rarely, if Ever,
Resulted in a Settlement or Consensual Plan of Reorganization**

64.     LTL asserts that "[e]stimation has been essential to the resolution of a number of mass tort cases" and has been the "key event to fostering a consensual resolution."  Status Report at 3.  But this is factually not true.

65.     Most mass tort cases that have resulted in consensual plans have not relied on separate estimation proceedings because as a matter of law and basic logic, such proceedings are not necessary to confirm a section 524(g) plan.

66.     PG&E—due to its similarities and differences—offers a revealing case study. PG&E filed for bankruptcy in California on January 29, 2019, facing over $30 billion in tort liability based on certain prepetition wildfires that PG&E caused.  *See In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal.) ("*PG&E*") at Dkt. No. 166.

67.     A key difference—relative to a section 524(g) case—is that PG&E sought to confirm a plan that did ***not*** include nonconsensual non-debtor releases.  PG&E could not utilize section 524(g) because it did not face asbestos liability.  *See* 11 U.S.C. § 524(g)(2)(B)(i).  And, in the Ninth Circuit nonconsensual non-debtor releases are not permissible, *see In re Lowenschuss*,

67 F.3d 1394, 1401 (9th Cir. 1995), thus foreclosing reliance on section 105(a).

68.    Since obtaining the support of a supermajority of tort victims was not a gating issue in *PG&E*, it was theoretically possible for PG&E to confirm a plan over the tort victims' objection. *See* 11 U.S.C. § 1129(b)(2)(B)(i).  PG&E could use estimation under section 502(c) for the purpose of showing compliance with section 1129(b) of the Bankruptcy Code.[13]

69.    PG&E moved for estimation and argued that it was needed to value tort claims for the purpose of determining the appropriate funding for a trust.  *See PG&E* at Dkt. No. 3498 at 5-6. The tort claimants' committee objected and argued that estimating personal injury claims to establish a trust that would limit distributions on the claims to the capped limit was, by definition, for purposes of distribution, which made the estimation proceeding a non-core proceeding under 28 U.S.C. § 157(b)(2)(B).  *Id.* at Dkt. No. 3431.  The committee also moved for relief from the automatic stay so that certain bellwether cases could go forward in State Court on an expedited basis pursuant to California's preference statute, Cal Civ. Proc. Code § 36 (West 2022).  *Id.* at Dkt. No. 2843.

70.    The *PG&E* Court granted relief from stay and permitted the preference cases to go forward in State Court.   *See PG&E* at Dkt. No. 3571.   Contemporaneously therewith, the Bankruptcy Court *sua sponte* recommended that the District Court withdraw the reference since

---

[13]    Cramdown on a class of tort claims under section 1129(b) cannot occur in a section 524(g) case.  Section 524(g) requires the support of 75% of the creditors whose claims are addressed by the trust.  75% is a higher threshold than the 2/3rds needed for an accepting class under section 1126(c) of the Bankruptcy Code.  If the talc claimants voted to accept by 75% or more, section 524(g) could be satisfied, and the class would be an accepting class. Accepting classes do not get the benefit of section 1129(b) for the simple reason that they are an accepting class. *See In re W.R. Grace & Co.*, 475 B.R. 34, 174-75 (Bankr. D. Del. 2012); *In re Winters*, 99 B.R. 658, 663 (Bankr. W.D. Pa. 1989).  If the talc claimants voted to reject the plan, section 524(g) could not be satisfied because the class vote—by definition—would be less than 66% in support and hence less than the 75% required by section 524(g).  Either the debtor has the votes to approve a section 524(g) plan (which means section 1129(b) cannot apply to the class and there is no need for estimation to determine if the statute's requirements are satisfied), or the debtor does not have the votes (and the plan fails under section 524(g) before section 1129(b) is even considered).

the proposed estimation involved personal injury and wrongful death claims.  *Id.* at Dkt. No. 3648.

The District Court withdrew the reference.  *Id.* at Dkt. No. 3671.

71.     Estimation had little (if any) impact on settlement.  PG&E's actions suggested that

it viewed estimation as a weapon that could be used against the tort victims.  If the tort victims did

not acquiesce to PG&E's numbers, PG&E would ask the bankruptcy court to impose them on the

tort victims.  This dream ended when the District Court correctly stated that "the clear goal of

estimation is to make sure nobody gets stiffed at the end of it for legitimate claims."  Sept. 10,

2019, Hr'g Tr. at 27:15-20, *In re PG&E Corp.*, No. 19-05257 (JD) (N.D. Cal. Sept. 10, 2019).

