**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>        Debtor.[1] | Chapter 11<br><br>Case No. 21-30589 (MBK)<br><br>Judge:  Michael B. Kaplan<br><br>**Hearing Date and Time:**<br>July 26, 2022 at 10:00 a.m. |

### DEBTOR'S MEMORANDUM ON THE NEED FOR ESTIMATION

In response to the Court's request at the June 14, 2022 hearing, LTL Management LLC,

the debtor in the above-captioned chapter 11 case ("LTL" or the "Debtor"), submits this

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

memorandum on the need for estimation in this case.  In support of this memorandum, the

Debtor incorporates the *Declaration of Dan B. Prieto* ("Prieto Decl."), filed contemporaneously

herewith, and respectfully represents as follows:

### **Preliminary Statement**

1.      Claims estimation is statutorily required in this chapter 11 case.

See 11 U.S.C. § 502(c).  It is also the path that will best promote the prospects for settlement

because it will focus the parties and the Court on the issue that is central to a consensual

resolution:  the extent of LTL's aggregate liability for talcum powder-related claims.

2.      At the July 6, 2022 hearing, the Court indicated that, in the event it

authorizes estimation, it is considering the appointment of an independent expert "to evaluate the

respective party positions, and to offer an opinion taking into account a host of factors such as

prior settlements, verdicts, liability risks, causation and science, or any factors, or limited factors

that the expert deems appropriate."[2]  July 6, 2022 Hr'g Tr. at 7:19-8:2.  The Debtor believes that

the incorporation of this concept into the estimation process would be beneficial because it will

both assist the Court in analyzing and ultimately determining the issues that will likely be raised

in estimation and will also galvanize the mediation process and further drive a consensual

resolution.

3.      Despite the best efforts of the mediators, no agreement has been reached,

to date, on a consensual plan, and it is simply not possible to liquidate the nearly 40,000 talc

---

[2]      Given the number of factors an expert would need to consider, the Debtor believes the Court should retain
two experts:  one to offer opinions or guidance on medical/science issues, the other to offer opinions or
guidance on economic issues.  The Debtor also proposes that the experts be used in two ways, first in the
near term to provide preliminary opinions and guidance to the Court and the parties on the parties'
respective positions as developed at that stage and, second, in the event this preliminary guidance does not
yield a consensual resolution, to participate in the estimation process itself, ultimately preparing reports on
the issues raised by the parties.  Additional details on the Debtor's thoughts with respect to the use of
court-appointed independent experts are set forth at II.B. below.

NAI-1531559839

claims pending against the Debtor without unduly delaying administration of the estate. The

facts here are in all material respects identical to cases where courts have ordered estimation.

The Debtor is not aware of any decision denying a motion for estimation in an asbestos-related

bankruptcy. Indeed, the parties have been preparing for estimation since the beginning of this

case through the retention of professional advisors to assist in the effort.

4. Conducting an estimation here would serve several legitimate purposes.

Estimation has a proven track record of facilitating a consensual resolution in mass-tort

bankruptcies, often even before an estimation hearing is held or a decision on liability is

rendered. The Debtor's proposed approach to estimation—set forth in its June 10, 2022

submission [Dkt. 2473] and supplemented herein—complements the parties' ongoing mediation

efforts, incorporates the Court's suggestion to involve independent expertise early in the process,

and is designed to promote such a consensual resolution. An estimation process will enable the

parties to gather information necessary to fairly estimate, and ultimately agree upon, the Debtor's

aggregate liability. Estimation will also assist the parties in formulating the specifics of a plan of

reorganization, including the levels of compensation to be paid to claimants, and the claimants in

evaluating and voting on a proposed plan.

5. None of the arguments raised to date by the Official Committee of Talc

Claimants (the "TCC") negates the need for estimation. Section 502(c) does not require

estimation only if it is "consensual" and "tethered" to a plan of reorganization. Nor are the

Debtor's proposed time frame or anticipated discovery requests in any way "remarkable," as the

TCC has protested. The Debtor's anticipated discovery is routinely ordered in estimation

proceedings. And the proposed schedule is significantly compressed compared to other cases.

6. The TCC's references to Bestwall, DBMP, and Aldrich do not undermine

the need for estimation. The delays in Bestwall are attributable to claimants' ongoing opposition

to the debtor's efforts to determine the extent of its responsibility for current and future asbestos claims, including opposition to estimation, opposition to discovery the debtor needs to develop and present its estimation case, and, more recently, claimants' blatant flouting of Judge Beyer's discovery orders—leading the court to impose sanctions and repeatedly express on-the-record frustration with claimants' counsel. The <u>DBMP</u> and <u>Aldrich</u> cases have been stalled by similar levels of opposition, requiring the debtors in those cases to relitigate the same issues adjudicated in <u>Bestwall</u>, and also by the claimant representatives' refusal to negotiate.

7.     The TCC's reference to other mass-tort bankruptcies that have proceeded to date without completing an estimation process is misleading. In those cases, estimation was ultimately not needed (or even typically sought) because the parties either were able to reach agreement on the debtor's liability or because the debtor was hopelessly insolvent, meaning that substantially all of its asset value would be needed to pay tort claimants no matter what the tort liability might be. Neither is the circumstance in this case, the latter fortunately for talc claimants.

8.     The TCC's proposed "alternatives" are not superior to, nor do they excuse the need for, estimation. Allowing the TCC to file a plan would not avoid the need for estimation. Confirming a plan requires more than simply obtaining sufficient enough votes to support paying claimants whatever the TCC demands. Absent estimation, there would be no basis to determine whether the TCC's proposed trust funding is reasonable or appropriate and no factual or legal basis to confirm the plan over the objection of the Debtor or its equity holder. For precisely this reason, in <u>Bestwall</u>, Judge Beyer refused to allow a claimant-proposed plan to move forward before estimation. Additionally, the notion that the TCC could confirm such a nonconsensual plan in six months is wholly unrealistic. The notice and solicitation requirements for such a plan, as well as the litigation over whether it could be confirmed under sections 524(g)

-4-

and 1129(b) over objection, would take considerably longer. A cramdown plan process would only cause delay and result in needless expense.

9.    In the Imerys case, the debtor, its parent, the ovarian cancer claimants, and mesothelioma claimants, from inception, pursued just such a futile path. The debtor and the claimants proposed plans with wildly inflated claimant recoveries and sought to stick Old JJCI (as indemnitor to Imerys) with the bill. By the time LTL filed for chapter 11 in October 2021, the Imerys debtor, with its TCC as a co-proponent—**representing the same claimants as those seeking recovery in this case**—had filed **nine** separate plans over 17 months (not including the time to formulate the first plan), and had spent, and wasted, tens of millions of dollars and countless amounts of legal and court time, on solicitation and litigation in connection with those plans. A TCC plan in this case would be no different.

10.    All of this ultimately produced nothing other than a failed process because the final plan did not even gain enough votes to go to a confirmation hearing, based on, among other things, voting irregularities that required Judge Silverstein to disallow thousands of plaintiff-law-firm-submitted votes. Indeed, not only could the ovarian and mesothelioma claimants, conspiring against Old JJCI, not conceive of a way to bring a confirmable plan before the bankruptcy court over almost two years, they ultimately could not even agree on how to divide up their sought-for spoils among themselves. Allowing the same group to again hijack the confirmation process, before there is an agreement or a judicial determination of what is owed, is not a path toward a structured and prompt resolution of this case.

11.    The TCC's proposal to lift the stay on a "small" group of up to 90 plaintiff-selected cases is even farther from a viable "alternative" to estimation. It would take several years, at least, to complete such a slate of unnecessary trials. The typical reason for

NAI-1531559839

"bellwether" trials is utterly lacking here. Over 40 Johnson's Baby Powder[3] cases already have been tried to verdict. The results of additional, plaintiff-selected, non-representative cases would not change the parties' perspective on the Debtor's **aggregate** liability across all claims. And the notion of trying 90 cases across several state and federal jurisdictions would divest this Court of all control over these proceedings, effectively bringing any progress in this bankruptcy to a halt.

12.    The only realistic next step in this case is estimation, a process that would be aided by the use of court-appointed independent expertise. The Debtor requests that the Court order it.

