**<u>Exhibit A</u>**

# ABA/BNA Lawyers' Manual on Professional Conduct, Current Reports™

February 18, 1998

- ## Witness Preparation Memos Raise Questions About Ethical Limits

  **Trial Conduct**

  **Ethics of Witness Preparation**

  Allegations that former White House intern Monica Lewinsky was urged to commit perjury about her relationship with President Clinton and that she delivered a "talking points" document encouraging former co-worker Linda Tripp to modify her testimony have riveted public attention on the provocative issue of unethical and possibly illegal witness coaching.

  But the issue must seem like deja vu to lawyers involved in asbestos litigation in Texas and an employment discrimination lawsuit brought in Illinois by the Equal Employment Opportunity Commission. In those cases, charges have been raised that witness preparation documents amount to "scripts" that tell witnesses what to say.

  Although lawyers routinely cloister clients or friendly witnesses to hone their testimony for deposition or trial, evidence of improper coaching is rare since most witness preparation takes place behind closed doors without any paper trail. The arguments over the propriety of the asbestos and EEOC documents illustrate the difficulty of determining the line between legitimate preparation and improper coaching.

During a deposition last August in Nueces County, Texas, the plaintiff in an asbestos case turned over to defense counsel a document called "Preparing for Your Deposition" and marked "Attorney Work Product." The lawyer accompanying the plaintiff that day was inexperienced and inadvertently produced the document without realizing its privileged nature, according to Frederick Baron, a shareholder of the Dallas law firm Baron & Budd, which represents that plaintiff and thousands of other claimants in asbestos cases.

The 20-page document provides detailed information about asbestos products and packaging; instructs witnesses how to deal with questions and issues at the deposition; gives a list of health symptoms that could enhance damages; and provides general information and advice about being deposed. The document does not mention a witness's obligation to tell the truth.

The controversy centers mostly on the parts of the document that direct prospective deponents in unqualified terms to make specific statements on key issues such as product identification and the presence or absence of warnings on asbestos packaging.

**Controversy Erupts**

News of the witness-preparation document spread quickly, sparking a surge of ancillary litigation. Asbestos defendants and their lawyers attacked it as a script designed to elicit false



testimony—especially on the crucial questions of product identification and warnings—while Baron & Budd tried to distance itself from the document without conceding any impropriety. The sprawling controversy, which extends through courts in several states, shows no sign of abating.

With mixed success so far, lawyers for various asbestos defendants have been seeking discovery into Baron & Budd's witness preparation practices, a stay of pending asbestos cases, and disqualification of the Baron & Budd firm. Among the numerous developments:

> • In an unpublished opinion, a Texas appeals court in Austin ruled that the document was privileged and that Baron & Budd clients who received the document in lawsuits in Travis County should not have been ordered to produce it (*In re Brown*, Texas CtApp 3dDist, No. 03-97-00609-CV, 1/29/98).

According to the court, production of the memo in a lawsuit in another county did not amount to a waiver of the privilege by these clients, and the crime-fraud exception did not apply because no evidence showed awareness by clients that the memo was part of any crime or fraud.

> • A Butler County, Ohio, trial court imposed sanctions after Baron & Budd persisted in refusing to answer questions during discovery that the court had authorized for inquiry into the firm's methods of preparing witnesses (*In re Asbestos Litigation (Abner v. A-Best Products Co.)*, Ohio CtCommPls, No. CV96-01-0180, 12/23/97).

"The circumstances give rise to a reasonable suspicion of implanted or supplied recollection of purported facts," the court declared, so that the inquiry into witness preparation practices was warranted despite the law firm's claim of privilege. The court framed a four-paragraph jury instruction on witness coaching to be given in any asbestos-related personal injury action in that county if Baron & Budd prevented court-ordered discovery on the subject.

> • A defense motion to disqualify Baron & Budd from representing clients in asbestos-related cases in Dallas was denied in a recent bench ruling (*English v. Owens-Corning Fiberglas Corp.*, Texas DistCt 14thDist, No. 96-06308-A, 2/9/98).

