**Exhibit E**

# EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In re

DBMP LLC,[1]

               Debtor.

Chapter 11

Case No. 20-30080 (JCW)

## <u>DECLARATION OF CHARLES E. BATES, PHD</u>

Charles E. Bates, PhD, deposes and states as follows:

1.      I am the Chairman of Bates White, LLC ("Bates White"), which maintains offices at 2001 K Street NW, North Building, Suite 500, Washington, DC 20006.

2.      I am duly authorized to make this Declaration as a consultant for DBMP LLC ("DBMP" or the "Debtor") in this case.  I make this Declaration at the request of the Debtor's counsel regarding the need for and usefulness of the information requested in the *Debtor's Motion for Order Pursuant to Bankruptcy Rule 2004 Directing Submission of Personal Injury Questionnaires by Pending Mesothelioma Claimants* (the "PIQ Motion") and in the *Debtor's Motion for Bankruptcy Rule 2004 Examination of Asbestos Trusts* (the "Trusts Motion").[2]  In particular, I explain how the requested information will be used to estimate DBMP's legal liability for mesothelioma claims; assess whether the amounts of DBMP's pre-petition settlements and resolutions of mesothelioma claims in the tort system represent its liability for such claims and can be extrapolated to estimate the Debtor's liability for current and future claims; provide support to the Debtor in designing Claim Resolution Procedures ("CRPs") that

---

[1]      The last four digits of the Debtor's taxpayer identification number are 8817.  The Debtor's address is 20 Moores Road, Malvern, PA 19355.

[2]      I refer to the PIQ Motion and the Trusts Motion together as the "Motions."

will provide payments to claimants that cover DBMP's share of any liability for current and
future mesothelioma claims; and evaluate the settlements-based analysis that the experts for the
Official Committee of Asbestos Personal Injury Claimants ("ACC") and the Future Claimants'
Representative ("FCR") may present to the Court.

3.      In this Declaration, I first describe the Law and Economics model I will use in my
analyses in this matter.  Second, I describe the information sought in the PIQ Motion and how it
will be used in performing the needed analytical tasks.  Third, I describe the information sought
in the Trusts Motion and, again, how it also will be used to perform the needed analytical tasks.
Finally, I describe Bates White's data security protocols.

## I. *Qualifications*

4.      I have more than 25 years of experience in a wide range of litigation and
commercial consulting areas, including extensive experience working on asbestos-related claims
and liability issues.  I specialize in the application of statistics and computer modeling to
economic and financial issues, including asbestos-related claims and liability valuation matters.
A detailed description of Bates White's and my expertise is contained in the January 23, 2020
Declaration by Charles H. Mullin, PhD, attached as Exhibit B to the Debtor's Ex Parte
Application of the Debtor for an Order Authorizing It to Retain and Employ Bates White, LLC
as Asbestos Consultants as of the Petition Date.[3]  In addition, a complete and updated copy of
my curriculum vitae is attached to this Declaration as Exhibit 1.

---

[3]      *Ex Parte Application of the Debtor for an Order Authorizing It to Retain and Employ Bates White, LLC as
Asbestos Consultants as of the Petition Date*, Jan. 23, 2020, Doc. 19, Exh. B(1).

5.     This Court issued an Ex Parte Order Authorizing the Debtor to Retain and
Employ Bates White, LLC as Asbestos Consultants as of the Petition Date.[4]

## II.  *Overview of the Law and Economics model that relates a defendant's settlements to its legal liability and the costs of defending claims*

6.     It is a well-established fact in the Law and Economics literature that the amount
that a defendant pays and a plaintiff accepts to settle a lawsuit is not a direct measure of the
defendant's liability.[5]

7.     Depending on the nature of the litigation, settlements can be lower or higher than
actual liability.  Some situations will lead the parties to settle for an amount less than the actual
liability (a windfall to the defendant and a loss for the plaintiff), while others will lead the parties
to settle for an amount more than the actual liability (a windfall to the plaintiff and a loss for the
defendant).

8.     Factors that affect the amount that a defendant pays in settlement, other than its
potential liability, include the direct costs of litigation, the potential impact on the defendant's
reputation, the effect of litigation on the defendant's finances (stock price, ability to borrow,
etc.), the time and resources that certain employees would have to spend on the process, and the

---

[4]     *Ex Parte Order Authorizing the Debtor to Retain and Employ Bates White, LLC as Asbestos Consultants as of the Petition Date*, Jan. 24, 2020, Doc. 37, as amended Doc. 363.

[5]     *See*, e.g.:
Richard A. Posner, "An Economic Approach to Legal Procedure and Judicial Administration," *Journal of Legal Studies* 2, no. 2 (1973): 399–458;
Lucian A. Bebchuk, "Litigation and Settlement Under Imperfect Information," *RAND Journal of Economics* 15, no. 3 (1984): 404–15;
George L. Priest and Benjamin Klein, "The Selection of Disputes for Litigation," *Journal of Legal Studies* 13, no. 1 (1984): 1–55;
David Rosenberg and Steven Shavell, "A Model in Which Suits Are Brought for Their Nuisance Value," *International Review of Law and Economics* 5 (1985): 3–13;
Lucian A. Bebchuk, "Suing Solely to Extract a Settlement Offer," *Journal of Legal Studies* 17 no. 2 (1988): 437–50; and
Lucian A. Bebchuk, "A New Theory Concerning the Credibility and Success of Threats to Sue," *Journal of Legal Studies* 25, no. 1 (1996): 1–25.

distraction of management from the main business of the company.  The amount that plaintiffs

accept for releasing a defendant from the litigation is also affected by factors other than liability.

Plaintiffs' litigation costs in personal injury claims also matter, though they are structured

differently than defendants' costs.  The litigation process is onerous and costly; it takes time,

sometimes years, to resolve a case.

9.    Figure 1 presents a simplified version of the Law and Economics model for

liability and settlements, and depicts its main components.[6]  The picture shows two equations,

one for the defendant (top equation) and one for the plaintiff (bottom equation).  I first describe

each of the equation's components, and then I explain how the two equations interact to

determine a settlement.

