**Exhibit G**

1

<pre>
 1                   UNITED STATES BANKRUPTCY COURT
                   WESTERN DISTRICT OF NORTH CAROLINA
 2                         CHARLOTTE DIVISION

 3   IN RE:                        :    Case No. 10-31607

 4   GARLOCK SEALING TECHNOLOGIES  :    Chapter 11
     LLC, ET AL.,
 5                                 :    Charlotte, North Carolina
          Debtors.                     Wednesday, July 27, 2016
 6                                 :    9:30 a.m.


 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8

            CORRECTED TRANSCRIPT OF HEARING ON (5333) DEBTORS'
 9      MOTION FOR ENTRY OF AN ORDER APPROVING DISCLOSURE
        STATEMENT FOR THE JOINT PLAN OF REORGANIZATION OF
10        GARLOCK SEALING TECHNOLOGIES, LLC, ET AL. AND
              OLDCO, LLC, PROPOSED SUCCESSOR BY MERGER
11            TO COLTEC INDUSTRIES, INC. AND HEARING
               ON (5341) DEBTORS' MOTION FOR ENTRY
12          OF AN ORDER APPROVING SOLICITATION AND
             CONFIRMATION PROCEDURES AND SCHEDULE
13          FOR CONFIRMATION OF THE JOINT PLAN
            BEFORE THE HONORABLE J. CRAIG WHITLEY,
14              UNITED STATES BANKRUPTCY JUDGE

15   APPEARANCES:

16   For the Debtors:              Robinson Bradshaw & Hinson, P.A.
                                   BY:  GARLAND S. CASSADA, ESQ.
17                                      RICHARD C. WORF, JR., ESQ.
                                        JONATHAN C. KRISKO, ESQ.
18                                 101 N. Tryon Street, Suite 1900
                                   Charlotte, NC  28246

19

20   Audio Operator:              COURT PERSONNEL

21   Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
                                  1418 Red Fox Circle
22                                Severance, CO  80550
                                  (757) 422-9089
23                                trussell31@tdsmail.com

24

     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
</pre>

1   preliminary values that were to be provided for the claims

2   resolution procedures.  Those values -- the term sheet provided

3   that the parties would confer and based on their agreement

4   after joint advice, the joint advice of their respective

5   experts, then there would be, preliminary CRP values would be

6   inserted into the disclosure statement and the plan and plan

7   documents, and then everything would go out.

8           And indeed, that's where we are today.  The disclosure

9   statement, literally every word, comma, period, semicolon, has

10  been vetted and approved.  Our notice agent is poised and ready

11  to put the packages together and send them out.  Our media

12  expert is prepared to launch a $5 million media campaign for

13  the notice.  Literally, everything is ready except for the

14  agreement on these claims resolution values.

15          We announced to Your Honor that we expected to have an

16  agreement by June 29th.  We were delayed a little bit in

17  starting the process because the experts were going to rely on

18  the Manville data and it took us a while to get the order

19  entered because of the notice that was required to the Manville

20  claimants.

21          But that happened and we thought we would be ready by

22  June 30th to enter the order and to get everything launched.

23  That did not happen and we have engaged in continual

24  discussions since then trying to reach an agreement.  And,

25  indeed, our expert has run various different scenarios trying

 1  can be modified after the, by the trustee after the first five

 2  years, but only to prevent manifest injustice and with the

 3  consent of the, of the Claims Advisory Committee and the FCR.

 4       And then there are provisions in, in the trust

 5  agreement that talk about what happens if, if that consent is

 6  not forthcoming, how that's, how that's resolved.

 7       So those are, those were the basic marching orders

 8  that the trustee would have when he's determining what the

 9  maximum settlement value and the MIF should be and these are

10  the considerations that the debtors and their claims experts,

11  Charlie Bates and Jorge Garcia, took into account as they made

12  their proposal.

13       Now, now we engaged in a process where we basically

14  turned it over to our experts and we asked them to come up with

15  recommendations about what these numbers should be and I

16  believe it's fair to say that Bates White, our expert, sort of

17  went first in the process, did the analysis, came up with

18  numbers, and provided working papers, the numbers and the

19  working papers to the other experts and I believe it's correct

20  to say that the other experts may have relied in some, to some

21  extent on the Bates White work.

