# Exhibit A

# Anthony Michael Hernandez-Valdez

Patient Health Summary, generated on Jul. 17, 2022

## Patient Demographics - Male; born Sep. 23, 1998

| Patient Address | Communication | Language | Race / Ethnicity | Marital Status |
|---|---|---|---|---|
| 2695 Agnes Way *(Home)* | ▮▮▮▮▮▮ (Mobile) | English (Preferred) | Other Race / Hispanic | Single |
| Merced, CA 95340-3133 | ▮▮▮▮▮▮ (Home) | | or Latino | |
| | ▮▮▮▮▮▮▮▮▮ | | | |
| *Former (Jan. 18, 2022 - Jan. 17, 2022):* | | | | |
| 2695 Agness Way *(Home)* | | | | |
| Merced, CA 95340 | | | | |
| *Former (Mar. 07, 2017 - Jan. 17, 2022):* | | | | |
| 2695 Agnes Way *(Home)* | | | | |
| MERCED, CA 95340 | | | | |

## Note from Stanford Health Care and University Healthcare Alliance

This document contains information that was shared with Anthony Michael Hernandez-Valdez. It may not contain the entire record from Stanford Health Care and University Healthcare Alliance.

## Allergies

**Prochlorperazine** (Other (Specify with Comments))
**Fosaprepitant** (Shortness of Breath)
**Oxycodone** (Itching, pruritis)
**Ondansetron Hcl** (Shortness of Breath, Nausea, Vomiting, Dizziness, Headache)

**EXHIBIT A**

## Progress Notes - documented in this encounter

Mohana Roy, MD - 07/15/2022 12:00 PM PDT
Formatting of this note is different from the original.
Images from the original note were not included.

Stanford Thoracic Oncology Clinic
Established Patient Visit
Palo Alto
RE:
Dr. Leah Backhus
Dr. Josh Fronk

MRN: 36945558
DOB: 9/23/1998

History of present illness:
Anthony Michael Hernandez-Valdez is a 23 Y old male who was recently diagnosed with epithelioid mesothelioma, suspect pericardial primary, on carboplatin and pemetrexed, here for followup

His oncologic history is summarized as follows:

2020: Developed cough and shortness of breath. Had been admitted with several echocardiograms performed, which showed pericardial effusions. Has only been treated on colchicine and prednisone.

6/8/2020-echo at that time with normal LV size and systolic function, EF 60 to 70%, moderate septal and moderate posterior LVH. Large pericardial effusion.

12/24/21-follow-up echo with normal LV size, small anterior and moderate sized posterior pericardial effusion

Of note the prior notes note that he was supposed to be on colchicine 0.6 mg twice daily for 3 months however did not follow-up between July 2020 and February 2021

not measured by radiologist at that time.

Recommended follow up imaging to better assess progression of the pericardial effusion.

1/4/22: Developed worsening adenopathy and neck swelling and underwent a CT neck for left sided neck swelling. Imaging revealed abnormal shotty appearing lymph nodes along the left neck and left neck soft tissue spaces including the left jugulodigastric which is enlarged measuring 1.3 cm. Numerous posterior cervical lymph nodes and bilateral supraclavicular lymph nodes.

CT chest revealed worsening lobulated masslike pericardial effusion. Worsening multiple enlarged neck soft tissue lymph nodes and subcutaneous soft tissue edema extending through the chest wall to level of the trachea. Notable supraclavicular, mediastinal, and retroperitoneal lymphadenopathy. Small pleural effusion.

1/10/22: Underwent right paratracheal (R4) lymph node biopsy. Path revealed mesothelioma, epithelioid type.

1/27/2022-patient went to Valley heart Institute in Modesto for chest discomfort, follow-up appointment at that time and, thought to be due to viral pericarditis from respiratory infection without tamponade.

1/28/2022: Initial Thoracic Oncology Visit (Roy)

1/31/22: AFP, LDH, beta HCG, uric acid levels are wnl.

2/3/22: Scrotal ultrasound is negative.

2/6/22- SHC admission for shortness of breath-initially relieved by 2 thoracentesis with 1-1/2 L taken out on each side. Pleural fluid confirms malignant cells, morphologically similar to mesothelioma.

2/12/-2/22/22-SHC readmission with worsening respiratory status, concern for right-sided heart failure and will remain tachycardic.
He underwent Pericardiectomy (performed by local Dr. Boyd) Bilateral PleurX catheters,  Resection of mediastinal mass and thymectomy on 2/17/22
OPERATIVE FINDINGS:
1.   Large bilateral chylothoraces.
2. Diffuse tumor involvement of the pericardium with areas of invasion into the myocardium

3/18/22 CT Chest- Similar to 2/26/2022, multiple pericardial masses nearly encasing the heart, thoracic lymphadenopathy, retrocrural lymphadenopathy, and adjacent right upper lobe and right middle lobe interlobular septal thickening, concerning for residual/recurrent malignancy. Interlobular septal thickening may represent lymphangitic carcinomatosis versus lymphatic obstruction. Interval increase in extensive filling defects throughout the venous system, including left internal jugular, left brachiocephalic, right internal jugular, right brachiocephalic, and right vertebral veins. No evidence of extension of the thrombus into the superior vena cava

3/18/22 - C1 Carboplatin AUC 5/Pemetrexed 375 mg/m2

Significant nausea, vomiting, fatigue- had also allergic rxn to Emend
Added low dose haldol for nausea/vomiting, compazine and reglan has not helped in past
Two admissions for symptom control

4/9/22- C2 carboplatin AUC 4, Pemetrexed 375 mg/m2 (scheduled admission for chemo given symptom burden)

4/29/22- C3 held given fatigue, cytopenia and anemia, 1 unit PRBC given

5/5/22- CT chest- Interval increased diffuse nodular interlobular septal thickening, right greater than left lung, as well as new and increasing pulmonary nodules, concerning for progression of disease.. Extensive thoracic lymphadenopathy and multiple pericardial masses nearly encasing the heart, overall stable compared to prior exam with the exception of a few lymph nodes which are slightly decreased in size.

5/13/22- C1D1 Nivolumab + Ipilimumab

5/29/22- ED visit -SOB

5/31/22-6/4/22- SHC admission- SOB-worsening effusions, no thoracentesis able. Course c/b catatonia -helped with ativan and amantadine.

6/7/22-he again went to a local emergency room for shortness of breath, CT chest done there noting worsening findings from February where the last scan there was done. Larger and more complex bilateral loculated pleural effusions, right pleural fluid location more loculated, multiple loculated pericardial masses which are overall similar.

prognosis and goals and goals of care had with the primary team and also palliative medicine. Started on an increased dose of methadone with her partner.

6/24/22- C2D1- Nivolumab + Ipilimumab

Interval History
Here for next dose of nivolumab, with his mother
He is much more alert today, sitting upright in wheelchair
Notes baseline SOB, on 5L NC most times, 6L with exertion and movement
No recent sensation of sudden SOB, using ativan occasionally
No recurrent nausea/vomiting
No new rashes, diarrhea
Has dry skin and frequently itchy

Review of systems:
A comprehensive 14-point review of systems was performed, with pertinent positives as noted above; all other systems negative.

Past medical history:
Anxiety
Appendicitis

Past surgical history:
Past Surgical History:
Procedure Laterality Date
• BILATERAL PROCEDURE; SECONDARY MODIFIER N/A 2/17/2022
Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM
• CHEST DRAINAGE CATHETER INSERTION Bilateral 2/17/2022
Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM
• MEDIASTINAL LYMPHADENECTOMY, BILATERAL TUNNELED PLEURAL CATHETERS (PLEUR-X), POSSIBLE PLEURECTOMY, RADICAL PERICARDIECTOMY, THYMECTOMY WITH CPB STANDBY N/A 2/17/2022
Performed by Boyd, Jack H, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM
• THYMECTOMY; MEDIAN STERNOTOMY APPROACH N/A 2/17/2022
Performed by Backhus, Leah Monique, MD at STANFORD HOSPITAL 500P INTERVENTIONAL PLATFORM

Appendectomy 2009

Medications:
Outpatient Medications Prior to Visit
Medication Sig Dispense Refill
• acetaminophen (Tylenol 8 Hour) 650 mg TbSR take 1 Tablet by mouth daily as needed
• albuterol 90 mcg/actuation HFA inhaler 1 Puff by Inhalation route daily as needed
• cetirizine (ZyrTEC) 10 mg tablet take 1 Tablet (10 mg total) by mouth daily as needed for Allergies 30 Tablet 0
• Cholecalciferol (Vitamin D3) (Vitamin D3) 2,000 unit CAPS take 1 Capsule by mouth every day 30 Capsule 3
• fluticasone propionate (Flonase) 50 mcg/actuation SpSn spray 2 Sprays by Nasal route daily as needed (spray in each nostril as needed for allergies)
• folic acid 1 mg tablet take 1 mg by mouth daily
• furosemide 40 mg tablet take 1 Tablet (40 mg total) by mouth 2 times a day 60 Tablet 0
• HYDROmorphone (Dilaudid) 2 mg tablet take 1 Tablet (2 mg total) by mouth every 4 hours as needed (pain) Can take 2mg in the morning and 2mg in the evening each day (please only take while alert and awake) 30 Tablet 0
• hydrOXYzine HCL (ATARAX) 50 mg tablet take 1 Tablet (50 mg total) by mouth every bedtime 30 Tablet 0
• lidocaine (Lidoderm) 5% patch apply 1 Patch to skin daily at noon Apply patch to back for up to 12 hours in any 24 hour period. 10 Patch 0
• LORazepam (Ativan) 1 mg tablet Please take lorazepam 0.5 mg three times a day scheduled. For break through anxiety, okay to take up to 1mg lorazepam three times a day. 30 Tablet 0
• melatonin 5 mg tablet take 1 Tablet (5 mg total) by mouth every bedtime as needed 30 Tablet 0
• methadone (Dolophine) 5 mg tablet take 0.5 Tablets (2.5 mg total) by mouth every day AND 1 Tablet (5 mg total) every bedtime. This drug is associated with a BLACK BOX WARNING. Click on the blue hyperlink below to review the details.. 21 Tablet 0
• metoprolol succinate (Toprol XL) 25 mg extended release tablet take 3 Tablets (75 mg total) by mouth daily 90 Tablet 0
• multivitamin tablet take 1 Tablet by mouth daily 30 Tablet 0
• naloxone (Narcan) 4 mg/actuation Spry Spray 0.1 mL (4 mg) into one nostril for suspected overdose. Repeat into other nostril after 2 to 3 minutes if no or minimal response. 2 Each 1
• ondansetron 4 mg orally disintegrating tablet take 1 Tablet (4 mg total) by mouth every 6 hours as needed 10 Tablet 0
• pantoprazole (Protonix) 40 mg delayed release tablet take 40 mg by mouth every morning
• polyethylene glycol (MIRAlax) 17 gram packet take 1 Packet (17 g total) by mouth daily 10 Packet 0
• potassium chloride (Klor-Con) 10 mEq sustained release tablet take 3 Tablets (30 mEq total) by mouth daily Do not crush. May

