## Simpson Thacher & Bartlett LLP

425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954

TELEPHONE:
FACSIMILE: +1-212-455-2502

| Direct Dial Number | E-mail Address |
|---|---|
| +1-212-455-3073 | afrankel@stblaw.com |

**JULY 19, 2022**

VIA ECF TO ALL PARTIES

Re:   *In re LTL Management, LLC*, Case No. 21-30589 (MBK)

Honorable Michael B. Kaplan, U.S.B.J.
Chief Judge
United States Bankruptcy Court
District of New Jersey
Clarkson S. Fisher US Courthouse
402 East State Street
Trenton, NJ 08608

Dear Judge Kaplan:

We submit this supplemental letter in further support of the Motions[1] seeking to lift the automatic stay pursuant to the *Amended Order Regarding Motions of New Jersey Coverage Action Plaintiff-Insurers and Travelers Casualty and Surety Company to Allow New Jersey Coverage Action to Proceed*. ECF No. 2424.

## Introduction

In previously adjourning the Motions, the Court referred to a perceived lack of prejudice to the insurers of a "short" or "limited period of inaction" in the NJ Coverage Action while the Court set a 90-day period for mediation so that parties could "get a sense whether there will be a negotiated resolution." Hr'g Tr., Mar. 31, 2022, at 66:6–10 (Mar. 31, 2022). The Court noted that reconsidering the Motions after such period would ensure that the breathing spell offered by the automatic stay was not "unending." *Id.* at 66:1–2.

---

[1]   The "Motions" are (i) the *New Jersey Coverage Action Plaintiff-Insurers' Motion for an Order (I) Confirming that the Automatic Stay Does Not Apply to the New Jersey Coverage Action or, in the Alternative, (II) Granting Relief from the Automatic Stay to Allow the New Jersey Coverage Action to Proceed*, ECF No. 1491, the (ii) *Travelers Casualty and Surety Company's Motion for an Order Granting Relief From the Automatic Stay to Allow the NJ Coverage Action to Proceed*, ECF No. 1488, and (iii) any joinders filed thereto.

Honorable Michael B. Kaplan, U.S.B.J.              -2-

Based on the developments in this case in the more than 100 days since the March 30 hearing, it is apparent that the NJ Coverage Action will not be an obstacle to resolution, and the Court should allow that action to proceed. Mediation efforts have not borne fruit thus far, and the Debtor and TCC have already staked out divergent paths forward for the case. Moreover, although the insurers have been nominally included in the mediation (as required by Court Order), the insurers have in fact been excluded from any direct discussions between Debtor, J&J, the TCC and FCR. It is time for the NJ Coverage Action to resume.

**Mediation Has Not Yielded a Prompt Consensual Resolution**

On the first day of this case, the Debtor stated its intention to work cooperatively with the TCC and FCR toward the goal of a consensual plan, using mediation as necessary to achieve that result. *Informational Brief of LTL Management LLC*, ECF No. 3, at 127–28. Early in the case, the TCC committed to opposing every motion until the case ended and claimants could receive their day in court. *Initial Statement of Official Committee of Talc Claimants Respecting Chapter 11 Case*, ECF No. 495, at ¶ 42. The TCC and other claimant representatives continue to prosecute the Third Circuit appeal, seeking to overturn this Court's denial of the claimants' motions to dismiss.

Several months of mediation have apparently not softened the parties' positions. As the Court recognized at the May 24 hearing, mediation has not yielded results. *See* Hr'g Tr. May 24, 2022, 3:22–4:2 ("I guess over the past month or so you've been engaged in mediation efforts with Judge Schneider and Mr. Russo. . . I think it's fair to say, [the parties are] not as far along as he would have liked"). Insurer "participation" in the mediation—such as it has been—has not moved the needle, and unsurprisingly so.

In their respective status reports and submissions on estimation, the Debtor and the TCC painted similar pictures of mediation, and offered very different visions for how to move the case forward. For its part, the Debtor stated that an estimation process is "necessary to move this case forward." *Debtor's Statement on Proposed Next Steps in Chapter 11 Case*, ECF No. 2473, at 3. In the Debtor's view, mediation coupled with an underlying estimation of the talc claims is the best path to a consensual plan. The TCC and other claimants seek a very different path, one that ultimately involves terminating Debtor's exclusivity and filing their own proposed plan. As they describe it, the plan would involve creation of a trust to qualify, value, and pay claims, with the trust funded by an assignment of LTL's rights under the $61 billion funding agreement "and certain insurance policies." ECF No. 2722, at 27.

Both the Debtor and the TCC agree that the parties' mediation efforts over the past few months have not been a silver bullet and, as the Court observed, appear to be at an impasse. Although the parties have committed to continued efforts to mediate in good faith, a mediated resolution in the short term appears unlikely. Given that the prospect of a mediated resolution by this juncture was the primary basis for the Debtor's opposition to lifting the stay, as well as the Court's adjournment of the Motions, at this juncture there is no reason to further delay granting the Motions and lifting the automatic stay as to the NJ Coverage Action.

