# Exhibit A

E-FILED
8/27/2018 4:05 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
18CV333609
Reviewed By: R. Walker

1   Joseph D. Satterley, Esq. (C.S.B. #286890)
      jsatterley@kazanlaw.com
2   Denyse F. Clancy, Esq. (C.S.B. #255276)
      dclancy@kazanlaw.com
3   Ian A. Rivamonte, Esq. (C.S.B. #232663)
      irivamonte@kazanlaw.com
4   KAZAN, McCLAIN, SATTERLEY & GREENWOOD
    A Professional Law Corporation
5   Jack London Market
    55 Harrison Street, Suite 400
6   Oakland, California 94607
    Telephone: (510) 302-1000
7   Facsimile: (510) 835-4913

8   Attorneys for Plaintiffs

9               SUPERIOR COURT OF CALIFORNIA

10                COUNTY OF SANTA CLARA

11  DANIEL CHRISTOPHER DOYLE and          Case No.   **18CV333609**
    KRISTIE LYNN DOYLE,
12                                         **COMPLAINT FOR PERSONAL
                 Plaintiffs,               INJURIES AND LOSS OF CONSORTIUM**
13
         v.                                **DEMAND FOR JURY TRIAL**
14
    IMERYS TALC AMERICA, INC., formerly
15  known as LUZENAC AMERICA, INC., and
    formerly known as CYPRUS TALC
16  CORPORATION (sued individually and as
    successor-in-interest to CYPRUS MINES
17  CORPORATION, CYPRUS INDUSTRIAL
    MINERALS CORPORATION, and CYPRUS
18  WINDSOR MINERALS CORPORATION);

19  JOHNSON & JOHNSON;

20  JOHNSON & JOHNSON CONSUMER, INC.
    (sued individually and as successor-in-interest to
21  JOHNSON & JOHNSON CONSUMER
    COMPANIES, INC.);
22
    CYPRUS MINES CORPORATION;
23
    IMERYS TALC VERMONT, INC.; and
24
    FIRST DOE through FIFTIETH DOE,
25
                 Defendants.
26

27

28

1672776.1                                               **EXHIBIT A**

Complaint for Personal Injuries and Loss of Consortium

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

## GENERAL BACKGROUND AND OTHER ALLEGATIONS

### I.

**The Plaintiffs:** Daniel Christopher Doyle is the physically injured Plaintiff. His mesothelioma was caused by asbestos exposures for which Defendants bear responsibility. Kristie Lynn Doyle is Mr. Doyle's wife.

### II.

**The Defendants**: All Defendants are listed in the case caption. The true names of the DOE Defendants are unknown to Plaintiffs. Each Defendant was the agent, employee, or joint venturer of its co-defendants, and was acting in the full course and scope of the agency, employment, or joint venture.

### III.

**Alternate Entities:** All Defendants are individually liable for their own defective products and wrongful conduct; and some Defendants are liable for the defective products and wrongful conduct of their alternate entities. Each such Defendant is liable for the torts of each of its alternate entities based on the following:

- There were express or implied agreements between the companies to transfer and assume the liabilities;

- The transactions between the companies amounted to a consolidation or merger;

- The purchasing company is a mere continuation of the seller;

- The transfer of assets to the purchasing company was for the fraudulent purpose of escaping liability for the seller's debts;

- Strict products liability was transferred because (i) there was a virtual destruction of Plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (ii) the successor has the ability to assume the original manufacturer's risk-spreading role, and (iii) it is fair to require the successor to assume responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business; and

- The companies are alter egos because (i) there is such a unity of interest, ownership, and business operations between the companies that their separate personalities do not in reality exist, and (ii) there would be an inequitable result if the torts in question were treated as those of one company alone.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entity |
|---|---|
| JOHNSON & JOHNSON CONSUMER, INC. | JOHNSON & JOHNSON CONSUMER COMPANIES, INC. |
| IMERYS TALC AMERICA, INC. | LUZENAC AMERICA, INC. CYPRUS TALC CORPORATION CYPRUS MINES CORPORATION CYPRUS INDUSTRIAL MINERALS CORPORATION CYPRUS WINDSOR MINERALS CORPORATION |

## IV.

**The Products:** The Defendants and/or their predecessors have for many years, manufactured, sold, distributed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce, asbestos-containing products, including talc products.

## V.

**The Asbestos Exposures:** At all times since his birth on November 29, 1970, Mr. Doyle was exposed to asbestos through his and his family members' personal, daily use of Johnson & Johnson's asbestos-containing talc powder products. Mr. Doyle used Johnson & Johnson asbestos-containing talc power products in California, Florida, Ohio, and Pennsylvania. Mr. Doyle was exposed to Defendants' asbestos in California because Defendants (i) marketed and sold their asbestos-containing products in California, and (ii) engaged in asbestos-related conduct that occurred in California. Mr. Doyle also was exposed to Defendants' asbestos in other states because Defendants (i) marketed and sold their asbestos-containing products in those states, and (ii) engaged in asbestos-related conduct in those states.

## VI.

**Venue:** Venue is proper in Santa Clara County because some of the Defendants reside in Santa Clara County. Specifically, the principal place of business of Defendant IMERYS TALC

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    AMERICA, INC. is in Santa Clara County.

2    **VII.**

3    **The Harm**: In June 2018, Mr. Doyle was diagnosed with epithelial/sarcomatoid

4 mesothelioma, an incurable and inevitably fatal cancer that stems from his exposures to asbestos.

5 The mesothelioma also has caused, and will cause, Mr. Doyle to experience physical pain, mental

6 suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief,

7 anxiety, humiliation, emotional distress, and other similar harm. The mesothelioma has caused

8 economic loss, including loss of income and loss of earning capacity. And the mesothelioma will

9 continue to inflict these harms on Mr. Doyle in the future, ceasing only when it causes his

10 untimely death.

11    Mr. Doyle's injuries have caused, and will cause, Mrs. Doyle to experience loss of

12 consortium. Mrs. Doyle's harm includes the loss of love, companionship, comfort, care,

13 assistance, protection, affection, society, moral support, sexual relations, and other similar harm.

14    Plaintiffs rely on the liability theories described below.

15    **FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY**

16    **I.**

17    **Design Defect:** Defendants, and DOE Defendants 1-50, have for many years,

18 manufactured, sold, distributed, designed, formulated, developed standards for, prepared,

19 processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled,

20 and/or otherwise placed into the stream of commerce, asbestos-containing talc powder products.

21 First, these Defendants' products were defective and unsafe for their intended purpose and

22 foreseeable use in that when used, handled, mixed, or otherwise disturbed, said products would

23 result in the release, and therefore inhalation of, hazardous and dangerous asbestos fibers by

24 exposed persons, including Mr. Doyle. Second, each product did not perform as safely as an

25 ordinary consumer would have expected it to perform when used or misused in an intended or

26 reasonably foreseeable way, because each product caused hazardous asbestos to become airborne.

27 Third, Mr. Doyle developed mesothelioma. Fourth, each product's failure to perform safely was a

28 substantial factor contributing to Mr. Doyle's risk of developing mesothelioma.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

## II.

**Failure-to-Warn Defect:** The Defendants, and DOE Defendants 1-50, are strictly liable for their products' failure-to-warn defects. First, these Defendants and/or their predecessors have for many years, manufactured, sold, distributed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce, asbestos-containing talc powder products. Second, each product had potential risks that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, label, distribution, and sale. Third, the potential risks presented a substantial danger when each product was used or misused in an intended or reasonably foreseeable way, because each product caused hazardous asbestos to become airborne. Fourth, ordinary consumers would not have recognized the potential risks. Fifth, these Defendants failed to adequately warn or instruct of the potential risks. Sixth, Mr. Doyle developed mesothelioma. Seventh, the lack of sufficient warnings or instructions was a substantial factor contributing to Mr. Doyle's risk of developing mesothelioma.

## III.

**Knowledge of Asbestos Hazards:** The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and what was known and knowable to Defendants. Health hazards from asbestos exposure were identified in the 1890s. During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

Defendants since the early 1900s possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in the manufacture goods, such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in consumer powder products, talc is known as "talcum powder."

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    Geologists and mining companies, including Defendants, have long known that the

2    deposits in the earth that are associated with talc are also associated with the formation of

3    asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term,

4    referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including

5    the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite,

6    amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in

7    1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite,

8    anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

9    As early as the 1920s, the term "asbestosis" was used to describe pulmonary fibrosis

10    caused by asbestos exposure. Case reports in Great Britain and the United States detailed

11    asbestosis in various workers. By 1929, lawsuits for disability related to exposure to asbestos were

12    filed against Johns Manville.

13    In the late 1930s, case reports were published addressing the relationship between asbestos

14    and cancer. In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

15    In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard

16    of care for work with asbestos. The same year, the State of Illinois enacted legislation recognizing

17    asbestosis as a compensable occupational disease under its Occupational Disease Act.

18    In March of 1933, Waldemar C. Dreesen of the United States Public Health Service

19    reported to the National Safety Council the results of a study conducted among tremolite, talc, and

20    slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being

21    45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of

22    the study seemed to indicate a relationship between the amount of dust inhaled and the effect of

23    this dust on the lungs of the workers." As early as 1934, the National Safety Council was

24    publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of

25    magnesium." In the September 1935 issue of National Safety News, an article entitled *No Halfway*

26    *Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from

27    "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral

28    dusts relatively low in free silica content." The article further noted that claims for disabilities

from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

By the 1940s, asbestos carcinogenicity was noted in reviews in fields of industrial medicine, cancer research, and pneumoconiosis. In 1946, the American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure.

During the 1940s and 1950s, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

In addition, beginning in the 1940s and 1950s, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

In 1955, Richard Doll published a study linking asbestos to lung cancer.

In 1960, Chris Wagner published a study linking asbestos to mesothelioma.

In the early 1960s, Dr. Irving Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the Annals of the New York Academy of Sciences published in 1965.

In 1968, a study presented at the American Industrial Hygiene Conference and published

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a ... fiber content ... averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits ... Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

In 1969, product-liability lawsuits were brought against asbestos manufacturers. Under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere a workplace standard of no more than 12 fibers per cubic centimeter of air. In 1970, OSHA established the first Federal guidelines for workplace asbestos exposure, which took effect in 1971. In 1972, the American Conference of Governmental Industrial Hygienists listed asbestos as a carcinogen.

A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc...We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).] The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year. The study and subsequent newspaper articles listed explicitly popular consumer cosmetic talcum powders as containing high percentages of asbestos.

