**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Matthew I.W. Baker, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
mbaker@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126
*Local Counsel for the*
*Official Committee of Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
Eric R. Goodman, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
egoodman@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
*Co-Counsel for the*
*Official Committee of Talc Claimants*

**BAILEY GLASSER LLP**
Brian A. Glasser, Esq.
Thomas B. Bennett, Esq.
Kevin W. Barrett, Esq.
Maggie B. Burrus, Esq.
bglasser@baileyglasser.com
tbennett@baileyglasser.com
kbarrett@baileyglasser.com
mburrus@baileyglasser.com
1055 Thomas Jefferson St. NW, Suite 540
Washington, DC  20007
Tel: (202) 463-2101
Fax: (202) 463-2103
*Co-Counsel for the*
*Official Committee of Talc Claimants*

**OTTERBOURG P.C.**
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 905-3628
Fax: (212) 682-6104
*Co-Counsel for the*
*Official Committee of Talc Claimants*

7059652.1

| | |
|---|---|
| **PARKINS & RUBIO LLP**<br>Lenard M. Parkins, Esq.<br>Charles M. Rubio, Esq.<br>lparkins@parkinsrubio.com<br>crubio@parkinsrubio.com<br>Pennzoil Place<br>700 Milan St., Suite 1300<br>Houston, TX 77002<br>Tel: (713) 715-1666<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>jmassey@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* |
| In Re:<br><br>**LTL MANAGEMENT, LLC,**[1]<br><br>     Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Honorable Michael B. Kaplan |
| In Re:<br><br>**LTL MANAGEMENT, LLC,**<br><br>     Plaintiff,<br><br>**THOSE PARTIES LISTED ON**<br>**APPENDIX A TO COMPLAINT AND**<br>**JOHN AND JANE DOES 1-1000,**<br><br>     Defendants. | Adv. Pro. No. 21-03032 (MBK) |

## REPLY IN FURTHER SUPPORT OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS' STATEMENT REQUESTING MODIFICATION OF THE PI ORDER

The Official Committee of Talc Claimants (the "TCC") in the above captioned case (the

"Case") and adversary proceeding ("Adversary Proceeding"), by and through its undersigned

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

7059652.1

counsel, hereby respectfully submits this Reply in Further Support of Its Statement Requesting

Modification of the PI Order (the "Reply").[2]  The Reply, first and foremost, responds directly to

the remarks that the Court made on the record during the hearing on July 6, 2022.   The Reply also

rebuts various objections asserted by the Debtor in the Debtor's Response to Statements and

Objections Regarding Continuance of the Preliminary Injunction [Main Dkt. No. 2631] (the

"Debtor's Response").

## INTRODUCTION

1.      The TCC appreciates the Court's sharing of its objectives for the upcoming hearing

on July 26th (and beyond), and, lest there be any doubt, has fully understood all along the Court's

mandate to the parties following its denial of the TCC's motion to dismiss and granting of stay

protection to the Debtor's affiliates and commercial partners:  The Court would like to see, and

facilitate, the parties' development of a consensual plan of reorganization, and expects the

discussion on the 26th to focus on "how and why modifying the injunction and stay would further

this goal."  [7-6-22 Tr. 6:23-25.]  For the reasons further discussed below, the TCC firmly believes

that carving out a small segment of cases from the PI Order (not the full universe of 90 cases

previously submitted by the TCC, but a small subset thereof), would – either alone or in

conjunction with appointment of an F.R.E. 706 expert – advance the case toward a consensual

plan.

2.      The Debtor has openly (and repeatedly) identified the single largest sticking point

to reaching consensus on a plan:  On the one hand, any such plan would be designed to compensate

the tort claimants who overwhelmingly comprise the creditors in the Case; on the other hand, the

---

[2]  Capitalized terms not defined herein have the meanings ascribed to them in the Statement of the Official Committee
of Talc Claimants in Support of the Court's Modifying Upon Revisiting of the PI Order [Main Dkt. No. 2566] (the
"TCC's Initial Statement").

Debtor vehemently denies that it has *any* liability to such claimants entitling them to any compensation. The Debtor maintains that recent scientific studies and publications validate its position. Thus, the Debtor has been vociferous that *any* amount J&J might deign to contribute to fund a plan would be more than the claimants deserve – in effect, a payment of ransom, not due compensation. Conversely, the TCC rejects the Debtor's position and believes, just as fervently, that J&J's talcum powder products cause cancer and have harmed, fatally in many cases, tens of thousands of individuals. Accordingly, the TCC firmly believes that claimants are legally entitled to a substantial amount of just compensation. With such diametrically opposed positions, reaching consensus on a plan was bound, and has proven, to be extraordinarily challenging.

