**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Matthew I.W. Baker, Esq.
dstolz@genovaburns.com
dclarke@genovaburns.com
mbaker@genovaburns.com
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Tel: (973) 467-2700
Fax: (973) 467-8126
*Local Counsel for the*
*Official Committee of Talc Claimants*

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Robert J. Stark, Esq.
Michael S. Winograd, Esq.
dmolton@brownrudnick.com
rstark@brownrudnick.com
mwinograd@brownrudnick.com
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

and

Jeffrey L. Jonas, Esq.
Sunni P. Beville, Esq.
Eric R. Goodman, Esq.
jjonas@brownrudnick.com
sbeville@brownrudnick.com
egoodman@brownrudnick.com
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
*Co-Counsel for the*
*Official Committee of Talc Claimants*

**BAILEY GLASSER LLP**
Brian A. Glasser, Esq.
Thomas B. Bennett, Esq.
Kevin W. Barrett, Esq.
Maggie B. Burrus, Esq.
bglasser@baileyglasser.com
tbennett@baileyglasser.com
kbarrett@baileyglasser.com
mburrus@baileyglasser.com
1055 Thomas Jefferson St. NW, Suite 540
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 463-2103
*Co-Counsel for the*
*Official Committee of Talc Claimants*

**OTTERBOURG PC**
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
mcyganowski@otterbourg.com
asilverstein@otterbourg.com
jfeeney@otterbourg.com
230 Park Avenue
New York, NY 10169
Tel: (212) 905-3628
Fax: (212) 682-6104
*Co-Counsel for the*
*Official Committee of Talc Claimants*

| | |
|---|---|
| **PARKINS & RUBIO LLP**<br>Lenard M. Parkins, Esq.<br>Charles M. Rubio, Esq.<br>lparkins@parkinsrubio.com<br>crubio@parkinsrubio.com<br>Pennzoil Place<br>700 Milan St., Suite 1300<br>Houston, TX 77002<br>Tel: (713) 715-1666<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>jmassey@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* |
| In Re:<br><br>**LTL MANAGEMENT, LLC,**[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Honorable Michael B. Kaplan |

## OFFICIAL COMMITTEE OF TALC CLAIMANTS' STATEMENT IN RESPONSE TO DEBTOR'S REPLY IN SUPPORT OF THE NEED FOR ESTIMATION

The Official Committee of Talc Claimants (the "TCC"), by and through its undersigned counsel, respectfully submits this Statement (the "TCC's Response") in response to the *Debtor's Reply in Support of the Need for Estimation* (Dkt. No. 2769) (the "Reply").

### INTRODUCTION

1. The Debtor's Reply is unauthorized. The Court instructed the parties to exchange position statements on the need for estimation on July 15th. No reply briefs were permitted. Notwithstanding, the TCC treats the unauthorized Debtor's Reply as another opportunity to lay bare a simple truth: estimation serves no legitimate purpose in this case and violates section 502(c) of the Bankruptcy Code.

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

2

2. Typical of an unauthorized pleading filed at 11:29 p.m. on a Friday, the Debtor's Reply is filled with incorrect statements. The TCC's Response addresses many of these misstatements. Because the Court did not permit responses to the position statements filed on July 15, 2022, the TCC is not using this Response to address the Debtor's authorized July 15th filing (Dkt. No. 2726). Counsel for the TCC will address all authorized filings at the hearing scheduled for July 26, 2022, as the Court's original directive intended.

3. In its Reply, the Debtor essentially admits that estimation, at this stage of the case, serves no logical purpose. The Debtor admits that this Court is unable to estimate for distribution purposes or to cap the funding to pay the claims of victims of J&J's toxic talc. LTL has not filed a plan and has not suggested that a plan is forthcoming. Estimation does not make any sense here.

