MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com

150 West 30th Street, Suite 201
New York, NY 10001
Tel: (800) 358-5922

*Counsel for Mesothelioma Claimant and Appellant
Katherine Tollefson and Certain Mesothelioma Claimants*

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 21-30589<br><br>Honorable Michael B. Kaplan |

**NOTICE OF MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC'S FIRST SUBMISSION TO MR. KENNETH FEINBERG COURT APPOINTED EXPERT**

MRHFM hereby files Notice of its First Submission to Rule 706 Expert Mr. Kenneth R. Feinberg, which is attached hereto, and which is being sent to him today.

Respectfully submitted:

**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**

*/s/ Suzanne M. Ratcliffe*
_____
Suzanne M. Ratcliffe, Esq.
**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
sratcliffe@mrhmflaw.com



<span style="float:right">**Clayton L. Thompson**
**Partner**

150 W. 30th Street, Suite 201  New York, NY 10001
Tel: 800.358.5922   Fax: 314.241.4838</span>

maune • raichle • hartley
french & mudd, llc

August 26, 2022

**MRHFM'S FIRST SUBMISSION TO KENNETH R. FEINBERG, RULE 706 EXPERT**

*VIA FEDERAL EXPRESS*

Mr. Kenneth R. Feinberg
The Willard Office Building
1455 Pennsylvania Avenue, N.W. Suite 390
Washington, D.C. 20004

Mr. Feinberg,

I write you on behalf of our Firm's sixty-one (61) mesothelioma victims with pending lawsuits against non-debtor Johnson & Johnson and "old" Johnson & Johnson Consumer Inc.[1] and seventeen (17) additional mesothelioma victims who cannot at present file suit against these entities.[2] All seventy-eight (78) of our clients suffer from a preventable, incurable, and inevitably fatal tumor which is a signature of prior asbestos exposure. All were exposed to substantial levels of asbestos fibers from J&J talc products, including Johnson's Baby Powder and Shower to Shower.[3] I am eager to tell you about each of our individual clients and the irreparable harm that malignant mesothelioma has caused them and their families. MRHFM will provide more detailed evidence, data, and information in future submissions about why juries consistently sided with mesothelioma victims and why J&J efficiently settled these cases in the tort system.

In this First Submission, MRHFM asks you to use the discretion given you by the bankruptcy court to ensure that full transparency is adhered to by all parties that communicate with you or make submissions to you as a testifying court-appointed expert.

---

[1] Now purportedly known as LTL Management LLC ("Debtor").
[2] This is MRHFM's First Submission. Each submission MRHFM makes to you will be numbered and filed on the online court docket and therefore served on all parties simultaneously. MRHFM refers herein to the Order appointing you as a Rule 706 Expert ("Order"), entered August 15, 2022 (Dkt. 2881), your Declaration of August 10, 2022 ("Declaration") (Dkt. 2861), and your letter to Judge Michael B. Kaplan, U.S. Bankruptcy Court, July 19, 2022 ("Letter") (Dkt. 2808). Attached as Exhibit 1 is a portion of the transcript of July 28, 2022, where Judge Kaplan announced his intention to appoint you as Rule 706 expert.
[3] MRHFM has diagnosing pathology records for every victim referenced above.

Judge Kaplan appointed you to estimate "the volume and values of current and future ovarian and mesothelioma claims for which the Debtor may be liable, whether arising in the United States or Canada…" under Rule 706 of the Federal Rules of Evidence. Order, ¶ 2. Importantly, the value and volume of claims against non-debtor Johnson & Johnson for the Company's independent non-derivative asbestos liabilities are *outside* your appointment and not within the opinions you will be rendering this case.

In discussing your role on July 28, Judge Kaplan said:

And as I've said before, all parties in interest are entitled to have this information before being asked to accept or reject a plan. I believe that the need for **transparency** and to preserve the integrity of the bankruptcy process and the system requires a reasonable effort to estimate the debtor's aggregate liability for both present and future claims for both ovarian and meso diseases.

Tr. 7/28/2022, pg. 4 (emphasis). These are weighty matters and Judge Kaplan gave you discretion to proceed as you see fit when it comes to confidentiality: "The Court-Appointed Expert **may**, in **his discretion**, participate in confidential meetings with any interested party pursuant to Paragraph 4 below." Order, ¶ 3(a) (emphasis). The Order's "Confidentiality and Non-Confidential Information" paragraph is set forth below in full:

(a) All parties, including the Co-Mediators, **may have** confidential *ex parte* communications with the Court-Appointed Expert. Except as otherwise specifically provided herein, the content of any confidential communications shall not be disclosed to any other party, shall not be subject to discovery in this or any other proceeding, and shall not be memorialized in a written record or transcript.

