# Exhibit C

**March 30, 2022 Transcript**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                         .     Case No. 21-30589(MBK)
                               .
LTL MANAGEMENT LLC,            .
                               .
          Debtor.             .
. . . . . . . . . . . . . .
LTL MANAGEMENT, LLC,           .     Adversary No. 21-3032(MBK)
                               .
          Plaintiff,           .
                               .     Clarkson S. Fisher U.S.
     v.                        .       Courthouse
                               .     402 East State Street
THOSE PARTIES LISTED ON        .     Trenton, NJ 08608
APPENDIX A TO THE              .
COMPLAINT, ET AL.,             .
                               .
          Defendants.          .     Wednesday, March 30, 2022
. . . . . . . . . . . . . .          10:00 a.m.

               TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE MICHAEL B. KAPLAN
            UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:           Jones Day
                          By:  GREGORY M. GORDON, ESQ.
                               DANIEL B. PRIETO, ESQ.
                               AMANDA RUSH, ESQ.
                          2727 North Harwood Street, Suite 500
                          Dallas, TX 75201

                          Otterbourg P.C.
                          By:  MELANIE CYGANOWSKI, ESQ.
                          230 Park Avenue
                          New York, NY  10169


Audio Operator:           Luz Di Dolci

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjCourt@jjCourt.com**
**(609) 586-2311   Fax No. (609) 587-3599**

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 3 of 122

2

TELEPHONIC APPEARANCES (Cont'd):

| | |
|---|---|
| For the Official Committee of Talc Claimants 1: | Brown Rudnik, LLP<br>By:  DAVID J. MOLTON, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| | Genova Burns, LLC<br>BY:  DANIEL M. STOLZ, ESQ.<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920 |
| For the Official Committee of Talc Claimants 2: | Cooley, LLP<br>By:  CULLEN DRESHCER SPECKHART, ESQ.<br>55 Hudson Yards<br>New York, NY  10001 |
| For moving insurers: | Katten Muchin Rosenman LLP<br>By:  TERENCE P. ROSS, ESQ.<br>2900 K. Street NW<br>North Tower - Suite 200<br>Washington, DC  20007 |
| For Arnold & Itkin, LLP: | Pachulski Stang Ziehl & Jones<br>By:  LAURA DAVIS JONES, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19801 |
| For the U.S. Trustee: | U.S. Department of Justice<br>By:  LAUREN BIELSKIE, ESQ.<br>       JEFF SPONDER ESQ.<br>One Newark Center, Suite 2100<br>Newark, NJ  07102 |
| For Travelers Casualty and Surety Company: | Simpson Thacher & Bartlett, LLP<br>By:  ANDREW T. FRANKEL, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017 |
| For TCC1: | Gilbert LLP<br>By:  SARAH SRADERS, ESQ.<br>700 Pennsylvania Avenue SE, Suite 400<br>Washington, DC  20003 |
| For Walsh Pizzi O'Reilly Falanga, LLP: | Walsh Pizzi O'Reilly Falanga, LLP<br>By:  MARK FALK, ESQ.<br>Three Gateway Center<br>100 Mulberry Street, 15th Floor<br>Newark, NJ  07102 |

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 4 of 122

3

1        THE COURT:  All right.  Good morning again, everyone.

2   This is Judge Kaplan.  We have a handful of people appearing

3   through Court Solutions.  I will try to keep my voice loud and

4   the mics up so they can hear.  For those who are on Court

5   Solutions, should you wish to be heard, please use the raise

6   hand function and I'll be sure to turn to you.  We're going to

7   address the LTL Management LLC matters.  I think I'll probably

8   follow the noticed agenda.  Let me just ask, are there any

9   calendaring issues anyone wants to raise at the outset?

10                    (No audible response)

11        THE COURT:  All right.  Then as far as housekeeping,

12  let me just say this is my law clerk's Alexandra Grant's last

13  day.  You've essentially chased her away.  I hope you're proud

14  of yourselves.  She'll be joining PSE&G and we wish her the

15  best and I will have a new term clerk joining tomorrow, Maria

16  Dalevares (phonetic).  We'll get you her contact information so

17  that you can bother her as well.

18        Let's turn -- oh, Mr. Gordon?

19        MR. GORDON:  I hope, Your Honor, we didn't chase her

20  away.  Your Honor, there is one calendar item.

21        THE COURT:  Yes.

22        MR. GORDON:  We just didn't rise quickly enough.  I

23  think the FTI matter, there's an agreement to push that to the

24  end if it's okay with Your Honor.

25        THE COURT:  That's fine.  I think that makes sense.

4

1          Let's start with something that's easy.  Let's start

2   with the U.S. Trustee's motion to appoint a fee examiner.  Good

3   morning, Ms. Bielskie.

4          MS. BIELSKIE:  Good morning, Your Honor.  Happy to

5   hear this is going to be easy.  Your Honor, as I previewed

6   during our last hearing, the U.S. Trustee is moving for the

7   appointment of an independent fee examiner, in particular,

8   Robert J. Keach of Bernstein Shur Sawyer & Nelson who I

9   understand is participating today via Court Solutions if the

10  Court has any questions for him.

11         Our office filed this motion on March 22nd at Docket

12  Number 1812 and we thank Your Honor for hearing this on

13  shortened time.  We have filed the certification of service on

14  March 23rd and that's at Docket Number 1826 indicating service

15  in accordance with the Court's amended order shortening time.

16         As set forth in more detail in the declaration of Mr.

17  Keach and in the attachments thereto, Mr. Keach currently

18  serves and has served as a court-appointed fee examiner in

19  other Chapter 11 cases.  Your Honor, in light of the size and

20  complexity of this case which at last count includes 13

21  professionals for the debtor, nine professionals for TCC1 and

22  seven professionals for TCC2, the U.S. Trustee requests that

23  the Court authorize the appointment of Mr. Keach as fee

24  examiner to review the fee applications filed in this case and

25  pursuant to the protocol that is set forth in the motion and

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 6 of 122

5

1  the proposed order.

2         Your Honor, agreement doesn't come easy in this case

3  so we are happy to say that as set forth in the motion, TCC1

4  and TCC2 agreed to the appointment of a fee examiner and

5  yesterday the debtor filed a statement in support of the motion

6  at Docket Number 1897.  This was filed on shortened time

7  though, Your Honor, so if objections are permitted today, I'm

8  not aware of any.

9         THE COURT:  Well, let me call out.  Are there any

10 parties or counsel wish to raise any issues?  The Court has had

11 the benefit of reviewing the debtor's statement in support.  Is

12 there anyone else who wishes to be heard?

13                    (No audible response)

14         THE COURT:  All right.

15         MS. BIELSKIE:  Unless Your Honor has any questions of

16 me or Mr. Keach, Your Honor, we would ask that the Court enter

17 the order on the fee examiner motion.

18         THE COURT:  Thank you, Ms. Bielskie.

19         I see Mr. Keach on Court Solutions.  I'm very

20 familiar with him.  I think he's a very good choice.  I think

21 he'll play a valuable role.  I welcome him aboard and the

22 professionals that he will retain which from what I read may

23 include a sommelier.  We'll look forward to his input.  Thank

24 you, Ms. Bielskie.

25         MS. BIELSKIE:  Thank you, Your Honor.

6

1    THE COURT:  All right.  And, Bruce, that was Number

2  17 I believe on the CHAP calendar.

3    Mr. Gordon, with respect to Number 7 -- I understand

4  Number 6 is the application for FTI which we're deferring for

5  the moment.  Number 7 on the agenda and Number 10 on the

6  calendar is the Orrick Herrington & Sutcliffe retention.  Is

7  that resolved, those issues?

8    MR. GORDON:  I believe Ms. Rush is going to handle

9  that, Your Honor.

10    THE COURT:  Okay, counsel?

11    MS. RUSH:  Good morning, Your Honor.

12    THE COURT:  Good morning.

13    MS. RUSH:  Amanda Rush, Jones Day, for the debtor.

14  Yes, Your Honor.  Our understanding is that that application is

15  resolved.

16    THE COURT:  All right.  Does anyone else wish to be

17  heard?  Mr. Molton, good morning.

18    MR. MOLTON:  Your Honor, David Molton, Brown Rudnick,

19  for TCC1.  Just confirming, Your Honor, that we have resolved

20  that matter with the debtor.

21    THE COURT:  All right.

22    MR. MOLTON:  And, Judge, it's good to be here without

23  the plexiglass, by the way.

24    THE COURT:  I think we're all happier.  No masks, no

25  plexiglass, could see faces and grimaces now and smiles.  Thank

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 8 of 122

7

1 you, counsel.

2          Office of the U.S. Trustee, Ms. Bielskie, you had no

3 further issues or Mr. Sponder?

4          MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

5 from the Office of the U.S. Trustee.  We, too, the United

6 States Trustee resolved their issues.  Just would want to look

7 at the proposed form of order.

8          THE COURT:  All right, then I'm going to mark Number

9 7 on the agenda and Number 10 on the CHAP calendar, as granted.

10          Ms. Rush, is there going to be an order submitted, an

11 order?

12          MS. RUSH:  Yes, Your Honor.

13          THE COURT:  All right, we'll mark it OTBS.  Thank

14 you.

15          We can now move to Numbers -- I think we should hear

16 them collectively -- 8 and 9.  It is the Travelers Casualty

17 motion for relief from the stay as well as the plaintiff

18 insurers' motion seeking a determination as to the stay and/or

19 relief.  Let me have -- I assume we'll hear them collectively.

20 Let's start with Travelers' counsel, and then I'll hear from

21 movants insurers, and then we'll have responses.

22          MR. FRANKEL:  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          MR. FRANKEL:  Andrew Frankel for Travelers.  If it's

25 okay with Your Honor, the plaintiff moving insurers, there's a

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 9 of 122

8

1   lot of overlap --

2           THE COURT:  Right.

3           MR. FRANKEL:  -- in a few motions.  They raise some

4   threshold issues that we did not raise so we thought it might

5   be a little bit more sensible to let them go first and then

6   I'll follow, and avoid any overlap if that's okay.

7           THE COURT:  I'm comfortable with that.  That's fine.

8   Thank you.

9           MR. ROSS:  Your Honor, Mr. Ross for the moving

10  insurers the plaintiffs, we're just going to need a minute to

11  --

12          THE COURT:  Displace them.

13          MR. ROSS:  Good morning, Your Honor.

14          THE COURT:  Good morning, counsel.

15          MR. ROSS:  Again, Terence Ross with Katten Muchin

16  Rosenman.  We represent the moving insurers, what we call the

17  moving insurers for this motion who are fundamentally the

18  plaintiffs in the New Jersey coverage action that we're

19  discussing here today and we are in alignment with Travelers'

20  motion, and so we've agreed that we'll handle the discussion of

21  whether or not the automatic stay applies at all and they will

22  handle the balance of the hardship, so as to save some time for

23  the Court.

24          THE COURT:  Thank you.

25          MR. ROSS:  Of course, we're relying on what we've

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 10 of 122

9

1  already represented to the Court in our briefs.  And I'm going

2  to hand up to Your Honor a copy of the PowerPoint presentation.

3  If I may approach?

4          THE COURT:  Absolutely.  Thank you.

5          MR. ROSS:  And, Your Honor, there's some animation at

6  one part of the presentation which cannot be reflected on the

7  printed page and I'll warn you when that's coming up.

8          THE COURT:  Okay.  What's the rating?

9          MR. ROSS:  The objectors argue to the motions, Your

10 Honor, that New Jersey coverage action is subject to the

11 automatic stay and they point to 362(a)(1) and (a)(3) as this

12 Court is aware.  Let me talk about (a)(1) first which we

13 contend does not apply for two independent reasons.  First, the

14 coverage action is not against the debtor and, second, the

15 coverage action does not seek to recover from the debtor.

16         Now, it's undisputed that the debtor is not and never

17 has been a party of the New Jersey coverage action.  In

18 response, the debtor argues well, we step into the shoes of Old

19 JJCI which was a party because we are successor-in-interest to

20 Old JJCI and that's simply not true.  The divisional merger

21 only gave the debtor certain assets.  It did not step into,

22 directly into the shoes of Old JJCI.

23         One of those was a right to make claims and I'd like

24 to just show you that language here.  If we could go to the

25 next slide.  So, this is the exactly language, Your Honor, from

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 11 of 122

10

1　Schedule 5(b)(1) of the insurance; it's alright to make claims

2　under any and all insurance policies to which Chenango Zero had

3　rights.  They didn't get a policy, they didn't get the claims

4　that are actually being litigated in the New Jersey coverage

5　action or else it would have said made claims.  This is the

6　right to make claims, i.e., any future claims that come in that

7　may be subject to the policy.  So, that's the first point.

8　　　　　The second point is they didn't even really get that

9　because if you look at Section 10(d)(1)(A) which we can show

10　now, they turned around and they gave the right to pursue those

11　claims to Chenango Two which is now New JJCI so all that they

12　were actually left with is this ephemeral concept that we can

13　make claims.  We don't actually get to go pursue them and

14　they're future claims which may or may not hit.  And that

15　simply does not give them the right to step into the shoes of

16　Old JJCI for purposes of the New Jersey coverage action.

17　　　　　Moreover, if they wanted somehow permissively

18　intervene, they'd have to show that their interest isn't being

19　adequately represented under New Jersey procedural.  And,

20　clearly, J&J is fighting that case tooth and nail for them and

21　that would suggest that their rights are big.  And so the point

22　here is that they're really not ever going to be

23　-- they haven't been a party, they're never going to be a party

24　and, therefore, those causes of action are not against a

25　debtor.

11

1          Now, secondly, there is this concept that we have to

2    be attempting to recover against the debtor.  That's the second

3    prong of (a)(1) and they have to be able to show both of those.

4    And the argument the debtor makes and TCC1 makes is, it takes

5    various forms, but essentially, the New Jersey action is going

6    to eviscerate the coverage.  I think at another point they say

7    it's $2 billion they're going to leave the estate.  That's

8    simply not true.  It's good rhetoric, but it's not true.  It's

9    a declaratory judgment action.  Now, the debtor says it's

10   styled as a declaratory judgment.  No.  It is a declaratory

11   judgment action.  We're seeking a determination as to what the

12   coverage means at some very fundamental levels including

13   whether the debtor even has any rights under the policy.

14   That's a contested issue.

15          And so if the New Jersey coverage action ultimately

16   decides that there is no coverage here for whatever reason or

17   that the debtor is not entitled to take advantage of whatever

18   coverage there is for whatever reason or that the pot of money

19   has been exhausted, that's just the way it was.  It's not a

20   change in status so there's nothing being taken from the

21   estate.  If they had no coverage in the first place, then there

22   was nothing suddenly disappearing from the estate.  They never

23   had coverage in the first place and, therefore, there's no

24   attempt to actually recover against a debtor.  We're simply

25   trying to determine what have we got here and that's something

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 13 of 122

12

1  that ought to happen as quickly as possible.

2          THE COURT:  But doesn't that analysis require an

3  after the fact perspective?  It would be after a judicial

4  determination that there was no rights in a policy.  But I'm

5  supposed to at a point in weighing whether the automatic stay

6  applies assume the worst --

7          MR. ROSS:  No, Your Honor, you're not --

8          THE COURT:  -- that there's no coverage and,

9  therefore, they have no interest?

10         MR. ROSS:  No, but the interest isn't from the

11 coverage that -- it's the second prong of the (a)(1) test.  Are

12 we attempting to recover from the debtor and we are not

13 attempting to recover from anything.  We're simply trying to

14 establish the old dragnet, the facts and just the facts.  What

15 is it that exists here?

16         So, we're not trying to take anything away from them,

17 to eviscerate coverage, take $2 billion away from them.  It

18 just is what it is and there's a dispute as to what that is and

19 so we have to go forth with the New Jersey coverage action to

20 make that determination.  Your question really is captured by

21 the second prong of (a)(1), the recovery from a debtor even if

22 you get past the first part that they're somehow a party, have

23 some sort of interest and they can't get past that second

24 prong.

25         So, let me move to 362(a)(3) because they also make

13

1  an argument of (a)(3) in court is this concept of exercising

2  control over property of the debtor or the estate.  We have two

3  arguments there.  The first is that there is no property at

4  issue here and the second is that we're not exercising control

5  or attempting to exercise control of the property.  And Your

6  Honor heard a lot during the motion to dismiss hearing on this

7  complicated divisional merger, this Texas Two Step.  What

8  didn't come up much is where the insurance was in all of that.

9  I think it's very important for the Court to understand that

10  and so we're going to show you what we say the debtor is saying

11  happened just based on the plan and the divisional merger.

12          And so you start off before this happened you have

13  Johnson & Johnson.  This, Your Honor, is the point where you

14  have to look at the screen because we got some animation.  So

15  you got Johnson & Johnson.  Apparently, they own the policy.

16  You have Old JJCI which is a named insured under the policy

17  and, therefore, has rights to make claims if there's coverage

18  applicable.

19          So, what's the first thing we do?  Well, we bring in

20  Chenango Zero.  So, Chenango Zero is created, Old JJCI goes out

21  of existence and those rights that Old JJCI had to make claims

22  in the policy goes to Chenango Zero.  So, now we have the

23  divisional merger occurs and under the divisional merger we

24  have something interesting that happens with the insurance

25  policies.  So, again, the policy ownership remains with Johnson

14

1  & Johnson.  Chenango Zero goes out of existence and there are

2  two new entities created, Chenango One and Chenango Two and

3  they each get parts of Chenango Zero.

4       And what Chenango One gets is the right to make talc

5  claims under the policy according to the debtor and what

6  Chenango Two gets is the more meaningful thing, the actual

7  opportunity to pursue and get money for those claims.  And so

8  if we could look at again at that language which is Section

9  10(d)(1)(A) of the plan, and I've already shown this to the

10 Court once, but Chenango Two which is now New JJCI is the one

11 who has the meaningful rights which is to actually go out and

12 pursue the future claims that might get made and, therefore, we

13 believe that -- and let me just show you what happens then

14 after all this is said and done.  If we can put up the next

15 screen?

16       So, just to square the tee, Your Honor, Chenango Two

17 goes out of existence, becomes New JJCI.  Chenango One goes out

18 of existence, becomes the debtor.  And as you see, the right to

19 actually go after these talc claims doesn't go to the debtor.

20 So what do we actually have when we're talking about whether

21 there's property here or not of the estate is -- go down the

22 next screen -- first, the debtor does not own the policy. That

23 has never been transferred.  Second, the debtor is not a named

24 insured, never has been.  Third, the debtor doesn't even have a

25 right to pursue these claims.  It has given that away to

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 16 of 122

15

1    Chenango Two which is now New JJCI.

2          So, our position is that on these facts you don't

3    have property with respect to the insurance policies.  Now,

4    debtor and objector have pointed to some cases in which they

5    argue to you, Your Honor, that on this set of facts other

6    Courts have said no, no, no, this is property of the estate, it

7    has to be considered and those are not being represented

8    correctly to the Court.  In every single one of those cases I

9    went back and read them carefully, the debtor is the owner of

10   the policy and a named insured which we don't have here.

