# Exhibit D

## Third Circuit Transcript

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

```
IN RE:                         .    Case No. 22-2003/22-2004
                               .
LTL MANAGEMENT LLC,            .    21400 U.S. Courthouse
            Debtor,            .    601 Market Street
                               .    Philadelphia, PA 19106
OFFICIAL COMMITTEE OF TALC     .
CLAIMANTS,                     .    Monday, September 19, 2022
            Appellant.         .
. . . . . . . . . . . . . . . ..
IN RE                          .    Case No. 22-2005
                               .
LTL MANAGEMENT LLC,            .
            Debtor.            .
                               .
LTL MANAGEMENT, LLC.           .
                               .
        v.                     .
                               .
THOSE PARTIES LISTED ON        .
APPENDIX A TO COMPLAINT AND    .
JOHN AND JANE DOES 1-1000      .
OFFICIAL COMMITTEE OF TALC     .
CLAIMANTS,                     .
            Appellant.         .
. . . . . . . . . . . . . . . ..
IN RE:                         .    Case No. 22-2006/22-2007
                               .
LTL MANAGEMENT LLC,            .
            Debtor.            .
                               .
OFFICIAL COMMITTEE OF TALC     .
CLAIMANTS, ET AL.              .
            Appellants.        .
. . . . . . . . . . . . . . . ..
IN RE:                         .    Case No. 22-2008
                               .
LTL MANAGEMENT LLC,            .
            Debtor.            .
                               .
LTL MANAGEMENT LLC             .
                               .
        v.                     .
                               .
THIRD PARTIES LISTED ON        .
APPENDIX A TO COMPLAINT AND    .
JOHN AND JANE DOES 1-1000,     .
OFFICIAL COMMITTEE OF TALC     .
CLAIMANTS, ET AL.              .
```

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 3 of 123

2

```
OFFICIAL COMMITTEE OF TALC     .
CLAIMANTS, ET AL.              .
               Appellants.     .
. . . . . . . . . . . . . . ..
IN RE:                         .   Case No. 22-2009
                               .
LTL MANAGEMENT LLC,            .
               Debtor.         .
                               .
ARNOLD & ITKIN LLP, ON BEHALF  .
OF CERTAIN PERSONAL INJURY     .
CLAIMANTS REPRESENTED BY       .
ARNOLD & ITKIN,                .
               Appellant.      .
. . . . . . . . . . . . . . ..
IN RE:                         .   Case No. 22-2010
                               .
LTL MANAGEMENT LLC,            .
               Debtor.         .
                               .
AYLSTOCK WITKIN KRIES &        .
OVERHOLTZ PLLC, ON BEHALF OF   .
MORE THAN THREE THOUSAND       .
HOLDERS OF TALC CLAIMS,        .
               Appellant.      .
. . . . . . . . . . . . . . ..
IN RE:                         .   Case No. 22-2011
                               .
LTL MANAGEMENT LLC,            .
               Debtor.         .
                               .
LTL MANAGEMENT LLC             .
                               .
          v.                   .
                               .
THOSE PARTIES LISTED ON        .
APPENDIX A TO COMPLAINT AND    .
JOHN AND JANE DOES 1-1000      .
                               .
AYLSTOCK WITKIN KRIES &        .
OVERHOLTZ, PLLC., ON BEHALF OF .
MORE THAN THREE THOUSAND       .
HOLDERS OF TALC CLAIMS,        .
               Appellant       .
. . . . . . . . . . . . . . ..
```

3

TRANSCRIPT OF ORAL ARGUMENT
BEFORE
THE HONORABLE JUDGE THOMAS L. AMBRO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE L. FELIPE RESTREPO
UNITED STATES THIRD CIRCUIT JUDGE
THE HONORABLE JULIO M. FUENTES
UNITED STATES THIRD CIRCUIT JUDGE

APPEARANCES:

For the Appellants:          MoloLamken
                             By:  JEFFREY A. LAMKEN, ESQ.
                             600 New Hampshire Avenue, N.W.
                             Washington, D.C.  20037

                             Kellogg Hansen Todd Figel & Frederick
                             BY:  DAVID C. FREDERICK, ESQ.
                             1615 M Street, N.W., Suite 400
                             Washington, D.C.  20036

For U.S. Trustee:            U.S. Department of Justice
                             By:  SEAN JANDA, ESQ.
                             Appellate Section
                             Room 7260
                             950 Pennsylvania Avenue, N.W.
                             Washington, D.C.  20530

For Appellees:               Hogan Lovells US
                             By:  NEAL K. KATYAL, ESQ.
                             555 Thirteenth Street, N.W.
                             Washington, D.C.  20004

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311      Fax No. (609) 587-3599**

**WWW.JJCOURT.COM**

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 5 of 123

4

# I N D E X

ORAL ARGUMENT                                                    **PAGE**

    BY MR. LAMKEN                                             6

    BY MR. JANDA                                              35

    BY MR. FREDERICK                                          46

    BY MR. KATYAL                                             58

REBUTTAL ARGUMENT

    BY MR. LAMKEN

    BY MR. JANDA

    BY MR. FREDERICK

1        THE COURT:  Welcome this afternoon.  We have In re

2  LTL Management LLC, Numbers 22-2003, 2004, 2005, 2006, 2007,

3  2008, 2009, 2010, and 2011.  And in connection with the oral

4  arguments today, I had told counsel previously that we would

5  probably go a bit longer than the two hours.  That said, once

6  upon a time, we had an oral argument we started in the morning

7  in a case called Combustion Engineering and we went from about

8  9:30 until about 5:30, 5:45 and I didn't realize we didn't -- I

9  was reminded years later that we only took two 15-minute

10  breaks, which was not fair.

11        Seth Waxman argued and he told me that and somebody

12  was with him at the time.  Now, Judge Craig Goldblatt said that

13  is exactly right.  And I didn't realize that Mr. Waxman doesn't

14  eat on the day of oral argument.  And so in the afternoon, one

15  of my law clerks was feeling a little faint and went and got

16  some M&Ms, and she's sitting over there and she looks at

17  Mr. Waxman and Mr. Waxman looks at her and they both go, open

18  their hands and each had M&Ms in their hands.  So I've learned

19  my lesson.

20        What we will do is we will not go past five o'clock

21  today and we will take a break after the first hour so that

22  everybody can get some time to regroup.  And also if somebody

23  wishes to have a break sooner than that, just give me a little

24  bit of a high sign and we'll go from there.

25        And with that, why don't we begin with Mr. Lamken.

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 7 of 123

6

1  And I've promised Mr. Lamken and Mr. -- come on up --

2  Mr. Katyal that similar to what the Supreme Court has been

3  doing the last few years, will have two minutes of

4  uninterrupted time at the beginning of your argument.

5         MR. LAMKEN:  Thank you, Your Honor.  May it please

6  the Court.  If I may reserve 15 minutes for rebuttal.

7         THE COURT:  You certainly may.

8         MR. LAMKEN:  For more than a century, companies

9  facing genuine financial distress have done what companies like

10 Johns-Manville did.  They submit themselves and their assets to

11 the bankruptcy court and to the Code's requirements and

12 creditor protections.  This is an effort to do the opposite.

13 In LTL's words, to put talc-related claims through the

14 Chapter 11 reorganization without subjecting the rest of the

15 assets of JJCI to bankruptcy procedures and to enjoin suits

16 against 670 non-debtors, including affiliates, even though they

17 have independent non-derivative liability.  That subverts at

18 least four different core bankruptcy principles.

19        First, if J&J or JJCI had declared bankruptcy,

20 priority rules would require creditors to be paid in full

21 before equity gets anything.  But here, J&J and JJCI operate

22 outside bankruptcy with Old JJCI's assets, paying billions in

23 dividends to equity, to shareholders.  Last week, J&J announced

24 a $5 billion stock buyback, more for equity.  But talc victims

25 alone are mired in bankruptcy as they die.

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 8 of 123

7

1          Old JJCI's trade creditors are compensated in the

2     ordinary course, but the disfavored creditors, talc victims,

3     sit languishing in bankruptcy.  A clear subversion of the

4     priority rules that ordinarily apply is hard to imagine.

5          Second, debtors-in-possession management ordinarily

6     have a powerful incentive to try and emerge from bankruptcy as

7     quickly as possible so they can get on with their ordinary

8     operations free from bankruptcy supervision.  But here, J&J and

9     JJCI, the tortfeasors funding all of this, have no such

10    interest in swift emergence.  They operate Old JJCI's assets

11    outside of the Bankruptcy Code free and clear of bankruptcy

12    court supervision, paying who they want while talc claimants

13    alone are in bankruptcy.

14         LTL has no incentive.  It exists only for bankruptcy,

15    no operating business, no transactions to engage in.  You need

16    only look at the three other two step bankruptcies to

17    understand exactly what happens to these incentives.  Before

18    bankruptcy, for example, Bestwall had resolved 15,000 asbestos

19    claims.  Now, five years in, not one claimant has received

20    compensation from bankruptcy.  We have no approved plan and all

21    the official committee representatives alive at the case's

22    outset have passed away.  Worse, the delay benefits LTL and

23    JJCI and Johnson and Johnson as talc victims can only get more

24    desperate.  They can only get more likely to cave each day they

25    face unreimbursed medical expenses and they get closer to their

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 9 of 123

8

1  own deaths.

2        THE COURT:  Is your principle argument that there is

3  not a proper bankruptcy purpose or that the debtor here is not

4  in financial distress or what?

5        MR. LAMKEN:  So the answer is it's not a proper

6  bankruptcy purpose because evading Bankruptcy Code principles

7  is not a valid bankruptcy principle.  As this Court pointed out

8  in SGL, those who seek relief in bankruptcy have to comport

9  with the underlying Bankruptcy Code principles.  And when the

10  bankruptcy is established for the very purpose of evading the

11  ordinary bankruptcy procedures --

12        THE COURT:  And by the ordinary Bankruptcy Code

13  principles, you mean what?

14        MR. LAMKEN:  I mean, for example, what I started out

15  with, which is the priority rules.  This is structured so that

16  all the dividends, all the equity can be paid while one

17  category of claimants, talc creditors, sit in bankruptcy and

18  don't get paid.  Another principle is that you have to have

19  incentives to come to the bankruptcy to come forward with a

20  reasonable plan in order to emerge swiftly.  But the opposite

21  is true when you take all the operating assets, all the

22  businesses, and you can operate them outside bankruptcy and the

23  only people who are mired in bankruptcy are the talc claimants.

24        THE COURT:  Are you referring to economic relief for

25  the victims?

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 10 of 123

9

1          MR. LAMKEN:  Yes.  Yeah, that's exactly right.  And

2   the ordinary principle is under the absolute priority rule, the

3   ordinary rule is no equity gets paid until creditors are paid.

4   And we have the exact opposite going on here.

5          THE COURT:  How was that economic relief

6   appropriated?

7          MR. LAMKEN:  I'm sorry, Your Honor.

8          THE COURT:  Is that economic relief delivered to the

9   victims?

10          MR. LAMKEN:  So in the ordinary tort system, the

11   victims bring their lawsuits and they either settle or they go

12   to trial and they get relief.  But they're allowed to proceed

13   and try and seek that compensation through the system that 50

14   states have used for two centuries to compensate victims of

15   misconduct.  But right now --

16          THE COURT:  So you're saying bankruptcy does not

17   allow that to happen?

18          MR. LAMKEN:  Well, bankruptcy delays it while we're

19   going through all the plans and trying to come up with it.  And

20   right now, if you look at how it works when you have these two-

21   step bankruptcies, it goes for <u>Bestwall</u>, five years with nobody

22   getting compensated, no plan, and everybody dying in the

23   meantime.  By contrast, if you don't separate it -- people

24   have, if you don't separate your liabilities and put them off

25   into one entity, an artificial entity with just these talc

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 11 of 123

10

1  liabilities and you instead have the people with liabilities

2  and the actual companies in bankruptcy, then there's an

3  incentive to go forward and come up with a plan so people

4  actually get compensated and get compensated promptly because

5  management wants to emerge from bankruptcy.  But right now,

6  there's no incentive actually to do that for J&J and JJCI

7  because they're operating Old JJCI's assets, famous brands of,

8  you know, Tylenol and the like, free and clear of bankruptcy's

9  requirements.

10         Instead, the only ones who are sitting in bankruptcy

11  are the talc claimants.  They pay their ordinary trade

12  creditors, no problem.  Pay them as the money comes due.  Only

13  the talc claimants sit in bankruptcy.  And it's just in essence

14  like SGL where you've just taken one set of creditors and put

15  them at a disadvantage, talc victims, and everybody else

16  proceeds as before.

17         THE COURT:  If LTL were formed in 1979 to hold the

18  talc products, so instead of it going to baby products, it goes

19  to LTL and LTL operated for a number of years but now is in the

20  process of doing, in effect, an orderly liquidation, would you

21  have a problem?

22         MR. LAMKEN:  So I think that the issue we have in

23  terms of evading the structure of the Bankruptcy Code and all

24  the principles of Bankruptcy Code, that would be a very

25  difficult argument to make because once you take an entity and

11

1 you operate it and you have a legitimate business purpose for

2 the structure that the entity has and you're operating it for a

3 number of years, then it has a legitimate non-bankruptcy

4 purpose.  Where you cross the line is, where two days before

5 you declare bankruptcy, you do a divisive merger in order to

6 put the talc claimants into bankruptcy alone and take the

7 assets, the operating businesses, the valuable brands of that

8 former company and put them outside bankruptcy, and it's solely

9 for the purpose to ensure that talc claimants are treated one

10 way and all the assets are outside the bankruptcy.  When you do

11 that two days before bankruptcy, I think that clearly crosses

12 the line.

13        THE COURT:  It sounds from what you're saying is,

14 you're saying it would be a different argument.  But it sounds

15 like if they had done that in '79 and ran the company for a

16 number of years, ultimately decided they couldn't go forward,

17 do a liquidating 11, it would be an acceptable bankruptcy

18 purpose in that particular circumstance.  Is that correct?

19        MR. LAMKEN:  So I would not be able to argue today

20 that this is an evasion of bankruptcy purposes because clearly

21 it was done for a purpose, not evading bankruptcy.  It was done

22 because that was a logical way to operate the business in 1979.

23 It was operated --

24        THE COURT:  So, and then you're saying at the other

25 end of the spectrum, what they did by forming on October 12,

12

1  2021, filing two days later, it doesn't work.  Where is the

2  line that is crossed in your view?

3       MR. LAMKEN:  So I think the line is when the sole

4  purpose is not a legitimate business purpose of this is a

5  logical way to operate the company, but the sole purpose is to

6  disrupt, to subvert, to frankly, pervert the Bankruptcy Code,

7  to evade its ordinary principles, I think that crosses the

8  line.  And here --

9       THE COURT:  What do we make of the timing here?  And

10 what I mean by the timing is, is I understand that about four

11 months after the Supreme Court denied cert in <u>Ingham</u>, LTL is

12 formed and shortly thereafter, the day after -- they file for

13 bankruptcy shortly thereafter.  What do you make of the timing

14 here?

15      MR. LAMKEN:  So, Your Honor, I think the timing is

16 clear that in essence, J&J had felt failed and they said this,

17 "We felt failed by the tort system."  And so they went to

18 another system they thought would be more favorable.  They went

19 to bankruptcy.  But the problem is, if they want to evade the

20 tort system and move to bankruptcy, if they have financial

21 distress, and I know that's disputed, and if they have a

22 legitimate purposes, that's fine.  But they also don't want to

23 actually face the usual bankruptcy rules because rather than

24 just taking, we have a distressed tortfeasor, JJCI or J&J, and

25 we'll put it into bankruptcy, which is the ordinary way of

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 14 of 123

13

1   doing it.  That's how it was done in <u>Johns-Manville</u>.  That's

2   how it's been done for 200 -- well, 100 years since we've had

3   something like a Chapter 11.

4           Rather than do that, they did something fancy and

5   they said we're going to take the talc claimants alone.

6   They're going to go into bankruptcy by themselves and they're

7   the only creditors that will be stuck in bankruptcy.  The

8   assets, these businesses that are producing valuable goods with

9   famous names, those are going to stay outside bankruptcy and

10  that subverts everything that bankruptcy supposed to do.

11          In fact, if I go to the third point is that, you

12  know, the usual rule in bankruptcy is the bankruptcy court has

13  supervision over the debtor's operations to make sure those

14  operations are working for creditor benefit to enforce

15  fiduciary duties towards the creditors.  But if you look at

16  Appendix Page 4463, J&J has now announced it's actually going

17  to spinoff its consumer products division, effectively spinning

18  off JJCI.

19          Now, if J&J or JJCI had declared bankruptcy, the

20  bankruptcy court, under Section 363, would have authority over

21  that non-ordinary course.  Creditors like the talc claimants

22  would then be able to have notice and an opportunity to be

23  heard.  But because they've shifted everything to a new entity

24  and they've only put an artificial entity, a concocted made-

25  for-bankruptcy entity into bankruptcy, none of those

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 15 of 123

14

1  protections apply.  There's no ability for the bankruptcy court

2  to look and say, yes, you're spinning off JJCI.  Let's make

3  sure that we put everything in escrow.  Let's make sure we do

4  something to make sure that all those funds are available for

5  the creditors for whom they should benefit.

6          THE COURT:  Your concern is principally for the talc

7  victims.  Is that --

8          MR. LAMKEN:  Absolutely, Your Honor.

9          THE COURT:  And your suggestion, if I'm not mistaken,

10 is to take them out of bankruptcy.  Is that --

11         MR. LAMKEN:  Pardon me?

12         THE COURT:  To take those talc victims out of

13 bankruptcy.  They should not be subject to the --

14         MR. LAMKEN:  That's right.

15         THE COURT:  -- bankruptcy requirements?

16         MR. LAMKEN:  Because this is not a good faith

17 bankruptcy, because the purpose of the bankruptcy by its terms

18 is to evade the usual bankruptcy requirements, the bankruptcy

19 should be dismissed.

20         Now, there's a second question --

21         THE COURT:  So it's a bankruptcy to avoid bankruptcy?

22         MR. LAMKEN:  Pardon?

23         THE COURT:  It's a bankruptcy to avoid bankruptcy.

24 Is that what you're saying?

25         MR. LAMKEN:  This is exactly what it is.  It's a

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 16 of 123

15

1  bankruptcy designed to avoid the purposes and principles of

2  bankruptcy.  It's been gerrymandered in a sense so as to place

3  only one class of creditors at risk.

4          THE COURT:  You were mentioning the second question,

5  but let me ask you.  If we come to the conclusion this was not

6  done in good faith, this is a bad faith filing, do we need to

7  get to the second question on the stay?

8          MR. LAMKEN:  No, Your Honor, because the mandatory

9  requirement under 1112(b) is if it's not, if there is cause,

10 the Court must dismiss.  It says it shall dismiss.  So if this

11 is not good faith, the standard and only remedy is dismissal.

12         Now, there is an unusual circumstances exception, but

13 there's requirements that have not been met.  One of them is

14 that there was good cause or good justification.  And there's

15 simply no good justification for a bad faith bankruptcy.  And

16 second is that there has to be a cure in a reasonable period of

17 time.  And I think when the entire bankruptcy is structured so

18 that talc victims are on their own in bankruptcy and all the

19 other creditors are outside bankruptcy, when the structure is

20 set up so that talc victims are in bankruptcy but all the

21 assets are outside bankruptcy, there's no cure there that some

22 would come up with and I don't think the bankruptcy court ever

23 suggested there could be a cure.

