<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC**
Clayton L. Thompson, Esq.
cthompson@mrhfmlaw.com
Suzanne M. Ratcliffe, Esq.
sratcliffe@mrhfmlaw.com
150 West 30th Street, Suite 201
New York, New York 10001
Tel: (800) 358-5922
*Counsel for Mesothelioma Claimant and Appellant Katherine Tollefson and Certain Mesothelioma Claimants*

In Re:

LTL MANAGEMENT LLC,

                         Debtor.

</td><td>

Case No:    21-30589(MBK)

Chapter:    11

Judge:    Honorable Michael B. Kaplan

Hearing:    **January 18, 2023, *10:00 am***

</td></tr>
</table>

**MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC'S MOTION TO DISQUALIFY KENNETH R. FEINBERG AS RULE 706 EXPERT AND TO TERMINATE ESTIMATION**

MRHFM moves this Court to disqualify Mr. Kenneth R. Feinberg as a Rule 706 Expert and to terminate estimation, and in support of its Motion states as follows:

**I.     Preliminary Statement**

1.     Sunlight is the best disinfectant and this fetid abuse of the bankruptcy system by Johnson & Johnson, its lawyers, and the stooge they created requires loads of it. ***Enough is enough.*** *Enough* secrecy. *Enough* confidentiality. *Enough* selective discovery. *Enough* cloak and dagger advocacy.

2.      Mr. Feinberg is an accomplished mediator and has facilitated resolution in several high profile and emotionally charged disputes, but he must be disqualified as a testifying expert in this matter for at least four independently dispositive reasons:

*First,* he falsely told the Court (and the public) that "everybody" with whom he has communicated told him they want to settle this bankruptcy case;

*Second*, he has repeatedly engaged in confidential *ex parte* communications with the parties, which is contrary to the Rules of Evidence and the Rules of Civil Procedure;

*Third*, he has persistently disregarded the role to which he was appointed. From the outset Mr. Feinberg has used his position to gain access to the parties and obtain information from them not as a testifying expert but as a *quasi*-mediator, instead. He told the Court he intends to use the *threat* of issuing his Rule 706 Report as leverage to drive a settlement and he has actively coordinated with the mediators, apparently, with the goal of forcing an unconstitutional "resolution" on objecting plaintiffs;

*Fourth*, he announced he intends to consider and opine on the merits of talc claims ("the science") against the Debtor, which is clearly beyond his authority under the Order appointing him. This Court itself is statutorily prohibited from attempting to liquidate or estimate the value of any plaintiff's tort claim. *See* 28 U.S.C. 157(b)(2)(B). While it might conceivably be relevant for Mr. Feinberg to perform some evaluation of the Debtor's—but ***not*** J&J's nor "new" JJCI's—total expected liability in the tort system, that evaluation is only germane to the question of whether the Debtor has a limited fund to pay

creditors. Such an estimate cannot be used to attempt a cram down of objecting individual claimants who insist on their right to have a jury liquidate their claims under 28 U.S.C. § 157(b)(5). In other words, the "merits" of the claims has nothing to do with estimation. *This* Court doesn't have power to opine on the "science" so neither does its appointed expert.

3.  *All* plaintiffs oppose this "bankruptcy:" the *Ad Hoc* group of mesothelioma appellants, the TCC, Arnold & Itkin, Aylstock, several *amici,* and the Department of Justice, in briefing or in open court to the Third Circuit panel or both, *all* advocated against J&J's scheme in the strongest terms. These *public* actions speak much louder than the Debtor's veiled references to mediation "progress" or Mr. Feinberg's sweeping misrepresentations about what has been told him in confidential communications.

4.  Mr. Feinberg uses confidentiality as a sword and a shield in a way that violates fundamental due process. He solicits confidential communications to encourage "candor," then makes sweeping and blatant **misrepresentations** about the content of these communications. *Not* everybody hopes his Report "will never see the light of day." MRHFM demanded transparency in its filed responses to Mr. Feinberg's proposed appointment in August and in its publicly filed submissions to him. *Not* everyone hopes this "bankruptcy" case will settle. MRHFM has made clear its clients stand on their unambiguous constitutional rights to a jury trial.

5.  This Court's Order appointing Mr. Feinberg, objected to by MRHFM, permits confidential *ex parte* communications with him and—like messages between Mafioso— forbids them to be memorialized in writing. *See* Order, ¶ 4(a). Therefore, the best way

MRHFM proves that Mr. Feinberg's sweeping characterizations are untrue comes from the Firm's **publicly** filed submissions to him. *See* Dkts. 2935, 3003, & 3117.

