| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Matthew I.W. Baker, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>mbaker@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br>*Local Counsel for the*<br>*Official Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Robert J. Stark, Esq.<br>Michael S. Winograd, Esq.<br>dmolton@brownrudnick.com<br>rstark@brownrudnick.com<br>mwinograd@brownrudnick.com<br>Seven Times Square<br>New York, NY 10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Jeffrey L. Jonas, Esq.<br>Sunni P. Beville, Esq.<br>Eric R. Goodman, Esq.<br>jjonas@brownrudnick.com<br>sbeville@brownrudnick.com<br>egoodman@brownrudnick.com<br>One Financial Center<br>Boston, MA 02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br>*Co-Counsel for the*<br>*Official Committee of Talc Claimants* |
| **BAILEY GLASSER LLP**<br>Brian A. Glasser, Esq.<br>Thomas B. Bennett, Esq.<br>Kevin W. Barrett, Esq.<br>Maggie B. Burrus, Esq.<br>bglasser@baileyglasser.com<br>tbennett@baileyglasser.com<br>kbarrett@baileyglasser.com<br>mburrus@baileyglasser.com<br>1055 Thomas Jefferson St. NW, Suite 540<br>Washington, DC 20007<br>Tel: (202) 463-2101<br>Fax: (202) 463-2103<br>*Co-Counsel for the*<br>*Official Committee of Talc Claimants* | **OTTERBOURG PC**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 905-3628<br>Fax: (212) 682-6104<br>*Co-Counsel for the*<br>*Official Committee of Talc Claimants* |

| | |
|---|---|
| **PARKINS & RUBIO LLP**<br>Lenard M. Parkins, Esq.<br>Charles M. Rubio, Esq.<br>lparkins@parkinsrubio.com<br>crubio@parkinsrubio.com<br>Pennzoil Place<br>700 Milan St., Suite 1300<br>Houston, TX 77002<br>Tel: (713) 715-1666<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>jmassey@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC  20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br>*Special Counsel for the*<br>*Official Committee of Talc Claimants* |
| In Re:<br><br>**LTL MANAGEMENT, LLC,**[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 21-30589 (MBK)<br><br>Honorable Michael B. Kaplan |

## STATEMENT OF THE OFFICIAL COMMITTEE OF TALC CLAIMANTS IN RESPONSE TO THE DEBTOR'S OBJECTION TO MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC'S MOTION TO DISQUALIFY KENNETH R. FEINBERG AS RULE 706 EXPERT AND TO TERMINATE ESTIMATION

The Official Committee of Talc Claimants (the "TCC") in the above captioned case, by and through its undersigned counsel, hereby submits this Statement in response to the *Debtor's Objection to Maune Raichle Hartley French & Mudd, LLC's Motion to Disqualify Kenneth R. Feinberg as Rule 706 Expert and to Terminate Estimation* (Dkt. No. 3611) (the "Objection").  In support of this Statement, the TCC respectfully states as follows.

### INTRODUCTION

1. On December 28, 2022, Maune Raichle Hartley French & Mudd, LLC ("MRHFM") filed its motion to disqualify Kenneth R. Feinberg (the "Court-Appointed Expert")

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

2

as Rule 706 expert and to terminate estimation (Dkt. No. 3553) (the "Motion to Disqualify").

2. On January 11, 2023, the TCC filed its Statement regarding the Motion to Disqualify. *See* Dkt. No. 3606 (the "TCC Statement"). On January 11, 2023, the Debtor filed its objection to the Motion to Disqualify. The Debtor's Objection opposes the Motion to Disqualify, but, not surprisingly, it also seeks to use its pleading to go beyond the issue of disqualification by including statements regarding the need for estimation in this case and what it believes estimation should entail. Clearly, Debtor and its parent, J&J, are, yet again, belting out a well-rehearsed tune for audiences other than the Court. So that silence cannot be construed as assent, the TCC files this Statement to address these statements.

## STATEMENT

3. The Debtor's view of estimation—which includes relitigating medical and science issues before this Court and discovery on plaintiffs, plaintiff lawyers, plaintiff vendors, and plaintiff trusts—would create undue delay in the administration of this case in contravention of section 502(c) of the Bankruptcy Code and should be rejected.

