| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-1(b) **SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.** Arthur J. Abramowitz Alan I. Moldoff Ross J. Switkes 308 Harper Drive, Suite 200 Moorestown, NJ 08057 Tel: (856) 662-0700 Email: aabramowitz@shermansilverstein.com amoldoff@shermansilverstein.com rswitkes@shermansilverstein.com *Counsel to Substantial Contribution Claimants* | |
| In Re: LTL MANAGEMENT LLC, Debtor. | Case No. 21-30589 (MBK) Chapter 11 Honorable Michael B. Kaplan, U.S.B.J., Chief Hearing Date: June 22, 2023 at 10:00 a.m. |

**OMNIBUS MOTION OF THE SUBSTANTIAL CONTRIBUTION CLAIMANTS FOR ALLOWANCE OF ADMINISTRATIVE CLAIMS FOR REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD FROM OCTOBER 14, 2021 THROUGH NOVEMBER 12, 2021 (PRIOR TO THE OFFICIAL COMMITTEE OF TALC CLAIMANTS' RETENTION OF COUNSEL) THAT PROVIDED A <u>SUBSTANTIAL CONTRIBUTION IN THE DEBTOR'S CASE</u>**

This omnibus motion (the "Motion") seeks allowance of administrative claims for reimbursement of fees and expenses incurred for the twenty-nine (29) day period from October 14, 2021 through November 12, 2021 (the "Pre TCC Period" and/or the "Relevant Period") from the Petition Date (as defined below) until the appointment of the Official Committee of Talc Claimants (the "TCC") and its retention of counsel. By and through their undersigned counsel, this Motion is collectively submitted by the following, individually and/or each on behalf of, and as counsel for, certain tort claimants (including those claimants in the MDL (as defined

below)), and including Randy Derouen, Katherine Tollefson, William A. Henry, and Julia Lathrop,

who are creditors in the above-referenced bankruptcy case (referred to collectively as, the

"Substantial Contribution Claimants"):

| SUBSTANTIAL CONTRIBUTION CLAIMANT | PROFESSIONAL(S) |
|---|---|
| MDL Plaintiffs Steering Committee (the "PSC") | Otterbourg, P.C. ("Otterbourg")<br><br>Cole Hayes, Esq.<br><br>Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr, Mougey, P.A. ("LP")<br><br>Burns Charest, LLP ("BC") |
| Maune, Raichle, Hartley, French & Mudd, LLC ("MRHFM"), as representative for an unofficial committee of mesothelioma claimants (the "Meso Committee") | Waldrep Wall Babcock & Bailey PLLC ("Waldrep") |
| Levy Konigsberg, LLP ("LK"), as counsel for and on behalf of certain mesothelioma claimants. | Massey & Gail<br><br>LK |

The Substantial Contribution Claimants seek compensation for their services provided during the

Pre TCC Period that provided a substantial contribution in the above-referenced chapter 11 case

("LTL I") of LTL Management, LLC (the "Debtor" or "LTL").[1] In support of the Motion, the

Substantial Contribution Claimants respectfully state:

## PRELIMINARY STATEMENT

1.     This Court is familiar with the history of the formation of the Debtor and its

bankruptcy filing in North Carolina prior to its change of venue to this jurisdiction, and for that

reason, those details will not be repeated in this brief.  Suffice it to say, the creation of "LTL" and

---

[1] LTL I was dismissed on April 4, 2023 pursuant to a directive from the Third Circuit as a bad faith filing.  On that same date, LTL filed a second bankruptcy proceeding ("LTL II").

its legal strategy that was employed had "been in the works" for some time before LTL filed for bankruptcy protection.  The Debtor had the opportunity to thoroughly research nuanced legal issues, and undertake actions to implement many of them, including the "Texas Two Step" and to establish venue, and to present the Court with extensive briefs and first day motions that had been worked on well before the filing.  On the other hand, LTL's creditors (primarily the approximately 38,000 talc claimants (which includes both ovarian and mesothelioma victims) (collectively referred to as the "Talc Creditors")) were ambushed by the filing in a forum later deemed to be improper and confronted with overwhelming pleadings and complex legal issues, that by and large, these tort claimants (and many of the law firms representing them), were not in a position to challenge on their own due to the complex bankruptcy issues that these primarily tort law firms did not have the bankruptcy law expertise to rebut.  Someone had to step up and protect the Talc Creditors who were unexpectedly catapulted into this large and complex bankruptcy case. The Substantial Contribution Claimants, knowing that they had a professional responsibility for their clients, stepped into the breach, serving the interests of all creditors for the period prior to the formation of an official creditors committee and the appointment of counsel for the committee. As such, the work that they performed and services that they provided (which also included the retention of other law firms more experienced in bankruptcy matters) provided a benefit for tort claimants beyond that of their own individual Talc Creditor clients and the bankruptcy estate as a whole.

2.      The Substantial Contribution Claimants are collectively two (2) separate *ad hoc* committees representing creditors other than a committee appointed under 11 U.S.C. § 1102 (the "Unofficial Committees") and the law firms providing professional services on behalf of those Unofficial Committees during the Pre TCC Period, as well as a separate law firm acting on behalf

3

of certain talc-plaintiff clients working in conjunction with the Unofficial Committees during that time period.  One of the Unofficial Committees was the PSC which represents the interests of approximately 38,000 plaintiffs in *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Multi-District Litigation* (MDL No. 2738) before the United States District Court for the District of New Jersey with direct tort claims against Johnson & Johnson ("J&J") and others for undisclosed life-endangering health risks for extensive use of J&J's talcum powder products (the "MDL").  The PSC acted as an Unofficial Committee in LTL I commencing on the Petition Date.  The other Unofficial Committee, the Meso Committee, was a group of law firms and a sub-group of Talc Creditors suffering from mesothelioma as opposed to ovarian cancer.  The Meso Committee's counsel, Waldrep, served as counsel to the Talc Creditor clients of MRHFM, LK, Ruckdeschel Law Firm, LLC, Weitz & Luxenberg P.C., and Kazan, McClain, Satterley & Greenwood, PLC.  LK worked in tandem with the Unofficial Committees. LK was a member of the Meso Committee which represented certain Talc Creditors suffering from mesothelioma.

3.      All of the Substantial Contribution Claimants concluded that they were compelled to mobilize to oppose the efforts of the Debtor until the "cavalry" (the official formation of a creditors committee and appointment of counsel thereto, i.e., the TCC) arrived.  The Substantial Contribution Claimants collectively served the role of Unofficial Committees and/or counsel working together during the Pre TCC Period.  The Claimants and their professionals provided critical services such as undertaking immediate discovery (including depositions), preparing and filing briefs, and participating in hearings.  This required a collective and concerted effort by the Substantial Contribution Claimants to maintain the status quo until the TCC could step in and officially act on behalf of all Talc Creditors as a unified body.

3313267.1

4.      As set forth herein, the Substantial Contribution Claimants request that this Court allow them administrative priority claims as a result of their providing critical services during the Pre TCC Period constituting a substantial contribution pursuant to 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The bases for the relief requested herein include sections 105(a) and 503(b) of title 11 of the United States Code (the "Bankruptcy Code").

## PROCEDURAL HISTORY & BACKGROUND[2]

6.      On October 14, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina (the "North Carolina Court").  Docket No. 1.