72.     The District Court would not provide its imprimatur to an estimation-based scheme

under which equity retained billions in value and tort victims saw their claims channeled to a trust

only to discover years later that the trust could not afford to pay them in full when their claims

were liquidated.  The proper use of estimation in the section 1129(b) context is to ensure that an

appropriate reserve is set to ensure that tort claims are paid in full when they are liquidated.

73.     PG&E *did* settle *but not* because of estimation.  The TCC joined forces with certain

bondholders and investors and proposed a competing plan that would have substantially diluted

PG&E's existing equity holders.  *See PG&E* at Dkt. No. 3940.  The Bankruptcy Court—

recognizing the benefits to claimants that competing plans almost always produce—terminated

exclusivity and permitted the TCC to file its plan of reorganization.  *Id.* at Dkt. No. 4167.  A global

settlement followed eight (8) weeks later, which settlement led to a plan that the victims supported

thereby mooting the estimation proceeding.  *Id.* at Dkt. No. 5038-1.

74.     Terminating exclusivity accomplished what an estimation proceeding did not

accomplish—a settlement and a consensual plan.  This result is hardly surprising.  Terminating

exclusivity gave the TCC the ability to truly defend itself, introduced competition and a level

playing field, and put pressure on the appropriate parties to reach a settlement.  This was true even in a case where estimation was not *senseless*.  The key to creating an environment that fosters a consensual resolution is not estimation—it is terminating exclusivity.

## I.    Estimation Will Not Impose Discipline

75.    LTL asserts that estimation "will impose discipline on the mediation process" and require "parties to develop factual and expert support for their position within a timeline and pursuant to a schedule set by this Court."  Status Report at 3-4.

76.    But the parties already have largely available to them the factual and expert support for their positions.  Indeed, LTL and J&J have useful and relevant settlement data that can and should be produced to the TCC today (yet, incomprehensibly, they continue to refuse to do so).

77.    Imposing discipline in the mediation process will not cause parties to act in good faith.  Further, since estimation is neither necessary nor helpful to confirming a plan, starting estimation would only move the parties further apart.  J&J certainly would have no incentive to negotiate in good faith because it benefits from the multiple years of delay that estimation would cause.  If the Court wants to impose a real schedule, that has real meaning, it should adopt the TCC's plan confirmation schedule and terminate exclusivity and let competition do its good work.

## J.    Estimation Is Not Required for Parties to Understand Positions

78.    LTL asserts that estimation "will exert pressure on the parties to objectively consider their positions in advance of a potential ruling by the Court on the merits of those positions."  Status Report at 4.  But *Garlock* proves that this is incorrect.

79.    Again, in *Garlock* the Court sided with the debtor and estimated the tort claims at a low value.  The victims simply voted the plan down, and Garlock had to disregard the Court's estimation to confirm a plan that it needed, and which complied with section 524(g).

80.     In truth, estimation would mean that J&J would face **no pressure** to reach a consensual resolution, **no settlements** will be reached, and cancer victims will continue to suffer and die without receiving compensation or being able to exercise their Seventh Amendment right to a jury trial.  Further, estimation is not required for the parties objectively to consider anything. Again, the parties here have been litigating for years.

### K.     Estimation Is Not Required to Resolve Disputes

81.     LTL asserts that estimation will "provide the Court with information it will need to address any future disputes or non-consensual plans."  Status Report at 4.  But LTL has not—and cannot—identify any information that the Court needs to resolve any disputes that an estimation proceeding would provide.

82.     LTL has not proposed a plan.  And, LTL has not identified any information needed to confirm (or object to) the TCC's plan that it does not already have.  If additional information is needed, it can be provided in the context of plan discovery under Bankruptcy Rules 3020(b) and 9014(c).  *See Camden*, Feb. 15, 2022, Hr'g Tr. at 8:3-8:12 (discovery over disputed tort claim values governed by "Bankruptcy Rule[s] 3[0]20 and 9014" and does not need to take place in a "separate [estimation] proceeding" under section 502(c) of the Bankruptcy Code.")