### Background

### A.    Status of Proceedings in this Court

13.    On March 18, 2022, the Court entered the *Order Establishing Mediation Protocol* [Dkt. 1780] and on May 16, 2022, the Court entered the *Amended Order Establishing Mediation Protocol* [Dkt. 2300] (together, the "Mediation Order"). The Mediation Order directs the co-mediators to mediate "a comprehensive resolution of issues in the Case (the "Mediation Issues"), which includes, without limitation, a chapter 11 plan, and all matters related to the estimation and plan treatment of personal injury claims against the estate related to talc or talc-containing products." [Dkt. 1780 at ¶ 2.] The parties have engaged in mediation, including an in-person mediation from May 9-12, 2022, that did not result in a global resolution. The Court has since directed the parties to continue their mediation efforts and emphasized the benefits to all parties of reaching a consensual resolution. May 24, 2022 Hr'g Tr. at 4:10-11, 5:22-25; July 6, 2022 Hr'g Tr. at 4:6-5:19.

---

[3]       Capitalized terms not otherwise defined have the meaning later ascribed to them herein.

NAI-1531559839

14.     While encouraging the parties to continue mediation, the Court has also

recognized that "[w]e have a pending bankruptcy case that has to move forward."  May 24, 2022

Hr'g Tr. at 4:17-18.  On June 10, 2022, the Debtor and the TCC filed submissions setting forth

their respective views on the appropriate next steps in the case [Dkts. 2465 (TCC), 2473

(Debtor)].  As more fully detailed in its submission, the Debtor proposed a two-phased claims

estimation process under 11 U.S.C. § 502(c) designed to complement ongoing mediation efforts.

The TCC, by contrast, proposed, first, to lift the preliminary injunction and automatic stay (either

entirely or in part) and, second, to terminate exclusivity and allow it to prepare, file, and solicit a

plan of reorganization.[4]

15.     After a hearing on June 14, 2022, the Court directed the parties to file

briefs on the need for estimation under 11 U.S.C. § 502(c).  June 14, 2022 Hr'g Tr. at 140:8-10,

141:7-18.  On June 27, 2022, the Court issued an *Order Adjourning Matters* [Dkt. 2609], which

adjourned oral argument on the continuation of the preliminary injunction and the automatic

stay, as well as on the merits of a claims estimation hearing, to the July 26, 2022 omnibus

hearing date.  The Court held an abbreviated hearing remotely on July 6, 2022, during which it

directed the parties to continue mediation efforts, expressed reservations about modifying the

injunction/stay, and noted that the claimants and the Court will need information as to the

number and value of present and future claims in connection with any plan of reorganization.

July 6, 2022 Hr'g Tr. at 4:6-5:19, 6:13-7:10.

16.     The Court further commented that, in the event it "opts to move forward

with a claims estimation process," it "is considering the appointment of an independent expert

---

[4]     The TCC's proposal to lift the injunction and stay to allow continued litigation in the tort system is further
set forth in the *Statement of the Official Committee of Talc Claimants in Support of the Court's Modifying
Upon Revisiting of the PI Order* [Dkt. 2566], which the Debtor responded to in the *Debtor's Response to
Statements and Objections Regarding Continuance of the Preliminary Injunction* [Dkt. 2631].

under Federal Rule of Evidence 706 to evaluate the respective party positions, and to offer an

opinion taking into account a host of factors such as prior settlements, verdicts, liability risks,

causation and science, or any factors, or limited factors that the expert deems appropriate."  Id.

at 7:19-8:2.

> **B.    The Highly Disputed Nature of the Talc Claims Underscores the Need for Estimation.**

17.    This case was necessitated by the unrelenting deluge of litigation alleging

that the JOHNSON'S® Baby Powder and "Shower to Shower" products (collectively,

"Johnson's Baby Powder") cause ovarian cancer and/or mesothelioma.  These products have

been used by hundreds of millions of people worldwide for over 125 years.  Multiple studies,

commissioned by government agencies and others, have shown that the product is safe.  Info.

Br. at 11-43.[5]

18.    Prior to the 2010s, only a small number of isolated product liability claims

involving Johnson's Baby Powder had ever been filed.  But that changed dramatically over the

last decade.  In 2013, the jury in the Berg case found for the plaintiff but awarded no damages.

In 2016, a St. Louis jury in the Fox case reached a plaintiff verdict of $72 million.  While the

verdict was reversed on appeal, it sparked significant interest in the plaintiffs' bar.  Five more

cases were tried in St. Louis over the next year and a half, resulting in plaintiff verdicts totaling

more than $235 million.  Id. at 46-47.

19.    These verdicts, too, were reversed on appeal.  But claims relating to

Johnson's Baby Powder exploded as plaintiff lawyers commissioned what the Debtor believes

were dubious expert causation reports (which some courts labeled "junk science") and launched

---

[5]    The information contained in this section is taken from the Debtor's Informational Brief and First Day Declaration.  Supporting citations are contained in those submissions, where indicated herein.

NAI-1531559839

extensive marketing campaigns through, in the Debtor's view, misleading commercials,
"infomercials," spam emails, and social media.  Advertising volume for talc claims is among the
highest of any tort.  Id. at 48, 77, 90-93.

20.     The resulting explosion in filings in such a short period of time was
unprecedented.  In 2014, Old JJCI was served with just 46 ovarian cancer complaints.  Only
three years later, that number had escalated to nearly 5,000.  By the year preceding the
bankruptcy filing, the company was, on average, served with a new ovarian cancer complaint
**every single hour of the day, 365 days a year**.  As of the Petition Date, approximately 38,000
ovarian cancer cases relating to Johnson's Baby Powder were pending.  New mesothelioma
filings also skyrocketed.  At the time of the Fox trial, only six mesothelioma cases included
Johnson's Baby Powder.  By the Petition Date, that number had grown to 430 pending claims.
First Day Decl. ¶¶ 42-44.

21.     Apart from the fundamental dispute over whether Johnson's Baby Powder
even can cause ovarian cancer or mesothelioma, there are other reasons to question the
legitimacy of the claims now pending against the Debtor.  To start, rampant irregularities have
plagued asbestos-related litigation for decades.  The Garlock bankruptcy exposed the
"widespread" nature of these irregularities.  In re Garlock Sealing Techs., 504 B.R. 71, 85
(Bankr. W.D.N.C. 2014).  Among other things, the court referenced irregularities in the early
years of the asbestos litigation, including "bogus diagnosis" of diseases by for-profit "screening"
companies.  Id. at 83.[6]  The court highlighted a 23-page set of directions used by a leading law

---

[6]     Independent reviews revealed that positive diagnoses were wildly overstated.  In one study, six independent
doctors reviewed nearly 500 radiographs that had a 95.9% "positive" rate; the independent doctors found
only 4.5% were truly positive.  See In re: Silica Prod. Liab. Litig., 398 F. Supp. 2d 563, 629 (S.D. Tx.
2005) (citing Gitlin, JN et al., COMPARISON OF "B" READERS' INTERPRETATIONS OF CHEST RADIOGRAPHS
FOR ASBESTOS RELATED CHANGES, Acad. Radiol., 11(8):843-56 (2004)).

NAI-1531559839

firm to "instruct[] their clients on how to testify in discovery." Id. at 84.[7]

22.     Discovery in Garlock proved that these were not isolated incidents of a
bygone era.  Rather, discovery showed that alternative "exposure evidence was withheld in each
and every one" of the cases in which the court permitted extensive discovery.  Id.  The court
found it was a "regular practice" of plaintiff firms to delay filing bankruptcy trust claims so that
the remaining tort system defendants would not have that information.  Ultimately, the court
found that these "demonstrable misrepresentation(s)" were "sufficiently widespread" in the
asbestos tort system "to have a significant impact" on settlement practices and results.  Id. at 85.

23.     Such irregularities are not just an abstract or academic concern for the
Debtor.  In their haste to grow the cosmetic talc litigation industry, plaintiffs' counsel amassed
vast listings of individuals diagnosed with ovarian cancer or mesothelioma.  As conceded under
oath in the Imerys bankruptcy, certain plaintiffs' counsel took the list and asserted claims against
Old JJCI and J&J without even assessing whether the claimant had been exposed to the talc used
in Johnson's Baby Powder.  Info. Br. at 112.  In some cases, counsel pursued such claims even
though the claimant had previously alleged and recovered on a theory that the disease was
exclusively attributable to other products.  Id.[8]

---

[7]     The memorandum, used by paralegals to conduct intake interviews, involved creation of a "Work History
Sheet" resulting from a suggestive intake process spotlighting specific manufacturers and products.
The memorandum warned against deviating from the agreed-upon list:  "Do NOT mention product names
that are not listed on your Work History Sheets."  Other suggestions were even more specific, including
"Remember to say you saw the NAMES on the BAGS," "The more often you were around it, the better for
you case," and "Do NOT say that you saw more of one brand over the other, or that one brand was more
commonly used than another … be CONFIDENT that you saw just as much of one brand as all the others."
The memorandum also warned against conceding any knowledge regarding asbestos hazards, e.g.:  "It is
important to maintain that you NEVER saw any labels on asbestos products that said WARNING or
DANGER."  See Rogers, JC, WITNESS PREPARATION MEMOS RAISE QUESTIONS ABOUT ETHICAL LIMITS,
ABA/BNA Lawyers' Manual on Professional Conduct (Feb. 18, 1998) (attached as Prieto Decl., Ex. A).