However, Judge John McClellan Marshall "excoriated" Baron & Budd and said he intended to refer the matter to a grand jury for criminal investigation, according to William J. Skepnek, of Skepnek & Maddox in Lawrence, Kan. Skepnek represents an asbestos manufacturer who is a defendant in lawsuits brought by Baron & Budd clients.

Frederick Baron provided BNA with a copy of a letter dated Jan. 7 from the Texas State Bar's Office of the Chief Disciplinary Counsel, stating that it had dismissed a grievance against him "since it does not state, on its face, a violation of a disciplinary rule." The grievance concerned the "Preparing for Your Deposition" document, Baron said.

> ***"I don't remember ever seeing a script like this in my lifetime that went so far in attempting to coach or script a witness."***
>
> ***Defense Expert Eugene A. Cook***

For its part, Baron & Budd filed motions to disqualify defense lawyers for allegedly failing to observe procedures that govern the conduct of attorneys when they receive inadvertently disclosed documents that appear to contain an opponent's confidential attorney-client communications and attorney work product. No hearings have been scheduled on those motions,

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Skepnek told BNA.

**'A Cancer in the Legal System.'**

At an October hearing in one of the Baron & Budd cases in Bexar County, Texas, former Texas Supreme Court Justice Eugene A. Cook, who is now with Bracewell & Patterson in Houston, testified as an expert for one of the asbestos defendants that Baron & Budd's witness-preparation document was "a cancer in the legal system" that violated Texas ethics rules and fell within the crime-fraud exception to any possible privilege.

Cook testified that the document violated the rules that prohibit a lawyer from engaging in conduct involving dishonesty or fraud, that direct a lawyer not to assist a witness to testify falsely, and that command a lawyer not to assist the client in conduct the lawyer knows is fraudulent.

"This document tells the witness how to testify" without once instructing the witness to tell the truth, Cook stated. "I don't remember ever seeing a script like this in my lifetime that went so far in attempting to coach or script a witness."

Lester Brickman, a professor at Cardozo School of Law in New York City, stated in an affidavit submitted in the Texas litigation that parts of the document violated the state's ethics rules and suborned perjury.

"The overall effect of the Baron and Budd document," Brickman stated in the affidavit, "is to script witness testimony, that is, to substitute a prepared script for the workers' actual testimony … on the basis of prior experience as to what testimony maximizes both the number of defendants which can be held liable and settlement values." Brickman provided his affidavit as an expert for an asbestos defendant.

Brickman told BNA that the document exemplifies "a very troubling, ongoing litigation process whereby it has become routine to prepare witnesses by going well beyond ethical limits, if not legal limits." He said he believes the same excesses occur in oral preparation, and by counsel for plaintiffs and defendants alike. The Baron & Budd document, he added, is "the tip of the iceberg."

Although Stephen Gillers, a New York University law professor, found much of the Baron & Budd document unremarkable, he focused on portions that state what the witness "must" prove, what the witness should "remember to say," or what it is "important to maintain."

Those parts, Gillers told BNA, "could be read, whether or not intended, by a witness unfamiliar with the legal process as an instruction to say certain things, true or not." Baron & Budd was "sloppy," he suggested, in not recognizing how a legally unsophisticated witness could misunderstand these instructions as a direction or command to give certain testimony whether or not the witness had the particular recollection.

The Baron & Budd document illustrates what a lawyer cannot properly do by way of witness preparation, according to Richard Wydick, a professor at the University of California School of Law–Davis. Wydick is the author of a lengthy article on witness preparation. *The Ethics of Witness Coaching*, 17 Cardozo L. Rev. 1 (1995).