**Figure 1. Law and Economics model relating liability and settlements[7]**



---

[6]    I present a simplified version of the model for illustrative purposes.  The actual model takes into account the more complex structure of how settlements are determined – a structure in which the amount the claimant receives in settlement is reduced by the plaintiff law firm's contingency rate, whereas the defendant pays the full settlement amount.

[7]    "Testimony of Dr. Charles E. Bates," presentation, *In re Garlock Sealing Technologies LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. 2013) (Trial exhibit GST-8005), slide 22.

10.    The top line of boxes in the figure illustrates the equation specifying the highest amount a defendant would be willing to pay in settlement at a given point in time in the litigation process.  The light blue box labeled "Defendant's Expected Liability" has two parts: the Compensatory Award Share and the Likelihood of Plaintiff's Success.  The Compensatory Award Share represents the amount of the defendant's liability if it were determined to be liable.  This component is the total expected compensatory award that the plaintiff would receive for the plaintiff's damages (economic and non-economic damages) multiplied by the percentage share of total liability for which the defendant would be responsible, if found liable.  The Likelihood of Plaintiff's Success is the defendant's perception of the probability that the defendant would be found liable at trial.  The gray component to the right of the Defendant's Expected Liability, labeled "Defendant's Avoidable Cost," represents the expenses that a defendant could avoid if it reached settlement instead of continuing the case until either the plaintiff releases the defendant or the case concludes.  The avoidable expenses component declines as the case progresses through litigation because, as the litigation proceeds, expenses are incurred and cannot be saved any more.  These components determine the Defendant's Highest Settlement Offer, as they represent the total expected cost that the defendant would incur from not settling the case.  If a plaintiff requested a settlement above this number, a (risk-neutral) defendant would be better off not settling and would continue to litigate.  In contrast, with any settlement below this amount, the defendant would be *better off* settling than continuing to litigate (considering here only the impact of settlement on that particular case).

11.    The bottom line of boxes in the figure illustrates the equation specifying the lowest net amount the plaintiff would be willing to accept in settlement at a given point in time in the litigation process (notice that the actual settlement would be above the calculated number

because the plaintiff law firm would charge its contingency fee, leaving the claimant with a

lower recovery).  The first component on the left is the "Compensatory Award Share," which is

defined in the same manner as the same component in the defendant's equation.  The second

component, labeled "1 *minus* Contingency Rate," is a factor that accounts for the portion of

compensatory recoveries that the plaintiff has to pay to their lawyer.  Typically, contingency

rates in asbestos cases are between 30% and 40% of the compensatory award, which means this

component is typically between 60% and 70% from the plaintiff's point of view.  The

"Likelihood of Plaintiff's Success" component reflects the plaintiff's perception of the

probability that the defendant would be found liable at trial.  Finally, the gray component labeled

"Plaintiff's Avoidable Costs" represents the expenses that the plaintiff lawyer would incur

throughout the litigation that would be deducted from the plaintiff's recoveries, after applying

the contingency rate.  In asbestos cases, these costs for the plaintiffs mainly arise during trial,

which may include experts, other trial costs, delay in compensation, and the emotional cost of

going through trial.  Importantly, in a contingency fee arrangement, a plaintiff, unlike the

defendant, cannot avoid their lawyer's fees by settling because the lawyer's compensation is a

percentage of the total recovery.  As mentioned above, these components determine the

Plaintiff's Lowest Net Acceptable Offer; i.e., the total expected net recovery the plaintiff would

receive from the defendant.  Therefore, if a defendant offered a settlement that would generate a

recovery (after the contingency fee) below the Plaintiff's Lowest Net Acceptable Offer, a (risk-

neutral) plaintiff would be better off continuing to litigate than settling.  In contrast, in the case

of any settlement offer above the Plaintiff's Lowest Net Acceptable Offer, the plaintiff would be

better off settling than continuing to litigate.

12.     In cases in which the Defendant's Highest Settlement Offer would yield a net recovery above the Plaintiff's Lowest Net Acceptable Offer, there is room for settlement because both parties would be better off settling than continuing to litigate.  The range between the Defendant's Highest Settlement Offer and an amount that would yield the Plaintiff's Lowest Net Acceptable Offer after applying the contingency fee is called the "Settlement Core."  In cases in which both parties understand and agree on the value of the case (given the available information to the parties) and have a general understanding about the cost structure of the opposing party, it is expected that settlements will fall within the Settlement Core.  This expectation is applicable to asbestos litigation because, on the one hand, defendants have faced thousands of cases and are represented by experienced defense attorneys and, on the other hand, although plaintiffs typically only experience one case in their lives, they are represented by sophisticated and experienced lawyers who have usually interacted multiple times with the defendant's counsel.

13.     If the Defendant's Highest Settlement Offer would result in a net recovery below the Plaintiff's Lowest Net Acceptable Offer, the Settlement Core is "empty," and there would be no room for settlement.  An empty Settlement Core occurs when there is a significant difference of opinion between the defendant and the plaintiff about the value of the case; it may be that the plaintiff considers that his probability of winning at trial, the defendant's share, or both are higher than what the defendant believes.[8]  Those are the rare cases that proceed to trial; they are not representative of the rest of a defendant's cases.

---

[8]     In some instances, a plaintiff lawyer or a defendant may wish to take a case to trial to demonstrate to the other party a willingness to spend the time and effort to try the case, even when the case could settle. Defendants may do this in an attempt to discourage non-meritorious filings.  A plaintiff's lawyer may want to take a case to trial to establish a reputation as a successful trial lawyer, though the plaintiff must agree to forego settlement and proceed to trial.