22       And ultimately, what Bates White had to do was, was

23  project the number of claims in each of the categories, A, B,

24  and C, project the number of compensable claims within the

25  current population of claims, claims that have been filed as of

Case 21-30589-MBK Doc 4472-7 Filed 08/01/16 15/22 Entered 08/01/16 15/22 20:30:31 Desc
Exhibit G   Page 5 of 17

 1   the petition date, and then to project what the different

 2   categories would be in the, in the future.  And Bates White

 3   used -- for pending claims, Bates White used information it had

 4   about, about those claims in hand.  The mesothelioma claimants

 5   had filled out a questionnaire that gave very detailed

 6   information about the demographics of those claims, their

 7   disease type, their age, their occupations and industries, a

 8   lot of information that actually is reflected in the factors

 9   that determine the values of claims.

10        So Bates White valued, projected the claims and valued

11   them under the claims resolution procedures and then with those

12   values applied the directions in Section 2.3 of the, of the

13   claims resolution procedures and made this proposal as it

14   relates to the maximum settlement values and the medical

15   information factors.

16        First, on the lower part of the, of this slide you'll

17   see the maximum settlement values and Group 1 is 200.  And then

18   everything else sort of proportionally follows that.  But

19   you'll see the maximum settlement values in each group.  So --

20   and you may recall that these groups were put together by the

21   debtors' industrial hygiene expert and they were ultimately,

22   they were tweaked a little bit during negotiations on the CRP

23   and they were ultimately adopted by the parties.

24        But Group 1 are people who, who are in occupations and

25   industries where they have, would be expected to have a lot of

```
 1   work with, with gaskets and packing and obtained the kind of

 2   exposures that would make them more plausible candidates for

 3   compensation.  And then as you go down the group categories

 4   below that you get occupations and industries that have

 5   decreasing interaction with gaskets and packing.

 6         And then you'll see the medical information factors

 7   that, that Bates White recommended.  1 for mesothelioma, .2 for

 8   lung cancer, .1 for other cancer, .2 for severe asbestosis, .02

 9   for disabling asbestosis, and .01 for non-disabling asbestosis.

10         So those factors would apply to the maximum settlement

11   values.  For example, a lung cancer claimant in Group 2 would,

12   in Group 1 would be entitled to a maximum settlement value of

13   one-fifth of the, of the $200,000 maximum settlement value.

14         So those were, were the numbers.

15         And if we look at the next slide, this is Bates

16   White's summary of, of what the projected claims would be and

17   what the value of those claims would be under the claims

18   resolution procedures.  And you'll see that under the Bates

19   White analysis, if we set the factors as Bates White

20   recommended, then you get a distribution of money as set forth

21   in that middle column there.  Those are the total payments that

22   would be projected.

23         And, and by the way, if you look at the bottom of

24   that, you'll see that Bates White took off of the top of the,

25   of the analysis the administrative costs of the trust.  That's
```

Case 21-30589-MBK Doc 4472 Filed 08/01/16 Entered 08/01/16 20:30:01 Desc Main
Case 21-30589-MBK Doc 4472-6 Filed 07/15/22 Entered 07/15/22 17:03:31 Desc Exhibit G Page 7 of 17

1   a net present value of about 69 million.  The pre-petition

2   unpaid settlement is projected to be up to 10 million and

3   pending, and a pending judgment projected to be up to 2

4   million.

5           So you take those off the top and that gives you the

6   net fund balance that's available for distribution to the

7   unliquidated claims.  And those, those are the numbers.  And

8   you see -- in the column on the right-hand side you'll see that

9   Bates White projects that there would be surpluses.  So there'd

10  be reserves there to resolve any unexpected claims or

11  forecasting errors, which is one of the factors that the

12  trustee will consider when he's determining where to set these

13  values.

14          Now the medical information factors determine the sort

15  of the  ratios of payments here and, and if you look at the

16  actual payments in the middle you'll see that -- and you did

17  the determination.  We don't have this column on here -- but

18  these numbers would result, if Bates White's projections are

19  correct, with 86.4 percent of the money going, that's actually

20  distributed, going to mesothelioma claims in Group A.  And, and

21  that's -- that number, agreed number, is 85 percent.  It would

22  result in 33.8 million, or 9.4 percent going to lung cancer.

23  That -- the allocation's supposed to be 10 percent.  And 4.2

24  percent to Category C.