Allergies:
NKDA

Social history: obtained at prior visits
Father works in construction and may have exposures, however only started in the past couple of years
Previously attended school in an old building, no clear asbestos exposure
Mother reports using large amounts of baby powder (Johnson and Johnson) in his childhood
No other exposures to hair salon products, chemicals in labs
Works at Home Depot
EtOH socially
No recreational drug use

Family history:
Father had ?bone cancer
Maternal aunt had early age breast cancer (diagnosed at age 33) and AML (diagnosed 35)

BRCA mutation:
- Mother, maternal grandmother, maternal aunts x 2

Physical Exam:
Filed Vitals:
07/15/22 1246
BP: 91/54
Pulse: 103
Resp: 18
Temp: 36.9 °C (98.4 °F)
TempSrc: Oral
SpO2: 99%
On 5L NC
General: chronically ill appearing, but more alert, answering questions
CV: Tachycardic, distant heart sounds
Resp: improved aeration at bases, crackles bilaterally still present
Abdomen: soft, non tender, sites of pleurx covered with bandage, minimal to no drainage
Extremities: no edema, +diffuse xerosis and excoriations

Labs and studies:
CBC
Recent Labs
07/15/22
1240 06/24/22
1626 06/20/22
0612
WBC 5.9 5.4 8.2 | 8.2
HGB 9.7* 8.1* 9.1* | 9.1*
HCT 33.1* 28.1* 31.0* | 31.0*
MCV 91.9 91.5 92.0 | 92.0
RDW 15.8* 16.7* 16.4* | 16.4*
PLT 396 321 362 | 362
NEUTAB 3.96 3.19 5.90

Recent Labs
07/15/22
1240 06/24/22
1626 06/20/22
0612
NEUT 67.0 58.9 72.4
LYM 8.3 10.0 5.8
MONO 20.1 24.8 16.2
EOS 3.6 5.0 4.7
BASO 0.7 0.9 0.7

CMP
Recent Labs

NA 133* 135 133* | 133*
K 2.9* 2.9* 2.4* | 2.9*
CL 88* 93* 92* | 92*
CO2 40* 35* 31* | 31*
AG 5 7 10 | 10
BUN 10 11 13 | 13
CR 0.57* 0.74 0.74 | 0.74
GLU 96 96 85 | 85
EGFR 141 131 131 | 131
CA 7.8* 8.4 8.3* | 8.3*
TP 5.8* 6.4 6.4
ALB 2.2* 2.6* 2.4*
TBIL 0.4 0.5 0.5
AST 21 18 20
ALT 15 10 15
ALKP 195* 199* 217*

ANEMIA
Recent Labs
04/29/22
0937
FERRITIN 1,351*
TIBC 200*
FE 32*
TRFSAT 16*

Imaging
As in HPI

Pathology:
2/25/22 Pericardiectomy Specimen Review

A. THYMUS PERICARDIAL FAT
B. PERICARDIUM AND TUMOR
DIAGNOSIS (MICROSCOPIC):
A. THYMUS AND PERICARDIAL FAT, EXCISION
--   PERICARDIAL TISSUE WITH MALIGNANT MESOTHELIOMA, EPITHELIOID
TYPE
--   METASTATIC MALIGNANT MESOTHELIOMA COMPLETELY REPLACING ONE
LYMPH NODE (1/1)
--   EXTENSIVE VENOUS AND LYMPHATIC INVOLVEMENT BY MALIGNANT
MESOTHELIOMA
--   INVOLUTED THYMIC TISSUE
B. HEART, PERICARDIUM AND TUMOR, EXCISION
--   MALIGNANT MESOTHELIOMA, EPITHELIOID TYPE
LIBERT/C. WANG/BERRY

COMMENT:  We note the patient's recent diagnosis of metastatic
malignant mesothelioma, epithelioid type (SHS-22-03759). The tumor
present in the current resection specimen is morphologically
similar.

Stanford Review
DIAGNOSIS:
LYMPH NODES. RIGHT LOWER PARATRACHEAL/4R, EXCISIONAL BIOPSY
(1/10/22; 22MS-133)
    --   HISTOLOGIC AND IMMUNOPHENOTYPIC FINDINGS SUPPORTING
METASTATIC MALIGNANT MESOTHELIOMA, EPITHELIOID TYPE.

COMMENT:  I have reviewed the H&E stained slides and accompanying
immunostains and agree with Dr. Silveira as listed above. In light
of the unusual diagnosis in this age group I performed a battery of
immunostains in our lab along with additional H&E stained slides.
The neoplastic cells within the lymph node show the following
immunophenotypic profile: WT1 positive, P40 negative, CK5/6
positive, D2-40 positive,  BAP1 retained, BerEP4 negative,

Molecular:
2/4/22 Guardant peripheral- negative

STAMP 1/26/22

Fusion STAMP 3/15/22- Negative: No fusions detected

Assessment & Plan:
Anthony Michael Hernandez-Valdez is a 23 Y old male with newly diagnosed pericardial mesothelioma, status post pericardiectomy and Pleurx placement on 2/17/2022, here for follow-up -he is status post 2 cycles of chemotherapy and 2 cycles of immunotherapy with nivolumab and ipilimumab.

#Epithelioid mesothelioma, pericardial-metastatic
We had previously discussed that this appears to be a primary mesothelioma of the pericardium which is exceedingly rare, even within the rare diagnosis of mesothelioma in general. In addition him being so young and age makes this additionally difficult.

Detailed discussion given patient's recurrent ED visits and hospitalizations for shortness of breath, uncontrolled anxiety and also uncontrolled respiratory symptoms with complex loculated effusions.

-Continue with nivolumab
-Messaged Dr. Fronk on reconnecting with him, prior missed appts esp with frequent hospitalizations

-Likely plan to remove Pleurx if not draining appropriately, multiple assessments of drain placement done with CTs

#Shortness of breath- continue methadone 2.5 mg qAM and 5 pm qPM
==Chronic Issues===

#Catatonia-he had during his last admission episodes with freezing and staring with minimal verbal response with was a clear change from his prior status. CT head without any acute findings. Likely catatonia from metabolic reasons, improved with amantadine which he continues. No clear evidence of encephalitis or other immunotherapy neurotoxicity or any infections. EEG unrevealing.No wimproved.

#Mouth Sores- improved- suspect chemotherapy related-

#Dry Skin, Linear dermatitis- -stable - can do VV likely with Dr. Rana in cutaneous oncology- messaged

#Nausea- multiple medications have been tried including ondansetron, Haldol, metoclopramide, Ativan.
Improved now off chemotherapy

#Chylous Pleural Effusions- drainage decreased on right, no further intervention, minimal drainage

#Anxiety-baseline with coping of diagnosis -
- Ativan 1mg TID PRN for anxiety
- Ativan 0.5 mg TID scheduled
- Amantadine taper of 25 mg Daily for 1 week (6/11-6/21)
- Dilaudid 2mg q4h PRN; per palliative recs, added dilaudid 2mg PO BID- not needing as regularly
- cont hydroxyzine 50 mg qHS

#Cardiac Management-in discussing the case with Dr. Boyd and Dr. Backus and reviewing the operative reports, he has still significant mesothelial tumor involvement around his heart and some into the myocardium. Recommend continuing metoprolol succinate 75 mg daily.
-Continue lasix 40 mg BID -hypokalemia likely due to furosemide, education re: potassium repletion at home
-Oral K and monitoring

#Hypokalemia-continue oral repletion

#Thrombosis - non occlusive thrombus bilateral internal jugular and left brachiocephalic veins-extension seen on recent CT, likely also due to impaired venous drainage from tumor burden
#Right subsegmental PE:
He is continuing on rivaroxaban daily

#Leg pain- seems to be related to chemo, no acute swelling- Negative for DVT

RTC for scheduled immunotherapy, 10 day symptom check

Advance Care Planning

Documented Time
Prognosis was shared as follows: continued decline in function
Comment: --- 6/09/2022 2 PM Mohana Roy, MD ---
Discussed that initial prognosis was uncertain but however given progression of disease and still large burden of disease, concerned about any further significant decrease is expected from immunotherapy. Still plan to continue medical treatment however would consider hospice focused care given high burden of symptoms and recurrent emergency visits and hospitalizations.

6/15/22 Mohana Roy, MD
I spoke to his mother, Anna, along with Dr. Chris chen (primary MD) and Dr. Torrey Simons (Palliative care MD). Expressed concern given large burden of pericardial and pleural-based disease without significant if any improvement after 2 doses of chemotherapy and 1 dose of immunotherapy. Discussed that in general mesothelioma is not responsive to as many systemic treatments. that I would be open to giving him 1 more dose of immunotherapy per her wishes as his advocate and spokesperson- however, if worsening clinical status beyond this, I do not think further cancer directed treatment would make sense.