Honorable Michael B. Kaplan, U.S.B.J.    -3-

**Debtor's and J&J's Attorneys will not be Distracted by the NJ Coverage Action**

The Debtor objected to the Motions for two primary reasons: continuing the NJ Coverage Action would distract the Debtor from its mediation efforts in this case, and continuing the NJ Coverage Action posed a risk of record taint.

To date, the Court has approved the retention of eight law firms to represent the Debtor (not including those employed as Ordinary Course Professionals). Debtor's retention application for Hogan Lovells as appellate litigation counsel illustrates the general trend that the Debtor retains additional law firms as needed to manage the workload necessary to avoid unnecessary distractions from these proceedings. *See Application for Retention of Hogan Lovells US LLP, Effective as of April 4, 2022* ECF No. 2240, at 3 (employment of Hogan Lovells is necessary because of "the anticipated intensity of the litigation of the Appeals"); *id.* at 5 ("Hogan Lovells' services will complement, and not duplicate, the services being rendered by other professionals").

In that vein, the Debtor long ago retained McCarter & English LLP to serve as its special insurance counsel, in part because for years McCarter represented Old JJCI (as well as J&J and its captive insurer Middlesex Assurance Company ("Middlesex")) in the NJ Coverage Action. McCarter was retained by J&J to handle the NJ Coverage Action from its inception, and was retained here to "counsel[] and represent[] the Debtor in connection with matters arising from or relating to the Debtor's insurance coverage, particularly with respect to talc liabilities." *Application for Retention,* ECF No. 555, at 3. Notwithstanding the stay of the NJ Coverage Action, McCarter continues to devote significant time not only to insurance coverage issues, but also to activities specific to litigating the NJ Coverage Action. Its fee applications reflect that even after the stay of the NJ Coverage Action, McCarter has spent months reviewing insurer document productions and policies, conducting legal research on coverage-related issues, and otherwise preparing for the reactivation of the NJ Coverage Action. It is apparent that J&J and its insurance counsel are more than capable of continuing the NJ Coverage Action without impeding the Debtor's (or J&J's) efforts in the bankruptcy.

Neither the pending Third Circuit appeal, potential dual-track mediation and estimation (whether accomplished through hearings with experts retained by the parties or an evaluation by a Court-appointed expert), nor defending bellwether trials means that the Debtor would have insufficient resources to defend the NJ Coverage Action while these proceedings move forward. The Debtor has no ongoing business other than litigation and its royalty business, and its army of experienced law firms have more than enough capacity to handle multiple non-overlapping litigations. Before this case, the Debtor's predecessor was able to handle tens of thousands of cases (including a number of trials and multi-district litigation in this district) while actively litigating the NJ Coverage Action and taking a very active role in the Imerys bankruptcy. With the tort litigation against the Debtor and J&J stayed, the Debtor does not need a further years-long breathing spell from the NJ Coverage Action to resolve discrete issues concerning insurance coverage.

Lifting the stay for the NJ Coverage Action will not distract Debtor's other counsel from their respective roles in managing the Debtor's overall litigation activities in this Court or continuing with mediation efforts, and McCarter is already well-positioned to continue

Honorable Michael B. Kaplan, U.S.B.J.            -4-

litigating the NJ Coverage Action.  Therefore, the Debtor would not be prejudiced by lifting the automatic stay to allow the NJ Coverage Action to proceed.

**The NJ Coverage Action does not Present a Risk of Record Taint**

Nor should the Court be concerned with potential record taint from prosecution of the NJ Coverage Action.  Both the Debtor and the TCC have proposed paths forward that incorporate determinations of various issues—the Debtor has proposed a two-phase estimation process and the TCC has requested that the automatic stay be lifted so that 90 trials can proceed—both allegedly to support a more accurate estimate of liability.  The purported risks of record taint posed by the NJ Coverage Action are illusory.  For example, any finding on whether a claim is barred because the injuries were expected or intended by the insured would be based on findings and rulings that have largely already been made by a jury and court, and comparing those findings with the terms of insurance contracts.  Any collateral estoppel or record taint would come from the prior jury verdicts and the prior court's findings about what J&J or Old JJCI expected or intended, not from the state court's application of the terms of the insurance contracts to those already-developed facts.  Indeed, expected or intended defenses could be adjudicated as a matter of law based on factual findings that are already available to both the Debtor and TCC.

Likewise, there are other legal issues, like the insurability of punitive damages, the method of allocating damages, allocation to Middlesex, and a host of other disputed issues that can be decided as a matter of law based on already-determined facts.  Regardless, courts routinely resolve insurance coverage actions seeking declaratory judgment while underlying tort claims remain pending.  *See, e.g., ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 666 F.2d 819, 823 (3d Cir. 1981*)*; *Criterion Claim Sols. v. Scottsdale Indem. Co.*, 2021 WL 794787, at *8 (D.N.J. Mar. 1, 2021).  The risk of record taint is therefore illusory, and the record developed in the NJ Coverage Action will in any case be dwarfed by the record that the Debtor, the TCC, and other claimants already have or will develop.  Neither the Debtor nor TCC will be prejudiced if the NJ Coverage Action continues.