In the early 1970s, the U.S. Food and Drug Administration began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants, who were part of an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products.

Several reports, studies, and guidelines published as early as the 1930s, including

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

California's Dust, Fumes, Vapors, and Gases Safety Orders, all recognized that asbestos is a dust which creates health hazards, and that certain precautions are required to mitigate human exposure to dust. Such measures include, but are not limited to, using water to suppress the dust at its source, as well as providing those who might be exposed to dust with adequate ventilation, showers, and changing facilities. These same measures that were recommended to protect workers from asbestosis in the 1930s would also have substantially reduced the risk that bystanders, household members, and other persons would contract mesothelioma from inhaling asbestos-containing dust that those who worked with and around asbestos and asbestos-containing products carried into their households on their person and personal effects. Defendants, and each of them, knew or should have known that anyone, including household members of those who used asbestos-containing products were at risk of developing an asbestos-related disease after inhaling dust from such asbestos-containing products.

All Defendants failed to place any warning on their talc and talcum powder products or ever disclose the fact that these products contained asbestos at any point, up to and including present day, despite the clear hazard and direct information that their products did contain asbestos.

### SECOND CAUSE OF ACTION FOR NEGLIGENCE

#### I.

**General Negligence:** All Defendants, and DOE Defendants 1-50, are liable for their general negligence. First, Defendants failed to use reasonable care to prevent harm to others, because they caused hazardous asbestos to become airborne. Second, Defendants unreasonably acted and failed to act. They acted in ways that a reasonably careful person would not do in the same situation, and failed to act in ways that a reasonably careful person would do in the same situation. Third, Mr. Doyle developed mesothelioma. Fourth, each Defendant's general negligence was a substantial factor contributing to Mr. Doyle's risk of developing mesothelioma.

#### II.

**Negligent Design, Manufacture, Supply, Testing, Packaging, and Labeling of Products:** The Defendants, and DOE Defendants 1-50, are liable for their negligent design, manufacture, marketing, supply, testing, packaging, and labeling of asbestos-containing talc

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   powder products. First, these Defendants designed, manufactured, sold, distributed, formulated,

2   developed standards for, prepared, processed, assembled, tested, listed, certified, marketed,

3   advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce,

4   asbestos-containing talc powder products. Second, these Defendants were negligent in

5   manufacturing, selling, distributing, developing standards for, processing, assembling, testing,

6   certifying, marketing, advertising, packaging and/or labeling, and/or otherwise placing into the

7   stream of commerce, asbestos-containing talc powder products because they caused hazardous

8   asbestos to become airborne. They failed to use the amount of care that a reasonably careful

9   person would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

10  Third, Mr. Doyle developed mesothelioma. Fourth, each Defendant's negligence was a substantial

11  factor contributing to Mr. Doyle's risk of developing mesothelioma.

### III.

13  **Negligent Failure to Warn about Products:** The Defendants, and DOE Defendants 1-50,

14  are liable for their negligent failure to warn about their products. First, these Defendants designed,

15  manufactured, marketed, distributed, packaged, labeled, and sold asbestos-containing talc powder

16  products. Second, these Defendants knew or reasonably should have known that each product was

17  dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable

18  manner, because each product caused hazardous asbestos to become airborne. Third, these

19  Defendants knew or reasonably should have known that users would not realize the danger.

20  Fourth, these Defendants failed to adequately warn of the danger or instruct on the safe use of each

21  product. Fifth, a reasonably careful person under the same or similar circumstances would have

22  warned of the danger or instructed on the safe use of each product. Sixth, Mr. Doyle developed

23  mesothelioma. Seventh, each Defendant's negligent failure to warn or instruct was a substantial

24  factor contributing to Mr. Doyle's risk of developing mesothelioma.

### IV.

26  **Negligent Failure to Recall and Retrofit Products:** The Defendants, and DOE

27  Defendants 1-50, are liable for their negligent failure to recall and retrofit their products. First,

28  these Defendants designed, manufactured, marketed, distributed, packaged, labeled, and sold

1   asbestos-containing talc powder products. Second, these Defendants knew or reasonably should

2   have known that each product was dangerous or was likely to be dangerous when used in a

3   reasonably foreseeable manner, because each product caused hazardous asbestos to become

4   airborne. Third, these Defendants became aware of this defect after each product was sold. Fourth,

5   these Defendants failed to recall and retrofit each product. Fifth, a reasonably careful person under

6   the same or similar circumstances would have recalled and retrofitted each product. Sixth,

7   Mr. Doyle developed mesothelioma. Seventh, each Defendant's negligent failure to recall and

8   retrofit each product was a substantial factor contributing to Mr. Doyle's risk of developing

9   mesothelioma.

10   **THIRD CAUSE OF ACTION FOR FRAUD**

11   **I.**

12       **Fraudulent Misrepresentation:** All Defendants, and DOE Defendants 1-50, are liable for

13   their fraudulent misrepresentations.

14       First, each of these Defendants, via its employees, agents, advertisements, or any other

15   authorized person or document, represented that certain facts were true when they were not. The

16   specific identities of these employees, agents, advertisements, or any other authorized person or

17   document are maintained in Defendants' records. Such records remain in the exclusive control of

18   Defendants pursuant to Defendants' respective document-retention policies. While Plaintiffs do

19   not currently know the specific advertisements or names of the employees, agents, or any other

20   authorized person who made the representations, they will have access to this information once

21   discovery has commenced and will be able to specifically name the advertisement as well as the

22   employee, agent, or any other authorized person.

23       Second, Defendants represented that the products they manufactured, supplied, or specified

24   for use were not hazardous to humans. These representations were made before and during the

25   years that Mr. Doyle purchased and was exposed to asbestos from Defendants' talc powder

26   products. Such representations were made either directly to Mr. Doyle, or to a third party

27   intending and reasonably expecting that the substances of these misrepresentations would be

28   repeated to Mr. Doyle.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1672776.1

11

Complaint for Personal Injuries and Loss of Consortium

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    Third, Defendants knew that the representations were false when they made them, or they

2    made the representations recklessly and without regard for their truth.

3    Fourth, Defendants intended that Mr. Doyle and/or the same class of persons as Mr. Doyle

4    rely on the representations or their substance.

5    Fifth, Mr. Doyle reasonably relied on Defendants' representations or the substance of these

6    representations.

7    Sixth, Mr. Doyle developed mesothelioma.

8    Seventh, Mr. Doyle's reliance on these representations was a substantial factor

9    contributing to Mr. Doyle's risk of developing mesothelioma.

10    **II.**

11    **Fraudulent Concealment (Nondisclosure):** All Defendants, and DOE Defendants 1-50,

12    are liable for their fraudulent concealment (nondisclosure).

13    First, each of these Defendants made affirmative statements that were so misleading (e.g.

14    misleading "half-truths") that they gave rise to a fraud cause of action even in the absence of a

15    specific relationship or transaction as between Defendants and Mr. Doyle. Specifically,

16    Defendants stated that their products could be used safely while concealing they were in fact lethal

17    because they contained and released asbestos fibers.

18    Second, Defendants (i) had exclusive knowledge of material facts not known to Mr. Doyle

19    (as set forth above), (ii) actively concealed these material facts from Mr. Doyle, (iii) made partial

20    representations but also suppressed material facts, as set forth above, and (iv) made factual

21    representations, but did not disclose facts which materially qualified those representations. Such

22    nondisclosures included Defendants representing their products as safe when used as intended and

23    as fit for the particular purpose for which they were marketed, while not disclosing the facts that

24    these products contained asbestos that would become airborne during the intended and foreseeable

25    use of the products, rendering them dangerous and unfit for their intended purpose.

26    Third, each Defendant entered into a relationship and/or a transaction with Mr. Doyle

27    sufficient to give rise to a duty to disclose. For example, Mr. Doyle used or otherwise encountered

28    Defendants' products that were purchased either directly from Defendants, Defendants' authorized

1  dealer or supplier, or any other entity upon which Defendants derived a direct monetary benefit

2  directly from Mr. Doyle's purchase and use of the products. As for another example, Defendants

3  directly advertised their products to those in California and elsewhere, as a symbol of freshness,

4  cleanliness, and purity. Defendants advertised and marketed this product as the beacon of

5  "freshness" and "comfort", eliminating friction on the skin, absorbing "excess wetness" helping

6  keep skin feeling dry and comfortable, and "clinically proven gentle and mild." The Defendants

7  compelled men and women through advertisements to dust themselves with this product to mask

8  odors. Defendants derived direct monetary benefit from these individuals' use of these products

9  because Mr. Doyle decided to use or purchase Defendants' products.

10  Fourth, Mr. Doyle did not know of the concealed facts.

11  Fifth, Defendants intended to deceive Mr. Doyle by concealing the facts, and/or by making

12  certain representations without disclosing additional facts that would have materially qualified

13  those representations.

14  Sixth, had the omitted information been disclosed, Mr. Doyle reasonably would have

15  behaved differently.

16  Seventh, Mr. Doyle developed mesothelioma.

17  Eighth, each Defendant's concealment was a substantial factor contributing to Mr. Doyle's

18  risk of developing mesothelioma.

19  **III.**

20  **Conspiracy to Commit Fraudulent Misrepresentation**: Plaintiffs hereby incorporate by

21  reference the allegations of Paragraph I of this Third Cause of Action as if fully stated herein.

22  All Defendants, and DOE Defendants 1-50, are liable for their conspiracy to commit

23  fraudulent misrepresentation. First, Defendants were aware that their conspirators, which included

24  all co-Defendants and others, planned to commit fraudulent misrepresentation against Mr. Doyle.

25  Second, Defendants agreed with their conspirators and intended that the fraudulent

26  misrepresentation be committed. Third, Mr. Doyle developed mesothelioma. Fourth, each

27  Defendant's participation in the conspiracy was a substantial factor contributing to Mr. Doyle's

28  risk of developing mesothelioma.

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**IV.**

**Conspiracy to Commit Fraudulent Concealment (Nondisclosure)**: Plaintiffs hereby incorporate by reference the allegations of Paragraph II of this Third Cause of Action as if fully stated herein.

All Defendants, and DOE Defendants 1-50, are liable for their conspiracy to commit fraudulent concealment. First, Defendants were aware that their conspirators, which included all co-Defendants and others, planned to commit fraudulent concealment against Mr. Doyle. Second, Defendants agreed with their conspirators and intended that the fraudulent concealment be committed. Third, Mr. Doyle developed mesothelioma. Fourth, each Defendant's participation in the conspiracy was a substantial factor contributing to Mr. Doyle's risk of developing mesothelioma.