3.      The best way to resolve this sticking point and help move the case to a consensual plan, the TCC respectfully submits, is to put *both* sides to a test of their convictions. The test would be limited, involving no more than 12 cases total (eight ovarian cancer cases and four mesothelioma cases) in venues across the country that are ready to be tried *now*. Most all of these cases could be tried to judgments before the end of this year, and would have *zero* impact on the Debtor's assets and estate. The Debtor would not even be party to those cases, and its parent company, J&J, has ample product liability trial counsel unaffiliated with the lead bankruptcy attorneys representing the Debtor. Further, the Debtor could be insulated from any indemnification claims by an order providing that any execution of judgments against any of the defendants in the actions would be stayed pending further order of this Court.

4.      Moreover, as the Court observed at the July 6th hearing, regardless of whether any plan eventually to be voted upon is consensual or not, the claimants who are eligible to vote are entitled to certain information regarding their claims. Fresh trial results – updated to incorporate

7059652.1

what the Debtor contends have been recent scientific studies and publications – will, either in lieu

of or in tandem with the opinions of an F.R.E. 706 expert, provide, or add to, such information.

## **ARGUMENT**

### I.    **Modification of the PI Order Will Achieve the Court's Goal of Progressing the Case**

5.    While accepting all, or substantially all, of the Debtor's arguments in finding its

bankruptcy filing to be in good faith [Main Dkt. No. 1572] and in granting the Debtor's request

for a sweeping stay and injunction halting tens of thousands of lawsuits against hundreds of non-

debtors [Dkt. No. 184], the Court's expressed inclination nevertheless was to "tak[e] measures in

smaller steps" to "ensure that the parties progress in good faith towards mediation and plan

formation."  [*Id.*, at p. 54.]  Thus, the Court expressly included an important caveat in the PI

Opinion (absent from injunctions entered in other Two-Step cases) that the Court will "will revisit

continuation of the automatic stay and preliminary injunction" every 120 days.  [*Id.*]  Three months

later, after observing at the May 24th omnibus hearing that mediation was "not as far along as" the

Court would have liked, the Court put the parties on notice that it would consider whether "there

is a small segment of cases that should go forward" as a "creative" way of advancing negotiations.

[5-24-22 Tr. 4:1-2, 22-25.]

6.    While what has transpired in negotiations is, and will remain, confidential, the

reasons for the lack of progress toward a consensual plan are not closeted.  In fact, the Debtor has

openly announced them.  In the Debtor's Statement on Proposed Next Steps in Chapter 11 Case

[Main Dkt. No. 2473] (the "Debtor's Status Report") (filed, in part, in response to the Court's

observations on May 24), the Debtor stated that "*the* central issue in this case" is *not* the amount

of the Debtor's liabilities, but "the *extent* of the Debtor's liability for current and future ovarian

cancer and mesothelioma claims *allegedly* caused by exposure to talcum powder products."  [*Id.*,

at p. 3 (emphasis added).]

7.     Despite *Daubert* opinions from the MDL and State Courts that sufficient scientific evidence exists to allow juries to decide issues of liability, the Debtor has continued to make consistent, unrelenting and thunderous declarations throughout this Case that:  J&J's talcum powder products are completely safe; J&J's talcum powder products have never harmed *any* of the claimants; the claimants are entitled to *nothing* from the Debtor (or J&J); and any claims to the contrary are based on "junk science" and outright manipulation by the plaintiffs' bar.

8.     The Informational Brief filed by the Debtor on day one of the Case set the tone. Under headings such as "Decades of Studies and Testing Showing that J&J's/Old JJCI's Talcum Powder Products Are Safe," "The Plaintiff Bar's Attempt to Create a New Mass Tort in Talc," and "Prejudicial Tactics Employed by the Plaintiff Bar in Cosmetic Talc Litigation," the Debtor devoted over *100 pages* to a full-throated defense of its products' safety and to attacking the plaintiffs' bar (and by extension, the claimants themselves).  [Main Dkt. No. 3, at pp. 8-116.]

9.     The Debtor's tone since then has not modulated a bit.  When asked during the trial on the motion to dismiss whether "Johnson & Johnson's view is that the talc claimant's claims are worth zero," the Debtor's representative, Mr. Kim, unequivocally answered: "yes . . . our position would be that the talc claimant's claims are worth zero."  [2-16-22 a.m. Tr. 21:7-10.]  In his closing on the motion to dismiss, the Debtor's counsel echoed the point, summing up:  "And finally, what makes this circumstance and this litigation so unique is that Johnson & Johnson, JJCI, and LTL vehemently and consistently dispute causation. Your Honor, we believe this product is safe. We believe this product did not cause any of the harms that are claimed here."  [2-18-22 Tr. 38:22-39:1.]  The Debtor's Status Report also is dripping with the Debtor's denial of liability to the claimants, as just one example citing a bankruptcy case "estimating at zero [certain] claims because they failed 'as a matter of law.'"  [Main Dkt. No. 2473, at p. 7, n. 2.]  And the Debtor's

7059652.1

Memorandum on the Need for Estimation, filed days ago, follows the same refrain, denying any liability and deriding the cases brought to date. [*See* Main Dkt. No. 2726, at ¶¶ 17-30.]