## RESPONSE

### I. Estimation in Prior Asbestos Cases Shows that Estimation Is Pointless

4. The Debtor asserts that it "knows of no court that has ever declined to order estimation when requested in an asbestos-related bankruptcy." Reply at ¶¶ 4 & 25.

5. But courts have declined to order estimation—particularly when it is proposed separate and apart from an actual plan. *See In re Diocese of Camden, New Jersey*, Case No. 20-21257 (JNP) (Bankr. D.N.J. Feb. 15, 2022) ("estimation would not satisfy the standard under Section 502(c) because it could cause, rather than prevent, undue delay in the administration of the case."); *accord In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS) (Bankr. D. Del.) (Dkt. No. 2612, ¶ 37) (in that case the debtor successfully argued that "the Movants' estimation proceeding, which would cause undue delay of the administration of these Chapter 11 Cases instead of avoiding it, is antithetical to section 502(c) and cannot be 'mandatory.'").

3

6. The fact that some courts have conducted estimation proceedings in asbestos-related cases does not mean that estimation was appropriate. The TCC offers *Garlock*, *G-I Holdings*, and all three prior Texas-Two Steps—*Bestwall*, *Aldrich*, and *DBMP*—as examples of the irreparable harm caused when a court is led down the estimation "road to nowhere." The asbestos cases where estimation has occurred separate and apart from the confirmation of a proposed plan have proven that estimation is a "road to nowhere" and inconsistent with section 502(c) because it creates undue delay.

7. Even without these examples, this fact follows from the plain language of the Bankruptcy Code. Section 524(g) requires the support of 75% of the creditors whose claims are addressed by the trust, which is a higher threshold than the two-thirds needed for a class to be deemed to accept a plan under section 1126(c).

8. The Debtor's position that "estimation is necessary for plan confirmation under 11 U.S.C. § 1129 and 11 U.S.C. § 524(g), at least in the absence of any consensual plan," is at best garbled: if the Debtor has the votes to approve a section 524(g) plan, it will have a consensual plan (which means section 1129(b) will not apply and there is no need for estimation to determine if the statute's requirements are satisfied), or the debtor does not have the votes (and the plan fails before section 1129(b) is considered). Reply at ¶ 26.

9. A section 524(g) plan cannot be confirmed absent the support of the tort victims. And estimation cannot make anyone more or less likely to vote in favor of a plan. *See Garlock*.

## II. Estimation Is Not Permissible for Mediation Purposes

10. The Debtor asserts that it "is not asking this Court to 'adjudicate' personal injury claims or establish a 'cap' on the Debtor's talc liability for purposes of distribution." Reply at ¶ 2.

4

And the Debtor asserts that is "does not seek to 'relitigate' 'liability determinations' made in the tort system." *Id.* at ¶ 3. But, what, then is the point of estimation according to the Debtor?

11. The Debtor's answer is that estimation would "complement[] ongoing **mediation** efforts," bring "the parties to a **middle ground** (albeit considerably closer to the debtor's estimate than the claimants' estimate)," "enhance[] the prospects of an **early** consensual resolution," and "assist in **negotiation**." *Id.* at ¶¶ 2, 4, 10 & 12 (emphasis added).

12. But section 502(c) does not permit estimation for the purpose of mediation or negotiation—only to avoid "undue[] delay [in] the administration of the case." 11 U.S.C. § 502(c); *Camden*, Feb. 15, 2022, Hr'g Tr. at 12:25-13:3 ("[h]aving the Court estimate claims to aid the mediation or settlement process is not – again, not the standard by which an estimation hearing is required under Section 502(c)."). The Debtor estimates its talc liability at $0. Any "middle ground" that is "considerably closer to the debtor's estimate" is not something that would ever be acceptable to the cancer victims.

13. This is why the Debtor has not filed a chapter 11 plan. The Debtor's plan, based on the Debtor's estimate of its talc liability, would be voted down just as the plan in *Garlock* was voted down. The Debtor's position is that if this Court—or a Court appointed expert—were to simply tell the cancer victims that J&J has no liability, that would somehow change everything, and this case would magically transform into a consensual resolution.