(b) All parties may submit written submissions to the Court-Appointed Expert for his consideration, which submissions may contain facts or data that the parties believe the Court-Appointed Expert should consider. To the **extent appropriate**, the parties may designate information, facts or data in the submissions as "confidential" under the Protective Order and subject to the disclosure restrictions thereunder. Any written submissions designated as confidential may be used by the Court-Appointed Expert in the Rule 706 Report subject to redaction or other confidentiality protections in accordance with the terms of the Protective Order. Prior to the issuance of the Rule 706 Report, and upon the request of one or more parties, the Court-Appointed Expert **may, in his discretion, disclose the facts or data underlying written submissions** to other parties, subject to the terms of the Protective Order. After the unsealing of the Rule 706 Report, any written submissions provided to the Court-Appointed Expert shall be made available to all parties and shall be subject to discovery as provided in Paragraph 3(e) above.

Order, ¶ 4 (emphasis added). Respectfully, MRHFM asks that you do *not* have confidential meetings or communications with any party. We also ask that you advise all parties that you will not accept or consider, in formulating your opinions, any communications or submissions that will not be fully disclosed to all other parties. As a neutral expert appointed by the court, it is critical that all parties are allowed to understand fully all communications had by you and any other party.

In referencing the work done by Judge Weinstein in the *Agent Orange* litigation and more broadly on the concept of "Democratization of Mass Litigation", you wrote of the importance of public awareness: "if the litigation itself, and the accompanying settlement reached behind closed doors, are not viewed as credible or 'just', we citizens lose faith in the ability of the courts to dispense and deliver 'justice.'"[4]  There are already more than enough confidential meetings between the mediators, the lawyers, the FCR, the Debtor and J&J in this case.

Respectfully, your appointment is to follow the evidence—not confidential communications that can't be tested by the other parties—and render an opinion to the bankruptcy court, to the Debtor, to thousands of cancer victims, and to the public as an independent, court-appointed testifying expert. Please consider:

- If you are *not* relying on confidential communications in forming your opinions, then *why* are confidential communications being had with you?

- If you *are* relying on confidential communications or submissions in forming your opinions, then *why* are those not discoverable?

Hypothetically, if your opinion is that the Debtor's liabilities are greater than $60 billion, the Debtor will likely dismiss this case and defend itself in the tort system.  If your opinion is that the Debtor's liabilities are $5 billion—which is markedly less than the Debtor speculated to the bankruptcy court during the motion to dismiss trial—that will have ramifications on whether not claimants as a whole will ever vote to confirm a plan.[5]  Regardless of what your opinion will be, anything less than full transparency in reaching your opinion will raise doubts about your credibility; and these doubts are **completely avoidable** if you require all parties to disclose and produce everything they send or say to you.  This is consistent with the Rules of Evidence governing court-appointed experts.

As it stands, and unless you say different, much of your participation in this case may occur behind "closed doors." For example, confidential communications to you "shall not be memorialized" in writing.  Order, ¶ 4 (a). This is not the mafia where nothing is written down to avoid criminal liability. You are a court-appointed testifying expert operating under the Federal Rules of Evidence. Anything provided to you by any party must be discoverable if your opinions are to have any reliability or credibility to the thousands of victims who must approve any "plan of re-organization." This is especially important here, where **all** victims asked the bankruptcy court to dismiss this case and **all** object to being in this "bankruptcy" at all.

---

[4] Kenneth R. Feinberg, *Democratization of Mass Litigation: Empowering the Beneficiaries*, Columbia Journal of Law & Social Problems, Symposium, Vol. 45, No. 4, 481-498 (Summer 2012). Quote from pgs. 483-84 (discussing Judge Weinstein in *Agent Orange* cases).  "Democratization" in large cases means "making sure individual plaintiffs have an informed role to play in judicial proceedings", that "justice delayed is justice denied", and that "all individual parties to the settlement have a full and complete understanding of their rights and obligations."  *Id.*, pgs. 484-85, 488.

[5] MRHFM's plaintiffs will never consent to having their Seventh Amendment rights unapologetically yanked away or negotiate with the Debtor or J&J with their arms tied behind their back with an injunction in place.