11         And I'm going to give Your Honor a reference, one

12   case cited by the debtor, and it's out of this court.  It's the

13   In re GB Holdings case, 2006.  And there, the Court said, you

14   know, I'll just read the language if you don't mind, Your

15   Honor, as the named entity on the D&O policy at issue the

16   debtor is the owner of the policy and is named insured under

17   coverage of the policy for securities claims, the policy is

18   therefore the property of the debtor's bankruptcy estate so the

19   point being the owner.

20         But that Court then cited with approval the Eastern

21   District of Pennsylvania case In re Eastwind Group, Inc. in

22   which that Court made the unimpeachable observation of quoting

23   because corporations pay for and own insurance policies, Courts

24   considering the question have concluded that the policies are

25   property of the estate pursuant to U.S.C. 541(a)(1).  It's

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 17 of 122

16

1  undisputably correct.  They own the policy, they pay the

2  premiums for the named insured and the entire line of cases

3  they rely upon derives from that proposition.

4         Here, the policies never changed ownership from J&J.

5  Moreover, the little bit of ephemeral rights that they got they

6  gave away to be pursued by New JJCI.  That is not the set of

7  facts of any previous case.  I can't find a case that's on

8  point with the weird fact here, Your Honor, but I would submit

9  to you that under those facts that's not property of the

10  estate.  And I'm not the only one that takes that view of the

11  situation.

12         So, let's look at what TCC1 said to the district

13  court a week ago today, Your Honor.  And TCC1 said any

14  insurance policies available to the debtor are not property of

15  the estate.  In that same pleading they said they describe the

16  policies are non-debtor insurance policies and this is Docket

17  Entry Number 1833 of last Wednesday.  So it's not just us

18  making this assertion.  It's TCC1.  But it's not just TCC1.

19  It's also the debtor itself.

20         So, Your Honor, remember that Mr. Kim came and

21  testified.  He's the chief legal officer that came and

22  testified here in court.  He was deposed at length.  He was

23  repeatedly asked about the assets of the debtor and gave a very

24  interesting questioning.  He's asked to list the assets and

25  curiously missing from any of that is mention of the insurance

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 18 of 122

17

1  policies.

2        And it's not just this one.  There's one we put up.

3  This comes up multiple times in his depositions under oath.

4  You would have thought that if it was property of the estate,

5  he would have mentioned that and he described how they don't

6  actually have offices.  They have to sublease them.  They pay

7  back, you know -- he went through in great detail what was the

8  substance of what the debtor was all about, what its assets

9  were, what his property was, never mentioned these insurance

10 policies.  I think they're of actually the same view that it's

11 not their property based on the divisional merger.

12        So, we're talking again, Your Honor, about (a)(3)

13 here.  Remember, there's two prongs to it.  It's property and

14 then exercise control over the property.  So we don't think

15 it's property in the first place but we're certainly not

16 attempting to exercise control of the property.  Again, we're

17 seeking a declaratory judgment.  We're not seeking to take

18 anything away from the debtor or the estate.  We're not trying

19 to eviscerate the estate.  We're not trying to take $2 billion

20 from the estate.

21        All we want to know is what is the meaning of the

22 policy, in other words, what is it?  And once that's

23 determined, that's what's determined.  We are not saying okay,

24 well, we're going to take it away from you now that you say

25 that you have it.  We're not trying to do any of that.  And,

18

1  therefore, under (a)(3) as well as (a)(1) we think this is not

2  subject to the automatic stay.

3         So, unless Your Honor has further questions, now I

4  want to turn to the second part of the argument because as you

5  know, we're seeking a determination whether or not the

6  automatic stay applies in the first place --

7         THE COURT:  Right.

8         MR. ROSS:  -- which many Courts including Your Honor

9  has said that is the appropriate course.  You don't just take a

10 risk and go out there and start litigating on a chance that

11 you're violating the automatic stay.  That's how you get

12 sanctioned.

13        We're coming in, doing the right thing, saying could

14 you tell us, we think we can keep going, we don't think the

15 automatic stay applies, let us know.  If you determine that the

16 automatic stay does apply in these circumstances, then our

17 argument to you under 362(d)(1) is that cause exists and that

18 cause exists as you know, the statute says, you know, relief

19 shall be granted and we're asking, at least the first instance,

20 that we simply be allowed to continue the litigation in its

21 totality.

22        And so, let me turn to the cause which we believe is

23 impeccably established here under the law of this court.  And

24 our argument is this, that mandatory abstention applies here.

25 We establish in our opening brief the six prongs that have to

19

1  be shown that come under 28 U.S.C. 1334(c)(2).  The objectors

2  have no comment on that.  TCC1 doesn't even want to

3  participate.  They said we have no dog in this fight on this

4  issue.  The debtor does not attempt in any way to refute that

5  mandatory abstention applies.  Instead, the argument made by

6  the debtor is this.  It's irrelevant, Your Honor.  It's not

7  where we're going to litigate.  It's when we're going to

8  litigate.  And as this Court has already said in In re

9  Congoleum, that's just wrong.  Mandatory abstention is not

10 always relevant to whether cause exits.  It's dispositive on

11 cause.

12         And I'll pull the one quote.  This is Judge Ferguson.

13 As a matter of fact, I think Your Honor ended up taking over

14 this case at the end.

15         THE COURT:  Yes.  Just another gift, yes.

16         MR. ROSS:  But this was Judge Ferguson, not Your

17 Honor.

18         THE COURT:  Correct.

19         MR. ROSS:  Judge Ferguson says since the movants have

20 established all the factors for a mandatory abstention, I'm

21 going to find that the movants haven't met their initial burden

22 for establishing cause for stay relief.  The objector said, oh,

23 you don't even had to think about what the harm to us is

24 because they don't establish cause because it's irrelevant this

25 mandatory abstention concept.  I'm sorry, it's been shown to

20

1  apply here and this Court says yeah, that's a really relevant

2  factor and we've met that.

3          And our argument to you, Your Honor, is that on that

4  ground alone it ought to be sufficient to lift the stay in its

5  totality.  Indeed, what Judge Ferguson did here, he was also

6  faced with a sort of complicated set of facts as far as whether

7  or not automatic stay applied in the first place so she

8  essentially said, you know, I don't want to do something

9  precedential over, just assume that it does, but then we're

10 going to lift the stay, a perfectly valid option part of this

11 Court noted, will make rulings on that, and she lifted the stay

12 in its entirety.

13         Now, this is a really good case, and it's on all

14 fours here because it was a mass tort case.  The other

15 litigation going on was insurance coverage litigation.  It

16 could not be any more applicable to the facts here and really,

17 it's something that the Court would have to figure out a way of

18 getting around this in order to deny the motion or else every

19 time you see Judge Ferguson, you go sorry, I disagree with you

20 on In re Congoleum.  And they don't have a single argument

21 against it other than it's irrelevant which it plainly is not

22 or else this would have to not exist for it to be irrelevant.

23         So, it's not just though the mandatory abstention as

24 cause.  Clearly cause is established, but Courts in this

25 circuit have also looked at a balancing of harms test and both

1  the moving insurers and Travelers believe that they are

2  significantly harmed and that's an additional factor that has

3  to be considered here.  We've laid those out in our brief.

4  We're going to turn the podium over to Mr. Frankel who's going

5  to discuss that aspect of the motions with you, Your Honor.

6          THE COURT:  All right, thank you, counsel.

7          Mr. Frankel?

8          MR. FRANKEL:  Good morning, Your Honor.  Andy Frankel

9  from Simpson Thacher for Travelers.

10         Just to level set a little bit, I've been involved in

11  dozens of asbestos and mass tort related bankruptcies and I

12  know many of my colleagues around the room, and Your Honor's

13  had some, and it's the rule rather than the exception that when

14  there's coverage litigation lurking in the background, that

15  that coverage litigation proceeds while the bankruptcy action

16  goes forward.

17         We've cited several examples in our brief, Your

18  Honor, where Courts have lifted the stay.  We've cited, you

19  know, <u>Imerys</u>, <u>Congoleum</u>, <u>Duro Dyne</u> was Your Honor's case, <u>Mid-</u>

20  <u>Valley</u>, <u>Kaiser Gypsum</u>, <u>Quigley</u>, <u>AC&S</u>, <u>Peerless</u>.  There are

21  other cases.  I mean, I was in this court, I'm dating myself,

22  but it was years ago in the <u>Moralo</u> bankruptcy and Judge Stern,

23  the late Judge Stern, issued the same ruling and agreed that,

24  yes, abstention applies to the coverage case whether it's

25  mandatory or discretionary, and for that reason the stay should

22

1  be lifted.

2        But the reason you don't see more decisions like

3  that, Your Honor, is because in most cases it's not even

4  disputed.  Everybody recognizes that there's an interest to all

5  the parties, not just the insurers, but the debtor to the

6  claimants in getting resolution of the coverage issues

7  particularly in mass tort cases; Lloyd E. Mitchell, Garlock,

8  Pittsburgh Corning, Plant Insulation, Honeywell NARCO, I mean

9  the list goes on and on where there are debtors pursuing their

10 bankruptcy and a coverage litigation happening simultaneously

11 in the mass tort context.  And by the way, those are to a tee

12 all cases where the debtor had far less resources at its

13 disposal to pursue both actions at the same time.

14        And the uncertainties here are in terms of the

15 insurance issues.  They're quite significant, Your Honor.  J&J

16 has demanded some $2 billion from 42 insurance companies for a

17 total of approximately $2 billion that they say applies and as

18 you know, those claims involve not just future claims but three

19 and a half billion dollars that J&J has already paid for in

20 defense costs, in settlements.  All the while J&J and Old JJCI

21 and Middlesex, which I'll get to in a minute, had no problem

22 litigating the coverage action while there were 38,000 claims

23 pending across the country in the NDL litigating, you know,

24 going to trial.

25        There was no -- J&J had no problem, you know,

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 24 of 122

23

1 defending those actions and at the same time dealing with

2 coverage action in which it was both a claimant and a

3 defendant.  And it's not as simple as saying well, you know,

4 there's $2 billion give or take in coverage and there's a lot

5 more than that in potential liability so either there's no

6 coverage of it's fully exhausted.  As Your Honor I'm sure can

7 appreciate, it's a lot more complicated than that.

8        There are all kinds of rules in mass tort cases when

9 you have injuries that span multiple policy periods determining

10 how you allocate damages, what policies are triggered, how you

11 account for the self-insured retention that the debtor or the

12 insured rather has self insurance, captive insurance, how do

13 you deal with asbestos and other exclusions.  There's a long

14 list of fairly complex issues that, frankly, all parties have

15 an interest in getting clarity on.  It's not just a binary

16 there is coverage, there isn't coverage, it's exhausted, it's

17 not coverage.

18        And the New Jersey state courts, Judge Vignuolo and

19 all through the court system in New Jersey are very experienced

20 in these issues.  They have case law dealing with most of these

21 issues.  There might be some novel issues in this particular

22 case but they've dealt with the rules of the road in terms of

23 how you allocate damages, they've dealt with issues about self

24 insurance, they're experienced in handling these types of

25 issues and as my colleague pointed out, they're the only forum

24

given mandatory extension that can resolve those issues.

And, you know, it would be nice if the insurers and J&J saw eye to eye on those issues but we don't.  The insurers have received, you know, massive demands for coverage and basically have disputed a lot of these rules of the road in terms of the declaratory judgments that the parties are seeking.  And so, it really is in everybody's interest to get clarity on those issues in the State Court.

Travelers and the other insurers have a cloud of uncertainty about their rights and obligations.  J&J has a cloud of uncertainty about the extent of coverage.  And it just doesn't make sense to hold all the insurers and all the parties hostage for further pointless delay while J&J and the debtor attempt to resolve the underlying talc claims and work on a plan of reorganization.  Inside and outside of bankruptcy it's commonplace for the insurance coverage issues to be sorted out while all those things take place in terms of resolution of the underlying tort claims and the bankruptcy issues.

But there's even greater urgency from the insurers' perspective in a bankruptcy action like this because as we've seen in many, many other cases, the fact is that while J&J and other debtors attempt to resolve on a massive basis a global resolution and develop a trust that says well, here's how we're going to handle claims, the stakes, the financial stakes for the insurers are going to accelerate and dramatically increase

25

1  rapidly all without any resolution of what do these policies

2  mean, how do you interpret, how do you apply policy provisions

3  to particular types of claims.  And so, the quantum of

4  liability which, you know, is what gives insurers standing

5  under the Third Circuit is dramatically going to increase.

6      And, you know, so everybody, as I said, are going to

7  have questions, you know, what policies apply, how do you

8  interpret the policies, how do you allocate damages and, you

9  know, one possibility which the debtor suggests is just leave

10  the insurers hostage while we sort all that out and we'll come

11  back and figure out the insurance after the fact.  Let's us

12  focus on a resolution.  But all those insurance coverage

13  issues, they're still going to remain.  It's not like they're

14  going to be resolved, Your Honor, and so at the end of the day

15  it's a lot better and, frankly, it's more likely to lead to

16  settlement if you can get a resolution if there's a Court

17  available to resolve those key questions while the settlement

18  discussions are going forward.

19      THE COURT:  Counsel, isn't the overarching

20  distinction between the cases that have been cited and you're

21  correct that every one of those cases insurance coverage was at

22  issue and I would venture to say in the 60-plus asbestos cases

23  that have been there, we've had coverage issues in most of them

24  as in the diocese cases, as in the pharmaceutical cases.  I

25  question how many actual coverage disputes go to trial and were

26

1  not resolved as part of the bankruptcies.  But isn't the

2  distinction here the fact that in all of those cases insurance

3  was critical to funding a plan and that's not definitive in

4  this case.

5          MR. FRANKEL:  I think everybody is in agreement, Your

6  Honor, that a plan of reorganization is not dependent on

7  insurance.  But from our perspective that only provides more

8  reason why the coverage case should go forward.  There's no

9  dispute that the debtor doesn't need the insurance in order to

10 go out and settle these claims.  That's what they're telling

11 Your Honor.  They're not making an argument that we have to

12 know how much insurance is available for us to be able to

13 resolve the claim.  They're making very different arguments

14 which I'll turn to in a minute.  But they're saying well, it'll

15 be a distraction.

16          So, everybody is in agreement, you don't need the

17 insurance coverage to resolve the claims, you don't need the

18 coverage to develop a plan of reorganization but yet the

19 insurers are asked to just kind of sit on the sidelines while

20 all these uncertainties exist.  And insurers, as Your Honor

21 knows, when given the risks that the debtor could go out and

22 J&J could go out and agree on a plan and agree on a global

23 resolution that they later intend to say well, you have to pay

24 your share of this and it's a lot of money, insurers don't just

25 sit on the sidelines and say fine, you know, we have an

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 28 of 122

27

1    interest in insuring that the plan is confirmable and that a

2    plan and a settlement doesn't trample on contract rights, it

3    doesn't impair our rights, it doesn't create new obligations.

4    And so you'll see in a lot of those cases, Your Honor, the

5    insurers turn out to be some of the most vociferous objectors

6    to the plan.

7          Now, if we had clarity on what the rights and

8    obligations under the policies were, I'm not saying every

9    objection would go by the wayside, but there could be fewer

10   objections.  There might be no objections.  They would be

11   narrower and more focused.  It's leaving this cloud of

12   uncertainty just doesn't make any sense in that context.

13         And to be clear, you know, Travelers has no problem

14   with the mediation going forward or participating in mediation.

15   In fact, we filed a motion yesterday where we're asking the

16   Court to require Travelers to be a participant in the mediation

17   alongside with J&J and the talc claims.  To the extent they're

18   going to seek money from Travelers and other insurers, we want

19   to be in the room.  And on the insurance coverage issues,

20   Travelers would be happy to mediate with J&J and I'm sure many

21   other insurers of J&J would be happy to have a mediation.

22         But, in my experience, Your Honor, when there are so

23   many complex disputed issues, having a Court available to issue

24   key rulings on some of those issues only makes settlement more

25   likely, not less likely.  I'll just give you one really quick

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 29 of 122

28

1  example.

2         We have this _Ingham_ judgment which Your Honor heard a

3  lot about during the trial a couple of weeks ago.  It's a $2

4  billion liability and to date J&J says well, the insurers are

5  responsible for all of that.  But there's no coverage for

6  punitive damages.  There are questions about some of the

7  claimants in that _Ingham_ case had exposure that post-dated the

8  policies.  There are some complicated issues that Judge

9  Vignuolo in the New Jersey courts can decide as a matter of

10 law.  You don't need a lot of discovery to issue rulings.  And

11 if we're right that there's no coverage for that claim or

12 regardless of the outcome, frankly, the parties would want to

13 know that as part of their settlement discussions.

14        There's another issue that's come up and it relates

15 to a point that my colleague made about, you know, whether or

16 not the declaratory judgment action is really trying to

17 eviscerate coverage or recover against the debtor.  It very

18 well might turn out, Your Honor, that as a result of the

19 rulings in the coverage case that would benefit the debtor, it

20 would benefit the TCC and the claimants.  I think they've lost

21 sight of some of these issues.

22        One of the big issues in the case, we talked about

23 this in our brief, is the issue of J&J's (indiscernible)

24 insurer, Middlesex.  They're an insurance company.  J&J says,

25 well, they paid enough, they don't owe anymore.  But, Your

29

1   Honor, Middlesex wrote billions of dollars in coverage that the

2   insurers believed should be part of this allocation and so if

3   we're right about that, and that's an issue for the state court

4   to decide, not this court, but if we're right about that, that

5   benefits the debtor.  It benefits the talc claimants.  And so

6   under these circumstances, particularly where there's mandatory

7   abstention and, you know, this Court is not a forum to resolve

8   those issues, it just makes perfect sense to allow those cases

9   to go forward, this case to go forward, the coverage case.

10          Let me just address quickly some of the debtor's and

11  the TCC's arguments on these issues.  First of all, the debtor

12  argues that lifting the stay could adversely affect their

13  settlement efforts because it would burden Mr. Kim who has to

14  focus his duties and responsibilities on settling.  First of

15  all, the debtor has very capable counsel, McCarter & English.

16  They've been litigating the coverage case for three years,

17  they're standing at the ready to deal with coverage issues and

18  I know Mr. Kim and as talented as he is, I doubt he was writing

19  all the briefs in the coverage case and handling all the

20  depositions.

21          But, again, remember, even before the automatic stay

22  was in place Mr. Kim was overseeing the coverage litigation

23  dealing with not just the talc claims but all the product

24  liability claims that J&J and there was no problem, that J&J

25  had no problem defending those cases entering into numerous

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 31 of 122

30

1   settlements while the coverage case was going forward.

2          They had an army of global law firms that were

3   dealing with those issues and they have breathing room now,

4   Your Honor, as a result of the stay.  There are 38,000 cases

5   that are not being litigated in the tort system.  There are

6   Attorney General actions that they like to cite that are not

7   going forward. We think Mr. Kim can chew gum and walk at the

8   same time and it's not this notion that there's some burden

9   like we can't deal with the coverage issues and try to work in

10  this case is vastly overstated.