24         THE COURT:  If you were in the shoes and you call it

25 Old JJCI, I'd probably just called for the sake of people here

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 17 of 123

16

1  in the audience, Old Consumer.  So you have Johnson and

2  Johnson, Johnson and Johnson Consumer which took over baby

3  products.  So Consumer doesn't go in, it keeps the other items

4  like, you know, Aveno, Tylenol, et cetera, and you separate

5  out -- it's like good bank, bad bank back in the late '80s when

6  you had -- come in on a Friday night and you separate

7  everything out and you open the bank up on Monday.

8          In light of the verdict in the Ingham case, which I

9  think surprised a lot of people, even though it was ultimately

10 reduced, what would you have advised to do if you were

11 representing J&J Consumer?

12         MR. LAMKEN:  So I think my answer would be the answer

13 that all the companies have confronted for a long time, which

14 is if you're genuinely in financial distress, you can take your

15 company into bankruptcy.  If you're not genuinely in

16 bankruptcy, excuse me, in financial distress, then you may

17 continue your fight.  Yes, you got a bad result in Ingham, but

18 look, after Ingham, what did J&J tell it's investors.  After it

19 was denied, it said the facts were "unique and the case is not

20 representative."  That's at Appendix 4 -- excuse me 4404.

21         After the denial in Ingham, what did they tell the

22 investors, that liabilities were "not expected to have a

23 material adverse effect on the company's financial position."

24 Appendix 4506.  And what did it tell the Court about -- what

25 did LTL tell the Court?  It reiterated that there was in light

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 18 of 123

17

1  of the liabilities, "no likely need of the debtor to invoke the

2  funding agreement," so that's supposedly $61 billion to its

3  maximum amount or anything close to it."  That's at

4  Appendix 3747.

5           This is probably the first planned major bankruptcy,

6  at least the first I've ever heard of, where if you're looking

7  for indicia of financial distress, you don't find any business

8  executive, you don't find any documents at J&J or JJCI before

9  the bankruptcy saying, "Wow, we're financially distressed.

10 We're heading for insolvency."  The first time you see that is

11 in the bankruptcy and where is it coming from?  It's coming

12 from the lawyers.

13          THE COURT:  When you look at financial distress, are

14 you looking at Old Consumer and LTL or just LTL?

15          MR. LAMKEN:  So I think that the proper answer since

16 we're -- if we indulge the facade that LTL as a legitimate

17 entity to put into bankruptcy, and mind you --

18          THE COURT:  You'll have to raise your voice just a

19 tad when you --

20          MR. LAMKEN:  Pardon?

21          THE COURT:  Raise your voice just the tad, sir.

22          MR. LAMKEN:  Yes.

23          So if we indulge the notion, one that I wouldn't

24 accept, that it's okay to take LTL and put LTL into bankruptcy,

25 I think the answer is you have to look at LTL's liabilities

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 19 of 123

18

1  because that's the chosen one, the one they've chosen, and you

2  would ask, can LTL -- is it suffering financial distress?

3        This case is live by the LTL, die by the LTL.

4  They've chosen to designate something LTL, claim it's a

5  separate entity, push it into bankruptcy with just the talc

6  victim claimants.  Well, then you're looking for financial

7  distress, you're going to just look at LTL.

8        THE COURT:  But I thought your initial concern was

9  the optics aren't right in breaking off and keeping out of

10  bankruptcy Good Company, while putting into bankruptcy Bad

11  Company with the liabilities.

12        MR. LAMKEN:  That's exactly right, Your Honor.  And

13  that's why if you're going to indulge the notion, but that's

14  the key thing.

15        THE COURT:  Doesn't that sound as if you're taking

16  Old Consumer into account?  It's almost like, I kept wondering

17  why somebody didn't file like a fraudulent conveyance action.

18        MR. LAMKEN:  So, Your Honor, you know, down the road,

19  if we're legitimately in bankruptcy, there are remedies for

20  certain individual transgressions.  But the fact that there are

21  remedies down the road for individual transgressions doesn't

22  make an otherwise bad faith bankruptcy a good faith bankruptcy

23  to begin with.  Good faith is a threshold requirement at the

24  outset.

25        When the entire structure of your bankruptcy is

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 20 of 123

19

1  designed to evade traditional bankruptcy requirements,

2  traditional priority rules, supervision over spinoffs, all the

3  things that courts do to make sure that the money is there for

4  creditors.  When it's designed to do that, well, it's just not

5  a good faith bankruptcy.  You don't even get to something like

6  a fraudulent conveyance.

7       THE COURT:  Let me go back to financial distress and

8  litigation for a minute.  Opposing counsel makes much of the

9  fact that there are 38,000 plus claims being filed, or have

10 been filed and more coming with respect to the talc litigation,

11 can fear or the cost of this litigation qualify as financial

12 distress?

13      MR. LAMKEN:  So, Your Honor, I don't think the

14 supposed efficiency of bankruptcy counts.  I think the Court

15 has said that in cases like <u>SGL</u>, that that isn't, thinking that

16 you're going to be more efficient in bankruptcy, doesn't count.

17 But even so, that still doesn't tell you whether or not it's --

18      THE COURT:  Not so much more efficient, but less

19 exposure.  Or is the exposure the same?

20      MR. LAMKEN:  Yeah.  So I think, Your Honor, the

21 notion that if one is going to be in financial distress, that

22 is the threshold.  You need immediate financial distress.  The

23 notion that you can just reduce your liabilities from yay to

24 lower isn't a sufficient basis.  And so the real question is,

25 looking at LTL, or if you want to indulge fiction and go back

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 21 of 123

20

1  to JJCI as the bankruptcy court do, was there legitimate

2  financial distress that they were not going to be able to make

3  their payments, that they really had a need to go into

4  bankruptcy, which is powerful medicine.  People don't get paid.

5  Forty thousand cases around the country get stayed.  That's

6  powerful medicine.  You have to have some significant showing

7  there, and we don't think they got there.

8          But even apart from it, if there is financial

9  distress, that just reinforces my first point which is, if

10  there's financial distress, that's all the more reason you want

11  the traditional bankruptcy protections to be in place.  If

12  there's financial distress, you don't want money going --

13          THE COURT:  But it sounds like what you're saying,

14  you want the traditional bankruptcy protections to be in place

15  for Old Consumer.

16          MR. LAMKEN:  Exactly.  Exactly.  Because if Old

17  Consumer and, you know, as LTL's telling us, you know, even --

18          THE COURT:  But you just said that you're looking

19  primarily at LTL in connection with this case and Old Consumer

20  is kind of off to the side.

21          MR. LAMKEN:  So we would for financial distress look

22  to LTL.  But remember, what is supposedly funding this

23  bankruptcy?  It's an unsecured funding agreement backed by J&J

24  and JJCI.  So if they face legitimate financial distress,

25  there's every reason to be worried about not supervising what

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 22 of 123

21

1  they're doing, every reason to believe that they shouldn't be

2  paying equity ahead of injured talc victims.

3       THE COURT:  Well, if you're a claimant, isn't the

4  only thing that you're really concerned with is that they pay

5  up as to what they say they'll pay up for?

6       MR. LAMKEN:  No, Your Honor.  I think who gets paid

7  first is critically important.  If I am left waiting my turn as

8  people are passing away, that's very different than the

9  absolute priority rule where equity doesn't get paid until I'm

10 paid first.  That's a hugely different endeavor.  It's entirely

11 different in terms of the incentives, as I pointed out.  Why is

12 J&J and JJCI going to push this through bankruptcy if they can

13 continue paying equity, if they can spinoff divisions without

14 bankruptcy court supervision?  If they continue their

15 operations just as before, then there's no reason for them to

16 push this through.  And LTL has no reason to push this forward

17 and have a reasonable plan because they're made for bankruptcy.

18 They have no assets, no operations --

19      THE COURT:  So you're saying is through the backdoor,

20 equity is coming out whole.  Whereas, if it had been Old

21 Consumer in bankruptcy, the absolute priority rule would've

22 played out differently.

23      MR. LAMKEN:  It may well be, Your Honor, but we don't

24 have to guess at an answer because the rules are there to make

25 sure that happens.  And we don't just -- and we don't set aside

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 23 of 123

22

1  the rules and say, well, we're going to play monkey business

2  with the absolute priority rule and allow this elaborate scheme

3  where you take one set of claimants out because it might work

4  out in the end.  There's no sort of it might work out in the

5  end exception to the absolute priority rule where you get to

6  pay equity as you go and certainly not without consent,

7  certainly not without a bankruptcy court supervising what's

8  going on.  That's what we count on the bankruptcy courts for.

9           THE COURT:  What's your thought about individuals who

10  may be exposed but the exposure is not really realized until

11  years, years down the road?

12           MR. LAMKEN:  Right.  And so look, first, you know, if

13  we're worried about the interests of future claimants, future

14  claimants would be as much protected by a JJCI bankruptcy as an

15  LTL bankruptcy.  That just simply doesn't answer whether or not

16  you should take this concocted made-for-bankruptcy entity and

17  put it in bankruptcy with just the talc claimants alone.  If

18  bankruptcy serves future claimants better --

19           THE COURT:  Your suggestion is that all these cases

20  should be out of bankruptcy?

21           MR. LAMKEN:  Pardon?

22           THE COURT:  Your suggestion is that all of these

23  cases should be out of bankruptcy?

24           MR. LAMKEN:  That's exactly right.

25           Everybody should be treated the same.  Either all the

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 24 of 123

23

1  creditors are in bankruptcy or all the creditors are out.

2  Either all the assets are in bankruptcy or all the assets are

3  out of bankruptcy.  And that's for future --

4          THE COURT:  I assume that would protect people who

5  were exposed years down the road.  They would not be subject to

6  bankruptcy, of course.  But they would be protected.

7          MR. LAMKEN:  Yes, they would have their claims as

8  they come up and as they realize they're injured.

9          And look, this is not the first mass tort that has

10 something of a tail to it where people end up getting sick over

11 time at later in time.  There's lots of mass torts like that.

12 There was Vioxx from Merck.  There's the diet drugs litigation.

13 These things happen and the tort system has ways of handling

14 them.

15         Now, if there is other reasons and a legitimate basis

16 for going into bankruptcy, well, bankruptcy has ways of

17 handling it too.  But concern for future claimants is not

18 itself a reason for bankruptcy.  And there's a little bit of an

19 irony here that we have Johnson and Johnson asserting that it's

20 concerned about future claimants when its position in this

21 litigation is that there was no asbestos, no one was injured,

22 this is just a matter of a litigation lottery and no one should

23 receive anything.

24         If we really are interested in the interests of talc

25 claimants, listen to the talc claimants.  There's just not one

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 25 of 123

24

1  here telling you that they'd rather be in bankruptcy, that they

2  really don't want be in the tort system that 50 states have

3  used for nearly 200 years.

4       THE COURT:  Well, let's assume we find or come to the

5  conclusion that it was a good faith filing.  What do we do with

6  the stay?  Did the bankruptcy court exceed its jurisdiction?

7       MR. LAMKEN:  So I think the bankruptcy court did

8  exceed its jurisdiction because even if one assumes that LTL is

9  a proper debtor, and that's our debtor, that has consequences.

10 And that means when you're looking at 362 and an automatic

11 stay, that applies to the debtor.  And what the bankruptcy

12 court did here is it stayed over 670 actions against over 670

13 non-debtors, including debtors that have their own independent,

14 own tortious conduct, non-derivative liability, and that just

15 exceeds its jurisdiction.

16      And to get there, the district court, or excuse me,

17 the bankruptcy court looked at two things.  It talked about

18 mostly supposedly shared insurance and indemnification

19 agreements.  But the key finding on that is on Appendix 159

20 where the court accepts, I'm quoting, that "Any claim of shared

21 identities of interest is based solely on the allocation of

22 agreements to the debtor on the eve of bankruptcy," and here's

23 the cure part, "for the very purpose of extending the stay."

24      The court, in essence said, look, even though the

25 purpose of this indemnification agreement which we allocated to

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 26 of 123

25

1  LTL, even though the purpose of having shared insurance was to

2  extend the stay, that's a good enough reason to give a stay to

3  companies like Johnson and Johnson that have their own tortious

4  conduct.  And that's just error twice over.

5          Combustion Engineering makes it very clear that

6  contrived agreements for purposes of creating jurisdiction just

7  can't be given that type of weight.  Because otherwise,

8  jurisdiction can be created by consent.

9          THE COURT:  What's the usual way that you would argue

10 that there is jurisdiction?

11         MR. LAMKEN:  For non-debtors?

12         THE COURT:  For a stay under 362 that would affect

13 non-debtors, correct.

14         MR. LAMKEN:  So the usual way you would find that is

15 if you found something that's akin to an identity of interest

16 where, if there's liability by the non-debtor, that is

17 automatic liability for the debtor.  And no ability of the

18 bankruptcy court to intervene and say, yes, I know the non-

19 debtor is liable, but I'm not going to let it dissipate the

20 assets of the debtor.  So --

21         THE COURT:  And in that context, is it core

22 jurisdiction or is it by virtue of arising under or arising in?

23 Or is it related to jurisdiction?

24         MR. LAMKEN:  So I think the better answer is to

25 adhere to the text of the statute, which says only the debtor

26

1  for 362(a)(1), actions against the debtor, literally.  When you

2  go to --

3          THE COURT:  But we know what courts tend to do,

4  practically speaking.  They tend to use 105 and they say, we're

5  going to extend it because there is this "identity of interest"

6  or there is insurance that's being paid out for the non-debtor

7  that would likely be also covering the debtor itself.

8  Therefore, you don't want to dissipate the insurance so

9  therefore, you fit under 362(a)(3) and we're going to combine

10  the two, (a)(1), (a)(3), along with 105, and go from there.

11  And it looks like a lot of courts just tend to deal with it

12  practically.

13          I was just looking for some cases and we found one by

14  Judge Posner on the Seventh Circuit.  You know, it says, no, it

15  wasn't all that much analysis, it's the right thing to do.

16          MR. LAMKEN:  Yeah, and I think the right-thing-to-do

17  theory really is relying on 105 because 105 is sort of the

18  necessary and proper clause that says, "Well, it's necessary

19  and proper."  But 105 doesn't create its own jurisdiction.  You

20  have to go find jurisdiction under another provision of the

21  Bankruptcy Code.  And the problem with 105 is, and here in

22  particular is, you'd have to have the necessary findings in

23  order to invoke it and the findings just are absent.

24          For example, for indemnification, the ordinary rule

25  is it has to be automatic indemnification.  If you need another

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 28 of 123

27

1   lawsuit for the indemnification to occur, as under <u>Federal-</u>

2   <u>Mogul</u> and <u>W.R. Grace</u>, if you need another lawsuit, then it

3   doesn't count for 105 because the bankruptcy court can

4   intervene when the other lawsuit is filed against the debtor.

5   And there's simply no finding, and I think LTL concedes this on

6   Page 96, that LTL would certainly face "automatic indemnity

7   obligations."  And so it just falls short under <u>W.R. Grace</u> and

8   under <u>Federal-Mogul</u>.

9           And second, even apart from the fact that these are

10  all either the bankruptcy indemnifications for the purpose of

11  establishing jurisdiction, the 1979 JJCI agreement, that can't

12  really establish even for Old JJCI an indemnity obligation

13  because that covers only liabilities that are allocated on the

14  books or records of J&J as pertaining to its baby division but

15  there were no type liabilities in 1979 allocated to Old JJCI at

16  that point.  And it doesn't really expressly indemnify J&J for

17  its own tortious misconduct and to indemnify a company for its

18  own tortious misconduct, you typically have to have language

19  regarding fault, negligence, culpability, something like that

20  in there.  There's no language like that in the 1979 agreement.

21          Finally, I see my red light is on --

22          THE COURT:  That's fine.  You're on our time.

23          I'd like to go into what the benefits and detriments

24  are in considering a 524(g) channeling injunction or trust, if

25  you will, versus the mass tort system because we've had a lot

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 29 of 123

28

1  of *amici* file briefs one way or the other.

2         The theme seems to be of the debtor that the 524(g)

3  trust can be set up.  It's adequately funded along with the

4  claims coordinator already in place.  The claims coordinator

5  has a proven track record of ferreting out valid claims from

6  invalid claims and you can do estimations and everything can be

7  resolved in one single venue.  And their point is, what's wrong

8  with that?

9         MR. LAMKEN:  All right.

10        So first, I think you don't get to a remedy like

11  524(g) until you have a legitimate good faith bankruptcy in the

12  first place and so that would not solve our problem with the

13  lack of good faith, the fact that we've hived off one set of

14  creditors, talc victims, for differential treatment, the fact

15  that we've taken the actual assets of the entity and put them

16  outside bankruptcy.

17        But one of the problems here is that 524(g) has been

18  distorted by that as well.  Look, for a 524(g) trust, the idea

19  is you take the debtor's securities and you put them in the

20  trust with a right to dividends, it says that in the statute,

21  so that you have sort of that ongoing evergreen source of

22  funding so you can keep coming up with more assets to pay

23  future claimants.  What this court in a footnote referred to or

24  quoted Congress as saying that you have a goose that can "lay

25  golden eggs and continuously fund those victims."

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 30 of 123

29

1          But what happened here is, because we swapped out

2    debtors from J&J and added somebody with an actual operating

3    business, Famous Brands, to somebody who's just a made-for-

4    bankruptcy entity, you've swapped out a very different goose

5    and it's a goose that doesn't lay golden eggs.  It just is a

6    goose with a right to have a funding agreement.  It's an

7    unsecured funding agreement, subject to defenses, and that's

8    just inconsistent with <u>Combustion Engineering</u> which says on

9    Page 248, it says, look, implicitness is that you need an

10   ongoing operating business.

11          And that's reinforced by Section 524(g)(2)(B) because

12   that says that you could only have this sort of 524(g) trust

13   when your debtor was named in litigation at the time of the

14   bankruptcy.  And that forecloses the idea of having --

15          THE COURT:  But that seems to be hyper literal in

16   this case because in the end, the LTL I think probably already

17   has been named in cases, has it not?

18          MR. LAMKEN:  No, Your Honor.  I don't think it's

19   hyper literal in the following sense because it serves an

20   important purpose.  Congress wants the real tortfeasor, the

21   real guy who has an operating business to be the one operating

22   the 524(g) trust because then his securities go into the trust.

23   By requiring somebody who would've been named when they

24   declared bankruptcy, it ensures that you have a real company

25   there, not a made-for-bankruptcy debtor like LTL that has no

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 31 of 123

30

1  real operations and it has no assets --

2         THE COURT:  But we have a real company and

3  liquidating 11s are allowed, and specifically, <u>Integrated</u>

4  <u>Telecom</u> tells you in Footnote 4 that oftentimes you have

5  liquidating 11s and, in my day, we had quite a number that were

6  filed in the 80s, or at least in the 90s all the time.

7         MR. LAMKEN:  So, Your Honor, you know, it's possible

8  that if you had a consensual plan, people could agree to having

9  something like LTL be putting it securities, whatever those

10  might look like, in a 524(g) trust.  I don't think it's

11  consistent with the statute, but one could conceive of it.  But

12  this deprives the claimants of that choice, right?  Now, the

13  debtor that would put its securities in it is LTL, this made-

14  for-bankruptcy entity that doesn't have operating divisions.