6.    **All** MRHFM's clients object to confidential communications occurring between Mr. Feinberg and: (1) the Debtor, (2) any non-debtor "Protected Parties", (3) the FCR, (4) any other party. *See* Dkt. 2457, Verified Rule 2019.1 Disclosure (listing MRHFM's plaintiffs with pending lawsuits). **All** MRHFM clients object to settlement negotiations taking place in which they are not specifically and individually represented by the Firm. The TCC, with whom MRHFM often agrees, does **not** speak for MRHFM's clients in **any** negotiations.

7.    **Enough is enough**. The Debtor repeatedly told the Third Circuit that $61 billion is a floor, not a ceiling, when it comes to paying claims. The TCC says it has a plan and the Debtor told the panel it also would propose a "good plan." <ins>**Then let's see them**</ins>. The sooner a plan is proposed that is **not** unconstitutional—because it does not infringe on jury trials and does not caps damages—the sooner dying plaintiffs can return to state and Article III federal courts in front of trial judges and juries that, *unlike* Mr. Feinberg, the FCR, Mr. Gordon, Mr. Murdica, the mediators, and this Court, have power to hear and decide the "fundamental dispute" about J&J's talc. And the Company will resume timely resolving valid claims at arm's length because risk is on **both** sides.

8.    Johnson & Johnson's demand for estimation is just cheap lipstick smeared on a tort reform pig. If Mr. Feinberg's estimate—which will be wrong whatever the number because "total liability" is a fiction—is $75 billion, the Debtor will dismiss this case and return to the tort system. If his estimate is $4 billion, the Debtor will bash the claimants over the head with this abject speculation and the claimants will never vote for a plan that incorporates this number as a benchmark. Meanwhile, J&J saves $500 million a year

perpetrating its long-con, money that would otherwise go to victims in arm's length settlements in the tort system.

9.      J&J's policy arguments about the "broken tort system" and "lottery" verdicts are the tired trope of companies that knowingly poisoned tens of thousands of Americans with asbestos and now whine about having to pay for the destruction they have heaped on broken and grieving families. At the invitation of the Supreme Court in *Amchem* (521 U.S. 591 (1997)) & *Ortiz* (527 U.S. 815 (1999)), Congress debated whether to address asbestos litigation and decided ***against*** it. *See* MRHFM Opp. Prelim. Inj.*,* Dkt. 2564, pgs. 7-24. Now, Two Step "debtors" repeat Chamber of Commerce talking points that ***all failed*** on Capitol Hill twenty years ago. If Johnson & Johnson doesn't like the law, it should call its Senator.[1]

## II.      Jurisdiction and Venue

10.     This Court has jurisdiction to decide this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

11.     At issue is this Court's Order ("the Order") of August 15, 2022, appointing Kenneth R. Feinberg as a Rule 706 expert, assigned to prepare and file a report "estimating the volume and values of current and future ovarian and mesothelioma claims for which the Debtor may be liable…" *See* Dkt. 2881, ¶ 2.

## III.      Factual Background

12.     The TCC and MRHFM opposed estimation. *See* MRHFM Opp., Dkt. 2717.

---

[1] *See* The Fairness in Asbestos Resolution Act of 2004 (S. 4078, 108th Cong.), The Fairness in Asbestos Compensation Act of 1999 (S. 758, 106th Cong.), the Asbestos Compensation Act of 2000 (H.R. 1283, 106th Cong.), and the Asbestos Claims Criteria and Compensation Act of 2003 (S. 413, 108th Cong.).

13.      Mr. Feinberg is a mediator in *Bestwall*, *Imerys*, *Cyprus*, and *Paddock*, and is being paid $500,000 per month by LTL in this case. *See* Dkt. 2861, ¶¶ 2, 6.

14.      In announcing its intention to appoint Mr. Feinberg on July 28th, this Court stressed the "need for **transparency** and to preserve the **integrity** of the bankruptcy process…" Exhibit 1, Tr. 7/28/2022, pg. 4 (emphasis).

15.      MRHFM **opposed** confidentiality and advocated for transparency for all the parties' communications with Mr. Feinberg. *See* Dkts. 2847 & 2856.

16.      After receiving input and objections, the Court entered the Order, which states as follows (¶ 2):

> Subject to Paragraph 4 below, the Rule 706 Report shall comply in all respects with Federal Rule of Civil Procedure 26(a)(2)(B), including, without limitation, to provide a complete statement of all opinions the Court Appointed Expert will express regarding the Talc Claims and the basis and reasons for such opinions, and **identify the facts or data considered** by the Court Appointed Expert in forming such opinions (emphasis).