**I.    Estimation Is Used to Avoid Undue Delay in the Administration of the Case**

4. Section 502(c) provides: "There shall be estimated for purposes of allowance under this section … any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case …" 11 U.S.C. § 502(c). The issue under section 502(c) is whether the estimation of a debtor's tort liability is needed to avoid the undue delay of the "administration of the case." *Id.*

**A.    Estimation Is Not the Same Thing as Liquidation**

5. Estimation is not the same thing as "actual liquidation"—*i.e.*, estimation is not a

3

"conclusive finding of liability."[2] Section 502(c) is employed as an alternative to the fixing or liquidating of a claim. Liquidation is a conclusive finding of liability in an exact amount—*i.e.*, it is a merits-based determination that is beyond this Court's jurisdiction.

6. Estimation, on the other hand, implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's estimate for the purpose of permitting the case to go forward and, thus, not unduly delay the administration of the case. Tort claims that are estimated in a bankruptcy proceeding still must be liquidated or adjudicated through a subsequent proceeding or process that is independent of the bankruptcy. *See Bittner*, 691 F.2d at 137. Section 502(c) does not require a Bankruptcy Court to become a District Court or a State Court and consider medical and scientific evidence in the same way that these Courts would if they were liquidating a personal injury claim.

### B.  Liquidation Occurs After a Plan Is Confirmed

7. In nearly all mass tort cases, liquidation occurs post-confirmation. The Third Circuit summarized how this can work in *In re Federal-Mogul Global Inc.*, 684 F.3d 355, 359 (3d

---

[2] *See* Jay M. Goffman, Skadden, Arps, Slate, Meagher & Flom LLP, Claims Issues—Selected Topics, 100104 ABI CLE 197 (Oct. 1, 2004) ("[C]ourts agree that estimation of claims is not the same as actual liquidation. Section 502(c) is employed by the courts as an alternative to the 'fixing or liquidating' of a claim. Liquidation is a conclusive finding of liability in an exact amount. Estimation, on the other hand, 'necessarily implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's best estimate for the purpose of permitting the case to go forward and thus not unduly delay the matter.'"); *accord Bittner v. Borne Chem. Co.*, 691 F.2d 134, 137 & fn. 9 (3d Cir. 1982) (affirming court's estimation of stockholders' claims for "voting" purposes "at zero, and temporarily disallowing them until the final resolution of the state action"); *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (holding that "[t]he estimation of [former chief executive officer's] claim for voting purposes does not entail consideration on the merits of all the issues in dispute respecting that claim. … This being but an estimation hearing, my findings of fact will not have any preclusive effect upon the ultimate disposition of [former chief executive officer's] claim."); *In re Farley, Inc.*, 146 B.R. 748, 756 (Bankr. N.D. Ill. 1992) (estimating personal injury claims "for purpose of voting and determining plan feasibility" and finding that "final determination sought by debtor" was not "within the purview of [28 U.S.C.] § 157(b)(2)(B)"); *In re Federal Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989) (estimating personal injury tort claims "for purposes of voting on the debtor's plan of reorganization, and not for the purpose of determining the debtor's ultimate liability for the claim or the amount of the claim for purposes of distribution."); *In re Continental Airlines Corp.*, 60 B.R. 903, 906 (Bankr. S.D. Tex. 1986) (estimating claim "at zero value for voting purposes" pending liquidation "through subsequent proceedings, independent of [the] reorganization [proceeding].")

4

Cir. 2012) ("The primary bankruptcy innovation for addressing mass tort liability has been the post-confirmation trust, which first appeared in the bankruptcy proceedings of the Johns-Manville Corporation, the largest producer of asbestos-containing products.").

8. A trust created by a plan assumes the debtor's obligation to pay all present and future tort claims. The trust is "governed by trustees who manage financial affairs, while a committee of advocates, consisting of representatives of current and future claimants, must approve substantial trust activities." *Id.* at 360. And "all trusts have Trust Distribution Procedures (TDPs) to govern how claims are processed, settled, and compensated," which "procedures are approved as part of the bankruptcy reorganization plan[.]" *Id.* As the Third Circuit explained, "[i]n function, the trusts are similar to quasi-administrative remedies that employ valuation grids to compensate injuries, subject to individualized and judicial review." *Id.* at 362.

9. Once a tort claim is processed, the trust will issue an award consistent with the TDPs, which is the equivalent of a settlement offer. A claimant can accept the award and enter into a final settlement with the trust. Or a claimant can elect to liquidate his or her claim to judgment in a court of competent jurisdiction. As this Court has made clear, "[t]he Seventh Amendment jury rights of talc plaintiffs" should "remain intact under a properly drafted and approved plan." Memorandum Opinion (Dkt. No. 1572) (the "<u>Opinion</u>") at 26; *see* 28 U.S.C. § 1411(a) (Title 11 does "not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim.").