7.      The Debtor's bankruptcy case is one of the largest and most complex cases ever filed.  Unquestionably, the Debtor, even before the Petition Date, had already researched and scripted the Texas Two Step, which involved many critical issues, including, venue selection, preparation of first-day motions, and seeking expansive injunctive relief.

8.      In furtherance of its strategy, on the Petition Date, the Debtor filed a barrage of substantive documents.  As reflected on the docket of this bankruptcy case, documents filed on the Petition Date included the following:

- *Voluntary Petition for Non-Individuals Filing for Bankruptcy* [Docket No. 1];

---

[2] The Substantial Contribution Claimants incorporate by reference the certifications filed in support of the Motion as if fully set forth at length herein.

- *Debtor's Ex Parte Motion for an Order Suspending Entry and Service of Standard Notice of Commencement* [Docket No. 2];

- *Informational Brief of LTL Management LLC* (the "Debtor's Informational Brief") [Docket No. 3];

- *Declaration of John K. Kim in Support of First Day Pleadings*) [Docket No. 5];

- *Debtor's Application for an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing and Ballot Agent* (the "Claims Agent Retention Application") [Docket No. 6];

- *Debtor's Motion for an Order: (I) Authorizing It to File a List of the Top Law Firms With Talc Cases Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors; (II) Approving Certain Notice Procedures for Talc Claimants; and (III) Approving the Form and Manner of Notice of Commencement of This Case* (the "Notice Procedures Motion") [Docket No. 7];

- *Debtor's Motion for an Order Authorizing Establishment of a Qualified Settlement Fund for Payment of Talc Claims* (the "QSF Motion") [Docket No. 8][3];

- *Debtor's Motion for an Order (A) Authorizing the Filing Under Seal of Certain Confidential Commercial Information in Connection With the Debtor's Motion for an Order Authorizing Establishment of a Qualified Settlement Fund for Payment of Talc Claims and (B) If Necessary, In Camera Hearing* [Docket No. 9];

- *Debtor's Motion for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures* (the "Case Management Motion") [Docket No. 10];

- *Debtor's Motion for an Order: (I) Approving the Continued Use of Its Bank Account and Business Forms; (II) Granting a Waiver of the Requirements of Section 345(b) of the Bankruptcy Code; and (III) Authorizing the Debtor's Bank to Charge Certain Fees and Other Amounts* (the "Bank and Business Forms Motion") [Docket No. 11];

---

[3] The Debtor used the QSF Motion to portray a narrative that the bankruptcy filing was legitimate because of the existence of a qualified settlement fund trust (the "QSF Trust") and a pre-petition funding agreement (the "Funding Agreement"). As set forth below, the Substantial Contribution Claimants made efforts during the TCC Period that would subsequently provide meaningful assistance to the TCC with its objection to the QSF Motion (Docket No. 746).

3313267.1

- *Debtor's Motion for an Order Authorizing the Retention and Compensation of Professionals Utilized By the Debtor in the Ordinary Course of Business* [Docket No. 12];

- *Debtor's Ex Parte Motion for an Order Extending the Time Within Which It Must File Its (A) Schedules of Assets and Liabilities and (B) Statement of Financial Affairs* [Docket No. 13]; and

- *Debtor's Ex Parte Motion for Entry of an Order (I) Scheduling an Emergency Hearing on Certain First Day Pleadings and (II) Approving the Form and Manner of Limited Notice Thereof* [Docket No. 22].

9.    Although some of the above-referenced filings were typical first day pleadings (e.g., Claims Agent Retention Application, Notice Procedures Motion, Case Management Motion, and the Bank and Business Forms Motion), certain filings were atypical, such as the Debtor's Informational Brief.  This pleading alone was more than 130 pages in length and set forth the Debtor's one-sided story and narrative in an effort to deny the legitimacy of the claims asserted while, in the same breath, to boost the legitimacy of its bankruptcy filing.

10.    At least three (3) major substantive and consequential issues affecting the estate and its creditors were presented: (i) a request for an expansive injunction against all talc-related litigation; (ii) whether the North Carolina Court was the appropriate venue for the Debtor's bankruptcy case under the circumstances; and (iii) whether the Debtor's bankruptcy filing constituted a bad faith filing in contravention of applicable law and fundamental policies underpinning the Bankruptcy Code.

11.    Notably, no official creditors' committee was appointed in this bankruptcy case until the North Carolina Court's entry of an Order approving the formation of the TCC on November 8, 2021.  Docket No. 355.  Although the TCC was officially formed on that date, the TCC did not formally select attorneys until November 12, 2021.  As such, there was no statutory entity in place to safeguard and protect the interests of estate creditors for more than four (4) weeks.

Those estate creditors include the tens of thousands Talc Creditors (which did not contemplate opposing a bankruptcy filing supported by one of the wealthiest companies in the world). In terms of checks and balances, someone had to counter what they believed were the Debtor's false and misleading statements regarding the claims and the Debtor's intentions in filing for bankruptcy. In the absence of any official committee of unsecured creditors, the Substantial Contribution Claimants determined that it was in the interests of all creditors to take immediate action and serve a leadership role to maintain the status quo for the creditors and other parties-in-interest to ensure that creditors' rights were not being impaired. Initially, it was necessary to counter the skewed statements in the Debtor's Informational Brief, in order to provide the Talc Creditors an opportunity to have their stories told. But, even more so, it was critical for the Substantial Contribution Claimants to actively participate in this bankruptcy case to refute the basis for the Debtor's bankruptcy case, which in relevant part set the stage and the predicate for the TCC's motion to dismiss.

12.     In that regard, in addition to the initial filings made on the Petition Date, at the same time, J&J (the Debtor's ultimate parent company) and its co-defendants in the MDL, filed a *Notice of Bankruptcy Filing and Stay of Proceedings*, which declared that "as a result of the Automatic Stay," "no further action may be taken to prosecute the talc-related claims" against a three-page list of nearly 700 non-Debtor entities. It was critical to address the *Notice of Bankruptcy Filing and Stay of Proceeding* as a unilateral and improper extension of the automatic stay, or at a minimum, as a woefully inaccurate and misleading statement, and as such the PSC advised the applicable Courts and the Debtor that it opposed any stay of the proceedings against non-debtor J&J, among other non-debtors.

13.     Only four (4) days after the Petition Date, on October 18, 2021, in response to the

PSC's notice, the Debtor filed an *Emergency Motion to Enforce the Automatic Stay Against Talc*

*Claimants Who Seek to Pursue Their Claims Against the Debtor and Non-Debtor Affiliates*

(the "Stay/Injunction Motion"), with less than 48 hours' notice, for the entry of interim and final

orders enforcing the automatic stay imposed under section 362(a) of the Bankruptcy Code against

all talc-related claims asserted against the Debtor, Johnson & Johnson Consumer Inc. (its direct

parent company), J&J, and a multitude of non-debtor affiliates.  Docket No. 44.  Clearly, the

Stay/Injunction Motion sought extraordinary relief that targeted a specific group of creditors – *i.e.*,

the plaintiffs who were injured by J&J's talc products – who comprised the overwhelming majority

of creditors of the Debtor's estate.  Unquestionably, that motion was of critical significance to the

Talc Creditors since the Debtor sought to stay all talc-related claims asserted against the Debtor

and its affiliates.