### L.     Estimation Will Not Create a Settlement Range

83.     LTL asserts that estimation will provide "'bookends' or range within which a settlement should be possible."  Status Report at 4.  But, again, *Garlock* proves that this is both false, naïve, and ultimately futile.  If the victims reject the estimation, the estimation is irrelevant. Sections 524(g) and 1129 of the Bankruptcy Code provide no substitute for the consent of at least 75% of the tort victims.  And the victims would certainly reject any range that treats their claims unfairly.  Estimation in this context accomplishes nothing other than delay.

**M.    Estimation Will Not Lead to or Aid in the Resolution of this Case**

84.    LTL asserts that "estimation will show that it currently is willing to agree to an

amount to resolve this case that is far in excess of any amount that could reasonably be presented

to and estimated by the Court." Status Report at 4. But this presumes (incorrectly) that LTL has

agreed to or offered to pay a reasonable and fair amount. And it presumes (incorrectly) that J&J

has any incentive to be reasonable at this time.

85.    J&J currently has no incentive to be reasonable because it enjoys the benefit of the

Court's preliminary injunction and plan exclusivity. And J&J will have no incentive to reach a

reasonable settlement if the Court embarks on a multiyear estimation process. J&J will celebrate

estimation and the concomitant delay it will create, and more victims will suffer and die, and this

case will not advance to a successful conclusion in a near future. Rather, this case will become

the next *Bestwall* and *Garlock*.

**N.    LTL's Ultimate Goal Is Undue Delay**

86.    LTL asserts that a lengthy estimation "is antithetical to the Debtor's goals here."

Status Report at 4. But the Debtor should be judged by its actions and not by its empty and

misleading rhetoric. Nothing that LTL or J&J have done to date indicate that they have any interest

in avoiding delay. Delay is their objective. The key to understanding this is the Funding

Agreement.

87.    Under the Funding Agreement, J&J became the ultimate insurer of JJCI's talc

claims. LTL is, in substance, an insured. J&J, in substance, the insurer. After the effective date,

whenever a talc claim is fixed—through final settlement or judgment—against LTL, J&J and JJCI

are required to pay it under the Funding Agreement.[14]  The Funding Agreement provides

---

[14]  *See* Funding Agreement at § 1 ("Permitted Funding Use" means … the funding of any amounts to satisfy:  (i)
Payee's Talc Related Liabilities established by a judgment of a court of competent jurisdiction or final settlement

"coverage" for all talc related liabilities up to an aggregate limit of at least $61 billion.

88.     J&J, like any insurer, benefits from delay.  The Texas Two Step is designed to create a "win-win" situation for J&J.  Either the victims accept pennies on the dollar (a settlement J&J would find acceptable), or J&J will use the bankruptcy of its affiliate company that has absolutely no need to exit bankruptcy (because it has no ongoing business) to deploy and run an estimation proceeding designed to create years of delay.  During this period, J&J keeps its money, and does not have to pay defense costs or pay judgments in the tort system.[15]  The costs associated with bankruptcy are less than the costs J&J was incurring defending talc claims in the tort system prior to the bankruptcy.  The Texas Two Step permits J&J to continue to pay dividends to its shareholders and operate its core business without any Court oversight.

89.     The tort victims, on the other hand, will continue to suffer irreparable harm and die before they receive any compensation or get their day in court.  LTL is not requesting estimation to avoid undue delay.  LTL, acting for and at J&J's behest, is requesting estimation to ***create undue delay*** and to put pressure on cancer victims to simply give up and accept pennies on the dollar from a company that caused their cancer.  That is not justice.  That is reprehensible abuse of the bankruptcy system, and antithetical to everything a bankruptcy should seek to accomplish.

## II.     TCC's Plan of Reorganization Does Not Require Estimation of Talc Claims

90.     But the cancer victims and this Court do not have to accept this.  There is another path.  The TCC is ready to move forward with a plan of reorganization—a plan custom tailored to

---

thereof at any time when there is no proceeding under the Bankruptcy Code pending with respect to Payee.")  The term "Permitted Funding Use" also includes the "Payee's Talc Related Liabilities in connection with the funding of one or more trusts for the benefit of existing and future claimants created pursuant to a plan of reorganization for the Payee … regardless of whether the Payors support such plan of reorganization."