[8]     When presented with evidence of mass assertion of claims without any due diligence by plaintiffs' counsel
in the Imerys bankruptcy, the court there excluded 15,719 votes proffered by that firm in favor of the
proposed plan.  Info. Br. at 112 n.439.

-10-

24.    Old JJCI itself uncovered irregularities in many of the cases that proceeded to trial against it.  The following are a few examples.

25.    ***Manipulating A Death Certificate.***  In a California case, a hospice doctor signed a death certificate stating that the cause of plaintiff's death was "Budd–Chiari syndrome," which is not associated with asbestos or talc exposure.  The plaintiff's law firm then sent a letter to the doctor, falsely stating that "[p]er New Mexico Law" he "must" amend the death certificate to add mesothelioma as a contributing factor to the plaintiff's death; the doctor complied.  The doctor testified that the letter led him to believe he was legally obligated to add mesothelioma to the death certificate.  New Mexico law required no such thing.  When asked in discovery for any communications with the doctor, the plaintiff's law firm withheld the letter, stating that it had not communicated with the doctor.  The company discovered the truth only when it requested communications directly from the doctor.

26.    ***Concealing Expert Analysis.***  In another case, the plaintiff's law firm hid expert analysis that severely undermined its client's case.  The firm had asked one of its experts to test the plaintiff's tissue, presumably hoping to find asbestos.  None was found.  The firm never produced the expert's analysis, which was voluminous and included multiple tests, even though it was required to be disclosed under both the relevant California rules of evidence and a case-specific deposition notice.  The expert later testified that he did not know if he had tested any tissue from the plaintiff.  Only later, after ongoing discovery efforts, did the company uncover emails showing not only that the expert, in fact, was aware that he had tested the plaintiff's tissue before testifying at the deposition, but so was the plaintiff's lawyer (who sat quietly during the deposition).

27.    ***Misrepresenting Talc Use.***  In a recent ovarian cancer matter, the representative of decedent's estate claimed that her ovarian cancer was caused by talc.  Defense

NAI-1531559839

counsel received an unexpected call from the decedent's former husband shortly before trial.  He explained that he had read about the case and wanted to set the record straight.  The decedent, he stated, had never used talcum powder.  The husband would know.  In the 10 years that he knew and he lived with her, he shopped for the decedent and shared a bathroom and bedroom with her. Yet he stated that he never saw talcum powder, never bought talcum powder, and never talked to her about talcum powder.

28.  ***Hiding Asbestos Trust Claims.***  Under a case management order in the Los Angeles, Orange, and San Diego counties' coordinated asbestos docket, plaintiffs are required to disclose any bankruptcy trust submissions.  In a recent matter, the plaintiff's law firm failed to disclose trust claims that had been submitted to two bankruptcy trusts—**submissions the firm had itself prepared**—evidence which would tend to show that plaintiff's mesothelioma was caused by exposure to asbestos from those sources, not any trace asbestos alleged to be present in talc.  The firm even failed to disclose the submissions in response to the company's separate discovery requests.  When deposed, the plaintiff disavowed any knowledge of trust claims; counsel made no effort to correct the misstatement.  The company independently discovered the bankruptcy trust submissions three years after its initial discovery requests.

29.  ***Exaggerating Exposure.***  In many cases, the plaintiff's allegations on the volume of Johnson's Baby Powder used have defied logic (often bordering on the alleged use of multiple bottles in a week).  Repeatedly, the company's investigation revealed a different story. In one matter, the plaintiff's wife testified that she purchased some **5,500** containers of Johnson's Baby Powder from 1985 through 2017, equating to **three full bottles of powder a week**.  The evidence did not support the allegations.  The company obtained the family's loyalty card information and matched it up with purchase records from various retailers (Costco, Albertsons, and RiteAid).  While the wife testified that about half the purchases were made at those stores

NAI-1531559839

(so, nearly 2000 bottles), the loyalty records failed to show a single purchase.  In another matter,
the plaintiff alleged that he used Johnson's Baby Powder at least two times per day for 52 years,
going through several bottles a year.  The loyalty cards obtained in discovery identified only a
handful of purchases over the years.

30.    The company's persistent efforts in discovery in cases set for trial brought
these examples to light.  The Debtor believes it a virtual certainty that similar issues plague the
larger body of pending claims.

### Relief Requested

31.    Pursuant to 11 U.S.C. § 502(c), the Debtor requests that the Court enter an
order authorizing an aggregate estimation of the Debtor's legal liability for talcum powder
claims.

### Jurisdiction

32.    This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157
and 1334.[9]  This is a core proceeding under 28 U.S.C. § 157(b).  Venue for this matter is proper
in this district under 28 U.S.C. § 1409.

---

[9]    Under 28 U.S.C. § 157, core proceedings include the estimation of personal injury tort or wrongful death
claims for purposes of confirming a chapter 11 plan of reorganization.  Moreover, neither 28 U.S.C. § 157
nor 28 U.S.C. § 1411 prevent a bankruptcy judge from estimating personal injury tort or wrongful death
claims "for purposes of the negotiation and confirmation of a reorganization plan, even if the maximum
aggregate payment to tort claimants will be based on this estimate."  S. ELIZABETH GIBSON, FED. JUD. CTR.,
JUDICIAL MANAGEMENT OF MASS TORT BANKRUPTCY CASES 89–90 (2005).

NAI-1531559839

## Basis for Relief Requested

**I.    Estimation is Required by Statute Here to Avoid Undue Delay.**

33.    Section 502(c) of the Bankruptcy Code provides:

There **shall** be estimated for purposes of allowance under this section —

(1)    any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case ….

11 U.S.C. § 502(c) (emphasis added).  By its plain language, in the absence of an agreement otherwise, section 502(c) establishes a clear obligation to estimate unliquidated claims when the failure to do so would result in undue delay.  See, e.g., In re G-I Holdings, Inc., 323 B.R. 583, 599 (Bankr. D.N.J. 2005) ("Section 502(c) of the Bankruptcy Code is drafted in mandatory terms.  That is, any contingent or unliquidated claim 'shall' be estimated so long as the 'liquidation' of the particular claim would 'unduly delay the administration of the case.'").[10] Numerous courts have found estimation necessary and appropriate in analogous, mass-tort contexts, especially when—as has been the case here—the parties have been unable to reach agreement on a plan of reorganization.[11]  Asbestos-driven bankruptcies provide a particularly

---

[10]    See also In re Federal-Mogul Glob., Inc., 330 B.R. 133, 154 (D. Del. 2005) ("[I]t is apparent that the Bankruptcy Code requires an estimation in order to prevent undue delay in the administration of the estate."); A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1011-12 (4th Cir. 1986) ("Th[e] duty of estimation in a proper case under section 502(c) is not a permissive one; it is a mandatory obligation of the bankruptcy court.").