"The [Baron & Budd] memo demonstrates a callous disregard of the information in the witness's mind at the beginning of the process," Wydick said in an interview with BNA. Rather than trying to extract



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

what is in the witness's head, it tries to inform the witness of what the witness needs to remember to win the case, he asserted. Witness preparation shouldn't "jam facts" into the witness without any concern for what the witness actually recalls, Wydick said.

**Aggressive but Not Unethical**

Baron denies any impropriety in his firm's preparation of its clients. "The document was very aggressive," he told BNA, but it "didn't step over the line when taken in context."

> *"The document was very aggressive … [but it] didn't step over the line when taken in context."*
>
> *Plaintiffs' Attorney Frederick Baron*

Baron added that one of the firm's 96 paralegals prepared the document without the knowledge or approval of Baron & Budd lawyers. That paralegal said she distributed the document along with a Defense Research Institute article that emphasizes the duty to tell the truth, Baron noted. (The DRI article is Fitzgerald, *Checklist for the Witness*, 34 For the Defense, No. 7, p. 18 (July 1992).)

The law firm's document does not reflect the way Baron & Budd typically prepares witnesses for depositions, Baron stated. In the normal process, the Baron & Budd lawyer orally tells clients "what their case is about, and what's important and what's not," and that the clients must prove whose products they used and that they were exposed to dust.

Then, Baron continued, the lawyer tries to refresh the client's recollection, largely by reviewing information that has already been produced to the defense. But well before this preparation and before any explanation of the law governing the case, the client is thoroughly interviewed in a neutral way about the facts of the case, Baron said.

In an interview with BNA, Professor William Hodes of the Indiana University School of Law–Indianapolis expressed the opinion that use of the "Preparing for Your Deposition" document did not violate legal ethics rules, and that the crime-fraud exception did not strip the document of its privileged character. Hodes, co-author of the treatise *The Law of Lawyering*, was retained by the Baron & Budd law firm as a consultant.

Hodes pointed out that the crime-fraud exception does not apply unless the client has consulted the lawyer for the purpose of furthering a crime or fraud (regardless of whether the lawyer is aware of this illicit purpose). And, Hodes said, a lawyer is not guilty of unethical conduct unless the lawyer knows that false testimony has been presented, or knowingly assists in its fabrication.

Although lawyers may not hide behind the sophistic evasion that they can never really "know" when their clients are up to no good, there are simply no indicia of such misconduct in the asbestos cases, Hodes told BNA. Unless there is inconsistency with independently established facts, or a radical departure from a client's unequivocal prior statements, a lawyer is obligated to give the client the benefit of the doubt, he said.

Hodes noted he had been told that Baron & Budd orally admonishes clients to tell the truth and that an article attached to the "Preparing for Your Deposition" document emphasized the duty to tell the truth.

He acknowledged that a few parts of the preparation document, when considered in isolation and not



in the context of the whole document and the entire witness preparation process, might be read as suggesting that witnesses should testify a certain way regardless of their actual recollections. But those same segments could just as easily be understood, he said, as the kind of probing and prompting of a client's memory that is not only not improper, but a mandatory part of competent trial preparation in a complex case.

Lawyers must be given particularly wide leeway, he said, when witnesses have the task of recollecting what they observed in the distant past, and especially when the recollections will involve judgments about such points as distance, time, and quantity.

According to Hodes, lawyers are justified in explaining to non-lawyer clients what would constitute favorable testimony, because otherwise they might "suppress" such testimony in the mistaken belief that it would be harmful.

He cited a famous example given by Hofstra University Law School Professor Monroe Freedman in his 1990 book, *Understanding Lawyers' Ethics*. A workers' compensation claimant who injured his back at work after tripping might omit information about tripping, even when speaking to his own lawyer, for fear that it would constitute evidence of carelessness or contributory negligence. But in some jurisdictions, an injury must be accompanied by an accident (such as tripping) in order to be compensable, and lawyers must be able to so inform clients without being charged with prompting perjury, Hodes stated.