14.     Examination of the components of the model presented in Figure 1 shows the potential impact of plaintiffs' withholding exposure information.  By withholding relevant alternative exposure information from a defendant in a particular case, a plaintiff can effectively increase each one of the three components of the defendant's settlement equation, thereby increasing the amount of the settlement the defendant would be willing to pay the plaintiff.  First, with fewer available co-defendants disclosed, the defendant's Compensatory Award Share appears higher than it would if the plaintiff disclosed all sources of exposure, especially in jurisdictions in which several liability apportionment rules apply.  Second, with the most likely contributors to a plaintiff's disease not included in the case, the likelihood that a remaining defendant would be found liable appears higher than it would if all exposure sources were disclosed.  Third, if a plaintiff does not willingly disclose all sources of the plaintiff's asbestos exposure, the defendant must spend more money trying to find alternative exposure information through indirect sources.

### III. *The information sought in the PIQ Motion*

15.     As explained above, a reliable estimation of expected liability requires analysis of the various factors relevant to compensatory award share and to the likelihood of plaintiff success, as well as the number of expected claims that could go to trial.  For the reliable estimation of DBMP's liability with respect to current claims and for the valuation of current claims under other approaches such as an extrapolation of historical settlement amounts or under CRPs, it is necessary to identify the number and characteristics of pending claims.  In this section I explain how each of the types of information sought in the PIQ Motion are needed for these analytical tasks.  Based on my experience working with a large number of asbestos defendants since the 1990s, asbestos defendants generally do not possess complete and up-to-date

8

information for most pending claims for several reasons, including because discovery has not

been initiated or completed or because defendants do not collect certain information about claims

and claimants until such claims resolve.

16.     **Pending DBMP claims.**  It is first necessary to identify the number and

characteristics of the mesothelioma claims that would currently be asserted against DBMP.  As

of today, there are at least two groups of potential current mesothelioma claimants: (1) claimants

who filed pre-petition mesothelioma claims against DBMP and who are reflected in DBMP's

claims database as having an unresolved mesothelioma claim; and (2) claimants who developed

mesothelioma and would allege contact with DBMP's asbestos-containing products but did not

file a pre-petition claim against DBMP.  There is also potentially a third group of such claimants:

those with unresolved claims for which the database does not have information about the

claimant's alleged disease; it is possible that some of these claimants have been diagnosed with

mesothelioma.

17.     The DBMP claims database contains approximately 4,000 records identified as

unresolved mesothelioma claims.  However, the number of records that actually represent a

pending mesothelioma claim against DBMP is unknown, and information is necessary to

determine which of the records actually represent pending mesothelioma claims.  This is the case

for several reasons.  Of those 4,000 claims, almost 1,400 were filed more than four years before

DBMP's petition date.[9]  Because more than 97% of DBMP payments to mesothelioma claimants

were made within four years of the date the claims were filed, it is necessary to determine which

---

[9]     These 1,400 claims include claims by approximately 200 claimants represented by firms with which DBMP
had a settlement agreement described in paragraph 19.

of those older records represent active claims against the Debtor as opposed to claims that have

been abandoned by the claimants who filed them.

18.     That a substantial number of mesothelioma records shown as pending in the

DBMP database are in fact not pending is typical.  In my experience, asbestos claims databases

consistently do not contain up-to-date information on abandoned or dismissed claims because

keeping track of that information is costly and provides no benefit to the defendant.  *Garlock* is

an example.  As of its petition date, Garlock's claims database showed 5,813 "pending"

mesothelioma claim records.  As a result of the Personal Injury Questionnaire ("PIQ") process in

that case, plaintiffs revealed that about 2,000 of those 5,813 claim records in fact did not

represent a pending mesothelioma claim against Garlock.[10]  The PIQ information established,

among other things, if a claim had already been resolved through dismissal or settlement, if a

claimant did not have mesothelioma, if a claimant did not have Garlock exposure, or if the

claimant had withdrawn or was no longer pursuing their claim against Garlock.  Further, of the

PIQ claimants who still asserted a pending claim against Garlock, only about 54% described any

direct, bystander, or secondary exposure to Garlock's asbestos-containing products.[11]  Similarly,

PIQs were authorized for individuals with pending mesothelioma claims in the Bondex

bankruptcy case.  That process revealed that about 1,500 of the 3,500 claims reflected as pending

in the Bondex database in fact did not represent pending claims against the debtors in that case.[12]

---

[10]    *See* Expert Report of Jorge Gallardo-García, PhD, *In re Garlock Sealing Technologies LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. Feb. 15, 2013) (Trial exhibit GST-8004) [hereinafter "Gallardo-García Garlock Report"], Exhibit 1 and ¶ 33.

[11]    Expert Report of Charles E. Bates, PhD, *In re Garlock Sealing Technologies LLC, et al*., No. 10-31607 (Bankr. W.D.N.C. Feb. 15, 2013) (Trial exhibit GST-0996) [hereinafter "Garlock Report"], Exhibit 46.

[12]    Expert Report of Charles H. Mullin, PhD, *In re Specialty Products Holding Corp. et al.*, No. 10-11780 (Bankr. D. Del. Aug. 15, 2012), Doc 3473-5, pp. 22–23.

10

19.     I understand that DBMP had longstanding settlement arrangements, dating back a
decade or more, with two law firms, under which DBMP agreed to resolve trial-set
mesothelioma cases for a set average amount and did not conduct discovery or otherwise litigate
the cases.[13]  Among the 4,000 pending mesothelioma records in the DBMP claims database,
approximately 1,400 records are associated with these law firms.  Historically, more than 60% of
the mesothelioma claims DBMP paid to settle after 2010 were with those firms with which it had
these kinds of agreements.  Further, there are more than 500 pending mesothelioma records in
DBMP's claims database filed within the six months prior to DBMP's petition date.[14]

20.     The DBMP claims database contains no information on mesothelioma claimants
who may exist but who have not filed a claim.  DBMP therefore has no information on these
claims.