25          So this would result in, in reserves in every

19

 1   category, but it gets a little bit out of kilter, the

 2   allocations, but the projected reserves are so large they can

 3   correct -- the trustee is, is able to not only allow for

 4   forecasting errors, but to correct any imbalance in the, in the

 5   allocations.  He could -- in this case, if Bates White is

 6   correct on the projected claims, the trustee can periodically

 7   make it up for the, for Category B and Category C claims.

 8          The, the next slide, Your Honor -- and I -- let me --

 9   let me say about this.  That if, if the parties agreed to Bates

10   White's medical information factors, then any number below, up

11   to 200 million would be agreeable to the debtors.  If the, if

12   the parties would like to be more conservative and lower that

13   number, the effect is it's just going to leave a bigger

14   reserve.  And that would work under the plan.  I mean, you

15   could, you could, arguably, get the, make the reserve be too

16   good.  It would have to be made up later.  I mean, that's a

17   judgment that the trustee will have to make and the parties can

18   make in this case on just how big should the reserve be.

19          And we should also allow for the fact that we're,

20   we're using Bates White's numbers here.  So other experts have

21   different numbers and they may come up, come up with different

22   numbers.  But it just so happens that the ACC and the FCR want

23   lower maximum settlement values.

24          So that, that makes the debtors' expert completely

25   flexible on it.  If you, if you come in at any number below

Case 21-30589-MBK  Doc 4472  Filed 08/01/15  Entered 08/01/15 20:30:01  Desc Main
Document  Page 9 of 17
Case 21-30589-MBK  Doc 4472-26  Filed 07/15/22  Entered 07/15/22 17:30:31  Desc Exhibit G  Page 20 of 51

20

 1  this, then, then we can say, we can go to the confirmation

 2  hearing and we can say that this plan is, is feasible and we

 3  think the reserves are reasonable.

 4        So, so that's where the debtors, what they propose.

 5        The Committee came up with a different set of numbers.

 6  First of all, as you'll see, the medical information factors,

 7  the Committee's numbers are not that far removed from, from

 8  Bates White's numbers except with, with, really, with three

 9  exceptions.  And that is on the lung cancer Bates White had a

10  .2 factor.  The Committee came up with a .3 factor, which is 50

11  percent higher.  And that makes a, that makes a big difference

12  on the, on how the allocation of the money would, would come

13  out.

14        The other factors are the same with the, with the

15  exception of disabling asbestosis and non-disabling asbestosis.

16  Where, while Bates White came out with .02 for disabling

17  asbestosis, the Committee's experts, LAS, are .03 and non-

18  disabling asbestosis, Bates White was at .01, the Committee's

19  at .02.  But the Committee proposed lower maximum settlement

20  values and you'll see that where Bates White was at 200 for

21  Group 1, the Committee's at 165.  And all of the other numbers

22  are sort of proportionally adjusted, adjusted down from that.

23        The, the next page, Your Honor, is Bates White's

24  analysis of what would happen under its claims projections if

25  we adopted the Committee's proposed MSVs and MIFs.  And, and

21

```
 1  you'll see that, that in the middle column, again, those are

 2  the projected payments to claims in each category and in the

 3  column on the far right-hand side you have the surplus or

 4  deficit.  And under Bates White's analysis the, the Committee's

 5  numbers would create a much, much larger reserve for

 6  mesothelioma claims.  Whereas, you know, Bates White's reserve

 7  was about 28 million, you'll, you'll see the Committee's

 8  reserve goes up to 82 million.  But there would be a deficit in

 9  the Category B, lung cancer, and there would be virtually no

10  reserve in Category C, which is for all of the other diseases.

11         And if you, if you look at the actual allocations in

12  the disease categories, under the Committee's about 80.7

13  percent of the money would be distributed to mesothelioma

14  claimants.  That's compared to the 85 percent.  13.1 percent

15  would be distributed to Category B, the lung cancer, and 6.2

16  percent -- should be 5 percent -- to the other cancer.  And,

17  and that's all right except for one thing and that is that you

18  set the MSV at 165, it results in a lack of reserves.  So the,

19  so the trustee wouldn't be able to correct the ship and get the

20  allocations back to what the formula says they're supposed to

21  be.

22         So if the Committee were proposing the same

23  information factors as the debtors, then we could say that,

24  that this would be feasible and it would work under the plan,

25  but our experts would not be able to say that this set of
```

22

1  preliminary numbers, numbers would work.