Documented by

RTC for immunotherapy schedule, ongoing conversations as above

As usual, I encouraged the patient to contact us should he develop any new symptoms or have any questions or concerns

Mohana Roy, MD
Clinical Assistant Professor-Oncology
Stanford Cancer Center Palo Alto and South Bay

Electronically signed by Mohana Roy, MD at 07/16/2022 10:24 PM PDT

# Exhibit B

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**06/15/2022 at 02:35:57 PM**
By: Cheryl Clark,
Deputy Clerk

1  Joseph D. Satterley (C.S.B. #286890)
     jsatterley@kazanlaw.com
2  Denyse F. Clancy (C.S.B. #255276)
     dclancy@kazanlaw.com
3  Ian A. Rivamonte (C.S.B. #232663)
     irivamonte@kazanlaw.com
4  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
5  Jack London Market
   55 Harrison Street, Suite 400
6  Oakland, California 94607
   Telephone: (510) 302-1000
7  Facsimile:  (510) 835-4913

8  Attorneys for Plaintiff

9              SUPERIOR COURT OF CALIFORNIA

10                 COUNTY OF ALAMEDA

11  ANTHONY HERNANDEZ VALADEZ,                 Case No.  22CV012759

12          Plaintiff,                          **COMPLAINT FOR PERSONAL INJURIES**

13       v.                                     **DEMAND FOR JURY TRIAL**

14  JOHNSON & JOHNSON;

15  ALBERTSONS COMPANIES, INC., individually
   and as successor-in-interest, parent, alter ego, and
16  equitable trustee of LUCKY STORES, INC.;

17  LUCKY STORES, INC.;

18  SAFEWAY INC.;

19  SAVE MART SUPERMARKETS, individually,
   and as successor-in-interest, alter ego and
20  equitable trustee of LUCKY STORES, INC.;

21  TARGET CORPORATION;

22  WALMART INC.; and

23  FIRST DOE through ONE-HUNDREDTH DOE,

24          Defendants.

25

26

27  //

28  //

3156712.3

Complaint for Personal Injuries

**EXHIBIT B**

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**GENERAL BACKGROUND AND OTHER ALLEGATIONS**

**I.**

**The Plaintiff:** Anthony Hernandez Valadez is the physically injured Plaintiff. His mesothelioma was caused by exposures to asbestos, asbestiform fibers, and asbestiform talc – collectively referred to herein as asbestos – for which Defendants bear responsibility.

**II.**

**The Defendants:** All Defendants are listed in the case caption. The true names of the Defendants sued as DOE's are unknown to Plaintiff. Each Defendant was the agent, employee, or joint venturer of its co-defendants, and was acting in the full course and scope of the agency, employment, or joint venture.

**III.**

**Alternate Entities:** All Defendants are individually liable for their own defective products and wrongful conduct; and some Defendants are liable for the defective products and wrongful conduct of their alternate entities. Each such Defendant is liable for the torts of each of its alternate entities because:

- there were express or implied agreements between the companies to transfer and assume the liabilities;

- the transactions between the companies amounted to a consolidation or merger;

- the purchasing company is a mere continuation of the seller;

- the transfer of assets to the purchasing company was for the fraudulent purpose of escaping liability for the seller's debts;

- strict products liability was transferred because (i) there was a virtual destruction of Mr. Valadez's remedies against the original manufacturer caused by the successor's acquisition of the business, (ii) the successor has the ability to assume the original manufacturer's risk-spreading role, and (iii) it is fair to require the successor to assume responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business; and

- the companies are alter egos because (i) there is such a unity of interest, ownership, and business operations between the companies that their separate personalities do not in reality exist, and (ii) there would be an inequitable result if the torts in question were treated as those of one company alone.

/ / /

/ / /

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entity |
|---|---|
| ALBERTSONS COMPANIES, INC. | LUCKY STORES, INC. |
| SAVE MART SUPERMARKETS | LUCKY STORES, INC. |

### IV.

**The Products:** For many years, Defendants and/or their predecessors have manufactured, sold, distributed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce products that contain asbestos, asbestiform fibers, and/or asbestiform talc.

### V.

**Knowledge of Asbestos Hazards:** The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and what was known and knowable to Defendants:

1.    Health hazards from asbestos exposure were identified in the 1890s. During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

2.    Defendants since the early 1900s possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in the manufacture of goods such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in consumer powder products, talc is known as "talcum powder."

3.    Geologists and mining companies, including Defendants, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

/ / /

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

4.    As early as the 1920s, the term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in Great Britain and the United States detailed asbestosis in various workers.

5.    By 1929, lawsuits for disability related to exposure to asbestos were filed against Johns Manville.

6.    In the late 1930s, case reports were published addressing the relationship between asbestos and cancer.

7.    Several reports, studies, and guidelines published as early as the 1930s, including California's Dust, Fumes, Vapors, and Gases Safety Orders, all recognized that asbestos is a dust which creates health hazards, and that certain precautions are required to mitigate human exposure to dust. Such measures include, but are not limited to, using water to suppress the dust at its source, as well as providing those who might be exposed to dust with adequate ventilation, showers, and changing facilities. These same measures that were recommended to protect workers from asbestosis in the 1930s would also have substantially reduced the risk that bystanders, household members, and other persons would contract mesothelioma from inhaling asbestos-containing dust that those who worked with and around asbestos and asbestos-containing products carried into their households on their person and personal effects. Defendants, and each of them, knew or should have known that anyone, including household members of those who used asbestos-containing products were at risk of developing an asbestos-related disease after inhaling dust from such asbestos-containing products.

8.    In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

9.    In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc, and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

10.    As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium."

11.    In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

12.    In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard of care for work with asbestos.

13.    Also in 1936, Illinois enacted legislation recognizing asbestosis as a compensable occupational disease under its Occupational Disease Act.

14.    By the 1940s, asbestos carcinogenicity was noted in reviews in fields of industrial medicine, cancer research, and pneumoconiosis.

15.    In 1946, the American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure.

16.    During the 1940s and 1950s, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

17.    In addition, beginning in the 1940s and 1950s, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

18.    In 1955, Richard Doll published a study linking asbestos to lung cancer.

19.    In 1960, Chris Wagner published a study linking asbestos to mesothelioma.

20.    DEFENDANT JOHNSON & JOHNSON started selling Johnson's Baby Powder in the late 1800s. As the parent company, JOHNSON & JOHNSON made Johnson's Baby Powder until 1978, when a new subsidiary corporation, Johnson & Johnson Consumer Inc., was formed. Both JOHNSON & JOHNSON and Johnson & Johnson Consumer Inc. shared with each other all of their health-and-safety information about the talc products. Throughout this Complaint, DEFENDANT JOHNSON & JOHNSON is referred to as "J&J."

21.    In the 1950s and 1960s, J&J contracted with the Battelle Laboratory in Ohio to examine its talc for the presence of dangerous minerals. Battelle reported back to J&J and William Ashton, a J&J managerial employee, that J&J's talc had tremolite, fibrous tremolite, and fibrous talc. J&J thus had knowledge for many decades that J&J's talc was dangerous to breathe.

22.    In the early 1960s, Dr. Irving Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the Annals of the New York Academy of Sciences published in 1965.

/ / /

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

23.   In 1966, J&J knew of published medical and scientific articles that warned it that breathing talc could lead to asphyxiation and death in infants. J&J knew that this information could hurt its baby products franchise and chose not to warn about the dangers of breathing talc for many decades.

24.   In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

25.   In 1969, product-liability lawsuits were brought against asbestos manufacturers. Under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere a workplace standard of no more than 12 fibers per cubic centimeter of air.

26.   In April 1969, J&J medical doctor, Dr. Timothy Thompson, wrote that J&J should consult the law department for potential litigation arising out of breathing tremolite. This J&J medical doctor specifically discussed the risk of cancer and other diseases from inhalation of needle-like tremolite.

27.   In 1970s, J&J knew of the risk of ovarian cancer and never warned regarding any type of cancer. Ovarian cancer occurs via inhalation and translocation of the asbestiform minerals in the body. J&J failed to warn of all cancer risks, including mesothelioma.

28.   In early 1970s, J&J submitted false information to the federal Food and Drug Administration ("FDA") claiming J&J's products did not have asbestos in them when J&J had internal documents demonstrating its submission was false. J&J and other companies jointly convinced the FDA to not regulate the issues of asbestos in talc. The FDA allowed the talc industry to self-regulate regarding the health impact of breathing talc.

29.   J&J claims to have had a facility since the early 1970s to retain samples of each batch of its talc for future analysis. J&J has destroyed those samples and all underlying testing data including photographs, Transmission Electron Microscopy grids, Energy Dispersive X-ray Spectroscopy grids, and Selected Area (Electron) Diffraction grids.

30.   In the 1970s, J&J worked jointly with other companies, including members of the Cosmetic, Toiletry & Fragrance Association ("CTFA"), to adopt a testing method that would not find the asbestos in their talc. That method, known as the J4-1, was adopted by the industry in 1976.

31.   In the 1970s, J&J misled physicians and nurses into believing that J&J's product was safe and falsely telling them in mailings that there was no asbestos in Johnson's Baby Powder.

32.   In 1970, OSHA established the first Federal guidelines for workplace asbestos exposure, which took effect in 1971. J&J management employees

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

worked to keep fibrous talc and asbestiform minerals in their product from being regulated by OSHA.

33.   In 1971, J&J met with scientists at Mt. Sinai Hospital in New York who warned J&J of the risk of asbestos in its products and the risk of disease. J&J knew that fibrous talc and asbestos from talc translocated through the body after inhalation and were found in the ovaries of women.

34.   In 1971, the Colorado School of Mines advised J&J managerial employee, Robert S. Russell, that there is fibrous tremolite and actinolite (asbestos), and fibrous talc in J&J samples submitted to them. Later in the mid-1970s, J&J agents and employees, including Mr. Russell, obtained, with his knowledge, used Johnson's Baby Powder in a study on live babies, thereby exposing these babies to risk of disease.