In contrast, the Insurers would be prejudiced by continued delay, not only because of continued uncertainty concerning their alleged rights and obligations, but as discussed in the prior briefing, by the loss of evidence, fading of memories, inability to obtain even third-party discovery from parties having no involvement in these proceedings, the possibility that J&J may attempt to foist a portion of any resolution in this case (consensual or otherwise) on its insurers while numerous disputed issues remain and without the insurers having meaningful involvement, and the potential accumulation of prejudgment interest J&J may seek from its insurers stemming from continued delay.

**Allowing the Parties to Obtain Needed Clarity on Disputed Coverage Issues Would Encourage Settlement**

As noted above, the Insurers are harmed by the cloud of uncertainty about their respective rights and obligations given the magnitude of the talc claims and liabilities in this case.  The ability to file a declaratory judgment action, commonplace in insurance coverage matters, reflects a recognition that judicial resolution of such uncertainty, even while the

Simpson Thacher & Bartlett LLP

Honorable Michael B. Kaplan, U.S.B.J.           -5-

parties' financial positions remain status quo, is an important goal. *Chamber of Commerce v. State*, 89 N.J. 131, 140 (1982) (The New Jersey Declaratory Judgments Act "authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity.") (emphasis added); *cf. Travelers Ins. Co. v. Davis*, 490 F.2d 536, 544 (3d Cir. 1974) ("An additional purpose [of the Federal Declaratory Judgment Act] is to clarify legal relationships before they have been disturbed or a party's rights violated.") (emphasis added). The Insurers should not be held hostage to further delay while the Debtor, J&J and the TCC attempt to litigate and/or mediate the issues in this case, especially insofar as the Debtor and TCC agree that any plan of reorganization is not dependent on insurance coverage.

Greater clarity on the extent of available insurance will also facilitate settlement negotiations because it will clarify the extent of Debtor's available insurance assets (including the availability of insurance coverage from Middlesex). And partial or complete resolution of the issues in the NJ Coverage Action could also narrow the need for insurers to further participate in this case to protect their contractual rights. Notably, J&J has expended far more in defense and indemnity resolving its *past* claims pre-petition than the total amount of alleged insurance limits. And given the amount J&J has committed to make available to resolve LTL's present and future talc liabilities in this bankruptcy case through the funding agreement—independent of insurance—it benefits no one to leave resolution of disputed coverage claims languishing in uncertainty.

Notably, the TCC and other claimants representatives apparently contemplate the filing of a competing plan that includes an assignment of LTL's purported insurance rights to a trust. Why that would be necessary is a mystery given the magnitude of the funding agreement. But even in the unlikely event the funding agreement proved insufficient to cover LTL's talc liabilities in the manner the TCC and FCR apparently contemplate, unlike the funding agreement, the value of LTL's purported rights (if any) under J&J's insurance contracts are highly uncertain given the disputed issues that remain to be decided in the NJ Coverage Action.

Resolving this needless uncertainty could be accomplished by letting the state court—which has presided over the NJ Coverage Action for three years, has the relevant expertise, and is the only court that can decide these issues given mandatory abstention—continue to adjudicate the NJ Coverage Action. As Judge Bernstein noted in *In re Quigley Co., Inc.*, 361 B.R. 723, 743-45 (Bankr. S.D.N.Y. 2007), "stay relief [to allow resolution of disputed insurance coverage issues] will have a greater chance of encouraging a complete resolution of the issues, … and will promote 'the interests of judicial economy and the expeditious and economical resolution of litigation.'"[2]

---

[2]     Just as the parties have observed here, the debtor and its affiliates in *Quigley* argued that it was unnecessary to resolve disputed insurance coverage issues to confirm a plan. As the court noted, "the lack of any connection with the confirmation process or the case is an argument for, rather than against, stay relief. If Quigley and Pfizer are right, the coverage dispute can move at its own pace without disturbing the administration of the case." *In re Quigley Co.*, 361 B.R. at 745.

Honorable Michael B. Kaplan, U.S.B.J.                -6-

Moreover, lifting the stay would not cause the Insurers of to be unwilling to participate in mediation. Nor would it inhibit other parties from continuing with mediation or detract from the Debtor's and claimants representatives' ability to move this case forward under whichever path may be adopted by the Court, whether that is estimation, competing plans, or otherwise. To the contrary, all parties would benefit from having a state court available to issue rulings concerning disputed coverage issues, which itself could move the parties closer to a consensual resolution, including one that resolves the parties' outstanding coverage disputes.

**Conclusion**

This case has reached its nine-month anniversary with no imminent resolution in sight. The automatic stay of the NJ Coverage Action is no longer for a "limited period" and at this juncture the parties and the Court have a better "sense whether there will be a negotiated resolution." Hr'g Tr., Mar. 31, 2022, at 66:6–10 (Mar. 31, 2022). The Debtor should not be afforded an "unending" stay of the NJ Coverage Action while the insurers are held hostage to further delays resulting from these proceedings. The Court should lift the automatic stay and allow the NJ Coverage Action to proceed while the parties work toward a resolution of the bankruptcy case.

Respectfully,

*/s/Andy Frankel*

Andy Frankel