**V.**

**Knowledge of Hazards:** At all times pertinent hereto, all Defendants, including DOE Defendants 1-50, owed Mr. Doyle a duty, as provided for in Civil Code sections 1708, 1709, and 1710, to abstain from injuring his person, property, or rights. In violation of that duty, these Defendants, and each of them, did do the acts and omissions, when a duty to act was imposed, as set forth herein, thereby proximately causing injury to Mr. Doyle. Such acts and omissions consisted of acts falling within Civil Code section 1710, and more specifically were (i) suggestions of fact which were not true and which the Defendants did not believe to be true, (ii) assertions of fact of that which was not true, which the Defendants had no reasonable ground for believing it to be true, and (iii) the suppression of facts when a duty existed to disclose it, all as are more fully set forth herein, and the violation of which as to any one such item gave rise to a cause of action for violation of Mr. Doyle's rights as provided for in the aforementioned code sections.

Since 1924, all of the Defendants have known and possessed of the true facts (consisting of medical and scientific data and other knowledge) which clearly indicated that the materials and products referred to herein were and are hazardous to the health and safety of Mr. Doyle, and others similarly situated. Defendants engaged in the following acts and omissions:

(a)    Did not label any of the aforementioned asbestos-containing materials and

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

products as to the hazards of such materials and products to the health and safety of Mr. Doyle, and others in their position using these products when the knowledge of such hazards was existing and known to Defendants, and each of them, since 1924. By not labeling such materials as to their said hazards, Defendants, and each of them, caused to be suggested as a fact to Mr. Doyle that it was safe for his to use such materials, when in fact these things were not true and Defendants did not believe them to be true.

(b) Suppressed information relating to the danger of using the aforementioned materials by requesting the suppression of information to Mr. Doyle, and the general public concerning the dangerous nature of the aforementioned materials to all persons, including users, bystanders and household members, by not allowing such information to be disseminated in a manner which would give general notice to the public and knowledge of the hazardous nature thereof when Defendants were bound to disclose such information.

(c) Sold the aforementioned products and materials to the public, including Mr. Doyle, and others in California and other states without advising them of the dangers of use of such materials and to those persons' household members, when Defendants knew of such dangers, as set forth herein and above, and had a duty to disclose such dangers. Thus, Defendants caused to be positively asserted to Mr. Doyle, and the public that which was not true and which Defendants had no reasonable ground for believing it to be true, in a manner not warranted by the information possessed by said Defendants, and each of them, of that which was and is not true, to wit, that it was safe for Mr. Doyle to use such materials and that it did not pose a risk of harm.

(d) Suppressed and continue to suppress from everyone, including Mr. Doyle, medical, scientific data, and knowledge of the accurate results of studies including, but not limited to, Waldemar C. Dreesen of the United States Public Health Service's 1933 report to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "The results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

(e) Belonged to, participated in, and financially supported the Industrial Hygiene Foundation, Asbestos Information Association, the Asbestos Textile Institute (ATI), and other industry organizations, including the

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Cosmetic, Toiletry, and Fragrance Association (now known as the Personal Care Products Council), which actively promoted the suppression of information of danger to users of the aforementioned products and materials for and on behalf of Defendants, and each of them, thereby misleading Mr. Doyle to their prejudice through the suggestions and deceptions set forth above in this cause of action. ATI's Dust Control Committee, which changed its name to the Air Hygiene Committee of ATI, was specifically enjoined to study the subject of dust control; discussions in such committee were held many times of (i) the dangers inherent in asbestos and the dangers which arise from the lack of control of dust and (ii) the suppression of such information from 1946 to a date unknown to plaintiff at this time.

(f)     Knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis in 1930 with the study of mine and mill workers at the Thetford asbestos mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina. This information was disseminated through the ATI and other industry organizations to all other Defendants, and each of them, herein. Between 1942 and 1950, Defendants, and each of them, knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and cancer, which information was disseminated through the ATI and other industry organizations to all other Defendants herein. Thereby, Defendants suggested as fact that which is not true and disseminated other facts likely to and did mislead Mr. Doyle for want of communication of true facts, which consisted of the previously described medical and scientific data and other knowledge by not giving Mr. Doyle the true facts concerning such knowledge of danger, when Defendants were bound to disclose it.

(g)     Failed to warn Mr. Doyle and others similarly situated regarding the nature of Defendants' talcum products. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).] Defendants failed to warn Mr. Doyle and others similarly situated that their talcum products are, among other things, dangerous when breathed and causes pathological effects without noticeable trauma, although Defendants possessed knowledge that such material was dangerous and a threat to the health of persons coming into contact therewith and under a duty to disclose it.

(h)     Concealed from Mr. Doyle, and others similarly situated the true nature of their exposure, the fact that Defendants knew that exposure to respirable asbestos meant that Mr. Doyle would inhale this asbestos, significantly increasing his risk of developing asbestosis, lung cancer, and mesothelioma; that Mr. Doyle that had in fact been exposed to respirable asbestos; that the materials to which Mr. Doyle was exposed would cause pathological effects in the human body without noticeable or perceptible trauma to warn him of

injury; and Defendants engaged in these acts and omissions while under a duty to and bound to disclose this information.

(i)    Failed to provide information to the public at large and buyers, users and physicians of Mr. Doyle for the purpose of conducting physical examinations of anyone whom came in contact with asbestos as to the true nature of the hazards of asbestos, in order for such physicians to diagnose, and treat individuals coming into contact with asbestos, in that the materials to which Mr. Doyle had been exposed would cause pathological effects without noticeable trauma, even though Defendants were under a duty to supply such information and such failure was and is likely to mislead persons including Mr. Doyle as to the dangers and risk of harm to which they were exposed.

(j)    Affirmatively misrepresented that asbestos-containing products were safe to use and handle, when Defendants knew such statements were false when made, or made said false statements recklessly and without regard for whether the statements were true.

Each of the foregoing acts, suggestions, assertions, and forbearances to act when a duty existed to act, the said Defendants, and each of them, having such knowledge, knowing Mr. Doyle did not have such knowledge and would breathe such material innocently, was done falsely and fraudulently and with full intent to induce Mr. Doyle to work in a dangerous environment and to cause them to remain unaware of the true facts, all in violation of Civil Code section 1710.

## BASIS FOR PUNITIVE DAMAGES

### I.

**Malice, Oppression, and Fraud**: Plaintiffs hereby incorporate by reference the allegations of all causes of action as if fully stated herein. All Defendants, and DOE Defendants 1-50, are liable for punitive damages because they engaged in the conduct that caused Mr. Doyle's harm with malice, oppression, or fraud.

First, these Defendants committed malice in that they acted with intent to harm when they caused Mr. Doyle's asbestos exposures, and because their conduct was despicable and was done with a willful and knowing disregard of the rights and safety of others.

Second, these Defendants committed oppression in that their conduct was despicable and subjected Mr. Doyle to cruel and unjust hardship in knowing disregard of his rights.

Third, the Defendants committed fraud in that they intentionally and fraudulently

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  concealed and misrepresented material facts and did so intending to harm Mr. Doyle and with

2  reckless disregard for whether their fraud would harm Mr. Doyle.

3      These Defendants' conduct constituting malice, oppression, and fraud was committed by,

4  authorized by, and adopted by one or more officers, directors, and managing agents within the

5  corporate hierarchy of each Defendant, who acted on behalf of each Defendant.

6                            **PRAYER FOR DAMAGES**

7                                    **I.**

8      Plaintiffs pray for judgment against all Defendants for:

9      1.    All economic and non-economic compensatory damages in excess of $25,000;

10     2.    Punitive damages according to proof;

11     3.    Pre- and post-judgment interest;

12     4.    Costs of suit; and

13     5.    Such other relief as is fair, just, and equitable.

14                          **DEMAND FOR JURY TRIAL**

15                                    **I.**

16     Plaintiffs hereby demand a trial by jury on all issues so triable.

17

18  DATED: August 27, 2018              KAZAN, McCLAIN, SATTERLEY & GREENWOOD
                                        A Professional Law Corporation
19

20

21                                      By: _____
                                            Joseph D. Satterley
22                                          Denyse F. Clancy

23                                      Attorneys for Plaintiffs

24

25

26

27

28

*Kazan, McClain, Satterley & Greenwood*
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# Exhibit B



18CV333609
Santa Clara Civil

E-SERVICE

63050169
Mar 11 2019
08:17AM

File & ServeXpress

1  Joseph D. Satterley (C.S.B. #286890)
      jsatterley@kazanlaw.com
2  Denyse F. Clancy (C.S.B. #255276)
      dclancy@kazanlaw.com
3  Ian A. Rivamonte (C.S.B. #232663)
      irivamonte@kazanlaw.com
4  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
5  Jack London Market
   55 Harrison Street, Suite 400
6  Oakland, California 94607
   Telephone: (510) 302-1000
7  Facsimile: (510) 835-4913

8  Attorneys for Plaintiffs

9              SUPERIOR COURT OF CALIFORNIA

10               COUNTY OF SANTA CLARA

11  KRISTIE LYNN DOYLE (individually and as       Case No. 18CV333609
    successor-in-interest to decedent DANIEL
12  CHRISTOPHER DOYLE) and ETHAN               FIRST AMENDED COMPLAINT FOR
    DOYLE (a minor, by his Guardian Ad Litem   PERSONAL INJURIES (SURVIVORSHIP)
13  JEFFERY DUANE YORS),                        AND WRONGFUL DEATH

14              Plaintiffs,                     DEMAND FOR JURY TRIAL

15       v.

16  IMERYS TALC AMERICA, INC., formerly
    known as LUZENAC AMERICA, INC., and
17  formerly known as CYPRUS TALC
    CORPORATION (sued individually and as
18  successor-in-interest to CYPRUS MINES
    CORPORATION, CYPRUS INDUSTRIAL
19  MINERALS CORPORATION, and CYPRUS
    WINDSOR MINERALS CORPORATION);
20
    JOHNSON & JOHNSON;
21
    JOHNSON & JOHNSON CONSUMER, INC.
22  (sued individually and as successor-in-interest to
    JOHNSON & JOHNSON CONSUMER
23  COMPANIES, INC.);

24  CYPRUS MINES CORPORATION;

25  IMERYS TALC VERMONT, INC.; and

26  FIRST DOE through FIFTIETH DOE,

27              Defendants.

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 3/11/2019 9:15 AM
Reviewed By: R. Walker
Case #18CV333609
Envelope: 2608647

1705754.1

**EXHIBIT B**

## GENERAL BACKGROUND AND OTHER ALLEGATIONS

### I.

**The Plaintiffs:** Daniel Christopher Doyle died from mesothelioma on December 20, 2018. Mr. Doyle's mesothelioma was caused by exposures to asbestos, asbestiform fibers, and asbestiform talc for which Defendants bear responsibility. Plaintiff Kristie Lynn Doyle is the successor in interest to Mr. Doyle as defined under Code of Civil Procedure sections 377.11, 377.20, and 377.30. [*See* Exhibit A hereto.] Plaintiff Ethan Doyle is Mr. Doyle's minor son whose guardian ad litem is Jeffrey Duane Yors pursuant to this Court's order of January 25, 2019.