10.     Obviously, it would be a major obstacle in any bankruptcy case to achieve a consensual plan of reorganization under which the debtor is to make distributions to its creditors while the debtor vehemently denies the existence of all but a select few creditors. This Case is no exception.

11.     The TCC respectfully submits that the best way to overcome this obstacle is to put *both sides'* convictions to a test (and *both sides* to their proof) in a small segment of cases to be tried around the country immediately.

12.     Exhibit 1 hereto contains a subset of the cases previously identified in Exhibit A to the TCC's Initial Statement.[3] It consists of a total of 12 cases (eight ovarian cancer and four mesothelioma cases), from seven different states plus the federal MDL, that (with two exceptions[4]) are "fully worked up," *i.e.,* cases that are ready to be tried *now*. Moreover, based on information provided to it by claimants' counsel, the TCC believes that the cases on Exhibit 1, if carved out from the PI Order, would be placed on their respective courts' trial calendars promptly and would

---

[3]   Exhibit 1 also highlights the personal stories of the individual claimants, whose last wish in life was to have the illnesses that qualified these individuals to commence litigation against J&J.

[4]   The first exception is the Tamara Newsome case, a bellwether case from the MDL. At the May 24th omnibus hearing, the Court expressed a particular interest in the MDL bellwether cases as one of the "options for the Court that I'm going to consider" and indicated that it would be contacting Judge Wolfson "to see where we left off." [5-24-22 Tr. 4:21-25.] At the time that the Debtor filed for bankruptcy protection on October 14, 2021, where the cases left off is that the MDL Court had identified six potential cases for a bellwether trial to begin in April 2022 (with plaintiffs to select the case). Defendants' expert reports were due shortly after October 14, when the Debtor notified the MDL Court of the bankruptcy filing and took the position that the MDL was stayed in its entirety. As a consequence, the MDL bellwether cases – unlike nearly all of the other cases on Exhibit 1 – are not yet fully worked up and do require certain additional pre-trial proceedings. It is for that reason that the TCC has included only one bellwether case, which the TCC believes, based on information provided to it by counsel in the MDL, reasonably could be ready for trial within a matter of five months and could be tried in January of next year. The second exception is the Deborah Schultz case, which falls within California's preference status statute due to her declining health and the substantial medical doubt she will survive beyond six months (CCP 36(d)(e)) and, thus, permitting the court set and commence the case (if it is carved out from the PI Order and a motion for preferential treatment is permitted to be filed) for trial to start within 120 days.

7059652.1

be tried to judgment within a matter of months thereafter, with all cases being tried to judgment before the end of this year (with the possible exception of the MDL bellwether case). Exhibit 2 hereto appends scheduling orders and/or other indicia of the trial readiness of certain of the cases at the time the bankruptcy was filed.

13.     Below is a brief description of the nature and status each case:

- Estate of Shawn Blaes, Missouri State Court. Ms. Blaes was diagnosed with ovarian cancer (serous) at the age of 48 and later died at the age of 50. The Blaes case was mid-trial when the United States Supreme Court issued its decision regarding personal jurisdiction in *BMS v. Superior Court*, 137 S. Ct. 1773 (2017), and because of the change in the law, the court ordered a mistrial. The case is ready to be set for a new trial date.

- Estate of Diane Brower, State Court of Fulton County, Georgia. Ms. Brower was diagnosed with ovarian cancer (serous) at the age of 62 and later died at the age of 65. The previous trial resulted in a mistrial due to a hung jury (10 of 12 jurors voted in favor of plaintiffs and Georgia state law requires a unanimous jury). The case is ready to be set for a new trial date.

- Estate of Corinne Carrino, Missouri State Court. Ms. Carrino was diagnosed with ovarian cancer (serous) at the age of 51 and later died at the age of 57. An in extremis deposition was taken of the plaintiff, and depositions of treating physicians and experts have been completed. The case is prepared for trial.

- Gayle Emerson, Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, Civil Trial Division. Ms. Emerson was diagnosed with ovarian cancer (serous) at the age of 64 and later died at the age of 68. Depositions of the plaintiff and the treating physicians have been completed, and the case was trial ready on June 6, 2021, but was not set for trial due to the bankruptcy filing.

- Estate of Patricia Matthey, Circuit Court of the Twelfth Judicial Circuit, Sarasota County, Florida. Ms. Matthey was diagnosed with ovarian cancer (serous) at the age of 69 and later died at the age of 72. Fact and expert discovery in the case is complete and the case was scheduled for trial in March 2022.

- Estate of Bernadine Moore, Court of Common Pleas of Philadelphia County, First Judicial District of Pennsylvania, Civil Trial Division. Ms. Moore was diagnosed with ovarian cancer (serous) at the age of 66 and later died at the age of 68. Depositions of the plaintiff and the treating physicians have been completed and the case was trial ready on September 7, 2021, but was not set for trial due to the bankruptcy filing.