14. On this point, the Debtor makes a stunning admission. The Debtor argues, in an effort to distinguish *PG&E*, where the Court granted relief from stay so that the debtor's tort liability could be decided by a jury in state court, that: "A decision in **one additional case**—or even 12 or 90 non-representative cases finely curated by the TCC—will **not** materially inform the

5

parties on the Debtor's aggregate **liability** of tens of thousand of current and future claims relating to Johnson's Baby Powder." Reply at ¶ 34 (emphasis added).

15. Why would J&J treat a decision by this Court any differently? If this Court were to fully accept the TCC's expert's opinion and ensure that no victims get "stiffed at the end … for legitimate claims"[2] when such claims are ultimately adjudicated, J&J could say that this Court's decision is just "one additional case."

16. If the past is any predictor of the future, a stand-alone estimation proceeding here would take three to five years (and that is a conservative estimate). Parties with co-liability would likely join in the proceeding, as would various insurers whose rights could be impacted (*see* Dkt. No. 2720). LTL has already shown that it will not comply with basic discovery requests seeking the disclosure of settlement data. It is, therefore, likely that estimation will require regular, constant, and Court-consuming discovery motion practice just to ensure that the Debtor complies with its discovery obligations under the Civil Rules.

17. During this time, J&J will continue to pay dividends and operate without the burdens of being in bankruptcy. And, during this time, cancer victims—many of whom could have had their claims tried in state court or the MDL—will continue to suffer and die. This bankruptcy case has been carefully crafted to make it nearly impossible for anyone to dare stand their ground against J&J. Estimation is not being sought here to avoid undue delay. It is being sought to *cause* undue delay and bully cancer victims—victims who are ready and willing to propose a chapter 11 plan that can be confirmed in the next eight (8) months.

---

[2] Sept. 10, 2019, Hr'g Tr. at 27:15-20, *In re PG&E Corp.*, No. 19-05257 (JD) (N.D. Cal. Sept. 10, 2019).

**III. The TCC's Plan Is a Viable, Feasible and Fair Path Forward**

18. The Debtor asserts that the "TCC's proposal for 'another path'—seeking to cram down a largely *undisclosed* plan with *unknown* claim values that the claimants apparently negotiated with themselves—is not a viable, feasible, nor fair path forward." Reply at ¶¶ 6 & 43 (emphasis added). But the TCC's plan[3] is the only viable, feasible and fair path forward.

19. If the TCC's plan is not a real threat, the Debtor should let the TCC file it. The Debtor criticizes the TCC for not disclosing the terms of its plan, and, at the same time, will not permit its filing. By maintaining exclusivity, the Debtor is free to box with an opponent whose hands are tied behind its back. This must end.

20. The TCC stands ready and willing to file a plan, a disclosure statement, a motion to approve solicitation procedures, notices, ballots, trust distribution procedures, and a trust agreement, and make all disclosures necessary to solicit votes and confirm a plan by the first quarter of 2023. The TCC's plan complies with sections 1129 and 1123 of the Bankruptcy Code and will produce a fair and equitable resolution of this case. If the Debtor thinks this is a bluff, the Debtor should call it and permit the TCC to file its plan.

**IV. The TCC's Plan Can be Confirmed Under Section 1129 of the Bankruptcy Code**

21. The Debtor asserts that "the notion that the TCC could cram down its proposed plan without estimation, using Bankruptcy Rule 9019's more lenient 'range of reasonableness' standard for approving settlements, is specious." Reply at ¶ 8.

22. The Debtor further argues that "Bankruptcy Rule 9019 requires a negotiated settlement among parties with real competing interests" and that "the absolute priority rule, which

---

[3] Subject to the reservation of rights set forth in the TCC's motion to terminate the Debtor's exclusive period pursuant to section 1121(d)(1) of the Bankruptcy Code (*see* Dkt. No. 2721-1 at 2), the TCC is prepared to file and prosecute a chapter 11 plan.