3

Wright and Miller recognize the necessity of transparency, especially when the testifying expert is appointed by the court:

> After the court informs the expert of his duties and the expert commences work, the court and the parties should remain available to answer the expert's questions or refine instructions where necessary. As a safeguard against bias, these communications also should be conducted in a manner open to all the parties. This means that *ex parte* communications between the judge and the expert or between a party and the expert are discouraged. Such communications may pose ethical issues for the judge or attorney involved. In fact, *ex parte* communications between the judge and the expert may justify disqualification of the judge. Similarly, *ex parte* communications between one party and the expert may justify rejecting the expert's analysis as unreliable. Further, such communications may compromise the impartiality of the witness or at least call that impartiality into question.

*See Wright & Miller,* 29 Fed. Prac. & Proc. Evid. § 6305 (2d ed.). Simply put, MRHFM's clients are entitled to know what information was provided to you or told to you by every other party. How can MRHFM's plaintiffs have a "full and complete understanding" of their rights and obligations in this case, if they do not have access to **all** information the Debtor provided you?[6] How will you be able to differentiate between "communications" that are "confidential" and that you do *not* rely upon, and "submissions" which are *not* confidential and which you *do* rely upon? And how can cancer victims be sure that "confidential *ex parte* communications" you had with the Debtor or the FCR did not influence your opinions? Absent full transparency, current and future victims will never know.

Johnson & Johnson and the Debtor want to have it both ways: they want to stop juries from seeing the evidence and deciding these cases *and* they want to argue their powders are "safe" and "did not contain asbestos." They want to say the cases are worth zero in public and tell you what they really think in private meetings. Allowing the Company and the Debtor to have confidential meetings with a testifying court-appointed expert shrouds this proceeding with secrecy and reeks of pre-determination. Johnson & Johnson and the Debtor very likely want to tell you what they believe the total liabilities are for mesothelioma and ovarian cancer cases, but they will **only** do that if they know those numbers will be kept confidential. Thus, they want to influence your opinions without having that influence disclosed. Johnson & Johnson's Treasurer, Michelle Ryan, told the S&P Global Ratings agency in October 2020 that its **total** talc liability—current and future—was $7-7.5 billion. Exhibit 2, Testimony of David of Kaplan, S&P Global Ratings and memorandum from his conversation with J&J Treasurer Michelle Ryan.[7]

These numbers didn't come out of thin air. The Company likely has internal data and analysis on J&J's and the Debtor's total talc liability and the Company absolutely has records for every settlement it reached in the tort system. This must all be disclosed to all parties given that the Debtor put this information directly at issue in this proceeding. It is very likely the Debtor's internal talc liability assessment is much lower than what the Debtor wildly speculated it **could** be to the bankruptcy court in February, i.e., much closer to the $7 billion Ms. Ryan told S&P than *$3 trillion*,

---

[6] *See Democratization,* pg. 485.

[7] This was only discovered *after* S&P Global Ratings was subpoenaed and one of its employees was deposed. In other words, J&J did not provide this information to the parties in this case.

4

as one of the Debtor's trial PowerPoint slides stated. Of course, if the Debtor say publicly that its total liabilities are $7 billion or less, this case must end because that's much less than the value of LTL Management before filing for bankruptcy ($60 billion). It would also demonstrate that the Company and the Debtor have full resources to resolve all current and future victims in the tort system.

MRHFM asks (1) that you do not have confidential (non-discoverable) meetings or communications with any party and that you advise all parties of this fact; and, (2) that anything provided to you in writing by any party be served on all other parties, and that only truly confidential information be redacted (personal identifying information), *not* J&J or the Debtor's settlement history and internal liability analysis, which they both put directly at issue in this proceeding.

On behalf of our seventy-eight mesothelioma victims, *please* be transparent in this case.

Respectfully submitted:

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**

_____
Clayton L. Thompson, Esq.
**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
cthompson@mrhmflaw.com

5

# Exhibit 1

```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF NEW JERSEY


 IN RE:                         .   Case No. 21-30589(MBK)
                                .
 LTL MANAGEMENT LLC,            .
                                .
         Debtor.                .
 . . . . . . . . . . . . . . . .
 LTL MANAGEMENT, LLC,           .   Adversary No. 21-3032(MBK)
                                .
         Plaintiff,             .
                                .   Clarkson S. Fisher U.S.
      v.                        .     Courthouse
                                .   402 East State Street
 THOSE PARTIES LISTED ON        .   Trenton, NJ 08608
 APPENDIX A TO COMPLAINT        .
 and JOHN AND JANE DOES         .
 1 TO 1000,                     .
                                .
         Defendants.            .   Thursday, July 28, 2022
 . . . . . . . . . . . . . . . .    11:00 a.m.


                       TRANSCRIPT OF RULINGS
              BEFORE THE HONORABLE MICHAEL B. KAPLAN
              UNITED STATES BANKRUPTCY COURT JUDGE
```