11          Also, Your Honor, in terms of the burdens of the

12  coverage litigation, the document discovery has been

13  substantially completed.  Judge Vignuolo, while the case hasn't

14  moved extremely rapidly, she's been presiding over this case.

15  She set a trial date.  I think it was in May which would have

16  to be adjusted.  But the fact is that even without depositions

17  or expert discovery, the insurers are ready to make partial

18  summary judgment motions that could resolve a lot of these

19  issues and wont take any further discovery.  It would be very

20  efficient.

21          I made the example of the _Ingham_ judgment is one

22  issue but there are lots of issues like that, Your Honor.  The

23  moving insurers have an issue with their claim control

24  provisions.  There might be, you know, dozens of other legal

25  issues that the Court can resolve without any undue burden.

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 32 of 122

31

1    And yes, there will be some depositions but those depositions

2    are not going to be from any LTL employees.  This is a breach

3    of contract case or a contract action, a declaratory judgment

4    action.  So, the witnesses who would likely have the most

5    knowledge for a coverage action would be from J&J's risk

6    management department.

7            So, what's the other argument?  The TCC argues, well,

8    we just hired insurance coverage counsel, we need to get up to

9    speed because they're going to have to intervene if this case

10   goes forward.  Well, first of all, that sounds very different

11   from what we saw in their retention application.  They touted

12   their experience in these areas.  Not only that, they touted

13   their knowledge of J&J's policies from their work in the Imerys

14   case.  But, regardless, the talc claimants have no right as a

15   matter of law to intervene in the coverage case.

16           There's clear New Jersey law on this.  We cited in

17   our brief, the Cruz Mendez case, the President v. Jenkins case.

18   It's the rule in almost every state jurisdiction that third

19   party tort claimants have no standing or right to intervene.

20   If they had a right, you would have seen claimants intervening

21   during the prior three years while this litigation was going

22   forward.  Not one claimant tried to intervene because they knew

23   that they couldn't.

24           Now, if the TCC thinks that, you know, we have the

25   law wrong or they have some unique factor, let them make a

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 33 of 122

32

1  motion to intervene with Judge Vignuolo.  We'll hash these

2  issues out.  If they believe they need more time to get up to

3  speed and the Court is inclined to let them intervene which I

4  think is highly unlikely, the state court can deal with that,

5  not this Court.

6         My colleague has already addressed the argument that

7  they make about trying to eviscerate coverage.  They argue that

8  -- I think I've covered those, Your Honor.  I think insure --

9  when you look at the policy arguments that, you know, for a

10 stay, they really don't apply in this instance.  I think

11 allowing the coverage case to go forward would help mediation

12 and settlement efforts.  There's no need for a breathing spell

13 for this one lawsuit that the parties have been dealing with

14 and while there's a stay of all the underlying talc claims,

15 it's not a collection effort.

16        And, in short, as I said from the outset, it's not

17 only the norm in cases like this that the coverage case go

18 forward simultaneously, but it really is in everybody's best

19 interest to get those issues resolved regardless of whether or

20 not insurance is critical to this case.  It's critical to my

21 clients to know what their obligations are.  And if J&J decides

22 that they're going to assign all their rights to a trust,

23 there's going to be a trust one day that's going to come after

24 the insurers and we're still going to hash out all of those

25 issues.  So, for all those reasons, Your Honor, and for the

33

1  reasons in our paper we respectfully ask that the stay be

2  lifted if it applies.

3         THE COURT:  Thank you, counsel.

4         Good morning.

5         MR. PRIETO:  Good morning, Your Honor.  Dan Prieto of

6  Jones Day on behalf of the debtor.  Your Honor, obviously the

7  debtor opposes the two motions filed by the insurers and we

8  filed a consolidated objection to those motions.  And I would

9  just say at the outset that, you know, the debtor would submit

10 to Your Honor that the stay clearly applies and I'll explain

11 why in a second.  We think it applies under both (a)(1) and

12 (a)(3).

13        I would also suggest to Your Honor that there has not

14 been established cause to lift the stay and I'll likewise sort

15 of address some of the arguments that the insurers have made.

16 I also want to state this up front that the debtor does not

17 oppose the insurers participating in the mediation subject, of

18 course, to the co-mediator's discretion to determine, you know,

19 if and when and how they participate.  I would also say we have

20 no opposition and are willing to separately engage in

21 settlement discussions with the insurers to see if we can limit

22 or resolve the issues.  So, it's not a situation where we're

23 sort of, you know, cut them out of the process.

24        But to be clear, and I think there's no dispute now

25 on this as I've heard this morning, we do not need a resolution

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 35 of 122

34

1 of the insurance issues in order to resolve this Chapter 11

2 case and that's because we have other sources of funding,

3 probably most importantly, the funding agreement.  But what

4 should be avoided at this critical juncture in the case from

5 the debtor's perspective is restarting this litigation at a

6 time when the parties have just started mediation and are

7 focusing their energy and efforts on trying to reach a

8 resolution in this case.  There may be a time in this case

9 where it makes sense to restart the litigation, but at this

10 point, Your Honor, I would submit it's not the right time.

11         So, let me just address some of the arguments you

12 heard this morning and that are, you know, in their papers and

13 I'll start with, you know, whether or not the automatic stay

14 applies to the insurance coverage action.  As I said before, we

15 think it's clear it does, Your Honor, and let me start with

16 Section 362(a)(1) and why that applies.

17         Your Honor, fundamentally, it applies to the coverage

18 action because the debtor, through its allocation of insurance

19 rights under the 2021 corporate restructuring, is effectively a

20 party to the litigation.  And as you heard, there's no dispute

21 that Old JJCI is already a party to that pending insurance

22 coverage action.  And as Your Honor knows, the corporate

23 restructuring resulted in Old JJCI no longer existing.

24         And as we cited to Your Honor in our objection under

25 applicable New Jersey State Court rules, LTL would be

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 36 of 122

35

1  substituted in for Old JJCI.  Now, I heard this morning and you

2  heard a lot about it, you know, these provisions in the merger

3  agreement that they suggest to Your Honor means that the debtor

4  can't participate even though it has these valuable contractual

5  rights that warrant protection.  But, Your Honor, that

6  provision is not -- it doesn't eliminate any rights.  It simply

7  obligates New JJCI to the extent, frankly, we decide it's

8  beneficial to pursue your coverage.

9        And I think the reason that's in there is because it

10  addresses a concern that the insurers could have raised that,

11  well, yeah, you transferred some rights over here but you're

12  not the proper withstanding.  Well, we solved that.  We put an

13  obligation on New JJCI to intervene and pursue coverage for our

14  benefit if it's necessary.  So, it's an obligation.  It doesn't

15  eliminate our right to also participate by virtue of holding

16  contractual rights under the insurance policies.

17        THE COURT:  How do you address the issue that the

18  debtor's right to intervene isn't automatic in that J&J, as a

19  party, would be representing the same interests and defending

20  the same goals, so-to-speak, so that the state court could have

21  discretion in not permitting LTL to join or intervene or come

22  into the litigation?

23        MR. PRIETO:  Well, I'm not an expert on the New

24  Jersey rule, but as I read it and as I understand the

25  application of the rule, it's pretty automatic and, obviously,

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 37 of 122

36

1  the debtor has rights.  They're valuable.  They're asserted to

2  be over 2 billion dollars.  As Your Honor heard in the PI trial

3  and all the evidence submitted there, the debtor's ultimately

4  responsible for the talc liabilities, so it would be a very odd

5  result that the party responsible for the talc liabilities with

6  contractual rights to assert claims and coverage isn't

7  permitted to participate simply because another affiliate is

8  alleged to have similar interest with respect to the coverage.

9           THE COURT:  The debtor is required to indemnify J&J,

10  correct?

11          MR. PRIETO:  Correct.

12          THE COURT:  Are their interests aligned then,

13  necessarily?

14          MR. PRIETO:  Yes, I would say their interests are

15  aligned with respect to the liability, you know, defending the

16  liability.  But I would also indicate to Your Honor is that,

17  and you saw this testimony before in the PI trial, the

18  insurance policies here is that you would expect to have a

19  defined term with respect to who's a named insured or who's an

20  insured under the policies and that includes subsidiaries.

21  Well, the LTL is a subsidiary.  It's another reason why we

22  have, clearly, we have standing to pursue our rights here.

23          So, one of the arguments that was advanced by the

24  insurers with respect to 362(a)(1) is that it doesn't apply

25  because they're not seeking to recover a claim.  They're just

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 38 of 122

37

1   seeking a declaratory judgment, so it's not applicable.  And I

2   think Your Honor knows, it's pretty clear from the statute, you

3   know, 362(2)(a)(1) is written in the disjunctive.  And, you

4   know, after they filed their reply, we looked at this issue and

5   the Third Circuit has made this, you know, claim and that's the

6   Borman v. Raymark Industries Inc. case at 946 F.2d 1031.

7           And the Third Circuit says, quote, Section 362(a)(1)

8   stays an action or proceeding against the debtor or to recover

9   a claim against the debtor.  This disjunctive language clearly

10  indicates that Congress intended for 362(a)(1) to stay actions

11  against a debtor that are not necessarily brought to recover a

12  claim.  So, clearly, 362(a)(1) could apply and does apply to a

13  declaratory judgment action because the -- you know, to the

14  extent the action is against the debtor and, again, I would

15  submit that under the circumstances here in light of the

16  transaction -- the 2021 transaction, the action is against the

17  debtor.

18          Your Honor, now turning to Section 362(a)(3), the

19  insurance action implicates a stay under 362(a)(3) because it

20  seeks to adjudicate valuable property rights of the debtor.

21  The insurers this morning said, well, we're not seeking to

22  eviscerate rights.  We're not seeking to do anything other

23  than, you know, get clarity as to how the contracts work and

24  that's not something (a)(3) addresses.

25          Well, again, the Third Circuit, I think, disagrees,

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 39 of 122

38

1  Your Honor.  The Third Circuit specifically found that Section

2  362(a)(3) is interpreted to stay acts that seek to diminish

3  insurance coverage, like a declaratory judgment action; and

4  that's in AC&S, Inc. v. Travelers 435 F.3d 252, 2006 opinion.

5       And, Your Honor, as you saw in the papers and as you

6  recall, I mean, Your Honor has addressed this issue in

7  connection with the PI ruling and found that the debtor's

8  property interest in the policies were rights to coverage our

9  properties, and that conclusion isn't inconsistent with

10 numerous other courts have similarly ruled that rights under

11 policies, not just the policies themselves but just rights

12 under policies are property of the estate.

13      So, Your Honor, I would submit that the stay clearly

14 applies.  So, the question then becomes should the stay be

15 lifted and has cause been demonstrated to Your Honor.  And,

16 again, we do not think cause has been established here.  And

17 let me start with the harm to the debtor.  And we think lifting

18 the stay here would harm the debtor for two primary reasons.

19      First of all, I think it's pretty clear that it would

20 disrupt settlement efforts.  And so this is simply not the time

21 to restart the coverage litigation.  Again, it may make sense

22 after the conclusion of the mediation depending on what

23 happens.  We can revisit that.  But at this very moment in

24 time, to distract both the debtor and the Talc Committees and

25 other parties with having to, sort of, refocus on whether or

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 40 of 122

39

1  not this, you know, what the issues are and how to litigate the

2  insurance coverage issues would be a distraction to the

3  mediation efforts.

4          Also, Your Honor, as a practical matter, the result

5  of the mediation could very well impact how the parties think

6  about or pursue the Insurance Coverage Action.  For instance,

7  there could be an agreement where it's clear the debtor is

8  going to maintain control over the insurance rights

9  notwithstanding a funding of a trust.  Or, alternatively, it

10 could be a partial assignment of insurance rights to the trust

11 for the benefit of the claimants.  Those types of discussions

12 may impact who ultimately has the ultimate interest in the

13 outcome of the litigation and, you know, it would make sense to

14 me to see where we land on issues like that before we start

15 restarting the litigation at this stage.

16         And then the second reason, Your Honor, I would

17 suggest that lifting the stay would harm the debtor goes to the

18 issue that -- some of the key issues in this case would be

19 addressed in that coverage action.  And we discussed this in

20 our objection and I'm referring, specifically, to the expected

21 and intended coverage defense that the insurers have asserted

22 in the coverage action.

23         Adjudication of that defense would require a

24 determination regarding whether Old JJCI or J&J had the

25 subjective intent to cause the alleged injury and whether Old

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 41 of 122

40

1 JJCI and J&J's talc products were harmful and contained

2 asbestos. Your Honor, that goes to the heart of the dispute in

3 this case. It's a dispute that we're trying to resolve through

4 the mediation process. And as Your Honor's well-aware, the

5 debtor maintains that the cosmetic talc products are safe, did

6 not contain asbestos and did not cause disease. And obviously

7 the Talc Claimants disagree and that's what we're trying to

8 work our way through. If the debtor's required to litigate

9 these issues now, it will face the risk of collateral estoppel

10 and evidentiary record prejudice which could directly impact

11 its ability to resolve the claims in this Chapter 11 case.

12 Now, Travelers, I think, in its reply, argued that

13 there shouldn't be really a concern because all they're really

14 doing is asking the Court to interpret its contract, the

15 insurance policy, and sort of apply it to the current record

16 underlining the tort claims. And while we're glad to hear the

17 suggestion that I think I hear from Travelers that they're not

18 -- they don't believe additional discovery would be necessary

19 on this defense, the debtor believes the other insurers

20 disagree with that.

21 And, in fact, if you look at the moving insurers'

22 reply brief, I think it's the last page, they suggest to Your

23 Honor that one of the things they'd like to do on a go forward

24 basis is take discovery on that defense. And putting aside

25 whether or not there's further discovery what the record is

41

1  fundamentally, what the insurers are asking the state court in

2  New Jersey to do is reach a conclusion on those issues which,

3  again, go to the key issue in this case.

4       Now, the moving insurers in their reply also try to

5  downplay why litigating that defense would be harmful to the

6  debtors because they say, look, that's a routine defense.  It's

7  litigated in a number of different cases including mass tort

8  cases where there's still pending tort claims, you know, what's

9  the issue doing it in this case.  But, Your Honor, what they're

10 overlooking is the uniqueness of this Chapter 11 case.  The

11 debtor here disputes that its cosmetic talc products cause

12 injury or contained asbestos.

13      Causation was a highly disputed issue in the

14 underlying tort system. You heard a lot of testimony about that

15 already in this case.  That is starkly different than many

16 other mass tort Chapter 11 cases where the debtors have

17 acknowledged that their product contained asbestos or otherwise

18 caused some harm.  So, pursuing that defense goes, again, to

19 the very heart of what's at issue in this case which is, to me,

20 different than a lot of other mass tort cases.

21      So, let me turn now, Your Honor, to the harm to the

22 insurers -- the alleged harm to the insurers.  Because I think

23 in contrast to the harm the debtor would suffer from the lift

24 stay here, from my perspective, the insurers haven't really

25 identified much harm at all for the stay staying in place.

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 43 of 122

42

1  They say that they need clarity with respect to their

2  obligations under the policies.  And I get the desire for

3  clarity but the question is what's the urgency?  Why does this

4  have to be done right now?  Why can't it be done later in this

5  case at some other stage?  They haven't really articulated why

6  there's a critical timing component to getting clarity.

7          The insurer suggested they would be harmed because

8  the debtor's affirmative claims that have been asserted by J&J

9  and Old JJCI, now the debtor, in the insurance coverage action

10  aren't stayed but on the other side their declaratory judgment

11  request is stayed, and that's sort of unfair.  Well, to the

12  extent this wasn't clear in our response, Your Honor, let me

13  just clarify our position on that.

14          The counterclaims that were asserted in the

15  underlying insurance coverage action are, effectively, mirror

16  images of what the insurers asserted.  And they go to the scope

17  and extent of the insurance coverage.  So, from the debtor

18  perspective, those claims are also, likewise, stayed because

19  they implicate 362(a)(3).  It implicates property of the estate

20  because it's asking this Court to fundamentally address the

21  coverage issue the same way that the insurers are asking the

22  Court to do so.

23          The insurers also argue that further delay may harm

24  them because if they lose the coverage action and the parties,

25  you know, J&J and LTL ask for it, we may seek prejudgment

1  interest.  But, obviously, Your Honor, I would point out that

2  during the pendency of the stay and the litigation, frankly,

3  insurers haven't been paying what the debtor believes is owed.

4  So they've been having the benefit of not paying us and they

5  would continue to have that benefit during the stay, so I don't

6  see the prejudgment interest as a major harm that they might

7  suffer.

8         And, of course, it's fairly premature to argue about

9  prejudgment interest at this stage when the coverage action

10  remains in its early stages, and, as I understand it, a trial

11  would likely not be scheduled to the end of 2023 or early 2024.

12  So, I'm not seeing a lot of harm, Your Honor, that's been

13  articulated.  And certainly not compared to the harm the debtor

14  would suffer.

15         So, just briefly touching on the factor of respect to

16  the likelihood of success on the merits, I would just say,

17  given the harm that the debtor would suffer, I don't think that

18  factor is all that illuminating as to whether there's cause and

19  I would suggest Your Honor doesn't have to consider it.  But if

20  the Court does consider it, I would say, Your Honor, that all

21  you have in the record is, sort of, conclusory allegations that

22  the insurers think they'll win.  And I think those unsupported

23  statements don't really provide that that factor would support

24  cause for lifting the stay.

25         So, let me address the argument that mandatory

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 45 of 122

44

1  abstention somehow equates to automatic lifting of the stay.

2  And you heard a lot about that this morning and you heard a lot

3  about that in the papers, as well.  That is not the law, Your

4  Honor, from my perspective.  And, you know, the case that the

5  insurers rely on exclusively is Congoleum and you heard, again,

6  a lot about it today.  And they say it's on all fours, it

7  clearly establishes the proposition and they showed you a quote

8  from the judge but, Your Honor, if you examine those facts, to

9  me, it's clearly distinguishable and it's not in any way our

10  situation.

11       So, in Congoleum, Your Honor, the debtor had entered

12  into a global settlement to resolve its tort claims through a

13  pre-packaged plan of reorganization.  And under that agreement,

14  the trust was to be funded primarily, if not exclusively, with

15  insurance proceeds.  But prior to that settlement and prior to

16  the bankruptcy case, the insurers had filed an action in state

17  court challenging coverage.  And at the time that Congoleum

18  filed for bankruptcy, there had already been significant

19  progress and developments in that state court action.

20       So, what the Congoleum Court found was that the

21  extent of the insurance coverage in that case, under those

22  circumstances, was a critical issue in the bankruptcy because

23  it went to whether the plan was feasible and could be

24  confirmed.  But if found that it had to abstain from hearing

25  the underlying insurance coverage action and that the State

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 46 of 122

45

1 Court, given the developments that have already transpired, was

2 in the best position to address those issues.

3          So, under those circumstances, it's not surprising to

4 me that the court who found it had to abstain would of course

5 lift the stay to permit the state court to address critical

6 issues that would be required to address in order for the case

7 to proceed.  That's a very different situation than we have

8 here.