15  And everything that it's guaranteeing, everything that is, you

16  know, sort of pledged in some sense that, you know, there's an

17  there's an unsecured funding agreement, all those assets are

18  now being spun-off by J&J and won't even be assets there until

19  it's funded anymore.  So I think it just completely upsets the

20  whole idea of 524(g) of taking the debtor's actual securities.

21         THE COURT:  But what would be the best approach?  I

22  mean, there are a lot of heartbreaking stories here and it's

23  very difficult to come up with a right game plan for everybody.

24  From your perspective, what would be the best approach --

25         MR. LAMKEN:  I think --

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 32 of 123

31

1           THE COURT:  -- for these very difficult cases, these

2    talc related disabilities?

3           MR. LAMKEN:  So I can speak from my perspective and

4    my clients.  And from my perspective and my clients, they are

5    happy to go forward with the traditional tort system that has

6    operated in this country to compensate people for 200 years.

7    But if --

8           THE COURT:  How long would that take?

9           MR. LAMKEN:  Your Honor, I don't know how long it

10   would take, but I know that these things do move very quickly.

11   For example, you know, Judge Robreno downstairs, 186,000 talc

12   resolutions, Vioxx resolved, diet drugs resolved.  The tort

13   system can handle these mass torts.  This is not the first.

14   But that also doesn't in the end tell you, what are you going

15   to have?  Is it okay to just go have a JJCI bankruptcy or even

16   to allow there to be this concocted entity, LTL, with only talc

17   victims, no other creditors and all of Old JJCI's assets

18   sitting outside bankruptcy.  That goes too far.

19          THE COURT:  But I think that -- I mean, part of what

20   Judge Fuentes is asking is which system is better, the MDL

21   system or the bankruptcy system, for resolving these types of

22   claims in an orderly way and getting money as quickly as we can

23   to people with valid claims?

24          MR. LAMKEN:  So under this structure, I can tell you

25   there's a clear answer and it's the tort system, because if you

32

1  look at <u>Bestwall</u>, when you separate the assets and the ability

2  to operate from the bankruptcy system, when you take only the

3  talc claimants, only the victims and put them alone in

4  bankruptcy, bankruptcy bogs down and you go five years without

5  a plan, without anybody getting compensated.  Before that --

6       THE COURT:  But with <u>Bestwall</u>, it has been five

7  years.  But in this case, we don't know.  If bankruptcy is

8  found to have a valid purpose here and it goes back, I don't

9  know when it's going to be over.  But it does seem, based on

10  what some people have filed, that MDLs take a long time.

11       And well, perhaps you can have Bellwether Trials.

12  Most of what you do is discovery.  You send it back to the

13  other courts.  You hope to somehow at some point you can get a

14  settlement discussions going, but that also can take many

15  years.

16       MR. LAMKEN:  Your Honor, I agree that no system is

17  perfect here.  But we're the ones looking for compensation and

18  we're happy to be in that system, which can sometimes be slow,

19  but it can also move very quickly as the examples I gave you

20  show.

21       But in the end, I don't think courts should be in the

22  position of saying I think bankruptcy is better because it's

23  more efficient or I think tort is better because it's more

24  consistent with other values like having jury trials and

25  individual justice.  I think that the answer is if you have a

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 34 of 123

33

1  bankruptcy that has been structured to bypass the traditional

2  bankruptcy protections, which is what you have here, that is

3  not a good faith bankruptcy.  If the purposes are to benefit

4  the parent, the corporate parent, which is the case here, that

5  is not a proper bankruptcy.

6      THE COURT:  So in your world view, any equities with

7  respect to which system is better or worse shouldn't be baked

8  into the equation?

9      MR. LAMKEN:  I don't think that is because it comes

10  very, very close, Your Honor, to litigation advantage, who

11  thinks which system is better.

12      Is this better for the victims?  Is this better for

13  the defendant or the petitioner?  That's just not someplace the

14  court should be.  And one of the reasons for that is you kind

15  of in the end have to ask more efficient, better for whom.  And

16  in this case, if you look at it, there's supposedly $61 billion

17  available for funding.

18      THE COURT:  I mean, the problem if you're a claimant

19  is it looks like in a lot of these cases you either get a home

20  run or a strikeout.

21      MR. LAMKEN:  Well, I think the framers understood

22  that juries can sort those sorts of things out.  And if you get

23  a strike out, it may well be because the jury determined that

24  you didn't have specific causation, that whatever your

25  condition is, it was caused by something else.  And that's --

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 35 of 123

34

1          THE COURT:  Well, Mr. Feinberg could probably do that

2    much more quickly and much more efficiently than having a full

3    blown trial.

4          MR. LAMKEN:  Well, Your Honor, I think that's right.

5    But the Seventh Amendment tells us that if you want your jury

6    trial, you're entitled that jury trial.  And the framers

7    understood that the community, the people of the United States

8    who sit in the dark and make the decisions, we trust them to

9    sort those things out.  And the fact that some people win and

10   some people lose, we trust that the juries are able to sort

11   that out.  And the notion that somehow bankruptcy may be more

12   efficient, that's just not a good basis for having a bankruptcy

13   case because in the end, even if it's more efficient, who for

14   is it more efficient and who is it benefitting?

15         Here, if there's anything under $61 billion that's

16   ultimately distributed in this bankruptcy, and believe me, when

17   a plan is proposed by J&J, when that happens, if it happens,

18   it's going to be well short of 61 billion.  Anything short of

19   that, all those efficiencies, all that extra, that accrues to

20   equity.  This is not more efficient for claimants.  It's more

21   efficient and better, perhaps, only for equity.

22         If I may reserve any remaining time for my rebuttal.

23   I thank you very much.

24         THE COURT:  We'll give you plenty of time for

25   rebuttal.

35

 1          MR. LAMKEN:  Okay.  If there are further questions,

 2    then I'm happy to entertain them.

 3          THE COURT:  I've got quite a few, but we'll come

 4    back.

 5          MR. LAMKEN:  Okay.  I'll brace myself here.

 6          THE COURT:  Why don't we get Mr. Frederick, or I

 7    guess Mr. Janda --

 8          MR. LAMKEN:  Thank you very much.

 9          THE COURT:  -- and then, we'll get you back.

10          MR. JANDA:  Thank you, Your Honor.  And may it please

11    the Court.  Sean Janda for the United States Trustee.

12          I think it's helpful to start by just taking a step

13    back to understand what's really happening here.  At bottom,

14    J&J has carved off one set of disfavored creditors claims, hand

15    picked a selection of assets, and sent only those claims and

16    only those assets into bankruptcy.  If that carefully

17    constructed bankruptcy is permitted to proceed, those claimants

18    will be held hostage against each other with no claimant

19    receiving any money until enough claimants agree to take

20    whatever drips LTL chooses to release from the spigot of the

21    funding agreement.

22          THE COURT:  I'm going to ask you a variation of the

23    question I asked of Mr. Lamken.  Let's assume, instead of 1979,

24    that LTL was formed 2010 when the first cases really started

25    coming, or maybe 2014 when they saw that the cases were for

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 37 of 123

36

1   real.  And so you had good assets, bad assets, LTL gets the

2   liabilities in connection with the talc.  So let's, it's now

3   been since 2014, let's say eight years, would you still be

4   objecting if LTL now filed for bankruptcy in 2022, 2021?

5            MR. JANDA:  So I think there's two different pieces

6   here, Your Honor.  The one piece is the sort of value of your

7   organizational purpose piece, whether there's assorted

8   financial distress that makes bankruptcy a legitimate choice.

9   And then the other piece is the sort of subverting the

10  structures and purposes of the Code.

11           And on the second piece, you know, I think it's hard

12  to say exactly where the line is.  In this case, the fact that

13  this scheme was implemented two days before the bankruptcy

14  filing was enacted, it's very obvious --

15           THE COURT:  I get it.  You're saying the optics

16  aren't good here, but I'm trying to -- you're writing an

17  opinion here.  Where's the line?

18           MR. JANDA:  And I think, as Mr. Lamken said, the line

19  is whether these machinations or the scheme was undertaken to

20  try to subvert the principles of the Bankruptcy Code.  And so

21  it might be the case that if it happened in 2014 with

22  bankruptcy on the mind, that might be enough.  It might be the

23  case that if it happened in 2014 with sort of valid business

24  purposes on the mind, it wouldn't be enough.  It's hard to give

25  a very clear line.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 38 of 123

37

1        But this case I think very obviously falls on one

2    side of the line.  And I don't think the Court needs to say too

3    much more than that to find that this sort of integrated

4    transaction very much undermines sort of a number of

5    fundamental purposes and structures of the Code.

6        THE COURT:  Where we left off with Mr. Lamken was the

7    reasons to have a 524 channeling trust versus the mass tort

8    system.  Do you have any thoughts on that?

9        MR. JANDA:  I mean, I think the most important thing

10   is, with all respect to the Court, that's not really the

11   Court's job to make the determination about which system is

12   more equitable or which system is fairer or better.  That's

13   Congress's job.  And Congress has created the 524(g) process

14   that sort of assumes a preexisting valid bankruptcy.  And once

15   you are in bankruptcy, Congress has determined that in certain

16   clearly defined circumstances, a 524(g) trust might be the best

17   resolution in those circumstances.

18       Congress has also implemented, you know, the MDL

19   procedures and other procedures to try to make the resolution

20   of mass claims more efficient, the balance, the competing

21   interests in that circumstance.  But the overarching thing is

22   that Congress has determined that the strong (indiscernible) in

23   the Bankruptcy Code is necessary or is appropriate in certain

24   circumstances, and really I think the sort of job of the Court

25   is to figure out whether those circumstances are met, not to

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 39 of 123

38

1  figure out whether at the end of the day one system or the

2  other system is better or fairer or more efficient.

3          THE COURT:  Can the fear of a lot of litigation, tens

4  of thousands of cases and huge jury verdicts, can that satisfy

5  this financial distress concern?

6          MR. JANDA:  So it depends on the particular

7  circumstances.  I point the Court to SGL Carbon which has a

8  very long discussion of this.  In SGL Carbon, the test that

9  this Court implemented was sort of an immediate financial

10  difficulty test and so it could be the case that litigation

11  fees or judgments that had been entered are such that there is

12  immediate financial difficulty.  But this Court in SGL Carbon

13  sort of specifically rejected the idea that the prospect even

14  of financial and operational ruin from a judgment, at some

15  point in the future, is not to satisfy that test.

16          And in this case, as we explain in our briefs, I

17  mean, LTL had access to the $61 billion funding agreement

18  before bankruptcy.  I don't think anyone is going to stand up

19  here and tell you that there was any immediate concern that the

20  $61 billion would be exhausted, that it wouldn't be enough to

21  satisfy judgments in the short term or to pay the litigation

22  costs in the short term.  And so just under the SGL Carbon test

23  that this Court implemented, LTL was not in financial distress.

24  But --

25          THE COURT:  When you consider financial distress, I

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 40 of 123

39

1  asked Mr. Lamken, do you consider Old Consumer and LTL or just

2  LTL?  And he answered LTL, initially.  What do you say?

3       MR. JANDA:  So I think this Court, again, has made

4  clear and Congress has made clear that really bankruptcy is

5  intended to benefit the debtor.  And the debtor here is LTL.

6  And to the extent that LTL, you know, wants to take advantage

7  of carving off this set of claims, I think it has to, as

8  Mr. Lamken suggested, if it's going to live by the sword, it

9  has to die by the sword in that way.

10       And LTL I think narrowly focused (indiscernible) and

11  as I said, no one would tell you, I don't think, that LTL was

12  in any sort of immediate financial difficulty.  That being

13  said, if you zoom out, the question might be --

14       THE COURT:  But wouldn't the argument be that LTL is

15  in financial difficulty, it's just that here it happens to have

16  a very, very big backstop, two backstops, in fact, Old Consumer

17  and Johnson and Johnson?

18       MR. JANDA:  I don't think so, Your Honor.  I mean,

19  the rights under the funding agreement give it access so long

20  as it's not in bankruptcy.  I mean, the money sort of

21  disappears as soon as it files for bankruptcy but give it

22  access when it's not in bankruptcy to $61 billion.  And to the

23  extent that as the bankruptcy court suggested that LTL

24  exercising its rights under that agreement, would have negative

25  effects on J&J or on Old or New JJCI, and I think that just

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 41 of 123

40

1   goes to the concern that this bankruptcy is primarily intended

2   to benefit non-debtors who have not submitted themselves to the

3   supervision of the bankruptcy court, who haven't complied with

4   the obligations of the Code, and that as this Court made clear,

5   BEPCO, just not a valid bankruptcy purpose.

6        THE COURT:  So there were some very, one could argue

7   on one side, far out projections by the bankruptcy judge here

8   as to what the potential liability can be or the range of

9   liability, I think at one point, up to 190 billion, which is

10  significantly more than the $61 billion backstop as provided by

11  Johnson and Johnson and Old Consumer.  In that case, would LTL,

12  if that's true, would LTL be in financial distress?

13       MR. JANDA:  No, Your Honor.  And I think -- so the

14  briefs obviously make clear that there are a lot of assumptions

15  baked into that number that are not necessarily valid or

16  supported.  But even assuming it's true, and SGL Carbon makes

17  clear that the test is not all of your potential liability or

18  all of your potential costs sort of stretching out into the

19  future, it's whether there's immediate financial difficulty.

20  And no one is contending, I don't think anyone's going to get

21  up here and tell you that there was that sort of immediate

22  financial difficulty with LTL.

23       THE COURT:  So the key word used in SGL Carbon was

24  premature and your point here is, at this point in time, today,

25  it would be premature for LTL to say it's in financial

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 42 of 123

41

1 distress?

2        MR. JANDA:  Correct.  And I think <u>SGL Carbon</u> makes

3 clear that it's not just because it's premature but because in

4 some ways it's speculative, right.  You don't know how suits

5 are going to turn out.  You don't know what costs are going to

6 be in the future.  If you have an operating business, it is

7 sort of --

8        THE COURT:  I think it's just another way of saying

9 premature.  I can speculate but it's not, we don't know.

10        MR. JANDA:  Correct.  But I think thinking about it

11 as speculation helps explain why the bankruptcy court's

12 findings on this are really problematic because they are

13 speculation.  They're based on assumptions that are not

14 necessarily supported and that, you know, may or may not turn

15 out to be true.  But certainly, there's nothing that justified

16 in the short term the invocation of the strong protections of

17 the Bankruptcy Code.

18        THE COURT:  Well, let's assume we reverse the

19 bankruptcy court, what would litigation look like going forward

20 and does J&J have any direct liability?

21        MR. JANDA:  So my understanding, Your Honor, and

22 we're obviously not involved for the most part in the tort

23 cases.  My understanding is that at least some of these

24 judgments have been entered against J&J directly whether sort

25 of that's appropriate, whether there will be more, I have no

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 43 of 123

42

1    idea.  You know, I think if this Court concludes that the

2    bankruptcy petition should have been dismissed, at that point,

3    J&J or JJCI sort of, or LTL merged back into new, I mean, who

4    knows what would happen, they could make a decision whether

5    they wanted to continue in the tort system or whether they

6    thought that they were facing the sort of financial difficulty

7    JJCI to justify invoking the protections of the Bankruptcy

8    Code.

9         At that point, they would submit themselves, all of

10   their assets to the supervision of the bankruptcy court and

11   would comply with the Code's obligations.  And, again, that's

12   just sort of fundamentally really the problem here is Congress

13   has given very strong protections to entities facing financial

14   difficulty and has determined that sort of the shield of those

15   protections is necessary and is appropriate in circumstances

16   where the person or the entity taking advantage of them submits

17   itself to the Code, submits itself to the bankruptcy court,

18   complies with the many obligations of the Code.

19        But here, I think sort of LTL or J&J is trying to

20   turn what should be that shield of bankruptcy into a sword by

21   not complying with any of the obligations and by trying to get

22   sort of full resolution indefinitely into the future without

23   undergoing any of those obligations that Congress has

24   determined are required.

25        THE COURT:  Is the biggest concern that the U.S.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 44 of 123

43

1  Trustee's Office has that the optics of this just don't seem

2  normal for the type of bankruptcy that is allowed by the Code

3  in America?

4          MR. JANDA:  So I don't think this is about the optics

5  of this, Your Honor.  It's about just fundamental subversion of

6  the Code.  I mean, the U.S. Trustee cares very deeply about the

7  structure and the integrity of the Code.  And here, I mean, as

8  we explained in our briefs and I'm happy to go through the sort

9  of transaction, the scheme here, just undermines --

10          THE COURT:  So let me try it another way.

11          LTL has existed for a number of years.  LTL has

12  massive liabilities in connection with and potential

13  liabilities in the future, suits being filed every day, with

14  regard to its talc products.  When can LTL be safely assured

15  that there won't be an objection of the Trustee if LTL files

16  for bankruptcy protection?

17          MR. JANDA:  And with apologies, I don't think I can

18  give you an answer that you're going to find satisfactory on

19  that.  I have no idea what in sort of other circumstances the

20  Trustee would or would not decide to object to.  I mean, the

21  key here and we don't think LTL was in financial stress.  We

22  don't think there's a valid reorganizational purpose.  We've

23  made that clear.  But I think the biggest problem from the

24  Trustee's perspective is the subversion of the Code, is the

25  sort of playing games with these really fundamental, important

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 45 of 123

44

 1  rules of the Code.  And to the extent that a particular

 2  bankruptcy wasn't doing that, I think the Trustee's interest --

 3          THE COURT:  And just to sum up, the most important

 4  rules of the Code in your view are?

 5          MR. JANDA:  And I think we will focus on three

 6  things.  One is the priority rules that creditors and equity

 7  holders have to be treated in a particular way.  Equity doesn't

 8  get anything until creditors are paid.  And here, equity has

 9  been getting stuff all along while creditors languish in

10  bankruptcy.

11          Two is the idea that, I mean at its core, the Code

12  sets up a fundamental quid pro quo where an entity submits

13  itself to a lot of obligations of the Code and the supervision

14  of the bankruptcy court in exchange for the Code's protections.

15  And here, that's just not (indiscernible).

16          THE COURT:  It sounds to me like you're talking about

17  Old Consumer, you're not talking about LTL.

18          MR. JANDA:  So, Your Honor, I think there's sort of

19  two things here.  And one is, to the extent that the Court

20  wants to focus sort of just on LTL --

21          THE COURT:  No, but I'm just following along with

22  your answer.

23          MR. JANDA:  I mean, I think the point is that LTL has

24  filed for bankruptcy I don't think anyone would disagree to

25  benefit JJCI, to benefit J&J, and those sorts of benefits to

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 46 of 123

45

1  non-debtors are just not contemplated by the Code.  The Code is

2  for debtor who submit itself to its obligations and the point

3  of this bankruptcy isn't to benefit LTL, it's to benefit the

4  non-debtors who haven't submitted to the Code's obligations,

5  who haven't done the sort of financial disclosures, who haven't

6  had the supervision of the bankruptcy court, who won't have the

7  supervision of the bankruptcy court.  And that's just not an

8  appropriate purpose for the very strong medicine the bankruptcy

9  court provides truly distressed entities, which again, LTL was

10 not at the time that it filed.

11         THE COURT:  And any other bankruptcy principles that

12 you think are violated.  You mentioned two.