17.      Over MRHFM's objections, paragraph 4 ("Confidentiality and Non-Confidential Information") states:

> (a) All parties, including the Co-Mediators, **may have confidential *ex parte* communications** with [Mr. Feinberg]. Except as otherwise specifically provided herein, the content of any confidential communications shall not be disclosed to any other party, shall not be subject to discovery in this or any other proceeding, and shall not be memorialized in a written record or transcript (emphasis).

18.      Paragraph 4(b): "all parties may submit written submissions to [Mr. Feinberg] for his consideration…prior to the issuance of the Rule 706 Report [Mr. Feinberg] may, **in his discretion**, disclose the facts or data underlying written submissions to other parties…" (emphasis).

19.     MRHFM subsequently made three submissions to Mr. Feinberg and filed each simultaneously so all parties received them. *See* Dkts. 2935, 3003, & 3117.

20.     On November 17th, Mr. Feinberg provided a status report, in which he acknowledged his appointment to estimate "the volume and values of current and future ovarian and mesothelioma claims for which the Debtor may be liable…" *See* Dkt. 3330, pg. 1.

21.     On December 20th, at a hearing, Mr. Feinberg provided a thorough status report to the Court and the parties. Exhibit 2, Tr. 12/20/2022.

22.     He said the following regarding his assigned role:

We have been moving forward pursuant to your August 15 order appointing me **not as a mediator**.  Very important the parties understand this. You already have three very distinguished mediators. I've been appointed rather creatively by Your Honor as a 706 court estimation expert and as the order expressly points out, **my job** in LTL is to estimate the **volume and value** of current and future tort claims and that is the assignment. *Id.*, pg. 4 (emphasis).

23.     He said the following regarding his coordination with the mediators:

We've conducted a **series of Zoom meetings** with the **three mediators** just to coordinate, no breach of any type of confidentiality. But there are three very distinguished and able mediators and we have **coordinated with them** on a timeline so **they know what we are doing, we know what they're doing**, and that's been, I think, very useful for both of us. Our latest meeting with the mediators was of yesterday and over the past couple of weeks, we've been Zooming and meeting **privately** with all of the various stakeholders in this estimation process. *Id.*, pg. 6 (emphasis).

24.     He said the following regarding his consideration of past settlements:

We're also evaluating this important issue of past talc and asbestos settlements.  Now how reliable are those settlements and those values in determining projected estimation to get both sides.  One side will say, here's the history, here's the track record of talc settlements with J&J. Here's the track record of asbestos settlements in the past in related or unrelated matters. Then you hear from the other side, those settlements are not credible.  They're not reliable.  *Id.*, pg. 11.

25.    He said the following regarding the third "issue" on which he purports to

opine:

> Now, that **means really three issues**.  One, can we get a handle and make an estimation report on the volume of claims, current and estimated future, on the value of those meso and ovarian cancer claims, current and future, and an important issue here, **the science that ought to be relied upon by the estimator** in coming up with volume and value. Science is disputed.  It's disputed by the plaintiffs. It's disputed by the FCR. It's disputed by the debtor. And that is an **integral element** of any final report that the estimation expert might issue. *Id.*, pg. 8 (emphasis).

26.    He said the following regarding the advocacy he is receiving from several

lawyers:

> But as Your Honor knows, supplementing the data is very **sophisticated oral advocacy**.  From David Molton's Committee, you get people very distinguished and I've worked with for many years.  On the Meso side, you've got Perry Weitz, you've got Steve Kazan, who's a resource in the history of mesothelioma, and is of certain degree of oral advocacy, beware (indiscernible), beware about relying on certain data. The debtor, Ali Brown and Greg Gordon and Jim Murdica, they're also their own best oral advocates and they say, well, you've got this data.  We have **other arguments and the science and other aspects of the bankruptcy** you must take into account, including collateral litigation that's ongoing.  Look behind a lot of these estimation projections.  And they've been very, very effective, you see, in trying to convince the estimation expert to look at certain priority issues. And that will continue. *Id.*, pg. 12 (emphasis).

27.    He said the following regarding settlement:

> **Everybody** we're speaking to, TCC, ovarian cancer and **meso lawyers**, the debtor, expressly, the FCR, not the U.S. Trustee only because the U.S. Trustee I think hasn't been asked, but **everybody** really hopes, fingers crossed, that that report will not see the light of day. **Everybody** has said, this is no secret, they would **rather settle** the case. And that is why **we are in communication with the three mediators**. They are the ones that have that burden, that challenge. But I think **everyone** involved in the estimation process is **hoping** that as estimation evolves and gets towards a conclusion that the parties will step back and say **we don't need that report public** with all of the ramifications that the Court spells out in its August 15 order. *Id.*, pgs. 14-15 (emphasis).