10. This "quasi-administrative scheme," as the Third Circuit called it, has become a staple of virtually every chapter 11 plan confirmed in a mass tort case since *Johns-Manville*, including cases that do not involve asbestos claims. *Federal-Mogul*, 684 F.3d at 360. This scheme solves a problem common to mass tort cases that this Court noted in its Opinion—how to liquidate

5

a substantial number of claims in an efficient and fair manner without overwhelming the "capacity for the state and federal courts to protect" current claimants and "future claimants, whose claims may surface in the next half century given the acknowledged latency period for the types of cancers at issue." Opinion at 26.

11. Following on decades of mass tort cases, this Court should not be asked to liquidate any talc claims. A plan here could afford eligible victims who want to settle with the ability to do so in accordance with Court-approved TDPs. And a plan here could also afford all victims who are ineligible—or do not want to settle—with the ability to liquidate their claims in the tort system.

12. But what is important for this Court to understand now is that absent dismissal by the Third Circuit, the process of liquidating talc claims will not begin until after a plan is confirmed. What must be avoided—and what Section 502(c) is designed to avoid—are efforts to delay the plan confirmation process. Section 502(c) is designed to combat anything that stands between a party who wants to file a plan and the ultimate resolution of the chapter 11 case.

### C. The Liquidation of Tort Claims Within a Trust Is Not the Same Things as the Administration of a Chapter 11 Case

13. Debtor's mantra here—like the mantra of debtors in other mass tort cases that invoked estimation apart from a filed plan—is that estimation is "mandatory" because there are a lot of tort claims. But this argument is a non-sequitur. There is no logical connection between the time it takes to liquidate tort claims and the time it takes to administer a chapter 11 case.

14. The time it takes to liquidate tort claims—a process that begins after a plan is confirmed—is obviously not the same thing as the time it takes to administer a case (*i.e.*, the time starting on the petition date and ending when a plan goes effective).

15. As the Court in the *Diocese of Camden* found, the "fixing or liquidating" of tort claims "within the trust" may "delay trust distribution[s]" to individual claimants—a process that

6

can take years to complete—is not the same thing as delaying "the administration of the Chapter 11 case" within the meaning of section 502(c). *See In re Diocese of Camden, New Jersey*, Case No. 20-21257 (JNP), Hr'g Tr. 5:23-6:6, 13:20-23 (Bankr. D.N.J. Feb. 15, 2022).

16. The amount of time it takes to liquidate tort claims post-confirmation within a trust—a period that increases when there are more tort claims to process—is not relevant. Rather, the time it takes to administer a chapter 11 case and get to a confirmed plan is the relevant period under section 502(c). When estimation is proposed for a proper purpose (or a purpose that is consistent with section 502(c)), it is proposed in connection with the confirmation of a chapter 11 plan combined with a clear explanation as to why estimation in necessary to confirm the plan that has been proposed. But the Debtor has not proposed any plan. The Debtor's version of estimation is contrary to the plain language and purpose of section 502(c).

## II.     The Debtor's Version of Estimation Is an Attempt to Create Undue Delay

17. To fully appreciate the Debtor's motives here, the Court needs to understand what happened in the last round of asbestos bankruptcies, particularly *In re Garlock Sealing Technologies, LLC*, Case No. 10-BK-31607 (Bankr. W.D.N.C.), and how the Texas Two Step was developed to take advantage of certain aspects of the *Garlock* case.

### A.     *Garlock* and the Futility of Estimation in a Section 524(g) Case

18. The debtors in *Garlock* filed for bankruptcy in June 2010 due to their liability for asbestos claims. After filing, the debtors asked the Court to estimate their aggregate liability for such claims. In January 2014, the Bankruptcy Court issued its opinion on estimation, adopted the debtors' position on nearly every issue, and estimated the debtors' aggregate liability at $125 million. *See In re Garlock Sealing Techs., LLC*, 504 B.R. 71 (Bankr. W.D.N.C. 2014). The debtors then filed a plan based on that estimation which the claimants summarily voted down.