14.     Shortly thereafter, the relief sought in the Stay/Injunction Motion was restyled by

the Debtor in the form of a complaint, filed on October 21, 2021, commencing an adversary

proceeding (Adv. Pro. No. 21-03032).  In addition to the complaint (the "Complaint"), which was

714 pages (24 pages of which set forth the allegations), the Debtor filed: (i) a 14-page supplemental

declaration from the John K. Kim, Debtor's Chief Legal Officer, and (ii) a 787-page motion

(including accompanying exhibits) for an order declaring the automatic stay applies to certain

actions, a request for preliminary injunction against such actions, and a request for a temporary

restraining order ("TRO") pending a final hearing.  Adv. Pro. No. 21-03032 (MBK), Docket Nos.

1, 2, 3.

15.     In response to these extraordinary requests made in these filings, on October 19,

2021, the PSC (now acting in the capacity of an Unofficial Committee), through its counsel

3313267.1

Otterbourg, and Cole Hayes, Esq., filed a motion seeking *to Strike the Debtor's Emergency Motion to Enforce the Automatic Stay and Objection to Scheduling of an Emergency Hearing, or, in the alternative, Motion to Reconsider the Order Scheduling an Emergency Hearing* (the "Motion to Strike").  Docket No. 76.  The PSC had retained Otterbourg along with Hayes as local counsel to assist in the suddenly filed LTL I case.  Otterbourg worked in concert with the other Substantial Contribution Claimants throughout the Pre TCC Period.

16.     On or about October 20, 2021, the North Carolina Court conducted First Day Hearings which were attended by the Substantial Contribution Claimants and/or their counsel.  *See* Docket Nos. 34, 35.  On October 22, 2021, the North Carolina Court continued its hearing on the TRO (the "TRO Hearing").

17.     Thereafter, through the efforts of the Substantial Contribution Claimants, the estate's creditors were able to establish that the Debtor failed to meet its burden of expanding the injunctive relief to non-debtors.  Thus on October 26, 2021, the North Carolina Court ruled against the overly broad restraining order, thereby permitting litigation by creditors to proceed, as appropriate, against non-debtors until otherwise ordered by a court of competent jurisdiction.  *See Order Regarding Debtor's Motions for an Order (I) Declaring the Automatic Stay Applies to Certain Actions Against Non-Debtors or (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining Order Pending a Final Hearing* (Docket No. 28, Adv. Pro. No. 21-03032 (MBK)).

18.     The Talc Creditors' battle over the injunction did not end, however, with the North Carolina Court's TRO ruling.  The North Carolina Court scheduled a further hearing on the Stay/Injunction Motion for November 4 and 5, 2021.  The Substantial Contribution Claimants

worked extensively to prepare for the continued hearing, and as described more fully below, actively participated in that hearing.

19.     On October 26, 2021, the North Carolina Court issued its *Order to Appear and Show Cause Why Venue Should Not Be Transferred to Another District* (the "OSC") and scheduled a hearing for November 10, 2021.  Docket No. 208.  Notably, the North Carolina Court permitted interested parties, if they desired, to file their own motions to transfer venue, which was also returnable on November 10.  Following the entry of the OSC, on October 29, 2021, the PSC filed a motion to transfer venue of this bankruptcy case to the District of New Jersey (the "Venue Transfer Motion").  Docket No. 235.  On November 5, 2021, the Meso Committee, filed support to the motion to transfer venue filed by the Bankruptcy Administrator (Docket No. 205).  *See* Docket No. 347.

20.     On November 4 and 5, 2021, the North Carolina Court conducted hearings on the Debtor's request for preliminary injunction and the motions to transfer venue which the Substantial Contribution Claimants attended and participated in.

21.     On November 8, 2021, the North Carolina Court entered an Order granting the motion filed by the Bankruptcy Administrator for the Western District of North Carolina for the appointment of the TCC.  Docket No. 355.  Counsel to the TCC was not appointed, however, until November 12, 2021 when they began filing retention applications.  *See* Docket Nos. 385-388.

22.     On November 10, 2021 (still during the Pre TCC Period), the North Carolina Court conducted a hearing on the Venue Transfer Motion.  The Substantial Contribution Claimants devoted significant efforts in connection with this hearing and actively participated.

3313267.1

23.    Following the hearing, the North Carolina Court entered an order transferring venue of this Bankruptcy Case to the District of New Jersey (the "Venue Order").  Docket No. 416. Notably, the North Carolina Court recognized that the TCC, which was formed just prior to the November 10 hearing, "could not retain counsel in time to respond to the Show Cause Order." Venue Order, at p.3 n.1.  The Substantial Contribution Claimants' efforts in moving to transfer venue, and supporting the motion filed by the Bankruptcy Administrator, provided a substantial contribution to this bankruptcy case by affording the parties the most convenient forum thereby saving the estate and its creditors expenses, and, perhaps more importantly, further establishing a record that would be relevant to and predicate for the TCC's motion to dismiss.  On November 16, 2021, the North Carolina Court entered an Order transferring the Case to the District of New Jersey.  The basis for this transfer was in large part attributable (and based primarily) on the work that was performed by the Substantial Contribution Claimants during the Pre TCC Period (the "Transfer Order"). Docket No. 416.

24.    During the Pre TCC Period (which time the Substantial Contribution Claimants are seeking compensation), the Debtor's lead counsel, Jones Day, billed approximately $1,637,011.25 from the Petition Date to October 31, 2021, and approximately $1,190,500.75 from November 1, 2021 through November 12, 2021, for a total of $2,827,512.00.  *See* Jones Day Monthly Fee Statements for October 2021 and November 2021, Docket Nos. 925, 1846.  The Debtor also retained at least seven (7) additional professionals that obtained significant compensation for services rendered during the Relevant Period.  *See* Docket No. 2507.

25.    In total, the Debtor's professionals billed, and largely sought payment of, legal fees in the amount of approximately $4,623,121.39 during the Relevant Period.[4]

---

[4] In addition to Jones Day, such professionals include Alix Partners, LLP (*see* Docket Nos. 1104, 1771), Bates White, LLC (*see* Docket Nos. 963, 1778), King & Spalding, LLP (*see* Docket Nos. 1550, 1753), McCarter & English, LLP

26.    For comparison, the Substantial Contribution Claimants seek the allowance of a claim totaling approximately $1,916,770.13 for the same period, which includes legal fees and expenses.

27.    Based in large part on the foundational work performed by the Substantial Contribution Claimants during the Pre TCC Period, subsequent work in connection with the outcome of LTL I was performed by the TCC after November 12, 2021 for which retained TCC professionals have been compensated.

28.    Shortly after the transfer of the Debtor's case to this Court, on December 1, 2021, the TCC filed a motion to dismiss. Docket No. 632.[5] The work performed by the Substantial Contribution Claimants formed a basis for much of the motion to dismiss.

29.    On December 23, 2021, the United States Trustee "reconstitute[d] and amend[ed] the Original TCC and formed two committees, the Official Committee of Talc Creditors I and Official Committee of Talc Creditors II ("TCC II"). Docket No. 965. Following the filing of motions by the Debtor and Arnold & Itkin to reinstate the Original TCC, on January 26, 2022, the Court entered an Order that, *inter alia*, disbanded TCC II and reinstated the TCC, effective March 9, 2022 (pending further Order of the Court). Docket No. 1273.[6] Members of the Meso Committee served on TCC II, along with their counsel Waldrep. Clients of the members of the PSC served on the TCC and the Official Committee of Talc Creditors I, with Otterbourg serving as one of that committee's retained legal counsel.