[15]  *See* https://www.yahoo.com/now/brilliance-buffetts-float-strategy-174213377.html (describing Warren Buffett's insurance strategy of investing policy premiums not otherwise paid out to policyholders as "free money" with a "negative interest rate").

the pronouncements made *by this Court* in its order denying the TCC's motion to dismiss this case.  The TCC's plan utilizes the bankruptcy venue to redress the harms of both present and future talc claimants by ensuring a meaningful, timely, and equitable recovery.  The TCC's would plan satisfy every requirement under section 1129 of the Bankruptcy Code and can be confirmed on a timely basis in the first quarter of 2023.

91.    LTL, citing *Bestwall*, asserts in its Status Report that the TCC's plan—which has yet to be filed—would somehow require estimation.  Status Report at 14.  To support this assertion, LTL offers two reasons.  LTL argues that estimation would be required to determine if the TCC's plan satisfies the "best interest of creditors" test under 11 U.S.C. § 1129(a)(7) and/or overpays talc claims.  *Id.* at 14-15.  Both arguments are incorrect.

**A.    Estimation Is Not Required to Defeat a Best Interest Challenge**

92.    Estimation is not required to defeat a best interest of creditors challenge to the TCC's plan.  The TCC's plan provides for the creation of a trust.  The trust will be funded with, among other things, an assignment of LTL's rights under the Funding Agreement and certain insurance policies.  The assignment of LTL's rights under the Funding Agreement and the insurance policies will occur pursuant to section 1123(a)(5) of the Bankruptcy Code.

93.    The assignment of these rights should not be controversial given the Third Circuit's holding in *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 382 (3d Cir. 2012), that section 1123(a)(5) preempts anti-assignment provisions in private contracts and permits the assignment of insurance rights to a section 524(g) trust.  Section 1123(a)(5) of the Bankruptcy Code makes J&J consent rights under Section 13 of the Funding Agreement inoperable, meaning that LTL's rights thereunder can be assigned to a trust without J&J's consent.

94.    LTL's counsel understands this and has represented to the Court, "if a plan is confirmed and it's a TCC plan as a proponent," the TCC "can include in that plan the funding agreement" "[w]ithout violating any assignment provision." Hr'g. Tr. Feb. 18, 2022, 64:11-25. Under a chapter 11 plan, the trust can take over LTL's rights under the Funding Agreement and access the (at least) $61 billion in "coverage" that J&J and JJCI are contractually obligated to pay.

95.    The TCC's plan would also include trust distribution procedures ("TDPs")—a common tool utilized to liquidate tort claims post-confirmation through final settlements and/or judgments. The TDPs include eligibility gating factors, a claims matrix with base and maximum values for mesothelioma and ovarian cancer claims, as well as scaling factors to account for differences in the impact of the disease.

96.    These values and factors will ensure that a consistent and objective criterion is applied to talc claims. Under the TDPs, the Trustees appointed by this Court will not be permitted to make settlement offers that are inconsistent with the TDP values and scaling factors. Thus, cancer victims will have a choice—enter into a final settlement with the Trust based on the TDP values and scaling factors or, alternatively, litigate to judgment in the tort system. Settlement is not compulsory and each talc claimants' jury trial rights are fully preserved.

97.    The TCC believes that the vast majority of claimants will elect to settle and receive compensation while they are still alive. There will be no uneven, slow-paced race to the courthouse. Present and future talc claimants will have viable options to obtain fair and equitable compensation in their lifetimes. The TCC expects that its plan would enjoy the support of every creditor constituency. All creditor classes are expected to vote in favor of the TCC's plan by overwhelming majorities, meaning that sections 1129 and 524(g) of the Bankruptcy Code will both be satisfied.

98.    Since all allowed talc-claims would be paid as settled and allowed under the TDPs and paid by J&J and/or JJCI pursuant to the Funding Agreement, all of LTL's resources would be committed to paying talc claims.  There could be no argument that talc-claimants would recover more from LTL in a chapter 7.  And there obviously would be no reason to conduct any estimation to defeat such argument.  Further, if such an argument were made, it would not be by LTL.  LTL is not a creditor.  LTL is the debtor.  "As its name implies, the best interests of the creditors test only applies to creditors."  *In re W.R. Grace & Co.*, 475 B.R. 34, 145 (Bankr. D. Del. 2012).

**B.      Estimation Is Not Required to Prove Talc Claims Are Not Being Overpaid**

99.    Estimation also would not be required to show that talc-claims are being overpaid. The TCC's plan would propose to pay talc claims (present and future) as they are settled and allowed under the TDPs and paid by J&J as required by the Funding Agreement.  The TCC's plan would not propose to pay anyone more than the allowed amount of their claims.