[11]    See, e.g., G-I Holdings, 323 B.R. at 599-600 ("[R]equiring the Company to first liquidate each and every asbestos-related personal injury claim outside of the bankruptcy context would undoubtedly cause undue delay in the administration of the bankruptcy case and could possibly be the death knell for the successful reorganization of this debtor.  Therefore, some form of estimation proceeding is required."); In re Federal-Mogul, 330 B.R. at 154 ("It is undisputed that the Personal Injury Claims are contingent and unliquidated, and that liquidation of each claim by a trial would unduly delay the administration of these cases."); Order Authorizing Estimation of Current and Future Mesothelioma Claims at ¶ 4, In re Bestwall LLC, No. 17-31795 (LTB) (Bankr. W.D.N.C. Jan. 19, 2021), Dkt. 1577 ("Bestwall Estimation Order") ("There is no dispute that the liquidation of the asbestos-related claims asserted or that may be asserted against the Debtor … would unduly delay the administration of this chapter 11 case; accordingly, cause exists to grant the [Estimation] Motion."); Order Authorizing Estimation of Current and Future Mesothelioma Claims, In re DBMP LLC, No. 20-30080 (JCW) (Bankr. W.D.N.C. Nov. 29, 2021), Dkt. 1239 (authorizing estimation of current and future mesothelioma claims); Order Authorizing Estimation of Asbestos Claims, In re Aldrich Pump LLC, No. 20-30608 (JCW) (Bankr. W.D.N.C. Apr. 18,

-14-

common situation where estimation has been ordered under section 502(c).[12]  This is especially

true here.  With nearly 40,000 talcum powder-related claims already pending against the Debtor

on the Petition Date, it would take literally hundreds of years to liquidate these claims on an

individual basis.

34.  Estimation need not commence at the beginning of a chapter 11 case.

Rather, as in this case, a court may decide first to allow time for the parties to reach a consensual

resolution.[13]  When those efforts come to a standstill, however, the bankruptcy case—as the

Court has observed here—should "move forward."  May 24, 2022 Hr'g Tr. 4:17-18.  At that

point, estimation becomes necessary to advance the chapter 11 case and avoid undue delay.

## II.  An Estimation Process Will Allow for Necessary Discovery, Complement Mediation Efforts, and Facilitate a Consensual Resolution.

35.  To date, the primary roadblock to a consensual resolution is differing

views on the extent of the Debtor's aggregate liability for current and future talc claims.  That is

the issue that must be resolved before a consensual resolution can be achieved.  A court-ordered

and supervised estimation process will assist the parties' negotiations and understanding of this

---

2022), Dkt. 1127 (same).

[12]  See id.; see also *Order for Estimation of Mesothelioma Claims*, In re Garlock Sealing Techs., LLC, No. 10-31607 (Bankr. W.D.N.C. Apr. 13, 2012), Dkt. 2102; In re Specialty Prods. Holding Corp., 2013 WL 2177694 (Bankr. D. Del. May 20, 2013); *Order Pursuant to 11 U.S.C. § 502(c) Authorizing Estimation of Debtor's Aggregate Liability for Asbestos Personal Injury Claims and Establishing Schedule for Estimation Proceeding*, In re Motors Liquidation Co. (f/k/a General Motors Corp.), No. 09-50026 (REG) (Bankr. S.D.N.Y. Dec. 15, 2010), Dkt. 8121; In re Eagle–Picher Indus., Inc., 189 B.R. 681 (Bankr. S.D. Ohio 1995); In re USG Corp., 290 B.R. 223 (Bankr. D. Del. 2003); Owens Corning v. Credit Suisse First Boston, 322 B.R. 719 (D. Del. 2005); In re UNR Indus., Inc., 45 B.R. 322 (N.D. Ill. 1984); In re Johns-Manville Corp., 45 B.R. 827, 830 (S.D.N.Y. 1984).

[13]  Multiple courts, including Judge Beyer in Bestwall, have adopted such an approach, ordering estimation after first ordering the parties to mediation.  See Bestwall Estimation Order; Bestwall Oct. 22, 2020 Hr'g Tr. at 9 [Dkt. 1435] (noting court previously ordered parties to mediation before ordering estimation) (excerpts attached as Prieto Decl., Ex. B); In re N. Am. Health Care, Inc., 544 B.R. 684, 686-88 (Bankr. C.D. Cal. 2016) (ordering two-step mediation/estimation protocol); In re Mona Lisa at Celebration, LLC, 410 B.R. 710, 717 (Bankr. M.D. Fla. 2009) ("In these adversary proceedings, mediation followed by an estimation of the filed claims is the most efficient and economical method to liquidate the claims and proceed toward confirmation of a plan.").

NAI-1531559839

central issue in many ways.  <u>First</u>, it will enable the parties to gather needed information relevant

to determining the Debtor's aggregate liability.  The Court itself recognized that information on

the "valuation and number" of claims is necessary to "know what the exposure out there is in this

case." June 14, 2022 Hr'g Tr. at 140:22-24.  <u>Second</u>, at various points throughout the process, it

will enable the parties to better understand and evaluate the strengths of their own positions and

the positions of other parties with respect to that liability, including through the views of any

independent, court-appointed experts.  <u>Third</u>, if settlement is not reached before the conclusion

of the estimation process (which has occurred in multiple other mass tort cases and is the goal

here), the parties will obtain the benefit of the Court's impartial views through an estimation

opinion.

### A.    Estimation Has a Proven Track Record of Success

36.    Courts have recognized the role estimation can play in promoting

settlement.  In <u>USG</u>, the court noted:

> The Court exists to assist the parties in resolving their differences.
> It does so by providing a framework within which the parties can
> litigate those differences to a Court-imposed result or compromise
> them based upon the parties' expectation of a predictable outcome.

<u>In re USG Corp.</u>, 290 B.R. at 225.  History has shown that estimation has, in fact, played a

pivotal role in mass-tort bankruptcies in fostering a consensual resolution and, ultimately,

confirmation of a plan of reorganization.

37.    In <u>Garlock</u>, the parties were at an impasse, with the claimants asserting a

section 524(g) funding amount more than four times greater than the amount proposed in

the debtor's initial plan.  Settlement discussions resumed immediately following Judge

Hodges' estimation decision.  Months later, Garlock and the future claimants' representative

reached agreement on a proposed plan.  Ultimately, the asbestos claimants' committee joined

Garlock and the future claimants' representative in reaching agreement on a fully consensual

plan.

38.    Likewise, in In re Specialty Products Holding Corp., No. 10-11780

(Bankr. D. Del.), efforts to reach a consensual plan stalled for more than three years before

the court issued its estimation opinion.  The parties reached agreement on a consensual plan the

following year.[14]

39.    In other cases—such as G-I Holdings, W.R. Grace, USG, Federal-Mogul

and General Motors—the parties reached agreement even **before** the court reached an opinion on

estimation (and in some cases, before the estimation hearing even commenced).[15]

### B.    The Debtor's Proposal, Complemented By Appointment of Independent Experts, Provides the Best Path To Consensual Resolution.

40.    As detailed in the *Debtor's Statement on Proposed Next Steps in Chapter*

*11 Case* [Dkt. 2473], the debtor proposes an innovative approach to estimation designed to foster

and inform the parties' ongoing mediation efforts.  To speed the process and promote mediation

efforts, the Debtor has proposed that the estimation proceed in two phases and that each phase

incorporate mediation sessions at key points within those two phases.  The Debtor agrees with

the Court's suggestion of incorporating independent, court-appointed expertise into the

---

[14]    See Mealey's Asbestos Bankruptcy Report, *Where Are They Now, Part Seven: An Update On Developments In Asbestos-Related Bankruptcy Cases* (July 2014) at 11, 37 (discussing Specialty Products) (excerpts attached as Prieto Decl., Ex. C).

[15]    See Mealey's Asbestos Bankruptcy Report, *Where Are They Now, Part Five: An Update On Developments In Asbestos-Related Bankruptcy Cases* (March 2009) at 6 (G-I Holdings: "Before the estimation was completed, G-I resolved its disputes with the asbestos constituencies, resulting in the proposal of a joint plan of reorganization on August 21, 2008.") (excerpts attached as Prieto Decl., Ex. D); id. at 8 (W.R. Grace: "As the time for the estimation hearing grew closer, Grace and the asbestos constituencies reached agreement on the terms of a joint plan of reorganization, which was filed on September 19, 2008."); Garlock, 504 B.R. at 88-89 (noting parties in USG "eventually settled their estimation dispute"); *Stipulation and Order Fixing Asbestos Trust Claim and Resolving Debtors' Estimation Motion*, General Motors (Bankr. S.D.N.Y. Feb. 14, 2011) [Dkt. 9214] (debtors, unsecured creditors' committee, asbestos creditors' committee and future claimant representative agreed on debtors' aggregate liability for asbestos claims, thereby resolving estimation proceeding).

NAI-1531559839

estimation process.  The Debtor believes doing so would promote an earlier resolution of the

case and assist the Court throughout the estimation process.