It is true, Hodes added, that some quick-witted and unscrupulous clients might seize on this information and falsely say they tripped, but a lawyer cannot therefore brand all clients as suspect and not to be trusted with full disclosure of what the law entails merely to guard against the possibility that some clients might abuse the lawyer-client relationship, Hodes said.

Hodes gave a second example of his own: in many tort cases—not just those involving toxic torts—the loss of sexual desire or function is a perfectly legitimate element of damages, if it was caused by the defendant's action. But how many plaintiffs, if not directly asked or "prompted" by their lawyers, would think to raise this embarrassing point? Hodes asked.

**'Dear Class Member.'**

The other witness preparation dispute that has flared up involves a letter distributed by the EEOC in its massive sex discrimination suit against Mitsubishi Motor Manufacturing of America Inc.

> ***The EEOC letter "appears to suggest that the recipients should tailor their testimony in order to obtain a monetary reward."***
>
> ***Illinois Law Professor Ronald D. Rotunda***

The Sept. 24 letter, addressed "Dear Class Member," notified 60 women about Mitsubishi's intention to take their deposition. After informing the recipients that they might be entitled to money damages and other relief, the letter set out a list of "memory joggers" and asked the women to "try to remember whether or not" they had experienced or observed certain activities. The letter did not mention a witness's obligation to tell the truth.

In a motion for sanctions, Mitsubishi claimed the letter would taint the testimony of the women who received it. University of Illinois law professor Ronald D. Rotunda provided an affidavit in support of



Mitsubishi's motion.

Rotunda wrote that among other problems, the letter "appears to suggest that the recipients should tailor their testimony in order to obtain a monetary reward." The letter, he said, makes clear that it would be very profitable for the women to recall "over 25 buzz words and phrases" in the list of "memory joggers" without informing the recipients that they should tell the truth or that the depositions would be under oath. According to Rotunda, the EEOC thus created the risk, exacerbated by the economic self-interest of the witnesses, that the letter and its "buzz words" would induce them to "remember" words or conduct that did not occur.

**'Suggestive,' but Not Objectionable**

A federal judge denied Mitsubishi's request for sanctions (*Equal Employment Opportunity Commission v. Mitsubishi Motor Manufacturing of America Inc.*, DC CIll, No. 96-1192, 10/23/97).

"While certainly suggestive, the letter does not go beyond the bounds of the privilege that attends attorney-client communications related to deposition preparations," Judge Joe Billy McDade said. "In fact, the 'memory joggers' that Mitsubishi finds so objectionable are probably, in most cases, no more suggestive than Mitsubishi's own communications with its people before a deposition."

The judge characterized as "somewhat disingenuous" the contention that the EEOC's letter would taint the truth-finding process. "The 'truth' told at depositions … is rarely the product of an unprepared witness," the court observed. The judge elaborated:

Lawyers routinely prepare their clients for depositions by focusing the client on the particular facts of the case that have legal significance. Although lawyers cannot ethically tell or allow their clients to tell a lie, suggesting subject matters to focus on in telling their story is surely what every competent lawyer, including the Mitsubishi lawyers, do [sic] to prepare their clients for a deposition.

In an interview with BNA, Rotunda reiterated his opinion that the letter, viewed as a whole, was improper.

Some of the women who received the letter interpreted it as an attempt to put words in their mouth, he noted. While it is proper for a lawyer to inform a client of requested relief, and what questions might be asked at the deposition, a lawyer should not imply that the client will get more money by saying certain words, Rotunda said.

"I don't think everyone does it," Rotunda said; but even if other lawyers engage in the same practice, "two wrongs don't make a right." A lawyer should always inform a client that the deposition will be under oath and urge the client to tell the truth, he added.

EEOC attorney John C. Hendrickson said he sees the letter as an entirely proper and even desirable form of witness preparation. Hendrickson is the EEOC's regional attorney in Chicago who is handling the Mitsubishi sexual harassment case.