21.     As stated above in paragraph 16, it is also possible that there are some potentially
pending mesothelioma claims not identified as mesothelioma claims in DBMP's claims database.
In particular, the DBMP claims database includes pending records with no alleged disease
information.[15]  There are more than 12,800 such records in DBMP's claims database that appear
as pending.  Based on my experience, the vast majority of these records likely either represent
old claims alleging non-malignant conditions or are abandoned claims with no prospects against

---

[13]   *Declaration of Michael T. Starczewski in Support of Debtor's Motion for Order Pursuant to Bankruptcy
Rule 2004 Directing Submission of Personal Injury Questionnaires by Pending Mesothelioma Claimants*,
Aug. 19, 2020, ¶ 6.

[14]   These 500 claims include claims by approximately 200 claimants represented by firms with which DBMP
had a settlement agreement described earlier in paragraph 19.

[15]   Further, although some unresolved records show a non-mesothelioma disease, the claimant may indeed
have mesothelioma.  This type of error is possible in databases with hundreds of thousands of records.

DBMP.[16]  This is likely the case with most of the 12,800 pending records with unknown disease information, particularly because about 12,500 of them were filed more than four years before DBMP's petition date.  Nonetheless, some of these pending records may represent mesothelioma claims.

22.     Determining the actual number of pending mesothelioma claims against DBMP is a critical starting point for any evaluation of DBMP's liability, for any evaluation of a plan of reorganization (including whether the plan contains sufficient funding to pay such claims the full amount of their legal liability or amounts negotiated with the ACC or the claimants), and to determine how much claimants should receive from an eventual Trust subject to prescribed amounts of Trust funding.  It is necessary to determine the extent of DBMP's liability for current claims and for estimating the number of future mesothelioma claims that could proceed to trial against DBMP.  To estimate DBMP's liability for future mesothelioma claims, I will project the number of future claims that will be filed against DBMP and the trial risk associated with each claim.  This estimate will take into account differences in demographic characteristics and exposure profiles revealed by the information sought in the PIQ Motion.  I am currently unable to perform a reliable estimate because of the lack of information on the number and characteristics of current claims alleging DBMP exposure, and on other exposure allegations made by current claimants and resolved claimants in claims they submitted to asbestos trusts.

23.     **Identifying information for the individual with mesothelioma and the individual pursuing the claim.**  For the individual with mesothelioma, we need 9-digit Social Security Number ("SSN"), gender, birth date, life status, death date (if applicable), and state of

---

[16]     In fact, of the 12,800 pending records with no disease information in DBMP's database, about 7,700 show a status of "inactive" which is used to indicate that a DBMP claim was placed on an inactive non-malignant docket.  Therefore, it is unlikely that any of these 7,700 records represents a pending mesothelioma claim.

residency.  For the individual pursuing the claim, we need name and SSN.  This information is

necessary to identify claimants across the multiple sources of asbestos claims information

available in this matter.  In addition, this information is necessary to identify multiple claims that

may have been generated by a single mesothelioma diagnosis, such as personal injury and

wrongful death claims for the same person.  This is important for all valuation purposes, because

these claims may appear twice in the claims database but represent a single mesothelioma

diagnosis.

24.    **Diagnosis information.**  This information includes the date of diagnosis and the

mesothelioma body site (e.g., pleural versus peritoneal).  This information is necessary to assess

the viability of the claim and to understand the potential economic loss for the claimant and,

accordingly, the possible damage amount.  Although DBMP's database includes general disease

information for many claim records, as discussed above, there may be unidentified

mesotheliomas in the database.  Similarly, the database includes diagnosis dates for a number of

records, but it lacks this information for a large number of unresolved records.  The diagnosis

date provides information to determine the portion of total US diagnoses in a given year that

were pursued against DBMP.  Further, DBMP's claims database typically does not include

information on the mesothelioma body site.

25.    **The injured party's alleged exposure to asbestos-containing products for**

**which DBMP is responsible.**  For valuing current (and future) claims under any of the analytical

tasks identified in this Declaration, information concerning the injured party's alleged exposure

to DBMP asbestos-containing products is needed.  We currently have little exposure information

for current claims, including how many claimants will actually assert contact with a DBMP

asbestos-containing product.

26.     If the claimant alleges DBMP exposure, the methodology for estimating DBMP's legal liability requires detailed information about claimants' exposures over time.  For this reason, the PIQ Motion requests, for each alleged exposure, information regarding type of exposure (occupational, non-occupational, secondary), location where the exposure allegedly occurred, dates of alleged exposure, occupation/job type of the individual while the alleged exposure occurred, and specific DBMP products to which the individual alleges exposure.  This information regarding the nature and extent of the plaintiff's exposure is fundamental for assessing the share of liability (if any) that DBMP should cover for that claim.  This information is also necessary to evaluate the ACC's/FCR's settlement analysis and the design of distribution procedures for a trust.  Fundamentally, this information is important for determining how much money claimants with different DBMP exposure profiles should receive from an eventual trust, including whether these claimants would qualify for any payment.

27.     **The injured party's alleged exposure to asbestos-containing products manufactured by or associated with other entities.**  The methodology for estimating DBMP's legal liability also requires information concerning allegations of exposure to non-DBMP asbestos-containing products and, for each alleged exposure, basic exposure-related information, including type of such exposure (occupational, non-occupational, secondary), location where the exposure allegedly occurred, dates of alleged exposure, occupation/job type of the individual while the alleged exposure occurred, and specific products to which the individual alleges exposure.

28.     In determining an appropriate apportionment of damages, it is first necessary to identify and quantify the number of entities and codefendants that would share in the liability

14

with DBMP, should DBMP be found liable.[17]  This determination requires sufficient information

on claimants' work and alleged exposure histories to identify the sources of asbestos exposure

for these claimants.