2         And then, finally, Your Honor, we have the FCR's

3  proposal.  The FCR proposes the medical information factors

4  that are identical to the Bates White factors, but the FCR

5  proposes a maximum settlement value that's, I guess it's

6  approximately 60 percent of what Bates White thinks that it,

7  that it could be.  And as, as you would expect, looking at the

8  next page, this is a, I mean, this is a very, very conservative

9  approach to what the numbers should be.  And so as you would

10  expect, the actual distributions come out to the same

11  allocations that Bates White did.  They've used the same

12  medical information factors, but the surpluses are, are just

13  huge.  For mesothelioma, the surplus would be 144 million

14  compared to the 28 million that Bates White had.  The lung

15  cancer, there would be an $18.7 million surplus and for

16  Category C, the other diseases, 10.4 percent surplus.

17         So you're talking about a 45, a 40 or 45 percent

18  surplus in those categories.  So, so would that, would that

19  work?  Would the trustee be able to meet his mandate?  Well,

20  the trustee would be able to ensure under these figures that

21  claims are treated equally -- our expert would believe that --

22  and would also be able to ensure that the claims ratios are

23  respected.  The question there, are, are the reserves created

24  by this, are they really necessary, given the risk?  Because

25  they do come at a cost and that's that, that the current

23

1 claimants will have to wait for a lot of their, a lot of their

2 money.  I don't know how long they would have to wait.  The

3 trustee would be able to, to, to determine that.

4       But at the end of the day, there's a lot of room for

5 agreement between these three positions and, in fact, I asked

6 Bates White to run some numbers, different sets of numbers that

7 might bring the, the parties together.  And, and one of the

8 things we analyzed, what would the maximum settlement factor

9 have to be if you used the Committee's medical information

10 factors.  If you, if you had a maximum settlement value that

11 created enough reserve in each of the categories so that if, if

12 the Committee's expert turned out to be wrong and Bates White

13 right and you got out of kilter on the claims ratios, as long

14 as you have appropriate reserves you can right the ship and

15 correct the ratios.  So -- so we -- from Bates White's

16 perspective we said, well, what is the maximum settlement value

17 that achieves that and we came up with, under the analysis,

18 with $148,000.

19       So if you set the maximum settlement value at $148,000

20 and you adopt the Committee's medical information factors,

21 then, then our experts would say, well, that, that would work.

22 It would leave, probably, relatively modest reserves for lung

23 cancer and other cancer and a huge reserve for, for

24 mesothelioma.  It would have you holding back a lot more money

25 for mesothelioma claims than, than the other claims, but if

Case 21-30589-MBK Doc 4472 Filed 08/01/16 Entered 08/01/16 17:30:31 Desc Main
Document   Page 13 of 17

 1   Bates White's analysis of the claims is correct, then we think

 2   that will, that would, would actually work.

 3           And then I asked, if you, if you look at the very last

 4   two slides in the presentation, one of the things we looked at

 5   was, well, what if we adopted that 148 number and we

 6   compromised on the, on the lung cancer number so that it's not

 7   .2, as Bates White and the, and FCR's expert wanted to do and

 8   it's not .3, but suppose we make it .25 and we use the 148?

 9   Here, now, there's no compromise on the disabling asbestosis

10   and the non-disabling.  You see we keep those at .03 and .02.

11           So these are compromise numbers.  And when I say

12   they're compromise, no one's, no one's agreed --

13           THE COURT:  You're, you're just suggesting.

14           MR. CASSADA:  This is us sort of exploring the

15   possibility.

16           Well, if you do that, then you come out with the

17   numbers at the -- at the -- in my last slide here and you'll

18   see, again, the middle numbers show what the distributions

19   would be and the column on the right shows the surpluses in the

20   different, in the different categories.  The distributions

21   would be 82.7 percent for mesothelioma claims, not the 85

22   percent in the allocation, but with reserves big enough to make

23   that up.  For lung cancer, it'd be 11.2 percent, a little bit

24   higher than the 10 percent in the agreed-on ratio, a little,

25   about a point or a little more higher, and for Category C, 6.1,

25

1  about a point or a little bit higher.  But in each case with

2  reserves that Bates White would say would be, would be

3  reasonable and would -- would -- you'd be able to adjust those

4  to get to the right claims payment ratios.

5         So, in any event, that is something that's a

6  compromise position that -- that our -- at least the debtors'

7  experts would be able to say that, that these numbers would be,

8  would allow the trustee to meet the requirements of the trust

9  and be financially feasible.

10        So that, that's sort of what, what's been happening in

11 the last month and a half.