35.   In 1972, the American Conference of Governmental Industrial Hygienists listed asbestos as a carcinogen.

36.   In 1974, J&J employee, Dr. Fuller, told the FDA that the risk of **any** harm would be reason to take J&J's talcum powder off the market. Dr. Fuller and J&J did not live up to their promise to the FDA and falsely reassured the FDA for decades J&J's product was safe.

37.   A 1976 follow-up study conducted by researchers at Mt. Sinai concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc...We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).] The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year. The study and subsequent newspaper articles listed explicitly popular consumer cosmetic talcum powders as containing high percentages of asbestos.

38.   In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants, who were part of an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products.

39.   In the 1970s and 1980s, J&J employee, William Ashton, knowing that fibrous talc and asbestos was dangerous, worked to keep J&J's product from being subject to any industry standards, including joining the American Society for Testing and Materials, and insuring J&J's product would not be subject to scrutiny by the scientific community.

40.   In the 1970s and 1980s, J&J continued to mislead the public by engaging in an anti-warning marketing campaign to tell consumers that J&J's product was "pure" and would "protect" the user of the product. The marketing campaign consisted of print, radio, and television advertisements to falsely reassure the public about the safety of talc.

/ / /

41.    In 1983, Anthony and Mary Rose Gambino sued J&J for injuries Mr. Gambino sustained from his use of Johnson's Baby Powder talc. J&J did nothing to preserve evidence of the talc samples it was allegedly testing from the early 1980s forward.

42.    In 1991, J&J knew that Dr. Alice Blount published on the presence of asbestos in its Johnson's Baby Powder. Dr. Blount told J&J several times in the 1990s and yet J&J did nothing to warn Mr. Valadez or other end users of the dangerous associated with J&J's product.

43.    J&J in the 1990s continued its pattern and practice of marketing talcum powder as safe despite knowing of the "cancer linkage." In 1992, J&J knew its major opportunities would be to market to minorities, but also knew the major obstacles would be the inhalation risk and cancer linkage.

44.    J&J were in charge of worldwide testing of talc to determine how much asbestos was in each talc. They created a testing scheme to appear like there was no asbestos in their talc. However, they knew the testing methods used were inadequate and would not detect the asbestos in the talc.

45.    J&J engaged in a pattern and practice of not warning the public through 2018 when its Chief Executive Officer, Alex Gorsky, falsely told American consumers that J&J's talcum products have always been free of asbestos.

All Defendants failed to place any warning on their products or ever disclose the fact that these products contained asbestos, asbestiform fibers, and/or asbestiform talc at any point, up to and including present day, despite the clear hazard and direct information that their products *did* contain asbestos, asbestiform fibers, and asbestiform talc.

**VI.**

**Additional Allegations as to J&J:** The following facts are illustrative, but not exhaustive, of J&J's wrongful conduct.

J&J knew that the needle-like shape of asbestos fibers, found in some talc deposits, makes the fibers causative of mesothelioma. And J&J knew that babies inhaled the talc, at variable levels, whenever Baby Powder was applied. J&J therefore understood that if its talc contained asbestos, and if that fact were publicized, it would be bad for J&J's business and reputation.

To avoid the risk of end-users' asbestos exposures, J&J always had the option to use cornstarch, instead of talc, as its Baby Powder's active ingredient. However, J&J waited until 1980 to start selling a cornstarch version alongside the talc version. Thereafter, J&J advertised that its cornstarch version was the "safest powder you can use on your baby." J&J never warned anyone

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  about the asbestos content of its talc.

2      Despite admittedly knowing that its talc Baby Powder contained toxic asbestos from at

3  least the 1960s through the 2000s, J&J concealed or otherwise misrepresented that fact from its

4  products' consumers, including Mr. Valadez. In part, J&J engaged in the following acts and

5  omissions:

6    1.   J&J lied to the FDA about the presence of asbestos in the talc used in J&J's
          products, including Johnson's Baby Powder. J&J hid these results and, in
7         some cases, asked that these results be altered or destroyed. For example, in
          January 1974, J&J's managing agents Dr. R. Fuller, Dr. G. Hildick-Smith,
8         and Dr. W. Nashed met with the FDA regarding "Talc/Asbestos." In that
          meeting, J&J promoted its Johnson's Baby Powder as the "best talc
9         available," despite knowing the talc's asbestos content. J&J also falsely
          claimed to the FDA that "substantial asbestos can be allowed safely in a
10        baby powder." J&J further assured the FDA that, if studies showed that the
          talc was unsafe, J&J "will not hesitate to take it off the market." J&J never
11        took its Johnson's Baby Powder off the market despite knowing that the
          product contained asbestos. J&J, itself and through the CTFA, also withheld
12        original documents and reports identifying asbestos in its talc and talc-
          containing products, like Johnson's Baby Powder, and instead falsely
13        reported to the FDA there was no asbestos. After providing this false
          information to the FDA, the CTFA, including J&J, met privately and
14        congratulated themselves on the "success" of the "presentations" to the
          FDA, and agreed that they should not bind themselves to having to further
15        update the FDA. Despite its admission that asbestos is a carcinogen, J&J
          never suggested—or revealed—to the FDA any asbestos in its Johnson's
16        Baby Powder or talc products, including the list of positive asbestos
          findings in its talc ore, talc, and products throughout the decades.

17

18    2.   In or around 1978, J&J and other members of the CTFA destroyed evidence
          showing positive findings of asbestos in round-robin testing of J&J and
19        other manufacturers' consumer talcum products for asbestos content. The
          FDA initially proposed regulating the cosmetic talc industry. However, J&J
20        and other members of the CTFA contended that they should be able to self-
          regulate. As a result, the FDA had no authority to "go into [J&J's] files"; it
21        was up to J&J to voluntarily provide information to the FDA. Because the
          cosmetic talc industry was self-regulating, the CTFA rejected the FDA's
22        proposal to have CTFA disclose the results of CTFA's respective periodic
          monitoring for asbestos. At J&J's direction, the CTFA was instructed to
23        "[d]estroy your copy of the table" containing the results of the CTFA Task
          Force on Round Robin Testing of Consumer Talcum Products for
          Asbestiform Amphibole Minerals.
24

25    3.   J&J fraudulently labeled and advertised its Johnson's Baby Powder as being
          pure and protective of health, and free of asbestos fibers. J&J maintained
26        the trust of mothers and other consumers who used its Johnson's Baby
          Powder products through print advertisements and other methods. In the
27        1940s, J&J emphasized that doctors and nurses preferred Johnson's Baby
          Powder because of its effectiveness and alleged purity. J&J described the
28        product as the "purest." J&J also directly promoted its baby powder to
          medical personnel. J&J provided samples for doctors to distribute. A 1965

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

brochure for doctors claimed that the powder was safe and had medical benefits. The bottle itself even said, "Purest Protection." Another version of the bottle said, "Good for baby, Good for you." However, J&J well knew that its Johnson's Baby Powder was not pure because it contained asbestos. J&J also knew that its Johnson's Baby Powder provided no medical protection or any other medicinal value.

4.      J&J and its officers, directors, and managing agents including, but not limited to, Bill Ashton, Dr. R. Fuller, Dr. Gavin Hildick-Smith, Dr. Al Goudie, Dr. W. Nashed, and members of J&J's Talc Advisory Group, kept from or otherwise misrepresented to the public test results showing the presence of asbestos and asbestiform fibers in its talcum products, including Johnson's Baby Powder. For example, in or around October 1972, Dr. Nashed stated to Dr. Goudie that he "thought tremolite was mistakenly identified in view of similarity to Na [sodium] sesquicitrate!" Dr. Goudie replied, "There are trace quantities present confirmed both by McCrone & Bill Ashton. Levels are extremely low but occasionally can be detected optically. *This is not new*." In or around June 1973, the University of Minnesota lab reported to J&J that its Shower to Shower talc powder contained "1/100th of 1 percent asbestos," as shown by electron microscopy, both in the material from J&J and from Dr. Lewin's sample. Shortly thereafter, J&J and the McCrone lab authored their own report in which they misquoted the University of Minnesota lab's report by using misleading ellipses that concealed the asbestos findings. In its November 1974 letter to a concerned consumer in California, J&J (i) falsely claimed that it used only the "purest talc available," (ii) described contrary articles as "sensational and scary," and (iii) claimed to be "highly ethical and responsible" because its products were safe.

## VII.

**The Exposures:** Mr. Valadez was born on September 23, 1998. He was exposed to asbestos, asbestiform fibers, and asbestiform talc through his and his family's use of Johnson & Johnson talc powder products. Mr. Valadez used and purchased Defendants' talc powder products in California and elsewhere. Mr. Valadez was exposed to Defendants' asbestos, asbestiform fibers, and asbestiform talc in California because Defendants (i) marketed and sold their talc products in California, and (ii) engaged in asbestos-related conduct that occurred in California.

## VIII.

**Venue:** Venue is proper in Alameda County because it is the headquarters and principal place of business of Defendant SAFEWAY INC.

## IX.

**The Harm:** Mr. Valadez has malignant mesothelioma caused by his exposures to asbestos, asbestiform fibers, and asbestiform talc. The mesothelioma has caused, and will cause,

3156712.3

10

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  Mr. Valadez to experience physical pain, mental suffering, loss of enjoyment of life,

2  disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress,

3  and other similar harm. And the mesothelioma will continue to inflict these harms on Mr. Valadez

4  in the future, ceasing only when it causes his untimely death.

5        Plaintiff incorporates by reference all of the above-mentioned allegations to each of the

6  liability theories set forth below and reserve the right to conform this Complaint to proof later

7  ascertained.