### II.

**The Defendants**: All Defendants are listed in the case caption. The true names of the DOE Defendants are unknown to Plaintiffs. Each Defendant was the agent, employee, or joint venturer of its co-defendants, and was acting in the full course and scope of the agency, employment, or joint venture.

### III.

**Alternate Entities:** All Defendants are individually liable for their own defective products and wrongful conduct; and some Defendants are liable for the defective products and wrongful conduct of their alternate entities. Each such Defendant is liable for the torts of each of its alternate entities based on the following:

- There were express or implied agreements between the companies to transfer and assume the liabilities;

- The transactions between the companies amounted to a consolidation or merger;

- The purchasing company is a mere continuation of the seller;

- The transfer of assets to the purchasing company was for the fraudulent purpose of escaping liability for the seller's debts;

- Strict products liability was transferred because (i) there was a virtual destruction of Plaintiffs' remedies against the original manufacturer caused by the successor's acquisition of the business, (ii) the successor has the ability to assume the original manufacturer's risk-spreading role, and (iii) it is fair to require the successor to assume responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business; and

- The companies are alter egos because (i) there is such a unity of interest, ownership, and business operations between the companies that their separate personalities do not in reality exist, and (ii) there would be an inequitable result if the torts in question were treated as those of one company alone.

The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entity |
|---|---|
| JOHNSON & JOHNSON CONSUMER, INC. | JOHNSON & JOHNSON CONSUMER COMPANIES, INC. |
| IMERYS TALC AMERICA, INC. | LUZENAC AMERICA, INC.<br><br>CYPRUS TALC CORPORATION<br><br>CYPRUS MINES CORPORATION<br><br>CYPRUS INDUSTRIAL MINERALS CORPORATION<br><br>CYPRUS WINDSOR MINERALS CORPORATION |

## IV.

**The Products:** The Defendants and/or their predecessors have for many years, manufactured, sold, distributed, designed, formulated, developed standards for, prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or otherwise placed into the stream of commerce talc products that contain asbestos, asbestisform fibers, and asbestiform talc.

## V.

**The Exposures:** At all times since his birth on November 29, 1970, Mr. Doyle was exposed to asbestos, asbestiform fibers, and asbestiform talc through his and his family members' personal, daily use of Johnson & Johnson's talc powder products. Mr. Doyle used Johnson & Johnson talc power products in California, Florida, Ohio, Pennsylvania, and other states. Mr. Doyle was exposed to Defendants' asbestos, asbestiform fibers, and asbestiform talc in California because Defendants (i) marketed and sold their talc products in California, and (ii) engaged in asbestos-related conduct that occurred in California. Mr. Doyle also was exposed to Defendants' asbestos, asbestiform fibers, and asbestiform talc in other states because Defendants

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    (i) marketed and sold their talc products in those states, and (ii) engaged in asbestos-related

2    conduct in those states.

### VI.

4    **Venue:** Venue is proper in Santa Clara County because some of the Defendants reside in

5    Santa Clara County. Specifically, the principal place of business of Defendant IMERYS TALC

6    AMERICA, INC. is in Santa Clara County.

### VII.

8    **The Harm**: In June 2018, Mr. Doyle was diagnosed with epithelial/sarcomatoid

9    mesothelioma, an incurable and inevitably fatal cancer that stems from his exposures to asbestos,

10    asbestiform fibers, and asbestiform talc. The mesothelioma caused Mr. Doyle to experience

11    financial harm as well as physical pain, mental suffering, loss of enjoyment of life, disfigurement,

12    physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress, and other

13    similar harm that occurred during the period from Mr. Doyle's mesothelioma diagnosis until his

14    untimely death. Plaintiffs are not claiming any damages barred by Code of Civil Procedure section

15    377.34.

16    Mr. Doyle's injuries have caused Mrs. Doyle to experience loss of consortium. Her harm

17    includes the loss of love, companionship, comfort, care, assistance, protection, affection, society,

18    moral support, sexual relations, and other similar harm. Mrs. Doyle seeks compensation only for

19    such harm that has occurred during the period from Mr. Doyle's mesothelioma diagnosis until his

20    untimely death.

21    Mr. Doyle's injuries have caused Plaintiffs to suffer the loss of: (i) Mr. Doyle's love,

22    companionship, comfort, care, assistance, protection, affection, society, moral support, training,

23    and guidance; (ii) financial support that Mr. Doyle would have contributed to Plaintiffs during his

24    life expectancy; (iii) gifts and benefits Plaintiffs would have expected to receive from Mr. Doyle;

25    and (iv) the loss of household services that Mr. Doyle would have provided. Mr. Doyle's injuries

26    have also caused Mrs. Doyle to suffer the loss of Mr. Doyle's sexual relationships. Plaintiffs also

27    had to incur expenses for funeral and cremation.

28    Plaintiffs assert the liability theories described below and reserve the right to conform this

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   Complaint to proof later ascertained.

2   **FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY**

3   **I.**

4         **Design Defect:** Defendants, and DOE Defendants 1-50, have for many years,

5   manufactured, sold, distributed, designed, formulated, developed standards for, prepared,

6   processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled,

7   and/or otherwise placed into the stream of commerce, talc powder products containing asbestos,

8   asbestiform fibers, and asbestiform talc. First, these Defendants' products were defective and

9   unsafe for their intended purpose and foreseeable use in that when used, handled, mixed, or

10   otherwise disturbed, said products would result in the release, and therefore inhalation, of

11   hazardous and dangerous asbestos fibers, asbestiform fibers, and asbestiform talc by exposed

12   persons, including Mr. Doyle. Second, each product did not perform as safely as an ordinary

13   consumer would have expected it to perform when used or misused in an intended or reasonably

14   foreseeable way, because each product caused hazardous asbestos, asbestiform fibers, and

15   asbestiform talc to become airborne. Third, Mr. Doyle developed mesothelioma. Fourth, each

16   product's failure to perform safely was a substantial factor in causing Mr. Doyle's mesothelioma

17   and wrongful death.

18   **II.**

19         **Failure-to-Warn Defect:** The Defendants, and DOE Defendants 1-50, are strictly liable

20   for their products' failure-to-warn defects. First, these Defendants and/or their predecessors have

21   for many years, manufactured, sold, distributed, designed, formulated, developed standards for,

22   prepared, processed, assembled, tested, listed, certified, marketed, advertised, packaged and/or

23   labeled, and/or otherwise placed into the stream of commerce, talc powder products containing

24   asbestos, asbestiform fibers, and asbestiform talc. Second, each product had potential risks that

25   were known or knowable in light of the scientific and medical knowledge that was generally

26   accepted in the scientific community at the time of design, manufacture, label, distribution, and

27   sale. Third, the potential risks presented a substantial danger when each product was used or

28   misused in an intended or reasonably foreseeable way, because each product caused hazardous

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

asbestos, asbestiform fibers, and asbestiform talc to become airborne. Fourth, ordinary consumers would not have recognized the potential risks. Fifth, these Defendants failed to adequately warn or instruct of the potential risks. Sixth, Mr. Doyle developed mesothelioma. Seventh, the lack of sufficient warnings or instructions was a substantial factor in causing Mr. Doyle's mesothelioma and wrongful death.

### III.

**Knowledge of Asbestos Hazards:** The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and what was known and knowable to Defendants. Health hazards from asbestos exposure were identified in the 1890s. During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

Defendants since the early 1900s possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in the manufacture of goods such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in consumer powder products, talc is known as "talcum powder."

Geologists and mining companies, including Defendants, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s in the United States, note the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

As early as the 1920s, the term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in Great Britain and the United States detailed

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  asbestosis in various workers. By 1929, lawsuits for disability related to exposure to asbestos were

2  filed against Johns Manville.

3      In the late 1930s, case reports were published addressing the relationship between asbestos

4  and cancer. In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

5  In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard

6  of care for work with asbestos. The same year, the State of Illinois enacted legislation recognizing

7  asbestosis as a compensable occupational disease under its Occupational Disease Act.

8      In March of 1933, Waldemar C. Dreesen of the United States Public Health Service

9  reported to the National Safety Council the results of a study conducted among tremolite, talc, and

10  slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being

11  45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of

12  the study seemed to indicate a relationship between the amount of dust inhaled and the effect of

13  this dust on the lungs of the workers." As early as 1934, the National Safety Council was

14  publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of

15  magnesium." In the September 1935 issue of National Safety News, an article entitled *No Halfway*

16  *Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from

17  "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral

18  dusts relatively low in free silica content." The article further noted that claims for disabilities

19  from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims

20  prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses,

21  occupational histories and a more satisfactory method of adjudicating claims than prosecution at

22  common law, we must conclude that it is necessary to find a practical method for controlling all

23  mineral dusts."

24      By the 1940s, asbestos carcinogenicity was noted in reviews in fields of industrial

25  medicine, cancer research, and pneumoconiosis. In 1946, the American Conference of

26  Governmental Industrial Hygienists established a maximum allowable concentration for

27  occupational exposure.

28      During the 1940s and 1950s, asbestos hazards were discussed in popular magazines,

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

In addition, beginning in the 1940s and 1950s, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

In 1955, Richard Doll published a study linking asbestos to lung cancer.

In 1960, Chris Wagner published a study linking asbestos to mesothelioma.

In the early 1960s, Dr. Irving Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the Annals of the New York Academy of Sciences published in 1965.

In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

In 1969, product-liability lawsuits were brought against asbestos manufacturers. Under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere a workplace standard of no more than 12 fibers per cubic centimeter of air. In 1970, OSHA

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    established the first Federal guidelines for workplace asbestos exposure, which took effect in

2    1971. In 1972, the American Conference of Governmental Industrial Hygienists listed asbestos as

3    a carcinogen.