7059652.1

- <u>Tamara Newsome, United States District Court, District of New Jersey (MDL)</u>. Ms. Newsome was diagnosed with ovarian cancer (endometrioid) at the age of 53. This is a case in the MDL bellwether pool. The plaintiff and treating physicians have been deposed and expert discovery was in process at the time of the bankruptcy filing.

- <u>Deborah Schultz, Superior Court of the State of California, County of Los Angeles</u>. Ms. Schultz was diagnosed with ovarian cancer (serous) at the age of 57. A preference motion under CCP 36(d)(e) is not yet filed due to the PI Order, but if the PI Order preventing its filing is modified, the motion and evidence demonstrating that the case qualifies for a preferential trial setting under CCP 36(d)(e) (*i.e.*, substantial medical doubt of plaintiff's survival beyond six months) will be filed immediately, which will permit the court to set and commence the trial within 120 days.

- <u>Randy Derouen, Superior Court of New Jersey, Middlesex County</u>. Mr. Derouen (a member of the TCC) was diagnosed with peritoneal mesothelioma at the age of 46. His trial date has been set/reset three times (October 25, 2021, January 10, 2021 and February 28, 2022) during the course of this Case.

- <u>Estate of Daniel Doyle, Superior Court of the State of California, Santa Clara County</u>. Mr. Doyle (whose widow is a member of the TCC) was diagnosed with biphasic malignant mesothelioma at the age of 47 and later died at the age of 48. All discovery has been completed, and the case has been set for trial on multiple occasions. The court is ready to assign the case to a trial judge.

- <u>Theresa Garcia, Illinois State Court</u>. Ms. Garcia was diagnosed with Stage 4 mesothelioma at the age of 53 and later died on July 27, 2020. Discovery has concluded and the trial was set to go forward in June 2022.

- <u>Estate of Brandon Whetsel, Missouri State Court</u>. Mr. Whetsel (whose mother is a member of the TCC) was 36 years old when he was diagnosed with peritoneal mesothelioma and later died at the age of 37. Mr. Whetsel, as well as other fact and expert witnesses, were deposed. This case has been scheduled for trial multiple times, including most recently on January 10, 2022.

14. Permitting the foregoing cases to be tried to judgment – especially with all interested parties watching – would advance stalled negotiations. While it is true that either side can discount or rationalize away any result it chooses (as the Debtor has done with every single adverse judgment against J&J to date), the reality is that a string of fresh new trial wins or losses (not just an isolated one or two cases, but a meaningful group) would provide inescapable new data points to be used in negotiations regarding, what the Debtor describes as, "*the* central issue in

this case," namely "the *extent* of the Debtor's liability." [Main Dkt. No. 2473, at p. 3.] Indeed,

with the intense spotlight that the media has shone on this Case, even the *risk* to both sides of

multiple adverse judgments is bound to budge the parties from any rigid negotiating postures, long

before the judgments are entered.

15.     Moreover, a fresh set of trial results or settlements would *not* be mere surplusage.

The Debtor recently has made that clear.  In the Debtor's Status Report, among the reasons

proffered by the Debtor for bifurcated estimation proceedings beginning, in "Phase One," with a

focus on "medical and science evidence," is that, since the MDL Court's *Daubert* ruling, "there

have been significant developments, including additional studies and publications by health

agencies and experts, that further establish the absence of any link between talcum powder

products and the development of ovarian cancer or mesothelioma." [Main Dkt. No. 2473, at p. 10,

n. 3.]  That is, the Debtor's position (heavily disputed by the TCC) is that past is *not* prologue –

that there have been recent scientific studies and publications casting doubt on the value of any

pre-petition judgments and settlements.  The *only* appropriate forums in which to test the Debtor's

theory are, respectfully, non-bankruptcy trial courts, not this Court.

16.     Even if the prospect of 12 new trials would not alter the negotiating stances of the

parties, it would provide, or at least add to, information upon which claimants are entitled to base

a vote for a plan.  Fresh trial results or settlements – incorporating up-to-the-moment scientific

developments – likely would assist voters in determining whether the compensation offered in a

plan is preferable to the alternatives.  The TCC does not suggest such trial results or settlements

would be the *only* information on which claimants would, or should, base their votes.  But recent

trial success or failures, and/or settlements, would be relevant, and would add to the total mix of

information available to voters.