7

prohibits them from receiving more than 100% of the value of their claims," applies here and defeats the TCC's plan absent an estimation. *Id.* at ¶ 52.

23. But the Debtor is conflating bankruptcy concepts. The TCC takes the Debtor's reference to "cram down" and the "absolute priority rule" as a reference to section 1129(b)(2)(C) of the Bankruptcy Code. J&J currently owns interests in LTL. J&J presumes that those interests will be impaired under the TCC's plan (as opposed to being reinstated) and that a plan cannot be confirmed if J&J votes against it.

24. That is, the Debtor argues that J&J must consent to and vote in favor of any plan that can be confirmed by this Court—the perfect position for J&J to be in while all litigation against it is stayed for the next three to five years and it does not have to pay anything under the Funding Agreement other than professional fees and expenses.

25. Assuming, *arguendo*, that equity is impaired, section 1129(b) allows this Court to confirm a plan over a dissenting class of interests if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of … interests that is impaired, and has not accepted, the plan," and the requirements of section 1129(a) (other than subsection (a)(8)) are satisfied). 11 U.S.C. § 1129(b)(1). The process of confirming a plan over a dissenting class is called a "cram down"—*see Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999)—although the term "cramdown" itself does not appear in the Bankruptcy Code.

26. Here, there could be no claim of "unfair discrimination"—which protects against "horizontal discrimination" (*i.e.*, paying one class of claims more than another)—because there could only be one class of interests—namely, J&J's interests in LTL—under any plan filed in this case. *See In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017).

8

27. A plan is "fair and equitable" with respect to a class of dissenting equity interest holders if it satisfies the following requirements:

>   (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
>
>   (ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

28. The TCC will easily show at confirmation that J&J's equity interests in LTL have no value and that the holders of any interest that is junior to J&J's interests will not receive or retain any property under the TCC's plan on account of such junior interest. Accordingly, a cram down here, and the satisfaction of the absolute priority rule, will not be a heavy lift.

29. The Debtor's assertion that the TCC's plan would pay talc claimants more than 100% of the value of their claims also confuses bankruptcy concepts. The term "claim" is defined in section 101(5) as a "right to payment"—*i.e.*, the amount owed by a debtor to the holder of the claim. 11 U.S.C. § 101(5). The amount that a claimant receives under a plan—*i.e.*, a "payment" or a "distribution"—is often less than the allowed amount of the claim.

30. In fact, unless the plan provides for "payment in full," the claim amount and the payment received on account of the claim are two different numbers. The TCC would never propose a plan that proposes to pay any talc claimant more than the allowed amount of his or her claim. There is no reason to do so—"payment in full" is adequate.

31. The more intelligible argument—or the one that LTL is making using the wrong terminology—is that a TCC plan could never include a settlement proposed by the TCC (as

9

opposed to LTL, as controlled by J&J), and that the resolution of LTL's objection to the proposed settlement values would somehow require estimation. But this is also incorrect.

32. **First**, courts in the Third Circuit have and can permit creditor committees and/or creditor groups to propose settlements. *See In re Petersburg Regency LLC*, 540 B.R. 508, 536 (Bankr. D.N.J. 2015); *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr. D. Del. 2008); *accord In re Smart World Tech.*, 423 F.3d 166, 176-77 (2d Cir. 2005) (rejecting *per se* rule that creditors cannot seek approval of a settlement under Bankruptcy Rule 9019).