Audio Operator:         Wendy Quiles


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

4

1 claims matrix and the settlements paid thereunder and agreed to
2 by a trust would not differ depending upon whether the trust is
3 funded with $1 billion or $15 billion.  So I think it makes an
4 important difference.  It is a big ask, I believe, to have this
5 Court approve the solicitation of one or more plans and to
6 confirm a plan with the requisite findings as to good faith
7 under 1129(a)(3) and fair and equitable treatment without a
8 meaningful record evidencing the amounts needed to satisfy
9 claims, the amounts intended to be paid out, and the available
10 funding.
11          And as I've said before, all parties in interest are
12 entitled to have this information before being asked to accept
13 or reject a plan.  I believe that the need for transparency and
14 to preserve the integrity of the bankruptcy process and the
15 system requires a reasonable effort to estimate the debtor's
16 aggregate liability for both present and future claims for both
17 ovarian and meso diseases.
18          Now, mechanically, it may well be that the funding
19 agreement requires that the debtor first also exhaust all other
20 assets before funding obligation kicks in and that, in itself,
21 as I've indicated even at the oral argument, may indeed
22 necessitate estimation.  As the Court has previously ruled that
23 the debtor's interest in the insurance coverage, estimated
24 anywhere between one and I think $3.5 billion, is property of
25 the estate.  And notwithstanding everyone's characterization of

5

1  the insurance as icing on the cake or the smallest teeniest of
2  flies on the smallest of dogs, whatever the references were,
3  the Court still requires a record upon which to make sure that
4  the estimated claims do in fact exceed the available insurance
5  and that the funding agreement, which will be the linchpin of
6  almost any plan, will actually be operational.
7         The Court believes strongly that all creditors and
8  claimants have a right to have this information, again, before
9  voting on any plans.  And I think at this juncture, I should be
10 candid as well.  I have not turned around on the road to
11 mediation.  I don't believe it is a road to nowhere.  I am
12 still barreling down that road and I hope the parties remain
13 with me on that pathway.  And I remain hopeful that fixing an
14 estimate of the aggregate volume and liability of the claims,
15 both present and future, will facilitate the plan negotiation
16 process and, hopefully, even settlement in advance of that
17 through continued mediation efforts.
18         So to be clear, I am ruling today that the
19 administration of this case and, in particular, the pursuit of
20 an efficient, fair, and transparent plan process, including
21 adequate disclosures to all parties in interest, requires a
22 reasonable estimate of claims under 502(c).  And, at this
23 point, let me emphasize, however, that I am not directing or
24 authorizing estimation to be employed for liquidating,
25 allowing, or calculating distributions for any individual

# Exhibit 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

Order Filed on February 24, 2022
by Clerk
U.S. Bankruptcy Court
District of New Jersey

In Re:

LTL MANAGEMENT LLC

Case No.: _____21-30589_____

Chapter: _____11_____

Hearing Date: _____

Judge: ___Michael B. Kaplan___

**JOINT STIPULATION AND AGREED ORDER BETWEEN MOVANTS AND DEBTOR REGARDING THE ADMISSION OF DEPOSITION DESIGNATIONS AT MOTION TO DISMISS TRIAL**

The relief set forth on the following pages is **ORDERED**.

**DATED: February 24, 2022**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

|   |   |   |
|---|---|---|
|  | 18 | that needs to be recorded. |
|  | 19 | But if there's notes that are |
|  | 20 | meaningful, the practice -- the practice |
|  | 21 | in the organization and the department is |
|  | 22 | to save them into a specific depository |
|  | 23 | for the record. |
|  | 24 | We are a regulated entity. And so, |
|  | 25 | we are required to save the material |
| 25:1 |  | information we gather, as part of that |
|  | 2 | rating analysis. |
|  | 3 | BY MR. SHAPIRO: |
|  | 4 | Q. And what is the name of that system |
|  | 5 | where you maintain your notes? |
|  | 6 | A. We refer to it as "RDR." |
|  | 7 | Q. RDR. And what does "RDR" stand for? |
|  | 8 | A. Probably something like "rating |
|  | 9 | depository" -- yeah. We use a lot of |
|  | 10 | acronyms. |
|  | 11 | Q. We can call it "RDR." And is -- and |
|  | 12 | is RDR a database of notes that the S&P |
|  | 13 | analyst take to record the conversations that |
|  | 14 | they have with the companies that they cover? |
|  | 15 | MR. STARNER: Objection. |
|  | 16 | You can answer. |
|  | 17 | A. It's a system where those documents |
|  | 18 | are saved. We often use, kind of, the |
|  | 19 | administrative assistants to help file it |
|  | 20 | there. Yes. |