9          There is no allegation in Congoleum that the

10 insurance coverage would require the adjudication of key issues

11 that are relevant to underlying tort claims like we have here.

12 There was no indication that lifting the stay would distract

13 the parties from critical settlement efforts -- there was

14 already a settlement there.  And unlike in Congoleum, the

15 insurance coverage action, and I think everybody agrees on this

16 now, does not need to be resolved in order for the debtors to

17 confirm a plan like it had to be resolved in Congoleum.  And,

18 again, that's because we have other sources of funding, Your

19 Honor.

20          So, to conclude, Your Honor, I would just say that at

21 this time these motions should be denied.  But at a bare

22 minimum, Your Honor, the insurer's request for stay relief

23 should be at least deferred until after mediation, which may

24 even include them.  It may even narrow the issues further.  It

25 may even result in settlements.  At that point in time, once

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 47 of 122

46

1  the mediation concludes, we could turn back to these issues.

2  Thank you, Your Honor.

3            THE COURT:  Thank you, counsel.

4            Good morning, Mr. Stolz.

5            MR. STOLZ:  Good morning, Your Honor.  Daniel Stolz,

6  Genova Burns, local counsel for TCC1

7            Your Honor, I had intended to rise merely to

8  introduce special counsel but I wanted to note two things.

9  Number (1), this is something of a landmark date in this case

10 since the debtor and TCC1 are in agreement on an issue in this

11 case.  That should be noted.

12           Number (2), as Your Honor is aware, I represented one

13 of the non-debtor insureds in <u>Congoleum</u> and just to make the

14 record complete, as Your Honor is aware, those same insurers

15 who asked for a mandatory abstention wound up funding

16 completely the debtor's confirmed plan in that case.  And so in

17 this case we suspect that the reason the insurers want to come

18 to mediation is that they want to contribute and the debtor and

19 TCC1 would like to receive their funds.

20           So, with that, Your Honor, I'll introduce Sarah

21 Sraders from Gilbert LLP, proposed special counsel for TCC1 on

22 insurance issues.  There is a pro hac pending before Your Honor

23 on Ms. Sraders.

24           THE COURT:  Thank you, Mr. Stolz.

25           Ms. Sraders, welcome.

47

1          MS. SRADERS:  Good morning, Your Honor.

2          As has been noted, the debtor and TCC1 are largely in

3 agreement here that the automatic stay applies in this act to

4 the coverage action and that the Court should refrain from

5 lifting the automatic stay.  So, I will not take up too much of

6 your time this morning repeating what's already been said.

7          There are just a couple of things I did want to

8 highlight.  First, with respect to the insurance policies as an

9 asset of the estate, the TCC1 continues to dispute the findings

10 made in this Court's February 25th opinion but the fact remains

11 that as we are now, the Court has concluded that the insurance

12 policies are property of the estate.  And given this and given

13 that the Court has stayed all of the talc-related actions

14 against the J&J entities, we see no reason not to conclude that

15 the stay applies equally to the coverage action for the reasons

16 that we've set forth in our brief.

17          So, given the Court's finding that these insurance

18 policies are assets of the estate, we believe that these assets

19 must be protected for the benefit of the creditors.  And for

20 that reason, we believe that the automatic stay clearly applies

21 to the coverage action here.  Despite the insurers' arguments,

22 it's clear that a ruling from the New Jersey courts in the

23 coverage action will deplete the assets of the estate.

24          The insurers argue that this is only a declaratory

25 judgment action.  That they seek only a determination of

48

1  whether the debtor's entitled to recover these proceeds and,

2  therefore, the debtor can't lose what it never had.  But this

3  would, obviously, be true in any contract dispute where the

4  contracting party sought to avoid the automatic stay.  If the

5  debtor loses, it didn't have the contract right it asserts.

6  But obviously any court has yet to make that determination and

7  that is not simply a foregone conclusion that needs to be

8  discovered.  This is something that the Court will have to

9  determine based on the arguments from counsel.

10      And that, Your Honor, speaks to the harm that will

11  really be at issue here for the debtor and, by extension, the

12  TCC if the automatic stay is lifted.  Allowing the coverage

13  action to continue would mean that the debtor and the TCC1's

14  focus would be diverted from the bankruptcy, so rather than

15  focus on the mediation or resolution of the talc claims, the

16  parties would waste their time, energy and resources litigating

17  the insurance.  And as you've heard today, there are still many

18  outstanding issues that remain in the coverage action.  And

19  it's quite simply unnecessary for the parties to have to deal

20  with these issues right now and distract from the mediation in

21  order to address insurance.

22      Here we have both the debtors and the creditors

23  agreeing that it is best for the parties to now focus on

24  mediating a global resolution and deal with the insurance

25  later.  And as has been stated already this morning, Your

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 50 of 122

49

1  Honor, it is possible that given the interest of some of the

2  insurers in participating in the mediation that the mediation

3  be resolved in the order of rejection entirely.  And while the

4  distraction of the coverage action would cause harm to the

5  debtor and the Committee if the coverage action were allowed to

6  proceed, on the other hand, it is difficult to imagine how

7  maintaining the stay here would possible result in any harm to

8  the insurers.

9          The insurers do not lose any of their coverage

10  defenses if the stay remains in place.  No one can force a

11  global settlement on them, and they are not deprived of a forum

12  in which to eventually litigate their defenses.  Instead,

13  everything will simply remain as is while the debtor and his

14  creditors work to resolve these talc claims.  And as has been

15  noted, the insurers get to hold on to the nearly $2 billion of

16  proceeds that may rightfully belong to the debtor and that may

17  eventually wind up being paid to the talc victims.

18          So, it's clear, Your Honor, that there is no harm

19  that will result to the insurers here.  Instead, the only harm

20  will be to the debtor and the overall resolution of the

21  bankruptcy.  So, for these reasons, we think that the stay not

22  only applies here but should not be lifted.

23          THE COURT:  Thank you, counsel.

24          MS. SRADERS:  Thank you.

25          MR. ROSS:  Your Honor, let me just start off by

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 51 of 122

50

1  something I should have said in my remarks is, you know, the

2  law is balancing a harm to the movants versus any harm to the

3  debtor or estate, not to creditors.  So, any harm to them is

4  just not in the equation.  That's the first point.

5       Second point I have is I'm just mystified.  Your

6  Honor sees far more cases than I do.  And you have, as

7  Travelers described, potentially billions of dollars of

8  additional assets available and neither the debtor nor the TCC1

9  seems to have any interest in that -- in seeing that move

10  forward and find out what that's all about.  Just mystified by

11  that.  And you would think maybe that's a point where the Court

12  should step in and say, well, look, it's our obligation to make

13  sure the estate has everything that's coming to it and we

14  really should be getting to the bottom of that as quickly as

15  possible.

16       Now, I'd like to just address a couple points.  Your

17  Honor asked a great question about isn't the distinction

18  between cases Mr. Frankel was referring to and the situation

19  here that insurance was not required to fund this plan as

20  opposed to those plans.  It's a great question.  Probably

21  really begs another question.

22       And Travelers, I'm not sure I have read their

23  policies, may not have this provision, but a central issue in

24  the New Jersey Coverage Action you've heard this as the claims

25  control provisions.  And let me just read one of them --

1  they're all similar.  And this is a quote, underwriters shall

2  have full control over the defense and settlement of all claims

3  or potential claims under the policy.  So, the Court says,

4  well, you know, let's just all make nice, we'll go to mediation

5  -- that will satisfy them.  No.  We would be nothing more than

6  some fly on the wall in that.  I mean, we'd love to hear what's

7  being said, that's why the motion got filed, but we wouldn't

8  have any control, let alone full control over the settlement of

9  all claims.

10       I mean, that's what the New Jersey Coverage Act is

11  fundamentally about.  There's, like 4. -- I may have the

12  numbers wrong -- 4.5 billion in claims already settled.  I

13  guess that includes defense claims, too, which we had no say

14  in, let alone full control over the defense that settled it.

15  And the harm to us is we're continuing to be prejudiced and the

16  mediation just prejudiced it that much more.

17       We have at ready -- we have ready to file on the day

18  the petition was filed in this court, a summary judgment motion

19  on that issue in the New Jersey Superior Court.  And we were in

20  the process of meet and confer, band toward meet and confer.

21  We were told by McCarter and English, pull back a little bit

22  more, and then they go and file a petition.  And then they go

23  and file a petition stopping us from filing a summary judgment

24  motion.  That's ready to go.  You should, if nothing else, you

25  should allow that to go forward because that's probably going

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 53 of 122

52

1  to be resolved before the mediation gets resolved.  So, that's

2  another overarching important point that I think.

3         Let me address a couple of these individual points

4  that have been made by opposing counsel that, I'm sorry, very

5  good counsel, good arguments, good briefs -- they're just wrong

6  on some of these points and I don't think they should go left

7  unsaid.

8         So, we're talking about whether or not they're a

9  party, you know, for purposes of a automatic stay.  They're not

10  stepping into Old JJCI's shoes.  Old JJCI went off in all

11  different directions.  That doesn't give you -- and they have

12  to ask the Court for permission to intervene and it was said,

13  well, I don't know the rule -- I'll read it to you because I

14  think Your Honor asked exactly the right question.  And the

15  rule is New Jersey Court Rule 4:33-1 and it says intervention

16  is proper when the intervening party now, quote, claims an

17  interest relating to the property or transaction which is the

18  subject of the action and is so situated that the disposition

19  of the action may, as a practical matter, impair or impede the

20  ability to protect that interest unless the applicant's

21  interest is adequately represented by existing parties.  Your

22  Honor correctly asked isn't J&J and the debtor aligned in the

23  New Jersey action and the answer was, yeah, we're perfectly

24  aligned -- they basically conceded.

25         THE COURT:  But are they perfectly aligned?

53

1          MR. ROSS:  I don't know.  That's their answer.

2          THE COURT:  Well, I don't have to accept their

3   answer.  There's an indemnification obligation, right?  So

4   that, ultimately, the debtor has to come up with whatever the

5   obligation is even if J&J falters in its defense in the

6   insurance.

7          MR. ROSS:  Well, with all due respect, I would submit

8   that's meaningless given the backstop.  So, you know, it's just

9   a circular flow of money and I don't think that would satisfy

10  this rule.  The Court is likely to say J&J is doing a pretty

11  good job.  McCarter and English is doing a pretty good job on

12  this.

13         THE COURT:  The backstop is to fund talc claims.

14         MR. ROSS:  And that's what --

15         THE COURT:  Well, no, not necessarily recovery --

16         MR. ROSS:  Of talc claims which is --

17         THE COURT:  But just limited to talc claims, correct?

18         MR. ROSS:  That's correct but that's what the New

19  Jersey Coverage Action is about -- talc claims.  And so I would

20  submit to you, that means they are not only not a party but

21  can't be a party under that.

22         There is another comment made by debtor to the extent

23  that Congoleum is all we relied on.  That's not right.  The

24  exact same conclusion was reached -- the exact same holding

25  bankruptcy court, here Southern District of New York in the In

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 55 of 122

54

1    In re Burger Boys case, which we cite in our brief, and by the

2    Ninth Circuit BAP in In re Calkins that same holding.  This is

3    -- I couldn't find any cases to the contrary.  I believe it is

4    the law that if you show mandatory abstention you have

5    established cause.  And we have shown that here.  And I really

6    didn't hear any argument against mandatory -- I heard why they

7    argue we're different from In re Congoleum.  I'll get to that

8    in a second.  I didn't hear any argument that mandatory

9    abstention does not apply and, therefore, I think that's the

10   starting point the Court has to accept that since we

11   established it in our opening papers and nobody came in to

12   rebut it or refute it in any way.

13          So, let's move on to Congoleum.

14          THE COURT:  Although, in fairness to you, rather than

15   as part of any ruling 1334(d) -- 20 U.S.C. 1334(d) -- let me

16   read it.  Subsection (c) which is the mandatory abstention

17   provision and this subsection shall not be construed to limit

18   the applicability of the stay provided for by Section 362 of

19   Title 11.

20          And I found In re Conejo Enterprises 96 F.3d 346, a

21   Ninth Circuit decision.  This subsection, which is the

22   mandatory abstentions provision, this subsection shall not be

23   construed to limit the applicability of the stay provided for

24   by 11 U.S.C. 362 and, as such, that section applies to any

25   action affecting property of the estate.

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 56 of 122

55

1          So, I'm not so sure, simply, if I may agree, a

2   mandatory abstention applies, but that mandatory abstention is

3   dispositive.

4          MR. ROSS:  So, here's my argument, Your Honor.  By

5   plain terms, what that section is saying is that I cannot get

6   up here and argue the automatic stay does not apply because of

7   mandatory abstention.  That's why I was careful to say if you

8   first decide that the automatic stay applies, then we have to

9   show cause which is a separate section than the one Your Honor

10  read.  And what I am saying to you is In re Congoleum and these

11  other cases say cause is established by showing a mandatory

12  abstention.  I'm not arguing that mandatory abstention means

13  there is no stay in the first place.  I'm simply saying we are

14  then entitled to relief from a stay that does exist.

15         THE COURT:  Well, in fairness, that's inconsistent

16  with the case I cited which held first, a finding that

17  mandatory abstention applies to the underlying state action

18  does not preclude denial of relief from Section 362's automatic

19  stay.  And it's unfair to have you respond -- you haven't read

20  the case.  I appreciate that.  I'm just --

21         MR. ROSS:  No, I'm perfectly -- no, I understand what

22  the Court is trying to say there.  I'm familiar with these --

23  not that case -- these cases is they're saying that there are

24  circumstances in which, you know, the way it works is we show

25  cause then the burden shifts to the.  There are circumstances

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 57 of 122

56

1   in which they can show sufficient burden to overcome that.

2   That's what I believe that the Court is saying there -- a

3   burden that was on them to come forward with that harm.

4         And as Mr. Frankel argued and we say in our brief, we

5   don't think they've done that.   There's no real distraction.

6   That the E and I issue, as Frankel so artfully said, was

7   largely resolved, it's just a question of getting a judicial

8   ruling on it.   I mean, that's when the court issues here, he's

9   trying to distinguish it in <u>In re Congoleum</u> in saying, wow,

10  we've moved along.   <u>Congoleum</u> hadn't moved on that far.

11        At the point in time the Judge ordered that, there

12  was not a trust in place.   It was before that.   It was in

13  anticipation -- well, we might need some help on that and local

14  counsel is correct that they then didn't need it because there

15  was a resolution.   But we don't know what's going to happen.

16  We have and, in particular, we have this claims control

17  provision which is central -- which is all teed up -- doesn't

18  need discovery, is ready to go in the New Jersey Superior

19  Court.

20        And it seems to me that's kind of an important thing

21  that ought to be decided and to the extent we're forced to go

22  into mediation without full control over settlement, we're

23  being really significantly harmed.   And that harm, you know, a

24  deprivation of a core right upon which the insurance was issued

25  in the first place, this control over settlements, is being

57

1  taken away from us.  And that ought to be sufficient when

2  coupled with mandatory abstention it would be any burden on

3  their part, my view, respectfully submit, Your Honor.

4          THE COURT:  Fair enough.

5          MR. ROSS:  And that is our argument.  Now, I want to

6  add one other thing.  I don't know what the Court is

7  contemplating as far as ruling from the bench, but in the past

8  --

9          THE COURT:  I don't have it in me to write anything

10  else.

11                    (Laughter)

12          MR. ROSS:  We would really give you the copyright

13  rights to our brief if you can just adopt that if you would

14  prefer.  But, Your Honor, in the Duro Dyne case, just one

15  example of several, they basically said, you know, there are

16  good arguments on both sides here.

17          You didn't say this but, in fact, maybe we should

18  split the baby and talked about it and in that case you ended

19  up saying -- and I don't remember what month it was, it was

20  filed in September and you said, you know what, I'm going to

21  give you a couple months to try to get this worked out and then

22  March 1st the stay's lifted, we get back into that litigation

23  in the Duro Dyne case.

24          You've done this in multiple instances where you say

25  pieces of the litigation can go forward or we'll set some

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 59 of 122

58

1  deadline.  You know, here it would be give the mediation

2  whatever you think necessary -- 90 days, 120 days, whatever and

3  then the stay's gone if you can't get it done.  It would sort

4  of light a fire under people.  Or let certain individual pieces

5  go forth like this claims control provision.

6        Summary judgment's ready to go.  Why should we wait

7  on that?  There's third-party discovery that's outstanding.  I

8  mean, there's a real risk here of spoilation of evidence, loss

9  of evidence, particularly the way corporate record keeping

10 provisions are nowadays where you automatically dump stuff

11 after a certain point in time.

12        So, I mean, if you're thinking of ruling now and

13 you're not -- you're disinclined to grant us complete relief

14 from the stay, I mean, I would invite the conversation as to

15 something less than that, unless you think that's also

16 inappropriate.

17        THE COURT:  Fair enough.  Thank you.  Thank you,

18 counsel.

19        MR. FRANKEL:  I'll keep it very brief, Your Honor.

20 Just a quick couple of follow-ups.  On the harm to the debtor,

21 I really don't think you heard anything other than a suggestion

22 that despite the fact that we have McCarter and English as

23 insurance coverage counsel, despite the fact that we have Jones

24 Day and our army of defense counsel that used to deal with

25 underlying claims that the debtor can only focus on one thing

59

1  at one time and somehow this would be a distraction.  I don't

2  think there's any credibility to that argument or support.

3          I do want to really, briefly touch on this other

4  argument that they made that there's going to be this

5  collateral estoppel risk and record taint and that the insurers

6  are going to litigate issues that are directly implicated in

7  the, you know, in the underlying merits of the talc claims and

8  an estimation proceeding.

9          First of all, from a big picture perspective, while

10  the insurers and J&J dispute coverage issues which, by and

11  large, are very different than the issues in the underlying

12  talc cases, the insurers in J&J have a common interest in the

13  defense of the underlying talc cases.  So, it's in nobody's

14  interest to go out and cause harm to J&J in any of those cases.

15          And the "E" and "I" issue, the expected and intended

16  issue is really just a red herring.  They have it backwards,

17  Your Honor.  Take the Ingham judgment for example.  Ingham is a

18  case it went to trial, there's a judgment, there are claims

19  that were decided by the jury and the jury made its judgment.

20  And the courts explained this is the basis for liability, these

21  are the findings that were made.

22          In the expected and intended issue, for purposes of

23  coverage, we don't go retry the Ingham case.  We don't put J&J

24  on trial and say, you know, you caused this harm.  You expected

25  the harm.  Let's litigate that issue.  That's already been

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 61 of 122

60

1 done.  Whatever record came to collateral estoppel effect might

2 exist is as a result of the underlying case.

3        So, just like my colleague is ready to file a summary

4 judgment motion on the claims control, as I indicated at the

5 outset, we're prepared to file a summary judgment motion on

6 that issue as well.  But there would be no collateral estoppel

7 effect.  The Court would say, well, here's the findings that

8 were already made in that case.  Now let's hold that up against

9 the policy language that says, you know, an occurrence does not

10 include injuries that were expected and intended.  There's no

11 record taint, there's no collateral estoppel effect and because

12 of the common interest that exists because of the insurers, I

13 mean, we could share privileged information based on that

14 common interest.