13         MR. JANDA:  And then, I mean the third one I think is

14 sort of in with the second one is the idea that in addition to

15 complying with the obligations of the Code, it's the debtor

16 submits itself to the supervision of the bankruptcy court and

17 sort of ensures that it's acting in a way to maximize creditor

18 returns.  And here, again, J&J, JJCI just haven't submitted to

19 that supervision.  So that, to the extent that it's separate

20 from the second regarding sort of the various other obligations

21 of the Code that J&J and JJCI are not themselves compliant.

22         THE COURT:  If tort litigants prefer to have their

23 day in Court, doesn't it seem wrong that Old JJIC can decide

24 otherwise by taking advantage of the bankruptcy system?

25         MR. JANDA:  I think that depends on the particular

46

1  circumstances, Your Honor.  I mean, obviously --

2              THE COURT:  I think that was a softball.

3                       (Laughter)

4              MR. JANDA:  Well, so Congress has constructed the

5  Bankruptcy Code and Old JJCI might well be able to file for

6  bankruptcy and might well have been able to take advantage of

7  Congress' protections even in the face of objections from tort

8  claimants.  I think in this case, obviously, tort claimants are

9  being uniquely disadvantaged relative to equity holders and

10  relative to J&J's other creditors.  And that's something that's

11  just not contemplated by the Code or by, I mean, anything else

12  that Congress has done.  I'd say Congress has established

13  procedures for resolving mass tort litigation, even mass tort

14  litigation that involves substantial liability and has

15  determined that those procedures best balance the relevant

16  interests in the context of mass tort.

17             THE COURT:  Thank you very much.

18             MR. JANDA:  Thank you.

19             THE COURT:  We'll hear from Mr. Frederick and then

20  we'll take a break after that.

21             Welcome.

22             MR. FREDERICK:  Thank you, Your Honors.  And may it

23  please the Court, David Frederick for the Arnold and Itkin

24  appellant.  I'd like to reserve three minutes of time for

25  rebuttal.

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 48 of 123

47

1          I'd like to emphasize two points in my presentation.

2     The first is that your cases, Third Circuit cases, should

3     compel reversal.  <u>BEPCO</u>, <u>SGL Carbon</u>, and <u>Integrated Telecom</u>,

4     all set out the appropriate tests for determining what is good

5     faith in a bankruptcy.  In this situation, LTL fails the

6     relevant tests for financial distress and good faith in

7     promoting a bankruptcy.  And I'd like to go into that in a

8     minute.

9          But my second point is that there is no limiting

10    principle to LTL's position.  They cannot tell you when any

11    other corporation would be constrained from doing exactly what

12    they have done, not just for a mass tort, but for any

13    significant liability.  Johnson and Johnson is a company with a

14    market capitalization of half trillion dollars that throws off

15    dividend income for its shareholders at the rate of $10 to $11

16    billion a year, that boasts that for 59 straight years, it has

17    increased its dividend.

18         And so if Johnson and Johnson can get away with

19    filing a bankruptcy to hive off its tort liabilities for talc

20    claimants, what's to stop any other company in America from

21    doing the same thing?

22         THE COURT:  It sounds to me like you're saying is if

23    the backstop, instead of 61 billion for these types of claims

24    were, pick a number, 5 billion, then wouldn't LTL be in

25    financial distress enough that it should be able to take

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 49 of 123

48

1  advantage of the bankruptcy system?

2         MR. FREDERICK:  Well, I think that you go through the

3  normal test, Judge Ambro, and one of the reasons why I think my

4  colleagues have resisted this hypothetical, which I think

5  you're searching for where is the line to draw.

6         THE COURT:  Right.

7         MR. JANDA:  And I think that the answer to that is

8  that you're going to have to assess was there a good faith

9  purpose and emphasize is the LTL in your hypothesized construct

10  an ongoing concern?  Because one of the purposes of a

11  Chapter 11 is to take a business that has an ongoing economic

12  value and preserve and help through the bankruptcy rules that

13  entity emerge out of bankruptcy.  You don't have that here.

14         THE COURT:  But liquidating 11s are allowed.  I mean,

15  Integrated Telecom tells us that.

16         MR. FREDERICK:  That is true.  But that is also why

17  in this Court's decisions in BEPCO and SGL Carbon, it looked

18  specifically at whether or not the entity claiming bankruptcy

19  in order to use that process to evade certain litigation

20  responsibilities had a parent and that the parent could either

21  provide financing or bail it out of whatever financial

22  difficulty it was in.

23         And so you have exactly that situation here where J&J

24  was paying the talc liabilities and it paid the Ingham

25  judgment.  That's undisputed.  So it was on J&J to pay that.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 50 of 123

49

1  It chose to create an accounting fiction by shifting the

2  liabilities on paper to JJCI.  But Johnson and Johnson did it.

3  Johnson and Johnson paid.  And there's no reason, Judge Ambro,

4  under your hypothesized situation one wouldn't look at the

5  circumstances for that bankrupt entity to determine, yes, it's

6  got a commitment for 5 billion, but is there some other

7  mechanism by which it could get financing in order to pay other

8  claimants?

9          Now, if I could go to some of --

10          THE COURT:  The usual one would be, if in some way it

11  had something going on, like the royalties coming and possibly

12  DIP financing, I don't know.  But I mean, if you are a

13  claimant, it would seem that this bankruptcy is about as good

14  as you can get absent getting punitives to have your claims

15  determined, estimated, and paid.

16          MR. FREDERICK:  Wrong.  I'm sorry, Judge Ambro.

17          THE COURT:  That's fine.

18          MR. FREDERICK:  That is not correct.  Sixty-eight

19  hundred talc claimants have already settled.  There has not

20  been a single settlement since they filed for bankruptcy.  What

21  the bankruptcy does is it bleeds the oxygen out of the room for

22  settlement by making every last claimant wait until there is

23  not just a final plan confirmed but all appeals have been

24  exhausted.  So there might be a --

25          THE COURT:  But that sounds like what you're -- the

50

1  problem there is, the stay that was given by the Court under

2  362.

3          MR. FREDERICK:  No.  The problem is the funding

4  agreement.  The funding agreement by its plain terms --

5          THE COURT:  And during the course of the appeal, you

6  have a built-in stay without having asked for it.

7          MR. FREDERICK:  That's exactly right.  But the

8  funding agreement also says no money flows until the last

9  appeal has been exhausted.  And so when you deal with any kind

10 of complicated bankruptcy in which there might be multiple

11 plans --

12         THE COURT:  That the last appeal has been exhausted

13 per that individual claim or per the case as a whole?

14         MR. FREDERICK:  The case as a whole.  No money flows.

15         And that's the problem that the funding agreement is

16 not the be-all end-all to this for the claimants.  And, Judge

17 Fuentes, you asked exactly the right question which is, who's

18 better off in such a system.  And there's no reason to think

19 that where J&J, which knew of talc liabilities for asbestos in

20 1969 and was found to have engaged in reprehensible conduct,

21 would not also be liable for judgments for these victims for

22 the asbestos in a product that seemingly is innocent.

23         They've paid more than $92 billion over the last six

24 years to their shareholders in dividends and through stock

25 buy-backs.  So there's no question that outside the bankruptcy

51

1  system in which J&J is being benefitted as a non-debtor that

2  they would be obligated to make payments for their own

3  culpability for these people's problems.

4        THE COURT:  Let's go back to Judge Ambro's

5  hypothetical.  So if you were on this panel, would you venture

6  to write an opinion identifying the line?  Or would you say, on

7  these facts clearly not a legitimate or a good faith

8  bankruptcy?

9        MR. FREDERICK:  Judge Restrepo, I think fairly, I

10  would urge the Court to say the precedents of your Court compel

11  reversal and explain why.  In doing so, some of those features

12  of what constitutes a reasonable way to draw a line will

13  emerge, but I don't think it's appropriate in a case

14  essentially a first impression where you're looking at the

15  Texas two step as the first appellate court to do that.  You're

16  looking at an entity that is not what <u>Johns-Manville</u> did and

17  what was the precursor to 524(g).  But it is a closed-end

18  capped system in which Johnson and Johnson has an incentive to

19  fix the value of the funding agreement by spinning off that

20  agreement which is permitted under the funding agreement itself

21  so you have an entity that is not like any other entity out

22  there.

23        And so to say, preemptively, these would be the

24  circumstances of which that would be permitted, respectfully,

25  feels advisory to me.  It doesn't feel necessary.  And given

52

1  the creativity that led to the Texas two step phenomenon in

2  which not a single one of these entities has ever emerged with

3  a confirmed plan and in the meantime, we've had victims of all

4  of these various torts go without a remedy, I don't think it

5  would be correct or appropriate for the Court to create a

6  roadmap for corporations to continue to do that.  That should

7  be subject to the warp and woof of litigation.

8         I would like to, though, address Judge Ambro a couple

9  of your questions.

10        THE COURT:  Sure.

11        MR. FREDERICK:  You asked whether it was appropriate

12  to look beyond LTL at JJCI.  I think that the way that you

13  appropriately do it under your cases is to look just at the

14  debtor and you look at the debtor's financial distress at the

15  time of filing.  It is an eminent financial distress test for

16  the debtor.  And the reason why you do that is because the Code

17  instructs that the debtor is going to be subject to the

18  strictures of the Code and the opportunities that the Code

19  presents.  And so looking beyond that is not the way you start.

20        Now, your cases have also looked beyond the actual

21  debtor to determine whether or not such things as financial

22  distress is appropriate and so I can't say you shouldn't do

23  that.  I think it is appropriate in this case to look at what

24  the assets are available by Johnson and Johnson to provide

25  additional liquidity and additional remedies for the debtor.

53

1  But that's not typically where you start.  The problem here,

2  though, is that as Mr. Lamken pointed out, what LTL is seeking

3  to do is to create a disfavored set of creditors.  It is only

4  the talc victims that are subject to this bankruptcy and the

5  strictures created by the bankruptcy.

6        Now, Judge Ambro, you also ask which system is

7  better.  Now, leaving aside the academic discussions that I'm

8  sure will ensue as soon as you have written --

9        THE COURT:  We've seen them already.

10        MR. JANDA:  -- this opinion, I would just say that --

11  I would say a couple of things.  For settlement and providing

12  remedies to victims, the tort system is unquestionably better.

13  Why?  Because Johnson and Johnson has every incentive to engage

14  in negotiations that are going to inure to its benefit, but

15  will pay money.  So the 6,800 talc victims that have already

16  received a settlement from Johnson and Johnson was because

17  Johnson and Johnson decided it was time to settle with them.

18        Now, it might have been that the law firm that was

19  the firm superintending those particular claimants proposed a

20  trial threat.  That is a perfectly valid reason for J&J to

21  decide we want to settle with that law firm and get them off

22  the board.

23        THE COURT:  And the tort system pays money also,

24  doesn't it?

25        MR. FREDERICK:  That's what I'm saying.  That's what

54

1    I'm saying.  You can't do what I just said in bankruptcy.  You

2    can do it in the tort system.  And that has happened in the

3    tort system.  It's no secret that the way that the company

4    would go about doing is from a top down.  We are afraid of this

5    law firm and we do not want to go against them in court.  We're

6    going to resolve those cases for that law firm, or we're not

7    afraid of this law firm, but we think if we can set a low

8    enough floor by settling out cheap, then that becomes the

9    market price.  And companies do that all the time.  It is a

10   perfectly rational way to go about resolving these.

11              That could happen in the mass tort MDL system.  And

12   it does not happen in bankruptcy because of the way the classes

13   of the different creditors are set up and the voting rules that

14   go along with relieving that system from the stricture of the

15   bankruptcy rules.

16              Now --

17              THE COURT:  Just a factual question.  For some

18   reason, I had assumed normally that punitives are not available

19   in bankruptcy.  But when I look at the briefs, there's not a

20   strong statement that that's one way or the other.  Are

21   punitives available in a bankruptcy?

22              MR. FREDERICK:  Well, we're now talking about

23   negotiating.  I think that the question of does a bankruptcy

24   confirmed plan take into account punitive damages, I don't

25   think the law is clear on that point.  There is unsettled --

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 56 of 123

55

1          THE COURT:  I agree.

2          MR. FREDERICK:  And so the question then is, what can

3 you negotiate and what is confirmable as a plan?  Here, the

4 anomaly is that Johnson and Johnson was hit with a higher level

5 of punitive damages than Old JJCI.  Why?  Because it was the

6 parent company that was misleading the scientists.  It was the

7 parent company that was dealing with the FDA and other foreign

8 regulators with respect to asbestos.

9          And so the parent company was viewed by juries as

10 more culpable for the reprehensible conduct than the consumer

11 entity.  And so when you look at the multiple upheld by the

12 Missouri Court of Appeals in the _Ingham_ case, that's why

13 Johnson and Johnson was hit with higher punitives.

14          Now, how you would do the valuation of that in a

15 confirmation of a plan, I hope that we never get to that

16 because I would fervently urge you to rule that this was not a

17 good faith bankruptcy.  But I would suggest that that will be a

18 much litigated question that will further delay the

19 finalization of any bankruptcy plan.

20          You asked, Judge Ambro, about what if LTL had been

21 created years earlier?  I think part of the test of what you

22 look at is whether it was still part of the parent company and

23 that the parent company was continuing to finance.  In which

24 case, I don't think you would find financial distress.  But

25 again, the test would be under _SGL Carbon_ and _Integrated_

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 57 of 123

56

1  <u>Telecom</u>, whether there was immediate or imminent financial

2  distress at the particular time, years later, that it was

3  seeking to declare bankruptcy.

4        But the second thing I'd like to say is that under

5  that construct, one of the reasons why the Texas two step is so

6  problematic in bankruptcy is that it does not provide for asset

7  maximization for creditors.  It is designed to starve off the

8  claims of creditors who are claimants in the tort system.

9        And that purpose is a very important purpose of a

10  Chapter 11 because the idea of allowing the reorganization is

11  so that you can maximize the assets available to the creditors.

12  But the Texas Divisional Merger Statute, as conceived and

13  implemented in these various cases that are pending, doesn't do

14  that at all.  It tries to create a fixed cap.  And, in fact,

15  that was what the J&J treasurer said in July of, the year that,

16  July of '21, that they were seeking to cap their talc

17  liability.  And so --

18        THE COURT:  Yeah, but if they cap it at 61 billion

19  and it turns out in a lot of the briefing that I've seen from

20  your side that the actual amounts are going to be far less than

21  that, does that make much difference?

22        MR. FREDERICK:  We don't know and that's the problem,

23  Judge Ambro.  I can't give you a definitive answer to the

24  question of what the value or what is going to be maximized or

25  not.  What I can tell you is that the incentives for J&J are to

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 58 of 123

57

1    drive the number as far down as they can and to wait out the

2    talc claimants who are dying at some, you know, horrible rate

3    every day while we're waiting for this.  And that's where the

4    incentives are being drawn in this case.

5         The problem that you also have with this is that

6    you're targeting one particular class.  So, Judge Ambro, if

7    you're going to talk about any of the features that might go

8    into what would be an acceptable plan for this, you have to

9    take into account the fact that any kind of divisional merger

10    that is seeking to skive off particular liabilities is going to

11    treat all the creditors the same way so that if an entity like

12    LTL goes into bankruptcy at some point in time, it has to meet

13    the financial distress test.  It has to meet the maximizing

14    creditor value test.  It has to have a valid purpose and not be

15    for litigation.  But it also can't target one class over

16    another so that the current creditors of LTL, or J&J for that

17    matter, get benefits that only the talc claimants uniquely

18    suffer from.

19         So I think --

20         THE COURT:  But in the course of a plan, I mean, you

21    would have a classification under 1122 or whatever it is that

22    specifically puts these people into their own class, would you

23    not?

24         MR. FREDERICK:  Well, if you did that, you are

25    talking about an inordinately large class which creates its own

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 59 of 123

58

1  confirmation challenges and problems.  And you're also dealing,

2  respectfully, with people of different ages, different

3  conditions, different states of ovarian cancer or situations

4  with respect to mesothelioma.  So you've got -- it's a much

5  more complicated situation and that's why in the tort system,

6  the way these are traditionally done, is that a group of cases

7  will be settled and then a special master will be designated by

8  the court to go through the circumstances of each individual

9  claimant and determine based on that pop that has been achieved

10 what each person is going to get.  That is a much more

11 challenging feature that would I think in the bankruptcy

12 system.

13         THE COURT:  All right.  Thank you.  Then we'll get

14 you back on rebuttal.

15         We'll take a -- do you want a 10-minute break or a

16 15-minute break, gentlemen?

17         UNIDENTIFIED SPEAKER:  Whatever you like.

18         THE COURT:  What do you guys want?

19         UNIDENTIFIED SPEAKER:  Ten.

20         THE COURT:  Ten-minute break.  The boss spoke.

21                     (Recess taken)

22         THE COURT:  Mr. Katyal, whenever you're ready.

23         MR. KATYAL:  Thank you, Judge Ambro.  May it please

24 the Court.

25         I very much appreciate the argument of my three

59

1    friends and I'd like to start by discussing three interlocking

2    problems with what you just heard.  Now, my friends said a lot

3    and if it's okay with the Court, I'd like to take about four

4    minutes, not two --

5            THE COURT:  Fine.

6            MR. KATYAL:  -- to try and describe these three

7    points because they reinforce each other.

8            First is the narrow scope of your review.  At this

9    point, you're being asked to decide two questions.  First, was

10   the petition filed by LTL made in good faith, and second,

11   should protected party litigation be stayed.

12           Now, my friends' arguments about harm to the

13   claimants is premature.  Those are plan confirmation questions,

14   or at least ones for the 524(g) 75 percent vote.  After all, as

15   Judge Ambro reminded my friends, Congress handcrafted a

16   specific solution to asbestos bankruptcy cases, which among

17   other things requires a super majority to approve a plan.  What

18   my friends are doing is taking all of their complaints about

19   the bankruptcy process and pushing that all into the good faith

20   question.  Those are questions for plan confirmation, not ones

21   for today.

22           What is before you today is the bankruptcy court's

23   conclusion that LTL acted in good faith.  That court spent five

24   trial days hearing from witnesses and crafted two detailed

25   opinions, all of which rejects what you just heard.  The

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 61 of 123

60

1   standard to overturn Judge Kaplan is daunting.  As the Supreme

2   Court in Lakeridge put it, "Factual findings are reviewable

3   only for clear error with a serious thumb on the scale for the

4   bankruptcy court."

5         Or as this Court just said in I-Fiber (phonetic), "In

6   a complex case where the bankruptcy court does substantial work

7   in seeking to understand the facts, great care must be

8   exercised to defer to those findings."  As for the other

9   questions about protected parties and the stay, the bankruptcy

10   court identified five separate bases for an injunction, and

11   even the U.S. Trustee doesn't dispute them.  That's the first

12   point.

13         The second, the transfer of liability.  Much of my

14   friends' argument hinges on the notion that J&J, not LTL, last

15   year evaded claims by restructuring.  But the key fact is this,

16   J&J didn't owe anything, didn't owe anything for these claims

17   last year.  J&J didn't owe anything the year before.  J&J

18   didn't owe anything for the preceding 43 years.  That is

19   because in 1979, J&J transferred its entire baby business and

20   all of that liability to JJCI, a separate entity.  And JJCI

21   agreed to fully indemnify J&J for all claims.