28.     In response to these untrue statements about settlement, MRHFM immediately reiterated and made clear that MRHFM's clients will not be settling this bankruptcy case regardless of what will be in Mr. Feinberg's report or when the report is released. *Id.*, pgs. 20-21.

29.     On December 23rd, MRHFM filed and served its Fourth Submission to Mr. Feinberg, attaching Keynote slides the Firm presented in its only meeting with him (over Zoom) and again refuted his assertions that MRHFM ever told him or anyone that it wanted to settle this case. *See* Dkt. 3539. The slides make plain the message from the Firm to Mr. Feinberg on September 21st was plainly against any "global resolution" in this fraudulent bankruptcy.

## IV.    Legal Standard

### A.    Full Transparency Is Required For Rule 706 Experts

30.     "The court may appoint any expert that the parties agree on and any of its own choosing." Fed. R. Evid. 706(a). *See also Scott v. Spanjer Bros.*, 298 F.2d 928, 930 (2d Cir. 1962), *referencing* 9 Wigmore, Evidence § 2484, p. 270 (3rd ed. 1940); and, 2 Wigmore, Evidence § 563, n. 7 (3rd ed. 1940).

31.     Certain functions are beyond the scope of duties which may be assigned to a Rule 706 expert. Among those is **dispute resolution** authority. *See Coleman vs. Brown*, E.D. Cal., No. 290-CV-0520KJMDBP (Nov. 29, 2018); *Armstrong v. Brown*, 768 F.3d 975, 987 (9th Cir. 2014). To that end, this Court must ensure that the Rule 706 Expert's role, procedures, and processes are conducted in a fully transparent manner.

32.     As a safeguard against bias, communications with a Rule 706 Expert should be conducted in a manner open to **all** the parties. This means that *ex parte* communications

between the judge and the expert or between a party and the expert are strongly **discouraged**. *See Donovan v. A.H. Riise Gift Shop, Inc.*, 65 V.I. 401, 420 (D.V.I. Jan. 21, 2016) citing *Wright & Gold*, Procedural Issues, 29 Fed. Prac. & Proc. Evid. § 6305 (2d ed.). *See also G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 671 F. Supp. 2d 1203, 1225 (D. Nev. 2009) (disapproving of *ex parte* communications between the judge and the court-appointed expert, or between a party and the expert); *Leesona Corp. v. Varta Batteries, Inc.*, 522 F.Supp. 1304, 1312 n. 18 (D.C.N.Y. 1981) (order prohibiting parties from engaging in *ex parte* communications with the expert witness.); *United States v. Green*, 544 F.2d 138, 146 (3rd Cir. 1976) (disapproving of *ex parte* judicial communication with the expert witness); *Crawford v. Greater Cleveland Regional Transit Authority*, 1991 WL 328037 (N.D.Ohio) (order prohibiting *ex parte* communications between court appointed expert and parties' counsel); *Kenneth C. v. Delonda R.*, 10 Misc.3d 1070(A), 814 N.Y.S.2d 562 (Table), 2006 WL 47429 (N.Y.Fam.Ct.2006) (suggesting that it is the practice in federal courts to prohibit *ex parte* communications between the court appointed expert witness and the parties' counsel).

33.     In *In re Joint E. & S. Districts Asbestos Litig.*, 830 F. Supp. 686, 694 (E.D.N.Y. 1993), a case involving The Manville Personal Injury Settlement Trust—where Johns-Manville filed for Chapter 11 and subjected all its assets to the jurisdiction of the bankruptcy court—the district court held that "[a] Rule 706 expert witness…is subject to the requirements of advance notice and opportunity for testing that apply to all evidence in civil cases." When the expert is directed to issue a report the court will rely on, "the parties must be afforded the opportunity to evaluate the report and test its validity." *Id.* at 694.

34.     To allow for proper cross-examination of the Rule 706 expert, the parties must have access not only to the materials the expert cites as helping him come to the conclusions

given in the Rule 706 Report, but they also must have access to *all* materials which were provided to the expert, ***whether he relies on them or not or whether they support his conclusions or not***. This is not novel, particularly in asbestos bankruptcy matters. For example, in *In re Joint E. & S. Districts Asbestos Litig.*, 151 F.R.D. 540, 542 (E.D.N.Y. 1993), citing *In re Joint E. & S. Districts Asbestos Litig.*, 830 F. Supp. 686, 694 (E.D.N.Y. 1993), *supra*, the court held that "all parties are entitled to be notified of the court's intention to utilize [the Report] and must be provided with some opportunity to review the expert's... work in advance."