7

19.     Without the required claimant support, the debtors could not confirm a plan that included a channeling injunction under section 524(g). But the debtors operated a business and needed to emerge from bankruptcy. To confirm a plan, the debtors had to reject the Court's estimation—meaning that estimation itself was a worthless exercise—and adopt the plaintiff's settlement demand of nearly $500 million. The debtors confirmed a plan based on that settlement and emerged from bankruptcy in July 2017—roughly 7 years after they filed for bankruptcy.[3]

20.     The defense bar took notice of the *Garlock* case. From their perspective there were both positive and negative aspects to *Garlock*. On the one hand, the debtors did not pay defense costs, suffer adverse jury verdicts, pay judgments, or make any payments to tort victims during their 7-year stay in bankruptcy. From the tortfeasor's perspective, this was extremely beneficial.

21.     On the other hand, the debtors had to reach a deal with the victims to emerge from bankruptcy (to reorganize an actual operating business), which meant that they ultimately had to negotiate in good faith. Further, section 524(g) trusts typically include an equity contribution. Section 524(g) provides that an asbestos personal injury trust must be "funded in whole or in part by the securities or 1 or more debtor involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends." 11 U.S.C. § 524(g)(2)(B)(i)(II).

22.     As the Third Circuit explained in *In re Combustion Engineering, Inc.*, "[t]he implication of this requirement is that the reorganized debtor must be a going concern, such that it

---

[3] In *Garlock*, and other asbestos bankruptcies where the tortfeasor filed for bankruptcy and submitted its assets to the jurisdiction of a Bankruptcy Court, there were limited assets available to pay claims. An estimation of liability and assets could be used to inform victims of the amount that they may be paid on account of their claims—*i.e.*, the trust payment percentage—if the plan was confirmed. But this is a full pay case—the payment percentage will be 100%. This Court found that "the resources under the Funding Agreement will be available upon confirmation of a plan—whether or not the plan is acceptable to J&J or New JJCI, and whether or not the plan offers payors protections under § 542(g)." Opinion at 45. Indeed, the Debtor has made it clear that the "Funding Agreement gives the entire value of JJCI, the entire value, $61 billion free and clear to the potential claimants so that entire pot of money is available." Third Circuit Oral Argument Tr. 65:6-9, Sept. 19, 2022. And "$61 billion is only a floor, not a ceiling." *Id.* at 65:13-17.

8

is able to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants." 391 F.3d 190, 248 (3d Cir. 2004). Equity holders, however, prefer plans that allow future dividends to flow to equity and not tort victims.

### B. The Texas Two Step as the Solution to *Garlock*

23. The question from the tortfeasor's perspective is this: can a solvent tortfeasor obtain the benefit of *years and years* of delay through a bankruptcy filing without affording the victims leverage in settlement discussions and without diluting existing equity? The Texas Two Step was created to afford a tortfeasor with all the "good" aspects of *Garlock*, but none of the "bad" aspects of *Garlock*, and allow the tortfeasor to eviscerate fundamental priority principles of bankruptcy.

24. The Texas Two Step splits the tortfeasor into "NewCo," which holds the assets (and preferred liabilities), and "TortCo," which holds the tort liability. TortCo then files for bankruptcy and asks the Court to extend the automatic stay to protect NewCo while settlement discussions are ostensibly ongoing. TortCo asserts that because NewCo (or its parent) is obligated to provide funding under a funding agreement to pay tort claims, the tort claimants themselves are not worse off. To keep the case going for as long as possible and create the desired delay, TortCo asks the Court to conduct an estimation of its aggregate tort liability.

25. The key part of the Texas Two Step—from the torfeasor's perspective—is that no good faith settlement need be reached. Unlike the debtors in *Garlock*, TortCo does not need to confirm a plan of reorganization. The debtors in cases like *Bestwall LLC*, *Aldrich Pump LLC*, and *DBMP LLC* were built to be able to stay in bankruptcy for years and years, and, as the Court knows, they remain there today, malingering. Creating delay is their business.

26. If the victims capitulate and agree to accept a *de minimis* settlement (or a settlement

9

NewCo finds reasonable in its sole and absolute discretion), TortCo can propose a plan based on a capped trust structure. Under this structure, NewCo will make a fixed contribution to a trust. If—and this is a key point—NewCo's contribution proves to be inadequate to pay present and future tort claims in full (as they are liquidated post-confirmation), NewCo will be protected by a channeling injunction and releases. Future dividends paid by NewCo can flow to its equity while tort claimants bear the risk that the trust funding is inadequate. The funding risk would shift from a solvent corporation—here, one with a market capitalization of nearly half a trillion dollars—to tort victims (like the members of the TCC).