---

(*see* Docket Nos. 1020, 1728), Rayburn Cooper & Durham, P.A. (*see* Docket No. 1748), Skadden Arps (*see* Docket Nos. 1610, 1779), and Weil, Gotshal & Manges, LLP (*see* Docket Nos. 1144, 1870).
[5] Arnold & Itkin filed a separate motion to dismiss which proceeded on a joint track with the TCC's motion. Docket No. 766.
[6] At a hearing on March 30, 2022, the Court extended the TCC II disbandment date until April 12, 2022.

30.    On March 2, 2022, the Court entered an Order denying the motion to dismiss. Docket No. 1603.    On March 7, 2022, the Court entered an Order granting the preliminary injunction.    Docket No. 1635.    Various parties-in-interest, including the TCC, appealed these Orders.    Again, the work performed by the Substantial Contribution Claimants during the Pre TCC Period was an essential predicate to the appeal efforts, which ultimately proved successful.

31.    On January 30, 2023, the U.S. Court of Appeals for the Third Circuit issued an opinion reversing this Court's Order denying the motions to dismiss and directed that the Debtor's case be dismissed.    On March 31, 2023, the Third Circuit issued a certified judgment that remanded the case to this Court with instructions to dismiss the Debtor's petition.

32.    On April 4, 2023, the Court entered an Order (I) Dismissing Debtor's Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b); (II) Establishing Procedures With Respect to Requests for Compensation; and (III) Granting Related Relief (the "Dismissal Order").    Docket No. 3938.    The Dismissal Order authorized the filing of the Motion within thirty (30) days of entry.

33.    As set forth herein, the Substantial Contribution Claimants respectfully request that the Motion be granted.    Much of the initial steps taken while this case was pending in North Carolina, including, (i) obtaining entry of the Transfer Order; (ii) opposing the expansive injunction sought by the Debtor; and (iii) establishing the factual record and legal arguments which were built upon as the case progressed, substantially contributed to laying the groundwork for the motion to dismiss and the ultimate decision by the Third Circuit to dismiss the case for lack of good faith.

## RELIEF REQUESTED

34.    By and through the Motion, the Substantial Contribution Claimants seek the entry of an Order, pursuant to §§ 105(a), 503(b)(3)(D), 503(b)(4), and 507(a)(2) allowing administrative

3313267.1

claims for reimbursement of expenses incurred in making a substantial contribution in the Debtor's

case.

35.    Specifically, the relief sought by this Motion is based on 11 U.S.C. § 503(b)(4)

which encompasses in relevant part 11 U.S.C. § 503(b)(3)(D) while section 507(a) establishes its

administrative priority similar to other allowed professional fees in this case.

36.    Section 503(b)(4) provides:

"[a]fter notice and a hearing, there shall be allowed, administrative expenses . . .
including - (4) reasonable compensation for professional services rendered by an
attorney or an accountant of an entity whose expense is allowable under
subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based
on the time, the nature, the extent, and the value of such services, and the cost of
comparable services other than in a case under this title, and reimbursement for
actual, necessary expenses incurred by such attorney or accountant[.]"

11 U.S.C. § 503(b)(4).

37.    Section 503(b)(3)(D) provides that:

"[a]fter notice and a hearing, there shall be allowed administrative expenses . . .
including – (3) the actual necessary expenses, other than compensation and
reimbursement specific in paragraph (4) of this subsection, incurred by – (D) a
creditor, an indenture trustee, an equity security holder, or a committee representing
creditors or equity security holders other than a committee appointed under section
1102 of this title, in making a substantial contribution in a case under chapter 9 or
11 of this title . . ."

11 U.S.C. § 503(b)(3)(D).

38.    It is the interplay between 503(b)(4) and 503(b)(3)(D) that defines the parameters

of such request for an administrative claim.

39.    The Third Circuit, in *Lebron*, characterizes this interplay as follows:

Because § 503(b)(4) authorizes awards of legal and accounting fees only in
situations coming within the scope of § 503(b)(3), and because subsection (D) is
the only portion of § 503(b)(3) arguably applicable here, we focus on §
503(b)(3)(D).

Under § 503(b)(3)(D), four categories of persons may apply for reimbursement of
expenses: (1) creditors, (2) indenture trustees, (3) equity security holders, and (4)

15

creditor and equity holder committees other than official committees appointed under § 1102 of the Bankruptcy Code. The court may award an applicant actual, necessary expenses which were incurred "in making a substantial contribution in a case under chapter 9 or 11." Under subsection (b)(4), this may include reimbursement for professional fees of an attorney or accountant, where those fees meet the additional requirements of that subsection. Any expenses reimbursed are administrative expenses with the attendant priority. 11 U.S.C. § 507 (1988).

Here, [the claimant] is a creditor as well as an equity security holder, and the administrative expenses that he seeks consist of attorney fees and general expenses. Therefore, he is entitled to these expenses if he incurred them as a result of activities which (1) made a "substantial contribution," (2) "in a case under chapter 9 or 11."

*Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 943 (3d Cir. 1994).

40.    More recently, the Third Circuit in *S.S. Body Armor Inc.*, characterized the requirements of a substantial contribution claim (in that case involving an equity security holder) under sections 503(b)(3)(D) and (b)(4) as:

The Bankruptcy Code permits the payment of "administrative expenses," including the "reasonable compensation for professional services rendered by an attorney" of "an equity security holder ... in making a substantial contribution *in a case under chapter ... 11*." 11 U.S.C. § 503(b)(3)(D), (b)(4) (emphasis added).

*S.S. Body Armor I Inc.*, 961 F.3d 216, 231 (3d Cir. 2020). Consistent with this formulation, the Substantial Contribution Claimants herein are seeking recovery under subsection (b)(4) for reimbursement for professional fees of counsel acting on behalf of an entities set forth in (b)(3)(D) (unofficial committees of creditors and certain individual creditors) which constituted a substantial contribution in LTL I.

## **LEGAL ARGUMENT**

### I.    **Applicable Authority Supports a Finding of a Substantial Contribution**

41.    The Substantial Contribution Claimants served the essential service of providing the necessary representation of <u>all</u> creditors during the Pre TCC Period, preserving their rights and

contributing significantly to the outcome of the LTL I case thereby constituting a substantial contribution.

### A. General Law Defining Substantial Contribution

42.    The Bankruptcy Code does not define "substantial contribution." *In re Summit Metals, Inc.*, 379 B.R. 40, 50 (Bankr. D. Del. 2007). "Since the Bankruptcy Code does not define 'substantial contribution' and the legislative history is of little help, courts have interpreted the statutory language in similar but slightly different ways." *In re Breland*, 2022 WL 17085014, at *3 (Bankr. S.D. Ala. November 17, 2022) (citing *In re New Power Co.*, 311 B.R. 118 (Bankr. N.D. Ga. 2004); *In re DP Partners, Ltd.*, 106 F.3d 667 (5th Cir. 1997); *In re Alert Holdings, Inc.*, 157 B.R. 753 (Bankr. S.D.N.Y. 1993); *In re Alumni Hotel Corp.*, 203 B.R. 624 (Bankr. E.D. Mich. 1996)). Indeed, legislative history merely defines substantial contribution negatively, "as not requiring a contribution that leads to confirmation of a plan, for in many cases, it will be a substantial contribution if the person involved uncovers facts that would lead to a denial of confirmation." *In re Encapsulation Intern., Inc.*, 1998 WL 801898, at *3 (Bankr. W.D. Tenn. November 9, 1998) (citing *NORTON BANKRUPTCY LAW AND PRACTICE 2D*, § 42.27).