**C.      LTL's Likely Plan Objection Will Also Fail**

100.    If the TCC is permitted to file its plan, LTL and J&J will likely object.  Their objection will not be an "estimation" objection or an objection that requires estimation to resolve. Rather, it will be the objection that ***insurers*** typically raise when a debtor proposes a plan that liquidates tort claims through trust distribution procedures.  Understanding this is the key to seeing why the Debtor's proposed path forward is intentionally misguided.

101.    Plans often include settlements.  Plans can include settlements involving claims by the debtor's estate against third parties.[16]  Plans can also include settlements involving claims

---

[16] 11 U.S.C. § 1123(b)(3)(A) (a plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate"); *see In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *18 (Bankr. D. Del. May 13, 2010) ("When evaluating a settlement under section 1123(b)(3)(A), courts apply the same standard as applied under Bankruptcy Rule 9019.")

against the debtor's estate.[17]   Courts have and can permit creditor committees and/or creditor groups to propose settlements under Bankruptcy Rule 9019.[18]

102.    The legal standard used to evaluate settlements (under section 1123(b) or Bankruptcy Rule 9019) is the "fair and equitable" standard set forth by the Third Circuit in *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).  *See Mallinckrodt*, 2022 WL 404323, at *10 (following *Martin*); *Nutritional Sourcing*, 398 B.R. at 832 (quoting *In re New Century TRS Holdings, Inc.*, 390 B.R. 140, 167 (Bankr. D. Del. 2008) and *In re Nutraquest*, 434 F.3d 639, 645 (3d Cir. 2006)).

103.    The Court does not have to reach certainty—only that the settlement falls within "the range of reasonableness."  *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014) (citing *Nutritional Sourcing*, 398 B.R. at 833 and *In re W.R. Grace & Co.*, 475 B.R. 34, 77-78 (D. Del. 2012)).  LTL's and J&J's likely objection will be that the TDPs are not "fair and equitable" because (in their view) they overpay talc claims.[19]

---

[17]   11 U.S.C. § 1123(b)(6) ( a plan may "include any other appropriate provisions not inconsistent with the applicable provisions of this title"); *In re Mallinckrodt PLC*, --- B.R. ---, 2022 WL 404323, at *10 (Bankr. D. Del. 2022) (applying fair and equitable standard to settlement of tort claims against the debtors' estate); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832-34 (Bankr. D. Del. 2008) (holding standard for approving settlement of claims against a debtor's estate "as part of a plan of reorganization are the same as the standards for approving settlements under Fed. R. Bankr. P. 9019.") (citing *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003) and *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 947-48 (Bankr. S.D.N.Y. 1994)); *In re Heritage Org., LLC*, 375 B.R. 230, 309 (Bankr. N.D. Tex. 2007) (under sections 1129(a)(1) and 1123(b)(6), a plan "may include a provision for the settlement of claims against the estate, where that settlement satisfies the standards for approval under Federal Rule of Bankruptcy Procedure 9019.")

[18]   *See In re Peterburg Regency LLC*, 540 B.R. 508, 536 (Bankr. D.N.J. 2015) (holding group of settling creditors, just like an official committee, has standing "under Rule 9019 and 11 U.S.C. § 105(a)" to seek approval of a settlement implementing an agreed distribution of estate assets to creditors); *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr. D. Del. 2008) ("The Court is therefore satisfied that the Committee has the right pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 105(a) to request the Court's approval of the Settlement.").

[19]   Whether trust distribution procedures proposed with a plan constitute a "settlement" subject to approval under the "fair and equitable" standard is being litigated in *Boy Scouts*.  If the "fair and equitable" standard does not apply to TDPs that implement and provide for the treatment afforded to tort claims under a plan, LTL would be left objecting to the TCC's plan and TDPs under sections 1123 and 1129 of the Bankruptcy Code on grounds that LTL would have to identify.  The TCC submits that the "fair and equitable" standard is the highest standard that this Court could apply to an objection lodged by the debtor and/or an equity holder.  The TCC reserves the right to argue that the approval of its plan and TDPs are simply a question of plan treatment.