41.    In practice, there are two types of court-appointed experts:  (1) "technical

advisors" appointed under the Court's inherent powers and (2) experts appointed under Rule 706

of the Federal Rules of Evidence, *Court-Appointed Expert Witnesses*.  A technical advisor's

"'role is to act as a sounding board for the judge—helping the jurist to educate himself in the

jargon and theory disclosed by the testimony and to think through the critical technical

problems.'"  <u>In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.</u>,

No. 2:16 MD 1203, 2010 WL 3732093, at *2 n.8 (E.D. Pa. Sept. 2, 2010) (quoting <u>Reilly v.

U.S.</u>, 863 F.2d 149, 158 (1st Cir. 1988)); <u>see also</u> <u>Fed. Trade Comm'n v. Enforma Nat. Prod.,

Inc.</u>, 362 F.3d 1204, 1213 (9th Cir. 2004) (citing <u>Ass'n of Mexican–American Educators v.

California ("AMAE ")</u>, 231 F.3d 572, 590 (9th Cir. 2000) (en banc) ("The role of a technical

advisor is to organize, advise on, and help the court understand relevant scientific evidence."));

29 Fed. Prac. & Proc. Evid. § 6303 (2d ed.) (discussing respective roles of technical advisors and

Rule 706 experts).  Unlike an expert appointed under Rule 706, a technical advisor does "not

assume the role of an expert witness by supplying new evidence; nor may an advisor usurp the

role of the judge by making findings of fact or conclusions of law."  <u>Ass'n of Mexican-American

Educators</u>, 231 F.3d at 590 (citations omitted).[16]  By contrast, an expert appointed under Rule

706 provides evidence and is subject to the Rule's requirements.[17]  Both types of court-appointed

experts have been appointed in mass-tort and other cases involving complex scientific or medical

---

[16]    For a discussion of potential procedural safeguards associated with appointment of a technical advisor,
see <u>TechSearch, L.L.C. v. Intel Corp.</u>, 286 F.3d 1360, 1378-80 (Fed. Cir. 2002).

[17]    Under Rule 706(b), a court-appointed expert "(1) must advise the parties of any findings the expert makes;
(2) may be deposed by any party; (3) may be called to testify by the court or any party; and (4) may be
cross-examined by any party, including the party that called the expert."

matters.[18]

42.     The Debtor will be prepared to discuss potential approaches to

incorporating court-appointed experts—under Rule 706 or in the form of technical advisors—

into the estimation process in greater detail at the upcoming hearing on July 26, 2022.  As a

general matter, the Debtor believes that different experts would be necessary for the

medical/science and quantification aspects of the estimation process, as those aspects involve

separate and distinct disciplines.  In addition, the Debtor recommends that all necessary

independent experts be appointed in the near term and that those experts immediately begin the

process of reviewing the relevant evidence, hearing the parties' preliminary opinions on

medical/science and quantification issues, and forming and providing feedback on their own

preliminary views of the Debtor's aggregate liability as soon as reasonably practicable.  Such an

approach would encourage a prompt resolution.  At the same time, the Debtor's proposed

two-phased estimation process—including fact discovery, exchange of expert reports, estimation

hearings, and judicial determinations (aided by the involvement of the independent experts)—

would proceed contemporaneously, ensuring that these activities (necessary to any valid judicial

---

[18]     See, e.g., Conservation L. Found. v. Evans, 203 F. Supp. 2d 27, 30 (D.D.C. 2002) (appointing technical
advisor in environmental action relating to alleged overfishing); Hall v. Baxter Healthcare Corp., 947 F.
Supp. 1387, 1392 (D. Or. 1996) (appointing technical advisors in the fields of epidemiology,
immunology/toxicology, and rheumatology in consolidated silicon breast implant case); Renaud v. Martin
Marietta Corp., 749 F. Supp. 1545, 1548 (D. Colo. 1990), aff'd sub nom. Renaud v. Martin Marietta Corp.,
972 F.2d 304 (10th Cir. 1992) (appointing three technical advisors in toxic wastewater case to review
evidence, including competing expert reports, on causation); TechSearch, 286 F.3d at 1368-69 (appointing
technical advisor in patent dispute); Order No. 31, In re Silicone Gel Breast Implants Prods. Liab. Litig.
(No. CV92-P-10000-S, MDL 926) (N.D. Ala. May 31, 1996) (issuing order to show cause why science
panel of Rule 706 experts should not be established in breast implant MDL, and appointing selection panel
to recommend neutral experts); In re Joint E. & S. Districts Asbestos Litig., 830 F. Supp. 686, 693
(E.D.N.Y. 1993) (appointing Rule 706 experts to assist in quantifying number future claims expected to be
submitted to existing asbestos trust, noting "the courts cannot proceed toward a just and equitable result
without some reasonably firm data projecting the numbers and volume of claims at issue"); Gates v. United
States, 707 F.2d 1141, 1144 (10th Cir. 1983) (per curiam) (finding no abuse of discretion in trial court's
appointment of a panel of Rule 706 experts to assess causation in a case alleging injury due to a flu
vaccination).

NAI-1531559839

estimation under section 502(c)) are not delayed.[19]  A more detailed outline of the Debtor's

proposed integration of independent experts into the estimation process is attached hereto as

Exhibit 1.

> **C.    Discovery is Critical To Fairly Estimating the Debtor's Liability.**

43.    Estimation constitutes an organized, court-mandated process through

which the parties gather evidence pertinent to determining the credibility, merit, and value of the

claims at issue.  See, e.g., Garlock, 504 B.R. at 74 ("The parties have engaged in wide ranging

discovery in preparation for these estimation proceedings.  The discovery included not only the

normal discovery tools pursuant to the Federal Rules, but also multiple questionnaires directed at

the claimants (and their law firms).").  The discovery the Debtor will seek here is exceedingly

basic and consistent with the discovery sought—and routinely ordered—in analogous cases.  It is

critical to properly valuing the claims.  And it is neither intrusive nor burdensome.

44.    As an example, the Debtor will seek completion of some type of personal

injury questionnaires ("PIQs").  PIQs are commonly ordered in mass-tort chapter 11 cases, and

for good reason.[20]  As the court in Garlock described it, the data gathered from PIQ responses is

"the freshest and most reliable data available," whereas historic claims data can be "stale and not

accurate."  504 B.R. at 96.  The information requested in the PIQs will assist the Debtor and the

TCC in assessing whether the Debtor has any, or only partial liability, for such claims and

whether claims already have been fully or partially satisfied from other sources (or even

---

[19]    If the Court decides to appoint one or more experts under Rule 706, the Debtor suggests that the
Court-appointed experts prepare and submit expert reports at a point in time after the parties have issued
their respective expert reports and that the Court schedule mediation sessions shortly thereafter.  This will
focus the Court-appointed experts on particular areas where the parties have disagreement and provide the
parties with the benefit of independent expert's views in advance of mediation.

[20]    See, e.g., G-I Holdings, Dkt. 8078; W.R. Grace, Dkt. 930; Garlock, Dkts. 2337, 2338; Specialty Products,
Dkt. 1466; USG, Dkt. 61; Aldrich Pump, Dkt. 1093; DBMP, Dkt. 1461; Bestwall, Dkt. 1670.

NAI-1531559839

abandoned).  In <u>Garlock</u>, for example, the PIQ process determined that approximately 2,000 of

the over 5,800 "pending" mesothelioma claims were invalid or no longer being pursued.[21]  The

same occurred in <u>Bondex</u>, where the PIQ process "revealed that about 1,500 of the 3,500 claims

reflected as pending mesothelioma claims in the Bondex database in fact did not represent

pending claims."  <u>Id.</u>  Likewise, based on the PIQ responses to date in <u>Bestwall</u>, at least 1,582 of

the approximately 5,700 "pending" mesothelioma claimants in the Debtor's database responded

that they do not have pending claims.[22]

45.     There can be little doubt that the existing inventory of lawsuits against the

Debtor likewise includes a material number of claims that either will be abandoned or lack any

merit.  It warrants repeating here that plaintiffs' counsel amassed vast listings of individuals

diagnosed with ovarian cancer or mesothelioma to assert claims without even assessing whether

the claimants had been exposed to Johnson's Baby Powder in the first place.  <u>See</u> <u>infra</u>.

### III.     Estimation Will Assist in Formulating and Soliciting a Plan of Reorganization and, Absent Agreement, is Necessary for Confirmation.