By probing their clients' memory, lawyers can help them recall more about what happened, he commented. Moreover, lawyers need to educate clients about the nature of their claim, he said, pointing out that some people think sexual harassment is limited to rape or touching. Although a written document may not be standard practice, it is an efficient method of preparing for depositions in a large case, and it makes sense to put things in writing, Hendrickson said.



The absence in the letter of an explicit instruction to tell the truth means nothing, in Hendrickson's view. "We assumed that was an absolute given," and were concerned instead about the women being too intimidated by their working environment to tell the truth, he said. Besides, he added, clients are reminded during oral preparation before their deposition to tell the truth.

> ***"[S]uggesting subject matters [for clients] to focus on in telling their story is surely what every competent lawyer … [does] to prepare their clients for a deposition."***
>
> ***Federal District Judge Joe B. McDade***

Lester Brickman told BNA that he agrees with Rotunda that the EEOC "Dear Class Member" letter goes too far in instructing witnesses what to say. However, other ethics authorities contacted by BNA, including William Hodes, Richard Wydick, and Stephen Gillers, said they see nothing improper about the letter.

"On a continuum from mild preparation, on the one hand, to turning the witness into a dummy and the lawyer into a ventriloquist on the other, the EEOC letter is at the mild end," Gillers said. It appropriately "alerts the witness to the particular subjects she can expect to arise at the deposition and prepares her to think about them in advance so that her memory is current," he commented.

Wydick's view is that the EEOC letter is an example of what a lawyer properly can do. By asking the witness to "try to remember whether or not" she recalls information, the letter shows concern for what the witness recalls, he said.

**Proper to Prepare Witnesses**

Extensive witness preparation is an expected and even essential part of trial preparation. Section 176(1) of the *Restatement of the Law Governing Lawyers* (Tent. Draft No. 8, 1997) expressly permits interviews with a witness for the purpose of preparing testimony, and comment b to Section 176 lists a wide range of permissible witness preparation activities.

Some courts have spoken disapprovingly in general terms about the practice of attempting to influence, supplement, or modify a witness's testimony during preparation. E.g., *Geders v. U.S.*, 425 U.S. 80, 90 n. 3 (US SupCt 1976) ("[a]n attorney must respect the important ethical distinction between discussing testimony and seeking improperly to influence it"); *Hall v. Clifton Precision*, 150 F.R.D. 525 (DC EPa 1993); *State v. Blakeney*, 408 A.2d 636 (*Vt SupCt 1979*).

But lawyers have rarely if ever been disciplined for merely attempting to influence or modify a witness's testimony—which is hardly surprising given that the entire process of witness preparation aims to influence testimony to some extent.

Reported disciplinary cases on attempts to influence testimony involve subornation of perjury or similar flagrant misconduct in which the lawyer overtly tries to induce clients or witnesses to give testimony that the lawyer knows is false or knows that the witness believes is false. E.g., *In re Attorney Discipline Matter*, 98 F.3d 1082 (CA 8 1996); *In re Mitchell*, 262 S.E.2d 89 (Ga SupCt 1979); *Goodsell v. Mississippi Bar*, 667 So.2d 7 (*Miss SupCt 1996*); *Harrison v. Mississippi Bar*, 637 So.2d 204 (*Miss SupCt 1994*); *In re Oberhellmann*, 873 S.W.2d 851 (Mo SupCt 1994); *In re Edson*, 530 A.2d 1246 (NJ SupCt 1987); *In re Stroh*, 644 P.2d 1161 (Wash SupCt 1982).

**Relevant Ethics Rules**



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Several of the ABA Model Rules of Professional Conduct potentially bear on a lawyer's ethical responsibility when preparing witnesses. A lawyer may not:

- counsel or assist a client in conduct that the lawyer knows is criminal or fraudulent (Rule 1.2(d));

- offer evidence that the lawyer knows to be false (Rule 3.3(a)(4));

- commit a criminal act that reflects adversely on the lawyer's fitness to practice (Rule 8.4(b));

- engage in conduct involving dishonesty, fraud, deceit, or misrepresentation (Rule 8.4(c)); or

- engage in conduct prejudicial to the administration of justice (Rule 8.4(d)).