      29.     Based on my preliminary analysis of DBMP's claims and resolutions history, I

expect that discovery in this matter will show that the number of entities sharing liability with

DBMP in pending and future mesothelioma claims will be substantial.  And it will likely vary by

claimant type.  As part of my preliminary analysis in this matter, I have merged the publicly

available Garlock Analytical Database[18] and DBMP's claims database to determine the overlap

between the two claiming populations.  The overlap is substantial: four of five DBMP

mesothelioma claims filed from 2002 to Garlock's petition date on June 5, 2010 were also claims

filed against Garlock, and approximately four-fifths of DBMP's payments to DBMP

mesothelioma claimants during this time period were to claimants who also pursued claims

against Garlock.[19]  These data, however, do not provide sufficient information about DBMP's

historical claims, both because about 2,900 of DBMP's mesothelioma claims that were filed

before Garlock's petition date were not asserted against Garlock (including many of DBMP's

highest-value claims) and because the Garlock data do not include claims filed after Garlock's

petition date.

---

[17]    I use a legal analysis provided by counsel that set forth the law in each jurisdiction governing the apportionment of damages awards among multiple joint tortfeasors and the extent to which damages awards must be reduced by claimants' settlements with other defendants.  *See* Garlock Report, Section V.3.7; Memorandum of Robinson, Bradshaw & Hinson P.A., *In re Garlock Sealing Technologies LLC, et al.,* No. 10-31607 (Bankr. W.D.N.C. Feb. 5, 2013) (Trial exhibit GST-1305).  In this matter, I will use an updated analysis provided by counsel.

[18]    This database is part of the Garlock Estimation Trial record that the *Garlock* Court made public.  For a description of the Garlock Analytical Database, *see* Gallardo-García Garlock Report.

[19]    If I also include DBMP mesothelioma claimants who voted in the Garlock bankruptcy even though they did not file a tort claim against Garlock, the overlap is approximately 85% of DBMP claims.

30.     Information on current claimants' job histories and exposure to other companies' asbestos-containing products is needed to identify alternative sources of exposure and assess the relative contribution of DBMP asbestos-containing products (if any) to a claimant's alleged asbestos exposure.  The same information for past claimants is also required.  The exposure-related information will be used to construct a full description of the exposure profiles of claimants with a pending mesothelioma claim against DBMP.  This information is central to liability apportionment and to estimate the likelihood of a plaintiff's success against DBMP, but is not in the Debtor's database and, for the reasons described above, is in major part not available to the Debtor.

31.     **Injured party's economic loss.**  Economic loss is another fundamental component of a liability estimate because it enables us to ascertain the expected award that a claimant may receive should they proceed to trial and prevail.  Economic loss estimates are based on the claimant's demographic information, as well as on information on lost income and expenses caused by the alleged disease.  They require information about key claimant characteristics, including work/retirement status, current or last occupation, current or last annual income, medical expenses, dependent information, and funerary expenses (if applicable).

32.     **Information about the claimants' lawsuits and claims against other entities.**  Information about other parties' payments to claimants and the status of claims against other entities is important for producing a reliable estimation of DBMP's share of liability for a given claim.

33.     To apply the liability apportionment rules described above, it is necessary to obtain information regarding claimants' settlements and recoveries from tort defendants and

asbestos trusts.[20]  This information permits us to take into account offsets when estimating

DBMP's share of the liability, if any.

34.     The PIQ Motion includes a request for claimants to submit documents as part of

their PIQ responses.  The requested documents include those generated through discovery in the

tort system such as responses to interrogatories, deposition transcripts, affidavits of exposure,

complaints, Social Security Administration work records, and economic loss reports, among

others.  In addition, the PIQ Motion requests copies of trust claims filed by claimants with trusts

or an authorization for the Debtor to obtain copies.  In my experience, these documents contain

readily available information compiled by claimants that characterize claimants' asbestos

exposure histories and demographic profiles.  These documents will allow me to perform the

analytical tasks described in this Declaration.

35.     Finally, as mentioned before, the information requested in the PIQ Motion is

needed for calculating and estimating the potential settlement offers that DBMP claimants would

receive from an eventual trust.  For example, the PIQ information in *Garlock* was fundamental

for this task.  After the Garlock Estimation Trial, once Garlock, the ACC, and the FCR reached a

settlement regarding total trust funding, the data gathered through the *Garlock* PIQ were a key

input in calculating the settlement offers that different types of claimants would receive from the

Garlock Trust's CRP.  Based on Bates White's analysis using the Garlock Analytical Database,

of which the PIQ data were a principal component, the parties were able to determine the level of

baseline settlement offer values for the Garlock Trust.  As these data were an important input for

determining trust settlement offers, the PIQ data in *Garlock* also enabled us to evaluate whether

the trust funding under the Garlock Plan would allow the Garlock Trust to provide substantially

---

[20]     Garlock Report, Section V.3.3.

equivalent treatment to pending and future claimants.  The PIQ data in this matter will play a similar role in formulating or evaluating any proposed plan of reorganization and in designing or evaluating CRPs and payments to claimants to ensure or determine that the payments are at levels that are substantially equivalent for present and future claimants.

36.     About 85% of the unresolved mesothelioma records in DBMP's claims database were filed by 25 plaintiff law firms.  My experience is that these law firms will have the information sought in the PIQ readily available in electronic form.  The remaining plaintiff law firms that filed mesothelioma claims that appear as unresolved in the DBMP claims database filed on average fewer than five claims.

### IV. _The information sought in the Trust Motion_

37.     The information DBMP requests from asbestos trusts is fundamental for estimating DBMP's legal liability.  It is also critical for assessing whether claimants withheld exposure information from DBMP while in the tort system and how its payments to claimants were impacted by these practices.  These data are needed to assess whether DBMP's historical settlements reflect its liability.  The Trusts discovery will permit us to compare data from asbestos trusts that document claimants' exposures to the products of the reorganized entities for which the trusts were established with the exposures those same claimants disclosed in their tort litigation against DBMP.  DBMP will have no information on any trust claims plaintiffs pursued after DBMP resolved those claims.

38.     The trust claims information on DBMP claims resolved with payment for a wide range of values will enable us to test the impact on DBMP's historical settlement amounts caused by claimants' failures to disclose alternative exposure evidence and/or claimants' decisions to delay filing claims.  In addition, analysis of the settlements under the Law and

18

Economics model will permit us to test how the non-disclosure of trust exposure evidence may
have affected the likelihood of success factor under the model in historical cases.