12        I will say one other thing.  There's -- there -- a big

13 point of disagreement on the claims projections, I think the

14 biggest, seems to be mesothelioma claims.  Bates White projects

15 that about 10,000 mesothelioma claims, present and future,

16 would be compensable under the, under the plan.  The Committee

17 believes that, projects up to 15,000 and the, and the Future

18 Claimants Rep, Representative, projects us to 20,000.

19        So those are huge swings in numbers and -- and the --

20 the reserves here, I think, I mean, Bates White would, would

21 think that, first, its projection is reasonable, but the plan

22 itself is designed in many different ways to address unexpected

23 claims.  And, and one of them is, as you noticed from those

24 maximum settlement values, that if you're in the lower contact

25 groups you get, you get lower payments.  In fact, if you're in,

36

1  required.

2  That's just a little example of the kinds of nuances

3  that the experts have to deal with in order to produce

4  something that's realistic.  You can't just say, oh, well,

5  we're going to jam the value of the lung cancers down to .2.

6  What you can say is we're not going to pay the lung cancers as

7  a whole, or the 10 percent of the available fund.

8  So we have some differences in methodology.  Despite

9  that, we have had a constructive dialogue among these experts.

10  It seems to me that agreement ought to be within reach.  It is

11  well worth, well worth putting the parties to the task of

12  knuckling down and striving further to achieve value.  It would

13  not be a real disclosure statement if it put forth a range of

14  200,000 to 120.  That doesn't give meaningful information.  It

15  would not be a meaningful agreement to say, hey, we'll take

16  the, the FCR's 120 with its medical information factors, we'll

17  take the Committee's on the other pole, and we'll just middle

18  those.  That would be arbitrary.  That is not meaningful

19  guidance either to the claimants or to the trustee when he goes

20  to make his independent evaluation.  We won't do that.  We will

21  engage in a reasoned analysis and dialogue with the other

22  experts to come to a consensus.

23  I am favorably inclined to recommend to my client what

24  the debtor has put forward here as a compromise not because it

25  middles anything, but because I can justify that based on my

37

 1  expert's analysis as within the range of reasonable expectation

 2  without doing violence to the historical relationship from the

 3  diseases and with appropriate regard to equality over time.

 4  That's not just pulling a number out of the air.  The

 5  requirement of the term sheet that we come to an agreement does

 6  not permit us, it seems to me, to just pull numbers out of the

 7  air.

 8          So what I'm asking you to do, Judge, is send us back

 9  for more work and recalendar this thing for early August once

10  Mr. Guy gets back and has a chance to deal with it.  In the

11  meantime, it is my hope and expectation that the parties will

12  continue to discuss, to exchange ideas, to negotiate, and to

13  work hard to bring to fulfillment this plan and this claims

14  resolution procedure, which Mr. Cassada appropriately described

15  as already a significant achievement.  Now it remains for us to

16  finish the job.

17          Thank you, Judge.

18          THE COURT:  All right.

19          Mr. Guy, did you hear all that?

20          MR. GUY:  I, I did hear most of it, Your Honor, and

21  what I needed.  Thank you.

22          And I apologize to you, the Court, and the parties for

23  not being available in person and I hope you can hear me okay.

24          THE COURT:  Well, even asbestos attorneys get a little

25  time off, so.

46

```
 1   progress has been made and I will --

 2              THE COURT:  Okay.

 3              MR. CASSADA:  I'll let Mr. Swett and Mr. Guy describe

 4   where we, where we are settled and where, where we are right

 5   now.

 6              THE COURT:  Okay.

 7              Mr. Swett.

 8              MR. SWETT:  Yes, sir.

 9              Counsel have coalesced on the alternative suggested by

10   the debtors' slides -- for shorthand, I'll call it the 148 --

11              THE COURT:  Okay.

12              MR. SWETT:  -- with those medical information factors.

13              Mr. Grier has said that would be agreeable to him.

14              My authority is at a different level of the MIFs.  So

15   I have to go back to the Committee for ratification, but I

16   will, I will recommend that resolution.

17              THE COURT:  Okay.

18              MR. SWETT:  And I will act promptly.

19              THE COURT:  All right.

20              So if we have an agreement, then we're ready to go

21   forward with those changes to the disclosure statement?

22              MR. CASSADA:  We would simply input those into the

23   disclosure statement and the plan documents.  And --

24              THE COURT:  Okay.

25              MR. CASSADA:  -- we would present to Your Honor the
```