8        **FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY**

9        **I.**

10       **Design Defect:** All Defendants, and the 1st through 100th Doe Defendants, have for many

11  years, manufactured, sold, distributed, designed, formulated, developed standards for, prepared,

12  processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled,

13  and/or otherwise placed into the stream of commerce, products containing asbestos, asbestiform

14  fibers, and/or asbestiform talc. First, these Defendants' products were defective and unsafe for

15  their intended purpose and foreseeable use in that when used, handled, mixed, or otherwise

16  disturbed, said products would result in the release, and therefore inhalation, of hazardous and

17  dangerous asbestos fibers, asbestiform fibers, and/or asbestiform talc by exposed persons,

18  including Mr. Valadez. Second, each product did not perform as safely as an ordinary consumer

19  would have expected it to perform when used or misused in an intended or reasonably foreseeable

20  way, because each product caused hazardous asbestos, asbestiform fibers, and/or asbestiform talc

21  to become airborne. Third, Mr. Valadez developed mesothelioma. Fourth, each product's failure to

22  perform safely was a substantial factor in causing Mr. Valadez's mesothelioma.

23       **II.**

24       **Failure-to-Warn Defect:** All Defendants, and the 1st through 100th Doe Defendants, are

25  strictly liable for their products' failure-to-warn defects. First, these Defendants and/or their

26  predecessors have for many years, manufactured, sold, distributed, designed, formulated,

27  developed standards for, prepared, processed, assembled, tested, listed, certified, marketed,

28  advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce,

1    products containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, each product

2    had potential risks that were known or knowable in light of the scientific and medical knowledge

3    that was generally accepted in the scientific community at the time of design, manufacture, label,

4    distribution, and sale. Third, the potential risks presented a substantial danger when each product

5    was used or misused in an intended or reasonably foreseeable way, because each product caused

6    hazardous asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Fourth,

7    ordinary consumers would not have recognized the potential risks. Fifth, these Defendants failed

8    to adequately warn or instruct of the potential risks. Sixth, Mr. Valadez developed mesothelioma.

9    Seventh, the lack of sufficient warnings or instructions was a substantial factor in causing

10    Mr. Valadez's mesothelioma.

### SECOND CAUSE OF ACTION FOR NEGLIGENCE

#### I.

13    **General Negligence:** All Defendants, and the 1st through 100th Doe Defendants, are

14    liable for their general negligence. First, Defendants failed to use reasonable care to prevent harm

15    to others, because they caused hazardous asbestos, asbestiform fibers, and/or asbestiform talc to

16    become airborne. Second, Defendants unreasonably acted and failed to act. They acted in ways

17    that a reasonably careful person would not do in the same situation, and failed to act in ways that a

18    reasonably careful person would do in the same situation. Third, Mr. Valadez developed

19    mesothelioma. Fourth, each Defendant's general negligence was a substantial factor in causing

20    Mr. Valadez's mesothelioma.

#### II.

22    **Negligent Design, Manufacture, Supply, Testing, Packaging, and Labeling of**

23    **Products:** All Defendants, and the 1st through 100th Doe Defendants, are liable for their

24    negligent design, manufacture, marketing, supply, testing, packaging, and labeling of products

25    containing asbestos, asbestiform fibers, and/or asbestiform talc. First, these Defendants designed,

26    manufactured, sold, distributed, formulated, developed standards for, prepared, processed,

27    assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or

28    otherwise placed into the stream of commerce, products containing asbestos, asbestiform fibers,

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    and/or asbestiform talc. Second, these Defendants were negligent in manufacturing, selling,

2    distributing, developing standards for, processing, assembling, testing, certifying, marketing,

3    advertising, packaging and/or labeling, and/or otherwise placing into the stream of commerce,

4    products containing asbestos, asbestiform fibers, and/or asbestiform talc because they caused

5    hazardous asbestos, asbestiform fibers, and asbestiform talc to become airborne. They failed to use

6    the amount of care that a reasonably careful person would use in similar circumstances to avoid

7    exposing others to a foreseeable risk of harm. Third, Mr. Valadez developed mesothelioma.

8    Fourth, each Defendant's negligence was a substantial factor in causing Mr. Valadez's

9    mesothelioma.

10                                        **III.**

11           **Negligent Failure to Warn about Products:** All Defendants, and the 1st through 100th

12    Doe Defendants, are liable for their negligent failure to warn about their products. First, these

13    Defendants designed, manufactured, marketed, distributed, packaged, labeled, and sold products

14    containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, these Defendants knew or

15    reasonably should have known that each product was dangerous or was likely to be dangerous

16    when used or misused in a reasonably foreseeable manner, because each product caused hazardous

17    asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Third, these Defendants

18    knew or reasonably should have known that users would not realize the danger. Fourth, these

19    Defendants failed to adequately warn of the danger or instruct on the safe use of each product.

20    Fifth, a reasonably careful person under the same or similar circumstances would have warned of

21    the danger or instructed on the safe use of each product. Sixth, Mr. Valadez developed

22    mesothelioma. Seventh, each Defendant's negligent failure to warn or instruct was a substantial

23    factor in causing Mr. Valadez's mesothelioma.

24                                        **IV.**

25           **Negligent Failure to Recall and Retrofit Products:** All Defendants, and the 1st through

26    100th Doe Defendants, are liable for their negligent failure to recall and retrofit their products.

27    First, these Defendants designed, manufactured, marketed, distributed, packaged, labeled, and sold

28    products containing asbestos, asbestiform fibers, and/or asbestiform talc. Second, these

1  Defendants knew or reasonably should have known that each product was dangerous or was likely

2  to be dangerous when used in a reasonably foreseeable manner, because each product caused

3  hazardous asbestos, asbestiform fibers, and/or asbestiform talc to become airborne. Third, these

4  Defendants became aware of this defect after each product was sold. Fourth, these Defendants

5  failed to recall and retrofit each product. Fifth, a reasonably careful person under the same or

6  similar circumstances would have recalled and retrofitted each product. Sixth, Mr. Valadez

7  developed mesothelioma. Seventh, each Defendant's negligent failure to recall and retrofit each

8  product was a substantial factor in causing Mr. Valadez's mesothelioma.

9                    **THIRD CAUSE OF ACTION FOR FRAUD**

10                                        **I.**

11        All Defendants, and the 1st through 100th Doe Defendants, are liable for fraud, including

12  fraudulent misrepresentation, fraudulent concealment, conspiracy to commit fraudulent

13  misrepresentation, and conspiracy to commit fraudulent concealment, as set forth herein.

14                                       **II.**

15        **Fraudulent Misrepresentation:** Defendants are liable for their fraudulent

16  misrepresentations.

17        First, each Defendant, via its employees, agents, advertisements, or any other authorized

18  person or document, represented that certain facts were true when they were not. The specific

19  identities of these employees, agents, advertisements, or any other authorized person or document

20  are maintained in Defendants' records. Such records remain in the exclusive control of Defendants

21  pursuant to their respective document-retention policies. While he does not currently know the

22  specific advertisements or names of the employees, agents, or any other authorized person who

23  made the representations, Plaintiff will have access to this information once discovery has

24  commenced and will be able to specifically name the advertisement as well as the employee,

25  agent, or any other authorized person.

26        Second, Defendants represented that the products they manufactured, supplied, or specified

27  for use were not hazardous to humans. These representations were made before and during the

28  years that Mr. Valadez and his family purchased and were exposed to asbestos from Defendants'

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    talc powder products. Such representations were made either directly to Mr. Valadez and his

2    family, or to a third party intending and reasonably expecting that the substance of those

3    representations would be repeated to Mr. Valadez and his family.

4           Third, Defendants knew that the representations were false when they made them, or they

5    made the representations recklessly and without regard for their truth.

6           Fourth, Defendants intended that Mr. Valadez and his family, and/or the same class of

7    persons as Mr. Valadez and his family, rely on the representations or their substance.

8           Fifth, Mr. Valadez and his family reasonably relied on Defendants' representations or the

9    substance of these representations.

10          Sixth, Mr. Valadez developed mesothelioma.

11          Seventh, Mr. Valadez and his family's reliance on those representations was a substantial

12   factor in causing Mr. Valadez's mesothelioma.

**III.**

14          **Fraudulent Concealment (Nondisclosure):** Defendants are liable for their fraudulent

15   concealment (nondisclosure).

16          First, each of the Defendants made affirmative statements that were so misleading (e.g.,

17   misleading "half-truths") that they gave rise to a fraud cause of action even in the absence of a

18   specific relationship or transaction as between Defendants and Mr. Valadez. Specifically,

19   Defendants stated that their products could be used safely while concealing they were in fact lethal

20   because they contain and release asbestos fibers, asbestiform fibers, and asbestiform talc.

21          Second, Defendants (i) had exclusive knowledge of material facts not known to

22   Mr. Valadez (as set forth above), (ii) actively concealed these material facts from Mr. Valadez,

23   (iii) made partial representations but also suppressed material facts, as set forth above, and

24   (iv) made factual representations, but did not disclose facts which materially qualified those

25   representations. Such nondisclosures included Defendants representing their products as safe when

26   used as intended and as fit for the particular purpose for which they were marketed, while not

27   disclosing the facts that these products contained asbestos, asbestiform fibers, and asbestiform talc

28   that would become airborne during the intended and foreseeable use of the products, rendering

3156712.3

1  them dangerous and unfit for their intended purpose.

2       Third, each Defendant entered into a relationship and/or a transaction with Mr. Valadez

3  sufficient to give rise to a duty to disclose. For example, Mr. Valadez used or otherwise

4  encountered Defendants' products that were purchased either directly from Defendants and

5  Defendants' authorized dealer or supplier, or any other entity upon which Defendants derived a

6  direct monetary benefit directly from Mr. Valadez's purchase and use of the products. As for

7  another example, Defendants directly advertised their products to those in California and

8  elsewhere, as a symbol of freshness, cleanliness, and purity. Defendants advertised and marketed

9  this product as the "purest protection," the beacon of "freshness" and "comfort," eliminating

10 friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable,

11 and "clinically proven gentle and mild." Defendants compelled men and women through

12 advertisements to dust themselves with this product for a wide variety of reasons, including the

13 elimination of odors. Defendants knew that users would use the talcum powder as a dry shampoo

14 and it would release substantial asbestiform minerals into user's breathing zone. Defendants

15 derived direct monetary benefit from these individuals' use of these products because Mr. Valadez

16 decided to use or purchase Defendants' products.