4         A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York

5    concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite,

6    chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc...We also

7    recommend that evaluation be made to determine the possible health hazards associated with the

8    use of these products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral and*

9    *Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).] The results of the Mount

10   Sinai study were soon picked up and reported by both the New York Times and the Washington

11   Post that same year. The study and subsequent newspaper articles listed explicitly popular

12   consumer cosmetic talcum powders as containing high percentages of asbestos.

13        In the early 1970s, the U.S. Food and Drug Administration began an inquiry into whether

14   to regulate and require warnings on consumer talcum powder products. Defendants, who were part

15   of an exclusive lobbying and advocacy group representing companies engaged in the cosmetic

16   products industry, repeatedly conspired and worked in concert to block efforts to label and warn

17   consumers regarding the dangers associated with cosmetic talcum powder products.

18        Several reports, studies, and guidelines published as early as the 1930s, including

19   California's Dust, Fumes, Vapors, and Gases Safety Orders, all recognized that asbestos is a dust

20   which creates health hazards, and that certain precautions are required to mitigate human exposure

21   to dust. Such measures include, but are not limited to, using water to suppress the dust at its

22   source, as well as providing those who might be exposed to dust with adequate ventilation,

23   showers, and changing facilities. These same measures that were recommended to protect workers

24   from asbestosis in the 1930s would also have substantially reduced the risk that bystanders,

25   household members, and other persons would contract mesothelioma from inhaling asbestos-

26   containing dust that those who worked with and around asbestos and asbestos-containing products

27   carried into their households on their person and personal effects. Defendants, and each of them,

28   knew or should have known that anyone, including household members of those who used

First Amended Complaint for Personal Injuries (Survivorship) and Wrongful Death

1  asbestos-containing products were at risk of developing an asbestos-related disease after inhaling

2  dust from such asbestos-containing products.

3      All Defendants failed to place any warning on their talc and talcum powder products or ever

4  disclose the fact that these products contained asbestos, asbestiform fibers, and asbestiform talc at any

5  point, up to and including present day, despite the clear hazard and direct information that their

6  products did contain asbestos, asbestiform fibers, and asbestiform talc.

7  **SECOND CAUSE OF ACTION FOR NEGLIGENCE**

8  **I.**

9      **General Negligence:** All Defendants, and DOE Defendants 1-50, are liable for their

10  general negligence. First, Defendants failed to use reasonable care to prevent harm to others,

11  because they caused hazardous asbestos, asbestiform fibers, and asbestiform talc to become

12  airborne. Second, Defendants unreasonably acted and failed to act. They acted in ways that a

13  reasonably careful person would not do in the same situation, and failed to act in ways that a

14  reasonably careful person would do in the same situation. Third, Mr. Doyle developed

15  mesothelioma. Fourth, each Defendant's general negligence was a substantial factor in causing

16  Mr. Doyle's mesothelioma and wrongful death.

17  **II.**

18      **Negligent Design, Manufacture, Supply, Testing, Packaging, and Labeling of**

19  **Products:** The Defendants, and DOE Defendants 1-50, are liable for their negligent design,

20  manufacture, marketing, supply, testing, packaging, and labeling of talc powder products

21  containing asbestos, asbestiform fibers, and asbestiform talc. First, these Defendants designed,

22  manufactured, sold, distributed, formulated, developed standards for, prepared, processed,

23  assembled, tested, listed, certified, marketed, advertised, packaged and/or labeled, and/or

24  otherwise placed into the stream of commerce, talc powder products containing asbestos,

25  asbestiform fibers, and asbestiform talc. Second, these Defendants were negligent in

26  manufacturing, selling, distributing, developing standards for, processing, assembling, testing,

27  certifying, marketing, advertising, packaging and/or labeling, and/or otherwise placing into the

28  stream of commerce, talc powder products containing asbestos, asbestiform fibers, and

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  asbestiform talc because they caused hazardous asbestos, asbestiform fibers, and asbestiform talc

2  to become airborne. They failed to use the amount of care that a reasonably careful person would

3  use in similar circumstances to avoid exposing others to a foreseeable risk of harm. Third,

4  Mr. Doyle developed mesothelioma. Fourth, each Defendant's negligence was a substantial factor

5  in causing Mr. Doyle's mesothelioma and wrongful death.

**III.**

7  **Negligent Failure to Warn about Products:** The Defendants, and DOE Defendants 1-50,

8  are liable for their negligent failure to warn about their products. First, these Defendants designed,

9  manufactured, marketed, distributed, packaged, labeled, and sold talc powder products containing

10  asbestos, asbestiform fibers, and asbestiform talc. Second, these Defendants knew or reasonably

11  should have known that each product was dangerous or was likely to be dangerous when used or

12  misused in a reasonably foreseeable manner, because each product caused hazardous asbestos,

13  asbestiform fibers, and asbestiform talc to become airborne. Third, these Defendants knew or

14  reasonably should have known that users would not realize the danger. Fourth, these Defendants

15  failed to adequately warn of the danger or instruct on the safe use of each product. Fifth, a

16  reasonably careful person under the same or similar circumstances would have warned of the

17  danger or instructed on the safe use of each product. Sixth, Mr. Doyle developed mesothelioma.

18  Seventh, each Defendant's negligent failure to warn or instruct was a substantial factor in causing

19  Mr. Doyle's mesothelioma and wrongful death.

**IV.**

21  **Negligent Failure to Recall and Retrofit Products:** The Defendants, and DOE

22  Defendants 1-50, are liable for their negligent failure to recall and retrofit their products. First,

23  these Defendants designed, manufactured, marketed, distributed, packaged, labeled, and sold talc

24  powder products containing asbestos, asbestiform fibers, and asbestiform talc. Second, these

25  Defendants knew or reasonably should have known that each product was dangerous or was likely

26  to be dangerous when used in a reasonably foreseeable manner, because each product caused

27  hazardous asbestos, asbestiform fibers, and asbestiform talc to become airborne. Third, these

28  Defendants became aware of this defect after each product was sold. Fourth, these Defendants

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  failed to recall and retrofit each product. Fifth, a reasonably careful person under the same or

2  similar circumstances would have recalled and retrofitted each product. Sixth, Mr. Doyle

3  developed mesothelioma. Seventh, each Defendant's negligent failure to recall and retrofit each

4  product was a substantial factor in causing Mr. Doyle's mesothelioma and wrongful death.

5  <u>**THIRD CAUSE OF ACTION FOR FRAUD**</u>

6  **I.**

7  **Fraudulent Misrepresentation:** All Defendants, and DOE Defendants 1-50, are liable for

8  their fraudulent misrepresentations.

9  First, each of these Defendants, via its employees, agents, advertisements, or any other

10  authorized person or document, represented that certain facts were true when they were not. The

11  specific identities of these employees, agents, advertisements, or any other authorized person or

12  document are maintained in Defendants' records. Such records remain in the exclusive control of

13  Defendants pursuant to Defendants' respective document-retention policies. While Plaintiffs do

14  not currently know the specific advertisements or names of the employees, agents, or any other

15  authorized person who made the representations, they will have access to this information once

16  discovery has commenced and will be able to specifically name the advertisement as well as the

17  employee, agent, or any other authorized person.

18  Second, Defendants represented that the products they manufactured, supplied, or specified

19  for use were not hazardous to humans. These representations were made before and during the

20  years that Mr. Doyle purchased and was exposed to asbestos, asbestiform fibers, and asbestiform

21  talc from Defendants' talc powder products. Such representations were made either directly to

22  Mr. Doyle, or to a third party intending and reasonably expecting that the substances of these

23  misrepresentations would be repeated to Mr. Doyle.

24  Third, Defendants knew that the representations were false when they made them, or they

25  made the representations recklessly and without regard for their truth.

26  Fourth, Defendants intended that Mr. Doyle and/or the same class of persons as Mr. Doyle

27  rely on the representations or their substance.

28  Fifth, Mr. Doyle reasonably relied on Defendants' representations or the substance of these

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    representations.

2        Sixth, Mr. Doyle developed mesothelioma.

3        Seventh, Mr. Doyle's reliance on these representations was a substantial factor in causing

4    Mr. Doyle's mesothelioma and wrongful death.

5                                   **II.**

6        **Fraudulent Concealment (Nondisclosure):** All Defendants, and DOE Defendants 1-50,

7    are liable for their fraudulent concealment (nondisclosure).

8        First, each of these Defendants made affirmative statements that were so misleading (e.g.

9    misleading "half-truths") that they gave rise to a fraud cause of action even in the absence of a

10    specific relationship or transaction as between Defendants and Mr. Doyle. Specifically,

11    Defendants stated that their products could be used safely while concealing they were in fact lethal

12    because they contain and release asbestos fibers, asbestiform fibers, and asbestiform talc.

13        Second, Defendants (i) had exclusive knowledge of material facts not known to Mr. Doyle

14    (as set forth above), (ii) actively concealed these material facts from Mr. Doyle, (iii) made partial

15    representations but also suppressed material facts, as set forth above, and (iv) made factual

16    representations, but did not disclose facts which materially qualified those representations. Such

17    nondisclosures included Defendants representing their products as safe when used as intended and

18    as fit for the particular purpose for which they were marketed, while not disclosing the facts that

19    these products contained asbestos, asbestiform fibers, and asbestiform talc that would become

20    airborne during the intended and foreseeable use of the products, rendering them dangerous and

21    unfit for their intended purpose.

22        Third, each Defendant entered into a relationship and/or a transaction with Mr. Doyle

23    sufficient to give rise to a duty to disclose. For example, Mr. Doyle used or otherwise encountered

24    Defendants' products that were purchased either directly from Defendants, Defendants' authorized

25    dealer or supplier, or any other entity upon which Defendants derived a direct monetary benefit

26    directly from Mr. Doyle's purchase and use of the products. As for another example, Defendants

27    directly advertised their products to those in California and elsewhere, as a symbol of freshness,

28    cleanliness, and purity. Defendants advertised and marketed this product as the beacon of

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    "freshness" and "comfort", eliminating friction on the skin, absorbing "excess wetness" helping

2    keep skin feeling dry and comfortable, and "clinically proven gentle and mild." The Defendants

3    compelled men and women through advertisements to dust themselves with this product to mask

4    odors. Defendants derived direct monetary benefit from these individuals' use of these products

5    because Mr. Doyle decided to use or purchase Defendants' products.

6        Fourth, Mr. Doyle did not know of the concealed facts.

7        Fifth, Defendants intended to deceive Mr. Doyle by concealing the facts, and/or by making

8    certain representations without disclosing additional facts that would have materially qualified

9    those representations.