7059652.1

17.     Furthermore, the small segment of cases that the TCC requests be allowed to proceed to trial would not – to address, directly, a concern of the Court – unduly burden the trial courts that would be required to preside over such trials.  During the July 6th omnibus hearing, the Court indicated it was "troubled by a release from the injunction" because "[t]hat would seem to place an undue strain and burden on the courts."  [7-6-22 Tr. 7:5-10.]  The TCC respectfully submits that the Court's concern is unwarranted.  Courts overseeing mass tort cases are eagerly setting them down for trial to alleviate the backlog of trials on their dockets created by the pandemic.  Indeed, in multiple instances, trial courts overseeing the talc litigations against J&J have inquired of counsel when those cases are ready to be tried, and, at least in one case, has already tentatively schedule a trial.  *See, e.g.*, July 14, 2022 Hr'g Transcript in *Doyle v. Imerys Talc America, et al*., Case No. 18cv3333609 (Sup. Ct. Santa Clara County), attached hereto as Exhibit 3 (indicating that the trial court was prepared to set a trial date for September or October 2022, subject to the lifting of the PI Order, and scheduling a further status conference for September 8, 2022).  Additionally, the 12 cases identified on Exhibit 1 are pending in an array of jurisdictions and, thus, no single court would be overburdened by the trials.

18.     Lastly, permitting a small segment of cases to proceed to trial does not have to be mutually exclusive from the Court's retention of an expert under F.R.E. 706.[5]  At the July 6th omnibus hearing, the Court indicated that it "is considering the appointment of an independent expert under Federal Rule of Evidence 706 to evaluate the respective party positions, and to offer an opinion taking into account a host of factors such as prior settlements, verdicts, liability risks,

---

[5]  The TCC reserves its right to be heard regarding the scope of any expert appointment the Court is considering pursuant to F.R.E. 706, and respectfully refers the Court to the TCC's Statement in Opposition to Debtor's Request for Estimation Under Section 502(c) of the Bankruptcy Code and Statement on Proposed Next Steps in Chapter 11 Case [Main Dkt. No. 2722 at ¶¶ 6, 106-107] for a discussion of the TCC's views as to appropriate use of expert opinion.

11

causation and science, or any factors, or limited factors that the expert deems appropriate." [7-6-22 Tr. 7:21-8:2.] Should the Court determine to do so, the trials to be carved out from the PI Order would proceed in parallel to any work by the expert, and the results would be available to inform (if the expert so chooses) the expert's opinions.  Additionally, fresh trial results or settlements would serve only to supplement, not replace, any expert's opinions to be disclosed to claimants.

19.     For all the foregoing reasons, the TCC respectfully submits that the Court's instincts in this regard have been right all along:  The PI Order should be taken in "smaller steps;" it should be revisited quarterly; in view of the stagnation in the parties' efforts to develop a consensual plan, it should be modified to permit a "small segment of cases" to proceed; and carving out the cases in Exhibit 1 from the PI Order, so that such cases can be tried to judgment now, would further the Court's goal of advancing the case to a consensual plan.

## II.     The Debtor's Opposition to Modifying the PI Order Is Meritless

20.     The Debtor's various objections to modifying the PI Order in the manner now requested by the TCC, as set forth in the Debtor's Response, are meritless.

21.     Many of the objections are off point altogether, premised on the mistaken belief that the TCC was proposing that all 90 cases previously identified move forward en masse to trial. That was not the case.  To the contrary, the TCC explicitly stated in its introduction to the TCC's Initial Statement that it was "looking forward to discussing with the Court at the [next] omnibus hearing exactly how many, and which, of these cases should proceed." [TCC's Initial Statement at p. 4.]  Having listened carefully to the Court's remarks during the July 6th omnibus hearing, and for the reasons discussed in Point I above, the TCC now believes that the 12 cases listed in Exhibit 1 reflects the right number and mix of cases to proceed to trial.  As such, the Debtor's objections that the requested modification of the PI Order is "unworkable," would take "four years to

conclude," and would pose "insurmountable challenges," simply miss the mark. [Debtor's Response ¶¶ 39-46.]

22.      The Debtor's other objections, addressed below, are factually and/or legally erroneous, and do not militate against modifying the PI Order in the manner now requested by the TCC.

### a.      The Debtor's Jurisdictional Objection Is Meritless

23.      The Debtor argues that the Court "lacks jurisdiction to modify the PI Order" in view of the pending appeal before the Third Circuit. [Debtor's Response ¶¶ 53-59.]  That simply is incorrect. The TCC's instant request is not an attempt to relitigate issues that are now on appeal in the Third Circuit, but rather an effort to ensure that the PI Order is modified to reflect changed circumstances as the Court originally contemplated in expressly providing for revisiting the PI Order quarterly.

24.      While it is true that the filing of a notice of appeal is "an event of jurisdictional significance" that "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal," *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982), even the Debtor recognizes that such rule is not absolute. [Debtor's Response ¶¶ 54-55.]  To the contrary, as the Debtor has conceded, even in the face of a pending appeal, "lower courts retain some authority to modify an injunction . . . 'when there has been a change of circumstances'" and to "to preserve the status quo or 'the integrity of the appeal.'" [Dkt No. 2429[6] ¶ 37 (quoting *Favia v. Ind. Univ. of Pa.*, 7 F.3d 332, 337 (3d Cir. 1993) and *Ortho Pharm. Corp. v. Amgen, Inc.*, 887 F.2d 460, 464 (3d Cir. 1989)).]