33. In *TSIC*, the official committee of unsecured creditors and a stalking horse bidder moved for court approval of a settlement resolving the committee's objection to the stalking horse's withdrawal of its opening bid. 393 B.R. 71. The United States Trustee objected and argued, like LTL here, that Bankruptcy Rule 9019 is not available to an official committee because "Rule 9019 is available only to the 'trustee' or debtor in possession and the Committee does not qualify as such." *Id.* at 77-78. In rejecting this argument, Judge Gross held that the official committee had "the right pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 105(a) to request the Court's approval of the Settlement." *Id.* at 78. The Court went on to analyze the settlement under the *Martin* factors, which the Court held were satisfied since the settlement maximized the value of the estate and the return to unsecured creditors. *Id.* at 79.

34. Likewise, in *Petersburg Regency*, a group of creditors sought court approval of a settlement they negotiated with all creditors of the estate, except for the debtor's insiders, that would result in distributions on their claims and the structured dismissal of the chapter 11 case. 540 B.R. 508. The chapter 11 debtor and its insiders objected and argued that the creditor group did not have standing to bring a settlement motion under Bankruptcy Rule 9019. *Id.* at 536.

10

35. In rejecting this argument, Judge Papalia found that "there is authority for such derivative standing on behalf of a creditors committee," and by extension a group of creditors representing all of the debtor's creditors except for insiders, "under Rule 9019." *Id.* The court went on to analyze the settlement of claims against the debtor's estate under the *Martin* factors, which the court found were satisfied because, among other things, the settlement and the structured dismissal were "plainly in the best interests of the Debtor's creditors and the estate." *Id.* at 545.

36. Tellingly, LTL fails to acknowledge *Petersburg Regency*, *TSIC*, or *Smart World* in its Friday night filing, and instead cites to *In re Cilwa*, No. 15-00263, 2015 WL 7307303, at *4 (Bankr. D.S.C. Nov. 18, 2015). Reply at ¶ 52. But the issue in *Cilwa* was the resolution of an objection to a filed proof of claim against an individual in a chapter 7 and not whether a settlement framework proposed by an official committee in a chapter 11 case *per se* violates Rule 9019.

37. Here, LTL is plainly conflicted. LTL is a special purpose vehicle. LTL has no business purpose and no employees apart from those seconded by J&J. LTL's board, management, and employees all work for J&J and owe 100% fealty to J&J. Talc claims are essentially LTL's only liabilities. The Debtor, as a true fiduciary, should be trying to maximize the value of its estate for the benefit of its creditors. *See In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 303 (3d Cir. 2010) (principal interest of chapter 11 is "protecting creditors' interests by maximizing the value of the bankruptcy estate").

38. But expecting LTL to propose a plan that does not serve J&J's interests would be akin to expecting LTL to sue J&J. As the Third Circuit explained in *Cybergenics*, certain situations in bankruptcy "immediately give rise to the proverbial problem of the fox guarding the henhouse"—if LTL can devise any opportunity to protect J&J from reputational or financial harm,

11

it will seize it even if doing so harms LTL's creditors. *Official Committee of Unsecured Creditors of Cybergenics v. Chinery*, 330 F.3d 548, 574 (3rd Cir. 2004).

39. The safeguard against a conflicted debtor—as the case law shows—is to permit an official committee to propose a settlement that preserves the integrity of chapter 11 and its principal interests—*i.e.*, the interests that this Court identified in its Memorandum Opinion (Dkt. No. 1572) denying the TCC's motion to dismiss this case.

40. The TCC's plan can achieve the Court's goals and functions in a similar manner as the settlement and structured dismissal in *Petersburg Regency*. The only difference is the TCC is an official committee (not a large group of creditors) and the TCC would be seeking the confirmation of a plan under section 1129 that resolves all claims instead of doing so through a structured dismissal.

41. But these distinctions favor the TCC's right to propose its plan since there is no question that the TCC is acting as a fiduciary for all tort claimants (the primary creditor constituency) and the confirmation process affords appropriate safeguards—namely, voting, discovery, and an opportunity to object—that are arguably more stringent that those applied to a structured dismissal that complies with *Czyzewski v. Jevic Holdings Corp.*, 137 S.Ct. 973 (2017).