### KAPLAN, DAVID - 02/11/2022

Page 26

|   |   |   |
|---|---|---|
| 26:10 |  | Q. Let me ask you the question this |
|  | 11 | way. Do you rely on those notes in the course |
|  | 12 | of developing ratings for the companies that |
|  | 13 | you cover? |
|  | 14 | A. Certainly, those are an input that |
|  | 15 | go into it. And we'll refer back to it. |
|  | 16 | Q. And do you rely on those notes for |
|  | 17 | the purpose of preparing the reports that S&P |
|  | 18 | prepares? |
|  | 19 | A. We could. Certainly, yeah. |
|  | 20 | Q. And -- and in the course of your |
|  | 21 | career at S&P, have you always intended for |
|  | 22 | those notes to be as accurate as possible? |
|  | 23 | A. They are shorthand. But they are |
|  | 24 | supposed to be a reference for -- at least for |
|  | 25 | me, to be able to decipher what I was thinking |
|  | 26 |  |
|  | 27 |  |
| 27:1 |  | or hearing. |
|  | 2 | I guess that is to say that, they |
|  | 3 | are not edited, or they are usually drafted as |
|  | 4 | the conversation is going. |
|  | 5 | So there is a little bit of a -- |
|  | 6 | there is a looseness in the note-taking that's |
|  | 7 | obviously not going to be present in something |
|  | 8 | we would publish, or even something that we |
|  | 9 | would share with a committee, like a -- a |
|  | 10 | package for others to review. |
|  | 11 | They are really not generally |
|  | 12 | reviewed by anyone else. So, you know, if |
|  | 13 | they have a grocery list on the side, that |
|  | 14 | wouldn't be a problem. |
|  | 15 | MR. SHAPIRO: Let me mark as |

|      |      |
|------|------|
| 16   | Exhibit 384, a document that's Bates |
| 17   | stamped SPG100 -- or "SPGI0001078_001" |
| 18   | through "002." |
| 19   | And for the videographer, it's tab C |
| 20   | in the binder. You can put that on the |
| 21   | screen. |
| 22   | (Exhibit 384 marked for identification) |
| 23   | BY MR. SHAPIRO: |
| 24   | Q. Mr. Kaplan, do you have the ability |
| 25   | to control the notes? To control the screen |
| 28 :1 | to go through it? |
| 2    | A. Yes. |
| 3    | Q. Okay. Let me know when you've had a |
| 4    | chance to review them. |
| 5    | [Witness perused document.] |
| 6    | A. Okay. |
| 7    | Q. Do you recognize these as your |
| 8    | notes, Mr. Kaplan? |
| 9    | A. I recognize these as mine. This |
| 10   | would not be -- these are not notes that were |
| 11   | taken during a conversation with the company. |
| 12   | This would be notes that I drafted |
| 13   | for our conversation with my colleagues to |
| 14   | discuss the rating on JNJ, or the outlook on |
| 15   | JNJ. In addition to having a rating, we also |
| 16   | have an outlook which could be stable, |
| 17   | positive or negative. |
| 18   | So, this was October of 2020. This |
| 19   | was, I guess, an internal conversation we had |
| 20   | scheduled to discuss JNJ's rating and some of |
| 21   | the developments. |
| 22   | Q. Are these notes that you prepared in |
| 23   | advance of the internal conversation? |
| 24   | A. Yes. |