15        It's in nobody's interest to do anything that would

16 interfere in any way with an estimation hearing  By the same

17 token, or on the other hand really, we've heard a lot about,

18 you know, both from the TCC and the debtor that, you know,

19 what's the harm and just wait, just wait.  We'll resolve these

20 cases, you could participate in the mediation.  Nobody has

21 suggested that they're not going to be looking to the insurers

22 to pay what could be a massive settlement or that nothing in

23 the plan will have any impact on the insurers rights or

24 obligations.  I mean, if we all stipulated to that, we'll pack

25 our bags and go home.

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 62 of 122

61

1          But as I said at the outset, the fact of the matter

2   is that bankruptcies, although Your Honor is going to keep a

3   tight leash on this case, you've made that very clear,

4   virtually -- not virtually -- the norm in these cases is that,

5   ultimately, it could take years for a bankruptcy resolution.

6   And these insurance coverage issues are not going to go away.

7   It's not going to make it any easier to resolve either the

8   underlying cases or the insurance coverage case without having

9   the Court, that's experienced in these issues, available to

10  issue rulings on some of these issues in the meantime.  Thank

11  you.

12          THE COURT:  Thank you, counsel.

13          Anything else in response?

14                  (No audible response)

15          All right.  Thank you, all.  Well argued.

16          So, as I've indicated, I don't have it in me to write

17  anything more.  I'm going to try to put something together from

18  the bench now.

19          These matters come before the Court on the motion

20  filed on behalf of Travelers Casualty and Surety Companies

21  seeking relief from the automatic stay to allow a New Jersey

22  coverage action to proceed at Docket 1488, as well as the

23  motion by, we'll call the moving insurers.

24          With respect to the New Jersey coverage action, the

25  plaintiff insurer seeking an order either confirming that the

62

1  automatic stay does not apply to the New Jersey coverage action

2  or, alternatively, granting relief from the automatic stay.

3  This Court has jurisdiction over this matter pursuant to 28

4  U.S.C. Section 1334.  This is a core matter under 28 U.S.C.

5  Section 157(b).

6        Let me start where I had touched on before and it

7  probably comes as no shock that not every bankruptcy judge

8  within a district agrees.  We tend to sometimes go our own way.

9  I respect Judge Ferguson, but to the extent she indicated in

10 Congoleum that mandatory abstention alone is dispositive of the

11 issue as to whether there should be stay relief, I disagree,

12 respectfully.  I believe the statute provides otherwise and the

13 statute being 28 U.S.C. 1334(d).

14       I respect the decision of the Ninth Circuit in its

15 indicating in In re Conejo Enterprises at 96 F.3d 346 that a

16 finding that mandatory abstention applies to the underlying

17 state action does not prelude denial of relief from the

18 automatic stay and it cited to 28 U.S.C. 1334.  Is a coverage

19 action a claim against the estate?  There has been briefing and

20 argument on that issue.

21       I believe counsel even referenced it this morning as

22 a contract action.  That's actually consistent with what and

23 how Judge Walrath moved in In re Mobile Tool International, a

24 bankruptcy court in the District of Delaware case, 320 B.R. 552

25 in which she indicated that, in contrast, Great American's

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 64 of 122

63

1    action seeking a declaratory judgment about the scope of the

2    insurance coverage is a claim for breach of contract, in

3    essence, it's a breach of contract claim.

4          For this Court, there are a lot of issues that we

5    could delve into.  I am going to focus on 362(a)(3) as to

6    property of the estate.  I recognize that the policies,

7    themselves, have not been assigned -- I don't think there's a

8    question as to that.  That may have an issue or have a bearing

9    later on in the case if settlements in which debtors sell back

10   policies to insurers, that may be difficult -- I'm sure you're

11   all gong to be creative and get around it.

12         But certainly the debtor was assigned interest in the

13   policy in order to have the right to make claims.  The right to

14   make claims under the policy is an interest in the policy as

15   far as this Court is concerned.  And as such, knowing the

16   breadth of Section 541(a) and what is considered property of

17   the estate, the ability to make claims under a policy are

18   certainly rights and interest which are deserving of the

19   protection of the automatic stay.  And therefore 362(a)(3), in

20   this Court's view, is applicable.

21         And continuation of the coverage litigation in the

22   state court, if the insurers are successful, let's be honest,

23   if they are successful, it would deplete or diminish the

24   coverage, which would have an impact on the debtor's rights to

25   be able to pursue and file claims under the policy.  I think

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 65 of 122

64

1  it's apparent.  So, the automatic stay applies.

2          The question is -- the more apt question is whether

3  or not there is cause for stay relief.  And primarily the Court

4  is looking weighing the respective harms.  The harms to the

5  insurers in further staying the action versus the harm to the

6  debtor in allowing it to proceed.  And the Court is persuaded

7  that, to date, in light of the fact that after three plus years

8  along the business track, the insurers' coverage dispute has,

9  for the most part, completed paper discovery prior to

10 dispositive motions, without expert discovery, without

11 depositions.

12         I am not sure that a short period or a limited period

13 of further inaction in that case truly prejudices the insurers

14 any more than what has gone on in the case to date.  A three

15 year old case is not a new case, but it hasn't progressed

16 substantially.  And that's by no means intended to be a slap or

17 a derogatory reference to the state court.  We all know what's

18 gone on in the last two or three years in COVID and everything

19 else, so I appreciate it.  But it hasn't progressed to expert

20 testimony.  It hasn't progressed past fact discovery and paper

21 discovery or depositions.

22         And, frankly, I don't believe I want to see the

23 debtor's personnel, the debtor's counsel, TCC's counsel,

24 involved in having to expend the time and energy and create

25 additional administrative expenses at this juncture while also

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 66 of 122

65

1  trying to pursue what should be the focus in this case, which

2  is the mediation efforts.

3          The mediation efforts are paramount and to have to

4  defend discovery efforts in which some of the defenses that are

5  targeted bear on the issues in the Chapter 11 case would be

6  unfortunate and time consuming and expensive and truly lacking,

7  in my view, the end result lacking any meaningful prejudice.

8          I've often said, somewhat tongue in cheek, in

9  insurance defense work, if the money remains in the insurer's

10 pocket and they don't have to expend on counsel, that's usually

11 the game plan.  And so if we have some time, the insurers

12 aren't expending money, they're not making payments and a short

13 stay to allow the bankruptcy mediation process to move forward,

14 I believe, offers little harm to the insurers while, certainly,

15 benefitting the bankruptcy estate by allowing counsel, all

16 counsel involved including the co-mediators, to focus on

17 something that this Court views as being paramount.

18         As to the counterclaims, I believe counsel is

19 correct.  Under the Third Circuit decision in St. Croix

20 those are stayed as well because the underlying action is

21 against the debtor and, therefore, I would be disinclined to

22 grant stay relief to allow counterclaims to go forward at the

23 same time so as to not prejudice the insurers.

24         I think counsel probably, deservingly so, has picked

25 up on this Court's style in trying to take things in pieces.

66

1 And a breathing spell and the breathing spell envisioned by the

2 automatic stay and by Congress is not unending and I am

3 prepared to carry these motions until June 14th.  That's about

4 90 days.  And I know half of you are taking bets, have already

5 said, that, I knew that, but I think it's appropriate.  It

6 allows the mediation to at least move forward.  We can get a

7 sense of whether there will be a negotiated resolution whether

8 the Circuit decides to step in -- we'll be discussing that in a

9 little bit now -- and make all of this moot.  There's so many

10 different possibilities.

11        So, again, yes, I recognize that the insurers are

12 losing some time.  Clarity -- clarity can come three months or

13 so or even if I continue it longer, further delay I don't

14 believe is prejudicial.  What I will do is simply carry it to

15 the June 14th date so that nobody has to re-file motions and in

16 anticipation of that, the parties one week prior to that date

17 an advise the Court of their position as to whether or not they

18 believe there should be further action on the automatic stay

19 but I think that's the most pragmatic and fairest result that

20 we can do at this juncture.

21        Are there any questions, counsel?

22        MR. ROSS:  No, Your Honor.  Thank you very much.

23        THE COURT:  Counsel?

24        MR. PRIETO:  Your Honor, the only clarification and I

25 think this can be done by consent with the other party but we

67

1  =would want automatic termination to occur by the adjournment.

2  I haven't looked back at the statute to make sure that that's

3  not implicated by the adjournment of the stay motion but --

4           THE COURT:  362 --

5           MR. PRIETO:  Yeah.  If you could just have the

6  insurers confirm that they consent to the adjournment in a

7  sense that the automatic stay won't be automatically lifted.

8           MR. ROSS:  We understand and agree, Your Honor.  We

9  understand what you're doing.  You're just postponing the

10 motions to the 14th.

11          THE COURT:  Thank you.

12          We'll mark this order to be submitted, both motions 8

13 and 9 ordered to be submitted.  It could be a consent order by

14 the parties.

15          Again, unlike in Duro Dyne I want to make it clear

16 I'm not automatically -- the stay is not automatically being

17 terminated on a specific date.  Duro Dyne was a little

18 different that progressed much further.  In fact, they were

19 looking, I think, for reconsideration on issues in Duro Dyne

20 There had been resolution on summary judgment.  And it also

21 took years.  So, it's a little different than where we're at,

22 at this point.  All right?  Thank you, counsel.

23          UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.

24          THE COURT:  Insurers' counsel are welcome to stay and

25 enjoy the festivities.

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 69 of 122

68

1          You know what, I'm sure people need a break.  So,

2     it's a quarter to 12, why don't we take a ten minute break --

3     five to 12.  Thank you, all.

4                          (Recess)

5          THE COURT:  All right.  We will continue on.

6          There have been questions regarding whether we're

7     going to break for lunch.  As my next comments would suggest, I

8     don't think we're going to have to.  I'm hoping we can get done

9     by one o'clock.

10         In that regard, I want to address the motions seeking

11    certification to the Third Circuit.  I am prepared, you may

12    have had a sense from my comments on the last motion, to issue

13    a ruling on those motions without further argument.  I don't

14    want to cut anybody short, though.  If there's anything anybody

15    wishes to add, I'll certainly be glad to listen.  I could

16    always have my mind changed but, otherwise, I'm prepared to

17    rule on the hundreds of pages of briefs that you've all given

18    me.

19         Mr. Molton?

20         MR. MOLTON:  Your Honor, David Molton for TCC1.

21    We're comfortable with Your Honor taking in the papers and

22    ruling on the papers.  We believe that all the positions were

23    put forth in those papers and, you know, the briefing was of

24    the highest level so we're comfortable with Your Honor going

25    forward.

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 70 of 122

69

1          THE COURT:  Thank you, Mr. Molton.  Thank you,

2  counsel.

3          On the debtor's side?

4          MR. GORDON:  Greg Gordon on behalf of the debtor.

5          It kind of depends how you're ruling.

6                        (Laughter)

7          THE COURT:  Want to flip a coin?

8          MR. GORDON:  I'm joking, obviously.  The only reason

9  I'm hesitating is, obviously, we didn't get the last word on

10 this and there were some things in the briefs that we are going

11 to comment on in the reply briefs, but --

12         THE COURT:  If you want to take a few moments, I'm

13 comfortable.  I don't want to short-circuit any issue.  It's up

14 to you.

15         MR. GORDON:  Well, can I have about two minutes to

16 think about it?

17         THE COURT:  You certainly can.  Is it going to be

18 another PowerPoint?

19                        (Laughter)

20         MR. GORDON:  It's going to go to waste, Your Honor.

21         THE COURT:  Well, a hundred and sixty-seven people

22 are going to miss out.

23         MR. GORDON:  I'm sure we can circulate it anyway.

24         I think we're good, Your Honor.

25         THE COURT:  All right.  Thank you, Mr. Gordon.

70

1          MR. GORDON:  Thank you.

2          THE COURT:  Thank you, counsel.  I appreciate the

3    cooperation and the professionalism.

4          As Mr. Molton noted, everything was extensively

5    briefed and briefed well.

6          Let's turn to, specifically, on the agenda today I'm

7    going to address Number 12, which is Number 5 on our CHAP

8    calendar.  Number 13, which is -- well, let me start.

9          Number 12 is the Official Committee of Talc Claimants

10   2 with related claimants.  Motion seeking certification for the

11   Third Circuit of the orders with respect to the motion to

12   dismiss and a preliminary injunction.

13         Number 13 on the agenda, Number 12 on the calendar,

14   is the similar motion filed on behalf of the Official Committee

15   of Talc Claimants 1.

16         Number 14 on the agenda, Number 13 on the calendar,

17   is the similar motion filed on behalf of Aylstock, Witkin,

18   Kreis and Overholtz.

19         And Number 15 on the calendar -- on the agenda and 14

20   on the calendar is the request of Arnold & Itkin for

21   certification for direct appeal.

22         There are also -- Numbers 16, 17 and 18 are the

23   related requests relative to the preliminary injunction

24   adversary proceedings.

25         So, before the Court are multiple requests and

1 opposition of course filed by the debtor seeking certification

2 by this Court under 20A U.S.C. Section 148(d)(2) to the Third

3 Circuit, requests of the Third Circuit to take direct appeals

4 with respect to the Court's motion denying -- I'm sorry --

5 order denying the motions to dismiss the Chapter 11 proceedings

6 and also the Court's order entering a preliminary injunction in

7 the adversary proceeding, and the Court is going to address

8 both of those orders together.

9        Essentially, under 28 U.S.C. Section 158(d)(2) the

10 basis for certification are that the orders must involve

11 questions of law as to which there is no controlling Third

12 Circuit or U.S. Supreme Court decisions, or the orders involve

13 matters of public importance, or that an immediate appeal will

14 materially advance the progress of the case.  There's a fourth

15 factor as to resolution of conflicting decisions which of

16 course is not relevant because nobody has made decisions on

17 these issues.

18        Let me turn to the last prong, materially advancing

19 the case.  Given five days of trial, hundreds of pages of

20 briefing, thousands of pages of exhibits, countless

21 PowerPoints, and over 110 pages of written opinions by the

22 Court, I have my doubts that the record needs further

23 development in the District Court, or that the District Court

24 would -- a review of the appeals would add anything truly of

25 value both from a legal argument perspective or factual

72

1  perspective to aid and assist the Circuit, should it decide to

2  take the appeal.

3         It seems senseless to me for issues that are going to

4  be pursued, I have from every indication as far as possible up

5  to the Circuit, if not beyond, that to have the parties expend

6  the time, energy and funds -- and have essentially truthfully

7  at the debtor's -- on the debtor's dime for most of it, in the

8  estate on an intermediate level appeal doesn't serve any

9  purpose.  It delays the progress of the case.  As I said, it is

10 doubtful that the record would be amplified for the benefit of

11 the Circuit.  I think everything the Circuit would need if it

12 chooses to hear these matters is in the record.  The issues are

13 exhaustive and have been laid out, at least from what I could

14 tell in these motions.  So, I think the third prong, in and of

15 itself, has been satisfied.

16        Going back to are there -- do the orders involve

17 questions of law as to which there is no controlling Third

18 Circuit or current Supreme Court decisions, I have been able to

19 glean -- there are countless issues.  Some merit review by the

20 Circuit.  I would suggest some don't.

21        From what I could tell in reviewing the briefs there

22 are significant issues for which there are no controlling

23 decisions.  I have penned them as follows.  Number one, whether

24 after a pre-petition corporate restructuring in which

25 liabilities are assigned to the ultimate debtor can the Court

73

1 take into account the assigned liabilities and financial

2 condition of the predecessor in evaluating financial distress

3 for purposes of good faith?  Now, these -- I'm not saying these

4 are how you all are going to be framing them, but they are

5 generally on target.

6           Number two, whether the financial distress for

7 purposes of good faith can be based upon anticipated future

8 liabilities associated with future litigation.

9           Number three, is there a requirement or standard for

10 the degree of stress facing a debtor for good faith purposes?

11           Four, whether the Court's analysis of the relative

12 merits of the bankruptcy system and the state and federal trial

13 systems can be part of the analysis of good faith, and

14 specifically the analysis of whether there is a proper

15 bankruptcy purpose, or included in the totality of the

16 circumstances test in determining a motion under 1112.

17           And seven, whether engaging in a pre-petition

18 corporate restructuring which assigns liabilities to an entity

19 which ultimately files bankruptcy while allowing the residual

20 business enterprise to continue operating outside of bankruptcy

21 constitutes bad faith or precludes a good faith finding as a

22 matter of law.

23           With respect to the preliminary injunction I will

24 tell you I find it more difficult to identify controlling

25 issues that have not been addressed.  The issues in the

74

1    preliminary injunction litigation were not uncommon.  The

2    parties are correct that this Court did reference the fact that

3    the source of authority to extend the automatic stay generally

4    and specifically to non-debtor joint tortfeasors hasn't been

5    addressed on point by the Circuit.  I personally believe the

6    McCartney decision does address the issues, but I certainly

7    have no problem allowing the Circuit to refine their analysis.

8          The truth is the preliminary injunction adversary

9    proceeding was bottomed on this Court's determination that

10   there was a proper bankruptcy purpose, and there was a

11   likelihood of a successful reorganization, two of the prongs.

12   And those are intertwined with the issues that are -- and the

13   questions of law that are wrapped and included in the motion to

14   dismiss.  So, the Circuit should have the ability to decide to

15   take both or neither if it so chooses.  It does not make sense

16   to the Court to have the preliminary injunction appeals pending

17   and litigated in the District Court at the same time the

18   Circuit might be considering the motion to dismiss order.  If

19   anything, one would probably -- one Court might defer, the

20   District Court might defer until there's been a resolution.

21         As to public importance, I think the parties agreed

22   on a standard that the issue -- the questions, not necessarily

23   legal questions, must transcend the litigants and involve legal

24   questions which implicate the public and developing

25   jurisprudence.  I can point to -- there was an article that

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 76 of 122

75

1  came out a few days ago, "J&J's Victory Over Cancer Victims

2  Clears the Pathway for 3M and Dow Chemical and Others."

3  Clearly -- whether you agree or not, I am being blamed for a

4  lot.  But clearly this goes beyond the litigants, even though

5  there are tens of thousands of litigants, and the Court

6  recognizes the claimants in these cases.  But this impacts

7  decisions and restructurings or potential restructurings beyond

8  what's being litigated in this court.

9           The Court recognizes that the question of the proper

10 venue to litigate mass tort cases has been brought to the

11 forefront, and has generated the interest, as I've indicated,

12 of policymakers, media, a few very nasty people on Twitter, and

13 the like, but that the Circuit may indeed wish to address these

14 matters in the short term.

15          The Court also takes into account the dollars

16 involved.  We're talking about billions upon billions of

17 dollars, and thousands upon tens of thousands of potential

18 claimants, all of which I think warrants the opportunity for

19 the Circuit to address these issues at this juncture in the

20 short term.