22         So what actually happened last year?  JJCI

23   restructured and created two entities, New JJCI and LTL.  Every

24   dollar that the Old JJCI was liable for, every dollar of its

25   own conduct and anything alleged by J&J, the New JJCI had

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 62 of 123

61

1  agreed to pay 100 percent.  The restructuring and bankruptcy

2  petition didn't debate anything.  It was a full one-to-one

3  placement.  Indeed, it was even more than one-to-one for

4  reasons our brief explains.

5         Now my friends say, well, they represent the victims

6  and speak for them.  That proves our point and proves

7  Congress's point.  They are all current claimants.  Our

8  argument is that each of their tort lawsuits has tunnel vision.

9  It examines only their individual case and delays future ones.

10 It's a home run or a strikeout and precious few get up to bat.

11 The only way to get a system wide resolution that's

12 comprehensive, that protects future claimants, is through

13 bankruptcy.

14        Third, and finally, they ignore several key limiting

15 principles of our argument, particularly Mr. Frederick, and

16 four things make this case unique.  First, a latency period of

17 nearly 50 years with many, many future claimants who can't get

18 any relief now and who risk not getting paid.

19        Second, wild lottery style judgments like <u>Ingham</u>,

20 including some for billions, and a massive number of cases,

21 40,000, with more filed every hour of every day of every year,

22 creating a tsunami of litigation.

23        Third, Congress has expressed handcrafted rules for

24 asbestos bankruptcy cases under 524(g), including a 75 percent

25 super majority requirement and a rule that two courts, not one,

62

1  a bankruptcy court plus a federal district court, must approve

2  the plan and scrutinize it for fairness and equity, and D,

3  finally, all -- or fourth finally, all in the context of a 1979

4  full transfer of liability from J&J to Old JJCI, as well as Old

5  JJCI providing full indemnity back to J&J.

6         So this isn't a case of a parent dumping its

7  liability the day before restructuring or anything like that.

8  J&J has not been liable for decades.  In short, nothing in the

9  restructuring hurts the claimants.  And even if you disagreed,

10 the proper time to evaluate that is far down the road, and here

11 you must just simply decide whether the petition is filed in

12 good faith.

13        THE COURT:  The blank response when you hear about

14 the divisional merger statute and how it's used and people use

15 the name pejoratively, Texas two step, is why didn't you just

16 file Old Consumer?  Life would be so much easier.

17        Now, you might still have a battle as to whether

18 there was financial distress, but it would at least be arguably

19 a cleaner battle.

20        MR. KATYAL:  So, Your Honor, there's several

21 responses, but the most important one is the one that the

22 bankruptcy court gave after listen to the testimony.  And you

23 never really actually heard a response to it from my other

24 side, which Judge Kaplan found is if you forced that entity,

25 Old JJCI, to go bankrupt, it would have "a horrific impact"

 1 because Old JJCI makes all sorts of -- JJCI makes all sorts of

 2 things like, you know, Bandaids, Tylenol, things like that.

 3         THE COURT:  It sounds to me like only that's an

 4 attempt to preserve goodwill, which of course has been earned

 5 over the years.  But it sounds like the argument that's being

 6 made from your side is that it's a whole lot of inconvenience,

 7 a whole lot of inefficiency, a whole lot of harm to goodwill

 8 and why not allow this more creative way to separate out the

 9 bad from the good.

10         MR. KATYAL:  Your Honor, that is part of the

11 argument.  It is not by any stretch the whole argument.

12         So just to take a step back, I think what the

13 Bankruptcy Code would ask is the relevant question is, is the

14 bankruptcy petition maximizing the value of the debtor's

15 estate.  That's the goal, the purpose that we are isolating

16 from Page 120 of <u>Integrated Telecom</u>.

17         So I don't think the Bankruptcy Code says you're to

18 burden debtors for the own sake.  You're supposed to do it

19 because in some sense, it's going to maximize the value.  And

20 so one thing, and this is my first answer to you, what Judge

21 Kaplan found is that you are maximizing the value by going

22 through the divisional merger statute, because otherwise there

23 will be actually less money available including to claimants

24 because of the loss of goodwill, the loss of all that, you

25 know, forcing the entire company into bankruptcy, all the

64

1  different findings he found.

2          Now another key part of this is there's two possible

3  reasons I think my friends isolate for why you'd want this

4  larger entity, to force this larger entity to go bankrupt.  One

5  is because you want to guarantee the amount of money that this

6  larger entity, JJCI, has for claimants.  And that's exactly

7  what the funding agreement does.

8          THE COURT:  So does Old JJCI qualify for financial

9  distress?

10         MR. KATYAL:  We believe it does, as does LTL --

11         THE COURT:  So if it --

12         MR. KATYAL:  -- as (indiscernible) U.S. Trustee.

13         THE COURT:  If it does, then isn't it the real party

14  in interest?

15         MR. KATYAL:  Well, I don't know if it's a real party

16  at this point because LTL is the one that filed the petition.

17  We agree with Judge Kaplan.  Either way you slice it, whether

18  it's LTL or JJCI, there's massive financial distress.  And I

19  can go through that evidence.

20         But I do want to first really deal with your first

21  question because I think it's the heart of what --

22         THE COURT:  Excellent.  They're dovetailing together.

23         MR. KATYAL:  Yeah, they dovetail.  But Mr. Lamken

24  really spent a lot of time on this idea that Old JJCI was the

25  entity that had to go bankrupt.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 66 of 123

65

1          And our first point to you is the one main reason why

2    he's isolating is because you want claimants to get paid.  But

3    this funding agreement gives the entire value of JJCI, the

4    entire value, $61 billion free and clear to the potential

5    claimants so that entire pot of money is available.

6          Now my friend says maybe JJCI will squander the

7    assets and that's why you need bankruptcy court jurisdiction,

8    maybe they'll transfer it to equity.

9          The funding agreement, this is quite important to our

10   argument, the funding agreement itself bars that or if it

11   occurred if there were any payment to J&J or to shareholders or

12   anything like that, distributions, all of that increases the

13   $61-billion pot; $61 billion is only a floor, not a ceiling.

14         I'd like to walk you through the language of the

15   funding agreement so that you -- so that it's clear why my

16   friend's argument is wrong.

17         So the funding agreement says that you would take the

18   greater of either, one, the fair market value of Old JJCI

19   immediately prior to the divisional merger.  That amount is

20   $61.56 billion, that's Appendix Page 7422.  Or it says it's the

21   fair market value on the date that LTL and the new JJCI refused

22   to pay under the funding agreement.  That's at Appendix Page

23   4316 and 4619.

24         Here's the most important point about 4619.  If a

25   hypothetical that my friend says happens and it materializes

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 67 of 123

66

1  that JJCI does something to try and give J&J money to -- you

2  know, in the form of distributions or something like that, that

3  just bumps up the amount of the funding guarantee under the

4  agreement.  That is Page 4319.

5          So the funding agreement solves for exactly the

6  problem.  We don't think there's anything in the Code that

7  requires, of course, you know, the larger entity to declare

8  bankruptcy.  But to the extent you're worried about it, to the

9  extent you're worried, oh, you know, maybe this is going to

10  create some bad incentive, the funding agreement does that.

11  And here's the second most important point.  J&J guarantees

12  that funding agreement, not just JJCI.

13          In the current world, in the pre-restructuring, pre-

14  bankruptcy baseline world, they could maybe try and sue JJCI.

15  We know those lawsuits take time and so on.  We could talk

16  about that in a moment.  But the most important point is

17  whatever their lawsuits would get, it would only get up to $61

18  billion and not even that because that money is not free and

19  clear.  It would be subject to all of the other creditors that

20  JJCI have and stuff like that.

21          And, of course, there's no J&J guarantee under the

22  pre-restructuring world.

23          THE COURT:  Let me work backwards.  When do funds

24  come out of the funding agreement to pay claimants in a

25  bankruptcy?

67

1          MR. KATYAL:  So under the terms of the agreement,

2    first, LTL has to pay and whatever they have.  And then New

3    JJCI is to pay whatever they have.  And then afterwards,

4    anything else if there's any excess, it goes to --

5          THE COURT:  What about the points Mr. Frederick makes

6    that no monies come out until all the appeals are resolved?

7          MR. KATYAL:  Well, I think that's true of course in

8    the regular tort system in the bonds under Rule 62 of Federal

9    Rules of Civil Procedures.  I don't think that's any different

10   from the standard system.

11         And, of course, here I think you've got to grapple

12   with Judge Kaplan's finding that there are -- you know, 49

13   trials have happened, Your Honor, to date in all of these

14   cases.

15         THE COURT:  Thirty-five have gone to verdict, right?

16         MR. KATYAL:  Yeah, very very few out of --

17         THE COURT:  So 18 you won, 17 you lost?

18         MR. KATYAL:  Yeah.  And then some of those were

19   reversed on appeal.  And as Judge Kaplan said, you know, we

20   have a very good batting rate for all of the reasons that our

21   briefs explain.  But, nonetheless, at the end of the day,

22   there's going to be financial distress because of the massive

23   number; 40,000 lawsuits and more being filed every day.

24         THE COURT:  Well, let's go back to you said the full

25   amount of all assets of Old JJCI are available to pay

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 69 of 123

68

1  claimants.  So, once again, you come back to my question.  Why

2  not file Old JJCI in the first place?

3          MR. KATYAL:  Yeah, for two reasons.  One is it would

4  reduce the number of the dollars actually available to

5  claimants because, forcing as Judge Kaplan found, Old JJCI into

6  bankruptcy reduces the value of JJCI.

7          THE COURT:  Except you've got a company that has --

8  is ongoing with very very profitable products that have been

9  well earned over decades.

10         MR. KATYAL:  And that's exactly Judge Kaplan's point,

11  which is you don't have to -- because of the funding agreement

12  because you get all of the good without the bad, you get the

13  full value of the company not subject to any creditors or

14  anything like that.  It's free and clear up to $61 billion, and

15  then you get a backstop from J&J.

16         And remember my friends, their brief says J&J has

17  better credit than the United States government.  So in terms

18  of which deal is better for the claimants, for all the

19  claimants, not just my friends sitting at the table but

20  including future claimants, which is a huge chunk as Congress

21  noted in 524(g) because of the latency period for asbestos.

22         THE COURT:  If I understand you correctly, if I'm

23  hearing you correctly, it almost sounds like J&J did this to

24  benefit the claimants.  They had the claimants' best interest

25  at heart and then they do this Texas Two Step.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 70 of 123

69

1          But the timing doesn't suggest that.  The timing

2  suggests that this was really done for a litigation advantage.

3  As I understand it, LTL is created four months after the

4  Supreme Court denies cert in the Missouri litigation, and the

5  next day they declare bankruptcy.

6          So how do you reconcile that for me because I'm a

7  little troubled.

8          MR. KATYAL:  Absolutely, Your Honor.

9          And this is exactly what my friends said to Judge

10  Kaplan, and he rejected it on the facts, not litigation

11  advantage but four separate purposes.

12          The first purpose --

13          THE COURT:  But you concede that there is a

14  litigation advantage by doing this?

15          MR. KATYAL:  Well, I think it's a byproduct of this.

16  Absolutely.

17          THE COURT:  So there is a litigation advantage?

18          MR. KATYAL:  Well, I think it's a byproduct but, as

19  Judge Kaplan found, that wasn't the reason.

20          LTL has been transparent.  there's been lots of

21  discovery on this that Judge Kaplan referred to and said, no,

22  the reason for this is four-fold: First, that there's huge

23  defense costs to the tune of two- to five-million dollars per

24  case multiplied by as many as 40,000 cases.  You didn't hear a

25  word from my friends, they had a lot of time up here, they

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 71 of 123

70

1 didn't have an answer to what Judge Kaplan found.  That's a

2 huge deadweight loss.

3         Every one of these cases costs us millions to fight,

4 and even if the claims are meritless.  So that's all money that

5 could be going to the claimants but now is not going to the

6 claimants.  Instead, it's going to pay attorneys.

7         The second is, as I was saying to Judge Ambro, the

8 horrific impact is what Judge Kaplan called the massive

9 disruptions that would endure if Old JJCI was forced into

10 bankruptcy.  That's at Page A-47.

11         Third, the equity concerns for future claimants,

12 which is of particular concern here given Congress' hand-

13 crafted statute in 524(g) and this very long latency period.

14 We understand my friends have to zealously represent their

15 client before this Court.  They represent current clients.

16         What Congress is telling you is there's a worry about

17 latency and about future claimants, and this is a solution

18 that's comprehensive for everyone.

19         And, lastly, Your Honor, it's because Judge Kaplan

20 found that bankruptcy process is a lot faster than the tort

21 process.  My friend talked about 6,800 settlements but doesn't

22 mention what Judge Kaplan said about that, which is he said two

23 things: One, that will be dwarfed by the 40,000 cases that have

24 already been filed and the many more that will come and, also,

25 he said that the past number of settlements won't occur in the

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 72 of 123

71

1  future -- and this returns to your question, Your Honor --

2  because of Ingham.

3          What Ingham did was basically create a shiny object

4  for folks to try and keep their cases in the tort system with

5  the hope of a lottery-style big pay day.  Some people will get

6  home runs.  Most people, Judge Kaplan found, don't get a turn

7  at the bat.

8          That's what J&J -- excuse me, that's what LTL was

9  dealing with in this restructuring and that's why the funding

10 agreement is written the way it does.  It provides my friends

11 as well as future claimants a guarantee of at least $61

12 billion.

13         Now, Judge Ambro, I think you pointed out, well,

14 there's some kind of contradictions here, how much are the

15 claims really worth.  You know, and Judge Kaplan, of course,

16 talked about that in his opinion.  He said --

17         THE COURT:  Yeah.  I didn't see any strong defense of

18 his 190 billion.

19         MR. KATYAL:  Well, it's up to 190 billion.  And it

20 was just the defense costs.  And he got it by simply saying two

21 to five million dollars per case multiplied by 40,000 cases.

22         THE COURT:  But it was the high end of every --

23         MR. KATYAL:  Correct.  And we're not defending

24 necessarily --

25         THE COURT:   -- every case.

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 73 of 123

72

1          MR. KATYAL:  -- the high end, of course.

2          But we do -- we are defending vehemently Judge

3    Kaplan's conclusion after hearing from expert after expert

4    including Dr. Bell about the level of financial distress that

5    the company faced.  And my friends are asking you to re-weigh

6    the evidence and say, oh, well, these lawsuits actually don't

7    impose as much of a present liability or this or that.

8          Judge Kaplan evaluated all of that and found

9    financial distress, including most significantly in 2019 the

10   Consumer Division had a $2.1 billion profit.  And just the very

11   next year because, Your Honor, because of <u>Ingham</u> along with

12   other talc litigation, they had a $1.1 billion loss in one

13   year.  And talc liability, Judge Kaplan found, was responsible

14   for that.

15         If you look at the years 2018 to 2020 --

16         THE COURT:  Talc liability was responsible for a

17   significant portion of that, wasn't that correct?

18         MR. KATYAL:  Correct.  Yes, a significant portion of

19   that.

20         And the talc litigation, for example, Judge Kaplan

21   found from the years 2018 to 2020 costs 32 -- 27 percent of all

22   costs of Old JJCI and 32 percent in the year 2021.

23         THE COURT:  But coming back to the -- at the outset,

24   if you have a parent company and it has a subsidiary that's

25   changed its name but the subsidiary's been there for 43 years.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 74 of 123

73

1    And the subsidiary has a major problem with one of its products

2    that's caused mass tort litigation and some fear of what could

3    happen in the future.

4        Usually what happens over all these decades is you

5    file the subsidiary and you go from there.  The concern -- and

6    you said that all of the assets of Old JJCI will be put into

7    play for funding the claimants' claims that are valid.  And you

8    look at the next case, I think as Mr. Frederick said, and

9    you're worried about, okay, you don't have a Johnson & Johnson

10   consumer, you have Acme, you know, Acme, Inc.

11       I don't mean the grocery chain, by the way.  I

12   apologize to them.  I'm thinking of the old Warner Brothers

13   cartoons.

14       But that they don't have 61 billion.  They are there

15   with maybe four or five billion at tops.  They're going to run

16   out of things, and they're saying we're going to do his

17   divisional merger and go from there.  And you can see that the

18   slippery slope comes into play and people are saying let's stop

19   this before it really gets out of hand.

20       MR. KATYAL:  Right.  Totally.

21       THE COURT:  That's the concern.

22       MR. KATYAL:  We are very sympathetic to exactly that

23   argument, Your Honor.  So refer to three points.  One is you're

24   exactly right that the ordinary course is a subsidiary would

25   declare bankruptcy.  That's your own opinion joined by Judge

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 75 of 123

74

1  Fuentes in In re Owens Corning back in 2005.  That's exactly

2  what happened.  That's what this Court approved.

3         Second, we're not here defending something in the

4  absence of a funding agreement.  If there is no funding

5  agreement, that valid bankruptcy purposes that Judge Kaplan

6  isolated those four look very different.  They look like

7  litigation advantages.

8         But here, if you were to ask what is the litigation

9  advantage that is served that could somehow dwarf Judge

10 Kaplan's four different findings of valid purpose, it would be

11 -- you're hard pressed to do so because this deal gives -- this

12 restructuring and this petition gives actually more to the

13 claimants, now all the claimants including future claimants.

14        And that's what Congress is telling you've got to do.

15        THE COURT:  This funding agreement has a bifurcation.

16 It will fund in bankruptcy and out of bankruptcy.  Isn't that

17 correct?

18        MR. KATYAL:  I believe it only funds in bankruptcy.

19 I mean --

20        THE COURT:  So what's it do outside of bankruptcy?

21        MR. KATYAL:  I don't think it has any life outside of

22 the bankruptcy.

23        So, you know, basically it's a --

24        THE COURT:  So in Ingham when Johnson & Johnson

25 stepped up and paid, it did it for what reason?  Because of a

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 76 of 123

75

1  judgment was against it?

2          MR. KATYAL:  So, actually, it's just flatly wrong,

3  Your Honor.  Ingham was paid not by Johnson & Johnson.

4          THE COURT:  Okay.

5          MR. KATYAL:  It was paid by JJCI.  I don't know where

6  my friend is getting that from.  And, you know, indeed, I can

7  point you to different parts of the record which directly

8  contradict what he's saying.

9          THE COURT:  Of the 17 verdicts or of the portion of

10  the 17 verdicts not overturned on appeal, how many of those

11  verdicts also were against J&J?

12          MR. KATYAL:  I think some may have been against J&J

13  for derivative liability or something like that.  But all of

14  them were paid for by JJCI or now LTL.  Every one.  Every

15  dollar.

16          And so, you know, the 1979 agreement actually is

17  written to say it's a full transfer of liability to JJCI but it

18  also says full indemnification for J&J and everything has to be

19  paid for by JJCI or now LTL.  So any suit against J&J at any

20  point is always going to be paid by now LTL.  That's the logic

21  behind Judge Kaplan's finding on question two about whether the

22  stay should be extended to protected parties.

23          THE COURT:  One of the questions I asked the other

24  side, more than one counsel, is when you look at this picture,

25  are you taking into account just LTL or LTL and Old JJCI, and

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 77 of 123

76

1 their answer uniformly was LTL.

2        It sounds like from what you're saying that part of

3 the equation here is taking into account Old JJCI.