35.     Implicit, if not explicit, within the meaning of FRE 706(b)(1)'s directive that "the expert must advise the parties of any findings the expert makes" is that all parties must have access to *all* materials submitted to Mr. Feinberg, including those he concludes ought ***not be*** considered reliable or relevant, and which are therefore excluded from being mentioned as supporting the findings of the Rule 706 Report. So, *all* communications between Mr. Feinberg and any party must be discoverable. The reasons for this are plain: if an expert disregards something he has considered, a party must know about it so the expert's methods, reasoning, and analysis can be tested.

36.     This transparency is fully consistent with Federal Rule of Civil Procedure 26(a)(2)(B) concerning Disclosure of Expert Testimony generally—which apply to Mr. Feinberg's role in this case:

> Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> > (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data **considered** by the witness in forming them;
(iii) any exhibits that will be used to summarize or support them...
(emphasis)

37.     All information ***considered*** by Mr. Feinberg, whether he accepts it or relies upon it or not, must be available to all parties, including MRHFM. This ***must*** include "advocacy" made to him by lawyers on all sides.

**B.     The Standard To Disqualify An Expert Witness**

38.     Federal courts have inherent power to disqualify experts. *U.S. ex rel Cherry Hill Convalescent, Center, Inc. v. Healthcare Rehab Systems, Inc.*, 994 F.Supp. 244, 248-49 (D. N.J. 1997) (*citing Koch Refining Co. v. Boudreaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996)). "This power derives from the court's duty to preserve confidence in the fairness and integrity of judicial proceedings." *Id.* (*citing Paul v. Rawlings Sporting Goods*, 123 F.R.D. 271, 277-78 (S.D. Ohio 1988) and *In re Ambassador Group, Inc., Litig.,* 879 F.Supp. 237, 241 (E.D. N.Y. 1994)). "Experts act as sources of information and opinions in order to assist parties and triers of fact understand the evidence." *Cherry Hill*, 994 F.Supp. at 249. The court in *Cherry Hill* noted that motions to disqualify experts are uncommon.

39.     The expert disqualification standard is different than that for an attorney; "experts are not advocates" in the litigation but sources of information and opinions. *Cordy v. Sherman-Williams Co.,* 156 F.R.D. 575, 580 (D. N.J. 1994). In *Cordy*, the issue was whether an expert should be disqualified due to a prior relationship with a party. More generally, however**,** "the policy objectives favoring disqualification include preventing conflicts of interest and **maintaining the integrity of the judicial process**"; those weighing against disqualification include ensuring access to expert witnesses and allowing experts to pursue their professional calling. *Id.* at 580 (emphasis). *See also First Niagra Risk Management, Inc.*

*v. Folino*, 317 F.R.D. 23, 29 (E.D. Pa. 2016) (discussing the inquiry to determine whether to disqualify an expert or consultant).

40.     Neutrality is presumed in a court appointed expert.  *See Cheese v. U.S.*, 290 Fed.Appx. 827, 830 (6th Cir. 2008) ("we have found no cases discussing a requirement of neutrality for court appointed experts. Assuming, as would be reasonable, that some neutrality requirement applies, and assuming that the most stringent neutrality requirement such an expert would face is that applied to judges"); *Gates v. U.S.*, 707 F.2d 1141, 1144 (10th Cir. 1983)(finding no bias in the court appointed panel of experts); *Gorton v. Todd*, 793 F.Supp.2d 1171, 1177-79 (E.D. Ca. 2011)(noting that "accurate fact-finding" is often the most important factor in determining whether to appoint a neutral expert).

41.     The audience for Mr. Feinberg's Report is this Court and all parties to this proceeding; ***all*** should know he "has no axe to grind." *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 665 (7th Cir. 2002) (discussing the use of a 706 neutral witness as opposed to "warring experts" retained by the parties).

42.     A panel of 706 experts were appointed in the *Manville* related proceedings (discussed *supra* ¶¶ 33 to 34) to properly allocate "the proceeds of the sale of Trust assets" between current and future claimants and "critical to that allocation would be estimates of the **number** of future claimants." *In re Joint E. & S. Districts Asbestos Litig.*, 982 F.2d 721, 731 (2nd Cir. 1992)(emphasis). The panel was ***not*** tasked with evaluating the science of asbestos disease causation, but to project the number of future claimants against the trust.

## V.    Mr. Feinberg Made False Statements To This Court

43.     This is simple: Mr. Feinberg made objectively untrue statements to this Court (and the public) about what the parties are telling him on material and important matters.