27. But settlement does not have to be the outcome of a Texas Two Step. The Texas Two Step assumes that no good faith settlement that is fair to victims will be reached, and no plan will be confirmed. If the victims stand firm, NewCo will still get the benefit of years of delay unless the Court intervenes to prevent this. NewCo will save substantial amounts on defense costs. NewCo will not have to make any payments to tort victims while the case is pending. And, during this time, NewCo can pay dividends, shower its executives, and engage in transactions outside of the ordinary course of business without seeking Court approval.

### C. Merits Based Estimation as a Path to Undue Delay

28. In the Debtor's perfect world, this Court will spend the next three to eight years listening to medical experts battle over issues of causation. As set forth in the Objection, the Debtor appears intent on using this case to attack medical evidence that it finds inconvenient and moving for summary judgment on a claims-wide consolidated basis. Objection at 12. The Debtor is intent on using estimation to collaterally attack *Daubert* rulings in the MDL as well as liability determinations upheld by state trial courts and state courts of appeal.[4] And the Debtor will try to

---

[4] *See In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Litigation*, 509 F. Supp. 3d 116, 198 (D.N.J. Apr. 27, 2020) (denying in principal part J&J's Daubert motions and admitting (with

convince this Court to assume the role of a State Court and make liability determinations that it has no authority to make.

29. The TCC believes that the medical and scientific evidence supports the talc claimants here. But that is not the point. Estimation is not the same thing as liquidation. If this Court were to adopt J&J's theories on the science in an estimation proceeding, the talc claimants could summarily reject any plan that includes that estimation. And, if at the end of estimation, the Court sides with the claimants, the Debtor would not propose or support a plan based on that estimation.

30. But, at that point, the damage will be done. And thousands of individuals would have died without having an opportunity to liquidate their claims. The Debtor's version of estimation is designed to avoid real litigation—in its bankruptcy case and in the tort system. As *Garlock* shows, a ruling by this Court as to the estimated value of talc claims can be treated as an advisory opinion. Estimation does not put the parties on the proverbial courthouse steps where the failure to reach a settlement would have the consequence of a Court issuing a final judgment. The final judgment that the Debtor and its parent fear the most in this chapter 11 case is an order confirming a plan that contains values acceptable to the victims. The Debtor's objective is to create undue delay in the administration of this case. The Debtor's playbook turns section 502(c)

---

limited exceptions) plaintiffs' expert testimony finding a causal relationship between talc products and ovarian cancer); *Bader v. Johnson & Johnson*,-- Cal. Rptr.3d --, 2022 WL 17883561, at *20-*21 (Cal. Ct. App. Dec. 23, 2022) (affirming trial court's adverse inference instructions against J&J for spoilation of key evidence, and finding that, notwithstanding the destruction of evidence, there was still "abundant evidence" that J&J's talc "contained asbestos."); *Ingham v. Johnson & Johnson,* 608 S.W.3d 663 (Mo. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) (highest Missouri state court sustaining $2.2 billion judgment against J&J and JJCI for 22 women alleging ovarian cancer claims, finding J&J "engaged in reprehensible conduct of its own."); *Echeverria v. Johnson & Johnson (Johnson & Johnson Talcum Powder Cases)*, 37 Cal. App. 5th 292 (Cal. Ct. App. 2019) (holding there is "substantial evidence to support" the jury's findings of general and specific causation (as against JJCI) and for compensatory damages from JJCI arising out of its breach of its duty to warn customers of the risk of ovarian cancer from use of its talc products, but affirming a judgment notwithstanding verdict as to liability and punitive damages for J&J (and punitive damages against JJCI) and granting JJCI's motion for retrial).

on its head.

## CONCLUSION

31.     As set forth in the TCC Statement, and recited by the Court-Appointed Expert, Mr. Feinberg, in open Court, the TCC is working cooperatively with Mr. Feinberg.  *See* Dec. 20, 2022 Hr'g Tr. 9:23-25 ("[T]he TCC, in particular, is moving heaven and earth to try to get us the necessary ovarian and meso data …").  However, the TCC's views regarding the dismissal of this case have not changed.  If case is not dismissed by the Third Circuit, the TCC will be prepared to take all appropriate steps to administer this case as quickly as possible so that the talc claims can be liquidated, and victims can be compensated fairly.  The Debtor's narrative regarding the need for and purpose of estimation, which the Debtor believes it must continue to make *ad nauseam*, continues to be flawed.

Respectfully submitted,

**GENOVA BURNS, LLC**

By: *Donald W. Clarke*
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee*
*of Tort Claimants of LTL Management, LLC*