43.    Given the lack of a statutorily defined meaning of the term "substantial contribution" in this context, the determination is essentially a factual inquiry. *See In re Geriatric Nursing Home, Inc.*, 195 B.R. 34, 36 (Bankr. D.N.J. 1996) (internal citation omitted). As such, whether a creditor makes a substantial contribution is a fluid concept, dependent upon the particular facts and circumstances of each case. *Encapsulation Intern, Inc.*, 1998 WL 801898, at *3. The burden of proof is on the applicant to be shown by a preponderance of the evidence that a substantial contribution claim has been made. *See Summit Metals, Inc.*, 379 B.R. at 50. Support of a request by a disinterested party can assist in meeting this burden. *See In re Worldwide Direct,*

*Inc.*, 334 B.R. 112, 123 (Bankr. D. Del. 2005).  Importantly, the Court has broad discretion to

allow section 503(b) administrative claims.  *Encapsulation Intern, Inc.*, 1998 WL 801898, at *3.

44.    The applicable test in the Third Circuit to determine whether a party has made a

"substantial contribution" within the meaning of section 503(b)(3)(D) is "whether the efforts of

the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors."

*Lebron*, 27 F.3d at 944 (citing *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)). "Inherent in the term

'substantial' is the concept that the benefit received by the estate must be more than an incidental

one arising from activities the applicant has pursued in protecting" their "own interests."  *Id.*

"Creditors are presumed to be acting in their own interests until they satisfy the court that their

efforts have transcended self-protection." *Id.* (internal citations omitted).  Put another way, the

Court must be able to find that his or her own actions were designed to benefit others who would

foreseeably be interested in the estate.  *Id.* at 946.  "Most activities of an interested party that

contribute to the estate will also, of course, benefit that party to some degree, and the existence of

a self-interest cannot in and of itself preclude reimbursement." *Id.* at 944.

45.    Some Courts have utilized multi-part tests when considering substantial

contribution applications.  For example, in *Deval Corp.*, the Court observed that:

> To aide in determining whether a creditor has made a substantial contribution,
> bankruptcy courts have considered numerous factors, including (1) whether the
> services conferred a benefit upon the estate; (2) whether the services were provided
> to benefit the estate generally or the creditor specifically; (3) whether the services
> were duplicative of services rendered by other parties; and (4) whether the services
> would have been provided absent an expectation of reimbursement.

*In re Deval Corp.*, 592 B.R. 587, 599 (Bankr. E.D. Pa. 2018) (internal citations omitted).

46.    Other Courts have applied the substantial contribution test in hindsight, requiring

the applicant to show a causal connection between the services and the contribution.  *In re KiOR,*

*Inc.*, 567 B.R 451, 458 (D. Del. 2017) (citing *In re Granite Partners*, 213 B.R. 440, 447 (Bankr.

S.D.N.Y. 1997)); *see also Breland*, 2022 WL 17085014, at *4 (observing that some courts apply a "but for" test to determine whether a causal relationship existed between the claimant's efforts and the requisite benefit and finding that "[c]ompensation must be limited to rare instances in which 'but for' the applicant's efforts, the movement toward final reorganization [or dismissal, here] would have been substantially diminished.").

47.     "The [overall] justification [for both allowing and limiting administrative claims] is that administrative claims should be allowed to the extent that they may redound to the benefit of general creditors of the estate." *Encapsulation Intern, Inc.*, 1998 WL 801898, at *3 ( quoting William L. Norton, Jr., *NORTON BANKRUPTCY LAW AND PRACTICE 2D*, § 42.13 (1997)). "The majority of cases allowing creditors' substantial contribution claims under sections 503(b)(3)(D) and (b)(4) have . . . found that the creditor played a leadership role that normally would be expected of an estate-compensated professional but was not so performed." *In re Bayou Group*, *LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010) (citing *In re Granite Partners*, 213 B.R. 440, 446-47 (Bankr. S.D.N.Y. 1997)).

48.     Significantly, Courts have found parties-in-interest to have made a "substantial contribution" in a variety of circumstances, including as in this case, where creditors step-in to perform the duties of a committee, unofficially, prior to appointment.  For example, in *In re Bayou Group*, the Court found that an unofficial creditors committee made a substantial contribution by, *inter alia*, identifying suitable candidates and moving for the appointment of receiver, researching potential claims, and by sharing that research with other creditors and the receiver. *Id.* at 563-66. Additionally, creditors may be reimbursed "under section 503(b)(3)(D) for services performed by it or its attorney prior to the formation of an official committee, to the extent those services provide a substantial contribution to the estate." *In re Worldwide Direct, Inc.*, 259 B.R. 56, 61-62 (Bankr.

D. Del. 2001). For instance, a creditor (through counsel), might appear and raise issues "protective of unsecured creditors' rights at a hearing on interim financing before the committee formation can be held." *Id.* at 62. As another example, in *In re General Electrodynamics Corp.*, 368 B.R. 543, 554-56 (Bankr. N.D. Tex. 2007), the Court found that the applicant's actions as a surrogate creditors' committee that policed the actions of the debtors and identified potentially voidable transfers to insiders were a substantial contribution to the estate.

49.    In addition, in *In re Service Merchandise Co., Inc.*, the Court found that not only was a law firm and financial advisor that initially represented a group of creditors that for the most part later became members of the official committee of unsecured creditors, and later were retained as professionals for the official committee (as occurred in this case), were entitled to an award of fees and expenses for critical services rendered prior to the formation of the official committee pursuant to section 330 as part of *nunc pro tunc* retention, but the same expenses could also be approved as an administrative claim under sections 503(b)(3) and (4) as a substantial contribution. 256 B.R. 738, 741-743 (Bankr. M.D. Tenn. 1999). In that case, the professionals provided "immeasurable benefits to the estate" and "were motivated by both self-interest and the estate's interests." *Id.*

50.    As will be demonstrated hereinafter, all of the work performed by the Substantial Contribution Claimants is similar to the examples above as it was essential work performed prior to the appointment of a committee under similar circumstances.

51.    Importantly, substantial contribution does not necessarily mean that a creditor's efforts must lead to confirmation of a plan. *In re Food Workshop, Inc.*, 70 B.R. 962, 968 (Bankr. S.D.N.Y. 1987). The focus is on the benefit to the debtor's estate, the creditors, and if relevant, the shareholders. *Id.* In fact, the Court in *In re Team Systems Int'l LLC*, when denying a motion

to dismiss, made clear that it believed that the work that the judgment creditors had done in establishing cause under section 1112(b) (work that may have been made more difficult and more costly as a result of the debtor's conduct in discovery) may turn out to provide a substantial contribution to the debtor's estate. 640 B.R. 296, 302 (Bankr. D. Del. 2022). In fact, the judgment creditor had the ability to seek an administrative claim for work under section 503(b)(3)(D) following the conversion and appointment of a trustee. *Id.* Additionally, efforts to convert a chapter 11 to chapter 7 after the debtor refused to cooperate, defend a conversion order on appeal, and obtain a change of venue, have constituted a substantial contribution. *In re Williams*, 49 Fed. Appx. 845, 850 (10th Cir. October 30, 2002).

52.    In the case before this Court, similar to the cases cited above, the Substantial Contribution Claimants' efforts contributed to the change in venue and the ultimate dismissal of LTL I.