104.    In considering this objection, the Court will not have to conduct an estimation of LTL's aggregate talc liability.  Rather, the Court would likely consider whether the TDP matrix values and scaling factors produce settlements that are "fair and equitable" and within the "range of reasonableness."  If LTL or J&J believe that the proposed settlement values are outside the range of reasonableness, they can object, present evidence, and be heard on this issue.  This Court would then have to make a ruling in the context of the confirmation of the TCC's plan.

105.    As the Court found in *Camden*, if fact and expert discovery are needed to adjudicate the "likely value" of tort claims, such discovery is properly "resolved at confirmation" under "Bankruptcy Rule[s] 3[0]20 and 9014 once a disclosure statement is approved and a plan is scheduled and contested," and not in connection with a "separate [estimation] proceeding" under section 502(c) of the Bankruptcy Code.  Feb. 15, 2022, Hr'g Tr. at 7:23-8:18.

106.    If this Court finds that the TDP values are too high, or the procedures are improper, for any reason, the TCC could adjust the matrix values and procedures.  Further, the TCC proposed timeline for plan confirmation includes a 90-day review period during which time a Court-appointed expert (and other experts) can review and vet the matrix values and procedures in the TDPs.  The TCC anticipates that the solicitation version of the TDPs that will be presented to the Court at the hearing on the TCC's disclosure statement will reflect the expert's input.  All claimants, therefore, will receive and vote on a plan of reorganization that includes TDPs supported by the TCC and vetted by the Court-appointed expert.  This should eliminate any reasonable objection that LTL or J&J may present.

107.    This is the proper use of a Court-appointed expert.  The TCC's plan preserves the full benefit of the Funding Agreement—*i.e.*, at least $61 billion—for the benefit of present and future talc claims.  An expert opinion offered on aggregate values as part of an effort to cap J&J's

liability at an amount less than $61 billion would shift the risk of underfunding from a highly solvent J&J to the cancer victims.  Or, to quote the District Court in *PG&E*, J&J is trying to make it possible for cancer victims to get "stiffed at the end … for legitimate claims."  Sept. 10, 2019, Hr'g Tr. at 27:15-20, *PG&E*, No. 19-05257 (JD) (N.D. Cal. Sept. 10, 2019).  This is not a legitimate bankruptcy purpose.

108.    In contrast, focusing on the proper values for TDP settlements could lead to the confirmation of a plan.  The plan confirmation forum is almost always the place where valuation issues are resolved, and where settlements are reached because it puts the prospect of true finality before the parties.  If the Court confirms the TCC's plan, J&J will be bound by the Funding Agreement and the legal consequences of its decision to undertake the Texas Two Step.

109.    Finally, LTL may argue that its liability exceeds $61 billion, and that estimation is necessary to confirm that the TCC's plan is feasible.  The TCC would be truly astonished if LTL argues that its liability exceeds $61 billion.  But even if it did, estimation would still not be required to confirm the TCC's plan.  Under the TCC's plan, the discharge and releases are coextensive with payment.  J&J cannot get the benefit of the channeling injunction and, at the same time, refuse to comply with the Funding Agreement.  Any talc claims that are not paid will simply pass through. Even in the unlikely event that LTL argued that its liability exceeds $61 billion, estimation would still not be required to confirm the TCC's plan under section 1129 of the Bankruptcy Code.

110.    The proposed paths forward here could not be more different.  On the one hand, LTL wants this Court to embark on a multi-year estimation process under which the Court would be asked to make liability determinations contrary to final judgments reached by juries and upheld by Appellate Courts, assign values to each category of talc claim (*e.g.*, ovarian, mesothelioma, third-party payor and governmental), and determine the number of valid talc claims (present and

future) for each category, thereby producing an aggregate estimation that LTL will use (if J&J finds it favorable) to propose a plan years from now that the talc claimants will likely reject and that cannot be confirmed, thus proving once again that estimation in this context only creates undue delay and violates section 502(c) of the Bankruptcy Code.

111.    The TCC, on the other hand, wants to move forward with a chapter 11 plan that can be solicited and confirmed in the next eight (8) months and will provide a meaningful opportunity for justice and produce comprehensive, equitable, and timely recoveries for cancer victims.  If this is the objective, the path forward is clear.  As in *PG&E*, the Court should terminate exclusivity and let the cancer victims file their plan which will garner wide creditor support and will best move this case to a just and expeditious conclusion.

Respectfully submitted,

**GENOVA BURNS, LLC**

/s/ *Daniel M. Stolz*

By: _____

Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee*
*of Tort Claimants of LTL Management, LLC*