46.     Estimation is also instrumental in plan formulation and solicitation,

including determining and advising claimants about the level of compensation to be paid on

different types of claims, if a plan is approved and confirmed.  There are many subtypes of

ovarian cancer and mesothelioma across claims already pending against the Debtor.  Info. Br.

at 50-51 n.193.  The different subtypes of ovarian cancer develop in different types of cells, look

---

[21]   <u>See</u> *Debtor's Motion for Order Pursuant to Bankruptcy Rule 2004 Directing Submission of Personally Injury Questionnaires by Pending Mesothelioma Claimants* at ¶ 20, <u>DBMP</u>, (Bankr. W.D.N.C. Aug. 19, 2020), Dkt. 417 ("claimants admitted that they did not have mesothelioma or exposure to a Garlock product; they had withdrawn or were no longer pursuing their claims; or their claims had already been resolved through dismissal or settlement") (citing declaration of Charles E. Bates PhD at Ex. C, ¶ 18) (attached as Prieto Decl., Ex. E).

[22]   <u>See</u> *Motion to Enforce PIQ Order with respect to Non-Compliant Claimants* at ¶ 13, <u>Bestwall</u>, (Bankr. W.D.N.C. Sept. 28, 2021), Dkt. 2065.

NAI-1531559839

different under a microscope, and involve mutations of different genes, and have different risk

factors and causes.[23]  This is also true for the different types of mesothelioma—pleural,

peritoneal, and pericardial—which have different risk factors that must be evaluated.  Info Br.

at 72 n.276.

47.    Plaintiff experts have previously acknowledged that the strength of any

theoretical correlation between use of Johnson's Baby Powder can vary considerably by disease

subtype.[24]  The compensation (if any) paid on individual claims should depend, in part, on

disease subtype and severity of disease.[25]  Estimation here will be instrumental in investigating,

evaluating, and establishing the level of compensation to be paid for these various disease types,

just as it has been in other cases.[26]

48.    As importantly, numerous courts have observed that estimation—in the

absence of a consensual plan—is necessary for plan confirmation.  See, e.g., W.R. Grace, 729

---

[23]    The largest prospective analysis of ovarian cancer risk factors ever conducted concluded that the "subtypes are indeed different diseases," with different risk factors that need to be evaluated.  See Wentzensen et al., *Ovarian Cancer Risk Factors by Histologic Subtype: An Analysis from the Ovarian Cancer Cohort Consortium*, 34 J. CLIN. ONCOLOGY 2888, 2889-2890, 2894 (2016) ("The heterogeneous associations of risk factors with ovarian cancer subtypes emphasize the importance of conducting etiologic studies by ovarian cancer subtypes.").

[24]    See, e.g., Depo. of Daniel L. Clarke-Peterson at 695:5-8, 703:25-704:6, In re Johnson & Johnson Talcum Products Marketing, Sales Practices, and Products Liability Litigation, MDL-No. 16-2738 (FLW) (LHG) (D.N.J. Aug. 27, 2021) (plaintiff's gynecologic oncologist expert testifying in MDL deposition that he would **not** opine that long-term talcum powder is a substantial contributing cause of a mucinous ovarian cancer) (excerpts attached as Prieto Decl., Ex. F).

[25]    See, e.g., L Dixon, G. McGovern, A. Coombe, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*, Rand Institute for Civil Justice (2010) at 7 n.8 ("Disease levels are classifications of different types of illnesses (e.g., mesothelioma, asbestosis, lung cancer).  Each disease level is assigned a monetary value, called the *scheduled value*, which a trust will offer if the claimant elects for an expedited (nonindividualized) claim review process.").

[26]    For example, in Garlock, the debtors' experts projected the claims and valued them under claims resolution procedures informed by the estimation process and its associated discovery.  This provided the basis for the debtor, Garlock ACC, and Garlock FCR to agree on preliminary Maximum Settlement Values and Medical Information Factors for disclosure purposes, which in turn informed claimants about what they were likely to recover from the trust.  See Garlock July 27, 2016 Tr. at 7, 15-25, 36-37, 46 (excerpts attached as Prieto Decl., Ex. G).

NAI-1531559839

F.3d 311, 330-31 (3d Cir. 2013) (the "fair and equitable" test requires court to "consider the amount being contributed to the trust in comparison to the liability exposure of the protected parties"); Bestwall Estimation Order ¶¶ 8-9 (stating that "some determination must be made about the Debtor's aggregate liability to current and future claimants for purposes of evaluating the Debtor's amended plan of reorganization" and that, without estimation, the Court "has no basis to assess the merits or fairness of either of the plans of reorganization proposed by the Debtor on the one hand and the ACC and the FCR on the other"); Garlock, 504 B.R. at 74 ("[E]stimation is necessary to consideration of that Plan or any subsequent modification to it or a competing Plan filed by another party."). It is just as necessary here.

**IV.    The Arguments Previewed by the TCC Against Estimation Are Not Well Founded.**

49.    None of the reasons offered by the TCC to date against estimation negate the need for estimation. The TCC notes that the Debtor's "proposed non-consensual one year estimation process [is] untethered to any plan." June 14, 2022 Hr'g Tr. at 131:3-5. But section 502(c) mandates estimation whether or not it is "consensual" or "tethered" to a proposed plan. Indeed, the estimations ordered in Aldrich, DBMP, Bestwall, USG, and In re UNR Industries, Inc., 45 B.R. 322 (N.D. Ill. 1984), were entered over the objection of claimant representatives. And those estimations (save Aldrich)—plus the estimations ordered in G.I. Holdings, W.R. Grace, and Specialty Products—were not "tethered" to a proposed plan.

50.    Nor is a one-year time frame and estimation-related discovery in any way "remarkable." June 14, 2022 Hr'g Tr. at 131:14 (TCC counsel). The duration proposed by the Debtor is short in comparison to other, analogous cases. Moreover, the Debtor's proposed mediation sessions integrated into the estimation process, as well as the incorporation of independent court-appointed experts, are designed to promote an early resolution. There is also nothing uncommon about the Debtor's expected estimation-related discovery; such discovery has

NAI-1531559839

been routinely sought and ordered in analogous cases.

       51.    The TCC's discussion of <u>Bestwall</u>, <u>DBMP</u>, and <u>Aldrich</u>, <u>see</u> Dkt. 2465 at

5-6; June 14, 2022 Hr'g Tr. at 150:22-151:4, does not support opposing estimation here.  There

is no "script" being followed by the Debtor's counsel in these cases.  Both <u>DBMP</u> and <u>Aldrich</u>

have been delayed by claimants' unstinting opposition to estimation and estimation-related

discovery—and this is notwithstanding the fact that the very same arguments were advanced by

the claimants and rejected by Judge Beyer in the <u>Bestwall</u> case.  Additionally, certain of the

claimant representatives have refused to negotiate.  In <u>DBMP</u>, rather than attempting to resolve

the case through settlement negotiations or mediation, the claimant representatives have focused

entirely on initiating adversary proceedings that seek an effective dismissal of the case.  In

<u>Aldrich</u>, the debtors reached a settlement with the future claimants' representative that would

result in funding of $545 million for a section 524(g) trust.  <u>See</u> *Joint Plan of Reorganization of*

*Aldrich Pump LLC and Murray Boiler LLC*, Aldrich Dkt. 831.  But, again, the official committee

of asbestos claimants has refused to negotiate, declining even to participate in

mediation.  <u>See</u> Aldrich Mar. 31, 2022 Hr'g Tr. 77:6-8 [Aldrich Dkt. 1112] (Committee

counsel:  "I think that, in particular, an imposed mediation would be counterproductive.  I would

ask that your Honor not order mediation at this time.") (excerpts attached as Prieto Decl., Ex. H).

       52.    The TCC's portrayal of <u>Bestwall</u> as a "cautionary tale" before ordering

estimation, Dkt. 2465 at ¶¶ 10-12, ignores that the delay in that case has been caused by ongoing

opposition to estimation and estimation-related discovery and claimants' blatant and unrepentant

disregard of Judge Beyer's discovery orders.  Judge Beyer herself has observed that Bestwall has

been "stonewalled in its efforts to get the PIQ discovery from the non-complaint claimants,"

Bestwall May 18, 2022 Hr'g Tr. at 23:22-24:1 (excerpts attached as Prieto Decl., Ex. I), and has

repeatedly expressed frustration at delays caused by Bestwall claimants and their

NAI-1531559839

representatives.[27]  The claimants' repeated defiance of bankruptcy court orders in <u>Bestwall</u>

cannot support or justify denial of estimation in this case.