Most directly on point is Rule 3.4(b), which states that a lawyer must not "counsel or assist a witness to testify falsely." Although Rule 3.4(b) does not expressly apply only when the lawyer *knows* that he is counseling or assisting a witness to testify falsely, arguably it can be interpreted to include a knowledge requirement. See, e.g., *In re Shannon*, 876 P.2d 548, modified on other grounds, 890 P.2d 602 (Ariz SupCt 1994) (lawyer did not know that revised answers to interrogatories were untrue so as to permit finding that he violated Rule 3.4(b)); see also *Restatement of the Law Governing Lawyers* § 180(1) (Tent. Draft No. 8, 1997) (lawyer may not "knowingly counsel or assist a witness to testify falsely" as to material issue of fact).

The ethical propriety of witness preparation, it has been said, "must turn on the question whether the lawyer knows of the falsity of the resulting testimony." Applegate, *Witness Preparation*, 68 Tex. L. Rev. 277, 343 (1989). Under the Model Rules' Terminology section, "knowledge" means "actual knowledge," but such knowledge may be inferred from circumstances.

The Rules' definition of knowledge suggests that a lawyer may be found to have the requisite state of mind under Rule 3.4(b) when the evidence shows the lawyer actually knew or *must have known* that his witness preparation would assist a witness in testifying falsely. See Wydick, *The Ethics of Witness Coaching*, 17 Cardozo L. Rev. 1, 18 (1995) (requisite knowledge exists when lawyer knows that witness is "practically certain" to interpret lawyer's conduct as inducement to testify falsely).

But see Note, *Professional Conduct and the Preparation of Witnesses for Trial: Defining the Acceptable Limitations of "Coaching,"* 1 Geo. J. Legal Ethics 389, 404 n. 71 (1987) (likely that attorney may be disciplined under Rule 3.4(b) for constructive knowledge or what attorney "should have known").

The Model Code's *DR 7-102(A)(6)* is worded differently, stating that a lawyer must not participate in creating evidence when the lawyer knows or "it is obvious" that the evidence is false. See *Florida Bar v. Lopez*, 406 So.2d 1100 (Fla SupCt 1981) (lawyer disciplined for urging testimony that referee found lawyer "knew, or should have known," was false).

**Did Lawyers Go Too Far?**

As a general rule, lawyers are permitted to tell witnesses about the applicable law and necessary proof. *Restatement of the Law Governing Lawyers* § 176, comment b; *State v. McCormick*, 259 S.E.2d 880 (NC SupCt 1979); Nassau County (N.Y.) Ethics Opinion 94-6 (1994) (lawyer may inform client about law before getting client's version of facts as long as lawyer in good faith does not believe that he or she is participating in creation of false evidence).



Hence, it seems unlikely that the portions of the Baron & Budd document that instruct the witness about proof requirements could furnish a basis for professional discipline under Rule 3.4(b).

> **Model Rule 3.4(b)** forbids lawyers to "counsel or assist a witness to testify falsely."

However, parts of the document that seem to direct witnesses to use particular words and phrases may be more problematic. The question remains where the boundary of making suggestions ends and the boundary of commanding testimony begins.

According to comment b to Section 176 of the Restatement, "A lawyer may suggest choice of words that might be employed to make the witness's meaning clear." The only ethics opinion directly on point, which applied the predecessor Model Code provision, found it permissible for the particular wording of testimony to originate with the lawyer rather than with the witness so long as the substance of the ultimate testimony, as far as the lawyer knows or ought to know, remains truthful and is not misleading. District of Columbia Ethics *Opinion 79* (1979).