39.      Furthermore, the information sought from asbestos trusts will supplement
DBMP's claims database with information about its claimants and their claims that is currently
not reflected in that database.

40.      The asbestos trust discovery seeks information for DBMP's mesothelioma claims
resolved by settlement or verdict in the tort system that is similar to (although only a subset of)
the information sought for current claims in the PIQ Motion.  This information includes basic
identifying information about the individual with mesothelioma and the claimant (if different),
diagnosis information about the alleged mesothelioma, identity of representing law firm,
information about the tort system claim (if one exists), and work and exposure information
submitted to the trust by the claimant to support their claim.  In addition, the discovery sought
includes basic information about the trust claim, including the date the claim was filed against
the trust; the date the claim was approved (if approved); the date the claim was paid (if paid); if
not approved or paid, status of claim; mode of review selected by the claimant; and mode of
review approved.

41.      The trusts and the trust processing facilities possess the information sought by the
Trust Motion in readily available electronic form.  The cost of searching for and identifying the
DBMP claimants within the Asbestos Trusts Processing Facilities' ("Processing Facilities")
databases is low and, with the cooperation of the Processing Facilities, could be implemented in
a short period of time.  The search can be performed electronically with simple computer code.
This especially will be the case because DBMP has SSNs for nearly all mesothelioma claims it
resolved by settlement or verdict.  Using SSNs will yield a reliable identification of claimants in

trusts' databases that will result in a minimal number of potential false positives, if any.  In

particular, the computer code required for identifying claims in the trusts' databases will be

simple, as it will only have to focus on SSN matches or matches of last four digits of the SSN

plus last name.  Given the sophistication and experience in data management that the Processing

Facilities have, this process will be easy for them to implement accurately.

     42.     In summary, the asbestos trusts discovery seeks information that is fundamental

for (1) estimating DBMP's legal liability, (2) assessing whether claimants withheld information

from DBMP in the tort system and how those practices impacted DBMP's settlements, and

(3) evaluating how those practices, if they occurred, may have affected DBMP's payments to

claimants.

## V. *Data security*

     43.     In the ordinary course of business, Bates White routinely receives privileged and

confidential information, often highly sensitive in nature.  Bates White has data security

protocols that implement industry best practices for data confidentiality and protection.  Such

protocols include, but are not limited to, the following safeguards: (1) each staff member has

unique log-in credentials to access Bates White's systems; (2) data access in each matter is

limited to staff based on "need-to-know" and "least privilege" principles, which include time

restrictions and other controls as necessary; (3) transmission of confidential or privileged

information is done through encrypted file sharing systems that are password protected (all

media that leave Bates White are encrypted and password protected); (4) physical external media

with confidential information are secured in a locked safe or cabinet; (5) to comply with data

destruction requirements, external media are destroyed, and external hard drives and laptops are

wiped to ensure all data are removed; and (6) Bates White's network is protected by next-

generation firewalls, web filtering, intrusion detection and prevention capabilities, and 24/7

monitoring by a third party.  Bates White also deploys next-generation antivirus protection to all

endpoints, two-factor authentication for external connections, and data loss protection designed

to monitor and prevent theft and unauthorized uses of data.  All Bates White employees must

complete a cybersecurity training program.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 19, 2020

_____
Charles E. Bates, Ph.D.
BATES WHITE, LLC
2001 K Street NW
North Building, Suite 500
Washington, DC 20006
Telephone:   (202) 408-6110
Facsimile:  (202) 408-7838

**<u>Exhibit 1</u>**

Curriculum Vitae



2001 K Street NW North Building, Suite 500
Washington, DC 20006
Main 202. 208. 6110

# CHARLES E. BATES, PHD

**Chairman**

**AREA OF EXPERTISE**



- **Asbestos liabilities and expenditures estimation**
- **Economic analysis**
- **Statistical analysis**
- **Microsimulation modeling**
- **Econometrics**

## SUMMARY OF EXPERIENCE

Charles E. Bates has extensive experience in statistics, econometric modeling, and economic analysis. He specializes in the application of statistics and computer modeling to economic and financial issues. Dr. Bates has more than 25 years of experience and provides clients with a wide range of litigation and commercial consulting services, including expert testimony and guidance on economic and statistical issues.

Dr. Bates is a recognized expert in asbestos-related matters. He speaks in national and international forums on the asbestos litigation environment and estimation issues. Dr. Bates is frequently retained to serve as an expert on such matters in large litigations and has testified before the US Senate Judiciary Committee and Federal Bankruptcy Court.

## EDUCATION

- Advanced Seminar in Pharmacoeconomics, Harvard School of Public Health
- PhD, Economics, University of Rochester
- MA, Economics, University of Rochester
- BA, Economics and Mathematics (high honors), University of California, San Diego

## PROFESSIONAL EXPERIENCE

Prior to founding Bates White, Dr. Bates served as a Vice President of A.T. Kearney. Previously, he was the Partner in Charge of the Economic Analysis group at KPMG. Dr. Bates began his career on the faculty of Johns Hopkins University's Department of Economics, where he taught courses in advanced statistical economic analysis and trade theory.

## SELECTED ASBESTOS AND PRODUCT LIABILITY EXPERIENCE

- Retained as an asbestos liability valuation expert on behalf of the debtor in the matter *In re DBMP LLC* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Retained as an asbestos liability valuation expert on behalf of the debtor in the matter *In re Bestwall LLC* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Retained as an asbestos liability valuation expert on behalf of Truck Insurance Exchange in the matter *In re Kaiser Gypsum Company, Inc., et al.* pending in the US Bankruptcy Court for the Western District of North Carolina, Charlotte Division.

- Served as an asbestos liability valuation expert on behalf of Garlock Sealing Technologies in its bankruptcy proceedings. Testified before the US Bankruptcy Court for the Western District of North Carolina both in preliminary case hearings and at trial.