17      Fourth, Mr. Valadez did not know of the concealed facts.

18      Fifth, Defendants intended to deceive Mr. Valadez by concealing the facts, and/or by

19 making certain representations without disclosing additional facts that would have materially

20 qualified those representations.

21      Sixth, had the omitted information been disclosed, Mr. Valadez reasonably would have

22 behaved differently.

23      Seventh, Mr. Valadez developed mesothelioma.

24      Eighth, each Defendant's concealment was a substantial factor in causing Mr. Valadez's

25 mesothelioma.

26                                          **IV.**

27      **Conspiracy to Commit Fraudulent Misrepresentation:** Plaintiff hereby incorporates by

28 reference the allegations above in this Third Cause of Action as if fully stated herein.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    Defendants are liable for their conspiracy to commit fraudulent misrepresentation. First,

2    Defendants were aware that their conspirators, which included all co-defendants and others,

3    planned to commit fraudulent misrepresentation against Mr. Valadez and his family, and/or the

4    same class of persons as Mr. Valadez and his family. Second, Defendants agreed with their

5    conspirators and intended that the fraudulent misrepresentation be committed. Third, Mr. Valadez

6    developed mesothelioma. Fourth, each Defendant's participation in the conspiracy was a

7    substantial factor in causing Mr. Valadez's mesothelioma.

8                                                     **V.**

9    **Conspiracy to Commit Fraudulent Concealment (Nondisclosure):** Plaintiff hereby

10    incorporates by reference the allegations above in this Third Cause of Action as if fully stated

11    herein. Defendants are liable for their conspiracy to commit fraudulent concealment. First,

12    Defendants were aware that their conspirators, which included all co-defendants and others,

13    planned to commit fraudulent concealment against Mr. Valadez and his family, and/or the same

14    class of persons as Mr. Valadez and his family. Second, Defendants agreed with their conspirators

15    and intended that the fraudulent concealment be committed. Third, Mr. Valadez developed

16    mesothelioma. Fourth, each Defendant's participation in the conspiracy was a substantial factor in

17    causing Mr. Valadez's mesothelioma.

18                                                    **VI.**

19    **Knowledge of Hazards:** At all times pertinent hereto, Defendants, including 1st through

20    100th Doe Defendants, owed Mr. Valadez a duty, as provided for in Civil Code sections 1708,

21    1709, and 1710, to abstain from injuring his person, property, or rights. In violation of that duty,

22    Defendants, and each of them, did do the acts and omissions, when a duty to act was imposed, as

23    set forth herein, thereby proximately causing injury to Mr. Valadez. Such acts and omissions

24    consisted of acts falling within Civil Code section 1710, and more specifically were

25    (i) suggestions of fact which were not true and which the Defendants did not believe to be true,

26    (ii) assertions of fact of that which was not true, which the Defendants had no reasonable ground

27    for believing it to be true, and (iii) the suppression of facts when a duty existed to disclose it, as

28    more fully set forth herein, and the violation of which as to any one such item gave rise to a cause

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

of action for violation of Mr. Valadez's rights as provided for in the aforementioned code sections.

Defendants have known and possessed of the true facts (consisting of medical and scientific data, and other knowledge) which clearly indicated that the materials and products referred to herein were and are hazardous to the health and safety of Mr. Valadez, and others similarly situated. In addition to the allegations set forth in this Third Cause of Action, Defendants engaged in the following acts and omissions:

1.    Did not label any of the aforementioned asbestos-containing materials and products as to the hazards of such materials and products to the health and safety of Mr. Valadez, and others in their position using these products when the knowledge of such hazards was existing and known to Defendants, and each of them, since 1924. By not labeling such materials as to their said hazards, Defendants, and each of them, caused to be suggested as a fact to Mr. Valadez that it was safe for his to use such materials, when in fact these things were not true and Defendants did not believe them to be true.

2.    Suppressed information relating to the danger of using the aforementioned materials by requesting the suppression of information to Mr. Valadez and the general public concerning the dangerous nature of the aforementioned materials to all persons, including users, bystanders and household members, by not allowing such information to be disseminated in a manner which would give general notice to the public and knowledge of the hazardous nature thereof when Defendants were bound to disclose such information.

3.    Sold the aforementioned products and materials to the public, including Mr. Valadez, and others in California and other states without advising them of the dangers of use of such materials and to those persons' household members, when Defendants knew of such dangers, as set forth herein and above, and had a duty to disclose such dangers. Thus, Defendants caused to be positively asserted to Mr. Valadez, and the public that which was not true and which Defendants had no reasonable ground for believing it to be true, in a manner not warranted by the information possessed by said Defendants, and each of them, of that which was and is not true, to wit, that it was safe for Mr. Valadez to use such materials and that it did not pose a risk of harm.

4.    Suppressed and continue to suppress from everyone, including Mr. Valadez, medical, scientific data, and knowledge of the accurate results of studies including, but not limited to, Waldemar C. Dreesen of the United States Public Health Service's 1933 report to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National

Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

5.  Belonged to, participated in, and financially supported the Industrial Hygiene Foundation, Asbestos Information Association, the Asbestos Textile Institute (ATI), and other industry organizations, including the Cosmetic, Toiletry, and Fragrance Association (now known as the Personal Care Products Council), which actively promoted the suppression of information of danger to users of the aforementioned products and materials for and on behalf of Defendants, and each of them, thereby misleading Mr. Valadez to their prejudice through the suggestions and deceptions set forth above in this cause of action. ATI's Dust Control Committee, which changed its name to the Air Hygiene Committee of ATI, was specifically enjoined to study the subject of dust control; discussions in such committee were held many times of (i) the dangers inherent in asbestos and the dangers which arise from the lack of control of dust and (ii) the suppression of such information from 1946 to a date unknown to Mr. Valadez at this time.

6.  Knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis in 1930 with the study of mine and mill workers at the Thetford asbestos mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina. This information was disseminated through the ATI and other industry organizations to all other Defendants, and each of them, herein. Between 1942 and 1950, Defendants, and each of them, knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and cancer, which information was disseminated through the ATI and other industry organizations to all other Defendants herein. Thereby, Defendants suggested as fact that which is not true and disseminated other facts likely to and did mislead Mr. Valadez for want of communication of true facts, which consisted of the previously described medical and scientific data and other knowledge by not giving Mr. Valadez the true facts concerning such knowledge of danger, when Defendants were bound to disclose it.

7.  Failed to warn Mr. Valadez and others similarly situated regarding the nature of Defendants' talcum products. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).] Defendants

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

failed to warn Mr. Valadez and others similarly situated that their talcum products are, among other things, dangerous when breathed and causes pathological effects without noticeable trauma, although Defendants possessed knowledge that such material was dangerous and a threat to the health of persons coming into contact therewith and under a duty to disclose it.

8.  Concealed from Mr. Valadez, and others similarly situated the true nature of their exposure, the fact that Defendants knew that exposure to respirable asbestos meant that Mr. Valadez would inhale this asbestos, significantly increasing his risk of developing asbestosis, lung cancer, and mesothelioma; that Mr. Valadez that had in fact been exposed to respirable asbestos; that the materials to which Mr. Valadez was exposed would cause pathological effects in the human body without noticeable or perceptible trauma to warn him of injury; and Defendants engaged in these acts and omissions while under a duty to and bound to disclose this information.

9.  Failed to provide information to the public at large and buyers, users and physicians of Mr. Valadez for the purpose of conducting physical examinations of anyone whom came in contact with asbestos as to the true nature of the hazards of asbestos, in order for such physicians to diagnose, and treat individuals coming into contact with asbestos, in that the materials to which Mr. Valadez had been exposed would cause pathological effects without noticeable trauma, even though Defendants were under a duty to supply such information and such failure was and is likely to mislead persons including Mr. Valadez as to the dangers and risk of harm to which they were exposed.

10. Affirmatively misrepresented that asbestos-containing products were safe to use and handle, when Defendants knew such statements were false when made, or made said false statements recklessly and without regard for whether the statements were true.

Each of the foregoing acts, suggestions, assertions, and forbearances to act when a duty existed to act, the said Defendants, and each of them, having such knowledge, knowing Mr. Valadez did not have such knowledge and would breathe such material innocently, was done falsely and fraudulently and with full intent to induce Mr. Valadez to be present in a dangerous environment and to cause him to remain unaware of the true facts, all in violation of Civil Code section 1710.

## BASIS FOR PUNITIVE DAMAGES

**Malice, Oppression, or Fraud:** Mr. Valadez hereby incorporates by reference the allegations of all causes of action as if fully stated herein. Defendants, including 1st through 100th Doe Defendants, are liable for punitive damages because they engaged in the conduct that caused Mr. Valadez's harm with malice, oppression, or fraud.

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    First, Defendants committed malice in that they acted with intent to harm when they

2  caused Mr. Valadez's exposures to asbestos, asbestiform fibers, and/or asbestiform talc, and

3  because their conduct was despicable and was done with a willful and knowing disregard of the

4  rights and safety of others.

5    Second, Defendants committed oppression in that their conduct was despicable and

6  subjected Mr. Valadez to cruel and unjust hardship in knowing disregard of his rights.

7    Third, Defendants committed fraud in that they intentionally and fraudulently concealed

8  and misrepresented material facts and did so intending to harm Mr. Valadez and with reckless

9  disregard for whether their fraud would harm Mr. Valadez.

10    The conduct of Defendants constituting malice, oppression, or fraud was committed,

11  authorized, and adopted by one or more officers, directors, and managing agents within the

12  corporate hierarchy of each Defendant, who acted on behalf of each Defendant.

### **PRAYER FOR DAMAGES**

13

14  Plaintiff prays for judgment for:

15  1.    All economic and non-economic compensatory damages in excess of $25,000;

16  2.    Punitive damages according to proof;

17  3.    Pre- and post-judgment interest;

18  4.    Costs of suit; and

19  5.    Such other relief as is fair, just, and equitable.