10        Sixth, had the omitted information been disclosed, Mr. Doyle reasonably would have

11    behaved differently.

12        Seventh, Mr. Doyle developed mesothelioma.

13        Eighth, each Defendant's concealment was a substantial factor in causing Mr. Doyle's

14    mesothelioma and wrongful death.

### III.

16        **Conspiracy to Commit Fraudulent Misrepresentation**: Plaintiffs hereby incorporate by

17    reference the allegations of Paragraph I of this Third Cause of Action as if fully stated herein.

18        All Defendants, and DOE Defendants 1-50, are liable for their conspiracy to commit

19    fraudulent misrepresentation. First, Defendants were aware that their conspirators, which included

20    all co-defendants and others, planned to commit fraudulent misrepresentation against Mr. Doyle.

21    Second, Defendants agreed with their conspirators and intended that the fraudulent

22    misrepresentation be committed. Third, Mr. Doyle developed mesothelioma. Fourth, each

23    Defendant's participation in the conspiracy was a substantial factor in causing Mr. Doyle's

24    mesothelioma and wrongful death.

### IV.

26        **Conspiracy to Commit Fraudulent Concealment (Nondisclosure)**: Plaintiffs hereby

27    incorporate by reference the allegations of Paragraph II of this Third Cause of Action as if fully

28    stated herein.

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1705754.1

14

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   All Defendants, and DOE Defendants 1-50, are liable for their conspiracy to commit

2   fraudulent concealment. First, Defendants were aware that their conspirators, which included all

3   co-defendants and others, planned to commit fraudulent concealment against Mr. Doyle. Second,

4   Defendants agreed with their conspirators and intended that the fraudulent concealment be

5   committed. Third, Mr. Doyle developed mesothelioma. Fourth, each Defendant's participation in

6   the conspiracy was a substantial factor in causing Mr. Doyle's mesothelioma and wrongful death.

7   **V.**

8   **Knowledge of Hazards:** At all times pertinent hereto, all Defendants, including DOE

9   Defendants 1-50, owed Mr. Doyle a duty, as provided for in Civil Code sections 1708, 1709, and

10   1710, to abstain from injuring his person, property, or rights. In violation of that duty, these

11   Defendants, and each of them, did do the acts and omissions, when a duty to act was imposed, as

12   set forth herein, thereby proximately causing injury to Mr. Doyle. Such acts and omissions

13   consisted of acts falling within Civil Code section 1710, and more specifically were (i)

14   suggestions of fact which were not true and which the Defendants did not believe to be true, (ii)

15   assertions of fact of that which was not true, which the Defendants had no reasonable ground for

16   believing it to be true, and (iii) the suppression of facts when a duty existed to disclose it, as more

17   fully set forth herein, and the violation of which as to any one such item gave rise to a cause of

18   action for violation of Mr. Doyle's rights as provided for in the aforementioned code sections.

19   Since 1924, all of the Defendants have known and possessed of the true facts (consisting of

20   medical and scientific data, and other knowledge) which clearly indicated that the materials and

21   products referred to herein were and are hazardous to the health and safety of Mr. Doyle, and

22   others similarly situated. Defendants engaged in the following acts and omissions:

23   (a)   Did not label any of the aforementioned asbestos-containing materials and
products as to the hazards of such materials and products to the health and
24   safety of Mr. Doyle, and others in their position using these products when
the knowledge of such hazards was existing and known to Defendants, and
25   each of them, since 1924. By not labeling such materials as to their said
hazards, Defendants, and each of them, caused to be suggested as a fact to
26   Mr. Doyle that it was safe for his to use such materials, when in fact these
things were not true and Defendants did not believe them to be true.

27

28   / / /

(b)    Suppressed information relating to the danger of using the aforementioned materials by requesting the suppression of information to Mr. Doyle, and the general public concerning the dangerous nature of the aforementioned materials to all persons, including users, bystanders and household members, by not allowing such information to be disseminated in a manner which would give general notice to the public and knowledge of the hazardous nature thereof when Defendants were bound to disclose such information.

(c)    Sold the aforementioned products and materials to the public, including Mr. Doyle, and others in California and other states without advising them of the dangers of use of such materials and to those persons' household members, when Defendants knew of such dangers, as set forth herein and above, and had a duty to disclose such dangers. Thus, Defendants caused to be positively asserted to Mr. Doyle, and the public that which was not true and which Defendants had no reasonable ground for believing it to be true, in a manner not warranted by the information possessed by said Defendants, and each of them, of that which was and is not true, to wit, that it was safe for Mr. Doyle to use such materials and that it did not pose a risk of harm.

(d)    Suppressed and continue to suppress from everyone, including Mr. Doyle, medical, scientific data, and knowledge of the accurate results of studies including, but not limited to, Waldemar C. Dreesen of the United States Public Health Service's 1933 report to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers." As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium." In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

(e)    Belonged to, participated in, and financially supported the Industrial Hygiene Foundation, Asbestos Information Association, the Asbestos Textile Institute (ATI), and other industry organizations, including the Cosmetic, Toiletry, and Fragrance Association (now known as the Personal Care Products Council), which actively promoted the suppression of information of danger to users of the aforementioned products and materials for and on behalf of Defendants, and each of them, thereby misleading Mr. Doyle to their prejudice through the suggestions and deceptions set forth above in this cause of action. ATI's Dust Control Committee, which

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

changed its name to the Air Hygiene Committee of ATI, was specifically enjoined to study the subject of dust control; discussions in such committee were held many times of (i) the dangers inherent in asbestos and the dangers which arise from the lack of control of dust and (ii) the suppression of such information from 1946 to a date unknown to Plaintiffs at this time.

(f)     Knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and asbestosis in 1930 with the study of mine and mill workers at the Thetford asbestos mines in Quebec, Canada, and the study of workers at Raybestos-Manhattan plants in Manheim and Charleston, South Carolina. This information was disseminated through the ATI and other industry organizations to all other Defendants, and each of them, herein. Between 1942 and 1950, Defendants, and each of them, knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and cancer, which information was disseminated through the ATI and other industry organizations to all other Defendants herein. Thereby, Defendants suggested as fact that which is not true and disseminated other facts likely to and did mislead Mr. Doyle for want of communication of true facts, which consisted of the previously described medical and scientific data and other knowledge by not giving Mr. Doyle the true facts concerning such knowledge of danger, when Defendants were bound to disclose it.

(g)     Failed to warn Mr. Doyle and others similarly situated regarding the nature of Defendants' talcum products. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).] Defendants failed to warn Mr. Doyle and others similarly situated that their talcum products are, among other things, dangerous when breathed and causes pathological effects without noticeable trauma, although Defendants possessed knowledge that such material was dangerous and a threat to the health of persons coming into contact therewith and under a duty to disclose it.

(h)     Concealed from Mr. Doyle, and others similarly situated the true nature of their exposure, the fact that Defendants knew that exposure to respirable asbestos meant that Mr. Doyle would inhale this asbestos, significantly increasing his risk of developing asbestosis, lung cancer, and mesothelioma; that Mr. Doyle that had in fact been exposed to respirable asbestos; that the materials to which Mr. Doyle was exposed would cause pathological effects in the human body without noticeable or perceptible trauma to warn him of injury; and Defendants engaged in these acts and omissions while under a duty to and bound to disclose this information.

(i)     Failed to provide information to the public at large and buyers, users and physicians of Mr. Doyle for the purpose of conducting physical examinations of anyone whom came in contact with asbestos as to the true

1  nature of the hazards of asbestos, in order for such physicians to diagnose,
   and treat individuals coming into contact with asbestos, in that the materials
2  to which Mr. Doyle had been exposed would cause pathological effects
   without noticeable trauma, even though Defendants were under a duty to
3  supply such information and such failure was and is likely to mislead
   persons including Mr. Doyle as to the dangers and risk of harm to which
4  they were exposed.

5  (j)    Affirmatively misrepresented that asbestos-containing products were safe to
         use and handle, when Defendants knew such statements were false when
6        made, or made said false statements recklessly and without regard for
         whether the statements were true.
7

8      Each of the foregoing acts, suggestions, assertions, and forbearances to act when a duty

9  existed to act, the said Defendants, and each of them, having such knowledge, knowing Mr. Doyle

10  did not have such knowledge and would breathe such material innocently, was done falsely and

11  fraudulently and with full intent to induce Mr. Doyle to work in a dangerous environment and to

12  cause them to remain unaware of the true facts, all in violation of Civil Code section 1710.

13                              **BASIS FOR PUNITIVE DAMAGES**

14                                          **I.**

15      **Malice, Oppression, and Fraud**: Plaintiffs hereby incorporate by reference the allegations

16  of all causes of action as if fully stated herein. All Defendants, and DOE Defendants 1-50, are

17  liable for punitive damages because they engaged in the conduct that caused Mr. Doyle's harm

18  with malice, oppression, or fraud.

19      First, these Defendants committed malice in that they acted with intent to harm when they

20  caused Mr. Doyle's exposures to asbestos, asbestiform fibers, and asbestiform talc, and because

21  their conduct was despicable and was done with a willful and knowing disregard of the rights and

22  safety of others.

23      Second, these Defendants committed oppression in that their conduct was despicable and

24  subjected Mr. Doyle to cruel and unjust hardship in knowing disregard of his rights.

25      Third, the Defendants committed fraud in that they intentionally and fraudulently

26  concealed and misrepresented material facts and did so intending to harm Mr. Doyle and with

27  reckless disregard for whether their fraud would harm Mr. Doyle.

28      These Defendants' conduct constituting malice, oppression, and fraud was committed by,

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  authorized by, and adopted by one or more officers, directors, and managing agents within the

2  corporate hierarchy of each Defendant, who acted on behalf of each Defendant.

3                          **PRAYER FOR DAMAGES**

4                                   **I.**

5          Plaintiffs pray for judgment against all Defendants for:

6    1.      All economic and non-economic compensatory damages in excess of $25,000;

7    2.      Punitive damages according to proof;

8    3.      Pre- and post-judgment interest;

9    4.      Costs of suit; and

10   5.      Such other relief as is fair, just, and equitable.