---

[6]   Debtor's Omnibus Objection to Anthony Hernandez Valadez's and Audra John's Motions Seeking Relief from the Preliminary Injunction and Certain Related Relief.

7059652.1

25.     Here, changes in circumstances since the Court entered the PI Order in March

warrant – indeed, necessitate – that the Court modify the PI Order to allow a total of 12 cases (an

infinitesimal fraction of all 38,000+ cases stayed by the PI Order) to proceed to trial.  Those

changed circumstances include that:  The mediation and process of consensual plan formation, in

aid of which the PI Order, at least in part, was entered has stalled; the Third Circuit has accepted

direct appeal from both the PI Order and the MTD Order, and has granted expedition of each

appeal (with oral argument, just yesterday, being tentatively scheduled for September 22, 2022);

accordingly, in just a matter of a few months, the cases identified in Exhibit 1 likely would go to

trial anyway *if* the Third Circuit were to reverse *either* order; and while negotiations over a

consensual plan have stagnated, hundreds of claimants have died, and will continue to die, without

being able to witness and participate in the prosecution of their claims that the Debtor (and J&J)

vehemently dispute.  Under such circumstances, modifying the PI Order to permit 12 cases to

proceed to trial – while the more than 38,000+ other pending cases remain on hold and no new

cases (save those the Court has lifted or may lift from the stay) are filed – could not possibly be

seen as a reconsideration, or revisiting, of the PI Order or an interference with the Third Circuit's

appellate review of the PI Order.

26.     The authorities cited by the Debtor are not to the contrary.  *None* suggest, let alone

hold, that the Court lacks jurisdiction to modify the PI Order in the narrow manner that the TCC

requests.  *See*, *e.g.*, *Ortho Pharm. Corp.*, 887 F.2d at 463-64 (holding that a district court had

jurisdiction to modify an injunction while it was on appeal and had the authority to impose new

requirements to ensure that the original purposes of the injunction would be served); *Venen v.

Sweet*, 758 F.2d 117, 120 n.2 (3d Cir. 1985) (affirming that "[a] district court, during the pendency

of an appeal is not divested of jurisdiction . . . to modify, restore, or grant injunctions."); *Sheet*

7059652.1

*Metal Workers' Intern. Ass'n Local 19 v. Herre Bros., Inc.*, 198 F.3d 391, 394 (3d Cir. 1999)

(observing that "[e]xceptions to the rule in *Griggs* allow the district court to retain jurisdiction to

issue orders staying, modifying, or granting injunctive relief").[7]

27.    In short, the pendency of the Third Circuit appeal presents no bar to the limited

modification of the PI Order that the TCC now requests.

### b.    The Debtor's Diversion of Attention and Resources Argument Is Baseless

28.    Invoking the Court's finding in the PI Opinion that the "the nondebtor Protected

Parties and Debtor enjoy such an identity of interests that a lawsuit asserting talc-related claims

against the Protected Parties is essentially a suit against Debtor," the Debtor asserts that its "ability

to negotiate a global resolution of all talc-related claims" would be impaired if the PI Order were

modified – as if the Debtor were actually one of the defendants that would be sent to trial in the

12 cases.  [Debtor's Response ¶¶ 22-24.]   That is not the case.  No trial would proceed against the

Debtor.

29.    Nor does the fact that the Court found an "identity of interest" between the Debtor

and J&J, the legal standard which the Court applied, to extend the stay and grant preliminary

---

[7]  *See also A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098-99 (9th Cir. 2002) (holding that the district court had jurisdiction to modify a preliminary injunction while an appeal was pending in order to ensure the defendant's compliance therewith and "to continue supervision" of the case); *Meinhold v. United States Dep't of Def.*, 34 F.3d 1469, 1480 n. 14 (9th Cir.1994) (holding that the district court's modification of a preliminary injunction during the pendency of an appeal was proper to clarify the injunction and supervise compliance in light of new facts); *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers' Statewide Benefit Funds*, 2019 WL 3812889, *7 (D.N.J. Aug. 14, 2019) ("Relying on Fed. R. Civ. P. 62, the Third Circuit has noted that the district court retains some injunctive powers even during the pendency of an appeal from an injunction. . . . Such relief would seem particularly suited to the context of a preliminary injunction, as injunctions, though appealable, are always subject to modification based on changed circumstances.") (citing *Ortho*); *New Jersey Sports Prods., Inc. v. Don King Prods., Inc.*, 15 F.Supp.2d 546, 549-50 (D.N.J. 1998) ("[T]he Court pauses to determine whether it retains jurisdiction to clarify the April Injunction in light of Mr. McCall's appeal of that Order. This Court concludes that it has the authority to clarify its original Order in order to effectuate its purpose."); *In re G-I Holdings, Inc.*, 568 B.R. 731 (Bankr. D.N.J. 2017) (not even involving a motion to modify an injunction); *In re Whispering Pines Estates, Inc.*, 369 B.R. 752 (B.A.P. 1st Cir. 2007) (not involving modification of injunctive relief to reflect changed circumstances); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 1648725 (Bankr. D.N.J. Apr. 24, 2014) (addressing "[a]ttempts to relitigate issues where they are on appeal," not at issue here).