42. A framework for settling talc claims post-confirmation by Court-approved Trustees can easily be incorporated into a plan proposed by an official committee. If this were not true here, no plan that provides "a meaningful opportunity for justice, which can produce comprehensive, equitable, and timely recoveries for injured parties" could ever be confirmed unless LTL, as controlled by J&J, has agreed to it. *See* Memorandum Opinion at 27.

43. LTL's counsel represented to this Court that "if a plan is confirmed and it's a TCC plan as a proponent," the TCC "can include in that plan the funding agreement" "[w]ithout violating any assignment provision." Hr'g. Tr. Feb. 18, 2022, 64:11-25.

44. LTL did not say that the Court could never confirm a plan that provides for a global resolution of talc claims unless LTL proposes it. LTL's position now implies that there is **no exit** from this bankruptcy other than dismissal or complete capitulation to J&J's position of no liability. For this case to not constitute a complete abuse of the bankruptcy system, a TCC plan that produces comprehensive, equitable, and timely recoveries for injured parties must be possible.

45. **Second**, contrary to LTL's argument, the resolution of appropriate claims values in the TCC's plan would not require an "estimation." *See* Reply at ¶ 49. Again, the Debtor is confusing bankruptcy concepts. The TCC's plan does not require the Court to estimate any specific talc claims—in the aggregate or individually—under section 502(c).

46. The Court would only need to decide if the claim values, gating criteria, and procedures in the Trust Distribution Procedures used for the settlement of talc claims are within the range of reasonableness. An aggregate estimation of liability is not necessary to answer this question. Nor is it necessary for this Court to adjudicate the merits of any specific talc claim.

47. The TCC's plan is based on a "pay as you go" structure under which J&J is required to pay talc claims under the Funding Agreement as they are liquidated post-confirmation. This structure is not only beneficial to current claimants, but future claimants as well because the risk of underfunding will not be placed on future cancer victims.

48. The full benefit of the Funding Agreement, and J&J's obligations thereunder, are preserved for all claimants. J&J, although it will not admit it *__today__*,[4] does in fact want a limited

---

[4] The Debtor emphatically states that it "**has not** said that an estimation decision would, by itself, set a hard 'cap' on the funding amount of the trust." Reply at ¶ 13 (emphasis in original). The Court should pay careful attention

13

or capped fund so that if the trust funding is inadequate, future claimants could have no source of recovery available to them on account of valid talc claims. That is the true purpose of what J&J is trying to accomplish here.

### V. A Contested Plan Would Provide for All of the Required Discovery

49. The Debtor asserts that the "TCC's proposed approach to confirming (via cramdown) its plan, the terms of which are largely undescribed, would provide for none of the *discovery* that courts in asbestos-related bankruptcies have found necessary and critical to estimating a debtor's aggregate liability for current and future claims." Reply at ¶¶ 8, 19 & 50 (emphasis added).

50. But as the Court held in *Camden*, discovery over disputed tort claim values is governed by "Bankruptcy Rule[s] 3[0]20 and 9014" and, therefore, does not need to take place in a "separate [estimation] proceeding" under section 502(c) of the Bankruptcy Code." Feb. 15, 2022, Hr'g Tr. at 8:3-8:12.

51. Discovery in bankruptcy typical occurs in one of two forums.

52. First, a party could file an adversary proceeding governed by the Rules found in Part VII of the Federal Rules of Bankruptcy Procedure. Those Rules include Rule 7026 (general provisions governing discovery); Rule 7032 (use of depositions), Rule 7033 (interrogatories to parties); Rule 7036 (request for admission), and Rule 7037 (failure to make discovery).