**KAPLAN, DAVID** - *02/11/2022*

**Page 30**

|      |      |
|------|------|
| 30 :1 | Q. That's okay. And what was the |
| 2    | purpose of the meeting? |
| 3    | A. So, based on, you know, the |
| 4    | contents, there were two legal matters that |
| 5    | were facing Johnson & Johnson, that seemed to |
| 6    | be -- had reached the point where the |
| 7    | liability could be material. |
| 8    | And so, we were discussing whether |
| 9    | this has, or should have an influence on the |
| 10   | rating or the rating outlook. |
| 11   | Q. And what was the source of the |
| 12   | information that you included in these notes? |
| 13   | A. So, it could be conversations we had |
| 14   | with the company. It could be information we |
| 15   | digested from media sources we viewed as |
| 16   | reliable. |
| 17   | It could be information that the |
| 18   | company had shared publicly with investors, or |
| 19   | had put in its SEC filings, like its 10K or |
| 20   | 10Q. |
| 21   | You know, we kind of gathered from |
| 22   | multiple sources. |
| 23   | Q. Okay. I want to ask you, if we can |
| 24   | scroll up. I guess I can't control it. Let |
| 25   | me -- let's scroll up to the part that says, |
| 31 :1 | "Talc settlements." |
| 2    | Do you see the section at the |

```
 3      bottom of the page, which is Bates stamped --
 4      I guess it's the first page, "001," which
 5      says, "Talc settlements?"
 6             You're there, Mr. Kaplan? If
 7      you scroll down.
 8         A. Sure.
 9         Q. Do you see that the first sentence
10      says:
11             "Company has capitulated on
12      talc, talcum powder/baby powder litigation
13      settlements in contrast to fiercely litigating
14      that."
15             Do you see that?
16         A. Yes.
17         Q. And is that based on a conversation
18      you had with Michelle Ryan?
19         A. That would have been my -- my view.
20      So the term, "capitulated," in particular, is
21      just a word that came to me. But it's -- this
22      is my interpretation of the events that I'm
23      observing.
24             So, I doubt that the company would
25      have said that to me, specifically. But the
32:1    company, in my experience, has been -- has
 2      taken the strategy -- and I believe
 3      Michelle Ryan had mentioned this -- of, you
 4      know, of generally being very assertive in
 5      litigating claims.
 6             Michelle had expressed that J --
 7      that the company feels -- Johnson & Johnson
 8      feels that they are unfairly challenged by
 9      litigation because of their financial
10      strength.
11             And so, their strategy is generally
12      to litigate even things that might be economic
13      to ignore, or just to settle, to avoid
14      nuisance cases.
15             So, it was therefore a change for us
16      to see that they started to reserve some --
17      some amounts on their financial statements as
18      expected losses or exhibited liabilities for
19      talc.
20             So that -- that's what that first
21      sentence refers to. Is that the company has
22      basically shifted in strategy from fighting
23      talc to starting to settle some cases, at
24      least.
25         Q. And the basis for your observation,
33:1    that the company had begun to settle some of
 2      the cases is the fact that, as reflected in
 3      your notes, that they had accrued $350 million
 4      in Q2, and $540 million in Q4?
 5             Is that fair?
 6         A. I'm not sure if it was -- was it Q4?
 7         Q. Q3, sorry.
 8         A. But the fact that they had reserved
 9      the 350, and expect to reserve another 540.
10      Right. Correct.
11         Q. And what was your understanding of
12      the significance of the fact that the company
13      had reserved $890 million in Q2 and Q3, for
14      this litigation? What was the significance of
15      that, to your understanding?
16         A. So, you know, we see litigation very
17      often in healthcare. And the overwhelming
```

```
18   majority of the time, it ends up not being
19   material -- not end up being a material
20   liability for the company.
21        And so, when we think about credit
22   risk, that's an important observation. But
23   when we see a company take a reserve, it --
24   it's one development that suggests that the
25   liability may be material here.
34:1        It's not the only way. And it's not
 2   a certainty. But that's one development that
 3   is suggestive; the liabilities might be
 4   material.
 5        And so, that is something we try to
 6   incorporate in the credit -- in the thinking
 7   around the credit risk is -- well, it looks
 8   like now the company is going to take some
 9   degree of liability.
10        Q. And did you understand, or do you
11   understand, that when a company takes a
12   reserve, the company is making a judgment that
13   the liability is probable and estimable?
14        A. Yes. Based on the SEC or GAP
15   definitions. Correct. Yeah.
16        Q. And then, let me ask you about the
17   third bullet point that refers to the 25,000
18   talc cases. Do you see that?
19        A. Uh-huh. Yes.
20        Q. In that bullet point, it says that:
21             "The company estimates that the
22   liability could reach as much as $7 billion to
23   $7.5 billion, inclusive of all future cases."
24             Do you see that?
25        A. Yes.
35:1        Q. And when you refer to the company in
 2   that bullet point, who are you referring to in
 3   particular, as the source of that information?
 4             MR. STARNER: Objection.
 5            You can answer.
 6        A. That would be our -- that would be
 7   from conversation we had with the company.
 8        Q. Okay.
 9        A. Most likely, Michelle Ryan.
10        Q. And what did you understand was the
11   significance of that estimate, that the
12   liability could reach as much as $7 billion to
13   $7.5 billion, inclusive of all future cases?
14             What did that mean?
15             MR. STARNER: Objection.
16        Q. Or what did you understand, based on
17   your conversation?
18        A. It sounds -- well, I don't recall.
19   But based on my reading of my notes, as I
20   would have written them, I think what I was
21   trying to communicate here to my colleagues
22   was that we had a conversation with
23   Johnson & Johnson. And, you know, although --
24   excuse me.
25             Although, you know, the company --
36:1   you know, there's a lot of uncertainty from
 2   the benefit of -- for the purposes of our
 3   credit risk, it's important to understand what
 4   the -- you know, maximum liability could be.
 5             And I think what we gathered from
 6   the company is that -- and maybe based on some
 7   of the math in the two bullet points above,
```