21          As to the procedural issue I had raised I think at

22 the last hearing, whether or not the motion to dismiss order

23 was interlocutory, in reading Rule 8004 I don't think, and I

24 would agree that the Circuit can, if it accepts direct

25 certification, allow the interlocutory order to be appealed.  I

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 77 of 122

76

1  will say though I'm not convinced that should the Circuit

2  decline certification, that whether or not the motion to

3  dismiss order is interlocutory I believe still remains an issue

4  for the District Court in light of <u>Bullock</u> and <u>Ritzen</u>, because

5  then you don't have the safety net of Rule 8004.  It's not

6  something I have to decide, thankfully, but I just lay it out

7  there.

8          So, with that -- and I appreciate the debtor's

9  professionalism in not extending the argument, but I do think

10  the interests of the public and the Bar are served by allowing

11  this -- allowing these issues to percolate to the Circuit

12  directly, and I will be granting the motions.

13          Let me defer to counsel for the movants.  I would

14  think there should be one order granting the motions.  I don't

15  know if you want to submit an order on all of the motions.  Do

16  you have a preference, because I have three different, or four

17  different motions?

18          MR. MOLTON:  Your Honor, I just took a sense of all

19  the movants.  David Molton for TCC1 again.  And I think we'd

20  put together a proposed order for all the movants in one single

21  order, and vet it, of course, with the debtor before getting it

22  to you.

23          THE COURT:  All right.  Thank you.  I think that's

24  preferable.  So, we'll mark these ordered to be submitted.

25  Thank you all.

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 78 of 122

77

1           All right.  Let's move to Number 10 on the agenda,

2   Number 4 on the calendar, and I'll probably want to take up

3   both, the issue of continuing TCC2 for purposes of the appeal,

4   their pending motion, as well as the appointment of a second

5   FTCR.  Counsel?

6           MS. SPECKHART:  Thank you, Your Honor.  Good

7   afternoon.  Cullen Speckhart for the record of Cooley LLP,

8   appearing on behalf of TCC2, Your Honor.

9           I'd like to go about my discussion of Agenda Item

10  Number 10 by being direct, and by acknowledging, in the

11  interest of complete candor, that the reality of where we were

12  when we filed this motion is a very different place than we

13  find ourselves today.

14          We filed the motion on March 7th for its stated

15  purpose of requesting that this Court maintain TCC2 intact to

16  protect the appeals, and to continue their separate prosecution

17  on behalf of the parties that continue to pursue them

18  separately as a distinct group of mesothelioma claimants that

19  independently participated in the trial.

20          And I want to be as transparent as I can in

21  addressing this with Your Honor because while it remains a

22  matter of critical importance for us to protect the independent

23  appeals that we independently filed following our separate and

24  distinct prosecution of our objectives at the trial, today we

25  are here for a much broader purpose because we are committed to

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 79 of 122

78

1  the cause that Your Honor described earlier today as the

2  paramount priority in the case.

3       Now, what has transpired since the time that we filed

4  this motion, there are a few examples of some critical events.

5       First, Your Honor, we expressed to the Court on March

6  8th that we're here in good faith to assist the process

7  constructively by negotiating with the debtors on parallel

8  paths in mediation.  Now, on that same day Your Honor appointed

9  Judge Schneider and Gary Russo as co-mediators.  We, as Your

10  Honor recalls, reserved rights on that.  We deliberated with

11  our group, and ultimately in the spirit of cooperation we

12  informed the Court via correspondence to Your Honor on March

13  10th that we agreed with the co-mediators.

14       Now, Your Honor permitted the continued separateness

15  of the committees through April 12th to allow for parallel

16  negotiations to begin, and on that basis we collaborated with

17  the parties on the material which was later memorialized by the

18  mediation protocol, which was approved by Your Honor and

19  entered on the docket at Item 1780 on March 22nd.  And that

20  order is important because it specifically designates and

21  defines TCC2 as a mediation party in Paragraph 3, and provides

22  for the mediation to include events marching out through the

23  end of May, which is proximal, perhaps not coincidentally to

24  the expiration of the preliminary injunction in June, and we

25  recognize that the Court is taking this matter in pieces and

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 80 of 122

79

1  parts quite appropriately and correctly.

2         Now, a little later in March, at the hearing on the

3  mediation protocol, I believe that was March 16th, when various

4  parties raised their hands asking to be included in the

5  mediation, Mr. Gordon responded that the debtors are supportive

6  of the mediation parties as indicated in the protocol, and as

7  we know, those parties included both TCC1 and TCC2 as separate

8  mediating entities.

9         And, Your Honor, without giving away any confidences

10  or divulging any information about the substance of the

11  mediation I will represent that the dual track of the mediation

12  is proceeding with a number of different work streams and

13  points of analysis underway at TCC2 to explore whether a deal

14  can be reached, and that remains our objective because we

15  believe, as I've said before, that the best resolution here is

16  a consensual resolution that is based on two separate tracks of

17  negotiations.  And that is the process that's been established

18  in the mediation protocol.  We want to see it through to its

19  conclusion, just as Your Honor contemplated when the Court

20  entered the order.

21         And just as we want to be forthright with our

22  negotiating counterparties, Your Honor, we want them to be

23  straight with us.  We want them to engage with us to try to

24  reach a deal that satisfies both groups of creditors, and we

25  don't want the debtor's attitude or anybody else's attitude to

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 81 of 122

80

1   be that all they have to do is wait it out until April 12th or

2   some other date because our request advanced in mediation will

3   disappear along with the parties that made them.  That

4   construct, we believe, is rife with the potential for delay and

5   gamesmanship, and like I said to Your Honor, we are here to be

6   fair in our negotiations and our dealings with the Court, and

7   to comport ourselves with integrity along the way.

8           So it's no secret that we take issue with a number of

9   things that the debtor have determined to do in this case, but

10  I give Mr. Gordon the credit he deserves as a professional, and

11  I would like to believe that the debtor embarked on this

12  process of mediation on a parallel path, and endorsed the

13  protocol because it believes and intends to mediate with the

14  designated mediation parties in good faith for the duration.

15          And I strain to think that the debtors could have

16  believed that a healthy consensus producing mediation would

17  involve a fundamental change in the mediation parties

18  midstream, or that such a result would be fair to the mediators

19  who are obviously working tirelessly to try to achieve

20  consensus in this case.  That would have been rather

21  disingenuous indeed, and we don't attribute those motives to

22  any party involved in this process.

23          So, I will not speak for Mr. Molton.  I know he does

24  intend to address the Court.  But given that TCC1, and I

25  believe the mediators, and I believe that TCC2 are satisfied

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 82 of 122

81

1    and comfortable with the current process, we would ask Your

2    Honor to maintain the separateness of the committees intact for

3    all purposes, including the mediation and the appeals so that

4    we can continue in the most direct way towards the ultimate

5    goal in this case, which is to achieve an appropriate

6    resolution of all outstanding issues in a way that is fair and

7    efficient, and comports with the Court's expectations of the

8    parties governing themselves in the interest of effective case

9    management.

10            THE COURT:  Thank you, counsel.

11            MS. SPECKHART:  Thank you, Your Honor.

12            THE COURT:  Mr. Molton?

13            MR. MOLTON:  Your Honor, we put in a statement, and I

14    am going to -- I think it just -- I had talked with Ms.

15    Speckhart about sequencing, and I know Mr. Gordon put in an

16    objection on behalf of his client, but I think it's important

17    for Your Honor to hear from TCC1, who all of this would have an

18    impact on one way or another, however Your Honor goes.

19            I am going to support what Ms. Speckhart said with

20    respect to what's happening with the word that I guess we're

21    not supposed to use, unless we're given approval to, but the

22    mediation.  But, needless to say, we will address the fact that

23    in accordance with Your Honor's order it has begun.  I think

24    Ms. Speckhart is right that both -- all the participants, and

25    that includes the debtor at this point, TCC1 and TCC2 have

82

1  engaged fully with the mediators, I think Ms. Speckhart is

2  right again that there are various data analyses and data

3  points that are going on with the mediators at this point

4  independent of each other.  So, the present structure from

5  TCC1's point of view, looking at Your Honor, and I heard a date

6  before, June 14tn, and that to me was a very important date,

7  and I'll get back to that in a minute, but that seems to be the

8  reporting date or soon after the mediation orders deadline for

9  a mediator's report on the status of the mediation.

10        So, as events have really taken over some of what has

11  happened with respect to the two committees it looks like we're

12  looking at a three-month period henceforth, or two-and-a-half

13  month period of intense attempt at resolution on all sides, and

14  the structure that is in place from my perspective should be

15  the structure that continues in that -- to that point.

16        So, I am going to support on behalf of TCC1, and we

17  support, and I want to put that down as a marker that TCC1

18  supports the continuation of the present structure through the

19  goal posts, so to say, or the milestones that Your Honor has in

20  fact constructed for the next April, May, two months, 60 days

21  plus two weeks until we get to the next omnibus hearing.

22        Further, Your Honor, this makes practical sense

23  because in the event Your Honor would say, well, TCC2 can

24  continue for a particular purpose, say the appeal, which was

25  the original ask of Ms. Speckhart and her committee, that puts

83

1    us in a very peculiar situation, Your Honor, where TCC1 would

2    then arguably become TCC0.0 again, bringing back in our former

3    members --

4              THE COURT:  Right.

5              MR. MOLTON:  -- from the mesothelioma committee, yet

6    TCC2 would exist for the purpose of the appeal, and what would

7    then happen with respect to TCC1's own viewpoint on appeal

8    issues.  And that's why we put in the statement, Your Honor,

9    that if TCC2 were given that life for a specific subject matter

10   it creates some confounding perplexities, including the fact

11   that you might have to have TCC1 and TCC2 continue to exist for

12   the purpose of the appeal and then return to TCC0.0 for all

13   other purposes, needless to say, a situation that I think we

14   all would like to avoid.

15             So, from a practical point of view, Your Honor, it

16   makes eminent sense to continue the structure to that day in

17   June that I think Your Honor noted in connection with the

18   insurer's motion, and we can also use to revisit these issues

19   when we know what has happened at that point.

20             I do want to note, Your Honor, that in light of Your

21   Honor's decision, which we were pleased about on the

22   certification issue, and I do want to reiterate that the

23   briefing from all sides was just spectacular on that issue, and

24   I hope it helped Your Honor --

25             THE COURT:  It did.

84

1          MR. MOLTON:  -- avoid two hours of further discussion

2    now.  So, in any event, it would seem to me, as we did in

3    Perdue, it may be that we go to the Third Circuit not only with

4    the certification, but a request for expedited briefing.

5          Judge McMahon's decision on Judge Drain's

6    confirmation order in Perdue is going to be heard actually next

7    -- this month, I mean next month, April 29th.  So, the Circuit

8    can work fast when it wants to.  And that would -- if that sort

9    of briefing comes together here, and I'm not going to

10   presuppose what the Third Circuit may or may not do, you

11   actually have a pretty logical track of the mediation.  Again,

12   I dare to use that word, but it's -- we've used it today.  A

13   number of people have used it and we have a public order.  But

14   we have a mediation that has a set time frame with a look see

15   in mid-June, and you might have at the same time a parallel

16   track in the Third Circuit, both of which I think help each

17   other, in my view and our committee's view.

18         So, with respect to those issues, and I do know, and

19   I don't know if Ms. Speckhart addressed, she did not address

20   the two FCR -- FTCR issue, Ms. Cyganowski --

21         MS. CYGANOWSKI:  Not yet.

22         MR. MOLTON:  Not yet.

23         THE COURT:  Right.

24         MR. MOLTON:  Ms. -- suffice it to say we have a

25   different view than TCC2 on that issue.

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 86 of 122

85

1          THE COURT:  Correct.

2          MR. MOLTON:  A very different view.  And you'll hear

3   from that in a minute.  And I don't want what I'm saying here

4   to prejudice what Ms. Cyganowski is going to say shortly.  But

5   it would seem to me that maintaining the structure that Your

6   Honor has carefully built under challenging conditions would be

7   a positive thing for the reasons that I've said.  So, that's

8   why TCC1 stands here and supports Ms. Speckhart's request, at

9   least for the purpose of maintaining the structure through that

10  omnibus date on June 14th.

11         THE COURT:  All right.  Thank you, counsel.  Ms.

12  Jones, good afternoon.

13         MS. JONES:  Good afternoon, Your Honor.  Laura Davis

14  Jones with Pachulski, Stang, Ziehl & Jones on behalf of Arnold

15  & Itkin.  Your Honor, I will confess this is the first I'm

16  hearing this.  We had not taken a position because the request

17  was that TCC2 would be staying in existence for purposes of the

18  appeal.  That was the request of this Court.  That's what was

19  noticed up for hearing today.

20         Again, Your Honor, we're finding TCC2 continuing in

21  what I think is becoming a little bit of a bad habit, which is

22  that they have creeping requests and they tend to be at the

23  very last minute.

24         Your Honor, from our perspective this is troubling.

25  While I understand what Mr. Molton said, I understand what Ms.

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 87 of 122

86

1   Speckhart said, Your Honor, this idea of creeping requests

2   cannot be granted when they're in violation of due process, and

3   this is not what was noticed up for today.  And again, Your

4   Honor, it's the second time that we've had this issue.

5           Your Honor, the TCC1 and TCC2, obviously, did not

6   like this Court's ruling with respect to the two committees,

7   and the vacatur of the two committees that were set up by the

8   Trustee's Office.  This is, Your Honor, just a continuing end

9   run around Your Honor's order.  We had it.  Your Honor had

10  vacated the new committees.  There was then a request, but,

11  Your Honor, we've put so much work in on the dismissal, we were

12  here through the whole trial, we need to be here, at least,

13  Judge, let us finish the trial.  Oh, at least, Judge, let us do

14  the appeal.  Nobody can do it like us.  We are separate.  We

15  are important.  We need to be here for the appeal.  And Your

16  Honor was willing to hear that today, and from your comments at

17  our last hearing I believe Your Honor would have granted that,

18  and indeed, we did not take a position against that.  We saw

19  the wisdom of that.

20          Your Honor, now we're going the next step.  Judge,

21  understand us, we were here for the trial, we were here for the

22  appeal.  Now we're in this mediation that none of us can talk

23  about.  And indeed, Your Honor, Arnold & Itkin is not in that

24  mediation.

25          So, Your Honor, my concern is that now -- I think

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 88 of 122

87

1  what I'm going to hear next is as we take this task by task,

2  project by project, is that, you know, we might as well swing

3  for the whole enchilada and say, you know, Your Honor, we were

4  here for the dismissal trial, we were here for the appeal, we

5  were here for the mediation, we need to be here for plan

6  confirmation.

7          And, Your Honor, as you have seen in our papers in

8  connection with the second FCR, and I know we will come back to

9  that, Your Honor, this is an end run around Your Honor's

10 ruling, and it is an elevation of representation of a full

11 statutory committee for claimants who represent less than one

12 percent of all the asbestos claimants now being able to take

13 this position and keep moving with it.

14          Your Honor, it's unfair.  It's contrary to Your

15 Honor's ruling.  Frankly I think it's disrespectful to the

16 parties.  I do not think it was meant with disrespect to the

17 Court.  I think it's just a bit clever.  And, Your Honor, we

18 suggest that this not be sanctioned, and that you deny the

19 request, Your Honor.  Thank you.

20          THE COURT:  Thank you, Ms. Jones.  Mr. Gordon?  Or --

21          MR. GORDON:  Greg Gordon on behalf of the debtor,

22 Your Honor.  Not to disappoint, I do have a short PowerPoint.

23          THE COURT:  Whew.

24                    (Laughter)

25          UNIDENTIFIED ATTORNEY:  We were going to be very

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 89 of 122

88

1    disappointed.

2        MR. GORDON:  So, Your Honor, there's really three

3    fundamental points that I am going to cover today.  And I will,

4    during the course of this, respond to some of the statements I

5    heard just this morning, as well.

6        So, the first, Your Honor, just to reset, and this

7    follows up on Ms. Jones' point, this again is coming all at --

8    at the very last minute, and it is a moving target in terms of

9    what the relief is that's being sought by TCC2.

10        THE COURT:  That's okay.  I can see it here.  Thank

11   you.

12        MR. GORDON:  We have plenty of those, Your Honor.

13                    (Laughter)

14        MR. GORDON:  So, if you'd just look at this time line

15   of events, and I'm not going to cover everything on here, I

16   mean, this dates all the way back to December of last year, and

17   that's -- on December 23rd was when the U.S. Trustee filed its

18   notice.

19        And I think as soon as we were in front of Your Honor

20   after that, on December the 30th, we indicated that we intended

21   to object, as did Arnold & Itkin, on the basis that we thought

22   that was improper, that the U.S. Trustee, given what had

23   happened in North Carolina and the ruling by Judge Whitley down

24   in North Carolina, did not have the authority simply to

25   reconstitute the committee like that.  We then followed that a

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 90 of 122

89

1   few days later by filing our reinstatement motion.  A few days

2   after that Arnold & Itkin filed its motion, and we had a

3   hearing.

4           And on January the 19th Your Honor granted those

5   motions, determining that I believe that in fact that was

6   improper, that the reconstitution of these committees was not

7   properly done, and that if there was going to be a change

8   basically the U.S. Trustee or other parties in interest needed

9   to take the appropriate steps under Section 1102 to do that.

10          As things then developed, you know, we had that occur

11  on January 19th, and then we had an indication from the U.S.

12  Trustee formally on March the 1st that it was not going to

13  pursue any relief with respect to the order.  And then it was

14  finally, on March the 7th, so now we're about three months

15  later, moving to continue its existence just for purposes of

16  the appeals, and with respect to a second FTCR.  So, it was a

17  very narrow request.

18          That was filed just before TCC2 was scheduled to

19  dissolve, and it was filed just the day before a hearing that

20  was scheduled on March the 8th.  And Your Honor, considering

21  the circumstances, on the 8th, decided that you would

22  temporarily extend their existence, you know, to hear them on

23  this appeal motion and the letter, what we call the letter

24  motion on the FTCR.  So, again, that all came at the very last

25  minute, and it was a very narrow request for relief at that

90

1  time.

2         So, having said that, Your Honor, I think the issue,

3  the fundamental issue here had been litigated and determined by

4  the Court, which was the question of whether TCC2 and TCC1 were

5  ever validly formed or not.  And I think Your Honor ruled on

6  that.  We were past that.  But you permitted this accommodation

7  to allow the trial to go forward, and allow time for issues to

8  be heard in the Court.  And again, if you go back to the order

9  Your Honor had entered a few days after the hearing you said

10 specifically that it was without prejudice to the U.S. Trustees

11 or any other party in interest's right to move for relief with

12 respect to that order and/or the appointment of an additional

13 claimant's committee, or additional committee member.

14         So, you didn't say we're done.  You just said, look,

15 I'm reserving your right, and you still have your right to take

16 appropriate steps under law, including under Section 1102, to

17 ask to be appointed.  And, of course, if you do that, if they

18 had done that, they have to file a motion, and they have to

19 make the appropriate showing.  That's never been done.  They

20 have never attempted to make the showings required, for

21 example, under Section 1102.