4        MR. KATYAL:  Well, we think actually -- we agree with

5 the U.S. Trustee that the relevant question is actually is

6 whether LTL as the petitioner is basing financial distress, but

7 we can understand why Judge Kaplan also made findings on Old

8 JJCI which --

9        THE COURT:  Yeah, because he specifically -- he

10 meshed them together.

11        MR. KATYAL:  Yes.  He found either way that there was

12 going to be financial distress.  And so we agree with -- you

13 know, we agree with the way Judge Kaplan approached it.  So

14 either way, whether you look at LTL and the litigations they

15 faced or you looked at Old JJCI and the litigations they face,

16 either way it's going to meet this Court's test for financial

17 distress.

18        What Mr. Frederick said is take a look at the three

19 cases that this Court has decided, BEPCO, SGL Carbon, and

20 Integrated Telecom.  We very much want you to look at those

21 cases because all three I think are miles away from this case.

22 In BEPCO, there were six litigations in total, six.  In SGL

23 Carbon, six complaints in the United States, one in Canada.

24 Integrated Telecom, a whopping one securities case at issue

25 there.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 78 of 123

77

1          And most importantly, each of those cases --

2          THE COURT:  But in -- let's just take for example <u>SGL</u>

3  <u>Carbon,</u> it looked like what was being done was ultimately to

4  file for bankruptcy and in the end when you have a dissolution,

5  it will be under state law that will return equity back to the

6  equityholders which one would under the absolute priority rule

7  in bankruptcy not see happening.

8          MR. KATYAL:  So I think -- you know, I think <u>SGL</u>

9  <u>Carbon</u> really goes on the notion of few litigations and this is

10  done for litigation advantage.  That's Page 124 and 125 of that

11  decision.

12          Of course, here to the extent you're worried, Your

13  Honor, about what my friends said about somehow money being

14  paid to equity and a violation of the absolute priority rule,

15  as I was saying, the funding agreement captures that because

16  every dollar that goes to J&J from JJCI in the form of a

17  distribution at Page 4319 of the record makes very clear this

18  funding agreement says that just bumps up the value of new

19  JJCI, the amount available to the claimants.

20          THE COURT:  How would you propose in the example I

21  noted that you'd have a much less funded entity in bankruptcy

22  and a much less funded backstop, how would you propose that bad

23  consequences be blunted?

24          MR. KATYAL:  Through the Court's review process.  So

25  -- and even before the review process, of course, was the

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 79 of 123

78

1  524(g) solution because 75 percent of the claimants would have

2  to approve it and, Your Honor, as you said to my friend on the

3  other side, you always have the possibility of filing an

4  adversary action for fraudulent conveyance.

5           And, indeed, they tried some of that language in the

6  bankruptcy court.  They tried to suggest this was a fraudulent

7  conveyance.  But at this Court as this case comes to the Court,

8  they dropped all of that out because I think it doesn't cut the

9  mustard.  Here this funding agreement is --

10         THE COURT:  The only answer I got was it's premature

11  to do so now.  Let's figure out whether the filing was in good

12  faith and then they'll cross that bridge when they come to it.

13  I mean that's the answer that I got.

14         MR. KATYAL:  Yeah.  And I just don't think that

15  ultimately answers the question.

16         And I just want to return for a moment to those three

17  cases that my friend was referring to because pointedly they

18  distinguish between those six or seven litigations and the many

19  thousands, I think 16,000 that were at issue in <u>Johns-Manville</u>.

20  And they said that is the kind of -- certainly the kind of

21  flood of litigation that would create financial distress.

22         And here Judge Kaplan looked at the existing 40,000

23  litigations and said that is certainly enough for financial

24  distress given the numbers, the testimony from Dr. Bell that I

25  referred to earlier, and the like.

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 80 of 123

79

1              THE COURT:  Is LTL fully capable of satisfying the

2     talc claims?

3              MR. KATYAL:  By itself without a resort to the

4     funding agreement, we think the answer to that is no.  But with

5     the funding agreement, absolutely.

6              Our position, and Judge Kaplan found this too, is

7     that we believe that $61 billion, which is of course only a

8     floor, it could go up, is enough to pay a hundred percent of

9     all valid claims.  And when I say valid claims, it excludes two

10    things.  It excludes the deadweight losses of billions and

11    billions of dollars paid to lawyers for defending against this.

12             So the bankruptcy system avoids that, as Judge Kaplan

13    explained.  And second, this gets to a question that, Your

14    Honor, you asked Mr. Frederick, it excludes lottery-style

15    punitive damages.  You're absolutely right, we spent a long

16    time looking trying to understand does the bankruptcy system

17    bar punitive damages.  I think the answer to that is, no, it

18    doesn't bar them.  And we certainly think that -- but we think

19    that it would even it out to the extent there were any

20    available.

21             The way that I think the process would unfold, Judge

22    Ambro, is there's been an estimation expert appointed by the

23    name of Ken Feinberg, you know, obviously an expert in this

24    field.  He is going to look at the amount of liability and he

25    could, I suppose and probable we'll get briefing on, should

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 81 of 123

80

1  punitive damages be part of that estimation process.

2        THE COURT:  Does J&J have any direct liability in

3  this case?  And given the 50-year latency period of these talc

4  claims, right, does J&J have any direct liability or direct

5  exposure?

6        MR. KATYAL:  We don't think they have -- we certainly

7  think they have any exposure.  I'll walk you through the

8  language of the 1979 transfer.

9        So it first transfers, quote, all of the business of

10  the Baby Division to this subsidiary, JJCI, and all assets and

11  liabilities.  Judge Kaplan excerpted it at A-163 and A-164.

12  And then it says JJCI, quote, agrees to assume all the

13  indebtedness, liabilities, and obligations of every kind and

14  the subsidiary will forever indemnify and save harmless J&J

15  against all the indebtedness, liabilities, and obligations.

16  That is a very very strong indemnification.

17        So J&J -- and that's why since this has been written

18  in 1979, J&J hasn't paid a dime.  It has always been Old JJCI.

19  Now it's true there was a centralized account which is used in

20  lots of parents and subsidiaries in which J&J initially may

21  have sometimes paid that cash out.  But as the record shows, it

22  was always booked back to Old JJCI.  That's Appendix Pages 4107

23  and Appendix 8103.

24        And, you know, as I say, if you look at who paid

25  Ingham, it was not J&J.  It was JJCI.

81

1          THE COURT:  Why would punitive damages be a factor to

2  consider?

3          MR. KATYAL:  Because I think -- and Congress was

4  worried about this in 524(g).  Because you have the massive

5  number of future claimants with this long 50-year latency

6  period, you have to worry that a $2-billion verdict in Ingham

7  added to other punitive damage verdicts will take away from the

8  ability of future claimants to recover.

9          That's why we're here, Your Honor.  That's the

10 purpose.  You know, that's what Judge Kaplan found was the

11 purpose based on looking at this evidence.  I know it makes for

12 a good story to say, you know, this big company that has all

13 these profits is somehow trying to evade responsibility or

14 something like that.  And as I said, the agreements from 1979

15 on has always transferred all of that liability.

16         Now, Judge Ambro, you asked my friend on the other

17 side, well, what if this were done in 2014 or what if the

18 restructuring as opposed to now is the use of this Texas

19 divisional merger statute, what is the problem there.

20         And I think the Bankruptcy Code takes the debtor's

21 corporate structure as a given as it comes under state law.

22 And we followed here Texas law meticulously.  And I think it

23 would be a very dangerous rule for this Court if you were to

24 start line-drawing.  And I couldn't hear my friend's answer to

25 the questions about line-drawing, is 2014 okay, is last year

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 83 of 123

82

1   okay, is two days different or something like that.

2          And so I think that's one important point.  The other

3   is actually that 524(g) itself contemplates pre-petition

4   restructuring, and I would point you to 524(g)(4)(A)(ii)(V).

5   Sorry about the --

6          THE COURT:  The long statute.

7          MR. KATYAL:  Exactly.  It is a long statute.

8          But it provides that a channeling injunction can bar

9   actions, quote, directed against a third party and arriving

10  because of its involvement in a transaction changing the

11  corporate structure of the debtor or a related party.

12          And so if Congress thought that a full company is the

13  thing that must declare bankruptcy, I don't think it would have

14  included this provision in it.  Rather, I think Congress

15  anticipated basically that there would be pre-petition

16  restructuring.

17          I think it's notable that my friends for all their

18  saying they say we're inconsistent with the Bankruptcy Code,

19  what provision are we inconsistent with?  What provision are we

20  violating?  There's some meta principle I guess that they're

21  isolating, but they can't point to any particular provision.

22          THE COURT:  They're pointing out the gateway

23  provision that you have to file a bankruptcy in good faith.

24  And they're claiming that this was not done.  So that's what

25  we're talking about.  That's the primary issue today.

83

1          MR. KATYAL:  And if that's what they're isolating, we

2     think Judge Kaplan found four different reasons why that -- why

3     the valid purpose of bankruptcy has been served.

4          THE COURT:  One just fact question, in terms of the

5     proposal made here to deal with the liabilities of LTL and the

6     funding, were those types of proposals, any variation of that

7     made in connection with the MDL litigation?

8          MR. KATYAL:  I don't believe the funding agreement

9     had anything to do with the MDL litigation.  Rather, as the

10    Court found in --

11         THE COURT:  Yeah, I'm just saying the concept.

12         MR. KATYAL:  Yeah, I don't know about the concept.  I

13    mean I think the only thing I'm aware of is the Court's finding

14    in A-13 (phonetic) relying on their own expert that this was a

15    single integrated transaction and so -- with the restructuring

16    and funding agreement.

17         Now you had asked before, Your Honor, I just have to

18    slightly correct something.  I understand that the funding

19    agreement does have provisions for funding outside of

20    bankruptcy.

21         THE COURT:  Yeah, that's what I thought.

22         MR. KATYAL:  Yes.  So I apologize for that.  But our

23    --

24         THE COURT:  What are the opt-outs that are being

25    considered?

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 85 of 123

84

1          MR. KATYAL:  So the 524(g) process has --

2          THE COURT:  People who can say I don't want to be

3    part of the bankruptcy, I'm going to opt out and go forward

4    with respect to my litigation.

5          MR. KATYAL:  Yeah.  So, I mean, I think Congress put

6    that into the statute itself saying there has to be a 75

7    percent requirement for the plan and then, of course, there's

8    two-court review.  So there's a lot that has to happen.

9          And I think th most important point about that is --

10         THE COURT:  You contemplate that this plan even

11   though it's not yet in place will allow for any type of opt-

12   out?

13         MR. KATYAL:  I don't know that we have gotten that

14   far.  I think that's a pre -- to use a word from earlier, I

15   think that's a premature question.  But I would say that, you

16   know, 75 percent threshold is of course very daunting.  We are

17   highly incentivized to put a good plan together because

18   otherwise we get returned to the mass tort system with all of

19   the uncertainty and all of the problems attendant to it.

20         And Judge Kaplan -- you know, my friend Mr. Frederick

21   said he wants you to write a decision really about these facts.

22   We absolutely agree.  Judge Kaplan has said time and again his

23   goal is to move this thing incredibly expeditiously.  My

24   friends on the other side said they thought this process could

25   be done as early as the first quarter of next year.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 86 of 123

85

1    And Judge Kaplan has rejected time and again any

2 attempt to delay the bankruptcy process which looks very

3 different, of course, than what's going on in the tort system

4 as Your Honor was asking my friends on the other side.  Massive

5 delay, only a few trials to verdict.  And, you know, as Judge

6 Kaplan found, future trials are going to be even more delayed

7 and very few settlements because of the Ingham verdict and

8 other things.

9    And so you are asked to compare two different worlds.

10 One is the baseline of the pre-restructuring, pre-bankruptcy

11 world in which Johnson & Johnson owes nothing, in which some

12 people slowly get paid but that's subject of course to any

13 other claims against Old JJCI, any recovery.  There are huge

14 defense costs, and future claimants risk not getting paid with

15 all the latency.

16    And under the restructuring and the funding

17 agreement, instead, you have a very different world, one with a

18 $61-billion plus floor.  That money is guaranteed free and

19 clear.  You have a faster process so current claimants get paid

20 and future claimants have a voice at the table.  They have a

21 representative because that is under 524(g).  And, of course,

22 the claimants, including everyone sitting at that table, will

23 -- we have to persuade three-quarters of them that this is a

24 fair and equitable solution and then we have to persuade two

25 different courts about that, the bankruptcy court and the

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 87 of 123

86

1  district court after that.

2          And we will have, you know, Ken Feinberg's estimation

3  as part of that to start to break what otherwise has been an

4  intractability between the parties.

5          THE COURT:  Is LTL going to continue as a going

6  concern afterwards or is this just a liquidating trust, in

7  effect?

8          MR. KATYAL:  Well, we suspect that, you know, LTL

9  does have, for example a royalty business that will continue.

10          THE COURT:  How much does that bring in a year?

11          MR. KATYAL:  It brings in about $50 million, the

12 record shows, a year and is worth about $350 million.  So by

13 itself, Your Honor, to answer one of your earlier questions,

14 that isn't enough to -- that money isn't enough to avoid

15 financial distress.

16          And so if LTL doesn't restructure and doesn't have

17 the funding agreement available to it, then obviously, it's

18 going to be under water and have all the problems Judge Kaplan

19 referred to.

20          THE COURT:  What do you make of the stay?  Your

21 friends, as you keep referring to them, are adamant that the

22 Court would exceeds its jurisdiction with respect to the stay,

23 issue number two.

24          MR. KATYAL:  Yeah.  We think that Judge Kaplan, as I

25 say, he identified five reasons why there is and crucial to all

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration    Page 88 of 123

87

1  five, and they're all independent of one another, they have to

2  run the table.  But I think once central idea he had is that

3  this involves the same basic claims during the same time

4  period.

5           And what he did is a limited stay against certain

6  parties, and it's a surgical one.  In order for a stay to

7  occur, two things have to happen.  One is --

8           THE COURT:  Surgical with 670 parties?

9           MR. KATYAL:  Yes.

10           THE COURT:  Non-debtors.

11           MR. KATYAL:  Yeah.  Well, but again, Your Honor,

12  we're talking about a massive amount of litigation.  670

13  versus, as I say, 40,000 claims that are currently in

14  existence.  I'll read to you the terms of this --

15           THE COURT:  How many insurers are we talking about of

16  that 670?  Is the whole shooting match 670?

17           MR. KATYAL:  I think it is; the whole shooting match

18  is 670.  The insurers, the list is at Pages A-249 and 250.  I

19  don't think it's very many.  It's like AIG, Prudential, and the

20  like.  Let me read to you the terms --

21           THE COURT:  How many retailers?

22           MR. KATYAL:  The retailers are -- that's a three-page

23  list at A-245 to '48.  There are a number of them.  It

24  includes, you know, CVS and things like that.  And here's what

25  it includes, and then let me tell you what it doesn't include.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 89 of 123

88

1          THE COURT:  Okay.

2          MR. KATYAL:  It includes two things: one, claims --

3  or two things must have to happen.  The claim must first arise

4  from the manufacture or sale of talc-containing products by Old

5  JJCI or J&J and, second, that were asserted against or could

6  have been asserted against Old JJCI.  That's Joint Appendix

7  Page 195.

8          And so it's not, for example, a stay on unrelated

9  things like mesh litigation against J&J or anything like that.

10  And it's done, and this is crucial, it's done for a simple

11  reason, because if you can start suing, Judge Ambro, the

12  retailers like CVS or the insurers, that reduces the overall

13  pot of money that is available to the claimants, both present

14  and future.  And particularly in a world in which Congress has

15  said a 75 percent super majority threshold that we have to

16  convince --

17          THE COURT:  CVS has its own insurance, right?

18          MR. KATYAL:  CVS may have some of its own insurance,

19  but certainly, you know, I think that there will be

20  indemnification obligations that Judge Kaplan found were

21  automatic at Page A-181.  And so -- and I don't think automatic

22  is even the test, but even to the extent you thought it was,

23  there were automatic indemnity obligations.

24          And so I think what Judge -- what the logic behind

25  this stay is is that otherwise that limited amount of money

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 90 of 123

89

 1  will be going to these other things and, therefore, reduce our

 2  ability to actually persuade 75 percent of them to confirm a

 3  plan which is of course what Congress is asking for here.

 4          Congress looked at the problems with the mass tort

 5  system, the problems with the MDL, which by the way here

 6  include no state claims, include no meso claims.  It wouldn't

 7  include Ingham, for example.  So -- and Congress decided that

 8  MDLs wasn't the way to deal with this specific problem.

 9          And so return to an earlier question you had, Your

10  Honor, about the precedent that's set, those four limiting

11  principles that I said at the outset we think are crucial here.

12  We're not saying that you can do this in other areas where you

13  don't have a latency problem.  But here you do.  You have a

14  huge number of future claimant, and Congress has isolated

15  specifically that out.

16          THE COURT:  But can be taken into account were one to

17  get a settlement in an MDL.

18          MR. KATYAL:  I'm sorry.  Could you --

19          THE COURT:  That could be taken into account were one

20  to get a global settlement in an MDL --

21          MR. KATYAL:  But an MDL will never give you the stay

22  that --

23          THE COURT:  -- litigation.

24          MR. KATYAL:  An MDL will never give you the stay on

25  litigation hat is necessary to craft a kind of comprehensive

90

1  plan.  All an MDL does is coordinate pretrial proceedings.  And

2  --

3          THE COURT:  But they often do result in settlements.

4          MR. KATYAL:  They may result in settlements, but in

5  order to, Your Honor, I think to go that way, you're going to

6  have to jump over Judge Kaplan's findings about settlements in

7  which he found that because of <u>Ingham</u> and because of a variety

8  of other things, the past settlement rate is no guarantee and,

9  indeed, is not going to happen in the future, that fewer

10 parties are willing to settlement because of <u>Ingham</u> and because

11 of other things like the FDA test and things he isolated at

12 Joint Appendix Page A-41.

13         THE COURT:  If settlement is a viable option in the

14 context of a bankruptcy via a plan, of course, why would it not

15 also be a viable option in an MDL?

16         MR. KATYAL:  Because you don't have -- for one thing

17 you don't have future claimants at the table.  So Congress has

18 specifically put in 524 --

19         THE COURT:  But a settlement could have provisions

20 for future claimants.  Could it not?

21         MR. KATYAL:  It could, but they don't have any voice

22 in the process.  And so the incentive is -- as, you know,

23 again, and I don't fault my friends, but their job is to

24 zealously advocate for current claimants, their clients.  There

25 is no -- that's why I think Congress wrote the statute in 524

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 92 of 123

91

1  that it did.

2          And, you know, could you imagine some hypothetical

3  world in which the MDLs do actually do all this?  I suppose you

4  could.  It's just there's literally no evidence that that's

5  ever happened in the amicae [sic] briefs that are before you

6  including I would suggest The National Association of

7  Manufacturers brief at Pages 15 to 16 really goes into detail

8  about the inability of MDLs to actually provide any relief or

9  any settlements, actually, that generate payments to the

10 claimants.

11          And so, again, to return Your Honor to the question

12 you asked my friend on the other side, which is what's the more

13 efficient solution, what's the way.  We've gone through this

14 process for year after year, and it's not working.  Congress

15 has given you a different approach, a different way to go in

16 524(g).  And what we've done is, through the use of this

17 funding agreement, provide a backstop that's much better than

18 they could get under the mass tort system, not for any one of

19 their individual client but comprehensively an overall.