He said "meso lawyers" really hoped "that [his] report will not see the light of day….**[e]verybody** has **said**, this is no secret, they would **rather settle** the case." Tr. 12/20/2022, pgs. 14-15 (emphasis).

44.    This is demonstrably false. MRHFM has adamantly opposed any settlement in any form in this fraudulent bankruptcy and the Firm made this clear to Mr. Feinberg in writing and in its single meeting with him. MRHFM only represents mesothelioma victims and has 61 of the 430 pending mesothelioma lawsuits against J&J and "Old" JJCI. So, all "meso lawyers" did *not* tell Mr. Feinberg "they would rather settle."[2] *See* MRHFM Submissions, Dkts. 2935, 3003, 3117 & 3539.

45.    Mr. Feinberg's misrepresentations to this Court are untrue and irresponsible. Pending before the Third Circuit, on an expedited basis, are two issues that will end this case if either is ruled on in the claimants' favor. Mr. Feinberg's objective in providing a status report should be related to the progress he is making towards reaching his conclusions, *not* as an opportunity to misinform the Court, the parties, or the public about settlement prospects.

46.    This Court said it was appointing a Rule 706 expert to preserve "transparency" and the "integrity of the bankruptcy process." Tr. 7/28/2022, pg. 4. Mr. Feinberg has not been transparent and current and future claimants cannot have any confidence in the integrity of the bankruptcy process when **this bankruptcy Court's own expert** is misrepresenting what the parties tell him, all while secretly coordinating with mediators and

---

[2] Based on the public filings and advocacy by Messrs. Satterley, Placitella, Block and Ruckdeschel, also "meso lawyers" and from other firms, MRHFM would be surprised if they made statements to Mr. Feinberg favoring settlement either.

back channeling his expected opinions, hoping that the TCC, the Debtor, and FCR will all agree to bind tens of thousands of claimants to a "deal" just so his Report won't "see the light of day."

47.    For these reasons, the Court must disqualify him.

## VI.    The Secrecy Of Mr. Feinberg's Work Is Contrary To The Rules Of Evidence And To The Rules Of Civil Procedure

48.    Mr. Feinberg must identify "the facts or data **considered**" in forming his opinions. Order, ¶ 2. *See* ¶ 16 *supra.* This is subject, however, to the "confidentiality" provisions in paragraph 4. While discovery is permitted after the Report is unsealed (¶ 3(e)), discovery means ***nothing*** if "confidential *ex parte* communications" between the parties and Mr. Feinberg are shielded from disclosure. *See* ¶ 4(a). He's not one of the party's experts, he's ***this*** Court's appointed neutral.

49.    Mr. Feinberg had discretion: "all parties…**may have** confidential *ex parte* communications" with him. Order, ¶ 4(a)(emphasis). MRHFM asked Mr. Feinberg in its First Submission to ***not*** have confidential discussions with the parties. *See* Dkt. 2935.

50.    The use of 706 experts is rare, especially in bankruptcy proceedings. But the cases involving such experts repeatedly disapprove of or prohibit *ex parte* communications between the parties and the expert, let alone *confidential* communications. *See* ¶¶ 30 to 37. Here, the parties are not only having *ex parte* meetings with Mr. Feinberg, but these meetings are *confidential* and not subject to discovery.

51.    More generally, and more importantly, the policy objectives in disqualifying an expert witness—court appointed or not—include "maintaining the integrity of the judicial process." *Cordy,* 156 F.R.D. at 580. *See* ¶¶ 38 to 40 *supra*. This Court decided to order

estimation over the claimants' objection citing the "need for transparency and to preserve the integrity of the bankruptcy process…" Tr. 7/28/2022, pg. 4.

52.    Here, MRHFM and all claimants are unaware who is communicating with Mr. Feinberg, when, how often, concerning which topics, and what documents and materials are being shown to him. He can then, without oversight, choose to include or exclude any of those communications and documents from his Rule 706 Report, and withhold any of those communications not only from the parties, but from the Court as well. This results in a process that will inevitably be seen as tainted.

53.    Mr. Feinberg and his lawyers have instituted a "one way door. What comes in, stays in. It doesn't get disseminated and that's promoted the type of **candor** that is necessary in estimation." Tr. 12/20/2022, pg. 10 (emphasis). "Candor" here really means secrecy, and this means the parties aren't going to know what arguments and advocacy other parties are making to him. That's fine if Mr. Feinberg were a mediator, but he's not. He's a testifying expert obliged to follow the Rules of Evidence and Rules of Civil Procedure.