53.    Finally, it is important to note that one of the factors listed in the *Deval* case is whether the services would have been provided absent an expectation of reimbursement. In connection therewith, Courts have also observed that the prospect of a substantial contribution claim could induce a creditor to take action. For instance, the Court in *Deval Corp.*, found a creditor made a substantial contribution when it incurred expenses far beyond what it would have normally incurred had it been a more passive participant in the chapter 11 case as it acted in belief that its efforts would support an administrative claim, although there was no guarantee there would be sufficient funds to satisfy such claim. *Deval Corp.*, 592 B.R. at 599-601. These efforts were done in a manner which transcended its own self-interest, and was entitled to recover a "substantial contribution claim" on an administrative priority basis. *Id.*

3313267.1

54.    In the instant case, the Substantial Contribution Claimants knew that the work being performed would impact all creditors, and understood the prospect for reimbursement of services performed to preserve the rights of all creditors.

### B.  The Movants Have Demonstrated a Substantial Contribution in this Case

55.    In this case, the Substantial Contribution Claimants undertook significant efforts which constituted a substantial contribution (as recognized by many Courts in the case-law cited above) as follows.[7]

### 1.  The PSC

56.    The PSC respectfully submits that its counsel, Otterbourg, Cole Hayes, and member firms acting on behalf of the PSC (*i.e.*, LP and BC), made a substantial contribution in the Debtor's case during the Pre TCC Period.

### a.   Otterbourg

57.    Otterbourg performed the following services which provided a substantial contribution to the bankruptcy estate.

58.    Otterbourg served as lead bankruptcy counsel to the PSC during the Pre TCC Period.  Otterbourg continued to perform those services for which it has been compensated by the estate as a retained professional serving as counsel to the TCC.  All of the services they provided on behalf of the PSC prior to its retention as counsel to the TCC substantially contributed both prior to and subsequent to TCC formation.

59.    Immediately upon the Petition Date, Otterbourg performed services to contest the Debtor's first day pleadings, including reviewing and analyzing research issues, communicating counsel for interested parties (including the Bankruptcy Administrator), filing limited omnibus

---

[7] The Substantial Contribution Claimants expressly incorporate the certifications submitted herewith of the PSC, Christopher Tisi, Esq., Daniel Charest, Esq., Jerome Block, Esq., and Thomas Waldrep, Esq. in support of the Motion.

objections to first day motions (Docket No. 67), and participating in the first day hearing on

October 20, 2021 (*see* Certification of PSC submitted herewith, Exhibit "C", at 45:16 through

50:22; 75:16 through 78:3), and addressing the *Notice of Bankruptcy Filing and Stay of

Proceedings* filed by J&J in the MDL by notifying Courts that it was an improper extension of the

automatic stay against non-debtors.

60.     In addition, Otterbourg prepared and filed the October 19, 2021 Motion to Strike

(Docket No. 76) and appeared and participated at the hearing before the North Carolina Court on

October 20, 2021 which ensured the interests of all Talc Creditors were protected against the

Debtor's efforts.  *See, e.g., id.*, Exhibit "C," October 20 Hearing Transcript, at 109:16 through

114:23; 119:11 through 119:19; 133:8 through 134:11; 142:13 through 144:11; 147:12 through

150:2: 153:4 through 154:8; 183:15 through 186:18.

61.     Further, Otterbourg, on behalf of the PSC, actively participated in the proceedings

related to the expansive injunction sought by the Debtor.  Such services included appearing and

actively participating at the TRO Hearing on October 22, 2022 (including oral argument,

introducing evidence and conducting re-cross examination of Mr. Kim[8]), analyzing the Complaint

and related pleadings filed on the eve of the October 22, 2021 hearing, participating in significant

discovery in preparation of the hearing on the Stay/Injunction Motion on November 4 and 5, 2021

(including written discovery and taking the lead roles in the deposition of Adam Lisman and John

Kim which testimony was later used by the TCC in future submissions), presenting opening and

closing remarks on behalf of the PSC at the November 4 and 5 hearings[9], and conducting cross-

---

[8] *Id.* at Exhibit "D" at 20:13 through 27:1; 148:11 through 149:12; 27:6 through 39:21; 138:6 through 140:23
[9] *Id.* at Exhibit "E", at 81:8 through 90:7; Transcript of November 5, 2021 Hearing at Exhibit "F", at 552:11 through
559:23

examination of the Debtor's primary fact witness, Mr. Kim, and presenting argument with respect to the testimony of Mr. Lisman who was not called as a witness at these hearings.[10]

62.     In addition, the PSC made substantial efforts to have venue transferred to New Jersey by and through the filing of the Venue Transfer Motion.  Docket No. 235.  In furtherance of the Venue Transfer Motion, Otterbourg devoted efforts analyzing relevant case documents, researching legal issues, drafting the necessary pleadings to put on file, working with counsel on a stipulation of facts with respect to the Venue Transfer Motion, preparing for and participating in the November 10 hearing, with Ms. Cyganowski and Mr. Silverstein of Otterbourg providing opening remarks, arguments, and rebuttal arguments.  *Id.* at Exhibit "G", at 32:13 through 35:18; 35: 21 through 42:23; 123:3 through 124:1.

63.     Further, with respect to the QSF Trust and Funding Agreement, the PSC, with the assistance of Otterbourg, carefully reviewed, analyzed and drafted opposition papers to the QSF Trust and Funding Agreement, and researched dismissal-related issues.  In fact, the efforts with respect to the QSF Trust and Funding Agreement, in combination with the PSC's other efforts described above, would subsequently provide meaningful assistance to the TCC with its objection to the QSF Motion.  Docket No. 746.

64.     The PSC respectfully submits that it made a substantial contribution to the within case and requests reimbursement of (i) $927,548.55 fees and $20,696.97 in expenses due to Otterbourg.

### b.  Cole Hayes

65.     Because Otterbourg required local counsel in North Carolina, the PSC further retained Cole Hayes, Esq. to serve in that role.  As part of his duties, Mr. Hayes provided critical

---

[10] *Id.* at Exhibit "E," November 4 Tr. (as defined in the PSC Cert.), at 260:4 through 292:9; Exhibit "F" at 527:2 through 529:3.

necessary services which enabled Otterbourg to perform the services described herein in making a substantial contribution.

66.    Local counsel is critically important to a case where the primary counsel is not admitted and is unfamiliar with local rules and procedures.  Importantly, Mr. Hayes' services were formally necessary in connection with admissions *pro hac vice* in the North Carolina Court.  In fact the North Carolina Court's local rules require that out of state attorneys associate with local counsel and be accompanied by local counsel at all hearings unless otherwise permitted by the Court.  *See* North Carolina Court Local Rule 2090-2.

67.    As such, the fees and expenses incurred by Mr. Hayes also provided a substantial contribution to the estate as he provided invaluable counsel to Otterbourg and the PSC on local practices and procedures and his involvement was necessary under Local Rules.

68.    The PSC respectfully submits that it made a substantial contribution to the within case and requests reimbursement of (i) $66,297.00 in fees and $6,609.16 in expenses due to Cole Hayes.

### c. **LP – Christopher V. Tisi, Esq.**

69.    Prior to the Petition, LP and Mr. Tisi were appointed to the PSC in the MDL, and Mr. Tisi serves as Chair of the Plaintiff's Discovery Committee.