53.    The TCC's contention that the Debtor's financial wherewithal, through its

rights under the Funding Agreement, eliminates the need for estimation is similarly misguided.

The central issue in this case is not the amount of the funds available to pay talc claims.  Rather,

it is Debtor's liability for and the amount of those claims.  The question estimation seeks to

address is not the Debtor's **<u>ability</u>** to fund a bankruptcy trust but, rather, the **<u>amount</u>** of the

Debtor's liability for talc claims.  The TCC cannot force the Debtor to pay more than a fair

estimate of its liability for those claims.  <u>See, e.g.</u>, <u>In re Breitburn Energy Partners LP</u>, 582 B.R.

321, 350 (Bankr. S.D.N.Y. 2018) ("An unwritten corollary to the absolute priority rule is that a

senior class cannot receive more than full compensation for its claims."); <u>infra</u> at Section V.A.

54.    The Aylstock firm's curious suggestion that it has "scour[ed] the briefing

in <u>DBMP</u>, <u>Bestwall</u>, <u>Garlock</u>, [and] these other cases" and is at a loss for the "purpose" of

estimation here, ignores the decisions in those cases.  June 14, 2022 Hr'g Tr. at 153:19-154:16.

The need for and purpose of estimation here, detailed above, tracks the need for and purpose of

estimation in those other cases.  In each case, the courts agreed and ordered estimation.[28]

55.    Nor do any of the bankruptcies cited by the TCC where estimation was not

---

[27]    <u>See, e.g.</u>, Bestwall Oct. 19, 2021 Hr'g Tr. at 71:10-72:1 ("And so any efforts/attempts to, you know, to
block [trust discovery] or to keep this case from proceeding forward along the lines of the CMO that we,
that I, you know, amended earlier today, the Court finds that to be very frustrating and it is the Court's
desire to get to the truth of the matter at the end of the day and, and, you know, we will do that in the
context of an estimation proceeding.") (excerpts attached as Prieto Decl., Ex. J); Bestwall March 3, 2022
Hr'g Tr. at 6:14-25 ("And those are your clients, Mr. Waldrep, and I believe that the tactic that you are
taking regarding this Exhibit A [to the PIQ] is unnecessary and it's dilatory and it stands to harm your
clients more than anybody else.") (excerpts attached as Prieto Decl., Ex. K).

[28]    Nor does section 524(g)'s 75% voting threshold undermine the need for estimation.  <u>Id.</u> at 154:13-15
(Aylstock counsel).  Aylstock seems to suggest that estimation here will simply lead to an "advisory
opinion," an argument that has been routinely rejected.  Moreover, as noted, estimation would be necessary
to confirm any TCC plan opposed by the Debtor.

NAI-1531559839

completed undercut the need for estimation here.  See Dkt. 2465 at ¶ 17; Dkt. 2488 at 3 n.2.

Both Mallinckrodt and Purdue Pharma entered bankruptcy having already reached a general

agreement with most claimants, an entirely different situation than presented here.[29]  In Imerys,

the parties agreed early in the case not to seek estimation, instead choosing to allow the TCC to

unilaterally set claim values and, as noted above, leave Old JJCI "holding the bag."  That is

because the Imerys debtor acknowledged from the outset that the value of the talc claims far

exceeded its resources.[30]

56.     In any event, as also noted, Imerys is not a case study in how to

successfully reorganize without estimation.  Imerys has been in chapter 11 for more than three

years with no confirmation of a plan in sight.[31]  Cyprus likewise cannot be described as a

successful reorganization without estimation.  Both the talc claimants committee and the future

claimants representative have expressed concern with the existing plan, and the debtor has not

even filed a motion seeking approval of a disclosure statement.  That case is best described as

"stuck;" it is not the model LTL seeks to emulate.

---

[29]    See J. Hoffman & M. Williams Walsh, *Purdue Pharma, Maker of Oxycontin, Files for Bankruptcy*, N.Y.
Times, Sept. 15, 2019, https://www.nytimes.com/2019/09/15/health/purdue-pharma-bankruptcy-opioids-
settlement.html (noting "tentative settlement agreement reached" prior to the bankruptcy would result in a
"proposed resolution of most" of the 2,600 federal and state lawsuits filed against Purdue Pharma);
*Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Mallinckrodt plc and Its Debtor
Affiliates Under Chapter 11 of the Bankruptcy Code*, In re Mallinckrodt plc, No. 20-12522 [Dkt. 2917] at
49-51 (Bankr. D. Del. Jun. 18, 2021) (noting debtor's pre-petition entry into "Opioid Settlement" with
plaintiff committee and certain State Attorneys General where, among other things, "All Opioid Claims
will be assumed by" an opioid trust).

[30]    In fact, the initial payment percentages under the previously proposed plan ranged from just .3% to 6.24%,
depending on disease category.  See *Disclosure Statement for Ninth Amended Joint Chapter 11 Plan of
Reorganization of Imerys Talc America, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy
Code* at 4, Imerys (Bankr. D. Del. Jan. 28, 2021), Dkt. 2866.

[31]    The original Imerys plan essentially fell apart because the ovarian cancer claimants and mesothelioma
claimants could not agree on the relative value of their claims.  An early estimation hearing on the value of
the respective claims could have shortened those chapter 11 cases and avoided three years of wasted time
and the incurrence of nearly $150 million in professional fees without a successful outcome in sight.
See May 2022 Monthly Operating Report, In re Imerys Talc America, Inc., Dkt. 4877 (Bankr. D. Del. June
21, 2022).

-26-

57.     In both <u>Diocese of Camden</u> and <u>BSA</u>, detailed proof of claim forms were approved by the court and submitted by claimants pursuant to a bar date order. This provided the parties with the information necessary to estimate the claims for purposes of mediation and plan confirmation.[32] <u>PG&E</u> supports the Debtor's request for estimation. There, the court **ordered** estimation and only terminated the proceedings after the parties reached agreement on a plan. <u>See</u> *Order Terminating Estimation Proceedings* at 4:1-2, <u>In re PG&E Corporation</u>, No. 19-05257-JD (N.D. Cal. June 9, 2020) [Dkt. 7585] (terminating estimation after finding the parties' "settlement liquidated the claims withdrawn for estimation").

58.     Any suggestion that the estimation sought by the Debtor—an aggregate estimation of all talc claims—is unlawful is groundless. The Debtor does not seek estimation by this Court "for purposes of distribution." Nor will estimation establish the liability amount for any individual claim. No individual claim is being adjudicated. All of that will be addressed in the future under the trust documents, including the trust distribution procedures.

## V. The TCC's Alternatives Would Neither Advance This Case Nor Eliminate the Need for Estimation.

59.     The TCC has suggested that the Court should decline to order estimation because "alternatives" exist. <u>See</u> *Statement of the Official Committee of Talc Claims in Support of the Court's Modifying Upon Revisiting the PI Order* ("<u>TCC PI Submission</u>"), Dkt. 2566 (June 22, 2022) at 4 n.2. The "alternatives" advanced by the TCC to date—(1) terminating exclusivity and (2) lifting the injunction entirely to allow 90 cases to proceed to trial—will neither advance this case towards a consensual resolution nor eliminate the need for estimation.

---

[32]     <u>In re The Diocese of Camden, New Jersey</u>, No. 20-21257 (JNP) (Bankr. D.N.J. Feb. 11, 2021), Dkt. 409 (bar date order approving detailed proof of claim form) & Dkt. 1724 (disclosure statement describing debtors' expert process for valuing claims); <u>In re Boy Scouts of America and Delaware BSA, LLC</u>, No. 20-10343 (LSS) (Bankr. D. Del. May 26, 2020), Dkt. 695 (bar date order approving detailed proof of claim form) & Dkt. 6445 (disclosure statement describing debtors' experts process for valuing claims).

NAI-1531559839

**A.     Permitting a TCC Plan of Reorganization Would Only Distract the Parties and Waste Time and Resources.**

60.     The TCC has suggested that if the Court terminates exclusivity it can "have a plan solicited, voted on and up for confirmation" by the end of this year.  June 14, 2022 Hr'g Tr. at 151:20-152:2.  It provides no detail on the type of plan it would propose.  The TCC claims, without support, that estimation would not be necessary to confirm their plan.  See TCC PI Submission at ¶ 13 ("The TCC has further indicated its readiness, upon the termination of exclusivity, to present a plan of reorganization that will garner overwhelming support, require no estimation whatsoever and will provide a pathway to exit the bankruptcy this calendar year.").