See also *Resolution Trust Corp. v. Bright*, 6 F.3d 336 (CA 5 1993) (lawyers did not violate Rule 3.4(b) by including previously undisclosed statements in language of witness's draft affidavit, where they had factual basis for doing so, brought disputed portions to witness's attention, and made sure that she signed it only if she agreed with its contents); *Haworth v. State*, 840 P.2d 912, 919 (Wyo SupCt 1992) (Urbigkit, J., dissenting) (competent trial preparation includes discussion about power of words; defense counsel did not act improperly by suggesting that client say "cut" rather than "stab").

But see *In re Eldridge*, 82 N.Y. 161 (NY CtApp 1880) (lawyer suspended for writing out answers for witnesses). *Eldridge* declared that a lawyer's duty is "to extract the facts from the witness, not pour them into him; to learn what the witness does know, not to teach him what he ought to know." More than a century later, however, a commentator surveying the law with respect to the practice of suggesting particular words indicated that lawyers are prohibited only from attempting to influence the intended meaning of a witness's testimony on a material issue. Note, *Professional Conduct and the Preparation of Witnesses for Trial*, 1 Geo. J. Legal Ethics at 401.

The same author contended that an attorney assists false testimony when he implies that it is acceptable and thereby creates a high probability of such testimony. The author suggested that this scenario might occur, for example, when a lawyer provides a witness with a motive to falsify his testimony and conveys the substance of the desired testimony without discussing the witness's obligation to tell the truth. Critics of the Baron & Budd document and the EEOC letter claim those communications involve just such circumstances.

As many scholars have noted, it is possible—given the well-recognized malleability of human memory—for even an ethical and well-intentioned lawyer to contaminate a witness's memory and produce false memories through witness preparation. E.g., Wydick, *The Ethics of Witness Coaching*, 17 Cardozo L. Rev. at 37.

Critics of the Baron & Budd document contend that the firm's process of interviewing and preparing clients produces implanted or created memories rather than refreshed memories, so that the witness may come to subjectively believe and testify to "facts" that the witness does not actually recall. A process that produces false memories would arguably justify discipline under Rule 3.4(b) if it could be proven the firm actually knew that the resulting testimony was false, or if such knowledge could be

inferred from the circumstances.

Moreover, it is not inconceivable that extreme practices within a firm that pose a great risk of producing false memories may be viewed as conduct involving fraud in violation of Rule 8.4(c), or conduct prejudicial to the administration of justice in violation of Rule 8.4(d). See generally Note, *Professional Conduct and the Preparation of Witness for Trial*, 1 Geo. J. Legal Ethics at 397, 401, 404.

However, as has been shown by the diversity of opinions displayed by courts and by the ethics authorities contacted by BNA, it is far from clear whether the law firm did anything wrong at all, much less something so improper that its lawyers should be charged with disciplinary offenses.

**Genuine Concern for Truth**

The limits of ethical witness preparation are impossible to define with the precision of a line on a map. From an ethical perspective, lawyers have leeway to instruct clients about proof requirements and even to suggest particular language, so long as the lawyer does not "know" that the resulting testimony is false.

But since actual knowledge can be inferred from circumstances, lawyers should avoid instructions that suggest wording without communicating the lawyer's genuine concern that the witness's testimony be truthful. See Altman, *Witness Preparation Conflicts*, 22 Litig., No. 1, p. 38 (1995).

Aside from disciplinary consequences, there is a more practical reason for lawyers to watch their step. Whether they actually cross the blurry line between right and wrong in preparing witnesses, practices that cause lawyers to spend too much time in the vast gray area of uncertainty can embroil them in ancillary litigation, with possibly grave adverse consequences. See, e.g., *Whetstone v. Olson*, [732 P.2d 159](#) (Wash CtApp 1986) (applying crime-fraud exception and permitting in camera review of taped witness preparation session); *Schmidt v. Ford Motor Co.*, [112 F.R.D. 216](#) (DC Colo 1986) (plaintiffs' attorney disqualified for counseling evasive answers).