- Served as an expert in asbestos claims valuation for financial reporting purposes in *Erica P. John Fund Inc. et al. v. Halliburton Company et al.* on behalf of certain Halliburton stockholders regarding Halliburton's financial disclosures of its asbestos liabilities after its acquisition of Dresser in 1998.

- Served as the Individual Claimant Representative on behalf of potential future No Notice Individual Creditors as part of the Amending Scheme of Arrangement for OIC Run-Off Limited (formerly the Orion Insurance Company plc).

- Authored expert reports and provided testimony in *United States Fid. & Guar. Co. v. American Re-Insurance Company* in asbestos claims valuation, estimation methodology, and asbestos reinsurance billing regarding the proper reinsurance bill associated with USF&G's reinsurance bill of its asbestos-related payments to Western MacArthur.

- Served as an asbestos liability valuation expert on behalf of Specialty Products Holding Corp./Bondex International in its bankruptcy proceedings.

- Retained as an asbestos liability valuation expert on behalf of the Official Committee of Unsecured Creditors of Motors Liquidation Company (f/k/a General Motors Corporation) in its bankruptcy proceedings.

- Authored expert report and provided deposition testimony regarding the value of diacetyl claims on behalf of the Official Committee of Equity Security Holders in the Chemtura Corporation bankruptcy proceedings.

- Testified in deposition on behalf of the ASARCO Unsecured Creditors Committee in the ASARCO bankruptcy proceedings regarding the valuation of past and future asbestos-related personal injury claims.

- Authored expert report and provided deposition testimony on behalf of the policyholder in the matter of *Imo Industries, Inc. v. Transamerica Corp.*

- Currently retained as an expert by Fortune 500 companies to produce asbestos expenditure estimates for annual and quarterly financial statements. Estimations aid clients with Sarbanes-Oxley compliance.

- Currently retained as an expert in asbestos estimation and insurance valuation, for numerous asbestos litigation matters, on behalf of insurance companies, corporations, and financial creditors' committees of federal bankruptcy proceedings.

- Testified before the Senate Judiciary Committee on the economic viability of the Trust Fund proposed under S.852, the Fairness in Asbestos Injury Resolution (FAIR) Act of 2005. Testimony clarified Bates White's independent analysis on the estimate of potential entitlements created by the administrative no-fault trust fund that uses medical criteria for claims-filing eligibility.

- Testified in deposition on behalf of Liberty Mutual Insurance Company in the Plibrico bankruptcy proceedings regarding the valuation of past and future asbestos personal injury claims and exposure criteria in plan proponents proposed trust distribution procedures.

- Testified at deposition on behalf of the joint insurers defense committee to address the fraction of expenditures associated with the company's asbestos installation operations in *Owens Corning v. Birmingham Fire Insurance Company of Pennsylvania*.

- Testified in the Babcock & Wilcox bankruptcy confirmation hearing on behalf of the Insurers Joint Defense Group to address asbestos liability. Developed claims criteria evaluation framework to assess asbestos liability forecasts and trust distribution procedures.

- Testified at deposition on behalf of Sealed Air in the fraudulent conveyance matter regarding the 1998 acquisition of Cryovac from W.R. Grace. Directed estimation of foreseeable asbestos liability for fraudulent conveyance matter to advise the debtor in the bankruptcy of a defendant with over $200 million in annual asbestos payments. Developed asbestos liability forecasting model and software. Directed industry research and interviewed industry experts.

- Testified at deposition on behalf of Hartford Financial Services Group to address the asbestos liability of MacArthur Company and Western MacArthur Company. Estimated asbestos liability in the context of bankruptcy proceedings.

- Testified at deposition on behalf of the Center for Claims Resolution in arbitration proceedings of *GAF v. Center for Claims Resolution*.

- Served as testifying expert on behalf of CSX Transportation on the suitability of asbestos claim settlements for arbitration proceedings of *CSX Transportation, Inc. v. Lloyd's, London*.

- Developed an econometric model of property damage lawsuits for estimating the future liability of a former asbestos manufacturer arising from the presence of its asbestos products in buildings.

## SELECTED LITIGATION AND CONSULTING EXPERIENCE

- Testified in US Tax Court on behalf of the taxpayers on the statistical basis and accuracy of shrinkage accruals in *Kroger v. Commissioner*.

- Served as consulting expert and performed statistical and quantitative analyses to assess the merits of a class action alleging payment of fees to mortgage brokers for referral of federally related mortgage loans.

- Testified in US Tax Court on behalf of the taxpayer analyzing the statistical prediction of bond ratings using company financial data in *Nestlé Holdings Inc. v. Commissioner*.

- Submitted written expert testimony on the statistical and financial analysis of option transactions and an analysis of alternative stock option hedges in *McMahon, Brafman, and Morgan v. Commissioner*.

- Testified in US Tax Court on behalf of the taxpayers of IRS experts on the statistical basis and accuracy of shrinkage accruals in *Wal-Mart v. Commissioner*.

- Served as consulting expert and analyzed the racial composition for a large manufacturing corporation using EEO data and employed sophisticated statistical analysis and modeling to determine the validity and strength of an employment discrimination claim.

- Testified on behalf of VNC in the arbitration hearing of *VNC v. MedPartners*.

- Provided expert testimony in California Superior Court on the validity of economic comparability adjustments for pipeline easement rents in *Southern Pacific Transportation Corp. v. Santa Fe Pacific Corp.*

- Served as statistical expert and developed detailed statistical analysis of customs trade data for use in criminal transfer-pricing litigation.

- Submitted written testimony in US Tax Court on the beneficial life of company credit card in a tax matter for a large retailer drawing on the company's point-of-sale data, credit card data, and customer demographic information.

- Developed state-of-the-art models to account for default correlation for underwriting credit insurance; models became the standard tools for the country's largest credit insurance firm.

- Led a team of economists that provided litigation-consulting services in one of the largest US price-fixing cases. Case involved the development of state-of-the-art economic models, damages' analyses, client presentations, pretrial discovery, industry research, preparation of evidence and testimony, depositions, and a critique of opposing expert analyses and reports.