### **DEMAND FOR JURY TRIAL**

20

21  Plaintiff hereby demands a trial by jury on all issues so triable.

22  DATED: June 15, 2022                KAZAN, McCLAIN, SATTERLEY & GREENWOOD
                                        A Professional Law Corporation
23

24

25                                      By: _____

26                                          Joseph D. Satterley

27                                      Attorneys for Plaintiff

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# Exhibit C

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): *FOR COURT USE ONLY*
Ian A. Rivamonte, Esq. SBN - Bar No.232663
KAZAN,MCCLAIN,SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO.: (510) 835-4913 | E-MAIL ADDRESS
ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ

**Superior Court of California, County of Alameda**
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
07/06/2022 at 02:40:48 PM
By: Andrei Gospel,
Deputy Clerk

CASE NUMBER:
22CV012759

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:  Valadez |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**
3. a. Party served *(specify name of party as shown on documents served):*
   **ALBERTSONS COMPANIES, INC., individually and as successor-in-interest, parent, alter ego, and equitable trustee of LUCKY STORES, INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**

   Age: 31-35 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino
4. Address where the party was served:  **330 N Brand Blvd Ste 700
   Glendale, CA 91203-2336**
5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/23/2022**     (2) at *(time):* **9:30 AM**

   b. ☐ **by substituted service.** On *(date):*  at  *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
      *(date):*   from *(city):*                                 **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

**EXHIBIT C**

PETITIONER: ANTHONY HERNANDEZ-VALADEZ
RESPONDENT: JOHNSON & JOHNSON, et al.

Case 21-30589-MBK    Doc 2736-2    Filed 07/19/22    Entered 07/19/22 17:06:11    Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION    Page 34 of 45
22CV012759

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*           (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*)* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **ALBERTSONS COMPANIES, INC., individually and as successor-in-interest, parent, alter ego, and equitable trustee of LUCKY STORES, INC.**

under the following Code of Civil Procedure section:

    ☑ 416.10 (corporation)            ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)       ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)   ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)            ☐ 415.46 (occupant)
                                    ☐ other:

7. **Person who served papers**

a. Name: **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**

c. Telephone number: **(510) 444-4690**

d. **The fee** for service was: **$ .00**

e. I am:

    (1) ☐ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☑ registered California process server:
        (i) ☐ owner    ☐ employee    ☑ independent contractor.
        (ii) Registration No.: **2013128925**
        (iii) County: **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/23/2022**

**N** Nationwide Legal, LLC
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

                                          ▶

    **Dion Jones**
    (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

**POS-050/EFS-050**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:    STATE BAR NO: 286,890 <br> NAME: JOSEPH D. SATTERLEY <br> FIRM NAME: KAZAN, McCLAIN, SATTERLEY & GREENWOOD, A Profesional Law Corp. <br> STREET ADDRESS: 55 Harrison Street, Suite 400 <br> CITY: Oakland    STATE: CA    ZIP CODE: 94607 <br> TELEPHONE NO.: 510- 302-1000    FAX NO.: <br> E-MAIL ADDRESS: <br> ATTORNEY FOR (name): PLAINTIFF | *FOR COURT USE ONLY* <br><br> **ELECTRONICALLY FILED** <br> Superior Court of California, <br> County of Alameda <br> 07/06/2022 at 02:38:55 PM <br> By: Andrei Gospel, <br> Deputy Clerk |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA <br> STREET ADDRESS: 1225 FALLON STREET <br> MAILING ADDRESS: <br> CITY AND ZIP CODE:    Oakland, CA 94612 <br> BRANCH NAME: Rene C. Davidson Courthouse | |
| PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ | CASE NUMBER: <br> 22CV012759 |
| DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, ET AL. | JUDICIAL OFFICER: |
| **PROOF OF ELECTRONIC SERVICE** | DEPARTMENT: |

1. I am at least 18 years old.

    a. My residence or business address is *(specify):*
       1609 JAMES M. WOOD BLVD., LOS ANGELES, CA 90015

    b. My electronic service address is *(specify):*
       NWLPROCESS@NATIONWIDELEGAL.COM

2. I electronically served the following documents *(exact titles):*
   Summons; Complaint; Alternate Dispute (ADR) Package; Civil Case Cover Sheet; Civil Case Cover Sheet Addendum; Notice of Case Management Conference; Letter to Judge Jo-Lynne Q. Lee

   [ ] The documents served are listed in an attachment. *(Form POS-050(D)/EFS-050(D) may be used for this purpose.)*

3. I electronically served the documents listed in 2 as follows:
    a. Name of person served: JOHNSON & JOHNSON

    On behalf of *(name or names of parties represented, if person served is an attorney):*

    b. Electronic service address of person served *:*
       serviceofprocess@its.jnj.com

    c. On *(date):* 6/28/2022

       [x] The documents listed in item 2 were served electronically on the persons and in the manner described in an attachment. *(Form POS-050(P)/EFS-050(P) may be used for this purpose.)*

Date: 6/28/2022

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Anthony Iavarone
_____
(TYPE OR PRINT NAME OF DECLARANT)                                    (SIGNATURE OF DECLARANT)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
POS-050/EFS-050 [Rev. February 1, 2017]

**PROOF OF ELECTRONIC SERVICE**
**(Proof of Service/Electronic Filing and Service)**

Cal. Rules of Court, rule 2.251
*www.courts.ca.gov*

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): *FOR COURT USE ONLY*
Ian A. Rivamonte, Esq | SBN : Bar No. 232663
KAZAN,MCCLAIN,SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO. (510) 835-4913 | E-MAIL ADDRESS
ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
06/22/2022 at 03:09:19 PM
By: Lynn Wiley,
Deputy Clerk

Superior Court of California, County of Alameda
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: Valadez |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**

3. a. Party served *(specify name of party as shown on documents served):*
   **LUCKY STORES, INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **Cogency Global Inc., Registed agent by serving Mai Yang - Dropped in Basket, Per Authorized Procedure**
   **Age: 26-30 | Weight: 100-120 Lbs. | Hair: Black | Sex: Female | Height: 5'1" - 5'6" | Eyes: Brown | Race: Asian**

4. Address where the party was served:  **1325 J St Ste 1550**
   **Sacramento, CA 95814-2976**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/22/2022**   (2) at *(time):* **2:00 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):* ☐ or a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
POS010-1/SF98374

PETITIONER: ANTHONY HERNANDEZ VALADEZ

RESPONDENT:  **JOHNSON & JOHNSON, et al.**

22CV012759

c. ☐  **by mail and acknowledgment of receipt of service.**  I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*                                         (2) from *(city):*

(3) ☐  with two copies of the  *Notice and Acknowledgment of Receipt*  and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)*

(4) ☐  to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐  **by other means** *(specify means of service and authorizing code section):*

☐   Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐   as an individual defendant.

b. ☐   as the person sued under the fictitious name of  *(specify):*

c. ☐   as occupant.

d. ☑  On behalf of **LUCKY STORES, INC.**

under the following Code of Civil Procedure section:

- ☑  416.10 (corporation)
- ☐  416.20 (defunct corporation)
- ☐  416.30 (joint stock company/association)
- ☐  416.40 (association or partnership)
- ☐  416.50 (public entity)

- ☐  415.95 (business organization, form unknown)
- ☐  416.60 (minor)
- ☐  416.70 (ward or conservatee)
- ☐  416.90 (authorized person)
- ☐  415.46 (occupant)
- ☐  other:

7. **Person who served papers**

a. Name:  **Michael Romero - Nationwide Legal, LLC REG: 12-234648**

b. Address:  **1625 Clay Street 4th Floor  Oakland, CA 94612**

c. Telephone number:  **(510) 444-4690**

d. **The fee** for service was: **$ .00**

e. I am:

(1) ☐   not a registered California process server.

(2) ☐   exempt from registration under Business and Professions Code section 22350(b).

(3) ☑   registered California process server:

(i) ☐  owner   ☐  employee   ☑  independent contractor.

(ii) Registration No.: **2020-03**

(iii) County: **Sacramento**

8. ☑  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/22/2022**

**N  Nationwide Legal, LLC
1625 Clay Street 4th Floor
Oakland, CA 94612
(510) 444-4690
www.nationwideasap.com**

_____
**Michael Romero**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶

**POS-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* *FOR COURT USE ONLY*
Ian A. Rivamonte, Esq. SBN: Bar No. 232663
KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO. (510) 835-4913 | E-MAIL ADDRESS
ATTORNEY FOR *(Name):* Plaintiff: ANTHONY HERNANDEZ VALADEZ

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
06/22/2022 at 03:10:22 PM
By: Tania Pierce,
Deputy Clerk

**Superior Court of California, County of Alameda**
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: Valadez |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**

3. a. Party served *(specify name of party as shown on documents served):*
   **SAFEWAY INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**

   Age: 36-40 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino

4. Address where the party was served:   **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/22/2022**   (2) at *(time):* **12:30 PM**
   b. ☐ **by substituted service.** On *(date):*   at *(time):*   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):*   **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]
**PROOF OF SERVICE OF SUMMONS**
Code of Civil Procedure, § 417.10
POS010-1/SF98373

PETITIONER: ANTHONY HERNANDEZ VALADEZ

RESPONDENT: **JOHNSON & JOHNSON, et al.**

22CV012759

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*                                                         (2) from *(city):*

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

(4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **SAFEWAY INC.**
under the following Code of Civil Procedure section:

☑ 416.10 (corporation)                    ☐ 415.95 (business organization, form unknown)
☐ 416.20 (defunct corporation)            ☐ 416.60 (minor)
☐ 416.30 (joint stock company/association) ☐ 416.70 (ward or conservatee)
☐ 416.40 (association or partnership)     ☐ 416.90 (authorized person)
☐ 416.50 (public entity)                  ☐ 415.46 (occupant)
                                          ☐ other:

7. **Person who served papers**
a. Name: **Dion Jones - Nationwide Legal, LLC REG: 12-234648**
b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**
c. Telephone number: **(510) 444-4690**
d. **The fee** for service was: **$ .00**
e. I am:

(1) ☐ not a registered California process server.
(2) ☐ exempt from registration under Business and Professions Code section 22350(b).
(3) ☑ registered California process server:
(i) ☐ owner    ☐ employee    ☑ independent contractor.
(ii) Registration No.: **2013128925**
(iii) County: **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/22/2022**

**N** **Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

_____
**Dion Jones**                            ▶
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): FOR COURT USE ONLY<br>Ian A. Rivamonte, Esq. SBN:. Bar No. 232663<br>KAZAN,MCCLAIN,SATTERLEY & GREENWOOD<br>55 Harrison Street Suite 400   Oakland, CA 94607<br><br>TELEPHONE NO.: (510) 302-1000 \| FAX NO. (510) 835-4913 \| E-MAIL ADDRESS<br>ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Alameda<br>06/22/2022 at 10:56:17 AM<br>By: Tania Pierce,<br>Deputy Clerk |

| | |
|---|---|
| **Superior Court of California, County of Alameda**<br>STREET ADDRESS: 1225  FALLON STREET<br>CITY AND ZIP CODE: OAKLAND, CA 94612<br>BRANCH NAME: Rene C. Davidson Alameda County Courthouse | |

| | |
|---|---|
| PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ<br>DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al. | CASE NUMBER:<br>22CV012759 |

| | |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>Valadez |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑  Summons
   b. ☑  Complaint
   c. ☑  Alternative Dispute Resolution (ADR) package
   d. ☑  Civil Case Cover Sheet
   e. ☐  Cross-Complaint
   f. ☑  other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF CASE MANAGEMENT CONFERENCE; LETTER TO JUDGE LEE REGARDING COMPLAINT**

3. a. Party served *(specify name of party as shown on documents served):*
   **SAVE MART SUPERMARKETS, individually, and as successor-in-interest, parent, alter ego and equitable trustee of LUCKY STORES, INC.**

   b. ☑  Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **Cogency Global Inc., Registed agent by serving Lya Dagette  - Dropped in the Basket, Per Authorized Procedure**
   Age: 36-40 \| Weight: 161-180 Lbs. \| Hair: Brown \| Sex: Female \| Height: 5'7 - 6'0 \| Eyes: Blue \| Race: Caucasian

4. Address where the party was served:  **1325 J St Ste 1550**
   **Sacramento, CA 95814-2976**

5. I served the party *(check proper box)*
   a. ☑  **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/22/2022**    (2) at *(time):* **10:25 AM**

   b. ☐  **by substituted service.**  On *(date):*  at  *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

      (2) ☐  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

      (3) ☐  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

      (4) ☐  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*  from *(city):*    **or** ☐  a declaration of mailing is attached.

      (5) ☐  I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

POS010-1/SF98273

PETITIONERS: ANTHONY HERNANDEZ VALADEZ
Case 21-30589-MBK    Doc 2736-2    Filed 07/19/22    Entered 07/19/22 17:06:11    Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION    Page 41 of 45
22CV012759

RESPONDENT: JOHNSON & JOHNSON, et al.

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                           (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)*

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **SAVE MART SUPERMARKETS, individually, and as successor-in-interest, parent, alter ego and equitable trustee of LUCKY STORES, INC.**
under the following Code of Civil Procedure section:

    ☑ 416.10 (corporation)                ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)          ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)             ☐ 415.46 (occupant)
                              ☐ other:

7. **Person who served papers**
  a. Name: **Michael Romero - Nationwide Legal, LLC REG: 12-234648**
  b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**
  c. Telephone number: **(510) 444-4690**
  d. **The fee** for service was: **$ .00**
  e. I am:

    (1) ☐ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☑ registered California process server:
       (i) ☐ owner    ☐ employee    ☑ independent contractor.
       (ii) Registration No.: **2020-03**
       (iii) County: **Sacramento**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    **or**

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/22/2022**

**N** **Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

    **Michael Romero**            ▶
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

POS-010

Case 3:21-30589-MBK Doc 2736-2 Filed 07/19/22 Entered 07/19/22 17:06:11 Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION Page 42 of 45

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Ian A. Rivamonte, Esq / SBN / Bar No./232663<br>KAZAN,MCCLAIN,SATTERLEY & GREENWOOD<br>55 Harrison Street Suite 400  Oakland, CA 94607<br><br>TELEPHONE NO.: (510) 302-1000 \| FAX NO. (510) 835-4913 \| E-MAIL ADDRESS<br>ATTORNEY FOR (Name): Plaintiff: ANTHONY HERNANDEZ VALADEZ | **ELECTRONICALLY FILED**<br>**Superior Court of California,**<br>**County of Alameda**<br>**07/06/2022 at 02:42:56 PM**<br>By: Gina Fu,<br>Deputy Clerk |

| Superior Court of California, County of Alameda | |
|---|---|
| STREET ADDRESS: 1225  FALLON STREET<br>CITY AND ZIP CODE: OAKLAND, CA 94612<br>BRANCH NAME: Rene C. Davidson Alameda County Courthouse | |

| PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ<br>DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al. | CASE NUMBER:<br><br>22CV012759 |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br><br>Valadez |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**

3. a. Party served *(specify name of party as shown on documents served):*

   **TARGET CORPORATION**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**
   **Age: 31-35 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino**

4. Address where the party was served:  **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/23/2022**  (2) at *(time):* **9:30 AM**
   b. ☐ **by substituted service.** On *(date):*  at  *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him or her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on
          *(date):*  from *(city):*  **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>POS010-1/SF98451 |
|---|---|---|

PETITIONERS: ANTHONY HERNANDEZ VALADEZ

RESPONDENT: **JOHNSON & JOHNSON, et al.**

Case 21-30589-MBK    Doc 2736-2    Filed 07/19/22    Entered 07/19/22 17:06:11    Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION    Page 43 of 45

22CV012759

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*               (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)*

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **TARGET CORPORATION**

    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

    a. Name: **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

    b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**

    c. Telephone number: **(510) 444-4690**

    d. **The fee** for service was: **$ .00**

    e. I am:

      (1) ☐ not a registered California process server.

      (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

      (3) ☑ registered California process server:

        (i) ☐ owner  ☐ employee  ☑ independent contractor.

        (ii) Registration No.: **2013128925**

        (iii) County: **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/23/2022**

**N** **Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

_____        ▶
**Dion Jones**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

POS-010

Case 21-30589-MBK   Doc 2736-2   Filed 07/19/22   Entered 07/19/22 17:06:11   Desc
Exhibit Exhibits A-C to Satterley Declaration   Page 44 of 45

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* *FOR COURT USE ONLY*
Ian A. Rivamonte, Esq | SBN, Bar No. 232665
KAZAN,MCCLAIN,SATTERLEY & GREENWOOD
55 Harrison Street Suite 400   Oakland, CA 94607

TELEPHONE NO.: (510) 302-1000 | FAX NO. (510) 835-4913 | E-MAIL ADDRESS
ATTORNEY FOR *(Name):* Plaintiff: ANTHONY HERNANDEZ VALADEZ

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
07/06/2022 at 02:44:03 PM
By: Andrel Gospel,
Deputy Clerk

Superior Court of California, County of Alameda
STREET ADDRESS: 1225  FALLON STREET
CITY AND ZIP CODE: OAKLAND, CA 94612
BRANCH NAME: Rene C. Davidson Alameda County Courthouse

PLAINTIFF/PETITIONER: ANTHONY HERNANDEZ VALADEZ
DEFENDANT/RESPONDENT: JOHNSON & JOHNSON, et al.

CASE NUMBER:
22CV012759

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.:
Valadez

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **CIVIL CASE COVER SHEET ADDENDUM; NOTICE OF HEARING; LETTER TO JUDGE LEE REGARDING COMPLAINT**

3. a.  Party served *(specify name of party as shown on documents served):*
   **WALMART INC.**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**

   Age: 31-35 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino

4. Address where the party was served:   **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **6/23/2022**  (2) at *(time):* **9:30 AM**
   b. ☐ **by substituted service.** On *(date):*  at *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him or her of the general nature of the papers.
      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.
      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him or her of the general nature of the papers.
      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*  from *(city):*  **or** ☐ a declaration of mailing is attached.
      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
POS010-1/SF98452

PETITIONERS: ANTHONY HERNANDEZ VALADEZ

RESPONDENT: **JOHNSON & JOHNSON, et al.**

Case 21-30589-MBK    Doc 2736-2    Filed 07/19/22    Entered 07/19/22 17:06:11    Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION    Page 45 of 45

22CV012759

c. ☐   **by mail and acknowledgment of receipt of service.**   I mailed the documents listed in item 2 to the party, to the address
shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*                                        (2) from  *(city):*

(3) ☐   with two copies of the  *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me.
*(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)*

(4) ☐   to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐   **by other means** *(specify means of service and authorizing code section):*

☐   Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐   as an individual defendant.

b. ☐   as the person sued under the fictitious name of  *(specify):*

c. ☐   as occupant.

d. ☑   On behalf of **WALMART INC.**

under the following Code of Civil Procedure section:

☑ 416.10 (corporation)                                    ☐ 415.95 (business organization, form unknown)
☐ 416.20 (defunct corporation)                            ☐ 416.60 (minor)
☐ 416.30 (joint stock company/association)                ☐ 416.70 (ward or conservatee)
☐ 416.40 (association or partnership)                     ☐ 416.90 (authorized person)
☐ 416.50 (public entity)                                  ☐ 415.46 (occupant)
                                                          ☐ other:

7. **Person who served papers**

a. Name:  **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

b. Address:  **1625 Clay Street 4th Floor  Oakland, CA 94612**

c. Telephone number:  **(510) 444-4690**

d. **The fee** for service was: **$ .00**

e. I am:

(1) ☐   not a registered California process server.

(2) ☐   exempt from registration under Business and Professions Code section 22350(b).

(3) ☑   registered California process server:

(i) ☐ owner          ☐ employee          ☑   independent contractor.

(ii) Registration No.: **2013128925**

(iii) County:  **Los Angeles**

8. ☑   **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐   **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **6/23/2022**

**N**   **Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

_____          ▶
                    **Dion Jones**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)