11                         **DEMAND FOR JURY TRIAL**

12                                  **I.**

13         Plaintiffs hereby demand a trial by jury on all issues so triable.

15  DATED: March 8, 2019                    KAZAN, McCLAIN, SATTERLEY & GREENWOOD
                                            A Professional Law Corporation

18                                          By: _____
                                                Joseph D. Satterley
19                                              Denyse F. Clancy

20                                          Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

# Exhibit A

1  Joseph Satterley (C.S.B. #286890)
   Denyse F. Clancy (C.S.B. #255276)
2  Ian A. Rivamonte (C.S.B. #232663)
    irivamonte@kazanlaw.com
3  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
4  Jack London Market
   55 Harrison Street, Suite 400
5  Oakland, California 94607
   Telephone: (510) 302-1000
6  Facsimile: (510) 835-4913

7  Attorneys for Plaintiffs

8              SUPERIOR COURT OF CALIFORNIA

9                COUNTY OF SANTA CLARA

10  DANIEL CHRISTOPHER DOYLE and          Case No. 18CV333609
    KRISTIE LYNN DOYLE,
11                                            Assigned for All Purposes to
                 Plaintiffs,                Judge Thomas E. Kuhnle, Department 5
12
          v.                               **DECLARATION OF SUCCESSOR IN**
13                                         **INTEREST**
    IMERYS TALC AMERICA, INC., et al.,
14                                            Action Filed:    August 27, 2018

                 Defendants.
15

16

17      I, Kristie Lynn Doyle, declare:

18      1.     I make this declaration pursuant to Code of Civil Procedure section 377.32 to

19  commence any and all actions related to Daniel Christopher Doyle's exposure to asbestos which

20  survive his death.

21      2.     Daniel Christopher Doyle died in Grove City, Ohio on December 20, 2018.

22      3.     No proceeding is now pending in California or Ohio for the administration of

23  Daniel Christopher Doyle's estate.

24      4.     I am Daniel Christopher Doyle's successor in interest, as defined in Code of Civil

25  Procedure section 377.11, and succeed to his interest in the action or proceeding.

26      5.     No other person has a superior right to commence and/or continue the action or

27  proceeding, or to be substituted for Daniel Christopher Doyle in the pending action or proceeding.

28      6.     Attached hereto is a true and correct certified copy of Daniel Christopher Doyle's

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  death certificate.

2      I declare under penalty of perjury under the laws of the State of California that the

3  foregoing is true and correct, and that I signed this declaration at Grove City, Ohio on January

4  11 , 2019.

5

6

7  _____
   Kristie Lynn Doyle

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1703764.1                          2

VERIFY  PRESENCE  OF  ODH  WATERMARK       HOLD  TO  LIGHT  TO  VIEW

Primary Reg. Office No. 2500                                                       State File No. 2018122375

Registrar's No.                2500-2018013346

# CERTIFICATE OF DEATH

| **DECEDENT** | 1. Decedent's Legal Name (First, Middle, Last, Suffix) (Include AKA's if any) **DANIEL CHRISTOPHER DOYLE** | | 2. Sex **MALE** | 3. Date of Death (Month/Day/Year) **DECEMBER 20, 2018** |
|---|---|---|---|---|

4. Social Security Number — 5a. Age (Years) **48** — 5b. Under 1 Year Months — 5c. Under 1 day Hours Minutes — 6. Date of Birth(Mo/Day/Year) **NOVEMBER 29, 1970** — 7. Birthplace(City and State or Foreign Country) **COLUMBUS, OHIO**

8a. Residence State **OHIO** — 8b. County **FRANKLIN** — 8c. City or Town **GROVE CITY**

8d. Street Address and Zip Code **2575 BRUNSWICK DRIVE  43123** — 9. Ever in US Armed Forces? **NO**

10. Marital Status at Time of Death **MARRIED** — 11. Surviving Spouse's Name (if wife, give name prior to first marriage) **KRISTIE LYNN YORS**

12. Decedent's Education **MASTERS DEGREE (E.G., MA, MS..)** — 13. Decedent of Hispanic Origin **NO** — 14. Decedent's Race **WHITE**

15. Father's Name **RAYMOND  DOYLE** — 16. Mother's Name (prior to first marriage) **BEVERLY  RUSSELL**

17a. Informant's Name **KRISTIE L DOYLE** — 17b. Relationship to Decedent **WIFE** — 17c. Mailing Address (Street and Number, City, State, Zip Code) **2575 BRUNSWICK DRIVE GROVE CITY, OHIO 43123**

| **DISPOSITION** | 18a. Place of Death **DECEDENT'S HOME** | | |
|---|---|---|---|

18b. Facility Name (if not Institution, give street & number) **2575 BRUNSWICK DRIVE** — 18c. City or Town, State and Zip Code **GROVE CITY, OH 43123** — 18d. County of Death **FRANKLIN**

19. Funeral Service Licensee or Other Agent **JONATHAN DAVID POLING** — 20. License Number (of licensee) **009464** — 21. Name and Complete Address of Funeral Facility **SCHOEDINGER GROVE CITY CHAPEL**

22. Method and Place of Disposition **CREMATION - SCHOEDINGER/COLUMBUS CREMATORY, COLUMBUS, OH** — **3920 BROADWAY ST GROVE CITY, OH 43123**

23. Local Registrar **SANDRA TAYLOR** — 24. Date Filed (Month/Day/Year) **DECEMBER 31, 2018**

**CERTIFIER**

25a. Certifier (Check only one)  [X] Certifying Physician: To the best of my knowledge, death occurred at the time, date, and place; and due to the cause(s) and manner stated.
[ ] Coroner or Medical Examiner: On the basis of examination and/or investigation, in my opinion, death occurred at the time, date, and place; and due to the cause(s) and manner stated.

25b. Time of Death **2300** — 25c. Date Pronounced Dead (Month/Day/Year) **DECEMBER 20, 2018** — 25d. Was Case Referred to Medical Examiner or Coroner? **NO**

25e. Certifier Name and Title **JENNIFER LAUREN HIRSH    MD** — 25f. License Number **35.090105** — 25g. Date Signed (Month/Day/Year) **DECEMBER 31, 2018**

27. Name and Address of Person who Completed Cause of Death **JENNIFER LAUREN HIRSH, 1144 DUBLIN ROAD, COLUMBUS, OH 43215**

**CAUSE OF DEATH**

28. Part I  Enter the disease, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line. Type or print in permanent blue or black ink. — Approximate Interval: Onset and Death

Immediate Cause (Final disease or condition resulting in death) a. **METASTATIC MESOTHELIOMA TO LEFT PLEURAL METASTASIS AND PERITONEUM WITH PERITONEAL CARCINOMATOSIS** — **6 MONTHS**

Sequentially list conditions, if any, leading to immediate cause. b. Due to (or as Consequence of)

Enter Underlying Cause (Disease or injury that initiated events resulting in a death) c. Due to (or as Consequence of)

d. Due to (or as Consequence of)

Part II. Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. — 29a. Was An Autopsy Performed? **NO** — 29b. Were Autopsy Findings Available Prior To Completion Of Cause of Death? **NOT APPLICABLE**

30. Did Tobacco Use Contribute to Death? **NO** — 31. If Female, Pregnancy Status **NOT APPLICABLE** — 32. Manner of Death **NATURAL**

33a. Date of Injury (Mo/Day/Year) — 33b. Time of Injury — 33c. Place of Injury (e.g., Decedent's home, construction site, restaurant, wooded area) — 33d. Injury at Work?

33e. Location of Injury (Street and Number or Rural Route Number, City or Town, State)

33f. Describe How Injury Occurred: — 33g. If Transportation Injury, Specify:

HEA 2724   Rev. 08/16

**Sandra Taylor, Franklin County Registrar**

**DEC 3 1 2018**

I HEREBY CERTIFY THIS DOCUMENT IS AN EXACT COPY OF THE RECORD ON FILE WITH THE OHIO DEPARTMENT OF HEALTH.
REV. 7/2015





 

Electronically filed
by Superior Court of CA,
County of Santa Clara,
on 3/11/2019 9:15 AM
Reviewed By:R. Walker
Case #18CV333609
Envelope: 2608647

**PROOF OF SERVICE**

*Kristie Lynn Doyle, et al. v. Imerys Talc America, Inc., et al.*
**Alameda County Superior Court Case No. 18CV333609**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Alameda, State of California.  My business address is Jack London Market, 55 Harrison Street, Suite 400, Oakland, CA 94607.

On March 11, 2019, I served true copies of the following document(s) described as:

**FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES (SURVIVORSHIP) AND WRONGFUL DEATH; DEMAND FOR JURY TRIAL**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY ELECTRONIC SERVICE:**  I electronically served the document(s) described above via File & ServeXpress, on the recipients designated on the Transaction Receipt located on the File & ServeXpress website (https://secure.fileandservexpress.com) pursuant to the Court Order establishing the case website and authorizing service of documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 11, 2019, at Oakland, California.

Catherine I. Boggs

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**

DENTONS US LLP
One Market Plaza
Spear Tower, 24 th Floor
San Francisco  CA 94105
Telephone: (415)267-4000
Facsimile: (415)267-4198
FOR: CYPRUS MINES CORPORATION,
IMERYS TALC AMERICA, INC. fka
LUZENAC AMERICA, INC., fka CYPRUS
TALC, IMERYS TALC AMERICA, INC. fka
LUZENAC AMERICA INC., IMERYS TALC
AMERICA, INC. fka LUZENAC AMERICA
sii CYPR WINDSOR MINERAL, IMERYS
TALC AMERICA, INC. fka LUZENAC
AMERICA sii CYPRUS IND MINERALS ,
IMERYS TALC AMERICA, INC. fka
LUZENAC AMERICA sii CYPRUS MINES
CORP. IMERYS TALC VERMONT. INC.

KING & SPALDING LLP
633 West  5th Street, Suite 1700
Suite 1700
Los Angeles  CA 90071
Telephone: 213-443-4355
Facsimile: 213-443-4310
FOR: JOHNSON & JOHNSON , JOHNSON &
JOHNSON CONSUMER COMPANIES, INC.
, JOHNSON & JOHNSON CONSUMER INC.
sii  JOHNSON & JOHNSON CONS
COMPANIES

# Exhibit C

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                       COUNTY OF SANTA CLARA

3                    HON. ROBERTA HAYASHI, JUDGE

4

5    KRISTIE LYNN DOYLE, et al.,

6           Plaintiffs,

7        vs.                              Case No. 18CV333609

8    IMERYS TALC AMERICA, et al.,

9           Defendants.
     _____/

10

11

12

13

14

15           Reporter's Transcript of Remote Proceedings

16                   Thursday, July 14, 2022

17

18

19

20

21

22

23           Reported By:  Sheila Pham, CSR No. 13293

24

25

**EXHIBIT C**

1

1       APPEARANCES OF COUNSEL

2

3   For Plaintiffs:

4           KAZAN, MCCLAIN, SATTERLEY & GREENWOOD
            BY: IAN RIVAMONTE, ESQ.

5           55 Harrison Street, Suite 400
            Oakland, CA 94607

6           (510) 302-1000
            irivamonte@kazanlaw.com

7

8   For Defendants Johnson & Johnson and Johnson & Johnson
    Consumer, Inc.:

9
            ORRICK, HERRINGTON & SUTCLIFFE

10          BY: C. ANNE MALIK, ESQ.
            1152 15th Street, N.W.

11          Washington, DC 20005
            (202) 339-8400

12          amalik@orrick.com

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1              Thursday, July 14, 2022

2              10:34 a.m. - 10:45 a.m.