injunctive relief in favor of non-Debtor defendants in 38,000+ talc lawsuits now mean that the Court cannot, and should not, modify that relief to allow 12 of those cases to proceed to trial.  As the Court has previously noted, it has the "inherent authority to revisit [its] prior orders."  [Main Dkt. No. 1212, at p. 9.][8]  Indeed, it is well settled in this Circuit that: "A court has the power to revisit prior decisions of its own . . . in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision . . . would make a manifest injustice."  *In re Pharm. Benefit Managers Antitrust Litig.* 582 F.3d 432, 439 (3d Cir. 2009) (quoting *Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 816 (1988)).  Here, for the reasons set forth in Point II.a, the change in circumstances since entry of the PI Order has been extraordinary, such that maintaining the current *status quo* is manifestly unfair:  Claimants sick with ovarian cancer and mesothelioma are dying by the day without having their day in court and while progress on a consensual plan in the bankruptcy is stalled; the limited modification of the PI Order to allow just 12 of the 38,000+ stayed cases to proceed would both give claimants their day in court *and* spark negotiations toward a consensual plan.

30.    Nevertheless, and even without regard to any identity of interest, the Debtor still contends that "authorizing the litigation of a claimant-selected segment of cases [against J&J] would only divert the Debtor's attention and resources from a comprehensive resolution of all current and future talc claims."  [Debtor's Response ¶ 39.]  That is untrue.  If the PI Order were modified as requested by the TCC, a total of 12 cases would go to trial, up to (but not beyond) the point of judgment, against J&J – *not* the Debtor.   *None* of the Debtor's seconded representatives (only one of whom, Mr. Kim, has had any prior experience with talc litigation) would be needed (either as witnesses or counsel) at, or to prepare for, the trials.  Nor would any of the Debtor's

---

[8]  Memorandum Opinion, entered January 20, 2022 regarding the formation of two committees.

funds be needed to defend the trials.  Thus, the *only* impact of allowing the requested handful of

trials to proceed would be on *non*-debtors; there would be *zero* impact on the Debtor.

31.     Moreover, even if any diversion of attention or resources from J&J were within the

purview of the Court (which, respectfully, it is not), it is clear – in light of J&J's virtually endless

resources – that any such "diversion" would be negligible.  J&J has an army of personnel, in-house

counsel and outside counsel, and a vault-full of funds, *both* to try the cases to judgment *and*

*simultaneously* monitor, and participate, as needed, in, this bankruptcy case, in general, and any

negotiations over a consensual plan, in particular.    Indeed, the Debtor's "ordinary course

professional" filings – comprised of *J&J's* expansive stable of outside law firms – reveal that J&J

employs experienced trial counsel to defend products liability claims across the country.  [Dkt.

No. 12]  Lest there be any doubt, J&J has many different trial counsel that it employs in its talcum

products liability cases, *none* of which is either the Debtor's bankruptcy counsel (Jones Day) or

J&J's bankruptcy counsel (White & Case) in this Case.[9]

32.     It also bears noting, in weighing the Debtor's attack on the fairness of modifying

the PI Order, that J&J, by the Debtor's own account, has saved over a hundred million dollars to

date in trial costs as a result of the PI Order.  According to the Debtor, "[i]n  the months prior to

the Petition Date, Old JJCI was paying anywhere from $10 million to $20 million in defense costs

on a monthly basis."  First Day Declaration of John Kim [Main Case Dkt. No. 5, at ¶40]; *see also*

Debtor's Informational Brief [Main Case, Dkt. No. 3, at p. 6] (Debtor stating that the "deluge of

cases has resulted in astronomical costs, with Old JJCI having incurred nearly $1 billion in defense

costs on account of cosmetic talc litigation, nearly all of which has been spent in only the last five

---

[9]  Such firms include, but are not limited to:  Skadden, Arps, Slate, Meagher & Flom LLP; Sidley Austin LLP; Faegre
Drinker Biddle & Reath LLP; Orrick, Herrington & Sutcliffe LLP; Proskauer Rose LLP; Blank Rome LLP; King &
Spalding LLP; Patterson Belknap Webb & Tyler LLP; Shook, Hardy & Bacon, L.L.P.; and Butler Snow LLP.

years."). Even if the 12 cases were allowed to proceed to trial, the cost to J&J is far less than the amount that it has saved to date as a result of the PI Order remaining in place for the past nine months.[10]   Further, the cost of trying 12 cases pales in comparison to the amount of money that J&J has made while the PI Order has otherwise been in effect.