53. Second, discovery can occur in a contested matter. Contested matters are governed by Bankruptcy Rule 9014, which makes various Rules found in Part VII of the Bankruptcy Rules applicable in a contested matter, including Rule 7026 (general provisions governing discovery);

---

to the Debtor's use of the phrase "by itself." What the Debtor will argue, if an estimation takes place, is that the confirmation of a plan based on an estimation creates a hard cap on the funding amount of the trust and that any section 157(b) issues can be cleansed if a District Court enters an order affirming the confirmation order. The problem, of course, is that *Garlock* and the requirements of section 524(g) show that this strategy is futile.

14

Rule 7032 (use of deposition), Rule 7033 (interrogatories to parties); Rule 7036 (request for admission), and Rule 7037 (failure to make discovery).

54. An estimation proceeding would constitute a "contested matter" governed by Bankruptcy Rule 9014, but so would a confirmation hearing—*see* Fed. R. Bankr. P. 3020(b) ("An objection to confirmation is governed by Rule 9014.")—a point that was not lost on Judge Poslusny in *Camden*. The talc claims would be in dispute in either context—estimation or plan confirmation. The Debtor would have discovery into all issues relevant to the confirmation of the proposed plan before the Court. In fact, it is in the context of a confirmation hearing that every issue that the Debtor argues today in its Reply—before the TCC can even file its plan—would prevent confirmation can be decided with all parties in interest afforded a fair opportunity to be heard and on proper notice.

55. If the Debtor thinks the matrix values are too high, it can object. If the Debtor thinks the gating criteria is wrong, it can object. If the Debtor thinks the Court-approved Trustees will not conduct themselves with the utmost integrity, it can object and explain its position to the Court. No one is saying that the Debtor is not entitled to discovery, due process, or an opportunity to be heard on anything. The TCC is committed to ensuring that no one's due process rights are violated in any respect. That includes the Debtor.

56. The Debtor's estimation path is designed to ensure that neither LTL nor J&J get within a country mile of a confirmation proceeding that could result in a final judgment. The TCC, in contrast, stands ready and willing to fight right now. As soon as the Court unlocks the handcuffs placed on the TCC by section 1121(d)—or those handcuffs fall away by the passage of time—the TCC is ready to go. The TCC is not interested in a multi-year estimation proceeding that will not even produce a final order. It wants real litigation with real consequences if a plan is to be

15

confirmed.  The Debtor and J&J need to stop hiding and see if it is possible to use the chapter 11 process to create a meaningful opportunity for justice and produce comprehensive, equitable, and timely recoveries for injured parties.  If the Debtor will not engage, its case should be dismissed.

### VI.     The Time to Liquidate Claims Does Not Equal Time to Administer a Case

57.     The Debtor asserts that estimation is somehow "mandatory" and "required by statute."  Reply at ¶¶ 4 & 25.  The Debtor contends that estimation is "fair and efficient" and could be done in a "faction of the time it would take to **litigate** the tens of thousands of current and future talc claims in an overburdened tort system." *Id.* at ¶ 19 (emphasis added).  And the Debtor argues that "[t]here is no dispute that **liquating** approximately 40,000 talc already-pending claims would unduly delay the **administration** of the estate." *Id.* at ¶ 25 (emphasis added).  But, again, the Debtor is confusing bankruptcy concepts.

58.     As Judge Poslusny found in *Camden*, while the "fixing or liquidating" of tort claims "within the trust" may "delay trust distribution[s]" to individual claimants—a process that can take years to complete—this is not the same thing as delaying "the administration of the Chapter 11 case" within the meaning of section 502(c).  Feb. 15, 2022, Hr'g Tr. 5:23-6:6, 13:20-23.

59.     In most mass tort bankruptcies, the process of fixing or liquidating tort claims does not begin until *after* a plan is confirmed.  This is what happened in *PG&E*.  And this is what was proposed in *Boy Scouts*.  After a plan is confirmed and a trust is created, claimants submit their claims for evaluation.  Claims administrators (acting for and under the authority of the Trustees) review the claims, determine if they satisfy the gating criteria, review documents submitted in support of the claims, and make determinations.  Claimants can accept settlement proposals or seek further review.  ***None*** of this work takes place in an estimation proceeding.  Estimation is not the same thing as actual liquidation.