|  |  |
|---|---|
| 8 | the company is estimating that its liability |
| 9 | will be -- could be as much as $7.75 |
| 10 | billion -- $7 billion to $7.5 billion. |
| 11 | Which is, again, helpful for us to |
| 12 | think about it, you know, in the context of |
| 13 | Johnson & Johnson. The company generates, you |
| 14 | know, $30 billion of EBITDA. |
| 15 | As a worst case scenario, you know, |
| 16 | what's -- what's the worst case scenario. So |
| 17 | even if it's not probable, but at least to |
| 18 | have some numbers around it can be very |
| 19 | helpful for us. |
| 20 | You know, I know the media had some |
| 21 | speculation with numbers that were higher than |
| 22 | that. So being able to say, you know, media |
| 23 | numbers are, you know, just, completely -- you |
| 24 | know, meaning when some of my colleagues will |
| 25 | sometimes see stuff in the media, and then, |
| 37 :1 | you know, send me a link or an article. |
| 2 | You know, hearing from the company |
| 3 | that they feel that the maximum is $7 billion |
| 4 | to $7.5 billion is reassuring in a sense, |
| 5 | relative to, maybe something that we read in |
| 6 | the media that said the liabilities could be |
| 7 | much more than that. |
| 8 | So it's helpful, even if it's not -- |
| 9 | it doesn't become our base case expectation. |
| 10 | Q. And let me ask you to take a look at |
| 11 | your next bullet point at the top of the next |
| 12 | page. Do you see where it says: |
| 13 | "The company expects payment |
| 14 | would be $2.5 billion per year, in each of the |
| 15 | next three years." |
| 16 | A. Yes. |
| 17 | Q. And is that also based on your |
| 18 | conversation with Michelle Ryan? |
| 19 | A. Yes. That's what -- that's what the |
| 20 | notes indicate. |

### KAPLAN, DAVID - 02/11/2022

Page 38

|  |  |
|---|---|
| 38 :24 | Q. And let me just ask you a couple of |
| 25 | more questions about these notes. You were |
| 39 :1 | explaining this at the beginning. These are |
| 2 | notes that you prepared in advance of your |
| 3 | internal meeting with other analysts at S&P? |
| 4 | A. Yes. |
| 5 | Q. And those -- this -- this type of |
| 6 | internal note is something that you regularly |
| 7 | prepared in advance of internal meetings like |
| 8 | that? |
| 9 | MR. STARNER: Objection. |
| 10 | A. So, we have two types of internal |
| 11 | conversations. There is a more formal one, |
| 12 | which is when we kind of formally gather a |
| 13 | committee. There's various formalities and |
| 14 | processes around that. |
| 15 | The internal conversation is kind of |
| 16 | a less formal. So it's typically for |
| 17 | developments that are where we don't expect |
| 18 | there to be a change in the rating, but we |
| 19 | just want to run it by our colleagues to make |
| 20 | sure they feel similarly. |
| 21 | Or in a company that, you know, is |

## JNJ – Internal conversation – 10-13-2020

<u>Background on litigation:</u>
Company has two primary cases (1) Opioids and (2) Talc.

<u>Current treatment of legal reserves in adjusted debt</u>
- Company had indicated it expect to pay $4 billion in 2020, as part of the proposed settlement for opioids. The company had a total of $4.5 billion on the balance sheet as legal reserves. We included that FULL $4.5 bil. (assuming the amounts would likely increase, beyond the potential discounts for tax/time value)
- The company has a deferred tax asset to offset this
- The company does not discount the reserve for the time-value of money (whether payment is due in the near term of over the long term).