22         So, now we're to the point -- I would sort of

23 characterize this now as death by a thousand cuts.  So they

24 were given a little bit of leeway to last for awhile to

25 accommodate them, and then they came in and said, okay, now we

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 92 of 122

91

1  want to continue for purposes of pursuing the appeals.  Again,

2  all came in at the last minute.  And now the latest is -- I

3  think it came in yesterday or the day before.  The days all are

4  running together in my mind.  Now, all of a sudden they are

5  trying to bootstrap off the mediation protocol order and their

6  involvement to some extent in this mediation to say now we

7  should be allowed to continue for all purposes.

8        And, in fact, it was suggested by Ms. Speckhart if I

9  were to stand up here and to point out that this really

10 shouldn't be condoned, that I would be disingenuous based on

11 comments I made with respect to the mediation protocol order.

12 When that order was entered I don't think any party was

13 agreeing or conceding that TCC2 could continue indefinitely for

14 all purposes, that TCC2 could continue to remain involved in

15 the mediation process indefinitely.  That order was simply a

16 recognition that at the time that order was put into place that

17 committee was still in existence under orders of this Court.

18        And I think there's even language in the mediation

19 protocol order that was intended to clarify the fact that if

20 someone was a party, either is a party or had been a party, it

21 wasn't supposed to be used basically in this proceeding or

22 discussed without the consent of the mediators.  Now, I don't

23 know whether that consent was asked for.  I'm not aware that it

24 was.

25        But that's I guess a long way of saying there was

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 93 of 122

92

1  certainly no understanding on this side of the room that by

2  saying we were in accord with that protocol that we were

3  basically agreeing that the committee could stay in place

4  indefinitely and for all purposes, including for purposes of

5  the mediation.  That was not what we had agreed to.  It was

6  simply a recognition of the facts on the ground at the time

7  that that committee was in existence at that time.

8          We would submit, Your Honor, that there's simply no

9  legal basis for the relief.  I mean, there's no basis, first of

10 all, no legal basis just to say we're going to have a committee

11 that was improperly formed become a formal committee for all

12 purposes in the case to represent this constituency without any

13 compliance with law.

14         The cases they cite -- that are cited in their brief

15 all involve validly formed committees.  There is not a

16 situation like this where they have a case they're relying on

17 where the committee was never validly in existence to begin

18 with.

19         The cases they cite involve situations where there

20 would be no remaining committee, like post-confirmation for

21 some purpose, and with respect to a plan.  There would be no

22 remaining committee.  Here you have the reconstituted TCC.

23         And that's the one thing that's constantly overlooked

24 in these various arguments that are made, which is the whole

25 idea of the order here was at its expiration, at the deadlines

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 94 of 122

93

1  Your Honor set the former committee would be reconstituted.

2  That committee has four mesothelioma claimant members on it.

3  That's like 40 times what their representation should be, if

4  you just look at the relative number of claims, mesos, 400

5  versus 40,000 on the ovarian side.  They would be well

6  represented.  And that shouldn't be lost.

7          This isn't a situation where this -- the committee

8  disappears, any formal representation of the group disappears.

9          And Your Honor even offered long ago the idea of an

10  ex officio subcommittee if there was some point of view on

11  behalf of the mesothelioma claimants that even having 40

12  percent or so of that committee wasn't enough you offered that,

13  and they had no interest in that for reasons that we have never

14  understood.

15          And, you know, I'm not going to spend a lot of time

16  on this, but the Chemtura case which is another case that's the

17  subject of all the briefing, I mean, there -- I mean, the

18  Courts acknowledge the problems when you have committees, and

19  the fact you have all these groups that are basically being

20  funded by the estate with no, you know, real reason to be

21  judicious in the use of their fees.

22          And in our view, you know, I think our briefing

23  indicates this, we think there's been substantial duplication

24  in this case that hasn't been helpful to the Court, and it's

25  made all these proceedings longer than they need to be, much

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 95 of 122

94

1  more expensive than they need to be.

2          This goes, Your Honor, to the point I made before.

3  This is just looking at the constitution of these various

4  committees.  You have four of the seven TCC2 members were on

5  the original TCC.  And if we stay on the track that we've been

6  on since January or so, that's where we would be again.  We'd

7  be back with the original TCC.  And you can also see in the

8  middle, just TCC1, you've got seven out of nine on TCC1 would

9  move -- or move back to the original TCC and be part of that

10 committee, as well.

11         And then of course we also have the issue with the

12 professionals.  We fully expect the professionals for TCC2, at

13 least two of them will likely migrate back to TCC1 because

14 that's where they started from to begin with.

15         So again, this isn't a situation where their

16 interests won't be represented, where they won't be protected,

17 where they won't have a say.  I mean, they will have a very

18 significant say in the actions of the original TCC because of

19 the fact there's four of them out of 11 parties on that

20 committee, or 11 members on that committee.

21         Again, I won't spend a lot of time on this, but some

22 of the arguments that were advanced as to why this continued

23 existence made sense were that TCC1 and TCC2 have basically

24 made different arguments, they have had different perspectives,

25 they have expressed to the Court different points of view, but

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 96 of 122

95

1  Your Honor sat through the proceedings.  You've been here for

2  every hearing obviously.  You sat through the five days of

3  hearings on the dismissal motion and the motion for preliminary

4  injunction.  I think that's just belied by what Your Honor

5  experienced.

6         Counsel advised the Court right at the beginning of

7  those hearings that their interests were aligned, that they had

8  determined to sort of allocate their arguments in certain ways

9  because of the time limitations they had, but I don't think

10 that there was any different set of arguments that was advanced

11 by one set of counsel for one committee versus the other.

12        And again, just the incredible, from our perspective,

13 waste and duplication that occurred as a result of having all

14 these firms representing two different committees advancing the

15 same arguments, being involved in the same discovery, you know,

16 just an example of a single deposition and the number of

17 professionals that were involved because of all these firms

18 being involved, that's what will continue if TCC2 is allowed to

19 continue going forward.

20        I'm not going to spend much time on this, Your Honor,

21 but again, this is just basically walking through the TCC2

22 arguments as to how they were acting in an independent way, and

23 it's simply, again, if you look down the right hand column,

24 it's simply not the case.

25        And, Your Honor, we shouldn't lose sight of the fact

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 97 of 122

96

1  that there's just no authority for this, as we've talked

2  before.  And I'm not going to belabor it again.  There's just

3  no authority for the idea that you have separate committees for

4  different diseases.  And as you've seen from the briefing, in

5  basically every other case that's never been the situation, and

6  you know, to start here to set that precedent to us is a

7  mistake.  It's unwarranted.  It's not needed.  And it's

8  particularly not needed because you have a committee that was

9  already set that represents the interests of both the mesos and

10  the ovarian cancer claimants.  And Your Honor knows, by the

11  way, better than I do, that creditors' committees, this is what

12  they deal with all the time.  They have different constituents

13  on the committee.  They have different points of view.  And

14  that's one of the great benefits of having a committee.  They

15  get to work together, hear each other's points of view, work

16  collectively to maximize the position of all creditors, and

17  that's what we would expect would happen here.

18         There was an argument made in connection when the

19  relief was more narrow that, well, if you don't allow us to

20  continue with the appeal other mesothelioma claimants will file

21  notices of appeal, and that's going to make this even messier

22  and more inefficient, well, that hasn't happened, and the time

23  has passed anyway.  You only have one group who has filed a

24  notice of appeal.  There's no further ability to do that

25  anyway.

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 98 of 122

97

1          And it is telling that prior to the Court -- or prior

2    to the U.S. Trustee setting up this TCC2, it wasn't like

3    mesothelioma claimants were coming in and filing their own

4    motions the way Arnold & Itkin did and some of the ovarian

5    cancer claimants did.  So, it wasn't like mesothelioma

6    claimants were apparently of the view that their interests were

7    not being adequately represented by the original TCC.  You

8    would have thought if that were the case they would have been

9    doing what Arnold & Itkin did, and what some of the other

10   ovarian cancer plaintiffs did.  They apparently were

11   comfortable with where they were with the original TCC2.

12          So, I mean, just with this movement today to now we

13   want to be -- continue indefinitely, and I guess Mr. Molton

14   followed that by saying we'll just move them out to June, let's

15   take it from there, that to me is kind of the -- I mean, both

16   are very problematic.  The first -- what I heard from Ms.

17   Speckhart is just go ahead and make this an official committee

18   for all purposes in the case even though there's no authority

19   for it, we haven't properly sought it.  There's no legal basis

20   for it.  We, obviously, oppose that.

21          Mr. Molton's idea, although obviously not as extreme,

22   is just as bad because all that's going to do is we're going to

23   be back here in June, hearing from Ms. Speckhart that well now

24   that we've been involved in the mediation we're going to tell

25   Your Honor that we were very helpful to the process, we're a

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 99 of 122

98

1   key contributor, we have been doing all our separate analyses

2   and all this separate work, our professionals have all been

3   engaged, and it would be a huge mistake to now terminate our

4   existence, and we should go for another four months because the

5   next stage of this case is estimation, or it's some other

6   process.  That's what's going to happen.  And so it's like no

7   good deed goes unpunished.  Now, Your Honor I thought was very

8   clear that what the U.S. Trustee did wasn't warranted, it

9   wasn't appropriate, and nonetheless he made an accommodation.

10  And now they are trying to use that accommodation to bootstrap

11  that ultimately into completely reversing your opinion.  And I

12  would say, Your Honor, that's not appropriate, and, you know,

13  we oppose this.  We think the time has come for TCC2's

14  existence to end, we should go back to the original TCC.

15          The other thing I wanted to comment on the concern

16  from Mr. Molton about the appeal, and is there going to be some

17  problem with the appeal about, you know, whose arguments can we

18  advance, or does the -- do the two committees have to exist for

19  that purpose only, and then TCC -- the original TCC comes back

20  into existence?  But we worked on a stipulation with the

21  parties to resolve that issue, which I think very clearly says,

22  and we agree to this, that the original TCC can basically adopt

23  whatever arguments it wants to adopt that were advanced by

24  either TCC1 or TCC2, and it seems to me that should fully

25  resolve any concern that any party might have in terms of

99

1  whether the appeal is somehow compromised, or whether there's a

2  need to have the committees exist for purposes of the appeal

3  only, and then be in this uncomfortable position of doing that

4  at the same time that the original TCC comes back into

5  existence.  So, Your Honor, we oppose the request.  We think

6  the time has come to go ahead and basically formalize what Your

7  Honor decided several months ago, and we should go back to the

8  original TCC.

9          THE COURT:  All right.  Thank you, counsel.  Mr.

10  Sponder?

11          MR. SPONDER:  Thank you, Your Honor, and good

12  afternoon.  Jeff Sponder from the Office of the United States

13  Trustee.  Your Honor, the United States Trustee was prepared to

14  provide its observations about TCC2 continuing in existence for

15  purposes of pursuing the appeals of the motion to dismiss and

16  the injunction, but as we've all heard it appears that that

17  request has been revised to allow TCC2 to remain in existence

18  for all purposes.

19          Your Honor, the United States Trustee does not take a

20  position on the new request, but observes that there are really

21  only two options here, either to allow TCC2 to remain in

22  existence for all purposes, or dissolve the two committees and

23  reconstitute the original committee.  Any partial existence

24  should not be allowed.  Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Sponder.  Ms. Speckhart?

1    MS. SPECKHART:  Thank you, Your Honor.  I would just

2  like to briefly respond to some of the remarks we've just

3  heard.  First, on the issue of timeliness, this is not a last

4  minute request, and as a point of fact we're actually quite

5  advanced in the timing of making this request for relief

6  because we're making it prior to the April 12th date, which is

7  the date of the next omnibus hearing, and the date upon which

8  TCC2 and TCC1 are scheduled to be reinstated back to TCC0.

9    And the reason that we've raised it today and not in

10  two weeks from now is actually twofold.  First, the motion for

11  a continuation of TCC2 for purposes of the appeal was on for

12  today, and again, we are in an open process of mediation, and

13  we would prefer to focus our energies on the mediation for the

14  next two weeks rather than having to continue to deal with the

15  potentiality that we're back to another committee for the rest

16  of the mediation, which may or may not have happened on the

17  12th.  So, we thought it would be appropriate, in the interest

18  of being direct and transparent, to bring it to Your Honor's

19  attention before we get too much further down the road with the

20  mediation itself.

21    I also want to address Mr. Gordon's point about an

22  1102 motion.  It does not need to be a mystery as to why we

23  have not filed a motion under 1102(a)(2).  As I said previously

24  in connection with a similar issue at a prior hearing, we were

25  surprised.  We had expected the U.S. Trustee, based on its

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 102 of 122

101

1  previous remarks, to file a motion under 1102(a)(1).

2       Now, we, as a party in interest, have a different

3  standard under the statute.  We need to proceed under

4  1102(a)(2), rather than (a)(1), which is the trustee standard.

5  And as we read the statute and the interpretive case law, what

6  that requires us to demonstrate is an actual conflict.  That

7  conflict does not exist right now because we have two

8  committees, so we have a bit of a chicken and the egg problem

9  under the statute.  We would have to show something that is

10 presently absent because right now we have the solution that we

11 would need to that problem.

12      So, what Mr. Gordon is suggesting is that we go back

13 to TCC0, where a conflict may very well arise, and then we come

14 back to Your Honor with a request under 1102(a)(2) for exactly

15 what we have right now, which is the lack of a conflict, and a

16 dual track mediated negotiation pattern that is designed to get

17 us to what I believe Mr. Gordon wants, which is a consensual

18 plan that is produced by a well-functioning, well-structured

19 mediation.

20      Now, on the question of duplication and fees, Mr.

21 Gordon now, as of this morning, has his solution in the form of

22 a fee examiner.  We did not challenge that appointment, and in

23 fact we welcome it.  We'll have a discussion at some point in

24 time about (indiscernible) service, I assume.  Well, we

25 certainly don't have as many professionals as J&J and the

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 103 of 122

102

1  debtor has, and we're committed to using our resources

2  judiciously.  Mr. Gordon said that again that this is something

3  that creditors' committees deal with all the time, and I would

4  respectfully object to that statement.  Nothing in this case

5  with respect to the one committee, two committee issue was

6  something that we deal with all the time.

7          But regardless of what happened in this case, or how

8  it happened, we are where we are.  We would like to continue

9  with the mediation.  We're knee deep into the mediation right

10 now.  And we're committed to exploring what settlements are

11 possible.

12         We would ask Your Honor to continue the status quo

13 for the benefit of TCC1 and TCC2, and all of the creditors that

14 those bodies represent, and to a date that Your Honor deems

15 appropriate under the circumstances, whether that's July 14th

16 -- or June 14th or some other date.  Thank you, Your Honor.

17         THE COURT:  Thank you.  Thank you, counsel.  I

18 appreciate TCC2's candor and transparency and professionalism.

19 You raised an issue, as -- you've made a comment that we

20 haven't seen these issues, and that's exactly what has

21 disturbed the Court is that we have had ample cases of asbestos

22 -- asbestos cases.  We have a related case, _Imerys_, in

23 Delaware, where we don't see two committees based on disease,

24 and we'll touch on this, I'm sure, coming up.  We don't see two

25 FTCRs or FCRs.  It's always baffled this Court why the District

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 104 of 122

103

1  of New Jersey suddenly becomes a petri dish for

2  experimentation.  It's rhetorical, you don't need to answer.

3  But there's no history that anybody can point to as to

4  structural problems with having a single committee.  There are

5  preferences.  I can understand, and I appreciate the

6  preferences of having separate committees, but I have not seen

7  any evidence of conflict or structural problems in having a

8  single committee.  I am determined to have a single committee

9  in this case, as my earlier decision reflects.

10         I've given to April 12th, so that steps could be

11  taken to reconstitute the initial committee, it's because I

12  believe TCC2 has a role in the initial committee, you have 40

13  percent, four members.  I've blessed the concepts of ex officio

14  subcommittees, I've blessed the concept of an ad hoc committee.

15  I don't, frankly, expect counsel to disappear and claimants not

16  to have a voice in this case going forward, but no case has

17  been presented to me why there is a need for two committees and

18  that's all I initially sought, was an explanation or a

19  justification, but at this juncture what I've seen is

20  cooperation.

21         What I saw through the trial was an effort where all

22  issues got raised, nobody was handcuffed and I have no

23  expectation that on an appeal or the balance of this case that

24  issues that need to be presented to the Court are not going to

25  be presented.  There's been a stipulation that ensures that and

1  there are structural mechanisms to allow the meso claimants to

2  have a voice and I would urge them to take advantage of that.

3  So, I'm denying the motion to allow the continuation of the

4  TCC2.  Frankly, I don't think we need to go through April 12th

5  but in case there has to be certain steps taken in conjunction

6  with the U.S. Trustee's Office as far as reconstituting the

7  committee and ensuring that there is a voice for the meso

8  claimants, I'll allow it to continue through April 12th.  But

9  in my view, especially with the fact -- and let me just

10 reiterate, we have, besides the appeal filed by TCC2, there's

11 three other appeals of the same two orders raising somewhat the

12 same issues and even if there are other strategies or issues

13 that are not incorporated in those appeals, they haven't even

14 been accepted by the circuit and solely are in that briefing

15 stages or argument stage, there's ample opportunity.

16        So, at this point the motion is denied.  Let's talk

17 about the second FCR and I'm going to switch it and tell you,

18 I'm not convinced that there's a need for a second FCR, so

19 those who want to advocate for that, I certainly want to

20 listen.

21        MR. MOLTON:  Judge, can I raise one issue?

22        THE COURT:  Yes.

23        MR. MOLTON:  With respect to Your Honor's just now

24 direction and ruling.  I haven't seen the stipulation that we

25 worked out between the two committees and the debtor has been

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 106 of 122

105

1  entered, Number 1.  And so, maybe I'm wrong on that.

2          THE COURT:  I thought it had been entered.  If not --

3  I thought it was presented to me.

4          MR. MOLTON:  It was presented but I don't -- I'm not

5  so sure that it's been entered.  At least that's what I've been

6  told.

7          THE COURT:  We'll have my staff take a look.

8          MR. MOLTON:  Yes.  That's number one.  Number two,

9  Judge, my appellate team and litigation team advises me that

10 the steps to go to the circuit have got to be done this week.

11 Yeah.  Will be done and, accordingly, we need some clarity as

12 to the actual date when the reunification or reconstitution is

13 going to occur.  Once that stipulation is entered, that gives

14 us the formula and the practical fix on what goes forward but

15 we need to know who is going to be filing, you know, who is

16 going to be on the submissions to the circuit and that's going

17 to depend on when exactly.  If it's April 12th, I think we can

18 work with that, am I right?

19         UNIDENTIFIED SPEAKER:  (indiscernible)

20         MR. MOLTON:  Yeah, but arguably if it's April 12th,

21 Judge, then we would have the various -- the two committees

22 file those papers and then the stipulation would take effect

23 and we'd deal with that with the circuit.

24         THE COURT:  Well, I haven't shortened it.

25         MR. MOLTON:  Okay.

1          THE COURT:  I've indicated that I don't see the

2    reason but now you've explained one of the reasons why it makes

3    sense to wait through April 12th.