20          If I could, you had asked about the stay before, as

21 well.  And I'd also point you to I think the language of

22 362(a)(3) and this Court's decision in McCartney, which I think

23 as Judge Kaplan found was square precedent in saying --

24          THE COURT:  How many of the 670 are J&J entities

25 besides J&J itself and J&J Consumer?

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 93 of 123

92

1          MR. KATYAL:  I suspect that most of them are not and

2     you know -- are not J&J entities.  And our point is not to

3     benefit --

4          THE COURT:  Roughly how many are?

5          MR. KATYAL:  Your Honor, I haven't looked at those

6     appendix pages.  It would be I think it's Appendix Page 245 to

7     '50 list all of the protected parties.  So I'd point you to

8     those.  I just don't want to characterize them.

9          THE COURT:  It's in the hundreds, is it not?

10          MR. KATYAL:  I think there's many many other

11     entities.  Our point is this stay is not being done to benefit

12     them.  It's not being done to benefit --

13          THE COURT:  Have they been sued in these various 49

14     actions that have gone to trial so far in the United States or

15     almost went to trial, I should say?

16          MR. KATYAL:  I'm not sure if they were sued in them.

17     I'm sorry, Your Honor.  I don't believe so but I'm not

18     positive.  I think there are litigations against them.  And the

19     purpose that we're seeking for the stay is not to benefit them

20     or not to benefit J&J.  It's rather to hit pause and make sure

21     that the corpus of funds is not available.

22          And we feel so strongly about this that if we weren't

23     able to get the 362 or 105 stay, this first question about

24     financial distress and valid bankruptcy purpose doesn't help

25     us.  The petition is basically meaningless for the reasons

93

1    Judge Kaplan found.  We need that stay because otherwise

2    plaintiffs will sue for these very same claims.  They'll sue

3    some other entity, and that will hurt us in forms of the

4    indemnification.

5              THE COURT:  But if it's not Johnson & Johnson or

6    Johnson & Johnson Consumer, which have been involved in

7    connection with this process, how could they possibly win

8    against Johnson & Johnson, you know, Floor Covering or

9    whatever?

10             MR. KATYAL:  They'll be indemnified.  So whoever the

11   entity is that's sued, they'll be indemnified, they'll share

12   insurance policies.

13             THE COURT:  But the point being that the suit's not

14   going to win against them.  I mean Johnson & Johnson was the

15   one involved until 1979 with the talc products  Then it was

16   Baby Products which later became Consumer, and now it's LTL.

17             These other entities in the hundreds, what I don't

18   understand is why this stay is so broad.

19             MR. KATYAL:  Because those are, and Judge Kaplan

20   looked at the claims, the same claims.  It's just a different

21   place in the supply chain.  And it's pretty common in these

22   mass tort cases to sue, you know, everyone in the chain, the

23   insurer, the retailer, and the manufacturer.

24             And to be sure, we think at least with respect to

25   suits against J&J, they wouldn't have viability.  But as Judge

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 95 of 123

94

1   Kaplan also found, you know, even a very low success rate is

2   enough to create financial distress.

3               THE COURT:  That's because of the indemnification

4   agreements, correct?  It would bleed --

5               MR. KATYAL:  The indemnification, insurance.

6               THE COURT:  It would bleed the fund.

7               MR. KATYAL:  Exactly.  It would bleed the fund.

8   Exactly.

9               And, again, with a 75 percent threshold that we have

10  to meet in order to confirm a plan, you know, if the fund is

11  bled and insurance proceeds are dropped or things like that,

12  it's very hard.  And then there's also of course the

13  possibility of record taint, as Judge Kaplan also found.

14              So those are all different reasons why the stay looks

15  the way it does.  And, you know, I understand it's a large

16  number of parties, but it's a large number of parties for a

17  very important reason.  There's a large amount of litigation in

18  this space, and 670 is an appropriate amount.

19              Now if you disagree and you're worried about it, as

20  Judge Kaplan also said, I think it's at A-173, he will have the

21  parties come back and have to continually justify the breadth

22  of the stay.  And, of course, anyone can come in and try and

23  lift the stay or something like that.

24              We're incentivized throughout this entire process to

25  make sure that we move expeditiously and quickly to try and

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration    Page 96 of 123

95

1  develop a plan that 75 percent of them can agree because

2  otherwise, as Judge Kaplan has said, he's going to dismiss the

3  bankruptcy petition.  He said it's really important that this

4  all move incredibly fast, and we are as incentivized as it

5  comes to make sure of that because otherwise, we're stuck in

6  the old pre-restructuring world.

7          THE COURT:  And the U.S. Trustee is saying with

8  respect to that, that's a matter for Congress in terms of

9  picking one system versus the other.

10          MR. KATYAL:  Well, we do think Congress has exactly

11  picked that out in 524(g), Your Honor.  And so, you know, to be

12  sure, if we violated some state law, violated the Texas

13  divisional merger statute in some way, shape, or form, that's a

14  problem and Congress would have to fix that by allowing

15  something.

16          But here, we complied with everything in that

17  statute.  And the Bankruptcy Code takes state law as it finds

18  it.  And we understand that there's a way to abuse the

19  divisional merger statute.  We don't doubt that.  It's just

20  that in this case, we think you should write a limited opinion

21  just as the bankruptcy court did that says with this funding

22  agreement, this is a valid purpose and this is an appropriate

23  amount of parties to be stayed.

24          THE COURT:  In connection with the stay, which Judge

25  Restrepo brought up, an opening question I have is the

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 97 of 123

96

 1  jurisdiction of the Court, is it a core proceeding, in other

 2  words saying that it's core by virtue of 362(a)(1) dealing with

 3  a debtor or 362(a)(3) dealing with the debtor's property or is

 4  it related to?

 5           I have a dumb question.  If it's just related to and,

 6  therefore, non-core, doesn't a bankruptcy judge have to go to

 7  the district court with a report and recommendation and have

 8  the district court sign off?

 9           MR. KATYAL:  I'm always scared, Your Honor, when you

10  ask a dumb bankruptcy question.  I'm starting to get worried,

11  but I think the answer --

12           THE COURT:  I've said to a couple of people this is a

13  dumb question, but --

14           MR. KATYAL:  No, I think the answer is --

15           THE COURT:  -- if it's related to --

16           MR. KATYAL:  -- I think you have it exactly right

17  that it is something that the district court would have to

18  approve if it's related-to jurisdiction.  Of course, here, it's

19  362 that we're placing predominant emphasis on and also the

20  other parts of 105 under arising-in and arising-under.

21           And if I could walk you through that.  So for

22  362(a)(1), there are two different theories the bankruptcy

23  court found.  One is that this is -- these are lawsuits that

24  are virtually against the debtor.  And so he said it fits under

25  the very first clause of a proceeding against the debtor.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 98 of 123

97

1          And then he also said it's, quote, a claim against

2    the debtor under the second part of 362(a)(1).  We think the

3    second part is the right way to think about this, that these

4    lawsuits are in effect for reasons that Your Honor mentioned

5    before effectively against the debtor, and it's a claim against

6    them.

7          And as he Second Circuit said in <u>Colonial Realty</u>,

8    that second part of (a)(1) has to have some meaning.  It can't

9    just literally be suits against the debtor.  It includes third

10   parties.  At least here where the third-party lawsuits involve

11   the same basic claims during the same time period.

12         And then there are questions about 105 and arising-in

13   and arising-under.  And we think there that, you know, the

14   automatic stay is --

15         THE COURT:  Well, arising-in and arising -- it's hard

16   for me to say 105's arising-in or arising-under.  Arising-under

17   means it's explicitly given to you in the Code.  Arising-under

18   means it comes to you as a result of something else that's in

19   the Code.  105 is sort of one of this things that implement

20   something that otherwise may be given to you.  It's --

21         MR. KATYAL:  But I think here the theory is, and many

22   courts have done it, including the court below, is to say that

23   362 is the thing given to you in the Code, the automatic stay.

24         THE COURT:  As for the debtor.

25         MR. KATYAL:  Exactly.

Case 21-30589-MBK   Doc 3256-5   Filed 11/03/22   Entered 11/03/22 15:37:20   Desc
Exhibit D to Malone Declaration   Page 99 of 123

98

1        And then as -- in order to safeguard the vitality of

2   that and to make that process work, you need a stay against

3   others, not that the Court will adjudicate on the merits, of

4   course, those other cases.  It's just a temporary pause under

5   362 and 105 to make that process work.

6        THE COURT:  My perception based on a lot of anecdotes

7   over the course of years is that most courts just say, okay,

8   we're going to be practical about this, we're going to put this

9   in play and go from there.  Basically it's a pause, we need

10  this pause in order for people to negotiate on and on and on.

11  And --

12       MR. KATYAL:  And we don't --

13       THE COURT:  And they glide over some of the

14  jurisdictional issues.

15       MR. KATYAL:  Yes.  I certainly think that's happened.

16  But I do think like the court in McCartney really did, I think,

17  you know, go into some of those jurisdictional issues.  And of

18  course A.H. Robins in the Fourth Circuit really in detail tried

19  to flesh out these different points.

20       But, Your Honor, absolutely, to the extent this Court

21  I worried about the breadth of this stay, if you don't think

22  it's surgical, we obviously do, but the remedy for that is that

23  very practical one which Judge Kaplan has already said he will

24  do, which is to make sure and police this stay for the

25  protected parties to make sure it is the same claims and that

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 100 of 123

99

1   it is justified.

2           Were not here to try and just stop litigation for its

3   own sake.  We're doing it in order to protect the integrity of

4   the process.  And as I say, it's so important to us.  The

5   entire first question is just not helpful to us unless we have

6   this stay in place.

7           THE COURT:  You have about -- since you don't get

8   rebuttal, as the appellee, I'm going to give you a chance to do

9   some summing up.

10          MR. KATYAL:  Great.

11          And if I could, there's just one -- I want to respond

12  to one other thing my friend said on the other side --

13          THE COURT:  Go right ahead.

14          MR. KATYAL:  -- which is that JJCI could be spun off,

15  he said, under this and that that will be problematic.  But the

16  funding agreement itself says that if there is a spinoff,

17  Paragraph 4(b) of this and this is Appendix Page 4239, says

18  that itself will be considered part of the fair market value.

19          So, again, this is an agreement that increases in

20  value over time as JJCI increases in value.  The claimants get

21  the upside of all of it.  And if they're -- to the extent

22  they're concerned whether it's distributions or spinoffs, the

23  agreements itself polices those things.

24          And we're asking you here, Your Honor, for a limited

25  ruling to affirm Judge Kaplan based on his factual findings.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 101 of 123

100

1  We know this is a painful case.  We know this is hard for

2  everyone involved.  But Judge Kaplan in the very last page of

3  his second opinion, he said, you know, delay is something that

4  he thinks about all the time as the claimants die.

5          And the best way, the most efficient way to actually

6  provide claimants with relief, both present and future, in an

7  even-handed equitable way that avoids the deadweight losses of

8  millions and millions of dollars being given to lawyers is

9  through this solution.

10         And if you're worried about whether it's fair or not,

11  they have remedies, the 75 percent vote, the two-court review

12  vote.  And that's why we think Judge Kaplan got it right.

13         THE COURT:  Thank you.

14         MR. KATYAL:  Thank you.

15         THE COURT:  What we will do is we'll take about a

16  five-minute break and we'll come back -- well, let's see.

17  We'll come back at 4:30 and be out of here at 5.

18                  (Recess)

19         THE CLERK:  All rise.

20         THE COURT:  Thank you.

21         We'll have rebuttal.  Mr. Lamken?

22         Can I ask you one of the things, and maybe you're not

23  the one to deal with it but if not maybe Mr. Frederick can.

24  How are you going to deal with the future claimants?  How do

25  you propose that be done?

1          MR. LAMKEN:  So, Your Honor, I think that for future

2    claimants, that doesn't tell us what an answer to my

3    fundamental pitch which is it doesn't tell us whether you

4    should have JJCI in bankruptcy or you should have LTL --

5          THE COURT:  I agree.  I agree.  But the point is that

6    if you don't have a bankruptcy, you're going to have an MDL

7    process.  And in an MDL process, how do you make sure that

8    future claimants are dealt with fairly?

9          MR. LAMKEN:  Right.  And I think in cases like the

10   diet drug cases, they did actually come up with a mechanism to

11   deal with future claimants because those cases also have a

12   tail.  There are ways of appointing people in order to

13   represent future claimants and come up with a structured

14   settlement that will handle it consistent with due process.

15         But until we actually have a valid bankruptcy, we

16   don't have a way of dealing with future claimants in

17   bankruptcy.  And I think that's really where I want to start

18   with is, look, the difficulty here is we don't have a good-

19   faith bankruptcy in the first place because the whole thing is

20   structured to evade bankruptcy's principles.

21         THE COURT:  So if we undo the bankruptcy, what

22   happens?  How  does this case go forward?

23         MR. LAMKEN:  There's two options there.  One would be

24   that J&J may decide we're going to put Old JJCI in bankruptcy.

25   And then we actually have just like <u>Johns-Manville</u>, just like

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 103 of 123

102

1  every other bankruptcy in history --

2          THE COURT:  But how does that advance the ball for

3  your client?

4          MR. LAMKEN:  Well, it advances the ball in multiple

5  ways.  First, when it comes to the priority rules, it means

6  that equity doesn't get paid ahead of creditor here.  It means

7  that we don't sit in bankruptcy literally dying while billions

8  of dollar go out to equityholders --

9          THE COURT:  But doesn't the funding agreement address

10  that concern?

11          MR. LAMKEN:  Actually, it doesn't.  The funding

12  agreement will increase the amount that's available to the

13  amount that's paid to equity.  But the absolute priority rule

14  doesn't say go ahead and pay equity as long as you have an

15  unsecured promise to pay an equal amount to creditors later on.

16          The absolute priority rule says until you have

17  satisfied your creditors, you don't give anything to equity, at

18  least not without their consent 75 percent and the court

19  approval.  And that is one of the reasons why it just

20  fundamentally undermines the incentives here because J&J can

21  operate its businesses as before including all the assets of

22  Old JJCI outside bankruptcy without bankruptcy court

23  supervision paying equity, paying other creditors while one

24  category of creditors sits in bankruptcy.

25          And I think that's the critical thing is that you've

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 104 of 123

103

1  actually taken one set of creditors, injured talc victims, and

2  put them in bankruptcy alone.  Trade creditors get paid ahead

3  of us.  We're behind, and that is a fundamental distortion of

4  the bankruptcy process.

5        Since history, the way to do it is to just simply

6  take your bankrupt company if you're financially distressed and

7  put that company in bankruptcy.  And I think the problem is

8  that --

9        THE COURT:  But their point is that no claimant with

10  a valid claim fairly estimated is going to be out a dollar.

11  Now there may be a significant delay if there is an appeal, but

12  in the end, that full claim will be paid.

13        MR. LAMKEN:  Your Honor, first, I don't think the

14  Bankruptcy Code says you may follow my principles unless you

15  give us an unsecured funding agreement that eventually may pay

16  everybody.  The Bankruptcy Code has structures that are meant

17  to be followed.  And if you've created your structure in order

18  to evade those bankruptcy --

19        THE COURT:  I think what they're saying is that this

20  is a case that's *sui generis*.  We're not talking about the next

21  case.  We're saying that with this, you are never or perhaps

22  almost never ever going to get this kind of backstop again.

23        MR. LAMKEN:  Not only that, Your Honor, but if this

24  goes forward, if *J&J* can do this, this is actually the model

25  for the future.  Who wouldn't do a build-your-own bankruptcy

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 105 of 123

104

1  where you choose, okay, which creditors I'm going to keep

2  outside of bankruptcy and pay them right away, which creditors

3  I'm going to put in bankruptcy and make them way, which assets

4  am I going to put outside bankruptcy and which assets will I

5  put in bankruptcy or will I just put an unsecured funding

6  agreement subject to defenses like if you fail to indemnify me,

7  I can stop paying the funding.

8          Those are dramatically different things and with

9  bankruptcy --

10          THE COURT:  But I think what they're saying is that

11  or the response to that would be, okay, the creditors that we

12  paid before were because we hadn't gone into bankruptcy yet.

13  Once we've gone into bankruptcy, those creditors, those

14  claimants are all going to be treated in a way in which there

15  won't be as many strikeouts as there might otherwise be if

16  there were litigation.

17          MR. LAMKEN:  So, Your Honor, to the extent that

18  sometimes people prevail before juries and sometimes they

19  don't, that's a function of the system that the framers

20  established 200 years ago or we entrust the common man, 12 of

21  them, to make these determinations and to find facts and make

22  determinations.

23          The notion that, well, bankruptcy might actually sort

24  of even out the balance isn't a way of indicting the tort

25  system that 50 states have operated to compensate victims for

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 106 of 123

105

1  200 years.  But even setting that aside, that still doesn't

2  answer the question of why LTL as opposed to JJCI?  Why not

3  take the company that was the tortfeasor that supposedly was in

4  financial distress and put it and its assets into bankruptcy to

5  satisfy the way it's done it before?

6          And what we were told here is, well, the bankruptcy

7  court looked at that and the bankruptcy court said, gee, that's

8  going to be very costly.  And I think the -- actually the court

9  said it's too much value to waste.  But when it comes to the

10 Bankruptcy Code, it's not a waste to enforce the absolute

11 priority rule so that people don't pay equity ahead of

12 creditors.

13         It's not a waste to --

14         THE COURT:  To further round that, I mean maybe it

15 was just an offhand comment that Mr. Katyal made, but -- and

16 I'm going to add on to it.  Almost every right that's given to

17 a creditor in bankruptcy likes who is secured, who's not, is

18 something that's outside bankruptcy.  Non-bankruptcy law tells

19 you who has these particular rights inside of a bankruptcy.

20 And that's basically following the Butner case from '79.

21         Transpose that to the corporate area that corporate

22 law is not affected by the bankruptcy.  And corporate law

23 allows for a divisional merger.  And if corporate law allows

24 that so all that we are dealing, as you say, is just LTL

25 itself, why is LTL not in some type of financial distress if

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 107 of 123

106

1  that's the only one we're looking to and luckily has somebody

2  who's willing to come to its -- meet all of its funding needs

3  with respect to the future of the bankruptcy?

4        MR. LAMKEN:  So, Judge Ambro, I think from the outset

5  when we say we take the a debtor as we find them, when you're

6  describing, when deciding good faith, under cases like the new

7  debtor syndrome cases, courts ask who's my debtor, where did it

8  come from, and why is he here.

9        And the answer to those questions here is whose my

10  debtor, it's an artificial entity created for bankruptcy; why

11  is he here, he's here so talc claimants will be in a single

12  class by themselves in bankruptcy and everybody else is outside

13  bankruptcy; why is he here, he's here so that JJCI's assets,

14  its operating business is outside bankruptcy beyond the

15  bankruptcy court's reach.

16        And only, only an unsecured funding agreement subject

17  to defenses is available to talc claimants.  That means that,

18  you know, you don't just accept them as they find them when you

19  have that sort of a purpose.  And I think, Judge Ambro, that

20  actually distinguishes the Chapter 11 rundown cases you

21  described.