54.    Mr. Feinberg said the plaintiffs are pointing to *Daubert* and the FDA and the Debtor is pointing to the "changing nature of the science and medicine" and he's "taking all of that in." *Id.*, pgs. 10-11. Mr. Feinberg discussed at length the "advocacy" he is receiving from all parties and commended the arguments made by lawyers for the Debtor as "their own best oral advocates." Tr. 12/20/2022, pg. 12.

55.    All of this serves to influence and impact Mr. Feinberg's opinions and ***none*** of this is discoverable, given that Mr. Feinberg ***chose*** to permit such communications. Meaningful cross-examination must include ***all*** information, including argument, supplied to

Mr. Feinberg, whether he relies on it or not. Rule 26(a)(2)(B) requires that all "facts or data **considered**" by the expert be disclosed to the parties.

56.    PowerPoint presentations to Mr. Feinberg are not subject to cross examination, and these presentations will clearly influence his opinions. In his deposition— which MRHFM will absolutely be taking if he is not disqualified—will Mr. Feinberg discuss every communication he had with every party? Will he discuss those communications he found reliable and which he found unreliable? Clearly not, which is why the Court needs to disqualify him to ensure transparency and the integrity of *this* proceeding, in which J&J's Two Step scam has already received overwhelmingly *negative* media attention.

57.    Absent disqualification, current and future claimants will never know all of what was presented to Mr. Feinberg and what he accepted or rejected in purporting to estimate the Debtor's liabilities. Johnson & Johnson's lawyers are simply trying to wash inadmissible arguments through Mr. Feinberg to re-appear as admissible testimony from this Court's appointed expert. This discredits the integrity of this entire process.

58.    Could MRFHM meet with this Court *ex parte* and present its arguments about what each of its clients' mesothelioma cases are worth? Of course not. Then why is this Court's appointed expert being allowed to do so? ***Especially*** when Mr. Feinberg has settlement data the TCC and MRHFM ***do not*** have, but that the Debtor and the FCR *do* have.

59.    For all these reasons the Court must disqualify Mr. Feinberg. There is no curing the damage to the integrity of this process that has already occurred.

## VII.    Mr. Feinberg Seeks To Settle This Case Which Is Not His Role

60.    Mr. Feinberg is a mediator in several bankruptcies including *Imerys* and *Cyprus*, and fraudulent Two Steps like *Bestwall*. *See* ¶ 13, *supra.* Here, by contrast, Mr.

Feinberg clearly understood he was not to mediate or facilitate a resolution, but to render an opinion as an expert witness. *See* Feinberg Declaration, Dkt. 2861; Tr. 12/20/2022, pg. 4.

61.      Nevertheless, Mr. Feinberg is improperly operating outside the scope of his appointment, telling the Court that "everybody really hopes, fingers crossed, that that Report will not see the light of day" because there will be a settlement, and the parties will "step back and say we don't need that report public…" Tr. 12/20/2022, pg. 14. In other words, he intends to use a leaked draft Report as a bargaining chip to drive a back-room and unconstitutional "settlement."  Tr. 12/20/2022, pgs. 14-15 (emphasis).

62.      Mr. Feinberg has been meeting with the mediators on a regular basis; "we have coordinated with them on a timeline so they know what we are doing, and we know what they're doing…" Tr. 12/20/2022, pg. 6. ***What is there to coordinate?*** The mediators are trying to settle this fraudulent "bankruptcy" and Mr. Feinberg is supposed to be rendering an opinion. These should be completely separate. What requires a "series" of Zoom meetings between the mediators and Mr. Feinberg if a timeline is all they are discussing? That's a 30-second conversation:

**Mediator:** "When do you think your report will be done?"

**Mr. Feinberg:** "Early March."

**Mediator:** "Okay. Have a nice weekend."

63.      Court appointed testifying experts cannot be mediating or working on dispute resolution. *See* ¶ 31, *supra.* Mr. Feinberg does not have that authority and he can't be coordinating with mediators. *See Coleman vs. Brown*, E.D. Cal., No. 290-CV-0520KJMDBP (Nov. 29, 2018); *Armstrong v. Brown*, 768 F.3d 975, 987 (9th Cir. 2014).

64.     The world is watching; public trust in the bankruptcy process requires that a Rule 706 expert operate completely separate from mediators. Mr. Feinberg has repeatedly failed to do so and he makes no secret about it. He must be disqualified.