70.    During the Pre TCC Period, at the direction of PSC leadership, Mr. Tisi took a lead role in connection with the deposing, and eliciting testimony, from Edward K. Kuffner, the former Old JJCI and current New JJCI Chief Medical Officer – Consumer Sector.  In the North Carolina Court, the Debtor had designated Dr. Kuffner to testify in support of the Debtor's request for the preliminary injunction.  To that end, on October 30, 2021, Mr. Tisi deposed Dr. Kuffner which

benefited all claimants as the examination included inquiries regarding the Transfer Venue Motion and the preliminary injunction hearings.

71.     In addition, Mr. Tisi reviewed and analyzed significant documentation produced by the Debtor prior to the preliminary injunction hearing, including documentation relating to the role of non-debtor J&J for talc safety as opposed to Old JJCI, the entity for which Dr. Kuffner worked. These documents included J&J SOPS that demonstrated that Johnson & Johnson –a financially heathy non debtor--itself assumed an independent duty from its affiliate (Old JJCI) for the safety of talc.

72.     Following the review of this information, Mr. Tisi cross-examined Dr. Kuffner at the preliminary injunction hearing conducted on November 5, 2021.  The cross-examination focused on the non-debtor's independent role in assessing the safety of any J&J product manufactured by any J&J affiliate.  This information was later used by the TCC to oppose the preliminary injunction in favor of non-debtor J&J.

73.     The PSC respectfully submits that it made a substantial contribution to the within case and requests reimbursement of (i) $115,280.00 fees and $4,519.36 in expenses due to LP.

### d. <u>BC- Daniel Charest, Esq.</u>

74.     Mr. Charest's partner, Warren Burns, serves as a member of the Plaintiffs' Executive Committee in the MDL.  Due to his expertise, the PSC designated Mr. Charest to perform the following services which the PSC respectfully submits constitutes a substantial contribution in the Debtor's bankruptcy case:

75.     Mr. Charest conferred with tort-claimant leadership, including Leigh O'Dell, Esq., Michelle Parfitt, Esq., Ted Meadows, Esq., James Green, Esq.. Chris Tisi, Esq., Amanda Klevorn, Esq., Chris Placitella, Esq., Joseph Satterley, Esq., and Jerome Block, Esq., and bankruptcy

counsel, including Melanie L. Cyganowski, Esq., Adam C. Silverstein, Esq., and John Bougiamas, Esq. of Otterbourg, regarding strategy for injunction hearings, opposition to the imposition of a stay, development of the bad-faith arguments, legal research and applicable precedent and rules, development of discovery requests and deposition strategy, and transfer of venue.  In addition, Mr. Charest reviewed and revised draft discovery requests to be issued to the Debtor and coordinated discovery efforts and task assignments with tort-claimant leadership and bankruptcy counsel.  Mr. Charest also attended the first-day hearings, injunction hearings, and hearing on motion to transfer venue, and conferred with tort-claimant leadership and bankruptcy counsel in real time on litigation strategy and developing issues.

76.    In connection with the discovery efforts, Mr. Charest reviewed documents relating to the depositions of critical witnesses.  On October 31, 2021, Mr. Charest actively participated in the deposition of Susan Schirger-Ward ("Schirger-Ward"), a J&J records custodian whose sworn statements were put at issue by a declaration served by LTL on October 30, 2021.  On November 1, 2021, Mr. Charest actively participated in the deposition of Charles H. Mullin, M.D. ("Mullin"), an expert witness of the Debtor.

77.    Following the deposition of Mullin, Mr. Charest conducted the cross examination of Mullin during the hearings on preliminary injunction, including November 5, 2021.

78.    The PSC respectfully submits that it made a substantial contribution to the within case and requests reimbursement of (i) $177,945.00 in fees and $6,042.85 in expenses due to BC.

## 2.  **The Meso Committee**

79.    Beginning on the Petition Date, Waldrep served as counsel to the Meso Committee. Following the transfer of the Debtor's case to New Jersey, Waldrep served as co-counsel to TCC

II.    The Meso Committee and PSC worked together and coordinated discovery, hearing coordination, and arguments to the Court.

80.    During the Pre TCC Period, Waldrep attended and participated in the following hearings: first day hearing held on October 20, 2021, temporary restraining order hearing held on October 22, 2021, preliminary injunction hearing held on November 4 and 5, 2021, and motion to transfer venue held on November 5, 2021.

81.    Waldrep, on behalf of the Meso Committee, further served written discovery relating to the above-referenced hearings and reviewed voluminous document productions.

82.    During the Pre TCC Period, Waldrep further drafted and filed the following substantive pleadings: *Objection to (A) Debtor's Motion for an Order: (I) Authorizing it to File a List of the Top Law Firms With Talc Cases Against The Debtor In Lieu of the List of the 20 Largest Unsecured Creditors; (II) Approving Certain Notice Procedures For Talc Claimants; and (III) Approving the Form and Manner of Notice Of Commencement Of This Case; and (B) Debtor's Motion For Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures* (Docket No. 51); *Objection to Debtor's Motion for an Order Authorizing Establishment of a Qualified Settlement Fund for Payment of Talc Claims* (Docket No. 52); *Objection to Debtor's Emergency Motion to Enforce the Automatic Stay Against Talc Claimants Who Seek to Pursue Their Claims Against the Debtor and its Non-Debtor Affiliates* (Docket No. 53); *Limited Objection of Kirk Smith to the Motion of the Bankruptcy Administrator to Appoint an Official Committee of Talc Claimants and Request to be Appointed to the Official Committee* (Docket No. 280); *Limited Objection and Reservation Of Rights as to the Motion of the Bankruptcy Administrator to Appoint an Official Committee of Talc Claimants* (Docket No. 309); and *Response of the Mesothelioma Group on Behalf of Creditors in Support of Motions of Bankruptcy*

*Administrator and MDL Plaintiffs' Steering Committee to Transfer Venue of Bankruptcy Case Pursuant to 28 U.S.C. § 1412 and Fed R. Bankr. P. 1014(A)(1) in the Interest of Justice or for the Convenience of Parties* (Docket No. 347).

83.    MRHFM, on behalf of the Meso Committee, respectfully requests reimbursement of fees and expenses due to Waldrep in the amount of $308,327.00 in fees and $4,586.19 in expenses.

### 3.    Levy Konigsberg, LLP

84.    LK, as representative for the Meso Committee and on behalf of its Talc Creditor clients, performed essential services which on their own constituted a substantial contribution.  In conjunction and coordination with the PSC and more specifically, the Meso Committee, LK retained Massey & Gail (whose expertise is in bankruptcy and appellate law) to preserve the rights of Talc Creditors.  Massey & Gail was ultimately appointed as special counsel to the TCC, and before that to TCC2, because of their skill and expertise.  The services of Massey & Gail also constituted a substantial contribution.  Notably, LK and Massey & Gail worked in conjunction with the PSC and the Meso Committee during the proceedings.  A summary of the services provided by LK and Massey & Gail are as follows.