61.     A confirmable plan, however, depends on more than the ability to garner the requisite votes.  As detailed above, the Debtor's aggregate liability for talc claims would need to be estimated or agreed to in order for a plan to have any prospect of success.  See, e.g., Bestwall Estimation Order at ¶¶ 8, 9 (stating that "some determination must be made about the Debtor's aggregate liability to current and future claimants for purposes of evaluating the Debtor's amended plan of reorganization" and that without estimation, "[t]he Court similarly has no basis to assess the merits or fairness of either of the plans of reorganization proposed by the Debtor on the one hand and the ACC and the FCR on the other").

62.     Among other things, the claimants would have to prove that they are not receiving more than the value of their claims.  As Collier states, "[t]he second major component of the 'fair and equitable' requirement is that no creditor or interest holder be paid a 'premium' over the allowed amount of its claim.  Once the participant receives or retains property equal to its claim, it may receive no more.  The reason for this rule is obvious, and goes back to the basic understanding between debt and equity." 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][ii] (16th

NAI-1531559839

2022) (footnotes omitted).[33]  And if the estimation demonstrated that the plan failed the "fair and equitable" test, the parties would have wasted tens of millions of dollars and months (or more) of time, only to have to start all over again.

63.    The TCC's proposal to seek a cramdown of its plan by the end of this year is unrealistic.  Its two-year odyssey seeking the same result in the Imerys case, only to cause $150 million in wasted fees and massive delay, demonstrates as much.  The TCC's desire to cram down a plan over the Debtor's objection in the next six months appears to be part of a strategy to pay talc claimants more than they are owed without any meaningful review of their claims.  The Court, however, cannot determine the amount that may be owed to talc claimants without allowing for appropriate discovery and hearing evidence developed from that discovery.[34]

64.    It is simply premature for the TCC to incur the significant costs of a plan solicitation process for a proposed cramdown plan—costs that will likely be incurred a second time after the parties reach an agreement on a consensual plan.  These costs would include preparation of a TCC-proposed plan of reorganization and related disclosure statement, as well as solicitation procedures and related noticing program.  They would also include the costs of providing notice of the hearing on approval of the disclosure statement and the hearing on confirmation of the plan, including by publication, to claimants, and the parties' attendance at

---

[33]    See also Breitburn Energy Partners, 582 B.R. at 350; In re Idearc Inc., 423 B.R. 138, 170-71 (Bankr. N.D. Tex. 2009) ("The corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims.").

[34]    See G-I Holdings, 2006 WL 2403531, at *23 n.38 (Bankr. D.N.J. Aug. 12, 2006) ("I've already told you that if the debtor is going to proceed with an estimation theory, **they're going to be allowed to get evidence that they feel is necessary to make their claim in this case**.  I'm not going to cut them off at the pass, which is what you want to do.") (quoting Sept. 19, 2005 hearing in USG) (emphasis added); Bestwall March 4, 2021 Hr'g Tr. at 13 [Bestwall Dkt. 1647] (discovery sought by the debtor was relevant to "the determination of whether pre-petition settlements of mesothelioma claims provide a reliable basis for estimating the debtor's asbestos liability," as well as the Debtor expert's "estimation of the debtor's liability") (excerpts attached as Prieto Decl., Ex. L).

NAI-1531559839

multiple court hearings. The TCC's efforts will likely be accompanied by substantial motion

practice. Moreover, it would require significant time to complete the solicitation and plan

process associated with a TCC-proposed plan. There is no basis to terminate the Debtor's

exclusive periods now nor any reason to move forward with a cramdown plan now that would

require a ruling on estimation. See Bestwall, Jan. 20, 2022 Hr'g Tr. 13:15-14:13 [Dkt. 2371]

(adjourning hearing on asbestos claimants' committee's proposed cramdown plan and related

disclosure statement until after conclusion of estimation hearing) (excerpts attached as Prieto

Decl., Ex. M).

**B.      Lifting the Stay Would Completely Undermine the Goal of this Case.**

65.      The TCC's second proposed "alternative," lifting the stay, in whole or

significant part, to unleash multi-case, multi-jurisdictional litigation for which the Debtor

ultimately is responsible, fares even more poorly. Initially, as discussed in the *Debtor's*

*Response to Statements and Objections Regarding Continuance of the Preliminary Injunction*

("Debtor PI Submission") [Dkt. 2631], because the TCC chose to appeal the Court's extension of

the stay and preliminary injunction, rather than allowing the Court to revisit that order as it

desired, the TCC stripped the Court of jurisdiction to do so. See id. at ¶¶ 53-59.

66.      In any case, lifting the stay will cause massive dislocation in this case. As

Judge Whitley and this Court have already recognized, lifting the stay in its entirety would

effectively act as a death knell for the case. See Nov. 10, 2021 Hr'g Tr. at 142:15-17 ("We're

not going to have a bankruptcy case of any sort if everybody can go sue J&J and assert the same

claims that they would be asserting there."); Injunction Opinion [Dkt. 1573] at 17 ("As Debtor

points out, and as expressly found by Judge Whitley after the initial hearing, if the stay is not

extended to the Protected Parties, it is difficult to envision how a successful reorganization can

be achieved in this case.").[35]

67.     Lifting the stay to permit 90 plaintiff-selected cases to proceed to trial would have essentially the same result and is, in addition, unworkable.  Approximately 40 cases were tried over the five-year period prior to the Petition Date.  Info Br. at 123 (42 cases had gone to trial in the previous five years).  At that pace, it would take some ten years to try the TCC's proposed cases (exclusive of appeal, which are common in these cases).  This is hardly a viable alternative to estimation to avoid undue delay.  The Debtor is not aware of any bankruptcy court that adopted or even seriously considered such a proposal.

68.     The typical reason to permit, outside of bankruptcy, a "bellwether" trial— the results of which inform the parties as to the aggregate mass-tort liability—is absent here. Over the last ten years, 13 ovarian cancer cases were tried to verdict.  Plaintiffs' counsel selected the individual cases that would proceed to trial and chose the state court jurisdiction in which the cases would be tried (most if not all of which are very well known to be challenging venues for defendants).  Yet plaintiffs sustained a judgment for monetary damages in only **one** of those ovarian cancer cases (Ingham).  In fact, Old JJCI and J&J obtained unanimous defense verdicts in all four ovarian cases tried in 2021 (including a 3-plaintiff trial), trials which occurred **after** the MDL court's Daubert opinion.

69.     Likewise, 33 mesothelioma cases alleging exposure to Johnson's Baby Powder have already been tried to verdict.  The facts of the cases ranged widely.  Some of the plaintiffs alleged that they were exposed to traditional sources of asbestos or other brands of

---

[35]     The Diocese of Rochester v. AB 100 Doe (In re The Diocese of Rochester), Case No. 19-20905-PRW, Adv. No. 22-02075-PRW (Bankr. W.D.N.Y. May 23, 2022), cited in the TCC's June 10, 2022, filing, does not support lifting the injunction here.  The court in Diocese of Rochester lifted the stay only after nearly three years of unsuccessful negotiations and only after the Diocese threatened to file a cramdown plan. Moreover, unlike here, there was no demonstrated basis in Diocese of Rochester to extend the automatic stay under 11 U.S.C. § 362(a).

NAI-1531559839

talcum powder.  Some alleged that they were exposed only to Johnson's Baby Powder.  The cases were tried before juries in thirteen separate cities across ten states.  The results of the trials run the gamut from defense verdicts to plaintiff verdicts, with compensatory damages ranging from $2.45 to $40 million for a single plaintiff.  While some juries awarded substantial punitive damages, others awarded none at all.[36]

70.    The results of new plaintiff-selected, non-representative cases will not change the parties' respective views on the Debtor's **aggregate** liability across all claims. Indeed, the TCC earlier acknowledged that "trying just a few cases … does little to help progress in this Case."  Dkt. 2465 at ¶ 16.

## Conclusion

For the foregoing reasons, the Court should order estimation under 11 U.S.C. § 502(c).

---

[36]    In addition, although the parties disagree on both the motivations and significance of settlements and, importantly, whether the settlements should be treated as proxies for the Debtor's liability, it bears noting that hundreds of mesothelioma cases were settled with numerous plaintiffs' firms across a variety of states and for a range of values.  Additional trials will not add any material information to this body of data.

NAI-1531559839

Dated: July 15, 2022

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*

Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (*pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**

Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

NAI-1531559839