By Joan C. Rogers

**Excerpts From Baron & Budd Memo**

*The following excerpts are taken from a document used by the Baron & Budd law firm to prepare its clients for their depositions in personal injury litigation against asbestos manufacturers:*

How well you know the name of each product and how you were exposed to it will determine whether that defendant will want to offer you a settlement.

. . .

Remember to say you saw the NAMES on the BAGS.

. . .

The more often you were around it, the better for your case. You MUST prove that you breathed the dust while insulating cement was being used.

Remember, the names you recall are NOT the only names there were. There were other names, too. These are JUST the names that YOU remember seeing on your jobsites.



© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

// PAGE 10

. . .

It is important to emphasize that you had NO IDEA ASBESTOS WAS DANGEROUS when you were working around it.

. . .

It is important to maintain that you NEVER saw any labels on asbestos products that said WARNING or DANGER.

. . .

You will be asked if you ever used respiratory equipment to protect you from asbestos. Listen carefully to the question! If you did wear a mask for welding or other fumes, that does NOT mean you wore it for protection from asbestos! The answer is still "NO"!

. . .

Do NOT mention product names that are not listed on your Work History Sheets.

. . .

Do NOT say you saw more of one brand than another, or that one brand was more commonly used than another…. Be CONFIDENT that you saw just as much of one brand as all the others.

. . .

Unless your Baron & Budd attorney tells you otherwise, testify ONLY about INSTALLATION of NEW asbestos material, NOT tear-out of the OLD stuff.

. . .

You may be asked how you are able to recall so many product names. The best answer is to say that you recall seeing the names on the containers or on the product itself. The more you thought about it, the more you remembered!

. . .

If there is a MISTAKE on your Work History Sheets, explain that the "girl from Baron & Budd" must have misunderstood what you told her when she wrote it down.

**Excerpts From EEOC Letter**

*The following excerpts are taken from a letter sent by the Equal Employment Opportunity Commission to women who were potential class members in a sex discrimination action brought by the EEOC against Mitsubishi:*

You are one of the women EEOC has identified as being possibly entitled to money damages and other relief.

. . .

To help you to take advantage of this opportunity to get your experiences and point of view on the



record, EEOC has developed a short list of "memory joggers" that we suggest that you begin thinking about. Consider each of them and try to remember whether or not you have experienced or observed such activities:

SEXUAL CONDUCT

- sexual jokes, unwanted nicknames or greetings
- propositions, requests for sex, requests for dates
- unwelcome touching, groping, brushing up against
- circulation of pornographic photos, drawings
- sexual graffiti, cartoons, signs, notes
- other sexual conduct you thought was offensive

HOSTILITY TOWARDS WOMEN

- anti-women statements, such as "women don't belong in the plant," "why aren't you home?" etc.
- women getting less favorable rotations/assignments
- women getting less training or cooperation or help
- women being called names like "bitch" (or worse)

COMPANY'S REACTION TO HARASSMENT

- Ever tell your UGL, GL, Branch Manager about it?
- Your or other UGLs, Managers ever see it?
- Ever go to ER or OPD and complain? What happened?
- Ever feel it would be "out of line" to complain?
- Know about other women complaining? What happened?

RETALIATION

- Did women suffer for reporting harassment? How?
- Know of bad assignments because of reporting?
- Know of people being ostracized by co-workers?
- What about increased harassment after complaining?
- Go on the bus trip to Chicago? Want to?
- Afraid about participating in EEOC law suit?
- Afraid about maybe getting relief in EEOC suit?



Copyright © 1998, by the American Bar Association and The Bureau of National Affairs, Inc.

# General Information

| | |
|---|---|
| **Date Filed** | Wed Feb 18 00:00:00 EST 1998 |
| **Citation** | 14 Law. Man. Prof. Conduct 48; DK:BNA A0A0P4M5X6 |
| **Topic(s)** | Professional Responsibility |

Bloomberg Law®

© 2022 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service