- For a start-up global telecommunications enterprise, provided consulting services and developed a comprehensive computer model to evaluate the firm's financial plan. Model incorporated marketing, pricing, and communications traffic in a single modeling framework to facilitate sensitivity analysis by creditors and to evaluate the risk associated with the strategic business plan.

- Served as senior economic advisor on issues of analytical methodology for numerous pharmacoeconometric and health outcomes research projects. Provided expertise in the development of decision tools and the creative use of modeling applications for pharmacoeconomics and outcomes research.

## PUBLICATIONS

- Bates, Charles E., Charles H. Mullin, and Marc C. Scarcella. "The Claiming Game." *Mealey's Litigation Report: Asbestos* 25, no. 1 (February 3, 2010).

- Bates, Charles E., Charles H. Mullin, and A. Rachel Marquardt. "The Naming Game." *Mealey's Litigation Report: Asbestos* 24, no. 15 (September 2, 2009).

- Bates, Charles E., and Charles H. Mullin. "State of the Asbestos Litigation Environment—October 2008." Mealey's Litigation Report: Asbestos 23, no. 19 (November 3, 2008).

- Bates, Charles E., and Charles H. Mullin. "Show Me The Money." *Mealey's Litigation Report: Asbestos* 22, no. 21 (December 3, 2007).

- Bates, Charles E., and Charles H. Mullin. "The Bankruptcy Wave of 2000—Companies Sunk By An Ocean Of Recruited Asbestos Claims." *Mealey's Litigation Report: Asbestos* 21, no. 24 (January 24, 2007).

- Bates, Charles E., and Charles H. Mullin. "Having Your Tort and Eating It Too?" *Mealey's Asbestos Bankruptcy Report* 6, no. 4 (November 2006).

- Bates, Charles E., and Halbert White. "Determination of Estimator with Minimum Asymptotic Covariance Matrices." *Econometric Theory* 9 (1993).

- Bates, Charles E., and Halbert White. "Efficient Instrumental Variables Estimation of Systems of Implicit Heterogeneous Nonlinear Dynamic Models with Nonspherical Errors." In *International Symposia in Economic Theory and Econometrics,* vol. 3, edited by W.A. Barnett, E.R. Berndt and H. White. New York: Cambridge University Press, 1988.

- Bates, Charles E. "Instrumental Variables." In *The New Palgrave: A Dictionary of Economics,* edited by John Eatwell, Murray Milgate, and Peter Newman. London: Macmillan, 1987.

- Bates, Charles E., and Halbert White. "An Asymptotic Theory of Consistent Estimation for Parametric Models." *Econometric Theory* 1 (1985).

## SELECTED SPEAKING ENGAGEMENTS

- "The Top Emerging Trends in 2015 Asbestos Litigation." Perrin Conferences Cutting-Edge Issues in Asbestos Litigation Conference, March 15–17, 2015.

- "Asbestos Bankruptcy: A Discussion of the Top Trends in Today's Chapter 11 Cases." Perrin Conferences Asbestos Litigation Conference: A National Overview & Outlook, Sept. 8–10, 2014.

- "An Asbestos Defendant's Legal Liability—The Experience in Garlock's Bankruptcy Asbestos Estimation Trial." Bates White webinar, July 29, 2014.

- "Concussion Suits against the NFL, NCAA, and Uniform Equipment Manufacturers." Perrin Conferences' Legal Webinar Series, May 24, 2012.

- "An Update on US Mass Tort Claims." Perrin Conferences' Emerging Risks on Dual Frontiers: Perspectives on Potential Liabilities in the New Decade, April 12–13, 2012, London, United Kingdom.

- "The Next Chapter of Asbestos Bankruptcy: New Filings, Confirmations, & Estimations." Perrin Conferences' Asbestos Litigation Conference: A National Overview & Outlook, September 13–15, 2010, San Francisco, CA.

- "Trust Online: The Impact of Asbestos Bankruptcies on the Tort System." Perrin Conferences' Asbestos Bankruptcy Conference: Featuring a Judicial Roundtable on Asbestos Compensation, June 21, 2010, Chicago, IL.

- "Current Litigation Trends that are Impacting Asbestos Plaintiffs, Defendants, & Insurers." Perrin Conferences' Asbestos Litigation Mega Conference, September 14–16, 2009, San Francisco, CA.

- "Verdicts, Settlements, and the Future of Values: Where Are We Heading? A Roundtable Discussion." HB Litigation Conferences' Emerging Trends in Asbestos Litigation, March 9–11, 2009, Los Angeles, CA.

- "Role of Bankruptcy Trusts in Civil Asbestos." Mealey's Emerging Trends in Asbestos Litigation Conference, March 3–5, 2008, Los Angeles, CA.

- "The Intersection between Traditional Litigation & the New Bankruptcy Trusts." Mealey's Asbestos Bankruptcy Conference, June 7–8, 2007, Chicago, IL.

- ABA's Insurance Coverage Litigation Committee Conference, March 1–4, 2007, Tucson, AZ.

- Mealey's Asbestos Conference: The New Face of Asbestos Litigation, February 8–9, 2007, Washington, DC.

- Mealey's Asbestos Bankruptcy Conference, December 4–5, 2006, Philadelphia, PA.

- "Seeking Solutions to European Asbestos Claiming: Will it be FAIR?" Keynote address, Mealey's International Asbestos Conference, November 1–2, 2006, London, United Kingdom.

- Mealey's Asbestos Bankruptcy Conference, June 9, 2006, Chicago, IL.

- Harris Martin Publishing Asbestos Litigation Conference, March 2, 2006, Washington, DC.

- Mealey's Wall Street Forum: Asbestos Conference, February 8, 2006, New York, NY.

- Mealey's Asbestos Legislation Teleconference, February 7, 2006.

## PROFESSIONAL ASSOCIATIONS

- National Association of Business Economists

- American Economic Association

- Econometric Society