3

4         THE COURT:  Let's go to Line 15, please, Doyle

5   versus Imerys Talc America, Inc.

6         MS. MALIK:  Good morning, Your Honor.  This is

7   Anne Malik --

8         (Simultaneous speaking.)

9         MS. MALIK:  -- on behalf of Johnson & Johnson

10   and Johnson & Johnson Consumer, Inc.

11         THE COURT:  I'm sorry, hold on just a moment.

12   I had a couple of people speaking at the same time.  My

13   apologies.  This is a case in which there's a lot of

14   attorneys.  So hold on one moment.  Let me get the list

15   of who's appearing today.

16         Okay.  This is Line 15 on the calendar.  It

17   originally had some different number, but it's Case

18   Number 18CV333609.

19         Let me ask first who is appearing for

20   plaintiffs, please.

21         MR. RIVAMONTE:  Good morning, Your Honor.

22   Ian Rivamonte for the plaintiffs, Kristie Doyle and

23   Ethan Doyle.

24         THE COURT:  Okay.  Are there other appearances

25   for the plaintiffs?

Case 21-30589-MBK    Doc 2745-2    Filed 07/19/22    Entered 07/19/22 18:21:45    Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION    Page 51 of 58

3

1            MR. RIVAMONTE:  No, Your Honor.

2            THE COURT:  Okay.  Thank you.

3            Are there any appearances for any of the

4    defendants?

5            MS. MALIK:  Yes, Your Honor.  This is

6    Anne Malik on behalf of Johnson & Johnson and Johnson &

7    Johnson Consumer, Inc.

8            THE COURT:  And, Ms. Malik, could you just

9    please spell your last name for us.

10           MS. MALIK:  Yes, M-A-L-I-K.

11           THE CLERK:  And, Your Honor, did we receive a

12   reporter stip?

13           THE COURT:  Is there a court reporter on this

14   matter?

15           THE REPORTER:  Yes.  Good morning, Your Honor.

16   This is Sheila Pham, court reporter.

17           THE COURT:  All right.  So we did receive a

18   stipulation for appointment of a reporter?

19           MR. RIVAMONTE:  One was filed yesterday.

20           THE COURT:  Oh, okay.  We'll track that down.

21   It hasn't shown up yet in the file, but we will track

22   that down and sign it.  Thank you.

23           So are there any other appearances for the

24   record on Doyle versus Imerys?

25           (No response.)

4

1          THE COURT:  Hearing none.

2          I do see that this case was set for a jury

3    trial before Judge Rosen in April 2022, and it was

4    canceled because of the stay in the proceedings due to

5    the bankruptcy or for some other -- or for an appeal.

6    I'm not sure which.  So --

7          MS. MALIK:  Yes --

8          MR. RIVAMONTE:  May I --

9          THE COURT:  Go ahead.

10          MR. RIVAMONTE:  Yes, Your Honor, Ian Rivamonte

11    for --

12          (Simultaneous speaking.)

13          MR. RIVAMONTE:  I apologize, Your Honor.

14    Ian Rivamonte for the plaintiffs.

15          I can briefly summarize for the Court and

16    counsel where we are with this case, if I may.

17          THE COURT:  Please.

18          MR. RIVAMONTE:  Yes.  So, Your Honor, there are

19    two trial defendants in this case, Johnson & Johnson and

20    Johnson & Johnson Consumer, Inc.  As to Johnson &

21    Johnson Consumer, Inc., plaintiffs' claims against that

22    entity are automatically stayed by virtue of the

23    bankruptcy filing.  All of its liabilities as it relates

24    to that entity are currently under bankruptcy

25    protection.

Case 21-30589-MBK    Doc 2745-2    Filed 07/19/22    Entered 07/19/22 18:21:45    Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION    Page 53 of 58

5

1          Now, for Johnson & Johnson, it's a bit of a

2     different story.  Johnson & Johnson remains a solvent

3     and viable corporation.  However, the bankruptcy court

4     issued a preliminary injunction that precludes

5     plaintiffs here and others like them from continuing to

6     prosecute or try their claims in state court against

7     Johnson & Johnson.  That preliminary injunction

8     basically precludes plaintiffs from doing anything in

9     this case for a period of 120 days.

10          That time has now expired.  However, Johnson &

11    Johnson is requesting that the bankruptcy court continue

12    that preliminary injunction for another 120 days or

13    maybe even longer.  Now, the hearing on that particular

14    request is set for July 26th in New Jersey.

15          With all that said, the bankruptcy judge has

16    informed the parties involved in the bankruptcy that he

17    may be inclined to allow certain cases to go forward in

18    state court, and Doyle could be one of them.  Now, there

19    is no guarantee that's going to happen, but, you know,

20    given that this case is completely worked up and I think

21    the parties are essentially ready for trial, that may be

22    one of the considerations that Judge Kaplan may take

23    into account.

24          With that said, Your Honor, because there is a

25    probability that the bankruptcy judge may lift the stay

Case 21-30589-MBK    Doc 2745-2    Filed 07/19/22    Entered 07/19/22 18:21:45    Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION    Page 54 of 58

6

1    as to Doyle, and it's still a probability.  It's not

2    certain -- one of the questions that the judge may ask

3    during that hearing is:  How soon can this case be set

4    for a trial assignment?

5              You know, if Your Honor can shed some light on

6    that, that'd be great.  Otherwise, I think we should

7    have another status conference in 30 days, definitely

8    after the July 26th hearing, to see where we are.

9              THE COURT:  Okay.  September 13th?

10             MR. RIVAMONTE:  Is that the trial date,

11   Your Honor?

12             THE COURT:  Yes.

13             MR. RIVAMONTE:  Okay.  So it may be set for

14   trial on September 13th.

15             THE COURT:  September 13th, September 20th.

16   Frankly, your odds are probably better September 20th or

17   September 27th.

18             MR. RIVAMONTE:  Okay.

19             THE COURT:  But we could set you on

20   September 13th.

21             Now, that may change if I don't set you today.

22   And if I set you -- I mean -- let me put it this way:

23   Like all the other courts, trial resources are in short

24   supply.  You've been through the trial setting

25   assignment here at this court the last go-around in

7

1    April.  The situation since April has not improved, and

2    in fact, it's gotten worse because right now, one of the

3    civil trial judges is doing rotations in criminal court

4    because of the criminal court backlog.

5            But as an example, every case that we had that

6    was set for trial this week went out.  Every case that

7    we had set for trial last week went out.  And we're

8    hoping that by September, we'll be back at full strength

9    on the civil jury side.  So --

10           MS. MALIK:  Your Honor, this is --

11           THE COURT:  Yes.

12           MS. MALIK:  I'm sorry, Your Honor.  This is

13   Anne Malik for the defendants.

14           If we do come back then a month after the

15   hearing in the bankruptcy court and were to get assigned

16   a trial date then, would it be sort of just pushed out a

17   month maybe, like, October?  Is that what we're

18   thinking?

19           THE COURT:  That's quite likely.

20           MS. MALIK:  Okay.  Thank you very much,

21   Your Honor.

22           MR. RIVAMONTE:  I have a question, Your Honor.

23           THE COURT:  Yes.

24           MR. RIVAMONTE:  So regardless of -- you know,

25   plaintiffs are not asking that the Court set a trial

Case 21-30589-MBK    Doc 2745-2    Filed 07/19/22    Entered 07/19/22 18:21:45    Desc
Exhibit EXHIBITS A-C TO SATTERLEY DECLARATION    Page 56 of 58

8

1  yet.  I just want to make the record clear.  I don't

2  want to run afoul with any of the bankruptcy court's

3  orders.

4           But the September dates or possibly even the

5  October date you just mentioned, is that when we're

6  going to be on trial call, or is there going to be an

7  actual department that we're going to be assigned the

8  trial?

9           THE COURT:  As you know from the last time that

10  you were here, that the assignment of a trial department

11  doesn't happen until the Thursday before your trial

12  date.  And, of course, it depends on, you know, what

13  else is set and is going out and whether any of those

14  cases have priority.

15           You do have priority because you've been reset

16  from a prior setting in April, but you also, I believe,

17  have a fairly long estimate of time, and you don't --

18  unless there's a statutory priority, you know, such as

19  -- and I don't know if you're approaching the five-year

20  statute or where you stand on that, there may be reasons

21  why it could go out -- well, let me look at your case

22  number.  You're a 2018 case, so you're getting close in

23  terms of priority.

24           MR. RIVAMONTE:  Thank you, Your Honor.

25           THE COURT:  Okay.  So what we'll do then is,

9

1    we'll continue today's date to --

2          Do we have anything earlier than -- you know,

3    than September?  Can we do anything in August?

4          THE CLERK:  August?  I think the earliest we

5    have is September 8th.

6          THE COURT:  September 8th is the earliest date

7    we have.

8          MR. RIVAMONTE:  For a further status

9    conference?

10          THE COURT:  Yes, for a further status

11    conference, September 8th.

12          September 8th is the earliest date we can set

13    it.  It's even earlier than on the trial setting

14    conference calendar.  So I'm going to keep you on this

15    calendar September 8th, 10:00 a.m., this department.

16          MS. MALIK:  Thank you, Your Honor.

17          MR. RIVAMONTE:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          (Proceedings concluded at 10:45 a.m.)

20

21

22

23

24

25

10

1           REPORTER'S CERTIFICATION

2

3        I, Sheila Pham, a Certified Shorthand Reporter, do

4    hereby certify:

5        That the foregoing proceedings were taken before me

6    at the time and place therein set forth, that the

7    proceedings were reported stenographically by me and

8    were thereafter transcribed under my direction and

9    supervision, and that the foregoing pages contain a

10   full, true and accurate record of all proceedings and

11   testimony to the best of my skill and ability.

12       In witness whereof, I have subscribed my name.

13

14

15   Dated:  0715/2022

16

17

18

19   _____

20            Sheila Pham
             CSR No. 13293

21

22

23

24

25