33.    In sum, the Debtor's objection that modifying the PI Order as the TCC requests would harm the Debtor's reorganization efforts is utterly baseless.

c.    **The Debtor's Other Objections Should Be Rejected**

34.    The Debtor's other objections to the narrow modification of the PI Order requested by the TCC are no more persuasive:

- The Debtor complains that the cases put forward by the TCC for trial (referring to the original universe of 90 cases) are "cherry-picked." [Debtor's Response ¶ 47.] That criticism is empty.   The only cherry-picking the TCC has engaged in by putting forward the 12 cases on Exhibit 1 to be carved out from the PI Order is selecting cases (with the exception of one MDL bellwether) that can proceed to trial *now*.   Moreover, there is nothing inequitable about permitting the claimants to choose a small handful of cases to proceed to trial.  J&J has reaped the benefit of the stay of 38,000+ cases to the detriment of the claimants.  Allowing the claimants to choose a mere 12 of those cases to be carved out from the stay cannot be considered any injustice to J&J (or the Debtor).   That is especially so when it is J&J, not the claimants, which needs to be convinced that its position is not infallible:  The claimants understand any case can be lost; it is J&J that needs to be convinced that not every case can be won.

- The Debtor also suggests that the claimed change in circumstances – namely, the stalling of negotiations over a consensual plan while hundreds of claimants have died during the bankruptcy case – is somehow the fault of the TCC insofar as, according to the Debtor, "the Talc Committee refused to engage in mediation for five of those eight months." [Debtor's Response ¶¶ 26-27.]  The charge is completely unfounded.  The TCC has engaged in the mediation in good faith at all times.   Further, its exercise of rights in seeking dismissal and opposing stay protection (considered to be important enough by the Third Circuit for direct appeal) can hardly be considered a bad faith unwillingness to mediate. Moreover, the Debtor's charge misses the point.  As the Debtor itself has declared, the "central issue" preventing consensus on a plan is the fundamental disagreement over J&J's

---

[10] The Debtor is now seeking to *further* expand the scope of the PI Order in favor of non-debtors, including J&J and Old JJCI, to enjoin actions brought by the State of New Mexico and the State of Mississippi. *See* Adv. Pro. No. 22-01231.

liability to the claimants. That major obstacle would have existed no matter when mediation had commenced, and, as the TCC argues in Point I above, will continue to remain until the current *status quo* is altered by allowing a small segment of cases to proceed to trial.

- The Debtor also complains that allowing *any* subset of the 38,000+ cases to go to trial is inherently unfair because it "would benefit only the claimants in those cases as opposed to [all] talc claimants." [Debtor's Response ¶ 30.] To avoid this claimed unfairness, it comes as no surprise, the Debtor asserts that *no* cases should go to trial. The Debtor's concern for the purported unfairness to 38,000+ claimants whose cases the Debtor sought, and was granted, a stay of litigation is nothing more than crocodile tears. In all events, it is the TCC, not the Debtor, that is entrusted with representing the interests of all claimants. Further, no claimant has come forward to object to the limited modification of the PI Order requested by the TCC. The Debtor's voicing of objections on claimants' supposed behalf is transparently self-serving.

- Also self-serving is the Debtor's complaint that any cases on Exhibit 1 that followed an earlier mistrial (for reasons such as a 12-2 hung jury) are unfair to claimants because it would "giv[e] the applicable claimants the unfair opportunity of a second trial." [Debtor's Response ¶ 47.] Again, the objection that no claimant should get a second bite at the apple before all claimants have gotten their first is being asserted by no one other than the Debtor, which does so self-servingly. The objection should be disregarded.

35.    The bottom line is that the Debtor has not offered, and cannot offer, *any* valid reason

not to modify the PI Order in the narrow and limited manner requested by the TCC.

## Conclusion

36.    For all the foregoing reasons, and those set forth in the TCC's Initial Statement, the

Court, respectfully, should modify the PI Order to permit the cases on Exhibit 1 to proceed to trial

through, but not beyond, judgment.

Dated:    July 19, 2022                          Respectfully Submitted,

                                                 **THE OFFICIAL TALC CLAIMANTS
                                                 COMMITTEE**

                                                 Respectfully submitted,

                                                 **GENOVA BURNS, LLC**

                                                 **/s/ *Daniel M. Stolz*_____**
                                                      Daniel M. Stolz, Esq.
                                                      Donald W. Clarke, Esq.
                                                      dstolz@genovaburns.com
                                                      dclarke@genovaburns.com
                                                      110 Allen Road, Suite 304
                                                      Basking Ridge, NJ  07920
                                                      Tel: (973) 533-0777
                                                      Fax: (973) 467-8126

                                                 *Local Counsel to the Official Talc Claimants
                                                 Committee*