16

60. If *PG&E* had gone the distance and the District Court had ruled that $20 billion was the appropriate reserve following a contested estimation proceeding involving written discovery, fact and expert depositions, and a trial, the District Court still would not have liquidated a single tort claim. It would have simply ruled that to ensure that no tort claimant got "stiffed at the end … for [a] legitimate claim[]" when his or her claim was liquidated, the debtor would have to fund a trust with at least $20 billion in total consideration. If the debtor in *PG&E* had confirmed such a plan, all the work necessary to liquidate the tens of thousands of tort claims would remain undone and, importantly, would not have even begun until the estimation process was complete.

61. Here, the Debtor is arguing that because it will take years for a trust to liquidate all the talc claims *after* a plan is confirmed, estimation is mandatory *now* to avoid undue delay in the administration of the chapter 11 case. But the administration of a *trust*—and the liquidation of tort claims—is not the same thing as the administration of the *chapter 11 case*—a point that Judge Poslusny clearly grasped.

62. Through its sleight of hand, the Debtor is desperately trying to create the illusion that estimation here is somehow mandatory or required under section 502(c) of the Bankruptcy Code when it is not. Estimation here only serves to place more time between today and the day when the talc claims will be liquidated and paid. The Debtor is not trying to avoid undue delay in the administration of its case; it is trying to create undue delay to lever dying cancer victims.

**VII.    Estimation Will Not Lead to a Consensus**

63. The Debtor continues its false narrative that estimation in other cases brought parties closer together and led to a consensual resolution. *See* Reply at ¶¶ 30-40. This is how the Debtor characterizes what happened in *Garlock*, *USG*, *Specialty Products*, *G-I Holdings*, *W.R. Grace*, *Federal-Mogul*, *General Motors*, and even *PG&E*. Putting aside the fact that the Debtor's

17

characterization of those cases, and what actually facilitated settlement, is inaccurate and is not supported by any evidence, the Debtor continues to ignore the elephant in the room.

64. The debtors in *Garlock*, *USG*, *Specialty Products*, *G-I Holdings*, *W.R. Grace*, *Federal-Mogul*, *General Motors*, and *PG&E* were real companies, with assets, employees, retirees, and liabilities that exceeded their asserts, that wanted to resolve their liabilities through the confirmation of a chapter 11 plan and exit bankruptcy as soon as possible.

65. J&J is presently enjoying all the benefits of being in bankruptcy with none of the burdens. There is a reason why LTL will not produce basic settlement data to facilitate mediation. A successful mediation that produces "comprehensive, equitable, and timely recoveries for injured parties" is not J&J's objective and it never will be.

66. The Debtor's bankruptcy strategy begins with *Garlock* and *G-I Holdings* because of the delay that those cases caused and the impact of that delay on the rights of tort victims. J&J wants a multi-year bankruptcy, and an estimation proceeding is essential to achieving that objective. But J&J did not want to place JJCI into bankruptcy.

67. Through this bankruptcy, J&J gets its delay and leverage over dying cancer victims without subjecting itself to any of the burdens that a chapter 11 debtor must face. J&J has no incentive to settle now, and J&J will have no incentive to settle if this Court orders an estimation proceeding. Estimation is not part of an overall strategy to lead to consensus. The Debtor is proposing estimation here to create undue delay in the administration of its chapter 11 case, which is not permitted under section 502(c) of the Bankruptcy Code. The TCC is willing to do all that it can to deliver justice to the victims. The Debtor's request for estimation should be denied and exclusivity should be terminated immediately so that the TCC can file its plan.

Respectfully submitted,

**GENOVA BURNS, LLC**

By: /s/*Daniel M. Stolz*
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee
of Tort Claimants of LTL Management, LLC*