Update
**<u>Opioids:</u>**
- Company expects to settle opioids for **<u>$5 billion</u>**. Company will announce that expectation with earnings.
- Company will not provide full details on settlement, but negotiations have advanced with AGs and they expect the global settlement will be finalized this month.
    - They believe AGs will want to come out with their press release (in coming weeks – in October), so they won't provide full details.
    - Company expects this revised settlement to satisfy 48 of the 50 states. Any state that does not accept, JNJ gets back that proportion of funds.
- The terms of the $5 billion, settlement allow **for more gradual payment**:
    - 1.5 billion in 2021
    - 800 million in 2022
    - 900 million in 2023
    - (200-)300 million annually for 6 years (2024 – 2029)

**<u>Talc settlements:</u>**
Company has capitulated on Talc (talcum powder/baby powder) litigation settlements, in contrast to fiercely litigating that. Those cases include both mesothelioma and ovarian cancer cases.
- Company had accrued $350 million of these cases in Q2, reflecting 1000 cases, from 4 legal firms. (implied settlement of $350K/case)
- Company expects to add $540 million to reserves for Talc this quarter, in relation to a settlement with legal firm "Mark Linear" who has been a leading and very outspoken firm, advertising and attracting cases.
    - $50 million for 60 specific mesothelioma cases. ($1.2 million/case).
    - And $500 million for 5000 ovarian cancer cases, including 2000 filed and 3000 future cases (@ about $100K/case)
- There are currently about 25,000 talc cases outstanding (90% are ovarian cancer). Inclusive of future cases, the company estimates the liability could reach as much as $7-$7.5 billion, inclusive of all future cases.

CONFIDENTIAL                                                                                                                                                                                    SPGI0001078_0001

- Company expects payment would be $2.5 billion/year in 2021, 2022, 2023.
- The company does not plan to reserve those at this point, as each case has distinct differences.

**Outstanding multi-billions talc judgement**
- The company had a $4.75 billion judgement against it relating to Talc. That was subsequently reduced to $2.1 billion, and the company is now appealing that to the supreme court of Missouri, and expects a judgement on that this month. That is in addition to the other amounts.
- In the event the company is unsuccessful in this appeal, the company would appeal this to the US supreme court, but would likely have to reserve for that, given the US supreme court may not agree to hear the case.

**Most recent comments on JNJ litigation: 12-2019:**
JNJ faces elevated levels of product liability-related litigation with three major cases including opioids, talc, and Risperdal. Given how pervasive litigation is within the pharmaceutical sector, and how infrequently it significantly hurts creditworthiness, we generally view the risks of litigation affecting ratings as low until we see ample evidence to the contrary. For JNJ, we see elevated risk of a material settlement in the opioid case, and already incorporate the proposed settlement amount in our measure of debt. (See "Opioid Litigation Developments Point To Increased Liability And Downgrades For Global Drug Manufacturers," published Sept. 23, 2019, for more details.) In contrast, we don't explicitly incorporate any estimated liability for the other two large cases. Moreover, with about $30 billion in annual EBITDA and about $10 billion in annual free operating cash flow after dividends, even an incremental liability of several billion dollars is barely material to credit ratios.

With regard to opioid litigation, we believe there is a pattern of judgements, settlements, and proposed settlements that support the assumption of liability. Our base case incorporates JNJ's proposed $4 billion global U.S. settlement on opioids (net yet final), and we incorporate that amount less taxes ($3 billion) in our measure of debt. We view that as nonrecurring and do not burden EBITDA with that amount.

Regarding the talc litigation, we believe the likelihood of a material settlement or liability is lower than suggested by media headlines and speculation, as the company has had an excellent track record of success in the judicial process so far. The company has had over two dozen talc cases go to trial, and more than two-thirds have concluded the judicial process without resulting in any liability (in some cases following an appeals process). In addition, JNJ plans to appeal all adverse judgements still outstanding, and has been successful in every one of the handful of cases appealed to date.

Although the merits of each case vary, we believe the company may be a particularly attractive target for lawsuits given its extraordinary financial strength. In turn, the company's litigation strategy has been to pursue trials and generally avoid settling, to discourage the stream of nuisance lawsuits. At some point though, given the expense of litigation, and the reputational risks of dealing with multiple lawsuits simultaneously, we could envision the company settling on these other cases too (talc or Risperdal) for as much as a couple billion dollars, even if just to rid itself of the negative media attention.

CONFIDENTIAL

SPGI0001078_0002