4          MR. MOLTON:  Yes.  So, we just needed some clarity on

5    that so that we know what we're doing in order not to confuse

6    the circuit as well.

7          THE COURT:  That's fine.  We don't want to confuse

8    them.

9          MR. MOLTON:  Thank you.

10          THE COURT:  All right.  So, Ms. Speckhart, I know

11    I've put a burden on you right now to explain why I'm wrong in

12    not seeing the need for a second FCR.

13          MS. SPECKHART:  Well, Your Honor, this matter comes

14    in connection to the letter brief that we filed on March 7th

15    requesting the appointment of a separate FCR.

16          That request was based on an understanding that in

17    the Third Circuit adequate representation of future claimants

18    is fundamental to any resolution under 524(g), and its repeated

19    mandates that future claimants must be adequately represented

20    throughout the process.  And in this Circuit, in the context of

21    524(g), adequate representation of future claimants and

22    interests requires the undivided loyalty of a fiduciary.  And

23    what we have in this case, notwithstanding whether there are

24    one committee or two committees, we have two separate classes

25    of claims and interests.  We have mesothelioma on one hand and

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 108 of 122

107

1    ovarian cancer on the other, which are categories of claims

2    with different attributes.  And it's not just the markers of

3    the disease that are different, it's the legal and settlement

4    attributes of the claims that are distinct and highly relevant

5    in a setting where an FCR is being asked to negotiate separate

6    resolutions.

7          And there are meaningful distinctions which I point

8    out on behalf of mesothelioma claims, without intending any

9    disrespect to anyone, it is just impossible to ignore that the

10   profile of legalities and practicalities expose a divergence of

11   character between these two sets of claims, that the future

12   claims representative should not have to struggle to resolve or

13   synthesize in any unitary construct.

14         And by way of distinction, but not disrespect, I

15   would reiterate that J&J had a very different experience with

16   mesothelioma claims, both in litigation and in settlement.  And

17   that, Your Honor, is not an accident.  It is because of the

18   legal and practical realities powering resolution of

19   mesothelioma claims that is entirely unique.

20         There is no dispute of this causation, there is no

21   dispute that asbestos causes mesothelioma which among other

22   things changes the complexion of these lawsuits and their

23   settlement values and their damages that are awarded in

24   litigation in the personal injury actions.  And all of these

25   distinct attributes must be taken into account by someone who

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 109 of 122

108

1  is negotiating for future mesothelioma claims and we view it as

2  a very unintrusive request for this Court to appoint someone

3  who is free as a fiduciary to advocate fully and fairly on

4  behalf of a distinct body of claims without suffering the

5  encumbrance of serving a divided master or effectuating dual

6  purposes in trying to get to a plan.

7           And, indeed, our view is that having two FTCR's to

8  negotiate for two distinct groups of claims as a fiduciary is

9  entirely consistent with those visions of the mediation process

10 that was established through the protocol.  And this is why it

11 is a little surprising that this modest request was met with

12 such an over response with dozens of pages of briefing by

13 parties saying that this might get so complicated and we've

14 never seen this before and similar arguments, but this is a

15 case specific consideration and no one can seriously argue that

16 this case is not entirely unique on its own merits.

17          And so, in this case, if we're going to do this right

18 and we're going to respect the Third Circuit's fiduciary

19 mandates, then we should have two FTCR's who are free to

20 independently negotiate and to advocate the interests of two

21 separate groups.  We have some thoughts on who would be an

22 appropriate candidate, taking out of consideration anyone who

23 was the subject of a previous strike and we're happy to share

24 those thoughts with the Court at the appropriate time, but we

25 do reiterate our request that two FTCR's be appointed for the

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 110 of 122

109

1 purpose of negotiation on behalf of the meso's.

2          THE COURT:  All right, thank you.  Ms. Cyganowski,

3 were you going to speak?

4          MS. CYGANOWSKI:  I would but I didn't know if the

5 debtor would like to go first, respect to Mr. Gordon.

6          MR. GORDON:  I'm happy to.  Your Honor, I won't say

7 much because, obviously, I heard what your, at least,

8 preliminary view is on this.  I think for the same reasons you

9 determined that there was no reason to continue TCC2, this

10 request should be denied, as well.  There's really no authority

11 supporting this at all.  I think in the briefs it was probably

12 made very clear that there's been many, many mass tort cases

13 involving different diseases, in fact, even different products

14 and the like in some cases, where there was a single FCR and

15 there's never been an indication as far as I know that that was

16 a problem.  And so, this would be sort of unprecedented for

17 Your Honor to do this.

18          And the second thing I would say, in some respects

19 it's even worse, you know, by virtue of the fact that this

20 request came after we went through this protocol that Your

21 Honor put together, the purpose of which was to have the

22 parties work together in some ways to come up with a single FCR

23 and to have had the parties all go through that process, to

24 have the two committees work together to propose Ms. Ellis as a

25 consensus candidate to be the FCR for mesos and ovarian.  And

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 111 of 122

110

1   then, of course, the debtor agreed to Ms. Ellis and then to

2   come back after that and to say, well, now, we're going to

3   rethink all of that.  And, apparently, Ms. Ellis isn't up to

4   the task, or she has a conflict, or some other disabling factor

5   that prevents her from being an effective FCR for both

6   diseases.

7           That, to me, just seems unfair, it seems too late.  I

8   think it's a slight, frankly, of Ms. Ellis to suggest that

9   having gone through this and having identified her as a

10  candidate who could perform this role on behalf of both mesos

11  and ovarian cancer claimants, to come back now and say no,

12  that's -- she can't do it for some reason, that's not

13  appropriate.

14          So, we continue to object, we think that a single FCR

15  is the way to go.  Ms. Ellis was a consensus candidate, you

16  heard at the last hearing, I think, from Mr. Molton, that she's

17  the first female FCR, you know, that's a great thing but to

18  come back now and say, well, that's all true but her role

19  should be diminished and we need to bring someone else in

20  because she can't perform that role, seems unfair to her,

21  unnecessary and would just create duplication.  Thank you.

22          THE COURT:  Thank you, Mr. Gordon.  Ms. Jones.

23          MS. JONES:  Thank you, Your Honor.  Your Honor, on

24  behalf of Arnold Itkin, Your Honor, we submitted a letter on

25  March 23, Docket 1829, and I'd incorporate that herein and I'll

111

 1  just make a few comments.

 2          Your Honor, as we discussed in our letter, the

 3  appointment of a second FTCR is not supported by law or prior

 4  practice.  We set forth in our letter and walked the Court

 5  through the somewhat painful statutory construction and

 6  analysis that 524(g) provides for one FCR per trust.  In

 7  Section F, 524(g)'s use of the singular with respect to quote,

 8  legal representative, stands starkly in contrast to elsewhere

 9  in 523(g) where the statute identifies the singular and the

10  plural, where it needs to be singular or plural.

11          Secondly, in the dozens of prior 524(g) cases, all of

12  them have had one FCR, regardless of disease type.  In the two

13  cases that the TCC2 identified, where two FCR's were appointed,

14  in both cases there was one FCR for persons who might

15  subsequently assert claims based on asbestos personal injury

16  claims.  The second FCR was for future claims that were either

17  not personal injury claims or were not asbestos related.  In

18  each case, very importantly, there were two separate trusts.  A

19  single trust for all asbestos personal injury claims and

20  demands and a second trust not related to asbestos personal

21  injury claims.  One FCR was appointed with respect to each

22  trust.

23          TCC2 has not identified any case where two FCR's were

24  appointed to represent personal injury claimants with varying

25  diseases arising from the same products.  Appointment of a

Case 21-30589-MBK   Doc 3256-4   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit C to Malone Declaration   Page 113 of 122

112

1  second FTCR to represent the meso claimants, again, Your Honor

2  is going to hear me say that those who represent less than one

3  percent of the Talc personal injury claims against the debtor

4  will add an unnecessary layer of divisiveness and complexity to

5  this case and, frankly, will elevate the meso claimants to a

6  position of disproportionate influence.

7          Your Honor, present claimants can be well represented

8  in a creditors' committee which has divergent interests in

9  membership so conflicts -- so can future claimants who have

10  different diseases arising from the same products be

11  represented by one FTCR with the fiduciary mandates to protect

12  their interests.

13          Your Honor, let's not insult the capabilities and the

14  experience that TCC2, along with the debtors and TCC1 see in

15  the FTCR they all nominated, consented to and Your Honor

16  approved.  As FTCR's fiduciary duty is to represent all future

17  claimants, the code provides for one FCR and a wealth of cases

18  prior to this one have shown that one FCR can do the job and

19  they have done the job.  We'd ask Your Honor that the request

20  for a second FTCR here be denied.

21          THE COURT:  Thank you, Ms. Jones.

22          MS. JONES:  Thank you.

23          THE COURT:  Mr. Falk.

24          MR. FALK:  Oh, I'm sorry, you were next.

25          MS. CYGANOWSKI:  You want to -- no, no, no.

113

1          MR. FALK:  No, no, no.  Mine is very brief and I just

2    want to introduce -- go ahead.

3          MS. CYGANOWSKI:  Sure?  I was going to introduce you,

4    too, so let me go first.  Melanie Cyganowski, Otterbourg,

5    co-counsel to TCC1.

6          Ordinarily, Your Honor, when a judge prefaces remarks

7    saying that you're going to rule in my favor, I would not say

8    anything, but there were a number of issues that were made

9    apparent in the papers and candid argument that I think I would

10   like to address briefly.

11         First and foremost, however, I'd like to bring the

12   Court back and bring us back, I think it's paramount that the

13   focus remain on the victims who have suffered from the harm

14   that we believe and avers was caused by use of Johnson &

15   Johnson's talc products.  A victim diagnosed with mesothelioma

16   or Stage 4 ovarian cancer, is facing odds of fairly certain

17   imminent death.  To suggest as TCC2 does, that a single FTCR is

18   unable or incapable of representing future victims facing this

19   type of diagnosis unfairly takes away the emphasis we believe

20   from the wrongs inflicted by Johnson & Johnson and distracts

21   from the importance of focusing on the provision of just and

22   fair compensation for all victims in this case.

23         But as we've also pointed out, and as Mr. Gordon and

24   Ms. Jones pointed out, there was a process and TCC2 actively

25   participated in the mediation protocol.  They affirmatively

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 115 of 122

114

1  agreed with the selection of Randi Ellis as the consensus FTCR

2  candidate and, indeed, they nominated Ms. Ellis as the

3  prospective FTRC candidate for mesothelioma if the Court were

4  to appoint one.  As I just indicated to former Judge Falk,

5  Randi Ellis is here in the courtroom, I don't know, Randi, if

6  you'd like to stand.  And next to her is very competent and

7  legal counsel, former Judge Mark Falk.  Both of them have been

8  actively participating in the case since their -- Ms. Ellis'

9  appointment.

10        But as I also reviewed the papers and arguments that

11  TCC2 made, not once did they say that she could not adequately

12  and properly serve as the single FTCR.  To be sure, they

13  advocate for two but their failure to say that she's unable to

14  perform her duties in a fair and appropriate manner as a single

15  FTCR confirms that appointment of one is appropriate here as it

16  is in other cases.

17        We also fear that to appoint a second FTRC to

18  adequately -- or excuse me -- to represent claimants with

19  different illnesses is not only duplicative but may engender

20  adverse consequences both in mediation and in the confirmation

21  process.  The FTCR, as you know, is charged with making

22  calculations of future claimants, based on reasonable and

23  thoughtful analysis of various numerical paradigms.  An

24  approach taken by any FTCR may vary based on individual biases

25  and may be conservative or aggressive in their approach.  The

115

1   notion of introducing two different viewpoints or approaches

2   into the mediation process is distracting, at best and at

3   worst, is inefficient and potentially disruptive of reaching

4   settlement which at the moment is the goal of all.

5        Indeed, we fear that instead of negotiating across

6   the table from the debtor and Johnson & Johnson, two FTRC's may

7   find themselves negotiating across the table from each other

8   and simply stated, this would not be helpful.

9        Fourth, and last, we believe that TCC2 may be going

10  down a path and this is, frankly, why I decided to stand and

11  make remarks known today to the Court, that they're going down

12  a path to set the stage for arguing that there should be two

13  classes of claims which will be required in any LTL Chapter 11

14  plan.  We totally appreciate that today is not the day to deal

15  with classification issues but for the record, we want it to be

16  on the record we disagree.  Two diseases caused by use of talc

17  products does not equate to the need for a separate class of

18  mesothelioma and a separate class of ovarian cancer claimants.

19  And this is especially so when one class numbers approximately

20  450 and the other in excess of 38,000.

21       We believe that both stand together in a single class

22  as unsecured creditors.  This happens all the time, even in

23  asbestos and mesothelioma cases.  There's one cancer, there's

24  asbestosis, there's mesothelioma, there are sadly many diseases

25  that happen from asbestos.

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 117 of 122

116

1          We are also at a loss as to why TCC2 argues that

2    TCC1 is somehow trying to bootstrap claims for damages for

3    ovarian cancer claimants by using so called higher value future

4    mesothelioma claims and any statistical analysis of damages.

5    The unfortunate bottom line is that any death caused by the

6    wrongful actions of Johnson & Johnson should be calculated

7    similarly.

8          Fortunately, many victims of ovarian cancer survive

9    and have lower mortality rates.  At no time has TCC1 argued

10   that victims of Stage 1 should be treated similarly to victims

11   of Stage 4.  But at the end of the day, none of this is

12   relevant to the question as to whether there should be one or

13   two FTCR's.  However parsed, a single FTCR in this case, Ms.

14   Ellis, is appropriate here as it was in <u>Imerys</u>, <u>Duro Dyne</u> and

15   other cases.  Thank you.

16         THE COURT:  Thank you, Ms. Cyganowski.  Mr. Falk.

17   Judge Falk.  I never quite know when it's appropriate to use

18   that title.

19         MR. FALK:  No, no, no, thank you for hearing from me,

20   I'll be very brief.  I'm Mark Falk, I'm counsel to Walsh,

21   Pizzi, O'Reilly and Falanga, prospective counsel for Randi

22   Ellis, who's just been introduced to the Court, which I was

23   going to do.

24         And a very brief comment and that is, we're very new

25   to the case as is Ms. Ellis and we completely defer to the

1  discretion of the Court in making a decision on this issue.

2  But what I wanted to say and say firmly, is given the

3  background, given the impeccable reputation, given the

4  experience of Ms. Ellis, I am confident, objectively confident,

5  that she can handle any of the tasks that the Court deems to

6  address to her.  And I thank you for hearing me.

7          THE COURT:  Thank you, counsel.  Ms. Speckhart.

8          MS. SPECKHART:  Your Honor, just one note. I do think

9  that we made it very clear in our papers that this is not about

10 Ms. Ellis' capabilities.  We did agree with Ms. Ellis as the

11 consensus candidate, I've had the opportunity to meet Ms. Ellis

12 and I have all the confidence in the world that her intellect,

13 her experience and her abilities.

14         Ms. Cyganowski is right, that we never took issue

15 with Ms. Ellis' aptitude.  We have no issue with Ms. Ellis'

16 aptitude, this is not a question of what can be done, Your

17 Honor, it's a question of what should be done in the interest

18 of efficiency and fairness, to give effect to the mandate

19 provided by the Third Circuit which is a requirement for the

20 undivided loyalty on behalf of the FTCR.  And as I said, Your

21 Honor, that loyalty should not have to be divided as between

22 two masters, two classes, particularly in an environment in

23 which, perhaps because of numerosity only, but not on account

24 of relative value or underlying merit, the voices of

25 mesothelioma claimants may be drown out to those -- to a chorus

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 119 of 122

118

1  of ovarian cancer claims which are entirely distinct.  Thank

2  you, Your Honor.

3           THE COURT:  Thank you, counsel.  Thank you all.  Very

4  good arguments.  I went into this past weekend, in all candor,

5  probably inclined to seek or to authorize the appointment of a

6  second FCR.

7           For the most part, if you recall my decision on the

8  motion to dismiss, much of it was premised on the need to

9  protect future claimants which is what I found lacking in the

10  MDL's and the class actions.  And it's still my concern that

11  future claimants have the utmost protections and a significant

12  voice.  But in reading through the briefs and the materials

13  and, see, briefs do count, it became clear to me that I was

14  looking for a solution for a problem that really didn't exist.

15  That nothing I saw in the record, in the certifications or in

16  the pleadings and the briefs, demonstrated to me anything but

17  confidence in Ms. Ellis' ability, including TCC2's confidence

18  in her abilities, but also that there, indeed, was a conflict.

19           A future claims representative, one of the primary

20  responsibilities is to ensure that the treatment of future

21  claimants and demands of future claimants are treated

22  consistently with those of the present claimants.  So, how

23  mesothelioma claims were treated in litigation in the State

24  Courts really has no bearing or defenses because it's a

25  different task to ensure that the future claimants can be

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 120 of 122

119

1  represented properly.  I do not -- and that can be accomplished

2  through structural mechanisms included in TDP's, through trust

3  agreements and through plans of reorganization.  And the

4  mesothelioma claimants will have advocates, will have their

5  voices heard throughout this case, they're a substantial part

6  of the committee and they can ensure that that holds true, not

7  only for the present but for the future claimants.

8          And if at some point in time it appears that there

9  is, indeed, a conflict, we can address that and it's never too

10  late to appoint an independent fiduciary.  But, again, I don't

11  see the issue at this moment --

12                        (Phone beeping)

13          THE COURT:  -- nor have there been -- they got tired

14  of me, court solutions -- they heard enough, don't worry, let's

15  continue.  I'm hungry.  At a future point in time if an

16  independent fiduciary is required, the avenues are there to

17  accomplish that.  But not at this juncture.  So, I'm denying

18  the request for a second FTCR and why we chose to use FTCR is

19  beyond me, just to make it that much more complicated.  But

20  where does that leave us -- and I will enter orders on the

21  motions.

22          The only thing I thought we had remaining was the FTI

23  application, which I'm not sure where that stands in light of

24  my ruling.

25          UNIDENTIFIED ATTORNEY:  Your Honor hit the nail on

Case 21-30589-MBK    Doc 3256-4    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit C to Malone Declaration    Page 121 of 122

120

1  the head.

2          THE COURT:  Do you want me to carry it?

3          UNIDENTIFIED ATTORNEY:  Yes.  We will carry it to

4  April 12th.

5          THE COURT:  Why don't we carry it to April 12th?

6  April 12th or April 14th?  April 12th, all right.

7          UNIDENTIFIED SPEAKER:  April 12th.

8          THE COURT:  All right.  I think we're done.  Take

9  care folks, have a good weekend.  Thank you.

10                        *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

WE, MARY POLITO, ALYCE H. STINE, TAMMY DeRISI and ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Mary Polito

MARY POLITO


/s/ Alyce H. Stine

ALYCE H. STINE


/s/ Tammy DeRisi

TAMMY DeRISI


/s/ Elaine Howell

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.    DATE:  March 31, 2022