22        When you have a Chapter 11 rundown case as I

23  understand it, Goodco and Badco are both in the bankruptcy,

24  both subject to the court's supervision.  This is the exact

25  opposite.  One company is in bankruptcy subject to the court

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 108 of 123

107

1 bankruptcy -- the bankruptcy court's jurisdiction.  But

2 everything else that happens, all of Old JJCI's assets as

3 they're operated, this spinoff, everything else that happens --

4          THE COURT:  What provisions of the Code if Old JJCI

5 were in bankruptcy, what provisions of the Code do you think

6 would apply that you would want to take into account with

7 respect to Old JJCI?

8          MR. LAMKEN:  So the absolute priority to begin with,

9 which is not a specific provision of the Code, but it's an

10 inflection from history and the structure of the Code where you

11 don't pay creditors, you don't pay equity ahead of creditors.

12          And that puts a lot of pressure on people to come up

13 with a good plan to the benefit of the creditors and not do

14 what Bestwall is doing now and let things go for five years as

15 people are rapidly failing.

16          The second one would be --

17          THE COURT:  And I should have asked this before.

18 Spin out the absolute priority concept here.  This is not like

19 SGL where they're going to do a state court -- or a state

20 dissolution and have all the money go to equity after the

21 bankruptcy.

22          What monies are going to equity during the course of

23 this bankruptcy?  Are you saying dividends?  Is that what

24 you're talking about?

25          MR. LAMKEN:  Yeah, well, there's dividends and

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 109 of 123

108

1  there's also $5 billion for a spinoff that was announced or $5

2  billion for a stock buyback that was announced last week.

3          So -- and the fact that you can continuously in

4  bankruptcy pay equity means that there's far less pressure to

5  actually achieve a plan that the creditors can live with.  You

6  can wait longer and longer just as Bestwall did.

7          But I'd also point to Section 363 which is your non

8  --

9          THE COURT:  Wait, you say stock buyback.  The stock

10  buyback is not for LTL.  The stock buyback is for Old JJCI.

11          MR. LAMKEN:  Exactly.

12          And the divisional merger was structured and the

13  funding agreement is structured specifically to allow J&J to

14  spinoff assets without anybody, any of our creditors, being

15  able to do what they would be able to do under Section 363, if

16  you had put the actual tortfeasor, the people funding this,

17  JJCI -- Old JJCI into bankruptcy, which would be they get

18  notice and an opportunity to be heard.

19          And the bankruptcy court would be able to supervise

20  it and to make sure that those assets are indeed available to

21  the creditors at the end of the day.  None of that, none of

22  that exists because instead of doing what one does ordinarily

23  and putting a bankruptcy -- the whole entity into bankruptcy,

24  they've simply hived off one set of claims, put them into

25  bankruptcy and taken all the assets, all the operating things

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 110 of 123

109

1  and all the famous brans and operate them outside of

2  bankruptcy.

3          And just I think the key thing here is <u>Jevec</u> makes it

4  clear from the Supreme Court that it's just not permissible to

5  say I have provided something that I think is better for the

6  creditors.  When you're talking about bankruptcy, the specific

7  provisions of the Code are important.  And the Code here

8  ordinarily requires absolute priority rule, Section 363

9  supervision of spinoffs and other non-ordinary course

10 transactions.

11         And even 524(g) requires that you put in equity

12 securities, securities of the debtor, with a right to

13 dividends.  But we have now swapped out one debtor, a valuable

14 business JJCI with famous brands, for a completely different

15 debtor which is LTL.

16         And I'd like to sort of turn if I could for a moment

17 to the injunction.  And I think the serious problem with the

18 injunction is this.  Section 105 simply doesn't say you can

19 reach out to non-debtors, 670 of them, and enjoin them on the

20 basis of, well, gee, I think it has some relationship to the

21 estate.  You actually have to have a clear right to relief.

22         The problem --

23         THE COURT:  What you're saying is that there's not an

24 identity of interest other than the fact that it has the same

25 corporate parent?

110

1          MR. LAMKEN:  Exactly, Your Honor.

2          In fact, the record is very clear that you can't do

3    this here because J&J has its own independent liability for its

4    own tortuous misconduct.  For example, in _Ingham_, as we've

5    mentioned, J&J had a higher multiple on punitive damages

6    because.

7          And I'll quote:

8          "Because defendants decision to chart their course of

9          reprehensible conduct began long before JJCI was spun

10         off as a separate entity.  J&J made all the health

11         and safety decisions.  It ignored its own scientists

12         for decades on end.  And actually, it worked

13         tirelessly to make sure that industry standards would

14         not change to make asbestos that's otherwise

15         undetectable detectable."

16         That's on Pages 716 to 717 of _Ingham_ and Pages 5841

17    to 592.  And it personally individually told -- falsely

18    advertised that baby powder does not contain asbestos and never

19    will and that it tested every lot to make sure.

20         And juries have repeatedly found J&J liable

21    separately from JJCI.  This is not a case of derivative

22    liability.  It is an instance of independent liability.  For

23    example, _Echeverria_ in California, 97.8 percent of the

24    liability was given to J&J, not JJCI.

25         If you look at Page -- the verdict sheets on Page

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 112 of 123

111

1  4532, 4592, and there's a summary at 4704 and 4627.  They are

2  regularly giving more liability to J&J than JJCI,  This is not

3  a case of derivative liability where J&J because it's the

4  corporate parent has some liability.  This is J&J's own

5  misconduct.  And when one is going to enjoin that type of

6  liability, you need more than what the Court came up with here.

7        For example, and even 524(g) if you want a channeling

8  injunction, it says the channeling injunction and <u>Combustion</u>

9  <u>Engineering</u> addresses this specific issue.  524(g) says when

10 you have a channeling injunction, it applies only to the

11 debtor, and you couldn't go beyond the debtor when the

12 liability is derivative because it comes from those corporate

13 relationships.

14       But the liability here isn't from corporate

15 relationships.  It's liability for J&J's own misconduct.  And

16 so you couldn't get a channeling injunction under 524(g) for

17 the liability of J&J.  Why under 105 on a preliminary basis are

18 you going to give that injunction and prevent talc claimants

19 from actually getting satisfaction when waiting for the

20 possibility of a 524(g) plan?  It simply doesn't make sense.

21 It takes those statutory provisions and it sets them on their

22 heads.

23       And the net result is there's simply no ability of

24 tort claimants to come forward and have any ability to pursue a

25 reasonable plan here because they're frozen in their tracks.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 113 of 123

112

1  J&J, it's got all the liability against it frozen.  650 other

2  people, that's frozen.  LTL, our made for bankruptcy debtor,

3  frozen, as well.

4         What is the leverage they have?  Nothing.  It simply

5  shuts everything down.  And you can't do that under 105.  You

6  can't do that under 362(a) when it is its own independent

7  liability.  And there's a key provision here that I don't --

8  key finding by the district court that I don't think I heard

9  Mr. Katyal mention, and it is this.

10        The district court found, and this is again 159,

11  that the shared identities of interest were based on allocation

12  of agreements to the debtor -- that means indemnification

13  agreements that they had often gave to the debtor -- shared

14  insurance agreements that they gave off the debtor on the eve

15  of bankruptcy, quote, for the very purpose of extending the

16  stay.

17        That is an effort to create equity through agreements

18  on the eve of bankruptcy.  And that doesn't work for two

19  reasons.  One is combustion engineering saying you can't buy

20  agreement establish jurisdiction.  But it also doesn't work as

21  a matter of equity.  As a matter of equity, two parties can't

22  enter into a contrivance and agreement on the even of

23  bankruptcy and say, aha, we now have a right to injure third

24  parties and prevent them from pursuing other parties that have

25  their own independent liability.

1          Ultimately, the problem here is that J&J decided to

2    take a corporate shell, LTL, and put it into bankruptcy.  But

3    then it turns around and says now that we've put this corporate

4    shell into bankruptcy, we want an injunction that protects not

5    just the corporate shell, it protects us from our own

6    independent liability, that protects retailers from their own

7    independent liability, that protects everybody from their own

8    independent liability.

9          But that's completely topsy-turvy.  If we're going to

10   accept putting LTL in bankruptcy, the automatic stay and any

11   possible standard 105 would extend to just LTL.  It wouldn't

12   extend to everybody else.  But we really shouldn't be saying

13   we're going to accept LTL as our debtor here because of the

14   very purpose of putting LTL into bankruptcy was to make sure

15   that talc claimants were treated differently or -- treated

16   differently.

17          I know one of the questions that came up here was,

18   well, how do we determine, what if it was, you know, 1994 when

19   they did the divisional merger or what happens if it was 1979.

20   And I think the short answer is two-fold.  One is in this case,

21   it was two days before bankruptcy.  In this case we know

22   exactly why it was done.  It was done to manipulate the

23   bankruptcy.  It was done to make sure that it was structured in

24   a way where JJCI would be out of bankruptcy and -- or its

25   assets would be out of bankruptcy and only talc claimants would

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 115 of 123

114

1  be in bankruptcy.

2      And that provides a very clear answer alone.  So it's

3  not just a matter of time; it's a matter of what the purpose

4  was.  If we look back and we have a non-bankruptcy purpose for

5  years on end that says, yeah, we've established this as a

6  meaningful way, we've not only given liabilities, we've

7  actually given them a business and they're operating that

8  business for years and they're building up assets and goodwill.

9  And it's a real company that's operating.

10      That's a very different scenario from saying we've

11 now created a company solely for the purpose of bankruptcy.

12 We've given it all the liabilities for just one set of

13 claimants, and we've done it for the purpose of keeping certain

14 assets out of bankruptcy so we continue to pay dividends,

15 continue to operate the brands, and continue to do so without

16 the bankruptcy court supervision that would otherwise be --

17      THE COURT:  Indeed, what you just said, that's your

18 principle theme, isn't it?

19      MR. LAMKEN:  That is my principle theme, Your Honor.

20 I think that really sums up the problem here.  I think -- and,

21 in addition, I think I should also stress in the end, it can't

22 be both it's all right to put LTL in bankruptcy and then to

23 extend the injunction to everybody else.  Be definition, you

24 just end up going way beyond all party -- the parties specified

25 by 362 --

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 116 of 123

115

1              THE COURT:  Yeah.

2              MR. LAMKEN:  -- the norm under 105.  You understand.

3              THE COURT:  Thank you.

4              MR. LAMKEN:  Thank you, Your Honor.  I appreciate

5    that.  If there's no further questions, thank you, Your Honor.

6              THE COURT:  No further questions.

7              I know Mr. Frederick reserved some time.

8              Mr. Janda, did you have anything further to say?

9              MR. JANDA:  I did not reserve any time, Your Honor.

10   But if you would like to hear from me?

11             THE COURT:  Yeah, I'll give you two minutes.  Do you

12   want two minutes?  It's your call.

13             MR. JANDA:  Thank you, Your Honor.

14             Just three points I'd like to make real quick.

15             So first is, you know, we've heard a lot of talk

16   today about what system, tort system or the MDL system or the

17   bankruptcy system, is better for which set of parties, current

18   claimants, future claimants, defendants.

19             And I think the point here is just that there's a

20   very complicated admittedly balancing of interests of trying to

21   get claims resolved efficiently, to get claims resolved

22   correctly, to get claims resolved equitably, and to ensure that

23   people are able to exercise the rights that they have, their

24   constitutional rights, their due process rights, their jury

25   trial rights.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 117 of 123

116

1         And that complicated balancing of interests has been

2  done by Congress.  Congress has enacted a number of different

3  aggregation mechanisms and has enacted the Bankruptcy Code.

4  But the Bankruptcy Code Congress has enacted and provides

5  strong tools to defendants only in a limited set of

6  circumstances as this Court said in both <u>Strong Tools</u> and <u>Vike</u>

7  <u>Abuse</u> (phonetic).  And it's really up to the courts to police

8  the boundaries of that system to ensure that it's not being

9  used for reasons that Congress didn't intend it be used.

10        And I don't think 524(g) changes the analysis in any

11  way.  524(g) pre-supposes you have a valid bankruptcy and

12  Congress has determined that 524(g) provides an appropriate

13  tool in bankruptcy once you have a bankruptcy to make sort of

14  the best of a bad situation.  But I don't think you can sort of

15  bootstrap your way into bankruptcy to try and take advantage of

16  the tool that pre-supposes the valid bankruptcy in the first

17  place.

18        Second, just very quickly on financial distress, I

19  heard my friend on the other side say two things that I think

20  together could resolve this case on their own.  I mean one is

21  that he says LTL is the appropriate entity and, two, is that in

22  his view or in LTL's view, the total legitimate value of all of

23  the current and future tort claims against it is less than $61

24  billion which he has access to under the funding agreement.

25        You put those two things together and I don't see how

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 118 of 123

117

 1  you can make any argument that there is a legitimate financial

 2  distress here on the part of the debtor that justifies invoking

 3  bankruptcy maybe ever and certainly not at this point.

 4          And then, third, just very briefly, you know, as we

 5  said, bankruptcy provides a lot of tools.  It's a very strong

 6  medicine.  It curtails creditors' rights in significant ways

 7  including allowing debtors to bind non-consenting creditors,

 8  possibly many non-consenting creditors to one particular

 9  resolution.

10          And that is appropriate when you have a debtor facing

11  financial distress that needs that time to reorganize its

12  affairs or to pursue an orderly liquidation.  But it's not

13  appropriate every time you just have a lot of tort claims

14  against an entity when those pre-conditions aren't met.  And

15  that's just the case here.

16          THE COURT:  Thank you very much.

17          MR. JANDA:  Thank you, Your Honor.

18          THE COURT:  Mr. Frederick, I know you reserved three

19  minutes.  We'll give you five.  Since you're batting clean-up.

20          MR. FREDERICK:  Thank you very much, Your Honors.

21          I want to start with the trilogy of Third Circuit

22  cases because the main point made on the other side was that

23  they didn't confront mass torts.  But the SGL Carbon case in

24  announcing why the good-faith standard was so important had an

25  extensive discussion of Johns-Manville.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 119 of 123

118

1        And the point that it was making was that Johns-

2   Manville had tried for many many years to pay off claimants and

3   until it got to a point where it did face imminent financial

4   distress because --

5        THE COURT:  There was no doubt that Johns-Manville

6   was in financial distress.

7        MR. FREDERICK:  And the question here is, is LTL in

8   financial distress.

9        Now you can either take the fundamental contradiction

10  of their position which is the funding agreement will fund

11  everything in which case LTL is not in financial distress or

12  the funding agreement depends on Johnson & Johnson and JJCI, in

13  which case this is not a proper bankruptcy purpose because

14  those two entities are not in the bankruptcy.

15       Either way, that contradiction should end the case on

16  as a matter of good faith and the Court need not go further in

17  order to decide how far it needs to go.

18       Now the point is made that after Ingham, it's

19  impossible to settle these cases.  Our expert said 98 percent

20  of asbestos cases settle or dismiss.  The bankruptcy law

21  professors who provided an amicus brief on their side said 97

22  percent of MDL cases settle or dismiss.  Common sense tells you

23  that you don't have to litigate all 38,000 to judgment.  We

24  weren't born yesterday.  And that point made by the bankruptcy

25  court is on its face not credible and is subject to plenary

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 120 of 123

119

1 review by this Court.

2          Now the main argument that they make for financial

3 distress is based on the speculation that they're going to have

4 to pay out many many tens of billions of dollars.  But SGL

5 Carbon says you don't look at speculation for future.  You look

6 at what is imminently before you.  Do you have a present

7 inability to meet present financial obligations?

8          And here, LTL unquestionably did that two days after

9 it was created.  There's no serious issue at the moment it had

10 filed its bankruptcy it was not facing financial distress.

11 Importantly, Mr. Katyal did not deny that not a dime gets paid

12 until the last appeal of the last objector has been resolved.

13 And we know from judgments and settlements in the civil system

14 that money has flowed.

15          Johnson & Johnson shouldn't be permitted to stop that

16 process.  But the spinoff of JJCI which is permitted, and he

17 acknowledges, under the financing agreement is what creates the

18 cap.  As soon as that cap is done, there is no greater value

19 that can be done.  And for that reason, their plan is not

20 consistent with the statute 524(g) that says you have to have

21 an evergreen source of continually growing assets and money to

22 pay the future claimants.  This plan undisputably does not do

23 that.

24          Now he takes me to task for saying that Ingham was

25 paid by Johnson & Johnson.  Look at the Appendix Page 6379.  It

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 121 of 123

120

1   was paid out of a central account.  He eventually acknowledges

2   that.  The point is Johnson & Johnson charged back to JJCI as

3   an accounting matter.

4          Now this wouldn't be -- this might be important if

5   JJCI had its own independent shareholders.  It is a wholly

6   owned subsidiary of Johnson & Johnson.  But Johnson & Johnson

7   wanted to be able to say that it's continuing streak of paying

8   higher dividends year after year has continued, so it fobbed

9   off the accounting deficit to JJCI.  I don't know why that

10  should warrant good faith in a bankruptcy.

11         Now he says that there are real limiting principles

12  here based on the facts.  He talks about the latency.  That's

13  true for all asbestos cases, not just those that are created

14  out of talc.  And it is true of many mass torts, as well.  He

15  says there's lottery-style but that's true in any case where

16  there are really good lawyers who know how to try cases and

17  there are really bad lawyers who don't know how to try cases

18  and you have the special problem of specific causation, which

19  is an evident problem and issue in establishing the legitimacy

20  of any person's claim.

21         Their fundamental problem with their 524(g) is that

22  they don't create an evergreen funding mechanism.  And when he

23  talks about the 79 transfer of liability, he doesn't respond

24  that J&J itself was engaged in reprehensible conduct for which

25  people have found them to be liable.

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 122 of 123

121

1          Now the last point I'd like to make is that Johnson &

2     Johnson did not go to all of this trouble in order to pay

3     claimants more money.  They went to this trouble to pay

4     claimants less money more slowly.  The civil system is designed

5     with whatever flaws that it has to promptly move along cases

6     and not to stop and stay all action.

7          This particular bankruptcy is intended to benefit

8     non-debtor affiliates.  It is a litigation tactic to stop civil

9     litigation.  And there is no increase in value to the

10    creditors, the tort claimants.  And for all of those reasons,

11    we urge you to reverse the bankruptcy court.

12         THE COURT:  Thank you very very much.

13         I would ask that a transcript be prepared of this

14    oral argument and just split the costs half this side, half

15    that side.

16         And I would also like to thank counsel for extremely

17    well presented arguments not only today but in your briefing

18    and also I should broaden that to thank those who took time to

19    write the amicus briefs, very helpful on both sides.  And we'll

20    take the matter under advisement.

21         Thank you.  It's a privilege having you here.

22         MR. FREDERICK:  Thank you.

23         THE CLERK:  All rise.  Court is adjourned until

24    tomorrow at 9:30 a.m.

25              (Proceedings concluded at 2:21 p.m.)

Case 21-30589-MBK    Doc 3256-5    Filed 11/03/22    Entered 11/03/22 15:37:20    Desc
Exhibit D to Malone Declaration    Page 123 of 123

122

* * * * *

# **C E R T I F I C A T I O N**

1.  
2.  
3.      We, KAREN WATSON and DIPTI PATEL, court approved
4. transcribers, certify that the foregoing is a correct
5. transcript from the official electronic sound recording of the
6. proceedings in the  above-entitled matter, and to the best of
7. our ability.
8.  
9. /s/ Karen K. Watson
10. KAREN K. WATSON, CET-1039
11.  
12. /s/ Dipti Patel
13. DIPTI PATEL, CET-997
14. J&J COURT TRANSCRIBERS, INC.       DATE:  September 23, 2022