## VIII.   Mr. Feinberg Purports To Evaluate "The Science" Surrounding Talc Claims Which Is Far Beyond His Appointment To Estimate Volume And Value

65.     Mr. Feinberg was assigned to estimate volume and value, not weigh the evidence or determine the "science that ought to be relied upon by the estimator in coming up with volume and value." Tr. 12/20/2022, pg. 8. Noting the dispute between the parties, he said the science "is an integral element of any final report that the estimation expert might issue." *Id.* "We're evaluating internally the science, the medicine being advocated by the Debtor and by TCC and we're evaluating what is credible, what we should draw inferences from that science." Tr. 12/20/2022, pg. 10.

66.     This is ***not*** what he was assigned to do. Juries draw inferences not court appointed experts, especially when inferences are being drawn from clandestine advocacy sessions with the Company's lawyers.

67.     As laid out in detail in MRFHM's Opposition to the Preliminary Injunction, only state and Article III courts have power to decide factual disputes, including the "fundamental dispute" about the "safety" of J&J's talc. *See* Dkt. 2564, pgs. 7-24. This Court does not have such power so neither does its appointed expert.

68.     The Order plainly states Mr. Feinberg's role is to estimate volume and value of current and future claims; nothing about weighing the merits of the claims or considering "the science." And if LTL wanted to litigate the "science" it shouldn't have filed for bankruptcy.

69.     Because Mr. Feinberg lacks power to consider or decide the "science" but he intends to anyway, he must be disqualified.

## IX.     The Fallacy Of "Total Liability"

70.     There are two types of companies: solvent and bankrupt. J&J and "new" JJCI are solvent. Solvent companies can pay all current and future claims in full. Bankrupt companies like Johns-Manville could not. LTL is a stooge and not a company.

71.     This Court has stated: "I think most of you or all of you could probably calculate on the back of an envelope a fair and accurate settlement estimation for these cases." Tr. 7/28/2022, pgs. 14-15. MRHFM appreciates this sentiment, but total liability is not relevant for solvent companies and not relevant to MRHFM's recommendations to its clients in this solvent company Two Step long-con. Solvent companies pay claims as they come due; just like J&J was doing in the tort system before stuffing its victims here.

72.     "Total liability" is a fiction; that's why, at best, it can only be estimated, and it's why estimating "total liability" is *only* done out of necessity when, in a real bankruptcy like *Manville*, there's not enough money to pay **all** creditors—current and future—in full. So MRHFM has no interest in "estimating" solvent company Johnson & Johnson's "total liability." It's a fiction and plays no role in representing plaintiffs with tort claims.

73.     MRHFM *would* be happy to negotiate with J&J for MRHFM's seventy-eight clients (which includes cases that can't be filed due to the Injunction). The Firm could make settlement demands for each of these cases. But MRHFM *cannot* calculate or estimate the value of other pending cases filed by other firms nor does MRHFM know what other firms' cases settled for prior to the LTL filing.

74.    Estimation of "total liability" is therefore merely a clumsy attempt by Johnson & Johnson—a fully solvent asbestos company—to cap what it pays the people it poisoned to death.

## X.    Conclusion

75.    After Mr. Feinberg is disqualified, estimation should be terminated. If the Debtor has a plan of "re-organization", it can propose it; if the TCC has one, it can propose it. J&J told the Third Circuit the Company would have a "good plan" for claimants. Let's see it.

76.    Any plan that doesn't contain an immediate pass through to the tort system with uncapped damages for mesothelioma victims will *never* be confirmed. MRHFM's plaintiffs will not bullied, browbeat, or crammed down; they will be heard by juries the easy way or the hard way.

77.    This corporate assault on individual rights and mockery of the bankruptcy system *will* fail; it's just a matter how many *more* claimants die deprived of their Seventh Amendment rights, before it does.

78.    Carolyn Pryor, who passed away in September from malignant mesothelioma of the peritoneum, used Johnson's Baby Powder for decades on herself and others as a pediatric nurse. Ms. Pryor battled her illness for over two years before succumbing. Her trial *was set* for October 2022 in Middlesex County, New Jersey. Absent the Injunction, would J&J and Ms. Pryor have agreed to a settlement before she passed? No one will ever know; what *is* known is that she never asked J&J, Ken Feinberg, the mediators, or this Court, for "help."

WHEREFORE, MRHFM asks the Court to enter the Order attached, disqualifying Kenneth R. Feinberg from the role of Rule 706 expert, and terminating estimation. Respectfully submitted:

**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**

*/s/Suzanne M. Ratcliffe*
_____
Suzanne M. Ratcliffe, Esq.
**MAUNE RAICHLE HARTLEY
FRENCH & MUDD, LLC**
150 W. 30th Street, Suite 201
New York, NY 10001
(800) 358-5922
sratcliffe@mrhfmlaw.com