85.    The critical services performed by Massey & Gail included, appearance the first day hearings on October 20, 2021, appearing at the temporary restraining order hearing on October 22, 20201, preparing written discovery and requests for production relating to the immediate issues confronting all Talc Creditors, meeting and conferring with counsel to discuss emergent matters relating to the Debtor, reviewing the initial document productions from LTL regarding emergent issues, co-authoring a memorandum of law with Waldrep on behalf of the Meso Committee in opposition to the Debtor's preliminary injunction motion (*see* Docket No. 44, Adv. Pro. No. 21-

03032 (MBK)), appearing at the preliminary injunction hearing conducted on November 4 and 5, 2021, co-authoring a memorandum of law with Waldrep in support of a motion to transfer venue (*see* Docket No. 347), and actively participating in oral arguments relating to the above applications.

86.    In addition to the services provided by Massey & Gail, it was necessary for LK to undertake work that needed to immediately oppose the Debtor's efforts in connection with its bankruptcy filing.

87.    The LK time and expense entries, as well as relevant transcripts, reflect the necessary work that benefited all Talc Creditors including work related to, active participation in first day hearings and statements made on the record in response to the Debtor's filings and statements by counsel on the record, active participation at October 22, 2021, hearing regarding the Debtor's seeking entry of temporary restraining order.  At that hearing, Mr. Block cross-examined the Debtor's Chief Legal Officer, John Kim.  On October 31, 2021, Mr. Block took the lead role in the deposition conducted of Schirger-Ward.   Mr. Block also appeared at the preliminary injunction hearing conducted on November 4 and 5, 2021 whereat Mr. Block (i) made necessary objections to the direct examination of Mr. Kim; (ii) conducted the lead cross examination of Mr. Kim; (iii) made necessary objections to the Debtor's re-direct examination of Mr. Kim; (iv) conducted re-cross examination of Mr. Kim; (v) made necessary objections to the Debtor's direct examination of Dr. Edwin Kuffner; (vi) conducted cross-examination of Dr. Kuffner; and (vii) performed services in connection with the opposition to the motion to transfer venue.

88.     LK respectfully requests reimbursement of (i) $181,450 fees and expenses ($3,136.92) due to Massey & Gail from LK; and (ii) $85,140 in fees and $12,328.05 in expenses due to LK from Talc Creditor clients.

89.     Importantly, Massey & Gail reduced its fees and expenses $131,537.42 from an original total of $312,987.42 (a reduction of over 40%).  Additionally, although LK incurred substantial additional time attributable to numerous partners, associates, paralegal and staff during the Pre TCC Period, LK firm is only seeking reimbursement for a limited amount of hours spent by Jerome Block, Esq. applicable to critically important events and hearings that benefited all Talc Creditors (i.e., work performed in Court and conducting depositions), along with limited expenses associated with that work.

### 4.   The Services Described Above Constitute Substantial Contributions

90.     As a matter of law and equity, all of the services described above during the Pre TCC Period have met the standard of substantial contribution.  Based upon the particular facts and circumstances of this case, the services provided by the Substantial Contribution Claimants and their professionals demonstrate an actual demonstrable benefit to the estate and its creditors as required by Third Circuit precedent (*see, e.g.,*, *Lebron*, 27 F.3d at 344) because such services related to critical issues affecting all creditors such as change in venue, opposing the preliminary injunction, and laying a foundation which resulted in the ultimate dismissal of LTL I by the Third Circuit.

91.     Important to this analysis, the Substantial Contribution Claimants undeniably performed the duties of a creditors committee until the TCC had been formed and effectively retained counsel.  Notably, several of the Talc Creditors associated with the Substantial Contribution Claimants later served on official committees, and Otterbourg and Waldrep later

served as counsel to the TCC and TCC II, respectively.  As explained above, Courts have allowed administrative priority claims when parties make a substantial contribution by serving the function of an official committee in an unofficial capacity.  *See e.g., Bayou Group*, 431 B.R. at 566; *General Electrodynamics Corp*. 368 B.R. at 554-56; *Services Merchandise Co., Inc.*, 256 B.R. at 741-743.

92.     In performing such services, the benefits conferred to the estate and its creditors were more than incidental and the efforts undertaken by the Substantial Contribution Claimants transcended self-interest.  *See Lebron*, 27 F.3d  at 944.   In fact, there was a clear causal connection between the services provided and benefits conferred on all creditors as follows.  *See e.g., Kior, Inc.* 567 B.R. at 458; *Breland*, 2022 WL 17085014, at *4.

a.  In connection therewith, all of the initial steps taken while this case was pending in North Carolina, including establishing the factual record and legal arguments which were built upon as the case progressed, and preserving the rights of all Talc Creditors until the TCC was in place to do so, substantially contributed to the motion to dismiss and ultimate decision by the Third Circuit to dismiss the case for lack of good faith.

b.  Similarly, the services rendered with respect to the preliminary junction while the Debtor's case was still pending in the North Carolina Court, also provided a benefit to all creditors in the absence of an official committee because the North Carolina Court initially declined to extend the injunction to non-debtors, and though it ultimately did so, limited that injunction to sixty (60) days.

c.  Further, the efforts with respect to the Transfer Venue Motion directly led to the Debtor's case being transferred to this District which is the

3313267.1

more convenient forum for the parties (including the Debtor), especially in view of the Debtor's operational/corporate ties to New Jersey, the location of the MDL, and other talc-related litigations that were all pending in New Jersey.  Thus, conferring a benefit upon the Debtor and all creditors.

d.  In addition the discovery obtained (including depositions) and witness testimony elicited and exhibits utilized by the Substantial Contribution Claimants and their professionals during the critical hearings conducted in the North Carolina Court: (1) became part of the record of the bankruptcy case; (2) was referenced and cited in numerous court filings including motions opposing the preliminary injunction and for dismissal; (3) were subsequently used at the dismissal hearing; (4) and were made part of the appellate record which formed the basis for the proper resolution (dismissal) of this case.

93.    Importantly, due to the absence of an unofficial committee during the Pre TCC Period, and coordination amongst the Substantial Contribution Claimants, there was no duplication of services rendered by additional parties.  *See Deval Corp.*, 592 B.R. at 599.  In addition, because the Substantial Contribution Claimants recognized that the rights of all creditors needed to be preserved during this critical period, the services were provided and related expenses incurred absent an expectation of reimbursement.  *Id.*  Despite that absence of an expectation of payment, it is noteworthy that if a committee were in place during the Pre TCC Period it would have a right to seek compensation for the same services during the Pre TCC Period, during which, the Debtor's

professionals billed over $4,000,000 in legal fees compared to the approximately $1,916,770.13,

sought by the Substantial Contribution Claimants (which includes expenses).

94.    In sum, based upon the particular facts and circumstances of this case, the services

of the Substantial Contribution Claimants conferred a benefit on the Debtor and all creditors of the

estate.

## CONCLUSION

95.    For all the foregoing reasons, the Substantial Contribution Claimants respectfully

request that the Motion be granted and they be allowed administrative priority claims under

sections 503(b)(3), (b)(4) on account of the substantial contribution made in this case for the

benefit of the estate and its creditors.

**SHERMAN, SILVERSTEIN,
KOHL, ROSE & PODOLSKY, P.A.**


Dated: May 3, 2023                By: */s/ Arthur J. Abramowitz*
                                      Arthur J. Abramowitz
                                      Alan I. Moldoff
                                      Ross J. Switkes
                                      308 Harper Drive, Suite 200
                                      Moorestown, NJ 08057
                                      Tel: (856) 662-0700
                                      aabramowitz@shermansilverstein.com
                                      amodolff@shermansilverstein.com
                                      rswitkes@shermansilverstein.com

                                      *Counsel to Substantial Contribution
                                      Claimants*

3313267.1